**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **PATRICK HENRY MURPHY JR.** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | CIVIL NO. 3:09-cv-01368-L |
| | § | |
| | § | *** DEATH PENALTY CASE *** |
| | § | |
| **RICK THALER**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| | § | |
| Respondent. | § | |

_____

**PETITION FOR A WRIT OF HABEAS CORPUS**
_____

**THIS IS A DEATH PENALTY CASE**

David R. Dow
Texas Bar No. 06064900

Laura Ferry
Texas Bar. No. 24069715

TEXAS DEFENDER SERVICE
1927 Blodgett Street
Houston, Texas 77004
Tel. (713) 222-7788
Fax (713) 222-0260

*Counsel to Patrick Henry Murphy Jr., Petitioner–Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................V

TABLE OF EXHIBITS ........................................................................................VIII

PETITION FOR A WRIT OF HABEAS CORPUS ....................................................1

JURISDICTION ..........................................................................................................1

PRIOR PROCEEDINGS .............................................................................................1

INTRODUCTION ........................................................................................................2

STATEMENT OF FACTS ...........................................................................................3

    A.   The December 24, 2000 Homicide and Mr. Murphy's Subsequent Arrest ........................3

    B.   Trial Proceedings: Guilt/Innocence Phase ...........................................................6

    C.   Trial proceedings:  Punishment Phase ................................................................8

        1.   State's Evidence ...............................................................................................8

        2.   Defendant's Evidence ....................................................................................10

CLAIMS FOR RELIEF ............................................................................................17

I. MR. MURPHY WAS SENTENCED TO DEATH WITHOUT THE NECESSARY FINDING THAT HE EITHER HAD THE PURPOSE TO COMMIT MURDER OR THAT HE WAS RECKLESSLY INDIFFERENT TO HUMAN LIFE WHILE BEING A MAJOR PARTICIPANT IN THE ROBBERY, IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. ....17

    A.   Pursuant to  *Enmund v. Florida*, 458 U.S. 782, 797 (1982), and *Tison v. Arizona*, 481 U.S. 137, 158 (1987), In Order to be Death Eligible for a Felony Murder the Defendant Must Either "Kill, Attempt to Kill, or Intend that a Killing Take Place or that Lethal Force Will be Employed" or He Must be a "Major [Participant]" in the Felony Committed, Combined with Reckless Indifference to Human Life." ..................................................................18

    B.   The Jury at Mr. Murphy's Trial Made No Necessary Finding of Either Intent or Major Participation in the Robbery. ....................................................................19

    C.   Pursuant to  *Ring v. Arizona*, 536 U.S. 584, 605 (2002), Personal Culpability of a Capital Defendant in a Felony Murder Prosecution Is a Fact "Increasing Punishment Beyond the Maximum Authorized by a Guilty Verdict Standing Alone" and Must Be Found by a Jury....23

II.   MR. MURPHY WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL AT BOTH STAGES OF HIS CAPITAL MURDER TRIAL BY COUNSEL'S FAILURE TO SEEK A CHANGE OF VENUE IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. ............................................26

    A.   The Controlling, Clearly-Established Supreme Court Precedent. ....................................26

    B.   Mr. Murphy's Right to a Fair Trial Was Denied Because Extensive Pretrial Publicity Rendered It Impossible for an Impartial Jury to be Seated in Dallas County...........................28

1.   The Pretrial Publicity Surrounding Mr. Murphy's Case Was Extensive and Inflammatory..................................................................................................28

2.   In Light of This Extensive Pretrial Publicity, Mr. Murphy's Right to Be Tried by an Impartial Jury Could Not Possibly Have Been Vindicated. ...................................34

C.   Trial Counsel's Failure to Seek a Change of Venue Was Objectively Unreasonable and Prejudiced Mr. Murphy..............................................................................36

III.   MR. MURPHY WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL IN THE SENTENCING PHASE OF HIS CAPITAL MURDER TRIAL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. ................................................................................................37

A.   The Controlling, Clearly-Established Supreme Court Precedent. ....................................37

B.   Trial Counsel Rendered Deficient Performance by Eliciting Highly Damaging Testimony from its Own Witness about Mr. Murphy's Future Dangerousness. .........................................53

C.   Trial Counsel Rendered Deficient Performance by Failing to Conduct a Reasonable Sentencing Investigation......................................................................................55

1.   Applicable Law and Prevailing Professional Norms. ......................................................55

2.   Trial Counsel's Failure to Retain a Mitigation Specialist in a Timely Manner and to Ensure that a Competent Mitigation Investigation Was Conducted Fell Below Prevailing Professional Norms. .........................................................................................61

3.   Trial Counsel's Failure to Investigate Whether Mr. Murphy Suffers from Post-Traumatic Stress Disorder Was Constitutionally Deficient. .................................................63

a.   DSM-IV Definition of Post-Traumatic Stress Disorder...............................................63

b.   Professional Standards with Respect to Investigating Post-Traumatic Stress Disorder Evidence in Capital Sentencing. .........................................................................64

c.   Trial Counsel Rendered Deficient Performance by Failing to Uncover Mitigating Mental Health Evidence.....................................................................................67

i.   Dr. Bekh Bradley-Davino's Declaration................................................................68

D.   Trial Counsel Rendered Deficient Performance by Failing to Object to Impermissible Closing Arguments during the Punishment Phase.....................................................70

1.   The Government's Punishment Phase Arguments Violated State Law............................70

a.   Derogatory References to Mr. Murphy.......................................................................70

b. Urging the Jury to Base Its Verdict on Sympathy for the Victim and His Family. .......71

c.   These Arguments Were Impermissible Pursuant to State Law.....................................72

2.   Trial Counsel's Failure to Object to These Arguments was Objectively Unreasonable. .74

E.   Trial Counsel Rendered Deficient Performance by Failing to Object to Impermissible *Voir Dire* Committing Jurors to an Affirmative Answer on the Second Special Issue and by Failing to Challenge Those Jurors for Cause or Exercise a Peremptory Strike.........................77

1. Legal Standard for Impermissible Commitment Questions.............................................77

2. The Voir Dire Conducted in Mr. Murphy's Case. ........................................................79

3. Trial Counsel's Failure to Object to Impermissible Voir Dire or to Challenge for Cause or Peremptorily Strike the Jurors Who Committed Themselves Was Objectively Unreasonable.....................................................................................................................87

    a. The Government's Commitment Questions Violated State Law.................................87

    b. Trial Counsel's Performance Was Constitutionally Ineffective. ................................90

F.     Mr. Murphy was Prejudiced by Counsel's Deficient Performance at the Punishment Phase of His Capital Trial...................................................................................................91

IV. MR. MURPHY WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL, IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. ...............................................................................96

CONCLUSION AND PRAYER FOR RELIEF ........................................................................98

VERIFICATION........................................................................................................................98

CERTIFICATE OF SERVICE ..................................................................................................99

TABLE OF AUTHORITIES

**Cases**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) ................................................................ 43

*Anders v. California*, 386 U.S. 738 (1967) ........................................................................... 96

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ...................................................................... 24

*Atkins v. State*, 951 S.W.2d 787 (Tex. Crim. App. 1997) ...................................................... 88

*Baldwin v. State*, 2009 Tex. App. LEXIS 4270 (June 12, 2009) ............................................. 74

*Bates v. Bell*, 402 F.3d 635 (6th Cir. 2005) ........................................................................... 76

*Battenfield v. Gibson*, 236 F.3d 1215 (10th Cir. 2001) .......................................................... 57

*Brandley v. State*, 691 S.W.2d 699 (Tex. Crim. App. 1985) .................................................. 74

*Brewer v. Quarterman*, 550 U.S. 286 (2007) ........................................................................ 43

*Burns v. Gammon*, 260 F.3d 892 (8th Cir. 2001) .............................................................. 76, 91

*Burrell v. State*, 526 S.W.2d 799 (Tex. Crim. App. 1975) ..................................................... 73

*Cabana v. Bullock*, 474 U.S. 376 (1986) .............................................................................. 26

*Chambers v. Florida*, 309 U.S. 227 (1940) ........................................................................... 35

*Combs v. Coyle*, 205 F.3d 287 (6th Cir. 2000) ...................................................................... 54

*Commonwealth v. Rompilla*, 653 A.2d 626 (Pa. 1995) .......................................................... 48

*Copeland v. Washington*, 232 F.3d 969 (8th Cir. 2000) ........................................................ 77

*Duhamel v. Collins*, 955 F.2d 962 (5th Cir. 1993) ................................................................ 96

*Duran v. State*, 356 S.W.2d 937 (Tex. Crim. App. 1962) ...................................................... 73

*Duvall v. Reynolds*, 139 F.3d 768 (10th Cir. 1998) ............................................................... 77

*Easley v. Dretke*, 122 Fed. Appx. 124 (5th Cir. 2005) .......................................................... 65

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ......................................................................... 56

*Enmund v. Florida*, 458 U.S. 782 (1982) ......................................................................... 18, 97

*Estes v. Texas*, 381 U.S. 532 (1965) ..................................................................................... 35

*Evitts v. Lucey*, 469 U.S. 387 (1985) .................................................................................... 96

*Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006) ............................................ 41, 42

*Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 2006) ...................................................... 57

*Gongora v. Quarterman*, 2008 U.S. App. LEXIS 22164 (5th Cir. Oct. 22, 2008) ...................... 22

*Gregg v. Georgia*, 428 U.S. 153 (1976) ................................................................................ 56

*Heath v. Jones*, 941 F.2d 1126 (11th Cir. 1991) .................................................................... 97

*Houston v. Estelle*, 569 F.2d 372 (5th Cir. 1978) .................................................................. 73

*In re R.D.B.*, 20 S.W.3d 255 (Tex. App. —Texarkana 2000) .................................................. 66

*Irvin v. Dowd*, 366 U.S. 717  (1961) ................................................................................ 34, 35

*Jones v. Ryan*, 583 F.3d 626 (9th Cir. 2009) ..................................................................... 64, 65

*Jones v. United States*, 526 U.S. 227 (1999) ......................................................................... 24

*Jupe v. State*, 217 S.W. 1041 (Tex. Crim. App. 1920) ........................................................... 74

*Kyles v. Whitley*, 514 U.S. 419 (1995) .................................................................................. 43

*Lambright v. Schriro*, 490 F.3d 1103 (9th Cir. 2007) ...................................................... 56, 59, 67

*Lockett v. Ohio*, 438 U.S. 586 (1978) ................................................................................... 56

*Lockhart v. Fretwell*, 506 U.S. 364 (1993) ........................................................................... 44

*Lowery v. Cummings*, 255 Fed. Appx. 409 (11th Cir. 2007) .................................................. 66

*Lydia v. State*, 109 S.W.3d 495 (Tex. Crim. App. 2003) .................................................... 78, 90

*Martin v. Parker*, 11 F.3d 613 (6th Cir. 1993) ...................................................................... 77

*Martinez v. State*, 332 S.W.2d 718 (Tex. Crim. App. 1960) .................................................. 73

*Marx v. State*, 150 S.W. 2d 1014 (Tex. Crim. App. 1941) ...................................................... 73

*Mayola v. Alabama*, 623 F.2d 992 (5th Cir. 1980) ..................................................... 35

*McGrew v. State*, 143 S.W. 2d 946 (Tex. Crim. App. 1940) ....................................... 73

*McIntosh v. State*, 52 S.W.3d 196 (Tex. Crim. App. 2001) ........................................ 21

*Meeks v. Moore*, 216 F.3d 951 (11th Cir. 2000) ...................................................... 37

*Miller v. Johnson*, 200 F.3d 274 (5th Cir. 2000) ...................................................... 91

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ................................................................ 47

*Moore v. Dempsey*, 261 U.S. 86 (1923) ...................................................................... 35

*Pamplin v. Mason*, 364 F.2d 1 (5th Cir. 1966) ........................................................... 35

*Penry v. Lynaugh*, 492 U.S. 302 (1989) .......................................................... 43, 67, 95

*Poindexter v. Mitchell*, 454 F.3d 564 (6th Cir. 2006) ................................................. 59

*Profitt v. Florida*, 428 U.S. 242 (1976) ...................................................................... 24

*Profitt v. Waldron*, 831 F.2d 1245 (5th Cir. 1987) ..................................................... 66

*Ramos v. State*, 991 S.W.2d 430 (Tex. Crim. App. 1999) .......................................... 73

*Rector v. Johnson*, 120 F.3d 551 (5th Cir. 1997) ....................................................... 66

*Renn v. State*, 495 S.W.2d 922 (Tex. Crim. App. 1973) ............................................ 73

*Rideau v. Louisiana*, 373 U.S. 723 (1963) ................................................................. 35

*Ring v. Arizona*, 536 U.S. 584 (2002) ................................................................... 23, 25

*Ringo v. Roper*, 472 F.3d 1001 (9th Cir. 2007) ......................................................... 66

*Rompilla v. Beard*, 545 U.S. 374 (2005) .................................................... 42, 48, 49, 50

*Shannon v. State*, 942 S.W.2d 591 (Tex. Crim. App. 1996) ....................................... 73

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) ................................................................ 35

*Smith v. Black*, 904 F.2d 950 (5th Cir. 1990) ..................................................... 76, 90

*Stahl v. State*, 749 S.W.2d 826 (Tex. Crim. App. 1988) ............................................ 74

*Standefer v. State*, 59 S.W.3d 177 (Tex. Crim. App. 2001) ....................... 77, 78, 87, 90

*Stevens v. McBride*, 489 F3d 883 (7th Cir. 2007) ...................................................... 92

*Strickland v. Washington*, 466. U.S. 668 (1984) .................................................. passim

*Tennard v. Dretke*, 542 U.S. 274 (2004) ......................................................... 43, 56, 65

*Tison v. Arizona*, 481 U.S. 137 (1987) .............................................................. 18, 19, 97

*Todd v. State*, 598 S.W.2d 286 (Tex. Crim. App. 1980) ............................................ 73

*United States ex rel. Emerson v. Gramley*, 883 F. Supp. 225 (N.D. Ill. 1995) ........... 57

*United States v. Agurs*, 427 U.S. 97 (1976) ............................................................... 27

*United States v. Hall*, 455 F.3d 508 (5th Cir. 2006) ................................................ 91

*Walbey v. Quarterman*, 309 Fed.Appx. 795 (5th Cir. 2009) ........................... 50, 52, 53

*Walbey v. State*, 926 S.W.2d 307 (Tex. Crim. App. 1996) ........................................ 50

*Walton v. Arizona*, 497 U.S. 639 (1990) .................................................................... 25

*Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000) ..................................... 76, 91

*Wiggins v. Smith*, 539 U.S. 510, (2003) .................................................................. passim

*Wilkerson v. Collins*, 950 F.2d 1054 (5th Cir. 1992) ................................................. 66

*Williams v. Taylor*, 529 U.S. 362 (2000) ................................................................. passim

*Woods v. State*, 59 S.W.3d 833 (Tex. App.—Texarkana 2001) .................................. 66

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ........................................... 56, 57, 74

**Statutes**

28 U.S.C. § 2241(d) ...................................................................................................... 1

28 U.S.C. § 2254 ........................................................................................................... 1

Cal. Penal Code § 190.3 ............................................................................................... 38

Fla. Stat. ch. 921.141 .................................................................................................... 38

Md. Code Ann., Criminal Law § 2-303(i)(1).............................................................. 38
Tex. Code Crim. Proc. Art. 31.01 – 31.09 ............................................................... 35
Tex. Code Crim. Proc. art. 37.071 ............................................................ 39, 43, 54
Tex. Code Crim. Proc. art. 37.071, § 2(b)(1).......................................................... 39
Tex. Penal Code § 7.02(b) ...................................................................................... 21
Tex. Penal Code § 15.02 ......................................................................................... 21
Va Code § 19.2-264.4 .............................................................................................. 41

**Other Authorities**

ABA, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev. ed. 2003) ...................................................................................... passim
American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders DSM-IV-TR* 309.89 (4th ed. 2000) ....................................................................................... 64
John H. Blume, *et. al*, *Future Dangerousness in Capital Cases: Always 'At Issue'*, 86 Cornell L. Rev. 397, 404 (2001) ....................................................................................... 55
Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Columbia L. Rev. 1538, 1539 (1998) ............................................................... 54
Ursula Bentele & William J. Bowers, *How Jurors Decide on Death: Guilt is Overwhelming; Aggravation Requires Death; and Mitigation is No Excuse*, 66 Brooklyn L. Rev. 1013, 1021, 1029 (2002).......................................................................................................... 54

TABLE OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| 1 | Jennifer Emily, *Manhunt Centers on D-FW*, DALLAS MORNING NEWS, Jan. 2, 2001 |
| 2 | Jennifer Emily, *Robbery Investigated for Link to Escapees*, DALLAS MORNING NEWS, Jan. 2, 2001 |
| 3 | Jennifer Emily, *Warrants to Expand Search for Escapees*, DALLAS MORNING NEWS, Jan. 5, 2001 |
| 4 | Nancy San Martin, *System Criticized by Family*, DALLAS MORNING NEWS, Feb. 8, 2001 |
| 5 | Tim Wyatt, *Escapees Won't Be Offered Plea Deals*, DALLAS MORNING NEWS, Jan. 30, 2001 |
| 6 | *Grant to Help Dallas County Pay for Escapees' Trials*, DALLAS MORNING NEWS, Feb. 10, 2001 |
| 7 | David McLemore, *Search for Prison Escapees Expands*, DALLAS MORNING NEWS, Dec. 15, 2000 |
| 8 | Holly Becka, *2 Escapees Still on Run After 4 Others Arrested*, DALLAS MORNING NEWS, Jan. 23, 2001 |
| 9 | Steve McGonigle and Brenda Rodriguez, *Families Fearing Worst*, DALLAS MORNING NEWS, Jan. 24, 2001 |
| 10 | Jennifer Emily, *Third Robbery May Be Tied to Escapees*, DALLAS MORNING NEWS, Jan. 22, 2001 |
| 11 | Holly Becka and Todd Besman, *Escapees May Plan Showdown*, DALLAS MORNING NEWS, Dec. 28, 2000 |
| 12 | Jan Jarvis, *Handgun Lessons, Alarm Sales up as Fugitives Remain Free*, FORT WORTH STAR-TELEGRAM, Jan. 6, 2001 |
| 13 | James Ragland, *Officer's Mom Clings to Memories*, DALLAS MORNING NEWS, Jan. 8, 2001 |
| 14 | David Flick, *Lives Forever Torn*, DALLAS MORNING NEWS, Jan. 25, 2001 |
| 15 | Rose Roberts Cannady, *A Very Silent Night*, DALLAS MORNING NEWS, |

Feb. 10, 2001

16          Jennifer Emily, *Death of Officers More Personal in Smaller Departments, Many Say*, DALLAS MORNING NEWS, Jan. 5, 2001

17          James Ragland, *Behind the Blue, Fear's a Fact of Life*, DALLAS MORNING NEWS, Jan. 10, 2001

18          Laurie Fox, *Dinner Aids Son of Officer*, DALLAS MORNING NEWS, Feb. 11, 2001

19          Selwyn Crawford, *Rivas Changes Story, Admits Escapees Had Help*, DALLAS MORNING NEWS, Jan. 28, 2001

20          Todd Bensman and Tim Wyatt, *Rivas Returned to Dallas for Trial*, DALLAS MORNING NEWS, Feb. 2, 2001

21          Jennifer Emily and Todd Bensman, *Escape Saga on its Way to Dallas*, DALLAS MORNING NEWS, Jan. 26, 2001

22          Court's Findings Regarding Publicity, Feb. 2, 2001

23          Holly Becka, *Witnesses Recount Inmates' Attack*, DALLAS MORNING NEWS, Aug. 15, 2001

24          Holly Becka and Jennifer Emily, *Rivas Sentenced to Die*, DALLAS MORNING NEWS, Aug. 30, 2001

25          Holly Becka, *Newbury Faces Life or Death*, DALLAS MORNING NEWS, Jan. 19, 2002

26          Terri Langford, *Second Escapee Gets Death*, DALLAS MORNING NEWS, Jan. 29, 2002

27          Holly Becka, *Rodriguez Sentenced to Death for Slaying*, DALLAS MORNING NEWS, May 10, 2002

28          Holly Becka, *Escapee Sentenced to Die for Slaying*, DALLAS MORNING NEWS, Feb. 14, 2003

29          Robert Tharp, *Fifth to Die in Officer's Slaying*, DALLAS MORNING NEWS, June 13, 2003

30          Restrictions Regarding Publicity, Feb. 2, 2001

31          *State v. Rodriguez*, F01-00326-T, R.R. Vol. 5: 6

32          "The Team Concept in a Capital Case"

33          Invoice of Dr. Mark Vigen, 11/21/03

34          Declaration of Bekh Bradley-Davino, Ph.D.

35          Affidavit of Patrick Murphy Sr.

36          Affidavit of Linda Goodman

37          Affidavit of Allen Ray Skinner

38          Declaration of Sheryl Green Fontenot

39          Affidavit of Kristina Murphy Rogers

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **PATRICK HENRY MURPHY JR.** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | CIVIL NO. 3:09-cv-01368-L |
| | § | |
| | § | *** DEATH PENALTY CASE *** |
| | § | |
| **RICK THALER**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

_____

**PETITION FOR A WRIT OF HABEAS CORPUS**
_____

Petitioner, Patrick Henry Murphy Jr., is currently confined on death row at the Polunsky Unit in Livingston, Texas. Through undersigned counsel and pursuant to the Constitution of the United States and 28 U.S.C. § 2254, Mr. Murphy petitions this Court to issue a Writ of Habeas Corpus and to order his release from confinement on grounds that his custody and death sentence violate the Constitution and laws of the United States.

## JURISDICTION

This court has personal jurisdiction pursuant to 28 U.S.C. § 2241(d) because Mr. Murphy was convicted in the 283rd District Court in Dallas County, Texas. Subject matter jurisdiction is conferred by 28 U.S.C. § 2254.

## PRIOR PROCEEDINGS

Mr. Murphy was convicted and sentenced to death in November of 2003. The Texas Court of Criminal Appeals affirmed the conviction and sentence on April 26, 2006. *Murphy v. State*, No. AP-74851, 2006 WL 1096924 (Tex. Crim. App. 2006) (unpublished). The conviction became final on January 8, 2007, when the United States Supreme Court denied Mr. Murphy's petition for writ of *certiorari*. *Murphy v. Texas*, 549 U.S. 1119 (2007).

Mr. Murphy filed an application for writ of habeas corpus in the state convicting court on November 15, 2005. The convicting court recommended that relief be denied, and the Texas Court of Criminal Appeals accepted the recommendation, denying relief on July 1, 2009. *Ex Parte Patrick Henry Murphy Jr.*, No. W01-00328-T, 2009 WL 1900369 (Tex. Crim. App. 2009) (unpublished).

## INTRODUCTION

Mr. Murphy was convicted and sentenced to death for being a party to the murder of Aubrey Hawkins, a member of the City of Irving Police Department. Mr. Murphy's indictment charged him with capital murder under alternate theories: causing the death of Officer Hawkins while Officer Hawkins was discharging his official duties as a police officer, and causing his death during the course of a robbery. There is no record of whether the jury determined under which theory it convicted Mr. Murphy or whether that determination was unanimous. Because the jury may have found him guilty as a conspirator to a robbery during which a death was foreseeable but never made the necessary finding that Mr. Murphy had the purpose of murdering Officer Hawkins or was recklessly indifferent to human life while being a major participant in the robbery, Mr. Murphy was convicted and sentenced to death in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

In addition, Mr. Murphy's trial was marred by constitutionally ineffective trial counsel. Both phases of his trial were tainted by counsel's objectively unreasonable and prejudicial failure to seek a change of venue due to extensive and inflammatory pretrial publicity.  The punishment phase of his trial was further blighted by counsel's deficient performance.  First, counsel elicited highly damaging testimony from its own witness regarding Mr. Murphy's future dangerousness. Second, counsel failed to conduct a reasonable sentencing mitigation.  These deficiencies included the failure to retain a mitigation specialist in a timely manner, the failure to thereafter conduct a competent mitigation investigation, and the failure to investigate whether Mr. Murphy suffers from post-traumatic stress disorder.  Third, counsel failed to object to highly inflammatory arguments made by the government during punishment phase summations. Fourth, counsel failed to object to impermissible questions posed by the State during *voir dire*. Mr. Murphy was thus deprived of his rights under the Sixth and Fourteenth Amendments to the United States Constitution, and his conviction and death sentence must be overturned.

## STATEMENT OF FACTS

### A.      The December 24, 2000 Homicide and Mr. Murphy's Subsequent Arrest

On December 13, 2000, a group of seven inmates escaped from the John B. Connally Prison Unit in Kenedy, Texas.  The escapees were Mr. Murphy, George Rivas, Donald Newbury, Michael Rodriguez, Larry Harper, Joseph Garcia, and Randy Halprin.

At approximately 5:45 p.m. on December 24, 2000, the employees of Oshman's Sporting Goods in Irving, Texas, were preparing to close the store for the evening.  R.R. Vol. 40: 57.[1] Employees Wes Ferris and Tim Moore were informed by a man whom they believed to be a security officer from ADT, Oshman's alarm company, that a grab-and-run ring was being

---

[1] Citations to the Reporter's Record appear as "R.R. Vol. [number]: [page number]."

investigated.  RR. Vol. 40: 54.  Mr. Ferris called over two employees to look at photographs of

potential suspects and took the man to the video room to examine security tape footage.  R.R.

