**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **PATRICK HENRY MURPHY JR.** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | CIVIL NO. 3:09-cv-01368-L |
| | § | |
| | § | *** DEATH PENALTY CASE *** |
| | § | |
| **RICK THALER**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| | § | |
| Respondent. | § | |

_____

**PETITIONER'S REPLY TO RESPONDENT'S ANSWER**
**WITH BRIEF IN SUPPORT**
_____

COMES NOW, Petitioner, Patrick Henry Murphy Jr., by and through his counsel of record, and files this Reply to Respondent Thaler's Answer. Docket Entry 40. Mr. Murphy's Petition for a Writ of Habeas Corpus, Docket Entry 18, along with the exhibits offered in support, demonstrate that his claims are meritorious and that he is entitled to relief. Mr. Murphy files the instant Reply to explain why Respondent's arguments to the contrary are unavailing.

At the outset, Mr. Murphy notes that, though he has been diligent in his efforts to investigate all potentially meritorious claims since counsel was appointed in these proceedings, his efforts have been impeded—through no fault of his own—on two fronts. First, as noted in his Petition, Docket Entry 18 at 17 n.4, counsel submitted an Open Records Act request, pursuant to Texas Government Code Chapter 552, to the Texas Department of Criminal Justice's

Office of the Inspector General (OIG) for a copy of its file related to the investigation of the

Texas 7 prison escape.  This request was submitted on September 11, 2009.   The OIG released

some of the materials in its possession pursuant to that request, but withheld numerous

documents and sought a determination from the Attorney General as to whether the remainder of

the file was subject to disclosure.  On December 16, 2009, the Attorney General's Open Records

Division directed the OIG to release numerous documents pursuant to counsel's request.

Counsel received nothing pursuant to that directive until June 17, 2010, and only then after

counsel made further requests that the OIG comply with the Attorney General's directive.  The

OIG's June 17, 2010 disclosure, moreover, consisted of "representative samples" and

acknowledged that counsel was entitled to many additional documents.  On September 14, 2010,

counsel made a further request to the OIG that it comply with the Attorney General's directive.

Having received nothing further from the OIG, counsel sent a letter to the Attorney General's

Open Records Division on November 14, 2010, requesting the Attorney General's assistance in

obtaining the remaining documents to which counsel is entitled.  On November 22, 2010, the

OIG General Counsel submitted a letter to the Attorney General stating that the OIG's review of

the materials in question is on-going.  As of the time of the filing of this Reply, counsel has

received nothing further from the OIG pursuant to the Open Records Act request made more

than a year ago.  The State's refusal  to disclose to Mr. Murphy's counsel all documents and

materials to which they are entitled has impeded counsels' efforts to identify all issues germane

to Mr. Murphy's habeas petition and has violated Mr. Murphy's right to due process.

Second, Mr. Murphy has not yet been successful in his efforts to examine the State's trial

file.  In November of 2009, counsel first contacted the State about reviewing the District

Attorney's trial file.  Because one of the attorneys working on Mr. Murphy's case went on

2

maternity leave and the District Attorney's Office required exclusive access to the file for a number of months through the beginning of 2010, discussion about the date on which the file review could take place continued through the filing of Mr. Murphy's Petition.  In July and August of 2010, counsel again contacted the District Attorney's Office and requested a date for review, at which point counsel was informed that a new condition—of a *quid pro quo* agreement with respect to the State's access to trial counsel's file—was being placed on counsel before access to the State's file would be allowed.  Discussions about counsel's access to the State's file remain on-going.  In short, it appears to Mr. Murphy's counsel that the Dallas County District Attorney acts inconsistently when dealing with counsel representing death-sentenced habeas petitioners, permitting some access to their files while denying such access to others.  This behavior has interfered with Mr. Murphy's counsels' ability to identify and develop all claims relevant to Mr. Murphy's habeas petition and has denied Mr. Murphy due process.

Once Mr. Murphy's counsel receive the OIG's file and also gain access to the State's trial file, it may be necessary for Mr. Murphy to file a supplement to this Reply.

## I.     MR. MURPHY'S CLAIMS ARE NOT PROCEDURALLY DEFAULTED.

None of Mr. Murphy's claims are procedurally defaulted.  Indeed, his claim that he was sentenced to death without the jury findings mandated by Sixth and Eighth Amendments was exhausted in the Texas courts.  To satisfy the exhaustion requirement, Mr. Murphy must show that "the substance of his claim" was "fairly presented" to the Texas courts.  *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001).  Mr. Murphy has met that standard.

The remainder of Mr. Murphy's claims, none of which have been exhausted due to his poor representation during his state habeas proceedings, are nevertheless procedurally viable.  As set out in Mr. Murphy's Motion for Stay and Abatement Pending Exhaustion of State Remedies

and Memorandum in Support, Docket Entry 31, the doctrines of exhaustion and procedural default, though their enforcement is often intertwined, are not co-extensive.  When the argument is that procedural default has occurred because a petitioner failed to first exhaust his claims in state court, two findings must be made: the claim must be deemed unexhausted **and** the federal court must find that "the court to which he would be required to return [to exhaust the federal claim] . . . would now find the claim procedurally barred."  *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).  Unless it is "entirely clear" that the state court would apply an independent and adequate procedural bar to petitioner's claim, however, "the State should be allowed to make the procedural, *vel non*, determination."  *Wilder v. Cockrell*, 274 F.3d 255, 262 (5th Cir. 2001).

It is not at all "entirely clear" that Mr. Murphy's claims would be procedurally barred if this Court granted his request to stay these proceedings and allowed him to return to the Court of Criminal Appeals.  As detailed in Mr. Murphy's stay motion and his reply to Respondent's opposition, Docket Entry 35, the Court of Criminal Appeals has recently acknowledged that there are judicially-created exceptions to Texas' procedural bar to successive petitions.  *See, e.g.*, *Ex parte Hood*, 211 S.W.3d 767 (Tex. Crim. App. 2007); *Ex parte Granados*, No. WR-51,135-01 (Tex. Crim. App. 2007) (suggesting the existence of equitable exceptions to the Section 5 procedural bar but finding that Granados has not raised any meritorious claims); *Ex parte Moreno*, No. WR-25,897-01, 2007 WL 2019745 (Tex.Crim.App. 2007) (judicial order – not designated for publication).  And while Mr. Murphy's earlier reliance on *Ruiz v. Quarterman*, 504 F.3d 523 (5th Cir. 2007), has been impacted by subsequent decisions in *Balentine v. Thaler*, 2010 U.S. App. LEXIS 23699 (5th Cir. Nov. 17, 2010), and *Rocha v. Thaler*, 2010 U.S. App. LEXIS 23696 (5th Cir. Nov. 17, 2010), the question of whether poor state habeas representation

will open the door to a successive petition in the Court of Criminal Appeals remains an open question that has recently gained traction.

Since at least 2007, it has been acknowledged that there is a "serious and unresolved question" as to whether appointment of incompetent state habeas counsel could operate as an equitable exception to Texas' procedural bar. *Ex parte Ruiz*, No. WR-27-328-03 (Tex. Crim. App. 2007) (Womack, J., concurring). That question has taken on increased urgency in the wake of the exoneration of Anthony Graves, who was recently cleared of the charges for which he spent years on Texas' death row. *See generally* Pamela Colloff, *Free at Last*, TEXAS MONTHLY, Nov. 2010; Pamela Colloff, *Innocence Found*, TEXAS MONTHLY, Jan. 2011. Notably, in 2002 the Court of Criminal Appeals invoked the procedural bar in denying Graves' state habeas successor raising the now indisputably-meritorious claims that his incompetent state habeas counsel initially failed to raise. *Ex parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002). Judges Price and Holcomb have joined their colleague Judge Womack in questioning "whether we should regard a colorable claim of ineffective assistance of original habeas counsel as a newly available fact for purposes of [Texas' procedural bar]; or, failing that, whether we should recognize a claim of ineffective assistance of original habeas counsel as, at least, a non-statutory gateway for raising discrete constitutional claims that would otherwise be barred under Article 11.071, Section 5." *Ex parte Foster*, 2010 Tex. Crim. App. Unpub. LEXIS 734, *25 (Tex. Crim. App. Dec. 30, 2010) (Price, J., dissenting) (Holcomb, J., joining dissent). Indeed, Judge Price has since gone even further, declaring that

> Article 11.071 [the Texas capital habeas statute] as a whole was meant to endow those who have been condemned to death in Texas with one last chance at a fair and complete review of the constitutional legitimacy of their conviction and punishment. That last chance is neither fair nor complete when the attorney who is appointed to assist in the endeavor does not properly do his job. The Court today persists in its crabbed interpretation of Section 5(a)(1), rejecting the notion

> that ineffectiveness of initial habeas counsel can ever constitute a newly available
> fact justifying a subsequent habeas application. While it may be insisted that this
> interpretation is the most faithful to the black letter of the statute, a more
> forgiving construction is more consistent with the manifest legislative intent. And
> it would assure that inmates like Anthony Graves do not have to resort to the
> federal courts for habeas relief that ultimately leads to their exoneration. Just
> because we are judges does not mean we have to leave our humanity in the robing
> room.

*Ex parte Foster*, No. WR-65, 799-02 (Tex. Crim. App. Jan. 10, 2011) (Price, J., dissenting).

