WRIT NO. W01-00328-T(A)

| | | |
|---|---|---|
| EX PARTE | § | IN THE 283RD JUDICIAL |
| PATRICK HENRY MURPHY, JR., | § | DISTRICT COURT OF |
| Applicant | § | DALLAS COUNTY, TEXAS |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having considered the original application for writ of habeas corpus, the State's response to the original application, official court documents and records, and the Court's personal experience and knowledge, the Court makes the following findings of fact and conclusions of law:

### CASE HISTORY

Applicant is confined pursuant to the judgment and sentence of the 283rd Judicial District Court of Dallas County, Texas, convicting him of the December 24, 2000, capital murder of Irving Police Officer Aubrey Hawkins. On November 20, 2003, in accordance with the jury's answers to the special issues, this Court sentenced Applicant to death.

The Court of Criminal Appeals affirmed Applicant's conviction and death sentence on direct appeal on April 26, 2006. *Murphy v. State*, No. AP-74,851 (Tex. Crim. App. Apr. 26, 2006).

071

Applicant untimely filed an original application for writ of habeas corpus on September 20, 2005. The application was forwarded to the Court of Criminal Appeals. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071, § 4(d) (Vernon 2005). On December 14,

2005, the Court of Criminal Appeals found good cause for the untimeliness of the application, ordered the trial court to proceed with its review of the application, and ordered the statutory timelines to run as of December 14, 2005, the date of the Court's order. The State filed its response on June 12, 2006. On November 9, 2007, the Court found there were no controverted, previously unresolved fact issues material to the legality of Applicant's confinement that required an evidentiary hearing, and the Court ordered the parties to file proposed findings of fact and conclusions of law within 30 days.

## SPECIFIC FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. APPLICANT WAIVED THE OPPORTUNITY TO FILE A SECOND ORIGINAL WRIT

1.     The Court finds that, in September of 2007, the state habeas counsel for Randy Halprin, one of Applicant's co-defendants, informed the Court that Applicant was dissatisfied with the representation of his state habeas counsel, Allan Fishburn. Halprin's counsel, Bruce Anton, informed the Court that he received this information from Applicant while interviewing him recently on death row.

2.     The Court finds that, in response to this information, it reviewed Applicant's writ application. Then, in October 2007, the Court notified Mr. Fishburn and the State that it had concerns with the quality of Applicant's representation in these proceedings. The Court also informed Mr. Fishburn that it would grant Applicant a request for new writ counsel and the opportunity to file another original application for habeas relief under article 11.071 of the Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 11.071 (Vernon Supp. 2006).

2

3.      The Court finds that the State opposed the Court taking such action on the grounds

that article 11.071 did not authorize a second original writ application. The State argued

that any new pleading filed would constitute a subsequent writ that would be barred

under section five of article 11.071. TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5

(Vernon Supp. 2006).

4.      The Court finds that, on November 5, 2007, Mr. Fishburn met with Applicant and

relayed the Court's proposal, but Applicant informed Mr. Fishburn that he wanted him to

continue as his counsel in these writ proceedings.

5.      The Court finds that, on November 6, 2007, the Court conducted a hearing at

which it personally expressed to Applicant its concerns with the quality of Mr. Fishburn's

representation. At this hearing, the Court specifically informed Applicant of the ABA's

guidelines and standards for the performance of state habeas defense counsel in death

penalty cases. *See* ABA Guidelines for the Appointment and Performance of Defense

Counsel in Death Penalty Cases (Revised ed. 2003). The Court asked Applicant if he

wanted the Court to conduct an inquiry into whether Mr. Fishburn had acted consistently

with these guidelines and standards in his representation of Applicant. In addition, the

Court informed Applicant that, if he so desired, Mr. Fishburn would withdraw and the

Court would appoint new habeas counsel. Finally, the Court informed Applicant that it

would be up to the Court of Criminal Appeals whether to consider any new claims raised

by new counsel. (Writ Hearing RR: 3-6).

6.      The Court finds Applicant understood the nature of the Court's offer as well as the          073

consequences of rejecting it. (Writ Hearing RR: 4).

