## PRICE, PROCTOR & ASSOCIATES, LLP
*A LIMITED LIABILITY PARTNERSHIP OF BOARD CERTIFIED FORENSIC PSYCHOLOGISTS*

11882 Greenville Ave., Suite 107; Dallas, Texas 75243
Telephone: 972-644-8686•Facsimile: 972-644-8688

**J. Randall Price, Ph.D., ABPP, FACPN**　　　　　　　　　　　**Timothy J. Proctor, Ph.D., ABPP**
*Board Certified in Forensic Psychology*　　　　　　　　　　　*Board Certified in Forensic Psychology*
*Board Certified in Neuropsychology*　　　　　　　　　　　　*Fellowship Trained in Forensic Psychology*

# Forensic Psychological Evaluation

### Identifying Information:

| | |
|---|---|
| Name: | Patrick Henry Murphy, Jr. |
| Evaluation Date: | 1/20/15 |
| Report Date: | 1/27/15 |
| Birth Date: | 10/3/61 |
| Age: | 53 |
| Style of Case: | Patrick Henry Murphy, Jr. vs. Rick Thaler, Director, TDCJ-CID |
| Civil Action No.: | 3:09-cv-01368-L-BN |
| Court: | United States District Court for the Northern District of Texas – Dallas Division |
| Judge: | Honorable U.S. Magistrate Judge David L. Horan |

### Referral Information:

The Petitioner, Mr. Murphy, was convicted of Capital Murder and sentenced to death in 2003. In response to a request by the attorneys for the Respondent (i.e., the Attorney General's Office), his attorneys agreed for him to undergo a forensic psychological evaluation by the undersigned evaluator. The major purpose of the evaluation was to address the following two issues: 1) the extent to which this evaluator agrees with the diagnostic conclusions expressed by John Matthew Fabian, Psy.D., J.D., ABPP in his 12/15/14 report; and 2) this evaluator's opinion regarding the extent to which, if at all, the findings expressed in Dr. Fabian's report were previously addressed during the sentencing phase of Mr. Murphy's Capital Murder trial.

**Evaluation Techniques & Sources of Information:**

Evaluation procedures utilized included clinical interview, behavioral observation, mental status examination, psychological testing, and a review of the following records and related materials:

1. Childhood Medical Records from Parkland Hospital;
2. Educational Records;
3. Military Personnel Records;
4. Texas Department of Criminal Justice (TDCJ) Records (1984 to present);
5. Surveillance Video;
6. Video Documentary of TDCJ – Connally Unit;
7. Audiotaped Interview of Mr. Murphy with Detectives John Moriarty and Terry Cobbs of the TDCJ Office of Inspector General (1/24/01);
8. Neuropsychological Evaluation Report and Related Records from Laura Lacritz, Ph.D. (11/4/03);
9. Psychiatric Evaluation Letter of Lisa Clayton, M.D. (11/17/03);
10. Psychological Evaluation Records from Mark Vigen, Ph.D. (2003)
11. Records from S.O. Woods, Jr. (2003);
12. Various Dallas Morning News Articles;
13. Capital Murder Trial Transcript and Related Documents (2003);
14. Report and Related Records from Mary Burdette, M.S.S.W., Mitigation Specialist (2010); and
15. Forensic Psychological Evaluation Report from John Matthew Fabien, Psy.D., J.D. (12/15/14).

**Evaluation Conditions & Informed Consent:**

The defendant was evaluated in an interview room at the TDCJ Polunsky Unit. The conditions for the evaluation were adequate. Mr. Murphy and the evaluator were the only ones present in the room. Although he wore leg shackles, his hands were free of handcuffs. Prior to beginning, he was explained the nature and purpose of the evaluation. This included that this evaluator was retained by the Attorney General's Office, and that the Attorney General's Office would be responsible for the evaluation's cost. He was told that the evaluation was for assessment purposes only, and that no treatment services would be provided. He was encouraged to put forth his best effort, and warned of the possibility that the conclusions and opinions developed during the evaluation could be used against him during his legal case. He was educated that the results of the evaluation would be communicated to the Attorney General's Office, including that a written report would likely be submitted. He was also informed that although not currently expected, live testimony by this evaluator might follow if requested. After being informed of the above, Mr. Murphy expressed an understanding of what he had been told and provided his consent to undergo the evaluation.

