1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF TEXAS

3                   DALLAS DIVISION

4
PATRICK HENRY MURPHY JR.      )        3:09-CV-1368-L-BN
5            Respondent,        )
                                )
6                               )
VS.                             )
7                               )        DALLAS, TEXAS
                                )
8  WILLIAM STEPHENS, Director,  )
   Texas Department of Criminal )
9  Justice, Correctional        )
   Institutions Division,       )
10           Respondent.        )        September 4, 2015

11

12          TRANSCRIPT OF EVIDENTIARY HEARING

13         BEFORE THE HONORABLE DAVID L. HORAN

14           UNITED STATES MAGISTRATE JUDGE

15

16  A P P E A R A N C E S:

17

18  FOR THE PETITIONER:        MR. DAVID R. DOW
                               University of Houston Law Center
19                             100 Law Center
                               Suite 114-BLB
20                             Houston, Texas  77204
                               ddow2@central.uh.edu
21                             (713) 743-2171

22

23

24

25

```
 1   FOR THE RESPONDENT:        MR. JEREMY C. GREENWELL
                                Office of the Texas Attorney General
 2                              Postconviction Litigation Division
                                P.O. Box 12548
 3                              Austin, Texas  78711
                                jeremy.greenwell@oag.state.tx.us
 4                              (512) 936-1400

 5
                                MR. TRAVIS BRAGG
 6                              Office of the Texas Attorney General
                                P.O. Box 12548
 7                              Austin, Texas  78711
                                travis.bragg@oag.state.tx.us
 8                              (512) 936-1400

 9
                                MS. GWENDOLYN VINDELL
10                              Office of the Texas Attorney General
                                P.O. Box 12548
11                              Austin, Texas  78711
                                gwendolyn.vindell@oag.state.tx.us
12                              (512) 936-1400

13
     ALSO PRESENT:              MS. KELLY HICKMAN
14

15

16

17

18
     COURT REPORTER:            MR. TODD ANDERSON, RMR, CRR
19                              United States Court Reporter
                                1100 Commerce St., Rm. 1625
20                              Dallas, Texas  75242
                                (214) 753-2170
21

22

23          Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

```
 1              EVIDENTIARY HEARING - SEPTEMBER 4, 2015
 2                      P R O C E E D I N G S
 3         THE COURT:  All right.  Good morning.  This is --
 4   we're here in Case 3:09-CV-1368-L-BN, Patrick Henry Murphy Jr.
 5   versus William Stephens for an evidentiary hearing the Court
 6   has set to determine whether the exception to procedural bar
 7   created in Martinez v. Ryan and extended to cases out of Texas
 8   in Trevino v. Thaler will apply to either of the claims of
 9   ineffective assistance of counsel asserted by Petitioner
10   Murphy.
11              I'll take appearances.
12         MR. GREENWELL:  Jeremy Greenwell on behalf of the
13   Respondent, Your Honor.
14         THE COURT:  All right.
15         MS. HICKMAN:  Kelly Hickman for Petitioner, Your
16   Honor.
17         THE COURT:  Okay.  Ms. Hickman, we still don't have
18   an admission status for you.  I mean, I hope I made this clear
19   Friday.  I regret to do this, but I don't really feel
20   comfortable having you take witnesses today when -- I mean, I'm
21   not saying I personally doubt that you will be admitted, but --
22         MS. HICKMAN:  Yes, sir.  I understand, Your Honor.
23         THE COURT:  Yes.
24         MS. HICKMAN:  As I said on the phone, the clerk said
25   that I had within 21 days.  I'm just waiting on a certificate
```

```
 1   in good standing.  I understand.
 2              THE COURT:  Yes.
 3              MS. HICKMAN:  And obviously, you know, we will follow
 4   whatever you prefer.
 5              THE COURT:  Okay.  All right.  Well, let me -- let me
 6   state for the record also that Mr. Murphy has consented in
 7   writing not to be present for the hearing, so just to make that
 8   clear.  And with that, we can get started.
 9              Mr. Dow?
10              MR. DOW:  May I?
11              THE COURT:  Uh-huh.
12              MR. DOW:  I'm David Dow.
13              THE COURT:  Yes.
14              MR. DOW:  Judge, you would prefer that I examine the
15   witness rather than Ms. Hickman?  She is -- she's admitted to
16   the Bar.
17              THE COURT:  Well, she's not admitted to this court,
18   though.
19              MR. DOW:  That's correct.  That's correct.
20              THE COURT:  Yeah.  I mean --
21              MR. DOW:  So, you'd prefer that I --
22              THE COURT:  I would.  I would, yes.
23              MR. DOW:  I understand.
24              THE COURT:  Okay.  All right.  Mr. Dow, would you
25   like to call your first witness?
```

```
 1              MR. DOW:  Yes.  Judge, we'll call Brook Busbee.

 2              THE COURT:  All right.

 3              (Pause)

 4              THE COURT:  If you could raise your right hand.

 5              (The witness was sworn)

 6              THE COURT:  Thank you.  Please be seated.

 7              BROOK BUSBEE, PETITIONER'S WITNESS, SWORN

 8                        DIRECT EXAMINATION

 9     BY MR. DOW:

10     Q.   Good morning, Ms. Busbee.

11     A.   Good morning.

12     Q.   I'm David Dow.

13     A.   Yes, sir.

14              THE WITNESS:  Can I get some water?

15              (Pause)

16              THE COURT:  Thank you, Mr. Dow.

17     BY MR. DOW:

18     Q.   Can you state your name for the record?

19     A.   Brook A. Busbee.

20     Q.   And can you please tell the Court your current occupation?

21     A.   I'm an attorney and a part-time adjunct clinical professor

22     at SMU in the criminal defense clinic.

23     Q.   What is the focus of your legal practice?

24     A.   Criminal.

25     Q.   Do you do a wide variety of criminal work?
```

```
1    A.   Well, I don't do tickets, but I appear in Federal court
2    from time to time.  I handle mostly felonies.
3    Q.   Did you represent Patrick Murphy at his trial?
4    A.   I did.
5    Q.   Was Patrick Murphy the first capital defendant who you
6    represented?
7    A.   No.
8    Q.   Can you tell me the names of some of the other defendants
9    who you have represented who were facing possible death
10   sentences at the time of their trials?
11   A.   Prior to Mr. Murphy?
12   Q.   Prior to Mr. Murphy.
13   A.   Mark Robertson and Licho Escamilla at that time were the
14   only two I had tried prior to Mr. Robertson -- I'm sorry --
15   Mr. Murphy.
16   Q.   Do you recall how long before Mr. Murphy's trial you were
17   appointed to represent him?
18   A.   Oh, yes.  I was appointed before he had actually returned
19   to Dallas from Colorado.  I don't recall the exact date, but it
20   would have been about 10 or 11 days after they were arrested.
21   Q.   At the time that you were appointed, was co-counsel
22   appointed as well?
23   A.   No.  Molly Francis was the Judge of the 283rd on -- when
24   these cases came to her court, and she called in six lawyers to
25   be the chief counsel.  And then she informed us that she would
```

1   like for us to choose our second chair, and I chose

2   Mr. Sanchez.

3   Q.   Had you worked with Mr. Sanchez before?

4   A.   No.

5   Q.   When you and Mr. Sanchez divided responsibility for who

6   was going to do what in the Murphy trial, was that a

7   collaborative decision, or was that a decision that you made as

8   the lead counsel?

9   A.   I made that decision.

10  Q.   Do you currently -- and I don't mean on September the --

11  whatever today's date is.  But, I mean, generally currently in

12  your practice do you continue to represent defendants facing

13  potential death sentences in Texas?

14  A.   I'm on the death penalty wheel along with a number of

15  other people.

16           The last time I had a death penalty case go to trial,

17  I think, was two thousand -- well, it was -- Juan was the chief

18  counsel in that one.  It was the retrial of Kenneth Thomas.

19  And that was -- I think we did that last summer, so that was

20  the last one.  I do not currently have a case where the

21  Defendant is facing the death penalty.

22  Q.   When you say you're on the wheel, does that mean that you

23  are eligible for capital appointments?

24  A.   They -- like all districts in Texas, as you know, they

25  have criteria that you have to meet in order to be on the list

1    of people -- they just call it a wheel in Dallas County -- the

2    list of people who can handle a death penalty case, can be

3    appointed to one.  They have a wheel for the first chair and a

4    wheel for the second chair with different educational and

5    experience minimums.

6    Q.   Ms. Busbee, has an ineffective assistance of counsel claim

7    been raised against you with respect to any case where you were

8    the lead counsel and the defendant was a capital defendant?

9    A.   Lead counsel?  Well, in Licho Escamilla I was technically

10   the lead counsel, but I had not done a death penalty case since

11   I did Mr. Robertson by choice, because it just took too much

12   time back then.

13          And so while I was technically lead counsel, I chose

14   Wayne Huff with some 30 prior death penalty cases to be lead

15   counsel in Mr. Escamilla's case, and so he was the lead

16   counsel.  And I believe that there were, as there seems there

17   always are, claims of ineffective assistance of counsel in

18   Mr. Escamilla's case.

19          So, I don't know -- the answer to that is yes, but I

20   wasn't truly the lead counsel.

21   Q.   Have there been any cases since the time that you

22   represented Mr. Murphy where you represented a defendant facing

23   death who was, in fact, sentenced to death where an

24   ineffectiveness claim has been raised against you?

25   A.   Indeed -- you're familiar with this.  Mr. Lizcano, Juan

1  Lizcano, that's pending.

2  Q.   Are you aware of the consequences in Texas of being found

3  ineffective in a capital murder trial?

4  A.   I am.

5  Q.   Can you tell the Court what those consequences are?

6  A.   I could lose my board certification.  I would never be

7  allowed to participate in the defense of another person charged

8  with capital murder.  I would lose my job at SMU because I

9  would have -- they would not be able to insure me, I think,

10  with medical -- I mean with malpractice insurance, which is

11  required for student practice.  So, there would be some

12  consequences to that determination.

13  Q.   Does your awareness of those consequences exert an

14  influence on how you answer questions when you're being

15  questioned about your performance in a trial?

16  A.   No.

17  Q.   Do you know who represented Patrick Murphy on his direct

18  appeal?

19  A.   John Tatum.

20  Q.   Do you have a professional relationship with Mr. Tatum?

21  A.   Mr. Tatum was the only person that was left, because --

22  and because Mr. Tatum had run a contested primary race against

23  Molly Francis's husband at the time, he wasn't appointed to any

24  other cases, but he was the only person I think that was an

25  appellate lawyer who was left.

1          Mr. Murphy was the last case to go to trial, and I

2     had to scramble -- I had to scramble around for experts because

3     everybody had been taken.  And we had Mr. Tatum appointed.

4          It was my practice to get an appellate attorney

5     appointed during the trial to help with all the decisions that

6     had to be made, and it was just an extra lawyer that you get.

7          And we had -- when -- I think I had Vick Cunningham

8     appoint him.

9          THE REPORTER:  I'm sorry.  Who?

10         THE WITNESS:  Vick Cunningham was the Judge who

11    succeeded Judge Francis, and that's why we were able to obtain

12    him.  That has come back to my mind.  She did not care for

13    Mr. Tatum and probably would not have appointed him for the

14    reasons I just stated.

15    BY MR. DOW:

16    Q.   I don't want to put words in your mouth, Ms. Busbee, but

17    would it be fair to say that the reason that Mr. Tatum was

18    appointed to represent Mr. Murphy on direct appeal was because

19    you selected him?

20    A.   Yes.

21    Q.   And at the time that you selected him, would it be fair to

22    say you selected him out of a field of one?

23    A.   There may have been other appellate counsel.  He's -- I

24    mean, he's well regarded, but he just had not been asked for

25    because of the personal problem, if it existed.

1    Q.   You stated a moment ago that from time to time you asked

2    that direct appeal counsel be appointed -- be appointed at the

3    time of trial so that that lawyer can observe the trial

4    proceedings.  Do you remember when Mr. Tatum was appointed?

5    A.   You know, it will -- should be reflected in the records,

6    but I'm going to say it was prior to the time that we began

7    jury selection, because it's just a way for me to get, you

8    know, an extra set of -- an extra brain.

9    Q.   Do you recall Mr. Tatum being in the courtroom during jury

10   selection?

11   A.   I don't remember.

12   Q.   Do you know who represented Mr. Murphy in his state

13   post-conviction proceedings in his 11.071 proceedings?

14   A.   It was my understanding it was Mr. Fishburn.

15   Q.   Do you know whether Mr. Fishburn has represented anybody

16   else that you have represented, either who you had represented

17   prior to the time of Mr. Murphy or since in post-conviction

18   proceedings?

19   A.   I do not know.  I don't know.

20   Q.   Have you ever represented a death-sentence inmate in

21   11.071 proceedings?

22   A.   I one time wrote a writ for a man named Brian Roberson

23   with the understanding that I would not go to Federal court.

24   It was a favor to Judge Keasler, because Judge Warder had been

25   elected as the judge and she couldn't obviously preside over

```
 1    that.  So that -- and that was in 1995.  And that was the only
 2    time I ever participated in the writ -- the capital writ
 3    process.
 4    Q.   What was the name of the --
 5    A.   Brian Roberson, R-O-B-E-R-S-O-N.
 6    Q.   Do you remember who represented Mr. Roberson at trial?
 7    A.   Yes.  Jeanette Drescher and Jake Johnson.  And he's
 8    deceased, but Jeanette is still available.
 9    Q.   When you prepared the 11.071 petition for Mr. Roberson,
10    did you contact the trial lawyer?
11    A.   Yes.
12    Q.   Did you obtain the records of the trial lawyers?
13    A.   I did.
14    Q.   Did Mr. Fishburn, who represented Mr. Murphy in post-
15    conviction proceedings, obtain your trial file?
16    A.   No, sir.
17    Q.   Did he contact you?
18    A.   No, sir.
19              (Pause)
20              MR. DOW:  Judge, may I approach the witness?
21              THE COURT:  You may.
22              (Pause)
23    BY MR. DOW:
24    Q.   I handed you, Ms. Busbee, what I believe are billing
25    records that you submitted in connection with your
```

1   representation of Mr. Murphy at his trial?

2   A.    Yes, sir.

3   Q.    Do you recognize those records?

4   A.    I do.

5   Q.    Did you create them yourself?

6   A.    I did.

7   Q.    Did you create those records from notes or other computer

8   or paper entries that you were making at the time you were

9   actually doing the work, or did you create them using the

10  benefit of hindsight?

11  A.    Probably a little bit of both, to tell you the truth.

12  Now, of course, we have much more sophisticated time-keeping

13  programs, but I didn't have one at that time.  In fact, I was

14  just looking in the one I have now, thinking perhaps I could

15  have these records.  And we even tried it with the auditor, and

16  they destroyed them after seven years, so this is the first

17  time I have seen them since I turned them in.

18  Q.    In view of the number of years that have passed since

19  you've looked at those, can you just glance at them quickly and

20  tell me whether you believe they accurately represent the time

21  that you spent both preparing for and conducting the Murphy

22  trial?

23  A.    I don't know that it's every pay sheet.  I don't know

24  where they came from.  But this -- this is definitely my

25  handwriting and my mother's handwriting.  She was a bookkeeper,

