IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **PATRICK HENRY MURPHY JR.** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -vs- | § | CIVIL NO. 3:09-cv-01368-L-BN |
| | § | |
| | § | ***DEATH PENALTY CASE*** |
| | § | |
| **WILLIAM STEPHENS**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

**PETITIONER'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.   Procedural history**

1.  Mr. Murphy was convicted and sentenced to death in November of 2003. The Texas Court of Criminal Appeals affirmed the conviction and sentence on April 26, 2006. *Murphy v. State*, No. AP-74851, 2006 WL 1096924 (Tex. Crim. App. Apr. 26, 2006) (unpublished). The conviction became final on January 8, 2007, when the United States Supreme Court denied Mr. Murphy's petition for writ of *certiorari*. *Murphy v. Texas*, 549 U.S. 1119 (2007).

2.  Mr. Murphy filed an application for writ of habeas corpus in the state convicting court on November 15, 2005. The convicting court recommended that relief be denied, and the Texas Court of Criminal Appeals accepted the recommendation, denying relief on July 1, 2009. *Ex parte Murphy*, No. WR-63,549-01, 2009 WL 1900369 (Tex. Crim. App. July 1, 2009) (unpublished).

3.  On June 30, 2010, Mr. Murphy filed his Petition for writ of habeas corpus with this Court. ECF No. 1.

1

II. **Claim 1: Mr. Murphy was sentenced to death without the necessary finding that he either had the purpose to commit murder or that he was recklessly indifferent to human life, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

    A. **Findings of fact**

    4. No testimony was given during the guilt phase of Mr. Murphy's trial that he left the van in which the group known as the Texas Seven (of which Murphy was one) was traveling when then other members of the group stole from the Oshman's sporting goods store, robbed its customers, and murdered Officer Aubrey Hawkins.

    5. George Rivas, the ringleader of the Texas Seven, testified during the punishment phase of Murphy's trial that before the group escaped from a South Texas prison, Murphy informed him that he did not want to go into any of the stores Rivas planned to burglarize and that he did not want to rob anyone.

    6. The instructions that the trial court read to Murphy's jury at the conclusion of the guilt phase of his trial listed four disjunctive theories under which the jurors could find Murphy guilty of capital murder. One of the theories allowed the jury to find murphy guilty of capital murder if the jurors believed he was guilty as a conspirator to a robbery during which a death was foreseeable.

    7. The jury returned only a general verdict finding the defendant guilty of capital murder, without indicating under which theory it chose to convict or whether the choice was even unanimous.

    8. Under Texas law, conspiracy does not require any participation; rather, it is a crime of agreement. Tex. Penal Code § 15.02.

    B. **Conclusions of law**

    9. The Supreme Court held in *Enmund v. Florida*, 458 U.S. 782 (1982), that, where a non-trigger person faces a death sentence, the Constitution requires that a jury consider both his degree of participation in the crime, as well as his mental state regarding the possibility that loss of life will occur. *Enmund v. Florida*, 458 U.S. 782, 788, 801 (1982).

    10. In *Tison v. Arizona*, 481 U.S. 137 (1987), the Court held that the Eighth Amendment permits a death sentence in the case of a non-trigger person if the State establishes, and the jury finds, that the defendant exhibited "reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death." *Tison v. Arizona*, 481 U.S. 137, 157 (1987).

11. Together *Enmund* and *Tison* require a finding that the defendant either intended to commit murder or that he was recklessly indifferent to human life while being a major participant in the robbery before he is eligible for a sentence of death.

12. A criminal defendant is entitled to a jury finding beyond a reasonable doubt of all facts exposing him to his punishment because "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999). Through the Fourteenth Amendment, *Apprendi v. New Jersey*, 530 U.S. 466 (2000), applied this principle to the states.

13. In *Ring v. Arizona*, 536 U.S. 584 (2002), the Court applied the principles and holding of *Apprendi* to state death penalty convictions, specifically, that the aggravating factors are "the functional equivalent of an element of a greater offense" and must be submitted to a jury. *Ring v. Arizona*, 536 U.S. 584, 609 (2002).

14. The Court finds that the *Enmund*/*Tison* factors are functionally equivalent to aggravating factors that must be found beyond a reasonable doubt by a jury before a defendant is eligible for a death sentence.

15. Because the jury only returned a general verdict on guilt, it is impossible to know under which theory Murphy was convicted, and it is therefore possible that Murphy's jury found him guilty as a conspirator to a robbery during which a death was foreseeable. Finding Murphy guilty under this theory would not have required the jury to find he participated at all in the robbery.

