**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **PATRICK HENRY MURPHY JR.** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -vs- | § | CIVIL NO. 3:09-cv-01368-L-BN |
| | § | |
| | § | ***DEATH PENALTY CASE*** |
| | § | |
| **WILLIAM STEPHENS**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| | § | |
| Respondent. | § | |

_____

**BRIEF IN SUPPORT OF PETITIONER'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
_____

David R. Dow
Texas Bar No. 06064900
University of Houston Law Center
4604 Calhoun Road
Houston, TX 77204-6060
Tel. (713) 743-2171
Fax (713) 743-2131

*Counsel for Petitioner, Patrick Henry Murphy*

**Table of Contents**

Table of Authorities…. .......................................................................................................... iv

Table of Exhibits…………….................................................................................................. vi

BRIEF IN SUPPORT OF PETITIONER'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW… ..................................................................................................... 1

I.      Mr. Murphy was sentenced to death without the necessary finding that he either
        had the purpose to commit murder or that he was recklessly indifferent to human
        life, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the
        United States Constitution. ............................................................................................3

        A.      Mr. Murphy's death sentence is unconstitutional. ................................................3

        B.      This Court can and should issue a decision on the merits of this claim
                because it was exhausted in direct appeal proceedings. ........................................6

II.     Mr. Murphy is entitled to a new sentencing trial because he was deprived of the
        effective assistance of counsel during the punishment phase of his trial, in
        violation of the Sixth and Fourteenth Amendments to the United States
        Constitution……. 7

        A.      Trial counsel provided deficient performance to Murphy during the
                punishment phase of his capital murder trial. .......................................................7

                1.      Trial counsel failed to conduct a reasonable mitigation
                        investigation ..................................................................................7

                2.      Trial counsel provided deficient performance by eliciting
                        highly damaging testimony from its own witness
                        concerning Mr. Murphy's future dangerousness. .......................13

                3.      Trial counsel provided deficient performance by failing to
                        object to impermissible closing arguments during the
                        punishment phase.......................................................................14

                4.      Trial counsel provided deficient performance by failing to
                        object to impermissible *voir dire* questions committing
                        jurors to an affirmative answer on the second special issue
                        and failing to challenge those jurors for cause or exercise a
                        peremptory strike. .....................................................................16

        B.      Murphy was prejudiced by trial counsel's deficient performance.......................18

C.  This Court can reach the merits of this claim because it should find the claim is procedurally viable through the equitable exception established in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), that was made applicable to Texas cases by *Trevino v. Thaler*, 133 S. Ct. 1911 (2013). ...............................21

　　1.  Mr. Murphy's claim of ineffective assistance of trial counsel during the punishment phase of his trial is substantial. ...........................21

　　2.  State habeas counsel provided Mr. Murphy ineffective assistance of counsel by his failure to brief or investigate any cognizable claims……. ..........................................................................................22

III.  Mr. Murphy was deprived of the effective assistance of counsel at both stages of his capital murder trial by trial counsel's failure to seek a change of venue in violation of the Sixth and Fourteenth Amendments to the United States Constitution…………….…………………….…………………….…………………….…………………….24

A.  In light of the extensive and inflammatory pretrial publicity, Mr. Murphy's right to be tried by an impartial jury could not possibly have been vindicated………. .......................................................................................24

B.  Trial counsel's failure to seek a change of venue was objectively unreasonable and prejudiced Mr. Murphy. ........................................................26

C.  This claim is procedurally viable through the exception created by *Martinez v. Ryan* and *Trevino v. Thaler*. ...........................................................27

　　1.  This claim is substantial. ........................................................................27

　　2.  State habeas counsel was ineffective in failing to raise the claim. ..........28

IV.  Mr. Murphy was deprived of the effective assistance of appellate counsel, in violation of the Sixth and Fourteenth Amendments to the Constitution. .......................28

A.  Direct appeal counsel provided ineffective assistance.........................................28

B.  This claim is procedurally viable through *Martinez* and *Trevino*.......................29

CONCLUSION AND PRAYER FOR RELIEF .......................................................................30

CERTIFICATE OF SERVICE ...............................................................................................31

## Table of Authorities

**Cases**

*Anders v. California*,
    386 U.S. 738 (1967) .................................................................................... 29

*Apprendi v. New Jersey*,
    530 U.S. 466 (2000) ...................................................................................... 5

*Cabana v. Bullock*,
    474 U.S. 376 (1986) ...................................................................................... 6

*Chambers v. Florida*,
    309 U.S. 227 (1940) .................................................................................... 25

*Combs v. Coyle*,
    205 F.3d 269 (6th Cir. 2000) ................................................................. 13-14

*Duhamel v. Collins*,
    955 F.2d 962 (5th Cir. 1993) ..................................................................... 29

*Enmund v. Florida*,
    458 U.S. 782 (1982) ...................................................................................... 4

*Estes v. Texas*,
    381 U.S. 532 (1965) .................................................................................... 25

*Evitts v. Lucey*,
    469 U.S. 387 (1985) .................................................................................... 28

*Ex parte Banks*,
    769 S.W.2d 539 (Tex. Crim. App. 1989) .................................................. 30

*Ex parte Buck*.
    418 S.W.3d 98 (Tex. Crim. App. 2013) ..................................................... 30

*Ha Van Nguyen v. Curry*,
    736 F.3d 1287 (9th Cir. 2013) ............................................................... 29-30

*Hamblin v. Mitchell*,
    354 F.3d 482 (6th Cir. 2003) ....................................................................... 9

*Heath v. Jones*,
    941 F.2d 1126 (11th Cir. 1991) .................................................................. 29

*Irwin v. Dowd,*
    366 U.S. 717 (1961) ................................................................................... 24-25

*Jones v. United States,*
    526 U.S. 227 (1999) ...................................................................................... 5

*Lambright v. Schriro,*
    490 F.3d 1103 (9th Cir. 2007) .................................................................... 12

*Lydia v. State,*
    109 S.W.3d 495 (Tex. Crim. App. 2003) .................................................... 17

*Martinez v. Ryan,*
    132 S. Ct. 1309 (2012) ................................................................................ 21

*Mayola v. Alabama,*
    623 F.2d 992 (5th Cir. 1980) ...................................................................... 25

*Miller v. Johnson,*
    200 F.3d 274 (5th Cir. 2000) ...................................................................... 18

*Pamplin v. Mason,*
    364 F.3d 1 (5th Cir. 1966) .......................................................................... 25

*Penry v. Lynaugh,*
    492 U.S. 302 (1989) .................................................................................... 21

*Poindexter v. Mitchell,*
    454 F.3d 564 (6th Cir. 2006) ...................................................................... 12

*Ramos v. State,*
    991 S.W.2d 430 (Tex. Crim. App. 1999) .................................................... 15

*Renn v. State,*
    495 S.W.2d 922 (Tex. Crim. App. 1973) .................................................... 15

*Rideau v. Louisiana,*
    373 U.S. 723 (1963) .................................................................................... 25

*Ring v. Arizona,*
    536 U.S. 584 (2002) ...................................................................................... 5

*Sheppard v. Maxwell,*
    384 U.S. 333 (1966) .................................................................................... 25

*Stahl v. State,*

749 S.W.2d 826 (Tex. Crim. App. 1988) ........................................................ 16

*Standefer v. State*,
59 S.W.3d 177 (Tex. Crim. App. 2001) .................................................. 16-17

*Strickland v. Washington*,
466 U.S. 668 (1984) ............................................................................ 28

*Tison v. Arizona*,
481 U.S. 137 (1987) .............................................................................. 4

