IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **PATRICK HENRY MURPHY JR.** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| -vs- | § | No. 3:09-cv-01368-L-BN |
| | § | |
| **WILLIAM STEPHENS,** Director, | § | **DEATH PENALTY CASE** |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |
| | § | |

## DECLARATION OF RICHARD BURR

I, Richard Burr, declare under penalty of perjury that the following is true:

### *Background of Declarant*

I am an attorney in private practice in Leggett, Texas (near Houston).   My practice has been devoted entirely to the trial, appellate, and post-conviction representation of defendants in capital cases since 1979.   I have represented persons in well over one hundred capital cases in twelve states and in the federal courts during this time.   Although my work has been heavily oriented toward post-conviction and habeas corpus proceedings, I have been trial counsel in three capital prosecutions, including *United States v. Timothy James McVeigh*, No.   96-CR-68 (D. Colo.) (the Oklahoma City bombing case), where I was lead counsel for the penalty phase and for penalty-related work.   I have argued two capital cases in the Supreme Court of the United States, *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Selvage v. Lynaugh*, 494 U.S. 108 (1990), and served as co-counsel on two others, *Hitchcock v. Dugger*, 481 U.S. 393 (1987), and *Tennard v.*

*Dretke*, 542 U.S. 274 (2004).

Because of my experience, I was retained by the Office for Defender Services of the Administrative Office of the United States Courts beginning in 1997, along with other similarly experienced attorneys, to serve through the Federal Death Penalty Resource Counsel project as an advisor and consultant to court-appointed and federal defender attorneys engaged in the defense of capital prosecutions in the federal courts.   Through this project, I worked extensively with counsel appointed to represent people charged in federal capital cases.   In a report by the Subcommittee on Federal Death Penalty Cases of the Committee on Defender Services of the Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998) (called the "Spencer Report" after the chair of the committee that authored the report) – which was adopted by the Judicial Conference – the work of our project was found to be "essential to the delivery of high quality, cost-effective representation in death penalty cases...."   *Id.*   at 50.[1]

As a result of my work in capital cases over the past 35 years, I am very familiar with the duties and responsibilities of defense counsel in capital cases to investigate and develop mental health issues.   This is a topic that I have been asked to address in scores of continuing legal education seminars focused on the defense of capital cases, as well as in my work assisting court-appointed and federal defender attorneys in federal capital trials.   I have also co-authored two litigation guides on this topic: Richard Burr, Lisa Greenman, James Patton, Anne James,

---

[1] As of October 1, 2014, I will retire as a contractor with Federal Death Penalty Resource Counsel.   I will continue my private practice which is entirely devoted to death penalty representation.   I will also continue to work as a contractor through the Administrative Office of the Courts with the Texas Habeas Assistance and Training Counsel project (TX HAT) – a project devoted to consulting with appointed counsel in federal capital habeas (28 U.S.C. § 2254) cases in Texas.   I began working as a contractor with TX HAT in 2010 and have continued since then.

Wendy Peoples, *A Practitioner's Guide to Defending Capital Clients Who Have Mental Retardation* (The International Justice Project (Third Ed. 2010)), and Richard Burr, Matthew Cross, David Freedman, Anne James, Russell Stetler, Kathy Wayland, *A Practitioner's Guide to Defending Capital Clients Who Have Mental Disorders and Mental Impairments* (The International Justice Project (2008)).

Because of my experience, I have been asked by counsel for Mr. Murphy to assist the court in understanding the duties and responsibilities of defense counsel in capital cases to investigate and develop mental health issues, and to assist the Court in assessing the performance of both trial counsel and state habeas counsel with respect to investigating and developing mental health issues in Mr. Murphy's case.

I.      ***What Capital Defense Counsel Must Do to Provide Effective Assistance in Connection with the Investigation and Development of Mental Health Issues***

Because of the high prevalence of mental illness and disabilities in capital defendants, in every capital case the defense team must include investigation into their client's possible mental illness and disability as a critical part of their investigation for every aspect of the prosecution – including capacity, waiver or competency questions, potential guilt-innocence defenses, potential death penalty preclusion, and potential penalty phase mitigation and rebuttal of aggravation.

