IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PATRICK HENRY MURPHY,            §
                                §
            Petitioner,          §
                                §
V.                              §            No. 3:09-cv-1368-L-BN
                                §
LORIE DAVIS, Director,           §            (Death Penalty Case)
Texas Department of Criminal Justice §
Correctional Institutions Division, §
                                §
            Respondent.          §

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Petitioner Patrick Henry Murphy ("Murphy") has filed an petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254, asserting claims, including ineffective

assistance of counsel, that were not presented to the state court. This case was referred

to the undersigned United States magistrate judge pursuant to 28 U.S.C. § 636(b),

implemented by automatic reference under Special Order 3-251. Because Murphy's

claims are procedurally barred and lack merit, the Court should deny his petition.

**I**

Murphy was convicted of capital murder and sentenced to death for the murder

of police officer Aubrey Hawkins during the robbery of a sporting-goods store on

Christmas Eve of 2000 with six others who escaped from a Texas prison. *See State v.*

*Murphy,* No. F01-00328-T (283rd Dist. Ct., Dallas Cty., Tex. Nov. 20, 2003); Vol. 1,

Clerk's Record ["CR"] at 64-65. These escapees became known as the "Texas Seven."

Dkt. No. 100 at 19.

Murphy's conviction and sentence were affirmed on direct appeal. *See Murphy v. State,* No. AP-74851 (Tex. Crim. App. Apr. 26, 2006). Murphy filed an application for a post-conviction writ of habeas corpus on September 20, 2005. *See* State Habeas Record ["SHR"] at 2, 41. The state district court sitting in review of the habeas petition (the "State Habeas Court") recommended that relief be denied. *See Ex parte Murphy,* No. W01-00328-T(A) (283rd Dist. Ct., Dallas Cty., Tex. Apr. 10, 2009); SHR 71-93. These findings and recommendation were adopted by the Texas Court of Criminal Appeals ("CCA"). *See Ex parte Murphy*, No. WR-63,549-01 (Tex. Crim. App., July 1, 2009).

Murphy subsequently filed a petition for writ of habeas corpus in this Court on June 30, 2010, including a request for an evidentiary hearing. *See* Dkt. No. 18 at 98. Murphy then filed a Motion to Stay and Hold Claims in Abeyance on August 10, 2010, *see* Dkt. No. 31, which was denied, *see* Dkt. No. 46. Respondent has filed his answer, *see* Dkt. No. 40, and Murphy filed his reply to the Answer, *see* Dkt. No. 45.

Following the Supreme Court's opinion in *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), these proceedings were stayed pending the issuance of the Supreme Court's opinion in *Trevino v. Thaler,* 133 S. Ct. 1911 (2013). Subsequently, these proceedings were reopened, and, following further briefing, an evidentiary hearing was conducted on September 4, 2015, "to determine whether the exception to procedural bar created in *Martinez* applies to any of Murphy's claims of ineffective assistance of trial counsel." Dkt. No. 61 at 6. Specifically, the purpose for the hearing was to receive evidence and arguments on "(1) whether Murphy has set forth any substantial claim of ineffective

2

assistance of trial counsel and (2) whether any such claim was not properly presented to the state court because of the ineffective assistance of state habeas counsel." Dkt. No. 61 at 6; *see also* Dkt. No. 80 at 2; Dkt. No. 95 at 1-2.

Following the filing of the transcript of the hearing, the parties filed further briefing and their proposed findings of fact and conclusions of law. *See* Dkt. No. 98; Proposed Findings and Conclusions by Murphy, Dkt. No. 104; Brief in Support by Murphy, Dkt. No. 105; Proposed Findings by Respondent, Dkt. No. 106; Brief in Support by Respondent, Dkt. No. 107.

Subsequently, Respondent filed a motion to strike untimely supplemental exhibits that Murphy submitted with his brief in support, *see* Dkt. No. 108; Murphy filed his response, *see* Dkt. No. 109; and Respondent filed his reply, *see* Dkt. No. 110. The Court entered an order denying the motion to strike "as submitted" but explaining that the motion "will be considered as an objection to the evidence that may be considered in making findings, conclusions, and a recommendation in this case" and that "the Court will not strike the affidavits submitted after the hearing but will address in the findings what consideration, if any, and weight, if any, the challenged evidence should be afforded." Dkt. No. 112 at 1.

## II

In his petition, Murphy presents four grounds for relief, as follows:

1. Murphy was sentenced to death without the necessary finding that he either had the purpose to commit murder or that he was recklessly indifferent to human life while being a major participant in the robbery, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. *See* Dkt. No. 18 at 17-26.

3

2. Murphy was deprived of the effective assistance of counsel at both stages of his capital murder trial by counsel's failure to seek a change of venue in violation of the Sixth and Fourteenth Amendments. *See* Dkt. No. 18 at 26-37.

3. Murphy was deprived of the effective assistance of counsel in the sentencing phase of his capital murder trial in violation of the Sixth and Fourteenth Amendments. *See* Dkt. No. 18 at 37-96.

4. Murphy was deprived of the effective assistance of appellate counsel in violation of the Sixth and Fourteenth Amendments. *See* Dkt. No. 18 at 96-97.

Respondent asserts that Murphy has not exhausted any of his claims in state court, *see* Dkt. No. 40 at 34-36, and that all of his claims lack merit, *see* Dkt. No. 40 at 39-103. In his Reply, Murphy asserts that none of his claims are procedurally barred, *see* Dkt. No. 45 at 3-8, and that each of his claims have merit, *see* Dkt. No. 45 at 8-40.

### III

The CCA summarized the relevant facts, in part, as follows:

On December 13, 2000, [Murphy] escaped from the Texas Department of Criminal Justice Connally Unit, along with inmates George Rivas, Larry Harper, Donald Newbury, Randy Halprin, Joseph Garcia, and Michael Rodriguez. They stole firearms and ammunition from the prison and eventually made their way to Irving, Texas, where they planned to commit the robbery of an Oshman's Supersports store on Christmas Eve.

On the evening of December 24, 2000, the group armed themselves with weapons and two-way radios and carried out their plan. Rodriguez, Halprin, Garcia, and Newbury entered Oshman's pretending to be customers, and they were followed by Rivas and Harper, who were dressed as security guards. [Murphy] stayed behind inside their Suburban in the store parking lot, acting as a lookout and monitoring the Irving Police Department's activity on a radio frequency scanner.

\* \* \*

4

Irving Police Officer Aubrey Hawkins was dispatched to Oshman's on a suspicious persons call. He was the first officer to arrive on the scene. When he drove around to the loading dock area at the back of the building, the escapees shot him multiple times. Rivas and Halprin were also shot during the incident. One of the escapees pulled Hawkins out of his vehicle, and another took his handgun. As the escapees fled the scene in the Explorer, they ran over Hawkins and dragged him several feet. They then drove to a nearby apartment complex, where they met [Murphy] and abandoned the Explorer.

When other officers arrived at Oshman's, they found Hawkins lying face down on the ground without a pulse. The medical examiner testified that Hawkins suffered eleven gunshot wounds, some of which caused fatal injuries to his brain, lungs, and aorta, and he had other injuries that were consistent with being run over and dragged by a vehicle.

* * *

[Murphy] and Newbury were apprehended after a standoff with police at a Holiday Inn in Colorado Springs on January 23. Officers recovered cash, firearms, ammunition, and ski masks from their hotel room. Colorado Springs police officer Matt Harrell testified that he spoke to [Murphy] on the telephone during the standoff at the hotel. Harrell testified [Murphy] told him that during the Oshman's robbery he "was in a truck with radio contact, with an AR-15, and he was set up to do damage from behind in a stand-off situation."

[Murphy] gave a written statement to Irving police officer Randall Johnson admitting his involvement in the Oshman's robbery. He stated that he and the other escapees planned to rob Oshman's "to increase [their] arsenal and to get rid of the weapons [they] stole from the prison." Prior to the robbery, they determined the layout of the store and the number of employees and decided the roles each of the escapees would play. [Murphy] acted as "backup and lookout." He programmed Irving police frequencies into a radio scanner and waited in the Suburban in the Oshman's parking lot.

The Suburban was loaded with weapons, including "2 357's with magnums loads, revolvers ... [an AR-15] with approximately 60 rounds of ammunition, and a twelve gauge pump with 10 rounds." The escapees communicated with each other over walkie-talkies, and, once inside, Harper or Rivas radioed [Murphy] to let him know "it was going down."

They occasionally radioed [Murphy] to "see if all was o.k. out front," and [Murphy] radioed them a few times to let them know there were some vehicles outside "apparently waiting on someone."

After Rivas went outside, got into an employee vehicle, and drove around the back of the store, [Murphy] heard on the scanner, "Suspicious activity at the Oshman[']s." [Murphy] "got on the walkie-talkie and [told] them to abort[;] the police were here." He gave them the precise location of the patrol car and the direction it was traveling. When the patrol car drove around to the back of Oshman's, [Murphy] radioed, "He's coming around the corner, leave, leave." Shortly thereafter, Harper radioed [Murphy] and told him to go to the "pickup point." [Murphy] secured the weapons in the Suburban and drove to the apartment complex where he met the rest of the escapees. He stated that if he were pursued by police, his purpose "was to initiate firefight with the AR-15."

During the punishment phase, the State introduced evidence that [Murphy] had committed the offense of burglary of a building in February 1984. He received a six-year probated sentence for the offense. In March 1984, he entered the apartment of a woman he had known in high school, tied her up, held a knife to her, and sexually assaulted her. He was convicted of aggravated sexual assault and received a fifty-year sentence. The other escapees were also serving sentences for serious offenses such as aggravated robbery, kidnapping, injury to a child, murder, capital murder, and sexual assault.

