VOL **2** OF **11**

No. <u>74851</u>

# PATRICK HENRY MURPHY, JR.
APPELLANT

## CAPITAL MURDER
OFFENSE

## DEATH
PUNISHMENT

## DALLAS
COUNTY

CONTENTS: RR VOLS. 1 - 9

74851

1                      REPORTER'S RECORD

2                  VOLUME 1 OF 61 VOLUMES

3             TRIAL COURT CAUSE NO. F01-00328-T

4   STATE OF TEXAS           *        IN THE DISTRICT COURT

5   VS.                    *        DALLAS COUNTY, TEXAS

6   PATRICK HENRY MURPHY, JR.    *        283RD DISTRICT COURT

7

8

9

10                \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

11                   MASTER INDEX

12                \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FILED IN**
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

13

14

15      On the 10th day of November, 2003, the following

16   proceedings came on to be heard in the above-entitled and

17   numbered cause before the Honorable Vickers L. Cunningham,

18   Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

19      Proceedings reported by machine shorthand.

20

21

22

23                             ORIGINAL

24

25

A P P E A R A N C E S

<u>APPEARING FOR THE STATE</u>

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


<u>APPEARING FOR THE DEFENDANT</u>

Ms. Brook Busbee
Attorney at Law
SBOT:  03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT:  00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

CHRONOLOGICAL INDEX

|  | PAGE | VOL. |
|---|---|---|
| Master Index | | 1 |
| Pretrial Hearing | | 2 |
| Pretrial Hearing | | 3 |
| Pretrial Hearing | | 4 |
| General Panel Questionnaires | | 5 |
| General Panel Questionnaires | | 6 |

Individual Voir Dire:

| PROSPECTIVE JUROR | CRT | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Christopher O'Neal | 5 | 7 | | 7 |
| Carole Lawson | 8 | 10 | 33 | 7 |
| David Shannon | 56 | 58 | 88 | 7 |
| Barbara Holcombe | 97 | 99 | 132 | 7 |
| Eugene Peterson | 138 | 140 | | 7 |
| Jill Ann Ervin | 153 | 155 | | 7 |
| Georgia Portillo | 4 | 5 | | 8 |
| Mary Sullivan | 25 | 27 | | 8 |
| Jamie Garber | 34 | 35 | 65 | 8 |
| Brad Richards | 74 | 75 | 101 | 8 |
| Glenn Hamman | 117 | 119 | 151 | 8 |
| Phillip Emery | 4 | 6 | 42 | 9 |
| Erica Hefner | 64 | 66 | | 9 |
| Marty Ingle | 76 | 80 | 114 | 9 |
| Frankie Freeland | 124 | 126 | | 9 |

| | | | | |
|---|---|---|---|---|
| 1 | Susanne Krupihnski | 136 | 138 | | 9 |
| 2 | Dona Garrett | 147 | 148 | | 9 |
| 3 | Rebecca Garza-Salas | 4 | 6 | | 10 |
| 4 | Wendee Leigh Stringer | 25 | 28 | 52 | 10 |
| 5 | Yvette Morton | 57 | 59 | | 10 |
| 6 | Brenda Echols | 73 | 74 | | 10 |
| 7 | Keith Pelusi | 4 | 5 | 21 | 11 |
| 8 | Donna-Marie Sexton | 22 | 23 | 45 | 11 |
| 9 | Deborah Pruett | 46 | 48 | 77 | 11 |
| 10 | Frank Arena | 82 | 83 | 104 | 11 |
| 11 | Christine Stucker | 107 | 108 | 134 | 11 |
| 12 | Everett Hulsey | 4 | 5 | 37 | 12 |
| 13 | Raymond Capetillo | 45 | 47 | | 12 |
| 14 | Margaret Rehwinkel | 54 | 57 | 88 | 12 |
| 15 | Kathryn Ryan | 108 | 109 | | 12 |
| 16 | Alicia Curtis | 112 | 114 | 145 | 12 |
| 17 | Linda Patterson | 150 | 152 | | 12 |
| 18 | Michael Collins | 4 | 5 | 35 | 13 |
| 19 | Clarence Davis | 42 | 43 | | 13 |
| 20 | Christopher Thompson | 46 | 49 | 71 | 13 |
| 21 | Antwanette Coleman | 75 | 77 | | 13 |
| 22 | Wayland Taylor | 85 | 88 | | 13 |
| 23 | James Nelson | 99 | 101 | 133 | 13 |
| 24 | Lisa Crawford | 4 | 6 | 35 | 14 |
| 25 | Don Jones | 48 | 49 | 75 | 14 |

| | | | | |
|---|---|---|---|---|
| 1 | Roy Davis | 95 | 96 | | 14 |
| 2 | David Evans | 104 | 106 | 134 | 14 |
| 3 | Nancy Carney | 155 | 157 | 193 | 14 |
| 4 | Virginia Farr | 4 | 5 | | 15 |
| 5 | Margaret Johnson | 18 | 20 | | 15 |
| 6 | Timothy Yancey | 77 | 80 | | 15 |
| 7 | David Karwoski | 89 | 90 | | 15 |
| 8 | Victoria Thompson | 103 | 106 | | 15 |
| 9 | J. Robert DeRossett | 6 | 8 | 47 | 16 |
| 10 | Shirley Miller | 61 | 63 | 96 | 16 |
| 11 | Kathie Burkhalter | 98 | 102 | | 16 |
| 12 | Sylvia Weaver | 103 | 105 | | 16 |
| 13 | Julie Danka | 126 | 128 | | 16 |
| 14 | Tonya Godbehere | 4 | 5 | | 17 |
| 15 | Trae Hamilton | 16 | 17 | | 17 |
| 16 | Monica Ortega | 37 | 38 | | 17 |
| 17 | Misty Glidewell | 57 | 60 | | 17 |
| 18 | Annette Watson | 75 | 74 | | 17 |
| 19 | Ben Ortiz | 92 | 94 | 125 | 17 |
| 20 | Louise Marker | 4 | 5 | 40 | 18 |
| 21 | Kyle McCoy | 76 | 77 | | 18 |
| 22 | Tonya Davis | 85 | 87 | 123 | 18 |
| 23 | Dana Stotts | 134 | 137 | | 18 |
| 24 | Floyd Fuller | 148 | 150 | 179 | 18 |
| 25 | Douglas Kolpanen | 4 | 5 | | 19 |

| | | | | |
|---|---|---|---|---|
| 1 | Pamela Martin | 34 | 38 | | 19 |
| 2 | Ruth Culver | 54 | 56 | | 19 |
| 3 | Kevin Harper | 60 | 62 | 99 | 19 |
| 4 | Lorna Lankford | 116 | 117 | 148 | 19 |
| 5 | George Nash | 157 | 158 | | 19 |
| 6 | Ronna Braggs | 4 | 5 | 41 | 20 |
| 7 | Sandra Paredes | 45 | 47 | | 20 |
| 8 | Stephen Owens | 67 | 69 | | 20 |
| 9 | Angel Chinuntdet | 71 | 73 | 95 | 20 |
| 10 | Jeffry Wingate | 99 | 100 | 135 | 20 |
| 11 | Sharon Hudgens | 143 | 144 | 181 | 20 |
| 12 | Burley Morvant,Jr. | 4 | 5 | | 21 |
| 13 | William Hodges | 16 | 17 | | 21 |
| 14 | Flora Williams | 31 | 29 | | 21 |
| 15 | Johnny Silva | 43 | 41 | | 21 |
| 16 | Gary Danaher | 58 | 56 | | 21 |
| 17 | Susan Braley | 4 | 5 | | 22 |
| 18 | Scott Mattinely | 25 | 26 | 38 | 22 |
| 19 | Judy Liston | 48 | 45 | 89 | 22 |
| 20 | Walter Thomas | 103 | 104 | 138 | 22 |
| 21 | Bradley Versteeg | 144 | 145 | | 22 |
| 22 | Cathryn Mitchell | 4 | 5 | 43 | 23 |
| 23 | Diane Courtney | 54 | 55 | | 23 |
| 24 | Michael Smith | 92 | 93 | 122 | 23 |
| 25 | Nelda Pitts | 4 | 5 | | 24 |

| # | | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|---|
| 1 | Sandra Geeslin | 14 | 17 | | 24 |
| 2 | Gayle Melara | 19 | 20 | | 24 |
| 3 | Carol Cunningham | 29 | 31 | 69 | 24 |
| 4 | Bonny Martin | 97 | 99 | | 24 |
| 5 | Jan Anderson | 112 | 116 | | 24 |
| 6 | General Panel Questionnaires | | | | 25 |
| 7 | PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
| 8 | Grace Evans | 4 | 5 | 36 | 26 |
| 9 | Linda Rowell | 41 | 43,95 | 75,96 | 26 |
| 10 | Mark Poole | 99 | 100 | 136 | 26 |
| 11 | Hardy Walker, Jr. | 145 | 146 | 177 | 26 |
| 12 | Sandra Barron | 194 | 196 | 236 | 26 |
| 13 | Nancy Wilkey | 241 | 242,271 276 | 261,274 290 | 26 |
| 14 | Robin Sterling | 4 | | | 27 |
| 15 | Jennifer Dillon | 10 | 12 | | 27 |
| 16 | Sandra Landers | 21 | 23 | 45 | 27 |
| 17 | Dee Dee Wheeler | 47 | 48 | | 27 |
| 18 | Julia Laux | 55 | 57 | | 27 |
| 19 | General Panel Questionnaires | | | | 28 |
| 20 | Roberto Ramirez | 4 | 6 | | 29 |
| 21 | Lisa Taylor | 24 | 26 | | 29 |
| 22 | Donna Hyde | 43 | 45 | | 29 |
| 23 | Derek Lackey | 54 | 56 | | 29 |
| 24 | James Sartor | 4 | 5 | | 30 |
| 25 | Lana Marshall | 11 | 14 | | 30 |

| | | | | |
|---|---|---|---|---|
| 1 | Keith Rabuse | 19 | 21 | | 30 |
| 2 | Andrea Canady | 37 | 38 | | 30 |
| 3 | George Navarro | 44 | 47 | 81 | 30 |
| 4 | Marisela Alaniz | 87 | 89 | | 30 |
| 5 | General Panel Questionnaires | | | | 31 |
| 6 | Andrea Miller | 4 | 6 | | 32 |
| 7 | Margaret Rasmussen | 24 | 26 | | 32 |
| 8 | Lawrence Bosworth | 53 | 54 | 89 | 32 |
| 9 | James Grace | 99 | 100 | 129 | 32 |
| 10 | Lynda Abbott | 144 | 145 | 152 | 32 |
| 11 | Elvin Slette | 155 | 157 | | 32 |
| 12 | Michael Nichols | 4 | 5 | 42 | 33 |
| 13 | Micheaux Glosson | 69 | 70 | | 33 |
| 14 | Virginia Brown | 78 | 81 | | 33 |
| 15 | Scott Albright | 85 | 86 | 125 | 33 |
| 16 | Maribel Willis | 138 | 140 | 162 | 33 |
| 17 | Angela Hacker | 4 | 5 | | 34 |
| 18 | Jay Gossage | 27 | 29 | | 34 |
| 19 | Dominga Saucedo | 52 | 53 | | 34 |
| 20 | Brian Simmons | 66 | 67 | 92 | 34 |
| 21 | Roger Gordon | 96 | 98 | 120 | 34 |
| 22 | Nathaniel Williams | 5 | 6 | | 35 |
| 23 | Kenny Martin | 4 | 6 | | 35 |
| 24 | Elaine Crooks | 22 | 23 | | 35 |
| 25 | Jan Sims | 26 | 28 | 68 | 35 |

| | | | | |
|---|---|---|---|---|
| 1 | Edward Campbell | 77 | 79 | 109 | 35 |
| 2 | Deloris Ellis | 4 | 5 | | 36 |
| 3 | Timothy Becher | 9 | 10 | 49 | 36 |
| 4 | John Henderson | 65 | 66 | | 36 |
| 5 | Kathy Fitzgerald | 77 | 79 | 102 | 36 |
| 6 | Sylvester Patton | 112 | 114 | | 36 |
| 7 | Nicholas Daigle | 4 | 5 | 25 | 37 |
| 8 | Lawrence Porter | 31 | 32 | 46 | 37 |
| 9 | Elizabeth Bastardo | 49 | 50 | | 37 |

10  Juror Orientation and Pretrial                    38

| | WITNESS | STATE | DEFENSE | VD | VOL. |
|---|---|---|---|---|---|
| 11 | | | | | |
| 12 | Randall Johnson | 48,68<br>88 | 55,89 | | 38 |
| 13 | | | | | |
| 14 | Patrick Murphy | 68,87 | 75 | 82 | 38 |

15  Juror Qualification Hearing                        39

16  Jury Trial:

17  Arraignment                                    8    40

18  Opening Statement:

19       State                                     9    40

20  State's Witnesses:

| | WITNESS | DIRECT | CROSS | VOL. |
|---|---|---|---|---|
| 21 | | | | |
| 22 | Jayne Hawkins | 26,36 | 33 | 40 |
| 23 | Wes Ferris | 36,93 | 91 | 40 |
| 24 | Tim Cassout | 96 | 112 | 40 |
| 25 | Dennis Norton | 114 | 126 | 40 |

| | | | |
|---|---|---|---|
| 1 | Randall Johnson | 129 | | 40 |
| 2 | | 11 | 5 | 41 |
| 3 | Misty Simpson | 15,29 | 28 | 41 |
| 4 | Michael Simpson | 30 | 44 | 41 |
| 5 | Marquis Washington | 45,59 | 59 | 41 |
| 6 | Steven Hazard | 60,122 | 120 | 41 |
| 7 | Curtis Chism | 123 | | 41 |
| 8 | Jeffrey Barnard | 5,31 | 30 | 42 |
| 9 | Brett Mills | 32 | 46 | 42 |
| 10 | Timothy Sliter | 47 | 63 | 42 |
| 11 | David Spence | 64 | | 42 |
| 12 | James Garcia | 84 | | 42 |
| 13 | Steve Bode | 80 | 102 | 42 |
| 14 | Frank Fehn | 103 | 114 | 42 |
| 15 | Roddy Alford | 116 | | 42 |
| 16 | William Petoskey | 131 | 144 | 42 |
| 17 | James Mahoney | 145 | | 42 |
| 18 | Miles Gooderham | 188 | | 42 |
| 19 | Lannie Emanuel | 194 | 213 | 42 |
| 20 | Jim Stinson | 3,46 | 16,44 | 43 |
| 21 | Matt Harrell | 27,47 | 31,50 | 43 |
| 22 | John Ford | 52 | 66 | 43 |
| 23 | Stephen DiRito | 68 | 79 | 43 |
| 24 | Jeff Spivey | 81 | 87 | 43 |
| 25 | State Rests | | 88 | 43 |

| | | | | |
|---|---|---|---|---|
| 1 | Defense Rests | | 88 | 43 |
| 2 | All Close | | 88 | 43 |
| 3 | Jury Charge Read | | 8 | 44 |
| 4 | Final Arguments: | | | |
| 5 | Mr. Wirskye | | 8 | 44 |
| 6 | Mr. Sanchez | | 19 | 44 |
| 7 | Mr. Shook | | 31 | 44 |
| 8 | Verdict | | 41 | 44 |
| 9 | Punish Phase: | | | |
| 10 | Troy Graham | 16 | 26 | 45 |
| 11 | Holly Becka | 28,32 | 29 | 45 |
| 12 | Jeannie Grieser | 35 | | 45 |
| 13 | Donald Kearney | 72 | | 45 |
| 14 | Bill Brown | 84 | 95 | 45 |
| 15 | Timothy Sliter | 94 | | 45 |
| 16 | Patrick Moczygemba | 102 | 151 | 45 |
| 17 | Mark Burgess | 5 | 20 | 46 |
| 18 | Martin Gilley | 22 | | 46 |
| 19 | Vernon Janssen | 32 | | 46 |
| 20 | Rita Samaniego | 45,51,60 | 57    48 | 46 |
| 21 | John Kemp | 61,82 | 81,83 | 46 |
| 22 | Larry Jaramillo | 85 | | 46 |
| 23 | Kurt Bonsal | 94,99 | 98 | 46 |
| 24 | Holly Becka | 10,11 | 14 | 47 |
| 25 | Christie Wimsatt | 35 | | 47 |

| | | | |
|---|---|---|---|
| 1 | Oscar Riveria | 41 | 47 | 47 |
| 2 | Harry Sanchez | 48 | | 47 |
| 3 | John Davis | 56 | | 47 |
| 4 | Jeff Spivey | 61 | | 47 |
| 5 | State Rests | | 66 | 47 |
| 6 | Defense Witnesses: | | | |
| 7 | Linda Goodman | 70 | 110 | 47 |
| 8 | S. O. Woods | 120,175 | 156 | 47 |
| 9 | George Rivas | 6,87,95 96 | 29,90 | 48 |
| 10 11 | Patrick Murphy, Sr. | 99,121 | 114 | 48 |
| 12 | Mark Vigen | 126,136 231 | 167,232 | 48 |
| 13 14 | Defense Rests | | 7 | 49 |
| 15 | All Close | | 16 | 49 |
| 16 | Final Arguments: | | | |
| 17 |     Mr. Shook | | 17 | 49 |
| 18 |     Mr. Sanchez | | 36 | 49 |
| 19 |     Ms. Busbee | | 39 | 49 |
| 20 |     Mr. Wirskye | | 57 | 49 |
| 21 | Verdict | | 79 | 49 |
| 22 | Sentence | | 81 | 49 |
| 23 | Motion for New Trial | | | 50 |
| 24 | Reporter's Certificate | | 4 | 61 |
| 25 | | | | |
| 26 | | | | |

ALPHABETICAL PROSPECTIVE JURORS

| PROSPECTIVE JUROR | CRT | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Lynda Abbott | 144 | 145 | 152 | 32 |
| Marisela Alaniz | 87 | 89 | | 30 |
| Scott Albright | 85 | 86 | 125 | 33 |
| Jan Anderson | 112 | 116 | | 24 |
| Frank Arena | 82 | 83 | 104 | 11 |
| Sandra Barron | 194 | 196 | 236 | 26 |
| Elizabeth Bastardo | 49 | 50 | | 37 |
| Timothy Becher | 9 | 10 | 49 | 36 |
| Lawrence Bosworth | 53 | 54 | 89 | 32 |
| Ronna Braggs | 4 | 5 | 41 | 20 |
| Susan Braley | 4 | 5 | | 22 |
| Virginia Brown | 78 | 81 | | 33 |
| Kathie Burkhalter | 98 | 102 | | 16 |
| Edward Campbell | 77 | 79 | 109 | 35 |
| Andrea Canady | 37 | 38 | | 30 |
| Raymond Capetillo | 45 | 47 | | 12 |
| Nancy Carney | 155 | 157 | 193 | 14 |
| Angel Chinuntdet | 71 | 73 | 95 | 20 |
| Antwanette Coleman | 75 | 77 | | 13 |
| Michael Collins | 4 | 5 | 35 | 13 |
| Diane Courtney | 54 | 55 | | 23 |
| Lisa Crawford | 4 | 6 | 35 | 14 |

| # | Name | | | | |
|---|---|---|---|---|---|
| 1 | Elaine Crooks | 22 | 23 | | 35 |
| 2 | Ruth Culver | 54 | 56 | | 19 |
| 3 | Carol Cunningham | 29 | 31 | 69 | 24 |
| 4 | Alicia Curtis | 112 | 114 | 145 | 12 |
| 5 | Nicholas Daigle | 4 | 5 | 25 | 37 |
| 6 | Gary Danaher | 58 | 56 | | 21 |
| 7 | Julie Danka | 126 | 128 | | 16 |
| 8 | Clarence Davis | 42 | 43 | | 13 |
| 9 | Roy Davis | 95 | 96 | | 14 |
| 10 | Tonya Davis | 85 | 87 | 123 | 18 |
| 11 | J. Robert DeRossett | 6 | 8 | 47 | 16 |
| 12 | Jennifer Dillon | 10 | 12 | | 27 |
| 13 | Brenda Echols | 73 | 74 | | 10 |
| 14 | Deloris Ellis | 4 | 5 | | 36 |
| 15 | Phillip Emery | 4 | 6 | 42 | 9 |
| 16 | Jill Ann Ervin | 153 | 155 | | 7 |
| 17 | David Evans | 104 | 106 | 134 | 14 |
| 18 | Grace Evans | 4 | 5 | 36 | 26 |
| 19 | Virginia Farr | 4 | 5 | | 15 |
| 20 | Kathy Fitzgerald | 77 | 79 | 102 | 36 |
| 21 | Frankie Freeland | 124 | 126 | | 9 |
| 22 | Floyd Fuller | 148 | 150 | 179 | 18 |
| 23 | Jamie Garber | 34 | 35 | 65 | 8 |
| 24 | Dona Garrett | 147 | 148 | | 9 |
| 25 | Rebecca Garza-Salas | 4 | 6 | | 10 |

| # | Name | | | | |
|---|------|---|---|---|---|
| 1 | Sandra Geeslin | 14 | 17 | | 24 |
| 2 | Misty Glidewell | 57 | 60 | | 17 |
| 3 | Micheaux Glosson | 69 | 70 | | 33 |
| 4 | Tonya Godbehere | 4 | 5 | | 17 |
| 5 | Roger Gordon | 96 | 98 | 120 | 34 |
| 6 | Jay Gossage | 27 | 29 | | 34 |
| 7 | James Grace | 99 | 100 | 129 | 32 |
| 8 | Angela Hacker | 4 | 5 | | 34 |
| 9 | Trae Hamilton | 16 | 17 | | 17 |
| 10 | Glenn Hamman | 117 | 119 | 151 | 8 |
| 11 | Kevin Harper | 60 | 62 | 99 | 19 |
| 12 | Erica Hefner | 64 | 66 | | 9 |
| 13 | John Henderson | 65 | 66 | | 36 |
| 14 | William Hodges | 16 | 17 | | 21 |
| 15 | Barbara Holcombe | 97 | 99 | 132 | 7 |
| 16 | Sharon Hudgens | 143 | 144 | 181 | 20 |
| 17 | Everett Hulsey | 4 | 5 | 37 | 12 |
| 18 | Donna Hyde | 43 | 45 | | 29 |
| 19 | Marty Ingle | 76 | 80 | 114 | 9 |
| 20 | Margaret Johnson | 18 | 20 | | 15 |
| 21 | Don Jones | 48 | 49 | 75 | 14 |
| 22 | David Karwoski | 89 | 90 | | 15 |
| 23 | Douglas Kolpanen | 4 | 5 | | 19 |
| 24 | Susanne Krupihnski | 136 | 138 | | 9 |
| 25 | Derek Lackey | 54 | 56 | | 29 |

| | | | | |
|---|---|---|---|---|
| 1 | Sandra Landers | 21 | 23 | 45 | 27 |
| 2 | Lorna Lankford | 116 | 117 | 148 | 19 |
| 3 | Julia Laux | 55 | 57 | | 27 |
| 4 | Carole Lawson | 8 | 10 | 33 | 7 |
| 5 | Judy Liston | 48 | 45 | 89 | 22 |
| 6 | Louise Marker | 4 | 5 | 40 | 18 |
| 7 | Lana Marshall | 11 | 14 | | 30 |
| 8 | Bonny Martin | 97 | 99 | | 24 |
| 9 | Kenny Martin | 4 | 6 | | 35 |
| 10 | Pamela Martin | 34 | 38 | | 19 |
| 11 | Scott Mattinely | 25 | 26 | 38 | 22 |
| 12 | Kyle McCoy | 76 | 77 | | 18 |
| 13 | Gayle Melara | 19 | 20 | | 24 |
| 14 | Andrea Miller | 4 | 6 | | 32 |
| 15 | Shirley Miller | 61 | 63 | 96 | 16 |
| 16 | Cathryn Mitchell | 4 | 5 | 43 | 23 |
| 17 | Yvette Morton | 57 | 59 | | 10 |
| 18 | Burley Morvant,Jr. | 4 | 5 | | 21 |
| 19 | George Nash | 157 | 158 | | 19 |
| 20 | George Navarro | 44 | 47 | 81 | 30 |
| 21 | James Nelson | 99 | 101 | 133 | 13 |
| 22 | Michael Nichols | 4 | 5 | 42 | 33 |
| 23 | Christopher O'Neal | 5 | 7 | | 7 |
| 24 | Monica Ortega | 37 | 38 | | 17 |
| 25 | Ben Ortiz | 92 | 94 | 125 | 17 |

| | | | | |
|---|---|---|---|---|
| 1 | Stephen Owens | 67 | 69 | | 20 |
| 2 | Sandra Paredes | 45 | 47 | | 20 |
| 3 | Linda Patterson | 150 | 152 | | 12 |
| 4 | Sylvester Patton | 112 | 114 | | 36 |
| 5 | Keith Pelusi | 4 | 5 | 21 | 11 |
| 6 | Eugene Peterson | 138 | 140 | | 7 |
| 7 | Nelda Pitts | 4 | 5 | | 24 |
| 8 | Mark Poole | 99 | 100 | 136 | 26 |
| 9 | Lawrence Porter | 31 | 32 | 46 | 37 |
| 10 | Georgia Portillo | 4 | 5 | | 8 |
| 11 | Deborah Pruett | 46 | 48 | 77 | 11 |
| 12 | Keith Rabuse | 19 | 21 | | 30 |
| 13 | Roberto Ramirez | 4 | 6 | | 29 |
| 14 | Margaret Rasmussen | 24 | 26 | | 32 |
| 15 | Margaret Rehwinkel | 54 | 57 | 88 | 12 |
| 16 | Brad Richards | 74 | 75 | 101 | 8 |
| 17 | Linda Rowell | 41 | 43,95 | 75,96 | 26 |
| 18 | Kathryn Ryan | 108 | 109 | | 12 |
| 19 | James Sartor | 4 | 5 | | 30 |
| 20 | Dominga Saucedo | 52 | 53 | | 34 |
| 21 | Donna-Marie Sexton | 22 | 23 | 45 | 11 |
| 22 | David Shannon | 56 | 58 | 88 | 7 |
| 23 | Johnny Silva | 43 | 41 | | 21 |
| 24 | Brian Simmons | 66 | 67 | 92 | 34 |
| 25 | Jan Sims | 26 | 28 | 68 | 35 |

| | | | | |
|---|---|---|---|---|
| 1 | Elvin Slette | 155 | 157 | | 32 |
| 2 | Michael Smith | 92 | 93 | 122 | 23 |
| 3 | Robin Sterling | 4 | | | 27 |
| 4 | Dana Stotts | 134 | 137 | | 18 |
| 5 | Wendee Leigh Stringer | 25 | 28 | 52 | 10 |
| 6 | Christine Stucker | 107 | 108 | 134 | 11 |
| 7 | Mary Sullivan | 25 | 27 | | 8 |
| 8 | Lisa Taylor | 24 | 26 | | 29 |
| 9 | Wayland Taylor | 85 | 88 | | 13 |
| 10 | Walter Thomas | 103 | 104 | 138 | 22 |
| 11 | Christopher Thompson | 46 | 49 | 71 | 13 |
| 12 | Victoria Thompson | 103 | 106 | | 15 |
| 13 | Bradley Versteeg | 144 | 145 | | 22 |
| 14 | Hardy Walker, Jr. | 145 | 146 | 177 | 26 |
| 15 | Annette Watson | 75 | 74 | | 17 |
| 16 | Sylvia Weaver | 103 | 105 | | 16 |
| 17 | Dee Dee Wheeler | 47 | 48 | | 27 |
| 18 | Nancy Wilkey | 241 | 242,271 276 | 261,274 290 | 26 |
| 19 | Flora Williams | 31 | 29 | | 21 |
| 20 | Nathaniel Williams | 5 | 6 | | 35 |
| 21 | Maribel Willis | 138 | 140 | 162 | 33 |
| 22 | Jeffry Wingate | 99 | 100 | 135 | 20 |
| 23 | Timothy Yancey | 77 | 80 | | 15 |
| 24 | | | | | |
| 25 | | | | | |

| | ALPHABETICAL WITNESS INDEX | | | |
|---|---|---|---|---|
| **WITNESS** | **STATE** | **DEFENSE** | **VD** | **VOL** |
| Roddy Alford | 116 | | | 42 |
| Jeffrey Barnard | 5,31 | 30 | | 42 |
| Holly Becka | 28,32 | 29 | | 45 |
| | 10,11 | 14 | | 47 |
| Steve Bode | 80 | 102 | | 42 |
| Kurt Bonsal | 94,99 | 98 | | 46 |
| Bill Brown | 84 | 95 | | 45 |
| Mark Burgess | 5 | 20 | | 46 |
| Tim Cassout | 96 | 112 | | 40 |
| Curtis Chism | 123 | | | 41 |
| John Davis | 56 | | | 47 |
| Stephen DiRito | 68 | 79 | | 43 |
| Lannie Emanuel | 194 | 213 | | 42 |
| Frank Fehn | 103 | 114 | | 42 |
| Wes Ferris | 36,93 | 91 | | 40 |
| John Ford | 52 | 66 | | 43 |
| James Garcia | 84 | | | 42 |
| Martin Gilley | 22 | | | 46 |
| Miles Gooderham | 188 | | | 42 |
| Linda Goodman | 70 | 110 | | 47 |
| Troy Graham | 16 | 26 | | 45 |
| Jeannie Grieser | 35 | | | 45 |
| Matt Harrell | 27,47 | 31,50 | | 43 |

| # | Name | | | |
|---|---|---|---|---|
| 1 | Jayne Hawkins | 26,36 | 33 | 40 |
| 2 | Steven Hazard | 60,122 | 120 | 41 |
| 3 | Vernon Janssen | 32 | | 46 |
| 4 | Larry Jaramillo | 85 | | 46 |
| 5 | Randall Johnson | 48,68 | 55,89 | 38 |
| 6 | | 88 129 11 | 5 | 40 41 |
| 7 | | | | |
| 8 | Donald Kearney | 72 | | 45 |
| 9 | John Kemp | 61,82 | 81,83 | 46 |
| 10 | James Mahoney | 145 | | 42 |
| 11 | Brett Mills | 32 | 46 | 42 |
| 12 | Patrick Moczygemba | 102 | 151 | 45 |
| 13 | Patrick Murphy | 68,87 | 75    82 | 38 |
| 14 | Patrick Murphy, Sr. | 99,121 | 114 | 48 |
| 15 | Dennis Norton | 114 | 126 | 40 |
| 16 | William Petoskey | 131 | 144 | 42 |
| 17 | George Rivas | 6,87,95,96 | 29,90 | 48 |
| 18 | Boscar Riveria | 41 | 47 | 47 |
| 19 | Rita Samaniego | 45,51,60    48 | 57 | 46 |
| 20 | Harry Sanchez | 48 | | 47 |
| 21 | Misty Simpson | 15,29 | 28 | 41 |
| 22 | Michael Simpson | 30 | 44 | 41 |
| 23 | Timothy Sliter | 47 94 | 63 | 42 45 |
| 24 | | | | |
| 25 | David Spence | 64 | | 42 |
| 26 | Jeff Spivey | 81 61 | 87 | 43 47 |

| | | | |
|---|---|---|---|
| 1 | Jim Stinson | 3,46 | 16,44 | 43 |
| 2 | Mark Vigen | 126,136,231 | 167,232 | 48 |
| 3 | Marquis Washington | 45,59 | 59 | 41 |
| 4 | Christie Wimsatt | 35 | | 47 |
| 5 | S. O. Woods | 120,175 | 156 | 47 |

EXHIBIT INDEX

| # | EXHIBIT | IDENT. | OFFER | ADMIT | VOL. |
|---|---|---|---|---|---|
| 20 | CRT.1 | CLOSING STMT. | 8 | 8 | 39 |
| 21 | ST.6 | PHOTO | 31 | 31 | 40 |
| 22 | ST.7 | PHOTO | 31 | 31 | 40 |
| 23 | ST.8 | PHOTO | 29 | 29 | 40 |
| 24 | ST.9 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 25 | ST.10 | PHOTO - OSHMANS | 43 | 43 | 40 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.11 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 2 | ST.12 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 3 | ST.13 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 4 | ST.14 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 5 | ST.15 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 6 | ST.16 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 7 | ST.17 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 8 | ST.18 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 9 | ST.19 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 10 | ST.20 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 11 | ST.21 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 12 | ST.22 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 13 | ST.23 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 14 | ST.24 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 15 | ST.25 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 16 | ST.26 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 17 | ST.27 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 18 | ST.28 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 19 | ST.29 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 20 | ST.30 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 21 | ST.31 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 22 | ST.32 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 23 | ST.33 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 24 | ST.34 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 25 | ST.35 | PHOTO - OSHMANS | 43 | 43 | 40 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.36 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 2 | ST.37 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 3 | ST.38 | PHOTO - OSHMANS | 43 | 43 | 40 |
| 4 | ST.39 | REVOLVER | 60 | 60 | 40 |
| 5 | ST.40 | RADIO | 60 | 60 | 40 |
| | ST.41 | DEF.  LINEUP | 82 | 82 | 40 |
| 6 | ST.43 | DIAGRAM, OSHMANS | 37 | 37 | 40 |
| 7 | ST.44 | PHOTO | 51 | 51 | 40 |
| 8 | ST.45 | LINEUP | 83 | 83 | 40 |
| 9 | ST.46 | POSTER OF GUNS | 86 | 86 | 40 |
| 10 | ST.47 | POSTER OF GUNS | 86 | 86 | 40 |
| 11 | ST.48 | POSTER OF GUNS | 86 | 86 | 40 |
| 12 | ST.49 | PHOTO - EXPLORER | 44 | 44 | 40 |
| 13 | ST.50 | PHOTO - EXPLORER | 44 | 44 | 40 |
| 14 | ST.51 | PHOTO | 97 | 97 | 40 |
| 15 | ST.52 | PHOTO | 97 | 97 | 40 |
| 16 | ST.53 | PHOTO | 97 | 97 | 40 |
| 17 | ST.54 | PHOTO | 97 | 97 | 40 |
| 18 | ST.55 | PHOTO | 97 | 97 | 40 |
| 19 | ST.56 | PHOTO | 97 | 97 | 40 |
| 20 | ST.57 | PHOTO | 97 | 97 | 40 |
| 21 | ST.58 | PHOTO | 97 | 97 | 40 |
| 22 | ST.59 | VHS TAPE | 121 | 121 | 40 |
| 23 | ST.61 | DISPATCH TAPE | 123 | 123 | 40 |
| 24 | ST.62 | GLOCK HANDGUN | 121 | 122 | 40 |
| 25 | | | | | |

| | | | | |
|---|---|---|---|---|
| ST.65 | PHOTO, APT. | 46 | 46 | 41 |
| ST.66 | PHOTO, APT. | 46 | 46 | 41 |
| ST.67 | DIAGRAMS, APT. HANDDRAWN | 56 | 56 | 41 |
| ST.68 | DIAGRAMS, APT. HANDDRAWN | 56 | 56 | 41 |
| ST.69 | DIAGRAMS, APT. HANDDRAWN | 56 | 56 | 41 |
| ST.70 | DIAGRAMS, APT. HANDDRAWN | 56 | 56 | 41 |
| ST.71 | DIAGRAMS, APT. HANDDRAWN | 56 | 56 | 41 |
| ST.72 | DIAGRAMS, APT. HANDDRAWN | 56 | 56 | 41 |
| ST.73 | PHOTO - OSHMANS | 64 | 64 | 41 |
| ST.74 | PHOTO - OSHMANS | 64 | 64 | 41 |
| ST.75 | PHOTO - OSHMANS | 64 | 64 | 41 |
| ST.76 | PHOTO - OSHMANS | 64 | 64 | 41 |
| ST.77 | PHOTO - OSHMANS | 64 | 64 | 41 |
| ST.78 | PHOTO - OSHMANS | 64 | 64 | 41 |
| ST.79 | PHOTO - OSHMANS | 64 | 64 | 41 |
| ST.80 | PHOTO - OSHMANS | 64 | 64 | 41 |
| ST.81 | PHOTO - OSHMANS | 64 | 64 | 41 |
| ST.82 | PHOTO - OSHMANS | 64 | 64 | 41 |
| ST.83 | PHOTO - OSHMANS | 64 | 64 | 41 |
| ST.84 | PHOTO - OSHMANS | 64 | 64 | 41 |
| ST.85 | PHOTO - OSHMANS | 64 | 64 | 41 |
| ST.86 | PHOTO - OSHMANS | 64 | 64 | 41 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.87 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 2 | ST.88 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 3 | ST.89 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 4 | ST.90 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 5 | ST.91 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 6 | ST.92 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 7 | ST.93 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 8 | ST.94 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 9 | ST.95 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 10 | ST.96 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 11 | ST.97 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 12 | ST.98 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 13 | ST.99 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 14 | ST.100 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 15 | ST.101 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 16 | ST.102 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 17 | ST.103 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 18 | ST.104 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 19 | ST.105 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 20 | ST.106 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 21 | ST.107 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 22 | ST.108 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 23 | ST.109 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 24 | ST.110 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 25 | ST.111 | PAPERWORK, RV | 64 | 64 | 41 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.112 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 2 | ST.113 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 3 | ST.114 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 4 | ST.115 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 5 | ST.116 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 6 | ST.117 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 7 | ST.118 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 8 | ST.119 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 9 | ST.120 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 10 | ST.121 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 11 | ST.122 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 12 | ST.123 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 13 | ST.124 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 14 | ST.125 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 15 | ST.126 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 16 | ST.127 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 17 | ST.128 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 18 | ST.129 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 19 | ST.130 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 20 | ST.131 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 21 | ST.132 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 22 | ST.133 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 23 | ST.134 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 24 | ST.135 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 25 | ST.136 | PHOTO - OSHMANS | 64 | 64 | 41 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.137 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 2 | ST.138 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 3 | ST.139 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 4 | ST.140 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 5 | ST.141 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 6 | ST.142 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 7 | ST.143 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 8 | ST.144 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 9 | ST.145 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 10 | ST.146 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 11 | ST.147 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 12 | ST.148 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 13 | ST.149 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 14 | ST.150 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 15 | ST.151 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 16 | ST.152 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 17 | ST.153 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 18 | ST.154 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 19 | ST.155 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 20 | ST.156 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 21 | ST.157 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 22 | ST.158 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 23 | ST.159 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 24 | ST.160 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 25 | ST.161 | PHOTO - OSHMANS | 64 | 64 | 41 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.162 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 2 | ST.163 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 3 | ST.164 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 4 | ST.165 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 5 | ST.166 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 6 | ST.167 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 7 | ST.168 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 8 | ST.169 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 9 | ST.170 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 10 | ST.171 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 11 | ST.172 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 12 | ST.173 | DIAGRAM, CRIME SCENE | 65 | 65 | 41 |
| 13 14 | ST.174 | OSHMANS VIDEOTAPE | 70 | 70 | 41 |
| 15 | ST.174-B | COPY OF OSHMANS VIDEOTAPE | 70 | 70 | 41 |
| 16 | ST.175 | HAWKINS' BELT | 89 | 89 | 41 |
| 17 | ST.176 | HAWKINS' RADIO | 89 | 89 | 41 |
| 18 | ST.177 | HAWKINS' MAGAZINE CARRIER | 89 | 89 | 41 |
| 19 20 | ST.178 | REVOLVER | 76 | 77 | 41 |
| 21 | ST.179 | RADIO | 87 | 87 | 41 |
| 22 | ST.180 | SCREWDRIVER | 118 | 119 | 41 |
| 23 | ST.182 | FRAGMENTS | 110 | 110 | 41 |
| 24 | ST.183 | SHELL CASINGS | 112 | 112 | 41 |
| 25 | ST.184 | PACKAGE | 113 | 113 | 41 |
| 26 | ST.184 | FRAGMENTS | 113 | 113 | 41 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | A-B | | | | |
| 2 | ST.185 | PACKAGE | 116 | 116 | 41 |
| 3 | ST.185 A-D | BOTTLES, FRAGMENTS | 116 | 116 | 41 |
| 4 | ST.186 | PACKAGE | 117 | 117 | 41 |
| 5 | ST.186 A-C | FRAGMENTS | 117 | 117 | 41 |
| 6 | ST.187 | MAGNET POSTER | 76 | 77 | 41 |
| 7 | ST.188 | PHOTO | 93 | 93 | 42 |
| 8 | ST.189 | PHOTO | 93 | 93 | 42 |
| 9 | ST.192 | PHOTO | 8 | 8 | 42 |
| 10 | ST.193 | AUTOPSY PHOTO | 8 | 8 | 42 |
| 11 | ST.194 | AUTOPSY PHOTO | 8 | 8 | 42 |
| 12 | ST.195 | AUTOPSY PHOTO | 8 | 8 | 42 |
| 13 | ST.196 | AUTOPSY PHOTO | 8 | 8 | 42 |
| 14 | ST.197 | AUTOPSY PHOTO | 8 | 8 | 42 |
| 15 | ST.198 | AUTOPSY PHOTO | 8 | 8 | 42 |
| 16 | ST.199 | AUTOPSY PHOTO | 8 | 8 | 42 |
| 17 | ST.201 | AUTOPSY PHOTO | 8 | 8 | 42 |
| 18 | ST.202 | AUTOPSY PHOTO | 8 | 8 | 42 |
| 19 | ST.203 | AUTOPSY PHOTO | 8 | 8 | 42 |
| 20 | ST.204 | AUTOPSY PHOTO | 8 | 8 | 42 |
| 21 | ST.205 | AUTOPSY PHOTO | 8 | 8 | 42 |
| 22 | ST.206 | AUTOPSY PHOTO | 8 | 8 | 42 |
| 23 | ST.207 | AUTOPSY PHOTO | 8 | 8 | 42 |
| 24 | ST.208 | AUTOPSY PHOTO | 8 | 8 | 42 |
| 25 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.209 | MANNEQUIN | 9 | 9 | 42 |
| 2 | ST.210 | FRAGMENTS | 32 | 32 | 42 |
| 3 | ST.211 | FRAGMENTS | 32 | 32 | 42 |
| 4 | ST.212 | FRAGMENTS | 32 | 32 | 42 |
| 5 | ST.213 | FRAGMENTS | 32 | 32 | 42 |
| 6 | ST.214 | FRAGMENTS | 32 | 32 | 42 |
| 7 | ST.215 | FRAGMENTS | 32 | 32 | 42 |
| 8 | ST.216 | FRAGMENTS | 32 | 32 | 42 |
| 9 | ST.217 | FRAGMENTS | 32 | 32 | 42 |
| 10 | ST.218 | FRAGMENTS | 32 | 32 | 42 |
| 11 | ST.219 | FRAGMENTS | 32 | 32 | 42 |
| 12 | ST.220 | FRAGMENTS | 32 | 32 | 42 |
| 13 | ST.221 | PHOTO, LEATHER | 66 | 66 | 42 |
| 14 | ST.222 | PHOTO, LEATHER DEFECT | 66 | 66 | 42 |
| 15 | ST.223 | PHOTO BELT DEFECT | 66 | 66 | 42 |
| 16 | ST.224 | PHOTO, CLIP | 66 | 66 | 42 |
| 17 | ST.225 | PHOTO, BOOTS | 66 | 66 | 42 |
| 18 | ST.226 | PHOTO, BOOTS | 66 | 66 | 42 |
| 19 | ST.227 | PHOTO, VEST | 66 | 66 | 42 |
| 20 | ST.228 | PHOTO, VEST | 66 | 66 | 42 |
| 21 | ST.229 | PHOTO, VEST | 66 | 66 | 42 |
| 22 | ST.230 | PHOTO, VEST DEFECT | 66 | 66 | 42 |
| 23 | | | | | |
| 24 | ST.231 | PHOTO, VEST DEFECT | 66 | 66 | 42 |
| 25 | ST.232 | PHOTO, VEST | 66 | 66 | 42 |

| | | | | |
|---|---|---|---|---|
| ST.233 | PHOTO, VEST | 66 | 66 | 42 |
| ST.234 | PHOTO, VEST | 66 | 66 | 42 |
| ST.235 | PHOTO, CLOTHES | 66 | 66 | 42 |
| ST.236 | PHOTO, CLOTHES | 66 | 66 | 42 |
| ST.237 | PHOTO, CLOTHES | 66 | 66 | 42 |
| ST.240 | VEST | 77 | 77 | 42 |
| ST.241 | PHOTO, OSHMANS, VEHICLE | 35 | 35 | 42 |
| ST.242 | PHOTO, OSHMANS, VEHICLE | 35 | 35 | 42 |
| ST.243 | PHOTO, OSHMANS, VEHICLE | 35 | 35 | 42 |
| ST.244 | PHOTO, OSHMANS, VEHICLE | 35 | 35 | 42 |
| ST.245 | PHOTO, OSHMANS, VEHICLE | 35 | 35 | 42 |
| ST.246 | PHOTO, OSHMANS, VEHICLE | 35 | 35 | 42 |
| ST.247 | PHOTO, OSHMANS, VEHICLE | 35 | 35 | 42 |
| ST.248 | DIAGRAM | 35 | 35 | 42 |
| ST.249 | DIAGRAM | 35 | 35 | 42 |
| ST.250 | DIAGRAM | 35 | 35 | 42 |
| ST.251 | DIAGRAM | 35 | 35 | 42 |
| ST.252 | DIAGRAM | 35 | 35 | 42 |
| ST.253 | DIAGRAM | 35 | 35 | 42 |
| ST.254 | DIAGRAM | 35 | 35 | 42 |
| ST.255 | DIAGRAM | 35 | 35 | 42 |

| | | | | |
|---|---|---|---|---|
| 1 | ST.256 | DIAGRAM | 35 | 35 | 42 |
| 2 | ST.257 | DIAGRAM | 35 | 35 | 42 |
| 3 | ST.258 | DIAGRAM | 45 | 45 | 42 |
| 4 | ST.259 | DIAGRAM | 86 | 86 | 42 |
| 5 | ST.260 | POSTER | 86 | 86 | 42 |
| 6 | ST.261 | PHOTO | 110 | 110 | 42 |
| 7 | ST.262 | PHOTO | 110 | 110 | 42 |
| 8 | ST.263 | PHOTO | 110 | 110 | 42 |
| 9 | ST.264 | PHOTO | 110 | 110 | 42 |
| 10 | ST.265 | DRAWING | 110 | 110 | 42 |
| 11 | ST.266 | PHOTO,RV PARK | 110 | 110 | 42 |
| 12 | ST.267 | PHOTO,RV PARK | 110 | 110 | 42 |
| 13 | ST.268 | PHOTO | 120 | 120 | 42 |
| 14 | ST.269 | PHOTO,AERIAL OF COACHLIGHT AREA | 120 | 120 | 42 |
| 15 | ST.270 | PHOTO,ARIEL | 120 | 120 | 42 |
| 16,17 | ST.271 | PHOTO,AERIAL OF COACHLIGHT AREA | 120 | 120 | 42 |
| 18 | ST.272 | PHOTO,RV PARK | 120 | 120 | 42 |
| 19 | ST.273 | PHOTO,RV PARK | 120 | 120 | 42 |
| 20 | ST.274 | PHOTO,VEHICLE | 120 | 120 | 42 |
| 21 | ST.275 | PHOTO,RV PARK | 120 | 120 | 42 |
| 22 | ST.276 | PHOTO,RV PARK | 120 | 120 | 42 |
| 23 | ST.277 | PHOTO,RV PARK | 120 | 120 | 42 |
| 24 | ST.278 | PHOTO,RV PARK | 120 | 120 | 42 |
| 25 | ST.279 | PHOTO,RV PARK | 120 | 120 | 42 |

| | | | | |
|---|---|---|---|---|
| 1 | ST.280 | PHOTO,RV PARK | 120 | 120 | 42 |
| 2 | ST.281 | PHOTO,RV PARK | 120 | 120 | 42 |
| 3 | ST.282 | DIAGRAM | 120 | 120 | 42 |
| 4 | ST.284 | RUGER PISTOL | 143 | 143 | 42 |
| 5 | ST.285 | BERRETTA GUN | 143 | 143 | 42 |
| 6 | ST.286 | WALLET | 143 | 143 | 42 |
| | ST.287 | POSTER OF GUNS | 143 | 143 | 42 |
| 7 | ST.288-A | HANDGUN | 154 | 154 | 42 |
| 8 | ST.289 | HANDGUN | 154 | 154 | 42 |
| 9 | ST.290 | HANDGUN | 154 | 154 | 42 |
| 10 | ST.291 | HANDGUN | 154 | 154 | 42 |
| 11 | ST.292 | HANDGUN | 154 | 154 | 42 |
| 12 | ST.293 | HANDGUN | 154 | 154 | 42 |
| 13 | ST.294 | HANDGUN | 154 | 154 | 42 |
| 14 | ST.295 | HANDGUN | 154 | 154 | 42 |
| 15 | ST.296 | HANDGUN | 154 | 154 | 42 |
| 16 | ST.297 | HANDGUN | 154 | 154 | 42 |
| 17 | ST.298 | HANDGUN | 154 | 154 | 42 |
| 18 | ST.299 | HANDGUN | 154 | 154 | 42 |
| 19 | ST.300 | HANDGUN | 154 | 154 | 42 |
| 20 | ST.301 | HANDGUN | 171 | 171 | 42 |
| 21 | ST.302 | HANDGUN | 171 | 171 | 42 |
| 22 | ST.303 | HANDGUN | 171 | 171 | 42 |
| 23 | ST.304 | HANDGUN | 171 | 171 | 42 |
| 24 | ST.305 | HANDGUN | 171 | 171 | 42 |
| 25 | | | | | |

| | | | | |
|---|---|---|---|---|
| 1 | ST.306 | HANDGUN | 171 | 171 | 42 |
| 2 | ST.307 | HANDGUN | 171 | 171 | 42 |
| 3 | ST.308 | HANDGUN | 171 | 171 | 42 |
| 4 | ST.309 | HANDGUN | 171 | 171 | 42 |
| 5 | ST.310 | HANDGUN | 171 | 171 | 42 |
| 6 | ST.311 | SHOTGUN | 161 | 161 | 42 |
| 7 | ST.312 | RIFLE | 161 | 161 | 42 |
| 8 | ST.313 | SHOTGUN | 161 | 161 | 42 |
| 9 | ST.314 | RIFLE | 161 | 161 | 42 |
| 10 | ST.315 | SHOTGUN | 161 | 161 | 42 |
| 11 | ST.316 | SHOTGUN | 161 | 161 | 42 |
| 12 | ST.317 | RIFLE | 161 | 161 | 42 |
| 13 | ST.318 | RIFLE | 161 | 161 | 42 |
| 14 | ST.319 | SHOTGUN | 157 | 157 | 42 |
| 15 | ST.320 | HANDGUN | 187 | 187 | 42 |
| 16 | ST.324 | REVOLVER FRAMES | 192 | 192 | 42 |
| 17 | ST.325 | REVOLVER FRAMES | 192 | 192 | 42 |
| 18 | ST.326 | REVOLVER FRAMES | 192 | 192 | 42 |
| 19 | ST.327 | REVOLVER FRAMES | 192 | 192 | 42 |
| 20 | ST.328 | REVOLVER FRAMES | 192 | 192 | 42 |
| 21 | ST.329 | REVOLVER FRAMES | 192 | 192 | 42 |
| 22 | ST.330 | REVOLVER FRAMES | 192 | 192 | 42 |
| 23 | ST.331 | REVOLVER FRAMES | 192 | 192 | 42 |
| 24 | ST.332 | REVOLVER FRAMES | 192 | 192 | 42 |
| 25 | ST.333 | REVOLVER FRAMES | 192 | 192 | 42 |

| | | | | |
|---|---|---|---|---|
| 1 | ST.334 | ITEM FROM JEEP | 182 | 183 (REC) | 42 |
| 2 | ST.335 | RADIO | 168 | 168 | 42 |
| 3 | ST.336 | RECEIPTS, RV | 182 | 183 (REC) | 42 |
| 4 | ST.337 | SCANNER | 168 | 168 | 42 |
| 5 | ST.338 | SCANNER | 182 | 183 (REC) | 42 |
| 6 | ST.339 | WALKIE-TALKIE | 168 | 168 | 42 |
| 7 | ST.341 | SMOKE GRENADE AND LIGHTER | 168 | 168 | 42 |
| 8 | ST.341-A | FREQUENCY GUIDE | 166 | 166 | 42 |
| 9 | ST.341-B | ITEM FROM RV | 168 | 168 | 42 |
| 10 | ST.342 | CAP | 168 | 168 | 42 |
| 11 12 | ST.342-A | SPEC WAR | 78 | 78 | 48 |
| 13 | ST.343-A | PURSE | 80 | 81 | 46 |
| 14 15 | ST.344 | CONTENTS,TORN PICTURES | 182 79 | 183 (REC) 79 | 42 46 |
| 16 | ST.344-A | SPEC WAR | 78 | 78 | 48 |
| 17 18 | ST.345 | PKG.INSURANCE PAPERS | 182 80 | 183 (REC) 80 | 42 46 |
| 18 | ST.346 | BANDOLIER | 167 | 167 | 42 |
| 19 | ST.347 | RADIO | 168 | 168 | 42 |
| 20 | ST.348 | PAPERWORK, JEEP | 177 | 183 | 42 |
| 21 | ST.349 | CLIPS, AMMO | 177 | 183 | 42 |
| 22 | ST.350 | FANNY PACK | 177 | 183 | 42 |
| 23 | ST.351 | PAPERWORK, JEEP | 177 | 183 | 42 |
| 24 | ST.352 | HOLSTER | 177 | 183 | 42 |
| 25 | ST.353 | HOLSTER, CLIP | 177 | 183 | 42 |
| 26 | | | | | |

| | | | | |
|---|---|---|---|---|
| ST.354 | ITEMS | 177 | 183 | 42 |
| ST.355 | CLIPS, AMMO BACKPACK | 177 | 183 | 42 |
| ST.356 | BAG OF AMMO | 177 | 183 | 42 |
| ST.358 | CONTENTS OF PKG. | 177 | 183 | 42 |
| ST.359 | HOLSTER | 177 | 183 | 42 |
| ST.359-A | NIGHT VISION SCOPE | 177 | 183 | 42 |
| ST.363 | BANDOLIER | 177 | 183 | 42 |
| ST.364 | PHOTO,RV | 177 | 183 | 42 |
| ST.364-A | PHOTO | 177 | 183 | 42 |
| ST.365 | PHOTO - RV PARK | 177 | 183 | 42 |
| ST.365-A | PHOTO | 177 | 183 | 42 |
| ST.366 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.367 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.368 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.369 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.370 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.371 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.372 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.373 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.374 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.375 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.376 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.377 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.378 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.379 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |

| | | | | |
|---|---|---|---|---|
| ST.380 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.381 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.382 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.383 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.384 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.385 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.386 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.387 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.388 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.389 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.390 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.391 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.392 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.393 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.394 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.395 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.396 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.397 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.398 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.399 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.400 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.401 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.402 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.403 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| ST.404 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |

| | | | | |
|---|---|---|---|---|
| ST.405 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.406 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.407 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.408 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.409 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.410 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.411 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.412 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.413 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.414 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.415 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.416 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.417 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.418 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.419 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.420 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.421 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.422 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.423 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.424 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.425 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.426 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.427 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.428 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.429 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |

39

| | | | | |
|---|---|---|---|---|
| ST.430 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.431 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.432 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.433 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.434 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.435 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.436 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.437 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.438 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.439 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.440 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.441 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.442 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.443 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.444 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.445 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.446 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.447 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.448 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.449 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.450 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.451 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.452 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.453 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.454 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |

| | | | | |
|---|---|---|---|---|
| ST.455 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.456 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.457 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.458 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.459 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.460 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.461 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.462 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.463 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.464 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.465 | POSTER | 177 75 | 183 75 | 42 43 |
| ST.466 | POSTER | 177 75 | 183 75 | 42 43 |
| ST.467 | POSTER | 177 75 | 183 75 | 42 53 |
| ST.468 | WALLET | 177 | 183 | 42 |
| ST.469 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.470 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.471 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.472 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.473 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.474 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.475 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.476 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| ST.477 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.478 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 2 | ST.479 | GRIPS | 177 | 183 | 42 |
| 3 | ST.480 | CYLINDERS | 177 | 183 | 42 |
| 4 | ST.481 | BAG | 177 | 183 | 42 |
| 5 | ST.483 | FREQUENCY PAGE | 177 | 183 | 42 |
| 6 | ST.484 | ENVELOPE | 118 | 118 | 41 |
| 7 | ST.484A-G | BULLET FRAGMENTS | 118 | 118 | 41 |
| 8 | ST.485 | ENVELOPE | 118 | 118 | 41 |
| 9 | ST.485A-C | BULLET FRAGMENTS | 118 | 118 | 41 |
| 10 | ST.486 | ENVELOPE | 117 | 117 | 41 |
| 11 | ST.486-A | PROJECTILES | 117 | 117 | 41 |
| 12 | ST.487 | SMOKE GRENADE | 119 | 119 | 41 |
| 13 | ST.488 | FRAGMENTS | 114 | 114 | 41 |
| 14 | ST.489 | DIAGRAM | 87 | 87 | 43 |
| 15 | ST.490 | PHOTO | 9 | 9 | 42 |
| 16 | ST.493 | DNA REPORT | 53 | 53 | 42 |
| 17 | ST.495 | POSTER,SERIAL NOS. | 211 | 211 | 42 |
| 18 | ST.496 | PKG.BULLET ROUNDS | 192 | 192 | 42 |
| 19 | ST.498 | RIVAS' PEN PACKET | 14 | 14 | 45 |
| 20 | ST.500 | PHOTO | 112 | 112 | 45 |
| 21 | ST.501 | PHOTO | 112 | 112 | 45 |
| 22 | ST.502 | PHOTO | 112 | 112 | 45 |
| 23 | ST.503 | PHOTO | 112 | 112 | 45 |
| 24 | ST.504 | PHOTO | 112 | 112 | 45 |
| 25 | ST.505 | PHOTO | 112 | 112 | 45 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.506 | PHOTO | 112 | 112 | 45 |
| 2 | ST.507 | PHOTO | 112 | 112 | 45 |
| 3 | ST.508 | PHOTO | 112 | 112 | 45 |
| 4 | ST.509 | PHOTO | 112 | 112 | 45 |
| 5 | ST.510 | PHOTO | 112 | 112 | 45 |
| 6 | ST.511 | PHOTO | 112 | 112 | 45 |
| 7 | ST.511-A | PHOTO | 112 | 112 | 45 |
| 8 | ST.512 | PHOTO | 112 | 112 | 45 |
| 9 | ST.512-A | PHOTO | 112 | 112 | 45 |
| 10 | ST.513 | PHOTO | 112 | 112 | 45 |
| 11 | ST.514 | PHOTO | 112 | 112 | 45 |
| 12 | ST.515 | PHOTO | 112 | 112 | 45 |
| 13 | ST.516 | PHOTO | 112 | 112 | 45 |
| 14 | ST.517 | PHOTO | 112 | 112 | 45 |
| 15 | ST.518 | PHOTO | 112 | 112 | 45 |
| 16 | ST.519 | PHOTO | 112 | 112 | 45 |
| 17 | ST.520 | PHOTO | 112 | 112 | 45 |
| 18 | ST.521 | PHOTO | 112 | 112 | 45 |
| 19 | ST.522 | PHOTO | 112 | 112 | 45 |
| 20 | ST.523 | PHOTO | 112 | 112 | 45 |
| 21 | ST.524 | PHOTO | 112 | 112 | 45 |
| 22 | ST.525 | PHOTO | 112 | 112 | 45 |
| 23 | ST.526 | PHOTO | 112 | 112 | 45 |
| 24 | ST.529 | PHOTO | 112 | 112 | 45 |
| 25 | ST.530 | PHOTO | 112 | 112 | 45 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.531 | PHOTO | 112 | 112 | 45 |
| 2 | ST.532 | PHOTO | 112 | 112 | 45 |
| 3 | ST.533 | PHOTO | 112 | 112 | 45 |
| 4 | ST.534 | PHOTO | 112 | 112 | 45 |
| 5 | ST.535 | PHOTO | 112 | 112 | 45 |
| 6 | ST.536 | PHOTO | 112 | 112 | 45 |
| 7 | ST.537 | PHOTO | 112 | 112 | 45 |
| 8 | ST.538 | PHOTO | 112 | 112 | 45 |
| 9 | ST.539 | PHOTO | 112 | 112 | 45 |
| 10 | ST.540 | PHOTO | 112 | 112 | 45 |
| 11 | ST.541 | PHOTO | 112 | 112 | 45 |
| 12 | ST.542 | PHOTO | 112 | 112 | 45 |
| 13 | ST.543 | DIAGRAM | 113 | 113 | 45 |
| 14 | ST.544 | DIAGRAM | 113 | 113 | 45 |
| 15 | ST.545 | PHOTO | 112 | 112 | 45 |
| 16 | ST.547 | PHOTO | 112 | 112 | 45 |
| 17 | ST.548 | PHOTO | 112 | 112 | 45 |
| 18 | ST.549 | PHOTO | 112 | 112 | 45 |
| 19 | ST.550 | PHOTO | 112 | 112 | 45 |
| 20 | ST.551 | PHOTO, PRISON | 33 | 33 | 46 |
| 21 | ST.552 | PHOTO, PRISON | 33 | 33 | 46 |
| 22 | ST.553 | PHOTO, PRISON | 33 | 33 | 46 |
| 23 | ST.554 | PHOTO, PRISON | 33 | 33 | 46 |
| 24 | ST.555 | PHOTO, PRISON | 33 | 33 | 46 |
| 25 | ST.556 | PHOTO, PRISON | 33 | 33 | 46 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.557 | PHOTO, PRISON | 33 | 33 | 46 |
| 2 | ST.558 | PHOTO, PRISON | 33 | 33 | 46 |
| 3 | ST.559 | PHOTO, PRISON | 33 | 33 | 46 |
| 4 | ST.560 | PHOTO, PRISON | 33 | 33 | 46 |
| 5 | ST.561 | PHOTO, PRISON | 33 | 33 | 46 |
| 6 | ST.562 | PHOTO, PRISON | 33 | 33 | 46 |
| 7 | ST.563 | PHOTO, PRISON | 33 | 33 | 46 |
| 8 | ST.564 | PHOTO, PRISON | 33 | 33 | 46 |
| 9 | ST.565 | PHOTO, PRISON | 33 | 33 | 46 |
| 10 | ST.566 | PHOTO, PRISON | 33 | 33 | 46 |
| 11 | ST.567 | PHOTO, PRISON | 33 | 33 | 46 |
| 12 | ST.582 | POSTER | 113 | 113 | 45 |
| 13 | ST.607 | PHOTO,AUTO ZONE | 63 | 63 | 46 |
| 14 | ST.608 | PHOTO,AUTO ZONE | 63 | 63 | 46 |
| 15 | ST.609 | PHOTO,AUTO ZONE | 63 | 63 | 46 |
| 16 | ST.610 | PHOTO,AUTO ZONE | 63 | 63 | 46 |
| 17 | ST.611 | PHOTO,AUTO ZONE | 63 | 63 | 46 |
| 18 | ST.612 | PHOTO | 83 | 83 | 46 |
| 19 | ST.615 | BALLISTIC VEST RECEIPT | 182 | | 42 |
| 20 | | | 75 | 75 | 48 |
| 21 | ST.755 | POSTER OF MANAGERS | 38 | 38 | 40 |
| 22 | ST.756 | TRANSCRIPT | 123 | 123 | 40 |
| 23 | ST.757 | PHOTO-AUTOPSY | 124 | 124(REC) | 40 |
| 24 | ST.758 | ENVELOPE | 128 | 129 | 41 |
| 25 | ST.758 A-C | SHELLS | 128 | 129 | 41 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | ST.759 | DIAGRAM | 109 | 109 | 41 |
| 3 | ST.760 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 4 | ST.761 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 5 | ST.762 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 6 | ST.763 | PHOTO, PAVEMENT | 124 | 125 | 41 |
| 7 | ST.764 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 8 | ST.765 | PHOTO, PAVEMENT | 124 | 125 | 41 |
| 9 | ST.766 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 10 | ST.767 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 11 | ST.768 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 12 | ST.769 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 13 | ST.770 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 14 | ST.771 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 15 | ST.772 | PHOTO | 93 | 93 | 42 |
| 16 | ST.773 | PHOTO | 93 | 93 | 42 |
| 17 | ST.774 | PHOTO | 93 | 93 | 42 |
| 18 | ST.775 | PHOTO | 93 | 93 | 42 |
| 19 | ST.777 | PHOTO | 110 | 110 | 42 |
| 20 | ST.778 | PHOTO | 110 | 110 | 42 |
| 21 | ST.779 | PHOTO | 110 | 110 | 42 |
| 22 | ST.780 | PHOTO | 110 | 110 | 42 |
| 23 | ST.781 | PHOTO, AERIAL | 7 | 7 | 43 |
| 24 | ST.782 | PHOTO, AERIAL | 7 | 7 | 43 |
| 25 | ST.783 | PHOTO, HOLIDAY INN | 7 | 7 | 43 |
| | ST.784 | PHOTO, HOLIDAY INN | 7 | 7 | 43 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | | ROOM | | | |
| 2 | ST.785 | PHOTO,HOLIDAY INN ROOM | 7 | 7 | 43 |
| 3 | | | | | |
| 4 | ST.786 | PHOTO,HOLIDAY INN ROOM | 7 | 7 | 43 |
| 5 | ST.787 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 6 | ST.788 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 7 | | | | | |
| 8 | ST.789 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 9 | ST.790 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 10 | | | | | |
| 11 | ST.791 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 12 | ST.792 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 13 | | | | | |
| 14 | ST.793 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 15 | ST.794 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 16 | | | | | |
| 17 | ST.795 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 18 | ST.796 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 19 | | | | | |
| 20 | ST.797 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 21 | ST.798 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 22 | | | | | |
| 23 | ST.799 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 24 | ST.800 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 25 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.801 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 2 | | | | | |
| 3 | ST.802 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 4 | ST.803 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 5 | | | | | |
| 6 | ST.804 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 7 | ST.805 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| 8 | ST.808 | HANDGUN | 69 | 69 | 43 |
| 9 | ST.810 | HANDGUNS | 69 | 79 | 43 |
| 10 | ST.811 | HANDGUNS | 69 | 69 | 43 |
| 11 | ST.812 | HANDGUNS | 69 | 69 | 43 |
| 12 | ST.813 | HANDGUNS | 69 | 69 | 43 |
| 13 | ST.814 | HANDGUNS | 69 | 69 | 43 |
| 14 | ST.815 | HANDGUNS | 69 | 69 | 43 |
| 15 | ST.817 | HANDGUNS | 69 | 69 | 43 |
| 16 | ST.818 | HANDGUNS | 69 | 69 | 43 |
| 17 | ST.819 | SHOTGUN | 76 | 76 | 43 |
| 18 | ST.820 | SHOTGUN | 76 | 76 | 43 |
| 19 | ST.822 | POSTER - GUN INFO | 75 | 75 | 43 |
| 20 | ST.824 | PEN PACKET,NEWBURY | 14 | 14 | 45 |
| 21 | ST.825 | PEN PACKET,NEWBURY | 14 | 14 | 45 |
| 22 | ST.826 | PEN PACKET,NEWBURY | 14 | 14 | 45 |
| 23 | ST.827 | PEN PACKET,HALPRIN | 14 | 14 | 45 |
| 24 | ST.828 | PEN PACKET, RODRIGUEZ | 14 | 14 | 45 |
| 25 | | | | | |

| | | | | |
|---|---|---|---|---|
| 1 | ST.829 | PEN PACKET,GARCIA | 14 | 14 | 45 |
| 2 | ST.830 | PEN PACKET,MURPHY | 14 | 14 | 45 |
| 3 | ST.846 | BAG | 193 | 193 | 42 |
| 4 | ST.864 | VIDEO TIMETABLE | 71 | 71 | 41 |
| 5 | ST.978 | PRIOR ARREST VOLUNTARY STMT. | 148 | 148 | 40 |
| 6 | ST.979 | MURPHY'S STMT. | 24 | 24 | 45 |
| 7 | ST.980 | CASSETTE TAPE | 84 | 84 | 38 |
| 8 | ST.985 | WALLET | 183 | 183(REC) | 42 |
| 9 | | | 151 | 151(ALL) | 45 |
| 10 | ST.986 | WALLET | 183 | 183(REC) | 42 |
| | | | 80 | 80(ALL) | 46 |
| 11 | ST.987 | HAWKINS' GUN | 82 | 82 | 43 |
| 12 | ST.988 | HAWKINS' GUN CLIP | 82 | 82 | 43 |
| 13 | ST.989 | HAWKINS' HOLSTER | 82 | 82 | 43 |
| 14 | ST.990 | PHOTO OF DIAGRAM | 44 | 44 | 45 |
| 15 | ST.991 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| 16,17 | ST.992 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| 18 | ST.993 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| 19,20 | ST.994 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| 21 | ST.995 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| 22,23 | ST.996 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| 24 | ST.997 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| 25 | | | | | |

| | | | | |
|---|---|---|---|---|
| ST.998 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.999 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1000 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1001 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1002 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1003 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1004 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1005 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1006 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1007 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1008 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1009 | DIAGRAM,APARTMENT | 78 | 78 | 45 |
| ST.1010 | MURPHY'S LETTER | 47 | 51 | 46 |
| ST.1011 | PKG.FOR LETTER | 47 | 51 | 46 |
| ST.1013 | DNA REPORT | 101 | 101 | 45 |
| ST.1014 | PHOTO | 55 | 55 | 46 |
| ST.1015 | PHOTO | 87 | 87 | 46 |
| ST.1016 | PHOTO | 87 | 87 | 46 |
| ST.1017 | PHOTO | 87 | 87 | 46 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.1018 | PHOTO | 87 | 87 | 46 |
| 2 | ST.1019 | PHOTO | 87 | 87 | 46 |
| 3 | ST.1020 | PHOTO | 87 | 87 | 46 |
| 4 | ST.1021 | PHOTO | 87 | 87 | 46 |
| 5 | ST.1022 | PHOTO | 87 | 87 | 46 |
| 6 | ST.1023 | PHOTO | 87 | 87 | 46 |
| 7 | ST.1024 | DNA REPORT | 41 | 41 | 47 |
| 8 | ST.1025 | LETTER TO BECKA | 30 | 30 (REC) | 45 |
| 9 | ST.1026 | LETTER TO BECKA | 30 | 30 (REC) | 45 |
| 10 | ST.1027 | AERIAL PHOTO | 46 | 46 | 45 |
| 11 | ST.1028 | AERIAL PHOTO | 46 | 46 | 45 |
| 12 | ST.1029 | AERIAL PHOTO | 46 | 46 | 45 |
| 13 | ST.1030 | EARPIECE | 92 | 92 | 46 |
| 14 | ST.1031 | EARPIECE | 92 | 92 | 46 |
| 15 | ST.1032 | COPY OF DIARY | 63 | 63 | 47 |
| 16 | ST.1033 | PHOTO | 51 | 51 | 47 |
| 17 | ST.1034 | PHOTO | 51 | 51 | 47 |
| 18 | ST.1035 | PHOTO | 51 | 51 | 47 |
| 19 | ST.1036 | PHOTO | 51 | 51 | 47 |
| 20 | ST.1037 | PHOTO | 51 | 51 | 47 |
| 21 | ST.1038 | PHOTO | 51 | 51 | 47 |
| 22 | ST.1039 | PHOTO | 51 | 51 | 47 |
| 23 | ST.1040 | PHOTO | 51 | 51 | 47 |
| 24 | ST.1041 | PHOTO | 51 | 51 | 47 |
| 25 | ST.1042 | PHOTO | 51 | 51 | 47 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.1043 | PHOTO | 51 | 51 | 47 |
| 2 | ST.1044 | PHOTO | 51 | 51 | 47 |
| 3 | ST.1045 | PHOTO | 51 | 51 | 47 |
| 4 | ST.1046 | PHOTO | 46 | 46 | 47 |
| 5 | ST.1047 | DIARY | 58 | 58 | 47 |
| 6 | ST.1048 | LETTER | 14 | 14 | 47 |
| 7 | ST.1049 | LETTER | 14 | 14 | 47 |
| 8 | ST.1050 | ENVELOPE | 14 | 14 | 47 |
| 9 | ST.1051 | ENVELOPE | 14 | 14 | 47 |
| 10 | ST.1053 | RIVAS' STMT.EXCERPT | 93 | 94 | 48 |
| 11 | ST.1054 | COURT JACKET,MURPHY | 79 | 79 | 49 |
| 12 | ST.1055 | COURT JACKET,MURPHY | 79 | 79 | 49 |
| 13 | DX-1 | PRISON VIDEO | 127 | 127 | 47 |
| 14 | DX-2 | MURPHY'S TDC RECORD | 140 | 140 | 47 |
| 15 | DX-3 | PHOTO | 100 | 100 | 47 |
| 16 | DX-4 | PHOTO | 90 | 90 | 47 |
| 17 | DX-5 | PHOTO | 100 | 100 | 47 |
| 18 | DX-6 | PAIR OF GLASSES | 98 | 98 | 48 |
| 19 | DX-7 | DR. VIGEN'S CV | 137 | 137 | 48 |
| 20 | DX-8 | EYE EXAM DOCUMENT | 16 | 16 | 49 |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

1   STATE OF TEXAS            *

2   COUNTY OF DALLAS          *

3       I, NANCY BREWER, Official Court Reporter for the 283rd

4   Judicial District Court, do hereby certify that the above

5   and foregoing constitutes a true and correct transcription

6   of all portions of evidence and other proceedings requested

7   in writing by counsel for the parties to be included in this

8   volume of the Reporter's Record, in the above-styled and

9   numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11      WITNESS MY OFFICIAL HAND on this the ___4___ day of

12  ___March___, 2004.

13

14

15  _____
    NANCY BREWER, CSR, NO. 5759

16  Expiration Date:  12-31-04
    Official Reporter, 283rd JDC

17  Frank Crowley Crts. Bldg. LB33
    133 No. Industrial Blvd.

18  Dallas, TX 75207
    (214)653-5863

19

20

21

22

23

24

25

1            REPORTER'S RECORD        **ORIGINAL**

2            VOLUME 2 OF 61

3            FEBRUARY 2, 2001

4        Trial Court Cause No. F01-34008-T

5            (later refiled as F01-00327-T)   **74851**

6   THE STATE OF TEXAS        *    IN THE 283RD JUDICIAL

7   VS.                       *    DISTRICT COURT OF

8   PATRICK MURPHY            *    DALLAS COUNTY, TEXAS

9   OTHER CAUSE NUMBERS AND DEFENDANTS:

10  F01-34005-T (later refiled as F01-00323-T   George Rivas

11  F01-34004-T (later refiled as F01-00324-T)  Donald Newbury

12  F01-34006-T (later refiled as F01-00326-T)  Michael Rodriguez

13  F01-34007-T (later refiled as F01-00325-T)  Joseph Garcia

14  F01-34010-T (later refiled as F01-00327-T)  Randy E. Halprin

15  ---------------------------------------------------

16                                    **FILED IN**
                                COURT OF CRIMINAL APPEALS
17  (APPEARANCES ON FOLLOWING PAGE)

18                                     MAR 9 - 2004

                                 Troy C. Bennett, Jr., Clerk
19          On the 2nd day of February, 2001, the above

20  entitled and numbered causes came on to be heard in the said

21  Court, Honorable Molly Francis, Judge Presiding, and the

22  following proceedings were held, to-wit:

23

24

25

LASER BOND FORM B   PENGAD • 1-800-631-6989 • www.pengad.com

```
 1
                         A P P E A R A N C E S
 2     MR. WILLIAM HILL
       SBOT NO.
 3     Dallas County District Attorney
       MR. TOBY SHOOK
 4     SBOT No.
       MR. GEORGE WEST
 5     SBOT No.
       MR. RICK JACKSON
 6     SBOT No.
       Assistant District Attorneys
 7     133 N. Industrial Blvd.
       Dallas, Texas  75207
 8     214-653-3700
       Attorneys for State of Texas
 9     ----------------------------------------------
       MR. WAYNE HUFF
10     Attorney at Law
       SBOT NO.
11     MR. KARO JOHNSON
       Attorney at Law
12     SBOT NO.
       MR. ADAM SEIDEL
13     Attorney at Law
       SBOT NO.
14     MS. MICHELLE MOORE
       Attorney at Law
15     SBOT NO.

16     MR. KERRY YOUNG -- Chief Staff Attorney for the Dallas
                      County Criminal Court Judges
17     OTHER CAUSE NOS. & APPEARANCES:

18     F01-34004-T    Donald Newbury        Mr. Kevin Brooks

19     F01-34006-T    Michael A. Rodriguez  Mr. Jim Oatman

20                                          Mr. Richard Carrizales

21     F01-34007-T    Joseph C. Garcia      Mr. Paul Brauchle

22     F01-34008-T    Patrick Murphy, Jr.   Ms. Brook Busbee

23                                          Mr. Juan Sanchez

24     F01-34010-T    Randy Ethan Halprin   Mr. George Ashford

25                                          Mr. Ed King
```

1                              CHRONOLOGICAL INDEX

2         Witness          Volume                              Page

3         (No witnesses)    2

4         Rulings of the Court ------------------------------------    6

5         Court Reporter's Certificate --------------------------    16

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          ALPHABETICAL INDEX

2       Witness          Volume

3       (No witnesses)   2

1                          EXHIBIT INDEX

2       Exhibit No.    Volume Description           Ident. Offer. Rec'd

3       (No exhibits)      2

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S

 2                      February 2, 2001

 3                      THE COURT:   These are Cause Numbers

 4      F01-34005-T, styled the State of Texas versus George Rivas.

 5      F01-34004-T, styled the State of Texas versus Donald Keith

 6      Newbury.  F01-34007-T, styled the State of Texas versus Joseph

 7      C. Garcia.  F01-34008-T, styled the State of Texas versus

 8      Patrick Henry Murphy, Jr.  F01-34010-T, styled the State of

 9      Texas versus Randy Ethan Halprin.  F01-34006-T, styled the

10      State of Texas versus Michael Anthony Rodriguez.

11                      I believe representing the State, I have here

12      today for purposes of the record, let's just put on, I have

13      District Attorney Bill Hill, Assistant District Attorney Toby

14      Shook, George West, Rick Jackson.

15                      MR. HILL:  That's correct, Your Honor.

16                      THE COURT:  All right.  Representing the

17      defense, and let me just first state for the record that the

18      only -- the only one of the above six defendants that I

19      actually have in court today and is actually in Dallas County

20      at this point is Mr. George Rivas.  The other five defendants

21      are still in Colorado pending extradition hearings.  They have

22      had attorneys that have been appointed here in Dallas County,

23      and I believe that each of the nonpresent defendants have

24      attorneys here today, at least one.

25                      Let me go through the list and at least for
```

1    purposes of the record let me get each attorney to state

2    present if you're here.  This is going to sound a little bit

3    like roll call, but since I need to know this for purposes of

4    the record who is here representing the interests of these

5    individuals, let's go ahead and do that.

6              For Mr. Rivas, I do have Mr. Wayne Huff present,

7    Mr. Karo Johnson, Mr. Adam Seidel and Ms. Michelle Moore is

8    assisting.  Donald Keith Newbury, his appointed attorneys are

9    Doug Parks, who I believe is not here.  Kevin Brooks.

10             MR. BROOKS:  Present.

11             THE COURT:  Co-counsel.  Joseph Garcia, attorney

12   Hugh Lucas, who I believe is not here.  Co-counsel, Paul

13   Brauchle.

14             MR. BRAUCHLE:  Here.

15             THE COURT:  Patrick Henry Murphy, Jr., lead

16   counsel Brook Busbee, who is here.

17             MS. BUSBEE:  Yes.

18             THE COURT:  And Juan Sanchez.

19             MR. SANCHEZ:  Present.

20             THE COURT:  Also here.  Randy Ethan Halprin,

21   George Ashford, lead counsel.

22             MR. ASHFORD:  Yes.

23             THE COURT:  Co-counsel, Ed King.

24             MR. KING:  Present, Your Honor.

25             THE COURT:  Michael Anthony Rodriguez, Jim

1    Oatman.

2              MR. OATMAN:  Present.

3              THE COURT:  And Richard Carrizales.

4              MR. CARRIZALES:  Present.

5              THE COURT:  Okay.  The chief staff attorney for

6    the Dallas County criminal court judges, Kerry Young, who is

7    also here, was asked to notify members of the media of my

8    intent to hold this hearing today and my intent to allow any

9    attorneys who are here representing various media agencies to

10   make statements, should they choose to, remarks about my

11   concerns over pretrial publicity and the effect of this

12   pretrial publicity on my ability to impanel a fair and

13   impartial jury.  Obviously, you have been asked to come today

14   to participate and, of course, to report anything that goes on

15   here today.

16              Of the six defendants, let me just say, and

17   anybody who disagrees with my recollection of what has gone on

18   here up until this point, of the six defendants in this case, I

19   believe five have made statements to the media regarding

20   certain levels of involvement in this particular case regarding

21   their beliefs as to their guilt or innocence and even

22   statements regarding what should happen to them back in Dallas

23   County upon trial.

24              You are here today and have been asked to come

25   today because I believe I have as a responsibility of the Judge

1    who is going to try these six cases to ensure that I am able to

2    select a fair and impartial jury, and I believe we are going to

3    begin, since I have Mr. Rivas here in Dallas County, we will

4    begin jury selection as early as June in that particular case.

5                    These juries that we impanel, these groups of

6    people that we bring up to the courthouse to make decisions in

7    these cases will, of course, be required to base their verdicts

8    on what they hear in the courtroom and on the evidence they

9    hear presented by the State and by the defense, should there be

10   any.  And of course, they will be required to disregard any and

11   all pretrial remarks or pretrial recordings that they hear,

12   including statements that are made by Mr. Rivas or purported to

13   have been made by Mr. Rivas or Mr. Halprin -- I believe Mr.

14   Halprin was on last night -- and will be required to disregard

15   statements made by these individuals unless they are properly

16   admitted during the trial.  And in that regard, they can, of

17   course, consider them for whatever purpose they choose.  But

18   they must be able to base their verdict on what they hear in

19   the courtroom and not on extraditial (sic) unsworn statements

20   made by participants of these trials.

21                   The six defendants, of course, each of them has

22   the right to come in on their trial date and enter pleas of not

23   guilty.  Regardless of what they have said to the media or

24   purported to have said to a reporter about being guilty, they

25   have the right to have a Dallas County jury base their verdict

1   on what is presented in the courtroom.   They have the right if

2   they are found guilty of capital murder then to have a jury

3   decide what punishment is appropriate.   And remarks that they

4   make regarding what they feel is appropriate and should happen

5   to them if they are found guilty are to be -- are to not be

6   considered unless those remarks are introduced during the trial

7   itself.

8                Over the past week, I believe I have even heard

9   an expert witness testify that after hearing an audio recording

10   of Mr. Rivas' voice, he could tell based on that audio

11   recording whether or not Mr. Rivas was lying.   And of course, I

12   believe he said that he was.   So these continued reports, of

13   course, affect the people that listen to them in Dallas County,

14   and I am concerned about the 72 people who are ultimately going

15   to be making the decision in each of these six cases, concerned

16   about their ability to base their verdict on what they hear in

17   the courtroom and not on what they hear reported in the news.

18                Now, let me make it very clear that if I do

19   impose an order restricting publicity on behalf of the

20   participants in each of these six cases, and that will include,

21   of course, attorneys, witnesses, potential witnesses, any

22   representatives of either side, investigators, co-counsel, of

23   course.   Any other experts that are employed by either side,

24   they will fall under this rule.   But my order will be directed

25   to them, not to the news media.   So this is directed to the

1      trial participants and will include the five defendants who are

2      still in Colorado and any remarks that they may say.

3                     Okay.  I would be glad to hear anything from

4      anybody here who is an attorney who has something they would

5      like to say regarding my intent to make these restrictions.

6      Any remarks from the State?

7                     MR. HILL:  Your Honor, we have no objections to

8      your proposed order.

9                     THE COURT:  Defense?  Any defendant?  Mr. Huff,

10     let's start with you.

11                    MR. HUFF:  We have no remarks, Your Honor.

12                    THE COURT:  All right.  Mr. Brooks for Donald

13     Keith Newbury.

14                    MR. BROOKS:  No objection, Your Honor.

15                    THE COURT:  All right.  Mr. Brauchle for Joseph

16     Garcia.

17                    MR. BRAUCHLE:  We have no objection, Your Honor.

18                    THE COURT:  Ms. Busbee for Patrick Murphy.

19                    MS. BUSBEE:  No objection, Your Honor.

20                    THE COURT:  Mr. Ashford for Randy Ethan Halprin.

21                    MR. ASHFORD:  No objections, Your Honor.

22                    THE COURT:  All right.  Michael Anthony

23     Rodriguez, Jim Oatman.

24                    MR. OATMAN:  No objection, Your Honor.

25                    THE COURT:  Okay.  State, defense,_members of

1    the media, anybody like to say anything?  This is your chance.

2             MS. DEBRA THOMAS:  Your Honor, I am Debra Thomas

3    from Haynes & Boone.

4             THE COURT:  Yes, ma'am.

5             MS. DEBRA THOMAS:  I represent the Fort Worth

6    Star Telegram.  While we are sensitive to the Court's concerns

7    about a fair and impartial jury, we are also sensitive to the

8    first amendment and the Texas constitutional rights afforded

9    the defendants in this matter, and we would request the

10   opportunity to brief the Court on our views of the law in this

11   matter in this regard and would appreciate any opportunity to

12   address our objections and concerns with the Court.

13            THE COURT:  Okay.  Thank you very much.  Anybody

14   else?  A lot of people looking down all of a sudden.  Come on,

15   this is your chance.

16            Is that it?  Anybody else have anything they

17   want to say?  All right.  As it relates to -- as it relates to

18   briefings and any authority you would like me to look at, I

19   would be glad to consider that.  However, I am going to find at

20   this point that any further extrajudicial statements made by

21   the trial participants on both sides are reasonably likely to

22   prejudice the proceedings in this court.

23            I find that there is a clear or serious threat

24   to the fairness of the trial.  I find that less restrictive

25   alternatives are not adequate to mitigate the harm caused by

1    the publicity, and that this order would effectively prevent

2    the threatened danger.

3                 I am issuing this order restricting parties,

4    attorneys and witnesses from making any further extrajudicial

5    statements or furnishing any information to members of the

6    media that might reasonably be expected to pose a serious

7    threat to the constitutional guarantees of a fair trial or

8    impair the Court's ability to impanel an impartial jury.

9                 Let me say for the purposes of the record that a

10   witness is someone who has been sworn in by the Court or anyone

11   that an attorney for the State or the defense believes in good

12   faith has information material to the trial of these cases and

13   the person has been notified of that fact and of the existence

14   of this order.

15                Any witness or potential witness shall be

16   notified of this order whether they be in Texas, Colorado or

17   elsewhere.  I find that these restrictions on pretrial

18   publicity are necessary to preserve the availability of the

19   option of change of venue, and there is no indication that

20   delaying the trial of this case or the other five defendants

21   would lessen the amount of pretrial publicity in these cases.

22                I do not restrict the publication or broadcasting

23   by members of the press or news media any information not

24   prohibited by law.  This order does not prohibit access by the

25   media to public records or documents.  A witness, _prospective

1 witness, defendant, law enforcement officer, attorney or other

2 person subject to this order is not prohibited by this order

3 from making out of court statements, reciting without comment

4 information contained in public records, scheduling or the

5 result of any hearing or the general nature of the proceedings.

6    Obviously, I am equally concerned about free

7 speech but believe that when you have free speech rights and

8 the right to a fair trial that conflict, that the right to a

9 fair trial is going to prevail.  I will issue an order this

10 afternoon.  I will be glad to revisit the issue any time I am

11 presented any authority to review, and you never know, may

12 change my mind.  I will also issue findings in this regard.

13 Thank y'all very much.

14    Sheriff, he can go back.

15    (End of proceedings)

16

17

18

19

20

21

22

23

24

25

1    STATE OF TEXAS          )

2    COUNTY OF DALLAS        )

3                       I, SHARON HAZLEWOOD, deputy court reporter in

4    and for the 283rd Judicial District Court of Dallas County,

5    State of Texas, do hereby certify that the above and foregoing

6    contains a true and correct transcription of all portions of

7    evidence and other proceedings requested in writing by counsel

8    for the parties to be included in the reporter's record in the

9    above styled and numbered cause, all of which occurred in open

10   court or in chambers and were reported by me.

11                       I further certify that this transcription of the

12   proceedings truly and correctly reflects the exhibits, if any,

13   offered by the respective parties.

14                       I further certify that Dallas County did not pay

15   a substitute court reporter while I prepared this transcript.

16                       WITNESS my hand, the 24th day of July, 2003.

17                       _Sharon Hazlewood_

18                       SHARON HAZLEWOOD, C.S.R.

19                       Certification Number: 628

20                       Date of Expiration: 12-31-2004

21   283RD JUDICIAL DISTRICT COURT

22   Frank Crowley Courts Building

23   133 N. Industrial, LB33

24   Dallas, Texas   75207-4313

25   214/653-5674

74851

1                    REPORTER'S RECORD

2                 VOLUME _3_ OF _6_       

3                 FEBRUARY 23, 2001

4         Court Trial Cause Number F01-34008-T

5           (later filed as F01-00328-T)

6  THE STATE OF TEXAS          IN THE 283RD JUDICIAL

7  VS.                       DISTRICT COURT OF

8  PATRICK MURPHY, JR.        DALLAS COUNTY, TEXAS

9  OTHER CAUSE NUMBERS AND DEFENDANTS:

10  F01-34004-T (later refiled as F01-00323-T)  George Rivas

11  F01-34004-T (later refiled as F01-00324-T)  Donald Newbury

12  F01-34006-T (later refiled as F01-00326-T)  Michael Rodriguez

13  F01-34008-T (later refiled as F01-00328-T)  Patrick Murphy, Jr.

14  F01-34007-T (later refiled as F01-00325-T)  Joseph Garcia

15  F01-34010-T (later refiled as F01-00327-T)  Randy Halprin

16  -----------------------------------------------------

17

18                            **FILED IN**
                     COURT OF CRIMINAL APPEALS

19  (APPEARANCES ON FOLLOWING PAGE)    MAR 9 - 2004
                           Troy C. Bennett, Jr., Clerk

20        On the 23rd day of February, 2001, the above

21  entitled and numbered cause came on to be heard in the said

22  Court, Honorable Molly Francis, Judge Presiding, and the

23  following proceedings were held, to-wit:

24

25

```
 1                    A P P E A R A N C E S
     MR. TOBY SHOOK
 2   SBOT No. 18293250
     MR. RICK JACKSON
 3   SBOT No. 10492980
     Assistant District Attorneys
 4   133 N. Industrial Blvd.
     Dallas, Texas  75207
 5   214-653-3700
     Attorneys for State of Texas
 6   --------------------------------------------------
     MR. KARO JOHNSON
 7   Attorney at Law
     SBOT NO.
 8

 9   MS. MICHELLE MOORE
     Attorney at Law
10   SBOT NO.

11

12   MR. THOMAS J. WILLIAMS
     MS. DEBRA THOMAS
13   Attorneys at Law
     Haynes & Boone
14   201 Main Street, Suite 2200
     Ft. Worth, Texas  76102-3126
15   Attorneys for Ft. Worth Star Telegram

16   OTHER CAUSE NUMBERS AND APPEARANCES:
     F01-34007-T    Joseph C. Garcia      Mr. Paul Brauchle
17   (later refiled as F01-00325-T)

18

19

20

21

22

23

24

25
```

1                          CHRONOLOGICAL INDEX

2       Witness          Volume

3       (No witnesses)    4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          ALPHABETICAL INDEX

2     Witness          Volume

3     (No witnesses)    4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              EXHIBIT INDEX

2      Exhibit Number Volume   Description        Ident Offered Rec'd

3      (No exhibits)     4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2              February 23, 2001

3                    THE COURT:  This is Cause Number F01-34005-T,

4    styled the State of Texas versus George Rivas, is the number we

5    are going to put this under, even though my order applies in

6    all six cases.  I have before me Debra Thomas, who was here

7    previously, and -- Mr. Williams, I'm sorry, I didn't write down

8    your first name.

9                    MR. WILLIAMS:  Tom, Your Honor.

10                    THE COURT:  Tom Williams from Fort Worth.  We

11   have -- I have a copy of your motion and your authority, and

12   will be glad for you to argue from that motion or present

13   anything additional you would like to.  Go right ahead.

14                    MR. WILLIAMS:  Thank you, Your Honor.

15                    Your Honor, I would have some argument and I

16   appreciate the opportunity the Court has given us to file this

17   and to come before you.  And what I would like to do this

18   afternoon is ask the Court to look at what it did on February

19   2nd and perhaps re-evaluate some of these issues, or at least

20   reconsider some of these issues.  And as the Court does so, I

21   would ask that the Court do so in the context of trying to

22   analyze what is it that we are concerned might happen going

23   forward that this order will do anything about.

24                    The publicity that has already occurred, Your

25   Honor, has occurred.  And what happened and what was reported
```

1    before this matter came within your jurisdiction is done, and,

2    obviously, the Court has no power to do anything about that.

3    There is going to be publicity going forward, as there always

4    is in cases like this.  And some of the types of publicity that

5    the transcript of the February 2nd hearing at least indicated

6    you were concerned about, I think will happen regardless.  Your

7    example about the so-called expert on lie detection who goes on

8    the radio talk shows and says, well, I can tell they're all

9    lying, an understandable concern that the Court has --

10            THE COURT:  My jury is watching that.

11            MR. WILLIAMS:  Sure.  Sure.  But we really can't

12    do anything about that.  And the -- I think -- what I wanted to

13    raise to your attention in the motion and to elaborate on a

14    little bit today is that it seems to me that an order such as

15    this in these kinds of cases really just deny the public access

16    to a source of information that people might actually know what

17    they're talking about and might have reliable and credible

18    information that isn't going to interfere with the ability

19    to --

20            THE COURT:  Are you talking about anybody or are

21    you talking specifically about the six defendants?

22            MR. WILLIAMS:  Well, Your Honor if I could, as

23    your order did, I am going to kind of break it down into

24    different categories --

25            THE COURT:  That is fine.

1              MR. WILLIAMS: -- of players.

2              THE COURT:  It is hard for me not to jump in

3     sometimes, and I will try not to.

4              MR. WILLIAMS:  I understand.  I understand.  I

5     appreciate it.

6              But what you did in your order, it seems to me,

7     is you said there is -- the defendants, the six, because I

8     understand you to say and I read your order that it would apply

9     to all of them.

10             THE COURT:  Yes, sir.

11             MR. WILLIAMS:  And then you've got the

12    attorneys, and then you've got what I call kind of everybody

13    else, the nonlawyer, nondefendant participants.  On the

14    attorneys, as I read your order, all you really told them to do

15    is follow the disciplinary rules, which I am sure they are

16    going to do anyway.  So I really would focus this afternoon on

17    the other two categories.

18             On the defendants, at least some of whom have

19    had some things to say --

20             THE COURT:  Five of six have.

21             MR. WILLIAMS:  Sure.  That's right.  Sure.

22             It seems to me, Your Honor, that with respect to

23    those defendants who are now represented by competent counsel

24    who will presumably advise them of the advisability of anything

25    they do.  If those defendants wish to speak out and if they are

1   going to -- if they want to be a willing speaker, then there is

2   no reason the Court should inhibit that.

3                    THE COURT:  Except that they have the right -- 

4   I'm sorry, I can't help myself.

5                    MR. WILLIAMS:  That is okay.

6                    THE COURT:  Except they have the right to come

7   in here and plead not guilty on the day of trial.

8                    MR. WILLIAMS:  Yes, they do.

9                    THE COURT:  If up until that point every day

10  they have said on every single news station and to every print

11  reporter I am guilty --

12                   MR. WILLIAMS:  That --

13                   THE COURT:  -- and then I have to bring these

14  people in and say you have to presume them innocent, and they

15  say, but I just saw in the Fort Worth Star Telegram, they gave

16  this big long interview and said they were as guilty as can be

17  and thought they ought to be given the death penalty.  It just

18  makes it very difficult, would you not agree, for me to be able

19  to get 12 people six times, if this continues up until the day

20  before trial?

21                   I am going to quit here in a minute.

22                   MR. WILLIAMS:  No, no.  That --

23                   THE COURT:  If it continues up until the day

24  before trial, it is going to be a very difficult thing for me

25  to get 12 fair and impartial people who can put aside what .

1    these -- what continues to be reported and base their verdict

2    on what they hear in the courtroom.

3                    MR. WILLIAMS:  Your Honor, I have two responses

4    to that.

5                    THE COURT:  Okay.

6                    MR. WILLIAMS:  One is more -- the first I will

7    give you is more general in nature, and the second will relate

8    to this specific order.

9                    THE COURT:  Okay.

10                   MR. WILLIAMS:  As to the more general comment,

11   in this day and age I think the ability to get the jury is

12   easier perhaps than it once was, particularly in a metropolitan

13   county such as this.  We have got a large pool of potential

14   jurors.  And we are exposed to all kinds of information about

15   all sorts of things.

16                   And as time goes on, I understand this case

17   probably, at best, won't be tried until the summer, news value

18   diminishes, people's interest diminishes, other news events

19   comes into play, we start talking presidential pardons or

20   bombing Iraq or, you know, whatever it is we are talking about.

21    And I think with careful voir dire and careful instructions,

22   which I know you will do, it can be done.

23                   And we have seen other cases, not just in

24   Dallas, but Houston, Fort Worth, Austin, where there has been a

25   high volume of publicity.  And some of the cases we cited in

1   the brief talk about that, that a large volume of publicity in

2   and of itself does not necessarily inhibit the ability to get a

3   fair trial.

4                   The other -- that is the more general comment.

5                   The specific on this order, and this is

6   something that will relate to the second category as well, the

7   nonlawyer, nondefendant category, is you gave the example of

8   what happens if one of the defendants goes on TV or talks to

9   newspaper every day and says, I did it, I did it, I did it.

10  You know, you're assuming that is what he's going to to say.

11                  THE COURT:  Which some have.

12                  MR. WILLIAMS:  And I think -- but what I think

13  your order potentially does, Your Honor, is it prohibits them

14  from saying anything because the defendant and his

15  representatives are ordered not to say anything which could

16  reasonably be expected to be disseminated if it may reasonably

17  be expected to pose a serious threat to the constitutional

18  guarantee to a fair trial.  And you use very similar language

19  on that category of nonlawyer participants and witnesses.

20                  And so I think by imposing upon someone who

21  might otherwise choose to speak, that standard, I cannot speak

22  out if it could reasonably be expected to pose a serious threat

23  to the constitutional guarantee to a fair trial, I think --

24                  THE COURT:  Does that seem unfair?

25                  MR. WILLIAMS:  I think people are going to err

1    on the side of caution, if they want to obey your order, and

2    they're not going to say anything.  And I think that is the net

3    effect of using language like that.  That is even stricter

4    language than we impose on the lawyers under the disciplinary

5    rules.

6            THE COURT:  The lawyers and the defendants and

7    anybody else can tell you what is going on in the case, what is

8    going to happen when, about settings --

9            MR. WILLIAMS:  That's true.

10            THE COURT:  -- about any procedural matters they

11    want to talk about, they can talk about.

12            MR. WILLIAMS:  Right, I agree with that.  But

13    about all that is, is -- I can tell you what I can also go find

14    out in the district clerk's jacket, too, and that's fine.  That

15    is --

16            THE COURT:  Well, not necessarily.

17            MR. WILLIAMS:  That is public and you made clear

18    that you're not restricting that, and I think that is as it

19    should be.  And I did not gather from the order or the

20    transcript of the 2nd that you were concerned about that.

21            But my concern about your order using words like

22    may reasonably be expected to pose a serious threat to the

23    constitutional guarantee of a fair trial, if I want to be safe

24    I better just not say anything, it seems to me, if I am a

25    person who potentially --

```
 1                    THE COURT:  They could come ask me what I

 2      think --

 3                    MR. WILLIAMS:  True.

 4                    THE COURT:  -- if I think what they intend to

 5      say is or is not.

 6                    MR. WILLIAMS:  True, they could.  I think that

 7      imposes a very serious constitutional issue if I have to come

 8      seek the permission of government before I want to do that.

 9      And I think that is the concern.

10                    So -- and to make the comparison to the rules

11      that the lawyers must abide by, what Rule 307 says, and which

12      you incorporated in your order, is that a lawyer should not say

13      anything that will have a substantial likelihood of materially

14      threatening the ability to get a fair trial.  And it seems to

15      me you've got an even stricter standard on these nonlawyers,

16      particularly the witnesses.  The defendants have their own

17      counsel, and that seems to be a little bit different.

18                    But for a nonlawyer who might be a witness,

19      might be involved in law enforcement, might have some

20      connection to the case, to try to have to make that judgment,

21      what -- if I say this, is it -- is there a reasonable

22      expectation this will pose a serious threat, I think the net

23      effect is that these people won't say anything at all.

24                    As far as defendants themselves --

25                    THE COURT:  But you will agree that is not what
```

1    I am telling them to do?  If they are overly cautious and law

2    abiding and their choice is to not say anything at all, then

3    that is their choice.

4              MR. WILLIAMS:  Except that if I make that choice

5    because I am concerned that if I guess wrong and you disagree

6    with me and then I am at risk of being in contempt of court,

7    then it really isn't my choice.

8              THE COURT:  I appreciate that.

9              MR. WILLIAMS:  The other comment I just want to

10   make about the defendants, Your Honor, is, of course,

11   obviously, constitutional rights can be waived.  And to the

12   extent that the defendants' own statements might create an

13   issue, assuming the statement was given knowingly, and it seems

14   to me there is less of a concern for the Court.

15             THE COURT:  That their constitutional right to a

16   fair trial could be waived?  I'm sorry, I don't understand.

17   This is more something I see as my issue.

18             MR. WILLIAMS:  And I agree.  The Court does have

19   that responsibility independently.  I do agree with that.

20             THE COURT:  Okay.

21             MR. WILLIAMS:  But it does seem to me that to

22   the extent a defendant -- whether it is this case or any other

23   case, to the extent a defendant chooses to grant a press

24   interview and some adverse consequence flows from that

25   decision, it seems to me the defendant has kind of accepted

1     that risk himself.

2                 THE COURT:  Except that I still have to pick a

3     jury that can follow the law, regardless of what consequence

4     they receive.

5                 MR. WILLIAMS:  Yes, you do, and your --

6                 THE COURT:  My concerns may be more selfish, Mr.

7     Williams, and that is at least for the system and the fairness

8     of the system because every one of these defendants are

9     entitled to a fair trial, and I am doing the best I can to see

10    that they get one.  But anyway, I'm sorry, keep going.

11                MR. WILLIAMS:  Well, I understand the Court's

12    point, but I am confident that when it comes time to pick the

13    jury you will have the process in place to determine if that

14    has been a problem, and to the extent certain people may have

15    been affected by something they heard, then that is what voir

16    dire is for.

17                The other thing, Your Honor, I would ask you to

18    think about this afternoon is not so much a constitutional

19    issue, not whether you have the power to issue some sort of an

20    order.  I do think as this one is written it is broader than

21    courts have upheld, but also to step back, as I said a moment

22    ago, and evaluate should we enter this order.  And in that

23    context, think about what is it that might happen in the future

24    going forward that this is intended to capture.

25                And I don't know that I know what it is, and I

1    regrettably was not here on February 2nd.  I have read the

2    transcript of the hearing.  The things that I saw the Court

3    expressed concern about in that transcript, it seems to me,

4    this order doesn't affect.  And so what we are doing is denying

5    the press, and then ultimately the public, access to a source

6    of information, of people who might have reliable information

7    to give out.

8              THE COURT:  Okay.  That's it?  Is that it?

9              MR. WILLIAMS:  Well, I will be happy to

10   entertain any more questions the Court has.  I would urge, as

11   we said --

12             THE COURT:  Would you let me just ask you this?

13             MR. WILLIAMS:  Yes.

14             THE COURT:  Would you not agree that the media

15   access to six defendants or five out of the six, access

16   probably to all six, this one chose not to talk, has been

17   unprecedented?  When ever has a criminal defendant over and

18   over given interviews repeatedly about their guilt or innocence

19   in a case and motives and what went on, et cetera, et cetera?

20   A whole fact -- it doesn't happen.  It doesn't happen.  Not

21   before trial.

22             MR. WILLIAMS:  Well, we certainly have precedent

23   of defendants giving interviews.  Now, quite often they're

24   saying I didn't do it and proclaiming their innocence.  But,

25   you know, you asked me if it is unprecedented -- _

1                    THE COURT:  Media access already --

2                    MR. WILLIAMS:  I am mentally thinking for some

3       examples, Your Honor.  I don't think the notion of accused

4       citizens talking to the press before trial is all that unusual.

5       Now, maybe what is said in a given case may vary, but we have

6       got plenty of examples out there where defendants, you know,

7       upon an initial --

8                    THE COURT:  You may see more criminal cases than

9       I do, but I believe this is the -- media access has already

10      been --

11                   (Ms. Thomas shaking her head)

12                   THE COURT:  Don't shake your head, please,

13      ma'am.

14                   MR. WILLIAMS:  Your Honor, cases with political

15      overtones, we see defendants talking all the time and we manage

16      to pick a jury.  I don't think it is unprecedented.  Perhaps it

17      is not common, but that is because most criminal cases don't --

18      are not the type of case that draw attention in the first

19      place.

20                   By definition, 95 percent of the cases we try

21      down here do not attract publicity.  There is nothing that

22      especially noteworthy about them.  So the pool of cases in

23      which there may even be any media coverage is a small pool.

24      But I don't find it terribly unusual that a defendant may speak

25      out.

1              Now, perhaps what has been said here might not

2    be common.

3              THE COURT:  I think the third defendant in the

4    James Byrd trial gave an interview before trial.

5              MR. WILLIAMS:  That is true, yes.  60 Minutes.

6              THE COURT:  Uh-huh.

7              MR. WILLIAMS:  And that is a good example.  You

8    know, what he wanted to say in that interview was not

9    inculpatory.  He was trying to say I didn't have quite as much

10   to do with it as those other two guys.

11             THE COURT:  Absolutely.  Okay.

12             MR. WILLIAMS:  I think the other thing, Your

13   Honor, and I alluded to this a little bit in the papers.  Some

14   of what some of these defendants have been reported to say in

15   the press I think goes beyond just guilt or innocence in this

16   case and rises to the level of what I call an agreed political

17   speech.  If I want to speak out on the failings of the criminal

18   justice system or speak out on the failings of the Texas prison

19   system, and, you know, somehow or another that led to something

20   that happened, that, it seems to me, does not really go to the

21   guilt or innocence of the accused in this case, but that is

22   captured by your order and it would seem to me they could not

23   do that under this order.

24             THE COURT:  Okay.  Anything else?  Mr. Shook,

25   remarks?

1          MR. SHOOK:  Nothing from the State, Judge.

2          THE COURT:  Mr. Johnson?

3          MR. JOHNSON:  We have no comment, Your Honor.

4          THE COURT:  Mr. Jackson, would you like to say

5     anything?

6          MR. JACKSON:  No, ma'am.  Thank you for

7     offering, though.

8          THE COURT:  Mr. Brauchle, comments?  I think

9     everyone should have --

10         MR. BRAUCHLE:  I will decline, Your Honor.

11         THE COURT:  All right.  I am going to deny the

12    request to vacate my restrictions regarding publicity.

13         Thank you both for coming over to Dallas today.

14    All right.

15              (End of proceedings)

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF TEXAS        )

 2   COUNTY OF DALLAS      )

 3        I, SHARON HAZLEWOOD, deputy court reporter in and for

 4   the 283rd Judicial District Court of Dallas County, State of

 5   Texas, do hereby certify that the above and foregoing contains

 6   a true and correct transcription of all portions of evidence

 7   and other proceedings requested in writing by counsel for the

 8   parties to be included in the reporter's record in the above

 9   styled and numbered cause, all of which occurred in open court

10   or in chambers and were reported by me.

11        I further certify that this transcription of the

12   proceedings truly and correctly reflects the exhibits, if any,

13   offered by the respective parties.

14        I further certify that Dallas County did not pay a

15   substitute court reporter while I prepared this transcript.

16        WITNESS my hand, the 15th day of July, 2003.

17                   _Sharon Hazlewood_

18                   SHARON HAZLEWOOD, C.S.R.

19                   Certification Number: 628

20                   Date of Expiration: 12-31-2004

21   283RD JUDICIAL DISTRICT COURT

22   Frank Crowley Courts Building

23   133 N. Industrial, LB33

24   Dallas, Texas  75207-4313

25   214/653-5674
```

SHARON HAZLEWOOD, CSR   (214) 653-5888

1          REPORTER'S RECORD

2     VOLUME  4  OF  6          **74851**

3          February 27, 2001

4     Court Trial Cause Number F01-00328-T

5

6

7   THE STATE OF TEXAS          ) IN THE 283RD JUDICIAL

8   VS.                         ) DISTRICT COURT OF

9   PATRICK MURPHY, JR.         ) DALLAS COUNTY, TEXAS

10

11          **ORIGINAL**

12     ----------------------------------------------------

13

14   OTHER CAUSE NUMBERS AND DEFENDANTS:

15   F01-34008-T (later refiled as F01-00324-T)   Donald Newbury

16

17     ----------------------------------------------------

18

19   (Appearances listed on next page)          **FILED IN**
                                      COURT OF CRIMINAL APPEALS

20                                      MAR 9 - 2004

21                                    Troy C. Bennett, Jr., Clerk

22          On the 27th of February, 2001, the above

23   entitled and numbered cause came on to be heard in the said

24   Court, Honorable Molly Francis, Judge Presiding, and the

25   following proceedings were held, to-wit:

SHARON HAZLEWOOD, 283RD JUDICIAL DISTRICT COURT

```
1              A P P E A R A N C E S

2    ATTORNEYS FOR THE STATE OF TEXAS

3    MR. TOBY SHOOK

4    SBOT No. 18293250

5    MR. RICK JACKSON

6    SBOT No. 10492980

7    Assistant District Attorneys

8

9    ATTORNEYS FOR THE DEFENDANT, DONALD KEITH NEWBURY

10   MR. DOUG PARKS

11   Attorney at Law

12   3300 Oak Lawn, Suite 600

13   Dallas, Texas  75219

14   (214) 521-2670

15   SBOT No. 1552000

16

17   MR. KEVIN BROOKS

18   Attorney at Law

19   700 North Pearl, Suite 2100

20   Dallas, Texas  75201

21   (214) 871-1995

22   SBOT No. 03070735

23

24

25
```

SHARON HAZLEWOOD, 283RD JUDICIAL DISTRICT COURT

1    ATTORNEYS FOR DEFENDANT PATRICK MURPHY

2    BROOK BUSBEE

3    JUAN SANCHEZ

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           CHRONOLOGICAL INDEX

2       (No witnesses)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          ALPHABETICAL INDEX

2      (No witnesses)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              EXHIBIT INDEX

2    (No exhibits)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHARON HAZLEWOOD, 283RD JUDICIAL DISTRICT COURT

```
 1                  P R O C E E D I N G S

 2          February 27, 2001

 3          THE COURT:  These are Cause Nos. F01-00324,

 4   F02-00328-T, styled the State of Texas versus Donald Keith

 5   Newbury who is here with his attorney, Doug Parks.  Co-counsel

 6   Kevin Brooks.

 7          Patrick Henry Murphy, Jr., who is here with his

 8   attorney Brook Busbee.  Co-counsel Juan Sanchez.

 9          Here today just to go over a couple of matters

10   that I thought I would bring Mr. Murphy and Newbury out to make

11   sure that they had gotten information from their attorneys.

12          And Ms. Busbee, you and Mr. Parks tell me you

13   all have discussed the restrictions regarding publicity that I

14   entered in the State of Texas versus George Rivas.

15          You have gotten copies of my order regarding

16   publicity regarding what your clients are allowed to talk to

17   the media about or anyone else about.  You-all have gone over

18   those orders.  Everybody understands those orders.

19          I imagine my orders are probably more lenient

20   than your own instructions to your clients.  I don't know.  I

21   might be wrong.  But everybody is aware of those and has gotten

22   copies.  Anything we need to talk about any more as it relates

23   to that?

24          MR. PARKS:  Nothing from us, Your Honor.

25          THE COURT:  Ms. Busbee, anything else?
```

SHARON HAZLEWOOD, 283RD JUDICIAL DISTRICT COURT

1          MS. BUSBEE:  No.

2          THE COURT:  I have before me in Mr. Murphy's

3     case an order asking that I appoint an investigator.  Ms.

4     Busbee, I have granted that order.

5          I have in Mr. Newbury's case a motion to

6     photograph the defendant that has been filed by the State.

7     Anything else the State wants to say in that regard?

8          MR. SHOOK:  I think the motion speaks for

9     itself, Judge.  It goes to some tatoos viewed by witnesses

10    there at the Oshman's but also his identification.  Obviously,

11    TDC keeps tracks of inmates' tatoos, and it is one of their

12    identifiers.  So we think it is relevant to identification.

13         THE COURT:  And it is your intent to take those

14    photographs today?

15         MR. SHOOK:  Right now.

16         THE COURT:  Yes.  Mr. Parks, response?

17         MR. PARKS;  Your Honor, we would object to the

18    State taking those photographs for two reasons.  One, we don't

19    believe they are, in fact, probative of any matter of fact to

20    be determined in this case.  They're not relevant under Rule

21    401.

22         The motion indicates that some of the witnesses

23    may have observed some tatoos, doesn't indicate where on Mr.

24    Newbury's body those tatoos were observed.  Certainly tatoos on

25    the chest, stomach, back probably would not have been observed

SHARON HAZLEWOOD, 283RD JUDICIAL DISTRICT COURT

1    by any witnesses, so we would object to those.

2              And with respect to the identifier portion of

3    Mr. Shook's motion, I certainly, while tatoos can be useful as

4    identifiers, fingerprints, I believe, are generally considered

5    to be the best use of identifiers.

6              And certainly I don't think there is any serious

7    question that Mr. Newbury is, in fact, Mr. Newbury, and we

8    would object to the photographs.

9              THE COURT:  Objection overruled.  Motion to

10   photograph the defendant granted.  That will be done today in

11   the holdover.

12             I also have evidentiary search warrants in both

13   cases.  I believe Mr. Shook, the bottom line is you-all want

14   saliva samples; is that correct?

15             MR. SHOOK:  That is correct, Judge.

16             THE COURT:  The facts have been recited in the

17   affidavit.  They have already been signed by a magistrate.  The

18   affiant has already sworn to them.  Any other remark about that

19   from the State?  And I assume that you want to have those

20   search warrants executed at this same time; is that correct?

21             MR. SHOOK:  That's correct, Judge, and I believe

22   the motions, probable cause speak for themselves, and the

23   officers are standing by with the materials needed.

24             THE COURT:  Okay.  They appear to be in order.

25   Any other response from either Mr. Parks or Ms. Busbee?

SHARON HAZLEWOOD, 283RD JUDICIAL DISTRICT COURT

```
 1                  MR. PARKS:  Nothing with respect to the search

 2    warrants, Your Honor.

 3                  THE COURT:  Ms. Busbee?

 4                  MS. BUSBEE:  No, Your Honor.

 5                  THE COURT:  Then those will be executed at this

 6    same time.  Anything else anybody would like to talk about?

 7                  MR. PARKS:  Your Honor, I noticed that you

 8    granted Ms. Busbee's motion for appointment of an investigator.

 9    I filed a motion some days ago but has that been --

10                  THE COURT:  And it very well may be here now

11    that I have got two -- here it is.  Let me put it in the other

12    file, Mr. Parks.  My clerk tells me we need to try real hard to

13    try to keep everything in the right file.

14                  That motion for court appointed investigator,

15    Mr. Parks, in the case of Donald Keith Newbury, that is also

16    granted.  As a matter of fact I also signed that February 6.

17    You have already had one 21 days.

18                  THE COURT:  Okay.  Anything else?

19                  MS. BUSBEE:  No.

20                  MR. PARKS:  No.

21                  THE COURT:  Sheriff, they can go back.  And Mr.

22    Shook, I bet your people are ready to go.

23                  MR. SHOOK:  They are, Judge.

24                  (Proceedings adjourned)

25
```

SHARON HAZLEWOOD, 283RD JUDICIAL DISTRICT COURT

1    STATE OF TEXAS         )

2    COUNTY OF DALLAS       )

3              I, SHARON HAZLEWOOD, deputy court reporter in and for

4    the 283rd Judicial District Court of Dallas County, State of

5    Texas, do hereby certify that the above and foregoing contains

6    a true and correct transcription of all portions of evidence

7    and other proceedings requested in writing by counsel for the

8    parties to be included in the reporter's record in the above

9    styled and numbered cause, all of which occurred in open court

10   or in chambers and were reported by me.

11             I further certify that this transcription of the

12   proceedings truly and correctly reflects the exhibits, if any,

13   offered by the respective parties.

14             I further certify that Dallas County did not pay a

15   substitute court reporter while I prepared this transcript.

16             WITNESS my hand, the 1st day of June, 2002.

17             _Sharon Hazlewood_

18             SHARON HAZLEWOOD, C.S.R.

19             Certification Number: 628

20             Date of Expiration: 12-31-2002

21   283RD JUDICIAL DISTRICT COURT

22   Frank Crowley Courts Building

23   133 N. Industrial, LB33

24   Dallas, Texas  75207-4313

25   214/653-5674

SHARON HAZLEWOOD, 283RD JUDICIAL DISTRICT COURT

REPORTER'S RECORD

**74851**

VOLUME 5 OF 6 VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| STATE OF TEXAS | * | IN THE DISTRICT COURT |
|---|---|---|
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JURY PANEL

QUESTIONNAIRES

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FILED IN**
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 16th day of May 2003, morning session, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Vickers L. Cunningham,  Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

1    A P P E A R A N C E S

2    APPEARING FOR THE STATE

3    Mr. Toby Shook
     SBOT NO. 18293250
4    And
     Mr. Bill Wirskye
5    SBOT NO.  00788696
     Assistant District Attorneys
6    133 No. Industrial Blvd.
     Dallas Texas 75207
7    Phone:  214/653-3600

8

     APPEARING FOR THE DEFENDANT
9
     Ms. Brook Busbee
10   Attorney at Law
     SBOT:  03488000
11   703 McKinney Ave. Ste. 312
     Dallas, TX 75202
12   214/754-9090

13   Mr. Juan Sanchez
     Attorney at Law
14   SBOT:  00791599
     5630 Yale Blvd.
15   Dallas, TX 75206
     214/365-0700

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2          THE COURT:  Good morning.  While I have

3   you standing up, I'm going to swear everybody in to be a

4   potential juror in this case.  Please raise your right

5   hands.

6                    [At this time the jury panel was

7                    sworn by the Court.]

8          THE COURT:  You may be seated.  I have

9   just sworn you in to be a venire juror.  Here the answer is

10  to tell the truth on the questions concerning your

11  qualifications to be a juror in this case.  We have a lot of

12  people standing over here on the sides and the back.  We

13  have seats in the middle.  If you would like to have a seat,

14  please do so.  I know it's hot.  You may be more comfortable

15  standing up.

16          We've asked the services this morning at

17  7:20 to turn the air down but your commissioners are trying

18  to save money, bottom line.  So if you are hot, I'm hot in

19  this robe.  I trust you that is the truth.  All right.

20          Thank you for being down here.  We have a

21  lot of work to do today.  I need to go over some issues with

22  you in this case.  At this time I'm going to call Cause No.

23  F01-00328, State of Texas versus Patrick Murphy.  What says

24  the State?

25          MR. SHOOK:  State's ready.

THE COURT:  What says the defense?

MS. BUSBEE:  Ready for this procedure, Your Honor.

THE COURT:  Yes.  Each of you have been summoned here today to be a juror in a capital murder case in which the State seeks the death penalty.  I hear the pin drop.  I know the Sheriff gave you a few preliminary instructions here.  I have to go over some issues with you at this time.  I'll read it straight out of the procedure book.

In a capital felony case in which the State seeks the death penalty, the Court shall propound to the entire panel of prospective jurors questions concerning the principles as applicable to the case on trial of reasonable doubt, burden of proof, return of indictment by a Grand Jury, presumption of innocence, and opinion.

So those issues I have to go over with you today.  I'll try to do it as quickly as I can.  I need to go over the qualifications and potential exemptions that you may have in this matter and we have a short questionnaire for you to fill out.

I'll start by introduction of the parties at this time.  For the State, Mr. Toby Shook, Mr. Bill Wirskye, Tom D'Amore.  All three of these gentlemen are Assistant District Attorneys working for your elected

1   District Attorney, Bill Hill.

2                   To your left, my right, we have Mr. Juan

3   Sanchez, Ms. Brook Busbee Alexander.  And up here is the

4   defendant, Patrick Murphy.  You have already met the

5   Sheriff, Bryan Cook.  He's -- if I don't have the answer,

6   he's got it.  And our Court Reporter, Ms. Nancy Brewer.  She

7   that to record everything that we say.  If we talk to

8   somebody individually, we have to do it at the corner of the

9   bench and let her make a record.  So those are the parties.

10                  Now, very, very important that you

11  understand the qualifications to be on any jury, much less a

12  capital case.  I'm going to go over the qualifications and

13  be sure this applies to each and every one of you here.

14                  Must be of at least 18 years of age.

15  Must be a citizen of this State and of the county in which

16  you are to serve as a juror.  Means Dallas County.  About

17  the only excuse that I'm going to let anybody off of jury

18  service is I'm going to move out of Dallas County.  And

19  beyond that, it's going to be really tough.

20                  Must be qualified under the constitution

21  and laws to vote in Dallas County.  How many people remember

22  years ago you didn't want to sign up to vote because you

23  didn't want to be called for jury duty?  We fixed that.  We

24  now use your drivers license information to summon people,

25  so that it gives us a wider pool, a better cross-section of

our community, and lets everybody participate in jury

service.  The key is to have to be qualified to vote.  You

don't have to be registered to vote.  You don't even have to

vote.  By the way I've got voters registration cards here in

the back, if you would like to register for free.

Must be of sound mind and good moral

character.  Now that might apply to a few people.  This is

Dallas County.  Now, you know the standard line is, Judge,

I'm depressed and on Prozac or whatever.  Well, it's 2003.

And that's just, you know, if you get along in life, we need

you to stay and fill out a questionnaire.

What do I mean by that?  Truthfully, if

you have a situation that is so on the forefront of your

mind that you cannot serve.  Let me give an example.  I

started a murder case and I will always remember this lady.

It was up in my courtroom.  And I seated the jury and told

the folks this was a murder case.  And a lady on the second

row you could tell was visibly moved, shaken.  Got up and

left.

And the Sheriff asked her what the

problem was and she had just buried her brother-in-law a

week before who was murdered.  So there's no way that she

would be able to focus and sit for that type -- any other

case down here, she would be fine.  But that was just way,

way too close to home.  That's what we're talking about.

Must be able to read and write the
English language.  If you are a United States citizen, if
you have been naturalized and you have taken an exam to be
qualified, you are qualified, folks.  I know English may not
be your first language.  You may think you have some
difficulty.  We want you to stay and fill out the
questionnaire.  It's an opportunity for you to serve.

Last one of the next ones is you must not
have served as petit juror six days in the preceding six
months in the county or six months in the district court.
Now, we've just started a new jury wheel, so I don't think
that would catch anybody here, but it's a possibility.  If
you actually served for six days, that's in the jury box and
heard a case.  We very rarely have cases that last more than
a week down here, so it's not likely that would be an issue
for anyone.  If it is, let me know.

Must not have been convicted of a felony
in this state or any other state or any federal
jurisdiction.  A felony conviction excludes you from jury
service forever.  And we're not talking about a deferred
probation.  I'm talking about a conviction.

Must not be currently today under any
legal indictment or accusation for any misdemeanor or felony
theft.  If you have a theft conviction of any type, that's
hot check at the grocery store, you cannot serve on the jury

1  if you are currently accused, if you are pending, going to

2  court, you are not qualified to serve at this time.  You may

3  be barred forever, but today you are not qualified.

4  What do I mean by a hot check?  We're not

5  talking about if you bounced a check at the bank.  We're

6  talking about you got arrested, you went to court, you were

7  found guilty, a final conviction for theft.  Not the letter

8  from the DA's Office that says you have hot checks out.

9  Come down and pick them up or we'll file a case against you.

10  If you went to a Judge, a JP, a county court Judge, and you

11  were found guilty of theft by check, you are not qualified.

12  If you think that issue applies to you, there's a place on

13  this questionnaire for you to put it down.

14  If you come up and ask me this morning,

15  Judge, I think I've been convicted of a theft, I can't help

16  you this morning.  That's no way we can check all these

17  records this morning.  Put it in the questionnaire.  Don't

18  talk to me because I can't answer it.  Okay?

19  So these are your qualifications,

20  exemptions.  Now, you can elect to take an exemption and be

21  excused from jury service.  You don't have to.  If you are

22  over the 70 years of age, you don't have to serve on a jury

23  anymore.  If you are over 70 and you are here, we would like

24  for you to stay.  We need your experience, your wisdom, and

25  your life history to add to the jury pool.  We would like to

1  have you.

2            If you have legal custody of a child or

3  children under the age of ten and your service on a jury

4  would require that child or children to be left without

5  adequate supervision.  What that means is if you have a job

6  and you have day care and your kids are taken care of,

7  that's not going to be an exemption you can claim.  We're

8  going to work business hours.

9            If you are a student in public or private

10 secondary school and if you have a student ID card, then you

11 can claim an exemption.  You need to be in school and that

12 also goes for a person that is enrolled and actually a an

13 institution of higher education.  That doesn't mean a class

14 at Eastfield at 8:00 at night.  It won't work.

15            Remember who writes these laws.  Next

16 one, if you are an officer or employee of the legislative

17 branch of state government, you do not have to serve.  And

18 we're not talking about folks just the 140 days they are in

19 Austin.  They wrote a blanket exemption forever.  If they

20 are an officer or employee of the legislative branch of

21 state government.  Amazing how that works, isn't it?

22            If you are the primary caretaker of a

23 person who is an invalid.  You take care of an aged parent

24 or family member in your home and you don't work outside the

25 home, it would require that person to be left without

adequate supervision, that's an exemption you may claim.

Like I said, if you had been on a jury in a case since May 1 of 2000 -- I don't know why that's on there.  This is an old card.  I already covered that.  So those are your qualifications for potential exemption.

Now I will speak to those folks who have those issues in a few moments.  But think about that while I go through the next phase of this voir dire.  I'll now go through with you some of the issues that are required by law.

Reasonable doubt.  The State has to prove any case in a criminal matter beyond a reasonable doubt.  They have to be able to present evidence to a jury to remove or beyond a reasonable doubt of the allegations they have alleged in the indictment.

Try to put this on a scale.  In a civil case you typically go and argue about money or contracts or disputes involving property or custody.  You have -- that standard in that case is by a preponderance, which means the greater weight and degree of credible evidence, fifty plus something percent.  The issue is money.

The intermediate standard is clear and convincing.  Very few people have heard of that standard.  That would be used, for example, in a case where the State has filed a lawsuit to terminate your parental rights to

1  your children.

2          The example that I use and I hope I never

3  have another one, everybody will remember the little girl

4  locked in the closet, the nasty closet in the trailer for

5  two years, was starved almost to death.  They had four other

6  children.  And the State filed a petition to remove all the

7  children and terminate the parents' custody of all the five

8  children.  Clear and convincing evidence is required to

9  terminate their parental rights.

10          The highest burden in our courts is

11  beyond a reasonable doubt.  Why?  You might lose your life

12  or your liberty as a result of a conviction for a criminal

13  case.  So it gives you a logical process of how much

14  evidence is required for the State to achieve their burden.

15  It's not beyond all possible doubt.  It's certainly not

16  proof of one hundred percent.

17          Someone says, Judge, I understand the

18  law, but I'm going to require the State to prove it to me

19  beyond all doubt.  If you think about how that statement

20  would sound, you would have to be a witness to the actual

21  crime for you to have no doubt as to what happened.  So,

22  therefore, you couldn't be on the jury.  So it's a doubt

23  based on reason.

24          I like this.  This is Cunningham's

25  definition.  Common sense.  If there's any one thing I want

1    to see from folks down here is exercise your common sense.

2    Add it up.  If the State meets their burden, find him

3    guilty.  If the State can't get there, find him not guilty

4    beyond a reasonable doubt.

5                Return of indictment by the Grand Jury.

6    The Grand Jury of Dallas County has returned an indictment

7    in this case for capital murder.  You say, Judge, I

8    understand that.  I know that the presumption of innocence

9    alone is sufficient to acquit someone.  But when they return

10   an indictment, that means somebody has already looked at it.

11   So that means something happened.

12               Well, let me -- I usually go through this

13   and it takes about ten minutes.  So I'll just give you the

14   answers.  The Dallas County Grand Jury this last year heard

15   27,000 cases.  This man here stands charged as one person

16   out of 27,000 that was indicted in Dallas County last year.

17   You take the amount of time, divided by the number of cases

18   that they have to hear, and you have three to four minutes

19   per case to listen to some evidence being presented to them

20   by an investigator that something happened.

21               So the twelve people who will ultimately

22   hear this case will be the first citizens, really, to hear

23   anything about this case in any depth.  So when I give you

24   the line that simply by being arrested, confined, or

25   otherwise charged with a crime gives rise to no inference of

13

1   guilt at his trial, that's exactly what it means.

2               Presumption of innocence.  The

3   presumption of innocence, alone, is sufficient to acquit the

4   defendant unless and until the State can prove his guilt

5   beyond a reasonable doubt.  You have got to come in, you

6   have got to have the mental acuity and the honesty to be

7   able to walk into a courtroom and say, I presume this man to

8   be innocent regardless of what the allegations are until the

9   State can prove it to me otherwise.

10              And I can't stress that enough, folks.

11  We just got through fighting a war in Iraq.  If you made one

12  of Saddam's buddies mad, they put you in a hole somewhere

13  until your family could buy your way out.  That's the

14  flipside of the presumption of innocence.  That's how strong

15  I believe in that principle.

16              You don't -- the defense doesn't have to

17  prove anything to you.  They don't have to bring any

18  evidence.  It's the State's burden and it never shifts to

19  the defendant.  People confuse that.  You see a three or

20  four-minute snippet on TV where you see the lawyers

21  blistering somebody on the witness stand and you confuse

22  that with requiring the defendant to bring their own

23  evidence.  You don't have to.  It's the State's burden.  I

24  can talk another 30 minutes on that, but I shall not.

25              Last thing is opinion.  Folks, I've

1  already told you, you have been sworn in to tell the truth

2  on these questionnaires.  I've already told you we want you

3  to bring your common sense into the courtroom.  We want your

4  honest opinions on these questionnaires.

5                    Now, a sure way to get right back down

6  here on a front row is to give some smart answer to a

7  question.  We had one juror that came in and, you know, just

8  was the only way I can describe her attitude was hateful.

9  Okay?  We've got too many things going on, folks.  You are

10  too busy in your life.  We're too busy down here.  We don't

11  need that.

12                    And if I ask anybody here, do you want to

13  be on a capital murder case?  The answer is no.  If you do,

14  there's something wrong.  All right?  So I understand where

15  you are coming from.

16                    I will make you two promises.  You can

17  ask anybody in this courthouse how I run a courtroom.  I

18  will not waste your time.  Number one complaint down here

19  from jurors is they hurry up and wait.  This morning it just

20  takes 30 minutes to get 550 people all seated.

21                    Now, this is the step one.  After we fill

22  out the questionnaires, you would be invited back to the

23  courtroom for individual voir dire where we go through this

24  questionnaire, one juror at a time.  And when you get called

25  back down here, you will either have a morning session or

afternoon session.  What I mean by that is, if you are

called back, you will be down here at 8:30.  We will be

through with you by noon.  If you have an afternoon session,

we call you at 1:30 and we will be through by 4:30.

Step one is you have a couple of hours

this morning and step two, you will have a few hours in a

morning or afternoon session.

Once the jury is picked, the procedure

will be like a normal case.  I heard the Sheriff talk to you

about the timing in this matter.  We will start the

individual portion of the voir dire, the individual

questioning, after school starts.  I know people are wanting

to travel on vacations during the summer.  We're not going

to bother you.  And if you are on a normal working schedule,

you have kids in school, that's fine.  We will work around

it.  So I think school starts like August 15 or August 26.

We will schedule you back at that time.

It will take approximately three months

to get the jury selected.  We anticipate having this trial

concluded before Thanksgiving.  I am not going to bother

anybody over the Thanksgiving holidays.  I want to be gone,

too.  So that gives you a timetable.

As I already told you, the only way,

really, I'm going to let you off this panel is, Judge, my

house is for sale or I have a contract.  I'm moving out of

1   Dallas County.  I will not be here in August.  I'll talk to

2   you.  Beyond that, if you don't have a legal exemption or a

3   qualification problem, don't come up.

4                   Last thing I need to talk to you about is

5   once you read this questionnaire, you will see on the second

6   page that there's been some media coverage involving this

7   case.  I saw a camera.  He's already gone.  Media coverage

8   down here on these cases, the newspaper, TV, is always

9   around.  If you think you have heard something about this

10  case, fine.  Put it down on the questionnaire.

11                  But let me ask you this.  You may have

12  remembered something about this case in the media, but

13  there's no way, no way that you have heard anything about

14  this person on this particular offense.  You may think you

15  may have, but the bottom line is, if you can set aside

16  anything that may have happened in the past and be able to

17  say, Judge, I will hear the evidence from the witness stand

18  and make my decision based on evidence submitted before this

19  Court, that's what we're talking about.  That's what we're

20  talking about.  You have an opportunity on the questionnaire

21  to share your opinion on the media issue.

22                  So with that -- all right, at this time

23  the Sheriff is going to pass out the questionnaire.  And as

24  I heard Sheriff Cook tell you to put an A or B on your

25  number on the top right-hand corner and circle the morning

1    or afternoon -- circle morning or afternoon panel.  The way

2    we contact you is by the phone numbers you provide and I

3    would like to have E-mail, if you have got it.

4                    The other thing I want to be sure you see

5    is on the bottom of each page I want your juror number again

6    on the bottom of the page, because we have these things just

7    clipped up here.  And at the end of the day we end up with

8    25,000 pages and two or three clips get pulled off and we

9    don't have the juror number on each page, then we have to

10   call you back down.  Ms. Smith, sorry, we lost your

11   questionnaire.  We can't find it.  It's in the box

12   somewhere.  Can you fill out another one?

13                   This questionnaire, I know, is detailed.

14   It's basically what is your name, when were you born, and

15   what happened next?  And it does ask for a lot of

16   confidential information.  I will tell you that the parties

17   are under Court order not to disclose any of this

18   confidential information beyond the needs of this trial.

19   When the trial is concluded these records are sealed by the

20   Court and only upon a court order by the Court of Criminal

21   Appeals whether I release a copy to that Court.  I mean, the

22   Court of Criminal Appeals doesn't get a copy unless they

23   send me a court order saying, Judge Cunningham, you must

24   send us a copy, because I put it on them to maintain the

25   integrity of these records.

1    So that's how we keep the chain of

2  custody of these records, so you will understand that we

3  have to have this information because we have got to be sure

4  you are qualified and we need this confidential information.

5  So if you have phone numbers, contact information, please

6  provide that, so we can get back in touch with you.

7    And beyond that I think the Sheriff is

8  ready to pass these out.  If you would, Sheriff, get the

9  questionnaires out to the folks.  If you need to talk to me,

10  and I stress "need", about a qualification problem, Judge,

11  I've been to the penitentiary, can't serve.  Okay?  I want

12  to claim an exemption.  Fine, talk to me.  If it's an issue

13  about I don't know, I'm not sure, fill out the

14  questionnaire.  We'll get back with you.

15    So if you need to talk to me, I will have

16  you line up by the corner by the Texas flag down the side of

17  that wall and that way we can try to have some privacy, if

18  there's a sensitive issue you need to talk about.  So if you

19  need to, come down.  Come on down.  Yes?

20    PROSPECTIVE JUROR:  I live in Denton

21  County.

22    THE COURT:  No. 332, Mr. Robert

23  Blackstone.  Mr. Blackstone, what is your issue?

24    PROSPECTIVE JUROR:  I live in Denton

25  County.

1          THE COURT:  Any objection.

2          MS. BUSBEE:  No.

3          MR. SHOOK:  No.

4          THE COURT:  Yes, ma'am?

5          PROSPECTIVE JUROR:  I'm first of June

6    moving to Cedar Creek Lake.  I believe that is in Kaufman

7    County.

8          THE COURT:  Any objection?

9          MS. BUSBEE:  No.

10          THE COURT:  No. 1614 Debra Berrins, you

11    are excused.

12          PROSPECTIVE JUROR:  I didn't file for an

13    exemption because --

14          THE COURT:  No. 243 George Graf, G-R-A-F,

15    and he's with DTS as a student.  So you are full-time

16    student, DTS?

17          PROSPECTIVE JUROR:  Yes.  I had the

18    summer off, but I'm a full-time student.

19          THE COURT:  That's an exemption we will

20    let you have.  Yes, your name?

21          PROSPECTIVE JUROR:  Damion Ford, F-O-R-D.

22          THE COURT:  No. 1856.  Yes?

23          PROSPECTIVE JUROR:  I'm attending school

24    at Cedar Valley and I didn't know that I was going to bring

25    an ID badge or anything.

1    THE COURT:  Are you a full-time student?

2    PROSPECTIVE JUROR:  Yes.

3    THE COURT:  And, what, are you in school

4  right now or just finished classes?

5    PROSPECTIVE JUROR:  No, I'm in school

6  now.

7    THE COURT:  What does your fall look

8  like?

9    PROSPECTIVE JUROR:  I'm not going to

10  school.

11    THE COURT:  Then you are qualified.  You

12  don't have an exemption.  Fill that out for us.  Thank you,

13  sir.  Yes, ma'am?  We have Jo Carroll Erwin, E-R-W-I-N, No.

14  528.  Yes, ma'am?

15    PROSPECTIVE JUROR:  I've been in a

16  federal prison before.

17    THE COURT:  FIC, so that's a final felony

18  conviction.  Any objection?

19    MR. SHOOK:  No.

20    MS. BUSBEE:  No.

21    THE COURT:  Thank you, ma'am.  You are

22  free to go.  Yes?  We have No. 253, Mr. Shawn Reynolds.

23  Yes?

24    PROSPECTIVE JUROR:  Attending school.  I

25  have my schedule here, current class, and I'm transferring

1    to Brookhaven next month.  I'm taking three classes.

2              THE COURT:  Are you a full-time student?

3              PROSPECTIVE JUROR:  Not a full-time

4    student, no, sir.

5              THE COURT:  What does your fall look

6    like?

7              PROSPECTIVE JUROR:  I'm going to be

8    taking three classes.

9              MR. SHOOK:  During the day?

10             PROSPECTIVE JUROR:  No, early evening.

11             THE COURT:  They don't have the times

12   here.  I see the start and end date.

13             PROSPECTIVE JUROR:  No, it doesn't,

14   you're right.  But I'm transferring next month to

15   Brookhaven?

16             MR. SHOOK:  We can agree.

17             THE COURT:  Parties have agreed.  Thank

18   you, Mr. Reynolds.  Have good luck in school.  Yes?  We have

19   No. 838, Mr. William McLemon.

20             PROSPECTIVE JUROR:  It's McLemore.  They

21   always misspell it.

22             THE COURT:  You have been to TDC?

23             PROSPECTIVE JUROR:  Yes.  Well, I was --

24   I did time in Decker.

25             THE COURT:  Have you been on parole?

1    PROSPECTIVE JUROR:  No.

2    MR. SHOOK:  What type of --

3    THE COURT:  What kind of case was it?

4    PROSPECTIVE JUROR:  Three DWIs.

5    THE COURT:  Three?

6    MS. BUSBEE:  So it was a felony, the last

7  one?

8    PROSPECTIVE JUROR:  Yes.

9    MS. BUSBEE:  No question about it.

10    THE COURT:  No question about it.  Thank

11  you, sir.

12    THE COURT:  Navy recruiter?

13    PROSPECTIVE JUROR:  That's me.

14    THE COURT:  You are not going to be

15  shipped out any time, are you?

16    PROSPECTIVE JUROR:  No.

17    THE COURT:  No. 1821, Mr. Ungel Harris.

18  Why wouldn't we want you?

19    PROSPECTIVE JUROR:  Because I still have

20  a case pending.  I have a lawsuit against Florida I have to

21  flip that case.

22    THE COURT:  You have been accused of

23  shipping cocaine.  All right.

24    MR. SHOOK:  Pending felony.  I hope you

25  take care of your case.

1      PROSPECTIVE JUROR:  The State dropped it

2  and the Fed picked it up, so I had to do the Feds case.

3  They had to drop it because it wasn't me.  So the Feds

4  picked it up.

5      THE COURT:  Yes?  No. 1571, Mr. Harry

6  Flood.

7      PROSPECTIVE JUROR:  I work at night and I

8  had to stay up all night.  If I have to, I just wanted to

9  say that.  I'm standing talking to you and I'm asleep.

10     THE COURT:  Can you stay awake long

11 enough to fill out the questionnaire?

12     PROSPECTIVE JUROR:  And I have a DWI.

13     THE COURT:  DWI won't hurt you.

14     PROSPECTIVE JUROR:  I plan to go to my

15 car.  I left my glasses.  The guy, he filled out mine for

16 me, but I couldn't see it.  I left my glasses.

17     THE COURT:  Go get your glasses, if you

18 need them.

19     PROSPECTIVE JUROR:  You will let me go

20 for my glasses?

21     THE COURT:  Sure.

22     PROSPECTIVE JUROR:  Cool.

23     THE COURT:  No. 2220, Brandy Reznicek.

24 And you are currently accused of a felony or theft?

25     PROSPECTIVE JUROR:  Do I explain?

24

1        THE COURT:  Yes.

2        PROSPECTIVE JUROR:  What it is, is we had

3   a car reported stolen and when we go to get it, when we

4   recovered the car, after it got towed, apparently it was

5   still showing.  So I got pulled over in it.  So before my

6   husband could get there with the paperwork, it was supposed

7   to be dismissed, but I don't have any final paperwork.

8        MS. BUSBEE:  Yes.

9        MR. SHOOK:  Yes.

10        THE COURT:  Thank you.  Ma'am.  The

11   parties have agreed you are excused.

12        THE COURT:  No. 905 Steven Sims.  Yes?

13        PROSPECTIVE JUROR:  I'm a member of the

14   NBC media.  I work for -- I'm familiar with a portion of

15   this and so --

16        THE COURT:  Certainly you wouldn't let

17   the media influence your opinion, would you?

18        PROSPECTIVE JUROR:  It wouldn't influence

19   my opinion.

20        THE COURT:  Great.  Fill out the

21   questionnaire for us.  We really appreciate it.  Yes, ma'am?

22        PROSPECTIVE JUROR:  I no longer live in

23   Dallas County.

24        THE COURT:  That will work.  Can I have

25   your card?  No. 159, Jennifer Schauer.

1    PROSPECTIVE JUROR:  I live in -- it's
2  been changed to Player (phonetic).  I got married.
3    THE COURT:  You are not qualified.
4    PROSPECTIVE JUROR:  I live in Tarrant
5  County now.
6    THE COURT:  Yes?  No. 1779, Mr. Jose
7  Melendez.  Yes?
8    PROSPECTIVE JUROR:  I cannot write and
9  read properly.
10    THE COURT:  How long have you lived here,
11  sir?
12    PROSPECTIVE JUROR:  Six years in Dallas.
13    THE COURT:  Six years in Dallas?
14    PROSPECTIVE JUROR:  Yes.
15    THE COURT:  Where do you work?
16    PROSPECTIVE JUROR:  I don't work right
17  now because I'm sick.
18    THE COURT:  You are sick?
19    MR. SHOOK:  Agree.
20    MS. BUSBEE:  I didn't understand what the
21  exemption was.
22    MR. SHOOK:  Can't read or write.
23    MS. BUSBEE:  I'll agree.  That's fine.
24    THE COURT:  Thank you, sir.  You are
25  excused.

```
 1                PROSPECTIVE JUROR:  I'm sorry.

 2                THE COURT:  Yes?  No. 1472, Waylon

 3   Pomroy.  Yes?

 4                PROSPECTIVE JUROR:  I'm a diabetic and

 5   have high blood pressure and I didn't know if it would

 6   interfere with your trial.

 7                THE COURT:  It won't interfere with my

 8   trial.  Put that on the questionnaire.  It has a portion on

 9   there.

10                PROSPECTIVE JUROR:  Thank you.

11                THE COURT:  Yes, ma'am.  Number?

12                PROSPECTIVE JUROR:  I have my 93-year-old

13   mother with me.  She's not bedridden, but she couldn't get

14   around and prepare meals.

15                THE COURT:  No. 1455, Bonnie stoner.

16   We'll let you claim an exemption.  Thank you, ma'am.

17                MS. BUSBEE:  Yes.

18                MR. SHOOK:  Yes.

19                THE COURT:  Yes, ma'am?  No. 1830 is

20   Cecilia, O-B-A-Z-U-G-H-A-H-M-W-A-N.

21                PROSPECTIVE JUROR:  I'm a resident.  I'm

22   not a citizen.

23                THE COURT:  You are not a citizen?

24                PROSPECTIVE JUROR:  I'm a resident.

25                THE COURT:  Not qualified.  Thank you,
```

1   ma'am, you are excused.   Number -- difficult name, 2427

2   Chounlamany.

3                    PROSPECTIVE JUROR:   I just bought a house

4   in Tarrant County and closing in two weeks and we'll be

5   moving.

6                    THE COURT:   Tarrant County.   Thank you,

7   sir.   You are excused.   No. 1849, Veronica Rich.

8                    PROSPECTIVE JUROR:   I sold my house and

9   will be moving out of Dallas County.

10                   THE COURT:   That will work.   Where?

11                   PROSPECTIVE JUROR:   Hunt County.

12                   THE COURT:   Thank you very much.   You are

13  excused.   Yes?   No. 489, Mr. Oscar Burrell, Jr.

14                   PROSPECTIVE JUROR:   I'm on medication

15  which includes Lasix, which is a dieretic and I brought my

16  prescription.   My doctor is out of town, so --

17                   THE COURT:   It won't bother you.   Just

18  fill out the questionnaire and put it on the questionnaire

19  where it asks.

20                   PROSPECTIVE JUROR:   Okay.

21                   THE COURT:   Yes, ma'am?   No. 2184

22  McCarter.

23                   PROSPECTIVE JUROR:   I have a brother

24  incarcerated and I feel I wouldn't make a good juror, a

25  judge.   I couldn't do that.   He's incarcerated for 13 and a

1  half years in the state of Texas.

2  THE COURT:  I understand that, but we

3  need people from all perspectives and all walks of life to

4  participate.

5  PROSPECTIVE JUROR:  I'll do my best.

6  THE COURT:  Fill it out on your

7  questionnaire.  I'm sure they will ask that you just put

8  that on there.  Yes?  No. 880, John Harris.  Yes?

9  PROSPECTIVE JUROR:  My school started.

10  I'll be out of the county.  I'll in  Rains County, then

11  moving.

12  THE COURT:  Are you a full-time student?

13  PROSPECTIVE JUROR:  No, moving.

14  THE COURT:  Any problems?

15  MS. BUSBEE:  No.

16  MR. SHOOK:  No.

17  THE COURT:  Thank you, sir.  You are

18  excused.  Yes?  No. 648, Stephen Fejes.  Okay.

19  PROSPECTIVE JUROR:  I live in Dallas

20  County, but I actually work in Brazil.  I. come back and

21  forth.

22  THE COURT:  How long does it take you to

23  get down here?

24  PROSPECTIVE JUROR:  Two days.

25  THE COURT:  Gee.

1    PROSPECTIVE JUROR:  I fly into Miami and

2  then Sapolo (phonetic).

3    THE COURT:  Are you gone a month?

4    PROSPECTIVE JUROR:  A week here and three

5  weeks there.

6    MR. SHOOK:  We can agree.

7    MS. BUSBEE:  Yes.

8    THE COURT:  The parties have agreed.  So

9  you don't have to serve on this jury yes.  No. 1360, Rick

10  Von Pfeil.

11    PROSPECTIVE JUROR:  Moving to Collin

12  County.

13    THE COURT:  Collin County.

14  Qualification.  When are you moving?

15    PROSPECTIVE JUROR:  By July 15th.

16    THE COURT:  By July 15th?

17    MR. SHOOK:  That will do it.

18    THE COURT:  You are excused.  No. 1169,

19  Lakisha Williams.

20    PROSPECTIVE JUROR:  I'm still in high

21  school.

22    THE COURT:  How old are you?

23    PROSPECTIVE JUROR:  Nineteen.

24    THE COURT:  Will you be in high school

25  this fall?

1     PROSPECTIVE JUROR:  I graduate next

2  January.

3     THE COURT:  That's an exemption.  Any

4  problems?

5     MS. BUSBEE:  No.

6     MR. SHOOK:  No.

7     THE COURT:  Good luck with school.  No.

8  2106, Angela Jones.  Yes, ma'am?

9     PROSPECTIVE JUROR:  I have a problem with

10  reading and filling this out.

11     THE COURT:  Have you looked at it and

12  have you tried to fill out the first couple of pages?

13     PROSPECTIVE JUROR:  I could probably fill

14  out the first page, but questions, I'm not going to be able

15  to.

16     MS. BUSBEE:  Agree.

17     MR. SHOOK:  Agree.

18     THE COURT:  The parties have agreed to

19  excuse you.  Thank you, Ms. Jones.  No. 1970, Peter Whipkey.

20     PROSPECTIVE JUROR:  I will be in school

21  full-time in the fall.  I'm currently enrolled.

22     THE COURT:  El Centro full-time?

23     PROSPECTIVE JUROR:  Yes.  Studying

24  computers.

25     THE COURT:  You will be a full-time

1    student this fall?

2                    PROSPECTIVE JUROR:  Yes, I will.

3                    THE COURT:  Agree?

4                    MR. SHOOK:  Agree.

5                    THE COURT:  Thank you.  Exemption.  Yes,

6    ma'am?  No. 485, Lorraine Grover.

7                    PROSPECTIVE JUROR:  I have a terminally

8    ill husband who will be coming home this weekend they were

9    giving him 206 months to live and I will be the one taking

10   care of him.

11                   MS. BUSBEE:  Agreed.

12                   MR. SHOOK:  Agree.

13                   THE COURT:  You need to be with your

14   husband.  The parties have agreed and our prayers are with

15   you.  No. 888, Carmencita Cobb.

16                   PROSPECTIVE JUROR:  I have a freshman in

17   high school.  I pick her up at school at 4:00.  Would that

18   affect --

19                   THE COURT:  You have a freshman in high

20   school?

21                   PROSPECTIVE JUROR:  And she gets off at

22   4:00 in the afternoon.

23                   MS. BUSBEE:  Agree.

24                   MR. SHOOK:  Agree.

25                   THE COURT:  The parties have agreed.  You

1    are excused.  No. 688, Mr. Juan Villarreal.

2                      PROSPECTIVE JUROR:  I was found guilty on

3    a DWI charge.

4                      THE COURT:  Won't hurt you.

5                      PROSPECTIVE JUROR:  Excuse me?

6                      THE COURT:  No problem.

7                      PROSPECTIVE JUROR:  No problem?

8                      THE COURT:  No, sir.

9                      MR. SHOOK:  Is it a misdemeanor?

10                     THE COURT:  How many DWIs have you had?

11                     PROSPECTIVE JUROR:  One.

12                     THE COURT:  No problem.  No. 793 Yvonne

13   Freeman.

14                     PROSPECTIVE JUROR:  I have like two or

15   three.  I'm in the process of going on medical retirement

16   and then I've got a son in special ed going through some

17   problems now and I have a family member in prison for --

18                     MS. BUSBEE:  We agree.

19                     MR. SHOOK:  We agree. No. 793?

20                     THE COURT:  No. 793.  Thank you, ma'am.

21   You are excused.  No. 1458, Rosa Sanchez?

22                     PROSPECTIVE JUROR:  Yes, I think I don't

23   understand anything.  I'm sorry.  I can talk to you, but I

24   can't --

25                     MS. BUSBEE:  We can agree.  I've talked

1  to her husband.

2               THE COURT:  The parties have agreed.

3  Thank you for coming down.  No. 2265, Patricia Buttery.

4               PROSPECTIVE JUROR:  Right.  I'm going to

5  be 70 in two weeks.  I want to be exempt so I can travel.

6               MS. BUSBEE:  Okay with me.

7               MR. SHOOK:  Okay.

8               PROSPECTIVE JUROR:  In two weeks by the

9  time the contract comes about.

10               THE COURT:  We start the case today so

11  it's 70 today?

12               PROSPECTIVE JUROR:  But when you call me.

13               MS. BUSBEE:  We're not going to aggravate

14  you.  We don't want you.

15               PROSPECTIVE JUROR:  I've been down here

16  many times on juries, so I think that I have paid my dues.

17               THE COURT:  Okay.  They've agreed.  Have

18  fun.  Your name?  It's going to be all right.  This is No.

19  1047, Blythe Schroeder.

20               PROSPECTIVE JUROR:  I live in Irving and

21  I'm a single mom with three kids and I was going to

22  Christmas Eve church when the ambulance went by me.  And I

23  was just at Oshman's yesterday and they renamed the street

24  behind and my kids boys are --

25               MS. BUSBEE:  Agree.

1    MR. SHOOK:  Agree.

2    THE COURT:  Okay.  We'll agree.  No. 311,

3    Shekeysa Ealey.

4    PROSPECTIVE JUROR:  I attend school in

5    Alabama and I'm leaving in August to go back to school.

6    THE COURT:  Where do you go to school?

7    PROSPECTIVE JUROR:  In Alabama Oakwood

8    College in Alabama.

9    THE COURT:  That will give you an

10   exemption.

11   THE COURT:  Study hard.  You are free to

12   go.  No. 1450, Nancy Robinson.

13   PROSPECTIVE JUROR:  I've booked -- my

14   husband and I have booked a cruise October 26 through

15   November 12.  Is that --

16   THE COURT:  That's the target date.

17   We're going to be right in the middle of trial in that

18   period.

19   MR. SHOOK:  You wouldn't mind missing

20   that, would you?

21   MS. BUSBEE:  You get paid six dollars a

22   day.

23   PROSPECTIVE JUROR:  I filled that out and

24   I thought maybe I better.

25   MR. SHOOK:  We can agree.

1    MS. BUSBEE:  Yes.

2    THE COURT:  They have agreed to let you

3    go on your cruise.

4    PROSPECTIVE JUROR:  My husband thanks

5    you.

6    THE COURT:  No. 1211, Diane Johnson.

7    Yes, ma'am?

8    PROSPECTIVE JUROR:  My daughter was

9    murdered last year, so I won't be able to stay.

10   MR. SHOOK:  We agree.

11   THE COURT:  Parties have agreed.  You are

12   free to go.  No. 725, Frank Arena?

13   PROSPECTIVE JUROR:  My concern is that my

14   job didn't pay me.  I don't mind sacrificing two or three

15   weeks in the event I was picked, but possibly you could

16   apply political pressure to where I work and ask them to pay

17   me.  I heard of a case like that where the Judge actually

18   called someone up.

19   THE COURT:  Well, at this point I can

20   tell you that I anticipate the trial will only last two

21   weeks, not three.  And if you would go ahead and fill that

22   out and put on there that you are self-employed.

23   PROSPECTIVE JUROR:  I'm not

24   self-employed.  I work for someone and we don't get paid for

25   something like that.  And I was wondering if it went on two

1   or three months, political pressure could be applied.

2                       MR. SHOOK:  Where do you work?

3                       PROSPECTIVE JUROR:  An auto dealership,

4   711.

5                       THE COURT:  Put that on the

6   questionnaire.  No. 38, Mr. Adel.

7                       PROSPECTIVE JUROR:  I just read the case.

8   I'm too close.  A friend of mine, work, was buddy with the

9   officer.  We heard a lot about it and --

10                      MR. SHOOK:  We can agree.

11                      THE COURT:  Thank you, sir.  You are

12  excused.  No. 860, Mr. Ricky Grogan.

13                      PROSPECTIVE JUROR:  I thought that I

14  could fill this out.  Some of these questions in there I

15  have some mixed emotions because I've had an uncle murdered

16  here in Dallas County, Michael Perkins.  And so I went --

17  and I have a grandfather down in Huntsville serving a life

18  sentence.  So starting to fill it out, thinking no problem,

19  but some of the questions I get into, it's more than I think

20  I really want to deal with.

21                      MS. BUSBEE:  If you agree, I will agree.

22                      MR. SHOOK:  We will agree.

23                      THE COURT:  Thank you.  The parties have

24  agreed to excuse you.

25                      [End of Volume]

1    STATE OF TEXAS       *

2    COUNTY OF DALLAS      *

3      I, NANCY BREWER, Official Court Reporter for the 283rd

4    Judicial District Court, do hereby certify that the above

5    and foregoing constitutes a true and correct transcription

6    of all portions of evidence and other proceedings requested

7    in writing by counsel for the parties to be included in this

8    volume of the Reporter's Record, in the above-styled and

9    numbered cause, all of which occurred in open court or in

10   chambers and were reported by me.

11      WITNESS MY OFFICIAL HAND on this the ___ day of

12   _____March_____, 2004.

13

14

15                          
NANCY BREWER, CSR, NO. 5759

16                          Expiration Date: 12-31-04

17                          Official Reporter, 283rd JDC
                         Frank Crowley Crts. Bldg. LB33

18                          133 No. Industrial Blvd.
                         Dallas, TX 75207

19                          (214)653-5863

20

21

22

23

24

25

74851

REPORTER'S RECORD

VOLUME 6 OF 6 VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 16th day of May, 2003, afternoon session, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Vickers L. Cunningham,  Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT: 03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT: 00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

P R O C E E D I N G S

1

2        THE COURT:  Good afternoon.  I'm going to

3   have you stand in just a second.  We're looking for a couple

4   more lawyers.  There they are.  Okay.  If everybody would

5   raise your right hand.  I need everybody to raise your hand

6   to take an oath to be a juror at this time.

7                    [At this time the jury panel was

8                    sworn by the Court.]

9        THE COURT:  Thank you.  You may be

10  seated.  If you can't find a seat, stand along the walls in

11  the back.  Each of you when you received your summons to be

12  down here on a special venire, I have some things that I

13  must do with you statutorily.  And I'll follow up on some of

14  the instructions the Sheriff gave you.

15             You have been summoned here on what is

16  referred to as a special venire in the case of the State of

17  Texas versus Patrick Murphy.  In a capital felony case in

18  which the State seeks the death penalty, the Court shall

19  propound to the entire panel of prospective jurors questions

20  concerning the principles as applicable to the case on trial

21  of the following, reasonable doubt, burden of proof, return

22  of indictment by the Grand Jury, presumption of innocence,

23  and opinion.  So that's what I have to do statutorily here

24  this afternoon.

25             I will go through your qualifications to

1  serve on any jury, exemptions to jury service in general for

2  any case, and then I will take specific questions.

3           At this time I will introduce the

4  parties.  We have the State of Texas being represented by

5  Mr. Toby Shook, Bill Wirskye, Tom D'Amore.  The defendant,

6  Mr. Patrick Murphy, up here, is represented by Ms. Brook

7  Busbee Alexander and Mr. Juan Sanchez.  And the Sheriff that

8  you heard from earlier is Bryan Cook over here.  If I don't

9  have the answer, he does.

10          So we do have a few seats here in the

11  middle of the aisle, if somebody would like to have a seat.

12  Raise your hand, if there's a seat next to you.  If there's

13  a seat next to you, raise your hand.  If you want a seat,

14  just come in and find one.  It's going to be a while.  I

15  don't want to say make yourself comfortable.  We have too

16  many people here to be comfortable and it's hot.  I know

17  it's hot.  Try putting a robe on.  I know it's hot.  But

18  please find a seat, if you want to.  You will be here for a

19  little while filling out a questionnaire here in a minute.

20  Plenty of seats in the middle, if you want one.  If you

21  don't want one, that's fine.  Just stand up.  Okay.

22          You know you are down here for jury

23  service on a special venire on a capital murder case in

24  which the State seeks the death penalty.  To serve on any

25  jury you have to be qualified with these following

parameters on any case. No. 1, you must be at least 18

years of age. No. 2, you must be a citizen of Dallas

County, Texas.

Now, the people I invite to come down and

talk to me, about the only way that you can get out of the

jury service on this case is if you are moving out of Dallas

County. Short of that, you are not going to do very well.

Now, I'll give you the dates. The best

example I have is my house has a contract. We're closing.

I'm moving to Collin County. Well, we can't use you. I

know about how many people should be selling their houses,

so we'll catch up to that.

You must be qualified under the

Constitution and the laws of Texas to vote in Dallas County.

You don't have to be registered to vote. How many people

remember the only way you got jury service was to be a

registered voter? And you ask somebody to register to vote,

oh, no, I don't want to be called for jury service. We

fixed that, you see. We fixed it. Now we use your drivers

license. So we're going to catch you.

But you have to be qualified. If you are

not registered to vote or if you need to change your voters

registration address, we have those cards available here for

you at your convenience. It's free and we would like to

have a current address for you. We want you to vote, but

you don't have to.

No. 4, you must be of sound mind and good moral character.  That will catch a few people.  What am I talking about?  Standard line is, Judge, I'm depressed.  I'm on Prozac or whatever.  Hello, this is Dallas.  That won't work.

Now, let me give you an example of what I'm talking about.  I will always use, which I hope I don't have another example, but it's a good one.  I had a jury come to my courtroom upstairs and I had them in the panel as a group to start voir dire like we're doing now and informed the panel that we're going to hear a murder case.

A lady on the second row obviously was moved, visibly shaken, and she gets up and leaves.  She doesn't even ask.  She just leaves and the Sheriff goes after her.  Ma'am, what's the matter?  She had just buried her brother-in-law that was murdered the week before and she came on down to jury service.  There's no way that she was going to be able to have any focus at all with such a recent traumatic event.  That's what we're talking about.

It probably won't apply here because our trial date is way off.  So I don't anticipate anybody down here with that situation.  I hope you don't have that.  But if you do, we'll ask you to write that down on your questionnaire.

1    Must be able to read and write the

2  English language.  Now, how many people here speak English,

3  but it's not your first language?  Okay.  If you are a U.S.,

4  naturalized citizen, and you had to take an English exam to

5  be a citizen, you can be a juror.

6    Now, this is -- probably we have a few

7  people that even though this morning, Judge, I've been here

8  20 years.  I've tried to complete the questionnaire.  I

9  simply don't understand some of the legal words that are

10  asking for my opinion here.  We probably need to talk to

11  you.  But you are going -- I'm going to have you try to fill

12  it out and see how well you can do.

13    In Dallas County this really doesn't

14  apply, but I'll read it.  You must not have served as a

15  petit juror for six days in the preceding three months in

16  the county court or six months in a district court.

17    What that means is if you were actually

18  sworn in and sat on a jury, in the jury box, on a felony

19  case or a civil case and were actually on the jury -- this

20  is not jury duty in that sense -- and you served for six

21  days.  Our jury wheel takes three years to go through the

22  jury wheel, so I doubt that somebody here would have served

23  three months in the county court or six months in the

24  district court.  But if you were at the end of the old one

25  and beginning the new one, it could happen.

1           Must not have been convicted of a felony

2    offense in this state or any other state or any federal

3    jurisdiction.  If you have a final felony conviction, you

4    are not qualified to serve on a jury from now on.  What does

5    that mean?  If you are on deferred for a felony, that's

6    deferred probation, you are qualified.  We need to know

7    about it.  But you are still qualified.

8           You must not have any grade of theft

9    conviction.  If you have ever been convicted of theft, you

10   are not qualified.  I'm talking about theft where you --

11   even a hot check.  I'm not talking about a hot check you

12   write to Minyards' and you go pick it up.  I'm not talking

13   about a hot check that the DA's Office sent you a letter

14   that said we're going to file a case on you, if you don't

15   come down here and take care of your business.

16          Only type of theft conviction I'm talking

17   about is if you actually wrote a hot check, you were

18   arrested, you had to go before a Judge, and you were found

19   guilty of theft by check or any grade of theft up to felony.

20   That's what excludes you from being on jury service.

21          A conviction for DWI, unless you have got

22   the third DWI, which is a felony, you are fine for jury

23   service.  Don't tell me, Judge, I got a DWI.  I can't serve.

24   Thank you so much.  Have a seat and fill out the

25   questionnaire.  Okay?

1    You currently cannot be under a legal

2    indictment or legal accusation for any misdemeanor or felony

3    theft or any other felony.  So if you are currently charged

4    with an offense, but haven't been found guilty, haven't even

5    gone to court yet, you are not qualified to sit right now.

6    Your status may change in the future.  But simply by being

7    accused of a crime, we don't want you on both sides of the

8    system.  Makes sense, doesn't it?

9    Those are your qualifications.  Each of

10   you in this room have to meet those qualifications.  Now,

11   you may have an exemption that you wish to use to avoid jury

12   service.  If you are over 70 years of age, you can say,

13   Judge, I appreciate the opportunity.  I don't want to take

14   it.  We would like to have you stay.  We need people with a

15   lot of life experience and wisdom to serve on juries.  We

16   certainly would appreciate it, if you would.

17   If you have legal custody of a child or

18   children younger than the age of ten and service on a jury

19   would require you to leave that child or children without

20   adequate supervision.  If you work a normal job, we work

21   normal business hours here.  That wouldn't be a problem.

22   If you are a student of a public or

23   private secondary school.  I did have one high school

24   student this morning.  And or if you are a person enrolled

25   and in actual attendance in an institution of higher

1  education.  I'm not talking about taking a computer class at

2  El Centro at night.  It won't get there.  We're talking

3  about a full-time student.

4                    Now, remembers who writes these rules.

5  Your legislators in Austin.  Listen to this one.  If you are

6  an officer or employee of the legislative branch of state

7  government, you never have to serve on jury duty, whether

8  you are up in Ardmore, Oklahoma, or not.  Once again,

9  remember who writes these rules.  They carved themself an

10  exemption and that's not just when they are in session.

11  This is forever.  So, there again, those are the ones who

12  make the rules.

13                    If you are the primary caretaker of a

14  person who is an invalid.  If you have an aged parent who

15  lives in your home.  Once again, it would require them to be

16  left without adequate supervision or some special needs

17  person where you are normally there during the day where you

18  can take care of them, you have an exemption.  If you work a

19  regular job, folks, that's not going to get there.

20                    So those are your exemptions and I'll

21  talk to a very few people who need to talk to me in a few

22  minutes about that.  Now, I need to go through the statutory

23  required issues before we proceed any further with the

24  questionnaires.  I need to talk to you about these following

25  principles of reasonable doubt.

1       The State has to prove their case to you

2   in any criminal indictment situation beyond a reasonable

3   doubt.  What does that mean?  Well, I don't have a

4   definition for you, but the best thing that I can do is give

5   you a scale to have you understand how important these cases

6   are.  You go to a civil court to argue about things,

7   contracts, money disputes, whether or not somebody moved a

8   trailer to your neighborhood.  That was one that was in the

9   paper lately.  You want a civil court to enforce a civil

10  sanction.  The issue is money, generally, or don't do

11  something on a civil matter.  Standard in that case is by a

12  preponderance of the evidence.  You have to prove your case,

13  just tilt the scale in your favor, 51 percent.  Why?  The

14  issue is money.

15      Intermediate standard is clear and

16  convincing.  Very few people have heard of that.  The type

17  of example I can use is if the State were to file a lawsuit

18  to terminate your parental rights to your children.  My

19  standard is over my dead body, but the legal standard for my

20  kids and your kids is clear and convincing.

21      Example.  You may remember the horrible

22  case, and I hope I never have another one like this, but the

23  little girl that was locked in the closet in the nasty

24  trailer for two years.  That family and four other children.

25  The State filed a lawsuit to terminate all five children.

1   The petition was filed.  The standard in that case is clear

2   and convincing evidence.

3                The highest burden in our court system is

4   beyond a reasonable doubt in a criminal case.  It makes

5   sense because you might lose your life or your liberty.  So

6   it's a logical process.  How high does proof have to be?

7   Well, it's not beyond all possible doubt.  It's certainly

8   not proof of one hundred percent.  It's a doubt based on

9   reason.  And I like to use the word, Cunningham's

10  definition, "common sense".  We have to have a reason.

11               The State has to prove certain things to

12  the jury.  If they have failed to meet their burden on any

13  one of the required elements and you have a reasonable

14  doubt, sure, not guilty.  It's their job.

15               Now, some people say, Judge, this is a

16  case where the State seeks the death penalty.  I want to be

17  absolutely sure.  Well, the only way that you can be

18  absolutely sure about anything is if you were a witness to

19  the particular criminal episode.  If you were a witness, you

20  couldn't be on the jury, because the jury would be listening

21  to you.  So you see that doesn't work, does it?  It's

22  certainly not a standard of one hundred percent because

23  nothing in the world is 100 percent sure.  It's a workable

24  standard, so reasonable doubt.

25               Burden of proof.  I said several times

the burden of proof is always on the State and it never
shifts to the defense.  Mr. Murphy or his lawyers do not
have to present any evidence.  People confuse this when you
see this on TV.  You get the four minute bite on a TV drama
courtroom show and you see that the defense attorney
blisters some witness and you confuse that with requiring
the defendant to produce evidence.  The defendant has no
burden to produce any evidence.  They're not bringing the
charges.  The State is those who are doing the accusing,
have to do the proving.  So you can never shift the burden
and say I would require the defendant to do X.  You can't do
that.

Return of indictment by the Grand Jury.
Some people say, Judge, you know, where there's smoke
there's fire.  Mr. Murphy has been indicted for capital
murder.  Something must have happened.  Well, all I can tell
you is we have a dispute of the facts and we need twelve
people to be fair and impartial and listen to the whole
case.  You say the Grand Jury returned an indictment, they
did something.  Well, they did.  Last year in Dallas County
they heard 27,000 cases.  That doesn't count 65 plus
thousand cases for A and B misdemeanors, almost 100,000
cases in the courthouse this year alone.

So if you have two brain cells working
together, you can figure out that the Grand Jury heard

1   27,000 cases.  They spent about two to three minutes on this

2   case, which means they heard very, very, very, very little,

3   if anything, that was substantive about this case.  So what

4   that means is the twelve people who would be impaneled on

5   this case will be the first citizens of Dallas County that

6   will hear any of this case in detail.

7               The indictment is simply an accusation

8   that the State has filed that says we will prove this to a

9   jury.  So I will give you a written instruction that says,

10  simply by being arrested, confined, or otherwise charged

11  with an offense, gives rise to no inference of guilt at his

12  trial.

13              Which leads me to the last thing,

14  presumption of innocence.  Any citizen who is accused of a

15  crime is presumed innocent.  Though he may be indicted by

16  the Grand Jury, you must presume Mr. Murphy innocent,

17  because you have heard no evidence.  Some people have a

18  problem with that.  And if you do, that's fine.  We simply

19  need to know about it.  But I can't tell you how much I

20  believe in that principle because it would take me another

21  hour and y'all don't want to be here.  I know y'all don't

22  want to be here.  If you want to be here, there's something

23  wrong.

24              You tell someone a capital murder case

25  and if you are stepping up on the front row, I want to be on

this jury, we have a problem.  So I know you don't want to
be here.  But it's one of those things your government has
called you to serve.

Now, presumption of innocence.  I try to
pare it down.  But we have just got through fighting a war
about this type of stuff.  If you make one of Saddam's
buddies mad over in Iraq, you get put in prison until your
family could buy your way out or prove your innocence, if
you will.  That's called shifting the burden.

People say, Judge, you know, the
defendant is going to have to prove his innocence to me.
No, it doesn't work that way.  The presumption of innocence
alone is sufficient to acquit the defendant unless and until
the State can prove each and every element required in their
indictment beyond a reasonable doubt.  I can go an hour and
a half on that one statement alone.  But for right now you
have got to have the mental acuity, you have to be smart
enough and honest enough to say, yes, I understand that.
Our Constitution is based on that.  Our whole criminal
justice system is based on that.  And I will follow the law.
I will wait until I hear the evidence before I make a
decision.

Last thing is opinion.  We need your
honest opinions to the questions that are going to be asked
of you in this questionnaire.  The questionnaire is 20 pages

1   or so.  Yes, I know.  Asks you, what's your name, when were

2   you born, and what happened next?  And the reason we have

3   these questionnaires is for this type of case.

4                    And I'll go through the timetable now.

5   We'll spend all day today talking to big panels.  The

6   lawyers will review these questionnaires for the next three

7   months.  At the end of the day we'll have 25,000 pages to

8   read.  Then we call in jurors, each of you, one at a time,

9   to the court and discuss your questionnaire individually.

10  That process will begin after school starts in August.

11  Whenever, I haven't checked with my wife.  I don't know when

12  DISD starts, but we'll start individual jury selection after

13  school, because you want to be out for vacation for summer,

14  if you have a family.  I understand that.  That's why we're

15  starting this early.

16                    So I anticipate individual will start

17  sometime in mid-August, the last week in August, whatever

18  the calendar tells us.  And I can't tell you exactly when

19  the trial will begin, but it will be sometime in November.

20  And I hope to have the trial concluded before Thanksgiving.

21  Nobody wants to be involved in these types of trials over

22  the holidays.

23                    I anticipate the actual trial itself will

24  last two weeks.  So that gives you a somewhat of a roadmap

25  of where we're going.  Nothing this summer, start individual

1   in August, take a couple of three months for that, and start

2   the trial sometime in November.  That's the best I can do as

3   a time estimate.  So if you are moving out of Dallas County

4   before November, then you can talk to me.

5               Opinion, like I say, we want your honest

6   opinions and your fair opinions.  We get some kind of

7   screwball answer on a question, the lawyers are going to

8   want to talk to you about that.  So what am I saying is be

9   honest and be fair.  I mean, we had a lady a couple of weeks

10  ago.  She was just in a bad mood.  I can use another

11  adjective, but I won't use it.  But she was in a foul mood.

12  And I can react several different ways.  But, folks, I have

13  other things that I need to do.

14              So we have plenty to do handling just

15  what we have to do.  We need to leave the attitudes out of

16  it.  And if you don't want to be down here, join the club.

17  And I just want to stress that.  So just give us a fair,

18  honest, good faith effort on these questionnaires.

19              Now, when you get the questionnaire, I

20  think the Sheriff told you to put your number at the top and

21  then circle afternoon questions.  I won't go through the

22  details, but we need to know that you are in the afternoon

23  panel.  And on each page I need to have your number because

24  they were just clipped together with a binder.  And if they

25  get pulled apart, we have a box full of a thousand

questionnaires and we have your top page with nothing else

but your name on it, so we have to call you back down here

to do it again.  So put your number on each page, so if it

gets pulled apart, we can find out where it goes.  Fair

enough?

Let me try to run traps for you on the

excuses.  I've heard them all.  A guy, Judge, I can't miss

work.  I won't get paid.  I'm sorry.  I can't help you.  I

understand that.  This is like paying taxes.  You don't want

to do it, but sometimes you have just got to strap it on and

go to Baghdad.  All right?  This is one of the highest

callings that you can have to participate in your

government.  I can't help you with a business excuse.

Typical one if I have a trial this week

is, Judge, I'm going out of town on Thursday.  Well, that

won't apply here simply because I'm cutting out all the

vacation time.  That won't be an issue.  You have far enough

lead time that you can plan your travel arrangements around

a trial in November.  After we get into it in August we will

have a firm trial date.  If you are called back in August,

we will have a firm trial date.  And if it's monumental, we

can work around it.

Judge, I'm a sole proprietor, no one to

run my business.  I understand that.  The law doesn't help

you.

1        So what am I trying to tell you?  Come up

2    here and visit.  Beyond a felony conviction or you are

3    moving out of Dallas County, I'm going to say, please have a

4    seat, fill out the questionnaire, and put your issue on a

5    questionnaire because there's no way that I can talk but to

6    just a few people.

7        So, Sheriff, would you like to pass out

8    the questionnaires for us.  Last thing I need to talk to you

9    about is media.  There are no cameras here this afternoon.

10   But this is a capital murder case and the media does cover

11   these trials.  If you think you know anything about this

12   case, chances are you may have heard something about it in

13   the news.  You have no idea what this individual is, in

14   fact, charged with or particular case in general.  You might

15   have some idea, but there's no way that you have heard any

16   detail to a sufficient degree to really know anything about

17   this case.

18       We did have one lady this morning that

19   did know a lot about it through her personal connection and

20   she was too close.  But short of that, I don't think the

21   media will be a problem in this case.

22       So if you will, your time is your own.

23   Please fill out the questionnaires and the Sheriff will take

24   them up and then you are free to go.  So if you need to talk

25   to me, start here at the Texas flag and line up along the

1  wall so we can talk to you individually.

2                    THE COURT:  Parties agree on excusing

3  Detective Curtis, No. 1387?

4                    MR. SHOOK:  Yes.

5                    MS. BUSBEE:  Yes.

6                    THE COURT:  Do you have your card?  No.

7  404 Vita Romero.

8                    PROSPECTIVE JUROR:  Yes.

9                    THE COURT:  What can I do for you?

10                    PROSPECTIVE JUROR:  I'm disabled.

11                    THE COURT:  I can see that.

12                    PROSPECTIVE JUROR:  It's supposed to be

13  on file down here, but they keep sending me these things.

14                    THE COURT:  We want you to serve on a

15  jury.

16                    PROSPECTIVE JUROR:  So even if I'm sick?

17                    THE COURT:  Sick and disabled are two

18  different things.  Are you --

19                    PROSPECTIVE JUROR:  I'm epilepsy.

20                    THE COURT:  Are you telling me you simply

21  can't make it through a two-week trial physically?

22                    PROSPECTIVE JUROR:  I guess, I guess, I

23  guess.

24                    THE COURT:  We have to make

25  accommodations.  We want you to serve.  If you tell me I

1  physically cannot make it through a two-week trial, then I

2  understand.  I know you don't want to.

3                    PROSPECTIVE JUROR:  My husband have to be

4  with me.

5                    THE COURT:  Do you work, sir?

6                    PROSPECTIVE JUROR:  Yeah.

7                    THE COURT:  That causes a completely

8  different problem.

9                    MS. BUSBEE:  We can agreed.

10                   MR. SHOOK:  Agree.

11                   THE COURT:  The attorneys have agreed to

12  excuse her.  Thank you, ma'am.  No. 1824, Michael Klein.

13                   PROSPECTIVE JUROR:  My father was

14  murdered and there was no way that I would be able to serve

15  as a juror.

16                   MS. BUSBEE:  Agree.

17                   MR. SHOOK:  Agree.

18                   THE COURT:  Thank you, sir.  The parties

19  have agreed.  No. 2494, Tamera George.

20                   PROSPECTIVE JUROR:  I'm a full-time

21  student.

22                   THE COURT:  Where?

23                   PROSPECTIVE JUROR:  At Mountain View

24  College.

25                   THE COURT:  Are you enrolled this fall?

1     PROSPECTIVE JUROR:   Yes.   I will be

2  transferring to UTA.

3     THE COURT:   Any problem?

4     MS. BUSBEE:   No.

5     MR. SHOOK:   No.

6     THE COURT:   Thank you, ma'am.   No. 1041,

7  Lashondria Sheppard.

8     PROSPECTIVE JUROR:   Today I have to pick

9  up my daughter by 3:00.

10    THE COURT:   No problem.   Just fill out

11 the questionnaire and you are free to go.   Number --

12    PROSPECTIVE JUROR:   I would have a

13 medical excuse.

14    THE COURT:   No. 20, Janet Nathan.

15    PROSPECTIVE JUROR:   I would have a

16 medical excuse by Wednesday morning.   I took early

17 retirement, so I wouldn't have to get up and be at any

18 particular time.   I'm type 2 diabetic and stress sends my

19 blood sugar up.

20    MS. BUSBEE:   We agree.

21    MR. SHOOK:   Agree.

22    PROSPECTIVE JUROR:   Do I need a letter

23 from the doctor?

24    THE COURT:   No.   They have agreed on you.

25 No. 505, David Maggard.

1      PROSPECTIVE JUROR:  I live in Tarrant
2  County.

3      THE COURT:  Not qualified.

4      MS. BUSBEE:  The bad news is you have to
5  go over to Tarrant County now.

6      THE COURT:  No. 1822, Jin Park.

7      PROSPECTIVE JUROR:  I'm going to take an
8  overseas trip and I have airline tickets June 7 and come
9  here after nine months.

10      THE COURT:  Be gone nine months.

11      MS. BUSBEE:  Agree.

12      MR. SHOOK:  Agree.

13      THE COURT:  Thank you.  The parties have
14  agreed.  You are free to go.  Number?

15      PROSPECTIVE JUROR:  I'm going to nursing
16  school.

17      THE COURT:  No. 1578, Oloyede.

18      PROSPECTIVE JUROR:  I'm going to nursing
19  school.

20      THE COURT:  Will you be a full-time
21  student this fall?

22      PROSPECTIVE JUROR:  Yes.

23      MS. BUSBEE:  Fine.

24      MR. D'AMORE:  Fine.

25      THE COURT:  No. 2815, Melia Emanuel.

1    Yes, ma'am?  You have it filled out.  You have been

2    convicted of a felony?

3                        PROSPECTIVE JUROR:  Shoplifting 16 years

4    ago.

5                        THE COURT:  Final conviction?

6                        PROSPECTIVE JUROR:  Sixteen years ago,

7    yeah.

8                        THE COURT:  Was it a final conviction for

9    shoplifting?

10                       PROSPECTIVE JUROR:  What do you mean by

11   that?

12                       THE COURT:  Did you go to jail?

13                       PROSPECTIVE JUROR:  No, I paid.

14                       MS. BUSBEE:  We can agree.

15                       MR. SHOOK:  That's fine.

16                       PROSPECTIVE JUROR:  Six months'

17   probation.

18                       MS. BUSBEE:  We'll agree.  On here it's

19   too iffy.

20                       THE COURT:  Thank you.  They have agreed.

21   You are free to go.  No. 2183, Stephen Dumaine.  Yes?

22                       PROSPECTIVE JUROR:  I am moving to Collin

23   County.

24                       THE COURT:  When?

25                       PROSPECTIVE JUROR:  I have a contract on

1  a house and it closes next month.

2                    THE COURT:  Close enough.  Thank you,

3  sir.  You are not qualified.  No. 953, Daryl Coleman.  Yes?

4                    PROSPECTIVE JUROR:  I'm moving to New

5  Orleans in two weeks.

6                    THE COURT:  That will get it.  No. 1758,

7  Deitrich Armstrong.

8                    PROSPECTIVE JUROR:  I feel like I

9  wouldn't be able to do it because my sister was murdered.

10                    MR. SHOOK:  Your sister was murdered?

11                    PROSPECTIVE JUROR:  Uh-huh.

12                    MR. SHOOK:  That's fine.  We'll agree.

13                    MS. BUSBEE:  Yes.

14                    THE COURT:  We'll find another case for

15  you, not this one.  They have agreed you can go.  No. 164,

16  Tracy Cook.  Yes, ma'am?

17                    PROSPECTIVE JUROR:  I'm going to be

18  moving to Denton County.  I will be closing on my house on

19  the 15th of next month.

20                    THE COURT:  That will work.  You are

21  excused.  No. 2159, Jalyn Zeiser.  You are moving?

22                    PROSPECTIVE JUROR:  Yes.

23                    THE COURT:  Where?

24                    PROSPECTIVE JUROR:  Frisco.  We were

25  there today.  Do you want our home warrant thing?  I have it

1  with me.

2              THE COURT:  You were sworn to tell the

3  truth.  You are not qualified, so you are free to go.  No.

4  2078, Matthew Butler.

5              PROSPECTIVE JUROR:  I was convicted of

6  burglary of a building when I was 18.

7              THE COURT:  Did you serve probation?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Go to the penitentiary?

10             PROSPECTIVE JUROR:  No.  I think it was

11  adjudicated probation.

12             MS. BUSBEE:  What year was that?

13             PROSPECTIVE JUROR:  '83.

14             THE COURT:  So you want to do a record

15  check or fill it out?

16             MS. BUSBEE:  Have him fill out the

17  questionnaire.

18             THE COURT:  Highlight that and disclose

19  it on your questionnaire.  Number --

20             PROSPECTIVE JUROR:  You got me for my

21  last case in Dallas County, but it's too late.

22             THE COURT:  No. 107 Donna Waller.  Moving

23  to Tarrant County.

24             PROSPECTIVE JUROR:  Yeah.  My house is

25  supposed to be done in July and I'll be moving in August.

1    THE COURT:  Very good.  You are
2  dismissed.  No. 2904, Victoria Mejia.

3    PROSPECTIVE JUROR:  I'm moving.

4    THE COURT:  To where?

5    PROSPECTIVE JUROR:  To New York.

6    THE COURT:  Have a good time.  No. 1195,
7  Freeman Gragg.

8    PROSPECTIVE JUROR:  I have glaucoma and I
9  can't read small print.

10    THE COURT:  Have you tried looking at the
11  questionnaire?

12    PROSPECTIVE JUROR:  It has to be pretty
13  big for me to read it.  No, I cannot read it.  I cannot read
14  it.

15    MS. BUSBEE:  Agree.

16    MR. WIRSKYE:  Agree.

17    PROSPECTIVE JUROR:  I can't read that
18  small print.  I can read that line there, probably.  I have
19  a magnifying thing at home that I use.

20    THE COURT:  The parties have agreed to
21  excuse you, sir.  You are free to go.  No. 2563, Paula
22  Enstrom.

23    PROSPECTIVE JUROR:  I'm moving to San
24  Francisco in the middle of August.

25    THE COURT:  Can't use you.

1          PROSPECTIVE JUROR:  Won't be here.

2          MS. BUSBEE:  Yes.

3          MR. SHOOK:  Yes.

4          THE COURT:  Number --

5          PROSPECTIVE JUROR:  Does this have

6  anything to do with it?

7          THE COURT:  No.  You are fine.  Fill it

8  out.  Bondsman.  No. 1937, Larry Hackney.

9          PROSPECTIVE JUROR:  I don't feel that I

10 could make a judgment on my -- on a death penalty.  I just

11 don't believe in it.  I mean, I just don't think I could.

12         MS. BUSBEE:  You know, I know he should

13 fill in the questionnaire, but if he's going to put it on

14 there let's agree and save him the trouble.

15         MR. SHOOK:  We can agree.

16         THE COURT:  Okay, sir.  Maybe we can find

17 another case for you.  No. 636, Miranda Baker.  Yes, ma'am?

18         PROSPECTIVE JUROR:  Full-time student in

19 the fall and spring.

20         THE COURT:  Where do you go to school?

21         PROSPECTIVE JUROR:  Richland College.

22         THE COURT:  Exemption.  Any questions?

23         MS. BUSBEE:  No.

24         MR. SHOOK:  No.

25         THE COURT:  Thank you, ma'am.  You are

1    excused.  No. 1744, Heather Cross.

2                    PROSPECTIVE JUROR:  My house is for sale

3    and we'll be moving to Waxahachie.

4                    THE COURT:  Ellis County?

5                    PROSPECTIVE JUROR:  Yes.

6                    THE COURT:  No. 2390, Jennifer Anderson.

7                    PROSPECTIVE JUROR:  We've signed a

8    contract off of our house.  I'm moving.  I'm going to be

9    doing some consulting work, but from a travel trailer and I

10   don't know whether you allow that.  I don't mind filling it

11   out, but we're moving to --

12                   MR. SHOOK:  You are moving to another

13   county?

14                   PROSPECTIVE JUROR:  Yes.  We're moving to

15   the coast.

16                   THE COURT:  Your residence will be down

17   there?

18                   PROSPECTIVE JUROR:  Smithpoint

19   (phonetic), yes.

20                   THE COURT:  They've agreed.  Thank you,

21   ma'am.  No. 2377, Valerie King.

22                   PROSPECTIVE JUROR:  Had this been over

23   the summer, I would be able to serve, but I'm trying to get

24   into medical school this year, so I'm going to be a

25   full-time student during the academic year.

1          THE COURT:  Questions?

2          MS. BUSBEE:  No.

3          THE COURT:  Thank you, ma'am.  We'll let

4  you claim your exemption.

5          THE COURT:  Number -- Malone, 567, Mary

6  Malone.

7          PROSPECTIVE JUROR:  My problem is I

8  didn't know we had to fill out questions and I didn't bring

9  my reading glasses.  Other than that, no problem.  I can't

10  see how to fill out the questions.  That's the only problem

11  that I have.

12          MS. BUSBEE:  Let her go.

13          MR. SHOOK:  Agreed.

14          THE COURT:  They have agreed to let you

15  go.  You don't have to fill it out.

16          PROSPECTIVE JUROR:  I was found guilty.

17          THE COURT:  No. 1079, Mr. Lane Lucas.

18  You were saying that you were found guilty of --

19          PROSPECTIVE JUROR:  Theft over $750,

20  embezzlement, '92.  I served a two-year probation, 120 hours

21  community service.

22          THE COURT:  Do you know if it was

23  straight or deferred?

24          PROSPECTIVE JUROR:  Straight.

25          MS. BUSBEE:  Excuse him?

1          MR. SHOOK:  Yes.

2          THE COURT:  Parties have agreed, sir.

3    No. 1576, Shannon Edwards.

4          PROSPECTIVE JUROR:  I'm technically

5    moving out of Texas.  I'm a student in Missouri, so I will

6    be in Missouri.

7          THE COURT:  You have a qualification, an

8    exemption.  I'll go for the out of state.  Any questions?

9          MS. BUSBEE:  No.

10         MR. SHOOK:  No.

11         THE COURT:  No. 1592, Ms. Foto.

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Not a citizen and school.

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  I believe we can let you go.

16   Qualifications.  No. 1720, Kara Devening.

17         PROSPECTIVE JUROR:  I brought a notice

18   and the -- I know it's far off, but I'm undergoing fertility

19   treatment and I'm having surgery on my uterus next week and

20   starting the process of in vitro.

21         MS. BUSBEE:  We agree.

22         MR. SHOOK:  Agree.

23         THE COURT:  They've already agreed.

24         THE COURT:  No. 2667, David Holguin.

25         PROSPECTIVE JUROR:  I'm moving to Denton

1  County.

2          THE COURT:  By the end of the month?

3          PROSPECTIVE JUROR:  House is sold.

4          THE COURT:  House is sold.  Thank you.

5  No. 795, James Weber.  Yes?

6          PROSPECTIVE JUROR:  I wasn't

7  understanding what you were saying when you said a pending

8  case.  I have a pending DWI.

9          THE COURT:  It says pending for theft or

10 any felony.

11         PROSPECTIVE JUROR:  And this is a

12 misdemeanor.

13         THE COURT:  Be sure you put that on your

14 questionnaire, please, sir.  No. 1542, Corinne Chamberlin.

15         PROSPECTIVE JUROR:  I'm a resident of

16 Denton County now.  I just left the title company to come

17 here.

18         THE COURT:  All right.  You are not

19 qualified.  We'll get you a case up in Denton County.  Good

20 luck.  No. 509, Franco Williams.

21         PROSPECTIVE JUROR:  I have enrolled and

22 attending Amberton University on a full-time basis and the

23 week of before Thanksgiving I'm taking my finals to get my

24 degree.

25         THE COURT:  Full-time student.  You are

1    claiming your exemption.  Any questions?

2                    MS. BUSBEE:  No.

3                    THE COURT:  You are free to go.  No. 31,

4    Louis Arnemann.

5                    PROSPECTIVE JUROR:  I'm being transferred

6    out of the state with my employer, American Airlines.  June

7    13 is my last day in Dallas, actually in Texas.

8                    THE COURT:  All right.  At least you have

9    a job.

10                   PROSPECTIVE JUROR:  On the beach in

11   Miami.

12                   THE COURT:  No. 1070, Alejandro Deanda.

13                   PROSPECTIVE JUROR:  I'm a full-time

14   student right now.  I'm on break, but by August I'm going to

15   be full time.

16                   THE COURT:  Any questions?

17                   MS. BUSBEE:  No.

18                   MR. WIRSKYE:  No.

19                   THE COURT:  Thank you, sir.  No. 1968,

20   David Reznik.

21                   PROSPECTIVE JUROR:  Eight years ago I had

22   a series of hot checks, spent a couple of nights in jail,

23   and paid restitution.

24                   THE COURT:  Did you go before a judge?

25                   PROSPECTIVE JUROR:  Yes.

1        THE COURT:  Found guilty?

2        PROSPECTIVE JUROR:  Pled guilty.

3        THE COURT:  Plead guilty and found

4   guilty?

5        PROSPECTIVE JUROR:  I was found guilty

6   and paid the fine and restitutions.

7        MS. BUSBEE:  I don't have any problem

8   with excusing him.

9        MR. WIRSKYE:  We agree.

10       THE COURT:  Thank you, sir.  You are free

11  to go.  No. 1311, Lino Casas.

12       PROSPECTIVE JUROR:  I'm not speaking one

13  hundred percent English and I don't know how to write and

14  read.

15       THE COURT:  Any questions?

16       MS. BUSBEE:  No.

17       MR. WIRSKYE:  No questions.

18       THE COURT:  Thank you, sir, you are free

19  to go.  No. 1052, John Jillson.

20       PROSPECTIVE JUROR:  I have two children

21  and when my wife goes to work, I take care of my kids.  I

22  have no child care provider.  I have a five year old and 15

23  month old.

24       THE COURT:  What do you do in the day?

25       PROSPECTIVE JUROR:  I work afternoons on

1  my days off when she flies the second half of each month, I

2  watch my children.

3              THE COURT:  Any questions?

4              MR. WIRSKYE:  No questions.

5              THE COURT:  Thank you, sir.  We'll let

6  you go.  No. 2320, Wade Brooks.

7              PROSPECTIVE JUROR:  I'm currently

8  building a new home in Denton County.

9              THE COURT:  Building a home?

10              PROSPECTIVE JUROR:  Yes.

11              THE COURT:  Moving at the end of the

12  summer?

13              PROSPECTIVE JUROR:  No, sir.  It should

14  be October, the first of October.

15              THE COURT:  Any questions?

16              MS. BUSBEE:  No.

17              MR. WIRSKYE:  No.

18              THE COURT:  They have agreed.  We will

19  let you go.  No. 2348, Ms. Ieong.  Yes, ma'am?

20              PROSPECTIVE JUROR:  Because my education

21  is really low, my English is poor.  I don't understand the

22  question and write.

23              MS. BUSBEE:  Okay.

24              MR. SHOOK:  Okay.

25              THE COURT:  They have agreed to let you

1  go.  No. 1011, Ms. Ko?

2                    PROSPECTIVE JUROR:  I'm sorry, English is

3  my second.  I can't read and I can't write.

4                    THE COURT:  You can't make any of that

5  out?

6                    PROSPECTIVE JUROR:  Just only the basics.

7                    THE COURT:  Just your name and address?

8                    MR. SHOOK:  We can agree.

9                    THE COURT:  They are not going to make

10  you fill it out.  You are free to go.

11                    PROSPECTIVE JUROR:  So I can go?

12                    THE COURT:  Yes, ma'am.  Number No. 26,

13  Dianne Goode.

14                    PROSPECTIVE JUROR:  I'm really worried

15  about my participation, because I have hearing loss.  I

16  didn't catch everything you said.  I notice there's a spot

17  in the very back where you can fill in if you have a

18  handIcap.  And I will be glad to do the questionnaire, but

19  I'm really shaky on it.

20                    MS. BUSBEE:  We'll agree.

21                    MR. SHOOK:  Agree.

22                    THE COURT:  You are free to go.  No. 838,

23  Kevin Thurmaan.

24                    PROSPECTIVE JUROR:  Right now it's one of

25  two problems.  One of them is I don't have prescription

1   eyeglasses, so I can't really read right now.  And the other

2   reason is I'm on a new medication.  My two different types

3   of medication, one is called Abillified (phonetic) and the

4   other one is called -- starts with a B-I, can't pronounce

5   it.  And it makes my vision blurry, so I can't --

6                    THE COURT:  We can't have blurry vision.

7   We have agreed to let you go.

8                    MS. BUSBEE:  Agree.

9                    MR. SHOOK:  Agree.

10                    THE COURT:  No. 1479, Mr. Anthony Ruffu.

11   Yes, what can I do for you?

12                    PROSPECTIVE JUROR:  Several months ago,

13   five or six, I was severely attacked from behind and beaten

14   in the face about 15 blows by a young African-American and I

15   don't know if that is -- I don't -- I'm not happy about it.

16                    MR. WIRSKYE:  Agreed.

17                    THE COURT:  I don't believe there's a

18   case you need to hear and the parties have agreed to excuse

19   you.  You are free to go.  No. 962, Ramon Esquivel.

20                    PROSPECTIVE JUROR:  I just read this in

21   the back and it says I'm not a citizen yet.

22                    THE COURT:  Not a citizen yet.  We can't

23   use you yet.  Become a citizen and come back, okay?

24                    PROSPECTIVE JUROR:  All right.

25                    THE COURT:  No. 2239, Haruno Bowdoin.

1   Yes, ma'am?

2                   PROSPECTIVE JUROR:  I cannot fill out all

3   this paper because I have problem with the language.  I can

4   speak a little bit, but I don't know much about murder.

5                   THE COURT:  You have tried and the

6   parties have agreed to excuse you.  Thank you.  You are free

7   to go.  No. 205, Reginald Durley.

8                   PROSPECTIVE JUROR:  Yes.  I don't feel I

9   can give a verdict in somebody's death.  I don't believe it.

10                 MS. BUSBEE:  Like I said before, we might

11   as well, because he's going to be a 4 or 5.

12                 THE COURT:  He's a 4 or 5.  So there's no

13   way that you can be fair in this case?

14                   PROSPECTIVE JUROR:  It will be in my mind

15   that I sentence somebody to death and I live with it.

16                 THE COURT:  You agree?

17                 MS. BUSBEE:  Yes.

18                 THE COURT:  Any questions?

19                 MR. SHOOK:  No.

20                 THE COURT:  They will let you go.  No.

21   851, Mr. Larry Burns.

22                 PROSPECTIVE JUROR:  My education won't

23   allow me to do this.  And for my beliefs, sending a person

24   to the death penalty, I don't feel comfortable doing that.

25                 THE COURT:  I have a whole room of people

1  that don't feel comfortable.

2  PROSPECTIVE JUROR:  My education won't

3  allow me to do this because some of the questions I have

4  problems with spelling, reading, and writing, so that's

5  going to be a big problem in that area.  And just along with

6  that, my feeling of sending somebody down there, I couldn't.

7  So I'm just being honest with y'all.

8  THE COURT:  Mr. Sanchez, any questions?

9  MR. SANCHEZ:  No.

10  MR. WIRSKYE:  Agree.

11  THE COURT:  All right, sir.  You are free

12  to go.  No. 1260, Ms. Pescador.

13  PROSPECTIVE JUROR:  Could you say again,

14  please?  Talk loud.  I can't put down what I want to say.  I

15  don't know how to spell.

16  THE COURT:  And what is your native

17  language?

18  PROSPECTIVE JUROR:  Japanese.

19  MS. BUSBEE:  Agreed.

20  MR. SHOOK:  Agreed.

21  THE COURT:  The parties have agreed.  You

22  can go.  No. 1276, Mr. Marco Salais.

23  PROSPECTIVE JUROR:  I'm a Dallas police

24  officer.

25  THE COURT:  So?

1          PROSPECTIVE JUROR:  And I also am in the

2  process of looking for an apartment in Rockwall.

3          THE COURT:  So?

4          PROSPECTIVE JUROR:  That's the only thing

5  that I wanted to talk to you about.

6          MR. SHOOK:  We can agree.

7          THE COURT:  I'm not going to let you off,

8  but they are.

9          MR. WIRSKYE:  I know him, Your Honor.

10          THE COURT:  Thank you, sir.  No. 869,

11  Mr. Pedro Cruz.

12          PROSPECTIVE JUROR:  I don't speak

13  English.

14          THE COURT:  Are you -- did you try to

15  read this?

16          PROSPECTIVE JUROR:  I tried, but I can't

17  figure it out.

18          THE COURT:  Any questions?

19          MR. SHOOK:  We can agree.

20          MS. BUSBEE:  No, sir.

21          THE COURT:  They have agreed to let you

22  go.  No. 1698, Reginald Turknett.

23          PROSPECTIVE JUROR:  It's against my

24  religion.

25          THE COURT:  What religion?

1    PROSPECTIVE JUROR:  Church of Christ.

2    THE COURT:  Questions?

3    MS. BUSBEE:  No.

4    MR. SHOOK:  No.

5    THE COURT:  No way you can do this case?

6    MS. BUSBEE:  Agree.

7    MR. SHOOK:  Agree.

8    THE COURT:  All right.  They will let you

9  off the hook.  No. 581, Mr. Leslie Shoots.  You could never,

10  even if you could read this, you could never return a

11  verdict that would assessing a death penalty in any

12  circumstances?

13    PROSPECTIVE JUROR:  I can read it, but I

14  don't feel comfortable placing myself in that condition to

15  condemn or judge.  I'm struggling answering these questions.

16  I'm really in a problem.

17    MS. BUSBEE:  What we said previously

18  about this matter, we can agree, because it won't make any

19  difference based on our agreement with the State.

20    THE COURT:  All right.  They are going to

21  agree to let you go.  No. 748, Sharon Vaca.  Yes, ma'am?

22    PROSPECTIVE JUROR:  My husband is going

23  to have major surgery.  He has a testicular tumor next month

24  and he's going to have equilibrium problems for about three

25  months.

1    THE COURT:  Husband having surgery.  He's

2  going to be down for three months?  We're not going to be

3  interviewing people before August.  I want you to put that

4  on your questionnaire and fill it out.  And if you get a

5  call and there's a problem when you get the call to come

6  back down, let us know at that time.  Okay?

7    PROSPECTIVE JUROR:  Okay.  Thank you.

8    THE COURT:  No. 2274, Mr. Gulley.

9    PROSPECTIVE JUROR:  Two things, number

10  one, I'm with the Dallas Morning News and we did cover this

11  in the newspaper when it happened.

12    THE COURT:  Yes.  Do you believe

13  everything that's in the newspaper?  You are under oath now.

14    PROSPECTIVE JUROR:  I have to say yes

15  because I work for the Dallas Morning News.  I have to say

16  yes, I believe in our product.  But even beyond that, second

17  thing is, in fact, I'm working out a traffic ticket with the

18  City of Carrollton.

19    THE COURT:  Traffic tickets?  No problem.

20  Finish that up for me.

21    PROSPECTIVE JUROR:  Yes.

22    THE COURT:  No. 931, Mr. Manuel Flores.

23    PROSPECTIVE JUROR:  I don't know if this

24  has anything to do, but I went to -- we went to elementary

25  school.

1       THE COURT:   We did.   I haven't seen you

2   in 30 years.

3       PROSPECTIVE JUROR:   Right.   Lakewood

4   Elementary.

5       THE COURT:   Absolutely.   I have not seen

6   you in 30 years.

7       PROSPECTIVE JUROR:   You know my brother,

8   Danny.

9       THE COURT:   Yes.

10       PROSPECTIVE JUROR:   So I don't know if

11   that --

12       THE COURT:   They need to know that.   It

13   doesn't bother me.

14       PROSPECTIVE JUROR:   We went to elementary

15   school together.

16       MS. BUSBEE:   So you have got some good

17   stories.   Put those in that questionnaire.

18       PROSPECTIVE JUROR:   He is different than

19   7th grade right now.

20       MS. BUSBEE:   Wouldn't affect you in the

21   trial.   He's a neutral party.

22       PROSPECTIVE JUROR:   If that's okay with

23   you.

24       THE COURT:   They need to know that you

25   are not going to make a decision on the evidence based on

1    the fact that you and I went to school together 30 years

2    ago.

3                         PROSPECTIVE JUROR:  I didn't know if that

4    was --

5                         THE COURT:  We appreciate you saying

6    hello and, if you would, fill that out for us.  No. 2556,

7    Mr. Ernie Brown.  Yes?  What can I do for you?

8                         PROSPECTIVE JUROR:  Okay.  I have kids

9    under ten.  You were saying if you have a child under ten

10   that you can't be exempt.

11                        THE COURT:  Where do you work?

12                        PROSPECTIVE JUROR:  I don't work.  I

13   don't have a job right now.

14                        THE COURT:  That's pretty thin,

15   Mr. Brown.  Who has them right now?

16                        PROSPECTIVE JUROR:  My mama watch them

17   for me, so I can come down here.

18                        MS. BUSBEE:  That's an exemption.

19                        MR. WIRSKYE:  You are the soul caretaker

20   of those children?

21                        PROSPECTIVE JUROR:  Yes.

22                        MR. WIRSKYE:  And they are under ten?

23                        THE COURT:  They are going to let you

24   claim your exemption.  You are free to go.  Number --

25                        PROSPECTIVE JUROR:  I'm not sure if I'm

1  part of Dallas County.  I tried to vote last November and

2  they told me I was part of Collin County.

3                    THE COURT:  No. 173, Ms. Radon.

4  Haverwoods (phonetic) up in Dallas, 75297 (phonetic).  So

5  did you say it was Denton County?

6                    PROSPECTIVE JUROR:  They told me it was

7  Collin.

8                    THE COURT:  City of Dallas.

9                    MS. BUSBEE:  That's possible.

10                    THE COURT:  It's possible.

11                    PROSPECTIVE JUROR:  I would love to stay.

12                    THE COURT:  Where do you pay your taxes?

13                    PROSPECTIVE JUROR:  My taxes?

14                    THE COURT:  Yes.  You don't pay property

15  taxes.  You live in an apartment?

16                    PROSPECTIVE JUROR:  Right.

17                    MS. BUSBEE:  Where do you send your

18  registration for your car?

19                    PROSPECTIVE JUROR:  I just bought a new

20  car, I'm sorry.

21                    THE COURT:  Put it on the questionnaire

22  and we'll check it with the map.

23                    MR. SHOOK:  We can probably check it

24  right now.

25                    THE COURT:  Are you registered to vote?

1    PROSPECTIVE JUROR:  Yes.

2    THE COURT:  Where do you vote?

3    PROSPECTIVE JUROR:  They told me Collin

4    County.

5    THE COURT:  Okay.  Probably want to

6    figure out what county.  They are going to let you go.

7    Thank you.  Number --

8    PROSPECTIVE JUROR:  I'm having cataract

9    surgery.  I can't see well.

10    THE COURT:  No. 1524, Ms. Nevaquaya.  You

11    are having cataract surgery in two weeks?

12    PROSPECTIVE JUROR:  Three weeks.  I can

13    see once I have my surgery.  I can't see to make out some of

14    the lines.

15    THE COURT:  You are having a problem

16    keeping between the lines?

17    MS. BUSBEE:  We've let other people go.

18    I don't have any problem with it.

19    MR. WIRSKYE:  Let her go.

20    THE COURT:  They are going to let you go.

21    No. 2289, Stephen York.  Yes?

22    PROSPECTIVE JUROR:  When I was 18 I did

23    something young and foolish and I got convicted of it and it

24    was pot smoking.  I took it very serious and I take it very

25    serious now.

1    THE COURT:  Just put it on your

2 questionnaire.  They need to know that.

3    PROSPECTIVE JUROR:  Do you put it down

4 here for a conviction of a felony?

5    THE COURT:  It probably wasn't a felony.

6    PROSPECTIVE JUROR:  I don't know.

7    MS. BUSBEE:  What year was it?

8    THE COURT:  1970.  Just write it on the

9 questionnaire.

10    MS. BUSBEE:  We didn't have deferred back

11 then.

12    PROSPECTIVE JUROR:  I'm ashamed to talk

13 about it now.  It's not considered serious now.  It's a very

14 small crime now.

15    THE COURT:  Just put it in there that you

16 were convicted of marijuana.  No. 2952, West, yes, ma'am.

17    PROSPECTIVE JUROR:  I'm a simple person

18 and I stay at home.  I go to work and I'm not strong.

19 That's not me.  I don't have good answers to that.  I don't

20 have a mind for it, in other words.  It would take me

21 forever just to sit there and fill this out and put on there

22 what y'all may want to hear.  It ain't going to work with

23 me.  I'm not the type of person, I'm just not -- I'm sorry.

24    MS. BUSBEE:  Let's not agree to people

25 that are marginal.

1          MS. BUSBEE:  I read my Bible and I pray.

2          THE COURT:  You are going to have to fill

3    this out, okay?  It's part of the program.  Number --

4          PROSPECTIVE JUROR:  I filled out.

5          THE COURT:  No. 680, Ms. Sosbe.

6          PROSPECTIVE JUROR:  This tells about a

7    medication that I have.

8          THE COURT:  Put it on your questionnaire.

9          PROSPECTIVE JUROR:  Okay.  That's all I

10   need to do.  You don't need a copy of this?

11         THE COURT:  Staple it to it if you want

12   to and put it in there.  No. 2171, Mr. Bailey.

13         PROSPECTIVE JUROR:  I can't do this.  I

14   don't believe in the death sentencing at all under any

15   circumstances.  The Bible --

16         THE COURT:  I need you to finish filling

17   this out, please, sir.  No.  -- Mr. Huynh, No. 1035.

18         PROSPECTIVE JUROR:  Because I'm not

19   understanding this well, that's why I can't --

20         THE COURT:  They have agreed to excuse

21   you.  You are free to go.

22                    [End of Volume]

23

24

25

49

1  STATE OF TEXAS          *

2  COUNTY OF DALLAS        *

3      I, NANCY BREWER, Official Court Reporter for the 283rd

4  Judicial District Court, do hereby certify that the above

5  and foregoing constitutes a true and correct transcription

6  of all portions of evidence and other proceedings requested

7  in writing by counsel for the parties to be included in this

8  volume of the Reporter's Record, in the above-styled and

9  numbered cause, all of which occurred in open court or in

10 chambers and were reported by me.

11     WITNESS MY OFFICIAL HAND on this the ___4___ day of

12 _____March_____, 2004.

13

14

15                    _Nancy Brewer_

16                    NANCY BREWER, CSR, NO. 5759
                      Expiration Date:  12-31-04

17                    Official Reporter, 283rd JDC
                      Frank Crowley Crts. Bldg. LB33

18                    133 No. Industrial Blvd.
                      Dallas, TX 75207

19                    (214)653-5863

20

21

22

23

24

25

REPORTER'S RECORD

**74851**

VOLUME 7 OF _61_ VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

STATE OF TEXAS               *       IN THE DISTRICT COURT

VS.                          *       DALLAS COUNTY, TEXAS

PATRICK HENRY MURPHY, JR.    *       283RD DISTRICT COURT


*********************

INDIVIDUAL VOIR DIRE

*********************

**FILED IN**
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk


On the 28th day of August 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.


**ORIGINAL**

1                    A P P E A R A N C E S

2       APPEARING FOR THE STATE

3       Mr. Toby Shook
        SBOT NO. 18293250
4       And
        Mr. Bill Wirskye
5       SBOT NO. 00788696
        Assistant District Attorneys
6       133 No. Industrial Blvd.
        Dallas, Texas 75207
7       Phone:  214/653-3600


8       APPEARING FOR THE DEFENDANT

9
        Ms. Brook Busbee
10      Attorney at Law
        SBOT:  03488000
11      703 McKinney Ave. Ste. 312
        Dallas, TX 75202
12      214/754-9090

13      Mr. Juan Sanchez
        Attorney at Law
14      SBOT:  00791599
        5630 Yale Blvd.
15      Dallas, TX 75206
        214/365-0700

16

17

18

19

20

21

22

23

24

25

## PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Christopher O'Neal | 5 | 7 | | 7 |
| Carole Lawson | 8 | 10 | 33 | 7 |
| David Shannon | 56 | 58 | 88 | 7 |
| Barbara Holcombe | 97 | 99 | 132 | 7 |
| Eugene Peterson | 138 | 140 | | 7 |
| Jill Ann Ervin | 153 | 155 | | 7 |

1                          P R O C E E D I N G S

2                 THE COURT:  Cause No. F01-00328, what

3    says the State?

4                 MR. SHOOK:  State's ready.

5                 THE COURT:  What says the defense?

6                 MS. BUSBEE:  For the purpose of picking a

7    jury, Your Honor, we're ready.

8                 THE COURT:  Arraign the defendant.

9                 MR. SHOOK:  "True bill of Indictment, by

10   the name and by the authority of the State of Texas, the

11   Grand Jury of Dallas County, State of Texas, duly organized

12   at the January Term AD 2001 of the 282nd Judicial District

13   Court, Dallas County, in said Court at said term do present

14   that one Patrick Henry Murphy, Jr.;" -- is that your name?

15                THE DEFENDANT:  Yes, sir.

16                THE COURT:  "-- on or about the 24th day

17   of December AD 2000, in the County of Dallas and said state

18   did unlawfully then and there knowingly and intentionally

19   cause the death of Aubrey Hawkins, an individual,

20   hereinafter called the deceased, by shooting the said

21   deceased with a firearm, a deadly weapon, and the said

22   deceased was a peace officer, namely, City of Irving police

23   officer, then and there acting in the lawful discharge of an

24   official duty and the said defendant then and there knew the

25   said deceased to be a peace officer and further unlawfully

1  then and there intentionally caused the death of Aubrey

2  Hawkins, an individual, hereinafter called the deceased, by

3  shooting the said deceased with a firearm, a deadly weapon,

4  and defendant was then and there in the course of committing

5  and attempting to commit the offense of robbery of Wesley

6  Ferris, against the peace and dignity of the State, Bill

7  Hill, Criminal District Attorney of Dallas County, Texas,

8  and signed by the foreman of the Grand Jury."

9                    THE COURT:  Mr. Murphy, how do you plead

10  to the indictment as presented to this Court?

11                    THE DEFENDANT:  Not guilty.

12                    THE COURT:  Sheriff, would you ask

13  Mr. O'Neil to come in.

14                    [Prospective juror in]

15                    THE COURT:  Good morning, sir.  How are

16  you?

17                    PROSPECTIVE JUROR:  I'm just fine, thank

18  you.  How are you doing?

19                    THE COURT:  You are Christopher Scott

20  O'Neil?

21                    PROSPECTIVE JUROR:  Correct.

22                    THE COURT:  Have you had a chance to

23  review the orientation guide that I provided for you?

24                    PROSPECTIVE JUROR:  That's right.

25                    THE COURT:  I'm not going to go outside

1  of that very much other than to ask you do you have some

2  understanding of the law that we're going to be talking

3  about here today?

4              PROSPECTIVE JUROR:  Yes, sir.

5              THE COURT:  Give you an outline of the

6  time frame we're going to be considering in this matter, do

7  you have any issues as far as being able to give the Court

8  two weeks of time beginning on November 10th?

9              PROSPECTIVE JUROR:  Actually I do.  I

10  tried to explain this.  Tuesday and Thursday -- at the time

11  of the first screening, I wasn't in school.  I wasn't going

12  to be.  And now I have class Tuesdays and Thursdays.  So --

13              THE COURT:  And where will you be

14  attending school?

15              PROSPECTIVE JUROR:  Richland.

16              THE COURT:  Is this full-time basis or

17  part-time?

18              PROSPECTIVE JUROR:  Part-time.

19              THE COURT:  What time are your classes?

20              PROSPECTIVE JUROR:  It's going to be from

21  about 10:00 to 2:00.  Actually, I have to go today to

22  finalize that.

23              THE COURT:  10:00 to 2:00?

24              MR. SHOOK:  Could I ask just a couple of

25  questions?

1        THE COURT:  Yes, sir.

2                    DIRECT EXAMINATION

3   BY MR. SHOOK:

4        Q.    How many classes are you taking?

5        A.    Three classes.

6        Q.    Three?  Okay.  And how many hours credit would

7   that be?

8        A.    Nine hours.

9        Q.    And this is all going towards a degree, I take

10  it?

11       A.    Yes.

12       Q.    What kind?

13       A.    Business, general business.

14       Q.    And you are going to also be working full-time

15  during this period?

16       A.    Yes, sir.

17       Q.    The trial will be a couple of weeks-period, I

18  guess, in November, which would be getting close to finals.

19  Obviously, if you were asked to miss two weeks, to be down

20  here for two weeks, that would be four class periods you

21  would have to miss?

22       A.    Correct.

23       Q.    Which, obviously, would be pretty bit of a

24  hardship.  I went to college, but Mr. Wirskye didn't go to

25  many classes and make it.  Would that be something that's

1    going to really weigh on your mind since you are enrolled

2    and working towards a degree, if you are placed on a jury

3    and you had to miss classes?

4         A.    I believe so.

5              MR. SHOOK:  We can agree, then, Judge.

6              THE COURT:  Mr. O'Neil, I appreciate you

7    taking time to fill out the questionnaire and respond to the

8    first jury call.  As you said, your circumstances changed.

9              PROSPECTIVE JUROR:  Yeah, they did.

10             THE COURT:  And we all recognize the

11   importance of education and we want your full attention, if

12   you were going to be on this case.  And the parties have

13   agreed to excuse you at this time.

14             PROSPECTIVE JUROR:  Thank you very much.

15             THE COURT:  Thank you, sir.

16                  [Prospective juror out]

17             THE COURT:  Sheriff, may we have Carol

18   Margaret Lawson.

19                  [Prospective juror in]

20             THE COURT:  Good morning, Ms. Lawson, how

21   are you?

22             PROSPECTIVE JUROR:  Good morning.  Fine,

23   thank you.

24             THE COURT:  You brought your reading

25   material.  And as the orientation guide said, we didn't know

1  if we're going to talk to someone for a few minutes or a few

2  hours.  So a person was a few minutes, the first one this

3  morning, but we appreciate you coming down.  Did you have an

4  opportunity read --

5                   PROSPECTIVE JUROR:  No, I didn't.

6                   THE COURT:  You weren't reading?

7                   PROSPECTIVE JUROR:  I started reading the

8  State's witness list.

9                   THE COURT:  So you didn't have time to

10  read the orientation guide?

11                   PROSPECTIVE JUROR:  No, sir.

12                   THE COURT:  It will shorten this up, if

13  you take a minute and look through that real quickly and

14  we'll be quiet.

15                   PROSPECTIVE JUROR:  [Prospective juror

16  complies.]  Okay.

17                   THE COURT:  Ms. Lawson, I know you had

18  just a few minutes to briefly look through that and that

19  gives you an idea of what we're going to be discussing this

20  morning.

21                   First question I have for you is this

22  trial is scheduled to begin with testimony beginning on

23  November 10th, last approximately two weeks.  Is there any

24  major problem that you would not be able to serve this Court

25  for that period of time?

1          PROSPECTIVE JUROR:  Um, I think that

2  would be fine.

3          THE COURT:  We'll be through way before

4  Thanksgiving week.  That is the objective.  We don't want to

5  mess with anybody's holiday.  All right?  Remember that you

6  are under oath.  If you don't understand any of the

7  questions, just say, I don't understand.  We're not trying

8  to trip you up or trick you or anything else.  It's a

9  complicated process and the lawyers will be talking to you

10  to get you to understand the law and then we'll answer any

11  questions that you have.

12          PROSPECTIVE JUROR:  Okay.

13          THE COURT:  With that I'll turn it over

14  to Mr. Shook.  You may inquire.

15          MR. SHOOK:  May it please the Court.

16          MARGARET LAWSON,

17  having been duly sworn, was examined and testified as

18  follows:

19          DIRECT EXAMINATION

20  BY MR. SHOOK:

21      Q.    Ms. Lawson, my name is Toby Shook.  I'm one of

22  the prosecutors.  I'll be asking questions on behalf of the

23  State today.  And as the Judge has told you, you know,

24  there's not any right or wrong answers to any of our

25  questions.  We just want your honest opinions.

1       We appreciate you taking the time, I

2  guess it was back in May, to fill out this questionnaire.   I

3  know it was quite lengthy.   There was some personal

4  information and believe it or not, it actually does save you

5  some time.   But it was quite informative.

6       What I'll do today is we'll ask some

7  questions from the questionnaire and follow up on a few

8  things.   We're going to talk a lot about capital murder, the

9  death penalty, want to know how you feel about it.   We're

10  going to go over the law in these types of cases and ask you

11  how you feel about different laws.   But the bottom line is,

12  we just want your honest opinions.   We know most people

13  would rather be somewhere else, obviously, but most people

14  like yourself understand your civic duty.

15       Have you -- I don't believe that you have

16  ever been on a jury before?

17       A.       No.

18       Q.       Have you been called down to jury duty?

19       A.       Yes.

20       Q.       You know from that experience, then, this is a

21  lot different?

22       A.       Yes.

23       Q.       We do this individual interview, so to speak.

24  I think it sometimes intimidates some people, because you

25  feel like you are the one on trial when you are on the

1    witness stand.  We all recognize that.  And I know we can

2    tell you to relax.  It's kind of hard to do.  But just try

3    your best.  We kind of warm up.  People get more comfortable

4    as we go along.  But we understand how it's a little

5    intimidating to be up there.  Okay?

6         A.    Yes.

7         Q.    Let me -- this is background information.  You

8    grew up here in Texas.  Looks like you spent your first

9    years growing up in the Houston area?

10        A.    Uh-huh, right.

11        Q.    And you went to the University of Texas?

12        A.    Uh-huh.

13        Q.    And then the last few years you have been here

14   in Dallas?

15        A.    Correct.

16        Q.    What brought you to Dallas?

17        A.    My husband's job.

18        Q.    And you have lived here for how long now?

19        A.    Nine to ten years.

20        Q.    Okay.  Let me -- you put on the questionnaire

21   that you had several friends that are attorneys?

22        A.    Uh-huh.

23        Q.    What type of law do they practice?

24        A.    You know, I don't know.  We have real estate

25   attorney friends and, you know, I don't know if we have any

1    criminal --

2         Q.     None that you know of, then?

3         A.     None that I know of.

4         Q.     Sometimes we ask that because if someone is a

5    close friend of a criminal attorney or prosecutor, then we

6    want to know what kind of war stories they've heard and that

7    sort of thing.  But you don't have that situation.

8              You know from talking with the Judge when

9    you were first brought down, that this is a capital murder

10   case and one in which the State is seeking the death

11   penalty.  And there was a lot of questions about the death

12   penalty and how you feel about it on the questionnaire and,

13   obviously, we're going to follow up on that.  You probably

14   had more time to think about it since that time.

15        A.     Yeah.

16        Q.     So I want to ask you several questions about

17   that.  You put on your questionnaire that you favor it as a

18   law.  Do you still feel that way?

19        A.     Yes.

20        Q.     Okay.  Just tell us in your own reasons or

21   your own words why you favor the death penalty, why you

22   think it's an appropriate punishment in certain cases.

23        A.     Um, well, I just feel like it's the law of the

24   land, first of all, and that we need to abide by it.

25        Q.     Is it something that you have always believed

1  in as you grew up?

2       A.    Yes.

3       Q.    Do you think it's a just sentence in certain

4  types of cases?

5       A.    Yes.

6       Q.    When you think of a death penalty case, what

7  types of cases come to mind?

8       A.    Um, murder, um, and I'm very compassionate

9  toward children, so that -- I mean, I don't know if that

10  would ever warrant --

11       Q.    A lot of people tell us that.  We ask

12  questions sometimes if you were the Governor of Texas and

13  could decide what laws would be death, they will bring up

14  certain murder cases and sometimes I ask if there was some

15  other case other than murder, usually people say if you

16  injure a child severely.

17            In Texas, right now the only cases

18  reserved for the death penalty are murder cases and then

19  only certain types of murder cases, one of those involving

20  the death of a child under the age of six.  But that's

21  something a lot of the jurors tell us.

22            Have there been any cases that you

23  followed in the media that you thought were appropriate for

24  the death penalty?

25       A.    Um, you know, my recollection is not that --

1    is not that good.  I do tend to read the newspaper a lot and

2    follow certain cases, but I just cannot specifically say.

3         Q.      We asked one question, if you thought some

4    crimes, just on the facts of the crime itself, might call

5    for the death penalty and the example you used was the

6    father that killed his daughters while his wife was on the

7    phone.  And that's a pretty infamous case.

8         A.      Yes.

9         Q.      That was the Bataglia case, I believe.

10        A.      Yes.

11        Q.      And you felt that was the type of case,

12   obviously, involving children as victims.

13        A.      Right.

14        Q.      In Texas, the death penalty is reserved for

15   intentional killings, not an accident, not self-defense.  An

16   intentional murder during the course of certain

17   circumstances or aggravating facts.  We have a lot of brutal

18   murders that could be prosecuted and get a life sentence,

19   but you can't get the death penalty.

20              I could pull a gun out, shoot Mr. Wirskye

21   in the head because I didn't like his tie, and I could laugh

22   about it.  It's a brutal killing, but I couldn't get the

23   death penalty.

24              To get the death penalty, you have to

25   commit a murder during the course of a felony.  If I go down

and rob the 7-Eleven and shoot the clerk, if I go break into
someone's home and murder someone in the home, if I kidnap
someone, if I murder someone during the course of a rape,
those types of felonies, that could be a death penalty case.

         A.      Okay.  I have a question.  So -- but if your
intention to kill him was premeditated, would that be --

         Q.      It would not.

         A.      Okay.

         Q.      And states differ.  But the Supreme Court has
left some guidelines.  They can't -- and what they have
basically in certain terms have said, look, you can't have
it for every murder case.  You have to have some guidelines.
And Texas has limited it just to these types of cases.  And
sometimes that's fair and sometimes it's not.

                 I mean, the example we get the most is, I
believe you talked about, is the Timothy Richardson case,
the man that killed his wife --

         A.      Uh-huh.  I'm familiar with that.

         Q.      -- in Park Cities was not a death penalty
case, because -- a brutal killing, horrible killing, but he
doesn't commit it during the course of a felony or that sort
of a thing, but got a life sentence or equivalent of one,
but didn't get a death penalty.

                 Other types of crimes, the murder of a
child under the age of six, could be a death penalty case.

1   They chose that age for whatever reasons.  Someone that

2   murdered someone for money, like a hitman situation, could

3   be a death penalty case.  Murder of specific victims, such

4   as a police officer on duty or a fireman on duty or a prison

5   guard, could be a death penalty case.  But those are the

6   types of cases that the death penalty is limited to.

7                  Do you think that's the -- those are

8   appropriate types of cases?

9          A.      Uh-huh.

10         Q.      If it were up to you, would you might expand

11  that to brutal crimes, such as, well, the Timothy Richardson

12  case or something like that?

13         A.      It would depend on the case, of course.

14         Q.      The premeditation and that sort of thing?

15         A.      Uh-huh.

16         Q.      But you agree that those crimes should be

17  considered for the death penalty?

18         A.      Um, well, see, I have a difficult time here.

19  Because if that's the law of the land, then I think we

20  should abide by it and that should override my personal

21  opinion.

22         Q.      But your personal belief is what, that you

23  might expand it some?

24         A.      I might expand it some, yes.

25         Q.      Okay.  That's fine.  A lot of people feel that

1  way, too.  But the crimes I talked about, you think are

2  appropriate, just depending on the facts of each case?

3         A.     Say that again, please?

4         Q.     The murder during a robbery, that sort of

5  thing, you feel could be appropriate, just depending on the

6  facts of the case?

7         A.     Yes.

8         Q.     Okay.  The way the law is set up, the trial is

9  divided into two portions.  We have the guilt/innocence

10  stage where we have to prove to you beyond a reasonable

11  doubt that the defendant is guilty of the offense.  If we do

12  that, we then move to the punishment phase where you can

13  hear additional evidence.  The additional evidence could be

14  the person's background, that sort of thing.  It could be

15  good things; it could be bad things.  Then you get these

16  Special Issues to answer in the punishment phase.

17         A.     Okay.

18         Q.     We'll go over these in a little more detail in

19  a minute.

20         A.     So the person's background would not be

21  brought up during the --

22         Q.     Guilt/innocence stage.

23         A.     It would not?

24         Q.     No.  Usually all we can talk about is the

25  crime itself.  Now, there are certain situations where maybe

the background would come up, but most cases, it doesn't.
Then in the punishment phase, you kind of get a view of
their whole life, good things, bad things.  And at that
point in time you get these Special Issues.

The first issue basically asks is the
defendant going to be a continuing danger to society?  The
second issue asks if the defendant actually caused the death
or if they did not cause the death, did he intend for that
to happen or anticipate that a life would be taken?  And
then the last question is a mitigation question which you
kind of look at all the factors, all the evidence, and see
if there's any mitigating circumstances in which you think a
life sentence should be imposed, rather than a death
sentence.

But if those questions -- and we will go
in a little more detail in a minute.  But if they are
answered yes, yes, and no, the Judge would then sentence the
defendant to death.  He doesn't have any choice.  He
sentences the defendant by how the jury answers those
questions.  If they are answered any other way, he would
sentence the defendant to life.

So if you found someone guilty of capital
murder, the only two possible alternatives are going to be a
life sentence or a death sentence and that all is determined
by how you answer these questions.  The Judge has no choice.

1  He's going to do -- he's going to sentence the defendant by

2  how the questions are answered.  Is that clear?

3        A.        Yes.

4        Q.        Are you aware of the method of execution in

5  Texas?

6        A.        Yes.

7        Q.        By lethal injection?

8        A.        Lethal injection, yes.

9        Q.        The procedures are the same in each case.  If

10 the defendant is found guilty and the questions are answered

11 yes, yes, and no, the Judge sentences that person to death.

12 He is placed on death row where he would wait for a number

13 of years.  I can't tell you how long.  At some point in time

14 the Judge would then issue a date of execution.

15                On that date or a date prior to that,

16 actually, he would be moved to downtown Huntsville where the

17 executions take place.  The reporters often have detailed

18 stories about executions.  You may have read some of them.

19 The execution is by lethal injection.

20                On the date of the execution, the

21 execution would take place at 6:00 p.m.  He would be given

22 an opportunity to meet with his family, with friends, loved

23 ones, with a minister, an opportunity for a last meal.  But

24 at 6:00 p.m. he would be taken to the execution chamber, put

25 on a gurney, and strapped down by leather straps.  They show

that photograph of the gurney all the time on the news.

There would be witnesses brought in for the defendant, also for the victim's family, if they desire to view the execution.  He would be given a moment of about two minutes to give a last statement.  At that point in time the warden then signals the executioner who would inject lethal substances which would cause his heart to stop, his lungs to collapse, and, basically, for him to fall into a sleep.  It doesn't take long, but those are the procedures in each case.

And I don't mean to be morbid to go over that, but it's one thing when we talk about the death penalty in a philosophical sense or you saw that horrible case on the news or that sort of thing and it's another one when you come down here and realize I might be on a jury, making these decisions.

And we want to put all our cards out on the table.  That's our goal in this case.  As prosecutors, we feel we have the type of evidence to prove to a jury the defendant is guilty under the law and that these questions should be answered in such a way that result in his execution.  The defense will take the opposite view, obviously.  And that's why we bring a jury down here.

Now, you have told us philosophically that you believe in the death penalty as a law, the law of

1    the land --

2              A.      Uh-huh.

3              Q.      -- for certain cases, depending on the facts.

4    What I want to know is do you feel -- and you can only

5    answer this because you know yourself a lot better than we

6    will ever know you, that you are the type of person who

7    could listen to this evidence and if the State does prove

8    these issues to you, you could answer in such a way that the

9    defendant would be executed some day?

10             A.      Okay.  Will you repeat that just one more

11   time?

12             Q.      Do you feel that you are the type of person

13   that if we do prove these allegations to you, that you could

14   take -- actually take pen in hand and answer the questions

15   in a way, knowing that when you did so, that some day down

16   the line that the defendant would actually be executed?

17             A.      Um, I have struggled with this since answering

18   that questionnaire because I have always thought of it

19   objectively and not on a personal basis.  And, um, I'm just

20   putting my cards on the table.  I'm a little bit hesitant

21   about the whole thing, because it is a personal thing that I

22   will have to bear for the rest of my life.  So --

23             Q.      So you have some hesitation there?

24             A.      Uh-huh.

25             Q.      That's fine.  That's why we ask the question

1  that way, because it's one thing to write about it or to

2  talk about it --

3       A.     Right.

4       Q.     -- and it's a completely other thing when you

5  realize that you have to participate in this decision.

6       A.     Exactly.

7       Q.     We have some people that come and talk to us

8  and say, you know what?  I believe in the death penalty.  I

9  believe in it in almost every case.  And put me on the jury,

10  you know, I want to do it.  They never make it on the jury.

11  But we have some people that tell us that.

12            We have other people that will tell us,

13  quite honestly, I have religious objections to it.  I've

14  always been opposed to it.  And to be perfectly honest, I

15  don't care how much evidence you give me, I'm not going to

16  answer them that way and I'm not going to be responsible.

17  I've got to live with myself.

18            We have other people that tell us, I

19  agree with the law and I think certain people should be

20  executed.  I would vote for it every time, if it were coming

21  up on a bill to pass or an amendment or something like that.

22  But if you got me down here and I have to make that

23  decision, I'm too uncomfortable and I could not make that

24  decision because you have to live with yourself.  And that's

25  fine if they feel that way.  We have people that agree about

1   the law, but can't actually participate.  You might be fine

2   in a burglary trial or regular murder case or DWI trial or

3   civil case, but have hesitation where you are unable to do

4   that.

5              And if you feel that way, that's fine,

6   too.  An example I give to take it out of this context is,

7   I'm glad when I see a new skyscraper going up or building

8   because I know that shows progress being made and shows a

9   strong economy in Dallas, but I've always been terrified of

10  heights.  And I see these guys walking around on high beams,

11  and I know I could never do that.  I'm glad someone can, but

12  I can't do it and I wouldn't do it.

13             But some jurors feel the same way about

14  the death penalty.  I believe in it as a law, but I can't

15  make that particular decision.  Because the bottom line is

16  that's something that you would have to live with.  After

17  you made that decision, you may have to second guess

18  yourself.  You may read about the actual execution of the

19  person, the relatives being sad, him claiming his innocence,

20  or whatever.  And some people can't do it.

21             And if you feel that way, that's fine,

22  too.  But we just need to know that, because, like I said,

23  there's no right or wrong answers.  As you thought about it

24  and we've talked about it, you filled out the questionnaire,

25  you thought about it more, now that you are actually here

1 today and you can see a living, breathing human being at

2 that end of the table, one which we feel will lie dead on a

3 gurney in Huntsville, Texas, because of the evidence, is

4 this something that you personally don't think that you can

5 do?  You would be fine in another case, but you could not

6 participate in this type of case because of your

7 hesitations?

8         A.     (Long pause)  Um, you know, I think I could do

9 it, but it might be -- it might be difficult.

10         Q.     Okay.

11         A.     You know, I know that's kind of an evasive

12 answer, but --

13         Q.     Well, you know --

14         A.     It's just one of those things.  I guess I'm a

15 very compassionate person and I love people.  So -- but at

16 the same time, you know, I feel like we should pay, you

17 know, that punishment is what we need.

18         Q.     I understand that.

19         A.     So --

20         Q.     From my point of view is this, once we put you

21 on the jury, that's it.  You are on.  And that's why I need

22 you to be as honest as you can right now, because you may be

23 in a situation where eleven jurors go, look, they proved the

24 case.  We've got to answer these questions.  And you are

25 going, hey, I'm not comfortable with doing this.

1          And that's why, you know, as I said,

2   there's nothing wrong with saying, hey, I couldn't do it,

3   you know. But I don't want you to put yourself in a

4   situation where you can't really do something and we go,

5   fine, you said you could and let's get on the jury and that

6   sort of thing.

7          But I'm never going to be able to know.

8   You are the one that's going to be able to know that and you

9   have never been in this situation.

10          A.     Right.  I've never been in this situation.

11          Q.     And it's tough.

12          A.     And one of my little theories that I live by

13   in my life is, if it's questionable, don't do it.

14          Q.     That's a pretty good philosophy.  And does it

15   feel questionable to you?

16          A.     Uh-huh, yes.

17          Q.     Let me go with you on one further avenue and

18   ask you about the law on this, because some people have

19   greater hesitation on this area of the law.

20          A.     Okay.

21          Q.     When we think of capital murder, we think of a

22   guy who goes in and actually pulls the trigger.  Okay?  I go

23   into a 7-Eleven, I pull a gun out, and I rob them and then I

24   shoot the clerk.  That's obviously a capital murder case and

25   one in which we could seek the death penalty.

1          The law says, though, that more than one

2   person can, obviously, commit certain crimes.  Sometimes

3   they commit them in a group.  Sometimes there's only one

4   person that actually commits the murder, but several people

5   help carry out the crime.

6          A.    Uh-huh.

7          Q.    We can prosecute everyone involved in the

8   case, if they are fully participating in the crime, for that

9   crime and the same with capital murder.  Let me give you an

10  example.

11         Say me and Mr. Wirskye decide we want to

12  rob a bank.  We go in.  I have a gun.  Mr. Wirskye just

13  starts loading up.  He's got the bag.  And I pull the gun

14  out, cover everyone, and he loads the money up.

15         A.    Uh-huh.

16         Q.    But for whatever reason, I start shooting

17  people.  Maybe I kill one of the tellers.  We leave the

18  bank.  We are caught later.  I'm, obviously, guilty of

19  capital murder.  If I'm prosecuted, I could get the death

20  penalty.  Under the law Mr. Wirskye could also be prosecuted

21  for capital murder.  Not only could he be found guilty of

22  capital murder because he participated in that event, but he

23  could get the death penalty, even though he's not the

24  triggerman.

25         And some people -- and that's the law.

1    But some people draw a line there, morally, for themselves.

2    They say for the triggerman, I'm for that type of death

3    penalty case.  When you talk about a situation where an

4    accomplice is involved that didn't pull the trigger, no, I'm

5    not.  We call that the law of parties.  I would just draw a

6    line there.  Life sentence, 99 years, 70 years, whatever,

7    yes.  But I could never give someone a death penalty that's

8    just an accomplice or a party to an offense.

9         A.    Uh-huh.

10        Q.    Some people feel that way.  Other people tell

11   us, no, I could.  How do you feel about that, that

12   particular law?  Is that something that you would draw a

13   line on, if we were prosecuting a person who was not

14   actually the killer, the triggerman, but just an accomplice

15   or a party to the offense?

16        A.    I would have to have more information.  But I

17   probably would draw the line.

18        Q.    Okay.  Is that -- and that's because they

19   didn't actually commit the actual killing?

20        A.    Uh-huh.

21        Q.    A lot of people feel that way, too.

22        A.    But, see, on the other hand, he shouldn't have

23   been with you.

24        Q.    Right.  Right.

25        A.    So -- you know, that's -- I would have to hear

more or know more.

Q. We can't go into the facts, obviously. All I can talk about is the law of parties itself. You could probably have some really brutal, where the accomplices are involved and some not. But some people would philosophically would draw a line there and say, look, I'm not going to execute people that aren't the triggerman. I'm going to reserve the death penalty for the killer.

A. Okay. I'm thinking about it further. I would probably draw the line.

Q. I mean, obviously, you could severely punish them with a life sentence or something.

A. Right.

Q. But if you would -- if it were up to you, reserve the death penalty for just the triggerman himself?

A. Yes.

Q. And as I said before, there aren't any right or wrong answers. We want to throw that out there because, again, putting all our cards on the table, we're prosecuting Mr. Murphy under the law of parties and we want to know from the get-go whether people can agree with that law or not. If you can't, that's fine. We have no argument with that.

A. So are you asking me whether I agree with the law?

Q. Yes.

1      A.      I would -- if that's the law, then I would

2  agree with it.

3      Q.      That's where I get a little sticky with

4  jurors because we want to ask you beforehand, telling you

5  what the law is, how you feel.  Because some jurors say, if

6  that's the law, then I agree with it.

7      A.      Yes.

8      Q.      But then they have personal reservations that

9  you reserve and say, look, that could be the law, but when

10  I'm in the jury box, are you going to do what the law says

11  or are you going to have these reservations?  And there's

12  nothing wrong with disagreeing with part of the law.

13      A.      Uh-huh.

14      Q.      Everybody disagrees with some part of it.  But

15  when we have to make our decisions, we have to know if you

16  are on board with that or is that something really we're

17  fighting too much of an uphill battle.  Put me on a

18  different type of case.

19              What you have told me when we first began

20  talking about this is if it came down to it, I guess, you

21  would draw the line and reserve the death penalty for the

22  triggerman, the person that actually caused the death?

23      A.      Well, okay.  We were talking the law versus

24  personal feeling.

25      Q.      Right.

1       A.      And so -- you are asking me when it came down

2    to it, what would I do?

3       Q.      I'm asking you -- well, let me ask you this

4    way.  If we prosecuted a case to you under the law of

5    parties, that is, the defendant didn't actually murder the

6    person.  It was an accomplice.

7       A.      Right.

8       Q.      Do you personally feel that that's a death

9    penalty case, that you could give someone the death penalty

10   or is that a case where you would say, no, if it's a

11   nontriggerman, I'm not for the death penalty.  I would

12   reserve that for the other person?

13      A.      Okay.  Okay.  I understand what you are

14   saying.  That would be questionable for me.

15      Q.      You have some problems with that, too?

16      A.      Yes.

17      Q.      Okay.  Well, I hate to keep beating around the

18   bush or asking the same questions, but it's the only

19   opportunity that I get to.  And the Judge has to be sure on

20   these things.  But you, after thinking about it, I take it,

21   have some reservations about personally participating in

22   this type of trial?

23      A.      Yes.

24      Q.      You agree with the law --

25      A.      Yes.

1   Q.   -- feel it's appropriate, but just making this

2   personal decision is something that you don't feel you would

3   be comfortable doing?

4   A.   Correct.

5   Q.   Okay.  Fair enough.  That's fine.  We just

6   want your honest opinions.  And the reservations that you

7   have about making a life and death decision, I take it

8   that's not something that's going to go away anytime soon?

9   A.   I don't think so.

10   Q.   Okay.  Just from your demeanor I think I can

11   tell that, but I want to make sure it's for the record.  And

12   are you telling us that this just isn't the type of case, a

13   death penalty case, where you would make the life and death

14   decision that you would be comfortable in making and don't

15   -- I hate to put it this way, but maybe not objectively be

16   able to look at the evidence because you are going to have

17   these reservations, reservations about making a life or

18   death decision?

19   A.   Well, see, that's where the other part of me

20   comes into play.  And I think if it's clear-cut, then I

21   think that -- it's just a lot of uncertainty, I guess,

22   within my being.  But I feel strongly -- although I feel

23   objectively strongly about the death penalty, can I issue

24   that myself?

25   Q.   Right.

1    A.    Can I live with that?

2    Q.    That's what you are struggling with?

3    A.    That's what I'm struggling with.

4    Q.    And that struggle continues today?

5    A.    Yes.

6    Q.    When you see this man that's alive here in the

7    courtroom and realize what our goal is?

8    A.    (Prospective juror nods head.)

9    Q.    As best you know yourself, then, do you think

10   this is the kind of case that you can participate in or just

11   not your cup of tea?

12   A.    Um, well, I certainly feel like if I'm called,

13   God has called me to serve and then I would do that.

14   Q.    Okay.

15         MR. SHOOK:  Can I have just a moment,

16   Judge?

17         THE COURT:  You may.

18         MR. SHOOK:  May we approach the bench?

19         (Bench conference)

20         MS. BUSBEE:  May it please the Court?

21         THE COURT:  Ms. Busbee.

22         CROSS-EXAMINATION

23   BY MS. BUSBEE:

24   Q.    Ms. Lawson, I know this is torturous, but

25   here's the question in my mind.  And let me take you to this

1  part.  We're talking about people who are parties and to a

2  hypothetical capital murder, not one that, you know, not

3  talking about any specific facts.  After a person has found

4  someone guilty of capital murder as a party, they are

5  eligible for the death penalty, certainly, that's correct.

6          But the juror has to go into an almost

7  entirely different trial.  It's a different trial.  The

8  second part has to do with these three issues.  And these

9  three issues as they are printed on that board, discuss what

10  would be necessary for a jury to assess a death penalty to a

11  party.

12          So, I mean, the first one makes sense.

13  Is this person going to continue to be a threat?  It's the

14  second one that is unique to where someone is a party to an

15  offense.  That one says whether he actually caused the death

16  or not, he either intended to kill the deceased or intended

17  to kill someone or anticipated that a human life would be

18  taken.

19          Before a juror would find that question

20  yes, they would have to be satisfied.  And I loved what you

21  said, when it's questionable, don't do it.  It's just a

22  simple way of saying beyond a reasonable doubt.  In fact,

23  it's a better way to say it.

24          So I ask you this question.  Under the

25  circumstances where you have -- you are sitting on a

1   hypothetical capital murder jury and you have found that

2   person guilty as a party, would you be comfortable following

3   the law and if it was proved to you beyond a reasonable

4   doubt, Special Issue No. 2 and Special Issue No. 1, could

5   you answer yes to those questions?

6          A.   If I were called and on the jury?

7          Q.   Yes, ma'am.

8          A.   Yes.

9          Q.   So you see -- and, actually, you are the

10  favorite kind of juror that we have because you are telling

11  us the absolute truth.  You are telling us how you feel, but

12  that you would follow the law?

13         A.   Right.

14         Q.   Okay.  I appreciate it.

15                  DIRECT EXAMINATION CONTINUED

16  BY MR. SHOOK:

17         Q.   So the hesitation you had, you are telling us

18  now --

19         A.   No.

20         Q.   I can do it, it won't be a problem, if you

21  prove the case to me?

22         A.   Okay.  Um, I can do it.  I can do anything.

23  So if I were called, I could do that.  But I'm telling you

24  that still my personal feelings are still there.

25         Q.   The hesitation?

1          A.      Uh-huh.

2          Q.      Let's talk, then, about some of these Special

3     Issues.

4          A.      Okay.

5          Q.      Special Issue No. 1 asks whether there is a

6     probability that the defendant would commit criminal acts of

7     violence that would constitute a continuing threat to

8     society.  That question starts out with a no answer and we

9     have to prove to you beyond a reasonable doubt it should be

10    answered yes.

11         A.      Uh-huh.

12         Q.      We do that by giving you new evidence, if

13    there is -- or, obviously, you looking at the

14    guilt/innocence evidence you have already heard and decide

15    that.  You are making a prediction of how the defendant will

16    behave in the future.  Do you feel you can answer that type

17    of question?

18         A.      Yes, definitely.

19         Q.      What types of evidence -- what type of

20    evidence do you think would be important to you in reaching

21    that decision?

22         A.      Um, see, here's -- okay.  So this is the

23    second phase of the trial, right?  So background would

24    definitely be important.

25         Q.      Right.  Okay.  What about the facts of the

1    case itself?

2           A.    Yes.

3           Q.    Okay.  What would be important about the

4    background?

5           A.    Well, whether this person is a habitual

6    criminal.

7           Q.    Okay.  If they have committed crimes like this

8    before?

9           A.    Uh-huh or similar.

10          Q.    And you feel that if we have proven that type

11   of evidence to you, then you could answer that question yes?

12          A.    Right.

13          Q.    What does the word "probability" mean to you

14   in the context of that question?

15          A.    Um, chance.

16          Q.    Okay.  Just any chance at all that he would be

17   a continuing danger?

18          A.    Well, it's more of a positive to me.

19          Q.    Okay.  Anyway you could put a percentage on

20   it?

21          A.    On the word "probability"?

22          Q.    Uh-huh.

23          A.    Um, I don't know.  Are you saying a percentage

24   just on the word or on the whole --

25          Q.    Just on the whole question?

1      A.      -- statement?  So, for instance, what you are

2  asking me is if I said that there's a 90-percent chance that

3  the defendant would commit another crime.  Is that how you

4  --

5      Q.      Well, I'm just kind of asking you how you feel

6  about it, because it's kind of an openended question.  I'm

7  just trying to get a feel on how you view the question.

8      A.      See, I feel like that's not openended.

9      Q.      Okay.

10     A.      I feel like it's definite.  I mean, I know you

11  are trying to foresee the future, but I also feel like if

12  you have seen patterns --

13     Q.      A pattern in the past?

14     A.      Past patterns.

15     Q.      That's going to make the question pretty easy

16  for you?

17     A.      Uh-huh.

18     Q.      The second question asks whether the defendant

19  actually caused the death of the deceased or did not

20  actually cause the death of the deceased, but intended to

21  kill the deceased or another or anticipated that a human

22  life would be taken.  It gets kind of confusing.  But that's

23  what we're talking about where the law of parties comes in.

24     A.      Uh-huh.

25     Q.      It's an easy question if you believe from the

1   evidence that he actually caused the death.  But the other

2   part gets into if he's just a party or accomplice.

3          A.     Right.

4          Q.     Did not actually cause the death, but intended

5   to kill the deceased or another.  Maybe he intended to.

6   Maybe someone else murdered the deceased before he had the

7   chance or maybe that was his intentions or he just

8   anticipated that a human life would be taken.  Okay?  He

9   didn't pull the trigger, didn't cause the murder, but he

10  anticipated based on the facts that a life would be taken.

11              Do you feel you can answer that question

12  yes, depending on the facts of the case?

13         A.     Depending on the facts of the case, yes.

14         Q.     And if you believe that's true, that's what

15  we're talking about, someone that's not a triggerman, they

16  are a party to it, you would answer that yes?

17         A.     Yes.  Because intended to kill to me means

18  they thought about -- I don't know if I -- I guess I would

19  equate it to premeditated, if you intend to kill somebody.

20         Q.     Intention can be formed in about a split

21  second.  When you are talking about premeditated, someone

22  planned it out?

23         A.     Well, nevertheless --

24         Q.     Okay.  You are comfortable with that?

25         A.     Yes.

1   Q.   And then this last Special Issue, if you take

2   a moment to read that to yourself.

3   A.   [Prospective juror complies.]   Okay.

4   Q.   That's the last question you get.   It kind of

5   -- no one has the burden of proof on it.   It lets you look

6   at everything in the person's background and the crime and

7   decide if you think that a life sentence is appropriate,

8   instead of a death sentence.   Do you think that's a fair

9   question to have?

10   A.   Um, well, I do think it's a fair question, but

11   that's in the punishment phase, correct?

12   Q.   Uh-huh.

13   A.   So I think it's a fair question.

14   Q.   You don't get to that question until you have

15   already found the defendant guilty beyond a reasonable doubt

16   of capital murder, you have found he's a continuing danger

17   to society, you found that he either caused the death or

18   anticipated that a death would occur.   That's all been

19   proven to you beyond a reasonable doubt.   Then you consider

20   this question.

21   A.   Uh-huh.

22   Q.   Do you think that you could answer that

23   question in a way that you could answer it yes, knowing all

24   that and already made those findings?   In other words, would

25   you be able to sentence someone to a life sentence, even

1    though you thought he was guilty of capital murder, a

2    continuing danger to society, and anticipated or intended

3    someone to die, even if he wasn't the actual triggerman?

4         A.    Okay.  I'm a little confused.  So I thought

5    you had said earlier that if the first two issues are

6    answered yes, then it's definitely a death penalty.

7         Q.    It is if the last answer is a no.  Now, if you

8    answer that one yes, if there's mitigating evidence, then

9    even though you answered those things, he gets a life

10   sentence.

11        A.    Okay.  Let me take a minute to reread it.

12        Q.    Okay.

13        A.    Okay.  Could you put that in layman's terms

14   for me?

15        Q.    That's a tough question.  Basically, what it

16   says is you can consider all the evidence, the crime itself,

17   what the person's role in it was, anything about their

18   character and background, the previous bad acts, if they

19   have seen a bad pattern, or it could be maybe they had --

20   well, we ask that question.  Mitigating evidence can be

21   anything you want it to be.  It could be a person's

22   background, how they were raised.

23        A.    So what does mitigating mean?

24        Q.    Something that lessens your moral culpability.

25   But it's up to you and the other jurors.  We can't even tell

1   you what it is.  We just have to see if your mind's open to

2   it.  Some jurors have told us young age is mitigating.

3   Someone in their early 20's or 19 years old, that could be

4   mitigating.  Other jurors say if they know what they're

5   doing, no, it's not mitigating.

6                Some jurors -- a big question comes up is

7   how a person was raised, their background.  Maybe they had a

8   -- maybe they were beaten, maybe they were abused mentally

9   or physically, maybe they grew up in a poor neighborhood,

10  maybe they didn't have a parent or father in the home.

11  Other jurors tell us, I feel bad if they were abused as a

12  child, but that's not an excuse once you grow up as an

13  adult.  A lot of people grow up in that situation and don't

14  murder people.

15               How do you feel about that type of

16  background evidence?  Is that something that you view as

17  mitigating or not?

18       A.      Well, if you grew up as an abused person and

19  you're an adult now, I feel like that you have had your

20  adult years to turn yourself around.

21       Q.      Okay.  Is there anything as you sit here today

22  that you might view as potentially mitigating evidence?  Any

23  other types of evidence?  Anything come to mind?

24       A.      Such as the background in their lives?

25       Q.      Yes.

1       A.      What would influence me?

2       Q.      Yeah.   Does anything strike you as potentially

3  mitigating?  I know you haven't sat around and thought about

4  these issues, at least I hope you haven't.  But --

5       A.      Um, I guess not really.  Because, you know, I

6  just feel like that a person should get it by the time they

7  are an adult.

8       Q.      Fair enough.  Some people actually tell us

9  this.  Look, if we have gone this far, if he's in my mind

10  guilty and a continuing danger and did anticipate someone

11  would die, then I'm not open to that question, to be

12  perfectly honest, and I'm not going to answer that in a way.

13  I mean, the death penalty is pretty much decided.  Other

14  people tell us, I'll keep my mind open to it.  I'll listen

15  to it.  And if I think something is mitigating sufficiently

16  where a life sentence is more appropriate, I will answer it

17  that way.  Other people, quite frankly, are closed to it

18  once they have already made these other decisions.

19              How do you feel about that?  Is this

20  something that you can keep your mind open to, once you

21  reach this stage?

22      A.      I think that I can keep my mind open to it.

23  You know, it all deals with the person and what he's gone

24  through.  Um, if he's an adult and still a habitual

25  criminal, then I feel like he's had the opportunity to

1  straighten himself out in prison through the corrections

2  system.

3        Q.       Let me go into one other area now.  One, we

4  can't get into the facts, but, obviously, we ask about this

5  case because it had a lot of news coverage.

6        A.       Uh-huh.

7        Q.       What do you remember?  It's been a while, but

8  what do you remember about the news coverage that you

9  personally watched or read?

10        A.       I remember the story about the police officer

11  being slain and I believe it was Oshman's?

12        Q.       Right.

13        A.       I remember hearing interviews with the

14  officer's -- either his wife or his mother, I can't remember

15  which one, on the radio.  I remember being on the lookout of

16  the Texas Seven and talking about it maybe socially.  Um, I

17  remember when -- I think I remember when they got caught.

18  It was in -- was it in Colorado?  Or I'm not sure.  North,

19  instead of south.  And I also remember that one of them

20  committed suicide.

21        Q.       Did you follow any of the other trials on the

22  news?

23        A.       I did not follow all of them.  Although

24  shortly after the May jury duty, I recall hearing that the

25  previous five had all been sentenced to the death penalty.

1    Q.    Obviously, in high publicity cases almost all

2    the jurors have heard something about the case.  The law is

3    this, whatever you have heard you can't take that and let

4    that affect your decision.  Some jurors can do that and

5    other jurors have read so much where it would affect their

6    decision.  They couldn't put it out of their mind.  We just

7    ask every juror individually how they feel about that.

8         Is what you have read or heard something

9    that would affect your decision already or is it something

10   that you can decide this case based on the facts and what

11   you hear in the courtroom?

12   A.    I think definitely decide it on the facts.  In

13   fact, I did not, intentionally did not go home and look on

14   the Internet for more facts or more information.

15   Q.    Okay.  The fact -- when we talk about this

16   mitigating question, the fact that we would be prosecuting

17   the defendant under the theory of parties, that he's a

18   nontriggerman --

19   A.    Uh-huh.

20   Q.    -- do you think that might potentially be a

21   mitigating circumstance to you?

22   A.    Um, that -- okay.  Say that again, because we

23   would have already decided in 2.

24   Q.    You decided that he anticipated, you know,

25   under the law of parties.

1    A.    Right.

2    Q.    But then other jurors have told us, I can

3  answer question No. 2 yes, yeah, he anticipated, but when I

4  look at this last question about what mitigation is, that's

5  going to come into play if I don't think that he's the

6  actual killer or he's not.  He just anticipated.  That might

7  be a mitigating fact.  Other people tell us that's not

8  really the type of information I'm looking at.

9    A.    Okay.  I'm a little confused, because I feel

10  like the -- I mean, to say it simplistically, that the

11  nontrigger issue is addressed in No. 2 and not in No. 3.

12    Q.    Okay.  So -- and it's up to you because

13  mitigation can be actually anything you want it to be as a

14  juror.

15    A.    Oh, okay.

16    Q.    We can't tell you what it is.  It's anything

17  that you want it to be.  And one juror might believe,

18  actually, yeah, if he's just a party, an accomplice, a

19  nontriggerman, that's going to be a mitigating issue to me.

20  Other jurors might tell us, no, that's for the other

21  questions.  I'm not really interested in that, once I've

22  reached that.

23    A.    I'm not interested in that at that point.

24    Q.    You feel that's satisfied?

25    A.    Uh-huh.

1    Q.    The bottom line, then, is you believe in the

2    death penalty as a law?

3    A.    Correct.

4    Q.    You feel it should be prosecuted?

5    A.    Yes.

6    Q.    You feel that it should be prosecuted or be a

7    law under the law of parties where they are the

8    nontriggerman as a death penalty case?

9    A.    Say that again, the last part of that.

10   Q.    You agree the law says that a nontriggerman --

11   A.    Yes.

12   Q.    -- can be prosecuted under the law of parties

13   and you agree with that law?

14   A.    Yes.

15   Q.    As best you know yourself, because you kind of

16   have given me some different answers --

17   A.    Right.

18   Q.    -- as best you know yourself, if we prosecute

19   and are prosecuting the defendant in this case under the law

20   of parties, that if we prove to you beyond a reasonable

21   doubt, you could find the defendant guilty, you could answer

22   these questions in a way, yes, yes, and no, if the facts

23   prove it to you, knowing that the defendant here, Mr.

24   Murphy, will be executed some day, could you do that?

25   A.    (Long pause)  I hate to be so wishy-washy.  I

1  know I could do it.  But I would still have some innate

2  hesitation.

3         Q.     Do you think that hesitation would prevent you

4  from answering those questions, then?

5         A.     From answering those questions?  Wouldn't

6  prevent me from answering those questions, but it's the end

7  result of the questions.

8         Q.     Right.  That's the sticky part.

9         A.     I know that's difficult.

10        Q.     Because we have to make a decision --

11        A.     I know you do.

12        Q.     -- based on your answers.

13        A.     I know you do.  I know you do.  So that's me.

14  That's what you get.

15        Q.     When it comes down to the bottom line, as best

16  you know yourself, then, is this a case that you can

17  participate in or is that hesitation going to be something

18  that's not going to leave you?

19        A.     Well, you know, I vacillate mentally.  If it's

20  beyond a reasonable doubt, you know, I believe that I could

21  do it.  If it's not, I might be one of those that can't do

22  it.

23        Q.     Well, yeah.  And I see you do vacillate.  You

24  are still struggling with it --

25        A.     Uh-huh.

1    Q.    -- and that's my concern.

2    A.    Yes.

3    Q.    Because from my position, obviously, I don't

4  want someone over there that is like maybe in the middle of

5  it go, look, this is not something that I can do,

6  participate in it and take someone's life.  And then at that

7  point, obviously, there's not a thing we can do about it.

8  You are just going to have to do it.

9              But that's why I keep asking you the

10 bottom line.  Because I see you struggling and the

11 hesitation is still there.

12   A.    Uh-huh.

13   Q.    And that's what, quite frankly, worries me.

14   A.    Uh-huh.

15   Q.    But I just -- I just kind of want to, you

16 know, it seems to me like that hesitation is probably not

17 going to leave you, even though intellectually you might say

18 certain things may be true and you sit there and look at

19 someone that's been there for two weeks, seeing him sit

20 there every day, it's something that is going to tug at you?

21   A.    It would definitely tug at me.  However, I

22 wouldn't be human, if it didn't.

23   Q.    Do you think that you could overcome that,

24 then, or is it just a situation where, I don't know?

25   A.    I don't know.  It is I don't know.  You know,

1    I feel like that it's hard to make a prediction on the way

2    I'm going to feel without hearing all the evidence.

3         Q.    Uh-huh.  And unfortunately I can't preview all

4    the evidence for you.

5              MR. SHOOK:  Judge, I believe that's all

6    the questions I have.  Thank you.

7              THE COURT:  You're only halfway through

8    with this.  Ms. Busbee has a few questions for you as well.

9                    CROSS-EXAMINATION

10   BY MS. BUSBEE:

11        Q.    And relax.  You are not going -- Mr. Shook has

12   covered the law so well that I just want to talk to you for

13   a little bit.

14        A.    Okay.

15        Q.    Because we know your background and we know

16   that despite the fact that you don't have a job in an

17   office, it looks like you do a lot of different things.

18        A.    Uh-huh.

19        Q.    Could you tell me -- you were talking about

20   volunteering at your school and I take it that's your kids'

21   school and some of the things you are involved in?

22        A.    Um, okay.  Well, I'm very involved in their

23   school.  I have cafeteria duty once a week.  My two older

24   children are in college, so I don't do volunteer work

25   associated them anymore.  It's more with the littler one.

51

1   She's involved in theater.   I do a lot of that and choir, a

2   lot of parental help with that.   She's busy with dancing and

3   singing and volleyball.   And I'm probably what you would

4   call a soccer mom, even though soccer is not in our realm.

5        Q.    You are as busy as?

6        A.    Yes.

7        Q.    I just wanted to get you away a little bit

8   from asking you these same questions in different ways,

9   because you sit through one of these and you realize why

10  people hate lawyers, because we're trying to make you split

11  hairs that we just introduced you to.

12            I mean, to me I think that this is --

13  that you have answered this question, but I want to get away

14  from asking it over and over so we could kind of have a

15  fresh start.

16            I hear you say that this would be a very

17  serious duty to you?

18       A.    Yes.

19       Q.    And that shouldn't bother any of us, because,

20  obviously, it's a very serious proceeding since we're doing

21  it in this manner with all these jurors and the law is as

22  complex as any criminal law that I'm aware of.   The courts

23  say that these laws must be very, very specific.   And in

24  order to give a death penalty, it's a very limited

25  individual that deserves the death penalty and they limited

1    it so that they can be comfortable with the jurors' decision

2    to give or to assess a death penalty.

3                     And so, essentially, I've heard this

4    described as hurdles to jump over.  Assuming that the person

5    has been found guilty of capital murder as a party, I don't

6    think we have any problem with Special Issue No. 1.

7         A.    Right.

8         Q.    Even anticipating that an answer of yes to

9    that may result in the death penalty, you wouldn't have any

10   trouble answering that question?

11        A.    No.

12        Q.    Now, on Special Issue No. 2, I hear you

13   saying, all of this is hard, but if it's proved to me beyond

14   a reasonable doubt, I can answer yes.

15        A.    Right.

16        Q.    So they have to prove it to you beyond a

17   reasonable doubt, so I'm hearing you saying you can follow

18   the law?

19        A.    Yes.

20        Q.    Here's -- Special Issue No. 3 is described by

21   some of us as -- mitigating, I don't know what that is.  And

22   sometimes we go into children and that sort of thing and you

23   have the same attitude that I have and most people have.

24   Come on, you now, you're an adult.  Get counseling and get

25   over it.  Don't inflict it on the rest of us.

1      A.      Uh-huh.

2      Q.      But I like to call it a safety valve.  And

3   it's just like Mr. Shook described to you, you don't have to

4   be able to say, there's just this one thing that makes me

5   say that even though I have answered 1 and 2 yes, I don't --

6   I'm going to answer this yes as well.  But even though 1 and

7   2 have been proven to me beyond a reasonable doubt, I still

8   think that this individual should not receive the ultimate

9   penalty of death.

10          And you don't have to -- you know, nobody

11   is trying to commit you to that because it may be something

12   that you, yourself, can't express, a feeling that you have.

13   Usually there's a reason for it.  I assume that since you

14   will be careful on Special Issues No. 1 and 2 that you are

15   going to have a reasoned reason, if that makes any sense,

16   for Special Issue No. 3.  I feel that even though I have

17   found 1 and 2 to be true beyond a reasonable doubt, I don't

18   believe a death penalty should be imposed in this case.

19   It's just a safety valve.  Do you understand?

20      A.      I understand what you are saying.  But I

21   thought if 1 and 2 -- okay, so if 3 is answered --

22      Q.      It sort of says, but anyway --

23      A.      Anyway life instead of death.

24      Q.      Right.

25      A.      Okay.  So --

1    Q.    It's awkward.

2    A.    So tell me your question.

3    Q.    Well, can you do that?

4    A.    Can I do No. 3?

5    Q.    Yes, ma'am.  Either way.  I mean, having found

6  Special Issue 1 and 2 true, you then get to the third issue

7  which is even though I do believe the other two things

8  beyond a reasonable doubt, I still feel -- and this is -- of

9  course, I can't give examples.  But I still believe that

10  there should be a life sentence instead of death.

11    A.    Well, I feel like if the defendant intended to

12  kill the deceased, that that would warrant the death

13  sentence.

14    Q.    Okay.  So I think what you are telling me is,

15  if you answered yes to Special Issue No. 1 and Special Issue

16  No. 2, there would be nothing that would make you opt to

17  answer yes to question 3, yes being the answer that would

18  cause it to be a life sentence?

19    A.    Right.  Well, I tell you what, if this person

20  were just an outstanding citizen --

21    Q.    And you don't even have to articulate what

22  your reasons might be, just that you would seriously

23  consider Special Issue No. 3 and if you felt that that

24  person should not get death, you would vote that way?

25    A.    Okay.  Um, let me focus more on this, again,

1    for a minute.

2         Q.    Sure.

3         A.    Previously, I was concentrating just on those

4    two, the first two issues, and probably not giving enough

5    emphasis to No. 3 and that's really important.  Um, but I

6    still feel strongly.  I have to say I feel strongly -- I

7    think that I would, if the first two were proved without,

8    you know, beyond a reasonable doubt, that No. 3 would impose

9    the death sentence.

10        Q.    So you couldn't answer yes to No. 3 if you had

11   found 1 and 2 beyond a reasonable doubt?  It's not a

12   character flaw on your part.  It's just how you --

13        A.    Right.

14        Q.    -- are personally.

15        A.    Right.  Well, I'm trying to figure that out

16   right now.

17        Q.    It's hard to explain for me and it's even

18   harder for someone who has never seen it before, so I

19   understand.

20        A.    Um, and it's just so difficult, since I've

21   never been on a jury before, to --

22              MR. SHOOK:  Judge, we have an agreement.

23              MS. BUSBEE:  We've decided not to torture

24   her anymore.

25              THE COURT:  All right.  Ms. Lawson, I bet

1   when you came down here this morning you had no idea how

2   complicated the law really is.

3                       PROSPECTIVE JUROR:  I had no idea.

4                       THE COURT:  You have learned more today

5   than you probably have ever watching TV, read about in

6   school, or whatever.  We appreciate your honesty.  Trust me,

7   the lawyers would rather have your honesty and talk to you

8   for an hour and a half and say we're going to let you go,

9   than you hide the ball and not be honest.

10                      We appreciate it.  You are excused from

11  your jury service.  And you can tell your children what you

12  learned today.  Please give the guide back to the Sheriff.

13  And we'll take a short break.

14                      (Recess)

15                      [Prospective juror out]

16                      THE COURT:  Mr. Shannon, please.

17                      [Prospective juror in]

18                      THE COURT:  Good morning, Mr. Shannon,

19  how are you?

20                      PROSPECTIVE JUROR:  Pretty good.

21  Yourself?

22                      THE COURT:  Doing pretty good, trying to

23  get the courtroom cooled off a little bit, but that's about

24  normal for the county.  You have had enough time this

25  morning to read the orientation guide?

1    PROSPECTIVE JUROR:  Yes, I have.

2    THE COURT:  View the witness list?

3    PROSPECTIVE JUROR:  Right.

4    THE COURT:  The potential witnesses that

5  may be called?  Do you have any problem serving this Court

6  with the scheduled November 10th trial date?

7    PROSPECTIVE JUROR:  Yeah, I read that.

8    THE COURT:  Would you have any problem

9  serving the Court?

10    PROSPECTIVE JUROR:  No, no.

11    THE COURT:  I know that we have given you

12  a lot of law to think about in the handout.  Do you have any

13  questions of me about the law we'll be talking about here

14  today before we begin?

15    PROSPECTIVE JUROR:  No.

16    THE COURT:  I'm quite sure the lawyers

17  are going to spend a lot of time with you.  You are still

18  under oath to tell the truth.  That's all we ask.  Don't

19  worry about what it is, just, you know, this is what I

20  think.  This is what I believe.  The lawyers will appreciate

21  that and we'll proceed forward from there.  With that, I'll

22  turn it over to Mr. Wirskye.

23    MR. WIRSKYE:  May it please the Court.

24    DAVID SHANNON,

25  having been duly sworn, was examined and testified as

follows:

DIRECT EXAMINATION

BY MR. WIRSKYE:

Q.   Mr. Shannon, how are you?

A.   Very good.

Q.   Again, my name is Bill Wirskye and I'll be the prosecutor that's going to be visiting with you for the next few minutes.  It looks like on your questionnaire you may have gone through this once before; is that right?

A.   That's correct.

Q.   Well, I don't know how much you remember.  Was it '94, '95?

A.   I don't remember.  It's been a while ago.

Q.   Ultimately, you didn't end up making the jury; is that right?

A.   That's correct.

Q.   But you did come down and talk to both lawyers?

A.   Right.

Q.   Again, we apologize.  It makes a lot of people feel they are on trial because they are sitting up there on the witness stand, but it's kind of the best system that we have.

I'll talk to you a little bit briefly about some of the answers in your questionnaire, get some of

59

1   your thoughts on the death penalty, and then we'll talk more

2   specifically about some of the legal aspects that may apply

3   and hopefully your previous experience will help you through

4   this and make it a little bit shorter for you.

5        A.      Okay.

6        Q.      You told us that you do believe in the death

7   penalty; is that right?

8        A.      That's correct.

9        Q.      Is that something that you have believed in

10  all your life?

11       A.      Pretty much, yeah.

12       Q.      What value do you see to, I guess, our

13  society, having a death penalty?

14       A.      Get rid of criminals, people that break the

15  law.

16       Q.      When you think about an appropriate-type case

17  for the death penalty, is there a particular type case that

18  comes to mind?

19       A.      Murder.

20       Q.      Okay.  Any particular case you may have heard

21  or read about or high profile case that when you think about

22  it, you think to yourself, gee, that's a good candidate or a

23  good case for the death penalty?

24       A.      The one that I was called on previously.

25       Q.      Okay.  And looks like you ended up following

1    that?

2         A.      Right.

3         Q.      At least through the paper?

4         A.      Yes, sir, sure did.

5         Q.      And saw the end result?

6         A.      I saw that it was pretty colorful.

7         Q.      And you saw how -- I guess the defendant in

8    that case acted up a little bit?

9         A.      Yes, he did.

10        Q.      Do you hold that belief so strongly that, you

11   know, that you would say there's never a murder case where

12   maybe a life sentence would be more appropriate other than

13   the death penalty?

14        A.      Pretty much.

15        Q.      Okay.  When you say pretty much, I guess is

16   there certain cases out there -- again, this is your

17   personal feelings.  We're not talking about the law.  Some

18   cases out there where you may think, you know, death is a

19   little extreme for that particular person or for that

20   particular crime?  Sounds like you are at least open to the

21   possibility?

22        A.      Okay.  I'm not going to say no to that.

23        Q.      Okay.  As you may remember from last time, if

24   you do make the jury in a capital case, we don't ask the

25   jury just to answer the question, you know, should the

1   defendant get a life sentence or should the death penalty be

2   imposed?

3           What we do is, we ask the jurors -- if

4   they convict someone of capital murder, we ask the jurors to

5   answer these three questions.  They are called Special

6   Issues, but they are basically questions.  And depending on

7   the answers to those questions, that determines whether the

8   defendant is actually sentenced to death.  I don't know if

9   you recall that --

10          A.      I don't.

11          Q.      --- almost ten years ago?

12          A.      Right.

13          Q.      But it's not a situation that we ask you as a

14  juror to kind of give a thumbs up or thumbs down on the

15  death penalty.  We just give you these questions.  Depending

16  on the answers to those questions, that determines the

17  appropriate sentence in a case.  Does that sound fair to

18  you?

19          A.      Right.

20          Q.      Okay.  We talked to you just a little bit

21  about this.  You know, oftentimes crimes aren't committed by

22  just one person.  You know, we think about a murder case, we

23  think about one guy maybe going into a 7-Eleven, robbing the

24  clerk, pulling the trigger, killing him during a robbery.

25  But oftentimes crimes are committed by groups or gangs of

people, that type of thing.

The law allows us in those cases to actually prosecute for the death penalty, depending on the facts and circumstances, people that didn't actually pull the trigger, nontriggermen. That's that the law in Texas allows us to do.

How do you feel about that, just off the top of your head?

A.     I don't have a problem with that.

Q.     Very frankly, we talk to some people that come down here and they say, you know, I believe in the death penalty for the person that pulled the trigger. But when you start talking about people who are accomplices or who are helping out in the offense who didn't pull the trigger, for those people I take the death penalty completely off the table.

But you sound like you would be able to follow the law and at least be able to consider the death sentence as an appropriate punishment for a person that didn't actually pull the trigger; is that right?

A.     That's correct.

Q.     And I'll be honest with you and lay all the cards right out on the table. In this case we don't anticipate the evidence will show that he pulled the trigger. We're prosecuting him as an accomplice or a party

1    to the offense, is what we call it in Texas.

2              But sounds like you have no hesitations

3    going into a trial of that nature, being able to answer

4    these questions and follow the law; is that right?

5         A.    That's correct.

6         Q.    Let me talk to you a little bit about the

7    publicity in this case.  Just based on what you heard back

8    in May when you came down, thinking about the case, showing

9    up today, do you think that you may have heard anything

10   about this case?

11        A.    No.

12        Q.    Okay.  You have no idea why we're down here or

13   any particular facts, haven't heard anything in the media or

14   anything like that?

15        A.    Since it happened or since I came down?

16        Q.    Uh-huh.

17        A.    No.

18        Q.    Okay.  But did you hear anything back when the

19   crime is alleged to have occurred?

20        A.    Yes.

21        Q.    Back in December, 2000?

22        A.    Right.

23        Q.    About the murder of a police officer over by

24   Oshman's?

25        A.    Right.

1    Q.    Okay.  Obviously, in cases like this that are

2  high profile cases, almost everyone we talk to has heard

3  something about the case.  And that does not necessarily

4  mean you are disqualified or can't be a fair and qualified

5  juror.  What the law says is, you know, despite what you may

6  have heard or read or seen on TV, that type thing, as long

7  as you can kind of base your decision in the case just on

8  the evidence and facts that you hear in the courtroom, you

9  would still be a qualified juror and be able to sit.

10         And, you know, we talk to a lot of people

11  and, very frankly, some of them tell us they can't do that.

12  They say, you know, I may have heard so much about this

13  case, you know, I've already formed an opinion and I can't

14  base my verdict just on what I hear in the courtroom.

15         Kind of where do you fall in that?  Do

16  you think that you would be able to base your verdict on

17  just what you hear in the courtroom?

18    A.    Yes.

19    Q.    Okay.  No problem just listening to the facts

20  and the evidence and deciding whether the person is guilty

21  and then answering those three questions or anything like

22  that?

23    A.    No problem.

24    Q.    Okay.  Do you have your juror guide up there

25  in front of you?  Did you bring it in?

1       A.      Juror guide?  No, I did not.

2       Q.      Okay.  Fair enough.  Just to kind of give you

3  a brief overview.  What we do in these cases, is basically

4  the trial is broken down into two parts.  If you can flip to

5  the very back of the last page on there, there should be a

6  copy of something called the indictment.  If you can just

7  look at that real briefly.

8       A.      Okay.  I'm looking at it.

9       Q.      That's basically what we've charged in this

10 case.  We have kind of charged that capital murder has been

11 committed two different ways, one, that a police officer was

12 killed during the course of his duties; the second way would

13 be that an intentional killing happened during the course of

14 a robbery.  If we prove one or prove either or both to a

15 jury beyond a reasonable doubt, which is our burden, then

16 the law would require the jury to find the defendant guilty.

17              And that's basically the first part of

18 the trial.  You hear the facts and evidence, just basically

19 about the case, what happened out there, and it's up to a

20 jury to decide whether we have met our burden and proven

21 beyond a reasonable doubt whether the person is guilty.

22 Does that make sense to you?

23      A.      Yeah.

24      Q.      Okay.  If we do that, then we slip into the

25 second phase of the trial.  And during the second phase of

1  the trial the rules of evidence kind of broaden out a little

2  bit.  You get to hear more facts about the man, the person,

3  you know, background, character, that type of thing.  May

4  have been a real bad guy.  May have been a real good guy.

5  But you get to hear that extra or additional evidence to

6  help you answer these Special Issues.  Does that make sense

7  to you?

8       A.      Right.

9       Q.      Again, the fact that you may have found

10 somebody guilty of capital murder does not necessarily in

11 and of itself or automatically help jurors answer any of

12 these three Special Issues.  Does that make sense?

13      A.      Yes.

14      Q.      Okay.  We ask jurors, even though you found

15 the person guilty of capital murder, to step back and answer

16 each of these issues independently.  Don't do anything

17 automatically.  Go back and take a fresh look at all the

18 evidence you have heard and decide what the answers to these

19 questions should be.

20              And just briefly, if you look up there,

21 question No. 1, whether the person is going to be a future

22 danger to society, basically.  And we'll talk more about

23 that in a second.  We have the burden of proving that to a

24 jury beyond a reasonable doubt, just like we did guilt.  And

25 if we meet that burden and the answer to that question is

1  yes, you move on to Special Issue No. 2.

2              And this question kind of deals with what

3  we've already talked about, you know, did the person

4  actually pulled the trigger, was a nontriggerman.  That's

5  kind of what Special Issue No. 2 deals with.  It's easy to

6  answer that question if the person on trial actually pulled

7  the trigger.  If they didn't, like the case we're here on

8  today, a nontriggerman, the jury would need to decide that

9  the person intended that person to be killed or anticipated

10  that a life would be taken.

11              Again, it's our burden to prove that to

12  you beyond a reasonable doubt.  If the answer is yes, then

13  you move on to the Special Issue No. 3.  It's kind of the

14  safety net.

15              No. 3 is a little bit different than 1

16  and 2 in that there's no burden of proof.  It's just up to

17  the jurors.  It's kind of the, like I said, the catch-all

18  safety net.  Step back, take a deep breath, see if there's

19  anything mitigating, such that a person's life should be

20  spared and they shouldn't face the death penalty.  Does that

21  scheme kind of make sense --

22       A.       Yes.

23       Q.       -- to you?  And, again, you know, just because

24  you found someone guilty of capital murder, you don't

25  automatically or necessarily answer those questions any

1    particular way.  We want jurors who can be fair and keep

2    that open mind and really work through each of these

3    questions, looking at the evidence.

4                    Do you think that you are the type of

5    person that could do that?

6          A.     Yes.

7          Q.     Okay.  Let's look a little bit at Special

8    Issue No. 1.  Again, this is the question that deals with

9    whether a person would constitute a continuing threat to

10   society.  There's a couple of terms in that question that

11   really aren't defined.  Unlike a lot of things the lawyers

12   do, we don't have specific definitions for those terms.  I

13   think it's because it's probably pretty much a common sense

14   question when you look at it.  But when you see that word

15   "probability", just off the top of your head, what does that

16   mean to you?

17         A.     Well, whether, I guess, he's going to commit a

18   -- probably do it again, do something just as violent.

19         Q.     Uh-huh.  I think, you know, when we look at

20   probability, more likely than not, I think.  You know, we

21   don't have to prove to you that it's going to happen.  You

22   know, obviously we could never do that.  That question kind

23   of asks a juror, I guess, to make a prediction about future

24   behavior or future events.

25                    Is that something you feel comfortable

1   with, making that prediction, you know, having sat through

2   the guilt part of the trial and having sat through the

3   second part of the trial, the punishment phase, is that

4   something that you think you can do?

5          A.     Yeah.

6          Q.     Then we have that phrase "commit criminal acts

7   of violence."  I'm just curious what that means to you,

8   "criminal acts of violence"?

9          A.     I guess if he had the opportunity to do it, he

10  would do it again.

11         Q.     Any particular crime that strikes you when

12  we're talking about a criminal act of violence?  I mean,

13  obviously, another murder or rape or something like that?

14         A.     Right.

15         Q.     The law doesn't necessarily define it, again.

16  It's just whatever a juror thinks would constitute a

17  criminal act of violence.  Could be an assault or threat,

18  something like that.  Does that make sense to you?

19         A.     Yes.

20         Q.     I guess the bottom line is, you know, I don't

21  want you to think that we have to prove there's a high

22  probability that he would kill again or participate in

23  another murder.  Does that make sense to you?

24         A.     Right.

25         Q.     Then, finally, the last word in that question

1    talks about society.  I'm just curious how you would define

2    "society" or if you put any limits on it as between people

3    out here in the free world or people locked up behind bars

4    or how would you define that?

5         A.     It's, obviously, going to be a criminal

6    society, incarceration.

7         Q.     Okay.  So you would define it very broadly to

8    include people like prison guards, ministers that work in

9    prisons, that type thing?

10        A.     I don't guess that you can throw out the

11   probability of escape again.  So you would have to -- this

12   is society out here and society in incarceration.

13        Q      So you define it broadly to include everybody?

14        A.     Right.

15        Q.     Okay.  Does that question make sense to you?

16   Do you kind of see why the law asks jurors to look at it?

17   And I'll tell you why I ask that question.  We have some

18   people down here who come down and, you know, if they found

19   somebody guilty of capital murder, by the time we get to

20   that second phase of the trial, their mind is closed.  It's

21   kind of shut down.  They are not really going to work

22   through these questions.

23                  And they tell us, you know, gee,

24   Mr. Wirskye, if I find somebody guilty of capital murder,

25   the triggerman or nontriggerman, by the time I get to

71

Special Issue No. 1, that's automatically answered for me.
If I find somebody guilty of that act, it's automatic.  I'm
going to answer it yes every time.

What the law says is, again, you can't do
it automatically.  You have to take that fresh or that
independent look at Special Issue No. 1.  You know, you are
certainly allowed to go back and look at the facts of the
offense to help you make that decision.  You just can't do
it automatically.  It has to be a separate, independent
inquiry for each question.  Does that make sense to you?

A.    Yeah.

Q.    Do you think, even having found somebody
guilty of capital murder, either as a triggerman or
nontriggerman, by the time you got to Special Issue No. 1
you would still have an open mind?  You would work through
that question and you wouldn't just automatically answer it
yes?

A.    Yeah, I think I could.

Q.    Okay.  You keep that open mind, take a fresh
look.  You wouldn't have any problem with that?  It wouldn't
be automatic?

A.    No.

Q.    Again, we have the burden of proof to you on
that question.  We have got to prove it to you just like we
did his guilt with evidence beyond a reasonable doubt.  If

1  the answer to that question is yes, we move on to Special

2  Issue No. 2.

3                     Again, like I said, this is the question

4  that deals with, you know, when people act in gangs or

5  groups, who's the triggerman, who's not the triggerman?

6  Obviously, if you think that he actually pulled the trigger

7  and killed the person, that's an easy answer.  Okay?  The

8  answer would be yes.

9                     But, again, I've told you what our cards

10  are that we laid them outside on the table for you.  We're

11  prosecuting him as a nontriggerman or as an accomplice.  So

12  it would be up to you as a juror to decide whether we have

13  proven to you beyond a reasonable doubt that he intended a

14  human life to be taken or that he anticipated that a human

15  life would be taken.  Does that make sense to you?

16         A.     Yes.

17         Q.     Okay.  Just to back up for just a second, when

18  you find somebody guilty of capital murder as a

19  nontriggerman, okay, you either have to decide that he

20  helped out the person that pulled the trigger, knowing, you

21  know, helped him commit the capital murder or you have to

22  decide that he should have anticipated that a human life

23  would be taken.  Okay?  That's the standard, should have

24  anticipated in order to convict someone of capital murder.

25                     By the time we get to punishment, the law

1    imposes a little bit higher burden on us and instead of

2    should have anticipated, the question becomes, did they

3    actually anticipate?  You can kind of see the difference

4    between those two?

5         A.    Yeah.

6         Q.    Okay.  Let's say Mr. Shook and I go in to do a

7    bank robbery.  He's carrying three fully loaded guns and I

8    know him to be an angry and violent person.  And we go in

9    there and something goes wrong.  He gets mad and he shoots

10   and kills someone.  He's the triggerman.  He's committed

11   capital murder.

12              If the jury finds that I should have

13   anticipated that a human life could be taken, they would

14   find me guilty as an accomplice or conspirator to capital

15   murder.  And if they found me guilty and we got to Special

16   Issue No. 2, then the jury would have to decide not only

17   should I have anticipated, but did I actually anticipate?

18   See the difference?

19        A.    Yes.

20        Q.    Just a little higher burden before we impose

21   the death penalty.  I want to make sure that you see kind of

22   the meaningful distinction between should have and actually

23   did.  Does that make sense to you?

24        A.    Yes.

25        Q.    Okay.  But if you look at something like that

1    and, again, it's up to us to prove it to you beyond a

2    reasonable doubt and you answer that question yes, you move

3    on to Special Issue No. 3.

4              Special Issue No. 3, again, is a little bit

5    different.  Neither side has the burden of proof.  It's kind

6    of the last stop in the process of a death penalty, because

7    at this point you have found him guilty of capital murder,

8    you said he's going to be a future danger, you said he

9    either pulled the trigger or he anticipated or intended that

10   somebody would be killed.  And this is the last question.

11   It kind of requires you to take a deep breath, take a step

12   back, and look at everything you have heard, the facts of

13   the offense, everything that you may have learned about him,

14   and ask yourself, is there anything that is mitigating and

15   if there is, is it sufficiently mitigating that his life

16   ought to be spared?  Does that make sense to you?

17        A.      Yeah.

18        Q.      And, again, we talk to some people who would

19   tell us, very frankly, by the time I get to Special Issue

20   No. 3, my mind is closed.  They tell me, Mr. Wirskye, I

21   found him guilty of capital murder, I said he's going to be

22   a danger, I said he pulled the trigger, that he intended or

23   anticipated, and by the time I get to Special Issue No. 3,

24   that's really no value in that question for me.  Okay?  By

25   the time we get that far in the process, it's over.  I'm not

going to work through that question.  I'm not going to make

that independent inquiry.  I'm just going to automatically

answer it no, such that he would get a death penalty.

And we've talked to a lot of people like

that.  But I want to make sure before we go on that you are

not one of those people, very frankly, that you do see some

value and some meaning to Special Issue No. 3, and if you

have got there, that you could go back and look at

everything else and see if there was anything mitigating in

the background or the crime to where his life ought to be

spared.  Does that make sense to you?

A.     Yes.

Q.     Do you think that you could do that?

A.     Yeah.

Q.     Okay.  Your mind wouldn't be closed at that

point?  That question No. 3 would still have some value to

you?

A.     Right.

Q.     Okay.  When you talk about mitigating

evidence, the law doesn't really define what mitigating is.

You know, a lot of people talk about reducing the moral

blameworthiness, you know, what blame does a person bear?

The law doesn't require that you consider any particular

thing mitigating.

You know, we talk to some people who say,

1   well, if the person was young, he was 19 or 20, to me that's

2   mitigating. Some people say, you know, by 19 or 20 you

3   ought to know right from wrong. You ought to be held

4   responsible for your actions. I don't consider that

5   mitigating. And there can be a difference of opinion. Even

6   the jurors don't have to agree on what may be mitigating.

7   Does that make sense to you?

8        A.    Yeah.

9        Q.    Okay. Anything off the top of your head

10  strike you as something that may be mitigating?

11       A.    No.

12       Q.    Okay. And that's the answer we most commonly

13  get. Hopefully, you know, people don't sit around thinking

14  about what would be mitigating in a death penalty case. And

15  the law doesn't require you to think of something right now.

16  It just requires that you keep that open mind and,

17  basically, it requires that when you get to that question,

18  you say, I have an open mind. If I hear something that I

19  think is mitigating, I'm going to think about it and I'm

20  going to go back and look at this question and answer that

21  question honestly and independently. Does that make sense?

22       A.    Yes.

23       Q.    Okay. So your mind is not closed to

24  mitigation?

25       A.    No.

1    Q.    Okay.  You recognize the possibility there

2  could be something mitigating?

3    A..    Yes.

4    Q.    Okay.  It may be slim and it may be slight,

5  but as long as you can keep that open mind, you would be a

6  qualified juror.  As long as you can follow the law, you

7  would be a qualified juror.  That's kind of what you are

8  telling me you can do; is that right?

9    A.    Yes.

10    Q.    Do you have any questions about any of these?

11    A.    No.

12    Q.    Mr. Shannon, I know that I'm kind of running

13  through it pretty quick, but I kind of feel like even though

14  it was ten years ago, this is the second time that you have

15  heard this.  Again, all it boils down to is being able to

16  keep that open mind, follow the law, you don't do anything

17  automatically, take a fresh look at each question, and you

18  told me you shouldn't have any problem doing that; is that

19  right?

20    A.    That's correct.

21    Q.    Okay.  Let's talk a little bit about the type

22  witnesses you may hear.  I think you indicated in your

23  questionnaire you may have had a brother who's a police

24  officer; is that right?

25    A.    That's correct.

1    Q.    Where was he a police officer?

2    A.    In Grand Prairie.

3    Q.    How long was he an officer?

4    A.    Um, maybe 11 or 12 years as a reserve.  He

5  worked for the Dallas County Boys Homes actually.

6    Q.    The fact that you have somebody in your family

7  close to you, a brother that was a police officer, do you

8  think that would have any bearing on your ability to be fair

9  in this case?

10    A.    Shouldn't, no.

11    Q.    Okay.  Obviously, we have alleged a police

12  officer has been murdered in this case.  I just want to make

13  sure that that, you know, wouldn't weigh into your

14  consideration at all, your personal experience or friendship

15  or anything like that?

16    A.    No.

17    Q.    What the law, basically, says is that no

18  matter what type witness comes in here, be it a police

19  officer, doctor, or anything else, the jurors kind of have

20  to start them out at that same level of credibility.  Does

21  that make sense to you?

22    A.    Yes.

23    Q.    You can't give them a leg up just because they

24  walk in wearing a gun and a badge.  You know, once they

25  start testifying, you may want to give them more

1    credibility.  You may want to give them less credibility.

2    But you have got to start everybody out at the same level,

3    including police officers.  And it doesn't look like it

4    would be a problem for you at all?

5        A.     No.

6        Q.     Typically in these type cases you may hear

7    from psychiatrists or psychologists.  Either side may call

8    them.  So it's kind of important that we, you know, talk to

9    you and get your thoughts about what you think about that

10   type of evidence, mental health professionals.

11                   We talk to a lot of people in these cases

12   and I guess they kind of break down into three different

13   groups.  You know, you have got the people that come in and

14   say, you know, I don't trust them as far as I can throw

15   them.  They are worthless.  I'm not going to listen to a

16   word out of their mouth.  You have got the opposite end of

17   the spectrum, you know, they think they walk on water.  No

18   matter what --

19       A.     Put me right in the middle.

20       Q.     And that's what the law anticipates.  That's

21   what the law envisions.  You have people right in the

22   middle.  Start them out on that same level.  If they make

23   sense, give them credibility.  If they don't, just disregard

24   their testimony.  Does that make sense to you?

25       A.     Yes.

Q.     We have kind of touched on this already and
you have been down here before, but, obviously, we have the
burden of proof at this table.  We have got to prove to you
his guilt beyond a reasonable doubt and Special Issue 1 and
2.  This side and, obviously, they have a different view of
the evidence than we do.  But they never have the burden and
the burden never shifts.  Does that make sense to you?

A.     Yes.

Q.     Okay.  And he's presumed innocent.  As he sits
here right now, you know, if the trial is over right now,
you would be required to vote not guilty.  You haven't heard
any evidence.  You know, that presumption of innocence
attaches right now and legally he sits there an innocent
man.  Does that make sense to you?

A.     Yes.

Q.     Okay.  As part of those, the presumption of
innocence and our burden of proof, you know, we have to
prove each and every element of the offense.  Okay?  That's
that indictment you read, you know, the two paragraphs?

A.     Right.

Q.     They're broken down into different elements of
the crime.  You know, we have to prove on a certain day --
on or about a certain day in Dallas County a certain person
was killed a certain way, that type thing.

        I'll give you a crazy hypothetical we throw

1    out sometimes.  We talk to a lot of people about this.  You

2    know, let's say our indictment said that a person was

3    stabbed to death.  Okay?  And it gets to trial and you

4    listen to the evidence.  The medical examiner comes in and

5    surprises the DA who don't do our homework and he says, he

6    wasn't stabbed.  He was shot.  That's what killed him.

7    Okay?  Then we missed an element of our crime.

8         A.    Yeah.

9         Q.    You may not like it.  You may be mad at us.

10   I'd be fired and out of a job, if I was that negligent.  But

11   under the law you would be required to find the defendant

12   not guilty, because we failed to prove an element to you

13   beyond a reasonable doubt.

14        A.    Right.

15        Q.    Does that make sense?

16        A.    Yes.

17        Q.    A lot of people consider it a technicality,

18   but it really is important.  We have to prove, you know,

19   each and every one.  We can't go nine for ten.  You know, we

20   have to go ten for ten.  Does that make sense to you?

21        A.    Yes.

22        Q.    Okay.  Another example we use sometimes, I

23   know you have at least some contact with Grand Prairie, but

24   some of it is in Tarrant County and some of it is in Dallas

25   County.  We allege that a murder happened in the Dallas

1    County part of Grand Prairie.  It comes to trial and the

2    evidence is it happened in Tarrant County.  Again, that

3    county is an element.  We didn't prove it, you would have to

4    say not guilty.  You may not like it.  We're going to get

5    fired, but do you think that you can do that?

6          A.     Oh, yeah.

7          Q.     Okay.  No problem along those lines?

8          A.     No.

9          Q.     Again, the defendant has the absolute right

10   not to testify, his Fifth Amendment right.  He doesn't have

11   to testify.  No one can force him to.  No one can keep him

12   off the stand, if he wants to.  The important thing to

13   remember is that you can't hold that against him, if he

14   didn't testify.  You can't consider it, can't talk about it

15   back there, and it's really just another way of holding us

16   to our burden of proof.  Does that make sense to you?

17         A.     Yes.

18         Q.     Let me talk to you a little bit about things

19   called lesser included offenses, okay, lesser included

20   offenses.  Basically, what that is, is sometimes in a case,

21   you know, the upfront guilt part of the case, jurors may

22   have different options.  You maybe convict him of capital

23   murder, convict him of the lesser included offense of

24   murder, or find him not guilty.  So murder would be a lesser

25   included offense of capital murder.  Does that make sense to

1   you?

2           A.      Yeah.

3           Q.      Say we prove the person caused the death, but

4   they weren't a police officer.

5           A.      Would you repeat that again?

6           Q.      Hold on just a second.

7           A.      Your question before that was murder is less

8   than capital murder, right?

9           Q.      Uh-huh.

10          A.      Okay.

11          Q.      They're called lesser included offenses.

12  Murder would be a lesser --

13          A.      Lesser than capital.

14          Q.      -- included of capital murder.  If you allege

15  murder in the course of robbery, robbery would be a lesser

16  included offense of murder.

17          A.      Right.

18          Q.      Say the person did the robbery, but they

19  didn't actually cause the death, so aggravated robbery could

20  be a lesser included, too.

21          A.      Okay.

22          Q.      What the law says is that we need to make sure

23  that all the potential jurors are qualified and can keep an

24  open mind to the full range of punishment for any possible

25  lesser included offenses that could come up, whether it be

1    murder or aggravated robbery or that type thing.

2              I'll just ask you now, talking about the

3    lesser included of robbery, aggravated robbery, the

4    punishment range is anywhere from five years all the way up

5    to 99 years or life for aggravated robbery.  Again, the law

6    contemplates or envisions that potential jurors go into this

7    process with an open mind and be able to say, you know, I

8    could keep an open mind to the low end of punishment, I

9    could keep an open mind to the high end of the punishment,

10   depending on the facts and circumstances.  Does that make

11   sense to you?

12        A.    Yes.

13        Q.    Because, I mean, you can commit a murder or

14   you can commit a robbery many different ways under many

15   different sets of facts, even if it's a lesser included of

16   capital murder.  Does that make sense to you?

17        A.    Yes.

18        Q.    Do you think that you can keep an open mind to

19   that full range of punishment --

20        A.    Yes.

21        Q.    -- for the lesser included offense of

22   aggravated robbery?

23        A.    Yes.

24        Q.    As I have told you, once a person is convicted

25   of capital murder -- I don't think I have told you this, but

there's two possible punishments.  You know, if the questions are answered yes, yes, and no, it's a death sentence.  If the questions are answered any other way, it's an automatic life sentence.

One way to look at it is, if a person is convicted of capital murder, he's kind of sitting on a life sentence.  And only if the questions are answered yes, yes, and no will they go ahead and the death penalty be imposed. Does that make sense to you?

A.      Yeah.

Q.      Okay.  You will be told, if you are a juror in this case, that what a life sentence means is forty years day for day without the possibility of parole.  After forty years, forty hard years, a person convicted of capital murder would become eligible for parole.  Doesn't mean they would get it.  They would just be eligible.  They may actually serve out a true life sentence.  You just never know.

We tell you that and then the law requires that you not consider it.  Okay?  We tell you what it is typically, right?

A.      Yeah.

Q.      The law of lawyers.  Let me see if I can make it make sense to you.  You know, we talked about kind of people having mental discipline and really working through

1    these questions, you know, we don't want people saying, gee,

2    forty years, that's long enough, so I'm just going to go

3    ahead and give them a life sentence.

4              And we don't -- conversely, we don't want

5    people saying forty years, that's not long enough.  I never

6    want to get him out of prison, so I'm not going to work

7    through the questions.  I'm just going to go ahead and give

8    them the death sentence.  Does that make sense to you?

9        A.    Yes.

10       Q.    It's really just a way of reenforcing that

11   mental discipline to work through the questions.  So, you

12   know, the bottom line question is in order to be able to

13   follow the law and be a qualified juror is, you know,

14   knowing that life means forty, could you kind of put that

15   out of your mind and just consider a life sentence to be a

16   life sentence?  Could you do that?

17       A.    Yes.

18       Q.    Wouldn't have any problems along those lines?

19       A.    No.

20       Q.    Okay.  Mr. Shannon, do you have any questions

21   of me about capital murder or any of the things we talked

22   about?

23       A.    No.

24       Q.    You said that you had some friends that were

25   attorneys; is that right?

1       A.      Yeah.

2       Q.      Any of them criminal attorneys or practice

3   criminal law?

4       A.      Some acquaintances.

5       Q.      Okay.  Any names that you can think of?

6       A.      Um, let's see.  I can't think of my neighbor's

7   name now.

8       Q.      Must not be too close to him, huh?

9       A.      No, I don't see him that often.

10      Q.      I tell you why I ask that question.  I left

11  somebody on the jury one time who was college roommates with

12  the defense attorney who was trying the case and they didn't

13  tell me that.  So I make sure I ask now.  If you ever think

14  of who your neighbor is -- do you think he practices

15  criminal law?

16      A.      Yeah, here in Dallas.

17      Q.      Okay.  You are retired now; is that right?

18      A.      Right.

19      Q.      And where did you work?

20      A.      I worked for aircraft companies, different

21  aircraft companies.

22      Q.      Okay.  As a toolmaker; is that right?

23      A.      Toolmaker supervisor.

24      Q.      What do you do now that you are retired?

25      A.      Now that the kids are off the golf course,

1  going back to school.  I plan on going back out there.

2           Q.     You also do some fishing; is that right?

3           A.     Exactly.

4           Q.     What type of fishing do you do?

5  I    A.     Let's see, I'm going deepsea fishing next week

6  off of Florida.

7           Q.     Any questions or concerns about going into

8  this process or anything we haven't talked about?

9           A.     No.  The time frame is good for me.

10          Q.     Once I finish talking to you here in another

11 minute, Ms. Busbee or Mr. Sanchez is going to visit with

12 you.  Do me a favor.  If you think of your neighbor's name,

13 let me know?

14          A.     I'll be thinking about it before I leave and

15 I'll give it to you.

16          Q.     Just raise your hand and tell one of them.

17          A.     Okay.

18          Q.     Give me just a second.  Mr. Shannon, thank you

19 for your time.

20                  MR. WIRSKYE:  That's all I have, Judge.

21                  MS. BUSBEE:  May it please the Court.

22                       CROSS-EXAMINATION

23 BY MS. BUSBEE:

24          Q.     Okay.  Mr. Shannon, I don't live in your

25 neighborhood or Mr. Sanchez, do we?

1  A.  No.

2  Q.  Okay.  I just wanted to make Mr. Wirskye feel

3 better.  He just went through a lot of questions with you

4 that were kind of yes and no questions.  It didn't get me

5 anywhere because I don't feel like I know you very well yet.

6  A.  Okay.

7  Q.  You said that -- in your questionnaire that in

8 certain circumstances a life sentence might be appropriate

9 in a capital murder case instead of the death sentence.  And

10 now, while you probably already knew this, refreshing your

11 memory, you know that a capital murder conviction doesn't

12 mean a death sentence by any means.

13    Do you have any thoughts on what sort of

14 things, what sort of things would factor into your decision

15 as to whether someone should get a life sentence or death

16 sentence?  I don't think you elaborated upon that in the

17 questionnaire and I wonder if you have given it much thought

18 since.

19  A.  I haven't given it much thought and I'm

20 probably not going to be very creative in that area for you.

21 If you have some suggestions, I may agree with them.

22  Q.  Okay.  We need to put you on the jury.  Let me

23 ask you some questions about this, then.  When you found

24 out, you know, what kind of case you were going to be on or

25 that you were going to be on this case, which, I guess, is

1  some notoriety, I suppose, particularly since Grand Prairie

2  and Irving are kind of close, did you think that you had

3  already formed some opinions as to what you knew happened in

4  this case?

5       A.    Probably.

6       Q.    Okay.  Could you tell us what those might be?

7       A.    Um, just opinions -- about him being guilty?

8       Q.    Well, any opinion that you have.  I didn't

9  want to put any words in your mouth, but we all have them

10  and you strike me as a man who has strong opinions.

11       A.    In some areas, yeah, I do.  But I didn't dwell

12  on it that long, you know.  I read it, saw it in the media a

13  couple of years ago.

14       Q.    Okay.  Fair enough.  You made some comments --

15  well, I'll come back to that in a minute.  You said that

16  your brother was an auxiliary cop, but he also was -- had a

17  social worker degree or something like that?

18       A.    Right.  He worked for the Dallas County Boys

19  Home.

20       Q.    How long was he employed doing that?

21       A.    Probably about 20, 25 years.

22       Q.    Did you ever have occasion to go out there or

23  help him or assist in any activities out there?

24       A.    Let's see, he took a bunch of kids to a camp

25  one time and I volunteered and went up and cooked for them.

1    Q.    You weren't necessarily involved in any of his

2  activities at the boys home?

3    A.    No.  That one instance is what I can remember.

4  I think that was some camp they had up in Texoma, Lake

5  Texoma.

6    Q.    When your brother worked as an auxiliary

7  police officer, did he perform the same duties as a regular

8  police officer?  Did he go with the police officers?  That

9  can mean different things.  Was he commissioned as a peace

10  officer?

11    A.    I don't know.

12    Q.    Did he carry a gun when he was --

13    A.    Yes.

14    Q.    I know that you mentioned that you have been

15  on two juries, but you weren't the foreman.  Would you

16  characterize those as pleasant experiences?

17    A.    Some parts of it, you know.  You get a

18  rewarded feeling.  Some -- let's see, there was one where in

19  the voir dire stage there was one of the guys that, you

20  know, after when we were deciding whether guilt or innocence

21  and he said -- he kept saying, nobody seen him do it.  Well,

22  that's what they asked you about two weeks ago, you know.

23  So that was an unpleasant experience.

24    Q.    And, see, that's what I'm trying to get to

25  with you.  I can't get a feel for you very much because you

1    know how you feel about things and are definitely certain

2    about them, but I'm not getting a feeling for it.

3    Obviously, we have lots and lots of people here to choose

4    from and I just kind of want to see where your mindset is,

5    see if you are somebody we would want to serve on this jury.

6              I noticed that you said on this previous

7    case where you had been in the hot seat once before that you

8    saw it on television, his reaction to the verdict.  I think

9    they know what case it is, but I'm not privy to that, so

10    could you tell us what you saw on television?

11         A.    The case was a Garland officer that was shot

12    and killed.  And the guy, when he found out he was guilty,

13    he was cussing the Judge out and, you know, do you remember

14    that one now?

15         Q.    Well --

16              THE COURT:  You didn't narrow it down

17    very much.

18         Q.    (By Ms. Busbee)  He didn't throw anything at

19    him, did he?

20         A.    I think he was trying to get to several of

21    them.

22         Q.    Well, no, but now that you mention, I do

23    remember.  Didn't it happen in a bank or something like

24    that?

25         A.    Yes.

1    Q.    I remember that.  I wasn't involved in that.

2    Now, we talked about it or Mr. Wirskye talked to you about

3    the various different types of capital murder and you know

4    this.  Capital murder can be the intentional killing of a

5    child under six, murder in the course of a robbery, murder

6    of a fireman in the course of his or her duties.

7         Do you think that when someone has been

8    found guilty of, say, killing a police officer, fireman,

9    child under six, that the death penalty is something that

10   they should receive automatically?

11   A.    After they have been convicted?

12   Q.    Yes.

13   A.    Um, not necessarily.

14   Q.    Okay.  Because, obviously, those are the kind

15   of cases that make emotions run high and everybody is mad

16   when a child gets killed and a police officer gets killed

17   and a fireman and that's one of the reasons that the law is

18   more severe for that sort of an offense.

19        Now, the problem is because the emotions

20   are high on that type of case, the courts have drawn up

21   these questions and the Legislature has -- well, the Court

22   has given us guidelines and the Legislature has come up with

23   this scheme of things to make sure that jurors don't just

24   act on their emotions, but rationally make decisions so that

25   the death penalty won't be administered with, you know, rage

or passion, but with -- based on facts and deliberation with members of the community.

So I think we have covered probability pretty well with Mr. Wirskye.  But I'm not too sure about your feelings about Special Issue No. 3.  Talking about a hypothetical death penalty case and not about this particular case at all, in a case where you have found someone guilty of the offense of capital murder as a party and not the person who actually committed the offense, but participated in it, if you felt that that person was -- there's a probability that person would be dangerous in the future, which is Special Issue No. 1, and that you felt like that person anticipated, not just should have, but anticipated someone was going to get killed and you answered that yes, too, would there be anything else that could be shown to you that would make you say despite the fact that I have found beyond a reasonable doubt that he knew it was going to happen and he was a future danger, I think that a life sentence is more appropriate than a death sentence?

A.     I don't know.  I guess I would hear all of that during the stage of the trial and formulate that opinion.

Q.     Okay.  So your mind would be open to considering this -- this is what we call kind of a safety valve.  I have found that, I have found this, and that would

1    be the death penalty except for I don't think this

2    individual should receive the death penalty.  That's kind of

3    briefly stated how that works.

4         A.    Right.

5         Q.    Would you -- are you open to that?

6         A.    Sure.

7         Q.    Do you have anything -- I hate asking this,

8    because I know it puts you on the spot, but do you have

9    anything in your mind that you think might be mitigating in

10   a mythical case, not the one we're here on now?

11        A.    No.

12        Q.    It's kind of hard to say.  Is there anything

13   that we haven't asked you about?  You know, you talked about

14   the juror who failed to raise his hand and talk about

15   something and then it caused a big problem back in the jury

16   room.  Is there anything that you think is important about

17   you or your feelings or anything that we should have asked

18   you and we didn't ask you?

19        A.    You probably should have had a newspaper out

20   there and probably offered me a drink of water.  Everybody

21   else has got one.

22        Q.    I agree with you there.  I don't know why we

23   don't do that.  You are the one having to do all the

24   talking.  How is our how-are-we-doing questionnaire?

25             MR. WIRSKYE:  Permission to approach the

1   juror?

2              THE COURT:  You may.

3        A.    Thank you, sir.

4        Q.    (By Ms. Busbee)  Other than the service, then,

5   is there anything that we should have asked you that you

6   would like to comment on?

7        A.    No, ma'am.

8              MS. BUSBEE:  I'll pass this juror, Your

9   Honor.

10             THE COURT:  Mr. Shannon, if you would,

11  please wait for us outside and give us a few minutes and

12  we'll have you back in and let you know if you will be on

13  this jury or not.

14                  [Prospective juror out]

15             THE COURT:  Mr. Wirskye, what says the

16  State?

17             MR. WIRSKYE:  State has no challenge for

18  cause, Your Honor.

19             MS. BUSBEE:  If -- may we have a minute,

20  Your Honor?

21             THE COURT:  What says the defense as far

22  as challenge for cause?  Cause or not?  Do you have a

23  challenge for cause?

24             MS. BUSBEE:  No, Your Honor.

25             THE COURT:  Now, would you like to have a

1   minute?  Would you like to step into your office?

2                   MS. BUSBEE:  Yes.

3                       (Recess)

4                   THE COURT:  Mr. Wirskye, what says the

5   State?

6                   MR. WIRSKYE:  State will accept the

7   juror.

8                   MS. BUSBEE:  Defense will strike.

9                   THE COURT:  Defense exercises peremptory

10  strike No. 1.  Ask Mr. Shannon to come back in, please.

11                      [Prospective juror in]

12                  THE COURT:  Mr. Shannon, we apologize for

13  the service this morning in court.  We do better in trial, I

14  can tell you that.  You are zero for two.  You are not going

15  to serve on this jury.  We appreciate your time and your

16  participation.  Thank you very much.

17                      (Recess)

18                  THE COURT:  Sheriff, Ms. Holcombe.  Thank

19  you. You may be seated.  Good afternoon, Ms. Holcombe, how

20  are you?

21                  PROSPECTIVE JUROR:  Fine.

22                  THE COURT:  Have you had enough time to

23  review the orientation guide?

24                  PROSPECTIVE JUROR:  Yes, uh-huh.

25                  THE COURT:  I'm not going to go over

anything other than try to relax a little bit.  Sometimes it
can be a little intimidating when you were here last in a
room with 800 people with you and we didn't have eye to eye
contact.  And you know that you filled out the questionnaire
and I remind you that you are still under oath here today.
As we said, just tell the truth.  That's all the lawyers
want.  If you don't understand the questions or don't
understand what it means, that's the opportunity for a give
and take.

So the objective is for you to understand
the law.  That's the long and short of it, understand the
law and then they will ask you your opinions based on the
law.  Once again, any questions of me or the attorneys, just
let us know.

Now, I've given you the outline for the
trial date we anticipate shall begin on November 10th.
Would you have any problems serving the Court for those two
weeks?

PROSPECTIVE JUROR:  No.

THE COURT:  With that, I'll turn it over
to Mr. Shook.  If you would, please try to remember to say
yes or no to any answers to questions because she has to
record everything that you say.

PROSPECTIVE JUROR:  Okay.

THE COURT:  Mr. Shook.

1    MR. SHOOK:  May it please the Court?

2    <u>BARBARA HOLCOMBE</u>,

3    having been duly sworn, was examined and testified as

4    follows:

5    <u>DIRECT EXAMINATION</u>

6    <u>BY MR. SHOOK</u>:

7    Q.    Ms. Holcombe, I'll ask you questions on behalf

8    of the State this afternoon.  I want to start out by

9    expressing our appreciation for you taking the time to fill

10   out the questionnaire.  I know it asks for a lot of

11   information, but it's quite helpful to us and you may not

12   believe it or not, but it speeds up this process a little

13   bit.

14          What I'll do is ask you questions on the

15   information that you provided us here in the questionnaire.

16   We'll talk about the death penalty, capital murder, and the

17   laws that apply and laws that apply in every type of case.

18   And what we're looking for is just your honest opinions.

19          You have been on several juries before,

20   so you are somewhat familiar with the process, although this

21   process is a little different from other jury selections.

22   As I'm sure you well remember, usually the juries are

23   selected from a large group of people with the lawyers

24   speaking to them.  But because this is a capital murder case

25   in which the State is seeking the death penalty, the law

1    allows us to have this individual discussion with each

2    juror.  Okay?

3              If you have any questions at any time,

4    feel free to ask.  All right?

5         A.    Okay.

6         Q.    Looking at your background, you work for the

7    American Heart Association?

8         A.    Yes.

9         Q.    What is it you do with them exactly?

10        A.    I'm a manager of applicant services.  In

11   essence I manage a unit that talks to potential applicants

12   MDs, PhDs, and then we receive the grant applications from

13   them and take them through a detailed process through what

14   we call peer review where a scientific group reviews them

15   and grades them.

16        Q.    Okay.  And you manage that and have a staff of

17   -- is it three people?

18        A.    Right.

19        Q.    That work under your supervision?

20        A.    Uh-huh.

21        Q.    And your husband works for the Bureau of

22   Citizenship and Border Protection which, I guess, is part of

23   the Homeland Security now?

24        A.    Right.

25        Q.    What are his duties with them?

1    A.    He's an immigration inspector, so he works at

2  the DFW Airport, in essence, as the port of entry doing

3  immigration inspection on people coming in from

4  international flights.

5    Q.    I recall that somewhere in the questionnaire

6  it looked like he had some training, some type of law

7  enforcement training?

8    A.    Right.

9    Q.    Is he a law enforcement officer with his

10  duties?

11    A.    Yes.  He's considered a federal law

12  enforcement officer.

13    Q.    Does he carry a weapon?

14    A.    Yes, he does, uh-huh.

15    Q.    And he works out at the airport?

16    A.    Yes.

17    Q.    He's been pretty busy, I guess, with the

18  events of the last two years?

19    A.    Well, he's -- this is a new position, so he's

20  actually only been at the airport since about April.

21    Q.    What was he doing prior to that?

22    A.    Substitute teaching in the Rockwall School

23  District.

24    Q.    Okay.  So he's just recently become part of

25  that?

1      A.      Uh-huh.

2      Q.      Does he enjoy that type of work?

3      A.      Um, yes.

4      Q.      Okay.  Now, I wanted to talk to you a little

5  bit about your jury service.  You have been, it looks like,

6  on a DWI, sexual assault that involved a minor -- was the

7  defendant a juvenile or was the victim the minor?

8      A.      It seems to me -- I mean, when it came to

9  trial she was 12 or 13 and the occurrence was several years

10  earlier.

11      Q.      The victim was?

12      A.      Uh-huh.

13      Q.      So was that trial down here at this

14  courthouse?  Do you recall?

15      A.      I believe so, yes.

16      Q.      Okay.  So the defendant wasn't a minor.  It

17  was the victim herself.  And --

18      A.      Right.

19      Q.      And then you've been on some type of

20  termination of parental rights case; is that right?

21      A.      My husband was.

22      Q.      Your husband was?

23      A.      Uh-huh.

24      Q.      The DWI, I believe you said, was a guilty

25  finding.  That was back in the '80s?

1      A.    Yes.

2      Q.    Would the -- this case involving the sexual

3  assault was in 1995 or thereabouts?

4      A.    Uh-huh.

5      Q.    Which resulted in a hung jury?

6      A.    Right.

7      Q.    You put some of the information here that some

8  of the problems where I think there were translators

9  involved and that sort of thing?

10      A.    Uh-huh, yes.

11      Q.    Ultimately, what happened as far as the

12  deliberations go?

13      A.    Um, I think in essence most of the jury came

14  to a consensus, but we had one person on the jury -- bottom

15  line came down to her not believing a policeperson's

16  testimony.

17      Q.    Okay.  They had some type of bias against

18  police officers?

19      A.    Uh-huh, right.

20      Q.    And it came down to one holdout, that type of

21  thing?

22      A.    Yes.

23      Q.    Overall, was that a pretty unpleasant

24  experience, then, with one person just holding out based on

25  that?

1  A.      It was.  It was, because the jury was very

2  diverse and expressed that diversity in the jury room.

3  Q.      Did you feel in that case, then, that the

4  State had met its burden of proof?

5  A.      Um, I have to stop and think about that.  Yes,

6  I mean --

7  Q.      Okay.  Another area I want to get into is we

8  obviously ask if you know anyone that's been involved in the

9  criminal justice system and it looked like your son had some

10  problems in the early '90s?

11  A.      Yes.

12  Q.      Some type of counterfeiting federal charge?

13  A.      Uh-huh.

14  Q.      Tell us a little bit about that, what all that

15  involved.

16  A.      Um, well, he was living elsewhere and we --

17  I'm trying to think how ultimately why we knew about it.

18  Q.      So he wasn't living here in the city?

19  A.      He wasn't living at our home.  He was living,

20  you know, with his girlfriend and in another part of the

21  city.

22  Q.      Okay.

23  A.      And I guess at some point we were contacted

24  about it and he -- he had used a computer to copy U.S.

25  currency and had actually given it to some friends and they

1    had distributed it.

2         Q.    All right.  And did he eventually go to some

3    type of detention center --

4         A.    Yes.

5         Q.    -- for some time?

6         A.    Yes.  He went to a federal -- I can't remember

7    what it's called -- in Texarkana, a federal prison there for

8    a year and a half.

9         Q.    Okay.  And I think you said that he had had

10   some drug problems in the past.  Was this around the same

11   time period?

12        A.    Earlier, yes.

13        Q.    Okay.  What's his situation now?  Has that all

14   been resolved?

15        A.    He's living in Oklahoma City and he's employed

16   with Sprint there in Oklahoma City.

17        Q.    What was your take on his experience with the

18   criminal justice system?  Do you think that he was treated

19   fairly?

20        A.    Ultimately, yes.

21        Q.    When you say "ultimately", what do you mean by

22   that?

23        A.    Well, as a parent you have very mixed

24   feelings.  He went -- he had several misdemeanors, so he

25   went through the system in different ways at different

1    times.  And -- but, as I say, ultimately I felt he was dealt

2    with fairly.

3         Q.    Okay.  Let me turn your attention now to the

4    death penalty capital murder and ask you how you feel about

5    that.  You put on your questionnaire that you are in favor

6    of it as a law.  Since filling out the questionnaire, you

7    probably have had some more time to think about it.  I just

8    want you to express in your own feelings how you feel about

9    the death penalty.  Do you agree with it, do you think that

10   we should have the death penalty for certain cases?

11        A.    I think that we should.  And other than that,

12   of course, I think it depends upon the individual

13   circumstance.

14        Q.    What purpose do you think the death penalty

15   serves?

16        A.    Um, I think it truly in some cultures, I'm not

17   sure in our culture, in some cultures it may be a deterrent

18   of some type.  And, you know, I feel under that certain

19   heinous crime that it would be appropriate for.

20        Q.    Okay.  Is the death penalty a law that you

21   have always been in favor of since you were an adult?

22        A.    I don't know that I've had to make that

23   decision until I was presented with your questionnaire.

24        Q.    Not something that you really thought about

25   that often?

1          A.     Right.

2          Q.     Have you ever followed any cases in the media

3    that you thought were appropriate for the death penalty case

4    or capital murder case?

5          A.     Um, I mean, not deliberately, no.

6          Q.     Okay.  In Texas there are only certain crimes

7    which can be prosecuted for the death penalty.  It has to be

8    an intentional killing and it has to be during some --

9    carried out during some aggravated facts, is what we call

10   it, during the course of another felony.  Someone goes in

11   and robs a convenience store clerk and murders them, that

12   could be a death penalty case.  Someone breaks into

13   someone's home, someone commits a capital murder then, that

14   could be a death penalty case.  If you murder someone during

15   the course of a kidnapping or during a rape, that could also

16   be a death penalty case, or during an arson.

17              Also, there are certain individuals, victims,

18   such as a police officer on duty, fireman on duty, prison

19   guard on duty, those could be death penalty cases.  Child

20   under the age of six is murdered intentionally, that could

21   be a death penalty case.  Murder of more than one person in

22   the same transaction or a serial killer situation could be.

23   And also murder of someone for hire.  Someone does it for

24   money or if you hire someone to go murder someone for money,

25   pay them, that could be a death penalty situation.

1       But those are the specific types of

2  crimes that we reserve for the death penalty.  There are

3  lots of other brutal murders, which the most the person

4  would get would be a life sentence, but could not get the

5  death penalty.

6       Those types of crimes I've gone over, do

7  you feel those are the types of cases which should be

8  considered for the death penalty?

9       A.    Um, I guess I would say generally, yes.

10      Q.    Any reservations on any of those types of

11 crimes?

12      A.    Um, only with the same thought that it would

13 always come down to the individual circumstances.

14      Q.    Okay.  In Texas when we think of what a death

15 penalty case is or capital murder, we can't go over the

16 facts of the case, obviously, but what we -- generally

17 people think of is the situation where someone goes in and,

18 let's say, murders a 7-Eleven clerk or something, the actual

19 triggerman.  Obviously, that type of person can be

20 prosecuted for the death penalty.

21      But sometimes more than one person

22 commits a crime or more than one person may be involved in

23 the crime.  Sometimes it takes more than one person to

24 commit a crime.  Groups of people can go in and commit a

25 crime.  Some may have different roles.  Some may be more

1    actively involved.  But if they were all actively involved

2    in helping one another, the law says they can all be

3    prosecuted for that crime, even though some may have a more

4    active role in it.

5                    The same is true for capital murder.  An

6    example we give is a bank robbery.  Let's say Mr. Wirskye

7    and I here decide we want to rob a bank.  If we go into the

8    bank and I have the guns and he has a bag for the money,

9    I make the threats, hold the guns on people, he goes to the

10   tellers and takes the money out of the drawer.  And during

11   the course of that robbery, I shoot one of the tellers and

12   murder them.

13                    We flee the bank, we are arrested.

14   Obviously, I can be prosecuted for capital murder.  I could

15   receive the death penalty because I'm the triggerman.  The

16   law says that Mr. Wirskye can also be prosecuted for capital

17   murder because he was assisting me and he was helping me

18   carry out that crime.  Ultimately, he could get the death

19   penalty, depending on the facts.

20                    Some people, though, when we talk about

21   the death penalty, draw a line there with the accomplices.

22   We call them parties or the law of parties.  If it were up

23   to them, they have no problem with the death penalty for the

24   person who actually causes the death or the triggerman, but

25   they do have reservations or they are personally opposed to

1    the death penalty for someone who assists in a crime, an

2    accomplice.

3                    Other people agree with the law,

4    recognizing that even if they are not the triggerman,

5    depending on the facts, you could be prosecuted for the

6    death penalty and ultimately receive it.

7                    But I like to ask people how they feel

8    generally about that.  There aren't any right or wrong

9    answers.  How do you feel about that law?  Do you feel it's

10   a fair law to be able to prosecute accomplices for capital

11   murder and ultimately receive the death penalty or is that

12   something that you would really reserve a different type of

13   punishment for?

14        A.    I think, generally, I would think it's a fair

15   law.

16        Q.    And why do you think it's fair to prosecute

17   others involved in a capital murder that aren't the actual

18   triggerman?

19        A.    Because I'm assuming that if they are involved

20   in the planning and know that this is a possibility of, you

21   know, the ultimate outcome, that they are, in essence,

22   accepting the risk.

23        Q.    Okay.  That's kind of what the law says.

24   There's two ways we can prove it.  One is the facts show and

25   you can draw all the intent from the facts that the person

1   is actively participating, aiding, maybe if they planned it

2   or they are actively there helping in the offense, that

3   could be one way to do it.

4            And the other is called conspiracy or

5   party conspiracy.  If Mr. Wirskye and I agreed to commit

6   aggravated robbery, we robbed the bank, and from the facts

7   -- and, say, I went ahead and committed murder in

8   furtherance of that conspiracy, in other words, I shot one

9   of the tellers to get away or just during the course of that

10  felony, the law says that all the parties involved should be

11  held responsible if they should have anticipated that

12  something like that could happen.

13           My fact situation, Mr. Wirskye knows I

14  have guns, maybe he knows what I'm like, and kind of what

15  your reasoning was, they kind of assumed that might happen.

16  And that's what we have to prove, they anticipated a life

17  could be taken.

18           In order to get them guilty, we don't

19  even have to prove that they wanted that to happen.  Now, to

20  get the death penalty, we have to eventually prove that they

21  did anticipate something would happen.  But it goes along

22  those lines that you talked about.  They don't have to be

23  the actual triggerman, but if they agreed to commit one

24  crime and another crime was carried out, then the law holds

25  them responsible.  It's a way, I guess, of deterring people

1 from committing these types of offenses.

2              What I hear you saying is you are in

3 agreement with the law of parties --

4      A.    Yes.

5      Q.    -- and could do that?  Okay.  Now, under our

6 procedures the trial would take -- would proceed the same in

7 any capital murder case.  You have the guilt/innocence stage

8 where the State must prove its case beyond a reasonable

9 doubt.  If we do that, we don't stop.  We go to the

10 punishment phase where you can hear additional evidence.

11 You may or may not hear additional evidence, but you can

12 hear additional background information and that sort of

13 thing.

14              And at the close of that, the jury then

15 gets these Special Issues to look at and we'll go over these

16 in more detail in a moment.  But basically, Special Issue

17 No. 1, the State has to prove the defendant will be a

18 continuing danger to society.  Special Issue No. 2, we have

19 to prove that he either caused the death or if he didn't, if

20 he was a party, that he anticipated someone could be killed.

21 And Special Issue No. 3 is the mitigating evidence issue in

22 that you look at all the facts of the case and decide is

23 there sufficient mitigating evidence that a life sentence

24 should be imposed, rather than a death sentence.  And those

25 questions are answered yes and no.

1    If the questions are answered yes, yes,

2    and no, the Judge has no choice, he would sentence the

3    defendant to death.  If the questions are answered any other

4    way, again, he would have no choice and he would sentence

5    the defendant to life in prison.  But those are the two

6    choices once someone has been found guilty of a crime.  It's

7    a death sentence or a life sentence and that's based just on

8    how the jury answers those questions.  Is that clear to you?

9         A.    Yes.

10        Q.    Are you aware of the method of execution in

11   Texas?

12        A.    Um, not really.

13        Q.    Okay.  It's by lethal injection.  It used to

14   be by the electric chair, but they changed it several years

15   ago.  The procedures are the same in each case.  Sometimes,

16   depending on the case, some will get a lot of news coverage,

17   which you may or may not have seen.  I don't know.

18        The procedures are the same.  If the

19   defendant is convicted and these questions are answered in

20   that way and the Judge sentences him to death, he would be

21   put on death row.  He would wait there a number of years.

22   At some point in time the Judge would actually issue a date

23   of execution.

24        On that day or the day before that date,

25   he would be taken from death row and put in the prison unit

1  that is in downtown Huntsville where all executions take

2  place.  On the date of his execution he would be given an

3  opportunity to meet with his family, friends, or a minister.

4  He would be given a last meal.

5          But at 6:00 p.m. all executions take

6  place under our law.  He would be taken to the execution

7  chamber.  He would be placed on a gurney.  He would be

8  secured there by leather straps and needles would be placed

9  in his arm.  Witnesses would come into the viewing rooms.

10 There are witnesses there for the defendant and there's

11 witnesses there for the victim's family, if they choose to

12 be there.

13         Once they are there, the warden moves

14 forward with the execution.  The condemned is allowed a last

15 statement and after he finishes that last statement a signal

16 is given and lethal substances are then placed in his body

17 which shut down his heart and lungs.  Death occurs very

18 quickly.  Oftentimes the news covers this.  They go over the

19 defendant's last words, maybe the family's last words, that

20 sort of thing.

21         That -- and I don't mean to be morbid,

22 but I want to lay all our cards on the table, too.  This is

23 a death penalty case in which we are actively seeking the

24 death penalty.  It's a case in which we feel we have the

25 type and quality of evidence to convince the jury of the

1   defendant's guilt and that these questions would be answered

2   in such a way which would result in his execution some day.

3                    And in Texas executions actually do

4   happen.  You may be aware that there are some states that

5   have capital murder, they prosecute people, and put them on

6   death row, but the executions rarely take place.  Texas

7   actually leads the nation in executions.  So we're talking

8   about a punishment that ultimately will be carried out.

9                    You've told us that philosophically you

10  feel that the death penalty is appropriate for some cases,

11  all depending on the facts?

12       A.       Right.

13       Q.       You told us that you agree with the law of

14  parties that accomplices can be prosecuted and they can get

15  the death penalty, again, depending on the facts?

16       A.       Yes.

17       Q.       And what I need to know is this, as best you

18  know yourself, do you feel you are the type of person that

19  could listen to this evidence and then make this decision

20  and if we do actually prove these things to you beyond a

21  reasonable doubt, you could take pen in hand and answer

22  those questions in a way, knowing that when you do, some day

23  the defendant would be executed in the manner I've

24  described?

25       A.       Yes.

Q.    Okay.  We just depend on your honesty and I appreciate your candor on that, ma'am.  Let's talk a little bit about these Special Issues.  You don't get to these questions, unless you have already found the defendant guilty.  But then the law says that you can hear additional evidence, additional background evidence, good and bad.  You may or may not.  It just depends on the particular case.

This first question, it starts out with a no answer, just like someone starts out with a presumption of innocence, and the State must prove it beyond a reasonable doubt that it should be answered yes.  And the question asks whether there's a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.  It's asking the jurors to make a prediction about the defendant's future behavior.

Do you feel comfortable answering a question like that, if you are given sufficient facts or evidence?

A.    Yes.

Q.    Okay.  What types of information would you want to know?  What would be important to you in answering that type of question?

A.    The history, background.

Q.    Someone has had a background or that sort of

1 thing?

2     A.    Uh-huh.

3     Q.    That's the answer we most often get.  People

4 want to know if there's a pattern, that sort of thing,

5 something like this may have occurred before.

6     A.    Uh-huh.

7     Q.    Now, if that type of information exists, we

8 can present it.  We can actually present the witnesses.

9 There are some capital murders where really the only

10 evidence the jury has is the facts of the crime itself

11 alone.  The person may not have an extensive history.  That

12 doesn't prevent us from prosecuting that person for capital

13 murder.  And the jury may have only the facts of the offense

14 alone to decide that, if they are a continuing danger.

15          Do you feel the facts of the offense

16 could give you enough information about an individual that

17 tells you that they are dangerous, again, depending on what

18 those facts are?

19     A.    I'm not sure.

20     Q.    Okay.  Why is that?

21     A.    I do think most of us look to patterns and

22 history, probably.

23     Q.    Okay.  So that would be the most important

24 factor to you?  The reason I say that is maybe a person may

25 not -- maybe they were a Boy Scout their whole life, but

1    then they commit some horrible capital murder, maybe a very

2    brutal crime.  And then the jury would really only have,

3    well, hasn't done anything or hasn't been caught on

4    anything, but, boy, this is a horrible crime.  Can that give

5    me enough facts, maybe the planning or how brutal it was,

6    what they did afterwards, that could tell you that person

7    would be a continuing danger?

8                    Some people tell us no, they would

9    actually require a criminal history.  Other people tell us

10   no, no, I could see someone who maybe they committed their

11   first act, but they started out very badly and that could

12   give them enough information, just depending on the actual

13   facts of the case.

14                   How do you feel about that?  Is it going

15   to come down to the facts or are you one of those persons

16   that really would require a previous criminal history?

17        A.    Well, because of the word "probability" to me

18   that really lends itself to looking for patterns and

19   history.  So --

20        Q.    When you see the word "probability" in that

21   question, what does it mean to you?

22        A.    It means statistical evidence, I guess, that's

23   working with MDs and PhDs, so that's why trends and history

24   would, you know, with that word "probability" seems

25   important to me.

1       Q.    Okay.  You will not get any legal definitions

2  in the punishment stage about what these words mean.  The

3  definitions would be left up to you and the other jurors.

4  That's why we kind of ask you about them.  Probability,

5  obviously, means more than a possibility because anything

6  could be possible.  It's certainly less than a certainty,

7  also.

8             Are you comfortable with probability as

9  it's used in that particular sentence?

10      A.    Um, yes.

11      Q.    Make sense to you?

12      A.    Yes.

13      Q.    When you see the words "committing criminal

14  acts of violence", what types of things do you think of?

15      A.    Harm to others.

16      Q.    Harm to others?

17      A.    Uh-huh.

18      Q.    Could be a murder case, could be some other

19  type of assaultive offense, that sort of thing?

20      A.    Uh-huh.

21      Q.    Okay.  And when you see the words "continuing

22  threat to society", what does "society" mean to you?

23      A.    The public at large, I guess.

24      Q.    Okay.  Could it also mean people down in the

25  prison system, guards, inmates, teachers, administrators,

1    that sort of thing?

2         A.      Uh-huh, yes.

3         Q.      It could mean anyone anywhere that the

4    defendant may come into contact with?

5         A.      Yes.

6         Q.      Okay. Special Issue No. 2, that question gets

7    a little lengthy. I would like you to take a moment and

8    read that to yourself before I ask you a couple of other

9    questions.

10                That question covers, again, kind of the

11    party situation. It can cover different scenarios. The

12    first part says whether the defendant actually caused the

13    death. If you believe from the evidence he was the actual

14    triggerman, then the question is pretty simple. But we

15    can't get into the facts, but we are prosecuting this case

16    under the theory of parties or that he was not the

17    triggerman. That's why I wanted to go over all that type of

18    law with you.

19                And that's why this is important, that if

20    you don't believe that he actually caused the death, if he

21    did not actually cause the death of the deceased, but

22    intended to kill the deceased or another, then that is his

23    intent was there, maybe someone else committed the murder,

24    or anticipated that a human life would be taken. And that's

25    what we talked about earlier, kind of what you said in your

1   own words, they kind of once they entered that situation

2   with someone armed like that, they kind of accepted the

3   responsibility that something could go wrong or happen like

4   that. Do you think this is a good question to have?

5        A.    Yes.

6        Q.    Okay. Now, you understand that this question

7   goes directly to the parties, that when prosecuting someone

8   under the law of parties, this is what we have to prove that

9   either he had the intent to kill or he did anticipate that a

10  human life would be taken.

11             In a jury trial we present the evidence

12  and when we are proving someone's intent, oftentimes we can

13  just present the facts and the jurors are allowed to make

14  reasonable deductions from the evidence to look at someone's

15  intent. In other words, we are not always able to say, you

16  know, this is what he intended. We can argue that a

17  person's intentions can be drawn from the actual facts of

18  the case, what they did, what their role in the crime was,

19  that sort of thing.

20             Do you feel that's a fair way of proving

21  a case, if we're able to present all the facts to you? In

22  other words, do you think, yes, you can draw or learn a

23  person's intentions from the facts of the case, if enough is

24  presented to you?

25        A.    Yes.

1    Q.    And is that all -- concerning all relevant

2  facts about how a crime was planned and how it was pulled

3  off and that sort of thing?

4    A.    Yes.

5    Q.    Okay.  You don't have any problem, then, I

6  take it, with Special Issue No. 2 as far as the death

7  penalty case?  You feel that, again, that that's a fair law

8  and that the State should be able to prosecute someone under

9  that theory?

10    A.    Yes.

11    Q.    That question starts out with a no answer and,

12  again, we have to prove to you that it should be answered

13  yes.  It may be the same evidence that you heard in the

14  guilt/innocence stage.  You just look at it again and then

15  make that decision did the State prove it to you.  And you

16  may also do it on additional background evidence that you

17  learned in the punishment phase that would aid you in

18  answering that question.

19                But what you have to do is wait.  Just

20  because you found the defendant guilty, you don't

21  automatically answer those questions.  You have to go back

22  in the jury room, look at the evidence you have already

23  heard and any new evidence you have heard and then decide if

24  the State has proven these two questions.  You feel you

25  could do that?

A.      Yes.

Q.      Would you require the State to prove this to you beyond a reasonable doubt?

A.      State that again?

Q.      That the law says that the State has to prove these questions to you beyond a reasonable doubt, just like we have to prove his guilt.  And what I want to ask you is would you be able to follow that law and require us to prove that to you beyond a reasonable doubt?

A.      Yes.

Q.      Okay.  Now, this last question is the Special Issue question.  It's the last one you get and neither side has the burden of proof.  You don't get to that question until you found the defendant guilty of capital murder, until you have already determined he's a continuing danger to society, and that he either caused the death or anticipated that a death would occur.

        And then you look at all the evidence you have heard, the crime itself, and his background evidence and determine if you think there's sufficient mitigating evidence that would call for a life sentence rather than a death sentence.

        If you will, just take a moment and read that question.  It's the lengthiest one and then we'll go over a few questions.

1    It's kind of a catch-all or we call it a

2    safety net.  It allows the jurors to look at everything in

3    his background and then decide if you think something is

4    sufficiently mitigating.

5    Now, what mitigating evidence is, I can't

6    tell you.  It's up to you and the other jurors.  You don't

7    even have to tell us what you think mitigating evidence is

8    or you don't have to agree with the other jurors.

9    Let me give you an example.  You may have

10   a capital murder case where you are sitting as a juror and

11   when you get to this question, the evidence may have shown

12   that the defendant has four PhDs from Harvard.  One juror

13   might think that's mitigating.  He's done some positive

14   things with his life.  May not be sufficient to spare his

15   life, but they may want to look at it that way.  Another

16   juror could say actually that's kind of aggravating.  You

17   know, someone that has four PhDs shouldn't go around killing

18   people or committing capital murders.  I would hold that

19   against him.  So it could go either way.  It just depends on

20   how you view the evidence and it could be anything.

21   As you sit there today, can you give us

22   any indication or anything you might believe could be

23   potentially mitigating evidence that you would consider?

24   A.    Not really.  I mean -- that statement, in

25   essence, if that's what the Judge says the jury is to look

1   at --

2        Q.     Right.  Consider all of that.

3        A.     Right.

4        Q.     Don't feel bad because I ask that question to

5   every juror and I would say 99 percent say, not really.

6   It's not an issue you usually wouldn't think about.  It's

7   just basically whatever you think could be mitigating.  We

8   go over some things with jurors.  Sometimes you consider a

9   person's background, how they were raised.  Maybe they were

10  raised in poverty.  Maybe they came from a broken home.

11  Some jurors feel that's potentially mitigating.  Other

12  jurors tell us, no.  A lot of people were raised in that

13  environment.

14       You may hear about physical or mental

15  abuse of a person as they grew up.  Some people believe

16  that's potentially mitigating, depending on the severity.

17  Other people tell us I feel bad for them, but that happens a

18  lot and once you are an adult you have to be held

19  accountable.

20       Sometimes you hear about drug use.  Some

21  people feel that could be mitigating and other people say,

22  if they are voluntarily taking drugs, no, no, that's not.

23       How do you feel about those types of

24  issues?  Do you view that as potentially mitigating or

25  something you might be open to it?  How do you feel about

1  that?

2       A.       In a very general way, I don't think those are

3  mitigating circumstances in my mind.

4       Q.       Just something you would have to hear?

5       A.       Uh-huh.

6       Q.       That's all the law says.  You don't have to

7  think of what is mitigating.  All you have to be able to

8  tell the Court is I'll keep my mind open to it.  If I feel

9  something sufficiently mitigating where I think a life

10  sentence should be imposed, I'll answer the question that

11  way.  If I don't, I'm going to answer it no.

12            But you have to be able to keep your mind

13  open to it, even though you have already found them guilty,

14  even though you already feel he's a continuing danger or

15  anticipated that someone would die, you can keep your mind

16  open and then answer the question yes or no, just depending

17  on the facts.  Do you feel that you can do that?

18       A.       Yes.

19       Q.       Okay.  Fair enough.  There's another area that

20  may or may not come up.  In any case you have the jury

21  considers lesser included offenses at times.  A lesser

22  included offense of capital murder where we have alleged

23  robbery, is aggravated robbery, taking someone's property at

24  gunpoint.  You may have a reasonable doubt about the

25  defendant causing the death, but maybe not about robbery.

1   In those situations you might find the defendant guilty of

2   aggravated robbery.

3                  Now, if you found the defendant guilty of

4   aggravated robbery instead of capital murder, the punishment

5   range changes completely.  You don't get these questions.

6   You just get a penalty range for years in prison.  One end

7   is a life sentence or 99 years and the other end is five

8   years in prison and anywhere in between.

9                  You get to hear all the background

10  evidence and then you decide what is appropriate.  If you

11  think a life sentence would be appropriate, you could do

12  that based on the facts, 50 years, 30 years, or as little as

13  five years in prison.

14                 Again, all you have to be able to do is

15  assure the Judge that you can keep your mind open to that

16  full range, consider it, and if you think the right thing to

17  do based on the evidence is give a life sentence, you could

18  do that, or as little as five years in prison, you could do

19  that or anywhere in between, just based on what the evidence

20  tells you to do.

21                 Do you feel you can keep your mind open

22  to that full range of punishment in an aggravated robbery

23  situation?

24      A.      Yes.

25      Q.      Okay.  There are some rules that apply to each

1  case and you will be familiar with these because you grew up

2  here, for one thing, and they are taught in school, most of

3  them, and, also, you have been on two juries so you have

4  probably heard these before.

5  The presumption of innocence, the Judge

6  covered some of these with the general voir dire.  The

7  defendant starts out a trial, he's presumed to be innocent

8  and the State overcomes that presumption by putting on

9  evidence.  But when you begin, just because the defendant

10  has been arrested, indicted, or even we're going through

11  this process, that's not evidence of his guilt.  You have to

12  wait for us to actually produce the evidence and then make

13  your decision.  Could you do that?

14  A.  Yes.

15  Q.  The burden of proof never shifts.  The defense

16  does not have to put on evidence.  They very well may.  In

17  fact, most people assume they will, but they are not

18  required to.  That burden of proof always stays with the

19  State.  At the close of our case, if they haven't asked any

20  questions or put on any evidence and you have that

21  reasonable doubt, then you simply must find the defendant

22  not guilty, if you don't think we have met our burden.

23  Could you do that and keep the burden of

24  proof on the State of Texas?

25  A.  Yes.

1    Q.    That burden of proof goes to the indictment.

2    We have to prove every portion of the indictment.  If you

3    have a reasonable doubt just on one element of it, one part

4    of it, you are obligated to find the defendant not guilty.

5    Could you do that?

6    A.    Yes.

7    Q.    Give you a small example.  One of the elements

8    we allege is the county it occurred in, Dallas County.  If

9    we even failed to prove Dallas County, some view that as a

10   technicality, but the law doesn't.  You would have to find

11   him not guilty.  I don't anticipate that would happen and if

12   it did, I'm sure we would lose our jobs.  But you can't help

13   us out.  You just have to be a neutral judge, kind of like a

14   referee.  Do you feel that you could do that?

15   A.    Yes.

16   Q.    And then another element or proposition of

17   laws is the Fifth Amendment.  If someone chooses to testify,

18   you would judge them like any other witness.  If they choose

19   not to testify, though, you can't hold that against them.

20   You have to just judge the case on the evidence you have

21   heard.  Could you follow that rule of law?

22   A.    Yes.

23   Q.    Okay.  Now, your husband is in law enforcement

24   now?  A lot of jurors, obviously, respect the job the police

25   do.  In a criminal case police officers are called to

130

1   testify.  However, you can't start them out ahead of other

2   witnesses, as far as credibility goes, without hearing them

3   first.  You have to wait and judge them like you would any

4   other witness.  Do you feel that you can do that?

5        A.    Yes.

6        Q.    You recognize there are some good police

7   officers, bad police officers, just like any other

8   profession.  Okay?

9              And one other area, the parole laws get a

10  lot of publicity.  In a capital murder situation, if someone

11  is given a life sentence, we can tell you that they have to

12  stay in prison forty calendar years before they become

13  eligible for parole, day for day, forty calendar years.  The

14  law, also, the Judge will tell you, that you can't consider

15  the parole laws in your deliberations.  You have to assume a

16  life sentence means a life sentence and then just base your

17  answers to these questions on the evidence that you hear.

18  Could you follow that instruction from the Court?

19       A.    Yes.

20       Q.    Okay.  Now, you, like the other jurors in this

21  case, heard some general news sometime back about this

22  crime?

23       A.    Yes.

24       Q.    It received a lot of publicity.  Can you tell

25  us what you recall hearing?

131

1     A.     Um, I remember hearing generally about the

2  officer's shooting, probably because it was Christmas Eve

3  and received lots of publicity and then over the period of

4  time, following and tracking and ultimately capturing the

5  people.

6     Q.     Did you follow any of the subsequent trials?

7     A.     No.

8     Q.     All right.  Again, when a case receives this

9  much publicity, all the jurors have heard something about

10  it.  The law is simply this.  Just because you have heard or

11  followed it in the news doesn't make you ineligible to be a

12  juror.  What you have to be able to do is -- we can't ask

13  you to forget about what you heard.  But just base your

14  decisions on what you hear in the courtroom.  In other

15  words, if you remember something different from what you saw

16  on TV from what you heard in the witness box, you,

17  obviously, can only make your decision on what you hear in

18  the courtroom.  That's going to be the more accurate

19  information.

20         Would you be able to follow that

21  instruction and just base your decisions on what you hear in

22  the courtroom and not anything that you read or heard on TV?

23     A.     Yes.

24     Q.     Your mind is open, then, and you would still

25  require the State of Texas to prove to you beyond a

1  reasonable doubt that these allegations are true?

2         A.     Yes.

3         Q.     Okay.  Do you have any questions of me?  We've

4  gone over a lot of information here pretty quickly.  Any

5  questions at all?

6         A.     (Prospective juror shakes head.)

7         Q.     Okay.  I appreciate your patience.

8               MR. SHOOK:  That's all the questions that

9  I have at this time, Judge.

10              THE COURT:  Ms. Busbee.

11              MS. BUSBEE:  May it please the Court?

12                   CROSS-EXAMINATION

13  BY MS. BUSBEE:

14         Q.     You don't seem as uncomfortable as some of

15  these other people that we've had up here and I appreciate

16  you talking to us so frankly.  Mr. Shook has covered the law

17  very well and so I don't need to go over the same territory.

18  I just have some specific questions for you.

19                   First of all, I know that this law

20  enforcement career for your husband, that's a new one?

21         A.     Uh-huh.

22         Q.     But do you think that it may affect you to sit

23  on a jury where a police officer is killed and to look at

24  the evidence in such a way that because your husband serves

25  as a police officer, law enforcement official, that it would

1  be more upsetting to you and might affect you in some way?

2       A.    I don't think that I would be, no.

3       Q.    We gave you a witness list, extensive witness

4  list. Did you have a chance to read over that?

5       A.    Yes.

6       Q.    Were there any names on that list that you

7  thought you might know that person?

8       A.    No.

9       Q.    In your questionnaire we asked some general

10 questions about the death penalty and you mention that --

11 checked that you thought that the death penalty may be

12 misused from time to time.  Do you remember answering that

13 or what you were thinking about when you said that?  See,

14 what I like about this is we give you the test and then we

15 give you the information.  So it's kind of unfair to ask you

16 questions about certain things when you don't really know

17 what you are answering.

18      A.    Right.

19      Q.    I guess -- from this table, I guess what we

20 would like to be sure of is that a juror recognizes that

21 just because someone has been found guilty of a capital

22 murder, that he's not by any means, they are not necessarily

23 going to receive the death penalty, that there are some --

24 there are narrow, narrow steps that have to be taken before

25 that person can be given the death penalty.

1    The first one is the probability question

2   that we talked about and the second one is something that

3   can't be answered until you have heard the facts of the

4   case.  But assuming that you have heard the facts of the

5   case and the probability of future dangerousness and the

6   intent or anticipation of taking a human life was proved to

7   you beyond a reasonable doubt -- and we don't know at this

8   point what the evidence would be or whether it would satisfy

9   you.  But let's say that it does, without even trying to put

10  you -- pin you down to ask you what that might be, could you

11  tell us that you could still consider voting yes on question

12  No. 3, a vote that would result in a life penalty instead of

13  a death penalty?

14       A.    Yes, I could.

15       Q.    Is there anything that's on your mind that you

16  think we should talk to you about?  We have this set series

17  of questions that we ask, but sometimes there are things

18  that jurors think they should share with us or tell us that

19  might be important that we haven't asked.

20       A.    Not that I can think of.

21       Q.    Let me consult here with my co-counsel.

22            MS. BUSBEE:  I'll pass the juror, Your

23  Honor.

24            THE COURT:  No further questions?

25            MS. BUSBEE:  No, Your Honor.

1    THE COURT:  Thank you, ma'am.  If you
2  would, I'm going to have you wait outside just for a moment
3  and we'll have you back in.  Give us just a few minutes.
4             [Prospective juror out]
5    THE COURT:  What says the State?
6    MR. SHOOK:  May we have one moment,
7  Judge?
8    THE COURT:  All right.  Find the juror to
9  be qualified or not?
10   MR. SHOOK:  Yes.  We have no grounds for
11 submission of cause at all, Judge.
12   THE COURT:  Defense?
13   MS. BUSBEE:  We have no grounds for
14 submission.
15   THE COURT:  Court finds, also, the juror
16 to be qualified.  What says the State?
17   MR. SHOOK:  State will accept the juror.
18   MS. BUSBEE:  The defense will accept the
19 juror.
20   THE COURT:  Thank you.  You may be
21 seated.
22            [Prospective juror in]
23   THE COURT:  Ms. Holcombe, I want to
24 inform you that you have been accepted as a juror in this
25 case.  And we have spent a lot of time with you today.  You

1    have read the orientation guide, we've been over the law,

2    and now this is probably a long period of time, but, once

3    again, just put this in the back of your mind because we'll

4    start this on November 10th.

5                What will happen is when you go back to

6    your work at the American Heart Association, they are going

7    to be, where have you been today?  Because they know where

8    you are, don't they?

9                PROSPECTIVE JUROR:  Uh-huh.

10               THE COURT:  Sure they do.  And if you go

11   back and tell them, well, I've been accepted on this jury,

12   no doubt they are going to tell you their opinions.  And you

13   know what?  These lawyers in the court are satisfied with

14   your opinions.  And because they weren't here today, they

15   have not been through the whole process.

16               So what you have got to do is just shut

17   it down.  I'm going to instruct you, don't lie, you have got

18   to tell your supervisor, but we're far enough out that you

19   can tell your supervisors, I need to schedule these two

20   weeks off.  And just say -- just leave it jury duty.  Don't

21   be any more specific than that.  If they have any questions,

22   tell them they can call me directly and that will cure it.

23   They won't want to do that.  All right?

24               But if you start telling people that you

25   are on this jury, they are going to start talking about it.

1  One of the instructions that I'm going to give you in

2  writing and I will follow this up and you will have your

3  paper, is you are to receive no information about this case

4  other than from that witness stand right there that you are

5  sitting in now.

6          So when this -- just don't read anything

7  about it in the paper.  If there is a news special,

8  whatever, I don't think there will be, just nothing.  You

9  have already told us that -- I remember your words.  I'll

10 have to see the evidence for myself to make a decision.

11 That's all we're asking you to do.

12          PROSPECTIVE JUROR:  Okay.

13          THE COURT:  Do you have any questions for

14 me?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  All right.  So again,

17 schedule your time with work.  Don't talk about this.  Just

18 kind of put it in the back of your mind.  You have plenty of

19 time to plan for it.  If you will go with Sheriff Cook, he

20 has a few other items that he needs to take care of at this

21 time.

22          And you will receive another -- let me

23 tell you what will happen.  I don't know the exact date.  I

24 anticipate the week prior to November 10th, we'll have all

25 the jurors back down here.  But I don't know what day it's

1  going to be.

2           Sheriff, how long was it, two hours last

3  time, three, for orientation?

4           SHERIFF COOK:  It was about two and this

5  one we're planning on an hour or less.

6           THE COURT:  It will be about another hour

7  or hour and a half of orientation.  That's with the whole

8  group here at once so I can give everybody the same

9  instructions and that will be prior to the 10th and

10 hopefully we'll get that out to you when that would be.  So

11 you will have one more day down here before testimony will

12 actually begin.

13          If you would, go with the Sheriff and we

14 appreciate your time.

15                 [Prospective juror out]

16          THE COURT:  Mr. Peterson.

17                 [Prospective juror in]

18          THE COURT:  Good afternoon, sir, how are

19 you?

20          PROSPECTIVE JUROR:  Doing good.

21          THE COURT:  And your name is Eugene Alan

22 Peterson?

23          PROSPECTIVE JUROR:  That's correct.

24          THE COURT:  I see you brought in the

25 orientation guide.  Have you had an opportunity to read that

1    --

2                    PROSPECTIVE JUROR:  Yes, I did.

3                    THE COURT:  -- with the witness list?

4                    PROSPECTIVE JUROR:  Yes.

5                    THE COURT:  Very well.  I don't have

6    anything at all to add to the guide, other than you

7    understand you will be going through the law and my job is

8    to be sure that you understand the law we'll be using in

9    this case.  Please ask questions.  This is the only time

10   that you will be able to.  If you don't understand the

11   concept the lawyer is trying to explain, say I don't

12   understand, if they can't explain it, I'll try.  The

13   objective is for you to understand.

14                    The only question that I have for you,

15   sir, is, I gave you the timeline, this trial shall begin on

16   the 10th of November.  Do you have any problems serving this

17   Court for those two weeks?

18                    PROSPECTIVE JUROR:  At this time I don't

19   see a problem.

20                    THE COURT:  Any questions?

21                    PROSPECTIVE JUROR:  Not yet.

22                    THE COURT:  Mr. Wirskye?

23                    MR. WIRSKYE:  Thank you, Judge.  May it

24   please the Court?

25                    EUGENE PETERSON,

1  having been duly sworn, was examined and testified as

2  follows:

3                    DIRECT EXAMINATION

4  BY MR. WIRSKYE:

5       Q.    Mr. Peterson, how are you this afternoon?

6       A.    I'm fine.

7       Q.    My name is Bill Wirskye and I'll be the

8  assistant DA that will be visiting with you for the next few

9  minutes and talk a little bit about some of the information

10 in your questionnaire, how you feel about the death penalty,

11 what your thoughts are there, and follow up a little bit

12 about the law that may apply in this type of case.  What

13 exactly do you do for a living?

14      A.    I work at a television station.

15      Q.    What station is that?

16      A.    KDAF, WB 33.

17      Q.    I notice you said you were a broadcast

18 engineer?

19      A.    Yes.

20      Q.    I hate to show my ignorance, but what exactly

21 does that mean?

22      A.    Basically, take care of the equipment side of

23 things.

24      Q.    Do you work on a newscast or any particular

25 programs?

1    A.    Not directly, you know, it's just generally
2    take care of all the equipment.
3    Q.    You are not an on-air guy?
4    A.    Oh, no.
5    Q.    Behind the scenes technical type?
6    A.    Yes.
7    Q.    I notice -- you probably don't remember this.
8    It's a little unfair of us to even refer back to these
9    questionnaires that you filled out, I guess, in May.  But on
10   the last page, like so many other people, you said that you
11   would prefer not to be chosen necessarily.  And I was just
12   curious what you were thinking when you put that down?
13   A.    Um, it would be an awesome responsibility, I
14   think.
15   Q.    Because of the type of case it is?
16   A.    Yes.
17   Q.    Okay.  And you have told us, I guess, in a
18   very general way that you are in favor of or support the
19   death penalty; is that right?
20   A.    Yes.
21   Q.    Is that a fair statement?
22   A.    Yes.
23   Q.    What value or utility do you see in, you know,
24   the State of Texas, I guess, having a death penalty?
25   A.    Well, in a way it's a deterrent because he

1  won't do it again.  But in some cases it's just -- it's

2  justified for society to do that.

3      Q.    Okay.  Kind of an intellectual belief or

4  religious belief or -- just trying to get a grasp of where

5  you are coming from on that.

6      A.    Intellectually, I guess.

7      Q.    Is it something you have been in favor of your

8  adult life?

9      A.    For most of it, yeah, there was a time when I

10 was younger when I didn't quite believe in it, but --

11     Q.    You think the older people get, the more

12 conservative they get?  At least that applies to me --

13     A.    Generally speaking.

14     Q.    -- I don't know if it applied to you.  You

15 said that you had a daughter, I guess, that didn't

16 necessarily agree with the death penalty; is that right?

17     A.    That's true, but --

18     Q.    Okay.  She's how old, 22 or --

19     A.    Twenty.

20     Q.    Okay.  Is that something that y'all have had

21 discussions about or she feels strongly about or just --

22     A.    I don't know how strongly she feels, but we

23 don't, you know, discuss it in depth or anything.

24     Q.    I would hope you wouldn't necessarily, unless

25 you do what we do for a living.  But you also said that you

1    were -- I guess, had read an article, a magazine article,

2    about the death penalty, is that right, "New American

3    Magazine"?

4        A.    Uh-huh.

5        Q.    Can you tell us about that article?

6        A.    It's been some time.  You know, trying to

7    remember the details.

8        Q.    What type of magazine is that?  I hate to show

9    my ignorance, but I'm not necessarily familiar with it.

10       A.    It's a magazine published by the John Birch

11   Society, so it's quite conservative in most of its

12   viewpoints.

13       Q.    I notice you consider yourself fairly

14   conservative?

15       A.    Uh-huh.

16       Q.    Was it a pro or con article?  One way or the

17   other on the death penalty?

18       A.    It was to dispell the myths behind not having

19   it and why a lot of the reasons people come up with for not

20   having it are not well thought out and not necessarily true.

21       Q.    Okay.  And I guess that article influenced you

22   enough for you to --

23       A.    Well, it strengthened my belief.

24       Q.    All right.  The belief that you already had?

25       A.    Uh-huh.

1    Q.    Okay.    Is there any particular type cases when

2  you think about the death penalty, a particular type of fact

3  situation or scenarios, that come to mind when you think

4  about the appropriate case for the death penalty or capital

5  punishment?

6    A.    Um, probably any case of a really heinous

7  nature, you know, where somebody was just so totally lacking

8  in concern for human beings that -- sure.

9    Q.    Any particular case you may have heard about

10  in the news or media that comes to mind when you think about

11  an appropriate case for that type of punishment?

12    A.    At this time I can't --

13    Q.    That's fine.    I wouldn't expect you to be able

14  to, very frankly.    Let me talk to you just briefly a little

15  bit about kind of your general impressions of our criminal

16  justice system.    Do you think it works pretty well or how

17  would you describe your thoughts about that?

18    A.    There's no doubt that it is somewhat slanted

19  toward those who are able to afford better justice.    But for

20  all its flaws, it's still the best system in the world, I

21  think.

22    Q.    Again, I don't know if you remember your

23  answers you put down.    At one point I think you said, I

24  guess, one of the potential dangers in the system is that

25  maybe some of the participants would get overly emotional

1   about it, I guess, I think the words you used.  I don't know

2   if you recall that, but I was curious what you were thinking

3   when you put that down, overly emotional or overly involved

4   in the case, maybe taking it too personally, I guess.

5           A.      Yeah.

6           Q.      Is that a concern of yours or --

7           A.      I'm not sure.

8           Q.      Okay.  Fair enough.  Particularly with the

9   death penalty, let me kind of run something by you and see

10  what you think.  We often give these fact situations or

11  scenarios.  You know, I think when a lot of people think

12  about a capital punishment case, you know, in Texas capital

13  punishment is just limited to a certain type of murder case.

14  You kill someone during the commission of a robbery or kill

15  a particular person like a police officer on duty, fireman,

16  child under six.  I think often people think of these crimes

17  as committed by one person.  In reality a lot of crimes are

18  committed by more than one individual, groups or gangs of

19  people.

20              And, you know, the law doesn't

21  necessarily require that in order to be eligible for capital

22  punishment, a capital murder conviction, and a death

23  sentence, that you necessarily have to be the person that

24  pulled the trigger, the person that caused the death.  In

25  certain circumstances the law allows us to prosecute people

1  and ask for the death penalty when those people did not pull

2  the trigger.  What do you think about that type of scenario?

3        A.    I would -- I agree with that, because if you

4  are an accomplice, you share in the responsibility, even if

5  you didn't actually pull the trigger.  You didn't stop it,

6  either.

7        Q.    Okay.  So -- and we talk to quite a few people

8  and we give them that example.  You know, some people tell

9  us, well, if you didn't actually pull the trigger or cause

10  the death, then I'd just take the death penalty off the

11  table for you.  I would limit the death penalty just for the

12  person that pulled the trigger.

13         And I take it you don't feel like that,

14  that you could keep an open mind and maybe a death sentence

15  for a nonshooter; is that right?

16        A.    Yeah.

17        THE COURT:  Yes or no, she has to record

18  everything that you say.  It's perfectly normal, perfectly

19  normal.  You have not been in this situation before, but she

20  can't record a head nod or uh-huh.

21        PROSPECTIVE JUROR:  Right.

22        Q.    (By Mr. Wirskye)  Mr. Peterson, that is,

23  basically, what the law envisions.  We call it sometimes the

24  law of accomplices or in Texas we call it the law of

25  parties, if someone is an accomplice or a party to an

1  offense.

2               Mr. Shook and I decide an offense.

3  Mr. Shook and I decide he's going to have the gun.  He's

4  going to pull the gun on the teller and I'm going to come in

5  and just grab the money.  And we get together and plan this.

6  And I know what a violent person he is and what a hair

7  temper he has.

8               And we go in there and rob that bank and

9  for some reason he shoots and kills the teller, you know.

10  Then, obviously, he's committed capital murder and could be

11  prosecuted for the death penalty.  And under certain

12  circumstances the law would, also, allow me, the nonshooter,

13  to be prosecuted for the death penalty.

14               And I take it that you would agree with

15  that depending on the facts and circumstances?

16         A.    Generally, yes.

17         Q.    Okay.  Is there anything that you can think of

18  off the top of your head that would be important when you

19  are looking at someone like me, a nonshooter, when you are

20  talking about getting a potential death penalty?

21         A.    At this time I can't.

22         Q.    Okay.  And the law, basically, is there's a

23  couple of different ways to find me guilty of capital

24  murder, the nonshooter, you know, if I help, encourage, or

25  aid him, I can be found guilty.  Or even if I didn't want

1  anybody to get killed, if I just signed up for a robbery, if

2  I should have anticipated a life would be taken, then I can

3  be held guilty.  And I knew he went in with a loaded gun, I

4  knew he had a bad temper, and he was the type of person that

5  may shoot or kill someone for no reason.  Obviously, under

6  the Texas law I could be found guilty and potentially face

7  the death penalty.

8            And that sounds like that's something

9  that you generally agree with, right?

10       A.    Yes.

11       Q.    One thing in Texas, a lot of people are not

12  aware of this when we ask a jury in a death penalty case

13  whether to assess the death penalty or not, it's not just,

14  you know, a thumbs up or thumbs down on the death penalty.

15  The system we have, and I'll refer you to this chart, is if

16  you find somebody guilty of capital murder, we ask the jury

17  to answer these.  They are called Special Issues.  I just

18  call them questions.  We ask the jury to answer these

19  questions and depending on how the jury answers these

20  questions, that ultimately determines what sentence will be

21  imposed on the defendant, whether it be a life sentence or

22  whether they actually receive the death penalty.  We'll talk

23  about them a little bit more in depth in a little while.

24            But I'll run them through you real quick.

25  The first question, basically, asks whether the person is a

1   continuing threat to society or future danger to society.

2   If the answer is yes to that, you move on to the second

3   question.  That kind of deals with the scenario we have just

4   been talking about, whether the person was the triggerman or

5   if he wasn't the triggerman, did he intend there be a death

6   or did he anticipate there be a death.  If the answer to

7   that is yes, then you move on to the final question or

8   Special Issue No. 3, which is kind of a safety valve, safety

9   net type question.  And that just asks the jury to see if

10  there's anything mitigating that you have heard, the facts

11  of the crime or the defendant's background, such that you

12  think it's sufficient to spare his life and give him that

13  life sentence, other than the death penalty.

14              That's kind of the scheme we have and

15  that's what we ask jurors to do.  You probably weren't aware

16  of that before you walked in here?

17      A.    No, I was not.

18      Q.    Is that something that you generally think

19  that you could agree with, that type of thing?

20      A.    Yes, I do.

21      Q.    Okay.  Have any hesitations on that?  You

22  didn't sound like -- you might have a little hesitation?

23      A.    No, just things you definitely have to

24  consider before imposing the death sentence.

25      Q.    Okay.  You would feel comfortable with that

1   scheme?

2          A.      Yes.

3          Q.      And we talk to quite a lot of people and there

4   are a lot of people, maybe such as yourself, that have

5   thought, intellectually at least, in favor of the death

6   penalty or in the abstract in favor of the death penalty as

7   a punishment, but when you get down here actually in a

8   courtroom and you may be called on to get on that jury and

9   you are sitting here looking at a living, breathing human

10  being, the defendant who is on trial, it becomes quite

11  another thing.

12         A.      Yeah.

13         Q.      And, you know, I'll be honest with you.

14  That's -- I'll put my cards on the table.  I mean, we think

15  that we have the nature and type of evidence that's going to

16  cause a jury to find this man guilty of capital murder as a

17  nontriggerman, as a party, or an accomplice.  We, also, feel

18  we're going to have the type of evidence that's going to

19  cause the jury to answer those questions in such a way that

20  ultimately one day the man down at the end of the table will

21  be lying dead on a gurney down in Huntsville.

22                 And I hate to put too fine a point on it,

23  but that's what we're here about.

24         A.      Right.

25         Q.      And there are some people we talk to that are

1  not necessarily comfortable making those decisions or taking

2  a pen in hand and answering those questions in such a way

3  that may result in the death of another human being.  And if

4  you feel that way, that's fine.  But we kind of need to know

5  before we get you in the jury box.

6              Are you comfortable participating in that

7  type of process?

8       A.     Not comfortable, but if it comes down to it, I

9  would do my best.

10      Q.     Okay.  If the facts and evidence showed you he

11 was guilty of capital murder and the questions should be

12 answered yes, yes, and no, would you be able to do that?  Do

13 your duty?

14      A.     I would hope so.

15      Q.     Okay.

16      A.     Until it comes down to it, it's hard to know.

17      Q.     Being a lawyer, we a lot of times talk in

18 terms of yes or no.  As the Judge said, we have to write it

19 down.  So when I hear an answer with any equivocation, I

20 have to go in and explore it.

21             It's really -- it really boils down to

22 this.  This is our chance to talk to you, both sides.

23 Neither side wants to put anyone in an uncomfortable

24 situation.  And, you know, once you are over on the jury,

25 it's too late --

1    A.    Right.

2    Q.    -- if something comes up and you are back in

3  the jury room with the other jurors.  So this is kind of our

4  chance to talk about it.  Probably comfortable is a bad

5  word, but at least if you think that you are the type person

6  that can participate in the process and hold the State to

7  their burden and follow the law, a fair trial for Mr.

8  Murphy, and depending on the facts and the law make whatever

9  decision is appropriate, even if it results in the death

10  penalty.

11         Do you think that you are the type person

12  that can do that?

13    A.    I believe so.

14    Q.    Okay.  Let me ask you to do this.  On the last

15  page, you may have already looked at that -- but I'll ask

16  you to look at it again.  On the back of the last page is

17  the indictment in this case.  Even if you have already

18  looked at it, take a few minutes to look over it again.

19    A.    [Prospective juror complies.]

20         MR. WIRSKYE:  Your Honor, can we

21  approach?

22         THE COURT:  You may.

23              (Bench conference)

24         THE COURT:  Mr. Peterson, I appreciate

25  your time and service to the Court here today.  The parties

1  have agreed to excuse you from jury service in this case, so

2  you do not have to come back.  And all I can do is thank you

3  for your time.  You are free to go.

4                    [Prospective juror out]

5               THE COURT:  Ready for Ms. Ervin.

6                    [Prospective juror in]

7               THE COURT:  Good afternoon, Ms. Ervin.

8  How are you?

9               PROSPECTIVE JUROR:  I'm fine.

10              THE COURT:  Doing okay?

11              PROSPECTIVE JUROR:  Yeah.

12              THE COURT:  A little bit nervous when you

13  are the focus of attention versus hiding in the Central Jury

14  Room with five hundred other people?

15              PROSPECTIVE JUROR:  Yeah.

16              THE COURT:  This is the only time that

17  the lawyers will ever have to talk to you individually about

18  their case and your jury service.  And my job is to be sure

19  that you understand the law.

20              PROSPECTIVE JUROR:  Okay.

21              THE COURT:  That's why I provided that

22  guide for you.  Did you have an opportunity to read that and

23  go through it?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  Did it cause more questions

1  than answers?

2                    PROSPECTIVE JUROR:  Yeah.  I have a

3  question about -- it's on page 4.  I'm not going to assume,

4  but what do you mean by the word "actor"?

5                    THE COURT:  Actor?

6                    PROSPECTIVE JUROR:  Yeah.

7                    THE COURT:  It could be a codefendant.

8  We use the word "party."  Sometimes you hear on TV

9  "accomplice."

10                   PROSPECTIVE JUROR:  All right.

11                   THE COURT:  You can substitute defendant,

12  as well.  You have someone who is not a defendant, but also

13  an actor in the crime.

14                   PROSPECTIVE JUROR:  I wanted to know if I

15  guessed it right.

16                   THE COURT:  Did you guess it right?

17                   PROSPECTIVE JUROR:  Yes.

18                   THE COURT:  Good.  We appreciate

19  questions like that.  Means you read it and are thinking

20  about it.  The attorneys will go over in more detail how

21  that law all interacts together, but my job is to be sure

22  that at the end of this process you understand what it

23  means.

24                   PROSPECTIVE JUROR:  Okay.

25                   THE COURT:  If you don't understand the

1  questions, you don't understand the law, say, Judge, I don't

2  understand.  Try to explain it to me again and we'll do

3  that.

4                    PROSPECTIVE JUROR:  No problem.

5                    THE COURT:  My question to you at this

6  point is will you be able to serve this Court for two weeks

7  beginning November 10th?

8                    PROSPECTIVE JUROR:  Um, yes.

9                    THE COURT:  Mr. Shook?

10                   MR. SHOOK:  May it please the Court.

11                        JILL ERVIN,

12  having been duly sworn, was examined and testified as

13  follows:

14                   DIRECT EXAMINATION

15  BY MR. SHOOK:

16        Q.     Ms. Ervin, my name is Toby Shook and I'm going

17  to ask you questions on behalf of the State.  There aren't

18  any right or wrong answers to any of our questions.  We just

19  want your honest opinions, all right?

20        A.     Okay.

21        Q      You have been pretty honest in your

22  questionnaire.  We appreciate you taking the time to fill

23  that out.  Believe it or not that saves you time.

24        A.     This is a little distracting.

25        Q.     You have to be able to speak up close enough.

1    You are close to her and your voice projects well.  Anyway,

2    I'm going to ask you some questions based on some

3    information that you put in here and also generally about

4    the laws and the death penalty and how you feel about it.

5         A.    Okay.

6         Q.    How long have you lived here in the Dallas

7    area?

8         A.    Been here for about 13 years.

9         Q.    Where did you live prior to that?

10        A.    Grand Prairie.

11        Q.    So you have lived in the Metroplex?

12        A.    I've been in Dallas -- well, I've been in

13   Texas, Dallas, first since 1972.

14        Q.    All right.  Let me ask you, on the death

15   penalty we asked -- you said that you are in favor of it as

16   a law.  And I don't know if you remember your answers, but I

17   like to give you your answer and then let you follow up on

18   it.  Okay?

19        A.    Okay, good.

20        Q.    Because we asked you to explain and you were

21   pretty straightforward.  You said if a person killed

22   someone, he or she should have the same fate.  Follow up on

23   that.  You are in favor of the death penalty as a law.  What

24   purpose do you think the death penalty serves?

25        A.    Um, well, it's, I think for most people it's a

1   deterrent.

2        Q.      Most people, it's a deterrent?

3        Q.      You do that, I mean, it's not like you crashed

4   into -- okay.  It's not like you crashed into a car or made

5   a mistake.  This is --

6        Q.      An intentional act?

7        A.      Yeah.  This is the word, that anyone can do.

8        Q.      Have you followed any cases in the media that

9   you thought were worthy of the death penalty or locally or

10  nationally?

11       A.      No, no.

12       Q.      Okay.  When you think of a capital murder case

13  or a death penalty case, what types of cases do you think

14  of?

15       A.      As a rule I don't generally watch the news.

16  The last big case, I guess, that I followed or paid any

17  attention to was the O. J. Simpson trial, so that's pretty

18  much.

19       Q.      What were your thoughts about that case?

20       A.      It was horrible.  And I believed that he did

21  it.

22       Q.      Okay.  And in 1994 you wrote that your cousin,

23  Ted, was shot to death by someone robbing a store.  Was that

24  here locally?

25       A.      Yes, it was.

1    THE COURT:  Did you say husband?

2    PROSPECTIVE JUROR:  No, it was my

3    husband's cousin, Ted.  He owned a pawnshop and --

4    Q.    (By Mr. Shook)  They came in and robbed?

5    A.    They came in and robbed and they shot him and

6    his business partner and they killed him.

7    Q.    Was he a former Dallas police officer?

8    A.    I don't believe so.  No, no, he wasn't.

9    Q.    Was his shop in the Pleasant Grove area?

10   A.    No.  It was close to the VA Hospital.  It was

11   on the same -- Lancaster, it was on Lancaster Road.

12   Q.    All right.  I thought it was a different case.

13   A.    Sorry.

14   Q.    Was anyone arrested in that case?

15   A.    No.

16   Q.    So it's still unsolved?

17   A.    Yes.

18   Q.    That case, you said, it influenced you, the

19   way that you feel about the death penalty?

20   A.    Well, it -- it wasn't -- it wasn't a case.  If

21   I put down case, I'm sorry.  Nothing happened.

22   Q.    I mean that event?

23   A.    Yes.  It was he had three beautiful children

24   and my cousin, Leslie, and --

25   Q.    Pretty emotional event?

1   A.   Yeah.

2   Q.   In fact, it still brings a lot of emotion to

3   you?

4   A.   Sorry.

5   Q.   That's okay.  We have that happen a number of

6   times.  Do you think that type of case, because you were

7   close or obviously caused effects on his family, and then

8   this is a similar type case, that that might affect you in

9   your deliberations or possibly?

10   A.   I don't think so, because I don't know any of

11   the particulars.

12   Q.   Sometimes we have cases, because you don't

13   know what type of case you are going to be brought down on

14   --

15   A.   Right.

16   Q.   -- and, obviously, most people don't have this

17   situation, fortunately.  If this was a burglary case or DWI,

18   you probably wouldn't have a problem at all.  But since you

19   have been close to a similar fact situation, sometimes it

20   brings up the emotions and that's fine, you know.  We can

21   always have you on another panel.

22   A.   Okay.

23   Q.   But you have a little emotion there and I

24   understand that.

25   A.   I'm sorry.

1    Q.    No.  We've had that before and that's why we

2    ask you that question.

3    A.    Okay.

4    Q.    And because you were close to that situation

5    and saw the effects, I'm just wondering if that might be a

6    factor or possibly could come up during, you know, the --

7    obviously, you start hearing similar facts in this type of

8    thing.

9    A.    I don't think that I would get emotional.

10   Because I don't -- okay.  I don't know any of these

11   particulars and I haven't -- and I don't even know who this

12   person is.  Apparently it's fairly recent.  But in 2000 I

13   was going through a divorce, so I wasn't paying attention to

14   anything that was going on in the news.

15   Q.    All right.

16   MR. SHOOK:  Your Honor, I think that we

17   have come to an agreement.

18   MS. BUSBEE:  Yes.

19   THE COURT:  Ms. Ervin, we appreciate your

20   honesty and willingness to serve, even on this type of case.

21   But the lawyers think it may be just a little too close for

22   this type of case and have agreed to excuse you from jury

23   service.

24   I want to thank you for your time and

25   coming back down here and having to relive that memory, but

1  you won't have to serve any further on this case.  So you

2  are free to go.

3                    PROSPECTIVE JUROR:  Thank you.

4                    THE COURT:  Thank you.

5                         [Prospective juror out]

6                         [End of Volume]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF TEXAS            *

2  COUNTY OF DALLAS          *

3      I, NANCY BREWER, Official Court Reporter for the 283rd

4  Judicial District Court, do hereby certify that the above

5  and foregoing constitutes a true and correct transcription

6  of all portions of evidence and other proceedings requested

7  in writing by counsel for the parties to be included in this

8  volume of the Reporter's Record, in the above-styled and

9  numbered cause, all of which occurred in open court or in

10 chambers and were reported by me.

11     WITNESS MY OFFICIAL HAND on this the 4 day of

12 _____March_____, 2004.

13

14

15

   NANCY BREWER, CSR, NO. 5759
16 Expiration Date:  12-31-04
   Official Reporter, 283rd JDC
17 Frank Crowley Crts. Bldg. LB33
   133 No. Industrial Blvd.
18 Dallas, TX 75207
   (214)653-5863

19

20

21

22

23

24

25

REPORTER'S RECORD

VOLUME 8 OF _6_ VOLUMES

**74851**

TRIAL COURT CAUSE NO. F01-00328-T

| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FILED IN**
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 29th day of August 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT:  03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT:  00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

## PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Georgia Portillo | 4 | 5 | | 8 |
| Mary Sullivan | 25 | 27 | | 8 |
| Jamie Garber | 34 | 35 | 65 | 8 |
| Brad Richards | 74 | 75 | 101 | 8 |
| Glenn Hamman | 117 | 119 | 151 | 8 |

PROCEEDINGS

1    
2    THE COURT:  Ms. Portillo.

3                [Prospective juror in]

4    THE COURT:  Good morning.

5    PROSPECTIVE JUROR:  Good morning.

6    THE COURT:  How are you?

7    PROSPECTIVE JUROR:  Okay.

8    THE COURT:  And your name is Georgina

9    Portillo?

10   PROSPECTIVE JUROR:  Yes.

11   THE COURT:  Thank you for being here on

12   time.  You were the second one we were going to talk to this

13   morning, but since you were here first and early and read

14   that, we got you in and probably saved you about an hour and

15   a half.  Sound good?

16   PROSPECTIVE JUROR:  Yeah.

17   THE COURT:  You recall being here back in

18   May and filling out that short questionnaire for us?

19   PROSPECTIVE JUROR:  Short?

20   THE COURT:  Yes, ma'am.  You recall that

21   you were under oath and sworn in and as you read you are

22   still under oath today.

23   PROSPECTIVE JUROR:  Yes.

24   THE COURT:  The main thing that the

25   lawyers ask is just tell the truth, give your honest

1  opinions, don't think he's going that way, she's going that

2  way.  Just say what is on your mind.  There are no wrong

3  answers.

4              My job is to be sure that you understand

5  the law and you have read very quickly this morning that the

6  law in this case can get somewhat complicated.  That's why

7  the lawyers are going to spend some time with you this

8  morning, go over the law, and if you don't understand it,

9  say I don't understand your question or would you rephrase

10 that and, as I said, the objective is for you to be able to

11 understand the law.  And they will ask you, can you follow

12 the law?  Fair enough?

13             PROSPECTIVE JUROR:  Okay.

14             THE COURT:  The only question that I have

15 for you, myself, is this trial is scheduled to begin on

16 November 10th.  Will you be able to give the Court two weeks

17 of your time?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  Very good.  Mr. Shook?

20             GEORGINA PORTILLO,

21 having been duly sworn, was examined and testified as

22 follows:

23             DIRECT EXAMINATION

24 BY MR. SHOOK:

25      Q.    Ms. Portillo, my name is Toby Shook.  I'm

1   going to ask you questions on behalf of the State.  You have

2   been on a jury before so you kind of know how this works a

3   little bit.  Although normally we select a jury from a large

4   panel, which I'm sure was done in your last case that you

5   served on, but -- and the questions were asked of the panel

6   as a whole and few individual questions.

7              But because it's a capital murder case

8   where the State is seeking the death penalty, we have this

9   process where we talk to each juror individually.  I know

10  that can be a little intimidating, at least make you feel

11  like you are on trial.  Most people come in feeling that

12  way.  But we try to make you as relaxed as possible and you

13  can ask us questions anytime.  We'll ask you a whole lot of

14  questions.

15             I'll go over some things in your

16  questionnaire.  I'm going to ask you how you honestly feel

17  about the death penalty, capital murder, some of the laws

18  that apply to this case.  All right?

19       A.    Okay.

20       Q.    You were born and raised here in Dallas?

21       A.    Yes.

22       Q.    And have worked here all your life.  Let me --

23  let me ask you this.  The Judge told you the trial should

24  last two weeks at the most and you indicated to him you

25  didn't think -- obviously, it would be an inconvenience, but

1   that wouldn't be a problem for you, if you were called to

2   sit down here for two weeks; is that right?

3         A.    That's correct.

4         Q.    Okay.  Let's talk, since you have had

5   experience in a trial, you put on your questionnaire that it

6   was a murder case and the defendant was sentenced to 80

7   years?

8         A.    Yes.

9         Q.    How long ago was that?

10        A.    Um, maybe a year and a half to two years ago.

11        Q.    Okay.  What -- tell us a little bit about what

12   you remember about the case, what type of facts, or what did

13   it involve?

14        A.    Well, it involved drugs.  Apparently somebody

15   knew somebody took them to another person's house.  That

16   person came back alone without the mutual friend and I guess

17   he wanted to take his drugs or something like that and

18   people shot at each other and the guy that lived at the

19   apartment ended up dead.

20        Q.    Ended up dead?

21        A.    Uh-huh.

22        Q.    So it was people involved in a drug

23   transaction?

24        A.    Something like that, yeah.

25        Q.    And they started shooting and one died?

1      A.      Uh-huh.

2      Q.      Okay.  How long did the trial last?  Do you

3  remember?

4      A.      Maybe two days and then we had -- were

5  sequestered one night or something like that, not too long.

6      Q.      So it wasn't a long process?

7      A.      No, not too long.

8      Q.      Did the defendant testify at trial?

9      A.      No, I don't think so, but I'm not sure.

10      Q.      Was a previous criminal record put on in the

11  punishment stage?  Do you remember?

12      A.      No, I don't think -- and I don't remember.

13      Q.      But primarily the punishment that was given

14  was just over the fact that a life was taken and the way it

15  was taken, the facts of the offense?

16      A.      Correct.

17      Q.      How did the deliberations go?  Were they

18  pretty smooth?  Or sometimes jurors tell us they were in

19  pretty much agreement and others tell us there were horrible

20  arguments back there.

21      A.      No, it went pretty smooth.  I think where we

22  had the problem was determining the actual penalty, the

23  actual time, or what have you.

24      Q.      And you came up with 80 years.  How was that

25  arrived at?

1     A.     Well, I mean, personally mine was -- I believe

2  in the death penalty and everything, but to be one to

3  actually say, to make that decision, it's kind of hard and I

4  think a lot of us felt that way, so we took apparently the

5  next best step we thought was to make it a permanent time

6  there.

7     Q.     Eighty years, was this case being tried for

8  the death penalty or was just the --

9     A.     I think it may have been.  I'm not sure.

10    Q.     Well, that's the next area I want to get into

11 is how you feel about the death penalty.  You told us that

12 you believe in it as a law?

13    A.     Yeah.

14    Q.     And you believe in the saying an eye for an

15 eye?

16    A.     Right.

17    Q.     Is that something that you were growing up or

18 taught as a child and you grew in maturity and believed in

19 the death penalty?

20    A.     Yes.  Basically out of my religion-type thing.

21    Q.     What purpose do you think the death penalty

22 serves?

23    A.     Um --

24    Q.     As a law, as a goal for punishment, just

25 punishment for punishment's sake, or to deter other people

1  from committing the crimes or --

2          A.      Um, I guess I do believe that it does take

3  that person out of society, if they have done something

4  horribly wrong.

5          Q.      Have you followed any cases or there's some

6  types of cases that you believe the death penalty should be

7  used for anything that you have seen in the news or your

8  personal beliefs?

9          A.      I don't really follow too much on them.  I do

10 believe where children are affected or killed and things

11 like that or even police officers.  I do believe that they

12 are there to protect and serve as a community, so we should

13 provide their protection.

14         Q.      So you believe the murder of a police officer

15 is one of the types of crimes that the death penalty should

16 be considered?

17         A.      Yes.

18         Q.      Okay.  Let me ask you this, while I'm thinking

19 about it.  This case received a lot of publicity when it

20 occurred and almost every juror has mentioned that they saw

21 something on TV and radio.  That's natural.  So we want to

22 talk to every juror about what they remember about the case.

23                 What do you remember reading or seeing on TV

24 when it occurred?

25         A.      Um, not very much to tell you the truth.  I

1    remember that -- I mean, I know the particular area that it

2    occurred at, that there were several, about four or five, I

3    guess, guys that were involved in that when they finally

4    caught them, I think, and that's really about it.

5        Q.      Okay.  Did you ever follow any of the trials

6    after they were caught?

7        A.      No.

8        Q.      Do you think that would influence you in any

9    way what you read or heard about the trial?

10       A.      No, I don't know very much of it.

11       Q.      That's -- the law is, if you read something,

12   you have to be able to put that away and just determine the

13   case based on the evidence.  And you wouldn't have a problem

14   doing that?

15       A.      No.

16       Q.      Let's talk about, a little more about the

17   death penalty.  The death penalty in Texas is reserved for

18   certain intentional murders, not every intentional murder.

19   You can have some bad killings and they couldn't get the

20   death penalty, but intentional killings that occur with some

21   aggravated facts.  And you mentioned a few.  Murders that

22   occur during the course of felonies such as robbery,

23   murdering someone while robbing a 7-Eleven store, killing

24   the clerk, that could be a death penalty case.  Murder or

25   kidnapping or burglary, someone breaking into a house and

1  they killed the homeowner, during a rape, during an arson.

2              Also, murder of a specific victim like a

3  police officer on duty, fireman on duty, or prison guard,

4  child under the age of six, would be a death penalty case,

5  or murder of more than one person in the same transaction or

6  series of transactions, mass murder, that sort of thing, or

7  a hitman situation, someone kills someone for money or

8  profit.

9              But those are the specific types of

10  situations that is reserved for the death penalty, at least

11  consideration of the death penalty in Texas.  That list I've

12  gone over, do you agree that those types of crimes are the

13  types that could be appropriate for the death penalty?

14        A.    Yes, I do.

15        Q.    If it were up to you, would you expand it and

16  include other types of murders or other types of crimes?

17        A.    Um, I don't know, possibly.

18        Q.    Possibly?

19        A.    Uh-huh.

20        Q.    Now, let's get down to another area.  A lot of

21  people tell us they believe in the death penalty.  Some

22  people told us they are against it, for religious reasons,

23  moral objections.  Not everyone that's for the death penalty

24  is comfortable or can sit in that type case.

25              We want to put all our cards on the table.

1  The way a death penalty case operates, you have the

2  guilt/innocence stage where we have to prove the defendant's

3  guilt.  And then if we do that, we move to the punishment

4  phase.  And in the punishment phase, you hear additional

5  evidence.  Then you make your decisions, looking at what

6  happened in the crime and any new evidence that you heard

7  about their background and then you get these questions.

8  And I'll go over the questions in a little more detail in a

9  little while.

10              But, basically, the questions ask is the

11  defendant a continuing danger to society?  Did he cause the

12  death or anticipate that a death would occur?  And is there

13  any mitigating evidence that a life sentence should be

14  imposed rather than a death sentence?  The jury does not

15  write death or life in, but they answer these questions.

16              And if you answer yes to the first two

17  and no to the mitigating question, the Judge would have no

18  choice.  He would sentence the defendant to death.  If they

19  are answered any other way, he would get a life sentence.

20  But those are the only two choices, once he's been found

21  guilty of capital murder, a death sentence or life sentence,

22  and that's determined by how the jury answers those

23  questions.

24              Are you familiar with the method of

25  execution in Texas?

1          A.     No, not really.

2          Q.     The procedures are the same.  And they're

3    covered sometimes on one of those high profile cases, that

4    sort of thing.  But the procedures are the same.  They would

5    be the same in this case.  If Mr. Murphy was found guilty

6    and these questions are answered yes, yes, and no, he would

7    be sentenced to death by the Judge and he would be placed on

8    death row.  He would wait in a cell.  I can't tell you how

9    long, but at some point in time Judge Cunningham would then

10   issue a date of execution.

11              Just prior to that date, the day before,

12   he would be moved from death row to downtown Huntsville

13   where there is a prison unit.  On the date of his execution

14   he would be given an opportunity to meet with his family,

15   friends, a minister.  He would be given an opportunity for a

16   last meal.

17              But at 6:00 p.m. by law the executions

18   take place.  He would be taken to the execution chamber.  He

19   would be placed on a gurney, because the method of execution

20   is by lethal injection.  He would be secured by leather

21   straps.  There are witnesses that are brought in.  Witnesses

22   that represent him, also witnesses for the victim.

23              The warden goes into the room.  After

24   he's secured, there's needles placed in his arm.  He's then

25   given an opportunity to make a last statement.  Sometimes

these are read in the paper the next day, asking for

forgiveness or expressing his innocence. But after that

statement is made, the warden signals the executioner and

poisons are injected into his body. It's poisons that act

very quickly while he is conscious. His lungs will

collapse. His lungs will force the air out. His heart will

be stopped and he will pass out into a coma within about ten

seconds.

And I don't detail that to be morbid, but I do

want to lay our cards out on the table because it's one

thing for us to talk about it philosophically, I believe in

the death penalty, it's right for some cases. And it's

another one when you get down here and you realize, I could

be placed on the jury and asked to make a decision that's

going to end someone's life some day. And I could be

reading about that and I would be responsible for that.

And I just want every juror to realize

that because it is our goal in this case that we feel we

have the type and quality of evidence that will convince a

jury to convict the defendant of this crime and to answer

those questions in a way that he would be executed some day

-- you probably know from reading in the papers that Texas

leads the nation in executions. Some states have it and

they never enforce it. You know in Texas that punishment

will be ultimately carried out and if these questions are

1  answered the way we think they will, Mr. Murphy will be

2  executed some day.

3          Some people can't sit on juries like this

4  and make these decisions and other people just say, I can't

5  do it for whatever reason and that's perfectly fine.  We

6  have no objection to that.  You just have to be able to tell

7  us that's the way you feel.  If you can do it, that's fine,

8  too.

9          But you talked a little bit -- I want to

10  make sure about this.  When you said, you know, I believe in

11  the death penalty.  I always have.  I just don't know if I'm

12  the one that could make that decision.  And that's what I

13  want to ask you about is to be as honest as you can with us,

14  if you were placed on a jury like this, would you be able to

15  take pen in hand and write in these answers, if the State

16  proves it to you, knowing that when you do that, this man

17  would be executed some day?

18          A.    I can answer the questions, yes.

19          Q.    And you feel you can take that responsibility

20  and do that?

21          A.    Yes.

22          Q.    When you said earlier about some hesitation,

23  what was going through your mind then?

24          A.    Well, it was just -- I mean, it is another

25  person's life.  Whatever he's done, he's done.  But, I mean,

1    in answering the questions, I could do that.

2        Q.    You feel you could?

3        A.    Yeah, I believe I could.

4        Q.    Let me get into another area.  When we talk

5    about capital murder we usually think about the triggerman,

6    the person that actually causes the death.  In any type of

7    crime you don't always have just one person committing the

8    crime.  Sometimes you have groups of people that commit

9    crimes.

10            The law says that if you all actively

11   participate in carrying out a crime, you could all be

12   responsible, even though one might have a greater role than

13   another.  Sometimes it takes more than one person to commit

14   a crime.  And the same is true with capital murder.  You can

15   have groups of people commit capital murder.

16            An example would be Mr. Wirskye and I,

17   let's say we want to rob a bank.  We go in there.  I have

18   the guns, but Mr. Wirskye, he's not armed.  He knows I have

19   guns.  He's got a bag.  We have another man that's outside

20   as our getaway driver.  We're all planning this out

21   together.  He waits outside and has the car running.  He's

22   going to shout at us if the police come.

23            I go in and I pull guns and I threaten

24   everyone and Mr. Wirskye starts gathering up the money.

25   Something goes wrong.  Maybe one of the tellers does

1  something I don't like.  Maybe one goes for an alarm.

2  Mr. Wirskye says that one is trying to get away.  Anyway, I

3  shoot them.  He didn't do it, the driver doesn't do it, I

4  shoot them.  We all run out.  We're captured soon after

5  that.

6              Obviously, I can be prosecuted for

7  capital murder.  I can receive the death penalty because I'm

8  the triggerman.  The law says that the other men involved,

9  Mr. Wirskye and the driver, can, also, be prosecuted for

10  capital murder and could even, depending on the facts, be

11  sentenced to death because they are just as responsible

12  under the law, if they are actively participating in this

13  crime.

14              Some people disagree with that part of

15  the law when it comes to the death penalty.  If it were up

16  to them, they would draw the line for someone deserving the

17  death penalty, as just -- they reserve it just for the

18  triggerman, the person who causes the death.  They might

19  have another very severe punishment, life sentence, 99

20  years, for the persons that helped them, the accomplices,

21  but they would not reserve the death penalty for them.

22  Other people feel the other way.  They think those people

23  should ultimately be given the death penalty.

24              How do you feel about that law as far as

25  the accomplices go?  I know you are fine with the

```
 1   triggerman, but in situations where there are other people
 2   that help, how do you feel about that?
 3          A.     Um, well, I mean, is it just specifically you
 4   were the only one with the gun?
 5          Q.     I'm sorry, what?
 6          A.     Are you saying that -- I mean, I guess, in
 7   other words, say from the news we know that you are the only
 8   one that had the gun.  Are you asking me -- I mean, are you
 9   asking me just because you have the gun, you shot, are the
10   other ones as equally as guilty?
11          Q.     Yes.  What I'm asking, do you have a problem
12   with the accomplices who don't have the gun being prosecuted
13   for capital murder --
14          A.     Oh, no.
15          Q.     -- and the death penalty?
16          A.     No.
17          Q.     Even if they didn't do any shooting?
18          A.     No.
19          Q.     You think that's fair?
20          A.     I do.
21          Q.     Why is that?  Why do you --
22          A.     Well, I mean, you go in with the idea of
23   robbing the bank.  Whatever end results, whether it was
24   planned or just you got nervous or whatever, he informed you
25   that person was reaching for the alarm, so what's the
```

1   difference?  He's signaling you for whatever action you

2   took.

3          Q.     So you feel he's just as responsible?

4          A.     Uh-huh, yes.

5          Q.     That's what the law envisions.  But I want to

6   make sure you are on board with that, because it is our

7   theory and we will prosecute this case under what we call

8   the law of parties.  We will prosecute Mr. Murphy as an

9   accomplice in that he's not the triggerman, but a party and

10  accomplice to the offense.  You have no problem with that?

11         A.     No.

12         Q.     Okay.  The way the law says is we can prove it

13  in two ways, either you are actively participating,

14  encouraging, aiding the offense to occur, and we'll

15  probably, usually you prove both methods, but you only have

16  to prove one.  Or the law also says if we enter into a

17  conspiracy, say Mr. Wirskye and I -- and a conspiracy is

18  merely just an agreement.  We decide we want to rob the

19  bank.  And if we're committing that, robbing the bank, and

20  one of us commits another offense, and in this case murder,

21  and in order to further that robbery, then we are all held

22  responsible, if we should have anticipated that something

23  like that should happen.

24                And I think that you kind of explained

25  that when you said, hey, you knew that guy had a gun.

1    A.    Uh-huh.

2    Q.    You know, you warned them that someone was

3  going for an alarm, so you should have known what was going

4  to happen.  You can use that loaded weapon and kill someone.

5    A.    Uh-huh.

6    Q.    Just a common sense principle.

7    A.    Uh-huh.

8    Q.    Maybe the theory would be different, if you

9  didn't know he had a gun.  And the example that I gave,

10  everyone knew he was armed and that sort of thing.  And then

11  that's how we have to go about proving this case and you

12  have no problem with that?  You agree with the law?

13    A.    No.

14    Q.    Let's talk a little bit about these Special

15  Issues.  I want to go over them kind of one at a time.  So

16  if you would take a moment to read Special Issue No. 1 to

17  yourself.

18    A.    [Prospective juror complies.]

19    Q.    Okay.  Question No. 1, it asks kind of for you

20  to make a prediction.  Starts out with a no answer under the

21  law and we have to prove from the facts of the crime itself

22  and any other evidence that you hear, that it should be

23  answered yes.

24         Now, you don't get to this question until

25  you have found the defendant guilty of capital murder.  And

1   it asks whether there's a probability that the defendant

2   would commit criminal acts of violence that would constitute

3   a continuing threat.  You see how that question is asking

4   you to make a prediction about how they are going to act in

5   the future?

6                    Let me ask you, first, do you feel you

7   could answer that question if you are given sufficient

8   facts?

9        A.     Yes.

10       Q.     Okay.  What would be important to you in

11  answering that question?

12       A.     Well, um, I guess it's previous -- not

13  previous, but if you had been in trouble before, I guess.

14       Q.     Okay.

15       A.     If we get to find that out or, um, I guess

16  just his behavior.

17       Q.     Okay.  If he has a criminal record and been in

18  trouble before, that type of evidence is admissible in that

19  stage of the trial.  It can go into that consideration and,

20  obviously, the crime itself, committing the murder, is

21  something that you can consider.

22                    Do you feel that you could get enough

23  information from the facts of the crime itself to enable you

24  to answer that question yes?  Their role in the crime, how

25  it happened?

1        A.      I believe so.

2        Q.      Okay.  Now, let me ask you this because people

3   feel differently and I want to get your honest opinion on

4   this when you get to this question.  You would have just

5   found the defendant guilty of capital murder, that is, you

6   believe he committed beyond a reasonable doubt.  Some people

7   tell us, if I have reached that decision where he is guilty

8   of capital murder beyond a reasonable doubt and this is the

9   future danger question, they are going to be a danger.  That

10  tells me enough at that point in time that he's going to be

11  dangerous.  He's committed capital murder.  Other people

12  tell us, no, that doesn't answer the question.  And, as I

13  said, people feel differently about that.

14               How do you feel about that situation

15  based on that question No. 1, the future danger question,

16  once you found him guilty of capital murder?

17       A.      What is the question?  I'm sorry.

18       Q.      Do you feel that that finding alone, he's

19  guilty of capital murder beyond a reasonable doubt, do you

20  think that answers yes to No. 1 for you that he is a

21  continuing danger to society?

22       A.      Yeah, I think so.

23       Q.      And why is that?

24       A.      Well, I mean, if he killed for whatever

25  reason, robbing a place, I guess, I mean, what makes us not

1  believe that if he gets a chance again that it wouldn't go

2  the same way?

3          Q.     Okay.  Let me ask you how you feel about some

4  of the language in question No. 1.  We have to prove that

5  there's a probability that the defendant would commit

6  criminal acts of violence in the future.  What does

7  "probability" mean to you in that sense?

8          A.     Just a possibility, the slightest chance.

9          Q.     Slightest chance, okay.  How about "criminal

10 acts of violence"?  What does that mean to you?

11         A.     That would be a robbery, a threat towards

12 family -- anybody, I guess, kids and adults.

13         Q.     A threat to another human?  And how about

14 "society"?  What does that mean to you?

15         A.     Just means me, my community.

16         Q.     Okay.  Question No. 2, will you take a moment

17 to read that to yourself?  That one is a little bit longer

18 and is a little more complicated.

19                MR. SHOOK:  Judge, may we approach?

20                THE COURT:  You may.

21                    (Bench conference)

22                THE COURT:  Ms. Portillo, the parties

23 have agreed we're not going to have you on this jury, but I

24 want to thank you for your time and your service to this

25 Court and this county and how much more you have learned

1  going through this process.  But this is not the case that

2  you will be seated on.

3          So you got in early and you saved about an

4  hour and a half and you are out the door before 9:00.  Not

5  too bad.  We appreciate your time and you are free to go.

6  Thank you.

7                    [Prospective juror out]

8                 THE COURT:  Has Sullivan arrived?

9                    [Prospective juror in]

10                THE COURT:  Good morning.

11                PROSPECTIVE JUROR:  Good morning.

12                THE COURT:  How are you?

13                PROSPECTIVE JUROR:  I'm fine.

14                THE COURT:  And your name is Mary

15 Elizabeth Sullivan?

16                PROSPECTIVE JUROR:  Yes.

17                THE COURT:  Good morning.  I want to

18 thank you for being here.  I see you brought your reading

19 material.  We didn't have you wait too long.  Did you have

20 an opportunity to review the guide that I provided for you?

21                PROSPECTIVE JUROR:  Yes.

22                THE COURT:  And the witness list?

23                PROSPECTIVE JUROR:  Um, no, sir.

24                THE COURT:  Didn't get a witness list?

25                PROSPECTIVE JUROR:  There was one in

1   there, but they just told us this.  They didn't say anything

2   about the witness list.

3                  THE COURT:  All right.  My job today is

4   to be sure that you understand the law, as you have read,

5   hopefully, a couple of times.  The law can be somewhat

6   complicated and can be overwhelming.  So our job here is to

7   be sure that you understand the law and the attorneys will

8   ask you questions about that.  If you don't understand the

9   question or if you do not understand how the law works, just

10  please tell us.

11                 PROSPECTIVE JUROR:  Okay.

12                 THE COURT:  The question that I have for

13  you is this trial shall begin on November 10th.  Will you be

14  able to give the Court two weeks of your time?

15                 PROSPECTIVE JUROR:  Um, it would be hard

16  because of my job.

17                 THE COURT:  I read that Medicare,

18  Medicaid billing.

19                 PROSPECTIVE JUROR:  For a nursing home.

20                 THE COURT:  And it would be an imposition

21  on your job, but they will just have to deal with that.

22                 PROSPECTIVE JUROR:  Yes.

23                 THE COURT:  I mean, we can't give

24  business reasons, trust me.  If, as I said to the general

25  panel, if I let everybody off that had a business excuse, we

1   wouldn't be able to have any jurors down here.  So I

2   understand it may be a hardship for your employer, but

3   that's just the way it goes.  Sometimes they will have to

4   understand.

5                    PROSPECTIVE JUROR:  Okay.

6                    THE COURT:  So with that, Mr. Wirskye,

7   you may inquire.

8                    MARY SULLIVAN,

9   having been duly sworn, was examined and testified as

10  follows:

11                   DIRECT EXAMINATION

12  BY MR. WIRSKYE:

13       Q.    How are you this morning, ma'am?

14       A.    I'm fine.

15       Q.    My name is Bill Wirskye and I'll be the

16  assistant DA that's going to visit with you a little bit

17  this morning, talk a little bit about some of the

18  information in your questionnaire.

19       A.    Okay.

20       Q.    Talk a little bit about how you feel, your

21  thoughts and feelings on the death penalty, and then talk to

22  you maybe about some of the law that may apply here, if you

23  are selected as juror in this case.

24             I know you told the Judge it would be a

25  hardship for your work?

1    A.    Yes.

2    Q.    Would you kind of tell us a little more

3  detail?

4    A.    I do the billing for six nursing homes that we

5  own.  I'm the only one right now that can do the Medicare

6  billing, so it would be a delay in funds for our nursing

7  homes.

8    Q.    Okay.  Would it interrupt the cash flow, is

9  what you put in the questionnaire maybe?

10    A.    Yes.

11    Q.    Would that be a major disruption for your -- I

12  guess what I'm --

13    A.    It would if we could -- I mean, there would

14  have to be a way that we would have to plan ahead to do it.

15    Q.    Do you think that given enough notice you

16  could make some arrangements?

17    A.    Probably, yes.

18    Q.    Okay.  How long -- what company is that that

19  you work with?

20    A.    It's called Paramount Healthcare.  I work at

21  the corporate office.

22    Q.    How long have you worked there?

23    A.    For -- since 1996.

24    Q.    Okay.  Before we get into all the serious

25  stuff, you said that your favorite show is "Trading Spaces"?

1    A.    Yes.  I'm not, you know, just --

2    Q.    That's what my wife and I do every weekend is

3 "Trading Spaces" or "While You Were Out".  So who is your

4 favorite designer?

5    A.    Vern.

6    Q.    Okay.  Do you like Genevieve?

7    A.    Not really.

8    Q.    Me neither, not a big fan of hers.  One thing

9 that we ask in the questionnaire and it's a little unfair we

10 talk about it, you filled it out in May and you have not

11 seen it and we all have copies of it, but when you are

12 talking about asking -- I guess, the first thing that popped

13 into your mind about prosecutors you said "Well, normally

14 stay within the law to convict".  And I was just wondering

15 what that means or coming from TV or --

16    A.    It is really because watching -- they have had

17 shows recently where they show one of the like the "Law and

18 Order" shows and sometimes you just wonder what they're

19 thinking when they're doing things and --

20    Q.    Not having been a prosecutor for a while the

21 things that they do on "Law and Order" surprise me.

22    A.    They have the real one, "Criminal Intent"

23 where they have actual cases.

24    Q.    What do you think about that series?  I

25 watched it a little bit.

1   A.   Um, sometimes I didn't think they did enough

2   research on their job or asked enough questions or sometimes

3   I thought they had evidence staring them in the face that

4   they didn't use.  But that might be because it's a TV show

5   and we didn't see everything.

6   Q.   The way it's edited?

7   A.   Uh-huh.

8   Q.   Okay.  If you are selected to serve as juror

9   in this case, are you going to have that in the back of your

10  mind as you watch us try our case?

11  A.   I would hope not.  We're not supposed to do

12  that.  So I would hope that I could come with the right

13  frame of mind for what it is.

14  Q.   Uh-huh.

15  A.   But I do, to be honest, I do tend to be

16  conservative, so that's going to play a part, I'm sure.

17  Q.   A lot of times we ask jurors to come down here

18  and not think or not consider about things they know to be

19  facts.  And in a sense that's a little bit unfair.  But let

20  me ask you this.  You, like almost everybody we talked to,

21  has mentioned that they have heard some of the publicity

22  about this case.

23  A.   Yes.

24  Q.   Can you tell us what you have heard or what

25  you remember about this case?

1    A.    Um, I would say about the defendant, nothing

2    personal.  I know absolutely nothing about this person.  I

3    don't know even what he was in jail for previously when he

4    escaped.  Just -- I haven't read up on it or anything to

5    that extent.  What I've heard has been on the radio or on

6    the TV news.

7    Q.    Okay.  Do you remember any details you may

8    have heard?

9    A.    Um, to be honest, just what the account of

10    what the crime was and what, you know, what happened and I

11    don't even know that that's fact, to be honest.  I mean,

12    just about the shooting that, you know, they rolled over the

13    police officer, supposedly.  I don't know that to be fact,

14    though.  That's just how it was reported.

15    Q.    Knowing those details or having heard that,

16    how do you think it may affect you if you actually get over

17    in the jury box and become one of the jurors in this case?

18    A.    I think that, unfortunately, knowing that if

19    it was true that it would really bother me in the sense that

20    it just couldn't be a robbery, that they had to roll over

21    the policeman with the car.  That would bother me.  I mean,

22    that display, I guess, a part is on my mind right now.

23    Q.    Okay.  And we talk to a lot of people and

24    people have heard differing information and formed different

25    opinions one way or another about this case.  And you know

1    yourself more than anyone what is in your heart of hearts.

2    You know, do you think it might affect your ability to

3    listen to the case or kind of --

4         A.    No.   I think that I could be openminded.   I

5    mean, I don't -- don't -- it's not that I can't be swayed

6    one way or the other.   I would like to be able to think that

7    I could hear facts and make a determination that way.

8         Q.    Okay.   I know -- I guess we all like to think

9    that, but --

10        A.    Right.

11        Q.    I guess what both sides are worried about,

12   what we have already spoken about, you have heard something

13   about this case and you are watching the trial and all, you

14   don't hear about it and why isn't the prosecutor doing this

15   or --

16        A.    Right.

17        Q.    You have the same thing with the defense

18   lawyers.   I mean --

19        A.    That wasn't favorable at all, I know.

20        Q.    Yeah.   But like I said, I know sometimes it's

21   unnatural to ask people to do that.   I just want to make

22   sure that you would be able to complete -- able to

23   completely clear your mind and just focus on what you hear

24   in the courtroom?

25        A.    I don't honestly know that I could completely

1  put it out of my mind, no.

2      Q.    So you think maybe what you heard, read, seen,

3  may possibly affect your verdict, something outside the

4  courtroom?  And that's okay if it does.  Like I said, we

5  talk to a lot of people.  We just really need to know in

6  your heart of hearts --

7      A.    I think with what -- I think my mind focuses

8  more on the other -- the other verdicts of the other

9  defendants, knowing that they have all been tried and

10 convicted and all have gotten the same penalty.  I think

11 that would play more on my mind than the brutality of the

12 crime, to be honest.

13     Q.    Okay.

14     THE COURT:  Ms. Sullivan, the parties

15 appreciate your honesty and you may have made a comment that

16 maybe I shouldn't have said that, but that's exactly what

17 they need to hear.  You are being honest.  It may cause a

18 problem and you want to be fair and a lot of people aren't

19 as honest with themselves as you are.  This case is just not

20 the right one for you.  The parties have agreed to excuse

21 you.

22     Thank you for coming down and now you

23 don't have to worry about your billing problems, but you can

24 tell your employer, the Judge would have made me do it

25 anyway.  But you don't have to serve on this case, so you

1    are free to go.

2                        PROSPECTIVE JUROR:  Thank you.

3                        [Prospective juror out]

4                    THE COURT:  Ms. Garber.

5                        [Prospective juror in]

6                    THE COURT:  Good morning.  How are you?

7                    PROSPECTIVE JUROR:  Good.  How are you?

8                    THE COURT:  Your name is Jamie R. Garber?

9                    PROSPECTIVE JUROR:  Garber.

10                   THE COURT:  Ms. Garber, thank you for

11   being here this morning.  Have you had enough time to review

12   the guide we provided for you?

13                   PROSPECTIVE JUROR:  Yes.

14                   THE COURT:  And did you look at the

15   witness list?

16                   PROSPECTIVE JUROR:  Yes.  I glanced over

17   that.

18                   THE COURT:  That's a lot of law to put on

19   someone at 8:30 in the morning.

20                   PROSPECTIVE JUROR:  It's all right.

21                   THE COURT:  And we don't expect you to be

22   able to memorize that.  The objective of the Court is for

23   you to be able to understand the law.  Once you understand

24   the law, can you follow the law?  That's the main -- my main

25   purpose here.  If you don't understand the questions or

1   concept that's being discussed by the attorneys, just say,

2   would you rephrase that or I don't understand.  You know,

3   this is the only time that you really get to interact with

4   the lawyers and the Court.

5                    PROSPECTIVE JUROR:  Okay.

6                    THE COURT:  Sometimes looks like you are

7   the one on trial.  We're certainly not trying to intimidate

8   you by any means.  It's just the only way that we can really

9   have an opportunity to visit with you.

10                   The question I have for you is, I've

11  given you the trial date of November 10th.  I need you for

12  two weeks.  Would you have any problem serving the Court

13  with that time period?

14                   PROSPECTIVE JUROR:  No, sir.

15                   THE COURT:  Mr. Shook?

16                        JAMIE GARBER,

17  having been duly sworn, was examined and testified as

18  follows:

19                     DIRECT EXAMINATION

20  BY MR. SHOOK:

21       Q.     Ms. Garber, my name is Toby Shook.  I'll be

22  asking you questions on behalf of the State this morning.

23  You have been down on jury duty before?

24       A.     Yes.

25       Q.     I was just looking at your questionnaire and I

1    couldn't tell if you actually served on a jury.

2         A.    I was on one in Coppell.

3         Q.    Okay.  One of the city courts?

4         A.    Yes, yes.

5         Q.    Did it have something to do with parks, park

6    rules?

7         A.    Yes.

8         Q.    Normally juror selection, you probably know

9    this -- how many times have you been called down?

10        A.    Three.

11        Q.    Okay.  So we get you a lot, I guess.  Normally

12   we talk to the jurors in a big panel and then maybe have a

13   few individual questions.  But because it's a capital murder

14   case where we're seeking the death penalty, the law requires

15   us to do it individually.  It's kind of a job interview

16   situation almost.  But you look pretty comfortable up there.

17   The rules are, if you have any questions you want to ask of

18   us, feel free to at any time.  All we want to know are your

19   honest opinions on these things.  Okay?

20        A.    Okay.

21        Q.    We can't go into the specific facts of this

22   case.  But, obviously, we may go into hypotheticals, ask you

23   how you feel about other cases, that sort of thing.  I'm

24   going to talk about some of the information given us in the

25   questionnaire and, also, how you feel about capital murder,

1    the laws that might apply.  All right?

2         A.    Okay.

3         Q.    I see from your questionnaire you work at the

4    -- How do I pronounce that?

5         A.    It's the Insco Dico Group.

6         Q.    I kept looking at dico and thinking disco.

7         A.    Most people do.

8         Q.    What do you do with them?

9         A.    We are a security bond company.

10        Q.    Okay.  And you have been with them how long?

11        A.    A year.

12        Q.    All right.

13        A.    As of July 29th.

14        Q.    Have you been in that type of business for

15   some time?

16        A.    Yes.  About, um, six years, I believe, six or

17   seven years.  I was in commercial insurance before that.

18        Q.    Okay.  I also saw that you -- and this

19   questionnaire covers a little bit of everything.  Believe it

20   or not, it is quite helpful to us.  Some of the questions

21   might sound ridiculous, but your favorite radio station is

22   1310, "The Ticket"?

23        A.    Yes.

24        Q.    What show do you like the best?

25        A.    I like "The Musers" and "The Hardline" in the

1  afternoon.

2        Q.      I enjoy that, too.

3        Q.      The jury you sat on in Coppell, that was just

4  someone violating the park rules?

5        A.      Yes.

6        Q.      Like a --

7        A.      They were playing on the field without

8  authorization.

9        Q.      Was that -- that case didn't take you a real

10  long time?

11        A.      No.

12        Q.      Let me ask you, then, a few questions from the

13  questionnaire.  We asked a whole lot of questions about the

14  capital murder, obviously, and specifically this case and

15  what you have heard about it and how, generally, you feel

16  about a capital murder.  You know that the State is seeking

17  the death penalty, so we, obviously, want to talk to you

18  about how you feel about the death penalty.

19              You put in your questionnaire that you

20  favor it as a law and what I want you to do is kind of in

21  your own words tell us why you favor it as a law or the

22  objective that you feel the death penalty has as a

23  punishment?

24        A.      Well, I believe that depending on what type of

25  crime was committed, that the death penalty should be asked

1  for.  I'm a little nervous up here, so please forgive me.  I

2  have not been -- considering this crime and what happened, I

3  believe that the death penalty should be given.

4       Q.    Okay.  When you say "this crime" you mean --

5       A.    The one that you're -- I'm here for.

6       Q.    We ask because this is a high publicity crime

7  in which people followed it a lot when it first occurred and

8  you are no exception.  You, obviously, followed it in the

9  news, the newspapers.  The law is this, just because you

10 have seen something or read something, doesn't necessarily

11 disqualify you as a juror.  However, some jurors have seen

12 more than others and followed the cases more closely than

13 others.

14              What do you recall about the case when

15 you followed it?

16       A.    That it happened at Oshman's.  Just describe

17 what I have read about it?

18       Q.    Just what you remember.

19       A.    That apparently the people were in Oshman's,

20 acting kind of strangely, and they were there to rob the

21 place.  And apparently -- I can't remember if they took guns

22 from Oshman's or if they already had them with them, but, of

23 course, they were -- the intent was to get away with goods

24 and by whatever means possible to try to escape, if they

25 were caught.

1          And the police officer showed up and I

2    don't know if he was in the back of the building or in the

3    front of the building when all this happened, but he was

4    shot. And I don't know if this is correct, but he was run

5    over, also.

6          Q.   Did you follow the crime after it occurred,

7    involving the capture and that sort of thing?

8          A.   Yeah. Apparently, they were caught in

9    Colorado in a trailer park area.

10         Q.   Okay. How about any subsequent court

11   proceedings with any of the individuals? Did you follow any

12   --

13         A.   Not too closely, no, I did not.

14         Q.   Here's what the law is. Obviously, we can't

15   ask you to forget everything you have heard. That would be

16   impossible and defies common sense. The law recognizes that

17   it's one thing to read things in newspapers and it's another

18   thing sitting on a jury and deciding these facts.

19         A.   Right.

20         Q.   Obviously, the jury has to decide and base

21   their decisions just on what they hear in the courtroom and

22   not on what they have seen on TV or newspapers because your

23   better information is, common sense, it's going to come from

24   the actual witnesses.

25         A.   Right.

1  Q.    Because the newspapers and TVs often get

2  things wrong.  In fact, they always get things wrong.

3  That's why we try cases here in the courtroom with

4  witnesses.

5          What the Judge instructs the jurors is

6  you have to decide this case based on what you hear in the

7  courtroom from the witnesses and cannot let what you have

8  read or heard influence you in your decisions.  And some

9  people can do that, you know, they recognize that this

10 information isn't the best.  Maybe they didn't follow it

11 closely and they cannot forget about it, but they would make

12 their decision and require the State to prove their case

13 just based on the witnesses.

14         And we just want your honest answer on

15 that.  You have read a lot.  You followed the cases pretty

16 closely, at least when it happened.  Would you be able to

17 follow that particular part of the law or from what you have

18 already read and heard, would that, you think, influence you

19 in your decision?

20 A.    I think I would try my best.  But just -- I

21 don't know.  I get emotional because of what happened.  I

22 would try to do that (juror crying).

23 Q.    And I appreciate your honesty because,

24 obviously, it got a lot of attention.  And you, like a lot

25 of people, were real interested in the crime.  And that's

1  all I want is your honest opinion. Some people can follow

2  that instruction and that's fine. And other people tell us

3  I'm a little too close to this case and it's going to

4  influence me from -- I've already formed an opinion as to

5  guilt and punishment and that might stay there.

6             Other people tell us, no, I mean, I

7  remember seeing a brutal crime, but I'm going to wait and

8  make my decision on what I see in the courtroom. But

9  there's no right or wrong answers. I just want your honest

10  opinion. I know the defense wants to know this just as much

11  as I do. And the Court, obviously, makes this decision.

12      A.      Well, I would do my best to go away from what

13  I've read. But with any crime that's like this for murder,

14  it's kind of hard to, I would think.

15      Q.      Do you think even if you tried your best,

16  there might be --

17      A.      I don't know. I can't -- I don't know. I

18  think I would. I think I would try to keep from reading,

19  you know, keep from what I read in the newspapers and just

20  base my opinion on what the defense and the prosecutors have

21  told me.

22             MR. SHOOK: Judge, can I approach just

23  one moment?

24             THE COURT: You may.

25             (Bench conference)

1    Q.    (By Mr. Shook)   I take it, then, from your

2  last answer, as best you know yourself, you believe that you

3  can do that and make the decision just on what you hear in

4  the courtroom?

5    A.    Yes, sir.

6    Q.    Okay.   Fair enough.   Let me -- you, obviously,

7  believe in the death penalty and you put in your

8  questionnaire that, you know, it just kind of depends on the

9  facts of the case.   In Texas the death penalty is reserved

10  just for certain types of murder cases.   We have some brutal

11  murder cases that actually could never get the death

12  penalty, but a lot of people wish we could.

13          But you have to go by certain guidelines.

14  We have a life sentence.   If I pull a gun out now and shoot

15  Mr. Wirskye in the heart, I couldn't get the death penalty.

16  Capital murder is an intentional murder that occurs with

17  other aggravating factors, during the course of a felony,

18  murder someone during a robbery, kidnapping, rape, during a

19  burglary, that could be a death penalty case.   Murder of a

20  police officer, prison guard, or fireman while on duty, that

21  could be a death penalty case, or child under the age of

22  six, or multiple victims.

23          But those are the type of cases that are

24  reserved for the death penalty.   And I take it from the

25  answers that you have in your questionnaire that you agree,

1    depending on the facts of the case, that those are the types

2    of cases that you feel could be appropriate for the death

3    penalty under the proper circumstances?

4        A.    Yes.

5        Q.    Okay.  A capital murder trial is divided into

6    two parts like all criminal trials.  We have the

7    guilt/innocence stage where we have to prove the guilt.  And

8    if we fail to do that, it's a not guilty finding and

9    everyone goes home.  If we meet our burden of proof and

10   prove the defendant guilty, we then move to the punishment

11   phase.

12            At the close of the punishment phase, the

13   jury gets these questions.  We'll go over those in more

14   detail in a minute.  But, basically, it asks is the

15   defendant a continuing danger to society?  Did he cause the

16   death or if he didn't cause the death, did he anticipate a

17   death would be taken and is there any mitigating evidence

18   where you think a life sentence should be imposed, rather

19   than a death sentence?

20            If the questions are answered yes, yes,

21   and no, the defendant would be sentenced to death.  If they

22   are answered any other way, it's a life sentence.  But those

23   are the only two alternatives once you found him guilty.  It

24   will be a death sentence or life sentence.  It all depends

25   on how the questions are answered.  We'll go over those in

1    more detail.

2         A.    Okay.

3         Q.    Going a little further, when we talk about

4    capital murder we usually envision circumstances of a

5    person, the triggerman, causing this.  Now, in any type of

6    crime you sometimes have more than one person committing the

7    crime, groups of people who commit crimes.  And the law says

8    that if we actively participate, encourage, help commit a

9    crime, we are all held responsible, even though someone may

10   have a greater role.

11        The same is true of capital murder.  The

12   example I want to give you is Mr. Wirskye and I, let's say

13   we want to rob a bank.  Our plan is we'll go there.  I have

14   the gun.  He knows that, but he's going to be the bag man.

15   I hold the gun on everyone.  He gathers up all the money.

16        At some point in time, maybe I start

17   shooting the teller because I don't like him or Mr. Wirskye

18   warns me they are going for an alarm or something and I

19   shoot.  We leave and we're caught.  Obviously, I could be

20   charged with a capital murder and could be prosecuted for

21   the death penalty because I'm the triggerman.

22        Under our law Mr. Wirskye can, too,

23   depending on the facts, because he actively participated in

24   the crime.  He was my accomplice.  There's a couple of

25   theories how that works, but the bottom line is this.  He

1   could be prosecuted for capital murder, and depending on the

2   facts, he could get the death penalty, even though he's the

3   nontriggerman.   Okay?

4              People feel differently about that law.

5   Some people, if it were up to them, they have no problem

6   with the death penalty for the triggerman.   The accomplice

7   that assisted in committing the offense, though, they have

8   reservations about.   But if it were up to them, they would

9   have a different punishment, maybe just a long prison term

10  for that person.   Other people agree with the law and tell

11  us, I agree with the law.   Accomplices that are helping

12  commit the capital murder should be held responsible, too,

13  and ultimately could get the death penalty, depending on the

14  facts, even if they are not the actual triggerman.   It all

15  comes down to the facts.   But they agree with the law in

16  that regard that the accomplices should be held responsible.

17             People differ on that.   And I want to ask you

18  how you feel about an accomplice being prosecuted for

19  capital murder and ultimately receiving the death penalty.

20  Do you feel that's fair, depending on the facts of the

21  particular case?

22       A.    On a capital murder trial?

23       Q.    Yes.

24       A.    Yes.

25       Q.    Okay.   Do you feel it's fair that an

1   accomplice could actually get the death penalty, even though

2   they didn't actually pull the trigger, depending on the

3   facts?

4       A.      That they could actually get the death

5   penalty?

6       Q.      Yes, ma'am.

7       A.      Yes.

8       Q.      Why is that?

9       A.      Because they were there.  They were an

10  accomplice to whatever is happening.  They knew what was

11  going to go on.

12      Q.      Okay.  So it depends on their role?

13      A.      Depending on their role.

14      Q.      And if they knew what was going on?

15      A.      (Prospective juror nods head.)

16      Q.      Okay.  Now, I want to talk about these Special

17  Issues for a moment because you only get these in a death

18  penalty case.  You don't get to these Special Issues until

19  or unless the defendant is found guilty.  Once he's been

20  found guilty, you can hear additional evidence, background

21  evidence, good and bad, about a person's background,

22  evidence, good and bad, about a person.

23              Go back into deliberations and you

24  consider what you heard in the guilt/innocence stage and,

25  also, any new background information, good and bad, you

heard about the individual and you answer these questions

separately as a juror.

Now, as you know from growing up here,

that everyone starts out with that presumption of innocence.

The State has to prove a case beyond a reasonable doubt.

And in the punishment stage on these first two questions,

those start out with no answers and we have to prove the

evidence beyond a reasonable doubt that they should be

answered yes.   The burden of proof stays on us on the first

question.   We use the evidence of the crime itself.

So you go back and you have already made

a decision on guilt/innocence, but you kind of look at that

evidence again from a different angle and decide, okay, how

that applies to question No. 1, has the State proven its

case to me that he's a continuing danger and any new

background information you have learned about him.

The question asks whether there's a

probability that the defendant would commit criminal acts of

violence that would constitute a continuing threat to

society?   It's asking the jurors to make a decision, do you

think he's going to be a dangerous person and commit

criminal acts of violence in the future?   So it's asking you

to make kind of a prediction of how they will behave in the

future.

Do you feel comfortable in making that

1   decision, if you are given enough evidence?

2        A.     Yes, sir.

3        Q.     Okay.  Now, the evidence you can use is his

4   role in the crime, what you found in the guilt/innocence

5   stage, as well as if he's had a prior criminal record or

6   lack of criminal record, you have seen a pattern before,

7   that sort of thing.  You can even hear from those witnesses

8   on the previous crime, if they exist, or you can hear good

9   character evidence.  Maybe it's the first time he's ever

10  done something.

11            We can't preview the facts for you.  I

12  could give you a whole bunch of scary facts or I could give

13  you a whole bunch of facts that show the person is not

14  dangerous.  The point is this.  As a juror you have to wait

15  until all the evidence is in so you have all the information

16  before you make that decision.  Just because you found

17  someone guilty of capital murder, proven beyond a reasonable

18  doubt, you don't go and answer yes right away.  It's no

19  automatic answers.  If they were automatic answers based on

20  your guilty verdict, there wouldn't be any reason even to go

21  through this process.

22            The law instructs the jurors and believes

23  that the jurors should wait, listen to all the evidence, and

24  then go back and deliberate and then make their decision

25  based on the evidence.  If you think beyond a reasonable

1  doubt that he is a continuing danger, you would answer the

2  question that way.  If you don't think the State has proven

3  it, even though he's guilty of capital murder, you would

4  answer it no, leave it as a no.  And that's fine.  You just

5  have to call it the way you see it based on the evidence.

6              In other words, there's no automatic

7  answers.  Just because you found him guilty, you don't go

8  check the yes off.  It's just going to depend on the facts

9  of that particular case.  Do you feel that you can follow

10  that portion of the law?

11         A.     Yes, sir.

12         Q.     And could you wait and require the State to

13  prove to you beyond a reasonable doubt that it should be

14  answered yes?

15         A.     Yes.

16         Q      And could you -- would you not automatically

17  answer yes just because you found him guilty?  In other

18  words, you would wait and listen to all the additional

19  evidence in the punishment stage, then deliberate and then

20  make your decision?

21         A.     Yes.

22         Q.     Okay.  So there wouldn't be an automatic yes?

23         A.     I would wait.

24         Q.     You would wait until you heard everything?

25         A.     Yes.

1    Q.    That's a common sense dealing in your line of

2  work with bonds and all that.   You want to get all the

3  information that you can before you make the decisions that

4  you make?

5    A.    Correct.

6    Q.    Or if you buy a house, you want to get all the

7  information before you make that type of decision.   The same

8  thing here.   You can't have a knee-jerk reaction and answer

9  these questions.

10        Question No. 2, that question asks

11  whether the defendant actually caused the death of the

12  deceased or did not actually cause the death of the

13  deceased, but intended to kill the deceased or another or

14  anticipated that a human life would be taken.

15        Now, it's complicated.   We didn't write

16  these questions.   I want to let you know that.   Someone down

17  in the Legislature did that years ago, so they are not

18  always that clear.

19        But the first part is pretty simple.   If

20  you believe from the evidence that he actually caused the

21  death, that question could be answered yes.   But the second

22  part of the question has to do with the accomplice

23  situation.   If he didn't actually cause the death of the

24  deceased, but his intention, he intended to kill the

25  deceased or another person or he anticipated that a human

1  life would be taken, then you can answer it yes.  And that's

2  just based on the evidence.

3              If it's an accomplice situation and he

4  didn't actually cause the death, but you feel from the role

5  and how the crime occurred that he anticipated something

6  like that would happen.  In my situation Mr. Wirskye knew I

7  had a gun and maybe he knew I was dangerous and that sort of

8  thing.  Then you could make the decision that way.  So that

9  encompasses the accomplice decision, but it's based simply

10  on the person's role in the offense and anything that you

11  have learned about him in the past, you know, in the

12  punishment stage, that might help you know about their

13  personality and what they are capable of.

14              Again, it starts out with a no answer and

15  we have to prove to you it should be answered yes, just

16  depending on the facts of the case.  Do you feel that you

17  could do that?

18      A.      Yes, sir.

19      Q.      Okay.  Just because you found him guilty or

20  just because you have already answered question No. 1 yes,

21  you don't automatically answer question No. 2 yes.  It's an

22  independent decision based on all the information.  And you

23  could follow the law?

24              This last Special Issue is the mitigation

25  question and neither side has the burden of proof.  We don't

1   have to prove it should be answered no and the defense

2   doesn't have to prove it has to be answered yes.  We will,

3   obviously, argue that way, I'm sure, but there's no burden

4   of proof like there is on the first two on us.

5                   It asks whether taking into consideration

6   all the evidence, including the circumstances of the

7   offense, the defendant's character and background, and the

8   personal moral culpability of the defendant, there is a

9   sufficient mitigating circumstance or circumstances to

10  warrant that a sentence of life imprisonment, rather than a

11  death sentence, be imposed.

12                  Now, the question gets kind of long, but,

13  basically, it's saying is there anything in the case, maybe

14  their role in the crime, something -- how they grew up,

15  something in their background, if there's something that

16  tells you in your heart that they should get a life

17  sentence, rather than a death sentence, you can answer the

18  question that way, if there's sufficient mitigating

19  evidence.  If there is not, you can leave it as no.

20                  It allows the jurors to kind of look at

21  everything and do what they think is right in the case.  In

22  other words, not every death penalty case where someone is

23  found guilty is going to result in a death.  You may find

24  there is mitigating evidence in that particular case.

25                  What mitigating evidence is, I can't tell

1   you.  And the Judge won't give you a definition.  Really,

2   it's going to be up to you and the other jurors what you

3   decide it is.

4             You know, we talk about a lot of things

5   and it's just going to depend on the facts.  It could be

6   something in his background.  Some people tell us if he grew

7   up in a poor neighborhood or maybe he was abused physically

8   or mentally, that might be mitigating evidence.  Other

9   jurors tell us, I feel bad for him, but, look, a lot of

10  folks grew up in an abusive home and once they were an

11  adult, they have to be held accountable and they wouldn't

12  view that as mitigating.

13            There's no right or wrong answer on that.

14  Do you feel strongly one way or another on those types of

15  issues?

16       A.    Well, I believe what you said that when you

17  become an adult you are held accountable for what your

18  actions are.

19       Q.    Okay.

20       A.    I believe that when you are growing up, you do

21  know the difference between right and wrong and you still

22  know the difference between right and wrong when you get

23  older.

24       Q.    A lot of people feel that way.  Another issue

25  that comes up is -- maybe here's one that many people feel

1    is mitigating.  We talk about mental retardation, someone

2    with a learning problem.  It's not to the point where they

3    don't know right from wrong, but it's something they were

4    born with and they don't have a problem with.  Maybe they,

5    you know, they were just following along.  It was a young

6    person and they are not very intelligent.  You may view that

7    as mitigating.

8                    It's just going to depend on the facts,

9    things like that.  As I said before, you don't have to tell

10   us today what you think is mitigating.  You don't have to

11   tell the Court.  All you have to be able to do as a juror is

12   say, my mind will be open to that type of evidence and I

13   will look at it and if I think in my heart and mind that

14   something is sufficiently mitigating that I think the

15   person's life should be spared and get a life sentence and

16   they wouldn't walk out, I could answer the question that

17   way.  If I don't believe that way, I will answer it no, just

18   base it on the facts of each case.

19                    Do you feel that you can do that, keep

20   your mind open to that evidence and then make the decisions?

21        A.    Yes.

22        Q.    Okay.  Again, it's hard for us because we

23   can't preview the facts.  It's just something that you are

24   going to have to wait and hear.  You may, if you were on a

25   hundred death penalty cases, there might be one where you

1  think there was a sufficient mitigating evidence for a life

2  sentence or there might be 20 or 30 or 40, just depending on

3  the facts of each case.

4                    And just because you found him guilty or

5  found he's a continuing danger to society or believe beyond

6  a reasonable doubt he anticipated a life would be taken,

7  there might be a fact situation where you think, even though

8  I know those things, I also feel the right thing to do in

9  this case would be to give a life sentence and you can do

10  that, just depending on what the facts tell you to do?

11  Again, the law contemplates that you will wait and make

12  these decisions just based on the evidence and do that and

13  just let the chips fall where they may and you feel you can

14  do that?

15       A.    I don't know about letting the chips fall

16  where they may.  I would listen to the evidence.

17       Q.    What I mean by that is you make your decision

18  based on the evidence?

19       A.    Yes.  I would hear it all, but I think that

20  depending on what he did in his past, I don't know if that

21  comes up in the trial or not.

22       Q.    Yes.

23       A.    I think if my decision that he was guilty, if

24  I think -- if my decision that he was guilty, if things came

25  up from his past, I don't know if that would have any waiver

1   on my decision.

2          Q.     Well, yeah.  And we could go over hypothetical

3   situations, I mean, situations, I mean, he's guilty and you

4   think he's actively involved and he's been in the pen 20

5   times and done horrible things in the past.  Obviously,

6   that's probably going to weigh real harshly against him.  Or

7   you could have a situation where he's never been in trouble

8   and some other mitigating facts.

9          A.     Correct.

10         Q.     What I mean by that is it's going to depend on

11  the facts.

12         A.     Correct.

13         Q.     But you can wait and make that decision based

14  on each case, whatever case you sat on, you would weigh and

15  listen to everything and then make a decision?

16         A.     Yes.

17         Q.     And if you think the question should be

18  answered yes, then give them a life sentence.  You could

19  answer it that way, if you believe that's what the evidence

20  told you to do?

21         A.     Yes, yeah.

22         Q.     Again, I can't preview the facts.  I'm just

23  asking you, can you keep your mind open and consider the

24  question and then answer the question based on the facts?

25         A.     Yes, I could do that.

Q.     And if it's a yes, it's a yes.  And if it's a

no, it's a no.  That's all I'm asking you to do and that's

all the law contemplates you to do.  When we start talking

about this, usually we conjure up very bad crimes and

sometimes that weighs on jurors' answers.

But I think what we need to emphasize is

the bottom line is can you make the decision on the facts of

each case and keep your mind open and then make the

decision?

A.     Yes.

Q.     Okay.  Let me go over a few rules that apply

in every criminal case, not just this one.  And you will be

familiar with most of these.  The presumption of innocence.

At the beginning of the case the defendant is presumed to be

innocent.  The fact that he's been arrested, indicted, or

that we're even going through this process is no evidence of

his guilt.  You have to wait and listen to the witnesses as

they testify and then make your decision based on what they

say.

You feel you can follow that rule of law,

start the defendant off with that presumption of innocence

and require us to prove beyond a reasonable doubt that he's

guilty?

A.     Yes.

Q.     Okay.  As I said, that rule of law applies on

1  each case.  Everyone starts out with that presumption and

2  then we overcome it by putting on the evidence.  That burden

3  of proof never shifts to the defense.  It stays on our

4  table.  Now, you can anticipate the defendant will try to

5  prove his innocence or at least try to poke holes in the

6  State, but they are not required to have a burden of proof.

7  You can't require them to prove things.  The requirement

8  should be on the State here to prove to you beyond a

9  reasonable doubt.

10          If they don't ask a question or raise a

11  finger and at the close of all the evidence you don't think

12  we have met our burden, you have a reasonable doubt in your

13  mind, it's pretty simple, you find him not guilty.  If you

14  don't have a reasonable doubt and we have met our burden,

15  you find him guilty.  Again, it's just based on the evidence

16  of each case.

17          But will you require us to prove beyond a

18  reasonable doubt the defendant is guilty?

19      A.      Could I require you to prove to me?

20      Q.      Yes.  The State, because that's the law.

21      A.      If that's the law.

22      Q.      The law in each case is the State has that

23  burden of proof.

24      A.      And the law is that all defendants are

25  innocent until proven guilty.

1   Q.   Right.

2   A.   But if I already had that feeling that he's

3   guilty, am I answering incorrectly?

4   Q.   Again, that goes to the bottom line of what we

5   talked about earlier.  You have read about the case, like

6   most of the jurors.  And the bottom line comes down to this,

7   can you just make your decisions based on the evidence you

8   hear in the case?  And I know you can't put it out of your

9   mind, but you can't base your decisions on what you read or

10  heard or seen on TV.

11          And this case, some people can do that,

12  follow the law, because, obviously, what I said before is

13  the good evidence or the reliable evidence is what you hear

14  from the actual witness stand.

15          You told me earlier you thought you could

16  do that.  You could -- and when you say you could do that,

17  what you will have to be able to do is presume him innocent

18  and require us to prove the case beyond a reasonable doubt.

19  In other words, you can't say I saw this stuff on TV, so I

20  think he's guilty already.

21  A.   I understand.  I will follow the law.

22  Q.   Okay.  Do you feel that you can give him that

23  presumption of innocence?

24  A.   I would have to, if I'm going to follow the

25  law.

1    Q.    And you feel that you can follow the law?

2    A.    It would be my duty to follow the law, yes.

3    Q.    And you would be able to do that in this case?

4    A.    Yes.

5    Q.    Okay.  Now, that burden of proof goes to every

6 portion of the indictment.  We have to prove everything we

7 allege in the indictment.  We have to prove to you beyond a

8 reasonable doubt.  And if we fail on just one element of

9 that offense, one portion of it, then you would have to find

10 the defendant not guilty.

11          Let me give you a couple of examples.  If

12 at the end of the trial you are not sure we proved the

13 identity of the killer, who the person was that committed

14 the offense, obviously, that's a reasonable doubt.  It's a

15 pretty simple example.  You would find him not guilty.

16          Another example we give is the county.

17 We have to prove it happened in Dallas County.  I don't

18 anticipate this happening, but I like to give a way-out,

19 kind of a way-out example to demonstrate how the law works.

20 We prove everything else to you, who the person was, how

21 they committed the offense, who they murdered, but you had a

22 reasonable doubt about the county, maybe it actually

23 happened in another county, Ellis County, Kaufman County.

24 You would have to acquit the defendant and find him not

25 guilty.

1          Now, that would be a horrible mistake on

2    our part.  We, obviously, would be fired if we made that

3    type of horrible error in our preparations and I don't

4    anticipate something like that would happen.  But the point

5    of that example is this.  The jury can't help us out.  If we

6    screw up that badly and miss out on our burden, you can't

7    say, well, I'm going to say I'm going to give them that one.

8    I'm going to ignore the fact that they have totally messed

9    this case up.  You have to be, as a juror, kind of like a

10   referee, you know, just call balls and strikes -- or an

11   umpire, call balls and strikes.  You can't give us a helping

12   hand.  You have to follow the law and find the defendant not

13   guilty, if you required us to prove our case beyond a

14   reasonable doubt on every portion of the indictment on this

15   case.  Can you do that?

16        A.    Yes.

17        Q.    In a criminal trial, if a person or defendant

18   wants to testify, he can.  No one can stop him.  He can tell

19   his story, you know, judge him like you would any other

20   witness.  If he chooses not to testify, the Judge would

21   instruct you that you can't hold that against him.  In other

22   words, you would have to make your decision just based on

23   all the other evidence you heard in the case.  You can't

24   say, well, I think he's guilty because he didn't testify.

25   There could be a lot of reasons why someone would choose not

1  to testify.

2              They could be very guilty and look bad.

3  They might actually not make a good witness.  They could be

4  nervous.  They could be not educated very well and an

5  experienced prosecutor could make them look bad.  There are

6  -- they could be following the advice of their lawyers.  I

7  don't think they have proven their case and I don't want you

8  to say anything.  There could be a number of reasons.

9              The law says if a person chooses not to

10  incriminate themselves or not testify, just don't pay

11  attention to it and base your decision based on everything

12  else.  Could you follow that rule?

13       A.    Yes.

14       Q.    Okay.  Police officers testify oftentimes in

15  criminal cases.  A lot of people have respect for the job

16  they do.  But police officers have to be judged like any

17  other witness.  There is some good ones.  There's some bad

18  ones.  You can't start them out ahead of the other

19  witnesses.  You have to judge them, judge their credibility

20  as a witness when they hit the witness stand.

21              Could you do that, judge them as you

22  would any other witness, judge their credibility?

23       A.    Yes, sir.

24       Q.    All right.  Sometimes we hear about parole

25  laws, that sort of thing, that are in the news.  Makes a lot

64

of controversy sometimes.  But what the Judge will instruct

you in this type of case is if a defendant gets a capital

life case, he would have to stay in prison forty calendar

years, day for day, before they become eligible for parole,

and then that doesn't mean they are paroled out.  That means

they become eligible.

The other instruction they give you is

this.  You can't consider the parole laws in making your

decisions.  You have to consider a life sentence to be a

life sentence, because someone else makes those decisions.

Do you feel that you could follow that rule?

A.    Yes.

Q.    The bottom line is this, I think that you

would be able to do this, is, again, as a juror, you would

have to wait and listen to all the evidence before you make

your decisions, guilt/innocence stage, or how these

questions should be answered, and then answer them the way

the evidence tells you to answer them.

Some cases could call for a death penalty

and other cases might call for a life sentence.  Some would

be guilty and some not guilty.  It would just depend on the

facts of each case.

Also, as we talked about several times,

comes down to this.  You have to make your decisions based

solely on what you hear in the case, not on anything that

1  you have read or heard about.  And you feel you can do that?

2       A.    Yes.

3       Q.    Okay.  Do you have any questions over anything

4  that I have gone over?

5       A.    No.  It's cold up here, though.  I'm shaking.

6       Q.    I appreciate your patience for everything I

7  have gone over and that's all the questions I have.

8       A.    Thank you for mine.

9            MS. BUSBEE:  Can we have a moment?

10 Approach the bench?

11           THE COURT:  You may.

12                (Bench conference)

13            CROSS-EXAMINATION

14 BY MR. SANCHEZ:

15      Q.    Good morning.

16      A.    Good morning.

17      Q.    How are you doing?

18      A.    Good.

19      Q.    Good.  My name is Juan Sanchez.  I'm going to

20 ask you some questions that have to do with some of your

21 answers that you have given already, some things that we

22 want to explore.  Okay?

23      A.    Okay.

24      Q.    But before we start that -- and have you ever

25 called in to "The Ticket" yourself or you just listen to it?

1    A.    I just listen to it.

2    Q.    You have never been P1 (phonetic)?

3    A.    I don't know if I can, I'm considered a P1

4    but, I listen to it all day.

5    Q.    But you expressed in your answers that deep

6    down you feel that he's already guilty of what they are

7    charging him with, Mr. Murphy here, is that true?

8    A.    Yes.

9    Q.    And why do you feel that's he's guilty

10   already?

11   A.    Because he was with all the other people and

12   he contributed to that day.

13   Q.    And I saw that you had strong feelings, I

14   mean, you got emotional up on the stand when the State was

15   asking you questions.  Did you follow this closely in the

16   newspaper when this happened?

17   A.    Well, just by reading about it and on TV and

18   just the emotional situation that happened with his family

19   and members of the family.

20   Q.    Did you follow that closely while it was

21   happening?

22   A.    I don't know how closely you mean.  Just by --

23   Q.    How closely did you follow that?  Did you look

24   in the paper for it while it was happening?  Did you get on

25   the Internet?

1    A.    No, I did not get on the Internet.  I listened

2  to it when the news came on, whenever I had the news on.

3    Q.    And in your heart, your gut, you feel he's

4  already guilty of what they are charging him with before you

5  heard evidence, based on what you know already?

6    A.    Based on what I know already.  But I also told

7  the prosecutors that I could listen to all the evidence

8  given to me before making a final decision.

9    Q.    And I understand that's what you told them,

10  but would that in some way play a part in you listening to

11  this case?  I know it's not easy to put it out of your mind,

12  but deep down if you are sitting in those chairs over there,

13  are you going to be remembering everything that you read or

14  be affected emotionally like you were today by what you know

15  already?

16    A.    I can't -- I can't see what's in the future.

17  I think that I can't tell you whether I would get emotional

18  or not.  I probably would.

19    Q.    It's possible?

20    A.    It could be possible.

21    Q.    Also, when you first started answering

22  questions, you indicated that you thought the death penalty

23  should be given for this offense; is that correct?  Is that

24  the way you said that?

25    A.    If that's what I said.

1   Q.   What did you mean by that?

2   A.   The severity of it.

3   Q.   Okay.  And were you talking about this, the

4   specific facts of this case or just any case where an

5   officer may be killed?

6   A.   Well, I believe that when any officer is

7   killed, the only purpose of killing an officer is to get

8   away.

9   Q.   And do you believe that that should be an

10  automatic death penalty at that point?  I mean, once you

11  find somebody guilty of killing a police officer, do you

12  believe that should be an automatic?

13  A.   You mean without a trial?

14  Q.   No.  Once you had a trial.  You don't have to

15  go over all the Special Issues that you have over here that

16  the death penalty should be assessed at that point.  Do you

17  think that?

18  A.   No.  I believe that you should have these.

19  Q.   That's my concern is that you said that the

20  death penalty should be given in cases like this one.  And

21  were you talking specifically about the facts of this case?

22  Is that what you were talking about?

23  A.   Like, I don't know.  I guess so.

24  Q.   You can't -- remember, the law said -- I know

25  it's hard to remember what you were saying, what you meant

1    exactly at that time, but is that possible that you have

2    already made up your mind that if you were to convict Mr.

3    Murphy of this offense, that the death penalty would be the

4    first thing on your mind for you --

5         A.    I think it's on anybody's mind.  I mean, I

6    don't think it's just me.

7         Q.    Is it possible would that be on your mind

8    before you even looked at the Special Issues?

9         A.    I think it would be, but I could be openminded

10   and go through those Special Issues as the evidence was

11   presented to me.

12        Q.    And as you were looking at those Special

13   Issues, would you be -- would you already start -- let me

14   put it this way.  When you talk about the Special Issues and

15   you found somebody guilty of capital murder, that person is

16   basically sitting on a life sentence unless you can answer

17   those questions in the way that -- the way the State talked

18   to you about.  Does that make sense to you?  In other words,

19   it's a life sentence.  You found somebody guilty of capital

20   murder, it's a life sentence at that point and unless you

21   can answer those Special Issues in the way that the State

22   talked about, then it would stay a life sentence.  Does that

23   make sense to you?

24        A.    Uh-huh.

25        Q.    In other words, those would be three hurdles

1    or three things that would have to happen, three different

2    decisions, that would have to occur before somebody could be

3    assessed a death penalty.  Does that make sense to you?

4        A.     Yes.

5        Q.     And based on the fact that you already feel

6    he's guilty of this offense, could you really hold the State

7    to their burden of proof, burden in proving Special Issue

8    No. 1 and Special Issue No. 2 to prove those beyond a

9    reasonable doubt?

10       A.     Yes.

11       Q.     You would require them to do that?

12       A.     Isn't that the law?  I mean, that's the law.

13       Q.     I know that's the law, but could you do it?

14       A.     Yes.

15       Q.     Would the fact that you already feel he's

16    guilty before we start the trial in any way cause you to

17    lessen their burden?

18       A.     I don't think so.

19       Q.     You don't think so?  And when I hear "I don't

20    think so", that means it could also --

21       A.     It's not a definite, is it?

22       Q.     Exactly.

23       A.     I believe that I could go through these issues

24    and answer it with the evidence given to me.

25       Q.     What do you think about a life sentence in

1  prison?  What do you think about that when you hear that

2  somebody receives a life sentence in a capital offense?

3  What do you think about that?  Do you have any feelings that

4  way?

5        A.      No.  I mean, that's the way the jury decided.

6        Q.      What would be your personal feelings about it?

7  Would it be a disappointment to you if somebody received a

8  life sentence or would you say probably that's what that

9  person deserved in that case?  What are your feelings about

10  that?

11        A.      Each case is different, so it depends.

12        Q.      Do you think a life sentence is a deterrent,

13  as opposed to the death penalty being assessed?

14        A.      I don't -- I don't know.  A deterrent?  I

15  don't believe it's a deterrent.  I don't understand -- I

16  don't understand what you mean by --

17        Q.      What are your general feelings about someone

18  receiving a life sentence?  Do you think it's a severe

19  punishment or do you think it's not a severe punishment?

20        A.      I believe it's a severe punishment in a way

21  that that person will possibly never see the outdoors again

22  and he won't be able to enjoy the things that other people

23  do.  I mean, that is a punishment in itself when you are in

24  a cell.

25        Q.      Do you think that could ever be an appropriate

```
 1   punishment in a capital murder case?

 2          A.      An appropriate?

 3          Q.      Yes.

 4          A.      Gosh, I don't believe so.

 5          Q.      And you think that would affect?

 6          A.      I don't know -- I've answered some questions

 7   one way and here I'm answering yours the other way and I

 8   feel that I'm not --

 9          Q.      That's why we ask these questions, both sides

10   have equal time to ask questions.  But the fact that you

11   don't believe it would ever be an appropriate sentence in a

12   capital case, that would somehow affect you answering these

13   Special Issues?

14          A.      Would you repeat the question?  I'm sorry.

15                  MR. SHOOK:  Approach the bench?

16                  THE COURT:  Just a minute.

17                      (Bench conference)

18                  THE COURT:  Ms. Garber, you are cold this

19   morning.  Yesterday we were all.  They can never get it

20   properly adjusted.  We appreciate your time and service here

21   today, but the parties have agreed that this is not going to

22   be the case for you.  You probably know just a little too

23   much and have your opinions just a little too cemented to be

24   on this jury and we appreciate your honesty.  That's the

25   main thing.  You have learned a lot about the law, probably
```

1    more than you ever wanted to know.

2                    PROSPECTIVE JUROR:  No, I found it

3    interesting.

4                    THE COURT:  And this process for you

5    today will be concluded.  Thank you for your time and

6    service to the Court and you are free to go.

7                    PROSPECTIVE JUROR:  Thank you.

8                    [Prospective juror out]

9                    THE COURT:  Let the record reflect that

10   the parties have previously scheduled to talk to juror No.

11   672, Mr. Kenneth Lewis Chance.  The Court has had contact

12   with the mother of Mr. Chance and the employer of Mr. Chance

13   and he is somewhere in Eastern Europe, far deep undercover,

14   working under the United Nations assignment and has been

15   unable to have contact in the last two weeks.

16                   Mr. Wirskye, any problem with the State

17   agreeing to excuse this juror?

18                   MR. WIRSKYE:  No, none from the State.

19                   THE COURT:  Defense?

20                   MS. BUSBEE:  No, Your Honor.

21                   THE COURT:  The Court will excuse

22   Mr. Chance.  For the record the other agreement we have is

23   to move Mr. Frank Arena from Thursday, September 4, to

24   Friday, September 5.  I will print a new schedule

25   accordingly.  That will conclude this morning's voir dire

1   and reassemble at 1:15 for the afternoon.

2                    (Recess)

3                  THE COURT:  Brad Richards.

4                  [Prospective juror in]

5                  THE COURT:  Good afternoon, Mr. Richards.

6   How are you?

7                  PROSPECTIVE JUROR:  Good.

8                  THE COURT:  Welcome to the 283rd and

9   thank you for being here on time.  Have you had enough time

10  to review the outline that I gave you?

11                 PROSPECTIVE JUROR:  Yes.

12                 THE COURT:  And the bottom line is, I

13  believe you said in your questionnaire, understand you were

14  sworn to tell the truth.  I think your quote stood out in my

15  mind.  If called back, "I will answer all questions

16  truthfully."  And I appreciate that very much.  My job is to

17  be sure that you understand the law.

18                 If you have read that, you can see it can

19  get complicated pretty quick.

20                 PROSPECTIVE JUROR:  Yeah.

21                 THE COURT:  So the lawyers are going to

22  spend some time with you to go over those issues and be sure

23  that you understand them.

24                 PROSPECTIVE JUROR:  Okay.

25                 THE COURT:  And then, once again, if you

1  have any questions in this process, please discuss it.  If

2  you don't understand, they want to shade a different

3  direction, just say so.

4                    PROSPECTIVE JUROR:  Okay.

5                    THE COURT:  Many people look at this as

6  an intimidating process.  You might be on trial.  That's not

7  the issue.  But it's the only way that we can actually talk

8  to an individual juror.  And the key is that you understand

9  the law.

10                    PROSPECTIVE JUROR:  Okay.

11                    THE COURT:  The only question that I have

12  for you before I let the lawyers voir dire is we have

13  scheduled this trial to begin on November 10th, two weeks,

14  as I said in my outline.

15                    PROSPECTIVE JUROR:  Yes.

16                    THE COURT:  Do you have any problem

17  serving the Court for those two weeks?

18                    PROSPECTIVE JUROR:  No.

19                    THE COURT:  Thank you.  Mr. Shook?

20                    <u>BRAD RICHARDS</u>,

21  having been duly sworn, was examined and testified as

22  follows:

23                    <u>DIRECT EXAMINATION</u>

24  <u>BY MR. SHOOK</u>:

25        Q.     My name is Toby Shook and I'm going to ask you

1    questions on behalf of the State this afternoon.  As the

2    Judge said, we're just interested in your honest opinions

3    and we try to stay somewhat informal.  If you have any

4    questions at any time, feel free to ask.  Okay?

5         A.    Okay.

6         Q.    Usually we select jurors for most cases just

7    out of a panel.  But because it's a capital murder case in

8    which we're seeking the death penalty, we have this

9    procedure where we talk to each juror individually.  You

10   provided us with a lot of valuable information in your

11   questionnaire and we appreciate you taking the time.  I know

12   it was a lot of questions.  Believe it or not, it actually

13   saves you time when you come down here.  And I'm going to

14   ask you just a few questions off of that, do some followup

15   questions.  We'll talk about capital murder, the death

16   penalty, and how you feel about that and some of the rules

17   and laws that apply to that type of case.

18        A.    Okay.

19        Q.    You are currently employed with the Dallas

20   County Appraisal?

21        A.    Central Appraisal District.

22        Q.    Yes.

23        A.    Yes, sir.

24        Q.    And have been doing that a little over a year,

25   I think?

A.      Three and a half years.

Q.      Okay.  I know we have always -- we've used y'all's website, I know a good source for looking at houses and good background information.  I think everyone else does that, too, nowadays, all on the web.  But I was also looking at -- we asked about past work history and it intrigues me that you used to work for the Texas Rangers Ball Club?

A.      Yes.  I was assistant groundskeeper for 11 years.

Q.      What years were you out there from?

A.      I was out there from '81 through '97, full-time from '87 to '97.

Q.      So you were at both ballparks?

A.      Yes, sir.  I helped build the new one.

Q.      New one.  Do you still go to a lot of games out there at the new one?

A.      Two or three a year.

Q.      It's a nice ballpark.  I'm always amazed how they keep that thing that green and the way the field drains so quickly and that sort of thing.

A.      Yeah, a lot of sand.

Q.      Let me talk to you a little bit about capital murder.  You know it's a death penalty case in which the State is seeking the death penalty.  And you have told us on your questionnaire that you do believe in the death penalty

1    as a law.

2            What I want to do is just ask you to

3    follow up on that a little bit and tell us why you believe

4    in the death penalty or what purpose you think the death

5    penalty serves in our society?

6        A.      Well, I think, like I answered in the

7    questionnaire, if someone were to go on trial and it proved

8    beyond a reasonable doubt that he did, you know, take

9    another's life, I mean, I'm not -- I think I said in there I

10   don't believe so much an eye for an eye as far as like if

11   you steal, you know, cut your hand off or if you lie, you

12   know, cut your tongue out like they did in the Biblical

13   stories, but just, you know, as far as, you know, I'm a

14   religious guy and I just feel that, you know, if you take

15   someone's life, you know, you should pay with your own.

16           There are advocates that feel that

17   spending the rest of your life in jail, that's a harder --

18   that would be a harder sentence than just someone, you know,

19   being put to death by lethal injection.  Some people feel

20   that's an easier way out.  I mean, there's arguments to both

21   sides, but I just feel if you do take someone -- or

22   someone's life, that you should pay with your own life.

23       Q.      Okay.  And I think that you also put in the

24   questionnaire that it depends on -- it's appropriate in some

25   murder cases.  Basically, it comes down to the particular

1  facts of that case?

2        A.     Yes.

3        Q.     Some cases it might be appropriate and other

4  cases another punishment might be appropriate?

5        A.     Yes.

6        Q.     Just depending on those particular facts?

7        A.     Yes.

8        Q.     Okay.  I take it that this is something you

9  believed in as a law for some time, most of your adult life

10  or since you have matured.  Have you always been in favor of

11  capital punishment?

12        A.     Yes, I have.

13        Q.     Okay.  In Texas the death penalty is reserved

14  not for every type of murder case.  We have reserved it just

15  for exclusive types.  We have a host of murder cases, brutal

16  murder cases, in which someone gets a life sentence.  The

17  death penalty is reserved for murder cases, intentional

18  killing, not legal justification, not accident, or

19  self-defense, but a killing that occurred during an

20  aggravated fact.

21               If you murder someone during the course

22  of another felony, such as robbing someone, 7-Eleven clerk,

23  if you shoot the clerk, that could be a death penalty case.

24  Breaking into someone's home, killing someone in the house,

25  that could be a death penalty case because you are

1   committing that felony.  Also, during a kidnapping or during

2   a rape or arson.  Those could all be death penalty cases,

3   also.

4                Specific types of victims come under the

5   statute.  Murdering a police officer on duty, a fireman on

6   duty, a prison guard on duty, it could be a death penalty

7   case.  Murdering someone for profit or money.  If you are a

8   hitman-type situation, that could be one.  Murder of a child

9   under the age of six could be a capital case.  And then

10  murder of more than one person like a mass murder or serial

11  killer situation could be a death penalty case.  But those

12  are the types of specific cases we reserve for consideration

13  of the death penalty.

14               Does that list fit your definition, your

15  personal definition of types of cases you think could be

16  appropriate, depending on the facts of those cases?

17       A.     Yes.

18       Q.     Okay.  Let me go over another area while I'm

19  on that.  When we think of capital murder, we usually think

20  of the examples that come to mind is the actual triggerman.

21  If I went into a 7-Eleven store, robbed it, the clerk, and

22  then shot him during the course of that, that's what you

23  think of as the actual triggerman.

24               The law says that when someone commits a

25  felony or any type of crime, if more than one person assists

them, if there is an accomplice, they call it, those people
can be held responsible, also.  Sometimes it takes more than
one person to commit a crime.  It takes groups of people.
They may have different roles in the crime, but if they are
all assisting, aiding, abetting, helping commit that crime,
then they can all be held responsible, even though some had
greater roles.

And the same is true for capital murder.
An example I give often is say Mr. Wirskye and I and another
individual wants to rob a bank.  I may have the gun.  That's
the plan.  I go in with the gun.  Mr. Wirskye has a bag.
We're going to put the money in.  He goes in the bank with
me and the other guy waits out in the getaway car.  He's
going to warn us if somebody is coming.  He will have the
car running so we can have a fast getaway.

I cover everybody, threaten them, and
then Mr. Wirskye goes and empties the cash registers.  We're
working as a team.  Maybe at some point in time somebody
tries to run out of the bank, they say something I don't
like, or maybe Mr. Wirskye sees them go for an alarm and
tells me and I shoot them.

We leave the bank and we're arrested soon
after.  I'm, obviously, the one that killed that person.  I
could be prosecuted for capital murder.  I could get the
death penalty because I'm the triggerman.  The law says that

1  Mr. Wirskye could, also, be prosecuted because he's actively

2  participating in it and the same for the getaway driver,

3  just depending on the facts, because they actively

4  participated in that event, even though they didn't actually

5  pull the trigger.  They could even ultimately get the death

6  penalty, depending on the facts.

7                 Some people agree with that law.  They

8  think that the law should apply to accomplices to deter

9  them.  Other people draw a line that -- they're for the

10 death penalty for a triggerman in those situations, but they

11 would not want the death penalty or capital murder to apply

12 to accomplices, maybe a long prison term or some other term,

13 but it just doesn't set with them.  How do you feel about

14 that?  Do you think accomplices should be prosecuted and

15 ultimately receive the death penalty, depending on the

16 facts, or would you only reserve the death penalty, if it

17 was up to you, for the actual triggerman?

18         A.     I think it would just depend on the evidence.

19 But I would be more inclined to -- I mean, I guess the

20 circumstance could be, you know, brought down to where say

21 maybe the getaway driver and the guy that's holding the

22 money, maybe those three made a pact they are not going to

23 kill anybody, if something like that were to come out, and

24 he on his own, did that.  I would probably be more inclined,

25 the guy that was just bagging the money and getaway driver,

1  you know, maybe not the death penalty for those.

2      Q.      Okay.

3      A.      That's not to say I don't believe in it.

4  That's what I put on my questionnaire.  I think there are

5  circumstances that even accomplices would be associated with

6  capital, you know, crime, such as you described that they

7  might not be charged with the death penalty.

8      Q.      Is it something that you believe that if it

9  were up to you, we could make you king of Texas or Governor

10  of Texas, king of Texas, and if you were to decide about our

11  death penalty laws, would you have a death penalty for an

12  accomplice or would you put it just for the triggerman, the

13  person that actually caused the death?

14      A.      I think that I would probably be more inclined

15  to have it for the triggerman.

16      Q.      And would not have it for the accomplices?

17      A.      No.

18      Q.      And let me get into one other area I meant to

19  ask you about.  Everyone has -- just about everyone has seen

20  some media coverage concerning this event.  I believe you

21  saw some of it on radio?  Television?

22      A.      I think on that I put I was unfamiliar with

23  this.

24      Q.      Well, there was another -- there was another

25  portion and it's been a while since we asked this question

1   and I know you don't have the questionnaire in front of you,

2   but we asked this question, have you ever watched any TV

3   shows or movies or read any books, articles, dealing with

4   the death penalty or life on death row and you said, yeah.

5   You said, "I saw the media coverage concerning the Texas

6   Seven and have seen TV shows and movies where this has been

7   a subject."

8          A.     Yes.

9          Q.     Are those some -- what shows were those?

10         A.     Probably, you know, in the past I've seen, you

11  know, various "Law and Order" shows.  I watch that CSI every

12  once in a while on Thursday.

13         Q.     The coverage on the Texas Seven, was that one

14  of the documentaries they had on it?

15         A.     No.  I think it was probably just watching the

16  news every night, just them leading into when it all broke

17  out and it sort of went away for a little bit.  And then I

18  drive by the courthouse every day like on my way to work, so

19  as those guys were going on trial, you know, you would see

20  the Channel 8 and Channel 5.  I didn't actually see the

21  media coverage, but I saw the vans out in the morning and

22  the news like at night 6:00 and 10:00.  The first for or

23  five went on trial here.

24         Q.     Did you follow those cases very closely?

25         A.     No, not very closely.

1  Q.   We can't get into the actual facts of the

2  case, but this is one of the Texas Seven trials.  They've

3  been going on for some time.  Obviously, a lot of people

4  have seen coverage of it when it first happened and followed

5  it.  We can't get into the general facts, but, obviously,

6  there was a lot of media coverage.  I can tell you that Mr.

7  Murphy is one of the persons involved in that, according to

8  our allegations.  We're prosecuting him concerning the

9  shooting that happened at the Oshman's back in December of

10  2000.

11  A.   Okay.

12  Q.   So what I need to ask you now is this, now

13  that you know that, how that publicity might affect you as a

14  juror.  The law is this.  Just because you have seen

15  publicity doesn't mean that makes you ineligible to be a

16  juror.  It just depends on if you made up your mind or it

17  might affect you in some way.  The Judge would instruct you

18  if you have seen any media coverage, we want you to put that

19  out of your mind and not let that affect your decision, just

20  make your decision on in the court.

21       Some people can do that and some people

22  can't.  Some people have watched the coverage more than

23  others and sometimes that affects their decisionmaking

24  process.  They will tell us, I've already made up my mind as

25  far as guilt/innocence or the punishment and that sort of

1  thing.  It just comes down to that individual and how much

2  they observed it, what kind of opinions they formed and how

3  strongly they formed those opinions, to be quite frank with

4  you.

5           Now that you know this is actually one of

6  the Texas Seven cases, do you think that would affect you in

7  any way?

8       A.    I don't think it would.

9       Q.    Okay.  Do you think you would be able to

10  ignore what you have read and seen and decide the case just

11  on its merits?

12      A.    Yes.

13      Q.    Okay.  Now, let me get back to this accomplice

14  business.  Saying what you said that if it was up to you,

15  you probably wouldn't have the death penalty for an

16  accomplice.  I will, also, tell you this now, that we're

17  prosecuting the defendant under the theory of parties as an

18  accomplice, not the actual triggerman.

19           Knowing how you feel about that, do you

20  think then, you could ever assess the death penalty to

21  someone who is not the actual triggerman, but just an

22  accomplice situation?

23      A.    I think I could.  I think before I answered

24  it, it would just depend on the circumstances and the

25  evidence that was, you know, provided.

1      Q.      Okay.   What would be important to you, then,

2   in that situation?

3      A.      As far as, you know --

4      Q.      If we're trying someone who was just an

5   accomplice and not the actual triggerman.

6      A.      I guess, like I said before, just the intent

7   that they had, you know, when they went there.   I mean, did

8   they have any intent of actually killing anybody?   Did they

9   even care, you know, if they did?   Were they just going

10  there -- even though he wasn't the triggerman, you know, was

11  it a group of them that just said, regardless, this is how

12  we're going?   If anybody gets in our way, any one of us

13  could have shot.   It just happens maybe it was one or two.

14  That would be stuff that would be brought out in the trial,

15  like the example I mentioned before like the guy in the car,

16  sitting in the car.   They, like, made a pact, just saying no

17  one is going to get hurt because we don't want anything like

18  that to happen and that guy would just -- I mean, that would

19  be, I guess, hard to prove that.

20     Q.      That would be my followup question.

21     A.      It would be like just -- be like if they went

22  on trial, I guess, separately, would be like one's word

23  against another, I guess.   It would be hard to believe, you

24  know, which one was telling the truth.   I mean, I can see it

25  would be like a question if you were saying, like, we just

1  went in and somebody got in our way, we were going to do it

2  and the other guy was maybe trying to save his skin and say,

3  no, we said we weren't going to do this.

4              So I guess you just have to, you know,

5  just hear the evidence and --

6        Q.    The followup question, I think you answered

7  it, would be hard to do sometimes.  One thing, we may not

8  know if they ever made a pact.  Obviously, they -- if you

9  are trying someone, the defendant doesn't take the stand,

10  and you may only have the evidence there of what happened at

11  the scene.

12              Now, jurors can infer someone's intent

13  from the facts of the offense, how had he acted, how the

14  killing took place, and that sort of thing, to look at

15  someone's intent.  Do you believe you can determine

16  someone's intent by what happened at the offense, how the

17  crime actually occurred?  That sort of thing?

18        A.    That question meaning -- you mean, like

19  another juror being able to persuade you?

20        Q.    No, whether you as a juror --

21        A.    As a juror.

22        Q.    -- could determine the defendant's intent from

23  the facts of the case, how the crime was planned, how it

24  went down, how brutal it was, their response when it

25  occurred, that sort of thing, what happened afterwards, all

 1   their actions.  You know, the State could argue what would

 2   these actions show?  This had to be their intent.  Look what

 3   they did.  And the defense could argue another way, but you

 4   may never have evidence of, well, they had a big meeting.

 5        A.    Yeah.

 6        Q.    And they decided this and that sort of thing.

 7   Most of the time that's what happens in cases.  Lawyers make

 8   reasonable deductions from the evidence and argue the case,

 9   here's what the facts show.  This had to be their intent.

10   Some jurors can do that if they feel they can make judgments

11   about people's intent just by their actions.  Other jurors

12   can't.

13             It's -- I just wanted to ask you how you

14   feel about that?  Do you think you can judge a person's

15   intent?  For instance, we're talking about intent to kill

16   for an accomplice from the way the crime actually occurred?

17        A.    I think I could.

18        Q.    What would be important to you about that?

19        A.    About determining, like, their intent?

20        Q.    Yes.

21        A.    Well, I mean, I guess it would just depend if

22   he actually, you know, took the stand and it would just be

23   the evidence that would be presented by the witnesses or --

24        Q.    The Fifth Amendment may come into play in that

25   the defendant does not have to take the stand.  He may

1    exercise his Fifth Amendment right and then never testify.

2    So we may never hear from the defendant.  In fact, that

3    often happens.  And the Court will instruct you that you

4    can't consider that as evidence of his guilt one way or the

5    other.

6                   Some people can do that.  Some people

7    can't.  Would you be able to consider, follow that

8    instruction, and not consider that as evidence against him,

9    if he did not testify?

10        A.     I think I could.

11        Q.     Okay.  Then if that situation occurs, you

12   don't have his version or his story.

13        A.     You just --

14        Q.     You just have the evidence as it was

15   presented.  Do you think that you could determine a person's

16   intent from circumstantial evidence of what happened there?

17        A.     I think I could.  I mean, we basically -- we

18   would have to.

19        Q.     Okay.  Let me ask you, then, if it gets down

20   to it, you do feel, then, in the prosecution of someone who

21   is not the actual triggerman, a party to the offense, an

22   accomplice to the offense, that you could, if the evidence

23   showed you, sentence him to death, even though, you know,

24   he's not the triggerman?

25        A.     Yes.

1    Q.    Okay.  Let me let you take a moment.  I want

2  to talk to you about these Special Issues.  If you would,

3  look at Special Issue No. 1 and read that to yourself.

4    A.    [Prospective juror complies.]  Just read No.

5  1?

6    Q.    Yeah.  We'll go over the other two in a

7  minute.  No. 1, that question is asking you to make a

8  prediction about how the defendant would behave in the

9  future, whether there's a probability he would commit

10  criminal acts of violence that would be a continuing threat

11  to society.

12         Do you feel you could make that type of

13  prediction, if you are given sufficient evidence?  Predict

14  someone's future behavior that way?

15    A.    I guess that would be hard to do.  I guess,

16  basically, all you could do is be presented what he's done

17  in the past.

18    Q.    All right.

19    A.    You just have to make -- I mean, you have to

20  use your own judgment to what he's done in the past and what

21  happened to him when he was incarcerated.  I guess you just

22  have to predict, use your own judgment, and predict what he

23  would do.

24    Q.    What type of evidence would be important to

25  you?  What's done in the past?  If he had done anything

1  wrong in the past?

2       A.    I mean, I would think to make a future

3  prediction, I mean, obviously, you don't know the gentleman

4  personally like, you know, like your brother or friend.  You

5  don't know how he acted.  You would be presented with

6  evidence, I guess, of past crimes, past behaviors.  You

7  know, just look at that, look at that to try to make a

8  future determination.  I mean, it's hard.

9       Q.    That type of evidence is admissible in that

10 portion of the trial.  But you don't get to those issues

11 unless you have found the defendant guilty.  But if they do

12 have a past, if they've been to prison, committed criminal

13 offenses, you can hear about those and hear from the

14 witnesses, if they are available, to help you determine.

15 You can, also, have the facts of the offense to tell you

16 whether you think this person would be dangerous, how that

17 crime was committed.

18            When we use the word there's a

19 "probability" that the defendant would commit criminal acts,

20 what does "probability" mean to you?

21      A.    There's a good chance.

22      Q.    Okay.  How about committing "criminal acts of

23 violence"?  What do those words mean to you?

24      A.    Be severe criminal acts, more of the severity

25 like armed robbery, murder, just not -- I mean, I guess

1  criminal acts, I guess, is speeding ticket or just

2  shoplifting to see, you know, criminal act, you think more

3  of like murder, aggravated assault, your more severe crimes.

4      Q.     And constituting a continuing threat to

5  society.  What does "society" mean to you?

6      A.     Society, the general population.  I guess, you

7  know, the area that he's living in, the other people.

8      Q.     Anyone and everyone that he may come into

9  contact with?

10     A.     Yes.

11     Q.     Including people down in the prison system?

12     A.     Yes, just anywhere.

13     Q.     Question No. 1 you don't get to until you have

14  found the defendant guilty of capital murder.  At that point

15  in time you can hear additional evidence of his background

16  and then you get these questions.  Question No. 1 starts out

17  with a no answer.  The State has to prove to you beyond a

18  reasonable doubt it should be answered yes.  The law says

19  that just because you found him guilty of capital murder,

20  you don't -- you don't automatically answer yes or find he's

21  dangerous.  You would have to depend on the facts.  You

22  would have to wait and require the State to prove that to

23  you beyond a reasonable doubt.  Could you do that?

24     A.     I believe I could.

25     Q.     Just because you found him guilty, you

1   wouldn't automatically answer No. 1 yes?

2        A.     That's correct.

3        Q.     Okay.  Special Issue No. 2 asks whether the

4   defendant actually caused the death of the deceased or did

5   not actually cause the death of the deceased, but intended

6   to kill the deceased or another or anticipated that a human

7   life would be taken.  That's the question that deals with

8   the accomplice or the parties, as we call them.

9                    First part, if you believe he actually

10  caused the death, you could answer that yes.  But the second

11  part is he didn't actually cause the death of the deceased,

12  but intended to kill the deceased or another or anticipated

13  that a human life would be taken.  You understand that part

14  about we have to prove that he anticipated that a human life

15  would be taken?

16       A.     I think I understand that.

17       Q.     What type of evidence or facts would be

18  important to you?  How could the State ever prove that to

19  you that someone anticipated?

20       A.     I guess it would just be other's testimony

21  that you would be relying on.  I guess you would have to

22  believe what they are saying.  I think like we were saying

23  before, when they went up there, even though he wasn't the

24  triggerman, they probably, you know, if they were all armed,

25  you know, they were just saying no one could get in their

1    way or stop them, it could be any one of them.  It was just

2    a circumstance to where the unfortunate victim was at that

3    time and where they were spaced.  It could have been any one

4    of them, you know, that killed him.

5                    So it would be the anticipating that that

6    life would be taken.  I mean, if he was -- I mean, like the

7    defendant was in the back of the store and the front of the

8    store, just depending on where the victim was at the time

9    something went wrong.  I mean, any one of them could have

10   pulled the trigger, which is probably saying, you know, all

11   of them did.

12        Q.    Do you think, then, those type of

13   circumstances where everyone is armed and maybe they're

14   violent men or something, that even if it's another part of

15   the store, they all should be held responsible?

16        A.    Yes.  Because what I was saying before, like

17   your example about the three men robbing the bank, if only

18   one of them is armed, you are more liable to believe the

19   other two saying they didn't anticipate taking a life

20   because they were not armed, you know.  You might be more

21   likely to believe those two guys sitting out in the car, the

22   guy bagging money or where they sort of had a pact where

23   they weren't going to kill anybody and the guy with the gun

24   did it.  Obviously, if they weren't armed, they weren't

25   going to be taken alive, but, then again, it would be hard

1    to make the determination.  Those three could have said, you

2    know, if we got to get away, you know, just be one is

3    against the other.

4                        I think in this case where all of them

5    were armed, if they were all spread out just at the time

6    something went wrong, any one of them could have taken one

7    or more person's life.  So I think they should all be held

8    accountable in that situation like that.

9         Q.    So it makes a big difference to you if they

10   are all armed?  It kind of goes to their intent, that sort

11   of thing?

12        A.    I would say that would go for more for their

13   intent.

14        Q.    And that's the situation where you think the

15   accomplices could be prosecuted for the death penalty?

16        A.    Yes.

17        Q.    Okay.  Let's talk about Special Issue No. 3.

18   This question is kind of long.  It's the mitigation

19   question.  You don't get to it unless you have found the

20   defendant guilty, unless you have found he's a continuing

21   danger to society, and unless you have found that he

22   intended for the person to die or anticipated a person would

23   die as a party, then you get to this last Special Issue,

24   which is the mitigating question.  Neither side has the

25   burden of proof.

1          It asks you to look at all the evidence

2  that's been presented and then answer the question.  If you

3  would, take a minute to read question No. 3 to yourself.

4       A.     (Prospective juror complies.)

5       Q.     That question covers a lot of areas.  It asks

6  you to take into consideration all the evidence,

7  circumstances of the offense, the defendant's character and

8  background, and personal moral culpability of the defendant.

9  It lets you look at everything, you know, how the offense

10  occurred, then if there's any previous crimes he's

11  committed, any good things he's done in his life, all that

12  stuff, good and bad, and you look at it all.  Then you

13  decide if there's sufficient mitigating circumstances that

14  would warrant a sentence of life in prison, rather than

15  death.

16          I can't tell you what mitigating evidence

17  is going to be.  It would be up to you and the other jurors.

18  You don't even have to agree with the other jurors.  I'll

19  give you an example.  You may have sat on a case -- you can

20  sit on a case and the evidence might show the defendant went

21  to Harvard and got three or four degrees.  One juror might

22  say that's mitigating because he's smart and did something

23  with his life.  And another juror might say, I would hold

24  that against him.  That's aggravating.  Someone that has

25  that opportunity or kind of brains shouldn't commit offenses

1    like this.

2         A.        Uh-huh.

3         Q.        We go over different areas and you don't have

4    to agree or disagree with any of them.  But for one example,

5    we talk about a person's background, the way they were

6    raised.  You know, someone may come from a poor background.

7    Perhaps they had a broken home or they were physically or

8    mentally abused as a child.  Some jurors tell us that could

9    potentially be mitigating because it's a child in that

10   shape.  And other jurors tell us, you know, I feel bad about

11   that, but a lot of people have a bad background and they

12   don't go out killing people and that sort of thing.  You

13   have to be held accountable when you grow up.

14              How do you feel about that type of

15   information?

16        A.        I think I go with what you said on the latter,

17   you know, it's probably too bad that something like that

18   happened, but, I mean, you know, it's up to you to make a

19   change.

20        Q.        Okay.  It kind of -- you don't -- you are not

21   required to tell us what you think mitigating evidence would

22   be.  You just have to be able to tell the Judge I can keep

23   my mind open to it and if I think there's something

24   sufficiently mitigating, I can answer the question that way.

25   Do you think that you can keep your mind open?

1        A.      Yes.

2        Q.      As you sit here today, does anything come to

3   mind that you might view as potentially mitigating evidence?

4        A.      In this particular trial or just --

5        Q.      General.

6        A.      For that Special Issue No. 3?

7        Q.      Yes.

8        A.      Not offhand, really.

9        Q.      Most jurors don't.  We recognize that

10  hopefully you are not sitting around thinking about these

11  types of things, but you think that you can keep your mind

12  open to it?

13       A.      Yes.

14       Q.      Now, the procedures are the same in every

15  capital case.  If you find the defendant guilty, you would

16  move on to the punishment phase.  And if the State proved to

17  you beyond a reasonable doubt that question No. 1 should be

18  answered yes, question No. 2 should be answered yes, and if

19  you answered no to the mitigating issue question, the Judge

20  would sentence the defendant to death.  If you answered the

21  questions any other way, he would get a life sentence.

22  Those are the only two possible outcomes, a death or life

23  sentence, based on how you answer those questions.

24              Are you familiar with the method of

25  execution in Texas?

A.      I believe it's lethal injection.

Q.      That's correct.  It's in the news a lot.  Are you aware that Texas leads the nation in executions?

A.      I've heard that on the news.

Q.      It's true.  There's in excess, usually, of 30 executions or more a year in Texas.  The procedures are the same in this case.  If the questions were answered yes, yes, and no, the Judge would sentence the defendant to death.  He would be housed on death row.

At some point in time, the Judge would actually set a date of execution.  On that date he would be given time with family, friends, a minister, a last meal. But at 6:00 p.m. the execution will take place in Huntsville.  He's put on a gurney, strapped down.  There's needles placed in his arm and witnesses come into the viewing room and view the execution.  At that point in time the warden signals and substances are injected which stop his heart and his lungs.  It happens in about 15 seconds.

It's a punishment that actually occurs in Texas.  And you have told us philosophically the way you were raised that you believe in the death penalty for certain crimes, kind of told us that you understand the kind of rules or the procedures that they set out.

It's one thing to talk about being in favor of the death penalty and it's another thing when you

1   get down here on a jury and think a little more and actually

2   participate in this event.  You know yourself a lot better,

3   obviously, than we will ever be able to know you.  I just

4   want to ask you this.  As best you know yourself, if we put

5   you on this jury and we prove these things to you like we

6   think we can, because we fully anticipate we will prove the

7   guilt and how these questions should be answered, which will

8   result in his execution, do you think that you could

9   actually take pen in hand and write in the answers, knowing

10  that when you do that some day down the line the defendant

11  here would actually be executed some day?

12       A.    Yes.

13       Q.    Okay.  Mr. Richards, I've been over a lot of

14  information.  I think I've run out of questions, believe it

15  or not.  Do you have any areas you would like to talk about

16  or anything else you think we should know about you?

17       A.    No, I don't think so.

18       Q.    Okay.  That's all the questions that I have,

19  then.  I'm sure the defense will have questions for you, but

20  I appreciate your patience and your cooperation.

21       A.    Okay.

22            THE COURT:  Mr. Sanchez?

23            CROSS-EXAMINATION

24  BY MR. SANCHEZ:

25       Q.    Mr. Richards, I know one of the persons that

1  you respected the most is Sparky Anderson.  Is that Sparky

2  or Spanky?  I couldn't read that.

3           A.     Sparky.

4           Q.     Baseball manager?

5           A.     Yes.

6           Q.     Did you meet him at the Rangers?

7           A.     Yes.  He was the stadium manager of the

8  Tigers.

9           Q.     Were you a Tigers' fan?

10          A.     No, not really.  I just like the way that he

11 conducted his team.

12          Q.     Okay.  Followed his career?  Went to the Reds

13 and Tigers?

14          A.     When I was growing up we lived in Indianapolis

15 and Louisville (phonetic) when I was in elementary school

16 and they were the closest team and he was the manager.  So

17 the Reds were my favorite team.  So I just always followed

18 him, not really the Tigers, just him.

19          Q.     Okay.  Is he a nice guy?

20          A.     Yeah.

21          Q.     All right.  Well, I also noticed in your

22 questionnaire that you indicated that you knew police

23 officers that were in your Sunday School classes?

24          A.     Yes.

25          Q.     Who are they?

1     A.     Um, one is Larry Allen.  He's with Dallas

2  Police Department.  I believe he's been there 10, 11 years.

3  And another one is Chad Chadwick.  He just started.  He's

4  still in training with Highland Park.  I guess they have a

5  unique system where they are firemen, policemen, and

6  paramedics, so I think he started about a year or so ago and

7  he's still in training.

8     Q.     Is your only contact with them through the

9  Sunday School?

10     A.     No, we're -- we're probably -- we're -- one of

11  the three couples we hang out with are the Chadwicks.  We do

12  stuff on Fridays, go to Six Flags, ballgames.

13     Q.     Close friends?

14     A.     Yes.

15     Q.     Do you have children yourself?

16     A.     We do have children.

17     Q.     Your children are friends with their children?

18     A.     Yes.

19     Q.     You understand that in this case the State is

20  alleging that an officer was killed by Mr. Murphy or the

21  party to it.  Would the fact that you have close

22  relationships with those people who are police officers play

23  into your decision --

24     A.     No.

25     Q.     -- in this case?  Would it somehow be in the

1    back of your mind when you are listening to the evidence

2    that you know these police officers that well?

3          A.    No.

4          Q.    If -- would you have a problem if the State

5    can prove their case to you beyond a reasonable doubt and

6    finding Mr. Murphy not guilty and not having to explain

7    yourself to your close friends?

8          A.    I wouldn't have a problem with it, if the

9    evidence warranted his verdict.

10         Q.    Okay.  And since you know police officers that

11   well, would the fact that a police officer comes in and

12   testifies -- let me just back up.  The law says that every

13   witness that walks in that you listen to starts off at the

14   same level of credibility.  Okay?  You can't give him any

15   more points or less points based on what they do for a

16   living.  Okay?

17         A.    I understand that.

18         Q.    That's before they testify.  Of course, once

19   they testify, you can decide, believe all or parts of what

20   they have to say.  Based on your close contact with

21   somebody, two officers, is there any possibility that you

22   would start off a police officer at a higher level of

23   credibility before they have even opened --

24         A.    No, I wouldn't.

25         Q.    Also, when you first sat here and started

105

1    answering questions, you indicated that there was advocates

2    out there who in a death penalty case, that life in prison

3    or a life sentence would be somehow better and that you

4    disagreed with that.  Am I misquoting you when I say that?

5        A.    Say that -- you are saying that I disagreed

6    with someone spending time, life imprisonment?

7        Q.    Instead of the death penalty.

8        A.    I think that it's a case by case matter,

9    warranted on the evidence, then that's the punishable crime.

10       Q.    You consider a life sentence to be -- is a

11   severe punishment in a death penalty case?

12       A.    I would say that it would be.

13       Q.    And you think or do you think that it would be

14   appropriate in some cases, but probably not in all cases or

15   how would you phrase that in a death penalty where the State

16   is seeking the death penalty?  Would you think that just

17   because they seek the death penalty that the death penalty

18   always has to be assessed?

19       A.    No.

20       Q.    Now, when talking about parties and

21   accomplices, also, you indicated that maybe as long as they

22   make a pact that no one was going to get hurt and somebody

23   kills somebody on their own that that can be in your mind a

24   circumstance where the death penalty wouldn't be warranted;

25   is that correct?

1    A.    That's what I said, yes.

2    Q.    Would you always need that pact before --

3    A.    No.

4    Q.    So you would look at the case and --

5    A.    Look at the whole case, the merits, because,

6    obviously, that would just be one -- be one part of the

7    evidence.

8    Q.    So when we look over here at Special Issue No.

9    3 where it says including the circumstances of the offense,

10   that might be something that you would look at and say on

11   how to answer that Special Issue how it happened, the

12   evidence of the case, what level of participation the person

13   took?

14   A.    I think you would have to look at No. 3 in all

15   cases.

16   Q.    Would that be something that you would

17   consider yourself?

18   A.    What --

19   Q.    The level of participation of the person in

20   trial.

21   A.    Yes.  I think I said before it just depends on

22   the nature and the circumstances.

23   Q.    Now, at first it seemed when you sat down, you

24   may not have been aware that this is one of the cases that's

25   been titled the Texas Seven cases.  Would that be right in

1    saying that?

2         A.    Yes.

3         Q.    And as we started talking, you realized that

4    we were talking about one of those cases?

5         A.    Yes.

6         Q.    And I noticed in some of your answers you

7    would say things that led me to believe that you already

8    decided about how this all happened out there at the scene.

9    I may be wrong, but have you -- you said something about

10   they were all spread out in the store?

11        A.    No.  I was just citing that as an example.

12        Q.    It wasn't something that you decided already

13   happened in this case?

14        A.    No.

15        Q.    Now, we need twelve jurors on this case who

16   haven't made up their mind as to what happened out there

17   based on what they heard on the media or documentaries or

18   newspaper articles or books that you have read.  I mean, you

19   know yourself better than I do.  Is there some possibility

20   that based on what you heard or have seen that you may have

21   already made up your mind as to what happened in this case?

22        A.    I don't think so.  I mean, obviously, I'm not

23   going to lie to you.  I've seen the media coverage on TV.  I

24   have been exposed to what they've said happened.  But I

25   haven't really read in depth anything in books or newspaper

articles, just what I saw on the news.

Q.    So the exposure you have had is the 5:00 news and in the newspapers?

A.    The 10:00 news and the bold headline on the front page of the paper.

Q.    Does that exposure in any way taint the way you think the facts are going to play out?

A.    I don't think so.  I'll be honest.  I mean, other than what I've seen on the news, that's about all I know that happened on it.  I never really followed that much.

Q.    Originally you said that you would reserve the death penalty for the actor and the accomplice may not in your mind, may not be the person to put to death. Originally when the State asked you that question, that was basically your answer; is that right?

A.    That's when I -- what I said.

Q.    And then your answer changed a little bit?

A.    No.  I said -- I think I said that my answer changed, but it would be based on the circumstance.

Q.    And it wouldn't --

A.    -- of what happened.

Q.    And I'm just curious if it at all had any effect that you found out later on in the question that that was one of the Texas Seven cases, how that would -- somebody

1  being an accomplice may receive the death penalty in your

2  mind where before you weren't that sure?

3  A.   No.  I don't think I said before that.  I said

4  accomplices shouldn't be convicted on the death penalty.  I

5  think I said based on the circumstances, it would warrant an

6  accomplice not being convicted.  That's not what you thought

7  I said.  That was what I was meaning to say.

8  Q.   That's why I was asking.

9  A.   I believe accomplices, they could be held

10 accountable and receive the death penalty.  It would just be

11 the circumstances.

12 Q.   On Special Issue No. 2, one of the things that

13 the jury is going to have to decide is whether the defendant

14 actually caused the death of the deceased or not actually

15 caused the death, but intended to kill the deceased or

16 anticipated that a human life would be taken.

17           Now, I know the State kind of went over

18 it, but you understand they have to prove Special Issue No.

19 2 beyond a reasonable doubt to the jury before you could

20 answer yes to that question?  Knowing that you found the

21 defendant guilty at this point of capital murder and knowing

22 that you have answered yes to Special Issue No. 1, would you

23 still require the State to prove that to you beyond a

24 reasonable doubt that the person anticipated that a human

25 life would be taken?  In other words, would you require them

to convince you beyond a reasonable doubt or would you

already just answer yes to that question because you already

answered the other ones?

                    In the way it's said, I think that's a

very confusing question.  But, in other words, would you

require the State to prove Special Issue No. 2 to you beyond

a reasonable doubt, first of all?

      A.      Yes.

      Q.      Okay.  And would you require circumstantial

evidence or hard evidence?  I mean, there was a question as

to whether you needed an agreement by the co-conspirators in

order to answer that.  What would you really need in order

to answer that question or have it proved to you beyond a

reasonable doubt?

      A.      For Special Issue No. 2?

      Q.      Yes.

      A.      I mean, for me to tell you, I don't know if I

could right now.  I mean, I would have to sit on the jury

and hear the whole case.  I think you are asking me, like,

anticipate what I hear to give you an answer.  I really

couldn't.

      Q.      But if you are on a jury, you know, found him,

you know, guilty, obviously, you are finding him guilty on

the evidence that was presented in the trial.  Probably most

of that evidence would be that Special Issue No. 2.

111

1          And another thing that you are going to,

2    if you are on this jury, that you are going to encounter is

3    you are going to take an oath, that oath that you are going

4    to have to follow the law that the Court gives you and the

5    law that applies in this case.

6          Sometimes people believe, well, you know,

7    I'm on the jury and I'm going to do what I think is right

8    regardless of what the law may say.  In your questionnaire

9    to the question, regardless of what the Judge says the law

10   is, jurors should do what they believe is the right thing,

11   and you had answered yes.

12         I don't know if you recall answering that

13   and you explained that by saying, "If I believe that

14   something is right, I'm going to go with my instincts."  I

15   want to explore that a little bit and ask you, are you going

16   to do what you think is right as a juror, regardless of what

17   the law says in answering these Special Issues because you

18   think that's the right thing to do and it may not have been

19   proven beyond a reasonable doubt or are you going to follow

20   the law and hold the State to the burden that they should be

21   held to?

22        A.     Could you read that again?  I don't remember.

23   It's been so long.

24        Q.     It's been a while since you filled this out.

25   Once of questions was, "Do you agree with the following

1  statement"?  And the statement was, "Regardless of what the

2  Judge says the law is, the jury should do what they believe

3  is the right thing."  And you wrote, you checked the box

4  that said yes.  And you explained it by saying, "If I

5  believe strongly that something is right, I'm going to go

6  with my instincts."

7  And I just want to explore what you meant

8  by that.

9       A.     And the question was about doing --

10      Q.     Basically, was some people think that or

11  regardless of what the Judge says the law is, in other

12  words, whatever the law is, jurors should do what they

13  believe is the right thing to do.

14      A.     Okay.  I must have misinterpreted that

15  question.  I mean, if I served on the jury and I took an

16  oath, I would do everything based by the law and not my own

17  personal, you know, feelings.

18      Q.     So when you said that you would go with your

19  instincts, would they be limited by the law, your instincts,

20  or still do what your instincts told you to do?

21      A.     No.  I would obey what the law told me to do.

22  I must have misread that.  I mean, the way it looks, I don't

23  know the way you are interpreting that question.  It's like

24  my mom got killed or something like that, if I just felt

25  that he killed someone that I would just go with the death

1    penalty no matter what the Judge said.  Is that how you are

2    interpreting that?

3           Q.     No.  I didn't know how to interpret that.

4    That's the reason I wanted to ask you to explain that.

5           A.     I must have misinterpreted the question,

6    because I wouldn't have just a personal vendetta.  I mean,

7    if the Judge said, you know, ignore that, I wouldn't say he

8    said it.  I'm going to stick to it.  I wouldn't do that.

9           Q.     Usually where that comes into play is holding

10   the State to their burden.  Your sole job as a juror is to

11   decide whether the State has proven their case beyond a

12   reasonable doubt and that's your sole job.  I mean, it's not

13   going to get into, you know, moral questions and things like

14   that.  You are just judging their case.  And sometimes

15   people think, well, you know, I need to do the right thing,

16   even though I'm not convinced beyond a reasonable doubt.

17   I'm still going to do what I think is right.  And by you

18   doing that, you are lessening the burden on the State.  And

19   you are going to take an oath that you would hold them to

20   it.  You understand what I'm saying?

21          A.     I understand what you are saying.

22          Q.     That's why I'm asking that question.

23          A.     Okay.

24          Q.     Now that I have explained it that way, would

25   you be more concerned about doing what you thought was right

--

A.     No.  I would be more concerned with how the evidence was presented.

Q.     And then after it was presented, would you still hold the State to their burden and make them prove their case beyond a reasonable doubt?

A.     Yes.

Q.     And make them prove those Special Issues?

A.     Yes.

MR. SANCHEZ:  I have nothing further, Your Honor.

THE COURT:  Mr. Richards, if you would, please, sir, give us a few minutes and wait for us outside and we'll have you back and let you know the final decision.

[Prospective juror out]

THE COURT:  What says the State?

MR. SHOOK:  We have no challenges for cause, Judge.

THE COURT:  Defense?

MS. BUSBEE:  We challenge the juror for cause.  I think it's clear that he has predetermined the facts in this case and I would like to outline to the Court some of the things that happened this afternoon that exhibit that.

First of all, he had a strong opinion as

1   to whether or not an accomplice was death worthy and that

2   was the opinion that he was not.  And if he were to write

3   such a law, he would not include those persons to those that

4   were subject to the death penalty.  Upon learning that this

5   case as one of the Texas Seven, there was a change in his

6   person.  He flipflopped on that after learning of the Texas

7   Seven.

8           He also told the Court under oath when he

9   filled out his questionnaire that he had seen the

10  documentaries or shows about the Texas Seven.  He told us

11  that before he knew this was a Texas Seven, after he found

12  out it was a Texas Seven case, he backpedaled and denied

13  that he had seen any shows, other than the news reports.

14          Furthermore, the questionnaire on page 9

15  asked the question very specifically as the Court is well

16  aware, do you agree with the following statement, regardless

17  of what a Judge said the law is, the juror should do what

18  they believe is right and he checked yes.  And I don't think

19  that there's any question that he understood what he was

20  being asked, because his answer is, if I believe strongly

21  that something is right, I'm going to go with my instincts,

22  indicating that his moral code of conduct would be stronger

23  than the Court's instructions.

24          Throughout his voir dire he has -- we see

25  a complete turn around from the time he learned part of the

1  -- prior to the time he learned the nature of this case, and

2  subsequent and some of his answers reflect a knowledge of

3  the facts of this case that he has denied under oath.

4                    And I think it's clear from the totality

5  of his questionnaire and his interview here today that he

6  has formed an opinion and that he does have a bias and I

7  would ask the Court to grant my challenge for cause on juror

8  No. 499, Mr. Richards.

9                    MR. SHOOK:  In response, Judge, I think

10  when we were talking about what he had seen on the Texas

11  Seven, he said that he had seen news reports and I might

12  have misread what he said about the documentaries.  I think

13  that was just on the others.  I don't think that he was

14  trying to say he saw those documentaries.  But regardless of

15  that, threw "under the law" out there about could you put it

16  aside and decide the case on the facts, he was clear on his

17  answers.

18                    So I don't think that he was disqualified

19  on publicity.  And I think he's qualified under the law in

20  all other areas.

21                    THE COURT:  Court finds that when

22  Mr. Richards was explaining the law and had an opportunity

23  to explain his answers he provided on the questionnaire, on

24  further reflection he had acknowledged to the Court that he

25  understands the law.  The Court finds this juror to be

1  qualified.

2              Would you like a minute to step in your

3  office?

4                    (Recess)

5              THE COURT:  What says the State?

6              MR. SHOOK:  State accepts the juror.

7              MS. BUSBEE:  Defense will exercise a

8  strike.

9              THE COURT:  Ask Mr. Richards to come back

10 in.

11                  [Prospective juror in]

12             THE COURT:  Mr. Richards, thank you for

13 your service and time to this Court.  And I know at this

14 point you will be disappointed, but you are not going to be

15 sitting on this case.  It's one of those things that people

16 don't want to serve on the jury, but you go through the

17 process.  You kind of do.  So I thank you again for the

18 parties, but you will not serve as a juror on this case.

19                  [Prospective juror out]

20             THE COURT:  Mr. Hamman.

21                  [Prospective juror in]

22             THE COURT:  Good afternoon, sir.  How are

23 you?

24             PROSPECTIVE JUROR:  Good.

25             THE COURT:  Your name is Glenn Scott

1   Hamman?

2                    PROSPECTIVE JUROR:  Hamman.

3                    THE COURT:  Sorry for the wait.  We don't

4   know if we'll speak to someone for ten minutes, an hour, or

5   two hours, so we have three people in the afternoon and

6   whoever gets here first goes first.  So I appreciate your

7   patience with us, but it's one of those things with

8   scheduling.  I have to make one person wait or ten people

9   wait.

10                   I appreciate you coming down.  Obviously,

11  you had time to review the guide that I provided for you.

12  It's a lot of law to be given to someone and we don't expect

13  you to understand it from front to back.  The lawyers will

14  speak to you on certain issues of the law.  My job is to be

15  sure that you understand the law and then can you follow it?

16                   Only thing the lawyers are interested in

17  is your truthful opinions and there are no wrong answers.

18  So this is the only time that you get to interact with the

19  lawyers and the Court on a case like this.  Some people

20  think it's somewhat intimidating because you are the focus

21  of attention.  Sometimes people think they are on trial and

22  they are not.  It's just the only way that we can really

23  have a good opportunity to visit with you and be sure you

24  understand what is involved in this case.

25                   Only question I have for you, the trial

1   date for this case shall begin on November 10th.  Will you

2   have any problems serving the Court with those two weeks?

3                    PROSPECTIVE JUROR:  I don't believe so.

4   I don't know of anything right now.

5                    THE COURT:  Very well.  With that,

6   Mr. Wirskye?

7                    GLENN HAMMAN,

8   having been duly sworn, was examined and testified as

9   follows:

10                    DIRECT EXAMINATION

11  BY MR. WIRSKYE:

12       Q.    Mr. Hamman, how are you?

13       A.    Good.

14       Q.    My name is Bill Wirskye.  I'm the Assistant DA

15  who will have a chance to visit with you for the next few

16  minutes.  And what I would like to do is touch on some of

17  the information in your questionnaire and talk a little bit

18  about your thoughts on the death penalty and capital

19  punishment and talk a little bit about the laws that apply,

20  if you are selected to be a juror in this case.

21                    Going through your questionnaire, on the

22  very last page we asked your thoughts about what you thought

23  about being chosen as a juror in this case.  I think you

24  said you were a little bit uneasy?

25       A.    Yes.

120

Q.     What did you mean by that?

A.     Well, what was the exact question on that?

Q.     I know it's unfair.  You filled it out in May.

A.     It's hard to remember.

Q.     We're all sitting here looking at it and you haven't thought about it.  How would you feel about being chosen as a juror in this case?  And your answer was "uneasy."

A.     I guess being -- it seems like I remember that I guess it was some mention of the case in there as to what it was or -- and I just kind of -- I guess I, being on a death penalty case, I never have sat on one of those before, so --

Q.     Yes.

A.     So I would be a little bit uneasy on doing something like that.

Q.     Particularly, just being on a different type of case or death penalty case in particular?

A.     Yeah, probably just the death penalty-type case.

Q.     You have been a juror before on just a regular straight murder case; is that right?

A.     Right.

Q.     How long ago was that?

A.     Oh, that was probably -- seems like at least a

1  couple of years ago.

2          Q.   Okay.

3          A.   I can't remember the exact date on that.

4          Q.   Late '90's or --

5          A.   Yeah, maybe two or three years ago, somewhere

6  around in there.

7          Q.   Okay.  Was it down in this building?

8          A.   Yes.

9          Q.   Okay.  What do you remember about that case,

10  the facts or --

11          A.   It was a case that was in -- Lancaster High

12  School kids like at a party and I think some people from

13  Ferris had come down and kind of busted up that party and I

14  guess there was probably some drinking and marijuana and

15  things like that being used.  And the guy was surrounded by

16  some people and I think a fight broke out and he had a gun

17  with him and he started shooting, hit somebody, killed them.

18          Q.   Based on what you recall, was the evidence

19  pretty straightforward?

20          A.   Yeah, it was fairly confusing, because there

21  was some people involved as witnesses, I mean, they had, I

22  think, about of a murder it's probably somebody is going to

23  do something like that, that they would like to not have any

24  witnesses around, but in this case here it was a party, so

25  there were probably 50 witnesses.  So everybody had a

1    different story and it was kind of hard to put everything

2    together on something like that.

3            Q.      Looks like y'all ended up finding the person

4    charged guilty of murder?

5            A.      Yeah.

6            Q.      And I think 75 years, was that the sentence?

7            A.      Right.

8            Q.      Did you hear any additional evidence in the

9    punishment or the second part of the trial?

10           A.      Um --

11           Q.      That you remember?

12           A.      I don't recall.  I don't recall that right

13   offhand.

14           Q.      Okay.  And you told us, I guess, generally,

15   you are in favor of having the death penalty available as a

16   punishment in some cases.  And I guess the case you served

17   on was just, again, what we call a straight murder case or

18   regular murder case.

19           A.      Right.

20           Q.      You know, in Texas you may or may not be aware

21   that only a certain subset of murder cases qualify to

22   actually be prosecuted as capital murders, actually qualify,

23   where the State can come in and seek death.  Just in your

24   own words, what do you think?  Why do you think we should

25   have the death penalty available in our society as a

1  punishment?  What value do you think it serves?

2      A.      Um, I guess that if you didn't have the death

3  penalty, then I feel it would probably be a little easier

4  for people to kill someone and, you know, it's somewhat of a

5  deterrent.  Somebody really wants to kill somebody, I don't

6  think anything would stop them doing that.

7      Q.      Sure.

8      A.      Whether it's short of the death penalty or

9  not.  But I think you have to have that because there is a

10  gray line there where somebody might not commit a murder.

11  They might think twice about it instead of doing it, if they

12  know they might die for it, so --

13      Q.      In Texas, generally, I think you can think of

14  capital murder as an intentional killing or intentional

15  murder plus something else.

16      A.      Uh-huh.

17      Q.      You shoot and kill a police officer, murder a

18  police officer in the course of their duty, a fireman, a

19  child under six, or if you commit a murder in the course of

20  committing another felony like robbery or burglary or rape,

21  that type of thing.  Those type cases are the only ones that

22  would be eligible for the death penalty.  And I can pull out

23  a gun right now and shoot Mr. Shook because I don't like his

24  tie ten times in the head in the courtroom in front of

25  everybody and that would not be eligible for the death

1   penalty.

2                     What do you think about that?  I mean, if

3   you were king of Texas or Governor for a day, would you kind

4   of expand the list of eligible cases or are you happy where

5   it is or shrink it or --

6        A.  .   Yeah, I mean, something like that, I guess, if

7   it's an outright murder, something like you just got through

8   describing, then I would warrant that being worth the death

9   penalty on something like that, I mean.  If you kill -- if

10  you kill somebody and you intentionally do that, then I

11  think it's warranted for the death penalty.

12       Q.     Okay.  So I guess just any intentional murder,

13  premeditated or bad facts, that type of thing?

14       A.     Yes.

15       Q.     But you realize the law that we have now, the

16  Legislature has given us, it's a more limited or narrow set

17  of facts?

18       A.     Uh-huh.

19       Q.     Do you know the murder case that you sat on,

20  was there only one person charged in that crime?  Do you

21  remember more than one person with a gun or --

22       A.     Let's see.  I think it was -- I think it was

23  just one person --

24       Q.     Okay.

25       A.     -- that was charged, because I believe -- I

1  think he's the one that had the gun.

2      Q.      Okay.  The reason I asked that is oftentimes,

3  especially in a situation like this where we're talking

4  about a capital murder case, I think most people tend to

5  think off the top of their head about the one guy going in a

6  7-Eleven, maybe, and shooting and killing the clerk during

7  the course of a robbery.  But as you probably know and can

8  imagine, oftentimes crimes are committed by groups or gangs

9  of people and sometimes you have only got, I guess, one

10  person pulling the trigger, but you have other people

11  involved in the crime.

12          And the law in Texas actually allows us

13  to prosecute those nontriggermen for capital murder, the

14  people that were active participants, but didn't actually

15  pull the trigger and depending on the circumstances, the

16  nontriggermen would actually receive the death penalty.

17          And I'm going to ask you how you feel

18  with that.  Because we talk to a lot of people and some

19  people, you know, would completely take the death penalty

20  off the table as an option for somebody that doesn't pull

21  the trigger.  I wonder what your thoughts are in that type

22  scenario?

23      A.      Well, I think if -- if you are -- if you are

24  in a group that something like that happened and you don't

25  know who actually did it and you're part of that group and

1   you made a choice to be part of that group, then you would

2   have to be -- have the death penalty, you know.  Whether or

3   not you were the shooter, who would really know?  And, you

4   know, they could be pushed back and forth between that group

5   and the pointing could start and say, I didn't do it, he did

6   it.  And that kind of stuff like that.  Well, you made a bad

7   choice of being with that group and have something like that

8   happen, so I think that group ends up being one in a case

9   like that.

10          Q.      Acting as one?

11          A.      Acting as one.

12          Q.      We get that a lot, acting in concert.  So you

13  wouldn't necessarily take the option of a death penalty off

14  the table for someone who didn't pull the trigger; is that

15  right?

16          A.      That's right.

17          Q.      I'll give you a quick example.  Say, Mr. Shook

18  and I decide we'll get together and rob a bank.  And, you

19  know, he's got the gun and we know each other.  I know how

20  mean he is and may have been to prison before.  And we go in

21  to do the bank robbery.  He's got the gun.  He's holding it

22  on the teller.  And I come in and I'm collecting the money.

23                  And at some point something goes wrong

24  and he shoots and kills that teller and, obviously, he's the

25  triggerman.  He could be prosecuted for capital murder and

1  ultimately, depending on what happens at the trial, receive

2  the death penalty.   But depending on my exact role in the

3  offense, maybe whether I had a gun or how actively I was

4  involved, that type of thing, I could also be found guilty

5  of capital murder and ultimately receive the death penalty.

6  What do you think about that type of scenario?

7  　　　　A.　　Well, I think in a case like that, that it's,

8  you know, you are part of that group and, you know, it's

9  unfortunate that something like that might happen, but you

10 still had a choice and you are going in there with an intent

11 to commit some kind of a crime.   And in your instance there,

12 talking about a bank robbery, well, there could be somebody

13 else in there with a gun that might try to stop the robbery

14 or something like that.   And before you go in you probably

15 know that somehow that there -- somebody could get hurt.

16 And so, there again, you made a bad choice of going in that

17 bank, trying to rob it.

18 　　　　Q.　　And we talk to a lot of people and they tell

19 us that sometimes if we had gotten together and said, hey,

20 no matter what happens, we're going to do what we need to do

21 to get out of here.

22 　　　　A.　　Yeah.

23 　　　　Q.　　We are not going to leave any witnesses, that

24 type thing.   That sounds like the type stuff that might be

25 important to you in deciding whether I should ultimately

1   receive the death penalty; is that right?

2        A.      Right.

3        Q.      Let me ask you this.  You know, again, we talk

4   to a lot of people down here.  We realize this isn't

5   everyone's cup of tea when you are talking about a capital

6   murder case where you know actually somebody could get the

7   death penalty, a person you are in the same room with like

8   Mr. Murphy, sits here today, a life, breathing person.

9            And we talk to a lot of people who, I

10  guess, philosophically or in the abstract are in favor of

11  the death penalty.  But, you know, probably be coming fast,

12  it's one thing to be philosophically for it and be for it in

13  the abstract and it may be another thing for some people to

14  actually participate in it.  And neither side is here to

15  force someone into something one way or the other if they

16  are not completely comfortable with it.  We don't want to

17  make anybody do anything to violate their conscience.

18            And, you know, I just want to make sure

19  before we start and go any further that you feel that you

20  are the type person that could make those decisions in a

21  capital murder case and, for lack of a better word, are

22  comfortable in participating in a trial like this.  How do

23  you feel about that?

24        A.      Well, as I stated on my last question there, I

25  wouldn't really feel, you know, that comfortable doing

something like that.  It's not an everyday occurrence for me
to do something like that.  But, I know how society is
supposed to work and if that ends up being the case where
somebody has broken the rules and that it leads to the
highest type punishment, then, you know, it's something that
I would have to do.  But although I might not feel that good
about doing something like that, but, you know, I guess I
could probably do that.

    Q.    Okay.  You know, in Texas we don't ask a jury
to kind of make -- we don't give them one question and say
should the defendant get the death penalty or should he get
a life sentence?  What we ask them to do, and you probably
read it in the handout, is -- the questions are up on the
wall -- to answer a series of questions.  And we let the
answers to those questions determine the appropriate
sentence.  If the questions are answered yes, he's a future
danger; yes, he caused the death or anticipated the death;
and, no, there's nothing mitigating about the crime or his
background or character, then under that situation the Judge
would have no discretion and the death sentence would be
imposed.

         So I just want to make sure that you are
comfortable, you are the type of person that could take pen
in hand and answer those questions such that you know it may
result in the death of a human being.  Again, I know it's

1  not easy or comfortable for anyone, but I want to make sure

2  you are the person that can answer those type questions.

3       A.   Yeah, that --

4       Q.   We're going to talk about the questions a

5  little more in detail, but I want to make sure that you are

6  okay before we go any further.

7       A.   Yeah, yeah, I think I could do that.

8       Q.   Okay.  Fair enough.  And as you may remember

9  from your trial, trials in Texas are divided into two parts.

10  The first part of the trial is, basically, the

11  guilt/innocence part where it's just mainly focused on the

12  facts of the trial.  It would be up to a jury to decide

13  whether the person is guilty of capital murder or not.  You

14  know, did the State prove their case beyond a reasonable

15  doubt?

16            And if the person is found guilty, then

17  you move into that second phase of the trial, which would be

18  the punishment phase.  The rules of evidence would be a

19  little bit broader.  You would get to hear different

20  information, good things about his past, bad things about

21  his past, if they are -- their prior criminal history, that

22  type of thing.  We try to bring you a little bit more

23  information so you can answer these questions and make that

24  decision and that's, basically, how the trial works at that

25  point.  Does that kind of make sense to you?

1     A.     Uh-huh.

2     Q.     That's our law in Texas.  And, you know, we

3 just want to make sure you are the type of person that feels

4 they can live with that and follow the law that the Judge

5 gave you; is that right?

6     A.     Yes.

7     Q.     All right.  Let's look at Special Issue No. 1

8 up here on the board.  They are called Special Issues.  I

9 like to call them questions.  Question No. 1.  And realize

10 before we even answer these questions, you would have found

11 the person guilty of capital murder.  Okay?

12     A.     Okay.

13     Q.     And then we go in --

14     A.     This is the punishment.

15     Q.     -- the second phase, the punishment phase,

16 that is assuming that you found him guilty.

17          Basically what the law is, is, you know,

18 nothing that you do in that first part of the trial, the

19 guilt phase, automatically answers any of the questions in

20 the second phase.  The law requires the jury, a juror, to

21 start in the second phase with an open mind and look at the

22 evidence again and answer these questions in good

23 conscience.  Does that make sense to you?

24     A.     Yes.

25     Q.     Okay.  No -- none of these questions are

answered automatically.

A.      Uh-huh.

Q.      Things like that, the first question,
basically, asks whether there's a probability that the
defendant would commit acts of violence that would
constitute a continuing threat to society.  Basically, is he
going to be a future danger?  That type of thing.

Do you see kind of how that question asks
you to make a prediction about future behavior?

A.      Yes.

Q.      Okay.  Is that something that you feel like
you would be comfortable with, looking at the type of crime
and maybe looking at his background and making somewhat of a
prediction about future behavior?

A.      Yeah.  I think, you know, after hearing enough
evidence and I guess he would end up having some
psychologists and things like that in there and kind of
getting the case history of somebody is kind of profiling
somebody, I could make a decision based on that information.

Q.      Okay.  That's the type of evidence that would
be important to you?

A.      Uh-huh.

Q.      Okay.  You know, that question is pretty
straightforward, unlike a lot of things we do.  Do you know
here when you see that word "probability", what does that

1  mean to you?

2      A.      That there's a pretty good chance of something

3  being positive and there's always that other chance of

4  something being on the negative.  But I think of a

5  probability of being on the higher side of something.

6      Q.      Okay.  Basically what it is, certainly doesn't

7  have a certainty or high probability.  Maybe more likely

8  than not.  Does that make sense to you?

9      A.      Yeah.  I mean, if you had the word "high" in

10  there, then it would mean one thing.  But just the word

11  "probability" is a little lower scale than the higher

12  probability, the way I look at it.

13      Q.      And then it talks about commit criminal acts

14  of violence just as you read that "criminal acts of

15  violence", I'm curious how you would interpret that.

16      A.      Well, I would say any kind of -- as we talked

17  about earlier, like robbing a bank or any kind of robbery or

18  bodily harm to someone else or something like that.

19      Q.      What about threats?  That type of thing?

20      A.      Yeah, that would kind of be on a little bit

21  lower scale, but threats, I think that would be probably one

22  of the things I read in there where somebody threatens

23  somebody's life and it's -- I can't remember if that was --

24  would be part of aggravated --

25      Q.      Robbery?

1       A.      -- robbery or something like that with a

2  threat, with some kind of bodily injury whether it's with a

3  weapon or not.  But --

4       Q.      Sure.

5       A.      But bodily injury threat.

6       Q.      I wanted to make sure that you understand the

7  law doesn't require us to prove that another murder is going

8  to be committed or aggravated robbery or rape.  It's just

9  any act that you would consider a criminal act of violence.

10 Does that make sense to you?

11      A.      Yes.

12      Q.      And finally the question talks about that very

13 last word "society."  Constitute that continuing threat to

14 society.  And I'm just curious how you would define

15 "society" when you think about that word.

16      A.      Um, I guess society is -- it's pretty general.

17 It's kind of -- I think of society as just the entire

18 population of people.

19      Q.      That's pretty much what people tell us.

20 Anyone that he might come into contact with, is that kind of

21 what I'm hearing you say?

22      A.      Yes.

23      Q.      Okay.  If it's out here in the free world with

24 us or behind bars.  Does that make sense to you?

25      A.      Yes.

1  Q.  Other prisoners, guards, that type of thing?

2  A.  Uh-huh.

3  Q.  Okay.  One thing to remember about these

4 questions, question 1 and question 2 are alike in the sense

5 that we have the burden of proof.  We have to prove it to

6 you as a juror beyond a reasonable doubt that the answer

7 should be yes.  Kind of a default setting on those first two

8 questions is no and it's up to us to prove to you beyond a

9 reasonable doubt that the answer should be yes.  Does that

10 make sense to you?

11  A.  Yes.

12  Q.  You had mentioned, you know, that you think

13 maybe some psychiatrists or psychologists, that type of

14 thing, may be helpful for you in answering No. 1?

15  A.  Yes.

16  Q.  What -- explain that to me again.

17  A.  Well, if we wanted to talk about backgrounds,

18 you know, if you were saying that we would have more

19 information on that punishment phase and find out if

20 somebody had a kind of a record in the past or their past

21 history, character witnesses coming up and talking about

22 what had happened in the past, and I assume that probably at

23 some point in the trial there would be some kind of

24 psychologist or psychiatric-type evaluation based in there.

25 So based on things like that, then you would know a little

1  more about that person to be able to make an educated --

2      Q.    Decision?

3      A.    Pardon?

4      Q.    Make an educated decision?

5      A.    Yes, that's --

6      Q.    Is that something that you feel like you would

7  want to hear from a psychiatrist or psychologist to answer

8  that?

9      A.    It wouldn't have to be, just be from other

10  people, other people that maybe he has worked with and been

11  associated with for years and high school friends or things

12  like that.  It doesn't have to just be from a professional

13  person.  But I would like to take everything there and put

14  it all together and try to sum up my own opinion based on

15  that information.

16      Q.    You wouldn't necessarily require that either

17  side bring you a psychiatrist or psychologist?

18      A.    No.  If there's not one present, it's just

19  character-type witnesses, then that might end up being

20  enough.

21      Q.    Let's move on to question No. 2.  This is

22  whether the defendant actually caused the death, whether

23  he's the triggerman.  Of course, if he's the triggerman,

24  that question is pretty easy.  Or if he didn't actually

25  cause the death of the person, if he intended to kill the

1  person, like a hitman or murder for hire, or he anticipated

2  that a human life would be taken.  This is the question that

3  kind of covers that nontriggerman scenario.

4              And I want to be honest with you and lay

5  all our cards out on the table.  This is a case where we're

6  prosecuting Mr. Murphy under that theory of accomplice, the

7  nontriggerman, and that's the theory we're proceeding under

8  in this case.  And, again, I want to make sure that you are

9  comfortable sitting on a case where the State is seeking the

10 death penalty for an accomplice or a nontriggerman.

11     A.     Uh-huh.  Yeah, like I said before, if you know

12 -- if you are part of a group and something like that

13 happens, then it's unfortunate that you are part of that

14 group, but I guess the answer is yes to your question on

15 that.

16     Q.     Okay.  Kind of going back to our example of me

17 and Mr. Shook, you know, if he goes in with that gun and I

18 say, hey, the teller is trying to get away, shoot her.

19 Obviously, I'm not the triggerman.  But I certainly had been

20 an active participant and I could be found guilty of capital

21 murder.  Or if I just should have anticipated that a life

22 may be taken, because I know he's mean, I know he has a

23 loaded gun, that type of thing.

24     A.     Uh-huh.

25     Q.     Then I could be convicted of capital murder.

1    In order to receive the death penalty in Special Issue No.

2    2, the bar is raised just a little bit from the standard of

3    should have anticipated to actually did anticipate.  They

4    would have to prove or the State is going to have to prove

5    in my case that I actually anticipated a life would be

6    taken, that type of thing.  Does that make sense to you?

7         A.    Yes.

8         Q.    And, again, question No. 1, that starts off

9    with a default setting of no and it's the burden of proof on

10   the State for us to prove to the jury beyond a reasonable

11   doubt that the answer to that question should be yes.  Does

12   that make sense to you?

13        A.    Yes.

14        Q.    Okay.  Let's talk about Special Issue No. 3.

15   That's a little bit different from the first questions, but

16   neither side has the burden of proof.  In that question --

17   okay, it's just up to you as the jury to answer that and

18   that's basically, I guess, a safety net or a safety valve.

19   That's kind of the last stop in the process, kind of ask a

20   juror to step back, take a deep breath, and looking at

21   everything they have seen and see if there's anything there

22   that is mitigating, anything that would lessen his personal

23   moral blameworthiness.  And if there is something like that,

24   is it sufficient that his life should be spared?  Does that

25   make sense to you?

1     A.     Yes.

2     Q.     Okay.  We talked to a lot of people and, you

3   know, realize before we even get to Special Issue No. 3, you

4   found the person guilty of capital murder.  You have decided

5   they are going to be a future danger to society.  You have

6   decided they either pulled the trigger or they anticipated a

7   life would be taken.  You know, you decide all that before

8   you get to Special Issue No. 3.

9             Some people tell us, you know, very

10   frankly, by the time I've gotten that far in the process, my

11   mind is closed.  I don't care what the law is, you know,

12   there's just not going to be anything mitigating.  My mind

13   is closed to it.

14             So I want to make sure that you kind of

15   understand about that last stop in the process and that you

16   can tell us truthfully that actually if you got to Special

17   Issue No. 3, that your mind would be open to that.  What do

18   you think about that?

19     A.     Um, you know, I guess the way I see that is

20   just, you know, maybe a back door to get out.  But like you

21   were saying, if the first there -- if you go through the

22   question 1 and 2, it seems to me the way those questions are

23   set up there is that you have pretty much made up your mind

24   at that point in time that someone like that would be a

25   menace to society and that they did act with an intent to do

1    some kind of a crime there.

2              So I think that at that stage there, I

3    don't know -- I mean, I don't know if that No. 3 would apply

4    to the way I'm thinking on something like that.

5         Q.    Uh-huh.  What the law, basically, says is the

6    law doesn't necessarily tell you what is mitigating.  You

7    can think something is mitigating and another juror would

8    think it's not mitigating, it's aggravating.  All you need

9    to tell us in order to be a qualified juror is, hey, going

10   into Special Issue No. 3, even though I have made these

11   other decisions, I can still keep an open mind.  And if

12   there's something there that I consider sufficiently

13   mitigating, I can keep an open mind and deny imposing the

14   death penalty and give a life sentence.  Does that make

15   sense to you?

16        A.    Yes.

17        Q.    That's the law.  Is that something that you

18   think you would be able to follow?

19        A.    Um, yeah, I guess I could -- it would probably

20   have to be something -- something big come up if I've

21   already made that decision based on those top two.

22        Q.    I know it's not something you sit around

23   thinking about.

24        A.    I mean, it would have to be something big that

25   would really sway my mind to change my thought process from

1  that to do that.  I know some people might end up needing

2  that back door to get out because they might end up thinking

3  what have I gotten myself into or something like that.  I

4  don't really want to do this.  That's the back door to do

5  that.

6          But I think for me that once I got

7  through the 1 and the 2, trying to keep up with the way the

8  laws are stated and the way your questions are stated, that

9  I don't -- it would just have to be something big to change

10  my mind.

11     Q.    We always ask people and no one sits around

12  thinking about this stuff and I hope you don't, unless you

13  are a lawyer like us.  But we ask a lot of people, you know,

14  anything off the top of your head that you would consider

15  mitigating and almost to a person no one can come up with

16  anything.  So it's not unusual and we can't require you to

17  come up with things.  Sometimes people say, well, if the

18  person was real young, that might be mitigating.  Other

19  people would say, no, you are old enough to know right from

20  wrong.

21          Some people may tell us, you know, if

22  they were abused or had a bad childhood, that may be

23  mitigating.  Other people would say, again, life is choices

24  and you can overcome a bad upbringing.  So we don't require

25  you to make a decision one way or tell us today what you

1  would consider mitigating.  We just need for you to be able

2  to tell us you can keep an open mind.

3                      You know, basically what it boils down to

4  is this is the final check, the final safety valve, the

5  final stop, in the process.  And can you honestly tell us

6  that you could keep an open mind and that you actually see

7  value to having, you know, that Special Issue No. 3 and, you

8  know, your mind isn't closed by the time you get there?

9         A.     Uh-huh.  Yeah, I guess I could keep an open

10 mind in doing that, if that's, you know, it would be -- it

11 would be pretty small at that stage, but I guess like a

12 one-percent-type open mind there once I got to that stage of

13 it after answering these other questions and finding

14 somebody guilty of that.

15        Q.     You know, like I said, we talk to people that

16 say, no, Mr. Wirskye, my mind is just closed.  That question

17 has no meaning for me, has no value.  I don't see the

18 purpose, utility, in it.  But I want to make sure you see

19 the value in it and that you can tell us you could keep an

20 open mind.  You don't know what it is.  You know, you may

21 listen to 99 or 100 death penalty cases and never hear

22 something that is mitigating.  As long as you can keep that

23 open mind, go into it and see some value in it, you would be

24 a qualified juror and you will be able to follow the law.

25 Do you think that's something that you can do?

1    A.    Like I said, it's a one at that stage of the

2  game right there.  It's a one-percent-type open mind.

3  There's --

4    Q.    What a lot of people tell us is, it's been in

5  the news a little bit, mental retardation.  You know, if I

6  heard evidence that somebody is severely or mentally

7  retarded, to me that might be mitigating.  That type of

8  thing.

9    A.    Uh-huh.

10    Q.    And a lot of people tell us that that's been

11  on the news a lot lately in capital punishment and stuff.

12  Do you think that you could keep that open mind?

13    A.    I guess in a situation like that, I don't know

14  if it would, the way I feel about murder.  No matter who

15  does it, you know, somebody is taking another life and it

16  might be hard for me to change my mind at that stage of the

17  game.

18    Q.    Okay.

19    A.    I mean, if my mind was going to change, it

20  might be somewhere in the trial process that would affect

21  the 1 and the 2.  But once I've got to that stage of the

22  game, it would be kind of hard for me to change my mind.

23    Q.    We kind of touched on this earlier.  That's

24  kind of the scheme that we have that the Legislature has

25  given us.  You don't make a choice between the death penalty

1   and life.  We ask you to use your, I guess, mental

2   discipline and work the process that we have if you find him

3   guilty of capital murder, find that doesn't automatically

4   answer -- you know, because you found him guilty, doesn't

5   answer No. 1 automatically, doesn't answer No. 2

6   automatically.  By the same token, because you found him

7   guilty and maybe answer No. 1 yes and No. 2 yes, it doesn't

8   automatically answer No. 3 for you no?

9        A.    Uh-huh.

10       Q.    I mean, that's what we're looking for.  Can

11  you really use that mental discipline?  You don't have to

12  think of an example right now.  You just have to tell us you

13  have an open mind and you can follow the law and that you at

14  least see some value in having that question.  You know, I

15  don't know what it would be.  We can't predict those things.

16  But, you know, it's kind of --

17       A.    I can see having that third question as a

18  value for certain people because everybody has different

19  thoughts and everybody works through life in different

20  manners.  So I can see having that third question available

21  for people.

22       Q.    Okay.

23       A.    It's just that third question is a small

24  percentage for me at that stage of the game.

25       Q.    That's fair enough as long as you tell us you

1    have an open mind.

2             A.       Okay.

3             Q.       You can follow the law in that respect?

4             A.       Yes.

5             Q.       I'll stop beating a dead horse.  Are you ready

6    to move along?

7             A.       Yes.

8             Q.       But the point is each one of those questions

9    you look at independently.  Nothing is automatic.  You make

10   a fresh, independent inquiry to each question.  You can use

11   everything that you heard to help you answer it.  You just

12   can't answer these things automatically.  Does that make

13   sense to you?

14            A.       Yes.

15            Q.       And that seems like the law and you can follow

16   it and that type of thing?

17            A.       Yes.

18            Q.       Okay.  Let's talk a little bit about, you

19   know, you have been on a murder trial before, but some of

20   the different types of witnesses that you may hear.  You

21   touched on it yourself earlier.  Oftentimes in these types

22   of cases, death penalty cases, either side would call

23   psychiatrists, may call a psychologist to testify.

24                     Just generally, how do you feel about

25   that?  Would you -- you know, a lot of people think that,

1    you know, they are very valuable.  Some people have no value

2    to them.  Some people are kind of in the middle and say, you

3    know, gee, I'll just have to listen and see what they have

4    to say.  Where do you kind of put yourself?

5        A.    Well, I would probably put myself in the

6    middle on that.  Just because somebody is, say, has --

7    that's their profession in doing that, I wouldn't -- I

8    wouldn't just totally, you know, be in awe of them and

9    whatever they said would make me change my mind on

10   something.  It depends on the entire case.

11                 So they are just part of that case and

12   just leading to one more piece of evidence to go on.  So

13   that's why I put myself in the middle.

14       Q.    That's what the law says.  You start over with

15   each witness out on the same level, psychiatrist or

16   psychologist or police officer, you can't give a police

17   officer an automatic leg up because they are wearing a badge

18   and a gun.  Obviously, there is a case where we allege a

19   police officer has been killed.  You have some tie to law

20   enforcement.  You said your sister works in the FBI?

21       A.    Yes.

22       Q.    Who does she work for or what division?

23       A.    I'm not sure who she actually works for, but

24   they are in the Dallas Division.  They were downtown.  I

25   think they moved to that office out on Northwest Highway.

Q.      The new big office building?

A.      Yeah.

Q.      Anything about having somebody close to you that works for the FBI make it difficult for you to be completely fair and impartial in this case?

A.      Um, I guess I've got a nephew that's going through the police academy now, so -- and that's in Garland, Garland Police Academy.  And so my sister, she actually is on the staff there.  She's not an agent out in the field.

Q.      Anything about that that would make it difficult for you to be completely fair to our side or Mr. Murphy?

A.      Um, I guess I would, having people on the police force and the -- I would probably, I guess if I had to sway to one side or the other, I would probably be swayed more towards the police side of it.

Q.      Would you be able to follow the law and start the police witness on that same level?

A.      Yeah, I think I could probably do that.

Q.      Okay.  And the other bottom line question, I guess, regardless of your ties to law enforcement, do you think that you could decide the case just on the evidence you hear in the courtroom?  Do you think that you can do that?

A.      Based on --

Q.      Just the evidence you hear in the courtroom,
not any feelings or emotions that you may have for somebody
else in law enforcement?

A.      Would that be based on anything -- I mean, I
know things about this case.

Q.      And that's the last -- the Judge has given me
I don't have much time left.  But let me cover that one last
area with you.  On a case like this that's a high profile
case, everybody we talk to has heard about the case.  And
we're never going to get a jury of people that don't know a
thing about this case.  And it's okay as a possible juror to
have heard about the case.  You may have even formed some
opinions somewhere along the line.

What the law basically requires is,
again, you know, regardless of what you heard, you don't
necessarily have to put it out of your mind.  You just have
to be able to tell us that I can base my decision on the
facts and the evidence that I hear in the courtroom.  Okay?
You would probably agree with me that would be the best
source of information.

I don't know if you are like me.
Sometimes I'm a little skeptical about what I read or hear
on the TV.  But do you think that you could, regardless of
what you heard or read about this case, just decide this
case based on the facts and the evidence that you hear in

1  the courtroom?

2       A.    Yeah.   I guess in all honesty on that, you

3  know, I do know about the case because I remember it being

4  on TV and I read about the case.

5       Q.    Sure.

6       A.    And that being, you know, something like this

7  happening to a police officer, you know, I do have feelings

8  about that and --

9       Q.    Do you think that you can put all that aside

10 and just base your verdict just on what you hear in the

11 courtroom?

12      A.    Yeah, I would like to think that I can do that

13 and do my societal job on something like that, but I do have

14 some mixed feelings just based on what I've read and what

15 has happened to where that might be a little harder for me

16 to do.

17      Q.    I understand it may be tough.  Because to tell

18 you not to think about something you already know is kind of

19 unnatural and not very within our human nature.  But,

20 actually, it works for both sides because, you know, what

21 you may have heard or read you never know whether it's

22 correct.

23           In order to be fair to both sides, you have to

24 concentrate and base your decision on what you hear in the

25 courtroom and it's kind of one of those questions I'm going

1   to have to pin you down on a yes or no answer.  May be hard,

2   maybe not.  But do you think that you can do it, just make

3   that decision based on what you hear in the courtroom?

4        A.     And it has got to be a yes or no --

5        Q.     Pretty much.  That will be the last question I

6   ask you.  I guarantee you.

7        A.     I guess if I have got to go with a yes or no

8   on that, you know, to being -- I guess I would have to say

9   yes on that.  Like I said, it's still a little difficult,

10  but I would like to think that I can do that.

11       Q.     Okay.  So you can make your decision just

12  based on what you heard in the courtroom, right?

13       A.     I'm trying to -- that's a tough one.

14       Q.     You have already answered yes, right?

15       A.     Yes, with a qualification, right.

16       Q.     It's a yes or no question.  If I don't ask

17  you, they are going to ask you and the Judge is going to ask

18  you.

19       A.     In this particular case it's, you know, I've

20  still got to qualify that it would be hard based on the

21  evidence that is presented in the courtroom.  I would like

22  to think that I can try to do that, but I do know what

23  happened.  And, you know, so I guess I can say yes on it, if

24  you have got to have an answer.  It's a little bit over the

25  line yes, but I'll say that.

1    Q.    I think that's where I'm going to quit,

2   Mr. Hamman.  Thanks for your time.

3                   MR. WIRSKYE:  I will pass the juror.

4                   THE COURT:  Ms. Busbee?

5                   CROSS-EXAMINATION

6   BY MS. BUSBEE:

7    Q.    Okay, Mr. Hamman.  I'm going to let you tell

8   me how you really feel.  You are the kind of juror that we

9   love to have down here because it doesn't seem like you are

10  trying to hide anything.

11                  Here's what happens.  Sometimes when we

12  talk to jurors, by the time you have made it to where you

13  are right now, you have already been culled out.  You don't

14  know how many times some of the strange things that people

15  say on their questionnaires and the opinions and whatnot

16  and, you know, we kind of agree on who we are going to talk

17  to.

18                  So from your questionnaire you,

19  obviously, appear to be middle of the road, that somebody --

20  that both sides may find a juror.  You know, it's hard to do

21  this.  And the reason that it's hard to do it is it's such

22  an extreme penalty.  Nothing hits harder to home than

23  causing the death of someone else.  It has to do with why

24  we're here and it has to do with what the outcome will be.

25                  So I'm pretty sure -- and after talking

1  to you or listening to you talk to Mr. Wirskye, I'm quite

2  certain that you can follow the law.  And I'm quite certain

3  that you are going to tell us the truth.  What I don't want

4  you to do is think that there's something wrong with your

5  opinions.  It's taken -- well, let's see.  You may or may

6  not know that at one point the death penalty in Texas was

7  found unconstitutional and because it was kind of -- it was

8  a formless question once someone had been found guilty of

9  capital murder, there were no guidelines for jurors to tell

10 them what they had to do to determine constitutionally to

11 assess a death penalty.  You know, so some communities it

12 was almost a lynch mob mentality and it wasn't fairly

13 administered.

14              So we -- and this has evolved even since

15 I think it was 1976 when they drafted the first death -- new

16 death penalty statutes.  So it's a work in progress in some

17 respects.  Once in a while you will read something in the

18 newspaper that the Supreme Court has either broadened it or

19 narrowed it.  It's a work in progress, which means if you

20 have an opinion that is different than our scheme here, it

21 wouldn't be surprising.  In fact, I think most people would

22 feel that way.  They either think it should be stronger or

23 they think it should be less strong.

24              So the thing is -- and you saw how many

25 people we brought down that morning.  We brought down -- we

1  brought that many again in the afternoon.  So we expect to

2  talk to a lot of people.  And there's nothing wrong with

3  not, you know, getting on this jury.  The only wrong thing

4  would be if we got a false impression of your feelings based

5  on just asking if you could follow the law.  I just want to

6  know how you feel, because it's okay.  I don't think that

7  anybody necessarily that I know agrees with every law.  It's

8  not like we're asking you to break the law.  We're just

9  asking you to tell us your personal feelings because nobody

10 wants to put you in a position to violate your own moral

11 code, so to speak, one way or the other.

12           So do you know -- you said that you were

13 uneasy and you had a hesitation.  And I kind of see this

14 here because you caught up to the scheme faster than anybody

15 else who has been sitting in your chair.  We've only been

16 doing this two days, but you pretty much honed in on your

17 feelings about this one.

18           Is he going to be dangerous in the

19 future?  You would like some evidence on that, whatever that

20 might be.  And was he part of a gang that anticipated or

21 planned to take a human life, would be things that would

22 have been proved to you beyond a reasonable doubt.  And it's

23 not a more if I say maybe, maybe not.  It's to be proved to

24 you beyond a reasonable doubt.  And if it was proved to you

25 beyond a reasonable doubt, you would have said yes to those

first two questions.

I think I'm hearing from you that No. 3 might be a good thing for people who were uncomfortable with assessing the death penalty, but that as a real matter in the real world, there really isn't anything else that you would need to know to be able to change your mind about giving the death penalty.

A.    Well, I think that some people, they might mean well or they might be bold enough to go that route with 1 and 2 and then at some point in time they might recheck themselves and say, man, what have I done?  I don't -- I got mixed in with the group or I got caught up in the subject of it all and I didn't really mean to go that far.  You know how some people -- well, some people in a group they will do things they might not do individually.  But the group gives the adrenalin flow or something and somebody will end up doing something.

And so that's what I'm saying.  That is my thoughts about that is that you have something in there where somebody can step out at the last minute, if they don't feel -- if they feel like they have gotten caught up in something and they do want to back out, that might be the back door to get them out of that for their own moral conscience.

Q.    Right.  I think that's what -- but you don't

1    need Special Issue No. 3 in your mind?

2         A.      In my mind, if I've gone the route of the 1

3    and the 2 and I've found that somebody has murdered somebody

4    beyond a reasonable doubt, then, yeah, that's just the way I

5    feel about the laws.  If we become too lenient, then, then I

6    think more people would end up doing that, if it was just a

7    life.  If we didn't have the death penalty, it was just life

8    in prison, then there's -- because I know -- well, I guess

9    from reading and hearing things on the news, I don't know

10   firsthand that people, they might have a better life in

11   prison or might be the same type of life.  It's a life that

12   I'm not used to.  I don't really know anything about.  But I

13   know it exists that there's life on the streets that goes on

14   just like life in a prison.

15              And so somebody might end up feeling like

16   they are better off or just as well off in prison.  At least

17   they are getting fed every day and they have some place to

18   stay and perhaps it -- perhaps it is less violent because

19   it's a little more structured, feel better in there.  So

20   they might end up committing a crime and murdering somebody,

21   knowing they are not going to have to die for it.  And they

22   -- maybe they don't intentionally mean to, I guess,

23   premeditate going out and killing somebody, but they might

24   rob somebody for some money and kill them and not think

25   anything of it because, hey, it's just going to be life in

1    prison.

2         Q.    Okay.   I get your point.   So the way you see

3    the scheme, you don't need and don't really consider Special

4    Issue No. 3 to be necessary to you?

5         A.    No.   Once I get to the 1 and the 2, if I'm

6    satisfied in my mind with those two and then like we were

7    saying, this is after the fact we found somebody guilty and

8    now we've heard other character witnesses and other

9    testimony and then we've gone back into the jury room to

10   decide that, then I don't think that I would need the No. 3

11   personally.

12        Q.    Okay.

13        A.    I see why it's there.

14        Q.    For other people?

15        A.    For other people.

16        Q.    So, quite frankly, and I think that you told

17   us this five times, but for the record, if Special Issues

18   No. 1 and 2 have been answered by you yes beyond a

19   reasonable doubt, you wouldn't say yes that he should live?

20        A.    Well, right.   Because if that's the way the

21   law -- I mean, if that's the way the case is set up and

22   that's how he's been prosecuted, then I wouldn't -- I

23   wouldn't have the 3 in there.   I mean, my feelings would end

24   up being that somebody would deserve the death penalty at

25   that stage.

Q.    Okay.  So, question 3 just isn't for you, just 1 and 2 and at that point you say it's been proved to me beyond a reasonable doubt and any of the other issues are immaterial?

A.    What do you mean by immaterial?

Q.    I found he's going to be a future danger, I found he did this intentionally, he knew it was going to happen or expected it to happen, that's all.  These are the questions that you need to answer in order to assess a death penalty?

A.    Uh-huh.

Q.    And the other question is for people who have some trepidation about assessing the death penalty?

A.    Well, you know, and like I said, somebody might get caught up into that and they might go through and they might have voted guilty and then they are coming in and answering 1 and 2 and they are looking at that and saying, yeah, that's good.  I go with that.  I go with the No. 2.  But then at some point in time they might get cold feet.  And so that No. 3 would leave them an out, according to the rules and the procedures going through there that answer 1 and 2.  And if you really can answer those yes at that stage of the game, you still might have cold feet and don't want to do that, you have changed your mind, so to speak, even though it's that late date, so the No. 3 does allow somebody

1    with the moral conscience to get out.  I assume that's put

2    in there so somebody has gone that far and they decide they

3    wanted out, then that might bother them for the rest of

4    their life that they actually had to put somebody to death

5    and so they're thinking about that so that allows them to

6    say, no, I don't answer that question yes.

7         Q.    Okay.  But you, yourself, do not consider --

8    would not consider that as a backdoor way to get out once

9    you have decided issue 1 and 2?

10        A.    Yeah, for me personally.

11        Q.    I think I got your true opinion out on that

12   and I have beat a dead horse, too.

13        A.    That's a hard one to answer a yes or no on.

14        Q.    I know that I spend a lot of time in the

15   courtroom and sometimes I, for various reasons, have to get

16   on the witness stand so I'm used to being in here and I know

17   it's a very nervous, you know, you get anxious and it's hard

18   to concentrate once you first sit up there.  So no matter

19   how cool you are in your normal course of business, it's

20   just an anxiety producing experience to be faced by a bunch

21   of lawyers and drilled.

22              But you have been real frank with me and

23   I appreciate it.  And I'm not going to take up the time I

24   have, but I was wondering, too, since you've been so candid,

25   you said this several times when you were talking to

1    Mr. Wirskye about your knowledge of this case and then when

2    asked if you could set it aside, I think it would be fair to

3    say that you seemed to indicate that you would try and

4    answer it yes, but you were really having some difficulty

5    with that.

6              So you help us -- if you just say, you

7    know, I can't promise you that I can set it aside or I swear

8    that I can set it aside, but you need to err on the side of

9    overcautiousness as far as fairness of the process goes.

10   And, you know, there are people who may not tell us the

11   truth and say they can.  But I think that you have been

12   telling us the truth.  And I'm going to ask you to err on

13   the side of cautiousness and tell us if you really can't set

14   that aside or if you, quite frankly, you know what happened

15   and you have already kind of made up your mind what

16   happened.

17        A.    Well, can I tell you what I do know about the

18   case?

19        Q.    Well, sure.

20        A.    And I guess this is why, you know, I do have

21   an opinion.  I mean -- and I know that the -- we watched it

22   on TV as it took place and it was interesting and this was

23   on that "America's Most Wanted" and things of that nature.

24   And, you know, I've read about the people involved in the

25   case.  And I know that in the robbery of the Oshman's, I

1    think it was that, you know, the policeman was shot about

2    20, 25 times and run over.

3              So -- that would be, you know, knowing

4    that information, that would be hard for me to consider that

5    No. 3.

6         Q.    Okay.  Well, I'm really not talking about No.

7    3 anymore.  I'm talking about if you already have an opinion

8    about guilt/innocence in this case.

9         A.    You know, based on what I do know about that,

10   you know, I guess I would probably have to say that I do

11   have an opinion on that as being somebody mixed in with a

12   group like that and having something like that happen, being

13   a police officer it might -- the evidence would have to

14   really be super strong for me to change my thoughts.

15        Q.    So, in essence, we would have to prove to you

16   that it hadn't happened or it hadn't happened as you think

17   it did before you could change that opinion?

18        A.    Yeah.  My thoughts there would end up being

19   that that whole group, that whole group of people, wouldn't

20   have to be there.

21        Q.    Okay.

22        A.    I mean, I see that group of people being there

23   and, like I said earlier, I think of a group of people as

24   one.  And so that whole group of people wouldn't -- if they

25   weren't at the scene and that was proven beyond a reasonable

1  doubt, then that was a mistake that somebody had made

2  arresting all these people and the other trials that have

3  happened.

4       Q.    So you would have to hear from us something

5  different than what you have already heard in order -- well,

6  that's one of those questions that makes sense to me, but

7  probably didn't make sense to someone else.  You know what

8  happened and I'm guessing that you are saying that you

9  really do know what happened and you can't promise us to a

10 certainty that you can set that aside if you sat on this

11 particular case?

12      A.    Yeah.  Knowing what happened, how it happened,

13 and, you know, just the degree of what happened, then that

14 would be hard for me to.  Like I said earlier, it might be

15 something I would try to put aside, just as a duty.

16      Q.    Sure.

17      A.    But it would be hard to just blank my mind of

18 that.

19      Q.    And you can't guarantee that?  I'm hearing

20 that in your voice?

21      A.    Yeah.  I don't know if I could guarantee that

22 I can blank my mind and start totally fresh without, like I

23 didn't know anything had happened.

24      Q.    Okay.  Listen, I appreciate your candor.

25           MS. BUSBEE:  Approach the bench?

1              THE COURT:  Parties agree?

2              MR. SHOOK:  Yes.

3              THE COURT:  Mr. Hamman, as she said, we

4    appreciate your honesty.  You have indicated that you know a

5    whole lot about this case and also the Special Issue No. 3.

6    The parties have agreed this is not your case.  So we're

7    going to excuse you from jury service and you are free to

8    go.  Thank you for coming down.

9                         [Prospective juror out]

10                        [End of Volume]

1   STATE OF TEXAS              *

2   COUNTY OF DALLAS            *

3        I, NANCY BREWER, Official Court Reporter for the 283rd

4   Judicial District Court, do hereby certify that the above

5   and foregoing constitutes a true and correct transcription

6   of all portions of evidence and other proceedings requested

7   in writing by counsel for the parties to be included in this

8   volume of the Reporter's Record, in the above-styled and

9   numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11       WITNESS MY OFFICIAL HAND on this the 4 day of

12  _____ March ____, 2003.

13

14

15  NANCY BREWER, CSR, NO. 5759

16  Expiration Date:  12-31-04
    Official Reporter, 283rd JDC

17  Frank Crowley Crts. Bldg. LB33
    133 No. Industrial Blvd.

18  Dallas, TX 75207
    (214)653-5863

19

20

21

22

23

24

25

REPORTER'S RECORD

**74851**

VOLUME 9 OF 6 VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

STATE OF TEXAS          *          IN THE DISTRICT COURT

VS.                     *          DALLAS COUNTY, TEXAS

PATRICK HENRY MURPHY, JR.   *       283RD DISTRICT COURT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

INDIVIDUAL VOIR DIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**FILED IN**
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 3rd day of September, 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT:  03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT:  00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Phillip Emery | 4 | 6 | 42 | 9 |
| Erica Hefner | 64 | 66 | | 9 |
| Marty Ingle | 76 | 80 | 114 | 9 |
| Frankie Freeland | 124 | 126 | | 9 |
| Susanne Krupihnski | 136 | 138 | | 9 |
| Dona Garrett | 147 | 148 | | 9 |

P R O C E E D I N G S

1

2       THE COURT:  Ready for Mr. Emery.

3            [Prospective juror in]

4       THE COURT:  Good morning, sir.  How are

5 you?

6       PROSPECTIVE JUROR:  I'm great.  Thank

7 you.

8       THE COURT:  Is your name Phillip Wayne

9 Emery?

10       PROSPECTIVE JUROR:  Yes.

11       THE COURT:  Good morning, Mr. Emery.

12 Thank you for being here.  You brought your guide.  Did you

13 have an opportunity to read that?

14       PROSPECTIVE JUROR:  Yes.

15       THE COURT:  We put a lot of law in front

16 of you and trying to digest in a very short period of time.

17 Please understand that you don't have to be able to

18 integrate all that law and understand it from front to back

19 right now.  The lawyers are going to visit with you and try

20 to explain it to where you can understand it.  And my job is

21 to be sure that you, A, understand the law --

22       PROSPECTIVE JUROR:  Okay.

23       THE COURT:  -- and, B, can you follow the

24 law?  If you don't understand their questions, just say,

25 Judge, can you explain it to me, if they get you confused,

1   and then I'll try to do my best to explain it to you.

2                   With that, the only question that I have

3   for you, sir, is will you be able to serve this Court for

4   two weeks, beginning November 10th?

5                   PROSPECTIVE JUROR:  Yes.

6                   THE COURT:  Any questions?

7                   PROSPECTIVE JUROR:  One, yes.  In reading

8   this when I first came down and filled out the survey, I

9   forget the date I was here --

10                  THE COURT:  Back in May.

11                  PROSPECTIVE JUROR:  It was for Patrick

12  Murphy and this is saying somebody else.  This is saying --

13  and maybe it's just an example, but I don't think it is.

14  This is saying for Randy Ethan Halprin.

15                  THE COURT:  You must have an old one.

16  Good reading.  I have corrected those.  If you should read

17  it was a different template, it is for Mr. Murphy.

18                  PROSPECTIVE JUROR:  Okay.

19                  THE COURT:  Good question.  We'll figure

20  that out, thank you.  Mr. Wirskye, would you like to

21  inquire?

22                  MR. WIRSKYE:  Yes.

23                  PHILLIP EMERY,

24  having been duly sworn, was examined and testified as

25  follows:

<u>DIRECT EXAMINATION</u>

<u>BY MR. WIRSKYE</u>:

Q.   My name is Bill Wirskye.  I'm going to be the Assistant DA to spend a few minutes visiting with you this morning.  We appreciate you showing up early and being on time so we can get started.

What do you think about all this now that you have been called back down for the individual interview?

A.   Well, it's a little -- I've never been involved in anything like this, so it's kind of overwhelming.

Q.   We apologize kind of for the setup.  In a normal nondeath penalty or noncapital case we talk to the jurors as a group.  But since this is a case where we're seeking the death penalty, we get to talk to you individually.  Kind of the best way to do it is put you on the witness stand.  I know it's a little uncomfortable, but to the extent possible I hope you will try to be comfortable.

There's no right or wrong answer.  Both sides really are trying to figure out how you feel about some issues and if you think you are the right type person to be on a case like this.  I'll talk to you a little bit about some of the things in your questionnaire, a little bit about the death penalty, and then maybe, finally, a little

1  bit about the law that you have read that may apply in this

2  case.

3              You told us you are generally in favor of

4  the death penalty; is that correct?

5        A.    Uh-huh.

6        Q.    What do you think the -- or why should we have

7  it as a society, the death penalty, in your view?

8        A.    Well, I just was brought up in church and I've

9  always believed in an eye for an eye.  You are not supposed

10  to take somebody else's life and I just have always been

11  taught and feel and I believe that if you take somebody's

12  life, your life should be taken, also.

13        Q.    Okay.  So that's something you have believed

14  in most of your adult life it sounds like?

15        A.    Uh-huh.

16        Q.    Are there any particular cases that come to

17  mind, maybe cases you read or heard about or particular type

18  of set of facts or something that when you think about the

19  death penalty you think, gee, that's an appropriate case for

20  the death penalty?

21        A.    I really can't think of one that comes to mind

22  per se, no.

23        Q.    No case that you followed in the media or

24  anything like that?

25        A.    Not really, not for the death penalty, I

1  guess.

2       Q.    Okay.  Just off the top of your head, do you

3  think that you might be the type person that could

4  participate in a process like this?  I know it's not for

5  everyone, but --

6       A.    Well, honestly, I would rather not.

7       Q.    Most people wouldn't.  I understand.

8       A.    But, you know, if I'm chosen and have to do

9  it, I'm sure I can do it.

10       Q.    Okay.  Great.  What type of work are you in?

11       A.    I'm in sales.

12       Q.    Okay.  What product or line?

13       A.    Plantation Shutters, so it's a lot of new home

14  construction, visiting with new home owners about all their

15  window coverings in their house.

16       Q.    Do you travel or pretty much in town?

17       A.    Pretty much Metroplex here, yeah.

18       Q.    Your wife works in some kind of security; is

19  that right?

20       A.    Yes.

21       Q.    What does she do?

22       A.    She's a private security officer for Tenant

23  Health Corporation, so she does a lot of traveling and she's

24  responsible for the security, the privacy security, of all

25  the patients for all the hospitals that Tenant Corporation

1    owns.

2          Q.    The health records and things like that?

3          A.    Yeah.

4          Q.    It's not a situation where she carries a

5    weapon or --

6          A.    No.

7          Q.    Wears a badge?

8          A.    No.  She probably wears a badge, but she

9    doesn't carry any weapons.

10          Q.    Okay.  You also told us in your free time you

11    like to fish?

12          A.    Uh-huh.

13          Q.    What type of fishing do you do?

14          A.    Mostly trout fishing is what I was brought up

15    fishing for, but it's learning to, you know, how to catch

16    bass and catch fish.

17          Q.    I'm a bass fishing, large mouth?

18          A.    That's the best kind of fishing.

19          Q.    I don't get the chance to go as much as I

20    would like.  My boat is full of cats and spiders.

21          A.    Yeah.

22          Q.    We talked a little bit about the death penalty

23    and you told us generally you are in favor of it.  Let me

24    run, I guess, a fact scenario by you and get your thoughts

25    on it.

1          You know, oftentimes crimes are not just

2    committed by one person.  I think when you think about the

3    death penalty in Texas or, you know, like murder in the

4    course of a robbery, you think about one person going in

5    with a gun, maybe holding up a 7-Eleven and shooting the

6    clerk and committing a capital murder.  But oftentimes they

7    are committed by gangs or groups of people, that type thing.

8          The law allows us, depending on the facts

9    and circumstances, not only to prosecute, I guess, for lack

10   of a better word, the triggerman for the death penalty, but

11   also depending on the facts and circumstances to prosecute a

12   nontriggerman, somebody that doesn't actually pull the

13   trigger in the case, prosecute them for capital murder and

14   ultimately maybe even receive the death penalty.

15         And there are some people who are in

16   favor of the death penalty, such as yourself, who, you know,

17   really are comfortable with that being the law and there's

18   another group of people that just say, you know, if I was

19   king for a day or Governor for a day, in my state and my

20   world that the option of the death penalty would never be

21   available for that nontriggerman.  Only the person that

22   actually pulled the trigger should be subject to the death

23   penalty, not the nontriggerman.  What do you think about

24   that?

25         A.     That's a real gray area, I have to admit.  I

would not have a problem sentencing somebody to a death
penalty if they were the trigger person, obviously.  A
nontrigger person, depending on the situation and that sort
of thing, you know, I don't know.  It's a tough question.
If they were just in the wrong place at the wrong time, I
would have a problem convicting somebody of the death
penalty.

Q.     Sure.

A.     Somebody may have just lost their head and
lost their cool and killed somebody and everybody else was
just like what are you doing, you know.  Then I don't know
if that person would be worthy of the death penalty.

Q.     Okay.  Let me give you this fact scenario and
see if it kind of crystallizes or helps think through this.
Let's say Mr. Shook and I decide we're going to rob a bank.
We've both been to prison before and I know he's a violent
guy.  The plan is for him to take the gun in and hold up the
bank teller, the bank clerk, while I go in without the gun
maybe and I'm supposed to collect the money, that type
thing.

As we go in and do that, I see the clerk
reaching for the silent alarm and I tell Mr. Shook, hey,
she's reaching for the silent alarm.  He shoots and kills
the clerk.  Obviously, he's the triggerman.  He's committed
capital murder.  The law also allows, you know, probably in

that set of facts and circumstances for me to be prosecuted
for capital murder and, depending on the answers to the
Special Issues that you looked at, maybe receive the death
penalty.  What do you think about that type of scenario?

A.    Oh, that seems a little more clearcut.  You
were definitely involved and participated one hundred
percent in the death of that clerk.  So, yeah, I wouldn't
have a problem there.

Q.    You can keep an open mind for the death
penalty for the nontriggerman in that scenario?

A.    Uh-huh.

Q.    That's basically what the law is.  Obviously,
if it's the wrong place at the wrong time, somebody that
wasn't connected in any way, of course, they wouldn't be
guilty of anything.

You know, sometimes it's called the law
of accomplices.  If I help Mr. Shook, if I aid, encourage,
solicit, or direct him to commit a capital murder, then it's
just as guilty legally of capital murder and depending on
the answers to the questions, I could receive the death
penalty.  Or if you believe we agree to commit this bank
robbery, under my example, and in the course of that robbery
Mr. Shook commits that murder in furtherance of the bank
robbery, even though I didn't have the intent for someone to
die, I could be found guilty of capital murder and

1    ultimately receive the death penalty, depending on what the

2    jury thinks.   Does that make sense to you?

3         A.      Yeah.

4         Q.      Okay.   So I just want to make sure you are not

5    one of those people that would completely take the death

6    penalty off the table in any situation for a nonshooter.

7    Doesn't sound like you are.

8         A.      No, I wouldn't.

9         Q.      Okay.   Under that fact scenario, what do you

10   think would be important to look at for the nontriggerman?

11   What types of facts would you want to know or what would you

12   be interested in knowing about the crime?

13        A.      Well, as much information as I could get.

14   Obviously, I think his background would mean a lot, you

15   know, if he had a violent background and had been known to

16   do it more than once, that kind of stuff.   And all the

17   involvement that he had, you know.   In the case you just

18   gave me there was quite a bit of involvement and quite a bit

19   of facts backing that up and that would all be very

20   important to me.

21        Q.      Okay.   Fair enough.   We talk to a lot of

22   people in these cases and almost everybody we talk to in

23   this particular case, I think, has heard something about

24   this case, pretty much heard something, TV, radio, that type

25   of thing.

1                The law is that just because you have

2    heard something about the case, you are not necessarily

3    disqualified from being a juror.  All the law requires is

4    that potential jurors base their verdict just on the

5    evidence they hear in the courtroom.  You know, it doesn't

6    ask you to forget what you have heard or anything like that.

7    It just asks you to base your verdict on what you hear in

8    the courtroom.

9                And you, like everybody we've talked to,

10   indicated they had heard something about this case.  What do

11   you remember hearing about it?

12        A.      Well, more than anything, just the Texas 7 was

13   a big term.  And the fact that they ended up being caught in

14   Colorado Springs and I'm from Colorado and lived there my

15   whole life.  So that was kind of an interesting event in

16   Colorado.

17        Q.      Trout fishing?

18        A.      Exactly.

19        Q.      You don't learn that in Texas.

20        A.      No.

21        Q.      Okay.

22        A.      Understand it's just a real coincidence and

23   didn't mean anything.  But the last time I had jury duty was

24   the day they were bringing the first Texas 7 to Dallas in

25   the big convoy and I just happened to go to lunch break and

1  I got out of the -- from my lunch break and all the cameras

2  were here and all the news stations, so I got to see the

3  convoy come in while I was here.  And just little things

4  like that.  And it was interesting to see them on TV and see

5  their faces.

6              But as far as all the facts go and stuff,

7  I really don't have all the facts.  What you see on the 6:00

8  news is what I know, what I heard.

9        Q.    But the actual details of anything, sounds

10 like you are still pretty much in the dark about them?

11       A.    I am, I really am.

12       Q.    So it doesn't sound like it would be that big

13 of an issue for you if you were a juror to just base your

14 verdict on what you hear in the courtroom?

15       A.    No, wouldn't be an issue.

16       Q.    So you can put anything you have seen or heard

17 out of your mind?

18       A.    I think so, yes.

19       Q.    Have you had a chance to follow any of the

20 other trials in this case?

21       A.    No, sir.

22       Q.    Okay.  Fair enough.  Like I said, we talk to a

23 lot of people and we really, we don't want to jam anybody up

24 or put anybody in a bad spot.  But I can tell you, you know,

25 it's our position at this table and just to be up front with

1   you, we are prosecuting Mr. Murphy under that law of

2   accomplices as a nontriggerman.

3            But I want to be up front with you.  This

4   table thinks, you know, we have the type and quality of

5   evidence that's going to cause a jury to find him guilty of

6   capital murder and answer those Special Issues in such a way

7   that he will actually receive the death penalty.

8            And I know it's one thing to kind of talk

9   in the abstract or philosophically about being in favor or

10  supporting the death penalty, but I know sometimes for some

11  people it's quite another thing to come down here and

12  actually see a living, breathing human being and maybe be

13  asked to participate in a process that ultimately would end

14  up, you know, with him being executed down in Huntsville, to

15  not put too fine a point on it, but actually lying dead on a

16  gurney in Huntsville.

17           In Texas the death penalty is a reality.

18  We do carry it out in this state.  If he receives the death

19  penalty some day he would be executed.  I want to make sure

20  that's something that you are comfortable with -- or maybe

21  that's not a good word, but you are at least okay with going

22  ahead with this process and potentially being a juror?

23      A.      Yeah.  I think so.  I have given a lot of

24  thought.  Never -- if somebody were to ask you, I've never

25  been involved in a situation like that and to answer the

1  questionnaire back in May, it was eye-opener and then, since

2  then, I've given it a lot of thought.  And up to that point

3  I never have -- you have never been put in that situation,

4  you don't really go to those extremes.  And it would be

5  difficult.

6            Yeah, it would be difficult, but at the

7  same time you have to take all the -- I have to take all the

8  facts and, you know, if the law says this and all the facts

9  point to the person being involved was guilty of those

10  facts, then I can do it.

11       Q.    Okay.  And as you may know now from looking at

12  the law for a few minutes, we don't ask a jury to vote yes

13  or no on the death penalty.  If a person is convicted of

14  capital murder, you know, we ask a jury to look at three

15  different questions and depending on how the jury answers

16  those questions, determines whether the person receives that

17  life sentence or they receive the death penalty.

18            So, again, I just want to make sure that

19  you feel you are the type person that could take pen in hand

20  and answer those three questions in such a way that it may

21  result in the death of a human being and sounds like you are

22  okay with that.  It's not easy or not anything that you

23  would enjoy.

24       A.    Yeah.

25       Q.    But you could do your duty, if you were called

1  on?

2       A.    Yes, sir.

3       Q.    Okay.  And, again, just a little bit of

4  background.  Capital murder in Texas is always a murder, an

5  intentional murder, plus something else.  If you murder a

6  fireman or policeman on duty, a child under six, you could

7  be subject to the death penalty.  If you commit an

8  intentional murder during the course of another felony like

9  robbery or something like that, you could be subject to the

10  death penalty.

11           A lot of people come down here and think

12  maybe any murder case would have the possibility of the

13  death penalty and that's just not true.  I could turn and

14  murder Mr. Shook right now because I don't like the tie he

15  has on, and do it in the most violent way and laugh about it

16  and I may have been to the penitentiary five different

17  times, but that would not be subject to the death penalty.

18       A.    I didn't know that.

19       Q.    We actually reserve just a certain subset of

20  murder cases for capital murder.  And in this case we have

21  alleged the murder of a police officer on duty and, also, an

22  intentional murder during the course of a robbery.  And if

23  we prove either one of those to a jury beyond a reasonable

24  doubt, the law would entitle us to a guilty finding, that

25  the jury find the defendant guilty of capital murder.  And

1    that's, basically, the first part of the trial where you

2    just kind of focus on the facts of the crime itself.

3            If that person is found guilty of capital

4    murder, then you move into the second phase of trial which

5    we call the punishment phase of trial.  And that's where the

6    jury answers those three Special Issues.  At that point the

7    rules of evidence broaden out a little bit.  You may get to

8    hear information about the person's background and

9    character, good, bad, that type thing, prior history, prior

10   crimes, if they exist, in order to help you as a jury answer

11   those three questions.

12            And, again, one way to look at it is, if

13   a person is convicted of capital murder, they are kind of

14   sitting on a life sentence at that point.  If the three

15   questions are answered in such a way yes, yes, and no, then

16   at that point and only then would they receive the death

17   penalty.

18            So it's really kind of a two-phase

19   process.  Does that make sense to you?

20       A.      Yes.  Of the three questions, do they all

21   three have to be yes or two of the three?

22       Q.      Do you have them in front of you?  Flip to

23   them.

24       A.      Uh-huh.

25       Q.      We usually have the big exhibit, but we don't

1  have it this morning.  It would be Special Issues No. 1, 2,

2  and 3.

3          A.   Yeah.

4          Q.   Take a second and run through those and,

5  again, I think you told us they had a different person's

6  name in it.  But if you just read over that, take just a

7  minute to read over that.

8          A.   Okay.  [Prospective juror complies.]  Okay.

9          Q.   Those are the three.  They are called Special

10  Issues.  I just refer to them as questions that need to be

11  answered in a case such as this.  They weren't drafted just

12  for this case.  The Legislature drafted them and they apply

13  to all capital murder cases.

14              One thing to realize when you get into

15  that punishment phase, the law asks the jurors to go back

16  and look at each of these three Special Issues and kind of

17  make an independent inquiry, okay, into each question to

18  really exercise mental discipline and work through each

19  question.

20              What the law doesn't want or doesn't

21  envision is somebody who answers anything automatically.

22  Sometimes we have people that come in here and say, if I

23  found him guilty of capital murder in the first phase,

24  that's automatically going to answer one of those three

25  questions for me.  And that's what the law doesn't want.

1              We want jurors that can keep that open

2    mind, use that mental discipline, be fair, and work through

3    the facts they heard in the first part and the facts they

4    heard in the second part and come to the right answer on

5    these.  Does that make sense to you?

6         A.    Yes, sir.

7         Q.    Okay.  And if you will look at Special Issue

8    No. 1, you know, you will see, you know, is there a

9    probability the defendant would commit criminal acts of

10   violence that would constitute a continuing threat to

11   society?  As you can see, we have the burden of proof on

12   that.  It's just like the first phase, the guilt.  It's up

13   to the State to prove to you as a juror that the answer

14   should be yes, that they are going to be a future danger to

15   society.  So that question kind of starts off with a no

16   answer.  That's kind of a default setting.  We have to prove

17   to you beyond a reasonable doubt the probability that he

18   would commit these future acts of criminal violence.  Does

19   that make sense to you?

20        A.    Yes.

21        Q.    And you can see it's basically asking the

22   jurors to make a prediction on future events based on what

23   they heard about the crime in the first phase and any other

24   evidence they may have heard in the second phase.

25              Is that something that you think you can

1  be comfortable with, making that sort of prediction, if you

2  had some evidence or information in front of you?

3        A.    Well, I don't know about comfortable, but --

4        Q.    Again, that's probably a bad word for anything

5  in this process, but is it something that you feel that you

6  can do?

7        A.    Yeah, I mean, yeah.

8        Q.    Okay.  A lot of words in that question are not

9  defined.  The law kind of leaves it up to the jury.  It's

10  kind of a common sense, really, question with some common

11  sense words.  But when you see that word "probability", what

12  does that mean to you?

13        A.    Well, probability, the likelihood or the

14  chance.

15        Q.    That's pretty much exactly what the law says,

16  more likely than not, maybe 51 percent.  It doesn't say a

17  high probability or anything like that.  Just more likely

18  than not.  Does that make sense to you?

19        A.    Uh-huh.

20        Q.    It talks about the "criminal acts of

21  violence."  Again, that phrase is not defined.  Criminal

22  acts of violence.  Is there anything that comes to you off

23  the top of your head that you think about when you hear that

24  phrase?  I know this is something you probably never thought

25  about.

A.     Well, I mean, if I hear the term "criminal

acts of violence", it's somebody violently breaking the law.

Q.     Okay.  Again, the law leaves that definition

up to you.  I just like to point out that the law doesn't

require us to prove to you as a potential juror that he's

going to be responsible for taking another life or commit

another murder or another capital murder, that type of

thing.  Does that make sense to you?

A.     Yes, sir.

Q.     It could be robberies, threats, assaults, that

type of thing.  Also, the very last word in that question

talks about society.  And the law doesn't really put a limit

on that word "society".  I'm kind of curious how you would

define that or what kind of definition would you give it?

A.     The world I live in.

Q.     Okay.

A.     My neighborhood.

Q.     Okay.  How about the world behind bars?

A.     Say that again?  I'm sorry.

Q.     The world behind bars, prison.  Again, the law

doesn't necessarily limit that word "society."  And I'm just

curious, I guess, when you look at it you would define it to

include, you know, people behind bars, other prisoners,

guards, teachers, doctors, that type of thing?

A.     Oh, I misunderstood your question for a while

1   there.

2          Q.      It's early in the morning, so it's probably

3   me.

4          A.      Yeah, it would go for anybody's space, you

5   know, whether it's minor, whether it's who is ever around

6   it, violent criminal.

7          Q.      Again, that's pretty much -- again, the law

8   allows you to define it that way.  It's a pretty

9   straightforward question.  We have to prove it to you beyond

10  a reasonable doubt.  Again, we do get some people who come

11  down here and when we explain the law to them, they tell us,

12  very frankly, Mr. Wirskye, when I get to that Special Issue

13  No. 1, that first question, my mind is closed.  If I have

14  found somebody guilty of capital murder, whether they are

15  the triggerman, nontriggerman, whatever, if I have found

16  them guilty of capital murder, I'm always automatically

17  going to answer that question No. 1 yes.  I'm always going

18  to feel that way.  It's automatic.  I know what the law

19  requires.  I just couldn't keep that open mind.

20              How do you feel about that?  Do you think

21  you could keep that open mind and again go back and make

22  that independent inquiry to answer that question No. 1?

23         A.      Well, really and honestly, if I found somebody

24  guilty, the State proved to me without a reasonable doubt

25  that that person was guilty of whatever act that we're

talking about, I would probably lean towards putting a yes

for No. 1 automatically.

Q.   It's okay to lean that way or be predisposed

to what the answer is.  What we can't have is people that do

it automatically, that don't look at the evidence, and just

say if I found him guilty of capital murder that fact and

that fact alone is going to cause me to automatically answer

that question yes.

I could sit here and give you

hypotheticals all day long.  You know, my neighbor sexually

assaults my young daughter, okay?  And I find out about it.

I think about it for a few days.  I go over there, kick down

his door, committing burglary, shoot him because he's

molested my daughter.  I've committed a capital murder.

But a jury may find when they get to that

Special Issue that I would never be a future danger because

it was such an isolated event.  It's out of character for

me, that type of thing.  So I could give you hypotheticals

all day long.

And it's okay to lean that way or be

predisposed.  We just need you to say you could keep that

open mind and you won't automatically answer the question

that way.

Do you think that you could, you know,

use that mental discipline and keep that open mind and give

an independent inquiry?

A.    Yes.   After your hypothetical, that kind of defined it a little better.

Q.    Well, the bottom line is, you just don't know what's coming.  We sit here now and ask you to keep an open mind and everyone conjures up those facts that are the worst facts imaginable and, gee, a capital murderer is probably going to always be a future danger.

But you just don't know what's coming in the case because you haven't heard the facts and evidence.  And that's why at this point we ask you, the law will, can you keep an open mind?  Sounds like that's something you can do.  You wouldn't just answer that question automatically yes because you found him guilty of capital murder; is that right?

A.    Yes.

Q.    Okay.  Moving on to Special Issue No. 2.  It's kind of like Special Issue No. 1.  We have the burden of proof on it.  It starts out with a no.  We have to prove it to you a yes.  It kind of deals with the situation we've already talked about whether a person actually pulled the trigger or doesn't actually pull the trigger.

You know, as you read this question, if the person actually caused the death of the deceased, that's easy.  They are the triggerman.  But if they didn't actually

1  cause the death, did they intend the deceased to be killed

2  or did they actually anticipate that a human life would be

3  taken?  And that's kind of, you know, in order to find

4  somebody guilty, going back to our scenario, if you find

5  that I should have anticipated that Mr. Shook may have shot

6  that teller, if I should have anticipated, you can find me

7  guilty of capital murder.

8           When we get to the second phase of the

9  trial, the law imposes a little bit higher burden and says,

10 you know, before you can assess the death penalty you have

11 got to find not only should I have anticipated that a life

12 could be taken, but that I actually anticipated that a life

13 would be taken, that type of thing.  Does that make sense to

14 you?

15      A.      Yes, sir.

16      Q.      Okay.  It's a little bit higher burden from

17 the guilt.

18      A.      Uh-huh.

19      Q.      It goes to that situation we talked about, the

20 person that doesn't actually cause the death, the

21 nontriggerman, which, you know, is how we're prosecuting

22 this case.  But, again, the law requires you to keep an open

23 mind.  You can't answer it automatically, even though you

24 may have found he should have anticipated.  You have to make

25 that independent inquiry in the second phase of the trial

1   and see whether we have proven it to you beyond a reasonable

2   doubt that they actually anticipated a life would be taken.

3   Does that make sense?

4         A.     Yes, sir.

5         Q.     And if we prove it to you, the answer would be

6   yes.

7         A.     Yes.

8         Q.     Make sense?

9         A.     Uh-huh.

10        Q.     I want to make sure you see that difference

11  between the should have in the first part and actually

12  anticipate in the second.

13        A.     Right.

14        Q.     And, again, you are not going to answer that

15  question automatically just because you found somebody

16  guilty of capital murder; is that right?

17        A.     That's right.

18        Q.     Okay.  Finally, Special Issue No. 3.  This is

19  kind of the last stop in the process.  Kind of call it our

20  safety net or safety valve.  We call it the mitigation

21  question.  This is a little bit different than the first two

22  questions because neither side has the burden of proof.

23  It's just up to the jury to answer this question yes or no.

24               Basically, this question asks you to go

25  back, look at the facts of the crime, look at the

1   defendant's character and background and his personal moral

2   culpability, what blame he bears in the offense, and see if

3   there's anything mitigating, anything that lessens his

4   personal moral blameworthiness, and if you do find that

5   there's something mitigating, is it sufficiently mitigating

6   that his life ought to be spared, that he ought to get that

7   life sentence instead of the death penalty.  Does that make

8   sense to you?

9           A.    Not really.  Would you say that one more time?

10          Q.    Sure.

11          A.    I'm not sure what mitigating means.

12          Q.    You know, there's not necessarily a legal

13  definition.  I've seen it defined as something that lessens

14  the defendant's moral culpability, his moral

15  blameworthiness.

16          A.    Okay.

17          Q.    You know, I'll give you a quick example.  Say

18  we go back to when I shoot Mr. Shook because of his tie.  I

19  may shoot him ten times and the jury would think that is

20  aggravating.  Okay?  I may shoot him once because I don't

21  like his tie and realizing, oh, my gosh, what have I done?

22  I throw away the gun, try to give him CPR, call 911.  The

23  jury may find that mitigating.  Yes, I committed the murder,

24  but my actions afterwards were mitigating.  It's opposite of

25  aggravating, anything that lessens a person's moral

1   blameworthiness.

2               Some people think maybe the age of the

3   person.  You know, if somebody is 19, 20 years old, some

4   jurors tell us, hey, that may be mitigating because they

5   were young.  Other jurors may think, gee, that's actually

6   aggravating and it was at least not mitigating because they

7   are old enough to know the difference between right and

8   wrong.

9        A.     Yes, thank you.

10       Q.     Does that make sense?

11       A.     Yes.

12       Q.     Again, we know this is nothing, hopefully, you

13   have ever thought about in your life and we are throwing a

14   lot out to you in a little bit.  Is there anything off the

15   top of your head that you think may be mitigating?

16       A.     With the case?

17       Q.     I'm sorry?

18       A.     Can you repeat the question?

19       Q.     Is there anything off the top of your head

20   that strikes you as maybe potentially mitigating when you

21   think about a capital murder case?  We talked about age.

22   Some people talk about drug use, maybe mental retardation,

23   things like that.  Any of those kind of strike you?

24       A.     Well, yeah, I mean, I think every case would

25   be isolated and you would have to take all the

1  circumstances.  But, yeah, I think a handicap, a mental

2  handicap, or a --

3       Q.   You know, we're not talking about somebody who

4  is so retarded, I guess, they don't know the difference

5  between right or wrong, but some mental handicap like you

6  said.  Does that make sense?

7       A.   Yes.  I think I would have to take a few of

8  those things into consideration.

9       Q.   And that's what the law asks you to do,

10  basically, to look at those things and if you find something

11  mitigating, is it sufficiently mitigating that his life

12  ought to be spared, that type of thing?

13       A.   I understand, yeah.

14       Q.   The law doesn't define mitigating,

15  necessarily, doesn't require that you consider any certain

16  fact or factor mitigating.  It just leaves it up to the

17  jury.  In fact, the jurors can disagree.  One juror could

18  think this is mitigating and another think, no, it's not.

19            So it's kind of up to you.  And, again,

20  it's that last stop, that last check in the system, that

21  safety valve, asks you to take a deep breath, stand back,

22  because you know at this point you have found him guilty of

23  capital murder, you said he's going to be a future danger,

24  you said he anticipated that a life would be taken, you have

25  already made a lot of decisions, but at this point we want

1    you to stand back, take that deep breath, look at everything
2    you have heard, look for mitigation, and see if it's there
3    such that his life should be spared.
4         A.     I understand.
5         Q.     Keep that open mind.  Again, we talk to some
6    people that say, if I'm that far in the process, if I have
7    already made those decisions, my mind is closed.  There's
8    never going to be anything mitigating at that point.  And
9    those people wouldn't be qualified to be a juror.
10              What I kind of hear you telling me is you
11   could keep that open mind even when we get that far in the
12   process; is that right?
13        A.     Yes, sir.
14        Q.     Okay.  Any questions about those Special
15   Issues, those three questions, or how they work?
16        A.     No, no, sir.  I think you have explained them
17   pretty well.
18        Q.     Well, it will be the first time, if I have.
19   So you have never been on a jury before; is that right?
20        A.     No, sir.
21        Q.     Okay.  Let me talk to you just a little bit
22   about some basic laws that apply in any trial, not
23   necessarily a death penalty case.  But the law kind of
24   requires that you start every witness out on the same level
25   of credibility, you know, when they walk in this courtroom

and hit the witness stand.  You can't necessarily give a
witness a leg up because, say, he's a police officer, that
type thing.  You know, once they start testifying, you can
find them credible or find them not credible, but you at
least have to start them off on the same level.  Does that
make sense to you?

A.     Yes.

Q.     You think that you can do that, you know,
start a police officer off on the same level of credibility,
that type of thing?

A.     Yes, sir.

Q.     Okay.  And I ask that because, obviously, this
is a case where we've alleged that a police officer has been
killed.  Your wife is in security.  I know it's not the same
as a police officer.  I want to make sure that you can
follow the law and start everybody out on the same level?

A.     Yes, sir.

Q.     Okay.  A lot of times in these type of cases
you may hear from a psychiatrist or psychologist or some
sort of mental health professional may be called by either
side to testify in that second phase of the trial.  We talk
to some people who say, you know, they are worthless.  I
wouldn't believe a word out of their mouth.  I don't trust
them.  And we talk to kind of another set of people that
just think they walk on water.  Every word out of their

1   mouth is golden.  And we talk to some people who say, you

2   know, I'm just going to start them off with that same level

3   of credibility and see where this goes.  You know, if they

4   make sense, I'll listen to them.  If they don't, I won't.

5   Make sense to you?

6        A.    Yes.

7        Q.    Do you kind of fall in the middle group of

8   people?

9        A.    Yes.  I'm a pretty good judge of character.

10  If somebody is talking off the wall, I catch up with that.

11  And if they are making sense and there's some important

12  information that I find is important to the case, I will

13  definitely listen to it.

14       Q.    We don't want people that will close their

15  minds because they are listening to a psychiatrist and the

16  psychologist.  Sounds like you would keep an open mind to

17  any type witness; is that right?

18       A.    Yeah.

19       Q.    We've talked about the burden of proof.  It's

20  always on us.  You know, the State, the DA's Office, has to

21  prove his guilt beyond a reasonable doubt.  We have to prove

22  Special Issue 1 and Special Issue 2 beyond a reasonable

23  doubt.  This side right here, you know, they are fine

24  lawyers.  They probably will do something, but they don't

25  have to.  The burden is always on us.  It never shifts to

them.

You probably heard about the presumption of innocence.  As we sit here right now, legally the law presumes Mr. Murphy to be innocent.  If we all quit right now and went home, he would be found innocent.  Does that make sense to you?

A.     Yes.

Q.     Okay.  And it's just another way of holding us to our burden of proof.  If you look on the back page of that, you will see the indictment, I guess.  Again, it's probably for the wrong case, but --

A.     This is correct.

Q.     Okay.  The indictment is correct.  That's basically what we have to prove.  We've alleged capital murder.  As I have told you, we have alleged it's been committed two different ways, the murder of a police officer and the murder in the course of a robbery.  That kind of breaks down into different elements that we have to prove.

We have to prove that a certain person on or about a certain date took the life of another certain person in a certain way.  These are what we call elements of the crime.  The law requires us to prove each and every element of the crime.  You know, we can't go nine for ten or eight for ten.  We don't get partial credit.  And if we omit one of those elements, the jury can't help us out.  If we

1   miss one, the law would require you to find the person not

2   guilty.  Does that make sense to you?

3        A.   Yes.

4        Q.   Just to give you kind of a far out example,

5   one of the elements we have to prove is what county this

6   happened in.  Let's say we had a capital murder case in

7   Grand Prairie where some of it is in Dallas County and some

8   of it is in Tarrant county.  The police don't do their

9   homework, the DA's Office doesn't do their homework, and we

10  allege in our indictment as an element of the crime that it

11  happened in Dallas County.

12            And when we get down here to trial and

13  you are on the jury and all the evidence shows it actually

14  happened in Tarrant County, on that case we haven't proven

15  one of our elements.  A lot of people say, hey, it's a

16  technicality.  I don't like it.  We would get fired if we

17  were that negligent, basically.

18            It's kind of an extreme example, but

19  under that example, whether you like it or not or think it's

20  a technicality, you would be forced to find the defendant

21  not guilty because we missed an element.  We don't get

22  partial credit.  We can't go nine for ten or anything like

23  that.  Does that make sense to you?

24       A.   Yes.

25       Q.   Is that something that you think that you can

do, if you have to?

A.      I wouldn't like it, but, yes, I can do it.  I would have to do it.

Q.      It's just our burden.  If we allege that the death happened from a handgun, a shooting, and the evidence shows it's a knifing, a cutting, again, you would have to do it under the law.  You may not like it, but it sounds like that's something that you would have that mental discipline to hold us to our burden of proof?

A.      I would have to, right?

Q.      Yeah, that would be the law.

A.      Yeah.

Q.      Let me talk to you a little bit -- we talked to -- kind of once a person is convicted of capital murder, they are kind of sitting on that life sentence and only if the questions are answered in such a way, do they get the death penalty.  If you serve as a juror, you will find out that a life sentence in a capital murder case means forty years, day for day, forty calendar or forty hard years before the person becomes eligible for parole.  Doesn't mean they are entitled to it, doesn't mean they are going to get it, but that's forty years before they see a parole board.

The law tells you that and then tells us you can't consider that, okay, that you have to treat a life sentence as actually meaning a life sentence, because they

1  may never make parole.  They may actually serve a life

2  sentence.

3              And the reason for that is this.  We've

4  talked about how we want jurors to keep that open mind and

5  really work through the questions.  We don't want jurors to

6  think, you know, forty years, that's just not long enough.

7  I don't want to take that chance, so I'm going to give him

8  the death penalty because he could parole out after forty

9  years.  Or we don't want jurors to say forty years, that's a

10  long time.  That's enough.  I'm not going to bother with the

11  questions.  I'm going to give him a life sentence.  Make

12  sense to you?

13       A.     Yes.

14       Q.     That's why we do it.  Again, we require jurors

15  to presume that life means life.  Does that make sense to

16  you?

17       A.     Yes.

18       Q.     Would you do that if you were called upon to

19  follow that law?

20       A.     Yes, sir.

21       Q.     Okay.  Also, sometimes we try cases like this.

22  You may have a choice of in that first part of the trial to

23  find someone, say, guilty of capital murder or find somebody

24  guilty of a lesser offense like aggravated robbery or find

25  somebody not guilty.  They are called lesser included

1  offenses, basically.

2          Let's say that you found that the death

3  didn't happen, okay?  We have alleged murder in the course

4  of a robbery.  The evidence shows that no one died at that

5  point.  The law would require you to find the person guilty

6  of the  lesser included offense of aggravated robbery.  Does

7  that make sense?

8      A.     Well, yes, except that would be one of the

9  areas that you were -- it would be a technicality, right?

10     Q.     We wouldn't have proven what we alleged.

11     A.     Right.

12     Q.     We could still prove a crime, a lesser crime,

13  like aggravated robbery.

14     A.     Okay.

15     Q.     Does that make sense to you?  Or say we allege

16  -- well, does that make sense?  It may or may not come up in

17  any case.  We just have to talk about it in an abundance of

18  caution.

19     A.     Let's talk about it one more time.

20     Q.     I'm sorry.  Say we try an aggravated or

21  capital murder case where we've alleged a murder happened

22  during the course of a robbery.  Okay?

23     A.     Okay.

24     Q.     And the evidence shows that the murder really

25  didn't happen.  A robbery happened, but a murder didn't.

1  Okay?  So at that point you would find the defendant guilty

2  -- or not guilty of capital murder because no murder

3  happened.  But you would find him guilty of a lesser of

4  aggravated robbery.

5    A.    That makes sense.

6    Q.    In some cases you may have that option.  So

7  aggravated robbery would be a lesser included offense of

8  capital murder, that lesser offense, because we don't know

9  whether it will come up or not in this case.  We still have

10  to deal with it.  It may come up, may not.

11    But in order to be a qualified juror,

12  again, you would have to be able to tell us that if I did

13  find somebody guilty of aggravated robbery, I could keep a

14  full mind to the entire range of punishment for the

15  aggravated robbery.  The range of punishment for aggravated

16  robbery is anywhere from five years in the penitentiary all

17  the way up to life.  Okay?

18    And, again, the law says -- we don't want

19  you prejudging them.  If you do find somebody guilty of

20  aggravated robbery, you would listen to the punishment case

21  and make an appropriate decision.  But you haven't closed

22  out the low end of punishment and you haven't closed out the

23  high end.  You can keep the open mind to the entire range of

24  punishment.  Make sense to you?

25    A.    Yes.

1    Q.    Five to life, is that something that you think

2  you can do?

3    A.    Yes, sir.

4    Q.    Okay.  We have run through a lot.  Do you have

5  any questions for me, Mr. Emery?

6    A.    Well, I don't really think I do.  I was just

7  here to answer questions.  And if I'm chosen to be on the

8  jury, I'm sure I will find out -- I'm sure my questions will

9  be answered, any that come up.  I really don't have any

10  right now.

11    Q.    It's a little unfair.  We bring you down here,

12  we haven't explained any law to you, and get you to fill

13  this out and haul you back down here and tell you all the

14  law.  And, you know, we know that you didn't know the law

15  when you filled this out.  So in a sense it's kind of unfair

16  to ask you questions about it.

17          And we recognize individuals can feel any

18  way they want about a particular law.  They can like it,

19  they can not like it, but the bottom line always is can you

20  follow the law, can you be fair, and keep that open mind and

21  follow the law?  And it sounds like that's something that

22  you could do, if you have to?

23    A.    I believe I could.

24    Q.    Okay.  Mr. Emery, I appreciate your time.

25  Thank you.

1          MR. WIRSKYE:  That's all I have, Judge.

2          THE COURT:  Ms. Busbee?

3                  CROSS-EXAMINATION

4  BY MS. BUSBEE:

5          Q.    Well, Mr. Emery, just like Mr. Wirskye said,

6  it does seem unfair that we ask you about how you feel about

7  things and then tell you what our law is.  But we feel like

8  if we tell people what the law is before we ask them

9  questions, they'll tailor their answers to the law.

10          Because I know you saw how many people

11  were there the morning that you came down.  I think it was

12  in the neighborhood of 2,500 people.  Some of those people

13  by their questionnaires -- a lot of those people by their

14  questionnaires, were unqualified based on some of their

15  answers, so we didn't even discuss them.  We got together,

16  the State and defense, and we went through questionnaires

17  and we weeded out most of them, a small percentage of the

18  folks that actually come down here to talk to us, real small

19  percentage, of that huge group of people that we saw there

20  that morning and I think that now you are getting a picture

21  of why.

22          A lot of people are for the death

23  penalty, but most people think of the death penalty in their

24  mind as, we'll find him guilty of the capital murder and

25  then the death penalty will follow.  But that's not actually

1  how it has evolved.  I mean, did you read the paper this

2  morning?

3         A.     No, ma'am, I didn't.

4         Q.     Well, this is what's happened over the years.

5  The Courts have said, it's not fair, it's not

6  constitutional, whatever kind of roof they hang that on,

7  it's not right to give someone a punishment of death unless

8  certain circumstances are shown and that's the law of the

9  land.

10         And when we get people like you down here

11  and, frankly, you are here because both sides thought you

12  were reasonable and intelligent and you gratified me today

13  because you, obviously, are thoughtful and intelligent and

14  have given this a lot of thought since May.  So I like to

15  preface my questions to you by saying, I want you to tell me

16  how you feel because we still have lots of folks around here

17  that -- lots you saw, that many people that afternoon, too.

18         And we each get about forty-five minutes

19  to talk to you about some of these things and it's not going

20  to be good for you if you have to be shoehorned into what

21  the law is.  Because, I guess what I'm trying to say, when

22  we get people down here like you, sadly, it seems like it's

23  a small percentage of the voters, but in any event, you are

24  going to tell us that you are going to follow the law,

25  obviously, because you are going to follow the law.

1          But this isn't a case of a traffic ticket

2     or a burglary of a house or anything like that.  This is

3     literally a life or death decision.  And so if we have to --

4     if we have to do anything that bothers your conscience, one

5     way or the other, we would like to know that because we have

6     other folks that we could talk to.  And nobody wants to put

7     that burden on somebody who is not -- and I'll use your word

8     "comfortable" with it.

9          So I want to talk to you a little bit

10    about your perspective of this and let you tell me some

11    things.  Unfortunately, the State has to run through a lot

12    of law, so you know what is being discussed.  And I'm going

13    to let you just talk to me a little bit after my five-minute

14    introductory.

15          First of all, just something I saw in

16    your questionnaire.  Are you on commission?

17         A.     Yes, ma'am.

18         Q.     So if you are off the two weeks before

19    Thanksgiving, is that going to be an undue hardship?

20         A.     Yes, ma'am.  Well, it's going to hurt, yeah.

21         Q.     We need to know things like that because

22    sometimes things -- I notice that your children work, but

23    they are in college.  Do you assist them in paying their

24    college tuition bills?

25         A.     Yes, ma'am.

1    Q.    Sometimes there are things going on in

2  people's lives that prey on their minds.  We wouldn't want

3  someone to come up here if their mother was dying of cancer,

4  despite the fact that they would be the best juror in the

5  world, because we may not have that person's full attention

6  simply because they are human beings with a life outside

7  this courtroom.

8          Would the -- if you were selected for

9  this jury and you were seated on this jury, do you think you

10  would be concerned about the amount of money that you would

11  lose?

12    A.    Yes, ma'am.

13    Q.    Only you can answer this.  Do you think that

14  it might distract you to the extent that you couldn't give

15  this your total and full attention?

16    A.    Well, it just depends on what type of activity

17  was going on during the trial.  I get a lot of my business

18  by phone call.  And if I got home each evening and had a lot

19  of phone calls to return and people need me at their house

20  to measure and quote for different projects, very well could

21  distract me.

22          THE COURT:  Let me tell you how we run

23  this court.

24          PROSPECTIVE JUROR:  Okay.

25          THE COURT:  On time.  You were asked to

1  be here at 8:30, you are in the seat at 8:35.  We work

2  business hours, take an hour and a half for lunch.  You can

3  use the phone.  You can use your cell phone back there.  We

4  quit between 4:30 and 5:00.  We take a break in the morning

5  and a break in the afternoon.

6              I understand that people have to use the

7  phone to take care of business.  Obviously, you can't go out

8  and the measure during the day.  You can do that after we

9  get through here.  But I'm not going to shut you down for

10 two full weeks.  Does that help somewhat?

11             PROSPECTIVE JUROR:  Well, yes, yes, that

12 does.

13      Q.    (By Ms. Busbee)  So you could do your

14 measuring after business hours?

15      A.    In some cases I probably could.  Some cases I

16 wouldn't be able to get in unless it was working hours.

17 Some cases I probably could go in the evenings.

18      Q.    Well, understanding now how this process

19 works, do you think -- and only you can tell us and I don't

20 -- we ask enough personal questions in this thing that I'm

21 just going to ask you to search your -- search your mind and

22 search your heart and tell us if you think that because you

23 have to -- you are on commission sales, sitting in here for

24 two weeks under the conditions that the Judge described

25 would distract you to some extent?

A.      Well, I'm not so concerned about the mental

distraction.  If I was told I needed to be here, I would be

here and I would do my best.  The only thing, it would hurt

me probably more financially than anything, to be real

honest with you.  Two weeks during that time, that's a busy

time of the year before Thanksgiving and before Christmas

because it takes about six weeks for these products to be

manufactured and everybody wants them before Christmas.  So

it's a busy time and so I would be out financially.

Q.      Well, you are not saying that you are a bad

person, if you are admitting that you are concerned about

your job and supporting your family.  That's kind of what we

expected you to be when you came up here.  I just, you know,

there are folks that get paid for coming to jury duty

because they are on salary and there are people that have

money and aren't -- or are retired and they can devote all

their time and attention to this.

And that doesn't make you a bad juror.

The only thing that makes somebody a bad juror in my mind is

someone who holds back something that might concern us in

the future.  Because once you are on, it's irreversible.

So if you really think that might be

bothering you and could distract you in any way from what is

going on here, we would like to know that.  I don't think

anybody at these tables wants anyone who is kind enough to

1  answer our questions as seriously as you have to suffer a

2  hardship for it.

3       A.   Well, I think I have answered that.

4       Q.   It's going to bother you?

5       A.   It's going to financially burden me, yes.

6       Q.   I mean, you know, when I'm short on my bank

7  account, it consumes my thoughts.  I'm just wondering if you

8  think it may distract you to the extent that you couldn't

9  give, whatever, your full attention, normally it's two weeks

10  of testimony, that might be preying on your mind to the

11  extent that you might not be able to give it your full

12  attention, in all honesty.

13       A.   Well, I'm not going to say, yeah, I know for a

14  fact that it would, because if my phone isn't ringing during

15  those two weeks for some reason, then it wouldn't bother me.

16       Q.   Has that ever happened?

17       A.   It's kind of a roller coaster.  My business is

18  -- it gets busy and gets slow and gets busy and gets slow.

19  And I'm anticipating that to be a busy time.  And if I

20  wasn't able to respond or be there when they needed me

21  there, then I would more than likely be a little distracted.

22       Q.   Be worried about it?  I mean, I would.  Okay.

23  Just tell me, do you think that if based on the time that

24  this trial will be held, that your financial burdens and

25  your duties of your job would be distracting to give your

1   full attention than, say, you might be able to give us in

2   January when your busy time was over?

3        A.      Yeah, if we could do it in January.

4            THE COURT:  We can't do that, sir.  She's

5   asked it 18 different ways.  Anybody that serves up here,

6   it's financially difficult.  It's like paying taxes.

7   Business is not a reason.

8            Her question is, can you listen to the

9   testimony and judge this case on what you hear from the

10  witness stand or are you going to be so worried about your

11  business that you can't listen to the testimony?

12           PROSPECTIVE JUROR:  Probably somewhere in

13  the middle, quite honestly.

14           THE COURT:  Very well, move on.

15       Q.      (By Ms. Busbee)  You will be somewhat

16  distracted, then?

17       A.      Yes, ma'am.

18       Q.      Now, we talked -- I think capital murder is

19  pretty clear in your mind as it is to most people in this

20  instance.  It's alleged to have been either murder in the

21  course of a robbery or the murder of a police officer in the

22  lawful discharge of his duties.  And you are familiar, I

23  guess, with the basic facts of what this case is.

24           But I'm not asking you about this case.

25  I'm asking you about the scheme that we have in this state

1   for assessing the death penalty.

2              And so let's assume that you are sitting

3   on a jury and you have found beyond a reasonable doubt that

4   that person is guilty of the offense of capital murder.  And

5   the first question that you come to is that question of

6   foreseeability.  You think that person would be a danger in

7   the future.

8              Could you tell us -- you said earlier

9   that you felt like the fact that someone had committed a

10  capital murder was a pretty big sign to you that they would

11  be dangerous in the future.  Would you expand on that and

12  tell me what you were thinking when you said that?

13       A.    Well, I guess I'm a little confused.  Is that

14  a two-part question?

15       Q.    Well --

16       A.    If I were to say that somebody was going to be

17  a problem in the future, I would have to know a lot more

18  about that individual and that individual's background and a

19  lot more than I know now of the facts that we're prosecuting

20  that individual about or I would not be able to make that

21  judgment.

22       Q.    When you -- typically -- so let's just talk

23  about in a typical case when you are asked to find somebody

24  guilty or not guilty.  You don't get to hear all the other

25  things about that person.  It's usually just focused in on

what happened around the indictment, around that.  Haven't

-- not things that happened before or after, anything like

that.  Subsequent to that.

Let's say you found some hypothetical

person guilty beyond a reasonable doubt of a capital murder.

Now you go into the second phase of the trial and the first

question that you have got to answer is do you think that

person would be a danger in the future?  Let's say you want

to hear something about the defendant and his circumstances.

Do you want to hear that from the defendant's table,

anything from us about his history or anything that relates

to that question?

A.     Yes, ma'am.  I would like to get all the facts

from anybody and everybody about that individual and at

least even if they are not going to talk about the past, at

least all the facts that are involved in the particular case

he's being tried for.

Q.     Sure, and you can do that.

A.     And that would be the only way that I could

make an assessment on whether or not he would be a danger in

the future.  That's the facts that I can get at this point.

I sure don't know that.

Q.     Right.  Sadly, we have to ask you questions

based on a no fact situation for the most part.

A.     Yes, ma'am.

1    Q.    Do you think that because they have committed

2  a capital murder that the defense needs to prove to you that

3  he won't be a danger in the future?

4    A.    Um, yes, ma'am.

5    Q.    I mean, what the law is is one thing, but how

6  you feel about it is what we have you up here and drilling

7  you about.  And most people take capital murder very

8  seriously.  And we would really need to hear from the

9  defense in some way to reassure them if they were going to

10  say that he wasn't going to be a danger in the future.  Is

11  that a fair statement of how you feel about it?

12    A.    Yes, ma'am.  I just think that -- I'm not sure

13  on the law, whether it's the defense's responsibility to

14  prove that the person is not going to be a danger to

15  society.  And that may be something that's up to each

16  individual juror, but it's certainly something that I would

17  have to make that assessment after hearing all the facts as

18  a juror.

19    Q.    Okay.  Well, it's not my job.  It's not the

20  defense's job.  The way the law is written -- and I know

21  that you want to say that you are going to follow the law.

22  I just want to know how you feel about it.

23    A.    Well, I guess what I would have to say about

24  that is I know I would be responsible making that decision

25  as a juror on whether or not a person is going to be a

1   threat to society, so I need all the information I can about

2   that particular case and that particular individual to -- in

3   order to make that assessment because I do have to make that

4   assessment.

5         Q.    Sure.  And it sounds like you are going to

6   take it pretty seriously.  I guess what I'm asking you is in

7   your -- despite the fact that the law says I don't have to

8   prove anything to you in the negative as far as he won't be

9   a danger in the future, I don't have to, in other words, for

10  you to decide that he wasn't going to have to be -- we

11  usually have them up there, so it's easy to refer to them.

12              But in order for you as a juror to say

13  this man will not be a danger in the future, you need to

14  hear something from us to reassure you, because that's just

15  the way you feel about it?

16        A.    No, ma'am.

17        Q.    Okay.  The second Special Issue, has to do

18  with anticipation.  We were talking about in this case a

19  theory that if the defendant was a party to an offense.  In

20  other words, a participant of some kind, but as they have

21  said, not actually someone who pulled the trigger.

22              What sort of facts can you think of that

23  would let you know or satisfy you that someone would have

24  anticipated or would have anticipated, not should have

25  anticipated, but did anticipate, that this capital murder

1  would occur?  What sort of things would you need to hear?

2      A.   I believe if everybody was armed with a weapon

3  would be a pretty strong red flag.  You know, I'm just going

4  cold blinder, but any kind of preplan about we're going to

5  do this, we're going to be here at this time, we're going to

6  go this, you are going to do that, there may be a scheme

7  written down on paper somewhere.  I don't know.  But

8  anything like that that was preplanned.  Obviously, if

9  everybody involved was armed -- gosh, I'm having a hard time

10 thinking of all the little things.  But there are a lot of

11 little things that to me would put up a red flag that they

12 were anticipating some violence.

13     Q.   Okay.  So you mean anticipating or planning a

14 robbery or anticipating planning a murder?

15     A.   Probably both.

16     Q.   Well, let me just make sure I have this -- I

17 think you are telling me that you would -- that you

18 understand -- we're not looking at them, so let me double

19 check.  The question is anticipated that the murder would

20 occur.

21     A.   Okay.

22     Q.   And would your answer be the same not

23 anticipate the crime would occur, but anticipate that a

24 murder would occur?

25     A.   Well, I still think being armed would be a red

1  flag that, you know, not too many people carry a weapon

2  without using it and usually when they use it, there's a

3  death involved is the way I see it.

4       Q.    Okay.  Now, let's take you to the mythical

5  hypothetical capital murder jury that you are sitting on and

6  you have found beyond a reasonable doubt that this person is

7  guilty of capital murder as a party.  And you found that

8  they may be a danger in the future and you have found that

9  they anticipated that a death would occur and all these

10  things you have found beyond a reasonable doubt.

11            Do you remember what Mr. Wirskye talked

12  to you about, this safety valve thing?  It's kind of a,

13  without sounding too girlie, to me mitigation is difficult

14  to explain, but I like to say mitigation softens your

15  feelings or softens your heart and aggravating hardens your

16  heart toward an individual.

17       A.    Yes, ma'am.

18       Q.    Would you be able to, after having decided in

19  a case of capital murder that someone was -- had done it,

20  they were going to be dangerous, and they knew this murder

21  was going to happen, could you consider answering that

22  question that they should not get the death penalty?  I mean

23  you, yourself, personally, do you think that you could do

24  that or do you think you just couldn't?

25       A.    Well, I think that I could, depending on what

1   the -- what was the term again?  Not aggravated, but --

2   Q.      Mitigating.

3   A.      Mitigating.  If there was some strong

4   mitigation or whatever the word would be, yeah, I could

5   consider.

6   Q.      Because what we want -- at least I'm speaking

7   for this table, is someone who is not just a knee jerk, I'm

8   going to give someone the death penalty.  No matter that

9   they really understand what we're talking about here and

10  going to give this table a fair shake on, under the

11  statutory scheme under the law, the way the law is, not the

12  way we think about it when we are sitting around drinking

13  coffee in the morning with our friends, just talking about

14  the news.

15  A.      The mitigation would have to be substantial.

16  I mean, it would have to be something without a shadow of a

17  doubt or that sort of thing proven to me.  But, yeah, if

18  there was something -- can't think of a good cause, but a

19  mental retardation or something, that would be something I

20  have to consider.

21  Q.      See, mental retardation takes the death

22  penalty away anyway, so we wouldn't be talking about mental

23  retardation.

24  A.      Something along those lines.  You know what I

25  mean, I think.

1    Q.    I want to be sure you understand that.

2    A.    I didn't know that, no.  And I know it now.

3    Q.    We could go through this all day long, but I'm
4  trying to get a feel for you.  And, as I say, we don't want
5  to torture people.  We have more people down the road we can
6  use, if there's some problem that you have with the law or
7  service.  And as I understand it, the only problem that you
8  have is you will be halfway distracted by your business
9  problems from full attention to the facts of the case?

10    A.    Yes, ma'am.

11    Q.    I don't necessarily or know at this point what
12  is going to happen in this trial in some respects.
13  Everybody has heard that you have the right not to testify.
14  You don't have to -- I hate to use the word "incriminate",
15  but you don't have to testify in a trial.  You being any
16  person on trial in this country.

17            Would that concern you on the issue of
18  punishment, if you hadn't heard from the defendant himself?

19    A.    Me, personally, I think it probably would.

20    Q.    You would need to hear?

21    A.    I'm a pretty much of a people person and I've
22  always just talked to people eye to eye.  And, yeah, I would
23  want to hear from a defendant.

24    Q.    Okay.  Well -- and that's why we bring you up
25  here to find out what your true feelings are.  And you don't

1  -- are you saying you wouldn't feel comfortable answering

2  those questions without having heard from the defendant like

3  mitigation and dangerousness and --

4       A.       I think it would be harder to answer those

5  questions without hearing from the defendant, but I

6  understand that that's what y'all do is speak for the

7  person, so we still have to take the same information and

8  dissect it and make our circumstances.  But just me

9  personally, I would -- I would just pick up on some things I

10 wouldn't pick up from if I heard directly from an

11 individual, you know, from the person.

12      Q.       I'm trying to think of how to ask this

13 properly.  So in reality, if the defendant didn't testify,

14 it would make a difference to you in answering some of the

15 Special Issues just in yourself?

16      A.       I'm sorry, repeat that?

17      Q.       Well, if the defendant didn't testify, not my

18 defendant, but in a case where you are being asked to assess

19 a death penalty, if the defendant didn't testify, of course,

20 depending on the facts which we're not talking about now, it

21 might weigh against them because you need -- there would be

22 something you would want to know before you could answer

23 some of those questions in his favor.  It's just how --

24      A.       I can't answer that without --

25      Q.       Answer it with what you want to say.

1    A.    It would just -- it would -- I think it would

2  make it a little clearer for me to answer those questions, a

3  little easier for me to answer those questions hearing from

4  the defendant.  Not that I couldn't, if I didn't, but I

5  think it would go a long ways with me if I did hear from the

6  defendant.

7    Q.    Okay.  So it would -- in a hypothetical case,

8  if the defendant didn't testify, your feeling is that you

9  might hold it against him because you would want to know

10  some of these things?

11    A.    No, ma'am, I didn't say that.

12    Q.    Then tell me.  I'm not getting the sense of

13  it.  You said that you would need to hear from him?

14    A.    No, it would be -- I think the information

15  that the jury would get hearing from the defendant would be

16  something that the defense couldn't -- couldn't put out

17  there to the jury.

18    Q.    Okay.  In other words his mouthpiece, so to

19  speak, his lawyers, can't tell you things that the defendant

20  -- about the defendant.  You know, you made the comment that

21  we speak for our client, but you would really prefer to hear

22  the defendant, look him in the eye, and hear the tone of his

23  voice, to assess his character, I guess, is what you are

24  saying, right?

25    A.    Yes.  I would like to hear from the defendant,

1  not necessarily to assess his character, but to hear what he

2  has to say and to pick up on vibes, if you will, and to just

3  hear what he has to say.

4      Q.    And if that person should choose for whatever

5  reason not to testify, would that be something that you

6  would think about when you were answering these questions?

7  Would it weigh against him?

8      A.    I don't think -- I don't think it would weigh

9  against him.  I think there would be a little bit of a void

10  in putting the whole package together in answering the

11  questions that we would have -- that I would have to put

12  together.  There would be a little bit of a void there, I

13  believe.

14      Q.    So, in other words, if the defendant didn't

15  testify in one of these situations, maybe, and you have been

16  -- correct me if I'm not saying the position right, so go

17  ahead and do that if I'm not.  But you are saying without

18  that, it would be a little bit easier for the State to meet

19  its burden of proof?

20      A.    I don't know.

21      Q.    Just tell me -- just --

22      A.    I don't know that it would help the State,

23  either.  I'm just talking a juror, and me personally, I

24  can't speak for any other juror --

25      Q.    Sure.

1      A.      -- I have to take all the facts and I've got

2   to make three decisions at some point in time.  And I

3   believe it would make those decisions easier and there

4   probably -- and maybe could be some more information that

5   would come about directly from a defendant's person rather

6   than his supposed persons.

7      Q.      Sure.

8      A.      And to me that would be -- I would not want to

9   miss that day.  You know what I mean?

10     Q.      So you are saying it would be important to you

11  --

12     A.      Yes, ma'am.

13     Q.      -- to hear from the defendant?

14     A.      Yes, ma'am.

15     Q.      Well, I think I have tortured you enough,

16  Mr. Emery.

17              MS. BUSBEE:  I'll surrender the juror.

18              THE COURT:  I have one question to follow

19  up on the last issue you stopped in midsentence.  The LAW on

20  the issue of a person testifying, the law is the Fifth

21  Amendment of the United States Constitution, guarantees that

22  he does not have to testify.

23              PROSPECTIVE JUROR:  Yes.

24              THE COURT:  You have told me it would

25  make your job more difficult.  You have told us that you

1   would like to hear from the defendant.  But her question and

2   the question of the law is the law says he does not have to

3   testify.  And if he chooses not to testify, I will instruct

4   you that you cannot and must not allude to that fact

5   throughout your deliberations or take it into consideration

6   for any purpose whatsoever.

7                      PROSPECTIVE JUROR:  Yes.

8                      THE COURT:  Can you do that?

9                      PROSPECTIVE JUROR:  I don't know.  That's

10  a pretty big issue to me.

11                     THE COURT:  Pretty big issue.

12                     PROSPECTIVE JUROR:  Yes.

13                     THE COURT:  You would like to hear from

14  him?

15                     PROSPECTIVE JUROR:  Yes.

16                     THE COURT:  Make your job more difficult,

17  but the law says he doesn't have to testify.

18                     PROSPECTIVE JUROR:  Yes.

19                     THE COURT:  Are you going to hold it

20  against him, if he chooses not to testify?

21                     PROSPECTIVE JUROR:  I wouldn't say I

22  would hold it against him, maybe against the judicial

23  system.  I don't know.  But there's going to be a void

24  there.

25                     THE COURT:  Sure there's going to be a

1  void.

2              PROSPECTIVE JUROR:  I would like to hear

3  from him and it's going to be an issue that's going to be

4  hard to overlook, if I'm asked to answer these three

5  questions and possibly convict somebody to a life sentence

6  and not even be able to hear from them.  It's going to be

7  difficult for me.

8              THE COURT:  Difficult is fine.

9              PROSPECTIVE JUROR:  It's going to be

10  difficult for me to not allude to it or think about it to

11  answer your question.  But I wouldn't hold it against him.

12              THE COURT:  Thank you, sir.  Wait for us

13  outside.  We'll have you back in just a minute.

14                  [Prospective juror out]

15              THE COURT:  What says the State?

16              MR. WIRSKYE:  State has no challenge for

17  cause.

18              MS. BUSBEE:  Are you asking me?  Your

19  Honor, I challenge the juror for cause.  I don't believe

20  this juror can adequately afford my client his Fifth

21  Amendment privilege not to testify.  He stated to the Court

22  it would make a difference to him and his decision as to

23  whether or not he would give a life or death sentence.  He

24  said ever which way you could he would consider it and it

25  would be negative to the defense.

1    And I am challenging him for cause based

2  on his inability to honor the defendant's Fifth Amendment

3  privilege against self-incrimination.

4    THE COURT:  Let me have a few minutes.

5    (Recess)

6    THE COURT:  The Court has been presented

7  with a typical vacillating juror back and forth, back and

8  forth.  I can put this man on the jury, find him to be

9  qualified very easily.  But I'm real, real careful about my

10  constitutional issues.  I gave him the law and he just, in

11  my mind, being honest and would not be able to give Mr.

12  Murphy his constitutional right against self-incrimination.

13    As much as I don't want to, I can't let

14  the fact we spent an hour and a half with this man and just

15  punt.  I'm going to grant your challenge for cause.  Take

16  ten minutes and we'll start on the next one.  Bring him back

17  in.

18    [Prospective juror in]

19    THE COURT:  Mr. Emery, thank you for your

20  service today and your honesty to the questions.  You are

21  not going to be seated on this jury.  Thank you, sir.  You

22  are free to go.

23    (Recess)

24    [Prospective juror in]

25    THE COURT:  Erica Marie Hefner.  How are

1   you?

2                   PROSPECTIVE JUROR:  I'm good.  How are

3   you?

4                   THE COURT:  Do you go by Erica or Marie?

5                   PROSPECTIVE JUROR:  Erica.

6                   THE COURT:  I'll be sure and get my

7   computer corrected and lined up here.  Thank you for being

8   here.  Did you have enough time this morning to read over

9   the juror orientation guide several times?  I know I put a

10  lot of law in front of you and we don't expect you to be

11  able to understand it all, just by reading it.  The

12  attorneys are going to spend some time with you going over

13  the law and provide some examples so you can make it a

14  little more understanding.  Don't think you've got to have a

15  law degree to come here and be a juror in this case.  All we

16  need to remind you is to be honest.

17                  PROSPECTIVE JUROR:  Okay.

18                  THE COURT:  If you don't understand the

19  questions, say I don't understand or give me another example

20  and they'll be happy to help you out that way.  My job is,

21  A, do you understand the law?  Second is can you follow the

22  law?  We don't want you to be intimidated.  It's somewhat of

23  an unusual situation for a citizen to come in and be on the

24  witness stand and look at all these lawyers here.  That's

25  the only way that we can do it.  It's not like a big group

1   where you were in with 800 people that Friday morning.  It's

2   something that's very personal.  They want to get to know

3   your feelings, how you think.

4                     The only question that I have for you is

5   you have read the trial shall begin on November 10th.

6                     PROSPECTIVE JUROR:  Mine said the 11th,

7   but, okay.

8                     THE COURT:  Does it say November 10th on

9   the front page?

10                    PROSPECTIVE JUROR:  Yes.  It's okay.

11  Either date is fine.

12                    THE COURT:  Can you serve us for two

13  weeks?

14                    PROSPECTIVE JUROR:  Uh-huh.

15                    THE COURT:  Thank you so much.

16  Mr. Shook.

17                    ERICA HEFNER,

18  having been duly sworn, was examined and testified as

19  follows:

20                    DIRECT EXAMINATION

21  BY MR. SHOOK:

22       Q.    Ms. Hefner, I'll be asking you questions on

23  behalf of the State and we're just looking for your honest

24  answers and opinions.  Have you ever been down on jury duty

25  before?

1   A.      No.

2   Q.      First time?

3   A.      Uh-huh.

4   Q.      Usually in most cases the jury selection is

5   done in a big group.

6   A.      Right.

7   Q.      But since it's a capital murder case in which

8   the death penalty is being sought, we talk to each juror

9   individually.  Gives you an opportunity to discuss any

10  questions at any time.  Okay?

11  A.      Uh-huh.

12  Q.      You have given us a lot of information on your

13  questionnaire.  We appreciate that.  I'm going to follow up

14  on some of that and I'm going to ask you a lot of questions

15  about the death penalty and how you feel about that and some

16  of the laws that apply.

17  A.      Okay.

18  Q.      You grew up here in the Dallas area?

19  A.      Yes, I did.

20  Q.      Did you grow up in Dallas itself?

21  A.      Uh-huh.

22  Q.      What area of town did you grow up in?

23  A.      The White Rock area.

24  Q.      What school did you go to?

25  A.      Bishop Lynch.

1      Q.     And the only time out of Dallas is when you

2   went to a school down in Austin?

3      A.     I went to San Marcos to school and then I

4   lived in Austin for several years after that.  I just moved

5   back to Dallas in March.

6      Q.     What brought you back to Dallas?

7      A.     My company.

8      Q.     Okay.  The 24-Hour Fitness?

9      A.     Uh-huh.

10      Q.     What do you do for them?

11      A.     Um, I do a lot of things.  Right now I do some

12   corporate sales and some personal training and I'm in

13   management training, so I kind of get a wide scope.

14      Q.     So you look at everything?

15      A.     Uh-huh.

16      Q.     And you told the Court that the two-week time

17   period that you would be required to be down here wouldn't

18   be a problem?

19      A.     No.

20      Q.     Now, let me ask you, you know, we can't get

21   into the facts of the case, but we gave a few facts in the

22   questionnaire regarding this case when it happened back at

23   the Oshman's on December 24 of 2000.

24      A.     Uh-huh.

25      Q.     Do you recall any of the facts surrounding

1   this case at all?

2        A.      No.   I was graduating from college in December

3   of 2000 so I had a lot of other things on my mind.   I wasn't

4   really current with current events.

5        Q.      So you didn't follow it any at any time?

6        A.      Huh-huh.

7        Q.      You don't know anything?

8        A.      No.

9        Q.      Let me ask you how you feel, generally, about

10  the death penalty?   Are you in favor of it as a law?

11       A.      Um, yes.

12       Q.      Tell me what purpose you think the death

13  penalty serves.

14       A.      I think it serves a purpose on an individual

15  basis.   If by the law it is warranted, then that's what

16  needs to happen.

17       Q.      Okay.   Is the death penalty something you have

18  always believed in as a law?

19       A.      Um, being 24, always believed in it isn't that

20  long, but pretty much, yeah.

21       Q.      What do you think led you to that belief?

22  Just the way you were raised or --

23       A.      Um, I'm not sure.   I've -- I've always

24  believed that whatever laws we have in place have been put

25  in place by very educated and well experienced people and so

1   if that's the law we have in place, then that's what needs

2   to be upheld.

3        Q.    If it were up to you, let's make you Governor

4   for a day and you get to decide which laws we have, would

5   you have a death penalty statute?

6        A.    I would have to look at the amount of

7   criminals and what type of criminals that we would have in

8   our state and what's happening to them now and money as to

9   how much it's costing to keep them in jail for life.  Or

10  there are a lot of other statistics.  I would have to look a

11  lot.

12       Q.    For what you know about the type of crime we

13  have in Texas, do you think that we should have the death

14  penalty?

15       A.    I don't know enough to say yes or no.

16       Q.    Okay.  Any cases you have followed in the

17  media that you think warrant the death penalty or would be

18  the types of cases you think should be considered for the

19  death penalty?

20       A.    No.

21       Q.    Well, what comes to mind when you think of a

22  death penalty case?  What type case should be at least

23  something the death penalty should be looked at?

24       A.    Um, I remember the yogurt shop murders.

25       Q.    Down in Austin?

1    A.    Yeah.

2    Q.    That was pretty --

3    A.    Gruesome.

4    Q.    Gruesome and got a lot of publicity.  If it

5    were up to you, would you just reserve the death penalty for

6    where a life was taken or would you have it for other

7    problems like rape and stuff like that?

8    A.    Mainly for when a life is taken.

9    Q.    In your questionnaire -- and I know you don't

10   have the questionnaire in front of you.  It's been a while

11   since you filled it out.  But we asked a lot of questions.

12   And on one we asked what's important to you in deciding

13   whether a person receives the death or life sentence?  And

14   you put several things, mental state of both victims and

15   suspected murderer at the time, chain of events leading up

16   to the supposed crime, and the scientific evidence in place.

17   What were you thinking there?  Go a little farther.

18   A.    As far as mental state, was the person who

19   committed the crime mentally altered, be it by a substance

20   or by their own physical and mental capacity?  What was the

21   other person who was, obviously, killed doing at the time to

22   provoke that?

23   Q.    What could be important about that?

24   A.    Well, I don't know if the person was provoked

25   to shoot the person, the other person.

1      Q.      Okay.  So if they provoked it in some way?

2      A.      Right.

3      Q.      All right.  Shootout between somebody and --

4      A.      Right.

5      Q.      Okay.  What about the chain of events leading

6  up to the supposed crime?  That's just all the facts

7  surrounding the crime?

8      A.      Right.

9      Q.      How about scientific testimony on placement?

10 What did you mean by that?

11     A.      I was thinking more if there was more than one

12 person -- candidate, that could have been the murderer as

13 far as gun position and bullet entry and that sort of thing.

14     Q.      Let me follow up on that and talk to you

15 generally about something.  In Texas the death penalty is

16 only reserved for certain types of murder cases, first of

17 all, murder that occurs with another aggravating factor.

18                  I could pull a gun out and shoot

19 Mr. Wirskye in the temple because I didn't like what he was

20 wearing that day or something he said to me, laugh about it,

21 but I couldn't get the death penalty.  Okay.  The death

22 penalty is reserved for murders that occur during the course

23 of a felony, rape, or robbery, you break into someone's

24 home, arson, or kidnap or murder of specific individuals

25 like a police officer on duty, prison guard on duty, fireman

1    on duty, murder of a child under the age of six, murder of

2    more than one individual, several victims, or a murder for

3    hire, someone like a hitman.

4                    Those are specific types of cases that

5    the death penalty is reserved for or at least for

6    consideration.  Do you disagree with any of those types of

7    cases?

8         A.    No.

9         Q.    Do you feel those are all fair types of cases

10   for consideration?

11        A.    Uh-huh.

12        Q.    Now, when we think of the death penalty, the

13   natural assumption one makes or when we think of the person

14   that actually causes the death, the triggerman, that's just

15   normal.  But the death penalty or capital murder, like any

16   other crime, there could have been more than one person,

17   sometimes, carries out a crime.  It's an issue we talk

18   about.

19                    An example we give sometimes is Mr. Wirskye

20   and I here, we might decide we want to go rob a bank and we

21   get another friend of ours to be the getaway driver to wait

22   outside to warn us if the police are coming.  We go in.  I

23   have guns.  Mr. Wirskye doesn't have a gun.  His role is to

24   take a bag out on one side.  And I pull the gun on the

25   tellers and threaten them.  He will gather the money up and

1    I will cover.   Okay?

2            But let's say we pull that plan off.   I get

3    mad or maybe I think, you know, Mr. Wirskye warns me that

4    one of them is going to hit an alarm.   I shoot one of the

5    tellers and kill them.   I mean to.   We run off, but we get

6    captured.

7            I can, obviously, be tried for capital murder

8    and could receive the death penalty because I pulled the

9    trigger and caused someone's death in the course of a

10   robbery.   Common sense.   Do you agree with that?

11       A.      Right.

12       Q.      The law says that because Mr. Wirskye and the

13   getaway driver assisted me in the crime, they could, under

14   some particular facts, could, also, be prosecuted for

15   capital murder and could even receive the death penalty,

16   even though they are not the triggerman.

17           Now, that's a point people, some jurors,

18   agree with some of that and it's fine if you do or don't.

19   Some people, if it were up to them, would reserve the death

20   penalty for the triggerman, have no problem with that.   They

21   do have a problem with the party or the accomplice who's not

22   the triggerman and personally could not assess the death

23   penalty if it was an accomplice or something where they

24   would draw the line and they couldn't do it.

25           And if you feel that way, it's fine, too.

1    Some people don't have -- how do you feel about the

2    nontriggerman situation, the accomplice, and the death

3    penalty?

4         A.     I wouldn't be really quick to assign the death

5    penalty to a nontrigger party.  However, if the event led to

6    shooting an armed and identified police officer, I might be

7    more willing to assess the death penalty just because of who

8    was killed.

9         Q.     And that's because of the particular type of

10   victim?

11        A.     Right.

12        Q.     Okay.  So in a police officer situation, if

13   someone, an accomplice, the example I gave the police

14   officer was somehow involved, maybe in the bank or

15   something, and I killed him, you think it would be fair to

16   prosecute Mr. Wirskye for the death penalty and could

17   receive it as an accomplice because he's assisting me in

18   that offense?

19        A.     I don't know.  I don't -- I don't think I

20   would, actually, just because he didn't kill him.

21        Q.     Okay.  So thinking about it a little further,

22   then, maybe if it were up to you, if you were in charge of

23   the law, you would reserve the death penalty just for the

24   triggerman?

25        A.     Yes.

1        Q.    Not the accomplice?

2        A.    Yeah.

3        Q.    Okay.  It's fair to feel that way.  I know you

4   probably haven't thought about these subjects in great

5   detail, I hope you haven't, at 24-Hour Fitness.  But

6   thinking about it now, that's how you feel?

7        A.    Yes, yes.

8                MR. SHOOK:  Judge, could we approach?

9                THE COURT:  You may.

10               (Bench conference)

11               THE COURT:  Ms. Hefner, we appreciate

12  your time and service to the Court.  At this time the

13  parties have agreed to excuse you.  You will not be on this

14  jury.

15               PROSPECTIVE JUROR:  Okay.

16               THE COURT:  Okay.  Thank you so much.

17               [Prospective juror out]

18               THE COURT:  Ask Mr. Ingle to come in.

19               [Prospective juror in]

20               THE COURT:  Good morning, Mr. Ingle, how

21  are you?

22               PROSPECTIVE JUROR:  Fine.  How are you,

23  sir?

24               THE COURT:  I have your name as Marty

25  Delbert Ingle.  What name do you go with?

1          PROSPECTIVE JUROR:  Marty with a D?

2          THE COURT:  M-A-R-D-Y.  And the jury

3   summons came up M-A-R-T-Y and I couldn't tell if it was

4   M-A-R-D-Y.  And I said, well, I need to ask him about that.

5          PROSPECTIVE JUROR:  On my birth

6   certificate it will probably say T, but my mom said I should

7   spell it with a D and girls spell it with a T, so change it

8   on my birth certificate is too much, but I spell it with a

9   D.

10          THE COURT:  I have to stick with what

11   your birth certificate says.  But the Texas pronunciation is

12   more of a Marty.  But I'm going to leave it with a T, if

13   that's what your birth certificate is.  All right?

14          PROSPECTIVE JUROR:  That's fine.

15          THE COURT:  Mr. Ingle, have you had an

16   opportunity to read the orientation guide there for you?  I

17   have provided you a copy of that short questionnaire that

18   you filled out for us in May.  If they need to refer to a

19   specific question and you need to review your answer, you

20   have it there before you.

21          Today the lawyers will go over the law

22   more in detail.  Obviously, when I gave you that guide,

23   that's a lot of law to put on someone and expect you to

24   understand how it all interlinks.  The lawyers are going to

25   speak to you about it and give you examples to where it will

1   be easier to understand how it works and the process that we

2   have to go through.

3                        What you need to be able to do for us is

4   just tell us the truth.  If you don't understand something,

5   tell us, and they will try to explain it.  If they can't

6   explain it or they get you confused, I'll get in the middle

7   of it.

8                        Only question I have for you, this trial

9   will begin on November 10th, last for approximately two

10  weeks and I don't expect two full weeks, but it will be a

11  two-part process.  You will have breaks in the morning and

12  certainly for lunch and the afternoon.  You will be able to

13  use the phone during that period of time.  You are not going

14  to be sequestered.  You won't be locked up at night in a

15  hotel room unless it's an extraordinary situation and that

16  would only be for one night, if deliberations carry over.

17                       So that's just -- I don't have a crystal

18  ball, but that's what I anticipate that the trial will be

19  able to do for us.  Do you have any problems serving the

20  Court for those two weeks?

21                       PROSPECTIVE JUROR:  Well, I'm a contract

22  worker and when I'm not there, I don't get paid.  And that's

23  a substantial amount of time that would affect me

24  financially.

25                       THE COURT:  Yes.  Everybody who comes in

here, I've had chairmen of the board of Fortune 500
companies and his time was worth thousands of dollars an
hour.  I understand that.  I've had doctors, I've had
lawyers -- lawyers are the worst ones, okay, because they --
lawyers, the whole deal is by the hour.  And we understand
it's going to be a financial hardship for anyone to sit on
this case.  I can't let you -- I can't let business reasons
excuse someone from the jury service.  But I will tell you
we understand that and I will work -- let you work around as
best we can.

           The question that the lawyers have is, if
your particular financial situation will be so overburdened
that you would not be able to sit in this courtroom and
listen to testimony in this case, that's the real core
issue.

           PROSPECTIVE JUROR:  Um, well, I don't
know about that, but --

           THE COURT:  See, what it gets down to
really is it going to be so overburdened --

           PROSPECTIVE JUROR:  I won't like it.

           THE COURT:  No.  I can't find anybody
that likes being down here, trust me.  And if someone does,
they -- we usually don't want them, you see, because they
have an axe to grind.

           PROSPECTIVE JUROR:  Right.

1          THE COURT:  Right.  So you see the

2   position we're in?

3          PROSPECTIVE JUROR:  Right.

4          THE COURT:  Nobody wants to be involved.

5          PROSPECTIVE JUROR:  Actually, if I was

6   working for the company, got paid, it wouldn't bother me if

7   they were paying my time.  But in this particular case, it's

8   a different situation.  I usually work for a company with

9   benefits and I don't have that at this point in time, so

10  that's the problem.  I wouldn't mind, but to sit here and

11  knowing that it takes a pretty good -- anyway, you know the

12  story.  It probably wouldn't detract me from the issues, but

13  I don't like it.

14         THE COURT:  I understand.

15         PROSPECTIVE JUROR:  You know.

16         THE COURT:  Trust me, I understand.  I

17  will do all I can do to not waste your time, get you in and

18  get you out and get you down the road.  Fair enough?

19         PROSPECTIVE JUROR:  Sure, I guess.

20         THE COURT:  Thank you, sir.  Mr. Wirskye?

21              MARTY INGLE,

22  having been duly sworn, was examined and testified as

23  follows:

24              DIRECT EXAMINATION

25  BY MR. WIRSKYE:

1     Q.      May it please the Court?  Mr. Ingle, how are
2   you?

3     A.      Fine.

4     Q.      We're sorry about that work situation.

5     A.      That's all right.

6     Q.      We'll talk about it in just a second, but my
7   name is Bill Wirskye.  I'm going to be the Assistant
8   District Attorney that's going to visit with you the next
9   few minutes.  Where is Mark Tree, (phonetic) Arkansas?

10    A.      Close to Memphis, a little north of the Delta
11  land.

12    Q.      I have people in southwest Arkansas, but I
13  have never heard of Mark Tree.

14    A.      The flat side.

15    Q.      How long did you live there?

16    A.      About 18, 19, 20 years.

17    Q.      And then you came here in the Metroplex kind
18  of --

19    A.      I came to Houston in '79 and then up to
20  Dallas.

21    Q.      What type of work do you do?  You told us you
22  are contract now and I notice it said Ratheon?

23    A.      TI slash Ratheon, for 20 years.

24    Q.      Your free time, what do you like to do in your
25  free time?

1     A.    Relax.

2     Q.    Looks like --

3     A.    Pardon?

4     Q.    It looks like you play music; is that right?

5     A.    Yeah, I like to do that.

6     Q.    What type of music do you play?

7     A.    Country, blues, and gospel, not necessarily in

8 that order.

9     Q.    We read a lot of people -- you listen to 95.9

10 (phonetic)?

11     A.    That ought to tell you something there.

12     Q.    We know no one wants to be down here,

13 Mr. Ingle.  I know it's a big inconvenience to everybody,

14 financially and otherwise.  As the Judge said, the bottom

15 line question is are you going to let something that's going

16 on in your life or in your mind affect you listening to the

17 testimony in the trial and affect the decisions you may

18 make?  You know, if it's that great a deal, it's that great

19 a burden to you where it might affect your decisions in the

20 case, that's what we need to know about it.

21     A.    It just dawned on me, I'm probably in a

22 position where I could work a second shift, if I had to.  So

23 I guess you could take it out of me.  It wouldn't bother me

24 so much.  It would be a long day.

25     Q.    It would be a long day.  Neither side wants

1   you to think about something else or be sleepy from working

2   a different shift.  We don't want you to miss something in

3   the courtroom and that type of thing.  Do you think it's

4   going to be that type situation?

5         A.     I'm a Judge Judy fan, so there you go.

6         Q.     All right.

7         A.     Pay attention.

8         Q.     So you think that you could just make your

9   decision based on what you hear in the -- on what you hear

10  in the courtroom?

11        A.     Yes.

12        Q.     I want to visit with you a little bit about

13  how you feel about the death penalty, since this is a case

14  where we're seeking the death penalty.  Talk to you a little

15  bit about some of the information in your questionnaire that

16  I think you have got in front of you and then, finally,

17  maybe talk a little bit about the law that might apply in

18  this case.  So are you okay up there?

19        A.     It's tight.

20        Q.     Now, you have told us that you generally are

21  in favor of the death penalty; is that right?

22        A.     Generally in favor of the death penalty would

23  be a correct statement.

24        Q.     Can you tell us what purpose you think it

25  serves society, having the death penalty?

A.      Well, I would hope it would make somebody think twice before they just kill somebody, you know.

Q.      Okay.  Deterrent effect?

A.      Exactly, deterrent.

Q.      Is there any particular type case that comes to mind that you think of when you think of an appropriate case for the death penalty or capital punishment?

A.      Just deliberated murder and, you know, I am -- I believe in our cops, you know, I think they ought to be protected at all costs.

Q.      Oh, sure.

A.      I believe they're special people.

Q.      And almost everyone we talk to feels that way. And, you know, a lot of people feel strongly about it like you do and the -- I guess the overriding concern in all this, we talk to a lot of people and we get them to put their views in the questionnaires.  And you can be strongly in favor of the death penalty or you cannot be in favor of the death penalty.  You can have your own personal views and opinions, thoughts.

The bottom line to all of this is would you be able to put that aside and be able to follow the law and do what the law says?  And as we go along, I'm going to ask you a lot of those type questions.  And you may not know that in Texas we only reserve a certain portion or certain

1    subset of murders for the death penalty.

2              You know, let's just say Mr. Shook here,

3    I've been working with him on this case for a long time and

4    I decided that I don't like him.  I deliberate on it a while

5    and plan it and I come into court one morning and shoot him

6    dead in front of everybody in the court.  If that's the

7    case, that particular type murder wouldn't be subject to the

8    death penalty.  Okay?

9              One way to think about capital murder is

10   it's always a murder plus something else.  Kind of like you

11   said, a special person, police officer on duty, firefighter

12   or prison guard or a young child under the age of six or

13   cases where an intentional murder is committed during the

14   course of another felony like robbery or burglary.  Somebody

15   breaks into your home and kills you is capital murder.

16   Somebody holds up the 7-Eleven down the street and kills the

17   clerk, that type of thing is capital murder.

18             Does that kind of make sense to you, the

19   scheme we have?

20        A.    Somewhat, yeah.

21        Q.    We talk to a lot of people that say, hey, I

22   think it should be an option for all murder cases.  But in

23   Texas we reserve it for that certain or particular type of

24   murder.

25        A.    I didn't know that.

1    Q.    Most people don't.  We talk to a lot of

2  people.  Some would like to expand the available group of

3  murder cases, you know, that it would be available for and

4  some want to shrink it.  Sounds like you might be in favor

5  of making it available in more different types of murders;

6  is that right?

7    A.    Possibly.  I mean, if you thought -- if you

8  were going to kill that guy right there just like you said

9  you were going to do, I don't know, you know, you need to

10  go, too.

11    Q.    And I may have been to prison five or six

12  times, may be the baddest of the bad.  But, you know, I just

13  want to make sure.

14    A.    With you, that's just my thought on it for

15  whatever.  I don't deal with this on a daily basis and don't

16  plan on it.  So that's why you guys are there.

17    Q.    And I hope you hadn't spent too much time

18  thinking about it.

19    A.    I haven't and don't care to.

20    Q.    I just want to let you know, it's okay to have

21  your views.

22    A.    I don't know what you were talking about.  You

23  drew the line and this gets this and this don't.  I didn't

24  know that.

25    Q.    But like I said, regardless of what your view

1   is, the bottom line question is always going to be can you

2   kind of set that aside and just follow the law that the

3   Judge gives you and that type thing?  So that's probably a

4   question I'm going to be asking you a lot as we visit and

5   stuff.

6           Let me ask you this.  Usually when you

7   think of that type of capital murder you think of one

8   person, I guess, going into a 7-Eleven, holding up the

9   clerk, shooting and killing the clerk, and getting off with

10  the money.  But oftentimes crimes are committed by more than

11  one person.  You know, maybe a group of guys or gang of guys

12  get together and commit the crime.

13          In Texas the death penalty is not

14  necessarily reserved just for the person that actually pulls

15  the trigger.  Okay?  What I mean by that is depending on the

16  facts and circumstances, even though I'm a nontriggerman, I

17  could still potentially face the death penalty.

18          Some people say, well, they are not

19  really in favor of that.  They can just draw a bright line

20  and say the death penalty is only for people that actually

21  pull the trigger and cause the death.  And some people say,

22  you know, I just keep an open mind about that and look at

23  the nontriggerman and see if the death penalty is

24  appropriate.  Where do you kind of fall?

25      A.      The last.

1    Q.    Okay.  So you wouldn't necessarily take the

2    death penalty off the table, just because somebody didn't

3    pull the trigger; is that right?

4    A.    Just because they didn't pull the trigger?

5    Q.    Yes.

6    A.    Not necessarily.

7    Q.    Again, a lot of people don't know this and

8    have no reason to know it before you get down here.  But if

9    you serve as a juror on a death penalty case, we don't ask

10   the jury to make a decision between the death penalty and

11   life, necessarily.  What we ask you to do is to answer a

12   series of three questions that you probably read about.

13   A.    Yeah.

14   Q.    And depending on the answers to those

15   questions, that's what determines the appropriate sentence.

16   A.    Right.

17   Q.    So it's not a situation where we just ask you

18   to decide the death penalty or not.  We really require

19   jurors to kind of work through and use some mental

20   discipline and let, you know, the chips fall where they may

21   --

22   A.    Right.

23   Q.    -- in respect to the death penalty based on

24   the answers to those questions.  Does that seem fair to you?

25   A.    Yeah.  That seems fair.

1    Q.    Let's say Mr. Shook and I decide we're going

2    to rob a bank.  I know he's a bad guy.  He's been to prison

3    a couple of times.  And the plan is for him to take the gun,

4    go in, and hold up the teller, and I'm going to go in with

5    the bag and collect the money from the bank.

6              And as we go in to do that, maybe I see

7    the teller reaching for like a silent alarm button and I

8    yell out, hey, they are going for the alarm.  Mr. Shook

9    turns around and kills the teller, that type of thing.

10             Obviously, he's committed capital murder,

11   murder in the course of a robbery.  He could face the death

12   penalty.  And if a jury thinks that I helped him, aided him,

13   directed him to do that, then I could be convicted of

14   capital murder, or if a jury thinks that I should have

15   anticipated by our plan going in there that somebody could

16   die like that teller, then I could also be found guilty of

17   capital murder.  That make sense to you?

18   A.    Yes.

19   Q.    Okay.  A lot of times it comes down to what I

20   should have anticipated.  You know, I knew he was a bad guy,

21   knew he had a gun, and I knew he would do whatever it took

22   to get out of there, that type thing.  Does that make sense?

23   A.    Yeah.  A couple of things come to my mind in

24   terms --

25   Q.    What comes to your mind?

90

1    A.    Accusation through association, birds of a

2    feather flock together, so, anyway.

3    Q.    And I want to make it real clear.

4    A.    I think that's what you were saying,

5    basically, in a nutshell.

6    Q.    We're talking about the law of accomplices.

7    A.    Right.

8    Q.    If I'm just there, innocent bystander, then

9    I'm not guilty of anything, if I don't know what he's going

10   to do.  But if I'm actively helping him or aiding him --

11   A.    Right.

12   Q.    -- and, or if I'm actively helping him to rob

13   that bank and should have anticipated that a life was going

14   to be taken, then I could be on the hook for capital murder

15   and maybe the death penalty, that type of thing.  If he

16   tricks me into going, thinking he's -- you know, he says,

17   hey, Bill, we're going to make a withdrawal from the bank.

18   Okay?  He didn't tell me what type of withdrawal he's

19   making.  And I really in my mind don't know what's going on

20   and I don't help him in any way, I'm not guilty of any

21   crime.  Make sense to you?

22   A.    Yes.

23   Q.    Just because I'm there means I'm not guilty.

24   I have to help him.  If you think I helped him, I should

25   have anticipated that a life would be taken, then I could be

1  convicted of capital murder.

2          And sounds like that's something, a law

3  that you can follow, that type of thing?

4      A.    Yes, sir.

5      Q.    Okay.  Everybody we talked to has probably

6  heard something about this case, kind of figured out from

7  the questionnaire which case this is.

8      A.    Uh-huh.

9      Q.    And what the law says is, you know, we don't

10 need twelve jurors that haven't heard a thing about the

11 case.  That would be almost impossible.  You know, in a high

12 profile case like this, we would never be able to get a

13 jury.  What the law says is, you know, are you able to put

14 out of your mind what you heard, not necessarily forget

15 about it, but put it out of your mind and just base your

16 verdict on what you hear in the courtroom, that type thing.

17         If you can say that I'll keep an open

18 mind, listen just to the evidence in the courtroom, then you

19 would be a qualified juror.  Is that something that you

20 think you would be able to do?

21     A.    Yes, sir.

22     Q.    Okay.  What exactly have you heard about this

23 case, Mr. Ingle?

24     A.    Basically, I guess, seven guys escaped from

25 somewhere and went to Ft. Worth and robbed or attempted to

1  rob a sporting goods store for something, guns or something.

2  I don't know.  All I know is robbery and a murder, seven

3  guys.

4       Q.     You got the big picture, but not necessarily a

5  lot of details?

6       A.     Right.

7       Q.     It's kind of the same question, talking about

8  your work commitment.  Would you be able to kind of put that

9  out of your mind and just make your decision based on what

10  you hear in the courtroom?

11       A.     Yes, sir.

12       Q.     You understand -- I mean, we do this to insure

13  both sides get a fair trial.

14       A.     Right, exactly.

15       Q.     We don't want jurors thinking about, gee, I

16  should be at work.  I'm losing money and miss something.  Or

17  we don't want jurors thinking about what I heard on TV two

18  years ago.  We want jurors to really concentrate on the

19  evidence to give both sides a fair trial.

20       A.     Exactly.

21       Q.     And I think you can see how important that is.

22  Sounds like that's a law you can follow?

23       A.     Yes, sir.

24       Q.     Okay.  As I told you, in a capital murder

25  case, you know, you have got those three questions to answer

1   on the back.

2         A.      Yeah.

3         Q.      Could you flip to those and find them in that

4   book real quick?  The first part of the trial, what we call

5   the guilt phase, that's where you as a juror would decide

6   whether he committed capital murder, whether he's guilty of

7   it.  And I'll lay all our cards on the table right now.  We

8   talked about triggerman, nontriggerman, accomplices.  It's

9   our theory in this case and we're prosecuting Mr. Murphy as

10  an accomplice, a nontriggerman.  That's how we're

11  prosecuting the case.

12              The first phase of the trial, it would be

13  up to you as a juror to decide whether the State has proven

14  him guilty beyond a reasonable doubt.  Okay?

15        A.      Uh-huh.

16        Q.      You find him guilty of capital murder, then we

17  move to that second phase of the trial and that's where you

18  would answer the three questions.  Have you had a chance to

19  look at the questions?

20        A.      The second question was kind of confusing to

21  me, I think.

22        Q.      Let me talk to you a little bit about that

23  because that's kind of what we've already talked about.

24  That's the situation where you do have an accomplice, you

25  know.  If you look at that question, the jury would have to

1   decide whether the person actually caused the death.   That

2   would be the triggerman.   I told you that's --

3        A.      I've understood that part, I guess, is,

4   basically, I understand whether or not he did that, but then

5   you want to find out whether or not he intended to do some

6   act of murder either there or later on down the line and

7   that kind of -- so what you are, basically, saying, is, you

8   are wanting me to say, do you think he did or didn't do

9   this, but would have or intended to later on down the line,

10  maybe.

11       Q.      Let me see if I can clear it up this way.

12  I'll do my best.   You know, we talked about me.   You could

13  convict me of capital murder with Mr. Shook, one, if you

14  think I should have anticipated a life would be taken.

15  Okay?   You could find me guilty.

16            In order to give me the death penalty,

17  you have to answer this question.   You have to be convinced

18  beyond a reasonable doubt that either I pulled the trigger

19  and, you know, in our case I didn't.   He did.   Or that I

20  intended that that person be killed.   That would be a

21  situation maybe where I hire somebody to kill my wife or my

22  business partner, a murder for hire.   Or, finally, that I

23  anticipated a human life would be taken.

24       A.      Okay.

25       Q.      It's a little bit different.   To find me

1  guilty you have to think I should have anticipated a life

2  would be taken.  In order to answer that question yes and

3  give me the death penalty, you have got to think that I

4  actually anticipated.  Okay?  That I did anticipate a life

5  would be taken.

6           And you may think, you know, hey, he knew

7  the plan for the robbery, he knew he had a loaded gun, he

8  knew he was dangerous, Mr. Wirskye, you should have and you

9  did anticipate that a life would be taken.

10      A.      Okay.  I get it now.

11      Q.      Does that make sense?

12      A.      I do now.  Intended was the key word there and

13  whether he did or not.

14      Q.      You know, I'm not the person that pulled the

15  trigger, so you need to decide whether I intended to kill

16  that person or I anticipated that that person could be

17  killed.

18      A.      Exactly, I understand it now.

19      Q.      One way to look at it, I guess, is if you

20  convict someone of capital murder, that person is sitting on

21  a life sentence.  Okay?  They are going to get a life

22  sentence unless these questions are answered yes, yes, and

23  no.  If the questions are answered in a particular way, they

24  are going to get the death penalty.

25           Some people call these maybe like a set

of filters.  You know, you take the facts that you heard in

the first part and take the facts that you heard in the

second part, run them through these questions, this set of

filters, and, like I said, however it shakes out, it shakes

out.  If it's yes, yes, and no, then it's an automatic death

penalty and the Judge would sentence the defendant to death.

Does that kind of make a little bit of sense?

          A.     Yes.

          Q.     Okay.  As you look at those first two

questions, No. 1 and No. 2, we have the burden at this table

to prove to you, the jury, that the answers to those

questions should be yes.  We've got to do that beyond a

reasonable doubt.  Okay?  Just like we've got to prove the

person's guilty beyond a reasonable doubt, we've got to

prove to you the answer to these questions should be yes.

Their default settings is kind of a no answer.

               Looking at Special Issue No. 1, is there

a probability that the defendant would commit criminal acts

of violence that would constitute a continuing threat to

society?  That's kind of where we ask the juror to look at

all the evidence, what they heard in the first part, what

they may have heard in the second part, and decide whether

he would be a continuing danger to society, make a

prediction, basically.

               Is that something that you think you can

1  do, if you are given enough information?

2       A.     Yes, sir.

3       Q.     Okay.  As I told you what the law requires,

4  you know, in order to get a fair trial is that the jurors

5  start the second phase of the trial, the punishment phase,

6  where they answer these questions, with an open mind.  And

7  none of these questions should be answered automatically,

8  based on what you did in the first part of the trial, the

9  guilt phase.

10       And let me give you an example of that.

11  We talked to some people that say, Mr. Wirskye, I find

12  somebody guilty of capital murder, when I get to question

13  No. 1, my mind is already closed.  I'm going to answer it

14  automatically every time yes.  Because if I find somebody

15  guilty of capital murder, I'm going to think that they are a

16  future danger.  You may say there's a lot of common sense to

17  that and that may be true.

18       But what the law requires you to do and

19  what we ask you to do if you were a juror, is to wait and

20  keep an open mind and look at all that evidence.  You know,

21  you may come back to that conclusion, he's going to be a

22  future danger.  But the point is, you just can't do it

23  automatically.  You kind of have to make this independent

24  inquiry.  Does that make sense to you?

25       A.     Yeah.  Are you saying that you will go through

1  one phase of this to come up with a guilty verdict and then

2  you will go and present stuff to make a decision on this?

3  Two phases?

4       Q.     Exactly.   The first phase we're just kind of

5  concerned, you know, like in our situation did we rob the

6  bank, commit capital murder.   When we get to the second

7  phase, you are probably going to hear extra information

8  about a person's background, if they had a good background,

9  bad background, and that's to help you answer these three

10 questions.   And that's why it's important when you start the

11 second phase of the trial, you go in with that open mind.

12              I could sit here and give you different

13 sets of facts all day long, where you convict someone of

14 capital murder, but never think they are going to be a

15 future danger.   The law doesn't require you to think of

16 anything like that.

17              But I want to make sure that you can, you

18 know, keep an open mind to that situation.   Just because you

19 have convicted somebody of capital murder, you are not going

20 to automatically answer No. 1 yes, and that type of thing.

21       A.     You have to prove that to me.

22       Q.     Right.   We have to prove it.   Exactly.   And

23 you can go back and look at the facts of the crime.   You

24 just can't make that decision automatically.   You can go

25 back and look at the facts of the crime, plus anything else

you may have heard in that second phase.  You have to keep

that open mind.  It can't be automatic.  Does that make

sense?

A.    Yes.

Q.    Again, we have the burden of proving that to

you beyond a reasonable doubt.  If you answer yes to that,

you move to the second one, we have kind of already talked

about.  You know, if you think we have proven beyond a

reasonable doubt that a person intended to kill or

anticipated a life would be taken, then you would answer

that yes as well, and you would finally get down to that

third question or that third Special Issue.

Mr. Ingle, what this is, is basically a

safety net, a last stop in the process before someone gets

sentenced to death.  Okay?  Before you even get to this

question, you have found somebody guilty of capital murder,

you have found beyond a reasonable doubt they are going to

be that future danger to society.  You found beyond a

reasonable doubt that they at least anticipated that a life

would be taken.

And this question No. 3 asks you to kind

of step back from all of that, look at everything you have

heard in the entire trial, both phases, and see if there's

something there either in the facts of the crime or the

facts and background of the person and his personal

1  culpability, what blame he bears, and see if there's

2  anything there that is mitigating, that lessens his blame,

3  and if there is, is it sufficient that his life ought to be

4  spared, that he not get the death penalty.  Does that kind

5  of make sense to you?

6       A.     Uh-huh.

7       Q.     It's just -- it's a last stop to give every

8  benefit of the doubt to the defendant and again, you know, I

9  can give you all sorts of different hypothetical deals.  But

10  we need to make sure that you can keep an open mind and at

11  least tell us at this point I can keep an open mind to

12  mitigating evidence.  If I hear something that I think is

13  mitigating, that lessens his blame, I can consider that and

14  I'll keep an open mind to that question.

15            Is that something that you think that you

16  can do?

17       A.     I think that I can be openminded about it.

18       Q.     Okay.  And this question is a little bit

19  different.  We don't have the burden of proof.  They don't

20  have the burden of proof.  It's just whatever the jury

21  thinks to answer this question yes or no.  And the law

22  doesn't necessarily require that you consider anything

23  mitigating.  You know, it's just whatever you think.  You

24  don't even have to agree with the rest of the jury.

25            Is there anything off the top of your

1    head that you can think of that might be mitigating, kind of

2    the type cases we've been talking about?

3           A.     What do you mean by mitigating?

4           Q.     Mitigating would be something -- I guess, take

5    my case for example.

6           A.     Uh-huh.

7           Q.     That would lessen my personal moral

8    culpability maybe.  Maybe I had a change of heart after the

9    teller got killed and I called 911.  You could think that

10   was mitigating.  Maybe I've never been in trouble before,

11   don't have a criminal record.  You can think that's

12   mitigating.  Maybe I was real young.  Maybe I was 18 years

13   old.  Some people think that could be potentially

14   mitigating.  Maybe I have some sort of mental defect or

15   something.  I still know the difference between right and

16   wrong, not really mentally retarded, but I have some issues,

17   that type of thing.

18                  Is there anything other than those that

19   maybe comes to mind for you, something that might be

20   mitigating?

21          A.     No.

22          Q.     That's the most common answer we get, because

23   I hope you don't sit around thinking about this, you

24   probably never thought about this.  Like I said, you don't

25   have to consider anything mitigating.  You just have to say,

gee, I could keep an open mind to it.  You know, maybe that situation or --

A.    I get it.  Mitigating, I didn't understand that, what that meant.

Q.    It's kind of opposite of aggravating.  You know, I may shoot Mr. Shook ten times.  That's aggravated. Or I may shoot him once out of anger and call 911.  That might be potentially mitigating.  It's kind of the opposite, something that lessens my moral blameworthiness.

A.    There you go.

Q.    Is that something that you think you can keep an open mind to?

A.    Yeah.  I thought I was pretty openminded until I got married.

Q.    As a newlywed myself, I tend to agree with you.  But, I mean, in all seriousness, Mr. Ingle, we talk to people who say if I have convicted somebody of capital murder, I found they were a future danger, found they anticipated, there's nothing -- nothing that could ever come up that I would think is mitigating.  My mind is closed. I'm going to answer no to that question every time.

And, of course, if you feel like that, you just wouldn't be a fair juror.  You wouldn't be able to give both sides a fair trial.  So that's why it's important when we talk to people, they can tell us, and really mean

1  it, they can keep an open mind and follow the law when you

2  get down to Special Issue No. 3.  Is that something that you

3  feel you can do?

4        A.     I think I can.

5        Q.     Okay.  If I don't ask you this question, they

6  probably are.  But whenever lawyers hear "I think I can", we

7  always kind of deal with black and white and yes or no.

8        A.     All right.

9        Q.     Do you think that you can keep an open mind to

10 that?

11       A.     I can keep an open mind --

12       Q.     Okay.  There you go.

13       A.     -- to both sides.

14       Q.     And that's all we're asking, somebody who

15 doesn't prejudge.

16       A.     Right.

17       Q.     Didn't come into this with preformed opinions.

18 Does that kind of scheme that we have make sense to you

19 about the two parts and then the three questions?

20       A.     Sure.

21       Q.     Kind of understand where we're coming from and

22 what's required of being openminded and be a fair juror?

23       A.     Yes.

24       Q.     Let me talk to you a little bit about just

25 some things, some laws, we have that apply in any criminal

1  case.  Have you ever been on a jury before?

2          A.     No, sir.

3          Q.     Okay.  But you will probably be familiar with

4  this stuff.  All criminal defendants are presumed innocent.

5  That means legally.

6          A.     Exactly.

7          Q.     We presume him innocent.  As he sits there

8  right now, he's presumed innocent.  If we all broke camp

9  right now and went home, you know, he would be found not

10 guilty.  It's up to us to prove to a jury beyond a

11 reasonable doubt that he's guilty.

12              We have the burden of proof.  It's up to

13 us to do the proving.  That burden of proof never shifts to

14 this table.  You know, these folks are fine lawyers.  You

15 will probably hear from them.  But legally you don't have

16 to, because they have no burden.  They can sit there and do

17 crossword puzzles all day, if they wanted to.  But it's up

18 -- we do the accusing, so we have to do the proving, type of

19 thing.

20              As a part of that, a person charged, a

21 criminal defendant, is not required to testify in their own

22 defense.  That's the Fifth Amendment.  You probably heard

23 about it.  No one can make him take the stand and testify if

24 he doesn't want to.  If he wants to testify, no one can keep

25 him off the stand.

1         But if he doesn't testify, what the Judge

2    will tell you the law is, is that you as a juror can't

3    consider that for any reason at all.  It's just got to be a

4    nonfactor that he didn't testify.  You can't hold it against

5    him or start thinking, boy, I wonder why he didn't take the

6    stand.  Or, if I was there, I'd take the stand and tell the

7    jury my side of the story.  It's natural to think that.

8         A.    I don't know about that.

9         Q.    Okay.  But legally you just can't hold it

10   against him.  Does that make sense to you?

11        A.    Right, uh-huh, yes.

12        Q.    Does that sound like something you can do?

13        A.    Yes.

14        Q.    Okay.  We talked about police officers

15   earlier.  You mentioned that you feel that -- felt pretty

16   strongly that they may deserve a little bit extra

17   protection.

18        A.    Respect.

19        Q.    Respect for the job they do.  We have alleged

20   that a police officer has been killed in this case.  You

21   probably are going to hear from police officer witnesses.

22   Okay?

23        What the law says about that is this,

24   that jurors can't give police officer witnesses more

25   credibility just because they are police officers, just

1  because they walk in the court wearing a badge and gun and

2  uniform.  The law says that you have to start them off with

3  that same level of credibility.  You start listening to them

4  and you believe they are credible, then you can believe

5  them.  But you just can't give them that extra headstart or

6  that extra leg up of credibility.  Does that make sense to

7  you?

8          A.      Don't make no difference to me.

9          Q.      Okay.  Another potential type witness you may

10 hear from is a psychiatrist or psychologist or something

11 like that, a mental health professional.  Sometimes in these

12 death penalty cases either side can call one.  So we always

13 have to make sure potential jurors like you can keep an open

14 mind to their testimony.

15              We talk to a lot of people and kind of

16 two ends of the spectrum and a group in the middle.  One end

17 says, I believe, you know, I believe them.  They walk on

18 water.  Every word out of their mouth is solid gold.  And

19 the other end says it's all magic and hokus pokus.  I don't

20 believe it.  It's a waste of money.  I wouldn't believe a

21 word a psychiatrist or psychologist told me.

22              The group we're kind of looking for is in

23 the middle, that could be fair, kind of like with police

24 officers.  And I'll just wait and listen and see what they

25 have to say.

1  If it makes sense, I'll go with it.  And if it doesn't, I

2  won't, that I could have that open mind.

3                    And we have a lot of strong feelings one

4  way or the other, but where do you kind of put yourself on

5  that scale?

6       A.    I respect people for getting an education.

7       Q.    Could you keep an open mind, if you heard from

8  a psychiatrist or psychologist and kind of start them off on

9  that same level?

10      A.    Yeah.

11      Q.    Okay.  So you are not automatically going to

12 discount what they have to say?

13      A.    I think it's his opinion based on a little bit

14 more education than others, basically.

15      Q.    So you would keep that open mind to it?  If it

16 makes sense to you, you would consider it and if it didn't,

17 you wouldn't?

18      A.    Right.

19      Q.    Okay.

20      A.    Yes.

21      Q.    Mr. Ingle, the packet you have in front of

22 you, I think on the back of the very last page, if you would

23 flip to it.  There should be something there called the True

24 Bill of Indictment.  Do you see it there?

25      A.    Yes, sir.

Q.    That's basically -- we call it an indictment, but it's, basically, the official legal paper that charges him with a crime.  And it kind of -- if you read through it, a certain person, Patrick Murphy, on a certain day in a certain county, basically, committed capital murder.  We have kind of said he committed it two different ways.  He shot a police officer in the course of his duties and that he also killed someone during the course of a robbery.  We can allege it two different ways.  If we prove one or both, he would be guilty of capital murder.

But each one of those is broken down into different elements of the crime.  We have to prove a certain person on a certain day killed a certain person in a certain way and those are elements that we have to prove.  It's part of our burden of proof.  We have to prove each and every element that we allege in that indictment.  Does that kind of make sense to you?

A.    Uh-huh.

Q.    I know it's not something that you sit around thinking about.  But kind of the bottom line is, we don't get partial credit.  You know, we can't go nine for ten or eight for ten and get a guilty or meet our burden of proof.  We have to prove each and every element.  In the eyes of the law, one of those elements isn't any more important or less important than another one.  Okay?

1        So I'll give you kind of a crazy example.

2   Let's say that Mr. Shook and I are in trial, trying a

3   capital murder that happened in Grand Prairie, Texas.  As

4   you may know, some of Grand Prairie is in Dallas County and

5   some is in Tarrant County.  We go to trial.  We think it

6   happened in Dallas County.  We don't do our homework.  The

7   cops are lazy.  They don't do their job.  We're lazy.  We

8   don't do our job.

9        You get down here as a juror and you

10  listen to the case and there's no doubt the defendant

11  committed a capital murder, but the evidence shows that it

12  actually happened in Tarrant County and not Dallas County.

13  Okay?  And in that situation we would have failed to prove

14  to you one of the elements of the crime.

15       You know, in the eyes of the law one

16  element is no less or more important than the others.  And

17  the law would require you to find that person not guilty

18  because we didn't do our job.  We didn't meet our burden of

19  proof.

20       Now, we would get fired, cops would get

21  fired, if we were that negligent and didn't do our job.  But

22  the law would require that you as a juror would find that

23  person not guilty.

24       A lot of people don't like that.  We talk

25  to a lot of people and they start crossing their arms like

1    you are and say, Mr. Wirskye, you are letting a murderer go

2    free on a technicality.  And a lot of people feel that way.

3    But --

4         A.    I didn't know that was why I crossed my arms,

5    but --

6         Q.    Usually people cross their arms when I get to

7    this.

8         A.    I wouldn't disagree.  It makes perfect sense

9    to me in the legal sense of things.

10        Q.    So you could follow that law and find him not

11   guilty, if we didn't prove all our elements?

12        A.    Yes.

13        Q.    Okay.  We allege in that indictment that he's

14   killed by a knife and it turns out he's killed by a gun.

15   You would find him not guilty because we haven't met one of

16   our elements, the way he was killed, and that type of thing?

17             Let me talk to you a little bit about a

18   life sentence.  You know, there's only two possible

19   punishments for capital murder, either the death penalty,

20   that we've talked about, and an automatic life sentence, if

21   you don't get the death penalty.

22             If you are a juror, the Judge will tell

23   you and the law will tell you what a life sentence means.

24   Okay?  In Texas a life sentence means a person will do forty

25   years day for day, week for week, forty calendar hard years,

before that person would become eligible for parole.  Okay?
They may not make parole after forty.  They may serve out a
whole hard life sentence or they may make parole the first
time after forty years.

     But the law tells you this, then, the
very next line tells you, you can't consider it.  Okay?  And
let me tell you why.  You know, we talked about using that
mental discipline and working through the questions to come
to the right answer.  We don't want people to say forty
years, man, that's a long time.  I'm satisfied with that.
So I'm not even going to worry about answering these
questions, really.  I'm going to answer them in such a way
that he gets that life sentence, okay, because I'm satisfied
with forty years.

     We -- also, the flipside of that is we
don't want people thinking forty years, that's not long
enough.  I never want him getting out and because of that
I'm going to answer these questions in such a way that he
gets the death penalty.  I'm not really going to work
through the facts and the evidence.  Does that kind of make
sense to you?

     A.     Yes.

     Q.     We kind of ask jurors to kind of assume that
life means life because he may make parole at forty and he
may not.  He may serve a hard life sentence.  But we require

1  you to kind of think that life means life.  Does that make

2  sense to you?

3          A.      Yes.

4          Q.      Okay.  And you wouldn't consider any of that

5  -- you would be able to make that assumption; is that right?

6          A.      Yes.

7          Q.      Okay.  Let me give you another example.  Let's

8  say we have a capital murder case, allege that robbery

9  happened, and somebody got killed during the course of that

10  robbery, that the murder -- robbers shot and killed

11  somebody.

12                  And we go to trial and there becomes some

13  doubt that a murder actually happened, okay, or what

14  particularly caused the death, okay?  So there might be

15  reasonable doubt about whether this person committed a

16  murder during a robbery, but there may not be any doubt that

17  that person committed robbery, you know, the lesser offense.

18  So you may have an option as a juror to convict someone of a

19  lesser offense, if that's what you think he's guilty of.

20                  You may have an opportunity in that first

21  phase of the trial to find someone guilty of capital murder,

22  find them guilty of an aggravated robbery, or find them not

23  guilty.  Does that kind of make sense to you, that scheme?

24          A.      Yeah.

25          Q.      And we call this aggravated robbery a lesser

1  included offense because it's lesser in punishment.  And

2  it's kind of included within the capital murder of that

3  aggravated robbery.  Aggravated robbery in Texas is a

4  first-degree felony and you can punish someone anywhere from

5  five years in the penitentiary all the way up to 99 years or

6  life.  You have got that full range of punishment.

7           And I don't know if this is ever going to

8  come into play in this case, but we need to talk about it

9  just a little bit, because there's that possibility there

10 that you may convict someone of that lesser offense of

11 aggravated robbery.

12          In order to be a qualified juror at this

13 point, you need to be able to tell us that I could keep an

14 open mind to the full range of punishment for aggravated

15 robbery, from five years all the way up to life, just

16 depending on what the facts and circumstances showed in

17 either phase of the trial or both phases.  I could assess

18 that appropriate punishment.  Does that make sense to you?

19      A.      Yes.

20      Q.      Could you keep an open mind to that full range

21 of punishment, five all the way up to life?

22      A.      Yes, sir.

23      Q.      Or aggravated robbery?

24      A.      Yes, sir.

25      Q.      Do you have any questions for me?  I know I

1  have thrown a lot at you.  You are starting to look like

2  you're tired of hearing me talk.

3       A.    That's why I folded my arms, that, and it's

4  just tight up here.  I mean, I'm kind of a big guy and --

5       Q.    It's tough on big guys.

6       A.    But, anyway, no, I don't have -- I don't think

7  I have any questions.

8       Q.    Do you feel that you are the type person that

9  could be fair in this case and give both sides a fair trial?

10      A.    Yes.

11      Q.    Not going to prejudge it in any way?

12      A.    Correct.

13      Q.    Because it sounds like you feel pretty

14  strongly about the death penalty; is that right?

15      A.    If it's appropriate.

16      Q.    Okay.

17            MR. WIRSKYE:  I'll pass the witness.

18                  CROSS-EXAMINATION

19  BY MR. SANCHEZ:

20      Q.    Mr. Ingle, my name is Juan Sanchez and I

21  represent Mr. Murphy here.  And as you know, you are down

22  here on the case where the State is seeking the death

23  penalty, right?  So literally it's a life and death question

24  that you may have to answer, if you are chosen on this jury.

25  Okay?

1              And a lot of times, you know, I think we

2    as attorneys ask questions of people and we phrase them in a

3    certain way where we give you the answer that we want to get

4    from you.  Attorneys are notorious for that.  And sometimes

5    people don't like being in front of them.

6              But my job here is to find out your true

7    feelings.  You have answered some questions today where you

8    indicated that you may be able to do something and, as

9    Mr. Wirskye said, you know, that leaves the question open

10   to, I may not be able to do something.

11        A.    Right.

12        Q.    And as you can appreciate, we're dealing with

13   a life and death situation here.  And we would rather have

14   you err on the side of caution.  Okay?  In other words,

15   sometimes it's better to put yourself in a position or not

16   put yourself in a position where you may not be able to do

17   something if you are not sure that you can do it.  Does that

18   make sense?

19        A.    Yes.

20        Q.    And I appreciate you for answering loudly so

21   we can hear you.  But our job is to get your true feelings.

22   You know, I think everybody wants to say they are fair.

23   Everybody wants to say they can follow the law.  But in

24   reality, I mean, that's just questions.  You say legally you

25   can be fair, but in reality, you know, based on your

1  feelings, you may not be able to do certain things.  And

2  does that make sense to you?

3       A.     Yes.

4       Q.     Okay.

5       A.     I get into this mode of this wife thing throws

6  everything off.  I think I know a lot of things.

7       Q.     Your wife tell you, you don't have an open

8  mind?

9       A.     No.

10      Q.     I've been married for seven years and three

11  kids.

12      A.     I think I have an open mind.  I think I have a

13  lot of things that somebody else might not think I have.

14      Q.     I have to be careful what I say about my wife.

15  She's a lawyer down here and I don't want her walking in

16  here and hearing what I'm saying.

17      A.     I have an open mind and I think that I'm a

18  fair guy myself.

19      Q.     I think that I'm an openminded guy, but there

20  are situations in life where I'm not openminded, whether it

21  comes to things like about children I may not be as

22  openminded as I thought I might be, depending on the

23  situation.  You might not be as openminded as you think you

24  are or other people.  That's the reason that we go through

25  this process, so we can find out what people really think so

1    it will give us an idea of who is going to sit on the jury

2    and make that life and death decision.

3                   So the one area that I want to cover is,

4    you have indicated on your questionnaire and you have

5    indicated on questions that you have strong feelings when

6    there's a police officer involved.  Would that be fair to

7    say?

8         A.    I respect police officers, highly respect.  I

9    give them the benefit of the doubt.  I mean, yes -- no, sir,

10   you are right and I'm wrong.

11        Q.    And I understand.

12        A.    Now --

13        Q.    And that's what I want to explore a little

14   with you.  Because --

15        A.    Not that they may always be right, but I'm

16   going to give them the benefit of the doubt.

17        Q.    I understand.  Because of your strong feelings

18   about police officers and if you were to find somebody

19   guilty of killing a police officer in the course of their

20   duties, do you think a life sentence would ever be

21   appropriate for somebody like that that you found guilty of

22   killing a police officer?

23        A.    I think it was a human being, number one, and

24   the circumstances surrounding it, would indicate life or

25   death, I guess.

1    Q.    Okay.  And would you be able to consider life?

2  Do you think it would ever be appropriate?

3    A.    I would consider the evidence and if it was

4  appropriate either way, I would try to make a decision based

5  on what I've heard from both sides as a party.

6    Q.    Another thing I want to talk to you about is

7  these Special Issues that we've talked about.  Like the

8  State said, it's a trial first.  And if you find the person

9  guilty of capital murder, then you have to consider these

10  issues that you have in front of you.

11          And you have indicated that you would

12  hold the State to proving issue No. 1 and issue No. 2,

13  correct?  You would make the State prove to you beyond a

14  reasonable doubt that the person was a continuing threat to

15  society; and issue No. 2, you would make them prove beyond a

16  reasonable doubt that the person that you found guilty

17  anticipated that a human life would be taken?

18          I mean, I'm kind of paraphrasing those

19  issues, but you have indicated that you would make them

20  prove that to you; is that correct?

21    A.    Yes.

22    Q.    Okay.  And then we get to Special Issue No. 3.

23  Neither side has a burden.  They don't have to prove to you

24  that there is no mitigating issues and we don't have to

25  prove to you that there are.  Of course, we may want to do

1   that, okay?

2              Now, a lot of times in answering Special

3   Issue No. 3, I mean, that's the last step before someone can

4   receive the death penalty.  People would like to hear from

5   the accused or the defendant.  What do you think about that?

6        A.    I think that's probably why I have a lawyer

7   for him to tell me whether to or not -- so you know what, I

8   go with what that lawyer -- if a lawyer told me to keep my

9   mouth shut, I'm going to keep my mouth shut.  And I believe

10  that's probably the best policy no matter what the deal is.

11  I don't know.

12       Q.    You can, no matter what the deal is.

13       A.    I don't know.

14       Q.    You can more importantly --

15       A.    I believe, you know, that's why you are

16  sitting there and that's why you are sitting there and

17  there's not -- it's not necessary unless maybe you think

18  it's necessary or --

19       Q.    And that's what I want to find out, if you

20  think it's necessary?

21       A.    I don't think it's necessary.

22       Q.    Okay.  And you are talking about as far as us

23  doing our job, whether we would advise him to take the stand

24  or not, correct?  But what about yourself?

25       A.    This is not us.  It's between y'all.  I don't

1   have any -- it's not -- I don't -- that's not a part of it

2   as far as I'm concerned.  If he wanted him to and you want

3   him to, fine.  But I'm not expecting him to say anything, if

4   that's what you are asking me.

5        Q.    What I'm asking you, if you sit on the jury

6   and you get down to Special Issue No. 3, would you want him

7   to get up and argue for his life?

8        A.    I would have to come up with some mitigating

9   issues in my mind and I don't know whether I would need him

10  to say anything or not based on what I've heard.

11       Q.    And if you didn't hear from him, you wouldn't

12  hold it against him in any way?

13       A.    I don't think -- no, no, I wouldn't.

14       Q.    Sometimes we don't phrase questions the right

15  way or sometimes we don't even think of asking things that

16  might affect people to sit in a jury on a case like this.

17  Is there anything that we haven't asked?  We've talked to

18  you for a long time, but is there something that you can

19  tell this Court or you can tell us that would keep you from

20  being fair on this case?  Something that in your background,

21  something -- an experience that you have had, a way of

22  thinking, moral grounds, something that would keep you from

23  being fair to Mr. Murphy as he sits here today?

24       A.    No.

25       Q.    That's a short answer.

1        A.      Pardon?

2        Q.      That was a short answer.

3        A.      I'm keeping it easy on her.

4               MR. SANCHEZ:  That's all the questions I

5    have.

6               THE COURT:  Thank you, sir.  If you

7    would, I need to have you stand outside just for a few

8    moments and we'll have you back.

9               THE COURT:  What says the State?

10              MR. WIRSKYE:  The State has no challenge

11   for cause.

12              MR. SANCHEZ:  We have no challenges for

13   cause.

14              THE COURT:  Would you like to step into

15   your office?

16                   (Recess)

17              THE COURT:  What says the State?

18              MR. SHOOK:  State will accept the juror.

19              THE COURT:  State accepts.

20              MR. SANCHEZ:  We accept the juror.

21              THE COURT:  He will be our No. 2 juror.

22   Ask him to come in.

23                   [Prospective juror in]

24              THE COURT:  Thank you.  You may be

25   seated.  Mr. Ingle, I'm going to inform you that you have

122

1  been selected to sit on this jury.  And we will go through

2  the next phase of this process.  The Sheriff will go over

3  some things with you and I have a document that I need you

4  to look at.  I'm going to provide some juror instructions

5  for you.

6              The first thing that will happen when you

7  go back to work and you tell them I got selected to sit on a

8  capital murder case, they are going to want to share their

9  opinions with you.

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  You know what I'm talking

12  about?

13             PROSPECTIVE JUROR:  I know what you're

14  talking about.

15             THE COURT:  Talk shop.  And the lawyers

16  like your honest opinion.  And if you can just block out --

17  if you are going back and tell someone, then they are going

18  to share with you.  So my instructions I'm giving you, will

19  tell you, please just tell them I have to arrange my

20  schedule to work on the second shift or whatever beginning

21  November 10th for a couple of weeks and leave it at that.

22  Just tell them I've got jury duty and leave it alone.

23             Hardest thing I think that you have

24  already indicated is your wife.  Tell her the same thing.

25  I've been selected to this jury.  I can't talk with you

1   about it.  I have to listen to the evidence from the witness

2   stand like you told us.  The Sheriff will go over with you a

3   few things.

4               Here's some instructions that I will give

5   you now.  These are the parking instructions to get

6   reimbursed for your parking downstairs.  This is a

7   supplemental information sheet to be sure that I have got

8   all your personal information, we haven't made any errors in

9   the numbers and so forth, and especially check the e-mail.

10              This information is retained by me in my

11  computer.  You understand, I'm not going over this on the

12  record because it's going to be in the Sheriff's control to

13  get your information.  That is for your protection.  Fair

14  enough?

15              PROSPECTIVE JUROR:  Yes.

16              THE COURT:  All right.  So with that, if

17  you would, the Sheriff has some things to go over with you

18  in the back.  You will receive another summons from me

19  sometime before the November 10th date.  You will come back

20  down here for about a one-hour orientation with all the

21  jury.  We're going to put everybody in the box together.

22  That way, when we start on November 10th, one thing that you

23  can ask the Sheriff about is I respect your time.  The

24  letter said half a day.  You are going to be out of here

25  before lunch.  When we say we will start at 8:30 on Monday

1  morning the 10th, I'm not talking about you coming down here

2  and having donuts and coffee and getting in the back at

3  11:00.  You will be in that box at 8:30.  We will be ready

4  to go to work.

5            The way we get there is we have the

6  orientation a week to ten days beforehand to get all your

7  questions answered, all the procedures down, and get the

8  Sheriff on line with you.  Fair enough?

9            PROSPECTIVE JUROR:  Uh-huh.

10            THE COURT:  Okay.  Go with the Sheriff

11  and we'll see you down the road.  Thank you, sir.

12                  [Prospective juror out]

13                  (Recess)

14            THE COURT:  Frankie Jean Freeland.

15                  [Prospective juror in]

16            THE COURT:  Thank you.  You may be

17  seated.

18            PROSPECTIVE JUROR:  Thank you.

19            THE COURT:  Good afternoon.  How are you?

20            PROSPECTIVE JUROR:  Fine, I think.

21            THE COURT:  Is it Frankie Jean Freeland?

22            PROSPECTIVE JUROR:  Correct.

23            THE COURT:  Welcome to the 283rd.  And I

24  want to be sure, did you have enough time to review the

25  guide I provided for you?

1    PROSPECTIVE JUROR:  Yes, I did.

2    THE COURT:  I know we put an awful lot of

3 law in front of you during a short period of time.

4    PROSPECTIVE JUROR:  Yes, there is.

5    THE COURT:  And we don't expect you to

6 know all of that coming in.  And the attorneys will spend

7 time with you this afternoon and visit with you and try to

8 educate you on the law, give you examples, to help you

9 understand how it works, because it all interrelates.

10    And my job is to be sure at the end that

11 you understand the law, number one.  Number two, can you

12 follow the law?  That's my job here.

13    PROSPECTIVE JUROR:  Okay.

14    THE COURT:  This is about as informal as

15 we can get.  I know many people feel they are the one on

16 trial.  Nerves are high because you haven't been through

17 this process before and we understand that.  So we try to

18 make you as comfortable as we can.  The attorneys are

19 certainly not going to ask you any trick questions.  There

20 are no wrong answers, only truthful answers.

21    The only question that I have for you,

22 ma'am, in reviewing the guide, do you have any questions

23 about the law which you have before we begin?

24    PROSPECTIVE JUROR:  No.

25    THE COURT:  Will you have any trouble

1  serving the Court for the two weeks beginning November 10th?

2  　　　　　　　　　　PROSPECTIVE JUROR:  No, sir.

3  　　　　　　　　　　THE COURT:  Very well.  Mr. Shook?

4  　　　　　　　　　　FRANKIE FREELAND,

5  having been duly sworn, was examined and testified as

6  follows:

7  　　　　　　　　　　DIRECT EXAMINATION

8  BY MR. SHOOK:

9  　　　　　Q.　　　Ms. Freeland, I'll be asking you questions on

10  behalf of the State.  Have you been down for jury selection

11  before?

12  　　　　　A.　　　Yes, sir, I have.

13  　　　　　Q.　　　You probably know from that experience that we

14  usually choose the jurors from just the large panel.

15  　　　　　A.　　　Correct.

16  　　　　　Q.　　　We use this procedure because it's a death

17  penalty case.  But we're just interested, as the Judge said,

18  in your honest opinions.  And if you have any questions at

19  any time, feel free to ask.  I have reviewed your

20  questionnaire and I'll be asking you some questions from

21  that.  And, obviously, we'll talk to you about -- in depth

22  how you feel about the death penalty and laws that apply to

23  this type of case.

24  　　　　　　　　　　You know from the Judge's first talk and

25  reading the questionnaire, that this case involves an

1  incident that happened at the Oshman's back on December 24,

2  2000, and it got a lot of publicity.

3      A.    Correct.

4      Q.    So every juror has heard something about it,

5  some more than others.  So we explore that with each juror.

6  And you live in Irving, and it looks like you were pretty

7  familiar with some of the facts in that particular store; is

8  that right?  The Oshman's itself?

9      A.    I've read about it.

10      Q.    Have you ever been in the Oshman's?

11      A.    Not this particular one, no.

12      Q.    Okay.  But you are aware that there is a

13  street named after it?

14      A.    Correct.

15      Q.    What do you remember about the case itself?

16      A.    Actually, all I remember is that an alarm had

17  gone off or something, that Officer Hawkins had answered

18  that alarm, and subsequently during his investigation or

19  walking through the store, he came upon these people and he

20  was shot and ran over.  That's basically my knowledge of it.

21      Q.    Do you remember anything about what happened

22  after that incident?

23      A.    Um --

24      Q.    Arrests or anything of that nature?

25      A.    I do remember them being -- leaving town and

1  the manhunt being on for them and trying to, you know, find

2  where they were and when they were arrested.  And I think

3  one committed suicide or something; is that correct?  And,

4  you know, that they were all brought -- eventually brought

5  back for trial.

6        Q.    Did you follow any of the subsequent court

7  proceedings?

8        A.    No, I have not.

9        Q.    Okay.  The law is that the simple fact that

10  you have heard or read something or seen something on TV

11  doesn't disqualify you.  We don't expect you to put it out

12  of your mind.  It's that if you sat on the jury, though, you

13  would have to decide the case based on the evidence you hear

14  in the courtroom.  Some people can do that.  Other people, a

15  few people, have told us, you know, they have already formed

16  opinions about what they read, saw, or heard.  Most people

17  can follow that instruction.

18                Would you be able to follow that Court's

19  instruction and determine this case just based on the facts?

20        A.    I believe so.

21        Q.    Okay.  Let's talk for a minute about how you

22  feel about the death penalty.  Are you in favor of it as a

23  law?

24        A.    Yes, I am.

25        Q.    Can you just tell me the reason you favor it,

the purpose you feel it serves society?

A.      I feel the death penalty is warranted in cases like this where a police officer is performing his duty.   I believe in the death penalty when it's a particularly heinous crime where someone is decapitated or, you know, children, in the case of death of children and where somebody plans to kill someone, that kind of thing.

Q.      Have you always been in favor of the death penalty as a law since you were an adult?

A.      Yes, I have.

Q.      Okay.   In Texas there are only certain types of cases which are eligible for the death penalty.   There are murder cases plus something else, some other aggravating fact, such as murder that occurs during the course of a felony.

A.      Correct.

Q.      During a robbery, burglary, arson, or rape. Also murder of a police officer or fireman or prison guard on duty, murder of a child under the age of six.

A.      Correct.

Q.      Murder for hire, someone does it for money, and murder of more than one victim.   Those are the specific types of cases that have been reserved for the death penalty.

Let me go over another area with you.

1   When we talk about the death penalty, we usually think of

2   examples involving the actual triggerman.  But capital

3   murder, like any other law, has situations where more than

4   one person may be involved.  An accomplice is the word we

5   use.  We call them parties to an offense.

6               An example would be if Mr. Wirskye and I

7   and another individual decided to go rob a bank and our plan

8   was for me to take in the guns to threaten the tellers.

9   Mr. Wirskye would go in with a bag and he would gather the

10  money up while I held guns on the tellers, where our third

11  accomplice stayed outside where the -- with the car running

12  and honk the horn if the police were coming and speed off

13  with us.

14              During the course of that robbery, if I

15  started shooting the tellers, maybe they were going for an

16  alarm or I didn't like them or got mad or whatever reason.

17  We were all able to get away and then arrested later.  I,

18  obviously, could be prosecuted for the death penalty because

19  I'm the triggerman.  But under the law Mr. Wirskye and the

20  getaway driver could also be prosecuted under certain facts,

21  if they were actively participating in the crime as

22  accomplices, even though they weren't the triggerman.  In

23  fact, they could be convicted of capital murder and could

24  ultimately receive the death penalty, depending on the facts

25  under the law, depending on particular facts, if they are

the nontriggermen.

But people feel differently about that and we want to explore that in great detail because a lot of people are fine with the death penalty applying to a triggerman, but not an accomplice. They may as far as someone's role as an accomplice and that type thing, they may have a very stiff prison sentence, but they don't feel the death penalty is a justified type sentence. They disagree with that aspect. Or if it were up to them they would hand them a different type punishment than the death penalty.

Other people agree with the law and think those type people should be prosecuted for the death penalty.

I want to know how you feel generally about the law as far as how the death penalty applies to an accomplice, a nonshooter, a nontriggerman.

A.    I'm not real sure how I feel about it. I don't -- of course, definitely the triggerman.

Q.    You have no problem with that aspect?

A.    No. The driver, if he's aware that guns are going in there and there's a possibility, then I would have to look at him, you know, at all of them. If the guns were taken in without his knowledge, then that might be something different.

1    Q.    Okay.  So you feel that you could prosecute

2  someone for the death penalty if they are the nontriggerman

3  and ultimately give them the death penalty under the proper

4  facts?

5    A.    If they were strongly involved, yes.

6    Q.    Okay.  You said when we asked you on the

7  questionnaire, and I think you have a copy of it there, on

8  page 4 we ask one question towards the bottom, I think the

9  second last to the bottom.  What would be important to you

10  in deciding whether a person received a death or life

11  sentence in a capital murder case?  And you said hard

12  evidence, not hearsay.

13    A.    Correct.

14    Q.    What did you mean by that exactly?

15    A.    Hard evidence that you could actually prove

16  that they were there, you know, not just somebody talking

17  about, saying, well, I know he was there or -- it would be

18  someone would have to have seen him there, proven in some

19  way other than just people talking about.

20    Q.    I want to ask you on page 5, the next page, we

21  asked a series of questions and make some statements and ask

22  if you strongly agree all the way down to strongly disagree.

23  In the middle we put uncertain.

24          And the first statement was, most

25  criminals are actually victims of society's problems and you

1   put uncertain on that.  I wanted to follow up on that.  What

2   were you thinking there, if you recall?

3       A.       I believe that society plays a role in a

4   person's conscience, maybe, and their rearing.  But I also

5   believe that once a person reaches the age of accountability

6   and has dealt with the public and society, he learns what's

7   right and what's wrong and by that time he should be able to

8   adhere to those laws or to society's rules, I guess you

9   would say.

10              And that's -- but I do know that your

11  upbringing can have some problems for you.

12      Q.       And on prosecutors just above that you put

13  underpaid sometimes, but sometimes not thorough in

14  preparedness.

15      A.       Preparedness.

16      Q.       Was there a specific example you know of or a

17  case you followed or have known of?

18      A.       Yes.  I think this was basically from a friend

19  of mine whose son actually was brought up on some charges

20  and the -- it was a court appointed and it seems like they

21  didn't really get all the facts.  They didn't take the time

22  to get all the facts.  And his court-appointed attorney

23  didn't seem to spend enough time preparing for the, you

24  know, trial.

25      Q.       What kind of case was that?

1      A.      Robbery.

2      Q.      Was that here in Dallas?

3      A.      No.

4      Q.      So the prosecutor didn't seem to get all the

5 facts and then you also had some problems with the

6 court-appointed lawyer, also?

7      A.      Right.

8      Q.      What happened in that trial?

9      A.      He got sentenced -- he went to jail.

10     Q.      Do you think he was treated fairly or do you

11 think they could have gone through the process a little more

12 thoroughly in your mind from what you knew about it?

13     A.      Um, you know, I wasn't there during the trial,

14 so I --

15     Q.      Just getting your information?

16     A.      Yeah.  So much of mine would be secondhand, so

17 I would hate to make a judgment on it.

18     Q.      You also had a friend from the Houston area

19 that had a criminal case.  You put down friend that I

20 believe was charged and convicted of rape; is that right?

21     A.      Where are you reading from?

22     Q.      On page 6.

23     A.      Correct.

24     Q.      Tell us a little bit more about those details.

25 How long ago did that happen?

1      A.      Oh, many, many years ago, that was probably 25

2 years ago.

3      Q.      What relationship were you to this person?

4      A.      Just knew him through the church.

5      Q.      Did you know much about the facts of his case?

6      A.      No.

7      Q.      Or what happened down there?

8      A.      Only from talking to his mother, no.

9      Q.      Have you kept in touch with him after he was

10 --

11      A.      When he was discharged, yes, I stayed in touch

12 with him for a while.  He came out of prison and he seemed

13 like he was a decent young man.  I don't know.  I find it

14 hard to say that anyone that commits rape is a decent

15 person, but --

16      Q.      Did he talk to you much about his prison

17 experience?

18      A.      You know, he really didn't.  Maybe he just

19 didn't want to dwell on it.

20      Q.      Okay.

21           MR. SHOOK:  May we have one moment,

22 Judge?

23           THE COURT:  You may.

24              (Bench conference)

25           MR. SHOOK:  That's all the questions that

1  I have, Ms. Freeland.

2                    THE COURT:  No questions?

3                    MS. BUSBEE:  No, Your Honor.

4                    THE COURT:  Ms. Freeland, we want to

5  thank you for your honesty and coming down and spending time

6  with us and filling out the questionnaire.  The parties have

7  agreed to excuse you from your jury service.  You are free

8  to go.  Thank you.

9                    PROSPECTIVE JUROR:  Thank you.

10                    [Prospective juror out]

11                    THE COURT:  Ms. Krupihnski.

12                    [Prospective juror in]

13                    THE COURT:  Good afternoon.

14                    PROSPECTIVE JUROR:  How are you?

15                    THE COURT:  I'm doing fine.  We've been

16  playing name that tune on how we pronounce your name.  Is it

17  Krupihnski?

18                    PROSPECTIVE JUROR:  Very good.

19                    THE COURT:  Close enough?

20                    PROSPECTIVE JUROR:  Uh-huh.

21                    THE COURT:  Please have a seat.  Have you

22  had enough time to preview the guide that I provided for

23  you?

24                    PROSPECTIVE JUROR:  Yes.

25                    THE COURT:  And a copy of the

1  questionnaire that you filled out for us Friday back in May?

2  PROSPECTIVE JUROR:  Yes.

3  THE COURT:  A short questionnaire, what

4  is your name, where were you born, and what happened next?

5  So we don't anticipate that you remembered all the answers

6  to the questions provided so if you need to refer to that,

7  please do.

8  This could be an intimidating process.

9  It's not designed to be.  It's as informal as best we can.

10  We don't want you to feel like you are the one on trial.  My

11  job is to be sure that you understand the law.  I've given

12  you as short a version as I can of the issues that the

13  lawyers will be talking about and they will give you

14  examples.  If you don't understand the examples, we'll

15  explain it so that you can understand how all the law

16  relates with each other.  That's the main thing, to get you

17  up to speed on the type of law we're dealing with.  Number

18  one, do you understand it?  Number two, can you follow the

19  law?

20  So before we go any further, after

21  reviewing the guide, do you have any questions about what

22  you have read so far?

23  PROSPECTIVE JUROR:  No.

24  THE COURT:  All right.  Do you have any

25  problems serving the Court for two weeks of jury duty

1    beginning on November 10th?

2                         PROSPECTIVE JUROR:  No, I sure do not.

3                         THE COURT:  Very well.  I shall turn it

4    over to Mr. Shook.

5                         SUSANNE KRUPIHNSKI,

6    having been duly sworn, was examined and testified as

7    follows:

8                         DIRECT EXAMINATION

9    BY MR. SHOOK:

10        Q.    Krupihnski, that is right?

11        A.    Yes.

12        Q.    My name is Toby Shook.  I'm going to speak to

13   you on behalf of the State.  Looking at your questionnaire,

14   I believe this is your first tour of jury duty; is that

15   right?

16        A.    Yes.  Here in Texas or ever.

17        Q.    Okay.  So you went right up to the --

18        A.    Uh-huh.

19        Q.    You skipped the minor leagues and went to the

20   major leagues?

21        A.    Yes.

22        Q.    Usually in every other case, except the death

23   penalty case, we talk to jurors in general.  But because it

24   is a case in which the State is seeking the death penalty,

25   we do this individual process.  And it's, as the Judge

1 alluded, it's not made to intimidate you, although it kind

2 of makes you feel like you are on trial.  We've had jurors

3 tell us that.  But it's the best way we found to get

4 information.

5     You provided a lot of information with

6 your questionnaire and I'm going to follow up on some of

7 that.

8    A.  Okay.

9    Q.  We're going to talk about how you feel about

10 the capital murder death penalty and some of the rules and

11 laws that apply to that and all criminal cases.  You have

12 lived, I think, here in the Dallas area for about the last

13 three years?

14    A.  Yeah, it's four years this month.

15    Q.  Okay.  And prior to that it was Florida?

16    A.  Orlando, uh-huh.

17    Q.  Let me ask you first about how you feel about

18 the death penalty, and I believe you put on the

19 questionnaire that you are in favor of it as a law.  And I

20 would like you to kind of follow up on that, give us a

21 little information as to why you favor the death penalty and

22 the purpose you feel it serves society.  It doesn't have to

23 be a long answer, just general feelings.

24    A.  I just don't believe in murdering other people

25 and I think if you do that, you pay the ultimate price with

1    your own life.

2          Q.    So you feel it's the proper punishment in

3    certain types of murder cases?

4          A.    Yes, I do.

5          Q.    Would that all just come down to the

6    particular facts of the case, the type of murder, that sort

7    of thing?

8          A.    Yes.

9          Q.    Okay.  If it's intentional?

10         A.    Yes.

11         Q.    Okay.  If it's -- and I take it it's a law

12   that you have kind of grown up with or always believed in

13   it?

14         A.    Yes.

15         Q.    Okay.  In Texas -- every state is a little

16   different.  In Texas the death penalty is just reserved for

17   murder cases, but not every murder case, just certain types

18   of murder cases.  When we talk about murder, we are talking

19   about an intentional killing.  But there's lots of different

20   types of intentional killings, brutal killings, you can't

21   get the death penalty for.  You can get a life sentence or

22   99 years, but not the death penalty.  There are certain

23   rules that we have to go by which the Supreme Court has

24   handed down.  Kind of limits us to which type case that we

25   can go for.

1          We had to put some criteria on the death

2   penalty, so what we're limited to right now is intentional

3   killings that occur during the course of a felony such as a

4   robbery.  Someone goes in and robs a 7-Eleven, killing the

5   clerk, that could be a death penalty case.  During a

6   burglary, during a rape, during an arson, those, or

7   kidnapping.  Those could be a death penalty case, again,

8   depending on the facts makes you eligible for the death

9   penalty.

10          I guess you could say murder of specific

11  victims, such as a police officer, fireman on duty, child

12  under the age of six, multiple murders, several victims,

13  mass killer or serial killer.  And then a murder for hire,

14  hitman-type situation.

15          But those are simply the types of cases

16  that have been reserved for the death penalty.  Lots of

17  other bad killings deserve the death penalty, but going

18  under the rules handed down from the Supreme Court, that's

19  what Texas is limited to.

20          Then if you committed that type of crime

21  under our procedure, that doesn't mean I get the death

22  penalty.  It depends on the facts of each case and the

23  Special Issues which I believe you looked over from that --

24       A.     Uh-huh.

25       Q.     -- the juror orientation.  Those have to be

1  answered a certain way before someone can get the death

2  penalty.  Some are answered that way and some aren't,

3  depending on each case.  It comes down to each particular

4  case.

5        The way the death penalty is set up right

6  now for the types of murders I've gone over where a person

7  could be eligible for the death penalty, do you agree

8  generally that those are the types of crimes --

9        A.    Yes.

10       Q.    -- that you think should be considered?  Okay.

11  Here's another area I want to get into, what is called the

12  law of parties.  I think it's more commonly known as

13  accomplices.  You know, when we think of a death penalty

14  case, someone committing capital murder, you immediately

15  envision the actual triggerman and very well may be that.

16       But also capital murder, like any other

17  crime, can be committed by more than one person, groups of

18  people.  Sometimes it takes several people to pull off a

19  certain crime.  Some people are more responsible or have a

20  larger role in a crime but that doesn't mean the rest aren't

21  held responsible, if the law says we actively participate in

22  the crime, participate, then we can all be held accountable.

23       Let me give you an example of capital

24  murder.  let's say Mr. Wirskye and I and one other person

25  would be the getaway driver.  We come up with a plan to rob

1  a bank.  The plan calls for me to have a couple of guns.  We

2  get driven to the bank.  Our getaway driver waits outside,

3  car running, so we can make a speedy getaway.

4             Mr. Wirskye and I go in and I pull the

5  guns out and threaten everyone and he gets a bag and starts

6  loading the money up.  During the course of that robbery, I

7  start shooting people.  Maybe Mr. Wirskye warns me, hey,

8  this one is going for an alarm or that one is trying to get

9  away and I shoot them.  Or maybe I start shooting on my own,

10  but I kill people intentionally, kill a person

11  intentionally.  We get away, but we're caught.

12             Obviously, I can be prosecuted for the

13  death penalty because I'm the triggerman.  But the law says

14  that Mr. Wirskye and the getaway driver, depending on the

15  facts of the case, could also be found guilty of capital

16  murder, even though they are not the triggerman.  They can

17  be prosecuted because they actively participated in that

18  crime and they ultimately could get the death penalty.

19  Depends on the particular facts of each case, even though

20  they didn't pull the trigger.

21             Some people don't agree with that area of

22  the law.  They would draw a line there and go, look, I'm all

23  for the death penalty for the triggerman, but not an

24  accomplice.  Other people tell us, no, I can see where a

25  death penalty could apply in that situation and it would

1   depend on the facts, obviously, how actively people are

2   involved in the crime.  But I can see the logic of pursuing

3   the capital murder, even the death penalty, against a

4   nontriggerman and accomplice.  And they agree with the law.

5           And we just want to know how you feel,

6   generally, about that, prosecuting someone who is a

7   nontriggerman, that is an accomplice to a crime for the

8   death penalty.  Personally, do you feel that is something

9   you are on board with, depending on the facts or something

10  you are not on board with?

11       A.    I would probably be one of the people that

12  would be on the other side that have the opinion.

13       Q.    Okay.

14       A.    You know, the accomplice may not have

15  understood what the intention was of the person who shot

16  them.

17       Q.    Okay.  So you're fine with the death penalty

18  for the triggerman.  It's the accomplice is where you would

19  draw the line?

20       A.    Yes.

21       Q.    Well, let me explore that a little bit further

22  with you.  Is that something if -- and I can't get into the

23  specific facts, but if you were in a situation where the

24  State were presenting a case with an accomplice, that you

25  would have an objection saying, look, life sentence, fine,

1    99 years, but no death penalty for the accomplice.  If we're

2    talking about the triggerman, it's a whole 'nother matter?

3         A.       Right.

4         Q.       But the accomplice from the get-go, I'm not on

5    board with that.  I'm not saying he would get away.

6         A.       Right.

7         Q.       Long prison term maybe, but that's not what I

8    could reserve the death penalty for and I'm being up front.

9         A.       Right, just my own personal feelings.

10        Q.       And that's how you feel?

11        A.       Uh-huh.

12        Q.       Do you feel that's something you are pretty

13   firm about in your convictions?

14        A.       Yes, sir.

15        Q.       You are telling us honestly, then, if this

16   were a case -- I can't get into the facts, but I can tell

17   you we are pursuing this case under the law of parties as an

18   accomplice, not a triggerman.  That's where you personally

19   would draw the line?

20        A.       Yes.

21        Q.       And wouldn't be able to return a verdict of

22   the death penalty, if we're talking about a situation of an

23   accomplice, a nontriggerman?

24        A.       I guess if it were clear to me that the

25   intention was understood, that a murder was going to take

145

1   place, it will be different.

2          Q.     Well, like the situation I gave, maybe the

3   example I have given, I mean, I just start shooting.  Now, I

4   don"t know if there's any plan ahead of that, but I don't

5   know how you feel about those fact situations.

6          A.     No, I would have difficulty with that.

7          Q.     Okay.  So you would require some agreement to

8   murder ahead of time?

9          A.     Uh-huh, yes, sir.

10         Q.     The accomplice would have to know someone is

11  going to go in there and be killed even before the crime

12  began?

13         A.     Yes.

14                MR. SHOOK:  Judge, I believe we have an

15  agreement.

16                THE COURT:  Ms. Krupihnski, we appreciate

17  your honesty, by your answers, obviously, to his questions,

18  the type of law here.  I said, you understand the law?  Now

19  you do.  And can you follow the law?  And you say, no, I

20  can't go there.  So the parties have agreed to excuse you.

21  We appreciate your time and service here today.

22                PROSPECTIVE JUROR:  Thank you.

23                [Prospective juror out]

24                THE COURT:  Ms. Garrett.

25                [Prospective juror in]

1                    THE COURT:  You may have a seat.  Ms.

2  Dona Michelle Garrett?

3                    PROSPECTIVE JUROR:  Uh-huh.

4                    THE COURT:  Ms. Garrett, you go by your

5  first name Dona or Michelle or Michelle?

6                    PROSPECTIVE JUROR:  Dona.

7                    THE COURT:  Okay.  D-O-N-A, not

8  D-O-N-N-A?

9                    PROSPECTIVE JUROR:  That's correct.

10                    THE COURT:  Making sure my records are

11  correct.  I know it's kind of tough to say relax a little

12  bit.  This is as informal as it gets.  Many people come in

13  under a lot of stress and feel like they are the ones on

14  trial.  That's not the case.

15                    We're trying to explore the law with you,

16  given you a guide to begin to try to think about the issues

17  we're going to talk about.  I know that is -- that's a lot

18  of law to read it and understand it the first time.  We

19  don't expect you to.  We want you to begin to think about it

20  and the lawyers will explore these issues with you.

21                    If you have questions, please ask us.

22  The whole idea is for you to understand the law, number one.

23  Number two, can you follow the law?  That's the ultimate

24  issue here.  You understand the law and can you follow the

25  law?  That will be the last question we ask.

1    Do you have any questions of me regarding

2  the issues I've presented to you in the guide before we

3  begin?

4                     PROSPECTIVE JUROR:  No, sir.

5                     THE COURT:  Are you able to serve this

6  court for two weeks beginning on November 10th?

7                     PROSPECTIVE JUROR:  Yes.

8                     THE COURT:  Mr. Wirskye?

9                     <u>DONA GARRETT</u>,

10  having been duly sworn, was examined and testified as

11  follows:

12                     <u>DIRECT EXAMINATION</u>

13  <u>BY MR. WIRSKYE</u>:

14       Q.    Ms. Garrett, how are you this afternoon?

15       A.    I'm fine.  How are you?

16       Q.    Good.  My name is Bill Wirskye and I'm the

17  assistant DA that will be visiting with you the next couple

18  of minutes, trying to -- sometimes you feel like you are on

19  trial, but you are not.  I want to visit with you a little

20  bit, get some of your thoughts and feelings about the death

21  penalty, talk a little bit about some of the information in

22  your questionnaire, and then maybe talk about some of the

23  law and rules that apply to death penalty cases.

24                     If you have any questions at all, just

25  stop me.  And we know people usually don't sit around

1  thinking about these things and we're giving you booklets

2  like a test in school.  If there's something you don't

3  understand or something I don't make clear, please stop me

4  because it's probably my fault and not yours.

5          You have told us you are generally in

6  favor of the death penalty; is that correct?

7          A.    Yes, sir.

8          Q.    Why is that?  What purpose do you think it

9  serves in our society?

10         A.    Okay.  I'll -- I think a lot has to do with

11  the way I was raised from the south.  I was raised in a very

12  religious family, Biblical and moral standards, and for me,

13  I mean, I believe in giving people a chance through the

14  system or if they are -- rehabilitation.  But there are

15  extenuating circumstances, repetitive crime and behavior,

16  extreme violent acts, violent acts against children or the

17  elderly or disabled, to me are unconscionable and for that

18  reason there has to be limitations placed on individuals.

19         We need to learn to be responsible for

20  our actions.  We know what the consequences are in advance.

21  I know -- I think most people know whatever state they're

22  living in what these laws are and what the repercussions of

23  their actions are.  And then I think that we have to hold

24  them accountable.  Unfortunately, if there is no

25  accountability and responsibility, then I think society

1    which is -- would, basically, be unruly.  I mean, there

2    would be no one -- no parameters for anyone.

3                    And as a parent with children, parameters

4    are very important.  Accountability is responsibility and

5    responsibility is important in raising them to be able to

6    conduct themselves in society.

7            Q.     Okay.  You have told us some of the types of

8    cases you think it may be appropriate.  Is there any

9    particular case or cases that come to mind?  I know you made

10   mention of a couple, I think, in your questionnaire.  I

11   think the Susan Smith case and Darlie Routier case?

12           A.     I think maybe not even being a parent, seeing

13   a violent act committed against a defenseless child or

14   disabled or mentally incapable, someone who is physically or

15   mentally unable to defend themselves, again, is

16   unconscionable.  These are people that can't protect

17   themselves from you as an adult or you as a parent.

18                   So for me those are extreme cases that

19   definitely the death penalty is warranted if proved beyond a

20   reasonable doubt.

21           Q.     Would you kind of reserve the death penalty

22   for just those types of extreme cases or --

23           A.     No.  Again, as I said earlier, anyone that is

24   repetitively committing criminal acts and violent acts

25   deserves to be punished.

1        Q.      Okay.  How long have you lived in Texas?

2        A.      I moved here the end of October, actually

3    October 31, 1995.

4        Q.      Okay.  From South Carolina?

5        A.      Uh-huh.

6        Q.      And looks like your brother is a police

7    officer in South Carolina?

8        A.      Yes.

9        Q.      As you may know by now, the allegations in

10   this case involve the murder of a police officer on duty,

11   which just to back up a second, capital murder in Texas is

12   only reserved for certain types of murder cases.  Not all

13   murder cases can be subject to the death penalty.  You kill

14   a certain person, a police officer, fireman, prison guard on

15   duty, mass murder, serial murder, or commit an intentional

16   murder during the course of another felony like robbery or

17   burglary, those are the type cases that in Texas we reserve

18   for the death penalty.

19               Obviously, in this case we have alleged a

20   police officer was murdered.  What effect do you think it

21   may have on you having a brother who is a police officer in

22   this type of case?

23       A.      Um, it's kind of difficult.  I'm learning to

24   be a sister of a police officer.  My brother joined the

25   force late in life.  It had been his lifetime goal to become

1  a police officer and I guess it took some time for him to

2  convince his wife and his family that it was okay.  So he's

3  actually only been on the force for about a year and a half.

4  He turned forty and made a huge career change.

5           You know, it's a sensitive subject for

6  anyone, be they sister, mother, daughter, to lose anyone,

7  regardless of what capacity they're serving their country,

8  their state, their job, their family.  Whatever their

9  lifestyle is, whatever their job position, I would think it

10  would be very difficult to lose an immediate family member

11  to a violent crime and not have it affect you.

12           I tend to weigh the evidence -- I mean,

13  I'm a believer, for whatever it's worth, I weigh the scales.

14  I try to balance things out.  I don't think it would impair

15  my being able to -- if you are asking whether it would

16  impair my being able to make a decision or color or slant me

17  being able to make a decision, I don't think so.

18      Q.      You know, you said you were learning how to be

19  a police officer's sister.  That's what I want to follow up

20  on.  We're not all the right type jurors in a case.  Only

21  you know in your heart.  And, obviously, the law in this

22  case requires the jury to decide it just on the facts and

23  evidence presented in the Court.

24      A.      Right.  Emotions have to be out of it.

25      Q.      And you know yourself better than anyone.  You

1   think that you can do that?

2       A.      I think I can.

3       Q.      If I had to pin you down for a yes or no,

4   where do you think you -- if you had to choose yes or no?

5       A.      Based on who I am and how I live my life, yes,

6   I know -- I think I could -- I know I could.

7       Q.      You can keep that out of your mind?

8       A.      I could keep that out of my mind and focus on

9   the facts.

10      Q.      Okay.  Fair enough.  Let me ask you this.  You

11  told us you were in favor of the death penalty.  I think

12  oftentimes when we talk about a death penalty case, we think

13  of one criminal acting alone, one murderer in the real

14  world.  There are often groups or gangs of people that

15  commit crimes, even murder.  So you may only have a

16  situation where you just have one person that actually

17  pulled the trigger, one person that actually caused the

18  death.

19              And we talk to a lot of people who are in

20  favor of the death penalty, but for the person that actually

21  committed the death, the person that actually pulled the

22  trigger, and they tend to draw a line sometimes and they

23  don't think the death penalty is necessarily appropriate or

24  ever appropriate for a person that didn't take a life, for

25  the accomplice, for lack of a better word.  Am I being

1  clear?

2       A.       Uh-huh.

3       Q.       So I'm just kind of curious where you come

4  down.  We talk to a lot of people who think the death

5  penalty is only warranted for someone who has taken a life.

6  And some people, you know, could consider it for an

7  accomplice, someone who didn't pull the trigger.  And I'm

8  wondering where you come down on that issue.

9       A.       I'm probably one of those that would be more

10 than actually taking a life or participating in the act.  I

11 don't think for me it would be one of those situations

12 where, okay, we can prove from his gun that it wasn't the

13 actual bullet that killed him, that that would be an issue

14 for me.  The fact that the person acted by actually shooting

15 with the intent to harm or cause death would be enough for

16 me to lean towards the death penalty.  But if they did not

17 actually participate, again, it would depend on the facts

18 and the situation and the evidence.

19      Q.       Let me give you a hypothetical.

20      A.       Okay.

21      Q.       Say Mr. Shook and I decided to rob a bank.  We

22 only have one gun.  He carries the gun in to hold up the

23 teller.  I'm going to go in with the bag and grab the money.

24 And for some reason, just out of pure meanness or somebody

25 is going for a silent alarm, and I tell Mr. Shook that, he

1  shoots and kills the teller.  Okay?  He's committed

2  intentional murder during the course of robbery.  He could

3  be found guilty of capital murder, depending on the facts

4  and circumstances.  He could get the death penalty.  What do

5  you think about my situation?

6       A.     I'm trying to figure out if they participated.

7  I don't think so.  I don't think that you are qualified for

8  the death penalty, if it were up to me, because you did not

9  have a weapon.  It was not your intention to do anything,

10  other than rob the bank.

11       Q.     Okay.

12       A.     Did I answer you?

13       Q.     There's no right or wrong answers.  We're just

14  trying --

15       A.     That's my impression.  The person that takes

16  the gun and wields the gun and is capable and does use

17  violent measures against another innocent person, I mean, I

18  think you have put yourself in the wrong crowd, of course,

19  and you have put yourself in a situation to be involved with

20  someone.  Obviously, he took a gun.  He was going to use it,

21  if necessary.  He made a decision that he could and would

22  cross the line.  You made a decision not to have a gun.  You

23  are still committing an act of crime, but he's the one that

24  actually fired the shot that killed someone, so I would not

25  -- I would not personally see that you need to face the

1    death penalty.

2         Q.      Okay.  You could give me a long prison

3    sentence?

4         A.      Yes.

5         Q.      Life in prison, but not the death penalty.

6    What if I had a gun?  Didn't shoot, he still shot, but I had

7    a gun, too?

8         A.      Well, did you call the police and turn him in?

9         Q.      No.

10        A.      Okay.  I still think that the person that

11   actually perpetuated the crime, the offense, the one that

12   actually murdered the individual, is the one that should

13   face the death penalty.  There's severe consequences for the

14   other person, but if they did not fire or shoot, then, no,

15   they should not.

16        Q.      What our law allows, basically, in the

17   situation I gave, Mr. Shook and I entered into a conspiracy

18   to commit bank robbery.  Mr. Shook committed the murder in

19   furtherance of the bank robbery.  And even though I had no

20   intention at all of that murder happening, I could still be

21   on the hook for capital murder and in Texas I could still

22   face the death penalty.

23               And there are some people, very frankly,

24   that disagree with that and that's fine.  And that kind of

25   sounds like where you are coming down.  The person that does

1  not have the intent, he's just an accomplice, just signed up

2  for a bank robbery, didn't sign on for capital murder,

3  sounds like you take the death penalty off the table for

4  that kind of person, right?

5       A.    Well, if it's the state law, then you have to

6  look at the law.  I'm just saying me personally.  But,

7  again, this is going to tell us how we have to come to a

8  verdict.

9       Q.    I'm just trying to get how you really feel.

10  For both sides there's no right or wrong answers.  The law

11  allows that, but we don't want to put anyone in a hard spot

12  or jam somebody up against their conscience or morals or

13  beliefs --

14       A.    Correct.

15       Q.    -- or that type of thing.  The law may allow

16  it, but we don't want to have you over in the jury box and

17  have a crisis of conscience.  We don't want to do that to

18  anyone.

19            And we'll be up front with you.  This is

20  a case that we're prosecuting as a nontriggerman under the

21  law of parties or the law of accomplice or conspiracy.  And

22  it sounds like maybe this, with everything going on, with

23  maybe your brother being in law enforcement, and then the

24  accomplice business, maybe you are probably not the right

25  juror for this case.  Is that fair to say?

1          A.      Probably.

2                      MR. WIRSKYE:  Give us just a minute.

3                      THE COURT:  Ms. Garrett, we appreciate

4     your honesty and coming down and going through the process.

5     You probably learned more about it then you ever dreamed.

6     So the parties have agreed to excuse you, because two

7     questions I said, do you understand the law, number one, and

8     number two, can you follow it?

9                      The bottom line is in this case you

10    indicated that you probably couldn't.  So with that, we'll

11    excuse you.

12                           [End of Volume]

13

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF TEXAS            *

2   COUNTY OF DALLAS          *

3       I, NANCY BREWER, Official Court Reporter for the 283rd

4   Judicial District Court, do hereby certify that the above

5   and foregoing constitutes a true and correct transcription

6   of all portions of evidence and other proceedings requested

7   in writing by counsel for the parties to be included in this

8   volume of the Reporter's Record, in the above-styled and

9   numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11      WITNESS MY OFFICIAL HAND on this the 4 day of

12  _____March_____, 2003.

13

14

15  NANCY BREWER, CSR, NO. 5759

16  Expiration Date:  12-31-04
    Official Reporter, 283rd JDC

17  Frank Crowley Crts. Bldg. LB33
    133 No. Industrial Blvd.

18  Dallas, TX 75207
    (214)653-5863

19

20

21

22

23

24

25