No. 74851

# PATRICK HENRY MURPHY, JR.

APPELLANT

## CAPITAL MURDER

OFFENSE

## DEATH

PUNISHMENT

## DALLAS

COUNTY

CONTENTS: RR VOLS. 10 - 15

REPORTER'S RECORD

74851

VOLUME 10 OF 61 VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

MAR   0 2004

Troy C. Bennett,

On the 4th day of September 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600

APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT:  03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT:  00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

1

## PROSPECTIVE JUROR INDEX

2 | PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
3 | Rebecca Garza-Salas | 4 | 6 | | 10 |
4 | Wendee Leigh Stringer | 25 | 28 | 52 | 10 |
5 | Yvette Morton | 57 | 59 | | 10 |
6 | Brenda Echols | 73 | 74 | | 10 |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

P R O C E E D I N G S

1

2          THE COURT:  Rebecca Garza-Salas.

3                    [Prospective juror in]

4          THE COURT:  Good morning.  How are you?

5          PROSPECTIVE JUROR:  Just fine.

6          THE COURT:  Please have a seat.

7          PROSPECTIVE JUROR:  Thank you.

8          THE COURT:  Welcome to the 283rd.  I have

9  your name as Rebecca Garza-Salas?

10         PROSPECTIVE JUROR:  That's correct, sir.

11         THE COURT:  You go by your hyphenated

12  name?

13         PROSPECTIVE JUROR:  Garza.

14         THE COURT:  Ms. Garza, it's a pleasure to

15  have you here this morning.  Have you had time to review the

16  guide I provided for you?

17         PROSPECTIVE JUROR:  Yes, sir.

18         THE COURT:  All right.  I know that's a

19  lot of law to hit someone with at 8:00 a.m. in the morning

20  and we don't expect you to be able to give it back to us

21  verbatim.  The objective this morning is for you to have an

22  opportunity to go over with the lawyers the law and they

23  will give you examples and talk about it.  My job is to be

24  sure that you, at the end of the process, that you

25  understand the law.

5.

1    PROSPECTIVE JUROR:  Okay.

2    THE COURT:  That's the first objective.

3 And then the next question is can you follow the law?  Many

4 times you come into this process and people think that they

5 are on trial.  This is about as informal as we can get.

6 It's the only way that the lawyers can have an opportunity

7 to visit with you and get you up to speed and using as

8 little of your time as we possibly can.

9    Because you were here on time this

10 morning, you get to go first.  You were second, so being on

11 time does have its advantages.  Before I let the lawyers

12 begin, do you have any questions about anything that you

13 have read thus far?

14    PROSPECTIVE JUROR:  No, sir.

15    THE COURT:  You saw that we're going to

16 begin trial on November 10th?

17    PROSPECTIVE JUROR:  Uh-huh.

18    THE COURT:  Do you have any problem

19 serving this Court for those two weeks?

20    PROSPECTIVE JUROR:  No, sir.

21    THE COURT:  Mr. Shook will inquire for

22 the State.

23    MR. SHOOK:  May it please the Court.

24    REBECCA GARZA,

25 having been duly sworn, was examined and testified as

follows:

<div align="center">DIRECT EXAMINATION</div>

BY MR. SHOOK:

Q.    Ms. Garza, I'm going to ask questions on behalf of the State.  You have been down on a jury before, so you know how the process is or usually is.

A.    Yes, sir.

Q.    This is a little different.  Because it's a death penalty case, we talk to each juror individually, but the same process in that we're going to ask you information and ask more questions and we'll follow up on some of the information you put in your questionnaire.

A.    Okay.

Q.    Tell us a little bit about that jury.  You were on a jury this last year?

A.    That is correct.

Q.    It was a murder case?

A.    Yes, sir.

Q.    What do you recall about the facts?  What type of murder case was it?

A.    Um, what type murder case?

Q.    Yeah, just generally, what do you recall about the facts?

A.    Basically, a gentleman took the life of another gentleman, basically, just because -- I mean, he had

1  no reason to.

2          Q.     Did they know each other?

3          A.     No, not from what I understood.

4          Q.     Had they gotten into an argument or --

5          A.     Somewhat of an argument.  The guy had been

6  drinking and, you know, they got a little rowdy and the

7  other guy was, basically, just doing his job by asking them

8  to leave the premises and --

9          Q.     This happened at a club of some sort or a bar?

10         A.     From what I recall, yes, sir.

11         Q.     Okay.  Did the defendant testify in that

12 trial?

13         A.     Yes, he did.

14         Q.     Okay.  How did the deliberations go?  Was it

15 pretty well agreed upon or were there a lot of arguments

16 back there or how was that situation?

17         A.     No, not a lot of argument that I recall.

18         Q.     Pretty good cut and dried case?

19         A.     Pretty much.

20         Q.     And the sentence was a life sentence?

21         A.     That's correct.

22         Q.     Anything -- was that a pretty easy decision to

23 make, also, among the jurors or was that some arguments

24 there?

25         A.     From -- on my point of view from everything

1    that was presented, yes.

2         Q.    Okay.  Anything about that experience which

3    might affect you sitting on another jury this soon?

4         A.    No, sir.

5         Q.    Okay.  You also had an uncle that's a Sheriff

6    of Webb County; is that correct?

7         A.    That's correct, sir.

8         Q.    How long has he been the Sheriff there?

9         A.    Good question.  I want to say he's on a second

10   term.

11        Q.    Okay.  Has he always been in law enforcement?

12        A.    From what I recall, yes, sir.

13        Q.    Are you very close to him?  Do you talk about

14   his job or --

15        A.    No.  I mean, I was close to him when I was

16   little.  I always wanted to be like him.  He was a detective

17   for a long time.  And we moved to Dallas.  I've been in

18   Dallas for almost 20 years.  And the last time I saw him was

19   at my grandma's funeral, which was in April.  But I really

20   didn't talk to him that much.

21        Q.    You don't think that relationship would affect

22   you in any way, then?

23        A.    No, sir.

24        Q.    Of course, this particular case has received

25   quite a bit of publicity when it occurred, somewhat

1  afterwards.  Every juror has heard a little bit about it.

2  You said that you recall hearing it on TV when you were

3  flipping channels?

4      A.    Uh-huh.

5      Q.    What is it that you recall about the facts of

6  the case or what you heard on TV?

7      A.    I don't really like to watch the news, to be

8  honest.  It's too depressing.  I don't really care to read

9  the newspaper, either.  I was just flipping channels.  I had

10  already heard about, you know, part of it and then when that

11  happened and I just -- it sounded too depressing being over

12  the holidays and I just --

13      Q.    So you didn't --

14      A.    I just really didn't pay attention, to be

15  honest with you, never followed it, never caught my

16  attention.

17      Q.    Tell us -- I want to talk to you a little bit

18  about the death penalty.  You believe in the death penalty

19  as a law.  You put that on your questionnaire.  Tell me why

20  you believe in the death penalty.  What purpose do you think

21  it serves as a law?

22      A.    Well, if you knowingly and intentionally cause

23  harm to someone else, I mean, that's -- for a long time I

24  didn't believe that way, but, you know, why should someone

25  continue living certain luxuries when you intentionally took

1  somebody else's life?

2      Q.      What caused you to -- you said a long time you

3  didn't believe that.  What caused you to change your mind?

4      A.      As I grew older and, you know, you get to know

5  people and, you know, how aggressive people are and their

6  way of thinking and I just don't understand why some people

7  feel and think that way and, I mean, it's just not right.

8      Q.      Okay.

9      A.      It's just not right.

10     Q.      How long has it been since you changed your

11  mind on the death penalty?

12     A.      Um, I'd say probably after I became

13  independent, when I became independent and started living on

14  my own and fending for myself, when I was 18.

15     Q.      What types of crimes do you think the death

16  penalty should be used for?  What comes to mind when you

17  think of a proper death penalty case?

18     A.      To start off, intentionally being you,

19  yourself, or being involved in the taking of somebody's life

20  and -- how can I say?  You place yourself in certain

21  situations and you are there because you know what is

22  already in the back of your mind.  You know what you are

23  capable of doing, knowing that you can control yourself and

24  you don't.  And you just find it easy to just take

25  somebody's life and that's not right.

1    Q.    The type of case you sat on last year, did you

2  feel that would be an appropriate death penalty case?

3    A.    In my opinion, yes, it would have.

4    Q.    Okay.  And that's because of his intentional

5  killing?

6    A.    Yes, sir.

7    Q.    Did that particular defendant, did he have a

8  prior criminal record that the jury was made aware of in the

9  punishment phase or do you recall?

10    A.    I believe he had been in and out of jail or --

11  jail -- jail or prison, I don't recall.

12    Q.    In Texas the death penalty is reserved just

13  for certain types of murder cases.  They have to be

14  intentional killings.  It doesn't take long to form the

15  intent, but it has to be an intentional killing.  It can't

16  be, you know, not self-defense, not legal justification, not

17  an accident.  So it has to be a murder case plus something

18  else, aggravated facts such as a murder during a robbery or

19  during a rape, kidnapping, arson, murder of specific

20  individuals, such as a police officer, fireman on duty,

21  murder of more than one person, several victims, could be

22  murder of a child under the age of six, murder for hire, if

23  you do it for money or profit.

24          Those are the specific types of

25  situations that the death penalty is reserved for in Texas.

1   The way the system is set up, the trial is divided into two

2   portions.   There's the guilt/innocence stage and the

3   punishment stage.   If you don't find him guilty, obviously,

4   everyone goes home.

5            But if you find him guilty, you move to

6   the punishment phase where you get some questions, Special

7   Issues, which we will talk about in a moment.   If those

8   Special Issues are answered yes, yes, and no, if you believe

9   the defendant is a future danger, that he did anticipate a

10  life would be taken, and there's no mitigating evidence,

11  then the defendant would be sentenced to death.   If they are

12  answered any other way, it's a life sentence.

13           Are you aware of the method of execution

14  in Texas?

15       A.     Um, no, not really.

16       Q.       It's by lethal injection.   It used to be by

17  the electric chair.   The procedures are the same in each

18  case.   If the defendant is sentenced to death by the Judge,

19  he would be placed on death row.   He would wait.   At some

20  point in time down the line the Judge would give him an

21  actual date of execution.

22           Just prior to that date he would be moved

23  to Huntsville, Texas, where the executions take place.   He

24  would be put in a cell a few feet from that execution

25  chamber.   He would be given an opportunity to speak with his

loved ones, family, friends, or a minister, if he so

desired.  He would be given a last meal.

At 6:00 p.m., though, all executions take

place, unless there is some type of delay, legal delay.  He

would be placed on a gurney and secured by straps.  You may

have seen it on TV.  I don't know.  They show it a lot.

There's witnesses there for both the defendant and the

victim, if they desire to be there.

And the execution takes place by simply

injecting lethal poisons which stop the heart, force --

collapse the lungs and put him into a very deep coma.  It

happens in about 15 seconds.  They are often described in

great detail in the media, you know, the last words and

those type of things.  Sometimes they ask for forgiveness,

sometimes they're defiant.

The point of it is this.  You know

probably from growing up here in Texas that the death

penalty is a crime which is prosecuted and a punishment that

is actually dealt out, unlike some states.  They have the

death penalty and they never use it.  They put people on

death row, but they never use it.  Texas does.  Texas leads

the nation in executions almost every year.  I'm sure they

lead in executions this year.

It is our goal in this case that the

defendant will be found guilty.  We believe we have that

1   evidence, and, also, to convince a jury to answer those

2   questions in a way which would result in his execution.  We

3   put all our cards out on the table.

4                       You have told us that you are in favor of

5   the death penalty as a law.  You think it should be

6   enforced.  And I just want to know if you think you are the

7   type of person, who, if you were put on this type of jury,

8   now that you are down here and you have thought about it a

9   little more, could you actually make those decisions?

10          A.      Yes, sir.

11          Q.      And be comfortable with it?

12          A.      Yes, sir.

13          Q.      Okay.  Now, let me go into one other area.

14   When we talk about the death penalty, we usually think of

15   examples of the actual triggerman.  If I go in a 7-Eleven

16   and shoot down the clerk, obviously, I could be prosecuted

17   for the death penalty.

18                       Some crimes, though, are carried out by

19   groups of individuals.  We call these parties or

20   accomplices.  The law says that you can be held responsible

21   even in a capital murder case if you are not the triggerman,

22   if you are actively involved in the crime.  You can even get

23   the death penalty, if you are actively involved in the

24   crime, just depending on the specific facts.

25                       Some jurors tell us, though, they have --

1  they would disagree with that aspect, that they have no

2  problem with the death penalty for the triggerman, the

3  person that takes the life.  Their problem comes with an

4  accomplice who didn't actually take the life, but maybe

5  assisted in the crime in some way.  They may give a life

6  sentence, would only prosecute him for a long prison term,

7  but not the death penalty.  They draw a line there.  Other

8  jurors say, no, they are fine with the law on accomplices

9  getting the death penalty.

10              How do you feel about a nontriggerman

11  getting the death penalty?

12       A.    Well, if you are old enough to make your own

13  decisions, you know, you're there because you want to be

14  there and you are part of it, knowing the consequences and

15  what may happen and what you are willing to do.

16       Q.    Okay.  So you don't have a problem with that?

17       A.    No.  You are just as guilty as the triggerman.

18       Q.    Now, I want to talk to you about these Special

19  Issues which are up here.  You probably read over them and

20  just to kind of review, read Special Issue No. 1 to

21  yourself.

22       A.    Okay.  Out loud or just to myself?

23       Q.    Just yourself.  Let me know when you are done.

24       A.    (Prospective juror complies.)  Okay.

25       Q.    Now, you see that question is asking you to

```
 1   make a prediction how someone would behave in the future.
 2   First of all, let me ask you, do you feel comfortable making
 3   that type of prediction?
 4        A.    Yes.
 5        Q.    What type of evidence would you want to know
 6   before you answered that question?
 7        A.    You mean whether or not they would continue?
 8        Q.    Yes.  If you were going to answer yes to that,
 9   what do you think you would need?  What type of evidence
10   would you want to hear and know which would be important to
11   you in making that type of decision?
12        A.    Well, I'd like to know a little more on the
13   background as far as, you know, his history, if -- you know,
14   you can make a mistake once, maybe twice, but we all have
15   enough time in life to change our ways, you know, make
16   certain decisions, just change our way of thinking.  And if
17   people have had opportunities to do that and they like to
18   continue down the bad path, well, you know, you made a bad
19   decision more than once and you have had time to, you know,
20   change your way of living and way of thinking and you don't,
21   then --
22        Q.    Okay.  Now, question No. 1, one piece of
23   evidence you will get to consider is the crime itself.  You
24   don't get to this question until you have found the
25   defendant guilty of capital murder.
```

1      A.      Okay.

2      Q.      After that, this is a question you receive.

3  Now you can hear additional evidence about the defendant's

4  background.  If they do have a previous criminal record, you

5  get to hear that.  If they don't, you get to hear that, the

6  good and the bad.  And that all goes into this question.

7              The question starts off with a no answer

8  and we have the burden of proof that it should be answered

9  yes.  Under the law the jurors have to look at that

10  evidence, review it again, and then decide if the State has

11  proven it beyond a reasonable doubt.  But you don't get to

12  it unless you have found the defendant guilty of an

13  intentional killing --

14      A.      Okay.

15      Q.      -- during the course of a felony or police

16  officer, whatever the particular indictment might be.

17      A.      Uh-huh.

18      Q.      I just want to make sure because you were,

19  like a lot of jurors, pretty -- what was key to you about a

20  death penalty case was the intentional killing.

21      A.      Uh-huh.

22      Q.      For instance, the murder case you sat on.  And

23  sometimes people have a problem with that area of the law

24  and I just want to cover that with you.  This question is

25  not designed to be an automatic yes.  The Judge would

1    instruct you that the law contemplates that you would review

2    the evidence and then decide.

3            A.      Right.

4        Q.      Some jurors, however, tell us, if I have made

5    the decision beyond a reasonable doubt he was guilty of

6    capital murder, that tells me all I need to know that he is

7    dangerous and it would be an automatic yes.

8            A.      Right.

9            Q.      Other jurors say, no, I can follow the law in

10   that regard, he necessarily may not be dangerous.  And I

11   just want you to be as honest with us as possible.  Would

12   you -- how would that affect you?  Would you be able to wait

13   and listen to the evidence on question No. 1 after finding

14   him guilty?

15           A.      I mean, after listening to all the evidence

16   provided, if it's proof enough of his acts, you know, that

17   he was guilty just as much as the other ones, then, yeah, he

18   would be a threat to society, period.

19           Q.      Okay.  But the law says that even if you found

20   him guilty, you can't automatically answer it yes.

21           A.      Right.

22           Q.      Would you be able to do that or would the

23   guilty finding be all you needed at that point in time?  See

24   where I'm going with that?  Some jurors tell us -- and I

25   just want to see if you can follow the law on this

1   particular aspect and just because you found him guilty,

2   doesn't automatically mean question No. 1 is yes.

3          A.     Right.

4          Q.     Would you be able to follow that law?

5          A.     Yes.

6          Q.     Let's talk about Special Issue No. 3.  That's

7   the last one and it's the longer question.  If you would

8   just take a moment to read that.

9          A.     [Prospective juror complies.]  Okay.

10                 MR. WIRSKYE:  May we approach, Judge?

11                 THE COURT:  You may.

12                    (Bench conference)

13         Q.     (By Mr. Shook)  That question is a longer one.

14  It's the last question you get to.  The question No. 2 has

15  to do with that parties deal, if a person is not actually

16  the triggerman, but you believe that they anticipated that a

17  human life would be taken, then you would answer that one

18  yes.

19                 Then the last one is the mitigation

20  question.  You have already found he's guilty.  You have

21  already found he's a continuing danger to society.  You

22  already found that he either intended someone to die or he

23  anticipated they would die.

24                 As you sit there today, can you think of

25  any type of evidence that you would deem to be mitigating?

A.      I don't understand.

Q.      Mitigating is anything you might -- I can't tell you what it is.  It's going to be up to you.  Anything you might feel would make the defendant deserving of a life sentence, rather than a death sentence.  It could be anything in his background, anything like that.

A.      I don't know.  I would have to -- I can't make that decision right now -- I mean, I would have to hear everything out to make that type of decision.

Q.      Okay.  The law says you don't have to tell us what mitigating is, mitigating evidence.  It could be something in his background that weighs in his favor.  But what you have to be able to do is keep your mind open to it.

But, again, I want to make sure you can follow the law on this particular point.  You don't get to that question unless you have already found him guilty.

A.      Uh-huh.

Q.      And you already feel that the State has proven to you beyond a reasonable doubt that he's a continuing danger to society and that he anticipated that a life would be taken.  Some jurors can follow that and say, well, I could still give him a life sentence under those circumstances --

A.      Uh-huh.

Q.      -- if there were sufficient mitigating

1  factors.  And other jurors tell us, well, once I have gone

2  that far down the road where I believe he's guilty and he's

3  a continuing danger and anticipated a life, no.  I mean,

4  that question is closed off to me and I would never consider

5  any mitigating evidence because he's, obviously, a very

6  dangerous human being.

7          A.     Right.

8          Q.     How do you feel about that law, that area of

9  the law?

10         A.     Well, after listening to everything and if I

11 feel he's guilty and everything is proven that he is guilty,

12 then he deserves the death sentence.

13         Q.     Okay.  Would the mitigating issue be closed

14 off to you, then, at that point in time?

15         A.     Probably.

16         Q.     Because of the guilt finding and the

17 continuing danger finding you have already made?

18         A.     Uh-huh.

19         Q.     Let me go over a couple of other areas.  You

20 said the defendant did testify in your previous trial?

21         A.     That is correct.

22         Q.     Okay.  If he did not testify, if the defendant

23 chooses not to testify in a criminal trial, the jury can't

24 hold that against him.

25         A.     Uh-huh.

1    Q.    Because it could be several reasons why

2    somebody may not choose to testify.  Would you be able to

3    follow the rule of law of not holding it against a defendant

4    if he chooses not to testify?

5    A.    Yes, sir.

6    Q.    Okay.  There was -- you have got a copy of the

7    questionnaire up there, do you?

8              THE COURT:  No.

9    Q.    (By Mr. Shook)  I want to ask you a couple of

10   questions.  I know you don't remember your answers, but I'm

11   going to go over a couple of areas here before I go on.  One

12   area we talked about, we give a statement where you can

13   agree or disagree with it or be uncertain about it and I

14   would like to follow up on a couple of those.

15   A.    Okay.

16   Q.    One was, my city's police officers are

17   enforcing the laws in a professional and fair way and you

18   put uncertain about that.  What were you thinking when you

19   saw that statement and you put uncertain?

20   A.    Well, I guess -- well, I was uncertain in the

21   aspect that I don't want to judge all of them by certain

22   behavior of some, because not everybody is the same and I've

23   just been -- not necessarily in situations, but some of them

24   take advantage of, you know, their badge, should I say.

25   Q.    What type of situations?  You said -- anything

1  you were personally involved in or just heard about or know

2  about?

3       A.     Situations where they seem to at times

4  discriminate people.  They take that authority to try to

5  intimidate.  And, you know, it's just -- it's not right

6  because we're supposed to feel that they are there to

7  protect and serve us.

8       Q.     Do you know anyone personally that it has

9  happened to in the criminal justice system?  Know anyone

10  that has ever been through it?  I know you have the uncle

11  that's a sheriff.  Do you know anyone who has ever been on

12  the other side?  Prosecuted?

13       A.     I don't understand what you mean.

14       Q.     You said that sometimes police officers take

15  advantage of their badge or discriminate.  Do you know

16  anyone personally that that's happened to?

17       A.     No.  I didn't know the people personally, no.

18       Q.     But you have heard about it?

19       A.     Heard about it or have seen it or just seen

20  the way they act towards other people.

21       Q.     Personal observations?

22       A.     Passing by, but, personally, no, sir.

23       Q.     And have you ever known anybody that's ever

24  been arrested or been through the criminal justice system?

25  Been close to anybody?

1   A.   Yeah, I've known some, but, no, not close to
2   them.
3   Q.   Anything like that happen in their particular
4   case?
5   A.   Not that I'm aware of.
6   Q.   Were they just friends or related to you?
7   A.   Relatives, but in Laredo, not here in Dallas.
8   I mean, I've lived here almost 20 years and kind of moved
9   away from that side of the family.
10   Q.   Okay.
11          MR. SHOOK:   Can I have just one moment,
12   Judge?
13          THE COURT:   Yes.
14          MR. SHOOK:   I don't have any other
15   questions at this time, Judge.   Approach, Your Honor?
16          THE COURT:   You may.
17              (Bench conference)
18          THE COURT:   Ms. Garza, we want to thank
19   you for your participation this morning.   The attorneys have
20   agreed to excuse you from this jury service.
21          PROSPECTIVE JUROR:   Okay.
22          THE COURT:   Please leave with the thanks
23   of the Court for your participation.   And you learned a lot,
24   probably a lot more about the Texas law than you anticipated
25   you would.   You just tell your uncle you just didn't make

1    the cut.  Try again next time.  Thank you.

2                    PROSPECTIVE JUROR:  Very good, thank you.

3                         [Prospective juror out]

4                    THE COURT:  Ms. Stringer.

5                         [Prospective juror in]

6                    THE COURT:  Good morning, Ms. Stringer.

7    How are you?

8                    PROSPECTIVE JUROR:  Good.

9                    THE COURT:  Wendee Leigh, is that how you

10   pronounce your name?

11                   PROSPECTIVE JUROR:  That's correct.

12                   THE COURT:  We appreciate you being here

13   this morning.  And have you had time to go over the guide

14   that I provided for you?

15                   PROSPECTIVE JUROR:  I have.

16                   THE COURT:  I know that's a lot of law to

17   give you first thing in the morning and we don't expect you

18   to be able to give it back to us verbatim.  But the

19   objective here this morning is for you to have an

20   opportunity to visit with the lawyers and they are going to

21   try to educate you a little bit further on how the law

22   interrelates.

23                   My job is to, number one, that you

24   understand the law.  So if you don't understand the question

25   or understand the concept, we'll explain it a different way

1    until you do.  The first step is do you understand the law?

2    The second issue is after you understand the law, can you

3    follow the law?

4                    PROSPECTIVE JUROR:  Okay.

5                    THE COURT:  So that's what this process

6    will involve this morning.  Only question that I have for

7    you, as stated, the trial shall begin on November 10th.  Can

8    you give the Court two weeks of your time?

9                    PROSPECTIVE JUROR:  It will probably be a

10   little bit difficult.  I'm a commissioned salesperson, but I

11   don't know if that's a reasonable excuse not to be here.

12                   THE COURT:  Yes, ma'am.  I understand you

13   deliver pharmaceuticals?

14                   PROSPECTIVE JUROR:  Medical equipment to

15   the elderly.

16                   THE COURT:  Excuse me.  I've read a lot

17   of these questionnaires.  I do pretty good.  I understand

18   that it would be a financial hardship and any jury service

19   is going to be a financial hardship on everybody, so we

20   understand.

21                   The first thing I tell people is that I

22   will use your time very wisely.

23                   PROSPECTIVE JUROR:  Okay.

24                   THE COURT:  Now, I think that you saw how

25   we do things, very organized.  Get the letters out, be here,

1   we'll get you in, and get you out.  We're not going to waste

2   your time.  And I also read in your questionnaire that you

3   could arrange your schedule ahead of time?

4                    PROSPECTIVE JUROR:  Uh-huh.

5                    THE COURT:  That's why we're doing this

6   to give you that much time in advance so you can arrange

7   your schedule.  We do work business hours and we anticipate

8   that you would be able to use a phone during the day and not

9   be sequestered at night.  So you could have some sort of --

10  you can make one or two runs in the evening, if you had to.

11                   PROSPECTIVE JUROR:  Yes, I could.  And in

12  the morning.

13                   THE COURT:  So we will do the best we can

14  to use your time and get you out of here.  Fair enough?

15                   PROSPECTIVE JUROR:  Fair enough.

16                   THE COURT:  Mr. Wirskye, would you like

17  to inquire?

18                   MR. WIRSKYE:  May it please the Court.

19                   WENDEE STRINGER,

20  having been duly sworn, was examined and testified as

21  follows:

22                   DIRECT EXAMINATION

23  BY MR. WIRSKYE:

24       Q.    Ms. Stringer, how are you this morning?

25       A.    Good, thank you.

1   Q.    I'm Bill Wirskye and I'm the assistant DA that

2   will be visiting with you in the next few minutes.   What I

3   want to do is talk to you about some of the information on

4   your questionnaire that you were kind enough to give us, I

5   think you have a copy in front.

6   A.    Uh-huh.

7   Q.    Maybe talk a little bit about your thoughts,

8   feelings, and opinions on the death penalty, capital

9   punishment, and then maybe finish up talking a little bit

10  about the law and some of the rules that apply in a death

11  penalty case.

12          What type of work do you do exactly?  I

13  know you are self-employed?

14  A.    I deliver medical supplies.  I market home

15  health agencies.  And when they need equipment for the

16  elderly, I deliver it.  They call me for it.

17  Q.    How long have you been doing that?

18  A.    About one and a half, two years.  I kind of

19  did it part time and then went full time.

20  Q.    At some point in the past you applied to be a

21  police officer; is that right?

22  A.    I did.

23  Q.    Tell us about that.

24  A.    I applied in California -- I apologize, my

25  cell phone.  I didn't turn it off.  I did apply to be a

1  police officer, but it got to the point where we went into

2  an orientation and I really realized that five foot one and

3  115, I wasn't going to stop a whole lot of people, so I

4  realized there was a problem with that.

5         Q.    Sure.  Was it something you were interested

6  in, though, law enforcement?

7         A.    Yes.

8         Q.    Something you are still interested in?

9         A.    Interested from a lawyer standpoint.

10        Q.    You keep track of the big cases?

11        A.    Not locally.  I just like to watch the cops

12  and court, you know, on TV.

13        Q.    You also told us, I guess, your husband had

14  been robbed twice?

15        A.    Way back before I knew him, uh-huh.

16        Q.    Do you know any details of that?

17        A.    Only that he became friends with a gentleman

18  and he told him he was leaving town and while he was out of

19  town, he was robbed.  And the guy came back the second time

20  and robbed him again.

21        Q.    Do you know whether the police were involved

22  or did it get down to the courthouse or anything like that?

23        A.    The police were involved because he thought he

24  knew who it was.  And I believe within a year he saw his car

25  at another location and he called the police again and said,

30

1   here's his car.  I don't know where he's at, but I don't

2   know if he was ever arrested.  I don't know the conclusion

3   of that at all.

4                    THE COURT:  We use a definition very

5   carefully here.  "Robbed" means it was a face-to-face

6   confrontation and took something from him.  "Burglary" is

7   when he broke into the house or car.

8                    PROSPECTIVE JUROR:  It was burglary.

9        Q.    (By Mr. Wirskye)  I thought that was what you

10  were talking about.

11       A.    Uh-huh.

12       Q.    Let's see.  And you have never been a juror

13  either in a civil case or criminal case; is that right?

14       A.    No, sir.

15       Q.    It looks like you were involved in some type

16  of civil litigation?

17       A.    Yes, I was.

18       Q     How long ago was that?

19       A.    Five years ago.  Actually, it just went to

20  arbitration.  It wasn't any type of court case or anything.

21       Q.    You weren't in front of a judge or have a

22  trial or anything?

23       A.    No.

24       Q.    Any lingering impressions about that process

25  on the civil side and arbitration?

31

1    A.    No, no, I thought it went smoothly.

2    Q.    Looks like you, also, had your sister in

3    Kentucky --

4    A.    Uh-huh.

5    Q.    -- that, I guess, in the mid '90's had a drug

6    case?

7    A.    Yes.

8    Q.    What do you know about that?

9    A.    We weren't really all that close at the time.

10   All I know is that she was with a gentleman who apparently

11   was manufacturing some type of drug in a warehouse.  She

12   happened to be there when everything, I guess, happened and

13   so she got arrested as well.  The only thing I know is she

14   was looking at a lengthy time in jail, but she turned, I

15   guess, evidence and they shortened her stay to 18 months.

16   And she didn't actually go to a facility that was real

17   locked down.  It was mainly rehab-type of jail time.  So

18   that's about all I know.

19   Q.    Did that rehabilitation-type thing work out

20   for her?

21   A.    Yes, very much so.

22   Q.    Kind of turned her life around?

23   A.    Yes.

24   Q.    Do you think she was treated fairly based on

25   what you knew about the process?

1    A.    You know, I really didn't -- I wasn't really

2    close to her at the time.  I was hoping for a lighter

3    sentence, of course, so I guess so.  I didn't really know

4    whether she was involved or not.

5    Q.    Okay.  You have also told us, I guess, that

6    generally you are in favor of the death penalty; is that

7    right?

8    A.    Yes.

9    Q.    Okay.  Could you tell us why, I guess, just in

10   your own words that you feel that we should have the death

11   penalty or what purpose you think it serves in having one?

12   A.    I just -- personally, I think that if a person

13   is going to go out and harm another person intentionally and

14   be very brutal about it, that they ought to pay the

15   consequences for that.

16   Q.    Okay.  Is there any particular type of case

17   that comes to mind when you think about an appropriate type

18   case for the death penalty?  Particular facts or something

19   that might be important to you?

20   A.    I think if I know the facts well enough, I can

21   -- I can make a decision for a death penalty.  If I can see

22   a direct cruelty, that would say I would probably make my

23   mind up quicker.  I think cruelty is the one that mainly

24   sticks out in my mind, like an execution or being kidnapped.

25   But I think other times you would have to really -- I would

1    have to be convinced quite clearly whether a person was

2    definitely in the wrong.

3            Q.    We've talked about, I guess, like some people

4    don't stay up on the local cases, but is there some famous

5    national case or something that you think of that you think

6    of cruelty or appropriate case for the death penalty?

7    Something you have seen on TV or heard about?

8            A.    I think that the one that just pops in my mind

9    is the one where the lady killed her five children, that

10   one.

11           Q.    The one down in East Texas?

12           A.    Yes.  That one to me, I just have no question

13   about that.

14           Q.    Fair enough.  Let me -- you know, you may not

15   know this or you may.  Most people don't.  Hopefully, you

16   don't sit around thinking about this.  But murder is the

17   only crime in Texas the death penalty is available for, and

18   then only a certain subset of particular type of murders,

19   what we call capital murders, are the only type of murders

20   that the death penalty is available for.

21                 If you kill a police officer on duty,

22   fireman, prison guard, child under six, mass murder, serial

23   murder, or you commit a murder, intentional murder, in the

24   course of a robbery, burglary, or that type of thing, those

25   are the only type crimes that it's available for.  So it's

1   kind of a very narrow subset of murder.

2              If you were Governor for a day, just off

3   the top of your head, do you think that you would broaden

4   that group or do you think you would shrink it?  I think

5   what I'm driving at --

6        A.   No, I don't think that I would broaden it.  I

7   think it has to remain pretty tight.

8        Q.   I guess a lot of times when we think of

9   capital murder, especially like murder in the course of a

10  robbery, you think of one person going in, I guess, a

11  7-Eleven, holding up the clerk and shooting and killing the

12  clerk and making off with the money, that type thing.

13             Oftentimes crimes are committed, though,

14  by more than one person, a group or gang of people.

15  Depending on the facts and circumstances of some of those

16  cases, the law in Texas allows for not only the triggerman,

17  the person that actually, I guess, intended or actually

18  caused the death, to face the death penalty, but also these

19  accomplices, the nontriggermen.

20             And we talk to a lot of people who are

21  otherwise in favor of the death penalty, but they think the

22  death penalty should just be limited to the person that

23  actually pulled the trigger or caused the death.  Only if

24  you take a life, will your life be taken.  And some people

25  feel the opposite.  They think that maybe it should at least

1   be considered for the accomplices or the nontriggerman.

2                    Where do you kind of come down on that?

3   I know it's not something that you would have ever thought

4   about.

5        A.    Right.  Um, for me I think I would have to

6   look at the whole picture.  Um, I'm not sure if I would

7   definitely put that on someone, if I didn't know their

8   intent, but I think that during the course of a robbery, I

9   think I would have to take in the circumstances of really

10  what went down whether or not I would include the whole

11  bunch.  I think I would have to really know that the

12  incident -- I would really want to know what their intention

13  was going in there to do some -- to harm and that they

14  stayed around long enough to do harm.

15       Q.    Looks like from your questionnaire, intent is

16  very important to you --

17       A.    Yes.

18       Q.    -- when you talk about who is deserving of the

19  death penalty?

20       A.    Yes.

21       Q.    And I want to be clear that our law allows

22  some accomplices or nontriggermen to actually face the death

23  penalty in a situation where they had no intent that someone

24  get harmed.

25       A.    I think if I had a law that showed me that,

1  which I'm not clear on at this point, then if the law states

2  that, then I'm willing to do that.  But I would have to have

3  a law to wrap that around it.

4      Q.    Let me do this.  Let me give you an example

5  and kind of bounce this off you.  Say Mr. Shook and I get

6  together with another friend of ours and we all decide we're

7  going to go rob a bank.  We only have one gun.

8           The plan is Mr. Shook is going to take

9  the gun in and kind of hold everybody at bay.  I'm going to

10  go in kind of as the bagman and collect the cash and our

11  friend is going to be the getaway car driver out front, keep

12  a lookout, and if the police come, he's going to honk or

13  something like that.

14           And we drive up.  Mr. Shook and I are the

15  only two that go in and he's holding everybody up.  And I'm

16  gathering the cash.  At some point for some reason, maybe

17  just because he's mean or he thinks somebody is about to hit

18  a silent alarm, for whatever reason, he shoots and kills the

19  teller.  We get away and are caught and brought to trial.

20           Obviously, I think you know he can be

21  prosecuted for capital murder.  He committed the intentional

22  murder during the course of a robbery.  He could face the

23  death penalty.  What do you think about somebody in my

24  shoes?  I never intended anybody to get hurt.  I signed up

25  for a bank robbery and all of a sudden a capital murder

37

1  breaks out.

2       A.     I believe because you were in the vicinity or

3  the area and you didn't stop it and I think that, yeah, I

4  feel like you were right there with him, kind of going in

5  there together and kind of that whole thing would consider

6  the two of you in one crime because you didn't stop it.

7       Q.     Okay.  How about the person, the getaway car

8  driver outside?  What do you think about him?  He could

9  still face the death penalty, too.

10      A.     I'm not quite sure.  I would have to have a

11 law on that whether or not that person had to be in the

12 vicinity of that crime, could they have stopped that crime?

13 I don't know the law well enough to say.

14      Q.     Basically, there's two ways to find people

15 like me or the getaway car driver guilty.  If you think I

16 aided or encouraged Mr. Shook, for instance, to actually

17 commit that murder.  Maybe if I said, go ahead and shoot

18 her, that type thing, I could be guilty as an accomplice.

19             The second way, kind of what we've been

20 talking about, is the law of conspiracy.

21      A.     Uh-huh.

22      Q.     The three of us agreed, conspired, to commit

23 that aggravated robbery.  And in furtherance of that crime,

24 during that crime, Mr. Shook commits a murder.  If myself

25 and the getaway car driver should have anticipated that a

1  life could be taken, then we're on the hook for that capital

2  murder, as well.

3      A.    Uh-huh.

4      Q.    So at least when you are talking about finding

5  somebody guilty, an accomplice guilty of capital murder, you

6  look at whether I should have anticipated that a life could

7  be taken or whether that getaway car driver should have

8  anticipated that a life would be taken.

9      A.    I guess I would take that into consideration

10 because a weapon was used during that crime in a close

11 proximity of that, I guess.  So if you are going in with a

12 weapon, with the weapon, when you started the crime, you had

13 the weapon with you and you went to do it, I suppose that

14 the anticipation that a life could have been taken, then the

15 three of you would be kind of classified in that crime as

16 far as how --

17     Q.    From the fact that me and the getaway car

18 driver knew that he had a gun?

19     A.    That you all went in with a gun, that there

20 was a gun when the whole crime started, uh-huh.

21     Q.    That would kind of answer that question for

22 you whether we should have anticipated that a life would be

23 taken?

24     A.    Yes, uh-huh.

25     Q.    That's what it would be to find somebody

1    guilty of capital murder.  In the second phase of the trial,

2    the punishment phase, we'll talk about it more in a little

3    bit, you would have to find that the people actually

4    anticipated, not should they have anticipated, but did they

5    anticipate that a life would be taken?

6         A.    Uh-huh.

7         Q.    So it's kind of a higher burden you get.

8         A.    Uh-huh.

9         Q.    But, you know, I guess -- and I'll be up front

10   with you.  We're prosecuting this case, prosecuting Mr.

11   Murphy as an accomplice, okay, a nonshooter, a

12   nontriggerman, and that's why we're spending so much time on

13   this.

14                  And we talk to a lot of people and some

15   people just tell us, you know, I know what the law is, I can

16   see the logic of the law, but when it comes to taking

17   someone who didn't actually take a life, when it comes to

18   taking their life by the death penalty, I just couldn't do

19   it.

20                  And we want to make sure that we don't

21   put anybody in that hard spot by putting them on the jury

22   and kind of give them a crisis of conscience, I guess --

23        A.    Uh-huh.

24        Q.    -- whether to follow the law versus what they

25   really feel inside.  How do you come down on that?

1     A.    I'm pretty much a law person.  I mean, you

2  know, everybody has the same law in their lap.  So whether

3  you follow it or not is your own decision.  If you break it,

4  you break it.  But I'm a real consequence kind of person

5  that you have to -- you know, everybody has got the same

6  amount of stuff on the table.  And you don't go with it, you

7  don't get the goods.  So --

8     Q.    So you wouldn't necessarily or automatically

9  take the death penalty off the table for a nonshooter or

10  just an accomplice, that type of thing?

11     A.    No.

12     Q.    You could keep an open mind, look at the facts

13  and circumstances?

14     A.    Right.

15     Q.    And that's basically what the law envisions.

16  I think you told us, like just about everyone we talked to,

17  that you have heard a little bit about this case?

18     A.    A little bit, uh-huh.

19     Q.    You know what case you are down here on.  And

20  everybody we talked to, basically, has heard something about

21  this case.

22     A.    Right.

23     Q.    What have you heard specific about this

24  particular case?

25     A.    Well, that they broke out.  That, I believe,

1  they tied up some people to get out.  I believe someone gave

2  them a truck or something or car to get away with it.  I

3  know that they went to the Oshman's, that a police officer

4  was killed during it.  I don't know where -- I don't know

5  the complete details of it.  I don't really know who has

6  been tried and who hasn't been tried on the case so far.  I

7  know some have and --

8      Q.    You haven't kept up with the results of --

9      A.    No.

10      Q.    -- of the previous trials?

11      A.    No, huh-huh.  And, basically, they were

12  caught, I believe, in Colorado in a trailer park, just those

13  kind of highlights.  I really didn't get involved deeply.

14      Q.    With the details?

15      A.    No, huh-huh.

16      Q.    How do you think -- knowing that, this is a

17  high profile case.  You have at least heard something about

18  it from the media, I guess, or maybe talked about it with

19  other people, but how do you think that might affect you, if

20  you are selected to be a juror on this case?

21      A.    Um, I'm not real affected by those kind of,

22  you know, by those discussions.  I mean, of course, I

23  discussed them with my husband.  But we've been known to

24  have pretty good debates about stuff.  I'm really -- I like

25  to see the whole thing.  I don't really know enough to make

1  any kind of informed decision right now.

2       Q.    You don't think any pretrial publicity that

3  you may have heard would affect you in any way in this case?

4       A.    Well, I know a lot of people are like, oh,

5  that's so terrible about what happened.  And I know terrible

6  things happen, but I have to see -- I don't know the details

7  of it or where this person was, what's going on at the time.

8  I really do not know all that stuff.

9       Q.    And all the law basically requires is that

10 people such as yourself just be able to base their verdict

11 on what they hear in the courtroom.

12      A.    Right.  I mean, we all have our preconceived

13 ideas, but I have not made any kind of decision for death or

14 not death or anything like that.  I know the person has a

15 criminal history, and so I'm sure he's going to be paying

16 for that.  But whether or not we go any further, I don't

17 know enough about it, you know, enough to say anything.

18      Q.    But, I guess, you would assume that he would

19 have at least some criminal history based on the facts?

20      A.    He broke out of prison, so I'm assuming he has

21 got a criminal history.

22      Q.    Okay.  Fair enough.

23      A.    I don't know what for, though.  I know that I

24 have seen the pictures in the paper and their crimes were

25 underneath, but I don't know what was which at all and I

haven't looked on the Internet so --

Q.     Let me ask you this.  Are you familiar with our method of execution in Texas, how we carry out, actually carry out, the death penalty?

A.     I know it takes a long time to get there.  And then, I guess, lethal injection.

Q.     That's right, lethal injection.  As you probably know -- how long have you lived in Texas now?

A.     Um, four and a half years, five years now.

Q.     You know the death penalty is a reality in our state?

A.     Uh-huh.

Q.     Some states don't have it and some states give the death penalty and it's never carried out.  In our state it's given fairly often and carried out, I guess, more than any other state in the country.

A.     Uh-huh.

Q.     So it's kind of a reality.  Just to be up front with you, I told you we're prosecuting him as an accomplice.  We feel we have the nature, type, and quality of evidence that is going to cause a jury to find him guilty of capital murder and answer these three questions in such a way that he will be sentenced to death and one day executed.  And I know it's one thing to kind of fill out a questionnaire or come down and talk about it philosophically

1  or in the abstract and kind of when you get down to this

2  point, it becomes very real.

3           You know, oftentimes when we have

4  executions, the press, you know, reports a lot of the

5  details.  If those -- if he's found guilty of capital

6  murder, those questions are answered yes, yes, and no, the

7  Judge has no discretion.  He will be sentenced to death.  He

8  will be taken down to death row where he will wait until the

9  date of execution that the Judge will give.

10          On that date he will be taken to downtown

11  Huntsville to a small holding cell.  During that last day

12  get a chance to meet with family, spiritual advisors.

13          But at 6:00 or right before 6:00, which

14  is the time for all executions in Texas, he'll be taken from

15  that small room forcibly, if he didn't want to go, be taken

16  into the death chamber.  You may have seen a picture of it.

17  It has got the gurney.

18      A.      Uh-huh.

19      Q.      He will be strapped down with leather straps,

20  again against his will, if he does not want to go.  An IV

21  will be started.  There will be witnesses, his friends,

22  family members, spiritual advisors.  Victims of the crime

23  will also be there.  He will get a chance to make a last

24  statement, if he chooses.  He could apologize, ask for

25  forgiveness, or, I mean, he could proclaim his innocence up

1    to the very end.

2              At some point after he's made that

3    statement, the poisons would be started.  They go into his

4    system, into his arms.  His lungs would shut down, his

5    heart.  Eventually he would lose consciousness and he would

6    fall into a deep coma and eventually die.

7              I don't want to be too morbid about that,

8    but those are the type details that the press reports.  And,

9    again, I just want to make sure that you feel that you are

10   the type of person that could actually participate in the

11   process which could end up, one day, ending up with the

12   things I just described to you, that you feel like you are

13   the type person that could take pen in hand and answer those

14   questions, knowing that some day that may lead to Mr. Murphy

15   lying dead on a gurney one day in Huntsville.  What do you

16   think about that?

17        A.     I can do that.

18        Q.     Okay.  Fair enough.  When we talk about, I

19   guess, any criminal trial, capital murder, basically breaks

20   down into two parts.  The first part is what we call the

21   guilt/innocence and that's basically where the jury is

22   concerned with did he commit the crime he is charged with,

23   basically hear the facts of the crime.  It would be up to

24   the jury to decide whether the State has proven beyond a

25   reasonable doubt that he's guilty of capital murder.

1           If it is a guilty of capital murder, then

2     we move into the second phase of the trial and that's where

3     the jury is asked to answer these Special Issues.  The jury

4     doesn't vote life or death.  We let the answers to these

5     issues or questions decide what the appropriate sentence is.

6           If you would take just a second and kind

7     of look over all three.  I know you had a chance to look at

8     them in the book, but I think they are phrased just a little

9     bit differently here.

10     A.     Okay.

11     Q.     Basically, these are the three questions.  The

12     first one kind of asks the juror, basically, to make a

13     prediction about the future.  Do you think he's a future

14     danger to society?  That question starts out with a no.

15     It's our burden as the State to prove to you, the jury, that

16     it should be answered yes and we have got to prove it to you

17     beyond a reasonable doubt, just like the guilt phase.

18           The second Special Issue, we kind of

19     already talked about that.  That comes into play when you

20     have got somebody where you don't know they are the

21     triggerman or they are not actually the triggerman.  So the

22     jury would have to find that either he actually caused the

23     death, he intended to cause the death, like a murder for

24     hire-type deal, or what we've actually talked about, that he

25     anticipated a human life would be taken.  That starts out as

1    a no.  Again, it's up to us to prove to the jury that the

2    answer should be yes beyond a reasonable doubt.

3                        And then finally Special Issue No. 3.

4    We'll talk about this in just a second.  But that's kind of

5    what we call the mitigation question or it's kind of the

6    last stop in the process to determine the appropriate

7    sentence.

8                        Directing your attention back to No. 1,

9    you can see how this kind of asks the jury to make a

10   prediction.  We talked to a lot of people and a lot of

11   people tell us, you know, gee, if I found somebody guilty of

12   capital murder, this question is pretty much already

13   answered for me, you know.  If I found out they were a

14   capital murderer, I'm always going to think there's a

15   probability they are a future danger to society.  And some

16   people don't feel that way.

17         A.       Uh-huh.

18         Q.       Very frankly, the law requires that at this

19   point you kind of have no preconceived notions for starting

20   that second phase.  But a lot of people just tell us as a

21   matter of common sense, if I find him guilty of capital

22   murder, I'm always going to think they are a future danger.

23   And in a certain sense -- where do you kind of come down on

24   that issue?

25         A.       Just like anyone else, I think that I would

1  automatically say probably.  You would have to do some

2  pretty good convincing, otherwise, I think.

3       Q.    Okay.  So you think that, you know, the fact

4  that you found him guilty of capital murder may answer that

5  first Special Issue for you?

6       A.    Uh-huh, yes.

7       Q.    We talk to a lot of people that feel kind of

8  like you do.  The law would require that jurors at this

9  point kind of -- that they don't answer it automatically.

10  But, very frankly, a lot of people tell us they just can't

11  do that.  That's one aspect of the law they can't follow.

12  We talk to a lot of people that -- who can't follow the law,

13  very frankly, and that kind of sounds like what you are

14  telling me at that point, that's just too much nonsense or

15  not common sense to follow that law?

16       A.    Yes.

17       Q.    Okay.  But, again, I want to make clear that

18  on these first two questions the burden is on us.  You've

19  kind of said that, you know, it would take some real

20  convincing by somebody to prove that that was a no.  I want

21  to make sure you are clear the answer starts off a no.  The

22  burden is on us.  These folks don't have to do anything to

23  prove that.  That's kind of the default setting.  If we

24  don't meet our burden, that answer stays no.

25            Moving down to -- we've talked about No.

2.  Same type deal.  We have got to prove it to you.  Moving

down to No. 3, this is kind of the last stop in the process,

the mitigation question.  It basically asks the juror to

look back at the facts of the offense, look at what you know

about him, his background, his character, and what personal

moral blame he bears, I guess, culpability for the crime,

and asks the jury is there anything that is mitigating,

anything that lessens his blame?  And if there is, is it

sufficient that his life ought to be spared?

Again, I'll be frank with you.  It's kind

of like Special Issue No. 1.  We talk to a lot of people and

they say this.  They say, by the time I found him guilty of

capital murder and by the time I found they are a future

danger and by the time I found they anticipated a human life

would be taken, there's really nothing at that point that I

will find mitigating.  You know, I've made too many

decisions already.  There's nothing that would cause me to

spare his life.

I'm just curious kind of where you come

down on that or can you think of anything that may strike

you as mitigating?

A.       When you say mitigating, like some --

Q.       It's not defined in law like what particular

things you have to consider mitigating.  It's just anything

that would strike you as an individual juror that is

1    something that lessens his moral accountability.

2          A.    So what you are asking me, then, is, is there

3    anything that I can think of that would spare this person's

4    life?

5          Q.    Some people tell us maybe age.  If he was 18,

6    19, 20, that may be a factor.  I might think that's

7    mitigating.  A lot of people tell us, hey, if you are old

8    enough, 18, 19, 20, to know right from wrong.  And, very

9    frankly --

10         A.    I think it would have to be placed out there.

11   If someone was trying to use a situation, it would have to

12   be just placed out there.  I can't really think -- I think

13   if I had to say anything, like you are saying, age, if a

14   person were very, very, very young, that would do it for me.

15               Or if you are talking about a person's

16   background, like how they were brought up as a child and so

17   forth, no.

18         Q.    When you talk about age, how young are you

19   talking about?  What age do you have in mind?

20         A.    We're talking probably 12 and under.

21         Q.    Okay.

22         A.    Possibly 13, 14.

23         Q.    I can tell you just the law in Texas.  In

24   order to be eligible for the death penalty, you have got to

25   be 17 or over.

1    A.    Okay.  I think sometimes 16 year olds know

2  exactly what they're doing.  So --

3    Q.    Sure.  Again, what the law requires is kind of

4  like No. 1, is that jurors, at least, kind of have an open

5  mind.  If they hear something that's mitigating, they can go

6  with it.  If they don't, it will be fine.

7    A.    It would have to be placed out in front of me.

8  I just can't really put my finger on anything.

9    Q.    Do you think that you can keep an open mind at

10  this phase of the trial?

11    A.    Yes.

12    Q.    For the mitigating evidence?

13    A.    Uh-huh, yes.

14    Q.    Do you have any questions about the scheme and

15  how we do things or any questions about anything we've

16  talked about or capital murder in general?

17    A.    No.  I'm quite sure that you will spell it out

18  clearly and make sure of that, so I really at this point am

19  just kind of here to see whether or not I'm, you know, am

20  going to be placed on the jury.  I really don't have any

21  questions right at this point.

22    Q.    How do you feel about potentially making the

23  jury?  Do you have any thoughts?

24    A.    Sure.  It will be interesting.  I mean,

25  everybody likes to, you know, get involved in something.

1  But, you know, I mean, it doesn't make my life one way or

2  the other. I mean, I can go or not. I mean, I don't live

3  my life by being curious about others.

4      Q.    I think that's all I have. Thank you, ma'am.

5                  CROSS-EXAMINATION

6  BY MS. BUSBEE:

7      Q.    My name is Brook Busbee and I'm one of the

8  lawyers on the other side and, fortunately, the State has to

9  pretty much outline the law to you, and so I get to be a

10  little bit freer in the questions that I get to ask you

11  about.

12              I want to explain something to you first

13  because I think it helps people answer questions if they

14  understand how they got in that chair. You saw how many

15  people came in the morning that you were there. I think it

16  was 2,500 plus?

17      A.    I know the room was full.

18      Q.    It was a huge number of people. We had that

19  same amount of people in the afternoon.

20      A.    Wow.

21      Q.    And they filled out stacks and stacks of these

22  questionnaires and you have got yours in front of you. We

23  don't -- we don't even bother wasting the taxpayers' money

24  copying the people who say that they would give the death

25  penalty for jaywalking, number one, because they, obviously,

1  would not be somebody we should talk to, and we don't talk

2  to people who couldn't assess the death penalty ever,

3  because that would waste everybody's time and money, too.

4          So we have this smaller group of people.

5  But that is not the people we talk to because we use 20 or

6  17 pages here.  We read those and then we meet and the two

7  sides meet.  And you wouldn't believe how few people get in

8  the pile of people we want to talk to because they said

9  something on their questionnaire that makes one side or the

10  other think that they would be too much for the State or too

11  much for the defense, and so we kind of winnow it out until

12  we have some people that both sides agree are reasonable,

13  intelligent, that sort of thing.

14          But I want you to understand that you

15  already have -- we already know that you can follow the law.

16  We're okay with that, you know.  We, both sides, are

17  comfortable with talking to you about your service and

18  whether or not you should sit on the jury.

19          And the reason I'm going into this is

20  because a lot of people, and it's human nature, you get on

21  the witness stand and you feel like you are being -- you are

22  on trial like your citizenship is on trial.  Yes, I can

23  follow the law.  We know that everybody who finally makes

24  the cut to get here in court can follow the law.  We are

25  totally okay with that.

1    But the thing that you are really here

2 for is that we, as Mr. Wirskye said to you, there's lots --

3 this is an emotional sort of case.  Taking someone's life is

4 involved in the prosecution of it and the defense of it.

5 Someone's life was taken.  Someone else's life might be

6 taken.  So we know people who didn't have any feelings about

7 this or, you know, emotion about it, we both would be

8 worried about having you on the jury.

9    We just need to know how you actually

10 feel.  We know that you know what the law is.  But how you

11 would feel about it, because if we get somebody on the jury

12 who we have not pursued this with or we haven't gotten their

13 true feelings about it, it could be bad for either side and

14 we would really like to only do this one time.

15    A.    Right.

16    Q.    So here's something that I find most people --

17 you know, nobody at this table hasn't been practicing law

18 for a long time, so we forget how we used to think before we

19 were lawyers.  But I start figuring out, usually, in the

20 second week, which is what we're in, that most people

21 logically do not get the difference between finding someone

22 guilty and giving the death penalty, because you say you

23 committed a capital murder, most people think that's a snap

24 decision.  That's a death sentence.  But truly that's not

25 so, obviously, because there's way too many cases that fall

1    into those categories and there's no way that all those

2    cases could go to trial, even if we had the resources, or

3    should go to trial.

4                        So we spend a long time talking to people

5    to make sure that they are comfortable -- not comfortable

6    with the law, but comfortable with sitting on a jury like

7    this.

8                        So having said that, you talked about --

9    I would like to know how you feel about it because we're

10   trying to get people -- we don't want to make any citizen in

11   Dallas County uncomfortable or unhappy.

12                       We're going to assume now that you are on

13   a jury that has found someone guilty of the offense of

14   capital murder.  They have knowingly and intentionally

15   committed a murder and it falls into that category of

16   capital murder, police officer, child, fireman, in the

17   course of a robbery, something that makes it capital.

18                       And when we're talking about Special

19   Issue No. 1, you said that you would really -- you would

20   need to hear some evidence, some additional evidence, to

21   prove to you that he wasn't a future threat to society?

22        A.      Um, I'm not sure on No. 1 that that's the

23   case.  Well, let me back up.  When you say a future threat

24   to society, to say a solid yes I would like to hear

25   everything.  But when he asked me -- he said, what would

1   your automatic response be?  I said normally, naturally,

2   because I'm a human being, my natural response would be,

3   yeah, you have been in jail, you broke out, you know, that

4   would be my natural response.  But -- for No. 1.

5        Q.    Okay.

6        A.    But going on to No. 2 and 3, there's not a

7   natural response.

8        Q.    Okay.  And that's what we needed to know is

9   how you feel about things.  So, in reality, once you have

10  decided that someone had committed a capital murder as we

11  defined it for you, you feel that they're a future danger,

12  and you would need to hear something to convince you that

13  they weren't?

14       A.    That's correct.  And in specifically this

15  case, because there's no denying that that person was there

16  at the time, then that yes is kind of automatic.  Now, in a

17  case where whether or not you had to prove they actually

18  were even there, I mean, then that's not an automatic

19  response for No. 1.

20       Q.    Because of what you know about this case, you

21  already have an opinion about Special Issue No. 1?

22       A.    I read enough to know that they were in jail

23  already.  For what, I don't remember.  So that's where my

24  automatic response would come in to some degree that they

25  are already a threat to society.

1    Q.    Okay.  So that opinion has been formed and you

2  would automatically answer that 1 and then go on to 2 and 3?

3    A.    Nos. 2 and 3 are not clear to me.

4    Q.    Okay.  Because you haven't heard any other

5  particular details?

6    A.    I don't have anything -- I don't.

7         MS. BUSBEE:  Could we approach, Your

8  Honor?

9         THE COURT:  Agree?  Ms. Stringer, we

10  appreciate your time and service today.  The parties have

11  agreed that your opinion on Special Issue No. 1 and how much

12  you know about this case, simply they are not going to allow

13  you to serve on this jury.  They have agreed to excuse you.

14  We thank you for your time and service to this Court and you

15  are free to go.  Thank you.

16              [Prospective juror out]

17              (Recess)

18         THE COURT:  Ms. Morton.

19              [Prospective juror in]

20         THE COURT:  Thank you.  You may be

21  seated.  Good afternoon, Ms. Morton, how are you?

22         PROSPECTIVE JUROR:  I'm fine.

23         THE COURT:  Have you had an opportunity

24  to read the guide that I provided for you?

25         PROSPECTIVE JUROR:  Yes.

1    THE COURT:  I know it's a lot of law to

2 give someone and we don't expect you to understand it from

3 front to back.  That's what the attorneys are going to visit

4 with you about, is to explain the law in some more detail

5 and try to help you understand how it all interrelates.

6    One thing you told us is I've sworn to

7 tell the truth.  That's all the lawyers want is your honest

8 opinions.  If you would, if you don't understand the

9 questions, you don't understand, just please say explain it

10 again, give me another example, whatever.

11    PROSPECTIVE JUROR:  Okay.

12    THE COURT:  What my job is, is to do two

13 things.  One is to be sure you understand the law.  Once you

14 do, can you follow the law?  That's the main objective here.

15    So you have had an opportunity to read

16 the guide.  Do you have any questions on what you have read

17 so far?

18    PROSPECTIVE JUROR:  Not right at this

19 moment, no.

20    THE COURT:  Are you able to serve this

21 Court for two weeks beginning on November 10th?

22    PROSPECTIVE JUROR:  Yes.

23    THE COURT:  Very well.  Mr. Shook, you

24 may inquire.

25    MR. SHOOK:  May it please the Court.

1          YVETTE MORTON,

2    having been duly sworn, was examined and testified as

3    follows:

4                    DIRECT EXAMINATION

5    BY MR. SHOOK:

6          Q.     Ms. Morton, my name is Toby Shook.  I'll be

7    speaking to you on behalf of the State today.  Have you been

8    down on jury duty before?

9          A.     Never been picked.  I've been at jury duty.

10   This is my third time.

11         Q.     Okay.  Usually, you know, then, that the jury

12   selection is done from a panel --

13         A.     Right.

14         Q.     -- in most cases.  But because it's a death

15   penalty case, the law prescribes for us to have this method

16   where we speak to each juror individually.  We don't mean to

17   make you feel like you are the one on trial or under

18   scrutiny, but you get to ask questions whenever you want to

19   during this process and feel free to do that.

20         A.     Okay.

21         Q.     We'll go over some of the things you put in

22   your questionnaire and we'll talk about capital murder and

23   how you feel about that and some of the laws that apply.

24         A.     Okay.

25         Q.     Did you -- you have lived in the Dallas area

1  here for quite some time; is that right?

2        A.    Yes, I have.

3        Q.    And you work now at Mustang --

4        A.    Interest.

5        Q.    What do you do with them?

6        A.    I do accounts payable.

7        Q.    The Judge told you that our trial date is

8  November 10th and we're pretty firm on the belief that it

9  will take two weeks.  That won't present a problem for you

10  on your duties there; is that right?

11        A.    No.

12        Q.    Good.  Let me ask you, we obviously inquire on

13  the questionnaire about anyone you have known that's been

14  through the criminal justice system and you had an

15  ex-husband that had a couple of public lewdness charges back

16  in 1980 and 1995?

17        A.    Right.

18        Q.    Tell us a little bit about what you know, if

19  anything, about the background of those cases.

20        A.    Well, he was in a public park picking up men

21  and then he went to Dallas.  In '95 he was in a restroom at

22  White Rock Lake and was arrested by a police officer that

23  was undercover.

24        Q.    Was he tried on any of those?

25        A.    Yeah.  He was both.  I think he got probation

61

1   on both of them.

2           Q.      Did you attend the trials?

3           A.      No, I did not.  The first one I didn't really

4   know about and the second one, I did, but I didn't go to any

5   of them.

6           Q.      You felt like he was treated fairly --

7           A.      Yeah.

8           Q.      -- by the criminal justice system and by the

9   police?

10          A.      Right.

11          Q.      And then you also had a nephew that had some

12  type of theft case?

13          A.      Right.  He -- well, he broke into someone's

14  apartment, stole some things, stored them in my friend's

15  apartment and my brother, his father, turned him in.  He was

16  treated fairly, I think.

17          Q.      Feel he was treated fairly?

18          A.      Yeah.  He broke in.  He should have gotten

19  caught.

20          Q.      Okay.  Let me ask you how you feel, then,

21  explore with you a little bit your feelings about the death

22  penalty.  You know the State is seeking the death penalty,

23  so --

24          A.      Right.

25          Q.      -- we talk to everyone about how they feel

1  about capital murder.  Do you agree with the law that we

2  should have a death penalty?

3         A.        Yeah.

4         Q.        What reasons do you think -- what purpose do

5  you think the death penalty serves?

6         A.        It takes people off the streets that commit

7  crimes against people that result in their death.

8         Q.        Okay.  What types of cases do you feel should

9  be considered for the death penalty?

10         A.        Cases against elderly and children or anybody,

11  really.

12         Q.        Have you ever followed any cases in the media

13  locally or nationally that you thought were death

14  penalty-type cases?

15         A.        I didn't really follow them.  I just read

16  about them.  I don't really.

17         Q.        Do you remember the names of them or what

18  types of cases they were?

19         A.        Andrea Yates, where she drowned her children,

20  and what was the other lady that drowned her two in the car?

21         Q.        Susan Smith?

22         A.        Susan Smith, yeah.

23         Q.        How did you feel about the outcomes of those

24  trials?

25         A.        Well, I don't know.  They were both sentenced

1    to life in prison?

2        Q.    Yes, ma'am.

3        A.    Right.  They should have, I think, gotten the

4    death penalty for taking their child's life.

5        Q.    Okay.  But you wouldn't limit the death

6    penalty just to children?

7        A.    No.

8        Q.    You're fine with it for other types of murder

9    cases?

10       A.    Right.

11       Q.    We ask a lot of questions about the death

12   penalty in the questionnaire.

13       A.    I know.

14       Q.    And one of them having to do with the death

15   penalty is, we ask, would it be important in deciding

16   whether a person received a death or life sentence in a

17   capital murder case or what would be important?  And you had

18   written down how much remorse they had.

19             What were you thinking when you wrote

20   that down?  What was going through your mind, if you recall?

21       A.    I don't remember because it was in May.

22   Whether -- could you repeat that again.  I'm sorry.

23       Q.    The question was what would be important to

24   you in deciding whether a person received a life sentence or

25   a death sentence and you had written how much remorse they

had.

A.     Right.  If they really, really were remorseful in killing someone, possibly the life.

Q.     How do you think you can tell if a person were truly remorseful?

A.     I think in their actions, the way they act, the way they look -- not really the way they look, but just in their actions mainly.

Q.     And we also always ask, and I don't know what significance it is, because it means different things to different people, but if you believe in the death penalty, how strongly you believe in it or hold that belief, and we kind of give you a 1 through 10 and you picked a 5.

A.     Yeah.

Q.     Why did you decide on a 5?

A.     Well, I don't know really.  It just -- it could go either way, you know, depends on certain things.

Q.     If it were up to you, would you have the death penalty for just certain types of murder cases or would you expand it to other crimes as a possible punishment option?

A.     Like what other crimes?

Q.     Just anything you personally feel.  Some people have told us, hurt children, you know, not killing them, but, you know, injuring a child in a bad way or for crimes of rape, that sort of thing.

1    A.    Would I --

2    Q.    Some people, when you ask them, they say,

3 well, I would have the death penalty for murder cases --

4    A.    Murder cases, yeah.

5    Q.    -- but also for rapists or people that injure

6 children or elderly people and that sort of thing.  And I

7 was just wondering how you felt about that.  Other people

8 tell us, I would just probably keep it for when a life's

9 taken.

10    A.    Right.  Most likely, yeah.  I don't know.  I

11 think murder is a really bad thing.  Of course, other things

12 are worse, too, but I don't know if it requires a death

13 penalty.

14    Q.    Okay.  In Texas the death penalty is reserved

15 just for murder cases and then only certain types of murder

16 cases.  We have some brutal killings.  I could pull a gun

17 out now and put it to Mr. Wirskye's head, and if I didn't

18 like his tie or something he said to me, I could shoot him

19 and laugh about it, but I couldn't get the death penalty.  I

20 could get a life sentence.

21         The death penalty is reserved for

22 intentional murders that occur during a felony, such as

23 robbery, burglary, or an arson or a rape, murder of specific

24 individuals, such as a police officer, fireman on duty,

25 murder for hire, like a hitman situation.  More than one

1   victim could be a death penalty situation, murder of a child

2   under the age of six, multiple victim situations.   Those

3   specific instances are the types of murder cases that are

4   reserved for the death penalty.

5                    Are you familiar with the procedures of

6   how the trial takes place in a death penalty case?

7        A.     No.

8        Q.     The trial is divided into two parts.   There's

9   the guilt/innocence stage where we have to prove the

10  indictment.   If we don't do that, obviously, it's a not

11  guilty finding.   If we do, we move to the punishment phase.

12                   And in the punishment stage we get these

13  questions and we will go over these more in a minute.   But

14  the questions are basically this, the State has to prove

15  that the defendant is a continuing danger.   It's a yes or no

16  question.   We have to prove that he either caused the death

17  or anticipated that a life would be taken, and then there's

18  a mitigating question where the jury is to determine if

19  there's sufficient mitigating evidence that a life sentence

20  should be imposed, rather than a death sentence.

21                   But if the jury answers yes, yes, and no,

22  the Judge has no choice.   The Judge would sentence the

23  defendant to death.   If the jury answers the questions any

24  other way, it's a life sentence.   But those are the only two

25  possible outcomes, once the defendant has been found guilty,

1    is a death or life sentence.  Is that clear?

2           A.    Yes.

3           Q.    Are you familiar with the method of execution

4    in Texas?

5           A.    Lethal injection.

6           Q.    That's correct.  It's in the news a lot.  They

7    cover certain executions more than others.  They usually

8    cover every execution.  Sometimes it's just a blurb and

9    sometimes it's a full-page article describing the execution.

10          I know last night in the news there was a

11   long news story about an execution in another state that

12   occurred in Florida.  So they do make the news a lot.

13          The procedures are the same.  If the

14   defendant were found guilty and these questions were

15   answered yes, yes, and no, Judge Cunningham would have no

16   choice but to sentence the defendant to death.  He would be

17   placed on death row where he would wait for some time.

18   Somewhere down the line Judge Cunningham would then actually

19   issue a date of execution.

20          All executions in Texas take place at

21   6:00 p.m. in Huntsville, Texas.  He would be placed,

22   actually brought in probably the day before, to that prison

23   in Huntsville.  Near the execution chamber he would have a

24   cell there, on the day of his execution be allowed to meet

25   with his family, a minister, given a last meal -- you know,

1   the news likes to talk about that -- if he could eat it.

2          At 6:00 p.m., though, ten minutes to 6:00

3   p.m., actually, they come and take him to that execution

4   chamber by force, if necessary.  He's placed on a gurney,

5   the kind that you see in a hospital, but there is leather

6   straps constructed on this gurney.  You may have seen it in

7   the news.  He would be secured down, so he would be

8   immobile.

9          Needles would be placed in his arms.

10  Tubes would go to another room where the executioner is.

11  Witnesses are then brought in to view the execution, maybe

12  family members of the defendant and family members of the

13  victim.  He's allowed to give a last statement, which is

14  almost always printed in the newspapers, where he may claim

15  his innocence.  He may not.

16         After that statement is given, the warden

17  gives a signal and lethal substances are then injected which

18  work very quickly.  They immediately stop his heart, they

19  collapse the lungs, air is forced out, he's conscious at

20  this time and he quickly dies.  I don't mean to be morbid --

21      A.    That's --

22      Q.    -- but, you know, it's one thing when we talk

23  about generally do you believe in the death penalty --

24      A.    Yeah.

25      Q.    -- and then it's another one when you get a

1    summons and you get down here and you realize this is a

2    capital murder case and the State is seeking the death

3    penalty.

4         A.    Right.

5         Q.    And it's quite another thing, once you are

6    sitting in the room and see the man.  And I put all my cards

7    out on the table.  It's our goal in this case, we feel we

8    have the type and quality of evidence to prove the defendant

9    guilty, and to prove to the jury that these questions should

10   be answered in such a way that the defendant will be

11   executed in the manner I described.

12             Some people can make these decisions and

13   other people cannot, because it would weigh on their

14   conscience too much.

15        A.    Yeah.

16        Q.    And that's fine, if they feel that way.  But I

17   like to go through this slowly and make sure a juror

18   recognizes that, so they can come to grips with that before

19   they are placed on the jury.  Once you are placed on the

20   jury, you can't do anything about that.  Before that, if

21   there are reservations, we need to know that and we can

22   explore that avenue.  But there aren't any right or wrong

23   answers at this point.

24        A.    Right.

25        Q.    Now that we've talked about it, you told me in

1  general that you do believe in the law.  Now that you

2  realize and filled out the questionnaire and now come down

3  here and gone through this, do you feel that this is the

4  type of case that you could sit on and make these decisions,

5  knowing that the defendant, if this is proven by the State

6  in such a way, will be executed in the manner I described?

7      A.      I don't really know.  You know, like you say,

8  thinking about it, can you do that, I'm not sure if I could

9  or not.  But --

10      Q.      Some hesitancy there?

11      A.      Just a little, you know, but I don't know.

12  How would I feel if it was my relative, you know, being

13  executed.  I don't know, taking a life, too, that's --

14      Q.      It's pretty significant.

15      A.      Yes, it is.  It's really scary.

16      Q.      We have some jurors who tell us, I'm opposed

17  to the death penalty on religious grounds, many times --

18      A.      Right.

19      Q.      -- and they'll tell us straight up, look, it's

20  something that I have always believed in and can't make

21  those decisions.  Don't care what your evidence is, I can't

22  make the decisions.  And they are excused from jury duty for

23  that particular case.  They would be fine on a burglary

24  case, maybe a DWI, or civil case of some sort.

25          And we have other jurors who tell us they

1    are for the death penalty and they want it in every case.

2    They really can't be fair because they are prone to it,

3    obviously, and they are excused.  We have some jurors who

4    are for the death penalty and can actually make the decision

5    and that's fine.  They are qualified under the law.

6                    And we have other jurors like yourself

7    who tell us philosophically I'm for it --

8         A.    Right, but just coming down to it.

9         Q.    -- but it would weigh on me and it's just

10   something that would weigh on my conscience and that's

11   something that I can't forget.  It's something that is going

12   to affect my deliberations.  I can't be like a computer and

13   just plug this stuff in.

14        A.    Right.

15        Q.    It's going to weigh on me and I may not be

16   able to make my decision just based on the evidence.  That

17   would weigh in there.  I don't want that responsibility at

18   this particular time in my life.  I couldn't handle that --

19        A.    Yeah.

20        Q.    -- and it would affect me.  And if you feel

21   that way, that's fine, too.

22        A.    Yeah.

23        Q.    You know, because the law contemplates some

24   jurors feeling that way and then they are not qualified.

25   Doesn't mean you are a bad citizen.  It just means that you

1   will get a summons another time to come down on a burglary

2   case or something like that.

3          A.          Yeah.

4          Q.          Would you be more comfortable sitting on a

5   type of case that did not involve the life and death issues,

6   but maybe if they were criminal cases, jail time or

7   something like that?

8          A.          Probably, yeah.

9          Q.          That wouldn't weigh on your conscience?

10         A.          No.

11         Q.          It's, obviously, holding a person's life in

12  your hand?

13         A.          Right.

14         Q.          And are you telling the Court that this is

15  just something that is not going to go away, obviously?   I

16  see you on the stand.   It's something that you are

17  uncomfortable with?

18         A.          Yeah.

19         Q.          And you are just not going to be able to

20  ignore these reservations or these feelings?

21         A.          I don't think that I can.

22         Q.          I appreciate your honesty.   That's why I took

23  the time to go through it.

24         A.          Right.

25                      MR. SHOOK:   Your Honor, I believe we have

1    an agreement.

2                    THE COURT:  Ms. Morton, I thank you for

3    your time and service here today, especially your honesty.

4    By your last answers, you really looked at it and said, I

5    just can't do it.  We appreciate that.  These cases aren't

6    for everybody, so don't feel bad about it.  You are just

7    being honest.  That's all we ask.  The parties have agreed

8    to excuse you, so you are free to go.  Thank you.

9                    PROSPECTIVE JUROR:  Thank you.

10                   [Prospective juror out]

11                   THE COURT:  Ms. Echols available?

12                   [Prospective juror in]

13                   THE COURT:  Good afternoon, Ms. Echols.

14   How are you?

15                   PROSPECTIVE JUROR:  Fine.  This is all

16   new to me.

17                   THE COURT:  Good.  We're going to get you

18   up to speed, so try to relax.  This can be somewhat

19   intimidating.  This is as informal a process as we can do at

20   this point.  The objective is for you to be able to talk to

21   us and the lawyers to explain the law to you, try to give

22   you a head start.

23                   We gave you a guide to let you try to

24   think about the issues we'll be discussing and there's your

25   copy of your questionnaire that you filled out for us in

1   May.  I know you don't remember that, so if they ask for a

2   specific question, refer to your answer.  Would you explain

3   further?  You can look at what you wrote and not remember

4   what you were thinking about.

5                    Bottom line here, my job is to be sure

6   that you understand the law we're dealing with.  Once you

7   understand the law, can you follow the law?  Seems real

8   simple to me, but that process can take up to about an hour

9   and a half to bring you up to speed.

10                    Do you have any questions about what you

11  have read thus far?

12                    PROSPECTIVE JUROR:  No, not yet.

13                    THE COURT:  All right.  Do you have any

14  problems serving the Court for a two-week trial beginning on

15  November 10th?

16                    PROSPECTIVE JUROR:  Not right now, I

17  don't.

18                    THE COURT:  Mr. Wirskye?

19                    MR. WIRSKYE:  May it please the Court.

20                    BRENDA ECHOLS,

21  having been duly sworn, was examined and testified as

22  follows:

23                    DIRECT EXAMINATION

24  BY MR. WIRSKYE:

25          Q.    Ms. Echols, how are you this afternoon?

1    A.      Nervous.

2    Q.      Don't be nervous.

3    A.      I've never done this before.

4    Q.      That's fine.  We know that.  My name is Bill

5  Wirskye.  I'm the Assistant District Attorney that is going

6  to visit with you for the next few minutes.  We apologize.

7  We kind of make you feel like you're on trial.  But we know

8  you're not and hopefully in a few minutes the awkwardness

9  will wear off and we'll be able to, basically, have a

10  discussion with both sides.

11          What I would like to do is maybe run over

12  some of the information that you gave us in your

13  questionnaire, I know you haven't looked at that, but you

14  have got it in front of you, talk about, a little about

15  maybe how you feel about the death penalty, and talk about

16  some of the laws and rules that might apply in a death

17  penalty case.

18          What's going through your mind when you

19  got called back down here?

20    A.      Oh, God, mostly.

21    Q.      Why did you think that?

22    A.      Well, it's just like I said, I have never done

23  this before and I don't like the unknown and I didn't really

24  know, like I said, after a while it would be comfortable,

25  but that's the only reason because I don't know.  It's just

1  kind of scary.

2         Q.     Okay.  Were you worried about this being, in

3  particular, a death penalty case where the State is seeking

4  the death penalty?

5         A.     No, not the death penalty, no.

6         Q.     You have never been a juror on any other type

7  of case; is that right?

8         A.     No.

9         Q.     This is all new to you?

10        A.     I go to the top when I do things the first

11 time.

12        Q.     Odds are you probably won't get called back

13 down on a death penalty case.  You told us that you are, I

14 guess, generally in favor of the death penalty; is that

15 right?

16        A.     In favor -- on circumstances.  It depends on

17 the whole circumstance.

18        Q.     Do you think we should have it for some

19 crimes?

20        A.     Yes.

21        Q.     Okay.  What crimes -- when you are thinking

22 about the death penalty, what type of crimes do you think it

23 might be appropriate for?

24        A.     Mostly if they kill someone else.  I mean, I

25 understand -- I don't really understand, but I see the --

77

1   like life, you know, behind bars and also they are there and

2   I just feel that, you know, why should they be alive when

3   the person, whoever they shot or killed or whatever they did

4   to them, isn't alive?

5        Q.    Okay.  Any other cases you think where it

6   might be appropriate, other than murder, the taking of a

7   life?

8        A.    Yeah, things that are done to children.

9        Q.    Crimes against children?

10       A.    Yes.

11       Q.    Okay.  And we hear that a lot.  A lot of

12   people feel very strongly about that.

13       A.    Uh-huh.

14       Q.    Any other type crimes that comes to you?  I

15   know you probably haven't been thinking about this.

16       A.    No.  It's based on the circumstances.  I mean,

17   I have no problem, you know, with it, but I figure whoever

18   it was or whatever happened that they killed, why should

19   they still be alive?  They didn't -- this person, especially

20   when this person was innocent, or something, whoever it is,

21   innocent bystander in the wrong place at the wrong time,

22   whatever, they're sitting there happy.  I don't know if

23   they're happy, but they are still alive and these people are

24   dead for no good reason.

25       Q.    Is there any particular case that you may have

1    seen on TV or read or heard about that comes to mind and you

2    say, gee, that's a good case for the death penalty or that

3    person deserves the death penalty?

4        A.    Not right at this second.

5        Q.    Fair enough.  Looking at your questionnaire,

6    we ask people to kind of -- I think it's on page 4, rank

7    yourself on how strongly you believe in using the death

8    penalty on a scale of 1 to 10, kind of towards the top of

9    the page, third question.  It asks you to rank yourself 1 to

10   10, 1 being the least, 10 being the most, how strongly do

11   you believe in using the death penalty and you gave yourself

12   a 10.

13       A.    Uh-huh.

14       Q.    A 10 for 10 and I -- just kind of explain that

15   to me or if you remember what you were thinking when you

16   gave yourself a 10.

17       A.    Basically, more or less what I just said, just

18   depends on the circumstance.  I know there's people that

19   have problems with putting people to death, but they put

20   someone to death, so why not?  You know, they shouldn't be

21   breathing, in my opinion, because the other person isn't.

22       Q.    And, you know, we talk to a lot of people and

23   they come in and find out this is a death penalty case and a

24   lot of people tell us, very frankly, that's not the type

25   case for me.  I'm uncomfortable with it.  What I hear you

1   saying, you are not necessarily uncomfortable with it, but

2   you don't have any objection to being a juror in a death

3   penalty case where the death penalty is an option; is that

4   right?

5         A.     No.

6         Q.     You told us on the first page that you kind of

7   believe in an eye for an eye?

8         A.     Uh-huh.

9         Q.     Is that from the way you were raised or church

10   or --

11         A.     I don't know if you can call it the way I was

12   raised.  It's more or less my belief, I mean, and, honestly,

13   some of it goes to whatever the deal is with adults, but

14   mostly children.  Or if you want an example of -- the eye

15   for an eye, well, I can't do it, because it's not legal.

16   But, I mean, if they put an innocent baby and scald it to

17   death, you know, they should die a slow death, too, just

18   like the baby, because they had no control, they were too

19   innocent, they couldn't fight back, that kind of deal.

20         Q.     We hear people say that.  People should suffer

21   the same death as the victims.

22         A.     And slow.

23         Q.     Do you think of murder cases that maybe don't

24   call for the death penalty, taking of a life or knowing and

25   intentional taking of a life where the death penalty

1  wouldn't be appropriate?

2      A.      I can't answer that right now.  It's hard to

3  think about certain ones or what I've heard.  I'm sure on TV

4  I have an opinion about a lot of things and what it is, if I

5  don't like it or something, but I can't right now.

6      Q.      Okay.  Let me ask you this.  On page 3 we

7  asked you if you had heard anything about this case, the

8  case we're here on today.

9      A.      Uh-huh.

10     Q.      And you, like just about everybody we've

11  talked to, answered that question yes, that you have heard

12  some things about the case.  I was just wondering what you

13  remember hearing about this case.

14     A.      First of all, scared when they escaped, but I

15  just heard they had escaped and they worked their way and

16  where they were going just like everybody else.  The only

17  thing I heard was that, I mean, by the news.  That's all

18  news and things like that and gossip that it was the -- they

19  were robbing the place or broke into the place to steal the

20  guns or whatever they needed to finish the job.

21              Honestly, I can't at this point remember

22  if there was someone in the building.  I'm thinking because

23  it was Christmas Eve, it was closed.  But the police

24  officer, that I remember, was just doing his job, burglar

25  alarm, whatever happened, and he was just out there.

1    I cannot honestly remember who fired

2 what, but, I mean, what I remember, let's put it that way,

3 it was only one officer.  Why did they have to shoot him?  I

4 mean, there's seven to his one or whoever was there.  So,

5 basically, that's probably what everybody else has heard.

6    Q.    And that's pretty, like I said, almost

7 everybody we talked to has heard different degrees of

8 information.  Just because you have heard about the case,

9 doesn't mean you are disqualified from being a juror.  What

10 the law requires of a potential juror like you, in order to

11 give a fair trial to both sides, very frankly, that if you

12 were a juror, you would just base your decision or your

13 verdict based on what you hear in the courtroom.

14    A.    Uh-huh.

15    Q.    Not something you may have heard a year or two

16 ago or read in the paper.

17    A.    Huh-huh.

18    Q.    Do you think the things that you have heard

19 you could kind of, I guess, move to the back of your mind

20 and just base your verdict on what you hear in the

21 courtroom?

22    A.    Yes.  Because of another point that I believe

23 in as far as penalty and that's I do not -- which it's in

24 there, I do not believe -- I don't believe -- not this case

25 aside, I don't believe the -- unless you have the so-called

smoking gun, that you should have the same penalty as the

other people.  I mean, unless they are all -- all of them

were shooting a gun and whoever he was unlucky to hit him,

then I don't think they should have the same thing.  I don't

believe they should all be put to death.  He should be

penalized or punished or whatever, but not -- I don't care.

One gets death, one gets life, it's still a difference.

Q.    You anticipated perfectly the next question I

was going to ask.  I think I know how you feel about it.

Let me go ahead and ask you my question.  You know, a lot of

times we think about a death penalty case, you think about

one person acting alone.  And as you already are thinking

about, crimes are committed sometimes by more than one

person.

A.    Uh-huh.

Q.    For lack of a better term, the smoking gun.

You would have the guy that pulled the trigger.

A.    Right.

Q.    The gun that actually caused the death.

A.    Right.  They actually caused the death.

Q.    But you may have some accomplices as well.

A.    Uh-huh.

Q.    They were there and may have even

participated.  And they could be charged with capital murder

--

A.      Uh-huh.

Q.      -- as well.  We talk to a lot of people maybe such as yourself that think, you know, I'm strongly in favor of the death penalty, don't get me wrong, but I'm only in favor of it for those people that actually had the smoking gun --

A.      Uh-huh.

Q.      -- or pulled the trigger or caused the death. With respect to these other people that didn't do it, you know, I may lock them up for life.

A.      Uh-huh.

Q.      But, you know, I don't believe in taking their life because they didn't take a life.  Is that kind of where you are?

A.      Yeah.  It's hard to explain, but it's like anything from minor to major.  I mean, the person, if the person was there, there's an intent.  I mean, whatever, but he should be judged and punished by what -- if you find out what exactly his part of it was, like it was whoever was there at the time, Texas -- whatever they were -- if all of them were firing guns and nobody knows who exactly killed this man, then you have to figure that part out, too.  If they all fired guns, then you have got a problem.  You have got to figure out who did what exactly.

Q.      Well, let me tell you this.  I'll be up front

1    with you.  The law allows us to prosecute people who are

2    accomplices, nontriggermen.  And that's what we're doing in

3    this case.  We're prosecuting Mr. Murphy as a nontriggerman,

4    as an accomplice.

5        A.      Uh-huh.

6        Q.      And I think I know where you are going.  I

7    think I know what your answer will be from what you told me.

8        A.      Uh-huh.

9        Q.      But it sounds like in that case where you have

10   somebody who wasn't shooting, you know, didn't cause the

11   death, I guess just your beliefs or your morals or your

12   conscience --

13       A.      Uh-huh.

14       Q.      -- tells you that the death penalty just

15   shouldn't be available for that?

16       A.      Not just available, I guess, but, you know.

17   Okay, if you have a group, the whole group -- if like it was

18   distinctive point blank, okay, one person shot and killed

19   the officer, okay, then his punishment should be very much

20   severe than the other ones.  Like I said, if he gets death,

21   that's not to say the others, because they were there

22   participating, had the same idea, just somebody did it.

23       Q.      Uh-huh.

24       A.      That they shouldn't be in there for life.  I'm

25   not saying let them off, no.

85

```
 1          Q.      Sure.
 2          A.      But I just don't think that people, you should
 3     line them all up if there was more than one, and say, okay,
 4     you know, go for it.  But I don't think they should all be
 5     punished the same, depending on what their part is in it and
 6     whatever the law allows.
 7          Q.      Let me tell you a little bit about the law and
 8     give you an example and kind of see what you think about
 9     this.  One of the laws that has to do with accomplices, we
10     call conspiracy.
11                  And just to give you an example, say
12     Mr. Shook and I agree or conspire or enter a conspiracy to
13     rob a bank.  The plan is he's going to take the gun in.  I'm
14     going to go in, and while he's holding everybody up, I'm
15     going to grab the money and we're going to make a clean
16     getaway and no one is supposed to get hurt.
17                  We go in to rob that bank.  And for
18     whatever reason he pulls the trigger and kills someone,
19     commits capital murder.  I never had any intent that that
20     would happen.  I just signed up for the bank robbery.  I
21     never wanted anybody to get hurt.  That wasn't my intent.
22                  The law actually allows not only
23     Mr. Shook to be prosecuted for the death penalty, but for
24     me, even though I didn't have any intent.  And there's a lot
25     of people -- I see you turning your head.  There are a lot
```

1  of people that disagree with that and that's fine, if you

2  do.

3       A.       Like, why would you get the same charge?  I

4  mean, you were there through the whole -- you were there for

5  the whole circle, but there was something one step too far.

6       Q.       But it sounds like from what you are telling

7  me, under that situation because I didn't have the intent,

8  that sounds like it is very important to you, because I

9  didn't have the intent, that the death penalty should be off

10 the table, shouldn't even be an option --

11      A.       No, because he shot and killed somebody.

12      Q.       -- for him?

13      A.       For him.  For you, I mean, they can -- your

14 lawyer can go -- you can go for anything you want to.  I

15 just don't believe your punishment would -- unless you can

16 prove something different, can, you know, be as bad.  Like I

17 said, it could be one step under, life in prison, instead of

18 just putting you to death, instead of just sitting there

19 waiting to die.  But it's not saying you are going to go

20 scot-free, no, huh-huh.

21      Q.       No.  You can lock me up for life.

22      A.       I don't think that you should get death,

23 because he's the one that -- he murdered.  He killed an

24 innocent person that's doing their job.

25      Q.       And that's why we talk to people.  Because the

1  law allows us to prosecute these type cases and we don't

2  want to put you on the jury when you have morals or a

3  conscientious objection.  We don't want to make it hard for

4  you and what your heart tells us and what your head tells

5  you, versus what the law allows.

6        A.      You just have to prove to me.  It's not

7  because -- use him as an example.  Just because you went for

8  capital, he shot -- it's not to say I'll go for the death

9  penalty, but I don't believe in the same thing for everybody

10 that's there.

11       Q.      Okay.  Let me ask you to do this.  You

12 probably looked at them briefly, but see these Special

13 Issues that are up on the wall?  Let me ask you to take a

14 few minutes and read through the three of those.

15       A.      (Prospective juror complies.)  Okay.

16       Q.      Let me ask you this.  A lot of people don't

17 realize that, you know, when you have a death penalty case

18 in Texas, you don't just kind of vote for -- as a jury you

19 don't vote for just the death sentence versus a life

20 sentence.  We ask you to answer these three questions.  And

21 depending on what your answers are to these three questions,

22 that kind of determines what the person's punishment is,

23 that type thing.

24            And this first question up here, first

25 Special Issue, I like to call them questions, deals with

1   whether, you know, assuming before you even get to that

2   question, you have found somebody guilty of capital murder.

3        A.    Uh-huh.

4        Q.    Okay.  This first question asks the jury to

5   decide whether there's a probability that the defendant

6   would commit criminal acts of violence such that he would be

7   a continuing threat to society, a continuing danger.  Some

8   people call it a future danger to society.  And, you know,

9   the question starts off with a no and it's up to us to prove

10  it to you yes.

11              We get a lot of people that feel very

12  strongly about the death penalty and give themselves a 10

13  for 10, much like you do.  And they say, Mr. Wirskye, if I

14  found somebody guilty of capital murder, okay, I found that

15  they are guilty of capital murder, when I get to this first

16  Special Issue, this first question, I'm going to think that

17  they are a future danger to society because they are a

18  capital murderer.  Maybe they have been violent once and I'm

19  going to think there's always a probability of them being

20  violent again.

21              I see you shaking your head yes.  It's

22  kind of common sense to it.  There's a little common sense

23  to it, but what do you think about that?

24       A.    Depends on the circumstances.

25       Q.    Okay.

89

1      A.     Okay.  The circumstances being -- it's hard --

2  an example, this is the first time somebody has ever been in

3  trouble, you know, say they were attacked, defending

4  themself, they kill somebody.  That's -- it may not be.  You

5  never know the future.  You can't predict.  But depending on

6  the background, if you get any of that, where if there's

7  that kind of a case and you are going for the death penalty

8  or whatever because he murdered someone, you have to

9  determine the odds are will it happen again.  I mean, if he

10  did this by being attacked or some reason like that.

11      Q.     Uh-huh.

12      A.     Then you have to judge what are the odds he's

13  not like he did this, like robbing a place, killing someone,

14  or whatever.  That's a whole different line.  It just

15  depends on the case, what happened.

16      Q.     To make it clear, when we talk about Special

17  Issue No. 1, it doesn't require that it be proved to you

18  that he's going to commit another murder or another capital

19  murder.  It's just kind of whatever you -- do you think

20  there's a probability.  Is it more likely than not that he

21  might commit criminal acts of violence, whatever that may

22  be, threats, assaults, all the way up to capital murder.

23               Does that kind of help a little bit when

24  you are looking at that?

25      A.     To determine this case or what I've heard

1   about this case or anything?

2          Q.      Just any case.

3          A.      It just depends on the circumstance, the

4   person on trial, the circumstance of what happened, and

5   things like that.

6          Q.      You realize -- I mean, if somebody acted in

7   self-defense --

8          A.      Right.

9          Q.      -- they wouldn't be guilty of anything.  We

10  wouldn't even be at this point.

11         A.      Uh-huh.

12         Q.      Okay.  But do you think if you found somebody

13  guilty of capital murder, that you could answer that Special

14  Issue No. 1 yes just because you found him guilty of capital

15  murder?

16         A.      Probably, if he's guilty.  If it's that high

17  of a degree of punishment that would pretty, well, say

18  uh-huh.

19         Q.      That's what a lot of people tell us.

20         A.      Yeah.

21         Q.      I'm sitting over here looking at a convicted

22  capital murderer and I'm almost always automatically going

23  to think there's a probability he would be a danger to

24  society.

25         A.      Just in my opinion, what I know, is that's

1    like a top of the line in punishment and pretty bad crime,

2    if you go for that, yeah.

3         Q.    That's what a lot of people tell us.  What the

4    law is, is that, basically, that when you get to that point,

5    when you answer question No. 1, you can't have already

6    automatically made up your mind.  And a lot of people tell

7    us I just can't do that, Mr. Wirskye.  Again, it's common

8    sense.

9         A.    Uh-huh.

10        Q.    I think they're a capital murderer.  I'm

11   always going to think they're a future danger.  And that's

12   kind of what I hear you saying.

13        A.    Yes.

14        Q.    Okay.  And it's kind of like what we're

15   talking about with accomplices.  Even though the law would

16   kind of ask you to keep that open mind and not do anything

17   automatically, it sounds like your mind is already made up

18   at that point, that once you convict them of capital murder

19   --

20        A.    Yeah.  Well, if I think it's to the point

21   where I agreed to put him to death, yeah, then my mind is

22   pretty well -- we don't want him out here, you know, because

23   of what he had done because he would probably do it again.

24   Who knows?

25        Q.    Let me just make sure I'm clear on this.  You

1    know, these questions determine whether he gets the death

2    sentence.

3              A.    Okay.

4              Q.    That first phase of the trial is just whether

5    you convict him of capital murder and find him guilty.  So

6    the answer to these questions is what determines the

7    punishment.  I hate to keep beating a dead horse, okay?  But

8    it sounds like if you convict someone of capital murder --

9              A.    Uh-huh.

10             Q.    -- just find him guilty, you are always going

11   to answer that Special Issue No. 1.  You are always going to

12   feel they are a future danger; is that right?

13             A.    Right.

14             Q.    Okay.  It sounds like it's something that is

15   pretty common sense with you?

16             A.    Uh-huh.

17             Q.    Looks like it's something that you feel pretty

18   strongly about?

19             A.    Yes.

20             Q.    Special Issue No. 2, we kind of already

21   touched on it.  That is the situation where there are

22   accomplices, you know, where the actual triggerman -- where,

23   I'm sorry, where the person you are talking about is not the

24   actual triggerman.  Again, from what you are telling me, I

25   hate to beat a dead horse, but, you know, you would -- just

1   wouldn't be able to consider the death sentence for somebody

2   that didn't actually pull the trigger?

3          A.    No.

4          Q.    Somebody like me in our example?

5          A.    Not when you have more than one person.  If

6   it's just strictly one person, then I would.  I mean, you

7   know, because when you have more than one you can prove to

8   me that who shot the gun and actually killed the man, well,

9   he should be -- get it worse.  I don't care if it's one step

10  down than the rest of them, even though what they were doing

11  was wrong and bad.  You know, if they are stealing guns and

12  the intent is they are going to do something with them, you

13  know.

14         Q.    So you have a situation, like we talked about,

15  Mr. Shook pulled the trigger, causes the death, you give him

16  the death penalty.  You would not give me the death penalty.

17  You would give me maybe a life sentence?

18         A.    Right.

19         Q.    Something like that?

20         A.    Uh-huh.

21         Q.    And that's because I didn't pull the trigger?

22         A.    Because you were there and it could be just as

23  easy as him, but you went there with a gun to rob a place.

24  Anything can happen.  So you knew when you walked in with

25  the gun, they are not like, have a good day, here's my

money.  Things can happen.

Q.    What you are telling me, and a lot of people tell us is, that's just where I draw the line?

A.    Uh-huh.

Q.    I would never be able to consider that death sentence for an accomplice, more than one person acting in a crime, who didn't pull the trigger and didn't actually cause the death.  Is that --

A.    Right.

Q.    -- what I hear you saying?

A.    Right.

Q.    Let's talk a little bit about Special Issue No. 3.  This is kind of a last stop in the process.  We call it the mitigation question.  What this question does is just ask you to look back at the crime, what you have learned about the person on trial, and what kind of personal moral blame do they bear for the crime and see if there's anything mitigating.  By mitigating we mean anything that lessens their personal moral blameworthiness, you know, makes them less to blame, I guess.  And if there is something like that, is it sufficient that his life ought to be spared, okay, that he shouldn't get the death penalty?

A.    Uh-huh.

Q.    And this is the last stop in the process, the last question.  And I see you kind of looking at me.  And we

1  talked to a lot of people and they tell us, some of them do,

2  if I find somebody guilty of capital murder --

3        A.    Uh-huh.

4        Q.    -- I think they are going to be a future

5  danger, if I think they pulled the trigger, or like in

6  Special Issue No. 2, there's just nothing I can think of

7  that would be mitigating.  At that point I've already made

8  up my mind after the guilty verdict and the answers on the

9  Special Issues, he's going to get a death penalty at that

10 point.  There's just nothing mitigating.  What do you think

11 about that?

12       A.    Well, if I understand you right, like

13 sometimes I hear about cases where even a woman kills her

14 husband, okay?  Automatic -- you know, she said it was

15 self-defense.  They automatically -- or they go to court and

16 automatically, I'm crazy, so they don't have to go to jail.

17 It's just going to depend on the circumstances.  But in some

18 cases what you did, you know, say somebody says I was beat

19 as a child, so I did this, that's how come I'm a bad person.

20 No, if we're talking 50 years later, you know, that doesn't

21 count.  It's not going to say if that's -- let him go,

22 huh-huh.

23       Q.    A lot of people tell us that age or background

24 isn't --

25       A.    It depends on the trial of the case or

1   whatever, depends on what it is.  But, no, that's not going

2   to get it.

3         Q.    Can you think of anything off the top of your

4   head that you might consider mitigating?  Any sort of factor

5   or set of facts?

6         A.    Not particularly.

7         Q.    Okay.  You think your mind would be open to it

8   if you heard something or, like I said, at that point is the

9   process just too far along?

10         A.    No, it's not too far along.  Nothing ever is

11   until the final -- until the final say.  I mean, until the

12   thing goes down.  That's not to say, but it just depends.

13         Q.    Okay.  Give me just a second.

14         MR. WIRSKYE:  May we approach, Your

15   Honor?

16           (Bench conference)

17         THE COURT:  Mr. Wirskye?

18         MR. WIRSKYE:  Pass the juror.

19         THE COURT:  Any questions?

20         MS. BUSBEE:  No, sir.

21         THE COURT:  Agree?

22         MR. SHOOK:  Yes.

23         MS. BUSBEE:  Yes.

24         THE COURT:  Ms. Echols, we appreciate

25   your service and time today.  The answers that you have

1    provided thus far, you are not qualified to sit on the jury.

2    We appreciate your fairness to come down and appreciate it.

3    Thank you very much.

4                              [Prospective juror out]

5                              [End of Volume]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF TEXAS          *

2    COUNTY OF DALLAS        *

3        I, NANCY BREWER, Official Court Reporter for the 283rd

4    Judicial District Court, do hereby certify that the above

5    and foregoing constitutes a true and correct transcription

6    of all portions of evidence and other proceedings requested

7    in writing by counsel for the parties to be included in this

8    volume of the Reporter's Record, in the above-styled and

9    numbered cause, all of which occurred in open court or in

10   chambers and were reported by me.

11       WITNESS MY OFFICIAL HAND on this the 4 day of

12   _____March_____, 2004.

13

14

15   _____
     NANCY BREWER, CSR, NO. 5759
16   Expiration Date:  12-31-04
     Official Reporter, 283rd JDC
17   Frank Crowley Crts. Bldg. LB33
     133 No. Industrial Blvd.
18   Dallas, TX 75207
     (214)653-5863
19

20

21

22

23

24

25

74851

REPORTER'S RECORD

VOLUME 11 OF 6̲1̲ VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

STATE OF TEXAS               *        IN THE DISTRICT COURT

VS.                          *        DALLAS COUNTY, TEXAS

PATRICK HENRY MURPHY, JR.    *        283RD DISTRICT COURT


********************

INDIVIDUAL VOIR DIRE

********************

FILED IN
COURT OF CRIMINAL APPEALS

MAR  9 2004

Troy C. Bennett, Jr. Clerk


On the 5th day of September, 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.


ORIGINAL

1
## A P P E A R A N C E S

2
### APPEARING FOR THE STATE

3
Mr. Toby Shook
SBOT NO. 18293250

4
And
Mr. Bill Wirskye

5
SBOT NO. 00788696
Assistant District Attorneys

6
133 No. Industrial Blvd.
Dallas, Texas 75207

7
Phone:  214/653-3600

8

### APPEARING FOR THE DEFENDANT

9

Ms. Brook Busbee

10
Attorney at Law
SBOT:  03488000

11
703 McKinney Ave. Ste. 312
Dallas, TX 75202

12
214/754-9090

13
Mr. Juan Sanchez
Attorney at Law

14
SBOT:  00791599
5630 Yale Blvd.

15
Dallas, TX 75206
214/365-0700

16

17

18
19

20

21

22

23

24

25

PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Keith Pelusi | 4 | 5 | 21 | 11 |
| Donna-Marie Sexton | 22 | 23 | 45 | 11 |
| Deborah Pruett | 46 | 48 | 77 | 11 |
| Frank Arena | 82 | 83 | 104 | 11 |
| Christine Stucker | 107 | 108 | 134 | 11 |

P R O C E E D I N G S

1

2          THE COURT:  Ready for Keith Pelusi.

3               [Prospective juror in]

4          THE COURT:  Good morning, sir, how are

5  you?

6          PROSPECTIVE JUROR:  Good, sir, and

7  yourself?

8          THE COURT:  Please have a seat.  Let me

9  try to pronounce your name.  Is it Keith Joseph Pelusi?

10         PROSPECTIVE JUROR:  That's correct.

11         THE COURT:  Sorry for the delay in

12 getting started.  We'll just get right into it.  Have you

13 had an opportunity to review the guide I provided for you?

14         PROSPECTIVE JUROR:  I have.

15         THE COURT:  A lot of law and you are not

16 expected to understand all of it from top to bottom.  That's

17 what the lawyers are going to visit with you about.  Just --

18 it's an outline to begin to have you think about the issues

19 that we're dealing with here.  If you don't understand the

20 questions, say, you know, rephrase that, give me another

21 example, to where you can understand what the law is talking

22 about.

23         My job is to be sure at the end of the

24 process, number one, you understand the law, and number two,

25 can you follow the law?  That's the big picture here.

1          Only question I have for you, sir, is the

2   trial shall begin on November 10th.  Do you have any reason

3   why you cannot serve this Court for those two weeks?

4          PROSPECTIVE JUROR:  No, sir.

5          THE COURT:  Very well.  Mr. Wirskye shall

6   inquire for the State.

7          MR. WIRSKYE:  May it please the Court.

8          KEITH PELUSI,

9   having been duly sworn, was examined and testified as

10  follows:

11          DIRECT EXAMINATION

12  BY MR. WIRSKYE:

13      Q.   Mr. Pelusi, how are you doing this morning?

14      A.   Good, sir.

15      Q.   My name is Bill Wirskye and I'm the Assistant

16  District Attorney that will be visiting with you for the

17  next few minutes.  What I would like to do is talk about

18  some of the information in your questionnaire and that type

19  thing and, also, talk about your thoughts and feelings about

20  the death penalty, and maybe, finally, talk a little bit

21  about the law and some of the rules that apply in a death

22  penalty case.

23          Have you had a chance to think about

24  coming down here since you got the call back --

25      A.   Yes.

1  Q.      -- to come down for an individual interview?

2  What's been going through your head?

3  A.      Probably the same things that go through every

4  potential juror's head.  The disruption of work and life.

5  And this one is a little different case because if I'm

6  picked for the jury, I'm uneasy about the consequences of

7  the trial.

8  Q.      Tell me what you mean by uneasy.

9  A.      Well, we're talking about a man's life and

10 that's something that becomes quite personal when you are

11 part of the decisionmaking process.

12 Q.      How do you think that might affect you?

13 A.      I think I will pay very close attention to

14 everything that you say.

15 Q.      Okay.  You know, we talk -- you saw the people

16 that came down with your group in the morning.  We had

17 another big group in the afternoon just like that and

18 everybody filled out questionnaires.  And the lawyers get

19 together and we kind of agree on who we're going to talk to

20 individually.  And we talk to quite a lot of people.

21 And one of the reasons we do it is we

22 understand that this isn't necessarily everyone's cup of tea

23 when it comes to serving on a death penalty case.  May be a

24 good juror in a civil case or another type of criminal case,

25 but both sides recognize there are some very strong feelings

1  or emotions that could be involved when you talk about

2  serving on the jury where so much is at stake, where a man

3  could actually lose his life by the State.

4                   So we don't want to force anybody or

5  pigeonhole anybody or try to put anybody over in the jury

6  box.  We don't want to make anybody violate their conscience

7  or make anyone uncomfortable, that type thing.  Just as you

8  sit there right now, do you think -- in your own mind, do

9  you think that you are the right type of juror for this

10  case?

11        A.    I don't know how to answer whether I'm the

12  right type or not.  I don't have the background for that.  I

13  think I should probably ask if you could rephrase the

14  question to something perhaps that I could answer.

15        Q.    Are you completely comfortable?

16        A.    No, I'm not completely comfortable.

17        Q.    And the reason for that would be?

18        A.    We're talking about a man's life.

19        Q.    Okay.

20        A.    I don't think that I could ever be completely

21  comfortable with sentencing a man to death.

22        Q.    Okay.  Do you think that you feel so strongly

23  about it, I guess, as a moral matter or matter of conscience

24  that, I guess, if you are sitting in my shoes, the State or

25  the prosecution, that you are probably not the best juror

1  for this type of case?

2      A.      If I were in your condition or in your

3  position, I -- and felt, obviously, that I had a case, then

4  I would press it to get the death penalty.

5      Q.      Okay.  Let me ask you how you feel about the

6  death penalty.  You told us a little bit in the

7  questionnaire that, I guess, in some cases you are in favor

8  of it.  And I know you haven't seen your questionnaire since

9  you filled it out, so it's a little bit unfair that I have

10 got it in front of me.  But we asked if you were in favor of

11 the death penalty and you checked yes.  And when asked to

12 explain, you said in extreme cases only.

13             And I was just curious what you mean by

14 extreme cases.  Is there a particular set of facts that come

15 to mind or a case you may have heard about or read about or

16 seen on TV?

17     A.      Um, you are correct.  I have forgotten most of

18 my mental thoughts while I was writing that.  There are

19 situations that I feel the death penalty is warranted.  I'm

20 not sure that I can give you legal -- I know that I can't

21 give you legal cases that would illustrate that.

22     Q.      Is there a particular set of facts that you

23 think about, you know, someone did that or someone did this,

24 then, that would probably be a candidate, at least, for the

25 death penalty?  I'm not talking about specific cases, just

1   types or sets of facts.

2        A.    I think that the definition that I read here

3   in the voir dire orientation guide would be cases where I

4   could feel that that was appropriate.

5        Q.    Okay.  And you probably learned from reading

6   that, that the only crime in Texas where the death penalty

7   is available is a type of murder case.  Not all murder cases

8   are capital offenses or subject to the death penalty.  We

9   reserve that sentencing option just for a subset or a narrow

10  group of particular type murder cases, which I'm sure is

11  what you are referring to, murder of a police officer,

12  fireman on duty, that type thing, a child under six, murder

13  in the course of another felony, say robbery, that type

14  thing.

15            Are you generally in agreement with that

16  law that, you know, in your mind that's a pretty good

17  definition, I guess, of the type cases you think where the

18  death penalty should be an option?

19       A.    Yes.

20       Q.    Okay.  Is there anything on that list that

21  kind of struck you as a little out there or that you were

22  uncomfortable with or anything like that?

23       A.    No.

24       Q.    Let me ask you this.  We talk to a lot of

25  people and, you know, we know people usually don't sit

1    around thinking about their thoughts on the death penalty.

2    We give you different facts or different examples and it's

3    probably something you haven't thought about and we

4    recognize that.

5                But let me run these past you.  I think

6    oftentimes when you think about capital murder or somebody

7    on trial for capital murder, you think -- or a lot of people

8    think of just one person acting alone.  One criminal going

9    in and holding up a 7-Eleven store, shooting and killing the

10   clerk, or maybe shooting and killing the police officer on

11   the way out.  But oftentimes down here we deal with crimes

12   that are committed by more than one person, you know, a

13   group or gang of individuals get together and commit the

14   crime.

15               In Texas the law allows us, depending on

16   the facts and circumstances, to prosecute for the death

17   penalty not only the person that actually pulled the

18   trigger, the person that actually took the life and caused

19   the death, but under some circumstances we can actually seek

20   death on a nontriggerman, what some people call an

21   accomplice, the person that didn't cause the death.

22               And we talk to a lot of people that are

23   generally in favor of the death penalty, but they would

24   limit it just to the person that actually took a life.  You

25   know, we've heard people say that to take a life through the

1   death penalty is only justified when that person has taken a

2   life, so they would reserve the death penalty just for this

3   group of people that actually pulled the trigger.  And they

4   would'dn't have, if they were Governor for a day, the death

5   penalty available to the accomplices.  Say, yeah, they need

6   to be punished, we could lock them up for life, but the

7   death penalty ought to be off the table for that group of

8   accomplices, the nontriggermen.  What do you think about

9   that?

10       A.    I think it would have to depend on the

11  situation.  An accomplice who was not involved at the time

12  of the shooting would be different than an accomplice who

13  was.

14       Q.    Maybe I'm not following you.  Can you explain

15  that to me?

16       A.    If there was an accomplice who was helping at

17  some other geographical location, I might view that as a

18  different situation than somebody who was there and present

19  and able to intervene.

20       Q.    Let me run you through a hypothetical or a set

21  of facts and kind of get your thoughts on it.  Say

22  Mr. Shook, the other prosecutor, and myself and a third

23  individual decide we're going to rob a bank and we agree

24  Mr. Shook is going to be the one that has the one gun.  He's

25  going in and hold up the teller.  I don't have a gun and I'm

1    going to go in and just collect the money while he's holding

2    everyone up.  We have a third guy who is the driver, our

3    getaway car driver, and our lookout.  His job is to get us

4    there and get us away.  Or if he sees the police coming,

5    he's going to hit the horn and let us know.

6                     And we go in there and do the bank

7    robbery.  And for whatever reason, Mr. Shook shoots and

8    kills one of those bank tellers.  Obviously, he's the

9    triggerman.  He's committed capital murder.  He could be

10   subject to the death penalty.

11                    What do you think in that situation about

12   the death penalty for someone like me, had no intent anyone

13   get hurt, didn't have a weapon, just went in there to

14   collect the money?  What do you think about that for me?

15        A.     I think I would have to learn more about the

16   law to have an opinion about that.

17        Q.     Okay.  What about the guy, just off the top of

18   your head, the getaway car driver?

19        A.     You've succeeded in creating questions in my

20   own mind about what I believe about these things.

21        Q.     I'll tell you what the law is.  If I actively

22   aid or encourage or direct or solicit someone to commit

23   capital murder, then I'm guilty as an accomplice.  If I tell

24   Mr. Shook, go ahead and shoot that bank teller so we can get

25   away, I would be guilty of capital murder and be subject to

1    the death penalty.

2                       And the law also says in the situation

3    that I gave you, if the three of us agreed or conspired or

4    entered into a conspiracy to commit a bank robbery, and even

5    though I may have not had an intent that anyone die or the

6    man, the getaway car driver, may not have had that intent,

7    if we should have anticipated that a life could be taken,

8    then we could still be charged with and face the death

9    penalty, charged with capital murder and face the death

10   penalty, even though we had no intent that someone die.

11   Does that help you out at all?

12        A.     Yes.

13        Q.     Okay.  What do you think about that, knowing

14   the law and knowing the set of facts, what do you think

15   about that scenario?

16        A.     I think we're bound by the law and so I would

17   have to do what the law directs us.

18        Q.     Okay.  And, I guess, going back to the point I

19   made earlier, we want -- both sides want people that can

20   follow the law, give a fair trial to both sides.  But what

21   neither side wants is someone over there whose duty to

22   follow the law kind of conflicts with any sort of moral

23   belief or conscience or anything like that.  We don't want

24   to put somebody in that difficult position.

25                       And I want to make sure that that

1   wouldn't be an issue for you, now that you know a little bit

2   of what the law is.  And I'll tell you, quite frankly, in

3   this particular case we are prosecuting Mr. Murphy as an

4   accomplice, a nontriggerman, not the person that pulled the

5   trigger.  That's our theory.  We don't want anybody, like I

6   said, we don't want to jam anybody up, put them in a hard

7   spot.

8            What do you think about that?  Do you

9   think, knowing now what you know, do you think you are the

10  type person that could serve on this jury?

11       A.     I believe that I am.

12       Q.     Okay.  So when it comes to looking at

13  somebody, an accomplice or a nontriggerman, you just have to

14  know the facts, I guess?

15       A.     That's correct.

16       Q.     Would it make any difference to you in our

17  scenario if I had a gun, a loaded gun?  Would that make it

18  more clear for you one way or another, knowing the standard

19  is should have anticipated?

20       A.     I'm not sure that it would make a difference

21  because the law doesn't state that that's an issue.

22       Q.     What the law requires is that the jury look at

23  the facts of the crime and say, should the accomplice,

24  should the nontriggerman, should they have anticipated that

25  a life would be taken?  And it allows you as a juror to look

at all the facts of the crime and come to that decision.  If
you feel it's been proven to you beyond a reasonable doubt
that I should have anticipated a life would be taken or the
getaway car driver should have anticipated that a life would
be taken, then you would convict him of capital murder and
proceed to decide whether the death penalty was appropriate.

So knowing all that, are those the type
factors that you think are important, knowing if I had a gun
or -- and you talk about the geographical factor, too, I
guess.

A.    I was thinking of an entirely different case.
I was thinking about the terrorists who have been supporting
active terrorists who actually do take lives, for example,
people who collect money to support them.

Q.    Okay.  Not necessarily the getaway car driver
outside the bank, but just somebody who helps, bankrolls,
from a distance, from afar, for the crime?

A.    Yes.

Q.    Okay.  You have told us, I think, like just
about everybody we talk to, that you have at least heard
something about this case.  You know what case you are down
here on?

A.    Yes.

Q.    Could you tell us what you remember hearing
about this case?

A.    I did not actively follow it.  I understand that there was a breakout from the Texas Correctional Institution.  In the course of the breakout, they, the escapees, robbed a sporting goods store and in the course of their robbery, the police officer was killed.

Q.    Okay.  Do you remember any other details or did you follow it after the event, after the crime?

A.    I did not.

Q.    Okay.  Follow the capture or the arrest or anything like that?

A.    I did hear about the capture, but I -- I did not follow it.

Q.    Have you followed any of the other trials related to this case?

A.    I have not.

Q.    Okay.  Do you think that might affect you, having that knowledge, if you were selected as a juror in this case, knowing something about it already or generally?

A.    I don't think so.

Q.    A lot of times, unfortunately, our law, we talk to people, I guess the law and lawyers are more comfortable with yes or no answers.  So I hope you don't feel like I'm trying to pin you down, but I am.  I'm not trying to be rude about it, but when you say you don't think so, do you think there is a possibility that it might?

1     A.     I don't know how to do your job and so I don't

2  know if there's anything in my recollection of the news

3  articles that would affect what you are trying to

4  accomplish.

5     Q.     Basically, you know, the law doesn't require

6  that in order to have twelve people on a jury, that we find

7  twelve people that have never heard anything about the case.

8  Obviously, in high profile cases like this, that would be

9  impossible.  The law requires that a juror be able to make

10  their decision on a case about guilt or about the death

11  penalty just based on what they hear in the courtroom and

12  not based on something they may have heard in the media.

13  That can't really influence their decision to any extent.

14           Knowing that, do you think that you would

15  be able to do that or you still think there may be a

16  possibility that you could be influenced by what you heard?

17     A.     I think I can do that.

18     Q.     Okay.  If you had to say yes or no, which one

19  would you choose?

20     A.     I'm not sure if I can answer yes or no,

21  because the question has been changed too many times.  Yes,

22  I think I can serve on the jury.

23     Q.     Let me ask you this.  I'll ask the question a

24  different way.  If you were picked to serve on this jury,

25  would you base your verdict just and only on the facts and

1    evidence that you heard in the courtroom?

2         A.     Yes, sir.

3         Q.     Let me ask you, again, another question off

4    your questionnaire.  Again, I know you don't have it in

5    front of you, but we ask you kind of your feelings in

6    general about the criminal justice system.  And you said it

7    was absolutely crucial to society and sometimes wrong.  I

8    was just wondering what was going through your mind about

9    the sometimes wrong, if there was a particular case or just

10   a view that you hold or an opinion or what was going on

11   there when you put down sometimes wrong?

12        A.     Recently there have been some publicized cases

13   -- I can't quote you the specifics -- of people who have

14   been incarcerated for many years and with new scientific

15   testing, the system has found that they were not guilty of

16   the crimes they were in prison for.

17        Q.     Okay.  Cases in Texas, some other state, or do

18   you remember?

19        A.     I don't remember if it was in Texas or another

20   state, but I remember reading and hearing about more than

21   one case.

22        Q.     Okay.  Kind of going back to what we were

23   talking about earlier, do you think that may weigh on your

24   conscience if you were selected to be a juror in a death

25   penalty case?

1   A.   It would not weigh on my conscience.  I would,

2  obviously, be very interested in the quality of the

3  information that was provided.

4   Q.   Because it's such an extreme penalty, I guess,

5  you know, you have talked about you would listen very

6  carefully to the information we give you.  Do you think that

7  you would kind of hold us to a higher burden than you would

8  in an ordinary criminal case, a nondeath penalty case?  Do

9  you feel that should be appropriate or should be the law or

10  how do you feel about that?

11   A.   I suppose that any criminal case or any case

12  at all should be held to the same high standard.  But, yes,

13  I would have to say that because a man's life is at stake, I

14  would expect things to be done in a very perfect way.

15   Q.   And we talk to people a lot and we hear that a

16  lot.  Because there's more at stake, because the possibility

17  of an error, which there is, I guess, in any system that

18  humans are involved in, because of that possibility of

19  error, you know, I know the law is beyond a reasonable

20  doubt, but I'm just going to have to be convinced, you know,

21  beyond a shadow of a doubt to a certaintude or I would

22  expect a certain case where if the State is asking to take a

23  life, I would expect and demand of them kind of that perfect

24  case, something beyond beyond a reasonable doubt.  Is that

25  what I hear you saying?

1    A.    Again, I come back to the -- the answer to

2  your question is no.

3    Q.    Okay.  The law states that any criminal case,

4  even a death penalty, that the burden that we have is beyond

5  a reasonable doubt.  Not beyond all doubt, not beyond a

6  shadow of a doubt.  You can have a doubt and still convict

7  someone unless and except it's a reasonable doubt.

8         What, very frankly, we're scared of at

9  this table is, because the stakes are so high, because this

10 is a death penalty case, we get people that say they can

11 follow the law, they can hold us to that beyond a reasonable

12 doubt standard, but once they get over there, realizing the

13 import of the case and the seriousness, in reality they are

14 holding us to a little higher standard.  Of course, under

15 the law, you know, the law doesn't envision that or

16 contemplate that.

17        So I want to be sure that if you make it

18 over on the jury that you wouldn't be holding us to an extra

19 high burden just because the stakes are so high in a death

20 penalty case.  What do you think about that?

21   A.    Again, the answer is no.

22   Q.    Okay.  You wouldn't hold us to a higher

23 burden?

24   A.    Correct.

25        MR. WIRSKYE:  May we approach, Your

1    Honor?

2                   (Bench conference)

3                   MR. WIRSKYE:   That's all the questions I

4    have.

5                   THE COURT:   Ms. Busbee?

6                   CROSS-EXAMINATION

7    BY MS. BUSBEE:

8         Q.     Mr. Pelusi, my name is Brook Busbee and I'm

9    one of Mr. Murphy's two attorneys.   You seem like an

10   intelligent man with an orderly mind which would be a good

11   thing in a juror.   But I also hear that following the law in

12   this case would be -- you're almost making me feel like it

13   would be painful or is that just because I don't know you

14   and that's the way you discuss things?

15        A.     I'm not sure I understand.

16        Q.     Well, let me cut to the chase.   We don't want

17   -- this is true, we don't want anybody on this jury on

18   either side that is troubled by this process.   Believe it or

19   not, we have folks up here that wouldn't be.   And I see by

20   your questionnaire that you would lose two weeks of work, if

21   you were selected on this jury.

22                   So we've agreed that you don't have to go

23   through this process anymore.   We're going to hope that you

24   come back on another jury case and get selected, because I

25   think that you are a fine juror.   But we're not going to put

1   you on this case because of some of those concerns.  Is that

2   fair enough?

3          A.      Yes.

4                    THE COURT:  Thank you, Mr. Pelusi, you

5   are free to go.

6                      [Prospective juror out]

7                    THE COURT:  Donna-Marie Sexton.

8                      [Prospective juror in]

9                    THE COURT:  Good morning, Ms. Sexton, how

10  are you?

11                   PROSPECTIVE JUROR:  Fine.

12                   THE COURT:  A little nervous?

13                   PROSPECTIVE JUROR:  Yes.

14                   THE COURT:  This is about as informal as

15  we can get and I'm sorry for the wait, but have you had an

16  opportunity to read the guide I have provided for you?

17                   PROSPECTIVE JUROR:  Yes.

18                   THE COURT:  It's a lot of law to give

19  someone first thing in the morning.  We don't expect you to

20  be able to give it back to us and understand every word of

21  it.  That's the opportunity we have now for the lawyers to

22  discuss the law with you, go over some examples of how the

23  law works, and then ultimately my question to you is, do you

24  understand the law?

25                   PROSPECTIVE JUROR:  I believe so.

1        THE COURT:  And then the second question

2   is, if you understand the law, can you follow it?

3        PROSPECTIVE JUROR:  I believe so.

4        THE COURT:  We'll find out in a little

5   while.  I appreciate the positive outlook.  But that's what

6   this opportunity is for, so the lawyers can discuss that.

7   Those are the ultimate questions that I have to ask

8   concerning whether someone is qualified or not to sit on

9   this jury.

10       The only question that I have for you at

11  this time is this trial shall begin on the 10th of November.

12  Do you have any problems serving this Court for those two

13  weeks?

14       PROSPECTIVE JUROR:  No.

15       THE COURT:  Any questions for me?

16       PROSPECTIVE JUROR:  No.

17       THE COURT:  Very good.  Mr. Shook?

18       MR. SHOOK:  May it please the Court?

19       <u>DONNA-MARIE SEXTON</u>,

20  having been duly sworn, was examined and testified as

21  follows:

22       <u>DIRECT EXAMINATION</u>

23  <u>BY MR. SHOOK:</u>

24       Q.    Ms. Sexton, my name is Toby Shook.  I'll be

25  asking questions on behalf of the State.  We're just

1  interested in your honest opinions. You have been pretty

2  honest on your questionnaire, so I don't think we'll have a

3  problem there. You have been on a jury before; is that

4  right?

5       A.    Yes, I have.

6       Q.    Okay. You probably realize, then, this

7  procedure is a little bit different. Because it's a death

8  penalty case, we talk to each juror individually. I'll ask

9  you some questions, follow up some on some information that

10 was put in your questionnaire, and, obviously, we'll talk to

11 you about the death penalty, how you feel about that, and

12 the laws that apply to those types of cases. If you have

13 any questions at any time, just feel free to ask. Okay?

14      A.    Okay.

15      Q.    All right. Now, first of all we did ask you

16 to fill out this 18-page questionnaire, a lot of questions.

17 You were very honest with us. Then several months have

18 passed and you get called to come down here for this

19 individual selection process.

20           Has anything in your life changed?

21 Anything in your life, personal or professional situations,

22 or with your family changed that you think we might need to

23 know about? Anything changed at all?

24      A.    No, sir.

25      Q.    Okay. So everything that has been put in the

1    questionnaire is pretty much the same --

2          A.     Yes.

3          Q.     -- as it was back when you filled it out?  All

4    right.  Let me go over a little bit about your background.

5    You were on a jury a couple of years ago; is that right?

6          A.     Yes.

7          Q.     What type of case was that?

8          A.     I've actually been on two juries.  First one

9    was a civil case on a -- okay, asbestos case.  I can't say

10   the word, but -- and it was initially started out with three

11   defendants.  Two dropped out after the first day and the

12   fifth one settled -- the third one settled after five days.

13         Q.     So you never reached a decision there?

14         A.     No.

15         Q.     What about the criminal case?  What was that?

16         A.     It was a drunk driving, alleged drunk driving

17   case.  They -- we had to decide the guy was not guilty

18   because they didn't prove that he had had anything to drink.

19         Q.     Okay.

20         A.     And he didn't do anything on his behalf.

21         Q.     On his --

22         A.     He -- his side didn't say anything.

23         Q.     Okay.  So you didn't feel the State met their

24   burden of proof of him being -- drinking any alcohol?

25         A.     Correct.

1    Q.    Now, let me ask you this.  Any unpleasant

2  experiences about that experience, either experience, as a

3  juror?

4    A.    No.

5    Q.    Now, let me go -- and we asked a lot of

6  background information, whether you have been involved or

7  known anyone involved in the criminal justice system and you

8  let us know about a situation with your son when he was --

9  was he a victim of an assault at school?

10   A.    Both.  He was -- well, he was on a school bus

11  and apparently he threw a drink out a window and a kid off

12  the bus got on the bus and punched him with a spiked band

13  around his hand.  So the police were called and they were

14  told that they could countercharge him with assault because

15  he hit back.  And then we took it to -- we were going to

16  take it to court and they never called us into the

17  courtroom.

18   Q.    But you came down to the courthouse?

19   A.    Yes, we did.

20   Q.    Was your son ever arrested or charged?

21   A.    He was charged with assault, but when we went

22  to go back for his case, the parents of the other child

23  didn't come back.

24   Q.    So it was dismissed?

25   A.    It was dismissed.

1   Q.    And then also the other person, the child that

2   got on the bus that assaulted your son, he had been charged

3   at one point?

4       A.    Yes.

5       Q.    And that's why you came down to the

6   courthouse?

7       A.    Yes.  And we were waiting to be called.  It

8   was both on the same day.  We were waiting in the morning to

9   be called in as witnesses and apparently our -- the DA said

10  his witnesses weren't there, even though we told him we

11  were.

12      Q.    So the case was dismissed?

13      A.    Against the other kid.  So the other kid never

14  came back against my son.

15      Q.    So both cases wound up getting dismissed?

16      A.    Yes.

17      Q.    Was this over at the juvenile courthouse?

18      A.    I guess it was.  I don't --

19      Q.    It wasn't this courthouse?

20      A.    No, I don't think so.

21      Q.    Okay.  And do you remember who the prosecutor

22  was that you talked to?

23      A.    No, I really don't.  My husband did most of

24  the talking with that one.

25      Q.    How did that make you feel, that experience?

1    A.    I was a little upset since we had let them

2  know we were there.  My husband had -- my husband went in

3  and let the prosecutor know and he said, basically, all the

4  kid is going to get is anger management and maybe some

5  probation and my husband said, fine.

6           There were so many cases that were

7  sitting there waiting to be -- and they said anyone who was

8  not the actual one being accused, go wait out in the

9  hallway.  And I said, my husband was standing there at the

10 door, so the guy would know we didn't leave and he never

11 called us in.  And he went up there and said he had no

12 witness.

13    Q.    Were you upset that they dismissed the case

14 against this person?

15    A.    Yes, because we felt that the parents of the

16 kid was not taking care of it because after the initial

17 accusing, she would drive her son around following the bus

18 and as they call it, flipping him off when they got off the

19 bus.

20    Q.    So there was some activity that went on after

21 the incident?

22    A.    Yes.  So we felt that he -- even if it was

23 just probation or anger management it would have been --

24    Q.    It would have done some good.  Has there been

25 any situations between that person and your son since then

1   or was that --

2       A.      No.

3       Q.      How -- do you think that might affect you in

4   some way that, obviously, I guess, you are a little angry

5   with the prosecutor at that point in time that did that,

6   just kind of, I guess they were somewhat dishonest or at

7   least didn't seem to care in that particular case or did

8   something?

9       A.      That was that one guy and it's not going to --

10      Q.      How long ago was that?

11      A.      My son's been out of school for about a year,

12  so about two years ago.

13      Q.      Okay.  Now, another area I want to get into

14  and, you know, we don't mean to get into your personal

15  business, but obviously, we can't help that in some

16  situations.  You had -- I guess it was another son that was

17  involved with an incident at school and that had some

18  psychiatric counseling since then; is that right?

19      A.      Yes.

20      Q.      Is that situation going on right now?

21      A.      Yeah.  He's been diagnosed with ADHD and been

22  put on medication and things have turned around totally on

23  that one.

24      Q.      Was that a pretty serious situation, the

25  incident that happened in the classroom?

1    A.    Um, he -- basically, he says that he was doing

2  it to scare the other kids because they would not stop

3  picking on him.  He had taken his line that had his ID tag

4  on it and I guess twisted it like he was choking himself.

5    Q.    How long ago did that happen?

6    A.    About a year ago.

7    Q.    Is he still in the same school?

8    A.    Yes.

9    Q.    All right.  But he's doing much better now?

10   A.    Yes.  Like I said, once he was on medication,

11 he stopped doing what the kids called playing space cadet

12 and spacing out and he turned things around a lot.

13   Q.    Good.  Let me talk to you a little bit about

14 the death penalty.  You know from listening to the Judge

15 when you were brought down the first time, that this is a

16 capital murder case in which the State is seeking the death

17 penalty.  In fact -- let me ask you this.  You probably

18 followed some of this case.  Most of the jurors have.  There

19 was a brief explanation.  We can't get into the facts, but

20 you know this case happened in the year 2000, Christmas Eve,

21 at the Oshman's?

22   A.    Yes.

23   Q.    And you said that you did see something on the

24 radio, TV, or newspaper.

25   A.    It was pretty hard at the time not to.

1    Q.    Right, saturated.  What do you remember about
2    the story?

3    A.    Um, that the guys escaped, they robbed the
4    Oshman's, and the police officer was killed and eventually
5    they did catch the guys.  That's really about it.  I really
6    am not a big one for following most news stories.

7    Q.    You didn't follow any of the subsequent court
8    proceedings?

9    A.    I know that the other ones were found guilty.

10   Q.    We just ask each juror to be honest with us on
11   that subject.  Do you feel that what you have read or saw on
12   the TV or radio, newspaper, or what you followed in the
13   other court proceedings, would that affect you in any way as
14   a juror in this case?

15   A.    No, no, because I think I could just pay
16   attention to what's going on.

17   Q.    Okay.  Do you feel from what you know -- let
18   me get into another area.  You told us just on the subject
19   of the death penalty that you believe in the death penalty
20   as a law; is that right?

21   A.    Yeah.  I was looking at my answer.  I believe
22   since it is the law and I believe in it, if it's planned, if
23   they know what they are doing, there's a good chance they
24   are going to have to kill somebody or would kill somebody in
25   the process.

1   Q.   Okay.  So if it's a planned killing?

2   A.   Or a possibility of.

3   Q.   Or a planned possibility, then you feel it

4   could be a death penalty case?

5   A.   Yes.

6   Q.   Have you followed any cases in the news that

7   you thought were death penalty cases?

8   A.   No.  As I said, I really don't follow the

9   news.  My husband likes to watch it, but I usually watch my

10  sit-coms.

11  Q.   Okay.  In Texas there's only certain types of

12  crimes which are eligible for the death penalty.  And you

13  see in the packet what they are is an intentional murder

14  that can occur during the course of a felony, such as a

15  robbery or rape, kidnapping, murder of a police officer or

16  fireman on duty, murder of a child under the age of six,

17  murder of more than one victim.  But these are the specific

18  types of cases that a person could receive the death penalty

19  in.  You may have read that in the packet, also.

20           Anything about those types of crimes that

21  you feel is unfair about seeking the death penalty or would

22  you expand it or would you limit it, if it were up to you as

23  far as those types of crimes?

24  A.   I don't think so.

25  Q.   In Texas a capital murder case is divided into

1  two parts.  There's the guilt/innocence stage in which we

2  must prove the defendant's guilt.  If we fail to do that,

3  it's a not guilty.  If we do meet that burden, we go into

4  the punishment stage in which you would then, at the close

5  of that evidence, get these Special Issues.

6            The Special Issues basically is this.  We

7  have to prove the defendant would be a continuing danger to

8  society, we have to prove that he either intended the victim

9  to die or he anticipated a death would occur, and then the

10  last question is, is there sufficient mitigating evidence

11  that a life sentence should be imposed rather than the death

12  sentence?

13            But if the questions are answered yes,

14  yes, and no, the Judge would have no choice.  He would

15  sentence the defendant to death.  The jury doesn't write

16  life or death in, but he bases or does his sentencing based

17  on how you answer those questions.  A yes, yes, and no,

18  equals a death sentence.  Any other combination of answers

19  equals a life sentence.  But those are the only two possible

20  outcomes once he's been found guilty.  Is that clear to you?

21        A.     Yes.

22        Q.     Are you familiar with the method of execution

23  in Texas?

24        A.     No.

25        Q.     The method of execution is by lethal

1  injection.  It used to be by the electric chair.  Now it's

2  by lethal injection.  The procedures are the same.  If the

3  defendant is found guilty and these questions are answered

4  yes, yes, and no, he would be sentenced to death.  He would

5  be placed on death row.

6  At some point in time the trial judge

7  would actually issue a date of execution.  On that date he

8  would be moved from death row, actually a day before, placed

9  in a special prison unit in downtown Huntsville where all

10  executions by law take place.

11  On the date of his execution, he's going

12  to be given time with family, you know, with a minister.  He

13  will be given a last meal, if he can eat it.  But at 6:00

14  p.m. all executions take place.  He would be taken to the

15  execution chamber.  He would be placed on a gurney.  He

16  would be secured there by leather straps.  You may have seen

17  the photographs of that in the news.  They show that a lot.

18  A.      Yes.

19  Q.      Documentaries and things like that.  He would

20  be secured.  There would be needles placed in his arm, tubes

21  which go to another room where the executioner is placed.

22  Witnesses come in for both sides, friends and relatives of

23  the victim, friends and relatives of the defendant.

24  He's then given an opportunity at that

25  point in time to make a last statement, which is often

played in the press.  Sometimes they ask for forgiveness,
sometimes they are defiant, sometimes they say they are not
guilty, very emotional scene, obviously.

When that statement is over, the warden
will simply signal the executioner who will then inject
substances which stop his heart, collapse his lungs.  All
these poisons take effect while he is conscious.  And in
about ten seconds he will lose consciousness and he will be
dead very quickly after that.

It's a procedure that occurs the same in
each case and these facts are all reported in each case.
But in Texas you probably know, even though you don't follow
the news, you probably know that executions actually take
place.  Are you aware of that?

A.     Yes.

Q.     Texas leads the nation in executions every
year.  Except one or two, Texas has led the states in
executions.  So we know in Texas that it's a punishment
that's not only given out by juries, but ultimately carried
out by the judicial system.  Some states have it, but they
never actually impose it.  People stay on death row and it
never occurs.

And I want to lay all my cards out on the
table, because to be perfectly frank, we here at this table
believe that we have the type and quantity of evidence to

1  convince the jury of the defendant's guilt and that these

2  questions should be answered in such a way that he would be

3  executed in the manner I described, no if's, and's, or but's

4  about that.  And the defense takes the opposite view, which

5  is why we are talking to jurors and going through this

6  process.

7             But you told us in your questionnaire,

8  like several people have, that you are a little nervous in

9  making that decision in this type of case where someone's

10  life is at stake.  And that's perfectly understandable.  We

11  have people that are against the death penalty, obviously,

12  and can't serve on the jury.  And we have people who are

13  adamant for it.  We have people that are for it

14  philosophically, but when you start thinking about taking on

15  that type of responsibility, they are not comfortable with

16  that.

17       A.      Yeah.  I mean, I think, you know, if the

18  evidence was there, I could say yes.  But it's a hard

19  thought.  I mean, like if you ask me, I don't necessarily

20  want to be on this case, but if anybody does --

21       Q.      I want you to -- and that's fine, if you feel

22  that way.  But I also want to be very honest with the

23  jurors.  As you sit here today and realize I could be placed

24  on a jury, knowing I will make a decision on this man that I

25  see living and breathing for two weeks, that he will be

1    lying dead on a gurney some day.  We have people the last

2    two weeks that say, I believe in the death penalty, but I'm

3    not going to be able to make that type of decision.  And we

4    say, thank you very much for coming down and we excuse them.

5    And we have other people that can.

6                    There's no right or wrong answers.  But

7    we don't want to put anyone here, because after they are in

8    the box, the jury box, there's nothing we can do about that.

9    But I notice that you, like several other jurors, have

10   talked about some hesitation in a couple of parts in your

11   questionnaire and I just want to make sure that you are on

12   board with that and comfortable with that.

13                   Do you think you, if it came down to it,

14   could make that decision or is there going to be some

15   reservations there about taking that type of responsibility?

16        A.     I know I would have to think real hard.

17        Q.     See, the problem is, we can't preview the case

18   for you.

19        A.     I know.

20        Q.     And that's -- but I think you realize how

21   serious the situation is.  You don't know what kind of jury

22   you are going to be on.  You were on a DWI last time which

23   was a lot different, obviously.

24        A.     Yes.

25        Q.     It could be a civil case like you were on the

1    time before or pot luck gets you on a death penalty case.

2    But that's why we call several thousand people down.

3    Remember, that room was full, all on just this one case,

4    because a lot of people feel differently and a lot of people

5    don't feel comfortable with making that decision.

6              A.     I understand and I think I could follow the

7    law and make the decision based on the way the law reads.

8              Q.     But you have a little bit of hesitation there?

9              A.     Yes.

10             Q.     Okay.  Let me go over another area and I want

11   you to be as perfectly honest with me as possible on this.

12   We talk about the death penalty.  Capital murders, you

13   usually conjure up an example of the triggerman, the person

14   that causes the death.  You follow me?

15             A.     Yes.

16             Q.     I walk into a 7-Eleven and I rob the 7-Eleven

17   and I shoot the clerk and murder them.  That's, obviously, a

18   capital murder case.  I could be tried for capital murder.

19   I could receive the death penalty because I'm the

20   triggerman.

21                    Capital murder, like all crimes, though,

22   sometimes more than one person helps commit an offense.

23   Those are called parties or accomplices.  And if you assist

24   and actively participate in the crime, you can be prosecuted

25   for that crime, even though someone else involved may have

1   more of an active role.

2               In a capital murder situation, you can

3   have maybe one triggerman, but you can have other people

4   helping commit the crime.  And if they are actively

5   involved, the law says that according to the facts they may

6   be prosecuted for capital murder, also, and found guilty.

7   They may even receive the death penalty, an accomplice can,

8   under the law, technically, even though they are the

9   nontriggerman.

10              And some people have a problem with that

11  and they say this.  They will tell us, I'm for the death

12  penalty as a law and I'm for the death penalty when the

13  person is actually the triggerman, murdering these people.

14  But I am not for the death penalty when it's someone that's

15  a nontriggerman, that's an accomplice that's just there

16  helping.  I find him guilty of aggravated robbery offense

17  and give him life, 75 years, or something, but I don't think

18  it's right to kill those people.  I would reserve the death

19  penalty, if it's up to me, for the actual triggerman, the

20  murderer.  How do you feel about that?

21       A.    It would be harder to give the death penalty

22  for the accomplice -- I believe that whatever the law, going

23  by what the law says, if the evidence is there, I could

24  follow it.

25       Q.    Well, a lot of people say the law says a lot

1    of things.  But people say, look, you can say that all you

2    want.  But I'm looking for your personal feelings right now.

3          A.      That would be harder.  I would have to believe

4    that that accomplice was -- if the other guy hadn't done it,

5    that he might have been willing to do it.

6          Q.      Do you think the State would ever be able to

7    prove that to you?

8          A.      Yes.

9          Q.      How would they be able to do that?

10         A.      Um, if the person had the weapon.  And I don't

11   know if he was in a position to use that weapon or prepared

12   to use that weapon.

13         Q.      Uh-huh.  How does it go back to -- you said on

14   the death penalty your personal belief in it, if it was

15   planned out or a good possibility something like that would

16   happen?

17         A.      If you are planning a crime and you approach

18   it with a weapon, with the ability to use that weapon, you

19   know that if you are going to, you feel you need to use that

20   weapon, you will.

21         Q.      Okay.  And in a part of the questionnaire we

22   ask, made a statement that criminal laws treat criminal

23   defendants too harshly, and we asked you if you agree with

24   that or disagree with that or you are uncertain about that

25   statement, and you put uncertain on that.

1          And I always like to ask a followup

2   question.  Do you recall what you were thinking in that

3   regard?

4        A.      Just the case -- I really haven't followed a

5   lot of the cases and don't know what's been, you know,

6   handed down one way or the other.

7        Q.      Okay.  Look at Special Issue No. 1.  And if

8   you would, just read that to yourself for a moment.

9        A.      (Prospective juror complies.)  Okay.

10        Q.      That question is asking the jurors to make a

11   prediction in the future about whether a person would be

12   dangerous.  Let me ask you just generally, do you think that

13   you could make that type of prediction?

14        A.      Yes.

15        Q.      What would be important to you in making that

16   decision?

17        A.      Past history would be part of it, probably be

18   a big part of it.

19        Q.      Past criminal history?

20        A.      Yeah, past history and personal history, too.

21   You can be violent without having been a criminal, too.

22        Q.      This question you don't get to unless you have

23   found the defendant guilty beyond a reasonable doubt of

24   capital murder, intentional killing during the course of a

25   felony, or intentionally killing a police officer or child

1    or whatever.  You would have to have found him guilty beyond

2    a reasonable doubt.

3                     If you found someone guilty of that type

4    of offense, would that be enough information for you to then

5    -- does that tell you enough that this person is, indeed, a

6    danger for a capital murder?

7          A.     I don't know.

8          Q.     Why is that?

9          A.     Um, I guess part of it would be whether he was

10   the actual shooter or the accomplice, which one.

11         Q.     You still would have some -- if it's an

12   accomplice, I take it, that might be a situation where you

13   don't think they're dangerous?

14         A.     That's where past history would fall in there,

15   too.

16         Q.     What would be important about that for an

17   accomplice?

18         A.     I guess because somebody could be there and if

19   they weren't the actual one who actually did it, they didn't

20   -- I don't know.  I don't know how -- really, I just don't

21   know how to word it.

22         Q.     Okay.  Let me follow up, then, with Special

23   Issue No. 2.  Read that to yourself.  That has to do with

24   the accomplice.

25         A.     (Prospective juror complies.)  Yes.

1    Q.    You see where that says, obviously, if he

2  caused the death, it's easy enough to answer.  But if he

3  didn't cause the death, but intended to kill the deceased or

4  another, but anticipated a human life would be taken, do you

5  think that the State could ever prove to you in a situation

6  that an individual anticipated that a human life would be

7  taken?

8    A.    Yes.

9    Q.    What would be important for you there?

10    A.    Basically, that they were ready with a weapon,

11  that they -- that they were ready to, you know, take a life,

12  if necessary, did not, you know, leaving the area whenever

13  their partner was doing it or whatever.

14    Q.    Now, the last question is the mitigation

15  question.  It asks you to look at everything involved in the

16  case, all the background, prior history, good and bad, and

17  then decide whether you think a life sentence should be

18  imposed, rather than a death sentence.  As you sit here

19  today, can you think of anything that might be mitigating?

20    A.    Whether they know right from wrong.

21    Q.    Okay.  You talking about like some mental

22  defect or something like that?

23    A.    Yes.  If they understand the difference

24  between right and wrong, if they can't understand.

25    Q.    If they can't understand the difference

between right and wrong, then we wouldn't be able to
prosecute them.  That might be an insanity issue or a mental
retardation issue or something like that.  But if it were
that severe where they didn't understand it, we would never
reach that particular issue.  It's a good point, though, but
we would never get that far because to get to just the
guilt/innocence, we have to prove that they intentionally
caused the death and they do know right from wrong.  Okay?

     A.     Right.

     Q.     Anything else other than that, then?

     A.     No.

     Q.     Okay.  Well, that's not unusual.  But I do
want to ask you your honest opinion on this.  Now, you
wouldn't get to that question unless you had found the
defendant guilty of capital murder, found that he was a
continuing danger to society, and believed beyond a
reasonable doubt they anticipated that a human life would be
taken, and with all that, he does know right from wrong.

          Some people say, you know, once I've made
all those decisions, this question really has no meaning to
me.  I mean, that pretty much is the deal for me.  That's
the type of person that needs to get death penalty and I'm
not open to the mitigation question.  Other people are.

          But we like to ask people just honestly
how they feel about it.  If you have already made that

1  decision that beyond a reasonable doubt he's guilty of

2  capital murder, that he's a continuing danger to society,

3  and that he did anticipate a life would be taken, once you

4  reach that point, would that be a death penalty for you in

5  your mind?

6        A.     I believe so.

7        Q.     That question really, then, would be closed

8  off to you, because you have made all those other decisions?

9        A.     Well, I would listen to what was said, but I

10  really don't know -- in my mind right now, I really don't

11  know what would -- anything that would be, but -- if you

12  answer 1 and 2 as you said, they're --

13                MR. SHOOK:  Can we approach, Judge?

14                THE COURT:  That's fine.  You pass the

15  witness?

16                MR. SHOOK:  Yes, I pass the witness.

17                THE COURT:  Brief questions?

18                MS. BUSBEE:  Yes.

19               CROSS-EXAMINATION

20  BY MS. BUSBEE:

21        Q.     Ms. Sexton, thank you for coming down here.

22  And your answers are thoughtful.  Obviously, you have given

23  it some thought since you filled out this questionnaire.  I

24  think we're going to agree that because of your answers, we

25  won't use you today, but we would welcome you back as a

1   juror on another day.  Are you all right with that?

2          A.     Yes.

3          Q.     And we all appreciate you coming down and your

4   frank answers.

5                      THE COURT:  Ms. Sexton, thank you, again.

6   The parties appreciate your service and it's pretty tough,

7   isn't it?

8                      PROSPECTIVE JUROR:  Yes.

9                      THE COURT:  It is.  Once again, we

10  welcome you here and we appreciate your service to the

11  county.  But the parties have agreed to excuse you.

12                     PROSPECTIVE JUROR:  Thank you.

13                     THE COURT:  You are free to go.

14                         [Prospective juror out]

15                     THE COURT:  Debra Pruett.

16                         [Prospective juror in]

17                     THE COURT:  Good morning, Ms. Pruett.

18  How are you?

19                     PROSPECTIVE JUROR:  I'm just fine, thank

20  you.

21                     THE COURT:  Welcome to the 283rd.  Have

22  you had an opportunity to read your orientation guide I

23  provided for you?

24                     PROSPECTIVE JUROR:  I have.

25                     THE COURT:  It's a lot of law first thing

1   in the morning and we don't expect you to understand it all

2   at this time.  That's what the lawyers will visit with you

3   about.  They will give you examples and see if you can, you

4   know, be sure how all of it relates together.  That's the

5   key here.

6               Still, the questions that I have, number

7   one is, do you understand the law?

8               PROSPECTIVE JUROR:  I do.

9               THE COURT:  And, number two -- this is at

10  the end of the program.  At the end of the program, do you

11  understand the law?  And the second one, can you follow the

12  law?  That's the big picture here.  When I was -- I'll give

13  you a little bit of insight.

14              When I was reading your questionnaire, I

15  saw that you work for Southwestern Bell?

16              PROSPECTIVE JUROR:  SBC.

17              THE COURT:  And your name is Debra

18  Pruett.  Do you know the other Debra Pruett at SBC?

19              PROSPECTIVE JUROR:  Do I ever.  We talk

20  on a daily basis and exchanging e-mails and sending her

21  stuff that went to her and it was a mess.  I was glad when

22  she retired.

23              THE COURT:  I see Debra Pruett, SBC, and

24  I just immediately assumed it was Judge Pruitt's wife.  And

25  I read further and the ages all lined up and I thought that

1  might be her and then I finally figured out that you

2  weren't.

3                    PROSPECTIVE JUROR:  She's I-T-T and I'm

4  E-T-T.  She's the white Debra Pruitt and I'm the black Debra

5  Pruett.  So for years that was a problem.

6                    THE COURT:  And I thought they wouldn't

7  talk to the Judge's wife.  And now that we got that

8  straight, I appreciate you being here.  If you have any

9  questions, just say I don't understand, please explain a

10  little bit more.  This can be -- we don't want it to be an

11  intimidating process.  It's the only way we can do it.

12                    PROSPECTIVE JUROR:  Okay.

13                    THE COURT:  So I know people get somewhat

14  nervous when they come in and try not to.  Just honest

15  answers to the best questions we can figure out.

16                    PROSPECTIVE JUROR:  I will.

17                    THE COURT:  With that, Mr. Wirskye, would

18  you like to inquire?

19                    MR. WIRSKYE:  May it please the Court.

20                    DEBRA PRUETT,

21  having been duly sworn, was examined and testified as

22  follows:

23                    DIRECT EXAMINATION

24  BY MR. WIRSKYE:

25       Q.    Ms. Pruett, how are you this morning?

1      A.      Just fine.

2      Q.      My name is Bill Wirskye.  I'll be the

3  Assistant District Attorney that will be visiting with you

4  for the next few minutes.  Again, try not to -- it feels

5  like you are on trial --

6      A.      It does.

7      Q.      -- because we put you on the witness stand.

8  But because this is a death penalty case, the law allows us

9  to talk to jurors individually and that's probably the best

10  way to do it, the way the courtroom is set up, is to put you

11  on the witness stand.  So we know it's uncomfortable, but

12  bear with us.

13          We would like to talk to you about some

14  of the answers you gave in your questionnaire, maybe talk to

15  you a little bit about your thoughts and feelings on the

16  death penalty, and then maybe talk about some of the law.

17  It looks like you have already looked through the packet?

18      A.      I have.

19      Q.      It looks like you were kind enough to tell us

20  -- and, again, we talk to a lot of people and we understand

21  people have got things going on in their own lives,

22  professional and personal and sometimes this isn't a good

23  time maybe for them to be involved in something like this.

24          But I think you told us on page 11 you

25  had some projects in progress at work that might affect your

1    ability to concentrate, if you were called upon to serve in

2    this case, I guess having to do with SBC's labor contract;

3    is that right?

4        A.    Exactly.

5        Q.    Tell us a little bit about that.  I know a

6    little bit about that.  I don't read the business pages too

7    much, but tell us about that.

8        A.    Of course, we are a union company and the

9    majority of our employees are union employees and they have

10   a contract renewal every three years.  It will come up again

11   in April of '04, but there's a lot of preparation before

12   that time that in the event of a work stoppage, you know,

13   business has to continue.

14            So I'm very involved corporately on the

15   committee to do what we call the business continuity plan

16   and look at every aspect of what would have to be done in

17   the event that there's a strike in April, you know, who

18   would do what, reassigning all of the 50,000 management

19   employees, determining what skills they have.  You know,

20   we've not climbed poles and installed phones in a long time,

21   but that's what would be involved if the nonmanagement folks

22   went on strike.  So just a lot of preparation for that.  You

23   know, what buildings would be open and closed, how you field

24   people, how many hours, all the logistics.

25       Q.    Sounds like you have got a lot on your plate

1   between now and April of next year, then.

2        A.        And, hopefully, it won't even happen.

3        Q.        Always, I guess, prepare for the worst and

4   expect the best?

5        A.        Exactly.

6        Q.        What do you think about taking two weeks or

7   so, which is our best guess for the length of this trial in

8   November, away from your job?  And I see you smiling.

9        A.        I don't think anybody in their right mind

10  wants to be on this jury.  I mean, you know, if that's what

11  it takes, that's what it takes.  It would be difficult, but

12  doable.

13       Q.        We understand to a large extent it's a

14  hardship for everybody.

15       A         Exactly.  I realize that.

16       Q.        There are people that are in the middle of

17  things that even though it may not be necessarily a legal

18  reason not to serve, sometimes lawyers could get together

19  and work around that.  But do you really need to be down

20  here on a death penalty case for two weeks in November based

21  on your work?

22       A.        No, I mean, I don't.

23       Q.        Take it kind of one step further, you

24  mentioned in your questionnaire it might affect your ability

25  to concentrate.  You know, I think I'm on page 11 at the

1  top.  I know you haven't looked at this since you filled it

2  out.

3       A.      I think it's just human nature.  You think

4  about what's going on in the office and what I didn't get

5  done before I took the two weeks off and, you know, just the

6  natural everyday things that come with working.

7                 THE COURT:  Ms. Pruett, let me try to

8  alleviate some of your apprehension.  The guide stated we

9  will be able to take a break in the morning.  You would have

10  a lunch hour.  You can use the phones.  You won't be locked

11  up, sequestered, at night.  We work real predictable,

12  regular business days, as I said.

13                 PROSPECTIVE JUROR:  Very good.  And

14  that's helpful.

15                 THE COURT:  We're not going to shut you

16  down.

17                 PROSPECTIVE JUROR:  Okay.

18                 THE COURT:  And we anticipate it could be

19  two weeks.

20                 PROSPECTIVE JUROR:  Okay.

21       Q.      (By Mr. Wirskye)  I guess, talking about

22  things, worrying about work or other things that you have

23  got going on, what both sides want to avoid, I guess, is

24  somebody that is lost in thought on the jury and maybe miss

25  something for either side, because it wouldn't be fair to

1  either side if we couldn't have a juror that could devote

2  100 percent of their attention to what is going on in the

3  court.  How do you think that might affect you?

4       A.      I think a day or so, it's hard to say without

5  actually doing it.  Do I think that if I'm called to serve,

6  that I could give it my undivided attention?  I would surely

7  hope I could.  That would be my intent to do so.

8       Q.      A lot of times down here we always kind of try

9  to ask people to give yes or no answers.  If I had to ask

10 you a yes or no answer on that, do you think that you could

11 completely put that out of your mind, what you have got

12 going on at work, and just concentrate on what is going on

13 in the court, do you think that you can do that?

14      A.      Yes.

15      Q.      Okay.  Fair enough.  You know, you kind of

16 already mentioned, I guess, this is not the type of case,

17 not because of work, but just not the type of case that a

18 lot of people want to serve on.  We certainly understand,

19 both sides.  We know there's strong feelings one way or the

20 other about the death penalty or about the system in which

21 we work.  And we're not here to kind of force people in the

22 jury box.  We just want to know how you actually feel about

23 some of these issues.

24              What's been going through your mind since

25 you got called back for the individual interview?

1    A.    I could not believe out of all the people in

2    that room that I got called back.  I think the thing that

3    probably goes through my mind the most is that other people

4    involved in this case have already been tried and convicted.

5    And, you know, even outside someone was saying, it's a slam

6    dunk.  It's automatic.  It's hard to see this one person

7    differently from his other partners in the crime.

8    Q.    Quite frankly, at this point in the process

9    there's a big fear, certainly, for the defense and Mr.

10    Murphy, but also for us.  It sounds like you followed some

11    of the other trials and the results of those trials?

12    A.    I did.

13    Q.    In fact, it sounds like you talked to somebody

14    right outside the court?

15    A.    I just overheard somebody talking.  I didn't

16    get involved in the conversation.

17    THE COURT:  You heard that here in this

18    courtroom?

19    PROSPECTIVE JUROR:  No, it was in the

20    hall.

21    THE COURT:  In the hall?

22    PROSPECTIVE JUROR:  Uh-huh.

23    THE COURT:  Could you tell whether they

24    were wearing a suit or --

25    PROSPECTIVE JUROR:  I was in the room, so

1   I could just hear the voices.  I was in the little waiting

2   room and someone just walked up outside and said, what is

3   this trial for?  And someone replied.  And he says, "They

4   have already done the other five or six and so this is just

5   a waste."  It's just conversation that I heard in the room.

6                 THE COURT:  Sheriff, would you please

7   investigate that outside now and see who that was?  We will

8   shut that down.

9                 PROSPECTIVE JUROR:  I didn't mean to get

10  anybody in trouble.

11                THE COURT:  No, ma'am, I need to know

12  this, because it's not fair to Mr. Murphy to have other

13  people injecting their opinions down here, unless they want

14  to come down and serve.  And if I find out who that is, I

15  will deal with it.

16                PROSPECTIVE JUROR:  I just think it was a

17  passerby, but I didn't see him.

18       Q.    (By Mr. Wirskye)  It wasn't any of the lawyers

19  at the table that you are looking at?

20       A.    I don't know who it was.  I was in the little

21  waiting room and it was just in a conversation outside.

22       Q.    I don't want a deputy coming after me.

23       A.    Sounds just like your voice (laughter).

24       Q.    Thanks.

25                THE COURT:  Pass the witness?

1    PROSPECTIVE JUROR:  That's good enough to

2  strike me.

3    Q.    (By Mr. Wirskye)  In all seriousness, though,

4  that is one of the problems that we face because so much has

5  been in the press and everybody we talked to has heard

6  something, differing amounts.  Some people just kind of

7  caught it back when it happened on the news.  Some people

8  read about it, seen stuff on TV, and some people actually,

9  such as yourself, are actually aware of the other verdicts

10  in the other cases.

11    A.    Exactly.

12    Q.    You know, we kind of ask people to do

13  something very unnatural down here and kind of put that out

14  of your head, you know, as a juror.  We know it's sometimes

15  -- it's not human nature, necessarily, to tell somebody not

16  to think about a pink elephant.  They are going to think

17  about the pink elephant.

18    How do you think that's going to affect

19  you, if you are selected to serve as a juror on this case,

20  knowing what you know about the case and the other trials?

21    A.    I do really believe that a person has to be

22  considered innocent until proven guilty, so, you know, there

23  are always different circumstances.  I don't know one party

24  from the other.  Could have been something very different

25  about this particular defendant.  So, I mean, I definitely

have an open mind from that perspective.

Do I feel like they were all in it together? I mean, I have read the newspapers, I have seen the television coverage, but I also know everything you hear and read is not necessarily true. So you have to keep an open mind.

Q. Okay. And what the law basically says, you know, even though you may have heard these things, that basically you have to put them out of your mind to the extent possible and just base your verdict in this case on what you hear in the courtroom. Do you think that you would be able to do that?

A. I will certainly try.

Q. Okay. Again, we get to that yes or no. Do you think that you could just base your verdict on what you hear in the courtroom?

A. Yes.

Q. Okay. Fair enough. Let me also ask you some questions. On page 2, I know you have your questionnaire in front of you, we asked you the best argument against the death penalty. Just to back up for a second, I think that you are generally in favor of the death penalty for some crimes; is that right?

A. That's correct.

Q. You said the best argument against the death

penalty is nothing could bring the victim back; therefore,

why give the murderer a swift death when instead he or she

could suffer more doing a long prison term.

I'm just curious, you know, we hear this

quite a bit.  Do you think in your mind it's a worse

punishment to lock someone up for life or a long prison

sentence as opposed to the death penalty?  Where do you kind

of come down on that?

A.     I think each case has to be looked at, you

know, individually.  I don't know that you can just say a

yes or no, best to do the long-term versus the death.  I

just think each case has its own merits.  But I do think

there are times when death does fit the crime and I think

there are other times when a prison sentence would probably

be better suited and to spare a life.

Q.     Is it a situation where you think for some

people that that long prison sentence could actually be a

worse punishment?

A.     I think it could be in some cases.

Q.     So kind of depending on the case or depending

on the person, I guess, depends on what you think the

harsher penalty is --

A.     That's correct.

Q.     -- the life or death penalty?  Okay.  We also

asked, do you think the death penalty is ever misused?  If

1  you want to follow along, I'm on page 4, about the middle of

2  the page. You said, jurors are humans, capable of allowing

3  prejudice or bias to impact their decision. Then the next

4  few questions down, do you feel the death penalty in Texas

5  is used too often or too seldom? And you said, too often

6  due to the bias and prejudice of Texas jurors.

7              I just kind of want you to follow up on

8  that. We hear comments like that quite frequently and we

9  kind of like, you know, to know who we're talking to and

10  what your thoughts are. If you can follow up on that, I

11  would appreciate it.

12         A.      Here, again, a lot of what we know as citizens

13  about death penalty cases come from television or newspaper.

14  And I always take all of that with a grain of salt, because

15  it's only as factual as the person writing or reporting.

16  But I just think there's no doubt that the majority of folks

17  on death row, most times, are poor, minority folks. And I

18  think that depending on where they were tried and who the

19  jury was, that bias and prejudice does come into play.

20         Q.      Having lived here for a while, do you have

21  that concern with what goes on in Dallas County or Tarrant

22  County? I know you are in Grand Prairie.

23         A.      I have lived in Grand Prairie, Dallas County,

24  all my life. Sometimes.

25         Q.      Is there a specific case that you can think of

1  or something that troubles you or something you heard about

2  and know about that troubles you with what's going on here

3  in Dallas?

4       A.    I probably can't think of a specific case

5  quickly, but I know there have been times in my adult life

6  when I felt like a minority defendant didn't stand a chance,

7  even before they walked in the courthouse.  And I don't know

8  if this is an ingrained thing because I'm a minority or

9  what, but it's just a very sincere feeling that I felt.

10       Q.    Sure.  How do you think that might affect you

11  as a potential juror?

12       A.    I think it makes me more sensitive to it.  I

13  mean, I think it's really important.  If you have to be in a

14  position to be on a jury, which I don't want to be, but if

15  so, I mean, I think it's very important that everybody --

16  that you listen to the facts and that you not take into

17  account on a negative basis whether a person is black,

18  white, Hispanic, that, you know, justice should be equal for

19  everybody.

20       Q.    Do you think it would make you more or less

21  likely to maybe assess a death penalty maybe because of the

22  defendant's race?

23       A.    No, because I would like to think that that's

24  exactly what I wouldn't do, because that's what I don't like

25  to see done.

Q.     Okay.

A.     I think that should not be a factor, just the facts that are presented, and then the defense that's presented.

Q.     Do you think based on some of your opinions that you are skeptical of the District Attorney's Office or law enforcement or -- I guess, how would you characterize about how you feel, I guess, about my office?

A.     Probably not any more than anyone else that I would know.  But, I mean, I don't have a conspiracy theory in my head that, you know, when you walk in the door, it's a slam dunk, if you are a minority, you are going to be found guilty or anything like that.  But it probably wouldn't be true to say there's not some skepticism at some time.

Q.     Okay.  If you were in my shoes, if you were a prosecutor, would you want you on the jury?

A.     Probably.  I mean, if you want somebody that was fair.

Q.     You know, what both sides look for is people -- as long as people are honest, we can deal with whatever they say.  We just, you know, don't want people with hidden agendas.

A.     If you have a strong case, you probably want me on the jury.  If you don't have a strong case, you probably don't want me on the jury.

1       Q.    The reason I ask that is you talked about both

2   prosecutors and defense lawyers.  We kind of asked you what

3   is the first thing that comes to mind, and you wrote flawed.

4       A.    I read my answer to that.  I don't know what I

5   was thinking.  That was a long survey that day and that was

6   getting near the end, I think.

7       Q.    Since I'm a prosecutor, let me start with

8   prosecutors.  What was going through your mind on that?

9       A.    I think I was thinking in terms of lawyers,

10  period.  And that is, you know, no matter what the crime is

11  or how bad the crime is, there is going to be somebody for

12  that person, and there's going to be somebody against that

13  person and somebody has got to be wrong, you know, someone

14  saying they are either innocent or should be given this

15  consideration.  And then your job is to tell me why they

16  shouldn't.  And something is flawed on one of the two sides

17  every time.  That's just kind of what I was thinking when I

18  wrote that.

19      Q.    You don't think that's anything that would

20  affect your ability to, I guess, serve as a juror for either

21  side, the defense lawyer or the prosecutor?  I guess what I

22  mean by that is, you know, both sides want this case just

23  decided on what happens in the courtroom.  And, again, we

24  don't want people with an agenda.  You know, I know

25  prosecutors are crooked and this prosecutor is not doing his

1 job or the defense lawyer doesn't seem like they are doing

2 their job or done their homework or anything like that.

3                    Do you think that might be going through

4 your head at all?

5      A.    I don't think so.

6      Q.    Okay.  We also asked you right below that, you

7 know, we gave you some statements and then gave you some

8 choices on whether you agreed, disagreed, or uncertain.  And

9 you said most criminals are actually victims of society's

10 problems and you marked uncertain.

11                   I was wondering what was going through

12 your mind, if you remember, when you filled that out?

13     A.    I think it was the word "most" that probably

14 made me go uncertain.  I surely think that society's

15 problems and environment are sometimes the cause of the

16 problems.  But I don't know that I could answer that based

17 on the fact that you asked about most criminals.

18     Q.    Okay.  To kind of follow up on that, you said

19 some crimes, society's problems, I guess, I think you said

20 the cause.  What do you mean exactly by that?

21     A.    Ask that again, please.

22     Q.    You had said you agree with it to some extent

23 that some criminals actually are victims of society's

24 problems.  How do you see that working?

25     A.    You know, I guess I think about someone who

has maybe -- maybe been raised in a violent home, severely

abused and mistreated.  It's pretty difficult in my opinion

for you to be raised in that environment during your

formative years and not have an impact on the type of human

being that you become as an adult.  So sometimes I think

environment really does stack the deck against certain

people.

          Q.     Is there some point in your mind where kind of

regardless of your background or your upbringing that a

person just has to be held accountable?

          A.     Oh, most definitely.  I mean, it could be that

that was the result of environment, doesn't mean that you

still aren't held responsible for your actions.

          Q.     Also, the statement right below that, it says

the criminal justice system fairly protects the rights of

persons accused of committing a crime and you marked

uncertain.  I was just curious what was going through your

mind with that.

          A.     Again, I was thinking about some of the biases

and prejudices that I think exist in some courtrooms.

          Q.     Okay.  You also, I guess, just kind of going

in order on the next page, page 6.  You have had some people

that, I guess, some relation to you that have had contact

with the criminal justice system, it looks like?

          A.     Members of my husband's family.

1  Q.    Is there anybody on that list that you were

2 particularly close to or that you had an interest in the

3 case or knew about or came down to court or --

4  A.    Didn't come down to court on any of the three,

5 but all three were family members that I was close to over

6 the years.

7  Q.    Were those all out of Dallas County?

8  A.    Yes -- well, possibly Tarrant County for

9 Dennis Day, but Dallas County mainly.

10  Q.    Okay.  How do you think they were treated by

11 the criminal justice system?  We kind of talked about the

12 flaws and maybe some bias and prejudice.  Do you think any

13 of that applied in those cases?

14  A.    They were probably treated fairly.

15  Q.    You thought they were guilty with what they

16 were charged with?

17  A.    Yes.

18  Q.    The particular punishments they received, did

19 you feel that was appropriate?

20  A.    Yeah, probably.  I think as a family member

21 you always like to see there be some leniency, but in

22 reality, probably fairly.

23  Q.    Nothing that you thought was beyond or just

24 too excessive?

25  A.    No.

```
1         Q.    Move on to the next page, page 7, at the top.
2   You had told us that you had a brother-in-law murdered in
3   1977 and a nephew murdered in the late 1990s?
4         A.    That's correct.
5         Q.    What do you remember about the
6   brother-in-law's murder?
7         A.    It hasn't been solved.  That's probably the
8   thing that stands out the most.
9         Q.    Was that in Dallas?
10        A.    That was actually in Tarrant County.
11  Probably, I guess it's just probably a crime of passion.  He
12  was found dead in his bed and my husband discovered the
13  body, so that one was a little closer to home.  And he was
14  not a criminal element, a very outstanding citizen.  So that
15  was more of a shock than probably any of the other things
16  that I have cited on the form.
17        Q.    Is it a situation where you think you might
18  know who did it?
19        A.    Exactly.  There was no forced entry, no.
20        Q.    Do you have someone in mind, I guess?
21        A.    Who I think?  Yeah, I do.
22        Q.    Have the police followed up on that or do you
23  think --
24        A.    Not really.
25        Q.    -- do you think --
```

1    A.    This has been years and no one has ever been

2    arrested in the case, so.

3    Q.    Fair to say you think they haven't given it

4    their full attention or full effort?

5    A.    I just think it was never a priority.

6    Q.    Okay.  And then the nephew that you had, were

7    you close to him?

8    A.    Yeah.  Had not been in later years because of

9    the lifestyle he lived, you know, but knew him from a child,

10   a baby, through his formative years, very close to him.

11   Q.    Was that in Dallas?

12   A.    Arlington, Tarrant County.

13   Q.    Was that ever solved?

14   A.    Yes.

15   Q.    Okay.  They got the person that did it, I

16   guess?

17   A.    (Prospective juror nods head.)

18   Q.    Was there a court proceeding that followed

19   that?

20   A.    There was and he was found guilty and given a

21   fairly light sentence, but --

22   Q.    Do you remember what the sentence was?

23   A.    I want to say less than ten years.

24   Q.    Was it for the charge of murder?

25   A.    Yes.

1    Q.    Okay.  Did you have any contact with the

2  District Attorney's Office?  I guess it would have been

3  Tarrant County?

4        A.    No, didn't attend the trial or anything.

5        Q.    Fair to say you are a little dissatisfied with

6  that?  Was it a trial or a plea bargain?

7        A.    I think it was a plea bargain.  You know, the

8  type of lifestyle that the nephew was leading, it was not

9  surprising.  And so, you know, I didn't really get involved

10  in the trial or get very emotionally involved in what even

11  happened to the defendant in the case.

12        Q.    Okay.  You also told us that you had friends

13  and acquaintances who are police officers?

14        A.    Mainly acquaintances, uh-huh.

15        Q.    No one real close friend?

16        A.    No.  Not anybody that I socialize with on a

17  daily or weekly basis, but church members, coworkers,

18  spouses, that kind of thing.

19        Q.    The fact that your life has been touched by

20  the violence that you have told us about, or the fact that

21  you know police officers, I mean, obviously, this is a

22  murder case where we have alleged a police officer has been

23  killed, do you think that may have any effect on you, either

24  of those factors?

25        A.    I don't.

1    Q.    Okay.  Let me talk to you a little bit more

2 about the death penalty.  You told us, I guess, that you are

3 in favor of it, I guess, philosophically --

4    A.    In some cases.

5    Q.    Is it something that when you get down here

6 and it actually becomes very real and you see the person

7 charged and see him in the courtroom, does that give you any

8 hesitation maybe of actually participating in the process?

9    A.    It makes it harder.

10    Q.    Quite frankly, we talk to a lot of people who

11 tell us philosophically in the abstract, I'm in of favor it,

12 I think that we should have it, and I think it should be

13 enforced.  But I'm just not personally comfortable in

14 participating in the process.

15    A.    There's definitely a level of discomfort.

16    Q.    And we certainly don't want to put anyone that

17 has any discomfort like that, we don't want to jam anybody

18 up against their conscience, their morals, their beliefs.

19 And we know it's quite a different thing to actually come

20 down here and participate in the process.

21         Do you think you are the type person that

22 maybe could do that, actually go through the process, and,

23 you know, render a verdict such that, you know, a man you

24 see in court today or you may see for two weeks during the

25 trial, that he would actually be executed and one day lie

1   dead on a gurney in Huntsville, Texas?  In your heart of

2   hearts do you think that you are the type person that could

3   actually participate in that process?

4        A.     If the facts present themselves, I mean, I

5   could.  But, you know, it would depend on the case that was

6   presented.

7        Q.     Okay.  Let me touch another aspect with you

8   briefly.  Again, we talk to a lot of people.  And as you can

9   imagine, murder cases aren't always committed by just one

10  person, groups and gangs of people.

11                   And you are somewhat familiar with some

12  of the allegations in this case.  The law allows under

13  certain circumstances not only the State can prosecute the

14  triggerman, the person that actually caused the death or did

15  the murder, for the death penalty, but the law also allows

16  in some instances the State to prosecute a nontriggerman or

17  an accomplice, the person who didn't pull the trigger, who

18  didn't actually cause the death.  Depending on the facts and

19  circumstances, that person could be convicted of capital

20  murder and even receive the death penalty.

21                   And a lot of people we talked to say, I'm

22  in favor of the death penalty, strongly in favor of it,

23  even, for the triggerman, you know, the person that actually

24  took the life, pulled the trigger, made the decision.  Some

25  people tell us it's religious or moral, they only feel you

1   are justified in taking a life of a person who has taken a

2   life.

3                    But they tell us, very frankly, that when

4   it comes to somebody who didn't actually cause the death or

5   even somebody that didn't have intent that a death would

6   happen, that the death penalty just shouldn't be an option.

7   If they were Governor for a day or legislator for a day,

8   they would just take it off the table and it wouldn't be an

9   option.  What do you think about that?

10       A.     I don't have a problem with that being an

11   option.  I understand that's the law.  I think, again, it

12   just depends on the facts that have been presented as to

13   whether I think it would actually warrant the death penalty,

14   if the person wasn't the triggerperson.

15                    But I definitely understand the law and

16   it's an option.  Sometimes you don't have to be the

17   triggerperson.  You could be the person yelling, pull the

18   trigger.  I mean, it just depends on the circumstances of

19   the case.

20       Q.     So you wouldn't automatically take the death

21   penalty off the table for the accomplice?

22       A.     Not automatically.

23       Q.     Let me give you a fact situation, run you

24   through it, and see what you think.  Say the other

25   prosecutor, Mr. Shook, and I decide we want to rob a bank.

1    And I've known Mr. Shook for a while and he's been to prison

2    before.  He's not a very nice guy.  We get to plan together

3    and we have got one gun.  He's going to take the gun into

4    the bank and hold up the teller.  I'm not going to have a

5    gun.  I'm just going to come in and put the bank's money in

6    the bag, make a getaway.  And we have a third friend who's

7    going to be the getaway car driver.  He's going to drive us

8    up there and sit outside.  If the police come, he may honk

9    the horn, that type thing.

10                    I don't have any intent that somebody is

11   going to get hurt.  I just kind of signed up for a bank

12   robbery.  We go to do the bank robbery and for some reason,

13   unknown to maybe everybody, Mr. Shook pulls the trigger and

14   shoots and kills a teller.  He's, obviously, committed

15   capital murder.  He's the triggerman.  He can receive the

16   death penalty.  But under that scenario I could,

17   potentially, receive the death penalty as well.

18                    What do you think about a person in my

19   position in that scenario?

20        A.      You put yourself in that position.  I would

21   have to hear more of the facts.  I would have to hear more

22   of the details of the situation.  Options would have to be

23   kept open, because you were a participant in the activity,

24   you knew a gun was there, and so the potential was there,

25   whether you thought it would be or not.

1  Q.     What do you think about the person out in the

2  car, the getaway car driver?

3  A.      Same thing.

4  Q.     And that's basically what the law is.  Even

5  though somebody in my circumstance or that driver's

6  circumstance didn't have intent that a life would be taken,

7  if we should have anticipated, okay, if we should have

8  anticipated that a life would be taken, then we could be

9  convicted of capital murder and ultimately face the death

10  penalty.  Does that make sense?

11  A.     It does.

12  Q.     Are you in general agreement with that?  And

13  I'll be frank with you.  We are prosecuting this case,

14  prosecuting Mr. Murphy as an accomplice, a nontriggerman.

15  That's why we spend time talking about this and, you know,

16  we certainly don't want somebody over there that has a

17  philosophical disagreement with that law or can't sit in a

18  case of this nature.  But it sounds like it's something that

19  you could do?

20  A.     Yes, I could.

21  Q.     Okay.  If you will take a few minutes just to

22  look, I know you have read them.  They are phrased a little

23  differently here, the Special Issues on the wall.  Actually,

24  the answers to those questions determine what the

25  appropriate sentence is.  If you could take just a few

1  minutes and read those to yourself, so we can talk about

2  them.

3       A.    (Prospective juror complies.)

4       Q.    We don't ask jurors in death penalty cases

5  just to write in life or death for a decision.  We ask them

6  to answer these three questions and, depending on the

7  answers to those questions, that determines what the

8  sentence will be.

9            The first Special Issue talks about

10  whether there's -- whether the person would be a future

11  danger, kind of asks the jury to make a prediction based on

12  what they know about the crime, what they may have heard in

13  the punishment phase, whether they feel that the person may

14  be a future danger.  That question starts off with a no

15  answer and can only be answered by the jury yes, if, you

16  know, we, the State of Texas or the DAs, prove it to you

17  beyond a reasonable doubt that the answer should be yes.

18            Special Issue No. 2 is exactly the same.

19  It starts off with a no answer, and only if we prove it to

20  you beyond a reasonable doubt, do you answer yes.  And this

21  question kind of deals with what we've been visiting about,

22  the accomplice.

23            Actually, what happens, you know, we

24  talked about it, if you find the person should have

25  anticipated, an accomplice should have anticipated that a

1  life would be taken, you can find them guilty of capital

2  murder.  Before the death penalty is assessed, if you look

3  at the last line on Special Issue No. 2, the law kind of

4  raises the hurdle or raises the burden and says, before you

5  can assess the death penalty, the jury must find not only

6  that they should have anticipated, but they actually

7  anticipated.  Does that make sense?

8       A.     It does.

9       Q.     It's kind of a fine distinction, but it's a

10  little bit higher burden.  Again, it's kind of a set of

11  filters, I guess, we run through to make sure that the

12  people that actually get the death penalty, I guess, are

13  truly deserving, is the way some people feel about it.

14              If both of those are answered yes, we

15  move on to Special Issue No. 3.  This is kind of a last stop

16  in the process.  We just kind of ask jurors to step back,

17  take a deep breath, you know, look at everything that you

18  have heard about the case, about him, his background, what

19  sort of moral blame he bears for what happened, and ask

20  yourself is there anything mitigating?  Is there anything

21  that lessens his blame?  And if there is, is it sufficient

22  that his life should be spared and that he shouldn't get the

23  death penalty?

24              It's kind of the final check in the

25  system, I guess, is one way to look at it.  Does that scheme

1    kind of make sense to you that we have?

2           A.     It does.

3           Q.     Okay.  Do you have any questions about it?

4           A.     No.

5           Q.     The only thing I'll point out on Special Issue

6    No. 3, neither side has the burden in that.  That's just up

7    to the jury to answer.

8           A.     Okay.

9           Q.     The jury doesn't even have to agree on what's

10   mitigating.  The law doesn't necessarily require that you

11   consider any particular fact mitigating.  A quick example,

12   some people may say, if he's very young, that could be

13   mitigating, 19, 20.  Other people feel if you are that old,

14   that's not mitigating.  You are old enough to know right

15   from wrong.  And jurors can disagree.  But the law doesn't

16   require that you necessarily consider any particular factor

17   mitigating.  Does that make sense?

18          A.     It does.

19          Q.     Okay.  Is there anything that just off the top

20   of your head strikes you as something that might be

21   mitigating in a death penalty case?

22          A.     In general or in this case?

23          Q.     Well, we can't talk about this case.  I know

24   you know a lot about it, but we can't talk about this case.

25          A.     As you mentioned, age is a factor,

1  self-defense type deal.  What the -- a lot of things that

2  could be mitigating, just depends on the situation.

3       Q.     Let me stop you right there, just so you are

4  clear.  If you kill someone in self-defense, you have not

5  committed a crime in Texas.  We have a right to defend

6  ourselves.  So if this was something that was done in

7  self-defense, we wouldn't even be here.  So just to clear

8  that up.  I think I know what you are trying to say.

9       A.     Yeah.

10      Q.     So everybody is clear.  But you think age may

11 be mitigating?

12      A.     In certain circumstances, yeah.

13      Q.     Give me just a second.

14               MR. WIRSKYE:  May we approach?

15               (Bench conference)

16               THE COURT:  Any further questions,

17 Mr. Wirskye?

18               MR. WIRSKYE:  No.  Pass the witness.

19 Thank you, Ms. Pruett.

20                 <u>CROSS-EXAMINATION</u>

21 <u>BY MS. BUSBEE</u>:

22      Q.     Just like the Judge, I know the other Debra

23 Pruitt and I was going, great, because I knew her.  And you

24 are just as nice.

25               I heard some when we were first talking

1    about this and I noticed on your questionnaire that there's

2    something going to happen next year that you're working on

3    right now and you told the Judge that this contract comes up

4    every three years.  Do you have to go through this every

5    three years?

6              A.    The company does, yes.

7              Q.    Is this the first time you have done it?

8              A.    This is the first time that I've been in the

9    current role that I'm in, in the time of the contract

10   renewal.  Been involved in work stoppages before, but not

11   the planning phase.

12             Q.    You keep getting stopped when you are talking

13   about the fact that you know about this case.  But, see, I

14   read you as somebody who is kind of no nonsense and you

15   can't put what you know out of your mind.  Some people say

16   that they can and sometimes we believe them.  But I think

17   that you probably are a person who has to take all the facts

18   -- and human resources, I'm guessing you came up having to

19   deal with employment issues and that sort of thing, so you,

20   obviously, have to look at all the facts on a situation like

21   that.

22             Do you think, just based on what you

23   heard and what you maybe heard in conversations today, that

24   you may have already formed an opinion about some of the

25   facts of this case?

1        A.     I'm sure to a certain extent, of course, I

2   have.  I mean, you know, this was a pretty widely publicized

3   case.  So, you know, from what I've read about it and I've

4   heard about it, so, you know.

5        Q.     Sure.  I would expect you to.

6        A.     Yeah.

7        Q.     You would be amazed to see how many people act

8   like they don't even remember this case and maybe they

9   don't.  Maybe they don't watch TV or read the papers, but it

10  certainly surprised me.  And that's all I wanted to know.

11  And I appreciate you coming down to talk to us today.

12       A.     Okay.

13          THE COURT:  Ms. Pruett, we want to thank

14  you for your time and very wonderful answers, being honest.

15  The parties have agreed to excuse you, number one, because

16  you know a lot about the case, and I'm troubled about what

17  you heard out in the hall, and I'm going to get to the

18  bottom of that, trust me.  Number one, it's not right.  As I

19  said, we're happy with your opinions.  And I will give you a

20  juror instruction that you can't talk about this to anyone.

21  And we have someone poison the juror before you come in the

22  door, that's not fair to you because they may or may not

23  know anything about this case, you see.

24          And so, given where we are and all that

25  you knew, the parties have agreed to excuse you.  Can't wait

1     to have you back for another case.

2                PROSPECTIVE JUROR:  There was -- there

3     was also another guy in the room with me that also heard the

4     conversation.

5                THE COURT:  Was that the bicycle guy?

6                PROSPECTIVE JUROR:  The bicycle guy, yes.

7                THE COURT:  He didn't share that with us.

8                PROSPECTIVE JUROR:  He was reading a book

9     and I was trying to read the stuff and that's probably why

10    it distracted me a little bit more.

11               THE COURT:  Thank you.

12               PROSPECTIVE JUROR:  Thank you.

13                [Prospective juror out]

14                (Recess)

15               THE COURT:  We're on the record.

16    Gentlemen, I know it was no fault of yours, the last juror

17    came in was very honest and shared with us that an

18    individual passing by, passing through, had some business

19    with the DA's Office, juror, witness, defendant, who knows.

20    And evidently the door to the waiting room for these jurors

21    is open.  And she testified that she heard someone say --

22    didn't see who it was -- that to the effect of, well, I

23    don't know why they are trying this case.  It's a slam dunk.

24    We can have it read back.  But it was a comment by an

25    unrelated party that was made and two jurors heard it.

1    So I don't know how to tell you to do

2  your job, other than if you hear that, snatch whoever it is

3  up and maybe come in here and I will deal with it.  So you

4  just have to be on guard for that because you know people

5  are going to make comments.

6                    UNNAMED SHERIFF DEPUTY:  Yes, sir.

7                    THE COURT:  But, basically, that blew my

8  morning.

9                    UNNAMED SHERIFF DEPUTY:  I understand.

10  We have already made one change out here, Judge, where we're

11  having people meet in the DA's Office come in through the

12  other door to keep them from coming through this way.

13                    UNNAMED SHERIFF DEPUTY:  Keep this door

14  locked.

15                    THE COURT:  Keep it closed and locked.

16                    MS. BUSBEE:  As long as anybody that is

17  admitted in the anteroom is informed that they can't have

18  any discussions about anything in the anteroom, then that

19  would be fine with me.

20                    THE COURT:  Well, it's just we don't

21  anticipate somebody is going to be that stupid, but there

22  again, we're in a criminal courthouse, we should.

23                    MS. BUSBEE:  Absolutely.

24                    THE COURT:  But, Sheriff, yeah, if you

25  can reduce the traffic to this area as best you can and keep

1   these jurors isolated as best we can, I appreciate that.

2                   UNNAMED SHERIFF DEPUTY:  Yes.

3                   THE COURT:  So we have Mr. Arena this

4   afternoon.  Anything else to put on the record?

5                   MS. BUSBEE:  No.

6                   THE COURT:  We have two this afternoon.

7                        (Recess)

8                   THE COURT:  Mr. Arena.

9                        [Prospective juror in]

10                  THE COURT:  Right up here, sir.  Thank

11  you.  You may be seated.  Good afternoon, Mr. Arena, how are

12  you?

13                  PROSPECTIVE JUROR:  Fine.  How about

14  yourself?

15                  THE COURT:  It's Friday afternoon.  That

16  says it all right there.  We appreciate you being here and I

17  see you have got the orientation guide in front of you.  Did

18  you have enough time to review that before you came in?

19                  PROSPECTIVE JUROR:  Uh-huh.

20                  THE COURT:  I've tried to provide you as

21  much information as I can in a short period of time.  I

22  don't expect you to know all the law, but we give it to you

23  to start thinking about it, how it all interrelates.  The

24  lawyers are going to visit with you, try to explain the law

25  in some more detail, give you examples, so you can

1 understand how it works.

2          And my job is to be sure, number one,

3 that you understand the law.  The second question is if you

4 understand the law, can you follow the law?  That's my job

5 here.

6          Only question I have for you before we

7 begin is will you be able to serve this Court for two weeks

8 beginning on November 10th?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  I'll turn it over to

11 Mr. Wirskye.

12          MR. WIRSKYE:  May it please the Court.

13                    FRANK ARENA,

14 having been duly sworn, was examined and testified as

15 follows:

16               DIRECT EXAMINATION

17 BY MR. WIRSKYE:

18     Q.   Mr. Arena, how are you this afternoon?

19     A.   Okay.

20     Q.   My name is Bill Wirskye and I'll be the

21 Assistant District Attorney that is going to visit with you

22 for the next few minutes.  What I would like to do is maybe

23 talk about some of the information that you were kind enough

24 to give us on the questionnaire that you filled out.  And I

25 think we've got you a copy of it up in front of you.  I know

84

1   it's been a while since you thought of it.

2   Also, talk to you a little bit about how

3   you feel and what you think about the death penalty and

4   maybe being a juror in a death penalty case, and then,

5   finally, maybe talk about some of the laws or rules that

6   apply in a death penalty-type case.

7   Do you have any questions before we get

8   started?

9   A.    No.

10   Q.    I frequently ask bad questions or confusing

11   questions, so if you don't understand something, just let me

12   know and I'll try to repeat it or if you have any questions,

13   let me know.

14   Normally in a nondeath penalty case we

15   talk to jurors as a big group.  Since this is a death

16   penalty case, it allows us to talk to you one on one.

17   Pretty much the best way we've found to do it is to put you

18   on the witness stand.  I know it's not very natural or not

19   very comfortable, but hopefully you will become more at ease

20   as we get a little further into this.

21   What went through your mind when you

22   found out you were going to be called back for the

23   individual interview?

24   A.    Well, I don't really know.  I was thinking you

25   would be calling in about five or six hundred people, so I

1   don't know what the numbers are, but I figured it was a

2   standard routine.

3          Q.     The group you came down with in the morning,

4   the large group of people?

5          A.     Uh-huh.

6          Q.     We had another group in the afternoon.  Had

7   everybody fill out questionnaires.  And the lawyers kind of

8   get together and we decide who we're going to talk to

9   individually.  It usually takes a couple of months to get a

10  jury, talking to five or six people a day, gives you some

11  idea of the numbers.

12                 What do you think about being a juror in

13  a death penalty case?

14         A.     It doesn't bother me.  I mean, I don't really

15  know what you mean by asking that question.  If you mean can

16  you do it or you can't do it or --

17         Q.     We can talk about that in a second.  A lot of

18  people, especially when they fill out the questionnaire,

19  it's not very real to them at that point and people who may

20  be otherwise very strongly in favor of the death penalty,

21  when they actually get down to this point in the process,

22  they are kind of thinking, it's not my cup of tea.  I'm not

23  really sure I'm cut out to do this.

24                 And I want to make sure that wasn't what

25  you were going through or going through your mind?

1      A.    Oh, nothing especially.  I don't think it

2 bothered me any more than a robbery case or anything else.

3 I mean, I have never served on a jury before.

4      Q.    You also told us, I think on the very back

5 page -- it's in front of you.  We asked, is there anything

6 else that you think the Judge or the lawyers from either

7 side ought to know and you said you don't get paid if you

8 are on jury duty; is that right?

9      A.    That is correct.

10      Q.    How big a hardship -- jury service is always a

11 hardship to everybody.  We know that.

12      A.    I understand that.

13      Q.    How big a hardship is it going to be for you

14 if you lose that two weeks of work?

15      A.    I've got two weeks vacation coming.

16      Q.    You would have to take your vacation for it?

17      A.    Yeah.  I mean, you do what you have to do.  I

18 mean --

19      Q.    Okay.  I guess the bottom line is we don't --

20 we don't want jurors who have something going on in their

21 professional life or personal life or at work that, you

22 know, if they came down here to serve as a juror for a

23 couple of weeks, would be thinking about something else

24 other than the case, what's going on, making enough money,

25 feeding the family, that type of thing.

1      Do you think that would be a problem for

2   you at all?

3      A.   Well, it says in this booklet that it's

4   expected to last about two weeks.  It really shouldn't, if

5   that's the case.  I mean, it's going to be a problem if it

6   drags out, yeah.

7      Q.   But if you were a juror, do you think that you

8   can base your decision just on what you hear in the

9   courtroom and you wouldn't be worrying about something else

10   and maybe miss something in the court or anything like that?

11      A.   No.

12      Q.   Okay.  Fair enough.  You have told us that you

13   are generally in favor of the death penalty; is that right?

14      A.   I don't -- what page?  I thought I was kind of

15   like I felt the crime needs to fit the punishment.

16      Q.   I guess it's on page 1 at the very start.  We

17   asked if you were in favor of the death penalty.  Looks like

18   you checked yes.

19      A.   Yeah, I mean --

20      Q.   I'm not asking for the death penalty in every

21   case.

22      A.   Yeah.  It doesn't bother me.  The fact I feel

23   an eye for an eye or whatever, you know, the punishment fits

24   the crime.

25      Q.   Okay.  You, I guess, feel we should have it as

1   an option in certain cases; is that right?

2          A.     I don't necessarily think an option.  I mean,

3   if the law states if the death penalty is implied for such

4   and such crime, I guess.

5          Q.     Uh-huh.  How we have it, to kind of give you

6   an overview, only certain types of crimes in Texas are

7   subject to the death penalty, only certain types of murder

8   cases, basically.  Kill a police officer on duty, fireman,

9   prison guard, child under six, you commit an intentional

10  murder in the course of another felony, like robbery,

11  burglary, then those type crimes are eligible for the death

12  penalty.

13              And if a person is convicted of capital

14  murder, it's not automatic just because they are convicted

15  of capital murder.  We go into that second phase of the

16  trial where we would ask the jury to answer those three

17  questions that you read about and are up on the wall.  And

18  depending on how the jury answers those questions, that

19  would determine whether it would be a life sentence or,

20  actually, the death penalty would be imposed.

21              Is that something you kind of generally

22  agree with?

23         A.     Yeah.

24         Q.     Okay.  Any particular type cases that come to

25  mind when you think about an appropriate type case for the

1  death penalty?  Any particular facts or anything like that?

2        A.    What type of case?  You mean, like murder or,

3  well, I mean, if someone is a threat to society, if you

4  murder somebody coldblooded and it was premeditated, I mean,

5  yeah.

6        Q.    Okay.  So planning, things like that --

7        A.    Yeah.

8        Q.    -- would be important to you?  Okay.  Let me

9  ask you to look at your questionnaire on -- I think it's on

10 page 3.  We asked you some questions about publicity and

11 everything else.  You, like everybody else we talked to, has

12 at least heard something about this case.

13       A.    Yes.

14       Q.    It's almost impossible in a case like this to

15 get people who haven't heard anything about it.  What do you

16 remember hearing about this case?

17       A.    That a police officer got killed in Irving at

18 the Oshman's, which I only live a few miles away from, which

19 is real close to home and a store that I've been into a lot

20 with my daughter.  And, you know, I was kind of shocked

21 because, like anything else, it happened so close to home.

22       Q.    It happened in a place you are familiar with?

23       A.    Yeah.  I've been in there several times.

24       Q.    For lack of a better term, I guess, your back

25 yard?

1    A.    Yeah.

2    Q.    How do you think that might affect you, living

3    that close, having heard what you heard, how do you think

4    that might affect you if you were selected as a juror in

5    this case?

6    A.    I don't know if it would affect me at all.  I

7    don't really see the difference if it happens in my back

8    yard or the other side of Dallas.

9    Q.    Okay.  Have you followed any of the other

10   court proceedings or trials on these type cases?

11   A.    No.  I remember one of them, hearing about it

12   on the news, I mean, that I think he got the death penalty.

13   And I haven't heard that much about it anymore because I

14   don't watch the news that much anymore.  I just --

15   Q.    Okay.  All the law requires, basically, is

16   that you are able as a juror to just base your decision on

17   what you hear in the courtroom, again, kind of like the same

18   thing, work problems.  As long as you can do that and not

19   let anything you have heard or any personal knowledge you

20   may have of the area of the crime scene affect your verdict,

21   you would be a qualified juror.  Sounds like you wouldn't

22   have any problem doing that?

23   A.    Correct.

24   Q.    Let me ask you to go up to the top of page 3.

25   We asked a couple of questions and they are kind of

1  confusing the way they are worded, and I want to make sure I

2  understand what your answer is.  That No. 2 at the very top,

3  jury's verdict should be based only on the evidence heard in

4  the courtroom and not from what one hears outside the

5  courtroom.  And there's a checkmark there by disagree and I

6  didn't know what your answer was to that.

7       A.    Well, yeah, the case should be based on the

8  evidence heard in the courtroom.  But, you know, if, the way

9  the news is and everything, if you hear something outside,

10  it's kind of hard to, I guess, to disclaim that.

11       Q.    Yeah.  It's kind of -- if you have heard

12  something, it's kind of hard, even if --

13       A.    You know, for example, I watched a deal on the

14  History Channel on the Darlie Routier, the FBI, and all the

15  investigations and it's like that pinpoint investigation,

16  you know, that I don't want to tell you my verdict on that,

17  but it's kind of hard to hear something like that and just

18  disclaim it.

19       Q.    Okay.  I will ask you, what is your verdict on

20  the Darlie Routier case?

21       A.    Guilty.

22       Q.    Okay.  So you think you would be able to put

23  that stuff aside that you heard and go ahead and base your

24  verdict on what you hear in the courtroom?

25       A.    Yeah.  I think that everyone is entitled to a

1  fair trial.

2      Q.    Okay.  And the question right below it, No. 3,

3  kind of what we've been talking about, what one hears in the

4  news media is a better source of information than testimony

5  one hears in the courtroom.  And, again, it's kind of

6  confusing the way it's worded.  But you checked that you

7  agreed with that.  I didn't know if that was really how you

8  felt.

9      A.    Which question is this?

10      Q.    No. 3 at the top of the page.

11      A.    Okay.  What one hears -- that, again, too, I

12  wasn't really just saying in the news media.  I guess it

13  would be replying to the previous case we just talked about.

14  I mean, you -- let's face it, you get better information off

15  a football game at home watching TV than going down to the

16  stadium.

17      Q.    Okay.  Feeling that way, how do you think that

18  might affect you as a juror?

19      A.    I don't think it would affect me.

20      Q.    Are you going to be worrying about second

21  guessing your verdict or thinking about something you heard,

22  wondering why either side hasn't presented that or gotten

23  into it?

24      A.    No.  I mean, I understand, too, that there are

25  laws and certain things in a trial are brought in and

certain things are left out.

Q.   Okay.

A.   And I also understand there are also plea bargains to where if you leave this out, this person will leave this out, because I've been there before on that during divorce, I mean, you know.

Q.   Okay.   The bargaining-type scenario?

A.   Yeah.

Q.   Okay.   You also told us, I think your son has a pending case, looks like maybe a misdemeanor?

A.   Yeah, he's taken care of it.   He graduated high school and was 18 years old and went to the high school to see some of his friends and got a ticket and it turned into a warrant.   And he didn't do the community service and it just got worse and worse and worse.   But he's doing the community service now and I think it's going to go away.

Q.   Sounds like he learned his lesson maybe?

A.   Doing what he is supposed to do.

Q.   Do you think your son was treated fairly during all of that?

A.   Yeah, I think so -- I think, I mean, my ex-wife would probably disagree with it because he lives with her.   But, yeah, I don't feel these younger generation of these kids, they don't teach in school all the aspects of the law and breaking the laws and the penalties and all that

1    and I think it, you know, it was a lesson.

2        Q.    Okay.  Getting back to the death penalty for a

3    second, we kind of ask you if you want to follow along, it's

4    on page 4.  If you believe in using the death penalty, how

5    strongly do you feel about it on a scale of 1 to 10, with 1

6    being the least and 10 being the most, and you gave yourself

7    a 10 on that; is that right?

8        A.    It's like I said, I mean, you know, murder,

9    you know, I don't -- you know, I'm not -- I guess it would

10   be a weak or faint person.  I mean, the word "death

11   penalty," that doesn't scare me, I mean.

12       Q.    So in the appropriate case, I guess you would

13   feel pretty strongly --

14       A.    Yeah.

15       Q.    -- it should be imposed?  Let's talk about

16   that.  I know everybody comes down here kind of with their

17   own beliefs and their own, I guess, preconceptions of what

18   they consider, I guess, a good candidate for a death penalty

19   case.  And we talk to a lot of people.  A lot of people come

20   in who are philosophically for the death penalty.  They can

21   do it.  But they start drawing some lines as to who would

22   get the death penalty and who wouldn't.

23                  And here's what I mean by that.  I think

24   usually when you think of the death penalty or capital

25   murder, you think of the guy maybe going into the 7-Eleven

1    and shooting the clerk, taking the money, and running off.

2    You think it's just that one guy, the triggerman, when you

3    think of the death penalty.

4                     But oftentimes, as you probably know,

5    crimes are committed by more than one person.  A group or

6    gang of people can commit crimes.  In Texas the law allows

7    under certain circumstances to prosecute the nontriggerman

8    or the accomplice, what some people call them, the person

9    who didn't actually cause the death.  They could be

10   prosecuted for capital murder.

11        A.    I read something on that one.

12        Q.    Do what?

13        A.    I read something about that, yes, when I was

14   here, yes, about this case.

15        Q.    And, obviously, you know, a lot of people who

16   feel very strongly about the death penalty, just feel it

17   should be reserved for those people that actually pull the

18   trigger, the people who actually cause the death of the

19   individual.  You know, they would kind of take the death

20   penalty off the table or wouldn't want it as an option for

21   an accomplice or a nontriggerman.  Mainly, a lot of people

22   tell us the accomplice or the nontriggerman didn't actually

23   cause the death.  You know, they may give them a life

24   sentence or something really stiff, but they wouldn't

25   necessarily or they wouldn't want the death penalty

1  available for that nontriggerman or the accomplice.  What do

2  you think about that?

3       A.   Well, I guess you did kind of bring up a gray

4  area.  You do have the 7-Eleven triggerman, but on the other

5  hand, too, the person that is an accomplice to that, I

6  guess, it's a way to reduce crime in a way to set an example

7  to where just because I drove the getaway car, I walk away,

8  I mean, that's not right, either.

9       Q.   So you wouldn't necessarily take away the

10  death penalty as an option for even the getaway car driver?

11      A.   I don't know.  I would have to hear the case.

12  I mean --

13      Q.   Let me give you an example.  I know people

14  don't sit around thinking about this and we hit you with a

15  lot of stuff.  Say Mr. Shook and myself and another friend

16  of ours decide we're going to rob the bank.  The plan is for

17  Mr. Shook to take our one gun in and hold up the teller.  I

18  don't have a gun.  I'm going to go in with the bag.  I'm

19  going to collect the money while he holds them up.  We have

20  a third friend who has a car that drives us up there.  He's

21  going to wait outside the bank.  If the cops come, he may

22  honk the horn and let us know.

23           But we go to do the bank robbery.  And

24  for some reason Mr. Shook decides to shoot and kill the

25  teller.  He's committed the capital murder.  Obviously, he

1   intended that.  He can face the death penalty.  The law

2   would also allow under certain circumstances for me, the

3   nontriggerman, and the guy out in the getaway car driver, to

4   be prosecuted and maybe receive the death penalty, even

5   though we may not have even had any intent that somebody get

6   killed.

7               What do you think in that situation under

8   those facts?  What do you think about the death penalty for

9   someone like me?

10        A.      Well, I guess the crime would have to fit the

11  punishment.  Like I had said earlier, I think you would

12  pretty much have to hear the case.  I don't think that you

13  can, you know, skip the trial and move directly into

14  sentencing.

15        Q.      Assuming that you found me guilty of my role,

16  do you think it's something that maybe somebody like me, you

17  know --

18        A.      Another thing would have to -- I don't know if

19  they could bring that up, would be past history, too.  I

20  think everybody is entitled to a fair trial.  I mean, are

21  you what do they call -- criminal crook or career criminal

22  --

23        Q.      Career criminal?

24        A.      -- first time offense and, you know, threat to

25  society?  I think that the trial needs to be fair.  Yeah, it

1   is possible you could get that.

2         Q.     Okay.  You wouldn't automatically take it off

3   the table for me?

4         A.     Right.  I wouldn't take it off the table or

5   put it on the table, but I would have to hear all the

6   evidence on that.

7         Q.     You would have it available as an option for

8   the guy out in the getaway car?

9         A.     Sure.

10        Q.     I'll be honest with you.  In this particular

11  case we're prosecuting Mr. Murphy as an accomplice, a

12  nontriggerman.  That's the theory we're proceeding under and

13  that's why it's so important that we find out how you feel.

14  Because if you really, truly, couldn't consider the

15  possibility of sentencing a nontriggerman to death, then,

16  obviously, we need to know about it before you get on the

17  jury, because at that point it would cause problems once you

18  are on the jury and you just couldn't, for whatever reason,

19  didn't believe in the death penalty for the accomplices.

20  That's why it's important to know how you feel.

21                   And I hear you saying, depending on the

22  facts and circumstances, that you can see where a death

23  penalty might be appropriate for an accomplice; is that

24  right?

25        A.     Yes.

Q.     And, of course, if you got into the trial, you would hear that type of background information and that kind of thing, the way the trial works.  I'll go ahead and talk to you about it right now.

If you are selected to serve as a juror, the trial would, basically, be broken down into two parts. The first part would be up to you to determine whether the person charged with the crime committed the crime, whether he was guilty or not guilty.  And you, basically, just hear the facts of the offense, the facts of the crime.

If you determined or found him guilty of capital murder, then you move into the second or the punishment phase of trial.  And that's where you get to hear about background.  You know, maybe it was a first offense, maybe they were a career criminal, that type of thing.  And you get to hear that information to help you, the juror, answer these three questions.

And depending on the jury's answers to those questions, the person convicted of capital murder would either get that life sentence or a death penalty.  So that's kind of the overview of how it works.  Does that seem to make sense to you?

A.     Uh-huh.

Q.     In order to find an accomplice guilty, going back to our example, you know, even though I had no intent

that anyone die in that bank robbery, I could still be found
guilty of capital murder as an accomplice, if I should have
anticipated that a life may have been taken.

You know, if I knew Mr. Shook maybe was a
bad guy, been to prison a couple of times, had a bad temper,
knew he was carrying a loaded gun, that type of thing, the
jury feels I should have anticipated that, then I could be
convicted of capital murder.  Does that make sense to you?

A.      Yes.

Q.      Let me let you take a few minutes.  I know you
may have looked at them in the booklet, but take a few
minutes and look at the Special Issues up there on the wall.

A.      (Prospective juror complies.)  Okay.

Q.      Those are the three questions the jury has to
answer.  Questions 1 and 2 start off with a no answer.  It's
up to us, the State of Texas, to prove to you the answers
should be yes.  Special Issue No. 1 or question No. 1 asks
the juror to look at and determine, make a prediction,
whether the person is going to be a future danger to
society, basically.  You can look back at the crime he was
convicted of and that's when you get to look, you know, at
his criminal record or his lack of a criminal record to help
you make that determination.

Is that something that you feel you can
do, make that prediction if you had some information?

1    A.    Yes.

2    Q.    If the answer to that is yes, you move on to

3  the second Special Issue and that kind of deals with the

4  situation we talked about before, the accomplices.  You

5  know, if you found out -- if you think the person actually

6  pulled the trigger, it's an easy answer.  If you think they

7  intended the person to be killed, obviously, you can answer

8  that question yes.  Or kind of what we've already talked

9  about, if you think that they anticipated a human life would

10  be taken as an accomplice, a nontriggerman, then you would

11  answer that question yes.

12    And it's a little bit higher standard

13  from finding somebody guilty of capital murder.  Instead of

14  finding that they should have anticipated to find them

15  guilty, in order to impose the death penalty, you have to

16  find that they actually anticipated, that they did

17  anticipate that a life would be taken.  Does that kind of

18  make sense to you?  It's kind of a fine distinction, but we

19  raise the burden a little bit before we actually impose the

20  death sentence, the death penalty, on someone.  Does that

21  make sense to you?

22    A.    Yes.

23    Q.    Okay.  And then, finally, with Special Issue

24  No. 3, that's kind of the last step or the last stop in the

25  process.  Neither side has the burden of proving that to

1   you.  That's just up to you as a juror.  That, basically,

2   asks the jury, you know, it's the last thing they do before

3   a death sentence is imposed.  If you have answered yes and

4   yes to 1 and 2, we ask you to go back and look at the crime,

5   look at what you know about the person, what sort of blame

6   he bears, and ask yourself, is there something mitigating,

7   something that lessens his personal blame or his moral

8   responsibility to that crime, such that his life ought to be

9   spared, you know, to avoid the death penalty.  Does that

10  make sense to you?

11          A.      Yes.

12          Q.      It's kind of the final safeguard in the

13  system.  You know, it's kind of like a set of filters.  You

14  run these cases through these three filters to make sure

15  only the really, truly deserving people actually get the

16  death penalty.  And that's just up to the jury.  There's no

17  -- you don't have to consider any particular thing

18  mitigating or not.  You just have to be, you know, you just

19  have to be able to tell us you can keep an open mind even at

20  that late part of the process.  If you heard something

21  mitigating where you think his life ought to be spared, that

22  you can answer that question.  Does that sound like

23  something you can do?

24          A.      Yes.

25          Q.      Okay.  Mr. Arena, do you have any questions

1  about anything we've talked about?

2       A.    No.

3       Q.    Okay.  Give me just a second here to finish

4  looking through your questionnaire.  Let me ask you this.

5  Typically, in these type cases, the death penalty cases, one

6  or both sides may call like a psychiatrist or psychologist

7  or some type of mental health professional to try to give

8  the jury some possible help in answering these questions.

9       Just kind of generally, how do you feel

10  about those type people, the psychiatrists, psychologists,

11  mental health professionals?

12       A.    I don't really know what kind of answer you

13  want to that.

14       Q.    I guess, I'm not looking for any particular

15  answer.  I just -- the law would require that any witness,

16  whether they are a police officer or psychiatrist, when they

17  walk in, the jury at least starts off with that open mind

18  and, you know, doesn't give them a leg up because they have

19  a particular profession, doesn't give them a leg down

20  because they have a particular profession.

21       And some people tell us, very frankly, I

22  don't trust psychologists.  I don't trust psychiatrists.  I

23  don't care who they are or what they say.  I don't believe a

24  word out of their mouth.  I just don't believe in that.  If

25  you brought one in here, in all honesty, I probably wouldn't

1   give any weight to their testimony, because even without

2   having heard what they said or heard their qualifications,

3   I'm just not going to buy off on that type of testimony.  A

4   lot of people tell us that.

5                    I'm just kind of curious how you come

6   down on that issue?

7        A.    I don't see a psychiatrist, don't plan to ever

8   do.  I guess I would feel that it wouldn't be as strong in

9   the trial as, you know, witnesses and lawyers, prosecutors,

10  and all that.  It wouldn't -- on a scale of 1 to 10, I might

11  give it a 2 or 3 on listing.

12       Q.    Do you think you could keep that open mind and

13  listen to them and if what they said made sense, you could

14  go with it, and if it didn't, you could just disregard it,

15  that type thing?

16       A.    Yeah.  I feel that I'm openminded.

17       Q.    That's basically all the law requires, is that

18  you keep an open mind throughout this process, just to give

19  both sides a fair trial.

20                    MR. WIRSKYE:  Thank you.  That's all the

21  questions I have, Judge.

22                    CROSS-EXAMINATION

23  BY MR. SANCHEZ:

24       Q.    Good afternoon, Mr. Arena.

25       A.    Good afternoon.

1    Q.    My name is Juan Sanchez and I'm going to be

2  asking you some questions.  Myself, along with Brook Busbee

3  here, represent Mr. Murphy.  And the State gets to go first

4  and they get to outline the law for you.  But there are some

5  questions that I need to ask you.  And, of course, you know

6  yourself better than anybody in this room and I want to get

7  your honest and true answers on how you feel.  Okay?

8             Because a lot of us, I think, we think we

9  can follow the law, we think we are openminded people, but

10  when it comes to certain types of cases, we may not be.

11  Okay?  Or we might have feelings that are so strong or

12  formed certain opinions that it would affect us and bias us

13  in certain decisions.  Okay?

14             And that's why I want to ask you on a

15  case as important as this, where you would be making, if you

16  are on the jury, a life or death decision, why you answered

17  certain questions a certain way in your questionnaire.  Is

18  that fair enough?

19    A.    That's fair.

20    Q.    If you look on page 3 of your questionnaire,

21  somewhere in the middle, there's a question that says, if

22  you are in favor of the death penalty in some cases, do you

23  agree that a life sentence rather than a death penalty would

24  be appropriate under the proper circumstances in some cases?

25  Do you see that there?

1    A.    Yeah.  Okay.

2    Q.    And you marked no?

3    A.    Okay.

4    Q.    What were you thinking when you did that?

5    A.    Well --

6    Q.    When you marked no, can you explain a little?

7    A.    It's like I said earlier, you have to hear

8  everything.  I mean, you just can't skip the trial and go

9  directly into sentencing.  I mean --

10    Q.    Because the way this could be read, some

11  people think, hey, if I find somebody guilty --

12              MR. WIRSKYE:  May we approach, Your

13  Honor?

14              THE COURT:  You may.

15                  (Bench conference)

16    Q.    (By Mr. Sanchez)  Sorry for the interruption

17  there.  But I thank you very much for answering these

18  questions thoughtfully and honestly, and that's all the

19  questions I'm going to have at this point.

20              MR. WIRSKYE:  Nothing further from the

21  State, Your Honor.

22              THE COURT:  Mr. Arena, I want to thank

23  you for your time.  The parties have agreed that they're not

24  going to put you on this jury.  Thank you for your time and

25  service to the Court and you are free to go.

1          PROSPECTIVE JUROR:  Thank you.

2                  [Prospective juror out]

3          THE COURT:  Christine Stucker.

4                  [Prospective juror in]

5          THE COURT:  Thank you.  You may be

6   seated.  Good Friday afternoon, Ms. Stucker.

7          PROSPECTIVE JUROR:  Hi.

8          THE COURT:  Did I pronounce that

9   correctly?

10         PROSPECTIVE JUROR:  Correct.

11         THE COURT:  Welcome to the 283rd.  Have

12  you had an opportunity to review a couple of times the guide

13  I provided for you?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  I know I put an awful lot of

16  law in front of you and, trust me, you don't have to know it

17  all and understand it all at this time.  The lawyers will

18  spend some time with you and give you examples and try to

19  help you understand how all this law interrelates with each

20  other.  So I know it's somewhat kind of intimidating.  You

21  come in here and you think that you might be on trial.  But

22  this is as informal as we get.  So I know people get nervous

23  and it's nothing to be nervous about.  No wrong answers

24  here, just honest answers.

25         PROSPECTIVE JUROR:  Okay.

1  THE COURT:  Just honest answers.  My job

2  is to, first, is to make sure that you understand the law.

3  That's my job.  Once you understand the law, can you follow

4  the law?  That's the big picture here.  We get -- we educate

5  you to a point where you can understand the law and then can

6  you follow it?  Only question I have for you, ma'am, is this

7  trial shall begin on the 10th of November.

8  PROSPECTIVE JUROR:  Yes.

9  THE COURT:  Can you serve this Court for

10  those two weeks?

11  PROSPECTIVE JUROR:  Yes, sir.

12  THE COURT:  Very good, thank you.  Mr.

13  Shook?

14  MR. SHOOK:  May it please the Court.

15  CHRISTINE STUCKER,

16  having been duly sworn, was examined and testified as

17  follows:

18  DIRECT EXAMINATION

19  BY MR. SHOOK:

20  Q.    Ms. Stucker, my name is Toby Shook.  I'll be

21  talking to you on behalf of the State of Texas this

22  afternoon.  As the Judge said, we try to be informal.  Have

23  you been down on jury service before?

24  A.    No.

25  Q.    Okay.  Usually we talk to jurors just in a

1   group.  Because it's a death penalty case, we use this

2   procedure where we talk to you individually.  You filled out

3   a questionnaire, giving us a whole lot of information which

4   we appreciate.  Believe it or not, it actually saves you

5   time and I'm going to follow up on some of that information

6   and talk to you about capital murder, the death penalty, how

7   you feel about that, and some of the laws that apply in this

8   case.

9                       I see you have worked for -- is it

10  Trinity Industries?

11          A.      Yes.

12          Q.      For about 18 years?

13          A.      Yes.

14          Q.      You are vice-president of the Trinity Rail

15  Management, which you look like you work with the

16  maintenance of the cars, that sort of thing?

17          A.      The maintenance of the rail cars.

18          Q.      And you went to Baylor?

19          A.      Yes.

20          Q.      Looks like you got two degrees from Baylor?

21          A.      Undergraduate and graduate degree.

22          Q.      Did you go straight through?

23          A.      No.  I had a twelve-year gap between the two.

24          Q.      Okay.  Then you lived in the Dallas area for

25  approximately how long?

1    A.    Eighteen years.

2    Q.    Okay.  From your questionnaire we asked the

3  general questions and then some followups whether you are in

4  favor of the death penalty.  You said you were as a law in

5  favor of it.  I would like you to just tell us in your own

6  words why you favor the death penalty and the purpose you

7  feel it serves society.

8    A.    I feel if somebody is guilty of killing

9  somebody else intentionally, that it's a just penalty.

10    Q.    Just depending on the particular facts of that

11  case?

12    A.    Yes.

13    Q.    Is this a belief in this particular law, is it

14  something you have grown up with and always believed in?

15    A.    I'm not sure.

16    Q.    Is there any time you remember in your life

17  when you decided you were in favor of it or is it just

18  something you just kind of gradually grew into or was there

19  a deciding event in your life that made you in favor of the

20  death penalty?

21    A.    Definitely not a deciding event.  I haven't

22  really thought about it a lot.

23    Q.    Probably just something as you grew up.  And,

24  obviously, the death penalty laws have always been around in

25  Texas.  But you have never been opposed to it or anything

111

1    like that?

2         A.    No.

3         Q.    Okay.  When you think of a capital murder case

4    or a death penalty case, what types of cases do you think

5    might be appropriate or what kind of cases come to mind in

6    your opinion or mind?

7         A.    That would be appropriate for the death

8    penalty?

9         Q.    For consideration of the death penalty.

10        A.    Where the killing was intentional.

11        Q.    Okay.  Would you have it for any other crime,

12   other than some type of murder case?

13        A.    No.

14        Q.    Okay.  You would reserve it just for certain

15   murder cases?

16        A.    Yes.

17        Q.    All right.  Have you followed any cases in the

18   media locally or nationally that you thought this was a

19   death penalty case or looked like it could be a death

20   penalty case?

21        A.    Followed closely or just kind of heard about

22   them on the news?

23        Q.    Just heard about them.

24        A.    Just probably heard about them on the news.

25        Q.    What types of cases were those?

1    A.    I think there's been a few with this Aubrey
2  Hawkins that's been the death penalty.
3    Q.    Right.  I was going to ask about that next.
4  Every juror, because this particular case has got a lot of
5  publicity, especially when it first occurred, some
6  subsequent, and almost every juror, I would say 99 percent,
7  have read or heard something about it, which doesn't make
8  you ineligible as a juror, necessarily.
9          The law contemplates, obviously, that you
10  would make your decisions just based on what you hear in the
11  courtroom and not what you have read in the newspaper or
12  seen on TV or heard on the radio.
13          What do you recall hearing about the case
14  when it occurred?
15    A.    I really just remember one that it came back
16  as it was the death penalty.  I don't remember reading the
17  details about it or anything like that.
18    Q.    Do you remember much about the facts when it
19  first occurred, the reporting on what had happened?
20    A.    Um, I remember that it was at Oshman's around
21  Christmas and that they fled to Colorado, I believe.
22    Q.    Okay.  So it's pretty general information that
23  you recall?
24    A.    Yes.
25    Q.    Would you be able -- we can't ask you to

1  forget what you heard. What we have to ask you to do is

2  make your decisions on what you hear here in the courtroom.

3  In other words, if you heard something different on TV, but

4  heard something completely different from the witnesses here

5  in the courtroom, you would have to, obviously, just rely on

6  what the evidence was that the witnesses produced in the

7  courtroom. You couldn't go in and go, well, I also heard

8  this on TV or I know this happened at another time, so I am

9  going to add that to my decision. You can't go in as a

10  juror in a case and let a newspaper report or a TV story

11  influence your decision. You have to make your decisions

12  just completely on the evidence as it's produced at trial.

13  Would you be able to do that?

14       A.    Yes.

15       Q.    Okay. In Texas there are only certain cases

16  and they have to be murder cases, intentional killings, that

17  can come into consideration for the death penalty. A lot of

18  brutal murders, intentional killings, occur in Texas that

19  they don't even qualify. You can get a life sentence or 99

20  years, but because of the rules that are laid down by the

21  Supreme Court and the laws enacted by the Legislature, we

22  reserve the death penalty for intentional killings with some

23  aggravating facts.

24            I think that the Judge probably has those

25  in the packet, but, basically, they are murder during the

1   course of a felony, such as burglary, a robbery, someone

2   goes in the 7-Eleven and murders the clerk.   Murder during a

3   sexual assault, during a kidnapping or arson could be a

4   death penalty case.   Also, murder of a police officer on

5   duty, fireman on duty, murder of more than one victim in the

6   same transaction or series of transactions, like a serial

7   killer situation, murder of a child under the age of six,

8   and murder for hire, someone does it for money or someone

9   hires someone to do it for money.   But those are the

10   specific types of cases that have been reserved for the

11   death penalty.

12          The procedures are the same in each case.

13   The trial is divided into two portions.   There's the

14   guilt/innocence stage where the State has to prove the

15   indictment to you beyond a reasonable doubt.   If we fail to

16   do that, obviously, we will all go home with a not guilty

17   finding.   But if we succeed in that, we move to the second

18   phase.

19          You may hear additional evidence in the

20   second phase.   At the close of that evidence, you get these

21   Special Issues.   We'll talk about those in more detail.

22   But, basically, what the State has to prove to you in the

23   punishment stage is that the defendant would be a continuing

24   danger to society, that he either intended the death of the

25   deceased or anticipated that that would occur, and that

1  there's not sufficient mitigating evidence to warrant a life

2  sentence.

3          So if those questions are answered yes,

4  yes, and no, in that order, the Judge has no choice.  He

5  would sentence the defendant to death.  If they are answered

6  any other way, again, he would have no choice.  He would

7  sentence the defendant to life.  But those are the only two

8  possible outcomes as far as punishment goes, once someone

9  has been found guilty of capital murder.  Is that clear to

10  you?

11          A.    Yes.

12          Q.    Okay.  Now, are you aware of the method of

13  execution in Texas?

14          A.    Lethal injection.

15          Q.    That's correct.  It gets in the news a lot

16  from time to time, depending on political races or the

17  particular person that's up for execution.  But you probably

18  know from growing up in Texas that the death penalty is a

19  punishment which is actually carried out.  It's unlike in

20  some other states, it's not.  But in Texas it is a penalty

21  that is sought and actually carried out every year.

22          The method is the same.  The procedures

23  are the same in each case.  If someone is sentenced to

24  death, this defendant were sentenced to death, he would be

25  placed on death row.  At some point in time the Judge would

1   give an actual date of execution.  On that date he would be

2   placed in the Huntsville prison, downtown Huntsville.  On

3   the day of execution given time with family, friends, a

4   minister, a last meal.

5          But at 6:00 p.m. all executions take

6   place.  He would be placed in the execution chamber.  They

7   are secured to a gurney, needles placed in their arm.

8   Witnesses are brought in, reporters, who always report this

9   stuff in graphic details at times about what the person says

10  as his last words or gasp at the execution or whatever.

11         But at the appointed time after his last

12  statement, the warden simply signals the executioner, who

13  injects poisons which stop the heart and the lungs.  Death

14  occurs within about 15 seconds generally.  That would be the

15  method of execution in this particular case.

16         I don't mean to be morbid going into

17  that, but, you know, it's one thing when you come and you

18  hear this is a capital murder case or you talk about capital

19  murder and you are for the death penalty in casual

20  conversation, and it's quite another when you have to start

21  going through this process and realize that you may be on a

22  jury that decides these issues.

23         From our point of view, from the State of

24  Texas, we want to lay our cards on the table from the

25  beginning.  We feel we have the type and quality of evidence

117

1    to prove the defendant guilty and that these questions

2    should be answered in a way that someday would result in his

3    execution.   The defense takes the other view and that's why

4    we go through this process.

5                    But I want you to -- what I want to do is

6    just let you know how serious we are, because the next

7    question I want to ask you is this.   We can't go into the

8    facts of the case.   We can't preview the facts.   You told us

9    that you are in favor of the death penalty in certain cases

10   and all I want to know is this.   If we prove these issues to

11   you, do you think that you are the type of person that could

12   take pen in hand and answer those questions in a way which

13   would result in another person's execution?

14        A.      Yes.

15        Q.      Okay.   Now, when we talk about capital murder,

16   we generally think about the triggerman, obviously, being

17   prosecuted.   If I go into a 7-Eleven and rob the clerk,

18   shoot him down, I can be arrested and prosecuted and could

19   receive the death penalty.   But all crimes -- some crimes

20   can be committed by other persons, groups of persons, and we

21   call that the law of parties.   Sometimes we have several

22   individuals that partake in a crime.   Some participate more

23   than others, but it may take all of them together to pull

24   the crime off.   The same is true of capital murder.

25                    An example I give is if Mr. Wirskye and I

here decide to rob a bank.  We get another accomplice to be
our driver.  He pulls up.  We say, keep the car running.
We're going to go in with our guns.

We go in with guns.  We rob the bank.  I
start covering the tellers.  Mr. Wirskye is loading the
money up.  I start shooting the tellers.  Maybe I don't like
the way they are looking at me.  Maybe Mr. Wirskye here says
they are going for an alarm or trying to get out the back.
Anyway, I kill one or two or however many.  We run outside
and we're captured.

Obviously, I can be arrested and
prosecuted and could receive the death penalty because I was
the triggerman.  The law says if Mr. Wirskye and the others
were actively participating in that crime, they could be
arrested and prosecuted for capital murder.  They could
ultimately receive the death penalty, even though they are
not the triggerman, under the law of parties, again,
depending on the facts, of course, but they have to be
actively participating.  And the State has to prove that
they anticipated that a death could occur.

Some people who are in favor of the death
penalty draw a line with just the triggerman, personally.
You know, they would say, I'm for the death penalty, if you
are prosecuting the person that actually caused the death.
I wouldn't for the accomplice.  I might give them a life

1   sentence or 99 years.  I'm not comfortable imposing the

2   death sentence on these accomplices.  If it were up to me,

3   that's where I would draw the line.

4                    Other jurors tell us, I'm in favor of

5   capital murder and the death penalty, and I can -- I do

6   believe in certain situations giving the nontriggerman the

7   death penalty, an accomplice, depending on their role in the

8   case, obviously.  And they agree with the law in that

9   aspect.

10                    We want to ask each juror how you feel

11  about that, the prosecution of someone who is a

12  nontriggerman for the death penalty.  Do you agree that the

13  law should allow that or do you disagree with that aspect of

14  it?

15       A.    I guess it would depend on the facts of the

16  case.  But if they actively participated and contributed, I

17  guess that I would tend to agree.

18       Q.    Okay.  What would be important to you?  How

19  actively they were involved or what?

20       A.    In your example, if the person in the car

21  didn't know that they had guns or something like that, then

22  I would say I would disagree.  But the guy that was helping

23  and knew that guns were pointed on people, probably say the

24  death penalty would be okay.

25       Q.    Okay.  You bring up a good point, then.  It's

1  the person's actual knowledge of exactly what was going on,

2  how dangerous these other individuals were, that sort of

3  thing?

4        A.     Yes.

5        Q.     A big factor to you would be their knowing

6  whether they possessed weapons?

7        A.     Yes.

8        Q.     A lot of jurors have told us that.  Let me put

9  one other minor point.  If you are going to be prosecuted as

10  an accomplice, the law says that mere presence alone doesn't

11  make you guilty.  If we had tricked the driver, said, hey,

12  we need to cash a check.  Take us down to the bank.  And

13  when we go in we pulled guns out and he doesn't know about

14  it, we couldn't even prosecute him for capital murder, if,

15  indeed, those were the true facts.  Now, if we said, we are

16  going to rob them and get some money, will you help us, and

17  he didn't really know we had guns, that could be a point you

18  brought up.  He might be guilty of a lesser and he might be

19  guilty of the capital, but not get the death penalty.  But

20  it all has to do with how much they participated in the

21  event.  If you actively participated, if you helped and

22  aided, you could be prosecuted and found guilty and

23  ultimately receive the death penalty.  That's one theory.

24             The other theory is by conspiracy.  They

25  cover the same type of facts.  If Mr. Wirskye and I, we

1  enter into a conspiracy to commit one crime, in this case

2  the aggravated robbery, and the jury believes that we should

3  have anticipated that a death could occur as a result of

4  pulling that off, i.e., you go in and pointing guns at

5  people, then you can be found guilty.  Everyone can be found

6  guilty that participated in that crime.  It just depends on

7  the facts.  Ultimately the accomplice could get the death

8  penalty, if the jury believes that not only should they have

9  anticipated, but they did anticipate.  That would come down

10  to the facts.

11              From what I hear you telling us, is that

12  you agree with the law that an accomplice can be prosecuted

13  for the death penalty.  You could actually render that

14  verdict, but it would just depend on the facts and their

15  participation and that sort of thing; is that right?

16       A.    Yes.

17       Q.    Okay.  Again, I can't go into the facts of the

18  case, but I do want to lay my cards on the table.  That's

19  the theory the State is going on in this case.  We are

20  prosecuting Mr. Murphy under the law of parties as an

21  accomplice to these events.  You don't have a problem with

22  that?

23       A.    No.

24       Q.    Okay.  Now, let's talk about these Special

25  Issues for a moment.  You don't get to these unless you have

1  found the defendant guilty of capital murder.  Then we move

2  to the punishment phase where you can hear additional

3  evidence and then you would get these Special Issues.  I

4  want to go over these one at a time.  You may have read them

5  in the back, but, if you would, just read Special Issue No.

6  1 to yourself.

7        A.     (Prospective juror complies.)  Okay.

8        Q.     This question asks that the jurors kind of

9  make a prediction about how the defendant would behave in

10  the future.  Do you feel comfortable making that kind of

11  prediction or answering that question, if you are given

12  sufficient evidence or sufficient facts?

13        A.     Yes.

14        Q.     Okay.  What types of information would be

15  important to you in deciding something like that?

16        A.     Their history.

17        Q.     Okay.

18        A.     Maybe their remorsefulness.

19        Q.     Okay.  Criminal history does come into play.

20  If a person has a criminal history, you can hear from those

21  witnesses if they are available.  If there is remorse or

22  something good about the defendant, you can hear about that,

23  too.

24              What would be important about a person's

25  remorse?  I take it if you believe they were truly

1  remorseful, that sort of thing?

2      A.     Yes.   If they were truly remorseful, I may

3  tend to think they were not a continuing threat.

4      Q.     Okay.   That would just be, I guess, facts you

5  draw from each particular case?

6      A.     Yes.

7      Q.     Okay.   Now, you can also decide this case on

8  the facts of the offense, too, the role involved, the

9  brutality of the killing, that sort of thing.   Obviously, we

10  will give you the information about how dangerous they are.

11  This question starts out with a no answer and the State has

12  to prove to you beyond a reasonable doubt it should be

13  answered yes.   So it's kind of a presumption of no, then we

14  have to prove to you it should be answered yes.

15          There aren't any automatic answers to

16  these questions.   In other words, just because you found him

17  guilty of capital murder, you don't automatically answer

18  this question yes.   There could be some cases where someone

19  is guilty of committing a capital murder, but you may not

20  believe they are a continuing danger.   The example you gave

21  is maybe they showed true remorse in your mind.   It would

22  just depend on the facts.

23          What the law requires you to do is wait

24  until all the evidence is in, in the punishment phase, go

25  back in the jury room, weigh the evidence, and then the

1  facts you heard in the guilt/innocence stage, along with

2  anything new, and then make this decision, did the State

3  prove it beyond a reasonable doubt that it should be

4  answered yes?

5              Do you feel that you can do that and wait

6  until all the evidence is in and then make your decision?

7        A.    Yes.

8        Q.    Okay.  It's kind of just common sense deal,

9  obviously, but the law does anticipate that the jurors will

10  wait and not put in automatic answers.  There wouldn't be

11  any need for those questions, if there were automatic

12  answers.  Like any major decision you make, whether buying a

13  house or anything with your business, obviously, you are

14  going to gather all the information and then make your

15  decisions or recommendations, whatever you do.

16              The second question, if you will take a

17  moment to read that to yourself.  That has to do with this

18  parties question.

19        A.    (Prospective juror complies.)

20        Q.    This question also starts out with a no answer

21  and it has -- and we have the burden of proof to prove to

22  you beyond a reasonable doubt it should be answered yes.

23  It's answered independently of question No. 1, or your guilt

24  finding, too.  You have to wait and listen to all the

25  evidence.  You can use the evidence from the guilt/innocence

stage and anything in their background you have learned in

the punishment stage to answer that question.

It's divided up into several parts.  The

first part, whether the defendant actually caused the death

of the deceased.  Obviously, that's pretty simple if you

believe he's the triggerman, you can answer it yes.  Or did

not actually cause the death of the deceased, but intended

to kill the deceased or another or anticipated that a human

life would be taken.  The intent is gathered from the

evidence and their actions.  If he's just an accomplice, but

you believe the State showed that he had the intent to kill

the deceased or someone else, even, or what we went back to

at the beginning, he anticipated that a human life would be

taken.  Again, that would just be based on the facts.  The

examples we went over is about how much knowledge the

accomplices had of weapons and how dangerous they were and

that sort of thing.

If we prove that beyond a reasonable

doubt, based on his criminal history and the facts of the

case, you could answer that yes.  Otherwise, you would leave

that as a no answer.  Do you feel that you can do that?

A.     Yes.

Q.     Okay.  Now, this last Special Issue, that's

the mitigation question.  It's a little different.  Neither

side has the burden of proof.  We don't have to prove it

should be answered no.  The defense doesn't have to prove it
should be answered yes.  Common sense will tell you,
honestly, that's the way we will be arguing, though, but
there's no burden of proof like there is on the first two
questions.  It's kind of a safety net.  It allows you to
review all the evidence you have heard in the defendant's
background and the crime and then decide if you think a life
sentence should be imposed rather than a death sentence.

It asks whether taking into consideration
all the evidence, including the circumstances of the
offense, the defendant's character and background and the
personal moral culpability of the defendant, there is
sufficient mitigating circumstance or circumstances to
warrant that a sentence of life imprisonment rather than a
death sentence be imposed.  Again, it just takes in
everything.

I can't tell you what mitigating evidence
will be.  It's up to you and the other jurors.  You don't
even have to agree with the other jurors on what mitigating
evidence is.

As you sit here today, does anything come
to mind as what you might view as potentially mitigating
evidence?

A.      No, I can't think of anything.

Q.      That's fine.  I would say 99 out of a hundred

1  jurors give us that answer.  We hope you haven't been

2  thinking about these issues.  I don't think that you would

3  be.  But all -- and you don't have to be able to think of

4  anything.  You just have to be able to tell the Court you

5  can keep your mind open to it.

6         You don't get to this decision unless you

7  have found someone guilty, found they are dangerous, found

8  they anticipated a life would be taken.  But the law

9  envisions that there might be some circumstance in their

10 background or the facts of the case where you think a life

11 sentence should be imposed rather than a death sentence.

12 You just think it might be the right thing to do.

13        Like I said, it could be anything.  We've

14 gone over many examples with jurors.  One juror might think

15 young age might be potentially mitigating, a 19, 18 year old

16 that committed a capital murder.  Other jurors tell us if

17 they are acting as an adult, making rational decisions, no,

18 that wouldn't be.  That might be aggravating.  They don't

19 have to agree, you know, or anything like that.

20        Sometimes you hear evidence of a person's

21 background.  Maybe they were physically or mentally abused.

22 Maybe they grew up in a poor home, maybe a broken home.  We

23 have jurors that have told us that potentially could be

24 mitigating, depending on the severity.  And we have other

25 jurors have told us, you know, I would feel bad for them,

1  but, look, a lot happens to a lot of folks.  And when you

2  are an adult, you have to be held accountable for your

3  decisions, and I don't believe that is really mitigating.

4                      How do you feel about those type of

5  issues?  Do you view those as potentially mitigating or are

6  those things that should be considered, but, obviously,

7  people ultimately have to be held accountable?

8          A.      I think maybe I would consider them, but I

9  don't think they would automatically be mitigating.

10         Q.      Okay.  What would be important to you about

11 those different types of issues?

12         A.      Probably the severity.

13         Q.      Of their upbringing?

14         A.      Uh-huh.

15         Q.      Would that have to do with a young person that

16 was on trial, older person on trial, or just depend on the

17 particular facts?

18         A.      Probably take it more into consideration if

19 they were young.

20         Q.      Okay.  The older a person gets, you feel that

21 they have had time to change, at least get past that, and

22 that wouldn't be as mitigating as, say, an 18 or 17 year old

23 or 19 year old or someone like that?

24         A.      Yes.

25         Q.      Okay.  Again, there's no requirements on what

129

1    you view as mitigating.  Really, the bottom line is can you

2    keep your mind open to it and if you think something is

3    sufficiently mitigating, you can answer the question that

4    way?  Do you feel that you can do that?

5          A.    Yes.

6          Q.    If you don't think something comes to the

7    level of mitigation, you could answer the question no.

8    Could you do that?

9          A.    Yes.

10         Q.    Knowing that when you do that, the defendant

11   would be executed at some point down the line?

12         A.    Yes.

13         Q.    Okay.  There are certain rules or laws that

14   apply to each criminal case, not just capital murder cases.

15   I want to go over those briefly with you.  One is the burden

16   of proof.  The burden of proof is on the State of Texas.

17   That burden doesn't shift to the defense.  You might

18   anticipate they may put on witnesses, cross-examine, or

19   argue, but they are not required to prove anything to you.

20   The burden of proof always stays at this table.  If we meet

21   our burden, we're entitled to a guilty verdict.  But if you

22   have a reasonable doubt and we don't meet our burden of

23   proof, you are obligated to find the defendant not guilty.

24   Can you do that?

25         A.    Yes.

1    Q.    You can't require the defense to prove his

2  innocence.  Again, you might anticipate they will try, but

3  you can't put the burden of proof on them.  It has to stay

4  here.  You can follow that rule of law?

5    A.    Yes.

6    Q.    The burden of proof goes to every portion of

7  the indictment.  If we fail in any one part of the

8  indictment and you have a reasonable doubt, you are

9  obligated, again, to find the defendant not guilty.  You

10  have to be a neutral referee or umpire.

11         Let me give an example.  One easy one is

12  at the end of trial if you have a reasonable doubt whether

13  we have proved the identity of the defendant as being the

14  killer, obviously, that would be a no brainer.  You would

15  find him not guilty.

16         But that burden of proof goes to even the

17  county where this occurs.  If we allege it happened in

18  Dallas County, if we didn't do a very good job of preparing

19  the case and found out maybe it was in the City of Grand

20  Prairie and it actually happened over in Tarrant County, we

21  would have messed up something as basic as the jurisdiction,

22  you, if you had a reasonable doubt about the county, you

23  would have to find him not guilty, just like you would on

24  the identity.  You may not like it and we would be fired if

25  we did something that dumb, but you can't help us out.

1      And that's why I use that example.  You

2  have got to just call the case just as you see it.  And if a

3  reasonable doubt exists, you have to find the defendant not

4  guilty.

5      Could you follow that rule of law and

6  require us to prove every element of our case beyond a

7  reasonable doubt?

8      A.     Yes.

9      Q.     All right.  The Fifth Amendment.  Anyone who

10  wants to testify on their own behalf in a criminal case,

11  can.  You would treat them like any other witness.  If they,

12  the defendant, chooses not to testify, the law says you

13  can't hold that against them.  You can't use that as

14  evidence against them.  There could be a lot of reasons why

15  someone chooses not to testify.  They may not be very well

16  educated and they may not make a very good witness, could be

17  very nervous.  They could be just following their lawyer's

18  advice.  It could be a lot of reasons.  So the Court

19  instructs the jury, you just can't hold that against the

20  defendant or consider it in any way.  Could you follow that

21  rule of law?

22      A.     Yes.

23      Q.     Police officers testify often in criminal

24  cases.  A lot of people respect the job the police do.  You

25  can't put police officers -- you can't give them a head

132

1   start over other witnesses without hearing them first.  I

2   mean, after you hear them, you may find them very credible,

3   but they don't automatically get a head start.  You have to

4   judge them like you would any other witness, recognizing, I

5   think, common sense, that police officers are like any other

6   profession, you have good ones and bad ones, credible ones

7   and uncredible ones.

8                Could you follow that rule of law and

9   just start out police officers like you would any other

10  witness?

11       A.     Yes.

12       Q.     Okay.  Sometimes in criminal cases defendants

13  are found guilty of lesser included offenses.  Like a

14  capital murder case, we often have the lesser included

15  offense of aggravated robbery.  Maybe you have a reasonable

16  doubt about whether the defendant murdered someone, but you

17  do feel he committed a robbery.

18                In that case you don't get these Special

19  Issues.  You would actually determine years from life to 99

20  years on the high end all the way down to five years in

21  prison on the other.  The law, again, just contemplates or

22  requires jurors to keep their mind open to the full range of

23  punishment.  If you think that 99 years or life is the right

24  thing to do after hearing all the evidence, you can assess

25  that.  If you think as little as five years in prison for

1  aggravated robbery is the right thing to do, you can do

2  that.

3         Do you feel you can keep your mind open

4  to that full range and make the proper assessment, either

5  five to 99 or life or anywhere in between, just based on the

6  evidence?

7      A.    Yes.

8      Q.    Okay.  Parole laws.  Sometimes there is

9  stories in the news about our parole laws.  In a capital

10  murder case the Judge would instruct you that a life

11  sentence, a capital life sentence, means the defendant has

12  to serve a minimum of forty calendar years before they can

13  even become eligible for parole.  And that doesn't mean that

14  they are paroled at that time.

15         He would, also, instruct you that you

16  can't take parole laws into consideration.  You just have to

17  consider a life sentence, a life sentence, and then make

18  your decision.  Do you feel that you can do that?

19      A.    Yes.

20      Q.    Okay.  Let me go over a couple of other

21  things.  First of all, I have run through a bunch of this

22  stuff real quickly.  Are there any questions that you have

23  over any of it?

24      A.    No.

25      Q.    Okay.  You work in a company who regularly

1 uses attorneys, you said.  You know attorneys.  Any of them

2 criminal attorneys or are they more business litigation,

3 that sort of thing?

4       A.    Business litigation.

5       Q.    Okay.  So you don't personally know any

6 criminal lawyers or people that practice criminal law?

7       A.    No.

8       Q.    Okay.  I believe that's all the questions I

9 have and I appreciate your patience.

10       A.    Okay.

11                   THE COURT:  Ms. Busbee?

12                   CROSS-EXAMINATION

13 BY MS. BUSBEE:

14       Q.    Ms. Stucker, I'm ignorant about what you do

15 for a living.  Can you kind of tell us what you do all day

16 long, what your job consists of?  I know you say repair rail

17 cars.  I'm assuming that you supervise what they do.  I

18 don't think you go out there with a hammer or a wrench or

19 whatever you use, but I'm guessing on a pretty high level.

20 So what sort of people do you deal with all day long?

21       A.    What I do is, we build rail cars and then

22 people who don't want to buy them, lease them from us.  So

23 we have a lease fleet of cars and usually the people, they

24 are shipping a product, they don't understand rail cars, but

25 they understand the product they are shipping in the rail

1   car.  So it would be comparable to like a warranty on a car,

2   that every time I have a problem, I turn it over to you and

3   you fix it and you keep it within regulations and then we

4   contract that out to shops, repair shops.  So I deal with

5   sales people and customers and repair shops and vendors for

6   parts and things like that.

7       Q.   So daily hassle this, that, and the other?

8       A.   Yes.

9       Q.   And I notice you said this organization you

10  belong to, and based on your degree, are you a CPA?

11      A.   Yes.

12      Q.   Does that come into your day-to-day dealings

13  or have you been promoted into the position you are in now?

14      A.   I used to be in accounting.  Now I no longer

15  really work on a day-to-day basis on accounting.

16      Q.   You made some mention that there would be some

17  problem if you were gone for two weeks.  Would you elaborate

18  on that for us?  You might have some problem arranging your

19  work schedule?

20      A.   Well, I travel probably every other week for

21  work.  So November would probably be an easier month, since

22  it has holidays in it and there's less travel.  But that was

23  really the issue.

24      Q.   As the Judge has said to you, that's not an

25  excuse, but sometimes we like to know just how pressing it

1  would be, so we would know if someone is sitting in the jury

2  box and they are in a constant state of panic because of

3  what is going on in the work place, that's one thing.  But

4  if they can work around it, that's acceptable to everybody.

5                   So you are telling us you think you can

6  work around that, particularly in November?

7       A.     Yes.

8       Q.     Good deal.  Who's Mark Stiles?  I may be

9  stupid, but you put that as someone you admire?

10      A.     He works at our company and he used to be in

11  -- a Legislator in Austin for about 17 years.

12      Q.     And is he your supervisor or company owner?

13      A.     He's a senior vice-president.

14      Q.     And I notice that, like me, you like to

15  decorate.  I was wondering if you developed your dislike of

16  Martha Stewart before or after?

17      A.     I think I developed it because of things I

18  heard about how she treated other people.

19      Q.     Yeah.  I've heard those things, too, because I

20  just think it's impossible to imagine anybody could live the

21  way she wants everybody to live.  But anyway.

22                   This is a situation.  You may possibly be

23  on this jury and, believe me, we have talked to a lot of

24  folks, not as many as we're going to, but we get in a

25  cadence sometimes, or the jurors do, with the State because

1   it's yes or no answers.

2              And I don't have any doubt that you

3   understand what the issues are.  But I want to ask it in a

4   plainer way.  Since you have had things explained to you, at

5   the same time you are being asked if you agree, sometimes

6   I'm not clear on what the final answer is.

7              So you have said that, obviously, if

8   someone is an accessory or party to a capital murder they

9   could be convicted of the offense of capital murder, but

10  there's an additional element to the issue of punishment, if

11  someone is not actually the person who pulled the trigger,

12  is the expression that we're using.

13             I understand that you understand

14  completely this question of probability on Special Issue No.

15  1.  But on Special Issue No. 2, and that's going to be, I

16  think, very critical in this case.  The question is whether

17  or not that person anticipated that a human life would be

18  taken.

19             When we say anticipate that an event will

20  occur, what does that say to you?  Well, I'm not asking that

21  right.  If you are being asked to find that someone

22  anticipated something beyond a reasonable doubt, what sort

23  of matters of proof do you think that you would need to hear

24  before you can say beyond a reasonable doubt that that

25  person anticipated the murder?

1    A.    Well, anticipated, maybe if there was

2 conversations before the robbery took place that no matter

3 what happens, if anybody gets in our way, we need to kill

4 them or just something like that.  If somebody fired a gun,

5 but missed, maybe that means that they intended to kill.  So

6 it would just be probably based on the facts of the case.

7    Q.    Okay.  Now, you did mention that you thought

8 you were in favor of rehabilitation, which is a common

9 concern of people.  How would you feel about a psychiatrist

10 or a mental health professional's testimony in assisting you

11 with questions concerning Special Issue No. 3?  Would it be

12 important to you what that -- and at this point, you know,

13 I'm not going to say psychologists, sociologists,

14 psychiatrists, I don't know who the State may call.  But

15 just in general that type of professional, what do you think

16 about the kind of testimony or evidence that they could give

17 you in a situation?  Would it be helpful to you?

18    A.    Probably would depend on how long they had

19 spent with the person, if it was 20 minutes or 30 minutes,

20 or if they had a history of dealing with the person.

21    Q.    I would expect you to take that into

22 consideration.  We used to see people coming up here and I'm

23 talking about a long time ago, who would just have a bare

24 bones idea of what the facts were and get up there and

25 testify about things.  And I wouldn't expect the juror to

1    give that much credibility.

2              But you would take, depending on what the

3    degree of their familiarity was, and, of course, I assume on

4    whether or not they seem credible to you, you would take

5    that into consideration on this issue of mitigation?

6         A.    Yes, I think I could.

7         Q.    I call mitigation something different than

8    this lengthy definition that some people like.  To me,

9    mitigation is there's something about either what happened

10   in the case or what happened or that anything I have heard

11   as a juror in the first or second part of trial that softens

12   my heart against the individual on trial that makes me think

13   that a life sentence would be proper instead of a death

14   sentence.  To me, that's an easy way to say mitigation,

15   because mitigation is different for every person.  But the

16   effect of mitigation is that a person who is going to be a

17   future danger and knew that a murder was going to happen, I

18   will not give him the death penalty based on other things

19   that I have heard in this case.  Can you do that in the

20   proper case?

21        A.    Say it one more time.

22        Q.    Okay.  That's the thing.  He calls them

23   filters.  I think of them as hurdles for the State because

24   those first two issues, the State has to prove beyond a

25   reasonable doubt.  Future dangerousness, absolutely beyond a

reasonable doubt.  Issue No. 2, anticipated a death would occur, beyond a reasonable doubt.  That's not anything that I, necessarily, or we, necessarily, have to give you anything on.

But the Special Issue No. 3, you come to after you have already made these two previous decisions beyond a reasonable doubt.  A future threat, a future danger, knew this was going to occur, guilty of capital murder precedes all that.

After you have made all those decisions, could you answer Special Issue No. 3, yes, he should receive a life sentence instead of a death sentence?

A.    I don't -- I just on Special Issue No. 3, I can't think of -- it would have to be something really big to mitigate, if I've answered the first two affirmatively, but it would have to be something really big.  And I just don't want to draw a line in the sand and say absolutely not, if, you know, there's nothing that could mitigate that.  There could be.  I can't think of what it would be.

Q.    You don't have to.  You don't have to.  You just have to say that I could just decide to impose a life sentence instead of a death sentence, even though I found Special Issue No. 1 and No. 2 to be true for it to be answered yes, and if you can -- that's the thing, you know, we can't say we're going to prove this and they're going to

141

1   prove that and then what would you do, because, obviously,

2   that would -- that would be a crazy way to pick a jury.

3   We'd have to try the case every time we talked to someone

4   and it wouldn't be fair because it would be us telling you

5   what we think is going to happen.

6           If you really think that you could never

7   consider Special Issue No. 3, I would ask you to tell us

8   that, because it's better to err on the side of caution

9   because that's erring on the side of fairness.

10          But if you can consider it, and you don't

11  have to tell me what it would be.  I'm not asking you that.

12  You just honestly tell me that in the abstract you could

13  consider a life sentence instead of the death sentence when

14  you get to that question, because you don't get there unless

15  you have already decided the other two, then that's really

16  all I'm asking.

17      A.    Yes, I could do that.

18      Q.    Now, we have beat you up to death over

19  questions.  Is there anything that you are concerned about

20  or you want to tell us that we didn't ask you, which I'm

21  sure we do in every case, but sometimes I like to ask people

22  what did you want to tell us or what did you think we would

23  ask you that would be a problem?  Do you have any thoughts

24  like that?

25      A.    No.

1       Q.    Okay.

2             MS. BUSBEE:  Pass the juror, Your Honor.

3             THE COURT:  Ms. Stucker, please wait for

4  us outside and we'll have you back in just a minute.

5                [Prospective juror out]

6             THE COURT:  What says the State?

7             MR. SHOOK:  State has no challenges for

8  cause.

9             THE COURT:  What says the defense?

10            MS. BUSBEE:  No challenge for cause.

11            THE COURT:  Would you like to step into

12  your office?

13            MS. BUSBEE:  No, sir.

14            THE COURT:  What says the State?  Do you

15  accept this juror?

16            MR. SHOOK:  State accepts the juror.

17            MS. BUSBEE:  Defense accepts this juror.

18            THE COURT:  Invite Ms. Stucker back in,

19  please.

20               [Prospective juror in]

21            THE COURT:  Thank you, you may be seated.

22  Ms. Stucker, I want to inform you that you have been

23  selected and you shall sit as a juror in this case.

24            PROSPECTIVE JUROR:  Okay.

25            THE COURT:  It's natural at this point

143

1   when you go back to the office on Friday afternoon, they

2   know where you've been, don't they?

3                    PROSPECTIVE JUROR:  Yes, they do.

4                    THE COURT:  Sure, they do.  What do you

5   think will happen, if you go back and tell them that I've

6   been selected as a juror to sit in this case?

7                    PROSPECTIVE JUROR:  They are going to

8   want to talk about it.

9                    THE COURT:  They are going to want to

10  talk about it.  And the lawyers are very satisfied with your

11  opinions and what you know about the law.  So as soon as you

12  go back and tell them, talk about it, then they are going to

13  offer their opinions.  And we like yours.

14                   For that, I'm going to give you some

15  written instructions and it simply highlights -- we're doing

16  it far enough out, just like I did the special venire back

17  in May.  I want to be as convenient with your time and not

18  waste your time.  But we're very tight on our schedule.  We

19  start, we start on time.  And when I gave you the guide,

20  when I tell you I start trial at 8:30, that means we start

21  at 8:30 because we're using your time, so I respect that.

22                   But you are going to have to -- you have

23  a long enough time to arrange your schedule so you won't

24  book any travel for those two weeks in November and then

25  that's the two weeks prior to the week of Thanksgiving.  So

1   it was intentionally set that week so we can be sure we're

2   way through with this case before we get to Thanksgiving.

3                   PROSPECTIVE JUROR:  Okay.

4                   THE COURT:  So go back and you need to

5   tell your supervisor only, the people who need to know that

6   you are going to have to take those two weeks off.

7                   PROSPECTIVE JUROR:  Okay.

8                   THE COURT:  Anything else around the

9   water cooler will be just what we don't need.  So I have

10  provided some written instructions for you.  That's just to

11  give you, once again, the address, phone numbers, and the

12  Sheriff is going to go over with you this information sheet.

13  What we've done is taken the information you've written down

14  and your handwriting is a lot better than most, but we have

15  to have contact information.  So I want you to very

16  carefully look at the way we have your name spelled and

17  phone numbers and Internet and e-mail and that's simply to

18  be able to get in contact with you.  As you can see, I've

19  been on the computer all the time.

20                  I told you in the special venire

21  downstairs that the information you provide is under my lock

22  and key.  I have the originals in my office.  I have scanned

23  that information so that the only way we can get at it is

24  by password.  The copies that the attorneys have will be

25  destroyed.

145

1    The only way this information will be

2 released is on an order from the Court of Criminal Appeals

3 in Austin.  So I want you to be comfortable with the

4 information you have provided.  It's simply for the Sheriff

5 to be able to make contact with you, because we will have a

6 short juror orientation sometime before the week of November

7 10th.

8    When I say that, it's when I get all

9 twelve people in the box, I'm going to have everybody back

10 down here to go over some general issues and have the

11 Sheriff go through their program with you.  So you have got

12 one more day down here before you hear any testimony.  So we

13 have to be able to get in contact with you and we'll do it

14 as convenient with your schedule.  We try to do it first

15 thing in the morning, so we can get you out of here.  Okay?

16    PROSPECTIVE JUROR:  Okay.

17    THE COURT:  That's what's ahead of you.

18 If you would, go with the Sheriff.  She has got some issues

19 to visit with you about and if you will check this

20 information for me and we shall see you in the coming

21 months.

22    [Prospective juror out]

23    [End of Volume]

24

25

STATE OF TEXAS          *

COUNTY OF DALLAS        *

     I, NANCY BREWER, Official Court Reporter for the 283rd

Judicial District Court, do hereby certify that the above

and foregoing constitutes a true and correct transcription

of all portions of evidence and other proceedings requested

in writing by counsel for the parties to be included in this

volume of the Reporter's Record, in the above-styled and

numbered cause, all of which occurred in open court or in

chambers and were reported by me.

     WITNESS MY OFFICIAL HAND on this the 4 day of

_____March_____, 2004.




                         NANCY BREWER, CSR, NO. 5759
                         Expiration Date:  12-31-04
                         Official Reporter, 283rd JDC
                         Frank Crowley Crts. Bldg. LB33
                         133 No. Industrial Blvd.
                         Dallas, TX 75207
                         (214)653-5863/5

74851

REPORTER'S RECORD

VOLUME 12 OF _61_ VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

STATE OF TEXAS            *          IN THE DISTRICT COURT

VS.                       *          DALLAS COUNTY, TEXAS

PATRICK HENRY MURPHY, JR.  *          283RD DISTRICT COURT


* * * * * * * * * * * * * * * * * * * *

INDIVIDUAL VOIR DIRE

* * * * * * * * * * * * * * * * * * * *

FILED IN
COURT OF CRIMINAL APPEALS

MAR  9 2004

Troy C. Bennett, Jr. Clerk


On the 8th day of September, 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.


ORIGINAL


283RD JUDICIAL DISTRICT COURT 214/653-5863
NANCY BREWER, OFFICIAL COURT REPORTER

1            A P P E A R A N C E S

2    APPEARING FOR THE STATE

3    Mr. Toby Shook
     SBOT NO. 18293250
4    And
     Mr. Bill Wirskye
5    SBOT NO. 00788696
     Assistant District Attorneys
6    133 No. Industrial Blvd.
     Dallas, Texas 75207
7    Phone:  214/653-3600

8

     APPEARING FOR THE DEFENDANT
9
     Ms. Brook Busbee
10   Attorney at Law
     SBOT: 03488000
11   703 McKinney Ave. Ste. 312
     Dallas, TX 75202
12   214/754-9090

13   Mr. Juan Sanchez
     Attorney at Law
14   SBOT: 00791599
     5630 Yale Blvd.
15   Dallas, TX 75206
     214/365-0700

16

17

18

19

20
21

22

23

24

25

1

PROSPECTIVE JUROR INDEX

2

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Everett Hulsey | 4 | 5 | 37 | 12 |
| Raymond Capetillo | 45 | 47 | | 12 |
| Margaret Rehwinkel | 54 | 57 | 88 | 12 |
| Kathryn Ryan | 108 | 109 | | 12 |
| Alicia Curtis | 112 | 114 | 145 | 12 |
| Linda Patterson | 150 | 152 | | 12 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

<u>P R O C E E D I N G S</u>

1

2          THE COURT:  Mr. Hulsey.

3                  [Prospective juror in]

4          THE COURT:  Good morning, sir, how are

5   you?

6          PROSPECTIVE JUROR:  Fine.

7          THE COURT:  We have your name as Everett

8   Breck Hulsey, H-U-L-S-E-Y.  How are you doing?

9          PROSPECTIVE JUROR:  Fine.

10          THE COURT:  Monday morning, first thing,

11   you were scheduled to be the number three person, but since

12   you were here first and ready first, we will put you on

13   first.  I appreciate people being on time and ready to go to

14   work.

15          Did you have enough time to go through

16   your orientation guide there to begin to think about what

17   we're going to discuss today?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  You don't have to be able to

20   give us all that law back and understand it completely right

21   now.  That's the objective this morning.  The attorneys are

22   going to go over the law with you.  The idea is for you to

23   think about it and see how it all interrelates.  And my job

24   is to be sure that at the end of the process, that you

25   understand the law.  Second question is can you follow the

1  law?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  That's the two objectives

4  here.  Do you understand and once you understand, can you

5  follow?  The only question that I have for you right now

6  from the Court, can you serve this Court for two weeks

7  beginning November 10th when this trial shall begin?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Any other questions you have

10  before we begin?

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  Mr. Wirskye?

13             MR. WIRSKYE:  May it please the Court.

14                  EVERETT HULSEY,

15  having been duly sworn, was examined and testified as

16  follows:

17                  DIRECT EXAMINATION

18  BY MR. WIRSKYE:

19        Q.    Mr. Hulsey, how are you this morning?

20        A.    Fine.

21        Q.    Thank you for being here.  My name is Bill

22  Wirskye.  I'll be the Assistant DA that's going to visit

23  with you for the next few minutes.  What I would like to do

24  is maybe talk a little bit about some of your information in

25  the questionnaire, some of your background, and visit with

1   you a little bit about what you think about the death

2   penalty and finally maybe talk about some of the rules and

3   laws that may apply in this trial or a death penalty trial.

4                Do you have any questions before we get

5   started?

6         A.    No.

7         Q.    Okay.  What went through your mind when you

8   found out you got called back for the individual interview?

9         A.    I was kind of expecting it.

10        Q.    Why were you expecting it?

11        A.    I thought they were going to call everybody.

12        Q.    We only call certain people, so I guess in

13  that sense you made the cut.  In an ordinary case or a

14  nondeath penalty case, we talk to jurors as a group.  But

15  since we are seeking the death penalty in this case, the law

16  requires that we talk to you individually.  I know it's a

17  little bit uncomfortable because we have you up on the

18  witness stand and you kind of feel like you are on trial

19  sometimes and I apologize.

20        A.    This is the first.

21        Q.    Hopefully it will get more comfortable as we

22  go along.  We'll try to make it as much like a discussion as

23  we can.  What line of work are you in?

24        A.    Printing.

25        Q.    What do you exactly do on a day-in, day-out

1  basis?

2        A.    I take care of the paper warehouse.

3        Q.    And you have been in that line of work, I

4  think I saw 15 years or so?

5        A.    Yes.

6        Q.    Did you do anything before that?  Any other

7  different type of work?

8        A.    Yeah, I had a restaurant and worked in the oil

9  field.

10       Q.    Okay.  Did you have the restaurant here in

11 Dallas?

12       A.    Ft. Worth.

13       Q.    Okay.  I grew up in Ft. Worth.  Anything I may

14 have heard of or eaten at?

15       A.    It was on Brentwood Stair and it was a

16 barbecue.

17       Q.    How long did you do that?

18       A.    Just a couple of years.

19       Q.    Okay.  It looks like you are a fisherman?

20       A.    Yes.

21       Q.    Based on your questionnaire and your shirt.

22 Fly fisherman?

23       A.    No.

24       Q.    Bass fisherman?

25       A.    Yes.

1    Q.    That's what I do as well.  I'm trying to learn

2  to fly fish, but I'm not very good at it yet.

3    A.    I think it would be good.

4    Q.    It looks relaxing, but it drives me crazy.  I

5  can't do it.  You also mentioned that you had some friends,

6  maybe, that were attorneys and judges, that type of thing?

7    A.    Yes.

8    Q.    Who is that?

9    A.    Judge Herndon in Oklahoma.

10    Q.    Okay.

11    A.    Judge Briar (phonetic) in Oklahoma.

12    Q.    Do you have any friends that are attorneys or

13  judges locally?

14    A.    No.

15    Q.    You also mentioned, I guess, a former

16  co-worker of yours is on death row in Oklahoma; is that

17  right?

18    A.    Yes.

19    Q.    Could you tell us about that?

20    A.    Um, he killed his father-in-law.

21    Q.    Okay.  Did that happen while y'all were

22  working together?

23    A.    No.  I didn't actually work with him.  I

24  worked on the same rig with him, but I grew up with him.

25  The same as the judges, I grew up in a small town and I

1    pretty much knew everybody.

2         Q.    Were you close friends with him?

3         A.    Not close friends, but I was friends.

4         Q.    Do you keep in touch with him at all?

5         A.    Oh, no.

6         Q.    Haven't had any contact with him since he's

7    been sentenced?

8         A.    No.

9         Q.    Based on what you know about the case, do you

10   have an opinion as to whether that was an appropriate

11   verdict?

12        A.    I thought it was.

13        Q.    Any hesitations going into this since you have

14   got a friend on death row that you might participate in a

15   capital murder or death penalty case down here in Texas?

16        A.    No.

17        Q.    You also told us -- let me see.  I know you

18   got your questionnaire in front of you.  It's kind of unfair

19   of us to question you on it after all this time, but under

20   prosecutors -- I'm looking at page 5, if you want to follow

21   along.  We asked you kind of the first thing that pops in

22   your mind when you think about prosecutors and defense

23   lawyers.  You said, you would hope they are honest.

24              I'm just curious, is that off the top of

25   your head or have you had some experience that led you to

make that statement?

A.    No, that was mainly off the top of my head.

Q.    And also further down the page on 5, we kind of give you these statements and ask whether you agree or disagree with them, that type of thing.  And that very first one, you said most criminals are actually victims of society's problems.  And you marked that you agreed with that.  And I just wanted to follow up with you and see exactly what you were thinking on that.

A.    I think a lot of it is upbringing, different circumstances when people are growing up.

Q.    Okay.  Do you think that may explain why somebody chooses a life of crime and that type of thing?

A.    I think it personally does.

Q.    Okay.

A.    Some people just seem to be unexplainable.

Q.    Some people just born bad, that type of thing?

A.    Uh-huh, yes.

Q.    Now, have you ever been on a jury before?

A.    Civil suit.

Q.    Okay.  How long ago was that?

A.    I want to say four or five years ago.

Q.    Okay.  Was that here in Dallas or Ft. Worth?

A.    Dallas.

Q.    Okay.  What type of case was it, do you

1    remember?

2          A.     It was a wrongful termination case.

3          Q.     And did y'all actually reach a verdict in that

4    case?

5          A.     Yes, we did.

6          Q.     And it looks like you found against the

7    plaintiff or for the defendant; is that right?

8          A.     Yes.

9          Q.     Didn't award any damages or anything like

10   that?

11         A.     No.

12         Q.     You also told us in general that you were in

13   favor of the death penalty; is that right?

14         A.     Yes.

15         Q.     Okay.  What value or what utility do you see

16   us having the death penalty in our society?  What purpose do

17   you see in it?

18         A.     Well, I just believe if you can't rehabilitate

19   somebody, that they're going to get what they deserve.

20         Q.     Is there a particular type of facts or set of

21   circumstances?  You have talked about your coworker's

22   circumstances, but a particular scenario that comes to mind

23   when you think about what may be appropriate for the death

24   penalty?

25         A.     I'm not sure I follow that.

1    Q.    Okay.  Any particular type of case, maybe a

2 case you have heard or read about comes to mind or you have

3 heard about it and you say that person deserved the death

4 penalty or that should be a death penalty case?

5    A.    Yeah.  I really think when somebody is

6 committing a crime and they have a gun with them, they are

7 pretty much planning on possibly doing it.

8    Q.    Okay.  Like a robbery-type scenario, robbery

9 gone bad?

10    A.    Yes.

11    Q.    And we asked you at one point in the

12 questionnaire to rank yourself how strongly you feel about

13 the death penalty from a 1 to 10, 1 being the least and the

14 10 being the most.  And I believe you gave yourself an 8.

15 Is that pretty indicative that you feel strongly about the

16 death penalty?

17    A.    Yes, I do.

18    Q.    Let me ask you this and I think kind of

19 following up what you said, that robbery scenario,

20 oftentimes people think that, you know, when you call a case

21 to mind you think about that person going in on a robbery

22 like a 7-Eleven with a loaded gun, at some point during the

23 robbery shooting and killing that clerk and trying to get

24 away, that type of thing, which would be capital murder in

25 Texas, murder, intentional murder, in the course of a

1    robbery.

2              But oftentimes crimes are not committed

3    by just one person.  You would have groups or gangs of

4    people, you know, who commit a crime.  In Texas the death

5    penalty is just not limited to the person that actually

6    caused the death.  It's commonly what we call the

7    triggerman.  Okay?  The death penalty is not just limited to

8    that person.

9              Depending on the facts and circumstances,

10   the law also allows us to seek the death penalty against a

11   nontriggerman, what a lot of people call an accomplice.  In

12   Texas we call them a party to a crime, but an accomplice to

13   a crime, the person that doesn't actually pull the trigger

14   or the person that didn't actually cause the death.

15             And we talk to a lot of people.  Some of

16   them, you know, feel strongly about the death penalty, as

17   you have told us you do, but they just believe in the death

18   penalty for that person that actually took a life, you know,

19   for the triggerman.  If it was up to them, they would take

20   the death penalty off the table for the accomplice or the

21   nontriggerman.  For whatever reason they just don't feel the

22   death penalty is justified unless it's the person that

23   actually caused the death, so they would never have the

24   death penalty available, even for the accomplice or the

25   nontriggerman.  What do you think about that type of

scenario?

     A.    I think it would depend on the situation.

     Q.    Okay.  Anything that comes to mind that might be important to you when you think about that type scenario?

     A.    I would think if the person that was the accomplice was carrying a gun himself, that he was just as guilty.

     Q.    Okay.  That would be good evidence to you that, I guess, that person's frame of mind or --

     A.    Or if he knew the other person was carrying a gun.

     Q.    Okay.  Let me give you a quick scenario or set of facts and see what you think about it.  Say Mr. Shook and myself and one other friend decide we're going to commit a bank robbery.  We're going to rob a bank.  We only have one gun between us.  The plan is for Mr. Shook to go in with the pistol.  I'm actually going to come into the bank, kind of with the bag and collect the money.  I'm going to be the bagman.  And our third friend is going to be the getaway car driver.  He's going to be outside.  He'll drive us up to the bank, wait outside.  If he sees something going on, he'll hit the horn and let us know we need to hurry up or get out of there, that type of thing.

     And that's what we agree to.  We agree to a bank robbery.  And at some point during this process or

1  during the robbery for some reason, maybe Mr. Shook sees

2  somebody going for a silent alarm or going to call the

3  police, he shoots and kills a teller, okay?  And after that

4  murder we get out of there.  Get captured at some point down

5  the line.

6          Obviously, Mr. Shook has committed capital

7  murder, an intentional murder in the course of a robbery.

8  He could be punished potentially with the death penalty.

9  What do you think about the death penalty under that set of

10 facts for a person like me, the guy that went in, didn't

11 have a gun, was just the bag man?

12      A.    Again, you would know that he had a gun when

13 you walked in.

14      Q.    Okay.  Do you think the death penalty may be

15 appropriate for somebody like me?

16      A.    I think it could be.

17      Q.    What about the getaway car driver, the guy

18 that --

19      A.    The same.  He knew.  He was aware that they

20 had a gun when they went in.

21      Q.    Just depending on the facts and circumstances?

22      A.    Yes.

23      Q.    Would it be a clear case for the death penalty

24 if I had a gun, as well, a loaded gun?

25      A.    I think so.

Q.      And that's basically what the law

contemplates.  The law talks about, you know, if I help

Mr. Shook commit a capital murder, if I actively aid and

participate, direct him, encourage him, solicit him to

commit a capital murder, I could be found guilty.

I could also be found guilty, and this is

the case that we've talked about, if Mr. Shook and I

conspire or agree to commit robbery and if during the course

of that robbery, a capital murder has been committed, the

law says if I should have anticipated, if I should have

anticipated a death would happen, then at that point I could

be also found guilty of capital murder and potentially

receive the death penalty.  That's the law.

And it kind of sounds like that's where

you are personally, kind of, from what we've talked about.

If I should have anticipated that a death would occur, you

can see convicting somebody like me of capital murder and

depending on the facts and circumstances potentially give

the death penalty; is that correct?

A.      That's correct.

Q.      Okay.  And the reason we kind of have been

talking about this and I'll be up front with you, this is a

case where we are prosecuting the defendant, Mr. Murphy,

under that theory of accomplice or conspiracy liability as a

nontriggerman.  The law allows us to do that and that's why

1  we spend so much time with people, such as yourself, making

2  sure that you can keep an open mind to the potential of a

3  death penalty for an accomplice or a nontriggerman.

4            Knowing that, do you have any hesitations

5  about potentially being a juror in that type of case?

6       A.   No.

7       Q.   Okay.  We also talked to a lot of people, such

8  as yourself, you know, that may be quite strongly in favor

9  of the death penalty, kind of in the abstract or

10 philosophically in favor of it.  When we talk to them down

11 here, it kind of hits home a little bit differently, I

12 guess, because there's a potential they may actually be

13 involved in a process that could end up with somebody like

14 Mr. Murphy lying dead, you know, on a gurney in Huntsville,

15 Texas, one day.  And that, very frankly, is our goal in this

16 case.

17           So I want to make sure that you are --

18 comfortable is probably not a good word, but at least --

19      A.   No, comfortable is not a good word.

20      Q.   No one is comfortable with it.  But we don't

21 want to put anybody in a tough position.  We understand, you

22 know, not everyone is cut out for this type of process.

23 Even though you may philosophically or in the abstract be in

24 favor of the death penalty, we just want to make sure,

25 before you get in the jury box, it's something that you

1    think you can do.   Because once you get over there, it's too

2    late.   And if you kind of have a crisis of conscience or

3    just can't do it, at that point it's too late.

4                        And that's why we need to talk to you

5    about it now.   In Texas we don't ask the juror to make that

6    life or death decision, write in a life sentence or write in

7    death.   We ask them to answer these three Special Issues

8    that you read about and are up on the wall and that kind of

9    determines what the appropriate sentence is.

10                       But we want to make sure, we ask this to

11   everybody, that you feel you are the type of person that

12   could take pen in hand and answer those three questions in

13   such a way that it may result in the death of Mr.

14   Murphy someday, the death sentence.   Do you feel like you

15   are the type person that could do that?

16        A.      I feel like I would prefer not to.

17        Q.      Okay.   How come?

18        A.      I just think I would think about it.

19        Q.      Okay.   You feel it might weigh on your

20   conscience?

21        A.      I don't see how it wouldn't.

22        Q.      Okay.   And a lot of people tell us that.

23   Because, you know, as you are aware living in Texas and

24   having lived in Oklahoma, Texas is a very active death

25   penalty state.   It's a reality in our state.   Our juries

assess the punishment probably as much or more than any

other state and the death penalty is actually carried out in

this state, you know, more so than any other state in the

union.  Texas typically leads the nation in executions.

And, you know, the press reports that.

You are going to hear the details of what may happen.  If

the jury answers those three questions in such a way that

the death penalty is appropriate, the Judge has no

discretion.  He will sentence Mr. Murphy, the defendant, to

an automatic death sentence.  He would be taken immediately

down to death row.

Someday in the future, I can't tell you

how long, Judge Cunningham would actually set a date of

execution.  And on that day he would be moved to the death

house in Huntsville to a cell, be given a chance to meet

with friends, family members, spiritual advisors, that type

of thing.  And right before 6:00, which is the time mandated

for all executions in Texas, he would be taken from that

holding cell, either voluntarily or involuntarily, taken

into that death chamber.  You have probably seen a picture

of it.  It has the gurney and leather straps.  Strapped

down, again either willingly or against his will, by the

guards.

And an IV would be started and there

would be two viewing rooms, one for the victim and victim's

1   family members and one for his friends, family members,

2   spiritual advisors.  Once that IV was started, he would be

3   given a chance to make a last statement.  He may proclaim

4   his innocence to the end.  He may ask for forgiveness.  You

5   never know.

6                   And at some point the warden would signal

7   the executioner.  The drugs would be started.  His heart and

8   lungs would shut down and he would lose consciousness and

9   fall into a deep sleep and ultimately die.

10                  I go into those details not necessarily

11  to be morbid with you, but those are the type details that

12  are routinely reported in the press.  If you served on a

13  death penalty jury, those are the type things you may hear,

14  you know, about this case one day in the future.

15                  And, you know, very frankly, we know not

16  everybody is cut out for that, again.  So I guess it comes

17  down to you.  You know yourself better than anybody.  In

18  your heart of hearts you said it may weigh on you.  I know

19  it's not something that you want to take part in, but if

20  called to do it, do you think it's something that you could

21  do?

22       A.    Yeah, I think I could.

23       Q.    Do you think the potential on down the line,

24  hearing those details like I talked to you about, do you

25  think that may enter into your decision in the courtroom?

1    A.    No.

2    Q.    What we require of our jurors is just to base

3  their decision on what they hear in the courtroom.  Based on

4  the facts and the evidence, you decide whether to find him

5  guilty of capital murder.  Based on the facts and evidence

6  in the second part of the trial is how you answer those

7  three questions.  And we let the answers to these three

8  questions determine the appropriate sentence.

9         So, like I said, we don't want somebody

10  over in the jury box that's got anything else going on, any

11  other issues other than just listening to the facts and

12  evidence and making the appropriate decision in a case.

13  Sounds like that's something you think you can do; is that

14  right?

15    A.    Yes.

16    Q.    Okay.  Like almost everybody else we've talked

17  to, you mentioned that you have heard something about this

18  case?

19    A.    Yes.

20    Q.    Okay.  And, like I said, everybody in these

21  type of high profile cases has heard something.  Do you

22  remember exactly what you have heard or what do you know

23  about this case?

24    A.    I know what was reported in the paper,

25  Christmas Eve, Oshman's.

1      Q.     Do you remember any of the details?

2      A.     Texas Seven or something like that.

3      Q.     Uh-huh.  Any of the details of the crime or

4   the capture?

5      A.     I remember they captured them in Colorado or

6   something like that.  And I'm -- the details are fairly

7   sketchy, but I remember pretty much what happened.

8      Q.     Have you followed any of the other trials that

9   may have gone on in this case?

10     A.     No, I haven't followed them.  I have read

11  about a few of them in the paper, but not all of them.

12     Q.     Are you aware of any of the other verdicts in

13  these cases?

14     A.     Yes.

15     Q.     Okay.  Do you remember which particular -- do

16  you remember a name or anything?

17     A.     I don't remember any names.

18     Q.     Knowing that, how do you think it might affect

19  you, if you were a juror?

20     A.     I don't think that would affect me.

21     Q.     Okay.  Again, kind of coming back to what we

22  already talked about, the law contemplates that a jury just

23  make up their mind on what they hear in the courtroom.  What

24  you may have heard, what you may know, you are going to have

25  to kind of put it out of your mind and just base your

1    verdict on the facts that you hear in the courtroom.

2                    Sounds like that shouldn't be a problem

3    for you.   You would be able to do that?

4        A.    No, it wouldn't be a problem.

5        Q.    Do me a favor real quick.   I know you have

6    looked at the law that we have given you, but if you would,

7    read three questions or the three Special Issues up on the

8    wall.   They are phrased a little differently than they are

9    in your pamphlet.   Take a minute and look over those.

10       A.    (Prospective juror complies.)

11       Q.    Again, those are the three questions that we

12   get to in the second phase of the trial to determine the

13   sentence.   Just to back up, all trials in Texas are

14   basically two-part processes.   The first part, we call it

15   the guilt/innocence phase.   The jury is just concerned there

16   with whether the person actually committed capital murder,

17   whether they are guilty of the crime.   You would hear facts

18   just basically or usually about the crime itself to

19   determine whether we've proven to you beyond a reasonable

20   doubt that the defendant's actually guilty of capital

21   murder.

22                   If the person is found guilty of capital

23   murder, then we move into that second phase, the punishment

24   phase of trial.   The rules of evidence kind of expand or

25   broaden out and you get to hear more about the person,

1    whether he has a criminal history, whether he doesn't, about

2    his background, character, reputation, maybe, that type of

3    thing.

4                    And with that extra information we ask

5    the jury to go through and look at these three questions and

6    answer the questions.  Looking with me on Special Issue No.

7    1, you can see it says there's a probability that the

8    defendant could commit criminal acts of violence that would

9    constitute a continuing threat.  You see how that's kind of

10   asking the juror to make a prediction about future behavior

11   or future events?

12        A.    Yes.

13        Q.    Asking you to look in the future.  Is that

14   something that you think you can do?

15        A.    I think it would be hard to do.

16        Q.    Why do you think that?

17        A.    It's pretty hard to determine what somebody

18   might do in the future.

19        Q.    Okay.  Would you be comfortable, you know,

20   looking at the crime maybe that you convicted them of and

21   maybe some extra information in maybe answering that

22   question?

23        A.    I'm sorry, I don't understand.

24        Q.    Do you think it's something that you could do

25   if you went back and looked at the crime they had been

1  convicted of and looked at this added information that you

2  may hear in the second phase of the trial?  Is it something

3  that you think you could possibly reach an answer on that

4  first question?

5       A.    Yes.

6       Q.    What would be important to you to answer

7  something like that?

8       A.    It would just depend on the testimony.

9       Q.    Would you think the defendant's background,

10  the person charged, their criminal history, maybe, would

11  that be important to you?

12       A.    I think it would.

13       Q.    Why do you say that?

14       A.    Well, they would have a history of crime.  I'm

15  kind of confused on what you are asking me here.

16       Q.    I want to make sure -- we talk to a lot of

17  people and some people are just flat uncomfortable about

18  making a prediction about future behavior, say there's not

19  enough information, the type of information, I need.  I just

20  can't look into a crystal ball into the future and make a

21  prediction about what another person may or may not do.  And

22  I want to make sure that you are, again, probably a bad

23  word, comfortable, but you feel that you could make that

24  prediction, if you were given enough information?

25       A.    Yeah, I think I could.

1    Q.    Okay.  Looking again at that question, it

2  talks in terms of probability.  These words aren't

3  necessarily defined or they are not defined legally.  We

4  kind of leave it up to the jurors to put their common sense

5  and interpretation on it.  But what does "probability" mean

6  to you when you look at that word?

7    A.    Possibility.

8    Q.    Okay.  And the law basically talks in terms of

9  probability being more likely than not.  It's not a high

10  probability.  We don't have to prove to you it's going to

11  happen again.  Just that, I guess, it's more likely than not

12  or a little bit more than a possibility.  Does that make

13  sense to you?

14    A.    Yeah, it does, yes.

15    Q.    Okay.  You know, if you put it on a scale,

16  maybe 51 percent of the evidence leans that way.  Something

17  is more likely than not to happen.  Also it talks about

18  criminal acts of violence.  That's not necessarily defined

19  for jurors.  Okay?  I'm kind of curious, just off the top of

20  your head, what that means to you, that phrase "criminal

21  acts of violence", what type of things come into your head?

22    A.    Just hurting someone when you were committing

23  a robbery or something.

24    Q.    Again, the law doesn't necessarily define it.

25  It can be anything you think it is or the jury thinks,

Threats, assaults, robberies.  I guess the bottom line from

my perspective is we don't have to prove to you that he may

cause another death, that he murder or he may commit another

capital murder.  It's not that high of a burden.  Does that

make sense to you?

     A.     Yes.

     Q.     Okay.  Then, finally, the very last word in

that question, "society."  How would you define that,

whether someone is a danger to society, or what pops into

your head on that?

     A.     Just someone that sits around and plans on

robberies or --

     Q.     When you think about the definition of

"society," who that word includes in that question, what do

you think of?  Obviously, people like us walking around in

the free world.  I guess my question is, would you also

include people behind bars, you know, other prisoners,

guards --

     A.     Yeah.  I think they are part of society.

     Q.     And that's what the law basically envisions,

that you can define that word to include both people not in

prison and the prison population and that type of thing.

Does that make sense to you?

     A.     Yes.

     Q.     Question No. 1 starts off with a no answer.

No. 2 is the same way.  The first two are alike in that they both start out with a no answer.  That's kind of the default setting or default mode.  And it's up to us at this table, the State, to prove to you beyond a reasonable doubt that answer should be yes.  Okay?  It's our burden to prove to you Special Issue 1 and Special Issue 2.

Any questions at all about Special Issue No. 1 before we move on?

A.    No.

Q.    Okay.  Special Issue 2 talks about kind of what we've already visited about, the scenario where somebody may not actually be the triggerman, the nontriggerman.  If they are the triggerman, the question is pretty easy to answer.  They actually caused the death.

The question also terms, it talks about intending to kill the deceased or another, maybe like a murder for hire type deal.  You hire somebody to kill your spouse or hire somebody to kill your business partner.

And, finally, that last line on Special Issue No. 2, anticipated that a human life would be taken.  And if you will recall, when we talked about it a few minutes ago, in order to convict someone of capital murder, you have to find that they should have anticipated that a life would be taken.

Going back to our example, you would have

to say that I should have anticipated that Mr. Shook would

have taken a life in that bank robbery.  By the time we get

down to punishment, because we're talking about the death

penalty, the law imposes a little bit higher burden that

says did the person really, did they actually anticipate a

human life would be taken?  So it's a little bit higher

burden before we move along in the process.  Does that make

sense to you?

A.    Yes.

Q.    Again, the question starts off with a no.

It's up to us to prove it to you beyond a reasonable doubt

that the answer should be yes.  If you find somebody guilty

of capital murder, answer question 1 yes and question 2 yes,

then you have got that final question, Special Issue No. 3.

Neither side has the burden on this.

It's just answered how the jury feels is appropriate.  It

asks you to kind of look back at all the evidence, the

circumstances of the crime, what you may know about the

defendant, his background, and his kind of personal moral

blame that he bears for the crime.

And it asks if there is anything

mitigating.  By mitigating, that means, you know, anything

that may lessen his personal blame or blameworthiness for

the crime.  And we ask a jury to look at that and if you

find something like that, is it sufficient that his life

1  ought to be spared?  Okay?  Such that he should get a life

2  sentence as opposed to a death sentence.

3                      Does that make sense to you?  It's kind

4  of the last stop in the process.

5          A.     Yes.

6          Q.     The last check or safety valve.  As you sit

7  there today, is there anything in these types of cases that

8  may strike you as being potentially mitigating?

9          A.     They would have to prove it to me.

10         Q.     Okay.  I didn't hear?

11         A.     I would have to hear the testimony and I, just

12 off my head, I can't think of anything.

13         Q.     That's commonly what we hear.  I hope people

14 don't sit around thinking about mitigation in a death

15 penalty case.  But some people tell us that, you know, if

16 the person was younger, that may be potentially mitigating,

17 because they haven't had much life experience.  Other people

18 tell us, no, if you are old enough to do this type of crime

19 and be tried as an adult, you are old enough to know right

20 from wrong, that type of thing.  What do you think about

21 that?

22         A.     I think if you are old enough to do the crime,

23 you are old enough to know right from wrong.

24         Q.     People tell us maybe how the person was

25 raised, you know, was there some early on well documented

1    history of some type of abuse, physical and mental abuse, in

2    their upbringing.  That may be potentially mitigating.

3    Others feel it's not.  Where do you come down on that?

4         A.    I don't think it would be.

5         Q.    Drugs and alcohol.  Some people tell us if the

6    person is high or drunk or an alcoholic or drug addict, that

7    potentially may be mitigating.  Other people say, no, you

8    know, you do that voluntarily.  It's not an excuse.  It's

9    not mitigating.  Where do you come down on that?

10        A.    I don't think that is.

11        Q.    Again, the law doesn't define what mitigation

12   is or what -- it doesn't require you to consider any

13   particular factor or fact as mitigating.  We just leave it

14   up to the jury.  You don't even have to agree with the other

15   jurors what's mitigation.  The law just requires that you

16   keep an open mind to mitigation and if you hear something

17   that you think is mitigating, you can keep an open mind,

18   look at it, and come up with the appropriate answer to that

19   question.  Does that make sense to you?

20        A.    Yes.

21        Q.    Okay.  Does that seem like something you could

22   do?  You can follow that law and keep an open mind?

23        A.    Yes.

24        Q.    Okay.  Again, one thing to point out about all

25   this, and that's kind of the bottom line with the law when

1   we get to the second phase of the trial is that you start

2   that punishment phase with an open mind.  You know, some

3   people tell us, hey, if I found somebody guilty of capital

4   murder, I'm automatically going to always answer Special

5   Issue No. 1 yes.  And they say, if I have found them guilty

6   as a capital murderer, I'm always going to feel that he's a

7   probability to commit that future act of violence.  You

8   know, the fact that I found him guilty necessarily or

9   automatically answers that question.

10              And a lot of people feel that way.

11   There's a certain common sense to it.  But what the law says

12   is just because you found somebody guilty of capital murder,

13   that doesn't automatically answer those questions for you.

14   You still have to start that second phase with the open

15   mind, and, you know, because you may hear additional

16   evidence.

17              Is that something that you think you can

18   do, even knowing you found somebody guilty of capital

19   murder?  Do you think that you can start off and keep an

20   open mind to those questions?

21      A.     Yes.

22      Q.     Okay.  Let's talk a little bit about some of

23   the rules that apply.  I know you have been a juror before

24   on a civil case, but there are certain kinds of basic things

25   that apply in a criminal case.  You probably are familiar

283RD JUDICIAL DISTRICT COURT 214/653-5863
NANCY BREWER, OFFICIAL COURT REPORTER

1  with them.  For instance, like the Fifth Amendment.  A

2  person that's charged with a crime has an absolute right not

3  to testify in their own defense.  No one can force a

4  defendant to take the stand.  Conversely, no one can keep

5  the defendant off the stand, if he chooses to testify.

6              But if he doesn't testify, the law is and

7  the Judge will instruct you, that you can't consider that in

8  your deliberations.  It's just basically a nonfactor.  You

9  can't hold that against him in any way.  Does that make

10 sense to you?

11      A.    Yes.

12      Q.    Is that something that you feel -- a law you

13 feel that you can follow, that type of thing?

14      A.    Yes.

15      Q.    Okay.  The law also starts out every criminal

16 defendant with the presumption of innocence.  As we sit here

17 right now, Mr. Murphy is presumed innocent.  For whatever

18 reason the trial stopped now, he would be found not guilty.

19 He would be found innocent.  That only goes away when the

20 State has proven it to you beyond a reasonable doubt.  And

21 everybody starts off with that presumption of innocence.

22 Does that make sense to you?

23      A.    Yes.

24      Q.    It's really another way of holding us to our

25 burden of proof because we always have the burden of proof.

1    It's up to us to prove to you that he's guilty of capital

2    murder beyond a reasonable doubt.  And in this case we also

3    have to prove the answers to Special Issues 1 and 2 should

4    be yes, and that's our burden.  This side never has a burden

5    in any criminal case.  Does that make sense to you?

6        A.    Yes.

7        Q.    You can't ask them to prove something.  As

8    part of our burden of proof, you know, you probably looked

9    at the indictment.  I think it's on the last, the back page,

10   the last page of your booklet.  That's basically what we

11   have alleged in this case.  We have alleged capital murder

12   as being committed two different ways, murder in the course

13   of a robbery, an intentional murder in the course of a

14   robbery, and also the murder of a police officer in the

15   course of his duty.

16              If we prove one or both of those to

17   you, we prove all the elements of the crime, the law would

18   require you to find the person guilty.  But the law requires

19   that we prove each and every element to you.  We can't go

20   nine for ten or eight for ten.  You know, we don't get

21   partial credit.  The jury can't help us out.  We have to

22   prove each and every element, whether it's the county the

23   crime happened in, if it's the particular manner and means

24   of death, no one element is any more important than the

25   other.  We have to prove them all to you.  Does that make

1    sense?

2          A.    Yes.

3          Q.    Do you think if we failed to prove to you one

4    element, that you could follow the law and find the

5    defendant not guilty?

6          A.    Yes, I do.

7          Q.    Okay.  I think you mentioned in your

8    questionnaire that you may be friends to some police

9    officers or known some police officers; is that right?

10         A.    I've known some.

11         Q.    Obviously in this case, we've alleged a police

12   officer has been killed.  We can't preview the case to you

13   or get into the evidence, but I think it's a safe assumption

14   that police officers are going to testify in this case.

15               What the law says is that you have to

16   start every witness, whether it be a police officer or

17   psychiatrist or psychologist, you have to start them out at

18   the same level of credibility.  You can't give them a leg up

19   just because of who they are or conversely you can't be

20   closeminded to them before you hear a word out of their

21   mouth because of who they are or what they do.  You have to

22   listen to them and see if they make sense, that type of

23   thing.  Does that sound like something you can do?

24         A.    Yes.

25         Q.    Okay.  We've talked about, you know, the two

1    options of sentencing for capital murder.  There's the death

2    sentence or the life sentence, if the questions aren't

3    answered yes, yes, and no.  What a life sentence means in a

4    capital case in Texas is that the person has to serve forty

5    years, forty calendar years, day for day, before they become

6    eligible for parole.  They may make parole the first time up

7    after their forty years or they may not.  They may serve an

8    actual life sentence, a hard life sentence.

9                    The law tells you that and then the law

10   tells you not to consider it.  It says you have to presume

11   that a life sentence really means a life sentence because no

12   one in this courtroom really has control over whether they

13   make parole at forty or actually serve a full life sentence.

14                   So we ask the jurors to assume and

15   presume that life means life in these type cases.  Is that

16   something that you think you can do?

17        A.     Yes.

18        Q.     Okay.  Do you have any questions about

19   anything we've talked about?

20        A.     No.

21        Q.     Okay.  Does the scheme we have in Texas kind

22   of make sense to you?

23        A.     Yes.

24        Q.     Okay.  And no hesitations or concerns about

25   potentially being over there in the jury box in a case with

27

1   life or death stakes?

2        A.      No.

3        Q.      Okay.   Only other question I have, Mr. Shook

4   pointed out to me you mentioned in your questionnaire if a

5   job came open, you may be moving out of the county at some

6   point.   I don't know if that is still a consideration or

7   concern.

8        A.      Yeah, I would, if I got the job I've been

9   waiting on.

10       Q.      Okay.   Is that something that you think might

11  come through in the next few months?

12       A.      I don't think it will start until January.

13       Q.      So as far as you know, you would still be a

14  Dallas County resident -- even if you got the job, you would

15  still be a Dallas County resident in November?

16       A.      No -- yeah, the job is not supposed to open

17  until January.

18       Q.      Mr. Hulsey, thank you for your time this

19  morning.

20              MR. WIRSKYE:   That's all I have, Judge.

21              THE COURT:   Ms. Busbee?

22                      CROSS-EXAMINATION

23  BY MS. BUSBEE:

24       Q.      Thank you, Mr. Hulsey.   So when we gave you

25  this questionnaire to fill out, we didn't tell you how it

1    worked in reality and then we get you down here and start

2    talking to you about things.  But I think it's clear -- it

3    becomes clear to me that people naturally hear the words

4    "capital murder" and think that we're talking about the

5    death penalty.

6            But I think you understand now there's

7    two different things.  Capital murder is an automatic life

8    sentence.  You understand that?

9        A.    Uh-huh.

10       Q.    I feel that way, too.  It's early in the

11   morning.  But you have to say yes or no so she can put that

12   down.  She can't put -- execute an expression.

13       A.    I understand it now.

14       Q.    So automatically when the State is seeking the

15   death penalty, I don't think anybody has any problem with

16   saying a person who is a party to an offense is guilty of

17   that exactly as the person who pulled the trigger because

18   that's -- that's our law in all cases in Texas.  And I'm

19   assuming you don't have a problem with that?

20       A.    No.

21       Q.    Okay.  So assuming that you are sitting on a

22   hypothetical capital murder case in which the State is

23   seeking the death penalty, you would have already found

24   somebody guilty of the offense of capital murder before we

25   get to these Special Issues.

1    And I like to put it a different way.

2   The law assumes or the law favors a life sentence in a

3   capital murder case.  So in order to get a death penalty

4   sentence, the State has to do some things, establish some

5   things to the jury beyond a reasonable doubt, before that

6   can be accomplished.

7    So Special Issue No. 1, the question

8   about the probability a person would commit a criminal act

9   of violence in the future, is something that is decided anew

10  by the jury and decided beyond a reasonable doubt.  Do you

11  think having decided that a person is guilty of the offense

12  of capital murder beyond a reasonable doubt, that you would

13  automatically answer Special Issue No. 1 yes?

14       A.    Yes, I would.

15       Q.    Okay.  And that's because someone who has

16  committed a capital murder is somebody you won't take a risk

17  on, I'm guessing, because that's what some people say?

18       A.    I wouldn't, yes, you're right.

19       Q.    And that doesn't mean -- I want to reassure

20  you about this.  You assumed we were going to talk about

21  everyone.  I'm thinking you are about the 28th or 29th

22  person we've talked to and your juror number is 957.  So

23  that kind of tells you how we winnow out people.  And we're

24  only talking with people who had intelligent and thoughtful

25  questionnaires that we thought might sit on our jury.

1          But we also called people down that we
2     felt would tell us the truth about how they felt about
3     things.  So no problem saying that you can't follow the
4     tortured statutory scheme we have.  The only problem would
5     be is if you didn't tell us so.
6          So having said that, I guess my question
7     is, on Special Issue No. 1, it wouldn't matter what you
8     heard in the case, it wouldn't matter.  You would say the
9     defendant was a future danger based on the fact that he had
10    been guilty of the capital murder.  Is that what you are
11    telling us?
12         A.     Yes.
13         Q.     Okay.  And in order to answer that question
14    no, would you need to hear something from us to disprove
15    that fact?  Would it require --
16         A.     No, I don't think so.
17         Q.     It would just automatically be answered yes?
18         A.     You are confusing me here a little bit.
19         Q.     That's what I'm afraid of.  I don't want to
20    confuse you, but I want to hear your real feelings and I
21    don't want to suggest an answer.
22         A.     I would think that if somebody has committed a
23    violent crime, there's a possibility they are going to do it
24    again.  I think there's a possibility that anybody in here
25    could do that again.

1    Q.    Okay.  There's a possibility that Mr. Wirskye

2  is going to go crazy and commit a crime, but we're getting

3  words mixed up.  It's probability.  So that means it's a

4  little stronger than possibility.  So tell me your thoughts

5  on that.

6    A.    If I felt somebody was guilty, I would

7  definitely think there's a probability that they would do it

8  again.

9    Q.    So the State wouldn't have to prove to you

10  anything else other than the fact that you already decided

11  that the person committed the offense of capital murder?

12    A.    The State would have to prove to me that they

13  did.

14    Q.    The capital murder?

15    A.    Yes.

16    Q.    And having decided that, it's clear to you

17  that Special Issue No. 1 would be answered yes?

18    A.    Yes, it would.

19    Q.    Okay.

20         THE COURT:  Mr. Hulsey, I'm going to try

21  to wade in, in the middle of the lawyers.  You say you were

22  confused.  Your answer to Mr. Wirskye when he asked you, do

23  you think that you can look in the future and answer this

24  question, you said that would be real hard.

25         PROSPECTIVE JUROR:  Uh-huh.

1        THE COURT:  And you can try to -- what

2    Ms. Busbee is saying, in a hypothetical case, if the jury

3    has found someone guilty of capital murder, you put that

4    part of the trial behind you.  Then you have a punishment

5    hearing which is a lot more evidence that comes after you

6    have found someone guilty.  You find someone not guilty,

7    it's completely different.

8             But on the second part of the trial, it's

9    answering these three questions.  The State has the burden

10   to prove to you whether or not there is a probability that

11   the defendant, this defendant, would commit criminal acts of

12   violence that would constitute a continuing threat to

13   society.  And the law is written such that you have to go

14   into that beginning of the punishment trial with the answer

15   no.  The law says we start with the answer is no.  The State

16   has to prove to you beyond a reasonable doubt that he is a

17   -- or there is a probability.  Probability means more than

18   possible.  Because it's possible, like she said, Wirskye

19   could go off today and commit a crime.

20             Probable, we don't have a definition for

21   it, but the lawyers have agreed it's more likely than not,

22   is a good base definition.  So it asks you to look in the

23   future about this defendant, if he were found guilty, taking

24   all the evidence you hear.  So it starts off no.  If the

25   State convinces you beyond a reasonable doubt, then you

1   would answer the question yes.

2              Ms. Busbee's question is, and this is

3   perfectly fine, don't make me change your opinion.  But some

4   people say, yes, Judge, if I found somebody guilty of

5   capital murder, I don't need any more evidence.  I'm going

6   to always answer this question yes.

7              Have I cleaned that up for you somewhat

8   or made it worse?

9              PROSPECTIVE JUROR:  I just don't

10   understand the procedure on that.

11              THE COURT:  All right.  We're going to

12   try it again.  The law states that this question starts off

13   with a no answer.  She said it perfectly.  Our capital

14   sentencing scheme is predisposed to a life sentence.  If

15   someone is found guilty of capital murder in the State of

16   Texas, they're guaranteed a life sentence.  There's only two

17   options for sentencing in a capital murder, a life sentence

18   or a death sentence, regardless of what the crime is,

19   underlying facts.  It's capital murder is equal to a life

20   sentence or death sentence.  It's predisposed to a life

21   sentence, which means if the State doesn't put any more

22   evidence on, then it's a life sentence.

23              In this case they are choosing to put

24   more evidence on.  If they obtain a capital murder verdict,

25   then the jury is asked to answer these questions.  These

1   questions start off as a no.  And unless the State convinces

2   you beyond a reasonable doubt, that question will remain no

3   and he will be sentenced to life in prison.

4                           If the evidence that the State presents

5   convinces you beyond a reasonable doubt that that question

6   should be answered yes, then you go to question No. 2.  Does

7   that help any?

8                   PROSPECTIVE JUROR:  It helps some.

9                   THE COURT:  Some.  So predisposed to a

10  life sentence, unless the State chooses to go through this

11  process.  Her question is, being fair to Mr. Murphy, is your

12  answer to Special Issue No. 1 going to be yes, simply

13  because you found him guilty of capital murder?

14                  PROSPECTIVE JUROR:  Okay.  I think I

15  could still listen to what was said.

16                  THE COURT:  And if you didn't believe the

17  State proved their case, what would your answer be to

18  Special Issue No. 1?

19                  PROSPECTIVE JUROR:  If they didn't prove

20  it?

21                  THE COURT:  Did not prove it.

22                  PROSPECTIVE JUROR:  That there's not a

23  probability?

24                  THE COURT:  And your answer would be?

25                  PROSPECTIVE JUROR:  Would be no.

1          THE COURT:  Ms. Busbee?

2          MS. BUSBEE:  May we approach, Your Honor?

3          THE COURT:  Sure.

4               (Bench conference)

5          THE COURT:  Mr. Hulsey, I want to thank

6    you for your time this morning to the Court.  The lawyers

7    have agreed that when you get three different shots at you

8    on three different angles, sometimes we get people so

9    confused that they aren't real clear about what we're doing

10   here and the parties have agreed to excuse you from this

11   case.  Thank you, sir.

12               [Prospective juror out]

13          THE COURT:  Raymond Capetillo.

14               [Prospective juror in]

15          THE COURT:  Good morning, sir, how are

16   you?

17          PROSPECTIVE JUROR:  Pretty good, sir.

18          THE COURT:  Raymond Capetillo, is that

19   close?

20          PROSPECTIVE JUROR:  Yes.  That's close

21   enough.

22          THE COURT:  Thank you for being here

23   first thing Monday morning.  Have you had an opportunity to

24   read a couple of times the guide that I provided for you?

25          PROSPECTIVE JUROR:  Yes.

1    THE COURT:  Did you have an opportunity

2  to look over your questionnaire?

3    PROSPECTIVE JUROR:  Yes.

4    THE COURT:  The objective this morning is

5  the attorneys are going to try to explain the law to you and

6  then after explaining the law, do you understand it?  That's

7  my main job is to be sure that you understand the law.  Once

8  you understand the law, the next question is, can you follow

9  the law?  And this law is complicated.  You are not supposed

10  to be able to figure it out before you walk in the door.

11  That's what this time is going to be is to work through it

12  and give you examples so you can understand it.

13    PROSPECTIVE JUROR:  Okay.

14    THE COURT:  Please, if you don't

15  understand the question or if you don't understand the

16  concept, just say, can you explain it a different way?  Many

17  people think you are on trial because you are sitting in the

18  witness stand.  Okay?  This is as informal a process as we

19  can have in this matter.  Please try to relax.  And there

20  are no wrong answers, just truthful answers.

21    The only question that I have for you,

22  sir, is will you be able to serve this Court for two weeks

23  beginning on November 10th?

24    PROSPECTIVE JUROR:  I should be able to,

25  yes.

1        THE COURT:  Mr. Shook, would you like to

2   inquire?

3        MR. SHOOK:  Yes, Judge, thank you.

4               RAYMOND CAPETILLO,

5   having been duly sworn, was examined and testified as

6   follows:

7               DIRECT EXAMINATION

8   BY MR. SHOOK:

9        Q.    Mr. Capetillo, my name is Toby Shook.  I'll

10  ask you questions on behalf of the State this morning.  If

11  you have any questions at any time, feel free to ask.  Okay?

12       A.    Okay.

13       Q.    There's not any right or wrong answers to any

14  of our questions.  We're looking for your truthful opinions.

15  You've been very honest in your questionnaire.  We just want

16  to continue on with that.  I'll follow up with a few

17  questions on the questionnaire, also ask you about capital

18  murder, the death penalty, some of the laws that apply, and

19  how you feel about those.

20       A.    Okay.

21       Q.    As the Judge said, the trial will begin

22  November 10th.  We feel that it will last two weeks.  And

23  the Judge keeps very regular hours, 9:00 to 5:00 type hours,

24  regular business hours.  That would not be a problem if you

25  were placed on the jury for that length of time?

1    A.    It shouldn't be, no, sir.

2    Q.    Okay.  Have you been on a jury before?

3    A.    No, sir.

4    Q.    All right.  The only person I think we always
5    -- we ask if you have known anyone that's been involved in
6    the criminal justice system and you knew a person by the
7    name of Steve Herrera, who was the -- I believe he was the
8    husband of --

9    A.    Husband of my niece, my niece, yes, by
10   marriage.

11   Q.    Do you know him very well?  Were you very
12   close to him?

13   A.    No, sir.

14   Q.    Okay.  And then he went to prison on some type
15   of drug sale; is that right?

16   A.    From what I understand, because, like I say, I
17   don't know all the particulars because we're not that close.

18   Q.    I take it from that, then, nothing from that
19   experience or anything you know about it would cause you to
20   be unfair as a juror in this case, would it?

21   A.    I wouldn't think so, no, sir.

22   Q.    You think he was treated fairly from what you
23   do know about the case?

24   A.    From what I know, yes.

25   Q.    Okay.  Let me ask you, then, you know that

1  this is a death penalty case, one which the State is seeking

2  the death penalty?

3        A.    Yes.

4        Q.    We want to ask every juror how they personally

5  feel about the death penalty as a law.  Are you in favor of

6  the death penalty as a law?

7        A.    I'm in favor if the crime that was committed

8  -- I'm saying in my own mind the guy deserved or the person

9  deserved the death penalty, I would have to really be aware

10  of the circumstances to really be able to say, yes, I want

11  the death penalty.

12        Q.    What purpose do you think the death penalty

13  serves in society?

14        A.    Well, in my opinion, like I say, the way the

15  crime rate is nowadays, we need to deter to keep the crime

16  down, you know.  And if the way the things -- the way

17  society is going nowadays, I think that we do need the death

18  penalty.

19        Q.    All right.  Have you always been in favor of

20  the death penalty as a law from, I guess, a philosophical

21  point of view, something you think we should have on the

22  books?

23        A.    Well, no, sir.  In my younger days, I didn't

24  believe in the death penalty because, like I said, I was

25  just -- I hadn't really given it much thought until I

1  started having a family of my own and then I looked at it

2  more closely.

3      Q.     And once you had a family of your own and your

4  family grew, that's when you started thinking about it more?

5      A.     Yes.

6      Q.     What types of crimes do you think could be

7  appropriate for the death penalty?

8      A.     Well, like I said, murder, rape, child abuse,

9  something of that nature.

10     Q.     All right.  Have you followed any crimes in

11  the news, local or national media, TV, or newspapers, cases

12  that you thought were cases appropriate for the death

13  penalty or cases at least deserving of it?

14     A.     The only thing that really catches my

15  attention, say, like if the news media picks it up and I

16  watch the news and if it happens to catch my eye on the

17  news, and then that's when I start paying attention.  But

18  other than as far as reading on it, I don't do that.

19     Q.     But you don't recall any cases by name right

20  now or anything?

21     A.     The only one that really caught my attention

22  is back when the O. J. Simpson was -- that was the only

23  thing.

24     Q.     I don't think you could have gotten away from

25  that.  And your opinion on that from everything that you saw

1   or read, that he was guilty?

2       A.      I felt that he was guilty, yes.

3       Q.      Now, there's a lot of publicity involved in

4   this particular crime.  We can't go into the facts, but we

5   could tell you from the questionnaire and what the Judge

6   told you that this crime occurred at the Oshman's on

7   Christmas Eve back in 2000.  It got a whole lot of publicity

8   back then, so almost every juror we know or talk to or

9   filled out a questionnaire said that, yes, they have read or

10  heard something about the case.  And you said that you had

11  heard about it on the TV and radio and newspaper.

12              What is it you recall you heard about the

13  case?

14      A.      Well, like I said, it was just that the

15  officer had been shot and it was one police officer by

16  himself and it was sort of like a gang-style execution and

17  that's what really caught my attention.

18      Q.      Did you follow the capture or any of the

19  subsequent proceedings or anything like that?

20      A.      I kept up to see when they escaped and, you

21  know, how they were looking for them and when they finally

22  caught them and so forth.

23      Q.      As I said before, almost every juror has read

24  or seen something on the news regarding this case.  And the

25  fact that you have doesn't make you unfit to be a juror.

1  But the law is this, if you have read or heard something

2  about it, you can't use that as evidence in the case.  You

3  have to make your decision just based on what you hear from

4  the witnesses on the witness stand.  You can't let any

5  opinions you have formed ahead influence you in any way.

6            Most jurors can do that.  Some tell us

7  honestly they can't because they have read so much and

8  followed it so closely that they did have an opinion one way

9  or the other.  Most can follow the law.

10            We just need to ask you this.  Can you

11 follow that particular law and just make your decisions, if

12 you were seated as a juror, on what you heard in the

13 courtroom?

14       A.     Well, the way I feel right now is from what

15 I've followed, the trial and everything, what I have read

16 and what I have heard, you know, I've sort of formed my own

17 opinion.  But I think that I could listen to somebody else

18 and might change my opinion.  But at this point in my own

19 mind I just have a feeling of how I feel.

20       Q.     Okay.  And that's kind of what I want to get

21 down to.  You have formed some opinions based on what you

22 read and heard and what you followed; is that right?

23       A.     Yes, sir.

24       Q.     And what opinion is that?

25       A.     I feel that the man is guilty and I feel that

53

1    --

2         Q.    Do you feel that would influence you in your

3    decision or could you wait and listen to the evidence and

4    ignore that opinion and then just make that decision on what

5    you hear in the courtroom or is it something that's going to

6    influence you?

7         A.    Right now I really don't -- I don't know how

8    to answer that, because I don't know.  Like I say, right now

9    in my own mind I know how I feel and I would have to -- I

10   don't know if I could just -- somebody would sway me or

11   persuade me.

12        Q.    Are you saying, then, that you have that

13   opinion and it's going to take something to change your mind

14   from it?

15        A.    Something really drastic to change my mind.

16             THE COURT:  Mr. Capetillo, we greatly

17   appreciate your honesty.  Probably the worst thing that you

18   can possibly do is come in and not be honest with your

19   opinions.  It's not fair to Mr. Murphy to have a juror who

20   comes in with the opinion, I think he's guilty before I've

21   heard any evidence.  And it takes a really honest, decent

22   human being to come in and say that and we appreciate it.

23             PROSPECTIVE JUROR:  That's what you asked

24   for is honesty and that's what I'm being.

25             THE COURT:  And there are a lot of people

1   up here that would shade that question and not be totally

2   honest with us and that's not right, because you would not

3   want to be judged by somebody who had already thought you

4   were guilty before they heard the case.

5                        PROSPECTIVE JUROR:  Right.

6                        THE COURT:  And that's the problem with

7   the high profile case.  So the parties have agreed to excuse

8   you, so this is not your case.  Hopefully we can catch you

9   for another one because I would like to have you on anything

10  else in this courtroom, but not this one.

11                       PROSPECTIVE JUROR:  Okay.

12                       THE COURT:  All right?

13                       PROSPECTIVE JUROR:  All right.

14                       THE COURT:  They have excused you and you

15  are free to go.

16                       PROSPECTIVE JUROR:  Thank you, sir.

17                       THE COURT:  Thank you.

18                          [Prospective juror out]

19                       THE COURT:  Ms. Rehwinkel.

20                          [Prospective juror in]

21                       THE COURT:  Good morning.  How are you?

22                       PROSPECTIVE JUROR:  Fine.

23                       THE COURT:  Margaret Rehwinkel.

24                       PROSPECTIVE JUROR:  Rehwinkel, right.

25                       THE COURT:  Glad to have you in the 283rd

1  this morning, Monday morning.  First thing, get down here

2  and fight traffic.

3                    PROSPECTIVE JUROR:  I work five minutes

4  from here.

5                    THE COURT:  You do?  Where do you work?

6                    PROSPECTIVE JUROR:  David Gilbert and

7  Associates in the design district.

8                    THE COURT:  So you know this area real

9  well?

10                   PROSPECTIVE JUROR:  Very well.

11                   THE COURT:  It's still Monday morning.

12                   PROSPECTIVE JUROR:  Yes.  I know, and I

13  was out of town this week and so I'm a little tired.  I got

14  in late last night.

15                   THE COURT:  Did you have one eye open

16  this morning to read the orientation guide?

17                   PROSPECTIVE JUROR:  Uh-huh.

18                   THE COURT:  And that's a lot of law to

19  give someone first thing in the morning and you are not

20  expected to understand it all.  That's why the attorneys are

21  going to visit with you on how the law really works and

22  interrelates.  They will give you examples, I anticipate.

23                   The questions that I have for you at the

24  end of the process, do you understand the law?

25                   PROSPECTIVE JUROR:  Yes.

56

1    THE COURT:  And then the second question

2 is, if you understand the law, can you follow it?

3    PROSPECTIVE JUROR:  Uh-huh.

4    THE COURT:  That's what we're going to

5 answer in about an hour from now.  So we appreciate at this

6 point -- people look at that and they are going to ask you

7 questions about it and go over your --

8    PROSPECTIVE JUROR:  I think I do, just

9 reading.

10    THE COURT:  Sure.  It's one of those

11 deals like you think, you know, you are ready for that test

12 and then they give you the test and where did that come

13 from?  So they are going to give you some examples to help

14 you go through the process.

15    The only question that I have for you

16 right now from the Court is, will you be available to serve

17 this Court for two weeks beginning on November 10th?

18    PROSPECTIVE JUROR:  I can.  It's a long

19 time, though, for me for my business, being away from it for

20 two weeks.  But if there are breaks, my office is five

21 minutes away, so I can always, you know.

22    THE COURT:  We work business hours.

23    PROSPECTIVE JUROR:  I saw that.

24    THE COURT:  You will be able to use a

25 phone and stay in contact with your office during the

1  breaks.  And because you are close, you can run by there

2  after the trial is over in the afternoon.

3                    PROSPECTIVE JUROR:  Right.

4                    THE COURT:  Wouldn't be able to leave

5  during lunch.

6                    PROSPECTIVE JUROR:  Okay.

7                    THE COURT:  But you will be able to use

8  the phone.  You won't be cut off or anything like that.  So

9  for you it would probably be the most convenient than any

10  juror we have down here.

11                    PROSPECTIVE JUROR:  Uh-huh.

12                    THE COURT:  I know business reasons are

13  always a person's concern.  Like paying taxes, nobody wants

14  to be involved in this process.  It costs people money.  But

15  I can't let somebody off for business reasons.  We can help

16  you the best we can and work around it, but I can't let you

17  off.  Thank you very much.  Mr. Shook, you may inquire.

18                    MR. SHOOK:  May it please the Court.

19                    MARGARET REHWINKEL,

20  having been duly sworn, was examined and testified as

21  follows:

22                    DIRECT EXAMINATION

23  BY MR. SHOOK:

24        Q.    Ms. Rehwinkel, is that right?

25        A.    Yes.

1    Q.    My name is Toby Shook.  I'm going to ask you

2  questions on behalf of the State.  We're just looking for

3  your honest opinions.  I think you are aware of that?

4    A.    Uh-huh.

5    Q.    And you are very forthcoming in your

6  questionnaire and we appreciate you taking the time to fill

7  it out.  I know it was a lot of information.  Believe it or

8  not, it will save you some time.

9    A.    Okay.

10    Q.    But I'm going to ask some questions, some

11  followup questions, off of that and obviously talk to you

12  about the death penalty, capital murder, and the laws that

13  apply, that sort of thing.  Your business is nearby.  What

14  do you do?

15    A.    The wholesale furniture.  I'm in the --

16  wholesale furniture rep.  I represent a lot of furniture

17  lines, work with designers, builders, developers, etc.,

18  working hotels, lawyers' offices, hospitals, things like

19  that.

20    Q.    All right.  And I saw on the questionnaire

21  that we always ask if you know any defense attorneys or

22  prosecutors and you said you know Jim Jacks?

23    A.    Jim Jacks.

24    Q.    How do you know him?

25    A.    His wife is a very good friend of mine and

1   Jim, I've known -- our children are friends.  His daughter

2   and my son went to school.  And I have several friends that

3   are attorneys.

4        Q.     Any of those criminal attorneys that you know

5   of?

6        A.     One of the gals that bought my house is a

7   litigator.  I don't know her very well.  Mike Kenoppick

8   (phonetic), I don't think he is criminal.  I don't think any

9   of them are.

10       Q.     But your son was friends with Jim Jacks?

11       A.     Daughter Molly went to the same and Becky his

12   wife is a good friend of mine.

13       Q.     And your son goes to Jesuit and is going to go

14   to Georgetown?

15       A.     He went to Jesuit.  And I was just at his game

16   in Georgetown this week in Washington, D. C.  He's a

17   freshman there, so.

18       Q.     Good.  That must be pretty exciting.

19       A.     It was great.  It was their first football

20   game.  Unfortunately, they lost by a point, but it went down

21   to the last five seconds.  It was a great game, football

22   game.

23       Q.     It should be a good experience up there.  We

24   enjoy this question.  I don't know if it does us a lot of

25   good, but we always ask people to list their three men and

1    women that they most respect and least respect.

2            A.      That one was a tough one.

3            Q.      You can imagine we get all kinds of responses.

4            A.      I'm sure you do.

5            Q.      But oftentimes we like to follow up on that.

6    And what I thought interesting about looking at yours again

7    is what's happened the last week or two with Chief Bolton

8    and everything because you had Ted Benevides down.

9            A.      Well, see, I've known Ted and Val, his wife,

10   forever.  Our children were babies together in preschool and

11   actually his son, Russell, is a senior at Jesuit.  And Ted

12   does a great job.  I know what he's up against.  I mean, I

13   don't talk to them as much as I used to, but --

14           Q.      I was going to ask you how he's holding up to

15   all this.

16           A.      I haven't talked to his wife.  But, you know,

17   it's, hey, anybody in public office, you never can please

18   everybody.  So he does a great job, though.

19           Q.      You also have Ken Molberg down.

20           A.      Yeah, I know him.  We were neighbors on Swiss

21   Avenue and he represented my husband, my late husband, in a

22   discrimination case.  And his wife, Linda, I know and,

23   again, his daughter and my son are the same age, so --

24           Q.      Okay.  And then you had Laura Miller?

25           A.      Yeah.  And I like her, but then I don't like

1  her.

2      Q.    You had the old Laura Miller down.  I thought

3  that was interesting.  Is that when she was with the

4  "Observer"?

5      A.    Well, just, there's just things about her,

6  even now there's things about her that I don't care for, but

7  she's doing the best job she can.

8      Q.    Mary Poss, do you know her personally?

9      A.    Just from Lakewood when I went to Lakewood,

10  different functions.  I don't know her personally, but I

11  have always admired her for her beliefs and cleaning up

12  White Rock Lake.  And when she ran for mayor, I voted for

13  her.  I didn't vote for Laura Miller.

14     Q.    Okay.  That's interesting.  I always like to

15  look at those.  Again, I don't know if it gives us any

16  insight, but you would be surprised with what we get on

17  that.

18     A.    I'm sure.

19     Q.    Let me talk to you a little bit about the

20  death penalty.  Obviously, you know from what the Judge has

21  told you and the questionnaire, that the State is seeking

22  the death penalty in this case.  So we obviously ask a lot

23  of questions in that area.

24          You put on your questionnaire that you

25  are in favor of the death penalty as a law and I would like

1  you to kind of follow up on that and tell us why you favor

2  the death penalty, maybe the purpose you feel it serves.

3        A.    Well, I've always believed in the death

4  penalty and I'm glad Texas is very pro death penalty.  I

5  just -- I guess growing up in the suburbs of Chicago for 20

6  some odd years and then moving to Dallas, not enough people

7  are penalized for their crimes.  And living in Atlanta,

8  going to college there, just reading in the paper and seeing

9  things that happen, they're not tried enough.

10            But when the death penalty is applied,

11 maybe if more people were put to death or had that

12 capability, states did, then maybe some of the crime issues

13 would -- people would think twice about committing a crime.

14        Q.    It might be more of a deterrence?

15        A.    Possibly, yeah,

16        Q.    Do you feel it's a just punishment, then, for

17 certain crimes?

18        A.    Yeah.  Actually, I think probably more people

19 should get the death penalty than life imprisonment.

20        Q.    What types of crimes come to mind which you

21 think could be justified or at least for consideration?

22        A.    Of course, I put down terrorism because that's

23 what everybody is thinking about now.  I think child

24 molesters should be penalized.  I think people that act

25 intentionally to commit a coldblooded murder should be

1  penalized, calculated murders, things like that.

2           Q.      In Texas there's only certain types of cases

3  which are considered for the death penalty.  And we follow

4  guidelines which are brought down by the courts, obviously,

5  but each state is a little bit different.  In Texas it used

6  to be the death penalty could be administered for murder

7  cases and rape cases and even robbery cases.

8                   But now it's limited to murder cases and

9  just specific types of murder cases.  It has to be an

10  intentional killing.  It can't be legally justified, not

11  self-defense, not an accident.  But it also has to have some

12  other aggravating fact.  We have a lot of intentional

13  murders which most, a lot of people would say, look, that

14  should be a death penalty case.  But because of the -- some

15  of the rules laid down by the Supreme Court, they are not.

16  You get a life sentence.

17                   The best example I can think of is

18  Timothy Richardson, the man that murdered his wife in

19  Highland Park.

20           A.      Right, University Park.

21           Q.      That was a murder case, not a death penalty

22  case.  And we have jurors all the time that say that's the

23  kind of case that I think because it was so brutal.

24           A.      Exactly, exactly.

25           Q.      But the Supreme Court, they wanted to issue

1   some guidelines in that they said you can't make every

2   murder case.  There has to be some guidelines.  So that's

3   why we have these aggravating factors.  They are a murder in

4   the course of a felony, such as robbery.  You murder

5   someone.  I walk in and pull a gun and murder a 7-Eleven

6   clerk while I'm robbing the store, that could be a death

7   penalty case.  Murder during a burglary, breaking into

8   someone's home, kill someone in there, murder during a rape,

9   during a kidnapping, during an arson.  These types of cases.

10          Also murder of specific individuals, such

11  as police officers, prison guards, or firemen on duty,

12  murder of a child under the age of six, multiple murders,

13  several victims, like a serial killer or mass murderer, and

14  murder for hire.  Someone does it for money.

15      A.      Right.

16      Q.      But these are the specific types of situations

17  that are reserved for the death penalty.  And the law

18  contemplates that not every one of those persons, if they

19  are found guilty, receive the death penalty.  It just

20  depends on the facts of that particular case and how these

21  questions are answered.

22          Trials are divided into two portions.

23  There's the guilt/innocence stage where you simply decide

24  has the State proven its indictment.  Then there's the

25  punishment phase.  If you don't believe the State has, you

1  find the defendant not guilty and we go home.  But if you

2  did, the trial is not over.  That doesn't mean there's a

3  death sentence because someone is found guilty.  You go to

4  the punishment phase.  You can hear additional evidence

5  about the person's background and then you get these

6  questions, which we'll go over in a minute.

7                But basically the way the system is laid

8  out is the State has to prove that the defendant is a

9  continuing danger to society, has to prove that they

10 intended the person to die or anticipated that they would

11 die, and that there's no mitigating evidence that would --

12 that the jury feels a life sentence should be imposed rather

13 than a death sentence.

14                But if those questions are answered yes,

15 yes, and no, the Judge would sentence the defendant to

16 death.

17       A.      Okay.

18       Q.      And if they are answered any other way, he

19 would sentence the defendant to life.  These are the two

20 alternatives once someone has been found guilty.  Now, are

21 you aware of the method of execution in Texas?

22       A.      Um, I think it's lethal and then gas chamber

23 or --

24       Q.      Lethal injection now.  It used to be the

25 electric chair.  They switched in the '70s to lethal

1    injection.  You know, I think, from what you have said and

2    what you followed in the news, that Texas is a state that

3    actually prosecutes the death penalty and the penalties are

4    actually carried out.

5        A.     Uh-huh.

6        Q.     There are some states that, as you have said,

7    have it --

8        A.     Right.

9        Q.     -- and they never carry it out, which doesn't

10   really do a lot of good.  But for some reason they don't.

11   We know here in Texas that if someone is prosecuted for the

12   death penalty, ultimately they are probably going to receive

13   it.  Texas leads the nation in executions.

14             And, quite frankly, that's our goal in

15   this case.  We, at the State's table, feel we have the type

16   and quality of evidence to convince a jury of the

17   defendant's guilt and that these questions should be

18   answered in a way in which someday would result in his

19   execution by lethal injection.  The defense takes the

20   opposite view and that's obviously why we go through this

21   whole scenario, jury selection, and a trial.  But ultimately

22   that is our goal in this case.

23             And so I want to talk to every juror

24   about that.  It's one thing to talk about it philosophically

25   whether you are in favor of the death penalty or not, and

1  it's quite another when you think, well, I could be on a

2  jury and make the decisions where the man I see in the

3  courtroom someday could be executed.

4      A.    Right.

5      Q.    So I think once you get down here, obviously,

6  you start thinking about that a little more seriously.  How

7  do you feel?  We will never know you, obviously, as well as

8  you know yourself.  Do you think you are the type of person,

9  if the State proves those issues to you beyond a reasonable

10  doubt, that you could take pen in hand and answer the

11  questions in a way knowing some day the defendant could be

12  executed?

13      A.    Uh-huh, yes.

14      Q.    Fair enough.  When we talk about the death

15  penalty, the first examples we usually conjure up in our

16  minds are the actual triggerman.  I walk in the 7-Eleven and

17  murder the clerk, that sort of thing, that's deserving of

18  the death penalty, that sort of thing.

19          But capital murder, like any other crime,

20  can be committed by more than one person.  There could be

21  groups of people at some time that commit crimes.  The law

22  says if you are actively involved in a crime, even though

23  some people in the crime may be more involved than you, but

24  if you are actively involved, participating, helping commit

25  it, then you can be held responsible for that crime, too,

1   even if you are not the most actively involved.

2                   And the same for capital murder.  The

3   example I want to give you, say, me and Mr. Wirskye go in to

4   rob a bank and we have another buddy of ours who's going to

5   help us.  Our friend is going to stay outside with the car.

6   He's going to keep it running.  He's going to yell if the

7   police come and he's going to take off so we can make a

8   quick getaway.  We're going to go in.  I have two guns.

9   Mr. Wirskye has a big bag.

10                  I throw out my guns, threaten the

11  tellers.  He starts gathering the money up.  That's our

12  plan.  Maybe during the course of that I don't like the way

13  one of the tellers looked at me.  Maybe Mr. Wirskye says,

14  this one is going for an alarm, and I shoot and kill them.

15  And we get out of there.  But we're arrested.

16                  Obviously, I could get prosecuted for

17  capital murder and I could receive the death penalty.  I'm

18  the triggerman.  The law says, though, that Mr. Wirskye, as

19  well as the getaway driver, could also be prosecuted for

20  capital murder, could ultimately get the death penalty,

21  depending on the facts of the particular case, even though

22  they are not the nontriggerman.  They could be prosecuted as

23  an accomplice for that particular crime.

24                  Some people disagree with that area of

25  the law.  They are for the death penalty, but they would

1  reserve it personally only for the triggerman.  Other people

2  agree with the law and say, no, you can have the death

3  penalty for an accomplice, too, depending on the particular

4  facts, how actively involved, that sort of thing.

5          But I always want to ask jurors about

6  that, how they feel about that from their gut reaction.  Are

7  you in favor --

8          A.     It's going to depend on the circumstances.

9  That's how I would say.  If they all went in there planning

10  to rob and possibly kill someone is one circumstance.  If

11  they were planning on just going in to rob and then you kill

12  someone, you know, you have to kind of analyze the other two

13  people that were involved, if they should --

14          Q.     What would be important about those

15  accomplices in your mind in the scenarios I have talked

16  about?

17          A.     Um, I guess an accomplice, if they could -- if

18  they were the ones with the guns, would they have shot the

19  man like the first man or not?

20          Q.     If you feel from looking at all the facts and

21  circumstances, would they have been capable of doing that or

22  had that intent?

23          A.     Uh-huh.  Then, again, how are you really going

24  to find out?  Are they going to be honest with you?

25          Q.     That's another good question, because a lot of

people tell us, well, if they all sat down and planned it

out and if someone gets in your way, do that.  But

oftentimes the State, obviously, won't present you with what

they planned.  We may never know what they planned.  We can

only draw inferences from the acts or what they did at the

crime itself.  Reasonable deductions, we call that.

A.    Yeah, you would have to.

Q.    Do you feel that you could get enough about a

person's intent by analyzing all the facts of the case, what

their role in the crime was, how the crime was carried out,

how planned out it was, and that sort of thing?

A.    Yeah, I could, I could.

Q.    Okay.  It would just come down to the facts

with you, then?

A.    Probably the facts, yeah, depending on how

many people were involved, just the circumstances, right.

Q.    Would it matter to you if there were a lot of

weapons involved, how planned out the crime was, that sort

of thing?

A.    Sure, that would be real important.

Q.    Okay.  So you would agree, then, that there

are certain circumstances in which an accomplice, a

nontriggerman, would be found guilty and ultimately receive

the death penalty?

A.    Uh-huh.

1    Q.    Depending on --

2    A.    Depending on the facts.

3    Q.    We can't get into the facts of the case,

4 obviously.  We can't preview the facts and say, how are you

5 going to answer the questions?  We can tell you that the

6 State of Texas is relying on that law of parties in this

7 case.  We're prosecuting Mr. Murphy under that law of

8 parties.  You don't have a problem with that, I take it,

9 from a philosophical point of view and you would just have

10 to hear the facts?

11    A.    Right.

12    Q.    Okay.  It works two ways under that law.  The

13 first one I talked about, if you are actively involved,

14 help, assist, to commit an offense, you can be found guilty

15 under that legal theory.  The other legal theory is very

16 similar.  We are call it the law of conspiracy.

17          If two people conspire to commit one

18 crime and one of them commits another one during carrying it

19 out, they all could be responsible.  Mr. Wirskye and I agree

20 or conspire to commit bank robbery and in the course of

21 that, I start shooting people.  If the particular facts show

22 that he should have anticipated that that could occur, then

23 he can be found guilty.  To get the death penalty we have to

24 prove that he did anticipate that would occur and it would

25 just depend on the particular facts.

A.      Uh-huh.

Q.      Now, every juror has read or seen something about this case in the paper or in the news, because it was so widely followed back when it happened in 2000 and subsequent to that.  But that doesn't make you a juror unfit for jury service.  Obviously, if that were true, we would probably never be able to seat a jury.

        The law is this.  It's kind of a common sense thing.  You have to, as a juror, wait and listen to the evidence and decide all these issues just on what you hear in the courtroom.  The fact that you have read something in the newspaper or seen something on TV, cannot influence your decision.

        You probably know from reading the newspapers and you look like you follow local politics and news pretty well, that what's recorded in the paper is not always that accurate, especially when you find out if you have personal knowledge, maybe your situation with Ted Benevides, obviously, you know him.  You probably have heard things over the years, seen things in the newspaper, and you know they are a lot different, talking to him or his wife or whatever.

A.      Right.

Q.      And that's the whole point of the law, is even though you may have read something, you have to wait and

1    listen and make your decision solely on what you hear in the

2    courtroom.  Do you think that you can follow that rule of

3    law?

4         A.    Yes, uh-huh.

5         Q.    Okay.  Let's talk about these Special Issues

6    for a moment there.  You only get these in capital murder

7    cases.  You only get to these questions unless you found the

8    defendant guilty, then you move to the punishment phase.  At

9    that point in time you can hear additional evidence.

10              If you could read question No. 1 to

11   yourself real quickly and we'll go over that.

12        A.    (Prospective juror complies.)

13        Q.    We call that the future danger question.

14   We're asking the jurors if they can actually predict how the

15   defendant would behave in the future, if he's going to be a

16   continuing danger to society.

17              Do you feel you could answer that

18   question, if you are given enough information?

19        A.    Yes.

20        Q.    The question under the law starts out with a

21   no answer.  And the State has to prove to you beyond a

22   reasonable doubt it should be answered yes.  Just like

23   someone in the beginning of a criminal trial starts out with

24   the presumption of innocence, we have that burden of proof

25   to prove him guilty.  The same here.  We have to prove it

should be answered yes.   There's no automatic answers to these questions.   And that's another common sense rule.

The fact that you found him guilty beyond a reasonable doubt of capital murder, doesn't mean, well, if he's guilty of capital murder, he's a continuing danger. That very well may be the case.   The law contemplates there may be some cases that he's not and some cases where he is, depending on facts.

And the jurors have to do this.   They have to wait and listen to the additional evidence that comes in the punishment phase and go back in the jury room and then make their decision based on what the evidence was. If they feel we have proved it beyond a reasonable doubt, they would answer it yes.   If you don't, you leave it as a no answer.

But there's not an automatic yes answer. If there were, just because you found him guilty, there wouldn't be any point to going through this process.

Do you feel you can follow the law in that regard and wait, listen to the evidence, weigh any new evidence that came in, and then decide if Special Issue No. 1 should be answered yes?

A.      Uh-huh.

Q.      And would you require the State of Texas to prove to you beyond a reasonable doubt that it should be

1   answered yes?

2         A.      Yes.

3         Q.      Okay.  You see what we have to prove is

4   there's a probability that the defendant would commit

5   criminal acts of violence.  The words in these questions

6   will be left up to you and the other jurors.  You won't get

7   any legal definitions.  I want to go over that with you.

8                When you see "probability", what does

9   that mean to you?  What is "probability"?

10        A.      To me, you would have to analyze what their

11  life was like before the murder happened, you know, their

12  childhood, high school, etc.  And if they have ever

13  committed an act or if this was a first time and then, you

14  know --

15        Q.      So past behavior --

16        A.      Past behavior.

17        Q.      -- would be important to you and then their

18  role in the particular crime would be important to you?

19        A.      Yes.

20        Q.      The laws have given us a few guidelines.

21  Obviously, probability has to be more than a possibility,

22  because anything could be possible.

23        A.      Right.

24        Q.      And it doesn't mean a certainty.  I don't

25  think that we could ever prove a certainty.  Most jurors

1   tell us more likely than not.  Are you comfortable with that

2   type of definition, that a probability it would occur?

3        A.      Yes.

4        Q.      We have to prove that he would commit criminal

5   acts of violence that would constitute a continuing threat

6   to society.  When you see criminal acts of violence, what

7   types of crimes do you think of?

8        A.      Um, robbery, murder, you know, selling drugs,

9   things like that.

10       Q.      Something that harms other human beings?

11       A.      Yeah, uh-huh.

12       Q.      And we have to prove he would be a continuing

13  threat to society.  When you see "society", what does that

14  mean to you?

15       A.      You know, human beings.

16       Q.      Anyone and everyone he may came into contact

17  with?

18       A.      Yes.

19       Q.      Including people in the prison system?

20       A.      Possibly, yes.

21       Q.      Again, that question is answered

22  independently.  You can hear if he has had previous criminal

23  history.  You can hear from those witnesses.  If he has led

24  a life -- or been a Boy Scout his whole life, you can hear

25  that type of evidence.  It all comes down to what's

1   happening in his previous life, as well as the role he

2   played in that particular crime.

3       A.     Right.

4       Q.     Once you answer that question, if it's a yes

5   answer, you move on to the second question.  The second

6   question, again, starts out with a no and the State has to

7   prove to you beyond a reasonable doubt it should be answered

8   yes.

9           Now, this question runs on a little bit,

10  but it asks whether the defendant actually caused the death

11  of the deceased, or did not actually cause the death of the

12  deceased, but intended to kill the deceased or another, or

13  anticipated that a human life would be taken.

14          Now, the first part of the question is

15  pretty easy.  If you believed from the evidence that he

16  actually caused the death, you would answer that yes.

17      A.     Right.

18      Q.     Second part involves that party situation I

19  talked about where he may not be the actual triggerman.  If

20  you don't think he actually caused the death, we have to

21  prove that he intended to kill the deceased and you kind of

22  touched on that yourself, I think, what the person's intent

23  was.  Would they have done that had they been in the

24  position to kill?

25      A.     Right.

Q.    Or another person or anticipated that a human life would be taken.  And, again, that comes from all the facts, how the crime was carried out.  Do you believe from that particular crime were they anticipating that might occur, even though they were not the actual triggerman?  It's a common sense kind of deal where it comes down to that, has to be decided on each fact.

A.    Right.

Q.    Just because you found him guilty doesn't mean it's a yes.  You can use the same evidence you heard in the guilt/innocence stage and then answer that question.  You may even use the additional evidence that you heard in the punishment phase to help you answer that question.

But ultimately you have to decide it independently and require the State to prove it to you beyond a reasonable doubt.  Do you feel that you could do that?

A.    Yes.

Q.    Okay.  Now, this last question is the mitigation question.  It's the last question you get to.  Neither side has the burden of proof.  It's kind of what we call a catch-all or safety net.  You have already found him guilty.  You have already found he's a continuing danger and he anticipated a life would be taken, but you get to look at all his background and the crime itself and then decide is

1   there something that you feel is sufficiently mitigating

2   that a life sentence should be imposed rather than a death

3   sentence. It's a decision you make in your heart, but based

4   on the evidence.  He doesn't get off scot-free.  He would

5   have to serve a life sentence, obviously.

6              But it's something that you have to be

7   able to keep your mind open to and consider.  Is there

8   anything as you sit here today that you think could be

9   possible mitigating evidence?  Any type of evidence that you

10   can think of or an example?

11       A.     Well, of course, pertaining to this case, I

12   haven't heard the case, so --

13       Q.     No.  I can't ask you about this case.  I'm

14   asking about just in general.

15       A.     I don't know.  If they were the driver of the

16   car and everyone else was inside a 7-Eleven, shooting

17   someone.  I would have to think twice whether they should

18   get the death penalty or capital punishment.

19       Q.     What would be important to you about that,

20   then, if they were an accomplice, as you said, the driver,

21   that sort of thing?

22       A.     Um, again, just the circumstances, kind of

23   what led up to the day that the incident happened.  I would

24   have to just really hear the whole case.

25       Q.     And we can't preview the case.

1    A.    I know.

2    Q.    So we just talk about this in general.  But

3    the situation you gave of some guys going in a 7-Eleven and

4    a guy was in the car, the driver of the car, again, would be

5    similar to some of the stuff we talked about, about weapons

6    used, how much he knew what was going on, how involved he

7    was and that?

8    A.    And then, you know, his previous incidents

9    that have happened.  Has he been arrested before?  And I

10   would have to look at it all.

11   Q.    All right.  If it's someone --

12   A.    If it's just a pattern that continually

13   happens, and then eventually this group is involved in a

14   murder, you know, obviously he has a pattern.

15   Q.    So it would be different, I guess, if someone

16   had never been in trouble and they get involved with a group

17   of people?

18   A.    Yeah.  Sometimes things happen when you are in

19   a group and it's happened to all of us.  And you are at a

20   party and, you know, it happens.

21   Q.    Okay.

22   A.    Murder is different.

23   Q.    So it will be similar to some of the other

24   issues, but it's something you would consider, then, too?

25   A.    Uh-huh.

1       Q.      We can't tell you what mitigation evidence

2   would be.  It's up to you and the other jurors.  Sometimes

3   you hear different types of information.  You might hear

4   about a person's background.  Maybe they were abused in

5   their childhood.  Maybe they had a poor childhood.  Maybe

6   they were mentally or physically abused.

7               So we have some jurors that tell us that,

8   if it's very severe, probably could be mitigating to me.  We

9   have other jurors that tell us I would feel pretty bad for

10  that person, but when you are an adult, you have to be held

11  accountable for your actions.

12      A.      Right.

13      Q.      And there is plenty of people that go through

14  that and don't start killing people or be involved with

15  capital murder.  We have people that tell us drug use might

16  be -- is possibly mitigating.  We have other jurors that say

17  it's aggravating, if you know what you're doing, that sort

18  of thing.  Anything strike you along those lines that may be

19  possibly mitigating?

20      A.      Yes.

21      Q.      Okay.  What would that be?

22      A.      Well, you know, drug use.  If a person is

23  under the influence, I mean, it can -- it can influence your

24  thinking ability, but, then again, if you are prone to

25  commit an act like that, whether you are on drugs or not,

1   you are going to commit the act.

2          Q.   Right.  And I'm not talking about he would

3   know in drug use.  Talking about the situations where they

4   voluntarily take it, not where someone slipped them a

5   Mickie.

6          A.   Right.  But if they voluntarily, if they have

7   a drug habit and they go out to commit crimes to get money

8   to buy drugs, I mean, that's, you know, a situation.

9          Q.   Would you view that as potentially mitigating?

10          A.   Yeah, possibly.

11          Q.   What would be important about that?

12          A.   Um, because if there was a pattern, again,

13   this goes back to if there's a pattern the person has that

14   there have been several crimes they've committed, robbing

15   7-Elevens to get drugs or money for drugs.  That's a

16   pattern.  And they end up committing murder, then that would

17   lead towards -- to me towards severe punishment.

18          Q.   So if it's something they have been doing, not

19   a first time offense?

20          A.   Again, if it's first time, it just depends on

21   the circumstances, you know.  Terrorism, I mean, anyone that

22   commits terrorism, I don't care what their circumstances

23   are, to me should get a death penalty.

24          Q.   Okay.  Fair enough.  The bottom line is you

25   have to keep your mind open to that.

1      A.    Right.

2      Q.    And then if you think something might be

3  mitigating, but it has to be sufficiently mitigating to

4  where a life sentence should be imposed, you can do that?

5      A.    Yes.

6      Q.    In a capital murder case you often have

7  psychiatrists or psychologists that will come in.  Many

8  times the defense calls them.  Sometimes the State even

9  calls them.  Sometimes both sides call them.  They can

10  render opinions about whether someone is a future danger,

11  whether someone anticipated.  They can give you lectures,

12  talk about studies about mitigation, that sort of thing.

13          Some people put a whole lot of stock in

14  psychologists or psychiatrists and their opinions.  Other

15  people will tell us, look, I know if you look hard enough

16  and pay them enough money, you will find one of those kind

17  of guys to say what you want them to.  Other people view it,

18  I will listen to it, but it's not going to carry any greater

19  weight with me than any other witness.  The facts of the

20  case will still be very important, but I would listen to it.

21  How do you feel about those types of experts?

22      A.    Well, I think psychiatrists and psychologists

23  are great people, if you get a good one.  There are some

24  that are bad out there and I just view that as part of the

25  pie, of the puzzle, of the circumstances.  And they can be

 1    very good judges of character and give good insights,

 2    especially for people that have never had any experience.

 3              I don't know.  I think they can give some

 4    good insight into the human being.

 5         Q.    Do you think you would be more likely to

 6    follow a person's expert advice or their testimony than you

 7    would like the facts of the offense or something like that?

 8         A.    Are you saying that would I follow --

 9         Q.    An opinion, a psychologist expert --

10         A.    I would listen to what they have to say and --

11    to what they have to say, as well as the other.

12         Q.    Just a piece of the pie?

13         A.    Yes, a piece of the pie.

14         Q.    Do you believe all psychologists or

15    psychiatrists would give you valuable information or are

16    there some that are just getting paid to form an opinion and

17    --

18         A.    Um, kind of depends on who they are.  I mean,

19    again, I know some that are tremendous doctors, but I know

20    they're some bad ones because you read about it.  But I

21    think you just have to listen to what they say.

22         Q.    That particular witness?

23         A.    Right.

24         Q.    Let me go over a few rules that apply to each

25    case.  There is the presumption of innocence.  Every

1  defendant starts out with that presumption of innocence and

2  the State has to overcome that presumption by putting on

3  evidence.  Could you follow that rule of law and presume the

4  defendant innocent and require the State to prove it beyond

5  a reasonable doubt?

6       A.    Yes.

7       Q.    The burden of proof never leaves this table.

8  It always stays on the table.  You might anticipate the

9  defense might put on witnesses or argue or ask questions.

10 They don't have to because the burden of proof never leaves

11 this table.  You can't put a burden on them.

12            Can you follow that rule of law and keep

13 the burden of proof on the State?

14      A.    Yes.

15      Q.    The burden of proof goes to every portion of

16 the indictment.  If we fail to prove just one element or one

17 part of the indictment, then the defendant is entitled to a

18 not guilty finding.  Do you feel that you can follow that

19 rule?

20      A.    Yes.

21      Q.    That goes to every portion of the indictment,

22 including the county.  I don't anticipate this will happen,

23 but if we failed to prove this crime occurred in Dallas

24 County, maybe it was close to Ellis County or Tarrant

25 County, and actually you believed from the evidence that it

1  did fall over there, you wouldn't be able to help us out and

2  go, I'll give them that one.  You would have to find him not

3  guilty.  You may not like it.  You could run upstairs and

4  get us fired.  But you couldn't help us out.  Do you feel

5  that you can follow that rule?

6          A.     Yes.

7          Q.     You probably have heard of the rules regarding

8  the Fifth Amendment.  If someone wants to testify in their

9  trial, they can.  Nobody can stop them.  But if a defendant

10 chooses not to, the Court will instruct you that you can't

11 hold that against them.  There could be a number of reasons

12 why a person may not testify.  They may not make a good

13 witness.  They could be simply following the advice of their

14 lawyers.  And the Judge would instruct you, you just can't

15 hold that against them.  You have to determine the case just

16 based on the evidence.  Can you follow that rule?

17         A.     Yes.

18         Q.     Police officers often testify in these

19 criminal cases, obviously, that's common sense.  A lot of

20 people respect the job the police do, but you can't start

21 them out ahead of the other witnesses.  You may very well do

22 that after you judge them.  But kind of like what you said

23 about psychologists or psychiatrists, there's good ones and

24 bad ones.  Same with police.  So you have to start them out

25 like you would any other witness and judge their credibility

1   once they testify.  Could you follow that rule of law?

2        A.     Yes.

3        Q.     Parole laws sometimes get in the news a lot.

4   In a capital murder case I can tell you that the Court would

5   instruct you that a life sentence for capital murder means

6   the defendant would have to serve forty calendar years

7   before he would be eligible for parole.

8              But the Court would also instruct you

9   that you couldn't consider that in any way in your decision.

10  You are probably aware of that.  You just have to consider a

11  life sentence, a life sentence.  Could you do that?

12       A.     Yes.

13       Q.     Okay.

14             MR. SHOOK:  Could I have one moment,

15  Judge?

16             THE COURT:  Yes.

17       Q.     (By Mr. Shook)  I've gone over a lot of areas

18  pretty quickly.  I think I've exhausted all my questions.

19  Do you have anything you feel we need to know about you that

20  we haven't asked that would be important to us?

21       A.     No, not that I can think of.  Never been

22  picked for jury duty so --

23       Q.     The bottom line is and I think you have said

24  it, is, I mean, you feel you are in favor of capital murder?

25       A.     Oh, yeah.

1    Q.    You have told us that you personally feel you

2    could assess those or answer these questions in a way which

3    ultimately would receive the death penalty, if it's proven

4    to you?

5    A.    Right.

6    Q.    You have told us that you agree with the law

7    of parties or an accomplice can be found guilty and

8    ultimately receive the death penalty, depending on the

9    facts.  You can do that?

10   A.    Uh-huh.

11   Q.    And you can follow all these rules and you can

12   wait until all the evidence is in and you will just make

13   your decision?

14   A.    Uh-huh.

15   Q.    Okay.  That's all we can ask and I appreciate

16   your patience with my questions.  Thank you.

17            THE COURT:  Ms. Busbee?

18                 CROSS-EXAMINATION

19   BY MS. BUSBEE:

20   Q.    First of all, Ms. Rehwinkel, would you like a

21   glass of water?

22   A.    No, I'm really fine.  I had some coffee

23   waiting in the room.

24   Q.    Sometimes we make you talk so much you are dry

25   mouth by the time --

A.      I'm not used to sitting still.  Usually I'm

out seeing clients and moving around.

Q.      Feel free to fidget.  That's okay.  We don't

like it too much either.  Let me just put this in context

for you, because I think it makes people feel better about

being drilled about their opinions if they understand that,

you know, we had, what, 2,500 people in the morning.  I

think you were a morning panel person and that many in the

afternoon.  You were juror No. 945 and yet you are not even

the 30th person we've talked to.  So that's a huge winnowing

process where some people get winnowed out, not even by us.

They have answered that they would give the death penalty

for jaywalking or they have answered that they would never

do it at all, no matter what.  So we didn't see those.  And

we have stacks of people that fall in the middle range,

which you do.  And we meet and some people, frankly, are

just not smart enough to even come down here and talk to us

about it and we can tell that.  And we kind of trade out.

So the people that we get up here are

people that we think are going to be honest with us and they

usually are and you are, and who are obviously intelligent.

So I want you to understand that that is what you are.  So

you don't feel like you are being grilled so much.

A.      How many people are you interviewing because

we were curious, the people that were sitting in the --

Q.    We're going to interview until we get 14, but we have three now, and so it's going to take a while.

A...    A lot of time.   The date is right around the corner, the 10th.

Q.    Of November.

A.    But I mean -- okay.

Q.    You know, we've done this before.   Some of us many times, some of us a few times.   But we'll get a jury. And if we didn't, I guess we would have to postpone it.   But I think we will.

A.    Right.

Q.    Now, you were very forthcoming in your questionnaire and actually Mr. Shook asked pretty much all the little housekeeping questions I would have asked you.

Now, are you okay with having phone contact with your office or your shop during the day?

A.    As I said, two weeks is a long time for me, but, then again.   Now, if it was in December, it would be no problem, because in December my industry really slows down. But, I mean, it's okay.   It's just, it is a lot of time to be away from the office.

Q.    And we do that -- if people didn't have much to do, they probably wouldn't be the sort of juror that we would want, anyway, for sure.

A.    Right.

1    Q.  Back when we asked you all these questions,

2 but you didn't really know how our death penalty scheme

3 worked, it kind of has to be that way so we get your knee

4 jerk reaction to things and then we bring you in here and

5 tell you just exactly how our scheme works.

6      But you said there would be some cases,

7 although you favor the death penalty, in which a capital

8 crime should have a life sentence instead of a death

9 sentence.

10    A.  Uh-huh.

11    Q.  Could you tell me what your thoughts are on

12 that?

13    A.  Again, if I understood it, for example, if

14 someone is out driving and hit someone and they die, you

15 know, that to me doesn't automatically call for the death

16 penalty.

17    Q.  Sure.  And that wouldn't be a death penalty

18 case now, now that you know.

19    A.  Yeah.  You have explained and, of course, half

20 of it sunk in and the other half didn't.  But if it's -- I

21 don't know.

22    Q.  I don't want to put you on the spot.  And I am

23 putting you on the spot.  Sadly, I'm required to kind of put

24 you on the spot on some things.  I'll be real frank with you

25 because you have been frank with us.  You are what I would

1  consider a real strong proponent of the death penalty and

2  that's fine.  Most people are.  I think that's true and

3  that's true of some of the people we have talked to here.

4              The only thing is I need to be sure that

5  you are not so strong a proponent of the death penalty that

6  Mr. Murphy wouldn't get the fairest trial possible.  So

7  that's why I want to ask you some questions.  And I think

8  you are going to tell me.

9              Obviously, you know about this case in

10 general, in a general sense?

11      A.    Yeah.  It's been a couple of years, but I

12 remember hearing about it and seeing it on TV.

13      Q.    Sure.  It was a big deal at the time.

14      A.    Uh-huh, uh-huh.

15      Q.    Have you formed any opinions about this case

16 that --

17      A.    I really haven't because, as I said, I have

18 read a little, seen it on the news, and then something was

19 on the news a couple of weeks ago about one of the men that

20 were tried and that's about it.  I'm real busy, so that's

21 not something I --

22      Q.    Okay.  And you said something in here, I don't

23 know if it's significant, but you were asked if you thought

24 that police were more likely or less likely to tell the

25 truth and you pointed an arrow and said both.  What was on

1    your mind when you said that?

2        A.    Every encounter I have had with a police

3    officer has been positive.  I have never had problems.  And

4    I guess that's why I put an arrow to the opposite because

5    some people I know have had negative experiences and don't

6    trust police officers.  But I personally do trust them.

7        Q.    And that's -- I guess you are saying just what

8    I would expect you to say.  You look at the witness and

9    decide from there, right?  Let's see.  I don't know if Mr.

10   Shook talked to you about this.  When we get to where we

11   talk to a lot of people, sometimes they start running

12   together.

13       A.    I'm sure they do.

14       Q.    But there could be in a case like this what we

15   call a lesser included offense.  In other words, the proof

16   might be almost there, but not quite enough to make the case

17   a capital murder.  Might be an aggravated robbery or it

18   might be just a murder, not a capital murder.

19             And in such a case the jury wouldn't be

20   talking about these Special Issues.  It would be -- it would

21   be a different question.  And I'm going to ask you whether

22   or not if you heard a case and you determined that there may

23   have been a death, but you determine it was not a capital

24   murder, it's an aggravated robbery, say, the range of

25   punishment in that instance would be from five to 99 years

1  or life imprisonment. Could you consider the lower end of

2  the punishment range under those circumstances?

3       A.   Again, it depends on the case and the

4  circumstances.

5       Q.   I can't name you a case. I am naming a case

6  where the person was originally charged and tried for

7  capital murder.

8       A.   Okay. Okay. Again, it depends on what the

9  person's involvement is in the case. I probably would have

10  a hard time with five years, but --

11      Q.   I'm not saying that you would have to say you

12  would give five years. I'm just asking you in reality would

13  you even consider the five-year punishment range?

14      A.   I'd consider, depending on what their

15  participation was in the capital case.

16      Q.   That's fine. Isn't this a crazy process?

17      A.   Because you have to analyze and hear all the

18  facts and just see --

19      Q.   Exactly. All right. Let's put you back on

20  our hypothetical jury and we're considering these Special

21  Issues. Now, I like to restate this because you said it

22  perfectly. You told me all the law and came at me real fast

23  and I'm pretty sure I understand it, but it's got to be a

24  blur on a Monday morning.

25            So your situation, a person can be

1  convicted of capital murder under the circumstances we

2  talked about, death of killing a police officer?

3         A.      Right.

4         Q.      Or fireman, child under six, but that is not

5  -- a capital murder does not equal the death penalty.  And,

6  in fact, the way our law is structured, it's far from it.

7  Capital murder means a life sentence --

8         A.      Okay.

9         Q.      -- automatically.  And that life sentence, no

10  range of punishment there.  That's a life sentence.  And the

11  law says that that's a life sentence for which the person

12  would have to serve forty calendar years, day for day --

13  we're not talking about good time or parole -- before they

14  would even be considered.  So that's a very harsh

15  punishment.

16              And the law then says the State can seek

17  the death penalty, certainly in a capital murder case, but

18  they are required to make some additional -- I don't know

19  how to put this.  We misstated it earlier this morning.  I

20  don't want to misstate it again.

21              The State is required to have additional

22  proof or -- or that a jury must find beyond a reasonable

23  doubt.  And I know what your attitudes are towards certain

24  of these things.  If you had found someone guilty of the

25  offense of capital murder, would you need to hear anything

1    in addition?  I mean, I'm not talking about whether you

2    agree with the law or not, but you, yourself, would you need

3    to hear anything else to decide that they would probably be

4    a future danger?

5            A.      Um, I would have to hear what you all

6    presented.  But, then again, I would be interested in

7    knowing what their life was before the incident happened and

8    if they have committed incidents before the murder.

9            Q.      So would you need to hear that from the State?

10           A.      Yeah, uh-huh.

11           Q.      You don't need to hear anything from us to

12   convince you one way or the other?

13           A.      Because the State would have to tell us, the

14   jurors, that this person, you know, committed these acts

15   before or -- I mean, I would want to know that, if they had

16   committed anything.

17           Q.      Before you could answer that question?

18           A.      I think so, uh-huh.

19           Q.      And --

20           A.      I mean, because I think most people when they

21   read articles in the paper about a murder, I mean, a major

22   murder, want to know what the person did beforehand.

23           Q.      Sure.

24           A.      You know, what led them to -- up to that act.

25           Q.      So that would go into your thinking on whether

or not someone would be a future danger?  Let's go on to

question No. 2 because you said something, and I made a note

about it, because, you know, we don't see this question if

the person is the gunman, so to speak, or it's clearcut who

caused the death.  This you are going to see and you will

see in this case where the State is relying on a party

charge, or an allegation someone is a party, for them to be

guilty of capital murder.  So they will have to prove to you

not just -- not just that they should have anticipated that

a death would be taken.  That's way back in the past when

you were finding them guilty or not guilty.

A.      Uh-huh.

Q.      But it goes further than that.  In order to

assess a death penalty, you would have to find beyond a

reasonable doubt that that person did anticipate that a

human life would be taken.  And what sort of things would

factor into that for you?

A.      Again, if it was premeditated going into the

act or -- I mean, that to me would be a big part and I don't

know.  I guess I'd just look at the whole thing of what the

incident -- the incident was a murder and do they go there

anticipating shooting someone or just, you know, robbing a

7-Eleven?  And, you know, I would just have to look at it

all.

Q.      I guess this is my question.  Would you need

1  to hear some information from the defendant as to what his

2  thought processes were or what happened --

3       A.    I think that would be important for a jury to

4  hear that.  Whether the person would be telling the truth,

5  is another thing.  You have to analyze that.

6       Q.    I think most people would say that.  Would you

7  -- would you need to hear from the defendant in order to

8  decide that question?

9       A.    Well, in a death case I think you should hear

10  from the defendant, yes.  I mean, I would think, again, all

11  the jurors would want to hear all the evidence.

12       Q.    Well, sure, of course you would, because it's

13  a very important decision.

14       A.    It's an important decision, that's right.

15       Q.    Everybody -- of course, you know, you talk to

16  them after the fact, immediately right after the case.  I

17  assume you think people think about their service for years

18  to come and upon pondering it, I suppose some cases might be

19  more clear-cut than others.

20       A.    Exactly.  And you don't want to -- I wouldn't

21  want to come into a case with a preconceived idea that he's

22  guilty and I'm going to sentence him to death.  I mean, I

23  want to hear all the information.  That's just how I am.

24       Q.    So I guess what I'm asking you, in order to

25  find Special Issue No. 2 to be no, you would want to hear

1   all the facts, including the defendant, whether you believed

2   him or not, you would like to hear from him in order to make

3   that decision?

4          A.    Yes.

5          Q.    And without hearing from him, that would kind

6   of hurt his case or hurt us?

7          A.    I think so.  I would think that he would want

8   to speak on his own behalf or where his mind was during the

9   incident -- I don't know all the details of the case, so --

10         Q.    That's what I wanted to know is how your

11  thought processes work, because these are -- we're slapping

12  you with controversy and issues and thoughts that you had no

13  idea you were going to be facing, I'm sure, when you walked

14  in here this morning at 8:15.

15         A.    No, I didn't.

16         Q.    But if that's your feeling that you really

17  need to hear from the defendant before you decide --

18         A.    I mean, I would want, as I said, to have all

19  the facts of the case to make a logical decision.

20         Q.    As to Special Issue No. 3, that's also -- I

21  have two questions on that.  I know that you know the bare

22  bone parameters of this case.  And this would require a

23  juror, after they decided Special Issue No. 1 and Special

24  Issue No. 2 in the affirmative beyond a reasonable doubt, do

25  you think that in this case you have already formed an

1  opinion about mitigation that would prohibit you from giving

2  that Special Issue any effect?

3        A.     No, because I really don't know enough about

4  it yet.  I really don't.

5        Q.     Let me talk to my co-counsel here a moment.

6  Is there anything that I've asked you that has raised

7  something that you would like to -- you would like to talk

8  about this or ask about this?

9        A.     Not really.

10       Q.     Okay.

11       A.     You know, I don't know.  You all are looking

12 for something and I'm just trying to answer the questions

13 that I understand.  Maybe I'm not understanding some of the

14 things you are saying.

15       Q.     No.  You understand perfectly.  I guess the

16 reason I go through the pumping you up thing at the very

17 beginning, sometimes I think people think there's something

18 wrong with their own opinion after we start drilling them on

19 the fine points.  There's no right or wrong answers, but

20 just how you feel about things.  I think you've been honest

21 with me because you say things, you say what a lot of people

22 say, these Special Issues would depend on the case.

23       A.     Right.

24       Q.     And Special Issue No. 2 is a difficult --

25 that's a difficult issue to decide.  And in that, you tell

101

1    us that in that issue you really couldn't decide that issue

2    in the defendant's favor, so to speak, answer no to that,

3    unless you heard from him?

4         A.    I would want to hear what that person did, as

5    well as the other people involved in the case.  How did each

6    participate in the murder and, you know --

7         Q.    You would have to?

8         A.    -- and then decide.  You would have to hear it

9    all.

10        Q.    And you would need to hear, particularly since

11   you are deciding the fate of the individual you are trying,

12   you would want to hear from him and need to hear from him

13   before you could make that decision?

14        A.    I think so.  I think I should hear.

15        Q.    Now, you understand that he doesn't have to

16   get on the witness stand, obviously.  We talked about that.

17   But you would need -- you would want to hear from him?

18        A.    Well, if he didn't get on the witness stand,

19   how are you going to hear --

20        Q.    You are not.

21        A.    Okay.

22        Q.    That's what I'm telling you.  He doesn't have

23   to get up there by law, obviously.  But if it's important to

24   you, that's what I want to know.

25        A.    I think it would be important to him to want

1   to, you know, state where his mind was at when the incident

2   happened.

3        Q.   Okay.  So --

4        A.   I would think, I mean --

5        Q.   And that's what I want to know.  I want to

6   know what you think, because if you are on the jury, what

7   you think is very important to --

8        A.   I would think if someone was up for a murder

9   case, and possibly going to be sentenced to death, he or she

10  would want to sit there and defend themselves.  I was either

11  thinking this or, you know, you would think.  But not

12  everybody thinks the same, so --

13       Q.   So when somebody's life is on the line, they

14  are not getting up on the witness stand, that says something

15  to you?

16       A.   Well, I would think it would.  You would

17  think, as I said, they would want to state what they were

18  thinking when the incident happened.  But if they don't,

19  then maybe they've decided that they are going to get the

20  death penalty and why bother.

21       Q.   Okay.

22       A.   They have given up already.

23       Q.   So that's your opinion of --

24       A.   I guess.

25                THE COURT:  Let me ask you to refer to

103

1 your guide real quick.  And if you look in there, I don't

2 know what page, it's 2 or 3, and it says constitutional

3 rights.  See the title there?

4                       PROSPECTIVE JUROR:  Okay.

5                       THE COURT:  Read the -- that page,

6 specifically the last paragraph, that's the law.

7                       PROSPECTIVE JUROR:  So I can't hold it

8 against the juror (sic) if they decide not to testify?

9                       THE COURT:  Ms. Busbee is very artful and

10 she needs to know your opinions.  I need to know if you

11 understand the law.  The law is, if he elects not to

12 testify, a juror cannot go back to that jury room and say he

13 didn't testify, because.  Just what you did.  So you dreamed

14 up a reason why someone may not testify.  And you can't do

15 that if you are sworn in, in this case to be a juror, and

16 end up in that room back there.

17                       And that's what she has to be aware of.

18 He has a constitutional right he doesn't have to present any

19 evidence --

20                       PROSPECTIVE JUROR:  Okay.

21                       THE COURT:  -- period.  He has a

22 constitutional right he doesn't have to testify, period.

23 Now, you said, I would think that he would want to testify.

24                       PROSPECTIVE JUROR:  Uh-huh.

25                       THE COURT:  I would like to hear his

1   testimony.  Her question was -- and I can have the Court

2   Reporter read it back -- she said, would you like to have

3   him testify and would you need to have him testify?

4                   PROSPECTIVE JUROR:  Right.

5                   THE COURT:  She put "like" and "need" in

6   the same sentence.  And you're being truthful.  Most people

7   would like to hear --

8                   PROSPECTIVE JUROR:  Right.

9                   THE COURT:  -- the whole story.

10                  PROSPECTIVE JUROR:  Exactly, I would.

11                  THE COURT:  Whose job is it to prove it

12  to you?

13                  PROSPECTIVE JUROR:  Well, I would think

14  the defendant's attorneys would have to prove maybe why

15  their client should get -- I don't know.

16                  THE COURT:  Go back to Special Issue No.

17  1 and 2.  The State has the burden to prove Special Issue

18  No. 1 and Special Issue No. 2 beyond a reasonable doubt.

19                  PROSPECTIVE JUROR:  Okay.

20                  THE COURT:  The defendant doesn't have to

21  prove anything to you on any of those issues.

22                  PROSPECTIVE JUROR:  So the State has to

23  prove that every party has committed X acts and the

24  defendant doesn't have to say anything?

25                  THE COURT:  She doesn't have to answer

1    one question.

2                    PROSPECTIVE JUROR:  She can sit there the

3    whole time.  Okay.  Okay.

4                    THE COURT:  No. 3, there's no burden

5    either way.  You can hear whatever you want to hear from

6    whatever source.  It can be yes, no, maybe, in the middle,

7    it doesn't make any difference.  There's no burden.  The

8    State doesn't have to prove anything to you and the

9    defendant doesn't have to prove anything to you.  It says

10   taking into consideration all the evidence.

11                   So now my question that I started with

12   you an hour and a half ago is, do you understand the law?

13   And you said, oh, sure.  It's not quite as clear as it was

14   when you walked in the door.

15                   PROSPECTIVE JUROR:  Well, yeah, it's a

16   little different.  The State has to prove their case, but I

17   personally would think the defendant would want to speak.

18   That's my personal -- even though they don't have to in this

19   case, personally I would think they would want to do that.

20                   THE COURT:  We're not changing your

21   opinion.  But understanding the law, if he elects not to

22   testify --

23                   PROSPECTIVE JUROR:  Right.

24                   THE COURT:  -- are you going to hold it

25   against him?

1    PROSPECTIVE JUROR:  I would wonder.  I've
2  got to be honest with you, I would wonder, yeah.
3    MR. SHOOK:  Are you saying that you can't
4  follow the law, then, ma'am?
5    MS. BUSBEE:  I'm not finished inquiring.
6    PROSPECTIVE JUROR:  I can follow the law,
7  yes, but I don't know, my personal opinion.
8    Q.    (By Ms. Busbee)  Nobody expects you not --
9  that's why we're asking these questions before we put you on
10  the jury, so you can tell us what you really feel.  Do you
11  really feel that if the defendant didn't testify, that would
12  be a negative for him in a case like this, just say so.
13    A.    Yeah, I would.  That's why I said it.  I
14  would, even though the State has to present their case, I
15  would think the defendant would want to --
16    Q.    I mean --
17    A.    If he wants to spend life in prison, maybe he
18  doesn't and he wants to die quickly.
19    Q.    And that's what I appreciate.  It's not that
20  you are not a lawabiding person, you are just telling us how
21  you really feel.
22    A.    I'm really trying to.
23    Q.    You speak up there --
24    A.    I am trying to.
25    Q.    Nobody is trying to call you a scoff law

1   (phonetic).  Is that a fair statement?  You understand what

2   the law is, but to you, if the defendant didn't testify, you

3   would hold it against him in this type of case?

4        A.     Well, I would consider that.  I don't know if

5   I would say hold it against him, but it would be in my mind

6   because that's -- I have to be honest.  It would be because

7   that's --

8        Q.     I appreciate it.

9              MS. BUSBEE:  I'll pass the juror, Your

10  Honor.

11             THE COURT:  Ms. Rehwinkel, wait for us

12  outside and we'll have you back in, in just a minute.

13                 [Prospective juror out]

14             THE COURT:  What says the State?

15             MR. SHOOK:  State has no challenges for

16  cause.

17             MS. BUSBEE:  Defense has a challenge for

18  cause, Your Honor, based on her inability to give the

19  defendant his right against self-incrimination.

20             THE COURT:  The Court is of the opinion

21  that Ms. Rehwinkel, even after being given the chance to

22  read the law again and the constitutional rights of Mr.

23  Murphy, she still held the opinion, well, if he wants the

24  death sentence, I guess he doesn't want to testify.  It's

25  pretty clear to me that she's going to require the defendant

1  to testify in order to avoid the death sentence.  I do not

2  find that she's qualified.  Ask her to come back in, please.

3                    [Prospective juror in]

4              THE COURT:  We appreciate your time and

5  service to this Court.  You are not going to be seated on

6  this jury.

7              PROSPECTIVE JUROR:  Okay.

8              THE COURT:  So when you came in this

9  morning, like I said, these laws sometimes look pretty easy

10 on paper, but when you start thinking about it, it can get

11 quite difficult.  We appreciate your service and maybe we'll

12 find another case down the line that you can be on.  Thank

13 you.

14                   [Prospective juror out]

15             THE COURT:  Is Reverend Ryan available?

16                   [Prospective juror in]

17             THE COURT:  Good afternoon.

18             PROSPECTIVE JUROR:  Hello.

19             THE COURT:  Reverend Kathryn Ryan; is

20 that correct?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  Welcome to the 283rd.  I

23 appreciate you coming down back in May and filling out that

24 short questionnaire, what is your name, when were you born,

25 and what happened next?  The attorneys have invited you back

1   to visit with you about those issues and I provided the law

2   for you, and have you had an opportunity to read the guide?

3                    PROSPECTIVE JUROR:  Yes.

4                    THE COURT:  It's a lot of law to hand

5   someone and we don't expect you to understand all of it and

6   how it all interrelates.  That's what the attorneys are

7   going to visit with you about.  At the end of the process,

8   the two questions I have is, number one, do you understand

9   the law?  The second one, if you understand the law, can you

10  follow the law?  That's my function here at this stage of

11  the trial.

12                   The only question that I have for you

13  before I let the lawyers begin, will you be able to serve

14  this Court for two weeks beginning November 10th?

15                   PROSPECTIVE JUROR:  I don't see any

16  reason why I could not.

17                   THE COURT:  Mr. Wirskye?

18                   MR. WIRSKYE:  May it please the Court.

19                   KATHRYN RYAN,

20  having been duly sworn, was examined and testified as

21  follows:

22                   DIRECT EXAMINATION

23  BY MR. WIRSKYE:

24       Q.    Is it Reverend?  Is that the proper address?

25       A.    No.  Kay will be fine, or Ms. Ryan.

1    Q.    How about Ms. Ryan?

2    A.    That will be fine.

3    Q.    My name is Bill Wirskye.  I'm the Assistant DA

4    that will be visiting with you for the next few minutes.

5    Because this is a capital murder case where the State is

6    seeking the death penalty, the law allows us to speak with

7    the jurors one on one instead of like a big group like we

8    normally do.  I know it's a bit strange to be up there on

9    the witness stand.  You kind of feel like you are on trial,

10   but we want people to come down and tell us their honest

11   thoughts, opinions, and feelings.

12            We recognize that not everyone probably

13   wants to be or is comfortable being a juror in a case where

14   the death penalty is a potential punishment.  We talk to a

15   lot of people.  Obviously, we don't want to put anybody on

16   the jury that -- and kind of back them into a corner where

17   they may feel like they need to -- or they're called upon to

18   violate their religious, moral, ethical concerns, things

19   like that.

20            You have told us that you are against the

21   death penalty; is that right?

22   A.    Yes, sir.

23   Q.    Can you tell us a little bit more about that,

24   how strongly you feel about it, where it comes from, that

25   belief?

1    A.    Well, I mean, my belief, my feelings, on the

2  death penalty, I think, come from two places.  One is my

3  sense that it seems to be applied unevenly.  The people with

4  the best defenses seem to get off and statistically the

5  number of people, for instance, of certain races who end up

6  on death row are much higher than other races who also

7  commit crimes.

8         And so that's part of it, is a sense that

9  we don't apply it justly, part of my opposition.  My deeper

10 opposition is the fact that I don't think that we should go

11 around taking human life for any reason or lightly take any

12 life.

13   Q.    You have religious scruples, I guess, for lack

14 of a better word against it, than kind of a practical

15 reason?

16   A.    Yes, sir.

17   Q.    It sounds like you are probably not the best

18 person to be on this jury; is that right?

19   A.    I -- I would think that probably is right.  I

20 mean, I would try to follow the law, but you have to know

21 that.

22   Q.    We really don't want to put anybody in a bad

23 position.  You know, we don't want anybody over there whose

24 personal beliefs, for whatever reason, religious, practical,

25 whatever, I guess, would substantially impair them in trying

1   to follow the law and render a verdict.  And it kind of

2   sounds like that's what you are telling me; is that right?

3          A.     Yes, sir.

4          Q.     And if you are, and these are the magic words,

5   if you were selected to serve as a juror in this case, that

6   your opposition to the death penalty would substantially

7   impair your ability to sit in this type of case; is that

8   right?

9          A.     Yes, sir.

10          Q.     Okay.  Hold on just a second.  I think we have

11   an agreement here.

12                THE COURT:  Reverend, we appreciate your

13   coming down here.  The parties have agreed to go ahead and

14   excuse you, as he said, straight up.  We appreciate it.  We

15   need all viewpoints, but in this case, it's not yours.

16                PROSPECTIVE JUROR:  Right.  I appreciate

17   that.  Thank you.

18                THE COURT:  You are free to go.  Thank

19   you so much.

20                [Prospective juror out]

21                THE COURT:  Ms. Curtis.

22                [Prospective juror in]

23                THE COURT:  Ms. Curtis, good afternoon.

24   Is it Alicia Curtis?

25                PROSPECTIVE JUROR:  Uh-huh.

1        THE COURT:  Welcome to the 283rd.  I can

2  tell you are just a little bit nervous?

3        PROSPECTIVE JUROR:  Yeah.

4        THE COURT:  Well, I wish there was a more

5  informal way to do this, but it's not.  The other option is

6  you are packed in a room with 750 other people where it's

7  hot and nowhere to sit and write on and we have the two

8  extremes where you are hidden in the group and now you are

9  the focus of attention, if you will.  Certainly not designed

10  to be intimidating.

11        · We want to give you an opportunity to,

12  first, understand the law.  The two questions that I have at

13  the end of the process are, do you understand the law?  And

14  we're going to spend some time with you on that.  The second

15  is, once you understand the law, can you follow the law?

16        This is a copy of your questionnaire just

17  so you can have it in front of you.  It's been several

18  months since you looked at some of those questions and they

19  can refer to your answers if they need to.

20        So those two questions, do you understand

21  the law, can you follow the law, that's my function here at

22  this point.  And the lawyers will go through the law, give

23  you examples, try to help you understand how it relates, and

24  give you a workable idea of what's going on here.

25        PROSPECTIVE JUROR:  Okay.

1    THE COURT:  If you don't understand, just

2    say, hey, I don't understand.  Will you explain it or give

3    me another example.  And the bottom line is they're just

4    looking for your thoughts.

5    PROSPECTIVE JUROR:  Okay.

6    THE COURT:  No wrong answers, so don't --

7    it's like -- like if you fail this exam.  You can't.  It's,

8    as I say, just tell the truth.

9    So looking at the law that I provided for

10   you, do you have any questions that jump out at you at this

11   point?

12   PROSPECTIVE JUROR:  No.

13   THE COURT:  Will you be able to serve

14   this Court beginning on November 10th for those two weeks?

15   PROSPECTIVE JUROR:  Yes.

16   THE COURT:  Very well, Mr. Wirskye -- no,

17   Mr. Shook.

18   MR. SHOOK:  May it please the Court.

19   <u>ALICIA CURTIS,</u>

20   having been duly sworn, was examined and testified as

21   follows:

22   <u>DIRECT EXAMINATION</u>

23   <u>BY MR. SHOOK:</u>

24   Q.    Ms. Curtis, my name is Toby Shook.  I'm going

25   to be asking you questions on behalf of the State today.

1    This is Bill Wirskye.  He's the other prosecutor assigned to

2    the case.  This is Brook Busbee and Juan Sanchez.  They are

3    the defense attorneys.  This is Patrick Murphy at the

4    defense table, the defendant.

5                   As the Judge said, we just want your

6    honest opinions.  You have been on a jury before, I believe.

7    It was a civil case?

8         A.    Yes.

9         Q.    That jury selection was like most criminal

10   jury selections.  You were selected from a group, asked

11   questions in a group.  But because it is a capital murder

12   case in which the State is seeking the death penalty, we go

13   through this one-on-one process.  You've been very helpful

14   with your answers on the questionnaire and we appreciate you

15   taking the time -- I know that took a long time to fill out.

16   And, believe it or not, it saves you time and it's quite

17   helpful to us.

18                   And I want to follow up on some of that

19   and, obviously, talk to you about capital murder and how you

20   feel about that, some of the laws and rules that apply to

21   these cases.

22                   You were born in Grand Prairie and I

23   believe you grew up here in the Dallas area; is that right?

24        A.    Yes.

25        Q.    And you work now as a physical therapist?

1    A.    Yes.

2    Q.    What exactly do you do on a day-to-day basis?

3    A.    I work in home health.  I travel to people's

4  homes after pneumonia, stroke, and help them get back on

5  their feet.

6    Q.    One of the interesting things I saw in your

7  questionnaire is you -- one of your hobbies is martial arts?

8    A.    Yes.

9    Q.    How long have you been doing that?

10   A.    Since my daughter was born, a year and a half

11 ago, not much at all.  Before that, about five years.

12   Q.    What type of martial arts are you involved in?

13   A.    I did primarily -- I liked weapons.  I liked

14 koli.  I did wing chung, somo ling ti (phonetic).

15   Q.    How did you get involved in that?

16   A.    Started taking Spanish with my husband and I

17 always wanted to try martial arts.  And he saw a school and

18 I went and interviewed the teacher and liked it and fell in

19 love with it and did it four nights a week.

20   Q.    Did he take with you, your husband?

21   A.    No.

22   Q.    I take it he doesn't argue much with you?

23   A.    Yes, he does.

24   Q.    But you also put on there that you met several

25 police officers in your martial arts classes?

1    A.    Yes.

2    Q.    What cities do they work for?

3    A.    Um, let's see, Tecan (phonetic) worked in

4  Arlington and the other one I met a couple of times, he

5  worked in Ft. Worth.

6    Q.    But you weren't close friends with them?

7    A.    There was another guy.  I only saw some of the

8  police officers a few times.  They didn't come on a nightly

9  basis.  Their schedules didn't allow it.  He worked in

10  Irving.  I can't remember his name.

11    Q.    Okay.  Did you look at the witness list?

12    A.    Yes.

13    Q.    Did you happen -- I know there's a whole bunch

14  of names on the witness list, but you didn't come across

15  his?

16    A.    The only one I saw was Whitely and I knew a

17  girl named Kimberly Whitely when I was young, but that's the

18  only thing that jumped out at me.

19    Q.    Just one more follow-up.  What is it that you

20  like about martial arts?

21    A.    I guess the sense of accomplishment.  It's

22  very complicated and I like to be able to do some of the

23  techniques and, you know, follow up and do that and then I

24  would say I'm not big on the sparring and the attacking

25  part.  I wasn't aggressive like that.  I just enjoyed the

118

```
1    training and the camaraderie.
2         Q.      Now, the civil case that you sat on, there was
3    a $200,000 judgment, I believe.  What type of case was it?
4         A.      A lawyer was due some money from an individual
5    and they were saying that they weren't going to pay him
6    because apparently there was some missing piece of paper
7    that said he was going to take his money once the company
8    flourished.  But that never happened.  The company folded
9    apparently.
10        Q.      And you awarded for the lawyer?
11        A.      Yes.
12        Q.      Was it a very complicated trial?
13        A.      No.
14        Q.      Okay.  And I notice you put on your
15   questionnaire that you participated more than most of the
16   jurors and maybe had more influence.  Why did you put that
17   down?  Were you the --
18        A.      Some of the jurors were questioning -- there
19   was a gentleman on there, he was talking about his health
20   and how terrible his health was and he was elderly and poor,
21   pitiful him.  And he took an aspirin and antidepressant and
22   he was 80 years old.
23              THE COURT:  Was that a lawyer or another
24   juror?
25              PROSPECTIVE JUROR:  This was a witness.
```

1    And they were wanting to know, you know, how could he be, if

2    he was really, really sick.  On an aspirin and an

3    antidepressant at 80 years old, you are actually doing quite

4    well.

5         Q.    (By Mr. Shook)  Over all, was your experience

6    positive, would you say?

7         A.    Yes.

8         Q.    And I also -- I see that you live in Irving.

9    And, obviously, this case got a lot of publicity when it

10   occurred because it occurred in Irving.  What do you recall

11   about the case?

12        A.    I recall -- I recall that there was a robbery

13   at the Oshman's store and that one of the police officers,

14   Aubrey Hawkins, was killed.  Other than that, I can say I

15   honestly did not follow it a whole lot.  There's been a lot

16   going on in my life.

17        Q.    Yes, I understand that.  So the law --

18   obviously, most of our jurors, the great, great majority

19   have heard or seen something on the news about this case and

20   that doesn't make you ineligible or unfit to be a juror.

21   The simple rule is, if you are placed as a juror in the case

22   or sat as a juror, you would have to decide the case on the

23   facts here in the courtroom and not anything that you have

24   seen on TV or read in the newspaper.  You can follow that

25   rule?

1        A.      Yes.

2        Q.      Okay.  Let's talk for a minute, then, about

3    capital murder, the death penalty.  I want to know how you

4    personally feel about it.  You checked on the questionnaire

5    that you are in favor of it in some cases.  Tell us why you

6    are in favor of the death penalty or the purpose you think

7    it serves society.

8        A.      Oh, boy.  I really have been dealing with that

9    since I got this letter.  I really honestly thought the

10   letter was your service has been done.  We picked the jury.

11   Thank you, bye.  So I've really been wrangling with that

12   back and forth.  But I do think people need to be judged on

13   what they do.  I know a lot of my friends and stuff are

14   like, no, you will be judged when you go to Heaven.  When

15   you die, that's your sentence.

16               But I'm here now and this is our world

17   and I think that we do have to make accountable for what

18   people do and make society safe.

19       Q.      Okay.  Have you always been in favor of the

20   death penalty since you were, say, an adult?  Maybe a better

21   way to put it, have you ever been against it, that changed

22   your mind or --

23       A.      I can actually say I've wavered back and

24   forth.  And most of the time it's kind of like, well, I

25   don't know.  I wasn't on the jury.  I don't know.  Because a

1    lot of my friends, a case would come up and they would go

2    back and forth on whatever, they should have hung him like

3    this, that, and the other.  And I, you know, if I don't

4    follow it, I'm not there, I don't know.  I guess if I'm most

5    in favor of it, it's going to be if someone injures a child.

6    That's just --

7         Q.    But philosophically have you ever been opposed

8    to the death penalty?

9         A.    At times, I guess.  It's kind of hard, you

10   know, putting somebody to death, you know, saying, oh, yes,

11   my yes answer to that is going to cause somebody to die.

12        Q.    Have you followed any cases in the media,

13   locally or nationally, that were death penalty cases or

14   potentially death penalty cases?

15        A.    I don't follow hardly any cases.

16        Q.    Well, in Texas, the death penalty is reserved

17   just for certain types of murder cases.  They have to be

18   intentional killings.  Can't be self-defense or accidents.

19   It's intentional murders, unjustified homicide.  And they

20   have to occur with some other aggravating facts, murder

21   during the course of a felony like robbery.  Go into a

22   7-Eleven, rob the clerk, shoot them, that could be a death

23   penalty case.  Murder during a burglary.  If you break into

24   someone's home, kill someone in the house.  Murder during a

25   rape, during an arson, those types of situations.  Also,

1   murder of a police officer on duty or fireman on duty can be

2   a death penalty situation.   Murder of a child, as you said,

3   under the age of six, is what the law says.   Murder of more

4   than one person in the same transaction, serial killer, or

5   mass murder situation.   And murder for hire.   Someone does

6   it for money, hitman situation.

7              But those are the specific types of cases

8   that have been reserved for the death penalty.   Any of those

9   types of cases which you, if it were up to you, you would

10  take out for consideration just because of the type of crime

11  they are?

12         A.      No.

13         Q.      The reason I ask that is some people from a

14  personal point of view, some of them have a broad scope.

15  They would include a lot more types of crimes.   Other people

16  would limit it to just certain types.   And other people

17  agree and they believe those sound just about right.

18         A.      That sounds fair.

19         Q.      You feel that when a police officer's life is

20  taken, that's the type of case that should be considered for

21  the death penalty?

22         A.      Yes and no.   I mean, I also know that a police

23  officer knows their job and they are put in harm's way.   But

24  then on the same token, they need to be reserved a little

25  bit better because they are put in harm's way all the time.

1  So, yes, I do believe that a police officer, that should be

2  a capital punishment.

3         Q.   Okay.  Now, when we think of the death penalty

4  and we think of examples, you always think of examples,

5  obviously.  I brought up the 7-Eleven example.  We always

6  think of the triggerman when we first talk about the death

7  penalty or the capital murder.  I go in and I pull the

8  trigger and murder the person during that felony.

9              But a capital murder, like any crime,

10  actually, can be committed by more than one person, what we

11  call the law -- in that case in Texas is called the law of

12  parties.  I don't know why they use parties, really, as that

13  term, but also you probably know it as accomplice.  An

14  accomplice helps you commit a crime.  If they are actively

15  involved, they can be held accountable, too.  They can be

16  found guilty of that crime and they can be punished.

17              The same is true of capital murder and

18  the death penalty.  If Mr. Wirskye and I decide we want to

19  rob a bank and we get another guy to help us, he's going to

20  be our getaway driver.  He drives us there.  We get out.

21  He's going to leave the car running.  He's going to warn us

22  if someone is coming.  He's going to be ready to speed off.

23              We go into that bank.  What we have

24  agreed to do is I'm going to be the gunman in this thing.

25  I've got a gun.  We give a big bag to Mr. Wirskye and he's

1   going to gather up the money out of the tills.  I pull a gun

2   out and I threaten everybody and he starts gathering money

3   up.

4              Maybe one of them starts to press an

5   alarm.  Mr. Wirskye warns me and I just execute them and we

6   leave.  We get caught.  I can obviously be prosecuted for

7   the death penalty.  I'm the triggerman.  I caused the death.

8   Under the law, Mr. Wirskye and the getaway driver, actively

9   involved, participating as parties to the offense, they can

10   be prosecuted for the capital murder, too.  They can even

11   get the death penalty under certain facts.

12              But what I like -- what I do with every

13   juror I talk to is talk to them about that because people

14   draw a line a lot of times.  They believe philosophically in

15   the death penalty and when they think about it and talk

16   about, obviously, the triggerman, the person that causes the

17   death.  But when you talk about an accomplice, the

18   nontriggerman, they draw a line there.  They would not, if

19   it were up to them, give the death penalty for that type

20   person.  A long prison term maybe, but not the death

21   penalty.

22              Other jurors agree with the law and say,

23   no, no, I think an accomplice, a nontriggerman, a person who

24   does not actually cause the death, could get the death

25   penalty, depending on the facts.  And they agree with that

1   aspect of the law.

2          But there's not any right or wrong

3   answer.  But I like to get your gut reaction on how you

4   honestly feel about that, because when we usually talk about

5   that, we think of the triggerman situation.  But I want to

6   know your views on the accomplice, the person prosecuted

7   under that law.

8          A.     Um, the guy that's in the bank with you, well,

9   he has the opportunity to stop it.  He knows you have a gun.

10  The guy in the car, I can see where he might not get the

11  death penalty.  He didn't know -- did he know that you had a

12  gun when you left?  Did he know that you were going to

13  possibly have the opportunity to kill somebody?  He wasn't

14  in there to possibly stop you.  All I know, he may have only

15  known you were going for some money.

16         Q.     You bring up several good points.  First of

17  all, the last point, if he is just present and not

18  participating and didn't even know a crime is occurring,

19  really, then he's not guilty.  If we fooled him and said,

20  give us a ride down to the bank, we need to cash a check,

21  and wait for us outside.  And meanwhile we're robbing the

22  bank.  He has no idea we have guns and are going to commit

23  robbery.  He would be not guilty under that fact situation.

24  The law would say mere presence alone is not -- you have to

25  actively know about it and participate.

 1              That's a good point.  But the other

 2    situations, if he does know what is going on, could be a

 3    situation -- you brought up a couple of good points.  If he

 4    wasn't in there, did he actually know whether the shooter

 5    had a gun, that sort of thing.  Would that be important to

 6    you?

 7         A.    Yes.

 8         Q.    Because he wouldn't -- if he did know that he

 9    was armed or they were armed men going in there, would that

10    be a factor in favor of that as the type of case an

11    accomplice, even if they are not actually even in there, but

12    right outside, would be a proper death penalty case?

13         A.    Oh, boy, these are so hard.  It's hard to say

14    yes or no.  It's kind of black and white, you know.  We're

15    just kind of throwing out a hypothetical situation.  I've

16    got to kind of come up with a yes or no answer.

17         Q.    Well, what I'm really looking for is your

18    reaction.  I can't go into the facts of the case.  People

19    feel very differently on the accomplice.  We have people

20    that are very much for the death penalty when it involves

21    the shooter, but they say, I really am not for it for the

22    accomplice business, even if they know, you know, it's five

23    guys and they've all got guns, you know, and they go in

24    there and one guy does the shooting, that's a death penalty.

25    But the other people didn't pull the trigger.

1    A.    Yeah.  I mean, if they all have guns, if you

2  go into a robbery with a gun, I mean, you have the intent to

3  harm somebody, possibly kill.  I mean, if you don't have a

4  gun, I don't know what goes on.  I mean, like I said, you

5  need to know the facts of the case.  Did he know -- did the

6  accomplice know there was a gun as you were going in or did

7  he just whip one out of his coat and say, no, give me the

8  money or something like that?  There's just so many

9  variables.

10    Q.    But it's important to you, I guess, if the

11  accomplice had knowledge that someone had a gun?

12    A.    I would be more prone to give a death penalty

13  if he had a gun, also.  He may not have shot the person, but

14  if he walked in with the gun, he had intent to harm.

15    Q.    What about the guy that just waits outside in

16  the car?  Could he ever get the death penalty in your

17  situation or does he need to be present, participating

18  inside, or --

19    A.    It would be hard for me to give him the death

20  penalty.

21    Q.    Because he's not inside?

22    A.    He wasn't inside, didn't know what went on.  I

23  mean, he's out there gunning the engine.  So, I mean, that's

24  where you would have to have all the facts in the case and

25  have to find out exactly what went on prior to the bank

1  robbery.

2        Q.     Like what?

3        A.     Well, if -- I mean, maybe he's the ringleader.

4  Maybe he's the one that said, okay, guys, I want you to go

5  in here and do that.  Then in that case he instigated the

6  whole thing.

7        Q.    Okay.  The reason I get into that is we can't

8  go into the facts, but I can tell you that we are

9  prosecuting this case under the law of parties or

10  accomplices.  In other words, we will not be arguing that

11  Mr. Murphy caused the death in this case, but we will be

12  prosecuting him for the death penalty under that law of

13  parties.

14          So I want to make sure everyone

15  understands that, understands the law, and find out if they

16  have a problem with it.  If they do, that's fine.  If they

17  don't, that's fine, too.

18          Now, you've spent some time thinking

19  about this, I think, because -- I think you filled out the

20  questionnaire probably thought, like most people, maybe they

21  won't call me and then you get the letter.

22          I believe you said that that caused you

23  to start thinking about the death penalty a lot more at that

24  point?

25        A.    Uh-huh.

1    Q.    And that's a natural reaction, obviously.

2  Because it is one thing for us to talk about it

3  philosophically and quite another when you think about

4  actually participating in this type of trial.

5              The trial is divided into two parts.

6  There's the guilt/innocence stage where we have to prove the

7  indictment.  If we got that, that's not the end of the

8  trial.  We move to the punishment phase where you would hear

9  additional evidence.

10             At the close of that, you get these

11 questions.  We have to prove that the defendant would be a

12 continuing danger to society.  We would have to prove in

13 this situation that if he didn't cause the death, that he

14 anticipated a death would occur and we would have to -- the

15 evidence would have to show that there was not sufficient

16 mitigating evidence to warrant a life sentence rather than a

17 death sentence.  And those questions are answered yes and

18 no.  We'll go over those in more detail in a minute.

19             But if the State proves yes, yes, and no,

20 that is, he's a danger, he anticipated a life, and there's

21 not sufficient mitigating evidence, the Judge has no choice.

22 He would sentence the defendant to death.  You don't write

23 death or life, but he would be sentenced according to how

24 the jury answers those questions.  If they are answered any

25 other way, it's a life sentence.  But those are the only two

1  possible outcomes once the defendant has been found guilty.

2       A.     Okay.

3       Q.     Now, if he is found guilty, the Judge will

4  then sentence him to death and he will be placed on death

5  row.  Are you aware of the method of execution in Texas?

6       A.     Lethal injection.

7       Q.     That's right.  I think you followed the news

8  before on some of these that, depending on the case, the

9  news covers some in greater detail.  In a political year, it

10 seems like they do it even more.

11             But the procedures are the same in each

12 case.  A person is placed on death row.  At some point in

13 time, I can't tell you when, he would be given an actual

14 date of execution.  The day prior to that date he is moved

15 from death row into downtown Huntsville to that kind of red

16 brick building that you have seen with the clock on the

17 wall.

18             On the date of his execution he's always

19 given time, if he chooses, to spend with his family, his

20 friends, or a minister.  He's given a last meal.  At 6:00

21 p.m. the law mandates that all executions take place.

22             He's taken from a cell near the chamber.

23 He's taken by force, if necessary.  He's placed on a gurney.

24 I'm sure you have seen on TV in that kind of blue room with

25 the leather straps on it.

1        A.     I'm thinking out of movies and stuff.

2        Q.     Well, they show it on the news a lot, but it's

3  a hospital gurney, but it has leather straps and he's put

4  down there and secured and needles are placed in his arm.

5  There's a visitors -- two visiting rooms for visitors, some

6  for the defendant, if they choose to attend, and some for

7  the victim's family.

8          The warden is there.  After he's been

9  secured and needles are placed in his arm, he's given an

10  opportunity to give a last statement.  These are always

11  covered in the news.  Sometimes they ask for forgiveness.

12  Sometimes they are defiant to the end.  Sometimes they say

13  things like, I didn't do it.  Why are you killing an

14  innocent person?  You hear about the loved ones there.  It's

15  a very, obviously, dramatic event.

16          But once he makes that statement, the

17  warden simply signals the executioner that injects poisons

18  which shut down his lungs and heart.  It happens very

19  quickly.

20          And that's, quite frankly, our goal in

21  this case.  We have the type and quality of evidence that we

22  think we can convince a jury of the defendant's guilt and

23  that the questions should be answered yes, yes, and no, and

24  that some day Patrick Murphy will lie dead on a gurney,

25  executed in the manner I have described.

1    I don't mean to be morbid, but you are

2  right when you think about it, when you really start

3  thinking about it, it affects people differently.  But I

4  want people to realize exactly what this case is about, in

5  that if they get placed on this jury, the type of decisions

6  they are going to have to make.

7    Because some people that are opposed to

8  the death penalty and tell us that at the get-go and that's

9  fine.  We can call them down on another case.  Some people

10  are too adamantly for it.  Others are for it, they may not

11  want to be here, but can make those decisions.  Other people

12  are for it philosophically, but once they start thinking

13  about it, they go, look, I can't really make that decision.

14  It's going to weigh on me.  I'm going to think about that

15  man dying.  I'm going to think about his family.  I don't

16  think that I can make that decision.  If they feel that way,

17  that's fine.  That's why we have about a thousand people

18  that come down.

19    But I want you to be sure and reflect for

20  a moment.  And I'll just ask you, do you think you are the

21  type of person who could actually make these decisions, if

22  we prove it, knowing that this man at the end of the table

23  will be executed some day, if you answer those questions the

24  way we believe the evidence will show?

25    A.    Yes.

1    Q.    Why do you think you can?

2    A.    If the law -- I mean, if it's very black and

3 white and these are your specific questions and I answer

4 them, I mean, without a reasonable doubt, this is this, this

5 is this, this is this, then that's the way it's got to be.

6 That's the way our law is set up.  I can't change that.  I

7 mean, I feel that that is my duty.

8              Now, do I want to be here?  No.  Do I

9 wish I would have got picked for a traffic ticket?  Yes.

10 But, yes, I believe I could do it.

11   Q.    And you have no problems sitting as a juror in

12 a case where the State is proceeding under the theory of an

13 accomplice being prosecuted for the death penalty?

14   A.    No, I don't have a problem.

15   Q.    Let's talk about these Special Issues for a

16 moment, then.  If you will, take a moment to read Special

17 Issue No. 1 to yourself.

18   A.    [Prospective juror complies.]

19   Q.    That question asks the jurors to make a

20 prediction on how the defendant will behave in the future.

21 Do you feel comfortable making that type of -- giving that

22 type of answer, answering that question, if you are given

23 sufficient evidence?

24   A.    You mean answering yes or no to that?

25   Q.    Yes.

1     A.     Yeah.

2     Q.     What types of things would you want to know

3  before you answer question No. 1 yes?

4     A.     Probably the things I couldn't know, like

5  history.

6     Q.     Actually, you could know that.

7     A.     At that point -- like history, what crimes

8  have been committed before, you know, this type of thing.  I

9  mean, I am aware of the case that it was an escape from

10  prison.  A bunch of inmates escaped from prison, so I knew

11  they were already in prison.  So there was something illegal

12  going on there, you know, deviant behavior.  But -- you

13  know, I guess primarily history.

14     Q.     That's what most people tell us and that type

15  of evidence is admissible.  You can hear even from the

16  witnesses themselves on previous crimes, if they are

17  available.  You can hear what punishments were received.

18  You can hear good things, too, good and bad.  And also you

19  get to consider the facts of the crime again in answering

20  that question.

21          The words here, you won't get legal

22  definitions.  You will just use your own definitions.  So I

23  want to go over with you "probability."  We have to prove a

24  probability that the defendant would commit criminal acts of

25  violence.  When you see "probability" used in that sentence,

what does it mean to you?

A.     That they are highly likely to commit a crime again.

Q.     Highly likely, does that -- is that a certainty or just better than 50 percent or where does it register in your mind?

A.     I guess it would -- I guess how -- I guess I need to know exactly what you are asking me.

Q.     Well, let me ask it this way.  We can probably never prove a certainly.  Sometimes people tell us that and obviously it has to be more than a possibility, more likely than not.  Some people tell us it would be 80 percent, 90 percent sure, other people tell us greater than 50 percent. We get all kinds of answers.

       I didn't know if anything was going on in your mind when you read "probability" there?

A.     No.

Q.     "Criminal acts of violence", what does that mean to you, "criminal acts of violence"?

A.     It's kind of like violence.  Robberies. murders.

Q.     Physical crimes to other humans, that sort of thing?

A.     Uh-huh.

Q.     And we have to prove he would be a continuing

1   threat to society.  What does "society" mean to you?

2          A.      Anybody, any person, any place.

3          Q.      Including people in prison that live or work

4   there?

5          A.      I guess you bring that point up, yeah.

6          Q.      That question starts out with a no answer and

7   the State has to prove to you beyond a reasonable doubt it

8   should be answered yes.

9          A.      Okay.

10         Q.      If we don't, you leave it as a no.  If we do,

11  you answer it yes.  But you have to be able to look at that

12  evidence independently and then make your decision.  Do you

13  feel that you can do that?

14         A.      Yes.

15         Q.      Then we move on to Special Issue No. 2.  Just

16  take a moment to read that to yourself.

17         A.      [Prospective juror complies.]

18         Q.      That question covers the parties issue.

19  Obviously, the first part, if we proved he caused the death,

20  that would be an easier answer.  But if he did not actually

21  cause the death, we have to prove that he intended to kill

22  the deceased or another or anticipated that a human life

23  would be taken.  The anticipated that a human life would be

24  taken, I imagine, comes in most of the time, the situations

25  that we were describing in our bank robbery scenario.

1    Do you feel that -- what types of things,

2  again, would be important to you when you see the question

3  asked that way as far as anticipate that a human life would

4  be taken?

5    A.    Just like the intent to kill.  You know, you

6  go into a robbery or, you know, go into a bank with a gun,

7  loaded gun, you have the intent to possibly shoot somebody.

8    Q.    And in an accomplice situation, either they

9  are armed or if they know their accomplices are armed, would

10 that be important to you?

11   A.    Yeah, I mean, before you go into any kind of

12 instigate -- or any type of thing, you have the opportunity

13 to stop, you know, not go, tell them to stop, you know, that

14 opportunity was there.

15   Q.    Okay.  Would it be important to you if they

16 knew what the -- if the accomplice that we were prosecuting

17 knew what the other individuals were like, their

18 personalties, that sort of thing?

19   A.    Yeah, I think so.

20   Q.    Okay.  Again, that question starts out with a

21 no answer and it has to be answered yes by looking at all

22 the evidence and all the background evidence.

23    Then this last Special Issue you get to.

24 You don't get to it unless you have found him guilty, unless

25 you have found him a continuing danger and that he

1   anticipated a death would occur.  And then you look at this

2   last Special Issue.  If you would take a moment to just read

3   that to yourself.

4        A.      (Prospective juror complies.)

5        Q.      That's a long one.

6        A.      That's a big one.

7        Q.      A catch-all.  Sometimes we call it the safety

8   net.  You have found all these things out about the

9   defendant and this question allows you to look at everything

10  you have heard in the guilt/innocence stage, as well as his

11  background evidence and then decide is there sufficient

12  evidence, something in his background or the evidence that

13  makes you feel that a life sentence should be imposed rather

14  than the death sentence.

15               Now, as you sit there today, does

16  anything come to your mind that you might view as

17  potentially mitigating evidence?

18       A.      No.

19       Q.      Okay.  Most people tell us that.  We don't

20  anticipate you have been thinking about these issues.  I

21  can't tell you what mitigating evidence is.  You don't even

22  have to agree with what -- with the other jurors on what it

23  may be.  You just have to be able to keep your mind open to

24  it.

25               We talk to a lot of jurors about what

1  they may view as potentially mitigating.  Some people talk

2  about young age.  In Texas you have to be 17 or above to be

3  prosecuted for the death penalty.  We've had jurors tell us

4  a 17, 18, 19 year old, they may view that as potentially

5  mitigating because they may be immature.  Other jurors tell

6  us, no, if they are legal adults at 17 under the law, I

7  would hold them as accountable as I would any person.  Do

8  you have any views on young age or old age or anything like

9  that?

10        A.    No.

11        Q.    Okay.  Sometimes you hear background evidence

12  about someone who has had a bad childhood.  Maybe they have

13  been physically abused, mentally abused, or raised in a

14  broken home.  Some jurors might feel that's potentially

15  mitigating because of the severity.  Other jurors tell us, I

16  might feel bad for them, but they have got to be held

17  accountable once they are adults.  There are lots of people

18  that undergo that and they don't commit these crimes.  How

19  do you feel about that type of background?

20        A.    I believe a lot of people have trauma in their

21  life at one point or the other.  But, I mean, they also see

22  good and you choose which path you go down.  So, I mean, you

23  know, I don't feel like that would actually -- I mean, it

24  would weigh one way or the other, but I don't know if it

25  would like, say, okay, life, I don't --

1    Q.    You don't know if you would view that as
2  potentially mitigating, really, because of other people have
3  been through that or --
4         A.    No.
5         Q.    Okay.  Sometimes we talk about drugs.
6  Sometimes people commit offenses while under the influence
7  of drugs.  The law says that's not a legal defense if they
8  voluntarily took it, but you can view it as mitigating, if
9  you want.  Other jurors view it as mitigating.  Other jurors
10  say it's actually aggravating, if you are going to take
11  drugs and commit offenses.  Do you feel one way or another
12  about that?
13         A.    No.
14         Q.    The bottom line is, really, you need to be
15  able to keep your mind open to this.  If you hear something
16  that you think is sufficiently mitigating, that you would
17  answer the question yes, you could, knowing he would get a
18  life sentence.  And if you hear it the other way, you would
19  answer it no -- or if you don't hear sufficient evidence,
20  you would answer it no.
21              And do you feel that you could keep your
22  mind open to that?
23         A.    Yes.
24         Q.    Do you think that's a good question to have in
25  this type of case?

141

1    A.    Yes.

2    Q.    Do you think you could honestly keep your mind

3  open to that question, if you had already found somebody

4  guilty, found they were a continuing danger, and found they

5  anticipated a life --

6    A.    Absolutely.

7    Q.    -- had been taken?  Why is that?

8    A.    Because when I answer these questions, that's

9  going to, you know, determine if the Judge is going to put

10  him on the gurney.  So I have to remain open to that.

11    Q.    Okay.  And you sound pretty strong in that?

12    A.    Yes.

13    Q.    So you will be able to follow the law in that

14  regard?

15    A.    Yes.

16    Q.    I meant to ask you this earlier.  When -- we

17  always ask if anyone in your close family, how they feel

18  about -- if they agree or disagree with you on the death

19  penalty and you said your husband was a little more

20  conservative than you are.

21    A.    Yes.

22    Q.    Has this been a subject you have really ever

23  discussed?

24    A.    No.

25    Q.    You are just guessing from how well you know

1  him?

2      A.      Yeah, yes.

3      Q.      That wouldn't cause any problems if you get on

4  the case, though.  He's not going to start trying to tell

5  you how you should --

6      A.      No.

7      Q.      -- find or --

8      A.      I can tell him to shut up real easily.

9      Q.      Okay.

10              MR. SHOOK:  May I have one moment, Judge?

11              THE COURT:  Yes.

12      Q.      (By Mr. Shook)  One other area I wanted to go

13  in.  We have this one question.  Do you have your

14  questionnaire there?

15      A.      Yes.

16      Q.      Would you turn to page 10.  We ask a lot of

17  questions and some of the answers, you know, everybody would

18  argue for hours why a person put that.  Sometimes I like to

19  ask.  At the very top there we asked the general statement,

20  do you generally hold your ground when you feel that you are

21  correct or are you usually swayed by the strong views of

22  others.  And people put different things, usually the top

23  three.  Rarely do we have people that say, I'm always swayed

24  by someone else, but once in a while we do.  You put, I

25  always hold my ground.  What was going through your mind

1  when you answered that?

2      A.      I mean, if I believe something strongly enough

3  and I think that I am right, I'm not going to let somebody

4  sway me and tell me something else.  I mean, if I see

5  something as, you know, this is the way it is, black and

6  white, I'm not going to let somebody muddy it up.

7      Q.      And in your other jury selection, were the

8  arguments pretty straightforward or the deliberations, or

9  was there a conflict back there in the jury room?

10      A.      It was really straightforward.  There was no

11  question, whatsoever.

12      Q.      One other area I forgot to go over.  In the

13  punishment phase you will often hear from psychologists or

14  psychiatrists called by one side or the other.  The defense

15  may call them to talk about future dangerousness, render an

16  opinion on that or question No. 2 or many times mitigation,

17  tell you what happened, or their opinion as to their take on

18  what happened, in the defendant's life.  The State may also

19  call a psychologist or psychiatrist.

20              Jurors feel differently about these types

21  of experts.  We had one question about that and I think you

22  said, you know, if they had seen them once, that would be

23  different or have they seen them or known them prior to

24  this.  I guess, how many times they have met with them or

25  that sort of thing.

          Some jurors don't believe in that stuff
at all.  They call it the soft sciences or they feel you can
probably find an expert if you paid them enough money to say
whatever you want.  And other jurors really do like those
types of experts.  They think you get some good insights
from them and give them greater weight.  And other jurors
really just plug them in like any other witness and not give
them any particular weight.

          How do you feel about those types of
experts in the punishment area?  Do you think that would be
valuable information to you or do you think --

     A.     I think I would weigh it equally with
everything else that went in.  I wouldn't put them higher
up.  I do believe that psychologists and psychiatrists, they
are more geared towards, you know, basic human behaviors.
So I think it's fair to put them on the stand to weigh one
way or the other, but I don't think that I would weigh it
heavier or lighter.

     Q.     Okay.  Just plug them in like anyone else?

     A.     Uh-huh.

     Q.     That's all I have, then.  Have you got any
questions over anything we've gone over?  I know we covered
a lot of areas.

     A.     No, no questions.

     Q.     Anything you think, if you were sitting at

1   this table, that we would want to know about you or your

2   personality that would be important that we haven't gone

3   over?

4          A.    No.

5          Q.    Appreciate your patience.

6                MR. SHOOK:  That's all we have, Judge.

7                THE COURT:  Mr. Sanchez?

8                        CROSS-EXAMINATION

9   BY MR. SANCHEZ:

10         Q.    Good afternoon.  I'm not going to have to

11  explain as much of the law as the State attorneys do, but

12  there are some things I want to go over with you.  First of

13  all, I want to congratulate you on being formal and not

14  being superhappy on receiving a letter to come down here and

15  maybe sit on a death penalty case.  I think both sides would

16  be a little concerned if you were jumping for joy and

17  walking in here and couldn't wait to get on.  And of course

18  the other side, some people, you can get them in this room

19  and there's no way they are going to make a decision based

20  on their views.

21                But what we're looking for are jurors who

22  could look at both sides, keep their mind open to all the

23  arguments that are made, and all the issues that are being

24  presented in a trial, and especially this trial, and who

25  will follow the law.

1           You have indicated that you could follow

2    the law.  And there are some things I just want to over with

3    you again.  I don't feel it was made clear during the first

4    part of the questions that were asked of you, but a lot of

5    people think when a case, where the State is seeking the

6    death penalty, that as soon as they find somebody guilty of

7    capital murder, then it's an automatic death penalty.  A lot

8    of people come in here thinking that and I think the State

9    did a good job explaining that and I want to make sure you

10   are clear on that.

11         A.    Yes.

12         Q.    Just because they are seeking the death

13   penalty and somebody is convicted of capital murder, that

14   doesn't automatically equal a death penalty.  As a matter of

15   fact, the law presupposes that it's an automatic life

16   sentence and that's where it stays unless these three

17   Special Issues are answered in a certain way.  And you

18   understand that, don't you?

19         A.    Yes.

20         Q.    And not only are they supposed to be proven --

21   I'm sorry.  Not only are they supposed to be answered in a

22   certain way, but there are certain burdens that the State

23   must meet in actually answering those questions.  And you

24   indicated that you could do that; is that correct?

25         A.    Yes.

1    Q.    And sometimes people forget, well, this is all

2    one big trial.  But it's a bifurcated case.  What that means

3    is it's actually two trials.  The first part would be

4    whether you are convinced beyond a reasonable doubt that Mr.

5    Murphy is guilty of capital murder.  If the State didn't

6    prove that beyond a reasonable doubt, well, it would be a

7    not guilty and you wouldn't even have to worry about these

8    Special Issues.  Does that concern you in any way?

9    A.    Well, no, it's straightforward.

10   Q.    All right.  Of course, the decision you make

11   in the first part of the trial in the guilt/innocence stage,

12   if you find him guilty of capital murder, that doesn't

13   necessarily mean that those Special Issues are answered

14   automatically.  You understand that, too, correct?

15   A.    Correct.

16   Q.    And -- but, you know, us over here at this

17   side of the table, we want to make sure that we get jurors

18   up on the jury that would look at those Special Issues

19   independently of their decision they made before.  Would you

20   do that?

21   A.    Yes.

22   Q.    And you would make them prove to you whether

23   he was a continuing threat to society, separate from the

24   decision you already had made, correct?

25   A.    Correct.

1      Q.      You could take into consideration what you

2  heard in the first part of the trial, but on Special Issue

3  No. 1 they would have to prove that to you independent.

4  Does that make sense?

5      A.      Yes, I understand.

6      Q.      All right.  And on Special Issue No. 2, again,

7  where we talk about the law of parties on Special Issue No.

8  2, your answer, there again, would be independent of what

9  you answered in Special Issue No. 1 and the guilt/innocence

10  stage.

11      A.      Yes.

12      Q.      Okay.  And you could do that?

13      A.      Yes.

14      Q.      All right.  Now, you also seem like a person

15  that you want to take everything into consideration because

16  it's probably an important decision.  It will be an

17  important decision.

18      A.      Big.

19      Q.      And sometimes people think they need to hear

20  everything under the sun before they could make that

21  decision.  But you would have to make your decision based on

22  what you hear here in court.  You talked about that you have

23  heard some things in the press, but would that in any way

24  cause you to form an opinion before you even start --

25      A.      No.

1    Q.    -- the trial?

2    A.    No.  I mean, and the stuff that I heard in the

3    press is just generalities.  The last thing I heard was that

4    they were seating a jury and it was supposed to start on

5    November 10th.  That's the kind of stuff I heard.

6    Q.    And any evidence that you would use to make

7    your decision would be here in this Court and not outside of

8    this courtroom?

9    A.    Correct.

10   Q.    All right.

11        MR. SANCHEZ:  That's all the questions I

12   have, Your Honor.

13        THE COURT:  Ms. Curtis, if you would,

14   please, ma'am --

15        PROSPECTIVE JUROR:  I'm done?

16        THE COURT:  -- have a seat outside and

17   we'll have you back in, in a few minutes.  Okay?

18                    [Prospective juror out]

19        THE COURT:  What says the State?

20        MR. SHOOK:  We have no challenge for

21   cause.

22        MR. SANCHEZ:  We have no challenge for

23   cause.

24        THE COURT:  The Court finds juror No.

25   990, Ms. Curtis, to be qualified.

1    MR. SHOOK:  Can we have a moment?

2    THE COURT:  Do you need to step into your

3    office?

4    MS. BUSBEE:  No, sir.

5    (Recess)

6    MR. SHOOK:  We'll exercise a strike.

7    THE COURT:  Ask Ms. Curtis to come back

8    in, please.

9    [Prospective juror in]

10   THE COURT:  Ms. Curtis, we want to thank

11   you for your time and attention you have given this Court.

12   And I'm going to inform you that you shall not sit on this

13   jury, so your stress can go down a little bit.  And -- but

14   we very much appreciate -- if we had people like you all day

15   long, it would make our job a lot easier.  We appreciate

16   your time and you are free to go.

17   [Prospective juror out]

18   THE COURT:  Linda Patterson.

19   [Prospective juror in]

20   THE COURT:  Thank you.  You may be

21   seated.  Good afternoon, Ms. Patterson, how are you?

22   PROSPECTIVE JUROR:  Just fine, thank you.

23   THE COURT:  Welcome to the 283rd.  And we

24   hope your stress level is not too high.  We get various

25   reactions.  This is as informal a proceeding as we can be.

1   Downstairs you are able to hide among the masses when you

2   fill out your questionnaire, but now the focus is on you.

3   And the reason we have to do this is the law requires that

4   we do it this way.

5              And have you had an opportunity to read

6   the guide and review your questionnaire?  My job is to be

7   sure that you, at the end of this process, you understand

8   the law.  That's why I gave you the Penal Code sections up

9   front, so you can begin to think about it.  The lawyers are

10  going to go over it with you in detail and give you examples

11  and help you understand how the law really does work.

12             If you have any questions, this is the

13  time that you get to ask.  See, if I do it in a big group,

14  nobody will ask any questions.  But the idea is that lawyers

15  want to know what you're thinking.  There are no wrong

16  answers, just honest ones.

17             PROSPECTIVE JUROR:  Okay.

18             THE COURT:  Only question I have for you,

19  ma'am, at this time, will you be able to serve this Court,

20  beginning on November 10th for those two weeks?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  I'll turn it over to

23  Mr. Wirskye.

24             MR. WIRSKYE:  May it please the Court.

25             LINDA PATTERSON,

1  having been duly sworn, was examined and testified as

2  follows:

3                    DIRECT EXAMINATION

4  BY MR. WIRSKYE:

5        Q.    Ms. Patterson, how are you?

6        A.    Just fine, thank you.

7        Q.    Thanks for being so patient with us this

8  afternoon.  My name is Bill Wirskye and I'm the Assistant DA

9  that's going to be visiting with you for the next few

10  minutes, kind of run over the information in your

11  questionnaire that you were kind enough to fill out, pretty

12  intrusive questionnaire, but thank you for filling that out.

13  Also talk to you about your thoughts and feelings and

14  opinions on the death penalty.  And, finally, we may talk

15  about some of the laws that apply in a death penalty case

16  and some of the general principles that apply in any

17  criminal case.

18              What's been going on or going through

19  your head since you found out you had to come back for the

20  individual interview?

21        A.    Well, I thought it would be interesting to

22  know the process and everything.  I've never been chosen for

23  a jury.

24        Q.    Some people tell us once they get that letter

25  to come back or phone call to come back, they really start

1    thinking about potentially actually being a juror in a death

2    penalty case.

3            A       Sure.

4            Q.      Did that go through your mind?

5            A.      Well, it's a possibility to be a potential

6    juror.

7            Q.      Okay.

8            A.      Sure.

9            Q.      And you work for the City of Garland; is that

10   right?

11           A.      Yes, I do.

12           Q.      What do you do for Garland?

13           A.      I'm a secretary for the Street Department.

14           Q.      Do you come into contact at all with any of

15   the police officers there or --

16           A.      No.

17           Q.      You don't have any friends that are police

18   officers?

19           A.      I've got -- like my boss is married to a

20   police officer.

21           Q.      Okay.  But no one that you come into contact

22   on a day-to-day --

23           A.      No.

24           Q.      -- business basis or anything like that?

25           A.      No.

1    Q.    You have been down to the courthouse before on

2    some different cases?

3    A.    Yes.

4    Q.    Did you ever make it on an actual jury?

5    A.    No.

6    Q.    You came out and sat back there and got talked

7    to in the big group?

8    A.    Yes.

9    Q.    How many times have you come down on that?

10    A.    Maybe twice.

11    Q.    Other than that, is that pretty much your only

12    exposure to the courthouse and the criminal justice system?

13    A.    Yes.

14    Q.    I notice -- we always ask if anybody has any

15    relatives or anything like that that have come into contact

16    with the system.   I think you put maybe your brother --

17    A.    Yes.

18    Q.    -- that had a case?

19    A.    Uh-huh.

20    Q.    What type case was that?

21    A.    It was assault against a peace officer.

22    Q.    Okay.  Was that here in Dallas County?

23    A.    I really -- I'm not sure where it happened,

24    exactly.

25    Q.    Okay.  And that was fairly recently or --

1        A.      It's been close to five years.

2        Q.      Okay.  And what was the outcome of that case?

3        A.      He is in prison now for five years.

4        Q.      Is it something that you keep in contact with

5   him?

6        A.      No.

7        Q.      Never been to visit him or anything like that?

8        A.      No.

9        Q.      Did you attend his trial?

10       A.      No.

11       Q.      Do you know if he had a trial or did he plead

12  guilty?

13       A.      I believe he had a trial.

14       Q.      Okay.  Based on what you know, do you think he

15  was treated fairly?

16       A.      Yes.

17       Q.      Okay.  Nothing lingering in the back of your

18  mind that maybe the system didn't work for him or anything

19  like that?

20       A.      No, no.

21       Q.      Anything about having had that experience

22  weigh on your mind one way or another about being a juror in

23  this case?

24       A.      No.

25       Q.      Okay, fair enough.  You told us that you are

1   generally in favor of the death penalty; is that right?

2        A.      Um, well, if everything points to without a

3   reasonable doubt --

4        Q.      Uh-huh.

5        A.      -- then, yes.

6        Q.      Okay.  So you think we should have the death

7   penalty available as an option in our system?

8        A.      Yes.

9        Q.      Why do you think that?  What purpose do you

10  think it serves?

11       A.      Well, people just shouldn't be going around

12  taking other people's lives in cold blood for no reason.

13  There has to be some kind of deterrent.

14       Q.      Has a deterrent effect, I guess?

15       A.      Yes.

16       Q.      Is it something you've been in favor of most

17  of your life or did you ever kind of switch positions or at

18  some point did you not believe in the death penalty?

19       A.      I guess I've always believed that.

20       Q.      Is there any particular case you may have

21  heard about, read about, or followed that comes to mind when

22  you think about an appropriate case for the death penalty?

23       A.      I can't think of anything offhand.

24       Q.      Okay.  In Texas you may or may not know -- I

25  know that we're hitting you with a lot of law that we're

1   asking you to read.  The only type crimes that the death

2   penalty is available are for murder cases and then only a

3   certain type of murder case.  If you murder a particular

4   person like a policeman, fireman, prison guard on duty, a

5   child under six, or if you commit an intentional murder

6   during the course of another felony like robbery, burglary,

7   that type of thing, those are the only type cases where the

8   death penalty is potentially an option.

9                   There are a lot of very bad and very

10  brutal intentional murders that don't fit under that, that

11  we can lock you up for life, but the death penalty is never

12  an option.

13                  Just kind of generally, do you kind of

14  agree with that or if you were Governor for a day, would you

15  expand the group of cases where it's available or --

16          A.      Oh, gosh, that was a long question.

17          Q.      Some people come down and tell us, gee, I

18  think any murder case, it should be an option, or some

19  people tell us child abuse cases or --

20          A.      Oh, okay, yeah, for the death penalty?

21          Q.      Yes, ma'am.

22          A.      Yeah.  It should be just what it said in here.

23  If it's a peace officer or a child under six or I think if

24  it's just a coldblooded killing for no reason.

25          Q.      Okay.  Fair enough.  Let me ask you this.  We

1  talk to a lot of people and, you know, even people who feel

2  strongly about the death penalty, that we should have one,

3  tend sometimes to draw lines.  And let me tell you what I

4  mean by that.

5           I think when we think of a capital

6  murder, maybe a murder in the course of a robbery, we think

7  about one guy taking a gun into a 7-Eleven, holding up the

8  clerk, shooting him, and taking off with the money.  In

9  reality, oftentimes crimes are committed by more than one

10 person, you know, a group or gang of people.

11          The law in Texas allows for us to

12 prosecute not only, for lack of a better word, the

13 triggerman, the guy that actually pulled the trigger and

14 caused the death, but also nontriggermen, what some people

15 talk about as accomplices.

16          So even though you didn't actually cause

17 the death, you could still potentially suffer the death

18 penalty.  A lot of people who are very strongly in favor of

19 the death penalty agree that you should have that death

20 penalty for the triggerman, but they don't feel it's

21 justified or ever appropriate when you are talking about an

22 accomplice or somebody that didn't pull the trigger.  Where

23 do you come down on that issue?

24      A.      Well, it's kind of a hard question, but I

25 think an accomplice, unless he knew that that person was

1  going to kill the store clerk, but I don't think he should

2  have the same crime if he didn't know that that other person

3  was just going to pull out a gun and shoot him.  I don't

4  think it should be the same.

5           Q.    Okay.

6           A.    Unless he willingly said, shoot him.

7           Q.    Let me give you an example.  Let's say

8  Mr. Shook and I, the other prosecutor, decide we're going to

9  rob a bank.  We're going to commit a bank robbery.  That's

10 what we agree to do.  We only have one gun.  He's going to

11 take the gun in.  He's going to hold up that bank teller.

12 And I'm going to go in unarmed with a bag to gather up all

13 the money so we can get away.

14           At some point during that robbery, for

15 whatever reason, maybe Mr. Shook sees somebody going for a

16 silent alarm or I tell him, hey, somebody's trying to call

17 911, something like that, Mr. Shook shoots and kills that

18 teller.  Okay?  He's committed an intentional murder during

19 the course of a bank robbery.  He could be convicted of

20 capital murder and ultimately receive the death penalty, if

21 the jury thinks it is appropriate.

22           What do you think about someone in my

23 shoes, that kind of went in?  I was the bagman.  I didn't

24 have a gun.  I was just going to pick up the money.

25           A.    Well, you would still be involved in that

crime because you went along with it, but I don't think you

would -- I don't -- in my own opinion, I don't think that

you should be charged with the death penalty because you

weren't the triggerman.

Q.     A lot of people tell us that, even people that

feel very strongly for the death penalty.  They just don't

think it's justified.  They hold the triggerman, the person

that actually caused the death, to a higher standard.  They

might convict me and sentence me for life, lock me up for

the rest of my life.

A.     Right.

Q.     But they just don't feel that the death

penalty is ever appropriate when you are talking about

someone who didn't actually cause the death, the accomplice.

Is that kind of what I hear you saying?

A.     Yes, because the person that the accomplice

may have thought he was just going to use the gun, you know,

just to scare him or something, but not actually use it, you

know.

Q.     Actually, the law in Texas, going back to the

situation I gave you, even though I had no intent that that

murder happen, I could still be convicted of capital murder

and potentially face the death penalty.  A lot of people,

very frankly, disagree with that law.  You are not the first

person to tell us that.  We hear that quite a bit.

161

1          And as we tell everybody, we talk to a

2   lot of people that come down here, not everyone is cut out

3   to be the perfect juror on a particular case.

4          A.    True.

5          Q.    And I'll be up front with you.  We're

6   prosecuting this case and prosecuting Mr. Murphy as an

7   accomplice, a nontriggerman.  So when we talk to somebody

8   like you who doesn't feel the death penalty is appropriate

9   for those accomplices, you know, it's very important we know

10  exactly how you feel.  And that's kind of what I hear you

11  saying that under no circumstances should the accomplice,

12  the nontriggerman, ever be subject to the death penalty; is

13  that right?

14         A.    Unless he was saying, shoot him, or egging him

15  on.

16         Q.    Uh-huh.

17         A.    I just don't think if he knew that he was

18  going to pull the gun, that --

19         Q.    Okay.  And there's really two different ways

20  that an accomplice can be found guilty, that I can be found

21  guilty.  If I turned to Mr. Shook and say, shoot him, shoot

22  him, like you are talking about, egging him on, then I could

23  be found guilty as an accomplice.

24              Or kind of my scenario, going back, if we

25  just agreed that a bank robbery happen and I had no intent

1  at all of Mr. Shook shooting and killing somebody, even

2  though he did it in furtherance of that crime, if I should

3  have anticipated, then I could be found guilty of capital

4  murder and face the death penalty.

5              And it sounds like it's kind of that

6  second scenario, that conspiracy accomplice, that you just

7  disagree with it and think the death penalty shouldn't be

8  available.  Is that kind of what I hear you saying?

9       A.    Yeah.  Unless you both conspired to go in and

10  say, we're going to shoot him.

11       Q.    Yeah.  The conspiracy that we had was just to

12  rob a bank.  I had no intent at all.

13       A.    You had no intention that -- you didn't know

14  he was going to go in and shoot him.

15       Q.    Uh-huh.

16       A.    So, no.

17       Q.    A lot of people draw the same line you did for

18  that type of an accomplice.  We just take the death penalty

19  off the table.  I just, you know, I may give him a life

20  sentence, but I would never give him the death penalty like

21  I might the person who actually pulled the trigger or

22  somebody who intended the murder would happen.  Is that kind

23  of what I hear you saying?

24       A.    Yes.

25              MR. WIRSKYE:  Ms. Patterson, give me just

1    a second.   I think we have an agreement, Judge.

2                        THE COURT:  Ms. Patterson?

3                        PROSPECTIVE JUROR:  Yes, sir.

4                        THE COURT:  You couldn't get past

5    question No. 1.   The parties have agreed this case is not

6    for you.   We appreciate your time and service coming down.

7    We thank you for participating and next time around you will

8    say, well, I got to the second round on a capital murder

9    case, but I didn't get chosen.   So we'll find another case

10   for you sometime.

11                       PROSPECTIVE JUROR:  Thank you.

12                       THE COURT:  Thank you.

13                           [End of Volume]

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF TEXAS            *

2  COUNTY OF DALLAS          *

3       I, NANCY BREWER, Official Court Reporter for the 283rd

4  Judicial District Court, do hereby certify that the above

5  and foregoing constitutes a true and correct transcription

6  of all portions of evidence and other proceedings requested

7  in writing by counsel for the parties to be included in this

8  volume of the Reporter's Record, in the above-styled and

9  numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11      WITNESS MY OFFICIAL HAND on this the  4  day of

12  _____March_____, 2004.

13

14

15  _____
    NANCY BREWER, CSR. NO. 5759

16  Expiration Date:  12-31-04
    Official Reporter, 283rd JDC

17  Frank Crowley Crts. Bldg. LB33
    133 No. Industrial Blvd.

18  Dallas, TX 75207
    (214)653-5863

19

20

21

22

23

24

25

REPORTER'S RECORD

74851

VOLUME 13 OF 64 VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

STATE OF TEXAS            *        IN THE DISTRICT COURT

VS.                       *        DALLAS COUNTY, TEXAS

PATRICK HENRY MURPHY, JR.   *      283RD DISTRICT COURT


*********************

INDIVIDUAL VOIR DIRE

*********************

FILED IN
COURT OF CRIMINAL APPEALS

MAR   9 2004

Troy C. Bennett, Jr. Clerk


On the 9th day of September, 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.


ORIGINAL

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT: 03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT: 00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Michael Collins | 4 | 5 | 35 | 13 |
| Clarence Davis | 42 | 43 | | 13 |
| Christopher Thompson | 46 | 49 | 71 | 13 |
| Antwanette Coleman | 75 | 77 | | 13 |
| Wayland Taylor | 85 | 88 | | 13 |
| James Nelson | 99 | 101 | 133 | 13 |

P R O C E E D I N G S

1
2          THE COURT:  Mr. Collins.
3               [Prospective juror in]
4          THE COURT:  Good morning, sir, how are
5   you?
6          PROSPECTIVE JUROR:  I'm fine.
7          THE COURT:  Welcome to the 283rd and
8   thank you for being here on time.  As my letter said, we do
9   like to start on time.  Have you had an opportunity to read
10  the orientation guide I provided for you?
11         PROSPECTIVE JUROR:  Yes, Your Honor.
12         THE COURT:  That's a lot of information
13  to give someone first thing in the morning and you don't at
14  this point need to completely understand everything.  The
15  lawyers will go over with you some examples and try to help
16  you understand how the law interrelates and how to apply the
17  law.
18              This is as informal a proceeding as we
19  can manage.  Sometimes people get nervous when they are up
20  on the witness stand and it's not intended to be that way.
21  The only way that we can visit with you and be sure that you
22  -- at the end of the process, two questions that I have to
23  ask are, do you understand the law?  And if you understand
24  the law, can you follow the law?  And that's the objective
25  here.

1    The only question I have before we begin

2  is, you saw the trial date in this case shall be the 10th

3  day of November and for two weeks.  Can you serve this Court

4  for those two weeks?

5    PROSPECTIVE JUROR:  Yes.

6    THE COURT:  And do you have any questions

7  of me before we begin?

8    PROSPECTIVE JUROR:  No, sir.

9    THE COURT:  Mr. Wirskye, you may inquire.

10    MR. WIRSKYE:  May it please the Court.

11    MICHAEL COLLINS,

12  having been duly sworn, was examined and testified as

13  follows:

14    DIRECT EXAMINATION

15  BY MR. WIRSKYE:

16    Q.    Mr. Collins, how are you this morning?

17    A.    Just fine, thank you.

18    Q.    My name is Bill Wirskye and I'll be the

19  Assistant District Attorney that's going to be visiting with

20  you for the next few minutes.  Just to introduce everyone in

21  the courtroom, this is Toby Shook to my left.  He's the lead

22  prosecutor in the case.  The defense lawyers, Brook Busbee,

23  Juan Sanchez.  At the end of the table is the person

24  accused, Patrick Murphy.

25    A.    Good morning.

Q.     What I would like to do with you is maybe
visit a little bit about some of the information that you
were kind enough to put down on our extensive questionnaire
and talk with you a little bit about some of your thoughts
on the death penalty and then finally visit a little bit
about the law that applies in death penalty cases.  You are
in sales; is that right?

A.     Yes, sir.

Q.     Okay.  Do you travel a lot or are you mainly
in town?

A.     I travel probably five weeks out of six.

Q.     Okay.  Do you think -- again, the Judge asked
you, but do you think it would cause any major, major
disruptions in your work schedule if you had to be a juror
for two weeks in November?

A.     With knowing that it's in November and that
it's two weeks, I'm quite certain my employer will work with
me on it.  Much longer than that, would be difficult only
from the point of view that it's commission sales and it's
-- if I don't do it, I don't get paid, so --

Q.     That's what we anticipate, usually about two
weeks.  It may be less, actually, than the two-week time
period.  How long have you been in that line of work?

A.     All total, probably 20 years -- 18 years,
something like that.  I was in manufacturing before that.

1    Q.    Okay.  And before that looks like maybe the

2  military?

3    A.    I was in the military.

4    Q.    What branch of the service?

5    A.    Army.

6    Q.    And your wife is a teacher in Richardson; is

7  that right?

8    A.    That's correct.

9    Q.    I have two nephews that are going out there.

10  What school does she teach at?

11    A.    Brentfield Elementary.

12    Q.    What did you think when you got our phone call

13  or a letter that said that you need to come in for the

14  individual interview?

15    A.    Well, I mean, it was stated that that would be

16  the next step that all of us that filled out the

17  questionnaire would then be called for individual voir dire

18  and so I wasn't that surprised, although the original date

19  that I was scheduled was last week and actually I was

20  scheduled to travel out of the country and the Judge was

21  kind enough to give me an extension to this week.

22    Q.    We don't actually talk to everybody that

23  filled one out.  That's kind of why we go through the

24  process.  So in a sense, I guess, you are one of the select

25  few that gets to come down here and visit with us

1    individually.

2         A.      Okay.

3         Q.      Let me ask you, generally you told us that you

4    are in favor of the death penalty.  I'm curious what purpose

5    you think it serves in our society having the death penalty?

6         A.      Well, I do believe it to be a deterrent,

7    except in those cases where individuals simply aren't

8    motivated by deterrence, perhaps they don't have no regard

9    for themselves or others and those particular cases I kind

10   of feel that those people are of such a disposition socially

11   or mentally or morally to the point where they are probably

12   going to be a threat to society anyway.

13        Q.      Okay.  And I know -- I don't think you have

14   your questionnaire in front of you.

15        A.      I do here.

16        Q.      Okay.  I know it's been a while since you

17   looked at it, but at one point, I believe it's on page 4, we

18   asked you to kind of rank yourself how strongly you feel in

19   using the death penalty on a scale of 1 to 10 and you gave

20   yourself a 9?

21        A.      That's correct.

22        Q.      Which is toward the high end of the scale and

23   I'm curious kind of what that means to you or if you can put

24   it into words.

25        A.      Okay.  I do not -- I don't -- once an

1    individual is convicted and has had the appeal process in

2    front of them and all of that appeal, all those numerous

3    appeals, I mean, I don't know what the statistic is, but it

4    seems to me like there are endless numbers of appeals

5    associated with it.  By the time they reach that last stage,

6    I believe that it's warranted and it's time.  I don't like

7    to reduce it to economics, but the economics of jailing

8    people forever or the balance of their life versus the

9    economics of going ahead and getting this thing over with,

10   makes a lot of sense to me as well.

11        Q.     Okay.  We obviously ask you a lot of questions

12   on the death penalty.  Towards the bottom of page 4, the

13   next to last question, what would be important to you in

14   deciding whether a person received the death sentence or a

15   life sentence, you said the circumstances and the subject's

16   state of mind.  I was kind of curious what you meant by

17   that.

18        A.     The circumstances are obvious, a heinous

19   crime, something like that.  But the state of mind, if it

20   was an impulse, if it was, you know, a reaction of some kind

21   that absolutely had no thought, no -- the word

22   "premeditation" or something like that involved in it, I

23   think I can understand that, even not necessarily understand

24   the crime, but understand the circumstances, and would be

25   less likely to vote in favor of death in that particular

1    situation.

2         Q.    Where it wasn't premeditated, that type thing?

3         A.    Exactly, yeah.

4         Q.    We also ask people, I hate to back up on you,

5    but I think it's on page 2, we ask people to give the best

6    argument for the death penalty and the best argument

7    against.  And I never know how strongly people subscribe to

8    those two views or whether they are just kind of in the

9    abstract, giving what they consider the strongest argument.

10   And you said the best argument against the death penalty is

11   that many consider the death penalty to be State sanctioned

12   murder.  And I'm curious if that's something you believe in

13   or you think that's the best argument against it?

14        A.    That's exactly what the question was and that

15   was my answer.  That's probably the best argument against

16   it.  No, I don't believe it.

17        Q.    We also asked you some questions about the

18   criminal justice system and the first thing that pops in

19   your mind when you think about the Assistant District

20   Attorney and you said politicians.  I'm just curious where

21   that comes from.

22        A.    Sitting in front of a room full of attorneys,

23   okay.

24        Q.    Mr. Shook and I are both career prosecutors.

25   I don't think that we have political aspirations.  I'm just

1  curious where that comes from.

2        A.      You get a little bit cynical about the system

3  sometimes from the point of view that -- and maybe a lot of

4  television has a lot to do with it, I'm not really sure.

5  But if you look at who the politicians are, I don't know,

6  four out of five of them are probably attorneys.  Who the

7  lawmakers are, four out of five are attorneys.  And if you

8  get to the point where you need an attorney, you damn well

9  better be able to afford it.

10             So it sort of equates to a system that is

11  sometimes self-defeating.  I've had situations where I

12  thought that, quite frankly, the situation ought to be

13  resolved.  These are civil matters, typically, ought to be

14  resolved between the individuals.  But you can't do it.  You

15  have to go out and spend the money to hire an attorney,

16  etc., etc.

17             So you get a little frustrated in the

18  attorney system in that it seems to be self-perpetuating

19  from a perspective that it's like you are at one stage of

20  attorneys and the next stage of attorneys are feeding the

21  information to the next.  So, anyway, that's the reason.

22  Sorry.  You asked.

23        Q.      That's why we asked you.  You sound a lot like

24  my father who claims his worst day was the day I decided to

25  go to law school.  If my dad made this jury, he would have

1  that cynical jaundiced eye against both sides, just because

2  we're attorneys.  Is that something that either side --

3       A.    Yes.  I have no particular feeling one way or

4  the other, about which attorneys are which.

5       Q.    No side is better than others?

6       A.    No, not necessarily.

7       Q.    We're not going to have to start with kind of

8  a black mark on our side just because we are attorneys?

9  Either side?

10      A.    No.

11      Q.    Okay.  You also told us your dad, I think, was

12  a psychiatric social worker?

13      A.    That's correct.

14      Q.    What type of work did he do?

15      A.    Well, dad is -- let's go back.  He was a

16  career Army NCO.  Retired from that, went back to school and

17  got his degree, became a psychiatric social worker, worked

18  in juvenile probation during -- in fact, did his masters on

19  high school dropouts and juvenile probation analyses there.

20  But he worked mostly with the United Way.  He was an

21  executive director with the United Way Chapter in San

22  Antonio, usually with family counseling.

23      Q.    Did he have any involvement in the criminal

24  justice system or anything like that?

25      A.    Only when he was in the juvenile probation

1  business which was during, I think, the last year of his

2  thesis.  I was in high school at that time.

3       Q.   Anything about that you think would affect

4  you, jaundice you, or make you cynical about the system?

5       A.   No.

6       Q.   Again, we ask if anyone that you know had any

7  contact with the system and you mentioned, I believe, a

8  nephew?

9       A.   I have a nephew who is -- has been in and out

10  of the system.  He's out on probation right now.  He's had

11  an alcohol problem and as a result has chalked up a record.

12  And it's -- I can't, you know, I don't really have any

13  feeling that he was mistreated in any way, unless you want

14  to talk about the probation system.  But he's -- he did some

15  wrong things.

16       Q.   Okay.  Obviously, both sides are -- we just

17  want people to be honest.  And our worst fear, either side,

18  is getting somebody over there that has a hidden agenda or

19  an axe to grind with either side.  Anything about that

20  experience with your nephew --

21       A.   No.

22       Q.   -- have a lingering mistrust with either side?

23       A.   No, like I said, unless you want to talk about

24  the probation system a little bit, but it wasn't too -- and

25  my feeling on that was that a great many people were getting

1  released by the State that had truly significant crimes as a

2  matter of overcrowding, and yet he couldn't get a -- he

3  didn't do that much in terms of -- he didn't do anything

4  violent.  Let's put it that way.  And he spent an awful lot

5  of time in jail while other people were getting released.

6  But that's the probation system.

7          Q.      You also told us, I believe -- I'm on page 5.

8  We kind of gave you a series of statements, gave you the

9  statement, asked if you agree or disagree strongly and that

10  type of thing.  One of the statements was most criminals are

11  actually victims of society's problems and you marked down

12  that you generally, I guess, agreed with that statement?

13         A.      I think so.  In that somewhere else in the

14  questionnaire you asked me the question about whether or not

15  I thought crime is on the increase and I think I indicated

16  yes, although recently I think statistics indicated no.  I

17  think that social pressures create temptations.  And when

18  the pressures get too great, people make bad judgments and

19  unfortunately, oftentimes, those bad judgments are criminal

20  in one way, shape, or form, and ends up perpetuating the,

21  you know, the criminal system, shall we say.

22         Q.      Okay.

23         A.      You know, I think that -- I don't think that

24  the average citizen who gets in trouble is violent.  I don't

25  know, I might be wrong.  I haven't done any statistical work

1    on that, so it's just my impression.

2        Q.    And we also ask you if the criminal justice

3    system fairly protects the rights of persons accused of

4    crime and you put uncertain.   I'm curious what you meant by

5    that.

6        A.    Um, I don't think I know enough about it, to

7    be honest with you.   I presume that they do, because the

8    appeals process, but, you know, you hear stories and I don't

9    know any particular story, but you hear where, you know, the

10   police have intimidated someone or, you know, extracted a

11   confession or some kind of thing like that where later it

12   comes out that they misused their authority and their

13   position or whatever.   I guess I presume that things like

14   that happen, so I'm not sure that they did.

15       Q.    Would that be a concern of yours going into a

16   case such as this where so much is at stake where the State

17   is seeking the death penalty?

18       A.    I guess it's always a concern, but I'm not

19   sure.   I don't know any -- I don't know anything about that

20   having happened in this particular case.   All I know about

21   this case is what I've read in the newspaper.

22       Q.    Let's talk about that.   A case like this that

23   is so high profile, everybody we talked to, just about, has

24   heard something.   What exactly do you recall hearing about

25   this case?

1    A.    Obviously, the details, you know, that were in

2  the paper about the escape, the confrontation in the parking

3  lot, the fact that Officer Hawkins was shot and shot and run

4  over and shot at close range numerous times, things that

5  make it sound like it was an awful lot of intentional,

6  harmful activity going on at that particular point in time.

7    Q.    Let me tell you what the law is and kind of as

8  we visit during the rest of my time, I will probably be

9  telling you what the law is --

10    A.    That's fine.

11    Q.    -- and asking you if you can follow it,

12  because that's basically what the process is.  The law

13  doesn't require that we get twelve people who haven't heard

14  anything about it.  What the law says, basically, even if

15  you have heard something about the case, even if you may

16  have formed some impressions or opinions, as long as you can

17  set those aside and -- not forget about them, but set them

18  aside and base your verdict on the evidence in the

19  courtroom, the facts and evidence that you hear here, you

20  would be a qualified juror.

21          Is that something that you think you can

22  do, just base your verdict on the evidence that you hear in

23  the courtroom?

24    A.    I think so.  You know, how do you eliminate

25  something that's already in your mind?  To the extent that I

1  can do that, I would do that.

2       Q.   I don't know.  Sometimes it's unnatural or

3  kind of goes against human nature.  And I think that's what

4  the law recognizes.  We don't ask you to forget about it.

5  We just ask you to base the verdict, you know, whether a

6  person is guilty and answer these three questions just on

7  what you hear in the courtroom.

8       A.   Sure.

9       Q.   And if you can do that, you would be a

10 qualified juror.  And, frankly, some people tell us they

11 just can't.  They have heard too much about it.  Sounds like

12 you think you can do that; is that right?

13      A.   I would try, let's put it that way.  That's

14 about the best I can tell you.  I've never had to do it, so

15 I'm not sure either way, but I believe so.

16      Q.   I hate to sound too much like a lawyer, but if

17 I don't, they will or the Judge will.  We kind of deal down

18 here in a world of yes and no sometimes.  If I had to get a

19 yes or no from you on that question, do you think that you

20 could base your verdict just on what you hear in the

21 courtroom --

22      A.   Yes.

23      Q.   -- and not -- okay.  Fair enough.  You told us

24 a little bit about how you feel about the death penalty and

25 we talked to a lot of people, a lot of people that seem to

feel very strongly about it, maybe as you do, giving
yourself a 9 out of 10.  But under certain scenarios those
people draw lines.

What I mean by that is this.  I think we
oftentimes think of a crime happening and being one lone
criminal maybe going into a 7-Eleven, holding someone up,
committing the murder, and trying to get away.  But
probably, as you well know or can imagine, oftentimes crimes
are committed by groups or gangs of people, more than one
person.

And in the context of capital murder,
when there are a lot of people who feel very strongly about
the death penalty, but would just reserve the option of the
death penalty just for the person that actually pulled the
trigger, the triggerman, or the person that actually caused
the death.

A lot of people would kind of draw that
bright line.  And for people who are nontriggermen or what
we call accomplices, sometimes, people that didn't actually
cause the death, they take away that option of the death
penalty for those people for a lot of different reasons, but
mainly because they didn't actually cause the death.  They
are fine with it on the triggerman, but like I said, when it
comes to an accomplice, they may sentence them to life or a
whole lot of time in the penitentiary, they just don't think

that the death penalty should be an option for those
accomplices.  How do you come down on that issue?

        A.    I believe the question is option.  It should
be an option.  But the decision would have to depend --
would have to depend upon the circumstances of that
individual's involvement.  If that individual was, in fact,
a bystander, had no intention, no involvement, but his
associates took it upon themselves to do it, then the death
penalty may not be appropriate.

        Q.    So you wouldn't necessarily or automatically
take the death penalty option off the table for those
accomplices?

        A.    No.

        Q.    You would look at their role in the crime, I
guess?

        A.    No -- yes, I'm sorry.

        Q.    Let me give you a hypothetical or scenario and
see what you think.  Let's say Mr. Shook and I get together
and we decide we're going to rob a bank.  We kind of recruit
a third friend to be the getaway car driver.  We have one
pistol.  The plan is for Mr. Shook to take the gun in, hold
up the teller.  I'm going to go in with the bag and collect
the money while he's holding everyone at bay.  And we have
our getaway car driver out front.  Never goes in the bank.
He's just sitting there watching for the police, tap the

1  horn or something if the police come.  And that's the

2  agreement.  That's our plan.

3            And as we go to do that robbery, for

4  whatever reason Mr. Shook shoots and kills the teller.

5  Maybe sees him going for a silent alarm or I see him going

6  for a silent alarm and tell him.  But he shoots and kills

7  the teller during the course of that robbery.  He's

8  committed a capital murder, an intentional murder, in the

9  course of a robbery.

10            Depending on the facts and circumstances,

11  as we've talked about, I could also be found guilty of

12  capital murder for my participation and, depending on the

13  answers to the questions, I could potentially receive the

14  death penalty.

15            What do you think about somebody in my

16  position, the bag man, somebody like that?

17       A.       You knew about the gun?

18       Q.       Yes.

19       A.       You knew it was loaded?

20       Q.       Yes.

21       A.       You're in.

22       Q.       What do you think about the guy, the getaway

23  car driver, out front?

24       A.       Same questions.  If he -- if the three of you

25  planned the contingency for violence and premeditation, then

1    I think you all three are equally guilty.

2        Q.    Okay.  And that's basically what the law is.

3    Just kind of a followup, if you will, on a point that you

4    made earlier talking about the bystander.  If Mr. Shook and

5    I tricked our friend to driving us up there --

6        A.    Right.

7        Q.    -- we said, hey, we need to go to the bank and

8    make a withdrawal and don't tell him what type of withdrawal

9    we're making, you know, he really is that innocent

10   bystander, just because he's there or just because he's

11   present, he couldn't be guilty of anything.

12       A.    That's correct.

13       Q.    I want to point that out.  What the law

14   recognizes is if I helped, aid, or directed him to commit a

15   capital murder, I could be held accountable for it, too.

16   I'm on the hook for it.

17              Or the second way that I could be found

18   guilty of capital murder is the scenario we talked about.

19   If we get together and enter into a conspiracy or an

20   agreement to commit a bank robbery and a capital murder

21   happens in the course or furtherance of that and I should

22   have anticipated that that could have happened and a life

23   could be taken, then I'm on the hook for capital murder.

24   And that's basically what the law says.  If I should have

25   anticipated that a life could be taken, I could be found

1  guilty of capital murder and potentially face the death

2  penalty.

3                It sounds pretty much exactly where you

4  are, kind of in accord with the law?

5        A.     I would agree with that.

6        Q.     And I think it's a pretty common sense deal.

7  The reason that I go into this and belabor this, is because

8  just to put our cards out on the table, we're prosecuting

9  Mr. Murphy as an accomplice, as a nontriggerman, in this

10  case.  And that's why we spend so much time talking about

11  it.

12                But it sounds like you would be able to

13  follow that law and just kind of look at the facts and

14  circumstances and you wouldn't automatically take the death

15  penalty off the table; is that right?

16        A.     That is correct, yes.

17        Q.     As you probably learned from reading the

18  pamphlet, the only crime for which you can -- the death

19  penalty is available as an option in Texas is murder and

20  then only a certain subset of murders.  If you kill a

21  particular person, a police officer, fireman, prison guard,

22  or a child under six, or commit an intentional murder in the

23  course of another felony like robbery that we talked about,

24  those are the only crimes, that subset of murders, is the

25  only crimes where the death penalty would be available.

1        And in a case such as this where we're

2  seeking the death penalty, we don't ask a jury just to write

3  in life or death.  We have this sentencing scheme with the

4  three Special Issues that I think you probably have had a

5  chance to look over.  And we let the answers to these three

6  questions, whatever the jury -- however the jury answers

7  these, to determine the appropriate sentence in the case.

8        I know you probably looked at them

9  already, but if you could just take a few minutes and read

10  those to yourself, all three.  They are phrased a little bit

11  differently, I think, up on the board.

12        A.        (Prospective juror complies.)  Okay.

13        Q.        And depending on the answers to those

14  questions, determines the appropriate sentence.  The first

15  phase of the trial, called the guilt/innocence phase, and

16  you as a juror would just be concerned with whether he did

17  the crime that he's charged with or not.  Another way to

18  look at it is did we meet our burden, did we prove to you,

19  as a juror, beyond a reasonable doubt that he's guilty of

20  capital murder?

21        If you find that he is guilty of capital

22  murder, we go into that second phase or the punishment phase

23  of trial.  The rules of evidence kind of expand or broaden.

24  You get to hear a little bit more about his background, a

25  history, whether he's good, bad, that type of thing.  And we

1   expand those rules of evidence to allow you, as a juror, to

2   kind of answer these questions.

3               What the law requires, basically, is that

4   you have got to start that second phase as a juror with an

5   open mind.  You can't go in and just automatically answer

6   these questions in such a way or based on the fact that you

7   found him guilty of capital murder.  You have to keep that

8   open mind when you start that second phase.

9               The first question or Special Issue

10  basically talks about whether the person is going to be a

11  future danger to society, a continuing threat, that type of

12  thing.  We kind of ask a juror to make a prediction about

13  future events.  Some people are uncomfortable with that,

14  trying to make that prediction.

15              Is that something that you feel you could

16  do, given enough information?

17          A.      Yes.

18          Q.      Okay.  The words aren't necessarily defined

19  for us.  Unlike most things in law, we don't have legal

20  definitions.  But the word "probability" in that question,

21  what does that mean to you, kind of off the top of your

22  head?

23          A.      "Probability" versus "possibility."

24  "Possibility" indicates to me some chance.  "Probability"

25  indicates a high percentage of certainty.

25

1    Q.    And that's typically what we hear.  Anything

2  is possible, I guess.  Probability, a lot of people talk

3  about it in terms of more likely than not, 51 percent of the

4  evidence, maybe, that type thing.

5    A.    Well, in this particular case, I think more

6  than 51 percent.

7    Q.    Why do you say that?

8    A.    Well, because you are making a life decision

9  and the term "continuing threat to society", is this person,

10  not -- can this person not be rehabilitated, meaning if they

11  could be rehabilitated, is this an individual that you want

12  back out on the street?

13    Q.    Okay.  Would you read that to be just kind of

14  high probability?

15    A.    High probability.

16    Q.    And that's kind of the way you would read it?

17    A.    Yes.

18    Q.    Okay.  All right.  When we talk about criminal

19  acts of violence, again, that's not particularly defined for

20  us.  The law leaves it up to the jury to use their common

21  sense.  And what does that mean to you when you see that

22  phrase "criminal acts of violence"?

23    A.    Um, violence to me is harm to another person

24  versus harm to property.  Violence can be harm to property,

25  obviously, in that somebody gets worked up and does it, but

1  in the context of the criminal system, I would take it to

2  mean harm to another person and the degrees of violence

3  escalating to ultimate violence being death and how much --

4  what degree of violence was initiated on or perpetrated on

5  the victim leading up to that death.

6        Q.    Okay.

7        A.    In other words, was it a, you know, your bank

8  teller situation, spontaneous bang and he's dead, or was it

9  tie him up and torture him for ten days and ultimately kill

10 him?  Those are the two extremes.

11       Q.    When you look at that question and you know

12 you are kind of making a prediction about future behavior,

13 is it a situation where you are going to -- and we have the

14 burden of proof on this question, the State does, they don't

15 have to prove anything to you.

16             Would you want us to prove to you there

17 is a high probability that, you know, he may be involved in

18 another murder or something like that?

19       A.    Well, threat to society indicates that, yeah.

20 You would have to prove that -- not necessarily murder, but

21 that he's going to continue to be, he or she, whatever, is

22 going to continue to be a threat to society, meaning the

23 individuals who make up society in that, yeah, if they have

24 murdered once, they may not intend to murder again, but if

25 they are prone to violence, ultimately it may lead to murder

1   again.  You know, some people just don't have good control

2   of themselves.

3        Q.   Okay.  How would you define that word

4   "society", the last word in that question?

5        A.   "Society" is the population, if you will, and

6   the entire culture made up of people.  Society is people

7   versus society is institutions.

8        Q.   Okay.  Okay.  You wouldn't limit it or define

9   it just to include people that aren't locked up.  You would

10  include prison and nonprison populations in that?

11       A.   Yes.

12       Q.   That's what a lot of people tell us, just

13  anyone he may come into contact with, either inside or

14  outside, prison guards, teachers, counselors, that type of

15  thing.

16            Again, we have the burden on that

17  question.  That first question and the second question we

18  have the burden on as well.  Both start off with no answers.

19  That's kind of the default setting and it's up to us, the

20  State, to prove to you beyond a reasonable doubt that the

21  answers to those questions should be yes.

22            Again, as I mentioned, the law requires

23  that you start that second phase of the trial where you are

24  looking at these questions with the open mind.  Some people

25  tell us, gee, if I found somebody guilty of capital murder,

1   I'm always going to answer Special Issue No. 1 yes just

2   because I found him guilty of capital murder.  I just can't

3   have that open mind when I start the second phase and look

4   at that first question.

5                    So I guess my question to you is, are you

6   going to automatically answer Special Issue No. 1 yes, just

7   because you found somebody guilty of capital murder in the

8   first phase of the trial?

9        A.    Wouldn't the information provided in the first

10  phase of the trial give you some sense --

11       Q.    You can certainly go back and look at that

12  information.

13       A.    Yes.

14       Q.    That may be all you hear.  You may not hear

15  any evidence in the second part.  You probably will.  I

16  guess the underlying point is you just have to have an open

17  mind.  You can't just say just because I found him guilty,

18  I'm going to answer it yes.

19       A.    That, I would agree.

20       Q.    You can always go back and look at the facts

21  of the crime to help you answer that question.  In fact, I

22  think most people would probably tell you that that would be

23  the most important factor or one of the most important

24  factors in answering that question.

25                   That kind of sounds like where you are.

1   You wouldn't answer it automatically or anything like that?

2        A.     That's correct.

3        Q.     Special Issue No. 2, that kind of deals with

4   the area we've already talked about where you have more than

5   one person involved in the crime.  The question kind of

6   breaks down into three different parts.  If you think the

7   person actually caused the death or he was the triggerman,

8   you would answer it yes.  It would be pretty easy.  If you

9   think he intended to kill the deceased or another, you would

10   answer that yes.  Commonly, that's the type scenario of

11   murder for hire.  Hire somebody to kill your spouse, your

12   business partner, that type of thing.

13        Then, finally, that last line on Special

14   Issue No. 2, which is what we've been talking about, did the

15   accomplice, the nontriggerman, anticipate a human life would

16   be taken?  And if you will recall, in order to find -- going

17   back to my scenario, in order to find me guilty of capital

18   murder, you would have to find that I should have

19   anticipated a life would be taken.  Should have.  By the

20   time we get down to the second phase of the trial, the law

21   imposes a little bit higher burden on us.  We've got to

22   prove not only they should have anticipated, but they

23   actually anticipated, that they did anticipate.  Does that

24   make sense to you?

25        A.     Yes.

1    Q.    It's kind of the same inquiry.  It's just a

2  little higher standard.  Some people call these questions a

3  set of filters.  We just run everything through to make sure

4  at the end of the process that we have reached the right

5  verdict.  Again, that starts off with a no.  It's our burden

6  to prove it to you yes.

7                  Finally, kind of the last stop in the

8  process, what a lot of people call the safety valve or the

9  safety net is Special Issue No. 3.  That's a little bit

10  different in that neither side has the burden of proof on

11  that.  We just ask the juror to answer that how they see

12  fit.

13                  We call it the mitigation question.  We

14  ask you to look back at the crime, the defendant's character

15  and background, what sort of personal, moral culpability or

16  personal, moral blame they bear in the crime.  We ask a

17  juror to look at all that and see if there's anything

18  mitigating and if there is, is it sufficiently mitigating

19  that his life ought to be spared and he should get that life

20  sentence as opposed to the death penalty?  Does that kind of

21  make sense to you?

22    A.    Yes, it does.

23    Q.    Again, the law requires that even at this late

24  stage of the process that you can go into Special Issue No.

25  3 with that open mind.  Is there anything -- I hope you

1  don't sit around thinking about this, but is there anything

2  that strikes you as mitigating in these type of cases, death

3  penalty cases?  Any particular fact or factor that you might

4  think would be mitigating?

5          A.      Um, you're right.  I don't sit around thinking

6  about it, so, no, not particularly.  I think under that

7  situation, again, you have to understand what was going on

8  and what's been going on over the course of the individual's

9  life, what led to this moment in time, and how did this

10  decision come about.

11          Q.      And, you know, most common answer we get is

12  most people can't think of a thing.  Sometimes we hear

13  people say, if there was a bad background, a bad upbringing,

14  history of abuse, they would consider that mitigating.

15  Other people --

16          A.      Possibly.

17          Q.      -- and other people tell us, no.  It's not

18  really mitigating.  You can overcome that.  You have got

19  free will.  You can make choices when you are an adult, that

20  type thing.

21          A.      I go back to my statement earlier where to me

22  too many criminals are victims of society and society

23  represents -- you have people locking kids in closets, you

24  know what I mean, for years.  How do you survive?  How do

25  you come back normally from that kind of thing?  You know

1    what I mean?

2             I think mitigating is by definition

3    something that contributes to the -- some event that

4    contributes to the total sum of events that led up to this

5    particular moment in time.  I don't think that you can

6    measure any one person against another in those kind of

7    extreme situations.

8        Q.    Some people tell us like drug or alcohol use,

9    if the person was high or drunk when they committed the

10   crime or maybe they were a drug addict or alcoholic, they

11   might consider that mitigating.  Other people tell us, no,

12   you made the choice to get drunk.  You made the choice to

13   get high.  I don't really consider that mitigating and they

14   may even think it's aggravating.  Where do you come down on

15   that one?

16       A.    You probably read my --

17       Q.    I did.  That's kind of where I'm going to.

18   I'm trying to be sneaky and sneak it up on you, but it

19   didn't work.

20       A.    Drugs in general, excluding alcohol, are all

21   on the list to be illegal.  And as soon as you start taking

22   them, whatever they are, you've already committed the crime

23   and you know that you are headed down a bad path, you know.

24   And so, consequently, whatever you end up doing there is, I

25   think, that's not mitigating.

1            On the other hand, we're going to go into

2  the lawyer thing again, because the entire treatment of

3  alcohol by the system is it's opposites.  I mean, on one

4  hand we tax it, we promote it, we do everything, you know,

5  within the system socially, etc., to encourage it somewhat,

6  but at the same time we come right back down on the

7  individual as soon as they step over the .08 or whatever it

8  is now, law.

9            Well, I think that society, meaning the

10  system, the system being politics, etc., has mishandled

11  alcohol to the extent where alcohol could be considered

12  mitigating because the individual could go down the alcohol

13  path and do something and feel like they shouldn't have been

14  there to begin with.  That one is a gray area for me,

15  because it's -- they are opposites.

16       Q.     How about a person's age?  Some people tell us

17  if the person was younger, that might be potentially

18  mitigating.

19       A.     Can be.

20       Q.     The flip side of that is a lot of people tell

21  us, no, if you are old enough to be tried as an adult, you

22  know right from wrong.  Sounds like you would keep an open

23  mind to that?

24       A.     I would, definitely, because the definition of

25  an adult, I think, varies from individual to individual as

1   well.

2       Q.    Okay.  Any questions about this sentencing

3   scheme that we have, kind of how it's done?  And if the

4   questions are answered yes, yes, and no, then the Judge

5   would have no discretion and he would sentence the defendant

6   to death.  That's kind of the system and how it works.  Any

7   questions or comments on it or observations?

8       A.    No, I haven't seen it before, but it looks

9   like a good system.

10       Q.    One way to look at it, I guess, is if you

11   convict someone of capital murder, they are sitting on a

12   life sentence.  And the only way they get the death penalty

13   is yes, yes, and no.

14             To follow up on that, a life sentence in

15   a capital murder case in Texas means forty calendar years

16   before a person is eligible for parole.  Okay?  And there's

17   no such thing as life without parole in Texas.  If you serve

18   as a juror, the law tells you that, that life means forty

19   before a person is eligible.

20             But then they turn back around and say

21   you can't consider that.  We ask jurors to kind of assume

22   that life means life.  We don't want jurors to say, you

23   know, forty years is long enough, so that satisfies me.  So

24   I'm just going to throw in the towel, not consider these

25   questions, answer them in such a way that he gets a life

1  sentence.  And we don't want people to say, he may make

2  parole his first time up in forty years, I'm not going to

3  run that risk, so I'm just going to not really look at the

4  evidence.  I'm going to answer these questions in such a way

5  that I know he's going to get the death penalty.

6         That's what we try to avoid.  We just

7  want jurors to really work through the questions.  Does that

8  make sense to you?

9         A.    Yes.

10        Q.    Is that something that you think you can do,

11 assume life means life?

12        A.    Yes.

13        Q.    Mr. Collins, about two minutes ago the Judge

14 gave me the five-minute sign, so I'm winding down.  Let me

15 visit with Mr. Shook real quick and see if there's anything

16 else, but we're about finished.

17        Mr. Collins, thanks for your time.  I

18 enjoyed visiting with you.  That's all I have.

19        THE COURT:  Ms. Busbee?

20        MS. BUSBEE:  May it please the Court.

21        CROSS-EXAMINATION

22 BY MS. BUSBEE

23        Q.    You will be happy to know that since

24 Mr. Wirskye is so thorough and other things, I'm not going

25 to have to talk to you too much.  But I do want to ask a few

1  questions and discuss a few things with you.  But since you

2  see right through your lawyer tricks --

3        A.    I don't know about that.

4        Q.    Yeah, you do.  Anyway, I was probably still

5  half asleep or my coffee hadn't kicked in.  Did we ask you

6  what you sell?  Did anybody ask you that?

7        A.    No, they did not.

8        Q.    What do you sell?

9        A.    Plastic materials used in operating room

10 garments, drapes, disposable materials of that type.  To a

11 certain extent some of that rolls over into the food

12 packaging, but I'm predominantly in the surgical.

13       Q.    How did you get into that?

14       A.    Accident.  I came out of the Army in '72, came

15 off of active duty and went back to school for a while,

16 finished up my degree and was looking for a job, actually

17 looking for a job in aviation.  I had been a pilot.  And

18 there were not a lot of jobs available.  A head hunter said,

19 why don't you go over and talk to these people?  And I went

20 over and interviewed and they hired me as a plant manager

21 trainee, and happened to be a packaging, film processing

22 facility.  And one thing led to another and 26 or so years

23 later, here I am.

24       Q.    It must have turned out well.  I noticed you

25 have been in Vietnam.  What did you do in Vietnam?  Were you

1  in combat?

2      A.      I was Army helicopter pilot for attack

3  helicopters.

4      Q.      I should have figured that out. Did you do

5  one or two tours?

6      A.      One tour.

7      Q.      I want to ease your mind about something, just

8  FYI, the appeals process is lengthy on a lot of things. But

9  in 1995 the federal government changed a lot of those

10  procedures. I mean, it did used to be unbelievable. You

11  would -- I once counted it up, because I had the unfortunate

12  job of handling one once, and once counted it up and it went

13  1, 2, 3, 4; 1, 2, 3, 4, the direct appeal, and you could end

14  up appealing like eight or nine times under the old system

15  and numerous times. All these you read about last minute

16  appeals to the Supreme Court and whatnot. And if they

17  granted it, it started all over again.

18          In 1995 the federal government, believe

19  it or not, came up with kind of a scheme that would balance

20  the rights of the defendant against, you know, perpetual

21  appeals. So that's been limited to one course up the

22  ladder, because at the same time there were two types of

23  bills, for what that's worth. So that's not as outrageous

24  as it used to be, but the process is still there.

25          You talked about and you mentioned, I

1    think twice in your questionnaire, your friend that was

2    killed in -- was a San Antonio police officer?

3         A.    That's correct.

4         Q.    Was anybody prosecuted for that?

5         A.    The driver of the vehicle -- actually two

6    officers were killed that night, George and his partner,

7    were both killed by a drunken driver.  He was -- I don't

8    know that -- I don't know the final outcome, let me put it

9    that way.  There was some initial prosecution.  There were a

10   number of extenuating circumstances.  And to my knowledge,

11   no, he was never convicted of anything.

12        Q.    I've written down all these things that I was

13   going to ask you but Mr. Wirskye went over them and I see no

14   point in asking you the same things or extending this

15   further for no particular reason.

16              Is there anything that we didn't ask you

17   that you thought we would ask you or you wish you had put on

18   your questionnaire or any thoughts you have on serving on

19   this jury?

20        A.    No.

21        Q.    To me you understand the scheme and you have

22   got it down, so --

23              MS. BUSBEE:  Your Honor, I would have no

24   other questions of this juror.

25              THE COURT:  Thank you, sir.  If you

1    would, wait for us outside and we'll have you back in just a

2    minute.

3                    PROSPECTIVE JUROR:  Thank you very much.

4                    [Prospective juror out]

5                    THE COURT:  What says the State?

6                    MR. SHOOK:  State has no challenge.

7                    MS. BUSBEE:  We have no challenge.

8                    MR. SHOOK:  State accepts.

9                    MS. BUSBEE:  We'll accept.

10                   THE COURT:  Ask Mr. Collins to come back

11   in, please.

12                   [Prospective juror in]

13                   THE COURT:  Thank you.  You may be

14   seated.  Mr. Collins, looks like you are going to need to do

15   some scheduling for us.

16                   PROSPECTIVE JUROR:  Okay.

17                   THE COURT:  The parties have accepted you

18   as juror in this case.  And what we're going to be doing is

19   I have documentation here I need you to fill out for me.

20   This is your personal information where we can contact you.

21   I need contact information there for another person.  This

22   information is retained by me in this computer.  As I have

23   told the group, the questionnaires you fill out, when we're

24   through with them, I order the District Clerk, they take

25   them out to West Texas and they burn them.

1    So, I mean, I'm real, real deliberate

2  about the security.  This information will be maintained by

3  myself and the Sheriff.  So you don't have to worry about

4  that.  I have some supplemental juror instructions.  Because

5  as soon as you go back to the office and you tell them, I

6  need to work two weeks off in November 10th and 17th, first

7  thing they want to know is, well, what for?  And you tell

8  them, I'm on a capital murder case, they are going to give

9  you their opinion.

10    PROSPECTIVE JUROR:  Yes.

11    THE COURT:  And the lawyers are very

12  satisfied with your opinions.  So obviously you have to plan

13  ahead.  We're doing this far enough out where people like

14  you can arrange your schedules.

15    We will be having an orientation.  Once I

16  get all the jurors selected in this case, I'm going to have

17  everybody back down here for about an hour's worth of

18  housekeeping, if you will, hopefully the week prior to the

19  10th of November.  For you, with your travel schedule, I

20  will try to arrange it far enough out.  I don't know what

21  date that will be, but I'll try to schedule it as soon as I

22  can to let you know you need to be here on that day as well.

23    The idea is once -- the Sheriff is going

24  to go over with you today some housekeeping things, but I

25  can't do it until I get the whole group.  I can't do some

1    other things.  So the idea is to get as much done as quickly

2    and as soon as possible.

3                        If you learn one thing, when I say 8:30

4    -- where were you at 8:30?

5                        PROSPECTIVE JUROR:  I was here.

6                        THE COURT:  It's not like going to the

7    doctor's office and show up -- the other folks, as I told

8    them, I have three people.  The other folks will be in.  You

9    are here first, you are on time, you come in.  I start on

10   time.  If there's one thing you can count on -- makes the

11   lawyers -- I push them.  We're going to start and not waste

12   your time.

13                       So I have some instructions.  It's real

14   important, extremely important, that you do not go out and

15   educate yourself about anything about this case or anything

16   that has previously been written in the newspaper or on the

17   Internet.  Just, if you tell somebody you are on this case

18   and it starts two months from now, they are going to talk to

19   you about it.  Don't do it.  Your employment, say I have to

20   arrange jury duty for two weeks and leave it at that.

21                       PROSPECTIVE JUROR:  Okay.

22                       THE COURT:  Fair enough?

23                       PROSPECTIVE JUROR:  Fair enough, sir.

24                       THE COURT:  Sheriff?  Go with the Sheriff

25   and she'll take you back here to the back and complete some

1   other documentation with you and we'll see you sometime the

2   week before November 10th.  I'll let you know as soon as I

3   can.

4                       PROSPECTIVE JUROR:  Thank you, sir.

5                       THE COURT:  Thank you.

6                       [Prospective juror out]

7                       THE COURT:  Mr. Davis.

8                       [Prospective juror in]

9                       THE COURT:  Good morning, Mr. Davis.  How

10  are you?

11                      PROSPECTIVE JUROR:  Just fine.

12                      THE COURT:  Welcome to the 283rd and

13  sorry for the delay in getting you in.  Have you had an

14  opportunity to read several times the orientation guide that

15  I provided for you?

16                      PROSPECTIVE JUROR:  Yes.

17                      THE COURT:  I know that's a lot of law to

18  give someone first thing in the morning and you are not

19  expected to be able to understand it completely at this

20  point.  The lawyers will go over that with you and give you

21  examples.

22                      And there are two questions that I have

23  at the end of the process are, number one, do you understand

24  the law?

25                      PROSPECTIVE JUROR:  Yes.

1    THE COURT:  And the second question is,

2    can you follow the law?  That's the picture here.  The

3    lawyers will spend some time with you and go over the law

4    and give you examples and be sure that you can work with it.

5    The only question that I have for you

6    before we begin is will you be able to serve this Court for

7    two weeks beginning on November 10th?

8    PROSPECTIVE JUROR:  Yes.

9    THE COURT:  Thank you, sir.  Mr. Wirskye?

10   MR. WIRSKYE:  May it please the Court.

11   CLARENCE DAVIS,

12   having been duly sworn, was examined and testified as

13   follows:

14   DIRECT EXAMINATION

15   BY MR. WIRSKYE:

16   Q.    Mr. Davis, how are you this morning?

17   A.    Just fine.

18   Q.    My name is Bill Wirskye and I'm the Assistant

19   DA that will be visiting with you for the next few minutes.

20   And I want to talk to you a little bit about some of the

21   information that you put in your questionnaire and you were

22   kind enough to fill out for us, talk to you a little bit

23   about what you think about the death penalty, and maybe end

24   up talking about some of the laws and the rules that apply

25   in a death penalty case.

1          What did you think when you got called to

2  come back down for the individual interview?

3          A.     I wasn't too happy about that.

4          Q.     How come?

5          A.     Well, I know quite a bit about this case.

6          Q.     Okay.  Through the media or personal

7  connection or --

8          A.     Through the media and the newspaper, plus I

9  live in Irving.

10          Q.     Well, we know -- we talk to a lot of people

11  and we recognize not everyone is a perfect juror in every

12  case.  And almost everybody we've talked to has heard

13  something about the case.

14              But some people have heard so much or

15  formed opinions that are so strong, very frankly, they just

16  wouldn't be able to be a fair juror in the case.  They

17  wouldn't be able to give Mr. Murphy a fair trial.  They have

18  just heard too much or have opinions that are just too

19  strong, that type of thing.  What have you heard about the

20  case?

21          A.     Well, just about everything that's been on the

22  news and television and different people talking about it.

23          Q.     Okay.  Have you followed some of the other

24  trials?

25          A.     No.  I've read about the outcomes of them.

1    Q.    Okay.  You know the outcomes?

2    A.    Yes.

3    Q.    Sounds like you may have already formed some

4  opinions in your mind about whether Mr. Murphy is guilty and

5  what the appropriate punishment may be.  Is that fair to

6  say?

7    A.    Yes.

8    Q.    Is it fair to say you are probably not the

9  right type juror for this case?

10   A.    Yes.

11   Q.    Okay.  So you have formed some opinions that

12 are so strong that you've just already got a bias or

13 prejudice in favor of the State and against Mr. Murphy; is

14 that right?

15   A.    Yes.

16   Q.    Okay.  Mr. Davis, I appreciate it.

17            MR. WIRSKYE:  I think we have an

18 agreement, Judge.

19            THE COURT:  Mr. Davis, I appreciate you

20 coming down this morning and they have agreed to excuse you.

21 You are free to go.

22            PROSPECTIVE JUROR:  Thank you, sir.

23               [Prospective juror out]

24            THE COURT:  Mr. Thompson.

25               [Prospective juror in]

1    THE COURT:  Good morning, Mr. Thompson,
2    how are you?
3    PROSPECTIVE JUROR:  I'm fine, thank you.
4    THE COURT:  Welcome to the 283rd and
5    sorry for the delay in getting you in.  We try to have three
6    folks in, in the morning, and we take them as the number the
7    computer gives us.  So you have to balance waiting an hour
8    on your end, versus having ten of us wait for the next
9    person to come in.  So I'm just balancing.  I apologize for
10   the delay.
11   Now it's your turn and we want you to
12   feel comfortable.  I know this can be somewhat of an
13   intimidating process.  People tell us that they are on
14   trial.  That's not anything like what it should be.  But
15   this is as informal as we can get.
16   The objective here is to provide you with
17   the law, as I have done so, in the guide and, hopefully, you
18   have had an opportunity to read it a couple of times.  You
19   certainly don't have to understand it right now, but the
20   lawyers will go over it with you in detail and how the law
21   interrelates in this process.
22   My job is, at the end of the process this
23   morning, is to be sure that you understand the law;
24   secondly, can you follow the law?  Those are the two big
25   questions for me.

1    Only question I have for you before we

2  begin is will you be able to serve this Court for two weeks

3  beginning on November 10th?

4    PROSPECTIVE JUROR:  I am not sure about

5  that question.  I am starting a giant project in San Antonio

6  and when it kicks off, I need to be there for five days a

7  week.  So to that extent, it should be starting sometime in

8  the next month and a half.

9    THE COURT:  Let me go more in detail.  I

10  see that you are vice-president of Thompson Millison

11  (phonetic)?

12    PROSPECTIVE JUROR:  Development, yes.

13    THE COURT:  And this is a family

14  business?

15    PROSPECTIVE JUROR:  It's my father and

16  his brother's business and I work for them, yes.

17    THE COURT:  Okay.  Will you be changing

18  your residence from Dallas County to Bexar County or will

19  you remain a resident of Dallas County?

20    PROSPECTIVE JUROR:  I would remain a

21  resident of Dallas County.

22    THE COURT:  Okay.  That's key number one.

23  Understanding that you are going to have obligations --

24    PROSPECTIVE JUROR:  Correct.

25    THE COURT:  -- but this is a family

1   business.  As I told the group downstairs, and I'll tell you

2   today, everybody we put on a jury unless --

3                   PROSPECTIVE JUROR:  They have other

4   obligations.

5                   THE COURT:  -- unless they are retired,

6   it's going to interfere with something.  We understand that.

7   Just like paying taxes, nobody wants to pay it.  But it's

8   just something we have got to do.

9                   PROSPECTIVE JUROR:  Okay.

10                   THE COURT:  If you were seated on this

11   jury, can you go to your dad and uncle and say, the Judge

12   said I've got to be here to do this trial and you are going

13   to have to work without me.  Is that possible?

14                   PROSPECTIVE JUROR:  It could be taken

15   care of, yes.

16                   THE COURT:  I understand you're -- but,

17   once again, the people who aren't busy, you know, will never

18   make the jury.  That's just the way it is.

19                   PROSPECTIVE JUROR:  I understand.

20                   THE COURT:  So one thing you can count

21   on, you're a businessman, I run this court like a business.

22   It's a unique concept, but I do.  I start on time.  We start

23   -- the first person was in the witness chair this morning at

24   8:30.  The letter gave you a specific time.  We stick to it

25   and I start on time.

1    And you can use the phone during the day

2 over lunch.  You are not going to be sequestered during the

3 trial.  While you're hearing testimony you won't be

4 sequestered, so I won't interfere with your daily

5 communications.  So you can at least be able to do that.  We

6 stop, as I said, before 4:30 and 5:00 every day, so you can

7 at least go to the office in the afternoon.

8    PROSPECTIVE JUROR:  Okay.

9    THE COURT:  So with that we'll let

10 Mr. Shook inquire.

11    MR. SHOOK:  May it please the Court.

12    CHRISTOPHER THOMPSON,

13 having been duly sworn, was examined and testified as

14 follows:

15    DIRECT EXAMINATION

16 BY MR. SHOOK:

17    Q.    Mr. Thompson, my name is Toby Shook.  I'm

18 going to speak with you on behalf of the State of Texas

19 today.  This is Bill Wirskye.  He's the other prosecutor in

20 the case.  Brook Busbee and Juan Sanchez are the defense

21 attorneys and Patrick Murphy is the defendant.

22    I want to just follow up on your

23 discussion with the Judge on your work situation.

24 Obviously, a lot of people have problems taking two weeks

25 off work.  No one really wants to do it, quite obviously.

1    You said that your project would be kicking off when?

2    Probably in October?

3         A.    Yes.   Probably end of this month or sometime

4    in October.

5         Q.    Okay.   As the Judge said, he's very efficient

6    and he runs the court, you know what hours you will be here.

7    The only thing he can't control is once the jurors start

8    deliberating.   Obviously, he can tell them -- he can't tell

9    them to quit deliberating and send them off, but we do know

10   as best we can tell that this is going to be -- California

11   is an example I always give.   For some reason, trials take

12   about five or six months out there.   I don't know why.   But

13   we won't be in this trial more than two weeks, maybe a

14   little less.

15        The Judge has informed you that,

16   obviously, the business excuse is not a legal justification.

17   But I know the defense wants to know this and we want to

18   know this.   As best you know yourself, if you are placed on

19   the jury for those two weeks in November and your project is

20   going on, but you have time to make plans, is your mind

21   going to be -- are you going to be able to concentrate on

22   the facts of this case and make your decision based on

23   everything you hear in the courtroom or is your situation

24   going to cause you the type of pressure for your mind to

25   wander or not to concentrate?   That's the bottom line.

1    Obviously, you know, most people it will
2  be a great inconvenience when you think about it.  But then
3  when you look at the ramifications of this type of case,
4  they concentrate on it and they make that decision.  But
5  sometimes we get folks in here that just say, the particular
6  situation, they wouldn't be able to.  But we can just depend
7  on you and your honesty on that, and as far as how you know
8  your situation and the best you know yourself.
9    So the bottom line is, if you were placed
10  on the jury with that project going on, but with the type of
11  advance notice, would you be able to devote your full time
12  and attention to concentrating on this case?
13    A.    I believe so, but, unfortunately, I'm not in
14  this situation.  I haven't been in this situation before, so
15  I'm not positive about that.
16    Q.    But you are pretty sure you can?
17    A.    I can usually focus on what is at hand.
18    Q.    Okay.  I wanted to approach that since the
19  Judge just spoke to you about it.  What I will do is talk to
20  you a little bit on your questionnaire, mostly talk to you
21  about capital murder, how you feel about that, that sort of
22  thing.
23    Obviously, you know from the Judge's
24  remarks when you were brought down the first time for the
25  questionnaire, that this is a capital murder case in which

1   the State is seeking the death penalty.  Have you ever been

2   on jury duty before?

3       A.    No, I have not.

4       Q.    Okay.  We speak -- the law prescribes since

5   this is a death penalty case, we speak to every juror

6   individually.  Usually we speak to them in a group.  We try

7   to get you -- at any time you have questions of us, you feel

8   free to ask.  But we are just looking for your honest

9   opinions.

10          You put on your questionnaire that you

11  are in favor of the death penalty as a law.  I would like

12  you to kind of follow up and tell us in your own words why

13  you favor the death penalty and maybe the purpose you feel

14  it serves society.

15      A.    Um, I guess I favor it because if I don't

16  believe that someone who has committed the offense of

17  murdering someone else more than once or in special

18  situations, should have the opportunity to -- I don't know,

19  it's just my feeling, I guess, is the way it boils down to

20  it.

21      Q.    Do you feel that we have to stop these type of

22  dangerous individuals who have committed certain types of

23  offenses from recommitting offenses or do you think it's a

24  just punishment for certain crimes?

25      A.    I think it's more the punishment.  I -- yes, I

1  don't want someone who has committed an offense to get out

2  and do it to someone that I may know or someone close to me.

3        Q.    Okay.  Have you always believed in the death

4  penalty as a law?

5        A.    I go back and forth on it.

6        Q.    What has caused you to go back and forth on

7  it?

8        A.    Just the situations.  I don't always know if

9  the situation deserved the death penalty in my own mind, but

10  I also don't always know the cases.

11        Q.    You talking about cases that you might see in

12  the media, that sort of thing?

13        A.    Correct.

14        Q.    Do you recall any cases that you have followed

15  in the media?

16        A.    I really don't ever follow them too closely.

17  Of course, the big ones out in California, you kind of

18  follow those, but I haven't really followed them, no.

19        Q.    But as far as just being in favor of the death

20  penalty as a concept, have you always been in favor of that,

21  I guess, as an adult?

22        A.    I guess the majority of the time, yes.

23        Q.    Case by case, you might change your opinion,

24  but just the concept of it as a law you feel -- if it were

25  up to you, say we could make you Governor for a day and you

1    have a whole lot of power, would you have the death penalty

2    on the statutes?

3              A.     I would have it available, yes.

4              Q.     Okay.  What types of crimes do you think the

5    death penalty would be appropriate for?  When you think of

6    appropriate cases, what classification of crimes come to

7    mind?

8              A.     Murder.

9              Q.     Okay.  In Texas the death penalty is reserved

10   for murder cases and only a particular type of murder case,

11   intentional killings, not self-defense, not an accident,

12   unjustified homicides that occur with some other aggravating

13   fact.  What we're talking about is a murder that occurs

14   during the course of another felony, such as a robbery.  If

15   I go in and shoot down the 7-Eleven clerk while I'm robbing

16   them, that could be a death penalty case.

17             A.     Yes.

18             Q.     And I believe you used to work at 7-Eleven?

19             A.     Well, yes, my family is very associated with

20   7-Eleven.

21             Q.     We use 7-Eleven as an example with each juror.

22   We weren't picking on you for that.  But you understand the

23   situation there.  You commit a felony, a robbery of the

24   clerk, that could be a death penalty case in Texas.

25             A.     Yeah.

1      Q.    Murder, someone breaks into someone's home.

2  That could be a death penalty case.  Murder during a rape,

3  during an arson, those could be death penalty cases.  Also,

4  there are specific types of victims that come under that

5  statute, such as a police officer on duty, fireman or prison

6  guard on duty, also a child under the age of six.  I don't

7  know why they chose that age, but that's an age they have to

8  decide on.  And then murder of more than one victim in the

9  same transaction or series of transactions, like your serial

10 killer situation or mass murderer, and, finally, murder for

11 hire, hitman does it.  You hire the person that actually

12 kills the man.

13     But those are the specific types of cases

14 that have been reserved for the consideration of the death

15 penalty.  Do you agree with those types of cases from your

16 own personal point of view as cases that should at least

17 come into consideration for the death penalty?

18     A.    I will say consideration, yes.

19     Q.    Then it would just depend on the specific

20 facts of those cases?

21     A.    Correct.

22     Q.    Let me talk to you about another area.  When

23 we think of examples, the 7-Eleven clerk or convenience

24 store clerk, or liquor store clerk, we generally think of

25 the capital murderer as the actual triggerman and certainly,

55

1    actually, those people are prosecuted for it.

2             But capital murder, like any other crime,

3    can be carried out by more than one individual, from time to

4    time, groups of individuals, sometimes.  Some have greater

5    roles than others, but they are all actively participating

6    in that crime.  We call that the law of parties in Texas.

7    It's better known usually through the media as an

8    accomplice.

9             If people get together and commit a crime

10   together, they can all be held accountable, even if one may

11   have a greater role.  In capital murder you may have a

12   triggerman, but you also may have accomplices that help him

13   accomplish that act, or that crime, and the law says that

14   they, too, can be prosecuted for capital murder and could

15   even receive the death penalty.

16            The example we often use is Mr. Wirskye

17   and I agree to rob a bank and we get another -- recruit

18   another accomplice to be our getaway driver.  He drives us

19   there.  He keeps the car running.  We go in with guns.  He

20   knows we have guns.  My role is to cover the tellers.  He

21   starts gathering the money up.

22            For some reason, maybe I don't like the

23   way a teller is looking at me, maybe he warns me that

24   someone is pressing the alarm, I shoot the teller, we leave,

25   and the teller dies.

1   I, obviously, could be prosecuted for the

2   death penalty, could receive it, because I'm the triggerman.

3   Under the law, because Mr. Wirskye and the getaway driver

4   helped me or my accomplices, they, too, can be prosecuted.

5   They ultimately, depending on the facts, could even get the

6   death penalty.

7   People feel differently about that law.

8   Some people are fine about the death penalty if it's applied

9   to the people that actually caused the death, the

10  triggerman.  Other people draw a line and go, when we talk

11  about accomplices or nontriggermen, that's where I would

12  draw a line, personally, as far as the death penalty goes.

13  Might reserve a stiff prison sentence for these folks, but

14  I'm not for the death penalty.  Other people tell us, I

15  agree with the law, depending on the facts, but if someone

16  is actively participating in that crime, they could be held

17  responsible and could get the death penalty, also.

18  But I want to approach each juror on how

19  they feel about the law of parties for the accomplice, for

20  the nontriggerman.  How do you feel about that?

21  A.      I draw the line.

22  Q.      If it were up to you, you would reserve the

23  death penalty just solely for the triggerman?

24  A.      Correct.

25  Q.      And in an accomplice situation, that's where

1    you don't think the death penalty should apply?

2         A.      I have a hard time doing it because in my mind

3    you don't always know that the triggerman is going to pull

4    the trigger when you go into something, even though the act

5    that they are doing I don't believe in.  But it's hard for

6    me to put the blame on someone else when they pull -- the

7    trigger is pulled by someone.

8         Q.      I wanted to get into that with you because I

9    know you put in your questionnaire participation and

10   actually doing, you actually wrote in your questionnaire,

11   would be very important to you and that's something that you

12   feel very strongly about, I take it?

13        A.      Correct.

14        Q.      And if it were up to you, would you change the

15   law in that regard and just reserve the death penalty for

16   the actually triggerman, if I could make you Governor again

17   for a day?  Is that where you would be coming from?

18        A.      I would probably lean more towards that idea,

19   yes.

20             MR. SHOOK:  If I could have one moment,

21   Judge.

22        Q.      (By Mr. Shook)  I have to go just a little

23   further with you on that concept and you are entitled to

24   your opinions.  That's what we want, your honest opinions.

25             Are you telling the Court, then, that --

1   the law basically is this.  If you feel -- the law is if a

2   person actively -- is actively involved and they

3   participate, even though they are not the triggerman, they

4   can be found guilty and they can actually get the death

5   penalty.

6              Some people like you have an objection to

7   that and they say, that's fine.  That's the law.  I will

8   just tell you from the start I will find him guilty,

9   perhaps, you know, a life sentence might be fine, but I'm

10  not going to -- I'm not going to sentence anyone to death,

11  if they are not the triggerman.  That's just the way I feel

12  about it.

13             And if you feel that way, that's fine.

14  We just want to know that because I want to be honest with

15  you.  I can't go into the facts, but we're prosecuting this

16  defendant under that law of parties as an accomplice, as a

17  nontriggerman.  So obviously we want to address each juror

18  how they personally feel about that.

19             Do you feel so strongly in that regard,

20  personal regard, that you can tell us up front, hey, it's a

21  situation where if we're talking about a situation of a

22  nontriggerman, then the death penalty is off the board for

23  me from my personal point?

24       A.    From my personal point, I would probably say

25  it's about 90 percent sure I could not use the death penalty

1   in that aspect.  But I don't know for one hundred percent,

2   because I have never been put in that position.

3         Q.      Well, I can't preview the facts.

4         A.      I understand that.

5         Q.      That's kind of a tough part from my point of

6   view.  We just have to ask you to be as honest as you can

7   with us and, I mean, if you are saying, yeah, I can, that

8   will be fine.  We can go forward and with our evidence and

9   that sort of thing.

10               You know, everyone feels differently.

11  That's why we bring about a thousand people down, literally,

12  for this case.  But you feel, then, that, then again, it may

13  be a case we put you on this jury that you could find in

14  favor and give someone a death penalty, if you think the

15  facts are for it, if they are a nontriggerman.

16        A.      I still would have a problem without them

17  being the triggerman.

18        Q.      Having a problem -- is it strong enough where

19  you just tell the Court, look, I can't do it?  That's the

20  way I feel.  I mean, if that's the way you feel, that's

21  fine.  We get people that tell us they don't believe in the

22  death penalty and they are never going to do it, no matter

23  if they are the triggerman or Charlie Manson.  We send them

24  on their way.  We have some people that are real hesitant,

25  but then they say, I can do it, maybe.  And we have other

1  people say, it's a nontriggerman, that's just the facts,

2  Judge, can't do it. But we just need you to tell us.

3       A.    In my mind right now, I would have a hard time

4  ever, if it's not the triggerman. Do I know what I'm going

5  to do once I get to the final end? I've never been there

6  and I've never been put in the situation, so I don't know.

7  Right now I know that I would have an extremely hard time

8  doing it to someone who was not the triggerman.

9       Q.    Couldn't envision a situation doing that?

10      A.    If the -- I guess if the intent was there

11 before the situation happened that that was going to happen,

12 yes, I may be able to. But if it was something that was

13 random and someone chose to do it at that time without the

14 knowledge of the other person.

15      Q.    Would it matter to you if they all had --the

16 other accomplices themselves had guns, but maybe didn't use

17 them or that sort of thing?

18      A.    Um, I really don't know. I know that the

19 incidence of crime where a gun is involved is usually for

20 the threat and for the use of it, once it's -- if needed.

21 But I still don't if -- I still don't know if I could do it,

22 if it was not the triggerman.

23      Q.    You still have tremendous reservations about

24 that --

25      A.    Right.

1    Q.    -- according to your answers.  Let me go on to

2  some other areas, then.  You know living here in Texas, that

3  the death penalty is actually carried out?

4    A.    Yes.

5    Q.    Some states, it's on the books, people are

6  prosecuted, they get on death row, but it's never carried

7  out.  But in Texas it is.  And that's our goal in this case.

8  We feel we have the type and quality of evidence where we

9  can convince a jury that the defendant is guilty and they

10  should answer these questions in a way that would result in

11  his execution.

12        The executions, as you probably are aware

13  of, are by lethal injection.  Are you aware of that?

14    A.    Yes.

15    Q.    The procedures are the same.  If the defendant

16  is sentenced to death in this case, he would be placed on

17  death row.  At some point in time Judge Cunningham would

18  issue an actual date of execution.  The day prior to that

19  date, he would be taken from death row into downtown

20  Huntsville.

21        He would go through the same process of a

22  last meal, visit with families, relatives, but at 6:00 p.m.

23  all executions take place.  They would take him down a

24  hallway, put him on that gurney, I'm sure you have seen on

25  TV, put him down, strap him to the gurney, put needles in

1  his arms.

2  The warden is there.  He gives him an

3  opportunity to say a few last words to any visitors he may

4  have.  And then at the -- when he's finished with that, he

5  simply signals the executioner who injects poisons which

6  immediately shuts off the heart and collapses the lungs.

7  Death occurs in about 10 to 15 seconds.

8  And, quite frankly, that's our goal in

9  this case.  It's one thing for jurors to tell us they

10  believe philosophically in the death penalty and it's

11  another thing once they get down here and they start

12  thinking about actually participating in this type of trial.

13  Again, we have jurors who are against the

14  death penalty and tell us from the get-go, I couldn't ever

15  sit on this type of jury and make these decisions.  Put me

16  on some other type of criminal case or civil case.  We have

17  other jurors who are just adamantly for the death penalty

18  and we don't usually -- they don't make the grade, either.

19  We have some that believe in it and can make the decision

20  and are comfortable making it.

21  We have other jurors who philosophically

22  are for it, feel we have to have it as a law, but tell us,

23  no, if I actually had to serve, that is something that is

24  going to weigh on my mind too much.  I would think about

25  that man dying.  I would think about his family.  I would

second guess myself.  I might second guess myself for years
and I don't want that on my conscience.  I couldn't do that,
especially after sitting in the trial and watching him
sitting there looking at him living and breathing for two
weeks.  It's just not in my heart and soul to be able to do
that and it's fine if you feel that way.  It impairs people.
It would weigh too heavily on their mind when they make
these decisions, these fact based decisions, and they would
always be thinking about that and it would interfere with
their thought processes that way.

And if they feel that way and tell us
that, that's fine, too.  But I want to tell every juror,
once they make it down to where you are sitting and remind
them how real it is and ask them as best they know
themselves, can they really make that type of decision, once
it gets down to it, if it's proven to you, or is it
something that you feel you really can't do, that it would
weigh too heavily on your mind?  How do you feel?

A.    It would definitely weigh, especially if I
understand from listening to you that it was the accomplice,
it wasn't the triggerman, it would definitely.

Q.    Exactly.  You already have expressed those
reservations that you cannot envision the situation where
you would ever give anyone the death penalty, although, of
course, we can't preview the facts, but that's how you feel

1    right now?

2          A.    Correct.

3          Q.    And this is something because of your

4    objections to that, it would -- that would weigh on your

5    mind when we put on this evidence?  Is that something that

6    might interfere with your decisionmaking process?

7          A.    Yes.

8          Q.    And, in other words, you are not going to be

9    able to forget about it, are you?

10          A.    No.

11          Q.    And that -- but that would constantly weigh on

12    your mind as the evidence came in and in your decisionmaking

13    process?

14          A.    Correct.

15          Q.    Well, just bear with me, then, and I'll go

16    over a few other things.  The law requires me to cover

17    several topics.

18                Special Issue No. 1, you don't get to

19    that unless you have found the defendant guilty.  And it

20    asks whether there is a probability the defendant would

21    commit criminal acts of violence that would constitute a

22    continuing threat to society.  It's asking the jurors to

23    make a prediction of the future.

24                Do you feel that you can make that type

25    of prediction?

A. I try to do it every day, so I imagine I can do it in that case, too.

Q. Here's the other point I want to make. Sometimes people tell us, I don't get to that question unless I have found him guilty. If I find him guilty of capital murder beyond a reasonable doubt, that answers the question for me. Then that would be it. If someone commits capital murder, then I feel they are a danger to society and that's a yes for me. Other people tell us, well, I don't know. It would depend on the case. Because the law is this, you would have to wait and listen to the evidence.

Some people can do that and some people tell us, quite honestly, if he's guilty in my mind, if the State has gone to that burden beyond a reasonable doubt, then that would be an automatic yes. How do you feel about that particular question once you have found the defendant guilty of capital murder beyond a reasonable doubt?

A. Once I found him guilty? I would probably say yes.

Q. Okay. Because of the fact that you have already found him guilty beyond a reasonable doubt?

A. Correct.

Q. You, like most jurors, have heard something about this case.

A. Yes.

1    Q.    And it was covered quite a bit in the media.

2    What -- tell us kind of what you recall hearing about it

3    when it occurred or anything you have read or heard since

4    then.

5    A.    I guess living here, I heard a lot of what

6    went on at the Oshman's in Irving, and I believe everything

7    from the shooting of the police officer to the escape to

8    Colorado, I believe it was, and then finding them in -- I

9    think it was a trailer park.

10    Q.    Have you followed any of the proceedings since

11    then, since the Colorado arrest?  Any of the other trials?

12    A.    I believe this is the last one, and besides

13    the one that did not make it out of Colorado, and each one

14    that has made it through the trial process has been found

15    guilty and received the death penalty.

16    Q.    Okay.  You followed it a little more than a

17    lot of other jurors, but --

18    A.    I can't say I followed it, I just --

19    Q.    You know more about it.

20    A.    I recall it.

21    Q.    Okay.  My next question will be this.  I maybe

22    should have asked you this from the beginning.  We go

23    different ways with different jurors.  Obviously, common

24    sense will tell you that the jury who has to sit here has to

25    decide the case just based on the witnesses and the law and

1  the evidence that they hear in the trial, not on anything

2  they have read or heard.  This is a high publicity case, so

3  we have jurors that have followed it closer than others.

4                   We have to ask each juror if they can put

5  whatever they heard out of their mind and just make their

6  decision on what they hear in the courtroom.  Some jurors

7  are able to do that.  I mean, they can't forget about it,

8  but they can make their decisions.  Other jurors have

9  already formed opinions that might influence them in this

10 decisionmaking process because they have followed it

11 closely.

12                   But only you can tell us if you can

13 follow that particular aspect of the law.  Do you feel you

14 could do that?  Would you be able to make your decision just

15 based on the evidence or from what you have read or heard

16 about those other five cases, would that influence you, do

17 you think, or possibly could in your decisionmaking process?

18       A.       I believe I would be able to make it based on

19 the evidence.  I only know of the outcome of the others.  I

20 don't know what went on during them.

21       Q.       Okay.  You think you could follow that area of

22 the law?

23       A.       Yes.

24       Q.       The second question is whether the defendant

25 actually caused the death of the deceased or did not

1    actually cause the death of the deceased, but intended to

2    kill the deceased or another, or anticipated that a human

3    life would be taken.

4                      That gets into that question, again,

5    about parties and that's where you have the problem, I

6    think?

7         A.    Correct.

8         Q.    If he didn't actually cause the death, the

9    State has to prove that he anticipated.  I take it your

10   feelings haven't changed about how you personally feel or

11   your personal objections about that law?

12        A.    No.

13        Q.    That's the question you would really have --

14   that's the question that would cause you the problem, if you

15   actually did sit on a jury of this nature; is that right?

16        A.    Correct.

17        Q.    Those feelings haven't changed about your

18   personal objections not being able to sentence someone to

19   death if they are the nontriggerman then?

20        A.    Well, I guess the difference between the

21   nontriggerman and anticipating are two different things to

22   me.

23        Q.    Okay.

24        A.    If the plan was to go in there and to take

25   someone's life, then I could probably do it for a

1  nontriggerman.  But if it was not anticipated, then I have

2  an issue with it.

3       Q..   What would be the major factors there for you

4  on whether someone anticipated?  Does it have to be, okay,

5  let's go in and we're going to put together, show you that

6  they planned it out and said, let's murder someone?  Or is

7  it a situation, well, if that opportunity arises, we can

8  take care of that situation?  You understand it might be

9  tough for us to say here's what they planned because there's

10  not going to be any police officers there for the meeting

11  when they planned to do these things, obviously.

12            A lot of times we have to prove a

13  person's intent just from their actions at the crime itself,

14  that sort of thing.  Some people can prove that intent that

15  way or that anticipation that way and other jurors tell us,

16  you know, you can't.  How do you feel about that?

17       A.    It would be, in my mind, would be very hard to

18  show me that it was anticipated, unless they went in with

19  guns blazing and if someone got in the way, then that

20  happened.  But when -- if I remember the situation correctly

21  at the store, and it was on the way out that only one person

22  -- it wasn't any of the people inside to me, almost sounds

23  -- I don't know if it was anticipated or not.

24       Q.    Do you think from what you know or what that

25  fact situation you just related, that that's something you

1   are going to be thinking about during your deliberations?

2        A.      Yes.

3        Q.      And that's just something because you have

4   followed the case, you are not going to be able to put out

5   of your mind?

6        A.      No.  I think it's also part of having worked

7   in a 7-Eleven, grown up with 7-Eleven, and the intent of

8   people to come in and take cigarettes from me.

9   Unfortunately, that happened to me several times when I

10  worked in there.  Someone would come there and take

11  cigarettes and usually the intent was just to take them and

12  run.  If you cause an issue, maybe something would happen.

13  So, of course, you are always trained not to.

14              But I have a hard time if it's not the

15  person -- anticipation isn't always there in my mind.

16       Q.      And that's -- well, let me ask you this.  What

17  you know, you kind of related some facts, your understanding

18  of how this crime actually occurred.  Would those facts,

19  what you know about the case, would those influence you, do

20  you think, in your decisionmaking process?

21       A.      Yes.

22              MR. SHOOK:  That's all the questions we

23  have at this time, Judge.

24              THE COURT:  Ms. Busbee?

25              CROSS-EXAMINATION

BY MS. BUSBEE:

Q.   Mr. Thompson, sometimes it's just surprising and gratifies me that when asking questions about the capital murder scheme, jurors sometimes hone right in on things obviously the Legislature was concerned about. You were asked a lot of questions about your feelings about certain things before we started talking about what the law actually is.

Do you have any problem with the concept that we have here in Texas, which is if you are a small part or a large part of a criminal enterprise, so to speak, you are as guilty, not saying the same punishment, but you are as guilty as everyone else who participated in a criminal act?   That's the law.

In other words, we say, use the word "party".  But the law in Texas is, to use their example, the getaway driver is as guilty as the robber as far as committing the offense of robbery.  That's the law in Texas. Do you have any problem with that?

A.   I think the getaway driver is as guilty as the robber.  I don't know if the getaway driver is as responsible for the -- if someone gets shot inside.

Q.   I'm coming to that.  I'm coming to that. Because I'm not trying -- I personally am not trying to commit you to any sort of fact situation.  You have some

1  knowledge from what you have read in the papers, I guess,

2  about this case.  But we're really not supposed to ask you

3  what you would do in this case.

4         A.    I understand.

5         Q.    That's not right.  At the same time, I'll get

6  to some specifics, as Mr. Shook did.  But once you found

7  someone guilty of the offense, in this case of capital

8  murder, the law says that's an automatic life sentence, an

9  automatic life sentence with a special condition that the

10 person who is convicted of capital murder cannot be paroled

11 until they have served forty years, day for day, and even

12 then there's no promise that they would be paroled.  But

13 that's the first time it can be considered.  So that's the

14 scheme and then the law favors that.

15              And to this, in this respect, if the

16 State has elected to seek the death penalty after a jury has

17 found someone guilty of the offense of capital murder, they

18 have to do some additional things and they have to do those

19 things, the questions of proof, beyond a reasonable doubt.

20              So it's not the scheme that most people

21 have in their mind.  I'll find him guilty of capital murder,

22 so he automatically gets the death penalty.  It's exactly

23 the opposite.  I have found someone guilty of capital murder

24 and now I have -- many additional things have to be proved

25 before a death sentence can be imposed.

1            So the fact that things give you pause,

2  actually makes you fall right in line with the law because

3  you are skeptical to the extent that the rest of it has to

4  be proved to me before I could vote on these issues.  Is

5  that a fair statement?

6       A.     Yes.

7       Q.     Okay.  That's what I heard you telling us.  In

8  fact, Mr. Shook asked you about Special Issue No. 1.  If you

9  were sitting -- and, once again, I'm not asking you about

10  this particular case.  I'm just asking you about cases in

11  general.

12            Would you have an open mind at the second

13  part of the trial as to whether or not the State could prove

14  to you the probability that someone would be a future

15  danger?  In other words, could you consider that question

16  separately and apart from what you heard in -- I should say,

17  can you consider that question and not automatically have

18  answered that question by your verdict in the first part of

19  the case?  In other words, just because someone has been

20  convicted of capital murder, would you have already made up

21  your mind that they would be a danger in the future?

22       A.     Yes.

23       Q.     And could you tell me how -- why you would

24  feel that way?

25       A.     Unfortunately, I guess, in my mind people are

1    sometimes -- maybe a creature of habit or if they have been

2    able to do something once, there's a probability they will

3    do it again.

4           Q.    Okay.  So you wouldn't require the State to

5    prove that to you beyond a reasonable doubt?

6           A.    If -- okay.  I may have misunderstood you.

7    Did we already find the person guilty?

8           Q.    Yes, sir.

9           A.    Then in my mind the probability is there.

10          Q.    Okay.  So -- okay.

11                THE COURT:  Mr. Thompson, we very much

12   appreciate your time and service here to the Court today.

13   Understanding the law, the parties have agreed to excuse you

14   from jury service in this case.  We want to thank you.

15                      [Prospective juror out]

16                      (Recess)

17                THE COURT:  Ms. Coleman.

18                      [Prospective juror in]

19                THE COURT:  Thank you.  You may be

20   seated.

21                PROSPECTIVE JUROR:  Thank you.

22                THE COURT:  Good afternoon.  How are you

23   doing?

24                PROSPECTIVE JUROR:  Good afternoon.  I'm

25   fine.  How are you?

1          THE COURT:  Doing pretty good.  You

2  pronounce your name Antwanette Coleman?

3          PROSPECTIVE JUROR:  Antwanette Coleman.

4          THE COURT:  Welcome to the 283rd.  Have

5  you had enough time to read the guide I provided for you?

6          PROSPECTIVE JUROR:  I have.

7          THE COURT:  And review your

8  questionnaire?  I know you filled that out in May.  They

9  will be asking you some followup questions, so I want to

10 give you an opportunity to reflect on what you put down

11 previously.  Please don't think you have to understand all

12 the law that I have provided you.  That's what this

13 opportunity is for, for the lawyers to visit with you, give

14 you examples, and let you figure out how it all

15 interrelates.

16          Two questions I have at the end of the

17 process are, number one, do you understand the law?  And,

18 number two, can you follow the law?  That's my role here in

19 this process.

20          Before I let the attorneys begin, the

21 question that I have for you now is will you be able to

22 serve this Court beginning November 10th for two weeks?

23          PROSPECTIVE JUROR:  I would -- I teach

24 school, so I would be away from my students for two weeks,

25 but I know that other people have jobs also and they have to

1   do this.

2                    THE COURT:   It's called substitute

3   teacher.

4                    PROSPECTIVE JUROR:   Yes.

5                    THE COURT:   Very good.   Mr. Shook?

6                    MR. SHOOK:   May it please the Court.

7                    <u>ANTWANETTE COLEMAN</u>,

8   having been duly sworn, was examined and testified as

9   follows:

10                   <u>DIRECT EXAMINATION</u>

11  <u>BY MR. SHOOK</u>:

12          Q.    Ms. Coleman, my name is Toby Shook.   I'm going

13  to ask you questions on behalf of the State today.   If you

14  have any questions of me, just feel free to ask me at any

15  time, all right?

16          A.    Yes.

17          Q.    We try to keep it informal.   Have you been

18  down on jury duty before?

19          A.    I've been on jury duty before.

20          Q.    Were you selected on a jury?

21          A.    No.

22          Q.    You know, then, probably, did you get at least

23  called to a courtroom?

24          A.    Yes.

25          Q.    Okay.   Jury selection usually is done in just

1  a big panel, but because it's a death penalty case, we talk

2  to each juror individually.  There are not any right or

3  wrong answers.  We just want your honest opinions.  And you

4  have been very forthcoming on your questionnaire and I want

5  to follow up on some of those answers and talk to you about

6  the death penalty.  Okay?

7          A.      Sure.

8          Q.      One of the things we ask you about in the case

9  is if you had any moral, religious, or personal beliefs that

10 prevent you from assessing this type of verdict, because

11 many people do.  People feel very differently about the

12 death penalty.  You said at the time that you were -- you

13 said yes, that you were somewhat uncertain about your

14 religious beliefs on it.

15                  Have you looked further into this or

16 talked to anyone about it since you filled out this

17 questionnaire?

18         A.      I did.  I went and talked to a minister at my

19 church and I also did my own research.

20         Q.      And what have you found?

21         A.      I found that in the Bible in Romans 13 it says

22 that there are laws that are here on the Earth that we must

23 follow.  And even though I am a Christian and I do believe

24 in Jesus Christ, I must follow the laws that are set here

25 before me.  So if the law is that the death penalty would be

1   the punishment that would be bestowed upon someone, then

2   that is the law that I would have to follow.

3            Q.       Now, we talk to everyone and want their honest

4   opinions because we talk about two areas.  We will talk

5   about what the law is, but we also want to know what your

6   honest feelings are, because, obviously, people feel very

7   differently on different ends, especially about the death

8   penalty.

9            And sometimes people agree with the law

10  and sometimes they don't.  Just because there is a law does

11  not mean you have to follow it, necessarily, especially if

12  you have some kind of objection to it morally or mentally or

13  based on your personal beliefs.  The law doesn't force you

14  on juries.  It just depends on how strongly you feel about

15  that, obviously.

16           You know, it kind of works both ways.  If

17  you were close to someone as a crime victim, let's say

18  someone close to you was hurt severely or killed in a

19  violent crime, then a week later you were called down for

20  jury selection and it's a violent crime.  At that point in

21  time you may not be suitable because you, obviously, would

22  be too close to that type of a case, even though the law

23  would ask you to be fair.  And you just wouldn't be able to

24  in that type of case.  See where that comes from?

25           A.       I do.

1    Q.    People feel the same way about the death

2    penalty, both ways.  And I want to explore with you how you

3    feel, really, about the death penalty.  Have you thought

4    about it more since you filled out that questionnaire?

5    A.    I have.

6    Q.    You seem like a thoughtful person.  You did

7    your own research to some extent.  How do you feel about the

8    death penalty as a law?  Is that something that you agree

9    with personally?

10   A.    I think that we need laws like that.

11   Q.    Why is that?

12   A.    Because I believe that it can act as a

13   deterrent to a person who may decide to commit a crime.

14   They may decide not to do it because they know that that's a

15   punishment that may be bestowed upon them.

16   Q.    What types of cases do you think should fall

17   into consideration of the death penalty?

18   A.    I think that if you are a child molester, I

19   think that if you are a child rapist, I think that if you

20   commit other crimes in the process of committing other

21   crimes, crime upon crime, that those things should be

22   punishable by death.

23   Q.    Okay.  So child molesters, child rapists, what

24   about rapists of adults?

25   A.    I view that as just as bad, but I view it

1   differently because children don't have -- they have an

2   innocence to me.  And children -- as adults, we're here to

3   protect children.  That's the way I view that.

4         Q.      All right.  In Texas the death penalty is

5   reserved just for certain types of murder cases, murders

6   with some aggravating factors.  Murders that occur during

7   felonies, such as a robbery.  Someone goes in and robs a

8   7-Eleven and shoots the clerk.  That can be a death penalty

9   case.  Someone who goes in and breaks into a building, a

10   house, and murders the homeowner, that could be a death

11   penalty case.

12         Someone who murders someone during a

13   rape, that could be a death penalty case or kidnapping or

14   arson.  Plus murder of a child under the age of six or

15   murder of a police officer or fireman on duty, could be a

16   death penalty case.  Or having more -- or several victims

17   like a mass murderer or serial killer.  But those are the

18   limited situations in which the death penalty could be

19   applied in those type cases.

20         Do you agree that those types of cases at

21   least should be for consideration of the death penalty?

22         A.      I do.

23         Q.      Okay.  Another concept I want to talk with you

24   about is what we call the law of parties or accomplices.

25   When we think of the death penalty or crime deserving of it,

1 we usually think of the triggerman, the person that goes

2 into, let's say, the 7-Eleven and robs the clerk and shoots

3 them.  The law says that capital murder can be -- you can

4 prosecute someone for capital murder if more than one person

5 commits it.  Sometimes you have more than one person commit

6 an offense.

7     If me and Mr. Wirskye, let's say, want to

8 rob a bank and we recruit someone to help us.  They are

9 going to be our getaway driver.  We drive to the bank.  They

10 are supposed to keep the car running, yell out if the police

11 are coming.

12     We go inside and I have guns and they

13 know I have guns.  I pull them out and hold everyone at bay

14 and Mr. Wirskye gathers the money up and puts it in a bag.

15 At some point in time during that robbery, I get mad at one

16 of the tellers or Mr. Wirskye warns me that someone is

17 hitting an alarm, and I start shooting.  I shoot one and

18 kill them.

19     Obviously, I could be prosecuted for

20 capital murder.  I could even receive the death penalty

21 because I caused that murder.  There are other situations in

22 which the law says that you can also pursue capital murder

23 charges against the accomplices, even though they didn't

24 actually pull the trigger.

25     People feel differently about that from a

1  personal point of view, and that's what I want to ask you.

2  I think you have told us that you are for the death penalty

3  for the triggerman, the people that actually caused these

4  murders, depending on the facts?

5       A.     Uh-huh.

6       Q.     But how do you feel about these people who

7  assist, the accomplice, that don't actually cause the death?

8  Do you think the death penalty is appropriate for those

9  types of cases or in your mind would that be more

10  appropriate for a prison sentence?

11       A.     I really think that a person is really just as

12  culpable if they accompany someone to commit a crime,

13  because at the same time you helped the person commit the

14  crime, you could have maybe talked them out of it and

15  stopped it.

16       Q.     So in my situation you think that Mr. Wirskye,

17  gathering up the money, and the getaway driver, since they

18  are in on it and they know what is going on, they are just

19  as guilty of capital murder?

20       A.     They are.  They planned it with you, they were

21  there with you, they were there the whole time, they could

22  have done something to stop that murder.

23       Q.     Okay.  And in your opinion are they deserving

24  of the death penalty?

25       A.     They would be -- they are just as culpable.

1    Q.    And this goes back to your feeling about

2 deterring other criminals and holding them accountable, that

3 sort of thing?

4    A.    Exactly.

5    Q.    Ms. Coleman, what do you recall about this

6 case?  This case got a lot of publicity, if you recall, and

7 we ask each juror what they remember about it.

8    A.    During the time that this was going on, I

9 believe I was working on my masters degree, so I did not

10 watch a lot of the news.  I do recall seeing there were some

11 escapees in southern Texas, from southern Texas, that had

12 escaped and they were believed to have killed an officer at

13 an Oshman's in Irving.  Um, I remember the capture, but the

14 fine details as far as reading the papers and really

15 watching the news about it, I did not do.

16    Q.    Do you think what you read or heard would

17 influence you in any way if you were chosen as a juror?

18    A.    No, I would have to hear the facts.

19    Q.    That's what the law is.  I figured that's what

20 you would tell us.  I just wanted to make sure.  The law is

21 that you have to decide on what you hear in the courtroom.

22 Look a minute on Special Issue No. 1.  If you would, read

23 that to yourself.  I want to ask you some questions about

24 Special Issue No. 1 and you can find that in the packet or

25 we have a board over here to the right.

1          MR. SHOOK:  May we have a moment, Judge?

2              (Bench conference)

3          MR. SHOOK:  I believe that's all the

4  questions that I have, then, Judge.

5          MS. BUSBEE:  I don't have any questions.

6  I believe we have reached an agreement.

7          THE COURT:  Ms. Coleman, the parties have

8  agreed to excuse you from jury service.  It's probably not

9  the best case for you and we appreciate your time and

10 service here today and you coming down.  And you can go back

11 and tell your students all about this process.

12         PROSPECTIVE JUROR:  I will.

13             [Prospective juror out]

14         THE COURT:  Wayland Taylor.

15             [Prospective juror in]

16         THE COURT:  Good afternoon, sir, how are

17 you?

18         PROSPECTIVE JUROR:  Good.  And you?

19         THE COURT:  I've had a good day so far.

20 Mr. Wayland Taylor?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  You go by Wayland or Terill?

23         PROSPECTIVE JUROR:  I actually go by

24 Terill.

25         THE COURT:  Have you had an opportunity

1   to review the guide that I gave you this afternoon?

2                    PROSPECTIVE JUROR:  Yes.

3                    THE COURT:  It's a lot of law to give you

4   all at once.  And you've had an opportunity to review your

5   questionnaire that you filled out for us?

6                    PROSPECTIVE JUROR:  Yes.

7                    THE COURT:  Trust me, you don't have to

8   understand it all right now.  The whole process, sir, is for

9   the attorneys to visit with you and explain the law to you,

10  so you have a better understanding of how it all

11  interrelates.

12                   Two questions that I will have at the end

13  of the process are, first, is do you understand the law?

14  The second question is, if you understand the law, can you

15  follow the law?  That's my job here.

16                   The only question that I have for you

17  before we begin is, this trial shall be beginning on the

18  10th day of November for a period of two weeks.  Is there

19  any major reason why you could not serve this Court during

20  that period of time?

21                   PROSPECTIVE JUROR:  There is a reason I

22  was going to bring up to you.  I just started a new job and

23  it's selling cough and cold medicine, pharmaceutical sales.

24  My base salary right now is $20,000 or a little bit less and

25  I'm kind of getting my feet planted in.  And our peak time

1  is going to be November and I have to be in the field to

2  make a living.  And through the summer we pretty much

3  starve.  And paying off student loans and paying off

4  hospital bills from an accident that I had is going to be --

5  it's going to hurt me pretty good.

6          THE COURT:  Mr. Taylor, I understand

7  that.  And I'm sympathetic with anyone who comes in the

8  door, but I cannot excuse anyone for business reasons.  I'm

9  putting this far enough out, if you are selected for this

10 trial, you would have to rearrange your schedule around

11 that.

12         PROSPECTIVE JUROR:  Right.

13         THE COURT:  You won't be sequestered.

14 You would be able to use the phone during the breaks, over

15 the lunch hour, afternoon breaks.  We work very normal

16 hours, as I gave you in my guide.  I won't shut you

17 completely down.  We don't think it would take the full two

18 weeks, but I'm being cautious for you to plan the two weeks,

19 that you have to block out.

20         The reality is it's like paying taxes,

21 nobody wants to do it.

22         PROSPECTIVE JUROR:  I understand.

23         THE COURT:  With that understanding, I

24 ask people, you know, you will just have to do the best you

25 can.  So can you serve?

1        PROSPECTIVE JUROR:  I can do my best.

2        THE COURT:  Thank you, sir.  Mr. Wirskye?

3        MR. WIRSKYE:  May it please the Court.

4            WAYLAND TERILL TAYLOR,

5    having been duly sworn, was examined and testified as

6    follows:

7              DIRECT EXAMINATION

8    BY MR. WIRSKYE:

9        Q.    Mr. Taylor, how are you?

10       A.    Good.  And you, sir?

11       Q.    Thanks for coming down.  My name is Bill

12   Wirskye and I'm an assistant DA and I'll be visiting with

13   you the next few minutes, talk a little bit about some of

14   the information on your questionnaire, talk kind of in

15   general how you feel about the death penalty.  And I know

16   you have given us some answers already in your

17   questionnaire.

18            Just following up from what the Judge

19   said, the work situation, you know, everybody has problems

20   and we can't let everybody off that it would be an economic

21   hardship to, necessarily.

22       A.     I understand.

23       Q.     But I want to ask you this.  It sounds like

24   you have student loans and I just finished off ten years of

25   them, so -- there is a lot of hope at the end of the

1   process.  But is it something you think if you were selected

2   to be a juror in this case, that it would be in your mind

3   what's going on at work or financial considerations or

4   something like that?

5          A.     It would in a sense, because I'm coming off

6   summer, which we make pretty much no money right now and

7   maybe $200 in commission.  And, like I said, that's just our

8   peak.  That's my make-up period for the next summer.  So I

9   would be hurting for a while if it's more than a week or so.

10         Q.     Sounds like you have some pretty substantial

11  concerns and that type of thing?

12         A.     Yes.

13         Q.     Do you think if you were here serving for a

14  two-week period in November, it is something that would

15  maybe substantially impair or affect your ability to

16  concentrate on what is going on in the courtroom?

17         A.     It might, it might just -- yeah, probably so,

18  yes.

19         Q.     Bills to pay, that type of thing?

20         A.     Yes.

21         Q.     Okay.  So it will be difficult for you to pay

22  full attention to the evidence and the witnesses and things

23  like that because you have over things going on in your head

24  with your own personal life; is that right?

25         A.     Yes.

Q.      Okay.  Let me also ask you this, you know,
now, obviously, this is a case where the State is seeking
the death penalty?

A.      Yes.

Q.      We talked to a lot of people.  You remember
that big group you were down with in the morning when you
came down and we had another big group in the afternoon.  So
we call down quite a few people.  We know this is not
everybody's cup of tea.

People -- you know, we have people that
don't believe in the death penalty.  Obviously, they are not
necessarily qualified.  We have people that believe, I
guess, too strongly in the death penalty and they are not
qualified to serve as a particular -- in this particular
type case.

And we know this is -- there's a lot at
stake for both sides.  It's an important case and we don't
want to force anybody into the jury box that may be
uncomfortable sitting in a death penalty case.  You have
told us that you are against the death penalty; is that
right?

A.      On most cases, most but the extreme cases.

Q.      And why do you feel that way?

A.      I generally don't believe that it's -- that
it's right to take human life in any situation, but I

1    believe there are certain instances where, where it's just

2    unavoidable, especially for some that's committed a pretty

3    heinous crime.

4         Q.    And you think in your own mind the heinous

5    crime that may be deserving of the death penalty, what type

6    of case are you thinking about?

7         A.    It's tough to put a label on it, but it would

8    have to be something that I would make the call personally

9    at the moment.  Of course, just, you know, generally the

10   more extreme ones would be, but --

11        Q.    Like mass murderers, serial murder type thing,

12   terrorism?

13        A.    All of those or of children or it's -- it

14   would be a tough decision.  I would have to -- but I would

15   have to make it, if need be.

16        Q.    You have told us in your questionnaire that

17   you think the death penalty is used too often in our state;

18   is that right?

19        A.    I believe it's used a lot in our state.  Maybe

20   too often in some instances, but, then again, I wasn't in

21   the courtroom.

22        Q.    And you have had a chance to look at the law

23   the Judge gave you in that little packet?

24        A.    Yes.

25        Q.    And you know now that the death penalty in

1    Texas is only available for a certain type of murder case.

2    And I was just wondering, and most people, when they come

3    in, have no idea what the scheme is or when and how it's

4    available.

5              But now that you have looked at some of

6    the crimes, the murder of a policeman or murder during the

7    course of a robbery, that type of thing, how does that kind

8    of square, you know, the law we have in Texas, square with

9    your beliefs as to what an appropriate death penalty case

10   should be?

11        A.    Personally, I'm not sure about the death

12   penalty for the robbery.  But murder of a policeman,

13   definitely I would be in favor of the death penalty for.

14        Q.    Okay.  Would it be a situation where you would

15   be comfortable serving as a juror in a death penalty case?

16   Like I said, we realize not everybody is cut out for this

17   and some people just don't want to be put in that position,

18   and we realize that.

19        A.    Right.

20        Q.    What are you thinking?

21        A.    I would be as comfortable as expected,

22   probably.

23        Q.    What?

24        A.    As comfortable as expected.

25        Q.    Let me take you to another issue.  Usually --

I'll give you an example.  Capital murder in Texas, you know, intentional murder during the course of a robbery, can potentially be a death penalty case.  And I think when most people think of that off the top of their head, they are kind of thinking of the lone gunman, the one guy that goes into the 7-Eleven, holds up the clerk, and shoots and kills them and makes off with the money.

Oftentimes, crimes are committed by more than one person, groups or gangs of people can commit a crime.  The law in Texas allows, you know, depending on the facts and circumstances, allows us to prosecute both, for lack of a better word, the triggerman, the person that actually caused the death, as well as the accomplices, the people that didn't actually cause the death.  We can prosecute them all for capital murder and, depending on the facts and circumstances, they could all receive the death penalty.

And we talked to a lot of people who believe very strongly in the death penalty and they believe in it just for the person that actually took the life, the person that actually pulled the trigger.  And they draw a line and say, under no circumstances would I ever even consider giving the death penalty to an accomplice, someone that didn't actually cause the death, who was there just participating in the robbery, that type of thing.  What do

1   you think about that?

2        A.       Again, it would be tough to make a blanket

3   statement without knowing all the facts.  I generally would

4   kind of go the same way.  It would be tougher.  It would be

5   tougher to impose the death penalty on an accomplice.  But

6   then, again, if the facts of the case could vary so widely,

7   it depends on how much involvement that person had or, you

8   know, what was actually going on in the crime situation.

9        Q.       Okay.  And I know, you know, we bring you down

10  here and hit you with a lot of things and we always keep

11  giving you examples and examples.  But let me give you this

12  one and get your thoughts on it.

13              Say Mr. Shook and I decide we're going to

14  rob a bank.  That's what we agree to do and we recruit a

15  third friend who has a car to drive us up to the bank.  He's

16  going to wait outside and look for the police.  And if the

17  police come, he's going to tap on the horn, that type of

18  thing.  We have only got one gun and the plan is for

19  Mr. Shook to take it in, hold up the bank teller, and I'm

20  going to go in just with a bag and collect the money.  And

21  that's what we've agreed to do is to commit this bank

22  robbery.

23              During the course of the robbery, for

24  whatever reason, maybe the teller looked at Mr. Shook wrong

25  or he thought maybe she was going for a silent alarm or

```
 1  something, he shoots and kills that teller, that clerk.
 2  Obviously, he's committed -- he's the triggerman.  He's
 3  committed capital murder and could be convicted of capital
 4  murder and potentially receive the death sentence.
 5                  What do you think about somebody in my
 6  spot in that example?
 7       A.     I would have trouble giving the death penalty
 8  to maybe the driver, but it would be tough.  Like I said --
 9       Q.     You know, let me see if this clears it up.
10  You know, we agree just for the bank robbery.  I never had
11  any intent that anyone would get hurt or killed.  That was
12  never in my mind.  That's not what I signed on for.  I just
13  signed on for the bank robbery.
14                  Sounds like from what you are telling me
15  is the death penalty would be off the table for the guy out
16  in the car, the lookout?
17       A.     I think so.
18       Q.     What about me?  What do you think?
19       A.     More than often I would probably say, no, it
20  wouldn't.  It just depends, you know, on the situation
21  happening at the time.  It's a tough call to make.
22       Q.     It is, you know, unfortunately, we kind of ask
23  these tough questions.
24       A.     Right.
25       Q.     I'll be frank with you.  We're prosecuting
```

this case under that accomplice theory.  That's the theory
we're prosecuting Mr. Murphy under, that he is not the
triggerman.  He's an accomplice.  That's why we kind of
start off with this and spend a lot of time talking to
people.  Like I said, even people who feel very strongly
about the death penalty, a lot of those folks would just
take it off the table for an accomplice or even the guy out
driving.

Do you think you would be comfortable --
well, do you think that you would be comfortable sitting in
that type of case with an accomplice being prosecuted?

A.     I mean, it would be a tough case.  I think
that -- I think that it could go -- it really could go
either way with the accomplice involved in that situation,
how much planning was involved in it.  That's a tough --
it's just a tough question to answer, I'm sorry.

Q.     That's okay.  The law allows us to prosecute
people under that theory and that's why it's important, you
know, whether you agree or disagree with the law.  The
important thing is whether you can follow it.  And, you
know, if you do disagree with it and you are on the jury and
you are asked to follow it, we don't want to put anyone in
that type of spot, a crisis of conscience, or jam somebody
up.  And that's why we spend so much time talking about it.

And just to be frank with you, I told you

1   we are prosecuting him as an accomplice.  We feel we have

2   the nature and type of evidence that's going to cause a jury

3   to convict him of capital murder and answer those three

4   questions in such a way that he would ultimately receive the

5   death penalty.

6           A lot of people we talk to, again, are in

7   favor of the death penalty in kind of an abstract or

8   philosophical way.  But when we get down to this point and

9   we're actually sitting in the courtroom and looking at

10  somebody that's alive and breathing right now, knowing they

11  may potentially participate in a process that takes that

12  person's life, that's kind of another thing.

13          The analogy I like to use sometimes is

14  I'm definitely scared of heights.  I see those guys downtown

15  that wash windows up on the skyscrapers.  I could never do

16  it.  I'm glad somebody can, but I just could never do it

17  because I'm scared of heights.

18          That's what a lot of people tell us about

19  participating in this process.  Do you think that you are

20  the type person that could participate in this process?

21          A.      I wouldn't enjoy it one bit.

22          Q.      And obviously no one would.

23          A.      I wouldn't -- excuse me, I didn't mean to

24  interrupt you.

25          Q.      No, go ahead.

1    A.    Yeah.  It wouldn't be something that I would

2 feel very comfortable doing at all.

3    Q.    Uh-huh.  I don't think anybody would.  I think

4 one of the reasons, you know, we talk to a lot of people

5 that say, you know, I don't want to live with this for the

6 next few years, the consequence of my decisions, because, as

7 you know, Texas is the most active state with the death

8 penalty.  A death penalty is a reality here.  Juries assess

9 it and it's actually carried out.

10    You know, oftentimes the press reports

11 kind of the grizzly details of each execution.  People tell

12 us, you know, I don't want that weighing on my mind.  I

13 don't want it weighing on my conscience.

14    But do you think that you are the type

15 person that could take pen in hand and answer those three

16 questions such that it might one day result in the execution

17 of Patrick Murphy?

18    A.    If I had to in a certain situation, I would.

19    Q.    But if you had your druthers, you would rather

20 not?

21    A.    Exactly.

22    Q.    Let me ask you to take just a few more minutes

23 and look at those questions.  We may talk about them here in

24 just a second.  Just take a few minutes and read them to

25 yourself.

```
 1          A.      [Prospective juror complies.]

 2                  MR. WIRSKYE:  May we approach, Your

 3   Honor?

 4                  THE COURT:  You may.

 5                      (Bench conference)

 6                  THE COURT:  Any further questions?

 7                  MR. WIRSKYE:  Nothing from the State.

 8   Thank you, sir.

 9                  MS. BUSBEE:  No, sir.  We have reached an

10   agreement.

11                  THE COURT:  Mr. Taylor, we appreciate you

12   coming down and serving today and the attorneys have agreed

13   they are not going to seat you on this jury.  So you are

14   free to go.

15                  PROSPECTIVE JUROR:  Thanks a lot.

16                      [Prospective juror out]

17                  THE COURT:  Mr. Nelson.

18                      [Prospective juror in]

19                  THE COURT:  Good afternoon, Mr. Nelson,

20   how are you?

21                  PROSPECTIVE JUROR:  Fine.  How are you?

22                  THE COURT:  Welcome to the 283rd.  Have

23   you had an opportunity to read the guide I provided for you

24   a couple of times?

25                  PROSPECTIVE JUROR:  Yes.
```

1    THE COURT:  And looked over your

2  questionnaire?

3    PROSPECTIVE JUROR:  Yes.

4    THE COURT:  You come in and expect you to

5  remember everything that you told us back in May.  Then we

6  hand you a bunch of law.  Please, sir, you don't have to

7  understand everything about it at this point.  The lawyers

8  are going to visit with you for a period of time.

9    The whole idea is at the end of the

10  process I have two questions to ask.  First is, do you

11  understand the law and how it all interrelates?  And the

12  second is, if you understand the law, can you follow the

13  law?  And that's my job here.  All they're looking for is

14  honest, truthful answers and your opinions.  They will ask

15  you questions about the answers you have already provided

16  and expand on an answer.  Tell me where you got it, that

17  type of thing.

18    The only question that I have for you at

19  this time, sir, is will you have any trouble serving this

20  Court for two weeks beginning on November 10th?

21    PROSPECTIVE JUROR:  I'm self-employed and

22  I'm the only person in my business.  So as long as I wasn't

23  here eight hours a day and had some opportunity to carry on

24  a little bit of business, it wouldn't be difficult.

25    THE COURT:  Yes, sir, I certainly

1 appreciate self-employed people.  It's like paying taxes,

2 nobody wants to do it.  You will be able to use the phone

3 during the day.  When we have a long lunch break, you would

4 be able to use a phone to stay connected with your office

5 and manage business as best you can.  If you read the first

6 page there, I do keep real regular hours.  So you can

7 predict when you can be out and be back at the office and

8 you will be able to have at least some time in the afternoon

9 to conduct some business.  I understand that and will make

10 the best accommodations as we can.

11                    Obviously, you can't have any

12 interruptions during the trial, but you would be able to use

13 your phone during the break.  Fair enough?

14                    PROSPECTIVE JUROR:  Yes.

15                    THE COURT:  Mr. Shook, would you like to

16 inquire?

17                    MR. SHOOK:  May it please the Court.

18                    JAMES NELSON,

19 having been duly sworn, was examined and testified as

20 follows:

21                    DIRECT EXAMINATION

22 BY MR. SHOOK:

23        Q.    Mr. Nelson, my name is Toby Shook.  I'll be

24 asking you questions on behalf of the State this afternoon.

25 You have been down on jury service before; is that right?

1   A.   I was called.  I wasn't selected, but, yes, I

2   have been.

3   Q.   Okay.  We do it a little differently because

4   it's a capital murder case in which the State is seeking the

5   death penalty.  The procedure is after filling out this

6   questionnaire, we talk to each juror individually and, as

7   the Judge said, we're just really interested in your honest

8   opinions.

9        You have been very forthright on your

10  questionnaire.  I want to follow up on a few things on that,

11  talk about the death penalty, capital murder, and some of

12  the laws that apply.

13       I see by your questionnaire you said that

14  you were self-employed.  You work in marble and granite

15  fabrication?

16  A    Yes.

17  Q.   Tell us a little more what you do with that.

18  A.   I take large pieces of stone and cut them and

19  grind them and polish them and make countertops and fire

20  places and furniture and those kinds of things and install

21  them in residential.

22  Q.   How do you get your business?  Is it word of

23  mouth?  Do you advertise?

24  A.   It's referrals.

25  Q.   Referrals usually?

1    A.    Exclusively.

2    Q.    The Judge told you and I know these cases in

3    California seem like they go on for whatever reason for four

4    or five months.  But this case won't go any longer than two

5    weeks, perhaps a little shorter.  We don't know.  But we can

6    tell you the most will be two weeks.

7              And as the Judge said, he keeps regular

8    business hours, pretty much on schedule.  We ask every juror

9    -- you know, everyone's situation is a little different.

10   But if you were selected as a juror for those two weeks in

11   November, would you be able to give the case your full

12   attention, even though you are self-employed?

13   A.    Like I said before, as long as I had some time

14   to do some things.  But if I'm completely shut down for two

15   weeks, it would be an extreme hardship for me.  But I work a

16   lot of hours.  So I could work a lighter load.  And as long

17   as I still have a few hours in the evening or early morning.

18   Q.    All right.  It's just -- it comes down to

19   this, is if you can tell the Court, when I'm here listening

20   to the evidence and deliberating, I will give the case my

21   full attention.

22   A.    Oh, yes, sir.

23   Q.    Some people have told us just because of my

24   particular situation at this time, no, I wouldn't be able

25   to.  Other people tell us it would be a hardship, but I

1    could.  And we just rely on your honesty and your particular

2    situation.  I take it from your answers you would be able to

3    do that?

4         A.    Yes, I believe so.

5         Q.    Thank you.  Now, you say you were raised in

6    Illinois and you spent some time in Iowa and then you came

7    down to Texas about 20 years ago?

8         A.    Yes.

9         Q.    What brought you down to Texas?

10        A.    A job.

11        Q.    And then raised your teens and raised your

12   family here?

13        A.    Yes, sir.

14        Q.    Your wife is a teacher in Garland?

15        A.    Yes.

16        Q.    What does she teach?

17        A.    She teaches sixth grade English at the Austin

18   Arts Academy in Garland.

19        Q.    Your children, I saw one is actually employed

20   with the Dallas Symphony; is that right?

21        A.    Yes, sir.

22        Q.    I saw an article this weekend that had a bunch

23   of profiles.  Was she in that by any chance?

24        A.    I don't know if she was.

25        Q.    It showed --

1    A.    It was their gala.

2    Q.    Yeah.   And the other is also a teacher at

3  Garland?

4    A.    Yes.   She teaches in Coyle Middle School in

5  Rowlett.

6    Q.    One of the interesting things, you know, we

7  see a little bit of everything in these questionnaires and

8  they are quite lengthy and, believe it or not, they are

9  quite helpful to us.   I know it takes a long time, but we

10  ask if you have ever been dealt within the system and you

11  had in 1966 an unlawful assembly case and I have never seen

12  that before.   Tell us a little bit about that.

13    A.    Well, there were about 12 or 14 of us that

14  went to a party and in that day it was called an open house

15  and we were walking up the driveway and a police officer

16  pulled up.   And we explained to him that it was an open

17  house and he said, were you invited?   And we explained, no,

18  you don't get invited.   You heard about it and you went.

19  And he couldn't understand that.

20                    And we were on our way back to our cars

21  and one young man decided to smart off to the officer and he

22  said, follow me.

23    Q.    Okay.

24    A.    Fourteen of us went to jail and only twelve of

25  us went to trial.   And one, I received probation and one guy

1  actually went to jail.

2      Q.     Would you --

3      A.     But there were a lot of different people who

4  kind of joined with us.

5      Q.     Okay.  Anything about that experience which

6  would cause you any problems sitting as a juror in this type

7  of case?

8      A.     I don't believe so.

9      Q.     All right.  Now, let me talk to you about

10  specifically capital murder and the death penalty.  You know

11  from the Judge's introduction back when you first came down,

12  and the questionnaire, that this is a case in which the

13  State is seeking the death penalty.  So we want to talk to

14  each juror individually how they feel about it.  You put on

15  the questionnaire that you are in favor of the death

16  penalty.  I would like you to kind of follow up and tell us

17  why you favor the death penalty, maybe the purpose you feel

18  it serves society.

19      A.     Well, I believe that there's one thing that

20  the death penalty does and that's that it never gives anyone

21  an opportunity to commit the crime again.  And I think that

22  in itself is a fairly good justification for it because, I

23  mean, we have a lot of repeat offenders.

24      Q.     Okay.  Has the death penalty been a law that

25  you have always agreed with?

107

A.     Um, I think probably.  I mean, it's only as I
get older that I think about it, you know.  When I was
younger, I didn't spend a whole lot of time thinking about
it.  It just seemed like a good idea and, you know, given it
more thought.

Q.     Okay.  Have you ever followed any cases in the
media locally or nationally, any criminal cases, murder
cases, that you thought were appropriate for the death
penalty or involved the death penalty, anything like that?

A.     I don't think anything that really made an
impression on me.  I mean, I read a little bit of the
newspaper, I listen to a lot of radio, and so, yes, I follow
them, but with some interest.  But I don't think that I have
ever had one that I remember that just really made a giant
impression on me.

Q.     Okay.  When you think of a case where they
have the death penalty or consideration of the death
penalty, what types of cases come to mind that you think
would be appropriate?

A.     Um, that's a tough question.  I think things
that, you know, where people just show total wanton
disregard for life.

Q.     If it were up to you, would you reserve the
death penalty for just certain types of murder cases or
would there be other crimes that might come into

consideration?

      A.      There might be some other crimes.

      Q.      What would those be?

      A.      Things like rape, involving kidnapping or torture, things like that, particularly heinous people.

      Q.      All right.  In Texas the death penalty in the current state is just reserved for murder cases and then only a specific type.  It has to be an intentional killing without legal justification.  That is, it's not in self-defense.  It's not an accident.  And then not every murder case is a death penalty case.  We have some brutal murders that can get life in prison or 99 years, but not the death penalty.

      I can take a gun out now and get mad at Mr. Wirskye because I didn't like his tie or something he said and really, for no good reason, shoot him, execute him, and laugh about it in front of everyone and I couldn't get the death penalty for that.  I could get punished severely with life in prison, but I couldn't get the death penalty.

      In Texas the death penalty is reserved for a murder that occurs with some other aggravating facts, such as a murder that occurs during a felony, robbery.  If I walk into a 7-Eleven and rob the clerk and kill him, that could be a death penalty case in Texas.

      Burglary, someone breaks in a home,

1    murders someone in the home, or during a rape, arson, or

2    kidnapping.  Also specific types of individuals, children

3    under the age of six, if they are murdered, that can be a

4    death penalty case.  Murder of a police officer on duty,

5    fireman on duty, prison guard on duty.  Murder for hire,

6    someone does it for money, that could be a death penalty

7    situation.  Or a mass murderer or serial killer situation.

8    Those are the specific types of cases that have been

9    reserved for the death penalty.

10                   Do you agree with those types of cases in

11   general, that they should come into consideration for the

12   death penalty?

13        A.     I believe so, yes.

14        Q.     Okay.  Also in Texas the law recognizes that

15   more than one person can carry out a crime.  When we think

16   of the capital murder or the case worthy of consideration,

17   we think of an example.  We automatically think of the

18   actual triggerman or the killer.  But like any other crime,

19   several people may commit a capital murder.

20                   The law says that if you are actively

21   participating in a crime or capital murder, you can be held

22   responsible, even though others may have a greater role.

23   You may have just one triggerman, but you can have several

24   people that carry it out.

25                   An example we use is if Mr. Wirskye and I

1  agree that we want to rob a bank and we recruit someone else
2  to help us in that, to be our getaway driver.  Let's say he
3  drives us there, pulls up in front, keeps the car running.
4  He's going to warn us if any authorities come.  The plan is
5  for me to go in with the loaded gun.  Mr. Wirskye will go in
6  with a big bag.
7              I draw down on everyone.  I threaten
8  everybody and he starts gathering the money.  Now, for some
9  reason, I don't like the teller or maybe he warns me that
10 someone is going to hit an alarm and I murder someone in
11 there.  We run out and get caught.
12             Obviously, I could be prosecuted for
13 capital murder and I could receive the death penalty.  I'm
14 the triggerman.  The law says that Mr. Wirskye and the
15 getaway driver could also be prosecuted, depending on the
16 particular facts, because they were assisting and they were
17 a party.  We call it the law of parties.  Or they were an
18 accomplice to the offense.
19             People feel differently about this as far
20 as the concept of the law and the death penalty goes.  You
21 have folks that agree with the death penalty, but they would
22 only apply it in cases of the actual triggerman.  They don't
23 think it's just or fair or they don't think the death
24 penalty is appropriate for an accomplice that didn't
25 actually cause the death.

1    Other jurors tell us they do feel that it

2  applies and they would assess the death penalty, depending

3  on the facts, to the accomplice.  They think that it's an

4  appropriate sentence.

5    We like to talk to each juror.  I want to

6  kind of get your gut reaction on how you feel about the

7  prosecution of capital murder and the death penalty case on

8  an accomplice, a nontriggerman.

9    A.    I think perfectly acceptable.  I think if you

10  go into something like that, you probably go in with your

11  eyes wide open and that's one of the things that you ought

12  to be looking at.

13    Q.    So if these people have knowledge of the

14  weapons or involved actively in the crime, you feel it's

15  appropriate that the State can pursue those types of

16  charges?

17    A.    Yes.

18    Q.    And ultimately give an assessment of the death

19  penalty, depending on the particular facts?

20    A.    Yes.

21    Q.    What's important to you when an accomplice or

22  nontriggerman is prosecuted in that type of situation?

23    A.    I suppose -- I'm sorry.  Degree of involvement

24  and reaction, maybe.

25    Q.    Okay.  What do you mean by reaction?

1      A.      What they do afterwards.

2      Q.      Okay.  Kind of what their reaction to the

3  crime was, what their actions were after the crime?

4      A.      Yes.

5      Q.      Whether they stayed with these people or

6  continued to commit crimes --

7      A.      Yes.

8      Q.      -- or things of that nature?  All right.  I

9  want to be up front with you.  I put my cards on the table.

10  I can't get into the facts of the case, the specific facts.

11  Obviously, this case got a lot of publicity, but I can tell

12  you that we are prosecuting this case under that law of

13  parties, the defendant as an accomplice.  And that's why I

14  asked that question.

15              And I'm going to follow up and make sure

16  every juror is on board with that.  And I take it from your

17  answers that if you were chosen to sit on the jury and the

18  evidence did show an appropriate death penalty case in an

19  accomplice situation, that you could assess that, if that's

20  what the facts showed?

21      A.      I believe so, yes, sir.

22      Q.      Okay.  Now, the next question I want to ask

23  you, obviously people don't choose what type of case they

24  come down on.  It's kind of pot luck.  It might be a civil

25  case, might be a criminal case involving a DWI, burglary, or

1  a capital murder case.  Most jurors are a little nervous,

2  you might say, or they are kind of a little apprehensive

3  when they first learn the State is seeking the death

4  penalty.

5          And we ask how you feel at the end of

6  your questionnaire and you put what several people put.  You

7  have mixed feelings.  And then you put very mixed.  Tell us

8  a little bit what was going through your mind at that time.

9          A.      Um, I would think a lot of things go through

10 your mind.  One is, you know, what am I going to do with my

11 business?  But after you get by that one, I think you have

12 to look at it as what an awesome responsibility it is to

13 have to participate or have to participate, however you look

14 at it.  And, you know, what your responsibilities are and,

15 you know, it just triggers a lot of thinking.

16         Q.      Have you thought about that more since you

17 filled out the questionnaire?

18         A.      Yeah.

19         Q.      Okay.  In addition, when you found out you

20 were coming down --

21         A.      Yes.

22         Q.      -- on a followup interview?  What thoughts

23 have gone through your mind or come to any decisions on any

24 thoughts or mixed feelings?

25         A.      I really, you know, I just kind of think the

1    same things over again that it is -- it's quite a

2    responsibility to, you know, to be asked to listen to what's

3    going on and make, you know, an intelligent, informed, and,

4    hopefully, correct decision.

5             Q.    Okay.   The trial in a capital case is divided

6    into two parts.   There's the guilt/innocence stage in which

7    we have to prove the indictment.   If you have a reasonable

8    doubt about that, you would find the defendant not guilty.

9    If we prove that, that doesn't end the trial.   We go into

10   the punishment phase where you can get additional evidence.

11             At the close of that, you get these

12   Special Issues.   And we'll go over these in a little more

13   detail in a minute.   But basically what the State has to

14   prove in the punishment phase is that the defendant would be

15   a continuing danger to society, that if he did not actually

16   cause the death, that he anticipated that a death would

17   occur, and, finally, that there's not sufficient mitigating

18   evidence that would cause the jury to assess a life

19   sentence.

20             A yes and a yes and a no answer, that is,

21   he is a continuing danger, he did anticipate a life, and

22   there's not sufficient mitigating evidence, would equal a

23   death sentence.   The jury doesn't write death or life in,

24   but that's how the Judge would sentence the defendant, if

25   it's a yes, yes, and no.   Any other answers would equal a

1 life sentence.   The Judge would sentence the defendant to

2 life.

3     But those are the only two possible

4 outcomes, once we reach that punishment stage, and it all

5 depends on how the jury answers those questions.

6     Are you aware of the method of execution

7 in Texas?

8   A. Yes.

9   Q. By lethal injection?

10   A. Yes.

11   Q. It's in the news quite a bit.   You probably

12 know from living here the last 20 years that Texas leads the

13 nation in executions.   It's not unusual that we will lead

14 the states in executions every year.   Once in a while

15 Florida has, I believe, or Oklahoma.   But usually Texas

16 does.   And this creates controversy at times depending on if

17 it's a political year or who is getting executed.   But it is

18 a state in which this is actually carried out, as opposed to

19 some states that carry it, have it on the books, and nothing

20 ever happens.   So jurors should fully expect -- I think you

21 realize this, that the person on trial, if convicted and

22 sentenced this way, will ultimately be executed.

23     The details of executions are often given

24 out.   The procedures are the same in each case.   They will

25 be the same in this case.   On the date of execution he would

1  be given time with family, a last meal.  All these things

2  are reported in great detail.  There's people that come to

3  watch the execution from both sides, friends or family of

4  the victims, friends or family of the defendant.

5          He's always given an opportunity to give

6  a last statement where he could do anything from beg for

7  forgiveness, to be defiant, plead his innocence.  There is

8  always quotes from the victim's family or, again, from the

9  defendant's family.

10          But ultimately what happens at 6 p.m. by

11  law after that last statement, the warden signals the

12  executioner and poisons are injected and he dies a very

13  quick death.

14          And to be as frank as possible with you,

15  that's our goal in this case.  We believe we have the type

16  and quality of evidence to convince a jury of the

17  defendant's guilt and that these questions should be

18  answered yes, yes, and no, so that someday Mr. Murphy will

19  lie dead on a gurney in Huntsville, Texas.

20          We can't go into the facts, obviously,

21  and ask you for your verdict.  We can't preview the case.

22  But we can ask you this.  As best you know yourself, and you

23  have thought about it, I think, if you were selected to sit

24  on this jury and the State did prove these things to you, do

25  you feel that you could take pen in hand and answer those

1  questions in a way knowing that a human life would be taken

2  at some point down the line as I described?

3      A.      I believe I could.

4      Q.      Okay.  And I think you have given careful

5  consideration to that.

6      A.      I believe so.

7      Q.      All right.  Let's talk about these questions,

8  then, for a minute.  You don't get to them unless you have

9  found the defendant guilty.  Then you can hear additional

10 evidence.

11         This first question asks whether there's

12 a probability that the defendant would commit criminal acts

13 of violence that would constitute a continuing threat to

14 society.  It's asking the jurors to make a prediction about

15 the defendant's future behavior.

16         Do you feel you could make that

17 prediction or answer that question, if you are given

18 sufficient evidence?

19     A.      I believe so.

20     Q.      What things would be important to you in a

21 question like that about future danger?

22     A.      Um, I don't know if I exactly understand the

23 question.

24     Q.      Well, when you look at that question, you are

25 sitting there as a juror.  What kinds of things do you think

1 would be important to you or would you want to know about a

2 person that would help you answer that question?

3       A.    Well, like -- I think, obviously, you would

4 want to know what kind of acts have been committed in the

5 past.

6       Q.    Okay.

7       A.    And where he was going and what his ability

8 might be to commit them in the future.

9       Q.    Okay.  What he's done in the past is

10 admissible.  You can even hear from those witnesses, if

11 they're available, what type of punishment he received, and

12 hear good things, too, kind of a --

13       A.    I believe so.

14       Q.    -- "This Is Your Life" type of thing.

15       A.    Yeah.  I think it would be hard to answer the

16 question without all of that.

17       Q.    Okay.  You also get, obviously, the facts of

18 the case itself, the person's role in that, and the killing

19 that also you could use to look at that evidence.  We have

20 to prove to you beyond a reasonable doubt that there's a

21 probability that the defendant would commit criminal acts of

22 violence.

23       When you see the word "probability"

24 there, what does that mean to you?

25       A.    Greater than 50 percent.

1    Q.    Okay.   That's kind of what the law says.   When

2   you see "criminal acts of violence", what is that?   What do

3   those mean to you?

4    A.    Injuring other people.

5    Q.    Any type of violence to another human being?

6   That sort of thing?

7    A.    I would say that would be criminal acts of

8   violence, yes.

9    Q.    And, finally, that would constitute a

10   continuing threat to society.   What does "society" mean to

11   you in connection with that sentence?

12    A.    I think society is just all those of us who

13   are just trying to live a good life.

14    Q.    Could it mean anyone and everyone the

15   defendant may come into contact with, either in the free

16   world or in prison?

17    A.    Yeah, I believe so.

18    Q.    Okay.   When you said part of your -- you said

19   would be important in getting a person's background is what

20   they have done or been capable of doing in the past and also

21   what they may be capable of doing in the future, where they

22   may be.   What did you mean by that exactly?

23    A.    Well, I meant what kind of acts of violence

24   they have been involved in, in their life before and, you

25   know, what the ability might be to have the opportunity to

1  do it again.

2         Q.     Okay.   That's the part I want to follow up.

3  When you say the "ability", do you mean what's in their mind

4  or where they will be?

5         A.     Both of those.

6         Q.     Okay.

7         A.     Where they will be and how they are going to

8  feel about being there and what their mind leads them to.

9         Q.     Okay.   I meant to ask you this a while ago.

10  This case did get a lot of publicity, so every juror has

11  read or seen something about it.   What do you recall reading

12  about this case when it occurred or since then?

13         A.     I don't remember reading a lot of details,

14  just about the breakout and the death of the officer and

15  fleeing and finding them in Colorado.   And I really remember

16  a lot of general things about the case.

17         Q.     Did you follow any of the court proceedings

18  since the arrests?

19         A.     No, I haven't.

20         Q.     The bottom line of that is, you would have to

21  just make your decision on what you hear in the courtroom

22  and not anything that you have read or seen on TV.

23         A.     Yes.

24         Q.     You can do that?   All right.   Special Issue

25  No. 2, both of these Special Issues start out with a no

1    answer and the State has to prove to you that they should be

2    answered yes.  The fact that you found him guilty doesn't

3    mean you answer those yes.  You have to go back, weigh the

4    evidence, and then make your decision.  Could you follow the

5    law in that regard?

6         A.    I believe so, yes.

7         Q.    Okay.  Take a moment and read Special Issue

8    No. 2 to yourself and I'm going to ask you a couple of

9    questions about it.

10        A.    (Prospective juror complies.)  Okay.

11        Q.    That's the question that involves the law of

12   parties.  First part of the question asks if he actually

13   caused the death.  That would be simple, if you believe that

14   were the facts.

15             The second part is what we get into on

16   the accomplice or the law of parties.  If he didn't actually

17   cause the death of the deceased, but intended to kill the

18   deceased or another, or anticipated that a human life would

19   be taken.

20             Again, the law is that if he's not the

21   triggerman, we must -- the facts must show that he

22   anticipated that a life would be taken or he intended that a

23   life would be taken.  Oftentimes what we have to do as the

24   State is produce the evidence that we have available, and

25   often the jurors have to draw inferences from a person's

intent. In other words, we can't open up a person's mind and say, here is what his intent was. But you can make reasonable deductions by the very actions, how the crime was carried out, how it was planned, what happened before the crime, and what happened after the crime. And these are the types of things that we can argue and jurors can look at to determine if someone actually anticipated that a human life would be taken.

An example that we talk about with the bank robbery is, I guess, knowledge of weapons and that sort of thing. Are you comfortable -- do you feel that you can answer that question yes if the State proves it to you by the facts of the case itself and then anything you may have learned in the person's background that might help you?

A. Yes, I believe so.

Q. Again, the same things that you talked about earlier when we talked about this concept, generally, would those be important to you about the person's participation and that sort of thing?

A. Yes.

Q. Okay. If you answer that question yes, you then proceed to that last question. That question runs on a little bit. Just take a moment to read that to yourself and I'll ask you a couple of questions on that.

A. [Prospective juror complies.]

1      Q.      This question is the mitigation question and

2   neither side has the burden of proof.  It's the last

3   question that you get.  You don't get to it unless you have

4   found the defendant guilty, unless you already believe he's

5   a continuing danger to society, and you believe that he

6   anticipated that a human life would be taken.

7               But it allows the jurors kind of a safety

8   net.  It allows you to review everything you have heard from

9   his role in the crime to his background and decide is there

10  sufficient mitigating evidence where you think a life

11  sentence should be imposed rather than a death sentence.

12  They don't get off scot-free, obviously.  He has to serve a

13  life sentence.  But it allows the jury to show a bit of

14  mercy, depending on the particular facts.

15              We can't tell you what mitigating

16  evidence will be.  It will be up to you and the other

17  jurors.  You are just required by the Court to keep an open

18  mind to it and if you think something is sufficiently

19  mitigating, you could answer the question that way.  If you

20  don't see sufficient mitigating evidence, you can answer it

21  no.

22              Do you think that's a fair question to

23  have in this type of case?

24      A.      I believe so.

25      Q.      As you sit there today, does anything come to

1    mind which you might view as potentially mitigating

2    evidence?

3         A.      Nothing comes to mind immediately, but I still

4    think it's a fair question.

5         Q.      Okay.  Most people usually don't think of

6    anything when I ask them that and we don't anticipate you

7    have been thinking about these issues, at least I hope you

8    haven't.

9              But we talk to a lot of jurors and we go

10   over different things.  You don't have to agree.  You don't

11   have to be able to tell us what mitigating would be to you.

12   You don't have to agree with the other jurors.  What is

13   mitigating to one juror, may not be mitigating to another.

14              You may hear a case where some guy has

15   four or five PhDs from Harvard and one juror may think it's

16   mitigating because he did something beneficial.  And another

17   juror might say that's aggravating.  Someone that smart with

18   those kind of opportunities shouldn't commit these murders.

19              We have jurors talking to us, sometimes

20   in these cases you may hear about how a person grew up.  We

21   ask about that in the questionnaire.  Some people come from

22   bad backgrounds.  Maybe they were abused physically, maybe

23   mentally.  Maybe they came from a broken home.  Some jurors

24   tell us if it's severe, it might be mitigating.  Others tell

25   us, I feel bad for them, sympathize, but lots of folks grew

1  up in those situations.  Once you become an adult, you have

2  to be held accountable.  You can't use that as an excuse.

3  But it could be anything along those lines.

4          Does that strike you one way or the other

5  when we generally talk about the way the person was raised,

6  bad background, that sort of thing?

7      A.      Um, I think there are too many really fine

8  people who have come from horrible, horrible upbringings to

9  make that a really serious issue for my consideration.  I

10  know a lot of people, you know, are taken -- not taken in --

11  but taken over by that.  But it's -- I'm not, you know, too

12  many good people.

13      Q.      What happens a lot of times in this type of

14  question or actually in any of these Special Issues is you

15  sometimes hear from experts, psychologists, or psychiatrists

16  that come in and they may give an opinion on mitigation, why

17  a person acts the way they do, or at least their opinion as

18  to why they do, or maybe on Special Issue No. 2 or the

19  future dangerousness issue.  The defense calls those

20  experts.  Sometimes the State does.  You may hear from both

21  sides.

22          But people feel differently about those

23  types of experts.  Some people put a whole lot of stock in

24  what a psychologist or psychiatrist says.  They really

25  respect them.  Other jurors more or less close the door.

1   They call those the soft sciences and really don't have much

2   respect for that.  They look at it as voodoo, almost.  And

3   then we have other jurors that say that's another piece to

4   the puzzle.  I will look at it.  I'm not going to give it

5   any particular weight.  It's not any more important than any

6   other piece of evidence, but I'll be happy to look it at.

7            Do you have any opinions on those types

8   of experts?

9        A.    Um, I think you can probably find an expert to

10  support whatever opinion you want to put forth.  That

11  doesn't mean they are not worth anything, but I think you

12  have to listen to them and see where they overlap and where

13  they diverge and kind of look at that.

14       Q.    Like you would any other witness, I guess?

15       A.    I suppose so.  That's correct.

16       Q.    The point of this question, I guess, is on

17  this Special Issue 3, is keeping your mind open to it.  If

18  there is that sufficient mitigating evidence and you

19  recognize it and you feel that it's sufficient where you

20  would say a life sentence should be imposed, you can answer

21  it that way.  If you don't, you can answer it no.

22            Do you feel that you could keep your mind

23  open to that Special Issue No. 3 and consider that type of

24  evidence and then answer the question according to how the

25  evidence comes out?

A.      I believe I could, yes.

Q.      Even though you found him guilty and you think he's a continuing danger and anticipated a death would occur, facts might show you, whatever they may be, and you don't have to tell us what they are, that a life sentence may be the just penalty rather than a death sentence, you could answer it that way?

A.      Well, I don't believe it would be easy, but putting a continuing threat opposite mitigating circumstances is kind of an interesting question.

Q.      Yeah.  And a lot of people tell us that.  Like on one hand I've already found he's dangerous and on the other hand it might be mitigating.  And it's kind of interesting how this question first came around.

There was a case called Pennery, which has been tried several times, where the defense alleged that he had some mental retardation.  It wasn't his fault.  He was born that way.  In fact, they believed the mental retardation made him more dangerous, so that jurors could actually use his background, which wasn't his fault, his mental defect, to answer question No. 1 yes.  But there was no mechanism to show any type of mercy to counteract that. And this is the question they came up with along those lines.

A.      I suppose in that case it's a good question.

Q.     And that's the point.  There might be some facts that you can't articulate now and might not know about and then come up with them.  I had one juror in East Texas, I thought, that came up with the best metaphor for these questions.  He said it's like a window and once you found him guilty, it starts closing.  And he says question No. 1, it gets closer; 2 closer; and he said, now, if I've asked that many questions, the window is open about that much, but it's still open.  Some jurors may have it open that much and some that much, but as long as the window is open, you will consider it is the point of law.  You don't know what the facts will be at this point in time.  You just have to tell the Court, I will keep my mind open to it and make my judgment once I hear everything and I'll decide back in the jury room.  Do you feel that you can do that?

A.     I think it's part of the responsibility that we talked about.

Q.     Let me talk to you about a few rules that apply to every criminal case and I think that you will be pretty familiar with these because you grew up with these.

The presumption of innocence.  Every person charged with a crime is presumed to be innocent at the beginning of that trial and the State has to overcome that presumption.  The fact that he's been arrested, tried, or there has been publicity on the case is no evidence of

129

his guilt.   The evidence must come here in the open

courtroom.   And you have to start that defendant out with

that presumption and require us to prove to you beyond a

reasonable doubt that he's guilty.   Could you follow that

rule of law?

A.      Yes, sir.

Q.      Okay.   The burden of proof is on this table.

It never shifts to the defense.   They don't have a burden of

proof.   They are not required to prove to you that he's

innocent or these questions should be answered in any way.

I think common sense will tell you, you would anticipate

that they will try to do that and ask questions and make

arguments, but they don't have to.   The burden of proof

never leaves this table.

And if they don't do a thing, don't ask a

question -- I don't anticipate this will happen.   They could

work crossword puzzles, if they wanted to.   But if you had a

reasonable doubt after we rested our case, you would be

obligated to find the defendant not guilty, because we

didn't prove the case.   You can't turn around and require

them to prove his innocence to you, because that burden of

proof never leaves this table.   Could you follow that part

of the law?

A.      Yes, sir.

Q.      That burden of proof goes to every portion of

the indictment, every element of the indictment.  If you
have a reasonable doubt on any portion of the indictment,
you are obligated to find him not guilty.  One example would
be the identity.  If we didn't prove in your mind who
committed this crime, obviously you are going to find him
not guilty.  That's an easy example.

But that law also goes to other portions
of the indictment, such as the county where it occurred.
Let's say maybe a crime occurred near the borderline and you
feel the evidence showed it actually happened in Tarrant
County, rather than Dallas County.  It may be a technicality
to you, but under the law it's just as big a part of the
case as the identity of the defendant.  And if you had a
reasonable doubt, you would have to find the defendant not
guilty.

Again, I don't anticipate that would
happen.  I just kind of use that as an example out there to
demonstrate the law.  If it did happen and we did that poor
of a job in preparation, you could go upstairs, I'm sure,
and have us terminated.  But you can't help us out.  You
can't give us an upper hand or give us a hand on one of the
elements.  Reasonable doubt on anything is a not guilty.
Could you follow that rule of law?

A.      Yes, sir.

Q.      The Fifth Amendment applies in every criminal

case.  The criminal -- in a criminal case, if a defendant
wants to testify, he can, and you judge him like any other
witness.  If he chooses not to testify, though, the Court
would instruct you that you can't hold that against him.
There could be numerous reasons why someone may not want to
testify.  They could be guilty and they look very guilty.
They may not be guilty, but they may be low educated.  They
may have a speech impediment.  They may act very nervous in
front of a jury, and might look guilty when they're not.
They may simply be following the advice of their lawyer that
tells them not to.

        You can't penalize a person if they
choose not to testify in their own case.  The Court would
just tell you, you have to judge the case based on what you
did hear.  Could you follow that rule of law?

        A.    Yes, sir.

        Q.    You often hear from police officers.  They are
like any other witness.  You may have a lot of respect for
them, but you can't start them out ahead of any other
witnesses.  You have to wait and judge them on the witness
stand like you would any other witness.  Do you feel that
you can do that?

        A.    Yes, sir.

        Q.    You often hear about parole laws.  Gets a lot
of publicity, sometimes.  The Court will instruct you in a

capital case that a life sentence means forty calendar years

have to be served day for day before they become eligible

for parole.  And he would also instruct you that you can't

consider the parole laws in any way, that you just have to

consider a life sentence, a life sentence.  Do you feel that

you can do that?

A.      Yes, sir.

Q.      Sometimes in a capital murder case you may

find the defendant guilty of what we call a lesser included

offense.  For instance, if we allege murder during the

course of a robbery, you may have a reasonable doubt about

the murder or whether he committed the murder, but you may

believe the evidence showed he committed aggravated robbery.

That would change the penalty range.  You wouldn't have

these questions.  You would simply have a term of years

you'd have to decide from 99 years or life, all the way down

to five years in prison or anywhere in between.

Again, you could assess the penalty just

based on the facts of that particular case.  You have to

keep your mind open to that full range and then just make

the proper assessment.  Life, if you think it's a life case,

or five years in prison, if you think it's a five-year case,

or anywhere in between.

Can you keep your mind open to that full

range of punishment and give a full consideration to both

1    ends of the penalty range?

2          A.    Yes.

3          Q.    Okay.

4                MR. SHOOK:  Can I have one moment, Judge?

5                THE COURT:  Yes.

6          Q.    (By Mr. Shook)  Mr. Nelson, I think we've gone

7    over lots of stuff pretty quickly, but I think that I have

8    covered everything I wanted to.  Do you have any questions

9    over anything we've gone over?

10         A.    I don't believe so.

11         Q.    I appreciate your time and attention.

12               MR. SHOOK:  And that's all the questions

13   the State has, Judge.

14               THE COURT:  Mr. Sanchez, do you have any

15   questions?

16               MR. SANCHEZ:  Yes.

17                    CROSS-EXAMINATION

18   BY MR. SANCHEZ:

19         Q.    Good afternoon.  Do you need any water?

20   You've been talking up there for a while, so you need

21   something to drink?

22         A.    Yes, please.

23         Q.    My mouth gets a little dry after talking for a

24   while, especially when you're sitting in the hot seat.  Is

25   that better?

1    A.    Much better, thank you.

2    Q.    You say you grew up in Chicago.  Are you a

3  baseball fan?

4    A.    Cubs fan, was.

5    Q.    You were?

6    A.    Yeah, I don't follow baseball much anymore.

7    Q.    You don't like the White Sox?

8    A.    No.  They're in a different part of town.

9    Q.    They are both doing quite well this season.

10  So you never know, could be a Chicago World Series, who

11  knows.  I just want to follow up on some of your answers and

12  talk to you a little bit about your feelings on certain

13  aspects of the law.

14         A lot of times we just ask you -- we tell

15  you this is the law, can you follow it, and I don't think

16  nobody likes to say they wouldn't.  But I like to ask people

17  what really, in their own minds, they would be thinking

18  about, things that would affect your decisionmaking.

19         Just to follow up on the questions about

20  this case that you were arrested on when you were younger.

21  Did you say you went to trial yourself or --

22    A.    This was west Des Moines, Iowa, and one guy

23  was with us, his father was a good friend of the Judge.  He

24  and one other guy never went to court.  Several of us

25  actually had to go to court and we couldn't make the Judge

1    understand what an open house was, either, and basically he

2    said get out and I don't ever want to see you in my court

3    again or I'll throw you in jail for 60 days.

4        Q.    So you didn't have to go out and hire an

5    attorney?  You just represented yourself?

6        A.    No, it was west Des Moines, Iowa, in 1966.

7        Q.    So you were not on any kind of long probation

8    or anything like that?

9        A.    No.

10        Q.    I just wanted to make that clear.  On your

11    questionnaire, also, do you have it in front of you or did

12    you get a copy of that?

13        A.    Yes.

14        Q.    If you will look on page 4, it's been a while

15    since you filled this out.  But if you look on page 4 near

16    the bottom you wrote -- one of the questions was, what would

17    be important to you in deciding whether a person received a

18    death or life sentence in a capital murder case and you

19    wrote no.

20        A.    I looked at that and I couldn't understand it

21    when I reread it.  And I think what I did was when I

22    answered the question, I left off the word "what."

23        Q.    I'm sorry?

24        A.    I left off the word "what".  So you read that

25    without the word "what", would it be important to you?

1   That's the only reason I could think of to answer it that

2   way.

3          Q.    What would be your answer, now that you have

4   read the sentence correctly?

5          A.    I think a lot of the things that we talked

6   about, about what went into the -- what went into the crime,

7   what went into the action, what the response was, what the

8   participation was.

9          Q.    And the reason I asked is because we get -- we

10  talk to a lot of people.  We're going to talk to a lot of

11  people and we've already talked to quite a few.  There's

12  people that come up here and tell us, you know, as far as

13  I'm concerned, you know, if I find somebody guilty of a

14  capital murder, then in my mind, in my own mind, that's a

15  death penalty.  I'm not going to really look at these issues

16  too carefully.  In my mind I've already made up my mind that

17  that person deserves to be put to death and you are going to

18  have to prove to me somehow why that person shouldn't be put

19  to death.

20              Of course, we have people that say the

21  opposite.  Where do you fall in regards to that?

22         A.    I'm kind of a -- kind of a prove it to me

23  person.  I think everybody has preconceived ideas as to what

24  ought to happen, but at some point you have to ask yourself,

25  you know, can I prove it to myself that I'm right or can you

1   prove it to me that I'm right or can you prove it to me that

2   I'm wrong. And I think, you know, that's where the

3   responsibility comes in. And in taking, you know, taking

4   your feelings and then believing that they're right because

5   of something other than just, you know, what's in your heart

6   or something like that.

7           Q.      Okay. Then from your answer are you telling

8   me that basically you, once the State has proven to you

9   beyond a reasonable doubt that someone is guilty of capital

10  murder, you would still require them to prove to you the

11  other issues they have to prove to you or in your mind --

12          A.      I think so.

13          Q.      Okay. Now, I also want to take you -- a lot

14  of times we get stuck talking about the punishment phase

15  right off the bat. I want to bring you back all the way to

16  the beginning of the trial. As we sit here right now, it's

17  an allegation.

18              And you have also indicated that you did

19  hear some things and you said that you didn't hear a lot of

20  facts about the case. But based on what you did hear, did

21  you form any opinion as to whether Mr. Murphy is already

22  guilty of what they're charging him with?

23          A.      No. To be honest with you, I don't remember a

24  lot of names. I don't remember Mr. Murphy's name from what

25  I heard and/or read. I just kind of read generalities about

1    what was going on.

2         Q.    And those generalities kind of match what the

3    allegations are?

4         A.    Pretty much, yeah.

5         Q.    Also, I know you have looked at it before you

6    walked in here today, was the actual allegation of -- the

7    indictment --

8         A.    Yes.

9         Q.    -- that you looked at.  And, as you know, the

10   indictment is no evidence of guilt.  Okay?  The indictment

11   is just the charging instrument or something that gives us

12   notice and Mr. Murphy notice as to what he's charged with

13   and the way they are charging him.  Does that make sense to

14   you?

15        A.    Yes.

16        Q.    Okay.  Because we get people in here sometimes

17   that say, you know, the fact that he's been charged,

18   arrested, accused, and the Grand Jury has decided to indict

19   him on this, then in my mind that already shows me that he's

20   guilty of something.  Where there's smoke, there's fire.

21   How do you feel about that?

22        A.    Well, I recently asked somebody what the Grand

23   Jury was all about and it kind of opened my eyes to the fact

24   that --

25        Q.    What did you think?

139

1     A.     Pardon?

2     Q.     What did you think?

3     A.     I was surprised.

4     Q.     What were you surprised at?

5     A.     I was surprised that you can make all kinds of

6 allegations that have no support at all to get an

7 indictment.  But that doesn't mean that -- some of those

8 things you can't hope to say in court, but, you know, it's

9 just part of the system, I guess.

10    Q.     And that's what the law would be.  The Judge

11 would instruct anybody that sits on the jury that somebody

12 who has been arrested, charged, or even indicted is no

13 evidence of guilt and you wouldn't be able to use that

14 against the person, the fact that they've been indicted.

15 Because all the Grand Jury does is decide whether there's

16 enough evidence to proceed with the case.

17    A.     Uh-huh.

18    Q.     If there's probable cause to proceed and not

19 whether they are guilty or not.

20    A.     Yes.

21    Q.     You agree with that?

22    A.     Yes.

23    Q.     And part of the indictment, as Mr. Shook

24 explained to you, is the elements or everything they have to

25 prove in their case beyond a reasonable doubt in order to

find somebody guilty of this charge.  But not only do they

have to prove every element exactly as it's in here, but

they have to prove it exactly as they have written it up.

He used the example of, you know, if we

alleged it happened in Dallas County and it actually

happened in Tarrant County, you have to find him not guilty.

And I think that's an easy one for people to agree with.

But they also have to prove the manner in which it happened,

in which -- they have to prove the manner in which they say

this happened that they give us notice of in their

indictment.

In other words, here they are alleging

that the complainant was shot.  But if you are sitting there

during trial and it's proven to you beyond a reasonable

doubt that the person was stabbed to death, not shot, you

would have to find that person not guilty.  You understand

that?

A.      Yes.

Q.      Okay.  I mean, some people say to me, well,

you have proven capital murder either way, but I can just

let -- that's why I would find him guilty, anyway.  I would

give the State what they're asking for, anyway.  How do you

feel about that?

A.      I think it would be wrong.

Q.      You would find him not guilty at that point?

1    A.    I think you would have to.

2    Q.    And you wouldn't have any problem with that?

3    A.    Not really.

4    Q.    We get some people in here that say, look, I

5  have a real big problem with that, and I would find him

6  guilty anyway.  So that's why I have to ask these questions

7  to be sure.

8    A.    Okay.

9    Q.    Getting to the Special Issues, jumping ahead

10  now.  As Mr. Shook has told you, the first part of the trial

11  is just whether you find him guilty or not of capital

12  murder.  Okay?  And at that point, if you do find him guilty

13  of capital murder, then the only sentence right there is

14  automatic life.  Okay?  He's sitting on a life sentence,

15  unless they can prove those issues to you and yes, yes, and

16  no, would be the answers.

17         And those issues have to be answered

18  independently of one another.  Okay?  In other words, some

19  people think if I find him guilty of capital murder, then

20  Special Issue No. 1 in my mind has automatically been

21  answered.  Okay?  I'm automatically going to believe that

22  person is a continuing threat to society.  How do you feel

23  about that?

24    A.    Um, well, I don't think one follows the other.

25  I mean, I don't think it's a given.  But I --

Q.    Would you be leaning that way already?

A.    Would I be --

Q.    You have to take into consideration --

A.    I didn't hear the words used.  Would I be leaning?

Q.    Would you already be leaning toward answering that in the affirmative just based on the fact that you found him guilty of capital murder or would you be able to stop yourself and answer that independently?

A.    To be perfectly honest with you, I might be leaning toward that if he were already found guilty, but I also think that I would have to stop myself.  That's the -- that's the weight of the whole thing.

Q.    And in Special Issue No. 2, of course -- really what I'm getting at, a lot of people say, if I have already found him guilty of capital murder, then these answers are going to be real easy to me.  In other words, I'm going to find he's a continuing threat and I'm going to find that he anticipated that a human life would be taken.

So in Special Issue No. 2 -- I don't know if Mr. Shook covered this or not, but in the first part of trial if you found somebody guilty of the parties, as it was explained to you, they have to prove beyond a reasonable doubt that that person should have anticipated that a human life would be taken.  And that makes sense to you, right?

1      A.      Could you --

2      Q.      When the State is prosecuting somebody under

3   the law of parties and you're an accomplice --

4      A.      Uh-huh.

5      Q.      -- all they have to prove to you at that

6   portion of the trial is that the person that's on trial, the

7   defendant, should have anticipated that another life would

8   be taken in the course of his participation.  Okay?  But on

9   -- when you get to the punishment stage in Special Issue No.

10  2, they have to prove to you that that person actually

11  anticipated that a human life would be taken.

12              You see the difference?  Should have

13  known or should have anticipated versus actually

14  anticipated?

15     A.      Yes, I understand the difference.

16     Q.      And that's a higher burden?

17     A.      I believe so.

18     Q.      Some people say, well, if you should have

19  known, that's good enough for me.  How do you feel about

20  that?

21     A.      I really don't think that should have known

22  and anticipated -- you know, anticipated is kind of a gray

23  word.  No, I don't think they are the same, but I think they

24  are close.  And, you know, that's why you have to give it

25  some thought.

1    Q.    Okay.  Would you hold them to proving to you

2  that he actually anticipated that a human life would be

3  taken or would should have anticipated be enough for you?

4          A.    No.  If it says anticipated, then I think

5  that's what I would have to ask of them.

6          Q.    And anticipation is not really what I'm keying

7  in on.  What I'm really trying to ask is would you make them

8  prove to you that not only he should have known or he should

9  have anticipated that a human life would be taken and make

10  them prove to you that he actually anticipated a human life

11  would be taken.  See the difference?

12          A.    Uh-huh.  I think if I were going to answer the

13  question, that he would have to prove that.

14          Q.    Okay.  And, of course, in asking that

15  question, like I said, you can't get into somebody's mind

16  all the time.  And there are some people that would say,

17  well, in order for me to answer that question, I may need to

18  hear from Mr. Murphy himself.  What do you think about that?

19          A.    Um, I don't know that I would have to hear

20  from him.

21          Q.    Would you like to hear from him?

22          A.    Sure.

23          Q.    And if you didn't hear from him, would that

24  somehow --

25          A.    No.

Q.     -- tend to make you think something?

A.     No.

Q.     Okay.  How about in Special Issue No. 3?  At this point you have found him guilty of capital murder, found he was a continuing threat to society, and he actually anticipated that a human life would be taken.  You have already answered those questions in the affirmative and you are at Special Issue No. 3, basically the last step before someone receives the death penalty.

          At that point would you have to or would you like to hear from Mr. Murphy himself and to explain to you his life or reasons why his life should be spared?

A.     Yes.  I mean -- I think it would add something, but I don't think that it's necessary.

Q.     If at that point you have already made those decisions, you don't hear from Mr. Murphy, would that somehow lead you to believe that somehow he may not care if his life is spared or he's hiding something?

A.     No.

Q.     Would you in any way allude to it in your decisionmaking?

A.     No.

Q.     Because that's what the law would be, then. People have the Fifth Amendment right --

A.     Yes.

1     Q.     -- not only in the first, first part of the

2  trial, but also throughout the trial in the punishment

3  stage.  And -- but there are some people who say, once I've

4  got to the punishment stage, I expect somebody to say

5  something.  We're here deciding his life or death and I want

6  him to speak up.  And if he didn't, well, I may count that

7  against him somehow.

8     A.     I don't believe I would.

9     Q.     Okay.  And when you say you don't believe you

10 would, of course, that leaves a possibility that you would.

11 So I'm not trying to --

12    A.     I don't have the question before me.

13    Q.     But -- but if you did have the question before

14 you, is there a possibility?

15    A.     I believe I wouldn't, so I don't have the

16 question before me so -- you are asking me to answer a

17 question about a question without -- without all of the rest

18 of the information.  And I think that's part of the

19 responsibility is to, even though there's every part, you

20 know, it all goes into one big --

21    Q.     I understand it's hard to give an answer right

22 now, because I can't preview the case for you.  I can't tell

23 you what's going to happen.  But as somebody representing

24 Mr. Murphy, we have to ask these questions.

25    A.     I understand.

Q.   We have to find out if it's a possibility that somebody could allude to it or hold it against him somehow, even though the law would be that they are not to do that.

A.   I would think that's part of the job is what the law says.  Then that's -- at that point it's not so important what I believe.

Q.   I'm almost done.  I will give you that preview.  Again, Special Issue No. 3, are you really going to be able to consider at that point any kind of mitigating evidence based on the fact you have already found him guilty of capital murder and you have answered the first two questions yes?  Can you tell this Court, can you tell us, that at that point you would really be able to consider any type of mitigation or would your mind be closed to it?

A.   No.  I don't think my mind would be closed to it.  But, you know, since I have no idea of what it might be, it's hard for me to tell you that it, you know, would influence me.  But I truly believe that I could look at the question with an open mind, with my open mind.

MR. SANCHEZ:  That's all the questions I have, Your Honor.

THE COURT:  Thank you, sir.  If you would, take a short break and wait for us outside and we'll have you back in a few minutes.

[Prospective juror out]

1    THE COURT:  What says the State?

2    MR. SHOOK:  No challenge for cause.

3    THE COURT:  What says the defense?

4    MR. SANCHEZ:  No challenge for cause.

5    MR. SHOOK:  We'll accept the juror.

6    MR. SANCHEZ:  We will use our strike.

7    THE COURT:  Use your strike.

8            [Prospective juror in]

9    THE COURT:  Mr. Nelson, thank you for

10   your service here today and your very thoughtful answers.

11   This case is not for you on this particular go round, so you

12   have been excused from this particular case.  We hope to see

13   you back down here again sometime.  We appreciate very

14   thoughtful people and thoughtful answers.  It's just that

15   this case is not yours.  Thank you very much.

16            [End of Volume]

17

18

19

20

21

22

23

24

25

STATE OF TEXAS          *

COUNTY OF DALLAS        *

I, NANCY BREWER, Official Court Reporter for the 283rd

Judicial District Court, do hereby certify that the above

and foregoing constitutes a true and correct transcription

of all portions of evidence and other proceedings requested

in writing by counsel for the parties to be included in this

volume of the Reporter's Record, in the above-styled and

numbered cause, all of which occurred in open court or in

chambers and were reported by me.

WITNESS MY OFFICIAL HAND on this the 4 day of

_____ March _____ , 2004.

NANCY BREWER, CSR, NO. 5759
Expiration Date:  12-31-04
Official Reporter, 283rd JDC
Frank Crowley Crts. Bldg. LB33
133 No. Industrial Blvd.
Dallas, TX 75207
(214)653-5863

**74851**

REPORTER'S RECORD

VOLUME 14 OF *61* VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

MAR   9 2004

Troy C. Bennett, Jr. Clerk

On the 10th day of September, 2003, the following
proceedings came on to be heard in the above-entitled and
numbered cause before the Honorable Vickers L. Cunningham,
Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

1                    A P P E A R A N C E S

2    APPEARING FOR THE STATE

3    Mr. Toby Shook
     SBOT NO. 18293250
4    And
     Mr. Bill Wirskye
5    SBOT NO. 00788696
     Assistant District Attorneys
6    133 No. Industrial Blvd.
     Dallas, Texas 75207
7    Phone:  214/653-3600

8
     APPEARING FOR THE DEFENDANT
9
     Ms. Brook Busbee
10   Attorney at Law
     SBOT: 03488000
11   703 McKinney Ave. Ste. 312
     Dallas, TX 75202
12   214/754-9090

13   Mr. Juan Sanchez
     Attorney at Law
14   SBOT: 00791599
     5630 Yale Blvd.
15   Dallas, TX 75206
     214/365-0700

16

17

18

19

20
21

22

23

24

25

PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Lisa Crawford | 4 | 6 | 35 | 14 |
| Don Jones | 48 | 49 | 75 | 14 |
| Roy Davis | 95 | 96 | | 14 |
| David Evans | 104 | 106 | 134 | 14 |
| Nancy Carney | 155 | 157 | 193 | 14 |

```
1                    P R O C E E D I N G S
2              THE COURT:  Ms. Crawford.
3                    [Prospective juror in]
4              THE COURT:  Good morning, how are you?
5         PROSPECTIVE JUROR:  Fine.
6              THE COURT:  Your name is Lisa Ann
7    Crawford?  You were actually second to be interviewed this
8    morning, but since you were here early, you get to go first.
9    How is that?
10             PROSPECTIVE JUROR:  Very well.
11             THE COURT:  Did you have enough time to
12   review the orientation guide I provided to you?
13             PROSPECTIVE JUROR:  All but about two
14   pages, yes.
15             THE COURT:  All but two pages.  Was that
16   the last two?
17             PROSPECTIVE JUROR:  Yes.
18             THE COURT:  The last one has my name on
19   it and the attorneys' names, Mr. Toby Shook and Bill Wirskye
20   are the two prosecutors in this case.  They work for the
21   Elected District Attorney Bill Hill.  Ms. Brook Busbee and
22   Juan Sanchez are the attorneys representing the defendant,
23   Mr. Murphy.  The back page is the indictment in this case
24   and you might want to look at that real quickly.  I'll let
25   you read that.
```

PROSPECTIVE JUROR:  (Prospective juror complies.)  Yes.

THE COURT:  And then also I provided you a copy of your questionnaire that you filled out for us last May.  It's still warm.  It just came out of the printer.  I maintain these as a digital file.  That way I can control security over your information.

This morning's opportunity is an opportunity for the lawyers to go over the law with you.  I know your first reading through that, you probably thought, all these laws, how do they interrelate?  You don't have to understand them all right now.  That's what this opportunity is for.  They are going to explain the law to you, give you examples.  At the end of the process, my job is to make sure, number one, that you understand the law.  And we'll talk as long as we need to, to get you to that point.  And the second is, if you understand the law, can you follow the law?  Those are the two main questions I have to answer this morning.

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  The only question that I have for you at this time is can you serve this Court beginning November 10th for the two weeks that we talked about?

PROSPECTIVE JUROR:  To my knowledge, yes, sir.

THE COURT:  Very well.  They are going to

be asking you questions about some of the issues covered in

the questionnaire.  That's why I provided it for you, in

case they want you to look back at your answers.  Who will

inquire for the State?  Mr. Wirskye?

MR. WIRSKYE:  May it please the Court.

LISA CRAWFORD,

having been duly sworn, was examined and testified as

follows:

DIRECT EXAMINATION

BY MR. WIRSKYE:

Q.     How are you this morning, Ms. Crawford?

A.     Very well, thank you.

Q.     Bear with me.  I haven't had enough caffeine

yet this morning, so I may be a little slow.  So I'll be the

assistant DA that will be talking to you for the next few

minutes.  What I will do is visit about some of the

information that you were kind enough to give us on the

extended questionnaire, talk to you a little bit about your

thoughts and feelings about the death penalty, and then

maybe talk a little bit about the law and some of the rules

that apply in a case like this where the State is seeking

the death penalty.  If you have any questions, just let me

know.

Because this is a case where we're

1   seeking the death penalty, the law requires us to talk to

2   jurors individually.  So the best way we know to do that is

3   put you up on the witness stand and I know it's kind of

4   unnatural and a bit intimidating.  You may feel like you are

5   on trial, but you are really not.  No right or wrong

6   answers.  Each side is just curious about what you think and

7   we really just want your honest thoughts and opinions.

8            You told us that you are generally in

9   favor of the death penalty; is that right?

10           A.    Yes, sir.

11           Q.    Okay.  Why do you think we should have a death

12   penalty as an option in our state?

13           A.    The first thought that comes to mind would be

14   to cut down on money.

15           Q.    That's fine.  We hear that a lot.

16           A.    Actually, to me, people -- I have to give

17   everybody the opportunity to be able to change.

18           Q.    Okay.

19           A.    To perform better than before.  If they are

20   given that opportunity and they do not show success, then I

21   believe in certain circumstances that it should be so.

22           Q.    I notice reading your questionnaire you talk

23   about it would be a case-by-case determination?

24           A.    Yes.

25           Q.    When you think of an appropriate-type case for

1   the death penalty, what comes to mind?

2       A.    Wow --

3       Q.    Are there any particular set of facts or maybe

4   even a case you heard or read about, a high profile case in

5   the media?

6       A.    Nothing sticks out, no, sir.  I -- to be

7   honest, I haven't -- like I said, everything is a case by

8   case.  I would have to know all of the details that I

9   possibly could to determine that.

10      Q.    Okay.

11      A.    Um, I guess if someone walked up to another

12  and in their mind this is exactly what I'm going to do

13  unconditionally, no matter what the circumstances are, no

14  matter what the repercussions are, I guess you could say,

15  that would be an unconditionally, that's what he was going

16  to do, set out to do to the person.

17      Q.    Premeditated?

18      A.    Exactly.

19      Q.    As you may know from briefly looking at that

20  packet of law that the Judge gave you, in Texas the death

21  penalty is only available as an option for murder cases and

22  then only certain types of murder cases.  Kind of following

23  up on your example, we've been in court, I guess, for two

24  weeks doing this now, and I've been sitting next to this guy

25  and he did something to annoy me yesterday.

1          So I went home last night and thought

2    about it, premeditated it, and said, you know, when I show

3    up in court tomorrow in front of all these bailiffs and the

4    Judge and attorneys, I'm going to shoot him ten times in the

5    head.  And I come in and do that, shoot him ten times in the

6    head and kind of laugh about it after I do it.  And, of

7    course, the bailiffs rush in and arrest me.  That's kind of

8    what you described.

9          A.     Yes, sir.

10         Q.     That wouldn't be a death penalty in Texas,

11   even though it was premeditated, even though it was brutal,

12   for no reason, that type thing.

13              In Texas you have to -- kind of one way

14   to think of it is you have to have a murder plus something

15   else.  If you murder a police officer on duty, a fireman on

16   duty, a prison guard, a child under six, or a mass murderer,

17   serial murderers, that type of thing.  Or if you murder

18   someone, an intentional murder in the course of another

19   crime, another felony, like a robbery or burglary or sexual

20   assault, rape, that type of thing.

21              So we actually just reserve the death

22   penalty for a very limited type of murder case in Texas.

23   What do you think about that, kind of the scheme we have

24   here in Texas?

25         A.     I think that you are saying it's conditioned,

1  as far as that goes, it's conditioned on the particular

2  occupation or age or, I mean, am I understanding that?

3          Q.    It's got to be a murder plus some other

4  element, some other element that elevates that particular

5  case to a capital murder case.  And there could be some very

6  violent people who -- say I've been to the penitentiary

7  three times and I commit that murder.  The worst that could

8  happen to me is a life sentence, you know.

9          A.    Okay.

10         Q.    Does that sound fair to you?

11         A.    Yes.

12         Q.    Okay.  We ask people on the questionnaire, I

13  guess, to kind of rank themselves on a scale of 1 to 10, 1

14  being the least and 10 being the most, kind of how strongly

15  they feel about the use of the death penalty and you were

16  kind of right in the middle.

17         A.    Right.

18         Q.    And you gave yourself a 5.

19         A.    Right.

20         Q.    I was wondering what that means to you,

21  because different numbers mean different things to different

22  people.  But when you gave yourself a 5, what were you

23  thinking?

24         A.    Pretty much I was thinking an individual --

25  that's pretty much where I am is individual -- I mean, I'm a

1  parent and I have to deal with two children.  I have to,

2  when I discipline this one child, I have to look at him,

3  what his background is, the way I can deal with him, and I

4  make my decision as to what he did.  And if it had anything

5  to do with what he has done in the past, then that's the way

6  I discipline.  And so, therefore, I'm on a case by case.

7       Q.    Sounds like that 5 that you gave yourself is

8  kind of a recognition you just have to look at the case?

9       A.    Exactly.

10      Q.    Let me run something else past you.  You know,

11  oftentimes when we think of murder or capital murder, like

12  murder in the course of robbery, we think of a guy going in

13  with a gun in the 7-Eleven and holding up the 7-Eleven and

14  shooting and killing the clerk --

15      A.    Uh-huh.

16      Q.    -- and getting off with the money.  Oftentimes

17  crimes are not committed by just one person.  You would have

18  a group or gang of people, more than one person that commits

19  a crime.

20      A.    Okay.

21      Q.    Even capital murder.  We talked to a lot of

22  people, such as yourself, who are in favor of the death

23  penalty, but they start drawing some lines.  Let me tell you

24  what I mean by that.

25           In Texas capital punishment is not just

1  reserved for the person that actually caused the death, like

2  the triggerman, the person that actually pulled the trigger

3  and caused the person's death.  They can, of course, be

4  convicted of capital murder and ultimately face the death

5  penalty.

6          But if they had an accomplice with them

7  or more than one accomplice who didn't actually pull the

8  trigger, who was not a triggerman, who didn't cause the

9  death, but under certain facts and circumstances those

10 accomplices could also be convicted of capital murder and

11 potentially face the death penalty.  And a lot of people,

12 even people that feel very strongly about the death penalty,

13 would just limit the death penalty to the triggerman, the

14 person that actually caused the death, actually pulled the

15 trigger.  And if it were up to them, they would take the

16 death penalty option off the table for the accomplices, the

17 nontriggermen.

18         And they tell us various reasons, some, I

19 guess, morally or religious basis, feel that the death, you

20 know, taking a life, the death penalty is only justified

21 when a person has taken a life actually.  And people feel

22 different ways about that.

23         What do you think about that?  Would you

24 reserve the death penalty just for the triggerman or --

25     A.     Not necessarily.  I guess the first thing that

1    comes to mind is there's no way that two people can pull the

2    same trigger at the same time on a gun.  Back to the example

3    -- and this is -- I may use this a lot because this is the

4    only way that I can give an example.

5              If one child is the one who actually in

6    my mind wrote on the wall, but the other one gave them the

7    Crayola, they did it together, I guess you could say.

8         Q.    Sure.  You will hold both responsible?

9         A.    Both of them would be responsible.

10        Q.    Okay.  So you wouldn't, I guess, automatically

11   take the death penalty off the table for a nontriggerman or

12   accomplice?  It would --

13        A.    Correct.

14        Q.    -- depend on the facts --

15        A.    Yes.

16        Q.    -- case by case basis, that type thing?  Let

17   me give you an example and see what you think about this

18   one.  Let's say Mr. Shook and I and a third friend of ours

19   decide we're going to rob a bank.  We sit down and make up a

20   plan to rob that bank.  We've got one gun, a pistol, and

21   Mr. Shook is going to take it in and hold up the teller.

22   I'm going to go in unarmed and have a bag and collect the

23   bank's money so we can make our getaway.  And our third

24   friend is going to drive us up there in his car and wait

25   outside and keep a lookout for the cops and maybe signal us

1    by tapping on the horn or something if the cops show up.

2    And that's the plan we come up with.

3                    And when we go to do that bank robbery,

4    for some reason or for no reason or maybe Mr. Shook sees a

5    teller going for an alarm, a silent alarm, or I see that and

6    I tell them that, Mr. Shook shoots and kills the bank

7    teller.  Okay?  He's committed an intentional murder during

8    the course of a robbery, which we talked about is capital

9    murder in Texas.  He's the triggerman.  He could be

10   convicted of capital murder and ultimately receive the death

11   penalty.

12                    I was an accomplice.  I didn't have a

13   gun.  What do you think about a person in my shoes in that

14   example when it comes to the death penalty?

15        A.      How would you know what he was thinking, as

16   far as -- or what -- how would you know what he saw, as far

17   as going for the alarm, unless you discussed it.  That's the

18   premeditated thing.

19        Q.      Uh-huh.

20        A.      You cannot at that point necessarily be

21   responsible for his actions or his choices.  Yes, you should

22   be punished for hanging out with them, for going along with

23   his plan, but you cannot be responsible for what actions he

24   took and what thoughts he has.  He's responsible for his

25   own.

1    Q.    Okay.   Sounds like because I didn't have any

2  intent that that murder happen or it wasn't premeditated,

3  that would pretty much take the death penalty off the table

4  for me in that fact scenario?

5    A.    You were hanging out with him.

6    Q.    You know, I could be found guilty maybe of the

7  bank robbery, something like that.   But do you think the

8  death penalty would be an appropriate type punishment for

9  somebody that played the role that I played in that crime?

10    A.    (No answer)

11    Q.    I'll tell you what the law says.   In our

12  example we planned, we premeditated, just a bank robbery.

13    A.    Okay.

14    Q.    When we went to do the bank robbery, I had no

15  intent in my mind that anybody get hurt.   That was not in my

16  mind.   That was not my intent.   But, nevertheless, the law

17  says if I should have anticipated that a life could have

18  been taken, then I could be found guilty of capital murder,

19  the same crime as Mr. Shook, and maybe receive the death

20  penalty, depending on how the jury answers these three

21  Special Issues that you read about.

22    A.    Right.

23    Q.    And a lot of people tell us, very frankly,

24  that's where they draw the line.   The accomplice, when they

25  didn't have any intent for the murder, the death penalty is

1  just off the table.  I recognize the law allows that, but I

2  just -- that's just not what I believe because that person

3  didn't have the intent.

4          A lot of people disagree with that law.

5  You know, you may want to give me a life sentence for the

6  role I played in that, but some people say because I didn't

7  have the intent, because I didn't actually cause the death,

8  the death penalty is just off the table for somebody like

9  me.  What do you think about that?

10      A.      I don't think that I could say that it's

11  totally, totally out of -- I mean, it's like not an option.

12  I don't think that I can honestly say that it's not an

13  option, as far as the death penalty for you.

14      Q.      Would it maybe make it a clearer case for the

15  death penalty for me if I also went in with a loaded gun?

16      A.      Yes.

17      Q.      How come?

18      A.      Because in my mind if you are walking around

19  with a gun, you're out walking through the field, a snake,

20  you see a snake, you are going to shoot it because you feel

21  it's doing something or coming against you, basically in, a

22  way, you know, you feel you are in some sort of harm whether

23  it be he's going to bite you or strangle, whatever kind of

24  snake it is, you feel you are in danger, so you are going to

25  take it out and shoot it, as far as that goes.

1          I know I've done the same thing.  I

2  didn't go out.  I just took it out as safety precautions.

3          Q.     So if it's a situation where we plan, hey, do

4  whatever you need to do so we can get out of there, even if

5  you need to shoot and kill someone?

6          A.     Exactly.  That's what I say, yeah.

7          Q.     Let me ask you this.  I think you, like so

8  many people, have heard something about the case that you

9  are down here about today.  I think you told us that in your

10  questionnaire that you have heard --

11          A.     Right.

12          Q.     -- read something about the publicity, that

13  type thing on this case.  What do you remember hearing,

14  exactly, about this case?

15          A.     The news, you know, basically.  I was in the

16  den, saw it on the news.  And all I remember as far as in my

17  mind, I believe it was like I saw a picture or TV up in

18  Oshman's and I believe a police car and heard an officer had

19  been killed by -- I can't even remember other than reading

20  through it now that there were people who broke out of

21  prison that had done it.  That's really honestly and --

22  really, I never -- I had never really discussed it with

23  anybody.  I have been associated with officers, but really

24  that's about it.  It's just that one flash, that one moment.

25          Q.     I know you told us you ride with the Iron

1   Pigs; is that correct?

2        A.    Uh-huh.

3        Q.    That is police officer bikers, right?

4        A.    Police officers, firefighters, paramedics,

5   Border Patrol, every kind of law enforcement you can even

6   imagine all over the U.S.

7        Q.    How long have you done that?

8        A.    Let's see, I started riding with them last

9   October because that's actually when my boyfriend, who is an

10  ex-police officer, got his motorcycle.  As far as knowing

11  all of those or a lot of those law enforcement guys, I've

12  known them for eight, eight -- ten years, you know, just met

13  more and more and more over the years.

14       Q.    Okay.  So you know a lot of people that are in

15  public service --

16       A.    Exactly.

17       Q.    -- or police officers?

18       A.    Yes.

19       Q.    And I know you just read the indictment in

20  this case, that last page where we allege --

21       A.    Uh-huh.

22       Q.    And you have heard it on the news --

23       A.    Right.

24       Q.    -- that a police officer was killed in this

25  case.  Being that you are such close friends and associate

1  and socialize with police officers, how do you think that

2  might affect you in this case?  I guess by that, I mean, we

3  talk to a lot of people and not every particular case is a

4  perfect case for each person.

5          A.    Right.

6          Q.    And you may be fine on a burglary case or just

7  another murder case where a police officer isn't the victim

8  and that type of thing.  How do you think it might affect

9  you in this case?

10         A.    I don't think that that would honestly -- I

11  don't think it would sway me one way or the other because of

12  his occupation.  And the reason why is because I know these

13  people as people.  Rarely do I ever see them in their

14  uniforms or doing their job.  I see them in black leather

15  jackets acting like humans, you know, I guess, you could

16  say.

17                  The thing that would bother me about that

18  is, as I guess everybody else, he was an officer doing his

19  job or -- he was doing what he was supposed to do or maybe

20  he wasn't doing anything.  I can't remember the case.  So I

21  can't tell you if he may have been an off-duty officer, I

22  don't know.

23                  But I don't necessarily know that putting

24  the uniform on the man would sway me one way or the other

25  because he could have been -- you know, he could have been a

1   security guard or somebody driving through the parking lot

2   or whatever.

3          Q.    Do you think maybe it would be a pressure on

4   you to consciously or subconsciously, once all your friends,

5   police officer friends, found out that you served as a juror

6   on this case maybe to lean towards the death penalty because

7   of a fellow officer was killed?  We don't want to put you in

8   a hard spot.

9          A.    Right, no, I understand that.  They do stick

10  together as far as the guys go.  Let's see.  What -- you

11  want to know what I would feel --

12         Q.    I'm just worried there might be some pressure

13  on you either during the trial or after the trial to maybe

14  lean a certain way because a police officer was killed.

15         A.    No, I will do as far as what I, in my mind,

16  you know, that's me.  I have to be responsible for me.  I

17  cannot be responsible for their feelings.

18         Q.    And the things that you have heard about the

19  case already, have they caused you to form some opinions one

20  way or the other about the case or the facts?

21         A.    No.  Because even after I left here on the day

22  that I filled this out up until I got my letter, I guess, I

23  really haven't thought about it, either.  At one point I

24  thought, you know, what was the whole deal?  Started to get

25  on the Internet and it kicked off.  And I thought, yeah, I

1    guess that was it and I never tried again.

2         Q.    Actually after you left here you got up on the

3    Internet?

4         A.    Out of curiosity.

5         Q.    Did you see results of other trials of the

6    other cases?

7         A.    No.  All I saw -- I went to the part where it

8    had like photos right here and maybe a date out to the side

9    and then I got kicked off, so I had -- I'm not a computer

10   person.  So when I get kicked off, I get bored.

11        Q.    So the photographs that you saw, were they of

12   the people that were charged?

13        A.    I believe so, because it had -- it looked like

14   -- it looked like the photos were in color and then the very

15   last one was in black and white and that's really all I

16   remember.

17        Q.    As we talked about, you know, not every case

18   is right for every juror and that's why we go through this

19   process.

20        A.    Right.

21        Q.    Especially a death penalty case, because a lot

22   of people are very uncomfortable with the issues that are

23   involved because so much is on the line for both sides,

24   obviously, when you are talking about the death penalty.

25   And even people that we talk to who are in favor of the

death penalty, like yourself, some of those people are in favor of it in a philosophical or abstract way.  What I mean by that is even though they are in favor of the death penalty, once they get down here and sit where you are sitting right now, it becomes very real to them.  And when they look down and see a living, breathing human being on the other end of the table, it becomes very real.

And, very frankly, that's our goal in this case.  We feel that we have the nature, type, and quality of evidence that's going to cause a jury to find Mr. Murphy guilty of capital murder and answer those questions in such a way that one day he's going to be executed and lie dead on a gurney in Huntsville, Texas.

And, you know, when it gets down to this point in the process where it's so real to people, a lot of people kind of say, you know, time out, this really isn't for me.  I'm in favor of the death penalty, I understand why we have it, but I'm not comfortable participating in the process that may, you know, ultimately end a man's life.

And, you know, some people tell us that it might weigh on their mind or weigh on their conscience. You know, oftentimes, as you may know, details of executions are reported in the paper, reported in the media.  You may have seen that.

Are you aware of what our method of

23

execution is in Texas?

A.    No, sir.

Q.    It's lethal injection.  And the procedures are basically the same in every case.  And they are often, again, reported in the media.  And I know that's a concern to some people on down the line.  You may read about it.  If the person is found guilty of capital murder and those three questions are answered in such a way to require a death sentence, the Judge has no discretion.  He will sentence the defendant to death.

He will be taken immediately down to death row where he will stay until Judge Cunningham issues a date of execution at some day in the future.  I can't tell you when that would be or how long it will be, but it will be some date in the future.  And on that day the person is moved from death row to the prison in downtown Huntsville where the death chamber is.

And on that day he is held outside by the death chamber.  They are allowed to meet with friends, family members, spiritual advisors, that type of thing, have a last meal.  But when it gets close to 6:00, which is the time that our law mandates all executions take place in Texas, he is taken from that holding cell.  He will either go voluntarily or if he doesn't want to go, he will be forced to go by the guards.

NANCY BREWER, OFFICIAL COURT REPORTER

1          He will be taken into the actual death
2   chamber.  You may have seen it on TV.  It has a gurney.
3   It's a brick room.  He would be taken there and strapped
4   down to that gurney with thick leather straps.  He will be
5   given a chance to make a last statement at that point.
6          And there will be people who witness the
7   execution, friends of the victim's family, also his friends,
8   family, spiritual advisors, will be there as witnesses.  He
9   will be strapped down with those leather straps.  The warden
10   will give him a chance to make a last statement.  He may ask
11   for forgiveness, he may proclaim his innocence to the very
12   end, he may express fear, he may express anger.
13          But at some point an IV will be started
14   in his arm and at some point the warden will nod to the
15   executioner and the executioner will press a series of
16   buttons where poisons are released through the IV and very
17   quickly after that the person's heart and lungs shut down.
18   They are still conscious briefly, but at some point they
19   lose consciousness and fall into a deep sleep and ultimately
20   die.
21          I don't run you through that to be
22   morbid, but those are the type of details that are often
23   reported and people say it weighs on their conscience.  We
24   don't want to put anybody -- if you are not cut out for
25   this, we need to know.  And you know yourself better than

1    anyone.  So I want to be sure that you are the type person,

2    even though you are in favor of the death penalty, that can

3    participate in that process, that you can actually take pen

4    in Hand and answer these questions, the tough issues, such

5    that it may ultimately result in Mr. Murphy lying dead on a

6    gurney in Huntsville, Texas, one day.

7              You know yourself better than anybody.

8    What do you think?

9         A.     If this man has been found guilty by a jury

10   and I'm sitting on that and whatever my choice is, you know,

11   I don't -- I cannot honestly say that -- I do have a

12   conscience and in the way I look at it is, he had the

13   opportunity to be told step by step, this is what you get to

14   do, you get to do, before you lay down to rest.  The person

15   that was killed did not have the opportunity at any point in

16   time to make his plans or her plans and get to tell the

17   loved ones goodbye, get to ask for forgiveness for whatever

18   sins, they did not have the opportunity, and basically the

19   gift to be able to say those things.

20        Q.     Okay.  So you do feel like you are the type

21   person that could participate in this?

22        A.     I believe so.

23        Q.     Let me talk to you a little bit about these

24   Special Issues.  If you find somebody guilty of capital

25   murder, you move into the second phase of the trial, which

1   is the punishment phase, and that's where we ask the jury to

2   look at these three questions or Special Issues.  You may

3   have looked at them briefly in the packet of materials.  But

4   if you could, just take a minute and look up on the wall and

5   just kind of read through these Special Issues for me.

6         A.    (Prospective juror complies.)

7         Q.    Did you get a chance to look through those?

8         A.    Uh-huh.

9         Q.    Those are the questions, the three questions

10  we ask people.  When it comes to the first two questions,

11  the burden of proof is on the State.  We have to prove it to

12  you.  It starts off with a no answer and we have to prove to

13  you that each of them should be answered yes.

14        You see how that first question kind of

15  asks a juror to make a prediction about future behavior,

16  whether the person will be a future danger, that type of

17  thing?  You know, we ask a juror is there a probability the

18  person would commit criminal acts of violence such that they

19  would be a continuing threat to society.  Does that make

20  sense to you?

21        A.    Uh-huh.

22        Q.    You can see how that's kind of asking the

23  jurors to make a prediction and that type of thing about

24  future events?

25        A.    Okay.  Yes, sir.

1    Q.    Okay.  You think that you would be comfortable

2  doing that?

3    A.    Judging someone else's character by his past?

4    Q.    Uh-huh.  Making a prediction about future

5  behavior, the probability of future behavior?

6    A.    Right.  Would I be comfortable with that?

7    Q.    Do you think that you could do it?

8    A.    Yes, I have to do it every day.

9    Q.    Okay.  What would be important to you in

10  answering a question like that?

11    A.    What would be important to me?

12    Q.    What types of things would you like to know?

13    A.    Details of his past.  Um, pretty much, I

14  guess, details of his past, where -- and maybe what his

15  ideas are of the future.

16    Q.    Okay.  Would you look back at the crime that

17  he had been convicted of for guidance in answering that

18  question?

19    A.    I'm sorry, could you say it again?

20    Q.    Would you look back at the crime that he had

21  been convicted of, the crime that he was on trial for?

22    A.    Okay.

23    Q.    A lot of people tell us they would look back

24  at the crime.

25    A.    Look --

1    Q.    What I'm getting at is this.  Some people tell

2  us, you know, hey, if I found somebody guilty of capital

3  murder, I'm always going to think they are a future danger,

4  that type thing.  If I found them guilty of capital murder,

5  if I'm convinced beyond a reasonable doubt that they're

6  guilty of that crime, I'm always going to think there's a

7  probability that they would be that future danger.

8    A.    Well, there's always a probability of anyone

9  doing something in the future.  But this person, is he going

10  to repeat the same crime as he did before?

11    Q.    That's not -- we don't ask is he going to kill

12  again.

13    A.    Right.

14    Q.    We just ask if he's going to be a danger.  And

15  a lot of people tell us, the fact that they found him guilty

16  kind of answers that first question.  If they are the type

17  person to be convicted of capital murder, then I'm always

18  going to think they're a future danger.  It's just kind of a

19  common sense proposition.

20    A.    I was going to say, I expect so.

21    Q.    To be very frank, what the law requires is you

22  cannot automatically answer any of these questions just

23  based on your guilty verdict.  But a lot of people, I guess

24  such as yourself, say it's such a common sense proposition.

25  Beyond a reasonable doubt I think he's a capital murderer,

1   I'm always going to think he's a future danger.  There's

2   that probability there.

3        A.        Yeah, I guess I can understand that because

4   once, I guess, your house is broken into, you are always

5   going to think there's a possibility of someone breaking

6   into it again.

7        Q.        So it sounds like -- I told you what the law

8   is, but it sounds like you are one of those people that if

9   you find somebody guilty of capital murder, that answers

10  that first question for you yes every time; is that right?

11       A.        Yes.

12       Q.        Again, the law requires that you have that

13  open mind.  But a lot of people, such as yourself, just

14  can't do it because it's a too common sense proposition?

15       A.        Right.

16       Q.        The second question kind of deals with those

17  issues we talked about before, you know, the accomplice

18  issue.

19       A.        Okay.

20       Q.        That type thing.  I'll be very frank with you,

21  we're prosecuting this case, prosecuting Mr. Murphy, under

22  the accomplice theory that he's a nontriggerman.

23       A.        Okay.

24       Q.        This question kind of deals with that.  If you

25  will recall what we talked about a few minutes ago, in order

1    to convict someone of capital murder -- maybe we didn't talk

2    about this.  But in order to convict someone of capital

3    murder, an accomplice, you have to find that they should

4    have anticipated that a life would be taken.

5         A.    Okay.

6         Q.    When we get down to this stage, the question,

7    that last sentence, asks you, if the person actually

8    anticipated that a life would be taken.  The reason I want

9    to visit with you about this is that I know premeditation is

10   very important to you.  You told us.

11        A.    Uh-huh.

12        Q.    Is it a situation where you don't think the

13   death penalty is ever appropriate unless it's a

14   premeditated-type crime?

15        A.    Can you ask the question, just the last bit?

16        Q.    Uh-huh, sure.  You know, the law allows us to

17   prosecute somebody and the potential of a death penalty in a

18   case where someone didn't have any intent, necessarily, that

19   someone die.

20        A.    Okay.

21        Q.    The law just looks at whether the person

22   anticipated someone would die.  I know premeditation is very

23   important to you when you look on that case by case basis.

24   And I'm just curious if you can ever assess the death

25   sentence unless the crime is premeditated.  If the person

1    didn't have the intent, they maybe should have anticipated

2    or they may have anticipated, but they didn't have the

3    intent, the premeditation.  And I'm just wondering, absent

4    that premeditation or intent, would you take the death

5    penalty off the table?

6            A.      No.

7            Q.      Okay.  Does that question make sense to you,

8    though, that you can look at a set of facts, you know, going

9    back to my example, I'm the bag man.

10           A.      Right.

11           Q.      Look at these facts and say, you know, ask

12   yourself, should I have anticipated or did I actually

13   anticipate that a life would be taken?  Does that make sense

14   to you?

15           A.      Yes.

16           Q.      Okay.  So under our example, even though it

17   wasn't premeditated or I didn't intend it, you could still

18   keep an open mind for the death penalty for me?

19           A.      Yes.

20           Q.      Okay.  And, again, that question starts off

21   with a no.  It's up to us to prove it to you beyond a

22   reasonable doubt.

23                   Let me let you look at Special Issue No.

24   3.  That's kind of the last stop in the process.  We call

25   that the mitigation question.  We ask jurors -- this is the

1  final thing you do before someone is sentenced to death.   If

2  questions 1 and 2 are answered yes and yes, then you move on

3  to this question.

4           We ask you to look back at the crime,

5  look at what you know about the person on trial, look at

6  what sort of personal, moral blame he bears, or culpability,

7  as the question says, and ask yourself if there's anything

8  mitigating, anything that lessens his blame.   And if there

9  is, is it sufficient that his life ought to be spared?

10          And, again, this is the last step in the

11  process.   And the law requires that, you know, even at this

12  late step in the process, that you are still able to kind of

13  keep an open mind, that you haven't prejudged.   See what I'm

14  saying?

15      A.      Uh-huh, yes.

16      Q.      A lot of people tell us, you know, if I've

17  convicted someone of capital murder, if I have found there's

18  a probability that they are a future danger, if I found at

19  the very least that they anticipated a life would be taken,

20  by the time we get that far in the process to question No.

21  3, it's kind of over.   There's really nothing at that point

22  that can sway me.   You know, my mind -- there's just nothing

23  there that could convince me that he deserves a life

24  sentence rather than the death penalty.

25          What do you think about that?  Does that

question have any meaning for you when you get that far in

the process or is it because you found him guilty of capital

murder, you think he's a future danger, you think he

anticipated?  A lot of people tell us, very frankly, there's

just no meaning in that question when you are that far in

the process.  I have made too many other decisions before

this one.  This decision is already made and there is just

never going to be anything mitigating or sufficiently

mitigating that I'm going to spare his life.  What do you

think about that?

     A.     I have to agree with, I guess, what you say

everybody else says.  Once I find yes on this and once I

found yes on that --

     Q.     Again, it's kind of like a common sense

proposition when you get that far in the process.  But what

the law requires is --

     A.     I still have to keep an open mind, if

something else in my own -- if somebody else said one little

word, it -- I don't know, because I've never been in this

situation, but I would think that one little word might

stimulate me to go, you know what?  But, then, I don't know.

I really honestly don't know, because I have not been in

that situation, so I cannot answer that question yes or no,

as far as that goes.

     Q.     So you don't know whether you could keep an

1  open mind?

2       A.      No, I can keep an open mind.  I don't know

3  what my response would be as far as, I said yes, they have

4  shown me this and, yes, I do believe that this is exactly

5  which way he needs to go.  I can't think of any

6  circumstances or anything, but I have to keep an open mind.

7       Q.      That's the most common response we get.

8  Because we ask people, is there anything that pops in your

9  head that you might consider mitigating in these types of

10 cases and most people can't think of anything.  So it's not

11 uncommon.

12      A.      So I'm average?

13      Q.      Pretty much.  Do you have any questions about

14 this whole process, the issues we've talked about or

15 anything that may go on?

16      A.      Not that I can think of.

17      Q.      Give me just a second and let me talk to

18 Mr. Shook.  Any police officers that you know, do they or

19 did they work for the Irving Police Department, do you know?

20      A.      To my knowledge -- to my knowledge, no, sir.

21 I don't know where -- like I said, all over the U.S.  I have

22 only like a certain -- Dallas -- I didn't know exactly where

23 they work.  And I can say Border Patrol, obviously, works

24 some place else outside of Irving.  But to my knowledge, I

25 do not know where they work out of, what stations.

1    Q.    You told us that your boyfriend was a police

2  officer for eight years; is that right?

3    A.    Yes, sir.

4    Q.    Where did he work?

5    A.    He worked for the Dallas Police Department

6  down in North Dallas on McCallum and Meandering.

7    Q.    And what does he do now?

8    A.    He's a computer geek.

9    Q.    All right.  Thank you for your time, Ms.

10 Crawford.

11           MR. WIRSKYE:  That's all I have, Judge.

12           MS. BUSBEE:  May it please the Court.

13                CROSS-EXAMINATION

14 BY MS. BUSBEE:

15    Q.    Now I get to tell you this, because it's kind

16 of a nice thing.  You are not average at all.  You are

17 probably the 32nd, 34th something person we've talked to in

18 this process, but you know what juror number you were?  No.

19 1144.  So there are a lot of people we tossed over our

20 shoulders because they just, you know, they just didn't make

21 the cut as far as being reasonable or rational or we're not

22 -- this takes a long time, but we're not trying to waste

23 time.  So you are not average by any means.

24           So we're talking to people who are

25 thoughtful and as middle of the road as we can get them to

1   be.  So don't feel average.  Obviously, you don't seem like

2   anybody who is necessarily governed by what other people

3   think, so I'm not going to have to go over as much as

4   Mr. Wirskye has, because he's told you a lot of things that

5   I don't have to cover again.

6              But I do want to talk to you about this

7   scheme that we have in Texas.  This is, I suppose, doing

8   these questionnaires is a good thing because we get people's

9   kneejerk reaction, but we ask you all these things about

10  capital punishment without telling you how it's assessed.

11             And a lot of times when people have said

12  things about how they feel about capital punishment, but

13  they see what the Legislature has come up with, they say,

14  you know, that is a good scheme and I can follow that as a

15  juror.  And you wouldn't have known otherwise, right, how we

16  do it.  So -- and I really appreciate your candor about how

17  you feel about things.

18             But there's two different ways to think

19  about this or discuss how you feel about something we need

20  to know, if you feel comfortable telling us.  But the real

21  issue is if you understand the law, which I know now that

22  you do.  And if you understand the law, can you follow it?

23  I think the Judge started out, he usually does start out

24  with jurors saying that's actually the bottom line as to

25  whether you are qualified as a juror or not.  So there was

1  some question to you about this Special Issue No. 1.

2  Now, just to recap, because we -- there

3  was a lot of stuff early in the morning. But to recap, when

4  we get to Special Issues here in this case, we've -- we -- a

5  jury has already found the person guilty of the offense of

6  capital murder under whatever circumstance.

7  And then under those circumstances,

8  really, the law is kind of contra death penalty. In other

9  words, once you have found someone guilty of the offense of

10  capital murder, the law requires an automatic life sentence

11  before another word is spoken or another piece of evidence

12  is put on, automatic life sentence.

13  If this is the case where the State

14  elects to, attempts to get a death penalty or a death

15  sentence in the case, then and only then, does a jury

16  address these Special Issues. And so these Special Issues

17  have to be proved to a juror beyond a reasonable doubt, just

18  like -- well, let me take that back. Nos. 1 and 2, the fact

19  questions, have to be proved beyond a reasonable doubt.

20  And yes, I think most people base decisions that they make

21  day-to-day on what's happened in the past. So obviously all

22  jurors are going to have that experience.

23  A.   Uh-huh.

24  Q.   If they are the sort of person who doesn't,

25  they probably wouldn't be talking to us, anyway. My

1    question is, can you make the State prove it to you beyond a
2    reasonable doubt that there's a probability?  Set aside any
3    thought that you have on that and say, well, the law says I
4    must find beyond a reasonable doubt based on evidence that
5    there's a probability that the defendant would be a
6    continuing threat to society, not something that you would
7    automatically decide, but you would follow the law?
8         A.     Right.  That -- yes, I do agree.  You are
9    going to have to give me information so that in my database
10   I can break it down and make my own decision, not
11   necessarily what someone tells me to decide.  I may look
12   that way, but I can think by myself.
13        Q.     Definitely.  All right, I thought you would
14   say that.  And Special Issue No. 2, just to kind of explain
15   that to you, this is a Special Issue that we only have when
16   the State has sought a conviction under the theory of
17   parties.  So there's another question, that party, accessory
18   to a crime, as we were talking about earlier.  So this would
19   be another thing that you would have to decide beyond a
20   reasonable doubt.
21               And I think that you told us that you
22   could listen to the evidence and make a determination as to
23   whether or not the person intended to kill someone or
24   anticipated that a life would be taken.  Is that a fair
25   statement?  You could do that?

A.      Say it again?

Q.      Special Issue No. 2, can you make the State
prove that to you beyond a reasonable doubt before you found
--

A.      To my knowledge, yes.

Q.      Okay.  I thought so.  Now, someone used this
example the other day.  I think it's a pretty good one.  I
used to say hurdles.  The State has to jump over Special
Issue No. 1 and then they have to accomplish Special Issue
No. 2.

But Mr. Shook used the example the other
day of a window, because this is a process.  You do the
first question and then you do the second question and you
get to the third question.  It's kind of subjective.  And
the only thing that we would like to know at this table is
we can't commit you to a set of facts, but if you had
decided a future danger and if the person anticipated that a
life might be taken, is your mind completely closed or would
there still be an opportunity to -- or would you still
consider something that you heard in the case, either what
happened in the case or what you learned in the trial about
the circumstances concerning the defendant or maybe some
other fact?

A.      See, that's what I was saying about the third
one.  I can say yes, I can say yes, and at this point, you

know, there could be -- like I said, I cannot tell you what
I'm going to be thinking tomorrow.  Something may come up.
There may be a word and it may stimulate another thought.  I
cannot tell you that -- I mean, it would be up to me,
obviously, to pay attention to everything from point A to
point B to get me to point C to be able to make that
decision.

        Q.    I appreciate that.  Is there something that we
haven't asked you that you are concerned about or something
you wanted to tell us or just any thoughts about serving on
this jury that we haven't exhaustively asked you about at
this point?

        A.    Because I don't wear your shoes, I have no
idea what I'm supposed to be thinking about or questioning.

        Q.    Most people say that.  It's just sometimes
someone might come up with, well, I've already decided this
case.  Not you, but I always give someone the opportunity,
because it's kind of -- even though you are not, you feel
like you are being on trial here.  So I thought I would give
you a chance to say something to us that you thought we
might think is important about your service.

        A.    I haven't made up my mind because I have no
idea what I'm supposed to make my mind up about as far as
that goes, I mean, other than you have to tell me and then I
have to decide.  I don't have any background knowledge,

other than an Oshman's maybe from the TV.

Q.    Okay.   Thank you.

MS. BUSBEE:   We'll pass the juror.

THE COURT:   Ms. Crawford, let me try to sum this up.   I have gotten two different answers from you on Special Issue No. 1, so I need to be real clear.

PROSPECTIVE JUROR:   That's fine.   Because I'm probably confused myself and don't know it.

THE COURT:   My job is to tell you what the law is.   The law requires that the State prove Special Issue No. 1 and Special Issue No. 2 to the jury beyond a reasonable doubt.

PROSPECTIVE JUROR:   Okay.

THE COURT:   As you have understood the process, if the jury has found someone guilty of capital murder, the law then requires an automatic life sentence.

PROSPECTIVE JUROR:   Okay.

THE COURT:   The State is going through this process and the jury will be asked in this case to look at these issues.   If these issues are answered in a certain way, then a death sentence would result.

PROSPECTIVE JUROR:   Uh-huh.

THE COURT:   If a person goes in and says, well, if I have found him guilty of capital murder, then Special Issue No. 1 has already been answered for me.

1    PROSPECTIVE JUROR:  Okay.

2    THE COURT:  The law says that you have to

3  wait and require the State to prove that to you.  You may

4  look at all the evidence in the case that you heard or there

5  may be additional evidence from the State, who knows?  But

6  if you say, well, I'm going to wait and make the State prove

7  that to me in the second phase of the trial, it's actually

8  two trials here.

9    PROSPECTIVE JUROR:  Okay.

10    THE COURT:  You have the first phase.

11  The jury goes out and decides is he guilty or not guilty.

12  If he's guilty, then you can come back in for the second

13  phase of the trial and they may present more evidence and

14  they may not.  But you go back and deliberate on a second

15  period to determine whether or not these issues have been

16  answered.

17    PROSPECTIVE JUROR:  Okay.

18    THE COURT:  Are we together on the

19  procedures here?

20    PROSPECTIVE JUROR:  Okay.

21    THE COURT:  So looking at Special Issue

22  No. 1, are you going to require the State to prove that to

23  you beyond a reasonable doubt or is it already answered if

24  you just found him guilty?

25    PROSPECTIVE JUROR:  Like I said, you have

1   to prove something to me.  But I'm human.  You can prove it

2   to me and the next part you can prove something else to me,

3   well, the big picture is this No. 1 and 2 together.  I

4   cannot honestly say that when the big picture is proven,

5   something was not -- either my brain didn't pick it up or it

6   was not presented to me, that might cause my brain to be

7   stimulated.  You know, I might think of something else.  You

8   see, I don't know.  I can't communicate, I guess, what I'm

9   thinking.  I mean, 1 yes, 2 yes, and then --

10                  THE COURT:  What we're doing now is you

11  have to have an open mind --

12                  PROSPECTIVE JUROR:  Okay.

13                  THE COURT:  -- in answering Special Issue

14  No. 1 yes or no.

15                  PROSPECTIVE JUROR:  Right.

16                  THE COURT:  See, those questions you have

17  to be --

18                  PROSPECTIVE JUROR:  So if 1 is yes and 2

19  is yes --

20                  THE COURT:  Listen.  You have to have an

21  open mind, that you would go back to deliberate and you

22  could answer Special Issue No. 1 yes or no.

23                  PROSPECTIVE JUROR:  Okay.  I have the

24  option to answer it yes or no.

25                  THE COURT:  That's the option.  The

1  question is could you answer it yes or no or, simply because

2  a jury has found him guilty of capital murder, would that

3  automatically answer No. 1 yes?  You see the difference

4  there?

5                    PROSPECTIVE JUROR:  If somebody else says

6  yes --

7                    THE COURT:  No.  Question, whether

8  there's a probability that the defendant would commit

9  criminal acts of violence that would constitute a continuing

10  threat to society.  Do you have an open mind that you could

11  answer that question yes or no, even after you found him

12  guilty of capital murder, depending on whatever evidence is

13  offered --

14                    PROSPECTIVE JUROR:  Uh-huh.

15                    THE COURT:  -- if any evidence, is your

16  mind open to both a yes and no answer?

17                    PROSPECTIVE JUROR:  I would think so.

18  But -- yes.

19                    THE COURT:  Look at the question.  Is it

20  -- is your mind open that you could answer that yes or no,

21  depending on what the evidence required you to do?

22                    PROSPECTIVE JUROR:  Is my mind?  Yes.

23                    THE COURT:  Your mind is open?

24                    PROSPECTIVE JUROR:  My mind is open.

25                    THE COURT:  Thank you so much.  If you

1  wait for us outside, we'll have you back in a few minutes.

2                  [Prospective juror out]

3                THE COURT:   What says the State?

4                MR. WIRSKYE:   State would submit the

5  juror on issue No. 1, Your Honor.   I believe she told me

6  when I questioned her, however difficult the questioning

7  was, that she would automatically answer Special Issue No. 1

8  yes, if she found the defendant guilty of capital murder.

9                I don't believe the question was ever

10  phrased to her in that way with the defense.   The defense

11  merely asked her if she would hold the State to the burden

12  of proving No. 1.   It's the State's contention she's

13  disqualified because she would have found that burden has

14  been met simply because he was convicted of capital murder.

15                Much to the Court's credit, when the

16  Court delved into the matter with her and attempted to ask

17  the question, I don't believe the Court ever asked the

18  question or I don't believe the juror ever understood the

19  Court to ask the question, could you keep an open mind to

20  Special Issue No. 1, even if you found him guilty of capital

21  murder.   I don't believe that was ever clear.

22                We submit her as the classic vacillating

23  juror.

24                MS. BUSBEE:   Your Honor, when Mr. Wirskye

25  questioned this juror, he used and she used the word

1    "possibility" interchangeably in that exchange and,

2    therefore, I don't think that she is disqualified, that

3    possibility is not the law.  I did ask her the question in

4    proper form.  I did point out to her that she would have

5    already found him guilty and she did say that she could make

6    the State prove that to her beyond a reasonable doubt before

7    she found that.  And I submit that she's imminently

8    qualified.

9                   THE COURT:  The Court, after giving the

10   potential juror an opportunity to understand the law and not

11   confuse her, even after she was already confused, she

12   understands her obligations, if she were to sit on this

13   jury, I find Ms. Crawford to be qualified.

14                  MR. SHOOK:  We submit her for being

15   totally confused.  I think it's obvious she didn't have the

16   slightest idea what these questions are, nor did she

17   understand any of the Court's instructions.  I don't think

18   she has any idea what this process is or what these Special

19   Issues are.  I don't think after your simple explanation she

20   has the slightest idea what you were talking about and we

21   submit her for that.

22                  THE COURT:  I find she's quite

23   deliberative, intelligent, and capable of understanding

24   simple questions without -- she's just not a kneejerk

25   reaction.  But I find she's -- certainly other people have

1   been a lot more confused after the parties have had an

2   opportunity to talk to them.  So I still find she's

3   qualified.

4                    MR. SHOOK:  I might agree with you about

5   being deliberate, but I sure wouldn't on being intelligent.

6   We will exercise a strike.

7                    THE COURT:  Have Ms. Crawford come back

8   in, please.

9                        [Prospective juror in]

10                   THE COURT:  Ms. Crawford, come on back

11  up.  I don't want to yell at you.  Thank you for your time

12  and service today.  You probably have no idea of the pickle

13  they would put you in this morning, did you?

14                   PROSPECTIVE JUROR:  No, sir.

15                   THE COURT:  We want to thank you for your

16  service, but you are not going to sit on this jury.  You now

17  have some experience you can go back and tell your buddies,

18  the Iron Hogs?

19                   PROSPECTIVE JUROR:  Iron Pigs.

20                   THE COURT:  So we appreciate your

21  service, but we're not going to seat you on this jury.

22  Thank you very much.

23                        (Recess)

24                   THE COURT:  Mr. Jones.

25                        [Prospective juror in]

1      THE COURT:  Good morning, sir, how are

2  you?

3      PROSPECTIVE JUROR:  Good morning.  Fine.

4      THE COURT:  Don C. Jones?

5      PROSPECTIVE JUROR:  Yes.

6      THE COURT:  Welcome to the 283rd.  We're

7  -- actually, you were scheduled to be the third one today,

8  but I was informed that you need to be in Austin, so we're

9  going to get you in a little early.

10      PROSPECTIVE JUROR:  Okay.  Appreciate it.

11      THE COURT:  Have you had an opportunity

12  to read a couple of times through the guide that I provided

13  for you?

14      PROSPECTIVE JUROR:  Yes.

15      THE COURT:  It's a lot of law to hand

16  someone first thing in the morning, here read this, and

17  understand it.  The lawyers are going to spend some time

18  going over the law with you and give you examples on how it

19  works, asking your opinions about what you think the law is

20  and review the questionnaire.  You haven't looked at it

21  since May, but it's there in front of you in case they ask

22  some specific questions like what were you thinking and you

23  can refer back to the question and your answer.

24      PROSPECTIVE JUROR:  Okay.

25      THE COURT:  At the end of the process,

1   the two questions that I need to be able to answer are,

2   number one, do you understand the law?  Number two, can you

3   follow the law?  That's my job here.  Only question I have

4   for you at this time is will you be able to serve this Court

5   for the two weeks beginning on November 10th?

6                    PROSPECTIVE JUROR:  Yes.

7                    THE COURT:  With that, the State may

8   inquire.  Mr. Shook?

9                    MR. SHOOK:  Yes, Judge.

10                        DON JONES,

11  having been duly sworn, was examined and testified as

12  follows:

13                  DIRECT EXAMINATION

14  BY MR. SHOOK:

15       Q.     Mr. Jones, my name is Toby Shook.  I'm the

16  prosecutor that will speak to you on behalf of the State

17  this morning.  As the Judge said, we're only interested in

18  your honest opinions.  You have been down on a jury before.

19  I believe you put in the questionnaire it was a civil case

20  --

21       A.     Yes.

22       Q.     -- involving custody?

23       A.     Uh-huh.

24       Q.     The jury selection was probably a little

25  different.  They probably chose the jurors from just one

1    panel, which is normally how it's done.  Because this is a

2    death penalty case, the law prescribes for us to talk to

3    each juror one on one.

4                    I'll talk a little bit about your

5    questionnaire, mostly about the law, the rules that apply to

6    each case, just kind of common sense rules.  I don't think

7    you would have any problem with them.  And a lot of them I'm

8    sure you have heard before growing up and being on jury

9    service and going through that sort of thing.

10                   Obviously, you know from what the Judge

11   has told you, this is a capital murder case in which the

12   State is seeking the death penalty.  So we want to talk to

13   each juror about how they feel about the death penalty.

14                   On the questionnaire you put that you are

15   in favor of it as a law and I would just like you to follow

16   up and tell us why you favor it, the purpose you feel it

17   serves society.

18        A.     Well, I've always kind of believed in the

19   eye-for-an-eye situation.  And, I mean, it's kind of if the

20   person does the crime, they need to do the time, same thing.

21        Q.     You put on the questionnaire that you circle

22   the, I believe the death penalty is appropriate in some

23   murder cases.  And that's if we were going to take a survey,

24   I guess, of responses we get, that's the majority.  Some

25   people want it in every case, no matter what the facts.

1    Other people are against it for religious purposes, but

2    people that are for it and think about it, normally say for

3    some murder cases, meaning in my mind it just depends on the

4    facts of the case.

5              A.     Right.

6              Q.     You are going to have to wait and listen to it

7    and then decide if you think it's the appropriate punishment

8    or not.  Is that how you feel?

9              A.     Yes, that's what I was thinking.

10             Q.     In Texas a capital murder is reserved only for

11   certain offenses.  First of all, it has to be a murder case,

12   an intentional killing, not a justified homicide, not

13   something in self-defense or accident.  The person wants to

14   intentionally murder another human being and acts upon that

15   intent.  It may only take a few seconds to form the intent,

16   but he has to have the intent there.

17             In addition to that, we have to have some

18   other aggravating factors.  We have a lot of murder cases, a

19   lot of brutal murder cases, which is, most folks that are

20   for the death penalty probably would want to be considered

21   for the death penalty, but it's not.  I could pull out a gun

22   now and execute Mr. Wirskye because I didn't like the tie

23   he's wearing.  I could laugh about it.  Pretty callous act.

24   But I couldn't get the death penalty for it.

25             Because what the State has done is

52

1    reserve the death penalty for murder cases under some

2    aggravating factors.  That's because of guidelines set down

3    by the Supreme Court years ago.  Murder during a felony.

4    Someone kills someone during a robbery, where you went to a

5    convenience store, murdered the clerk, that could be a death

6    penalty case, depending on the facts.  Or murder, burglary,

7    breaking into someone's home, during an arson, rape,

8    kidnapping, committing it during another felony, that could

9    be a death penalty case.  Again, it would just depend on the

10   facts.

11                  Murder of a police officer or fireman on

12   duty, murder of a child under the age of six, murder of more

13   than one victim in the same transaction or series of

14   transactions.  And then murder for hire, someone does it for

15   money or profit.  But those are the only specific types of

16   situations where the death penalty is reserved for, for

17   consideration.

18                  Those cases, generally, are those the

19   types of cases that you feel should at least come into

20   consideration for the death penalty?

21        A.    Yes.  Until I read this, I didn't really

22   realize what the term "capital murder" meant.

23        Q.    Okay.

24        A.    You know, I did today after seeing this.

25        Q.    It seems to me that your own thoughts, and we

just try to get your gut reaction on this, you put, you
know, in the questionnaire that if a person kills another
while committing a crime, that is something that should be
considered. And that's kind of what the law is. That's
some of those aggravating factors.

Again, the way the system is set up, not
every case, even if you found him guilty, is going to be a
death penalty. Again, it's going to depend on the facts.
The trial is divided into two portions. There's the
guilt/innocence stage where we have to prove he's guilty.
If we are unable to do that and you have a reasonable doubt,
you are going to let him go. It's a not guilty. That's
pretty simple.

If we do prove it, though, that doesn't
end the trial. You then move into a second trial, so to
speak. It's really a second part of the trial where you can
get more information and then you get these questions, these
Special Issues. And we'll go over those in a minute.

And whether it's a death sentence or life
sentence, depends on how you answer those. When we talk
about capital murder, the first example we usually think of
is the triggerman. You know, I rob a 7-Eleven. And you
think I committed a capital murder. You think of the
situation of a person going in and pulling the trigger and
murdering.

1          But capital murder is like any other

2    crime in Texas.  Sometimes you have more than one individual

3    that helps carry that crime out and sometimes they act as a

4    team.  Sometimes they act as a group.  The laws says that if

5    you are actively participating in a crime, you could be held

6    responsible for it and be punished, even if you are not the

7    -- you don't participate as much as others.  It might be

8    someone that does a little more, but if you are actively

9    participating, you are held responsible.  It's true for

10   capital murder.

11         If Mr. Wirskye and I decide to go into a

12   bank and rob it and we're going to act as a team.  I have

13   the gun.  He's going to be the bagman and he gathers the

14   money up.  And I shoot a clerk down in the middle of it, or

15   a teller, and we escape.

16         I, obviously, can be prosecuted for the

17   death penalty, but so can he, depending on the facts, if he

18   knew I had a gun and he agreed to help me commit this

19   offense.  Maybe I couldn't have pulled it off without him.

20   That's what we call a party, the law of parties.

21         And the law says that in a capital murder

22   situation, even a nontriggerperson can be prosecuted for the

23   death penalty, if the jury believes they have actively

24   participated.  And ultimately, depending on the facts and

25   how they answer those questions, they can get the death

1   penalty.

2                    Some people disagree with that.

3   Sometimes they say, you know, if it was up to me, the death

4   penalty would just be up for the triggerman, not the

5   accomplices.  Other people agree with the law and say, well,

6   it would depend on the facts.  But if you are helping carry

7   out these crimes, then you have to be held responsible, too.

8                    How do you feel about an accomplice or

9   nontriggerman being prosecuted and ultimately receiving the

10  death penalty?  Do you feel that could be appropriate under

11  the given facts?

12       A.     I think he would be -- should get about the

13  same punishment as the person that pulled the gun and did

14  the shooting.

15       Q.     Okay.  And that would --

16       A.     If they were together in this thing, you know.

17       Q.     So you agree with the law that if he is

18  actively participating, that he should be held responsible,

19  also?

20       A.     Yes.

21       Q.     Okay.  Now, here's how the case is set out.  I

22  can't get into the facts of this case, obviously, but there

23  was some publicity about it.  I think you said you had seen

24  some?

25       A.     Uh-huh.

Q.     It was on the TV and the newspapers.  You
don't remember anything about this particular defendant, but
you do remember the general coverage, I take it?

A.     Yes, sir.

Q.     The law says this, if you have seen the crime
covered on TV, that doesn't mean you were ineligible or
unfit to be a juror.  We wouldn't get a jury then, if that
were the law.  What the law says is that if you are going to
sit on a jury, you can make your decisions only on what you
hear in the courtroom from the witness stand and from the
evidence submitted to you.

In other words, you can't say, well, I
know I heard all these witnesses say this, but I remember
three years ago on TV I saw this about this story, so I'm
going to go this other way.  You probably recognize, you
have been around the block once or twice, that the
newspapers don't always get it right?

A.     Right.

Q.     And that's what the law contemplates that the
more accurate information, obviously, is going to come from
the witness stand.  Could you follow that rule of law?  And
we know you can't forget what you have read, but at least
promise the Court you won't let that influence you and make
your decisions on this case, if you were seated as a juror,
just based on what you hear from the witness stand and that

1  sort of thing?

2      A.    Right, yeah.  And, you know, through the time,

3  my memory has gotten -- I've forgot a lot of what went on at

4  that time, too.

5      Q.    Okay.  Simple rule of law.  You feel you could

6  follow that rule of law?  If you were seated on the jury,

7  you would make your decision, then, just based on what the

8  witnesses told you and not anything that you have read in

9  the newspaper or seen on the TV a year or two ago?

10     A.    Correct.

11     Q.    Now, the trial, as I said before, is divided

12  into two parts.  We first have the burden of proof to prove

13  to you beyond a reasonable doubt that the defendant is

14  guilty.  If we're able to do that, the trial doesn't end.

15  You go to the punishment phase and you can hear additional

16  information.  You can hear about a person's background, you

17  can hear bad things, if they have committed other crimes, or

18  you can hear good things.  Maybe they have never committed

19  a crime.  Good and bad, kind of like the TV show, "This is

20  Your Life," they had where people come from your past.

21           And at the close of that, the jury gets

22  these Special Issues, which are unique to a death penalty

23  case.  These issues -- you don't write in death or life at

24  the end of the punishment phase.  What you do is answer the

25  questions.  You have to go back and reweigh all the evidence

1    you heard in the guilt/innocence stage and then any new

2    information you got and then make your decision.

3                    The first question has to do with whether

4    the defendant is a future danger to society, if you look at

5    that evidence.  And then the second question, did the State

6    prove to you that he anticipated that a life would be taken?

7    And the last one is the mitigation question where you view

8    everything and decide is there sufficient mitigating

9    evidence where I think a life sentence should be imposed

10   rather than a death sentence.

11                   But if you answer them yes, yes, and no,

12   it's a death sentence.  If they are answered any other way,

13   it's a life sentence.  Is that clear to you?

14        A.    Yes.

15        Q.    Let's talk a little bit about this first

16   Special Issue.  It asks whether there's a probability that

17   the defendant would commit criminal acts of violence that

18   would constitute a continuing threat to society?

19                   You see where that question is asking you

20   to make a prediction about the future, how he's going to

21   behave, whether he's going to be a danger?  Do you feel you

22   could answer that question yes, if you are given enough

23   information?

24        A.    I believe so.

25        Q.    What types of things would you want to hear

1    from -- as a juror, what things would be -- what type of

2    information would you be looking for?

3         A.        Well, in that case they're talking about the

4    probability that the defendant would commit criminal acts.

5    I guess you would need to know his background.

6         Q.        Okay.

7         A.        To see kind of what kind of history is there.

8         Q.        See if there's a pattern or something like

9    that?

10        A.        Right, uh-huh.

11        Q.        You can hear that information at this point in

12   time.  You can even hear from the witnesses, if they are

13   available.  You can hear what he got in punishment.  You can

14   even hear from crimes that he wasn't caught on, but we can

15   prove.  You can hear the opposite, too.  If he was a Boy

16   Scout or choir boy, that sort of thing.  But you are exactly

17   right.  That's the information that you can get in this

18   portion of the trial to help you see if there's a pattern,

19   that sort of thing.  And, quite obviously, you get the facts

20   of the crime itself and his role in the crime to see if that

21   could aid you in answering that question, too.

22        A.        Uh-huh.

23        Q.        The State -- what happens is, you know from

24   growing up here in this country, that every defendant starts

25   out with that presumption of innocence and we have to prove

1  him guilty.  The same holds true in the punishment phase in

2  that this question starts out with a no answer and we have

3  to prove to you beyond a reasonable doubt it should be

4  answered yes.  We do that by putting on new evidence, if we

5  have it, in the punishment phase and then arguing or

6  resubmitting the evidence in the guilt/innocence stage.  But

7  we have that burden of proof.  We have to prove that to you

8  beyond a reasonable doubt.

9            Probability, these words will be -- the

10  definitions are up to you.  We're given some guidelines on

11  probability.  We don't have to prove it's a certainty,

12  because I don't think that we could ever do that.  But,

13  obviously, probability is more than just a possibility.

14  If they meant just possibility, anything could be possible.

15  More people tell us more likely than not or greater than 50

16  percent.  Are you comfortable with that type of definition?

17        A.     With what percent?

18        Q.     Greater than 50 percent.

19        A.     Oh, yes.

20        Q.     More likely than not, that sort of thing?

21        A.     Yes.

22        Q.     Again, what we do is put on evidence, as you

23  said, to see if there's a pattern or what the background is.

24  The law contemplates that just because you have found

25  someone guilty beyond a reasonable doubt of committing

1    capital murder, that doesn't mean you automatically answer

2    question No. 1 yes.

3              The law contemplates that what you will

4    do as a juror is wait and then weigh all the new evidence,

5    talk about that, deliberate the new evidence with the other

6    jurors, and then make the decision has the State proven that

7    beyond a reasonable doubt?

8              There's no automatic answers.  Some

9    jurors frankly tell us, I can't follow the law.  You know,

10   if I find somebody guilty, that tells me all I need to know.

11   He's going to be dangerous and they check off yes without

12   ever thinking about it.

13             But that's not what the law contemplates.

14   There may be fact situations where they commit a murder, but

15   you don't think they will be a continuing danger to society.

16   I can't tell you what those facts will be.  There may be

17   other fact situations where you do think they are after

18   weighing the evidence.  But the law contemplates there's no

19   automatic answers.  Just because you find him guilty, you

20   don't automatically answer it yes.  If that were true, there

21   would be no need for these answers, obviously.  You

22   understand that?

23   A.       Right.

24   Q.       It's kind of like what they want to do, since

25   this is a death penalty, is they want the jurors to wait and

1  carefully deliberate all the information and then make their

2  decisions.  Does that make sense to you?

3        A.    Yes.

4        Q.    Okay.  We do this in our everyday lives.  I

5  know you put in the questionnaire that you are, I believe, a

6  -- you inspect boilers?

7        A.    Yes.

8        Q.    And supervise that sort of thing?

9        A.    Uh-huh.

10        Q.    And I take it from that, I'm sure from your

11  duties, a lot goes into that.  You gather a lot of

12  information before you pass a boiler or they have to pass

13  inspection?

14        A.    Right, correct.

15        Q.    Because I know from reading in the newspapers,

16  bad things can happen if those things -- something goes

17  wrong with them.

18        A.    And it has happened, so --

19        Q.    And that's the same principle that applies as

20  a juror.  You want to get all the information in before you

21  make this decision and then decide.  Do you feel that you

22  can follow that rule of law, that you can wait, and then

23  after -- if you found someone guilty, you would wait and

24  then wait for all the evidence to come in, in the punishment

25  phase, and then decide whether the State proved it beyond a

1  reasonable doubt?

2       A.       Yes.

3       Q.       Okay.  The fact that you found him guilty

4  doesn't mean you will automatically answer it yes.  You will

5  wait and if you don't think the State proved it, you will

6  answer it no.  And if you think they did, you will answer it

7  yes.  In other words, you are open to a yes or no answer

8  either way?

9       A.       That's correct.

10      Q.       Okay.  Fair enough.  Now, the second Special

11 Issue, you get to that next.  And just like the first one,

12 it starts out with a no answer and the State, again, has to

13 prove to you that it should be answered yes.  And it asks

14 whether the defendant actually caused the death of the

15 deceased or did not actually cause the death of the

16 deceased, but intended to kill the deceased or another, or

17 anticipated that a human life would be taken.

18                 That question has to do with that party

19 or accomplice law we talked about.  If they are not the

20 actual triggerman, what we have to prove is that they had

21 the intent to kill.  Maybe they wanted to kill the person,

22 but one of the other accomplices did, or that they

23 anticipated that a human life would be taken.  We have to

24 actually prove that.  To get him guilty we have to prove he

25 should have and then we have to go a step further in the

1  punishment phase and prove to you from the evidence that he

2  did anticipate.  Again, that's just going to depend on the

3  evidence, how the crime went down, whether it was planned,

4  how brutal it was, what his actions were in it.

5              Then, again, you may hear something in

6  the punishment phase regarding his past history that would

7  aid you in helping you answer that question yes or no.  But

8  the point is, it's just like question No. 1.  The State has

9  to prove to you beyond a reasonable doubt.  Just because you

10 found him guilty, just because you found he's dangerous, you

11 don't automatically answer that question yes.  You have to

12 consider that question separately and then make that

13 decision after weighing everything you heard.  Could you do

14 that?

15     A.     Yes.

16     Q.     Okay.  Then the last question is the

17 mitigating issue question.  It's a little different.

18 Neither side has the burden of proof.  You just simply look

19 at everything you have heard about the person's background

20 and the crime and see if you think there's sufficient

21 mitigating evidence.  Kind of runs on, but it asks whether

22 taking into consideration all the evidence, including the

23 circumstances of the offense, the defendant's character and

24 background, and the personal moral culpability of the

25 defendant, there's sufficient mitigating circumstance or

1    circumstances to warrant that a sentence of life

2    imprisonment, rather than a death sentence, be imposed.

3              This question, we kind of refer to it as

4    the safety net.  It allows a jury to show mercy, so to

5    speak, if they think that's the right thing to do in their

6    heart, based on some piece of evidence.

7              You are not required as a juror to tell

8    us what you think mitigating evidence would be.  Most jurors

9    haven't contemplated these issues.  And we don't require you

10   to tell us what it would be or come up with something.  All

11   the law requires you as a juror is to be able to tell the

12   Court I will keep my mind open to it.

13             If I think something is sufficiently

14   mitigating where I think he deserves a life sentence, I will

15   answer the question that way.  If I don't, I will answer it

16   no.  It's just a matter of keeping your mind open and then

17   weighing everything in his background, his character, and

18   then the crime, to see if you think it's there.  Do you feel

19   that you can do that?

20        A.     Yes.

21        Q.     Do you feel that's a fair question in a death

22   penalty case for you to look at everything in his

23   background?

24        A.     Oh, yes, uh-huh.

25        Q.     Okay.  I had a juror -- you know, the law is

1   this.  Just because you found him guilty, just because you

2   found he's a danger to society and just because you found he

3   intended someone to die, anticipated that a life would be

4   taken, there still may be a fact situation or something in

5   his background which tells you he should get a life

6   sentence.  What that is, I don't know.  But it still could

7   be there.  The law contemplates that.

8           I had a juror, I guess he explained it

9   best this way, is when he would be thinking about these

10  questions, it's like a window going down.  If we prove

11  question No. 1, that window would be closed a little bit.

12  Question No. 2 more, and then, finally, if he believed there

13  wasn't mitigating evidence, the window would be closed.  But

14  when you get to question No. 3 your window still has to be

15  open.

16          It depends on the juror.  You know, one

17  of them told us the window would be open about that much,

18  maybe, if we had proven all the other things.  And the other

19  juror said it would be about halfway open.  But the point is

20  you would have to be able to keep your mind open and then

21  decide.  In other words, just because you found him guilty

22  and dangerous, you don't say, I would never give him a life

23  sentence.  You would have to tell the Court, I will wait and

24  see what it is, and if I think there's something

25  sufficiently mitigating, then I will do that.  You feel that

1  you can do that?

2        A.     Yes.

3        Q.     It might be something in his background.

4  Maybe he was abused as a child.   Some jurors have told us

5  that.   The way we got this question originally was there was

6  a defendant who had some mental retardation questions.   He

7  was born with a mental defect and, in fact, the mental

8  defect might have made him dangerous, more prone to

9  violence, but it wasn't his fault, because it was a birth

10 defect.

11              And at that time, at his first trial,

12 there was no question that the jury could consider.   They

13 could only consider that and find he's dangerous.   So what

14 the Court did is they plugged this new question in and said,

15 well, there might be something in his background, a mental

16 defect that would allow you to give him a life sentence and

17 show him mercy that way.   But it's a catch-all.   It lets you

18 make a decision based on your heart and based on your common

19 sense.

20              But, again, you don't have to tell us

21 what it would be, but just be able to assure the Court that

22 your mind would be open to it.   Do you feel that you can do

23 that?

24        A.     Yes.

25        Q.     Okay.   Let me get into an issue that may or

68

1    may not come up.  Sometimes jurors find defendants guilty on

2    what we call lesser included offenses.  One of the lesser

3    included offenses of capital murder is actually robbery or

4    aggravated robbery.

5              Let's say we maybe charge a guy with

6    committing a murder during the course of a robbery, but you

7    feel you had a reasonable doubt whether he ever committed

8    murder.  But maybe you feel he committed aggravated robbery.

9    In those situations the penalty range is different.  It goes

10   from life or 99 years at the heavy end and all the way down

11   to five years in prison at the light end and anywhere in

12   between, 20, 30, 40 years.

13             The law says that as a juror you have to,

14   once again, keep your mind open, and then weigh everything

15   in his background, anything you find about his background in

16   the punishment phase, and then decide what you think the

17   appropriate punishment is.

18             If you think it's a life sentence, you

19   have got to be able to assess that.  If you think the right

20   thing to do is five years in prison, the minimum, you can do

21   that.  We have jurors do both all the time, five years all

22   the way up to life, 20, 30, 40 years, whatever they think is

23   necessary based on the evidence.

24             Do you feel you can keep your mind open

25   to the full range for the offense of aggravated robbery and

NANCY BREWER, OFFICIAL COURT REPORTER

1   assess either the maximum or the minimum or anywhere in

2   between, just based on what the evidence tells you?

3        A.    Yes.

4        Q.    Okay.  Some rules of law that apply in every

5   criminal case are these.  The presumption of innocence.

6   Just because a person gets arrested, gets indicted by a

7   grand jury, or the fact that we're going through this

8   process, doesn't mean he's guilty.  The Judge will instruct

9   you that the defendant must start out with the presumption

10  of innocence and the State has to overcome that presumption

11  but putting on evidence.

12             And every juror must start out a

13  defendant with that presumption of innocence and require us

14  to prove our case beyond a reasonable doubt.  Do you feel

15  that you could do that?

16       A.    Yes.

17       Q.    I think you even said from anything you have

18  read about the case, you don't remember this man's name, you

19  don't know what the facts are against him, so you would be

20  able to give him the presumption of innocence?

21       A.    I know absolutely nothing about him.

22       Q.    The burden of proof is always on the State of

23  Texas and never shifts to the defense.  You know, you can't

24  require them to prove his innocence.  I'm sure common sense

25  will tell you, you think they are going to try to prove his

1    innocence or ask questions, cross-examine, argue.

2    Technically under the law, they don't have to.  They just

3    have to show up and not ask a question.  I anticipate they

4    will, but they don't have to because the burden of proof

5    never leaves this table.

6              At the close of the evidence, if they

7    haven't asked a question or put on a witness and you look at

8    all the evidence and decide there's a reasonable doubt, you

9    find him not guilty.  You can't require them to prove

10   anything to you.  It's just based on whether you have that

11   reasonable doubt and whether we have met that burden.

12             Can you follow that rule of law and

13   require the State of Texas to prove this case beyond a

14   reasonable doubt?

15        A.    Yes.

16        Q.    And not require the defense -- not put a

17   burden of proof on them, just keep that burden of proof here

18   on the State of Texas?

19        A.    Right.

20        Q.    Okay.  The burden of proof goes to every

21   portion of the indictment.  Let me give you a couple of

22   examples.  One is the identity.  We have to prove who

23   committed this crime.  Obviously, at the close of the

24   evidence, if you had a reasonable doubt about a defendant's

25   identity, you would find him not guilty, common sense

1   proposition.

2                    But that burden of proof goes to every

3   element, just not identity.  You know, if -- we have to

4   prove that it happened in Dallas County, and under the law

5   Dallas County is just as important as the identity of the

6   defendant.

7                    Let me give you kind of a way-out example

8   to demonstrate that.  Perhaps you might sit on a jury and

9   you believe we have proven everything, who did the killing,

10  how they did the killing, who they murdered, but this case

11  occurred near the Tarrant County border.  Maybe the evidence

12  really shows it happened in Tarrant County and you believe

13  that.  Well, in that particular case you would have a

14  reasonable doubt about the county it occurred in, and you

15  would be obligated under the law to find the defendant not

16  guilty.

17                   Probably wouldn't want to do it.  It

18  would leave a bad taste in your mouth.  You have every right

19  to be outraged at our poor preparation and I'm sure it would

20  cause us to lose our jobs.  You could have us fired.  But

21  you can't help us out as a juror.  And I don't anticipate

22  that happening.  But I use that as an example to demonstrate

23  how that burden of proof goes to every part of the

24  indictment.

25                   And a juror is kind of like an umpire at

1   a baseball game.  He just has to call the balls and strikes.

2   He can't give us an extra strike or an extra ball when we

3   need it.  Do you feel that you can follow that rule of law

4   and make the State prove everything, every part of -- every

5   element of the indictment to you beyond a reasonable doubt?

6          A.     Yes.

7          Q.     Okay.  Fifth Amendment, you know, you have

8   probably heard that if a person is charged with an offense

9   and they want to testify, no one can stop them.  They get up

10  there and testify and you judge them like you would every

11  other witness.

12              But if they choose not to testify, you

13  can't hold that against them.  It's kind of a cornerstone of

14  democracy.  There could be many reasons why a person may not

15  choose to testify.  He may not be very well educated.  He

16  may have a speech impediment, be very shy in public, may not

17  perform well, may not be guilty, but could look guilty just

18  by the way he testifies.  He may not be any match for an

19  experienced prosecutor.  His lawyer might tell him, I don't

20  think that they have proven the case.  He's just following

21  his lawyer's advice and doesn't take the stand.  Could be

22  he's real guilty and we can make him look bad.  There could

23  be a lot of reasons.

24              If someone chooses not to testify, the

25  Court instructs the jury you cannot hold that against him.

1    In other words, you can't consider that in any way as

2    evidence.  You just have to just decide the case from what

3    you have heard.  If you have a reasonable doubt, you find

4    him not guilty.  If you think the State has proven the case

5    beyond a reasonable doubt, you would find him guilty.  But

6    you just can't consider that proposition.  Do you feel that

7    you can follow that rule of law?

8         A.     Yes.

9         Q.     Police officers often testify in criminal

10   cases.  Most of our jurors have a lot of respect for police

11   officers.  But the law says you can't start them out ahead

12   of the other witnesses before they testify.  There's good

13   cops, bad cops.  You know, you have got your hardworking

14   ones and you have some lazy ones, just like boiler

15   inspectors or postmen or prosecutors or defense attorneys.

16                   And the law says you have to wait and

17   judge their credibility when they hit the witness stand.

18   Could you follow that rule of law?

19        A.     Yes.

20        Q.     Okay.  Parole laws sometimes come up in the

21   news.  The Judge will instruct you in a capital murder case

22   that if someone is convicted and given a life sentence in a

23   capital murder case, they have to spend forty calendar years

24   in prison before they can even become eligible for parole.

25   That is day for day.

74

1            But he will also instruct you that you

2   can't consider parole laws in deciding how to answer these

3   questions or what the appropriate punishment is.  You just

4   have to consider a life sentence to be a life sentence.  Do

5   you feel that you can do that?

6        A.    Yes.

7        Q.    Okay.  The bottom line is, and I think you

8   have covered this pretty good, Mr. Jones, is that you have

9   to wait and listen to all the evidence before you make any

10  of these decisions.  In other words, you can't have a

11  kneejerk reaction.  You can't automatically answer these

12  issues yes.  You have to wait, follow the law, and then make

13  your decisions based just on what you hear in the courtroom.

14  Do you feel that you can do that?

15       A.    Yes.

16       Q.    Keep your mind open until every piece of

17  evidence is in, in the guilt/innocence stage and also the

18  punishment stage, and kind of let the chips fall where they

19  may?  If you think these questions should be answered in a

20  way in which a death sentence would be appropriate, you can

21  do that.  You could also be comfortable if you think that

22  the questions are answered in a way in which he gets a life

23  sentence after he's committed capital murder, you can do

24  that.  It's just going to depend on the facts of that

25  particular case.

1    A.      Uh-huh.

2    Q.      Do you feel that you can do that?

3    A.      Yes.

4    Q.      Okay.  Do you have any questions over anything

5  we've gone over?  I know I've gone over pretty quickly a lot

6  of different principles, kind of a continuing theme.  But

7  the last thing I like to do is ask if you have any questions

8  over anything we've covered at all?

9    A.      No, sir, I don't believe so.

10   Q.      Okay.  I appreciate your patience with me, Mr.

11  Jones.  That's all the questions we have.

12                     CROSS-EXAMINATION

13  BY MS. BUSBEE:

14   Q.      Mr. Jones, good morning.

15   A.      Good morning.

16   Q.      You've answered yes a lot, but I kind of like

17  to hear you tell me your thoughts on some things.  Sometimes

18  we have jurors who tell us way too much and sometimes we

19  have people who listen to the questions and answer them.

20  But we don't really feel like we know you yet, so we'll talk

21  to you a minute, if you don't mind too much.

22                     What brought you and your wife here to

23  Dallas from Greenville, Mississippi?

24   A.      It was the economy in that area was real bad.

25  And the type of work I was in, it was an opening that came

1  up with an insurance company doing pretty much what I'm

2  doing right now with the State and so we were ready to make

3  a move.  And so we moved out here in 1978.  We moved to

4  Mesquite.  And, you know, it was just a lot more opportunity

5  here than what we had back there.

6        Q.    I'll ask you about that.  It looks like you

7  had done this prior to working for the State of Texas.  You

8  had inspected boilers for an insurance company?

9        A.    Several insurance companies.

10       Q.    What kind of training do you get to be an

11 inspector?

12       A.    Mine started off, I worked for a boiler

13 manufacturer for ten years in Mississippi from Greenville,

14 which qualified me to be tested -- we take what they --

15 what's called a National Board Exam.  It's a commission that

16 we have to have to -- which is good worldwide to do boiler

17 inspections and you have to be employed by an inspection

18 agency of some sort, which an insurance company would fall

19 -- certain insurance companies would fall within that.  And

20 the state jurisdictions would -- also, the various states

21 would honor this commission.

22       Q.    So like a certification --

23       A.    Right.

24       Q.    -- or something.  Did you have occasion to

25 have to be called into court?  Was that your kind of job

1   where you had, like if there's a lawsuit or something?

2        A.    No, I never had to.  I mean, that possibility

3   is there, but I've never had it.

4        Q.    While I'm thinking about it, if you do your

5   job perfectly, hopefully there are no lawsuits?

6        A.    Hopefully.

7        Q.    So --

8        A.    Of course, we can't -- when we go in and do an

9   inspection, we can't catch everything, you know, so, you

10  know, it's possible something could happen.

11       Q.    Things like metal fatigue or something you

12  might not be able to --

13       A.    Right.  There are things you can't see.

14       Q.    Okay.  And I think you said that you came to

15  work for the State of Texas and you have gone back.  Have

16  you retired from a job and are working for the State or is

17  this a better job?

18       A.    I retired from the insurance company.  Factory

19  Mutual -- used to be Factory Mutual Engineering, they merged

20  with two insurance companies and became Factory Mutual

21  Insurance, FM Global.  And so rather than quit, I was able

22  to retire.  And so I retired from them and started with the

23  State, doing basically the same thing that -- I had to get

24  away from all the overnight travel.  That's the main reason

25  I left the company I was with.  I was gone a lot.

1    Q.    And I know you have to go to Austin today.

2  Didn't you say that to the bailiff that you needed to --

3    A.    Right.  I was able to -- I talked to Austin

4  and they said that I didn't have to come down, so it worked

5  out okay.  I found out yesterday afternoon.

6    Q.    Fair enough.  Do you still travel

7  significantly in your job now?

8    A.    Not overnight.  I'm out about maybe three

9  nights a year.  That's when I make a trip to Austin.  We

10 usually spend the night down there.

11   Q.    And so I take it other people can take over

12 your duties, if you are involved in a jury trial?

13   A.    Yes.  There's four of us that work out at the

14 Dallas office.

15   Q.    Some people have to go on vacation, too, so

16 sometimes we get self-employed people who are going, oh, my

17 God, I can't be gone for two weeks.  Okay.  Fair enough.

18   A.    Most -- a big part of my work is just

19 walk-in-type stuff.  It's not scheduled.  I do make

20 appointments, too, for certain inspections.  But I would say

21 probably 80 percent of it is just walk-in, unannounced-type

22 thing.

23   Q.    Good.  Those of us who go in public buildings

24 are grateful for that.

25   A.    Yeah.  And that's the way we want to do it.

1    We want to see what's happening without giving anybody a

2    chance to get in there and fix things up before we come in.

3         Q.    All right.  What happens if you find a

4    violation?  Are there grades of violations, for instance --

5         A.    It's different severities.  There's a

6    violation form that we write up.  Depending on what it is,

7    we give them X number of days to get it fixed and then we

8    come back and do a followup.  If it's something that is

9    really dangerous, we can shut them down right then and say

10   you have to cut this thing off until you get it fixed.

11        Q.    Have you ever had occasion to do that?

12        A.    Once.  It was a dry cleaners that the boiler

13   was in terrible shape.  It looked like it had overheated and

14   it was just about to go.  So I told him he has got to

15   replace it and that's the only option he had.  I try to work

16   with them as much as I can and, you know, especially in

17   these -- I'm using dry cleaners as an example because that's

18   where you see most of your high pressure boilers.  And if

19   you shut him down, of course, you shut down his whole

20   operation for possibly days.  So we try to help them as much

21   as we can, but there's limits to what we can do.

22        Q.    Sometimes a business man can't see the profit

23   margin isn't really the bottom line.

24        A.    That's right.  That's right.  If he loses that

25   boiler, he's lost a lot more than, you know.

1    Q.    Possibly some lives, I guess?

2    A.    Yes, it's possible.  These things go off, they

3  could go off like a bomb.  And I've seen pictures of them

4  where they've taken out whole apartment complexes before,

5  two or three stories, you know.  Oklahoma was a good

6  example.  They had a hot water heater in a school several

7  years ago that exploded and somebody removed the safety

8  valve.  It overpressured and blew up and killed several

9  children.

10    Q.    Wow.

11    A.    So even a hot water heater can become a bomb,

12  really.

13    Q.    Now you make me want to go home and check my

14  water heater.  And that's kind of what I envisioned, but I

15  didn't think -- I didn't know quite that much about it and I

16  guess it makes sense.  But I didn't know they were in the

17  dry cleaners.

18    A.    Yeah, probably 99 percent of the dry cleaners

19  has got a boiler in them.

20    Q.    I don't trust dry cleaners, so it's just

21  another thing to take a look at the next time I go in there.

22  Your son-in-law is a city marshall in Garland?

23    A.    Right.

24    Q.    I'm guessing because that's nearby, that you

25  are probably pretty close to him?

1    A.    Yeah.  Well, he lives about two blocks from

2  me.

3    Q.    Okay.  How long has he been a city marshall?

4    A.    He's been in Garland, I can't remember for

5  sure.  I'm thinking three to four years.  Before that he was

6  with Dallas Police, stationed out at Love Field.

7    Q.    Okay.

8    A.    In security out there.

9    Q.    Yeah.  And then I seem to remember they closed

10  that station.

11    A.    They did.  They dismissed them and that's when

12  he left there and went to the City of Garland.

13    Q.    Now, I'm not real sure -- we have so many

14  little different police agencies around here now.  In

15  Dallas, city marshalls sometimes go out and execute

16  warrants.  What do they do in Garland?

17    A.    Yes, he does that, too, uh-huh.  He makes

18  pickups and issues warrants.

19    Q.    So he's a fully commissioned peace officer?

20    A.    Right.

21    Q.    Have you talked to him about the fact that you

22  are coming down on this case, mentioned it to him?

23    A.    Yes, uh-huh.  You know, I told him where I was

24  coming.

25    Q.    Well, the reason I ask that and I'll be frank

1  with you is you saw how many folks came down the morning you

2  were down?

3          A.    Uh-huh.

4          Q.    We had that many in the afternoon.  And

5  because a life is at stake and a life has been lost in this

6  type of case, we do this torturous questioning of people

7  just to get just the right sort of person on the jury to be

8  the fairest that they can be.  And people's emotions are

9  involved in this type of case, can't be helped.

10               But, you know, as counsel for the

11  defendant in this case, I have to ask you whether or not it

12  would make you uncomfortable to give a life sentence on a

13  case where a peace officer has been killed?

14         A.    I don't think any more so than any other

15  person.  I wouldn't separate whether it's a police officer

16  or whether it's an individual.

17         Q.    I mean -- and I apologize, but I have to ask

18  these questions because this is the only time I get to do

19  that.  You said that you were on a jury back, looks about

20  four years ago?

21         A.    Best I remember, I think it was about that far

22  back.

23         Q.    Do you have any -- we asked that question, but

24  I'm going to ask you, again.  What was that like?  Did that

25  bother you having to make a decision on custody?

A.      It did some.   It was kind of -- I looked at it kind of like we were making a decision for this child where -- which parent he was going to go to and live with.   And at that time he was with his father and I felt like really both parents weren't really that good.   So it was kind of the lesser of the two evils.

But the father -- in that case, the father ran a nightclub, had the child there, and he also, we found out, had a convicted child molester that had been babysitting in the past.   So we felt like he shouldn't be in that environment, so -- and the mother had taken him to soccer practice and school activities and this kind of thing.   So I felt like he needed her.   He should be with her rather than the father.

Q.      Well, I kind of see how you would.   I wonder how it got that far?

A.      I don't know how it ended up with him having custody.   Like I said, she was unemployed, I think, at one time for quite a while and she was a waitress-type thing and I think she wasn't making much money and that influenced maybe who got him, originally.

Q.      That is sad.   How old was he?

A.      He was either 11 or 12.   I can't remember.   I think 12.

Q.      You remember a whole lot more than most people

1  do about prior service.  I can see why you wouldn't need to

2  revisit that or be concerned about that because it was

3  pretty clear cut?

4         A.      Right.

5         Q.      Um, I'm sure when you came down in May, you

6  weren't thinking too much about -- you were just coming down

7  for jury duty as you were in the past.  But since then when

8  you were notified and asked to come down here for an

9  individual interview, have you done any soulsearching or

10 thinking about sitting on a death penalty jury?

11        A.      Yes, I really have.  When you get to thinking

12 about the decision you might have to make, it does make you

13 think about that and kind of give it a second thought.

14        Q.      Any reluctance to sit on this jury?

15        A.      No.  I don't have any reluctance to sit on it.

16 Like I said, it just makes you think again, you know, what

17 the consequences would be at the end or what it could be,

18 rather.

19        Q.      It requires -- the Judge uses this expression,

20 kind of a discipline, because the rules are complex, kind of

21 like your rules are.  I mean, I wouldn't have the first

22 notion how to inspect a boiler.  But the law doesn't let me

23 go down there and do it, just like, I guess my analogy is,

24 and yet we invite jurors in to make decisions on this case

25 and it's complex, too.

1          So we get to ask you about some of these

2   rules and to see not so much if you will follow the law,

3   because, believe me, by the time you have been selected for

4   this process you are one of probably less than ten percent

5   of the people who are asked to actually come down after we

6   agree.  So we know that you can follow the law and are

7   lawabiding and possibly that you agree with the law.

8          But I'm going to go a little further and

9   ask you if you have feelings against it, which you are

10  certainly entitled to.  And one of my concerns with any

11  juror is this question No. 1.  You know, you stated that you

12  can follow the law that a person who is a party to a capital

13  murder can be found guilty of a capital murder.  And most

14  people don't have a problem with that.

15         But once somebody has been found guilty

16  of a capital murder, it's certainly not an automatic death

17  penalty, in fact, just the opposite.  It's an automatic life

18  sentence.  And by law other questions have to be proved by

19  the State beyond a reasonable doubt.

20         And so -- but my question for you on

21  Special Issue No. 1 about this probability that a person

22  would be a continuing threat, a continuing danger, that is

23  one of the questions that has to be answered.  And I thought

24  maybe you got cut off before you finished answering that

25  question earlier about the probability.

1        If you found somebody guilty of a case of

2   capital murder, a hypothetical one, would you pretty much be

3   persuaded that they would be a future danger without -- I

4   mean, before you heard other facts?

5        A.     No, I would have to hear the other facts

6   before I could make that determination.

7        Q.     Okay.  Now, the question of probability, what

8   does that mean to you?  What is "probability"?

9        A.     Well, the likelihood it's something that is

10  going to happen, you know, and in all likelihood it's going

11  to happen.

12       Q.     See, this is what people hate lawyers for.  So

13  I hate splitting hairs with you here, but we have people use

14  probability and possibility interchangeably.  But you

15  probably very well know the difference between possibility

16  and probability.

17       A.     Right, uh-huh.

18       Q.     So are you comfortable with the way we have

19  been describing this probability as more likely than not?

20  Is that --

21       A.     Um, well, I would think maybe possibility

22  would be more appropriate than probability there.

23       Q.     Because it's -- this question is sort of a

24  public safety question, really.  And that's why I want to

25  ask you.  I sensed that when you were talking to Mr. Shook.

1    And if that's your opinion and that's how you feel, that's

2    fine.   I mean, I have some real problems serving on certain

3    juries on laws that I may not agree with, income tax.

4                        But in any event, if you feel that way,

5    it's better to tell us now --

6          A.      Uh-huh.

7          Q.      -- than to be in a bad situation down the

8    road.

9          A.      Uh-huh.

10         Q.      So if you thought that there was a chance or a

11   possibility that a person would commit criminal acts of

12   violence in the future, you would answer that question yes?

13         A.      That one?  Well, I really don't know, to be

14   truthful.   I guess it will take more proving on possibility,

15   rather than probability.

16         Q.      Tell me what you mean when you said that?

17   I've confused myself now.

18         A.      More evidence, possibly.  Somebody is going to

19   possibly do something, I think they are not as likely to do

20   it as probability, as probably would do it.

21         Q.      So baldly stated, are you telling us that if

22   you felt there was a possibility you would answer that

23   question no?

24         A.      I think I would.  If it was possibility,

25   rather than probability, yeah, I would answer no.

1    Probability would be answered yes.

2         Q.    Fair enough.  And that's something that the

3    State is required to prove to you.  Sometimes we throw out

4    the terms like burden of proof, what does that mean?  It's a

5    John Grisham title.  It's just a phrase.  But the point of

6    the matter is that the jury has to look to the State's table

7    for the proof, in other words, not ask the defense to, or

8    expect the defense, to put something else on.  That's not

9    the way it works.

10             Are you comfortable with that?  Because

11   I'm not telling you what is going to happen in this case.  I

12   can't and I wouldn't.  But would you need to hear anything

13   from the defense, in order to make up your mind about

14   probability?  I mean, would you need to hear something?

15        A.    Yes, I would.

16        Q.    Okay.  Can you elaborate on that?

17        A.    Yeah.  Well, yeah, there again, I would need

18   to know some background information.

19        Q.    So don't let me put words in your mouth,

20   please, because that just makes us stay here longer.  Would

21   you want to hear from the defendant himself about his

22   background or his --

23        A.    I don't think I would have to hear from him,

24   but I would think the defense would want to give some kind

25   of explanation.

1      Q.     Okay.   Then if you -- keeping this a

2  hypothetical jury, on this hypothetical jury, after the jury

3  has found somebody guilty of capital murder and you have

4  either maybe you heard something from the State or maybe the

5  State has not put anything on, because you can just consider

6  the crime itself, of course, for that answer.   Some capital

7  murders will effectively answer that future dangerousness

8  question without too much problem.   In your mind, you would

9  really need to hear from the defense, in order to answer

10 that question no?

11     A.     Yes.

12     Q.     I think that's fair enough.   So you need to

13 hear a little bit from both sides --

14     A.     Right.

15     Q.     -- before you can answer that question no?   Is

16 that -- I don't want to put words in your mouth.   I want to

17 make sure I have stated it correctly.

18             The second Special Issue, whether the

19 defendant caused the death of the deceased, you know, I

20 think we have previewed this for you.   This is a case where

21 the defendant, the theory of the prosecution is not that he

22 actually pulled the trigger or actually caused the death,

23 but was a participant of some sort in this crime.

24             You stated that, you know, your gut

25 feeling was a person who participates gets the same.   But

1  sometimes I don't know if people mean are convicted of the

2  same offense or get the same punishment?

3       A.    I was going by the example he gave in that

4  case.

5       Q.    What do you think about punishment for someone

6  who is not a triggerman, in general, now?

7       A.    I still feel like that if a person is with a

8  person and a crime like that is committed, unless I hear

9  something to convince me different, that they are just as

10 guilty as the person that pulled the trigger.

11      Q.    Now, when we get to -- and I think that that

12 is a fair statement of the law.  They are as guilty.  Now,

13 but Special Issue No. 2 is a punishment issue and that is,

14 do you think -- you would have to answer that question yes

15 for a death penalty case and you would have to answer it no,

16 if it wasn't proved to you to your satisfaction beyond a

17 reasonable doubt.

18            Could you answer that question no, if you

19 found somebody guilty of a capital murder?

20      A.    I guess under -- depending, there again,

21 depending on the evidence, you know, or lack of evidence.

22      Q.    All right.  Would --

23      A.    I wouldn't say that's locked in one hundred

24 percent yes without knowing the facts.

25      Q.    Okay.  Sure.  So this -- the way that the

1  Legislature has written this, that's okay with you?  That's

2  within the way that you think about things?

3       A.    Oh, yes.

4       Q.    Okay.  Fair enough.  Now, we breezed over this

5  mitigation.  Mitigation means -- and we're just lawyers

6  giving it our own spin, so to speak.  But mitigation means I

7  heard something in this case that even though I have found 1

8  and 2 to be yes beyond a reasonable doubt, I don't want to

9  assess the death penalty in this case for whatever reason.

10  Could you do that?

11      A.    Based on the evidence, I could make that

12  decision.

13      Q.    So if you have found that they are a future

14  danger and that they intended that a human life would be

15  taken, you could still assess a life sentence based on some

16  other fact that might have softened your heart towards

17  giving the death penalty?

18      A.    That's kind of hard to answer without knowing

19  what the evidence --

20      Q.    But it's the only way that we can do it, so we

21  have to kind of put you on the spot.  If you really don't

22  think that you can --

23      A.    I would say it's possible that I could answer

24  that way.

25      Q.    That's fair enough.  You have told us that

1   you, like everyone else, has heard some publicity about this

2   particular case.  And now that you know what the scheme of

3   our law is, have you formed an opinion in this case as to

4   future dangerousness?

5          A.    No.

6          Q.    Or as to whether or not you could consider any

7   mitigating issues in this case?

8          A.    No, I haven't formed any kind of opinion.

9                MS. BUSBEE:  I have no other questions of

10  this witness, Your Honor.

11               THE COURT:  Mr. Jones, you answered one

12  of Ms. Busbee's questions regarding Special Issue No. 1.  I

13  want to go back over that with you.  The law requires the

14  State to prove Special Issue No. 1 and Special Issue No. 2

15  beyond a reasonable doubt.

16               PROSPECTIVE JUROR:  Uh-huh.

17               THE COURT:  The defense has no burden to

18  put on any evidence at all.

19               PROSPECTIVE JUROR:  (Prospective juror

20  nods head.)

21               THE COURT:  You said that you understand

22  that concept.  And one of her questions, would you like to

23  have some evidence from the defendant or would you like to

24  hear him testify?  Your answer was, no, I don't have to hear

25  from the defendant, but I might -- I can't remember the

1  exact word.  I would like to hear from the defense or I

2  would think you would hear something from the defense before

3  I could answer that question no.

4                 Do you understand, sir, that they can sit

5  there and do crossword puzzles, they don't have to present

6  any evidence at all?  It's the State's burden to prove to

7  you beyond a reasonable doubt Special Issue No. 1 and 2.

8                 PROSPECTIVE JUROR:  Okay.  I guess I

9  misunderstood.

10                THE COURT:  Now that you understand the

11  law, could you answer Special Issue No. 1 yes or no,

12  depending on the evidence you hear from the State?

13                PROSPECTIVE JUROR:  Yes, I could answer

14  that one.

15                THE COURT:  Same question for No. 2.

16                PROSPECTIVE JUROR:  Yes.

17                THE COURT:  Thank you, sir.  If you would

18  wait for us outside, I'll have you back in just a minute.

19                     [Prospective juror out]

20                THE COURT:  What says the State?

21                MR. SHOOK:  State has no challenges for

22  cause.

23                THE COURT:  Defense?

24                MS. BUSBEE:  Your Honor, we will

25  challenge juror No. 118, Mr. Jones, for cause.  And the

1  record will reflect this that he stated unequivocally that

2  he would need to have evidence from the defense before he

3  could answer Special Issue No. 1 in the negative.  And he

4  answered it in a manner that I think indicates he understood

5  the question and he answered it in a manner that indicated

6  that he knew what the law was.  He didn't say like to or

7  need to.  He said he could not answer that question in the

8  negative without hearing from the defense, and, therefore,

9  his answer indicated unequivocally that he, himself, would

10  shift the burden to the defense to -- in order to answer

11  question, Special Issue No. 1 in a negative -- in the

12  negative and, therefore, he cannot follow the law and is not

13  qualified to be a juror.  And so we submit him for cause.

14                    THE COURT:  Motion denied.  After

15  Mr. Jones understood the law that I gave him, indicated that

16  he misunderstood.  He understands the law certainly a whole

17  lot better than Ms. Crawford did and I find he's qualified.

18                    MS. BUSBEE:  Just for the record, I'm

19  making this objection under the due process and Sixth

20  Amendment and Fifth Amendment privileges or Amendment to the

21  Constitution of the State -- of the United States and

22  Article 1, Section 10 and Section 6 and 8 of the Texas

23  Constitution.

24                    THE COURT:  So noted.  The Court having

25  found Mr. Jones qualified, what says the State?

1          MR. SHOOK:  State accepts the juror.

2          MS. BUSBEE:  We would like to talk.

3          THE COURT:  Please step in your office.

4              (Recess)

5          MS. BUSBEE:  We will exercise a

6   peremptory challenge No. 4.

7              [Prospective juror in]

8          THE COURT:  Mr. Jones, thank you for your

9   thoughtful service to this Court and we appreciate your

10  coming down.  We're not going to seat you on this jury.

11         PROSPECTIVE JUROR:  All right.  Thank

12  you.

13         THE COURT:  Thank you.

14             [Prospective juror out]

15         THE COURT:  Mr. Davis.

16             [Prospective juror in]

17         THE COURT:  Come on up, Mr. Davis.  Good

18  morning, sir, how are you?

19         PROSPECTIVE JUROR:  Good.

20         THE COURT:  Sorry for the delay.  We

21  never know how long an individual will talk to somebody.  I

22  know the maximum time.  I never know if we're going to use

23  it all.  Obviously, you have had time to read the guide,

24  several times probably, the news, crosswords, these couple

25  of hours this morning, and now it's your turn.

1          Please, sir, don't think you have got to

2 understand everything in that guide that you have read.  I

3 wanted to get you to begin thinking about the issues that

4 they are going to discuss.  They're going to talk to you

5 about the laws, see how -- see if you understand how it

6 interrelates.

7          At the end of the process I have two

8 questions to ask.  First one is, do you understand the law?

9 Second is, can you follow the law?  That's my job here.

10          Only question I have for you at this time

11 before we begin is will you be able to serve this Court for

12 two weeks beginning on November 10th?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Mr. Wirskye?

15          MR. WIRSKYE:  May it please the Court.

16                    ROY DAVIS,

17 having been duly sworn, was examined and testified as

18 follows:

19                DIRECT EXAMINATION

20 BY MR. WIRSKYE:

21     Q.    Mr. Davis, how are you?

22     A.    Fine.

23     Q.    My name is Bill Wirskye and I'm the Assistant

24 DA that would be visiting with you for the next 30 minutes.

25 Again, we all appreciate your patience.  Sometimes it drags

1   on a little longer than we anticipate.  What I would like to

2   do with you is visit with you a little while about some of

3   the information you were kind enough to give us in that

4   pretty extensive questionnaire, talk to you a little bit

5   about your thoughts and feelings on the death penalty, and

6   then talk about some of the laws and some of the rules that

7   apply in a case where the State is seeking the death

8   penalty.

9                  Now, you told us you are generally in

10  favor of the death penalty; is that right?

11        A.      I support it.

12        Q.      Okay.  And why is that?  What purpose do you

13  see having a death penalty?

14        A.      Mainly because it's the law, like I think the

15  Government has a right to enforce it.  I'm not -- I don't

16  know if I could pull the trigger, but since it is the law, I

17  support that.

18        Q.      Would you be uncomfortable maybe serving as a

19  juror on a case?

20        A.      Sure, that's a big decision.

21        Q.      I guess what I mean, I know it's probably a

22  bad word.  Everybody is uncomfortable.  We know that not

23  everybody is cut out for these types of cases.  A lot of

24  people when we talk to them are philosophically in favor of

25  the death penalty or in favor of it in the abstract, but

1  when you actually get down here and one step away from

2  making it on the jury, you see the defendant, a live, living

3  human, breathing human being, so much on the line, you know,

4  some people tell us they are just not cut out for it.

5           The analogy I like to use is the guys

6  that wash the windows in the skyscrapers downtown.  I'm

7  deathly afraid of heights.  There's no way that I could do

8  it.  I think it needs to be done and it's an important job,

9  but I just couldn't do it.  Just my fear of heights would

10  override anything.

11           What do you think about that, actually

12  being in the jury box and participating in a case like this?

13      A.      Well, like I say, I think the State has the

14  right to do that.  It is the law.  Sitting up there and

15  deciding, I mean, it would be -- it would be tough to

16  actually be, you know, part of the decision to take

17  somebody's life.

18      Q.      Do you think it's something that may bother

19  you on down the line, whatever decision you reached or

20  especially, I guess, if you sentenced someone to death, is

21  that something that -- we talk to people that tell us it may

22  weigh on my mind or weigh on my conscience on down the line.

23      A.      I think the morning or the evening it was

24  administered, the next morning I would be -- I would -- it

25  would be a really difficult day for me.

1    Q.    Again, we're not trying to shoehorn anybody

2  onto this jury.  Let me run this past you.  Talking about

3  the death penalty, I think most people in talking about

4  capital murder, that type of crime, envision kind of a

5  lone gunman going in, maybe holding up a 7-Eleven, killing a

6  clerk -- or liquor store and making off with the money.

7           But oftentimes crimes are committed by

8  groups or gangs of people and the law for any crime, even

9  for capital murder, allows us as a state to prosecute people

10  as accomplices.  When you are talking about a capital

11  murder, I guess you can break it down to the triggerman, the

12  guy that actually caused the death, and the nontriggerman.

13  The accomplices, is what a lot of people call them.

14           And some people who are very strongly in

15  favor of the death penalty, actually draw a line sometimes.

16  They say I'm in favor of the death penalty, strongly in

17  favor of the death penalty, but I would limit it just to the

18  guy that actually pulled the trigger, just the person that

19  actually caused the death.

20           As far as these nontriggermen or these

21  accomplices, maybe we need to give them a life sentence and

22  lock them up as long as we can, but I just in good

23  conscience don't feel that the death penalty ought to be

24  available for those accomplices or the nontriggermen.  Where

25  do you come down on that?

180

1      A.      I don't know.  What does the law say as far as

2  that?  Are they just as guilty?

3      Q.      The law allows us under certain circumstances

4  to prosecute those accomplices for capital murder and they

5  could also potentially face the death penalty.  You know, I

6  can tell you what the law is.  We're really just trying to

7  see what your feelings are.

8      A.      Well, like I say, my feelings about this are I

9  support the law.  I'm behind that.  I don't -- you got to

10  watch who you hang out with, not necessarily guilty by

11  association, but you -- I mean, if you are participating and

12  don't try to stop it, you know.

13      Q.      I guess, let's take the law out of it for a

14  second.  Say you were Governor of Texas.  You had the power

15  to kind of reconfigure the capital murder.  Would you have

16  the death penalty available as an option for accomplices?

17      A.      I don't know.  Yeah, I guess depending on the

18  degree of accompanying the actual trigger puller.

19      Q.      Okay.  Depending on the facts?

20      A.      Yeah.

21      Q.      What the accomplice did --

22      A.      Yeah.

23      Q.      -- for lack of a better term?  Let me run you

24  through this example or hypothetical real quick.  Say

25  Mr. Shook and I get together with a third guy and we decide

1    the three of us are going to rob a bank.   Mr. Shook is going

2    to have a pistol.   He's going to go in and hold up the

3    teller.   I'm going to come in with a bag, no weapon, and

4    collect the money.   And we've got a getaway car driver out

5    front.   That's the plan.

6               And we go to do that bank robbery and for

7    whatever reason, for some reason, Mr. Shook intentionally

8    shoots and kills the teller.   Okay?   He's committed an

9    intentional murder in the course of a robbery, which is

10   capital murder in Texas.   He could be convicted and face the

11   death penalty.

12              What do you think about somebody in my

13   shoes, the accomplice, or the bagman as some people call it?

14        A.    I guess in that case your intentions were not

15   to be part of that crime.

16        Q.    I had no intent anyone would get hurt.

17        A.    Yeah, I could lean towards you not being as

18   guilty of the murder as the shooter.

19        Q.    If a person in my shoes didn't have the intent

20   for that death, that murder, is that something that you

21   think --

22        A.    Well, in that case the other guy didn't have

23   the intent going in, I'm assuming.

24        Q.    Mr. Shook, it was an intentional act.   The law

25   tells us that intent can be formed in an instant, which is,

1  basically, in that example, what he did.  He intentionally

2  shot and killed.  Going in, at least, I just signed up for a

3  bank robbery.  I had no intent anyone would get hurt.  And

4  that's the point where some people say guys like me,

5  accomplices with no intent, the death penalty should just be

6  off the table.

7         A.      I think you have to -- you need -- your

8  intentions matter a lot.  If you don't intend to do it, of

9  course, I shouldn't intend to go in and rob the bank.

10        Q.      Sure.  You could still find me guilty of

11  robbery, aggravated robbery, and give me a life sentence.

12  But do you think that the death penalty should be on the

13  table?

14        A.      I don't know.  I don't know.  I don't know how

15  to answer that.

16        Q.      Okay.  Taking it out of that context, let me

17  ask you this.  You have told us, like everybody we talk to,

18  that you know something about this case, I guess from the

19  media.  It's a high profile case.  What do you remember

20  particularly about this case?

21        A.      I just remember the seven guys escaping.  I

22  live in Irving, so I remember them coming through Irving and

23  the officer getting shot.  And then I remember thinking they

24  were idiots for not separating and going on living together

25  in Colorado and getting caught in Colorado.  And one of them

1  killed himself.

2      Q.     And I believe you told us you have actually

3  been to that Oshman's?

4      A.     Yeah.  And seen -- there's a little bench out

5  there for him.

6      Q.     How do you think having actually been to the

7  crime scene, I guess, how do you think that might affect you

8  as a juror?

9      A.     It's hard to not sit there and know what

10 happened and know that he was one of the guys that went

11 through and --

12     Q.     And, I mean, that's why we talk to a lot of

13 people.  Believe it or not, we talked to some people who

14 haven't heard anything about the case.  We talk to some

15 people who have heard a lot about the case and tell us they

16 can kind of put that out of their mind.  And we talk to a

17 certain group of people that say kind of in your position, I

18 know about the case.  I may have been to the scene.  And,

19 you know, I may have formed some opinions about the case,

20 but I just don't think I could put that out of my mind.  I'm

21 just too into it.  I know too much about it.  I'm too close

22 to it, that type of thing.

23            Where do you think you fall into that

24 spectrum?

25     A.     The hardest thing for me to get out of my mind

1  is that five of them have already been sentenced to death.

2        Q.    Okay.

3        A.    And it's -- it's real hard for me to think

4  that five were involved and intended and there and

5  participated and one stood over on the side and didn't want

6  it to happen.

7        Q.    Give me just a second, Mr. Davis.  I know you

8  have tax time coming up, right?

9        A.    Uh-huh.

10        Q.    And we may have some good news for you in a

11  second.

12              MR. WIRSKYE:  Judge, I think we have an

13  agreement.

14              THE COURT:  Mr. Davis, it's clearly

15  appearing to the Court that you know too much about this

16  case and having visited the crime scene, that this trial is

17  not one that you are going to be able to sit on.  The

18  parties have agreed to excuse you.  Thank you for your time

19  this morning.  Sorry for the delay and coming in on a short

20  interview.  But, see, we don't know where a person might end

21  up.  So thank you and you are free to go.

22              [Prospective juror out]

23              THE COURT:  Mr. Evans.

24              [Prospective juror in]

25              THE COURT:  Thank you.  You may be

1   seated.   Good afternoon, how are you?

2                        PROSPECTIVE JUROR:  Fine.

3                        THE COURT:  And we have David J. Evans.

4                        PROSPECTIVE JUROR:  Yes.

5                        THE COURT:  Good afternoon, Mr. Evans.

6   Thank you for being here on time.  As you can see how many

7   courts start on time, but we do.

8                        PROSPECTIVE JUROR:  None that I have

9   seen.

10                       THE COURT:  Well, you can chalk one up.

11  I appreciate you being here.  Have you had an opportunity to

12  review the guide that I have provided for you?

13                       PROSPECTIVE JUROR:  Yes.

14                       THE COURT:  I know it's a lot of law to

15  hand somebody.  We don't expect you to understand it

16  completely at this point.  The lawyers are going to visit

17  with you about your questionnaires and that's why I provided

18  that for you because you don't remember the answers you

19  made.  The objective here is for you to understand the law.

20                       PROSPECTIVE JUROR:  Okay.

21                       THE COURT:  My function here today is two

22  fold, one to make sure you understand the law; two, if you

23  understand the law, can you follow the law?  That's the big

24  picture for me.  If you don't understand the questions, just

25  ask to rephrase the question, give me another example,

1    however you want to get there.

2                    Only question I have for you before I let

3    the State begin, will you be able to serve this Court for

4    two weeks beginning on November 10th?

5                    PROSPECTIVE JUROR:  Yes.

6                    THE COURT:  Mr. Shook?

7                    MR. SHOOK:  May it please the Court.

8                    DAVID EVANS,

9    having been duly sworn, was examined and testified as

10   follows:

11                   DIRECT EXAMINATION

12   BY MR. SHOOK:

13       Q.    Mr. Evans, my name is Toby Shook.  I'll be the

14   prosecutor speaking to you this afternoon.  I believe you

15   have been down on jury duty several times before in the

16   past; is that right?

17       A.    Yes.

18       Q.    Okay.  Then you are aware that we usually

19   speak to the jurors as a group, but because it's a capital

20   murder case in which we're seeking the death penalty, the

21   law prescribes us going through this particular proceeding.

22   If you have any questions at any time, feel free to ask.

23   We're just interested in your honest opinions.

24                   You have been very forthcoming in the

25   questionnaire.  You gave us detailed information.  I'll just

1   follow up on a few things in there and talk to you at some

2   length about capital murder and the laws and rules that

3   apply to that type of case and your opinions about that.

4                    What types of cases have you sat on in

5   the past?  I believe in your questionnaire you said most of

6   them settled before actually you went to deliberations?

7        A.     Well, one involved a motor vehicle where a

8   truck had, if I recall the facts, had pulled out in front of

9   this other car and it caused a wreck.  Another one was more

10  or less a shut -- an open-and-shut case where this defendant

11  had committed a crime, but he was judged to be mentally

12  incompetent.

13       Q.     Okay.  So it was kind of an agreed competency

14  hearing?

15       A.     Right.  The defense and the prosecution both

16  agreed.

17       Q.     Okay.  And you originally are from Tennessee?

18       A.     Right.

19       Q.     And I think you said in the questionnaire that

20  you lived there for about 23 years and the rest of the time

21  you have been down here in Texas?

22       A.     Yes.

23       Q.     What brought you down here to Texas?

24       A.     After I got out of the college, I had a job

25  opportunity with Collins Radio in Richardson.  And I just

1   came down here for a couple of years.

2        Q.   And you have been here ever since?

3        A.   I've been here ever since.

4        Q.   And you now work out of your home as a

5   financial consultant?

6        A.   Right.

7        Q.   Let me talk to you, then, about capital

8   murder.  You know from what the Judge has told you, this is

9   a capital case in which the State is seeking the death

10  penalty, so we want to speak to every juror how they

11  personally feel about the death penalty laws.

12            On your questionnaire you checked that

13  you are in favor of the death penalty and I would like you

14  to just elaborate on that as to why you favor that law,

15  maybe the purpose you think the death penalty serves

16  society.

17       A.   Well, I think there are some individuals who

18  aren't or can't -- the chances of rehabilitating these

19  individuals are low and the crimes that they commit are so

20  horrific that that punishment seems to be warranted in my

21  opinion.

22       Q.   Okay.  What types of crimes do you personally

23  feel should come into consideration for the death penalty?

24       A.   Well, crimes that are premeditated, in

25  particular where they are not -- maybe a crime of passion

1   where someone went out of control temporarily.

2          Q.      Okay.

3          A..       You know, crimes involving children, the abuse

4   of children, those types of things.

5          Q.      Okay.  Have you ever followed any cases in the

6   news locally or nationally, some criminal case, a murder

7   case, that you thought might be worthy of a death penalty

8   case or involved the death penalty?

9          A.      I really haven't paid that much attention.  I

10  mean, I'm aware of this case.  I think everybody followed

11  this case for several weeks.  But I haven't followed up on

12  -- I know what happened to the other defendants, but I

13  haven't followed that with any kind of regularity.

14         Q.      That's kind of my next line of questioning.

15  This case got a lot of publicity when it occurred, a lot of

16  TV coverage, a lot of coverage, obviously, in the

17  newspapers.  I would say 99.9 percent of all the jurors that

18  we talked to have heard something about the case, some more

19  than others.

20                 The fact that you have read stories or

21  seen stories or followed the case when it occurred, does not

22  make you ineligible to be a juror or unfit.  If that were

23  the rule of law, we could never seat jurors in cases like

24  this, obviously.  But basically it's this.  The jury that

25  sits in this case has to make its decisions just based on

1    the evidence they hear in the courtroom from the witness

2    stand.  We can't ask you to blank out or completely forget

3    what you have read or seen on TV.  However, you can't use

4    that in your decisionmaking process.  You can't let those

5    news stories influence you in your decisionmaking process,

6    because, obviously, the better evidence comes from the

7    witness stand.

8              You probably know and have seen stories

9    and realize that the newspapers and the TV reporters don't

10   get it right all the time when they are reporting these

11   matters.  And that's the rule of law.  So we ask each juror

12   as best you know yourself, would you be able to follow that

13   rule of law in this case and if you were seated as a juror,

14   would you be able to make your decisions just on what you

15   hear in the courtroom and not let any news stories you have

16   seen or read influence your decisions in any way?

17        A.    Yes, I believe I could.

18        Q.    Okay.  Fair enough.  Now, in Texas the death

19   penalty is reserved just for specific types of cases.  You

20   mentioned child abuse cases.  We have child abuse cases, if

21   the child is not killed, where you can get a life sentence,

22   but you can't get the death penalty.  There used to be

23   certain rape cases which were eligible for the death

24   penalty, but now it's just reserved for murder cases and

25   then just certain types of murder cases.

1        You use "premeditated."  That's a word

2   that a lot of us use.  "Intentional" is the key word under

3   the law.  It has to be an intentional killing.  They have

4   the intent to kill and they act upon it.  It may only take a

5   few seconds to form that intent, but they do that.

6        And it has to be some other aggravating

7   circumstance, for instance, a murder that occurs during the

8   course of another felony, during a robbery.  If you go into

9   a 7-Eleven and rob the clerk and you intentionally murder

10  the clerk during the course, that could be a death penalty

11  case.  If someone breaks into someone's home and kills

12  someone there in the house, that could be a death penalty

13  case, or during a rape, robbery, or arson.

14       Also specific victims, such as police

15  officers on duty, firemen on duty, can be a death penalty

16  case or murder of a child under the age of six.  Murder for

17  hire, someone does it for money or profit and then a serial

18  killer situation or mass murderer where there are several

19  victims.  But those are the specific types of cases that

20  have been reserved for consideration of the death penalty.

21       Now, I know I went over that list kind of

22  quickly, but does that list comport or do you agree that

23  those are the types of cases from your personal point of

24  view that should at least be under consideration for the

25  death penalty?

1          A.     Yes, that seems reasonable.

2          Q.     Okay.  Let me go into one other area of the

3  law.  We talk about -- the example I gave was robbing a

4  7-Eleven and murdering the clerk.  When we think about the

5  death penalty, we generally use that as an example, the

6  actual person who causes the death, the triggerman.

7               However, a capital murder is like any

8  other crime.  Sometimes you have more than one person commit

9  a crime.  They do it in a group.  Some have a greater role

10 than the others, but they are all participating actively in

11 it to carry out the crime.

12               In those situations the law prescribes

13 that everyone, if they are actively participating, can be

14 held accountable and can be found guilty.  And the same is

15 true of capital murder.  If you have more than one person

16 participating in that crime, but maybe only one person is

17 the triggerman who actually causes the death, but the others

18 assist in it, they can be found guilty under the law.

19               An example we often give is, let's say

20 Mr. Wirskye and I, and we get another accomplice, we decide

21 we want to rob a bank.  The plan calls for me to go in with

22 some loaded guns, Mr. Wirskye to have a bag, and the

23 accomplice is going to be our getaway driver.  He's going to

24 drive us there, keep the car running, and warn us if the

25 police are coming and give us a quick getaway.

1    We go in and I pull my two guns out.   I

2 threaten everyone.  Mr. Wirskye starts running through the

3 teller's drawers and grabbing the money.  Sometime during

4 the course of that, maybe I don't like the way someone

5 looked at me, maybe Mr. Wirskye says someone is about to go

6 for an alarm, and I shoot them and kill them and we leave.

7 We're arrested.

8    Quite obviously, I have committed capital

9 murder and I could be prosecuted for it and I could

10 ultimately receive the death penalty, depending on how the

11 jury felt about the facts.  The law says that since Mr.

12 Wirskye and the getaway driver were actively participating,

13 they, too, could be prosecuted under the capital murder

14 statute and could ultimately, depending on the facts,

15 receive the death penalty.

16    And we ask each juror that comes in here

17 how they feel about that, because we have a lot of jurors

18 that agree with capital murder when it involves the actual

19 triggerman or the person that causes the death.  Personally,

20 they would draw a line on the accomplice.  They have an

21 objection and would not, if it were up to them, would not

22 give the death penalty or have the death penalty as a

23 consideration for someone who didn't actually cause the

24 death.  Other jurors tell us, no, I think an accomplice,

25 depending on his participation and involvement, could be

1  prosecuted and could ultimately receive the death penalty.

2  People just feel differently about it.

3                      And I want to ask you, Mr. Evans, how you

4  feel about that, the accomplice or nontriggerman.  Do you

5  think that they should be prosecuted in these situations and

6  ultimately could receive the death penalty, depending on the

7  facts?

8       A.    I believe they definitely should be prosecuted

9  and I think they, depending on the circumstances, could be

10 eligible for the death penalty.

11      Q.    Okay.  What factors come to mind when you

12 think of an accomplice situation that would be important to

13 you in determining those types of things?

14      A.    I guess the act itself, whether it was

15 intentional or not, some of the factors that you reviewed,

16 if it was during the course of an armed robbery or a

17 situation that could lead to other people being harmed,

18 should they come upon the scene.

19      Q.    Okay.  Just the type of situation or how the

20 crime was carried out and the potential harm that could be

21 done to people?

22      A.    Yes.

23      Q.    Okay.  The fact that you brought up kind of

24 mirrored exactly what the law is.  There's two theories

25 under the law of parties.  That's what we call it, the law

of the parties.  We all know it as accomplice.  But they
named it the law of parties, if you are a party to an
offense.

One is if you actively participate,
encourage, aid, in committing a crime, then you could be
found guilty, if you are not the actual triggerman.

The other is this, it's called under the
law of conspiracy.  And they are very similar.  If we
conspire to commit one felony, in this case Mr. Wirskye and
I agreed to commit a bank robbery, and during the course of
carrying out that crime, one of us in the conspiracy commits
another felony in the furtherance of it, and in this case I
shot one of the tellers to get away or whatever reason, then
we can all be held accountable, if the accomplice should
have anticipated that that could occur.

In other words, similar to what you said,
there are circumstances where you should have foreseen
somebody would get hurt in that situation, which I think is
kind of a common sense point of view, I guess, when you are
talking about aggravated robbery and that sort of thing.
And that's what we have to prove to get a guilty.

Now, in the punishment phase we have
these questions and we'll get to those in a minute.  But
basically if you find someone guilty under the law of
parties or as the person that actually caused the death, the

1    trial is not over.  You move to the punishment phase.

2                        Then the State has to prove that the

3    defendant would be a continuing danger to society and then,

4    if it's a situation involving a nontriggerman, we have to

5    prove that he did anticipate a death would occur or intended

6    someone to die, again using the same types of evidence.

7                        And then, finally, the last question is,

8    is there sufficient mitigating evidence where a life

9    sentence should be imposed rather than the death sentence?

10   But if those questions are answered yes, yes, and no, the

11   Judge would sentence the defendant to death.  If they are

12   answered any other way, he would sentence the defendant to

13   life.  And those are the only two possible outcomes once

14   someone has been found guilty.  Is that clear?

15        A.    Yes.

16        Q.    And I want to lay all our cards on the table.

17   We can't go into the facts, obviously, of this specific

18   case, but we are prosecuting this case under the law of

19   parties.  We are prosecuting the defendant as an accomplice,

20   as a nontriggerman.

21                        And I take it from your previous answers

22   that you would agree with the law that a person can be

23   prosecuted under that law and if there are sufficient facts

24   proven to you, you could actually assess the death sentence

25   in those situations?

```
 1        A.      Yes.

 2        Q.      Okay.  Now, I've gone over the procedures of

 3   how the trial is set up into two portions, the

 4   guilt/innocence stage and then the punishment stage.  How

 5   the answers play out, the defendant being sentenced to

 6   death, and I believe living in Texas these past years, you

 7   are probably familiar with the method of execution in Texas

 8   --

 9        A.      Yeah.

10        Q.      -- being lethal injection.  And you are also

11   probably aware that in Texas these executions actually do

12   take place.  You know, there are some states where it's on

13   the books, people are on death row, but they are never

14   carried out.  But in Texas, it is.  Texas leads the nation

15   in executions.  And so I think it's different in Texas.  A

16   juror fully realizes that once he's called down here and

17   going through this process, this is the sentence, if the

18   defendant is found guilty, if those questions are answered,

19   and he is sentenced to death, that someday down the line

20   that sentence will actually be carried out.

21                You look like from your questionnaire and

22   listening to you talk, you are a reflective man.  I'm sure

23   you have thought about this a little more since you found

24   out what type of case it was.  How would you feel about

25   sitting on a case and judging another human being, knowing
```

1    that if the State can disprove these things to you and you

2    were called on to answer these questions, would you feel you

3    could answer them knowing that the defendant you see in the

4    courtroom every day could be executed someday?

5         A.     Well, as to how I would feel about it, I think

6    it's an awesome responsibility.  I hope I don't get on it,

7    but I think that I could do -- I think that I could do the

8    job.

9         Q.     Okay.  Most people feel that way.  They

10   realize it is an awesome responsibility.  None of them want

11   to be on it, actually.  The few people over the years that

12   I've talked to in these situations that do want to be on it,

13   never make it on the jury.  We usually have a problem with

14   them.

15              But you feel that if you were chosen,

16   that you could make that decision?

17        A.     Yes.

18        Q.     Okay.  Now, let's look at Special Issue No. 1.

19   If you would read that to yourself just for a moment and I

20   want to go over a few things.

21        A.     (Prospective juror complies.)

22        Q.     That question, as you can see, asks the jurors

23   to make a prediction about how the defendant will behave in

24   the future, whether he would be a continuing danger.

25              Let me ask you first, do you feel that

1  you could answer that question about how he will behave, if

2  you are given enough information and enough facts?

3       A.     I think so.  Past behavior is one of the best

4  predictors of future behavior, I believe.

5       Q.     That's what most jurors tell us.  And I can

6  tell you in this portion of the trial, if there is a pattern

7  or if there have been other crimes committed, you will get

8  to hear about that.  You will get to hear from witnesses.

9  You can hear bad things and you can hear good things in that

10 person's past.

11            And also, obviously, you will get to

12 consider what you heard in the guilt/innocence stage about

13 their role in the crime and also plug that in and consider

14 that.

15            Under the law it starts out with a no

16 answer and the State must prove to you that it should be

17 answered yes.  We have to prove that to you beyond a

18 reasonable doubt.  We do that by putting on any new evidence

19 about the person's past that we may have available and also

20 by arguing and you deliberating and considering the evidence

21 of the crime itself to determine if we have proven that to

22 you beyond a reasonable doubt.

23            The fact that you found him guilty of

24 capital murder beyond a reasonable doubt does not mean you

25 answer that question yes.  We have some jurors that will

1  tell us that's all I need and it's going to be a yes and I'm

2  not going to think about it anymore.  The law contemplates

3  that jurors will not give an automatic answer.  There would

4  be no reason to have the questions, if that were true.

5          It requires the jurors to wait and listen

6  to the additional evidence that might be brought forth in

7  the punishment phase and then go back to the jury room and

8  deliberate and decide if the State has actually proven its

9  case beyond a reasonable doubt.

10          Do you feel that you could follow that

11 rule of law and require the State to prove that to you

12 beyond a reasonable doubt?

13     A.     Yes.

14     Q.     Okay.  Now, the words in these questions, you

15 are not going to get legal definitions.  The definitions

16 will be left up to you and the other jurors, just your

17 common usage of them.  So I want to go over a few of the

18 words in these questions.

19          We have to prove in 1 whether there is a

20 probability that the defendant would commit criminal acts of

21 violence.  When you see "probability" in that sentence, what

22 does "probability" mean to you?

23     A.     Well, it means chance.  What are the odds, you

24 know.

25     Q.     We've gotten a little bit of guidance from the

1   Court and it's this, "probability" does not mean a

2   certainty.   I don't think that we could ever prove to

3   anyone's mind an actual certainty, obviously, about

4   something that's going to happen.   And it's more than a

5   possibility.   Because if it were a possibility, our burden

6   of proof would be pretty low, because anything is possible.

7   More likely than not is the term we hear most often.   A lot

8   of jurors have told us greater than 50 percent, more likely

9   than not, that sort of thing, when they look at probability.

10  We've had all kinds of answers.

11                 Does that -- are you comfortable with

12  that type of the parameters of more likely than not, more

13  than a possibility?

14           A.      Yes.

15           Q.      Okay.   We have to prove to you that he would

16  commit criminal acts of violence.   When you see "criminal

17  acts of violence" there, what types of crimes come to mind?

18           A.      Well, murder, rape, assault.

19           Q.      Okay.   Any type of violence to another human

20  being?   And finally, we have to prove he would constitute a

21  continuing threat to society.   What does "society" mean to

22  you in terms of that question?

23           A.      Um, society, well, that's us in this room.   I

24  mean, it's the general population, if you will.

25           Q.      Okay.   Could it be the potential of coming

1    into contact with anyone, how he might react to these people

2    on the street or anywhere he might be, as well as the prison

3    system, administrators, inmates, people that work there,

4    guards, teachers, that sort of thing?

5         A.    Yes.

6         Q.    Okay.  This question, as I said before, starts

7    out with a no and we have to prove to you it should be

8    answered yes.  And if we do, you go on to the second

9    question.

10        The second question also starts out with

11   that no answer and the State has to prove to you beyond a

12   reasonable doubt it should be answered yes.  Again, you use

13   the evidence from the guilt/innocence stage about their role

14   and also any additional information that you have learned

15   about the person in the punishment stage.

16        That's the party question, the accomplice

17   question.  It asks whether the defendant actually caused the

18   death of the deceased.  Now, if you believe the evidence

19   shows he's the actual triggerman or caused the death, then

20   that part of the question is pretty simple.  But the second

21   part asks did not actually cause the death of the deceased,

22   but intended to kill the deceased, that is, their intention

23   was there.  Maybe another accomplice did that, or another

24   person, or anticipated that a human life would be taken.

25        And that goes back to the first question

1    where we have to first prove in the guilt/innocence stage

2    where he should have anticipated.  And here the evidence is

3    just a little different in that he did anticipate.  Again,

4    kind of what you said, look at how the crime was planned,

5    how it was pulled off, and their role in it, those sorts of

6    things.

7                   We can't get into a person's mind and

8    open it up and say, here's what his intentions were.  But

9    what we can do is put on all the relevant evidence and the

10   jurors can draw conclusions, use their common sense, and

11   draw reasonable deductions from a person's intent, from

12   their actions, and what happened in the crime.  Does that

13   make sense to you?

14         A.     Yes.

15         Q.     Do you feel that you can answer that question

16   based on all the evidence that would be submitted to you?

17         A.     Yes.

18         Q.     The fact that you have found the defendant

19   guilty in the guilt/innocence stage beyond a reasonable

20   doubt, doesn't mean you would answer, obviously, question

21   No. 1 yes or question No. 2 yes.  You have to look at each

22   of those issues separately and then make your decision.  You

23   could do that?

24         A.     I understand.

25         Q.     Then the last Special Issue is a little

different in that there's no burden of proof.  The State is
not required to prove to you beyond a reasonable doubt it
should be answered yes.  The defense is not required to
prove to you that it should be answered no.  It gets a
little lengthy.  It asks, whether taking into consideration
all the evidence, including the circumstances of the
offense, the defendant's character and background, and the
personal, moral culpability of the defendant, there's
sufficient mitigating circumstance or circumstances to
warrant that a sentence of life in prison, rather than a
death sentence, be imposed.

We sometimes call this the safety net,
catch-all, the safety valve.  It allows a juror to, even
though they found someone guilty, even though they believe
he's dangerous and has anticipated a life would be taken, it
allows them to show mercy, if they believe in their hearts
and minds that that's the right thing to do in a case, if
they think there is sufficient mitigating evidence that a
life sentence should be imposed rather than the death
sentence.

He doesn't get off scot-free, obviously,
he has to serve a life sentence.  But it's something that --
I can't tell you what mitigating evidence would be.  It's up
to you and the other jurors.  And as you sit there today,
you are not required under the law to tell us what you think

1    mitigating evidence is.  All you are required to do is tell

2    the Court, I can keep my mind open to it and if I think

3    something is sufficiently mitigating, I'll give it that

4    weight.  But if I think it's enough in my heart where I

5    believe it's a life sentence, I'll answer it that way.  And

6    if I don't, I'll answer it no.  Do you feel that you could

7    do that?

8          A.     Yes.

9          Q.     As you sit there, today -- you are not

10   required to do this.  But I like to measure someone's gut

11   reaction.  Does anything come to mind as potentially

12   mitigating?  Any type of evidence that you can think of?

13         A.     Well, the one that comes to mind is if, you

14   know, if someone maybe had a low IQ or something like that,

15   maybe wasn't fully capable of understanding the

16   circumstances they found themselves in or, you know, maybe

17   --

18         Q.     That's a good example.  It's kind of how that

19   question first came about.  The person had a mental defect.

20   They were somewhat retarded.  It was kind of argued about

21   how much, but there was no argument that he was slow, and

22   the fact there was argument, that that is what actually made

23   him dangerous.  And we didn't have that question the first

24   time he was prosecuted.

25                The Court said, well, they could use that

1  evidence, it's not his fault, to find him dangerous, but

2  there's not a mechanism for the jury to find that as

3  mitigating.  So that's how we came up with the question.

4       But it's a good example in that it could

5  be someone is slower, maybe they just follow along and they

6  were influenced or something.  Knew right from wrong, but

7  could be influenced that way.  We hear all kinds of things

8  from jurors and, again, they don't even have to agree among

9  each other.  They just have to be able to look at it.

10      Sometimes you hear about a person's

11 background.  Maybe they were raised in a bad home.  Maybe

12 they were beaten.  Maybe they were physically abused.  Maybe

13 they were mentally abused.  But some jurors think that could

14 be mitigating, I guess, depending on the severity.

15      Other jurors tell us, I feel bad for

16 them, but once you reach adulthood and you are past that,

17 you have to be held accountable.  That can't be an excuse.

18 Does that kind of background information, you feel one way

19 or the other about that?

20      A.   Well, I feel when you get to be an adult, you

21 have to put those things behind you and move on.

22      Q.   Again, you gave a good example.  Another

23 example, I think, is the Yates' case, which you mentioned,

24 the woman accused in the murder of her children, drowned,

25 got a lot of press coverage.  She was found guilty, but,

1    obviously, she had some mental problems.  And I think the

2    jury pretty quickly found that to be mitigating and she was

3    given that life sentence.  Could be some mental background

4    like that, that sort of thing.

5              It's just anything that might come out of

6    the person's background that you view that the right thing

7    to do is give a life sentence.  And I think you have told

8    the Court that you can do that, even though you found those

9    other things.  You could keep your mind open there?

10         A.    Yes.

11         Q.    Okay.  Now, many times in these types of cases

12   psychiatrists or psychologists are called.  The defense may

13   call someone to give an opinion about the future danger or

14   oftentimes they may call some mitigation expert that might

15   tell you their opinions as to whether something is

16   mitigating or a reason why someone may act this way.  The

17   State may have these types of experts, too.

18              People feel differently about those

19   experts.  We have some people that really like them and

20   respect them and would put a whole lot of faith or stock in

21   those opinions.  We have other jurors who take the opposite

22   view, actually.  They say, you know, you can probably find

23   one of those guys to say what you want, if you look hard

24   enough or pay them enough money.  It really wouldn't matter

25   to me.  And you have other jurors who kind of put them in

with any other witness.  They wouldn't necessarily give them any greater weight.  They will use that and look at it as another piece of the pie, if you will, look at that along with the offense and anything in their past and then make their decision.

Do those types of experts hold any particular weight with you one way or the other or do you view them like any other witness?

A.     I think I would view them like any other witness in that I think you can find people to say just about anything.

Q.     But you would be open to it like any other witness and wouldn't --

A.     Of course.

Q.     -- give greater weight at the beginning?  You would just have to wait and hear about it?  Okay.  Let me go over a few rules that apply in every criminal case.

One is the presumption of innocence.  The fact that someone has been charged or arrested or been indicted or even that we are going through this jury selection process, is no evidence of his guilt.  The law is that a person begins a case being presumed with that presumption of innocence.  And that's how you have to start the defendant off.  And then the State is required to prove to you beyond a reasonable doubt with the witnesses and the

1    evidence that it should be answered yes.

2             Can you follow that rule of law and give

3    the defendant his presumption of innocence?

4         A.    Yes.

5         Q.    Okay.  The burden of proof is on this table

6    and it never leaves.  We have to prove our case beyond a

7    reasonable doubt and it never shifts to the defense.  Their

8    only obligation under the law, technically, is to show up.

9    They don't have to ask a question.  They don't have to make

10   an argument.  They don't have to make an objection.  They

11   don't have to put on witnesses.  I anticipate that they will

12   ask questions, obviously, and do their job, but they don't

13   have to, because that burden of proof never leaves here and

14   you can't require them to prove anything to you.

15            If they don't say a word and at the close

16   of the evidence you have a reasonable doubt based on what we

17   put forth, then you simply find the defendant not guilty.  I

18   take it you can follow that rule of law?

19        A.    Yes.

20        Q.    The burden of proof goes to every element of

21   the indictment.  We have to prove each and every portion of

22   that indictment to you beyond a reasonable doubt.  And if we

23   fail on any portion, you are obligated to find the defendant

24   not guilty.

25            Let me give you a couple of quick

130

examples. An easy one is the identity. We have to prove

who committed this crime and at the close of the evidence,

if you have a reasonable doubt about that, you would find

him not guilty.

We also have to prove to you where it

happened, in Dallas County. We may prove to you in your

mind beyond a reasonable doubt who did the killing, where,

how, when, who the victim was, but we may not prove up that

Dallas County element. Maybe the evidence showed it

happened in Tarrant County.

Now, that would be very poor preparation

on our part, obviously, and, again, I don't anticipate that

happening. But if you have a reasonable doubt, even about

the county, you would be obligated under the law to find him

not guilty. You would probably have us fired for,

obviously, doing such a poor job, but you couldn't help us

out and give us a leg up. And I just use that as an example

to demonstrate how it goes to every portion.

Do you feel that you can follow that rule

of law and require us to prove every portion of the

indictment?

A.      Yes.

Q.      Okay. Now, the Fifth Amendment applies in

every criminal case, if a defendant does not testify. If he

wants to testify, no one can stop him and he's judged just

1   like any other witness.  If he chooses not to testify, the

2   Court will instruct you that you can't hold that against him

3   and use that as evidence against him and consider it in any

4   way.

5           There could be numerous reasons why

6   someone chooses not to testify.  They may make a poor

7   witness.  They may not be educated.  They may not perform

8   well and they look guilty when they're not.  And they could

9   simply be following their lawyer's advice.  And the jury

10  would simply be instructed not to consider that.  And could

11  you follow that rule of law?

12          A.    Yes.

13          Q.    Police officers often testify.  Most jurors

14  have a great deal of respect for the job they do.  And being

15  a criminal case, you will see a lot of them.  But you can't

16  give them a leg up over the other witnesses ahead of time.

17  You have to start them out the same as you would any other

18  witness and then judge their credibility once they are on

19  the witness stand.  They are, obviously, like any other

20  profession, you are going to have some good ones and have

21  some bad ones, and you have to wait and make your decisions

22  once you hear.  Would you be able to follow that rule of

23  law?

24          A.    Yes.

25          Q.    And then, finally, you may hear about the

1    parole laws or you have read about them.  They get stirred

2    up in the news sometimes.  The Judge would instruct you that

3    in a capital case anyone found guilty of capital murder and

4    gets a capital life sentence, they have to serve forty

5    calendar years before they become eligible for parole.  He

6    would also instruct you that you can't consider the parole

7    laws in any shape or form in making your decision.  You just

8    have to consider a life sentence a life sentence.  Could you

9    follow that rule of law?

10        A.     Yes.

11        Q.     Okay.

12               MR. SHOOK:  Could I have one moment,

13   Judge?

14               THE COURT:  Yes.

15        Q.     (By Mr. Shook)  There's one other area I

16   forgot to go over.  Sometimes juries find defendants guilty

17   of what we call lesser included offenses.  And one of the

18   lesser included offenses of capital murder is aggravated

19   robbery, robbing someone with a gun or a deadly weapon.

20               If you found -- if you had a reasonable

21   doubt about the murder, you may find him guilty of

22   aggravated robbery and in that situation the penalty range

23   goes from life to 99 years at the maximum all the way down

24   to five years in prison and anywhere in between, 20 years,

25   50 years, 70 years.

1              What a jury has to do is wait until the

2      punishment phase, listen to all the background evidence,

3      good and bad, then make their decision as to what they think

4      is the proper range of punishment, a life sentence, or as

5      little as five years in prison, depending on the facts and

6      anywhere in between and, again, you have to wait and make

7      that decision.

8              Could you keep your mind open to that

9      full range and then make your decision, either the maximum,

10     minimum, or whatever you thought in between, just depending

11     on the facts of the case?

12         A.     Yes.

13         Q.     Okay.  I notice like a lot of jurors that you

14     watch "The Practice."  That always concerns us as lawyers,

15     obviously, because I think "The Practice" is the one where

16     the prosecutors never really are on the ball.  And we're

17     crooked or taking bribes or something.

18         A.     And it's over in an hour, too.

19         Q.     And all wrapped up.  The other big show people

20     watch is "CSI", I think.  I don't know if you have seen

21     that, but as a prosecutor I know we wish that the police

22     were that effective and could find that type of stuff.  They

23     are good, but they are not nearly as good as that show.  And

24     I'm always afraid jurors will do that, might hold us to that

25     burden, but I don't think that you are that type of person.

1          Do you have any questions over anything

2    I've gone over?  I've covered a lot of area here, but

3    hopefully it hasn't been too confusing.

4          A.      No.  I think I understood the questions and

5    the law to the extent that it's been explained today.

6          Q.      Okay.  Well, Mr. Evans, I appreciate your

7    patience.  I think you have told us that you are the type of

8    person that can make these decisions.  You really wouldn't

9    want to be here, I don't think.  I don't think anyone would.

10   But if you are called upon, you can make these decisions, if

11   these issues are proven to you and you can keep your mind

12   open and listen to everything and then render what you think

13   is a just decision in this case based on the evidence?

14         A.      Yes.

15              MR. SHOOK:  That's all I have, then,

16   Judge.

17                 CROSS-EXAMINATION

18   BY MR. SANCHEZ:

19         Q.      Good afternoon, how are you doing?

20         A.      Good.

21         Q.      My name is Juan Sanchez.  I'm going to ask you

22   some questions and I'll get to know you a little better.

23   You didn't get to speak a lot when you were answering the

24   questions, yes or no answer, but just to get to know you a

25   little better.

135

```
 1              You are from -- is it you were born in
 2   Maryville, Tennessee?  Where in Tennessee is that?
 3        A.    It's about 16 miles south of Knoxville.
 4        Q.    Okay.
 5        A.    It's near Gatlinburg, if you have ever been to
 6   the Great Smokies.
 7        Q.    The only place I've been to is Nashville.
 8        A.    Really no comparison.
 9        Q.    No comparison.  Much nicer in Maryville?
10        A.    Right.
11        Q.    A lot of Tennessee fans, University of
12   Tennessee.  Is that Knoxville?
13        A.    Right.
14        Q.    Also, I notice that your father was a boiler
15   maker.  Is that what it said in here?
16        A.    Yes.
17        Q.    That's funny because we just had a boiler
18   inspector this morning, so it's a boiler day.  And I notice
19   that your -- one of your sons or is it your only son is in
20   the military?
21        A.    I have two sons.  The oldest is in the Navy.
22        Q.    Is he in active duty right now?
23        A.    Yeah.  He's in Norfolk, Virginia.
24        Q.    He's not overseas anywhere?
25        A.    No.
```

1    Q.    Is there a possibility that may happen?

2    A.    No.  He has a new top secret assignment and

3    they actually flew him off his ship.  He was on his way to

4    Iraq and they flew him off by helicopter to go to his new

5    assignment, so --

6    Q.    He couldn't tell you about that?

7    A.    No.  Loose lips sink ships.

8    Q.    And I also notice, is it Jamie?  She's a

9    talent scout?

10   A.    Yes, for Warner Brothers.

11   Q.    Really?

12   A.    She finds bands, musical bands.

13   Q.    She works here in Texas or --

14   A.    Yes, she lives in Dallas.

15   Q.    Sounds pretty interesting.

16   A.    It is.

17   Q.    Has she discovered anybody we know about?

18   A.    She is still working, so she hasn't found that

19   one artist that she needs to retire.

20   Q.    That one.  Okay.

21   A.    Just takes one.

22   Q.    I just wanted to ask you that.  I found that

23   curious.  When we read the questionnaires, there's always a

24   million questions we want to ask people.  But since we have

25   a little bit of time, but I'm not going to take more time

1    than that.

2                   As you know, the day that you came down

3    to fill this out, you saw a lot of people there, didn't you?

4    Lots of people?

5         A.    Yes.

6         Q.    And of all those people, we only picked out a

7    certain amount of questionnaires that we actually looked at.

8    And --

9         A.    I'm sorry to hear that.

10        Q.    And so just to make you feel good or bad, I

11   don't know how you are going to feel, you made the cut to

12   come down here and talk to us.  As I said, sitting on this

13   side of the table we want to make sure that somebody who is

14   going to end up on the jury is going to have an open mind

15   and is going to be fair and also is going to tell us really

16   how they feel about certain things when it concerns the law.

17                   I think that we can all say somebody

18   gives a proposition, can you follow that law, nobody wants

19   to say they can't.  And you can always say you can follow

20   the law.  But in reality, sometimes people get over there in

21   the comfortable chairs and they say, well, I know that I can

22   follow the law, but I'm having a problem with it right now.

23   And we don't want to put people in that situation, you know,

24   where there's going to be a crisis in their own mind that

25   they want to be fair and follow the law, but something -- or

the way they think or something has happened to them, they

may not be able to at that point.  And once you make it onto

the jury, it's too late.

So that's why we have this process here

where you can tell us if there is something that you may not

be comfortable with and that may play into your

decisionmaking.  Okay?

You talked about the fact that you were

aware of some media coverage in this case and you told

Mr. Shook that you could put that out of your mind and

decide the case based on what you hear in this courtroom.

But even though you can do that, have you formed any

opinions as to this case?

A.      I was really trying not to think about it.  I

haven't sought any information about what's happened to the

other defendants or anything like that.

Q.      Have you formed any opinion as to how

something may have happened or not happened?

A.      You know, when I say "follow it", I just mean

that I know they escaped, I know they visited at a store

over in Irving, and I know they were captured in Colorado.

And that's the extent of the information that I know.

Q.      Okay.  You didn't do any reading on it or --

A.      No.

Q.      -- looking on the Internet or anything like

that?

     A.     No.

     Q.     But the one thing I did notice in your questionnaire was at the very end you said that when asked how you felt about being chosen, you said you would rather not, but I would do a good job if I was.  And you told us earlier, also, that it would be an awesome responsibility. Is that the only reason that you would rather not be chosen as a juror or is there something more to that?  Is it just the responsibility alone or somehow another reason why you would be more comfortable sitting on a different type of case?

     A.     What is your question, again?  I'm sorry.

     Q.     You mentioned earlier that you thought it was an awesome responsibility.

     A.     Yes.

     Q.     And that was the reason why you may not want to sit on this jury.

     A.     Yes.

     Q.     Is that the only reason or is there more to that?

     A.     Well, sitting in judgment of another human being which could result in his death is not something that I look forward to.

     Q.     And would that play in your mind when you are

1    sitting over there listening to the evidence and maybe

2    having to decide the questions that are presented to you?

3    Would that play some part in your mind having that

4    responsibility?  Would it make it -- at that point make you

5    not want to be part of the process at all?

6          A.     Well, I probably would not want to be.  I

7    would probably not welcome being part of the process, but I

8    believe, if I was chosen -- why am I arguing?

9          Q.     You have no choice, you know, sometimes we get

10   jurors that tell us, you know, because morally I may have a

11   problem with it.

12         A.     I believe in mercy, you know, and -- but I

13   also believe that we have to have laws to function in this

14   society.  You know, I'm a left brain person.  You know, my

15   undergraduate is in electrical engineering, so I don't know

16   if logical people go into engineering or if engineering

17   makes you a logical thinker.  But, you know, I, you know, my

18   wife -- she always makes emotional decisions, you know, so

19   she and I are a good team.  But I'm a more logical person,

20   if that helps you in any way.

21         Q.     So you wouldn't have -- I notice that you are

22   a very religious person --

23         A.     Yes.

24         Q.     -- like a lot of people that come in here and

25   those people sometimes have a problem being on this type of

1  jury because they don't want to be a part of a process that

2  may end up in a man's death based on their Biblical --

3         A.     They must not have read the Old Testament.

4         Q.     That's what I want to know from you.  Would

5  that in any way be a problem?

6         A.     I don't think so.

7         Q.     You just said that you believe in mercy.  What

8  do you mean by that?  Can you expound on that a little bit?

9         A.     Well, you know, we're all sinners, you know.

10 And but for the grace of God go I.  So -- I believe in

11 mercy, you know.

12        Q.     Okay.  Let me talk to you a little bit about

13 the death penalty and the law.  It was explained very well

14 by Mr. Shook.  But, as you can see, and not all cases are

15 eligible for the death penalty or the State seeks the death

16 penalty.  I mean, it's only murder cases and then only

17 certain types of murder cases are eligible for the death

18 penalty, and even capital murders, not all of them are to be

19 assessed the death penalty, unless these certain issues here

20 are answered the way the State explained to you.

21             So you can see the law favors that the

22 death penalty not be given in every single case and only

23 certain types of cases, and not even those cases, not only

24 until they met their burden on the questions, or as

25 sometimes we like to say, the State has jumped over those

1    hurdles in order to have the juror sign the answers the way

2    they would ask them to.

3                    And as you can see, I mean, basically the

4    law does not favor the death penalty, unless they have met

5    their burden.   Does that make sense to you?

6          A.    Yes.

7          Q.    You indicated when the State was asking you

8    questions that you thought past behavior was -- would tell

9    you what somebody would do in the future or was a good

10   indicator of future behavior; is that correct?

11         A.    Yes.   We were talking about probability of how

12   someone might act in the future.

13         Q.    And when you are asking that Special Issue No.

14   1, of course, in your mind, if you get to that Special Issue

15   No. 1, you would already have found that person guilty of

16   capital murder.   In other words, you don't get to those

17   questions unless you find the person guilty of capital

18   murder.

19                    Would the fact that you already know that

20   in your mind, would that lead you in Special Issue No. 1 to

21   automatically find him to be a continuing threat to society?

22   In other words, would that question already be answered yes

23   in your mind based on the fact that you found him guilty of

24   capital murder in the first part of the trial?

25         A.    No, I don't think so.   I think they would be

1    -- there would be some additional weighing of other evidence

2    or past behavior beyond this issue would be my expectation

3    there.

4         Q.    So you would wait, even though you found him

5    guilty of capital murder, you would wait and have the State

6    prove that Special Issue to you beyond a reasonable doubt?

7         A.    Yes.   It says probability of committing

8    criminal acts of violence, you know.   So, I mean, he may run

9    a stop sign, but that doesn't mean that he's going to turn

10   into a serial killer.

11        Q.    The reason I ask that question, because, like

12   I said, there are some jurors they find not much value in

13   that question because they say, look, I've already found him

14   guilty of capital murder.   What more do I need?   I'm already

15   going to answer that yes before we get to it.   Do you find

16   yourself in that situation or is it possible?

17        A.    Anything is possible, you know.   But I don't

18   think that's the intent of the question --

19        Q.    You would be able to stop yourself and

20   basically start anew on that question No. 1 and

21   independently answer it regardless of what your verdict was

22   in the first part of the trial?

23        A.    Yes, I believe so.

24        Q.    Now, question No. 2 has to do with intent and

25   also with parties.   You as a juror on a jury is going to

1    have to determine what somebody's intent was and what they
2    anticipated when certain things were happening.  And I know
3    the State, like I say, couldn't get into somebody's head.
4    You have to infer from their acts and things like that.

5                    But sometimes we have jurors who say, for
6    me to answer that question or for me to say that that person
7    didn't anticipate that a life would be taken, I may need to
8    hear from that person and they have to tell me what they
9    were actually thinking when things were happening.  How do
10   you feel about that?

11        A.    Well, I sort of feel if you are -- and this
12   may get me off the jury -- but I sort of feel that if you
13   are with a group of people and you have a weapon and you go
14   in to rob somebody, then there's a pretty good chance that
15   somebody is going to get hurt.  That's the way I honestly
16   feel about that.

17        Q.    And just to follow up on that, though, in
18   order for you to answer that question no, would you have to
19   have -- would you have to hear from the defendant, from Mr.
20   Murphy, as to what his actual thoughts were or whether he
21   actually anticipated that a human life would be taken?

22        A.    Well, it might be a good idea for him to share
23   that information in order that we have the best outlook that
24   we can on question No. 2.  But you know, as we said, we
25   can't make him testify.

1    Q.    And if he didn't get up and tell you those

2    things, would somehow in your mind that be -- I don't want

3    to say a point against him, but somehow tell you something

4    or are you going to answer the question --

5    A.    No.

6    Q.    -- not in his favor?

7    A.    No.   There's a lot -- I watch "The Practice"

8    enough to -- and there's a lot of reasons that you don't

9    have the defendants testify.

10   Q.    Okay.

11   A.    But it might be, I mean, if he had something

12   good to say about that, then maybe that would be a good idea

13   for him to share it with us.   It might be to his benefit,

14   you know.

15   Q.    But you wouldn't require it?

16   A.    No.

17   Q.    And you could answer that question no, if the

18   State hadn't proved that to you beyond a reasonable doubt?

19   A.    Yes.

20   Q.    Okay.   Question No. 3 talks about mercy.   I

21   guess mercy in a way like you talked about, the mitigation

22   question, basically.   Can you see value in that Special

23   Issue No. 3, that last --

24   A.    Oh, definitely.

25   Q.    What value do you see in that?

1    A.    I mean, as it says, there may be some special

2 or mitigating circumstances where the person, you know, and

3 we talked about some maybe -- maybe they didn't have a high

4 enough IQ or maybe they legitimately did go through some

5 things in their childhood that they just couldn't -- that it

6 wasn't reasonable for someone to overcome, you know, that

7 set them down this path, you know.

8    Q.    So you can see how and, I guess, like we said,

9 you have that question there as a safety net.

10    A.    Right.

11    Q.    Because you could see -- we've had jurors that

12 say, you know, I don't want to say they work themselves into

13 a frenzy, but we convicted him of capital murder and we

14 already found him guilty of that, it's been proven to us.

15 It's been proven to us that he's a continued threat to

16 society, and they have proven that to us, and we said yes.

17 And they have proven to us that he anticipated that a human

18 life would be taken.  Why are we even dealing with Special

19 Issue No. 3?

20                Are you going to be able to step back and

21 really consider that question after you have got that far in

22 the process?

23    A.    Yes.  I mean, this is life versus the death

24 penalty question.  I mean, that's what No. 3 is.  I mean,

25 all of those, I mean, those three questions.  Do I

1    understand that, right?

2         Q.    Yes.  And if you found some mitigating factor,

3    something about the offense itself, something in his

4    background, something that you yourself thought was

5    mitigating, you would be able to answer that question yes --

6         A.    Yes.

7         Q.    -- and impose -- an automatic life sentence

8    would be imposed?

9         A.    Yes.

10        Q.    Okay.  Now, you have seen that it's been

11   alleged in this case a killing of a police officer.  There's

12   some people that say, you know, I can consider Special Issue

13   No. 3, you know, somebody goes into a convenience store,

14   robbing it, and kills the person behind the counter, and

15   maybe he needed money or grew up in a bad house, something

16   like that.

17              But when it comes to taking the life of a

18   police officer, Special Issue No. 3, there's really nothing

19   ever that could mitigate that situation or I couldn't find

20   anything mitigating in that situation.  Would that make a

21   difference to you?

22        A.    I had not had that thought.

23        Q.    So it wouldn't make a difference to you?

24        A.    No.

25        Q.    I just want to follow up on something.

1  Correct me if I'm wrong, you told us that if you found him

2  guilty of capital murder, if you found -- you gave a

3  situation where somebody goes in there with guns, that they

4  may have already -- they should have anticipated that a life

5  could be taken.  Did I misquote you on that?

6       A.     Well, no.  I don't think you misquoted me.

7  Paraphrasing.  I think I said something very close to that.

8       Q.     Okay.  If you found that in the first part of

9  the trial, that that's what happened, would that Special

10  Issue No. 2 already be answered for you?  Would the State

11  have to prove anything other than what they have proven in

12  the guilt/innocence stage of the trial?

13       A.     Well, I guess I would anticipate there would

14  be some testimony as to this person's role in all of this

15  and whether he was more or less along for the ride or

16  whether he was an active participant, planner, just, you

17  know, how much of a co-conspirator, you know, was he in all

18  of this.  And that would weigh into it, I think, question

19  No. 2.

20       Q.     So would question No. 2 in your mind be

21  basically answered that he did anticipate before you even

22  got to it?

23       A.     I'm sorry, say that again?

24       Q.     Would question No. 2 or the fact that they had

25  to prove that he anticipated a human life would be taken,

1  would that already be answered in your mind before you even

2  started deliberating on that issue?

3       A.    No, I don't think so.   I mean -- I would have

4  to go back and read the definitions here of capital murder.

5  But, you know, this is in the sentencing phase, you know,

6  and you wipe the slate clean and they have to prove that

7  this is a yes.   I mean, they have to prove that, right?

8       Q.    Okay.   I wanted to make sure we're on the same

9  page.   And just basically you had talked about the fact

10 that, or you had written in your questionnaire, that you had

11 followed the Houston case, the mother with her children.

12 And your answer, I think, was that you gave an opinion, did

13 you form an opinion as to something about that case, and you

14 wrote she had a mental problem -- did you form any opinion

15 on page 7 of your questionnaire.

16            Have you been interested in the outcome

17 of a criminal case, either personally or through the media,

18 and you were interested in the Houston case.

19      A.    Yes.

20      Q.    And it said, did you form an opinion as a

21 result of that interest and you wrote she was mentally ill

22 at the time.   Did you form the opinion that she was mentally

23 ill or did you think she may have been not guilty of it

24 because of her illness or what did you think about that?

25      A.    You know, now it's not clear to me when I

1  formed that opinion, whether it was after, you know, the

2  trial or before the trial, you know.  People that do that

3  sort of thing have to have some defect, you know.

4      Q.     Did you agree with the outcome of that -- of

5  that trial?

6      A.     Which was life, life sentence?

7      Q.     Do you think that was a little harsh or did

8  you think that was just right or not enough?

9      A.     You know, I just don't have enough information

10 to really judge what the jury did there, you know, I didn't

11 follow it that closely.

12     Q.     Did you kind of feel sorry for her in her

13 situation or --

14     A.     Well, yes, I think so.

15             MR. SANCHEZ:  I have no further

16 questions.

17             THE COURT:  Thank you, sir.  Wait for us

18 outside and we'll have you back in just a few minutes.

19                    [Prospective juror out]

20             THE COURT:  What says the State?

21             MR. SHOOK:  State has no challenges for

22 cause.

23             MR. SANCHEZ:  We have no challenge for

24 cause.

25             THE COURT:  What says the State?

151

1       MR. SHOOK:  The State accepts the juror.

2       MS. BUSBEE:  We would like to have a

3   moment, please.

4       THE COURT:  Would you like to step into

5   your office?

6       MS. BUSBEE:  Yes.

7            (Recess)

8       THE COURT:  Mr. Sanchez?

9       MR. SANCHEZ:  We accept the juror.

10      THE COURT:  Juror No. 1159 shall be

11  accepted.  Ask him to come back in, please.

12           [Prospective juror in]

13      THE COURT:  Mr. Evans?

14      PROSPECTIVE JUROR:  Yes.

15      THE COURT:  I don't know if it's good

16  news or bad news, but you have been accepted for this jury.

17  So now the hard part begins.  Obviously, the attorneys

18  thought you were very thoughtful and deliberate in your

19  understanding and your answers and your reflection upon

20  these issues.

21      The hardest part from this point forward

22  is now that you know you are going to be sitting in this

23  case -- I've prepared some written instructions for you --

24  that you have already told us you haven't done any

25  independent investigation, you haven't looked at the media,

1  you haven't looked at the Internet.  You are now under court

2  order not to do that.

3             PROSPECTIVE JUROR:  Okay.

4             THE COURT:  As the attorneys have said,

5  they are satisfied with your ability to be able to judge

6  everything that you hear on this case from that witness

7  stand and nowhere else.  The Sheriff will go over with you

8  some other details this afternoon.

9             I can't tell you the exact date, but it

10 will be sometime before November 10th, once I get all the

11 jury selected and I have the jury, I will have everybody

12 back down here for a group orientation.  Should be about an

13 hour.  We have some procedures that we can't go over until

14 we get everybody here.  Does that make sense, some sense, to

15 you?

16            PROSPECTIVE JUROR:  Yes.

17            THE COURT:  The objective is, and now you

18 have seen, is I start on time.  I think you see I'm very

19 organized.  You will get a letter with enough time to plan

20 your schedule to be here.  I told you to be here starting at

21 1:30, probably an hour and a half.  It's -- we're pretty

22 much on schedule.  The objective is that when we start this

23 case on Monday morning, November 10th, at 8:30, that means

24 that you will be in the box and the State will present their

25 indictment at 8:30.  That doesn't mean you are here at 8:30

153

1    and we jerk around until 10:00.

2                    PROSPECTIVE JUROR:  Good.

3                    THE COURT:  That's one thing that you can

4    count on.  And you are an independent businessman and I will

5    not waste your time.  I've even had jurors ask for breaks,

6    okay?  So that's one thing you can count on.  We start on

7    time and if I take a break or do something that I have to do

8    procedurally, I have to tell -- I will tell you, I need two

9    hours.  There are certain procedures that I have to manage

10   that I make time for.  And we may quit early in the day.

11   But I will not have you here and waiting around two hours

12   before we start.

13                   PROSPECTIVE JUROR:  I like that.

14                   THE COURT:  We will get along just fine.

15   Sheriff, if you would, I have a supplemental information

16   sheet that she's going to go over with you and check

17   information that we have entered into the computer.  This is

18   my information.  It's contained in my computer.  Your

19   information sheet that you had this afternoon, I printed it

20   right here and it will be shredded this afternoon.  That way

21   we keep real tight security on your information.  But this

22   is so we can make contact with you.

23                   So with that, if you will go with the

24   Sheriff and she'll give you some other instructions.

25                   [Prospective juror out]

154

1              THE COURT:  Jacqueline Wiley.

2                  [Prospective juror in]

3              THE COURT:  Please have a seat.  How are

4  you doing?

5              PROSPECTIVE JUROR:  Fine.  And you?

6              THE COURT:  Is it Jacquelyn Wiley?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  And, Ms. Wiley, welcome to

9  the 283rd.  Sorry for the delay.  We never know exactly how

10  long we're going to talk to someone.  You came up second.

11  That's the way the computer put your numbers in the till.

12             PROSPECTIVE JUROR:  All right.

13             THE COURT:  Obviously, you have had

14  enough time to read and get bored on the orientation guide I

15  provided for you.  It's a lot of law to give someone.  We

16  don't expect you to understand it completely.  The lawyers

17  will go over it with you to provide examples on how it

18  relates.

19            The two questions that I have at the end

20  of the process are, number one, do you understand the law?

21  Number two, can you follow the law?  That's my function.

22            At this point the only question I have

23  for you is this trial shall begin on November 10th.  Do you

24  have any reason why you cannot serve this Court for those

25  two weeks?

1    PROSPECTIVE JUROR:  Yes, sir, I do.

2    THE COURT:  Yes, ma'am.

3    PROSPECTIVE JUROR:  Kind of a personal

4 medical issue.  But urinary incontinence, frequent use of

5 the restroom.  So I don't know how often you all --

6    MS. BUSBEE:  Your Honor, we don't want to

7 embarrass her.  We'll agree.  You're a perfect stranger.

8 You don't have to tell us.

9    THE COURT:  Despite what you see on TV

10 and despite what you think you might know about lawyers,

11 these guys are a good group to work with and sorry you had

12 to come in and make that revelation, but they have agreed to

13 let you off.  Maybe we'll have a shorter trial for you

14 later.

15    PROSPECTIVE JUROR:  Yes, thank you.

16    THE COURT:  Thank you, Ms. Wiley.

17    [Prospective juror out]

18    THE COURT:  Nancy Joy Carney.

19    [Prospective juror in]

20    THE COURT:  Good afternoon.  Is it Ms.

21 Nancy Joy Carney?

22    PROSPECTIVE JUROR:  Yes.

23    THE COURT:  And do you prefer your first

24 name Nancy or Joy?

25    PROSPECTIVE JUROR:  Nancy.

1    THE COURT:  So I can make my computer do

2  the right thing.  Ms. Carney, welcome to the 283rd.  You

3  never know exactly how long we're going to speak with

4  someone.  The first gentleman we talked to for over an hour

5  and the second lady we talked to 30 seconds.  So I hate to

6  have you wait until you get to the door.  I have to make a

7  balancing on ten people in here and one or two people

8  outside.  I never know how long.  I apologize for your wait.

9    PROSPECTIVE JUROR:  That's fine.

10    THE COURT:  You have had enough time to

11  go through and get bored reading the material that I

12  provided for you.  That's a lot of law.  I understand that.

13  The objective is for you to start thinking about these

14  issues.  The lawyers are going to follow up with examples on

15  how the law relates.

16    And my bottom line at the end of the

17  process are two questions, one, do you understand the law?

18    PROSPECTIVE JUROR:  Yes.

19    THE COURT:  Secondly, can you follow the

20  law?

21    PROSPECTIVE JUROR:  Yes.

22    THE COURT:  All right.  It's easy to say

23  yes right now.  They're going to spend a little time with

24  you and go through that.  The only question that I have for

25  you, will you be able to serve this Court for the two weeks

beginning on November 10th?

PROSPECTIVE JUROR:  Yes.

THE COURT:  With that I shall turn it over to Mr. Wirskye.

MR. WIRSKYE:  May it please the Court.

NANCY CARNEY,

having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WIRSKYE:

Q.     How are you this afternoon?

A.     Good.

Q.     Good.  Thanks for being with us.  We've kind of got distractions in front of us, don't we?

A.     Yes, a couple.

Q.     See if I can move over.  How's that?  Your chair doesn't move.  It kind of swivels.  But thanks for waiting with us.  What I would like to do is go over some of the information that you were kind enough to give us in the long questionnaire that you filled out, talk to you a little bit about your thoughts and feelings about the death penalty, and maybe, finally, talk about some of the law that applies.

It's a little bit intimidating to some people to have to be up there on the witness stand.  You

1  probably feel like you are on trial.  Because this is a

2  death penalty case, the law requires that we talk to you

3  individually.  This is kind of the best way that we have

4  found to do it, so I apologize that you are up there on the

5  witness stand.

6          But what did you think when you got the

7  word that you had to come back for the individual interview?

8      A.    Um, I was kind of frightened.  Um, I think it

9  will be hard to actually have to give someone the death

10  penalty, so I was kind of worried about that.

11     Q.    And, you know, you saw the people that you

12  were down with, I guess, back in May?

13     A.    Uh-huh.

14     Q.    And we had a group that big in the afternoon

15  and everybody fills out the questionnaires.  And we talked

16  to a lot of people and we know this isn't exactly everyone's

17  cup of tea.  Some people don't believe in the death penalty.

18  They wouldn't be qualified.  Some people always believe in

19  the death penalty and you don't want them on the jury,

20  either.  They are not qualified.

21          We're looking not only for someone that

22  can follow the law, but someone who is completely

23  comfortable with the process, I guess, both with the death

24  penalty philosophically or in the abstract and the people

25  who are also comfortable when you get down here and it

1  becomes a little more real.  You know, you are actually just

2  a few feet away from making the jury and having to make

3  those life or death decisions?

4      A.      Uh-huh.

5      Q.      Now, you told us you are generally in favor,

6  philosophically, of the death penalty?

7      A.      Right.

8      Q.      Where did it come from and why do you favor

9  it?

10     A.      Um, I'm not sure really where it comes from,

11 but I just believe that if you commit a certain crime, then

12 you should be punished in a way that fits that crime, I

13 guess.

14     Q.      Okay.  Is that something that you have gone

15 back and forth on or is it something that you have kind of

16 always believed?

17     A.      I think it's something that I have always

18 believed.

19     Q.      When you think about an appropriate type of

20 case for the death penalty, what comes to mind?  What type

21 of case or what set of facts?

22     A.      Um, someone who murders or kills someone with

23 planning.  I guess what comes to mind is like mass murderers

24 and those types of people.

25     Q.      Okay.  Is there a particular case you may have

160

1    heard about, read about, or seen in the media or followed

2    that comes to mind when you think of a death penalty case?

3           A.    No.

4           Q.    Okay.  In Texas, as you may know, we gave you

5    that packet of law to read.  I don't know how much sense it

6    made to you, just reading it cold, but the death penalty is

7    only available in a murder case and then only a certain type

8    of murder case, mass murder, serial murders, as you have

9    described.  If you murder a police officer, a fireman on

10   duty, a child under six, or if you commit an intentional

11   murder during the course of another crime like in a robbery

12   or burglary or somebody breaking into your house or sexual

13   assault or rape, that type thing.

14                   And those are kind of the cases that the

15   option of the death penalty is reserved for in Texas.  Is

16   that something that kind of is in accord with what you

17   believe or kind of jives with what you believe?

18          A.    Yes.

19          Q.    Let me touch on another area with you.  We

20   talked to a lot of people, some that are very strongly in

21   favor of the death penalty.  But some people would draw a

22   line in certain types of cases.

23                   What I mean by that is this.  I think

24   when we think about a death penalty-type case, we often

25   think maybe one person acting alone, one person going into a

1  7-Eleven, holding up the clerk, shooting and killing them,

2  making off with the money.

3              Oftentimes crimes are committed by more

4  than one person.  A group or a gang of people oftentimes

5  commit a crime.  In Texas and every other state, they could

6  be held accountable, everyone that participated in the

7  crime.  In a death penalty scenario when we talk about

8  giving that sort of extreme punishment, a lot of people tell

9  us that they would just reserve the death penalty for a

10  person that actually caused the death.  I guess for lack of

11  a better word the triggerman, the person that actually

12  pulled the trigger, actually caused the death.  And they

13  draw that bright line.

14             And when it came to the person who was

15  the accomplice, I guess, as you probably heard that word,

16  the nontriggerman, the people that helped in the crime but

17  didn't actually cause the death, for those type people they

18  take the death penalty off the table.  You know, they may

19  convict him and put him in prison for life, give him still a

20  severe punishment, but they just don't think the death

21  penalty is justified in that type of scenario.  What do you

22  think about that?

23        A.     Um, depends on how much planning, I guess,

24  they had in the murder, if they knew that that was the

25  intent of the person was to kill the other person, I think

1  they should probably suffer the same consequences as the

2  person who shot them.

3       Q.   Okay.  So you wouldn't automatically take the

4  death penalty off the table for an accomplice or a

5  nonshooter, that type deal?

6       A.   No.

7       Q.   Okay.  Let me give you a fact scenario and see

8  what you think about that.  Let's say the other prosecutor,

9  Mr. Shook, and I get together with a third friend of ours

10 and, say, we all need money because we have law school

11 student loans, something that sounds like you will be

12 familiar with pretty soon.  So we need some money real bad.

13            So we decide to rob a bank.  The plan is

14 Mr. Shook is going to take a gun and go in, hold up the

15 teller.  I'm going to go in unarmed.  I would have my bag to

16 start collecting the money from the tellers.  And our third

17 friend who has the car and drives us up there, waits outside

18 and kind of keeps a lookout for the cops and let us know if

19 any show up.  And that's what we agree to.

20            And as we go to do this bank robbery, say

21 for whatever reason, maybe one of the tellers looks at

22 Mr. Shook the wrong way or he thinks they're going for a

23 silent alarm or something like that and call 911, he shoots

24 and kills one of the tellers.  He's committed capital

25 murder, an intentional murder during the course of a

1   robbery.  He could be convicted of capital murder and could

2   face the death penalty, depending on how the jury answers

3   these questions that you read.

4                    What do you think about me in that

5   scenario, the nontriggerman, or the accomplice, who just

6   went in to collect the money?

7          A.     Um, I don't think that you would deserve the

8   death penalty.

9          Q.     Why do you say that?

10         A.     Um, because you didn't tell him or you were

11  not planning on killing anyone.

12         Q.     Okay.  Is there anything, if you change the

13  facts up a little bit that would make it a clearer case to

14  give me perhaps the death penalty or where you would

15  consider the death penalty in my case?

16         A.     Um, maybe if you had a weapon as well, or if

17  y'all had intended before you went in to rob the place,

18  y'all had intended to kill someone.

19         Q.     Okay.  We kind of made a plan.

20         A.     You are going to kill this one.

21         Q.     Whatever we need to do to get out of here --

22         A.     Yeah.

23         Q.     -- I guess, that type deal, not leave any

24  witnesses.  Or if I had a gun, that would make a difference

25  to you?

1          A.     Yes.

2          Q.     What about the getaway car driver out front?

3          A.     Um, I guess the same kind of scenario.  If

4    they had a weapon, if there was a plan to kill people, no

5    matter what it took to get away safely.

6          Q.     Okay.  Let me tell you, it sounds like you are

7    fairly close to what the law is.  The law is when we talk

8    about accomplices, in Texas we call it parties to a crime.

9    Instead of accomplice, they would be a party to a crime.

10              But in that type scenario, if I aided,

11   assisted, promoted, directed, or solicited Mr. Shook to

12   commit a capital murder, actively involved in it, then I

13   could be held guilty and ultimately face the death penalty,

14   just like he does.  Or if, going back to my scenario under

15   the law of conspiracy, we conspire or agree to commit one

16   crime, the bank robbery, and a murder happens during that, a

17   capital murder is committed in furtherance of that bank

18   robbery, an accomplice like me should have anticipated, even

19   though I didn't intend for anyone to get hurt, but if I

20   should have anticipated, I could also be on the hook for

21   capital murder and face the death penalty.  What do you

22   think about that, that being the law?

23         A.     I guess if you go in to rob someone and you

24   have a weapon, you probably intend on maybe using it.

25         Q.     Okay.

1     A.    So --

2     Q.    A lot of people tell us it's kind of a common

3   sense proposition, I guess.

4     A.    Uh-huh.

5     Q.    A person such as me that didn't have that

6   intent, you know, I just signed up for a bank robbery.  I

7   never wanted the murder to happen.  You know, assuming I

8   wasn't armed --

9             MS. BUSBEE:  Your Honor, may we approach

10  the bench?

11            THE COURT:  You may.

12              (Bench conference)

13            MS. BUSBEE:  Your Honor, I object based

14  on reasons that were stated in a sidebar to be put on the

15  record at a future time this afternoon.

16            THE COURT:  Sustained.

17     Q.    (By Mr. Wirskye)  I guess the bottom line is

18  you wouldn't automatically take the death penalty off the

19  table as an option when we're talking about an accomplice?

20     A.    No.

21     Q.    Okay.  Just to be up front with you, the

22  reason we're talking about this and kind of belaboring the

23  point, is we're prosecuting Mr. Murphy as an accomplice to

24  the crime and that's why we spend so much time talking to

25  people like you about it, again, to make sure once you get

166

1  down here and it becomes more real, that you are exactly

2  comfortable with what we may ask you to do.  You are a

3  nurse; is that right?

4       A.     Yes, sir.

5       Q.     Where do you work or what are your duties?

6       A.     I work in the intensive care unit at Zale

7  Lipshy University Hospital.  I take care of critically ill

8  patients.

9       Q.     Like people that come in from the emergency --

10  I say that to show my ignorance, but people that come in

11  from the emergency room or other type cases or --

12       A.     Well, Zale Lipshy doesn't have an emergency

13  room, so the only way that you can get there is if you are

14  accepted by a physician.  So most of our ICU patients are

15  surgical patients.  We deal maybe 60 to 70 percent in

16  brain-type injuries, aneurysms, and vascular issues in the

17  brain.

18       Q.     Okay.  Looks like also at some point you were

19  a 911 dispatcher; is that right?

20       A.     Uh-huh.

21       Q.     Where was that?

22       A.     I went to Texas A&M University and while I was

23  there, I volunteered on the ambulance.  I was on the

24  ambulance as well as a dispatcher.  And then I also had a

25  part-time job dispatching ambulances for hospitals there in

College Station.

Q.     In connection with that, did you come into contact with a lot of police officers and things like that?

A.     Um, not a lot.  We didn't need police officers for many of our calls, but there were a few that we would have police officers at.

Q.     Okay.  The fact that you are a nurse and you do work in the intensive care unit, I guess, with kind of life or death cases there, I guess, people that are severely or critically ill, how do you think that might affect you, if you were actually picked in this case to be a juror?

A.     Um, I think I accept death in a different way than maybe most people do, just because I see death on pretty much a daily basis.  So I guess I just accept death as part of life.

Q.     Okay.  We talked a little bit about maybe some of the concerns, I guess, that kind of frightened you coming down and being a part of this process.  Do you feel completely comfortable maybe serving on a jury where the death penalty is going to be an issue -- at issue?

A.     Not completely comfortable, but I think that it's probably my duty or -- I've thought about it, I guess.  I think that I would be able to decide, but I think that it would be a hard decision to make.

Q.     Okay.  Because of, I guess, the life and death

1    decision that is involved?

2         A.    Yes.

3         Q.    Again, we talk to a lot of people and we

4    really don't want to -- I know that not everyone is cut out

5    for it and comfortable is probably a bad word.  But we at

6    least want to be sure that people that are on the jury,

7    we're not forcing them into some type of crisis of

8    conscience or things like that.

9              And we talk to a lot of people that say

10   they would be scared or frightened and maybe on down the

11   line that would weigh on their conscience or their mind

12   because oftentimes the details of executions are reported.

13   And you know from being in Texas, we are the most active

14   death penalty state in the United States.  The death penalty

15   is a reality here.  Jurors give it, it's assessed, it's

16   carried out.

17             You know, the death penalty procedure is

18   pretty much the same in every case and it's what you may

19   hear reported.  A jury finds a person guilty of capital

20   murder and answers those three questions in such a way, a

21   yes, yes, and no answer, that they are a future danger, that

22   they did anticipate a life would be taken, no, there's

23   nothing mitigating, then at that point the Judge would have

24   no choice.  He would sentence the defendant to death.

25             The person would be taken immediately to

1  death row, in Texas, in the Livingston Unit, where they stay

2  until some day in the future.  I can't tell you when or how

3  long, but some day in the future Judge Cunningham would set

4  an execution date.

5          Before that day or on that day, the

6  defendant would be taken from the Livingston Unit to the

7  Walls Unit, which is the old prison in downtown Huntsville,

8  be taken to a cell right outside the death chamber.  You may

9  have seen the death chamber.  It's the gurney we have with

10  the leather straps.

11      A.      Uh-huh.

12      Q.      He would be taken there that day and be given

13  a chance to meet with friends, family, spiritual advisors,

14  be given a last meal. As it got close to 6:00 p.m., which

15  is the time in Texas that is mandated for executions, he

16  would be taken from that holding cell over to the death

17  chamber.  He would either go voluntarily or he would be

18  moved involuntarily, be strapped down on the gurney.

19          An IV would be started.  There would be

20  witnesses for both sides, for the victim's friends and

21  family members, his friends and family members.  He would be

22  given a chance to make a last statement.  He may beg for

23  forgiveness and he may proclaim his innocence.

24          At some point the warden will signal the

25  executioner.  The poisons will be released through the IV.

The heart and lungs would shut down and he would eventually lose consciousness and die.

I don't want to be morbid with you, although you are a nurse, but these are the type details that are reported.  And I want to make sure that, you know yourself better than anyone, that you think in your heart of hearts that you are the type person that can take pen in hand and answer these three questions in such a way that it may result, you know, in the death of a living, breathing, human being, someone you have seen day in and day out in court for two weeks.  What do you think about that?

A.     I think that I could.  I hope that I could, because then I really couldn't believe in the death penalty, if I wasn't able to really follow through with, I guess, holding up the death penalty.

Q.     Okay.  So even though you may have some, I guess, nervousness about it, you feel that you could participate as a juror in that type case?

A.     Uh-huh.

THE COURT:  Yes or no.

PROSPECTIVE JUROR:  Yes.

THE COURT:  I know you are nervous, but she has to record everything.  So head nods -- and you have to give a verbal --

PROSPECTIVE JUROR:  I didn't realize that

171

I didn't say it.

Q.     (By Mr. Wirskye)   Now, you've told us that,
like almost everybody we talked to, you have heard something
about this case in the media.   It's kind of a high profile
case; is that right?

A.     You know, I'm really not sure.   I thought when
I first read about it, just in here, that maybe I had.   But
since then I haven't -- I haven't really discussed it with
anyone or I really don't know if I know anything about the
case.

Q.     Okay.   So as far as you know, as you sit there
right now, there's nothing in your mind that would possibly
influence your verdict at this point?

A.     No.

Q.     Okay.   If it's a situation where you did get
picked as a juror and you started to hear some testimony and
say, gee, I did hear something about this case, the law
would require you at that point not necessarily to forget
what you may have heard through the media, but kind of put
that in the back of your mind and just base your verdict on
what you hear in the courtroom, the facts and evidence in
the courtroom.   Is that something that you think you can do?

A.     Yes.

Q.     Okay.   And that's basically as we go along,
pretty much what I'll be asking you, telling you the law and

1  asking if you can follow it, this type of thing.  Where is

2  your husband in law school?

3          A.    At SMU.

4          Q.    What year is he there?

5          A.    His first year -- actually his second now.  He

6  just started his second.

7          Q.    Does he have any idea what type of law he

8  wants to practice?

9          A.    He doesn't want to do litigation.

10         Q.    Are you happy with that choice, I guess?

11         A.    Whatever he wants to do.

12         Q.    Okay.  If you are picked to serve as a juror

13  on this case, do you think he may want to talk to you about

14  it every night or try to influence your decision?  I keep

15  thinking back me.  If my wife was on a death penalty case

16  when I was in law school, I can only imagine what a pest I

17  would be for trying to annoy her for details or telling her

18  what the law really is, instead of what the Judge says.

19         A.    Right.  I think that since he's just starting

20  law school, he doesn't really know that much and he knows

21  that he doesn't know much.  But he is --

22         Q.    That's rare.  That's very rare.

23         A.    He was trying to tell me today what y'all were

24  going to be asking me, the prosecution wants to know this,

25  and I was like, Ryan.

1    Q.    Has he been right so far?

2    A.    Um, yeah, on a few things.  He has his own

3  stuff to worry about.

4    Q.    You really don't think that would be a factor

5  to either side?

6    A.    No.

7    Q.    Obviously, again, you have to base your

8  verdict on what you hear here in the courtroom and the law

9  that the Judge gives you.  You know, it really wouldn't be

10  fair to either side if we kind of let that wild card law

11  student type deal come into play.

12    A.    Yeah.

13    Q.    As we talked about, trials in Texas are

14  usually in two parts.  The first part is the guilt/innocence

15  where you are just concerned whether we have proven it to

16  you beyond a reasonable doubt that he's guilty of the crime

17  of capital murder.

18         If he's found guilty of capital murder,

19  that's when we move into the second phase.  You get to hear

20  extra additional evidence, maybe, about his background, his

21  history, that type of thing.  And that's where we ask the

22  jury to answer these three Special Issues.  I like to call

23  them questions.  That's all they are.

24         I know you had a chance to look at them

25  in the booklet, but if you will take a few minutes and read

1  them up on the board on the wall.

2      A.    (Prospective juror complies.)

3      Q.    Those are the three questions that we ask a

4  jury to decide.  You know, we don't ask you to write in a

5  life sentence or death sentence.  We just let answers to

6  these questions determine the appropriate sentence.

7            Let's look at Special Issue 1 or question

8  No. 1.  This is kind of what we generally refer to as the

9  future danger question, whether there's that probability

10  that they will commit criminal acts of violence in the

11  future such that they would be a continuing threat to

12  society.  Does that question make sense to you as you just

13  read it?

14      A.    Yes.

15      Q.    You see how it's kind of asking a juror to

16  make a prediction about future behavior?

17      A.    Yes.

18      Q.    Is that something that you would feel

19  comfortable doing, making --

20      A.    Yes.

21      Q.    -- making that sort of prediction?

22      A.    Yes.

23      Q.    Any type of information that you feel would be

24  important to you in making that decision?

25      A.    Um, maybe past acts of violence or past

history.

Q.    Okay.  And that's typically what we hear.
That question has several words and phrases that aren't
necessarily defined.  You know, they don't have the legal
definitions like a lot of things that we deal with.  But
that word "probability", what kind of definition would you
give that or what does that mean to you?

A.    Highly likely that he would commit another
crime or commit another act of violence.

Q.    And that's what we hear a lot, likelihood or
more likely than not.  Does that make sense to you?

A.    Yes.

Q.    The law gives us a little bit of guidance.
It's something more than a probability, because anything is
possible.  But it's something less than a certainty,
obviously a likelihood or that type of thing.  Does that
make sense to you?

A.    Yes.

Q.    Also that phrase on the second line in the
middle, the "criminal acts of violence."  What pops into
your head when you think about that phrase?

A.    Um, maybe another murder or any type of harm
to other people in society.

Q.    Okay.  Would you necessarily require another
murder or could it be some other act?

176

1    A.    No.   I don't think it would have to be murder.

2    Q.    I think that's pretty much what the law is.

3 You know, we don't necessarily have to prove to you that he

4 would be involved in another murder or take a life, that

5 type of thing, just anything criminal in its nature that

6 involves violence.   Does that make sense to you?

7    A.    Yes.

8    Q.    And, finally, that last word, "society."   When

9 you think of society, what do you think of?   How would you

10 define that or what would you include in that definition?

11   A.    Um, everyone.

12   Q.    Okay.   Would you include both, I guess,

13 nonprison populations, those of us in the free world, and

14 prison population?

15   A.    Yes.

16   Q.    That's pretty much what we hear.   What the law

17 says, anyone who you may come into contact with, nurses in

18 prison, teachers, wardens, guards, that type of thing.   This

19 question starts off with a no answer and that's kind of a

20 default setting on questions No. 1 and 2.

21          And on both of those questions, the State

22 at this table, we have the burden of proving to you that the

23 answer to those two questions should be yes.   That's our

24 burden.   This side doesn't have to do anything.   They never

25 have to prove anything to you in the course of the whole

1    trial.

2            But they start off with that no or

3    default setting of no and we have to prove it to you.  Does

4    that make sense?

5        A.    Yes.

6        Q.    And the law basically requires or kind of

7    contemplates or envisions that, you know, you kind of start

8    the second phase of that trial, the punishment phase, with

9    that open mind.  Okay?  You find him guilty of capital

10   murder, but you have to go into that second phase with the

11   open mind.

12           And what I mean by that is you can't

13   necessarily say, well, I'm going to answer Special Issue No.

14   1 yes, just because I found him guilty of capital murder.

15   Okay?  And when you get to the second phase, you can,

16   obviously, go back and look at the facts of the crime to

17   help you make that decision, along with some additional

18   information, his history, that type thing.

19       A.    Okay.

20       Q.    But the point is you have to start with an

21   open mind, you know, one verdict or one answer to one

22   question doesn't necessarily automatically help you answer

23   another one.  We kind of require a juror to really use some

24   mental discipline, work through these questions one by one,

25   and kind of make an independent inquiry into each question.

1    Does that make sense to you?

2         A.    Yes.

3         Q.    Because we do have some people, frankly, that

4    tell us, you know, if I found someone guilty of capital

5    murder, my mind is closed to Special Issue No. 1.  For

6    instance, I'm always going to think they are a future danger

7    and I'm going to answer that automatically yes, just because

8    I found him guilty of capital murder.

9              That person wouldn't necessarily be

10   qualified because they wouldn't be able to follow the law.

11   They wouldn't be able to keep that open mind.  Is that

12   something you think you could keep that open mind?  You

13   wouldn't automatically answer that yes, just because you

14   found him guilty?

15        A.    Um, yes, I think I could keep an open mind.

16        Q.    And obviously you can go back and look at the

17   facts of the crime and look at everything else.  But, like I

18   said, we just want you to start fresh with a clean slate

19   when we get to that second phase of the trial.

20             It's the same thing for Special Issue No.

21   2, and that question basically deals with a kind of a

22   scenario we've already talked about, when we have more than

23   one person involved in the crime.  It's kind of a three-part

24   question.  I mean, if you think the person was, again, for

25   lack of a better term, a triggerman, you are going to find

out they actually caused the death of the deceased, it would

be easy.

And if you think the State has proven to

you beyond a reasonable doubt that the defendant intended to

kill the deceased or another, then you would answer yes.

That may be a type scenario like a murder for hire.  You

hire somebody to kill your husband or your business partner,

that type thing.  Obviously, you would intend the death, but

you didn't actually commit it and that type thing.

And the very last line on Special Issue

No. 2, again, following up on what we talked about earlier,

to answer that question yes, you would have to find that the

accomplice anticipated that a human life would be taken.

When you are talking about finding an accomplice guilty of

capital murder in the first phase of the trial, the question

is, going back to my example, should I have anticipated that

a life would be taken?  If you think the State has proven it

to you beyond a reasonable doubt, you can find him guilty.

When we get to the second phase of the

trial, that second question, the law gives us a little bit

higher burden.  We have to prove not only that they should

have anticipated, but that they did anticipate that a life

would be taken.

And, again, you know, it may be the same

evidence that you use that you heard in the first part of

180

the trial.  You may find out some additional evidence in the

second part of the trial to help you answer that.

Again, the bottom line is you are going

to have to go into that question with an open mind, take a

fresh look at everything you have heard in the first part of

the trial and the second, and decide whether we've met our

burden, we have proved to you the answer should be yes

beyond a reasonable doubt.  Does that kind of make sense?

A.     Yes.

Q.     Okay.  Finally, with Special Issue No. 3, it's

kind of what we call the mitigation question.  It's really

kind of the last stop in the process.  I think a lot of

people think of it as a safety net because at this point

when we get to Special Issue No. 3, you have found the

person guilty of capital murder, you found they are going to

be that future danger, you found they anticipated that a

life would be taken.  This is the last step.

We ask a jury to kind of stop, take a

deep breath, go back and look at everything they have heard,

the facts of the crime, what you may have heard about his

character and background, to look at what kind of personal

moral culpability he has, you know, what blame does he bear

in the crime?

And ask yourself, looking at all that, is

there anything mitigating, anything that lessens his blame,

1 and if there is, is it sufficient that his life ought to be

2 spared and he shouldn't receive the death penalty, and he

3 ought to get that life sentence.   Does that make sense to

4 you, that question?

5      A.      Yes.

6      Q.      Do you see the value in having that question,

7 even kind of that last step in the process?

8      A.      Yes.

9      Q.      Okay.   The law doesn't tell jurors what

10 mitigating is.   We kind of leave it up to you.   Is there

11 anything that strikes you, maybe, as potentially mitigating

12 as you sit there and think about it?   Any sort of facts or

13 factors in these types of cases?

14      A.      Um, I think there could be a lot of different

15 things, actually.

16      Q.      We ask people, the most common response is

17 most people can't think of anything, because we hope you

18 don't sit around thinking of these things, but what were you

19 going to say?

20      A.      Um, well, in here it was asking about alcohol

21 and drug use at the time.   There's also mental health

22 issues, I guess.

23      Q.      Okay.   Let's talk about alcohol.   When we talk

24 to people, some people think, you know, if a person -- we're

25 talking about voluntary intoxication, not if somebody drugs

someone and that type deal.  But some people may feel that

if a person had got drunk or used drugs or alcoholic or drug

addict, that may be potentially mitigating, somehow lessen

their blame.  Other people say no, it doesn't.  They have

choices and that actually may be aggravating that they

choose to get high and do these types of things.  Where do

you come down between those two extremes?

A.      I'm on the second one that you stated.  I

think that you choose to drink and you choose certain paths

in your life.  And if you choose that and you commit a

crime, you still committed the crime.

Q.      Okay.  What do you think about a person's age?

Some people tell us, you know, if the person is younger,

maybe that could be potentially mitigating, they haven't had

the life experience, that type thing, or some people say, if

you are old enough to do the crime, you are old enough to

suffer the consequences, that type of thing.  Where do you

come down on that?

A.      Probably more on the second end of that one,

too.

Q.      How about a person's upbringing?  Some people

tell us, you know, if a person was, I guess, severely

physically or mentally abused, you know, as a youth, had a

tough go of it when they were younger, that may be

potentially mitigating.  And, again, other people say, no,

you are old enough to make choices at some point and you

have to be responsible.  What do you think about that?

A.       A second end of that as well.  I think that

you still make your own decisions in your life, no matter

what has happened to you previously.

Q.       Okay.  And you talked about a person's, I

guess, mental state?

A.       Uh-huh.

Q.       You know, we're obviously not talking about

mental retardation here.  Someone who is that retarded or

somebody who has such a mental defect that they don't know

the difference between right and wrong, obviously, this

would be the chance to take that type of information into

consideration.

The law, again, requires that you just

keep an open mind to mitigation.  You don't have to think of

anything now.  Legally, you don't have to consider any

factor mitigating.  We leave it up to you.  You don't even

have to agree with the other jurors, you know.  You just

have to be able to tell us, to be qualified, I can keep that

open mind.  That question still has value to me, even at

that late stage.  If I hear something that is mitigating,

I'll consider it and if it's sufficiently mitigating, then I

will spare his life.

Do you think that you can follow that law

184

1    and keep that open mind?

2         A.    Yes.

3         Q.    Okay.  Do you have any questions about the --

4    kind of the scheme that we have, the two parts of the trial

5    or the three Special Issues or three questions that we

6    talked about?

7         A.    How much time is usually between the first and

8    the second part of the trial?  Is there like a time period?

9         Q.    Once the jury reaches a verdict, usually we,

10   in this court, the Judge is very efficient, we usually start

11   that second phase almost immediately, depending on what time

12   of the day the verdict comes in.  We anticipate, our best

13   guess, is the trial will last two weeks, maybe a little

14   less, maybe a little more.

15              THE COURT:  Hopefully less.

16        Q.    (By Mr. Wirskye)  Is that a concern of yours?

17        A.    No, I was just wondering.

18        Q.    It's not like some states where it cranks up

19   like a month later or something.  It's a two-part process,

20   but we kind of look at it as one trial, really.  Any

21   questions at all about anything else?  The burden of proof

22   or what you have to do, the open mind, independent inquiry,

23   or anything of that?

24        A.    No.

25        Q.    Let's talk a little bit, generally, about some

1    of the rules that apply at every trial.  You may have heard

2    about them.  You may have heard about them from your

3    husband, I don't know.

4                    In our criminal system all defendants are

5    presumed innocent.  You know, the fact that he's been

6    arrested, indicted, or he's sitting here in court today is

7    no evidence of his guilt.  You have to presume he's innocent

8    and it's up to us to prove to you beyond a reasonable doubt

9    that he's guilty.  If for some reason we all quit this trial

10   right now and went home, you would have to find him not

11   guilty.  Does that make sense?

12        A.      Yes.

13        Q.      We've talked a little bit about the burden of

14   proof.  We have it at this table.  We have to prove his

15   guilt.  We have to prove Special Issues No. 1 and 2 should

16   be yes.  This side doesn't have to do anything.  You

17   probably anticipate they will.  They are fine lawyers.  But

18   legally they just have to show up.  They can sit here and do

19   crosswords and it's always up to us.  We always have the

20   burden of proof.

21                    Sometimes we have jurors that say, you

22   know, in order for me to answer one of those Special Issues,

23   I'm going to need them to prove something to me, the

24   defense.  Or I'm going to need to hear from the defendant

25   and that's just not how our laws are set up.  We always have

1    the burden in that type of thing.  Does that make sense?

2         A.    Yes.

3         Q.    Following up on that, the Fifth Amendment, the

4    person charged with a crime has the absolute right not to

5    take the stand in his own defense.  If he doesn't want to

6    testify, no one can force him.  If he does want to testify,

7    no one can stop him.

8              The Judge will tell you that if he does

9    not testify, that the jurors cannot consider that in their

10   deliberations.  It's just a nonfactor, basically.  And

11   that's kind of in recognition of there may be many reasons

12   why he doesn't testify.  He may be guilty.  Maybe he's not

13   well spoken or maybe his lawyers tell him not to.

14              So basically if he doesn't testify, the

15   Judge will tell you, you just can't consider it.  Does that

16   make sense to you?

17        A.    Yes.

18        Q.    Okay.  Did you get a chance to look at the

19   indictment on the back of that last page of the booklet?

20        A.    Uh-huh, yes.

21        Q.    That's basically what we have to prove.  We

22   have kind of alleged that a crime has been committed two

23   different ways, capital murder, intentional murder in the

24   course of a robbery, and also the murder of a police

25   officer.  If we prove one or both of those to a jury beyond

1    a reasonable doubt, the law would entitle us to a guilty

2    verdict, if the jurors feel we have met our burden.

3                    Each of those crimes is kind of broken

4    down into different elements that we have to prove, that a

5    certain person on or about a certain day in a certain county

6    killed a certain person in a certain way, basically, is one

7    way to kind of summarize it.  But those would be very

8    roughly the elements of the crime.

9                    As a part of our burden of proof, the law

10   requires that we prove each and every element of the

11   indictment.  You know, we can't go nine for ten or we can't

12   get partial credit or if we almost get there, a juror can't

13   help us out.  Does that make sense to you?

14        A.    Yes.

15        Q.    We have to prove everything.  As a part of

16   that, the law also says that one element is not necessarily

17   any more important than the other.  You know, just an easy

18   example is, say we don't prove that we have the right

19   person.  We don't prove the element of identity.  We don't

20   prove that, you have to find the defendant not guilty.

21                    By the same token, if we don't prove the

22   county a crime happened in, we would have to prove that or

23   find the defendant not guilty.  That's kind of a far out

24   example, but let me give that to you.

25                    Let's say we allege in our indictment

1    that a capital murder happened in Grand Prairie.  Some of

2    Grand Prairie is in Dallas County and some is in Tarrant

3    County.  The guys at this table, the DA's, we don't do our

4    jobs and we get sloppy.  And we alleged that it happened in

5    Dallas County.

6                 You are a juror on that case and you feel

7    beyond a reasonable doubt or you find beyond a reasonable

8    doubt that the guy committed the murder, but you also find

9    beyond a reasonable doubt it happened in Tarrant County.  We

10   didn't prove one of our elements.  We went nine for ten.

11   You may feel it's a technicality, wouldn't be happy about

12   it.  We would lose our jobs.  But the law would require you

13   to find the person not guilty.  Does that make sense to you?

14        A.    Yes.

15        Q.    It's the same type thing.  If we allege a

16   person was shot to death with a pistol.  The medical

17   examiner comes in here and says, no, the cause of death was

18   actually cutting with a blade.  We just got it wrong.  We

19   missed an element.  We didn't do our jobs.  You would have

20   to find the defendant not guilty.  Does that make sense to

21   you?

22        A.    Yes.

23        Q.    Okay.  You know, as you are looking at that

24   indictment, we have alleged a police officer was shot and

25   killed.  You can obviously expect in a criminal case, such

1    as this, you are going to hear from police officers.

2                    What the law says is that jurors have to

3    treat police officers just like any other witness.  You

4    can't give them kind of a headstart or an automatic leg up

5    just because they walk in wearing a badge and a gun.  Once

6    they start testifying, if they are credible, you know, you

7    can go with them.  If they are not, then disbelieve them.

8    You just can't automatically start them off at a higher

9    level of credibility, just because they are a police

10   officer.  Does that make sense to you?

11        A.    Yes.

12        Q.    Sometimes in these type cases one or both

13   sides may call like a mental health professional,

14   psychiatrist, psychologist, that type of thing.  It's pretty

15   common in these cases.  Again, the law wants jurors to keep

16   that open mind.  Some people tell us, you know, they don't

17   believe in that type stuff.  They think it's voodoo.  Or if

18   you find some doctor and that you pay them enough, you will

19   get them to say anything.  They disregard it totally.  The

20   opposite side of that is people who think these people walk

21   on water.  Every word out of their mouth is golden.  We

22   don't want those people.

23                    We want the people kind of in the middle,

24   just like police officers, start everybody out with that

25   same level of credibility and judge them based on what they

180

1   have to say.  Does that make sense to you?

2          A.    Yes.

3          Q.    Is that something that you think you can do?

4          A.    Yes.

5          Q.    Being an RN, how would you feel if you had

6   psychiatric testimony, doctors as expert witnesses?  Do you

7   think that might affect you in any particular way or --

8          A.    Um --

9          Q.    Just kind of depends on what they have to say?

10         A.    I think it depends on what they have to say.

11         Q.    You could keep that open mind, basically?

12         A.    Yes.

13         Q.    One way to look at this process is once you

14  find somebody guilty of capital murder, they are sitting on

15  a life sentence.  Okay?  And only if we prove yes, yes, and

16  no, as the answers, only then do you get the death sentence.

17              So let me talk to you just a second about

18  what a life sentence means, because people are concerned

19  about parole and you hear about parole laws.  In Texas a

20  capital life sentence means that a person has to serve 40

21  years, 40 calendar years, day for day, before they become

22  eligible for parole.  They may make parole the first time up

23  after 40 years and they may never make parole.  They may

24  serve all their time in a real life sentence.  You just

25  never know.  It's beyond the control of anyone in this

191

courtroom.

And for those reasons we tell a jury what a life sentence means, but then we ask you to assume that a life sentence means life, that it really means life, you know. We don't want somebody thinking, you know, 40 years, that's long enough, so I'm not going to work through the questions. I'm just going to answer them in such a way that it gives them that life sentence or, conversely, we don't want people thinking he's going to get out in 40 years. That's not long enough. I'm just going to answer these questions such that he gets a death sentence. Does that make sense to you?

A.    Yes.

Q.    Do you think that you can assume that a life sentence means a life sentence?

A.    Yes.

Q.    Another thing that we have to talk about. I don't know if it would come up in this case, but sometimes in the first phase of the trial a jury may find a person guilty of what is called a lesser included offense.

Let me give you an example of what I mean. You try somebody for a capital murder, murder in the course of a robbery. You as a juror may have a reasonable doubt about that murder, but you don't have any reasonable doubt that they are guilty of, say, aggravated robbery.

1          At that time you may have the option to

2     find him guilty of aggravated robbery.  If you did that,

3     then this kind of punishment scheme would go by the wayside

4     and the law would just ask you to look at what you hear in

5     the second phase of the trial and set that person's

6     punishment that you found guilty of aggravated robbery

7     somewhere between 99 years or a life sentence and five

8     years, from five years all the way up to 99 or life.

9          And it's kind of the same rule.  We just

10    ask you to keep an open mind in that second phase.  You may

11    hear something where you want to give somebody a life

12    sentence.  And you may hear some facts and you may want to

13    give somebody -- think five years is the right thing to do

14    and give that.

15         But the bottom line is can you follow the

16    law and keep that open mind to the full range of punishment?

17         A.     Yes.

18         Q.     Do you have any questions of me?  I have kind

19    of given you -- I bet you learned more law today than your

20    husband did.

21         A.     Yes, probably.

22         Q.     Any questions about anything we have gone

23    over?

24         A.     I don't think so.

25         Q.     Any -- are you more frightened now or less

1    frightened, now that we've talked about the process?

2        A.    I think I'm less frightened now.  I think I

3    know a little bit more what to expect.

4        Q.    I think Mr. Shook was out of the room making

5    sure you don't argue with your husband at the end of the

6    day.  We just get worried about those things, because I know

7    how I was in law school.

8        A.    I can imagine.  My husband said that I would

9    never get picked because he was in law school.

10       Q.    Well -- it's too early to tell if he's going

11   to be right.

12       A.    Yeah.

13       Q.    Thank you for visiting with me and we

14   appreciate your time.  That's all I have, Judge.

15              THE COURT:  Ms. Busbee?

16                   CROSS-EXAMINATION

17   BY MS. BUSBEE:

18       Q.    Ms. Carney, I'm not going to maybe talk to you

19   as much as Mr. Wirskye, but I want you to talk to me.

20       A.    Okay.

21       Q.    Because when people come up here, I think he

22   told you this, but I'm going to tell it to you, too.  We had

23   several thousand people and of those people you are juror

24   1183, but you are probably the 35th juror that we're taken

25   in order.  So we were tossing out people right and left.

1    And we hone that down to people who are reasonable based on

2    the questionnaires and that we thought might make a good

3    juror.

4                   So you are not being examined as to

5    whether or not you are reasonable or you follow the law.

6    We, obviously, pretty much already decided that or we

7    wouldn't be wasting your time.  But you're a human being and

8    you pointed out at the very beginning of this procedure that

9    a death penalty case is, in fact, it's an extraordinary

10   procedure.  It's not like anything else we do, hence, the,

11   for lack of a better term, I'm sure you will agree with me,

12   grilling of people that may sit on our jury.  It doesn't

13   happen any place else.

14                  But then this is -- this can't help but

15   be a personal type of -- it evokes strong emotions and on

16   both sides it evokes strong emotions because someone has

17   been killed and it evokes strong emotions because someone

18   may die.  And so you get to say how you feel about things.

19                  I think you were asked a lot of times

20   does that make sense?  Well, yeah, our laws, hopefully they

21   do make sense and make sense to you, since we, obviously,

22   think you are reasonable and rational and intelligent enough

23   to go through the process.

24                  But what I would like to know, yes, that

25   is reasonable.  However, I would like to tell you this is

195

how I feel about it, okay?  Because you made some comment

about, well, if I'm going to support the death penalty, I

would have to be able to engage in the process.  But I don't

think anybody here would hold you to that burden.  It's not

like you have been drafted and you have to do it because you

said you support the death penalty.  You don't.

We've got -- we've had lots of people in

front of you and we'll have lots of people behind you.  If

for some reason one side or the other, just based on your

own personal experiences and beliefs, you have a problem

with any of the things that you will be asked to do in this

case, or you have made your, you know, you have feelings

that would affect you and you can't set it aside, lots of

folks do.

So you can tell me and it's not like you

are a bad citizen or you don't support the death penalty in

the proper case.  It's just that like the majority of

people, you might not be the right juror on this case or you

might be.  But I'm not going to know that until you tell me

how you feel.

So let me just ask you some background

information, having prefaced it with all that.

A.     Okay.

Q.     I saw and you kind of rolled your eyes about

what your husband had instructed you this morning.  Would

1   you feel embarrassed to sharing some of that with us so we

2   can get a giggle or be so amazed that he's so smart?

3          A.     Um, exactly what he wanted me -- what he said

4   that y'all would want?

5          Q.     Tell me what he's told you about coming down

6   here.

7          A.     Um, well, I guess he didn't have as much time

8   being worried about me as I wanted him to have.  He started

9   interviews today.  He has three interviews today for summer

10  internship.  So I've been kind of worried about this for the

11  last two weeks and I keep trying to express that to him and

12  he hasn't really been listening, so --

13         Q.     That happens.

14                THE COURT:  You have been married one

15  year?

16                PROSPECTIVE JUROR:  One year.  He's very

17  stressed, though, right now.

18         Q.     (By Ms. Busbee)  At least you are not both

19  lawyers married to each other, which we have right here,

20  boy.  Okay.  Well, what's going through your mind?  What

21  kind of -- you said that -- that's a dumb question.  You

22  said he said they wouldn't pick you?

23         A.     Uh-huh.

24         Q.     And he knows you.  Why does he think they

25  won't pick you?

A.      Just because he's in law school.

Q.      Oh, oh, oh.

A.      That's why he said they wouldn't pick me.

Q.      Well, he thinks he's pretty important, doesn't he?

A.      He does, I guess.

Q.      And that would be of some concern if we thought he was going to be trying to give you other law, which I doubt, or that we thought that you were going to take his opinion over what you are told in court, which I don't believe at all.  So I'm comfortable with that.

        The funny thing about this is we ask you all these questions about the death penalty and just wear you out asking you your opinions about your feelings and stuff without giving you any idea of what the law is.  And so now you know what the law is and you have obviously been fretting about it or thinking about it.

        The way that this is in Texas at this point, would this be the way you would do it, if you were going to devise a scheme where some people might be eligible for a death sentence?

A.      Um, well, I guess I don't have as much experience as y'all do with the law, so I really don't know if this is the way that I would do it or not.  I just kind of am going with the thought that this is the way that we

1  have decided is the proper way.  So it must be the best way.

2       Q.   Right.  Except that going back to what I said

3  before, we ask people to do something extraordinary and so

4  they have a right to say, you know, that's not the way I

5  would devise a scheme for society killing somebody or giving

6  the death penalty.

7            So if that's the case, you can tell us,

8  because we don't want to put anybody in an uncomfortable

9  position, either way that cuts.  We just kind of like to

10  know your thoughts on it.

11      A.   Um, it seems like an okay way to go about it

12  to me.

13      Q.   That's kind of careful.

14      A.   Yes.

15      Q.   I notice that your father practiced medicine

16  and your mother is a nurse or at least he did practice

17  medicine.  What kind of medicine did he practice?

18      A.   He's a family practitioner.  He's been retired

19  for about 12 years now, though.

20      Q.   And much happier no doubt?

21      A.   Yes, he plays golf every day.

22      Q.   I was going to ask you that.  And that's

23  great.  I'm sure he worked real hard.  Did he ever discuss

24  or your mother ever discuss anything having to do with their

25  opinions about the death penalty?

199

1    A.    Um, no.  My family, my mother and father

2    weren't ever very political or didn't really ever discuss.

3    I don't even know what their opinions are, actually.

4    Q.    Um, you have mentioned in your questionnaire

5    something about you didn't want to see gruesome details or

6    be concerned about seeing gruesome details, pictures, or

7    hearing things about a murder.  And, you know, without going

8    into the facts of this case, that's often what happens in a

9    murder case.  Obviously, there's going to be exhibits and

10   photographs and that sort of thing involving the murder.  Do

11   you think that sort of thing would distress you?

12   A.    Um, no.  I don't remember putting that,

13   actually, but maybe I did.  I work in a place where I see

14   stuff like that, blood and stuff, all the time, so --

15   Q.    I figured that.

16   A.    I don't know why I put that.

17   Q.    Maybe I misspoke.  You said it would be

18   disturbing to hear facts relating to someone's death.

19   A.    I think that I meant that it would be

20   disturbing for me to have to decide whether someone lived or

21   died.

22   Q.    And that's fair enough, because if it wasn't

23   disturbing we'd be worried about that at this table.  Okay.

24   Let's go back and ask you these things.  Let me hear what

25   you have to say.  I'm just asking this in general and I'm

1    not going to ask you this having to do with, you know, I

2    went into the First National Bank and shot Mr. Sanchez or

3    anything like that.

4                        But, in general, how do you feel about

5    the death penalty for an accessory?

6         A.      Um, I think that an accessory should, can be

7    given the death penalty because they had to have thought or

8    in some -- some -- how can I word this?  If they are putting

9    themselves in that situation with those people with guns and

10   they're going to go rob a bank or whatever, then they should

11   maybe expect that someone was going to die.  So I think,

12   therefore, they should possibly be considered for the death

13   penalty.

14        Q.      Okay.  And I think that when explaining that

15   to you, Mr. Wirskye did, that when you are deciding if

16   someone is guilty, understanding these are definitely two

17   trials, someone is guilty, we would have made a

18   determination that they should have known.  And that's how

19   you find them guilty.  Guilty not because they did it, but

20   they should have known, which is kind of an iffy sort of

21   thing.  Can't say for sure, but a reasonable person would

22   have known that that might happen.

23                       Now, and finding, then, that person is

24   convicted and they have a life sentence and the law favors a

25   life sentence.  It's -- it's an uphill climb to get a death

291

1    sentence in any capital murder case, including one involving

2    a party to an offense.

3                    So talk to me about how you feel about

4    Special Issue No. 1, not whether or not it makes sense, but

5    this question about a probability of future dangerousness.

6         A.    Um, if I felt that someone could commit such a

7    crime again or would be a threat to, say, people that I know

8    or even people that I don't, then I think that I would have

9    to agree with No. 1.

10        Q.    Okay.  And would you, having found someone

11   guilty of capital murder, is that good proof to you by

12   itself that someone may be a danger in the future?

13        A.    No, not only that they just committed that one

14   murder.  I don't think that they -- that would definitely

15   mean that they would always be a threat to society.

16        Q.    I mean, obviously it probably would depend on

17   the facts, because some cases are just so heinous and some

18   aren't.  And so would you require -- in a case that, you

19   know, maybe wasn't heinous, would you require the State to

20   prove that to you beyond a reasonable doubt that you felt

21   beyond a reasonable doubt there was a probability that there

22   would be future dangerousness?

23        A.    Yes.  They would have to prove that to me.

24        Q.    Okay.  Now, here's the sticking point for some

25   people and I need to ask your honest opinion about this.  On

1    Special Issue No. 2 we don't ask about whether someone

2    anticipated a life would be taken, if they were the person

3    who took the life, because that would be kind of nutty.

4    That's already been decided, actually decided, that they did

5    it.

6                    But in Texas if someone is a party and

7    the State seeks a death penalty against a party, the jury

8    has to do something and make a decision beyond a reasonable

9    doubt not only that they should have, that's kind of a

10   reasonable man's determination, but they have to say beyond

11   a reasonable doubt that that person did anticipate, did

12   anticipate.  It says anticipate.  But the meaning of the

13   word is did actually anticipate that a life would be taken.

14                   Can you tell me how you think, how you

15   feel, about that Special Issue and what you would want to

16   hear on that point?

17        A.      Um, did they discuss killing someone before

18   they went in?

19        Q.      See, that's the thing.  We can't talk to you

20   about what may or may not be proved in this case.  That's

21   against the law.  So it's kind of -- I know it's not fair,

22   but would you need to hear that, since you brought it up,

23   would you want to hear what the planning --

24        A.      That's what I mean, did they discuss it before

25   they went and committed the crime that possibly people would

be killed?

Q.   Well, you may not get to know that.  You know, just -- it may be something that you have to decide without knowing what the perpetrators did prior to the -- prior to the event.  Sometimes that's just not available.  Would you be able to make that decision without knowing that?

A.   Um, I'm not sure.

Q.   Okay.  Well, let me just -- you're acquainted with and I hear that you are fine with the concept or the constitutional provision that says that no one be required to testify or on trial or incriminate themselves or say a word when they're a criminal defendant.  And which, I think what you are saying is, I would like to hear from someone who could tell me how the planning occurred, but that might not be available because the State can't drag people up there and make them talk.

So if that wasn't available, what would be your feelings about deciding that question?

A.   Um, I'm not really sure.  I think, I mean, they would have to somehow sway me using something, whether it was how they planned it or the fact that they didn't plan it.  Both of those would be swaying factors.  Someone is going to have to give me some sort of evidence.

Q.   Of course, we've all thought through how this scheme works, but we get you up there and make you nervous

1  anyway and then grill you some more.

2  But here's my concern.  Jurors want to do

3  the right thing, obviously.  And a hypothetical juror, say

4  you are the juror on a hypothetical case, has found someone

5  guilty beyond a reasonable doubt and said, you know, a

6  reasonable person would have anticipated this, so he should

7  have anticipated that, so I find that beyond a reasonable

8  doubt.  Then, the second question is, well, I don't -- I

9  haven't heard from the defendant, so I'm just going to

10  assume that he anticipated, because he should have

11  anticipated it.

12  I'm just trying to figure out what else

13  you need to hear or if you would need to hear anything else

14  in order to answer Special Issue No. 2, yes, they did intend

15  or did anticipate.

16  A.     I don't know what I would need, but I would

17  need something.

18  Q.     Let me ask you this.  In all honesty would you

19  want to hear from the defendant?  You don't have to, but

20  would you feel like the defendant would need to tell you

21  that he hadn't anticipated that?

22  A.     No.  I don't think it would have to come

23  straight from him.

24  Q.     It would have to come from some facts?

25  A.     Right.

Q.    That's fair enough because we're not talking about the actual facts as lawyers want to be, as you know, because now you are married to an advocate.  That works.  Okay.

Last question on these Special Issues.  What about this mitigation, this business about, well, okay, he's dangerous beyond a reasonable doubt, he knew somebody was going to be killed, and he's guilty of capital murder, in reality, is there anything that would make you answer that last question, no, I don't want to give him the death penalty having found these other things to be true beyond a reasonable doubt?

A.    Yes.

Q.    Okay.  Am I reading you, saying that you would be reluctant and make the State prove its case to you and all these Special Issues beyond a reasonable doubt?

A.    Yes.

Q.    I'm going to give you, you know, the accused in this case gets a safety valve, so I'm going to give you one.  We don't want anybody on this jury who genuinely doesn't want to be on it.  Is there anything else that you want to share with us, the Judge, or the State, anybody, your thoughts on serving on this jury?

A.    Um, no, I'm really not looking forward to it.  I mean, I don't think -- it's going to be hard, but I think

1    that we all have responsibility to do this, if we're called

2    upon to do it, so --

3            Q.      Okay.

4                    MS. BUSBEE:  I have no more questions of

5    this juror.

6                    THE COURT:  Ms. Carney, if you would, be

7    so kind and wait for us outside and we'll have you back in,

8    in just a few minutes.

9                    [Prospective juror out]

10                   THE COURT:  What says the State?

11                   MR. WIRSKYE:  State has no challenge for

12   cause.

13                   MS. BUSBEE:  We have no challenge for

14   cause.

15                   MR. SHOOK:  State accepts.

16                   MS. BUSBEE:  We need to talk.

17                   THE COURT:  You may step into your

18   office.

19                   (Recess)

20                   MS. BUSBEE:  Defense will accept this

21   juror.

22                   THE COURT:  Defense accepts.  Ask Ms.

23   Carney to come back in, please.

24                   [Prospective juror in]

25                   THE COURT:  Thank you.  You may be

1  seated.  Ms. Carney, I will inform you that you have been

2  accepted to sit on this jury.  And that just reinforced the

3  people of most first-year law students, they don't know very

4  much.  They are more dangerous than anything else.  You can

5  share that opinion with your husband.  That's about as far

6  as I'm going to let you go with this.

7           This is probably going to test his

8  ability to be a lawyer.  Part of being a lawyer, you have to

9  be able to communicate with a client and not reveal those

10 communications.  So if he needs to hear it from me, I'll be

11 happy to have him come down here and I'll tell him.  But I

12 believe you can do the job.

13          The Judge has instructed me I cannot talk

14 to you about this case, period.  Don't let him do any

15 research on capital punishment, capital murder.  Don't you

16 do any.  Don't look at the Internet or anything, read

17 stories or anything to do with this case, because you have

18 taken an oath today to render -- I mean, to tell us the

19 truth.  You will take an oath when you are in here on the --

20 when we start the case that you will base your verdict on

21 the law and the evidence presented to you, so help you God.

22 And that comes from that witness stand right there.

23          PROSPECTIVE JUROR:  Okay.

24          THE COURT:  So I can't stress that

25 enough.  We don't need a shadow juror telling you what's

1    going on because you are smart enough and intelligent

2    enough, and as Ms. Busbee said, you have the mental acuity,

3    toughness, to be able to say, yes, I can follow the rules.

4    That's why they put you on this jury.  So that's the warning

5    from the Court.  I'm going to provide you with written

6    instructions --

7                    PROSPECTIVE JUROR:  Okay.

8                    THE COURT:  -- that says basically the

9    same thing, but a lot more detailed.  I'm not going to read

10   it to you.  I have a supplemental sheet.  This is the

11   information retained in my computer.  This is contact

12   information maintained by me and the Sheriff.  So I will

13   have you go with the Sheriff in a minute and you will fill

14   this out.  As you heard, I was on the computer all the time.

15   I'm taking notes.  And that's where we come up with all

16   these documents.  I'm a computer geek and I know that.  But

17   I'm always on the computer, always taking notes.  I can tell

18   you what's going on at any given minute in a trial.

19                    So what happens from this point forward,

20   at some point before November 10th and I don't know, it will

21   hopefully be a week, ten days, before November 10th.  I

22   don't know what day it will be.  We'll have -- once I get

23   all the people that will be on this jury, we will have

24   everybody back down here and there are certain things I

25   can't do until I get everybody in the room.

1    At that point we will have about an hour

2  of additional orientation to go through with the group.  The

3  reason we do that, we found, just like when you came in

4  today, initially you were very nervous.  Your pressure goes

5  down just a little bit.  That will be the same way you come

6  in on orientation.  There will be a bunch of strangers, but

7  you will all be in the same position, having to make a

8  decision.

9    So we get that out of the way.  The

10  reason we do that is so on Monday morning on November 10th

11  at 8:30, you will be in that box and the State will start

12  their case.  It's not come down at 8:30 and, you know, the

13  Court, we jerk around for a couple of hours and finally get

14  you in and then take a break.  Okay?  You have heard about

15  how bad that can be.  Not in this court.  All right?

16    As far as work, an admonition for your

17  coworkers, you would have to allow your supervisors to

18  schedule you away from your work for these two weeks.

19  So, obviously, you are going to need to tell them, I'm going

20  to have jury duty for two weeks beginning on November 10th.

21  Please schedule me accordingly.

22    Now, you will be able to use the phone

23  during the day.  We will bring in lunch.  You will be able

24  to communicate during the day, if you need to do that.  We

25  work normal business hours, so if you have to go by the

1    hospital in the evening for any reason, you can do that.

2    That will not be a problem.

3             You will not be sequestered, but only if

4    a jury is out and unable to reach a verdict at the end of

5    the day.  But that's at the end of the trial.  So during the

6    trial, you won't be sequestered.  You can go home.  Do you

7    have any questions of me?

8             PROSPECTIVE JUROR:  No.  So just tell my

9    supervisor it's going to be for two weeks?

10            THE COURT:  Tell them two weeks, Monday

11   through Friday.  So you can work the weekends, if you

12   normally do, but I need you Monday through Friday for two

13   weeks, hopefully not that long.  But that's what you need to

14   block out.

15            So if you will, go with the Sheriff and

16   she will have some additional information for you.

17                [Prospective juror out]

18            THE COURT:  Let the record reflect that

19   juror No. 6 has been retired.  And, Ms. Busbee, you have an

20   objection you wanted to put on the record?

21            MS. BUSBEE:  Yes, Your Honor.  I'm going

22   to object and I think in an abundance of fairness to the

23   State, I would like to make a written request for a running

24   objection.  But I will state it into the record at this time

25   and I'll submit that in a written form to you tomorrow in

211

1  the morning.

2          But my objection to the question asked by

3  the State on voir dire is that it's a hypothetical question

4  which sets forth facts which are so detailed, includes facts

5  that may have to be decided in the case at bar, requires a

6  commitment from the juror and it's a commitment on a

7  question that's not really a mindset that's necessary for a

8  challenge for cause.

9          In other words, I think the Court is

10 aware that the Court of Criminal Appeals is leery of

11 questions containing facts, hypotheticals, asked of jurors,

12 unless they directly -- the answer would result in a

13 challenge for cause or reason to make the challenge for

14 cause.

15         The questions that are asked having to do

16 with peremptory challenges, the case law seems clear that

17 these facts that are -- the detailed facts included in

18 questions having to do with peremptory challenges are not

19 allowed.  And the series of questions that the State has

20 asked this juror and has asked most jurors previously in

21 selecting this jury have set forth facts that are

22 impermissible under the law.

23         And I'm going to ask -- I know the Court

24 granted my objection on the basic tender of it on this

25 juror, but I would like to have a running objection based on

1    that.

2                   THE COURT:  Yes, ma'am.  I did sustain

3    the objection and the State knows they have to be careful.

4    But, also, as well as you know, when you get a nonlawyer on

5    the jury and you try to explain parties to them, they don't

6    understand it by any stretch of the imagination.  And they

7    need to provide some guidance as to what a party may or may

8    not be, just the same as so many opinions are, if they're in

9    for a penny, they're in for a pound, even though they did

10   nothing.

11                  So they have to distinguish between mere

12   presence alone is not sufficient to sustain a conviction,

13   but also include some culpability.  So I have to allow some

14   discretion in explaining the law.

15                  I agree with you that they need to stay

16   away from a fact pattern that even gets close to resembling

17   what we have here.  So it's obviously a case-by-case

18   interview.  It depends on what these people are giving us

19   back.  I agree with you that they are getting too detailed,

20   too specific.  Please object and I will shut that down.

21                       [End of Volume]

22

23

24

25

1    STATE OF TEXAS          *

2    COUNTY OF DALLAS        *

3        I, NANCY BREWER, Official Court Reporter for the 283rd

4    Judicial District Court, do hereby certify that the above

5    and foregoing constitutes a true and correct transcription

6    of all portions of evidence and other proceedings requested

7    in writing by counsel for the parties to be included in this

8    volume of the Reporter's Record, in the above-styled and

9    numbered cause, all of which occurred in open court or in

10   chambers and were reported by me.

11       WITNESS MY OFFICIAL HAND on this the __4__ day of

12   ___March___, 2004.

13

14

15

         NANCY BREWER, CSR, NO. 5759
16       Expiration Date:  12-31-04
         Official Reporter, 283rd JDC
17       Frank Crowley Crts. Bldg. LB33
         133 No. Industrial Blvd.
18       Dallas, TX 75207
         (214)653-5863
19

20

21

22

23

24

25

74851

REPORTER'S RECORD

VOLUME 15 OF _6_ VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 11th day of September, 2003, the following
proceedings came on to be heard in the above-entitled and
numbered cause before the Honorable Vickers L. Cunningham,
Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

ORIGINAL

# A P P E A R A N C E S

## APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


## APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT: 03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT: 00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

## PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Virginia Farr | 4 | 5 | | 15 |
| Margaret Johnson | 18 | 20 | | 15 |
| Timothy Yancey | 77 | 80 | | 15 |
| David Karwoski | 89 | 90 | | 15 |
| Victoria Thompson | 103 | 106 | | 15 |

P R O C E E D I N G S

1

2          THE COURT:  Call in our first juror.

3                    [Prospective juror in]

4          THE COURT:  Good morning.  Please have a

5    seat.  How are you?

6          PROSPECTIVE JUROR:  Fine.

7          THE COURT:  We have Virginia Ruth Farr;

8    is that correct?

9          PROSPECTIVE JUROR:  Uh-huh.

10         THE COURT:  I appreciate you being here

11   on time.  I bet you didn't think we would start on time, did

12   you?

13         PROSPECTIVE JUROR:  Well, no.

14         THE COURT:  I try to break the

15   expectations sometimes.  We get here and we go to work.  Did

16   you have enough time this morning to review the guide I

17   provided to you?

18         PROSPECTIVE JUROR:  Yes, I did.

19         THE COURT:  Also provided you a

20   questionnaire that you filled out in May.  The objective

21   this morning is for you to be able to understand the law.  I

22   know I gave it to you in writing.  There's a lot of it.  You

23   need to understand how it relates.  The attorneys will go

24   over the law in more detail, give you examples, and try to

25   help you understand how it works.

1    At the end of the program here I have two

2 questions to answer.  One is do you understand the law?  Two

3 is can you follow the law?  That's my job.  That's the

4 ultimate question.

5    Before we begin, do you have any

6 questions about what you have read thus far?

7    PROSPECTIVE JUROR:  No.

8    THE COURT:  Will you be able to serve

9 this Court beginning November 10th for two weeks?

10    PROSPECTIVE JUROR:  Yes.

11    THE COURT:  I'll turn it over to the

12 State.  Mr. Shook?

13    MR. SHOOK:  May it please the Court.

14    <u>VIRGINIA FARR</u>,

15 having been duly sworn, was examined and testified as

16 follows:

17    <u>DIRECT EXAMINATION</u>

18 BY MR. SHOOK:

19    Q.    Ms. Farr, my name is Toby Shook.  I'll be the

20 prosecutor speaking to you this morning.  You have been on a

21 civil case before, I believe; is that right?

22    A.    Right.

23    Q.    What did that case involve?

24    A.    I don't remember.  It's been a while.

25    Q.    Okay.  You have been -- you have never been

1    down on a criminal case, though?

2         A.    On criminal?  No.

3         Q.    Because this is a death penalty case, we talk

4    to each juror individually and I know that it makes some of

5    the jurors a little nervous.

6         A.    Right.

7         Q.    They feel like they are the ones on trial.

8    But it's the procedures that are prescribed by law.  It kind

9    of works pretty good.  We just want your honest opinions.

10   If you have any questions at any time, feel free to ask.

11              You have been very helpful in your

12   questionnaire, given us a lot of information.  I want to

13   follow up on a couple of things.  One thing I noticed, you

14   know, we call so many people down and we talk to more and as

15   I read in your questionnaire this morning, I saw the name

16   Frankie Freeland.  And we talked to Frankie Freeland last

17   week.

18        A.    Yes.

19        Q.    Is that the same Frankie Freeland?

20        A.    She's my roommate, yeah.

21        Q.    That's quite a coincidence.

22        A.    Yeah.  We couldn't believe we got called at

23   the same time.

24        Q.    And y'all came down on the same day and filled

25   out the questionnaire and everything?

1    A.    Yes, we did.

2    Q.    Did you have any discussions about what Ms.

3 Freeland went through last week?

4    A.    I just asked her, you know, what you asked.

5    Q.    Okay.

6    A.    I didn't know we had to sit up here.

7    Q.    She didn't tell you that?

8    A.    Right.

9    Q.    Tell us kind of what you know about the case.

10 Everyone has heard a little bit about it, so we always

11 explore that with the jurors, what they remember about the

12 case when it first came out or what they followed since

13 then.

14    A.    I just remember when it happened and it was

15 very bad.  And I think -- I don't know.  I was trying to

16 keep up with the others that were involved.  I think they

17 have all been sentenced, right?

18    Q.    Did you follow some of these cases or read --

19    A.    Just read.

20    Q.    -- in the newspaper?  Okay.  What we do with

21 each juror, because they have all read and seen something

22 different, we want to ask them if that has influenced them

23 in any way.  Because, obviously, the fact that you have read

24 something doesn't necessarily disqualify you as a juror.

25 The test is this.  Whether what you have read has influenced

1  your verdict in any way.

2            Because the rule is, obviously a jury has

3  to make its decision just based on what they hear in the

4  courtroom.  But only you can tell us that.  You know, some

5  people have made up their mind or have an opinion that might

6  influence them.  Other jurors who have read or seen it on

7  TV, tell us, no, I can follow the rule of law.  That stuff

8  wouldn't influence me.

9            But someone that's followed it a little

10 more than others, we want to make sure how you feel about

11 that and if you would be able to follow that particular rule

12 of law or would you be influenced somewhat?  But only you

13 can tell us.

14           How do you feel about that particular

15 area of the law?

16      A.    Well, I think when you read something like

17 that, you are naturally going to form some kind of opinion.

18 However, you know that all the facts aren't there.

19      Q.    Right.

20      A.    So I'm still open.  I mean, you know, I didn't

21 know anything concrete.

22      Q.    Okay.  So you don't think anything you have

23 read or heard would influence you in your decisionmaking

24 process, if you were seated on the jury?

25      A.    Well, I think it does somewhat, but not -- you

1  know, I would have to hear it all.

2      Q.     When you think it does somewhat, what do you

3  mean?  What do you --

4      A.     Well, I don't think you get all the facts, you

5  know.

6      Q.     Right.  I think you are right there.  That's

7  kind of a common sense deal.

8      A.     Right.

9      Q.     Obviously, the news folks may not get all the

10 facts or may not get their facts right.

11     A.     True.

12     Q.     And that's why the law is you would have to

13 wait and make your decision just on what you hear in the

14 courtroom and you couldn't let that other stuff, anything

15 you have read or seen on TV influence you in any way.  Do

16 you feel that you can do that?

17     A.     No, I think I could do okay.

18     Q.     Okay.  All right.  Tell us, you put on your

19 questionnaire that you are in favor of the death penalty and

20 that you believe people should be held accountable for their

21 actions.  Tell us why you favor the death penalty, the

22 purpose you think it serves society.

23     A.     Well, I feel if you -- you have choices to

24 make and if you make the wrong choice, then you should know

25 you are going to be accountable for whatever happens during

1   that time.  And I think if it's -- you made that choice

2   yourself, placed yourself there, then, yes.

3        Q.      What types of crimes from your personal point

4   of view do you feel should be eligible for the death

5   penalty?

6        A.      Murder.

7        Q.      Okay.

8        A.      Definitely murder.

9        Q.      Any other crimes other than murder?

10       A.      No.

11       Q.      Is there any particular type of murder case

12  that comes to mind that you think would be appropriate, any

13  particular victim or how the crime was carried out or

14  anything like that?

15       A.      No.  Of course, we all watched O. J. and that

16  kind of stuff.  But, you know, I don't feel like it's always

17  fair.  But like I say, it would depend on if they made that

18  choice themselves, if they placed themselves in that

19  position.

20       Q.      In Texas capital murder is reserved for just

21  in murder cases, one that is not self-defense or accident,

22  but an intentional killing and plus some other aggravating

23  fact, a murder that occurs during the course of a felony,

24  such as robbery.  You go into a 7-Eleven and you murder the

25  clerk, that could be a capital murder case.  You break into

1    someone's home during a burglary and murder them, that could

2    be a death penalty case.  Murder during an arson, during a

3    rape, during a kidnapping, those types of cases can be

4    eligible for the death penalty in Texas.

5              Also, murder of a police officer and

6    fireman on duty, murder of a child under the age of six,

7    those are death penalty cases.  And then murder for hire,

8    you do it for money or profit or murder of more than one

9    victim in the same transaction.  But those are the types of

10   cases that are reserved for the death penalty, for

11   consideration of the death penalty.

12             Do you agree with those types of cases

13   from your personal point of view?

14        A.    Yes, I do.

15        Q.    Okay.  Another area I want to go into is what

16   we call the law of parties or accomplices.  Sometimes more

17   than one person commits capital murder, groups of

18   individuals that go in, and they have different roles, some

19   more prominent than others.  The law says if you are

20   actively participating in a crime, you can be held

21   accountable for it, even if you are not the most active

22   participant.

23             In a capital murder case, you may have

24   one person that actually commits the murder, but several may

25   have helped carry out the crime.  And the law says that they

1  can all be held responsible.  An example we often give is a

2  bank robbery.  Mr. Wirskye and I decide to rob a bank and I

3  have got the gun, but he's got a bag and we have another

4  friend who has got a car.  And we all agree to commit the

5  crime together and he knows we're going to commit it.

6           The plan is for me to go in with a gun

7  and threaten everyone and Mr. Wirskye will come in and take

8  the money up, and our friend who waits outside with the car

9  running so we can make a getaway and warn us if the police

10 come.

11          We execute that plan.  And in the middle

12 of it, maybe I shoot a teller, maybe Mr. Wirskye warns me

13 that an alarm is going to go off and I shoot the teller.  I

14 can be arrested and prosecuted.  I could receive the death

15 penalty.  But the law says that Mr. Wirskye could, too, and

16 the getaway driver, depending on the facts and how actively

17 involved they are.

18          But people feel differently about that.

19 And we want to get your honest opinions on it.  You know,

20 some people are fine with the death penalty, if it's being

21 prosecuted and sought against the actual killer or the

22 person who pulls the trigger.  They're not okay with it with

23 an accomplice, and they feel that usually a severe

24 punishment or prison time, but not the death penalty, and

25 they would kind of draw a line there personally.  Other

1    jurors are fine with it.

2              How do you feel about the law of

3    accomplices, a person being tried for the death penalty in

4    those situations?

5         A.    I still say that if you intentionally put

6    yourself in that position, then you are guilty.  I mean, and

7    you are part of it.

8         Q.    Okay.  So you are fine with that particular

9    aspect of the law?

10        A.    Yes, yes.

11        Q.    All right.  Then you also know from living

12   here in Texas that the death penalty is a law that is

13   actually carried out.  You know, there are some states that

14   have it on the books and they even prosecute it, but they

15   may never execute anyone.  But, you know, in Texas that,

16   obviously, those executions do take place.

17             It's our goal in this case that -- and we

18   believe that we can convince a jury that the defendant is

19   guilty and we believe that we can convince them to answer

20   these Special Issues in such a way that would cause him to

21   be executed.

22             Are you familiar with the method of

23   execution in Texas?

24        A.    Pardon?

25        Q.    Are you familiar with the method of execution

1   in Texas?

2        A.    Yes.

3        Q.    Lethal injection?  The procedures are the

4   same.  They would be the same in this case.  If he were

5   found guilty and sentenced to death, at some point in time

6   Judge Cunningham would give him a date of execution.  On

7   that date, or just prior to it, he would be moved to

8   downtown Huntsville.  He would be given an opportunity to

9   meet with his family and friends or a minister and given an

10  opportunity for a last meal.

11              But at 6:00 p.m. all executions by law

12  take place.  There are witnesses there, you often read

13  about, from both sides, the victim's family, the defendant's

14  family.  He's given a time to make a last statement which

15  almost always appears in the press.

16              But at the end of that statement, they

17  would inject him with lethal substances, substances which

18  shut down his lungs and heart immediately.  And I think you

19  realize that this happens several times a year, sometimes as

20  many as 40 times a year in Texas.

21              And that is our goal.  You have told us

22  that from your personal point of view you believe in the

23  death penalty.  You believe it should be prosecuted.  And

24  now that you have gone through this process and going

25  through this process, it often gives jurors time to pause

1    and kind of reflect on how they really feel about it a

2    little further when they realize they could be actually

3    participating in this trial.

4                    Do you feel that you could participate in

5    this type of trial and if the State did prove these things

6    to you beyond a reasonable doubt, that you could answer

7    these questions in a way, knowing that if you did, then the

8    defendant here would be executed some day?

9         A.    Yes.

10        Q.    Okay.  Let's look at these Special Issues for

11   a moment.  If you would take a moment to read Special Issue

12   No. 1.

13        A.    (Prospective juror complies.)

14        Q.    This question asks the jurors to make a

15   prediction about how the defendant will behave in the

16   future, if he's going to be a continuing danger to society.

17   Do you feel that you could answer that question if you were

18   given enough information?

19        A.    Yes.

20        Q.    What would be important to you?

21        A.    Just -- well, I think No. 1, I mean, I don't

22   think that I would have any problem with it.

23        Q.    You don't get to this question unless you have

24   found the defendant guilty, unless we have proven to you

25   beyond a reasonable doubt.

1          A.      True.

2          Q.      And then this is the first question that you

3    would answer in the punishment phase.

4          A.      Uh-huh.

5          Q.      I want to get your true feeling on this.  Some

6    people tell us that if I -- once I have found the defendant

7    guilty of capital murder beyond a reasonable doubt, that

8    tells me all I need to know about question No. 1 and that's

9    the type of person that's going to be dangerous.  They will

10   commit that type of murder and that question No. 1 will be

11   yes for me.  It will be answered for me, if I get to that

12   beyond a reasonable doubt guilty of capital murder.  A lot

13   of jurors tell us that.

14              Some other jurors tell us, no, that's not

15   necessarily true.  You know, he may not be a continuing

16   danger.

17              The law is you would have to wait and

18   listen to any additional evidence and then make your

19   decision.  Some jurors tell us, quite frankly, if I go all

20   the way beyond a reasonable doubt and found him guilty of

21   capital murder, that answers question No. 1 and I would

22   answer it yes based on that decision, once I make that

23   finding of guilt.

24              How do you feel about that in relation to

25   this question?

1    A.    I feel it does, also, yes.

2    Q.    That that answers the question?

3    A.    Uh-huh.

4    Q.    You seem to be pretty strongly in favor of the

5  death penalty and rated yourself a 10 and believe that

6  people should be held accountable.  And is that what goes

7  into your feeling on question No. 1?

8    A.    True.

9    Q.    That if they are guilty, then they are

10 obviously going to be a danger to our society?

11   A.    Yes.

12   Q.    I appreciate your honesty on all that.

13        MR. SHOOK:  Could we approach the bench

14 for a minute?

15        THE COURT:  You pass the witness?

16        MR. SHOOK:  Yes.

17        MS. BUSBEE:  May we approach?  We have an

18 agreement.

19        THE COURT:  You have an agreement.

20 That's fine.  Ms. Farr, we appreciate you coming down.  The

21 first question I asked, do you understand the law?  You

22 indicated that you do.  The second is can you follow it.

23 And your opinions are such that you haven't demonstrated

24 that you can, and that's fine.  We appreciate that.

25        You will not be seated on this jury, so

1  you can go back and talk about it over breakfast or dinner

2  this evening with Ms. Freeland.

3                    PROSPECTIVE JUROR:  Okay.

4                    THE COURT:  You can tell her you didn't

5  make the cut, either, so she shouldn't feel too bad.  Thank

6  you very much.  You are free to go.

7                    [Prospective juror out]

8                    THE COURT:  Margaret Johnson.

9                    [Prospective juror in]

10                   THE COURT:  Please have a seat.

11                   PROSPECTIVE JUROR:  Thank you.

12                   THE COURT:  Good morning, Ms. Johnson.

13  How are you?

14                   PROSPECTIVE JUROR:  I'm fine, and you?

15                   THE COURT:  A little nervous?

16                   PROSPECTIVE JUROR:  Very first time.

17                   THE COURT:  Just give you a few minutes.

18  Try to relax a little bit.  Why everybody is standing up is

19  to show respect for you.

20                   PROSPECTIVE JUROR:  I appreciate that.

21  Thank you.

22                   THE COURT:  This is as informal a process

23  as we can have at this point.  It's a whole lot better than

24  being stuffed in a room with 700 other people in the morning

25  and being told what, you know, what we're doing and then

1   here's a questionnaire.  Please tell us your name, when you

2   were born, and what happened next.

3                     You can see I provided a copy of your

4   questionnaire for you.  Have you had an opportunity to go

5   over that?

6                     PROSPECTIVE JUROR:  Yes.

7                     THE COURT:  Did you have an opportunity

8   to go through the guide I provided for you?

9                     PROSPECTIVE JUROR:  Yes.

10                    THE COURT:  Best thing about this, there

11  are no wrong answers.

12                    PROSPECTIVE JUROR:  All right.

13                    THE COURT:  So there's really very little

14  to be nervous about.  The process will be that the attorneys

15  will visit with you about the law and go through examples

16  and get your opinions in more detail over what you have

17  already provided for us.

18                    PROSPECTIVE JUROR:  All right.

19                    THE COURT:  So they are not trying to

20  trick you up.  It's not -- you know, people look, you know,

21  sit up here, oh, I'm the focus of attention.  We have to

22  make a record of everything that we say, so that's why we

23  put you up there and try to be somewhat personal.

24                    PROSPECTIVE JUROR:  Okay.

25                    THE COURT:  So just, okay.  Only two

1    questions that I have at the end of the process will be,

2    number one, do you understand the law that we're talking

3    about and how it works?

4                    PROSPECTIVE JUROR:  Okay.

5                    THE COURT:  The second question I'll be

6    asking is once you understand the law, can you follow the

7    law?

8                    PROSPECTIVE JUROR:  All right.

9                    THE COURT:  That's my job here is to be

10   able to ask you those two questions.  So, first, the State

11   prosecutors will ask you some questions and then the defense

12   lawyers will ask you some questions.

13                   PROSPECTIVE JUROR:  Thank you, Your

14   Honor.

15                   THE COURT:  All right.  Mr. Shook?

16                   MR. SHOOK:  May it please the Court.

17                   MARGARET JOHNSON,

18   having been duly sworn, was examined and testified as

19   follows:

20                   DIRECT EXAMINATION

21   BY MR. SHOOK:

22       Q.    Ms. Johnson, I'll be asking you questions on

23   behalf of the State.  As the Judge said, there are no right

24   or wrong answers.  We just want your honest opinions.  Okay?

25       A.    Yes, sir.

```
 1        Q.      We're going to ask you some questions from
 2  your questionnaire.  It was valuable information to us and I
 3  want to do some follow-up stuff and talk to you about
 4  capital murder, the death penalty, how you feel about that,
 5  and some of the rules that apply in these types of cases.
 6        A.      Yes.
 7        Q.      From the questionnaire it looks like you have
 8  been on a civil jury and it didn't reach a conclusion; is
 9  that right?
10        A.      Okay.
11        Q.      What was that case involving?
12        A.      It involved a family matter between a husband
13  and an ex-wife or ex-wife and ex-husband in regards to
14  visitation of their children.  The gentleman, the father,
15  apparently tried to make some sort of side agreement and
16  then -- with the wife, and whether or not that was a valid
17  side agreement, even though it didn't go before the Court.
18        Q.      Okay.  Did that actually -- but you didn't
19  reach a conclusion in that case?  They settled it?
20        A.      The jury did not.
21        Q.      But you have never been on a criminal case?
22        A.      No, sir.
23        Q.      One of the things -- and, obviously, a lot of
24  our questionnaire gets into some personal matters, but I
25  think you can understand why we need to ask some of these
```

1    things.

2          A.    Certainly.

3          Q.    But Peggy Railey was your high school music

4    teacher?

5          A.    Yes, sir.

6          Q.    So, obviously, you took great interest in

7    that?

8          A.    Absolutely.

9          Q.    Were you pretty close to her?

10          A.    When I was in high school, yes, sir.

11          Q.    And I think your sentiments about what

12    happened in Walker Railey's case mirror what a lot of people

13    feel about the case, obviously.

14          A.    I would like to think so.

15          Q.    Do you think that would affect you in any way

16    as a juror in a violent crime case?

17          A.    No, sir.

18          Q.    Okay.  The other areas I wanted to ask you

19    about is your stepson has a pending aggravated assault case.

20    Is that a juvenile case?

21          A.    Yes, sir.

22          Q.    Okay.  What is the status of that case?

23          A.    We would like to know the same.  Currently,

24    from what I understand, the Judge has ordered mediation.

25          Q.    Okay.

1    A.    And that was ordered back in July.  Here it is

2  September, so --

3    Q.    Nothing has happened on that yet?

4    A.    No, sir.  It is not resolved.

5    Q.    I don't want to really get into too much of

6  the facts, obviously.  You weren't a witness to any of the

7  facts, were you?

8    A.    No, sir.

9    Q.    Is that something that occurred at school or

10  --

11    A.    After school hours.

12    Q.    After school hours?

13    A.    But on school property.

14    Q.    What police agency is handling it?

15    A.    Dallas.

16    Q.    Dallas?

17    A.    Yes.

18    Q.    Again, do you think that would affect you in

19  any way?

20    A.    No, sir.

21    Q.    Okay.  And then this telephone harassment

22  case, is that a pending case right now, too?

23    A.    It is.  Actually we go to trial tomorrow.

24    Q.    Really?  Down here?

25    A.    Yes, sir.

1    Q.    You will make a lot of trips down here.

2    A.    It's been an interesting year.

3    Q.    And that --

4         THE COURT:  Whose trial is that tomorrow?

5         MR. SHOOK:  Husband's ex-wife; is that

6    right?

7         PROSPECTIVE JUROR:  That's correct.  I

8    don't know which court it's in.  I can refer to my --

9         THE COURT:  I didn't want to mix up in my

10   mind, so excuse me.

11   Q.    (By Mr. Shook)  And what police agency is

12   handling that case?

13   A.    Dallas.

14   Q.    Okay.  All right.  And I take it that case

15   wouldn't affect you in any way?

16   A.    No, sir.  It's a misdemeanor.

17   Q.    Okay.  All right.  I wanted to cover those

18   because they all looked like they were, except for the

19   Walker Railey, obviously, were pending and going on at this

20   time.

21        Let me ask you how you feel about the

22   death penalty.  You put on the questionnaire that you favor

23   it as a law, but we always like to follow up and ask jurors

24   how they personally feel about it, why they favor it, the

25   purpose they think it serves society.

1        A.      Well, I certainly think it's a deterrent to

2   crime to have the death penalty, so I do believe in the

3   death penalty.

4        Q.      Okay.  Have you always believed in the death

5   penalty since you were an adult?

6        A.      Yes.

7        Q.      When you think of what's an appropriate death

8   penalty case, what types of crimes do you think should come

9   up for consideration of the death penalty?

10       A.      Well, as I stated on my questionnaire, I truly

11  think that heinous, willful, intentional crimes, abductions

12  where murder is involved.

13       Q.      Okay.

14       A.      Or the death of an individual is involved.

15       Q.      We always ask jurors, obviously, this

16  particular case got a lot of coverage in the press.

17       A.      Yes.

18       Q.      You said that you had seen it on TV and the

19  newspaper?

20       A.      Yes.

21       Q.      What do you recall about this case that you

22  read or saw on TV?

23       A.      What I recall is that it occurred at a

24  sporting goods store in Irving --

25       Q.      Okay.

     A.     -- around Christmas time.

     Q.     All right.  Did you follow the events after the crime?

     A.     Yes, to the extent that individuals were out and they were considered dangerous and everybody certainly was on the lookout for individuals that might meet that criteria that we were looking for at that time through the media.

     Q.     Did you follow any of the news stories after the arrest or any of the other court proceedings since that time?

     A.     No, sir.

     Q.     Okay.  Now, just because you have seen something on TV or read it in the newspaper, doesn't necessarily make you unfit to be a juror.  Obviously if that were true, we couldn't qualify any jurors in high publicity cases.  The bottom line is this, to be qualified as a juror you have to be able to assure the Court that you wouldn't let anything you have read or seen on TV about the case influence you or have an opinion that would influence you.

               We can't ask you to forget what you have seen, obviously, but what the Court requires is jurors to make their decisions in the case based solely on what they hear in the courtroom from the witnesses, from the evidence introduced at trial, and they can't let these outside

1    stories they have seen influence their decisionmaking.

2                   And it really comes down to what the

3    juror tells us, if they have -- if they would be able to do

4    that.  Different jurors have read different things, more

5    information than others, and some tell us they can't and

6    some tell us they can.  And we just depend on your honesty

7    and how you feel about this particular case and what you

8    know about it and whether you can assure the Court you can

9    do that.

10                   So I want to get that out up front.  You

11   have read a little bit, seen a little bit on TV, do you

12   think that would influence you in any opinions on the case

13   or would you be able to make your decisions just based on

14   the courtroom?

15        A.    I can make my own opinion based on the

16   information that's given me.

17        Q.    Okay.  Fair enough.  Now, in Texas capital

18   murder is reserved for just murder cases and then only

19   certain types of murder cases.  You have to have an

20   intentional killing with some other aggravating fact, murder

21   during the course of a felony, such as a robbery.  A person

22   goes into a 7-Eleven store and shoots the clerk during the

23   robbery.  That can be a death penalty case.  During a

24   burglary, someone breaks in a house and murders someone in

25   the home.  During a sexual assault, during a kidnapping, and

1   arson, those types of cases come under consideration for the

2   death penalty.

3                  Also, specific victims, such as a police

4   officer on duty, fireman on duty, prison guard on duty, a

5   child under the age of six, come into consideration for the

6   death penalty.  Murder for hire, some call it a hitman in

7   Hollywood, but someone murders someone for money or profit.

8   Someone hires someone to murder someone for money or profit,

9   could be that situation, as well as mass murderers who kill

10  several people in the same transaction or a series of

11  transactions, like a serial killer.

12                 But those are the only types of murder

13  cases that right now can come into consideration for the

14  death penalty.  We have a lot of brutal killings that don't

15  come into consideration.  A person could get life.  And

16  that's the structure of the law at this time.

17                 Those types of cases I have gone over

18  with you, do you agree with those from your personal point

19  of view as those are the types of cases that you feel should

20  be considered for the death penalty?

21       A.    Yes.

22       Q.    Okay.  The next area I want to go over is what

23  we call the law of parties.  You know, when we think of a

24  capital murder, generally we think of an example of the

25  person actually causing the death, the triggerman, the guy

that goes in and shoots the clerk in the 7-Eleven.

But capital murder, like any crime, may be carried out by several individuals.  The law says that if you are actively participating in a crime, you can be held accountable for it and could be prosecuted, even if maybe you are not the -- maybe someone else in the group participated more.

Now, in a capital murder situation, you may have someone that's caused the death, but he may have accomplices that help him carry out the crime.  An example we give is Mr. Wirskye and I, let's say we want to rob a bank and we come up with a plan.  We recruit another friend of ours who has a car.

What our plan is, I've got a gun and I'm going to go in there and threaten the tellers, the bank tellers.  Mr. Wirskye is going to accompany me.  He's going to have a bag and he's going to load up all the cash while I keep everyone at bay.  Our other accomplice is going to keep the car running outside, right at the curb.  He's going to have it ready to go.  We're going to run out and he's going to take off.

We execute the plan.  And during the course of the bank robbery, maybe the teller looks at me the wrong way or Mr. Wirskye says one of them is going for the silent alarm, and I shoot them, intentionally kill them.  We

1   leave.  But we're arrested.

2               I think it's clear under the law that I

3   could be prosecuted for the death penalty because I'm the

4   triggerman.  The law says, though, under the facts, if

5   Mr. Wirskye and the getaway driver were actively

6   participating in this event, that they can be prosecuted for

7   capital murder and they could ultimately receive the death

8   penalty.

9               And people feel differently about that

10  aspect of the law when we talk about an accomplice, a

11  nontriggerman.  Many people are for the death penalty and

12  want it prosecuted when we talk about someone who actually

13  causes the murder.  Then when we talk about situations where

14  there's an accomplice involved, they kind of draw a line

15  there.  They would reserve punishment for an accomplice,

16  maybe a long prison time, but not a death penalty.  They

17  would reserve that simply for the triggerman.  Other jurors

18  tell us they agree with the law and think those people

19  should be held accountable, too, and get the death penalty

20  in these situations, depending on their involvement.

21              And we just want to ask you what your

22  honest feelings are about that law, how you feel about the

23  prosecution of accomplices?

24       A.     I have to agree with the law.  I think as an

25  accomplice, if they know what they are walking into, they

1   need to be held accountable, just as everyone else in the

2   party.

3        Q.     Okay.  And you feel that they could even

4   receive the death penalty, depending on their involvement?

5        A.     Yes.

6        Q.     What would be important to you, then, about an

7   accomplice?  What types of factors come to mind when you

8   think in a capital murder situation with the death penalty

9   involved?

10       A.     Obviously, it depends upon the intent of the

11  crime, what was the intent of the crime?  When you walk in

12  with a handgun, the intent isn't to scare someone.

13       Q.     Okay.

14       A.     Is my opinion.

15       Q.     Okay.  So the knowledge of me with the gun

16  with my accomplices --

17              MS. BUSBEE:  I object based on an

18  objection made previously considering hypotheticals.

19              THE COURT:  Sustained.  Re-ask the

20  question.

21       Q.     (By Mr. Shook)  I think your answer was pretty

22  clear.  You were referring back to the example we were

23  talking about?

24       A.     Yes, sir.

25       Q.     Okay.  Let's -- you know, then, from living

1   here in Texas that the death penalty is something that is

2   actually carried out.  You know, there are some states that

3   have it and they prosecute it and then it's -- actually they

4   just keep them on death row and they never carry it out.

5           In Texas, though, the death penalty is

6   carried out and executions actually take place.  We've had

7   some years where there's been as many as forty executions.

8   Sometimes it gets a lot of press, in the national press,

9   obviously, and some view it negative and some positive.  But

10  it is a punishment that's actually carried out.

11          The procedures are the same in each case.

12  Are you aware of the actual method of execution in Texas?

13      A.    I believe it's by injection.

14      Q.    That's right.  In this case the trial would be

15  divided into two parts, the guilt/innocence stage, in which

16  the State has to prove the indictment beyond a reasonable

17  doubt.  If we fail to do that, it's a not guilty.  If we are

18  able to do that, we move into the second phase of the trial

19  where the jurors get these questions, these Special Issues,

20  basically, and I'll go over those in a minute.

21          But, basically, what we have to prove in

22  the punishment stage is, is the defendant is a continuing

23  danger to society, did he anticipate that a death would

24  occur, and is there sufficient mitigating evidence where you

25  think a life sentence should be imposed rather than a death

1   sentence?  If you answer those questions yes, yes, and a no

2   to the mitigation question, then it would equal a death

3   sentence.  Okay?

4           The Judge has no choice.  That's how he

5   would sentence the defendant.  And if they are answered any

6   other way, it's a life sentence.  But those are the only two

7   possible outcomes, once a defendant has been found guilty,

8   the death sentence or the life sentence, and it all depends

9   on how the jurors answer these questions.

10          In this case if the defendant were

11   sentenced to death, he would be placed on death row.  At

12   some point in time Judge Cunningham would actually issue a

13   date of execution.  He would be taken to downtown Huntsville

14   where by law the executions take place.

15          He would be given, on the date of

16   execution, a time with family, a religious minister or

17   religious counselor.  He will be given a last meal.  But at

18   6:00 p.m. all executions take place, and these are usually

19   covered pretty, pretty intently by the press, some more than

20   others.

21          There are visitors there that would

22   witness the execution.  Family members from the victims

23   could be there, also family members from the defendant in

24   separate viewing rooms.  He's always given an opportunity to

25   make his last statement.  Sometimes you read them in the

1  press.   Sometimes they beg for forgiveness and sometimes

2  they are very defiant.   Sometimes they proclaim their

3  innocence.

4              But after that statement is read, the

5  execution takes place, which is simply the injection of

6  three lethal substances which cause him to become

7  unconscious, cause him to lose the -- his lungs to collapse,

8  cause his heart to stop.   Happens in about ten to 15

9  seconds.

10             It's one thing to talk about the death

11 penalty in a philosophical way, whether you agree with it,

12 grown up that way, and that sort of thing.   And it's another

13 one when we get jurors down here and they really start

14 thinking about I could actually participate in this type of

15 case.

16             And we -- I don't mean to be morbid when

17 I talk about executions that way, but I want every juror to

18 realize exactly what we'll be asking them to do.   We'll put

19 our cards on the table.   We feel that we do have the type

20 and quality of evidence to prove the defendant guilty and

21 cause the jurors to answer these questions in a way which

22 would result in his execution.

23             You've told us from your personal point

24 of view that as an adult you believe in the death penalty.

25 You believe in its prosecution.   You believe in people being

1  held accountable.   You believe in accomplices being held

2  accountable.

3              And I just want to ask you after you have

4  kind of reflected on it, after you filled out this

5  questionnaire and come down here, do you feel that you are

6  the type of person that could listen to the evidence in this

7  case, and if we do prove these things to you beyond a

8  reasonable doubt, could you answer these questions in a way

9  which would cause you -- which would cause this execution to

10 take place someday, knowing that he would be executed some

11 day?

12         A.    Yes.

13         Q.    Okay.  People tell us, you know, it's not

14 something that I really want to do, but if I'm called upon

15 to do it and the evidence is there, I could.  Is that how

16 you feel?

17         A.    Yes.

18         Q.    Okay.  Again, we talked at length about the

19 law of parties.  I can't go into the facts of this case, I

20 can't preview the facts of this case, but I can tell you

21 that we are prosecuting this case under the law of parties

22 as an accomplice.

23              And I believe from your previous answers,

24 you are fine with that aspect of the law?

25         A.    Yes, sir.

1    Q.    Okay.  Let's look for a minute, then, at these

2    Special Issues.  And I want you to just take a moment and

3    read Special Issue No. 1 to yourself and we'll go over a few

4    questions.

5    A.    (Prospective juror complies.)

6    Q.    This question asks the jurors to make a

7    prediction about how the defendant would behave in the

8    future.

9         First of all, let me ask you, do you

10   think that you could make that type of prediction, if you

11   were given sufficient facts and information?

12   A.    Yes.

13   Q.    What types of things as a juror would you want

14   to know in this part of the trial?  What would be important

15   to you?

16   A.    Whether or not there were any other previous

17   crimes committed, although, I don't know if that's

18   information that I would receive.

19   Q.    Most jurors tell us that and in this part of

20   the trial, that is the type of information you can receive.

21   If there have been other previous crimes, the State can even

22   produce the witnesses, if they are available, and you can

23   hear about that, the results of any trials, that sort of

24   thing.  You can hear good things, too, kind of a good/bad

25   situation, this is your life, in that situation.

1      And, also, you obviously get to consider

2  the facts of the crime itself, their role in the crime, in

3  deciding this question.

4      The question starts out with a no answer,

5  just like a defendant starts out with a presumption of

6  innocence.

7      A.    Yes, sir.

8      Q.    It starts out with a no answer.  Just because

9  you have found the defendant guilty of capital murder,

10 doesn't mean that it's an automatic yes.  There aren't any

11 automatic answers in this process.  The law requires the

12 jurors to wait and listen to that additional information

13 that could be produced and also review the information they

14 have already learned in the guilt stage of the trial and

15 then decide has the State proven this to me beyond a

16 reasonable doubt?  If we haven't, if we failed, then you

17 leave it as a no answer.  If we have, then you answer it

18 yes.  But you can't answer yes, just because you found him

19 guilty.

20      We have a few jurors that tell us they

21 would, quite frankly, that answers the question for them.

22 But the law contemplates that there may be some fact

23 situations where someone is a continuing danger based on

24 their history and facts of the case, and then there's other

25 situations which maybe they won't be viewed as a continuing

1  danger.  It's just up to the juror after they hear those

2  particular facts.

3          Do you feel that you can follow that

4  aspect of the law, that rule of law, and wait and make your

5  decision on question No. 1 after you have heard all the

6  additional evidence and then deliberate on all the issues

7  and decide if we have proven that?

8      A.    Yes.

9      Q.    Just because you found him guilty, you

10  wouldn't automatically answer question No. 1 yes, then?

11      A.    That is correct.  I would not.

12      Q.    It could be some situations where you would

13  and some situations where you won't.  It's just going to

14  depend on the facts of the case?

15      A.    Absolutely.

16      Q.    Okay.  That's what the law contemplates the

17  jurors will do.  Obviously, they want you to look at all the

18  information before you make these types of decisions.

19          Now, we have to prove that there's a

20  probability that the defendant would commit criminal acts of

21  violence.  When you see the word "probability" there, what

22  does that mean to you?

23      A.    That there's a propensity to have another

24  crime committed by this particular individual.

25      Q.    When -- I ask that question because, you know,

1    you get a lot of legal definitions when you sit on a jury,

2    but you wouldn't get legal definitions for these particular

3    words.  The courts have left the meaning of these words up

4    to the jurors, really.  And they ask you to use your common

5    sense.

6              The only guidelines we get on probability

7    is at one end, obviously, probability in that question

8    doesn't mean a certainty because the State would never prove

9    something is going happen in the future to an absolute

10   certainty.  Then at the other end, it's obviously more than

11   just a possibility.  Anything is possible.  So they want it

12   to be more than a possibility.  So they come up with this

13   word "probability".

14             A lot of people tell us more likely than

15   not, greater than 50 percent, that sort of thing.  Are you

16   comfortable with that type of language in this question and

17   that type of definition?

18        A.    Yes.

19        Q.    In other words, we would have to prove more

20   than a possibility, but not to the extent that it's an

21   absolute certainty.

22        A.    Yes.

23        Q.    We have to prove that he would commit criminal

24   acts of violence.  When you think of "criminal acts of

25   violence" in the context of that sentence, what types of

crimes do you think of?

A.      I think of armed robbery, I think of sexual abuse, or violence.  I think of any type of firearm usage, whether it's a home invasion with a firearm.

Q.      Some type of violence, then, to another human being, either a threat to actual violence to them?

A.      Yes.

Q.      And then constituting a threat to society. What does "society" mean to you?

A.      Us.

Q.      Okay.  Just any human beings that the defendant may come into contact with?

A.      Absolutely.

Q.      Could it include people in the prison system, guards --

A.      Certainly.

Q.      -- wardens, teachers, that sort of thing?

A.      Certainly.

Q.      This question is answered independently.  It's the first one you get.  And as I said before, the State has to prove to you that it has to be answered yes.  If you answer that question yes, you move to the second question.

Again, it starts out with a no answer and we have to prove to you that it should be answered -- it should be answered yes.  If you will take a moment to read

1    that one to yourself.

2         A.    (Prospective juror complies.)

3         Q.    This question has to do with that law of

4    parties that we talked about.  It -- the first part asks if

5    he actually caused the death.  So if you believe he's the

6    triggerman, it's a pretty easy answer.

7               But the second part deals with the

8    accomplice situation, the nontriggerman.

9         A.    Yes.

10        Q.    What we have to prove from the facts are

11   either he had to intentionally kill, or maybe one of the

12   other accomplices did so, or he anticipated that a human

13   life would be taken.

14              What we have to do, we obviously can't

15   stop and open up someone's head and show you what their

16   intent was.  But we can produce all the facts surrounding

17   the crime and jurors can draw inferences from a person's

18   intent.

19              Do you feel that you can do that, if you

20   are given sufficient facts surrounding the crime?

21        A.    Yes.

22        Q.    Part of that law is in the guilt/innocence

23   stage.  Under the law if Mr. Wirskye and I have a conspiracy

24   to commit one crime -- and that just simply means we have an

25   agreement to.  An example I gave is bank robbery.  And

1    during the course of that crime, if one of the persons

2    involved commits another crime to further it, in our case

3    murder, then they are all held responsible, if they should

4    have anticipated that a crime would occur.  It's kind of a

5    common sense proposition.  That's what we have to prove to

6    get a person guilty.

7              Then in this question, we go just a

8    little step further, and not just should they have

9    anticipated, but did they anticipate.  And, again, all the

10   jury does is look at all the facts surrounding the

11   particular crime and then any additional information in the

12   person's background that might help them answer that

13   question.  Do you feel that you could do that?

14        A.    Yes.

15        Q.    Okay.  Then we move to Special Issue No. 3.

16   That's the most lengthy question.  So take a moment and read

17   that and I'll go over a couple more things on it.

18        A.    (Prospective juror complies.)

19        Q.    That's the mitigation question.  It's the last

20   question you get and neither side has the burden of proof.

21   It's kind of what we call the safety net.  You have already

22   found the person guilty.  You would have already found they

23   are a continuing danger.  You would have already found that

24   they anticipated a human life would be taken, but it allows

25   the jurors to look at all the information, the person's

1   background, the crime, and then decide if they think a life

2   sentence should be imposed or a death sentence.  It's a

3   decision you make in your heart and, also, in your mind,

4   because it has to be based on evidence.

5                    As you sit there today, you are not

6   required to tell us what you think mitigating evidence is.

7   You are just required to keep your mind open to it.  Do you

8   think that's a good question to have in this type of case?

9       A.    Yes.

10      Q.    As you sit there today, does anything come to

11  mind?  Do you have any gut reactions about anything you

12  would view as potentially mitigating?

13      A.    No, but I certainly understand why they want

14  to try to get a total picture of the individual, a better

15  picture of the individual of their character, not just of

16  this particular situation or incident.

17      Q.    Right.  As I said before, you don't have to

18  tell us what mitigating evidence would be.  Most jurors

19  can't.  They don't sit around thinking about these issues,

20  thankfully, but you just have to keep your mind open to it.

21                   And we hear lots of different areas,

22  because it can cover just about anything.  We talk about

23  background information a lot.  You know, you may hear about

24  a person's childhood.  We've had some jurors tell us if they

25  were abused physically or mentally, that could be

1   mitigating, depending on the severity, and maybe they came

2   from a poor background.  We've had other jurors tell us, I

3   feel bad for them, but once you reach adulthood, you know,

4   you have to be held accountable for those things and that

5   really doesn't weigh a lot with me in that regard.

6              But you hear a lot about background

7   information in these types of cases.  Do you feel that could

8   be potentially mitigating information or do you think that

9   really doesn't come up in these situations?

10        A.     I think it may come up for other people.  It

11   doesn't come up for myself.

12        Q.     Okay.  Sometimes you hear about drug use, drug

13   habits.  People feel differently about that.  Some people

14   feel strongly that it could be mitigating and others very

15   strongly -- they actually view it as aggravating, if it's

16   voluntary drug use, that sort of thing.  Do you have any

17   feelings about that one way or the other?

18        A.     No.

19        Q.     The bottom line is, whatever it is, you can

20   keep your mind open to it and if you think it's sufficiently

21   mitigating, you could answer the question in a way which

22   would spare the defendant's life.  And if you don't think

23   there's sufficient mitigating evidence, you can answer it

24   no, knowing when you did that, the defendant would be

25   executed someday down the line.  Do you think that you can

1    do that?

2         A.    Yes.

3         Q.    There are certain rules that apply to each

4    case, each criminal trial, not just capital murder.  One is

5    the presumption of innocence which I'm sure you have heard

6    of.  Every defendant must start out with that presumption of

7    innocence.  The fact that they've been arrested, indicted,

8    go to the Grand Jury, is no evidence of his guilt.  You

9    must, as a juror, start him off with that presumption of

10   innocence, and the State has to prove to you beyond a

11   reasonable doubt it should be answered yes.

12             Do you feel that you could follow that

13   rule of law?

14        A.    Yes.

15        Q.    The burden of proof stays at this table.  We

16   have to prove this case beyond a reasonable doubt and that

17   burden of proof never shifts to the defense.  They don't

18   have to ask questions.  They don't have to put on witnesses.

19   They don't have to make arguments.  Now, I anticipate they

20   will defend the defendant.  They are good lawyers.  They are

21   going to do their job.

22             But I give that example of -- sometimes I

23   give an example of they can sit there and work crossword

24   puzzles, if they wanted to.  And the law says that because

25   the burden of proof never leaves this table, and you can't

1    require them to prove his innocence or anything else.  You

2    can't shift the burden on them.  It must remain on this

3    table at all times.

4                    Do you feel that you can follow that rule

5    of law and require the State of Texas to prove this case to

6    you beyond a reasonable doubt?

7         A.    Yes.

8         Q.    You would not require the defense to prove the

9    defendant's innocence or anything else to you?

10        A.    No.

11        Q.    Okay.  The burden of proof goes to every

12   portion of the indictment.  The indictment sets out what we

13   have to prove in this case and we have to prove every

14   element of it.  We even put where the crime occurred, Dallas

15   County.  The law requires us to prove that beyond a

16   reasonable doubt as well as the identity of the killer and

17   how it occurred.  If you have a reasonable doubt, even on

18   Dallas County, the law says the jurors would have to acquit.

19   May sound like a technicality, but it's not under the law.

20                    And I don't anticipate it would be

21   happening, but if you sat on a case where maybe you believe

22   everything we put in the indictment, that we have proven it,

23   but you felt maybe this case happened in Tarrant County, we

24   really bungled the case in our preparation, and it did

25   happen in another county, you would be required under the

1  law to find the defendant not guilty.  You may not like it,

2  obviously, and I'm sure we would be fired for our lack of

3  preparation, but you can't help us out as a juror in that

4  regard.  You have to require us to prove every bit of it.

5  Can you follow that rule of law?

6          A.     Yes.

7          Q.     Let me talk about the Fifth Amendment.  I'm

8  sure you have heard that word before.  Anytime someone is

9  charged with an offense, if they choose not to testify,

10  exercise their Fifth Amendment privileges, the Court

11  instructs the jury that they cannot consider that as

12  evidence of their guilt.

13              There could be many reasons why a person

14  may not testify.  You know, they may not make a very good

15  witness, they may be very poorly educated, they may be very

16  nervous, they may appear to be guilty, and they are not --

17  they simply may be following their lawyer's advice --

18          A.     Yes, sir.

19          Q.     -- who tells them not to.  The Court takes

20  care of any number of reasons why a person may not testify

21  by simply telling the jury you can't hold that against him.

22  You have to decide this case just based on the law and

23  evidence that you hear.  Do you feel that you can do that?

24          A.     Yes, sir.

25          Q.     The parole laws come up in the news quite

1  often.  I can tell you that the Court will instruct you that

2  in a capital murder case a capital life sentence means a

3  person must serve forty calendar years before they become

4  eligible for parole.  Then that doesn't necessarily mean

5  they will be paroled.  They are just eligible.  The Court

6  will also instruct you that you can't consider the parole

7  laws at all during your deliberations.  You have to consider

8  a life sentence, a life sentence.  Could you follow that

9  rule of law?

10       A.      Yes, sir.

11       Q.      Police officers often testify in these cases

12  and most of the jurors respect the job that the police do.

13  They come in as witnesses.  And what the Court merely says

14  is you would have to start them out like you would any other

15  witness.

16       A.      Yes, sir.

17       Q.      Despite having respect for them, I think

18  everyone recognizes there are good police officers and bad

19  police officers.  Like any profession, you have good and

20  bad.

21       A.      They're human beings, I'm sorry.

22       Q.      Exactly, they are just human beings.  So start

23  them off and then judge their credibility once they testify.

24  And, again, the bottom line is you just have to keep your

25  mind open on all these questions.  Just because you found

1   him guilty, you don't answer them yes.  You have to wait and

2   weigh any new information that you hear in the punishment

3   phase and then require the State to prove question No. 1 and

4   question No. 2 to you beyond a reasonable doubt.

5                That last question is simply you look at

6   all the evidence and decide if you think there's sufficient

7   mitigating evidence.  You do, you answer it yes.  If you

8   don't, you answer it no.  And you feel you can do all of

9   that?

10          A.     Yes, sir.

11          Q.     We've gone over a lot of different areas.  Do

12   you have any questions over anything that we've gone over?

13          A.     No, sir.

14          Q.     Okay.  I appreciate your attention and

15   patience with me.

16                MR. SHOOK:  And, Judge, that's all the

17   questions that we have at this time.

18                THE COURT:  Ms. Busbee?

19                CROSS-EXAMINATION

20   BY MS. BUSBEE:

21          Q.     Do you need some water or anything?

22          A.     No, ma'am, thank you.

23          Q.     Sometimes we get dry mouth talking so much.

24          A.     I appreciate that, thank you.

25          Q.     Here I am offering you some water.  You do

1  that sometimes for a living, don't you?

2          A.      Yes, I do.

3          Q.      We want everybody to be comfortable, too.

4          A.      But you don't thank people for their trash.

5          Q.      I'm not going to lob that one back.  Anyway,

6  you saw how many people we had down here that morning --

7          A.      Yes, ma'am.

8          Q.      -- you came?  And, you know, obviously, we're

9  not trying to make a lifetime case of this.  We weed a lot

10 of people out.  I think you are about the 38th, more or

11 less, person we've talked to, but your juror number is 1242.

12 So you can see that we pick the people that both sides feel

13 would be the most reasonable and most likely to sit on this

14 jury.

15                 And I'm prefacing my comments to you by

16 stating that, because I want you to talk to me.  And I know

17 you understand the law and I know that when you filled out

18 this questionnaire you weren't told what the law is, which

19 seems unfair, but, you know, we kind of want to get your gut

20 feelings about things before we tell you the scheme and the

21 way this is handled.

22                 And the reason for that is that this

23 isn't, you know, a contract or a question about who is going

24 to raise a child or whether somebody should go to prison for

25 X number of years.  It's something that is gut level for

everybody.  And someone died, the victim of the crime.  And

someone else may die.  And so it arouses emotions in people.

          And there's nothing wrong with having

that feeling.  It's recognized that people have that.

That's why we have this individual voir dire that we have.

          So I guess what I'm trying to explain to

you is, it doesn't make you a bad person or bad citizen, if

you have concerns that you think may affect your service,

one way or the other.  I was just thinking when we were

looking at your questionnaire and talking to you this

morning, that you have kind of seen things in the system

from both sides.  I mean, you have a son that's involved in

-- not a defendant, but is in a civil matter and then you

are a victim of a crime.  So I think in both instances you

would want jurors who could be unbiased in that type of

case.  And I hesitate to use the word "bias".  I don't --

because that has a negative connotation.

          And I'm just telling you that, so you

will feel free and relax and just tell us your true thoughts

on things, because Mr. Shook always does a real thorough job

of telling you what the law is.  And I just want to talk to

you about your thoughts on it, now that it's been explained

to you.

          I spend most of my time in the courtroom,

but whenever I get called to the witness stand, there's a

1   rush of nervousness and I'm sure that jurors feel that way,

2   particularly when they come in here and they don't know what

3   they are going -- how they are going to be questioned or

4   anything.  And then they get sent up on the witness box and

5   grilled.  So relax.  And I'm not going to take as long as

6   Mr. Shook, I don't imagine.

7                      But let's talk about this case and how

8   you feel about sitting on this jury.  But I want to ask you

9   this first, because I made this note.  You expressed some

10  frustration in what was going on in your son's case.  Could

11  you elaborate on that?

12       A.     Well, the frustration is the unknown and the

13  unknown is there's no particular timeframe.  I thought there

14  was a particular timeframe of ordered mediation and there

15  may be, but I'm just not aware of it.

16       Q.     Is this a case where there was restitution to

17  be paid?

18       A.     I don't know.  This is my first time here.

19  It's my first time there.  So I'm -- I'm truly not educated

20  in that arena to really be able to answer that properly,

21  because I really, truly, don't know how long those types of

22  situations take place.

23       Q.     The few times I've gone over to juvenile, I've

24  collared somebody I know and said do this for me, because

25  it's really different.  It's a different system.  Do you

1   have a lawyer?

2        A.     Yes, ma'am.

3        Q.     So you have confidence in that person?

4        A.     Yes, ma'am.

5        Q.     As to this case tomorrow, has it been set for

6   trial before?

7        A.     Yes, ma'am.

8        Q.     How many times?

9        A.     Twice.

10       Q.     And have you had any communication with the

11  District Attorney's Office as to whether it's going to go to

12  trial?

13       A.     It's going to trial tomorrow.

14       Q.     For sure?

15       A.     Yes, ma'am.  It's either for trial or dismiss.

16       Q.     But are you the complainant?

17       A.     Yes, ma'am.

18       Q.     So you are going to be there.  So I assume

19  it's going to be tried?

20       A.     Yes, ma'am.  First time.

21       Q.     Do what?

22       A.     It would be my first time there as well.

23       Q.     Now, you will have some experience.

24       A.     Yes, ma'am.

25       Q.     You would be a cool, collected witness.  The

1  District Attorney's Office is not exactly representing your

2  interests in this case or representing you as a victim.  Do

3  you have any feelings like the District Attorney's Office is

4  your attorney and somehow you owe them something because of

5  that?

6          A.      No.

7          Q.      I like to ask that question.

8          A.      Certainly, I understand that.  I just know

9  that I have talked to a few different people.  They move

10  quite frequently through that office is what I've learned.

11         Q.      Yes, they do.  Yes.  And they try really hard

12  on those domestic cases.

13         A.      Yes, ma'am.

14         Q.      It's got everybody's attention.  So your

15  situation is probably better than most victims of a

16  misdemeanor crime.

17         A.      Yes.

18         Q.      They watch those cases carefully.  Okay.  Do

19  you remember who the defense attorney is on that case where

20  you were harassed or do you know?

21         A.      It's her brother.

22         Q.      Do you know his name?

23         A.      Yes.

24         Q.      Could you tell me?

25         A.      Certainly.  His name is William Connelly

1  (phonetic).  He's coming in from South Carolina.

2        Q.     Wow.  I need to come watch that.

3        A.     It ought to be entertaining, I'm sure.

4        Q.     I'm visualizing some guy in a straw hat and a

5  white suit.  Now, people -- well, let's see.  Now, when you

6  spoke originally, as I said, on your questionnaire about the

7  death penalty, you said that you envisioned that for heinous

8  and willful crimes.  And words to that effect we often see

9  on these questionnaires.  And I suspect that you probably

10 were thinking of one individual, sort of, situation.  Would

11 that be a fair statement?

12       A.     Yes and no.  Yes, it is, but I neglected to

13 include my friends that were involved in September 11th.

14       Q.     You know, he mentioned that to me and I never

15 did know whether to bring it up or not.

16       A.     Well, and I did not deliberately omit that,

17 but that happened and --

18       Q.     You lost some personal -- I suspected that you

19 might have some personal friends in 9/11?

20       A.     Yes, yes.

21       Q.     Since you spontaneously told me that, do you

22 think that's in your mind as far as prosecuting people for

23 capital murder?

24       A.     Well, it's a totally separate crime.

25       Q.     Well, it is.  But it would be certainly a case

1  that would be a capital murder case, had anybody survived to

2  prosecute.

3      A.     Yes, that's true.

4      Q.     I mean, would that be in your mind somehow

5  while this case is going on?

6      A.     No, because it's a totally separate --

7      Q.     Okay.  Well, I just, you know, I told you I

8  wanted to know how you feel about things, just to see.  I

9  know you understand the scheme where the State is allowed to

10 seek the death penalty for someone who is not actually the

11 person that committed the murder.

12             How do you feel about that as a law?

13 What were your thoughts on that?

14     A.     I think that there is accountability for all

15 who is involved.  I think that if it's a group effort, I

16 think the group certainly has an idea of what their goal is

17 in committing their crime.  And I don't know if this

18 particular group was aware.

19     Q.     So you would make them prove that to you?

20     A.     Absolutely.

21     Q.     So let me just reiterate this.  The

22 responsibility, I suppose, is the guilt and I don't think

23 anybody has any quarrel with the fact that if you are a

24 party or sometimes we use the word "accessory" here,

25 although that's not the legal term in Texas, but it makes

1   more sense to people because that's the more common word.

2   But an accessory would be just as guilty.  Guilty now, not

3   punished, but guilty of a crime that the primary actor

4   committed.  That's the law here in Texas.

5            But the question this voir dire focuses

6   on is the punishment of that guilt.  And I'm just asking you

7   if you distinguish in your mind, as far as punishment is

8   concerned, between the actual -- the person who actually

9   committed the murder and a lesser participant?

10       A.    Can I distinguish between the two?

11       Q.    Would you --

12       A.    Yes.

13       Q.    -- in your mind?  And does this scheme make

14   sense to you as a way to make that distinguishment to

15   distinguish that?  Does that make sense to you?

16       A.    Yes.

17       Q.    I would like to talk to you about Special

18   Issue No. 2.  This is -- this may be a difficult one to a

19   jury because it requires a finding beyond a reasonable doubt

20   that a person did anticipate that a life would be taken.

21            What kind of proof would you need to make

22   that determination, just off the top of your head?

23       A.    Motivation, the goal, the intent of what they

24   were after.

25       Q.    Okay.  Like intent to commit a murder?  Is

1    that in your mind?

2         A.      Intent to commit a crime.

3         Q.      Well --

4         A.      I mean, was there an intent to commit a crime?

5         Q.      Well, you would have already decided that when

6    you found them guilty.

7         A.      Okay.

8         Q.      So having decided, and as Mr. Shook explained

9    to you, when you find someone guilty of capital murder, you

10   have found beyond a reasonable doubt that person should have

11   anticipated, should have anticipated, that a life would be

12   taken.

13        A.      Yes.

14        Q.      So would you feel like you had decided that

15   someone should have anticipated, that that answers that

16   question as to whether they did anticipate that a human life

17   would be taken?

18        A.      Yes.

19        Q.      And that's a hard question.  So pretty much,

20   if you have decided, as a juror in a hypothetical death

21   penalty case, that someone should have anticipated that

22   someone would be killed, you would answer Special Issue No.

23   2 yes?

24        A.      Yes.

25        Q.      Understanding that actually you would have to

1    -- your finding would be different.  You would be finding

2    that he did anticipate it, but should have anticipated and

3    did anticipate are the same to you, as far as deciding

4    Special Issue No. 2?

5            A.       Yes.

6            Q.       And just as one last question, if you have

7    decided in a capital murder case that someone was guilty of

8    the offense of capital murder and it was established to you

9    beyond a reasonable doubt that they were a continuing threat

10   to society and that they did anticipate that a human life

11   would be taken, would there be anything, really, that would

12   sway you to say that they shouldn't be given the death

13   penalty?

14           A.       Well, that gets into Special Issue No. 3.

15           Q.       Right, right.

16           A.       And I think until you see all the facts, hear

17   all the testimony to get the total picture, it can't be

18   answered until you hear all the evidence.

19           Q.       Okay.  Fair enough.  I appreciate your honesty

20   because we just need to know that, some of these fine points

21   on how people actually feel.  As I said, you don't have to

22   agree with the law necessarily, but we need to know your

23   thoughts on what things mean to you personally before we can

24   pick that special, unlucky fourteen that we're going to pick

25   to sit on this jury.  So I appreciate your time.

1    MS. BUSBEE:  I have no other questions of

2    this juror.

3    THE COURT:  I will go through the issue

4    again with Ms. Johnson.  Ms. Johnson, like I said, when we

5    give the law, it's a lot to understand.  I need to tell you

6    again what the law is regarding Special Issue No. 2.  We use

7    some words of art that are not defined.  It's much like the

8    language that you speak on your job that I wouldn't have any

9    clue what you are talking about.

10    This scheme here is a filter.  Let me

11    give you an example of Special Issue No. 2 where a person

12    did not actually cause the death, but intended to kill or

13    anticipated that a human life would be taken.  Murder for

14    hire.  If I hire a hitman to kill my business partner.

15    PROSPECTIVE JUROR:  Okay.

16    THE COURT:  Fair enough?

17    PROSPECTIVE JUROR:  Yes.

18    THE COURT:  I intend for my business

19    partner to die and it's called murder for hire.  That's a

20    capital case.  That's a real good issue, real good example,

21    for Special Issue No. 2.  You look at it real carefully.

22    Then you have got the example that

23    Mr. Shook gave you of the bank robbery.

24    PROSPECTIVE JUROR:  Yes.

25    THE COURT:  Where you have got a driver,

1  the bagman, and the gunman.  Now, if I'm the driver and I

2  know we're going to go and rob the bank, but I didn't have

3  any intent that anyone be killed, but they both go in with

4  guns.

5                    MS. BUSBEE:  Your Honor, I would renew

6  the objection I made previously concerning questions to the

7  jurors about fact situations.

8                    THE COURT:  Overruled.  I'm trying to be

9  sure she understands the law.  You have three different

10 people doing three different things.

11                   PROSPECTIVE JUROR:  Yes.

12                   THE COURT:  If a murder occurs, all three

13 could potentially be guilty.

14                   PROSPECTIVE JUROR:  Yes.

15                   THE COURT:  But then if we go to the

16 sentencing phase, the State has to prove that any of the

17 three individuals went into the program with the intent to

18 kill or actually anticipated that a human life would be

19 taken.

20                   PROSPECTIVE JUROR:  Yes.

21                   THE COURT:  Do you see there's a

22 distinction there --

23                   PROSPECTIVE JUROR:  Yes.

24                   THE COURT:  -- between guilt and

25 punishment under this scheme?

1    PROSPECTIVE JUROR:  Yes.

2    THE COURT:  If you go in like if you are

3    in for a penny, you are in for the pound, if you are going

4    in to commit one felony and another one occurs, you are good

5    for it, if you are a party.

6    PROSPECTIVE JUROR:  Yes.

7    THE COURT:  That's the fine distinction

8    here.  It's a filter.  It's saying that you can commit a

9    horrible crime, but in order to get to that Special Issue

10    No. 2, you have got to have the intent, specific intent,

11    that a death will occur or you -- or you did anticipate that

12    a human life would be taken.  Should have anticipated on the

13    guilt side.  You should have known if you go into a bank

14    with a loaded gun, somebody might get killed.

15    PROSPECTIVE JUROR:  Yes.

16    THE COURT:  Versus before you walk in,

17    did you anticipate someone would be killed?  Should have and

18    did.  There's a distinction there.

19    PROSPECTIVE JUROR:  Yes.

20    THE COURT:  Have I drawn that a little

21    clearer for you?

22    PROSPECTIVE JUROR:  Yes.

23    THE COURT:  That's the law.  Ms. Busbee's

24    question was if you have found someone guilty of capital

25    murder, does it automatically answer Special Issue No. 2 for

63

1    you?

2               PROSPECTIVE JUROR:  No, because it has to

3    answer the question as a filter, as you stated.

4               THE COURT:  Would you like to redirect

5    some more questions?

6         Q.    (By Ms. Busbee)  What was your understanding

7    of what the Court just told you?  Could you explain that to

8    me?

9         A.    What the Judge just stated about whether or

10   not actually knowing going in and whether or not you

11   anticipate in the crime of going in and committing murder.

12        Q.    What about that changed your answer?

13        A.    I think you have to really look at the

14   question and you have to look at whether or not they

15   anticipated, as the Judge stated, or whether or not they

16   knew going in.

17        Q.    Well, that's what the law is, of course, and

18   you already said that you understood the law.  My question

19   to you originally was as a practical matter, the way you

20   think, if you had previously determined that someone should

21   have anticipated that a human life would be taken, which you

22   would have done, that you would answer yes to whether or not

23   they actually anticipated.

24        A.    But I think that you still need to look at all

25   the facts before you assume that.

1    Q.    Sure.  But that's not my question.  My

2  question is, you on this hypothetical capital murder case,

3  have already determined beyond a reasonable doubt that

4  someone should have anticipated that a life had been taken

5  because that's a given.  You have said beyond a reasonable

6  doubt this person should have anticipated that a human life

7  would be taken.

8    A.    Yes, ma'am.

9    Q.    Okay.  Now, Special Issue No. 2, having made

10  that determination, would those facts that you heard in the

11  first part of the case, have you answered that he did

12  anticipate because you would have taken the facts into

13  consideration --

14    A.    Yes.

15    Q.    -- in guilt/innocence?  And would you say,

16  well, I have already decided that because we looked at that

17  in guilt or innocence?

18    A.    But I think it needs to be looked at a little

19  bit closer, as the Judge explained, as a filter.

20    Q.    And that's based on the facts that he told you

21  about a hypothetical, how that might have happened?

22    A.    No.  It's based upon how the statement is,

23  which is real poor English.

24    Q.    We're all guilty of that.

25           THE COURT:  That's your Legislature that

1    does that.

2                    PROSPECTIVE JUROR:  I was curious as to

3    who did it.  It wasn't an English major.

4         Q.    (By Ms. Busbee)  And in considering Special

5    Issue 2, what sort of evidence would you think you need over

6    and above what you have already heard?

7         A.    I guess it wouldn't be, if you got all the

8    evidence to make that decision for capital murder of guilt

9    or innocence at that time.

10        Q.    So you wouldn't need additional evidence to

11   find that?

12        A.    No.

13        Q.    Now, see, I think that's what you are really

14   trying to tell us, but -- and nobody is arguing with you.

15   But it's what you said originally.  And understanding what

16   the law is and saying that you feel one way, are two

17   different things.  If you had already --

18        A.    Maybe I don't understand the law.

19        Q.    And we will work you to death on this and I'm

20   sorry.  You don't have to understand the law, necessarily,

21   to answer these questions.  In fact, I appreciate that you

22   are a lawabiding citizen or you wouldn't be here, if you

23   weren't.

24                    But my question is you, yourself,

25   personally, not anybody else, if you had already determined

1  beyond a reasonable doubt based on what you heard from the

2  State, that an individual was guilty of capital murder

3  because he should have anticipated that a life would be

4  taken, would that be enough evidence to also convince you

5  that they did anticipate that a life would be taken?

6          A.    Yes.

7          Q.    Okay.  So to you, like some people, perfectly

8  valid opinions, should have anticipated and actually

9  anticipated have no actual difference in your mind, as far

10  as making these determinations?

11              MR. SHOOK:  We object to that question, I

12  guess, actually the previous questions in that there doesn't

13  have to be additional evidence presented, necessarily, for

14  question No. 2.

15              MS. BUSBEE:  I think my question doesn't

16  address that.  My question is whether those terms are

17  interchangeable in her mind.

18              THE COURT:  Overruled.

19          Q.    (By Ms. Busbee)  That means you can tell me if

20  that does mean the same thing to you as a practical matter?

21          A.    Now, I'm totally confused and I apologize.  I

22  mean --

23          Q.    Of course.  You have already determined in a

24  death penalty -- in a capital murder that someone should

25  have anticipated a human life would be taken based on the

1   facts that were told to you when you tried to decide if they

2   were guilty or not.  That's decided beyond a reasonable

3   doubt in your mind, they should have known, should have

4   anticipated that a life would be taken.

5              We get to the second part of the trial.

6   When you get to Special Issue No. 2, would that question be

7   answered for you that they did anticipate because you felt

8   they should have anticipated?

9       A.     I think that question would be answered during

10   the trial.

11       Q.     Okay.  The first part of the trial?

12       A.     I don't know.  I've never been through a

13   trial, so --

14       Q.     But we can't put you through it and then ask

15   you questions.

16       A.     No, I understand.  But what I'm saying is, and

17   correct me if I'm wrong, but in order to decide your Special

18   Issues, you have to have all the information first.

19       Q.     Well, you may decide these Special Issues

20   based on the facts of the guilt or innocence.

21       A.     Yes.

22       Q.     I mean, we don't know what the State may

23   offer.  My question, again, just understanding this is a

24   hypothetical and it's not a trap you are going to fall in,

25   it's just how you feel.  Believe me, we couldn't outsmart

1   you.  We're just asking questions.

2          A.       I'm sure you can.

3          Q.       But, anyway, you, yourself, I've decided that

4   this individual should have anticipated.  I've decided that

5   already, because I found him guilty.  As a practical matter,

6   in my mind, Special Issue No. 2, should have anticipated

7   means I'm going to find that he did anticipate, he

8   anticipated a human life would be taken.

9          A.       I think that you would as it plays out in

10  court.  I don't think that you come into any conclusion

11  until you come to that part of the --

12         Q.       But now you have had your deliberation on

13  Special Issue No. 1 and you go to Special Issue No. 2 and

14  you say to yourself or don't, I've already decided this on

15  when I decided that he should have anticipated, and having

16  decided that he should have anticipated it, I have no --

17  need no more to feel that he did anticipate that a murder

18  would be taken.

19                  You have told me before we started

20  yanking on your arms in the opposite direction, you said,

21  yeah, it's the same thing to me as a practical matter and I

22  just -- I don't want to confuse you with telling you

23  hypothetical this, that, and the other.

24                  Just bottom line thing, I found he did,

25  should have anticipated.  It's no different for me.  I don't

1  need anything else to find that he did anticipate.

2  A.  That is correct.

3  Q.  Okay.  And that's all I wanted to ask you,

4  because if you feel that should have anticipated in the

5  first part and did anticipate in the second part are

6  equivalent and having decided --

7  A.  I don't know that they are actually

8  equivalent.  I don't know that I would agree with that

9  statement, but --

10  Q.  Do you think --

11  A.  I answered yes, but I don't -- I don't see

12  them as the same.

13  Q.  All right.  My question is, you would

14  automatically feel that he had anticipated because you had

15  already found that he should have anticipated?

16  A.  I can't say how I automatically feel.

17  Q.  All right.  Now that we've worked you to

18  death, what haven't we asked you about that you wanted to

19  talk about?  You started to talk about a friend that you

20  lost on September 11.  Is there anything else about that

21  that you wanted to talk to us about?

22  A.  That it was a difficult day.

23  Q.  It was a horrible day.  Any thoughts about

24  serving on this jury?

25  A.  No.  I think that I would be proud as a

1    citizen of Dallas County to participate in whatever I can

2    do.

3         Q.     And I appreciate that.  Something else here on

4    my notes, you talked about in response to questions to

5    Mr. Shook about how you remembered some of the coverage and

6    the people that were considered dangerous.

7            Do you feel like you will be thinking of

8    that in sitting on this case?  Do you have any opinions

9    about that?  I mean, people sometimes do have opinions about

10    things that may be in the back of their mind.

11        A.     There are no concerns about this particular

12    case.

13        Q.     Okay.  My question is, have you already formed

14    an opinion, say, for instance, as to the question of future

15    dangerousness, just based on what you have heard?

16        A.     No.  I mean, that was when individuals were

17    supposedly, you know, not found and --

18        Q.     Okay.  So you don't have any preconceived

19    ideas about this individual based on publicity?

20        A.     No.

21        Q.     Okay.  All right.  Fair enough.

22           MS. BUSBEE:  That's all the questions

23    that I have, Your Honor.

24           THE COURT:  Ms. Johnson, I'm not going to

25    ask you any more questions or give you any more law.  But I

1   do say at the end of the process, do you understand on

2   Special Issue No. 1 and Special Issue No. 2 that the State

3   has to prove those to you, a juror, beyond a reasonable

4   doubt?

5                    PROSPECTIVE JUROR:  Yes.

6                    THE COURT:  Do you have an open mind that

7   you could answer those questions both yes and no?

8                    PROSPECTIVE JUROR:  Yes.

9                    THE COURT:  No. 3, neither side has to

10  prove it to you.  They simply -- you can use all the

11  evidence that you are given, step back, and you can answer

12  that question yes or no, depending on the evidence; is that

13  correct?

14                   PROSPECTIVE JUROR:  Yes.

15                   THE COURT:  Thank you very much, ma'am.

16  If you will, wait outside.  We'll have you back in just a

17  few minutes.

18                   [Prospective juror out]

19                   THE COURT:  What says the State?

20                   MR. SHOOK:  State has no challenge for

21  cause.

22                   MS. BUSBEE:  Defense has a challenge for

23  cause, Your Honor, based on actually two challenges for

24  cause.  This juror has stated unequivocally and

25  spontaneously that she would decide Special Issue No. 2 in

1 the affirmative, having decided that an individual was

2 guilty of a capital case offense of capital murder. She

3 stated not once, but she stated it twice.

4                 The Court gave her hypotheticals over

5 objection of counsel and made some statements of law to

6 which we object to. And it's my feeling that some of the

7 law was a misstatement of law.

8                 THE COURT: If I misstated it, please

9 tell me.

10                 MS. BUSBEE: Well -- and so my first

11 challenge for cause has to do with the fact that she cannot

12 follow the law and she will automatically assess -- answer

13 question No. 2 yes. That's the challenge for cause number

14 one.

15                 THE COURT: If I have made a misstatement

16 of the law, let's review the record and see where I've made

17 an error. Have Nancy pull it up and show me.

18                         (Recess)

19                 THE COURT: Back on the record.

20 Ms. Busbee, have you had an opportunity to review the

21 comments I made to Ms. Johnson?

22                 MS. BUSBEE: Yes, Your Honor.

23                 THE COURT: Did the Court make any

24 misstatement of the law?

25                 MS. BUSBEE: Your Honor, so you are

1    denying my challenge for cause?  My first challenge for

2    cause was having to do with the fact that she can't -- she

3    can't give effect to Special Issue No. 2.  She would have

4    already decided that.

5                    THE COURT:  Motion denied.

6                    MS. BUSBEE:  Now, I think when you take

7    the totality of the comments of the voir dire and the

8    colloquy with the Court and her answers to you and her

9    answers to me, that it's clear that -- it's unclear to me

10   whether she actually understood what the Court was telling

11   her, but it's abundantly clear to me that she -- she did not

12   understand what the Court was telling her.  She only

13   understood that she needed to change what she said to me

14   and, in fact, when I asked her flat out again, after she had

15   spoken to the Court, that she said that she had prejudged

16   that question, once again.

17                    And I think that the comments of the

18   Court -- I don't want to call it -- necessarily say I think

19   in the totality it was a misstatement of the law in the

20   totality of the comments to her, because it was unclear to

21   the juror as to whether or not the Court was talking to her

22   about the guilt/innocence stage or the punishment phase, and

23   I suppose that's something, a hair that may or may not have

24   to be split at the appellate level, but I made the objection

25   and the Court overruled it in the presence of the juror.

1    I feel that the juror is subject to a

2    challenge for cause based on the line of cases having to do

3    with the prosecutor making the statements and overruling

4    would be an even stronger situation where the Court has

5    overruled my objection.

6    And I ask that you grant a challenge for

7    cause on that, on the totality of this voir dire with this

8    juror.

9    THE COURT:  Does the State have any

10   response?

11   MR. SHOOK:  Judge, we feel that based on

12   all her responses, she's obviously a very intelligent juror.

13   And I think even on her own she said it might be -- it was

14   something we need to look at a little further.  And after

15   she talked to the Court, she understood it.  It could be the

16   same exact evidence, it's just that you have to go that step

17   further.  I think in the end she articulated that.  So I

18   think she is qualified.

19   THE COURT:  The Court finds with the

20   totality of the understanding and opportunity to listen to

21   the witness, see her response, see her deliberations on this

22   Special Issue No. 2, and her comment that it was very poorly

23   drafted, which is a pretty accurate statement, that she does

24   understand there is a difference.  She does understand it

25   would be a subsequent inspection of the evidence and

1    subsequent finding which she said she could both find yes

2    and no after finding someone guilty of capital murder.  The

3    Court finds Ms. Johnson to be qualified.

4                    MR. SHOOK:  State accepts the juror.

5                    MS. BUSBEE:  May we have a minute?

6                    THE COURT:  Yes.  Yes, ma'am.

7                        (Recess)

8                    THE COURT:  Back on the record.  The

9    Court, after reviewing the entire record and looking at the

10   challenges for cause, have the parties reexamined their

11   position?

12                    MR. SHOOK:  We can agree, Judge.

13                    MS. BUSBEE:  We'll agree.

14                    THE COURT:  This one was close.  The

15   Court will accept the agreement and discharge Ms. Johnson.

16   Ask her to come back in, please.

17                        [Prospective juror in]

18                    THE COURT:  Ms. Johnson, come on up.  We

19   want to thank you for your time and attention today in this

20   case and your thoughtful process of all the information that

21   you have been given.

22                    But there's just too much going on

23   between today and tomorrow and other issues that we cannot

24   seat you on this jury, but thank you.

25                        (Recess)

1      THE COURT:  Next potential juror up will

2  be Gail Edward Duell.  Let the record reflect the Court has

3  been informed that Mr. Duell has some issues concerning his

4  criminal history that he may or may not have made a full

5  disclosure on, on the Court's questionnaire, and in an

6  abundance of caution, I have appointed Melissa Owens,

7  attorney at law, to prepare Mr. Duell so he does not

8  incriminate himself in front of this Court.

9      And I've also been informed that the

10 parties have agreed to excuse him from jury service.  But

11 the Court wanted to satisfy itself on the level of either,

12 A, misrepresentation, or, B, lack of understanding by

13 Mr. Duell when he answered these questionnaires on how

14 extremely important they are to make a disclosure.

15     Ms. Owens, have you had an opportunity to

16 talk with him and are you satisfied that he understands the

17 program?

18     MS. OWENS:  Yes, Your Honor.

19     THE COURT:  And, Mr. Wirskye, she invited

20 you, also the prosecutors, to talk to him; is that correct?

21     MR. WIRSKYE:  That's correct, Your Honor.

22     THE COURT:  And do you have an opinion

23 for the Court?

24     MR. WIRSKYE:  Based on my discussions

25 with Ms. Owens and discussions with the juror, I'm satisfied

1   to the extent there was a mistake, it was an honest mistake.

2   It wasn't anything intentional or willful misrepresentation

3   on the part of Mr. Duell.

4                    THE COURT:  Ms. Busbee?

5                    MS. BUSBEE:  I couldn't have said it

6   better.  I agree with Mr. Wirskye.

7                    THE COURT:  Ask Mr. Duell to come in,

8   please.

9                    [Off the record]

10                   (Recess)

11                   THE COURT:  Timothy Yancey.

12                   [Prospective juror in]

13                   THE COURT:  We have juror No. 1292,

14  Mr. Timothy C. Yancey.  Mr. Yancey, is that pronounced

15  correctly?

16                   PROSPECTIVE JUROR:  Yes.

17                   THE COURT:  Have you had the opportunity

18  to read the orientation guide I have provided for you?

19                   PROSPECTIVE JUROR:  Yes.

20                   THE COURT:  You hear my printer going.

21  I'm printing out a copy of your jury questionnaire.  The

22  attorneys are going to go over the questionnaire with you

23  and expand on some of your answers.  The bottom line to this

24  interview, I will have two questions to ask.  First question

25  is at the end of the process do you understand the law?

1      PROSPECTIVE JUROR:  Yes.

2      THE COURT:  Once you understand the law,

3  can you follow the law?

4      PROSPECTIVE JUROR:  Yes.

5      THE COURT:  That's the picture here.  The

6  only question I have at this point before I let the lawyers

7  begin, will you be able to serve this Court for a period of

8  two weeks beginning on November 10th?

9      PROSPECTIVE JUROR:  Yes.

10      THE COURT:  There was a hesitation.  You

11  had to think about that.  So tell me what your problem is.

12      PROSPECTIVE JUROR:  I have employees that

13  work for me.  If I'm not there, they won't get to work, so

14  they will be out of work for that amount of time.

15      THE COURT:  What business are you in?

16      PROSPECTIVE JUROR:  Utility contractor.

17      THE COURT:  Utility contractor.  Now, I

18  understand how that goes.  Are you saying that you would not

19  be able to line up work for them in advance and be able to

20  check on them?

21      PROSPECTIVE JUROR:  I'm the competent

22  person on the job, so I have to be there or they don't get

23  to work.

24      THE COURT:  You have to have a license,

25  you said?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Everybody has to serve jury

3  duty.

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  What do you do when you go on

6  vacation?

7          PROSPECTIVE JUROR:  They usually take a

8  vacation the same time I do.

9          THE COURT:  We're talking about November

10  10th.  Is it possible for you to be able to schedule

11  vacation for that period of time?

12          PROSPECTIVE JUROR:  I can try.

13          THE COURT:  This is far enough out.

14  That's why I'm doing this so far out, so if you are chosen,

15  you can arrange your work schedules accordingly.  I tell

16  people to schedule two weeks.  I don't anticipate this will

17  be a full two weeks, but I have to be able to schedule it.

18          So it's like paying taxes.  You don't

19  want to do it, but can you do it?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Thank you.

22          MR. WIRSKYE:  May it please the Court.

23          TIMOTHY YANCEY,

24  having been duly sworn, was examined and testified as

25  follows:

<u>DIRECT EXAMINATION</u>

<u>BY MR. WIRSKYE</u>:

Q.    Mr. Yancey, how are you this afternoon?

A.    Great.

Q.    Thanks for bearing with us on a rainy afternoon.  My name is Bill Wirskye and I'm the Assistant DA that will be visiting with you for the next few minutes, go over some of the information on your questionnaire that you were kind enough to give us, talk to you a little bit about what you think about the death penalty, and, finally, talk about maybe some of the laws and rules that apply in a case like this where the State is seeking the death penalty.

Just following up on what the Judge was talking to you about, how many people are in your crew that you have that work for you?

A.    I have fourteen people.

Q.    Fourteen?

A.    Uh-huh.

Q.    And if you weren't there, there would be at least a chance that those 14 people wouldn't be able to work for as long as you were out?

A.    Very likely.

Q.    Do you think with this much advance notice that you can schedule around it?

A.    I can try.  I will have to get somebody else

1    to try to do it, to take my place.  Somebody has to be there

2    that is a competent person.

3         Q.    Again, exactly what line of work -- you know,

4    you said utility.

5         A.    We do utility work.  We do water and sewer

6    lines and we dig ditches and there has to be somebody there

7    for the shore end comprehension safety of it.

8         Q.    What do you do in your free time?

9         A.    Hunt and fish.

10        Q.    Have you done any dove hunting yet this year?

11        A.    Yes, I would like to have went today, if the

12   rain hadn't come in.

13        Q.    I woke up Monday, September 1st, and took a

14   look outside at 5:30 and went back to bed and I haven't been

15   back since.  But I have put up a couple of feeders already

16   this year.

17                  What do you think about maybe being a

18   juror in a death penalty case?  What went through your mind

19   when you found out that you would have to come down for the

20   individual interview?

21        A.    I wasn't pleased.  That's a hard decision to

22   make.

23        Q.    And you told us that, I guess, generally you

24   are in favor of the death penalty?

25        A.    If you know without a doubt that they are

1  guilty, yes.

2        Q.    You know, we kind of ask people in that

3  questionnaire to rank themselves as to how strongly they

4  believe in using the death penalty from 1 to 10, 1 being the

5  least and 10 being the most and you gave yourself a 6.  And

6  that means different things to different people.

7        A.    Right.

8        Q.    But what were you thinking when you gave

9  yourself a 6?

10       A.    Well, I'm for -- I'm not for feeding somebody

11 the rest of their life, if they are a menace to society.  If

12 they are going to be that type of person, then save the

13 taxpayer some money.

14       Q.    Is there a particular type of case that comes

15 to mind when you think about a good or an appropriate case

16 for the death penalty?

17       A.    No.

18       Q.    Okay.  Any case you have heard about, read

19 about, know about, you think about that case?

20       A.    Just when I see it on the news and forget

21 about it the day afterwards, you know.

22       Q.    But no particular case comes to mind?

23       A.    No.

24       Q.    In Texas, as you may know -- I know you have

25 had a lot of time to look at the packet of law that we gave

1   you, but the death penalty is only reserved for murder cases

2   and then at that it's only reserved for a certain subset of

3   murder cases.   It's got to be murder plus something else,

4   murder of a police officer, fireman on duty, a child under

5   six, or an intentional murder in the course of a robbery or

6   burglary and that type of thing.

7            A.       Right.

8            Q.       Is that something that is pretty well in

9   accord with what you believe?

10           A.       Yes.

11           Q.       Okay.  If you were Governor of Texas for a day

12  and got to write the capital murder law we have, would you

13  expand the category of cases where it's available or shrink

14  it or think it's about right?

15           A.       I think it's about right.

16           Q.       Okay.  Let me ask you this.  When we talk

17  about the death penalty, I think most people think of the

18  death penalty, just using like a 7-Eleven robbery, for

19  example.  One guy takes a gun in and goes up and holds up

20  that clerk at the 7-Eleven, maybe shoots him and doesn't

21  want to leave a witness, shoots him, takes the money, and

22  leaves.

23                    Oftentimes crimes are committed by more

24  than one person.  The law in Texas allows us in capital

25  murder all the way down to the smallest of crimes to

1  prosecute accomplices, people that also actively participate

2  in crimes.  Like I said, that's the same way all the way up

3  to capital murder.

4            You may have a capital murder where more

5  than one person is involved.  You may have a triggerman and

6  then you may have the nontriggerman or accomplices.  And

7  depending on the facts and circumstances as to how actively

8  they participate in the crime, the law allows us to convict

9  someone of capital murder and pursue the death penalty

10  whether they were the triggerman or the nontriggerman.

11            And we talked to a lot of people and

12  there are a lot of people that feel very strongly about

13  using the death penalty, but they would draw the line and

14  they would just reserve the death penalty for the person

15  that actually caused the death, the triggerman.  And when it

16  came to an accomplice, somebody that didn't actually pull

17  the trigger, they would say, you know, I may want to lock

18  them up for the rest of their life and punish them that way,

19  but I just don't feel the death penalty is appropriate for

20  those nontriggermen or those accomplices.  What do you think

21  of that issue?

22       A.    That's about the way that I think.

23       Q.    Okay.

24       A.    If you know who done it.

25       Q.    Okay.  If you could -- if you knew for sure

footer283RD JUDICIAL DISTRICT COURT 214/653-5863
NANCY BREWER, OFFICIAL COURT REPORTER

1  that this accomplice didn't pull the trigger, you just take

2  the death penalty off the table?

3           A.     Yes.

4           Q.     Okay.  And we talked to a lot of people that

5  feel that way.  What the law in Texas is, when you are

6  talking about accomplices, and I want to run this past you

7  and see what you think about it, there's two different ways

8  you can find an accomplice guilty.  If the accomplice aids,

9  directs, solicits, or encourages another person like I do to

10  Mr. Shook, encouraged him to commit that capital murder,

11  then I'm just as guilty, even though I didn't pull the

12  trigger.

13           The other way they can be found guilty is

14  under the law of conspiracy.  Let's say Mr. Shook and I

15  enter into an agreement or a conspiracy to commit bank

16  robbery.  During the course of that bank robbery, Mr. Shook

17  is the triggerman, shoots and kills someone, the law says

18  that if I, the nontriggerman, should have anticipated that a

19  life would be taken, even though I didn't have any intent

20  that that person would lose their life, you know, I just

21  signed up for the bank robbery.

22           But if I should have anticipated, then I

23  could be found guilty and possibly receive the death

24  penalty.  And it kind of sounds like it's in that last

25  section that maybe if you were Governor for a day, you would

1    have some disagreement with?

2         A.    Yeah, very likely, yes.

3         Q.    The person that doesn't have any intent, that

4    just signed up for the bank robbery --

5         A.    Yes.

6         Q.    And I'll be up front with you.  The reason

7    we're talking about it right off the bat is this is a case

8    where we're prosecuting Mr. Murphy under that law of

9    accomplices as a nontriggerman.  We're seeking the death

10   penalty.  We think we have the type and quality of evidence

11   that will cause a jury to find him guilty as an accomplice

12   of capital murder and answer these questions in such a way

13   that he would receive the death penalty.

14              But, again, we talked to a lot of people.

15   And some people just couldn't do it as an accomplice.  They

16   just disagree with that law.  They may believe in it very

17   strongly for the triggerman, as you told us you do, but they

18   just couldn't do it for a nontriggerman or the accomplice,

19   that conspirator, that didn't have the intent.

20              And that's kind of what I hear you

21   saying; is that right?

22        A.    Yes.

23        Q.    Okay.  Just couldn't give the death penalty

24   for an accomplice or nonshooter that didn't have the intent;

25   is that right?

1    A.    Probably not.

2    Q.    Okay.  When you say probably not, you know,
3 we're lawyers.  We -- it's easier for us to deal with yes or
4 no's and we know most people don't talk that way in your
5 regular life.  You say probably or maybe or that type of
6 thing.

7              Kind of what I hear you saying is you
8 just couldn't do the death penalty for an accomplice; is
9 that right?

10    A.    Yes.

11    Q.    Okay.  Fair enough.  You told us, like a lot
12 of people we talked to, that you have heard something about
13 this case?

14    A.    Yes.

15    Q.    You know why you are down here.  Everybody we
16 talk to, just about, has heard something about it.  What do
17 you remember hearing about this case?

18    A.    Um, I know it happened at the sporting goods
19 store.  It was a robbery that went bad.  It was seven
20 involved, not one.  And all the rest of them have got the
21 death penalty, if I remember right.

22    Q.    And sounds like you followed it a little bit
23 closer than some of the people.  You have not only followed
24 the crime itself, but some of the court proceedings?

25    A.    Yes.

1    Q.    Some of the people we talked to that have had

2    that much knowledge tell us, very frankly, that that would

3    be hard to put out of their mind, that that may have some

4    effect if they were going to be a juror in this case.  How

5    do you think -- what do you think about that?

6    A.    Before I came here I just about had made my

7    mind up they were all about the same.

8    Q.    Okay.

9    A.    And I'm not hearing anything other than the

10   news.

11   Q.    So you think that may have some effect on your

12   verdict, if you were selected to be a juror in this case?

13   A.    It could, yes.

14   Q.    Okay.  Give me just a second, Mr. Yancey.

15   MR. SHOOK:  Judge, I think the parties

16   have reached an agreement.

17   THE COURT:  Thank you, Mr. Yancey.

18   Obviously, you have a lot of knowledge about this case, so

19   you don't need to worry about the November 10th issue.  They

20   have agreed to let you go.

21   PROSPECTIVE JUROR:  Okay.

22   THE COURT:  Thank you, sir.  Be careful.

23   [Prospective juror out]

24   THE COURT:  Mr. Karwoski.

25   [Prospective juror in]

1    THE COURT:  We have juror No. 1249, David

2    P. Karwoski.  Is that pronounced correctly?

3    PROSPECTIVE JUROR:  Uh-huh.

4    THE COURT:  Mr. Karwoski, have you had

5    time to read the guide I provided for you at this point?

6    PROSPECTIVE JUROR:  Yes.

7    THE COURT:  Did you hear my printer

8    going?  I'm producing a copy of your juror questionnaire and

9    they will refer to that and maybe explore some of your

10   answers in more detail on the issues we're going to be

11   discussing today.

12   The two large questions I need you to

13   answer at the end of the process are as follows, number one,

14   do you understand the law?

15   PROSPECTIVE JUROR:  Uh-huh.

16   THE COURT:  That's the major question

17   and, number two, if you understand the law, can you follow

18   the law?

19   PROSPECTIVE JUROR:  Yes.

20   THE COURT:  That's at the end of the day.

21   Here's a copy of your questionnaire.  And before I begin,

22   the only question I have for you now, sir, is will you be

23   able to serve this Court for two weeks beginning on November

24   10th?

25   PROSPECTIVE JUROR:  Yes.

1                THE COURT:  With that I will turn it over

2    to Mr. Wirskye.

3                MR.  WIRSKYE:  May it please the Court.

4                <u>DAVID KARWOSKI</u>,

5    having been duly sworn, was examined and testified as

6    follows:

7                <u>DIRECT EXAMINATION</u>

8    <u>BY MR. WIRSKYE</u>:

9        Q.     Mr. Karwoski, how are you?

10       A.     Pretty good.  You?

11       Q.     Good.  My name is Bill Wirskye.  I'll be the

12   Assistant DA that will be visiting with you for the next few

13   minutes.  Thank you for hanging in there with us and

14   spending the time going over, you know, the questionnaire

15   and all the law.

16               What I would like to do with you is go

17   over some of the information you were kind enough to give us

18   in your questionnaire, talk to you a little bit about your

19   thoughts and feelings about the death penalty, and then

20   maybe talk about some of the law that applies in a death

21   penalty case such as this.

22       A.     Okay.

23       Q.     Have you ever been on a jury before?

24       A.     Yes.

25       Q.     What type of jury was that?

1    A.    It was a civil case, I believe.

2    Q.    Okay.  Was it here in Dallas County?

3    A.    Yes.

4    Q.    How was that experience for you?

5    A.    It was good.

6    Q.    Okay.  What type of case was it, do you

7  remember?

8    A.    It was a theft.

9    Q.    Was it pretty clear-cut?  The facts?

10   A.    To some extent.  It was a little questionable

11 until the very end.

12   Q.    Okay.  Did the jury have a difficult time

13 reaching a decision?

14   A.    Yeah, pretty much.

15   Q.    How long did y'all spend deliberating?

16   A.    It was a couple of days' deliberation.  It

17 just boiled down to one fact.

18   Q.    Okay.  And that was recently here in Dallas

19 County, right?

20   A.    Yeah.

21   Q.    How long did that case last?

22   A.    I think it was two or three days, I think.

23   Q.    So it wasn't that long a case?

24   A.    No.

25   Q.    Not as long as a two-week case --

1    A.    No.

2    Q.    -- that you may be down here on.  Tell us what

3 you do for a living.

4    A.    Um, I was an engineer at one point, then I

5 recently changed over to actually hold two positions.  I'm a

6 web master and I support cadcam drafting and engineering

7 services.

8    Q.    And looks like you moved to Texas here in '95?

9    A.    Uh-huh.

10   Q.    Did you move here job related?

11   A.    Job and health related.

12   Q.    Okay.  Do you have health problems or --

13   A.    Not currently.

14   Q.    Okay.  I notice on the last page you said that

15 you took an anti-rejection medicine?

16   A.    Yeah.

17   Q.    I hate to pry, but you understand we have to

18 ask these things.

19   A.    No, that's okay.  The main reason we moved

20 here was I have a blood disorder.  And it's the cold

21 weather.  Living in Illinois was really unbearable.  So --

22   Q.    How do you like Texas?

23   A.    Much better.

24   Q.    The particular disorder you have, do you think

25 it would cause you any problems at all sitting and serving

1    --

2         A.    Oh, no.

3         Q.    -- the two weeks?

4         A.    No.

5         Q.    Fair enough.  You have told us, I guess in

6    theory, that you are generally in favor of the death

7    penalty; is that right?

8         A.    Uh-huh.

9         Q.    Could you tell us kind of why that is and what

10   purpose you think it serves in society?

11        A.    Um, well, I believe, basically, that, you

12   know, if somebody takes a life, um, and it's a horrible

13   death, it's just, you know, I feel, yeah, that it is, you

14   know, permissible for that person, you know, to die for

15   that.

16        Q.    Okay.  I think you also told us in your

17   questionnaire on the first page that you believe that

18   although religiously it's a struggle for you --

19        A.    It is, uh-huh.

20        Q.    Can you expand on that just a little bit?

21        A.    Um, I mean, basically, I mean, it's, um, you

22   know, you are not supposed to -- a life isn't supposed to be

23   taken.  Um, but, you know, like I say, there again, it is a

24   struggle.  I mean, you know -- you know, it's an eye for an

25   eye.  So, you know, where do you draw the line?  I mean, you

1  know, our church doesn't make -- give any grounds for making

2  that type of decision.

3      Q.    The reason we ask, obviously we know that this

4  particular type of case, the death penalty involved, and

5  this type process isn't for everyone.  And we certainly, I

6  think neither side wants to put somebody over in the jury

7  box that's -- comfortable is a bad word, but --

8      A.    It isn't going to make a fair decision.

9      Q.    Yeah.  That we don't want to jam you up and

10  put you in a hard spot with your religious beliefs and your

11  conscience, that type of thing and that's why we ask the

12  questions.

13          But do you think at least at this point

14  this is something that you would be able to participate in?

15      A.    Yeah.

16      Q.    Okay.  Let me follow up a little bit more on

17  that.  Is there a particular type of case that comes to mind

18  when you think about an appropriate case for the death

19  penalty?

20      A.    No, not offhand.  I mean, to me every case,

21  you know, needs to be weighed fairly.

22      Q      Okay.  Any case you may have heard about in

23  the media that comes to mind, what you know about it, you

24  think, you know, that's a good example of maybe where they

25  need the death penalty, that type of thing?

1    A.    Not right offhand.  I don't think of one right

2 offhand.

3    Q.    Okay.  You probably had a chance to read that

4 packet of law?

5    A.    Uh-huh.

6    Q.    In Texas the death penalty is only available

7 for murder and then at that only a small subset, a

8 particular type of murder.  It has to be murder plus some

9 other aggravating factor, murder of a police officer,

10 fireman on duty, child under six, murder in the course of

11 one of those other felonies, robberies, burglary, that type

12 of thing.

13         Is that something that you are generally

14 comfortable with, the scheme that we have in Texas?

15    A.    Yes.

16    Q.    Okay.  Let me kind of take you to the next

17 level with you.  We talk to a lot of people, such as

18 yourself I guess, who philosophically are in favor of the

19 death penalty that maybe struggle with it a little on

20 religious grounds.

21         And when we visited earlier just a few

22 minutes ago, you said it would be justified when a person

23 took a life.

24    A.    Uh-huh.

25    Q.    I want to follow up on that point with you

1   just a bit.  You know, oftentimes crimes are not committed

2   by just one person.  You could have groups and gangs of

3   people that commit crime.  The law allows us to prosecute

4   everyone that was an active participant in a crime, anywhere

5   down from the lowest misdemeanor all the way up to capital

6   murder and the death penalty case.  And, obviously, when

7   we're talking about something like a capital murder, you may

8   have one person that's actually the triggerman that pulled

9   the trigger and actually took the life and, of course, they

10   could be convicted of capital murder and potentially

11   sentenced to death.

12             But a lot of people, even people who are

13   very strongly in favor of the death penalty, kind of draw a

14   line at that point and treat them differently or see them

15   differently than they do the accomplices.  It's a word you

16   commonly hear, the nontriggerman, the people that were

17   actively involved in the case but didn't take the life.

18             And when it comes to those people quite a

19   few people tell us, very frankly, I may want to punish them,

20   I may want to lock them up for the rest of their life and

21   get them off the street, but they didn't actually take a

22   life and I just -- I don't think the death penalty is

23   appropriate for those accomplices.  They didn't actually

24   pull the trigger.  They didn't actually cause the death.

25   What do you think about that?

97

1    A.    To me it depends on the law.

2    Q.    Okay.

3    A.    Um, obviously, we're here to make a decision

4    based on the law.  If I feel that that accomplice, you know,

5    if he broke the law and the death penalty applies, then, you

6    know, then he needs to be -- to get his, you know, his

7    sentence.

8    Q.    Okay.  If we made you Governor of Texas for a

9    day and you could --

10   A.    Those are big shoes.

11   Q.    I don't think you are eligible.  You have to

12   be a native Texan, I think.  But if we made you Governor of

13   Texas for a day and you could write the capital murder

14   statute, would you have the option of the death penalty

15   available for those accomplices?

16   A.    I think so.

17   Q.    Okay.  What the law is, very frankly, is, you

18   know, if I say Mr. Shook and I commit a crime and he commits

19   capital murder and I encouraged, directed, solicited, or

20   aided him to commit that capital murder, I'm just as guilty.

21   I could be convicted of capital murder and I could

22   ultimately face the death penalty.  And that makes sense, I

23   think, to a lot of people and I think that's what a lot of

24   people think of when they think of the accomplice-type

25   scenario.

1    There's also a different way for a

2  nontriggerman to be found guilty of capital murder and face

3  the death penalty and it's under the law of conspiracy.  And

4  let me explain that to you.

5    Mr. Shook and I decide to commit a bank

6  robbery.  We agree or we conspire to commit that bank

7  robbery.  And Mr. Shook is the person that actually takes

8  the gun and causes the death.  I don't cause the death.

9  Maybe I just collect the money, that type of thing.  We're

10  caught and charged with capital murder, and if -- and the

11  law is if I should have -- if the accomplice should have

12  anticipated that a life could be taken during that robbery,

13  then I could be found guilty, even though I didn't have any

14  intent that anyone would get hurt, even though I just kind

15  of signed up for a bank robbery.

16    If the jury finds that I should have

17  anticipated that a life would be taken, then I could be

18  found guilty of capital murder and potentially face the

19  death penalty.  What do you think about a scenario like

20  that, the law of conspiracy, that second way for an

21  accomplice?

22    A.    Again, I kind of struggle with that, too.  But

23  to me if you're going into something where you know that the

24  possibility, you know, of death is there, to me you are

25  going in with that mindset and you should be able to be

1  sentenced accordingly.

2       Q.    Okay.  You think if you were selected to serve

3  as a juror that you could follow that law?

4       A.    Yes.

5       Q.    And I'll be very frank with you and lay our

6  cards on the table.  We're prosecuting Mr. Murphy under that

7  theory, that theory of an accomplice or nonshooter.  That's

8  why we spend so much time talking with jurors to make sure,

9  number one, that you understand the law, and, number two,

10 you can follow it.

11            Very frankly, it wouldn't be fair to

12 either side if we put someone on the jury that didn't

13 believe in the law and couldn't follow it, because they

14 didn't believe it.

15      A.    Sure.

16      Q.    And it sounds like you wouldn't have any

17 issues or qualms about that part of the law?

18      A.    No.

19      Q.    Okay.  Like almost everybody we talk to in

20 these cases, you have indicated that you knew something

21 about the case; is that right?

22      A.    (Prospective juror nods head.)

23      Q.    What do you remember hearing about these

24 cases?

25      A.    Just the little bit that I heard on the TV,

1   just the fact that the seven came in and had escaped from

2   prison and that Officer Hawkins was at the scene and was

3   killed.  That is about as much as I know.

4        Q.     Did you follow the other proceedings after

5   that, the capture, arrest, or anything like that?

6        A.     No.

7        Q.     Have you followed any of the court proceedings

8   --

9        A.     No.

10       Q.     -- that have gone on?  Okay.  Based on what

11  you know about the case already, how do you think that might

12  affect you, if you were picked to be a juror in this case?

13       A.     Um, it shouldn't affect me at all.

14       Q.     Okay.  And I think that's what the law

15  contemplates.  We obviously don't need to find twelve people

16  that haven't heard a thing about the case.  We need to find

17  twelve people that can base their verdict just based on what

18  they hear in the courtroom, that type thing.

19       A.     Okay.

20       Q.     We also ask you before I move on, a couple of

21  other questions on your questionnaire.  You have it in front

22  of you; is that right?

23       A.     Uh-huh, yes.

24       Q.     Let me ask you to turn maybe to page 5.  See

25  about halfway down the page we ask all these -- we give you

1   all these statements and ask if you agree, disagree.

2   Sometimes I question how helpful they are because these

3   things mean different things to different people, but

4   sometimes they serve as a basis for us to talk about

5   something.

6          But that very first one says most

7   criminals are actually victims of society's problems.  And

8   you marked that you would agree with that statement.  I'm

9   just kind of curious what you were thinking when you marked

10  that?

11       A.     I believe was that -- my thinking was that,

12  you know, as you grow up, you know, what you learn, what you

13  see around you, is kind of, you know, what you form your

14  decisions and your thoughts on.

15       Q.     Okay.  And also the very last one, it says

16  criminal laws treat criminal defendants too harshly and you

17  put you disagreed.  And I just kind of wanted to follow up

18  and see where you come down on that, I guess just generally

19  what you think about our system and how we punish people.

20  What are your thoughts on that?

21       A.     I think oftentimes it's -- it's fair, but I

22  think there are a lot of times, too, where people get away

23  with not enough.

24       Q.     Okay.  You also mention, I think, on the next

25  page that you have a good friend, I guess at church, who is

1    an attorney?

2         A.     Uh-huh.

3         Q.     We're always curious to know if anybody knows

4    any attorneys in the criminal system or anybody we know or

5    anything like that.

6         A.     No, I think he's a title attorney and that

7    type of an attorney, yeah.

8         Q.     Let me ask you.  I know you got a chance to

9    read the law, these three Special Issues that we ask jurors

10   in a case like this, I think they are phrased a little

11   differently up on the wall.  If you could take a minute or

12   two and just read those to yourself and we'll talk about

13   them in just a minute.

14        A.     (Prospective juror complies.)

15             MR. WIRSKYE:  Your Honor, could we

16   approach while the juror is reading that?

17             THE COURT:  You may.

18                  (Bench conference)

19        Q.     (By Mr. Wirskye)  You may have lucked out.

20             MR. WIRSKYE:  That's all the questions I

21   have.

22             THE COURT:  Any questions, Ms. Busbee?

23             MS. BUSBEE:  No, we have reached an

24   agreement.

25             THE COURT:  Mr. Karwoski, I thank you for

1    your time and attention today, but the parties have agreed

2    you are not going to sit on this jury.  Thank you, sir.

3                    [Prospective juror out]

4                    THE COURT:  We have juror No. 1315,

5    Victoria Thompson; is that correct, ma'am?

6                    PROSPECTIVE JUROR:  That's correct.

7                    THE COURT:  Ms. Thompson, have you had an

8    opportunity to read the guide that I provided for you?

9                    PROSPECTIVE JUROR:  Yes.

10                    THE COURT:  That's a lot of law to lay on

11   someone and the attorneys will go over it in more detail, so

12   you can understand how it all relates.  And you hear my

13   printer going.  I'm providing a copy of your questionnaire,

14   so if they want to have you expound on a question, you will

15   be able to look at your answer that you gave us in May and

16   refer to that.

17                    Then at the end of the process I have two

18   questions that I must answer.  Number one is, do you

19   understand the law?

20                    PROSPECTIVE JUROR:  Yes.

21                    THE COURT:  We'll find out in a few

22   minutes, if that's true.  And, number two, once you

23   understand the law, can you follow the law?  That's the big

24   picture for me.  Only question I have for you at this time

25   is will you be able to serve this Court for a period of two

1    weeks beginning on November 10th?

2                    PROSPECTIVE JUROR:  It would be a little

3    difficult in the job situation that I have.

4                    THE COURT:  And what is your job

5    situation?

6                    PROSPECTIVE JUROR:  I'm the manager of

7    the clinics at Baylor College of Dentistry.

8                    THE COURT:  And when you say manager of

9    the clinics, I know they have more than one person over

10   there that works at Baylor College, so if you had to -- if

11   you go on vacation somebody covers for you, correct?

12                   PROSPECTIVE JUROR:  I haven't had a

13   vacation in ten years, so -- because I don't have anyone to

14   really cover for me for more than a day or two at a time.

15                   THE COURT:  You would be able -- we work

16   very normal hours -- just, you know, despite a long lunch,

17   you would have opportunity to use the phone during the day.

18   We work -- you can go to the office in the evening.  You

19   wouldn't be sequestered.

20                   So, you know, it would be an imposition

21   on you, but it sounds like you would be able to work around

22   it.

23                   PROSPECTIVE JUROR:  If I had to.  I

24   wouldn't really want to, but if I had to.

25                   THE COURT:  I know you don't want to.

1   Nobody likes being on jury duty or paying taxes or anything

2   like that.

3                    MS. BUSBEE:  Your Honor, could we

4   approach for a minute?

5                    THE COURT:  You may.

6                    (Bench conference)

7                    THE COURT:  Taxes, and nobody likes

8   dealing with that or jury duty.  It's just one of those

9   things that as a citizen of a free country, it's -- you are

10  called upon and unless you are going to go fight for us in

11  Iraq, this is about the next best thing that you can do for

12  your country.

13                   Along those lines, do you have any

14  medical reason why you would not be -- we usually work about

15  an hour and a half in a block.  I drink a lot of water and

16  in about an hour and a half I take a break.  Would that be a

17  problem?

18                   PROSPECTIVE JUROR:  Um, sometimes in the

19  mornings I have to take diuretics, so I have to go

20  frequently.  Usually by lunchtime I'm okay.  But sometimes

21  in the morning I have to go about every hour, so --

22                   THE COURT:  If it -- obviously, if we're

23  in trial and you have a problem, raise your hand and we'll

24  take a break.  If it's not like every ten minutes, then it's

25  not a problem.  Mr. Shook, would you like to inquire?

MR. SHOOK:   May it please the Court.

**VICTORIA THOMPSON,**

having been duly sworn, was examined and testified as

follows:

**DIRECT EXAMINATION**

**BY MR. SHOOK:**

Q.     Ms. Thompson, my name is Toby Shook.  I will

speak to you on behalf of the State.  And as the Judge said,

we just want your honest opinions.  There aren't any right

or wrong answers.  You have been very honest on your

questionnaire, so I don't think that we have a problem with

you along those lines.

You seem like a person that tells us what

is on your mind and will give us your honest opinions.  I

want to follow up on your work issues.  I was just looking

over again on your questionnaire and it looks like you do a

lot of different things at the clinic.

A.     Yes, I do.

Q.     And you have really not had an extended

vacation for the past ten years?

A.     No, I have not.

Q.     So the most you have taken off is maybe a day

here, a couple of days there?

A.     Yes, sir.

Q.     All right.  The bottom line on the law is

this.  Obviously, we don't have business excuses or we wouldn't get anyone.  But the test is basically this, and only you will be able to tell us this.  In November, as far as you know what's going on then with your work, if you were placed on the jury for a two-week period -- as the Judge said, he's very good on his hours.  It will be business hours, but you will have to be here during the day.  If you missed that two-week period, would that -- would you be able to concentrate on the evidence and the witnesses, give the case your full attention?

The reason I ask you that is when people are in your situation, some people can tell us, I can, I just have to work later hours at night, but I think that I can do it.  Other jurors have told us, no, I would be thinking about what is going on at work because of that particular time or what's going on and I couldn't give the case my full attention.

But the bottom line is that.  Of course, the only person that can really tell us that is yourself.  And we just depend on your answers on that.  Would it be a situation if you were placed on the jury, that your concentration might wane or would you be able to give the case your full attention?

A.     Well, I would like -- I would like to say that my concentration would wane, but I have to be honest with

1   you and say that I would give my full attention to

2   everything that I do.

3          Q.      Okay.  Now, let me talk to you about a couple

4   of other areas.  One is we asked if anyone has ever been a

5   victim of a crime and you had said on your questionnaire

6   that you, yourself, actually had been in the past?

7          A.      Yes.  My home was burglarized.

8          Q.      Okay.  When did that happen?

9          A.      That happened in -- I'm trying to think.  The

10  mid to late '80s.  I can't give you a definite date, it's

11  been so long.

12         Q.      Anyone ever caught on that?

13         A.      No.

14         Q.      Okay.  Another area you talked about was that

15  at some point in time you were a battered spouse?

16         A.      Correct.

17         Q.      Was that case -- how long ago was that?

18         A.      It never went to trial.  It was never

19  reported.

20         Q.      Okay.  I know that they're reported more often

21  now, but there was a time when the police were hardly ever

22  called to those situations.

23         A.      I left in 1980.

24         Q.      Okay.  So we're talking 20 years ago or over

25  20 years?

1   A.  Correct.

2   Q.  Is that an occurrence that happened on more

3 than one occasion?

4   A.  The battering?

5   Q.  Yes.

6   A.  It was constant.

7   Q.  Okay.

8   A.  Yes.

9   Q.  Going through that as a victim, do you think

10 that might affect you as a juror in a case involving a

11 violent crime?

12   A.  No.

13   Q.  And why is that?

14   A.  Because I try to be an honest and fair person

15 in every judgment that I make and in every way that I

16 perceive a person.  I realize that all men don't batter

17 their wives.  And, you know, it's an individual thing.

18   Q.  Okay.  Let me ask you how you feel about the

19 -- there was one other, before I get into the -- you had a

20 name down here about a Michael Sanchez who was serving a

21 murder case, I believe, 15 years in prison?

22   A.  Correct.

23   Q.  What is your relationship to that person?

24   A.  Michael Sanchez is the brother of my

25 daughter-in-law.

1    Q.    Okay.  And did you know him very well?

2    A.    I did not know him real well.  I will tell you

3  that I have sent him a Christmas card because I feel sorry

4  for him because he's in prison, so I send him a Christmas

5  card every year.  It was a crime of passion and, you know,

6  the whole family suffered because of it.

7    Q.    Who was the victim in that case?

8    A.    I believe it was his girlfriend.  I didn't

9  know her at all.

10    Q.    Do you know what the facts were or why the

11  crime occurred?

12    A.    Yes.

13    Q.    What was that?

14    A.    Um, supposedly she had taken all of his items,

15  his furniture, everything, moved in with another man.  And

16  when he went to get it, the two men got into a

17  confrontation.  Apparently he pulled a gun.  I wasn't at the

18  trial.  I'm just telling you.

19    Q.    What you heard?

20    A.    He pulled a gun, fired at the man, and the

21  bullet ricocheted and killed his girlfriend.  I believe the

22  man is also crippled because of it today.

23    Q.    Okay.  Do you think he was treated fairly by

24  the judicial system --

25    A.    I would assume so, I mean.

1     Q.      -- from what you know about him?

2     A.      He went in with a gun.

3     Q.      Okay.  Now, you know that this is a death

4  penalty case, one in which the State is seeking the death

5  penalty.  So we want to ask every juror how they feel about

6  the death penalty.  Are you in favor of it as a law?

7     A.      Yes, I am.

8     Q.      Why do you favor it as a law?

9     A.      Um, it's difficult to answer that as a yes or

10  a no for me because I believe that there are circumstances

11  where I do favor it and circumstances where I don't.

12     Q.      What circumstances do you favor it in?

13     A.      You know, if it's a murder of a child, you

14  know, I am very much in favor of the death penalty on a

15  murder of a child.  If it's a murder involving someone who's

16  defenseless, no matter what their age, I believe there

17  should be a death penalty.  But, then again, you know, I'm

18  faced with my daughter-in-law's brother and we would hate

19  for him to go to the chair, but that's not my decision.

20     Q.      Okay.  What cases are you not in favor of the

21  death penalty or can you give us examples of that?

22     A.      Um, I would say, for instance, if two people

23  were in a fight and one of them killed another one, maybe

24  under some circumstances maybe that wouldn't be a death

25  penalty, perhaps just a life sentence or something.

1    Q.    Okay.  Now, you have reviewed that packet and

2    you have seen the indictment, no doubt, which alleges a

3    murder, capital murder, two ways.  One is the murder of a

4    police officer on duty and the other is a murder during the

5    course of a robbery.

6    A.    Correct.

7    Q.    From your personal point of view, do you feel

8    those types of cases could be death penalty cases?

9    A.    Yes.

10    Q.    Okay.  Why is that?

11    A.    I truly believe that if you enter a place to

12    burglarize it and you have a weapon, I feel like, you know

13    going in there that something may happen that you may have

14    to use that weapon.

15    Q.    Okay.  And in Texas there's only certain

16    crimes that are reserved for the death penalty.  Those are

17    covered in the packet and some are ones that you brought up,

18    at least the murder of a child-type situation.

19          The next area I want to get into has to

20    do with what we call the law of parties.  You know, when we

21    talk about the death penalty, generally we think of the

22    person that actually caused the death.  The law says that if

23    you help commit any crime, including capital murder, you can

24    be held accountable for those crimes, also.

25          If I assist Mr. Wirskye or he assists me

1   in a capital murder, if he's actively involved in the crime,

2   then we can both be prosecuted for the crime.  An example we

3   use is if more than one person commits a bank robbery.  We

4   agree to go in there, but I'm going to be the gunman.  He's

5   going to be the guy that gathers up the money.  We carry out

6   that plan.  And during the middle of the robbery, I start

7   shooting people.  We leave.  We're arrested and caught.

8                    I can obviously be prosecuted because I'm

9   the triggerman in the situation.  But under the law if he's

10  actively involved in the case, he, too, can be arrested and

11  prosecuted and could ultimately receive the death penalty.

12  Some people -- what we like to do is ask you, get your gut

13  reaction to that, because we have some folks who tell us

14  they are in favor of the death penalty, but they are only in

15  favor of the death penalty for the actual triggerman.  And

16  if it comes down to an accomplice or nontriggerman party

17  helping, they reserve some other punishment for him.  They

18  don't think that's fair, maybe a life term in prison or

19  less, but not a death penalty situation.  Other jurors tell

20  us they agree with that law and do think these accomplices

21  should be prosecuted for the death penalty.

22                    How does that strike you as far as the

23  situation of an accomplice or nontriggerman?

24       A.    If the accomplice knows that you are both

25  going in there, that there's a weapon involved, then I think

1   they are both guilty.

2          Q.      Okay.  Do you agree, then, that the accomplice

3   should be prosecuted for the death penalty and could

4   ultimately receive the death penalty, depending on the

5   facts?

6          A.      Yes.

7          Q.      All right.  Let me get into the kind of scheme

8   of how the trial works.  It's divided into -- have you been

9   down on a jury trial before and --

10         A.      Just civil.

11         Q.      Okay.  And in a criminal trial the trial is

12  divided into two parts.  The first part is the

13  guilt/innocence stage where we have to prove that

14  indictment.  If we don't do that, obviously, it would be a

15  not guilty and we would go home.

16              And then if you found him guilty, we go

17  to the second phase, which is the punishment phase.  In that

18  phase of the trial you may hear additional evidence and then

19  you get these questions, which we'll go over in more detail.

20              Basically, the questions ask this, did

21  the State prove that he's a continuing danger to society?

22  Did they prove that he intended or anticipated that a death

23  would occur?  And is there sufficient mitigating evidence

24  that you think a life sentence should be imposed rather than

25  a death sentence?

1           If you answer the questions yes, yes, and

2    no, the Judge has no choice.  He has no discretion.  He

3    would sentence the defendant to death.  If you answer them

4    any other way, it would be a life sentence.  But those are

5    the only two choices once the defendant has been found

6    guilty of capital murder.  Is that clear to you?

7           A.    Yes.

8           Q.    There is one area on your questionnaire I

9    forgot to go over.

10          A.    Okay.

11          Q.    That is the fact that -- and I don't know what

12   the situation is now, but your mother had a stroke recently

13   when you filled this out and you at that time were having to

14   check on her pretty frequently?

15          A.    Uh-huh.

16          Q.    Is that still the same situation?

17          A.    I still check on her daily, usually in the

18   evenings after I go home from work.

19          Q.    Okay.  Do you think that situation may cause

20   you distraction on the jury if something, well -- is her

21   condition stable right now?

22          A.    Right now it is, yes.

23          Q.    Our concern, obviously, is if you want to,

24   obviously, going to attend to your mother --

25          A.    Uh-huh.

1    Q.    -- and you might be thinking about her at this

2   point in time in your life.  Is that going to be a bit of a

3   distraction to you, do you think, if you were placed on the

4   jury?

5    A.    As the situation is right at this moment, no.

6   But with a stroke, you never know.  If something happened

7   tomorrow, I'm not going to sit here and tell you that I

8   wouldn't be distracted.  But at this point she's stable and

9   it's not distracting me.

10    Q.    Okay.

11         MR. SHOOK:  Could we approach the bench,

12   Judge?

13         THE COURT:  You may.

14              (Bench conference)

15         MR. SHOOK:  That's all the questions we

16   have.

17         THE COURT:  Ms. Busbee?

18         MS. BUSBEE:  I believe the parties have

19   reached an agreement on juror No. 1315.

20         THE COURT:  Ms. Thompson, as you just

21   heard Ms. Busbee, you know, maybe one thing doesn't push

22   somebody this way or -- but you have a lot of things and

23   with your job and your mother and health and so forth,

24   there's just so many things going on, this is probably not

25   the right case for you, so they have agreed to excuse you

1   from jury service.

2                                    [End of Volume]

1   STATE OF TEXAS              *

2   COUNTY OF DALLAS            *

3       I, NANCY BREWER, Official Court Reporter for the 283rd

4   Judicial District Court, do hereby certify that the above

5   and foregoing constitutes a true and correct transcription

6   of all portions of evidence and other proceedings requested

7   in writing by counsel for the parties to be included in this

8   volume of the Reporter's Record, in the above-styled and

9   numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11      WITNESS MY OFFICIAL HAND on this the 4 day of

12  _____March_____, 2004.

13

14

15  _____Nancy Brewer_____
    NANCY BREWER, CSR, NO. 5759
16  Expiration Date:  12-31-04
    Official Reporter, 283rd JDC
17  Frank Crowley Crts. Bldg. LB33
    133 No. Industrial Blvd.
18  Dallas, TX 75207
    (214)653-5863
19

20

21

22

23

24

25