Vol. 40: 54-55.  Mr. Ferris later learned that this man was George Rivas.  R.R. Vol. 40: 52.

Mr. Ferris accompanied Mr. Rivas to the customer service area at the front of the store,

where another man dressed as a security guard was showing photographs to other employees.

R.R. Vol. 40: 56-57.  Mr. Ferris made an announcement that the store was closing. R.R. Vol. 40:

57.  When he turned to see if any customers were coming to check out, Mr. Rivas pointed a gun

toward the ceiling and announced that a robbery was now in progress.  R.R. Vol. 40: 58.  Mr.

Ferris stepped toward Mr. Rivas, who pointed the gun at Mr. Ferris and threatened to shoot him

if he tried anything.  R.R. Vol. 40: 59.

Mr. Ferris then saw six to eight armed men around him and the other employees.  R.R.

Vol. 40: 60.  Mr. Ferris also heard Mr. Rivas using a radio to talk with someone outside the store

who said that everything was fine and that the police were involved with an accident.  R.R. Vol.

40: 61.

Mr. Rivas emptied the cash registers into a large bag and then demanded Mr. Ferris's car

keys.  R.R. Vol. 40: 68-69.  Mr. Rivas asked Mr. Ferris to lead him to the video room so that Mr.

Rivas could take the security camera's videotape.  R.R. Vol. 40: 69.  En route to the video room,

Mr. Rivas noticed a door down a hallway.  R.R. Vol. 40: 69.  When Mr. Rivas saw the safe in

that room, he ordered Mr. Ferris to put the money from the safe into the bag.  R.R. Vol. 40: 70.

Mr. Rivas also directed Mr. Ferris to collect a number of guns, which the robbers stole.  R.R.

Vol. 40: 72-73.

Mr. Ferris then heard someone say over Mr. Rivas' radio that they needed to hurry up

because the police were arriving.  R.R. Vol. 40: 77.  About thirty seconds after the robbers left,

Mr. Ferris heard what he believed to be gunfire coming from outside, toward the rear of the store.  R.R. Vol. 40: 78.

Mr. Ferris later positively identified four of the robbers from photographs at the police station, and tentatively identified an additional two.  R.R. Vol. 40: 85.  The four positive identifications were of Mr. Rivas, Michael Rodriguez, Joseph Garcia, and Donald Newbury, and the two tentative identifications were of Randy Halprin and Larry Harper.  R.R. Vol. 40: 86.

Timothy Cassout, a police officer with the Irving Police Department, testified that on December 24, 2000, he came on evening patrol duty at the same time as Officer Hawkins.  R.R. Vol. 40: 97.  At about 6:30, Officer Cassout heard what sounded like fireworks going off.  R.R. Vol. 40: 100-01.  Shortly after hearing the noise, Officer Cassout was dispatched to the Oshman's on a suspicious persons call.  R.R. Vol. 40: 102.  Hawkins had previously been dispatched to the Oshman's, and Officer Cassout became concerned because dispatch was checking on Officer Hawkins's status but he was not answering. R.R. Vol. 40: 102, 104.

Officer Cassout arrived at the back parking lot area of the Oshman's, noticed debris in the road and Officer Hawkins' patrol car in an odd position, then saw a person lying face down on the ground. R.R. Vol. 40: 105-07.  It was later determined that this person was the decedent, Aubrey Hawkins.

Randall Johnson, a detective with the Irving Police Department, testified that several employees subsequently identified the suspects' photographs.  R.R. Vol. 40: 134.  On January 22, 2001, Det. Johnson received information that the suspects had been located in Colorado.  R.R. Vol. 40: 136.  Det. Johnson and two other law enforcement officers went to an RV park near Colorado Springs, Colorado named Woodland Park.  R.R. Vol. 40: 136-37.  By the time they arrived, Rivas, Rodriguez, Garcia, and Halprin had already been arrested and taken to the

county jail.  R.R. Vol. 40: 137-38.  Det. Johnson also learned that Harper had committed suicide; his body was found inside an RV at the RV park.  R.R. Vol. 40: 137-38.  Mr. Murphy and Donald Newbury were still at large. R.R. Vol. 40: 139.

On January 23, 2000, the search for Mr. Murphy and Mr. Newbury centered on a Holiday Inn in Colorado Springs.  R.R. Vol. 40: 140.  As the hotel was being secured and people were being removed from the premises, the authorities entered into negotiations with Mr. Murphy and Mr. Newbury, during which each made a number of statements.  R.R. Vol. 40: 141. Around 3:30 a.m., Mr. Murphy and Mr. Newbury surrendered to the Colorado Springs police.  R.R. Vol. 40: 141.  After the arrest, Det. Johnson interrogated Mr. Murphy at the Colorado Springs Police Department, where Mr. Murphy made a statement.  R.R. Vol. 40: 143-49.

### B.      Trial Proceedings: Guilt/Innocence Phase[2]

Steven Hazard, a City of Irving police officer assigned to the Physical Evidence Section, was in charge of collecting and documenting any physical evidence at the Oshman's scene.  R.R. Vol. 41: 60-123.  Officer Hazard testified that he discovered evidence that there had been a car crash between the decedent's vehicle and a white Ford Explorer, later discovered to be owned by Oshman's manager Wes Ferris.  R.R. Vol. 41: 67.  Officer Hazard testified that by the time both vehicles started moving, Officer Hawkins had already been shot, and someone had dragged his body about six feet from his car.  R.R. Vol. 41: 79-80.   Officer Hazard testified regarding the damage to both vehicles from bullets, the blood evidence, and the location of numerous spent shell casings and bullet fragments in and around the vehicles. R.R. Vol. 41: 95-122.

---

[2] The summary that follows does not include each witness who testified.  Rather, it summarizes the testimony of only the key witnesses.

Jeffrey Barnard, the Chief Medical Examiner for Dallas County, performed the autopsy on Aubrey Hawkins on December 25, 2000.  R.R. Vol. 42: 6.  Dr. Barnard testified that he found eleven gunshot wounds on Hawkins's body.  R.R. Vol. 42: 11.  Of those eleven, three were considered rapidly fatal injuries: one that went through the left eye and caused injury to the brain, one that went through the left chin area and then went through the left lung, and one that entered the left back area and then went through the aorta.  R.R. Vol. 42: 20, 24.  The latter was the most rapidly fatal injury of all of them, and Dr. Barnard testified that even if that injury had been sustained at or near a hospital, Officer Hawkins could not have been saved.  R.R. Vol. 42: 24-25.

Lannie Emanuel, a firearms expert at the Southwestern Institute of Forensic Sciences, testified about matching certain bullet fragments/projectiles to specific weapons found at Oshman's.  R.R. Vol. 42: 194-213.  Mr. Emanuel was able to match some of the bullet fragments to some of the specific weapons recovered from the scene, and he was also able to determine that at least five different firearms were used.  R.R. Vol. 42: 200, 208.  Mr. Emanuel also testified that he was able to recover serial numbers and/or Texas Department of Corrections numbers from the weapons retrieved from the crime scene. R.R. Vol. 42: 210.

There was no testimony at any point that Mr. Murphy was suspected of having fired a weapon during the Oshman's robbery.  Rather, the government's theory was that Mr. Murphy served as the lookout and getaway car driver during the robbery and subsequent shooting.  R.R. Vol. 40: 15.

The defense neither gave an opening statement nor presented any evidence.  R.R. Vol. 40: 25, 43: 90.

7

### C.    Trial proceedings:  Punishment Phase

#### 1.   State's Evidence[3]

The State's first witness was Deputy Troy Graham. R.R. Vol. 45: 16. Deputy Graham

testified that he arrested Mr. Murphy in February of 1984 for burglary of a building. R.R. Vol.

45: 18.

Jeannie Grieser testified that Mr. Murphy raped her in March of 1984, that he was tried for

the sexual assault in November of 1984, and that he was convicted and received a sentence of 50

years.  R. R. Vol. 45: 68.

Patrick Moczygemba was an Assistant Maintenance Supervisor at the Connally Unit in

December of 2000. R.R. Vol. 45: 102.  He testified that he was familiar with the men who

escaped with Mr. Murphy, as they all worked in his department.  R.R. Vol. 45: 103-106.  On

December 13, 2000, the inmates and craftsmen in his department went to lunch, except for the

six men that Mr. Moczygemba held back to finish work on the floor: George Rivas, Donald

Newbury, Joseph Garcia, Randy Halprin, Larry Harper, and Patrick Murphy.  R.R. Vol. 45: 126.

Mr. Moczygemba was in the office when Mr. Rivas asked him to come into the shop to look at a

motor.  R.R. Vol. 45: 126.  When Mr. Moczygemba knelt down to look at it, he was knocked

unconscious.  R.R. Vol. 45: 127-130.  When Mr. Moczygemba awoke, he tried to get away from

Mr. Rivas.  R.R. Vol. 45: 130.  The inmates came towards him, and Mr. Garcia put a knife to his

throat.  R.R. Vol. 45: 130.  Mr. Garcia told him he could "end it now" but if they did, they would

"end it now" for anyone else that walked in the door.  R.R. Vol. 45: 131-132.  At this point Mr.

Moczygemba was undressed, tied, gagged, and dragged into the electrical room.  R.R. Vol. 45:

133-34.  The inmates then began bringing other inmates and craftsmen to the electrical room.

R.R. Vol. 45: 134-135.  When the room was full, the escapees waited outside with the light

---

[3]  Again, only the testimony of the government's key witnesses is summarized here.

turned off.  R.R. Vol. 45: 137.  Terry Schmidt, a lock technician, was able to free himself and started freeing others.  R.R. Vol. 45: 138.  Suddenly, Mr. Newberry opened the door and saw the hostages trying to escape.  R.R. Vol. 45: 139.  Newberry, Rodriguez and Rivas tried to force the door back open but could not do so.  R.R. Vol. 45: 142.  Mr. Newberry got stuck in the door and was slashing a shank wildly.  R.R. Vol. 45: 142-143.  The hostages were able to pry him out of the door and shut it.  R.R. Vol. 45: 144.  The hostages then heard what sounded like the escapees welding the door shut.  R.R. Vol. 45: 144.  After the escapees left, fifteen to twenty minutes passed before they heard officers coming to rescue them. R.R. Vol. 45: 146.  Mr. Moczygemba testified that he saw everyone except Mr. Murphy when the escape occurred.  R.R. Vol. 45: 151.

Holly Becka, a reporter at the Dallas Morning News, testified that in 2001, she was assigned to cover the Texas Seven cases. R.R. Vol. 47: 10.  As part of her assignment, Ms. Becka wrote Mr. Murphy a letter asking him to communicate with her about his background. R.R. Vol. 47: 10.  The State presented two letters, from Mr. Murphy to Ms. Becka, dated March 16, 2001 and April 10, 2001.  R.R. Vol. 47: 8-11.  On cross-examination, the Defense read these two letters in their entirety.  R.R. Vol. 47: 12-33.  The letters contained detailed descriptions of Mr. Murphy's family life, education, and his criminal history. R.R. Vol. 47: 12-33.

Jeff Spivey, one of the co-lead detectives in the murder of Aubrey Hawkins,  testified that he had the opportunity to research some web pages and the addresses from a book the authorities recovered that belonged to Mr. Murphy.  R.R. Vol. 47: 60.  He stated to the jury that the list of business addresses shown in the diary was "paramilitary survivalist-type businesses where you order military surplus equipment, things of that nature."  R.R. Vol. 47: 61-62.  On subsequent pages in the diary, there were addresses of Mr. Murphy's relatives, telephone numbers of

9

Southwest Airlines, a rare coin number, and belt buckle companies, among other notations.  R.R. Vol. 47: 62.

The State rested its case in chief on punishment. R.R. Vol. 47: 66.

### 2.  Defendant's Evidence

The defense waived opening statements at the punishment phase.  R.R. Vol. 47: 68.

The first witness called by the defense was Linda Goodman, Mr. Murphy's maternal aunt.  She testified that her sister Carol was Mr. Murphy's mother, that Carol died in 1995, and that their father was a drunk.  R.R. Vol. 47: 69-71.  Carol became pregnant in high school and married Patrick Murphy Sr.  R.R. Vol. 47: 76.   Ms. Goodman testified that she, her mother, and her grandmother often took care of Mr. Murphy for days and weeks at a time.  R.R. Vol. 47: 74.  For the first five years of Mr. Murphy's life, Carol left Mr. Murphy with them a third of the time.  R.R. Vol. 47: 74.  Carol would not leave money, food, or clothes to take care of Mr. Murphy; she seemed high or drunk when she reappeared; and she could not keep a job for very long.  R.R. Vol. 47: 76.  When Carol became pregnant again when Mr. Murphy was only a few months old, Patrick Murphy Sr. knocked Carol across the bed and slapped her around until she miscarried.  R.R. Vol. 47: 76.  After Carol and Mr. Murphy's father divorced, Patrick Murphy Sr. had weekend visitation rights.  R. R. Vol. 47: 79.  When Mr. Murphy was a year and a half old, his father did not return him after his weekend visitation. R. R. Vol. 47: 79.  Carol and Ms. Goodman went to court to seek Mr. Murphy's return.  R. R. Vol. 47: 79.   When he was brought to Court, Mr. Murphy was dressed in dirty clothes, had cigarette burns all over his body, and his diaper was fastened with a diaper pin that was pinned through his skin.  R. R. Vol. 47: 79.  After this, Mr. Murphy did not see his father often.  R.R. Vol. 47:80.

10

Carol then became pregnant with her son Allen.  R.R. Vol. 47: 80.  Carol abused alcohol while pregnant with Allen.  R.R. Vol. 47: 80-85.  The man Carol was living with at the time, Ray Skinner, raped Carol when she returned home after giving birth to Allen.  Carol began to hemorrhage and returned to the hospital, where she stayed for two weeks.  R.R. Vol. 47: 80-85.  Afterwards, Carol obtained multiple prescriptions from different doctors and took more drugs than prescribed.  R.R. Vol. 47: 85-86.  While taking these medications, Carol began physically abusing Mr. Murphy.  47: 86.  She would hit and slap Mr. Murphy, pull his hair, scream at him, and leave for prolonged periods of time, with no explanation of her whereabouts.  R. R. Vol. 47: 86.

During Mr. Murphy's childhood, Carol and her children lived off and on with a man named Leslie Green, who was a convicted child molester.  R.R. Vol. 47: 81-82, 88-89.  The fact of his conviction was known to Carol and Ms. Goodman, as Mr. Green served jail time on the weekends.  R.R. Vol. 47: 88-89.  Ms. Goodman further testified that between 1961 and 1970, Carol regularly used drugs and alcohol.  R.R. Vol. 47: 93.  Mr. Murphy was always dirty and would not bathe.  R.R. Vol. 47: 95.  Ms. Goodman attempted to get counseling for Mr. Murphy, who was uncontrollable even at age nine, but Carol would not agree to it.  R.R. Vol. 47, 94, 97.

At one point, Mr. Murphy ran away, because he was angry with Ms. Goodman for punishing him for taking $20 out of her purse.  R.R. Vol. 47: 99.  After this incident, Mr. Murphy moved in with his father and Ms. Goodman did not see him again until he was seventeen years old.  R.R. Vol. 47: 100.

Ms. Goodman also testified about the severe birth defects with which Mr. Murphy's younger half-sister, Sandra, was born due to Carol's drug and alcohol abuse during her pregnancy.  R.R. Vol. 47: 100-03.  These included Downs Syndrome, a hole in her heart, and

11

facial deformities.  *Id.*  When Sandra was only a few months old, Carol hit Sandra on the head with a hammer, because she could not deal with all her medical problems. R.R. Vol. 47: 104.

S.O. Woods, a retired Assistant Director for the Department of Criminal Justice Institutional Division, provided testimony on the prison system and Mr. Murphy's prison record. Referring to the sentence Mr. Murphy was serving when he escaped, Mr. Woods testified that Mr. Murphy could have had a mandatory release date as early as 2001 because of his good time earned.  R.R. Vol. 47: 143.  Because he escaped, his good time would be forfeited upon his return to the penitentiary.  *Id.*  Mr. Woods also testified that, if given a life sentence, Mr. Murphy would earn no good time and would have to serve forty years before being eligible for parole. R.R. Vol. 47: 145.  Mr. Woods detailed Mr. Murphy's prison record, which included sixteen incident reports prior to the escape, and testified that there was no evidence that Mr. Murphy had ever been part of a gang.  R.R. Vol. 47: 150-52.

On cross-examination by the State, Mr. Woods testified that Mr. Murphy should have been aware of his mandatory release date and that—as the term suggests—that release date would have been mandatory if he had not committed any major offenses.  R.R. Vol. 47: 156-57. He also testified that, if given a life sentence, Mr. Murphy would be placed in administrative segregation and could one day reach a minimum security classification.  R.R. Vol. 47: 159.  Mr. Woods explained that death row and administrative segregation share the same security procedures and that on death row, just as in administrative segregation, violent incidents have occurred in which other inmates and staff have been injured.  R.R. Vol. 47: 158, 160-65.

Mr. Woods further testified that Mr. Murphy, before his escape, worked in maintenance and was housed in an area of the prison that provided him with a considerable amount of freedom compared to the rest of the inmates.  R.R. Vol. 47: 167-169.  In addition, he testified

that Mr. Murphy had an average IQ, had 15 prior arrests, and was committed to the juvenile

detention center when he was younger. R.R. Vol. 47: 170. Based on this evidence, Mr. Woods

stated his opinion that Mr. Murphy is dangerous in the free world and is dangerous in prison.

R.R. Vol. 47: 171-173.

Mr. Murphy's co-defendant George Rivas was the next defense witnesses.  Mr. Rivas

testified that he  met Mr. Murphy when they worked together in the maintenance department at

the Connally Unit.  R.R. Vol. 48: 6.  He testified that Murphy was a friendly, hard working

"stand-up guy," who was not affiliated with any gangs.  R.R. Vol. 48: 6-7.  Mr. Rivas testified

that he initially planned the escape and that he chose Mr. Murphy to go with him because Mr.

Murphy talked about owning his own shop when he got out, instead of committing more crimes.

R.R. Vol. 48: 7-9.  Mr. Rivas first told Mr. Murphy about the escape plan in May 2000.  R.R.

Vol. 48:10.  Mr. Murphy later told Mr. Rivas that he wanted to back out of the escape plan,

because he was going to be before the parole board sometime in 2001.  R.R. Vol. 48:10.

Sometime later, a person who worked with Mr. Murphy was informed that he would be paroled

and was preparing to be released when he was told there had been a protest to his parole.  R.R.

Vol. 48: 11.  Mr. Murphy was very upset about this.  R.R. Vol. 48:11.  Mr. Murphy was also

concerned about having to register as a sex offender when he was released, because he had seen

on television that a registered sexual offender had been beaten up by his neighbors. R.R. Vol. 48:

12-13.  After these two incidents, Mr. Murphy once again decided to participate in the escape

plan.  R.R. Vol. 48: 13.

Mr. Rivas gave Mr. Murphy the role of  "lookout" because "[h]e's not overly

aggressive." R.R. Vol. 48: 14.  Mr. Rivas testified that Mr. Murphy's only role in helping with

the escape was to carry someone by his feet.  R.R. Vol. 48: 14-15.  Furthermore, Mr. Rivas and

13

Mr. Harper made the plans outside of prison to rob stores.  R.R. Vol. 48: 15.  Mr. Rivas also testified that Mr. Murphy stated that he did not want to go into any of the stores and did not want to rob anyone, so Mr. Murphy always stayed in the car.  R.R. Vol. 48: 19-20.

Mr. Rivas testified that Mr. Murphy's role at the Oshman's was to monitor the police scanner and to alert him of anything going on.  R.R. Vol. 48: 20.  Mr. Murphy stayed in the truck located at the front of the store and watched over the weapons, because Mr. Rivas did not feel comfortable leaving all that equipment in the motel at which they were staying.  R.R. Vol. 48: 20-21.  Mr. Rivas testified that Mr. Murphy communicated with him that he heard a suspicious activity report and that police were on the way, but that he was still at the front of the store when the shooting occurred.  R.R. Vol. 48: 23-24.  Mr. Rivas further testified that there was never any discussion about Mr. Murphy being a sniper, because he was nearsighted.  R.R. Vol. 48: 25-27.  Mr. Murphy learned of the shooting when three of the men got into the car with him.  R.R. Vol. 48: 24.

On redirect examination, Mr. Rivas testified that the purpose of Mr. Murphy calling and warning him about the officer that was coming was so that Mr. Rivas would get away from the scene, not to attack the officer.  R.R. Vol. 48: 87.  He also testified that he thought Mr. Murphy felt less a part of the group, because he did not actively participate in any of the robberies.  R.R. Vol. 48: 89.

The defense then called Patrick Murphy Sr.  He testified that Carol, Mr. Murphy's mother, was a good mother, but that she changed after their divorce.  R.R. Vol. 48: 101.  He and Carol divorced when Mr. Murphy was eighteen months old, and she moved away with Mr. Murphy.  R.R. Vol. 48: 102.  He did not see Mr. Murphy from the time that Mr. Murphy was three until he was nine years old.  R.R. Vol. 48: 105.  The next time he saw Mr. Murphy, Mr.

14

Murphy was nine years old, had run away, and was hiding in an old school bus.  R.R. Vol. 48: 105.  Mr. Murphy was dirty and covered with mosquito bites and ringworm.  R.R. Vol. 48: 106.  Mr. Murphy then moved into his home and did not have the normal hygiene of a nine year old.  R.R. Vol. 48: 108.  Thereafter, Mr. Murphy's hygiene and schoolwork improved, but he continued to get in trouble.  R.R. Vol. 48: 112.

When Mr. Murphy was eighteen or nineteen he married and had a child who died at birth.  R.R. Vol. 48: 112-13.  The day after the baby died, Mr. Murphy pulled a shotgun on his father, but Patrick Murphy Sr. testified that he knew Mr. Murphy was not going to shoot.  R.R. Vol. 48: 123-24.  Mr. Murphy married again when he was twenty and had a son.  R.R. Vol. 48: 113-14.  He also testified that two of his brothers, who were around Mr. Murphy when he was a child, were sent to prison for child molestation.  R.R. Vol. 48: 121.

Dr. Mark Vigen, a psychologist, testified as an expert witness for the defense.  He noted that he had interviewed Mr. Murphy, his family members, and doctors who had treated Mr. Murphy.  R.R. Vol. 48: 145-146.  Dr. Vigen also testified that he reviewed records and police reports in preparing for his testimony.  R.R. Vol. 48: 145-146.  Dr. Vigen testified that Mr. Murphy has a diagnosis of sexual disorder not otherwise specified and a narcissistic borderline personality with antisocial traits.  R.R. Vol. 48: 145-148.  In addition, he stated that Mr. Murphy is empathetic, but this quality is "developmentally delayed."  R.R. Vol. 48: 152.  Dr. Vigen testified that Mr. Murphy had several traits of a borderline personality, which include a frenetic need to avoid real or imagined abandonment and a pattern of unstable and intense personal relationships, characterized by alternating between extremes of idealization and devaluation.  R.R. Vol. 48: 154.  Other traits include impulsivity in the areas of sex and substance abuse.  R.R. Vol. 48: 154-55.  He also asserted that Mr. Murphy has antisocial personality traits, manifested

in a pervasive pattern of disregard for and violations of the rights of others.  R.R. Vol. 48: 155.

Dr. Vigen testified that Mr. Murphy's sexual disorder was a result of a long and severe

developmental history of family dysfunction and sexual abuse.  R.R. Vol. 48: 157.

Dr. Vigen stated his belief that Mr. Murphy was more of a follower than a leader in the

escape and ultimate murder of Officer Hawkins.  R.R. Vol. 48: 162-163.  Furthermore, he

testified that due to Mr. Murphy's lack of violence during his sixteen years in prison, Mr.

Murphy would be assigned to administrative segregation and therefore posed a very low risk of

committing any future acts of violence within the prison system.  R.R. Vol. 48:164.  Also, based

on his conversations with Mr. Murphy and the disorders from which Mr. Murphy suffers, Dr.

Vigen stated that Mr. Murphy has "additional potential for rehabilitation and possible personal

spiritual conversion as he moves into the latter part of his second half of life."  R.R. Vol. 48: 164.

Finally, Dr. Vigen stated that Mr. Murphy had done well in the penitentiary system and was

actually a better person because of the system.  R.R. Vol. 48: 167.

On cross-examination by the State, Dr. Vigen testified that Murphy knows right from

wrong, is not mentally incompetent, and is not insane.  R.R. Vol. 48: 175.  The State questioned

Dr. Vigen on whether or not he believed Mr. Rivas' version of what happened at Oshman's,

whether he thought Murphy anticipated the type of violence that could happen, and whether he

thought the escapees had set up an ambush around Officer Hawkins.  R.R. Vol. 48: 175-183.  Dr.

Vigen testified that he did believe Rivas to a certain point, that Murphy anticipated and thus had

some worries about what would happen when they robbed 17 people, and that he would not

characterize what happened to Officer Hawkins as an ambush.  R.R. Vol. 48: 175-183.  Dr.