There is, moreover, no question that Mr. Murphy was saddled with precisely the type of

incompetent counsel of whom Judge Price complains. Mr. Murphy's state habeas counsel filed

an error-ridden petition comprised of eight record-based claims for relief.[1] Six of these eight

claims challenged the sufficiency of the evidence against Mr. Murphy. Because state habeas

counsel presented the legal and factual sufficiency challenges to the same evidence as separate

claims, however, every other claim was duplicative. For instance, claim one was a challenge to

the legal sufficiency of the evidence that Mr. Murphy should have anticipated the commission of

the offense, while claim two was a challenge to the factual sufficiency of the same evidence.

None of these sufficiency of the evidence claims were even cognizable in state habeas corpus.

*See, e.g.*, *Ex parte McLain*, 869 S.W.2d 349, 350 (Tex. Crim. App. 1994) (sufficiency of the

evidence arguments not cognizable during state habeas proceedings).

The remaining two claims raised by state habeas counsel were constitutional challenges

to Texas' statutory structure permitting the death penalty for non-triggerman parties to an

offense. These claims were presented in just over four pages and were likewise not cognizable

in state habeas proceedings. *See, e.g.*, State Bar of Texas Guidelines and Standards for Texas

Capital Counsel 12.2(B)(1)(a) ("Habeas corpus counsel must understand that the state habeas

---

[1] The state habeas petition was attached to Docket Entry 35 as Exhibit A.

corpus proceeding is not a second direct appeal. Direct appeal-like, record-based claims are not

cognizable in state habeas corpus and can be fatal to the capital client.").

As the foregoing makes clear, counsel failed to present any claims that were not record-

based, and utterly failed to conduct an independent investigation of the trial proceedings and

underlying facts.[2]  Indeed, when undersigned counsel contacted state habeas counsel to obtain

his file, undersigned counsel was informed that the file consisted of the reporter's record from

Mr. Murphy's trial and that state habeas counsel had not taken even the most rudimentary step of

obtaining trial counsel's file.  *See, e.g.*, SBOT Guideline 12.2(B)(3)(b) ("Counsel must also

inspect the evidence and obtain the files of trial and appellate counsel, scrutinizing them for what

is missing as well as what is present.").  Though the state habeas petition was due on May 12,

2005, counsel had not filed anything in the case as late as August 3, 2005, when he requested a

90-day extension.[3]

_____

[2] The vouchers submitted by state habeas counsel to Dallas County for preparation of the writ, moreover, leave no doubt that counsel failed in his obligation to conduct a thorough and independent investigation of Mr. Murphy's case.  Those vouchers, which were attached as Exhibit B to Docket Entry 35, reveal no billing related to obtaining or reviewing trial counsel's file, conducting an independent mitigation investigation, or otherwise investigating Mr. Murphy's case beyond reading the trial record.

[3]  The trial court in which Mr. Murphy's state habeas petition was initially filed also expressed serious concerns about the quality of state habeas counsel's representation.  Indeed, after the petition was filed, the judge directed the parties to appear and stated that he had "reviewed the writ and I had some questions about what work was done or not done."  *State v. Murphy*, W01-003280T(A) at 3 (Nov. 6, 2007).  A copy of the transcript of this hearing is attached hereto as Exhibit A.  The court informed Mr. Murphy that he was prepared to hold a hearing on whether counsel should be replaced, though the court noted that it was unclear whether the CCA would accept anything filed by newly appointed counsel.  Significantly, the court relied on state habeas counsel to explain the proceedings to Mr. Murphy.  *Id.* ("THE COURT: Your attorney has explained to you what's going on?  THE DEFENDANT: Yes, sir.  We have spoken about it.").  Moreover, when Mr. Murphy began to explain why he was declining the court's offer, the court cut Mr. Murphy off and informed him that the court was not interested in Mr. Murphy's reasoning.  *Id.* at 5 ("THE COURT: I am prepared to have that hearing.  Do you wish to have a hearing of that nature?  THE DEFENDANT: Your Honor, no, sir, I do not wish to have that hearing because I realize that--  THE COURT: I don't need to get into any of the wheres or

Indeed, it is entirely possible that, once Mr. Murphy returns to the Court of Criminal

Appeals, the state court will reach the same conclusion it reached in *Ex parte Kerr*, 64 S.W.3d

414 (Tex. Crim. App. 2002). In that case, state habeas counsel raised a single, non-cognizable

claim. Noting that "this entire [state habeas] statute is built upon the premise that a death row

inmate *does* have one full and fair opportunity to present his constitutional or jurisdictional

claims," the Court of Criminal Appeals found that the document filed by Kerr's initial state

habeas counsel "was not, in fact, a true application for a writ of habeas corpus." *Id.* at 419, 416.

Mr. Murphy's state habeas counsel similarly filed a document that was not a "true application,"

in that it failed to raise a single claim that was cognizable in that proceeding.

In short, because of the clear incompetence of Mr. Murphy's state habeas representation

and the developments in the case law discussed above, it is not "entirely clear" that the Court of

Criminal Appeals would apply a procedural bar to Mr. Murphy's claims. Accordingly, Mr.

Murphy requests that this Court stay these proceedings and hold his Petition in abeyance so that

he may return to the state courts and exhaust his claims.

## II. MR. MURPHY IS ENTITLED TO RELIEF ON HIS CLAIM THAT HE WAS SENTENCED TO DEATH WITHOUT THE JURY MAKING THE NECESSARY FINDING THAT HE WAS A SUBSTANTIAL PARTICIPANT IN THE ROBBERY AND ACTED WITH RECKLESS INDIFFERENCE TO HUMAN LIFE.

Before turning to the substance of Respondent's arguments, Mr. Murphy again notes that

there is a case pending before the Fifth Circuit that presents claims closely related, if not

---

whys. . . ."). The court's decision to rely on the very attorney about whom it had such serious
concerns—and whose interests were at that point adverse to Mr. Murphy's—to explain the
proceedings to him is baffling, as is the court's utter failure to determine what precisely state
habeas counsel had told Mr. Murphy that led to Mr. Murphy's decision to decline new
representation. Given the failure to appoint independent counsel to confer with Mr. Murphy, as
well as the failure to inquire into Mr. Murphy's reasoning, Mr. Murphy's rejection of the court's
offer of a hearing and new counsel should not be held against him.

identical, to those raised in this portion of Mr. Murphy's petition. *See Gongora v. United States*, 2008 U.S. App. LEXIS 22164 at *16 (5th Cir. 2008) (*per curiam*). To the extent that this Court is not prepared to grant Mr. Murphy relief at this point in time, Mr. Murphy respectfully requests that the Court delay its decision on his petition until the Fifth Circuit has issued its decision in *Gongora*.

A.    **Respondent Misconstrues the Nature of Mr. Murphy's Claim.**

Respondent misconstrues the nature of Mr. Murphy's claim under *Enmund v. Florida*, 458 U.S. 782 (1982), *Tison v. Arizona*, 481 U.S. 137 (1987), and *Ring v. Arizona*, 536 U.S. 584 (2002), in two significant respects. First, Respondent repeatedly asserts that Mr. Murphy is challenging his capital murder conviction, rather than his death sentence. Docket Entry 40 at 39-53. As even the headings of Mr. Murphy's claim make clear, Mr. Murphy's claim is that he cannot be sentenced to death without the findings mandated by *Enmund* and *Tison*. Docket Entry 18 at 17-18. This argument necessarily involves a discussion of the instructions given to and the findings—or lack thereof—made by the jury at the guilt-innocence phase. Recognizing that the guilt-innocence phase is relevant to his claim, however, does not somehow convert it into one challenging his conviction.

Second, Respondent appears to believe that the entirety of Mr. Murphy's claim is rooted in the Eighth Amendment, which leads Respondent to argue "[n]or does the Eighth Amendment require that a jury make the findings required by *Enmund*." Docket Entry 40 at 51-55. Respondent apparently has failed to grasp that Mr. Murphy is making a two-part argument. The first—that he is entitled to the findings mandated by *Enmund* and *Tison*—is, indeed, grounded in the protections of the Eighth Amendment. The second part of his argument, as to the procedure by which those findings must be made, arises from the Sixth Amendment's guarantee of trial by

jury.  Accordingly, Respondent's argument that the Eighth Amendment does not require the jury

to make *Enmund* and *Tison* findings is, as far as it goes, not necessarily incorrect, but it is

irrelevant to Mr. Murphy's claim that the ***Sixth Amendment*** mandates that those findings be

made by a jury.

Properly understood, it is clear that Mr. Murphy's claim entitles him to relief, as detailed

below.

**B.     Respondent Cannot Justify a Constitutionally Infirm Result by Relying on State Law Requiring a General Verdict in Capital Cases.**

The State prosecuted Mr. Murphy for capital murder under alternate theories.  Each of the

four theories under which the jury could find Mr. Murphy guilty was presented to the jury in the

court's charge.  At no point did the trial court, either during its oral charge or on the verdict form,

instruct the jury to agree unanimously under which of the four theories it convicted Mr. Murphy.

1 CR 39-41; 1 CR 45.  These instructions and the jury form were similarly devoid of any

requirement that the jury make the findings required by *Enmund* and *Tison*,[4] as were the

instructions and verdict form provided to the jury at the punishment phase.[5]  Because of the

disjunctive nature of the jury charge, the possibility that Mr. Murphy was found guilty of capital

murder upon the mere finding that he was a conspirator to a robbery during which death was

foreseeable cannot be ruled out.