3

7.     The Court finds that Applicant declined the Court's offer to conduct an inquiry into the quality of Mr. Fishburn's representation. In addition, Applicant informed the Court that he wanted Mr. Fishburn to continue to represent him in these proceedings.

8.     The Court finds that Applicant's decision to reject the Court's offer was voluntary.

9.     The Court finds and concludes that Applicant knowingly and voluntarily elected to proceed with Mr. Fishburn as counsel.

10.    The Court finds and concludes that Applicant knowingly and voluntarily elected to proceed on the application filed by Mr. Fishburn.

11.    The Court finds and concludes that Applicant knowingly and voluntarily waived the opportunity for the appointment of new habeas counsel and the filing of a second original writ under article 11.071.

       The following findings, conclusions, and recommendations address the claims raised in the original application for habeas relief filed by Mr. Fishburn on Applicant's behalf.

### B. SUFFICIENCY OF THE EVIDENCE (GROUNDS 1-6)

12.    In his first six grounds for relief, Applicant challenges the legal and factual sufficiency of the evidence supporting his conviction and death sentence. In Grounds 1 and 2, he attacks the sufficiency of the evidence of his culpability as a party conspirator. In Grounds 3 and 4, he attacks the sufficiency of the evidence supporting the jury's affirmative answer to the anti-parties special issue. In Grounds 5 & 6, he attacks the sufficiency of the evidence supporting the jury's affirmative answer to the future dangerousness special issue.

074

4

## 1. Insufficiency Claims Are Not Cognizable

13.     Applicant urges this Court to conduct its own legal and factual sufficiency review

of the evidence under the standards enunciated in *Jackson v. Virginia*, 443 U.S. 307

(1979) and *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996).

14.     The Court notes it has long been the general rule that the sufficiency of the

evidence cannot be collaterally attacked. *See Ex parte McLain*, 869 S.W.2d 349, 350

(Tex. Crim. App. 1994); *Ex parte Brown*, 757 S.W.2d 267, 268 (Tex. Crim. App. 1988).

15.     Thus, the Court concludes that the sufficiency challenges Applicant raised in

Grounds 1 through 6 are not cognizable on habeas review. *See McClain*, 869 S.W.2d at

350 (holding allegation that evidence insufficient to support finding that Applicant used

or exhibited deadly weapon not cognizable on habeas corpus).

## 2. Insufficiency Claims Are Procedurally Barred

16.     The Court concludes that all of Applicant's sufficiency challenges are also

procedurally barred from collateral review.

### *a. Grounds 1-4*

17.     The Court finds Applicant challenged the legal and factual sufficiency of the

evidence to support his guilt as a party-conspirator in his eleventh and twelfth points of

error on direct appeal. And in his thirteenth and fourteenth points of error, he challenged

the legal and factual sufficiency of the evidence supporting the jury's affirmative answer

to the anti-parties special issue. The Court of Criminal Appeals rejected all of these

challenges. *Murphy v. State*, No. AP-74,851, slip op. at 8-13 (Tex. Crim. App. Apr. 26,

2006).

5

18.     The Court notes that claims raised and considered on direct appeal cannot be relitigated through habeas corpus unless the direct appeal judgment was subsequently rendered void or the Court of Criminal Appeals decided to retroactively apply relief following a change in the law. *Ex parte Ramos*, 977 S.W.2d 616, 617 (Tex. Crim. App. 1998); *Ex parte Drake*, 883 S.W.2d 213, 215 (Tex. Crim. App. 1994).

19.     The Court finds that neither of these exceptions exists in Applicant's case.

20.     Thus, the Court concludes Grounds 1 through 4 should be dismissed because they are procedurally barred.

### *b.  Grounds 5 & 6*

21.     The Court finds that Applicant could have, but did not, present any challenge on direct appeal to the legal and factual sufficiency of the evidence of his future dangerousness.

22.     The Court notes that habeas will not lie as a substitute for direct appeal. *Ramos*, 977 S.W.2d at 617.

23.     Thus, the Court concludes that Applicant's grounds 5 and 6 should be dismissed because they, too, are procedurally barred.