**Summary of Relevant Background Information:**

Multiple summaries of Mr. Murphy's self-reported clinical history, including most recently that found in Dr. Fabian's report, are available for review and therefore this information will not be repeated in detail here. During the current evaluation, Mr. Murphy expressed that he read Dr. Fabian's report, so he was asked if he disputed any of the background information detailed in it. He responded that he did not. Consistent with this, the historical information he provided this evaluator was consistent with that provided to Dr. Fabian. This included that he reported a history of experiencing emotional, verbal, physical, and sexual abuse during childhood/adolescence at the hands of various perpetrators including his mother, two stepfathers, and an uncle. He also reported a history of neglect as well as witnessing significant abuse of others, in particular his mother, during this time period of his life. He also acknowledged engaging in abuse of of others including sexual abuse of two half-sisters.

Regarding Mr. Murphy's mental health history, it appears that he has undergone some counseling, but has never been treated with psychotropic medications. Per available records, his mental health treatment history began at age 14 (approximately 1975) when he was required to attend mandatory counseling in connection with three counts of Theft of Motor Vehicle. At approximately age 23 (around 1984), he was incarcerated in TDCJ for Aggravated Sexual Assault, and after disclosing his history of receiving counseling as a juvenile, he was referred for a mental health assessment. No mental illness was reported or observed at that time, but he agreed to request help if needed in the future. In 1991, at approximately age 30, he began counseling while in TDCJ. It appears these sessions were at least attempted on a near weekly basis for several months during that year. He was described as talkative and bright with fair insight. Records indicate that he declined several of these sessions because as he had "nothing to say," but on other occasions he discussed depression, low self-esteem, mood swings, and impulsivity. These sessions also focused on his abuse history as well as his substance abuse difficulties. On at least one occasion in 1991, he reported a dissociative episode in which his mind and body felt separate. He also reported depressive episodes, feelings of guilt, fearful episodes, mood lability, and sleep disturbance at that time. His diagnoses while in counseling were sexual disorder not otherwise specified as well as narcissistic, borderline, and antisocial personality traits. Finally, dysthymia was also considered, although not fully diagnosed, at one point. He was referred for the Sex Offender Treatment Program, but reportedly did not qualify as that program is reserved for inmates nearing their release date. He did, however, successfully complete substance abuse treatment, including in 1993 (approximately age 32), at which time he produced an elevated score on the Substance Abuse Subtle Screening Inventory (SASSI). In 1995 (approximately age 34), he reported anxiety and insomnia during a mental health screening while in prison. Also during this screening, he reported that he sexually abused his half-sister when he was age 13 and she was age six "before expanding to many more youngsters and increased incorrigibility, truancy, and theft etc." The assessment of the mental health professional who conducted this screening was "persistent addictive dysfunction, chronic offender, [and antisocial personality disorder]." It appears that in 1999 and 2000, he again successfully

completed various substance abuse treatment of some type. In 2000, he was part of a group escape from TDCJ. The Capital Murder offense occurred while he was in the free world.

In conjunction with his Capital Murder trial in 2003, Mr. Murphy underwent several mental health evaluations that are briefly summarized below. It appears that each of these were at the request of defense counsel. Psychiatrist Lisa Clayton, M.D. evaluated him in 10/03. She diagnosed antisocial personality disorder and sexual sadism, and opined that he did not have any psychiatric problems that would create mitigating evidence.

In 10/03, Mr. Murphy underwent a neuropsychological evaluation with Laura Lacritz, Ph.D. This was at the request of psychiatrist Jaye Crowder, M.D., who was apparently retained by defense counsel. Dr. Lacritz identified the following neurocognitive risk factors based on her evaluation of Mr. Murphy: prolonged binge drinking, episodic drug use (marijuana, cocaine, amphetamines), reports of several concussions without lasting effects, and physical abuse. He reportedly denied psychological symptoms during her assessment of him. Behaviorally, he demonstrated some impulsivity, but was easily redirectable. Formal testing yielded an intact profile with estimated average intellectual functioning and no indication of organic brain damage or depressive symptomology. With respect to the latter, his score on the Beck Depression Inventory – Second Edition (BDI-2) was reportedly very low.