```
 1    so she would expense my stuff back in.
 2              MR. DOW:  Judge, I just want to say for the record
 3    that Ms. Busbee's mother passed away yesterday, and so we're
 4    particularly grateful that Ms. Busbee was still comfortable
 5    enough in view of that to attend today's proceeding.
 6              Both Mr. Greenwell and the Attorney General's Office
 7    very generously agreed that if Ms. Busbee did not feel
 8    comfortable appearing today that we would ask Your Honor to
 9    reschedule the hearing, but Ms. Busbee wanted to go forward.
10              THE COURT:  Thank you.
11              THE WITNESS:  I'm fine.  I would tell you if I
12    wasn't.
13              THE COURT:  Okay.
14              MR. DOW:  I know you were.  I just wanted to say for
15    the record that we're grateful for that.
16              THE COURT:  Thank you for that, Mr. Dow.
17              And, Ms. Busbee, thank you for being here.  I'm very
18    sorry for your loss.
19              MR. DOW:  Your Honor, I would like to move that those
20    billing records be Exhibit -- be admitted as Petitioner Exhibit
21    1.
22              (Petitioner's Exhibit No. 1 marked)
23              THE COURT:  Any objection?
24              MR. GREENWELL:  We have no objection, Your Honor.
25              THE COURT:  All right.  They will be admitted as
```

```
 1   Petitioner Exhibit 1.
 2              (Petitioner's Exhibit No. 1 received)
 3   BY MR. DOW:
 4   Q.   Is it typical for you, Ms. Busbee, to do work on a case
 5   that you do not bill for?
 6   A.   Well, I used to be pretty bad about remembering what I had
 7   done.  I'm better at it now.  But, yeah.
 8   Q.   The billing records refer to mitigation investigations or
 9   mitigation investigation?
10   A.   Some of them appear to be trial dates.  Some of them
11   appear to be jury selection dates.  I'm just -- I'm looking at
12   a number of different things here.  Here's one for out of
13   court.  I'm sure they reflect both.
14   Q.   Yes.  I -- what I would like to know at this point so that
15   we can explore those records further is that when you refer in
16   those records to mitigation investigation, can you tell the
17   Court what you mean by that?
18   A.   Well, for instance, I traveled to Palm Springs at one
19   point to meet with Aunt Linda and -- I think it was his sister.
20   No, his sister lived -- I can't remember who the other person
21   was.  Some other relative or cousin.  I'm sure I billed them
22   for that.
23              I accompanied Dr. Vigen down to Temple for a day to
24   interview his father and sister.  I went a couple of times with
25   my investigator to talk to his brother, so I'm sure there must
```

1  be a billing here for that someplace, if this is complete.  I

2  don't -- I can't say.

3  Q.   I'm asking a bad question.  I mean to be asking when you

4  use the phrase "mitigation investigation," what do you mean by

5  that phrase?

6  A.   Well, it would have included conversations with Dr. Vigen.

7  It would have included conversations with other experts that

8  may or may not have been used or consulted in mitigation -- you

9  know, preparing for the second portion of the trial.  It would

10 have included, of course, those interviews with people.

11 Q.   What is the purpose of a mitigation investigation?

12 A.   It's to be able to present a sympathetic, if there is one,

13 view of the defendant's past and maybe -- obviously to educate

14 the jury as to whether or not the person would be a future

15 danger, if that's possible.

16          And as we have all noticed, it's the two-edged sword.

17 You have to bring forward things sometimes that some people may

18 consider mitigating and other people may consider detrimental

19 to your -- to your client's character.  But you collect as much

20 information as you can and try to present it in such a way that

21 your client will live based on the jury's verdict.

22 Q.   At the time you were appointed to represent Mr. Murphy,

23 what did you, Ms. Busbee, view as your principal goal or

24 objective?

25 A.   Well, to save his life.

1    Q.    And how does a mitigation investigation figure in the

2    context of that objective?

3    A.    Well, in the course of these cases being tried, *Wiggins*

4    was decided.  And so I don't know if it was after Mr. Rivas

5    or -- I can't remember.  I guess it was Newbury, was the second

6    one.

7              So, there were three or four people who, you know --

8    that's when we had to decide what that meant and who we were

9    going to use to do it.  And it was -- it was believed at that

10   time by capital trial counsel that we needed a psychologist to

11   organize that, and so everybody got a psychologist to help us

12   organize that.

13             But we -- at the time that we were appointed on

14   Mr. Murphy, there was not a judge in Dallas County who would

15   consider spending the kind of money that we ended up spending

16   on mitigation investigation.  They allowed us to -- free hand

17   with investigators.  There was a free hand with testing and

18   that kind of thing.  But as far as having to pay somebody, an

19   expert, to gather information and do the kind of investigation

20   that was constitutionally required, as it turned out, that

21   was -- we would never have been able to obtain that much money.

22             You know what?  Let me finish answering your

23   question.  So, we began to look for a mitigation expert

24   subsequent to decision of witnesses.  We didn't do it, of

25   course, prior to that time.

1  Q.   And once you started to looking for a mitigation

2  investigator, did you find one?

3  A.   It was not easy.  There was -- I got a lot -- a lot of

4  solicitations from people who were like former police officers

5  and things like that, and I kind of tossed them in the trash.

6  I had been reading, of course, every record as it came through,

7  and I was reading the records of the testimony.  And they were

8  putting mitigation experts on the witness stand, too, which is

9  now a bad practice, as it turns out.

10       But I called people, and I called people, and I

11  called.  I finally -- you know, they had either been consulted

12  or they had actually actively participated in one of the prior

13  Texas Seven defendants.

14       But I called Mark Cunningham, who really doesn't make

15  a very good witness, but I know him, and he is that type of

16  psychologist.  I called him on the phone, and I know him pretty

17  well.  And I asked him, you know, did he have any

18  recommendations.  And he had done some -- published some

19  scholarly works with Dr. Vigen and suggested that I talk to

20  Dr. Vigen.

21       And so Dr. Vigen traveled to Dallas.  Unfortunately,

22  I don't know when that was.  But he traveled to Dallas.  I

23  liked him.  I liked his resume, his CV.  I thought he -- and he

24  seemed to be a person who would have a lot of influence on the

25  jury.  He looked kind of like Father Knows Best, and he had a

 1    religious back -- or a religious master's degree, and he had a

 2    very good presentation, so I was happy to have him.

 3    Q.   For the sake of the record, Ms. Busbee, can you tell the

 4    Court what the Texas Seven refers to?

 5    A.   Oh, yes.  In 2000 -- in December of 2000 -- I might be

 6    wrong about.  It may be 1999.  2000.  The -- seven men escaped

 7    from the Texas Department of Corrections and went on a crime

 8    spree, and they weren't arrested for almost six weeks, if I'm

 9    not mistaken, and they were arrested in Colorado.  In the

10    course of their crime spree they murdered a police officer in

11    Irving named Aubrey Hawkins, so -- and it was even a notorious

12    case at the time.

13    Q.   And Mr. Murphy was one of those seven?

14    A.   Mr. Murphy was one of the seven.

15    Q.   I believe that you said that the Supreme Court decided

16    *Wiggins against Smith* at some point after you had been

17    appointed to represent Mr. Murphy?

18    A.   That's right.

19    Q.   Had you conducted a mitigation investigation in any of the

20    previous cases where you represented capital defendants even

21    though *Wiggins* had obviously not been yet decided?

22    A.   I had in both of those cases.  I had -- in Mr. Robertson's

23    case I was in contact with his family.  We had -- we had him

24    looked at both medically and psychologically.  I honestly don't

25    remember everything that we did, but we did what we could --

1    you know, what we -- I guess you'd call the state of the legal

2    art at the time.

3            On Mr. Lizcano, I had him -- I had difficulty with

4    his family.  They wouldn't participate for reasons that aren't

5    relevant here.  But we finally did get interviews with the

6    family.  One of the -- one of the family members was a

7    probation officer in the juvenile department that was familiar

8    with psychological issues.  We used her somewhat to explain

9    some of the family dynamics.

10           I had him looked like by an expert in adolescent

11   behavior disorders.  That wasn't helpful.  And we just found

12   out everything we could about him, but we did not have an

13   organized mitigation investigation.

14   Q.   In the Murphy case, who was it that designed the

15   mitigation strategy?

16   A.   Dr. Vigen.  Well, let me just put it -- I don't know.  Let

17   me just clarify that.  He discussed with me what he had found

18   and what he could testify about, what he thought might be

19   important to the jury.  And he gave me those conclusions, and

20   we discussed them and practiced testifying about them.  It's

21   contained in the file that I brought today.

22   Q.   Do you remember how long before Mr. Murphy's trial

23   commenced you hired Dr. Vigen?

24   A.   No, I don't.

25   Q.   If the billing records that you have in front of you --

```
 1  I'm sorry, Ms. Busbee.  If Dr. Vigen's billing records
 2  reflected that he was hired in September of 2003, would you
 3  have any reason to believe that those records are incorrect?
 4  A.    I don't.  I don't.  I don't.  But it seems to me that we
 5  had been working with him for longer than that.  But I don't
 6  have Dr. Vigen's records, do I?
 7  Q.    No.
 8  A.    Okay.  I don't see them in here.
 9          (Pause)
10          MR. DOW:  Judge, may I approach the witness?
11          THE COURT:  You may.
12          (Pause)
13  BY MR. DOW:
14  Q.    If you turn first, Ms. Busbee, to -- the pages are not
15  numbered, but if you just flip to the fifth page, which is a
16  page that looks like a bill that was generated by Dr. Vigen's
17  office.  It's hard to read, but if you look at the first date
18  in the top of that column, August the something, 2003?
19  A.    Uh-huh.
20  Q.    If Dr. Vigen believes that that was when he was originally
21  contacted by you or somebody on your behalf, would you have any
22  reason to think that he's mistaken about that?
23  A.    Well, I mean, it says it's a phone consult.  I don't -- I
24  don't know.  I really don't know.  That could be -- it could
25  be.
```

1   Q.   If you look at page 3 of those records that I handed you,
2   Ms. Busbee --
3   A.   Uh-huh.
4   Q.   -- where Dr. Vigen indicates that the date of his
5   appointment was September of 2003, do you have a reason to
6   believe that that's an error?
7   A.   You said page 3?
8   Q.   The third page of the -- it says, "Defense Claim for
9   Expenses" -- "Defense Claim for Services or Expenses" at the
10  top of the page.
11  A.   Oh, you mean page 3 of his billing?
12  Q.   Yes.
13  A.   No, I mean, it's -- whatever it says is what it says.  I
14  don't --
15  Q.   You don't have any personal reason to believe that those
16  are mistakes?
17  A.   No, I don't.
18  Q.   Okay.  When Dr. Vigen was conducting his investigation, do
19  you know who he counted on to educate him about people,
20  subjects, issues that he might investigate?
21  A.   I'm sure he counted on me.  I don't know how -- he also
22  I'm sure talked to Mr. Sanchez, but I don't know if -- because
23  we both had, you know, copies of all the records.  So, I don't
24  know if he consulted with Mr. Sanchez.  You'll have to ask him,
25  of course.

1    Q.   And when Dr. Vigen consulted with you about those things,

2    do you know whether you had, at that time, formed a mitigation

3    strategy?

4    A.   Yeah.  You know, he had a very, very rough upbringing, and

5    that's always something that's sympathetic.  So, if you're

6    asking me in retrospect, I'm going to tell you more likely than

7    not it had to do with the horrible way that he was raised to

8    get sympathy for his behavior as an adult.

9    Q.   What kind of doctor is Dr. Vigen?

10   A.   He's a forensic psychologist.  He might be a neuro-

11   psychologist.

12   Q.   I believe you said that the Murphy case was the first case

13   where you had worked with him?  Did I understand you correctly

14   to say that?

15   A.   That's right.  I did not know him prior to receiving the

16   recommendation from Dr. Cunningham.

17   Q.   Have you worked with him since?

18   A.   I have.

19   Q.   Have you worked with him in other capital murder cases?

20   A.   Let's see.  Not as a mitigation expert.  The next case

21   after that that I tried, I think, was the Lizcano case.  And

22   we -- we needed Spanish-speaking doctors for the testing, but

23   that judge would give me a psychiatrist every time I asked him

24   for one.  And at that point, Dr. Vigen had become interested in

25   a study on future dangerousness that he participated in with

1   S.O. Woods, former classification head of the Texas Department

2   of Corrections.  And so we consulted him more as an expert on

3   that study of future dangerousness than we did as mitigation.

4           So -- and I used him to do a danger assessment on a

5   client here in Federal court who threatened a federal judge.

6           I'm trying to think of what other things I used him

7   on.  I used him on a capital murder case that did not -- was

8   not a death penalty case.  It had to do with a psychological

9   interview of a mother who killed her children.

10          I think that's all I have ever used him on.  That's

11  what comes to mind.

12          MR. DOW:  May I have just a moment, Judge?

13          THE COURT:  Yes, of course.

14          (Pause)

15  BY MR. DOW:

16  Q.   To your knowledge, Ms. Busbee, had Dr. Vigen received any

17  specialized training or education as a mitigation investigator

18  at the time that you hired him?

19  A.   I -- no, I don't think that he had.  I don't think anybody

20  had.

21  Q.   Who else besides Dr. Vigen conducted any part of an

22  investigation that was relevant to your construction of a

23  mitigation narrative?

24  A.   Bill Van Sickel was an investigator who went around

25  finding family members and had preliminary interviews with

1    those people.  Dr. Jay Crowder did medical imaging tests.  He

2    may have done more.  I don't know.  Dr. Lacritz, who is a

3    psychologist -- I think she's associated with the medical

4    school -- did some testing.  And Dr. Vigen.  So, those persons

5    that I can recall at this time.

6    Q.   Was the --

7    A.   I'm sorry.  One other person.  A psychiatrist, Dr. Lisa

8    Clayton.

9    Q.   To the best of your knowledge, was the manner in which

10   these other investigators conducted their investigations

11   similar to the manner in which Dr. Vigen did?  And by that, I

12   mean that you were having ongoing conversations or

13   consultations with them while they were conducting their

14   investigations?

15   A.   No.

16   Q.   What was different?

17   A.   Well, Dr. Crowder is sort of the thing we always did,

18   because you want to look for organic brain damage in a -- or

19   some explanation for behavior that may not be the fault of

20   the -- or blamed upon the defendant.

21        Dr. Crowder recommended Dr. Lacritz, the best that I

22   can recall, and she just did whatever test she did -- I have

23   her report -- and made a diagnosis of any psychiatric problems

24   that he may have that she diagnosed him with.

25        I don't have Dr. Clayton's report, but she is

1    somebody that we use in Dallas often to -- just because she's

2    one of the people that we go to for "is my client competent"

3    and that type of thing.

4         So, I don't remember and don't currently have her

5    report, but I have referenced somehow that she talked to him

6    and made a report.  But she was not ongoing.  This was just us

7    doing as much as we could to find out what an expert could say

8    about him prior to the time that we had mitigation assistance.

9    Q.   Did you conduct any part of the mitigation investigation

10   yourself?

11   A.   Yes.

12   Q.   What did you yourself do?

13   A.   I traveled out to visit with Linda -- I'll have to call

14   her Aunt Linda because I can't think of her last name -- and

15   another family member, a younger female, who were residing near

16   Palm Springs.  And I talked with them at length a couple of

17   times.  They were typical family members.  We got them -- you

18   know, everything was rosy in their life -- this, that, and the

19   other.

20        Dr. Vigen conducted much more intensive interviews

21   with them and was able to obtain a whole lot more information

22   than I could when I went out there.  But I think -- I'm sure I

23   went out there to see them before Dr. Vigen was involved.

24   Q.   Would Aunt Linda be Linda Goodman?

25   A.   Yes, that's her name.

1   Q.   Do you remember which members of Mr. Murphy's family you

2   called as witnesses at his trial?

3   A.   We called Linda.  We called the sister.  We called the

4   father.  His mother, of course, was deceased.  The brother was

5   not going to be a good witness.  And he was present in the

6   courtroom, but we did not call him.  That's just what comes to

7   mind.

8   Q.   Can you tell the Court, Ms. Busbee, what has to happen in

9   a capital murder trial in Texas in order for the defendant to

10  be sentenced to life rather than death?

11  A.   The jury has to determine that the person is not a future

12  danger.  The person -- the jury has to determine that there is

13  no mitigating evidence that would convince them that despite

14  the fact that they are a future danger -- I'm trying to think.

15  At that time it wasn't a deliberateness question back then.

16  And I've asked this, of course, a thousand times.  Let's see.

17  He was a party.  There was a parties' question in his case,

18  which I can't remember how that goes.  And -- now I'm blanking

19  out on what the other question is.

20          But in any event, they have to answer the question so

21  that they -- it was not intentional.  I'm blanking out on the

22  word.  That they're not a future danger and that there is

23  nothing that has been presented that is mitigating enough that

24  the person should receive life instead of death.

25  Q.   Thank you.

Busbee - Direct