16. It is impossible to know whether the jury made the findings of fact required by *Enmund* and *Tison*. Unless the jury made these finding Murphy is not eligible to be sentenced to death.

17. The substance of this claim was fairly presented to the Texas Court of Criminal Appeals during Murphy's direct appeal proceedings.

18. The Texas Court of Criminal Appeals denied Murphy's *Enmund* claims on their merits.

19. The Texas Court of Criminal Appeals' denial of Murphy's *Enmund* claims was contrary to, or involved an unreasonable application of, clearly established Federal law. Murphy is entitled to habeas relief under 28 U.S.C. § 2254. The Court remands his case to the trial court so that the required findings pursuant to *Enmund* and *Tison* can be made by a jury.

III.    **Claim 2: Mr. Murphy is entitled to a new sentencing trial because he was deprived of the effective assistance of counsel during the punishment phase of his trial, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.**

   A.    **Findings of fact**

   20.    Trial counsel was appointed to represent Murphy in February 2001.

   21.    Less than a month after counsel was appointed to represent Murphy, John Niland of the Texas Defender Service wrote both lead counsel and co-counsel. In addition to offering to help develop themes for the case including mitigation themes for the punishment phase, Niland provided a list of trained social workers able to perform mitigation work in the Dallas area at that time.

   22.    Murphy's lead trial counsel testified to this Court that she did not plan to hire a mitigation specialist until the trial court contacted her some time after the Supreme Court handed down its opinion in *Wiggins v. Smith*, 539 U.S. 510 (2003) in June 2003.

   23.    According to trial counsel, after the court told he she needed to get a mitigation expert, she began looking for one.

   24.    In response to a request from the fact investigator employed by trial counsel, Vince Gonzales contacted trial counsel to inform her of his desire to serve as the team's mitigation specialist via fax.

   25.    Mr. Gonzales included information reporting that he had been conducting mitigation investigations in Texas since the 1986. Gonzales also included a list of the many trainings he had attended on the subject.

   26.    On September 12, 2003, trial counsel asked the trial court to appoint psychologist Dr. Mark Vigen as a mitigation expert. The trial court granted the motion that same day.

   27.    Trial counsel testified to this Court that Dr. Vigen had no experience conducting a mitigation investigation and had never received any training on how to conduct such an investigation.

   28.    Notwithstanding the communications from Niland and Gonzales, trial counsel testified it was her belief that there were no mitigation experts in Texas before the Supreme Court handed down *Wiggins*.

   29.    There were, in fact, several mitigation investigators in the Dallas area at the time trial counsel was appointed to represent Murphy and at the time she elected to hire someone with no experience.

30. Dr. Vigen met with Murphy for the first time on October 10, 2003 – one month before trial commenced.

31. Dr. Vigen did not meet with Murphy's father, one of the only two lay witnesses who provided any sentencing phase testimony at trial until November 9, 2003.

32. Dr. Vigen did not meet with Linda Goodman, the other lay witness who provided mitigation evidence, until November 16, 2003, a mere two days before she testified.

33. S.O. Woods, the trial team's classification expert, testified that Murphy was a danger to society and a "very dangerous inmate."

34. During closing arguments, counsel for the State referred to Murphy as an "evil man." The State argued that "a criminal cancer, a malignant, criminal cancer" grew inside Murphy and that it should be removed from society. The State drew parallels between Murphy and Satan in closing arguments. The State implored the jury to base their verdict on sympathy for the victim and his family.

**B.  Conclusions of law**

35. In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court demonstrated how to apply the framework announced in *Strickland v. Washington*, 466 U.S. 668 (1984) to analyze whether trial counsel provided ineffective assistance in the punishment phase of a capital murder trial.

36. The Court looks first at whether counsel was deficient, which the Court defined as falling below an objective standard of reasonableness as defined by the prevailing professional norms. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

37. The ABA Guidelines are guides as to determining what is reasonable.

38. That ABA Guidelines state that the investigation for the penalty phase of a capital trial "should begin immediately upon counsel's entry into the case." 2003 ABA Guidelines, Guideline 1.1 comment.; 1989 ABA Guidelines, Guideline 11.4.1(A); *id.* at Guideline 11.8.3(A).

39. The Guidelines also mandate that the penalty phase investigation should be conducted with the assistance of trained investigators, such as mitigation specialists.

40. Trained professionals were conducting mitigation investigations for Texas death penalty trial teams long before the Supreme Court handed down *Wiggins*.