*Todd v. State*,
598 S.W.2d 286 (Tex. Crim. App. 1980) ........................................................ 15

*Trevino v. Thaler*,
133 S. Ct. 1911 (2013) .......................................................................... 21

*Unites States v. Hall*,
455 F.3d 508 (5th Cir. 2006) .................................................................. 18

*Wilder v. Cockrell*,
274 F.3d 255 (5th Cir. 2001) ................................................................... 6

*Wiggins v. Smith*,
539 U.S. 510 (2003) ........................................................................... 8-9

**Rules and Statutes**

Tex. Code Crim. Proc. art. 26.052 ...................................................... 10

Tex. Penal Code § 15.02.. ................................................................ 3

**Other Authorities**

Am. Bar Ass'n, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev. ed. 2003) ...................................................... 9, 12

Am. Bar Ass'n, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (1989)…… ................................................................ 8-9, 12

State Bar of Texas, *Guidelines and Standards for Texas Capital Counsel* (2006) ...................... 23

**Table of Exhibits**

| Exhibit | Description |
| --- | --- |
| A | Declaration of John Niland |
| A1 | John Niland's letter to lead trial counsel |
| A2 | John Niland's letter to trial co-counsel |
| A3 | John Niland's list of eighteen mitigation investigators working around the Dallas area sent to trial counsel |
| B | Declaration of Vince Gonzales |
| C | Fax from Vince Gonazales to lead trial counsel |
| D | Declaration of Jane Bye |
| E | Declaration of Gerald Byington |
| F | Declaration of Dick Burr |
| G | Report of John Fabian |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **PATRICK HENRY MURPHY JR.** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -vs- | § | CIVIL NO. 3:09-cv-01368-L-BN |
| | § | |
| | § | ***DEATH PENALTY CASE*** |
| | § | |
| **WILLIAM STEPHENS**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

_____

**BRIEF IN SUPPORT OF PETITIONER'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
_____

Patrick Henry Murphy was convicted and sentenced to death for being a party to the murder of Aubrey Hawkins, a member of the Irving Police Department.  While the other six members of the group of Texas inmates that came to be known as the Texas Seven were engaged in the activities that culminated in the murder of Officer Hawkins at the Oshman's sporting goods store, Mr. Murphy waited in a vehicle.  In fact, before the group arrived at the store, Mr. Murphy had made it known to the group's leader, George Rivas, that he would not participate in any of the burglaries and robberies the group was planning.  He had no idea a murder might occur, and he had absolutely no participation in that murder.

The Eighth Amendment will only permit the execution of a non-trigger person if that person exhibits a reckless disregard for human life and knowingly engages in activities known to

1

carry a grave risk of death.  At no point on the night Officer Hawkins was killed did Mr. Murphy exhibit a reckless disregard for human life.  At no point did Mr. Murphy knowingly engage in activities known to carry a grave risk of death.  The instructions given to Mr. Murphy's jurors did not require them to find he possessed this level of culpability to find him guilty of capital murder and subsequently sentence him to death.  Because his jury did not have to find he possessed the requisite level of culpability, this Court should find that the Fifth, Sixth, Eighth, and Fourteenth Amendments will not permit his execution.

Mr. Murphy received ineffective assistance from appointed counsel from the time trial counsel was appointed through his state habeas proceedings.  His trial counsel failed to: employ an experienced mitigation specialist, conduct a competent mitigation investigation, employ a medical professional that could have opined as to whether he suffers from post-traumatic stress disorder, seek a change of venue due to extensive and inflammatory pretrial publicity, object to impermissible questions during voir dire, and object to inflammatory arguments made by the State.  To the extent Mr. Murphy's claims that he received ineffective assistance from trial counsel were cognizable on direct appeal but not raised by direct appeal counsel, Mr. Murphy received ineffective assistance from direct appeal counsel.  State habeas counsel failed to exhaust Murphy's claims that he received ineffective assistance from both trial and direct appeal counsel.  State habeas counsel conducted no extra-record investigation and filed a document he called a habeas application but which, in fact, raised no claims that were cognizable in state habeas proceedings.  Because state habeas counsel was ineffective, this Court can reach a decision on the merits of Mr. Murphy's unexhausted ineffective assistance of counsel claims and should find that both his conviction and sentence were obtained in violation of the Sixth and Fourteenth Amendments.

I.    **Mr. Murphy was sentenced to death without the necessary finding that he either had the purpose to commit murder or that he was recklessly indifferent to human life, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

A.    **Mr. Murphy's death sentence is unconstitutional.**

There was no testimony given during the guilt phase of Mr. Murphy's trial that he left the van in which the group was traveling when the other members of the Texas Seven stole from the sporting goods store, robbed its customers, and murdered Officer Hawkins.  Even under the State's theory, Mr. Murphy was in the van while the others carried out all these activities.  R.R. Vol. 40: 15.[1]  George Rivas, the ringleader of the Texas Seven, testified during the punishment phase of Murphy's trial that Murphy had informed him that he did not want to go into any of the stores Rivas planned to burglarize and that he did not want to rob anyone.  R.R. Vol. 48: 19-20.

The instructions that the trial court read to Murphy's jury at the conclusion of the guilt phase of his trial listed four disjunctive theories under which they could find Murphy guilty of capital murder.  One of the theories allowed the jury to find Murphy guilty of capital murder if they believed he was guilty as a conspirator to a robbery during which a death was foreseeable.  C.R. Vol. 1: 39-41.[2]  However, as a matter of Texas law, conspiracy does not require participation; it only requires agreement.  Tex. Penal Code § 15.02.  Murphy's jurors were instructed that to be guilty of a conspiracy, Murphy only had to agree that a felony be committed.  C.R. Vol. 1: 37.  In other words, one of the four theories allowed the jury to find Murphy guilty of capital murder by merely finding he agreed with his co-felons who ultimately carried out the robbery because a foreseeable death occurred during the planned robbery.  The verdict returned by the jury was simply a general verdict that said they found Murphy to be guilty of capital

---

[1] Citations to the Reporter's Record appear as R.R. Vol. [number]: [page number].

[2] Citations to the Clerk's Record appear as C.R. Vol. [number]: [page number].

murder.  The verdict did not indicate under which theory the jury chose to convict or whether the choice was even unanimous.  Given the choices presented to the jury and the general verdict returned, it is impossible to rule out the possibility that Murphy's jury found him guilty as a conspirator to a robbery during which a death was foreseeable.

In *Enmund v. Florida*, the Supreme Court held that, where a non-trigger person faces a death sentence, the Constitution requires that the jury consider both his degree of participation in the crime and his mental state regarding the possibility that the loss of life could occur.  *Enmund v. Florida*, 458 U.S. 782, 788, 801 (1982).  In *Tison v. Arizona*, the Court refined *Enmund's* personal culpability requirement, holding that the Eighth Amendment permits a death sentence in the case of a non-trigger person if the state establishes and the jury finds that the defendant exhibited "reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death."  *Tison v. Arizona*, 481 U.S. 137, 157 (1987).  Together, these cases explain that the Eighth Amendment requires a finding that the defendant either intended to commit murder or that he was recklessly indifferent to human life while being a major participant in the robbery before he or she may be considered eligible for a death sentence.  The defendant in *Enmund* was ineligible for a death sentence notwithstanding the fact that he was found to have planned the capital felony of which he was found guilty.  *Enmund*, 458 U.S. at 806 (O'Connor, J., dissenting).  Murphy's death sentence violates the core principles established by *Enmund* and *Tison* for assessing the culpability of a non trigger-person.