To work up mental health issues effectively in a capital case, defense counsel must understand and be guided by:

a.      the process of competent forensic mental health evaluation and the responsibility that defense counsel bears for assuring the reliability of the evaluation;

b.      the various kinds of expertise that may be necessary for reliable evaluation; and

c.    the process of consulting with mental health experts

·        to assure the adequacy of the defense investigation, and

·        to help determine the appropriate evaluative techniques for a particular
case.

A.    *The Responsibility Defense Counsel Bears for Assuring the Reliability of the
Evaluation*: *Gathering the Client's Life History*

Competent forensic mental health evaluation in capital cases requires adherence to four

principles.  First, an accurate and complete medical, psychological, and social – often called

bio-psycho-social, or simply, life – history must be obtained, not only from the client, but also

from sources independent of the client, and that history must be organized and analyzed.

Second, a thorough physical examination (including neurological examination) must be

conducted.  Third, appropriate diagnostic studies (*e.g.* psychological and neuropsychological

testing, brain imaging techniques, and electroencephalograms) must be undertaken in light of the

information obtained from the client's history and the physical examination.  Fourth, while a

standard mental status examination (*i.e.*, clinical interview of the client by a mental health

expert) must be part of the evaluation, it cannot be relied on in isolation as a diagnostic tool.  *See*

Liebert and Foster, The Mental Health Evaluation in Capital Cases:  Standards of Practice, 15

AM. J .FORENSIC PSYCHIATRY 43 (1994).

Defense counsel bear primary responsibility for providing mental health experts with a

complete and accurate life history.  Generally, mental health experts do not gather and develop a

criminal defendant's life history.  The experts need the defendant's history and cannot perform a

professionally competent and reliable evaluation without it, but they do not put the history

4

together themselves.   In a clinical setting, psychiatric social workers perform this task.   In criminal cases, defense counsel is responsible for developing the history.

Evaluations conducted without a complete life history not only fail to meet the standard of care for forensic evaluation, they are also very likely to be inaccurate.   Most people are not able to remember their life histories completely, will remember events inaccurately, and will omit critical facts such as incidents of head trauma.   Certain important areas of information – such as prenatal history, whether their mother drank or took drugs during the pregnancy, early developmental issues, injuries, illness, exposure to environmental toxins, and genetic predispositions to illnesses – are not likely known by the defendant.   A defendant's narrative about his or her life provides important information but not nearly all the information that is needed for a complete bio-psycho-social history.

Accordingly, only through:

·        thorough gathering of records – *e.g.*, medical and mental health records of the client and immediate family members and both sets of grandparents, pregnancy and birth records, school records, social welfare agency records, military and employment records, criminal records, environmental toxin reports, and community-dysfunction records (such as incidents of violence in the neighborhood);

·        interviewing scores of people whose identities are provided by the client, gathered from records, and provided by people as they are interviewed – *e.g.*, parents, grandparents, siblings, knowledgeable extended family members, teachers, previous health care providers, friends, co-workers, military buddies and commanders, police officers, jail and prison personnel and fellow inmates, and co-perpetrators in criminal offenses; and

·  analysis of all this information,

can a complete life history be developed.  *See* American Bar Association, GUIDELINES FOR THE
APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (2003)
[hereafter, "ABA Guidelines"], Guideline 10.7, Investigation, Commentary, at 83-84.

This process must be undertaken in every capital case.  It cannot be short-circuited,
because it provides the information that is essential for the development of all mitigating
evidence, including reliable, accurate, and probative mental health evaluation.  Every record
pertaining to the client must be gathered.  No assumptions can be made that records no longer
exist, even if the record is decades old.  Every interview that might yield relevant information
must be conducted.  To assure that no relevant factors in the client's life are overlooked, the
process of developing the life history must be thorough, systematic, and complete.