After the escape[,] an officer at the Connally Unit searched [Murphy's] dormitory cubicle and found a handwritten note. The note stated: "I refuse to abide by the dictations of a police state, which Texas has surely become. Today I fire the first shot of THE NEW REV[O]LUTION. Long live freedom. Death to tyranny."

After their escape from the Connally Unit and prior to the Oshman's robbery, the escapees committed the robbery of a Radio Shack and an Auto Zone. An Auto Zone employee testified that he saw Rivas communicating with someone outside on a two-way radio during the robbery. The escapees took the truck of another Auto Zone employee, which police found in the parking lot of a nearby grocery store. There was an earpiece for a handheld radio in the truck bed. DNA testing of the earpiece revealed a profile that was consistent with that of [Murphy].

Rivas testified at punishment that he planned the escape and robberies and assigned [Murphy] the role of "lookout." Rivas confirmed

6

that [Murphy] stayed outside the Oshman's in the Suburban with their guns and gear, monitored a police scanner, and communicated with Rivas on a two-way radio. [Murphy] told him over the radio that there was a suspicious activity call and that the police were on their way. After Rivas went outside and drove behind the Oshman's, [Murphy] radioed him and told him that a police car was coming around the corner to the back of the store.

*Murphy v. State*, No. AP-74,851, 2006 WL 1096924, at *1-*4 (Tex. Crim. App. Apr. 26, 2006). These findings are entitled to deference. *See* 28 U.S.C. 2254(e).

## IV

Federal habeas review of these claims is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), setting forth preliminary requirements that must be satisfied before reaching the merits of a claim made in these proceedings. "[T]he provisions of AEDPA apply with full force even when reviewing a conviction and sentence imposing the death penalty." *White v. Wheeler*, 136 S. Ct. 456, 462 (2015).

A.   Exhaustion

Under the AEDPA, a federal court may not grant habeas relief on any claim that the state prisoner has not exhausted in the state corrective process available to protect his rights. *See* 28 U.S.C. § 2254(b)(1)(A); *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This entails submitting the factual and legal basis of any claim to the highest available state court for review in a procedurally correct manner. *See Satterwhite v. Lynaugh*, 886 F.2d 90, 92-93 (5th Cir. 1989); *see also Nickleson v. Stephens*, 803 F.3d 748, 753 (5th Cir. 2015) ("The exhaustion doctrine demands more than allusions in state court to facts or legal issues that might be comprehended within a later federal habeas

petition. The exhaustion doctrine is based on comity between state and federal courts, respect for the integrity of state court procedures, and 'a desire to protect the state courts' role in the enforcement of federal law.'" (quoting *Castille v. Peoples*, 489 U.S. 346, 349 (1989) (in turn quoting *Rose v. Lundy*, 455 U.S. 509, 518 (1982)))). In Texas, a prisoner must present his claims to the CCA in a petition for discretionary review or an application for state post-conviction relief. *See Bautista v. McCotter*, 793 F.2d 109, 110 (5th Cir. 1986).

The federal court may, however, deny relief on the merits notwithstanding any failure to exhaust. *See* 28 U.S.C. § 2254(b)(2); *Miller v. Dretke*, 431 F.3d 241, 245 (5th Cir. 2005).

B.   <u>State-Court Procedural Determinations</u>

If the state court denies the claim on state procedural grounds, a federal court will not reach the merits of those claims if it determines that the state law grounds are independent of the federal claim and adequate to bar federal review. *See Sawyer v. Whitley*, 505 U.S. 333, 338 (1992); *see also Johnson v. Lee*, 136 S. Ct. 1802, 1803-04 (2016) ("Federal habeas courts generally refuse to hear claims 'defaulted ... in state court pursuant to an independent and adequate state procedural rule.'" (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991))). "State rules count as 'adequate' if they are firmly established and regularly followed." *Johnson*, 136 S. Ct. at 1804 (citation and internal quotation marks omitted). As for the "independent" prong, "[w]hen application of a state law bar depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law," and, "whether

a state law determination is characterized as 'entirely dependent on,' 'resting primarily on,' or 'influenced by' a question of federal law, the result is the same." *Foster v. Chatman*, 136 S. Ct. 1737, 1746, 1747 n.4 (2016) (citations and internal quotation marks omitted).

And, if the state procedural determination is based on state grounds that were inadequate to bar federal habeas review, or if the habeas petitioner shows that an exception to the bar applies, the federal court must resolve the claim without the deference AEDPA otherwise requires. *See Miller v. Johnson*, 200 F.3d 274, 281 n.4 (5th Cir.2000) ("Review is *de novo* when there has been no clear adjudication on the merits.") (citing *Nobles v. Johnson*, 127 F.3d 409, 416 (5th Cir. 1997)); *Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999) ("the AEDPA deference scheme outlined in 28 U.S.C. § 2254(d) does not apply" to claims not adjudicated on the merits by the state court); *Woodfox v. Cain*, 609 F.3d 774, 794 (5th Cir. 2010) (the AEDPA deferential standard would not apply to a procedural decision of the state court).

C.    State-Court Merits Determinations

Where a state court has already rejected a claim on the merits, a federal court may grant habeas relief on that claim only if the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington*, 562 U.S. at 98.

A state court decision is "contrary" to clearly established federal law if "it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Busby*, 359 F.3d at 713; *see also Lopez v. Smith*, 574 U.S. ___, 135 S. Ct. 1, 2 (2014) (per curiam) ("We have emphasized, time and time again, that the AEDPA prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established.'" (citation omitted)).

A decision constitutes an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "'[C]learly established Federal law' for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." *White v. Woodall,* 134 S. Ct. 1697, 1702 (2014) (citation and internal quotation marks omitted). "And an 'unreasonable application of' those holdings must be 'objectively unreasonable, not merely wrong; even clear error will not suffice." *Id.* (citation and internal quotation marks omitted). Thus, "[f]or purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law.... A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the

correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (citations and internal quotation marks omitted).

"Under § 2254(d), a habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington*, 562 U.S. at 102 (internal quotation marks omitted). The Supreme Court has further explained that "[e]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* at 101 (internal quotation marks omitted). And "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102.

The Supreme Court has explained that, "[i]f this standard is difficult to meet, that is because it was meant to be," where, "[a]s amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings," but "[i]t preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents," and "[i]t goes no further." *Id.* at 102.

Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

11

at 103; *accord Burt v. Titlow*, 571 U.S. ___, 134 S. Ct. 10, 16 (2013) ("If this standard is difficult to meet – and it is – that is because it was meant to be. We will not lightly conclude that a State's criminal justice system has experienced the extreme malfunctio[n] for which federal habeas relief is the remedy." (internal quotation marks and citations omitted)).

As to Section 2254(d)(2)'s requirement that a petitioner show that the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," the Supreme Court has explained that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance" and that federal habeas relief is precluded even where the state court's factual determination is debatable. *Wood v. Allen*, 558 U.S. 290, 301, 303 (2010). Under this standard, "it is not enough to show that a state court's decision was incorrect or erroneous. Rather, a petitioner must show that the decision was objectively unreasonable, a substantially higher threshold requiring the petitioner to show that a reasonable factfinder must conclude that the state court's determination of the facts was unreasonable." *Batchelor v. Cain*, 682 F.3d 400, 405 (5th Cir. 2012) (brackets and internal quotation marks omitted).

The Court must presume that a state court's factual determinations are correct and can find those factual findings unreasonable only where the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001). This presumption

12

applies not only to explicit findings of fact but also "to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001); *see also Harrington*, 562 U.S. at 98 ("[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning."); *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003) ("a federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision" (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc))).

In sum, Section 2254 creates a "highly deferential standard for evaluating state court rulings, which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). To overcome this standard, a petitioner must show that "there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.

In a habeas case brought under 28 U.S.C. § 2254, a federal court cannot expand the record on a claim adjudicated on the merits in state court. *See Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011). That is, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 180. Because Section 2254 "requires an examination of the state-court decision at the time it was made," the Supreme Court held that "the record under review is limited to the record in existence at that same time i.e., the record before the state court." *Id.* at 182; *see also Gallow v. Cooper*, 505 F. App'x 285, 295-96 (5th Cir. 2012) (per curiam)

13

("Similarly, the language of § 2254(d)(2) limits review to the 'evidence presented in the State court proceeding.'" (footnote omitted)).

## V

In his first claim, Murphy asserts that he was sentenced to death without the necessary finding that he had the purpose to commit murder or that he was recklessly indifferent to human life while being a major participant in the robbery, in violation of the Fifth, Sixth, and Fourteenth Amendments. *See* Dkt. No. 18 at 17-26; Dkt. No. 105 at 3-6. Murphy argues that, where a non-trigger person faces a death sentence, the Constitution requires that a jury consider both the defendant's degree of participation in the crime and his mental state regarding the possibility that loss of life will occur. *See* Dkt. No. 18 at 18 (citing *Enmund v. Florida,* 458 U.S. 782, 788, 801 (1982)); Dkt. No. 105 at 4.

Respondent argues that this claim as presented is unexhausted and procedurally barred, *see* Dkt. No. 40 at 34-36, but that, even if this Court could reach the merits, the claim lacks merit. *See* Dkt. No. 40 at 39-55. Respondent asserts that, contrary to Murphy's arguments, the requirements of *Enmund* were satisfied by the jury's finding that Murphy "intended to kill the deceased or another or anticipated that a human life would be taken." Dkt. No. 40 at 40 (quoting Dkt. No. 18 at 22). Respondent also asserts that the state court's findings in the post-conviction habeas proceedings that Murphy was culpable in Officer Hawkins's death satisfies the Eighth Amendment. *See* Dkt. No. 40 at 53-55.