Vigen did acknowledge, based on the rape Mr. Murphy committed in 1984, the escape from

prison, and the events that occurred after, that he participated in high risk behavior and that he

was violent in prison.  R.R. Vol. 48: 188-190.  He also acknowledged that although he characterized Murphy as a follower, Mr. Murphy was not acting as a follower in 1984 when he and his brother Allen broke into a building, Mr. Murphy committed the rape on his own, and Mr. Murphy and Mr. Newbury broke off on their own when the escapees reached Colorado.  R.R. Vol. 48: 200.  Dr. Vigen testified that although he saw remorse from Mr. Murphy, Mr. Murphy seemed to be enjoying himself in Colorado by going to "massage parlors" and Mr. Murphy did not show remorse for the rape he had previously committed.  R.R. Vol. 48: 198-200.  When questioned about his reasoning as to why he thought Murphy should be sent to administrative segregation, Dr. Vigen explained that he would most likely not be violent because of his lack of violent behavior in the prison during his 16 years there and it would be very difficult to escape from that unit. R.R. Vol. 48: 201-202.

After Dr. Vigen testified, the defense rested its case.  R.R. Vol. 49: 16.  The prosecution did not call any witnesses in rebuttal.  *Id.*

## CLAIMS FOR RELIEF[4]

I.    **MR. MURPHY WAS SENTENCED TO DEATH WITHOUT THE NECESSARY FINDING THAT HE EITHER HAD THE PURPOSE TO COMMIT MURDER OR THAT HE WAS RECKLESSLY INDIFFERENT TO HUMAN LIFE WHILE BEING A MAJOR PARTICIPANT IN THE ROBBERY, IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

---

[4] Counsel anticipates filing an amended petition in this case to supplement the claims for relief set out below.  Counsel has contacted the State and requested access to its trial file but was informed that counsel would not be allowed to review the file until sometime in July.  In addition, counsel submitted an Open Records Act request for information in possession of the Texas Department of Criminal Justice's Office of the Inspector General related to its investigation of the escape.  Though the Attorney General ordered the Office of the Inspector General to release a number of documents on December 16, 2009, counsel has yet to receive all of the documents to which counsel is entitled.  Accordingly, though counsel has been diligent about investigating all available claims for relief, that investigation is not yet complete.  Undersigned counsel and counsel for the respondent are in communication regarding the filing of a joint proposed scheduling order, which counsel expects to file in the coming days.

**A. Pursuant to *Enmund v. Florida*, 458 U.S. 782, 797 (1982), and *Tison v. Arizona*, 481 U.S. 137, 158 (1987), In Order to be Death Eligible for a Felony Murder the Defendant Must Either "Kill, Attempt to Kill, or Intend that a Killing Take Place or that Lethal Force Will be Employed" or He Must be a "Major [Participant] in the Felony Committed, Combined with Reckless Indifference to Human Life."**

The Eighth Amendment to the United States Constitution only allows the death penalty when it is a proportionate response to the defendant's personal culpability.  458 U.S. at 801 ("[C]riminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt.").  The death penalty is not available for mere accomplice liability.  In *Enmund*, the defendant was the driver of a car used by two others to commit a robbery.  Enmund drove them to an isolated farmhouse and parked some distance away while they went in to rob the residence.  During the robbery one of the criminals was shot in the shoulder, and both of their victims were shot to death.  Enmund was sentenced to death for his role in the crime.  *Id.* at 784-85.  In upholding Enmund's death sentence, the Florida Supreme Court reasoned that Enmund's degree of participation in the crime, as well as his personal mental state, were irrelevant.  According to the state court, the death sentence could be sustained on the mere basis that Enmund was an accomplice under state law.  The Supreme Court reversed.  The Court held that, where a non-trigger person faces a death sentence, the Constitution requires that a jury consider both the defendant's degree of participation in the crime, as well as his mental state regarding the possibility that loss of life will occur.  *Id.* at 788, 801.

In *Tison*, the two defendants and their brother conspired with their incarcerated father and his cellmate to break him out of prison.  They broke into his jail with several weapons and managed to get the two prisoners out without firing a shot.  While on the run from law

enforcement one of their tires blew out and they needed a spare.  They flagged down a passing

car and planned to steal it, leaving its owners stranded in the desert with their old car.  Before

departing, the Tisons' father and his cellmate killed the car's owners with shotguns provided by

his sons.  The state offered no evidence beyond the circumstances of the crime that either

defendant intended or expected their father to kill.  *Id.* at 139-41.  Again the Supreme Court

reversed and, in so doing, refined *Edmund*'s personal culpability requirement.  The Court held in

*Tison* that the Eighth Amendment permits a death sentence in the case of a non triggerman if the

state establishes and the jury finds that the defendant exhibited "reckless disregard for human life

implicit in knowingly engaging in criminal activities known to carry a grave risk of death."  481

U.S. at 157.

### B. The Jury at Mr. Murphy's Trial Made No Necessary Finding of Either Intent or Major Participation in the Robbery.

Mr. Murphy was found guilty of capital murder on one of four possible theories of

liability.  The jury charge in the guilt-innocence phase read in part:

> (1) If you believe from the evidence beyond a reasonable doubt, that on or about
> December 24,  2000, in Dallas County, Texas, George Rivas, Donald Keith Newbury,
> Michael Anthony Rodriguez, Joseph C. Garcia, Randy Halprin, or Larry Harper,
> hereinafter referred to as 'the others,' or any combination of the others, knowing Aubrey
> Hawkins was a police officer, did intentionally or knowingly cause the death of Aubrey
> Hawkins, an individual and a peace officer, namely a City of Irving police officer, acting
> in the lawful discharge of an official duty, by shooting him with a firearm, a deadly
> weapon, and if you further find from the evidence beyond a reasonable doubt that the
> defendant, Patrick Henry Murphy, Jr., acting as a party, as that term is hereinbefore
> defined, did, with the intent to promote or assist the commission of the offence of murder,
> solicit, encourage, direct, aid, or attempt to aid the others, or any one or combination of
> the others, in intentionally or knowingly causing the death of Aubrey Hawkins, then you
> will find the defendant, Patrick Henry Murphy Jr., guilty of capital murder.
>
> OR
>
> (2) If you believe from the evidence beyond a reasonable doubt, that on or about
> December 24,  2000, in Dallas County, Texas, the defendant, Patrick Henry Murphy Jr.,
> entered into a conspiracy with one or more of the following persons: George Rivas,
> Donald Keith Newbury, Michael Anthony Rodriguez, Joseph C. Garcia, Randy Halprin,
> or Larry Harper, hereinafter referred to as 'the others,' to commit the felony offense of

robbery, and in the attempt to carry out this conspiracy, if any, one or more of the others, knowing Aubrey Hawkins was a police officer, did intentionally or knowingly cause the death of Aubrey Hawkins, an individual and a peace officer, namely a City of Irving police officer, acting in the lawful discharge of an official duty, by shooting him with a firearm, a deadly weapon, and if you further find that intentionally or knowingly causing the death of Aubrey Hawkins was committed in furtherance of the unlawful purpose to commit robbery and should have been anticipated as a result of carrying out the conspiracy to commit robbery, whether or not the defendant Patrick Henry Murphy Jr., had the intent to case the death of Aubrey Hawkins, then you will find the defendant, Patrick Henry Murphy Jr., guilty of capital murder.

OR

(3) If you believe from the evidence beyond a reasonable doubt, that on or about December 24,  2000, in Dallas County, Texas, George Rivas, Donald Keith Newbury, Michael Anthony Rodriguez, Joseph C. Garcia, Randy Halprin, or Larry Harper, hereinafter referred to as 'the others,' or any combination of the others did intentionally or knowingly cause the death of Aubrey Hawkins, an individual, by shooting him with a firearm, a deadly weapon, while in the course of committing or attempting to commit the offense of robbery or Wesley Farris, and if you further find from the evidence beyond a reasonable doubt that the defendant, Patrick Henry Murphy, Jr., acting as a party, as that term is hereinbefore defined, did, with the intent to promote or assist the commission of the offence of murder, solicit, encourage, direct, aid, or attempt to aid the others, or any one or combination of the others, in intentionally or knowingly causing the death of Aubrey Hawkins in the course of the commission or attempted commission of the offense of robbery or Wesley Farris, then you will find the defendant, Patrick Henry Murphy Jr., guilty of capital murder.

OR

(4) If you believe from the evidence beyond a reasonable doubt, that on or about December 24,  2000, in Dallas County, Texas, the defendant, Patrick Henry Murphy Jr., entered into a conspiracy with one or more of the following persons: George Rivas, Donald Keith Newbury, Michael Anthony Rodriguez, Joseph C. Garcia, Randy Halprin, or Larry Harper, hereinafter referred to as 'the others,' to commit the felony offense of robbery of Wesley Farris, and in the attempt to carry out this conspiracy, if any, one or more of the others did intentionally cause the death of Aubrey Hawkins by shooting him with a firearm, a deadly weapon, and if you further find that intentionally causing the death of Aubrey Hawkins was committed in furtherance of the unlawful purpose to commit the robbery of Wesley Farris, and intentionally causing the death of Aubrey Hawkins was an offense that should have been anticipated as a result of carrying out the conspiracy to commit robbery, whether or not the defendant Patrick Henry Murphy Jr., had the intent to case the death of Aubrey Hawkins, then you will find the defendant, Patrick Henry Murphy Jr., guilty of capital murder.

C.R. Vol. 1: 39-41.[5]

---

[5] Citations to the single volume of the Clerk's Record appear as "C.R. Vol. [number]: [page number]."

However, following this lengthy, disjunctive instruction, the jury simply returned a general verdict finding the defendant guilty of capital murder.  Nowhere did the jury indicate under which theory it convicted him or whether there was a unanimous choice at all.  C.R. Vol. 1: 45.  It is impossible to rule out the possibility that Mr. Murphy's jury found him guilty as a conspirator to a robbery during which a death was foreseeable.

As a matter of Texas law, conspiracy does not require any participation at all in the criminal objective of the conspiracy; it is a crime of agreement.  "(a) A person commits criminal conspiracy if, with intent that a felony be committed: (1) he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and (2) he or one or more of them performs an overt act in pursuance of the agreement."  Tex. Penal Code § 15.02 (2010).  The jury was told that a conspiracy "means an agreement…with intent that a felony be committed," and they were also instructed with a verbatim copy of §7.02(b) of the Texas Penal Code: "If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy."  C.R. Vol. 1: 37.  Nowhere in either the statute or the jury instructions was any one member of the conspiracy required to have any participation at all in the robbery or the death of Aubrey Hawkins.  In other words, to be guilty of capital murder because a foreseeable death occurred during a planned robbery, Mr. Murphy needed only to agree with his co-felons who ultimately carried out the robbery.  *See, e.g.*, *McIntosh v. State*, 52 S.W.3d 196, 199 (Tex. Crim. App. 2001) (A conspiracy conviction only requires some member to have performed an overt act and not any particular defendant.).  In the instant case, the Texas Court of

Criminal Appeals adopted the legal finding that "[t]o prove [Murphy's] guilt as a party conspirator, however, the State only had to demonstrate that [Murphy] should have anticipated Officer Hawkins' death." *Ex Parte Patrick Henry Murphy, Jr.*, No. W01-00328-T, 2009 WL 1900369 (Tex. Crim. App. 2009) (unpublished) (adopting findings from *Ex Parte Patrick Henry Murphy, Jr.*, No. W01-00328-T slip op. at 7 (283d Tex. Dist. April 10, 2009)).  Mr. Murphy's participation was irrelevant to the guilt-innocence verdict.

The jury did not make any finding as to participation in the punishment phase, either. Under the Texas capital sentencing scheme the same jury from the guilt innocence phase is asked to answer special issues.  Mr. Murphy's jury was given three special issues.  In the first they found it was possible that Mr. Murphy would commit violent acts in the future and in the third they declined to find mitigating circumstances that would warrant a sentence of life imprisonment. C.R. Vol. 1: 54, 56.  In special issue two, the jury found that Mr. Murphy "did not actually cause the death of the deceased, Aubrey Hawkins, but intended to kill the deceased or another or anticipated that a human life would be taken."  C.R. Vol. 1: 55.  This finding, like the finding with respect to guilt-innocence, has nothing to do with Mr. Murphy's conduct during the robbery or the murder; the finding addresses nothing more than Mr. Murphy's mental state at the time he agreed to go along with the conspiracy.  To the extent the jury found any mental state, they only necessarily found that Mr. Murphy anticipated that someone might die, not that he had any intent for that to occur.

The Fifth Circuit has identified this exact problem with Texas' capital sentencing scheme in *Gongora v. Quarterman*, 2008 U.S. App. LEXIS 22164 (5th Cir. Oct. 22, 2008).  In *Gongora*, the defendant was convicted of capital murder and sentenced to death in a case where the jury instructions contained theories of direct liability for felony murder and conspiracy liability for a

22

robbery during which a foreseeable death occurred.  2008 U.S. App. LEXIS 22164 at 19-20.

The relevant sections of the jury's instructions were substantially the same as Mr. Murphy's.[6]

The panel concluded that Gongora's case was not akin to other Texas cases where the defendant

was convicted as an accomplice to the murder and thus the jury necessarily found participation in

the underlying felony.  They also accepted as debatable, and possibly correct, Gongora's

argument that the language of Texas' second special issue, the same as Mr. Murphy's, does not

satisfy *Tison*'s recklessness requirement.  *Id.* at 17.  The Fifth Circuit granted a certificate of

appealability on Gongora's *Tison* claim.  Mr. Murphy request that, if this Court is not presently

prepared to grant Mr. Murphy relief on the basis that the *Enmund-Tison* culpability finding was

not made in this case, that this Court delay a decision on his petition until the Fifth Circuit issues

its opinion in *Gongora*, which contains a closely-related if not identical claim.[7]  *Id.* at 22.

> ### C. Pursuant to *Ring v. Arizona*, 536 U.S. 584, 605 (2002), Personal Culpability of a Capital Defendant in a Felony Murder Prosecution Is a Fact "Increasing Punishment Beyond the Maximum Authorized by a Guilty Verdict Standing Alone" and Must Be Found by a Jury.

---

[6] The panel quoted the instructions as follows: "Now, therefore, if you believe from the evidence beyond a reasonable doubt, that the Defendant, Nelson Gongora, . . . did . . . intentionally cause the death of an individual, Delfino Sierra, by shooting Delfino Sierra with a deadly weapon, to-wit: a firearm, and that said Defendant was . . . in the course of committing or attempting to commit the offense of robbery of Delfino Sierra, or if you find and believe from the evidence beyond a reasonable doubt, that the Defendant, Nelson Gongora, entered into a conspiracy with Albert Orosco to commit the felony offense of robbery of Delfino Sierra and that . . . in the attempt to carry out this conspiracy, Albert Orosco did then and there intentionally cause the death of an individual, Delfino Sierra, by shooting Delfino Sierra with a deadly weapon, to-wit: a firearm, and that such offense was a felony committed in furtherance of the unlawful purpose to commit robbery of Delfino Sierra and  was an offense that should have been anticipated by the Defendant as a result of carrying out the conspiracy, then you will find the Defendant guilty of capital murder, though he may have no intent to commit capital murder, as charged in the Indictment."  2008 U.S. App. LEXIS 22164 at 19-20 (ellipses in original).

[7] The Fifth Circuit may also rule in Gongora's case about the applicability of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), to *Tison* challenges on federal habeas review.  2008 U.S. App. LEXIS 22164 at 20 n.4.  Mr. Murphy makes a similar argument in his case, *infra*.

The Supreme Court has clearly established the principle that a criminal defendant is entitled to a jury finding beyond a reasonable doubt of all facts exposing him to his punishment. "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999). Through the Fourteenth Amendment the Supreme Court applied this rule to state crimes in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In *Apprendi*, the defendant was convicted of the second degree felony of possession of a prohibited weapon, but he was then sentenced to a term only available to a first degree offender based on the trial judge's finding that his purpose for possessing the weapon was to intimidate another on the basis the victim's race. *Apprendi*, 530 U.S. at 492. The *Apprendi* Court dismissed New Jersey's argument that the judge's finding was merely a sentence enhancer because Apprendi's sentence was outside the prescribed range for second degree offenses and thus the finding of racial animus was "the functional equivalent of an element of a greater offense." *Id.* at 494 n.19. *Apprendi* holds that the jury must make all necessary findings that authorize the punishment that the defendant ultimately receives. *See Profitt v. Florida*, 428 U.S. 242, 252 (1976) ("It has never [been] suggested that jury sentencing is constitutionally required.").

Two years later, *Ring* applied the principles and the holding of *Apprendi* to the findings that make convicted murderers death eligible under state laws. The *Ring* Court held that "[t]he right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death. We hold that the Sixth Amendment applies to

24

both." 536 U.S. at 609.  In *Ring*, the defendant was convicted of felony murder by a jury, and under the Arizona law at the time a judge was empowered to sentence him to death.  That judge correctly realized that a conviction for felony murder could not lead a death sentence unless Ring was the actual murderer or he met the *Tison* standard.  *Id.* at 594.  After a hearing, he found that Ring was death eligible, his crime contained aggravating circumstances, and Ring lacked sufficient mitigating circumstances so he sentenced him to death.  Under Arizona law at the time, the jury verdict alone was insufficient to impose the death penalty.  While the Supreme Court had found no Sixth Amendment right to jury fact finding in *Walton v. Arizona*, 497 U.S. 639 (1990), the *Ring* court decided that after *Apprendi*, *Walton* was necessarily overruled.  The aggravating factors were "the functional equivalent of an element of a greater offense" and must be submitted to a jury.  536 U.S. at 609.

The same result must obtain in this case.  Under *Enmund* and *Tison*, only certain murders can lead to a sentence of death.  Moreover, there is no reason why the *Enmund* and *Tison* factors should be treated any differently from the aggravating factors that must be found beyond a reasonable doubt by a jury before a death sentence is cognizable.  The law threatens all those who conspire to commit a felony where death is a foreseeable result with time in jail, but it only threatens additional pains – death – to those who intend to kill or those who, recklessly indifferent to human life, participate substantially in carrying out the felony.  *Apprendi* and *Tison* make clear that these additional factors are the facts that make death possible.  As such, they are functionally elements of the offense.  Mr. Murphy is entitled to a jury finding that his conduct

makes him death eligible.  That his jury made no such finding dictates that his death sentence cannot stand.[8]

For the purposes of the Sixth Amendment it does not matter why a fact is necessary to a punishment, only that it is.  *Ring*, 536 U.S. at 610 ("whether the statute calls them elements of the offense, sentencing factors, or Mary Jane") (Scalia, J., concurring).  There never was any jury finding that Mr. Murphy had any participation at all in the robbery.  He cannot legally be sentenced to death until there is.

## II.    MR. MURPHY WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL AT BOTH STAGES OF HIS CAPITAL MURDER TRIAL BY COUNSEL'S FAILURE TO SEEK A CHANGE OF VENUE IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

### A.    The Controlling, Clearly-Established Supreme Court Precedent.

A criminal defendant is deprived of effective assistance of counsel when (1) counsel's performance falls below an objective standard of reasonableness, as judged by prevailing professional norms, and (2) a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Strickland v. Washington*, 466. U.S. 668, 688, 694 (1984).

---

[8] Several years before *Apprendi*, the Supreme Court held that the *Enmund* findings need not be made by a jury because "[i]f a person sentenced to death in fact killed, attempted to kill, or intended to kill, the Eighth Amendment itself is not violated by his or her execution regardless of who makes the determination of the requisite culpability."  *Cabana v. Bullock*, 474 U.S. 376, 386 (1986).  This is technically still true today, but it entirely avoids the Sixth Amendment issue addressed in *Ring*.  In fact, the Sixth Amendment is mentioned only once in *Bullock* for the proposition that the Sixth Amendment does not require jury sentencing, which is still true but not relevant to the instant claim.  *See Bullock*, 474 U.S. at 375.  Nothing in *Bullock* contradicts applying the Sixth Amendment holding of *Ring* to *Tison*.  In fact, *Bullock* is extensively cited by the court's opinion in *Walton* in support of the very propositions overruled by *Ring*.  Unlike *Bullock*, *Ring* addresses the relevant Sixth Amendment issue noting, as in *Apprendi*, that under English law at the time of the Bill of Rights "the jury's role in finding facts that would determine a homicide defendant's eligibility for capital punishment was particularly well established."  536 U.S. at 599 (quoting *Walton*, 499 U.S. at 710-11 (Stevens, J., dissenting)).

The prejudice inquiry "finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution." *Strickland*, 466 U.S. at 694 (citing *United States v. Agurs*, 427 U.S. 97, 104, 112-13 (1976)). Consequently, to prove prejudice, "a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

This test is not outcome determinative. The *Strickland* Court itself expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case. *Strickland*, 466 U.S. at 693-94. Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* Thus, the "reasonable probability" standard—a probability sufficient to undermine confidence in the outcome—is a less onerous burden than even the preponderance of the evidence standard.[9] The Supreme Court reiterated this point in *Williams v. Taylor*, 529 U.S. 362 (2000), expressly noting that a state court's use of a preponderance of the evidence standard rather than the less-onerous reasonable probability standard would result in a decision that was contrary to federal law as determined by that Court. *Id.* at 405-06 ("If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal

---

[9] In *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990), the Fifth Circuit recognized that the prejudice prong imposes "a lower burden of proof than the preponderance standard." *Id.* at 595. Even when "the evidence arguably supports a different result under a preponderance standard," a reviewing court still can be "confident that it meets the 'reasonable probability' standard." *Id.*; s*ee also Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006) (reciting *Strickland* prejudice standard of "reasonable probability" as "somewhat less than a preponderance of the evidence"); *Hodge v. Hurley*, 426 F.3d 368, 376 n.18 (6th Cir. 2005) (*Strickland* standard "is a lesser standard than preponderance of the evidence").

proceeding would have been different, that decision would be 'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a 'reasonable probability that...the result of the proceeding would have been different.'").

**B.   Mr. Murphy's Right to a Fair Trial Was Denied Because Extensive Pretrial Publicity Rendered It Impossible for an Impartial Jury to be Seated in Dallas County.**

**1.  The Pretrial Publicity Surrounding Mr. Murphy's Case Was Extensive and Inflammatory.**

The coverage of Mr. Murphy's case saturated Dallas County.  Innumerable media reports detailed the escape, the subsequent manhunt, the Oshman's robbery and Aubrey Hawkins' shooting, and the legal proceedings following the arrest of Mr. Murphy and his co-defendants. *See, e.g.*, Exhibit 1 (Jennifer Emily, *Manhunt Centers on D-FW*, DALLAS MORNING NEWS, Jan. 2, 2001) (reporting that the search for escapees was focused in the Dallas-Fort Worth area).  The intensity of the media interest is evidenced by the fact that Mr. Murphy and his co-defendants were given the group moniker "the Texas 7" or the "Connally 7"—a dubious distinction reserved for those criminal proceedings, such as those of the "Jena 6", receiving significant media coverage.  *See, e.g.*, Exhibit 2 (Jennifer Emily, *Robbery Investigated for Link to Escapees*, DALLAS MORNING NEWS, Jan. 2, 2001).  Many of these articles were accompanied by large photo spreads of the Texas 7, drawing additional attention to the coverage.  *See, e.g.*, *id.*; Exhibit 3 (Jennifer Emily, *Warrants to Expand Search for Escapees*, DALLAS MORNING NEWS, Jan. 5, 2001).

The near-daily presence of the story in the media was fueled not only by the sensational nature of the underlying crimes, but by their wide-ranging effects on other issues of community

concern, which received their own coverage.  The escape, for instance, led to legislative hearings on prison reform, at which both the victim's widow and his mother testified.  *See, e.g.*, Exhibit 4 (Nancy San Martin, *System Criticized by Family*, DALLAS MORNING NEWS, Feb. 8, 2001).  Reports also focused on the tremendous financial burden that the trials would place on Dallas County.  *See, e.g.*, Exhibit 5 (Tim Wyatt, *Escapees Won't Be Offered Plea Deals*, DALLAS MORNING NEWS, Jan. 30, 2001 (noting that the trials "could last more than a year and cost more than $1 million)); Exhibit 6 (*Grant to Help Dallas County Pay for Escapees' Trials*, DALLAS MORNING NEWS, Feb. 10, 2001 (noting estimates that Dallas County "will spend $1.5 million to $3 million to house and prosecute the defendants")).

This extensive reporting was not merely a dry recitation of the underlying facts, moreover, but frequently contained highly inflammatory and prejudicial information about Mr. Murphy.  Numerous articles appeared in the DALLAS MORNING NEWS detailing Mr. Murphy's prior criminal history and linking the escape to other violent episodes in the Texas prison system. *See, e.g.*, Exhibit 7 (David McLemore, *Search for Prison Escapees Expands*, DALLAS MORNING NEWS, Dec. 15, 2000).  Others contained highly prejudicial information asserting that Mr. Murphy followed a bizarre religious movement called Odinism that involves the worship of "a divine sorcerer and a master of occult terrors", Exhibit 8 (Holly Becka, *2 Escapees Still on Run After 4 Others Arrested*, DALLAS MORNING NEWS, Jan. 23, 2001), and quoting a family member's assertion that he is a "psycho" and has "a short fuse when it came to satisfying his carnal urges."  Exhibit 9 (Steve McGonigle and Brenda Rodriguez, *Families Fearing Worst*, DALLAS MORNING NEWS, Jan. 24, 2001 (also reporting Mr. Murphy's alleged adherence to Odinism)).