---

[4] Specifically, the jury was never asked to find that Mr. Murphy was a major participant in the robbery and that he acted with reckless indifference to human life.

[5] The jury's finding as to the second special issue, that Mr. Murphy "did not actually cause the death of the deceased, Aubrey Hawkins, but intended to kill the deceased or another or anticipated that a human life would be taken," 1 CR 55, addresses nothing more than Mr. Murphy's mental state at the time he entered the agreement forming the basis of the conspiracy. To the extent that this finding could be read to satisfy the *Enmund/Tison* requirements as to mental state, it certainly does not satisfy the requirement that the jury find that Mr. Murphy was a substantial participant in the robbery.  481 U.S. at 150.

In an attempt to cut Mr. Murphy's argument off at the pass, Respondent asserts that Texas law does not permit a capital jury in Texas to "choose which alternative charge formed the basis for its verdict of guilty; only a general verdict in a capital murder trial is allowed to a Texas jury." Docket Entry 40 at 41 (citing *Kitchens v. State*, 823 S.W.2d 256, 258 n.2 (Tex. Crim. App. 1991)). Respondent goes on to cite a case in which federal habeas relief was denied to a petitioner directly challenging the unanimity of his death sentence. *Id.* at 42 (citing *Paredes v. Thaler*, 617 F.3d 315, 326 (5th Cir. 2010)). Though Respondent has accurately cited *Kitchens* and *Parades*, his argument again misses the mark. Mr. Murphy's claim is not a challenge to the disjunctive nature of the jury charge. His claim is that further fact-finding by the jury as to the *Enmund/Tison* facts was necessary. Mr. Murphy has simply recognized that the disjunctive charge opens the door to his claim that he was sentenced to death without the findings mandated by the Eighth Amendment. Such a constitutionally infirm result cannot be justified with the assertion that it is permissible under state law.

## C. The Jury's Findings in Mr. Murphy's Case Do Not Satisfy the Mandates of *Enmund* and *Tison*.

Respondent argues that "[t]he facts in Mr. Murphy's case—provided by Murphy's own words—are more than sufficient to satisfy *Tison*" and goes on to catalogue the evidence that he believes could have and implicitly did provide a basis for *Enmund* and *Tison* findings. Docket Entry 40 at 44-50. Following this recap, Respondent claims that the fact "[t]hat [Mr. Murphy] was a major participant who was morally culpable were implicit findings in the verdict of guilty." *Id.* at 52-53.

Tellingly, in arguing that "[i]t was in the guilt or innocence phase that the jury had to determine Murphy's mental culpability and participation level," Respondent includes no

11

citations to the trial record.  Docket Entry 40 at 52.  This is not surprising, because at no time was the jury instructed to make any such findings.  Indeed, as noted above, the jury was not even required to make an explicit finding as to which of the four theories of guilt it found the State had proven beyond a reasonable doubt.  Respondent's argument that the jury must have made the necessary *Enmund* and *Tison* findings in answering the third special issue is equally unavailing.  Docket Entry 40 at 52.  Nothing about that question—"whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed"—asks the jury to make a specific, unanimous finding that Mr. Murphy was a major participant in the robbery and acted with reckless indifference to human life.

Though he does not identify his argument as such, Respondent goes on to invite this Court to conduct a harmless error analysis.  While the Fifth Circuit has found that *Apprendi* errors are subject to harmless error analysis, *see United States v. Matthews*, 312 F.3d 652 (5th Cir. 2002), the error in this case was not harmless beyond a reasonable doubt.  "The standard for determining harmlessness when a jury is not instructed as to an element of an offense is whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element."  *Id.* at 664 (citing *United States v. Virgen-Moreno*, 265 F.3d 276, 297 (5th Cir. 2001)).  There is ample evidence in this case that could rationally have led the jurors to find that Mr. Murphy was not a major participant in the robbery, as required by *Enmund* and *Tison*.

The undisputed evidence at Mr. Murphy's trial was that he was tasked with driving the getaway vehicle.  He never entered the Oshman's, nor was there ever a plan for him to do so.

12

Though this provides a sufficient evidentiary foundation for a jury to find that Mr. Murphy

entered into a criminal conspiracy by virtue of his agreement to drive the getaway van, such an

agreement does not render him a ***major*** participant in the robbery.   *See* Tex. Penal Code §

15.02(a) ("A person commits criminal conspiracy if, with intent with a felony be committed: (1)

he agrees with one or more persons that they or one or more of them engage in conduct that

would constitute the offense; and (2) he or one or more of them performs an overt act in

pursuance of the agreement.").   This is the finding—of major, not simply some type of,

participation—that *Tison* held is mandated by the Eighth Amendment.   *See Gongora v. United

States*, 2008 U.S. App. LEXIS 22164 at *16 (5th Cir. 2008) (*per curiam*) (granting certificate of

appealability on a claim nearly identical to the claim raised in Mr. Murphy's petition).

> **D.     The State Habeas Court's Findings Do Not Satisfy Mr. Murphy's Right to a
> Jury Finding under *Ring*.**

Finally, Respondent argues that the state habeas court's findings satisfy Mr. Murphy's

right to explicit findings under *Enmund* and *Tison*.   As noted above, Respondent's argument is

fatally undermined by a misunderstanding of the two-pronged nature of Mr. Murphy's claim.

Mr. Murphy does not claim—as Respondent asserts—that he is entitled to jury findings of the

*Enmund* and *Tison* facts by virtue of the Eighth Amendment.   Rather, Mr. Murphy is entitled to

have those findings made by a jury by virtue of the Sixth Amendment's guarantee of a trial by

jury.

It is certainly true, as Mr. Murphy pointed out in footnote 8 of his petition, that the

Supreme Court held in *Cabana v. Bullock* that "[i]f a person sentenced to death in fact killed,

attempted to kill, or intended to kill, the Eighth Amendment itself is not violated by his or her

execution regardless of who makes the determination of the requisite culpability."   474 U.S. 376,

13

386 (1986). *Bullock* pre-dated both *Apprendi*, which was decided in 2000, and *Ring*, which was decided in 2002, and mentioned the Sixth Amendment only once, for the proposition that the Sixth Amendment does not require a defendant to be sentenced by a jury.[6] *Id.* at 385. Mr. Murphy is not asking this Court to find a new Eighth Amendment right and overrule *Bullock*. Rather, he asks this Court to apply *Ring* to findings that make him eligible for death. This is not a novel application of *Ring*; indeed, it precisely tracks—and is mandated by—the Supreme Court's ruling in *Ring* itself.

## III. MR. MURPHY WAS PREJUDICED AT BOTH STAGES OF TRIAL BY COUNSEL'S INEFFECTIVE FAILURE TO SEEK A CHANGE OF VENUE.

### A. The *Strickland* Standard Is Not Outcome Determinative.

Respondent asserts that Mr. Murphy cannot prevail on his claim that trial counsel were ineffective for failing to seek a change of venue because no such change was warranted and because he has not demonstrated prejudice as a result of counsel's failure. Docket Entry 40 at 55-66. Respondent is, of course, correct in his assertion that "a mere allegation of prejudice is not sufficient to satisfy the prejudice prong of *Strickland*." *Id.* at 57. It bears repeating, however, that the requisite showing of prejudice under *Strickland* is not outcome determinative. The *Strickland* Court itself expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case. *Strickland v. Washington*, 466 U.S. 668, 693-94 (1984). Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the

---

[6] *Bullock*'s continued vitality in general and relevance to the actual claim raised by Mr. Murphy in particular is further undermined by the fact that *Bullock* is cited extensively in the Supreme Court's opinion in *Walton v. Arizona*, 497 U.S. 639 (1990), in support of the very propositions that *Ring* explicitly overruled.

outcome." *Id.*  Because Mr. Murphy has met both prongs of the *Strickland* standard, he is entitled

to relief on his change of venue claim.

> **B.      Respondent Minimizes the Inflammatory and Prejudicial Media Coverage of
> This Case and Wholly Ignores the Trial Court's Findings Regarding
> Publicity.**

Respondent asserts that trial counsel could not possibly have been ineffective for failing

to seek a change of venue because they "had no grounds upon which to base a motion for change

of venue."  Docket Entry 40 at 66.  This assertion flies in the face of both the extensive media

coverage cited by Mr. Murphy in his petition, as well as the findings made by the trial court in

the Texas 7 cases.  As noted in Mr. Murphy's Petition—and in contrast to Respondent's

characterization of the publicity surrounding these cases—the media coverage of the prison

escape and manhunt, the Oshman's robbery and Aubrey Hawkins' murder, the subsequent

capture, and the trials of Mr. Murphy's co-defendants was not merely a dry recitation of the

underlying facts.  Rather, news reports contained highly inflammatory information about these

events in general and Mr. Murphy in particular.  Mr. Murphy's Petition cites, for instance,

articles appearing in the *Dallas Morning News* claiming that Mr. Murphy practices a bizarre

occult religion involving worship of "a divine sorcerer and a master of occult terrors" and quoted

a family member calling Mr. Murphy a "psycho" who has "a short fuse when it comes to

satisfying his carnal urges."  Docket Entry 18 at 28-33, Exhibits 8-9.