### 3. Evidence is Sufficient

24.     Alternatively, the Court concludes that, even if preserved and cognizable, none of Applicant's insufficiency claims have merit.

### *a.  Evidence is Sufficient to Support Capital Murder Conviction*
(Grounds 1 & 2)

25.     The Court notes that the standards for reviewing sufficiency claims are well

076

6

established. In assessing the legal sufficiency of the evidence, the reviewing court affirms the conviction if, considering the evidence in the light most favorable to the verdict, any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Threadgill v. State*, 146 S.W.3d 654, 663 (Tex. Crim. App. 2004) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)).

26.     The Court notes that, in a factual sufficiency review, the reviewing court views the evidence in a neutral light and reverses the conviction if (1) the evidence supporting the verdict is too weak to support the finding of guilt beyond a reasonable doubt or (2) the evidence contrary to the verdict is strong enough that the beyond-a-reasonable-doubt standard could not have been met. *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007).

27.     The Court finds that the State sought to convict Applicant as a regular party or a party-conspirator. (CR: 39-42).

28.     The Court notes that to prove Applicant guilty as a regular party, the State had to demonstrate that Applicant acted with the intent to promote or assist in the capital murder of Officer Hawkins. *See* TEX. PENAL CODE ANN. § 7.02(a) (Vernon 2003). To prove Applicant's guilt as a party-conspirator, however, the State only had to demonstrate that Applicant "should have anticipated" Officer Hawkins's death while in the course of carrying out a conspiracy to commit robbery. *See* TEX. PENAL CODE ANN. § 7.02(b) (Vernon 2003); (CR: 2).

29.     Applicant contends only that the evidence fails to establish his guilt as a party-conspirator. Because he does not also challenge the sufficiency of the evidence to prove

077

7

his guilt as a regular party, this Court need not even address his insufficiency claim. *See Pachecano v. State*, 881 S.W.2d 537, 541 (Tex. App. – Fort Worth 1994, no pet.) (holding appellate court need not address insufficiency complaint when defendant does not challenge all theories alleged in the charge).

30.    Nevertheless, the Court finds there is substantial proof that Applicant not only should have anticipated the officer's death.

31.    The Court notes that Applicant's guilt as a party may be inferred from the events occurring before, during, and after the murder of Officer Hawkins. *Burdine v. State*, 719 S.W.2d 309, 315 (Tex. Crim. App. 1986). It may also be deduced from Applicant's actions that show an understanding and common design to commit murder. *Id.*

32.    The Court finds that Applicant and his six codefendants plotted the Oshman's store robbery contemplating the use of deadly force. Applicant's codefendants, all escaped convicts, had prior convictions for crimes of violence. (RR45: 14-16). All of them, including Applicant, were present at the store and armed with loaded guns. (RR40: 58-61; State's Ex. 978). They committed the robbery in a large store on Christmas Eve, a time and place guaranteed to provide a large number of potential victims. (RR40: 37-40). From these circumstances alone, Applicant should have anticipated the possibility that someone would be killed during the robbery. *See Mosley v. State*, 983 S.W.2d 249, 254-55 (Tex. Crim. App. 1998) (holding Mosley's intent to kill could be inferred from evidence that he brought loaded gun to robbery); *Green v. State*, 682 S.W.2d 271, 285-86 (Tex. Crim. App. 1984) (holding evidence that Green and codefendants agreed to burglarize victims' house and rob them, together with evidence that Green entered house

8

armed with gun, was legally sufficient to prove Green should have anticipated victim's murder).

33.     Furthermore, the Court finds that, although Applicant did not personally shoot Officer Hawkins, he acted as lookout during the robbery – watching the parking lot, monitoring the radio frequencies used by the Irving Police Department, and keeping his codefendants apprised of police activity in the area. He notified his codefendants that the police had been dispatched to the store on a suspicious persons call, and he informed them of Officer Hawkins's arrival. Then, moments before the shooting, he warned co-defendant Rivas that Officer Hawkins was driving around to the back of the store where Rivas was waiting and the codefendants were exiting. (RR40: 52-79; RR41: 20-27, 35-41, 47-54; RR43: 49-50; State's Ex. 978). By warning his codefendants, Applicant afforded them the advantage over Hawkins and gave them the opportunity to prepare for his arrival at the back of the store.