Mark Vigen, Ph.D. also evaluated Mr. Murphy in 2003 at the request of defense counsel. In addition to his own opinions, Dr. Vigen's records document Dr. Crowder's opinions, which apparently included that Mr. Murphy had adequate IQ, exaggerated his accomplishments, was manipulative but not terribly angry, and had borderline tendencies and a history of antisocial behaviors. Although Dr. Crowder apparently considered a paraphilic disorder, one was not diagnosed. As part of Dr. Vigen's assessment, he interviewed some of Mr. Murphy's family members. These interviews apparently mostly corroborated Mr. Murphy's account of childhood abuse, although the uncle who allegedly sexually abused him denied that such had occurred. At trial, Dr. Vigen testified regarding Mr. Murphy's chaotic upbringing including wide-ranging, prolonged abuse at the hands of multiple perpetrators. In addition to Dr. Vigen, multiple witnesses including family members such as his aunt, Ms. Linda Goodman, and his father, Mr. Patrick Murphy, Sr., presented details regarding his problematic upbringing. Dr. Vigen's diagnoses were sexual disorder not otherwise specified and narcissistic, borderline, and antisocial personality traits, which he attributed to Mr. Murphy's long and severe developmental history of family dysfunction.

Since being convicted of Capital Murder and sentenced to death in 2003, Mr. Murphy has been housed in the Polunsky Unit. While there, he has received routine mental health checks, but is not on the mental health caseload. During an assessment conducted early on during his time at the Polunsky Unit, his substance abuse history was noted as were antisocial personality traits, but no other mental health difficulties

were documented. Notes from other mental health checks over the years appear to indicate no complaints or observations of mental health symptoms.

In 2010, mitigation specialist Mary Burdette, M.S.S.W. reviewed records and interviewed Mr. Murphy and several of his family members to generate a family genogram and mitigation report. In light of his reported abuse history and chaotic home life, Ms. Burdette opined that Mr. Murphy did not successfully form proper attachments, develop trust, or have appropriate relationships modeled for him. She opined that this led to his future antisocial and criminal behaviors including perpetrating sexual abuse, substance abuse, and a pattern of running away that began in childhood and carried over to adulthood by running away from marriages, the United States Army, and prison.

Most recently, John M. Fabian, Psy.D., J.D. evaluated Mr. Murphy on 12/12/14. This was at the request of Mr. Murphy's current attorneys. The purpose of the evaluation was to assess for potentially relevant mitigating psychological and psychiatric issues, especially pertaining to the alleged history of trauma. Mr. Murphy's attorneys reportedly requested the evaluation in relation to concern that the mitigation investigation at his trial was insufficient. The report of this evaluation is dated 12/15/14. As was noted above, Dr. Fabian's report contains a lengthy summary of Mr. Murphy's self-reported clinical history, which overall was consistent with that found in prior reports. Dr. Fabian administered Mr. Murphy the Detailed Assessment of Post-traumatic Stress (DAPS), which is a self-report inventory that includes direct questioning of the respondent regarding exposure to potentially traumatic experiences as well as subsequent reactions. Mr. Murphy's responses resulted in elevations on all of the clinical scales except the one dealing with suicidal ideation/behavior. His highest score was on the Substance Abuse scale. Notably, the items he endorsed on this scale focused on alcohol use, as he denied use of other drugs despite multiple reports to the contrary over the years including during the current evaluation. He reported experiencing eight different types of trauma from a list of 13 possibilities. He endorsed a wide range of reactive symptoms and behaviors, but indicated experiencing most of them once per week or less. Dr. Fabian ultimately opined that Mr. Murphy experienced complex trauma early in his life that resulted in disorganized attachment that negatively impacts his relationships. In addition to antisocial personality disorder with borderline traits and a substance-related diagnosis (i.e., alcohol use disorder), which are consistent with prior assessments, Dr. Fabian diagnosed posttraumatic stress disorder (PTSD), a condition that does not appear to have been previously assigned to Mr. Murphy.