```
 1            So, would you agree with me, Ms. Busbee, that if the
 2   jury concludes that the Defendant would not be a future danger,
 3   that he will receive a life sentence rather than a death
 4   sentence?
 5   A.   If they determine -- if one person determines that
 6   that's -- that's their verdict, then, yes.
 7   Q.   If one person on the jury believes that the defendant will
 8   not be a future danger, that person will be sentenced to life
 9   rather than death?
10   A.   Yes.
11   Q.   And if one person on the jury believes that there are
12   sufficient mitigating facts to warrant a life sentence rather
13   than a death sentence, will that person be sentenced to life
14   rather than death?
15   A.   Yes.
16   Q.   So, when you were constructing your mitigation narrative,
17   focusing for a moment on the future dangerousness question,
18   what was your strategy?
19   A.   Well, I had a much better situation than the other
20   defendants, because my client had not participated in any of
21   the beating of the guards or the restraining of the guards.
22   None of the people who had been attacked when they escaped
23   could even identify Murphy.  So, that was good.
24            Mr. Murphy was -- had a -- spotless compared to
25   everybody else, a spotless disciplinary record.  His
```

1  disciplinary record, if I recall, has to do with tobacco

2  products and unauthorized fan, something like that.

3         So, furthermore, he wasn't present at the time; that

4  he was driving the get-away car and it was blocks away,

5  allegedly, at the time that this murder happened.

6         And we used -- George Rivas came back and testified

7  in his behalf to say that he was sort of a dufus.  I think

8  that's in the record that they -- he set forth how he selected

9  the people who would participate in the scheme.  And actually

10 he had a criteria for future dangerousness as well.  He didn't

11 want anybody who was going to cause problems and get them

12 recaptured.

13        So, I just tried to show the jury that he was a

14 follower, that he was kind of an inept bumbler as far as the

15 rest of these, you know, bad criminals were concerned and that

16 he was included in their group, you know, to fill a number

17 requirement, the best I can recall.

18 Q.   Did you call any witnesses at the punishment phase of the

19 trial whose testimony you intended to be specifically useful

20 with respect to the future dangerousness question?

21 A.   I don't think that we had that study by Dr. Sorenson.  I

22 think that came after this.  But I called Dr. Vigen for that,

23 and I called S.O. Woods for that.

24 Q.   Had you interviewed both Dr. Vigen and Mr. Woods prior to

25 calling them as witnesses with respect to the future

1   dangerousness question?

2   A.   Yes, I did.

3   Q.   Did you ask them when you were talking to them, prior to

4   calling them, specifically what their answer would be to the

5   future dangerousness question?

6   A.   Yes.

7   Q.   Do you recall asking Mr. Woods whether he believed

8   Mr. Murphy would be a future danger while you were examining

9   him as a witness?

10  A.   I don't remember specifically, but the gist of what I

11  recall is, is that he was a person who under the classification

12  system that he designed would not be considered a danger in

13  prison, because that's where he would be if he would be given a

14  life sentence.  So, that was the -- that was my goal in calling

15  him for that issue.

16  Q.   Do you recall what Mr. Woods' testimony actually was in

17  Mr. Murphy's trial?

18  A.   Well, I remember -- I remember the bad moment when on

19  cross-examination he admitted that -- or said -- made a

20  statement that he was a very dangerous man, but up until that

21  time he had said what I had anticipated that he would say,

22  which was that within the prison system Mr. Murphy was not a

23  dangerous person.

24  Q.   So that during your interviews with him, prior to calling

25  him as a witness, did he tell you privately something that he

```
 1  then contradicted as a witness?

 2  A.   Yes.

 3            MR. DOW:  Can I have just a brief moment, Judge?

 4            THE COURT:  Of course.

 5            THE WITNESS:  Can I get some more water?

 6            THE COURT:  Yes, yes.

 7            (Pause)

 8            MR. DOW:  For the record, Judge, Mr. Greenwell and I

 9  were discussing before the hearing commenced how we would refer

10  to the reports that are already contained as part of the habeas

11  application or the Government's reply, and both of our

12  experience is that it is less confusing not to admit them

13  because they are already attached as exhibits to a habeas

14  application.  And so if we admit them as exhibits during this

15  proceeding, they are going to have two different numbers or

16  letters.

17            THE COURT:  I agree with that.  I think it would be

18  better -- I think first identify them.  Identifying them with

19  the header from ECF is helpful for this.  Identify where

20  precisely they are in the record.  I think -- in the existing

21  docket, I think.  I agree with you, it makes more sense.

22            MR. DOW:  Thank you, Judge.  So, for the same of the

23  record I will indicate that what I have given the witness is a

24  copy of a report that was prepared by Dr. John Fabian, who

25  was -- who is a psychologist who has been hired by Mr. Murphy's
```

```
 1 | current counsel.
 2 |        (Pause)
 3 | BY MR. DOW:
 4 | Q.   I would like you to turn, if you wouldn't mind,
 5 | Ms. Busbee, to page 17 of the report that I've handed you, the
 6 | very bottom of page 17 and the very top of page 18.
 7 |        THE COURT:  I guess -- let me just say for the
 8 | record, this is -- what we're all looking at is Docket Entry
 9 | 84-1, so --
10 |        MR. DOW:  Yes.
11 |        THE COURT:  Yeah.
12 |        MR. DOW:  Thank you, Judge.
13 | BY MR. DOW:
14 | Q.   At the bottom of page 17 and the top of page 18,
15 | Ms. Busbee, Dr. Fabian identifies sources of trauma that
16 | Mr. Murphy suffered?
17 | A.   Yes.
18 | Q.   Can you look at that list and tell me whether you were
19 | aware from your investigation of the specific items on that
20 | list?
21 | A.   Yeah.  All of this is contained in Dr. Vigen's timeline
22 | that he provided to the defense.
23 | Q.   All eight of those items are in Dr. Vigen's timeline?
24 | A.   I don't remember seeing Dr. -- this Mr. Don Ballinger, but
25 | I remember knowing that.  So, yes.
```

1  Q.   When -- Dr. Crowder, is he the -- can you remind me who
2  the neuropsychologist was?
3  A.   He's a physician.  Dr. Crowder is the one who did the
4  MRI's or CAT scans or whatever we did back then.
5  Q.   Which of the experts that you identified for me earlier
6  would have been the expert on your team who would have made a
7  psychological diagnosis of Mr. Murphy based on, among other
8  factors, these eight factors?
9  A.   Dr. Vigen, Dr. Clayton, Dr. Lacritz.
10         There's also a psychological evaluation that -- I
11  think we obtained this through S.O. Woods that the State didn't
12  have this -- that was done at the time that he was considered
13  for the sex offender treatment program at TDC where they looked
14  at his past.  So, I have relied on all of those reports.
15  Q.   Did you have conversations with Dr. Vigen or Dr. Clayton
16  or Dr. Lacritz prior to Mr. Murphy's trial where you asked them
17  specifically how these trauma factors would manifest or exhibit
18  themselves in Mr. Murphy?
19  A.   I don't remember having -- I don't remember conversations
20  with any doctor other than Dr. Vigen off the top of my head.  I
21  don't remember those conversations, if I had any.  I'm sure we
22  had many conversations, Dr. Vigen and I, concerning what this
23  meant in terms of where he was, sitting there with a potential
24  death sentence and how some of these factors may explain it and
25  mitigate it.

1   Q.   Are you familiar with the concept of posttraumatic stress
2   disorder or PTSD?
3   A.   As much as any layperson.  Not -- I don't have any special
4   knowledge about it.
5   Q.   Did you Dr. Vigen discuss specifically whether in his view
6   Mr. Murphy suffers from PTSD?
7   A.   I don't remember that conversation.  I don't remember
8   having a conversation about that.  I'm not saying we didn't,
9   but I don't recall it if we did.
10  Q.   If Dr. Vigen had told you that he believed that Mr. Murphy
11  suffers from PTSD, would that have been a factor that you would
12  have been able to use in your mitigation narrative?
13  A.   Yeah, I think that would have been very helpful.
14  Q.   Earlier we were talking about your objective with respect
15  to the future dangerousness question.  I would like to ask you
16  now a bit about the other question that we were discussing, the
17  mitigation question.
18       I understood you to say that if a single juror
19  believed that the mitigating facts warranted it, the defendant
20  would be sentenced to life rather than death?
21  A.   Well, to the extent that it requires a unanimous verdict
22  on each of the questions.
23  Q.   With respect to that mitigation question, what was your
24  mitigation strategy at Mr. Murphy's trial?
25  A.   To characterize him as a victim of his upbringing and to

1  show to the jury that he was not going to pose a further

2  danger.

3  Q.   Who were the witnesses that you called at the punishment

4  phase whose testimony you believed at the time would be

5  relevant to the jury's consideration of the mitigation

6  question?

7  A.   Well, anybody that could talk about the horrendous

8  childhood that he had, and those would be family members.  And

9  then -- of course, the record will speak for itself.  And I'm

10 sorry that I have not read that punishment thing.  I intended

11 to do that yesterday.  But whoever -- certainly Dr. Vigen and

12 certainly Mr. Woods, who had just retired from TDC not too long

13 before this trial and was a nationally respected expert on

14 classifications and safety in prisons.  And so we thought that

15 would be a really great thing to hang our hat on, that he did

16 not feel he would be a danger in the prison.

17 Q.   I want to focus specifically, though, for a moment,

18 Ms. Busbee, if I can, on the mitigation question, not the

19 future dangerousness question.

20 A.   Oh, sorry about that.

21 Q.   That's all right.

22      With respect to the mitigation question, would there

23 have been any reason for you not to have included the fact that

24 Mr. Murphy suffers from PTSD as part of that narrative?

25 A.   Well, I did not have that diagnosis.  It was never

1   suggested to me by anybody that looked at him.

2          Now, I know that the criteria for PTSD has changed

3   from the DSM-IV to the DSM-V, so I don't -- you would have to

4   ask them why they did not diagnose him with that.  That may be

5   one of the issues.  I noticed that this was -- that this

6   diagnosis was made under the new criteria, so I don't -- I am a

7   layperson when it comes to this.  I do not know why they did

8   not diagnose him with PTSD and this gentleman did.

9   Q.   And just to be clear, Ms. Busbee, I'm not asking you to

10  speculate about why Dr. Vigen reached any diagnosis or didn't

11  reach any diagnosis.  I'm simply asking whether if Mr. Murphy

12  had been diagnosed prior to the time you went to trial as

13  suffering from PTSD whether you would have used that as part of

14  your mitigation narrative?

15  A.   I would have.

16  Q.   How would you have used that?

17  A.   I would have -- well, it would have dovetailed perfectly

18  within the theory of the mitigation, which is he was a product

19  of a terrible upbringing.  It would have been very good

20  evidence in mitigation.

21  Q.   Do you recall discussing any specific psychological or

22  psychiatric diagnosis with Dr. Vigen?

23  A.   Yes.

24  Q.   Which specific psychological or psychiatric diagnosis?

25  A.   If you will let me refer to my file that I brought with

1   me.  I reviewed some of that last night.  It's back here.

2           THE COURT:  Any objection to --

3           MR. GREENWELL:  No objection, Your Honor.

4           THE COURT:  All right.

5           MR. DOW:  Certainly not, Judge.

6           THE COURT:  Okay.  All right.

7           (Pause)

8           THE COURT:  Okay.  Ms. Busbee, just for the record,

9   what records have you retrieved that you're now reviewing?

10          THE WITNESS:  These are records that -- I don't know

11  that it's necessarily the entire file, but it's the majority of

12  my trial file that was never asked for by anybody.

13          THE COURT:  Okay.

14          THE WITNESS:  And I went through it last night, and I

15  see that there are some opinions that Dr. Vigen has faxed to

16  me, and I have some of my own handwritten notes about -- it

17  looks like this -- I don't know which came first, but it looks

18  like we did it once and then we came back again and did some

19  more elaboration.

20          I'll have to -- ask me the question again.  I'm going

21  to have read my own handwriting here.

22  BY MR. DOW:

23  Q.   You've asked me the hardest question anybody could ask me.

24          Ms. Busbee, I believe that what I asked you was

25  whether you discussed with Dr. Vigen any specific psychological

1   or psychiatric diagnosis that he had made of Mr. Murphy and, if

2   so, what it was?

3   A.   Well, what it is here is -- it looks like exactly the same

4   five opinions that Dr. Vigen was going to give me.  One was

5   faxed to me, and I have got a few notes on it.  And this looks

6   like what I worked off of, because it's got a lot of notes on

7   it.

8          We discussed that he had a diagnosis of sexual order

9   [sic] nonspecific on Axis I and narcissistic borderline and

10  antisocial traits on Axis II; that he wanted me to ask him

11  about the course of antisocial personality disorder, that that

12  declines over time; to read something concerning persistent

13  sexual orientation succession of -- cover feelings of

14  inadequacy, I think.  Narcissism, persistent pattern of

15  grandiosity.  Antisocial tendencies, somewhat borderline,

16  equals abuse -- and I put a star by "antisocial equals" --

17  deceitful, impulsive, violates law.

18         And I have scratched through what he had typed here,

19  scratching through "Patrick Murphy is a sex offender."  So,

20  apparently we discussed that he wouldn't say that, which he

21  subsequently did.

22         That the second opinion on my final working copy was

23  that Patrick Murphy has a sexual disorder and his personality

24  traits as a result of a long and severe history of family

25  dysfunction.  Repeated sexual violation makes a person sneaky,

1    that he may -- a controlled rapist.  Sexual disorder usually

2    have family component.  And plus these extensive relocations

3    equal many different kinds of parents.

4            Newly numbered opinion Number 3.  Given his

5    personality traits, Patrick Murphy is more of a follower than a

6    leader in the escape and ultimate murder of Aubrey Hawkins.  He

7    based that on interviews with Defendant and observations of

8    father, Linda, and sister, George Rivas, written material --

9    something about being an inadequate man or men.  I don't know

10   what I meant by that.

11           Number 4.  Given the escape and conviction and given

12   the absence of violence in his 16-year-prison history, it was

13   his belief that the TDC will assign Patrick Murphy to

14   administrative segregation and as a result Patrick Murphy has a

15   very low risk of future violence.

16           And that he has potential for rehabilitation and

17   possible personal and spiritual conversion as he moves into the

18   latter part of the second half of his life; that the best thing

19   for him would be to serve time in TDC where they can control

20   his behavior; that he has -- not have skills here.  I don't

21   know what that meant.

22           That he has -- he has begun writing people and he's

23   getting better in his interpersonal relations with people.  And

24   something about "abuse trusted adults, no."  And I don't know

25   what I mean by toxic waste dump, but it's probably something

1   Dr. Vigen had to say about the entire upbringing of Mr. Murphy,

2   because it was pretty bad, as I recall.

3         So, I don't have independent recollection of this,

4   but this is just -- this makes me know that this was when we

5   were practicing his testimony, because I did now see I

6   scratched through this business that he ultimately spit out

7   when he was being cross-examined.

8   Q.   Is there anything in either Dr. Vigen's report or the

9   notes of yours that you were just looking over that makes you

10  think that Dr. Vigen diagnosed Mr. Murphy with PTSD?

11  A.   I'm relatively certain he did not.

12  Q.   I believe I already asked you this, but because I can't

13  remember for sure, if -- I'll ask you again.  If he had

14  diagnosed Mr. Murphy with PTSD, would you have used that

15  diagnosis in your mitigation narrative?

16  A.   I absolutely would have.

17  Q.   Why?

18  A.   Because I think it would have been an effective diagnosis.

19  It would have tied his current behavior to -- or his recent

20  behavior to his dreadful childhood, and it would have been

21  sympathetic.

22  Q.   Ms. Busbee, if this Court were to conclude that Dr. Vigen

23  was not, in fact, qualified to conduct a mitigation

24  investigation at the time of Mr. Murphy's trial, on whom would

25  that failure fall?