41. There were trained mitigation specialists available to work on Murphy's trial team.

42. Trial counsel was deficient for not employing a trained mitigation specialist and for not employing one immediately upon appointment.

43. Based solely the time needed to develop a complete life history for most capital clients and the additional time needed to work with experts after the life history has been developed, the defense team needs at least 18 months from the time mitigation investigation resources are approved before the case goes to trial.

44. Both because of his lack of training and the fact that counsel waited so long to hire him, Dr. Vigen did not compile the complete psychosocial history of Murphy that the ABA Guidelines and other prevailing professional norms (including the many trainings in Texas at that time) demand trial teams compile.

45. Because a complete history was not completed and was not completed prior to deciding which mental health professionals to employ, trial counsel failed to hire a mental health professional with expertise in trauma.

46. Had a complete history of Murphy been compiled before experts were employed, the need to hire an expert with expertise in trauma would have been clear because of the many traumatic events experienced by Murphy in his youth.

47. Dr. John Matthew Fabian is a mental health professional with expertise in trauma. The information contained in his report is very mitigating. The Court finds that had information such as the information contained in the Fabian report been presented to Murphy's jury, it is reasonably probable that the results of his sentencing trial would have been different. It is reasonably probable that Murphy's jurors would have sentenced him to life in prison instead of to death.

48. Murphy's trial counsel provided him ineffective assistance in the punishment phase of his trial by failing to employ and present testimony from a mental health professional with expertise in trauma.

49. The testimony from S.O. Wood was in direct conflict with trial counsel's theory that Murphy would not be a future danger.

50. Trial counsel should have known that Woods believed Murphy was dangerous. Trial counsel was deficient in calling Woods to testify.

51. Because Woods testimony was testimony that would lead the jurors (if they believed it) to answer "yes" to the first special issue (i.e., that Murphy was a future danger), Murphy was prejudiced by trial counsel's deficiency.

52. The arguments made by the State during closing arguments were inflammatory, highly derogatory, and impermissible under Texas law.

53. Because the arguments were impermissible and harmful to Murphy, trial counsel was deficient in not objecting to the State's argument.

54. Had trial counsel objected, the trial court should have sustained the objection.

55. Because trial counsel's failure to object allowed the jurors to hear harmful argument they otherwise would not have heard, Murphy was prejudiced by trial counsel's deficiency.

56. Commitment questions asked by the State during voir dire were impermissible. Trial counsel was deficient for not timely objecting and moving to strike jurors that were committed to give the answer the State wanted.

57. Murphy was prejudiced by counsel's deficiency in voir dire.

58. The aggregate effect of these errors so infected Murphy's trial as a whole that it was rendered fundamentally unfair. *See, e.g., United States v. Hall*, 455 F.3d 508, 520-21 (5th Cir. 2006); *Miller v. Johnson*, 200 F.3d 274, 286 n.6 (5th Cir. 2000).

59. Murphy's claim that he received ineffective assistance in the punishment phase of his capital murder trial was not presented to the state courts.

60. On March 20, 2012, the Supreme Court decided *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). Under *Martinez*, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012).

61. The holding in *Martinez v. Ryan* was made applicable to cases arising from Texas by *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).

62. Murphy's claim that he received ineffective assistance in the punishment phase of his capital murder trial is substantial.

63. Prevailing professional norms dictate that state habeas counsel conduct a thorough extra-record investigation that includes the complete psychosocial history that should initially be completed by trial counsel.

64. Because state habeas proceedings is the only opportunity for Texas defendants to raise extra-record claims in the state courts, defendants are prejudiced by state habeas counsel's failure to conduct an extra-record investigation.

7

65. As with trial counsel, the two-pronged test announced in *Strickland v. Washington*, 466 U.S. 668 (1984), is the appropriate measure by which to determine whether state habeas counsel was ineffective.

66. This Court finds that state habeas application filed on behalf of Mr. Murphy raised only record-based claims, none of which were cognizable in a habeas proceeding and half of which were copied directly from the direct appeal.

67. This Court finds that the application, state habeas counsel's billing records, and counsel's testimony in this Court all reflect that counsel conducted no extra-record investigation when preparing Murphy's state habeas application.

68. This Court finds that state habeas counsel was deficient for failing to conduct the required investigation to discover the evidence presented in Murphy's *Wiggins* claim and for failing to raise the claim in the state habeas courts.

69. The Court finds that Murphy was prejudiced by this deficiency because it prevented him from having his claim heard by the state habeas court.