During Murphy's trial, because of the instructions given to the jury, the jury did not have to find Murphy participated at all in the robbery.  Although Murphy's degree of participation in the robbery was irrelevant to the guilt-innocence verdict (because he could be found guilty of capital murder if he merely agreed to the robbery), *Enmund* and *Tison* require a finding that he

either intended to commit murder or was recklessly indifferent to human life *while being a major participant* in the robbery.  The jury did not have to make findings regarding the level of Murphy's participation in the robber or his mental state during the guilt phase of his trial.  Neither was Murphy's level of participation in the robbery something the jury had to consider in the punishment phase.  The second special issue asked the jury to find whether Murphy "intended to kill the deceased or another or anticipated that human life would be taken."  It did not address at all his level of participation in the robbery.

The Supreme Court has clearly established the principle that a criminal defendant is entitled to a jury finding beyond a reasonable doubt of all facts exposing him to his punishment.  "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."  *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999).  Through the Fourteenth Amendment, the Supreme Court applied this rule to state crimes in *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  *Apprendi* holds that the jury must make all necessary findings that authorize the punishment that the defendant ultimately receives.

Two years later, *Ring* applied the principles and holding of *Apprendi* to the findings that make convicted murderers death eligible under state laws.  The *Ring* Court held that "[t]he right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death.  We hold that the Sixth Amendment applies to both." The aggravating factors were "the functional equivalent of an element of a greater offense" and must be submitted to a jury.  *Ring v. Arizona*, 536 U.S. 584, 609 (2002).

The same result must be reached in this case.  Only certain murders can lead to a sentence of death.  And even among people found guilty of such a murder, under *Enmund* and *Tison*, only certain defendants are eligible for a death sentence.  Moreover, there is no reason why the *Enmund* and *Tison* factors should be treated any differently than the aggravating factors that must be found beyond a reasonable doubt by a jury before a death sentence is permissible.  The law threatens all those who conspire to commit a felony where death is a foreseeable result with time in jail, but it only threatens additional pains – death – to those who intend to kill or those who, recklessly indifferent to human life, participate substantially in carrying out the felony.  *Apprendi* and *Tison* make clear that these additional factors are the facts that make a person death eligible.  As such, they are functionally elements of the offense.  Mr. Murphy is entitled to a jury finding that his conduct makes him death eligible.  That his jury was required to make no such finding dictates that his death sentence cannot stand.[3]

### B.    This Court can and should issue a decision on the merits of this claim because it was exhausted in direct appeal proceedings.

This Court can and should issue a decision on the merits of this claim because it was exhausted in the state court and is therefore not procedurally barred from federal review.  The exhaustion doctrine requires that "a petitioner 'must have fairly presented the substance of his claim to the state courts.'" *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) (quoting *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997)).  Murphy properly raised his *Enmund*-based claims in direct appeal proceedings before the Texas Court of Criminal Appeals (CCA).  Brief

---

[3] Although it is true that, several years before *Apprendi* and *Ring* were decided, the Supreme Court held in *Cabana v. Bullock*, 474 U.S. 376 (1986), that the *Enmund* findings need not be made by a jury, this holding entirely avoids the Sixth Amendment issue later addressed by *Ring*.  The Sixth Amendment is only mentioned once in *Bullock*, for the proposition that the Sixth Amendment does not require jury sentencing, which is true, but not relevant to this claim.  *See Bullock*, 474 U.S. at 375. Nothing in *Bullock* contradicts applying the Sixth Amendment holding of *Ring* to *Tison*, both decided after *Bullock*.

for Appellant at 40-42, *Murphy v. State*, No. AP-74851, 2004 WL 3142172 (Tex. Crim. App. Sept. 20, 2004). The CCA denied the claims on their merits. *Murphy v. State*, No. AP-74851, 2004 WL 3142172, at *51-56 (Tex. Crim. App. Apr. 26, 2006). Because the Texas Court of Criminal Appeals was fairly presented with the substance of Murphy's claim that his death sentence is in violation of *Enmund v. Florida*, 458 U.S. 782 (1982), this Court should hold this claim is exhausted, not procedurally barred, and thus amenable to federal review.[4]

Murphy is entitled to have a jury decide whether his conduct subjected him to the penalty of death. Namely, he is entitled to have a jury determine whether he had any participation at all in the robbery. Absent a jury making this finding, Murphy is not eligible for a death sentence. Because a jury never found beyond a reasonable doubt that Murphy was a major participant – or participated at all – in the robbery, he cannot legally be sentenced to death, and the Texas Court of Criminal Appeals' disposition of this claim was contrary to, or involved an unreasonable application of, clearly established federal law. This Court should grant habeas corpus relief and order that Murphy is entitled to a have a jury make the required findings.

**II.     Mr. Murphy is entitled to a new sentencing trial because he was deprived of the effective assistance of counsel during the punishment phase of his trial, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.**

   **A.     Trial counsel provided deficient performance to Murphy during the punishment phase of his capital murder trial.**

      **1.     Trial counsel failed to conduct a reasonable mitigation investigation.**

At the time of Murphy's capital murder trial, the prevailing professional norms mandated

---

[4] Murphy's present claim that his death sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments is not, as argued by the State, fundamentally distinct from the claims raised in state proceedings; rather, Murphy's present claim merely supplements – but does not alter – the substance of the claim raised on direct appeal. However, if this Court decides this claim is not exhausted, this Court should find that direct appeal counsel's failure to exhaust the claim as an additional ground for finding Murphy received ineffective assistance on direct appeal. *See infra* Part IV.

that capital defense counsel "should begin immediately upon counsel's entry into the case" "prepar[ing] for the sentencing phase" of the trial.   Am. Bar Ass'n, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, Guideline 11.8.3(A) (1989) [hereinafter 1989 ABA Guidelines].   Despite that, trial counsel failed to hire a mitigation investigator until ***thirty-one months*** after being appointed and did so then only because the trial court insisted counsel do so.   R.R. Vol. 2: 7 (indicating trial counsel had been appointed by February 2, 2001); C.R. Vol. 1: 386-87 (September 12, 2003 ex parte motion to appoint mitigation expert and order granting motion the same day); ECF No. 100 at 50 ("In fact, if I'm not mistaken, when *Wiggins* came down, Judge – the Judge called me and said, 'You're going to have to get a mitigation expert,' and I started looking around.").   The person counsel finally did employ, forensic psychologist Dr. Mark Vigen, had no experience conducting a mitigation investigation for a capital murder trial and had never received any training on how to conduct such an investigation.   ECF No. 100 at 24.   Voir dire began two weeks before Vigen was appointed, and trial proceedings began a mere eight weeks after he was appointed.

Contrary to trial counsel's assertions at the September 4, 2015 evidentiary hearing, the Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003), did not announce a new requirement for counsel trying death penalty cases.   In *Wiggins*, the Court merely demonstrated how to apply the framework it had announced almost twenty years earlier in *Strickland v. Washington*, 466 U.S. 668 (1984), to analyze whether trial counsel provided ineffective assistance in the punishment phase of a capital murder trial.   *Strickland* asks first whether counsel was deficient, which the Court defined as falling below an objective standard of reasonableness as defined by the prevailing professional norms.   *Wiggins v. Smith*, 539 U.S. 510, 521 (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)).   As the Court had done

previously in *Strickland* and in *Williams v. Taylor*, 529 U.S. 362 (2000), it referred to the ABA Guidelines as guides to determining what is reasonable. *Wiggins*, 539 U.S. at 524.