Typically, once the funding necessary for this effort has been secured, the defense team
needs approximately 12-18 months to compile, organize, and analyze the client's life history.
Identifying, locating, and actually obtaining copies of all relevant records is time-consuming.  It
requires constant follow-up because most records are old, presumed by the agencies that maintain
them to have been discarded, and located only with persistent requests and searches.  Interviews
often involve finding people with whom the client has had little or no contact in years, many of
whom may now live elsewhere.  These interviews also often require considerable time and
repeat visits, because much of what needs to be recalled is painful and long-suppressed in the
witness's memory (such as the abuse of the client during childhood by a parent or other adult).
In addition, nearly every record and many interviews reveal additional records to gather and
people to interview that were not previously identified.

6

**B.**     *Without a Complete Biopsychosocial History, Counsel Cannot Make an Informed Choice of Mental Health Experts*

Without a complete biopsychosocial history, counsel not only cannot ask a mental health expert to undertake an evaluation, he or she cannot know what kind of mental health expert he or she needs.

The ABA Guidelines provide that "[c]ounsel should choose experts who are tailored specifically to the needs of the case, rather than relying on an 'all-purpose' expert who may have insufficient knowledge or experience to testify persuasively."   Guideline 10.11, The Defense Case Concerning Penalty, Commentary, at 108 (citing *Caro v. Calderon*, 165 F.3d 1223, 1226-27 (9ᵗʰ Cir.), *cert. denied*, 527 U.S. 1049 (1999), for the following proposition: "although counsel consulted four experts, including a medical doctor, a psychologist, and a psychiatrist, counsel failed to consult neurologist or toxicologist who could have explained neurological effects of defendant's exposure to pesticides").

The mental health professions have evolved into numerous areas of expertise, often focused on the kinds of experiences a person has had and the associated symptoms that he or she manifests.   Thus, there are experts, for example, in disorders associated with acute or chronic exposure to stress and trauma (including childhood abuse), neurological damage due to environmental toxins, neurological damage due to fetal exposure to alcohol and drugs, intellectual disability, mental illness associated with chronic drug abuse, drug-and-alcohol-induced states similar to mental illness, bipolar disorder, and various forms of schizophreniform disorders.   The days of the mental health generalist are long past.   While the defense team will need a primary expert, together with secondary experts as dictated by the

7

client's life history and the findings of the experts as they evaluate the client, the choice of the primary expert cannot be made intelligently – and effectively – without the complete life history.

The reason for this is that the life history enables the defense team to identify the factors in the client's life and/or genetic and familial heritage that may cause various mental diseases or disorders or that put the client at risk for various mental diseases and disorders. The choice of the primary mental health expert must be guided by these factors. To attempt to select an expert prior to the completion of the client's life history is, thus, to gamble with the areas of expertise that turn out to be necessary. Since funding is limited, such gambling can have fatal consequences if an expert is chosen whose expertise is not a fit with the client's life history.

The standard of practice does not assume that every capital defense lawyer must have a sufficient understanding of mental disorders to be able to recognize the factors in the client's life and/or genetic and familial heritage that may be associated with specific mental disorders, and thus choose an appropriate mental health expert based on that client's life history. However, the standard of practice does require that every capital defense team have someone on it – lawyer, investigator, or mitigation specialist – who does have this kind of knowledge. ABA Guidelines, The Defense Team and Supporting Services, Guideline 4.1 (A)(2), at 952 ("[t]he defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments").

### C.    *The process of consulting with mental health experts*

The most important principle about putting together the appropriate team of experts for any particular case is that the facts of the client's life and case should govern the particular kinds

8

of expertise and experts who are chosen.   Securing the primary expert is the initial step.   The legal team is responsible for knowing enough about the client and enough about varying degrees of expertise to choose as a primary expert a person whose expertise fits the major factors causing or risking the development of mental illness in the client.   Working with the primary expert, with crucial guidance from the client's biopsychosocial history, the defense team can then determine what other experts are needed and who they should be.