Murphy replies that he exhausted this claim on direct appeal before the CCA and that his Court should consider his claim on the merits. *See* Dkt. No. 105 at 6-7.

A.   <u>State Court Action</u>

Murphy raised an *Enmund* complaint in his eighteenth point of error on direct appeal, but the CCA found that he only asserted a point of error regarding his conviction and not his sentence. *Murphy v. State,* 2006 WL 1096924, at *21. Murphy alleged on direct appeal that "[t]he trial court erred in overruling [his] objection to the jury charge concerning the applicability of [Texas Penal Code] Sec. 7.02(b) (conspirator liability) of the law of parties as being contrary to the constitutional requirements of *Enmund v. Florida*, which requires that there be specific intent of the accused to kill or to cause the loss of life." *Id.*; App. Br. at 71.[1]

The CCA denied his claim, holding that his reliance on *Enmund* was misplaced: "*Enmund* prevents imposition of the death penalty under certain circumstances; it does not prohibit a capital murder conviction for a non-triggerman under the law of parties." *Murphy v. State,* 2006 WL 1096924, at *21 (citing *Johnson v. State,* 853 S.W.2d 527,

---

[1] In his appeal brief, Murphy relied on the portion of the trial record during the charge at the guilt/innocence phase, in which Murphy had moved for "an instructed verdict based on the *Enmund versus Florida* case 458 US 782, that evidence fails to show that defendant killed or attempted to kill the deceased." *See* Vol. 44, Reporter's Record, at 4-5 (hereinafter 44 RR at 4-5). Murphy also objected to the party's charge as follows:

> We also object to the submission of the case under the 702(b) theory of co-conspirator liability as a parties charge because it conflicts with the requirement of capital murder that there be a specific intent to kill or the conscious objective of the defendant to kill or to cause the loss of life. And it was - - or you cannot work it together. They don't work together.
>
> And we also feel that it violates the various constitutional sections that were previously stated.

44 RR at 6-7.

535 (Tex. Crim. App. 1992)).

In post-conviction habeas review, Murphy again raised an *Enmund* claim, but it was found to be procedurally barred. The State Habeas Court found that a proper objection had not been made at trial to the conviction but, rather, only to the sentence. *See* SHR at 90. But, on direct appeal, the CCA did not find that a proper objection had not been preserved and addressed the merits of the claim. *See Murphy,* 2006 WL 1096924, at *21.

To the extent that Murphy's claim had already been raised and rejected in the direct appeal, the State Habeas Court found that it could not "be relitigated through habeas corpus unless the direct appeal judgment was subsequently rendered void, or the Court of Criminal Appeals decided to retroactively apply relief following a change in the law." SHR at 90 (citing *Ex parte Ramos,* 977 S.W.2d 616, 617 (Tex. Crim. App. 1998); *Ex parte Drake,* 883 S.W.2d 213, 215 (Tex. Crim. App. 1994)). The State Habeas Court also found that Murphy could have challenged the constitutionality of his death sentence under *Enmund* on direct appeal but did not and that habeas did not lie as a substitute for direct appeal. *See* SHR at 90-91 (citing *Ramos,* 977 S.W.2d at 617). Therefore, the claim was dismissed as procedurally barred.

In the alternative, the State Habeas Court found that the claim lacked merit. To the extent that Murphy's claim asserted an *Enmund* complaint against the conviction, the State Habeas Court concluded that the CCA correctly determined on direct appeal that such claim was misplaced. *See* SHR at 91. To the extent that the *Enmund* complaint was asserted against the death sentence, the State Habeas Court

16

found that the submission of an "anti-parties" special issue that was answered in the affirmative by the jury was sufficient to satisfy *Enmund*. SHR at 91. The State Habeas Court noted "that this special issue prevents assessment of the death penalty against a defendant unless the jury finds he actually caused the victims death, intended to cause it, or anticipated that a human life would be taken," SHR at 91 (citing TEX. CODE CRIM. PROC. ANN. ART. 37.071 § 2(b)(2)), and that "any one of these three mental states" would satisfy *Enmund*, *id.* at 92 (citing *Ladd v. State,* 3 S.W.3d 547 573 (Tex. Crim. App. 1999)).

These findings and conclusions were adopted by the CCA. *See Ex parte Murphy,* No. WR-63,549-01, 2009 WL 1900369, at *1 (Tex. Crim. App. July 1, 2009)

B.   Exhaustion and Procedural Bar

To properly exhaust a claim, a habeas petitioner must fairly present its factual and legal basis to the highest available state court for review in a procedurally correct manner that allows the state court to consider the merits of the claim. *See Carty v. Thaler,* 583 F.3d 244, 254 (5th Cir. 2009); *Deters v. Collins,* 985 F.2d 789, 795 (5th Cir. 1993); *Satterwhite v. Lynaugh*, 886 F.2d 90, 92-93 (5th Cir. 1989); *see also Nickleson v. Stephens*, 803 F.3d 748, 753 (5th Cir. 2015) ("The exhaustion doctrine demands more than allusions in state court to facts or legal issues that might be comprehended within a later federal habeas petition. The exhaustion doctrine is based on comity between state and federal courts, respect for the integrity of state court procedures, and 'a desire to protect the state courts' role in the enforcement of federal law.'" (quoting *Castille v. Peoples*, 489 U.S. 346, 349 (1989) (in turn quoting *Rose v. Lundy*, 455 U.S.

17

509, 518 (1982)))). In Texas, a death-sentenced prisoner must present his claims to the CCA on direct appeal or in an application for state post-conviction relief. *See Bautista v. McCotter*, 793 F.2d 109, 110 (5th Cir. 1986) (noting procedure in noncapital cases); *Fuller v. State,* 253 S.W.3d 220, 224 (Tex. Crim. App. 2008) (noting that direct appeal to CCA is automatic under TEX. CODE CRIM. PROC. art. 37.071, § 2(h)); *Beazley v. Johnson,* 242 F.3d 248, 269 (5th Cir. 2001) (noting death-sentenced petitioner's failure to raise claim on direct appeal to CCA resulted in failure to exhaust claim).

"The purposes of the exhaustion requirement 'would be no less frustrated were we to allow federal review to a prisoner who had presented his claim to the state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it.'" *Carty,* 583 F.3d at 254 (quoting *Edwards v. Carpenter,* 529 U.S. 446, 453 (2000)). This can also result in a procedural bar from federal review.

> "[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." If the "independent and adequate state ground" doctrine were not applied, a federal district court or court of appeals would be able to review claims that [the Supreme] Court would have been unable to consider on direct review.

*Lambrix v. Singletary,* 520 U.S. 518, 523 (1997) (quoting *Coleman,* 501 U.S. at 730-731, 732; internal citations omitted).

If the state court finds that the claim is procedurally barred from review on a state law that is independent of the federal ground and adequate to bar relief in federal court, the claim will be procedurally barred in this court as well, unless an exception to bar applies. "A prisoner may obtain federal review of a defaulted claim by showing

18

cause for the default and prejudice from a violation of federal law," *Martinez,* 132 S. Ct. at 1316 (citing *Coleman,* 501 U.S., at 750), or demonstrating that the failure to consider the federal claim will result in a "fundamental miscarriage of justice." *Harris v. Reed,* 489 U.S. 255, 262 (1989).

The Texas contemporaneous objection rule constitutes an adequate and independent ground to bar federal habeas review of a petitioner's claims. *See Turner v. Quarterman,* 481 F.3d 292, 301 (5th Cir. 2007); *Cardenas v. Dretke,* 405 F.3d 244, 249 (5th Cir. 2005); *Dowthitt v. Johnson,* 230 F.3d 733, 752 (5th Cir. 2000). Also, the Texas rule that claims that should have been, but were not, raised on direct appeal are procedurally barred in state post-conviction habeas review, *see Ex parte Gardner,* 959 S.W.2d 189, 199 (Tex. Crim. App. 1996), is also an adequate state ground to bar federal habeas review, *see Aguilar v. Dretke,* 428 F.3d 526, 535 (5th Cir. 2005); *Busby v. Dretke,* 359 F.3d 708, 719 (5th Cir. 2004). But the mere fact that the same claim was barred from review by the state court on post-conviction habeas review because it had already been raised and rejected on direct appeal does not prevent the claim from being considered in federal court. *See Ylst v. Nunnemaker,* 501 U.S. 797, 804 n.3 (1991); *Bennett v. Whitley,* 41 F.3d 1581, 1582-83 (5th Cir. 1994).

C.    <u>Analysis</u>

To the extent that Murphy failed to make a proper objection at trial or failed to present an available *Enmund* claim on direct appeal, the finding by the state court that this claim was barred on post-conviction habeas is an independent and adequate state ground to bar federal review of the claim. But, to the extent that the merits of this

claim were presented and adjudicated on direct appeal, it may be considered by this Court under 28 U.S.C. § 2254(d).

But, in any event, the CCA's adjudication on direct appeal was not an unreasonable application of federal law. *Enmund* does not prevent a conviction for capital murder but only restricts the punishment that may be imposed. Therefore, that portion of Murphy's first claim that presents the claim raised in his direct appeal to the state court should be denied.