Reports that the Texas 7 were linked to other robberies that occurred after the escape contributed to the media frenzy.  *See, e.g.*, Exhibit 1 (Jennifer Emily, *Manhunt Centers on D-FW*, DALLAS MORNING NEWS, Jan. 2, 2001); Exhibit 10 (Jennifer Emily, *Third Robbery May Be Tied to Escapees*, DALLAS MORNING NEWS, Jan. 22, 2001).  Moreover, many reports contained speculation that the escapees would not be captured without a violent standoff resulting in additional deaths.  *See, e.g.*, Exhibit 11 (Holly Becka and Todd Besman, *Escapees May Plan Showdown*, DALLAS MORNING NEWS, Dec. 28, 2000 (reporting that the Texas 7 had stolen "a cache of weapons, ammunition and money" from Oshman's and the prison from which they escaped and that "authorities . . . say they fear the escapees won't be taken without bloodshed")).

Not surprisingly, such reports produced significant fear and anxiety in Dallas County.  An article that appeared in the FORT WORTH STAR-TELEGRAM, for instance, contained interviews with local residents who stated that their fears of the Texas 7 were leading them to change their daily routines.  Exhibit 12 (Jan Jarvis, *Handgun Lessons, Alarm Sales up as Fugitives Remain Free*, FORT WORTH STAR-TELEGRAM, Jan. 6, 2001).[10]  Based on such interviews, the reporter noted that "[o]verall anxiety is heightened" in the area since the Christmas Eve robbery and shooting.  *Id.*  Indeed, a local instructor of a handgun class was "perplexed" when he began to receive "five times the calls he usually receives" about his class until "someone said it's that 'Connally 7,' and that's exactly what it was."  *Id.*

The reporting also focused considerable attention on the plight of the victim's family.  *See, e.g.*, Exhibit 4 (Nancy San Martin, *System Criticized by Family*, DALLAS MORNING NEWS,

---

[10] "Concerned about encountering the fugitives, more people are locking their car doors, turning on their home alarms and looking over their shoulders.  'Some people won't let their wives walk at night,' said Jack Griffith, an Arlington instructor of concealed handgun use.  'And every time they go into an Oshman's or a 7-Eleven they think about it.'"  Exhibit 12 (Jan Jarvis, *Handgun Lessons, Alarm Sales up as Fugitives Remain Free*, FORT WORTH STAR-TELEGRAM, Jan. 6, 2001).

Feb. 8, 2001 (describing Aubrey Hawkins' widow crying in testimony before the Texas legislature: "I live alone now . . . . I live with his clothes in the closet, his car in the garage and his toothbrush still in the same place he left it.")); Exhibit 13 (James Ragland, *Officer's Mom Clings to Memories*, DALLAS MORNING NEWS, Jan. 8, 2001); Exhibit 14 (David Flick, *Lives Forever Torn*, DALLAS MORNING NEWS, Jan. 25, 2001).  A particularly poignant letter to the editor of the DALLAS MORNING NEWS appeared in the paper on January 7, 2001.  Exhibit 15 (Rose Roberts Cannady, *A Very Silent Night*, DALLAS MORNING NEWS, Feb. 10, 2001).  Written by the wife of the Chief of the Irving Police Department, it described the ordeal of notifying the victim's family and friends that he had been killed[11] and the devastation that followed:

> Left in the aftermath of this senseless killing are the shattered dreams of his family.  The presents that sat unopened under the Christmas tree became a constant reminder that Aubrey was not coming home, and that the innocence of a young child's Christmas was forever ruined.

*Id.*  The letter appeared in the DALLAS MORNING NEWS again on February 10, 2001, after receiving the Golden Pen Award from the paper.  *Id.*

New stories similarly devoted attention to the effect that Aubrey Hawkins' death had on the Irving Police Department, and linked the shooting to the dangers faced by all police officers. *See* Exhibit 15 (Rose Roberts Cannady, *A Very Silent Night*, DALLAS MORNING NEWS, Feb. 10, 2001 ("Aubrey's co-workers are also struggling with the pain and frustration at the loss of a fellow officer.  However, the sad and frightening reality of Aubrey's death for police families is that somewhere in America an officer will die every 2 ½ days in the line of duty.  Officer

---

[11] "It's Christmas Eve[,] for God's sake.  How do you tell a wife her husband is not coming home?  How do you tell a 9-year-old son his father is dead?  How do you tell a mother her only child has just died?  Like angels of death, we rolled in the darkness of night from one home to another delivering a message that no one wanted to believe.  Officer Hawkins was a fine young man, an outstanding officer dedicated to his job of protecting the community.  His quick response to the robbery at Oshman's probably saved lives, but cost him his own." Exhibit 15 (Rose Roberts Cannady, *A Very Silent Night*, DALLAS MORNING NEWS, Feb. 10, 2001).

Hawkins' death on Christmas Eve reinforces the fact that policing is a dangerous profession every day of the year.")); Exhibit 16 (Jennifer Emily, *Death of Officers More Personal in Smaller Departments, Many Say*, DALLAS MORNING NEWS, Jan. 5, 2001).

Not surprisingly, the local community responded with an outpouring of sympathy for the bereaved, which received its own coverage. *See, e.g.*, Exhibit 17 (James Ragland, *Behind the Blue, Fear's a Fact of Life*, DALLAS MORNING NEWS, Jan. 10, 2001); Exhibit 18 (Laurie Fox, *Dinner Aids Son of Officer*, DALLAS MORNING NEWS, Feb. 11, 2001 (detailing local events and memorial funds to benefit victim's son and widow)). Perhaps the most telling indication of the local community's fascination with the case and sympathy for the victim is the fact that Aubrey Hawkins' funeral was broadcast live in the Dallas area. Exhibit 11 (Holly Becka and Todd Besman, *Escapees May Plan Showdown*, DALLAS MORNING NEWS, Dec. 28, 2000 (providing information for Aubrey Hawkins' burial and memorial services and noting that "Texas Cable News (cable Channel 38 in Dallas) will broadcast the funeral beginning at 11 a.m.").

The media coverage continued apace through the arrest of Mr. Murphy and his co-defendants. These reports contained extra-judicial admissions of guilt made by co-defendants to the media. For instance, George Rivas gave a telephone interview from the Teller County Jail in Colorado with a local news affiliate (WFAA-TV, Channel 8), in which he admitted to shooting Officer Hawkins and asserted that "he thinks he deserves a death sentence and . . . hopes his execution will bring some solace to the slain officer's family." Exhibit 19 (Selwyn Crawford, *Rivas Changes Story, Admits Escapees Had Help*, DALLAS MORNING NEWS, Jan. 28, 2001). Other reports included admissions made by Michael Rodriguez, *see* Exhibit 20 (Todd Bensman and Tim Wyatt, *Rivas Returned to Dallas for Trial*, DALLAS MORNING NEWS, Feb. 2, 2001), and

by Larry Harper, *see* Exhibit 21 (Jennifer Emily and Todd Bensman, *Escape Saga on its Way to Dallas*, DALLAS MORNING NEWS, Jan. 26, 2001).

Indeed, written findings issued by the trial court in co-defendant George Rivas' case on February 2, 2001, document the extent of the media coverage through the early stages of the case:

> There has been extensive media coverage of this case throughout the initial investigation, arrest, and grand jury proceedings.  There is no indication that delaying the trial of this case would lessen the amount of pretrial publicity in this case, and the Court so finds.

> There has been extensive news coverage of inculpatory statements allegedly made the defendant in this case which may or may not be admissible in the trial of this case.

> There has been extensive news coverage concerning the events surrounding the commission of this offense and possible extraneous offenses occurring both before and after the time of the offense alleged in this case.

> There has been extensive news coverage concerning statements made to the press relating to the number and type [of] firearms seized, the type of firearms involved in the offense, and who may or may not have fired shots during the offense with which the defendant is charged.

> Statements have been made to, and reported by, the press regarding what punishment the defendant feels he deserves.

Exhibit 22 (Court's Findings Regarding Publicity, Feb. 2, 2001, at 1).[12]

This extensive—and prejudicial—reporting regarding Mr. Murphy's co-defendants only intensified as their trials were held and each was convicted and sentenced to death.  *See, e.g.*, Exhibit 23 (Holly Becka, *Witnesses Recount Inmates' Attack*, DALLAS MORNING NEWS, Aug. 15, 2001 (providing detailed summary of testimony at Rivas' trial and including photograph of exhibit showing the multiple gunshot wounds Aubrey Hawkins suffered)); Exhibit 24 (Holly Becka and Jennifer Emily, *Rivas Sentenced to Die*, DALLAS MORNING NEWS, Aug. 30, 2001

---

[12] Though the order was issued initially in the case of Texas 7 member George Rivas, the court subsequently made clear that her findings and order restricting publicity applied to all of the Texas 7 cases, including Mr. Murphy's.  R.R. Vol. 3: 6.

(reporting jury's conviction and sentence; the reaction of the victim's family upon hearing the news, including extensive quotations; and the prosecutors' pleas that Mr. Rivas be sentenced to death "to show Andrew Hawkins that '12 good people brought his father's killer to justice.'")); Exhibit 25 (Holly Becka, *Newbury Faces Life or Death*, DALLAS MORNING NEWS, Jan. 19, 2002 (including Mr. Newbury's confession and noting that the jury took only 35 minutes to convict Newbury)); Exhibit 26 (Terri Langford, *Second Escapee Gets Death*, DALLAS MORNING NEWS, Jan. 29, 2002 (quoting the victim impact statements made by Aubrey Hawkins' widow and mother and noting that jurors took approximately an hour to sentence Mr. Newbury to death); Exhibit 27 (Holly Becka, *Rodriguez Sentenced to Death for Slaying*, DALLAS MORNING NEWS, May 10, 2002 (quoting emotional victim impact statements));[13] Exhibit 28 (Holly Becka, *Escapee Sentenced to Die for Slaying*, DALLAS MORNING NEWS, Feb. 14, 2003 (same)); Exhibit 29 (Robert Tharp, *Fifth to Die in Officer's Slaying*, DALLAS MORNING NEWS, June 13, 2003 (same)).

### 2. In Light of This Extensive Pretrial Publicity, Mr. Murphy's Right to Be Tried by an Impartial Jury Could Not Possibly Have Been Vindicated.

The right to a jury trial guarantees a criminal defendant a fair trial by a panel of impartial, indifferent jurors, and the failure to accord an accused a fair hearing violates even the minimum standards of due process. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (citing *In re Oliver*, 333 U.S. 257 (1948); *Tumey v. Ohio*, 273 U.S. 510 (1927)). A juror's verdict must be based upon the evidence developed at the trial, regardless of the heinousness of the crime charged, the apparent guilt of the offender, or the station in life which he occupies. *Id*.

---

[13] The fact that many of these headlines reference Mr. Murphy's co-defendants by name is further evidence of the pervasiveness of the coverage: the paper's editors were clearly confident that readers were familiar with the case and the names of the defendants.

Due process and the right to a fair trial are denied to the accused whenever prejudice or passion is allowed to undermine the impartial administration of justice.  *See Chambers v. Florida*, 309 U.S. 227, 236-37 (1940); *see also Moore v. Dempsey*, 261 U.S. 86 (1923) (mob dominated atmosphere is a denial of due process); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (extensive inflammatory publicity denied due process and a fair trial).  One of the primary procedural safeguards against the influence of "prejudice, passion, [and] excitement" is the change of venue.  *See Irvin*, 366 U.S. at 721.  Under certain circumstances only a change of venue is sufficient to ensure the kind of fair trial mandated by the Sixth and Fourteenth Amendments to the United States Constitution.  *See, e.g., Rideau v. Louisiana*, 373 U.S. 723 (1963).[14]

Prejudice may be presumed from the totality of the circumstances.  For example, a defendant can demonstrate that prejudicial, inflammatory publicity about his case so saturated the community from which his jury was drawn as to render it virtually impossible to obtain an impartial jury.  *See, e.g., Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Estes v. Texas*, 381 U.S. 532, 542-43 (1965); *Mayola v. Alabama*, 623 F.2d 992, 996-997 (5th Cir. 1980); *Pamplin v. Mason*, 364 F.2d 1 (5th Cir. 1966).  Proof of such poisonous publicity raises a presumption that the defendant's jury was prejudiced, relieving him of the obligation to establish actual prejudice. *Mayola*, 623 F.2d at 997; *see also Estes*, 381 U.S. at 543-44.

Mr. Murphy's is precisely the type of case in which such prejudice should be presumed. The media coverage in Mr. Murphy's case was relentless, saturating Dallas County for close to three years before Mr. Murphy's trial commended in November of 2003.  Though the escape

---

[14] The Texas Code of Criminal Procedure incorporates these constitutional safeguards by providing a statutory mechanism for parties to seek a change of venue or for a trial court to change a trial's venue *sua sponte*.  TEX. CODE CRIM. PROC. Art. 31.01 – 31.09 (2004).

garnered national attention, there is no question that the coverage reached a level of intensity in Dallas County that was unmatched in other media markets.  As the DALLAS MORNING NEWS reported, the search for Mr. Murphy and his co-defendants was focused in the Dallas-Forth Worth area.  *See* Exhibit 1 (Jennifer Emily, *Manhunt Centers on D-FW*, DALLAS MORNING NEWS, Jan. 2, 2001).  The fact that the victim of the shooting was a police officer from Dallas County further heightened the degree of media attention, as reports focused both on his status as an officer killed in the line of duty and on the outpouring of community sympathy for his family. Finally, Mr. Murphy was the last of the escapees to be tried.  He therefore suffered the unique prejudice of being tried in a county where the details of his co-defendants' trials—including the fact that each of them was convicted and sentenced to death—were splashed across the headlines in the months leading up to his trial.  Given this pervasive and inflammatory pretrial publicity, it was impossible for a fair and impartial jury to be selected in Dallas County.

### C.  Trial Counsel's Failure to Seek a Change of Venue Was Objectively Unreasonable and Prejudiced Mr. Murphy.

Reasonably competent counsel should have sought a change of venue in Mr. Murphy's case.  As noted above, there were judicial findings made in February of 2001 regarding the media frenzy that accompanied the case, of which counsel should have been aware.[15]  Moreover, counsel should have been aware that the trial court was amenable to granting such a motion, as co-defendant Michael Rodriguez's attorneys sought and received a change of venue for his trial.

---

[15] In light of these findings, the court issued an order restricting publicity and made a further finding that "the out-of-court statements relating to the investigation and trial of this cause pose a serious and imminent threat to the defendant's constitutional right to a fair trial, and to the fair administration of justice." Exhibit 30 (Restrictions Regarding Publicity, Feb. 2, 2001, at 1).  As the extensive and inflammatory media coverage that followed makes clear, the court's order restricting publicity—which placed restrictions only on what direct trial participants could disseminate to the media and did not limit media coverage more generally—was insufficient to stem the tide of highly prejudicial publicity.

At the hearing that was held on that motion on January 31, 2002, Mr. Rodrigeuz's attorneys noted that the "Dallas television media have [aired] in excess of 650 stories" and the "Dallas print media has printed more than 45,000 or 50,000 words."  Exhibit 31 (*State v. Rodriguez*, F01-00326-T, R.R. Vol. 5: 6).  They went on to note that "[t]his is far in excess of any other place in the State of Texas," *id.*, and that "the Dallas media has carried and covered this in a uniquely different way because of the fact that the last two trials have been covered daily and have been in Dallas County."  *Id.* at 7.  The court accepted counsel's arguments and granted the motion.  *Id.* at 9.

Mr. Murphy was prejudiced by counsel's failure to seek a change of venue.  Given the court's ruling on Mr. Rodriguez's motion, there is every reason to believe that the court would have granted such a motion.  Indeed, Mr. Murphy's motion would have been supported by even more powerful evidence than was Mr. Rodriguez's, given that Mr. Murphy was the final co-defendant to be tried.  The presumption of prejudice to which Mr. Murphy is entitled on the underlying claim, moreover, satisfies the prejudice finding necessary under *Strickland*.  *See Meeks v. Moore*, 216 F.3d 951, 967-68 (11th Cir. 2000) (noting that a finding of presumed prejudice would satisfy *Strickland*'s mandated, but denying habeas relief based on an insufficient showing of either presumed or actual prejudice).

III.   **MR. MURPHY WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL IN THE SENTENCING PHASE OF HIS CAPITAL MURDER TRIAL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

A.   **The Controlling, Clearly-Established Supreme Court Precedent.**

The introduction to Mr. Murphy's claim that he was denied the effective assistance of counsel due to counsel's failure to seek a change of venue sets out the *Strickland* standard applicable to these claims.  With respect to how a court should analytically conduct the prejudice

37

inquiry in an individual case—particularly in relation to claims of ineffective assistance at the punishment phase—several additional points require mentioning.  First, in making the determination whether counsel's errors resulted in the required prejudice, a court must presume that the jury acted according to law.  *Strickland*, 466 U.S. at 694.  In other words, "[t]he assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."  *Id.* at 695.  Therefore, not only does one presume that the decisionmaker followed the law, the law itself (*i.e.*, "the standards that govern the [sentencing] decision") must be considered when determining whether a probability sufficient to undermine confidence in the outcome exists.

      The prejudice inquiry is therefore case-specific, in that it is an attempt to assess the effect that trial counsel's deficient performance had on the reliability of the outcome of a particular proceeding.  In many death penalty states, sentencing laws require that the sentence in a capital case—life or death—be determined by weighing aggravating factors found to exist by the decisionmaker against mitigating factors found to exist by the decisionmaker.  If the jury determines that the mitigating factors outweigh the aggravating factors, the jury is instructed to return a verdict of life.  If, however, the jury determines that the aggravating factors outweigh the mitigating factors, then the jury is instructed to return a verdict of death.[16]   In these cases, "the question is whether there is a reasonable probability that, absent the errors, the sentencer …

_____

[16] *E.g.,* Cal. Penal Code § 190.3 ("the trier of fact … shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances.  If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole"); Fla. Stat. ch. 921.141 (trier of fact must determine "[w]hether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist"); Md. Code Ann., Criminal Law § 2-303(i)(1) ("If the court or jury finds that one or more of the mitigating circumstances … of this section exists, it shall determine by a preponderance of the evidence whether the aggravating circumstances … of this section outweigh the mitigating circumstances.").

would have concluded that the balance of aggravating and mitigating circumstances did not

warrant death." *Strickland*, 466 U.S. at 695.

A court reviewing a judgment imposing death from Texas, however, would not ask this

precise question, because the sentencing laws that govern Texas capital trials do not require the

decisionmaker to weigh aggravating factors and mitigating factors when deciding what penalty

to assess.  Instead, Texas asks jurors to answer two "special issues."[17]   The special issues are

questions of fact that the jury must answer either "yes" or "no."  Depending upon how these

questions are answered, the trial court sentences the defendant to either life or death.

The first special issue a Texas jury is required to answer is "whether there is a probability

that the defendant would commit criminal acts of violence that would constitute a continuing

threat to society."  Tex. Code Crim. Proc. art. 37.071, § 2(b)(1).  The second special issue a

Texas jury is required to answer in a case such as Mr. Murphy's, where he was convicted as a

party, is whether they find "beyond a reasonable doubt that the defendant did not actually cause

the death of the deceased, but intended to kill the deceased or another or anticipated that a human

life would be taken."  *Id*. at §2(b)(2).  The third special issue Mr. Murphy's jury was instructed

to answer asked:

> Whether, taking into consideration all of the evidence, including the
> circumstances of the offense, the defendant's character and background, and the
> personal moral culpability of the defendant, there is a sufficient mitigating
> circumstance or circumstances to warrant that a sentence of life imprisonment
> without parole rather than a death sentence be imposed.

*Id*. at § 2(e)(1).  If the jury answers the first and second special issue "yes" and the third special

issue "no," the trial court must impose a sentence of death.  For any other combination of

---

[17] In a minority of cases, the sentencing jury must answer three questions.  The third question asks whether the defendant intended or anticipated loss of life.  The jury is given this third special issue only when the jury was charged in the guilt phase under Texas's law of parties. Tex. Code Crim. Proc. art. 37.071 § 2(b)(2).

answers—including the inability of the jury to unanimously agree on an answer for any question—the trial court must assess a sentence of life.  Tex. Code Crim. Proc. art. 37.071, § 2(g).

In making the prejudice determination, a court must consider the totality of the evidence before the jury and then assess the effect the errors might have had on any of the fact findings made by the sentencer.  As the *Strickland* Court observed:

> Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland*, 466 U.S. at 695-96.  Thus, a court reviewing how counsel's errors affected the punishment phase of a Texas capital sentencing proceeding must examine the relevant special issue (*i.e.*, the "factual findings") to determine whether and to what extent it may have been affected in light of the evidence before the jury.[18]

---

[18] The Supreme Court's opinion in *Williams v. Taylor*, 529 U.S. 362 (2000), is instructive for Texas cases.  In that case, the Court considered whether Williams was prejudiced during the punishment phase of his Virginia capital murder trial by his trial counsel's failure to discover and present relevant mitigating evidence. *Id*. Although not identical, the standards governing the Virginia capital sentencing scheme are similar to Texas's scheme.  At the time of Williams' capital murder trial, Virginia law required the jury's verdict to be in one of the following forms:

For a death sentence:

> We, the jury, on the issue joined, having found the defendant guilty of (here set out statutory language of the offense charged) and that (after consideration of his prior history that there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society) or his conduct in committing the offense is outrageously or wantonly vile, horrible or inhuman in that it involved (torture) (depravity of mind) (aggravated battery to the

The Texas Court of Criminal Appeals affirmed the above analytical framework for reviewing the prejudice prong of an ineffective assistance claim in the punishment phase of a Texas capital trial in *Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006).  There, the Court of Criminal Appeals wrote:

> Second, the applicant must show that counsel's performance prejudiced his defense at trial.  In order to satisfy this prong, an applicant must show there was a reasonable probability that, absent the errors, the jury would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.  Texas' capital sentencing scheme does not involve the direct balancing of aggravating and mitigating circumstances.  It asks the jury to answer a mitigation issue.  We have adapted the Supreme Court's prejudice test to require a showing that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently. "A reasonable probability is a probability sufficient to undermine confidence in the outcome."

---

> victim), and having considered the evidence in mitigation of the offense, unanimously fix his punishment at death.

Va Code § 19.2-264.4.  For a life sentence:

> We, the jury, on the issue joined, having found the defendant guilty of (here set out statutory language of the offense charged) and having considered all of the evidence in aggravation and mitigation of such offense, fix his punishment at imprisonment for life.

*Id.*  Unlike Texas, Virginia jurors were not given specific questions to which they must give yes or no answers. *See id.*  Like Texas, however, Virginia did not require jurors to weigh aggravating factors against mitigating factors in order to make a decision, instead requiring them simply to find one of two aggravating factors and then to consider the mitigating evidence before making a decision. *See id.* Consequently, the Supreme Court was able to conclude that Williams suffered prejudice even while conceding that the undiscovered mitigating evidence "may not have overcome a finding of future dangerousness," because that mitigating evidence "might well have influenced the jury's appraisal of his moral culpability." *Williams*, 529 U.S. at 397-98.  Because Texas is like Virginia in that it does not require the jury to find one set of factors to outweigh another set, this standard is appropriate to review allegations of ineffective assistance of counsel in the punishment phase of Texas capital cases. *See also Wiggins v. Smith*, 539 U.S. 510, 538 (2003) ("available mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of Wiggins' moral culpability" (internal quotations omitted)); *Rompilla v. Beard*, 545 U.S. 374, 393 (2005) ("undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of Rompilla's culpability" (internal quotations and brackets omitted)).

*Id.* at 393-94 (internal citations omitted).  In making the prejudice inquiry, a court "consider[s] the totality of the evidence, 'both that adduced at trial, and the evidence adduced in the habeas proceeding.'"  *Id.* at 398 (citing *Wiggins*, 539 U.S. at 534).  The *Gonzales* Court determined that Gonzales had suffered prejudice from his counsel's failure to locate and present mitigating evidence because the "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of the applicant's moral culpability."  *Gonzales*, 204 S.W.3d at 399 (quoting and citing *Wiggins*, 539 U.S. at 538).

From 2000 to 2005, the U.S. Supreme Court accepted three cases to address effective representation at the sentencing phase of a capital trial:  *Rompilla v. Beard*, 545 U.S. 374 (2005) (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); and *Williams v. Taylor*, 529 U.S. 362 (2000). This trio of decisions addressed death penalty cases tried in the 1980's, and the Court held in each instance that the clearly established law of *Strickland* mandated a finding of ineffective assistance of counsel and thus that AEDPA posed no bar to relief. *Rompilla,* 545 U.S. at 374; *Wiggins*, 539 U.S. at 510; *Williams*, 529 U.S. at 362.

While *Rompilla*, *Wiggins*, and *Williams* are not ground-breaking in the sense that they represent clearly-established law, they provide a detailed set of instructions to lower courts on the proper application of *Strickland* to capital sentencing proceedings.  That the Court deemed such instruction necessary is evident from the fact that it devoted its scarce resources to taking not one but three, relatively speaking, unremarkable capital cases and modeling how to adjudicate claims of ineffective assistance of counsel.  The Court scrupulously enforced the right to effective assistance of counsel in capital sentencing proceedings, even under the deferential scheme of AEDPA.