Perhaps even more persuasive are the findings that the trial court entered in this very case

regarding the media attention lavished on the Texas 7 defendants—findings that Respondent

wholly ignores.  On February 2, 2001, the trial court entered findings that "[t]here has been

extensive media coverage of this case throughout the initial investigation, arrest, and grand jury

proceedings" and that "[t]here has been extensive news coverage concerning the events

15

surrounding the commission of this offense and possible extraneous offenses occurring both before and after the time of the offense alleged in this case." Docket Entry 18 at 33, Exhibit 22 (Court's Findings Regarding Publicity, Feb. 2, 2001, at 1). The trial court's fear that "the statements made to, and published by, the press [pose] a serious and imminent threat to the constitutional right of the defendant" to trial by a fair and impartial jury proved prescient, as the exhibits attached to Mr. Murphy's Petition demonstrate that media coverage continued as each of his co-defendants was convicted and sentenced to death. *Id.* (Court's Findings Regarding Publicity, Feb. 2, 2001, at 2).

Moreover, the trial court granted co-defendant Michael Rodriguez's motion for a change of venue—a fact that proves fatal to Respondent's assertion that there was no basis for a change of venue motion. At the hearing on that motion on January 31, 2002, Rodriguez's counsel stated that the "Dallas television media have [aired] in excess of 650 stories" and the "Dallas print media has printed more than 45,000 or 50,000 words." Docket Entry 18 at 36-37, Exhibit 31 (*State v. Rodriguez*, F01-00326-T, 5 RR 6). In addition, the court granted counsel's request that it take judicial notice of the fact that the two trials that preceded Rodriguez's—those of George Rivas and Donald Newbury—were televised and that Newbury's trial was covered daily on Court TV. *Id.* at *State v. Rodriguez*, F01-00326-T, 5 RR 5. Further, the trial court noted that features on the Texas 7 case were broadcast on America's Most Wanted for four consecutive weeks. *Id.* at *State v. Rodriguez*, F01-00326-T, 5 RR 6. As noted in his Petition, such a motion filed on Mr. Murphy's behalf would have been supported by even more persuasive evidence, as Rodriguez, Joseph Garcia, and Randy Halprin were all convicted and sentenced to death before individual *voir dire* commenced in Mr. Murphy's case on August 18, 2003. Respondent's assertions that Mr. Murphy would not have been entitled to a change of venue and that the

extensive and inflammatory media coverage of his case do not entitle him to a presumption of

prejudice are unavailing in light of these findings.

IV.     **MR. MURPHY WAS PREJUDICED BY COUNSEL'S SEVERELY DEFICIENT PERFORMANCE DURING THE PENALTY PHASE OF HIS TRIAL.**

   A.     **The Prison Expert Called by Mr. Murphy's Own Counsel Provided Highly Damaging Testimony on Mr. Murphy's Future Dangerousness.**

During the presentation of Mr. Murphy's mitigation evidence, trial counsel called S.O.

Woods to provide expert testimony about the Texas prison system and the likelihood that Mr.

Murphy would pose a future danger in the prison system.  47 RR 120-76.  During his direct and

re-direct examination, Mr. Woods testified that maximum security prisoners—of whom he

predicted Mr. Murphy would be one when returned to prison—had in the past escaped from their

cells and done harm to other inmates and staff, 47 RR 145-47; that maximum security prisoners

had likewise done harm to staff in hospitals, 47 RR 148-49; and disagreed with trial counsel that

Mr. Murphy's refusal to acknowledge his guilt for his underlying sexual assault was common

among inmates whose sentences were on appeal, 47 RR 175-76.  On cross examination, Mr.

Woods testified that Mr. Murphy could eventually be released into the general population of the

prison if not sentenced to death, 47 RR 159; that he is dangerous in the "free world", 47 RR 171;

that he has proven himself dangerous in prison by virtue of his escape, *id.*; that this escape was

"very violent", *id.*; that the lives of the hostages taken in the prison were in danger, 47 RR 171-

72; and that this was the largest escape in the history of the Texas prison system, 47 RR 172.

The State concluded its cross-examination by asking Mr. Woods whether it is his opinion that

Mr. Murphy is a "very dangerous inmate," and Mr. Woods responded in the affirmative.  47 RR

173.

Although Respondent is correct that Mr. Woods provided his most damaging testimony on cross-examination by the State, the fact that Mr. Woods held the opinion that Mr. Murphy is a "very dangerous inmate" should have been known to counsel, and as a result they should not called him as a witness.  The Sixth Circuit case of *Combs v. Coyle* presents a similar factual scenario.  In that case, trial counsel called an expert witness whose testimony on cross and re-cross examination flatly contradicted the defense theory of diminished capacity.  205 F.3d 269, 287-88 (6th Cir. 2000).  The court condemned trial counsel for calling this witness, finding that counsel had not only failed to conduct an adequate investigation by virtue of being caught unawares by the expert's opinion, but that it was objectively unreasonable to put him on the witness stand regardless of whether they had actual knowledge of the expert's opinion.  *Id.* at 288.  The fact that the expert in *Combs* provided the damaging testimony during examination by the State did not affect the court's analysis, nor did the fact that the expert provided some information helpful to the defense during his testimony.  *Id.*  Instead, the court focused on the fact that diminished capacity was "crucial to the defense theory; defense counsel's failure to have questioned [the expert] in this regard prior to trial is inexcusable. Defense counsel should have known [the expert's] opinion on this ultimate issue and should have prepared accordingly."  *Id.*

The same can be said of Mr. Murphy's counsel.  Trial counsel called a witness whose testimony provided the jury with an unequivocal, affirmative answer to the future dangerousness special issue.  Indeed, in the State's closing argument, the prosecutor adopted Mr. Woods' testimony and assured the jury that it could find that Mr. Murphy poses a future danger based on Mr. Woods' testimony:

> Let's talk about these Special Issues.  Let's go through them one by one.  Is he is a future danger?  Of course he is.  Of course he is.  The expert with some integrity, S.O. Woods, a man that shows some good, plain common sense, told you very clearly, he's dangerous.  The fact that he broke out of prison, the fact

that he broke out of a maximum security prison in order to rob, in order to kill, in order to go with his violent friends, answers this question clearly, answers this question conclusively, answers this question without a doubt.  Of course he's a danger.  S.O. Woods tells you he's a danger in prison.

49 RR 64-65.

    **B.**    **Counsel's Failure to Hire a Mitigation Specialist in a Timely Manner Resulted in a Deficient Mitigation Investigation.**

Respondent argues that Mr. Murphy has not shown any deficiencies in the mitigation investigation conducted in Mr. Murphy's case, despite the fact that counsel failed to hire a mitigation investigator until September 12, 2003, 1 CR 386, a full ***thirty-one months*** after their appointment; two weeks after *voir dire* had begun (with half of the jury already seated); eight weeks before trial proceedings began; nine weeks before the start of the punishment phase; and nearly a month after counsel hired mental health experts.  Docket Entry 40 at 69-82. Respondent's argument sets a higher bar for proving deficiency than case law requires and minimizes the additional mitigating evidence that Petitioner identifies that a competent mitigation investigation would have uncovered.

        **1.**    **Respondent Asserts the Existence of a Higher Bar for Proving Deficiency Than Case Law Requires.**

While Respondent is certainly correct that neither the Supreme Court nor the Fifth Circuit has held that the Guidelines function as a constitutionally mandated checklist of actions that effective counsel must take, there is no question that the Guidelines have long been cited by the Supreme Court as "guides to determining what [performance] is reasonable." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting S*trickland*, 466 U.S. at 688).  *See also Rompilla v. Beard*, 545 U.S. 374, 387 (2005).

Moreover, the Supreme Court has been emphatic in holding—repeatedly—that the fact that trial counsel conducted *some* investigation and presented *some* mitigation evidence to the jury does not insulate counsel from a finding of ineffectiveness.  As the Court recently reiterated in *Sears v. Upton*, "we also found deficiency *and* prejudice in other cases in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase."  130 S. Ct. 3259, 3266 (June 29, 2010) (*per curiam*) (emphasis in original) (citing *Williams v. Taylor*, 529 U.S. 362 (2000); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 130 S. Ct. 447 (2009) (*per curiam*)).

Respondent goes on to detail the facts of *Williams*, *Wiggins*, *Rompilla*, and *Walbey v. Quarterman*, 309 Fed. App'x 795 (5th Cir. 2009), and argues that "it is clear that Murphy does not meet the standard set by these cases of highly egregious childhood abuse."  Docket Entry 40 at 78.  Respondent appears to believe that the facts of those cases set out categorical imperatives, as he follows this with the assertion that Mr. Murphy does not present evidence that he "was beaten with a belt and stick, locked in a dog pen, lived in houses with no indoor plumbing or heat, had fetal alcohol syndrome, had schizophrenia, was raped or gang-raped by anyone, deprived of food, forced to sleep in his mother's bed while she had sex with strange men, was borderline mentally retarded, or had organic brain impairment."  *Id.* at 79.  There is, of course, no support in the case law for the contention that a petitioner must make a showing of particular facts to be entitled to relief.  Rather, the *Strickland* standard is case-specific, and a finding of deficient performance and subsequent prejudice, in light of the special issues, turns on whether the subsequently discovered "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of the applicant's moral culpability."  *Gonzales*, 204 S.W.3d at 399 (quoting *Wiggins*, 539 U.S. at 538).