34.     Applicant denies his radio warnings were intended to facilitate the murder of Officer Hawkins. (Application, p. 19). He claims they were only intended to assist his codefendants' flight from the store. In support of this claim, Applicant cites evidence that his codefendants encircled Hawkins's patrol car and, consequently, fired shots at each other. According to Applicant, this evidence shows the shootout was not a planned ambush, but the product of "unplanned chaos." (Application, p. 18-19, 21-24).

35.     The Court finds, however, that it is reasonable to conclude that Applicant's warnings evince an intent to avoid capture and give his codefendants the opportunity to confront Officer Hawkins. By circling around Hawkins and firing on him, Applicant's

079

9

codefendants undeniably manifested a lethal group intent. The fact that some of them were injured in the process shows the ambush was poorly executed – not that it was never contemplated.

36.    In addition, the Court finds that Applicant admitted it was his job to "initiate a firefight" if they were pursued and to "do damage from behind" in the event of a standoff at the store. (RR43: 49-50; State's Ex. 978). Thus, Applicant, himself, clearly contemplated the use of lethal force against Officer Hawkins, even before his arrival at the store.

37.    The Court finds that Applicant's act of warning his codefendants, coupled with his admission that he was prepared to shoot at the police if the need arose, is ample, persuasive evidence that he should have anticipated Officer Hawkins's death. *Compare with Tippitt v. State*, 41 S.W.3d 316, 324-28 (Tex. App. – Fort Worth 2001, no pet.) (holding evidence legally insufficient to prove Tippitt should have anticipated murder as possible result of robbery where, despite Tippitt's agreement with codefendant to rob victim, there was no evidence that Tippitt knew codefendant was carrying a gun during robbery or that he knew codefendant was inclined to commit murder).

38.    Moreover, the Court finds that this evidence is unimpeached, and there is no evidence, much less overwhelming evidence, controverting it.

39.    In light of the foregoing, the Court concludes that the evidence is both legally and factually sufficient to prove Applicant possessed the requisite culpability for capital murder.

080

10

40.     Therefore, the Court recommends denying the relief Applicant requests in
Grounds 1 and 2.

### b.  Evidence is Sufficient to Support Affirmative Finding on Anti-Parties Issue
(Grounds 3 & 4)

41.     The Court finds that Applicant's jury answered yes to the "anti-parties" special
issue, finding that Applicant either intended to kill Officer Hawkins or another or
anticipated that a human life would be taken. *See* (CR: 55); TEX. CODE CRIM. PROC. art.
37.071, § 2(b)(2).

42.     Applicant claims the evidence is insufficient to support the jury's answer because
the State failed to prove that he actually anticipated Officer Hawkins's death. In support
of this claim, Applicant relies on the evidence cited by him in the preceding point of error
as well as evidence offered at punishment, namely, Rivas's testimony. (Application, pp.
28-29).

43.     As discussed above, the Court finds that the evidence of Applicant's actual
anticipation is strong.

44.     In addition, the Court finds that Rivas's testimony does not alter the strength of the
State's proof, nor does it constitute overwhelming evidence that Applicant did not
anticipate the officer's death.[1]

---

[1] Applicant relies, in part, on Rivas's punishment testimony in support of his attack on the
sufficiency of the evidence of his guilt. (Application, p. 23). Because punishment testimony has
no bearing on the sufficiency of the guilt evidence, this Court only addresses the significance of
Rivas's testimony to the anti-parties special issue. *See Munoz v. State*, 853 S.W.2d 558, 560 n. 3
(Tex. Crim. App. 1993) (holding sufficiency review is necessarily limited to that evidence before
the jury at the time it rendered a guilty verdict).