In terms of Mr. Murphy's current health status, he reported that his physical health is good, and that the only medication he takes on a regular basis is Benadryl for allergy/sinus problems. He is not receiving mental health treatment of any type. He said he requested sleep medication a few years ago, but was told that medication treatment for sleep disorders is not provided. When questioned during the current evaluation about mental health symptoms, a notable difference was found between his answers to open-ended questions versus leading ones. Indeed, when asked in an open-ended manner about current mental health symptoms, he reported only trouble falling asleep, irritability/short-temperedness, and, on occasion, seeing "shadows" and hearing things

that did not appear to really be there such as his name or "hello." When asked about past symptoms, such as those prior to and at the time of the Capital Murder offense, he listed the same ones, but indicated that they are more of an issue now than they were then. He attributed this difference to being more active previously due to being in general population than is the case in his current housing assignment. In terms of substance use, he reported that alcohol and marijuana are his substances of choice, but that he had experimented with cocaine, "speed," and LSD. He reported an ongoing desire to engage in substance use, but refrains in his current situation due to the difficulty involved in getting the substances/ingredients, and because he is "trying to do the right thing."

## Behavioral Observations & Mental Status Examination:

Mr. Murphy was dressed in a prison issued white jumpsuit. He was pleasant and completed all tasks asked of him. His hygiene and grooming were good. He was alert and fully oriented. His eye contact was good. His speech was within normal limits in terms of rate, rhythm, and tone. In terms of his speech volume, he at times spoke loudly, especially when laughing and making jokes. His psychomotor behavior was unremarkable. While he described his mood as, "anxious," his affect was mostly bright. Indeed, he presented in a fairly jovial manner during much of the evaluation, and appeared to enjoy the social interaction associated with it. He was talkative, and as was alluded to above, often smiled and laughed. He frequently made use of humor during his interactions with this evaluator, and such was also noted during his interactions with the correctional staff. However, he was noted to become more serious at times when relating his history of abuse. As noted previously, he described sleep difficulties, specifically with respect to falling asleep. He denied significant appetite problems. He denied suicidal ideation and cautioned that while some of his responses to psychological test questions might be taken to be suggestive of such, this was not the case. His thought processes were logical and goal-directed. Although he mentioned seeing shadows and hearing things such as his name or "hello" being called when this was not actually the case, these did not appear indicative of psychosis. Further, he did not express any beliefs that appeared delusional in nature. Although not formally tested, he impressed as being of average intelligence with grossly intact memory, language, and higher order functions, which is consistent with prior testing.

## Psychological Tests Administered:

Morel Emotional Numbing Test for Posttraumatic Stress Disorder (MENT)
Minnesota Multiphasic Personality Inventory – Second Edition – Restructured Scales (MMPI-2-RF)
Personality Assessment Inventory (PAI)
Trauma Symptom Inventory – Second Edition (TSI-2)

**Psychological Test Results:**

MENT – The MENT is designed to assess an individual's willingness to feign symptoms that they believe to be associated with PTSD. Results from the MENT were not indicative of Mr. Murphy attempting to feign symptoms of the type assessed by this test.

MMPI-2-RF – The MMPI-2-RF is a standardized objective measure of psychological symptoms and personality functioning that provides information about the test taker's response style through validity scales and psychological functioning through clinical scales. In terms of the validity scale results, there were indications that Mr. Murphy endorsed a larger than average number of infrequent responses. This can result from individuals with genuine psychological distress reporting credible symptoms, symptom over-reporting, or a combination of the two. Additionally, he endorsed a much greater number of somatic concerns than those typically reported by individuals with genuine medical conditions. This was a surprising finding given his self-report of good physical health. Although validity scale issues found on this test did not occur at a level that fully invalidated the results, the possibility that symptom over-reporting artificially inflated/distorted the clinical scale results warrants consideration. Given these validity scale results, the clinical scale findings must be considered with some caution. With this in mind, those with this profile tend to have a history of acting out, juvenile misconduct, and substance abuse. They tend to report an array of depressive symptoms (e.g., self-doubt, dissatisfaction, hopelessness/helplessness, thoughts of death/suicide). They also report multiple somatic complaints (e.g., vague neurological symptoms, diffuse cognitive problems, fatigue), which tend to be related, at least in part, to psychological distress. They are prone to rumination, stress, and worry. They exhibit poor impulse control and reactive behaviors. They are typically not very self-reliant. They report unusual thoughts and perceptions including at least a history of paranoid thinking. Interpersonally, they tend to be quite suspicious. A proneness to being passive and dependent on others due to low self-confidence also tends to be present. They tend to be shy and uncomfortable around others, have a general dislike for social interaction, and have difficulty forming close relationships. Poor family relationships and functioning are common for those with similar profiles and they are likely to blame their family members for their difficulties.