```
1   A.   Well, to me it would fall on the fact that this was a
2   brand-new field and we were flailing around, trying to figure
3   out what a mitigation expert was and did.
4           MR. DOW:  May I have one moment, Judge?
5           THE COURT:  You may.
6           (Pause)
7           MR. DOW:  I pass the witness, Judge.
8           THE COURT:  All right.  Cross-examination?
9           MR. GREENWELL:  Your Honor, I know Mr. Dow has been
10  siting the entire time.  Is it your preference that we stand
11  or --
12          THE COURT:  You know, actually, it's fine.  Sitting
13  is fine.
14          MR. GREENWELL:  Okay.  I just wanted to --
15          THE COURT:  No, I appreciate that.  And it's
16  typically different than between State court and Federal court,
17  but given the paperwork and everything y'all are working
18  with --
19          MR. GREENWELL:  Got you.
20          MR. DOW:  Thank you, Judge.  And I apologize.
21          THE COURT:  No, that's quite all right.  If it
22  bothered me, I would have said something about it, so --
23                      CROSS-EXAMINATION
24  BY MR. GREENWELL:
25  Q.   Well, Ms. Busbee, my name is Jeremy Greenwell.  I'm
```

```
 1   counsel for Respondent Stephens in this proceeding.
 2            I wanted to go ahead and get something preliminary
 3   out of the way.  You and I have met previously; is that
 4   correct?
 5   A.   Did we?
 6   Q.   Well, earlier?
 7   A.   Yeah.  I intended to come here at 8:30 because I was going
 8   to talk to you beforehand, but I -- well, actually, I was going
 9   to talk to you yesterday, but I couldn't get a chance to do it
10   yesterday, so I tried to get up here at 8:30.  And I called you
11   or told you last night that I had found this file, but I hadn't
12   gone through it at that time.
13   Q.   So, we have spoken on the phone before?
14   A.   Sure, sure.
15   Q.   Okay.  In any of these conversations that we've had, has
16   either I or anybody from our office instructed you how to
17   testify at this hearing?
18   A.   Not to testify or how to testify?
19   Q.   How to testify?
20   A.   No.
21   Q.   In one way or another?
22   A.   No.
23   Q.   Okay.  So, your testimony is based purely on your
24   recollection as you remember it?
25   A.   Yes.
```

```
 1   Q.   Okay.  I just wanted to get that out of the way.
 2            A lot of what I want to ask you is probably redundant
 3   to what Mr. Dow has already asked you.  We probably will do it
 4   in a different order, so forgive me if it's already been asked
 5   and answered.
 6            Let's first start out with your background.  How long
 7   have you been practicing law, did you testify?
 8   A.   Since 1979.
 9   Q.   1979.  And you've been a defense attorney this entire
10   time?
11   A.   No.  I started out at the Travis County District
12   Attorney's office, which, as you may not know, is a -- has only
13   felony jurisdiction.  So, I stayed there for -- well, I
14   actually worked there when I was in law school, and then I
15   stayed there -- I was the chief of the 147th District Court for
16   about a year, and then I moved back to Dallas, my hometown, and
17   began -- which was the very end of 1981.  And I've been
18   practicing law in private practice since then.
19   Q.   Okay.  So, in your capacity as either defense attorney or
20   prosecutor, how many felony murder trials have you been
21   involved in?
22   A.   Oh, gosh.  Probably -- I never have counted up my trials,
23   but I wouldn't be surprised that it would be around 100, maybe
24   75.
25   Q.   How many of those have been capital murder trials?
```

```
 1   A.    That went to trial?  Six.

 2   Q.    Six capital murder trials?

 3   A.    Uh-huh.

 4   Q.    Okay.  How many of them were you lead counsel in?

 5   A.    Three, I think.

 6   Q.    Okay.  At the time of Murphy's trial, I think you may have

 7   said this before, but how many had you done before you were

 8   appointed as Murphy's counsel?

 9   A.    Two.

10   Q.    Two before then.

11         Okay.  And you were appointed as lead counsel in this

12   case?

13   A.    Yes.

14   Q.    And your co-counsel was Juan Sanchez; is that correct?

15   A.    Juan Sanchez, yes, sir.

16   Q.    Okay.  How did the two of you decide how to divide up

17   duties?

18   A.    Well, being something of an aggressive control freak, I

19   did -- I did most of the case and had him do the -- there was

20   extensive testimony concerning weapons and ballistics and

21   matters having to do with the shooting of Mr. Hawkins.

22   Essentially -- and, of course, we had the benefit of reading

23   all the prior testimony.

24         But our client actually had no participation in the

25   actual shooting, because he wasn't there.  So, the fine points
```

```
 1  of, you know, whether that was going to help or hurt Mr. Murphy
 2  did not exist.  And so I asked Juan to take over the
 3  cross-examination of anything having to do with the ballistics.
 4          And I don't remember if he did anything else, but
 5  that was -- that was what he did.  This was his first death
 6  penalty case.  And he participated in all meetings that I can
 7  recall except maybe some of the travel meetings with Dr. Vigen.
 8  And that was a learning experience for everybody, because it
 9  was new.
10  Q.   But as lead counsel, any decisions that were made
11  regarding either guilt/innocence phase testimony or punishment
12  phase testimony ultimately went through you; is that correct?
13  A.   That's true.
14  Q.   Okay.  Were either you or Mr. Sanchez assigned mainly for
15  the mitigation investigation or the punishment phase, or did
16  you do it together?
17  A.   We did it together.
18  Q.   Let me talk a little bit about how you normally prepare
19  for trial ordinarily, in a capital murder trial especially.  Do
20  you have a routine that you normally follow when you are first
21  appointed?
22  A.   Oh, yeah.  I go -- I have a warning that I fax to the
23  Sheriff's Department immediately.  I mean, that goes before I
24  probably even find out about it.  My secretary sends it over
25  there and says something to the effect of "You may not speak to
```

 1   my client.  You may not allow the press in to see my client.

 2   My client invokes his Fifth and Sixth Amendment rights," et

 3   cetera, et cetera, just something that we fax over.

 4        Then we -- I see him as soon as physically possible

 5   and give him a number of -- or her -- a number of warnings

 6   concerning talking to people in the jail, talking on the

 7   telephone, talking to the press, just -- just kind of a

 8   prophylactic behavior to keep it from getting worse, because

 9   sometimes that happens.  In fact, it happens a lot.  They

10   get -- I've met the press leaving the jail as I come in to meet

11   my client, and it's never good.

12   Q.   Okay.  Do you have a certain timeline as to when you file

13   certain motions, motions in limine, motions for funding,

14   anything of that sort?

15   A.   No.  In fact, as I mentioned previously, all the motions I

16   let the appellate attorney file.  Sometimes I have suggestions

17   on that.  Often I have suggestions on that.  I say, "Draft me a

18   motion for this, that, or the other."  And --

19   Q.   Okay.

20   A.   I compartmentalize my defense that way.

21        First of all, sometimes you don't know whether or not

22   the State is going to seek death.  You know, you assume it at

23   the very beginning, but Dallas has been pretty good about

24   letting us know, yes or no, on whether they're going to seek

25   death.  And so, you know, if they're not seeking death, it goes

1   one way.  If they are seeking death, of course, it goes

2   another.

3   Q.   How about specifically with regard to your preparation for

4   the punishment phase of the trial, assuming the D.A.'s office

5   has informed you that they are going to seek death?

6   A.   Well, pre-mitigation expert, it was "Let's get him looked

7   at by Dr. Crowder over at UT Southwestern.  Let's have him

8   looked at by this person.  Let's" -- you know, we use an

9   investigator, which would be, you know, often, frequently,

10   former law enforcement or something like that that are now

11   private investigators to speak with everybody that we can to

12   find out everything we can about our client.  We would always

13   have them evaluated psychologically.

14        Post then, we get a mitigation expert.  Now, I think

15   the last two or three I have been second chair.

16   Q.   Okay.

17   A.   And, in fact, the last one I was involved in, Mr. Sanchez

18   was first chair and he lost his second chair, so I didn't get

19   involved in the case until very late, and all these decisions

20   had previously been made.

21        So, it's been a while since I have been called into

22   action when they were seeking death, so I can't really give --

23   tell you that I have a game plan that I invoke the minute I get

24   a death-penalty case.

25   Q.   That's no problem.

1          But you mentioned you have the defendant evaluated by

2    experts.  What are you looking for when you have him

3    evaluated --

4    A.   Well --

5    Q.   -- in general?

6    A.   -- first you would like to find some organic brain damage

7    so that you can say it's not his fault; he got a whack on the

8    head or he was born with some kind of a defect that makes him

9    abnormal.

10         Then you want to find out whether there's, you know,

11   a psychological diagnosis that might explain some behavior that

12   might be mitigating.  And that's what you do.

13   Q.   Okay.  When you're looking for something, do you also

14   examine, say, medical records or school records --

15   A.   Oh, sure.

16   Q.   -- or TDCJ records or whatever you can get your hands on?

17   A.   Oh, yeah.  We always get all of those records.

18   Q.   Okay.  You mentioned hiring an investigator.  Is that

19   something you always do, is hire an investigator?

20   A.   Absolutely.

21   Q.   Okay.  Is that one of the first things you do?

22   A.   Yes.

23   Q.   Okay.  We talked a bit about what is now being referred to

24   as a mitigation expert.  In the capital murder cases that

25   you've been involved in, have you ever hired a mitigation

1    expert or what is now being termed a mitigation expert?

2    A.    Now I have.  Well, let's see.  Let me think about it.  I

3    was appointed on Lizcano because after that I was second chair.

4    Yes, I hired a mitigation expert in Mr. Lizcano's case early

5    on.

6    Q.    Were such experts around at the time of this trial,

7    Mr. Murphy's trial, in 2003?

8    A.    I don't even think that we even still -- that we had a --

9    we know what a mitigation expert is, like, for certainty.

10          In the second occasion I was called upon to hire a

11   mitigation expert, we ended up -- we needed a Spanish speaker.

12   That was almost impossible.  And we ended up getting -- using

13   an investigative journalist, who was -- did an excellent job of

14   investigating the defendant's background.  I've never seen

15   anything quite like it.  She coordinated with other

16   specialists, of course.

17          But I can't tell you to this day that we have -- I

18   mean, that they -- I know they go to meetings and this, that,

19   and the other, but there is some ideal mitigation expert out

20   there.  Probably, as I'm saying, it had a lot to do with the

21   kind of case it was.

22   Q.    And this mostly came about, from your recollection, as a

23   result of the *Wiggins* case in 2003; is that correct?

24   A.    When I was allowed to hire a mitigation expert?

25   Q.    Or the term "mitigation expert" --

1   A.   Right.

2   Q.   -- as it's now known?

3   A.   Yeah.  We didn't really know what that meant.  But my

4   feeling at the time was it was somebody who was going to

5   investigate everything possible in the defendant's background

6   to present it in a sympathetic fashion, if there was such a

7   way, to the jury.

8   Q.   In 2003, you mentioned funding.  Would there have been

9   funding available to hire such an expert if they actually

10  existed?

11  A.   In 2003, yes.  That was -- because that decision had been

12  made.  In fact, if I'm not mistaken, when *Wiggins* came down,

13  Judge -- the Judge called me and said, "You're going to have to

14  get a mitigation expert," and I started looking around.

15  Q.   Okay.  Is that when you hired Dr. Vigen?

16  A.   Probably not.  It took me a while to find somebody.

17         You know, as I say, I got this slew of things in the

18  mail, trying to get me to hire people.  And they all seemed

19  suspect to me.  And I actually read -- I can't tell you what

20  order.  Obviously, we had to have a transcript of the prior

21  trial before we could commence with the next trial.

22         So, I read a couple of -- I read a couple of records

23  before I decided how to use a mitigation expert, because I

24  remember a Dr. Kelly Good or something or the other.  She's

25  horrible.  And somebody else that I read was horrible.  And I