70. Because the first opportunity for Murphy to raise this substantial claim was during state habeas proceedings and because state habeas counsel provided Murphy ineffective assistance, this Court, through the exception created by *Martinez*, can reach the merits of this unexhausted claim.

71. Murphy's trial counsel provided him ineffective assistance in the punishment phase of his capital murder trial in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

72. The Court remands Murphy's case to the trial court so that he can receive a new sentencing trial.

IV. **Claim 3: Mr. Murphy was deprived of the effective assistance of counsel at both stages of his capital murder trial by counsel's failure to seek a change of venue in violation of the Sixth and Fourteenth Amendments to the United States Constitution.**

   A. **Findings of fact**

73. This Court finds that there were innumerable newspaper articles and TV news stories detailing every aspect of the Texas Seven escapade, including the escape, manhunt, Oshman's robbery, Aubrey Hawkins' murder, and the legal proceedings following the arrest of Mr. Murphy and his co-defendants. Many of the articles published included large photo spreads of the Texas Seven.

74. This Court finds that there were additional articles published detailing the effects of the escape on other aspects of the community. This included, for example,

8

legislative hearings on prison reform, ECF No. 18 at Exhibit 4, reports on the tremendous financial burden that the trials would place on Dallas County, ECF No. 18 at Exhibit 6, and the impact on the Irving Police Departments and the dangers faced by all police officers. ECF No. 18 at Exhibit 15. The reporting also highlighted the plight of the victim's family, including stories about their lives after the murder and manhunt as well as their various appearances and testimony. ECF No. 18 at Exhibits 4, 13, 14.

75. This Court finds that this intense media coverage continued through the arrest of Mr. Murphy and his co-defendants. These reports contained extra-judicial admissions of guilt made by co-defendants to the media, including a statement by George Rivas that "he thinks he deserves a death sentence," ECF No. 18 at Exhibit 19, as well as by Michael Rodriquez, ECF No. 18 at Exhibit 20, and Larry Harper, ECF No. 18 at Exhibit 21.

76. This Court finds that in response to George Rivas' trial team request, the trial court issued written findings of on February 2, 2001 detailing the extensive media coverage. These findings indicated that the news coverage included "inculpatory statements allegedly made by the defendant which may not be admissible at trial," that there was extensive news coverage "concerning the events surrounding the commission of the offense and possible extraneous offenses occurring both before and after the time of the offense alleged in this case … extensive news coverage concerning statements made to the press relating to the number and type [of] firearms seized, the type of firearms involved in the offense, and who may or may not have fired shots during the offense which the defendant is charged … [and] statements made to, and reported by, the press regarding what punishment the defendant feels he deserves." ECF No. 18 at Exhibit 22.

77. This Court finds that the trial court issued an order restricting publicity and made further findings that "the out-of-court statements relating to the investigation and trial of this cause pose a serious and imminent threat to the defendant's constitutional right to a fair trial, and to the fair administration of Justice." ECF No. 18 at Exhibit 30.

78. This Court finds that the trial court granted a change in venue for Michael Rodriquez, and during the hearing on that motion which was held on January 31, 2002, Mr. Rodriquez' attorneys noted that the "Dallas television media have [aired] in excess of 650 stories" and the "Dallas print media has printed more than 45,000 or 50,000 words." This coverage is "far in excess of any other place in the State of Texas," and that "the Dallas media has carried and covered this in a uniquely different way because of the fact that the last two trials have been covered daily and have been in Dallas County." ECF No. 18 at Exhibit 31.

B.   **Conclusions of law**

79. The right to a jury trial guarantees a criminal defendant a fair trial by a panel of impartial, indifferent jurors, and the failure to accord an accused a fair hearing violates even the minimum standards of due process. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (citing *In re Oliver*, 333 U.S. 257 (1948); *Tumey v. Ohio*, 273 U.S. 510 (1927)).

80. A juror's verdict must be based upon the evidence developed at trial, regardless of the heinousness of the crime charged, the apparent guilt of the offender, or the station in life he occupies.

81. Due process and the right to a fair trial are denied to the accused whenever prejudice or passion is allowed to undermine the impartial administration of justice. *Chambers v. Florida*, 309 U.S. 227, 236-37 (1940). And therefore, under certain circumstances only a change of venue is sufficient to ensure the kind of fair trial mandated by the Sixth and Fourteenth Amendments to the United States Constitution. *Rideau v. Louisiana*, 373 U.S. 723 (1963).