The ABA Guidelines state that the investigation for the penalty phase of a capital trial "should begin immediately upon counsel's entry into the case." Am. Bar Ass'n, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913 (2003), Guideline 1.1 comment. [hereinafter 2003 ABA Guidelines][5]; 1989 ABA Guidelines, Guideline 11.4.1(A); *id.* at Guideline 11.8.3(A). The Guidelines also mandate that that the penalty phase investigation should be conducted with the assistance of "trained investigators," 1989 ABA Guidelines, Guideline 8.1. comment., such as a "mitigation specialist," 2003 ABA Guidelines, Guideline 4.1.A.1. ("The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; … and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation").

It is incumbent on counsel appointed in death-penalty cases both to be aware of what is required of and to abide by the prevailing professional norms for trying death penalty cases. It is

---

[5] While the revised ABA guidelines were adopted in February 2003, they "simply explain in greater detail than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003). The Supreme Court has consistently used the ABA's standards and guidelines in capital cases to assess the performance of trial counsel who prepared their cases before the relevant ABA publications had been issued. In *Strickland*, the Court cited standards published by the ABA in 1980 when assessing trial counsel's performance in 1976-77. In *Wiggins*, the Court cited the 1989 ABA Guidelines when assessing trial counsel's performance in 1988-89. In *Rompilla v. Beard*, 545 U.S. 374 (2005), the Court used multiple ABA publications from 1980, 1989, and 2003, to assess deficiencies in a 1988 trial. Finally, in *Nixon v. Florida*, 543 U.S. 175 (2004), the Court used the 2003 Guidelines to assess performance in 1984-85.

statutorily-required that death-penalty appointed attorneys attend CLEs specifically about representing clients in death penalty cases. Tex. Code Crim. Proc. art. 26.052(d)(2)(G). Trial counsel admitted she did not even know what a mitigation expert was prior to the Supreme Court's handing down its decision in *Wiggins* on June 26, 2003, *see* ECF No. 100 at 50, 67. ("As far as I know, this was the first time in Texas that we had mitigation experts.") The fact she testified without contradiction she was unaware of a core duty of trial counsel explains, but does not excuse, her grievous ineffectiveness. Moreover, counsel ignored the offer of help from others. On February 19, 2001 – less than a month after counsel was appointed to represent Murphy – John Niland of the Texas Defender Service – wrote both trial lead counsel and co-counsel, volunteering his expertise. Exhibit A; Exhibit A1; Exhibit A2. In addition to offering to help develop themes for the case, including mitigation themes for the punishment phase, Niland provided a list of trained social workers able to perform mitigation work in the Dallas area at that time. Exhibit A3. Counsel never replied to Niland's offer to help. Exhibit A at para. 4. In fact, she insisted there were no mitigation investigators in Texas at the time she represented Murphy. ECF No. 100 at 71 ("I don't think that existed then."). Her testimony that there were no qualified and experienced mitigation investigators available to assist her was false, and she would have known better had she acted to accept the help she was offered.

Trained professionals were conducting mitigation investigation for Texas death penalty trial teams long before the Supreme Court handed down *Wiggins*. Vince Gonzales has been working as a mitigation specialist in Texas since 1988. Exhibit B at para. 2. Gerald Byington began working as a mitigation specialist in Texas in 2000. Exhibit C at para. 3. In addition to the trainings for mitigation specialists hosted by Niland and the Texas Defender Service, Exhibit A at para. 5, the Texas Criminal Defense Lawyers Association (TCDLA) and the National

Institute for Trial Advocacy (NITA) also provided training for mitigators by 2001.  Exhibit B at paras. 3-4; but see ECF No. 100 at 71 ("I don't think that existed then.").

While it is certainly true that the fact that the trials of the Texas Seven increased demand for people available to work on death penalty cases in the Dallas area at that time, in addition to the list provided by Niland, Exhibit A3, trained mitigation specialists Vince Gonzales was available to work on Murphy's case.  Exhibit B at para. 5.[6]  Trained mitigation specialist Jane Bye (known then as Jane McHan) believes she might have been available to work on Murphy's case.  Exhibit D at para. 4.  Had counsel contacted trained mitigation specialist Gerald Byington, he, as Niland had also offered, would have helped find counsel a trained specialist to work for the Murphy trial team.   Exhibit E at para. 6.

Instead of hiring or consulting with any of these trained professionals, counsel hired someone with no experience or training a mere nine weeks before the punishment phase of Murphy's trial commenced.  It was impossible to conduct the investigation required by the prevailing professional norms in that amount of time.  Exhibit F at 10 ("Based solely on the time needed to develop a complete life history for most capital clients and the additional time needed to work with experts after the life history has been developed, the defense team needs at least 18 months from the time mitigation investigation resources are approved before the case goes to trial.").  Dr. Vigen did not meet with Mr. Murphy for the first time until October 10, 2003 – one month before trial proceedings commenced.  ECF No. 18 at Exhibit 33.  Dr. Vigen did not meet with Mr. Murphy's father, one of the only two law witnesses who provided any sentencing phase testimony at trial, until November 9, 2003.  *Id*.  He did not meet with Linda Goodman, the other

---

[6] Contained in the trial counsel's file was a fax sent to lead trial counsel from Mr. Gonzales apparently at the bequest of the team's fact investigator.  The fax included an affidavit detailing both Gonzales's experience and training.  Exhibit C.

lay witness who provided mitigation evidence, until November 16, 2003, a mere two days before she testified. *Id*.

In fulfilling counsel's duties, the ABA Guidelines specify that counsel should investigate the defendant's full history, including "medical history, (mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays); … family and social history (including physical, sexual or emotional abuse)." 1989 ABA Guidelines, Guideline 11.4.1.D.2. Counsel must also interview "witnesses familiar with aspects of the client's history that might affect the … possible mitigation reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death." *Id*. at 11.4.1.D.3. Counsel's duty "is not discharged merely by conducting a limited investigation." *Lambright v. Schriro*, 490 F.3d 1103, 1120 (9th Cir. 2007). Counsel must "seek records, interview family members and friends, and obtain appropriate mental evaluations well in advance of trial." *Poindexter v. Mitchell*, 454 F.3d 564, 579 (6th Cir. 2006); *see also* Exhibit F at 4-6 (detailing the mitigation investigation that must be performed in a capital case).[7]

It is only after completing an exhaustive biopsychosocial history of the client that a capital trial team can know what type of experts to employ. The ABA Guidelines provide that "[c]ounsel should choose experts who are tailored specifically to the needs of the case, rather than relying on an 'all-purpose' expert who may have insufficient knowledge or expertise to testify persuasively." 2003 ABA Guidelines, Guideline 10.11 comment.; *see also* Exhibit F at 7-8. While trial counsel did discover some of the traumas Murphy had been exposed to as a child,

---

[7] At the September 4, 2015 evidentiary hearing counsel claimed to have interviewed three of Murphy's relatives prior to hiring Dr. Vigen. ECF No. 100 at 65-66. While this activity is not reported in the fee vouchers which counsel has obtained for trial counsel's services, even assuming these interviews did occur, together with the work done by Vigen and the four hours of interviews reflected in trial co-counsel's billing records, the team conducted nowhere near the investigation required by the then-prevailing professional norms.

counsel did so only after selecting an expert.  Had counsel first conducted the investigation, counsel would have been aware of the need to employ a trauma expert (instead of clinical psychologist without the expertise in trauma).  Instead, counsel employed a clinical psychologist who did not possess expertise in trauma.