The process of working with mental health experts is dynamic and based on the gradual, step-by-step accrual of information.   No mental health expert, of course, can work effectively without a complete life history.   However, once that base level of information is known, the primary expert can interview the client (usually on numerous occasions over a period of time) to begin to examine the client in relation to his history.   That process usually uncovers areas of the client's history that need further investigation.   That process, along with the further investigation, will also lead invariably to the need for additional mental health expertise and diagnostic examination.   As the need for a new area of expertise emerges, the new expert undertakes his or her examination in light of the life history and the information the primary expert and any other secondary expert has gathered.   The contours and direction of the any new examination – whether it be, for example, neuropsychological testing, neurological examination, or evaluation of various traumatic experiences – take direction from the entire evolving body of knowledge that has been accumulated and analyzed.   For this reason, in most instances, new areas of expert examination need to proceed sequentially, rather than concurrently, because each new area of expert inquiry needs to be informed by the information gathered from the life history and preceding expert examinations.

This process takes time beyond the time needed for the development of a complete life history.   It takes time to identify the next area of expertise needed for the client's examination, it takes time to secure the services of the appropriate person with the needed expertise, and it takes time for that expert to conduct his or her examination and report back to the team.   Because this process is driven by the gradual accrual of information, it – like the development of the life history – cannot be short-circuited.

### D.     *The Time Frame for a Capital Case*

Based solely on the time needed to develop a complete life history for most capital clients and the additional time needed to work with experts after the life history has been developed, the defense team needs at least 18 months from the time mitigation investigation resources are approved before the case goes to trial.   Obviously, however, the time needed to investigate and develop mental health-related issues and defenses is not the sole determinant of when, from the perspective of the defense, a case can be ready for trial.   At the very least, the defense will need this amount of time for the mental health-related work they need to do.

### II.     *Trial Counsel's Efforts to Investigate Mr. Murphy's Life History and Potential Mental Disorders Fell Below the Standards Required of Capital Defense Counsel*

Trial counsel performed deficiently in attempting to investigate Mr. Murphy's life history and develop mental-health-based mitigation.

First, counsel failed to develop the kind of life history for Mr. Murphy that is necessary for reliable mental health evaluation.   Critically, counsel failed to obtain the assistance of a mitigation specialist despite having had ample time – thirty-one months from the time they were

10

appointed to the time jury selection began – to secure funding and have the mitigation specialist

develop a complete and reliable life history.   The investigative expertise and knowledge of a

mitigation specialist in developing complete life histories is necessary to develop a life history.

As the commentary to ABA Guideline 4.1, *supra*, explains,

> Mitigation specialists possess clinical and information-gathering skills and
> training that most lawyers simply do not have.   They have the time and the ability
> to elicit sensitive, embarrassing and often humiliating evidence (e.g., family
> sexual abuse) that the defendant may have never disclosed.   They have the
> clinical skills to recognize such things as congenital, mental or neurological
> conditions, to understand how these conditions may have affected the defendant's
> development and behavior, and to identify the most appropriate experts to
> examine the defendant or testify on his behalf.

*Id.* at 959.   Thus, even the best capital defense lawyers need the expertise of mitigation

specialists to develop their clients' life histories.

   Here, counsel apparently conducted a few interviews themselves of Mr. Murphy's

immediate family members and caregivers.   While they gained some useful information, these

interviews did not begin to reveal Mr. Murphy's complete life history.   Counsel did not

interview the number and variety of people who would have had essential information about Mr.

Murphy.   They failed to interview teachers, coaches, close friends of Mr. Murphy and his family,

Mr. Murphy's former girlfriends and wives, and anyone who ever worked with him or hired him

to work.   Moreover, even though they interviewed several important family members, counsel

did not conduct the kind of interviews necessary to develop all the necessary information

concerning the critical pattern that was manifest in Mr. Murphy's life – severe, ongoing exposure

to trauma.   In addition, counsel did not make any systematic effort to identify and gather records

– mental health, medical, school, social welfare, military, and employment -- concerning Mr.

Murphy, his parents, his siblings, his aunt, his stepfathers, and other people who played

significant roles in shaping his life.   While they gathered law enforcement and corrections

records for Mr. Murphy, they gathered no such records for the people who played the most

immediate roles in shaping his life.   As a result, the information they obtained from interviews

and records failed to plumb the necessary information about the longstanding patterns in Mr.