The remainder of Murphy's first claim should be dismissed as procedurally barred. The State Habeas Court properly applied its rule prohibiting the consideration of claims on post-conviction habeas that were not presented on direct appeal. But the State Habeas Court's alternative merits analysis was also correct. The "anti-parties" special issue was given in accordance with the requirements of *Enmund. See Rockwell v. Davis,* No. 4:14-CV-1055-O, 2016 WL 4398378, at *21 (N.D. Tex. Aug. 18, 2016). Because the special issue satisfied *Enmund*, this claim lacks merit. Therefore, if the claim were not procedurally barred, it should be denied for lack of merit.

## VI

In his second, third, and fourth claims, Murphy asserts that he was deprived of the effective assistance of counsel at his capital murder trial and in his direct appeal. None of these claims were presented to the state court. Because they would now be barred by the Texas abuse-of-the-writ rule and have not been shown to come within an exception to bar, the claims should be denied as barred.

A.     Claims and Defenses

In his second claim, Murphy argues that his counsel was ineffective at both stages of his trial by failing to seek a change of venue in violation of the Sixth and Fourteenth Amendments. *See* Dkt. No. 18 at 26-37; Dkt. No. 105 at 24-28.

In his third claim, Murphy argues that counsel was ineffective in the punishment stage of his trial by (1) eliciting highly damaging testimony from his own witness about Murphy's future dangerousness, (2) failing to conduct a reasonable sentencing investigation, (3) failing to object to impermissible closing arguments during the punishment phase, and (4) failing to object to impermissible voir dire committing potential jurors to an affirmative answer on the second Special Issue and failing to challenge those potential jurors for cause or exercise a peremptory strike. *See* Dkt. No. 18 at 37-96; Dkt. No. 105 at 7-24.

In his fourth claim, Murphy argues that his appellate counsel was ineffective in failing to present the claims raised in his federal habeas petition. *See* Dkt. No. 18 at 96-97; Dkt. No. 105 at 28-30.

Respondent asserts that these claims are unexhausted and now procedurally barred by the Texas law restricting subsequent state habeas applications. *See* Dkt. No. 40 at 36 (citing *Gray v. Netherland,* 518 U.S. 152, 161 (1996), *Coleman,* 501 U.S. at 735 n.; *Finley v. Johnson,* 243 F.3d 215, 220 (5th Cir. 2001); and Tex. Code Crim. Proc., Art. 11.071, § 5 (West 2009)); Dkt. No. 107 at 3-18. Respondent also argues in the alternative that, if these claims are not procedurally barred, they lack merit. *See* Dkt. No. 46 at 39-103; Dkt. No. 107 at 8-15.

Murphy acknowledges that these claims were not presented to the state court but argues that they come within the exception to procedural bar created in *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), and *Trevino v. Thaler,* 133 S. Ct. 1911 (2013). *See* Dkt. No. 45 at 3; Dkt. No. 60 at 1-2; Dkt. No. 105 at 2, 21. Although his reply was filed before *Martinez,* Murphy presciently argued that these claims were procedurally viable because they were not presented to the state court due to the ineffective assistance of state habeas counsel and that these proceedings should be stayed to allow such exhaustion. *See* Dkt. No. 45 at 3-8.

Following the Supreme Court's decisions in *Martinez* and *Trevino,* Murphy argues that the newly created exception applied to these claims but that this Court should not stay these proceedings for exhaustion. *See* Dkt. No. 60 at 1-5, 8-9. Respondent concurs that these proceedings should not be stayed for exhaustion, *see* Dkt. No. 59 at 11-14, and argues that Murphy has not shown the claims to come within the exception because he has not demonstrated that a substantial claim of ineffective assistance of trial counsel was not presented to the state court because of the ineffective assistance of state habeas counsel, *see id.* at 1-6. Respondent also argues that Murphy is not entitled to evidentiary development. *See id.* at 2, 6-10.

B.     Exhaustion and Procedural Bar

1.     General Rule

As noted above, federal habeas petitioners are required to exhaust their claims by fairly presenting them to the highest state court before asserting them in federal court. *See Harrington*, 562 U.S. at 103; *Picard v. Connor,* 404 U.S. 270, 275 (1971);

*Deters,* 985 F.2d at 795. This Court cannot grant relief on an unexhausted claim. *See* 28 U.S.C. § 2254(b)(1)(A).

Generally, a petition containing both exhausted and unexhausted claims must be dismissed or stayed so that the petitioner may return to state court to exhaust state remedies. *See Rhines v. Weber,* 544 U.S. 269, 277-78 (2005); *Rose v. Lundy,* 455 U.S. 509, 519-20 (1982). Such action would be futile, and the federal court should find claims to be procedurally barred, if "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman,* 501 U.S. at 735 n.1; *see also, Neville v. Dretke,* 423 F.3d 474, 480 (5th Cir. 2005) (holding unexhausted claims ineligible for stay when state court would find them procedurally barred). But a habeas petitioner may avoid the imposition of this bar by demonstrating a recognized exception.

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman,* 501 U.S. at 750. The meaning of cause and prejudice was later expanded to include substantial ineffective assistance of trial counsel claims that were not presented to the state court because of the ineffective assistance of state habeas counsel. *Martinez,* 132 S. Ct. at 1318,

2.   <u>Procedural Bar</u>

Texas law precludes successive habeas claims except in narrow circumstances.

*See* TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5 (West 2015). This is a codification of the judicially created Texas abuse-of-the-writ doctrine. *See Barrientes v. Johnson,* 221 F.3d 741, 759 n.10 (5th Cir. 2000).

Under this state law, a habeas petitioner is procedurally barred from returning to the Texas courts to exhaust his claims unless the petitioner presents a factual or legal basis for a claim that was previously unavailable or shows that, but for a violation of the United States Constitution, no rational juror would have found for the State. *See id.* at 758 n.9. This is an independent and adequate state law ground to bar federal habeas review. *Hughes v. Quarterman,* 530 F.3d 336, 342 (5th Cir. 2008). Therefore, unexhausted claims that could not make the showing required by this state law would be considered procedurally barred from review on the merits in this Court unless an exception is shown. *See Beazley v. Johnson,* 242 F.3d 248, 264 (5th Cir. 2001).

    3.   <u>Exception to Bar</u>

Murphy concedes that his claims were not presented to the state court and would now be procedurally barred if he were to file a subsequent habeas application there, but he asserts that federal review of the claim is permitted under the *Martinez* exception. *See* Dkt. No. 45 at 3; Dkt. No. 60 at 2-5; Dkt. No. 105 at 21-24. In *Martinez,* 132 S. Ct. at 1320, the Supreme Court created an equitable exception to procedural bar for certain substantial claims of ineffective assistance of trial counsel that were not presented to the state court due to the ineffective assistance of state habeas counsel. In *Trevino*, 133 S. Ct. at 1921, the Supreme Court applied this new exception to Texas cases. This Court therefore granted Murphy the opportunity to prove at an evidentiary

hearing (the "*Martinez* hearing") that the claim comes within this exception to procedural bar.

To show that the ineffective-assistance-of-trial-counsel claim falls within the exception, Murphy must demonstrate that the claim is "substantial" – in that it "has some merit" – and that the claim was not presented to the state court because the habeas petitioner had no state habeas counsel or because his state habeas counsel was ineffective. *Martinez,* 132 S. Ct. at 1318. Respondent can defeat this by showing either that the claim "is insubstantial, *i.e.,* it does not have any merit or that it is wholly without factual support, or that the attorney in the initial-review collateral proceeding did not perform below constitutional standards." *Id.* at 1319.

    a.    Substantiality

 To show that a claim comes within the *Martinez* exception, a federal habeas petitioner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* at 1318-19 (citing *Miller-El v. Cockrell,* 537 U.S. 322 (2003) (describing standards for certificates of appealability)). To determine whether a claim has some merit, this Court applies the two-pronged standard by which a claim of ineffective assistance of counsel is measured as set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

The first prong of *Strickland* requires the defendant to show that counsel's performance was deficient. *See id.* at 687. The second prong of this test requires the defendant to show prejudice resulting from counsel's deficient performance. *See id.* at

694. The Court need not address both prongs of the *Strickland* standard if the complainant has made an insufficient showing on one. *See id.* at 697.

Under the first, "performance" prong, the petitioner must demonstrate that the performance of his attorney fell below an objective standard of reasonableness. *See id.* at 687-88. To be cognizable under *Strickland*, trial counsel's error must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "It is well settled that effective assistance is not equivalent to errorless counsel or counsel judged ineffectively by hindsight." *Tijerina v. Estelle*, 692 F.2d 3, 7 (5th Cir. 1982).

Under the second, "prejudice" prong, the petitioner also must prove that he was prejudiced by his attorney's substandard performance. *See Strickland*, 466 U.S. at 687, 692. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. To demonstrate prejudice, a habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Thus, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington*, 562 U.S. at 111. "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different," which "does not require a showing that counsel's actions 'more likely than not altered

the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case." *Id.* at 111-12 (quoting *Strickland*, 466 U.S. at 693, 696, 697). "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 112.

In the context of a capital sentencing proceeding, "the question is whether there is a reasonable probability that, absent the errors, the sentence ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

> [B]ecause of the risk that hindsight bias will cloud a court's review of counsel's trial strategy, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."

*Feldman v. Thaler*, 695 F.3d 372, 378 (5th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689). "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003). Moreover, "[j]ust as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Harrington*, 562 U.S. at 110. "Under the deferential standard of *Strickland*, [a court] must affirmatively entertain the range of possible

reasons [defendant's] counsel may have had for proceeding as they did." *Clark v. Thaler*, 673 F.3d 410, 418 (5th Cir. 2012) (internal quotation marks omitted).