Just as its decisions in *Tennard v. Dretke*, 542 U.S. 274 (2004); *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007); and *Brewer v. Quarterman*, 550 U.S. 286 (2007), reanimated the rule of *Penry v. Lynaugh*, 492 U.S. 302 (1989), after a decade-and-a-half of lower court precedent had rendered it essentially dead letter, this trio of decisions reflects the Court's strong dissatisfaction with the direction of lower court Sixth Amendment jurisprudence during the sixteen years following *Strickland*.  They likewise overturn a vast body of inconsistent lower court cases that had accumulated during the interim.

In *Williams v. Taylor*, 592 U.S. at 362, the Supreme Court assessed Williams' 1986 capital trial through the prism of clearly established Supreme Court precedent.  When assessing the potential impact of mitigating evidence, the *Williams* Court emphasized that whether the mitigating evidence might have resulted in a different outcome is an entirely separate question from whether it negates future dangerousness or the prosecution's case for death eligibility.  *Id.* at 398.  Specifically, "[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, *even if it does not undermine or rebut the prosecution's death-eligibility case*."[19] *Id.* (emphasis added).  Thus, the Court made it clear that prejudice inures even if the omitted evidence does not rebut the State's case for death eligibility.  The question is not whether there is sufficient evidence to justify a death sentence; rather, it is whether the totality of the mitigating evidence "might well have influenced the jury's appraisal of [the defendant's] moral culpability."  *Id.*; *see, e.g., Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995) (stating that the *Brady* and *Strickland* prejudice test is "not a sufficiency of evidence test").

---

[19] This is particularly true in Texas cases because the jury is asked to assess the defendant's future dangerousness in the first special issue. Tex. Code Crim. Proc. art. 37.071. The jury proceeds to the second special issue only if it unanimously determines that the defendant may pose a future danger. *Id.* The second special issue is an entirely separate and distinct inquiry into the defendant's moral culpability in light of any mitigating evidence. *See id.*

As the Court noted, either Williams' tragic childhood or his borderline mental retardation was sufficient to justify a finding of *Strickland* prejudice, even though the prosecution proved that Williams was very dangerous defendant who had repeatedly committed vicious crimes. *Williams*, 529 U.S. at 398. The Virginia Supreme Court's conclusion to the contrary that Williams had not shown prejudice "was unreasonable in at least two respects." *Id*. at 397.  First, it had mistakenly read *Lockhart v. Fretwell*, 506 U.S. 364 (1993), as having grafted on an additional requirement to *Strickland's* test for prejudice.  *Williams*, 529 U.S. at 397.  Second, "the State Supreme Court's prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Id*. at 397-98; *see also id.* at 416 (O'Connor, J., concurring) (stating that the Virginia Supreme Court's application of Strickland was unreasonable because of the "failure to consider the totality of the omitted mitigation evidence.").

Three years following its decision in *Williams*, the Court revisited the issue of capital defense investigation and representation in *Wiggins v. Smith*, 529 U.S. 510 (2003).  Wiggins was convicted of drowning 77-year-old Florence Lacs in her bathtub and ransacking her apartment. *Id*. at 514.  In preparation for the sentencing proceeding, trial counsel investigated and developed mitigating evidence, including "psychological reports and expert testimony demonstrating Wiggins' limited intellectual capacities and childlike emotional state on the one hand, and the absence of aggressive patterns in his behavior, his capacity for empathy, and his desire to function in the world on the other."  *Id*. at 516.  "At no point did [trial counsel] proffer any evidence of petitioner's life history or family background."  *Id*.

In post-conviction proceedings, Wiggins "challenged the adequacy of his representation at sentencing, arguing that his attorneys had rendered constitutionally defective assistance by failing to investigate and present mitigating evidence of his dysfunctional background." *Id.* Wiggins' trial counsel acknowledged that he did not retain "a forensic social worker to prepare a social history, even though the State made funds available for that purpose." *Id.* at 517.  The Maryland Court of Appeals held that trial counsel made "'a deliberate, tactical decision to concentrate their effort at convincing the jury' that appellant was not directly responsible for the murder." *Id.* at 518 (quoting *Wiggins v. State*, 724 A.2d 1, 15 (Md. 1999)).  Trial counsel "knew of Wiggins' unfortunate childhood" and had "'social service records that recorded incidences of physical and sexual abuse, an alcoholic mother, placements in foster care, and borderline retardation.'" *Wiggins*, 539 U.S. at 518 (quoting *Wiggins*, 724 A.2d at 15).  The Maryland court "acknowledged that this evidence was neither as detailed nor as graphic as the history elaborated in a subsequent report but emphasized that 'counsel did investigate and were aware of appellant's background.'" *Wiggins*, 539 U.S. at 518 (quoting *Wiggins*, 724 A.2d at 16 (deleting emphasis in original)).  Because counsel knew that "at least one uncontested mitigating factor— Wiggins' lack of prior convictions—would be before the jury should their attempt to disprove Wiggins' direct responsibility for the murder fail," the state court concluded that trial counsel "'made a reasoned choice to proceed with what they thought was their best defense.'" *Wiggins*, 539 U.S. at 518 (quoting *Wiggins*, 724 A.2d at 17).

The federal district court granted habeas corpus relief but the Fourth Circuit reversed, holding that counsel "had made a reasonable strategic decision to focus on petitioner's direct responsibility." *Wiggins*, 539 U.S. at 519.  Counsel knew "at least some details of Wiggins' childhood," though the Fourth Circuit "acknowledged that counsel likely knew further

investigation 'would have resulted in more sordid details surfacing.'" *Id*.  Counsel's knowledge was thus sufficient to make an informed strategic decision.  *Id*.

Justice O'Connor, writing for a seven-member majority of the Court, concluded that Wiggins' counsel were ineffective during his 1989 capital trial, because their investigation failed to satisfy *Strickland*'s performance standards, and the Maryland court's conclusion to the contrary was objectively unreasonable. *Id*. at 510.   After identifying the two-part *Strickland* test as controlling, the Court emphasized that "failure to uncover and present voluminous mitigating evidence" could not be excused as trial counsel's tactical decision.  *Id*. at 522.  Rather, this failure indicated trial counsel had failed in their obligation to thoroughly investigate the defendant's history and background.  *Id*.  The Court emphasized counsel's duty to investigate by referring to the ABA Standards for Criminal Justice.  *Id*.

Because Wiggins' complaint was that his counsel failed to conduct a thorough social history investigation, the Court's "principal concern in deciding whether [trial counsel] exercised 'reasonable professional judgmen[t],' [] is not whether counsel should have presented a mitigation case.  Rather, [the Court] focus[ed] on whether the ***investigation*** supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was ***itself reasonable***." *Id*. at 522-23 (quoting *Strickland*, 466 U.S. at 691) (emphasis added and in the original).

The Court then cataloged the investigative efforts of Wiggins' counsel.  Counsel retained a psychologist who evaluated Wiggins and determined that he had a low IQ, "difficulty coping with demanding situations," and features of a personality disorder.  *Wiggins*, 539 U.S. at 523. Counsel had a pre-sentencing report, which included a one-page personal history noting Wiggins' "misery as a youth," his self-reported "disgusting" background, and noting that he had

spent most of his life in foster care. *Id*. Counsel also located and obtained Baltimore's

Department of Social Services records documenting Wiggins' placements in foster care. *Id*.

The Court held that "counsel's decision not to expand their investigation beyond the PSI

and the DSS records fell short of the professional standards that prevailed in Maryland in 1989."

*Id*. More specifically, the Court faulted counsel for obtaining only a rudimentary understanding

of Wiggin's social history from a narrow range of sources before making their allegedly strategic

decision. *Id*. at 524-25. The existence of extensive records regarding Wiggins' extensive, long-

standing physical and sexual abuse indicated that the scope of trial counsel's investigation was

unreasonable. *Id*. Moreover, counsel's actions during trial indicated that they acted deficiently

and were not executing trial strategy. *Id*. at 526. For example, trial counsel referenced Wiggins'

"difficult life" during opening arguments, then failed to present any relevant testimony. *Id*.

The Court concluded that "the 'strategic decision' the state courts and respondents all

invoke to justify counsel's limited pursuit of mitigating evidence resembles more a post hoc

rationalization of counsel's conduct than an accurate description of their deliberations prior to

sentencing." *Id*. at 526-27.[20] Just because trial counsel had *some* information regarding

Wiggins' personal history, it should not be assumed that they were in a position to be able to

---

[20] The Supreme Court's willingness to subject the state court's finding of trial strategy to
careful scrutiny in light of the actual record, and determine that it is more likely a *post hoc*
rationalization of trial counsel's conduct, is consistent with the Supreme Court's admonition that
the AEDPA "deference" does not require judicial abdication:

> Even in the context of federal habeas, deference does not imply abandonment or
> abdication of judicial review. Deference does not by definition preclude relief. A
> federal court can disagree with a state court's credibility determination and, when
> guided by AEDPA, conclude the decision was unreasonable or that the factual
> premise was incorrect by clear and convincing evidence.

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). In *Wiggins*, as in *Miller-El*, the Supreme Court
demonstrated how to apply the AEDPA. A state court finding of trial strategy does not insulate
counsel's performance from federal review. Federal courts must scrutinize the finding in light of
the record as a whole.

make a tactical decision with respect to a mitigation defense. *Id*. at 527. Rather, the issue is whether a reasonable attorney would perform additional investigation, in light of the presently-available evidence. *Id*. Consequently, the state court unreasonably had applied *Strickland* because it was excessively deferential to counsel's invocation of strategy by failing to examine whether they were justified in making such decisions. *Id*. at 527-28. In reaching its holding, the Court evaluated "the totality of the evidence—'both that adduced at trial, *and the evidence adduced in the habeas proceeding*[s].'" *Id*. (quoting *Williams v. Taylor*, 529 U.S. at 397-98) (emphasis added) (internal citation omitted).

Two years later, in *Rompilla v. Beard*, 545 U.S. 374 (2005), the Court held trial counsel must make reasonable attempts to obtain and assess mitigating evidence, even if a defendant and his family have suggested that none is available. *Rompilla*, 545 U.S. at 377.

Ronald Rompilla was sentenced to death for the 1988 murder of James Scanlon. *Id*. at 375. Mr. Scanlon was discovered dead outside of his bar, after he had been stabbed repeatedly and then set on fire. *Id*. One of the three aggravating factors justifying Rompilla's death sentence was that the murder was committed by torture. *Id*. at 378. In finding the evidence sufficient to uphold the jury's finding of a torture-killing, the state court cited to the medical examiner's testimony:

> Dr. Isidore Mihalakis, a forensic pathologist, testified at the sentencing hearing that the victim was alive during the infliction of almost all of the injuries that he received. [] These injuries included abrasions, lacerations, blunt force injuries, a fractured nose, and multiple stab wounds. [] Dr. Mihalakis further testified that the number and location of the various wounds on the victim's body were indicative of injuries that were inflicted with the intent of causing pain.

*Commonwealth v. Rompilla*, 653 A.2d 626, 634 (Pa. 1995) (citations omitted). In addition to torture, the jury also found that the murder was committed in the course of another felony and that Rompilla had a "significant history of felony convictions indicating the use or threat of

violence." *Rompilla*, 534 U.S. at 378.  In support of the latter aggravating factor, the prosecution presented evidence of a burglary and that Rompilla raped a woman at knifepoint.  *Rompilla*, 653 A.2d at 633.  An assistant district attorney read the rape victim's testimony to Rompilla's jury in the sentencing phase of his capital trial.  *Id*.

The defense's punishment phase case consisted of five family members who, for the most part, begged the jury for mercy, saying that they loved Rompilla and thought he was an innocent, good man.  *Rompilla*, 545 U.S. at 378.  Rompilla sought post-conviction relief in state court on the basis that the defense failed to present "significant mitigating evidence about Rompilla's childhood, mental capacity and health, and alcoholism," but the state court deemed sufficient trial counsels' investigation.  *Id*.

The federal district court held that the state court had unreasonably applied *Strickland* and granted habeas corpus relief, due to fairly obvious signs that Rompilla had a troubled childhood, suffered from mental illness and alcoholism.  *Id*. at 379.  Moreover, defense counsel had unjustifiably relied on Rompilla's own description of his personal history when determining whether to conduct a mitigation investigation.  *Id*.  A divided panel of the Third Circuit reversed. *Id*.  The panel acknowledged that trial counsel failed to discover mitigating evidence located in Rompilla's school, medical, police, and prison records, but it held that—based on the information they had—trial counsel were justified in failing to look.  *Id*.  Thus, unlike the case in *Wiggins*, where counsel ignored obvious leads, Rompilla's counsel did enough to reasonably conclude that further investigation would be a waste of limited resources.  *See id*.  Nonetheless, the Court found trial counsel's investigation deficient because they failed to examine the public files on Rompilla's prior conviction that they knew would be used to support the prosecution's case for a death sentence.  *Id*. at 383.  The Court held that reasonably diligent counsel must

obtain all available evidence related to the prosecution's case in aggravation. *Id.* at 385-86. In

so holding, the Court again relied on the ABA Guidelines for the standard of care, and

emphatically rejected the state court's conclusion that trial counsel were excused from looking at

the case files based on their other efforts to seek mitigation. *Id.* at 397, 389.

With respect to *Strickland*'s prejudice inquiry, the Court indicated that if trial counsel had

inspected the files on Rompilla's prior conviction, they would have discovered "a range of leads

that no other source had opened up." *Id.* at 390. Additionally, the information would have

dislodged the incomplete and/or inaccurate information provided by Rompilla and his family. *Id.*

at 391-92.

Proper application of these principles to a Texas capital case is demonstrated by the Fifth

Circuit's decision in *Walbey v. Quarterman*, 309 Fed.Appx. 795 (5th Cir. 2009), *available at*

2008 WL 5972180 (5th Cir. 2008) (unpublished). Gaylon Walbey was sentenced to death in

1994 for breaking into Marionette Beyah's home and strangling, beating, and stabbing her to

death with an extension cord, fire extinguisher and several different knives. *Walbey v. State*, 926

S.W.2d 307, 308-09 (Tex. Crim. App. 1996). In preparation for the punishment phase of the

case, trial counsel had obtained and reviewed documents relating to Walbey's background.

*Walbey*, 309 Fed.Appx. at 796. Trial counsel also retained and presented the testimony of two

psychologists during sentencing. *Id.* Counsel, however, did not begin his sentencing

investigation or retain his primary expert until a week before trial, and did not thoroughly review

the documents he had obtained. *Id.* at 796, 801.

At sentencing, Walbey's trial counsel presented some evidence of Walbey's troubled,

abuse-filled childhood and expert testimony that Walbey would not be a future danger to society.

*Id.* at 795. However, following Walbey's conviction and death sentence, his post-conviction

counsel discovered a plethora of additional mitigating evidence that "describe[d] a nightmarish

hell of cruelty and neglect." *Id*. at 797. The Fifth Circuit first held that there was "little room for

debate" that trial counsel's mitigation investigation was deficient, calling it "severely limited."

*Id*. at 800. In light of the "case law that firmly establishes a duty to investigate the background

and character of a capital defendant, along with his family and social circumstances and mental

health history," the *Walbey* Court faulted trial counsel because he did not (1) interview Walbey's

mother or people who worked with him as a youth, (2) hire a mitigation expert, (3) reach an

independent conclusion about the viability of a mitigation defense, instead delegating that task to

an expert, which expert understood his role as limited to assessing only future dangerousness and

spent two hours preparing the case, *or* (4) investigate the history of Walbey's relationship with

the victim. *Id*. at 800-01. Despite counsel's investigation into and presentation of Walbey's

maternal grandmother, two former foster parents, and two psychological experts, "[t]here was

essentially no effective investigation of the mitigation issue." *Id*. at 801. Moreover,

> [g]iven the Texas law establishing that the facts of Walbey's crime are themselves
> legally sufficient to support a finding of future dangerousness, the virtually
> impossible battle that Ezell faced on future dangerousness makes all the more
> unreasonable Ezell's failure to investigate a mitigation defense thoroughly. …
> Neither can there be any contention that the facts of Walbey's childhood were
> hidden or difficult to find; in fact, many were contained in a box delivered to
> Ezell by the district attorney that Ezell elected only to skim. Ezell's mere
> possession of 'some information with respect to petitioner's background ... [did
> not put him] in a position to make a tactical choice not to present a mitigation
> defense.'

*Id*. (quoting *Wiggins*, 539 U.S. at 527). The Court further held that the Texas Court of Criminal

Appeals' conclusion that counsel did not perform deficiently was an objectively unreasonable

application of *Williams*. *Walbey*, 309 Fed.Appx. at 801.

The district court had held that there was no prejudice due to trial counsel's deficient

performance, because Walbey's trial counsel had "outlined the same mitigating factors for the

jury as Walbey now contends should have been presented." *Id*. at 802. Despite counsel's presentation of a substantial part of Walbey's abusive and neglectful childhood, however, the Fifth Circuit disagreed. *Id*. The *Walbey* court again relied on *Williams*, characterizing the decision as "stand[ing] for the proposition that counsel can be prejudicially ineffective even if some of the available mitigation evidence is presented and even if there is psychiatric testimony." *Id*. at 801.

> The fact that the presentation of some mitigation evidence does not necessarily defeat a prejudice showing is also clear from the test that *Williams* establishes. There, the Court held that it is an unreasonable application of Supreme Court precedents for a state court not to 'evaluate the totality of the available mitigation evidence-both that adduced at trial, and the evidence adduced in the habeas proceeding.' This standard clearly contemplates that even when *some* mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete.

*Id*. (emphasis in original).

Finally, the *Walbey* court rebuffed two additional arguments made by Texas in support of the district court's determination that Walbey was not prejudiced. First, it rejected "the State's stereotypical fall-back argument" that the heinous and egregious nature of the crime itself would have ensured assessment of the death penalty even absent the deficiency. *Id*. at 804 (quoting *Gardner v. Johnson*, 247 F.3d 551, 563 (5th Cir. 2001)). That argument "eviscerat[es] the Supreme Court-approved Texas 'special issues' scheme" and "would be to return to the days of inflicting capital punishment based on emotion and revenge, supplanting altogether the questions of deliberateness and future dangerousness which make the Texas scheme constitutional."[21]

*Walbey*, 309 Fed.Appx. at 804. Moreover, it stated:

---

[21] Additionally, jurors are allowed to take into consideration the facts of the crime under the theory that the evidence is relevant to the future dangerousness special issue. *Muniz v. State*, 573 S.W.2d 792, 795 (Tex. Crim. App. 1978). However, the future dangerousness special issue and mitigation special issue are ***entirely distinct*** questions. Tex. Code Crim. Proc. art. 37.071.

> Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief ... would virtually never be available, so testing for it would amount to a hollow judicial act.

*Id*.  Second, the *Walbey* court noted that Texas's argument that prejudice could not be shown because the mitigating evidence contained both helpful and aggravating was foreclosed by *Williams*.  *Id*. at 806.  Ultimately, the mitigating evidence Walbey's trial counsel's deficient investigation failed to discover was "sufficient to create a reasonable probability that one juror would have voted for life in prison rather than death," and "[i]t was unreasonable under *Williams* for the TCCA to conclude otherwise."  *Id*.

To the extent that previous lower court decisions failed to derive the above principles from *Williams*, *Wiggins*, and *Rompilla*, they are no longer valid precedent.  Federal courts adjudicating claims of ineffective sentencing-phase defense in capital cases should be wary of relying on decisions made without the benefit of the Supreme Court's guidance in *Williams*, *Wiggins*, and *Rompilla*.

**B.      Trial Counsel Rendered Deficient Performance by Eliciting Highly Damaging Testimony from its Own Witness about Mr. Murphy's Future Dangerousness.**

S.O. Woods, the defense's prison expert, testified that Mr. Murphy was a danger to society and a "very dangerous inmate."  R.R. Vol. 47: 171, 173.  Mr. Woods' testimony was in direct conflict with the trial counsel's theory that Mr. Murphy would not be a future danger, as his past history indicated a pattern of non-violence.  R.R. Vol. 49: 41-42.  In fact, Mr. Woods'

---

Aggravation and mitigation are not weighed by a Texas capital sentencing jury. *See id*. Consequently, the question of aggravation is not a legally relevant consideration to the prejudice component of an ineffective assistance of counsel claim for failing to conduct a reasonable mitigation investigation and present a reasonable mitigation case.

testimony directly helped the State with their closing arguments:  it allowed the State to emphasize that the answer to Special Issue No. 1—whether or not Mr. Murphy would constitute a future danger to society—should be an unequivocal "yes."  R.R. Vol. 49: 64.

Trial counsel is ineffective when its own expert witness provides testimony that is not only in direct conflict to the defense's own theory, but that also bolsters the State's case against the defendant.  *See Combs v. Coyle,* 205 F.3d 287, 288 (6th Cir. 2000).  Furthermore, this testimony indicates a complete failure of the duty to investigate with no possible professional justification.  If trial counsel had adequately questioned S.O. Woods prior to trial, they surely would have learned that his testimony would be in direct conflict to their argument that Mr. Murphy would not constitute a future danger.

Mr. Murphy's defense counsel was ineffective for allowing a defense expert witness to testify in such a manner.  Juries in Texas are instructed that instead of choosing to sentence an individual to life or death, the answers they give to specific special issues will determine the ultimate sentence.  Tex. Code Crim. Proc. art. 37.071. The first special issue they are presented with concerns future dangerousness.  *Id.*  Understandably, jurors' penalty phase discussions most often come down to the issue of the defendant's future dangerousness.  Ursula Bentele & William J. Bowers, *How Jurors Decide on Death: Guilt is Overwhelming; Aggravation Requires Death; and Mitigation is No Excuse*, 66 Brooklyn L. Rev. 1013, 1021, 1029 (2002).  This phenomenon occurs because jurors as a whole are "deeply concerned that such a defendant will cause more harm to someone else unless he's executed.  They would rather have the defendant's blood on their hands than that of another victim."  Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Columbia L. Rev. 1538, 1539 (1998).

54

Additionally, many jurors mistakenly believe that they "*must* return a death sentence if…the defendant himself is especially likely to present a risk of future danger." *Id*. at 1542. Indeed, evidence of future dangerousness has been found to overshadow mitigation evidence and was also found to be second only to the crime itself in the focus of penalty phase deliberations. John H. Blume, *et. al*, *Future Dangerousness in Capital Cases: Always 'At Issue'*, 86 Cornell L. Rev. 397, 404 (2001).

Mr. Murphy was clearly prejudiced by S.O. Woods' testimony—his own trial counsel elicited testimony from their own expert witness that Mr. Murphy was a "very dangerous inmate." Indeed, trial counsel's ineffectiveness bolstered the State's argument that Mr. Murphy would be a future danger and in effect led the jury to answer the first special issue affirmatively.

C.     **Trial Counsel Rendered Deficient Performance by Failing to Conduct a Reasonable Sentencing Investigation.**

1.     **Applicable Law and Prevailing Professional Norms.**

As noted above, in determining whether trial defense counsel were ineffective in failing to adequately investigate and present the available mitigating evidence during sentencing, this Court must apply the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, the defendant first "must show that counsel's representation fell below an objective standard of reasonableness," which must be judged under "prevailing professional norms." *Id*. at 688.  In evaluating a claim that counsel failed to adequately investigate, *Strickland* states that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691.  Second, the defendant must satisfy the prejudice requirement by showing "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

In capital sentencing, the Supreme Court has held that the Eighth and Fourteenth Amendments require that sentencing procedures "focus the jury's attention on the particularized nature of the crime," *Gregg v. Georgia*, 428 U.S. 153, 206 (1976) (plurality opinion), while also allowing "the particularized consideration of relevant aspects of the character and record" of the individual defendant, *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976).  Because "an individualized decision is essential," *Lockett v. Ohio*, 438 U.S. 586, 605 (1978), the Eighth Amendment mandates that the sentencer "not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id*. at 604. Likewise, the sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence," *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982), such as a "troubled youth," i*d*. at 107.[22]

Relevant mitigating evidence is not limited only to evidence that would "relate specifically to petitioner's culpability for the crime he committed."  *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986).  Likewise, there is no requirement that mitigating evidence even have a "nexus" to the offenses or that the defendant make any showing that "the criminal act was attributable" in any way to the mitigating factors.  *Tennard*, 542 U.S. at 286.  Relevant mitigating evidence includes any evidence that would be "mitigating" in the sense that it "might serve 'as a basis for a sentence less than death.'"  *Skipper*, 476 U.S. at 5 (quoting *Lockett*, 438 U.S. at 604).  *See also Lambright v. Schriro*, 490 F.3d 1103, 1115 (9th Cir. 2007) ("If evidence

---

[22] In *Eddings*, the sentencing judge wrongly believed that he was legally prohibited from considering as mitigation that: the defendant was "raised without proper guidance;" his parents were divorced; he lived "without rules or supervision" with a mother who was possibly an alcoholic and a prostitute; when he stayed with his father he was subjected to "excessive physical punishment" and "physical violence;" he was "emotionally disturbed;" "his mental and emotional development" were less than his 16-years-of-age; and he "had a sociopathic or antisocial personality disorder." *Id.* at 107.  The U.S. Supreme Court reversed and remanded the for a new punishment phase trial.  *Id.* at 117.

relating to life circumstances with no causal relationship to the crime were to be eliminated, significant aspects of a defendant's disadvantaged background, emotional and mental problems, and adverse history, as well as his positive character traits, would not be considered, even though some of these factors, both positive and negative, might cause a sentencer to determine that a life sentence, rather than death at the hands of the state, is the appropriate punishment for the particular defendant").