Finally, Respondent asserts repeatedly that any new evidence adduced by Mr. Murphy must be non-hearsay to have any import in these proceedings.  Docket Entry 40 at 78-82.  This assertion is incorrect for three distinct reasons, the first two of which both deal with the ways in which this hearsay evidence, had counsel discovered it, would have affected the mitigation case presented to the jury.  First, expert witnesses may rely on hearsay evidence in conducting their evaluations and arriving at the conclusions about which they will testify.  Tex. R. Evid. 702 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by, reviewed by, or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, *the facts or data need not be admissible in evidence*.") (emphasis added).  *See also Sears*, 130 S. Ct. at 3263 (dismissing concerns expressed by the dissent that the expert assessment relied upon by the majority included "informal personal accounts").  Thus, hearsay evidence is highly relevant to Mr. Murphy's claim that counsel were deficient for failing to investigate and present to the jury evidence that he suffers from post traumatic stress disorder, a claim discussed in detail below.

Second, evidence that may, under a strict reading of a state's evidentiary rules, qualify as hearsay may nevertheless be admissible at capital punishment phase trials.  In the recent case of *Sears v. Upton*, for instance, the Supreme Court noted that it has "recognized that reliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded by rote application of a state hearsay rule." 130 S. Ct. at 3263 n.6.[7]

---

[7] The Court goes on to cite *Green v. Georgia*, 442 U.S. 95, 97 (1979) (*per curiam*) ("Regardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause . . . . The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial."), and *Chambers v. Mississippi*, 410 U.S. 283, 302 (1973) ("In these circumstances, where constitutional rights

21

Third, regardless of whether the proffered hearsay evidence would have been admissible at the trial itself, it is admissible at this proceeding as this Court makes the determination of whether trial counsel's performance was deficient.  In *Wiggins*, for instance, the Supreme Court—in finding that trial counsel provided ineffective assistance—relied upon documents and testimony that contained hearsay.  This included testimony and a report from a social worker who related "conversations with Wiggins and members of his family," 539 U.S. at 534, as well as other documents, such as a prior pre-sentence investigation report, that would necessarily have contained hearsay.  Indeed, the very documents that Respondent faults Mr. Murphy for failing to produce, including school records, "prior evaluations," and military records, all would have necessarily contained hearsay statements.

### 2.     Respondent Minimizes the Additional Mitigating Evidence that a Competent Investigation Would Have Uncovered.

Respondent's minimization of the additional mitigating evidence that a competent investigation would have uncovered occurs in two ways.  First, Respondent provides an incomplete accounting of the new information Mr. Murphy asserts a competent investigation would have uncovered.  Second, Respondent overlooks the significance of the fact that some of this information constitutes an entirely new category of information that counsel's slap-dash investigation and presentation to the jury failed to unearth.

In footnote 24 of page 80 of his answer, Respondent asserts that Mr. Murphy has disclosed only six new pieces of information:

---

directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.").

> (1) Carol [Mr. Murphy's mother] never wanted to be a mother and resented him; (2) his grandmother taught him how to shoplift;[8] (3) he had "at least seven 'step fathers,' many of [whom] both physically and sexually abused him"; (4) he was "disciplined with a belt" while living with his father; (5) Don Ballinger had a sexual relationship with him when Murphy was a teenager; and (6) his half-sister Sheryl wrote to him while he was in prison for aggravated rape, which was therapy for her.

Docket Entry 40 at 80 n.24.  Respondent ignores the new information that has come to light about the true depths of the neglect and abuse that his mother visited upon her children.  Mr. Murphy's aunt, Linda Goodman, attests in her affidavit that Carol would often move in with any man who would let her in order to escape her child and her family, Exhibit 36 at ¶ 13, and she constantly had men in and out of her house, Exhibit 37 at ¶ 15, Exhibit 38 at ¶ 6.  Indeed, Mr. Murphy's mother was so desperate to have a man in her life that she lived with—and allowed her children to be around—a convicted child molester who would answer the door naked and walk around the house in front of the children wearing fishnet underwear.  Exhibit 36 at ¶ 21, Exhibit 37 at ¶ 10, Exhibit 38 at ¶ 8.  She later married a man named Jerry Wright who sexually abused Mr. Murphy's half-sister, which their mother ignored.  Exhibit 38 at ¶ 9.

Mr. Murphy's mother failed to take her children to the doctor, even when they were sick. Exhibit 36 at ¶ 13.  Mr. Murphy's mother was also physically abusive, shaking her children and pulling their hair.  Exhibit 38 at ¶ 11.  She "often" left her children in the car while she went into bar without leaving them any food.  *Id.* at 12.  When they became hungry, Mr. Murphy's brother Allen "sometimes had to steal food so that we could eat."  *Id.*  She allowed her children to drink and use drugs.  *Id.* at ¶ 13, 15.  Her own addiction was so severe that she had frequent blackouts and was repeatedly stopped for driving drunk when her children were in the car.  *Id.* at ¶ 16.

---

[8] The evidence is not merely that Mr. Murphy's maternal grandmother taught him how to shoplift. Patrick Henry Murphy Sr.'s affidavit attests that she also "verbally abused and whipped Patrick" and that "Patrick spent a lot of time" with her when he was a child.  Exhibit 35 at ¶ 10.

The horror of life for Mr. Murphy and his siblings with his mother is summed up in his half-sister Sheryl Fontenot's statement that their "mother didn't protect me or my siblings.  She always chose men over her children."  Exhibit 38 at ¶ 10.

Second, and relatedly, Respondent characterizes the good character evidence that counsel failed to uncover as follows: "his half-sister Sheryl wrote to him while he was in prison for aggravated rape, which was therapy for her."  Docket Entry 40 at 80 n.24.  Ms. Fontenot's description of the comfort and support that Mr. Murphy provided is far more moving than Respondent's description indicates.  In her affidavit, Ms. Fontenot attests:

> By the time I was a teenager, Patrick was in jail for aggravated rape.  We wrote letters to each other where we talked about what happened to us growing up.  Patrick was the only person I could talk to about what happened to me.  He didn't judge me and believed what I was saying.  Writing to Patrick was like therapy.  I think he was so understanding because he knew what our mother was like.  He knew things were not good at home.  He was very angry at our mother for the way she had treated us.

Exhibit 38 at ¶ 18.  This evidence is significant, as it represents an entire category of evidence that was not presented at trial.  No other such evidence—that Mr. Murphy, despite his faults, was capable of good and had positively influenced another person—was placed before the jury.  As the Supreme Court and the Fifth Circuit have repeatedly recognized, good character evidence is highly relevant to a jury's determination of whether a defendant is deserving of the ultimate punishment.  *See Pierce v. Thaler*, 604 F.3d 197, 209 (April 19, 2010) (citing *Ayers v. Belmontes*, 549 U.S. 7, 15 (2006) (noting that good character evidence may "extenuate[ ] the gravity of the crime"); *Brown v. Payton*, 544 U.S. 133, 142-43 (2005) (commenting on the relevance  of good character evidence as a means of "lessen[ing] or excus[ing] a defendant's culpability"); *Boyde v. California*, 494 U.S. 370, 382 n.5 (1990) (commenting on relevance of good character evidence as a means of showing "character strengths in the face of . . .

difficulties" and showing that "criminal conduct was an aberration from otherwise good character")).

    **C.**    **This Court Should Grant Mr. Murphy Funds to Fully Develop His Claim that Counsel Were Deficient for Failing to Investigate and Present to the Jury Evidence that He Suffers from Post Traumatic Stress Disorder.**

Respondent is correct that Mr. Murphy's claim that counsel were deficient for failing to investigate and present to the jury evidence that he suffers from post traumatic stress disorder (PTSD) is not, at this point, fully developed.  Docket Entry 40 at 83.  After filing his Petition, Mr. Murphy filed an *ex parte* Application for Authorization of Funds for Reasonably Necessary Services of Post Traumatic Stress Disorder Expert.  After filing supplemental briefing, that motion was denied.  Mr. Murphy hereby re-urges the Court to grant his funding motion so that this claim may be fully developed.

As argued in his Petition, the extensive abuse and neglect to which Mr. Murphy was subjected as a child fit the diagnostic criteria for underlying traumatic events that can give rise to PTSD.  Mr. Murphy attached to his Petition the declaration of Dr. Bekh Bradley-Davino, a clinical psychologist with expertise in this area.  Docket Entry 18, Exhibit 34.  Dr. Bradley-Davino attests that, based on his record review, Mr. Murphy has long displayed behavioral and emotional characteristics consistent with PTSD.  For the reasons explained above, this claim, though unexhausted, is not procedurally defaulted.  Nevertheless, the courthouse doors will functionally be closed to him and he will be able to neither exhaust his claim in state court nor press it in this Court if he is not provided with the funds necessary to develop the claim.  The reasoning of *Patterson v. Johnson* on this score is instructive and merits quoting at length:

> In order to obtain relief in a federal post-conviction proceeding, [petitioner] must allege facts which, if true, would entitle him to relief. Without investigative funds to help identify promising habeas corpus claims, [petitioner's] counsel may not be able to

marshal the facts needed to make a good-faith allegation of a federal constitutional violation. Even if he could allege facts which, if true, would establish 'cause' for the procedural default, without investigative funds at the pre-application stage, [petitioner] may be unable to show a constitutional violation with sufficient particularity (and perforce, would be unable to show 'prejudice'). As the Supreme Court noted in *McFarland v. Scott*, 512 U.S. 849, 855 (1994), the investigative resources provided under 28 U.S.C. § 848(q)(9) 'may be critical in the preapplication phase of a habeas corpus proceeding, when possible claims and their factual bases are researched and identified.' Ultimately, the court concludes that it makes little sense to force [petitioner] to first try to make a good faith claim of a constitutional violation before supplying him with the resources to investigate this claim's factual basis and validity. This is especially true of a claim that may have been procedurally defaulted in the state post-conviction forum, for which [petitioner] must also allege and prove not just 'cause' for the procedural default, but 'prejudice' as well. If [petitioner] is to make the requisite allegation of constitutional deficiency and consequent 'prejudice' in his petition, he should be allowed to investigate and develop the full extent of the mitigating evidence that trial counsel allegedly failed to investigate and produce at his trial.