11

45. The Court finds that Rivas testified that Applicant always acted as the lookout, claiming he did so during the escape and the extraneous robberies of the Auto Zone and Radio Shack as well as the Oshman's robbery. (RR48: 16-17). According to Rivas, Applicant did not want to go inside the stores during the robberies and he was hesitant about the Oshman's robbery. (RR48: 19-20). Rivas denied Applicant was supposed to engage in a firefight with police if they were pursued, and he denied that Applicant acted as a "sniper," claiming his vision was too poor for it. (RR48: 26-27, 64-66). He also attempted to minimize Applicant's role during the Oshman's robbery, claiming Applicant had an arsenal of weapons with him in the getaway vehicle only because they had put them there for safekeeping. (RR48: 20-21, 58-63). Furthermore, Rivas claimed it was known among the defendants that Rivas had not injured the victims of his prior robberies. (RR48: 18-19).

46. The Court finds that Rivas's testimony is not credible. By his own admission, Rivas has lied under oath on more than one occasion and has lied to manipulate his victims. (RR48: 35, 41-44). Furthermore, some of Rivas's testimony in Applicant's trial conflicted with Rivas's testimony at his own trial. (RR48: 67-69, 92-94).

47. Furthermore, the Court finds that none of Rivas's testimony refutes the fact that during the Oshman's robbery, Applicant was specifically looking and listening for the police and that he warned his codefendants, all of whom were armed and at least one of whom was waiting at the rear of the store, that Officer Hawkins was approaching. Even Rivas admitted that Applicant fulfilled his role as lookout during the Oshman's robbery. (RR48: 49).

12

082

48.    Moreover, the Court finds that Applicant's desire not to go inside during any of the robberies was more likely born out of a desire to avoid being identified or captured rather an aversion to violence. Applicant confessed that he refused to go inside the Oshman's during the robbery because "I was afraid of being recognized." (State's Ex. 978, p. 2).

49.    The Court also finds that regardless of what Rivas believed, Applicant thought his role in the Oshman's robbery was to use deadly force against the police if necessary. (RR43: 49-50; State's Ex. 978).

50.    Finally, as for Rivas's claim that all the codefendants knew he had not previously injured his robbery victims, the Court finds that Rivas's past conduct of holding people at gunpoint and robbing them is a violent act. Plus, while Rivas may not have shot or stabbed anyone during his prior robberies, neither he nor the other codefendants hesitated to use deadly force during the escape. (RR45: 129-42; RR46: 8-17, 26-30).

51.    In the face of this evidence, the Court concludes that no reasonable juror could conclude anything other than that Applicant actually anticipated that Officer Hawkins or another person would die.

52.    The Court concludes the evidence is legally and factually sufficient to support the jury's answer to the anti-parties special issue.

53.    Therefore, this Court recommends denying Applicant's request for relief in Grounds 3 and 4.

Ü83

### c. *Evidence is Sufficient to Support Affirmative Finding of Future Dangerousness* (Grounds 5 & 6)

#### *Factual Sufficiency*

54.    The Court notes that the jury's affirmative finding of Applicant's future dangerousness cannot be reviewed for factual sufficiency. *See Wardrip v. State*, 56 S.W.3d 588, 590 (Tex. Crim. App. 2001) (citing *McGinn v. State*, 961 S.W.2d 161, 169 (Tex. Crim. App. 1998)). To conclude that a jury's finding is against the great weight and preponderance of the evidence and, thus, factually insufficient, would require the reviewing court to assign some evidence mitigating value. Whether a particular piece of evidence is mitigating in the context of the future dangerousness issue, however, is a normative judgment not amenable to appellate review. *McGinn*, 961 S.W.2d at 169.

#### *Legal Sufficiency*

55.    The Court notes that the law does permit a legal sufficiency review of the future dangerousness finding. The evidence is viewed in the light most favorable to the finding to determine whether a rational trier of fact could have found beyond a reasonable doubt that appellant would commit criminal acts of violence constituting a continuing threat to society. *See Trevino v. State*, 991 S.W.2d 849, 853 (Tex. Crim. App. 1999).