PAI – Like the MMPI-2-RF, the PAI is an objective measure of psychological and personality functioning that provides information about the test taker's response style through validity scales and psychological/personality functioning through the clinical scales. The validity scale results suggested some inconsistencies in responding. In addition, consistent with the MMPI-2-RF validity scale results, indications of a tendency to emphasize negative traits while minimizing positive ones was noted. Although, like with the MMPI-2-RF, this was not to such an extent that it invalidated the results, the possibility that symptom over-reporting artificially inflated/distorted the clinical scale results to some extent warrants consideration. Therefore, the clinical scale findings must be considered with some caution. With this in mind, those with the clinical scale profile obtained by Mr. Murphy tend to have a problematic alcohol use history that might be related, at least to some extent, to social anxiety and discomfort. Also, consistent with the MMPI-2-RF, those with this profile tend to present with suspiciousness and hold

grudges. They also report unusual perceptual experiences and peculiar thinking. Anxiety and depression are also reported. They tend to view themselves as worthless and are quite pessimistic/hopeless about the future. They tend to complain of confused thinking, distractibility, and poor concentration and present with cognitive, affective, and physical symptoms related to psychological difficulties. They report a history of trauma-related anxiety as well as significant depressive episodes, and may exhibit maladaptive behaviors aimed at controlling their distress. Problematic personality traits also tend to be present. Indeed, these individuals tend to struggle with identity problems, volatile relationships, fear of abandonment, and reckless behavior. They report a history of antisocial behaviors such as juvenile misconduct, physical aggression against others, and illegal activity. They tend to be reckless, impulsive, and risky in their behaviors. Anger management issues and suicidal ideation were not reflected in this profile.

TSI-2 – Although not of the depth and quality of those found on the MMPI-2-RF and PAI, the TSI-2 has two validity scales [i.e., Response Level (RL) and Atypical Response (ATR)]. The results of these were within normal limits. The TSI-2 clinical scales measure 12 different types of trauma-related symptoms: (1) Anxious Arousal; (2) Depression; (3) Anger: (4) Intrusive Experiences; (5) Defensive Avoidance; (6) Dissociation; (7) Somatic Preoccupation; (8) Sexual Disturbance; (9) Suicidality; (10) Insecure Attachment; (11) Impaired Self-Reference; and, (12) Tension Reduction Behavior. His clinical profile is marked by significant elevations across three scales including those dealing with intrusive experiences, defensive avoidance, and general somatic preoccupation. A mild elevation with respect to depression was also noted. In total, the TSI-2 results suggested that when questioned directly, Mr. Murphy reported trauma-related distress including intrusive experiences and defensive avoidance.

**Opinions**:

Based on the results of the current evaluation, this evaluator's opinions regarding the above-referenced referral issues are as follows:

1) The extent to which this evaluator agrees with the diagnostic conclusions expressed by John Matthew Fabian, Psy.D., J.D. in his 12/15/14 report; which were PTSD, antisocial personality disorder with borderline traits, and alcohol use disorder. These will be addressed individually.

    a. Regarding whether Mr. Murphy meets criteria for PTSD, it must first be said that although multiple prior mental health professionals have evaluated him of over the years, including several much closer in time to the Capital Murder offense than is now the case, none of them diagnosed this condition until Dr. Fabian. Indeed, even those that were clearly aware of his developmental history did not diagnosis this condition. Moving to the results of Dr. Fabian's evaluation as well as the current one, several issues warrant consideration. First, the difference between information obtained from Mr. Murphy via open-ended questions as opposed to more direct, leading ones is of note. As was described above, during the current