```
 1    was trying to find out who we were going to use and how we were
 2    going to use them, because it was just -- it was a developing
 3    field at that time.
 4    Q.   Okay.  Let me back up for a second.  You hired a fact
 5    investigator to help you in this case; is that correct?
 6    A.   Bill Van Sickel, yes, sir.
 7    Q.   Okay.  His name is --
 8    A.   Van Sickel.
 9    Q.   Van Sickel.  Do you remember when he was hired?
10    A.   He was -- I brought him on immediately.
11    Q.   Okay.  And did he help you in your punishment phase
12    investigation?
13    A.   Yes.
14    Q.   Okay.  And you then hired Dr. Vigen, correct?
15    A.   Yes.
16    Q.   Would you have considered him, for lack of a better term,
17    your mitigation expert?
18    A.   I did.
19    Q.   Okay.
20    A.   That was -- that was -- that was his title.
21    Q.   Okay.  That was his actual title?
22    A.   To my mind.  I mean, that wasn't his title on his
23    letterhead, but that was the purpose he was hired.
24    Q.   Okay.  And do you believe he was qualified to serve that
25    purpose?
```

1    A.    I did then and I still do.

2    Q.    Okay.  In his petition Mr. Murphy has complained that your

3    investigation into the mitigation phase only started around two

4    months prior to the punishment phase.  First of all, do you

5    believe that's true?

6    A.    Oh, no, no.  That's not true at all.  I had been out a

7    year or two before to talk to his family.  I had talked to his

8    brother.  I talked to quite a few people prior to the time that

9    he -- that Dr. Vigen, I guess -- if that's true when he was

10   hired.  I had been out and talked to lots of folks.  I reviewed

11   a lot of records.

12   Q.    So, you yourself interviewed numerous witnesses?

13   A.    I did.

14   Q.    Okay.  And your investigators, both Vigen and -- I'm

15   sorry, I can't remember the name.

16   A.    Van Sickel.

17   Q.    -- Van Sickel also interviewed numerous witnesses?

18   A.    Well, once Dr. Vigen was onboard, he wanted to talk to

19   everybody again with his -- you know, his special knowledge,

20   and so that's what we did.  He went back and talked to

21   everybody.

22         And, I mean, I don't remember if he -- he may have

23   been able to obtain additional records from TDC.  There was a

24   secret back then and may still be to getting certain medical

25   records that S.O. Woods was hip to, so he got us -- probably

1    got us some additional records.

2            But once Dr. Vigen was onboard, Mr. Van Sickel's role

3    was to assist him, if he did, in finding people and arranging

4    meets and whatnot.

5    Q.   So you had -- you essentially had a team of people working

6    on this case?

7    A.   Yes.

8    Q.   At least four, possibly more?

9    A.   Three lawyers, Dr. Vigen, Mr. Van Sickel, and Mr. Woods.

10   So, that would be six if you want to call them a team.  I think

11   really S.O. Woods is more like a witness.  But he did -- did

12   help us in a field where we wouldn't have known -- wouldn't

13   have been able to put on that evidence otherwise.

14   Q.   Okay.  So, I assume you had fairly intimate contact with

15   all of the people working as your investigative team --

16   A.   Yes.

17   Q.   -- into what they were looking into?

18   A.   Uh-huh.

19   Q.   Do you recall more or less how many witnesses you had

20   contacted about potentially testifying in Murphy's case?

21   A.   Before Dr. Vigen?

22   Q.   Before trial?

23   A.   Before trial?  I couldn't say.  But let's say four or five

24   family members.  He didn't have any friends that -- other than

25   his brother that we were able to contact.  Old girlfriends.  I

1    think we tried to -- I think we got in touch with his ex-wife.

2    Not helpful.  So --

3    Q.    So, ex-wife, father, siblings?

4    A.    Living siblings, aunt.

5    Q.    Living siblings, aunt?

6    A.    I mean, the people that -- obviously, he had been in

7    prison for 17 years prior to this, so he really hadn't had any

8    contact with anybody.  He didn't have a social network outside.

9    And so we talked to the people that we could who were

10   essentially his family members.

11   Q.    And as you testified before, in consulting with these

12   various witnesses, did you ever uncover any evidence of

13   Murphy's abusive childhood or negligent upbringing?

14   A.    Yes.

15   Q.    Okay.  And this was obviously something you considered

16   presenting and did present at trial, correct?

17   A.    Yes.

18   Q.    Through how many witnesses?  Do you recall?

19   A.    I think that Aunt Linda could talk about -- Linda Goodman

20   could talk about his childhood.  His father knew something --

21   whatever is in the record.  There wasn't anything that is --

22   the dad had known some stuff I don't think I was able to get

23   out of him when he was on the witness stand.  That's just a

24   faint memory.

25        Other than that, we put on what we had.  Obviously,

1  we couldn't put on hearsay.  We had -- we had a report that he

2  had been -- had been sexually abused and then had been a sexual

3  abuser from the time he was a child, so --

4  Q.  But you were unable to substantiate that?  Is that why you

5  did not --

6  A.  I mean, it wasn't that.  We didn't have any witness to it.

7  We did not -- it was a joint effort or a joint decision,

8  including the Defendant, that he would not testify.  So, he

9  couldn't talk about it.

10         And I don't -- whatever is in the record was what we

11 were able to put forward and then kind of get a little in

12 through Dr. Vigen.

13 Q.  Dr. Vigen ended up testifying to that effect, did he not?

14 A.  Right.

15 Q.  Okay.  So, the jury -- with regard to at least sexual

16 abuse that Mr. Murphy may have suffered, the jury at least

17 heard that from one witness, being Dr. Vigen; is that correct?

18 A.  Right.

19 Q.  Okay.  Is there anything from Mr. Murphy or his family or

20 that you gathered through your investigation that would have

21 indicated that Mr. Murphy suffered from posttraumatic stress

22 disorder?

23 A.  That was never mentioned in connection with any of the

24 evaluations or family members.  That bunch wouldn't have known

25 what that was, so, no.

```
1    Q.   Okay.  But you had hired, as you testified, several

2    psychological experts who evaluated Mr. Murphy?

3    A.   Yes, sir.

4    Q.   Did any of them diagnose him with posttraumatic stress

5    disorder?

6    A.   No.

7    Q.   Do you have any reason to doubt their diagnosis or --

8    A.   I relied on them.  So, no, I don't have any reason to

9    doubt it.

10   Q.   Okay.  And those experts again were Lisa Clayton, and she

11   was a general --

12   A.   Psychiatrist.

13   Q.   She's a psychiatrist?

14   A.   Yes.  Forensic psychiatrist.

15   Q.   Okay.  And Laura Lacritz was a psychologist?

16   A.   She -- yeah.  She did some -- some neuro testing.  She is

17   an associate director of the Department of Psychiatry,

18   Neuropsychology.  She's a Ph.D. at Southwestern -- what was

19   Southwestern Medical School at the time.

20   Q.   And you mentioned Dr. Jay Crowder.  Did he evaluate

21   Murphy?

22   A.   I don't have his report, but he would have done the

23   physical testing of the brain -- or examination.

24   Q.   And Dr. Vigen is also a clinical psychologist.  Did he

25   evaluate Mr. Murphy?
```

```
 1   A.   Yes, he did.
 2   Q.   So, you had no less than three, possibly four experts
 3   evaluate Mr. Murphy?
 4   A.   And the evaluation that was done at TDC while he was
 5   there.
 6   Q.   And what did that evaluation say?
 7   A.   If I may?  That's in my file as well.
 8            THE WITNESS:  If I may, Your Honor.
 9            THE COURT:  Yes.
10            Well, any objection?
11            MR. DOW:  I have no objection.
12            (Pause)
13   A.   I looked through this last night.  My recollection, that
14   there was -- I mean, I did look for posttraumatic stress
15   disorder.  It was not diagnosed when he was considered for the
16   sex offender treatment program at TDC.  And they did a pretty
17   thorough report, and they came to many of the same conclusions
18   that the experts that I had hired had concluded:  borderline
19   personality disorder, if I'm not mistaken, antisocial
20   personality disorder.  And it outlined some -- most of the same
21   abuse that had been reported to us.
22   Q.   So, the report that you had mentioned from Dr. Vigen after
23   looking through your trial notes concerning his diagnosis of
24   certain disorders -- I believe there was a sexual disorder,
25   narcissistic disorder, antisocial disorder.  Were these all
```

```
 1   testified to at Murphy's trial ultimately?

 2   A.    I believe so, but the record will reflect.

 3   Q.    Okay.  So most, if not all, of the things that Vigen

 4   reported to you was explained to the jury?

 5   A.    Yes.

 6   Q.    Okay.  So, in your investigation you found evidence of

 7   neglect and abuse, a neglected childhood and some mental

 8   disorders of some sort?

 9   A.    (Indicating in the affirmative)

10   Q.    Do you believe that you presented this evidence

11   effectively to the jury?

12   A.    Well, I hope so.  I did the best that could be done, in my

13   opinion.

14   Q.    After the investigation that you and your team undertook,

15   can you explain again the strategy that you developed for the

16   punishment phase?

17              THE WITNESS:  I'll have to have some more water.  I'm

18   sorry.

19              MR. GREENWELL:  Okay.  If you're out, I have some

20   over here.

21              MR. DOW:  Yeah, we're out over here.

22              THE WITNESS:  This allergy medicine makes me dry-

23   throated.

24              (Pause)

25   A.    The strategy for mitigation, is that the question?
```

1    Q.   Or for the punishment phase in general.

2    A.   Punishment phase.  Well, as I said, we wanted to establish

3    for the jury that the Defendant was not -- was kind of an

4    ineffective criminal, kind of a dufus; that he wasn't the

5    ringleader, although he was the oldest; that he did not

6    participate in any of the violence that occurred when they were

7    released; that he had a terrible childhood and that that was

8    the reason that he was making the -- had made the bad decisions

9    that he had made; to make him sympathetic and to distance him

10   from the really bad criminals that he escaped with.

11   Q.   And that was just part of the strategy; is that correct?

12   A.   Well, right.

13        I mean, even TDC, when they had escaped, had ranked

14   the defendants in order of dangerousness.  On all those lists

15   Murphy was the least dangerous.  One list they even forgot

16   about him and left him off.

17        So, you know, we were trying to -- and it's difficult

18   to make a case for won't be a future danger when they escape

19   from prison and a police officer has died, obviously.  So, the

20   strategy was to make him sympathetic.

21   Q.   And you did this not only to show that he was a follower,

22   but did you also present evidence of his upbringing in order to

23   sympathize him more in the jury's eyes?

24   A.   Certainly.

25   Q.   And also evidence of his mental health issues?

```
 1   A.    Yes.

 2   Q.    Through the testimony of Dr. Vigen, correct?

 3   A.    Yes.

 4   Q.    Okay.  One more question concerning your investigation.

 5   Again, the allegation against you is that not enough time was

 6   spent in your investigation.  Do you believe this to be true?

 7   A.    No.

 8   Q.    Okay.  As an exhibit, Counsel has submitted a timesheet.

 9   Is that the only timesheet you had submitted in this case?

10   A.    I don't know.

11   Q.    Okay.

12   A.    As I say, I went back to the auditor.  They destroyed them

13   after seven years.  I don't have these records.

14   Q.    Okay.

15   A.    So, I don't know.

16   Q.    Okay.  Part of your mitigation strategy was to present

17   S.O. Woods, as you spoke to before?

18   A.    Yes.

19   Q.    Did you speak with -- or for how long did you speak with

20   Mr. Woods prior to his testimony?

21   A.    I can't remember, but I remember that we went over his

22   testimony several times, but length of time I'm not sure.