82. Prejudice may be presumed from the totality of circumstances. *Sheppard v. Maxwell*, 384 U.S. 333 (1966). In such circumstances, proof of poisonous publicity raises a presumption that the defendant's jury was prejudiced, relieving him of the obligation to establish actual prejudice. *Mayola v. Alabama*, 623 F.2d 992, 996-997 (5th Cir. 1980). Presumed prejudice can satisfy the prejudice finding necessary under *Strickland v. Washington*, 466 U.S. 668 (1984). *Meeks v. Moore*, 216 F.3d 951, 967-68 (11th Cir. 2000) (noting that a finding of presumed prejudice would satisfy *Strickland's* mandate).

83. This Court concludes, based on the record before it, that pursuant to *Irvin v. Dowd*, 366 U.S. 717, 722 (1961), Mr. Murphy was deprived of his right to a fair trial by a panel of impartial and indifferent jurors because his panel was so infected by pretrial publicity it would be impossible for his jurors to base their verdict on the evidence developed at trial.

84. The Court concludes that the only way to ensure the impartial administration of justice and the fair trial mandated by the Sixth and Fourteenth Amendments was through a change of venue.

85. Trial counsel was deficient in failing to move for a change of venue.

86. It is reasonably probably that the trial court would have granted the motion for a change of venue and that the trial would then have convened in a district that had not been as saturated with media coverage.

87. Murphy was prejudiced by trial counsel's failure to seek a change of venue.

88. This claim was not exhausted in the state courts.

89. However, for the same reasons as enumerated in numbers 60 through 67 above, this Court can reach the merits of this claim.

90. The Court finds that Mr. Murphy is entitled to relief on this claim and remands Murphy's case to the state trial court so that he can receive a new trial.

V. **Claim 4: Mr. Murphy was deprived of the effective assistance of appellante counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.**

   A. **Findings of fact**

91. With the exception of the claim raised pursuant to *Enmund* and *Tison*, this Court finds Mr. Murphy's direct appeal did not raise any of the claims raised in his federal habeas petition.

   B. **Conclusions of law**

92. Every criminal defendant has a right to effective assistance of counsel during their first direct appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984).

93. The standard applicable to determining whether a client received effective assistance of counsel during their direct appeal is the two-pronged standard announced in *Strickland*. *Evitts*, 469 U.S. at 387.

94. Appellate counsel must make a "conscientious examination" of the record to identify all of the potential issues for an appeal, thoroughly research every colorable claim, and make a reasonable professional judgment about which points to raise. *Anders v. California*, 386 U.S. 738, 744 (1967).

95. Counsel must have a "firm command of the facts of the case as well as governing law before [they] can render reasonably effective assistance of counsel." A failure to raise a point of error that has a reasonable probability of success is sufficient to make a showing of deficient performance. *Duhamel v. Collins*, 955 F.2d 962, 966-67 (5th Cir. 1993).

96. There is only one opportunity in Texas to raise record-based claims, and a direct appeal attorney's failure to raise those claims forecloses the possibility of any review on the merits of those issues. *See, e.g.*, *Ex parte Buck*, 418 S.W.3d 98, 98 (Tex. Crim. App. 2013) (Alcala, J., dissenting) (stating that record-based claims are not cognizable in 11.071 proceedings).

97. To the extent any of the other claims raised in Murphy's federal habeas petition were cognizable in direct appeal proceedings, this Court concludes that direct appeal counsel rendered deficient performance for failing to raise the claims and that Murphy was prejudiced by that deficiency.

98. This court finds that because direct appeal counsel provided ineffective assistance to Murphy, he is entitled to a new direct appeal proceeding.

99. This claim was not exhausted in the state courts. Nevertheless, this Court finds it can make a decision on the merits of the claim through *Martinez* and *Trevino* because the claim is substantial and because state habeas counsel was ineffective in failing to raise the claim.

## CONCLUSION

Accordingly, it is recommended that this Court grant the petition for a writ of habeas corpus.

Respectfully submitted,

s/ David R. Dow

_____
David R. Dow
University of Houston Law Center
4604 Calhoun Road
Houston, TX 77204-6060
Tel. (713) 743-2171

**CERTIFICATE OF SERVICE**

  I certify that November 6, 2015, a copy of the foregoing pleading was electronically served on counsel for the Respondent by filing the document with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.

  Jeremy C. Greenwell
  Office of the Texas Attorney General
  Post Office Box 12548
  Austin, Texas 78711
  Jeremy.greenwell@texasattorneygeneral.gov

  s/ David R. Dow
  _____
  David R. Dow