> **2.**   **Trial counsel provided deficient performance by eliciting highly damaging testimony from its own witness concerning Mr. Murphy's future dangerousness**

S.O. Woods, the trial team's classification expert, testified that Murphy was a danger to society and a "very dangerous inmate."  R.R. Vol. 47: 171, 173.  Woods' testimony was in direct conflict with the trial counsel's theory that Murphy would not be a future danger, as his past history indicated a pattern of non-violence.  R.R. Vol. 49: 41-42.  In fact, Woods' testimony directly helped the state with their closing arguments:  it allowed the State to emphasize that the answer to the first special issue – whether Murphy would constitute a future danger to society – should be an unequivocal "yes."  R.R. Vol. 49: 64.

While this part of Woods' testimony was elicited on cross-examination by the State, the fact that Woods held the opinion that Murphy is a "very dangerous inmate" should have been known to counsel, and as a result, counsel should not have called him as a witness.  The Sixth Circuit case of *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000), presents a similar factual scenario. In that case, trial counsel called an expert witness whose testimony on cross and re-cross examination flatly contradicted the defense theory of diminished capacity.  *Combs v. Coyle*, 205 F.3d 269, 287-88 (6th Cir. 2000).  The court condemned trial counsel for calling this witness, finding that counsel had not only failed to conduct an adequate investigation by virtue of being caught unaware by the expert's opinion, but that it was objectively unreasonable to put him on the witness stand regardless of whether counsel had actual knowledge of the expert's opinion.

*Id*. at 288.   The fact that the expert in *Combs* provided the damaging testimony during examination by the State did not affect the court's analysis, nor did the fat that the expert provided some information helpful to the defense during his testimony.  *Id*.  Instead, the court focused on the fact that diminished capacity was "crucial to the defense theory; defense counsel's failure to have questioned [the expert] in this regard prior to trial is inexcusable. Defense counsel should have known [the expert's] opinion on this ultimate issue and should have prepared accordingly." *Id*.

The same can be said of Murphy's trial counsel.  Trial counsel called a witness whose testimony provided the jury with an unequivocal, affirmative answer to the future dangerousness special issue.  Trial counsel called Woods to give testimony related to the future dangerousness special issue.  Obviously, trial "counsel should have known [Woods'] opinion on this ultimate issue…."  Counsel did not know Woods' opinion on the issue and could not recall at the September 4, 2015 evidentiary hearing whether she thought to ask him of his opinion before trial.  ECF No. 100 at 30.  Woods told the jury exactly what the State wanted it to find on the first special issue.  Indeed, in the State's closing argument, the prosecutor adopted Woods' testimony and assured the jury that it could find Murphy poses a future danger based on Woods' testimony.  R.R. Vol. 49: 64-65.

### 3.      Trial counsel provided deficient performance by failing to object to impermissible closing arguments during the punishment phase.

The record is replete with derogatory references to Mr. Murphy made by the prosecutors during their punishment phase summations.  For instance, the prosecutors informed the jury that Murphy lacks their humanity before repeatedly calling him an "evil man."  R.R. Vol. 49: 63, 64. The State argued that "[i]nside him grows a criminal cancer, a malignant, criminal cancer that should be excised and removed from the body that is our society."  R.R. Vol. 49: 67.  Perhaps

14

most egregiously, the State drew a parallel between Murphy and Satan, telling the jury that just as the defense mental health expert found mitigating factors in Murphy's background, he "would probably find mitigation in Satan's childhood or Satan's upbringing.   Why do I say that? Because that's exactly what he did yesterday with this very, very evil man."  R.R. Vol. 49: 63. The State further inflamed the jury by repeatedly imploring the jury to base their verdict on sympathy for the victim and his family, R.R. Vol. 49: 76, to send a message to the victim's family through its verdict, to reduce the number of widows, R.R. Vol. 49: 76, and to rule for the victim's son who will now grow up without a father.  R.R. Vol. 49: 35.  The cumulative effect of these arguments was a plea by the State for the jury to abandon its duty to objectively weigh the evidence and to instead base its verdict on sympathy for the victim's family.  Trial counsel never once objected.

These inflaming and highly derogatory arguments fall well outside the permissible scope of closing arguments in Texas.  In Texas, closing arguments are permissible only if they fall within the following four categories: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) pleas for law enforcement.  *Todd v. State*, 598 S.W.2d 286, 296-97 (Tex. Crim. App. 1980).  The Texas Court of Criminal Appeals routinely and repeatedly condemns the practice of making the types of derogatory statements made by the State at Murphy's trial.  *See, e.g.*, *Ramos v. State*, 991 S.W.2d 430, 437 (Tex. Crim. App. 1999) (prosecutor exceeded permissible scope of argument in describing defendant as "Satan personified").  The Court has also repeatedly found such statements to be reversible error.  *See, e.g.*, *Renn v. State*, 495 S.W.2d 922 (Tex. Crim. App. 1973), *overruled on other grounds*.  The Court of Criminal Appeals has likewise disallowed the tactic of imploring the jury to base its verdict on sympathy for the victim's family because it

calls for the jury to abandon its objectivity.  *Stahl v. State*, 749 S.W.2d 826, 830 (Tex. Crim. App. 1988).

Trial counsel was clearly ineffective for failing to object to these impermissible statements made during closing arguments.  Counsel was well aware of the prejudicial impact that these kinds of statements can have on a jury as they filed two motions in limine the purpose of which was to limit these exact types of statements. The first motion in limine asked the trial court to prohibit the State from mention[ing], allud[ing] to, … or in any way bring[ing] to the attention of the jury" information concerning "[t]he impact or effect that the death of the deceased in this case has had on the family of the deceased, the friends of the deceased, or any other person."  C.R. Vol. 1: 177-78.  The second asked that court not permit "the attorneys for the State [to]  call or refer to the Defendant by any name other than his Christian and surname, the 'Defendant' or the 'Accused.'"  C.R. Vol. 1: 157-58.  Both motions were granted.  Despite counsel's obvious awareness of the harm that these statements can cause, counsel inexplicably failed to object to any of the State's impermissible arguments.  Given the clarity of the Court of Criminal Appeals' case law prohibiting this conduct and that the trial court granted both motions in limine, trial counsel's failure to object is inexcusable.  Trial counsel's performance in this regard falls well below the prevailing professional norms.

> **4.      Trial counsel provided deficient performance by failing to object to impermissible *voir dire* questions committing jurors to an affirmative answer on the second special issue and failing to challenge those jurors for cause or exercise a peremptory strike.**

Texas law prohibits attorneys from asking questions that "attempt to bind or commit a prospective juror to a verdict based on a hypothetical set of facts."  *Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001) (internal citations omitted).  Commitment questions need not be posed through a strict "yes" or "no" response, but may be "open-ended if the question asks the

prospective juror to set the hypothetical parameters for his decision-making." *Id*. at 180 (citing *Allridge v. State*, 850 S.W.2d 471, 480 (Tex. Crim. App. 1991)).  A commitment question is improper if it could not lead to a valid challenge for cause. *Lydia v. State*, 109 S.W.3d 495, 498 (Tex. Crim. App. 2003). However, even if a commitment question could give rise to a valid challenge for cause, it can still be improper if it "includes facts *in addition* to those necessary to establish a challenge for cause." *Standefer*, 59 S.W.3d at 182 (emphasis in original).  A proper commitment question "must contain *only* those facts necessary to test whether a prospective juror is challengeable for cause." *Id*. (emphasis in original).