Murphy's life – the severity and long duration of the abuse (sexual, physical, emotional) and

abandonment to which he was subjected throughout childhood and adolescence, the problems he

had making sound judgments in many aspects of his life, his difficulty in regulating impulses,

and his difficulty in regulating emotional reactions and responses – all of which had to do with

the genetic heritage he was born with and how he was treated throughout his childhood and

adolescence.

Second, defense counsel chose a mental health expert to evaluate Mr. Murphy who did

not have the expertise needed to evaluate him.   Critically, counsel failed to develop the fraction

of Mr. Murphy's life history they did develop *prior* to retaining a mental health expert.   Thus,

they failed to understand, before retaining an expert, that the experiences that most shaped Mr.

Murphy's functioning were repeated exposures to severe trauma throughout his childhood and

adolescence.   Counsel did discover much of the trauma to which Mr. Murphy was exposed, but

it appears that they did so *after* they had already retained the services of Dr. Vigen.   Thus,

instead of seeking the services of an expert in trauma and trauma-related mental and behavioral

disorders, Mr. Murphy's lawyers selected a clinical psychologist without this expertise.   Dr.

Vigen, by his own account, had a general practice, seeing "patients or clients or couples for

individual treatment or counseling," working with police officers and firefighters, and

12

undertaking some forensic work.   Tr. 48:139.   Dr. Vigen, limited by his own expertise as well

as by the incomplete bio-psycho-social history for Mr. Murphy, saw only troublesome personality

"traits" or, in one instance, a personality disorder in Mr. Murphy, and a "sexual disorder not

otherwise specified."   The consequences of this were devastating for Mr. Murphy.

Dr. Vigen's characterization of what he learned about Mr. Murphy as having

"narcissistic" and "borderline" personality traits, "anti-social personality disorder," and "sexual

disorder not otherwise specified," portrayed Mr. Murphy as the kind of person deserving of death

rather than life.   Thus, he described Mr. Murphy in the following terms:

3.      He "has a grandiose sense of self-importance" and "exaggerates his own achievements

and talents."   Tr. 48:151-52.

4.      He "is interpersonally exploitive," "tak[ing] advantage of others to achieve his own

ends," without "empathy for others ... he really ought to have for a man his age."   *Id.* at

152.

5.      He makes "a frenetic effort to avoid real or imagined abandonment."   *Id.* at 154.

6.      He has "a pattern of unstable and intense interpersonal relationships, characterized by

alternating between extremes of idealization and devaluation [of the other person in a

relationship]."   *Id.*

7.      He has "a marked and persistently unstable self-image or sense of self."   *Id.*

8.      He is "impulsive in terms of sex and substance abuse."   *Id.* at 154-55.

9.      He has an antisocial personality disorder characterized by "a pervasive pattern of

disregard for and the violation of the rights of others" since before the age of 15.   *Id.* at

155-57.

Dr. Vigen did try to explain that Mr. Murphy "has a sexual disorder and these personality traits as a result of a long and severe developmental history of family dysfunction," *id.*, at 157, including sexual abuse by adults during his childhood, a history of many moves during his life, abandonment from his father, mistreatment by an unstable mother, physical abuse, and a lack of needed attention and nurturing from his father. *Id.* at 157-61. The result was, according to Dr. Vigen,

> this teenaged boy who has essentially not taken on any values from his parents, not taken on any values or many values from school and religious organizations and so on and lacks a real sense of himself. And so he's acting out, you know, he's running away and he's engaging in truant behavior, ... as Mr. Murphy, Sr. said.

*Id.* at 161.

All of this – the many negative and harmful personality traits Mr. Murphy manifested – communicated aggravation, not mitigation, to the jury. It portrayed him as the kind of person who deserved the worst degree of punishment, not any measure of compassion, because he was just this way. Even Dr. Vigen's effort to explain how "a long and severe developmental history of family dysfunction" caused Mr. Murphy to become this way fell short of providing mitigation, because the sense remained that Mr. Murphy was somehow responsible for not doing better, for "not tak[ing] on any values" from "his parents" or "school and religious organizations...." *Id.* at 161.