It is not enough for a habeas petitioner to merely allege deficiencies on the part of counsel. The petitioner must affirmatively plead the resulting prejudice in the habeas petition. *See Hill v. Lockhart*, 474 U.S. 52, 60 (1985); *Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988).

b. <u>State Habeas Counsel</u>

In addition to demonstrating that the ineffective-assistance-of-trial-counsel claim is substantial, a federal habeas petitioner seeking to bring a claim within the *Martinez* exception must show that the claim was not presented to the state court either because he had no counsel in his post-conviction collateral review proceedings or because his attorney in those proceedings was ineffective under the *Strickland* standard. *See Martinez,* 132 S. Ct. at 1318.

This does not merely require that the state habeas counsel be shown to have engaged in some deficient conduct but, rather, that the deficiency shown was that counsel failed to present the claim of ineffective assistance of trial counsel found to be substantial. *See Segundo v. Davis,* 831 F.3d 345, 350-51 (5th Cir. 2016) (agreeing with the district court that "habeas counsel was not ineffective in failing to raise a meritless claim"); *Beatty v. Stephens,* 759 F.3d 455, 466 (5th Cir. 2014); *Garza v. Stephens,* 738 F.3d 669, 676 (5th Cir. 2013).

4.     Evidentiary Hearing

Murphy was granted an evidentiary hearing to prove that his claims of ineffective assistance of trial counsel come within the exception to bar. *See* Dkt. No. 61 at 6. This hearing was not intended merely to allow Murphy an opportunity to present the evidence he already had gathered but to compel the critical evidence needed to establish his claims that he might not otherwise be able to obtain. Specifically, Murphy was allowed the opportunity to examine trial counsel under oath regarding information that only trial counsel might know, such as the extent of trial counsel's knowledge from their investigation and counsel's strategic reasons for the decisions in question, and to test the reasonableness of such strategy.

At this hearing, Murphy's counsel called lead trial counsel Brook A. Busbee to testify but did not call co-counsel Juan Sanchez even though he was present and available to testify. *See* Dkt. No. 100 at 75-76.

a.     Abandoned Opportunities

Despite having been afforded the opportunity to do so, Murphy did not ask trial counsel any questions about three of the five specific claims of ineffective assistance of trial counsel asserted in the petition. In each of these three claims, Murphy challenges trial counsel's strategic decisions, but he has made no attempt to overcome the presumption that these decisions were based on a reasonable trial strategy by questioning trial counsel about these matters.

The Supreme Court has repeatedly stated that "counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment,' ... and that the burden to '"show that counsel's performance was deficient' rests squarely on the defendant." *Burt*, 134 S. Ct. at 17 (quoting *Strickland,* 466 U.S., at 687, 690). Therefore, Murphy's decision to not examine counsel regarding these strategic decisions effectively abandons the opportunity that this Court afforded to him to overcome this presumption.

### 1.   Change of Venue

In his second claim, Murphy argues that trial counsel was ineffective in their decision to not seek a change of venue. *See* Dkt. No. 18 at 26-37. The decision whether to seek a change of venue is a matter of trial strategy. *See Pruske v. Scott,* 71 F.3d 876 (table), No. 95-50261, 1995 WL 725626, at *3 (5th Cir. Nov. 6, 1995); *Phillips v. Collins,* 12 F.3d 1097 (table), No. 93-2874, 1993 WL 543259, at *5 (5th Cir. Dec. 13, 1993); *Larson v. United States,* 275 F.2d 673, 675 (5th Cir. 1960).

The only examination of trial counsel on this claim was by Respondent, and it indicated a reasonable trial strategy. Lead counsel Brook Busbee testified that trial counsel originally wondered if they should file a change of venue but decided against it. The problem was that the publicity was not merely local but, rather, "every county in Texas had received the same coverage and the same news interest that Dallas had." Dkt. No. 100 at 63-64. Counsel also determined strategically that a change of venue would likely result in a less favorable forum. *See id.* She opined that Dallas County juries are more liberal than the county that would have likely received the transfer

where they would have had a "much more conservative and death-leaning jury." *Id.* at 64. As an example, Busbee recounted the plight of Murphy's co-actor who was granted a change of venue and ended up in "a much, much worse situation." *Id.* at 63. Busbee also testified that she did not really feel that there were grounds for a motion for change of venue. *See id.* at 64.

Murphy's counsel relinquished his opportunity to prove otherwise when he asked Busbee no questions about this decision.

2.   <u>Jury Argument</u>

In a subpart to his third claim, Murphy argues that his counsel was ineffective for failing to object to the prosecutor's improper jury argument in the sentencing phase of his trial. *See* Dkt. No. 18 at 70-77. "A decision not to object during a closing argument is a matter of trial strategy." *Drew v. Collins,* 964 F.2d 411, 423 (5th Cir. 1992); *accord Wiley v. Puckett,* 969 F.2d 86, 102 (5th Cir.1992). In such cases, courts "ordinarily need to hear from counsel whether there was a legitimate trial strategy for a certain act or omission. Frequently, we can conceive potential reasonable trial strategies that counsel could have been pursuing. When that is the case, we simply cannot conclude that counsel has performed deficiently." *Andrews v. State,* 159 S.W.3d 98, 103 (Tex. Crim. App. 2005). The exception to this is where the prosecutor's argument misstates the law in a materially prejudicial way. *See id.* (noting "the extremely unusual circumstances" of that case that allow the record to overcome the presumption of reasonable trial strategy).

Murphy does not assert that the prosecutors misstated the law but complains that the prosecutors made derogatory references to him during their punishment phase summations, calling him an evil man that lacked humanity. *See* Dkt. No. 18 at 70-71; Dkt. No. 105 at 14-15. For this type of argument, a decision to not object is presumed to be reasonable trial strategy. "[C]ounsel may have believed that it was sound trial strategy not to object and bring the [allegedly] improper argument to the jury's attention." *Jett v. Bell,* No. 2:06-cv-13938, 2008 WL 1837268, at *8 (E.D. Mich. Apr. 23, 2008). "[C]ounsel may have had strategic reasons for waiting until [their own] closing argument to address the jury" about those matters. *Martin v. Thaler,* No. 4:10-cv-50-A, 2010 WL 2697155, at *8 (N.D. Tex. July 7, 2010).

Again, Murphy's counsel abandoned his opportunity to challenge counsel's strategy when he asked no questions about these decisions.

### 3.   Jury Selection

In another subpart to his third claim, Murphy argues that his counsel was ineffective for failing to object to the prosecutor's improper questions during jury selection. *See* Dkt. No. 18 at 77-91; Dkt. No. 105 at 16-18. Specifically, Murphy complains about the prosecutor's use of two categories of questions.

> In the first, the prosecutors questioned jurors using a hypothetical that involved three bank robbers, one of whom served as the lookout and getaway car driver. In many instances, the prosecutors added the detail that the lookout/getaway car driver either knew that his accomplices entered the bank with guns or possessed a gun himself. In the second, the prosecutors asked open-ended questions designed to have the jurors set the hypothetical parameters of their decision-making on the second special issue.

Dkt. No. 18 at 79. Murphy argued that the prosecutor's improperly sought to commit the prospective jurors to certain answers to the punishment special issues and noted the objections made by trial counsel to the use of hypotheticals which were overruled. *See* Dkt. No. 18 at 85-87.

Respondent contends that the questions were not improper commitment questions but were proper hypothetical questions that were asked to explain the application of the law of parties, to discover the juror's views and to determine whether the prospective juror would be subject to a challenge for cause. *See* Dkt. No. 40 at 94-95, 99-101.

When and whether to object to the prosecutor's questioning during voir dire is, again, a matter of trial strategy that is presumed to be reasonable. *See Teague v. Scott,* 60 F.3d 1167, 1172 (5th Cir. 1995) ("The attorney's actions during voir dire are considered to be a matter of trial strategy."). This Court "must be highly deferential of counsel's conduct and maintain a strong presumption that counsel's trial strategy fell within the wide range of reasonable professional assistance." *Pape v. Thaler,* 645 F.3d 281, 291 (5th Cir. 2011).

The determination of whether the questions were improper commitment questions or proper hypothetical questions appears to be a close one. Each party points to portions of the record that support their arguments on the issue, and trial counsel made objections to these questions during jury selection that received varying rulings by the trial court. Whether the trial court would have sustained additional or different questions is not clear, and the undersigned would defer to trial counsel's decisions

unless they were clearly shown to be the product of an unreasonable trial strategy.

Again, Murphy asked no questions of trial counsel at the hearing conducted in this case regarding the reasons for their decisions to object or not object to specific questions during the jury voir dire. By failing to avail himself of the opportunity to question trial counsel under oath regarding these matters, Murphy has abandoned his opportunity to overcome the presumption that counsel made reasonable strategic decisions at the time. Murphy has not overcome the presumption that trial counsel exercised reasonable professional judgment during jury selection.

Regarding each of Murphy's complaints that require this Court to give deference to the professional judgment of trial counsel and about which Murphy has abandoned his opportunity to examine trial counsel, the undersigned cannot conclude that counsel's trial strategy was anything other than a reasonable one. Therefore, these claims are not shown to have any merit and are not substantial under *Martinez*. Accordingly, these claims should be dismissed as procedurally barred and, in the alternative, denied for lack of merit.

      b.   <u>Examined Claims</u>

      1.   <u>S. O. Woods</u>

Murphy also complains that his trial counsel rendered deficient performance by eliciting highly damaging testimony from the defense's own witness about Murphy's future dangerousness. *See* Dkt. No. 18 at 53-55; Dkt. No. 105 at 13-14. Respondent argues that trial counsel engaged in a reasonable strategic decision to call the expert and did not elicit the complained-of testimony, which was a concession extracted by the

prosecutor during cross-examination. *See* Dkt. No. 40 at 67-69.