In essence, the fundamental Eighth Amendment premise is that if the sentencer fails to consider "those compassionate or mitigating factors stemming from the diverse frailties of humankind," an unacceptable risk exists that the death penalty will be imposed in spite of factors that warrant a less severe penalty.  *Woodson*, 428 U.S. at 304.  A jury can consider evidence in mitigation, however, only if trial defense counsel vigorously investigates and presents the available evidence.

"Because the scope of mitigation evidence which may be considered by the jury in sentencing is much broader than the range of relevant information which may be considered in determining guilt or innocence, counsel is under a greater obligation to discover and evaluate potential evidence of mitigation."  *United States ex rel. Emerson v. Gramley*, 883 F. Supp. 225, 243 (N.D. Ill. 1995), *aff'd*, 91 F.3d 898 (7th Cir. 1996).  *See also Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 2006) ("The imperative to cast a wide net for all relevant mitigating evidence is heightened at a capital sentencing hearing").  The responsibility of the lawyer is to walk a mile in the shoes of the client, to see who he is, to get to know his family and the people who care about him, and then to present that information to the jury in a way that can be taken into account in deciding whether the client is so beyond redemption that he should be eliminated from the human community.  *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001) (quoting

Stephen B. Bright, *Advocate in Residence: The Death Penalty As the Answer to Crime: Costly,*

*Counterproductive and Corrupting*, 36 Santa Clara L. Rev. 1069, 1085-86 (1996)).

The American Bar Association's (ABA) revised Guidelines for the Appointment and

Performance of Defense Counsel in Death Penalty Cases, published in 2003, articulates

professional norms for capital defense counsel, ensuring that constitutionally relevant evidence

necessary to a reliable individualized assessment of the defendant's moral culpability is

presented to the sentencing jury for consideration.   ABA, *Guidelines for the Appointment and*

*Performance of Defense Counsel in Death Penalty Cases* (rev. ed. 2003), reprinted in 31 Hofstra

L. Rev. 913, 1027 (2003) [hereinafter 2003 ABA Guidelines].  The Supreme Court has

traditionally referred to the ABA's standards for capital defense work as "guides to determining

what [performance] is reasonable."  *Wiggins*, 539 U.S. at 524 (quoting S*trickland*, 466 U.S. at

688).

The ABA Guidelines state that investigation for the penalty phase of a capital trial

"should begin immediately upon counsel's entry into the case."  2003 ABA Guideline 1.1

Commentary; ABA, *Guidelines for the Appointment and Performance of Defense Counsel in*

*Death Penalty Cases*, Guideline 11.4.1A (1989) [hereinafter 1989 ABA Guidelines]; *id*. at

11.8.3A.  The Guidelines also mandated that the penalty phase investigation should be conducted

with the assistance of "trained investigators," *id*. at 8.1 Commentary (quoting Goodpaster,

*Effective Assistance of Counsel in Capital Cases*, 58 N.Y.U. L. Rev. 299, 344-45 (1983)), such

as a "mitigation specialist," 2003 ABA Guideline 4.1.A.1.[23]

---

[23] "The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; . . . and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation."

Regardless of whether counsel retains a mitigation investigator or a specialist to prepare the social history report and present testimony, the "investigation should comprise efforts to discover all reasonably available mitigating evidence . . . ." 1989 Guideline 11.4.1C. "This duty is intensified (as are many duties) by the unique nature of the death penalty." *Id*. at 11.4.1 Commentary.

In fulfilling counsel's duties, the ABA Guidelines specify that counsel should investigate the defendant's full history, including "medical history, (mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays); . . . family and social history (including physical, sexual or emotional abuse)." *Id*. at 11.4.1.D.2. Counsel must also interview "witnesses familiar with aspects of the client's history that might affect the . . . possible mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death." *Id*. at 11.4.1.D.3. Counsel's duty "is not discharged merely by conducting a limited investigation." *Lambright*, 490 F.3d at 1120. Counsel must "seek records, interview family members and friends, and obtain appropriate mental evaluations well in advance of trial." *Poindexter v. Mitchell*, 454 F.3d 564, 579 (6th Cir. 2006).

Moreover, professional norms with respect to mitigation in capital cases are reflected by continuing legal education seminars predating petitioner's trial, and they clearly embodied the constitutionally mandated duties of capital defense counsel described by the Supreme Court, the ABA, and the State Bar of Texas. For example, materials distributed at a February 2001 seminar in Austin, Texas, explain that every capital defense team must include a mitigation specialist:

> In a death case, the ultimate goal is the preservation of the client's life. The entire preparation of the case must be directed to that end. Because of this all-important goal, these cases are, in essence, prepared in reverse order. Regardless of guilt, the attorneys must aim their efforts from the beginning at saving, the client's life.

2003 ABA Guideline 4.1 Commentary.

> For this reason and because the death penalty is, in part, a sociological issue, counsel must include human service professionals on the defense team. The mitigation specialist is the first, and usually most important, expert that should be consulted in every capital case. They should have both sound, clinical skills for interviewing and assessment and a thorough working knowledge of the court system.

Exhibit 32 ("The Team Concept in a Capital Case" at 2).

A mitigation specialist is not a guilt/innocence investigator, ***nor is the role of one synonymous with a mental health expert.***  A mitigation specialist performs critical functions that are distinct from other members of the defense team.  *See id.* at 3-8.  The mitigation specialist's most crucial function is to develop the defendant's social history that will be relied upon by the trial attorneys and mental health experts:

> The largest role of the mitigation specialist is that of a psycho-social investigator. The complete social investigation compiled by the mitigation specialist is the base upon which a successful mitigation is built.
>
> * * * *
>
> The social history helps the attorney understand the client and what happened and aids the attorney in explaining to the court and jury what the client is about and why.  ***The social history also contains invaluable information for other team members, such as the psychologists and psychiatrists.  This material guides the lawyers and mental health experts in determining what to test for and why.***

*Id.* at 4 (emphasis added).

Because the mitigation specialist plays such a critical role in preparing for sentencing, the standard of care requires entrusting the social history investigation only to someone with the appropriate expertise and training:

> The lawyer must also take care in hiring the mitigation specialist. This is not someone who will just go out and talk to people. This should be a professional who is trained in conducting mitigation investigations. This can be a licensed social worker with an MSW or Ph.D. This is an expert. Someone who can testify at trial as to her findings, conclusions and opinions.
>
> * * * *

60

A mitigation specialist should possess an understanding of the psycho-social aspects of human development, human relations skills, and management skills. Try to select a mitigation specialist with a background in any combination of clinical social work, counseling other human service professions coupled with some sort of forensic or criminal justice knowledge.

*Id*. at 2–3.

### 2. Trial Counsel's Failure to Retain a Mitigation Specialist in a Timely Manner and to Ensure that a Competent Mitigation Investigation Was Conducted Fell Below Prevailing Professional Norms.

According to the ABA Guidelines, the role of a mitigation specialist differs from that of a mental health expert, and it is a serious mistake to confuse the two roles. The reasoning behind this warning is stated in the Guidelines—without a qualified mitigation specialist to conduct a full psychosocial evaluation of the client, counsel cannot effectively determine what, if any, mental health issues to test for or investigate further. It is imperative that counsel choose a mental health expert carefully, based on a specific area of inquiry that she intends to investigate; however, counsel cannot determine this specific area of inquiry without a qualified mitigation specialist.

In this case, a competent mitigation investigation would have determined that Mr. Murphy's life long history of trauma and abuse warranted a full mental health evaluation from an expert who specializes in trauma. However, the defense of Mr. Murphy during the punishment phase of his capital murder trial was hastily thrown together at the eleventh hour. Mr. Murphy's trial counsel was appointed on February 8, 2001. C.R. Vol 1: 4. Despite professional norms that mandate capital defense counsel immediately begin assembling his or her defense team and initiate investigation of the sentencing phase, trial counsel failed to hire a mitigation investigator until September 12, 2003, a full ***thirty-one months*** after their appointment, two weeks after jury voir dire had begun (with half of the jury already seated), eight weeks before trial proceedings

began, and nine weeks before the start of the punishment phase.  C.R. Vol. 1: 386.  Trial counsel

hired mental health experts on August 18, 2003, almost a month *before* hiring a mitigation

investigator and just ten days before jury voir dire began.  C.R. Vol. 1: 389.

No reasonable mitigation investigation could have taken place between the retention of

the mitigation specialist, Dr. Vigen, on September 12, 2003, and the day the sentencing phase of

the case began nine weeks later.  Indeed, Dr. Vigen did not meet with Mr. Murphy for the first

time until October 10, 2003, one short month before trial proceedings began.  Exhibit 33 (Invoice

of Dr. Mark Vigen, 11/21/03).  Dr. Vigen did not meet with Mr. Murphy's father, one of the only

two lay witnesses who provided any sentencing phase testimony at trial, until November 9, 2003.

*Id.*  He did not meet with Linda Goodman, the other lay witness who provided mitigation

evidence, until November 16, 2003, a mere two days before she testified.  *Id.*

One of the difficulties of conducting a mitigation investigation in such a short time span

is the inability of the investigator to establish relationships with; conduct in-depth interviews of;

and—as is almost always necessary—re-interview important life history witnesses who possess

significant but sensitive (and sometimes embarrassing) information.  1989 ABA Guideline

4.1(A)(1) Commentary.  As a result of trial counsel's failure to retain a qualified mitigation

specialist for over two and a half years, no biopsychosocial history was ever created.  As detailed

above, the social history contains invaluable information for the attorneys who, in conjunction

with the mitigation specialist, can craft mitigation themes that tell the client's story to the jury.

A biopsychosocial history is critical to counsel, as it allows for the identification and selection of

appropriate mental health experts who, in turn, use the information provided by the mitigation

investigation to develop an appropriate plan for forensic testing or evaluation.

Trial counsel's delay in retaining a mitigation specialist and mental health expert to assist in the preparation of trial violated their duties to assemble a defense team as soon as possible upon appointment and to immediately begin sentencing phase investigation.  As a result of this delay, no proper investigation into mental health issues (i.e. post-traumatic stress disorder and trauma) was ever conducted, nor were any further mental health professionals, qualified in these areas, hired to consult or testify.

### 3.  Trial Counsel's Failure to Investigate Whether Mr. Murphy Suffers from Post-Traumatic Stress Disorder Was Constitutionally Deficient.

#### a.  DSM-IV Definition of Post-Traumatic Stress Disorder.

The Diagnostic and Statistic Manual of Mental Disorders, 4th Edition, defines post-traumatic stress disorder ("PTSD") with six criteria:

A. The person has been exposed to a traumatic event in which both of the following have been present:

> (1) the person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others
> (2) the person's response involved intense fear, helplessness, or horror.

B. The traumatic event is persistently reexperienced in one (or more) of the following ways:

> (1) recurrent and intrusive distressing recollections of the event, including images, thoughts, or perceptions.
> (2) recurrent distressing dreams of the event.
> (3) acting or feeling as if the traumatic event were recurring (includes a sense of reliving the experience, illusions, hallucinations, and dissociative flashback episodes, including those that occur upon awakening or when intoxicated).
> (4) intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event.
> (5) physiological reactivity on exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event.

C. Persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (not present before the trauma), as indicated by three (or more) of the following:

(1) efforts to avoid thoughts, feelings, or conversations associated with the trauma
(2) efforts to avoid activities, places, or people that arouse recollections of the trauma
(3) inability to recall an important aspect of the trauma
(4) markedly diminished interest or participation in significant activities
(5) feeling of detachment or estrangement from others
(6) restricted range of affect (e.g., unable to have loving feelings)
(7) sense of a foreshortened future (e.g., does not expect to have a career, marriage, children, or a normal life span).

D. Persistent symptoms of increased arousal (not present before the trauma), as indicated by two (or more) of the following:

(1) difficulty falling or staying asleep
(2) irritability or outbursts of anger
(3) difficulty concentrating
(4) hypervigilance
(5) exaggerated startle response.

E. Duration of the disturbance (symptoms in Criteria B, C, and D) is more than one month.

F. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders DSM-IV-TR* 309.89 (4th ed. 2000) (hereinafter DSM-IV).

### b.  Professional Standards with Respect to Investigating Post-Traumatic Stress Disorder Evidence in Capital Sentencing.

Various considerations affect the determination of whether a defendant was prejudiced by the exclusion of certain evidence from trial.  For example, a defendant is prejudiced when trial counsel introduces some of a defendant's social history "in a cursory manner that was not particularly useful or compelling."  *Jones v. Ryan*, 583 F.3d 626, 647 (9th Cir. 2009) (quoting

*Stankewitz v. Woodford*, 365 F.3d 706, 724 (9th Cir. 2004)).  In fact, failure to accurately present the defendant's life history would alone be sufficient to undermine confidence in the sentence, and would lead to the conclusion that the deficiency was "fatal."  *Jones*, 538 F.3d at 647.  If expert witnesses can give "newly definitive and expansive opinions" on a defendant's mental disorder based on the defendant's social history and relevant testing, courts may find the existence of prejudice.  *Id.* at 642.  Prejudice results from the "cumulative impact" of multiple deficiencies.  *Id.* at 647 (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)).

There are no specific factors necessary for a court to find the existence of prejudice.  In particular, it is not necessary for a Mr. Murphy to "demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances."  *Jones*, 583 F.3d 637.  Additionally, there is no requirement that mitigating evidence have some nexus or causal connection to the crime of which the defendant was convicted in order for a jury's failure to consider that evidence to be deemed prejudicial.  *Tennard*, 542 U.S. at 289.  Instead, courts should reweigh the evidence in aggravation against the totality of available mitigating evidence.  *Jones*, 583 F.3d at 637 (citing *Wiggins*, 539 U.S. at 534).

In addition, trial counsel has a responsibility to investigate a client's social history regarding any mental or psychological disorders with which the client may be affected, including post-traumatic stress disorder (PTSD).  Specifically, ABA Guidelines specify that trial counsel should investigate a defendant's medical history, including mental and physical illness or injury.  1989 ABA Guideline 11.4.1.D.2; *id.* at 11.7(F). [24]

---

[24]   In *Easley v. Dretke*, 122 Fed. Appx. 124 (5th Cir. 2005), the Fifth Circuit held that trial counsel's failure to hire an expert, discover, and present evidence of a defendant's PTSD did not amount to deficient performance, when counsel had examined the defendant's history and but

There can be no justification for not having included this evidence as part of Mr. Murphy's defense.  To be sure, the Fifth Circuit has held that failure to put on mitigating evidence at the punishment phase of a capital murder trial is not *per se* ineffective assistance, but it is justifiable if and only if such an omission is based on *well-informed* and strategic decisions. *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997).  Further, the failure to present such potentially mitigating evidence is strategic only if the evidence is "double-edged in nature." *Id.* Thus, counsel's decision to leave out mitigating evidence is only reasonable if trial counsel has reason to believe that pursuing certain investigations would be "fruitless or even harmful" to the defendant's case. *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992) (quoting *Strickland*, 466 U.S. at 691).[25]

---

had absolutely no reason to suspect the existence of PTSD. *Id.* at 128.  However, the Fifth Circuit itself clearly distinguishes this instance from cases where counsel is aware of his client's *potential* mental disorder  *Bouchillon*, 907 F.2d at 596-97 (holding that counsel's failure to investigate a possible insanity defense was unjustified because the defendant told him that he had been institutionalized several times and was taking medication for mental problems); *Profitt v. Waldron*, 831 F.2d 1245, 1247-49 (5th Cir. 1987) (holding that counsel's failure to investigate an insanity defense was unreasonable because counsel knew that the defendant had been previously adjudicated insane).  Texas state cases also hold that trial counsel performance must investigate and present mitigating evidence if they are aware that a defendant may have a mental disorder. *Woods v. State*, 59 S.W.3d 833, 837-38 (Tex. App.—Texarkana 2001), *rev'd on other grounds*, 108 S.W.3d 314 (Tex. Crim. App. 2003) (holding that counsel's failure to examine defendant's mental history was unreasonable because he was aware that the defendant had a history of commitment to mental health hospitals and there was evidence that he heard voices and suffered hallucinations); *In re R.D.B.*, 20 S.W.3d 255, 256-57, 261 (Tex. App. —Texarkana 2000) (holding that counsel's failure to utilize a mental health expert was unreasonable because the defendant had a frontal lobe brain injury, was taking medication for it, and a psychiatric evaluation indicated that the injury may have contributed to his behavior).

[25] Trial counsel's decision to exclude certain mental health evidence from the trial is considered to be reasonable, informed and strategic if such evidence would conflict with, and possibly discredit, more significant trial evidence. *Ringo v. Roper*, 472 F.3d 1001, 1007 (9th Cir. 2007).  Additionally, trial counsel's failure to present evidence regarding a defendant's possible PTSD claim is considered to be reasonable if the defendant is not considered to have had a viable PTSD defense in the first place. *Lowery v. Cummings*, 255 Fed. Appx. 409, 417 (11th Cir. 2007).

A lawyer's obligation to conduct a thorough mental health investigation is further heightened in a case like this one, where there are various indicators of potential mental illness. *Jones*, 583 F.3d at 640.  In *Lambright v. Schriro*, 490 F.3d 1103 (9th Cir. 2007), defense counsel failed to conduct a sufficient examination of "classic mitigation evidence," even though he was aware that such evidence potentially existed.  *Id*. at 1108.  Counsel not only failed to request relevant medical/hospital records, but also did not explore defendant's known serious drug problem, traumatic childhood, and apparent signs of PTSD.  *Id*.  Trial counsel spent only five-plus hours preparing for the penalty phase and offered few testifying witnesses.  *Id.*  As such, trial counsel's investigation of potentially mitigating evidence was "utterly deficient".  *Id.* at 1119.  This standard serves as an example from which a counsel's obligation to investigate and present evidence of mental health history may be determined.

### c.  Trial Counsel Rendered Deficient Performance by Failing to Uncover Mitigating Mental Health Evidence.

Because the punishment stage is directly related to the personal culpability of the defendant, the jury must be able to consider and give effect to mitigating evidence relevant to a defendant's character or record or circumstances of the offense.  *Penry*, 492 U.S. at 327-28.  In the case at bar, trial counsel failed to perform the work mandated by prevailing professional norms, as reflected in *Strickland v. Washington*, the ABA Guidelines, and the State Bar of Texas Guidelines.

Even though there were numerous stressors indicating that Mr. Murphy might suffer from PTSD, trial counsel ignored these indicators and failed to pursue a comprehensive mitigation investigation.  Prior to trial, trial counsel failed to conduct a detailed investigation into Mr. Murphy's personal and social history and failed to conduct meaningful interviews of Mr.

Murphy's family and other individuals who possessed critical information regarding potential PTSD stressors.  As a result of these deficiencies, trial counsel failed to obtain a PTSD expert to further examine Mr. Murphy's apparent symptoms of this psychiatric disorder. [26]  This leads to the conclusion that trial counsel's deficiencies were "fatal."  *Jones*, 538 F.3d at 647.

### i.     Dr. Bekh Bradley-Davino's Declaration

Undersigned counsel obtained the assistance of a psychologist, Bekh Bradley-Davino, to conduct a preliminary review of records available to trial counsel to determine whether they should have explored the distinct possibility that Mr. Murphy suffers from PTSD.  Exhibit 34 (Declaration of Bekh Bradley-Davino, Ph.D.).  Dr. Bradley has published extensively regarding PTSD and its link to childhood trauma and abuse.  He reviewed excerpts from Mr. Murphy's sentencing phase trial testimony and notes taken by Dr. Vigen during his interviews with Mr. Murphy and his family in order to assess the relationship between Mr. Murphy's childhood traumas and his mental health.  Based on his review of these documents, Dr. Bradley-Davino has concluded that "from a young age, [Mr. Murphy] displayed behaviors and problems that are often associated with Post Traumatic Stress Disorder (PTSD), trauma, and abuse.  Mr. Murphy's history indicates that an in-person comprehensive psychological assessment taking into account PTSD is warranted."  Exhibit 34 (Declaration of Bekh Bradley-Davino, Ph.D.) at ¶ 1.

PTSD is a "psychiatric diagnosis that is associated with exposure to childhood sexual abuse, childhood physical abuse, and witnessing violence against others."  Exhibit 34 (Declaration of Bekh Bradley-Davino, Ph.D.) at ¶ 11.  Mr. Murphy's childhood was filled with repeated incidences of sexual abuse by his "step father", his step siblings, his mother, his uncle,

---

[26]  Undersigned counsel has filed herewith a motion seeking funding to retain an expert who can conduct an in-person, comprehensive evaluation of Mr. Murphy's claim of PTSD and assess the effect that the trauma and abuse had on his mental health.

and an older male who ran a youth program.  Exhibit 34 (Declaration of Bekh Bradley-Davino,

Ph.D.) at ¶ 4, 5.  He was also physically and emotionally neglected by his mother, who would

leave him for extended periods of time with his relatives so that she could abuse drugs and

alcohol and pursue sexual relationships with various men, one of whom was a convicted child

molester.  *Id.* at ¶ 7.  Dr. Bradley-Davino states that these instances of abuse represent the

"prototypical examples of complex trauma exposure" that often manifest themselves in PTSD

symptoms and in other emotional and behavioral impairments.  *Id.* at ¶ 23.

Trial counsel failed to conduct the necessary investigation into the behavioral and

emotional problems indicating that Mr. Murphy may suffer from PTSD.  As Dr. Bradley-Davino

explains, this impairment would have had far-ranging effects on virtually every aspect of Mr.

Murphy's life:

> The ability to use reason and logical thinking to override emotional responses is
> developed over the course of childhood and adolescence and even into early adulthood.
> Among the capacities often disrupted by exposure to abuse and traumatic and adverse life
> events during childhood and adolescent development is the ability to regulate impulses,
> the ability to effectively learn from experiences and engage in effective and adaptive
> behavior based on this learning, and the ability to regulate emotional reactions and
> responses.  Problems in developing the key capacities are often associated with increased
> risk for development of psychiatric disorders (e.g., substance abuse, PTSD, and
> depression).  Such problems are also associated with increased risk for
> delinquent/criminal behavior in adolescence/adulthood. This type of response to complex
> trauma, which includes problems across multiple behavioral and emotional domains,
> reflects a constellation of symptoms that has a foundation in psychiatric research and
> which are referred to as "Developmental Trauma Disorder", "Disorders of Extreme Stress
> Not Otherwise Specified" and  "Complex PTSD".

*Id.* at ¶ 24.  Had counsel conducted the appropriate mitigation investigation of Mr. Murphy's

clear mental health symptoms, counsel could have presented to the jury a wealth of mitigating

evidence.  This would have included not only the fact of Mr. Murphy's diagnosis, but also the

ways in which Mr. Murphy's symptoms have manifested themselves.  Counsel thus would have

been able to place in proper context the testimony heard by the jury regarding Mr. Murphy's

prior criminal convictions, in particular his prior conviction for a sexual assault; his inability to take advantage of being placed in a stable, loving home at age nine after sustaining years of abuse while living with his neglectful, drug- and alcohol-addicted mother; and the necessarily incomplete testimony of defense mental health expert Dr. Mark Vigen.   Counsel's failure to conduct this necessary mitigation investigation was constitutionally deficient.

> **D.     Trial Counsel Rendered Deficient Performance by Failing to Object to Impermissible Closing Arguments during the Punishment Phase.**
>
> **1. The Government's Punishment Phase Arguments Violated State Law**
>
> **a.  Derogatory References to Mr. Murphy.**

The record is replete with derogatory references to Mr. Murphy made by the prosecutors during their punishment phase summations.   For instance, the prosecutors informed the jury that Mr. Murphy lacks their humanity[27] before going on to call him repeatedly an "evil man."   R.R. Vol. 49: 63, 64.   The government further asserted that "[i]nside him grows a criminal cancer, a malignant, criminal cancer that should be excised and removed from the body that is our society."   R.R. Vol. 49: 67.   Perhaps most egregiously, the government drew a parallel between Mr. Murphy and Satan, telling the jury that just as the defense mental health expert found mitigating factors in Mr. Murphy's background, he "would probably find mitigation in Satan's

---

[27] *See* R.R. Vol. 49: 21 ("He's a violent felon.   He's not like you.   He doesn't possess a conscience."); R.R. Vol. 49: 22 ("He doesn't think like you folks."); R.R. Vol. 49: 31 ("They [apparently referring to Mr. Murphy and George Rivas] think differently.   There's no conscience. They're pathological liars.").   The final quotation lumping Mr. Murphy and Mr. Rivas together is particularly egregious, as the government is essentially asking the jury to determine Mr. Murphy's deathworthiness based, in part, on the character and acts of his co-defendants.   Such a plea violates Mr. Murphy's rights to due process and an individualized sentencing determination under the Eighth Amendment.

childhood or Satan's upbringing.  Why do I say that?  Because that's exactly what he did

yesterday with this very, very evil man."  R.R. Vol. 49: 63.[28]

> ### b. Urging the Jury to Base Its Verdict on Sympathy for the Victim and His Family.