2000 U.S. Dist. LEXIS 12694, *4-6 (N.D. Tx. 2000).

This claim, moreover, is crucial to establishing the cumulative prejudice Mr. Murphy suffered by virtue of his attorneys' deficiencies during the punishment phase of his trial, as discussed further below.  To the extent that, as counsel expects, Mr. Murphy is diagnosed with PTSD, the requested evaluation will shed light on the ways in which Mr. Murphy's PTSD have affected his life.  Such a diagnosis would place in proper context the testimony heard by the jury regarding Mr. Murphy's prior criminal convictions, in particular his prior conviction for a sexual assault; his inability to take advantage of being placed in a stable, loving home at age nine after sustaining years of abuse while living with his neglectful, drug- and alcohol-addicted mother; and the necessarily incomplete testimony of defense mental health expert Dr. Mark Vigen. Whether this claim entitles Mr. Murphy to a new sentencing trial is entirely a function of additional facts that cannot be known unless this Court authorizes additional funding.  Because there is a sufficiently great likelihood that additional investigation will reveal facts that warrant

this Court in ordering habeas relief, Mr. Murphy respectfully reiterates his request for the

funding necessary to complete that investigation.

> **D.**     **Counsel Were Deficient for Failing to Object to the State's Highly Improper Closing Arguments.**

> **1.**     **Respondent Misconstrues the Nature of Mr. Murphy's Claim.**

In arguing that counsel's performance was not deficient in this area, Respondent begins

by citing cases from the Court of Criminal Appeals that set out the standard for improper jury

arguments under Texas law.  Docket Entry 40 at 86.  Respondent goes on, however, to cite a

series of cases delineating the standard for finding that improper arguments made in state court

proceedings constitute an independent federal due process violation.  *Id.* at 86-87 (citing

*Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974); *Darden v. Wainwright*, 477 U.S. 168, 181

(1986); *Nichols v. Scott*, 69 F.3d 1255, 1278 (5th Cir. 1995); *Geiger v. Cain*, 540 F.3d 303, 308

(5th Cir. 2008)).  Not surprisingly, the standard for showing such a violation is more onerous than

that necessary to establish that counsel was ineffective for failing to object to arguments

impermissible under state law.  The reasoning for this distinction was made clear by the Supreme

Court in *Donnelly v. DeChristoforo*, one of the cases cited by Respondent:

> This is not a case in which the State has denied a defendant the benefit of a
> specific provision of the Bill of Rights, such as the right to counsel, or in which
> the prosecutor's remarks so prejudiced a specific right, such as the privilege
> against compulsory self-incrimination, as to amount to a denial of that right.
> When specific guarantees of the Bill of Rights are involved, this Court has taken
> special care to assure that prosecutorial conduct in no way impermissibly
> infringes them.  But here the claim is only that a prosecutor's remark about
> respondent's expectations at trial by itself so infected the trial with unfairness as
> to make the resulting conviction a denial of due process.

416 U.S. 637, 643 (1974) (internal citations omitted).  In other words, when the allegation is that

improper argument constitutes a due process violation, the petitioner must show that remark was

so wildly improper that it infected the trial with such gross unfairness that the entire conviction must fall.

Mr. Murphy, of course, has not argued in his Petition that the State's arguments—improper though they were—constitute an independent violation of the Due Process Clause. Rather, he argues that trial counsel's inexplicable failure to object to arguments that were clearly improper under Texas law deprived him of his right to the effective assistance of counsel. As such, he need not meet the higher burden of establishing that the State's arguments constitute an independent due process violation.

Respondent's misunderstanding of the nature of Mr. Murphy's claim likewise leads him to argue incorrectly that even if the State's argument were improper, any error was harmless because Mr. Murphy cannot show actual prejudice. Docket Entry 40 at 88-89. Because Mr. Murphy is alleging an ineffective assistance of counsel claim, all that he must do to prevail on his claim is meet the two-prong *Strickland* standard and show, as he does below, that 1) counsel was deficient in failing to object to improper arguments by the State and 2) Mr. Murphy was prejudiced by this failure. 466 U.S. at 687. As *Strickland* itself and its progeny make clear, that is **all** that Mr. Murphy show. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362 (2000) (granting habeas relief after finding two prongs of *Strickland* test had been met); *Wiggins v. Smith*, 539 U.S. 510 (2003) (same); *Rompilla v. Beard*, 545 U.S. 374 (2005) (same); *Walbey v. Quarterman*, 309 Fed. App'x 795 (5th Cir. 2009) (same).

### 2. The State's Arguments Were Improper.

Respondent asserts that the arguments of which Mr. Murphy complains—including calling Mr. Murphy evil, comparing him to Satan, asserting that he lacks the humanity of the jurors, and urging the jury to base its verdict on sympathy for the decedent's nine year old son—

28

were all proper.  Specifically, Respondent argues that the State's pleas that the jury abandon its duty to objectively weigh the evidence and instead base its verdict on sympathy for the victim's family were permissible pleas for law enforcement, Docket Entry 40 at 87, and that the derogatory references to Mr. Murphy made by the State were reasonable deductions from the evidence, *id.* at 88.

Neither of these assertions is supported by Texas law.  Respondent cites *Martinez v. State*, 17 S.W.3d 677, 693 (Tex. Crim. App. 2000), in support of its contention that the State was engaged in a proper plea for law enforcement.  *Id.* at 87.  *Martinez* is, in fact, a salient case for comparison, but it does not support Respondent's position.  Rather, *Martinez*, in addition to the cases cited in Mr. Murphy's petition, Docket Entry 18 at 74, demonstrates the highly inflammatory nature of the arguments by the State here.  In *Martinez*, the State urged the jury to sentence the defendant to death because "[t]he family of the murdered victims, the family—the victims themselves, they cry out to you, for the death penalty in this case."  17 S.W.3d at 692.  In finding that the "degree of misconduct, if any, was relatively mild," the Court of Criminal Appeals noted that the "prosecutor did not attempt, through this argument, to convey any specific facts about the effect of the victims' deaths upon their families."  *Id.*

The same cannot be said of the arguments made in Mr. Murphy's trial, which were not only more extensive than those made in *Martinez*, but far more pointed in conveying "specific facts about the effect of the victim['s] death[ ]."  The passage below is but the most graphic example:

> On that day he and his friends took away—they took away a valuable police officer, a man of our community. They took away a man from his wife. They took away a son from a mother and a father. And they took away a nine-year-old boy's father. When he was nine, he had a loving father, who tried to provide him a home. But Andrew Hawkins doesn't have a father anymore because of him. As you grow up as a boy, you play baseball, you play football, you can always look

on the sidelines to see if your dad is watching. Andrew, he doesn't get that. He won't have the opportunity to talk to his father before he goes out on that first date. He won't have the opportunity to have his father watching him walk across that stage at high school graduation because they took it away from him. And you, as a jury, have to hold him responsible for his actions.

49 RR 35.  This argument—with its emotional appeal that the jurors put themselves in the place of a nine year old boy who lost his father on Christmas Eve and will never see him again—is far closer to the arguments disallowed by the Court of Criminal Appeals in *Stahl v. State*, 749 S.W.2d 826, 830-32 (Tex. Crim. App. 1988) (reversing the defendant's conviction and finding, among other errors, that the prosecutor's argument that the jury has "an opportunity to tell them that we don't like them causing grief to good people like [the victim's mother].  You have an opportunity to let [the victim's mother] know that her son did not die in vain" was inflammatory and amounted to a call for the jury to abandon objectivity), and *Brandley v. State*, 691 S.W.2d 699, 712-13 (Tex. Crim. App. 1985), *overruled on other grounds*, *Baldwin v. State*, 2009 Tex. App. LEXIS 4270 (June 12, 2009) (finding the prosecutor's statement urging the jurors "to think about the feelings of the father who lost his baby daughter and . . . how you would feel if you lost your children" to be an inappropriate "plea for abandonment of objectivity").