56.    The Court notes that several factors bear on a defendant's future dangerousness, including, but not limited to: (1) the circumstances of the murder, including the defendant's state of mind and whether he was working alone or with others; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the murder's execution; (4) the existence of a prior criminal record, and the severity of

084

prior crimes; (5) the defendant's age and personal circumstances at the time of the murder; (6) whether the defendant was acting under duress or the domination of another at the time of the murder; (7) psychiatric evidence; and (8) character evidence. *See Brooks v. State,* 990 S.W.2d 278, 284 (Tex. Crim. App. 1999). These factors are evaluated using all of the evidence presented during both the guilt and the punishment phases of trial. *See id.*

57.     Applicant contends the jury's future dangerousness finding was an irrational response to his affiliation with the infamous "Texas Seven."

58.     The Court finds, however, that the jury rationally based its finding on ample evidence that Applicant, himself, posed a continuing threat of violence toward others.

### Nature and Circumstances of Offense

59.     The Court finds that, contrary to Applicant's contention, the jury could logically infer his future dangerousness from his affiliation with the Texas Seven.

60.     The Court finds that Applicant voluntarily and actively participated in the group's criminal activities – all of which were carefully and deliberately planned and executed.

61.     The Court finds that the escape, the largest prison-break in Texas history, was orchestrated with military-like precision – each group member carrying out assigned tasks. Applicant carried out his responsibilities during the escape, including the use of violence against those who stood in the way of the group's freedom. In particular, Applicant lured Martin Gilley, a civilian plumber, into the warehouse so he could be overtaken by some of the other escapees, and Applicant helped subdue Vernon Janssen, the TDCJ guard working the back gate at the prison unit. (RR46: 26-28, 38-44).

15

62.    Furthermore, the Court finds that, once free, Applicant chose to remain with the other escapees and continued committing crimes with them, including the Auto Zone and the Radio Shack robberies. (RR46: 62-98; RR47: 33-38). In each robbery, the group threatened its victims with lethal violence. Moreover, in the Oshman's robbery, the group clearly anticipated the use of deadly force against the police, and when confronted by Officer Hawkins, they showed no mercy, ambushing him in a hail of gunfire, dragging his body from his car, and running over him as they fled.

63.    The Court finds that the fact that Applicant acted as lookout in both of these robberies and did not fire a shot at Officer Hawkins does not make him less dangerous than his cohorts. By Applicant's own admission, it was his job to engage the police in a firefight if they pursued the group. (State's Ex. 978). Furthermore, as lookout, Applicant played a pivotal role in the group's efforts to avoid detection and capture. Indeed, it was Applicant's actions outside the Oshman's on Christmas Eve 2000 that gave his cohorts the upper-hand in their confrontation with Officer Hawkins. But for Applicant's radioed warnings, Officer Hawkins might have survived the confrontation behind the store and some of the other escapees might have been captured.

64.    The Court concludes that, from evidence of the nature and circumstances of the crime alone, the jury could have concluded beyond a reasonable doubt that Applicant posed a continuing threat of future violence.

## Criminal History and Character

65.    The Court finds that Applicant's future dangerousness can also be inferred from evidence of his criminal history and character.

086

66.     The Court finds that Applicant demonstrated a penchant for crime and violence and a disrespect for authority long before he ever became a member of the Texas Seven. As a juvenile, Applicant regularly got into fights at school, stole cars, and according to his father, was sometimes "out of control." (RR48: 116-17). At the age of 20, Applicant pointed a loaded shotgun at his father during an argument. (RR48: 117-18, 123). Also, Applicant sexually molested his younger half-sister, Christine. (RR48: 120).

67.     The Court finds that, in 1984, Applicant and his younger brother were caught burglarizing a store. (RR45: 16-26). That same year, Applicant also broke into the apartment of an acquaintance, Jeannie Grieser, and sexually assaulted her at knife-point while her mother and her two-year-old son slept in the next room. Applicant was sentenced to fifty years in prison for the assault. (RR45: 35-67).

68.     Applicant contends he was a model prisoner during the ensuing sixteen years, denying he participated in any violence while in prison.