evaluation Mr. Murphy reported much fewer psychological difficulties when presented with open-ended questions. Indeed, the difficulties he reported in response to questions of this type (i.e., difficulty falling asleep, anger/temper issues, occasionally seeing shadows or hearing his name being called or someone saying "hello" when this was not the case) fell well below the criteria required to establish a diagnosis of PTSD. In contrast, when asked more direct, leading questions such as the type found in the psychological testing, including the TSI-2, he reported many more symptoms including those that can be associated with PTSD. While it could be argued that this response style was due to Mr. Murphy minimizing his true difficulties in response to open-ended questions, while then being more forthright in response to leading questions, this was not supported by the totality of the psychological test results. Indeed, the MMPI-2-RF and PAI results raised concern about over-reporting/exaggeration of difficulties, not minimization of them. Apparently similar to the current evaluation is that Mr. Murphy endorsed a large number of symptoms, including those that can be related to PTSD, when assessed by Dr. Fabian with the DAPS, which includes questions that are fairly direct/leading in nature. While the DAPS validity scales were reportedly within normal limits, other commonly used measures with validity scales such as the MMPI-2-RF and PAI utilized in this evaluation, were not administered. Had measures of this type been administered, they might have raised the concerns with over-reporting/exaggeration found in the current testing, which of course would then need to be considered in the diagnostic assessment process. Also an important consideration when assessing the possibility of PTSD on Mr. Murphy's part is the extent to which many of the criteria (e.g., irritable behavior or angry outbursts) could also be explained by other conditions including personality disorders. Indeed, it appears that this is the manner in which prior evaluators have conceptualized Mr. Murphy's difficulties, as he has repeatedly been assessed to have personality pathology, but not PTSD. Finally, it is of note that part of the criteria for PTSD is that "the disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning." While assessment of functioning is of course very difficult with an incarcerated individual (e.g., occupational functioning could not be assessed at all in Mr. Murphy's case), it is nonetheless of note that available information regarding Mr. Murphy does not indicate clinically significant distress. Indeed, with the exception of difficulty falling asleep it does not appear that he has complained of psychological difficulties or requested treatment in some time, and has rarely ever done so over the course of his life. When questioned about the reason for this, he indicated that he was not even aware of a need for such treatment until he read Dr. Fabian's report. Further, his presentation during the current evaluation did not suggest significant distress. To the contrary, his affect was bright, and he frequently smiled, laughed, and made use of humor. While it could be argued that this was simply a façade

   masking his true distress, again, the totality of the test results indicated over-reporting/exaggeration of symptoms as opposed to minimization of them. In total, for the reasons noted above, it is this evaluator's opinion that a diagnosis of PTSD is not warranted at this time.

   b. Dr. Fabian also diagnosed Mr. Murphy with antisocial personality disorder with borderline traits, which is consistent with many of the past diagnoses by mental health professionals as well as the results of the current evaluation. There is some indication he also exhibits narcissistic traits such as his tendency to inflate his skills and abilities. Again, it appears that some of the signs/symptoms Dr. Fabian attributed to PTSD are more likely attributable to his longstanding personality dysfunction.

   c. The alcohol use diagnosis put forth by Dr. Fabian is also supported by available evidence. This disorder appears to currently be in sustained remission in a controlled environment. A cannabis use disorder in sustained remission in a controlled environment is also appropriate based on available information.

2) Regarding the extent to which, if at all, the findings expressed in Dr. Fabian's report were previously addressed during Mr. Murphy's Capital Murder trial, a review of the trial transcript revealed that Mr. Murphy's chaotic upbringing including wide-ranging, prolonged abuse at the hands of multiple perpetrators was presented via Dr. Vigen's testimony. While Dr. Vigen did not diagnosis PTSD as Dr. Fabian has now done, he did attribute the diagnoses he put forth (i.e., sexual disorder not otherwise specified and narcissistic, borderline, and antisocial personality traits) to a long and severe developmental history of family dysfunction. In addition to Dr. Vigen, multiple witnesses including family members testfied regarding his problematic upbringing.

Please note that this evaluator reserves the right to make adjustments or changes to the above diagnoses and opinions if new information becomes available that warrants such changes.

Respectfully Submitted,

_____
Timothy J. Proctor, Ph.D., ABPP
Licensed Psychologist #32021
Board Certified in Forensic Psychology #6382