23   Q.    What was the initial purpose of consulting with Mr. Woods?

24   A.    Well, he was newly available.  He had stated that he would

25   like to -- or he would be amenable to testifying for the
```

1    defense, which is something I didn't actually ever expect.

2           But I don't -- I can't say this for sure, because I

3    used him in the -- subsequent to this I used him again.  But I

4    don't know if he met Dr. Vigen because Dr. Vigen was interested

5    in his statistics of classification and recidivism, or it came

6    to my attention somehow that he would testify.

7           But they -- they began a dialogue.  And he went down

8    to TDC, Dr. Vigen, and worked with Mr. Woods.  And he reported

9    to me that S.O. Woods could say that Patrick Murphy would not

10   be a danger in TDC.  And I thought that would be very valuable,

11   because he's -- he's a warden, so to speak, in TDC, and he was

12   the one who designed the classification system.

13          Everybody else who was going to come down and testify

14   was basing their -- the State's witnesses, if there were some,

15   would be basing their -- would have been trained by S.O. Woods

16   to classify people.  And so I thought it would be very damaging

17   to the State to have him come and say in his opinion, which

18   was, you know, coming from God as far as the classification was

19   concerned, that he did not think that Mr. Murphy would be a

20   danger in the penitentiary.

21          So, I thought he would be a great witness.  It hadn't

22   been -- it was something they -- that hadn't been tried before.

23   Q.   Okay.  So, to paraphrase, Mr. Woods was there to basically

24   bolster a strategy that Murphy would not be a continuing danger

25   to society should he be locked away for life as opposed to

1   given a death sentence?

2   A.   Exactly.

3   Q.   Okay.  Do you believe his testimony accomplished that?

4   A.   I think it established that, yes.  Whether it accomplished

5   anything, obviously not.

6   Q.   Okay.  Now, Mr. Woods stated at some point during trial

7   that he believed Mr. Murphy was a -- I believe was a very bad

8   man or something?

9   A.   Or dangerous man.

10   Q.   Very dangerous man.

11        Was that something you elicited during your direct

12   examination?

13   A.   My recollection is, is that Toby Shook got him out of

14   him --

15   Q.   Okay.

16   A.   -- to spontaneously say that.  It was disappointing.

17   Q.   Okay.  So, let me ask you this.  It's been alleged that

18   there is no possible professional justification for hiring

19   Mr. Woods.  Do you believe that to be true?

20   A.   Oh, no.  I think that he's -- for the reasons I just

21   stated, it was very helpful, because he's the one who designed

22   the system that had been -- that has stood the test of time and

23   is still in place now for TDC, and indeed other states have

24   copied his system.

25        To say who's dangerous and who's not, it's very --

1  it's believed to be very predictive.  And so I felt that, you

2  know, here's the guy that makes those decisions at TDC, and he

3  says he doesn't think he will be a danger in TDC.  So, I

4  thought, wow, that answers their question from -- really from

5  the other side.

6  Q.  And, in fact, you stated you had used Mr. Woods subsequent

7  to this case?

8  A.  I did use him again.  I used him in -- I don't -- I don't

9  think he testified in Lizcano, but I put him on -- he might

10 have.  I put him on a second time, only I worked even harder

11 with him to make sure that he was prepared more for

12 cross-examination, because he had never said that to me prior

13 to the time that he blurted that out in cross-examination.  And

14 he was a very good witness.

15 Q.  Let me switch gears real quick and ask you, at any point

16 since you were appointed counsel did you ever consider filing a

17 motion for a change of venue?

18 A.  Originally, we all wondered if we should file a change of

19 venue.  The problem with that was it wasn't a local story.  One

20 defendant -- was it Michael Rodriguez?  I can't remember.  But

21 one defendant did file a motion for change of venue, which was

22 granted by the Court; and he ended up in a much, much worse

23 situation than he was.

24        You would have had to have gone to another county in

25 Texas, and every county in Texas had received the same coverage

1    and the same news interest that Dallas had.  It was a national

2    story at the time.  It was quite notorious.

3            And so we considered it, but based on what would have

4    happened if we had filed that -- and I'm pretty sure -- you'll

5    have to ask Mr. Sanchez to verify this.  I think we discussed

6    it with the Defendant.

7            But Dallas County juries are more liberal, if you

8    will, than the jury that the Judge would have transferred the

9    case to, Mount Pleasant.  I can't think of the name of the

10   county.  But he transferred the case on the motion of -- I

11   think it was Keith Hampton, who represented that gentleman, to

12   a jurisdiction where the primary employer was the Texas

13   Department of Corrections.  In fact, I think they ended up with

14   a prison guard on their jury.  So, it seemed ill advised to me.

15   And I didn't really feel that there were grounds for a motion

16   for change of venue.

17   Q.   So, it was something you did consider --

18   A.   I considered it.

19   Q.   -- and ultimately chose not to do?

20   A.   But it seemed like -- yeah, because it would have been

21   deleterious to him as far as picking a jury.  We would have had

22   a much more conservative and death-leaning jury than we could

23   get in Dallas.

24   Q.   Okay.  That is all the specific questions I have at the

25   time.  I assume you have looked at the allegations that have

1   been made against you?

2   A.    I did earlier, not in the last week.

3   Q.    Is there anything you would like to add regarding those

4   that I haven't asked you?  I like to give witnesses an

5   opportunity in case I'm missing something.

6   A.    I can't think of anything.

7   Q.    Okay.

8   A.    I'm happy to answer any questions.

9   Q.    Well, thank you, Ms. Busbee.

10                MR. GREENWELL:  That's all I have, Your Honor.

11                THE COURT:  Okay.  Mr. Dow?

12                        REDIRECT EXAMINATION

13  BY MR. Dow:

14  Q.    Just a few questions, Ms. Busbee.  You said in answer to a

15  question that Mr. Greenwell asked you that you conducted part

16  of the mitigation investigation yourself prior to the time that

17  Dr. Vigen got involved.  Did I understand you correctly to say

18  that?

19  A.    Yes.

20  Q.    And you commented on the number of witnesses that you

21  interviewed.  How long did you interview each of those

22  witnesses?

23  A.    I spent a significant amount of time with Aunt Linda and

24  the cousin out there.  I talked to them several hours.  And

25  then when they came -- we brought them back or flew them in to

1    Dallas and spent additional time with them.  But that, of

2    course, was with Dr. Vigen.

3          I had two interviews with the brother, maybe three

4    prior to the time that Mr. -- Dr. Vigen became involved.  Those

5    interviews would have been an hour, maybe hour and a half.  The

6    other one was so much shorter, as I recall.

7          These are people that are really, really simple, and

8    there's just not that much that you can obtain from them.

9    Dr. Vigen, of course, because he's a skilled interviewer, was

10   able to get more information out of them.

11         But I myself, the best to my recollection, those are

12   the people I talked to prior to the time we got a mitigation

13   expert.

14   Q.   And you don't have any reason to believe that your billing

15   records are incomplete with respect to the number of people you

16   interviewed or the time that you spent interviewing them, do

17   you?

18   A.   I don't know.  I don't know.  I mean, I know what I did.

19   I don't know -- and I know I like to get paid for what I do,

20   but I can't say, because I don't -- I don't have those records.

21   Q.   At the time of Mr. Murphy's trial, did you have any

22   mitigation investigation training?

23   A.   No.

24   Q.   Is it your testimony, Ms. Busbee, that at the time of

25   Mr. Murphy's trial there was nobody in the Dallas area who had

1    training as a mitigation investigator?

2    A.   No, I'm not saying that.  I'm saying there was nobody that

3    I could find that I had confidence in.  I don't know that there

4    was official training for mitigation experts at that time or

5    who would have administered it if there was.  I mean, as we

6    know, you can get online now and get a degree in practically

7    anything.  It doesn't mean that you would be good at your job.

8          So, I relied on -- I relied on people that I had

9    respect for.  I wanted to hire somebody that I would feel

10   confident putting them on the witness stand, in other words,

11   somebody that I felt had -- was honest and would do a good job,

12   and that's what I found in Dr. Vigen.

13   Q.   Is it fair to say that Mr. -- that Dr. Vigen's experience

14   as a mitigation investigator played a role in your decision to

15   hire him?

16   A.   There were no people with experience.  As far as I know,

17   this was the first time in Texas that we had mitigation

18   experts.

19         Some that I might have used were used by the

20   previous -- the previous Texas Seven, and I could not use them

21   because they were conflicted.  And other people I would not

22   use, because I did not have any confidence in their abilities.

23         I had -- I met with Dr. Vigen.  I talked with him.

24   He came to Dallas, and I talked to him about it, and I was

25   happy with him based on what I determined in our interview and

1   based on what Dr. Cunningham had told me.

2   Q.   I just want to be clear in understanding what your

3   thinking was in hiring Dr. Vigen.  Are you saying that at the

4   time you hired Dr. Vigen to your knowledge there was nobody

5   trained as a mitigation investigator who was available to hire?

6   A.   I don't know that.  I'm telling you I got a slew of people

7   telling me that they were mitigation investigators.  I was

8   reading records from lawyers that I respected who had used

9   psychologists as mitigation experts.

10          People I spoke with, everyone seemed to think that a

11   psychologist would be an ideal mitigation expert because they

12   would be able to make the interviews, and they would be

13   knowledgeable about the testing, and they would be a good

14   person to guide defense counsel in putting on a mitigation

15   phase.

16          But there's a large range of experts in the field of

17   psychology, and some of them, you know, I would never use in a

18   case.  Some of them -- I can name you some -- I won't -- in

19   Dallas that I would never use.  They are known not to be

20   reliable.  They're known -- their opinions are for hire.  They

21   would have been easily destroyed on cross-examination if they

22   were put on the witness stand.

23          Dr. Vigen had excellent, excellent psychological or

24   psychology experience and education.  He had worked in prisons.

25   I'm looking at his CV right now.  He had consulted with police

1    departments.  He had been a clinical professor of neurology.

2    He seemed to be -- and I did not find anything to the

3    contrary -- a very good choice as a mitigation expert.

4    Q.   I'm sure that he has a very impressive resume, Ms. Busbee.

5    I'm simply trying to determine whether at the time that you

6    hired him the reason that you hired him is because you believed

7    that there were no potential candidates who had training as

8    mitigation investigators.

9          You would agree with me, would you not, that

10   Dr. Vigen had no specific training as a mitigation

11   investigator?

12   A.   Yeah, I will.

13   Q.   And you hired him knowing that?

14   A.   I did not know of anybody who had a -- that there -- who

15   had at that time any specific accepted -- accepted training in

16   mitigation.

17   Q.   So, the reason that you did not hire a mitigation

18   investigator is because you did not know anybody who had that

19   training at the time of Mr. Murphy's trial?

20   A.   Right.  I couldn't find anybody that was -- when you say

21   training, I don't know what that means, because training could

22   be "I went to a course and I paid $200.00 and now I'm a trained

23   mitigation expert."

24         There could be people who claim that they were

25   trained.  I was not satisfied, based on what people were

1    sending me of trying to solicit this business, that they would

2    have been an effective mitigation investigator or -- and/or

3    witness.

4    Q.   Were there people who you considered hiring at the time of

5    Mr. Murphy's trial who held themselves out to you as trained

6    mitigation investigators?

7    A.   That I considered hiring?  No.

8    Q.   Was there anybody -- you referred a moment ago to

9    unsolicited letters and resumes that you were getting.  Do you

10   recall receiving an unsolicited letter or resume from anybody

11   who held him or herself out as a trained mitigation

12   investigator in a capital case?

13   A.   Oh, yes.  I -- some of them had, you know, brochures and

14   folders and things, but they -- they weren't convincing.

15   Q.   So, at the time of Mr. Murphy's trial, based on

16   unsolicited letters and brochures that you received from

17   people, you were aware that there were people who were trained

18   mitigation investigators.  Is that what you just said?

19   A.   Well, I don't remember what they said in their things.

20   I -- some of them seemed incredibly cheesy, if that's a word.

21   That's just a word that comes to mind.  "I used to be a police

22   officer, and I can -- I can do your mitigation investigation."

23   Junked.  You know, that kind of thing.  And there would be

24   people like from different states trying to solicit that

25   business, but --

1    Q.   Well, let me ask you this, Ms. Busbee.  Are you aware

2    today what someone who claims to be a trained mitigation

3    investigator is claiming as a credential?

4    A.   I do -- you know what?  I do know that, but I couldn't

5    tell you right now.  I know that they do training, because I

6    have been involved in discussing this with the MCLAP, the

7    Mexican Capital Legal -- that's what we went through on

8    Lizcano.  That was one of our concerns.

9            We needed a Spanish speaker.  We needed an

10   investigator.  This woman had not gone fully through the

11   training, so she was guided by someone who had been through all

12   the training.

13           So, yes, I do know that now.  I don't think that

14   existed then.  If it did, I wasn't aware of it.

15   Q.   That is my question for you; that when you hired

16   Dr. Vigen, you were not aware of anybody who was a trained

17   mitigation investigator as you understand the phrase "trained

18   mitigation investigator" to refer to someone today?

19   A.   Right.

20   Q.   Can you remind me the names of the three capital murder

21   trials where you've been the lead counsel since the time that

22   you represented Mr. Murphy?

23   A.   Let's see.  Lizcano.  And I was second chair in Kenneth

24   Thomas and second chair in John Wade Adams.

25   Q.   So, the lead in Lizcano?

```
1    A.    Uh-huh.
2    Q.    Did you hire Dr. Vigen in the Lizcano case?
3    A.    Not as a mitigation investigator.  I hired him --
4    Q.    I mean as the mitigation investigator.  Have you ever
5    hired Dr. Vigen as the mitigation investigator since the Murphy
6    trial?
7    A.    No.
8    Q.    You refer to a psychological diagnosis that was done of
9    Mr. Murphy at TDCJ?
10   A.    Yes, sir.
11   Q.    Did that diagnosis rely on the facts that your team
12   discovered about Mr. Murphy during the course of your
13   mitigation investigation?
14   A.    It did -- once again, I glanced at it last night.  But it
15   had an almost completely similar account of his early years of
16   abuse and abusive behavior, so --
17   Q.    Do you have any reason to believe that anybody at TDCJ
18   interviewed any members of Mr. Murphy's family --
19   A.    No.
20   Q.    -- in arriving at a psychological diagnosis?
21   A.    No, I don't think they would have, but I don't know.  I'll
22   be happy to find that report and let you take a look at it if
23   you would like.
24   Q.    Did you hire Mr. Woods in the Lizcano case?
25   A.    Yes.
```

```
 1   Q.   What did he testify to in the Lizcano case?
 2   A.   I don't remember.  And I don't even remember if he
 3   actually testified.  At that point Dr. Sorenson had done a
 4   statistical analysis and come up with a formula for future
 5   dangerousness.  I don't know -- I would have to look and see if
 6   we put him on or just relied on what he said as the basis for
 7   Dr. Sorenson's opinion.
 8          But I have put him on on somebody since then, and it
 9   may be -- I don't remember which one, but it might have been
10   John Wade Adams who actually ended up with a life sentence on
11   retrial, on his retrial.
12   Q.   Who was the first chair in the Adams case?
13   A.   Brad Lollar.
14   Q.   Is it your understanding, Ms. Busbee, that until the
15   Supreme Court decided Wiggins it was not incumbent upon trial
16   lawyers representing capital defendants to conduct a mitigation
17   investigation?
18   A.   No, I didn't say that.  It was incumbent upon us to
19   conduct a mitigation investigation.  It was not incumbent upon
20   us to obtain an expert to assist us in that.
21   Q.   You're aware, are you not, that the Supreme Court's
22   decision in Wiggins relied in part on the ABA standards for
23   representation in capital trials?
24   A.   I am aware of that.
25   Q.   Do you believe that at the time of the Murphy trial the
```

1    ABA guidelines required you to hire experts in order to conduct

2    a mitigation investigation?

3    A.   You know what?  I don't recall that.  I know that they

4    have changed since then, so --

5    Q.   Did you consult the ABA guidelines at the time of

6    Mr. Murphy's trial?

7    A.   I don't think so.

8             MR. DOW:  That's all I have, Judge.

9             THE COURT:  All right.

10             MR. GREENWELL:  Just one question, Your Honor.

11             THE COURT:  Okay.

12                       RECROSS-EXAMINATION

13    BY MR. GREENWELL:

14    Q.   Ms. Busbee, you said you didn't consult the ABA

15    guidelines.  To your knowledge, at the time of trial are you

16    required to follow the ABA guidelines?

17    A.   Well, I don't think -- I don't think so.  I mean, I was

18    aware of them, obviously, and made more aware of them because

19    of the *Wiggins* decision.  I don't know where we would have

20    spent any extra time doing anything else.  That was a -- there

21    were a limited number of people who knew him.  We got all the

22    records that were obtainable.  We did everything that in my

23    opinion was possible, so any additional time spent would have

24    been unnecessary.

25    Q.   These are guidelines and not rules, correct?