The State egregiously made a series of improper commitment question to the potential jurors to which trial counsel failed to object.  The State first sought to make improper commitments of the jurors by using precisely the factual scenario that formed the basis of their case at trial.  Once that scenario was developed, the State continued by asking the jurors a series of specific questions seeking to commit them to ruling in a specific way when confronted with a specific fact scenario—nearly identical to Mr. Murphy's case.  These questions included questions on what would be important to them in sentencing a person to death, R.R. Vol. 11: 117-20; R.R. Vol. 14: 112-14, specific questions about whether the "getaway car driver" would be equally guilty, R.R. Vol. 13: 18-21, how to change the facts presented to the juror so that they would be willing to sentence the getaway car driver to death, R.R. Vol. 14: 161-64, and what additional factors would be important in determining whether the death penalty was appropriate for the non-triggerman.  R.R. Vol. 11: 119-20. All these questions are improper commitment questions because they are all seeking to commit the juror to ruling in a specific way and none of which can give rise to a valid challenge for cause.

Three jurors, Michael Collins, David Evans, and Christine Stucker, were asked these

improper questions and were seated without objection, only after Nancy Carney was questioned did trial counsel object to this line of questioning.  R.R. Vol. 14: 210-12.  That counsel was apparently aware that these questions were improper and finally objected to them, only highlights their inexplicable failure to object to the State's repeated use of the hypothetical and their failure to object to the seating of three prior jurors faced with those questions.

Second, the prosecutors asked open-ended questions designed to have the jurors set the hypothetical parameters of their decision-making on the second special issue.  Of the seated jurors, four were asked, and committed to, the impermissible questions.  Trial counsel never objected to these questions, and had no objections to allowing those jurors to be seated.  *See*, R.R. Vol. 11: 117-20; R.R. Vol. 13: 18-21; R.R. Vol. 14: 112-14; R.R. Vol. 14: 161-64.Trial counsel was ineffective, there can be no doubt that allowing the State to ask this type of question, and allowing jurors to be seated having faced it, falls short of prevailing professional norms.  Mr. Murphy was undoubtedly prejudiced by this, his own counsel allowed the State to eek information from four of the seated jurors about exactly what information needed to be presented to them in order to secure a death sentence.

**B.      Murphy was prejudiced by trial counsel's deficient performance.**

Mr. Murphy was prejudiced by the accumulation of these errors.  Each raises a deficiency of constitutional dimensions.  And as detailed below, the aggregate effect of these errors so infected Murphy's trial as a whole that it was rendered fundamentally unfair.  *See, e.g.*, *United States v. Hall*, 455 F.3d 508, 520-21 (5th Cir. 2006) (noting applicability of cumulative error doctrine to ineffective assistance of counsel claims but finding that, on the particular facts of the case, petitioner was not entitled to its application because he had not demonstrated error); *Miller v. Johnson*, 200 F.3d 274, 286 n.6 (5th Cir. 2000) (same).

Trial counsel unreasonably failed to employ a mitigation specialist in a timely fashion. That failure prevented trial counsel from hiring the correct mental health expert to testify at Murphy's trial, one with expertise in trauma. Had counsel employed such an expert, Murphy's jury would have learned that "Murphy has a significant history of complex trauma, PTSD, and disorganized attachment." ECF No. 84-1 (attached as Exhibit G) at 13. The jury would have learned that his psychological and emotional traumas were extensive and diverse in nature. *Id.* at 14. The jury would have learned that Murphy's disorder put him at significant risk for developing conduct and behavior problems. *Id.* at 18. The traumas he experienced early in life prevented him from developing psychologically and emotionally as those who grow up without these traumas develop. *Id.*

The jury could have also learned that PTSD often leads to the destructive and maladaptive behavior similar to what they learned about Murphy – including his having been found guilty of a sexual assault. *Id.* PTSD was the cause of Murphy's other destructive behaviors. *Id.* at 17.

In short, had trial counsel employed the proper expert, the jury would have learned that the trauma Murphy experienced as a child and the disorder he developed as a result made him much more likely to engage in the behavior for which it found him guilty. And while treatment at an early age might have helped Murphy develop differently and not have participated in the escape with the other members of the Texas Seven or have committed the offense for which he was in prison at the time of the escape, instead of treatment, Murphy's parents neglected and abused him, both physically and sexually.

While Respondent's expert is correct that none of the experts employed by trial counsel found that Murphy suffers from PTSD, that is because none of those experts possessed expertise

in trauma.  And none of those experts were provided a detailed history of Murphy's history of trauma because trial counsel failed to even begin the process of learning about Murphy's history until after the experts were hired.  And little, if any, investigation was completed prior to the experts forming their opinions.

In addition to informing counsel of the proper type of mental health professional to employ and fully informing that expert's analysis, a proper mitigation investigation would have presented to the jury the wealth of mitigating evidence contained in the exhibits attached to Murphy's habeas petition.  ECF No. 18 at Exhibits 35-39.

Moreover, the punishment phase of Murphy's trial would have been cast in a decidedly different light had it not been marred by the State's impermissible voir dire questioning and improper arguments.  These arguments permeated the State's initial and rebuttal arguments. They were repeated, lengthy, and – given the highly emotional themes at their disposal, particularly considered in juxtaposition to trial counsel's deficient presentation of the mitigation case – undoubtedly effective.  Their cumulative effect was to bombard the jurors with an emotionally charged plea to abandon their duty to make an individualized decision based on the evidence in the record.

Furthermore, four of the deliberating jurors at Murphy's trial were asked improper questions during voir dire, and all of them answered the government's questions in a way that committed themselves to an affirmative answer to the second special issue.  During punishment phase summations, the government reminded them of their commitments, telling them that "each of [them] agreed with the law" of parties.  R.R. Vol. 49: 19.

Mr. Murphy should be granted a new punishment phase in which the jurors are exposed to neither improper voir dire nor argument; are not tainted by pervasive and inflammatory

pretrial publicity; and during which – after hearing a balanced presentation of all the mitigating and aggravating evidence – they are provided with an opportunity to formulate a "'reasoned moral response to the defendant's background, character, and crime.'" *Penry v. Lynaugh*, 492 U.S. 302, 327 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).

If trial counsel had objected to the government's impermissible voir dire and summations, conducted and timely reasonable mitigation investigation, and employed an expert with expertise in trauma, there is a reasonable probability that the result of Murphy's punishment stage would have been different.

**C.    This Court can reach the merits of this claim because it should find the claim is procedurally viable through the equitable exception established in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), that was made applicable to Texas cases by *Trevino v. Thaler*. 133 S. Ct. 1911 (2013).**

On September 4, 2015, this Court convened a hearing for the purpose of hearing evidence relevant to determining whether Murphy's claims that he received ineffective assistance of counsel, though unexhausted, are procedurally viable through *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).

**1.    Mr. Murphy's claim of ineffective assistance of trial counsel during the punishment phase of his trial is substantial.**

In order to reach the merits of Murphy's unexhausted ineffective assistance claim, this Court must find the claim is substantial. *Martinez v. Ryan*, 132 S. Ct. 1309, 1318 (2012); *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013). Murphy's claim is substantial. Trial counsel was appointed to represent Murphy over two and a half years before trial proceedings commenced. Trial counsel should have employed a person trained in investigating mitigating evidence in death penalty cases immediately upon appointment. Had counsel done so, counsel

would have been alerted early on to the need to request funds to employ a mental health expert with expertise in trauma. Such an expert would have provided the jury with the mitigating evidence contained in Dr. Fabian's report that might well have led the jury to find there were sufficient mitigating circumstances to warrant sentencing Murphy to life in prison instead of to death. Because trial counsel did not employ a person to investigate mitigation until two months before trial began, counsel did not employ the type of mental health expert that should have been appointed to evaluate Murphy and testify at his trial.

Trial counsel presented testimony from S.O. Woods relevant to the future dangerousness special issue. However, counsel did not ask Woods what his opinion was with respect to whether Murphy was a future danger before deciding to use him as a witness. Counsel was therefore caught off guard when that witness testified exactly as the State wanted: that Murphy was a future danger. Murphy would have been far better had trial counsel called no witness at all during punishment.