By contrast, a trauma expert like Dr. Bradley-Davino, could have helped the jury understand Mr. Murphy through the lens of the severe and prolonged trauma he experienced throughout childhood and adolescence – trauma inflicted upon him by the very people, parents and parent-figures, whose duty was to protect him from trauma. A trauma expert would have

14

focused on the horrifying details of the trauma to which Mr. Murphy was exposed repeatedly throughout his childhood, exposure to events "involving threat to the life or physical integrity of [Mr. Murphy] or others."   Habeas Petition, Exhibit 34, ¶13.   Such an expert would have helped the jury understand that "exposure to these types of traumatic events in childhood ... disrupts key biological and psychological developmental processes[,]" including

·       "[t]he ability to use reason and logical thinking to override emotional responses...,"

·       "the ability to regulate impulses,"

·       "the ability to effectively learn from experiences and engage in effective and adaptive behavior based on this learning," and

·       "the ability to regulate emotional reactions and responses."   *Id.*

Rather than in any way blaming Mr. Murphy for failing to overcome these experiences and "take on" positive values, the work of a trauma expert could have helped the jury understand that Mr. Murphy bore no responsibility for the difficulties he experienced in the wake of his traumatic upbringing.   This would not have meant there was no hope for Mr. Murphy – there are effective therapies for the victims of severe trauma.   However, it would have meant that Mr. Murphy's negative "traits" and personality disorders were not matters that could have been held against him but were matters that symptomatic of a severe mental illness for which he bore no responsibility.   In short, this kind of work by an expert would have evoked compassion and given the jury powerful reasons not to kill Mr. Murphy.

        Finally, although the investigation conducted by trial counsel uncovered the tip of the iceberg of trauma that Mr. Murphy experienced – sufficient to provide insight into Mr. Murphy's history by Dr. Bradley-Davino – it is plain that a much more complete life history investigation

was necessary to allow even an appropriate expert to evaluate Mr. Murphy.   Thus, As Dr.

Bradley-Davino observed,

> The reviewed records[2] do not indicate that Mr. Murphy was systematically
> evaluated for the presence pf PTSD symptoms (either with respect to PTSD
> symptoms that may have been present in childhood/adolescence or PTSD
> symptoms that may have been present as an adult).
> ....
>
> The reviewed records are inadequate to determine if any of the above noted
> behaviors may have been reflective of or associated with PTSD symptoms.
> However, the data from the records does clearly indicate that an assessment taking
> into account PTSD is indicated.   In order for a more complete assessment of Mr.
> Murphy with respect to ... trauma-related/PTSD/complex PTSD symptoms [to be
> conducted], an in-person comprehensive psychological assessment is necessary.
> Such an assessment would also include a more comprehensive psychological
> history as well as use of collateral sources (e.g., interviews of family members)
> that address both trauma history and potentially associated emotional/behavioral
> patterns.

Habeas Petition, Exhibit 34 ¶¶ 11, 25.

## III. *State Habeas Counsel's Failure to Recognize that Trial Counsel Had Failed to Investigate and Develop a Complete Life History and Obtain Appropriate Expert Services, and to Then Conduct the Life History Investigation and Obtain the Expert Assistance that Was Necessary, Amounted to Deficient Performance*

State habeas counsel did no better than trial counsel.   He neither conducted nor engaged

anyone to conduct an investigation of Mr. Murphy's life history.   Indeed, state habeas counsel

conducted no investigation of any factual matter outside the trial record.   He raised only

record-based issues.   His performance was woefully deficient.

Habeas counsel's deficient performance began with his apparent failure to understand that

the mission of state habeas proceedings is to investigate and develop non-record-based issues.

[2]The records Dr. Bradley-Davino reviewed were Dr. Vigen's notes and the trial testimony of
Patrick Murphy Sr. and Linda Goodman.