Trial counsel sought to show that, within the prison system, Murphy would not be a future danger. This was particularly challenging because Murphy was one of seven inmates who overcame prison guards and escaped from a high-security prison facility. Lead counsel Brook Busbee observed that "it's difficult to make a case for won't be a future danger when they escape from prison and a police officer has died, obviously." Dkt. No. 100 at 59.

To make this showing, trial counsel contacted S. O. Woods, former classification head for the prison system, the Institutional Division of the Texas Department of Criminal Justice. *See* Dkt. No. 100 at 24. Busbee explained that she contacted

> Mr. Woods, who had just retired from [Texas Department of Criminal Justice ("TDC")] not too long before this trial and was a nationally respected expert on classifications and safety in prisons. And so we thought that would be a really great thing to hang our hat on, that he did not feel he would be a danger in the prison.

Dkt. No. 100 at 35. Dr. Mark Vigen also reported to Busbee "that S. O. Woods could say that Patrick Murphy would not be a danger in TDC. And I thought that would be very valuable, because he's – he's a warden, so to speak, in TDC, and he was the one who designed the classification system." *Id.* at 61. Woods designed the classification system "[t]o say who's dangerous and who's not, it's very – it's believed to be very predictive. And so I felt that, you know, here's the guy that makes those decisions at TDC, and he says he doesn't think he will be a danger in TDC." *Id.* at 63.

Woods reviewed the available information and indicated to Busbee that he thought Murphy was not a dangerous person in the prison system. *See id.* at 30. Woods

also would be able to explain to the jury how Murphy would be classified within the prison system and the security measures that would be imposed on him. During the cross-examination at trial, however, the prosecutor got Woods to admit that Murphy was "a very dangerous inmate." 47 RR at 173.

Murphy relies on *Combs v. Coyle,* 205 F.3d 269, 287-88 (6th Cir. 2000), in which the United States Court of Appeals for the Sixth Circuit found counsel failed to question an expert regarding his opinions before calling the expert as a witness at trial. Busbee testified that she had consulted with Woods several times before the trial and believed that he would testify that Murphy would not be a danger in prison. *See* Dkt. No. 100 at 29-30, 53, 60, 63. Specifically, Murphy's counsel questioned lead counsel Busbee as follows:

> Q.   Do you recall what Mr. Woods' testimony actually was in Mr. Murphy's trial?
>
> A.   Well, I remember – I remember the bad moment when on cross-examination he admitted that – or said – made a statement that he was a very dangerous man, but up until that time he had said what I had anticipated that he would say, which was that within the prison system Mr. Murphy was not a dangerous person.
>
> Q.   So that during your interviews with him, prior to calling him as a witness, did he tell you privately something that he then contradicted as a witness?
>
> A.   Yes.

Dkt. No. 100 at 30-31.

The undersigned finds that trial counsel was not deficient in calling Woods to testify. Trial counsel developed a reasonable strategy to show the jury that Murphy

would not be a future danger in prison and reasonably believed that Woods would testify in accordance with what he told trial counsel before he was called at trial. Busbee was surprised by Woods' testimony on cross-examination when the prosecutor got him to agree that Murphy was dangerous, testifying differently than he told her in private. *See id.*

Further, Murphy has not established the prejudice prong of *Strickland*. Interrogating Woods from the records, the prosecutor drew out progressively more damaging information from Murphy's own admissions and the facts of his case that appear to have been as prejudicial to Murphy as the conclusion at the end that is the subject of Murphy's complaint.

> Q.   How many arrests does Mr. Murphy admit to there?
>
> A.   He admitted having 15 prior arrests.
>
> Q.   And how about punishment as a juvenile offender?
>
> A.   This indicates that he had a one-year juvenile probation in Dallas for unauthorized use of a motor vehicle and three commitments to the juvenile detention center here in the Dallas area for unauthorized use of a motor vehicle, runaway from home, and shoplifting.
>
> Q.   All right. Did it also indicate in here – when someone comes into TDC, do they ask the inmate about their particular crime they have been sent there for?
>
> A.   Yes, sir.
>
> Q.   And do they ask them if they committed the crime?
>
> A.   Yes, sir, we do.

Q.  What was Mr. Murphy's response in that particular case for the aggravated sexual assault?

A.  Let's see. The current offense of aggravated sexual assault with a deadly weapon involves the subject allegedly forcing his way into the apartment of a 23-year-old white female, holding a knife at the victim's throat, tying her hands with a towel, blindfolding her, and forcing her to participate in one act of oral sodomy as active partner and participate in sexual intercourse. And then he had a disclaimer saying that he claims no knowledge of the offense.

Q.  Patrick Murphy, obviously, has proven that he's dangerous in the free world by the types of offenses he's been committing back in 1984, as well as what occurred in 2000?

A.  I agree.

Q.  He's also proven now that he's dangerous in the world of the prison unit by this escape, has he not?

A.  I agree.

Q.  The escape he participated in was a very violent escape in your opinion?

A.  It was, yes.

Q.  The hostages' lives were threatened and they were beaten?

A.  They were, yes, sir.

Q.  And you believe that their lives were in danger, do you not?

A.  Definitely.

Q.  And, in fact, most inmates well, some may think about escaping, but very few actually make the attempt, do they not?

A.  I believe that's a true statement.

Q.  Mr. Murphy has proven that he's able to work with other inmates on an escape plan and successfully complete that plan?

A.   That's true.

Q.   In fact, is this the largest escape, successful escape, you have had from the penitentiary?

A.   In my career it is, yes, 30 something years.

Q.   The system, you obviously take a lot of precautions, but it's run by humans, so it's subject to human error?

A.   That's true.

Q.   When people make mistakes, then people like Patrick Murphy exploit those opportunities?

A.   Yes, sir.

Q.   And that's when people get hurt?

A.   That's when people get hurt, yes, sir.

Q.   And in your opinion, sir, is Patrick Murphy a very dangerous inmate?

A.   I believe he would be so, yes.

47 RR at 170-173.

While this final admission is damaging, it is not clear that the conclusion is materially more damaging that the underlying facts that led to that conclusion. Nor is it clear that there is a reasonable probability that this conclusion changed the outcome. Instead, this appears to be a case showing how particularly damaging facts can be used by a skilled prosecutor in examining a defense expert rather than any deficiency by trial counsel in her selection of experts.

The undersigned finds that Murphy has not shown trial counsel to have been deficient in calling Woods or in questioning her expert prior to trial but that, even if

she was, Murphy has not shown that "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

Accordingly, Murphy has not satisfied either prong of the *Strickland* test regarding this claim. Therefore, this claim should be dismissed as procedurally barred and, in the alternative, denied for lack of merit.

### 2.    Mitigation Investigation

Murphy claims that trial counsel did not conduct an adequate sentencing investigation. *See* Dkt. No. 18 at 55-70; Dkt. No. 105 at 7-13. Specifically, Murphy complains that trial counsel failed to retain a mitigation specialist in a timely manner and conduct a competent mitigation investigation that would have discovered Murphy's post-traumatic stress disorder. *See* Dkt. No. 18 at 61-70; Dkt. No. 105 at 10-13.

Respondent argues that Murphy does not identify any adverse impact resulting from the delay in obtaining a mitigation investigator and that trial counsel conducted an adequate investigation resulting in a significant mitigation presentation at trial. *See* Dkt. No. 40 at 70-82; Dkt. No. 107 at 8-13. Respondent also questions the validity of Murphy's evidence of post-traumatic stress disorder and its significance in this case. *See* Dkt. No. 82-85; Dkt. No. 107 at 9-11.

### A.    Law

As set out above, Murphy must show that a substantial ineffective assistance of trial counsel claim was not presented to the state court because of the ineffective assistance of state habeas counsel under the *Strickland* standard in order to come

within the exception to procedural bar set out in *Martinez* and *Trevino.* In the context

of capital sentencing, this standard requires that trial counsel conduct a reasonable

investigation into potentially mitigating evidence that might warrant a life sentence

rather than a sentence of death. As repeatedly stated by the Supreme Court,

> "[S]trategic choices made after thorough investigation of law and facts
> relevant to plausible options are virtually unchallengeable; and strategic
> choices made after less than complete investigation are reasonable
> precisely to the extent that reasonable professional judgments support
> the limitations on investigation. In other words, counsel has a duty to
> make reasonable investigations or to make a reasonable decision that
> makes particular investigations unnecessary. In any ineffectiveness case,
> a particular decision not to investigate must be directly assessed for
> reasonableness in all the circumstances, applying a heavy measure of
> deference to counsel's judgments."

*Wiggins v. Smith,* 539 U.S. 510, 521-22 (2003) (quoting *Strickland,* 466 U.S. at 690-91).

In *Wiggins,* the Supreme Court held that its "principal concern" in deciding whether

trial counsel exercised reasonable professional judgment was not whether counsel

should have presented a mitigation case. *Id.* at 522-23.

> Rather, we focus on whether the investigation supporting counsel's
> decision not to introduce mitigating evidence of *Wiggins*' background was
> itself reasonable. In assessing counsel's investigation, we must conduct
> an objective review of their performance, measured for reasonableness
> under prevailing professional norms, which includes a context-dependent
> consideration of the challenged conduct as seen from counsel's perspective
> at the time.

*Id.* at 523 (internal quotation marks and citations omitted).

In addition to proving that trial counsel was deficient in failing to conduct a

sufficient investigation, a capital habeas petitioner must also show prejudice in that

"there is a reasonable probability that, absent the errors, the sentencer ... would have

41

concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695.