In a similar vein, the government sought to inflame the jury by repeatedly imploring them

to base their verdict on sympathy for the victim and his family.  For instance, the government

implored the jurors to send a message to the victim's family through its verdict[29] and to sentence

Mr. Murphy to death to "insure there's [*sic*] no more widows, to insure there's [*sic*] no more

children that will grow up without a father."  R.R. Vol. 49: 76.[30]  Not content to leave it at that,

the government made a further plea for retribution based on the suffering of the victim's son:

---

[28] These statements resonated with derogatory references made during the government's guilt-innocent phase summations, compounding their effect.  *See* R.R. Vol. 44: 11 (referring to Mr. Murphy as a "villain[ ]"); R.R. Vol. 44: 31 (referring to Mr. Murphy as a member of "dark forces that descended upon that Oschman's"); R.R. Vol. 44: 35 (calling Mr. Murphy a "coward[ ]").

[29] That passage is as follows:

> Now we have reached the punishment phase.  In the guilt-innocence stage we are concerned with the defendant's rights and whether the State is able to prove its case beyond a reasonable doubt.  We have met that burden and now we go to the punishment phase where the scope widens.  Now we're concerned with society's rights and victims' rights.  ***And that's why the twelve of you are so important in the message you will send, the message you will send to the victim, the victim's family, the message that you will send to this particular defendant and others like him.***  That's what's so important about your verdict, because the message should be clear.  In this part of the trial we are concerned about deterrence and stopping this kind of behavior. . . . And the message your verdict will give to others like him in prison like him [*sic*], that if you consider committing crimes such as this and you come to our community, then you, too, will pay the ultimate price.  And that's what is so important about your duty today.

R.R. Vol. 49: 18.

[30] The full argument on that point is as follows:

> At some point in every trial I think a focus has to shift.  What I mean by that is this.  For two weeks we've been involved protecting his rights, making sure he got a fair trial, making sure he got due process, and that's the way it should be.  But at some point in a trial, and I'll submit to you that point is now, the time is here, the focus must shift away

On that day he and his friends took away—they took away a valuable police officer, a man of our community. They took away a man from his wife. They took away a son from a mother and a father. ***And they took away a nine-year-old boy's father. When he was nine, he had a loving father, who tried to provide him a home. But Andrew Hawkins doesn't have a father anymore because of him. As you grow up as a boy, you play baseball, you play football, you can always look on the sidelines to see if your dad is watching. Andrew, he doesn't get that. He won't have the opportunity to talk to his father before he goes out on that first date. He won't have the opportunity to have his father watching him walk across that stage at high school graduation because they took it away from him. And you, as a jury, have to hold him responsible for his actions.***

R.R. Vol. 49: 35.[31]

At no point did trial counsel object to any of these arguments.

### c. These Arguments Were Impermissible Pursuant to State Law.

from the criminal and his crimes to the good people in our community. The focus must shift to us. And we must make the decision, what type of community, what type of society do we want to live in? And we must realize in a very real sense in cases like this, we have a communal right to self-defense. We have the right to come together as a jury, to come together as a community, and say enough is enough, to exercise our right of self-defense against people like Patrick Murphy. ***We have a right to do that, to stop them, to insure there's no more widows, to insure there's no more children that will grow up without a father***. We have a right to do it. And we should do it now. We should stop him now. We should exercise our right of self-defense.

R.R. Vol. 49: 76. This passage is particularly troubling, as it asserts that Mr. Murphy has already been afforded as much process as he is due and is not entitled to the type of searching, individualized determination of punishment mandated by the Eighth Amendment. *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (because "the penalty of death is qualitatively different from a sentence of imprisonment, . . .there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case").

[31] Again, these arguments built on statements made during the guilt-innocence phase summations:

You know, this day back on Christmas Eve, Aubrey Hawkins was on the job. Most fathers of nine-year-old boys were home on Christmas Eve having dinner with their families, perhaps reading a story to their children, putting together a bicycle, some other toys. But Aubrey Hawkins chose to be a police office. And on that day, that evening, he was out alone and he was in the cold and he was in the wet and he was outnumbered and he was ambushed.

R.R. Vol. 44: 39-40.

Under Texas state law, argument is limited to the following four areas: "(1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and, (4) pleas for law enforcement." *Todd v. State*, 598 S.W.2d 286, 296-97 (Tex. Crim. App. 1980). The Fifth Circuit has recognized that "Texas applies the rule that argument be limited to the evidence and reasonable inferences from it as strictly in the punishment phase of trial as in the guilt phase." *Houston v. Estelle*, 569 F.2d 372, 381 n.12 (5th Cir. 1978). The arguments of which Mr. Murphy complains fall into none of these categories and were therefore impermissible.

The Court of Criminal Appeals has repeatedly condemned the practice of making the type of derogatory references that were made about Mr. Murphy. *See, e.g.*, *Ramos v. State*, 991 S.W.2d 430, 437 (Tex. Crim. App. 1999) (prosecutor exceeded permissible scope of argument in describing defendant as "satan personified"); *Shannon v. State*, 942 S.W.2d 591, 597 (Tex. Crim. App. 1996) (prosecutor's reference in closing argument to defendant as a "sociopath" was improper). Indeed, the Texas courts have long held that such impermissible arguments constitute reversible error. *See, e.g.*, *Renn v. State*, 495 S.W.2d 922 (Tex. Crim. App. 1973), *overruled on other grounds*, *Burrell v. State*, 526 S.W.2d 799 (Tex. Crim. App. 1975) (reversing conviction on the sole basis of prosecutor's repeated derogatory references to the defendant, including calling him a "hippy" and a "Communist"); *Duran v. State*, 356 S.W.2d 937, 938 (Tex. Crim. App. 1962) (reversing conviction on the sole basis of references to defendant as a "punk"); *Martinez v. State*, 332 S.W.2d 718, 719 (Tex. Crim. App. 1960) (reversing conviction on the sole basis of prosecutor's references to the defendant as a "thug", "thief", and "vagrant"); *Marx v. State*, 150 S.W. 2d 1014, 1017 (Tex. Crim. App. 1941) (reversing conviction based in part on references to defendant as a "beast"); *McGrew v. State*, 143 S.W. 2d 946, 946-47 (Tex. Crim. App. 1940)

(reversing conviction based in part on references to defendant as a "fiend from hell"); *Jupe v. State*, 217 S.W. 1041, 1042 (Tex. Crim. App. 1920) (reversing conviction on the sole basis of references to defendant as a "cowardly cur").

The Court of Criminal Appeals has likewise disallowed the tactic of imploring the jury to base its verdict on sympathy for the victim's family.  In *Stahl v. State*, the prosecutor told the jury that, with its verdict, it had "an opportunity to tell them that we don't like them causing grief to good people like [the victim's mother].  You have an opportunity to let [the victim's mother] know that her son did not die in vain."  749 S.W.2d 826, 830 (Tex. Crim. App. 1988).  The Court of Criminal Appeals reversed the conviction, finding—among other errors—that the prosecutor's argument was inflammatory and amounted to a call for the jury to abandon objectivity.  *Id.* at 832.  *See also Brandley v. State*, 691 S.W.2d 699, 712-13 (Tex. Crim. App. 1985), *overruled on other grounds*, *Baldwin v. State*, 2009 Tex. App. LEXIS 4270 (June 12, 2009) (finding the prosecutor's statement urging the jurors "to think about the feelings of the father who lost his baby daughter and . . . how you would feel if you lost your children" to be an inappropriate "plea for abandonment of objectivity" but finding that, in light of the record as a whole, reversal was not warranted).[32]

It is apparent from the cases cited that the government's arguments did not constitute a summation of the evidence, reasonable deductions from the evidence, or proper pleas for law enforcement.  Nor is there any portion of the defense summations that could be construed even remotely as inviting the government's comments.

### 2.  Trial Counsel's Failure to Object to These Arguments was Objectively Unreasonable.

---

[32] *See also Woodson*, 428 U.S. at 305.

The ample caselaw cited above leaves no doubt that reasonably competent counsel should have been aware that the arguments made by the government were improper.  Indeed, in the instant case, there is definitive evidence that counsel knew that the arguments made by the government were highly prejudicial and objectionable and that it was the defense strategy to keep such statements out.  Before trial commenced, counsel filed a motion entitled "Defendant's Motion in Limine Name-Calling by Prosecution."  C.R. Vol. 1: 157.  In that motion, counsel requested the judge to instruct the prosecutors "not to engage in any name-calling of the Defendant. . . ."  *Id.*  As the basis for this motion, counsel observed that "attaching derogatory and satirically unflattering labels to the Defendant . . . would be prejudicial and likely . . . create bias against the Defendant before the jury which would prevent him/her from obtaining a fair trial . . . ."  *Id.*

Trial counsel also filed two motions seeking to prevent the jury from being tainted by arguments about the emotional impact of Aubrey Hawkins' death on his family.  In the first, entitled "Motion in Limine with Regard to Matters Concerning the Deceased," counsel moved the court to "instruct the attorneys for the State not to mention, allude to, elicit testimony concerning, or in any way bring to the attention of the jury . . . any of the following matters until such time as a hearing is heard outside the presence of the jury to determine the admissibility of the same[:] . . . The impact or effect that the death of the deceased in this case has had on the family of the deceased . . . ."  C.R. Vol.1: 177.  As grounds for the motion, counsel argued correctly that such arguments are "irrelevant, . . . not material to any fact at issue in this case concerning the guilt or innocence or any of the questions to be answered by the jurors at the punishment phase . . . . [and] prejudicial."  *Id.*  In the second motion, entitled "Motion in Limine Character of Complainant Victim Impact," counsel requested that the court instruct the

government "to refrain from making any direct or indirect reference whatsoever, at trial before

the jury . . . to the emotional impact of the death of the deceased on friends and family."  C.R.

Vol. 1: 226.  Counsel specifically noted that the government's summations should be free of

such references and were emphatic about the prejudicial nature of such arguments: "Any

ordinary objection during the course of trial, even sustained with proper instructions to the jury,

will not remove the harmful effect of this inadmissible evidence, in light of its highly prejudicial

content."  *Id.* at 227, 228.

In light of these motions, the failure to object to any of the government's improper

arguments is nothing less than baffling, particularly because each motion was granted by the trial

judge.  C.R. Vol.1: 157, 177, 229.  Counsel thus failed to follow their motions in limine with a

single objection at trial, despite every indication that the judge would be likely to sustain them

and give corrective instructions.  There is no question that counsel's failure to object to these

arguments was constitutionally deficient.  *See, e.g.*, *Smith v. Black*, 904 F.2d 950, 980 (5th Cir.

1990) ("failure to object properly or to preserve fundamental errors at trial may constitute

ineffective assistance of counsel"); *Burns v. Gammon*, 260 F.3d 892, 896 (8th Cir. 2001) (trial

counsel's failure to object to prosecutor's improper remarks in closing constituted ineffective

assistance of counsel); *Washington v. Hofbauer*, 228 F.3d 689, 709 (6th Cir. 2000) (trial

counsel's failure to object to prosecutor's improper examination and closing arguments

amounted to ineffective assistance of counsel; "One of defense counsel's most important roles is

to ensure that the prosecutor does not transgress the[e] bounds [of proper conduct].").[33]  *See*

*also, e.g., Bates v. Bell*, 402 F.3d 635, 643-44 (6th Cir. 2005) (granting relief to state habeas

---

[33] *See also* 2003 ABA Guideline 10.8 Commentary ("One of the most fundamental duties of an
attorney defending a capital case at trial is the preservation of any and all conceivable errors for
each stage of appellate and post-conviction review.") (internal citations omitted).

petitioner upon finding that the government, among other arguments, improperly compared the defendant to a rabid dog); *Copeland v. Washington*, 232 F.3d 969, 972, 975 (8th Cir. 2000) (affirming grant of state habeas petition on the ground that the prosecutor's arguments, which included references to the impact on the victims' families as well as the defense and prosecuting attorneys' children, were the sort "that would result in 'mob justice' rather than result in reasoned deliberation"); *Duvall v. Reynolds*, 139 F.3d 768 (10th Cir. 1998) (stating that comments urging sympathy for the victim are not to be condoned but finding that, in light of the conduct of the trial as a whole, relief for state habeas petitioner was not warranted); *Martin v. Parker*, 11 F.3d 613 (6th Cir. 1993) (granting habeas petition due to repeated attacks on character of defendant, including comparison to Hitler).

> **E.     Trial Counsel Rendered Deficient Performance by Failing to Object to Impermissible *Voir Dire* Committing Jurors to an Affirmative Answer on the Second Special Issue and by Failing to Challenge Those Jurors for Cause or Exercise a Peremptory Strike.**

### 1.  Legal Standard for Impermissible Commitment Questions.

Texas state law prohibits attorneys from asking questions that "attempt to bind or commit a prospective juror to a verdict based on a hypothetical set of facts."  *Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001) (internal citations omitted).  The inquiry into whether a question posed during *voir dire* is an impermissible commitment question proceeds in two steps. The court must first determine whether the question is, indeed, a commitment question. Commitment questions are defined as "those that commit a prospective juror to resolve, or to

refrain from resolving, an issue a certain way after learning a particular fact." *Id.*[34]  Commitment questions, though often posed to elicit a "yes" or "no" response, may also be "open-ended if the question asks the prospective juror to set the hypothetical parameters for his decision-making." *Id.* at 180 (citing *Allridge v. State*, 850 S.W.2d 471, 480 (Tex. Crim. App. 1991), *cert. denied*, 510 U.S. 831 (1993) (finding the question "What circumstances in your opinion warrant the imposition of the death penalty?" to be an improper attempt to commit jurors to the parameters of their decision-making).  The Court of Criminal Appeals has also noted that commitment questions "may contain words such as 'consider,' 'would,' and 'could.'" *Lydia v. State*, 109 S.W.3d 495, 498 (Tex. Crim. App. 2003) (internal citations omitted).[35]

Once a question has been deemed a commitment question, a determination must be made as to whether the question is improper.  This inquiry turns on whether the question leads to a valid challenge for cause.  *Id.*  First, the court must ask whether any answer to the question would give rise to a valid challenge for cause.  *Id.* at 182.  Second, even if that inquiry is answered in the affirmative, the court must ask whether a question "includes facts *in addition* to those necessary to establish a challenge for cause."  *Id.* at 182 (emphasis in original).  In other words, a proper commitment question "must contain *only* those facts necessary to test whether a prospective juror is challengeable for cause."  *Id.* (emphasis in original).

---

[34] Put another way, "a question is a commitment question if one or more of the possible answers is that the prospective juror would resolve or refrain from resolving an issue in the case on the basis of one or more facts contained in the question."  *Standefer*, 59 S.W.3d at 180.

[35] The Court of Criminal Appeals has further stated that the use of "the word 'consider' often marks a commitment question in which the prospective juror is asked to refrain from resolving an issue after learning a fact that could be used to resolve that issue."  *Standefer*, 59 S.W.3d at 180.  In addition, the court has stated that "[t]he word 'would' instead of 'could' indicates a much stronger level of commitment," though—as noted in the text accompanying this footnote—both words may be used in improper questioning.  *Id.* at n.9.

## 2. The *Voir Dire* Conducted in Mr. Murphy's Case.

During *voir dire*, the government repeatedly—and successfully—sought to commit prospective jurors to an affirmative answer to the second special issue for a defendant in precisely Mr. Murphy's position. As set out in detail below, the government's impermissible *voir dire* consisted of two categories of questions. In the first, the prosecutors questioned jurors using a hypothetical that involved three bank robbers, one of whom served as the lookout and getaway car driver. In many instances, the prosecutors added the detail that the lookout/getaway car driver either knew that his accomplices entered the bank with guns or possessed a gun himself. In the second, the prosecutors asked open-ended questions designed to have the jurors set the hypothetical parameters of their decision-making on the second special issue.

Both categories of questions were posed to seated jurors Christine Stucker, Michael Collins, David Evans, and Nancy Carney. Excerpts from their *voir dire* by the government follow, with particularly troubling portions highlighted. In addition, the excerpts from Michael Collins' and Nancy Carney's *voir dire* include footnotes calling attention to the fact that the government was perfectly capable of gleaning sufficient information to determine a prospective juror's ability to follow the law of parties without asking these impermissible commitment questions. Christine Stucker's *voir dire* follows:

> Q. Okay. Now, when we talk about capital murder, we generally think about the triggerman, obviously, being prosecuted. If I go into a 7-Eleven and rob the clerk, shoot him down, I can be arrested and prosecuted and could receive the death penalty. But all crimes—some crimes can be committed by other persons, groups of persons, and we call that the law of parties. Sometimes we have several individuals that partake in a crime. Some participate more than others, but it may take all of them together to pull the crime off. The same is true of capital murder.
>
> ***An example I give of this is if Mr. Wirskye and I here decide to rob a bank. We get another accomplice to be our driver. He pulls up. We say, keep the car running. We're going in with our guns.***

*We go in with guns. We rob the bank. I start covering the tellers. Mr. Wirskye is loading the money up. I start shooting the teller. Maybe I don't like the way they are looking at me. Maybe Mr. Wirskye here says they are going for an alarm or trying to get out the back. Anyway, I kill one or two or however many. We run outside and we're captured.*

Obviously, I can be arrested and prosecuted and could receive the death penalty because I was the triggerman. The law says if Mr. Wirskye and the others were actively participating in that crime, they could be arrested and prosecuted for capital murder. . . .

We want to ask each juror how you feel about that, the prosecution of someone who is a nontriggerman for the death penalty. Do you agree that the law should allow that or do you disagree with that aspect of it?

A.      I guess it would depend on the facts of the case. But if they actively participated and contributed, I guess I would tend to agree.

Q.      Okay. *What would be important to you? How actively they were involved or what?*

A.      In your example, if the person in the car didn't know that they had guns or something like that, then I would say I would disagree. But the guy that was helping and knew that guns were pointed on people, probably say the death penalty would be okay.

Q.      Okay. You bring up a good point, then. It's the person's actual knowledge of exactly what was going on, how dangerous these other individuals were, that sort of thing?

A.      Yes.

Q.      *A big factor to you would be their knowing whether they possessed weapons?*

A.      Yes.

Q.      *A lot of jurors have told us that. . . .*

R.R. Vol. 11: 117-20. Trial counsel neither challenged Ms. Stucker for cause nor exercised a

peremptory strike against her. R.R. Vol. 11:142.

Michael Collins was asked a similar series of questions:

Q:      . . . . And for people who are nontriggermen or what we call accomplices, sometimes, people that didn't actually cause the death, they take away that option of the death penalty for those people for a lot of reasons, but mainly because they didn't actually cause the death. They are fine with it on the triggerman, but like I said, when it

comes to an accomplice, they may sentence them to life or a whole lot of time in the penitentiary, they just don't think that the death penalty should be an option for those accomplices.  How do you come down on that issue?

A.      I believe the question is option.  It should be an option.  But the decision would have to depend—would have to depend upon the circumstances of that individual's involvement.  If that individual was, in fact, a bystander, had no intention, no involvement, but this associates took it upon themselves to do it, then the death penalty may not be appropriate.

Q.      So you wouldn't necessarily or automatically take the death penalty option off the table for those accomplices?

A.      No.

Q.      You would look at their role in the crime, I guess?

A.      No—yes, I'm sorry.[36]

Q.      Let me give you a hypothetical or scenario and see what you think.  ***Let's say Mr. Shook and I get together and we decide we're going to rob a bank.  We kind of recruit a third friend to be the getaway car driver.  We have one pistol.  The plan is for Mr. Shook to take the gun in, hold up the teller.  I'm going to go in with the bag and collect all the money while he's holding everyone at bay.  And we have our getaway car driver out front.  Never goes in the bank.  He's just sitting there watching for the police, tap the horn or something if the police come.  And that's the agreement.  That's our plan.***

And as we go to do that robbery, for whatever reason Mr. Shook shoots and kills the teller.  Maybe sees him going for a silent alarm or I see him going for a silent alarm and tell him.  But he shoots and kills the teller during the course of the robbery.  He's committed a capital murder, an intentional murder, in the course of the robbery.

Depending on the facts and circumstances, as we've talked about, I could also be found guilty of capital murder for my participation and, depending on the answers to the questions, I could potentially receive the death penalty.

***What do you think about someone in my position, the bag man, somebody like that?***

***A.      You knew about the gun?***

***Q.      Yes.***

***A.      You knew it was loaded?***

---

[36] By this point in the *voir dire*, the government had sufficient information to exercise its challenges for cause.

*Q.      Yes.*

A.      You're in.

*Q.      What do you think about the guy, the getaway car driver, out front?*

A.      Same questions.  If he—if the three of you planned the contingency for violence and premeditation, then I think you all three are equally guilty.

*Q.      Okay.  And that's basically what the law is. . . .*

R.R. Vol. 13: 18-21.  Trial counsel neither challenged Ms. Stucker for cause nor exercised a

peremptory strike against her.  R.R. Vol. 13:39.

The government engaged in the same tactic when questioning David Evans:

Q.      . . . . An example we often give is, let's say Mr. Wirskye and I, and we get another accomplice, we decide we want to rob a bank.  *The plan calls for me to go in with some loaded guns, Mr. Wirskye to have a bag, and the accomplice is going to be our getaway driver.  He's going to drive us there, keep the car running, and warn us if the police are coming and give us a quick getaway.*

We go in and I pull my two guns out.  I threaten everyone.  Mr. Wirskye starts running through the teller's drawers and grabbing the money.  Sometime during the course of that, maybe I don't like the way someone looked at me, maybe Mr. Wirskye says someone is about to go for an alarm, and I shoot them and kill them and we leave.  We're arrested.

Quite obviously, I have committed capital murder and I could be prosecuted for it and I could ultimately receive the death penalty, depending on how the jury felt about the facts.  The law says that since Mr. Wirskye and the getaway driver were actively participating, they, too, could be prosecuted under the capital murder statute and could ultimately, depending on the facts, receive the death penalty.

. . . .

And I want to ask you, Mr. Evans, how do you feel about that, the accomplice or nontriggerman.  Do you think that they should be prosecuted in these situations and ultimately could receive the death penalty, depending on the facts?

A.      I believe they definitely should be prosecuted and I think they, depending on the circumstances, could be eligible for the death penalty.

Q.      Okay.  *What factors come to mind when you think of an accomplice situation that would be important to you in determining those types of things?*

A.      I guess the act itself, whether it was intentional or not, some of the factors that your reviewed, if it was during the course of an armed robbery or a situation that could lead to other people being harmed, should they come upon the scene.

Q.      Okay.  Just the type of situation or how the crime was carried out and the potential harm that could be done to people?

A.      Yes.

Q.      Okay.  *The fact that you brought up kind of mirrored exactly what the law is. . .*

R.R. Vol. 14: 112-14.  Trial counsel neither challenged Ms. Stucker for cause nor exercised a

peremptory strike against her.  R.R. Vol. 14: 150-51.

Nancy Carney was also presented with this hypothetical:

Q.      . . . . Oftentimes crimes are committed by more than one person.  A group or a gang of people oftentimes commit a crime.  In Texas and every other state, they could be held accountable, everyone that participated in the crime.  In a death penalty scenario when we talk about giving that sort of extreme punishment, a lot of people tell us that they would just reserve the death penalty for a person that actually caused the death.  I guess for lack of a better word the triggerman, the person that actually pulled the trigger, actually caused the death.  And they draw that bright line.

And when it came to the person who was the accomplice, I guess, as you probably heard that word, the nontriggerman, the people that helped in the crime but didn't actually cause the death, for those type of people they take the death penalty off the table.  You know, they may convict him and put him in prison for life, give him still a severe punishment, but they just don't think the death penalty is justified in that type of scenario. What do you think about that?

A.      Um, depends on how much planning, I guess, they had in the murder, if they knew that that was the intent of the person was to kill the other people, I think they should probably suffer the same consequences as the person who shot them.

Q.      Okay.  So you wouldn't automatically take the death penalty off the table for an accomplice or a nonshooter, that type deal?

A.      No.[37]

---

[37] This exchange perfectly highlights the sort of permissible questions that the government could have employed to gain all the information they required.  The government explained that

Q.      Okay.  Let me give you a fact scenario and see what you think about that.  Let's say the other prosecutor, Mr. Shook, and I get together with a third friend of ours and, say, we all need money because we have law school student loans, something that sounds like you will be familiar with pretty soon.  So we need some money real bad.

**So we decide to rob a bank.  The plan is Mr. Shook is going to take a gun and go in, hold up the teller.  I'm going to go in unarmed.  I would have my bag to start collecting the money from the tellers.  And our third friend who has the car and drives us up there, waits outside and kind of keeps a lookout for the cops and let us know if any show up.  And that's what we agree to.**

And as we go to do this bank robbery, say for whatever reason, maybe one of the tellers looks at Mr. Shook the wrong way or he thinks they're going for a silent alarm or something like that and call 911, he shoots and kills one of the tellers.  He's committed capital murder, an intentional murder during the course of a robbery.  He could be convicted of capital murder and could face the death penalty, depending on how the jury answers these questions that you read.

**What do you think about me in that scenario, the nontriggerman, or the accomplice, who just went in to collect the money?**

A.      Um, I don't think that you would deserve the death penalty.[38]

Q.      Why do you say that?

A.      Um, because you didn't tell him or you were not planning on killing anyone.

Q.      Okay.  **Is there anything, if you change the facts up a little bit that would make it a clearer case to give me perhaps the death penalty or where you would consider the death penalty in my case?**

---

nontriggermen are eligible for the death penalty and asked the juror whether she would be capable of performing her legal duty of considering that punishment for such a defendant without providing unnecessary and prejudicial facts or asking the juror to set hypothetical parameters for her decision-making.