Respondent's citation to *Westbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000), in support of his contention that the derogatory references to Mr. Murphy were reasonable deductions from the evidence, is equally infirm.  *Westbrook* involves a prosecutor who argued to the jury on the basis of a statement by the defendant that was not admitted in evidence.  *Id.*  It does not stand for the proposition that the State may engage in derogatory and inflammatory name-calling because "killing an officer in the lawful discharge of his duty is an intolerable act" and the jurors may thus deduce that the defendant is less than human.  Docket Entry 40 at 88.  If Respondent's argument were taken to its logical conclusion, it would open the floodgates to all

manner of argument that the Court of Criminal Appeals has long found improper.  *See, e.g.*, *Ramos v. State*, 991 S.W.2d 430, 437 (Tex. Crim. App. 1999) (prosecutor exceeded permissible scope of argument in describing defendant as "satan personified"); *Shannon v. State*, 942 S.W.2d 591, 597 (Tex. Crim. App. 1996) (prosecutor's reference in closing argument to defendant as a "sociopath" was improper); *Renn v. State*, 495 S.W.2d 922 (Tex. Crim. App. 1973), *overruled on other grounds*, *Burrell v. State*, 526 S.W.2d 799 (Tex. Crim. App. 1975) (reversing conviction on the sole basis of prosecutor's repeated derogatory references to the defendant, including calling him a "hippy" and a "Communist"); *Duran v. State*, 356 S.W.2d 937, 938 (Tex. Crim. App. 1962) (reversing conviction on the sole basis of references to defendant as a "punk"); *Martinez v. State*, 332 S.W.2d 718, 719 (Tex. Crim. App. 1960) (reversing conviction on the sole basis of prosecutor's references to the defendant as a "thug", "thief", and "vagrant"); *Marx v. State*, 150 S.W. 2d 1014, 1017 (Tex. Crim. App. 1941) (reversing conviction based in part on references to defendant as a "beast"); *McGrew v. State*, 143 S.W. 2d 946, 946-47 (Tex. Crim. App. 1940) (reversing conviction based in part on references to defendant as a "fiend from hell"); *Jupe v. State*, 217 S.W. 1041, 1042 (Tex. Crim. App. 1920) (reversing conviction on the sole basis of references to defendant as a "cowardly cur").

Moreover, in asserting that the arguments were proper and counsel were therefore not deficient, Respondent wholly ignores the fact that trial counsel filed pre-trial motions in limine on both of these issues and that both motions were granted—demonstrating both that counsel believed such arguments to be improper and that the court agreed.  In counsel's Motion in Limine with Regard to Matters Concerning the Deceased, the trial court granted the motion to hold a hearing outside the presence of the jury prior to "mention[ing], allud[ing] to, . . . or in any way bring[ing] to the attention of the jury" information concerning "[t]he impact or effect that

the death of the deceased in this case has had on the family of the deceased, the friends of the

deceased, or any other person." 1 CR 177-78.  The motion styled Defendant's Motion in Limine

Name Calling by Prosecution was unequivocally granted; the court's order stated that "[d]uring

the trial of this case, the attorneys for the State are ordered not to call or refer to the Defendant

by any name other than his Christian and surname, the 'Defendant' or the 'Accused.'"  1 CR

157-58.   Given that the trial court granted both of these motions and that the Court of Criminal

Appeals' case law is clear that these arguments were improper, there is no excuse for counsel's

failure to object to the State's arguments.

> **E.     Counsel Were Ineffective for Failing to Object to the State's Impermissible
> *Voir Dire* Committing the Jurors to Return an Affirmative Answer to the
> Second Special Issue, to Challenge Those Jurors for Cause, or to Exercise a
> Peremptory Strike.**

Respondent argues that the *voir dire* questions of which Mr. Murphy complains in his

final punishment phase ineffective assistance claim were permissible under state law and that, in

any event, the State's questions do not relate to any of the sentencing special issues.  Docket

Entry 40 at 93-101.  Both of these arguments are belied by the record and the relevant case law.

It is certainly true that, as Respondent notes, hypothetical questions are not per se

impermissible under Texas law.  Such questions, however, may not go beyond the statutory

elements of an offense or punishment range and ask jurors to set "the hypothetical parameters of

their decision-making."  *Standefer v. State*, 59 S.W.3d 177, 182 (Tex. Crim. App. 2001);

*Allridge v. State*, 850 S.W.2d 471, 480 (Tex. Crim. App. 1991), *cert. denied*, 510 U.S. 831

(1993).  The Court of Criminal Appeals' recent decision in *Cardenas v. State*, 2010 Tex. Crim.

App. LEXIS 1391 (Nov. 10, 2010), reiterating the principles set out in *Standefer*, amply

demonstrates why the questions posed by the State in this case were impermissible.  In

*Cardenas*, the defense attorney asked the following question of the jury panel:

> I want you to assume that you have found somebody guilty of sexual assault,
> aggravated sexual assault of a child.  They intentionally or knowingly caused the
> penetration of the sexual organ of the complaining witness, of the victim, by the
> means of the sexual organ or any other [*sic*] or with a finger or with touching
> genital to genital . . . Could you honestly ever fairly consider on an aggravated
> sexual assault of a child as little as five years in prison and give probation as an
> appropriate punishment[?]

*Id.* at *1.  The Court of Criminal Appeals held that this question was proper because a) an answer

in the negative would give rise to a valid challenge for cause, as such a juror would have

indicated an unwillingness to consider the full range of punishment under the relevant statute;

and b) it provided no facts specific to the case at hand, and was instead limited to the statutory

elements of the offense and statutory range of punishment.  *Id.* at *passim*.

Perhaps most instructive are the examples the court provided of the sorts of

additional facts that transform a permissible commitment question into one that is impermissible.

The court instructed that

> counsel veers into impermissible commitment questions when he attempts to
> commit a veniremember to consider the minimum sentence based on specific
> evidentiary facts.  For example, a party may ask the potential juror if he could
> consider the minimum of five years' imprisonment in a murder case, but he may
> not ask if the juror could consider five years in prison in a case in which the State
> alleged that the defendant "tortured, garroted, poisoned, and pickled" the victim.
> The nonstatutory manner in which the defendant was alleged to have committed
> the offense adds evidentiary facts peculiar to the case on trial.  The question,
> because it goes beyond the statutory elements and statutory manner or means, is
> improper under *Standefer*.

*Id.* at *11 (internal citations omitted).

Again emphasizing that counsel's question in *Cardenas* "contained no evidentiary facts,"

the court provided a contrast with the question found impermissible in *Sells v. State*:

> The State cites *Sells v. State*, in which we held that the question, "Can you imagine a set of circumstances, set of facts where you would find a person guilty of capital murder, killing a young girls where you would [not impose the death penalty?]" was an improper commitment question. That question "sought to commit [the venireperson] to a particular answer after learning a particular fact," namely, that a young girl had been killed. The capital murder statute in Texas has no statutory element of a "young girl" being killed. The defendant in *Sells* had been charged with murder in the course of committed burglary, thus the age of the victim was irrelevant for purposes of *Standefer* commitment questions.

*Id.* at *24-25 (quoting *Sells v. State*, 121 S.W.3d 748 (Tex. Crim. App. 2003)). In a similar passage, the court noted that the question posed in *Atkins v. State*—"If the evidence, in a hypothetical case, showed that a person was arrested and they had a crack pipe in their pocket, and they had a residue amount in it, and it could be measured, and it could be seen, is there anyone who could not convict a person, based on that"—was improper. The court reiterated that a proper question would have been "Can you follow a law that says a person can be found guilty of possessing a residue amount?" *Id.* at *26 (quoting *Atkins v. State*, 951 S.W.2d 787 (Tex. Crim. App. 1997)).

The court concluded by noting that

> Defense counsel's commitment question contained no evidentiary facts such as "Can you consider the minimum sentence if the child was a relative of the defendant's?" or "Can you consider the minimum sentence if the child was a four-year-old?" or "Can you consider the minimum sentence if the child was of the same sex as the defendant?" These are improper questions because they go beyond the statutory language of the criminal offense. Here, counsel did not include any facts in his hypothetical that went beyond the statutory elements and statutory manner and means of committing that offense.

*Id.* at *27.

These illustrative examples leave no doubt that the questions posed by the State in Mr. Murphy's case were impermissible. The State did not limit its questions to the "statutory elements and statutory manner and means of committing" the offense and ask whether jurors would be willing to consider the permissible range of punishment authorized under the statute.

Rather, the State provided additional, non-statutory, evidentiary facts that tracked the facts of Mr. Murphy's case.  This is evident from the very passage cited by Respondent from the *voir dire* of juror Christine Stucker:

> An example I give of this is if Mr. Wirskye and I here decide to rob a bank. **We get another accomplice to be our driver.  He pulls up.  We say, keep the car running.  We're going in with our guns.**
>
> We go in with guns. We rob the bank. I start covering the tellers. Mr. Wirskye is loading the money up. I start shooting the teller. Maybe I don't like the way they are looking at me. Maybe Mr. Wirskye here says they are going for an alarm or trying to get out the back. Anyway, I kill one or two or however many. We run outside and we're captured.
>
> ****
>
> We want to ask each juror how you feel about that, the prosecution of someone who is a nontriggerman for the death penalty.  Do you agree that the law should allow that or do you disagree with that aspect of it?

11 RR 117-19 (emphasis added).  This is not, as Respondent asserts, "a most generic hypothetical."  Docket Entry 40 at 100.  It is, instead, precisely the factual scenario that formed the basis of the State's case at trial, and is the equivalent of the attorney in *Cardenas* adding to his question evidentiary facts regarding the relationship between the complainant and defendant, and the age and sex of the complainant—all of which the Court of Criminal Appeals held would have made the question impermissible.  After this impermissible question, the State went on to ask possibly even more egregious questions, asking Ms. Stucker specifically what additional factors would be important to her in determining whether the death penalty was appropriate for the non-triggermen in the hypothetical and whether "[a] big factor to [her] would be their knowing whether they possessed weapons."  11 RR 119-20.