69.     The Court finds that Applicant ignores the violence of the escape – violence in which he willingly participated despite the likelihood that he would be released from prison within months. (RR47: 143, 157). He also makes no mention of his complicity in the hiding of contraband (radios, knives, food) in the prison carpentry shop. (RR45: 6, 11-12).

70.     The Court finds that Applicant also fails to acknowledge the personal writings and research left behind by him during the escape. These documents contained a personal promise of future violence by Applicant. In a note left in his cell, Applicant states:

17

> I refuse to abide by the dictations of
> a police state, which Texas has surely become.
> Today I fire the first shot of
> THE NEW REVALUTION [sic]
> Long Live Freedom
> Death to Tyranny

(RR46: 51-61; State's Ex. 1010).

71.    The Court also finds that in the TDCJ pickup truck used by Applicant and his codefendants to escape, police found Applicant's journal which contained a list of a multitude of paramilitary websites and websites that sold weapons, false identification documents, and body armor. (RR47: 39-51, 52-57, 60-66).

72.    The Court finds that despite his lengthy incarceration, Applicant's violent nature endured. This fact could be no more evident than in the circumstances of Applicant's capture. Applicant sequestered himself in a hotel room with codefendant Newbury and an arsenal of firearms, giving himself up only when outnumbered and outgunned by law enforcement. (RR43: 37-80).

73.    Applicant contends the opinion of his psychological expert, Dr. Mark Vigen, constituted strong evidence that he posed no future danger.

74.    The Court finds that Dr. Vigen opined that Applicant had a sexual disorder and various narcissistic borderline antisocial traits, that he was more of a follower than a leader in the escape and murder of Officer Hawkins, and that under the security measures of administrative segregation, he posed a low risk of future danger in prison. (RR48: 136-67).

088

75.    According to Applicant, Dr. Vigen's opinion was neither refuted nor impugned. The Court finds that Applicant is wrong.

76.    The Court finds that, on cross-examination of Dr. Vigen, the State successfully challenged his characterization of Applicant as the most passive member of the Texas Seven. In particular, the State impeached the credibility of Dr. Vigen's opinion with evidence of Applicant's history of violence, leadership capabilities, and lack of remorse. (RR48: 168-214).

77.    The Court also finds that, on cross-examination, Applicant's prison expert, S.O. Woods, contradicted Dr. Vigen's assessment of the risk Applicant posed to others in prison. Woods acknowledged that Applicant would surely be housed in the maximum security of administrative segregation, but he also testified that no security measures are fool proof and escapes, violence, and even murders have been committed by inmates in administrative segregation. (RR47: 157-66). Moreover, even Woods conceded that, in his opinion, Applicant remains a very dangerous inmate. (RR47: 173).

78.    In sum, the Court concludes that there was substantial evidence from which Applicant's jury could rationally conclude beyond a reasonable doubt that he posed a continuing threat of future danger to society.

79.    The Court concludes the evidence is legally sufficient to support the jury's affirmative answer to the future dangerousness special issue.

80.    Consequently, if addressed on the merits, this Court recommends that the relief requested in Grounds 5 and 6 be denied.

089

19

## C. ENMUND/TISON (GROUNDS 7 & 8 )

81.    Relying on *Enmund v. Florida*, 458 U.S. 782 (1982), Applicant contends his
capital murder conviction and his death sentence violate the Eighth Amendment because
both exposed him to a death sentence without a finding that he possessed the specific
intent to kill.

### 1. Claims Are Procedurally Barred

82.    The Court finds that, at trial, Applicant never challenged the constitutionality of
his conviction under *Enmund*. He only challenged the constitutionality of his sentence
under *Enmund*. (RR49: 11-12).

83.    The Court notes that the failure to object at trial generally waives error for
collateral review. *See Ex parte Dietzman*, 851 S.W.2d 304, 305 (Tex. Crim. App. 1993).

84.    Alternatively, the Court finds that Applicant challenged the constitutionality of his
conviction under *Enmund* on direct appeal, and the Court of Criminal Appeals rejected
his claim. *See Murphy*, No. AP-74,851, slip op. at 44-45.