```
 1   A.   Well, they are called guidelines.
 2   Q.   Exactly.
 3            MR. GREENWELL:  No further questions.
 4            THE COURT:  All right.  Mr. Dow, anything further
 5   from this witness?
 6            MR. DOW:  Nothing more, Judge.
 7            THE COURT:  All right.  Can Ms. Busbee be excused as
 8   far as --
 9            MR. GREENWELL:  Yes, Your Honor.
10            THE COURT:  All right.  Ms. Busbee, thank you for
11   your testimony and coming down this morning.
12            THE WITNESS:  Thank you, sir.
13            THE COURT:  You're excused.
14            (Witness excused)
15            THE COURT:  All right.  Let's take a -- Mr. Dow,
16   who's your next witness going to be?
17            MR. DOW:  Our next witness and last witness is going
18   to be Allan Fishburn.
19            THE COURT:  Oh, okay.  All right.  Very good.  Let's
20   take a 10-minute break.
21            MR. GREENWELL:  Your Honor, one quick thing.
22            THE COURT:  Yes, sir.
23            MR. GREENWELL:  Are you not going to call
24   Mr. Sanchez?
25            MR. DOW:  I'm not going to call Mr. Sanchez.
```

```
 1              MR. GREENWELL:  Can you go ahead and agree to release
 2    him?
 3              MR. DOW:  Yeah.
 4              MR. GREENWELL:  He probably has other things to do.
 5              MR. DOW:  Yes.
 6              THE COURT:  Okay.  All right.  So, no one is going to
 7    call Mr. Sanchez.
 8              Okay.  All right.  Mr. Sanchez, thank you for making
 9    yourself available today and being here.
10              (Pause)
11              THE COURT:  Let's take a 10-minute recess, and we'll
12    come back and pick up with Mr. Fishburn, then.
13              SECURITY OFFICER:  All rise.
14              (Recess from 11:06 to 11:16)
15              SECURITY OFFICER:  All rise.
16              THE COURT:  You may be seated.
17              All right.  Before you call Mr. Fishburn, again, I'm
18    not asking for a commitment on this.  And live testimony, I
19    would never ask anyone to predict with certainty about live
20    testimony, but do you-all think that we will likely be able to
21    finish up with Mr. Fishburn's testimony and the hearing without
22    the need for a full lunch break or -- I don't know what your
23    expectations are at this point.
24              MR. DOW:  We have really very little for
25    Mr. Fishburn.
```

```
 1          THE COURT:  Okay.  All right.

 2          MR. GREENWELL:  Yeah, I don't think that would be a

 3  problem at all, Your Honor.

 4          THE COURT:  Okay.  All right.  I'm just trying to

 5  anticipate where we may be going.  I'm available all day, so

 6  it's not an issue, but --

 7          All right.  Mr. Dow?

 8          MR. DOW:  We call Allan Fishburn, Judge.

 9          THE COURT:  Okay.

10          (Pause)

11          THE COURT:  Good morning, Mr. Fishburn.  If you would

12  raise your right hand.

13          (The witness was sworn)

14          THE COURT:  Thank you.

15          ALLAN FISHBURN, PETITIONER'S WITNESS, SWORN

16                      DIRECT EXAMINATION

17  BY MR. DOW:

18  Q.   Will you please state your name for the record,

19  Mr. Fishburn?

20  A.   Allan Fishburn.

21  Q.   Mr. Fishburn, I'm David Dow.  I represent Patrick Murphy

22  in his federal habeas proceedings.  Have we met before?

23  A.   We have not.

24  Q.   What was your role in representing Mr. Murphy?

25  A.   I wrote the death penalty writ.
```

1   Q.   For the sake of the record, the State habeas writ?

2   A.   That's correct.

3   Q.   If I refer to that State habeas writ as the 11.071, will

4   you know what I'm referring to?

5   A.   I will.

6   Q.   Do you remember when you were appointed to represent

7   Mr. Murphy?

8   A.   I do not.

9   Q.   Do you recall approximately how long between the time that

10   you were appointed and the time you filed the writ how much

11   time elapsed?

12   A.   No, but I know that I violated the time limit for filing

13   the writ.  I did that on purpose.

14   Q.   Can you explain why you purposefully violated the time

15   limit?

16   A.   Because I think that the time limit potentially chills the

17   death penalty writ lawyer from asserting that the direct appeal

18   lawyer was effective or ineffective, because the writ is due

19   before the -- before the mandate issues on the direct appeal,

20   so I figured that if I filed it late and the sanctions were

21   imposed I would have something to hand the federal writ lawyer

22   to use.

23   Q.   Were sanctions imposed?

24   A.   No.  They just accepted the writ.

25   Q.   Did you raise any claims regarding the effectiveness of

1    direct appeal counsel?

2    A.    I did not.

3    Q.    Did you read the brief that was filed by the direct appeal

4    counsel prior to filing the 11.071 writ?

5    A.    Yes.

6    Q.    Did you identify any issues that if you had been the

7    direct appeal counsel you would have raised that were not

8    raised?

9    A.    No.

10   Q.    I notice in your billing records, Mr. Fishburn, that you

11   have entries for legal research involving the case of *Enmund*

12   *against Florida* and *Tison against Arizona*.

13   A.    Yes.

14   Q.    I don't mean to be conducting a quiz here, but do you

15   remember while you are sitting there what those cases deal

16   with?

17   A.    No.

18   Q.    Do you recall raising a claim in the 11.071 under either

19   Tison or Enmund?

20   A.    I do.

21   Q.    So, you recall raising the claim.  You just don't remember

22   what it is?

23   A.    I don't.  I did not reread my writ.

24   Q.    Okay.  Did you have an evidentiary hearing in the State

25   court with respect to your 11.071?

1    A.    I did not.

2    Q.    Did you request one?

3    A.    I did not.

4    Q.    Have you filed 11.071 applications for death-sentence

5    inmates in other cases besides Mr. Murphy's?

6    A.    I have not.

7    Q.    At the time that you were appointed to represent

8    Mr. Murphy in his 11.071 proceeding, do you recall how the list

9    of attorneys eligible to handle 11.071 cases was maintained?

10   A.    I think it was maintained by the Court of Criminal

11   Appeals.

12   Q.    And did you have to take affirmative steps to get on that

13   list?

14   A.    I did.

15   Q.    Are you still eligible to do 11.071 --

16   A.    I'm not --

17   Q.    -- applications?

18   A.    I'm sorry.  I'm not -- I haven't because I have chosen not

19   to remain qualified.

20   Q.    Had you done 11.071 applications prior to Mr. Murphy's?

21   A.    No.

22   Q.    So, just to make sure I'm understanding, Mr. Murphy is the

23   only death-sentence prisoner you have represented in State

24   habeas proceedings; is that correct?

25   A.    Yes.

1          MR. DOW:  May I approach the witness, Judge?

2          THE COURT:  You may.

3          (Pause)

4          MR. DOW:  I'm not going to move to admit this, Judge.

5    It's just the State habeas petition.

6          THE COURT:  Okay.  Thank you.

7    BY MR. DOW:

8    Q.   I have handed you -- I have handed you, Mr. Fishburn, a

9    copy of the State habeas application in Mr. Murphy's case.

10   Does that look familiar to you?

11   A.   Yes.

12   Q.   If you look at the index of authorities on the fifth page,

13   the first case is *Clewis against The State*?

14   A.   Yes.

15   Q.   Do you see either *Enmund against Florida* or *Tison against*

16   *Arizona* in that list of authorities?

17   A.   I do not.

18   Q.   So, might you have been mistaken earlier when you said

19   that you raised a claim under *Tison* or *Enmund*?

20   A.   Yes, I might have been mistaken.  I might have raised the

21   claim but not by the name of the case.  They may be the claim

22   itself -- or the theory of the claim may be in one of these

23   State cases.  I don't recall.

24   Q.   Do you remember how you went about the process of deciding

25   which claims you were going to include?

1    A.   I read each of the five records of the prior trials.  I

2    did research on each of the cases that was tried in the past,

3    the other five.  I did research into what I believed the record

4    showed relating to the problems with Mr. Murphy getting a fair

5    trial under the Constitution.

6            I ascertained that from my investigation, my

7    knowledge of the prior lawyers involved, the knowledge of the

8    record, the fact that Murphy was tried last, that there would

9    be no ineffective assistance of counsel claim against trial

10   counsel.

11   Q.   I want to talk a little bit about how you reached the

12   conclusion that there would be no ineffectiveness claim against

13   the trial counsel.  Did you interview either of Mr. Murphy's

14   trial lawyers?

15   A.   I did not.

16   Q.   Did you interview anybody in connection with your

17   investigation?

18   A.   I did not, except my client.

19   Q.   Did you obtain the trial file from the trial lawyers?

20   A.   I did not.

21   Q.   Did you seek funding to hire any experts?

22   A.   I did not.

23   Q.   Mr. Fishburn, what does your practice principally consist

24   of today?

25   A.   Mostly direct State appeals and felony trials.

1   Q.   How would you characterize the difference between a direct
2   appeal and an 11.071 application?
3   A.   A direct appeal is based on what happened in court, and an
4   11.07 or an 11.071 would be based partly on what happened in
5   court but also what happened outside the courtroom that might
6   be cognizable.
7   Q.   In your investigation of the Murphy case, what did you
8   learn about what had happened outside the courtroom that might
9   be cognizable?
10  A.   I didn't learn anything that would be cognizable outside
11  the courtroom in Murphy's case.
12  Q.   What investigation did you undertake to try to learn
13  whether there was anything that happened outside the courtroom
14  that might have been cognizable?
15  A.   I conducted no formal investigation at all.
16          MR. DOW:  Pass the witness, Judge.
17          THE COURT:  Okay.
18                      CROSS-EXAMINATION
19  BY MR. GREENWELL:
20  Q.   Hello, Mr. Fishburn.  My name is Jeremy Greenwell.  I
21  represent the Respondent in these proceedings.
22          As I did with Mr. Busbee, let me first ask, have you
23  and I ever spoken either in person or on the phone?
24  A.   No.
25  Q.   Have you ever been instructed by anyone from my office,

1   including me or anybody at this table, on how to testify today?

2   A.   No.

3   Q.   Even if we would, would you have listened to us?

4   A.   No.

5   Q.   Okay.  So, your testimony is based purely on your

6   recollection of the case?

7   A.   It is.

8   Q.   Okay.  How long have you been practicing law,

9   Mr. Fishburn?

10   A.   Since December 14, 1984.

11   Q.   Okay.  And in those years has it been solely defense work?

12   A.   I was staff attorney for the Felony District Judge in

13   Dallas County, Texas, for three years when I got out of law

14   school, and after that, yes.

15   Q.   Okay.  How many capital murder trials in general or as

16   appellate or trial counsel have you been involved with?

17   A.   One direct appeal on Leon David Dorsey and Patrick Henry

18   Murphy.

19   Q.   On Patrick Murphy?

20   A.   Yes.

21   Q.   What about as trial counsel?

22   A.   None.

23   Q.   We spoke a little bit or you spoke with Mr. Dow a little

24   bit about the 11.071 writ list.  What exactly did you have to

25   do to become qualified to be on that list?

```
 1   A.   Judge Cunningham asked me to do the writ.  I told him I --
 2   I told him I wasn't on the list.  He told me to get on the
 3   list.
 4          I looked at the Court of Criminal Appeals -- might
 5   have been the website thing.  I'm not sure.  I found out what
 6   they wanted and made my application, and they approved it right
 7   away.
 8   Q.   Okay.  Did you have to obtain any specialized training to
 9   be on that list?
10   A.   No, I didn't have to do anything other than make the
11   application.
12   Q.   Just apply and be on the list?
13   A.   Uh-huh.
14   Q.   Okay.  Well, you said you hadn't been involved in very
15   many capital murder trials.  Have you been involved in many
16   murder trials?
17   A.   Yes.
18   Q.   How many, approximately?
19   A.   I have no idea.
20   Q.   Ballpark?
21   A.   Trial or appeal?
22   Q.   Both.
23   A.   A couple hundred.
24   Q.   Couple hundred?
25   A.   Including appeals, yes.
```

1  Q.   So, you're not a novice to felony murders by any stretch

2  of the imagination, are you?

3  A.   No.

4  Q.   Okay.  Let's skip forward to what you did in Mr. Murphy's

5  case here.  I'm sure you're aware the gist of Mr. Murphy's

6  accusation is that you didn't prepare adequately for this and

7  file a sufficient writ.

8         Let's talk about the investigation.  Can you explain

9  what, if any, investigation you did or what procedure you went

10  through prior to filing this writ?

11  A.   Just as I said before on direct, the same.

12  Q.   Okay.  Can you elaborate any further?

13  A.   No.

14  Q.   Okay.

15         MR. GREENWELL:  Your Honor, may I approach?

16         THE COURT:  You may.

17         (Pause)

18         MR. GREENWELL:  This has already been made part of

19  the record.  It's Docket Entry 35, Exhibit 2.

20         THE COURT:  Okay.

21         MR. GREENWELL:  It is Mr. Fishburn's expense report.

22         THE COURT:  Okay.

23         MR. GREENWELL:  So, I'm not going to submit it as an

24  exhibit.

25         MR. DOW:  We have it.