Trial counsel similarly provided ineffective assistance by failing to object to the State's impermissible closing arguments during which the State made repeated derogatory and inflammatory statements about Mr. Murphy as well as calls for retribution on behalf of the victim's family and by failing to challenge the State's improper questioning during *voir dire*, which impermissibly committed at least four of the impaneled jurors to their answer to the first special issue.

But for these deficiencies of trial counsel, the results of Murphy's sentencing phase might well have been different. It is reasonably probable that but for these errors, Murphy's jury would have sentenced him to life in prison instead of to death.

      **2.**    **State habeas counsel provided Mr. Murphy ineffective assistance of counsel by his failure to brief or investigate any cognizable claims.**

To reach Murphy's claims through *Martinez* and *Trevino*, the Court must also find that Murphy had no counsel or that his state habeas counsel was ineffective.  State habeas counsel's testimony at the September 4 hearing and the pleading he filed on behalf of Murphy demonstrate that Murphy effectively had no counsel during state habeas proceedings.

The State Bar of Texas Guidelines and Standards for Texas Capital Counsel make clear the state habeas counsel is to conduct a thorough extra-record investigation.  State Bar of Texas, *Guidelines and Standards for Texas Capital Counsel* (2006).  The pleading filed by state habeas counsel contained no evidence that counsel had conducted any extra-record investigation whatsoever.  The billing vouchers submitted by counsel similarly contained no evidence of any extra-record investigation.  As counsel confirmed in his September 4, 2015 testimony, he "conducted no formal investigation at all."  ECF No. 100 at 83.

Because no extra-record investigation was conducted, the pleading which counsel purported to be a state habeas application contained only record-based claims, some of which were copied directly from Murphy's direct appeal brief and none of which were cognizable. ECF No. 35 at Exhibit 1.

At the September 4 hearing, state habeas counsel claimed to have decided that there was no claim of ineffective assistance of counsel to raise because of knowledge "ascertained [from his] investigation, [his] knowledge of the prior lawyers involved, the knowledge of the record, the fact that Murphy was tried last."  ECF No. 100 at 82.  However, it is impossible to determine whether there is a claim to raise that trial counsel provided ineffective assistance in the absence of any extra-record investigation.  With respect to Murphy's *Wiggins* claim, state habeas counsel did not know what additional mitigating evidence could have been presented to the jury because counsel did not interview any witnesses.  Counsel could not have known what an expert with the

proper expertise, such as Dr. Fabian, could have testified to at trial because counsel failed to employ such an expert – or any expert for that matter.  Concluding that no ineffective assistance claims existed absent an extra-record investigation is per se deficient performance.  Murphy was prejudiced by state counsel's deficient performance because he did not have an opportunity to have his substantial *Wiggins* claim heard by the state habeas court.

**III.**     **Mr. Murphy was deprived of the effective assistance of counsel at both stages of his capital murder trial by trial counsel's failure to seek a change of venue in violation of the Sixth and Fourteenth Amendments to the United States Constitution.**

**A.**     **In light of the extensive and inflammatory pretrial publicity, Mr. Murphy's right to be tried by an impartial jury could not possibly have been vindicated.**

The coverage of Mr. Murphy's case saturated Dallas County.  *See* ECF No. 18 at Exhibits 1-29.  Innumerable media reports detailed the escape, the manhunt, the Oshman's robbery, Officer Hawkins' murder, and the subsequent capture and trial of the Texas Seven.  While the group was on the run, the near-daily presence of the story in the media was fueled not only by the sensational nature of the underlying crimes, but by their wide-ranging effects on other issues of community concern, which received their own coverage.  These reports were not dry recitations of the facts.  Frequently the stories contained highly inflammatory and prejudicial information about Mr. Murphy.  Reports that the Texas Seven were linked to other robberies that occurred after the escape contributed to the media frenzy.  Many reports contained speculation that the escapees would not be captured without a violent standoff resulting in additional deaths.  Not surprisingly, these reports produced significant fear and anxiety.in Dallas County.

The right to a jury trial guarantees a criminal defendant a fair trial by a panel of impartial and indifferent jurors, and the failure to accord an accused a fair hearing violates even the minimum standards of due process.  *Irwin v. Dowd*, 366 U.S. 717, 722 (1961) (citing *In re*

*Oliver*, 333 U.S. 257 (1984)).  A juror's verdict must be based upon the evidence developed at trial, regardless of the heinousness of the crime charged, the apparent guilt of the offender, or the station in life which he occupies.  *Id*.

Due process and the right to a fair trial are denied to the accused whenever prejudice or passion is allowed to undermine the impartial administration of justice.  *See Chambers v. Florida*, 309 U.S. 227, 236-37 (1940).  One of the primary procedural safeguards against the influence of "prejudice, passion, [and] excitement" is the change of venue.  *See Irvin*, 366 U.S. at 721.  Under certain circumstances only a change of venue is sufficient to ensure the kind of fair trial mandated by the Sixth and Fourteenth Amendments.  *See, e.g.*, *Rideau v. Louisiana*, 373 U.S. 723 (1963).

Prejudice may be presumed from the totality of the circumstances.  For example, a defendant can demonstrate that prejudicial, inflammatory publicity about his case so saturated the community from which his jury was drawn as to render it virtually impossible to obtain an impartial jury.  *See, e.g.*, *Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Estes v. Texas*, 381 U.S. 532, 542-43 (1965); *Mayola v. Alabama*, 623 F.2d 992, 996-97 (5th Cir. 1980); *Pamplin v. Mason*, 364 F.3d 1 (5th Cir. 1966).  Proof of such poisonous publicity raises a presumption that the defendant's jury was prejudiced, relieving him of the obligation to establish actual prejudice.  *Mayola*, 623 F.2d at 997; *see also Estes*, 381 U.S. at 543-44.

Mr. Murphy's is precisely the type of case in which such prejudice should be presumed.  The media coverage in Mr. Murphy's case was relentless, saturating Dallas County for close to three years before Mr. Murphy's trial commenced in November of 2003.  Though the escape garnered national attention, there is no question that the coverage reached a level of intensity in Dallas County that was unmatched in other media markets.  Given the pervasive and

inflammatory pretrial publicity, it was impossible for a fair and impartial jury to be selected in Dallas County.

**B.    Trial counsel's failure to seek a change of venue was objectively unreasonable and prejudiced Mr. Murphy.**

Reasonably competent counsel would have sought a change of venue in Murphy's case. There were judicial finding made in February 2001 regarding the media frenzy that accompanied the case.  ECF No. 18 at Exhibit 30.  Moreover, counsel should have been aware that the trial court was amenable to granting such a motion, as co-defendant Michael Rodriguez's attorneys sought and received a change of venue for his trial.  At the hearing that was held on that motion on January 31, 2002, Mr. Rodriguez's attorneys noted that the "Dallas television media have [aired] in excess of 650 stories" and the "Dallas print media has printed more than 45,000 or 50,000 words."  ECF No. 18 at Exhibit 31.  They went on to note that "[t]his is far in excess of any other place in the state of Texas," *id*., and that "the Dallas media has carried and covered this in a uniquely different way because of the fact that the last two trials have been covered daily and have been in Dallas County."  *Id*. at 7.  The court accepted counsel's arguments and granted the motion.  *Id*. at 9.