16

As the state habeas statute itself makes clear, counsel was obligated to conduct an extra -record

investigation into potential collateral claims, including ineffective assistance of trial counsel.

Tex. Code Crim. Proc. art. 11.071 § 3(a) (requiring "expeditious[]" investigation, "before and

after the appellate record is filed," of the factual and legal basis for potential claims).   Moreover,

the standard of practice in Texas capital habeas cases plainly required extra-record investigation.

In 2006, the State Bar of Texas published its *Guidelines and Standards for Texas Capital*

*Counsel*, "set[ting] forth a statewide standard of practice for the defense of capital cases...."   69

Tex. Bar J. 966, 967 (2006).   Addressing the standard of practice in state habeas proceedings,

the Bar made clear that the mission of state habeas proceedings is the investigation of

non-record-based matters:

> Habeas corpus counsel must understand that the state habeas corpus proceeding is
> not a second direct appeal.   Direct appeal-like, record-based claims are not
> cognizable in state habeas corpus and can be fatal to the capital client....
> Habeas corpus counsel cannot rely on the previously compiled record, but must
>
> conduct a thorough and independent investigation.

*Id*. at 976.

Second, counsel failed to undertake the very investigation of Mr, Murphy's life history

that trial counsel failed to investigate.   As the Bar standards recognize, "[h]abeas corpus counsel

must conduct a mitigation investigation...[,]" *id*. at 980, and to do this, "counsel should retain an

independent mitigation specialist as a member of the defense team as soon as possible after

appointment...."   *Id*.   The mitigation investigation must include the elements necessary to

develop a complete life history:

> Habeas corpus counsel's mitigation investigation should include a review of the
> capital client's

(I.) medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, prenatal and birth trauma, malnutrition, developmental delays, and neurological damage);

(ii.) family and social history (including physical, sexual, or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment, and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one, or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

(iii.) educational history (including achievement, performance, behavior, and activities) and special educational needs (including cognitive limitations and learning disabilities);

(iv.) military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(v.) employment and training history (including skills and performance, and barriers to employability); and

(vi.) prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

*Id.* at 981.

Mr. Murphy's state habeas counsel did none of this. There could have been no strategic reason not to undertake this investigation, especially in a case in which trial counsel failed to undertake the investigation. Had state habeas counsel performed effectively, his investigation would have led him to obtain the services of a trauma expert, and he would have been able to make the same showing that Mr. Murphy now seeks to make in federal habeas proceedings as to how appropriately-selected expert assistance would have served Mr. Murphy's interests. State habeas counsel's performance was woefully deficient.

18

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct, this 15th day of September, 2014.

Richard Burr

19

Appendix Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B)(v)

I have given live testimony in three cases over the past four years:

1. State of Texas  v. Jonathan Bruce Reed, No. F81-01988-FK, Criminal District Court No. 4, Dallas County, Texas (testimony as expert capital defense lawyer in support of a motion to preclude the death penalty due to inability to develop mitigation in a case set for retrial in 2011 after more than twenty years since the previous trial) – testimony given February 2011

2. United States v. Angela Johnson, No. C 09-3064-MWB, United District Court, ND Iowa (testimony during federal post-conviction hearing on ineffective assistance of trial counsel claim concerning my contact with trial counsel as Federal Death Penalty Resource Counsel) – testimony given March 2011

3. Eaton v. Wilson, No. 09-cv-00261-ABJ, United States District Court, DWyoming (testimony as ineffective assistance of counsel expert in federal habeas corpus hearing in Wyoming capital case) – testimony given August 2013

I have also provided numerous declarations and affidavits over the past four years on (a) the time and resources needed to investigate and develop the case in mitigation in capital cases, (b) the work that defense counsel must do to investigate and develop mental health defenses and mitigation in capital cases, (c) the need to have the resources and time to investigate and develop mitigation in a capital cases prior to the prosecution deciding whether to seek the death penalty, and (c) the resources and time necessary to investigate and develop claims of intellectual disability under *Atkins v. Virginia*, 536 U,S. 304 (2002).