## B.   Analysis

The parties sharply disagree about the extent and timing of trial counsel's investigation. Murphy contends that trial counsel did not begin their mitigation investigation until 31 months after lead counsel was appointed because that is when the defense mitigation specialist was obtained. *See* Dkt. No. 105 at 8. Respondent points to lead counsel's testimony that the mitigation investigation began long before then, more than a year before trial. *See* Dkt. No. 107 at 8-9.

It appears that the mitigation investigation did begin earlier by a trial counsel with experience in death penalty litigation who quickly obtained the assistance of a fact investigator. The state court appointed lead and co-counsel to represent Murphy, and both counsel have both been determined qualified to be appointed as lead counsel in the defense of death penalty cases. *See* Dkt. No. 100 at 7-8. Busbee, lead counsel, was first appointed before Murphy was extradited from Colorado, where members of the Texas Seven had been arrested. *See id.* at 6. She is a board certified attorney who began in 1979 as a felony prosecutor in Travis County and eventually became the chief prosecutor for the 147th District Court. *See id.* at 9, 43. By the end of 1981, she had returned to Dallas County where she maintained a private practice in criminal defense work. *See id.* at 43. She has tried six capital murder trials, two of them prior to Murphy's trial. Busbee selected co-counsel Juan Sanchez who was later appointed as lead counsel in a capital murder defense of another death penalty case. Sanchez

selected Busbee as his co-counsel in that other case. *See id.* at 7. Busbee is also a part-time law professor at the criminal defense clinic of the SMU law school. *See id.* at 5.

Busbee testified that, in a capital case, one of the first things she does is hire an investigator. *See id.* at 48. In Murphy's case, she immediately obtained the assistance of investigator Bill Van Sickel, who helped with the punishment phase investigation. *See id.* at 24-25, 51. Busbee explained that her purpose from the time she was appointed was to save Murphy's life. *See id.* at 16. In conducting a mitigation investigation, she seeks "to be able to present a sympathetic, if there is one, view of the defendant's past and maybe – obviously to educate the jury as to whether or not the person would be a future danger, if that's possible." *Id.* at 16.

Busbee also testified that *Wiggins v. Smith,* 539 U.S. 510 (2003), was decided in the course of the trials of the Texas Seven. She explained that "it was believed at that time by capital trial counsel that we needed a psychologist to organize that, and so everybody got a psychologist to help us organize that." Dkt. No. 100 at 17. Busbee did not hire anyone from a mere solicitation but called people who she thought would do well and, in doing so, learned that they had either already been consulted or actively participated in one of the other Texas Seven trials. *See id.* at 18. She was eventually referred by Dr. Mark Cunningham to Dr. Mark Vigen. She liked his curriculum vitae and thought he would have a lot of influence with the jury. *See id.*

Busbee also explained that Dallas County judges would generally have been reticent about paying for a separate mitigation expert at that time. *See* Dkt. No. 100 at 17. But she noted that the trial judge in this case expressed a willingness to do so

following the Supreme Court's opinion in *Wiggins*. *See id.* at 50. That is when she started looking for an expert to organize and present the mitigation evidence that they had been gathering. *See id.* at 17, 50. After Dr. Vigen joined the defense team, he wanted to re-interview all of the witnesses and did so. *See id.* at 52.

Following the evidentiary hearing, Murphy produced exhibits purporting to show that Busbee was contacted by an attorney and mitigation investigator offering assistance. *See* Dkt. No. 105-1, 105-2, 105-3, 105-4, 105-5, & 105-6. Murphy also produced two other exhibits purporting to be from mitigation investigators that would have been available to assist but were not claimed to be in contact with Busbee. *See* Dkt. No. 105-7 & 105-8.

Respondent has objected to the consideration of these exhibits, which were not disclosed earlier and not provided to Busbee during the hearing. *See* Dkt. No. 108 at 2-3. Busbee was not examined on these documents or given any opportunity to respond despite the clear opportunity afforded by this Court at the hearing. In fact, Busbee testified that she had received letters and brochures from people claiming to be mitigation investigators, which she did not find convincing. *See* Dkt. No. 100 at 69-70.

Therefore, the existence of such solicitations was already acknowledged at the hearing. Beyond that, Murphy has waived his opportunity to examine Busbee regarding these documents, and they will not now be considered to impeach her testimony.

The undersigned finds that lead trial counsel and co-counsel timely began the mitigation investigation with the assistance of a fact investigator, a prison expert, an

advising appellate counsel, and four mental health experts prior to trial. Dr. Jay Crowder, a physician at UT Southwestern, did medical imaging tests to examine for organic brain damage. *See id.* at 25, 47, 56. Dr. Crowder recommended Dr. Laura Lacritz, a psychologist and the associate director of the Department of Neuropsychology at Southwestern Medical School at the time, who conducted neurological testing and evaluation of Murphy. *See id.* at 25, 33, 56. Dr. Lisa Clayton, a forensic psychiatrist, also evaluated Murphy and provided a report. *See id.* at 25, 26, 33, 56. Dr. Mark Vigen, a forensic psychologist, reviewed records, spoke with other doctors, evaluated Murphy, conducted extensive interviews with Murphy's family members, constructed a time-line for Murphy's history and testified regarding mitigation and future dangerousness. *See id.* at 15-16, 18, 23, 26, 29, 32, 52, 57. Before trial, Dr. Vigen informed counsel that Murphy had a sexual disorder, narcissistic borderline and antisocial traits, was more a follower than a leader, had a very low risk of future violence and had a potential for rehabilitation. *See id.* at 38-39. Trial counsel also obtained a psychological evaluation of Murphy from the prison through S. O. Woods that the prosecution did not have. *See id.* at 33.

Trial counsel's strategy was to present Murphy as an ineffective criminal that was a follower and did not participate in the violence of the other Texas Seven after their escape, to show that Murphy had a terrible childhood that led to the bad decisions he had made, and to make Murphy sympathetic to the jury and "to distance him from the really bad criminals that he escaped with." *Id.* at 59. At trial, counsel followed this strategy.

The defense's punishment case showed Murphy's tragic childhood marked by poverty, neglect, abuse, and developmental deficiencies and showed that his participation in the offense was less than the other of the Texas Seven. At the punishment stage of trial, counsel presented evidence that Murphy's early life was in the housing projects in West Dallas. His mother, frequently on drugs and/or alcohol, neglected and abandoned Murphy and divorced his father, who left Murphy filthy and scarred by cigarette burns and a diaper that was pinned through Murphy's skin. *See* 47 RR at 73-79, 93. His mother would run off with different men, was physically and sexually abused by them, and inflicted physical abuse on Murphy. *See id.* at 86. After one sexual assault that resulted in her hospitalization, Murphy's mother changed, taking large doses of tranquilizers and having extreme fits. *See id.* at 87. She would discipline her children by yelling at them, slapping their face, and pulling their hair. *See id.* at 87. Murphy eventually began stealing and running away from home. *See id.* at 99. After one episode, he was found filthy, with ringworms all over his head and sores all over his body that "looked like infected mosquito bites or ticks or something that somebody had pulled off of him and they had gotten infected." 48 RR at 105-106.

Murphy's mother's alcoholism and drug abuse worsened, and she struck one of her children in the head with a hammer, resulting in the child's hospitalization. *See* 47 RR at 103-104. Murphy and his brother ended up in jail, and Murphy later was imprisoned for aggravated sexual assault. *See id.* at 105-107.

In the 16 years that Murphy was confined in prison before this incident, he had a half dozen minor disciplinary violations, such as possession of a radio speaker and

extension cord. *See id.* at 149-51. He was also charged with three major incidents: possession of tobacco, possession of a pen with a paper clip in it, and the escape immediately preceding this incident. *See id.* at 149-52. There was no evidence of gang membership or other violent conduct in prison. *See id.* at 152-53. During the escape, Murphy and all of the other Texas Seven were on minimum security. *See id.* at 154. At the time of the escape, Murphy was only months away from his mandatory release date. *See id.* at 142-43. Due to his escape, he forfeited all of his good time credit, "something like 11,000 days." *Id.* at 144. Upon any readmission to prison, he would be a maximum-security prisoner, meaning that he would be locked in a single cell alone for 23 out of 24 hours every day. *See id.* at 145-46.

Dr. Vigen explained that Murphy has a diagnosis of sexual disorder on Axis I and has narcissistic borderline and antisocial traits on Axis II that did not rise to the level of a disorder. *See id.* at 148, 150. Murphy's sexual disorder and these personality traits are the "result of a long and severe developmental history of family dysfunction." 48 RR at 157. Dr. Vigen explained how childhood abuse could cause trauma and lead to the sexual disorder. *See id.* at 158-59. Dr. Vigen then related that Murphy had a history of being sexually abused, of being with a very unstable mother, and of being shipped off and raised by other people, including his aunt, of early school failure and running away from a lot of family dysfunction. *See id.* at 159-60. Dr. Vigen recounted Murphy's tragic childhood and how he was "a very undeveloped, uncared for child, a very neglected child." *Id.* at 160-61. This abuse was an attack on his personality which produced emptiness from a lack of validation from adults and, combined with his

47

running away, his multiple schools and truancy, marked a teenager who had not taken on any values from home or school and lacked any real sense of self. *See id.* at 161-62.

Dr. Vigen also concluded that Murphy was more a follower than a leader in the escape of the Texas Seven and the murder of Officer Hawkins. *See id.* at 162-63. (Murphy's counsel also called George Rivas, the leader of the Texas Seven, to establish Murphy's minimal participation in the offense. *See id.* at 4-99.) Dr. Vigen also testified that Murphy would be a very low risk of future violence in the penitentiary, *see id.* at 164, and that he "has additional potential for rehabilitation and possible personal and spiritual conversion," *id.* at 164-65. Dr. Vigen shared studies suggesting that Murphy's antisocial personality traits would diminish over time in the prison. *See id.* at 165-67. Dr. Vigen concluded that Murphy is "institutionalized" and does well in the penitentiary system. *Id.* at 167.