[38] Ms. Carney's equivocal answer in response to the government's hypothetical does not excuse the questions that follow, which ask her to set the parameters for her decision-making.  Indeed, the question that produced this answer is a prime example of the reason that commitment questions are disallowed.  Ms. Carney had already evinced a willingness to follow the law and consider the permissible range of punishments.  The fact that she would hesitate to render a death sentence in a particular case does not give rise to a challenge for cause.  *See Standefer*, 59 S.W.3d at 183 n.28 ("And while it is true that a juror must be able to consider the full range of punishment for an *offense*, it is *not* true that a juror must be able to consider the full range of punishment for an *offense committed under a certain set of facts . . . .*") (emphasis in original).

A.      Um, maybe if you had a weapon as well, or if y'all had intended before you went in to rob the plan, y'all had intended to kill someone.

Q.      Okay.  We kind of made a plan.

A.      You are going to kill this one.

Q.      Whatever we need to do to get out of here—

A.      Yeah.

Q.      --I guess, that type deal, not leave any witnesses.  *Or if I had a gun, that would make a difference to you?*

A.      Yes.

Q.      *What about the getaway car driver out front?*

A.      Um, I guess the same kind of scenario.  If they had a weapon, if there was a plan to kill people, no matter what it took to get away safely.

Q.      Okay.  *Let me tell you, it sounds like you are fairly close to what the law is.*

R.R. Vol. 14: 161-64.

Following the government's questioning of Ms. Carney on this point, trial counsel objected in a sidebar, which was not recorded.  R.R. Vol. 14: 165.  At the conclusion of the day's *voir dire*, counsel placed the objection made at the bench on the record and announced her intention to submit a written request for a running objection.  R.R. Vol. 14: 210-12.  The trial judge noted that he sustained the objection at the bench, stating, "I agree with you that they are getting too detailed, too specific.  Please object to that and I will shut that down."  R.R. Vol. 14: 212.  Despite the fact that the trial court sustained counsel's objection to the government's questioning, counsel failed to challenge Ms. Carney for cause or to exercise a peremptory strike. *Id.* at 206.

Two days later, prior to beginning the day's *voir dire*, trial counsel asked for a clarification of the court's ruling on the objection to the government's hypothetical.  R.R. Vol.

16: 4.  The trial court indicated that while a fact pattern could be used to explain the law of

parties, it would sustain an objection to any fact pattern that is "too fact oriented to this particular

case."  *Id.* at 5.  The court then advised the parties that—because they had not agreed on a fact

pattern that could be posed to prospective jurors—counsel would be required to object each time

the government posed a hypothetical that counsel found objectionable and the court would then

"rule on each situation individually on your objection."  *Id.* at 6.

Immediately following this discussion, the government began its *voir dire* of prospective

juror J. Robert DeRossett, whom the defense challenged for cause and, after a denial of that

challenge, peremptorily struck.  *Id.* at 60.  When the government began to pose its hypothetical

to Mr. DeRossett, trial counsel objected, and the court instructed Mr. DeRossett to wait outside

while the parties discussed the issue.  *Id.* at 13.  Trial counsel asked that the government be

disallowed from posing hypothetical questions mirroring the facts of the case.  *Id.* at 14.  After

hearing the government's argument that hypothetical questions are not *per se* impermissible, *id.*

at 15, the court asked the government for the hypothetical it intended to pose.  *Id.* at 18.  The

government responded as follows:

> The hypothetical was Mr. Shook and I agree to commit a bank robbery.  He has a gun.  I
> go in as a bag man.  For whatever reason during the course of the robbery Mr. Shook
> shoots and kills the teller, an intentional murder during the course of a robbery.  He
> could, obviously, be found guilty of capital murder and prosecuted for the death penalty.
> And the law says under certain facts and circumstances so could I.
>
> And I would proceed to explain regular law of parties, for lack of a better term, and also
> explain the law of parties conspiracy and ask him if he's one of those people that just
> takes parties conspiracy or regular parties, those type individuals, the death penalty off
> the table for them, using it to explain the law, not committing him to those facts.

*Id.* at 19.  The court overruled the objection.  *Id.*[39]

---

[39] Counsel then lodged an additional objection to the government asking questions inviting the
jurors to set the hypothetical parameters of their decision-making: "[Y]ou said something to the

*Voir dire* resumed six days later.  Counsel informed the court that the defense had filed a written motion requesting a running objection to the government's use of commitment questions. R.R. Vol. 17: 91.[40]  The trial judge stated that he would continue to deny the objection but would grant the request for a running objection.  *Id.*

### 3.  Trial Counsel's Failure to Object to Impermissible *Voir Dire* or to Challenge for Cause or Peremptorily Strike the Jurors Who Committed Themselves Was Objectively Unreasonable.

#### a.  The Government's Commitment Questions Violated State Law.

To answer the first of the two-step *Standefer* test, it must be determined whether the questions posed by the government sought a commitment from the juror.  There can be no doubt that the answer to that question, for both categories of questions identified above, is yes.

The government's hypothetical sought a commitment from the jurors to answer the second special issue affirmatively.  The Court of Criminal Appeals' decision in *Atkins v. State* condemned the practice of asking a detailed hypothetical under the guise of explaining the law to

---

State about asking the juror what kind of case they envisioned for parties.  I would object to that question as well on the same ground."  R.R. Vol. 16: 19.

[40] *See* C.R. Vol. 1: 242.  Counsel also requested permission to refer to "this written objection as Defendant's Voir Dire Objection One in the presence of the Juror, if the state should propound other questions to a juror in the course of this jury selection which Defendant deems violate the afore cited rules of law."  Counsel described the questions to which she objected as follows:

> The State of Texas has used a hypothetical fact situation in which the two prosecutors make a decision to rob a bank.  The hypothetical situation posed to the juror is one in which one prosecutor shoots someone in the course of the robbery and the other prosecutor is the "Non-Triggerman".  Various other details may be added as to whether one knew what the other contemplated, whether one was merely a getaway driver, etc. Defendant objects to setting forth a fact situation which closely parallels the case at bar, Defendant objects to the use of a hypothetical which purports to speak to what the law provides in a certain fact situation, and Defendant objects to the question as a mechanism for eliciting a commitment from a juror.

*Id.*

jurors.  951 S.W.2d 787 (Tex. Crim. App. 1997).  In that case, the prosecutor asked the jury

panel, "If the evidence, in a hypothetical case, showed that a person was arrested and they had a

crack pipe in their pocket, and they had a residue amount in it, and it could be measured, and it

could be seen, is there anyone who could not convict a person based on that—."  *Id.* at 787.  The

court found that this question was not a proper attempt to explain the law regarding possession of

residual amounts of illegal substances and instead "was used seeking to commit the

veniremembers to the specific facts of the case."  *Id.* at 790.  In explaining that this detailed

hypothetical was improper, the court provided an instructive contrast with a permissible

question: "Certainly a residue amount is not as much of an amount as, let's say, a usable quantity.

  But under the eyes of the law—and the legislature has said, it doesn't matter how much cocaine

it is, if it can be seen and it can be measured, that's possession of cocaine; and if it's proven, the

person can be found guilty. Can you follow a law that says a person can be found guilty of

possessing a residue amount?"  *Id.* at 789-90 (emphasis omitted).  As noted in the excerpts

above, the prosecutors in Mr. Murphy's case were perfectly capable of asking precisely this type

of general question to determine whether the jurors were capable of following the law of parties.

    After presenting the jurors with its improper hypothetical, the government went on to ask

the second category of impermissible questions identified above.  These questions sought

specific facts that would lead the jurors to return a verdict of death for a nontriggerman,

repeatedly going so far as to ask point-blank questions about how a defendant knowing that his

accomplices had guns would affect their decision-making.  *See Voir Dire* of Christine Stucker,

R.R. Vol. 11: 120; *Voir Dire* of Michael Collins, R.R. Vol. 13: 20; *Voir Dire* of Nancy Carney,

R.R. Vol. 14: 163.  The Court of Criminal Appeals has been clear that it is "improper to ask an

open-ended question designed so that the venireperson could set the hypothetical parameters of

their decision-making." *Allridge v. State*, 850 S.W.2d 471, 480 (Tex. Crim. App. 1991), *cert.*

*denied*, 510 U.S. 831 (1993).  In *Allridge*, the court held that the question "What circumstances

in your opinion warrant the imposition of the death penalty?" was an improper attempt to

commit a juror to hypothetical parameters.  *Id.*  The questions posed by the government in Mr.

Murphy's case are indistinguishable.

Addressing the second prong of the *Standefer* test, the commitment sought by the

government was improper.  First, the government's hypothetical supplied facts well beyond

those necessary to determine whether the jurors could follow the law of parties**.**  This is evident

both from the excerpts themselves, in which the government—in the *voir dire* of Michael

Collins, R.R. Vol. 13: 18-19, and Nancy Carney, R.R. Vol. 14: 161-62, for instance —

demonstrated its ability to ask proper questions before delving into its hypothetical, as well as

from the discussion of *Atkins* above.  Second, the government's questions were improper

because they sought a commitment on an issue that would not result in a valid challenge for

cause.  As discussed above, the government repeatedly asked the jurors what effect a non-

triggerman's knowledge of guns in the hands of his accomplices would have.  This question is

improper because a juror is not required under the law to give such evidence any particular

weight; thus, no answer would give rise to a valid challenge for cause.  In *Standefer*, the Court of

Criminal Appeals noted that the questions "Could you find someone guilty on the testimony of

one witness?" and "Could you find someone guilty on circumstantial evidence alone?" are both

improper because "[a] party is not entitled to commit a juror on whether he can convict based on

one witness nor is he entitled to commit a juror to a certain disposition if only circumstantial

evidence is presented."  59 S.W.3d at 183 n.28.  Similarly, a question as to "whether a juror

considers a particular type of evidence to be mitigating is not a proper area of inquiry" because

no answer would give rise to a valid challenge for cause.  *Id.* at 181.  Again, the questions in Mr.

Murphy's case are indistinguishable and were improper.[41]

### b.  Trial Counsel's Performance Was Constitutionally Ineffective.

Trial counsel's conduct with respect to this issue was ineffective in two respects.  First,

counsel failed to object at all to the *voir dire* of Christine Stucker, Michael Collins, and David

Evans.  Second, though counsel objected to the questioning of Nancy Carney and lodged a

running objection thereafter, counsel failed to challenge her, Ms. Stucker, Mr. Collins, or Mr.

Evans for cause or to exercise a peremptory strike against them, despite the fact that they had

committed themselves to an affirmative response to the second special issue.

Under the first prong of the *Strickland* test, these deficiencies fell below an objective

standard of reasonableness.  As is evident from counsel's objections during Ms. Carney's

questioning, during the questioning of prospective jurors who followed Ms. Carney, and from the

written motion filed thereafter, counsel was well aware of the clear caselaw from the Court of

Criminal Appeals disallowing precisely the type of hypothetical posed by the government.[42]

Moreover, these objections and the written motion that followed show that attempting to prevent

the jury from exposure to these commitment questions was, in fact, counsel's sound legal

strategy.  Counsel simply failed to implement that strategy, and that failure renders their

performance ineffective.  *See, e.g.*, *Smith v. Black*, 904 F.2d 950, 980 (5th Cir. 1990) ("failure to

object properly or to preserve fundamental errors at trial may constitute ineffective assistance of

---

[41] After asking these improper questions, moreover, the government compounded the problem by assuring jurors that the hypothetical parameters to which they had committed themselves matched "[w]hat a lot of jurors have told us", R.R. Vol. 11: 120, or "mirror[ed] exactly what the law is."  R.R. Vol. 14: 114.

[42] In the written motion filed on this issue, counsel cited to *Lydia v. State*, 109 S.W.3d 495 (Tex. Crim. App. 2003); *Standefer v. State*, 59 S.W.3d 177 (Tex. Crim. App. 2001); the Texas Constitution; and the Sixth and Fourteenth Amendments to the United States Constitution.  C.R. Vol. 1: 242.

counsel"); *Burns v. Gammon*, 260 F.3d 892, 896 (8th Cir. 2001) (trial counsel's failure to object

to prosecutor's improper remarks in closing constituted ineffective assistance of counsel);

*Washington v. Hofbauer*, 228 F.3d 689, 709 (6th Cir. 2000) (trial counsel's failure to object to

prosecutor's improper examination and closing arguments amounted to ineffective assistance of

counsel; "One of defense counsel's most important roles is to ensure that the prosecutor does not

transgress the[e] bounds [of proper conduct]."). [43]

**F.      Mr. Murphy was Prejudiced by Counsel's Deficient Performance at the
        Punishment Phase of His Capital Trial.**

Mr. Murphy was prejudiced by the accumulation of these errors.  Each claim above raises

a deficiency of constitutional dimensions.  And as detailed below, the aggregate effect of these

errors so infected Mr. Murphy's trial as a whole that it was rendered fundamentally unfair.  *See,*

*e.g.*, *United States v. Hall*, 455 F.3d 508, 520-21 (5th Cir. 2006) (noting applicability of

cumulative error doctrine to ineffective assistance of counsel claims but finding that, on the

particular facts of the case, petitioner was not entitled to its application because he had not

demonstrated error); *Miller v. Johnson*, 200 F.3d 274, 286 n.6 (5th Cir. 2000) (same).

Trial counsel unreasonably failed to investigate, discover, present, and explain mitigating

evidence at the punishment phase of Mr. Murphy's capital trial.  Trial counsel failed to conduct a

detailed life-history investigation of Mr. Murphy's background by a qualified mitigator retained

in a timely manner; failed to conduct meaningful interviews of Mr. Murphy's family who

possessed critical information about his troubled childhood; and failed to hire a PTSD expert to

investigate and analyze whether Mr. Murphy suffers from PTSD.

---

[43] *See also* 2003 ABA Guideline 10.8 Commentary ("One of the most fundamental duties of an
attorney defending a capital case at trial is the preservation of any and all conceivable errors for
each stage of appellate and post-conviction review.") (internal citations omitted).

Had trial counsel conducted a reasonable sentencing investigation, counsel would have discovered and presented a wealth of mitigating evidence relevant to Mr. Murphy's background, character, and mental health.  Mr. Murphy suffered from a childhood filled with trauma— exposure to physically and sexually abusive male "father" figures, including a convicted child molesters; being clearly unwanted and uncared for by his mother; and living in a home filled with violence, drugs, and alcohol.  Additionally, a reasonable sentencing investigation would have better informed counsel's selection and use of a mental health expert in presenting his sentencing case to the jury.  A mental health expert who was provided with a thorough and reasonable sentencing investigation would have been able to give expert testimony that would have strengthened the mitigation evidence presented by "focusing the jury on the concrete results of years of abuse on [Mr. Murphy's] psyche."  *Stevens v. McBride*, 489 F3d 883 (7th Cir. 2007).  Specifically, a competent and thorough mitigation investigation would have alerted trial counsel of the pressing need to retain a mental health expert who specialized in and would focus on Mr. Murphy's signs of post-traumatic stress disorder (PTSD).  *See Sears v. Upton,* No. 09-8854, 561 U.S. ___, slip op. at 12 (June 29, 2010) (*per curium*) (the proper prejudice analysis includes "the newly uncovered evidence of…mental and psychological impairments" along with the mitigation evidence presented at trial).

Competent counsel would have presented the following information to the jury.  Mr. Murphy was born on October 3, 1961, to Carol Goodman and Patrick Murphy Sr., while Carol was still in high school.  Exhibit 35 (Affidavit of Patrick Murphy Sr. at ¶ 3); R.R. Vol. 47: 72.  Carol never wanted to be a mother and resented Patrick and her other children for existing.  Exhibit 36 (Affidavit of Linda Goodman at ¶ 4); Exhibit 37 (Affidavit of Allen Ray Skinner at ¶ 6); Exhibit 35 (Affidavit of Patrick Murphy Sr. at ¶ 7).  Carol and Mr. Murphy Sr. divorced

when Mr. Murphy was around eighteen months old.  R.R. Vol. 48: 102.  After the divorce, Carol

would routinely leave Mr. Murphy with his grandmother and Aunt Linda for days or weeks at a

time.  R.R. Vol. 47: 74; Exhibit 36 (Affidavit of Linda Goodman at ¶ 7, 8).

While Mr. Murphy was with his relatives, his grandmother would verbally and physically

abuse him and "taught him how to shoplift from a young age."  Exhibit 35 (Affidavit of Patrick

Murphy Sr. at ¶ 10).   When Carol left Mr. Murphy with his relatives, it fell to Ms. Goodman,

then a child herself, to take care of him.  R.R. Vol. 47: 75; Exhibit 36 (Affidavit of Linda

Goodman at ¶ 10).  Carol would often move in with any man who would let her in order to

escape her child and her family.  Exhibit 36 (Affidavit of Linda Goodman at ¶ 13).  There were

always men in and out of the house.  Exhibit 37 (Affidavit of Allen Ray Skinner at ¶ 5); Exhibit

38 (Declaration of Sheryl Green Fontenot at ¶ 6).  She lived with Ray Skinner, a man who

caused her to hemorrhage so severely she required hospitalization because he demanded sex just

after she had given birth.  R.R. Vol. 47: 85; Exhibit 36 (Affidavit of Linda Goodman at ¶ 16).

She also lived with Leslie Green, a convicted child molester, who would answer the door naked

and walk around the house in front of the children wearing fishnet underwear.  Exhibit 36

(Affidavit of Linda Goodman at ¶ 21); Exhibit 37 (Affidavit of Allen Ray Skinner at ¶ 10)l;

Exhibit 38 (Declaration of Sheryl Green Fontenot at ¶ 8).   Mr. Murphy had at least seven

different "step fathers," and many of them both physically and sexually abused him.  Exhibit 35

(Affidavit of Patrick Murphy Sr. at ¶ 11).  Mr. Murphy's mother consistently chose the men in

her life over her children, and failed to protect Mr. Murphy and his siblings from their abuse.

Exhibit 38 (Declaration of Sheryl Green Fontenot at ¶ 9, 10).  Mr. Murphy also spent time with

two paternal uncles who have since been incarcerated for sexually molesting children.  Exhibit

39 (Affidavit of Kristina Murphy Rogers at ¶ 14).

Mr. Murphy ran away from his mother many times as a young child, and when he was nine years old she finally called Mr. Murphy Sr. to take their child.  Exhibit 35 (Affidavit of Patrick Murphy Sr. at ¶ 13).  When Mr. Murphy was found, he was covered in sores, ringworm, and filthy old clothes.  R.R. Vol. 48: 106; Exhibit 35 (Affidavit of Patrick Murphy Sr. at ¶ 14).  Mr. Murphy's nine years of abuse had caused severe emotional damage.  Exhibit 35 (Affidavit of Patrick Murphy Sr. at ¶ 20).  He did not know right from wrong or how to brush his teeth or take a bath.  R.R. Vol. 38: 108-9; Exhibit 35 (Affidavit of Patrick Murphy Sr. at ¶ 21); Exhibit 39 (Affidavit of Kristina Murphy Rogers at ¶ 6).  While living with his father, Mr. Murphy was often disciplined with a belt.  Exhibit 35 (Affidavit of Patrick Murphy Sr. at ¶ 19); Exhibit 39 (Affidavit of Kristina Murphy Rogers at ¶ 5).

Mr. Murphy remained with his father until he ran away to a halfway house called House of Abel, led by a man named Don Ballinger.  R.R. Vol. 47: 100; Exhibit 35 (Affidavit of Patrick Murphy Sr. at ¶ 28); Exhibit 39 (Affidavit of Kristina Murphy Rogers at ¶ 10).  Don Ballinger, a married minister in his thirties, took advantage of Mr. Murphy and began having a sexual relationship with him; Mr. Murphy was only a teenager at the time.  Exhibit 35 (Affidavit of Patrick Murphy Sr. at ¶ 28); Exhibit 39 (Affidavit of Kristina Murphy Rogers at ¶ 11).

Competent counsel would also have presented information that, despite Mr. Murphy's prior criminal convictions and other misdeeds, he was capable of good and had been a source of solace to his half-sister Sheryl Green Fontenot as she dealt with the pain of suffering years of abuse similar to the abuse visited upon Mr. Murphy.  Exhibit 38 (Declaration of Sheryl Green Fontenot at ¶ 5, 8-13, 16-17) (detailing abuse).  Specifically, Ms. Fontenot and Mr. Murphy began writing letters to each other when Ms. Fontenot was a teenager.  *Id.* at ¶ 18.  Mr. Murphy was the only person in whom Ms. Fontenot felt she could confide, as Mr. Murphy believed Ms.

Fontenot's reports of what had happened to her and did not judge her. *Id.* Indeed, writing to Mr. Murphy was "like therapy" for Ms. Fontenot. *Id.*

In addition, the punishment phase of Mr. Murphy's trial would have been cast in a decidedly different light had it not been marred by the prosecutors' impermissible *voir dire* and improper arguments.[44] These arguments permeated the State's initial and rebuttal arguments. They were repeated, lengthy, and—given the highly emotional themes at their disposal, particularly considered in juxtaposition to trial counsel's deficient presentation of the mitigation case—undoubtedly effective. Their cumulative effect was to bombard the jurors with an emotionally charged plea to abandon their duty to make an individualized decision based on the evidence in the record.

Furthermore, four of the deliberating jurors at Mr. Murphy's trial were asked improper questions during *voir dire*, and all of them answered the government's questions in a way that committed themselves to an affirmative answer to the second special issue. During punishment phase summations, the government reminded them of their commitments, telling them that "each of [them] agreed with that law" of parties. R.R. Vol. 49: 19.

Mr. Murphy should be granted a new punishment phase trial in which the jurors are exposed to neither improper *voir dire* nor argument; are not tainted by pervasive and inflammatory pretrial publicity; and during which—after hearing a balanced presentation of all the mitigating and aggravating evidence—they are provided with an opportunity to formulate a "'reasoned moral response to the defendant's background, character, and crime.'" *Penry*, 492 U.S. at 327 (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).

If trial counsel had properly moved for a change of venue, objected to the government

---

[44] As noted above, Mr. Murphy's punishment phase was likewise tainted by trial counsel's failure to seek a change of venue.

impermissible *voir dire* and summations, conducted a reasonable inquiry of Mr. Murphy, and thereafter conducted a reasonable investigation of the information such an inquiry would have produced, there is a reasonable probability that the result of Mr. Murphy's punishment stage trial would have been different.

## IV. MR. MURPHY WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL, IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Every criminal defendant has a right to effective assistance of counsel on his first direct appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984). The standard applicable to such claims is the same two-pronged *Strickland* standard of deficient performance and prejudice governing claims of ineffectiveness of trial counsel. *Evitts*, 469 U.S. at 387.

Counsel's role on direct appeal is "that of an expert professional whose assistance is necessary in a legal system governed by complex rules and procedures for the defendant to obtain a decision at all—much less a favorable decision—on the merits of the case." *Evitts*, 469 U.S. at 394. Thus, appellate counsel must make "a conscientious examination" of the record to identify *all* of the potential issues for an appeal, thoroughly research every colorable claim, and make a reasonable professional judgment about which points to raise. *Anders v. California*, 386 U.S. 738, 744 (1967). To do so, appellate counsel "must have a firm command of the facts of the case as well as governing law before [they] can render reasonably effective assistance of counsel." Appellate counsel's inexcusable failure to raise a point of error that had a reasonable probability of success is sufficient to make the showing of deficient performance. *Duhamel v. Collins*, 955 F.2d 962, 966–67 (5th Cir. 1993).

Direct appeal counsel's performance in Mr. Murphy's case was unreasonable under the prevailing professional norms, and there is a reasonable probability that, but for appellate counsel's errors, Mr. Murphy's death sentence would have been reversed on direct appeal. *See Duhamel*, 955 F.2d at 966; *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991). With the exception of Mr. Murphy's claim that he was sentenced to death without the necessary *Enmund* and *Tison* findings, direct appeal counsel failed to present each of the potentially meritorious claims raised in this petition. Because there is a reasonable probability that Mr. Murphy would have prevailed on these claims had they been timely presented to the Court of Criminal Appeals in his direct appeal brief, Mr. Murphy is entitled to a new direct appeal process.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Mr. Murphy prays that this Court:

1.      Issue a writ of habeas corpus to have him brought before it, to the end that he may be relieved of his unconstitutional sentence of death;

2.      If necessary to resolve disputed factual issues, schedule an evidentiary hearing during which Mr. Murphy may present evidence in support of his claims;

2.      Grant such other relief as law and justice requires.


Respectfully submitted,


s/ David R. Dow
_____

David R. Dow
Texas Bar No. 06064900

Laura Ferry
Texas Bar. No. 24069715

TEXAS DEFENDER SERVICE
1927 Blodgett Street
Houston, Texas 77004
Tel. (713) 222-7788
Fax (713) 222-0260

*Counsel to Patrick Henry Murphy Jr., Petitioner–Appellant*


## VERIFICATION

I, David R. Dow, attorney for Petitioner in the above-entitled action, state that to the best of my knowledge and belief, the facts set for in this Petition are true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 30, 2010.

s/ David R. Dow
_____

David R. Dow

98

**CERTIFICATE OF SERVICE**

I certify that on June 30, 2010, a copy of the foregoing pleading was electronically served on counsel for the Respondent by filing the document with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.

Jeremy C. Greenwell
Office of the Texas Attorney General
Post Office Box 12548
Austin , TX 78711
jeremy.greenwell@oag.state.tx.us

s/ David R. Dow
_____

David R. Dow