As is evident from this passage—and in the excerpts of the *voir dire* of Michael Collins, David Evans, and Nancy Carney included in Mr. Murphy's petition—these questions would not

35

have given rise to a valid challenge for cause.[9] Docket Entry 18 at 80-85. This is so because a party is not allowed to commit jurors to returning a particular sentence in a particular factual scenario. Rather, a party may only ascertain whether a juror is open to considering the full range of permissible punishments. In *Standefer*, the Court of Criminal Appeals noted that the questions "Could you find someone guilty on the testimony of one witness?" and "Could you find someone guilty on circumstantial evidence alone?" are both improper because "[a] party is not entitled to commit a juror on whether he can convict based on one witness nor is he entitled to commit a juror to a certain disposition if only circumstantial evidence is presented." 59 S.W.3d at 183 n.28. Similarly, a question as to "whether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry" because no answer would give rise to a valid challenge for cause. *Id.* at 181. The questions posed by the State here, which included detailed fact patterns mirroring the facts of the case and went well beyond the statutory elements and manner and means, were similarly impermissible under Texas law.

Respondent's assertion that "the record clearly shows that hypotheticals given by the prosecutor to each juror had nothing to do with punishment phase special issues" is equally fallacious. Docket Entry 40 at 99. The entire point of the State's questions was to determine whether these jurors would be willing to sentence a non-triggerman getaway driver to death, and what evidence the juror would require to render such a verdict. These questions go directly to the heart of the second special issue—whether the jurors would find that a getaway driver who

_____

[9] Indeed, in the *voir dire* of Michael Collins, David Evans, and Nancy Carney, the State grew even bolder, asking both Mr. Collins and Ms. Carney specifically about their feelings about whether the death penalty would be appropriate for the "getaway driver" in the hypothetical. 13 RR 20 (*voir dire* of Michael Collins); 14 RR 164 (*voir dire* of Nancy Carney). The State likewise asked all three what specific evidence they would like to have presented in determining whether the non-triggerman should be put to death. 13 RR 20 (*voir dire* of Michael Collins); 14 RR 114 (*voir dire* of David Evans); 14 RR 163 (*voir dire* of Nancy Carney) ("Or if I had a gun, that would make a difference to you?").

36

knew that his accomplices had guns "did not actually cause the death of the deceased, Aubrey Hawkins, but intended to kill the deceased or another or anticipated that a human life would be taken." 1 CR 55. Because trial counsel failed to object to these impermissible questions and— once the jurors had committed themselves to returning a death verdict to a getaway driver in precisely Mr. Murphy's position—neither moved to strike them for cause nor exercised a peremptory strike against them, counsel were deficient.

**F.    Mr. Murphy Was Prejudiced by the Cumulative Effect of the Deficiencies that Infected the Punishment Phase of His Trial.**

Respondent expresses uncertainty as to whether Mr. Murphy, in asserting that the cumulative effect of trial counsel's deficiencies prejudiced him, is claiming presumed prejudice under *United States v. Cronic*, 466 U.S. 648 (1984). Docket Entry 40 at 90. Mr. Murphy is not making that claim. Rather, he argues that, because each of the punishment phase errors discussed above was of a constitutional dimension, this Court should conduct the prejudice analysis by examining the cumulative impact of these errors. *See, e.g.*, *United States v. Hall*, 455 F.3d 508, 520-21 (5th Cir. 2006) (noting applicability of cumulative error doctrine to ineffective assistance of counsel claims but finding that, on the particular facts of the case, petitioner was not entitled to its application because he had not demonstrated error); *Miller v. Johnson*, 200 F.3d 274, 286 n.6 (5th Cir. 2000) (same).

In conducting this cumulative prejudice analysis, the Court must also be cognizant of the fact that Texas is not among the states in which the question posed to the jury is whether the mitigating factors presented by the defense outweigh the aggravating factors presented by the prosecution. Docket Entry 18 at 38-40 (citing state statutes). Rather, in Texas, capital jurors are asked to answer special issues. In Mr. Murphy's trial, those special issues were first, "whether

there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  Tex. Code Crim. Proc. art. 37.071, § 2(b)(1).  Second, the jury was asked to find "beyond a reasonable doubt that the defendant did not actually cause the death of the deceased, but intended to kill the deceased or another or anticipated that a human life would be taken."  *Id.* at § 2(b)(2).  Third, the jury was asked "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed."  *Id.* at § 2(e)(1). Accordingly, the question before this Court is not whether the aggravating factors presented at Mr. Murphy's trial outweigh the mitigating factors, but whether there is a "reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently." *Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006) (adopting this analytical framework in light of its recognition that "Texas' capital sentencing scheme does not involve the direct balancing of aggravating and mitigating circumstances").

The answer to that question is clearly yes.  Each of the errors detailed above—counsel's failure to seek a change of venue from Dallas County, where the jurors were besieged by a steady influx of inflammatory publicity; counsel's failure to conduct a reasonable mitigation investigation by timely hiring a mitigation specialist and evaluating Mr. Murphy for PTSD; counsel's failure to object to impermissible closing arguments; and counsel's failure to object to grossly prejudicial *voir dire* in which jurors committed themselves to returning an affirmative answer to the second special issue—is sufficiently prejudicial to warrant relief on its own.  Taken together, there is no question that Mr. Murphy is entitled to relief.

Respondent's characterization of the mitigation evidence presented at the punishment phase perfectly illustrates the prejudice Mr. Murphy has suffered.  Respondent argues that "[w]hat was uncontested was that Murphy always had a home and was cared for even when his mother went away for extended periods, or when his father was away on his job.  He had a caring aunt and stepmother."  Docket Entry 40 at 79.  The evidence that Mr. Murphy has identified in his petition belies the picture of a stable and caring upbringing painted by Respondent.  The aunt to whom Respondent refers, Linda Goodman, was twelve years old when Mr. Murphy was born.  Exhibit 38 at ¶ 5.  She was only a child herself when she was tasked with caring for her sister's abandoned child.  *Id.* at 10.  Indeed, during the time that Respondent claims that Mr. Murphy was being provided with this caring home by his aunt, both were living with Mr. Murphy's maternal grandmother, who not only verbally and physically abused him, but also taught him to shoplift at a young age.  Exhibit 35 at ¶ 10.  Similarly, Mr. Murphy's stepmother subjected him to brutal "discipline" that involved being whipped with a belt.  Exhibit 35 at ¶ 19, Exhibit 39 at ¶ 5.

Moreover, it is precisely this argument that evidence of Mr. Murphy's PTSD symptoms should have been developed to rebut.  As Dr. Bradley-Davino's declaration makes clear, PTSD is a psychiatric diagnosis that has wide-ranging effects, including increased risk of physical aggression, substance abuse, sexual abuse, and emotional impairment.  Exhibit 34 at ¶ 16-24.  In Mr. Murphy's case, the requested evaluation—and expected diagnosis—would have placed in proper context the testimony heard by the jury regarding Mr. Murphy's prior criminal convictions, in particular his prior conviction for a sexual assault; his inability to take advantage of being placed in his father's home at age nine after sustaining years of abuse while living with

his neglectful, abusive, and drug- and alcohol-addicted mother; and the necessarily incomplete testimony of defense mental health expert Dr. Mark Vigen.

In sum, Mr. Murphy is entitled to be sentenced by a jury that is privy to all of the mitigation evidence he has identified, and that has not been tainted by inflammatory media coverage, improper *voir dire*, and highly prejudicial arguments from the State.

**V.      Mr. Murphy's Appellate Counsel Was Ineffective for Failing to Raise the Unexhausted, Meritorious Claims Presented in Mr. Murphy's Petition.**

For all the reasons stated above, the claims raised in Mr. Murphy's petition are—contrary to Respondent's assertion—meritorious, and there is a reasonable probability that he would have been afforded relief in the Texas courts had they been raised in his direct appeal.  Because his appellate counsel failed to raise all but one of these meritorious claims, counsel's performance was deficient and prejudicial, and Mr. Murphy is entitled to a new direct appeal process.  *Evitts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984).

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Mr. Murphy prays that this Court:

1.     Issue a writ of habeas corpus to have him brought before it, to the end that he may be relieved of his unconstitutional sentence of death;

2.     If necessary to resolve disputed factual issues, schedule an evidentiary hearing during which Mr. Murphy may present evidence in support of his claims;

3.     Grant such other relief as law and justice requires.


Respectfully submitted,


s/ David R. Dow
_____
David R. Dow
Texas Bar No. 06064900

TEXAS DEFENDER SERVICE
1927 Blodgett Street
Houston, Texas 77004
Tel. (713) 222-7788
Fax (713) 222-0260

*Counsel to Patrick Henry Murphy Jr., Petitioner*

**VERIFICATION**

I, David R. Dow, attorney for Petitioner in the above-entitled action, state that to the best of my knowledge and belief, the facts set forth in this Petition are true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on February 7, 2011.

s/ David R. Dow
_____
David R. Dow

**CERTIFICATE OF SERVICE**

I certify that on February 7, 2011, a copy of the foregoing pleading was electronically served on counsel for the Respondent by filing the document with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.

Jeremy C. Greenwell
Laura Turbin
Office of the Texas Attorney General
Post Office Box 12548
Austin , TX 78711
jeremy.greenwell@oag.state.tx.us
laura.berins@oag.state.tx.us

s/ David R. Dow
_____
David R. Dow