85.    The Court notes that claims raised and considered on direct appeal cannot be
relitigated through habeas corpus unless the direct appeal judgment was subsequently
rendered void or the Court of Criminal Appeals decided to retroactively apply relief
following a change in the law. *Ramos*, 977 S.W.2d at 617; *Drake*, 883 S.W.2d at 215.

86.    The Court finds that neither of these exceptions exists in Applicant's case.

87.    By the same token, the Court finds that Applicant could have challenged the
constitutionality of his death sentence under *Enmund* on direct appeal, but he did not.

U90

20

88.     The Court notes that habeas will not lie as a substitute for direct appeal. *Ramos*, 977 S.W.2d at 617.

89.     Therefore, the Court concludes that Grounds 7 & 8 should be dismissed because both are procedurally barred from habeas review.

## 2. There is No Constitutional Violation

90.     The Court finds that, even if Grounds 7 & 8 were reviewable, Applicant demonstrates no right to relief.

91.     The Court notes that *Enmund* concerns the proportionality of a death sentence for someone who did not intend to kill. It has no bearing on the constitutionality of a conviction for capital murder under the law of parties.

92.     Thus, the Court concludes, as did the Court of Criminal Appeals on direct appeal, that *Enmund* is irrelevant to the propriety of Applicant's conviction. *See Murphy*, No. AP-74,851, slip op. at 44-45; *see also Johnson v. State*, 853 S.W.2d 527, 535 (Tex. Crim. App. 1992) (holding Johnson misplaced his reliance on *Enmund* and *Tison* in support of his contention that his conviction for capital murder as a party is unconstitutional).

93.     As for the constitutionality of Applicant's death sentence, the Court finds that it submitted an anti-parties special issue to the jury in accordance with section 2(b)(2) of article 37.071.

94.     The Court notes that this special issue prevents assessment of the death penalty against a defendant unless the jury finds he actually caused the victim's death, intended to cause it, or anticipated that a human life would be taken. TEX. CODE CRIM. PROC. § 37.071, §2(b)(2).

21                                                                    091

95.     The Court also notes that the death penalty is not disproportionate for a defendant with any one of these three mental states. *See Ladd v. State*, 3 S.W.3d 547, 573 (Tex. Crim. App. 1999)(citing *Tison v. Arizona*, 481 U.S. 137 (1987)) (holding Eighth and Fourteenth Amendments' guarantees of proportionate sentencing and due process are ensured by anti-parties instruction mandated by article 37.071).

96.     Thus, the Court concludes that Applicant's challenge to the constitutionality of his death sentence is meritless.

97.     For the foregoing reasons, the Court recommends denying the relief requested in Grounds 7 & 8.

092

## ORDER

THE CLERK IS ORDERED to prepare a transcript of all papers in cause number W01-00328-T(A) and to transmit same to the Court of Criminal Appeals as provided by article 11.071 of the Texas Code of Criminal Procedure. The transcript shall include certified copies of the following documents:

1. Applicant's Original Application for Writ of Habeas Corpus filed in cause number W01-00328-T(A), including any exhibits;

2. The State's Answer to Original Writ Application filed in cause number W01-00328-T(A), including any exhibits;

3. The State's and Applicant's proposed findings of fact and conclusions of law;

4. This Court's findings of fact and conclusions of law, and order;

5. This Court's Order Finding No Hearing Necessary and Setting Deadlines For Filing Proposed Findings and Conclusions, dated November 9, 2007.

6. The indictment, judgment, sentence, docket sheet, and appellate record in cause number W01-00328-T(A), unless they have been previously forwarded to the Court of Criminal Appeals.

7. The reporter's record of the hearing conducted by the trial court on November 6, 2007.

THE CLERK IS FURTHER **ORDERED** to send a copy of this Court's findings of fact and conclusions of law, including its order, to Allan Fishburn, attorney for Applicant, 211 North Record Street, Suite 450, Dallas, Texas 75202, and to counsel for the State, Assistant District Attorney Lisa Smith.

SIGNED the ___10___ day of ___April___, 2009.

JUDGE RICK MAGNIS
283RD JUDICIAL DISTRICT COURT
DALLAS, TEXAS

23

093