```
 1              MR. GREENWELL:  You have it already?
 2              (Pause)
 3              THE COURT:  Thank you.
 4    BY MR. GREENWELL:
 5    Q.   Mr. Fishburn, feel free to take a moment if you need to
 6    refresh your memory.  If not --
 7    A.   It looks familiar.
 8    Q.   Okay.  It looks familiar.
 9              On the front page you see where it states you
10    submitted a bill for over 300 hours of work --
11    A.   That's correct.
12    Q.   -- on the petition?
13              Other than what you stated before, is there anything
14    specific that you worked on in these 300 hours?
15    A.   Not that I recall.
16    Q.   Okay.  Do you recall in preparing this petition ever
17    considering raising an allegation that trial counsel performed
18    inefficiently?
19    A.   I considered it, but I immediately decided not to raise it
20    because it wasn't there.
21    Q.   Okay.  Well, I would like to go into it a little further.
22              On page 14 it states you spent three hours on
23    *Strickland versus Washington*.  That's the standard by which
24    these claims are evaluated, correct?
25    A.   Yes.  That's correct.
```

1   Q.   And on page 17 you again referenced *Strickland* for three

2   hours you spent concerning trial counsel's voir dire

3   performance; is that correct?

4   A.   That is correct.

5   Q.   Okay.  And on page 12 you spent a few hours on a

6   commitment objection to the State's voir dire example, for lack

7   of a better term; is that correct?

8   A.   That's correct.

9   Q.   Okay.  So, this indicates that you at least considered

10  raising ineffective assistance of counsel claim about voir dire

11  at least, correct?

12  A.   Yes.

13  Q.   Okay.

14  A.   But there's so little time overall compared to what I

15  turned in on my timesheet was actually spent.  That's why I

16  stated it the way I just did.

17  Q.   Okay.  Just for posterity's sake, page 9 and 13, you also

18  mentioned the term "mitigation," for a total of fours hours.

19  Would that possibly indicate you were investigating errors

20  counsel may have made during the punishment phase?

21  A.   It may indicate that.  Yes, it may indicate that.

22  Q.   Okay.  And on the last one, page 15, you spent a couple of

23  hours on "trial counsel's closing."  Does that indicate you may

24  have been contemplating a claim concerning the way trial

25  counsel handled closing arguments?

1   A.   It does indicate that.

2   Q.   Okay.   In light of these entries and your own

3   recollection, is it fair to say you at least investigated the

4   possibility of raising an ineffective assistance of counsel

5   claim?

6   A.   Yes, I did, as I do with all direct appeals that I do, as

7   well as briefs I do.

8   Q.   And you ultimately decided not to raise this for what

9   reason?

10   A.   It wasn't there.

11   Q.   It just wasn't there?

12   A.   No.

13   Q.   During your review of the records of the trial, certainly

14   you became aware that counsel presented numerous witness family

15   members, Dr. Vigen, S.O. Woods, having him evaluated by

16   numerous mental health professionals.

17          Did this affect your decision not to raise an

18   ineffective assistance of counsel claim?

19   A.   Yes, in the overall picture, of course it did.   I examined

20   every trial.   I examined every witness.   I read -- I read

21   everything that anyone else had done.

22          And if I might say, trial counsel's performance in

23   Murphy's case, after reading everything I read, I considered it

24   to be maybe first or second place if you wanted to grade them

25   that way.   I saw no problem whatsoever.

1   Q.   Okay.  So, you believe they did a bang-up job, for lack of
2   a better term?
3   A.   Yes, I do.  I believe they did very well.
4   Q.   Okay.  On the issues you ultimately raised, do you believe
5   those were your strongest avenues left for appeal?
6   A.   Yes.
7   Q.   Okay.
8        (Pause)
9        MR. GREENWELL:  May I approach again, Your Honor?
10       THE COURT:  You may.
11       MR. GREENWELL:  Now, this is a part of the State
12  habeas record as well, but we may want to introduce it because
13  it's kind of hard to name.  So, we'll just introduce it as
14  Respondent's Exhibit 1, Your Honor.
15       THE COURT:  Okay.
16            (Respondent's Exhibit No. 1 marked and received)
17       MR. GREENWELL:  It's the hearing during the State
18  habeas writ.
19       THE COURT:  Thank you.
20       (Pause)
21  BY MR. GREENWELL:
22  Q.   Mr. Fishburn, do you remember this hearing?
23  A.   I do, yes.
24  Q.   Now, you stated you had spoken with Murphy before you
25  filed your petition.  How many times did you speak with him?

```
 1  A.    I can't recall right now.
 2  Q.    Okay.  Did you have any correspondence with him?
 3  A.    Yes.
 4  Q.    Okay.  Do you recall the purpose of the hearing from which
 5  I just gave you?
 6  A.    I do.
 7  Q.    And what was that purpose?
 8  A.    Judge Magnis had concerns whether or not my writ
 9  application was sufficient.
10  Q.    Okay.  Was the purpose of the hearing to determine whether
11  Mr. Murphy would like to have new counsel appointed?
12  A.    I believe that was part of it.
13  Q.    Okay.  Do you recall what your client's response to that
14  hearing was?
15  A.    I don't recall a specific response, no, but I believe the
16  overall response was that he would like to keep me as his
17  lawyer.
18  Q.    Okay.  Did he ever tell you this personally?
19  A.    Yes.
20  Q.    Okay.  So, even though he had a chance at this hearing to
21  have your performance evaluated, he ultimately voluntarily and
22  knowingly waived that chance and continued with your
23  representation?
24            MR. DOW:  I object to that characterization, Judge.
25            MR. GREENWELL:  I believe it's stated in the record.
```

```
 1            THE COURT:  The objection is overruled.  It's a
 2   question, but the Court can give the question and the answer
 3   whatever weight it's due in light of the transcript itself,
 4   so --
 5            Mr. Fishburn, do you need the question repeated?
 6            THE COURT:  Yes, I do.
 7   BY MR. GREENWELL:
 8   Q.   Do you remember Mr. Murphy ever handing you a note at the
 9   end of that hearing?
10   A.   I don't remember that.
11   Q.   You don't remember.
12            Okay.  You don't recall what that note said?
13   A.   Could have.  Maybe he did.
14   Q.   Okay.
15   A.   Maybe he did; maybe he didn't.  I'm sorry.
16   Q.   Okay.
17            MR. GREENWELL:  That's all I have, Your Honor.
18            THE COURT:  All right.
19            MR. DOW:  Very briefly, Judge.
20            THE COURT:  Sure.
21                         REDIRECT EXAMINATION
22   BY MR. DOW:
23   Q.   Mr. Fishburn, are you familiar with the case of Wiggins
24   against Smith?
25   A.   No.
```

1   Q.   And so, therefore, if you conducted any investigation that

2   would be required by *Wiggins versus Smith*, that would just be

3   an accident?  You wouldn't have conducted an investigation

4   because it was required by *Wiggins versus Smith*?

5   A.   I wouldn't have gone looking for the *Wiggins* holding or

6   its rationale in my work.

7   Q.   Okay.  Do you recall at the hearing that Mr. Greenwell was

8   just referring to the trial judge informing Mr. Murphy that if

9   you were replaced as habeas counsel and new habeas counsel were

10  appointed the Court of Criminal Appeals might treat whatever

11  that new counsel filed as a successive petition?

12  A.   I don't recall that, but I have not read the record of the

13  hearing.

14          MR. DOW:  Does he have a copy of the hearing in front

15  of him?

16          MR. GREENWELL:  He does.

17          THE WITNESS:  I do.

18  BY MR. DOW:

19  Q.   Can you turn, if you would, Mr. Fishburn, to page 5 of

20  that document that Mr. Greenwell gave you?

21  A.   Yes.

22  Q.   On line 15 of page 5 where the Court says --

23  A.   Uh-huh.

24  Q.   -- "Now, I don't know -- in the event that were to occur,

25  if I had that hearing, your counsel withdraw and I appointed

1    new counsel, I don't know if new counsel would be able to

2    re-brief this without it being treated as a second writ or

3    not."

4    A.   I see that.

5    Q.   Would Mr. Murphy have been present in the courtroom at the

6    time that the Judge made that observation from the bench?

7    A.    It is so indicated at line 11 the Defendant was present in

8    court.  So, I assume at line 15 he was.  And my recollection

9    indicates he was present at all times.

10   Q.   Thank you, Mr. Fishburn.

11            MR. DOW:  That's all I have, Judge.

12            THE COURT:  All right.

13            MR. GREENWELL:  No further questions, Your Honor.

14            THE COURT:  All right.  Can Mr. Fishburn be excused?

15            MR. GREENWELL:  Yes, Your Honor.

16            MR. DOW:  Yes.

17            THE COURT:  Okay.  Mr. Fishburn, thank you for coming

18   down this morning for your testimony.  You may be excused.

19            (Witness excused)

20            THE COURT:  Mr. Dow, do you have any additional

21   evidence?

22            MR. DOW:  No further evidence, Judge.

23            THE COURT:  All right.  Mr. Greenwell?

24            MR. GREENWELL:  No, Your Honor.

25            THE COURT:  All right.  Counsel like to be heard

1    with -- on argument on anything -- on any of the evidence today

2    or any of the other matters that were alluded to in the order

3    setting hearing?

4            MR. DOW:  If it please the Court, I think that it's

5    clear that our position is that Ms. Busbee was ineffective in

6    hiring Dr. Vigen.  If she had had not been ineffective, she

7    would have hired a different expert who would have been able to

8    diagnose PTSD.

9            I also think that it's clear that our position with

10   respect to Mr. Fishburn is that his behavior was such that

11   insofar as the merits of the allegations against Ms. Busbee are

12   persuasive that we come within the *Trevino* exception to the

13   procedural bar.

14           What I would prefer to do, rather than make the

15   merits of that argument right now, with the Court's permission,

16   is wait until there's a transcript of the proceedings so that

17   we can refer to specific passages in the examination, in

18   particular of Ms. Busbee, and then make the substantive

19   argument at that time.

20           THE COURT:  Mr. Greenwell, any objection --

21           MR. GREENWELL:  I have no objection.

22           THE COURT:  -- to post-hearing brief?

23           Okay.  I do think that probably makes sense to the

24   Court the most.  So, I think it probably makes sense to trigger

25   the time for the post-hearing brief off of -- briefs off of the

```
 1    filing of the transcript.

 2            Mr. Dow, how much time do you -- would you request?

 3            MR. DOW:  If -- thirty days would be fine.

 4            THE COURT:  Okay.

 5            MR. GREENWELL:  That's plenty of time, Your Honor.

 6            THE COURT:  All right.  Do y'all anticipate -- would

 7    you anticipate doing simultaneous briefs, or would you ask that

 8    they be seriatim?

 9            MR. DOW:  I prefer they be simultaneous --

10            THE COURT:  Okay.

11            MR. GREENWELL:  That's fine.

12            MR. DOW:  -- due to the hearing.

13            THE COURT:  I think that makes sense.  So, I will

14    order that post-hearing briefs will be -- on the issues covered

15    by the hearing today will be due by 30 days from the date that

16    the transcript is filed.  I think that makes a lot of sense.

17            Do y'all want reply briefs or -- to follow that, or

18    do you think that the one brief will --

19            MR. DOW:  I think that it will cover everything we

20    need to cover in the brief.  Obviously, if Your Honor wants to

21    hear from us after they're filed, we're certainly more than

22    happy to appear.  But I don't anticipate we would need to file

23    anything additionally.

24            THE COURT:  Okay.

25            MR. GREENWELL:  Neither do I, Your Honor.
```

1          THE COURT:  Okay.  Well, I think that makes a lot of

2    sense.

3          All right.  Well, yes, I will do sort of an

4    electronic order after this, setting the dates down for the

5    post-hearing briefs.

6          Anything further for today, then?

7          MR. GREENWELL:  Your Honor, just one question.

8          THE COURT:  Yes.

9          MR. GREENWELL:  Would the post-hearing briefing be

10   simply just argument, or are we submitting proposed findings to

11   the Court, or a little bit of both?

12         THE COURT:  Oh, I see.  Well, you know, probably both

13   makes sense.  And so I think proposed findings of fact,

14   conclusions of law, and then a brief to accompany it is often

15   helpful because -- well, most findings of fact, conclusions of

16   law are extremely helpful in my putting together my proposed

17   findings -- I mean, my findings and conclusions to Judge

18   Lindsay.  It's -- yeah.  It doesn't involve the same levels of

19   argument and -- we'll just stick to argument -- that the

20   briefing can.  So, that's -- let's do that, then.

21         Mr. Dow, anything further for today?

22         MR. DOW:  That's all, Judge.  Thank you.

23         THE COURT:  Okay.  The only thing I did want to say

24   is it's very important to me to have less experienced lawyers

25   get experience in court, and I try as best I can to do that at

```
1   every turn in all the proceedings in front of me.  And so it's
2   not with great joy that I had to ask that Mr. Dow take the
3   witnesses today rather than you.  So, I just wanted to make
4   sure you understood that, and so --
5           MS. HICKMAN:  I understand.  Thank you very much,
6   Your Honor.
7           THE COURT:  Of course.  All right.
8           All right.  Then we will be adjourned.  Have a good
9   rest of the day.
10          MR. DOW:  Thank you.
11          MR. GREENWELL:  Thank you, Your Honor.
12          SECURITY OFFICER:  All rise.
13          (Hearing adjourned)
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                            INDEX

 2                                                    Further
                    Direct   Cross   Redirect   Recross   Redirect
 3
     WITNESSES FOR THE
 4   Petitioner

 5   BROOK BUSBEE        5      41       65        74

 6   ALLAN FISHBURN     77      83       92

 7
     PETITIONER'S EXHIBIT:                  Marked   Received
 8
        1   Defense Claim for Services       14        15
 9            or Expenses

10
     RESPONDENT'S EXHIBIT:                   Marked   Received
11
        1   11-6-07 Reporter's Record         90        90
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    I, TODD ANDERSON, United States Court Reporter for the

2  United States District Court in and for the Northern District

3  of Texas, Dallas Division, hereby certify that the above and

4  foregoing contains a true and correct transcription of the

5  proceedings in the above entitled and numbered cause.

6    WITNESS MY HAND on this 16th day of September, 2015.

7

8

9

                    /s/Todd Anderson

10                  TODD ANDERSON, RMR, CRR
                       United States Court Reporter

11                  1100 Commerce St., Rm. 1625
                       Dallas, Texas  75242

12                  (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25