Trial counsel for co-defendants Rivas and Rodriquez both acknowledged the pervasive media coverage and sought relief from the trial court.  The trial court granted each a form of relief, including issuing written findings in Rivas' case detailing the extent of the coverage, and upon written motion, granted a change of venue to Rodriquez.  However, trial counsel for Mr. Murphy, who was tried last, and therefore suffered from the most media attention, failed to investigate or make any motion seeking a change of venue.

It was objectively unreasonable for trial counsel to fail to seek a change of venue.  The trial court and other capital teams were clearly aware of the issue and attempted to remedy it.

But, despite that, Murphy's team let him chance his fortunes in the County most impacted by the coverage. That Counsel's actions fell below prevailing professional norms and that this prejudiced Mr. Murphy is unquestionable.

      **C.**    **This claim is procedurally viable through the exception created by *Martinez v. Ryan* and *Trevino v. Thaler*.**

         **1.**    **This claim is substantial.**

In light of the extensive and inflammatory pretrial publicity concerning not only Mr. Murphy's case, but the cases of his co-defendants, including extra-judicial confessions of guilt, stories about the plight of the victim's family, and the impact on the Dallas economy, trial counsel's failure to seek a change of venue was ineffective and Mr. Murphy was prejudiced as a result.

Trial counsel was on notice that the extensive publicity was problematic. The trial court issued Judicial Findings of Fact acknowledging the potential impact the media frenzy could have on all members of the Texas Seven's ability to receive a fair trial. ECF No. 18 at Exhibit 22. The trial court even attempted to remedy this by issuing an order restricting publicity and making further findings that the "out-of-court statements relating to the investigation and trial of this case pose a serious and imminent threat to the defendant's constitutional right to a fair trial, and to the fair administration of justice." ECF No. 18 at Exhibit 30. Despite the trial court's efforts to preserve a right to a fair trial for all of the Texas Seven, its efforts were clearly not enough to reduce the prejudicial impact, as the Court acknowledged by granting Michael Rodriquez a change of venue. ECF No. 18 at Exhibit 31. In spite of this, trial counsel egregiously failed to seek a change of venue. Counsel were aware that the Court was aware that the media frenzy was problematic to the cases and also that the Court was amendable to change of venue motions, and yet, they did nothing. Mr. Murphy's right to a fair trial could not have been vindicated in Dallas

County, all the jurors and potential jurors were inundated with media coverage about every aspect of the case for nearly three years.  Trial counsel's failure to seek a change of venue was ineffective and the outcome of Mr. Murphy's case was no doubt impacted by this failure.

> **2.     State habeas counsel was ineffective in failing to raise this claim.**

State habeas counsel failed to investigate, research, or brief any cognizable claims in Mr. Murphy's state habeas application.  *See supra* Part II.B.2.  As a consequence of this lack of investigation and research, state habeas counsel failed to raise Mr. Murphy's meritorious claim that he was deprived of the effective assistance of counsel at both phases of trial by trial counsel's failure to seek a change of venue.  Billing records reflect that, despite the trial court's findings that the extensive media coverage was problematic and a successful change of venue claim raised by a co-defendant, state habeas counsel spent no time considering this claim.  ECF No. 35 at Exhibit 2.  This is nothing short of ineffective.

## IV.    Mr. Murphy was deprived of the effective assistance of appellate counsel, in violation of the Sixth and Fourteenth Amendments to the Constitution.

### A.    Direct appeal counsel provided ineffective assistance.

Every criminal defendant has a right to effective assistance of counsel during their first direct appeal as a matter of right.  *Evitts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984).  The standard applicable to such claims is the same two-pronged *Strickland* standard of deficient performance and prejudice governing claims of ineffectiveness of trial counsel.  *Evitts*, 469 U.S. at 387.

Counsel's role on direct appeal is "that of an expert professional whose assistance is necessary in a legal system governed by complex rules and procedures for the defendant to obtain a decision—much less a favorable decision—on the merits of the case."  *Evitts v. Lucey*, 469 U.S. 387, 394 (1985).  Thus, appellate counsel must make "a conscientious examination" of

the record to identify all of the potential issues for an appeal, thoroughly research every colorable claim, and make a reasonable professional judgment about which points to raise. *Anders v. California*, 386 U.S. 738, 744 (1967). To do so, appellate counsel "must have a firm command of the facts of the case as well as governing law before [they] can render reasonably effective assistance of counsel." Appellate counsel's inexcusable failure to raise a point of error that had a reasonable probability of success is sufficient to make a showing of deficient performance. *Duhamel v. Collins*, 955 F.2d 962, 966-67 (5th Cir. 1993).

Direct appeal counsel's performance in Murphy's case was unreasonable under the prevailing professional norms, and there is a reasonable probability that, but for appellate counsel's errors, Murphy's death sentence would have been reversed on direct appeal. *See Duhamel*, 955 F.2d at 966; *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991). To the extent they could be raised on direct appeal, with the exception of Murphy's claim that he was sentenced to death without the necessary *Enmund* and *Tison* findings, direct appeal counsel failed to present each of the potentially meritorious claims raised in this petition.[8] Because there is a reasonable probability that Murphy would have prevailed on these claims had they been timely presented to the Court of Criminal Appeals in his direct appeal brief, Mr. Murphy is entitled to a new direct appeal process. .

**B.      This claim is procedurally viable through *Martinez* and *Trevino*.**

This Couse should find this claim to be cognizable through and *Trevino*. When addressing the effectiveness of direct appeal counsel, exactly the same concerns are present that are present in addressing claims that trial counsel was ineffective. *See Ha Van Nguyen v. Curry*,

---

[8]      Should this Court find that Murphy's claim raised pursuant to *Enmund* and *Tison* is not exhausted, direct appeal counsel's failure to exhaust that claim is additional reason to find direct appeal counsel provided Murphy ineffective assistance.

736 F.3d 1287, 1294 (9th Cir. 2013).   In Texas, there is only one opportunity to raise record

based claims, and a direct appeal counsel's failure to do so forecloses that claim from any further

review in state courts.   *See, e.g.*, *Ex parte Buck*, 418 S.W.3d 98, 98 (Tex. Crim. App. 2013)

(Alcala, J., dissenting) (stating that record-based claims are not cognizable in 11.071

proceedings); *Ex parte Banks*, 769 S.W.2d 539 (Tex. Crim. App. 1989) ("Traditionally habeas

corpus is available only to review… denials of constitutional rights.  The Great Writ should not

be used to litigate matters which should have been raised on [direct] appeal.").   An application

for a post-conviction writ of habeas corpus is the only means through which to raise a claim to

the Texas courts that a defendant received ineffective assistance on direct appeal.   Murphy's

state habeas counsel was ineffective in failing to raise a claim that direct appeal counsel provided

Murphy ineffective assistance.

**CONCLUSION AND PRAYER FOR RELIEF**

WHEREFORE, Mr. Murphy prays that this Court:

1.   Issue a writ of habeas corpus to have him brought before it, to the end that he may
     be relieved of his unconstitutional sentence of death; and

2.   Grant such other relief as law and justice requires.

Respectfully submitted,

s/ David R. Dow
_____
David R. Dow
Texas Bar No. 06064900
University of Houston Law Center
4604 Calhoun
Houston, Texas 77204-6060
Tel. (713) 743-2171

*Counsel to Patrick Henry Murphy, Jr.*

## CERTIFICATE OF SERVICE

I certify that November 6, 2015, a copy of the foregoing pleading was electronically served on counsel for the Respondent by filing the document with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.

Jeremy C. Greenwell
Office of the Texas Attorney General
Post Office Box 12548
Austin, Texas 78711
Jeremy.greenwell@texasattorneygeneral.gov

s/ David R. Dow
_____

David R. Dow

31