As noted above, the undersigned finds that trial counsel timely obtained investigative assistance and conducted a thorough mitigation investigation. But, even if Murphy's complaint were true, the failure to line up a mitigation investigator earlier would make little difference if no effective mitigating evidence was missed. Since the primary concern in *Wiggins* was not whether counsel should have presented a mitigation case, but whether the investigation supporting counsel's strategic decision was sufficient, the real issue in this claim is whether an adequate mitigation investigation was done with respect to the specific evidence that is claimed to have been missed.

In this case, the specific evidence that Murphy claimed was missed is that he

48

suffered from post-traumatic stress disorder ("PTSD"). Respondent contends that this diagnosis is inaccurate and that there is no credible evidence that Murphy suffers from PTSD. *See* Dkt. No. 107 at 10.

It is not necessary to resolve this disagreement between experts, however, to find that trial counsel reasonably relied on the expert assistance that was obtained. "An expert's failure to diagnose a mental condition does not constitute ineffective assistance of ***counsel***, and [a petitioner] has no constitutional guarantee of effective assistance of experts." *Earp v. Cullen,* 623 F.3d 1065, 1077 (9th Cir.2010) (emphasis in original). Counsel should normally be entitled to rely on the opinions of her or his own mental health experts in deciding what defensive theories to pursue. *See, e.g.*, *Turner v. Epps,* 412 F. App'x 696, 702 (5th Cir. 2011) ("Counsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses without worrying that a reviewing court will substitute its own judgment ... and rule that his performance was substandard for doing so.") (quoting *Smith v. Cockrell,* 311 F.3d 661, 676-77 (5th Cir. 2002), *overruled in part on other grounds, Tennard v. Dretke,* 542 U.S. 274 (2004)); *Wilson v. Sirmons,* 536 F.3d 1064, 1089 (10th Cir. 2008) (noting that, to a degree, counsel should be able to rely on an expert to determine what evidence is necessary to an effective evaluation, and what additional evidence the expert needs to complete testing); *Hendricks v. Calderon,* 70 F.3d 1032, 1038 (9th Cir. 1995) ("In general, an attorney is entitled to rely on the opinions of mental health experts in deciding whether to pursue an insanity or diminished capacity defense."). The nature of expert assistance would not be served by imposing on counsel a duty to

"already be possessed of the skill and knowledge of the expert." *Hendricks,* 70 F.3d at 1038-39.

In this case, Murphy's trial counsel obtained the assistance of four competent mental health experts, none of whom diagnosed Murphy with PTSD. Trial counsel testified during the evidentiary hearing on this point:

> Q.   With respect to the mitigation question, would there have been any reason for you not to have included the fact that Mr. Murphy suffers from PTSD as part of that narrative?
>
> A.   Well, I did not have that diagnosis. It was never suggested to me by anybody that looked at him.
>
>   Now, I know that the criteria for PTSD has changed from the DSM-IV to the DSM-V, so I don't -- you would have to ask [the defense experts for trial] why they did not diagnose him with that. That may be one of the issues. I noticed that this was -- that this diagnosis was made under the new criteria, so I don't -- I am a layperson when it comes to this. I do not know why they did not diagnose him with PTSD and [the federal habeas expert] did.

Dkt. No. 100 at 35-36. This also reflects that counsel did not consider herself an expert on these mental health issues but relied on her trial experts, who did not provide that diagnosis.

Further, the reasonableness of counsel's trial strategy does not appear to be an issue. Counsel testified that she would have used the diagnosis if it had been made. It would have "dovetailed perfectly" with her mitigation trial strategy, but she simply did not have the evidence to present. *Id.* at 36.

Murphy speculates that the testifying mental health expert at trial would have found PTSD if provided evidence of trauma sufficiently prior to trial but does not show

that any of this information was not already available to and considered by Dr. Vigen or any of the other defense mental health experts obtained prior to trial or that any of the information that Murphy subsequently found would have changed any of the opinions held by any of those experts. *See* Dkt. No. 105 at 19. In fact, trial counsel testified that the same information was considered by Dr. Vigen, who did not come to the same conclusion. *See* Dkt. No 100 at 32.

And, while Murphy claims that trial counsel could have obtained a different expert who would have provided that opinion, he has not identified any expert who was actually available to trial counsel before trial that would have provided that testimony.

Murphy produces the report of Dr. Matthew Fabian of Cleveland, Ohio, in support of his claim, *see* Dkt. No. 84-1, but does not show that Dr. Fabian was available to Murphy at the time of his trial and would have provided such opinion testimony. Murphy has not identified any expert who was actually available to trial counsel who would have testified to such an opinion at the time of Murphy's trial.

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain. *See Alexander v. McCotter,* 775 F.2d 595, 602 (5th Cir. 1985). For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by "nam[ing] the witness, demonstrat[ing] that the witness was available to testify and would have done so, set[ting] out the content of the witness's proposed testimony, and show[ing] that the testimony would have been favorable to a particular defense." *Day v. Quarterman,* 566 F.3d 527, 538 (5th Cir. 2009). This requirement applies to both uncalled lay and expert witnesses. *Id.*

*Woodfox,* 609 F.3d at 808. Murphy has not made this showing.

Finally, to show prejudice in the context of a capital sentencing proceeding, "the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695. The state presented a considerable case in aggravation, and Murphy's counsel placed significant mitigating evidence before the jury. Murphy was convicted and sentenced to death for the murder of a police officer during a robbery of a sporting goods store for weapons following his escape from the Texas prison with six other inmates. The evidence at trial showed that he had a long history of juvenile and adult offenses, including aggravated sexual assault with a deadly weapon. Murphy also sexually molested his step-sister, pulled a loaded shotgun on his father, and went AWOL from the army.

Murphy's trial counsel put on a substantial mitigation case that focused on his tragic childhood of abuse and neglect that resulted in a lack of development and mental dysfunction that contributed to the offense, and his mitigation expert at trial testified that he had a low risk of violence in prison and had a possibility of rehabilitation.

Murphy has not proven that the addition of a PTSD diagnosis, even if available at the time of trial, would likely have shown that the balance of aggravating and mitigating circumstances did not warrant death. Murphy therefore has not shown either prong of *Strickland* regarding trial counsel's effectiveness. At most, he has shown a disagreement between experts that cannot itself prove that trial counsel was ineffective.

Murphy, accordingly, has not shown any merit to this claim and has not

presented a substantial claim that trial counsel was ineffective under *Martinez*. Further, state habeas counsel could not be found ineffective in failing to present a meritless claim. *See Garza*, 738 F.3d at 676 (agreeing with the district court that "habeas counsel was not ineffective in failing to raise [a] claim at the first state proceeding" because "there was no merit to [the petitioner's] claim"); *Beatty,* 759 F.3d at 466).

Murphy has not shown that this claim comes within the exception to procedural bar created in *Martinez* and *Trevino*. Accordingly, it should be dismissed as procedurally barred, and in the alternative, denied for lack of merit.

c.      Cumulative Claim

In the last subpart of his third claim, Murphy asserts that the Court should find the cumulative ineffective assistance of trial counsel in the punishment stage based on all of the claims asserted against trial counsel. *See* Dkt. No. 18 at 91-96; Dkt. No. 105 at 18-21. He argues that "the aggregate effect of these errors so infected Mr. Murphy's trial as a whole that it was rendered fundamentally unfair." Dkt. No. 18 at 91; *see also* Dkt. No. 105 at 18 (same).

Murphy relies on *United States v. Hall,* 455 F.3d 508, 520 (5th Cir. 2006), which held that "ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions." *See also Miller,* 200 F.3d at 286 n.6 ("Miller has not demonstrated error by trial counsel; thus, by definition, Miller has not demonstrated that cumulative error of counsel deprived him of a fair trial"). "Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total

number raised." *Westley v. Johnson,* 83 F.3d 714, 726 (5th Cir. 1996).

Because none of Murphy's individual claims of ineffective assistance of trial counsel are shown to have any merit, there is nothing to cumulate and this claim also lacks merit.

Therefore, this claim should also be dismissed as procedurally barred and, in the alternative, denied for lack of merit.

      d.    <u>Appellate Counsel</u>

In his fourth claim, Murphy argues that his counsel on direct appeal provided ineffective assistance by not raising all of the other claims asserted in his petition. *See* Dkt. No. 18 at 96-97; Dkt. No. 105 at 28-30. Murphy acknowledges that this claim was not presented to the state court and argues that it comes within the exception to procedural bar set out in *Martinez* and *Trevino. See* Dkt. No. 105 at 29-30.

That exception, however, does not apply to claims of ineffective assistance of appellate counsel. *See Reed v. Stephens,* 739 F.3d 753, 778 n.16 (5th Cir.), *cert. denied,* 135 S. Ct. 435 (2014).

But even if it did, appellate counsel could not be found ineffective for failing to raise meritless claims. *See Williams v. Collins,* 16 F.3d 626, 635 (5th Cir. 1994); *Cantu v. Collins,* 967 F.2d 1006, 1017 (5th Cir. 1992).

Accordingly, this claim should be dismissed as procedurally barred and, in the alternative, denied for lack of merit.

**Recommendation**

Murphy's petition for a writ of habeas corpus should be denied.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

SO ORDERED.

DATED: November 29, 2016

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE