No. <u>74851</u>

# PATRICK HENRY MURPHY, JR.

APPELLANT

## CAPITAL MURDER

OFFENSE

## DEATH

PUNISHMENT

## DALLAS

COUNTY

CONTENTS: RR VOLS. 16 - 20

*74851*

REPORTER'S RECORD

VOLUME 16 OF _61_ VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

**FILED IN**
**COURT OF CRIMINAL APPEALS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MAR   9 2004

INDIVIDUAL VOIR DIRE

Troy C. Bennett, Jr.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 12th day of September, 2003, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Vickers L. Cunningham, Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

1                    A P P E A R A N C E S

2       APPEARING FOR THE STATE

3       Mr. Toby Shook
        SBOT NO. 18293250
4       And
        Mr. Bill Wirskye
5       SBOT NO. 00788696
        Assistant District Attorneys
6       133 No. Industrial Blvd.
        Dallas, Texas 75207
7       Phone:  214/653-3600

8

9       APPEARING FOR THE DEFENDANT

10      Ms. Brook Busbee
        Attorney at Law
        SBOT: 03488000
11      703 McKinney Ave. Ste. 312
        Dallas, TX 75202
12      214/754-9090

13      Mr. Juan Sanchez
        Attorney at Law
14      SBOT: 00791599
        5630 Yale Blvd.
15      Dallas, TX 75206
        214/365-0700

16

17

18

19

20
21

22

23

24

25

## PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| J. Robert DeRossett | 6 | 8 | 47 | 16 |
| Shirley Miller | 61 | 63 | 96 | 16 |
| Kathie Burkhalter | 98 | 102 | | 16 |
| Sylvia Weaver | 103 | 105 | | 16 |
| Julie Danka | 126 | 128 | | 16 |

P R O C E E D I N G S

1 THE COURT:  Yes, ma'am.

2 MS. BUSBEE:  Your Honor, for the record I
3 would like to object again to the State using hypotheticals
4 in discussing the law of parties.  You know, we talked about
5 making a ruling on that.  I wonder if we could clarify that
6 today.  On one juror yesterday, of course, none of these
7 people counted because we all agreed on them, ultimately,
8 but it gave me some insight as to how it's no hardship to
9 follow the law for the State because they explained the law
10 to the juror and the juror said they could follow it.

11 There is no need to give an example that
12 gives facts at all.  And if at such time the State feels
13 they need to give a hypothetical, I ask the Court to order
14 them to approach the bench so we can talk about that out of
15 the presence of the juror.

16 THE COURT:  I know that you would like to
17 have a running objection.  And, as previously discussed on
18 the record, some people simply need a fact pattern in their
19 mind to understand how the law applies, especially with the
20 nuances in this issue on 2.  Between should have anticipated
21 and did anticipate, many people need an example.  The law
22 allows an example to be used or a fact pattern to be used,
23 if it would lead to a person being challenged for cause.

24 If the State is using a hypothetical that

1  is too fact oriented to this particular case, your objection

2  will be sustained.

3              MS. BUSBEE:  Well, which previously you

4  granted that motion, granted my objection.

5              THE COURT:  I have when it was too fact

6  specific.

7              MS. BUSBEE:  As I understand the state of

8  the law, the State is allowed to inquire of the juror

9  whether or not they can follow the law, giving such facts

10  that would elicit an answer as to yes or no, but not giving

11  any specific fact situation, and only so much as they need

12  to discover whether or not the juror can follow the law.

13              The State is exceeding that by giving an

14  example of a robbery and who shot who and I think it

15  violates the law and it's an improper question asking for a

16  commitment on the part of the juror.

17              And I would ask the Court to order the

18  State not to give a hypothetical or tell a specific fact

19  situation or a story to the juror and ask if -- in

20  explaining the law, they don't explain the law.  They tell

21  the story and then ask them if they understand it.

22              I'm asking the Court to instruct the

23  State to inquire of the juror whether or not they can follow

24  the law.  And if the juror expresses confusion, then perhaps

25  we could have a discussion out of the presence of the juror

1    as to what would be a proper hypothetical to use to explain

2    the law to a juror which didn't give facts and didn't

3    require a commitment.

4                    THE COURT:  I understand about

5    commitment.  I have encouraged the parties to agree on a

6    fact pattern that we could use.  So far the parties have not

7    agreed on a fact pattern.  So I would have to rule on each

8    situation individually on your objection.

9                    MS. BUSBEE:  Just for the record, can we

10   clarify what your ruling is?  You are going to allow the

11   State to give a hypothetical to the juror and I will have to

12   object to it?

13                   THE COURT:  Yes, ma'am.

14                   MS. BUSBEE:  May we establish this, that

15   at such time as I object, the juror to retire.  So we can

16   have a full discussion on the record?

17                   THE COURT:  Yes, ma'am.  DeRossett.

18                   [Prospective juror in]

19                   THE COURT:  Good morning, sir.  How are

20   you?

21                   PROSPECTIVE JUROR:  Good morning.

22                   THE COURT:  We're taking a poll, DeRossa

23   (phonetic) or DeRossett (phonetic)?

24                   PROSPECTIVE JUROR:  DeRossett.

25                   THE COURT:  How are you?

1    PROSPECTIVE JUROR:  Good, thanks.

2    THE COURT:  So you waded through the high

3  water and rain and traffic and we appreciate you being here

4  and on time.  Have you had enough time to review the

5  orientation guide I provided for you?

6    PROSPECTIVE JUROR:  Yes, sir, yeah.

7    THE COURT:  And look over a copy of your

8  questionnaire that you completed for us back in May?

9    PROSPECTIVE JUROR:  Yes.

10    THE COURT:  I know it's a lot of law to

11  give someone first thing in the morning, certainly don't

12  have to understand it all right now.  The attorneys will go

13  over the issues with you in detail.  Hopefully, you will see

14  how they relate and at the end of the process I have two

15  questions I must answer.

16    PROSPECTIVE JUROR:  Okay.

17    THE COURT:  The first question is do you

18  understand the law we're talking about?  Secondly, if you

19  understand it, can you follow the law?  That's the -- my

20  position here in this interview.

21    Before we begin, do you have any

22  questions that have popped up in your mind with what you

23  have read so far?

24    PROSPECTIVE JUROR:  No.

25    THE COURT:  Will you be able to serve

1    this Court for two weeks beginning November 10th?

2                          PROSPECTIVE JUROR:  Yes.

3                          THE COURT:  Mr. Wirskye?

4                          MR. WIRSKYE:  May it please the Court.

5                          J. ROBERT DEROSSETT,

6    having been duly sworn, was examined and testified as

7    follows:

8                          DIRECT EXAMINATION

9    BY MR. WIRSKYE:

10           Q.    Mr. DeRossett, how are you this morning?

11           A.    Good, thanks.

12           Q.    My name is Bill Wirskye and I'm the Assistant

13   DA that will be visiting with you for the next few minutes.

14   What I would like to do is maybe follow up on some of the

15   information that you were kind enough to provide for us in

16   that lengthy questionnaire.

17           A.    Okay.

18           Q.    Talk to you a little bit about your thoughts

19   and feelings on the death penalty, and, finally, talk about

20   the laws and the procedures that apply in a death penalty

21   case or any criminal case, for that matter.  What line of

22   work are you in?

23           A.    Electrical contracting.

24           Q.    You have been doing that for a while looks

25   like?

1          A.       Twenty something years.

2          Q.       What do you do?  What is a normal day like?

3          A.       I'm a service department manager at a local

4    firm and the day is pretty much everything.

5                   THE COURT:  This is not Wheel of Fortune.

6    You can tell us which firm you work for.

7                   PROSPECTIVE JUROR:  I work for Mill's

8    Electrical Contractors.  I work at the Ft. Worth office and

9    drive across town every day to get to it.  It's pretty much

10   a babysitting job, a lot of days.  But, you know, it's just

11   managing the whole group, a lot of different things going

12   on, from sales, to collecting on people's past due accounts,

13   to solving problems in the group.

14         Q.       (By Mr. Wirskye)  So kind of a problem solver,

15   people person?

16         A.       Yeah, I have to be.

17         Q.       Angry phone calls?

18         A.       Not too much, hopefully.

19         Q.       What do you do in your free time?

20         A.       Play a little golf, fish a little bit, and go

21   to church.  We're involved in our church quite a bit, and

22   just run around with my kid and wife.

23         Q.       Did you have any particular thought come to

24   mind when you found out you had to come back down here on

25   the individual interview?

A.     No, not really.  I knew I was coming already,

sooner or later, so --

Q.     You were kind of expecting it?

A.     Yeah, I was expecting it.

Q.     Any thoughts about maybe being a juror in a

case where the State is seeking the death penalty?

A.     None other than it's going to fall on

somebody, you know, you have to do it.

Q.     And you told us you are generally in favor of

the death penalty; is that right?

A.     Yes.

Q.     What value do you see or what purpose do you

think it serves in our society?

A.     I still think that it has merit for punishment

and for, you know, preventing other crimes.  And I just

think that there's not any other punishment that would

really work on some of the cases, you know, they just --

they warrant the use of the death penalty just by the nature

of the crime itself.

Q.     I know you have had a chance to kind of look

and see how we define capital murder, which crimes are

subject to capital punishment in Texas.  But is there a

particular type of fact scenario that comes to mind when you

think of an appropriate case for the death penalty?

A.     I don't know that I put enough thought to it

1  to think that there's a certain type of crime.  I mean, I

2  really believe that murder, not in every circumstance, but

3  in many circumstances the death penalty is probably

4  warranted.  I guess I have enough trust in our legislators

5  to put it together for me, a lot of people put a lot of

6  thought into it that I probably haven't had time to think

7  about.

8         But as far as, you know, murder during

9  the commission of another crime, robbery, or, you know, some

10 other thing.  I'm not sure how that exactly got put

11 together, how they put those two items together, especially

12 when it comes to the murder of a police officer.  I guess

13 that is separate, I guess, if it's a murder of a police

14 officer.  You don't have to have a commission of another

15 crime.

16        I tried to read through that, but I would

17 think that would be, obviously, a reason for the death

18 penalty.

19        Q.    The murder of a police officer?

20        A.    Yeah.

21        Q.    Do you have any concerns about that part of

22 the law that talks about you intentionally kill someone in

23 the course of another felony?  Is that a concern you have?

24        A.    No, it's not a concern.  I would probably need

25 to know -- read it a little more in depth to understand how

1   the law applies in those cases.  But, no, I don't have any

2   problem with it.

3        Q.    Actually in this case we have alleged capital

4   murder has been committed two different ways.

5        A.    Right.

6        Q.    The murder of a police officer on duty and the

7   intentional murder during the course of a robbery.

8        A.    Correct.

9        Q.    So that's why I kind of go into those issues

10  with you.

11       A.    Yeah.

12       Q.    Let me kind of take you to the next level when

13  we talk about the death penalty.  As you can probably

14  imagine, crimes are oftentimes committed by more than just

15  one person, a group or gang of people that commit crimes.

16  The law allows us, as the State of Texas, to punish those

17  people, everyone that was actively involved and participated

18  in the crime, from shoplifting all the way up to capital

19  murder.

20            Obviously, when we're talking about

21  something like capital murder, a group of people, you can

22  probably imagine that you may be able to discern who the

23  triggerman is, who actually caused the death, and who was, I

24  guess, an accomplice, a nontriggerman, who didn't actually

25  cause the death.

1    The law allows us to prosecute not only

2  the triggerman for capital murder and ultimately the death

3  penalty, but also depending on the facts and circumstances,

4  we could prosecute the accomplice, the nontriggerman.

5    Some people who, I guess such as

6  yourself, may feel very strongly about using the death

7  penalty in an appropriate case, would kind of draw a line

8  and take the death penalty off the table for the accomplice.

9  They would just limit the death penalty only for the shooter

10  or the triggerman, for lack of a better word, that type of

11  thing.

12    And let me give you an example to

13  illustrate what I'm talking about, show you how the law

14  works.  Say Mr. Shook and I get together and we decide we're

15  going to rob a bank.

16    MS. BUSBEE:  Your Honor, I object to a

17  specific fact situation and ask to be able to discuss this

18  with the Court.

19    THE COURT:  Yes.  Sir, I'm sorry, I need

20  to have you wait outside for us and we'll be right back.

21    [Prospective juror out]

22    MS. BUSBEE:  May it please the Court, the

23  problem that I see with having to object each and every time

24  that the State starts their example is that it's my position

25  it's an improper question.  The Court has ruled previously

1  and sustained my objection.  But each time a juror comes up

2  here, the State launches into the same fact situation.  Some

3  of these cases on improper questions have to do with a

4  question asked of a panel of jurors.

5          And I think that it would be fair and

6  just to the defendant in a capital jury selection that we

7  resolve this, so I don't have to object each and every time

8  that a juror is voir dired by the State.  And, once again,

9  the State is asking a question and making an example of the

10  two prosecutors being involved in a robbery, a fact

11  situation that closely parallels the fact situation in this

12  case.

13          And the juror, for the record, when asked

14  about an accomplice receiving the death penalty, nodded his

15  head in agreement.  There was no need to go into the

16  hypothetical, but the hypothetical was launched.

17          I would ask the Court to instruct the

18  District Attorney's Office not to ask a hypothetical

19  question which involves facts.  It's not necessary for them

20  to sustain a challenge for cause.

21          THE COURT:  The record does not reflect

22  whether the venire juror was understanding or in agreement,

23  because a nod of the head you may have seen, but may not

24  have been interpreted the same way.  I will sustain the

25  objection at this time, because he has not had an

1 opportunity to say whether or not he understands the law of

2 accomplices and the applicability of the death penalty for

3 accomplices.  If he expresses any problem with the law or he

4 is not able to give you an example of what he's thinking of,

5 let him have an opportunity to provide an example of what

6 he's thinking when you say accomplice.

7 　　　　　　　　MR. SHOOK:  May we be heard on this

8 matter, Judge?

9 　　　　　　　　THE COURT:  Yes.

10 　　　　　　　　MR. SHOOK:  I would like you to read

11 these cases which clearly say that we can use hypotheticals

12 to explain the law and none of them have parameters where we

13 have to see whether he's confused or not.  And I've heard

14 sometimes Ms. Busbee say it's an objection under the law,

15 but I don't know which case she's talking about.

16 　　　　　　　　Those at the bottom clearly say we can

17 use hypotheticals to explain the law and there's no

18 conditions that the juror look confused or can't understand.

19 We can do it from our point of view of how we want to voir

20 dire this juror.

21 　　　　　　　　MS. BUSBEE:  May I be apprized of what

22 cases the Court has been handed?

23 　　　　　　　　THE COURT:  About eight -- I think we're

24 splitting hairs here on the Standifer question, is asking

25 for a commitment by a person to what would you do, given ABC

1  fact pattern, versus here's the law, here's a hypothetical

2  on how the law works, and that's where we're splitting

3  hairs.

4          MR. SHOOK:  And that's how we've been

5  doing it the past day or so.  And I think that's fine.  Ms.

6  Busbee objected a couple of days about where we asked them

7  about guns, so we haven't been doing that.  But I think that

8  we can explain the fact situation and then we ask them, do

9  you agree with that law?  And some people don't and they

10  tell us one way or the other.

11          I think that's perfectly well within our

12  rights to give that fact situation on robbery and then ask

13  them about the law of parties.  We're not committing them to

14  anything other than the law.

15          THE COURT:  I see no problem under

16  Standifer asking for, providing a hypothetical to explain

17  the law and see if they understand the law, if it could be a

18  basis for a challenge for cause.

19          MS. BUSBEE:  Your Honor, I'm just reading

20  this case that the Court of Criminal Appeals decided two

21  months ago in July where they reiterate where you put forth

22  more facts than are necessary to issue a challenge for

23  cause, then it's an improper question.

24          THE COURT:  There again, we're splitting

25  hairs.  The key word was "more facts than necessary".  You

1   objected to adding more guns to the situation and whatever,

2   and I sustained that objection.

3                 MS. BUSBEE:  I guess maybe we need to

4   start back at what my core problem with this is.  Any

5   hypothetical, these hypotheticals, are commitment questions

6   to a set of facts.  And I just don't think that under the

7   current state of the law that they are allowed to ask a

8   juror if they can follow a law when they have asked a

9   hypothetical.

10                Now, they're entitled to inquire as to

11   whether or not the juror understands the law and they can

12   follow it, but they are not asking that question.  And they

13   state it and then they launch into their hypothetical, which

14   I still contend to the Court is an improper question.  It

15   asks for a commitment and it gives facts.

16               MR. SHOOK:  It doesn't ask for a

17   commitment at all, Judge.  And it wouldn't be very smart to

18   start talking about hypotheticals and then go, now the

19   reason I gave you that is here is the law.  You know, we

20   don't commit them to on a, can you do it in that particular

21   fact situation.  But we're entitled to give a hypothetical

22   based on capital murder during the course of a robbery.  And

23   we keep the facts pretty basic, you know.  We would have to

24   go a lot further to fit the facts of this case.

25               THE COURT:  Just a question of degree.

And I know you want a hearing each time and we can't agree

on a hypothetical and if you object, I'll have a hearing

each time.

            MS. BUSBEE:  It really isn't my job to

give the State -- tell the State how to do their voir dire.

It's really my job to try to --

            THE COURT:  I said, if you can't agree, I

will have a hearing each time.  So, Mr. Wirskye, what's the

question that you propose to ask this juror?

            MR. WIRSKYE:  I believe where I left off,

I told them I was going to give them a hypothetical to

explain the law of parties.

            THE COURT:  Yes.  What was your

hypothetical?

            MR. WIRSKYE:  The hypothetical was

Mr. Shook and I agree to commit a bank robbery.  He has a

gun.  I go in as a bag man.  For whatever reason during the

course of the robbery Mr. Shook shoots and kills the teller,

an intentional murder during the course of a robbery.  He

could, obviously, be found guilty of capital murder and

prosecuted for the death penalty.  And the law says under

certain facts and circumstances so could I.

            And I would proceed to explain regular

parties, for lack of a better term, and also explain the law

of parties conspiracy and ask him if he's one of those

1   people that just takes parties conspiracy or regular

2   parties, those type individuals, the death penalty off the

3   table for them, using it to explain the law, not committing

4   him to those facts.

5                    It goes to a challenge for cause.  The

6   juror would not be qualified if he couldn't assess or

7   couldn't consider the death penalty on an accomplice.

8                    THE COURT:  Objection is overruled to

9   that question.

10                    MS. BUSBEE:  Your Honor, just to avoid us

11  having to do this again, you said something to the State

12  about asking the juror what kind of case they envisioned for

13  parties.  I would object to that question as well on the

14  same ground.

15                    THE COURT:  Yes, ma'am.

16                    MS. BUSBEE:  Is that overruled?

17                    THE COURT:  That's participatory.

18                    MS. BUSBEE:  You said it to me.

19                    THE COURT:  Okay.  Have Mr. DeRossett

20  back in.

21                         [Prospective juror in]

22                    THE COURT:  Sorry for the delay, sir.

23                    PROSPECTIVE JUROR:  It's okay.

24       Q.    (By Mr. Wirskye)  All right.  Let me see if I

25  can remember where we were before we took that break.  I

1  want to talk with you a little bit about the death penalty

2  and its application to what we call, basically, accomplices,

3  the common term for people that didn't actually pull the

4  trigger.  And let me give you an example to kind of show you

5  how the law works in Texas.

6          Mr. Shook and I agree we're going to rob

7  a bank.  The plan is he's going to go in with a gun.  I'm

8  not going to be armed.  I'm just going to have a bag and

9  collect the money as he holds up the tellers.  And at some

10 point as we go to do that, for whatever reason, Mr. Shook

11 shoots and kills the teller.  And we get the money and get

12 out of there.  And ultimately we get arrested and are

13 brought back for trial.

14          Mr. Shook, obviously, could be convicted

15 of capital murder, that intentional murder in the course of

16 a robbery.  Depending on how, you know, the jury answers the

17 questions, he could receive the death penalty.  The law also

18 allows for people like me, the accomplice, the

19 nontriggerman, depending on the facts and circumstances, to

20 also be prosecuted for capital murder and again, depending

21 on the facts and the answers to the questions, I could also

22 potentially receive the death penalty.

23          And, again, a lot of people would draw

24 that line between the shooter and the nonshooter.  What do

25 you think about that, the death penalty for an accomplice?

21

A.    Well, as you described it, I would agree with
that.  I guess I could figure some reason that an accomplice
would not, you know, if -- I would just have to judge that
as it came up.  So as you described it, I would agree with
that.  I think the law would have -- was probably written
that way to give you some judgment, one way or the other.
But I don't have a problem with imposing the death penalty
on an accomplice under those kind of circumstances.  I felt
like you were there for the same reasons.  You just had just
as much responsibility in the death of that person as the
person who pulled the trigger.

Q.    I think the way you feel is exactly what the
law contemplates.  There are some people that just wouldn't
consider it, no matter what the facts and circumstances are.
We just want somebody that can keep an open mind and follow
the law.

There are, basically, two different ways
that I can be held responsible.  If you find that I actively
encouraged, directed, solicited, or aided him to commit
capital murder, then I could be found guilty as an
accomplice.  Or if you found that we, under the law of
conspiracy, if we agreed or conspired to commit one crime
and during that crime, the bank robbery, Mr. Shook shot and
killed the teller and committed capital murder, if the jury
finds that I should have anticipated, if the accomplice

should have anticipated that death, then you can find the

accomplice guilty of capital murder.  Does that make sense

to you?

A.       Sure.

Q.       Okay.  It's a common sense proposition, but we

just want to make sure that people can keep that open mind

and follow the law once it's explained to them, that type

thing.

Like almost everyone else we have talked

to, you indicated that you do know something or have heard

something about the facts of this case.  As you can well

imagine, like I said, 99 out of a hundred people we have

talked to have heard something.  The law says that you are

not disqualified just because you have heard something in

the media or read something about this case.

What the law contemplates is that a juror

will kind of base their verdict just on the evidence that

they hear in the courtroom.  Even if the juror has, you

know, formed some impressions, as long as they can set that

aside and base their verdict just on what they hear in the

courtroom, they would be a qualified juror.  They will be

able to follow the law.

Is that something that you think you can

do, even though you have heard something about the case?

A.       Yes.

23

1      Q.    Okay.  What, exactly, do you remember hearing

2 about the case?

3      A.    As I put on the questionnaire, it was kind of

4 funny, I think, and the reason I put that is it's been a

5 couple of years or maybe more, so -- and in that amount of

6 time some different cases and things you hear on the

7 television might run together a little bit.

8          But as I recall, some guys escaped from

9 prison, were in Irving in the process of burglarizing a

10 sporting goods store out there.  And this police officer

11 came up on them.  I remember that and I think if it was the

12 same people, they went to Colorado where they were caught.

13      Q.    Sounds like you don't know that many details.

14      A.    Not other than that, no.

15      Q.    Have you followed any of the court proceedings

16 in the case?

17      A.    No.

18      Q.    Okay.  Sounds like that probably wouldn't even

19 be an issue for you, since you haven't heard any real

20 details?

21      A.    What would?

22      Q.    Just basing your verdict --

23      A.    No, other than that, that's really all I know

24 about it.

25      Q.    I know you have been a juror, what, at least

1 twice?

2       A.    Yeah, two times that I can remember and seems

3 like it's three, but I can't really recall.

4       Q.    What do you remember about the first case?

5       A.    It was a conspiracy case for these guys were

6 trying to buy cocaine with the intent to sell it and they

7 were both being tried at the same time, two young guys, and

8 one lived here.  I think one lived in Kansas City.

9       Q.    Did the case seem pretty straightforward to

10 you?

11       A.    Yeah.

12       Q.    Did the jury have any problems reaching a

13 verdict?

14       A.    Other than, you know, a couple of ladies on

15 the jury that were -- I think could see their children in

16 these guys a little bit and they were just -- and conspiracy

17 for them was tough because the drugs were being bought, or

18 at least they thought they were buying drugs, were from

19 police officers.  So there was a little bit of discussion, I

20 guess, back and forth on something about entrapment.  And

21 some of those folks had a little bit more trouble.

22               But that's really the only thing that

23 stands out about it.

24       Q.    I know you were foreman on one of your two

25 cases.  Were you foreman of that jury?

1    A.    No, I think it was the DWI.

2    Q.    And that was more recently?

3    A.    Yeah.  It's been -- I think it's been two to

4 three years ago, though.

5    Q.    What do you remember about that experience?

6    A.    Um, the use of the video camera, I guess, at

7 the jail and that it was pretty obvious, just from the guy's

8 speech and the way he was walking and some different things

9 on video, that he was intoxicated or at least he was

10 impaired in some way.

11    Q.    Okay.  So that was also relatively

12 straightforward for you?

13    A.    Yeah.  There was nothing really special about

14 it, other than just being here.

15    Q.    Getting back to the death penalty a little

16 bit, as you probably have gotten a chance to read now, we

17 don't ask a jury to write in a life sentence or a death

18 sentence.  When we get to that second phase of the trial,

19 the punishment phase, we ask a jury to look at these three

20 questions and we let kind of whatever the jury's answers are

21 to those determine the appropriate sentence.

22         You know, the first part of the trial is

23 just concerned with whether we have proved our case.  If we

24 prove it to you as a juror that he's guilty of capital

25 murder beyond a reasonable doubt, if you find that, then the

1   law contemplates that you go into that second phase of the

2   trial.

3                The law asks that jurors kind of go into

4   the second phase of trial with an open mind, you know, that

5   you don't automatically answer any of these questions just

6   based on what you heard in the first phase of the trial.

7   And we ask you to look at these types of questions.  If the

8   questions are answered yes, yes, and no, then a death

9   sentence will be imposed.  The Judge has no discretion in

10  that matter.

11               And, you know, we always -- we don't want

12  to put anyone in an uncomfortable position.  So we want to

13  be sure that you feel like you are the type person that

14  could take pen in hand and answer those questions in such a

15  way that it may result in the death of a human being.

16       A.      Yeah, with just a yes, yes, and no, I think it

17  takes a little bit of the pressure off.  It's not -- because

18  some people would have and I would, too, just -- I hate to

19  impose the death penalty on anybody for any reason because

20  it's taking a life.

21       Q.      Sure.

22       A.      But it takes the pressure off of you a little

23  bit.  You are answering the questions and the law determines

24  what happens from that point.

25       Q.      And I think that's what the law contemplates.

1 That's why the Legislature has come up with these questions.

2 I think that's why it's so important, you know, that you

3 start that second phase with that open mind.  You don't

4 really answer anything automatically.  You keep that open

5 mind, because in the second phase of trial the rules of

6 evidence expand a little bit.  You get to hear extra

7 information, maybe his history, whether he's been good,

8 whether he's been bad, prior crimes, and that type thing, to

9 help you answer these questions.

10           You know, I know you have looked at them,

11 but will you take just a minute and look at these three

12 again and we'll kind of run through them after you have had

13 a chance to look at them

14      A.      (Prospective juror complies.)

15      Q.      Those are the three questions that we ask.

16 They are called Special Issues.  I just call them questions.

17           The first one kind of deals with future

18 danger and that's kind of what we call it, the future danger

19 question, whether there's a probability that the defendant

20 would commit criminal acts of violence such that he would be

21 a continuing threat to society.

22           That question starts off with a no

23 answer.  That is kind of the default setting on it.  We have

24 the burden of proof on that and we have to prove it to you

25 as a juror beyond a reasonable doubt that the answer to that

1  question should be yes.  You can't answer it yes, unless we

2  have met our burden.  By the same token, you can't answer it

3  automatically, just because you found somebody guilty of

4  capital murder.

5        Obviously, you can go back and look at

6  the facts of the crime to help you answer that question,

7  but, again, the law kind of contemplates once you get to the

8  second phase, to keep that open mind.  So as long as you

9  don't automatically answer that question or any of those

10 questions in a certain way based on what you did in the

11 first part of the trial, you will be a qualified juror.

12 Does that make sense to you?

13        A.     Sure, absolutely.

14        Q.     That is fair to both sides, very frankly.

15 That first question kind of asks jurors to make a prediction

16 about future events.  Is that something that you feel like

17 you would be comfortable doing?

18        A.     Yeah.  I wouldn't have a problem with that.  I

19 guess you would at that point be able to look at past

20 history during that phase of the trial and be able to form

21 an opinion on what has gone on in the past to what would

22 happen in the future.

23        Q.     That's what a lot of people tell us, that that

24 type of information would be important to them, one way or

25 the other.  A lot of the words in that question are not

1  necessarily defined, so we always ask people what pops into

2  their head when they think about the word.  Looking at that

3  word "probability", what does that mean to you?

4       A.       I guess it would mean based on previous

5  actions, what the probability would be, what the chances

6  are, that that could happen again given even a similar set

7  of circumstances.  So "probability" would be more than, I

8  guess, a percentage as well, I guess, you could figure into

9  that.

10       Q.       A lot of people tell us 51 percent, more

11  likely than not, that type of thing.

12       A.       Yeah, I would agree with that.

13       Q.       Obviously, anything is possible and,

14  obviously, we couldn't prove it to anybody as a certainty.

15  So I think likelihood or more likely than not a lot of

16  people are comfortable with.

17               When you see that phrase "criminal acts

18  of violence" in the context of that question, what comes to

19  mind?

20       A.       Well, an act on some person that would cause

21  them bodily harm.

22       Q.       Okay.  And we basically, again, leave it up to

23  the jurors.  I think the bottom line point is the law

24  doesn't necessarily require us to prove to you he's going to

25  be involved in another murder or he's going to kill someone

1  again, that type of thing.

2  And then, finally, the last word in that

3  question, "society."  Again, there's no real definition in

4  law, but what does that word mean to you, "society"?

5  A.  Any citizen on the street.

6  Q.  Okay.  Would you restrict it to just people

7  outside of prison or would you define society to include

8  people behind bars, you know, other prisoners, guards,

9  teachers, doctors, that type of thing?

10  A.  I guess we're all part of society, no matter

11  where we are.

12  Q.  And I guess the word "society" could include

13  prison and nonprison populations.  Again, that starts off

14  with a no.  We have to prove it to you that it's a yes.

15  If you answer it yes, you kind of move to

16  the second Special Issue and this is kind of the question we

17  ask when you have a case where an accomplice is an issue.

18  And to be very frank with you, laying our cards out on the

19  table, we are prosecuting Mr. Murphy as an accomplice in

20  this case and that's why we spend so much time talking about

21  it.

22  But this is what that question really

23  deals with.  It's really three parts to the question.  If

24  you think he was one of the ones that actually pulled the

25  trigger, it would probably be an easy answer.  You could say

1    he actually caused the death.

2              If you think he intended to kill the

3    person or another, a lot of times what comes to mind is like

4    a murder for hire.  You hire someone to kill your spouse or

5    your business partner.  You have obviously intended it, but

6    you didn't cause it, and kind of back to what we were

7    talking about earlier, that last line, anticipated that a

8    human life would be taken.

9              And if you kind of recall what we talked

10   about a moment ago, what the law is, in order to find

11   somebody guilty as an accomplice of capital murder, you have

12   got to be convinced beyond a reasonable doubt that the

13   accomplice should have anticipated that a life would be

14   taken.  By the time we get to punishment, the law imposes a

15   little bit different, a little bit higher burden.  Instead

16   of should have anticipated, it's did they anticipate.  Did

17   they actually anticipate.  So it's a little bit higher

18   burden before the death penalty could be imposed.  Does that

19   make sense to you?

20        A.    Yes.

21        Q.    Do you see the difference in the distinction

22   between those two standards?

23        A.    Yes.

24        Q.    Again, these questions are -- you can think of

25   them kind of like a set of filters, if you want.  We're

taking the facts and the evidence through the filter and hopefully will end up with a right and just result at the end.

But if you find the person did actually anticipate that a human life would be taken, you would answer that question yes. It's similar to the first question in that it starts off with a no answer. That's kind of the default setting, and just like No. 1, we have the burden to prove it to you beyond a reasonable doubt. If we don't meet that burden, then the answer would stay no. But, you know, this table, this side, never has a burden of proof. It's always on the State.

Finally, kind of the last step in the process, we call it kind of a safety net or safety valve, is Special Issue No. 3. It's a little bit different from the first two in that neither side has the burden on this. We call it the mitigation question.

We kind of ask a juror to step back, take a deep breath, look at everything they have heard, the facts and circumstances of the crime, the defendant's character, the background, the person's personal, moral culpability, or what sort of responsibility or blame do they bear, and we ask the juror to kind of look and see if there's anything mitigating, anything that might lessen his blame or lessen his responsibility. And if there is, is it sufficient that

1    his life ought to be spared?

2                    That's kind of the safety net, basically.

3    Does that make sense to you?

4        A.    Sure, absolutely.

5        Q.    Do you see the value --

6        A.    Yes.

7        Q.    -- of having that question?  It's kind of the

8    last stop in the process.

9        A.    Yes.

10       Q.    The law doesn't necessarily tell jurors what

11   is mitigating and what isn't.  They leave it up to the

12   individual juror even.  You wouldn't, you know, you don't

13   have to agree with another juror back there on what's

14   mitigating and what's not.  You know, a lot of people may

15   consider a certain fact mitigating and some may consider it

16   aggravating.

17                   The key is, again, even at this late

18   stage, could you keep an open mind to mitigating evidence?

19       A.    Yes.

20       Q.    Have you not closed your mind?  And, again,

21   that's what the law contemplates.  You just don't do

22   anything automatically.  Even though you convicted someone

23   of capital murder, you find they were a future danger, you

24   found that they actually anticipated that a life could be

25   taken, even at that late stage in the process, could you

1   keep an open mind to mitigation?

2        A.      Yes.

3        Q.      And if you hear something sufficient, you

4   could answer that question yes, and if not, you would answer

5   it no.  It sounds like something you could do; is that

6   right?

7        A.      Yeah, I could do that.

8        Q.      Is there anything that pops into your mind

9   that may be mitigating in a case such as this, the death

10  penalty case?

11       A.      The actual circumstances.

12       Q.      Circumstances of the crime or just the

13  defendant's character, background, or --

14       A.      I would think that the person's character, if

15  it's brought out, their background -- I mean, I guess it

16  would all -- I would try to think that some of those

17  circumstances or the character, the background, some of

18  those things would actually take place.  You could consider

19  those in No. 1, especially.

20       Q.      Sure.  I think the law contemplates that, that

21  you can use all the evidence that you have heard in

22  answering each of the questions as long as you make that

23  separate, independent inquiry in each questions.

24       A.      I would think that those same circumstances,

25  if you did say yes to the first two, some of them would

1   already be solved in your mind by the time you got to 3, but

2   at the same time --

3          Q.       You know, that very well may be true as long

4   as you can just keep that open mind.

5          A.       Right.

6          Q.       We always ask people if anything pops into

7   their head that's mitigating.  Hopefully, people don't sit

8   around thinking about these things.

9          A.       Yeah.

10         Q.       Most common, no one can.

11         A.       Right.

12         Q.       Nothing pops into their head.  Some people

13   have told us like maybe an abusive background, a well

14   documented early history of physical or emotional abuse,

15   that may potentially be mitigating.  Other people feel,

16   well, at some point you are old enough to get past your

17   past, no matter how bad, and have free will and can make

18   choices, that type of thing.  Where do you fall on that

19   question?

20         A.       I think at that point the jury would have to

21   discuss all of those things that they heard, you know, I

22   wouldn't want to just use my thoughts.  I would like to hear

23   the other folks or the jury's thoughts.  You know, there's

24   wisdom in a group, instead of just trusting your own

25   thoughts.

1    So I would hope at that point, even

2  though if you answered yes to the other two, that you still

3  had that time that you could spend with other people and

4  decide based on what you think and take other people's

5  opinion.  But I think that I could do that.

6    Q.    Okay.  Like I said, the law doesn't require

7  that you consider any particular fact, or factor, like

8  background mitigating.  You don't have to agree with the

9  other jurors, necessarily, as long as you can just keep that

10  open mind.

11    Some people tell us like a person's young

12  age, somebody that was 18, 19, 20, that may be potentially

13  mitigating, because they haven't had the life experiences of

14  some people.  Other people tell us, no, it's not mitigating,

15  or some people tell us it's actually aggravating to do

16  something that bad at such a young age.  What do you think

17  about that?

18    A.    I think that all of those could be mitigating

19  or aggravating, as you say, but it would really depend on

20  what you hear in the case and the person's background.  I

21  don't think that I could sit here and make a blanket

22  statement as to any of these things.  It would really depend

23  on that person's background and their character and all the

24  things that I heard during the case.  Simple as that.

25    Q.    Again, I think that's what the law

1  contemplates.  Sounds like you would be perfectly qualified,

2  as long as you can keep an open mind and follow the law.

3  Any questions about the scheme we have in capital murder,

4  the two phases of the trial, and the three questions that we

5  ask the juror to decide?

6          A.    No, I don't guess.

7          Q.    Okay.  Does it seem pretty straightforward --

8          A.    Yes.

9          Q.    -- to you, now that it's been explained?

10  Again, we have the burden on the first two.  Neither side

11  has the burden on the third.  As long as you keep that open

12  mind in the second phase, you would be qualified and be able

13  to follow the law.

14               Let's talk about a couple of things that

15  apply in all criminal trials.  You are probably very

16  familiar with them, since you have been on at least two

17  juries and foreman of one of them.

18               The first one, obviously, is the

19  presumption of innocence.  Our system, we presume every

20  person innocent.  The fact that he's been arrested for,

21  charged with, or indicted for a crime, is absolutely no

22  evidence of guilt.  As he sits there right now, he's

23  presumed innocent.

24               You know, if for some reason the whole

25  process stopped now, he would have to be found not guilty.

1    That presumption only goes away when we've met our burden of

2    proof on the guilt phase and on the two separate questions.

3                    And that burden of proof always stays at

4    this table.  It never shifts.  Those folks are fine lawyers

5    and you can probably anticipate that they are going to do

6    something, but legally they don't have to.  They can sit

7    there and do crossword puzzles all day.  You would only find

8    someone guilty, you know, if we have met our burden of

9    proof.  It's always on this table.  Does that make sense to

10   you?

11        A.     Yes.

12        Q.     As part of, I guess, holding us to our burden

13   of proof, the law requires that we prove each and every

14   element of the crime to you beyond a reasonable doubt.  You

15   know, if you look at that indictment on the case, the way we

16   allege crimes, it would kind of be broken down into

17   different elements, that a certain person, on or about a

18   certain day, in a certain county, killed a certain person in

19   a certain way.  Those are kind of generally the elements.

20   The law says that we have to prove each and every one of

21   them.

22                    And the law doesn't recognize that one is

23   more important than the other.  And if we didn't prove one

24   of them to you, even if we went nine for ten, the law would

25   say that you have to find somebody not guilty.  You know,

1  you can't give us that extra help, if we fail to prove one

2  element.

3             As kind of a far out example of that,

4  I'll give you this.  Let's say we allege a murder that

5  happened in -- a capital murder that happened in Grand

6  Prairie, Texas.  And we allege it happened in the Dallas

7  County part of Grand Prairie.  And the cops don't do their

8  homework, we don't do our homework.  We're real sloppy and

9  negligent.

10             And when we get to trial you are

11  convinced that the person who committed the capital murder,

12  we have proven nine out of the ten elements to you, but you

13  are convinced beyond a reasonable doubt it happened in the

14  Tarrant County side of Grand Prairie.  Well, we failed to

15  meet our burden on one element.

16             And even though some people may consider

17  it a technicality, what county it happened in, the law

18  doesn't consider it that way.  And the law would be that you

19  would have to find the person not guilty at that point.  A

20  lot of people may not like it.  They consider it a

21  technicality.

22             And it's kind of an extreme example.

23  Hopefully, that would never happen.  If it did, we would be

24  fired the very next day.  But I think that it serves to

25  illustrate the kind of mental discipline it takes to be a

1   juror and really say I can follow the law and if the State

2   did not prove each and every element to me, I could find the

3   defendant not guilty.  Is that something you think you can

4   do?

5        A.    Yes.  I've been through that before and I

6   think that there are folks that have trouble with different

7   aspects of the case, but the Judge would give you the charge

8   before you go in to deliberations.  I mean, those are the

9   elements that you have to consider and nothing else.  And

10  sometimes it's trouble, but I think that I could do that.

11       Q.    We talk to people all the time and some people

12  consider it a technicality.  But one person's technicality

13  is another person's constitutional right.

14       A.    That's right.

15       Q.    So another example may be that we allege a

16  certain person was killed by shooting with a firearm,

17  shooting a gun.  The medical examiner comes in and says, no,

18  they actually died because they were stabbed.  We missed an

19  element, the manner and means of the crime.

20             Even though you were convinced the person

21  may have caused the death, the law would require you to find

22  the person not guilty.  Again, we didn't do our homework.

23  We didn't do our job.  Does that make sense to you?

24       A.    Yes.

25       Q.    You could hold us to our burden of proof to

1    prove each and every element?

2         A.     Yes.

3         Q.     Again, as a part of that burden you are

4    familiar with the Fifth Amendment, I'm sure.  You have been

5    through juries before.  The criminal defendants, people

6    charged with crime, have an absolute right not to testify.

7    No one can force them to.  Conversely, if they want to

8    testify, no one can keep them off the stand.

9              But if they don't testify, the law is and

10   the Judge would tell you, that you couldn't hold that

11   against them in any way.  You just flat couldn't consider

12   his failure to testify against him.  There may be a lot of

13   reasons why he didn't testify.  He may be guilty.  He may

14   not be well spoken.  His lawyers may have told him not to do

15   it.

16             So the law requires that you just not

17   consider that failure to testify.  Is that something that

18   makes sense to you?

19        A.     Yes.

20        Q.     And you think you can follow that aspect of

21   the law?

22        A.     Yes.

23        Q.     The law also talks about starting each witness

24   off kind of at the same level of credibility.  You know, you

25   don't automatically necessarily give one class or type of

1  witness a leg up, just maybe because of what they do for a

2  living.

3              You can well imagine in a criminal case

4  where we have alleged a police officer has been killed, you

5  are going to hear from police officers.

6         A.    Yes.

7         Q.    And we ask every juror this question.  And,

8  obviously, a lot of folks respect the job they do, but the

9  law would require that you couldn't give him that automatic

10 leg up just because they come in wearing a badge and a gun.

11 You know, if you start listening to them and what they said

12 sounds credible and makes sense, then you can go with it.

13 But you just can't start them out and give them that extra

14 headstart.  Does that make sense?

15        A.    Yes, it does.

16        Q.    You can hold them to the same level?

17        A.    Yes.

18        Q.    Let me get your feelings.  A lot of times in

19 cases such as this the defense and maybe even sometimes the

20 State, will call like a psychiatrist or a psychologist.  A

21 jury might hear them to help them answer one of the Special

22 Issues, that type of thing.  What do you think about that

23 type of testimony in these cases?

24        A.    I think you just have to listen to what that

25 person said and see if they would actually apply in this

1   case, probably have to decide whether that person really

2   knew what they were talking about, sounded like they did.  I

3   just -- I don't think that I would make a judgment one way

4   or the other based on whether I thought they should be there

5   or not, just listen to what they had to say, how they were

6   questioned, the answers they give.

7        Q.    They are kind of like any other witness in a

8   sense, you know.  You have to listen to what they say.  We

9   don't want people that would automatically close their mind

10  or automatically give them that leg up.  And a lot of people

11  feel like you can find an expert witness to say anything, if

12  you pay enough money and that type of thing.

13            But you have to go into it, again, with

14  that open mind.  Sounds like that's something that you can

15  do?

16       A.    Yes.

17       Q.    Getting back to capital murder for a second, I

18  guess one way to look at the scheme we have is once you have

19  convicted someone of capital murder, before you even start

20  that second phase, the person is sitting on a life sentence.

21  Okay?

22       A.    Okay.

23       Q.    And only if those questions are answered yes,

24  yes, and no, do you get a death sentence.  You would be

25  told, if you are a juror, what a capital life sentence means

1    in Texas.  We don't have a life without parole in Texas.

2    You would be told that a capital life sentence means forty

3    years, day for day, you know, forty calendar or hard years

4    before a person sees a parole board, before they become

5    eligible for parole.

6              A person may make parole that first time

7    up after forty years or they may never make parole.  They

8    may actually serve a hard life sentence.  Because of that

9    fact the law kind of requires jurors to presume that life

10   means life, and not really consider or factor in the parole

11   law.

12             We tell you what it is, but we ask you to

13   say life means life.  And, very frankly, that's fair to both

14   sides because we want people to work through the questions

15   with that open mind and give the right answers.  Does that

16   make sense to you?

17        A.     Yes.

18        Q.     You can presume life means life?

19        A.     Yes.

20        Q.     Another area of the law I would like to talk

21   with you about, sometimes in that first phase of the trial,

22   the guilt phase, a jury may have an option of finding a

23   person guilty of capital murder or finding the person guilty

24   of a lesser offense, what we call a lesser included offense,

25   or finding them not guilty.

1          An example of that would be that we have

2  alleged a murder in the course of a robbery.  If you get to

3  the end of the evidence in the guilt phase, the first phase,

4  and you have a reasonable doubt whether the State has proven

5  the murder to you, okay?  But you are convinced beyond a

6  reasonable doubt that there's a robbery, an aggravated

7  robbery, then you could find the defendant guilty of that

8  lesser included offense of aggravated robbery.  Does that

9  make sense to you?

10      A.    Yes.

11      Q.    Okay.  And if that happens, kind of everything

12  we talked about goes out the window.  That's just reserved

13  for capital murder, obviously.  And we would ask the jury to

14  assess punishment somewhere in the punishment range,

15  somewhere between life and 99 years, all the way down to

16  five years.

17          And we would just require a juror in an

18  aggravated robbery case, again, be able to go into that

19  second phase with the open mind.  If you hear an aggravated

20  robbery case that you think deserves life, you can do it.

21  And if you hear an aggravated robbery case where you think

22  five years is the proper thing to do, you can do it.

23          So in order to be qualified, I have to

24  ask you if you can keep an open mind to the full range of

25  punishment --

1      A.      Yes.

2      Q.      -- in an aggravated robbery case?

3      A.      Yeah.

4      Q.      Okay.  You about ready for the legal lesson to

5  be over?

6      A.      Yeah, it's okay.

7      Q.      We've kind of run through a lot of things.

8  Any questions that you have about our scheme or any last

9  thoughts or hesitations that you have going into this

10  process of maybe being a juror?

11      A.      No, I don't think so.

12      Q.      What kind of fishing do you do?

13      A.      Bass, white bass.

14      Q.      Where do you fish?

15      A.      Lake Fork and a few stock ponds around.

16      Q.      Sounds about like me.  That's my illness.  I

17  don't get to go as much as I'd like, but I have a feeling my

18  boat is full of water right now out in the driveway.  I

19  think that's about it.

20              You know, again, the bottom line is just

21  be able to follow the law and keep that open mind and not do

22  anything automatically, and if you can do that, you will be

23  a qualified juror and I appreciate your time.

24      A.      Sure.

25              MR. WIRSKYE:  That's all I have, Judge.

THE COURT:  Mr. Sanchez?

CROSS-EXAMINATION

BY MR. SANCHEZ:

Q.   Good morning, sir.

A.   Good morning.

Q.   How are you doing?

A.   Fine, thanks.

Q.   What was your first thought when you got the letter to come down and talk to us?

A.   I guess I expected it.  We were told back in May about we would be getting a letter to come back and be interviewed, so I thought it was probably right on time.

Q.   Just so you know, we didn't talk to everybody.  We didn't talk to all those people.

A.   I was wondering how you would have time to do that.

Q.   What we do is look through all the questionnaires.  And some people that say I could never consider a death penalty in any case and we're not going to waste our time talking to those people.  And at the same time, we saw some questionnaires where people were just itching to get on the jury to give the death penalty and both extremes.  So people like that we're not going to spend time with.

What we do, just to make you feel better

1   about coming down here, is we look at these questionnaires

2   and we say, well, let's look at some people we think are

3   fair, down the middle, give both sides a fair trial, and

4   let's talk to them and see how they feel.

5              I'm not going to sit here and give you a

6   law lesson.  I would rather talk to you and find out your

7   true feelings about things, because I think we all can say

8   that we all want to follow the law.  But sometimes we are

9   put in situations where what we feel personally, morally,

10  and ethically, doesn't exactly fit with the law or the

11  situation doesn't exactly fit the way we thought it was

12  going to be.  And then we're put in a position where we may

13  not be able to follow the law or it's going to be real hard

14  for us.

15             And we don't want to put people in that

16  situation.  I think every juror at some point is going to

17  have some problems or some feelings either way.  But,

18  really, our job on this side of the table is to find out

19  more about you and how you really feel about certain things.

20             I did notice, also, that you golf.  Where

21  do you golf?

22       A.    There's a club near my house, Woodbridge.

23       Q.    Do you get out there a lot?

24       A.    I try to about once a week.

25       Q.    I see your kids are a little bit older now, so

1  it's probably a little easier?

2      A.      Yeah, I have a little more time.

3      Q.      I just took up golfing three years ago and, as

4  you know, when you get that bug you want to be out there in

5  nice weather and I have the kids, so it's kind of hard.

6              One thing I want to talk with you about

7  is kind of talk a little bit -- when Mr. Wirskye was

8  questioning you is you were aware there was some media

9  coverage.  And you indicated that you had heard some things.

10     A.      Yes.

11     Q.      Based on what you heard through the media or

12  what you read in the newspaper, did you form any opinions as

13  to what may have happened in this case?

14     A.      Well, yeah, I formed opinions of what I heard.

15  I don't know that I formed opinions of that the news media

16  had everything correct.

17     Q.      What opinions did you form?  Would you share

18  those with us?

19     A.      Well, I guess I would say that my opinion

20  would have been that if the facts, you know, if what I heard

21  in the news were the facts, that it was a pretty despicable

22  act.

23     Q.      And based on that opinion that you formed, how

24  do you think that would affect you, if you are sitting as a

25  juror in this trial?  The reason I say that, some people

1   say, you know, I can put that out of my mind and be a juror.

2   And we had some lady said, I've already formed an opinion

3   that he's guilty, but I can put that out of my mind.

4          A.     Yes.

5          Q.     Can you see how that would make somebody

6   uncomfortable?

7          A.     Sure.

8          Q     It's like your boss saying I've already formed

9   the opinion I'm going to fire you, but I can put it out of

10  my mind.  You can see how that would be unfair and that

11  would be -- even though people can say, sitting here today,

12  can say I can put that out of my mind.  But when they sit

13  over there, it's still in their mind and it may play a part

14  in their deliberations.

15               So based on what you have told us here

16  today, you really think you are going to be able to totally

17  put that out of your mind?

18         A.     I'm not sure that that's humanly possible for

19  anyone to totally put anything out of their mind, so I don't

20  want to be dishonest with you.  I don't know that I have

21  formed -- I formed an opinion about what happened that day.

22  Your client here, I don't think I have formed an opinion of

23  him because I couldn't pick him out walking down the street.

24               But I'm not going to say that I could get

25  over here and completely put it out of my mind.  I would do

1   my very best to not allow that to affect my decisionmaking

2   in this case.  You know, I've in the past have gone through

3   this and just -- I think I've been able to do a good job of

4   just listening to the facts of the case and applying the law

5   as it was told to us as a juror.

6              But I don't think it's humanly possible

7   to completely put, at least what I've heard, out of my mind.

8   But, you know, I don't think that I have actually formed an

9   opinion, just because the news media had it there.  I think

10  they can make mistakes.  I think they sensationalize things.

11  So, you know, I just -- I would believe that I could,

12  regardless of whether I put out of my mind the facts or the

13  things that I had heard, I wouldn't regard them as facts

14  without hearing them in the courtroom.

15       Q.     I think we agree on the assessment of the

16  media.  Have you followed any of the other trials involved

17  in this case?

18       A.     No.

19       Q.     Another thing I want to talk to you about is

20  also you mentioned that you had read what type of case is

21  qualified for the death penalty.  And, you know, the State

22  talked to -- Mr. Wirskye talked to you, explained to you,

23  that the law basically doesn't want the death penalty to be

24  an automatic answer right away.

25              What you would do is, like you said, is

hear the case in the guilt/innocence stage and at that point all you would have to determine is whether the person is guilty or not guilty of capital murder. We have people that come up here sometimes and say, well, once that's done, it is a death penalty right there. That's not really the way it works.

What happens is once somebody is found guilty of capital murder, then it's an automatic life sentence. That's what it states and the law favors that. And the only way that you can get to the death penalty is some people call them filters. We call them hurdles. But once you have gotten through the three hurdles or filters, then, and only then, would the death penalty be imposed. And that's why it's important that those things are considered in this case and it's required by law.

But we've also had jurors that say, well, you know, I can keep an open mind when it comes to certain capital murders because there's many ways that a capital murder can happen or be charged. But in this case they're alleging the death of a police officer. And we've had people who -- and we don't blame them for thinking this way -- and we need to know about it -- that say, well, if this was just a robbery of a convenience store and he shot the clerk, not to say that their life is any less valuable, but in that situation, we may be able to consider these

1   questions.   We would like to know what led up to that or

2   certain situations where the death penalty may not be

3   appropriate or a life sentence would be more appropriate.

4                       But sometimes some jurors have told us,

5   when it involves a police officer, because of my feelings

6   for police officers, I may not be able to keep an open mind

7   as to the Special Issues and answer them in a way where it

8   would result in a life sentence.   What do you think about

9   that?

10        A.      Well, I think probably most people do respect

11  law enforcement folks in a certain way that they do

12  consider, you know, they're kind of special to us, because

13  they do their best to protect us.   I'm not going to tell you

14  that I wouldn't feel that way, because I do.

15                      But on the other hand, I just -- I'm

16  convinced that it would be my responsibility to just

17  consider the facts, how the law requires, and not based on

18  whether the person is a convenience store operator or a

19  police officer.   I think I could do that.   Obviously, I

20  haven't been involved in a case like this.   I would just try

21  to consider if it was myself or someone else that I cared

22  about that the folks in the jury would do their best to only

23  consider the facts of the case and not determine anything

24  based on who the person was that was killed.

25        Q.      When you say, I think you could do that,

1   because we're going --

2        A.      I understand why you would ask that.  I guess

3   think is probably not the best word.  I'm convinced that I

4   would do my best to not let those circumstances enter my

5   decisionmaking, because I realize that's the only way that

6   you can make an accurate assessment is just to use what you

7   are given, like these circumstances, to keep -- I guess

8   that's what they're there for, to keep you from using your

9   own personal feelings.  My own personal feelings really are

10  not the law.  So I think that's just a guide for the person

11  on the jury to use to be able to make a fair assessment and

12  to stay away from your personal feelings.  So I could do

13  that.

14              I'm just trying to state that, obviously,

15  I don't have -- I do have some biases, you know, I respect

16  police officers and I appreciate what they do.  I would

17  think it would be pretty unfair if I didn't feel that way.

18  But at the same time I think it's -- it would be my

19  responsibility to do the best I could to see that that

20  person charged would not be unfairly convicted or punished.

21       Q.      And that's the reason we ask these questions.

22  That's the reason, like you say, we have these Special

23  Issues in the law, especially people's feelings toward

24  police officers, while more emotional -- yesterday was 9/11

25  and we had a juror in here yesterday that lost friends on

1  9/11 and those emotions can take over, you know, the

2  thinking and the proper assessment in a trial. And we're

3  trying to avoid that.

4        A.    Okay.

5        Q.    We talked about Special Issue No. 1, also, and

6  I'm trying to -- maybe I wasn't listening at the time. I

7  was writing notes. But I guess Mr. Wirskye explained the

8  first part of the trial, we find him guilty or not guilty of

9  capital murder. Once you get to Special Issue No. 1, you

10  have to determine whether that person is a continuing threat

11  to society, just paraphrasing it.

12               Based on the fact that you already found

13  him guilty of capital murder, would that automatically lead

14  you to an answer on Special Issue No. 1 of yes, just solely

15  on the fact that you have already found him guilty of

16  capital murder?

17        A.    I don't think so. I mean, I consider that

18  just on its own merits, not based on, you know, the first

19  part of the trial.

20        Q.    We have some jurors that come in here and they

21  say, we've already found him guilty of capital murder. To

22  me that alone is already -- to me the answer is yes, he's a

23  threat, a continued threat to society. But you would be

24  able to make that independent inquiry?

25        A.    Yes. I don't know what the facts of the case

1    are going to be at this point, obviously, but I would assume

2    that they were -- that he would commit capital murder, that

3    would be their first time they did anything outside the law,

4    possibly, but, so I would have to consider it just based on

5    the facts of the case only.

6         Q.     And I'm going to talk a little bit about

7    Special Issue No. 2, also.  As you can see, the jury is

8    going to have to determine, especially in the accomplice

9    situation, whether that person, if they weren't the actual

10   triggerman, as Mr. Wirskye said, whether that person

11   actually anticipated that a human life would be taken.

12             In other words, the jury is going to have

13   to make an assessment as to what that actor or that

14   accomplice was thinking at the time the situation happened.

15   Would that be fair to say?

16        A.     Sure.

17        Q.     You have to do that and you can't get in

18   somebody's head.  And sometimes people look at the Special

19   Issue No. 2 and it comes into conflict with somebody's right

20   not to testify.  Some people say, well, we would need to

21   hear from that person.  We would need to hear from the

22   accused as to what they were actually thinking.  And, of

23   course, the State has to prove that to you beyond a

24   reasonable doubt and we have no burden to disprove it.  Does

25   that make sense?

1      A.      Yes.

2      Q.      What would you think -- what are your feelings

3  if a person would not -- would invoke their Fifth Amendment

4  and not testify?  How would that affect you answering

5  Special Issue No. 2, if it would?

6      A.      I don't think that would affect it.  I

7  understand that we have that right and it may be better for

8  the person not to testify, for whatever reason, you know,

9  that would just be their choice.  And I think that the only

10  way that you cannot get into someone's head, necessarily,

11  you have to look at what happened leading up to this and

12  during the time that the murder was committed to determine

13  what that person was thinking at that time.  That's the only

14  way that we could determine that, really, I guess.

15      Q.      And then Special Issue No. 3, you know, it's

16  the last step.  That's the last hurdle or filter before a

17  death penalty would be imposed.  And the reason I ask this

18  question is people are back there in the jury room, you have

19  found them guilty of capital murder, and you found them to

20  be a continued threat to society, and they already found

21  beyond a reasonable doubt that that person anticipated that

22  a human life would be taken.

23              And you had made a comment that that

24  would be considered, mitigation issues and circumstances of

25  the offense would already be considered in Special Issue No.

1 and 2.  Some jurors would say, I already kind of made up

my mind at that point and Special Issue No. 3 really may not

have as much value as you want it to.  What do you think

about that?

A.    I just think that some of the pieces in

Special Issue No. 3 have probably been used to decide

Special Issues 1 and 2.  I just think at that point you

would need to, if you have answered yes to the first two,

you would have to still push those aside as a jury and sit

and talk among yourselves so you would have an idea if there

is anything, any reason at that point, that you would still

not impose the death penalty.  Because I think it's such a

serious -- obviously, it's pretty final.  It's not much left

after that.  I think it's serious enough that you would have

to consider any and all things at that point, you know.

I think it's hard for jurors on any kind

of jury, it's very difficult for them to reach a verdict.

They, you know, I've seen people on those juries get very

emotional because it's just -- it's hard.  But if you have

answered yes to the first two, I think that still gives

those folks a chance to, you know, give their final

thoughts, give it one last look.  So I think that I could do

that.  I wouldn't have my mind made up just because of the

first two.  I think that I would need that last bit of

chance to make the final decisions based on all those

1   circumstances and character and background and other things.

2        Q.     And if you did find there was sufficient

3   mitigating evidence or something in your mind that made it

4   sufficiently mitigating, could you answer that yes?

5        A.     Yes.

6        Q.     So your mind wouldn't be closed to it, then?

7        A.     No.

8        Q.     Is there anything I just haven't asked you or

9   Mr. Wirskye didn't ask you in a certain way that somehow

10  would affect your service on this type of case or something

11  going on in your life or something that we just haven't

12  asked the right way?

13             The reason I ask that is one time I had a

14  juror say, hey, he looks like this bully I knew when I was a

15  little kid and I couldn't be fair to him, or have somebody

16  say, he looks like my ex-husband or something like that.

17  Something that would somehow affect you being fair to both

18  sides --

19       A.     No.

20       Q.     -- or Mr. Murphy?

21       A.     I don't think so.

22             MR. SANCHEZ:   Those are all the questions

23  I have, Your Honor.

24             THE COURT:   Thank you, sir.   If you

25  would, wait for us outside one more time and we'll have you

1  back in.  All right?

2                    [Prospective juror out]

3                    THE COURT:  What says the State?

4            MR. WIRSKYE:  State has no challenge for

5  cause.

6            MS. BUSBEE:  Your Honor, the defense

7  would challenge the juror for cause because the State has

8  asked this juror a question as to whether or not he thought

9  the death penalty could be appropriate in a certain fact

10  situation which mirrored the fact situation here and

11  committed him to a course of action or bound him.  And I

12  think that was reflected in the fact that after giving their

13  example, the juror stated, well, now that you have explained

14  it that way or words to that effect, I could do so.

15            So we will challenge this juror for cause

16  because he's been asked an improper voir dire question and

17  has indeed expressed that he agrees with the fact situation

18  as set forth to that juror.

19                    THE COURT:  Motion denied.

20                    MR. WIRSKYE:  We accept the juror.

21                    MS. BUSBEE:  Defense will strike the

22  juror.

23                    THE COURT:  Have Mr. DeRossett to come

24  back in, please.

25                    [Prospective juror in]

61

1    THE COURT:  Mr. DeRossett, we greatly
2    appreciate your time and service to the Court this morning.
3    You are not going to be sitting on this case.
4                    PROSPECTIVE JUROR:  All right.
5                    THE COURT:  Thank you, sir.
6                         [Prospective juror out]
7                    THE COURT:  Shirley Miller.
8                         [Prospective juror in]
9                    THE COURT:  Thank you.  You may be
10   seated.  We have juror No. 1348, Shirley Jane Miller; is
11   that correct?
12                   PROSPECTIVE JUROR:  Yes.
13                   THE COURT:  How are you?
14                   PROSPECTIVE JUROR:  Fine.
15                   THE COURT:  I appreciate you coming down
16   and wading through the water this morning and waiting on us.
17   Sometimes we talk to folks about an hour and a half and
18   sometimes a little less.  And you have obviously had time to
19   read the guide I provided for you?
20                   PROSPECTIVE JUROR:  Uh-huh.
21                   THE COURT:  And look over a copy of the
22   questionnaire that you filled out for us in May.  The
23   attorneys are going to visit with you about that law and how
24   it relates and maybe expound on some of the questions and
25   answers that were provided.

1          And if you would, I know it's hard for

2    people to come in and it's kind of nervous.

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  You can tell when people come

5    in here and it's a little nervous.  This is as informal a

6    proceeding as we can have.  But the law provides that we

7    speak to potential jurors individually.  As you can tell

8    when you came down and you were with 750 other people,

9    there's really not any meaningful back and forth with such a

10   large panel.  So that's why we do this individually.  So

11   there are no wrong answers.

12         PROSPECTIVE JUROR:  Okay.

13         THE COURT:  And try not to be nervous.

14   They won't -- it wouldn't be that difficult, other than just

15   to tell the truth and give your honest opinions.

16         The questions I have at the end of the

17   process will be two.  One, do you have an understanding of

18   the law?  If you understand the law, number two, can you

19   follow the law?  That's the big picture that I have to look

20   at.

21         PROSPECTIVE JUROR:  Okay.

22         THE COURT:  Please say yes or no in

23   response to questions.  The Court Reporter has to record

24   everything that we say.  Many times people will nod or make

25   some other expression that's not able to be recorded.  So we

63

1   have to remind you to say yes or no as a response.

2                    PROSPECTIVE JUROR:  Okay.

3                    THE COURT:  Any questions of me before

4   you begin?

5                    PROSPECTIVE JUROR:  No, not right now.

6                    THE COURT:  Will you be able to serve

7   this Court for two weeks beginning November 10th?

8                    PROSPECTIVE JUROR:  As far as I know.

9                    THE COURT:  Mr. Shook?

10                   MR. SHOOK:  May it please the Court.

11                   <u>SHIRLEY MILLER</u>,

12   having been duly sworn, was examined and testified as

13   follows:

14                   <u>DIRECT EXAMINATION</u>

15   <u>BY MR. SHOOK</u>:

16        Q.    My name is Toby Shook and I'll be asking you

17   questions on behalf of the State.  As the Judge said, we're

18   just looking for your honest opinions.  You have been on a

19   couple of juries, so you know that we usually select the

20   jury from a panel.  But because it is a death penalty case,

21   we use this procedure, one-on-one interview.

22                    Again, we don't mean to make you feel

23   uncomfortable or like you are the one on trial.  And if you

24   have any questions at any time, feel free to ask.  You have

25   provided us with a lot of information in your questionnaire.

1    I'm going to follow up on some of that and we'll also talk

2    about capital murder, the death penalty, how you feel about

3    that, and the rules that apply in cases such as this.  I see

4    you are retired now; is that right?

5         A.     Yes, sir.

6         Q.     You used to work for Lusa (phonetic)?

7         A.     Yes.  I have a part-time job now that --

8         Q.     What do you do on your part-time job?

9         A.     I work for Hallmark.  I stock cards in three

10   of their stores, a fun job.

11        Q.     How long have you been doing that?

12        A.     Two years now.

13        Q.     Okay.  Where is Saratoga, Texas?

14        A.     I'm not real sure.  I've never been there.  I

15   was born there, but --

16        Q.     Okay.  You were raised there?

17        A.     No, I was born in the Big Thicket.  So --

18        Q.     I had never seen the name, so I was just

19   wondering.  I see by your questionnaire that you have been

20   down on a couple of juries.  One looked like some kind of

21   assault case with a deadly weapon and another some type of

22   theft case?

23        A.     Right.

24        Q.     What was the theft case about?

25        A.     That was the first one that I was on.  It was

1  -- I'm trying to remember all the details.  It's been

2  several years ago.  I don't remember what the dollar amount

3  was, but it was theft over so much and he was found guilty.

4  Q.   Was it a misdemeanor or felony or do you know?

5  A.   It was a felony because I believe the sentence

6  was two and a half to five years.  I'm not sure.  I can't

7  remember the details.

8  Q.   Did the jury assess the punishment or did the

9  Judge do it?

10  A.   The Judge assessed that one.

11  Q.   Okay.  And then the other one -- well, let me

12  ask you about that one.  Did that case go pretty smoothly as

13  far as the facts go or the deliberations?

14  A.   Yeah.  I'm trying to remember how long we

15  deliberated.  We had one afternoon and I think we came back

16  the next morning and then we reached a verdict.  And it was

17  not an easy case because it was a young kid, but --

18  Q.   Did you have personal problems with it,

19  yourself, or just some of the other jurors or --

20  A.   No.  Just the fact that you are passing

21  judgment on someone, that bothers me, I have to tell you.  I

22  can do it, but it does make me nervous and --

23  Q.   You mentioned that in your questionnaire and I

24  was going to follow up on that.

25  A.   Right.

1    Q.    Because the other one was actually some type

2  of violent felony, an aggravated assault with a deadly

3  weapon?

4        A.    Yeah, he had a gun.

5        Q.    Did he actually use the gun or just threaten

6  someone?

7        A.    Threaten.

8        Q.    And did the parties know each other or --

9        A.    Um, I don't believe so.  As I remember, he was

10  just robbing this other kid.  It was like two kids is what

11  it was.

12       Q.    Another young defendant?

13       A.    Yeah, they were like 16, 17 years old.

14       Q.    And the jury found him guilty?

15       A.    Yes, we did.

16       Q.    Did the deliberations go smoothly in that case

17  or --

18       A.    Yeah.  I mean, there was a lot of arguments

19  back and forth.  I mean, just people's opinions and what

20  they had heard and that sort of thing.  And -- but we were

21  all convinced in the end that he was guilty.  It was just

22  hard to sentence a kid, you know.

23       Q.    Did you assess punishment?

24       A.    Yes, we did.

25       Q.    How much -- do you recall what the punishment

1    was?

2         A.    Ten years.

3         Q.    Was that hard for you to do?

4         A.    Yes.

5         Q.    Okay.  Did you have any second thoughts about

6    that afterwards, days later, months later?

7         A.    No.  But part of the reason I didn't have any

8    second thoughts about it was because after we had assessed

9    the punishment and the jury had been dismissed, some of the

10   attorneys, even the attorney for the kid, came back and

11   talked to us and made us feel like we had really made the

12   right decision because there were some things that we

13   hadn't, of course, heard during the trial.  And it made us

14   realize then that we had really done the right thing.

15              But, you know, ten years is a long time

16   for a 16 year old and that was really hard to think that you

17   can put somebody in jail or prison for ten years and they

18   come out a man.  But are they going to come out with more

19   problems than they went in with?  I have to tell you that it

20   does make me nervous to pass judgment on people, but I can

21   do it.

22        Q.    When you were discussing what would be the

23   correct term of years, were there some jurors that were at a

24   high end and some very low?  How did that go?

25        A.    I'm trying to remember what the high end was.

1    I think the high end was 20 years and it seems like there

2    were some that wanted the five years, which is what I

3    started out with and there were some that wanted the 20.  So

4    we came together.

5           Q.    So you came together on the ten?

6           A.    Uh-huh.

7           Q.    Okay.  Let me ask you a little bit, then,

8    about the death penalty.  You know from what you've -- what

9    the Judge told you in voir dire and the questionnaire that

10   this is a case involving the death penalty where the State

11   is seeking the death penalty.  So we ask every juror how

12   they personally feel about that law.  Are you in favor of

13   the death penalty as a law?

14          A.    Yes, sir, I am.  I definitely believe in the

15   death penalty.  However, I do have to say it's going to be

16   hard for me to sit there and be the one that says you are

17   going to die.  That would be tough for me, but I do believe

18   in the death penalty.

19          Q.    So from a philosophical point of view you

20   agree there should be the law?

21          A.    Yes.

22          Q.    I think that you have been pretty clear, you

23   are pretty uncomfortable sitting in judgment and, obviously,

24   the death penalty, sitting in the ultimate judgment?

25          A.    I would be lying if I told you that I wasn't.

1    Q.    A trial is divided into two parts.  First, let

2    me just talk about your philosophical view about the law.

3    You agree we should have it.  What kind of cases do you

4    think the law should apply to when you think of a death

5    penalty case?

6    A.    Calculated murder.  Someone that intends to do

7    harm to especially a child or an elderly person, someone

8    that really can't defend themselves at all.  Um, I really

9    don't know.  I mean, I really can't give you specifics,

10   other than when it pertains to a child and harm to a child,

11   when it pertains to the people that are out there trying to

12   protect us, you know, I don't think that every murder case

13   should probably be a death penalty, simply because I think

14   sometimes there are some circumstances now -- and I'm not

15   saying that people shouldn't be held accountable for what

16   they do, because they definitely should.  I'm just not sure

17   that every death should result in a death penalty.

18   Q.    Okay.  Just kind of based on the facts itself?

19   A.    Yes.

20   Q.    When you say a calculated death, do you mean

21   premeditated, planned out?

22   A.    Premeditated, yes, going into it knowing that

23   somebody is going to be harmed.  Maybe you don't know that

24   they are going to be killed, but you know they are going to

25   be harmed.  I just think people have to take, as I have said

1  in my questionnaire, I think that people have to take the

2  consequences for their actions.

3       Q.      Let me ask you this.  We talk to every juror

4  about what they have heard about this case because it did

5  receive a lot of publicity and you said that you saw

6  something on TV and, also, word of mouth.  What do you

7  recall hearing?

8       A.      I remember, you know, I don't remember a lot

9  of the specifics.  I do recall that there was an officer

10 killed.  I recall there was a lot of media coverage and

11 people were concerned.  I was concerned because we didn't

12 know where these people were.  I remember thinking that when

13 they were caught, that I was really surprised that there was

14 no bloodshed.  But, basically, that's all I remember.  I

15 don't remember -- in fact, I didn't even remember the names

16 until we got the little sheets telling us and that sort of

17 thing.  I remembered Aubrey Hawkins' name, but not the Texas

18 Seven.

19      Q.      Did you follow any of the cases or court

20 proceedings after the arrest?

21      A.      Not really.  I mean -- and I've heard and I

22 don't even know if this is the last one or where this one

23 stands, but I know there have been some preceding this one

24 and I know that they were found guilty, as far as I know.

25      Q.      Obviously, just because you have heard

1    something, doesn't necessarily make you unqualified to be a

2    juror.  We just have to go over that with each juror because

3    jurors have to decide their case, each case, based on what

4    they hear in the courtroom, not on what they have read or

5    seen in newspapers.  You can't let that influence you.

6              Some people form strong opinions about

7    what they've read or seen and they honestly tell the Court

8    it would influence them in some way.  Other jurors tell us,

9    I've read a lot about it or I've followed it some, but I

10   wouldn't let that influence me.  So we just ask you as best

11   you know yourself, would you be able to, if you were chosen

12   as a juror in this case, just decide the case on the facts

13   and not let those other things you have read or seen

14   influence you?

15        A.    I believe so.

16        Q.    Okay.  Now, you have told us philosophically

17   you are for the death penalty in Texas.  Texas -- I think

18   you have looked at the packet -- has just certain types of

19   cases which can be prosecuted for the death penalty.  Those

20   are an intentional murder, not an accident, not

21   self-defense, but an intentional murder that occurs with

22   some other aggravating facts, such as a murder during a

23   felony, robbery.  If I go into a 7-Eleven store and shoot

24   the clerk, that could be a case, or I break into someone's

25   home, murder someone in the home, that could be a death

1  penalty case.

2  Murder during a rape or arson,

3  kidnapping.  Also murder of specific individuals, such as a

4  police officer or fireman on duty.  Those could be death

5  penalty cases.  Murder of a child under the age of six.

6  Mass murder, several victims, that sort of thing.  Or murder

7  for hire.  Someone does it for money.  But those are the

8  specific types of situations that have been reserved for the

9  death penalty.

10  From your own personal point of view, do

11  you agree with that list of cases, at least from the type

12  that those should come into consideration?  Or do you

13  disagree with any of those?

14  A.  No, I believe I agree with that.

15  Q.  Okay.  In Texas the way the trial is set up is

16  it's divided into two parts like any criminal trial.  You

17  have the guilt/innocence stage in which we have to prove

18  beyond a reasonable doubt that the defendant is guilty.  If

19  we do that, we then move to the punishment phase where you

20  can hear additional evidence.

21  At the close of that evidence, you get

22  these questions that we'll go over more in a minute.  But

23  basically the State has to prove to you that the defendant

24  would be a continuing danger to society, that he either

25  intended the death or anticipated that a life would be

1    taken.

2              And, also, that there's -- the jury

3    reviews and decides if there is sufficient mitigating

4    evidence for a life sentence.  If they don't believe, they

5    will answer that one no.  A yes and yes and then a no would

6    equal the death sentence.  The Judge has no discretion.  He

7    sentences the defendant according to how the jury answers

8    those questions.  You don't write death or life in as a

9    juror.  You answer these questions.

10             But two yeses and a no equal a death

11   sentence.  Any other combination equals a life sentence, and

12   those are the only two possible outcomes once someone has

13   been found guilty of capital murder.  Is that clear to you?

14        A.     I think so.  I would have to read over the

15   questions.

16        Q.     Sure.  But the only two possible outcomes by

17   the way you answer is a death or life sentence.

18        A.     Okay.

19        Q.     The procedures are the same in each case.  Are

20   you familiar with the method of execution in Texas?

21        A.     Lethal injection.

22        Q.     That's right.  It gets on the news a lot.

23   Sometimes when it's a political year, it gets covered more,

24   or it depends on the person that's actually being executed

25   at the time.  But that's the method in Texas.

1    And the procedures are the same in each

2  case.  You probably know from living here in Texas that

3  executions are actually carried out.  Texas, in fact, leads

4  the nation in executions.  I think there was an execution

5  earlier this week.

6    Under our laws, if the defendant is

7  sentenced to death, he will be placed on death row.  He

8  would be placed there in a single cell and he would wait.

9  At some point in time the Judge would give an actual date of

10  execution.

11    On that day or the day before, he would

12  be moved from death row to downtown Huntsville where I'm

13  sure you have seen that red brick building with the clock.

14  He would be given time in a cell near that death chamber to

15  talk to his family, talk to a minister, if he wanted to.

16  Have a last meal.

17    At 6:00 p.m. by law all executions take

18  place.  There are visitors in two rooms, from the

19  defendant's side, if they desire to be there, or the

20  victim's family, that are brought in to view the execution.

21    The prisoner is brought down from that

22  hallway.  He's placed on the gurney, which is so often shown

23  on TV shows.  It's like a hospital gurney, except there are

24  leather straps constructed with it and he would be placed

25  down there by force, if necessary.  Needles would be placed

1   in his arm.

2                   He would be given an opportunity after

3   the witnesses are brought in to make a last statement and

4   the press always writes about these statements in the paper,

5   I know.  Sometimes they ask for forgiveness and sometimes

6   they are defiant.  And sometimes they profess their

7   innocence.

8                   But after that statement is made, the

9   warden simply signals that executioner who would then inject

10  chemicals which will immediately, when they hit his system,

11  collapse his lungs, which forces air out of his body.  He's

12  conscious when that happens.  It will stop his heart.  And

13  within about 15 seconds, he would lapse into a coma and he

14  will die.

15                  And that's the method in each case as it

16  occurs.  And that's what is reported in the media.  And I

17  don't mean to be morbid to go over that, but it's one thing

18  for us to talk about this thing philosophically and then

19  it's quite another when you realize, I've been summoned to a

20  death penalty case and I'm being considered to be placed on

21  this jury.

22                  Quite frankly, some people aren't cut out

23  for this.  There's no law that requires jurors to serve,

24  necessarily.  We have some people that come down that have

25  deep religious convictions against the death penalty and

1  tell us that I couldn't serve in this case.   I could never

2  answer questions in a way it would violate my conscience,

3  and that's fine.

4                 We have other people that are the extreme

5  the other way, do it anytime, and they are not qualified.

6  We have some people that philosophically are for the death

7  penalty, but because it involves the taking of another's

8  life, they are not comfortable.   They are unable to make

9  that decision.   It will weigh on their conscience.   If they

10 sat on a jury and saw someone living and breathing every

11 day, they would think about that afterwards.

12                 There might be a lot of evidence to

13 convince them how to answer those questions, but they, quite

14 frankly, couldn't go there and answer that.   They are not

15 comfortable doing that, and it would -- their -- they have

16 some uncomfortable feelings in sitting and making that

17 judgment on a life or death decision that would impair them

18 in their process.   They couldn't look at the questions

19 fairly and they are honest with us when that happens.

20                 And there's nothing wrong with that,

21 either.   You didn't get to choose which jury you get called

22 down on.   It's kind of a pot luck deal.   If that's how you

23 feel, that's fine, too.   You seem like a pretty honest

24 person.   You believe in our laws and you, in fact, have

25 served on two juries.

1     But you have been very honest with us,

2  too, that it made you a little uncomfortable sitting in

3  judgment and that's fair.  We appreciate you being honest

4  with us.  But this time the pot luck has got you in on a

5  death penalty case.

6     A.     Right.

7     Q.     And the stakes are a lot higher than 20 years

8  in prison or 10 years or even 2 years.  It involves taking

9  that man's life down at the end of that table.  I'll put all

10 my cards on the table.  We're confident from this table that

11 we have the type and quality of evidence that we can

12 convince a jury of his guilt and that those questions will

13 be answered in a way that he will lie dead on a gurney

14 someday, executed in the manner I described.  These are good

15 lawyers here and they feel the opposite way.

16     But I just want to ask you honestly, I

17 know you believe in the law, but do you really think in your

18 heart of hearts that you could actually partake in this type

19 of decision, knowing that someday this man would be

20 executed, if you answered the questions in a way we think

21 the evidence will show?

22     A.     It would be the hardest decision I probably

23 have ever made in my life.  But if you can convince me and

24 according to the law that he did this crime and the death

25 penalty is deserved under the laws of our state, I could do

1    it.

2              But I'm telling you, it would be very

3    uncomfortable for me.

4         Q.    Well, I think it would be uncomfortable for a

5    lot of people.  But there are some people that tell me, I

6    know in my mind you could convince me, but in my heart I

7    could never do it, because I would be staring, looking at

8    that man, knowing he's going to die.  I feel and can see a

9    lot of discomfort right now from you.

10        A.    Yes.

11        Q.    And if you feel that way, that's fine.  But we

12   just want to know that now.

13        A.    I could sit here and tell you I couldn't do it

14   because I'm terribly uncomfortable, because I am.  I mean,

15   you're right.  We're talking about a person's life and that

16   to me is greater than anything.  So it would be terribly,

17   terribly hard.  But I feel like we have to do things like

18   this, sometimes, just for our justice and our law and order.

19              Now, you would have to convince me, sir.

20   I mean, I would have to have no doubts.

21        Q.    Okay.  Because it would be taking someone's

22   life?

23        A.    And it would bother me, probably, for the rest

24   of my life.

25        Q.    When you say I would have to convince you, you

1  know, you have sat on two criminal cases and we've had to

2  prove to you beyond a reasonable doubt that person is

3  guilty.

4              Would because this involves someone's

5  execution, would we have to have an even higher burden in

6  that case in your mind?

7       A.    No, I don't think so.  I just have to know

8  that I'm making the right decision.  I have to know in my

9  heart of hearts based on what I've heard.

10      Q.    Okay.

11      A.    And -- I don't know how else to answer you.

12  I'm just telling you it's something that I don't really want

13  to do at all, but I feel like, you know, we as citizens, we

14  have to do.  We wouldn't have any justice, if we didn't take

15  responsibilities.

16      Q.    Well, that's why we bring a thousand people

17  down for jury selection.  And I want to make sure you are

18  not thinking, I'm obligated as a citizen to follow the law

19  and then get placed in a position where you would have to

20  say, look, I just can't go there.

21      A.    I would tell you if I couldn't go there.  I

22  can go there, but it would be hard.

23      Q.    Let me go over another area, then.  When we

24  talk about capital murder, we usually think of the

25  triggerman or the person that causes the death.  Capital

1   murder, like other crimes, can be carried out by more than

2   one person, by accomplices.  Some may have greater roles in

3   the crime than others and we call that in Texas, the law of

4   parties.  I don't know where they came up with that name.

5   We interchange accomplices, because that's what you grew up

6   hearing on "Perry Mason" or whatever.

7                    The law says that in capital murder, like

8   any other crime, if more than one person helps commit a

9   crime, they can all be prosecuted under that law.  An

10  example we give often is if Mr. Wirskye and I decide we want

11  to rob something, say we want to go rob a bank.

12                   MS. BUSBEE:  Your Honor, at this time I

13  make an objection.  If the Court would recall the objection

14  previously made?

15                   THE COURT:  I do.

16                   MS. BUSBEE:  And could the Court rule on

17  that objection?

18                   THE COURT:  The objection is overruled at

19  this time.

20       Q.    (By Mr. Shook)  Say Mr. Wirskye and I decide

21  we want to go rob a bank.  I've got a gun and I'm going to

22  go in and make the threats and Mr. Wirskye has a big bag.

23  And while I'm holding the gun on everyone, he's going to

24  gather the money up.

25                   And we do that.  But then in the course

1  of the robbery, maybe I get mad at one of the tellers or he

2  says one is going for an alarm, and I kill them

3  intentionally and murder them.  We leave and we're caught

4  later on.

5       Obviously, I could be prosecuted for

6  capital murder.  I could receive the death penalty because I

7  murdered that person.  I pulled the trigger.  The law says

8  that Mr. Wirskye was assisting me and he could, under the

9  facts, depending on the facts, be prosecuted for capital

10  murder, too.  He could even receive the death penalty, even

11  though he did not commit the murder, that he's an

12  accomplice.

13       Now, people feel differently about the

14  law of accomplices.  We have people that agree with the

15  death penalty when someone actually murders someone, the

16  triggerman, let's say, but they would draw a line personally

17  about someone that helps them, an accomplice or party.  They

18  would maybe severely punish them with a long prison term,

19  but they don't think the death penalty is appropriate for

20  those types of folks.  That's just their personal view.

21  Other jurors tell us they do think it's appropriate to

22  prosecute those people for the death penalty.

23       So we like to ask every juror how they

24  personally feel about it, not what the law is, but how you

25  personally feel about the prosecution of persons involved in

1  capital crimes, but not the triggerman, the accomplice.

2             Do you think that's fair to do in your

3  own personal view?

4      A.    I think that in some cases it would be fair to

5  do.  And I'm not sure what those cases would even be.  I

6  will have to listen to all the facts of the case and know

7  exactly what happened and go from there.  I can't really say

8  one way or the other whether I think that -- I don't draw a

9  line in the sand, no.  But I can't say one way or the other

10 that I believe one way or the other.

11     Q.    Do you believe, then, there could be cases

12 where an accomplice could receive the death penalty?

13     A.    Yes.

14     Q.    And why do you think it's important from your

15 own personal view that the State be able to prosecute

16 accomplices for capital murder?

17     A.    I believe that when you consciously go

18 somewhere with someone with a gun with the intent to do

19 something to -- theft or whatever, those are consequences

20 you have to take.  And you know the person you are with.

21 You know who these people are most of the time, I think.

22 That's part of the facts part of it.

23             You know, if it's somebody you just

24 picked up on the highway and you both said, yeah, let's go

25 rob this store and one of you has a gun, you know, the other

1   person doesn't really know that person, then, and don't

2   really know what they're capable of.  I don't know.  I have

3   to be honest, I don't really know.

4         Q.     It just comes down to the facts?

5         A.     It comes down to the facts with me.

6         Q.     I want to be honest with you.  Again, I can't

7   go into the facts of this situation, but that's the theory

8   of law that we're prosecuting the defendant under, the law

9   of parties.  And you are saying, depending on the facts,

10  from your personal point of view, you could find a person

11  guilty under that law and depending on the facts, could

12  answer the questions in a way that would result in his

13  execution under the law of parties?

14        A.     Yes, if depending on the facts.

15        Q.     Okay.  Now, under that law of parties there's

16  two theories.  One is you are assisting, helping,

17  encouraging the crime to occur.  The other one we call

18  conspiracy.  If we conspire to commit one crime, Mr. Wirskye

19  and I agreed to commit robbery, in other words, and during

20  the course of that crime, one of us commits another felony,

21  in this case murder or capital murder, to further that

22  crime, then we're all held responsible if we should have

23  known it could occur.  That's to get him guilty.

24               And to go to death we have to actually

25  prove in the second question that they did anticipate that a

1   life would be taken, not that they should have anticipated,

2   but that's the difference.  And that's what I wanted to --

3   we have to prove it one way or both under the law of

4   parties.

5                    Let's talk for a minute, now, about these

6   questions.  I want you to take a moment and read Special

7   Issue No. 1 to yourself.

8         A.     (Prospective juror complies.)

9         Q.     That question is the first question you get in

10  the punishment phase.  You don't get to these questions

11  unless you have found the defendant guilty.  It asks the

12  jurors to make a prediction about how the defendant would

13  behave in the future.

14                   First, let me ask you first, do you think

15  that you could make that type of prediction, if you were

16  given sufficient facts?

17        A.     I would have to know, yeah, the background and

18  that sort of thing.

19        Q.     That's going to be my next question.  What

20  types of information do you think would be valuable to you?

21  Background information?

22        A.     Yes.

23        Q.     Okay.  Anything else that comes to mind?

24        A.     Um, background, I assume, would include not

25  only their adult background, but their -- the way they grew

1   up.

2          Q.      What would be important to you about that?

3          A.      Well, maybe not -- yeah, well, just the fact

4   that if they grew up in a bad situation at home, I mean,

5   that could definitely -- I do believe that people that

6   commit crimes most of the time in my heart I believe they

7   are products of society and the environments that have been

8   forced on them.

9          Q.      Would that be important to you on question No.

10  1 about whether he's going to be a danger, then, because

11  we're going to get to question No. 3?

12         A.      Not necessarily just that, but what he's done

13  previously.

14         Q.      Okay.

15         A.      Would have to weigh heavily into that, I

16  think.

17         Q.      Prior criminal record, that sort of thing?

18         A.      Yes.

19         Q.      Those types of things can come up and you can

20  consider those in question No. 1, along with the facts of

21  the offense, obviously.  The question starts out with a no

22  answer and you are required -- or the State is required to

23  prove to you beyond a reasonable doubt it should be answered

24  yes by any new evidence that we have in the punishment

25  stage, and then anything that you have heard in the

1    guilt/innocence stage.

2              Just because you found the defendant

3    guilty of capital murder, believe that beyond a reasonable

4    doubt, doesn't mean you would answer yes in that situation.

5    The law requires for you to stop and relook at all the

6    evidence and look at anything new and then decide.  Some

7    jurors can't do that.  They would automatically answer it

8    yes because you found him guilty.  Other jurors tell us, I

9    could follow the law and I could keep my mind open.

10             Do you feel that you can follow the law

11   in that regard and review all the evidence and then make

12   that answer?

13        A.    Yeah.  These are questions that would be asked

14   after the verdict has been rendered?

15        Q.    Guilty.

16        A.    This is like another deliberation?

17        Q.    Right.  It's the second half of the trial, the

18   punishment phase.  Now, let's talk about some of the words

19   in question No. 1.  You won't get legal definitions, but

20   let's talk about the word "probability".  We have to prove

21   beyond a reasonable doubt that there's a probability the

22   defendant would commit criminal acts of violence.

23             What does "probability" mean to you in

24   the context of that sentence?

25        A.    More than likely.

1  Q.  Okay.  That's basically what the courts have

2  looked at.  We could never prove a certainty.  You recognize

3  that, I think?

4  A.  Yeah.

5  Q.  We could never prove a certainty to a jury,

6  but it's more than a possibility.  When you see the words

7  "criminal acts of violence", what does that mean to you?

8  A.  Acts that are against our laws and violence,

9  harm to others.

10  Q.  Okay.  Other human beings?

11  A.  Right.

12  Q.  And then when we say "continuing threat to

13  society", what does that mean to you?

14  A.  That they would more than likely commit the

15  crimes again.

16  Q.  Would society include anyone and everyone he

17  may come into contact with or possibly come into contact

18  with?

19  A.  Possibly, but I wouldn't necessarily mean

20  everyone.

21  Q.  Could it include people in the prison system?

22  A.  Yes.

23  Q.  Okay.  Let me talk to you a little bit about

24  question No. 2.  That's the question that has to do with the

25  law of parties.  I'll tell you, we didn't write these

questions, the Legislature did.  They are kind of confusing, but we always worry jurors may think we sat down and got together and we did not.

Question No. 2 asks whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased, but intended to kill the deceased or another, or anticipated that a life would be taken.

Now, if you believe he actually caused the death, the question in the first part is pretty easy.  But the second part of the question deals with that law of the parties or the accomplice.  If you do not believe he actually caused the death, you can answer the question yes, if you feel he really -- that was his intention to kill the deceased or someone else or he anticipated that a life would be taken.

Now, we can't sit there and obviously open the defendant's mind up to show you his intent.  All we can do is produce all the relevant evidence of the crime and his role in the crime.  And a jury can infer from a person's actions their intentions.

I can't get into what the specific facts were, but do you think that you can do that as far as question No. 2 goes, on whether someone, an accomplice, anticipated?

1    A.    I think that would be a much harder question

2    to answer, because like you said, you can't open up that

3    person's mind.  All you can do is -- here comes that pass

4    judgment again based on what you've heard and what you've

5    seen in the courtroom.

6              But that's where it gets harder, I think,

7    is when you are trying to know what's going on in their

8    mind.

9    Q.    Right.  Do you think the State could actually

10   ever prove that type of question to you in a death penalty

11   situation?

12   A.    I think they could.  But, like I said, the

13   facts would have to be there, yes.

14   Q.    Okay.  Well, that question starts out with a

15   no answer and we have to prove it to you beyond a reasonable

16   doubt, just like the other question.

17             Now, Special Issue No. 3.  That's the

18   mitigation question and that might be the -- you talked a

19   little bit about a person's background and that often comes

20   up in this question.  It asks whether taking into

21   consideration all the evidence, including the circumstances

22   of the offense, the defendant's character and background,

23   and the personal, moral culpability of the defendant, there

24   is sufficient mitigating circumstance or circumstances to

25   warrant that a sentence of life imprisonment, rather than a

1  death sentence, be imposed.

2              It's kind of a catchall question.  You

3  have already found him guilty.  In your mind you already

4  believe he's dangerous.  You also believe he anticipated

5  that a life would be taken.  But it allows the jurors to

6  look at everything in their background and determine if you

7  think there's sufficient mitigating evidence to give him a

8  life sentence, to spare his life.  It's kind of a mercy

9  question, even though you believe he's dangerous.

10             Do you feel you can keep your mind open

11  to that question?

12       A.     Yes.  I feel like I can keep my mind open.  I

13  don't really know how to answer -- I mean, all of this comes

14  down to -- every one of these come down to what you have

15  heard in the courtroom.

16       Q.     Right.

17       A.     And what each side has presented.

18       Q.     When I first talked about question No. 1, one

19  of the things you brought up on your own was the person's

20  background.  You said that people are products of their

21  environment and sometimes people talk about that on Special

22  Issue No. 3.  If a person was abused physically or mentally

23  as a child, maybe they had a very bad home life, that may

24  have shaped them.

25             And sometimes we have jurors that say,

1    that is something that I think may be mitigating to me where

2    I think a person's life should be spared.

3            A.     Well, also, to balance that out, you have to

4    look at what the other part of the question is, is that

5    person a continuing threat to society?

6            Q.     That's where some jurors have problems because

7    they go, you know, when I get to this last question, I've

8    already decided that he's dangerous to society, you know,

9    and I've kind of taken some of his background and I've

10   considered that kind of in question No. 1 already.

11           And if I have determined in my mind he's

12   a continuing danger to society, and then I've gone to

13   question No. 2 and in my mind beyond a reasonable doubt I

14   feel that he anticipated that a life would be taken or

15   intended that a life would be taken, and I know he's guilty

16   of this, at that point Special Issue No. 3 is kind of closed

17   to them.   There's no way I can really in good conscience

18   spare a person's life that I feel is a capital murderer and

19   a danger to society.   Some people tell us that.

20           A.     Well, I mean, but No. 3 says sufficient

21   mitigating circumstances.   I haven't heard -- I don't know

22   what the circumstances are yet.   But I understand what you

23   are saying that if you have answered yes to the first two,

24   then the obvious answer you are saying should be yes to the

25   third one, and I'm not sure that I agree.

1    Q.    Some people feel that way.  Other people tell

2    us, even though I found him guilty in those questions, I

3    could keep my mind open because that's what the law

4    contemplates that a juror could do that.

5              You don't have to tell us what mitigating

6    evidence is.  You have to be able to say I can keep my mind

7    open to it.  Some jurors can do that and some say, if I go

8    that far, I've gotten that far along the line, my mind is

9    closed to it.

10   A.    No.  If those are the three questions I have

11   to answer, my mind is not closed at any point.

12   Q.    So your mind could still be open and you could

13   still consider that type of evidence?

14   A.    Yes, I could.

15   Q.    Let me ask you this, coming from the opposite

16   view.  There are some jurors who may, because of their being

17   uncomfortable sitting in judgment in a life and death

18   situation, some jurors who, if they sat on a jury for a week

19   or two and stared, saw the defendant, a living, breathing,

20   human being, maybe even heard him talk, at the end of that

21   time they know, you know, the State has proven those first

22   two questions yes, but this question three always gives me a

23   way out.  Even if I don't think there is mitigating

24   evidence, I could at least in good conscience for my own, I

25   could sleep at night if I answer that one yes and spare his

1  life.

2      A.      I see what you are getting at.  Um, I said in

3  the beginning that this would be the hardest thing that I

4  would ever have to do in my life, if I did that, if I made

5  that kind of decision, but I could do it.  If everything is

6  -- if the facts are all there and the laws have been broken,

7  I believe in our justice system, I really do.

8      Q.      Do you feel you would have the mental

9  discipline, then, to even if you wanted to spare his life,

10  if the evidence wasn't there, you would answer it no?

11     A.      I could do it, yes.

12     Q.      Okay.

13     A.      I could.  You know, it's just going to depend

14  -- I have got to hear the facts.

15     Q.      I understand and that's kind of what the law

16  contemplates.  We can't get into the facts.  But you have to

17  be able to keep your mind open to it.

18             Let me just ask you a couple more things

19  here.  You've had some relatives at some point in time were

20  involved in the criminal justice situation as a defendant.

21  You had a sister that looked like 30 years ago may have had

22  some type of possession case?

23     A.      Uh-huh.

24     Q.      That was eventually dismissed.  What did that

25  involve, if you know?

1    A.    I really don't -- I didn't get all the details

2    on that.  All I know is that it was in Kaufman County.

3    Q.    Okay.

4    A.    And she and a cousin of mine were stopped by

5    -- I don't know if it was Highway Patrol, Sheriff's

6    Department or who, and they were taken to jail.  And the

7    next thing I heard it was dismissed and I never knew that

8    she went to trial for anything, so I'm assuming that it was.

9    I'm not real close to my sister.

10   Q.    Your son-in-law had a fraud case and he got

11   probation.  Do you know anything about that?

12   A.    A little bit, just what he's told me.  He --

13   it had to do with insurance fraud, I think.  He was buying

14   airplanes, remodeling them and reselling them.  And he was

15   just getting this business off the ground -- and this is the

16   story that I know.

17         He was just getting his business off the

18   ground and the pilot of the -- the test pilot forgot to put

19   the landing gear down and it crashed.  No one was hurt, but

20   it crashed.  And I guess he had lied about -- when he got

21   the loan for the plane, he had lied about either collateral

22   or he didn't insure it.  I'm not real sure on that part of

23   it.  But it was probation and a fine.

24   Q.    Did he actually go to trial or was it an

25   agreed plea?

85

1    A.    This was long before I met him, but, yeah, I'm

2 assuming.  That's what he said.

3    Q.    So you didn't even know him when this

4 happened?

5    A.    No.

6    Q.    And then on the other side you have had a

7 daughter that was a victim of a crime that was assaulted at

8 the post office?

9    A.    Uh-huh.

10    Q.    How long ago did that happen?

11    A.    That was in -- she was in college in San

12 Marcos.  It was probably '91, 1991.

13    Q.    What type -- you know, we hate to get into

14 these details, but it's kind of important since it was a

15 violent crime we're dealing with here.  What type assault

16 was that?

17    A.    She went into the post office to mail a letter

18 and he came from nowhere and just caught her from behind.

19 She struggled with him.  She fortunately had remembered to

20 have her keys with her and she struck him in the nose with

21 the keys and he gave way at that point and she ran.

22    Q.    So she was able to get away from him?

23    A.    But as far as I know, they never found out who

24 it was.

25    Q.    A pretty scary situation.

1    A.    Yeah, it was.

2    Q.    I'm glad she was able to defend herself.

3    A.    She's a pretty smart little cookie.

4    Q.    All right.  I appreciate your patience with

5  us.  I know it's kind of tough going through this, but you

6  have been pretty honest and I appreciate that.  Thank you.

7    A.    Thank you.

8          THE COURT:  Ms. Busbee?

9          CROSS-EXAMINATION

10  BY MS. BUSBEE:

11    Q.    I have such good news for you.  That's the

12  first time you have had that big smile.  I have semi-good

13  news.  I, at this point, don't know if you are going to

14  serve on the jury, but I will tell you that your answers

15  have been so forthcoming and complete that we really don't

16  feel like we need to ask you any of these questions about

17  the law.  I'm perfectly satisfied that at least we would be

18  happy to have you.

19          Is there anything that you would like to

20  discuss with me that I need to know now that you've been up

21  here for about forty minutes?

22    A.    I don't think so.  I mean, this is all

23  terribly new to me.  I have served on two juries, but this

24  is a whole different matter.

25    Q.    It's a rare occasion when we talk to someone

1    who has already sat on a case of this magnitude, because

2    it's not that -- it's not that common.

3           A.     Uh-huh.

4           Q.     I just need to reiterate and get your

5    assurance that you haven't predecided anything in this case,

6    simply because there's been some publicity.

7           A.     I don't believe so.  I really truly think that

8    I can keep an open mind, especially when we're talking about

9    people serving time in prison and people getting especially

10   a death penalty.  I mean, that's got to be the most, the

11   biggest responsibility I've ever had in my life is to think

12   that I would have a part in the decisionmaking in something

13   like that.

14               So, yeah, I think that I can keep an open

15   mind.  In fact, I know that I can keep an open mind.  Just

16   how easy this is going to be, I can't --

17          Q.     We don't want anybody that thinks it's an easy

18   thing to do.  That would be frightening, I think, to all

19   parties.

20          A.     Maybe easy is the wrong word.  It would be

21   terribly, terribly uncomfortable for me.

22               MS. BUSBEE:  I don't have any more

23   questions of this juror.

24               THE COURT:  Ms. Miller, if you would,

25   wait for us outside.  I'll have you back in, in a few

1    minutes.

2                        [Prospective juror out]

3                        THE COURT:  What says the State?

4                        MR. SHOOK:  We have no challenge for

5    cause, Judge.

6                        MS. BUSBEE:  No challenge for cause.

7                        MR. SHOOK:  We will exercise a peremptory

8    strike, Judge.

9                        THE COURT:  Thank you very much.  Have

10   Ms. Miller please return.

11                       [Prospective juror in]

12                       THE COURT:  Ms. Miller, thank you so much

13   for coming and serving.  Your wishes are going to be granted

14   in this case and you will not be seated on this particular

15   jury.  We look forward to seeing you next time.  Thank you

16   very much.

17                       [Prospective juror out]

18                       THE COURT:  Ms. Burkhalter, please.

19                       [Prospective juror in]

20                       THE COURT:  Good morning.  You are Ms.

21   Burkhalter.  How are you?

22                       PROSPECTIVE JUROR:  Fine, thank you.

23                       THE COURT:  We appreciate you wading down

24   here through the high water and rain and sorry it took us so

25   long to get you in this morning.  We don't know if we're

1   going to speak to someone an hour and a half or a few

2   minutes.  We take them as they come.  You have obviously had

3   enough time to read the orientation guide I gave to you and

4   the questionnaire that you filled out for us back in May,

5   probably several times, and then you've been bored.

6                    PROSPECTIVE JUROR:  Newspapers.

7                    THE COURT:  At least you have a newspaper

8   there for you.  This process is going to involve the

9   attorneys visiting with you about the law, maybe expand upon

10  some of your answers that you provided and hopefully help

11  you understand how all this relates.

12                    At the end of the process I have two

13  questions to answer, number one, do you understand the law?

14  Number two, can you follow the law?  That's the big picture

15  for me.  Do you have any questions about what you have read

16  so far?

17                    PROSPECTIVE JUROR:  No.

18                    THE COURT:  Will you be able to serve

19  this Court for a period of two weeks beginning on November

20  10th?

21                    PROSPECTIVE JUROR:  I would rather not.

22                    THE COURT:  I know, ma'am.  You saw that

23  whole room of people.  If I asked how many people don't want

24  to be down here, I don't think anybody would be shy.  Nobody

25  wants to be down here.

1              PROSPECTIVE JUROR:  I get paid on

2   commission only, so being off work is financially draining

3   and to be out of work for a couple of weeks and having to

4   make it up for a couple of weeks after that would be pretty

5   tough.

6              THE COURT:  If I remember, you are with

7   Chase?

8              PROSPECTIVE JUROR:  The Chase Financial

9   advisor.

10             THE COURT:  Financial adviser?

11             PROSPECTIVE JUROR:  Uh-huh.

12             THE COURT:  You would not be shut down.

13  You would be able to use the phone during the day, over the

14  lunch hour.

15             PROSPECTIVE JUROR:  I see clients by

16  appointment only.  It's not by the phone.  It's scheduling

17  financial profiles.

18             THE COURT:  You would be able to

19  schedule.  And it's like paying taxes, nobody wants to pay

20  their taxes.  And if we only took people who wanted to be on

21  the jury, we would really be in trouble.  And business

22  reasons are not valid for letting someone off.  And I

23  understand that.

24             So what I do is I run a real tight ship

25  as far as time.  We started this morning at 8:30.  Were you

1  here at 8:30?

2                    PROSPECTIVE JUROR:  Uh-huh.

3                    THE COURT:  We called the first person at

4  8:30.  We take a break five minutes between each one.

5  That's what I owe you is to run an efficient court.  I can't

6  help you with your business.  That's one of those things.

7  That's why we put this far enough out so you will be able to

8  schedule.  I don't think it will take a full two weeks, but

9  I need to prepare you for a full two weeks.  Fair enough?

10                    PROSPECTIVE JUROR:  I still don't think

11  -- I still would not -- being out of work for two weeks, I

12  mean, I have to do that at least once a year and it takes me

13  about a month to build my business up because I can't

14  schedule.  It's just like if a doctor didn't have any

15  appointments and they had to start new clients for the next

16  two weeks.  I see clients, new clients, to do financial

17  planning on a daily basis.

18                    So if I don't, if I'm not there for two

19  weeks, it takes me another two weeks to build up my

20  clientele and then it takes me another month before I get

21  paid for that business.

22                    THE COURT:  I understand it would be a

23  hardship.

24                    PROSPECTIVE JUROR:  It would be a big

25  hardship.

1          THE COURT:  I can't --

2          PROSPECTIVE JUROR:  You asked me and I

3  told you.  It would be a big hardship because if I'm not at

4  work, I don't get paid.  If I'm sick, I don't get paid.  If

5  I'm on vacation, I don't get paid.

6          THE COURT:  As you will find, the lawyers

7  sitting here at the table, the same program here.  If they

8  are not down here, they don't get new clients and they

9  suffer on the back end, just like you do.  And we are at

10  least aware of that.

11          I promise you I will be as mindful of

12  your time, but I can't let people off for business reasons.

13  Thank you for sharing it with us.  Mr. Wirskye?

14          MR. WIRSKYE:  May it please the Court.

15          KATHIE BURKHALTER,

16  having been duly sworn, was examined and testified as

17  follows:

18          DIRECT EXAMINATION

19  BY MR. WIRSKYE:

20     Q.     Ms. Burkhalter, how are you this morning?

21     A.     Good.

22     Q.     I may have some good news for you.  Even

23  though the Judge can't legally disqualify you and get you

24  out of jury duty so you can get back to your work, sometimes

25  prosecutors and defense attorneys are not as bad as people

1  make them out.  And we have the ability to agree to allow

2  you to go back and continue your work, so it won't be too

3  big of an interruption for you.

4               So next time somebody says something bad

5  about DAs or defense attorneys, take up for us, okay?

6     A.     Okay.

7               MR. WIRSKYE:  That's all I have, Judge.

8  We have an agreement.

9               THE COURT:  You do?  After I brow beat

10  Ms. Burkhalter, you're going to let her off?

11              MS. BUSBEE:  Yes.

12             (Recess)

13              THE COURT:  Ready for Ms. Weaver.

14             [Prospective juror in]

15              THE COURT:  Good afternoon.  How are you?

16             PROSPECTIVE JUROR:  Fine.  How are you?

17              THE COURT:  I have juror No. 1384 Sylvia

18  Weaver; is that correct?

19             PROSPECTIVE JUROR:  Yes.

20              THE COURT:  Welcome to the 283rd.  Have

21  you had enough time to review the guide I provided for you?

22             PROSPECTIVE JUROR:  Yeah, I just got here

23  and I kind of went through it real quickly.

24              THE COURT:  Did you have an opportunity

25  to look at your questionnaire that you filled out for us?

1           PROSPECTIVE JUROR:  No.

2                THE COURT:  The attorneys may have to

3    refer to a question and expand on an answer.  So you have it

4    there in front of you for your reference.  It's your day to

5    come down to the courthouse and race through the process.

6    You can figure out we need to talk to people individually

7    was because when we have a room full of 700 people, there's

8    no way that we can have any meaningful --

9                PROSPECTIVE JUROR:  Right.

10               THE COURT:  -- communication between the

11   attorneys and prospective jurors.  The objective here today

12   is twofold.  One, at the end of the process we need to be

13   sure that you understand the law.  Once you understand the

14   law, the next question is, can you follow the law?  That's

15   my function here today.

16               PROSPECTIVE JUROR:  Okay.

17               THE COURT:  Since you really didn't have

18   much time, they are going to go through this in detail and

19   you should be able to understand how it relates and have a

20   good working knowledge of it.

21                Before we go any further, if you have any

22   questions, please ask us.  This is not meant to be

23   intimidating or cause you a lot of stress.  I know some

24   people feel uncomfortable when you are the focus of

25   attention.  It's not meant to be.  Please ask questions, if

1   you don't understand.

2              The only question that I have for you

3   before I let Mr. Shook visit with you is will you be able to

4   serve this Court for the two weeks beginning November 10th,

5   as I listed there on the front page?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  You may inquire.

8              MR. SHOOK:  May it please the Court.

9              SYLVIA WEAVER,

10  having been duly sworn, was examined and testified as

11  follows:

12              DIRECT EXAMINATION

13  BY MR. SHOOK:

14       Q.    Ms. Weaver, my name is Toby Shook.  I'm the

15  prosecutor who will be asking you questions this afternoon.

16       A.    Okay.

17       Q.    As the Judge said, we're just looking for your

18  honest opinions.  There are no right or wrong answers.  I

19  believe you have been down on jury duty before?

20       A.    Yes.

21       Q.    So you know that we usually talk to the jurors

22  as a whole in a panel, but because it's a death penalty

23  case, the law prescribes we interview each juror

24  individually.  And feel free to ask questions at any time.

25  We don't mean to put you on the spot like you are the one on

1    trial, but we have found that this is the best process for

2    getting information.

3                      I'm going to go over some of the

4    information in your questionnaire and follow up on some of

5    that.  It's been very helpful to us.  We'll also talk about

6    capital murder, the death penalty, how you feel about it,

7    some of the rules that apply.

8          A.    Okay.

9          Q.    I noticed in your questionnaire, one of the

10   last questions we always ask is do you know of anything that

11   might affect you.  And at that time when you filled it out

12   you said that y'all were going through the adoption process?

13         A.    Yes.

14         Q.    And I just wanted to ask you, has anything

15   changed on that or today that might conflict with the trial

16   date?

17         A.    No.

18         Q.    So that shouldn't --

19         A.    That shouldn't, huh-huh.

20         Q.    All right.  And you work with a lawyer.  We're

21   always interested and inquire into what type of lawyer it

22   is.  What type of work do you do?

23         A.    I work with Crow Holdings, the general counsel

24   for Crow Holdings.  Crow Holdings is the Crow family, like

25   in Trammell Crow, and I work for the general counsel and he

1    does mainly corporate law.

2         Q.    So no criminal law involved there?

3         A.    No.

4         Q.    And you have served on a couple of juries?

5         A.    Yes.

6         Q.    What types of cases were those?

7         A.    One was insurance and one was drug dealing,

8    drug dealer.

9         Q.    When was the drug dealing case?

10        A.    Maybe four years ago.

11        Q.    Okay.  Was that a felony involved?  Were there

12   twelve jurors?

13        A.    Yes.

14        Q.    Okay.  What happened with that case?

15        A.    We had to dismiss him.

16        Q.    And kind of -- do you recall the facts?  Tell

17   me what the facts were.

18        A.    Um, I believe there -- I believe the -- the

19   defendant shot someone and the prosecution couldn't find and

20   didn't have enough information for the jurors to rule for,

21   you know, concentration (phonetic) or whatever.  I can't

22   remember.  I think there was many circumstances because of

23   the time of the shooting and where it was and there was no

24   witnesses.  And so we had to -- I mean, the jurors, we

25   elected not to -- we had to dismiss it.  It wasn't hung.  I

1   don't remember exactly what the ruling is, but I remember we

2   couldn't -- we couldn't charge him, I mean, we couldn't --

3            Q.      Was it a not guilty finding?

4            A.      Yes, it was not guilty.

5            Q.      But he was charged with shooting someone?

6            A.      I remember there was a shooting involved, so I

7   don't know if he -- if there was.  I don't think that he was

8   -- they couldn't -- they couldn't decide whether he was the

9   shooter or not.  But they were trying to do -- I remember

10  there was drugs.  It was a drug dealer incident, yeah.

11           Q.      How did the deliberations go in that case?

12  Were they kind of heated?  Were there arguments?  Or was it

13  a pretty clearcut case in your mind?

14           A.      I think it was pretty clearcut.

15           Q.      Did you speak with the attorneys afterwards?

16           A.      Yes.

17           Q.      What did they tell you?

18           A.      Um, gosh, I think the prosecutors were anxious

19  to find -- I think they kind of knew because of the -- they

20  asked questions like something about the circumstances of

21  the -- of the shooting or whatever it was.  I remember, you

22  know, I just remember there was a lot of talk about the time

23  of day it was and there wasn't any witnesses and so it was

24  more circumstantial evidence, I believe.

25           Q.      In your mind did the prosecution just not do

 1    its job in that case or --

 2         A.    It seemed like that's what it was.

 3         Q.    Okay.

 4         A.    If I can remember that far back.

 5         Q.    All right.  You just feel they didn't prove

 6    their case?

 7         A.    That's right.

 8         Q.    All right.  Also on your questionnaire I saw

 9    that you knew someone that was in Seagoville.  You said a

10    friend, I believe?

11         A.    Where was that?

12         Q.    That's going to be on, let's see, page, page

13    6, a guy named Steve Havord (phonetic), a friend in

14    Seagoville?

15         A.    Yeah, I can't -- I think it's V-O-R-D.  He

16    actually is a friend of my brother's.  And, um, I don't know

17    too much about it.  But I do know that he was caught, I

18    think, laundering money.

19         Q.    Okay.

20         A.    And he got caught.

21         Q.    You don't know him very well, then?

22         A.    I know him like we know him as a family friend

23    before like, you know, before he got in trouble.

24         Q.    Do you feel he was treated fairly by the

25    criminal justice system?

1          A.     Yes.

2          Q.     Okay.  And you grew up in Dallas; is that

3     right?

4          A.     Yes.

5          Q.     Went to high school here, went to SMU?

6          A.     Yes.

7          Q.     What high school did you go to?

8          A.     Bryan Adams.

9          Q.     I went to Woodrow Wilson and the Judge went to

10    Woodrow Wilson.  Bunch of East Dallas folks.

11         A.     That's right.

12         Q.     What year did you get out of Bryan Adams?

13         A.     '81.

14         Q.     I hear they are having a big reunion in a

15    while?

16         A.     Yes, they are.

17         Q.     All the '80s and stuff?

18         A.     Yes.  We just actually had -- the class of '81

19    had our reunion two years ago and it was a lot of fun.

20         Q.     Let me get into some areas about the death

21    penalty, then.  You know from the Judge's talk and the

22    questionnaire that this is a case involving the State is

23    seeking the death penalty.  So, obviously, we talk to every

24    juror how they personally feel about that.

25         A.     Yes.

1   Q.    The questionnaire and here in person, you put

2   on the questionnaire that you were in favor of the death

3   penalty as a law?

4       A.    Yes.

5   Q.    And I want you to kind of follow up on that in

6   your own words why you favor the death penalty and maybe the

7   purpose you think it serves.

8       A.    I knew you were going to ask a big loaded

9   question about that.  Can I refer to -- well, I think the

10  death penalty is a -- is, obviously, a very harsh penalty to

11  decide and I think it's a very personal kind of issue.

12          But I think when there's a crime that is

13  committed and with the law being the law and if both sides

14  can represent, then I think -- I think a penalty of that

15  magnitude is needed sometimes.  And especially in our

16  society nowadays.  I think there's sometimes no regard to,

17  you know, the law.  And we need -- we need structure.

18  Q.    If we could make you Governor of Texas for a

19  day, give you a lot of powers where you could decide what

20  laws we had, would you have a death penalty statute on the

21  books?

22      A.    Yes.

23  Q.    What types of crimes do you think from your

24  own personal point of view are appropriate for the death

25  penalty or types of crimes that should at least be

1   considered for the death penalty?

2        A.        Certainly any acts against children,

3   molestation.  Sexual crimes like rape, depending on the

4   severity, you know, the severity.  I mean, everything is

5   within degrees, I think.

6        Q.        Okay.  In Texas we have reserved the death

7   penalty under the current law for just murder cases and then

8   only certain types of murder cases.

9        A.        Right.

10       Q.        Used to be you get a death penalty for murder

11  plus some robbery cases and also rape cases, but they kind

12  of cut it down to specific murder cases.  There is always

13  talk of expanding that, or changing that.  I know that

14  Louisiana just recently tried a case where they convicted a

15  child rapist of a death penalty and there's talk of changing

16  that.

17            But under the current law it's reserved

18  just for intentional murder cases with some aggravating

19  facts, an intentional killing during the course of a felony,

20  such as robbery.  Rob the 7-Eleven clerk, shoot them, that

21  could be a death penalty case.  During a burglary where they

22  break into someone's home and kill them, during a kidnapping

23  or during a rape, during an arson.  Also murder of specific

24  individuals like a police officer on duty --

25       A.        Right.

1    Q.      -- fireman on duty, child under the age of

2    six.  Murder for hire, someone does it for money or profit.

3    And then a mass murderer or serial killer situation.  But

4    those are the specific types of cases that have been

5    reserved for the death penalty.

6              From your own personal point of view,

7    those types of cases that I have listed, do you feel those

8    are the types of cases that should be considered for the

9    death penalty?

10    A.      Yes.

11    Q.      Do you feel the murder of a police officer on

12    duty is the type of case that should come under

13    consideration?

14    A.      Yes.

15    Q.      All right.  When we think of the death

16    penalty, when we talk about these examples, we generally

17    think of the triggerman or the person that causes the death.

18    But in Texas, like most states, if more than one person

19    carries out a crime, then they, too, can be prosecuted.

20              And in capital murder you can prosecute

21    more than one person.  If a group of individuals commits the

22    crime, they can ultimately receive the death penalty,

23    depending on the facts.  We call this the law of parties or

24    accomplices.

25              Again, it takes more than one person,

1 sometimes, to commit a crime.  Some persons may have a

2 greater role in the crime.  One person may be the only

3 triggerman, but it doesn't always prevent us for trying them

4 for capital murder.

5 　　　　　　　An example we frequently give is if two

6 guys decide to go rob a bank.  One of them has got a gun,

7 one of them has a big bag.  They plan to go in there.  One

8 of them holds a gun on everyone and threatens them and the

9 other one starts gathering up everybody's money.

10 　　　　A.　　　Right.

11 　　　　Q.　　　During the course of that, maybe the guy with

12 the gun starts shooting people.  Maybe he's mad, maybe he

13 doesn't like the way they're looking at him.  Maybe he's

14 warned by the other, his accomplice, that they are going for

15 an alarm.  But he kills them intentionally.  They're caught.

16 　　　　　　　Obviously, the shooter can be prosecuted

17 for the death penalty, could ultimately receive it,

18 depending on the jury and what they find in the facts.  But

19 the accomplice could, also.  The law says if someone assists

20 someone in a crime like that, they can be prosecuted, they

21 could be found guilty, and they could ultimately receive the

22 death penalty.

23 　　　　　　　And we ask each juror their honest

24 opinions, not just if they can follow the law, because

25 people kind of fall one side or the other on that.  Some

115

1  people are for the death penalty from their own personal

2  point of view, but when they are -- they are for the

3  triggerman, they think the person that causes that death

4  should be the one to pay.  If it's an accomplice, someone

5  that is helping in the crime, they say no.  And they may

6  give him life or 99 years or a long term in prison --

7      A.      Right.

8      Q.      -- but they don't feel the death penalty is

9  appropriate in those situations because they didn't actually

10  cause the death.  Other jurors feel, no, those types of

11  people should be held accountable and could receive the

12  death penalty.

13          And we just look for your own personal

14  point of view here.  How do you feel about accomplices and

15  the death penalty laws?

16      A.      Now, this is the first time I have ever -- I

17  have never heard that, that you could try someone and give

18  them the death penalty on that.  Um, I have to think about

19  it.  I mean, I -- I hate to make just a quick decision on

20  that, I mean --

21      Q.      What's your gut reaction on it?

22      A.      I think that -- I think I could be -- I think

23  I could still be in favor of the death penalty there.

24      Q.      Okay.  And why do you think -- and, again, I

25  know you haven't really thought about it, but why do you

1    think it's fair or it would be good public policy to

2    prosecute an accomplice?

3         A.    Well, from what you are just saying that

4    as the law reads, um, if the intent is like a group like the

5    bank robbers or whatever, I mean, I have to put my answers

6    in good order.  I think that we all have choices.  And at

7    the end of the day, someone could say, man, this is not the

8    way I want to do it.  It hurts doing that.  And, of course,

9    you know, the triggerperson may not be real happy about it,

10   but at the end of the day we all have choices.

11        Q.    And you feel if the accomplice is actively

12   participating in the crime, then they, too, could be held

13   accountable and could ultimately receive the death penalty?

14        A.    Yes.

15        Q.    Okay.  Now, the law works, there's two

16   theories.  One is if they are actively involved, they

17   encourage, aid, help in any way in committing the crime,

18   they can be viewed as an accomplice.

19             The other way is what we call kind of a

20   conspiracy law.  If two or more people conspire to commit

21   one crime -- and conspire really just means we agree to do

22   it.

23        A.    Right.

24        Q.    Say me and another guy agree we are going to

25   commit robbery and during the course of that crime, or the

1   robbery in that case, one of us commits another felony to

2   further the conspiracy, in this case shooting someone, then

3   we all can be held responsible for that other crime.

4                    My agreement was we're going to commit

5   robbery, but my buddy then starts shooting people, then I

6   can --

7                    MS. BUSBEE:  Your Honor, excuse me, I

8   object to a hypothetical involving facts and ask the Court

9   to remember the objection it previously accepted.

10                   THE COURT:  I do.

11                   MS. BUSBEE:  And the ruling?

12                   THE COURT:  Overruled.

13       Q.    (By Mr. Shook)  Then I can be found guilty if

14   the jury believes I should have anticipated that a life

15   could be taken.  To get to the death penalty we have to go

16   further and prove to the jury that, in fact, I did

17   anticipate.  And that's all just going to depend on the

18   facts.

19       A.    Right.

20       Q.    Now, we can't get into a person's head and

21   open it up and show you their intent.  We have to put on all

22   the evidence, what the person's role in the crime was as we

23   know it, how the crime was planned, how it went down, and

24   their actions during the crime.  And you can make reasonable

25   deductions or inferences from there to prove their intent.

1    But it is clearly a situation where they are not the killer,

2    but can be prosecuted under that law and ultimately receive

3    the death penalty.

4                  Do you feel that you could find someone

5    guilty if the facts showed you that and ultimately a person

6    could get the death penalty, if he is a nontriggerman being

7    prosecuted under that theory of law?

8         A.    Yes.

9         Q.    Because I can't preview the facts to you, I

10   can't go over the facts, but I can tell you that that's the

11   theory of law we're going under in this case.  We're

12   prosecuting Mr. Murphy under that law of parties.  So that's

13   why I want to be up front with every juror and make sure

14   that they can do that under the proper facts and

15   circumstances.

16        A.    In this particular trial, that's correct.

17        Q.    That's correct.  You are fine with that.  Now,

18   every juror in this case, almost every juror we've talked

19   to, I've looked at the questionnaire, has said -- knows

20   something about the facts of the case, because it received a

21   whole lot of publicity.  And you put down on your

22   questionnaire that you remember following this a little bit

23   on the TV news?

24        A.    Right.  Just, you know, on what they -- I

25   think when they fled to Colorado or wherever they went to, I

1  mean, I remember that.  I don't -- I didn't read the paper

2  and follow it from -- nor did I watch "Court TV" about it.

3       Q.   So there's no problem in that.

4       A.   Right.

5       Q.   As I said before, every juror has.  We just

6  like to kind of go over with you how much you remember.  Did

7  you follow -- you obviously followed it when the crime

8  occurred and when they went to Colorado, I believe?

9       A.   Well, I think the only -- the only memory I

10  have is just the -- probably the initial day of the

11  shooting, I mean, because of that day and then it seemed

12  like it went weeks and then our -- maybe not weeks, but a

13  couple of days, and then there was the Colorado deal and

14  that was it.  I mean, that's pretty much all I know.

15       Q.   Did you follow any of the cases, any other

16  subsequent --

17       A.   No.

18       Q.   -- court proceedings or anything like that?

19       A.   No.

20       Q.   The law is this, that you have to, even though

21  you may have seen something on TV or in the newspaper --

22       A.   Right.

23       Q.   -- just decide the case on what you hear in

24  the courtroom.  You can't let anything you have read or seen

25  influence you.  You can follow that rule of law?

1    A.    Yes.

2    Q.    Now, the procedures in a case are the State

3 must prove beyond a reasonable doubt, obviously, in the

4 first part of the indictment.  If we fail to do that, it's a

5 not guilty, which apparently happened in that case that you

6 sat on with the drug prosecutors.

7          If we do prove that case, we move on to

8 the second phase of the trial where you hear additional

9 evidence, where you get these Special Issues.  We'll go over

10 those in more detail in a minute.  But, basically, the

11 Special Issues that the State must first prove are that the

12 defendant is a continuing danger to society, we must prove

13 that they anticipated that a human life would be taken, and

14 there's a mitigation question in which the jurors review all

15 the evidence and decide is there sufficient mitigating

16 evidence that tells them a life sentence should be imposed

17 rather than a death sentence?

18          But if you answer those questions yes,

19 yes, and no, the Judge has no choice.  The Judge would

20 sentence the defendant to death.  If they are answered any

21 other way, it would be a life sentence.  But those are the

22 only two choices once someone has been convicted of capital

23 murder.  You don't write death in.  You don't write life in.

24 The Judge sentences according to how the jurors answer those

25 questions.

1     A.     Okay.

2     Q.     And he has no discretion.  I mean, he just

3 sentences according to exactly how these questions come out.

4 So it would be the jurors' decision.  Are you familiar with

5 the method of execution in Texas?

6     A.     No.

7     Q.     Okay.  The procedures are the same in each

8 case.  Texas is a state which actually does proceed with

9 executions.  You probably knew that.  Texas leads the nation

10 in executions.  It's some states have the death penalty on

11 the books.  Some of them even put people on death row, but

12 they never execute them, but Texas does.

13          The method of execution is by lethal

14 injection.  The procedures for these executions are the

15 same.  They would be the same in this case.  If the

16 defendant is found guilty, those questions are answered yes,

17 yes, and no, the Judge would sentence him to death.

18          He would be placed on death row.  He

19 would wait there.  Then at some point in time, the Judge

20 would actually set a date of execution.  The day prior to

21 that execution, he would be moved from death row to downtown

22 Huntsville to the prison unit there where executions are

23 mandated to take place.

24          On the date of his execution he would be

25 given time with family, friends, with a religious counselor.

1 He would be given a last meal.  But at 6:00 p.m. the

2 executions are carried out under the law.

3          At that time the defendant will be

4 brought to the execution chamber, be placed on a gurney.  He

5 would be secured by leather straps and needles will be

6 placed in his arms.  Witnesses are brought in from both

7 sides, the defendant's family, the victim's family, if they

8 choose to be there to view this part of the execution.

9          And at that point in time the warden

10 allows him to make a last statement and these statements are

11 oftentimes reported in the newspapers and on TV.  You know,

12 sometimes they are quoted as, you know, asking for

13 forgiveness.  Sometimes they are extremely defiant.

14 Sometimes they proclaim their innocence.  Sometimes they

15 don't want to go there and there are guards there,

16 obviously, equipped and trained to force them there.

17          But at the end of that statement, the

18 warden signals the executioner and he simply causes

19 chemicals to be injected into his body, chemicals which

20 react very quickly.  This is often described, also, in the

21 newspaper accounts, but they generally, one chemical forces

22 the lungs to collapse, immediately forcing the air out.  One

23 chemical stops the heart.  And after about 10 to 15 seconds,

24 he will lapse into a coma and he will be dead within a very

25 short period of time.

1    A.     Not minutes?

2    Q.     Oh, yes.  I would say they lose consciousness

3    within 12 seconds and he's pronounced dead within five

4    minutes, but he's probably dead within 30 seconds.  That's

5    the procedure that happens in each case.  That's the

6    procedure that would happen in this case.

7                Jurors sometimes read about what happened

8    to defendants in cases they have sat on before and they have

9    various reactions.  And the reason I go into the detail is

10   it's one thing for us to talk about the death penalty kind

11   of around the water cooler or you see something in the news

12   or even here and then we start filling out questionnaires

13   and then you get called back down here, and you realize, I

14   may be on a case where I make these actual decisions.

15   A.     That's correct.

16   Q.     And it's kind of -- people view it

17   differently.  We've had people that are opposed to the death

18   penalty and they tell us that and they tell us, I could

19   never answer the questions in a way, because they violate my

20   principles, and that's fine.  That's why we bring a thousand

21   people down here to fill out questionnaires, because people

22   feel so adamantly both ways.

23                We have people that -- a few that are for

24   the death penalty all the time and really couldn't be fair.

25   And we have other people that are for it.  They don't really

1  want to do it, but they can.  And we have other people that

2  are for it and believe it ought to be prosecuted.  But when

3  it gets down to it, it would weigh on their mind too much

4  sitting in a jury every day, seeing the person living and

5  breathing here, maybe even hearing them talk, and then

6  making a decision knowing they are going to be executed

7  within a few short years.  And they tell us, quite honestly,

8  put me on some other case, but that's going to weigh on me

9  too much.

10              Every juror feels differently.  And all

11  we can do is depend on your honest opinions.  We can't

12  preview the facts.  And you have never been in this

13  situation before.

14              But as you sit here today, do you think

15  that you are the type of person that could take pen in hand

16  and if the State proves these things to you, answer those

17  questions in a way, knowing that the defendant would be

18  executed some day?

19      A.    I can say that, yes, I could.  I know that it

20  would weigh a lot on me, but, yes, I could do that.

21      Q.    Okay.  And that's just because of the human

22  life being taken?

23      A.    That's right.

24      Q.    And you being a part of that decision?

25      A.    Sure.

1     Q.    Do you think it would weigh on you so much

2  that this might interfere or impair your thought processes

3  in answering these questions?

4     A.    I don't think so.

5     Q.    Okay.  Would you think that you could do it

6  when it got down to it?

7     A.    Sure.

8     Q.    Let's talk about these Special Issues for a

9  minute.  I want you to look at Special Issue No. 1 and read

10  that to yourself.  I don't know if you had time to go over

11  all of those back in the room.

12     A.    No.

13     Q.    Take a moment, then, just to read that to

14  yourself and I'll go over that with you.

15     A.    (Prospective juror complies.)

16          MR. SHOOK:  Judge, may we talk to you for

17  a moment?

18          THE COURT:  You may.

19              (Bench conference)

20          MR. SHOOK:  Judge, that's all the

21  questions I have at this time.

22          MS. BUSBEE:  Your Honor, I believe the

23  sides have reached an agreement on this juror.

24          THE COURT:  Ms. Weaver, what that means

25  is the parties are not going to have you sit on this case as

1   a juror.  Don't feel bad.

2                      PROSPECTIVE JUROR:  Okay.

3                      THE COURT:  Just this case is not the

4   best one for you at this time.  We appreciate your time and

5   service to this Court.  And all I can do is say thank you.

6   See you the next time around.

7                      PROSPECTIVE JUROR:  Thank you.

8                      [Prospective juror out]

9                      THE COURT:  Julie Danker.

10                     [Prospective juror in]

11                     THE COURT:  Good afternoon.  Ms. Julie

12  Danker; is that correct?

13                     PROSPECTIVE JUROR:  That's correct.

14                     THE COURT:  Juror No. 3451.  Ms. Danker,

15  I got notice from the Sheriff that you are going to get to

16  go on a cruise; is that correct?

17                     PROSPECTIVE JUROR:  Yes.

18                     THE COURT:  We're all very envious of you

19  because by the time you get back, we'll still be here.  So

20  I'm glad you were able to rearrange your schedule and get in

21  early, versus your appointed schedule a few weeks from now.

22                     PROSPECTIVE JUROR:  Yeah.

23                     THE COURT:  Thank you.  Have you had an

24  opportunity to read the orientation guide I provided for

25  you?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Have you had an opportunity to review the questionnaire that you filled out for us back in May?

PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.

PROSPECTIVE JUROR:  Most of it.

THE COURT:  Today is the opportunity for the attorneys to visit with you in more detail regarding the issues that are discussed there, maybe follow up on some answers that you gave or ask you even more questions.

Obviously, when we have 750 people in the room, there's no really meaningful way that we can communicate with a potential juror and that's what this process is about.  Please, please, this is as informal as we can get.  Many people are nervous when they come in, like you, and it's not meant -- it's not going to be bad.  No wrong answers.  But if you would, just honest answers.

Two questions that I have to answer at the end of the process.  Number one, do you understand the law?  Number two, can you follow the law?  That's the big picture.

Only question I have for you at this time, will you be able to serve this Court for two weeks beginning on November 10th, if you are seated in this case?

```
 1              PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  Mr. Shook?

 3              MR. SHOOK:  May it please the Court.

 4                   JULIE DANKER,

 5    having been duly sworn, was examined and testified as

 6    follows:

 7                   DIRECT EXAMINATION

 8    BY MR. SHOOK:

 9         Q.    My name is Toby Shook.  I'm going to ask you

10    questions on behalf of the State this afternoon.  And as the

11    Judge said, we just want your honest opinions.  We don't

12    mean to put you on the spot up there.  It's the best

13    procedure we have found and it's prescribed by law that

14    since it's a death penalty case, we talk to you individually

15    that way.  Okay?

16                   You have given us a lot of information

17    off your questionnaire.  I want to go over some of that.

18    First thing I wanted to look at is your employment.  You

19    still work out at the Sachse Police Department?

20         A.    Yes, sir.

21         Q.    What are your -- I think you work for the CID

22    Section and for the Assistant Chief there?

23         A.    Yes, sir.

24         Q.    Kind of tell us what your duties are with

25    them.
```

1    A.    I'm kind of a secretary for the Chief and the

2  Assistant Chief.  But most of all I'm the CID secretary for

3  three detectives and I do prosecution reports and I do court

4  routings for officers and training schedules.

5    Q.    So you are on the inside knowing everything

6  that goes on, I guess?

7    A.    Well, I've only worked there for two years and

8  I started out in records.  And I've only been in CID for a

9  year.  I'm learning.  There's a lot to learn.

10   Q.    But as far as the detectives, they cover any

11 type of, I guess, criminal investigations like robbery,

12 murder, theft, burglary, all that stuff?  You do all the

13 reports for them?

14   A.    Yes, sir.

15   Q.    And then you do the duties for the Chief and

16 Assistant Chief, too?

17   A.    Very little for them.

18   Q.    Most of your contacts are through the

19 detectives, then?

20   A.    Yes.

21   Q.    Do you have much contact with the patrol

22 officers?

23   A.    Yes, sir.  I also do their payroll.

24   Q.    Okay.  You see cops all day long.  Let me ask

25 you this, because I know the defense is going to want to

1  know this.  This case, we can't get into the facts, but I

2  think that every juror kind of knows what this case is

3  about.  But it does involve the murder of a police officer

4  on duty.

5           And you work with police every day, so

6  obviously both sides want to know how that's going to affect

7  you or if it will affect you because of your relationship

8  with the people you work with.  And only you can tell us

9  that, obviously.

10          Have they talked to you about you coming

11 down on this case?

12      A.      Of course, I had to tell the Chief and

13 Assistant Chief where I'm going.

14      Q.      Right.

15      A.      And I showed them the letter and they just

16 said tell the truth and, of course, I know to do that.

17      Q.      How about, then, my original question, because

18 you work with police on a daily basis there at your work,

19 would that affect you as a juror, do you think?

20      A.      I don't think so.

21      Q.      Why is that?

22      A.      I haven't worked there very long.  The law is

23 the law, whether I work there or not.

24      Q.      All right.  What do you recall hearing about

25 this case when it first occurred?

A.    I remember hearing at the very beginning, but I really didn't keep up with it.  Because I had this, I went on the Internet and looked up a few things.  But I just know basics.

Q.    When did you look that up?

A.    A couple of days ago.

MS. BUSBEE:  May we approach?

Q.    (By Mr. Shook)  What all did you find out?  Do you remember?

A.    That there were seven and I think this is the last one.  And four were arrested in Colorado and this one and another one was arrested after that.  And one committed suicide.

Q.    That's pretty good.

A.    But I don't know after that.

MR. SHOOK:  In an abundance of caution, we better agree then.

THE COURT:  Ms. Danker, the parties come in and you have a secretary who works for the police, can mean anything.  Obviously, when you do the prosecution reports, that's pretty close.  And then, well, when you gave a magic word, I looked on the internet, there's no way in the world I can have you sit on this case, because you have got to be able to judge this case from everything that you hear from the witness stand and not any independent

1   investigation.  But you are way too close.  Information at

2   your hands, NCIC and other things, that may or may not be

3   admissible.

4                    And the parties agree that this is not

5   your case.  So you can go and enjoy your cruise and not

6   worry about coming back.

7                    MS. BUSBEE:  But we will mark you in our

8   book as being very truthful.

9                    PROSPECTIVE JUROR:  I am.  Ask the Chief.

10                   THE COURT:  Give the Chief our best.

11                        [End of Volume]

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF TEXAS        *

2   COUNTY OF DALLAS      *

3       I, NANCY BREWER, Official Court Reporter for the 283rd

4   Judicial District Court, do hereby certify that the above

5   and foregoing constitutes a true and correct transcription

6   of all portions of evidence and other proceedings requested

7   in writing by counsel for the parties to be included in this

8   volume of the Reporter's Record, in the above-styled and

9   numbered cause, all of which occurred in open court or in

10   chambers and were reported by me.

11       WITNESS MY OFFICIAL HAND on this the 4 day of

12   _____March_____, 2004.

13

14

15                _____
                NANCY BREWER, CSR, NO. 5759

16                 Expiration Date: 12-31-04
                Official Reporter, 283rd JDC

17                 Frank Crowley Crts. Bldg. LB33
                133 No. Industrial Blvd.

18                 Dallas, TX 75207
                (214)653-5863

19

20

21

22

23

24

25

REPORTER'S RECORD

**74851**

VOLUME 17 OF _0/_ VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

MAR   9 2004

Troy C. Bennett, Jr. C...

On the 18th day of September, 2003, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Vickers L. Cunningham, Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

1                   A P P E A R A N C E S

2     APPEARING FOR THE STATE

3     Mr. Toby Shook
      SBOT NO. 18293250
4     And
      Mr. Bill Wirskye
5     SBOT NO. 00788696
      Assistant District Attorneys
6     133 No. Industrial Blvd.
      Dallas, Texas 75207
7     Phone:  214/653-3600

8

      APPEARING FOR THE DEFENDANT
9
      Ms. Brook Busbee
10    Attorney at Law
      SBOT: 03488000
11    703 McKinney Ave. Ste. 312
      Dallas, TX 75202
12    214/754-9090

13    Mr. Juan Sanchez
      Attorney at Law
14    SBOT: 00791599
      5630 Yale Blvd.
15    Dallas, TX 75206
      214/365-0700

16

17

18

19

20
21

22

23

24

25

## PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Tonya Godbehere | 4 | 5 | | 17 |
| Trad Hamilton | 16 | 17 | | 17 |
| Monica Ortega | 37 | 38 | | 17 |
| Misty Glidewell | 57 | 60 | | 17 |
| Annette Watson | 75 | 74 | | 17 |
| Ben Ortiz | 92 | 94 | 125 | 17 |

P R O C E E D I N G S

1

2                THE COURT:  Ms. Godbehere.  Good morning.

3    How are you?

4                PROSPECTIVE JUROR:  Good.

5                THE COURT:  Please have a seat.  We've

6    got Ms. Tonya Godbehere.

7                PROSPECTIVE JUROR:  Yes.

8                THE COURT:  Welcome.

9                PROSPECTIVE JUROR:  Thank you.

10               THE COURT:  I know you are probably a

11   little nervous.

12               PROSPECTIVE JUROR:  Yes.

13               THE COURT:  You can tell when somebody

14   comes in and they're like this (demonstrating).  This is

15   about as informal a proceeding as we can do at this phase of

16   the trial.

17               PROSPECTIVE JUROR:  Okay.

18               THE COURT:  You remember when we had a

19   room full of folks downstairs, you were one of 700 people

20   and all crammed in there like sardines.  It was hot and --

21               PROSPECTIVE JUROR:  Yes, it was.

22               THE COURT:  And you got to fill out your

23   questionnaire.  And I will give you a copy of it, if you

24   need to refer back to it.  But all we're doing this morning

25   is visiting with you about the next step, is do you

understand the law?  We have provided the law for you and given you an opportunity to read it a couple of times.  The lawyers are going to visit with you about the law and how it relates to this case and see if you can understand it.  Certainly, you can't just read it.  You have to sit there and think about it.

And the two questions that I have at the end of the process are, number one, do you understand the law?  Number two, if you understand the law, can you follow the law?  That's my big picture, what I have to look for.

The only question that I have for you at this time before we begin is, do you have any problems serving this Court for a period of two weeks beginning on November 10th?

PROSPECTIVE JUROR:  No.

THE COURT:  Mr. Wirskye?

MR. WIRSKYE:  May it please the Court.

TONYA GODBEHERE,

having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WIRSKYE:

Q.    How are you, ma'am?

A.    Pretty good.

Q.    My name is Bill Wirskye.  I'm an Assistant DA

1  and I'm the one that's going to be visiting with you for the

2  next few minutes.  Following up on what the Judge said, I

3  know sometimes it's a little intimidating having you up on

4  the witness stand and you probably feel like you are on

5  trial, but we apologize for that.  But it's the best way

6  that we have to do this.  Feel free to ask questions.  If

7  something I say doesn't make sense, stop me and we'll visit

8  about it.

9           What I would like to do is go over some

10  of the information in your questionnaire, with you

11  particularly about the death penalty, your thoughts and

12  feelings about the death penalty, since, as you know, this

13  is a case where we're seeking the death penalty.  And then

14  maybe, finally, talk about some of the laws and rules that

15  apply in this type of case, a capital punishment case.

16           What went through your mind when you got

17  the letter or got notified that you had to come back for the

18  individual interview?

19       A.    I really didn't have any thoughts.  I just

20  thought, well, it's just another part of the process.  I

21  just really didn't think much about it.

22       Q.    Do you have any thoughts one way or another

23  about potentially being a juror in a case where the death

24  penalty is available?

25       A.    No.  I just, it's, you know, something we're

1   called to do, you know, as a society.  It's something that

2   we have to do.  So if I have to do it, I have to do it.

3        Q.    You don't have to.  We talk to a lot of the

4   people --

5        A.    Yeah, I'm fair enough to where I think that I

6   can listen and hear both sides and come upon a fair

7   judgment.

8        Q.    Okay.  And you told us in the questionnaire

9   that you were generally in favor of the death penalty; is

10  that right?

11       A.    Yes, that's correct.

12       Q.    Why do you think we should have a death

13  penalty in our society?

14       A.    Um, I think that there's some crimes that are

15  committed that warrant it.  I think there's some that is

16  not.  I think that not really an eye for an eye, because

17  there are some cases where it doesn't apply, but if you do

18  wrong and do wrong on others, then it should come back to

19  you.

20       Q.    Okay.  Is there a particular type of case or

21  set of facts that come to mind when you think about what may

22  be an appropriate case for the death penalty?

23       A.    I mean, just the things that I hear.  You

24  know, I've never sat on one and had to, you know, decide the

25  factor.  So I don't know.  I can't answer that.

1    Q.    Is there any case that you may have heard in

2    the media or followed or seen on TV come to mind?

3    A.    Not that I can just think of, no, when put on

4    the spot, no, I don't.

5    Q.    I don't think that you have your questionnaire

6    in front of you, do you?

7    A.    No.

8    Q.    I don't know if you remember.  It was a

9    particularly long questionnaire and we appreciate you

10   filling it out.  But one of the questions we ask you is to

11   kind of rank yourself on a scale of 1 to 10 on how strongly

12   you feel about the use of the death penalty, 1 being the

13   least and 10 being the most and you gave yourself a 9.

14   Of course, that means different things to

15   different people.  And I'm curious what it meant to you when

16   you ranked yourself a 9?

17   A.    Like I said, certain crimes depending on the

18   facts, if it warrants it, then, yes, there's -- I guess it

19   is kind of high, but if the crime warrants it, then, yeah, I

20   believe that, you know, death -- the death penalty does

21   apply.

22   Q.    Okay.  And you got a chance to look at some of

23   the law that the Judge gave you in the packet, and not a lot

24   of people know this, but maybe you do after reading that,

25   that in Texas, at least, the only crime where we have the

1    death penalty is a murder case and then only certain types

2    of murder cases.

3                    You know, I could commit a very brutal

4    murder and I could turn and shoot Mr. Shook, my buddy here,

5    because I don't like the tie he has on, shoot him ten times

6    in the head and laugh about it.  Maybe I've been to the

7    penitentiary five times.

8         A.    Right.

9         Q.    That wouldn't be the type murder that's

10   eligible for the death penalty.  We always have to have a

11   murder plus something else, some other aggravating factor.

12        A.    Okay.

13        Q.    Did you get a chance to look at that?

14        A.    Yes.

15        Q.    Is that something that you generally agree

16   with?

17        A.    Um, yes.

18        Q.    If it was up to you, if you were Governor of

19   Texas for the day and you could, I guess, expand or narrow

20   the group of crimes where the death penalty would be

21   available, what would you do?

22        A.    What was the question?  I'm sorry.

23        Q.    If you could write the law, if you were

24   Governor for the day or a Legislator, would you kind of

25   expand the type cases where the death penalty is available?

1    Are you happy where it is?

2         A.     I think I'm happy where it is.

3         Q.     Okay.  Fair enough.  Let me ask you this.  And

4    I know you don't have the questionnaire in front of you, but

5    we ask you what would be important to you in deciding

6    whether a person received a death or a life sentence in a

7    capital murder case?  And you answered the severity of the

8    case and if the person truly committed the murder or was

9    just in the wrong place at the wrong time.  Do you remember

10   that?

11        A.     Yes.

12        Q.     What did you mean by that, just kind of

13   following up on that.

14        A.     Um, well, of course, I haven't ever been in

15   that situation.  But I've been in places at the wrong time

16   where things have happened and, you know, I just happened to

17   be there.  I mean, it wasn't as severe as what is being

18   charged, but, you know, sometimes you go out planning

19   something and sometimes you are just there.  So, I mean,

20   does that answer your question?

21        Q.     Sure.  Let me kind of follow up on that.  It

22   actually kind of leads to some questions that I wanted to

23   ask you.  Oftentimes crimes are committed by more than just

24   one person.

25        A.     Right.

1     Q.    A group or gang of people could commit crimes.

2 When you are talking -- and the law allows us to prosecute

3 those other people, as long as they were actively involved

4 in the crime.

5     A.    Right.

6     Q.    Anything from shoplifting all the way up to

7 capital murder, as long as they were actively involved.

8     A.    Right.

9     Q.    When you are talking about a capital murder

10 context, you may have a situation where you just have one

11 person that actually pulled the trigger and caused the

12 death, maybe call him the triggerman, but you may have other

13 people who didn't pull the trigger who were actively

14 involved in the murder.

15     And we talk to a lot of people and there

16 are a lot of people maybe such as yourself, seems like, that

17 you may be very strong on the death penalty for the person

18 that actually, you know, pulled the trigger.  But a lot of

19 people just kind of draw that bright line and say, you know,

20 I may want to give the nontriggermen, the accomplices, what

21 a lot of people call them, I may want to give them life in

22 prison.  But if it were up to me, I would take the death

23 penalty off the table for those people.

24     A.    Right.

25     Q.    Because they didn't pull the trigger, didn't

1    actually cause the death.  Where do you fall down on that?

2        A.    I agree on that because just because you are

3    with a certain group of people, I don't think, well, I'm

4    going to say I wouldn't think they would sit around and go,

5    okay, we're going to kill this person.

6            Just like I said, I've been in situations

7    where I was with a group of people and I had no idea what

8    was going on and they did certain things.  Of course, like I

9    said, it's not as severe.  But, you know, and I was totally

10   not involved.  I didn't know anything about it because their

11   actions or whatever should have been on them and not me

12   because I didn't know.  But -- and it wasn't, but, you know.

13       Q.    And we talk to a lot of people and a lot of

14   people feel that way.  They may want to lock the accomplices

15   up for life and never have them get out, but as far as the

16   death penalty, they don't think it's justified --

17       A.    Right.

18       Q.    -- since they didn't actually cause the death

19   or they didn't have the intent.  And that's what I kind of

20   hear you saying, right?

21       A.    Right.

22       Q.    Just to let you know, the law in Texas does

23   allow us to prosecute an accomplice for capital murder, and

24   depending on the facts and circumstances, those accomplices

25   or nontriggermen, even though they didn't have any intent at

1    all that a death happen, they could still be prosecuted for

2    the death penalty.  And a lot of people very frankly

3    disagree with that.  That kind of sounds like where you are

4    at.  And you have to answer yes or no.

5         A.    Yes.

6         Q.    It sounds like where you are at.  Let me give

7    you an example just so you are clear on the law, give you an

8    example of how the law works in Texas.  Let's say Mr. Shook

9    and I decide we're going to commit a bank robbery.  The plan

10   is we've got one gun.  Mr. Shook is going to take the gun

11   in.  He's going to hold up the teller.  I'm going to be the

12   bagman.  I'm just going to go in and collect the money.  And

13   we've got a third friend of ours who's going to drive us up

14   there, wait outside the bank.  He's the getaway car driver,

15   keep an eye out for the cops.

16             That's our plan.  That's what we agree to

17   do.  As we go in to do the bank robbery, for whatever

18   reason, Mr. Shook shoots and kills the teller.  Okay?  He's

19   obviously committed capital murder at that point.  He's

20   committed an intentional murder during the course of a

21   robbery.

22        A.    Okay.

23        Q.    You know, I had no intent that that murder

24   happen, you know, I just signed on for a bank robbery,

25   basically.

1    A.    Right.

2    Q.    And we have the guy out in the car who just

3    signed on for the bank robbery.  Depending on the facts and

4    circumstances, the law in Texas would allow me, the bagman,

5    to be prosecuted for the death penalty and also the driver

6    out in the car.

7                 Kind of sounds like where you are at.

8    You would just draw that line.  You may want to lock me up

9    for life, you may want to lock him up for life, the getaway

10   car driver, but the death penalty shouldn't be an option at

11   that point, right?

12   A.    Yes, that's correct.

13   Q.    Okay.  Fair enough.  Sounds like it's

14   something you have some strong beliefs about.  You are

15   shaking your head kind of affirmatively and that type of

16   thing.  I'll be honest, the reason we talk so much about

17   this is because in this particular case we are proceeding

18   under that theory.

19   A.    Right.

20   Q.    The accomplice theory.  We're prosecuting Mr.

21   Murphy as an accomplice.  And, obviously, we don't want

22   anybody in the jury box -- we don't want to put you in a

23   crisis of conscience or put you in a hard spot.  And a lot

24   of people feel like you do and they tell us, you know, I

25   really wouldn't be comfortable serving in this case because

1  of my beliefs that something that, I guess, would

2  substantially impair me to sit as a juror in this type case.

3                  And that's kind of what I hear you

4  saying; is that correct?

5          A.     That's correct.

6          Q.     You have also told us that you heard something

7  about this case.  Just about everybody we talk to has heard

8  something.  It was a high profile case, so I'm just curious

9  what you have heard or what you know about this case.

10         A.     The -- basically the stuff on the media, the

11  seven broke out and the seven ran away, just the general --

12  they robbed a couple of places here and there, found a

13  little trailer, and kind of stayed there and then kind of

14  branched off and I think they were caught here and there,

15  but not all together.

16         Q.     Have you heard or kept up with any of the

17  court proceedings that has gone on in these cases?

18         A.     No.

19         Q.     Sounds like you know a little more of the

20  details than some of the people we talked to.  How do you

21  think that might affect you, if you were a juror in this

22  case, knowing what you know?

23         A.     I don't think it would.  I'm a very fair

24  person and I would listen to the facts and see, you know,

25  what really happened.  And because I can watch Channel 4 in

1    the morning and they say something and I can turn on Channel

2    5 and the story is completely different.  So I would be fair

3    to hear the facts in the case.

4            Q.      Okay.  Fair enough.  Give me just a second,

5    ma'am.  May we approach, Judge?

6                         THE COURT:  Any more questions?

7                         MR. WIRSKYE:  No more questions from the

8    State.  Thank you, ma'am.

9                         MS. BUSBEE:  Your Honor, we have reached

10   an agreement on Ms. Godbehere and appreciate her coming

11   down.

12                         THE COURT:  Ms. Godbehere, thank you for

13   your time coming here today.  And your pressure level went

14   down once you got in.  But the parties have agreed to excuse

15   you from this trial and we appreciate your time and service

16   to the Court.

17                         PROSPECTIVE JUROR:  Thank you.

18                         [Prospective juror out]

19                         THE COURT:  Ms. Trae Lynne Hamilton.

20                         [Prospective juror in]

21                         THE COURT:  Ms. Hamilton, how are you?

22                         PROSPECTIVE JUROR:  Good.

23                         THE COURT:  Welcome to the 283rd and have

24   you had enough time to review the guide I provided for you

25   this morning?

1     PROSPECTIVE JUROR:  Yes.

2     THE COURT:  I know you may feel a little

3 nervous with this process.  It's as informal as we can get.

4 It's a lot better than being crammed in with the 700 folks

5 that you were with back in May when you filled out the

6 questionnaire, what's your name, where were you born, and

7 what happened next program.  The opportunity today is for

8 the attorneys to explore those issues a little more in

9 detail with you, go over the law with you, see if you

10 understand it, how our law relates to this case.

11     And the two questions that I have to ask

12 and have you answer at the end of the process, number one,

13 do you understand the law?  Number two, if you do, can you

14 follow the law?  That's the big picture that I have to look

15 at.

16     Only question that I have for you before

17 I turn it over to the State is will you be able to serve

18 this Court for the two weeks beginning on November 10th?

19     PROSPECTIVE JUROR:  Yes.

20     THE COURT:  Mr. Shook?

21     MR. SHOOK:  May it please the Court.

22     <u>TRAE LYNNE HAMILTON</u>,

23 having been duly sworn, was examined and testified as

24 follows:

25     <u>DIRECT EXAMINATION</u>

BY MR. SHOOK:

Q.    Ms. Hamilton, my name is Toby Shook.  I'm going to be asking you questions on behalf of the State.  As the Judge said, there aren't any right or wrong answers.  We just want your honest opinions.

I'm going to follow up on some of the information you put in the questionnaire, talk to you about capital murder, and some of the laws and rules that apply to this case.  I see from your questionnaire that you have been on a jury before?

A.    Yes, sir.

Q.    In 1997?

A.    Yes.

Q.    What type of case was that?

A.    Drive-by shooting.

Q.    Okay.  I think you put down he was found guilty and there was some prison time?

A.    Yes, sir.

Q.    Did the jury actually assess punishment or did the Judge?

A.    The jury did.

Q.    Okay.  So the trial was in two parts, guilt/innocence, and then you had another punishment phase?

A.    Yes.

Q.    Was there any evidence produced in the

1    punishment phase, any additional information given?

2         A.     Um, not substantial, no.

3         Q.     Okay.  Sometimes there's a lot and sometimes

4    there's just, you know, if there is convictions or character

5    witnesses, that sort of thing.  Do you recall if there was

6    anything like that?

7         A.     Yeah, they had witnesses, yeah.

8         Q.     What do you recall -- what kind of sentence

9    was given?

10        A.     I think like five or six years with a fine.

11        Q.     It was a drive-by shooting.  Was it gang

12   related?

13        A.     Yes.

14        Q.     How old was the defendant?

15        A.     Seventeen.

16        Q.     Okay.

17        A.     Eighteen, somewhere around there.

18        Q.     Anytime we've had someone who has been on a

19   criminal jury, especially a felony, we like to ask them how

20   that went.  We have that one question on the questionnaire

21   where we ask you, did you have more or less -- did you

22   participate more or less or did you feel you had more or

23   less influence?  And I think that you said you participated

24   more than most jurors, yes, but you don't really feel you

25   had as much influence.

1          And we always ask people to follow up on

2   what your feelings were on that.

3          A.    Um, I'm trying to recall it here.  It was a

4   tough case.  It was a hard decision to make.

5          Q.    What was tough about it, the guilt/innocence

6   stage or the punishment or both?

7          A.    The guilt/innocence.  And they were proving

8   it.  There was a small child involved that he had shot,

9   spray in the apartment complex or whatever.  And there was a

10  small child that almost got hit.  So that's really what got

11  the jurors' attention, a near-death situation.

12         Q.    Did you feel it wasn't that strong a case or

13  concerns about whether the State had met its burden of

14  proof?

15         A.    I felt it was a good case.

16         Q.    You did?

17         A.    Yes.

18         Q.    What about other jurors?  Were there some

19  jurors having problems with that?

20         A.    There was some questionable stuff.

21         Q.    Were you a juror that participated more in the

22  jury deliberation and the evidence proved it was guilty and

23  that sort of thing?

24         A.    Yes.

25         Q.    Is that what you were talking about?

1       A.      Yes.

2       Q.      And as far as punishment goes, how did those

3    deliberations go?

4       A.      The Judge gave us a certain --

5       Q.      Penalty range?

6       A.      -- two or three things to choose from and we

7    decided on that.

8       Q.      Did those go pretty smoothly or was there

9    people that --

10      A.      It was half and half.  It was mixed.  The big

11   question was to fine the individual, knowing that his family

12   would have had to pay the fine because he was going to be in

13   prison or go ahead and not do the fine and let him just do

14   prison time.  That was our biggest dilemma.

15      Q.      So the actual prison time wasn't the big

16   issue.  It was the fine?

17      A.      Yes.

18      Q.      All right.  That happens from time to time.  I

19   think Mr. Wirskye and I usually tell them to forget about

20   the fine because we have jurors that stay out for hours

21   arguing about it.

22      A.      Right.

23      Q.      But overall how do you feel about sitting on

24   that type of case?  Were you satisfied with the whole

25   process?

1    A.    Yes.

2    Q.    Did it leave you unsatisfied?

3    A.    I think it was good.  I think that he got

4  justice, so --

5    Q.    Okay.  You also had a friend or an

6  acquaintance in 1990 had some type of case in Kentucky, a

7  conviction for robbery or something.

8    A.    Uh-huh.

9    Q.    Tell us a little more about that.

10    A.    I mean, I didn't know her when she did it, but

11  I heard about it.  She was -- she had lost her mom, kind of

12  lost it, and got her dad's gun and robbed the local

13  convenience store and got cigarettes, beer, and drove down

14  the road and they got her.  It was pretty cut and dry.

15    Q.    So it all happened before you knew her?

16    A.    Yes.  To know her now, I wouldn't have known

17  it.

18    Q.    You had a civil case, which I think you won a

19  sexual harassment case.  How long ago was that?

20    A.    2002.

21    Q.    Did it actually go to trial?

22    A.    No.  We settled out of court.

23    Q.    Okay.  Civil cases are a lot different from

24  criminal.  Anything about that case which would cause you

25  any problems sitting as a juror or left you bitter about the

1   system or anything?

2          A.      No.  I won the case, so --

3          Q.      You actually live in Irving now; is that

4   right?

5          A.      Yes.

6          Q.      Participate in the Crime Watch?

7          A.      Yeah, neighborhood stuff.

8          Q.      We ask each juror about what they read or

9   heard about the case, because, obviously, this case got a

10  lot of publicity.  What do you remember reading and hearing

11  about the case?

12         A.      Lots, lots.

13         Q.      Is it something you followed a lot?

14         A.      I think there for a week or so, all you had to

15  do was just turn the TV on.  I didn't personally follow it,

16  but it was certainly very, very publicized.

17         Q.      What facts do you recall about it?

18         A.      The escapes, you know, we got alerted for and

19  then the actual shootout at Oshman's, the deaths.  And then

20  actually when they caught them.  I think it was Colorado or

21  whenever they caught them hanging out when they sprayed

22  their hair and colored their hair and tried to hide out.  It

23  was pretty kind of scattered facts, but I remember the case.

24         Q.      Did you follow the cases at all after that,

25  after the arrest, any subsequent court proceedings?

1       A.    No.  I've heard very little.

2       Q.    Well, most people have seen or heard something

3  about this case, which doesn't make you automatically

4  ineligible to be a juror, obviously.  If that were the case,

5  then we could never seat a jury.  But some have read more

6  than others.

7       The bottom line is this, and only you can

8  tell us this.  The law is, obviously, the jury has to decide

9  the case based on the law and evidence that they hear in the

10  courtroom.  You can't let what they've already read or heard

11  influence them in some way.  So we ask each and every juror

12  about, you know, what they have seen and heard, how they

13  feel about it, and if they can follow that particular law.

14       Do you feel from what you've read and

15  heard that you could follow the law and not let any opinions

16  you have formed or any news stories you have seen influence

17  you in your verdict in this case, if you were seated on the

18  jury?

19       A.    Yes, sir.

20       Q.    Okay.  We can't ask you to put it out of your

21  mind, but, obviously, we can ask you if you honestly feel it

22  wouldn't influence you.  Do you feel it wouldn't?

23       A.    No.

24       Q.    Okay.  About capital murder, you're in favor

25  of that as a law; is that right?

1    A.    For the most part, yes.

2    Q.    Okay.  What types of cases or what purpose do

3  you think the death penalty serves?  Why do you think we

4  should have the capital murder case?

5    A.    When people are convicted without a doubt that

6  are truly guilty, that could be a menace to our society,

7  that's no rehabilitation that could help them.

8    Q.    Okay.  What types of cases come to mind from

9  your personal point of view that you think could possibly be

10  death penalty cases?

11    A.    That could be?

12    Q.    Yeah.  Or at least come up for consideration.

13    A.    Intent to kill.  Someone who intended to kill

14  somebody.  Certainly officers of the law are, you know,

15  that's kind of to me is our most important.  I think some

16  rapists, some people who do assaults.  I'm not real sure.

17  I'm kind of guessing, but I think some people have crossed

18  over.  Maybe there's not help for them.

19    Q.    So if it were up to you, you would have some

20  types of murder cases would come under the death penalty

21  statute and some cases, other than murder cases, like rape

22  cases or some type of assaults and that sort of thing?

23    A.    Yeah, depending on the case.

24    Q.    Depending on the facts?

25    A.    Yeah, exactly.

1   Q.   Okay.  In Texas the death penalty is reserved

2   right now just for murder cases and then only certain types

3   of murder cases, murders with some other aggravating

4   factors, such as a murder that occurs during the course of a

5   felony like a burglary.  Someone breaks into the house and

6   kills somebody in the house.  During a robbery, rob the

7   7-Eleven, shoot the clerk.  During a sexual assault, rape.

8   During a kidnapping or an arson.

9              Also, murder of specific victims, such as

10  a police officer or fireman on duty, prison guard on duty,

11  child under the age of six, those could be death penalty

12  cases.  The serial killer situation or mass murder with

13  several victims can fall under the statute, as well as

14  murder for hire, someone does it for money.

15             But those are the specific types of cases

16  that have been reserved for the death penalty.  From your

17  own personal point of view, do you feel that's a good list

18  or do you feel that those are the types of crimes that at

19  least should be considered for the death penalty?

20  A.   Yes.

21  Q.   Okay.  When we think of the death penalty,

22  generally the examples we come up with in our mind,

23  obviously, involve the actual triggerman.  If I go into a

24  7-Eleven, rob the clerk and kill them, I'm thinking of the

25  guy that actually does that.  But capital murder can be

committed by more than one person like any crime.

Under the law in Texas we call that the law of parties.  The more common term, I think, that we grew up watching "Perry Mason," is accomplices, people that assist in the crime.  Some may have greater roles in the crime than others, but if they are all acting together, trying to carry out that crime, helping, aiding, each other, the law says that they can all be held responsible, depending on the facts of each case.

And the same is true of capital murder.  In fact, under the law a person can be found guilty of capital murder and they may even receive the death penalty and they may not be the actual triggerman.  The law, and again it depends on the facts -- let me give you an example to demonstrate what I'm talking about.

If Mr. Wirskye and I decide we want to rob a bank and we have to do it together to accomplish that, maybe we come up with a plan where I have a gun and he has a big bag and we go in there.  I pull the gun out and hold everyone at bay with it and make threats and he starts gathering the money up out of the trays.

During the course of that robbery I shoot somebody, one of the -- one of the tellers.  I don't like the way they look or he warns me they are about to hit an alarm and I shoot them and kill them.  We're caught soon

1       after that.

2                       I can, obviously, be arrested and

3       prosecuted and could receive the death penalty, because I'm

4       the triggerman.  I committed capital murder, murder during

5       the course of a robbery.  But Mr. Wirskye could, also, be

6       prosecuted for capital murder, if the facts show that he was

7       actively aiding me and assisting me and that sort of thing.

8       He could even receive the death penalty, depending on the

9       facts, even though he didn't pull the trigger or kill the

10      person.

11                      But we like to get everyone's gut

12      reaction on that because some people feel differently on

13      that.  They are very much for the death penalty and support

14      it when we are talking about the people that actually murder

15      the victim, the triggerman; however, they draw a line from

16      their own personal point of view when we talk about an

17      accomplice situation.  Prison time, maybe a life sentence,

18      but they don't think it's appropriate for a death penalty in

19      those situations.  And we have other jurors who say, yes, I

20      am for the death penalty for accomplices.

21                      But there's no right or wrong answers.

22      We just want your honest opinions on how that fits on the

23      death penalty case involving an accomplice and the law.

24          A.      That's kind of a shade of gray.  It would

25      really depend on the facts of the individual situation and

1  the two of you, if that was a situation, if he had really,

2  you know, supported you and really trying to get you, hey,

3  yeah, this guy is pulling the plug, take care of him, or

4  whatever, or encouraged you to shoot the teller or whatever,

5  then, yeah, I think that would be aiding, certainly a very

6  big accomplice.

7          Do I think he's just as guilty as you in

8  the crime?  Yes.  Was he the triggerman?  No.  But if he was

9  pushing you to do the trigger, then I can see where you

10  could find that he would be just as guilty.  If not, and you

11  just kind of reacted on your own, then I can see where a

12  line could be drawn, you know, hey, we weren't supposed to

13  -- I mean, I've seen TV.  Nobody was supposed to get hurt,

14  one of those kind of situations.

15          So it would really depend on the

16  individual case and the facts.

17      Q.      There are two theories.  One legal theory is

18  someone aiding you, helping you, the kind of example you

19  gave, hey, take him out, shoot him, that sort of thing, aid,

20  direct, that sort of thing.  There's another legal theory

21  that we call conspiracy.  Kind of works like this.

22          We conspire to commit one crime.  Mr.

23  Wirskye -- and that merely means we agree we want to commit

24  robbery.  And while carrying out that crime, one of us

25  commits another felony to further the crime, in this case me

1    shooting someone.  I did that to further the crime, to get

2    away, or whatever.  And Mr. Wirskye could be held

3    responsible, if, from the facts, the jury believes he should

4    have anticipated a life would be taken.  And that's a little

5    different from the other theory.

6         A.     Uh-huh.

7         Q.     In fact, to be found guilty, he doesn't even

8    have to have the intent that I die.  To get to the death

9    penalty, though, the State has to prove then that he did

10   anticipate, that sort of thing.

11        A.     Uh-huh.

12        Q.     But, you see, that theory is a little

13   different?

14        A.     Uh-huh.

15        Q.     And people agree or disagree with that.  If

16   they were going to have accomplices, maybe they want to have

17   someone directly involved in an agreement up front, but

18   under that theory of law, you did not necessarily have to

19   have an agreement up front.  It all depends on the facts and

20   whether someone should have anticipated someone would die.

21                    How do you feel about the conspiracy law?

22   Do you feel that's fair?

23        A.     Um, it does make sense.  I mean, if you knew

24   you had a weapon and you were definitely going in, there was

25   that probability that somebody was probably going to get

1   hurt.  And you had that choice before you entered with him

2   to make the decision, no, don't take the gun, put the

3   bullets in it, make the decision are you really intending to

4   kill someone.  So, yeah, I can see that.

5          Q.     Let me ask you now.  The trial is divided into

6   two parts, the guilt/innocence stage and then there's the

7   punishment stage.  If he's found guilty of capital murder,

8   we move to the punishment stage where you hear additional

9   evidence and then you get these questions.  The questions

10  basically say this.

11         The State has to prove beyond a

12  reasonable doubt that the defendant is a continuing danger

13  to society.  The State has to prove that he caused the

14  death, intended it to happen, or anticipated that a death

15  would occur.  And, finally, there's a mitigation question in

16  which the jurors consider if there is sufficient mitigating

17  evidence that a life sentence should be imposed rather than

18  a death sentence.

19         They are yes or no questions, but if they

20  are answered yes, yes, and no, the Judge has no choice.  He

21  would sentence the defendant to death.  If they are answered

22  any other way, it would be a life sentence.  But those are

23  the only two possible outcomes once someone has been found

24  guilty.  Is that clear?

25         A.     Yes.

1    Q.    Are you familiar with the method of execution

2  in Texas?

3    A.    Um, I guess.

4    Q.    Lethal injection?

5    A.    Yeah.  I'm thinking lethal and that's pretty

6  much --

7    Q.    The procedures are the same in each case.  You

8  have probably followed some of them in the news.  Some

9  executions get a lot more publicity than others.

10    A.    Uh-huh.

11    Q.    The procedures would be the same in this case.

12  If the defendant were found guilty and the jury answered

13  those questions yes, yes, and no, the Judge would have no

14  choice but would sentence the defendant to death.

15              He would be placed on death row.  At some

16  point in time he would be given a date of execution.  On

17  that day or the day before that date, he would be moved to

18  downtown Huntsville to the unit where all executions take

19  place.  All executions take place at 6:00 p.m. unless there

20  is some delay by the Appellate Court.

21              He will be given time that day to meet

22  with his family members or friends, his wife, a minister, a

23  last meal.  But shortly before 6:00 he would be taken and

24  placed on that gurney.  He would be secured with leather

25  straps.  Witnesses would be brought into the room, the

1 viewing rooms, to view that execution, and as soon as he

2 gives his last words, the warden signals the executioner to

3 inject lethal substances.  It occurs the same way, same

4 procedure, every time.

5 People have different reactions.  The

6 poisons take effect very quickly.  They collapse the lungs.

7 They stop the heart.  In about 15 seconds he would lapse

8 into a coma and be dead.

9 That's our goal in this case, to be quite

10 frank with you.  It's one thing for us to talk about it in

11 kind of a philosophical point of view, you know, with your

12 friends or even filling out a questionnaire.  But when you

13 get down here and, you know, it gets a little more serious.

14 And we want to go over that, not to be

15 morbid to jurors, but just let them kind of think about that

16 for a moment.  Because this isn't for everybody.  Some

17 jurors believe in the death penalty and they can actually

18 make these decisions.  Other jurors, even though they

19 believe in it as a law, they would have some qualms, some

20 reservations, in ever sitting in this type of case.  It

21 would weigh on them too much and thinking about that would

22 interfere with them really making objective judgments and

23 that sort of thing.

24 If you feel that way, that's fine, too.

25 That's why I go over it in this detail.  Because it's one

1  thing to talk about it philosophically and it's another

2  thing when you get in a room and you get the man in here

3  that you can look at, knowing that from this point of view

4  we do have the evidence that would get him guilty and cause

5  the jury to answer the questions in a way in which he will

6  die in the manner I described.

7       You told us philosophically that you do

8  believe in the death penalty in certain fact situations.  Do

9  you think that you are the type of person who, if you

10  listened to the evidence, could actually take pen in hand

11  and answer the questions in a way that would result in his

12  execution some day?

13       A.    Yeah.  If the -- yeah, it's really based on

14  the facts and stuff to me.  It's a very, very hard decision

15  to make.  It's kind of the philosophical part, can I play

16  God or be a part of that to end a life or sustain a life.

17  That's really not -- it's a hard one.  But, also, it's

18  really based on the facts, I guess, you know, to me, coming

19  down to what comes out in court, too.

20       Q.    This first question you don't get to unless

21  you have found the defendant guilty.  And then it asks

22  whether there's a probability the defendant would commit

23  criminal acts of violence that would constitute a continuing

24  threat to society.

25       You see where that question is asking the

1    jurors to make a prediction about the future?

2          A.     Yes.

3          Q.     Do you feel that you can answer that question

4    if you are given sufficient facts?

5          A.     Yes.

6          Q.     What would be important to you?

7          A.     I guess it would be important the person, you

8    know, the facts when they acted on their -- something in

9    their past, their own criminal behavior, has there been any

10   -- was it, you know, I mean, I think that everybody can have

11   a mental thing.  But to mentally snap and to kill someone is

12   way beyond, I think, most of our realm.  It would all come

13   down to the proven facts.

14         Q.     You, obviously, get to look at the facts of

15   the case, the role in the crime.  Also, if there is any

16   additional criminal history, you can hear that, even from

17   the witnesses.  The law is this, there's no automatic yes

18   answers.  The law wants you to keep an open mind and then

19   determine if the State has proven it beyond a reasonable

20   doubt.

21                We have jurors that tell us if I have

22   come to the conclusion that the State has proven beyond a

23   reasonable doubt that he's guilty of capital murder, that

24   tells me all I need to know about question No. 1, in that

25   he's dangerous.  And that will be a yes answer, just because

1    I have reached that decision of his guilt.

2                    We have other jurors that tell us, I

3    don't know.  It may be even though he's guilty, he may be

4    dangerous, he may not, the law wants jurors to keep their

5    minds open and answer it one way or the other.  And we have

6    other jurors who just honestly tell us, if I have gone to

7    that length of finding him guilty beyond a reasonable doubt,

8    that's the main factor in my mind whether he's guilty and

9    the State can prove that to me.

10                   How do you feel about that issue?  If he

11   has been found guilty beyond a reasonable doubt, is that

12   question answered yes for you?

13        A.    Yeah, certainly, yeah.

14        Q.    As you talked at the beginning about how you

15   felt about the death penalty, I think you said, first answer

16   was, the main thing was, if this could be proven without,

17   you know, beyond a reasonable doubt, that's going to be the

18   main factor for you on the capital murder.  That's still how

19   you feel?

20        A.    Yes.

21                   MR. SHOOK:  May we approach for a moment,

22   Judge?

23                   THE COURT:  You may.

24                   (Bench conference)

25                   MR. SHOOK:  Judge, that's all the

1  questions that I have.  Thank you very much.

2              MS. BUSBEE:  We have reached an agreement

3  on Ms. Hamilton.

4              THE COURT:  Ms. Hamilton, I want to thank

5  you for your time and service to this Court.  The parties

6  have agreed to excuse you, so you don't have to serve on

7  this jury.

8              [Prospective juror out]

9              THE COURT:  Ready for Ms. Ortega.

10             [Prospective juror in]

11             THE COURT:  Have a seat on the witness

12  stand.  Good morning.  Thank you.  Sometimes the attorneys

13  like to refer to or I will refer to law that I gave you.

14  Did you have an opportunity to read it and review it a

15  couple of times?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  You look a little nervous.

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  This is as informal a

20  proceeding as we can have and it's a whole lot better than

21  being one of 700 people stacked into the Central Jury Room

22  and filling out that questionnaire.  If you recall, it was

23  what's your name, when were you born, and what happened

24  next?

25             This is an opportunity for the lawyers to

1  visit with you individually and go over the law, see if you

2  understand the law, and if you do understand the law, can

3  you follow the law?  That's -- those are the -- that's the

4  big picture I've got.  I have to answer those two questions

5  at the end of the process.  No wrong answers.  Just truthful

6  answers.

7               So do you have any questions of me

8  before we proceed any further?

9               PROSPECTIVE JUROR:  No.

10              THE COURT:  Will you be able to serve

11 this Court for the two weeks beginning on November 10th?

12              PROSPECTIVE JUROR:  Yes.

13              THE COURT:  I'll turn it over to

14 Mr. Wirskye.

15              MR. SHOOK:  I'll do it, Judge.  May it

16 please the Court.

17                    <u>MONICA ORTEGA</u>,

18 having been duly sworn, was examined and testified as

19 follows:

20                    <u>DIRECT EXAMINATION</u>

21 <u>BY MR. SHOOK</u>:

22      Q.     Ms. Ortega, my name is Toby Shook.  I'll ask

23 you questions on behalf of the State.  As the Judge said,

24 there are no right or wrong answers.  We just want your

25 honest opinions.  We don't mean to make you feel like you

39

1    are the one on trial because you are on the witness stand.

2    Because it's a capital case in which we're seeking the death

3    penalty, the law prescribes that we talk to each juror

4    individually, so it's the best procedure that we have.

5                    You have been down on jury duty before, I

6    believe; is that right?

7        A.    I've been called in, but I have never served.

8        Q.    Okay.  What type case was that that you were

9    called down on?

10       A.    I believe it was a DWI case and I think it was

11   in here.

12       Q.    Okay.  You recognize the Judge?

13       A.    Yes.

14       Q.    All right.  But you didn't -- you didn't --

15   you weren't selected?

16       A.    Correct.

17       Q.    But you talked to lawyers out on the panel and

18   that sort of thing?

19       A.    Yes.

20       Q.    Is that the only time that you have been down

21   for jury duty before?

22       A.    Yes.

23       Q.    And you grew up here in Dallas, I see?

24       A.    Yes.

25       Q.    What part of Dallas were you raised in?

1        A.      In Garland.

2        Q.      Okay.  And then now you work for the City of

3    Dallas?

4        A.      Yes.

5        Q.      Has there been a lot of, with recent events, a

6    lot of talk going on around the city?

7        A.      Yes.  I'm in human resources.

8        Q.      I bet there's been a lot of talk.

9        A.      A lot of talk.

10        Q.      Ted Benivides been through there?  Terrell

11    Bolton?

12        A.      I haven't seen them personally, but, yeah.

13        Q.      How does that affect everyone down there, in

14    all seriousness?

15        A.      Um, I guess a lot of people are concerned

16    because I work with a lot of people that actually lived in

17    Dallas, you know, so they're concerned with what's going on

18    because they are the ones who it's going to affect the most,

19    but it's a little tense right now.

20        Q.      Okay.  Overall do you think everything has

21    come about fairly from what's happened the last month or so

22    or what are your personal views on it?

23        A.      Well, um, they have different procedures that

24    they have to follow and you don't -- there are steps that

25    lead to an outcome, so there's a lot of ways for that to

1   happen and they have different procedures for that.

2           Q.      So you haven't been personally involved in

3   those?

4           A.      No.

5           Q.      All right.  We put on the questionnaire at the

6   very end, we asked how would you feel about being a juror in

7   this case and you put, I wouldn't be -- I would be very

8   unhappy about serving.

9           A.      Yes.

10          Q.      Tell us a little more about that, what you

11  were thinking when you --

12          A.      I would be unhappy, just for the fact that I

13  would have to sentence someone.  It's a life or death matter

14  and it would be a difficult decision to take -- to be the

15  person to take their life away, good or bad, or if you make

16  the wrong decision to set someone free.

17          Q.      Okay.

18          A.      It's just a tough decision to make.

19          Q.      We'll talk about that a little more in a

20  minute.  Because we ask each juror about that individually

21  and I'll do some follow-up questions on that.  Looks like

22  you are actively involved with T-ball and you are a soccer

23  coach?

24          A.      Uh-huh, yes.

25          Q.      That sort of thing and a part of the Soccer

1  Association.  Let me ask you about that.  Your five year

2  old, the Judge keeps a very efficient courtroom in that we

3  know this trial will last approximately two weeks and he

4  keeps kind of regular business hours, from 9:00 to 4:30 or

5  5:00.

6         A.    Uh-huh.

7         Q.    Would that affect you in any way with your

8  five year old or will he be taken care of?

9         A.    He will be taken care of.

10        Q.    Okay.  So that shouldn't be a problem for you?

11        A.    Right.

12        Q.    Okay.  Let me talk to you about this case.

13  You know it's a capital murder case in which the State is

14  seeking the death penalty, so we want to talk to everyone

15  about how they personally feel about the death penalty.

16        A.    Okay.

17        Q.    Are you in favor of it as a law?

18        A.    Yes.

19        Q.    Tell us why you favor it as a law.

20        A.    Um, if the person is convicted and actually

21  did do that crime of killing another person, I just feel

22  that it's just for them to be convicted and to death -- get

23  the death penalty.

24        Q.    Have you always felt that way about the death

25  penalty?

1          A.      Yes.

2          Q.      Have there been any cases that you followed in

3    the media, either locally or nationally, that you thought

4    was a death penalty case or a case worthy of consideration

5    of the death penalty case?

6          A.      None that can come to mind right now.

7          Q.      What types of cases do you think should come

8    into consideration for the death penalty?  What type of

9    case?

10         A.      Um, definitely a murder case.

11         Q.      Okay.  Any particular type of murder case?

12         A.      Um, I guess it just depends on the crime, how

13   the person was murdered, who was murdered, the age of the

14   victim.

15         Q.      Okay.  Are there certain -- are there certain

16   types of victims you feel should be protected by having a

17   capital murder statute?

18         A.      Children, most definitely.

19         Q.      What about police officers?  How do you feel

20   about those types of cases?

21         A.      Um, yes, they are out there to protect us and

22   to make sure that our safety is, you know, followed through.

23   So I feel that they are very important people.

24         Q.      All right.  Would there be any other crimes

25   other than murder cases that you think if it were up to you

1  should be considered for the death penalty?

2        A.    Um, no.

3        Q.    Okay.  In Texas the death penalty is reserved

4  for murder cases and then only certain types.  You have to

5  have an intentional killing.  It can't be self-defense,

6  can't be an accident.  It has to be a homicide, an

7  unjustified murder.

8              But we have a lot of murders that a

9  person could get life, but they can't get the death penalty.

10  They can be real brutal, you know, the man who killed his

11  wife in front of his children in Highland Park a few years

12  ago.  That couldn't be a death penalty case.

13              A lot of people disagree with that, but

14  they have limited the death penalty to murders that occur

15  with some other aggravated factor, such as murder that

16  occurs during the course of another felony, like murder

17  during the course of a robbery.  If I go into the 7-Eleven

18  and rob the clerk and kill him, that could be a death

19  penalty case.

20              Murder during a rape.  If I'm sexually

21  assaulting someone and murder them, that could be.  Murder

22  during an arson or murder during a burglary.  Break into a

23  home and kill someone in the house.

24              Those are the types of cases when

25  committing another felony that could come under our death

1    penalty statute.  Also murder of a specific victim, like a

2    child under the age of six, a police officer on duty,

3    fireman on duty, that sort of thing.  And then mass

4    murderers or serial killers.  They can come under, or

5    murdering someone for money, for hire, a hitman situation.

6                    But those are the specific situations

7    that have been reserved for consideration of the death

8    penalty.

9                    Any on that list that you disagree with

10   or did you agree with that those are the types of cases that

11   at least should be considered?

12           A.      For the murder trial?

13           Q.      Yes.

14           A.      Yes, I agree with them.

15           Q.      You think that makes sense?

16           A.      Yes.

17           Q.      All right.  Now, a capital murder case is

18   divided into two portions.  You have the guilt/innocence

19   stage where the State has to prove whether the person is

20   guilty or not.  If we don't do that, there would be a not

21   guilty finding and everyone would go home.

22                    But if we do do that, then the jury would

23   find the defendant guilty and you would go to the punishment

24   phase where you can hear additional evidence.  At that point

25   in time you then would get some Special Issues to answer.

1        Now, when we talk about capital murder --

2   let me back up for just a second.  We talk about -- we think

3   of the example of the actual triggerman.  You know, I pull

4   the gun out and shoot the 7-Eleven clerk.  Capital murder

5   can be committed, though, by more than one person.

6   Sometimes groups of people have to pull it off like any

7   crime.  Some people have a greater role in it.  Some

8   participate more in it, but there may be several people

9   participating in it.

10        The law says if more than one person

11  commits a crime, if they are actively participating in

12  pulling the crime off, they can all be held responsible,

13  even though some may have a greater role.  Capital murder,

14  you may have one person that causes the death, the

15  triggerman, but you may have others that assist him.  And

16  under our law under certain facts they can be found guilty

17  of capital murder.

18        An example we give to demonstrate that

19  would be, I'll use myself and Mr. Wirskye.  We want to -- we

20  decide we want to commit a crime together.  We want to rob

21  the neighborhood bank.  I have a gun with bullets.

22  Mr. Wirskye knows that and our plan is for me to come in and

23  I'm going to threaten everyone.  He's going to have a big

24  bag of money -- I mean, a big bag and he's going to be the

25  guy, while I hold everyone at bay with the gun, he's going

1  to go through the teller's drawers and grab all the cash.

2  We go in and I make the threats.  I pull

3  the gun out and he starts robbing and taking their money.

4  During the course of that robbery, I shoot one of the

5  tellers.  I don't like the way they are looking at me.

6  Mr. Wirskye, maybe he tells me that someone over there is

7  going for an alarm and I shoot them intentionally.  And then

8  we leave and we're caught.

9  Obviously, I can be prosecuted for

10  capital murder because I'm the triggerman.  Mr. Wirskye,

11  however, didn't murder anybody.  He just participated in the

12  event.  The law says that he, too, depending on the facts,

13  could be prosecuted, could ultimately maybe even receive the

14  death penalty, depending on the facts, even though he's just

15  a party to the offense or an accomplice.

16  And we want to get everyone's just down

17  gut, gut reaction, honest opinion, about that, because

18  there's some people that agree with the death penalty as a

19  law for the triggerman.

20  MS. BUSBEE:  Your Honor, I will make my

21  objection to this question, again based on Article 1,

22  Section 10 of the Constitution of the United States and the

23  Sixth and Fourteenth Amendments to the United States

24  Constitution.

25  THE COURT:  Overruled.

1    Q.    (By Mr. Shook)  And some people

2  philosophically disagree with that as far as whether it's

3  appropriate to prosecute someone for the death penalty who

4  is an accomplice and not a triggerman.  They feel those

5  people deserve prison time, maybe a life sentence, even, but

6  not the death penalty.  That's where they would draw the

7  line, if it were up to them.

8                There's no right or wrong answers on

9  that, but we want to get every juror's opinion on that.  How

10  do you feel about the accomplice being prosecuted in these

11  situations?

12    A.    Um, yeah, he should.  I think that the

13  accomplice should get the same sentencing as the person that

14  actually pulled the trigger.

15    Q.    Why do you think it's important that an

16  accomplice be -- the law allows the State to prosecute an

17  accomplice or nontriggerman for the capital murder in a

18  death penalty case.

19    A.    Because if that person were to go on his own,

20  he would do that anyways or if he would be out in society

21  after several years, maybe he might do that again, because

22  it would be a threat.

23    Q.    So you feel the active participation, even

24  though they didn't pull the trigger, shows they are a

25  dangerous person?

1    A.    Correct.

2    Q.    And you feel that they should be held

3 responsible for that crime just as much as the triggerman?

4    A.    Yes.

5    Q.    Okay.  And that's just your honest opinion on

6 it?

7    A.    Yes.

8    Q.    That's what the law contemplates and, of

9 course, it all depends on the facts.  And there's really two

10 theories.  If I actively participate, aid, encourage,

11 direct, another person to commit a capital murder, then --

12 and I don't actually do the killing, I can be found guilty.

13 I may have the intentions there, but I don't do the killing

14 and I could be found guilty and I could even receive the

15 death penalty.

16             And the other theory is the law of

17 conspiracy.  If we conspire to commit one crime and one of

18 the co-conspirators commits a different crime while we're

19 committing it in order to further it, we can all be held

20 responsible.

21             Now, I'll put that in regular language.

22 When we say conspire, that means an agreement.  Mr. Wirskye

23 and I conspire to commit a bank robbery, which means we

24 agree, let's go commit a bank robbery, and if I, in the

25 example I gave, commit another crime, murder, to further

1  that first felony, then he can be held responsible, too, if

2  you feel from the facts he should have anticipated that a

3  death could occur from looking at all the facts, kind of

4  like what you said.

5          A.      Uh-huh.

6          Q.      And then to get to the death penalty, we will

7  go over that in a minute, not only does the State have to

8  prove that he should have anticipated, but that he did

9  anticipate.  And that all comes down to the facts of each

10 case and what the State can prove.

11              But the law allows us to prosecute an

12 accomplice, a nontriggerman, for capital murder and even

13 receive the death penalty.  And you agree with the law in

14 that regard?

15         A.      Yes.

16         Q.      Okay.  The reason I go over that in such

17 detail is that's the theory we are prosecuting this case

18 under.  We can't get into the facts, but I can tell you that

19 we are prosecuting Mr. Murphy as an accomplice, a

20 nontriggerman, and seeking the death penalty in this

21 situation.

22              And you are fine with that, just as long

23 as the facts would prove him guilty in this type of case; is

24 that right?

25         A.      Correct, yes.

Q.     Okay.   Now, let me go to the next question you brought up and, again, we're just looking for your honest opinions.   A capital murder case in which the State is seeking the death penalty is divided into two portions, the guilt/innocence phase and the punishment phase.

In the punishment phase you can hear additional evidence, but at the end of that you get these questions.   Basically, the questions ask did the State prove to you beyond a reasonable doubt that the defendant is a continuing danger to society?   We also ask -- we have to prove to you that he intended the person to die or he did anticipate that someone would die.   And the last question the jury considers is whether there is sufficient mitigating evidence that a life sentence should be imposed.

If you answer those questions yes, yes, and no, the Judge has no choice.   He will sentence the defendant to death.   The jury doesn't write death or life in.   They just answer those questions, those fact-based questions, yes or no, and the Judge bases his decision or he sentences on how you answer that.

He doesn't really have any discretion. If you answer them yes, yes, no, he has no choice.   He would sentence the defendant to death.   If you answer them any other way, again, he has no choice.   He would give him a life sentence.   But those are the only two choices at that

1  point in time.  Is that clear to you?

2       A.     Yes.

3       Q.     Now, are you familiar with the method of

4  execution in Texas?

5       A.     Lethal injection.

6       Q.     That's correct.  It's on the news a lot.  You

7  probably know from growing up here in Dallas that executions

8  do actually take place in Texas.  In fact, Texas leads the

9  nation in executions.  And frequently they are reported in

10  the news, how the executions take place.

11             I can tell you that the procedures are

12  the same.  They would be the same in this case, if the

13  defendant were found guilty and these questions were

14  answered yes, yes, and no.  The Judge would sentence the

15  defendant to death.

16             He would be placed on death row and at

17  some point in time down the line the Judge would give a date

18  of execution.  The day before that date he would be moved

19  from death row into that prison unit that often appears on

20  TV in downtown Huntsville where all executions take place.

21             On the date of his execution he would be

22  given time with a minister, he would be given time with some

23  close friends or family members.  But at 6:00 p.m. the

24  executions do take place.

25             He would be taken from his cell down a

1  small, short hallway, put in the gurney that you have

2  probably seen on TV that has leather straps constructed to

3  it.  He would be secured by force, if necessary, onto that

4  gurney.  And after he is secured, needles would be placed in

5  his arms which there is tubes that go into another room

6  where the executioner sits.  Visitors or witnesses from both

7  sides, either the victim's family and the defendant's

8  family, come into separate viewing rooms at some point in

9  time.

10             The warden then allows the defendant to

11  make a last statement.  These are reported quite frequently

12  in the news where they may ask for forgiveness.  They may

13  proclaim their innocence.  They may protest what's being

14  done to them.  Oftentimes, the newspapers quote family

15  members, how could you do this?  And jurors who have sat on

16  cases have read this.

17             But after that last statement is made,

18  the warden simply signals the executioner who then injects

19  lethal substances, substances that act very quickly on the

20  body.  He would still be conscious, but they immediately

21  collapse his lungs, force the air out.  It will immediately

22  stop his heart from beating and then he will lapse into a

23  coma after about ten seconds and within a few minutes he

24  would be dead, pronounced dead.

25             That's the procedure that would happen in

1   this case.   It's the procedure that happens in every case.

2   And I don't mean to go over such detail to be morbid, but

3   you kind of hit the nail on the head when we first started

4   talking to you.   It's one thing to talk about the death

5   penalty philosophically and it's another to sit on the jury

6   and actually make that decision, knowing what is going to

7   happen somewhere down the line.

8                    And that's why we bring a thousand people

9   down.   That's how many people we brought down, that room

10  full of people, to answer those questionnaires, because some

11  people tell us they are against the death penalty and

12  couldn't ever assess it and that's fine.   Some people are

13  for it adamantly and they couldn't be fair.

14                   Other people are for it.   They tell us,

15  quite frankly, I'm for it philosophically, I think we need

16  it, but I can't sit on that kind of case.   That would weigh

17  on my conscience too much.   It would interfere with me.   I

18  know I can listen to evidence, but I would be thinking about

19  that and it would weigh on me too much.   I just can't make

20  that decision.   Other people tell us I'm for it, I don't

21  know if I would really want to be here, but I could make

22  that decision, knowing that person is going to die some day.

23                   It just depends on the individual juror

24  and, again, we just want your honest opinions.   You have

25  told us philosophically you do believe in the death penalty.

1  You believe in it for accomplices, depending on the facts.

2  You believe it should be enforced.

3                    Now that you have had more time to think

4  about it and we've talked about it in detail, you have seen

5  the defendant here in the courtroom, as best you know

6  yourself do you think that you could actually render this

7  decision, take pen in hand and answer those questions,

8  knowing that this person would be executed in the manner

9  I've described?

10        A.      No.

11        Q.      That's because of the life and death decision?

12        A.      Correct.

13        Q.      Okay.  I appreciate your honesty on that.

14  That's all we're looking for is your honest, honest answers.

15  And that's why I spend so much time talking about it

16  because, like I said, some people agree with the law.  But

17  you can't always sit on these types of juries.  It would

18  weigh on you too much.  You couldn't objectively look at the

19  questions.  It would impair you, substantially impair you.

20  It would just be something that would weigh on your

21  conscience too much.  And if you honestly feel that way,

22  that's fine.  We don't force people to be on these juries,

23  if they have those types of objections.

24                    But we just have to tell them -- have to

25  have them honestly tell us that's how they feel.

 1       A.      (Prospective juror nods head.)

 2       Q.      And that's how you feel?

 3       A.      Right.

 4       Q.      And that's -- it's the life and death decision

 5  that you just don't feel you can make?

 6       A.      Right.

 7       Q.      If this were a DWI case, I think that you

 8  would be a lot more comfortable?

 9       A.      Yes.

10       Q.      It's kind of pot luck when you come down here.

11  One time it might be a DWI case and next time it's a death

12  penalty case or civil case.  And the life and death decision

13  is a problem, a decision that you can't make?

14       A.      Yes.

15       Q.      You feel that it would weigh on you too much

16  and it's something that you are not going to be able to put

17  out of your mind?

18       A.      Right.

19       Q.      Okay.

20               THE COURT:  Any further questions?

21               MR. SHOOK:  No, sir, I don't have any.

22               MS. BUSBEE:  We've reached an agreement,

23  Your Honor.

24               THE COURT:  Ms. Ortega, once again, I

25  will echo what he said.  We appreciate your honest answers.

1   The parties have agreed to excuse you from this case, so you

2   shall not serve.   Thank you very much.

3                          [Prospective juror out]

4                  THE COURT:  Misty Glidewell.

5                          [Prospective juror in]

6                  THE COURT:  Thank you.  You may be

7   seated.  Good afternoon.  Misty Glidewell?

8                  PROSPECTIVE JUROR:  Yes.

9                  THE COURT:  Welcome to the 283rd.  Thank

10  you for being a little bit early.  You have had an

11  opportunity to read the questionnaire and how many times

12  have you heard of court starting early?

13                 PROSPECTIVE JUROR:  Not very often.

14                 THE COURT:  Not very often.  We

15  appreciate you being here on time.  That way we can move on

16  and get your interview completed and start with the next

17  one.

18                 Did you have a sufficient period of time

19  to review the guide I provided for you?

20                 PROSPECTIVE JUROR:  Yes.

21                 THE COURT:  Okay.  That contains the law

22  we'll be dealing with in this case.  The attorneys are going

23  to discuss that with you in more detail.  Hopefully you will

24  begin to understand how it relates with this type of case.

25  And please, please, just ask questions.

1    You may be a little nervous.  You don't

2  seem to be too nervous.  This is as informal a process as we

3  can make it, certainly a lot better than if we have all 700

4  people down there in the Central Jury Room at one time.

5  There are no wrong answers.  You can't fail.

6                    PROSPECTIVE JUROR:  Okay.

7                    THE COURT:  Just honest answers is all

8  they're looking for.  Only question that I have for you,

9  will you be able to serve this Court for a period of two

10  weeks beginning on November 10th?

11                    PROSPECTIVE JUROR:  I believe so.

12                    THE COURT:  You believe so.  One thing

13  the lawyers and the Court hear believe, you know, we really

14  do need to have a positive or negative response.  Yes, I

15  can, I don't foresee any problem at this time.  What would

16  be a problem?

17                    PROSPECTIVE JUROR:  The only problem I

18  have is my grandfather is very ill and in the hospital.

19                    THE COURT:  And that's today?

20                    PROSPECTIVE JUROR:  Yes.  He's been in

21  the hospital for two weeks now.

22                    THE COURT:  Obviously, no one can look in

23  a crystal ball in the future and a family member is

24  extremely ill and, of course, we think will pass.  We have

25  to deal with those things.  And if that happened to anybody

1  on the jury, we would have to deal with it. I understand

2  your concern and we hope your grandfather -- is he expected

3  to pull through or --

4              PROSPECTIVE JUROR: Not at this time.

5              THE COURT: Not at this time. We're

6  deeply sorry for that and we'll try to get you out of here

7  as quickly as we can. But it's important that you focus

8  your attention, if you can, to those matters in front of us

9  and that's far enough away. And that's why I do this so far

10  in advance is to let people schedule. Any questions for me?

11              PROSPECTIVE JUROR: No, sir.

12              THE COURT: Mr. Wirskye?

13              MR. WIRSKYE: May it please the Court.

14              <u>MISTY GLIDEWELL</u>,

15  having been duly sworn, was examined and testified as

16  follows:

17              <u>DIRECT EXAMINATION</u>

18  <u>BY MR. WIRSKYE</u>:

19       Q.    Ms. Glidewell?

20       A.    Yes, sir.

21       Q.    My name is Bill Wirskye and I'm the Assistant

22  DA that will be visiting with you for the next few minutes.

23  What I would like to do is maybe go over the information

24  that you were so kind to put in our extensive questionnaire.

25  I think that you have a copy of it in front of you; is that

1  right?

2       A.    Yes.

3       Q.    Follow up a little bit on that, talk to you a

4  little bit about your thoughts and feelings about the death

5  penalty, since, as you know, this is a case where the State

6  is seeking the death penalty, and, finally, talk to you a

7  little bit about some of the laws and rules that apply in a

8  case such as this.

9              What went through your mind when you

10 first got the call or got the letter that you had to come

11 down and talk to us individually?

12      A.    Oh, no.

13      Q.    Why did you think that?

14      A.    Oh --

15      Q.    Other than the obvious, I mean.

16      A.    Well, I have never served on a jury.  I've

17 been called to when I lived in Hawaii, but I never had to,

18 so --

19      Q.    Any concerns about this being a case where it

20 involves capital punishment?

21      A.    No.

22      Q.    Okay.  You were born in Dallas or Garland; is

23 that right?

24      A.    Dallas.

25      Q.    I know you spent some time in Hawaii; is that

```
 1   right?

 2           A.     Yes, sir.

 3           Q.     How many years did you spend there?

 4           A.     Eight and a half.

 5           Q.     Did you go to school there or --

 6           A.     No, just moved there.

 7           Q.     And made your way back to Dallas?

 8           A.     Yes.

 9           Q.     Do you miss Hawaii?

10           A.     Yes.

11           Q.     You don't have any plans on moving back to

12   Hawaii in the next few months?

13           A.     Not the next few months, no.

14           Q.     Somewhere down the line, maybe, right?  What

15   type of work do you do?

16           A.     I'm an office manager.

17           Q.     For a doctor's office?

18           A.     No.  It's for my father's electrical company.

19           Q.     How long have you worked there?

20           A.     Since June of 2000.

21           Q.     Okay.  And now you have told us through your

22   questionnaire that you were generally in favor of the death

23   penalty for certain crimes?

24           A.     Yes.

25           Q.     Is that a fair statement?  What do you see
```

1  generally the purpose or why do you think that we should

2  have the death penalty in our society?

3      A.    For crimes that are -- what am I trying to

4  say? Heinous crimes, the death of a child, a police

5  officer, fireman, I do believe totally in the death penalty.

6      Q.    Have you had a chance to look at the law?

7      A.    Yes.

8      Q.    And most people aren't aware until they get

9  down here, necessarily, what types of crimes, at least in

10 Texas are eligible for the death penalty and it sounds like

11 you have a pretty good grasp of what types of crimes we have

12 in Texas that are eligible for capital punishment.

13              If you were Governor of Texas for a day,

14 would you kind of expand that group of crimes or would you

15 make it available for other type crimes?

16     A.    I think we have a pretty good hold on it at

17 this time.

18     Q.    When you think about an appropriate case for

19 the death penalty, is there a particular case that you may

20 have heard about, read about, followed on TV, that comes to

21 mind?

22     A.    The death of a child, definitely I believe in

23 capital punishment. Also for a policeman and fireman. I do

24 have friends in law enforcement and firemen and if anything

25 was to happen to them on purpose, yes, I do believe in the

1  death penalty.

2      Q.    Okay.  And as you probably know now from

3  looking through the packet, if you are selected as a juror

4  in a capital case, it's not a situation where we ask a jury

5  to kind of write in a life sentence or write in a death

6  sentence, what they feel the appropriate sentence is.  We

7  ask them to answer these three questions that you have had a

8  chance to look at and they are up on the wall.  And based on

9  the jury's answers, that's what determines the appropriate

10  punishment in a case.

11          Does that make sense to you, kind of the

12  scheme we have?  And we'll talk about it more in a minute,

13  but --

14      A.    Yeah.  It makes sense.

15      Q.    A lot of people come down and think, you know,

16  if I'm a juror on a death penalty case, I'll be asking you

17  to write in life sentence or death sentence.  And that's not

18  exactly how it works here in Texas.  Does that make sense to

19  you, the scheme that we have?

20      A.    Yes, sir.

21      Q.    Okay.  We ask people to kind of rank

22  themselves on how strongly they feel about the death penalty

23  from 1 to 10, 1 being the least and 10 being the most.  And

24  I think you gave yourself a 7?

25      A.    Yes.

1    Q.    I know that means different things to
2  different people.  But what does that mean to you when you
3  gave yourself a 7?
4    A.    When I gave myself a 7, I realize that there
5  are some people that -- accidents have happened where police
6  officers or someone has gotten hurt or killed and people try
7  to make -- what am I trying to say, make a big show about it
8  like let's punish this person just so my name is in the
9  paper or so forth and so on.  I don't believe in that.
10         I believe that if something -- if you
11  committed a crime, you really should pay for that whether
12  it's jail time, life sentence, or death.  And you should --
13  you go in fully knowing what you are doing.
14    Q.    Okay.  Let me talk a little bit about the law
15  we have in Texas that applies to capital murder.  You know,
16  oftentimes crimes are committed by more than one person.  It
17  could be a group or gang of people that commit a crime, and
18  from all the way down to shoplifting, all the way up to
19  capital murder.
20         And the law in Texas allows us to
21  prosecute everybody that was actively involved in a crime.
22  When you are talking about a capital murder scenario, that
23  type of facts, it may be a situation where you just have, I
24  guess, one person that actually pulls the trigger.  For lack
25  of a better term, we'll call him the triggerman, you know,

1  one person that actually causes the death of the individual.

2  But you may have other people who are

3  actively involved in the crime, even up to capital murder.

4  Commonly people call those accomplices, you know,

5  nonshooters, nontriggermen.  And we talk to quite a few

6  people, a lot of whom feel very strongly about the death

7  penalty, say some of the things that you have told us.  But

8  they start drawing some lines when you are talking about

9  situations where you have a triggerman and a nontriggerman.

10  And what I mean by that is some people

11  think the death penalty would only be appropriate or only be

12  justified just for the person that actually pulled the

13  trigger.  And when it came to somebody like an accomplice, a

14  person who didn't actually cause the death, you know, they

15  may want to lock them up for life, they may want to punish

16  them another way, but for whatever reason, religious, moral,

17  ethical, they don't think the death penalty should be

18  available for an accomplice.  Where do you kind of fall --

19  MS. BUSBEE:  Your Honor, if I could make

20  the objection I made previously concerning this question and

21  ask the Court to take notice of my written objection to this

22  question filed with the State.

23  THE COURT:  The Court takes notice of

24  your objection in written form and I will overrule it at

25  this time.

1    Q.    (By Mr. Wirskye)   Remember the question?

2    A.    Yes.

3    Q.    Okay.   Where do you fall in that area?   Would

4  you, you know, just reserve the death penalty for the

5  triggerman or would you take the death penalty off the table

6  for the nontriggerman, an accomplice, or what do you think

7  about that?

8                MS. BUSBEE:   I renew the objection

9  because you made the statement at this time, so I feel like

10  it's incumbent upon me to continue to object to the

11  hypothetical questions and commitment questions.

12                THE COURT:   Overruled.   Overruled.   Mr.

13  Wirskye, do you want to re-ask the question?

14    Q.    (By Mr. Wirskye)   The law in Texas allows us

15  to prosecute people, both triggermen and nontriggermen for

16  capital murder.   And depending on the facts and

17  circumstances, the triggerman could be convicted of capital

18  murder and ultimately face the death penalty.   And a

19  nontriggerman can as well, depending on the facts and

20  circumstances.   And an accomplice can be convicted of

21  capital murder and potentially face the death penalty.

22                Some people tell us they don't agree with

23  that.   If they were making the law or just based on their

24  own belief, that they would take the death penalty option

25  off the table for the accomplice, the person that didn't

1   actually cause the death.  What do you think about that?

2        A.     I don't agree with that, I agree that the

3   death penalty for the -- I believe in the death penalty,

4   whether you are an accomplice or the triggerman.

5        Q.     Okay.  And that's kind of what the law allows.

6   The law is basically this.  If, you know, as an accomplice,

7   if I aid, direct, or encourage someone to commit a capital

8   murder, then, of course, I would be guilty of capital murder

9   and could potentially face the death penalty.

10             Or kind of a second scenario under the

11   law of conspiracy.  You know, if I agree with somebody else

12   to commit one crime, say bank robbery, and during the course

13   of that bank robbery a person is shot and killed, the law

14   says if I should have anticipated, should have anticipated

15   that that death could have occurred, then again, I could be

16   found guilty of capital murder or potentially face the death

17   penalty.  Does that make sense to you?

18        A.     Absolutely.

19        Q.     And that's kind of what the law is.  Just to

20   give you a quick example to explain the law, say Mr. Shook

21   and I decide we're going to rob a bank and that's what we

22   agree to do.  The plan is for him to take in a gun, hold up

23   the teller.  I'm going to go in unarmed, just have my bag,

24   and I'm going to collect the money.

25             But during the course of this robbery,

1  for whatever reason, maybe one of the tellers looks at him a

2  little funny or he sees somebody going for a silent alarm or

3  I do and I tell him that, he shoots and kills the teller.

4  Okay?

5          Now, he, obviously, could be convicted of

6  capital murder.  He committed an intentional murder during

7  the course of robbery which constitutes capital murder in

8  Texas.  And the law says me, as the accomplice, the

9  nontriggerman, again, under those facts, if I aided,

10  encouraged, or directed him to commit that capital murder or

11  if I just should have anticipated that a death could have

12  occurred when we went in and did the bank robbery, then I

13  would also be guilty of capital murder.  Does that make

14  sense to you?

15          MS. BUSBEE:  Your Honor, I object to this

16  question based on my written objection to the State's

17  hypothetical inquiries.

18          THE COURT:  Overruled.

19      Q.    (By Mr. Wirskye)  Does that make sense to you?

20      A.    Yes, sir.

21      Q.    I give you that example so you can see how the

22  law may work.  A juror can very well think, you know, gee,

23  Mr. Wirskye, you just signed up for the bank robbery and you

24  may not have actually had any intent that anyone get killed.

25  But if you should have anticipated that somebody could have

1   been killed because your friend took in that loaded gun,

2   then you can be convicted of capital murder.  And sounds

3   like you are exactly where the law is; is that right?

4        A.    Yes, sir.

5        Q.    Following up a little bit more on the death

6   penalty, again, we talked to a lot of people who are in

7   favor of it.  And I think it's kind of one thing to maybe

8   talk to your friends or come down here and fill out a

9   questionnaire and say you are in favor of the death penalty

10  kind of in a philosophical and abstract sort of way.  And

11  for some people when they get down here, it becomes quite a

12  different thing, because it gets a little more real, the

13  possibility that you may actually be on the jury and sit

14  here and end up making life and death decisions about

15  somebody that you see in the courtroom.

16              And I want to make sure before we go any

17  further that, you know, you feel like you are the type

18  person that could participate in that process?

19       A.    Yes.

20       Q.    You don't have any qualms about potentially

21  being a juror in a case such as this?

22       A.    No, sir.

23       Q.    Okay.  Another area we talked to everybody

24  about is kind of the publicity surrounding the case. And

25  you, like almost everybody we talked to, indicated on your

1   questionnaire that you have heard at least something about

2   this case.

3                 What the law says is you are not

4   disqualified, just because you may have heard something

5   about the case.  You know, obviously, if that were true,

6   then we would never get a jury in cases such as this.

7                 What the law says is in order to be a

8   qualified juror, if you can kind of push what you may have

9   heard about the case to the back of your mind and not let it

10  affect your decisionmaking process, if you will, basically,

11  just base your decision on what you hear in the courtroom,

12  you would be a qualified juror.  Does that make sense to

13  you?

14          A.      Yes.

15          Q.      Okay.  Is that something that you think you

16  could do, even though you may have heard something about the

17  case?

18          A.      Honestly, I don't know.

19          Q.      Okay.  You know, in a sense it's a little

20  unnatural.  We kind of ask people to go against human nature

21  when we say, you know, don't think about what you may have

22  heard, and the law, I think, recognizes that.  You know,

23  people may have formed opinions or had some thoughts about a

24  case and that's okay, as long as you can set them aside and

25  just tell us, you know, I'm just going to base my verdict on

the case, whatever it may be, just on what I hear in the courtroom.

And in a sense, that makes perfect sense because I don't know if you are like me, but I'm kind of skeptical sometimes of what I hear in the media. We talked to a lady this morning that said sometimes I flip on Channel 4 and I see a story and I flip over to Channel 5 and it's something completely different. You know, they don't get their facts right.

I think that's what the law recognizes and I think that's why we require jurors to make their decisions just on what they hear in the courtroom. Do you think that you could do that, just base your decision on what you hear in the courtroom?

A.     Can I ask a question?

Q.     Sure.  Okay.

A.     We're basing this, from my understanding, is that he was part of the Texas Seven where he broke out of jail, was committing -- was it robbery or burglary? I don't know the difference, and then in the process killed a police officer. To me that's three strikes right there. I mean, I don't know how that would affect the trial. I don't know my decision. But just going by that, that's three strikes.

Q.     Well -- and a lot of people feel that way. And what we ask you to do, no matter what you may have

1  heard, is kind of put that out of your mind, be able to

2  follow the law that Judge gives you, and just listen to the

3  testimony in the trial.

4            One reason we talk about this deal about

5  accomplices, just to be very frank with you and lay our

6  cards on the table, we are prosecuting Mr. Murphy as an

7  accomplice to this crime, as a nontriggerman, not the

8  triggerman.  That's our theory of the case.

9            So, you know, like I said, I don't know

10  if you are like me, but sometimes what you hear and what you

11  read on TV or in the newspapers, you know, I always kind of

12  take it with a grain of salt, because I'm never sure if I'm

13  getting the whole story.  And that's what trials are for, to

14  give jurors the whole story, not what the media says it is

15  or the TV station or things like that.

16            And that's why we require, you know, you,

17  in order to be a qualified juror, to be able to tell us,

18  hey, I may have heard this, I may have even formed some

19  opinions, I have some thoughts, but in all fairness to give

20  both sides a fair trial, I can kind of put that to the back

21  of my mind, not necessarily forget about it, but put it to

22  the back of my mind and start with that clean slate and just

23  base my decisions on what happens in the courtroom.

24            And, very frankly, you are the only

25  person that can tell us.  You can look into your heart of

73

1  hearts and we kind of rely on you to be honest with us and

2  tell us if that's something that you think that you can do?

3       A.   I don't think I could.

4       Q.   Okay.  Just, you have heard too much?

5       A.   I have heard too much and, you know, piling a

6  crime on top of a crime, any kind of punishment, I just feel

7  -- I don't feel my slate would be very clean.

8       Q.   Okay.  So not to put words in your mouth, but

9  you think what you may have heard through the media or read

10 through the papers would affect your verdict in this case?

11      A.   I believe so.

12      Q.   Couldn't put it out of your mind?

13      A.   No, no.  I've heard too much, all different

14 stories.

15      Q.   All right.  Fair enough.  Hold on just a

16 second.

17           MR. WIRSKYE:  Judge, I believe that's all

18 I have and I think the parties have an agreement.

19           THE COURT:  Ma'am, we appreciate your

20 honesty and don't leave thinking -- you did the right thing.

21 Because if you were ever in a position to be judged, you

22 want someone to be fair with you.

23           PROSPECTIVE JUROR:  Absolutely.

24           THE COURT:  That's all we're asking.

25 Thank you for your time and you are free to go.

1    [Prospective juror out]

2    THE COURT:  Annette Watson.

3    [Prospective juror in]

4    THE COURT:  Thank you.  You may be
5    seated.  Good afternoon.  How are you?

6    PROSPECTIVE JUROR:  Hi, I'm just fine.

7    THE COURT:  No. 1594, Ms. Annette Watson;
8    is that correct?

9    PROSPECTIVE JUROR:  That's right.

10   THE COURT:  Welcome to the 283rd.

11   PROSPECTIVE JUROR:  Thank you.

12   THE COURT:  Have you had enough time to
13   review the guide I provided for you?

14   PROSPECTIVE JUROR:  Yes, I did.

15   THE COURT:  Also, gave you a copy of your
16   questionnaire that you filled out in May, hopefully to give
17   you a chance to read through that and I'm quite sure the
18   attorneys may want to more fully develop some of your
19   thoughts that you had on that day.  I know that was an
20   uncomfortable place to be that morning, only had like 700
21   people crammed in the jury room.

22              So this is an opportunity for the
23   attorneys to visit with you about the law that's going to be
24   involved in this case, be sure you understand how it
25   relates.

1            Two questions I have to ask at the end of

2 this process is, number one, do you understand the law?

3 And, number two, if you do understand the law, can you

4 follow the law?  That's my function here with this phase of

5 the trial.

6            Before I let the attorneys ask you

7 questions, will you be able to serve this Court for the two

8 weeks beginning on November 10th?

9            PROSPECTIVE JUROR:  Yes, I guess I would.

10 I would have to make some arrangements.

11            THE COURT:  For your work?

12            PROSPECTIVE JUROR:  I don't work, but I

13 keep my granddaughter for my daughter while she works.

14            THE COURT:  That's why we're doing this,

15 this far in advance, so you would have an opportunity to

16 make those arrangements.  With that, I will turn it over to

17 Mr. Wirskye.

18            MR. WIRSKYE:  May it please the Court.

19            <u>ANNETTE WATSON</u>,

20 having been duly sworn, was examined and testified as

21 follows:

22            <u>DIRECT EXAMINATION</u>

23 <u>BY MR. WIRSKYE</u>:

24     Q.    Ms. Watson, how are you this afternoon?

25     A.    I'm just fine, thank you.

Q.      My name is Bill Wirskye and I'm the Assistant
DA that is going to visit with you in the next few minutes.
I apologize in advance.  We talk to people individually and
we put them up there on the witness stand and I know
sometimes they feel like they are on trial with everybody
looking at them and the Judge up there.  We apologize for
that.

        But to the extent possible, hopefully we
can kind of make this more of a conversation.  If you have
any questions as we go along, just feel free to ask.

        What I would like to do is go over some
of the information that you were kind enough to provide for
us in this long, long questionnaire you were kind enough to
fill out, talk to you a little bit about your thoughts and
feelings on the death penalty, and then maybe talk about
some of the laws and some of the rules that apply in a case
like this where the State is seeking the death penalty.

        What do you think about all of this,
being called back down for an individual interview and in a
death penalty case?

A.      Well, it's the first time I have ever done
anything like that, so it's all new to me.

Q.      Okay.  And you told us you're, I guess,
generally in favor of the death penalty; is that right?

A.      Well, I believe in it, yeah, I believe if it's

1   necessary.

2        Q.    Why do you believe it's necessary?

3        A.    Well, I believe some things you just need to

4   pay the ultimate price for.  Some crimes are just -- are

5   just that bad.

6        Q.    Okay.  When you think about those type crimes

7   that you talk about, what comes to mind?  What type crimes?

8        A.    Well, most of them would probably be any time

9   another life is taken.  Of course, there would be

10  circumstances and situations, but any time another life is

11  taken I would think that would certainly be one to be

12  considered.

13       Q.    Is there any particular case that comes to

14  mind that you may have heard or read about or followed in

15  the media that when you think about that case, that's a good

16  case or good candidate for the death penalty?

17       A.    No, because I really don't just jump to that

18  conclusion.

19       Q.    Okay.

20       A.    I think about the end result right away.

21       Q.    A lot of people come down before they have had

22  a chance to read and find out what the law is in that packet

23  that you read, I think a lot of people think that any murder

24  case in Texas potentially could be a death penalty case.

25            And while murder is the only case in

1   Texas where you can get the death penalty, it's only for a

2   certain subset or certain type of murder case.  You have got

3   to have a murder plus some other factor.  If you commit an

4   intentional murder during the course of a robbery, stick

5   somebody up, or the burglary of somebody's home, rape, if

6   you kill a small child, a child under six, a police officer,

7   fireman on duty, that type thing, those are just the

8   specific types of murder cases we reserve for the death

9   penalty.  You know, sometimes very, very brutal crimes don't

10  qualify.  You may be able to lock somebody up for life, but

11  they don't qualify under our law to be punished by the death

12  penalty.

13       A.     I did not realize that until I read this.  I

14  did not know how that was.

15       Q.     Most people don't.  A case you may have heard

16  about happened a couple of years ago, a man in University

17  Park, I think, strangled his wife and cut her throat in

18  front of his kids.  While a very brutal murder, it didn't

19  technically qualify under our law for the type of crime

20  where you can get the death penalty.  It's just that certain

21  type or subset that kind of applies.

22              Now that you know kind of what our scheme

23  is, what do you think about that?

24       A.     Well, I guess you have to have some way to

25  make those establishments, so I just wasn't aware of those.

1    Q.    Most people aren't.  Let me ask you this.

2  Oftentimes murders are committed by more than one person.

3  You know, you may have a group or gang of people that commit

4  murder or commit any crime for that matter, and the law

5  allows us, whether it be a shoplifting or capital murder, to

6  prosecute everybody who is actively involved in a crime.

7           You know, sometimes you may have heard

8  the word accomplices --

9    A.    Uh-huh.

10   Q.    -- and that type thing.  And when you get --

11 when you are talking about a capital murder-type scenario,

12 you may have a situation where you have got one person who

13 actually pulled the trigger or who actually caused the

14 death.  For lack of a better word, we can call him the

15 triggerman.  And you may have other people who are actively

16 involved in a crime, accomplices, but who didn't actually

17 cause the death.

18           And when we talk to people on what they

19 think about the death penalty, we will ask them, you know, a

20 lot of people say, hey, I'm very much strongly in favor of

21 the death penalty for the person that actually caused the

22 death.  I believe in that.

23           But I would kind of draw a line and I

24 would take the death penalty off the table for those

25 accomplices, for those people that didn't actually cause the

death.  You know, I may want to lock them up for life and

punish them that way, but for whatever reason, religious,

moral, or ethical, I don't think that the death penalty is

appropriate for an accomplice, for someone who doesn't cause

the death.  What do you think about that?

A.     Well, that gets to be a little sticky because,

you know, the accomplices may never have intended for anyone

to be killed and whoever took that life did that on his own.

So I would have to do some soulsearching on that, depending

on --

Q.     It sounds like you would kind of have to know

more of the facts?

A.     Yeah.  I couldn't say right off, just because

you are there.

Q.     You wouldn't automatically take the death

penalty off the table for the accomplice.  It would just be

based on the facts?

A.     Yeah, yeah.

Q.     Some people have that, like I said, religious,

moral, or ethical, and they could only assess a death

sentence against a person who actually caused the death.

Kind of what I hear you saying is not that.  You're just

saying, wait, let me listen to the facts.

A.     Yeah.  There might be something there that

would make me think differently about a case.

1   Q.   Let me tell you what the law is in Texas,

2   because the law allows us, as I said, to prosecute not only

3   the triggerman, but the accomplices.  Let me kind of explain

4   the law to you and I'll give you an example to help explain

5   it.

6       Let's say Mr. Shook and I, the other

7   prosecutor, decide we are going to rob a bank.  Okay?  And

8   the plan is for Mr. Shook to take a pistol in and to hold up

9   that bank teller and I'm going to go in unarmed and I'm

10  going to have a bag and I'm going to collect the money while

11  he's holding everybody up, and we're going to take the

12  bank's money and make a getaway.  And that's what we've

13  agreed to do.

14      Let's say during that bank robbery, for

15  whatever reason, maybe Mr. Shook, maybe somebody just looked

16  at him wrong, for whatever reason, he decides to shoot and

17  kill a teller, okay, during the course of a robbery.  He's

18  committed capital murder, an intentional murder during the

19  course of a robbery.  He's the triggerman.  He could be

20  convicted of capital murder and he could potentially face a

21  death sentence.

22      The law also says, depending on the facts

23  and circumstances, that me, as an accomplice, I could, also,

24  potentially be convicted of capital murder and face that

25  death penalty.  You see kind of how the law works?  What do

1  you think about that -- about the law?

2      A.    Well, I think that would probably be -- be a

3  good thing, because if you both go in to commit a robbery

4  with a firearm, then anything could possibly happen.  So

5  more than likely I would probably think that both of them

6  should be accountable.

7      Q.    That's what a lot of people tell us.  Going

8  back to my example, say I see somebody going for a silent

9  alarm and I say, Mr. Shook, he's going for an alarm, shoot

10  and kill that person.  You know, I would be guilty of

11  capital murder.  I've aided, directed him, encouraged him,

12  to commit the crime, so I would be just as guilty.

13          Or even kind of the second way that I can

14  be found guilty is under the law of conspiracy, which

15  basically means Mr. Shook and I had an agreement or

16  conspiracy to commit bank robbery.  And while that bank

17  robbery was going on, he took a life.

18          And the law says if the accomplice should

19  have anticipated that a life could be taken, then I could be

20  convicted of capital murder and maybe face the death

21  penalty.  And that kind of sounds like where you are?

22      A.    Yeah.

23      Q.    And that's the law in Texas.  It sounds like

24  that's something that you agree with?

25      A.    Yeah, I would.

1    Q.    Okay.  Let me ask you this, some people we

2  talk to when they come down on this case have heard

3  something about the case, one way or another.  You know,

4  they are familiar with some of the publicity surrounding the

5  case.

6           Obviously, what the law says is just

7  because you have heard something about the case, doesn't

8  disqualify you from being a juror.  You know, what the law

9  requires is even if you have heard something about a case,

10  as long as you can base your verdict just on what you hear

11  in the courtroom, you would be a qualified juror.

12           Is that something that you think you

13  would be able to do, Ms. Watson?

14    A.    I think so.

15    Q.    Okay.  What have you heard about the case?

16    A.    Well, it's been so long ago, I just heard what

17  was on television that these guys escaped from prison and

18  ended up down here and was trying to commit a robbery and

19  shot the policeman.  That's basically all I really knew.

20    Q.    Sounds like it's not something that you have

21  heard anything about recently?

22    A.    Not until I was called for this.

23    Q.    Okay.  Hadn't followed any maybe court

24  proceedings or anything like that?

25    A.    I did hear where some of the others had

1   already been on trial, but I didn't really think a lot about

2   it.  It was on the news and happened.

3       Q.    It didn't give a lot of details?

4       A.    Huh-huh.

5       Q.    But, again, regardless, you think what you

6   heard you could kind of push to the back of your mind just

7   to give both sides a fair trial, you could base your verdict

8   just on what you hear in the courtroom?

9       A.    I think I could.

10      Q.    Okay.  You know, like I said, we talk to a lot

11  of people.  A lot of them that are in favor of the death

12  penalty kind of in an abstract or philosophical way, you

13  know, when you sit around and think about it, maybe talk to

14  your friends, family, when you fill out the questionnaire,

15  maybe come down for jury duty, you are in favor of it in

16  kind of that abstract or philosophical way.

17                    Some people we talked to, when they get

18  down here and the process becomes a little more real, you

19  know, when you are actually looking at somebody charged with

20  a crime, a living, breathing, human being, and you know that

21  the State is asking for the death penalty, that kind of

22  affects different people differently.  And we realize that

23  not everybody is cut out for this, you know, that even

24  people that may be in favor of the death penalty, you know,

25  shouldn't be on the jury.  They may when it gets concrete,

1  when it's no longer philosophical, it just may not be your

2  cup of tea and we realize that.

3                    And some people tell us, hey, I'm in

4  favor of the death penalty.  I just don't think that I can

5  participate in the process.  It may weigh on my mind and

6  weigh on my conscience.  Living in Texas, like you have, you

7  are probably aware in Texas that we do carry out the death

8  penalty in Texas.  We are always the leader in the nation in

9  that regard and oftentimes when we have executions, the

10  press reports some of the details of the executions, you

11  know.

12                    And the procedures are the same in every

13  case.  If the jury answers those questions, those three

14  Special Issues that you looked at, in such a way, the Judge

15  has no discretion.  He will sentence the defendant to death

16  and the defendant will be taken immediately to death row

17  where he will wait until sometime in the future.  I can't

18  tell you how long or when it would be, but sometime in the

19  future Judge Cunningham will issue a date of death.

20                    And on that day he would be taken from

21  death row and taken to that main prison in downtown

22  Huntsville to a holding cell outside the death chamber.  He

23  would get to spend time with family, friends, a spiritual

24  advisor, get a chance for a last meal.

25                    But when it gets close to 6:00, which is

1   the time that is mandated in Texas when all executions must

2   take place, he would be moved or removed from the holding

3   cell and taken into the actual death chamber.  If he didn't

4   want to go voluntarily, he would be forced to go.  And you

5   may have seen that picture of the gurney, the death chamber,

6   that type thing.

7              Be taken in there and strapped down.  An

8   IV would be started.  There would be witnesses there for the

9   victim, witnesses there, also, of his choosing.  And he will

10  be given a chance to make a last statement.  He may proclaim

11  he's innocent.  May be angry.  He may beg for forgiveness.

12             But at some point the warden would signal

13  the executioner and the drugs would be released into the IV.

14  His lungs would shut down.  His heart would stop beating.

15  He would lose consciousness and ultimately fall into a deep

16  sleep and die.

17             And, again, I don't go through those

18  details with you to be morbid, but those are the types of

19  facts and details that are generally reported in the press.

20  And I want to make sure before we go any further that you

21  feel that you are the type of person that could be a juror

22  in this case, that you are the type of person that could

23  take pen in hand at the end of a case and answer those three

24  questions that we ask people to answer in such a way that

25  would result in the death of a living, breathing, human

1   being.

2                  And only you can answer that.  And that's

3   kind of why I ask the question.  Do you think that you are

4   the type person that could do that?

5        A.    Well, I always have thought I could do that.

6   But, like you said, when it gets right down to it, it would

7   bother me.  It wouldn't be as easily done as what I've

8   always thought that it would be.  And I have not really

9   thought about that a whole lot up until this.

10       Q.    We hear that a lot.  That's why we ask people.

11  Neither side is trying to force people over into that jury

12  box.  But we need to talk about these issues now, because if

13  you get over in the jury box and that's something that kind

14  of impairs your ability to make a decision, you know, your

15  ability to make a decision in this type of case, by then

16  it's too late.  We can't fix it.  We need to know now.

17       A.    I always thought that I would be able to do

18  that, but it would probably bother me a lot.  I don't know

19  that I can say that I wouldn't do it, but it would probably

20  bother me a lot more than I ever thought it would.

21       Q.    Do you think that it would be something that

22  might weigh on your conscience so much that it would really

23  impair you, you know?

24       A.    Well, it might.  It might.  I've softened in

25  my old age.

Q.     Looks like just talking about it, you have kind of gotten uncomfortable and moving around.  I do not want to put words in your mouth, but it looks like something that if you got in the jury box and were asked to make those decisions about those Special Issues, just knowing what the ultimate or the end result would be, is something that would impair you or substantially impair your ability to make a decision in a case; is that correct?

A.     I would probably feel really, really bad and it would bother me.

Q.     Okay.  Let me have you do this.  We've been talking about these three questions.  If you could just take a second and look at those three Special Issues up on the board.  You may have read them already, but if you would take another minute or two and read those three questions.

A.     (Prospective juror complies.)

Q.     Did you get a chance to read those?  Those are the three questions that we ask the jury to answer.  It's not a situation where we ask the jury to write in life sentence or write in death penalty.  We ask you to answer these three questions and let the answers to those questions kind of determine the appropriate penalty.

That first Special Issue, or I like to call them questions because that's what they are, whether there's a probability that the defendant would commit

1   criminal acts of violence such that he would be kind of a

2   future danger to society.

3                    Does that question kind of make sense to

4   you?

5        A.     Yes, it does.

6        Q.     Can you see how it's kind of asking a juror to

7   make a prediction about things?

8        A.     Yes.

9        Q.     Is that something that you are comfortable

10  with, making that sort of prediction?

11       A.     Well, I think that I could probably do that.

12  I could probably arrive at what I would think that I would

13  think about what he would do.

14       Q.     Just looking at that question, what type of

15  information do you think would be important to you in

16  answering that question?

17       A.     Well, maybe his background, what other crimes

18  he might have committed, and things like that.

19       Q.     Uh-huh.  Would you look back at the crime he

20  was charged with, the crime he was on trial for?

21       A.     Well, yes, yes.

22       Q.     Kind of the law envisions that, you know, when

23  you start that second phase of the trial, you know you found

24  him guilty of capital murder for what he did.  You kind of

25  start this second phase of the trial to answer these

questions.  The law envisions that jurors kind of start that

second phase with an open mind about the answers to these

questions.

And what a lot of people tell us, very

frankly, with respect to that first question is, they say,

you know, you are asking me to determine whether he's going

to be a future danger.  Whether there's a probability that

he will be a future danger, a lot of people tell us, hey, I

don't care what the law says, if I just convicted him of

capital murder, if I just found him guilty of capital

murder, I'm always going to think there's that probability

that he's always going to be a future danger.  If I have

convicted him, that's answered that question for me already.

And it's kind of a common sense

proposition.  What do you think about that?

A.      Yes, I agree with that.

Q.      And, again, it makes logic.  The law presumes

that we kind of have this second phase where decisions are

not prejudged.  But a lot of people tell us that they just

can't do it, what you have told us, if I think he's a

capital murderer, I'm going to answer that question yes

every time.  Does that make sense to you?

A.      Yes.

Q.      Okay.  Ms. Watson, give us just a second.

MR. WIRSKYE:  May we approach, Judge?

1    THE COURT:  No.  Any more questions?

2    MR. WIRSKYE:  No more questions from the

3  State.  Thank you, ma'am.

4    MS. BUSBEE:  None from the defense, Your

5  Honor.  We've reached an agreement.

6    THE COURT:  Ms. Watson, we appreciate you

7  coming down today and your very honest answers.  The parties

8  have agreed that they are going to excuse you from jury

9  service in this case.

10    MS. BUSBEE:  You'll have a much happier

11  Thanksgiving.

12    [Prospective juror out]

13    MS. BUSBEE:  Your Honor, you had

14  previously granted me a running objection that I had stated

15  orally, but I feel more comfortable reducing that to writing

16  so there is no question as to what my objection is, and ask

17  the Court to re-grant my running objection based on that

18  motion and I served the State a copy of it.

19    THE COURT:  The Court has your objection,

20  it's reduced to writing, and I appreciate it very much, very

21  succinct and very direct on point and clear for the

22  appellate review.  And I will continue to deny your

23  objection.  I will grant your running objection.

24    MS. BUSBEE:  I appreciate it, Your Honor.

25  And may I just tell the Court so nobody is surprised, if

1   some other situation arises with that same objection, I will

2   refer to it as I have stated in that motion so we don't have

3   to let the juror out and go through all of that?

4                    THE COURT:  Just say my voir dire

5   objection.

6                    MS. BUSBEE:  Thank you, Your Honor.

7                    THE COURT:  Mr. Ortiz.

8                    [Prospective juror in]

9                    THE COURT:  Good afternoon.  Ben Ortiz?

10                   PROSPECTIVE JUROR:  Ben Ortiz.

11                   THE COURT:  How are you doing?

12                   PROSPECTIVE JUROR:  Just fine, sir.

13                   THE COURT:  Welcome to the 283rd.  Have

14   you had an opportunity to review the guide I provided for

15   you?

16                   PROSPECTIVE JUROR:  Yes, sir, I have.

17                   THE COURT:  I know it's a lot of law to

18   give you and we don't expect you to understand it all at

19   first glance.  The attorneys are going to spend some time

20   with you going over the law, help you understand it a little

21   bit better, and be able to relate it to the type of case

22   we're dealing with here today.

23                   At the end of the process I have to

24   answer two questions myself.  Number one, do you understand

25   the law?  Second question is, if you understand the law, can

1  you follow the law?  That's the big picture for me right

2  here.  All right?

3                      The only -- do you have any questions on

4  what you have read so far?

5                      PROSPECTIVE JUROR:  Not really, no.

6                      THE COURT:  I also provided a copy of

7  your questionnaire that you filled out back in May, along

8  with the other 700 people that were there that morning.  The

9  attorneys will review those questions or more fully develop

10 some of your thoughts.  There are no wrong answers, just

11 truthful answers.

12                     The only question that I have for you at

13 this time is will you be able to serve this Court for two

14 weeks beginning on November 10th?

15                     PROSPECTIVE JUROR:  Yes.

16                     THE COURT:  Mr. Shook?

17                     MR. SHOOK:  May it please the Court.

18                          BEN ORTIZ,

19 having been duly sworn, was examined and testified as

20 follows:

21                     DIRECT EXAMINATION

22 BY MR. SHOOK:

23      Q.      Mr. Ortiz, my name is Toby Shook.  I am the

24 Assistant DA that will be talking to you this afternoon.  I

25 believe you have been down on a jury before, civil case; is

1   that right?

2          A.      Yes, sir.

3          Q.      Okay.  We usually talk to jurors in a group,

4   but because it's a capital murder in which the State seeks

5   the death penalty, the law prescribes that we speak to each

6   juror individually.  We don't mean to make you feel like you

7   are the one on trial, but it is the best way we found to get

8   information.

9                 And what I want to do is follow up on

10  some of your information here in your questionnaire and then

11  get your thoughts on capital murder and the rules and laws

12  that apply in a death penalty case.  There aren't any right

13  or wrong answers.  We're just looking for your honest

14  opinions, okay?

15         A.      Yes, sir.

16         Q.      I see that you've lived in the Dallas area for

17  quite some time and you currently work with the school

18  district; is that right?

19         A.      Yes, I do.

20         Q.      What do you do with them?

21         A.      I'm a teacher assistant, computer room.

22         Q.      What school do you work at?

23         A.      George Peabody.

24         Q.      And you have been doing that about nine years

25  or so?

1    A.    Yes, sir.

2    Q.    And prior to that you were a letter carrier

3    with the post office?

4    A.    Yes, sir, I was.

5    Q.    Here in Dallas?

6    A.    Yes, sir.

7    Q.    What station did you work out of?

8    A.    Beverly Hills.

9    Q.    My dad worked for the post office for about 30

10   something years.  Your son is also a police officer with

11   DPD?

12   A.    Yes.

13   Q.    How long has he been with DPD?

14   A.    I would say about five or six years.

15   Q.    Is he a patrol officer?

16   A.    Yes.  Well, no, I think he's undercover right

17   now.

18   Q.    He is?

19   A.    Yes.

20   Q.    He works undercover right now?

21   A.    Yes, sir.

22   Q.    And tell us a little bit about that civil case

23   you were on.  What was that case about?

24   A.    It was back payment on some -- the man was

25   hurt or something like that, you know, and he wanted his

1   back pay for, you know, for being off for injuries,

2   something like that to that effect.

3         Q.    Did you find in favor of his client?

4         A.    Yes, we did.

5         Q.    About how much money was awarded?

6         A.    I can't recall how much it was.

7         Q.    Was it a whole lot or just --

8         A.    No, not a lot.

9         Q.    But how did the jury deliberations go in that

10  case?  Pretty smoothly or was it --

11        A.    Well, just one question popped out, should we

12  have given more and most of us agreed not to, just to go

13  with what was asked for.

14        Q.    Okay.  But you -- overall it went pretty

15  smoothly?

16        A.    Yes, sir, it did.

17        Q.    All right.  Let me ask you, Mr. Ortiz, just

18  generally, about the death penalty.  I believe you put in

19  your questionnaire that you are in favor of it as a law; is

20  that right?

21        A.    Yes.

22        Q.    Could you just tell us in your own words why

23  you favor the death penalty and maybe the purpose you feel

24  it serves?

25        A.    Mainly because of, you know, if you take a

1   life, you should, you know, pay with your own, you know.

2          Q.      Okay.

3          A.      Including myself.

4          Q.      Have you always believed in the death penalty

5   as a law your adult life?

6          A.      Yes.

7          Q.      Okay.  What types of crimes do you feel could

8   at least come into consideration for the death penalty?

9          A.      Um, mainly murder.

10         Q.      Okay.  Any particular type of murder case?

11         A.      Um, what do you mean?

12         Q.      Was there different types of fact situations

13  or murders of specific types of victims that you think of or

14  do you think that murder in general should be something that

15  you should at least consider for the death penalty?

16         A.      Um, certain, certain types of murders.

17         Q.      All right.  Any come to mind at all?  Or would

18  it just depend on the facts?

19         A.      Well, one I saw, "In Cold Blood," a movie that

20  I saw was true, you know, that one.

21         Q.      The Truman Capote one?

22         A.      Yes.  That was one that stands out.

23         Q.      Okay.  In Texas, the death penalty right now

24  is reserved just for certain types of murder cases.  There's

25  a lot of brutal murders that you can get a life sentence

1  for, but you can't get the death penalty for.  We've

2  reserved it for murders during the course of some

3  aggravating circumstances, murders during the course of a

4  felony, for instance.  If you intentionally kill someone

5  during the course of a robbery, that could be a death

6  penalty case.  Going into the 7-Eleven, rob the clerk, shoot

7  them down, that could be one that is for consideration.

8          Murder during a burglary, which is the

9  example you gave in "In Cold Blood" when they broke into the

10 farmhouse and murdered the family, that could be a death

11 penalty case.  Murder during a kidnapping or during a rape

12 or during an arson.

13          Also, murder of specific victims, such as

14 a police officer on duty, fireman on duty, and prison guard

15 on duty.  They come under consideration for the death

16 penalty.  And murder of a child under the age of six.

17 Murder for hire, someone does it for money, a hitman

18 situation.  Or a mass murderer or serial killer situation

19 where there's more than one victim.  But those are,

20 basically, the types of cases that come under consideration

21 for the death penalty at this time.

22          Now, that list, I went over it pretty

23 quickly, but from your own personal point of view, do you

24 feel that's fair, fair types of cases that should -- fair

25 consideration for the death penalty?

1    A.    Yes, I do.

2    Q.    Okay.  Now, the death penalty -- a death

3    penalty trial is divided into two parts.  You have the

4    guilt/innocence stage and the punishment stage.  Now, when

5    we first think of what a death penalty case is or the type

6    of crime for consideration, everyone thinks of examples or

7    conjures up a fact situation in their mind, we generally

8    think of the actual triggerman.  That's the person being put

9    on trial.  If I walked in and robbed a 7-Eleven and murdered

10   the clerk, obviously, I could be prosecuted.  I could

11   receive the death penalty.

12         But the law also says that persons that

13   assist, accomplices, we call them under the law, the law of

14   parties, but accomplices, people that assist, take part in

15   the crime, can also be held responsible.  And that's true

16   for capital murder, too.

17         Sometimes it takes more than one person

18   to pull off a crime or capital murder and several people may

19   be involved.  Some people may be involved more than others.

20   Some may have greater roles.  You may actually have only one

21   triggerman that causes the death, but he may have

22   accomplices in there.  And the law says that they can be

23   prosecuted even for capital murder and under certain fact

24   situations and scenarios could even receive the death

25   penalty.

1          Let me give you an example to illustrate
2  my point on the law.  And what I will do is just use Mr.
3  Wirskye and myself.  We decide we want to commit a crime.
4  We want to commit aggravated robbery.  We want to rob a bank
5  down the street.  And I get a gun.  And our plan is I'll go
6  in and I'll threaten everyone with a gun, tell them to put
7  their hands up and he's going to get a big bag and gather up
8  the money.  And we do that.

9          I pull a gun out and threaten them and he
10 starts gathering money up out of the tills.  Something
11 happens.  Maybe I don't like the way one of them looks at me
12 or maybe Mr. Wirskye says, that one over there is going for
13 an alarm and so I turn and I intentionally shoot them and
14 kill them.  We get out and we get arrested.

15         Obviously, I can be arrested, prosecuted,
16 and I could receive the death penalty because I'm the
17 triggerman.  I caused their death.  The law says that Mr.
18 Wirskye can also be prosecuted for capital murder because he
19 assisted me in the offense.  He helped me commit.  He,
20 ultimately, depending on the facts, could even receive the
21 death penalty.

22         And what we want to do is get your honest
23 opinions on how you feel about the law, because people feel,
24 quite frankly, differently.  Some people believe in the
25 death penalty for a triggerman.  They're fine on that and

101

they think those cases should be prosecuted for the death

penalty. But they, from their own personal point of view,

aren't -- don't feel the same on the accomplice, someone

that assisted in an offense. They would draw a line. Maybe

they would put these people in prison, but they just don't

feel the death penalty is the type of crime, punishment,

that should be prosecuted for someone who is an accomplice

or a nontriggerman.

          Other folks say, no. Depending on the

facts, an accomplice could be prosecuted for that crime and

ultimately could receive the death penalty, depending on the

facts, but they think that is a fair law in that regard.

          And, like I said, there aren't any right

or wrong answers, but I want your honest opinion about how

you feel about the accomplice or nontriggerman being

prosecuted for the death penalty. How do you feel about

that?

    A.   I feel that depending on the facts that they

should be prosecuted and receive the same conviction.

    Q.   All right. So you agree with the law as far

as an accomplice goes, prosecution in a nontriggerman

situation?

    A.   Yes, sir.

    Q.   Why do you think it's important for society to

prosecute persons that are accomplices for capital murder?

1    A.    Because, say, they get a lighter sentence or

2  something, they get out, and they go do the same crime that

3  they didn't complete, you know, maybe go back and make sure

4  they do it right, maybe try doing it right the next time.

5    Q.    All right.  So you feel it's fair that an

6  accomplice could be prosecuted and ultimately could get the

7  death penalty, depending on the facts?

8    A.    Yes, sir.

9    Q.    All right.  The law, there's two theories

10  under it.  If we're actively involved in committing a crime

11  together, the scenario I was talking about, he knew what was

12  going on and actively involved, if someone aids, directs, or

13  helps, actively participates in the crime, then they can be

14  found guilty of capital murder.

15       Another theory is what we call the law of

16  conspiracy.  If we conspire to commit one crime, which

17  simply means we agree, he and I say we want to commit -- we

18  want to rob a bank, and during the course of committing that

19  crime, one of us commits another felony, in this case

20  murder, then we are all held responsible, if the jury

21  believes that we should have anticipated that might happen.

22  And that's all the surrounding facts, if you should have

23  anticipated someone could be killed in that situation, that

24  particular fact scenario, you could be found guilty.

25       To get the death penalty -- and I'll talk

1  to you about this more in a minute, but not only do we have

2  to prove that he should have, but from all the facts that

3  they did anticipate that a life could be taken, and that's

4  what the law looks at.  If you anticipated that a life could

5  be taken and you didn't actually cause the death yourself,

6  you could still get the death penalty based on some other

7  facts, also.  Does that sound fair to you?

8       A.    Yes, sir, it does.

9       Q.    Okay.  Now, the trial is broken down into two

10  phases in a criminal case.  You have the guilt/innocence

11  phase which we have to prove the indictment to you beyond a

12  reasonable doubt.  And then there's the punishment phase

13  where we have to, if we can, put on additional evidence and

14  then you get these questions.

15            Basically, what we have to do in the

16  punishment phase is prove to you beyond a reasonable doubt

17  that he's a continuing danger to society, and No. 2, that he

18  anticipated that a death would occur, and No. 3, the jury

19  considers if there is any mitigating evidence that they

20  think a defendant deserves a life sentence rather than a

21  death sentence.  And they are just yes or no questions.

22            If you answer the first two yes and that

23  last one no, he gets a death sentence.  The Judge has no

24  choice.  He'll sentence the defendant by how you answer

25  those questions.  If you answer them any other way, it's

1   going to be a life sentence.  Those are the only two

2   choices, a death or life sentence, based totally on how the

3   jury answers those questions.  Is that clear to you?

4         A.     Um, not really.

5         Q.     You don't write death or life in.  What you do

6   is you weigh the evidence after everything is in and then if

7   we first have proven to you in your mind that he's a

8   continuing danger, you would write yes.  If we have proven

9   in your mind that he did anticipate a life would be taken,

10  you would write yes.

11              And then, after looking at all the

12  evidence, if you don't think there's enough mitigating

13  evidence, if you don't think he deserves a life sentence,

14  you would write no.  So yes, yes, and a no would equal a

15  death sentence.  This is a dangerous human being, he

16  anticipated a life would be taken, and there's no mitigating

17  -- there's nothing that mitigates it to a life sentence.

18              Now, if you answer them the other way, if

19  you don't think he's a continuing danger or he didn't

20  anticipate, then that's going to equal a life sentence.  But

21  that's how that sentence comes out.  It's based on how you

22  answer those questions.  And it's either going to be a life

23  sentence or a death sentence, once he's been found guilty.

24  It all depends on the facts.  Okay?

25        A.     Right.

1   Q.  Are you familiar with the method of execution

2 in Texas?

3   A.  Um, injection?

4   Q.  You are exactly right.  By lethal injection.

5 It used to be the electric chair.  You probably remember

6 that.  And once they reinstituted the death penalty, they

7 came up with the procedure of lethal injection --

8   A.  Yes.

9   Q.  -- which is primarily what's used in most

10 states.  From living here in Texas you know that, no doubt,

11 that the death penalty is actually employed.  They actually

12 carry it out.

13   A.  Yes.

14   Q.  Texas leads the nation in executions.  The

15 procedures are the same in each case.  If this defendant

16 were found guilty and those questions were answered in a way

17 in which the Judge would sentence him to death, he would

18 then be taken down to death row.  At some point in time down

19 the line, I couldn't tell you when, he would actually give a

20 date of execution for the defendant.

21   The day prior to that date, he would be

22 moved to downtown Huntsville.  You may have seen the

23 photographs of where executions take place, that prison with

24 the orange brick with the clock.  On his day of execution

25 he's given a last meal.  He's given time with family,

1    friends, and a minister.

2              But at 6:00 p.m. the law says executions

3    take place and he would simply be moved down the hallway by

4    force, if necessary, put in that execution chamber, put on

5    the gurney, secured with leather straps, needles placed in

6    his arms, and tubes go into another room.

7              At that point in time friends or family

8    members of the victim would come into one viewing room and

9    friends and family members of the defendant would come in

10   the other.  And then the warden gives the condemned two

11   minutes to make their last statement.  And you always read

12   about these statements in the media.  They cover that quite

13   well.

14             But after that it's simply a matter of

15   signaling the executioner who injects poisons, poisons which

16   cause the lungs to collapse, the heart to stop, and him to

17   lapse into a coma.  Death occurs within 15 to 20 seconds.

18   That's the procedure that occurs in each case and, quite

19   frankly, that's the procedure that would occur in this case,

20   if these questions were answered in that way.

21             Now, we can't review the case to you, but

22   we can tell you, quite frankly, that that's our goal in this

23   case, that the defendant be executed.  The defense takes the

24   opposite view, and that's why we're interviewing jurors at

25   length.

1    You have told us philosophically that you

2  believe in the death penalty --

3       A.    Yes, sir.

4       Q.    -- for certain cases.  You also have told us

5  that you believe it should be carried out in certain cases?

6       A.    Yes.

7       Q.    But, you know, we always want to lay our cards

8  out on the table because it's one thing to talk about

9  philosophically and another thing when you think about, I'm

10  going to actually participate in this type of case.  Because

11  some people can do that and some people can't.

12           Let me just ask you, as best you know

13  yourself, do you feel you are the type of person, if the

14  State proved these things to you, that you could take pen in

15  hand and answer those questions in a way which would result

16  in the defendant's execution some day?

17       A.    Yes, sir.

18       Q.    Okay.  Now, let's talk for a minute about the

19  publicity in this case.  Almost every juror has read or seen

20  something about this case, seen it on TV, read something in

21  the newspaper.  That doesn't mean you are not qualified as a

22  juror.  If that were the rules of the case, then we would

23  never get a jury for a high publicity case.

24           What the law says is that if you are on

25  the jury, you, obviously, have to make your decisions based

1   only on the witnesses that you hear in the courtroom and the

2   evidence introduced.  You can't base it on anything you have

3   seen on TV or read in the newspaper, because common sense

4   will tell you that stuff is not always accurate, for one

5   thing, and the better evidence is going to come from the

6   witness stand.

7               We can't ask you to blank it out of your

8   mind, but we can require you not to let it influence you as

9   a juror.  Ultimately, only you can tell the Judge that.  But

10  I think you understand why we have that particular law.

11              What do you recall reading or seeing on

12  the news about this case?

13  A.      I recall the night that they reported it on

14  the news that the officer, you know, Hawkins had been

15  murdered and there was a group of men that did it, you know.

16  I don't recall the number, you know, I mean, there were, you

17  know, in the group.

18              But they were -- they escaped to some

19  other state and they were finally caught and brought back,

20  you know, and tried.  And some haven't been tried yet, are

21  pending, you know.

22  Q.      Did you follow any of those cases at all?

23  A.      No, not really.  Just what I saw on TV.  I

24  didn't really take it to heart, but I did follow -- I heard

25  some of it.

1    Q.    Like I said, a lot of people, jurors, 99 point

2    9 have seen something on the news about the case.  But the

3    law, what I have already explained, if you have seen

4    something, read something, you can't let that influence your

5    decision.  You can base your decisions only on the evidence.

6                Let me just ask you, do you feel that you

7    could follow that rule of law?

8    A.    Yes, sir.

9    Q.    You would, if you were seated on this jury,

10   base your decisions only on what you hear in the courtroom

11   and wouldn't let anything you have seen on the news

12   influence you in any way?

13   A.    Um, no, sir.

14   Q.    You feel you could do that?

15   A.    Yes, sir.

16   Q.    Okay.  And you understand why we have that

17   rule of law, obviously?

18   A.    Yes.

19   Q.    And it's something you are confident you can

20   do?

21   A.    I didn't hear that last part.

22   Q.    It's something that you are confident that you

23   can do?

24   A.    Yes, sir.

25   Q.    Okay.  Fair enough.  Another area that I want

1   to get into is the fact that your son is a Dallas police

2   officer. A lot of jurors either know police officers as

3   friends or have relatives like yourself that are police

4   officers.

5             Again, that doesn't necessarily make you

6   unqualified to be a juror. It's whether you can be fair.

7   We can't preview the facts. I can tell you, though, that

8   there should be no Dallas police officers testifying in this

9   case, so we're not going to see your son in here. We

10  wouldn't have to worry about that. I guess, if he were a

11  witness, you might be a little bit biased. But it wouldn't

12  be -- won't be a situation where the Dallas police will come

13  in.

14            But there will be other police officers

15  testifying from other agencies. The fact that they are just

16  other police officers, would that bias you in any way by the

17  fact that your son is a police officer or would you treat

18  them like you would any other witness?

19        A      Treat them as any other witness.

20        Q.     Okay. That's one of the rules. I think

21  common sense, we respect police officers, but you can't

22  start them out ahead of other witnesses. You have to wait

23  and judge them like you would any other witness. There are

24  good police officers and bad police officers. And you have

25  to wait until they testify and then make your judgments. Do

1    you feel that you can do that?

2         A.    Yes, sir.

3         Q.    Now, let's talk about these Special Issues.

4    These are unique to a capital case.  And you don't get these

5    unless you have found a defendant guilty.  Just because you

6    find someone guilty, doesn't mean they get the death

7    penalty.  We have to put on additional evidence and then you

8    get these questions.

9              If you would, just read Special Issue No.

10   1 to yourself and I'm going to go over some of that with

11   you.

12        A.    (Prospective juror complies.)

13        Q.    That first question obviously asks the jurors

14   to make a prediction about how the defendant will behave in

15   the future.  Do you feel you could answer that question, if

16   you are given enough evidence?

17        A.    Yes, sir.

18        Q.    What types of things or facts would be

19   important to you in considering that question?

20        A.    Um, if the person accused didn't actually know

21   that this murder was going to take place, you know, mainly.

22   If he beyond a doubt he didn't know it was going to happen,

23   you know, and you could prove that, you know.

24        Q.    You don't get to this question unless it's

25   been proven to you that he is guilty, either as the

principal or we call the party or accomplice.  And I can't
preview the facts, but I can tell you that we are proceeding
under this case under that accomplice, the rules of the
accomplice, about a person actively involved.

If you found him guilty, then we would
get to this particular question.  You get to consider what
his role was in the offense, what he did, how actively
involved, that sort of thing.  And you get to hear new
information in his past.  If he's had a criminal history in
the past, you get to hear about that.  You even get to hear
from the witnesses.  Then, after all that evidence is in,
you retire to the jury room and you make your decision.

The question starts out with a no answer
and we have to prove to you beyond a reasonable doubt it
should be answered yes.  We have the burden of proof.  Just
because you found him guilty doesn't mean that you would
answer question No. 1 yes automatically.  You would have to
depend on the facts that you hear in the guilt/innocence
stage and you reconsider and any new evidence that you hear
in the punishment phase.

But what the law requires is you have to
keep your mind open to that evidence, then make your
decision after everything is in, in the punishment phase,
and require the State to prove that to you beyond a
reasonable doubt.

1        Do you feel that you can do that?

2        A.    Yes, sir.

3        Q.    If we fail to do that, you would have to leave

4   it as a no answer.  Could you do that?

5        A.    Yes, sir.

6        Q.    And if we do prove it to you after you have

7   looked at the evidence, you can answer it yes?

8        A.    Yes, sir.

9        Q.    Okay.  Again, you consider the person's role

10  in the offense as well as their criminal background or lack

11  of criminal background.  We have to prove that there's a

12  probability that he would commit criminal acts of violence.

13        What does "probability" mean to you in

14  that sentence, that there's a probability he would commit

15  criminal acts?

16        A.    That he could actually do it.

17        Q.    You know, we could never prove there's a

18  certainty that he would commit criminal acts of violence.

19  Obviously, I don't think that we can prove a certainty on

20  anything, so the law says that we are not required to prove

21  an absolute certainty.  Do you agree with that proposition?

22        A.    Yes, sir.

23        Q.    But the law also says it's got to be more than

24  a mere possibility, because anything is possible.  More

25  likely than not is the language we hear most often.  Do you

1    feel comfortable with that type of language?

2          A.     Yes.

3          Q.     Okay.  We have to prove that he would commit

4    criminal acts of violence.  When you see "criminal acts of

5    violence", what does that mean to you?

6          A.     He has no self-control against hurting

7    somebody.

8          Q.     Okay.  Assaulting, murder, any kind of harm to

9    another human being?

10         A.     Yes, sir.

11         Q.     And then constituting a continuing threat to

12   society.  What does "society" mean to you?

13         A.     Anybody around him.

14         Q.     Okay.  Anyone and everyone that may come into

15   contact with him?

16         A.     Yes.

17         Q.     Including people down in the prison system,

18   that sort of thing?

19         A.     Yes, sir.

20         Q.     Okay.  Let's talk about Special Issue No. 2.

21   Now, you don't get to that unless you found him guilty and

22   then you found he was a continuing danger.  Then you get to

23   Special Issue No. 2.  It also starts out with a no answer

24   and we have to prove to you it should be answered yes, again

25   using his role in the crime and then the background evidence

you may have heard.

We have to prove to you beyond a reasonable doubt that whether the defendant actually caused the death, if he's the triggerman it's pretty easy, of the deceased, or if he did not actually cause the death of the deceased, but he intended to kill him, that is, he had the intent for that person to die, but maybe he wasn't the triggerman, or another, or that he anticipated that a life would be taken.

You remember I talked about that earlier on the accomplice situation?

A.      Yes, sir.

Q.      You didn't actually cause the death, but the evidence shows that you actually anticipated a life might be taken, then the State can prove that that should be answered yes and you are well on the way to a death penalty.

Those are the situations in which an accomplice could get the death penalty.  Do you agree with the law in that regard?

A.      Yes.

Q.      Now, what that evidence is, is just going to depend on the particular case.  We can't stop and open a person's head up and say that's his intentions.  But what we can do is put all the evidence on, what their role was, what happened before, during, and after the crime, and then you

1    can just use your common sense and draw reasonable

2    deductions from the evidence about what a person's intents

3    are from his actions.  Do you feel that you can do that?

4            A.      Yes, sir.

5            Q.      Okay.  Again, it's just going to depend on the

6    facts of each case.  But if -- to get him guilty, we have to

7    prove that he should have anticipated a life would be taken.

8    And here we go a step further and prove that he did

9    anticipate.  It might be the same evidence or maybe

10   additional evidence that you hear about his past.  But you

11   have to look at it a second time in this part of the case.

12   Do you feel that you could do that?

13           A.      Yes, sir.

14           Q.      And just because you found him guilty doesn't

15   mean that you would answer that yes.  You have to wait and

16   look at the evidence again and then make your decision.

17   Would you do that?

18           A.      Yes, sir.

19           Q.      Okay.  You see how the law contemplates you

20   look at these questions one at a time and then decide if the

21   State has proven it to you?

22           A.      Yes, sir.

23           Q.      Now, this last question, neither side has the

24   burden of proof.  You have already found him guilty, you

25   already found he's a continuing danger, and that he

1  anticipated that a life would be taken.

2          And here you look at all the evidence you

3  have heard and decide if there's mitigating evidence that

4  you think tells you that he should get a life sentence,

5  rather than a death sentence.  It allows you to show mercy

6  in a fact situation, depending on what it is.

7          The question asks whether taken into

8  consideration all the evidence, including the circumstances

9  of the offense, the defendant's character and background,

10 and the personal moral culpability of the defendant, there

11 is sufficient mitigating circumstance or circumstances to

12 warrant that a sentence of life imprisonment rather than a

13 death sentence be imposed.  You see how that question is

14 asking you to look at everything in the case --

15      A.    Yes, sir.

16      Q.    -- everything in his background and decide if

17 you think there's something that tells you he needs a life

18 sentence rather than a death sentence.  You don't have to

19 tell us right now what you think mitigating evidence may be.

20 You just simply have to tell the Court you can keep your

21 mind open to it.  Do you feel that you could do that?

22      A.    Yes.  I could keep an open mind.

23      Q.    All right.  Do you feel -- just let me ask

24 you.  Does anything come to mind right now that you view as

25 potentially mitigating?

1    A.    No, sir.

2    Q.    Okay.  Most jurors tell us the same thing.  We

3    hope they don't sit around thinking of these things.  We

4    hear different things from jurors.  Jurors don't even have

5    to agree with one another.  A lot of times you will hear

6    about a person's background, maybe the way they were raised,

7    maybe they had a bad background, maybe a broken home, maybe

8    they were physically or mentally abused.  We have some

9    jurors that tell us that could be potentially mitigating, I

10   guess, if it was real severe.

11                We have other jurors tell us, I would

12   feel bad for them, but, you know, once you become an adult,

13   you need to be held accountable.  There are lots of people

14   that go through that and they are fine citizens.  They don't

15   commit crimes.

16                How do you feel about that kind of

17   background information?

18   A.    You have to have some effect on the person,

19   their background, to get to the point where he got to.

20   Q.    Do you think that would be an excuse where you

21   think that would be a life sentence or is that just

22   something you would consider?

23   A.    I would consider.

24   Q.    Okay.  Do you feel people can overcome that

25   and should be held accountable for their actions?

1      A.     Yeah.  They should be accountable -- yeah, we

2 should be accountable for our actions.

3      Q.     Okay.  Is it something, though, that you can

4 keep your mind open to and even if you found the person

5 guilty, even if you felt he anticipated a death would occur,

6 you can still say, hey, in one case, I might think that a

7 life sentence is the right thing to do?

8      A.     Yes, sir.

9      Q.     If that's what the facts tell you?

10     A.     Yes, sir.

11     Q.     Okay.  That's what the law contemplates, that

12 you keep your mind open to it.  Now, let's talk about a few

13 rules that apply and I'll see if you can follow these rules.

14                Presumption of innocence.  Every

15 defendant starts out with a presumption of innocence and we

16 have to prove him guilty.  The fact that he's been arrested

17 or indicted or that we're going through this process is no

18 evidence of his guilt.  You have to require the State to

19 prove to you beyond a reasonable doubt that he is guilty and

20 at the beginning of trial he's entitled to that presumption

21 of innocence.  Could you follow that rule of law?

22     A.     Yes, sir.

23     Q.     The burden of proof is on the State and it

24 never leaves the State.  It never shifts over to them.  They

25 don't have a burden to prove his innocence.  Okay?  You can

1    anticipate, I think, that they will ask questions or make

2    arguments, or call witnesses, but they don't have to because

3    that burden of proof never leaves this table.  If you have a

4    reasonable doubt after our case, then you are obligated to

5    find him not guilty.  Could you do that?

6          A.     Yes, sir.

7          Q.     Would you require the State to prove this to

8    you beyond a reasonable doubt?

9          A.     Yes, sir.

10         Q.     And vice-versa.  You would not require the

11   defense to prove his innocence to you because they never

12   have a burden of proof.  The burden of proof always stays

13   here.  Could you follow that rule of law?

14         A.     Yes.

15         Q.     The burden goes to every portion of the

16   indictment.  You know, one part of the indictment is we have

17   to prove who committed the crime.  Now, at the close of the

18   evidence, if you had a reasonable doubt about who did the

19   crime, obviously you are going to find him not guilty.

20         A.     Yes, sir.

21         Q.     Let me give you an example of how it goes a

22   little further than that.  We have to prove to you that it

23   happened in Dallas County, too, where it happened.  We may

24   have proved to you who committed the crime, who they killed,

25   how, but maybe this crime happened kind of on the border and

the evidence really showed it happened in Tarrant County.

In that case, then, you would have a reasonable doubt on the

portion of the indictment because we would have been real

ill prepared, obviously, but you can't help us out and say,

I'll give them that one.

If you have a reasonable doubt on any

portion of the indictment, then you have to find him not

guilty.  That would be our fault.  Probably get fired, but

you would have to, under the law, find him not guilty.

Could you follow that rule of law and

require us to prove every portion of the indictment to you

beyond a reasonable doubt?

A.      Yes, sir.

Q.      Okay.  Now, the Fifth Amendment applies to

each case.  If someone wants to testify in their case, no

one can stop them.  But if they don't testify, you can't

hold that against them.  It might be a lot of reasons

someone may not testify.  They may be real guilty and look

even more guilty.  They may not be very educated.  They may

have a speech impediment.  They may be nervous in front of

someone and could be made to look guilty.  They could be

following their lawyer's advice and following his orders and

don't testify.  They haven't proven their case.

You can't consider any of that.  If

someone doesn't testify, you must simply base your decision

1    on what the State has already produced.  Can you follow that

2    rule of law?

3           A.      Yes, sir.

4           Q.      Okay.  The parole laws come up sometimes.

5    People read about them.  The Court will tell you in a

6    capital murder that a life sentence is forty calendar years.

7    He will also tell you, though, that you can't consider our

8    parole laws in any way.  You can just consider a life

9    sentence, a life sentence.  Could you follow that rule of

10   law?

11          A.      Yes, sir.

12          Q.      Sometimes defendants are found guilty of

13   lesser included offenses.  A lesser included offense of

14   capital murder is aggravated robbery, taking property from

15   someone by threatening them with a weapon.

16                  The penalty range is very wide.  It goes

17   from a life sentence on one side all the way down to five

18   years in prison on another and anywhere in between.  And

19   what you have to be able to do as a juror is keep your mind

20   open to that full range.  If you think the maximum is called

21   for after hearing about their background and their role in

22   the crime, you can do that.  Or if you think as little as

23   five years in prison is called for, you can do that.

24                  Do you feel that you can keep your mind

25   open to that full range of punishment?

1    A.    Yes, sir.

2    Q.    Okay.  Let me go over a couple of other

3 things.  Your brother had a DWI, I think, looks like at some

4 point in time.  And you put on the questionnaire you weren't

5 sure of the date, but he had served or was serving his

6 sentence; is that right?

7    A.    Yes, sir.

8    Q.    Do you know if that was a misdemeanor or a

9 felony or do you know?

10    A.    I just know he was -- he did commit it several

11 times, DWIs, and that's why he was convicted of, you know,

12 sentenced for a year or something like that.

13    Q.    Okay.  So he had had several over a period of

14 years?

15    A.    Yes, sir.

16    Q.    Was that here in Dallas?

17    A.    No, sir, Victoria or Beeville, either one, in

18 that area.

19    Q.    Do you feel from what you know about his cases

20 that he was treated fairly?

21    A.    Yes, sir, he was.

22    Q.    All right.  You also, looks like -- is this a

23 third cousin that was prosecuted as a child, some type

24 offender, and he received 70 years or 90 years, some lengthy

25 sentence?  How close were you to that person?

1    A.    Distant, you know, I wasn't too close.

2    Q.    Do you know about the facts of the case very
3    well?

4    A.    Um, offhand, not offhand --

5    Q.    From what you know about the case do you feel
6    he was treated fairly?

7    A.    No, sir.

8    Q.    What are your thoughts on that?

9    A.    I think they should have given him less years
10   for -- from what I heard, you know.

11   Q.    Did you come to any of the court proceedings?

12   A.    No, sir.

13   Q.    Did you feel he was guilty of the offense,
14   though?

15   A.    Yes, sir.

16   Q.    Do you keep in touch with him at all?

17   A.    Yes.

18   Q.    Just write him?

19   A.    By mail.

20   Q.    Okay.  And the only other trial you have been
21   on is the civil trial; is that right?

22   A.    Yes, sir.

23   Q.    That's all the questions that I have.  I
24   appreciate your patience.

25   A.    Thank you.

1              THE COURT:  Mr. Sanchez?

2              CROSS-EXAMINATION

3  BY MR. SANCHEZ:

4      Q.     Good afternoon, Mr. Ortiz, how are you doing?

5      A.     Fine.

6      Q.     My name is Juan Sanchez and I'm going to talk

7  to you about some things that we want to cover.  But before

8  I start, where is Beeville?

9      A.     South Texas on the way to Corpus Christi.

10     Q.     It's not close to Laredo in any way?

11     A.     No.

12     Q.     Okay.

13     A.     It's -- it's a little ways.

14     Q.     My brother-in-law is a basketball coach and he

15  is always going to Beeville.  That's all he talked about.

16  So I was curious where that was.  Also, you were a letter

17  carrier for a long time?

18     A.     Yes, sir.

19     Q.     Did you ever get bit by a dog or anything like

20  that?

21     A.     Almost.

22     Q.     Almost.  I always ask letter carriers that.

23  But you were called down here, obviously, because we thought

24  you were fair.  Okay?  We thought that.  Both sides got to

25  go through all the questionnaires and there was some people

1  that said, hey, you know, I just can't be fair in this case

2  for certain reasons.  And some people said, I would always

3  give the death penalty, no matter what type of case it is.

4  And some people said, I could never give a death penalty.

5              So what we did is look at all the

6  questionnaires and we picked people that we thought could be

7  down the middle, because that's what you need to be when you

8  are -- when you are a juror.  Neither side wants people or

9  jurors that come in with predisposed ideas or dispositions,

10  in other words, already thinking someone is guilty or

11  already thinking they could never prove the case.  Does that

12  make sense to you?

13        A.      Yes.

14        Q.      And so we looked at your questionnaire and we

15  said, this is a person that I think we need to talk to and

16  explore and see if they can be qualified as a juror.  And I

17  think a lot of times when questions are asked, can you

18  follow the law, everybody says yes.  Many people when just

19  given that -- and the law, can you follow it, I think 99

20  percent of the people say, yes, right.  Would that be fair

21  to say?

22        A.      Yes, sir.

23        Q.      But the reason we bring you down here to talk

24  to you is because when we put you in reality, when we put

25  you in a real situation, where you may be called upon to

127

make a decision, sometimes people's feelings or their thoughts clash with the laws.  And once they are sitting in those seats over there as jurors, they may not be able to follow the law the way they thought they could.  They might say, I can follow the law, but maybe not in this situation. Does that make sense?

A.    Yes.

Q.    And that's why we're going to ask you the questions we're going to ask you.  Okay?

A.    Yes.

Q.    What I want to explore is the fact that your son is a police officer, just like, you know, the State did.

A.    Yes, sir.

Q.    Are you very close to your son?

A.    Yes.

Q.    Sounds like you are.  Do you see him all the time?

A.    Yes.

Q.    And talk to him?

A.    Yes, I do.

Q.    Visit you every weekend?

A.    Yes.

Q.    Does he talk to you about his work?

A.    Some of it, not all of it.

Q.    But some stuff he can't talk to you about?

1        A.      Right.

2        Q.      Generally he talks to you about what he does

3  every day?

4        A.      Yes, sir.

5        Q.      Okay.  You have indicated that that may not

6  affect you in being a juror on this case, but, as you know,

7  the allegation here is the capital murder of a police

8  officer.  Okay?

9        A.      Yes, sir.

10        Q.      And I need to talk to you about that because

11  sometimes people say that won't affect my decision, but once

12  you are sitting on the jury and there's evidence of the

13  capital murder of a police officer, then things change.  You

14  know, you are close to that situation.  You are close to

15  your son.  You are close to a police officer.

16                And only you can tell us whether that

17  could make a difference in you deciding this case or not.

18  What do you think about that?

19        A.      I can be open.

20        Q.      I'm sorry?

21        A.      I can keep an open mind, yes.

22        Q.      Do you think that it would affect you in any

23  way being so close to your son and making a decision in a

24  case like this?

25        A.      No, sir.

Q.    Okay.  Because we've had jurors that say, you know, are real close to a police officer that say, if I'm sitting on that jury, you know, I may not be able to find a situation or answer a verdict form or Special Issue in a way that would not give that person the death penalty, because if I did that, I would feel I'm letting down that person I'm close to.  What do you think about that?

A.    No, sir.  I don't think I would be letting him down.

Q.    Okay.  So are you telling us that if the State didn't prove their case to you, you wouldn't have a problem facing your son after the trial, if you found that person not guilty?

A.    No, sir.

Q.    Okay.  Or if you answered the Special Issues in a way that would lead the person accused to receive a life sentence instead of the death penalty, you don't think that would be back in your mind about how you were going to face your son the next day or that night?

A.    No, sir.

Q.    Not at all?

A.    No.

Q.    Okay.  That's why we ask these questions because, you know, there are some jurors that say that would be in the back of my mind, you know, and that would be an

1   outside influence that wouldn't be proper.  And that person

2   would be taking into consideration things that aren't being

3   presented here in court and that's why we ask these

4   questions.

5              So can you -- do you think, just to cap

6   that off, do you think it would ever be appropriate for

7   someone to receive a life sentence instead of a death

8   penalty in a case where someone was found guilty of killing

9   a police officer?

10       A.    Can you repeat that again?

11       Q.    Do you think it would ever be appropriate for

12  someone to receive a life sentence instead of the death

13  penalty in a case where someone was convicted of killing a

14  police officer?

15       A.    Yes, sir.

16       Q.    What kind of things would be important to you

17  in deciding whether someone should receive a life sentence

18  over a death penalty or the death penalty, I'm sorry.

19       A.    I would have to hear and see and witness all

20  the evidence that they have for or against it, you know, to

21  make the decision.

22       Q.    You also talked about, or you mentioned, that

23  you had some media exposure like a lot of people do about

24  this case.  And you said that you could put that out of your

25  mind.

1           Based on what you know already, have you

2  formed any opinions as to what may have happened or what may

3  not have happened in this case?

4      A.    Um --

5      Q.    If you have, that's fine.  Have you?

6      A.    Well --

7      Q.    It sounds like you may have formed some

8  opinions already; is that correct?

9      A.    He was with a group, you know, that -- and I

10  don't know the extent of what he actually did, but I know

11  that he was with the rest of the people that committed the

12  -- that murdered, you know.

13      Q.    So you have already formed that opinion?

14      A.    Right.

15      Q.    Would that opinion affect you -- in your mind

16  does that make him already guilty of the offense that he's

17  charged with?

18      A.    No, sir, because I don't know, like I said,

19  all the evidence and all the proof they actually have

20  against him, just what the media came up with.

21      Q.    And the fact that you have already formed the

22  opinion that he was with them, would that in any way --

23  would you be able to put that out of your mind and listen to

24  the evidence --

25      A.    Yes.

Q.    -- in this case and decide it only on the
evidence that you hear in this courtroom?

A.    Yes, sir.

Q.    Did you get your questionnaire to look at
before you?

A.    Yes, sir, I do.

Q.    Okay.  I just wanted to make sure you had that
because I'll be referring to it in a little bit.  We talked
about these Special Issues.  You know, as Mr. Shook
explained to you, not every case, every murder, not every
case is a death penalty case and not every murder case is a
death penalty eligible case.  That makes sense to you,
right?

A.    Yes, sir.

Q.    Only certain types of cases, only certain
types of murder cases are eligible for the death penalty.

A.    Yes.

Q.    And then, even if that person is convicted of
that type of murder, they don't automatically get the death
penalty.  Did you understand that?

A.    Yes, sir.

Q.    So the way the law is written, it favors a
life sentence over a death penalty.  Does that make sense to
you?

A.    Yes.

1    Q.    In other words, for a person to receive the

2    death penalty, the State would have to overcome these

3    hurdles or have to go through these filters or prove these

4    Special Issues before anybody could receive the death

5    penalty.  Does that make sense?

6    A.    Yes, sir.

7    Q.    Okay.  So as you can -- another way to look at

8    it is once someone is convicted of a capital murder, they

9    are sitting on a life sentence and that's where it stays

10   unless issues 1 and 2 are proved to you beyond a reasonable

11   doubt and issue No. 3 is answered no.  Does that make sense

12   to you?

13   A.    Yes, sir.

14   Q.    Okay.  And the reason I'm going to go over

15   this is because you will have already been sitting through a

16   long trial.  Okay?  Probably hear a lot of witnesses.  You

17   are going to see a lot of effort from the DA's Office and

18   the defense.  And you are going to go back there and

19   deliberate.

20         And if you come back with a guilty

21   verdict, you are going to hear punishment evidence.  And,

22   again, you may hear a lot of witnesses, see a lot of effort

23   and time spent on presenting those cases.  And there are

24   some people that believe that once they found somebody

25   guilty of capital murder, that Special Issue No. 1 would

1  already be answered yes.  In other words, I've already

2  convicted this man of killing a police officer, so Special

3  Issue No. 1 is a no brainer.  Yes, he's a threat to society

4  because he's been convicted of killing a police officer.

5  How do you feel about that?

6        A.    Um, I would say that he would be, you know, a

7  threat.

8        Q.    Okay.  And would that be just based on the

9  fact that you have already found him guilty of killing a

10  police officer, Special Issue No. 1 would already be

11  answered to you yes automatically?  Would that be fair to

12  say?

13        A.    Would you repeat that again?

14        Q.    Would it be fair to say just because you found

15  him guilty of killing a police officer, capital murder, that

16  Issue No. 1 would already be answered for you, it would be a

17  no brainer, the fact that you convicted him alone is enough

18  for you to automatically say he's a threat, a continued

19  threat, to society?

20        A.    I would say yes.

21        Q.    So, in other words, you wouldn't need to be

22  convinced other than the fact that you found him guilty of

23  capital murder?

24        A.    After all the evidence and everything is, you

25  know, brought up and then I would, you know.

1   Q.    You already would have answered in your mind

2   Special Issue No. 1 to be yes, just based on your verdict in

3   the first part of the trial; is that correct?

4   A.    Yes, sir.

5          THE COURT:  Mr. Ortiz.  Do you understand

6   -- I'm sorry, Mr. Sanchez.  Let me clarify this.  Do you

7   understand how we get to these Special Issues?

8          PROSPECTIVE JUROR:  Um, not fully, no.

9          THE COURT:  That's why I was sensing some

10  confusion.  Would you like to more fully describe the

11  process?

12  Q.    (By Mr. Sanchez)  Okay.  Mr. Ortiz, the way

13  the law works or the way the death penalty scheme works in

14  Texas, is that you first go through the guilt/innocence part

15  of the trial.  Okay?  In other words, the only decision you

16  have to make before you even get to these Special Issues is

17  whether the State has proven to you beyond a reasonable

18  doubt that the defendant is guilty of capital murder the way

19  they have alleged it, which in this case they are alleging

20  the death of a police officer.  Okay?

21  A.    Yes, sir.

22  Q.    And that's the only decision that you have to

23  make at that point.  Okay?

24  A.    Yes, sir.

25  Q.    And if you decide that the person is -- that

1  it has been proven to you beyond a reasonable doubt and you

2  find him guilty, then you come back out into the jury room

3  and the verdict is given.  And then the State at that point

4  can offer witnesses in order to prove these Special Issues.

5  Does that make sense to you?

6         A.    Yes.

7         Q.    In other words, there's two parts to the

8  trial.  Some people think it's all done in one phase, but

9  it's two different parts.  Now, what the law requires is

10 that -- or what the law says is that you are not to decide

11 the Special Issues until all the evidence has been presented

12 in the second part of the trial or the punishment phase.

13        A.    Yes.

14        Q.    But there are jurors that tell us, I won't be

15 able to step back and decide those issues independently of

16 my verdict I already made in the guilt/innocence stage.

17 Does that make sense to you?

18        A.    Yes.

19        Q.    And what you have told us here today is that

20 Issue No. 1 would not have been answered independently by

21 you.  You have told us that once you find him guilty of

22 capital murder, of killing a police officer, that that

23 Special Issue No. 1 would have already been answered for you

24 before you heard any evidence in the punishment stage.  Is

25 that fair to say?

1    A.    No.   I would have to listen to the evidence

2   and, you know, whatever was brought up, the witnesses and

3   all that to come to the first one, you know.

4    Q.    But would -- in your mind would that be

5   automatic because you told us before that that would

6   automatically be answered in your mind just based on what

7   you heard in the first part of the trial in the

8   guilt/innocence part.

9         Would in your mind that already be

10  answered yes just based on the fact alone that you found him

11  guilty of capital murder?

12   A.    No.

13   Q.    No?   Because if it would be -- it's fine to

14  tell us.

15   A.    Right.

16   Q.    You don't have to be afraid to say that.

17   A.    Right.

18   Q.    And we would rather know it now.   It would

19  still be -- you would still say no, it wouldn't be answered

20  automatically?

21   A.    No.   I would have to wait for the second part,

22  yeah.

23   Q.    And would you require the State to prove that

24  to you?

25   A.    Yes, sir.

1    Q.    Okay.  Now, Special Issue No. 2.  I want to

2  talk to you a little bit about because of something you

3  wrote in your questionnaire.  If you look at page 4 of your

4  questionnaire that you have in front of you.  If you look at

5  the bottom, there's a question that says what would be

6  important to you in deciding whether a person received a

7  death or life sentence in a capital murder case?  Do you see

8  that?

9    A.    Yes.

10    Q.    And you wrote if the person shows it was not

11  in the plan.  What did you mean by that?

12    A.    If that person didn't know they were going to

13  murder somebody.

14    Q.    And were you dealing there with like an

15  accomplice situation?  Is that what you were talking about

16  there?

17    A.    Yes, sir.

18    Q.    Okay.  Because in Special Issue No. 2, that's

19  where we deal with the accomplice situation.  Okay?  The

20  State has to prove to you beyond a reasonable doubt that if

21  the person doesn't actually cause the death of the deceased,

22  that he actually anticipated that a human life would be

23  taken.  Does that make sense?

24    A.    Yes.

25    Q.    Okay.  Is that kind of what you are saying

1  here in your answer that it would have to be proven to you

2  that that person didn't know that it was in the plan to kill

3  somebody?

4       A.      Yes, sir.

5       Q.      Okay.  Who would you require to show that to

6  you?  Because what I'm looking at here is if the person

7  shows it was not in the plan, would you want the defendant

8  to say something about that or would you want the defense to

9  prove to you that that person didn't know a life would be

10  taken?  Would that be important to you?

11       A.      No, not the person himself, you know, but all

12  the evidence that was brought out, you know, by the defense.

13       Q.      You would have the defense prove to you that

14  --

15       A.      That that person didn't know.

16       Q.      So, in other words, you would start with the

17  proposition that they did know, but you would have the

18  defense prove to you otherwise; is that correct?

19       A.      Yes, sir.

20       Q.      And even if the law required that only the

21  State prove to you beyond a reasonable doubt Special Issue

22  No. 2, that will be your feeling that you would want the

23  defense to show you that the defendant didn't know that that

24  was in the plan or anticipated that a life would be taken?

25       A.      Yes.

1                    THE COURT:   Any further questions?

2                    MR. SANCHEZ:   No further questions.

3    Thank you, Mr. Ortiz.

4                    THE COURT:   Mr. Ortiz, I want to thank

5    you for your time and service here today.   The parties have

6    agreed that they are going to excuse you from this trial and

7    you are not going to serve as a juror in this case.   I very

8    much appreciate you coming down and going through this

9    process.

10                         [End of Volume]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF TEXAS          *

COUNTY OF DALLAS        *

I, NANCY BREWER, Official Court Reporter for the 283rd Judicial District Court, do hereby certify that the above and foregoing constitutes a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

WITNESS MY OFFICIAL HAND on this the 4 day of _____ March, 2004.

NANCY BREWER, CSR, NO. 5759
Expiration Date: 12-31-04
Official Reporter, 283rd JDC
Frank Crowley Crts. Bldg. LB33
133 No. Industrial Blvd.
Dallas, TX 75207
(214)653-5863

748 1

REPORTER'S RECORD

VOLUME 18 OF _61_ VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

********************

INDIVIDUAL VOIR DIRE

********************

**FILED IN**
**COURT OF CRIMINAL APPEALS**

MAR   9 2004

Troy C. Bennett, Jr. C

On the 19th day of September 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT: 03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT: 00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

## PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Louise Marker | 4 | 5 | 40 | 18 |
| Kyle McCoy | 76 | 77 | | 18 |
| Tonya Davis | 85 | 87 | 123 | 18 |
| Dana Stotts | 134 | 137 | | 18 |
| Floyd Fuller | 148 | 150 | 179 | 18 |

P R O C E E D I N G S

1

2          THE COURT:  Ms. Marker here?

3                    [Prospective juror in]

4          THE COURT:  How are you?

5          PROSPECTIVE JUROR:  Doing great, thanks.

6          THE COURT:  We have Louise Elaine Marker;

7  is that correct?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  You go by Louise or Elaine?

10         PROSPECTIVE JUROR:  Louise.

11         THE COURT:  I want to correct my record

12  and be sure your name is titled correctly.  Welcome to the

13  283rd.

14         PROSPECTIVE JUROR:  Thank you.

15         THE COURT:  Many times people complain

16  about courts or judges not being on time and I called right

17  at 8:30 and you had just gotten here.  And we didn't mean to

18  rush you so much, but we care about your time, get you in

19  and get you on down the road.  So we're very diligent about

20  getting you in here and out of here on time.

21         PROSPECTIVE JUROR:  I would have been

22  here at 8:00, if I knew I had to read so much.

23         THE COURT:  We'll go over that in detail

24  and the attorneys will explain it.  I give it to you in

25  written form, tell you to think about it, understand how it

1  works, and how it relates to what we're talking about, the

2  law.

3            And I want to get you warmed up a little

4  bit. And I think that you have got the issues that we'll be

5  discussing.  I know it's a lot to hit someone with at 8:30

6  in the morning.  There are no wrong answers.  You can't fail

7  this test, only truthful answers.

8            The only question that I have for you

9  before we begin is will you be able to serve this Court for

10  the two weeks beginning on November 10th?

11            PROSPECTIVE JUROR:  Yes, I would be able

12  to do that.  I would have to rearrange all my work schedule.

13            THE COURT:  And that's why we're doing

14  this far enough out to give people the opportunity to

15  rearrange.  And I understand nobody wants to be on this

16  jury.  It's a pain for everybody.  But that's just the way

17  it goes.  We have to just work around it.  So I'm trying to

18  be as convenient with your schedule as I can be.  The main

19  thing is I won't waste your time.  Any questions before we

20  begin?

21            PROSPECTIVE JUROR:  No, thank you.

22            THE COURT:  All right.  Mr. Shook, you

23  may inquire.

24            MR. SHOOK:  May it please the Court.

25            LOUISE MARKER,

1    having been duly sworn, was examined and testified as

2    follows:

3                    DIRECT EXAMINATION

4    BY MR. SHOOK:

5         Q.    My name is Toby Shook.  I'm going to be asking

6    you questions on behalf of the State this morning.  And as

7    the Judge said, there aren't any right or wrong answers to

8    any of our questions.

9                    I believe you have been on a civil case

10   before; is that right?

11        A.    Yes.

12        Q.    Normally, we select juries in a group, but

13   because it's a death penalty case, the law prescribes we do

14   this individual interview.  Again, we're not trying to put

15   you -- make you feel like you are on trial, but we found

16   it's a pretty good process.

17                   Your questionnaire gives us a lot of

18   information.  I'm going to follow up on some of that and

19   obviously ask you a lot of questions about how you feel

20   about capital murder, some of the laws and rules that apply,

21   some issues that may or may not come up.

22        A.    Okay.

23        Q.    If you have any questions at any time, feel

24   free to ask.  Okay?

25        A.    Thank you.

1    Q.    From reviewing the questionnaire, you work at

2    Delta and you supervise 120 flight attendants?

3    A.    Yes.

4    Q.    Tell us a little of what you do on a

5    day-to-day basis, what your duties are.

6    A.    Um, let's see.  I handle all the

7    administrative work, telephone calls for operational duties,

8    whether it's upstairs in the concourse helping board a

9    flight when they are short, agents, when a flight attendant

10   crew is late coming inbound, handling reroutes, human

11   resource end of it with sick, administrative part of the

12   sick and benefits.

13           I don't think there's -- other than

14   flying, actually flying the plane, there's not too much that

15   I don't get involved with.

16   Q.    Sounds like you do a little bit of everything.

17   A.    I fly a couple of times a month and I am

18   actually a qualified flight attendant.  All our supervisory

19   staff is for inflight service.

20   Q.    I only know one Delta flight attendant because

21   I used to work for her husband, Sherry Euell (phonetic)?

22   A.    Is she based in Dallas?

23   Q.    Now that I think about it, she may fly out.

24   A.    That's fine.  She probably commutes.

25   Q.    But her husband was a prosecutor down here

1  years ago and so I know there's thousands.

2       A.       Yeah.  There are not quite as many thousands

3  as there used to be.  Everybody has had cutbacks.

4       Q.       Let me ask you a little bit about your civil

5  jury that you sat on.  What type of case was that?

6       A.       Um, gosh, you know, it's been a long time ago.

7  It was something to do with a payment.  Really, it's been so

8  long ago.  It was right one of the first juries that I ever

9  got picked and called for right after my children -- after

10 you reach the age when you're not taking care of your

11 children anymore and I got called right away.  It's been a

12 long time ago.

13      Q.       Go pretty smoothly as you recall?

14      A.       Oh, yeah, went very quickly.  It was very

15 smooth.

16      Q.       All right.  Let me get into the topic, then,

17 of capital murder.  You know, we can't preview the facts,

18 but, you know, the Judge has said that this is a capital

19 murder case in which the State seeks the death penalty.

20              So we ask a lot of questions on the

21 questionnaire about that and we always follow up with a

22 bunch, obviously, in the individual interview.

23              On the questionnaire you said it's

24 appropriate if appropriate to the crime.  So generally I

25 think you believe in the death penalty as a law?

1     A.     Uh-huh.

2     Q.     What I would like you to do is to expound a

3 little bit of why you do and maybe the purpose you feel it

4 serves society.

5     A.     Well, I just feel that it's a sad situation

6 that our country has really gotten to that point.  But I

7 think oftentimes with so much going on and that when people

8 resort to taking another person's life, that I just feel

9 it's appropriate in return.  It's not really quite eye for

10 an eye, tooth for a tooth, but I kind of almost feel that

11 way in a lot of instances, especially to do with children,

12 elderly people, but that just doesn't make sense.  They

13 could have done something else than have a gun.  And I think

14 a lot of time it's in -- the gun is drawn in reaction or the

15 knife is drawn in reaction and when they could have done the

16 right thing and maybe talked more about it.

17     Q.     Okay.  You just feel it's a just sentence for

18 certain crimes?

19     A.     I just -- yes, I do.

20     Q.     All right.  When you think of the types of

21 crimes that are appropriate for consideration of the death

22 penalty, what comes to mind?  I think you already named

23 crimes of children, obviously.

24     A.     Yeah.

25     Q.     What other types?

1    A.    Um, senseless.  I mean, to go in to rob a

2  store and then you kill somebody.  To be -- and oftentimes

3  they get nothing out of the robbery.  And the clerk, the

4  poor clerk, is defending whatever they are doing and they

5  get killed.  So many of the convenience store things, I just

6  -- they're just senseless, you know, anything that somebody

7  killed -- I just don't think there's a reason to kill

8  somebody else when it's for that reason.  And I know that

9  sounds controversial when I'm willing to do the death

10  penalty for somebody who does that, but that's how I feel.

11  If they are going to do that to somebody, you know what,

12  this is what it feels like.

13    Q.    You talked also -- you don't have a copy.

14    A.    I do have a copy.

15    Q.    On page 3 --

16    A.    Uh-huh.

17    Q.    -- we asked about certain crimes and you said

18  also abuse cases?

19    A.    I'm sorry, where?

20    Q.    On the bottom of page 3 like the next to the

21  last question.

22    A.    And it says --

23    Q.    When you were talking about abuse cases.

24    A.    Abuse cases.

25    Q.    Where an individual has gone to all means for

1    assistance.  That's how their survival --

2         A.     I see what you are seeing here.  When somebody

3    is fighting for survival against somebody else and they kill

4    that person, then I think, again, it's almost just

5    punishment for what you have done.  Why do you think you

6    should be able to live in a prison?  And I know the prison

7    system has changed tremendously, so they almost get a good

8    deal living in prison better than what they were to start

9    with.

10        Q.     Have you ever followed many cases in the news

11   that were like death penalty cases or you felt were

12   appropriate for the death penalty?  I know you followed some

13   cases.

14        A.     Well, I mean, I read the newspaper.  It's not

15   like I am just attached.  Probably with everybody else, the

16   O. J. Simpson case, you know, but --

17        Q.     Everyone saw that.

18        A.     But I don't think that -- I was working every

19   day, so you only caught the things that you caught on the

20   evening news and read in the newspaper.

21        Q.     Okay.  In Texas and I know you kind of read

22   through the law quickly, but the death penalty right now is

23   reserved just for murder cases and then only certain types

24   of murder cases.  We have some intentional -- first of all,

25   a murder case has to be an intentional killing.  You

1    mentioned premeditated in your questionnaire, which a lot of

2    the jurors do.  We kind of grow up with that.

3         A.       Yeah, TV.

4         Q.       Exactly, "Drag Net" and all that stuff.

5         A.       Yeah.

6         Q.       And we don't have to require premeditation.

7    But what it is, is intentional.  You may have someone who

8    thinks about committing a crime for days, weeks, or hours or

9    they can think about it in a few seconds and intentionally

10   kill someone.  You have to have the specific intent to

11   murder someone and then you act on it.  It can't be

12   self-defense or an accident.  You know, if you are defending

13   yourself, then you have a legal right.  We're talking about

14   an unjustified homicide.

15             And then there has to be some other

16   aggravating facts.  We have some brutal murders, murders

17   which many people think are deserving of the death penalty,

18   but under our laws they don't qualify and they get a life

19   sentence.  For example, most people think of three or four

20   years ago Timothy Richardson was a guy who murdered his wife

21   in front of his children in Highland Park.  That was a

22   brutal murder, but it didn't fall under the parameters of

23   the death penalty.

24             What you have to do is have a murder plus

25   something else, a murder during the course of a felony like

1   you mentioned, murder during robbery.  A guy goes in and

2   shoots down the 7-Eleven clerk, that could be a case.

3   Murder during a burglary.  Someone breaks into a home and

4   murders someone.  During a rape, during a kidnapping, during

5   an arson.

6            Also murder of certain specific victims,

7   such as a police officer on duty, a fireman on duty, a

8   prison guard on duty, or a child under the age of six.  The

9   age they came up with is six.  They had to choose somewhere.

10   Murder of more than one individual in the same transaction,

11   or same types of transactions, would cover a mass murder or

12   serial killer situation.  And then murder for hire, someone

13   does it for money or profit, that could be a death penalty

14   case.  But those generally are the specific situations that

15   are reserved for the death penalty.

16            Does that list from your own personal

17   point of view make sense?  Do you agree with those types of

18   crimes?

19       A.    Yes.  I mean, all the ones you named for the

20   death penalty does make sense.

21       Q.    Okay.  Now, let me go over another area of the

22   law.  When we think of the death penalty, when it's

23   appropriate, the examples we automatically give are the

24   person that actually causes the death, the triggerman, let's

25   say, the person that goes in and shoots the person.

1          Capital murder, like any other crime, may

2   be carried out by more than one individual, depending on the

3   specific facts.  Sometimes it's several people commit a

4   crime and some of them have greater roles than the others,

5   but they are all committing the crime together.  And the law

6   says they all can be held responsible, even though some may

7   have a greater role, depending on their role in the crime.

8          And capital murder is the same.  More

9   than one individual may commit a capital murder.  You may

10  have a situation where only one person actually commits the

11  murder, but the other people are involved.  And we call that

12  the law of parties.  The term I grew up with was accomplice.

13  I think more people are familiar with that, but it's someone

14  who is assisting in the crime.

15          The law says that you can be held

16  responsible, an accomplice can, in a capital murder

17  situation, and even receive the death penalty, you know,

18  depending on the facts.

19          The example I give is if Mr. Wirskye and

20  I, we decide we want to go rob a bank.  And the plan calls

21  for me to go in there with a gun and he goes in there with a

22  big bag.  And we run into the bank and I pull the gun out

23  and threaten all the tellers.  And after we've done that, he

24  starts unloading the money out of the slots.

25          During the course of that I shoot one of

15

the tellers intentionally. I don't like the way they're looking at us or Mr. Wirskye says that one, I think, is going for an alarm, and I shoot them. We get out of the bank, but we are captured soon afterwards.

Obviously, I could be arrested and prosecuted and could ultimately receive the death penalty from the jury because I'm the triggerman. The law says that Mr. Wirskye could also be prosecuted for capital murder and could ultimately receive the death penalty, depending on the facts and his involvement.

But we want to ask jurors what their gut reaction is on that because people differ. A lot of people -- some people agree with the death penalty in the situation where we're talking about the triggerman, but they would personally draw a line when talking about accomplices, because they didn't actually cause the death. They may reserve a stiff prison sentence for them, but they wouldn't reserve the death penalty. That's just their personal point of view.

Other jurors feel that, no, accomplices should be held accountable in those situations, depending on the facts, and ultimately could receive the death penalty, even though they didn't actually cause the death. How do you feel about that area of the law as prosecution of accomplices?

1    A.    Well, isn't that what we're supposed to teach

2  our children that you can be just as guilty as the person,

3  so, yes, I do agree with that.

4    Q.    So you are on the side that you think that is

5  a good law to have?

6    A.    Absolutely.

7    Q.    And teaches accountability --

8    A.    Absolutely.

9    Q.    -- and that sort of thing?  From your own

10 personal point of view, then, you wouldn't have a problem

11 with the State seeking the death penalty in an accomplice

12 situation and ultimately possibly giving the death penalty

13 in those situations?

14   A.    Would not.

15   Q.    You feel that could be just?

16   A.    Absolutely.

17   Q.    All right.  And I can't preview the facts, but

18 I can tell you that that's the theory of law we're going

19 under in this case.  And so we want to get all the jurors'

20 opinions on that.  There aren't any right or wrong answers.

21 But from your answers you are on board with that theory of

22 law and the State prosecuting under that theory of law?

23   A.    Yes.  I do not have a problem with that.

24   Q.    All right.  Now, the -- any criminal case is

25 divided into two parts, including a capital murder case.

1    And how that works is this.  The first portion is the

2    guilt/innocence stage in which we have to prove to you and

3    the other jurors beyond a reasonable doubt the indictment.

4                Now, obviously, if you have a reasonable

5    doubt at the end of the first part, you are going to find

6    him not guilty and then we would all go home.  If you found

7    him guilty, though, the trial is not over at that point in

8    time.  You have a punishment stage that directly follows

9    that where you can hear additional evidence and additional

10   witnesses.

11               At the close of that you get these

12   Special Issues, which are three questions.  We'll go over

13   those in more detail in a minute.  But basically they ask

14   this.  Did the State prove to you beyond a reasonable doubt

15   that the defendant is a continuing danger?  Yes or no.  Did

16   we prove that he either intentionally caused the death or

17   did he anticipate a death would occur?  And, finally, is

18   there sufficient mitigating evidence that you think a life

19   sentence should be imposed or not?  If you think there is,

20   you would answer it yes.  If you don't think there is, it

21   will be a no.

22               But a yes to the first two, danger and

23   anticipating a life would be taken, and a no to the

24   mitigation question, the Judge has no choice.  He would

25   sentence the defendant to death.  Any other answers would

1  equal a life sentence.  The Judge doesn't have discretion.

2  He just sentences according to how the jury answers those

3  questions.  They don't write life or death in, but that's

4  the result.

5              Are you familiar with the method of

6  execution in Texas?

7       A.    I think it's the drip or something, whatever,

8  I don't think they do gas.

9       Q.    Lethal injection.

10      A.    Yeah, lethal injection.

11      Q.    Exactly.  And it's been that way for some

12  years.  You probably know from living here for the past,

13  what --

14      A.    Thirty-three years.

15      Q.    Thirty-one?

16      A.    Thirty-one years.

17      Q.    -- that Texas is a state that not only

18  prosecutes the death penalty, but it actually occurs.  Some

19  states have it on the books and no one is ever executed.

20  But Texas leads the nation in executions.

21      A.    Uh-huh.

22      Q.    Usually does every year.

23      A.    It's a big state.

24      Q.    And there's a lot of population.

25      A.    Yeah.

1    Q.    But sometimes it's controversial and sometimes
2    it's not.  It depends on your views.

3    A.    I know.

4    Q.    But the methods and procedures are the same in
5    each case, and you may have read about them sometimes in the
6    newspaper because it's often covered.  You know, in this
7    case it's the State's goal, and we feel that we have the
8    type and quality of evidence to convince the jury of the
9    defendant's guilt and those questions will be answered in a
10   way that the Judge will sentence him to death.  And the
11   defense takes the opposite, obviously.

12             If he were sentenced to death, he would
13   be placed on death row.  He would wait there.  I can't tell
14   you how long, but at some point in time the Judge would
15   actually set a date of execution.  He would be moved from
16   death row just prior to that day to downtown Huntsville,
17   where they often set up cameras outside that prison with the
18   big clock.

19             On the date of his execution, the
20   procedures are the exact same.  He's given time for family,
21   friends, a minister, a last meal.  But at 6:00
22   p.m. executions take place.  You have probably seen the
23   picture of the gurney.  They love to show that on the news.
24   He would be placed down there.  He would be secured with
25   straps.  He would have needles placed in his arm.

1          Witnesses come in from the defendant's

2   side, as well as the victim's.  He gets to give a last

3   statement.  Could range from asking for forgiveness to being

4   defiant and proclaiming his innocence.  But that's all

5   reported in the news with each execution.

6          But after that, the warden signals the

7   executioner who would inject poisons which would stop his

8   heart, shut down his lungs, and he would be dead probably

9   within 15 seconds.  That's the method in each case.  But it

10  is something that actually occurs.

11          Because it's one thing when we talk to

12  jurors kind of philosophically about the death penalty and

13  you talked to your friends or associates, and then it's

14  another thing when you start thinking about, man, I might

15  come down and they might put me on a jury where I decide

16  these issues.

17          You have told us from your own personal

18  point of view that you do believe in the death penalty in

19  certain cases, that people should be held accountable, and

20  it's a just punishment.  And what I want to know is after

21  the reflection that you have given it, do you think that you

22  are the type of person that could actually take pen in hand

23  and answer these questions if the State proves these issues

24  to you, knowing that as a result that this defendant would

25  someday be executed in the manner I have described?

1    A.    Absolutely.

2    Q.    Okay.  Fair enough.  The reason I asked that

3  is we do have some people who believe in it philosophically,

4  but when they get down here they go --

5    A.    I cannot do this.

6    Q.    -- you know, I don't think that I can

7  participate.  And I don't think that anyone really wants to.

8  Obviously, you would rather be some other place.  But we

9  have other jurors who tell us, I believe in the law and I

10  could do that, if you prove these things to me.  And I may

11  not feel great about it, but I could do it.  And you feel

12  confident in your ability to do that?

13    A.    Yes.

14    Q.    Now, these Special Issues, I want to talk to

15  you about those.  You won't get any legal definitions.  The

16  jury will interpret that the way they want to.  They are

17  pretty common sense stuff, though.  They do get kind of

18  lengthy.  I will tell you now before you read them that we

19  didn't write them.  The Legislature did that years ago.

20          But if you will just take a moment and

21  read over question No. 1 to yourself and then we'll go over

22  that.

23    A.    Just read 1?

24    Q.    Yes.

25    A.    (Prospective juror complies.)

Q.      As you can see, question No. 1 kind of asks
you to make a prediction on how the defendant will behave in
the future.  First of all, do you think that you can make
that kind of prediction or answer that question or make that
prediction if you are given enough information or facts?

A.      Oh, gosh, yes.

Q.      What kind of things would be important to you
when looking at that question or answering that question?

A.      Background of the defendant, in and out of
jail, what his past record is, and is this the first time,
and he just got caught up with these guys in the fray of
things, or really, that's just background, his background.

Q.      Okay.  That's the type of information that is
available at that portion of the stage.  If there is a prior
criminal record, you can hear from the witnesses.  You can
hear what type of sentence it was and that sort of thing.
You can also hear anything good.  It's kind of, "This is
Your Life" show where you can hear all about a person's
background, good or bad, and then, obviously, you get to
consider their role in the crime itself, too, in considering
that question.

        But that question starts out with a no
answer and the State has to prove to you beyond a reasonable
doubt it should be answered yes.  What the law contemplates
is you will wait, and just because you found someone guilty,

that's not an automatic yes answer.  There may be some cases where you feel he is dangerous.  There may be other cases, even though they have committed a capital murder, you don't feel they are a continuing danger.  It's kind of what you said about did they just get caught up with something and never been in trouble, that sort of thing.  It just depends on the facts.

So what the law contemplates is the jurors will wait and listen to the new information that's brought up in the punishment stage, then reevaluate what they have already heard in the deliberation room, and then make their decision, has the State proven this to me beyond a reasonable doubt?  You can't automatically answer yes, just because you found him guilty.  You have to wait and reevaluate all the evidence.  Do you feel you can do that?

A.      Yes.

Q.      Does that process make sense to you?

A.      Yeah, it makes sense.

Q.      Okay.  Now, as I said before, you won't get legal definitions in this portion of the trial for these words in the Special Issues.  So I want to go over just a few of them with you.  We have to prove that there is a probability that this would happen, that he would be a continuing danger.

What does "probability" mean to you in

1   the context of that question?

2          A.      From his past experiences that it shows that

3   this is his way of life, this is his choice of how to pursue

4   life, he's in and out of this all the time, because that's

5   the only thing he knows to do, he's not trying to change his

6   course of life.

7          Q.      Like I said, I can't give you a definition of

8   "probability".  I can give you some guidelines.  We don't

9   have to prove it's a certainty because I don't believe that

10  we can ever prove a certainty something would happen.

11         A.      No.

12         Q.      But, obviously, it's more than a possibility

13  because anything could be possible.  A lot of people use the

14  term and courts have used it of "more likely than not".  Do

15  you feel comfortable with that type of definition?

16         A.      Uh-huh.

17         Q.      We have to prove that he would commit criminal

18  acts of violence.  What do "criminal acts of violence" mean

19  to you?

20         A.      Um, anything that he's either laying hands on

21  or using some implement to threaten someone to cause bodily

22  injury to someone, whether it's using his own hands or using

23  something else, but he is attacking somebody and creating

24  harm to someone.

25         Q.      So actual acts of violence or even potential

1   for violent threats and that sort of thing?

2            A.      Yes.

3            Q.      And, finally, we have to prove he would be a

4   continuing threat to society.  What does "society" mean to

5   you?

6            A.      What does "society" mean?

7            Q.      Uh-huh.

8            A.      People, I mean, the world, people.

9            Q.      Anyone and everyone --

10           A.      Anyone.

11           Q.      -- he may come into contact with?

12           A.      Sure.

13           Q.      Including people in the prison system?

14           A.      Including people in the prison system.

15           Q.      All right.  That question, as I said before,

16   is answered separately from the others.  And it's the first

17   one you would get to.  If you do answer that one yes, then

18   you move on to that second question which has to do with the

19   parties.  If you just take a moment and read that one to

20   yourself.

21           A.      Okay.  (Prospective juror complies.)

22           Q.      That one gets kind of wordy, but the first

23   part, obviously, if you believe the defendant actually

24   caused the death, that's pretty simple.

25                   But the second part of the question deals

1   with the party situation, the accomplice.  We either have to

2   prove that he, if he did not actually cause the death, he

3   intended to kill the deceased or another or anticipated that

4   a human life would be taken.

5           Now, there's kind of two theories on

6   that.  Let me back up for a minute.  To get someone guilty,

7   we have -- as an accomplice, we have to prove that either

8   they encouraged, aided, directed, some way, actively

9   participated in the crime.

10          Or the other theory is conspiracy.  If we

11  conspire, which simply means we agree to commit that

12  robbery, and one of us commits another felony, murder, in

13  furtherance of it, we could all be held responsible, if the

14  jury believes that we should have anticipated that a death

15  could occur.  And that's just what the facts show.  And

16  that's what we have to prove to you to get guilty.

17          And we have to go one step further in the

18  punishment phase and not only prove to you that he should

19  have anticipated, but he did anticipate.  And, again, that's

20  just, you know, you can't -- that could be done just many

21  different ways.  We can't, obviously, open the top of his

22  head up and peer in and see what his intentions were.

23          What a jury does in any type of case is

24  get all the evidence before, during the crime, their role,

25  and you can obviously infer and draw legal, you know, use

1  your common sense to figure out what a person's intent was.

2  It just depends on each case, what their role in the crime

3  was, you can draw inferences what they were intending.  That

4  happens in every case and that's what would happen here.

5              Also, you can use any additional evidence

6  in their background which might aid you in determining are

7  they anticipating that a life could be taken before, during,

8  or after the crime, and that sort of thing.

9              But that's the -- what we have to prove

10  in Special Issue No. 2.  And it has to do with what I talked

11  about, the law of parties.  Does that question seem clear to

12  you and one you feel you could answer, if you were given

13  enough facts?

14       A.    Yes.

15       Q.    Again, would it just depend on the person's

16  role in the crime and the facts that you heard and their

17  background evidence?

18       A.    Would it just depend on that?  Is that what

19  you said?

20       Q.    Yes.  Would it cover all those things?

21       A.    It would cover all those things, yes.

22       Q.    Okay.  Special Issue No. 3, that gets the most

23  lengthy.  That is the mitigation question.  There's no

24  burden of proof.  We have to prove to you on Special Issue

25  No. 2, that that has to be proved beyond a reasonable doubt.

1    And just because you found him guilty or Special Issue No. 1

2    was answered yes, again, you wouldn't automatically answer

3    No. 2.  It's like question No. 1.  You have to look at it

4    independently, reevaluate the evidence and see if we have

5    proven it to you.

6              And then you get to the last Special

7    Issue.  And if you just take a moment and read that to

8    yourself.

9         A.    (Prospective juror complies.)

10        Q.    The mitigation question is kind of a catchall.

11   Sometimes we refer to it as a safety net.  It allows you to

12   look at everything, everything in their background, their

13   character, the crime itself, too, and you determine is there

14   something that you think is sufficiently mitigating that

15   tells you in your heart and mind that the defendant deserves

16   a life sentence.  They don't get away with the crime,

17   obviously, they have to do a life sentence.

18              But -- and what mitigating is, I can't

19   tell you.  The Court is not going to tell you.  It's going

20   to be up to you and the other jurors.  All you have to be

21   able to tell the Court is I can keep my mind open to it.

22              Do you feel that you could keep your mind

23   open at that stage of the trial to something that could be

24   mitigating?

25        A.    Absolutely.

1    Q.     As you sit there today, does anything come to

2  mind that you view as possibly mitigating evidence?

3    A.     Um, going back to this is so -- sounds pretty

4  trite, but going back to the teenaged kids that are in a car

5  and they are good friends.  And they -- one of them, like

6  you are talking about with your friend, you go into a

7  7-Eleven, but the one kid that's sitting out, he's the

8  driver of the car, just wait, we're going to go in and buy a

9  pack of cigarettes and he has no idea.  And the two kids go

10  in and rob the place, come out, and the kid still doesn't

11  really know what is going on.  And suddenly the police cars

12  come up and he's clueless.  He still needs to be held

13  accountable for everything that happened, but he was totally

14  clueless as to what was going on.  That to me would be sort

15  of mitigating for the kid that's in the --

16    Q.     He had a lot lesser role?

17    A.     A lot lesser role.  Of course, I'm thinking

18  I'm the mother of the child driving the car.  But maybe

19  other things have happened in the past that would show that

20  that child, really, you are playing dumb.  You do know

21  better than that and you knew what was going on because

22  maybe it happened some other time.  That would be sort of

23  where I was heading with mitigating.

24    Q.     A lot of jurors have or some have brought up a

25  similar example and let me go over one because I meant to do

1    this earlier.  Under the law of parties, the accomplices,

2    mere presence alone, the fact that you are there, doesn't

3    necessarily make you guilty as an accomplice.  We have to

4    prove that you were involved.

5              If you have a situation where the driver,

6    as you said, was duped and really had no idea -- let's say

7    Mr. Wirskye and I said, hey, we are going to go cash a

8    check.  Give us a ride to the bank.  And they had no idea we

9    had anything planned.  And then we came out and got in and

10   they still had no idea, they wouldn't be prosecuted.  They

11   would have a legal defense, if that were clearly the case,

12   that they were fooled.  Obviously, if you had some knowledge

13   that something was going on, that might change things.  But

14   if the situation was they were just present and don't know a

15   crime is going on, then they are not going to be held

16   accountable.  It would be a not guilty.

17             But, then, if there's more involvement,

18   depending on their level of involvement --

19        A.    Sure.

20        Q.    -- obviously, it would change things --

21        A.    Sure.

22        Q.    -- in that situation.  You brought up in

23   different parts of the questionnaire, we always ask about

24   someone's genetics and upbringing and that sort of thing.

25   And you mentioned, yeah, that's important.  And we also

1  brought up prosecution of the youthful defendant and you

2  brought up again how a person was raised would be important.

3  And I remember in your questionnaire you

4  said in a young person, a younger defendant, it would be

5  more important if they have an abusive background, but not

6  in an older adult, because I think you said they have time

7  to change and obviously --

8  A.    Choices, they can make choices along the way

9  and get help.  There's some things out there and available

10  to them.

11  Q.    Because a lot of people bring up background,

12  you know, because a lot of people come from -- maybe they

13  have been abused physically or mentally or had a bad

14  upbringing.  That potentially could be mitigating.  We've

15  had jurors say it could be, if it's real severe.  We've had

16  other jurors say, well, I would feel a lot of empathy or

17  sympathy for them, but a lot of people have grown up in that

18  situation and they don't commit those crimes or you have to

19  be held accountable at some point.

20  But those are the types of things that

21  may come up.  And some are more sympathetic when it's a

22  younger defendant, and some less when it's an older one and

23  that sort of thing.  And from what you said in your

24  questionnaire and what you have said up here, is when a

25  person is older you feel that they have made choices at that

1  point in time.  What it is, though, it's just -- it could be

2  anything.

3            And, like I said, you are not required to

4  think of what it could be as long as your mind is open to

5  that.

6       A.      Uh-huh.

7       Q.    . And then if you think something is

8  sufficiently mitigating where you think a life sentence

9  should be imposed, you could actually assess that.  And,

10  again, if you don't think there is that sufficient

11  mitigating evidence, you would answer it as a no, knowing he

12  would get a death sentence.  Do you feel that you could do

13  that?

14      A.      Oh, yes.

15      Q.      Okay.  The question -- and the reason I go

16  over it in such detail is you don't get to it unless you

17  have found somebody is guilty of capital murder, you found

18  they were a continuing danger, you found that they

19  anticipated a life would be taken.  And some people will

20  take the viewpoint, gosh, if I found all those things,

21  there's no way that I would give them a life sentence.  I

22  think they're a dangerous person.

23            But there could be situations where that

24  might happen.  And I had one juror describe it pretty good.

25  We were trying a case in another county and he had grown up

1  in East Texas.  He kind of had this common sense way of

2  explaining it, which I thought was good.  He said these

3  Special Issues, as he goes and answers them, are kind of

4  like a window to him and it was closing.  But he said, when

5  I got to that third question, it wouldn't be open much, but

6  my window would still be open.

7            And that's kind of what jurors have to

8  do.  They have to keep their window open some.  Some jurors

9  may keep it open this much and some maybe this much, but as

10  long as they can tell the Court it's open, that their mind

11  is open to it, and if they think something is mitigating,

12  then they can assess it.

13            Now, neither side has the burden of proof

14  on that question.  We don't have to prove it should be

15  answered no.  They don't have to prove it should be answered

16  yes.  Common sense will tell you which way we'll be arguing,

17  obviously.  It could be something a juror comes up with on

18  their own from the facts of the case, something they have

19  seen.  And you just have to be able to tell the Court you

20  can keep your mind open to it and if you think a life

21  sentence is the just thing to do, you can do that.

22       A.    Sure, absolutely.

23       Q.    Okay.  Now, let me go over a few things that

24  come up in every criminal trial and you will be familiar

25  with a lot of these.  The presumption of innocence.  When a

1   person is arrested and charged and you begin the trial, the

2   jury has to -- has to presume them innocent and start out

3   with that presumption.

4                    Now, this trial got a lot of publicity,

5   this case did, obviously.  And the fact that a case gets a

6   lot of publicity and is covered does not mean -- and the

7   jurors have read that or seen it on TV, doesn't make them

8   ineligible as jurors.  If that were true, we could never

9   seat a jury on a high publicity case.

10                   And the jurors have to start the

11  defendant out with that presumption of innocence.  And the

12  reason -- the law is basically this, even though you have

13  read something, seen something on TV, the best evidence,

14  obviously, comes from the courtroom from the actual

15  witnesses that testified to the evidence.  Because the media

16  doesn't always get everything right.  Most of the time they

17  don't.  You probably know that from watching the news.  You

18  watch it one day, the story is this way.  And the next day

19  it's completely different.

20                   I always remember that case of the

21  Atlantic -- during the Olympics in Atlanta when we had the

22  bombing and Richard Jewel was being looked at.  And if you

23  followed the media for about a week, he was convicted.  And

24  then it turns out he was actually the hero in the deal.

25                   And that's the sort of thing the law

1  contemplates.  Even though you -- jurors have looked at it,

2  they can't use that or let that influence them.  We don't

3  expect you to be able to forget about anything you have read

4  or seen on TV, but you can't let it influence you.  You have

5  to wait and listen to the evidence that's brought in court

6  and then decide.

7          Do you feel that you can follow that rule

8  of law and just, if you are chosen as a juror, listen to the

9  evidence and make all your decisions based on what you hear

10 in the courtroom and not on anything you have seen on TV or

11 read in the newspaper?

12 A.     Yes, yes.

13 Q.     Okay.  Make sense?

14 A.     Yeah, absolutely.  That's what the whole

15 system is based on.

16 Q.     Okay.  Fair enough.  Now, that presumption of

17 innocence, then, starts out and we have to prove to you with

18 the evidence that he is guilty.  So he starts out with that

19 presumption of innocence.

20          Do you feel that you can grant him that

21 presumption of innocence and require us to prove to you

22 beyond a reasonable doubt that he is guilty?

23 A.     Yes.

24 Q.     Okay.  That burden of proof never leaves this

25 table.  The defense never has a burden of proof and you

1   can't require them to prove him to be innocent or answer

2   these questions in a certain way.  You can, I think,

3   anticipate that, obviously, they will ask questions and

4   cross-examine and maybe call witnesses, but they are not

5   required to.  They could sit there and work crossword

6   puzzles.  I don't anticipate they would do that, but they

7   could because the burden of proof never leaves this table.

8              And when we rest our case, if you have a

9   reasonable doubt in your mind, then you would find the

10  defendant not guilty, even if they haven't uttered a word,

11  because the burden of proof never leaves this table and

12  never shifts to their side.

13             Could you follow that rule of law and

14  require the State to prove this case and never require the

15  defense to prove anything to you?

16        A.    Yeah.  I think that would be pretty

17  interesting, if it actually worked that way.

18        Q.    I don't anticipate it would, obviously, but we

19  kind of use some wayout examples to demonstrate the law.

20        A.    Yeah, I know that.

21        Q.    The burden of proof goes to every portion of

22  the indictment.  We have to prove each and every element of

23  it to you.  And if you have a reasonable doubt, even on one

24  portion, you have to find him not guilty.

25             And I'll use another one of those goofy

1  examples.  The first one is identity.  Obviously, we have to

2  prove who committed the crime.  If you had a reasonable

3  doubt, you would find him not guilty.  But we also have to

4  prove the county, it happened in Dallas County.  We have to

5  do that in every case we prosecute in Dallas County.  It may

6  be a case that actually happened on the borderline and the

7  evidence showed you it happened in Tarrant County.  Now,

8  that would mean we were pretty bad prosecutors in our

9  preparation, but you couldn't help us out as a juror, if you

10 had a reasonable doubt about that.  You would have to find

11 him not guilty.

12          You may not like it.  You may hate it.

13 And you could have us fired, I'm sure.  But you can't help

14 us out.  And I don't expect that to happen, but that's an

15 example I give to demonstrate how it goes to all the

16 indictment.

17          Do you feel that you can follow that rule

18 of law and require us to prove every portion of that

19 indictment?

20      A.      Yes.

21      Q.      Another important rule is the Fifth Amendment.

22 Anyone who is charged with a crime, if they want to testify,

23 they can.  No one can stop them.  You judge them like any

24 other witness.  But if they choose not to testify, the Judge

25 would instruct you, you can't hold that against them.  You

1  can't consider that as evidence.

2                      There could be many reasons why someone

3  chooses not to testify.  They may not be very educated.

4  They may be very nervous.  They may not perform well.  They

5  may look guilty when they're not.  They may simply be

6  listening to their lawyer who tells them not to.  It could

7  be a situation where they are real guilty.  It could cover a

8  lot of situations.

9                      And that's why the Court says you can't

10  hold that against them.  You can only decide the case on

11  what you hear and you can't use the fact that they did not

12  testify as evidence in any way.  You feel you can follow

13  that rule?

14        A.      Yes.

15        Q.      Police officers often testify in these cases.

16  A lot of people respect the job they do, but you can't start

17  them out ahead of other witnesses before they testify.

18  There's going to be good ones and bad ones, like any

19  profession.  And you have to wait and listen to them once

20  they testify and then make your judgments on their

21  credibility.  Do you feel that you can do that?

22        A.      Yes.

23        Q.      Okay.  Parole laws come up in the news

24  sometimes.  I can tell you that the Judge will tell you in a

25  capital murder situation, if someone receives a capital life

1    sentence, they have to serve forty calendar years before

2    they can become eligible for parole, day for day.

3              But he would also instruct you that you

4    can't consider the parole laws in any way in your decisions.

5    You have to consider a life sentence, a life sentence.  Do

6    you feel that you could do that?

7         A.    Yes.

8         Q.    And finally, and I don't know if this

9    situation will come up, but sometimes defendants are found

10   guilty of what we call lesser included offenses.  A lesser

11   included offense is aggravated robbery and its penalty range

12   is five years to life or 99 years and anywhere in between.

13             And when you are considering the

14   punishment, the law is pretty clear, a juror, again, just

15   has to keep their mind open to that full range, listen to

16   all the evidence, all their background, and then decide what

17   is appropriate.  If you think a life sentence should be

18   imposed, you could do that.  If you think as little as five

19   years should be imposed, you can do that, or 20, 30, 70,

20   whatever.

21             Again, can you keep your mind open?  Do

22   you feel you can do that?

23        A.    Absolutely.

24        Q.    Okay.  That's kind of what the law

25   contemplates on all these issues, that you keep your mind

1    open until everything is in and then make your decision and

2    require the State to prove them to you.  And you feel you

3    can do that?

4         A.    Yes.

5         Q.    Okay.  I've covered a bunch of information

6    pretty quickly.  I appreciate your patience.  Do you have

7    any questions over anything we've gone over?

8         A.    No.

9         Q.    Thank you.  I appreciate your attention and

10   cooperation.

11              MR. SHOOK:  And that's all the questions

12   I have, Judge.

13              THE COURT:  Ms. Busbee?

14              CROSS-EXAMINATION

15   BY MS. BUSBEE:

16        Q.    First of all, Ms. Marker, are you thirsty?  We

17   make you talk up there, but don't give you any water.

18        A.    It's okay.  I'm fine, thank you very much.  I

19   appreciate the offer.

20        Q.    I'm not going to have to be as long as

21   Mr. Shook was, because he went over all the law from A to Z,

22   so that's been done.  I want to hear more about you, if

23   possible.

24              First of all, I notice that you -- one of

25   you hobbies is gardening?

1      A.     Uh-huh.

2      Q.     Do you engage in that a lot or is that just

3  something that you do on the weekends?

4      A.     Well, you know, I mean, I mow the yard.  I

5  have lots of plants and plant those.  And any gardening is

6  ongoing in Texas, especially with the heat and the water

7  bills and everything else, you know.  It's continual.

8      Q.     Now, I was kind of listening with half an ear

9  when we got started this morning.  Do you have the -- the

10  job that you have with Delta involves -- does that involve

11  hiring and firing decisions as well?

12      A.     It does not involve hiring.  That is done at

13  the corporate offices through employment.  The only firing

14  that I would do is because of administrative action that

15  would have been taken.  And I do not even do that alone.  It

16  goes through our actual Human Resource Department.  It's

17  only something that -- because a flight attendant has

18  created themselves in a situation, whether it's attendance,

19  whether it's -- obviously, if it's stealing on the airplane,

20  drugs, alcohol, any of that kind of stuff.  But I'm not a

21  lone person in that.  Even if it's my recommendation, they

22  have put themselves in the position that I then have to

23  recommend to them that that's their next step.

24      Q.     Is there a union or something?

25      A.     We have no union in Delta Airlines except for

1   the pilots and we're very proud of that.

2        Q.    I'm glad I gave you a chance to give us a

3   commercial.  You know, we read about those things, but I

4   just trust the planes to run and flight attendants to be

5   friendly, which they usually are.  What did you think when

6   we called you down here?  Were you surprised or --

7        A.    No.  The only thing I can tell you is when I

8   sat in that little room and opened up this -- not the first

9   page, but the second page, and saw murder.  It made me kind

10  of sick to my stomach, you know, just the word.  But,

11  really, I didn't think that much of it when I got my form.

12       Q.    Well, and I kind of want to tell you this, so

13  you understand where I'm going with all my questions.  You

14  saw all the people.  I think you were there in the morning.

15  So all the people that were in the great big jury room down

16  there --

17       A.    Yes.

18       Q.    -- and they all filled out questionnaires.  We

19  had a group that large or larger in the afternoon and they

20  filled out questionnaires.  And you probably are about the

21  45th juror that we talked to, but your number, as far as the

22  jurors are concerned, is 1643.  So we culled a lot of folks

23  out.  Obviously, it would take us years to talk to all those

24  people.

25            One of the reasons you fill out the

1   questionnaire is so we get an idea who kind of falls in the

2   middle. You know, we have these kind of arbitrary rating

3   systems, one being I would give the death penalty to

4   somebody who shoplifted or, you know, five being I would

5   never punish anybody for anything. So those people we don't

6   even see their questionnaires. We just file them away some

7   place. We talk to people who are kind of in the middle of

8   the road, which you are. But we don't talk to all of those

9   people, either. In fact, we may have a stack of

10  questionnaires this high and we meet and come out with this

11  many, because we have agreed they would be the people that

12  could potentially be jurors.

13            And the reason I'm telling you this is

14  when the State talks to you, they cover so much law and I'm

15  satisfied that you, obviously, are lawabiding and sensible

16  and understand the law. That's really not my question. I

17  get the opportunity to kind of ask you how you feel about

18  certain things. Because a case, like you said, murder made

19  your stomach kind of do a little flipflop, that's the reason

20  that we go into all these questions and your attitudes and

21  your opinions, because it doesn't mean you are a bad person

22  or an unworthy person. Obviously, you have made quite a few

23  cuts to get down here. Whether that makes you happy or sad.

24            But murder is -- and capital murder is

25  kind of an emotional thing. For one thing someone has died

1    and you have to decide if someone else is going to die.  And

2    so we're all aware that it's not just an intellectual

3    exercise.  And we have to kind of make a decision on people

4    based on really just a few moments of conversation.

5                    And so I'm just going to ask you, having

6    prefaced my remarks that way, I'll ask you to be candid and

7    how you really feel about things, because it's not a problem

8    for anyone here if you have some problems or different

9    attitudes.  That's not a bad thing.  We just need to know it

10   because some people aren't comfortable either sitting on

11   this type of case or making these type of decisions or

12   sometimes they just tell us that's the law and I understand

13   the sense of it, but as a practical matter I couldn't follow

14   it or I couldn't promise you I could follow it because I

15   don't feel that way.

16                   And that's fine, too.  You don't get a

17   black mark in your citizenship book for that.  We go on to

18   the 1,644th person maybe or whoever is next and we talk to

19   them, too.  So don't feel that you have to say necessarily

20   that you are going to follow the law, if in the back of your

21   mind, you're thinking what a dumb law or that's a good law,

22   but that's not the way I think about things.

23                   Did you discuss this with anybody, like I

24   would have told my husband if I was coming down here.

25        A.     He brought me down here.

1    Q.    He did?

2    A.    But it was just because I didn't want to have

3    to park, do all the parking thing, and drive my car down

4    here and all that.  I work with him on Fridays.  This is my

5    only day off that I have usually during the month.  And so I

6    was fortunate that I didn't have to rearrange my schedule

7    for this day.  But he drove me down here because I help him

8    on Fridays.  So I said, leave my car there.  You drive me

9    down there.

10   Q.    I'm glad you were number one, then, because

11   otherwise you might have to be here all morning long.  Were

12   you aware at the time that you filled out this questionnaire

13   that it was the Texas Seven case?

14   A.    Yes, I think it was kind of brought to our

15   attention, if I remember right, when we were sitting in the

16   big room.

17   Q.    You would be amazed how many people actually

18   come down here who don't remember anything about it.  And I

19   think that they are telling us the truth.  They either

20   weren't paying that much attention or they didn't remember

21   it or they have forgotten it since then.  And other people

22   do remember it and remember there's a lot of publicity

23   because of the -- at that time, amount of time that passed.

24             Do you have any opinions about what

25   happened?  I mean, just things that you think about this

1  situation?

2  A.  Well, I mean, it was sad and senseless and

3  needless and I think that there had been other prison people

4  that had escaped either prior to or after.  And so you start

5  wondering about what's the matter with our prisons that they

6  can't keep these people in, so --

7  Q.  Do you have any opinions about the death

8  penalty in this particular case?

9  A.  Did I when I was reading about this?

10  Q.  Yeah.

11  A.  Yeah, I thought it was the right thing.

12  Q.  And that's kind of what we need to know, what

13  you are thinking, in order to make a decision on jurors.  So

14  my question, quite frankly, is in this case do you think

15  that you have already formed an opinion about what the right

16  outcome should be?

17  A.  I don't know all the facts.  But I know in

18  reading about it and watching TV, the times that I -- I

19  mean, I didn't focus on it, but when I would see it, I just

20  thought, never knowing that I was going to be part of this,

21  I thought that was the right thing to do.

22  Q.  I mean, do you still have that opinion, I

23  guess, is my question?

24  A.  Well, depending on what is brought forth,

25  yeah, in general right at the moment that's exactly what I

1   think.  But I don't know any of the facts.  I don't know any

2   -- like I said, I did not read every -- I'm a person in the

3   newspaper that reads titles and then moves on.  If it

4   doesn't catch my interest, I gaze through the article.  I

5   don't read word for word unless it's something that is

6   specific to what I'm -- the airline industry right now, I

7   would probably read every word.

8        Q.     Right.  And I'm sure you wouldn't be expecting

9   to be taking a test on it two and a half years later either?

10       A.     No.

11       Q.     You brought up some things that are kind of

12  close to home in this case, talking about a group of people

13  committing an action and looks like you raised your daughter

14  and a son?

15       A.     A daughter and son.

16       Q.     Is your daughter a ballet dancer?

17       A.     Yes.  She's in Ft. Worth now.  She's just left

18  New York City Ballet and moved here.

19       Q.     I bet you had a 10 or 15 years of taking her

20  to dance lessons and all that.

21       A.     Yes.  She was hired by New York City at 15, so

22  she is now 34, so she was in New York from the time she was

23  15.

24       Q.     I guess what I'm talking about here is we

25  really kind of got two things going on.  First of all -- and

1    your sense of justice and this is just what the law is.  If

2    I'm with someone who commits an act and I aid, assist, abet,

3    whatever that means, you only hear that in a criminal

4    courtroom, but encourage someone to commit a crime, under

5    the law I'm just as guilty as that person, just like your

6    example of the kid that goes into the 7-Eleven.

7               But if I'm just there and, you know,

8    we're not finding fault with what you're saying because

9    we're asking you for examples off the top of your head,

10   which probably isn't fair, but that's how this works.  But

11   if you are just there, obviously, you are not guilty of

12   that, not guilty of anything.

13              So I would like to take you in your mind

14   to a mythical, a hypothetical death penalty case where you

15   are sitting as a juror and you have found that someone has

16   committed beyond a reasonable doubt the act of capital

17   murder.

18              Let me rephrase that.  Is guilty of

19   capital murder as a party to an offense, whatever fact

20   situation.  You decided beyond a reasonable doubt that

21   they're responsible in one part or another for causing the

22   death of, say, a fireman.  That would have been decided by

23   you as this hypothetical juror before we get to these

24   Special Issues.  So you would have decided that beyond a

25   reasonable doubt.  In other words, proof would have been

1    clear to you that there was no doubt that that person was

2    guilty.

3                So then we go on to the second part and

4    that's the part where there is even -- there's a separate

5    decision to be made.  If you found somebody guilty of

6    capital murder, you know, just frankly, how you feel, would

7    you already pretty much have decided that they would

8    probably be a future dangerousness, be dangerous in the

9    future?

10        A.    Yeah, I think they kind of go hand in hand --

11        Q.    Explain that.

12        A.     -- to my thinking.  If you were found guilty

13   of capital murder, I mean, there's a lot of facts there.

14   You are taking one little incidence without the whole

15   picture because a lot depends on what has happened up to

16   that point.  I mean, was this a young kid that walked in and

17   has never committed a crime in their whole life and happens

18   to get caught up in it and they are guilty of capital

19   murder?  And they are -- or is this somebody who is, I don't

20   know, 35 years old?  I'm just throwing out an age like you

21   are doing, that is 35 years old and has had a whole crime

22   spree up to 35, where it's just continually gotten worse and

23   worse and worse.

24                That's hard to answer when you are --

25   saying that it goes --

1    Q.    It is.  But back to the fact situation.  If he

2  was 20, would you do that?

3    A.    No.  But that's what you would learn in the

4  case.  I would hope to be able to make a good decision on 1,

5  2, and 3.

6    Q.    So you are telling me that you wouldn't

7  automatically answer Special Issue No. 1 yes?  You wouldn't

8  say that automatically just because they committed a capital

9  murder?

10    A.    If they shot someone, if they actually had the

11  gun in their hand or knife in their hand or rope or whatever

12  they used to kill someone, they should get the death

13  penalty.  Is that what you are asking?  I'm a little

14  confused.

15    Q.    I want your opinion.  Like I said, there's no

16  right or wrong answer.  I was hearing this when you were

17  talking to Mr. Shook, but he does have to cover all the law

18  and he's done that now.

19           And I think what I'm hearing from you is

20  that someone who has committed a capital murder in your

21  mind, you are more likely, you are more inclined to assess a

22  death penalty than a life sentence?

23    A.    Um, it -- you know, I can't answer that

24  because it depends on a lot of the facts.  You are just

25  isolating one thing.  I would have to hear -- I would have

1  to know all -- I could not come to a decision without

2  knowing all of the facts.  The only thing I can say is the

3  person that actually has the gun, that actually did the

4  shooting.

5              But I don't know.  The party involved, it

6  would depend on how much other information I had to be able

7  to make that decision.

8        Q.    Okay.  All right.  And Special Issue No. 2

9  goes to that question.

10       A.    Right.

11       Q.    Tell me how you feel -- legal mumbo jumbo

12  aside, what does that question mean to you?

13       A.    Well, first it's saying that the person

14  actually caused the death and then the second part that they

15  maybe knew about, intended to, you know, if they knew -- if,

16  going back to my example, if the three kids, even the

17  driver, if the driver knew, changing a little bit, if the

18  driver knew that his friend had a gun, had taken a gun, I

19  have a knife, if he knew that, what the possibility could

20  be, then that driver is now guilty in my eyes just as much

21  as everybody else.  He knew.  He could stop it.  He could

22  say, I'm not going.  Leave me home.  Get somebody else.  So

23  that's kind of how I see that.

24       Q.    So he's guilty.  Now -- but on Special Issue

25  No. 2, you have already found him guilty as having -- should

1   have anticipated, should have known, just as you said,

2   should have known that that would be a result, that a human

3   life would be taken.

4        A.     Yes, ma'am.

5        Q.     But this goes a little further.  You have to

6   make a further determination and it's a little bit more.

7   It's more certainty.  Not should have anticipated, but did

8   anticipate that a human life would be taken.

9        A.     I think if the other person had any kind of a

10  weapon, especially, that that person has got to know that

11  bad things can happen.  And I'm not going, leave me at home,

12  you find another driver.

13       Q.     Well, here's my question.  If using your

14  example, if you found the person in the car who knew that

15  the person was carrying a gun in there, if you found him

16  guilty of capital murder from the facts that you heard in

17  the first part of the case, would you say that Special Issue

18  No. 2 would be yes for you?

19       A.     Yes.

20       Q.     Would you have to hear anything else?

21       A.     I would have heard everything, I would think.

22  I don't know exactly when this is done.  Is this when you go

23  in the jury room and then -- and I don't know when this all

24  comes into play or if that's part of the whole initial

25  thing.

1      Q.    That's a fair question, because we tell you

2   this, but we overload you with so much information.  I'm

3   sure it's not categorized yet in your mind.  You see the

4   indictment that's in that little packet that we showed you

5   this morning?

6      A.    Uh-huh.

7      Q.    That's the first part of the trial.

8      A.    Right.

9      Q.    That's when you hear everything that happened

10   in this case, what happened before, what happened maybe

11   after, everything that happened about this particular

12   incident on the 24th of December.  And the jury goes back in

13   the jury room and they elect a foreperson and then they vote

14   and they decide is that person guilty beyond a reasonable

15   doubt or not.

16             So in your hypothetical you have gone

17   back and voted on the people that went in the 7-Eleven and

18   you found them guilty beyond a reasonable doubt.  Maybe as

19   a, in your instance, someone who was outside in the car, but

20   knew someone carried a gun in and it turns out killed

21   somebody.  You have already decided that beyond a reasonable

22   doubt.

23             Now you are back out here for this part

24   of the case, which is the punishment part.  First guilt,

25   then punishment, obviously.  You have already decided when

1   you found the person guilty that they should have

2   anticipated that someone was going to be killed.  Then you

3   are asked the question again, but a little differently, that

4   they did anticipate that it was going to happen.

5           And my question to you is, would you have

6   already made that decision?

7       A.    Um, I mean, they seem to go hand in hand, so I

8   guess I would have to say that if no other information is

9   given to me, I guess the answer is yes, if I have already

10  answered it in the first part, would I not have answered it

11  in the second part?  I don't know.  I'm a little confused.

12          MR. SHOOK:  Judge, we object to the form

13  of the question, since the juror has not been given the law

14  in regard to the question.

15          THE COURT:  Sustained.

16      Q.    (By Ms. Busbee)  As to Special Issue No. 2,

17  all these things are sort of like things that you saw in the

18  indictment in the first part.  They are things that have to

19  be established in the second part of the trial, Special

20  Issues No. 1 and No. 2 as well, beyond a reasonable doubt.

21      A.    Could I do that beyond a reasonable doubt?  Is

22  that what you are asking?

23      Q.    Well, I kind of think that you can.

24      A.    Yes.

25      Q.    Obviously, that's something that you can do.

1    My question kind of goes to a separate issue.

2          A.    Okay.

3          Q.    And now we're talking about, you know, how you

4    really feel about things.  I know that you understand the

5    law and it is confusing the way that we explain it to people

6    and particularly since we have to explain it several times a

7    day.

8          A.    I'm sure.

9          Q.    We get confused.  On this jury that you are

10   sitting on, we're discussing just hypothetically, you have

11   already found this person guilty beyond a reasonable doubt

12   of the offense of capital murder.  And the Judge would have

13   charged you that you would have found him beyond a

14   reasonable doubt that he should have anticipated that a life

15   would be taken.  You did that when you found him guilty.

16   Okay?

17         A.    Uh-huh.

18         Q.    Now, as Mr. Shook pointed out, we didn't write

19   these laws and the fact that you are frowning at it, let's

20   me know that you understand what we're talking about,

21   because they go on to say for Special Issue No. 2 you have

22   to make a finding not that he should have, but that he did

23   anticipate.

24         A.    Right.

25         Q.    Okay.  So it's a little different.  My

1  question is, as a practical matter in your mind would you

2  have already made your decision that he did anticipate and

3  that question would be answered yes because you have already

4  found that he should have anticipated?

5      A.    Right.

6      Q.    Is that how you feel about that question?

7      A.    How you are explaining it, right, yes.

8      Q.    It's a fine distinction, but it's a

9  distinction.  Let me just ask you this.

10     A.    The one in here is easier to understand than

11 the one up there.

12     Q.    I need that one, then.  Now, let's say that

13 we're in the second part and you have found the defendant

14 guilty, like we said, and in order to answer Special Issue

15 No. 2 no, would you have to have something from us, from the

16 defense, to answer that question no?  Would you need to

17 hear, not even from the defendant, but hear some evidence

18 that would convince you that he did not anticipate that a

19 life would be taken?

20     A.    Absolutely, of course.

21     Q.    Okay.  And the law -- the law doesn't require

22 us to do it.  But what I'm hearing from you is you would

23 need to hear something from us to answer that question no?

24     A.    If I have already decided he's guilty, yes, I

25 would have to hear something that would show that he did not

1    intend.

2         Q.    I hope I haven't confused you.  I didn't mean

3    to, but morning is not my time.  It's just not my time.

4    Sometimes I feel like you need to tell me what the law is

5    before 10:00.  Okay?  And that's kind of what I wanted to

6    know.

7                   That's the law, that we don't have to.

8    But in your mind you want to hear from us.  You are just

9    answering how you really feel about that.  Is that a fair

10   statement?

11        A.    Well, I mean, my understanding, right.  You

12   don't have to give anything.  You don't have to -- from what

13   I understand from what they said, you absolutely don't even

14   have to say a word during the whole thing and they have to

15   prove all of this.  Well, that would, also, if they could

16   not prove these things, then I would not answer that

17   question in that direction.

18        Q.    All right.  And that's fair.  But then I asked

19   you --

20        A.    But if you are going to start, if you are

21   going to talk, I would expect that you would be supporting

22   what you want me to know and you would probably bring up

23   something that maybe they didn't know.  I mean, that's --

24   but if you are not going to talk, they are going to have to

25   prove to me all of these things, answer those things.

1      Q.     So here's where I'm getting confused and I

2   think I'm confusing you.  You already decided the guy should

3   have anticipated.  You have already decided that.

4      A.     They have proven that.

5      Q.     They proved that to you.

6      A.     They have proven that to me.

7      Q.     Now we're in the second part.  You have heard

8   enough to make you think beyond a reasonable doubt he should

9   have anticipated.  I think you are telling me that should

10  have anticipated and anticipated in your mind is the same

11  thing?

12     A.     Um, I guess the word "should" is the only

13  difference in there.

14     Q.     Well, yes.  And what I'm asking you is just

15  truly if you have already decided he should have

16  anticipated, seems to me that your personal code of justice

17  is that you would say, unless you prove to me that he didn't

18  anticipate it, I'm going to answer Special Issue No. 2 yes

19  without having, you know, irrespective of anything that

20  comes.

21     A.     I don't know.  I'm, whatever.  That's just

22  kind of how I feel over and over.  I don't know.  I haven't

23  heard any facts.  I don't know anything about any of it.

24     Q.     I can't tell you the facts.

25     A.     Right, but I don't know.  I mean, I have to

1   know whether I -- who proves what to hear the information.

2   I don't know.

3        Q.    If only I could just say --

4        A.    Should, could, and would.

5        Q.    We're going to do this and we're going to do

6   that, now what would you do?  But we can't do that.

7        A.    I understand.

8        Q.    Some people say to us, actually, if I have

9   already found them guilty of capital murder, I've already

10  found, you know, that they should have known that this was

11  going to happen.  And to me they did anticipate that a human

12  life would be taken.  I would say yes to that question

13  without even needing to hear anything else from the State or

14  from the defense.  I've already answered that question yes

15  in my mind when I found him guilty.  Is that --

16       A.    That could happen.

17       Q.    Well --

18       A.    I mean, I don't know, but that could happen.

19       Q.    We need a yes or no answer, really.  Do you

20  think -- and be fair.  Do you really think that if you found

21  him guilty, that question is already answered for you

22  without having to hear anything else?

23       A.    Well, the way this reads right here in this, I

24  would say if I knew all the facts and I had already chosen

25  him guilty, that my answer to No. 2 would be yes, the way he

1    has it in here.  If you need a yes or no after reading

2    Special Issue No. 2, that's written in this little book that

3    when I read that, if I had gotten to that point and from

4    just from what I'm reading here and you are wanting me, you

5    are forcing me to say yes or no, then I would say yes to

6    this issue right here.  I don't know what else you want me

7    to say.

8                    THE COURT:  Don't think about capital

9    murder and don't think about murder.  Can you give me an

10   everyday example to define the concept of I should have

11   anticipated something?

12                   PROSPECTIVE JUROR:  You can stop right

13   there.  The person comes to my son's house, knocks on the

14   door.  I've got a gun.  My son should anticipate that there

15   is going to be a problem.

16                   THE COURT:  Okay.  Should anticipate.

17   Now, give me an example on he actually did anticipate

18   something was going to happen.

19                   PROSPECTIVE JUROR:  He's hanging around

20   with a bad group of guys.  He knows, he did anticipate that

21   this was never going -- I need to get out of this group.

22   This is not a good group for me to be with.  He did

23   anticipate that if he continued to stay with those people

24   and be in that group, that it was never going to go for

25   good, so he got away from them or chose to get away from

1  them.  I keep using my son like he's a criminal.  He's not.

2  He's a very nice guy.

3                    THE COURT:  Does he have potential?  I

4  have four brothers.  My mother said there's always

5  potential.

6                    PROSPECTIVE JUROR:  Do I understand?

7  From my explanation or not really?

8                    THE COURT:  We're not going to change

9  your opinion.  We need to know what your opinion is.  We're

10  trying to explore what your definitions are.  It's not my

11  call.

12                    PROSPECTIVE JUROR:  Yeah.

13        Q.     (By Ms. Busbee)  I think you are telling us

14  should have anticipated and did anticipate on your balance

15  scale are the same thing?  You have to say yes or no.

16        A.     Yes, I guess.

17        Q.     When you are referring -- of course, it all

18  gets written down.  You are referring to a document.  It's

19  the Voir Dire Juror Orientation Guide, page 6?

20        A.     Uh-huh.

21        Q.     And that's --

22        A.     Yeah, it's 6.

23        Q.     And it's your testimony or answer that you

24  would automatically answer that question yes if you had

25  found someone, found the defendant guilty of capital murder

1   in the first part of the trial?

2        A.    That's what I said, yes.

3        Q.    Okay.  I appreciate that.

4             MS. BUSBEE:  Could we approach?

5             THE COURT:  Ms. Marker, if you would --

6   any more questions at this time?

7             MS. BUSBEE:  No, Your Honor.

8             THE COURT:  Ms. Marker, please wait

9   outside and I'll have you back in just a minute.

10                  [Prospective juror out]

11            THE COURT:  Mr. Shook?

12            MR. SHOOK:  We have no challenges for

13   cause, Judge.

14            THE COURT:  Ms. Busbee?

15            MS. BUSBEE:  We challenge Ms. Marker for

16   cause.  She's expressed the inability to follow the scheme

17   and has predecided Special Issue No. 2.

18            THE COURT:  State's response?

19            MR. SHOOK:  Judge, this juror is clearly

20   qualified because when given the law, she's proven she's an

21   intelligent juror, understands the law, and would follow it

22   in making her decision.  During the defense voir dire she's

23   not given the law.  All her answers are filled with

24   hypotheticals, with facts, if there were guns involved, that

25   sort of thing.  Ms. Busbee never qualifies or ever tells her

63

1   what the law is.  All she says is, well, you have been given

2   the law.  She's never prefaced any of her questions, when

3   trying to disqualify her, what the law is.

4              She can ask her personal opinions all she

5   wants, but when this juror is given the law, she's a quite

6   intelligent juror.  She'll follow the law and does see the

7   difference.

8              The example that you gave her, she sees

9   the difference.  If some guy goes up and goes let's go rob,

10  common sense would tell you he's anticipating something will

11  happen.  Then her second example that she's hanging around

12  with a bunch of hoodlums who commit crimes all the time,

13  yeah, I guess he is anticipating something will happen.

14  That is common sense.  And knows the reputations.  That's

15  the example she gave off the top of her head.

16             Clearly she sees the difference on that.

17  My objection is the defense -- they can ask all this.  I

18  don't mind.  They can ask her personal opinions.  It's

19  common sense stuff what she's coming up with.

20             But they don't ever give her the law.

21  And when she gives answers such as, well, you know, they

22  keep knocking around and she will say it would depend on all

23  the facts.  I guess I would find that after I look at all

24  the facts.  She comes up with that all on her own.  And it's

25  very hard for a juror who's just getting hit with this and

1   you give the questions, doesn't it mean the same thing to

2   you, without giving the law.

3                   But when I asked her can you keep your

4   mind open to all these things and you have seen her

5   demeanor, she's obviously an intelligent woman from what she

6   does, her education, the way she filled out that

7   questionnaire.  Yeah, sure, I would want to learn all the

8   facts, that sort of thing.

9                   When they ask her questions about would

10  you require us to do something, even on her own she goes

11  finally.  But you don't have to do that.  I would have to

12  hear all the facts first and then make those decisions.

13                  Clearly this juror is qualified and when

14  given the law by the State, here's the law, can you follow

15  the law, unequivocally she said, yes, I can.

16                  THE COURT:  All right.  She is close and

17  with her response to my questions as to what she considers

18  the definitions to be, I did not want to get in the middle

19  of your voir dire, but you need to preface your question

20  with this is the law.  I understand what your opinion is.

21  Preface we understand what your opinion is, but here is the

22  law.

23                  MS. BUSBEE:  I had said that to her early

24  on and she said the same thing.

25                  THE COURT:  I want it to be a clear yes

1    or no, up or down, on this issue.  We understand what your

2    opinion is.  This is what the law says.  There is a

3    difference between should have and did anticipate.  And it's

4    a much higher -- it's not much, but it's a higher level of

5    proof required by the State to show an individual did

6    anticipate.  I'll let you frame it any way you want to.

7                MS. BUSBEE:  She's the one that brings up

8    the hypotheticals.  And everything she's ever said in

9    response to, you know, the question is in her mind there is

10   no difference.  But I'll go over it.  I'll touch it again.

11               THE COURT:  And the reason why we're

12   having this problem is that we're not using the correct

13   hypotheticals to draw their attention to the law.  So I'm

14   going to ask you again to state the law to her that there is

15   a difference.  The law requires the State to prove a higher

16   mental culpability, in order for her to be able to answer

17   that question.

18               So, Sheriff, have Ms. Marker to come back

19   in.

20                    [Prospective juror in]

21        Q.    (By Ms. Busbee)  Ms. Marker, we had a meeting

22   and decided that we had totally confused you, so I'm sorry

23   about that.  This is the thing.  The law is that should have

24   anticipated and did anticipate are two different things to

25   the law.  And that's what the law is.  And so did anticipate

1    doesn't use the word "did" in it, but that's obviously the

2    meaning of the word.  Did anticipate is a higher state of

3    mind, a more higher burden of proof, a little bit more than

4    should have anticipated.  That's what the law is.

5                     So -- and you are frowning because that's

6    just kind of a distinction that the law makes.  Once you

7    have found somebody guilty of capital murder, you have found

8    that they should have anticipated and then they come back

9    and ask you to make a determination that they did

10   anticipate.  And the law requires, the law says that did

11   anticipate is a little bit more than should have

12   anticipated.

13                    And I guess I felt that's what you

14   understood, the gist of the question, and I don't know if

15   you did or not, but I want to make that crystal clear.  Now,

16   this is just for the record.  Do you understand that

17   distinction?

18           A.      Yes.

19           Q.      Okay.  Now, that's the law.  Here's my

20   question.  Irrespective of that, you have said that you

21   would have answered that question yes, if you had found that

22   they should have anticipated, anyway, because to you that's

23   not a difference.  That should have anticipated is enough

24   for you to answer that they did anticipate in that second

25   question.  Do you understand my question?  The law is that

1  did anticipate is a little bit higher, is a higher burden

2  than should have anticipated.  There should be more proof

3  required if someone did anticipate than would be necessary

4  to prove that they should have anticipated.

5       A.    So you are asking me do I think that that --

6       Q.    Well, that's the law.  The law is that the

7  State has to prove to you did anticipate beyond a reasonable

8  doubt and that is more than should have anticipated.

9       A.    Okay.

10       Q.    We don't have any definitions of these words.

11  It's just a common definition that people usually use for

12  these words.

13       A.    Okay.

14       Q.    My question is, I know you understand the law.

15  And I know that you feel like that you want to follow the

16  law.  But my question is, is there a distinction there for

17  you or as a practical matter, having to say that someone

18  should have anticipated beyond a reasonable doubt, would you

19  require anything else from the State to answer that question

20  yes?

21            MR. SHOOK:  Judge, I object.  We don't

22  have to prove anything else or require anything else.  It

23  can be the same exact evidence.  We object to her putting

24  that additional burden and misstating the law.

25            MS. BUSBEE:  I think I did, sorry.

1  THE COURT:  Sustained.

2  Q.      (By Ms. Busbee)   See, now I'm confused.

3  THE COURT:  Would you like me --

4  MS. BUSBEE:  Yes.

5  THE COURT:  I didn't want to get in the

6  middle of the lawyers' program.  Our law is set up as a

7  filtering system.  And in order to find someone guilty of

8  capital murder, you can have more than one actor.  You gave

9  us the example of your son.

10  PROSPECTIVE JUROR:  Poor Josh.

11  THE COURT:  Or my son.  But you have a

12  filtering mechanism.  If you understand the question, the

13  State has a burden of proof they have to prove Special

14  Issues No. 1 and 2 beyond a reasonable doubt.  And you have

15  already told us in your own words you think they might ask

16  some questions or they might present something to you, but

17  you understand that the defendant does not.

18  PROSPECTIVE JUROR:  Absolutely.

19  THE COURT:  What the law requires you to

20  do is after the first phase of the trial is to step back.

21  PROSPECTIVE JUROR:  Okay.

22  THE COURT:  The State may present more

23  evidence.  They may not.  But you have to step back and say,

24  well, I can look at all the evidence I have heard in the

25  first part of the trial and, if any, or more in the second

1    part of the trial and I have to answer this question,

2    whether the defendant actually caused the death.  If it's

3    one person that's the shooter, that's easy.

4                    PROSPECTIVE JUROR:  Uh-huh.

5                    THE COURT:  That's no issue.

6                    PROSPECTIVE JUROR:  Uh-huh.

7                    THE COURT:  Or if there's two people with

8    two guns and they both shot, that's fairly easy.

9                    PROSPECTIVE JUROR:  Uh-huh.

10                    THE COURT:  But whether the defendant

11    actually caused the death of the deceased or if he didn't

12    actually cause the death of the deceased, but intended to

13    kill -- let's use a murder for hire.  Your husband hired

14    somebody to kill you.  Well, he didn't pull any trigger, but

15    he intended to cause the death.

16                    PROSPECTIVE JUROR:  Uh-huh.

17                    THE COURT:  Or another.  Or here's the

18    key word "anticipated" that a human life would be taken.

19    Now, that's a difference between should have anticipated,

20    because your son, he should have known better than to go

21    with these folks.

22                    PROSPECTIVE JUROR:  Right.

23                    THE COURT:  But anticipated that a human

24    life would be taken, there's a -- it's a filter.  There's a

25    capital scheme in saying we're going to reserve the death

1   penalty for those people who actually caused the death,

2   intended to cause the death, or anticipated that a human

3   life would be taken.  It's a higher burden.  So the law

4   contemplates that simply because you found someone guilty of

5   capital murder -- and then examples they're using as an

6   accomplice.

7                    PROSPECTIVE JUROR:  Uh-huh.

8                    THE COURT:  You step back and you answer

9   that question, did their mental state go to that higher

10  level to impose a death sentence?  It's a filter.  Does that

11  make some sense?

12                    PROSPECTIVE JUROR:  Yeah, that makes a

13  lot of sense.

14                    THE COURT:  Okay.  The parties, is that a

15  decent explanation?  Okay.  Her question to you is, are you

16  capable of stepping back and reviewing all the evidence,

17  whether there's more or not provided to you, and filtering

18  these facts, whatever the facts may be, to determine whether

19  or not the State has proven this additional or higher burden

20  of did anticipate that a human life would be taken?

21                    PROSPECTIVE JUROR:  And you want my

22  answer?  Yes, I could do that.

23                    THE COURT:  Ms. Busbee?

24                    MS. BUSBEE:  Actually, Your Honor, my

25  question goes a little further than that.

1          THE COURT:  Go ahead.  I think she has

2    the scheme.  I use the word "filter."

3          Q.     (By Ms. Busbee)  Here's my question.  That's

4    the law and I know you understand it.  My question to you

5    is, having already found that person guilty of capital

6    murder, have you already -- would you already automatically

7    say that they did anticipate?

8          MR. SHOOK:  We object because you've

9    asked and answered that same question.

10         MS. BUSBEE:  And she answered that she

11   would answer it yes.

12         MR. SHOOK:  And you just asked her that

13   same question.

14         THE COURT:  Overruled.  Let her see if

15   she understands the question.

16         Q.     (By Ms. Busbee)  As it is written here, you

17   would answer that yes because you found him guilty?

18         A.     With his explaining the kind of filtering

19   system, I would have to -- I mean, I don't know how to

20   answer it differently.  I will just say yes, yes, I would

21   answer it.

22         Q.     Okay.

23         A.     I understand exactly what he's saying, but you

24   are forcing me to say yes or no and if I say no, I don't

25   know, yes.

1    Q.    You would answer that question yes because you

2  had already determined that he should have anticipated.  Is

3  that --

4       A.    Depending on what the facts are, I could --

5       Q.    All right.  That's what we want to know.

6       A.    I said that way back when.

7       Q.    But they asked you, would you follow the law?

8       A.    I mean, I said it way back when with you.  But

9  that's all right.  It's confusing.  I'm confused.  And the

10 more we talk about it, the more confusing it gets.  I

11 thought I had it very clear in my mind.

12      Q.    It's not just you.  This law is very confusing

13 and we ask people and we talk fast and it's kind of

14 terrifying to be on the witness stand, anyway, and then be

15 asked questions about something this serious.  All right.

16                THE COURT:  Wrap it up.

17      Q.    (By Ms. Busbee)  Special Issue No. 3.  Now,

18 we're not going to talk about this case.  I like to keep

19 this just purely on a theoretical level.

20      A.    Uh-huh.

21      Q.    Because it makes things clearer, at least to

22 me.  If you have already found somebody guilty of the

23 offense of capital murder and have established beyond a

24 reasonable doubt yes to question 1 and yes to question 2,

25 when considering whether or not you heard anything that

 1   would make you vote for a life sentence instead of a death

 2   sentence, would there be anything at all that would make you

 3   think that a life sentence would be -- should be imposed

 4   instead of the death penalty?

 5        A.      If I answered yes to 1 and 2, no.

 6        Q.      And a lot of people say that.  They say, if I

 7   say 1 and 2 are yes, then I don't care what else I have

 8   heard, I would answer that question no.

 9        A.      I mean, it goes back to what you bring up to

10   make a difference to make mitigating circumstances.

11        Q.      Okay.  What do you mean by that?

12        A.      It's all part of what -- well, he had asked

13   could you listen to mitigation.  Of course.  I mean, I'm

14   trying to think of an example.

15        Q.      You don't have to.  You don't have to.  That's

16   the thing, you know.  That's the problem.  I'm not asking

17   you to think of an example, necessarily.  The law doesn't

18   require that you do that.  I'm just asking you, really, in

19   your mind, would anything make any difference to you or

20   would you just say that is a person that should receive the

21   death penalty and I just wouldn't say yes to Special Issue

22   No. 3?  I just wouldn't, because I had already decided that

23   they were a future danger and answered Special Issue No. 2

24   yes.

25        A.      With what you just said, the answer to No. 3

1  would be yes, with what you just said to me, walking through

2  what you just said, that would be the death penalty

3  sentence, if I followed what you said --

4       Q.   Well --

5       A.   -- just now.

6       Q.   I know we're all tired.  The law requires that

7  a juror be able to consider some mitigating circumstances.

8  And in considering Special Issue No. 3, if you really would

9  not consider anything mitigating after having decided

10 Special Issue No. 1 and 2, if you just couldn't consider

11 giving a life sentence, just tell us.

12      A.   I could consider a life sentence.

13      Q.   Okay.

14      A.   I didn't say I couldn't consider a life

15 sentence.  I said that way back at the beginning, also.  You

16 are just taking a different side approach.  That's what you

17 are supposed to do.

18      Q.   That's what I'm supposed to do.  Anything that

19 we haven't talked to you about or tell us or you just hate

20 us now, or --

21      A.   No, none of the above.  I'm fine.

22           MS. BUSBEE:  I have no other questions

23 for this juror.

24           THE COURT:  Thank you, ma'am.  If you

25 will step out and wait for us one more time, we'll have you

1  back in.

2                      [Prospective juror out]

3                  THE COURT:  Does the defense still have a

4  challenge for cause?

5                  MS. BUSBEE:  Yes, Your Honor.

6                  THE COURT:  You know, if you let people

7  just talk and she's answered to both of the issues of

8  contention here, I told you that an hour ago.  And her last

9  response is yes, I could consider a life sentence.  And with

10  what she does on dealing with complex issues on a daily

11  basis, I have a very good feeling that if she understands

12  the law, if it's given to her and she has any more than 30

13  minutes to deal with it, that she does understand the law

14  and would be able to follow the law.  She's just told us

15  that she could consider a life sentence, even though having

16  found 1 and 2 to be in the affirmative.  She's gone back and

17  forth.

18                  But, there again, if you get her to back

19  up and understand the program here, I find that she is

20  capable as exhibited in her own words that she can

21  understand the law and can follow it.

22                  I find Ms. Marker -- do you have anything

23  else you would like to say?

24                  MS. BUSBEE:  No, sir.

25                  THE COURT:  Ms. Louise Marker, 1643, to

1  be qualified.

2             MR. SHOOK:  State will accept the juror.

3             MS. BUSBEE:  We will have to have a

4  conversation.  We will exercise a peremptory challenge on

5  Ms. Marker.

6             THE COURT:  Have Ms. Marker come back in,

7  please.

8                 [Prospective juror in]

9             THE COURT:  Ms. Marker, we appreciate

10  your time and service today.  And I don't know if it's good

11  or bad, but you are not going to sit on this jury.  You have

12  now learned more about the law than you ever anticipated and

13  you will now have a different definition of that word as

14  well.  Thank you so much and enjoy the rest of your day off.

15                   (Recess)

16             THE COURT:  Mr. McCoy.

17                 [Prospective juror in]

18             THE COURT:  Good morning.  We've got

19  Mr. Kyle Gregory McCoy, juror No. 1637.  How are you doing,

20  sir?

21             PROSPECTIVE JUROR:  Pretty good.

22             THE COURT:  Obviously, you had a little

23  time to read through, preview the guide that I gave you and

24  a copy of your questionnaire that you were kind enough to

25  fill out for us back in May.  The opportunity this morning

1    is to go over these issues with you to further explore the

2    law and hopefully give you an idea how it all relates.

3                    The objectives that I have to answer at

4    the end of this session is twofold.  Number one, do you

5    understand the law?  Number two, can you follow the law?

6    That's the big picture I have to answer.  Okay?  The

7    attorneys are going to visit with you and go through in

8    detail and give you examples maybe on how some of these

9    things work.

10                   The only question that I have for you

11   before we begin, will you be able to serve this Court for

12   the two weeks beginning on November 10th?

13                   PROSPECTIVE JUROR:  Yes.

14                   THE COURT:  Mr. Wirskye?

15                   MR. WIRSKYE:  May it please the Court?

16                   KYLE MCCOY,

17   having been duly sworn, was examined and testified as

18   follows:

19                   DIRECT EXAMINATION

20   BY MR. WIRSKYE:

21        Q.    Mr. McCoy, how are you this morning?

22        A.    Fine.

23        Q.    Okay.  Thanks for bearing with us.  My name is

24   Bill Wirskye.  I'm the Assistant DA that's going to have a

25   chance to visit with you for the next few minutes.

1    What I would like to do is maybe follow

2  up on some of the information that you gave us in that long

3  questionnaire we asked you to fill out.

4       A.    Okay.

5       Q.    And talk to you a little bit about your

6  thoughts and feelings about the death penalty, since this is

7  a case where the State is seeking the death penalty, and

8  then talk to you a little bit about some of the rules and

9  procedures that apply to a death penalty case or any

10 criminal case for that matter.  Hopefully, I'll be fairly

11 clear.  If there is something that I say that doesn't make

12 sense, just stop and ask me again, ask a question, and I'll

13 try to rephrase it.

14      What went through your mind when you got

15 notified that you had to come back down here for the

16 individual interview?

17      A.    I have never been through an experience like

18 this, so I wasn't sure what to expect, as I was thinking

19 there would be a lot more people to be down here the first

20 time.

21      Q.    What we do, to let you know, is we call by

22 groups of people down to get everybody to fill out the

23 questionnaires.  And then the lawyers get together and we

24 decide who we want to talk to individually, who, kind of

25 both sides, just at least look on paper, thinks can be a

1    fair juror or may be a fair juror in each case.

2                    And that's why we only talk to a small

3    percentage of that big group of people that you saw.  We

4    talk to about six people today.  Unfortunately, you were

5    number two this morning, so you didn't get to go first.  But

6    that's why you had to wait.

7                    Any particular feelings one way or

8    another because this is a death penalty case?

9         A.    Not really.

10        Q.    And you told us in your questionnaire that you

11   are generally in favor of the death penalty; is that right?

12        A.    Yes.

13        Q.    Why is that?

14        A.    It's -- I don't know if I can explain it.

15   It's just something I came up on.  It's part of the penalty

16   punishment that -- for people that deserve it.

17        Q.    Do you feel that it serves any particular

18   purpose in our society having that?

19        A.    To a degree it will.  I don't know.  A lot of

20   people are not really learning from examples, so --

21        Q.    That's what some people tell us, that it may

22   have a deterrent effect, that it may potentially stop other

23   people.  But a lot of people, such as yourself, have some

24   doubts whether that's really working.

25        A.    If it doesn't really affect them in a certain

1   way, they don't acknowledge it.

2       Q.      Is there a particular type of case that comes

3   to mind when you think about the type of case that's

4   appropriate for the death penalty?

5       A.      Particular type of case as being --

6       Q.      Certain set of facts that comes to mind or

7   maybe even a case you have heard about or read about?

8       A.      Nothing really comes to mind, no.

9       Q.      Okay.  And we kind of, you know, we ask jurors

10  to kind of rank themselves on a scale of 1 to 10 how

11  strongly they feel about the death penalty and you gave

12  yourself a 10, which is the top end of the scale.  And I

13  know that means different things to different people.  I'm

14  curious what it meant to you when you kind of gave yourself

15  that 10.

16      A.      Hum, I'm not really sure how to answer that.

17      Q.      It's something that you feel strongly about

18  that we should have for certain types of crimes?

19      A.      Yeah, most definitely.  I'm not really sure

20  how to answer that.  A lot of people do a lot of bad things

21  and if it warrants it, it needs to be done.  The death

22  penalty needs to be implemented.

23      Q.      I guess what I'm getting at, we talk to a lot

24  of people and some people tell us, you know, I'm just not in

25  favor of the death penalty, or I may be in favor of it, but

1    I could just never return a verdict of a death sentence,

2    just couldn't do it.  They wouldn't necessarily be qualified

3    to be on the jury.

4         A.    Yeah.

5         Q.    On the other end of the spectrum, you have

6    people that come down and feel so strongly about the death

7    penalty, they think it's appropriate in every murder case,

8    that type thing, and, of course, they wouldn't be the proper

9    person to be on the jury.  And there's some people that come

10   down and say, you know, I've got an open mind to it and I

11   believe in it.  If the facts and circumstances show me it's

12   the right thing to do, I could do it.  If the facts and

13   circumstances show me it's not the right thing to do, I

14   wouldn't do it.

15              Where do you kind of fall in that

16   spectrum?

17        A.    I guess more towards -- I'm not really good at

18   this, I'm sorry.

19        Q.    That's okay.  There are no right or wrong

20   answers.  We're not trying to trick you.  We're just trying

21   to figure out what you think about the process, what you

22   think about the death penalty.

23        A.    I think it's good in a way.  I'm not really

24   sure how I could explain how, since I feel like I'm just a

25   little person.

1    Q.    What we've got, and you have probably seen it

2  in the packet, in Texas the death penalty is reserved just

3  for murder cases and then only certain murder cases, a

4  certain subset, a particular type murder.  It's always

5  murder plus some other factor, an aggravating factor.

6            You kill a police officer or fireman on

7  duty, if you commit an intentional murder during the course

8  of a robbery, burglary, or rape, if you kill a child under

9  six, a mass murder, serial murder, that type thing.

10            Is that something that you generally

11  agree with, the type crimes that we reserve the death

12  penalty for in Texas?

13    A.    That's, yeah, the most severe.

14    Q.    Okay.  And that's basically what the law is.

15  We just reserve the option of the death penalty for those

16  particular type cases.  Sounds like that's something that

17  you pretty much agree with; is that right?

18    A.    Yes.

19    Q.    Do you have your questionnaire in front of

20  you?

21    A.    Yes, sir.

22    Q.    Okay.  On page 2 kind of towards the top, we

23  kind of ask everybody this, the best argument for the death

24  penalty and against the death penalty.  You put the best

25  argument for it is an eye for an eye.  And I didn't know if

1    that was something that you personally believed or --

2         A.    Yeah, I do.  I mean, I go on a lot of

3    fairness.  I like things to be fair and if somebody is

4    treated in a way -- I guess you would say in a certain way.

5         Q.    Okay.  Before we kind of move on to your

6    questionnaire, what, exactly, what line of work are you in?

7         A.    Independent contractor.  I'm a courier around

8    the DFW Metroplex.

9         Q.    Basically work for yourself?

10        A.    Yes, sir.

11        Q.    We kind of anticipate this trial may take

12   about two weeks.  Is that something that may cause some

13   problems for you, if you have to be away from your work?

14        A.    I'm in a decent situation.  No, it wouldn't.

15        Q.    Okay.  And you, like so many people we talk

16   to, told us that you know some of the facts about this case.

17   You have heard something about the case.  I'm just curious

18   what it is that you remember hearing about this particular

19   case.

20        A.    It's been a while.  I know that the five

21   before him have been, I guess, convicted.

22        Q.    You followed those cases and the sentences in

23   those cases?

24        A.    Not closely, no.  I just remember hearing the

25   outcomes.

1    Q.    Okay.  Knowing the outcomes in the other

2  cases, how do you think that might affect you, if you were a

3  juror in this case?

4    A.    It kind of leans me more towards already

5  thinking that he should be -- have the death penalty because

6  I thought about that question over and over and if you got

7  -- unless I know the facts, five out of six, yeah.

8    Q.    We talk to a lot of people.  A lot of them

9  like you are aware of the results in the other trials.

10    A.    Yes.

11    Q.    And they tell us, very frankly, even people

12  such as yourself, I know you told us you want everything to

13  be fair, but sometimes people who have heard so much about

14  the case aren't the best jurors in the case.

15    A.    Yeah.

16    Q.    A lot of people tell us, hey, I know so much

17  about it, I know about the other verdicts, the other

18  outcomes, I probably couldn't get that out of my mind.  It

19  may have some effect on my verdict and that's kind of what I

20  hear you saying.

21    A.    Yes.

22    Q.    You'd try to be fair to the extent you could,

23  but you just couldn't put that out of your mind; is that

24  right?

25    A.    Yeah.  I'm already kind of the mindset, I

1    guess you would say.

2         Q.    And in all fairness it sounds like you

3    probably wouldn't be the perfect juror, wouldn't be able to

4    give Mr. Murphy a fair trial; is that right?  I know you

5    would try, but you just know too much about it?

6         A.    I would try.  I don't know if subconsciously I

7    could and be able to sustain both the different things.

8         Q.    Give me just a second, Mr. McCoy.

9              MR. WIRSKYE:  That's all the questions we

10   have.

11             MS. BUSBEE:  No questions, Your Honor.

12             THE COURT:  Mr. McCoy, we very much

13   appreciate your honesty and it takes a very intelligent man

14   to come in and say, yeah, I know what happened and I can't

15   be fair.  Your jury service is -- that's probably more than

16   any other jury service you have ever served on and we

17   appreciate that.  And the parties are going to excuse you

18   from this case.

19             PROSPECTIVE JUROR:  Thank you.

20             THE COURT:  Thank you, sir.  You are free

21   to go.

22             [Prospective juror out]

23             THE COURT:  Tonya Davis.

24             [Prospective juror in]

25             THE COURT:  Good morning.  How are you?

1          PROSPECTIVE JUROR:  Good.  How are you?

2          THE COURT:  We're doing just fine.  Tonya

3   Marie Davis.

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  You go by Tonya or Marie?

6          PROSPECTIVE JUROR:  Tonya.

7          THE COURT:  I want to correct my computer

8   to reflect how you prefer.  Good morning, Ms. Davis.  I'm

9   sorry for the delay in getting you in.  We don't know if

10  we're going to talk to someone an hour and a half or the

11  last gentleman, three minutes.  I have to balance having 10

12  people wait or just one.  I apologize for the delay.

13          PROSPECTIVE JUROR:  No problem.

14          THE COURT:  You planned on half a day

15  coming down.  We will have you out of here certainly before

16  noon.

17          PROSPECTIVE JUROR:  Okay.

18          THE COURT:  You have had time to review

19  the guide I provided for you?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  That's a lot of information

22  to give someone at 8:30 in the morning and hopefully you had

23  a chance to get a cup of coffee and think about it.  I also

24  provided a copy of your questionnaire that you were so kind

25  to provide us back in May.

1      Some people say this is somewhat

2  intimidating.  It's kind of scary to come in the courtroom

3  and be the focus of attention.  The best way we can do it.

4  When we have 700 folks downstairs all crammed into the jury

5  room, you can't do any meaningful voir dire that way.  So we

6  have to do it individually.

7      Here, the idea is for you to be able to

8  at the end of the day understand the law.  I have to answer

9  two questions.  Number one, do you understand the law and

10  how it relates and how it works and all that.  Once you

11  understand the law, can you follow the law?  That's the big

12  picture here.

13      Only question that I have for you at this

14  time is will you be able to serve this Court on November

15  10th for the two weeks?

16      PROSPECTIVE JUROR:  Yes.

17      THE COURT:  I'll turn it over to

18  Mr. Shook.

19      MR. SHOOK:  May it please the Court.

20      TONYA DAVIS,

21  having been duly sworn, was examined and testified as

22  follows:

23      DIRECT EXAMINATION

24  BY MR. SHOOK:

25      Q.    My name is Toby Shook.  I'm going to ask you

1    questions on behalf of the State.

2         A.    Okay.

3         Q.    And as the Judge said, there are no right or

4    wrong answers.  I know we throw you up on the witness stand

5    and you feel like you are the one on trial.  But the law,

6    since it's a death penalty case --

7         A.    Yes.

8         Q.    -- it's different from other jury selections.

9    Usually we talk to everybody out in just one panel, but we

10   do this individual voir dire and we found that it helps us.

11              And you have given us a lot of

12   information in your questionnaire.  Believe it or not, it

13   actually saves you some time.  But I want to follow up on

14   just a little bit of that and then talk to you about a

15   capital murder, how you feel about it, and like the Judge

16   said, we're just looking for your honest opinions.

17        A.    Okay.

18        Q.    You grew up here in the Dallas area in Grand

19   Prairie, right?

20        A.    Yes.

21        Q.    And looks like you work for Ozarka now in the

22   Human Resources?

23        A.    Yes.

24        Q.    What all do you do out there in human

25   resources on a day-to-day basis?

1   A.      I do the interviewing, I do all the staffing

2   for the Ozarka plant.  And I do employee relations.  I

3   handle the write-up's and the terminations.

4       Q.      So you kind of do it all?

5       A.      Yes.

6       Q.      You are on the hiring and the firing and all

7   and everything in between?

8       A.      Yes.

9       Q.      How many people are working out there now?

10      A.      In our particular plant there's about 145.

11      Q.      Okay.  Now, do you get all the free Ozarka you

12  can take out of the place?

13      A.      None.

14      Q.      Really?

15      A.      None.

16      Q.      I don't know.  I always am amazed when I watch

17  these talk shows and all the people come on and everybody

18  has water in their hands.  I'm always amazed how they got by

19  all these years before we --

20      A.      Before you bottled it?

21      Q.      -- bottled it.

22      A.      I know.

23      Q.      I guess they were just thirsty all the time.

24  Let me talk to you a little bit now about capital murder.

25  We want to get your general feelings about it.  You put on

1  your questionnaire -- and you have got a copy of it, right?

2       A.    Yes.

3       Q.    We don't have to go over it all, but you did

4  put that you were in favor if it as a law.  And I want you

5  to tell me in your own words why you favor the death penalty

6  and kind of what purpose it serves in society to have it as

7  a law.

8       A.    I think that someone is going to be more or

9  less likely to commit a crime, if they know that they could

10 possibly be penalized to the fullest extent.  I do believe

11 that there's cases where the death penalty should be used,

12 and then, I also believe there's cases where it shouldn't.

13      Q.    Just kind of depends on the facts?

14      A.    It depends definitely on all the facts.

15      Q.    Okay.  Let me ask you, when you think of a

16 death penalty case, what kinds of crimes do you think would

17 come into play where it should at least come under

18 consideration?

19      A.    I think definitely if it's premeditated.  You

20 know, someone knew they were going in to intentionally kill

21 somebody.  Or if it -- I want to say like in an act of

22 anger, like, you know, they were trying to do something and

23 got really angry and just brutally murdered someone, you

24 know.  I have a hard time like, you know, if someone murders

25 someone, but I don't really think that they intentionally

1   did it or something like that, then I don't believe it.  But

2   if they intentionally, knowingly, murdered someone, then

3   that's when I believe it would come into role.

4        Q.     Have you followed any cases locally or

5   nationally in the media that you thought that's a death

6   penalty case or I can see why they are looking at that as a

7   death penalty case?

8        A.     Only one, and it was because I'm a mom and it

9   was the lady that drowned all her kids.

10       Q.     The Susan Smith case?

11       A.     No, in Houston.

12       Q.     Over in Houston?

13       A.     I didn't know all the facts, so I wouldn't

14  really place an opinion, you know.  But I thought, God, if I

15  was her husband, you know, or something and they -- all my

16  kids she killed.

17       Q.     That was a strange case.

18       A.     That was a very strange case.  So, but no, I

19  haven't really followed any cases or anything.

20       Q.     All right.  You use -- if it were up to you,

21  make you Governor of Texas for a day, then I take it you

22  would have the death penalty on the books as a law?

23       A.     Yes.

24       Q.     For certain crimes?

25       A.     Yes.

1    Q.    Would you have it on in considering the death

2    penalty for crimes other than murder?

3    A.    Um --

4    Q.    Would it include other types of crimes,

5    possibly?

6    A.    I don't think so.  I pretty much believe kind

7    of in an eye for an eye, tooth for a tooth.  If they

8    murdered someone, then it could come into a role.

9    Q.    Because a life was taken, that's the important

10   factor for you?

11   A.    I would think so, yes.

12   Q.    You used the words that a lot of jurors use,

13   premeditation and also intentional.

14   A.    Uh-huh.

15   Q.    Premeditation, I guess when I think of it -- I

16   grew up watching "Dragnet" and the other cop shows or "Perry

17   Mason," is they think about it ahead of time, maybe plan it

18   out, that sort of thing?

19   A.    Uh-huh.

20   Q.    An intentional, legally intentional, can be

21   formed in a second, but it has to be you want the person to

22   die --

23   A.    To die.

24   Q.    -- and they die.

25   A.    Yes.

1    Q.    And you can form it (snaps fingers) like you

2    said, maybe they are mad and they brutally kill them.  Maybe

3    they didn't go there mad and something happened, but then

4    they want that person to die and they kill them and that

5    could be a lot quicker than premeditation.

6    A.    Yeah.  And that's why I believe in both cases,

7    premeditated where they sit at home and they know they are

8    going to hunt this person down.  And then intentional being,

9    you know, something happened that, you know, that sparked it

10   and they intentionally killed them.

11   Q.    Okay.  Now, in Texas under the law, capital

12   murder is reserved only for murders which are intentional

13   killings.

14   A.    Uh-huh.

15   Q.    That intent can be formed in a split second.

16   But the key is kind of what I think is already in your mind.

17   They have to have that specific intent in their mind and

18   then they act on it.  And it could be something they --

19   could be premeditated and intentional or it could be

20   something they formed in a split second, but it does have to

21   be intentional.

22   A.    Yes.

23   Q.    Now, if you are acting in self-defense, that's

24   not murder.  If someone is coming at you and doing you harm

25   and you act and kill them in self-defense under the facts,

1  then you won't be held guilty of murder under the law.

2       A.     Yes, I believe in that.

3       Q.     And that's what the law says.  Also an

4  accident isn't necessarily a murder case.  You can have

5  different degrees of recklessness where like a car accident

6  or something like that or manslaughter.

7              But to get to a murder, we have to have

8  an unjustified homicide and intentional killing.  And to get

9  to capital murder under our laws and guidelines, it's only

10  reserved for certain types of murder cases.

11       A.     Yes.

12       Q.     There are a lot of brutal cases that probably

13  a lot of people think would be deserving of the death

14  penalty, but they don't fall in our categories.

15       A.     So they're murder, but not capital murder.

16       Q.     You can get a life sentence, but you can't get

17  the death penalty.

18              What we reserve the death penalty for is

19  the intentional murder that occurs with some other

20  aggravating fact, such as a murder that occurs during the

21  course of a felony.

22       A.     Okay.

23       Q.     If you go in and rob a 7-Eleven and shoot the

24  clerk, that could be a death penalty case.

25       A.     Okay.

1    Q.    If you go in and burglarize someone's home,

2  break into a house and kill someone in the house, that can

3  be a death penalty case.  If you murder someone during a

4  rape, during a kidnapping or arson, that could be.  Also

5  murder of specific victims, such as a police officer,

6  fireman, or prison guard.  That could be a death penalty

7  case.  Child under the age of six.  Or murder of more than

8  one person in the same transaction like a serial killer or

9  mass murderer situation.

10    A.    Okay.

11    Q.    Or murder for hire, someone does it for money

12  or profit.  But those are the specific types of cases that

13  are currently reserved for the consideration of the death

14  penalty.

15    A.    Okay.

16    Q.    Do you agree with that list?

17    A.    I do.

18    Q.    Okay.  Now, let me go over another area.  We

19  talk about capital murder and whether people get the death

20  penalty or not and we conjure up -- we automatically conjure

21  up fact situations as examples.  I like to use the 7-Eleven

22  situation.

23    A.    Uh-huh.

24    Q.    And when we do that, it's normal to think of

25  the actual triggerman who actually causes the death, but the

1  capital murder can be committed by more than one person like

2  any crime. And under the law all persons involved, if they

3  are actively involved in the crime, know it's going on, can

4  be held accountable, even though some may have a greater

5  role than others. It just depends on the facts.

6          The example we use in capital murder is

7  Mr. Wirskye and I decide we want to go rob the bank down the

8  street from our house. And so our plan is I'm going to go

9  in with a gun and I'm going to pull it on everyone and

10  threaten them. And then Mr. Wirskye will come in with a big

11  bag and he's going to go, and while I'm holding everyone at

12  bay, take all the money out of the teller's drawers and dump

13  it in there and then we're going to make our getaway.

14          But during the course of that robbery, I

15  see one of the tellers, maybe I don't like the way they're

16  looking at me, maybe Mr. Wirskye says that one is going for

17  an alarm, so I shoot them. I intentionally kill them during

18  the course of a robbery. That makes it fall under the

19  capital murder statute.

20          The law says obviously I could be held

21  accountable for that. I could be prosecuted. I could even

22  get the death penalty, because I caused that death. The law

23  also says that Mr. Wirskye, as my accomplice, since he was

24  actively involved, he, too, could be prosecuted for capital

25  murder. He could even, under certain facts, get the death

1  penalty.  It just depends on the facts.

2              But we want to ask every juror how they

3  feel from their own personal viewpoint, gut reaction,

4  because jurors feel differently on this issue.  Some jurors

5  believe that the death penalty would, from their personal

6  point of view, would just reserve it for the people that

7  actually caused the death, the triggerman.

8       A.     Uh-huh.

9       Q.     And they would reserve a different penalty for

10 the accomplice.  Because they didn't cause the death, they

11 may give them a lengthy prison term, but they don't think

12 the death penalty is fair in those situations.  Other jurors

13 tell us, no, I do think accomplices should be held

14 accountable to the same extent and could ultimately get the

15 death penalty, even though they didn't cause the death, if

16 they are actively involved.

17             But people feel differently.  And there's

18 no right or wrong answers.  And that's what I want to ask

19 you how -- what is your honest, gut reaction on the

20 accomplices being prosecuted?

21      A.      I would think that it would depend on all the

22 circumstances in there, but I do feel that you choose your

23 friends and you know that your partner would have chosen to

24 go in there with you knowing that you have a gun that could

25 have possibly killed someone.  So I would have to know all

1  the circumstances, but I would think that, yes, they could

2  be held just as responsible as you.

3        Q.    Do you feel that an accomplice, a

4  nontriggerman, could ultimately receive the death penalty?

5        A.    Depending on the -- like if he, you know,

6  said, hey, she's going for something, you know, if he had an

7  active part and wasn't just in the back of the room and

8  didn't even know that you were shooting this person that was

9  there, then I would say no.  But if he was actively kind of

10  involved in the situation, then I would say, yes,

11  potentially he could.

12        Q.    Why do you think it's good that the State, or

13  it is a good policy that the State can prosecute an

14  accomplice for the same crime and even receive the death

15  penalty?

16        A.    Because he went in there intentionally,

17  knowing that y'all were committing a crime.  And, I mean, I

18  kind of feel like you choose your friends and I don't want

19  to say, you know, if you are a friend, if you are a bad

20  person, then all your friends are bad people.  But if you

21  knew that you were going in there to commit this crime, then

22  --

23        Q.    You should have known something might happen?

24        A.    It could have, yes.

25        Q.    Okay.  Let me get into another area.  This

1   crime received a lot of publicity.

2        A.      Yes.

3        Q.      And we ask that in the questionnaire.  Almost,

4   I would say 99 percent, remembers something on TV or in the

5   newspaper about it.  What do you recall about the coverage?

6        A.      I recall when it happened.  I was actually in

7   Colorado at the time, snow skiing with my family.  And I

8   remember them saying, you know, that some people had broken

9   out of jail and, you know, a police officer had gotten

10  killed.

11              I didn't really follow up a whole lot on

12  the case and I didn't particularly hear any names, like any

13  individual's names, but I do remember the case.  I just

14  don't remember a lot of details about it.  I just know it

15  was like at an Oshman's or something like that and a police

16  officer was murdered.

17       Q.      Did you follow any of the subsequent court

18  proceedings or anything like that?

19       A.      No.

20       Q.      The law is pretty simple, a common sense deal.

21  Just because you have seen something on TV or newspaper,

22  doesn't make you ineligible to be a juror.  What you have to

23  do as a juror is ignore that in your decisionmaking process.

24  We can't ask you to forget about it.

25       A.      Learn all the facts.

1    Q.    You have to wait and listen to the evidence

2  from the witnesses and then make your decision.  You can't

3  let anything you have seen on TV or read in the newspaper

4  influence you.

5    A.    Yes.

6    Q.    And it just comes down to whether that person

7  can honestly tell us whether they can do that or not.  How

8  do you feel about that?  Could you do that?

9    A.    I feel that I could do that.

10    Q.    Okay.  Fair enough.  Now, the procedures in a

11  capital murder case are that the trial is divided into two

12  parts.  There's the guilt/innocence stage and the punishment

13  stage.

14    A.    Okay.

15    Q.    We first have to prove guilt to you.  And if

16  we don't do that, obviously it's a not guilty and we go

17  home.

18         But if we do prove a person is guilty

19  beyond a reasonable doubt, we move to the second stage and

20  in the second stage you may get additional evidence.  But at

21  the close of that, the jury gets these Special Issues.  And

22  I'll go over those in more detail.

23         But the Special Issues, basically, are

24  this.  The jury has to decide is the defendant a continuing

25  danger to society, did he anticipate a life would be taken,

1   and is there mitigating evidence which tells you a life

2   sentence should be imposed rather than a death sentence?

3          A.      Okay.

4          Q.      But if you answer them yes, yes, and no, that

5   he's a danger, anticipated a life, and there's no mitigating

6   evidence, then the Judge has no choice.  He would sentence

7   the defendant to death.

8          A.      Okay.

9          Q.      If you answer any other way, the Judge, again,

10  would have no choice.  He would sentence the defendant to

11  life.  But those are the only two possible outcomes once

12  someone has been found guilty.

13         A.      Okay.

14         Q.      Are you familiar with the method of execution

15  in Texas?

16         A.      Lethal injection?

17         Q.      That's right.  It gets on the news a lot.

18  Certain executions are covered more than others.  Some are

19  covered in great detail.  The procedures are the same in

20  each case.

21                 And in this case, if the defendant were

22  found guilty and those questions were answered in that way,

23  the Judge would sentence the defendant to death.  He would

24  be placed on death row.  At some point in time, I can't tell

25  you when, the Judge would actually issue a date of

execution.

     A.     Okay.

     Q.     The day prior to that date he would be taken from death row, put in downtown Huntsville prison where executions take place by law.  He would be given, on the date of his execution, a time with his friends, his family members, a minister.  He would be given a last meal.

          But at 6:00 p.m. the executions take place.  Shortly before 6:00 he would be taken from his cell.  He would be walked down the hallway and he would be secured on a gurney, which they often show on the news, a hospital gurney with leather straps.  If he resists, obviously there's trained guards to force him to do that.

          Once he's secured, they simply put needles in his arms, which have tubes that go to another room where the executioner sits.  Witnesses are brought in, in the two viewing rooms, one side is witnesses for the defendant and the other side for the victim's family.

          At that point in time the warden then asks him if he would like to make a last statement.  This is often published in the newspapers or seen on TV.  They may proclaim their innocence, they may protest what is happening to them, they may ask for forgiveness.  Different people do different things.

          After that time, though, the warden would

1  signal the executioner who would then inject lethal

2  substances which act very quickly.  While he's conscious he

3  would feel his lungs collapse, his heart would then stop,

4  and then he would lapse into a coma and be dead within 20 to

5  30 seconds.

6              And that's the procedure in every case.

7  You know from growing up in Texas that the death penalty is

8  actually carried out.

9       A.   Yes.

10      Q.   There are some states where it's not.  And

11 it's one thing for us to kind of sit around and talk about

12 the death penalty, I guess kind of in a philosophical sense,

13 and it's another when you get down here and you fill out a

14 questionnaire and then you realize I may be on a jury

15 deciding these things.

16             Some people are against the death penalty

17 on religious grounds, moral grounds, can't sit on these

18 types of cases, they would be fine on another.  Other people

19 are adamantly for it and they really can't be fair and

20 objective.  We have other people that are for it and they

21 can make the decision.  And we have other people that are

22 for it, but when it gets down to it, they are not

23 comfortable making a life or death decision.

24             We can't preview the facts for you.  But

25 we can just ask you, and I think you know from the

1  situation, from our point of view, we feel we have the type

2  of evidence and quality of evidence to convince a jury of

3  the defendant's guilt and these questions will be answered

4  in such a way that he would be executed some day.  And the

5  defense takes the opposite view.

6          As best you know yourself, do you think

7  that you could actually take pen in hand and answer these

8  questions in a way if the State proves it to you, knowing

9  that the defendant would be executed some day in the manner

10  I described?

11       A.     Yes.

12       Q.     Okay.  Getting back to the law of parties, I

13  can't get into the facts at all.  But I can tell you that's

14  the theory of law we're prosecuting this case under, that he

15  is an accomplice in the case.

16       A.     Okay.

17       Q.     You have told me philosophically that you feel

18  that it's fair to have a law like that.

19       A.     Yes.

20       Q.     Do you feel that you could sit on a jury

21  involving the law of parties and could actually sentence

22  someone to death, depending on the facts, knowing that they

23  are not the actual triggerman?

24       A.     Yes.

25       Q.     Okay.  We prove that in two ways in the

1   guilt/innocence stage.   One is if someone is actively

2   involved, participating, directing, that sort of thing, they

3   could be found guilty.   Or the other way is through

4   conspiracy.

5           An example I gave, Mr. Wirskye and I, if

6   we conspire, which just means we agree to commit a crime,

7   and then while we're committing the crime, if one of us

8   commits another crime, murder in this case, we could all be

9   held responsible, if the facts show that we should have

10  anticipated something could happen.

11          A.   Yes.

12          Q.   If I'm guilty, Mr. Wirskye doesn't even have

13  to have the intent that someone die.   He may not want

14  someone to get killed, but the facts may show he should have

15  anticipated someone might die by our plan or knowing me or

16  whatever.

17          To get to the death penalty we have to go

18  a step further and actually show that they did anticipate,

19  you know.   And that's the difference there.   But we don't

20  have to actually prove in the guilt/innocence stage the

21  intent someone should die, but just that he should have

22  anticipated.

23          And it kind of goes back to what you were

24  saying, the facts, the involvement, how much they knew, how

25  involved they were in the crime, all the facts involved.

1   You understand that?

2        A.     Yes.

3        Q.     Okay.  Now, let's talk about the Special

4   Issues for a minute.

5        A.     Okay.

6        Q.     You don't get to these unless you have found a

7   defendant guilty and then you can hear additional evidence,

8   and then you will get these, and you look at them one at a

9   time.  And I want you to read Special Issue No. 1 to

10  yourself.

11       A.     (Prospective juror complies.)  Okay.

12       Q.     You see how that question asks how -- it asks

13  the jurors to make a prediction about the future, how

14  someone is going to behave.  Do you feel that you could

15  answer that question, if you were given enough information?

16       A.     Yeah.  I sometimes believe their past history

17  could determine how their future history would be.  I feel

18  like I could answer that question.

19       Q.     A lot of people tell us that.  Some people

20  tell us the best predictor of future behavior is past

21  behavior or they say I want to see a pattern or that sort of

22  thing.  And if that kind of information exists, we are

23  allowed to put it on.  We can even put on the witnesses from

24  past crimes, sentences, that sort of thing.  And you can

25  hear good things, too.  It's good and bad, it's just

1   everything that may happen in a person's life.

2                   It starts out with a no answer and we

3   have to prove to you it should be answered yes.

4        A.    Okay.

5        Q.    We do that by presenting any new evidence we

6   have that is relevant and also you get to reevaluate what

7   you heard in the guilt/innocence stage, what their role was,

8   that sort of thing, and then decide.  The law is, though,

9   you can't automatically answer that question yes.

10       A.    Okay.

11       Q.    Just because you found him guilty of capital

12  murder doesn't mean, yes, he's a future danger.  That may

13  very well be the case, but what you have to do as a juror is

14  reevaluate the evidence, wait for anything new we put on,

15  and then decide what the facts tell you.

16       A.    Okay.

17       Q.    If you don't believe he's a future danger,

18  even though you found him guilty, you would leave it as a no

19  answer.  If you do believe, you would leave it as a yes.

20  But do you understand the law and the common sense behind

21  the law of waiting and listening to the evidence and then

22  deciding?

23       A.    Yes, sir.

24       Q.    Okay.  And would you be able to follow the law

25  in that you wouldn't automatically answer the question yes,

1    even though you found him guilty, you could -- you would

2    wait and then analyze all the evidence?

3         A.    Yes.

4         Q.    Okay.  Fair enough.  Now, the words in

5    question No. 1, or any of these issues, actually, you are

6    not going to get legal definitions of.  You will get plenty

7    of legal definitions of the other words, but not these.

8    They are up to you and the other jurors.

9              But what we have to do is prove that

10   there's a probability.  What does "probability" mean to you

11   in terms of that question?

12        A.    I take it from the word "probably" that it

13   could probably happen again.

14        Q.    Not just a common sense to you.  The

15   parameters we kind of work with is it's not a certainty.

16        A.    Uh-huh.

17        Q.    We could never prove that.  But it's,

18   obviously, more than a possibility.

19        A.    Yes.

20        Q.    Because anything is possible.  A lot of people

21   tell us more likely than not, that sort of thing.  When you

22   see the words, "criminal acts of violence" --

23        A.    Yes.

24        Q.    -- what kinds of things do you think of?

25        A.    I think like burglary with a weapon or

1  fighting, you know, some type of violent act on another

2  human being.

3       Q.   Okay.  And then when we say "constitute a

4  continuing threat to society" --

5       A.   Uh-huh.

6       Q.   -- what does "society" mean to you?

7       A.   Other people that you live around.

8       Q.   Could it be anyone and everyone they come into

9  contact with?

10      A.   Yes.

11      Q.   Including people in the prison system?

12      A.   It could be.

13      Q.   Like wardens, teachers, guards, inmates,

14  anyone?

15      A.   Yes.

16      Q.   Okay.  Now, let's talk about Special Issue No.

17  2 and take a moment to kind of read that to yourself and

18  I'll ask you a couple of questions about that.

19      A.   (Prospective juror complies.)  Okay.

20      Q.   Special Issue No. 2 starts out with a no

21  answer, also.

22      A.   Okay.

23      Q.   And, again, there aren't any automatic answers

24  there.  Just like question No. 1, just because you found the

25  defendant guilty of this crime doesn't mean you would answer

1  yes.  You have to again reevaluate everything that you have

2  heard in the guilt/innocence stage and then anything you

3  heard in the -- new about his background that may help you

4  answer that question and then decide, did the State prove

5  question No. 2?

6           Question No. 2 has to do with that party

7  situation, the accomplice situation.  The first part asks

8  whether the defendant actually caused the death.  Now, if

9  you think from the facts he actually caused the death,

10  that's different.  That's pretty straightforward.  You would

11  answer it yes.

12           But if you didn't think the evidence

13  showed he caused the death or he is prosecuted as an

14  accomplice, you would answer it yes, if we prove that he

15  intended to kill the deceased.  His intentions were there

16  but maybe he didn't, or another person, or he anticipated

17  that a human life would be taken.

18           The last part has to do with that one

19  theory of conspiracy.  We have to prove he should have

20  anticipated --

21       A.    Yes.

22       Q.    -- in the guilt/innocence stage and here

23  that's slightly different because the word "should" is left

24  out, you know.  And we just have to prove he did anticipate.

25  It may be the same exact evidence.  But it's a little

1    different way of looking at it.

2            A.    Okay.

3            Q.    Do you see the difference there --

4            A.    Yes.

5            Q.    -- between you should anticipate something --

6            A.    And he did anticipate.

7            Q.    -- and he did anticipate it?

8            A.    Yes.

9            Q.    And can you give that difference in the law on

10   the guilt/innocence stage, we're required to prove should,

11   and we have to go a step further in the punishment phase and

12   prove did anticipate?

13           A.    Yes.

14           Q.    Okay.  You recognize the difference and you

15   could apply it when looking at these questions?

16           A.    Yes.

17           Q.    Okay.  And, again, it is just going to depend

18   on the facts.

19           A.    Definitely.

20           Q.    We can't preview the facts, but it's a common

21   sense method, I think.  Jurors get to review all the facts

22   and the background and then make reasonable deductions.  You

23   apply your common sense.  We can't open a person's head up

24   and show you here's what his intent was.  Here's what he

25   anticipated.  All we can do is put on all the relevant

1    evidence and you can draw inferences from a person's actions

2    and their history and that sort of thing.  It kind of

3    depends on what a person does.

4                      You provide a good example with your

5    occupation because you are in human resources.

6         A.      Yes.

7         Q.      You deal with people every day?

8         A.      Yes.

9         Q.      Hiring them, firing them, dealing with work

10   problems.  You deal with how you view their intentions,

11   probably their job performance, you know, that sort of

12   thing?

13        A.      Yes.

14        Q.      And I take it on a day-to-day basis you are

15   probably making decisions on what you think their intentions

16   are, how they are acting, how they are going to act in the

17   future, and all these kinds of things?

18        A.      Yes.

19        Q.      It's the same thing here, nothing different.

20   It's just your common sense.  And then looking at the facts

21   of each case, do you feel comfortable answering that

22   question, if we give you sufficient facts?

23        A.      If I had all the facts, yes.

24        Q.      Okay.  Now, the last Special Issue, neither

25   side has the burden of proof.

1      A.      Okay.

2      Q.      And you don't get to it unless you found the

3  defendant guilty, unless you had already found he was a

4  future danger, unless you had already found he anticipated a

5  life could be taken.   But that allows the jurors to show

6  mercy.   Even though you found those things, maybe something

7  in his past or his role in the crime which you believe in

8  your heart tells you a life sentence should be imposed

9  rather than a death sentence.   It's not as if he gets off

10 scot-free.   He has to serve a life sentence.   But it allows

11 you to do that.

12     A.      Okay.

13     Q.      Do you think this is a good question to have

14 in a death penalty case?

15     A.      Yes.

16     Q.      It allows jurors to show some mercy, if they

17 choose to.

18     A.      Yes.

19     Q.      They have to do it on something based on

20 evidence, obviously.   The question asks whether taking into

21 consideration all the evidence, including the circumstances

22 of the offense, everything that happened in the crime, the

23 defendant's character and background, and the personal moral

24 culpability of the defendant, there's a sufficient

25 mitigating circumstance or circumstances to warrant that a

1   sentence of life imprisonment rather than a death sentence

2   be imposed.  You see, it asks you to review everything, the

3   crime, his character, all his background.

4                   As you sit there today you are not

5   required under the law to tell us what you think mitigating

6   evidence could be or may be, you know.  You just have to be

7   able to tell the Court, my mind would be open to it and I'll

8   look at it.

9        A.    Yes.

10       Q.    Okay.  If you think there's sufficient, you

11  could answer it yes.  If you don't think there's sufficient,

12  you would answer it no.  It would just depend on the facts.

13       A.    Okay.

14       Q.    As you sit there today, does something come to

15  mind as potentially mitigating?

16       A.    No.

17       Q.    Okay.  You are like 99 percent of the jurors.

18  Kind of -- hopefully, you are not thinking about these

19  things and so it's not surprising and that's why the law

20  doesn't require you to.  One thing might be mitigating to

21  one juror, and may not be mitigating to another.

22                   An example I give is maybe you would have

23  a capital murder defendant that went to Harvard and has got

24  four degrees.  You may have one juror that goes, wow, he did

25  something with his life.  He's smart.  That's mitigating.

1    And we may have another juror that goes, man, that's

2    aggravating.  Someone that smart who had that opportunity

3    shouldn't do this.  They don't have to agree as long as they

4    can consider it.

5                    Sometimes in these types of cases you

6    hear about a person's background.  Maybe they grew up in a

7    poor neighborhood, maybe they had a broken home, maybe they

8    were abused physically or mentally.  Some jurors view that

9    as potentially mitigating, depending on the severity.  Other

10   jurors tell us, well, if they are an adult, they should be

11   held accountable.  There's lots of people that come from

12   that background and they don't do these things.

13                    Do you feel one way or another about that

14   general background?

15        A.    I don't think that their general background is

16   mitigating.  I think that as an adult you choose your

17   actions.

18        Q.    All right.  A lot of people feel that way.

19   It's just one example that I give.  Another one might be

20   some type of a mental defect.  Maybe they are slower.  They

21   still know right from wrong, but they are slower than other

22   people and that's through no fault of their own.  Mental

23   defects like that might be mitigating and things of that

24   nature.

25                    And, again, I can't tell you what it

1  would be.  It's just if you can promise the Court, I'll keep

2  my mind open to it.

3        A.    Yes.

4        Q.    And if it's sufficient, I'll give a life

5  sentence.  And if it's not, I'll give a death sentence.

6        A.    Yes.

7        Q.    But it's not predicated on what you answered

8  in these other questions.  You may think he's guilty, you

9  may think he's real dangerous, but still a life sentence

10  should be imposed.  That's the deal.  That's keeping your

11  mind open.

12       A.    Okay.

13       Q.    Do you believe that you can do that?

14       A.    Yes.

15       Q.    In capital murder cases oftentimes you might

16  hear from an expert, such as a psychiatrist or psychologist,

17  from one side or the other.  Maybe they will come give an

18  opinion on someone's danger or whether they anticipated or a

19  lot of times their opinions on mitigating evidence or why a

20  person is the way they are and it's their opinion.

21              Some jurors really put a lot of stock in

22  them.  They really believe in those types of experts.  We

23  have other jurors who actually think -- they don't put a lot

24  of stock.  They think you can probably find an expert who

25  will say anything you wanted, if you look hard enough.

1            And then we have other jurors who tell

2   us, I would look at it, but it's not going to weigh one way

3   or the other.  I'll weigh it with everything else.

4            Do you have any particular opinions,

5   strong or otherwise, on those types of experts?

6       A.    I don't have an opinion.  I would just look at

7   it as any other evidence.

8       Q.    Okay.  Now, here's some rules that apply in

9   each criminal case and you are going to be familiar with

10  these because this is stuff you grew up with in school and

11  stuff.

12      A.    Okay.

13      Q.    Presumption of innocence.

14      A.    Yes.

15      Q.    The fact that someone has been arrested or

16  charged, if they are even going through this process, is no

17  evidence of guilt.  You have to start out a trial with them

18  presumed to be innocent and we have to overcome that

19  presumption by putting on evidence.

20      A.    Yes.

21      Q.    Could you follow that rule of law and --

22      A.    Yes.

23      Q.    -- presume the defendant innocent?  All right.

24  The burden of proof is on the State.  We have to prove to

25  you beyond a reasonable doubt he's guilty and that burden of

1   proof never shifts.  It never goes to the defense.

2        A.      Okay.

3        Q.      If they -- this is kind of a goofy example.

4   Their only obligation is to show up.  I'm sure common sense

5   will tell you, you can anticipate they may call a witness or

6   ask a question, make arguments, and things like that.  But

7   they don't have to.  I mean, they could sit there and play

8   tiddly-winks or work crosswords if they wanted to.  They

9   won't, but they could, because that burden of proof never

10  leaves this table.

11       A.      Okay.

12       Q.      At the close of the evidence, if they hadn't

13  said a word, but you had a reasonable doubt, you have to

14  find them not guilty.  You can't go and say prove he's

15  innocent.

16       A.      Okay.

17       Q.      They don't have that burden ever.  Okay?  I

18  think that you have got that one down.  You can follow that

19  rule of law?

20       A.      Yes.

21       Q.      The burden of proof goes to every part of the

22  indictment.  If we fail on any part of it, you have to find

23  him not guilty.

24       A.      Okay.

25       Q.      We have to prove each and every element.

1       A.      Okay.

2       Q.      I'll use a couple of other goofy examples.

3  First of all, we have to prove -- here's an easy one.

4  Identity.  You know, we have to prove who committed the

5  crime.  If you had a reasonable doubt about who committed

6  the crime, it's pretty much a no-brainer.  You are going to

7  find him not guilty.  But just as important as a person's

8  identity is the county.  We have to prove it happened in

9  Dallas County.  We have to prove that in every case we try

10 here in Dallas.

11      A.      Okay.

12      Q.      If you had a reasonable doubt, maybe it's one

13 of these cases that happened in Grand Prairie -- Grand

14 Prairie, let's say, is on -- they are on the Tarrant County

15 line that goes down the middle and it happened over on the

16 Tarrant County line, and you believe that, then the State

17 would have a -- you would have a reasonable doubt about that

18 portion of the indictment --

19      A.      Okay.

20      Q.      -- for us.  You couldn't help us out.  I mean,

21 that would show us pretty poor prosecutors in our

22 preparation.  You couldn't help us out.  You might not like

23 it.  You would have to find him not guilty.  Again, that's a

24 wayout example.  If that did happen, I expect you would get

25 us fired the next day or we would be fired, but that just

1 shows, illustrates the point that that burden of proof goes

2 to every part of the indictment.  And you are obligated as a

3 juror, kind of like an umpire is in a baseball game, just

4 call the balls and strikes as you see them.

5       A.    Okay.

6       Q.    Could you follow that rule of law?

7       A.    Yes.

8       Q.    The Fifth Amendment.  If someone wants to

9 testify in their own trial, they can.  No one can stop them.

10 But if they choose not to, the Judge will tell you, you

11 can't hold that against him.

12       A.    Okay.

13       Q.    There could be a lot of reasons why someone

14 might not want to testify.  They may be real guilty and we

15 could make them look guilty.  They may not be well educated

16 or perhaps they are very shy or have a speech impediment.

17 They might look guilty when they are not on the witness

18 stand.  They may just be following the advice of their

19 lawyer.  Don't think the State has proven the case and he

20 says don't testify.  And they say you are the expert.  Okay,

21 I won't.

22       A.    Okay.

23       Q.    So there could be a lot of reasons and that's

24 why the Court says you can't -- you can't hold that against

25 them in any way.  You just have to consider the evidence on

1    what you hear in the courtroom.

2          A.    Okay.

3          Q.    Could you do that?

4          A.    Yes, sir.

5          Q.    Okay.  All right.  Parole laws.  We hear about

6    parole laws sometimes.  The Judge would instruct you in a

7    capital case if you found someone guilty and they got a

8    capital life sentence, that that means they would have to

9    serve forty calendar years before they became eligible, day

10   for day, and even then that wouldn't mean they would be

11   paroled.

12         A.    Okay.

13         Q.    But the Court will also instruct you that you

14   can't even consider that.  You have to think a life sentence

15   is a life sentence.  And that can't come into your

16   deliberations in any way.

17         A.    Okay.

18         Q.    Sometimes jurors find defendants guilty of

19   lesser included offenses.  One lesser included offense of

20   capital murder, for instance, is aggravated robbery.  If you

21   found somebody guilty of aggravated robbery, the penalty

22   range changes.  You don't get these questions.  It's a term

23   of years, 99 years to life is the maximum and five years is

24   the minimum and anywhere else in between.

25                And what you have to do as a juror is

1    keep your mind open to that full range of punishment.  It's

2    a real wide range because there could be a million different

3    fact situations.  But if, after all the evidence is in, if

4    you think a life sentence should be imposed, you could do

5    that.  You could consider the heavy end.

6                    And, after all the evidence is in, if you

7    think five years, as little as five years, should be

8    imposed, you could do that, or anywhere in between?

9         A.    Okay.

10        Q.    Could you keep your mind open to that full

11   range of punishment?

12        A.    Yes.

13        Q.    And then make your decision just based on what

14   the evidence tells you?

15        A.    Yes.

16        Q.    Okay.  Police officers often are called to

17   testify.  People have a great deal of respect for them.  A

18   lot of people do.  But you can't start them out ahead of any

19   other witness.  You have to wait and judge them like anyone

20   else because there's good police officers and bad police

21   officers.

22        A.    Uh-huh.

23        Q.    And you have to judge their credibility once

24   they hit the stand.  You could do that?

25        A.    Yes.

1      Q.     Okay.  One other area I want to go over.  We

2   ask if you know anyone that's been through the criminal

3   justice system and you had a stepbrother that had some type

4   of theft case and got probation?

5      A.     Yes.

6      Q.     Do you know anything about the facts of the

7   case?

8      A.     No.  It's my stepbrother.  I didn't go -- I

9   just know that he did serve some probation for stealing.

10     Q.     As far as you know, then, was he treated

11  fairly?

12     A.     Yes.

13     Q.     Well, I think that's all the areas.  I went

14  over that pretty quick, but I think that you have a good

15  understanding of the law.  Do you have any questions over

16  anything we have gone over?

17     A.     No.

18     Q.     I appreciate your attention.

19             MR. SHOOK:  That's all the questions I

20  have.

21             THE COURT:  Mr. Sanchez?

22             <u>CROSS-EXAMINATION</u>

23  <u>BY MR. SANCHEZ</u>:

24     Q.     How are you doing?

25     A.     Good.  I'm a little nervous.

1      Q.      Don't worry.  We have to go through this

2  process with everybody that comes up here.

3      A.      Okay.

4      Q.      So like I told you at the beginning, there's

5  no right or wrong answers.

6      A.      Okay.

7      Q.      The reason we go through this process and ask

8  you questions is we're looking for jurors who haven't made

9  up their minds about the case.  We're looking for jurors who

10 haven't made up their mind about the case, who may have

11 heard something about it in the media, but can come here and

12 can tell us that they are going to listen to what happens

13 here in the courtroom and decide the case solely on that.

14 And you have indicated that you can do that --

15     A.      Yes.

16     Q.      -- is that correct?  And, you know, we're

17 looking for people that are down the middle, that are not on

18 either side before they have heard anything and decide it

19 only after they have heard all the evidence.

20     A.      Yes.

21     Q.      And I'm sure -- you are in human resources.

22 Do you interview people and decide whether they get jobs?

23     A.      Every day.

24     Q.      And I'm sure it's happened you look at an

25 application and you are not sure whether that person would

1   be right for your company, but then once you talk to them,

2   because you kept an open mind, you say, wow, this person is

3   great for us, because you didn't prejudge.

4          A.     Yes.

5          Q.     And that's kind of the same process here.

6   It's something serious.  We're talking about a case where

7   you may serve on a jury where it's going to be a life or

8   death situation.  We're looking for people who haven't

9   prejudged and are going to do their job and not be

10  influenced by what other people outside the courtroom may

11  have to say or the social climate or things like that. Does

12  that make sense to you?

13         A.     Yes, it does.

14         Q.     I just want to touch on some things.  You did

15  talk about that you have followed the case in Houston, the

16  mother?

17         A.     I didn't follow it.  I just heard about it.

18         Q.     Had an interest in it?

19         A.     Yeah.

20         Q.     Do you know what the outcome was?

21         A.     I do not, sorry.

22         Q.     Well, okay.  I guess it doesn't make a big

23  difference to you how it ended?

24         A.     No.  That was just one case that I heard that

25  I thought it could potentially include the death penalty,

1    but I didn't ever hear if she got it or -- I don't know.

2         Q.    I don't know if you remember.  You may have

3    heard.  She didn't receive the death penalty.

4         A.    She did not?

5         Q.    No.  She was given a life sentence.  But I

6    think in that case some evidence was presented as to her

7    mental state or mental problems that she had.  So obviously

8    in that case the jurors believed that was mitigating enough.

9         A.    Okay.

10         Q.    But I was wondering what you think about that

11    whole --

12         A.    I didn't follow it, so I didn't really have a

13    strong opinion on it.

14         Q.    Okay.  And I can also tell by you preface most

15    of your statements with depending on the facts.  And, like I

16    said, that's really what we're looking for.

17         A.    I work in HR, so I have to really investigate

18    when someone comes to me with a harassment case or

19    something, so I can't make a decision until I know all of

20    the facts.

21         Q.    Okay.  All right.  And that's what the law

22    contemplates in every criminal accusation.  And -- but what

23    I really need to know from you --

24         A.    Okay.

25         Q.    -- are kind of the same things that the State

1  was asking you, but from this side of the table.

2         A.    Okay.

3         Q.    The -- Mr. Shook took you through the whole

4  process and asked you could you be the type of juror to take

5  pen in hand and answer the questions in a way that would

6  result in a death penalty, and you said that you could.

7         A.    Yes.

8         Q.    What I need to know is, are you the kind of

9  juror, knowing this case has received some media attention,

10  and can take pen in hand and if the case wasn't proven to

11  you beyond a reasonable doubt, are you the kind of person

12  that could take pen in hand and write in a verdict that

13  would result in a not guilty, if the case was not proven to

14  you beyond a reasonable doubt?

15         A.    If it was not proven beyond a reasonable

16  doubt, yes.

17         Q.    And also knowing, again, that the media

18  attention that this case has received, are you the type of

19  juror that if those Special Issues weren't proven to you in

20  the way that would result in a death penalty case, could you

21  take pen in hand and answer them in a way that would result

22  in a life sentence instead of a death penalty?

23         A.    Yes.

24         Q.    And you wouldn't have to worry -- you wouldn't

25  worry about who you would have to answer for your decision?

1    You would do it because you feel that's the thing that had

2    to be done, correct?

3         A.    Yes.

4         Q.    Sometimes we don't phrase questions the right

5    way.

6         A.    Okay.

7         Q.    And sometimes people have concerns about their

8    ability to be fair in a certain case.  Is there something

9    just that either side hasn't asked the right way that you

10   think would affect you being a fair juror on this case?

11        A.    I don't think so, no.

12        Q.    Thank you very much for answering our

13   questions and that's all we have.

14        A.    Thank you.

15             THE COURT:  Be so kind as to wait for us

16   outside and we'll have you back in a few minutes.

17                  [Prospective juror out]

18             THE COURT:  Mr. Wirskye, what says the

19   State?

20             MR. WIRSKYE:  State has no challenge for

21   cause.

22             THE COURT:  Mr. Sanchez?

23             MR. SANCHEZ:  We have no challenge for

24   cause.

25             THE COURT:  Do you need a few minutes?

1          MR. SHOOK:  Sure, Judge.

2                    (Recess)

3          THE COURT:  What says the State?

4          MR. SHOOK:  We'll accept the juror.

5          MR. SANCHEZ:  We accept the juror, Your

6  Honor.

7          THE COURT:  Ask Ms. Davis to come back

8  in, please.

9                    [Prospective juror in]

10         THE COURT:  Ms. Davis, I want to

11 congratulate you.  You have been selected to sit on this

12 jury.

13         PROSPECTIVE JUROR:  Okay.  Thank you.

14         THE COURT:  I have provided a couple of

15 documents there on the corner.  One is entitled,

16 "Supplemental Information Sheet."  We want to verify that we

17 have all your personal data input correctly.

18              You will go back with the Sheriff.  If

19 you notice, probably the copy of your questionnaire, you may

20 wonder what I was doing the whole time on my computer.  I'm

21 making notes.  And she keeps a real time record.  Every word

22 we say she writes down.  I'm making notes for legal issues

23 on my computer, as well as I keep a copy of all of the

24 questionnaires from everybody who has filled one out.  So I

25 printed that for you when you came in this morning and we

1  shred it this afternoon.  We're being careful to secure

2  juror's personal information.  It's under my control and the

3  Sheriff's control and that's it.  Okay?

4                      What we are going to do is verify that to

5  make sure if there's any changes or corrections.  Obviously,

6  I need some additional stuff and this is the second page

7  there.  A fairly detailed juror instruction sheet on where

8  you are from that point forward.

9                      PROSPECTIVE JUROR:  Okay.

10                      THE COURT:  We've got a couple of

11  machines.  Before we start this trial the parties are very

12  satisfied that you understand the law, that you are a very

13  thoughtful, careful person.  But what's going to happen, if

14  you go back to your work and tell your people in the office,

15  I'm going to sit as a juror on this case, all of a sudden

16  they are going to offer their opinions to you.

17                      PROSPECTIVE JUROR:  Yes.

18                      THE COURT:  Because no doubt they know

19  you're here.  And the parties are satisfied with your

20  opinions without any outside influence.

21                      PROSPECTIVE JUROR:  Okay.

22                      THE COURT:  So just -- obviously, you are

23  going to tell your supervisors at work that I need to

24  schedule two weeks for jury service and leave it at that.

25                      PROSPECTIVE JUROR:  Okay.

1              THE COURT:  The Judge has instructed me I

2      cannot talk about this case until it's concluded.  If they

3      don't like it, call me.

4              PROSPECTIVE JUROR:  Everything is

5      confidential at my job, so --

6              THE COURT:  You will also read in the

7      instructions, please do not do any research of any type from

8      any source about this case.

9              PROSPECTIVE JUROR:  Okay.

10             THE COURT:  I think I've covered it.  And

11     I always try to be global.  Everything that you need to

12     learn about this case comes from that witness chair.

13             PROSPECTIVE JUROR:  Okay.

14             THE COURT:  As you have said numerous

15     times this morning, that you will have to wait until you

16     hear the evidence and the facts before you make a decision.

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  The court order is to wait.

19             PROSPECTIVE JUROR:  Okay.

20             THE COURT:  And it's just real simple.

21     It's not fair.

22             PROSPECTIVE JUROR:  Okay.

23             THE COURT:  We believe that you can do

24     that.  That's why you are on this jury.  We've given you a

25     whole lot to think about this morning and I've given you

1   some very -- I won't call them serious instructions, but I

2   expect those instructions to be followed.

3                    PROSPECTIVE JUROR:  Yes.

4                    THE COURT:  Do you have any questions of

5   us?

6                    PROSPECTIVE JUROR:  No.

7                    THE COURT:  Okay.  I'll have you go with

8   the Sheriff.  She's going to go through additional

9   procedures with you.  And you will receive a notice.  We

10  will have -- once I get all the people on the jury -- we

11  don't have everybody in the box now.  Once we have the jury

12  composed, I don't know what date that's going to be, you

13  will be back down here for a subsequent hearing that should

14  last about an hour with everybody here all at once.

15                   PROSPECTIVE JUROR:  Okay.

16                   THE COURT:  That way we just -- there are

17  certain things we can't do until we get the whole jury

18  selected.  And the objective of that is on Monday morning,

19  the 10th of November, at 8:30, the jury will be in the box

20  and the State will present their indictment.  It's not show

21  up at 8:30 and we'll jerk around until 10:30 before we bring

22  the jury in.  You will find I'm very mindful of your time.

23  I like to say, my mother would say, I'm considerate of your

24  time because we're using your time.

25                   So the best thing that I can do is run on

1  time.  I've had the jurors complain, Judge, give us a break.

2  We work real normal hours.  And the DA's, they want a break,

3  and the defense lawyers, they want a break, but we start on

4  time, take breaks, and we quit when we should.  Because you

5  have got -- did you say you have children?

6                  PROSPECTIVE JUROR:  Yes, I do.

7                  THE COURT:  And you read in the guide

8  that we work normal business hours.  You can count on it.

9  You will be able to use the phone during the breaks.  During

10 the lunch hour, you will be able to use the phones.

11                 The question may come up, Judge, do you

12 think we might be sequestered?

13                 PROSPECTIVE JUROR:  I was going to ask if

14 we got to go home every night.

15                 THE COURT:  I try to anticipate as much

16 as I can.  The answer is as long as the jurors follow my

17 instructions --

18                 PROSPECTIVE JUROR:  Okay.

19                 THE COURT:  -- and don't communicate to

20 anybody about this case, the answer will be, yes, you get to

21 go home at night.  Now, for example, if at some point when

22 the jury is out deliberating, all the evidence has been

23 offered, the attorneys have argued, and you go to the jury

24 room with the law that I hand you, at that point no one will

25 have contact with you.  That's when the jury is out

1    deliberating.

2                    PROSPECTIVE JUROR:  Uh-huh.

3                    THE COURT:  Let's say that they work all

4    day and they still haven't reached a verdict.  At that point

5    you would be sequestered.

6                    PROSPECTIVE JUROR:  Okay.

7                    THE COURT:  But the Sheriff will give you

8    heads up and you will have plenty of time to prepare if that

9    opportunity should arise.  And that decision is solely

10   within the decision of the jurors.  Sometimes they do and

11   sometimes they don't.  I cannot predict.  I will just tell

12   you it's possible.  But during the trial on the regular days

13   of hearing testimony, you will go home on time, I promise.

14                   PROSPECTIVE JUROR:  Thank you.

15                   THE COURT:  Be so kind and continue with

16   Ms. Davis in the back.

17                       (Recess)

18                   THE COURT:  Mr. Stotts.

19                       [Prospective juror in]

20                   THE COURT:  Good afternoon.  How are you?

21                   PROSPECTIVE JUROR:  Good.  How are you?

22                   THE COURT:  Juror 1697, Mr. Dana Matthew

23   Stotts?

24                   PROSPECTIVE JUROR:  That's correct.

25                   THE COURT:  You go by Dana?

1    PROSPECTIVE JUROR:  Dana.

2    THE COURT:  Welcome to the 283rd.  And

3  you see it is 1:30.  Have you had enough time to read the

4  guide I have provided for you?

5    PROSPECTIVE JUROR:  Yes, I did.

6    THE COURT:  And look over your

7  questionnaire that you filled out for us in May?

8    PROSPECTIVE JUROR:  I did not have a

9  chance to look over the questionnaire.

10    THE COURT:  They may refer to a specific

11  question.  That's why I provided it for you because you did

12  that several months ago.  And they look at a question, what

13  did you think when you made that answer?  And you can refer

14  to it.

15    As you can tell, I did run on time

16  because we're using your time and we appreciate you being

17  here.

18    PROSPECTIVE JUROR:  I appreciate it.

19    THE COURT:  One rule of thumb here, there

20  are no wrong answers.  All we want are your honest opinions.

21  We have given you the guide to get you to start thinking

22  about the area of law we're going to be talking about.  It's

23  important that you understand it.

24    At the end of the process, I will have

25  two questions I must answer.  Number one, do you understand

1  the law?  Number two, can you follow the law?  That's the

2  big picture I have to look at.

3                 PROSPECTIVE JUROR:  Okay.

4                 THE COURT:  The lawyers can confuse you

5  real easily, so don't let them do that.  If they do, just

6  say ask the question again or I don't understand and be

7  sure.  This is the only time that you have the opportunity

8  to communicate with the Court.  The rest of the time they

9  have to read your mind.

10                 PROSPECTIVE JUROR:  Okay.

11                 THE COURT:  Do you have any problems

12  serving this Court for two weeks beginning on November 10th?

13                 PROSPECTIVE JUROR:  My only concern is

14  that I -- since I filled this questionnaire out, my job -- I

15  am in Chicago two weeks out of the month, every other week.

16                 THE COURT:  Every other week.  And, I'm

17  sorry, I've read so many.  How are you employed, sir?

18                 PROSPECTIVE JUROR:  I work for a

19  marketing agency.

20                 THE COURT:  This is not "Wheel of

21  Fortune".  Which one is it?

22                 PROSPECTIVE JUROR:  It's -- well, it's

23  Crosscut Marketing here in Dallas.  Part of Crossmark and

24  we're merging with Jay Brown and Associates.  And I work for

25  Jay Brown and Associates in Chicago and Crosscut in Dallas.

1    THE COURT:  So you are walking the

2    balance?

3    PROSPECTIVE JUROR:  Yes.

4    THE COURT:  If push came to shove and you

5    told your employer in Chicago, look, I've been impaneled on

6    a jury, it will take two weeks, and I need to schedule this

7    week off -- you would be able to use the phone.  You

8    wouldn't be sequestered.  You could have some contact with

9    your office.  Is it possible?

10   PROSPECTIVE JUROR:  It's possible.

11   THE COURT:  I know it would be difficult.

12   It's like paying taxes.  Nobody wants to do it.

13   PROSPECTIVE JUROR:  Right.  And it's

14   possible.

15   THE COURT:  That's why we do this, this

16   far in advance so you can set your schedule.  Mr. Wirskye?

17   MR. WIRSKYE:  May it please the Court.

18   DANA STOTTS,

19   having been duly sworn, was examined and testified as

20   follows:

21   DIRECT EXAMINATION

22   BY MR. WIRSKYE:

23   Q.    Mr. Stotts, how are you this afternoon?

24   A.    Good.  How are you?

25   Q.    Good.  My name is Bill Wirskye.  I'm the

1  Assistant DA that will be visiting with you the next few

2  minutes. I don't intentionally try to confuse anybody.

3  Sometimes I confuse myself. If you have any questions or

4  you think you have a trick question coming or something,

5  just stop me and ask me and I'll try to explain a little

6  better, a little more clearly.

7           What I would like to do is follow up on

8  some of the information in your questionnaire that you were

9  kind enough to provide us in the 16, 17 pages, talk to you a

10  little bit about what you think about the death penalty,

11  since this is a case where the State of Texas is seeking the

12  death penalty, then, finally, maybe talk to you a little bit

13  about the law that applies in a death penalty case and the

14  law that applies generally in any criminal case.

15           What did you think about getting notified

16  and coming back for an individual interview on a death

17  penalty case?

18      A.     It was a shock.

19      Q.     Why was it a shock?

20      A.     I don't know. I don't know. I just really

21  didn't think out of all the people that I'd be selected, so

22  -- and interesting. I've never served on a jury before, so

23  --

24      Q.     Did you think just the matter of numbers you

25  had a pretty good chance of not being selected --

1    A.    Yes.

2    Q.    -- or something you said in the questionnaire?

3    A.    Yeah.

4    Q.    Just numbers?

5    A.    Just numbers.

6    Q.    Do you have any hesitations going into a --

7  potentially ending up in the jury box and being a juror on a

8  death penalty case?

9    A.    Um, you know, the only hesitation that I would

10 say that I would have is actually having to make that

11 decision of having someone's life in my hands.  And as you

12 will probably -- we'll probably get into is I'm prodeath

13 penalty, but when push came to shove, actually having to

14 make that decision, that's my only hesitation.

15   Q.    We talk to a lot of people.  You know, most of

16 the people we talk to individually at least are in favor of

17 the death penalty.  Some people tell us, very frankly, you

18 know, philosophically or in the abstract, I'm in favor of

19 it, but when it comes down to actually getting this close

20 and this real in the process and looking at a living,

21 breathing human being and knowing kind of what the State is

22 asking you to do, it takes on a very different feel.  And

23 it's just a little too uncomfortable.  We'll probably talk

24 about that a little bit more in a second.

25         But I know you are in marketing, but what

1   exactly -- what is a normal day like for you?

2        A.    I'm in the account services field of marketing

3   agency, so basically I work with all of our clients to keep

4   the process going.  I'm focused in the consumer package

5   goods industry, more promotions marketing, in-store

6   marketing, than typical advertising.  So we -- my new role

7   has me in Chicago two weeks out of the month is with a dairy

8   marketing company.  And so, ahh, the power of cheese, all

9   that stuff, we do all that stuff in the store.

10        Q.    All right.  And you've been in that, looks

11   like, I guess, since you got out of school?

12        A.    Yes.

13        Q.    And you lived in a bunch of different cities.

14        A.    Missouri, Memphis, Dallas, and maybe Chicago

15   soon.

16        Q.    How long have you been in Dallas?

17        A.    It will be four years in January.

18        Q.    What do you think about Dallas?

19        A.    Love it.

20        Q.    What do you think about Texas?

21        A.    Love it.

22        Q.    Is it a good chance you may move up to

23   Chicago, though, for work?

24        A.    Yes, it is.  I was born in Illinois, so it

25   would be a chance for me to get back home.  When that is, is

1   probably not until early next year.

2        Q.      Nothing we need to be concerned about possibly

3   with a November trial?

4        A.      Unless there's something I don't know, no.

5        Q.      Okay.  You told us, I guess generally or kind

6   of philosophically, in the abstract, I guess, you are in

7   favor of the death penalty?

8        A.      Yes.

9        Q.      I'm just curious what purpose you think it

10  serves or why you are in favor of it?

11       A.      I just think that the punishment fits the

12  crime.  And if you take someone's life, then your right to

13  your own life is lost.

14       Q.      Okay.  Is there a particular type of case that

15  comes to mind when you think about an appropriate type case

16  for the death penalty?

17       A.      Um, well, I would say the case in question

18  here.  I mean, when it's a violent act against someone like

19  that and it was just such a brutal act, then that certainly

20  would be the case for the death penalty.  Anything against

21  children.  Anything, you know, sexual act against someone,

22  an elderly person, anything like that, to me is not that any

23  death or murder is okay.  But --

24       Q.      Sure.

25       A.      -- those types are the ones that really make

1  you feel that the death penalty is appropriate.

2       Q.       Okay.  Looking through that packet of law that

3  the Judge gave you, that pretty much reflects what our law

4  is in Texas.  We just reserve the death penalty for murder

5  cases and then only a certain type of murder case, a subset

6  of murder cases.  If you kill a police officer, a fireman,

7  prison guard on duty, commit an intentional murder during

8  the course of a robbery.  Burglary, somebody breaks into

9  your home.  A rape, that type of deal or mass murder, serial

10  murder, murder for hire.

11           Looking at the questionnaire, it looks

12  like maybe if you were Governor of Texas for a day, you

13  might expand that group where it's available, maybe a rape

14  case or certain crimes against children?

15       A.       Yes.

16       Q.       But just knowing what the law is in Texas, is

17  that something that you are comfortable with?

18       A.       Yes.

19       Q.       In terms of when it applies?

20       A.       Yes.

21       Q.       You know, we always ask people to kind of rank

22  themselves on a scale of 1 to 10.  I think that question

23  says, you know, how much you are in favor of the death

24  penalty, how strongly you feel about the death penalty, 1

25  being the least and 10 being the most, and you gave yourself

1 a 10.

2     I know that means different things to

3 different people and I'm curious what that meant to you when

4 you kind of assigned yourself that number 10?

5    A.  I just think that there's very few cases that

6 I would be against it, the death penalty.  I really do,

7 especially in cases like we are talking about here where

8 it's -- and as I read that as it applies to Texas law, there

9 would be very few instances where I would be opposed to it.

10    Q.  Let me take you to the next step.  Oftentimes,

11 you know, I think when we think about a death penalty case,

12 we think about maybe the guy going in and robbing a 7-Eleven

13 and shooting and killing the clerk and committing capital

14 murder that way.

15     Oftentimes crimes are committed by more

16 than one person, of course, a group or gang of people that

17 commit a crime.  The law allows us to prosecute everybody

18 that was actively involved in a crime, whether it be

19 shoplifting or all the way up to capital murder.

20     When you are talking about that context

21 of capital murder, you may have a situation where you have

22 one person who's, for lack of a better word, the triggerman,

23 the person that actually caused the death.

24     And then you may have some other people,

25 who, although they were actively involved, they didn't

1  actually cause the death, the nontriggermen.  A word you

2  hear a lot is accomplices.  In Texas we call it parties to a

3  crime, but, basically, they are accomplices.

4              The law allows us not only to prosecute

5  for capital murder the triggerman, who may be convicted and

6  ultimately face the death penalty, but also the accomplices,

7  the nontriggermen.  That's the law in Texas.

8              A lot of people we talked to who are very

9  strongly in favor of the death penalty kind of draw a line.

10 And they kind of make a distinction, I guess, between the

11 triggerman and the nontriggerman and they may be strongly in

12 favor of the death penalty for the person that actually

13 pulled the trigger and caused the death.  But if it were up

14 to them, for whatever reason, religious, moral, or ethical,

15 they would just take the death penalty off the table for the

16 accomplices, the nontriggermen.

17              And they -- I guess a lot of people tell

18 us they only feel like the death penalty is justified for

19 the person that actually took the life, you know, they may

20 want to punish the accomplice and give them life in prison,

21 but they don't feel the death penalty is appropriate.  How

22 do you come down on that issue?

23      A.     Boy, that would be a case -- I would have to

24 understand exactly the circumstances of what happened on

25 each case.  I don't really think I would say that I totally

1   agree with having the triggerman having -- getting the death

2   penalty and the others not.  I would -- I would want to hear

3   the details to understand the entire picture and then I

4   would be open, depending on the situation, to have the

5   accomplices get the death penalty.

6        Q.   Okay.  And that's basically what our law

7   envisions.  It's on a case by case or factual basis.  I

8   wanted to make sure you are not one of those people that

9   feel strongly that under no circumstances should the death

10  penalty ever be given to an accomplice.

11       A.   That's not the case.

12       Q.   Okay.  Let me ask you this.  You mentioned

13  twice that you know something about this case?

14       A.   Uh-huh.

15       Q.   Almost everybody we talked to knows something.

16  Kind of looking at your questionnaire and you kind of

17  indicated to me that you may know more than the average

18  person.  And I'm just curious what kind of exposure you have

19  had to the facts of this case.

20       A.    I watched the news and obviously there was a

21  lot of coverage on it and on the internet a lot, so I have

22  surfed the internet and just looked up general details of

23  the case.  So I will say that I know not a lot about it, but

24  more than probably the average person.

25       Q.   How do you think that might affect you?  You

1   know, we kind of recognize, I guess, that not everyone is a

2   perfect juror in every case and this case is a little

3   exceptional in the sense of the exposure it had.  It affects

4   some people differently.  Some know more about it and some

5   less.  Some people, very frankly, have told us, I have

6   already formed some opinions, some conclusions.  I don't

7   think that I would be the right juror in this case, in all

8   honesty, to give a fair trial to both sides.  Where do you

9   come down on that?

10          A.      I certainly have formed my opinions based on

11  what has been presented in the media and based on what is on

12  the internet.  So as far as being a juror on this case, I

13  don't know.  I don't know all the details of everything, so

14  -- but I certainly have an opinion.

15          Q.      Okay.  And what is that opinion?

16          A.      Um --

17          Q.      It's okay to tell us.

18          A.      I feel that he's guilty and I would go for the

19  death penalty.

20          Q.      Okay.  And that is based on what you have

21  heard in the media?

22          A.      Yes, sir.

23          Q.      It looks like something you feel pretty

24  strongly about?

25          A.      Yes, sir.

1   Q.   Okay.  Is it something that I guess if you sat

2   in the jury box, it would always kind of be in the back of

3   your mind, since you do know about the case?  And I'll tell

4   you, very frankly, what the law is.  You know, we don't

5   require people to have never heard anything about the case.

6   What we do require is the people that serve on the jury can

7   kind of put whatever they've heard in the back of their mind

8   and just base their verdict on what they hear in the

9   courtroom.

10           And a lot of people tell us, especially

11   in this case, just to be honest to both sides, I just

12   couldn't do it.  I know too much about it.  The conclusions

13   I have formed and the impressions that I have are just too

14   strong.  I'm not comfortable being a juror in this case and

15   I don't think that I could follow the law in that respect.

16   And that's kind of where I see you going.

17   A.   It would take a lot -- it would take something

18   for me to really change my opinion, it really would, that

19   hadn't been in the media.  And I don't know if there is

20   anything like that.  And it would take -- and, you know, I

21   think that I could listen impartially, but I would still

22   have something -- I would be waiting for that thing, okay,

23   well, that's it.  But other than that, I would have my

24   opinion already formed.

25   Q.   And that's why we ask everybody.  You know

1   yourself better than anyone.  You are the only person that

2   can answer it.  Very frankly, both sides rely on you to be

3   honest.  And it sounds like maybe you are probably not the

4   best juror, at least for Mr. Murphy in this case.

5          A.      Okay.

6                      MR. WIRSKYE:  Pass the juror.

7                      MS. BUSBEE:  Your Honor, we think that we

8   have reached an agreement on this juror.  We have an

9   agreement.

10                     THE COURT:  Thank you, Mr. Stotts.  As

11  Mr. Wirskye said, this case is not for you and the parties

12  have agreed to excuse you.  And we appreciate your honestly

13  and coming on down.

14                     [Prospective juror out]

15                     THE COURT:  Mr. Fuller.

16                     [Prospective juror in]

17                     THE COURT:  Good afternoon, sir.  How are

18  you?

19                     PROSPECTIVE JUROR:  Just fine.

20                     THE COURT:  Juror No. 2557, Mr. Floyd

21  Jeffery Fuller.  Mr. Fuller, have you had an opportunity to

22  read the guide I prepared for you?

23                     PROSPECTIVE JUROR:  Yes.

24                     THE COURT:  Look at your questionnaire

25  that you filled out for us in May?

1      PROSPECTIVE JUROR:  Yes.

2      THE COURT:  Just by your number I can

3 tell you that you are not -- this was not your first date.

4 You called in a reschedule; is that correct?

5      PROSPECTIVE JUROR:  That's correct.

6      THE COURT:  Were you going to be out of

7 town?  I don't remember the exact thing.

8      PROSPECTIVE JUROR:  I would be out of

9 town next week.

10      THE COURT:  We got you in a little early

11 and hopefully you didn't have to wait too long to get in.

12 This is a juggling act, so we don't waste people's time.

13 And we do appreciate your service to this Court.

14      The issues today, the attorneys will be

15 talking to you about the law that I provided for you.  They

16 may follow up on some of the answers that you provided in

17 your questionnaire, and that's why you have it there to

18 refer to.  If they say, what did you mean by that answer,

19 you would have it in front of you.

20      The objective here at the end of the

21 process is twofold for me.  I have to determine, number one,

22 do you understand the law?  Secondly, if you understand the

23 law, can you follow the law?  Big picture.

24      Only question I have for you at this time

25 is will you be able to serve this Court for two weeks

1   beginning on November 10th?

2                         PROSPECTIVE JUROR:  Yes.

3                         THE COURT:  I'll turn it over to

4   Mr. Shook.

5                         MR. SHOOK:  May it please the Court.

6                         FLOYD FULLER,

7   having been duly sworn, was examined and testified as

8   follows:

9                         DIRECT EXAMINATION

10  BY MR. SHOOK:

11        Q.     Mr. Fuller, my name is Toby Shook.  I'm going

12  to speak to you on behalf of the State this afternoon.  And

13  as the Judge said, we're just interested in your honest

14  opinions.  You have been very forthcoming in the

15  questionnaire.  I'm going to follow up on a few things that

16  you wrote about there and talk about capital murder, the

17  death penalty, how you feel about that and some of the laws

18  and rules that apply to these types of cases.

19                        I see from your questionnaire you are the

20  Director of Parks and Recreation in Farmers Branch; is that

21  right?

22        A.     That's correct.

23        Q.     Tell us on a day-to-day basis what your duties

24  are there.

25        A.     Basically, I see -- oversee the operations of

1  our Parks and Recreation Department, which includes the

2  recreation center, senior center, 29 parks, athletic fields,

3  and then I'm also over building maintenance of all the

4  facilities in the city.

5      Q.    All right.  In the questionnaire you also said

6  that you had a neighbor named Frank Shore, who I know he

7  practices some criminal law.  How well do you know Frank?

8      A.    I've known Frank 15 years, pretty well.  His

9  son and my son grew up together playing sports.

10     Q.    All right.  More of the just a neighbor then?

11     A.    Yes.

12     Q.    Does he ever discuss his cases with you or

13  anything like that?

14     A.    No.

15     Q.    I see you served on a civil case?

16     A.    Yes, sir.

17     Q.    Involved the Delta crash some years ago?

18     A.    That's correct.

19     Q.    Someone who viewed the accident?

20     A.    Yes, sir.

21     Q.    And the verdict looked interesting to me.

22  Fined the plaintiff one dollar?

23     A.    Yes, sir.

24     Q.    How long did that trial go on?

25     A.    It lasted one day.

1        Q.      Really?

2        A.      Yes, sir.

3        Q.      Okay.   How about the deliberations.   What were

4   they like?

5        A.      They were quick.

6        Q.      Okay.

7        A.      Probably took an hour at the most.

8        Q.      All right.   Any thoughts or impressions from

9   that particular case?

10       A.      No, sir.

11       Q.      Have you ever been down here on any criminal

12  case at all?

13       A.      No, sir.

14       Q.      Well, obviously, this is, you know from what

15  the Judge has told you and the questionnaire, that this is a

16  capital murder in which the State is seeking the death

17  penalty.   So we talk to each juror how they feel about

18  capital murder.

19               On your questionnaire you said that you

20  were in favor of it.   I would like you just to follow up

21  with that and tell us in your own words why you favor it and

22  maybe the purpose you feel the death penalty serves society.

23       A.      I think that the death penalty is a deterrent

24  to criminals, particularly in cases where I consider the

25  crime to be heinous, such as the murder or killing of

153

1 children or premeditated.

2       Q.      Any cases you have followed in the media

3 locally or nationally that you thought were cases worthy of

4 consideration of the death penalty?

5       A.      Yes, sir.

6       Q.      What were those?

7       A.      I believe it was the one in Plano where that

8 little girl was kidnapped at the playground.

9       Q.      Okay. Crimes against children, obviously, a

10 lot of jurors tell us that. What other crimes come to mind

11 from your personal point of view that you would think or at

12 least have consideration of the death penalty? What types

13 of crimes?

14       A.      I would guess an example would be if somebody

15 broke into a home where the elderly or something and, you

16 know, really killed them or cut them up or did something.

17 Or something that was premeditated, I have a problem with

18 that, yes.

19       Q.      Okay. Lots of jurors use that term

20 "premeditation". I think it's because we grew up watching

21 "Perry Mason" and that sort of thing. In Texas there is no

22 requirement of premeditation.

23       And when I think of premeditation, I

24 think what most jurors think of is something that is thought

25 out ahead of time.

1    A.    That's correct.

2    Q.    And in Texas what you have to have in a murder

3 case is an intentional killing.  To be intentional the

4 definition is basically they formed the intent, a specific

5 intent, to kill and they act upon it.  That may be, in fact,

6 premeditation.  They could think about it days or hours

7 ahead of time or it could be formed in just a few seconds,

8 also.  But they have to have that intent in order to commit

9 murder.

10          And it can't be in self-defense, can't be

11 an accident, that sort of thing.  Once in a while we get a

12 juror that says they actually, their personal requirement in

13 a death penalty case would be the planning out of a killing.

14 Most jurors agree or they have no objection to the laws as

15 far as just intent could actually be formed in a matter of

16 seconds.  It's the actual wanting to do that act which is

17 important to them.

18          How do you feel about that?  Are you

19 comfortable with intent being --

20    A.    I'm comfortable with intent, yes, sir.

21    Q.    Okay.  In Texas there are only certain murder

22 cases which fall under our death penalty statute and they

23 are probably all included in the packet.  I want to go over

24 a few of those.  It's an intentional killing.  But not all

25 intentional murders are the death penalty.  We have a lot of

brutal killings.

I could pull a gun out now and maybe I don't like the tie or shirt that Mr. Wirskye is wearing or he said some joke I didn't like and I could shoot him in the head, empty the gun into him. And I could laugh about it and be brutal and callous. I couldn't get the death penalty. I could get a life in prison or 99 years, but I couldn't get the death penalty.

In Texas the death penalty is reserved for an intentional killing with some other aggravating fact, such as an intentional killing in the course of a felony. Someone that is committing a robbery, they rob the 7-Eleven clerk, shoot them intentionally, that could be a death penalty case. Breaking into someone's home could be a death penalty case. Sexual assault during a rape or kidnapping or an arson.

Also, specific individuals, such as a police officer on duty, fireman on duty, a prison guard on duty, and a child under the age of six, that could be a death penalty situation, as well as murder of more than one victim in the same type of transaction like a serial killer or mass murder situations or the hitman situation, where someone just does it for money.

But specifically those are the types of cases. And that list, are those the types of cases from

1  your personal point of view that you think could be

2  appropriate for the death penalty?

3      A.      Yes, sir.

4      Q.      Okay.  Now, when we think of capital murder

5  and the types of cases that are appropriate, we

6  automatically think of examples in our mind.  That's just

7  natural.  And we always think of the example of the actual

8  triggerman or, for instance, the example I used in going to

9  the 7-Eleven and shooting that clerk.

10          But the law contemplates that more than

11  one person may commit capital murder, just like any crime.

12  There may be groups of individuals.  Some may have a greater

13  role than others.  And in a capital murder situation you may

14  have one person actually committing the murder, but others

15  assisting in the crime.

16          The law says that everyone who assists in

17  the crime can be held accountable, depending on the facts.

18  Ultimately, they may even receive the death penalty.

19          Let me give you an example.  Mr. Wirskye

20  and I decide we want to go rob the bank in our neighborhood.

21  The plan we come up with is I've got a gun and ammunition

22  and we get a big bag and I'm going to go in and I'm going to

23  be the person who pulls the gun out and threatens everyone

24  and tells everyone not to move.  And while I'm doing that,

25  he goes behind the counters and starts loading up the cash

1   out of the drawers.

2               During the course of that robbery,

3   someone does something I don't like.  Maybe I don't like the

4   way they are staring at me.  Maybe Mr. Wirskye warns me that

5   someone is going for a silent alarm and I shoot them

6   intentionally.  We leave, but we're caught.

7               Obviously, I could be prosecuted for

8   capital murder.  I could receive the death penalty because

9   I'm the triggerman and that was during the robbery.  But

10  under the law Mr. Wirskye can also be prosecuted for capital

11  murder because he's actively participating in that crime,

12  and depending on the facts of each case he could ultimately

13  receive the death penalty.

14              But each juror we like to ask their gut

15  reaction about that because some folks draw the line.  They

16  are for the death penalty in situations involving the actual

17  triggerman.  And in a situation involving an accomplice,

18  they would draw a line there.  If it were up to them, they

19  would not have the death penalty for those cases, maybe a

20  long prison sentence.

21              We have other jurors that say, no, a

22  nontriggerman, an accomplice, should be held accountable in

23  some cases depending on the facts that are involved and that

24  sort of thing and, no, they wouldn't draw a line and, in

25  fact, could give the death penalty to them.  They think

1  that's a fair thing to do.

2             But every juror feels differently and

3  there's no right or wrong answers.  So we like to ask every

4  juror their gut reaction to that law.  How do you feel about

5  the prosecution of accomplices in these types of cases?

6  A.    I believe that if the accomplice did not go in

7  with the intent of anybody getting hurt and his partner did

8  the murder, got mad and did the murder, then that individual

9  -- I would have a hard time giving them the death penalty.

10  I'm sorry.

11  Q.    If it were up to you, would you not have the

12  death penalty for accomplices?

13  A.    Not necessarily, no.

14  Q.    What, then, from your own personal point of

15  view, what is -- what's the reason or what would be the

16  logic in prosecuting accomplices in certain cases for the

17  death penalty?

18  A.    Well, if somebody went in to rob a bank and

19  the guy is holding the gun and the accomplice there is

20  taking money and said, shoot him, or something like that,

21  and the guy shoots him, then I would hold both of them

22  accountable for that, then.

23  Q.    Okay.  So more or less, if he gives the orders

24  to shoot or something like that?

25  A.    That's correct.

Q.     Situations you have a problem with is if the other person is acting on his own and you don't think the other person has that intent?

A.     That's correct.

Q.     Okay.  What the law says is we can prosecute that from the situation if they are participating, encouraging, helping, that sort of thing.  Or under the conspiracy theory, that is, if we conspire to commit one crime, we agree to commit one crime, bank robbery, and during the course of that, one of us commits another felony to further it, in this case I'm shooting people to further the robbery, then we both can be found guilty if the jury believes that the accomplice should have anticipated a life could be taken.

And, in fact, to get them guilty under the law the State does not have to prove that they intended anyone to die, that the law is simply they should have. They could sit there and say, don't shoot them.  But if the jury believes that they should have anticipated, under the law they can be found guilty.

Some jurors agree with that and some people don't.  They think maybe he should be found guilty of another crime, bank robbery, perhaps, but not capital murder.  How do you feel about that conspiracy law where a person --

1   A.      If they conspired earlier before the event,

2   then they can be held accountable.  I think if they are

3   together and they say we're going to rob the bank and if

4   anybody gives us any trouble, we're going to shoot them and

5   everybody is aware of what they are saying, then as far as

6   I'm concerned, he's guilty, too.

7   Q.      Okay.  But the situation on the guilt -- and

8   this is where I want to concentrate on right now, guilt for

9   capital murder, is, in that situation, the law is they

10  should have anticipated.  And the accomplice doesn't even

11  necessarily have to have the intent that someone die.  He

12  can stand up and say, I don't want anyone to die.  But if

13  the facts show it was a situation where he should have

14  anticipated that might happen, they can be found guilty.

15  Now, do you agree with that situation?

16  A.      Yeah.  I don't have a problem with that.

17  Q.      Even though the person doesn't have that

18  intention --

19  A.      Yes.

20  Q.      -- anyone die?  Okay.  And get into another

21  area of the law, now, to get the death penalty at that

22  point, we have to prove that they did anticipate.  What it

23  comes down to is a person's intent.  How do you think the

24  State can prove a person's intent in a crime, their

25  intentions?

1        A.     I'm not sure of the question.

2        Q.     Well, when we talk about a person's intent we

3   can't take the defendant and, obviously, open up the top of

4   their head and go, here's what they were intending to do.

5   All we can do as a prosecutor is produce all the relevant

6   evidence, what we know or what can we produce before the

7   crime, during the crime, and after the crime.  I guess we

8   could, but usually we don't, we don't have witnesses to the

9   planning stage and that sort of thing.

10              But jurors can draw reasonable

11  deductions, use their common sense, and look at a person's

12  actions in a crime.  And then we argue what their intents

13  were.  And I think this is what people do every day and I'm

14  sure that you do.

15       A.     Yeah.

16       Q.     You obviously deal with a lot of folks during

17  the day and personnel decisions and that sort of thing and

18  you have to determine their intent and those decisions.  And

19  that's what we have to do in this type of a case.

20              Are you comfortable in a capital murder

21  situation in determining what a person's intent was, whether

22  they anticipated someone would die and that sort of thing,

23  just from their actions from the scene and the other

24  relevant evidence?

25       A.     I believe that I could draw a conclusion, yes,

1   sir.

2       Q.    Okay. Fair enough. Let me ask you before I

3 go further, all the jurors have heard a little bit about

4 this case because it had a lot of publicity. You said you

5 saw something on the TV and newspaper. Kind of tell us what

6 you remember about the case.

7       A.    The most I remember is I believe they were in

8 Colorado when they were captured and in a trailer home. I

9 do remember the night I think it happened or the day it

10 happened was on the news. And the big thing that I remember

11 was what they considered the manhunt or the statewide hunt.

12       Q.    Did you follow any of the subsequent court

13 proceedings?

14       A.    No.

15       Q.    Okay. As I said, most jurors have read or

16 seen something on TV. The law is this. If you are chosen

17 to sit as a juror, you have to make your decision based only

18 on what -- on what you hear from the witnesses in the

19 courtroom, not anything you heard on TV or read in the

20 newspaper. You can't let that influence you. We can't very

21 well ask you to forget it, but you can't let that influence

22 you, because common sense will tell you that the most

23 accurate information is going to come from the witnesses.

24 Can you follow that rule of law?

25       A.    Yes, sir.

Q.      Okay.   Now, in Texas a capital murder trial is divided into two parts.   There's the guilt/innocence stage where we have to prove the person is guilty.   If we don't do that, obviously, we all go home with a not guilty finding. But if we do do that, the trial is not over.   You have the punishment stage where you get additional evidence or can get additional evidence and then you get these questions. And I'm going to go over in detail the questions in a moment.

But basically what the State must prove in the punishment phase is that the defendant is a continuing danger, that he anticipated that a life would be taken, and that there's no mitigating evidence that would cause a jury to give him a life sentence.   And they are yes or no questions.

If they are answered yes, yes, and no, the Judge has no discretion.   He would sentence the defendant to death.   If they are answered any other way, again, he has no discretion.   He would sentence him to life. But those are the only two possible outcomes is a death or life sentence.   It's not written in, but it's determined by how you answer those questions.

The procedures are the same in each case. Are you familiar with the method of execution in Texas?

A.      Yes.

Q.    Lethal injection?

A.    Yes.

Q.    You know from growing up in Texas, living here, and you follow the news, that Texas is actually a state that not only prosecutes the death penalty, but actually executes persons found guilty and sentenced to death at some point in time.  There are some states that have it, but they never actually carry it out.  But it's a very real punishment in Texas.

And it's one thing for us to talk about philosophically for the death penalty and it's another once you start thinking about actually participating in something like that.  Because to be, you know, to lay our cards out on the table, it's our goal, we feel we have the type and quality of evidence that will prove the defendant guilty. We feel we can convince a jury that these questions will be answered in a way which will result in the defendant's execution, that he will lie dead on a gurney someday in Huntsville, Texas.  The defense takes the opposite view, and that's why we talk to each juror individually.

You have told us that philosophically you are for the death penalty, that philosophically you are for the prosecution of the death penalty for accomplices, depending on the facts.  As best you know yourself, do you feel that you are the type of person who could listen to the

1   evidence, make these decisions, take pen in hand, and if we

2   prove these things to you, write in those answers, knowing

3   that the defendant would be executed someday?

4          A.      Yes, sir.

5          Q.      Okay.  Let's talk, then, for a minute about

6   these Special Issues and I'll ask you to kind of read

7   Special Issue No. 1 to yourself.

8          A.      (Prospective juror complies.)

9          Q.      That is asking the jurors to make a prediction

10  about how the defendant will behave in the future.  Do you

11  think you could answer that question, if you are given

12  enough information?

13         A.      Given enough information, yes.

14         Q.      What kind of things would you want to know

15  before you answer that question?

16         A.      What kind of crimes was committed in the past,

17  things of that nature.

18         Q.      That's what most people tell us and that kind

19  of evidence is admissible in that portion of the trial, if

20  it exists.  A person's past, we can even, if they are

21  available, produce the witnesses and that sort of thing,

22  what type of punishment they had.  You can also hear good

23  things, good and bad, about the defendant from their past.

24  And you also get to reconsider their role in the crime and

25  the brutality of the crime and what happened and that sort

1    of thing, also.  Everything you have heard in the

2    guilt/innocence stage and then any new evidence you hear in

3    the punishment stage is what you consider here.

4                    It starts out with a no answer and the

5    State has to prove to you it should be answered yes.  We

6    have to prove that to you beyond a reasonable doubt, again,

7    using the evidence you have already heard as well as any new

8    information that you heard in the punishment stage.

9                    The fact that you have just found the

10   defendant guilty of capital murder doesn't mean you would

11   answer yes that they are a danger.  That very well may be

12   the case, but the law contemplates there are no automatic

13   answers, otherwise there would be no need for any further

14   deliberations.  It contemplates that you will wait, listen

15   to the new evidence in the punishment stage, then go back in

16   the jury room and make your decision, require the State to

17   prove it.

18                   Could you follow the law on that, under

19   that area, and require the State to prove to you beyond a

20   reasonable doubt that this question should be answered yes?

21       A.     Yes, sir.

22       Q.     Okay.  We have to prove that there's a

23   probability that the defendant would commit criminal acts of

24   violence.  What does "probability" mean to you?

25       A.     "Probability" means that if he's released from

1   prison again, that the odds are good that he would commit

2   another crime.

3        Q.    That's what most people tell us.  Parameters,

4   the words are going to be up to you, the definitions.  You

5   will get legal definitions in the first part of the trial on

6   some other things, but not on these words in these

7   questions.

8              I can give you a couple of guidelines.

9   "Probability" doesn't mean a certainty.  We could never

10  prove a certainty to you, obviously.  But it's more than a

11  possibility because anything is possible.

12             "Criminal acts of violence", what does

13  that mean to you?

14       A.    It's where he committed a crime and he was --

15  either had a gun or some type of weapon or injured somebody

16  during the crime.

17       Q.    Okay.  His potential to be violent to some

18  other human being, that sort of thing?

19       A.    Yes, sir.

20       Q.    And then continuing threat to society, what

21  does "society" mean to you in that question?

22       A.    Basically the human race.

23       Q.    Any humans they may come into contact with?

24       A.    Yes, sir.

25       Q.    Could it also include people in the prison

1   system, wardens, guards, teachers, and inmates that may be

2   there?

3        A.      Yes.

4        Q.      Okay.  When you look at that question, does it

5   -- in your mind does it have to do with the person on trial,

6   their mindset, how dangerous they are, their capability of

7   committing acts, that sort of thing?

8        A.      Yes, sir.

9        Q.      Okay.  Again, there's -- just because you

10  found him guilty, you don't answer yes.  It's going to

11  depend on the facts.  I can't preview the facts.  The law

12  contemplates that some cases a capital murderer is going to

13  be considered a continuing danger by a jury and other fact

14  situations he may not.  The jury just has to wait and make

15  those decisions after they have heard everything in the

16  punishment stage.  Do you feel that you can do that?

17       A.      Yes.

18       Q.      Okay.  Special Issue No. 2, that's the

19  question that has to do with the parties situation again.

20  If you recall, to get someone guilty, we have to prove that

21  they should have anticipated.  Here in the punishment stage

22  you look at the evidence again from just a little bit

23  different viewpoint.  You get that additional evidence.  I

24  don't know if it would help or not, but something in the

25  person's background might aid you in this decision, also.

1    And you would determine if the defendant

2 actually caused the death or -- of the deceased, or if he

3 did not actually cause the death of the deceased -- and this

4 is the parties part or the accomplice part -- intended to

5 kill the deceased, in other words, he had that intention to

6 kill, but someone else did it, or another, or anticipated

7 that a human life would be taken, and that's that

8 anticipation language again.

9    Again, to get him guilty we have to prove

10 he should have anticipated, and here it's a little

11 different, that they did anticipate.  But it may be the very

12 same evidence.  You know, you are just looking at someone

13 should have anticipated, actually did anticipate, also.  But

14 there may be some situations where he didn't anticipate.

15 It's all going to come down to the facts.  It's all going to

16 come down to the person's role in the crime.  It's all going

17 to come down to their history.

18    And, again, it's what we talked about,

19 you, as a juror, drawing reasonable deductions about a

20 person's intent from all the evidence.  You feel comfortable

21 with that?

22    A.    Yes.

23    Q.    It starts out with a no answer and the State

24 must prove to you it should be answered yes.  It's just like

25 the rules on Special Issue No. 1.  There's no automatic

1  answer that it should be answered yes.  It's looked at

2  independently.  You wait for all the new information you

3  hear in the punishment stage and then you make your

4  decision.

5            This last question is a little different

6  in that the State does not have the burden of proof.  The

7  defense does not have the burden of proof.  It allows the

8  jurors to review everything they have heard and decide if

9  they think there's sufficient mitigating evidence that

10 warrants a life sentence rather than a death sentence.  You

11 don't get to it unless you have found someone guilty of

12 capital murder and you believe they are a danger to society

13 and anticipated that a life would be taken.  But it shows

14 that there might be some fact situations, something in their

15 background, which you as a juror feel the right thing to do

16 would be to give a life sentence.

17            What that is you don't have to tell us.

18 You know, we're not going to require you to tell us what

19 mitigating evidence is.  The law only requires you to keep

20 your mind open to it.  You may hear 100 death penalty cases

21 and you may only find one or two that you think sufficient

22 mitigating evidence exists.  You know, it's just going to

23 depend on the facts of each case.

24            As you sit here today, is there anything

25 that comes to mind which you might view as potentially

1    mitigating evidence?

2         A.    No, sir.

3         Q.    Okay.  Most jurors tell us that.  Kind of gets

4    our attention when someone does think of something, but we

5    don't anticipate you've been thinking about these issues.  A

6    lot of times what comes up -- different things can come up

7    in these trials.  You may hear about a person's background,

8    the way they were raised.  Maybe they came from a poor

9    family, maybe a broken home, maybe they were physically

10   abused or mentally abused.

11             You had a good answer because we kind of

12   ask an openended question on your questionnaire on page 9 in

13   the middle there.  We asked about genetics, circumstances of

14   birth and upbringing.  And you said it may factor in why a

15   person turns out as they do, but should not be a factor in

16   determining the penalty.

17             I think it's common sense that obviously

18   the way a person is raised is obviously going to factor in

19   how they behave.  Some people think that would influence

20   them in a capital murder case and other people tell us, I

21   could empathize, I could sympathize with them, if they had a

22   bad childhood.  But if they are an adult, making choices, I

23   still feel like they should be held accountable.

24             How do you feel generally about that, the

25   genetics, and the way a person is raised?

1        A.        I believe that, well, there are some

2   circumstances, if a person had a difficult time growing up.

3   As an adult, he has to make choices, right or wrong.

4        Q.        Okay.   And you think people should be held

5   accountable for those choices?

6        A.        Yes, sir.

7        Q.        Again, you are not required to think of what

8   you might view as mitigating, but you can keep your mind

9   open to it, even though you have already found them guilty,

10  even though you think he's a danger, even though you know he

11  anticipated a life would be taken, there may be a fact

12  situation out there that a life sentence would be the

13  appropriate sentence.   You don't know what it would be,

14  because you would have to hear the facts first.

15              But that's what the law contemplates, you

16  would keep your mind open to it like any major decisions

17  that you make on a daily or weekly basis with your Parks and

18  Recreation Department.   You want all the information in

19  before you make that decision.   And that's what the law

20  contemplates.

21              Do you feel that you can keep your mind

22  open to that question?

23        A.        Yes.

24        Q.        And answer it yes or no, just depending on the

25  facts?

1        A       Yes, sir.

2        Q.      Okay.  In the punishment phase you sometimes

3   will hear from an expert, a psychologist or a psychiatrist,

4   from one side or the other.  The defense may call one to

5   talk about future danger, maybe about mitigation, maybe even

6   about that Special Issue No. 2.  They can talk about the

7   person's background, offer their opinions.  The State may

8   call one, also.

9                Jurors feel differently about those types

10  of experts.  We have some jurors that really put a lot of

11  faith in them.  They think those are people that can give

12  them a good strong reliable opinion on human nature.  We

13  have other jurors that really don't put any faith in them.

14  They think that you can find an expert that, if you look

15  hard enough, they can say what you want them to say, if you

16  look hard enough or pay them enough money.  We have other

17  jurors that say, you know, I can factor that in with

18  everything else.  It's not going to weigh one way or the

19  other.  It's just another piece of the puzzle for me.

20                Do you have any opinions one way or the

21  other about those types of experts, how valuable they are or

22  any kind of thing?

23       A.      I think a lot depends on the testimony they

24  give.  I'm somewhat in the middle of the road on that.  It's

25  whatever they present to us.

Q.      You would have to wait and hear it?

A.      Yes.

Q.      And then make your decision?

A.      Yes.

Q.      There may be some that are more liable and there may be others that you might not put any reliability on at all.

A.      Yes.

Q.      Okay.  There's certain rules that apply in all criminal cases and these are rules we were raised on, kind of in our civics class.  So these will be pretty familiar to you.

One is the presumption of innocence. Anyone charged with a crime, arrested, is presumed to be innocent by the jury and the State is required to remove that presumption by putting on evidence.  But when we start out you have to give him the presumption of innocence.  The fact that he's been arrested, been on TV, that we're even going through this process, is no evidence of his guilt. The evidence only comes from the witness stand.

Would you be able to follow that rule of law?

A.      Yes, sir.

Q.      Okay.  The burden of proof is on the State as you probably know.  We have to prove it beyond a reasonable

1   doubt and that burden of proof never shifts to the defense.

2   You cannot require them to prove his innocence because the

3   burden of proof never shifts.  In fact, under the law they

4   don't have to do anything but show up.  They don't have to

5   ask questions or make an argument or call a witness.  I

6   anticipate they will, but they don't have to because that

7   burden of proof never shifts and you can't require them to

8   prove his innocence.

9           Can you follow that rule of law and keep

10  the burden of proof on the State of Texas and never shift it

11  to the defense?

12      A.      Yes, sir.

13      Q.      Okay.  The burden of proof goes to every

14  element of the indictment.  We have to prove each and every

15  part of it beyond a reasonable doubt or you are required to

16  find the defendant not guilty.

17          One example is the identity.  It's pretty

18  easy.  We have to prove who committed the crime.  If we fail

19  in that, you have a reasonable doubt, you would find him not

20  guilty.

21          But another element is Dallas County.  We

22  have to prove the county where it occurred in.  If you

23  believe from all our evidence who did the murder, who they

24  killed, and how, but had a reasonable doubt about whether it

25  happened in Dallas County, maybe it happened near the border

1  and you think it actually happened in Tarrant County, you

2  would have to find him not guilty.

3              That, I don't anticipate will happen, but

4  it would be pretty poor preparation on our part.  We would

5  deserve to be fired.  But a juror can't go out of his way to

6  help us and give us a leg up.  And you would have to find

7  him not guilty.  Again, I don't anticipate that will happen,

8  but I use that example to demonstrate that that burden of

9  proof does apply to each and every element.  Could you

10  follow that rule of law?

11         A.     Yes.

12         Q.     All right.  The Fifth Amendment.  I'm sure you

13  have heard of that rule.  If someone wants to testify, no

14  one can stop him.  You judge them like any other witness.

15  But if they choose not to, the defendant chooses not to, the

16  Judge will instruct you that you can't hold that against him

17  and consider it as evidence in any way.

18              There could be many reasons why someone

19  may not testify in their trial.  They may be just following

20  the advice of their lawyer.  They may not be very well

21  educated or perhaps they don't do well in front of people,

22  and they could look guilty when they're not.  They may be

23  real guilty and they don't want to testify because it could

24  hurt them.

25              The Judge simply takes care of that by

1  giving you that instruction that you can base your decision

2  only on what you have heard already in the courtroom and you

3  can't speculate on why someone may not testify.  Could you

4  follow that rule?

5      A.    Yes, sir.

6      Q.    We have jurors that say, I would want him

7  because I would want to hear everything.  If I had my

8  choice, I would want to hear from him.  But you can't

9  require that.  And if he doesn't, you can't hold it against

10  him.

11          Police officers often testify in these

12  trials.  Do you know many police officers from your work?

13      A.    Yes.

14      Q.    It's fine for jurors to have high opinions.

15  We hope they do have high opinions of police officers.  But

16  you can't start them out way ahead of other witnesses.  You

17  have to wait until they testify and then judge their

18  credibility.  There are going to be good ones and bad ones,

19  and you have to wait and judge them like you would any other

20  witness.  Could you do that?

21      A.    Yes, sir.

22      Q.    Okay.  Sometimes you hear about the parole

23  laws in the newspapers.  In a capital murder trial, the

24  Judge would instruct you that a life sentence equals --

25  well, a person would have to serve forty calendar years

1  before they become eligible for parole.  He would also

2  instruct you that you can't consider the parole laws.  You

3  can't speculate in any way.  And they can't enter into your

4  deliberations.  You have to just consider a life sentence to

5  equal a life sentence.  You could do that?

6      A.    Yes, sir.

7      Q.    Okay.  And, finally, sometimes jurors find

8  defendants guilty of what we call lesser included offenses.

9  A lesser included offense of capital murder would be

10  aggravated robbery.  Aggravated robbery is a first-degree

11  felony and carries a penalty range of life on one end all

12  the way down to five years on the other and anywhere in

13  between.

14          And what you have to do as a juror is,

15  again, keep your mind open to that full range.  If you think

16  the evidence in the person's background tells you to give

17  life, you can do that.  If you think it tells you to give

18  the minimum of five years in prison, you can do that, or

19  anywhere in between.

20          Do you feel that you can follow that rule

21  of law and keep your mind open to that full range?

22      A.    Yes.

23      Q.    Okay.  I have covered, I think, all the areas

24  of law I wanted to and asked you about your opinions.  I

25  think the bottom line comes down to, again, what we've

1    already said, that the law requires jurors to wait and hear

2    all the evidence both in the guilt/innocence and punishment

3    stage.  Once you get all the facts, then you make your

4    decisions.

5            You look to me like the type of person

6    that does that on a daily basis, so you shouldn't have a

7    problem with jury service, either; is that right?

8        A.    That's correct.

9        Q.    Do you have any questions over anything we've

10   gone over?

11       A.    No, sir.

12       Q.    I appreciate your patience with me.

13            THE COURT:  Ms. Busbee?

14            CROSS-EXAMINATION

15   BY MS. BUSBEE:

16       Q.    Mr. Fuller?

17       A.    Yes, ma'am.

18       Q.    You are getting closer and closer to being on

19   this jury.  So we have people that come down here and I'm

20   looking at them and they are saying, oh, I can be fair and I

21   don't believe them for one minute.  I can just tell that

22   they are just saying that because that's what they think we

23   need to hear.  But you seem to be really right down the

24   middle on the issues that we talked about in this case,

25   particularly where parties are involved or, as the State

refers to them, nontriggermen.

I know that as most people do, they've heard some stuff about this case, but they haven't, obviously, heard all of it and it's been some time ago.  So I would like to ask you some questions about your feelings about the death penalty and whether or not you honestly think they would have -- affect you in this case.  Because, unlike a lot of things, you are not required by law to agree with the law, obviously.

And in a case where someone has been killed and someone else may be executed, obviously emotions run high.  If they didn't, you wouldn't be here.  We would have looked at your questionnaire and said, oh, this person really isn't suitable.

So I want to chat with you a little bit about the scheme that we have here.  Once someone has been found guilty of capital murder, whether they have been found guilty as the lone individual who committed the crime or as a party, the law says that's an automatic life sentence as has been explained to you.

And it's kind of an uphill battle after that for the State to obtain a death penalty verdict.  If -- there's just a lot more that has to be proved to the jury before they could return a death penalty for the -- assess a death penalty.

1            I'm not so concerned about Special Issue

2    No. 1.  There would be facts and we learn about that later.

3    That's pretty clear.  And as for Special Issue No. 2, I

4    think if you recall how Mr. Shook explained that should have

5    anticipated, I would like to say is what we say in the law

6    is an ordinary person of reasonable intelligence under those

7    situations, they should have anticipated that would happen.

8    So that's kind of an abstract.

9            But once we get to this part of the

10   trial, we're talking about actually did, that person did

11   anticipate.  Can you think of what -- or do you have any

12   comments as to what you may need to hear to determine

13   whether someone anticipated something beyond a reasonable

14   doubt?

15       A.    I think if they could prove evidence that

16   prior to the crime being committed that they discussed it

17   and said, we will not leave any witnesses alive, or things

18   of that nature, then that's what I would consider.

19       Q.    I'm not limiting you to that.  But I kind of

20   wanted to know how that question sounded to you.  Now, as to

21   Special Issue No. 3, this has to do with, it's kind of just

22   the whole thing.  It's not anything that this table over

23   here, we don't have to prove over 50 percent and they don't

24   have to prove over 50 percent.  It's kind of, for lack of a

25   better term, a touchy feely question as to whether or not --

1   and you can take into consideration the circumstances of the

2   offense to make your decision.

3                   Now -- and I know that you know the bare

4   outlines of what this case is about and I'm just going to

5   ask you if -- I know that you agree with the law and can

6   follow it.  In this case do you think that if you answered

7   Special Issues No. 1 and 2 yes beyond a reasonable doubt,

8   that you actually could consider giving a life sentence

9   instead of a death sentence?

10          A.      Yes, ma'am.

11          Q.      Okay.  I have to ask that question.  Are you

12   concerned about serving on this jury, missing work or

13   anything --

14          A.      No, ma'am.

15          Q.      -- would bother you about that?  I forgot to

16   ask you what I intended to ask you first and my co-counsel

17   is reminding me.  Have you formed any opinions about this

18   case or what should happen in this case?

19          A.      No, ma'am.  I haven't read enough about it,

20   what I have seen on TV.

21          Q.      I thank goodness you are not like one of those

22   jurors that we had a couple of times in here who took it

23   upon themselves to educate themselves about it since they

24   came down here the first time, told us all about it, and

25   then we had to say bye.

1    A.    I don't care to read about that stuff.

2    Q.    This is like a job interview for a job you

3   really don't want.  And that's why I'm giving you the

4   opportunity to tell us that.  We don't want somebody who has

5   closed their mind to the possibility of a life sentence,

6   somebody who will consider both sides and consider the

7   evidence and follow the law.  So --

8    A.    Yes, ma'am.

9    Q.    One other thing.  He touched on -- at this

10   point we don't know whether the defendant is going to

11   testify or not.  We don't have any idea.  It would be

12   something discussed later on.

13    If you did not hear from the defendant in

14   a death penalty case, would you have -- would that affect

15   you in any decisions that you make on the punishment phase?

16    A.    No, ma'am, I don't believe so.

17    Q.    Okay.

18    MS. BUSBEE:  Pass the juror, Your Honor.

19    THE COURT:  Mr. Fuller, if you would wait

20   for us outside and we'll have you back in just a few

21   minutes.

22    [Prospective juror out]

23    THE COURT:  What says the State?

24    MR. SHOOK:  We have no challenges for

25   cause.

1          MS. BUSBEE:  We have no challenge for

2  cause.

3          THE COURT:  Please take a few moments.

4          (Recess)

5          THE COURT:  Court finds juror No. 2557,

6  Fuller, to be qualified.  What says the State?

7          MR. SHOOK:  State accepts the juror.

8          MS. BUSBEE:  We'll accept this juror.

9          THE COURT:  Ask Mr. Fuller to come back

10  in, please.

11          [Prospective juror in]

12          THE COURT:  Mr. Fuller, give me just a

13  minute.  You have been seated on this jury.  And from this

14  point forward you have got now even a higher duty to the

15  Court in this process.  I'm going to provide you in a few

16  minutes with additional instructions, if my computer will

17  cooperate.  And they are fairly lengthy, but they are

18  extremely important.

19          At this point you have sworn an oath to

20  tell the truth.  And when you are actually, come back down

21  here and in the jury box to hear this case, you will also

22  swear another oath that you will make a render -- or render

23  a verdict in accordance with the law and the evidence that

24  you hear from this case.

25          I will provide the law to you in writing

1  in the form of the Court's charge.  And you understand that

2  the only evidence you can consider in this case comes from

3  that witness stand that you are seated in right now.  I

4  can't tell you how important that is.  I believe Ms. Busbee

5  indicated some jurors have done an investigation on the

6  Internet and formed opinions and so forth.

7              What do you think the first thing will be

8  if you go back to your place of work, and you said Farmers

9  Branch Parks and Recreation --

10             PROSPECTIVE JUROR:  Parks and Recreation.

11             THE COURT:  You go back to the Parks

12  Department and tell them, I'm going to be on the jury in a

13  capital murder case.  What do you think your coworkers will

14  do?

15             PROSPECTIVE JUROR:  Start asking

16  questions.

17             THE COURT:  Or offer their opinions.

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  The attorneys and Mr. Murphy

20  are satisfied with your opinions, not theirs.  So what you

21  are going to -- the reason we do this so far in advance is

22  you are going to have enough time to block out work and be

23  available to the Court for those two weeks.  Obviously, you

24  are going to have to tell the supervisor or department head

25  or someone in the city that you are on this jury.  But after

1    that, say Judge Cunningham has told me I cannot discuss this

2    case.  I have been impaneled and I can't talk.

3              Don't tell them what kind it is.  Some

4    people might figure it out because of the length of the

5    trial, but don't talk to them.  Say, the Judge has

6    instructed me I cannot discuss this case, period.

7              You will, also, find out when you read

8    your instructions, don't make any independent investigations

9    from any source.  I can't be -- as broad as newspapers,

10   friends, Internet, whatever, you can't do it.

11             Now, what happens from this point

12   forward?  The Sheriff is going to go over those.  I'll

13   provide you those printed instructions in just a minute.

14   She has some other issues to go over with you.  And getting

15   prepared for this trial, at some point, I don't know what

16   day this will be, we'll be back down here as soon as they

17   get all the folks in the box and I don't know how long it's

18   going to take.  Once we get everybody on board, I'll send a

19   letter out and have everybody back down here for about a

20   one-hour orientation.

21             We have found that's a very good use of

22   your time because on Monday morning, November 10th, you will

23   be in that box at 8:30 in the morning and the State at that

24   point will present their indictment.

25             Now, you may have figured out that this

1  Court, hopefully, is unusual in that we start on time.  Your

2  letter said to be here at 1:30, you were in the box at 1:45.

3  That's not too bad.  Now, what -- the reason I do that is

4  because you come in on Monday morning and we jerk around

5  until 10:30 or 11:00 and take a break and go to lunch,

6  that's a waste of your time.  There's a lot of things to

7  cover to get to that point.  We find it's real good to bring

8  everybody down and if there are any questions we can head

9  those off before the trial begins.

10          I've been told I work too hard and the

11  jury says, Judge, I need a break.  You will be allowed to

12  use the phone during a break.  We will have phone time at

13  lunch.  You will not be sequestered during the trial as long

14  as the jury can follow my instructions.  Now, you may be

15  sequestered, which means put in a hotel overnight with the

16  Sheriff guarding the doors, if the jury is unable to reach a

17  verdict in one day.  Should the evening come and the jury is

18  still out, no one can have contact with you at that point

19  and you might be put in a hotel that evening.

20          But you would certainly have plenty of

21  advance notice.  The Sheriff will be able to work those

22  details with you, so that will not be a surprise.  We've had

23  some courts down here that they will work until 8:00 at

24  night and say we'll put everybody up and they have no

25  preparation.  That's not fair to you.  So, hopefully, there

1   will be no surprises.  We will be able to accommodate your

2   schedule as best we can.

3                    I don't read minds, but I do anticipate

4   questions fairly well.  Have I covered yours or do you have

5   others for me?

6                    PROSPECTIVE JUROR:  I anticipate being

7   out of town October 22nd through the 24th.  I don't know

8   when you are going to bring us in for that hour.

9                    THE COURT:  I don't know when that will

10  be.  I don't have a crystal ball.  But to get all 14 people

11  just with the dart on the wall, I don't know if that's

12  occurred.  If you are out of town, you are out of town.  We

13  will deal with it.  The hard date is November 10th.  Good

14  question.  Anything else?

15                   PROSPECTIVE JUROR:  No, sir.

16                   THE COURT:  If you would, go with the

17  Sheriff.  She'll have some other items to cover with you and

18  I'll get that printed document back to you in just a few

19  minutes.

20                        [End of Volume]

21

22

23

24

25

STATE OF TEXAS          *

COUNTY OF DALLAS        *

I, NANCY BREWER, Official Court Reporter for the 283rd

Judicial District Court, do hereby certify that the above

and foregoing constitutes a true and correct transcription

of all portions of evidence and other proceedings requested

in writing by counsel for the parties to be included in this

volume of the Reporter's Record, in the above-styled and

numbered cause, all of which occurred in open court or in

chambers and were reported by me.

WITNESS MY OFFICIAL HAND on this the ___ day of

_____, 2004.


NANCY BREWER, CSR, NO. 5759
Expiration Date:  12-31-04
Official Reporter, 283rd JDC
Frank Crowley Crts. Bldg. LB33
133 No. Industrial Blvd.
Dallas, TX 75207
(214)653-5863

74851

REPORTER'S RECORD

VOLUME 19 OF _61_ VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

MAR   9 2004

Troy C. Bennett, Jr.

On the 22nd day of September, 2003, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Vickers L. Cunningham, Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

ORIGINAL

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT: 03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT: 00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

1          PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Douglas Kolpanen | 4 | 5 | | 19 |
| Pamela Martin | 34 | 38 | | 19 |
| Ruth Culver | 54 | 56 | | 19 |
| Kevin Harper | 60 | 62 | 99 | 19 |
| Lorna Lankford | 116 | 117 | 148 | 19 |
| George Nash | 157 | 158 | | 19 |

```
 1                  P R O C E E D I N G S
 2            THE COURT:  Douglas Kolpanen.
 3                  [Prospective juror in]
 4            THE COURT:  Good morning, sir, how are
 5   you?  Please be seated.
 6            PROSPECTIVE JUROR:  Thank you.
 7            THE COURT:  I believe we figured out your
 8   name is Douglas Kolpanen?
 9            PROSPECTIVE JUROR:  Yes.
10            THE COURT:  Close enough.  You are No.
11   1814.  Welcome to the 283rd.  We were waiting for Ms.
12   Martin, but she was late enough getting here, we'll go on to
13   you.  So you were in for a wait, but now you are first up.
14            PROSPECTIVE JUROR:  Okay.
15            THE COURT:  Have you had an opportunity
16   to read the orientation guide I provided for you?
17            PROSPECTIVE JUROR:  Yes.
18            THE COURT:  Did you have an opportunity
19   to review your questionnaire that you filled out for us in
20   May?
21            PROSPECTIVE JUROR:  Yes.
22            THE COURT:  Many people come in and you
23   are the focus of attention and sometimes your stress is
24   elevated and maybe a little nervous.  This is an opportunity
25   for the attorneys to visit with you.  There are no wrong
```

1   answers.  This is as informal a process as we can have.  The

2   opportunity here is for you to understand the law.  And then

3   the attorneys will give you back and forth questions and

4   answers on how the law works, how it relates.

5           At the end of the process there's two

6   questions that I have to be able to answer.  Number one, do

7   you understand the law?  Number two is can you follow the

8   law?  That's my big picture here.

9           PROSPECTIVE JUROR:  Yes.

10          THE COURT:  The only question that I have

11  for you before we begin is will you be able to serve this

12  Court for two weeks beginning on November 10th?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Thank you, sir.  Mr. Shook?

15          MR. SHOOK:  May it please the Court.

16          <u>DOUGLAS KOLPANEN</u>,

17  having been duly sworn, was examined and testified as

18  follows:

19          <u>DIRECT EXAMINATION</u>

20  <u>BY MR. SHOOK</u>:

21      Q.    Mr. Kolpanen, my name is Toby Shook.  I'm

22  going to be speaking to you on behalf of the State this

23  morning.  As the Judge said, there aren't any right or wrong

24  answers.  We're just asking for your honest opinions.  I'm

25  going to talk to you, do a little bit of follow-up on your

1  questionnaire, and also speak to you about capital murder,

2  the death penalty, how you feel about that, get your honest

3  opinions of some of the rules and laws that apply.

4                    If you have any questions at any time,

5  feel free to ask.  Okay?

6         A.    Yes, sir.

7         Q.    Reviewing your questionnaire, I see you are

8  from Wisconsin originally; is that right?

9         A.    Yes.

10        Q.    Grew up there?

11        A.    Yes, sir.

12        Q.    What brought you down here to Texas?

13        A.    Just job.  In 1980 the market was real soft up

14  there, so I moved down here.

15        Q.    And you've been here since 1980?

16        A.    Yes, sir.

17        Q.    And you work for Abbott Laboratories?

18        A.    Yes.

19        Q.    Tell us what you do on a day-to-day basis.

20        A.    I'm a programmer analyst.  I work with the

21  computers in the -- what we call the ERP Suite which runs

22  all the accounting and manufacturing software.

23        Q.    And you have been with them for about nine

24  years or so?

25        A.    Yes.  Contract and full-time.

1     Q.      Prior to that were you in the same field of

2  work?

3     A.      Yes.  Since about 1985 I worked at LTV which

4  is, I think, Vought right now and then I did some

5  contracting with a company called Database Consultants.

6     Q.      Okay.  I see that you have been on a criminal

7  jury before, several years ago?

8     A.      Yes, sir.

9     Q.      That was a DWI?

10     A.      Yes, sir.

11     Q.      And the finding in that case was a not guilty?

12     A.      Yes, sir.

13     Q.      Tell us a little bit if you remember anything

14  about the case.  Was it just a simple --

15     A.      I believe it was real simple.  A person, a

16  doctor, got pulled over in a -- I think he was speeding and

17  they charged him with DWI.

18     Q.      Usually those cases aren't that complicated.

19  But I saw, though, on page 8, that's where we asked about if

20  you have ever been on a criminal jury.  We ask this one

21  question.  It means different things to different people.

22     A.      Yeah.

23     Q.      If you did serve on a jury, how much did you

24  participate and you said less than others and less of an

25  influence.

1            What did that mean?  If you would do a

2  little follow-up.  Did you -- sometimes that means you were

3  on the other side of the issues.  Sometimes it means it was

4  pretty clearcut, so there wasn't much said.  So I was just

5  wondering.

6       A.    It was a six-person jury and I think five of

7  us found him not guilty or -- and there was one person that

8  thought he -- yes, not guilty.  And there was one person who

9  thought he was guilty.  And I didn't participate much in the

10  discussion.

11       Q.    The deliberation part?

12       A.    Right.

13       Q.    Okay.  Anything about that experience which

14  was unpleasant for you in any way?

15       A.    No, sir.

16       Q.    Okay.  And then another area I wanted to talk

17  to you about is, we always ask -- one of the last questions

18  on the last page, just kind of get your gut reaction on the

19  questionnaire, how you would feel about being chosen as a

20  juror and you said you weren't really that comfortable

21  because of your argument skills.  Looks like you were being

22  pretty honest with us.

23       A.    Yes.

24       Q.    I would like you to kind of follow up with us

25  on that.

1        A.    I was afraid if I were to get onto a jury, I

2  would find one way or the other in my mind.  I wouldn't be

3  able to clearly state my case and maybe persuade other

4  people who are on the fence, if you will.

5        Q.    Okay.  Okay.  We'll talk a little bit more

6  about capital murder because it is kind of unique,

7  obviously, from a lot of the other trials.  Let me ask you

8  one other area on page 5 of the questionnaire.  We gave

9  these statements and asked you if you strongly agree, go all

10  the way down to strongly disagree.  And, again, these mean

11  different things to different people.

12        So we often ask kind of a followup.  The

13  first one, most criminals are actually victims of society's

14  problems and you put strongly agree.  And I would like you

15  to kind of expand on that a little bit, why you feel that,

16  kind of where you are coming from.

17        A.    I feel mostly people who are brought up in an

18  environment that doesn't give them the opportunity to raise

19  themselves up in society are probably more prone to be

20  criminals, I guess.

21        Q.    A lot of people -- a lot of people tell us

22  that.  Let me ask you now about how you feel about the death

23  penalty.  Are you in favor of it as a law?

24        A.    Yes, sir.

25        Q.    Tell us why you favor the death penalty, what

1   purpose you feel it serves.

2       A.      I feel that if a person is found guilty in a

3   court of law of capital murder that it's a good deterrent

4   that other people won't do it in the future.  They will

5   think twice.

6       Q.      From your personal point of view, what types

7   of crimes do you think should be considered for the death

8   penalty?

9       A.      As stated in the law, that killing of an

10  officer, a child, or somebody who is -- just can't help

11  themselves, basically.

12      Q.      If it were up to you, would you expand the

13  capital murder statutes to cover crimes other than murder or

14  would you just leave it at certain types of murders?

15      A.      I would just leave it at certain types of

16  murder, I believe.

17      Q.      How long have you believed in capital murder?

18  Since you were an adult, basically, or have you thought

19  about it, as far as you know?

20      A.      Yes, I guess so.

21      Q.      Was there just any particular episode in your

22  life or anything that you read or heard or is it just

23  something you were kind of raised to believe?

24      A.      Raised to believe, I believe.

25      Q.      Okay.  Have there been any cases in the media

1  locally or nationally that you followed, any murder cases or

2  capital murder cases that you felt were deserving of

3  consideration of the death penalty?

4       A.     None that I can really recall.  The ones, the

5  local ones, like the Routier, but I didn't really follow it

6  very close.

7       Q.     Okay.  Didn't really form any opinions on it

8  or anything like that?

9       A.     No, not really.

10      Q.     All right.  In Texas there are, from reviewing

11  the questionnaire, certain types of murder cases that come

12  into consideration for the death penalty.  We have a lot of

13  murder cases that are brutal, but they don't come into

14  consideration.  You have to have some other aggravating

15  fact, such as a murder that occurs during the course of a

16  felony, such as robbery.  Someone goes into a 7-Eleven,

17  shoots the clerk.  Murder during a burglary.  Someone breaks

18  into someone's home and murders someone in the house.

19  During an arson.  Murder in a kidnapping or rape.  Those

20  types of offenses come under the statute.

21             Also, murder of specific individuals or

22  victims, such as police officers, firemen or prison guards

23  on duty, murder of a child under the age of six, murder for

24  hire, someone does it for money like a hitman situation, and

25  then mass murder or serial killer situation, more than one

1   victim.

2              But those are the types of cases that

3   come into consideration for the death penalty at this time.

4   When we think of the death penalty or any kind of crime,

5   capital murder, we generally think of examples in our minds

6   like the going into a 7-Eleven and shooting the clerk.

7              And when we talk about capital murder,

8   it's involving, usually, the triggerman.  Capital murder,

9   like any other law, may have more than one person that

10  actually helps commit the crime.  And the law says that if

11  more than one individual is actually participating in the

12  crime and they are actively involved, they, too, can be held

13  accountable and can be found guilty of that crime, even

14  though they may have had a lesser role, okay?

15             In a capital murder situation sometimes

16  you have one person who is the triggerman and then he will

17  have an accomplice and it just depends on the facts.  But in

18  a capital murder situation involving a robbery, an example I

19  will give is using Mr. Wirskye and myself.  We want to

20  commit a bank robbery and we agree to do that.  I have a

21  gun.  He gets a large bag that he's going to carry into the

22  bank.

23             We go into the bank.  I pull the gun on

24  the clerks, the tellers there, and I threaten them.  After I

25  have them subdued, he comes in and starts loading the money

1 up while I keep everyone covered.  During the middle of

2 that, let's say I don't like the way one of the tellers

3 looks at me, maybe Mr. Wirskye says one is going for a

4 silent alarm, so I intentionally murder them.  I shoot them.

5 We then leave and we're caught.

6        I can obviously be prosecuted for capital

7 murder.  I'm the triggerman.  I caused someone's death

8 during the course of a robbery.  The law says, though, that

9 since Mr. Wirskye was actively participating with me, he can

10 also be prosecuted for capital murder.  He could even be

11 found guilty if the jury believes that he was actually

12 involved and he can ultimately receive the death penalty.

13        But jurors feel differently about that

14 area of the law when we talk about an accomplice.  And we

15 like to get everyone's honest opinions on that.  Some people

16 who believe in the death penalty, they would personally

17 reserve it for the actual triggerman, the person that causes

18 the death.  And they would draw a line in an accomplice

19 that's there helping.  They might reserve a long prison

20 sentence, maybe a life sentence for him, but they personally

21 don't feel it's justified in taking their life, if they

22 didn't actually take a life.

23        Other jurors are for the prosecution of

24 accomplices for the death penalty.  But everyone feels

25 differently.  But we want to get everyone's honest opinion

1  about that law.  How do you feel about the prosecution of

2  accomplices in a death penalty situation?

3         A.      I feel they're fair game.  I think if they are

4  a willing accomplice, that they actually participated in the

5  murder and they are found guilty of the murder or there was

6  a murder committed there, then I believe that they would be

7  guilty in a capital murder offense.

8         Q.      Why do you think it's a good policy under the

9  law to be able to prosecute an accomplice for the death

10 penalty?

11        A.      Well, same thing.  If -- I mean, if they were

12 a willing participant, they might as well just have pulled

13 the trigger themselves, too.  I mean, they shouldn't have

14 been there in the first place.

15        Q.      So it doesn't matter to you that they didn't

16 actually cause the death.  If they are actually helping

17 participate in the crime, then you feel they are just as

18 guilty and could have pulled the trigger themselves?

19        A.      Yes, sir.

20        Q.      Okay.  And I can't go into the facts of this

21 case, but I can tell you that's the theory of law we're

22 prosecuting the defendant under, that he is -- the theory

23 that he's an accomplice or in Texas we call it a party to

24 the crime, under the law of parties.

25                But you have no personal problems with

1  that as a juror?

2         A.      No, sir.

3         Q.      All right.  Now, there's two theories of law

4  under that.  We can either prosecute him as a party where

5  he's actively participating, aiding, directing, helping with

6  the crime.  The jury could find him guilty under that

7  theory.

8               Or the law of conspiracy.  Mr. Wirskye

9  and I conspire to commit one crime, in this case robbery of

10 the bank.  And that's just a mere agreement.  It doesn't

11 have to be any long drawn out conspiracy.  It might be.  And

12 then one of us commits another crime to further that

13 conspiracy, in this case me shooting one of the tellers,

14 then everyone could be held accountable if the jury believes

15 they should have anticipated that a death would occur.

16 Okay?

17              In fact, to get him guilty, Mr. Wirskye

18 doesn't even have to have the intent that a life be taken,

19 it's just that he should have anticipated that something

20 like that could occur.

21        A.      Right, yes, sir.

22        Q.      And to go to the death penalty, we have to

23 move a step further in the Special Issues and prove that

24 they did anticipate.  But that intent or anticipate is

25 proven by presenting all the facts.  We can't stop and open

1  someone's head and show their intent.  Jurors have to infer

2  a person's intent from all the person's actions before,

3  during, and after the crime.  Do you feel comfortable in

4  doing that?

5       A.    Yes, sir.

6       Q.    Okay.  Now, a capital murder case is divided

7  into two parts.  There's the guilt/innocence stage and then

8  there's the punishment stage.  The guilt/innocence stage is

9  simply the indictment itself.  We have to prove that to you

10 beyond a reasonable doubt.  If we fail to do that, then you

11 find the defendant not guilty and we all go home.

12            If you found the defendant guilty,

13 though, you move to the punishment phase where you hear

14 additional evidence.  At the close of that evidence you then

15 get these Special Issues which we'll go over in a minute.

16 But kind of to put them succinctly, the State has to prove

17 the defendant would be a continuing danger, that he did

18 anticipate that a life would be taken, and, finally, that

19 there was not sufficient mitigating evidence to warrant a

20 life sentence.

21            So if those questions are answered yes,

22 yes, and no, the defendant is sentenced to death.  The jury

23 doesn't actually write life or death in, but the Judge

24 sentences according to how the jury answers those questions.

25 So a yes to the first two and a no to the mitigation

1    question equals a death sentence.

2               Now, if you answer those questions any

3    other way, it would be a life sentence.  But those are the

4    only two possible outcomes, once someone has been found

5    guilty of capital murder.  Is that clear to you?

6         A.    Yes, sir.

7         Q.    Are you familiar with the method of execution

8    in Texas?

9         A.    I believe so, sir, injection, lethal

10   injection.

11        Q.    The lethal injection.  And from -- since you

12   have lived in Texas since 1980, you are probably aware,

13   because that's right around the time that the executions

14   started up again, that Texas does actually execute capital

15   murder defendants.

16        A.    Yes, sir.

17        Q.    There are some states that actually have the

18   death penalty on their books, even prosecute them, have them

19   on death row, but no one has ever been executed.  California

20   is one of those states.  They have a very large death row

21   population, but very few have ever been executed, whereas

22   Texas leads the nation in executions.  Almost every year

23   they lead the nation.  Florida sometimes has, Oklahoma

24   sometimes, but Texas by far and away leads the nation.  So

25   it's something that the jurors can actually know actually

1    takes place.

2             The procedures are the same in each case.

3    They would be the same in this case.  If the defendant were

4    found guilty and the questions were answered in that way,

5    the Judge would sentence him to death.  He would be placed

6    on death row.  And I couldn't tell you when, but at some

7    point down the line Judge Cunningham would actually issue a

8    date of execution.

9             On the day prior to that, he would be

10   moved from death row.  He would be placed in a cell in

11   downtown Huntsville, Texas, prison where all executions take

12   place by law.  He would be given a last meal, a time with

13   his family, a minister, on that day.

14            But at 6:00 p.m. the execution would take

15   place.  Several minutes before that he would be moved from

16   his cell into that execution chamber that is often shown on

17   the TV or the newspaper, put on a gurney, restrained there

18   by leather straps, needles placed in his arm with tubes

19   going to the execution room, which is adjacent to the

20   chamber.

21            He's always given an opportunity to make

22   a statement to witnesses there.  There's witnesses from his

23   side and also the victim's side.  But after that, the warden

24   would simply signal the executioner, who would inject

25   substances to stop his heart, which would force the collapse

1   of his lungs, and then within about 15 seconds he would

2   lapse into a coma and die.

3                    That's the procedures that would occur in

4   this case and every case.  They are often reported in the

5   media.  And the reason I go into that in detail is it's one

6   thing when you get called down here or we talk about the

7   death penalty, kind of in a philosophical way, and it's

8   another once you realize you potentially could be a juror on

9   this case, making these types of decisions, because it's

10  pretty unique.  It involves the execution of another human

11  being.

12                   Some people we talk to, and you probably

13  recall we talked to about a thousand people, are against it

14  morally and religiously and they can't serve on this case.

15  We put them on other cases.  Some are adamantly for it, too

16  much for it.  They can't be fair.  Other people are for it,

17  can serve, and make these decisions.  Other people are for

18  it philosophically, but once they get down here and reflect

19  on it, they really are not comfortable making that decision

20  in the life or death circumstances.

21                   But only you can tell us.  I wanted to

22  talk to you in detail about it because that's frankly our

23  goal in this case.  We feel we have the type and quality of

24  evidence to convince a jury that he will be found guilty and

25  those questions will be answered in a way which would result

1    in his execution someday.

2                    You have told us philosophically you do

3    believe in the death penalty.  You believe in his

4    prosecution and you believe in it for accomplices.  From

5    your own personal point of view, if it were proven to you,

6    do you feel you could take pen in hand and answer these

7    questions in a way knowing the defendant would be executed

8    someday?

9         A.    Yes, sir.

10        Q.    Let's then talk about these Special Issues.

11   If you would, take a moment to read Special Issue No. 1

12   again to yourself.

13        A.    (Prospective juror complies.)

14        Q.    That Special Issue starts out with a no answer

15   and the State has to prove to you beyond a reasonable doubt

16   it should be answered yes.  Now, you can see from the

17   question it asks the juror to make a prediction about the

18   defendant's behavior, how he's going to behave in the

19   future.

20                    Do you feel comfortable in answering that

21   question, if you are given sufficient facts?

22        A.    Yes.

23        Q.    Making a prediction like that?

24        A.    I believe so, sir, yes.

25        Q.    What would you want to know or learn about the

1    defendant before you answered a question like that?

2        A.    I would like to know what has happened in the

3    past and if there's been -- if the person has been given due

4    process to get better, I guess.

5        Q.    Okay.

6        A.    And if -- I guess that's it, sir.

7        Q.    Just see if he's had problems with the law

8    before, if he's had a chance to be rehabilitated, that sort

9    of thing?

10       A.    Yes, thank you.

11       Q.    Past criminal record is admissible in this

12   portion of the trial, if it exists.  You can even hear from

13   the witnesses, if they are still around.  You can hear good

14   things, bad things.  You can even hear about crimes that

15   have not been prosecuted in the past, if they can be proven

16   to you.  You can hear kind of a good and bad throughout his

17   whole life.

18            Obviously, you get to reconsider the

19   facts, his role in the crime, also, and then determine if

20   this question has been answered for you.

21            You won't get legal definitions of these

22   words.  These words would be up to you and the other jurors.

23   Let's look at the first one.  Whether there's a probability.

24   What does "probability" mean to you?

25       A.    A likelihood if the person has been violent in

1   the past and he just finally got caught doing it or if

2   there's any kind of violence in the past, I guess.

3       Q.    Okay.  We don't have to prove there's a

4   certainty that he would commit a crime of violence in the

5   future.  Obviously, I don't think that we can ever prove a

6   certainty, but it has to be more than a possibility.  More

7   people tell us more likely than not, that sort of thing.  Do

8   you feel comfortable with that type of thing?

9       A.    Yes.

10      Q.    We have to prove that the defendant would

11  commit criminal acts of violence that would constitute a

12  continuing threat.  What do "criminal acts of violence" mean

13  to you in the context of that question?

14      A.    A criminal act, again, would be murder or

15  rape, like robberies, things like that.

16      Q.    Murder, obviously, rape of another individual,

17  threats, that sort of thing?

18      A.    Correct.

19      Q.    And then constitute a continuing threat to

20  society.  What does "society" mean to you?

21      A.    Just -- the society would be the way we live.

22      Q.    Okay.  Anyone and everyone he may come into

23  contact with?

24      A.    Yes.

25      Q.    Including people in the penitentiary?

1    A.    Any person.

2    Q.    All right.  Do you feel it's the person's

3    mindset which is important in that question how they

4    approach life and the ability to or I guess the desire to

5    commit crimes, that sort of thing, which makes a person

6    dangerous, if they are given that opportunity, that sort of

7    thing?

8    A.    Yes.  I believe the mindset has a lot to do

9    with it.  That's what I was talking earlier, if you are

10   raised in that environment.

11   Q.    And I'm going to do a followup question of

12   that when we get to the mitigation question because a lot of

13   people say that enters into all these questions in a lot of

14   ways.  It kind of cuts both ways, how you were raised, that

15   sort of thing.

16         This question is answered separately.  As

17   I told you before, it starts out with a no answer.  Just

18   because you have found someone guilty of capital murder,

19   that's been proven to you beyond a reasonable doubt, doesn't

20   mean necessarily that he would be a continuing danger.

21   Ultimately it might.  The law contemplates that jurors will

22   wait and listen to all the evidence and then decide has the

23   State also proven that he's a continuing danger?  In other

24   words, just because you found him guilty, you don't

25   automatically write in a yes answer.  It might be a no

answer.  It might be a yes answer.  It depends on the facts

of the case.  You have to look at that again and also any

new evidence that you hear in the punishment phase.

                    Do you feel that you can do that, listen

to any new additional evidence brought in and then make your

decision separately?

         A.      Yes, sir.

         Q.      Okay.  We then move on to Special Issue No. 2.

If you would read that to yourself for just a moment.

         A.      (Prospective juror complies.)

         Q.      That question has to do with the party

situation or accomplice situation we talked about.  The

first part of the question asks whether the defendant

actually caused the death of the deceased.  Now, if you

believe he's the triggerman, then that part of the question

is answered for you, or the question is answered for you.

                    But the second part of the question

covers the accomplice situation.  Didn't actually cause the

death of the deceased, but he intended to kill.  So we -- if

the evidence shows his intentions were there for the

deceased to die or someone else, or he anticipated that a

human life would be taken, again the guilt/innocence stage

with the accomplice, we have to prove he should have

anticipated.  And here we go a step further that he actually

did anticipate.  And, again, it would be the evidence of the

1  crime itself you look at and then you also look at any

2  additional evidence you have from their background that may

3  be able to aid you in deciding whether he anticipated a life

4  would be taken.

5          Again, we can't open up his mind and show

6  you his intentions, but we can put on all the evidence from

7  his background as well as his role in the crime and the jury

8  can make inferences what his actions show his intentions to

9  be.

10          But there's a difference between should

11  have anticipated and did anticipate.  And we have to go a

12  step further in the punishment phase and prove to you that

13  he actually did anticipate.  It may be the same exact

14  evidence, but you have to be able to sit back and look at

15  that question separately and determine if the State has

16  proven it to you beyond a reasonable doubt.  Do you feel

17  that you can do that?

18      A.    I believe so, sir.  Anticipated, I believe if

19  there were guns involved, there would have to be an

20  anticipation that there may be a death or going to be a

21  death.

22      Q.    A lot of jurors tell us that.  It's kind of a

23  common sense deal.  I can't preview the facts, you know, and

24  I guess we could give you a million different fact

25  situations.  But you are not required to think of one

1    necessarily.  And I don't get to preview our facts.

2                        But it's that kind of evidence that you

3    look at, you look at it all, involvement in the crime.  The

4    fact is, though, just because you found him guilty in the

5    guilt/innocence stage, doesn't mean under the law that you

6    would automatically answer that question yes.  It might be a

7    no answer.  It might be a yes answer.  It's just going to

8    depend on the facts of the case.  And you have to be able to

9    assure the Judge that you can wait and you will reevaluate

10   the evidence, look at it again from just the viewpoint of

11   that question, and determine if the State has proven to you

12   beyond a reasonable doubt it should be answered yes.

13                       In other words, again, there's no

14   automatic yes answers.  It just depends on the evidence and

15   you have to be able to assure the Court, I'll wait and I'll

16   look at that question again in the punishment deliberations

17   and then determine whether the State has proven to me beyond

18   a reasonable doubt.  Do you feel that you can do that?

19        A.      I'm not sure.  Again, like I said, if there

20   were guns involved, I would think that the anticipation was

21   there.

22        Q.      Okay.  Well, again, so you put a fact in and

23   that may very well be the fact that determines that for you.

24   But I can't preview the facts.  All I can ask you to do is

25   whatever the facts are, will you wait and look at the

1   evidence again in the punishment phase and then make the

2   decision?  And it might be the same exact evidence, you

3   know.  You know, it might be overwhelming evidence in your

4   mind, but you still have to be able to tell the Court, hey,

5   I will look at it again and I'll weigh it again and it might

6   only take me a few minutes to decide that question, but I

7   will honestly look at it again and then determine if the

8   question should be answered that way.

9              If it were a different fact situation,

10  depending on -- and we're all talking about hypotheticals

11  here, and I don't think that he anticipated a life would be

12  taken, I'll leave it at a no answer.  It would just have to

13  depend on what the facts are.  You have given us some facts

14  and that's fine.  But we can't give you the facts.  We have

15  to talk in hypotheticals as a jury if you were going to sit

16  on any type of capital case.

17             You are saying -- what I have to ask you

18  is if you would keep your mind open to it and then

19  determine, looking at the evidence, if we could prove it to

20  you beyond a reasonable doubt and require us to prove it to

21  you beyond a reasonable doubt?

22       A.     Yes, sir, I could.

23       Q.     If you didn't believe that we proved to you

24  that he anticipated a death would occur, would it bother you

25  to put it as a no answer?

1    A.    No.

2    Q.    You don't feel that you owe any obligation to

3  the State to answer that question yes, even though you found

4  him guilty or anything like that?

5    A.    No, sir.

6    Q.    So in your mind you are open to both yes and

7  no in the punishment phase, just depending on the facts of

8  each case?

9    A.    Yes.

10    Q.    That's all the law contemplates, that a juror

11 will keep his mind open, you know, whatever the facts are.

12 We can't preview the facts, but you have to be able to

13 assure the Court that you could answer it yes or no,

14 depending on the facts and then require the State to prove

15 it to you beyond a reasonable doubt.

16             Again, you are just looking at the

17 question from a different view.  Guilt/innocence, you are

18 looking at guilt.  Here you are looking at whether he

19 anticipated or one of these other scenarios in the question.

20 The bottom line is you have to keep your mind open to it and

21 you feel that you can do that?

22    A.    Yes, sir.

23    Q.    Okay.  Fair enough.  Finally, this last

24 Special Issue, neither side has the burden of proof.  It

25 asks whether taking into consideration all the evidence,

1   including the circumstances of the offense, the defendant's

2   character and background, and the personal moral culpability

3   of the defendant, there is a sufficient mitigating

4   circumstance or circumstances to warrant that a sentence of

5   life imprisonment, rather than a death sentence be imposed.

6               That's the mitigation question.  It

7   allows the jurors to show mercy based on something in the

8   defendant's background.  And I can't tell you what that

9   would be.  In fact, you don't have to tell us what you think

10  mitigating evidence would be.  You don't get to the question

11  unless you have found the defendant guilty, found that he's

12  a danger to society, found that he anticipated the death.

13  But there might be something in his background which would

14  tell you a life sentence is more deserving than a death

15  sentence.

16              You have to be able to promise the Court

17  honestly that you can keep your mind open to that.  Like I

18  said, you don't have to tell us what mitigating evidence is,

19  just that your mind has to be open to it.  You don't even

20  have to agree with the other jurors what it is.  It's

21  totally up to you.

22              We talked a little bit.  You mentioned a

23  person's background and that kind of comes up, obviously, in

24  this question.  A lot of people believe that common

25  sensewise you are kind of influenced by the way you were

1  raised.  Maybe you came from a bad home or abusive

2  background, physically or mentally.  Some people even view

3  that, if it's severe enough, can even be a mitigating

4  circumstance.  It's just going to depend on the facts.

5             Other people tell us, even if it's bad, I

6  think if the person is an adult, they are still making

7  choices and necessarily wouldn't be.  But that's the type of

8  information jurors often look at, as well as maybe someone's

9  intelligence.  Maybe they are a little slow and they still

10  know right from wrong, but they are a little slow and easily

11  led, that sort of thing.

12             Do you feel you could keep your mind open

13  to Special Issue No. 3?

14        A.     Yes, sir.

15        Q.     When you talked earlier about the way a person

16  was raised, is this the type of information you would look

17  at in the mitigation question?

18        A.     Yes, sir.

19        Q.     Do you feel even though a person may have been

20  formed or shaped by the way they were raised, that they

21  should still be held accountable for their actions as an

22  adult?

23        A.     Yes, sir.

24        Q.     Okay.  But you feel that your mind could be

25  open and even though you found him guilty, even though you

1  found he's a continuing danger, even though you found he

2  anticipated that a life would be taken, there may be a fact

3  situation, whatever it is, something in his background,

4  which might tell you in your heart and your mind that a life

5  sentence should be imposed and you can answer the question

6  that way or leave it as a no answer, depending, again, on

7  all the facts?  Can you do that?

8         A.    Yes, sir.

9         Q.    All these questions, again, depend on the

10  facts.  The law contemplates that you would wait for all the

11  information to come in and then answer each question

12  separately and analyze each question separately and be able

13  to do that.  Do you feel that you can do that?

14        A.    I would like to make one statement that is

15  heavy on my mind here, is on the questionnaire, before we go

16  on.  I do have prior knowledge of this case and I just want

17  to make that -- that's been -- I thought you were going to

18  get to that earlier, actually.

19        Q.    I usually do and sometimes I blow right by it.

20  Almost every juror --

21        A.    Has heard of it.

22        Q.    -- has heard something about this case and I

23  know you had initially put, no, you hadn't, but when I do

24  follow up, a lot of people go, yeah, I have heard something

25  about it.

1    A.    Yes, I have.

2    Q.    It had a lot of coverage.

3    A.    Yes.

4    Q.    What do you recall hearing about the case?

5    A.    Just probably everything.  When I filled out

6 the questionnaire I didn't connect the name with the alleged

7 crime and I thought the alleged crime was kind of like --

8 like just in case or just a case, not actually this case.

9 But I have heard of it and my inlaws live in Woodland Park

10 and my sister-in-law lives in Colorado Springs, like a

11 couple of blocks where some of the people were captured, I

12 believe.  And I used to drive by the Oshman's Sporting Goods

13 every day to work.

14    Q.    You have relatives in Woodland Park and

15 Colorado Springs?

16    A.    Yes.

17    Q.    Have they told you a lot about the facts?

18    A.    We visit there every -- I'm not sure about the

19 facts, but what has happened and --

20    Q.    Have you followed any of the cases since they

21 -- subsequent court proceedings?

22    A.    Just what has been in the news, that the rest

23 were found guilty.

24    Q.    Okay.  The bottom line is this.  Obviously,

25 almost every juror, I would say 99.9 have read or seen

1  something about the case, but some more than others.  The

2  bottom line is jurors have to -- if seated on the jury, have

3  to make their decision just based on the evidence on what

4  they hear in the courtroom and can't use news stories they

5  have read about and let that influence them in any way.

6  Obviously, the best evidence is going to come from the

7  actual witnesses.  News stories are often inaccurate, that

8  sort of thing.

9       Some jurors tell us they can do it.  Some

10 tell us you can't be influenced in your opinions ahead of

11 time in that way.  We can't ask you to forget about it,

12 obviously, but we have to ask you to use the mental

13 discipline just to decide the case based on what you hear in

14 the courtroom.

15      But then, again, only you can tell us if

16 you can do that.  You have read a lot about the case,

17 obviously know some people up there in Colorado.  Do you

18 think that you would be able to follow that particular rule

19 of law?

20      A.     I'm not sure.  I guess the bottom line is.

21             MR. SHOOK:  Well, Judge.

22             MS. BUSBEE:  We have an agreement.

23             THE COURT:  Mr. Kolpanen, we appreciate

24 your time and service today.  And knowing all three ends of

25 this program here, the attorneys have agreed that you know a

1    little bit too much, a little bit too close.  We appreciate

2    your time today and I'll excuse you from jury service.

3                    PROSPECTIVE JUROR:  Thank you.

4                         (Recess)

5                    THE COURT:  Ms. Martin.

6                    [Prospective juror in]

7                    THE COURT:  Good morning.

8                    PROSPECTIVE JUROR:  Good morning.

9                    THE COURT:  We have Pamela Martin, No.

10   1746.  Ms. Martin, it was Monday morning, was it not,

11   getting down here through the traffic?

12                   PROSPECTIVE JUROR:  Oh, Jesus whip, yes,

13   sir, it was.

14                   THE COURT:  We waited for you a little

15   bit and then --

16                   PROSPECTIVE JUROR:  I called.

17                   THE COURT:  I appreciate that so much

18   because we were all sitting around here waiting and trying

19   to get people in order.  You were the first one up, so we

20   tried to wait and we let Mr. Kolpanen come in and now it's

21   your turn.

22                   PROSPECTIVE JUROR:  I did what I could,

23   when you are sitting dead in the water.

24                   THE COURT:  I appreciate the phone call.

25   Bottom line is now you have had time to come down and get

1  settled down.  Gave you an opportunity to read the

2  questionnaire that you filled out for us in May?

3                 PROSPECTIVE JUROR:  Yes.

4                 THE COURT:  And have you had an

5  opportunity to read the guide I provided for you this

6  morning?

7                 PROSPECTIVE JUROR:  Yes.

8                 THE COURT:  I know that's a lot of law to

9  hit someone with on a Monday morning when you are running

10  late.  You don't have to be able to understand everything

11  right now or give it back to us verbatim, but this is an

12  opportunity for the attorneys to visit with you about the

13  issues in this case and understand how all these laws

14  relate.

15                 At the end of the program I need to be

16  able to answer two questions.  Number one, do you understand

17  the law?  Number two, can you follow the law?  That's my big

18  picture here.

19                 PROSPECTIVE JUROR:  Okay.

20                 THE COURT:  The only question that I have

21  for you at this time is will you be able to serve this

22  Court, beginning on November 10th for two weeks?

23                 PROSPECTIVE JUROR:  I'm a high school

24  teacher with three lesson plans a day.

25                 THE COURT:  Yes.

1    PROSPECTIVE JUROR:  It's going to -- it's

2  going to put a bind on my school district.

3    THE COURT:  Yes, ma'am.  I understand

4  that and that's just the way -- if we had to excuse people

5  for business reasons --

6    PROSPECTIVE JUROR:  I know.  I'm telling

7  you.  You know, personally can I be here?  Yes.  But it's

8  going to -- it's going to be a problem for my job.

9    THE COURT:  That's why I'm going so far

10  enough out in advance so you would have an opportunity to

11  plan and schedule around.  It's not like you show up on

12  Monday morning with jury service, you are told once you get

13  here it's going to be two weeks.  I'm telling you in

14  advance, so you will be able to schedule your sub and your

15  district will have to work around it.  That's just the way

16  it is.

17    PROSPECTIVE JUROR:  Will I be able to

18  leave at all to go, like, go pick up materials to grade?

19    THE COURT:  Oh, yes, ma'am.

20    PROSPECTIVE JUROR:  Subs don't grade.

21    THE COURT:  You will be able to use the

22  phone during the day.  We'll have breaks in the morning,

23  lunch, and in the afternoon.  And you would be able to go

24  home at night.

25    PROSPECTIVE JUROR:  Okay.

1          THE COURT:  We work, as I said in the

2    guide, normal business hours.

3          PROSPECTIVE JUROR:  Okay.

4          THE COURT:  The only time that you would

5    be sequestered, which means put in a hotel overnight, is if

6    the jury is unable to reach a decision by the end of the

7    day.

8          PROSPECTIVE JUROR:  Okay.

9          THE COURT:  And that would only occur at

10   the end of the trial.

11         PROSPECTIVE JUROR:  As long as I can be

12   in communication at my school to pick up, you know, this is

13   what I want you to do, look at what they did, and then this

14   is what I need for you to do the next day.  I teach reading,

15   okay?  A lot of my students are ESL.  And it's not like I

16   can go in there and make two weeks' worth of lesson plans,

17   because a lot of it is on an individual day-to-day, what

18   were they able to do today, what do they need to do tomorrow

19   in sequence to that.

20         THE COURT:  I understand your

21   apprehension.  But I can tell you are a very organized

22   person and you will be able to organize it.

23         PROSPECTIVE JUROR:  Thank you.

24         THE COURT:  Mr. Wirskye?

25         PROSPECTIVE JUROR:  That didn't work,

1   huh?

2              THE COURT:  No, ma'am.  It hasn't worked

3   on anybody, so don't feel bad.

4              PROSPECTIVE JUROR:  I have another

5   question.  I have a bite plate.  I had to have emergency

6   surgery on my mouth this summer.  Is that a problem with you

7   understanding me at all?  Is that a problem right now?

8   Because I've had some problems with my kids trying to get

9   used to -- I have a little bit of a lisp because of it.

10             THE COURT:  No, ma'am.

11             MR. WIRSKYE:  May it please the Court.

12                  PAMELA MARTIN,

13   having been duly sworn, was examined and testified as

14   follows:

15                  DIRECT EXAMINATION

16   BY MR. WIRSKYE:

17        Q.    Ms. Martin, how are you?

18        A.    Oh, I'm wonderful.

19        Q.    I'm not sure I quite believe you.

20        A.    Then you do recognize sarcasm when you hear

21   it.

22        Q.    I'm frequently on the other end of sarcastic

23   remarks.

24        A.    I understand.  You must be married.

25        Q.    About a year now.  My name is Bill Wirskye.

1    I'll be the Assistant DA that will be visiting with you for

2    the next few minutes.  I'd like to talk to you a little bit

3    about some of the information on your questionnaire and talk

4    to you about what you think about the death penalty and then

5    maybe talk to you a little bit about some of the laws and

6    rules that apply in a death penalty case and just any

7    criminal case.

8            A.    Okay.

9            Q.    Yeah.  You gave it a good shot with the Judge

10   trying to get out, but you said that you teach reading; is

11   that right?

12           A.    I teach reading and English.

13           Q.    Okay.  And you have just, I guess, recently

14   moved to Dallas County within the last four or five years?

15           A.    Yes.  I was raised in Mineola, Texas, lived

16   there for 36 years, went through an early midlife crisis,

17   and I woke up and lived in Montgomery, Alabama, and stayed

18   there for ten years.  And my daughter came there and went to

19   school, went to college, went to Auburn.  And then when she

20   came back to Texas in '97, I was near the end of being

21   vested in their program.  So I came back to Dallas.

22                 I've only lived -- I've had family in

23   Dallas forever, but I've only lived in Dallas myself since

24   July of '99.

25           Q.    Okay.  And you teach at Lake Highlands; is

1    that right?

2              A.    Yes.

3              Q.    And your husband is in the catering business?

4              A.    Yes.

5              Q.    What type of business does he have?

6              A.    He's an independent caterer.  I know you have

7    seen him.  He works in South Dallas.  As a matter of fact,

8    it was because he showed me how to get here last time that I

9    was only able to bail off the freeway and come through the

10   wonderful South Dallas homeless shelters to get here.  But I

11   knew where I was going at least, anyway.  He's a -- he has a

12   truck.  He's a co-caterer.

13             Q.    Okay.  You have been on a jury before; is that

14   right?  A civil jury?

15             A.    A civil jury, yeah.  And it was years and

16   years ago in Wood County.

17             Q.    Anything you remember about that or what type

18   of case it was?

19             A.    It was a workers compensation case.  There

20   were only six of us.  Nobody wanted to be -- take the

21   initiative and even act as a foreman.  Finally I said, look,

22   I don't want to be here all day.  I ended up acting as a

23   foreman.  And I don't even remember the verdict.  I know

24   there was some compensation, but not what was asked for.

25             Q.    Okay.  So there was some recovery, but not --

1    A.    Yeah.   I mean, we're talking 25 years ago,

2 maybe.

3    Q.    Okay.   Fair enough.   Now, you have told us on

4 your questionnaire that you believe in the death penalty; is

5 that right?

6    A.    Yes.

7    Q.    Why do you think we should have a death

8 penalty in our society?

9    A.    Why?

10    Q.    Yes, ma'am.

11    A.    Well, it's like I said in my questionnaire,

12 there are some people who, for whatever reason, lack of

13 values, lack of upbringing, lack of morals, whatever, choose

14 to dedicate themselves to hurting other people.   And once

15 that pattern is established and recognized, why should we --

16 and it just keeps going on and on and on, why should we as

17 taxpayers continue to support that person's life when they

18 are a burden to society?

19         I'm an educator.   Give me $38,000 a year

20 that we spend on an inmate and let me put it in my

21 education.   Let me educate children.

22    Q.    Okay.   Is there a particular type of case, a

23 factual type of case or maybe a case you read or heard about

24 that comes to mind when you think about the death penalty in

25 an appropriate case?

1    A.    No, not a particular case.  Um, repeated, you

2  know, a serial killer.  I'm fascinated by serial killers.

3    Q.    I read that in your questionnaire.

4    A.    I can't explain it.  My husband says it's

5  because I'm crazy.  But I know that there is so little

6  difference between you and me and a serial killer.  What is

7  it in that mindset that makes them cross that line?  And I'm

8  fascinated by that.  What turned -- what was the trigger?

9  What was the key?  Children, of course, harming, killing

10  children.  But there's no particular case.

11    Q.    Okay.  As you have probably got a chance to

12  read our law in Texas we reserve the death penalty only for

13  murder cases, and then only for a certain type of murder

14  case, a certain subset of murder cases.  Serial killers

15  would be among them, mass murderers.  A person that commits

16  an intentional murder in the course of another felony like

17  robbery, rape, burglary, child under six, kill a policeman

18  or fireman on duty, that time of thing.

19    A.    Right.

20    Q.    Is that something generally -- looks like you

21  are nodding your head, that you kind of agree with?

22    A.    Yeah.  There has to be some standards.  If we

23  didn't, Texas would be executing somebody every 30 minutes.

24  There has to be, you know, some degree of severity to say,

25  okay, we're going to try this as capital and we're just

1  going to try this as murder.  There has to be some line of

2  separation.

3       Q.    Let me ask you this.  On the questionnaire we

4  asked people to kind of rank themselves on a scale of 1 to

5  10 how strongly they feel about the use of a death penalty

6  and you gave yourself an 8, which I know means different

7  things to different people.  I'm curious as to what it meant

8  to you when you assigned yourself an 8?

9       A.    An 8, okay.  If I, by giving somebody or

10  saying that an 8 to me, I think I'm in favor of it.  I think

11  if we give somebody the death penalty, it should be carried

12  out.  There are some, you know, as I said, there are some

13  crimes so bad, so horrific, that that person does not even

14  need to be in the population of a prison.  I mean, his very

15  existence or her very existence is simply bleeding the

16  system.  We are spending more money on upkeep and appeals

17  and all those things.  And the person themselves are not

18  being changed at all.

19       Q.    Uh-huh.

20       A.    You know.

21       Q.    So it sounds like you feel fairly strongly

22  about its use in an appropriate case?

23       A.    Yes.

24       Q.    We talk to a lot of people.  Some people don't

25  believe in the death penalty.  They obviously wouldn't be

1    qualified to be a juror.  And some people believe too

2    strongly and too adamantly in the death penalty.

3         A.     You mean like the people that say let's kill

4    them all and let God sort them out?

5         Q.     Pretty much that type.  And there's people in

6    the middle like you that it just depends on the facts and

7    circumstances.

8         A.     Right.

9         Q      Let me take it to the next level with you.  I

10   think oftentimes when we think about a capital murder or a

11   person committing that type of crime, we think about the

12   person that actually caused the death.

13        A.     Right.

14        Q.     The triggerman.  And oftentimes, as you well

15   know, crimes are committed by more than just one person.

16        A.     Exactly.

17        Q.     You can have a group or gang of people commit

18   the crime.  A lot of people we talked to who are very

19   strongly in favor of the death penalty for the triggerman or

20   the person that actually took the life, would, when it came

21   to an accomplice, a person who actively participated but

22   didn't actually cause the death, when it comes to that

23   accomplice-type person, they would not have the death

24   penalty available for an option.  They would just reserve

25   the death penalty for the person that actually pulled the

1    trigger, the person that actually took the life.

2         A.    Uh-huh.

3         Q.    When it came to an accomplice, you know, they

4    may want to lock me up for life, but they don't feel for

5    whatever reason, morally, ethically, philosophically, that

6    the death penalty is justified for an accomplice.  I'm

7    curious where you come down on that issue?

8         A.    My husband and I had this conversation Friday

9    night.  If we're together and we decide to rob a store and

10   I'm with him and I go in and he pulls a gun and kills the

11   merchant, I am not guilty of murder.  I did not commit that

12   murder.  He did.

13        Q.    Okay.  Because you didn't have the intent,

14   sounds like?

15        A.    Exactly.

16        Q.    Okay.  And let me explain our law to you,

17   because there's two ways under the law in Texas that you can

18   find an accomplice guilty of capital murder --

19        A.    Uh-huh.

20        Q.    -- and ultimately face the death penalty.  One

21   is if the accomplice actively aids, directs, or solicits or

22   encourages someone to commit that capital murder.  The other

23   is under the law of conspiracy.  And I think it's almost the

24   exact same example you were probably talking about with your

25   husband.

1          But let me give you this example and see
2  if it's the same one.
3          A.      Okay.
4          Q.      Mr. Shook and I decide we're going to go rob a
5  bank.  He's got a gun.  I don't have one.  I'm going to be
6  the bagman.  He's going to go in and hold everyone up at
7  bay, threaten them, while I pick up the money.  And that's
8  the plan.
9          And then we go to do that bank robbery
10  and for whatever reason, you know, maybe somebody looks
11  funny at Mr. Shook, he decides on his own to shoot and kill
12  that person.  Okay?
13          A.      Right.
14          Q.      He's committed a capital murder.  He's the
15  triggerman.  He had the intent to cause the death.  I didn't
16  have any intent.  I just signed up for the bank robbery.
17  That's all our plan was.  That's all our agreement was.
18          But the law in the State of Texas,
19  depending on the facts and circumstances, could actually
20  hold me responsible for capital murder and ultimately I
21  might receive the death penalty, even though I didn't have
22  any intent that that happen.
23          Is that kind of the same example you were
24  talking about with your husband?
25          A.      That's exactly right.  And I'm sorry, I can't

1  hold someone responsible if they did not actually fire the

2  gun that killed the person.

3      Q.    A lot of people feel that way.  You know, the

4  law is a little broader.  It allows us to prosecute people

5  as an accomplice.  And I'll be very frank with you, that's

6  what we're doing in this case, prosecuting Mr. Murphy as an

7  accomplice, not as a triggerman.

8            And if people disagree with that law to

9  such an extent that they just couldn't ever consider the

10 death penalty for an accomplice, then they just couldn't

11 follow the law, they wouldn't be qualified to be a juror in

12 this case, and we thank them for coming down and probably

13 send them on their way.  And that's kind of what I hear you

14 saying.  You disagree with that aspect of the law?

15     A.    You are going to have to -- you would have to

16 prove to me that he knew that that was going to happen and

17 that he was -- if he was not a participant, at least a

18 willing bystander.  Do you understand the difference?

19     Q.    Run me through that again.

20     A.    Okay.  That he was a willing participant, not

21 as far as having a gun in his hand, but knowing that if

22 someone got in the way, that that person would be killed and

23 that was agreed upon.

24     Q.    Okay.  Absent that, you would never consider

25 the death penalty?

1    A.    I don't know.  I'm telling you from my heart I
2  need to know without a shadow of a doubt that this person
3  conspired, prompted, coerced, helped, did something more
4  than just stood there and watched another person.

5    Q.    Okay.  The law exactly, going back to the
6  hypothetical that you mentioned and I talked about, the bank
7  robbery --

8    A.    Uh-huh.

9    Q.    -- if the jury finds in my situation that I
10 should have anticipated that a life could be taken during
11 the --

12    A.    Because of the circumstances.

13    Q.    Yes, ma'am, looking at the facts and
14 circumstances, then I could be found guilty of capital
15 murder.

16    A.    Okay.

17    Q.    If I'm found guilty of capital murder, like an
18 accomplice, if the jury thinks I should have anticipated,
19 before the death penalty could be imposed upon me, we have
20 these Special Issues that you looked at.

21    A.    Right.

22    Q.    Then there's a little higher burden.  And the
23 jury has to find not only should I have anticipated that a
24 life would be taken, but did I anticipate?  Did I actually
25 anticipate?

1          A.     Okay.

2          Q.     And see the standard between should have and

3    did anticipate?

4          A.     Say the last part again for me.

5          Q.     Okay.  I want to make sure that you see the

6    difference between the two standards, should have

7    anticipated and did anticipate.

8          A.     And the difference between should have would

9    be going into this you knew what was going to happen and you

10   anticipated that it could happen?

11         Q.     In order -- there's two different standards.

12         A.     Or am I confusing myself or --

13         Q.     Let me back up and run through it one more

14   time.

15         A.     Let's try it one more time.

16         Q.     In order to find somebody, an accomplice,

17   guilty under the law of conspiracy --

18         A.     Okay.

19         Q.     -- of capital murder where they didn't, you

20   know, cause the death and didn't have the intent, a jury

21   would have to find that he should have anticipated, should

22   have anticipated, that a life would be taken.

23                And if they are convicted of capital

24   murder, before the death penalty could be imposed, then the

25   jury would have to find a little bit higher, not only did

1  they should have anticipated, but did they actually

2  anticipate, did they anticipate?

3       A.    Okay.  So you are talking about prior

4  knowledge?

5       Q.    Pretty much, in a general sense.

6       A.    Right.  Which is a different scenario than

7  what I told you about my husband and I.  If we go in to rob

8  something and I don't even know he has a gun and he pulls it

9  out and kills somebody, I am not guilty of murder, even

10 though I'm present.  If we're simply going in there to rob

11 and there's -- I have no knowledge of the gun.  But, now, if

12 we've all got guns and we're going in there, you know, with

13 the threat of that and somebody is killed, yeah, I'm

14 responsible because I went in there willingly with the

15 weapon to make this transaction take place.

16      Q.    Okay.

17      A.    Did I clarify myself any on that?

18      Q.    Uh-huh.  How about my example?

19      A.    Where you are the bagman and your accomplice

20 has the gun?  Yeah, because you knew.

21      Q.    Okay.  Knew what could happen?

22      A.    You knew that somebody had the gun.  My

23 scenario was I didn't know there was a gun there at all.

24      Q.    Okay.  So let me see if I -- make sure that

25 I'm hearing you right.  You wouldn't automatically take the

1  death penalty off the table for an accomplice?

2      A.      No.  Because if he went in with -- if he went

3  in with the weapon and everybody else has weapons, somebody

4  is going to get hurt.

5      Q.      Okay.  So just depends on the facts and

6  circumstances of the case?

7      A.      Yes.

8      Q.      And, like I said, that's what the law

9  recognizes.

10     A.      Right.

11     Q.      I think you were actually right on par with

12 the law.  If they should have anticipated and they did

13 participate, they could actually be found guilty of capital

14 murder and be executed.

15     A.      Well, it doesn't take a brain scientist, if

16 all of us have guns and we walk into a bank and only one of

17 us uses the gun, the rest of us knew that the possibility of

18 the rest of us using a gun was very strong.  I mean --

19     Q.      A lot of people tell us that and it's kind of

20 a common sense proposition.

21     A.      Right.  But the scenario that I was talking

22 about prior to was because -- I've lost some sleep over

23 this, having to come down here and do this.

24     Q.      Okay.

25     A.      And I was talking to my husband and I said, I

1   know one of the things that they are going to question me

2   about is can I find -- can I find someone guilty if he did

3   not commit -- if he did not actually commit the murder.  You

4   are going to have to prove to me that he knew what they were

5   doing, that he was a part and parcel, that he would not, you

6   know, he was unarmed, not -- you understand?

7          Q.     Yes, ma'am.  Let me ask you this, kind of

8   moving along from that area real quick.  Almost everybody we

9   talk to that we bring down has heard about this case.

10         A.     Sure.

11         Q.     You know, and --

12         A.     Unless you live in a cave.

13         Q.     Pretty much.  I was curious if you could tell

14  us what you have heard about this case.

15         A.     News coverage.  Followed it, you know, on the

16  news when it happened.  I've read and seen the news coverage

17  of the other, what, five trial results?

18         Q.     Okay.  Do you remember the details in terms of

19  the crime that you may have heard from the news?

20         A.     That's one thing I didn't reread today.  But

21  I'm going to tell you what I remember.  Okay?  It was

22  Christmas Eve, Oshman's, Irving.  These seven men who had

23  escaped from prison had made their way to the Dallas/Ft.

24  Worth area.  They went in to rob Oshman's.  During the

25  robbery or as the robbery was ending, Mr. Hawkins, Aubrey

1    Hawkins, was that his name?  A security guard, showed up and

2    in their attempt to escape he was killed.

3         Q.    Okay.  You said you are aware of the results

4    of the other trials, too?

5         A.    Yes.

6         Q.    Having the knowledge of the facts of the crime

7    or at least what the media has reported and the verdicts in

8    the prior cases, how do you think that might affect you, if

9    you were selected to be a juror in this case?

10        A.    I can't tell you why the other five sentences

11   were returned the way they were, because I wasn't in the

12   courtroom and I didn't hear the testimony.  I didn't sit on

13   that jury.

14        Q.    That's basically what the law requires that a

15   person who -- to be a juror in a case such as this or any

16   case, just bases their verdict on the evidence they hear in

17   the courtroom, not something they would have heard or

18   anything like that.

19             Is that something that you think that you

20   can do?

21        A.    Yes.

22        Q.    Ma'am, give us just a minute.

23             MR. WIRSKYE:  I think we have an

24   agreement, Your Honor.

25             THE COURT:  Any further questions?

1           MR. WIRSKYE:  Nothing further.

2           MS. BUSBEE:  Your Honor, we do have an

3    agreement.

4           THE COURT:  Ms. Martin?

5           PROSPECTIVE JUROR:  Yes.

6           THE COURT:  You won't have to worry about

7    your lesson plans.  You will be able to manage your show.

8    We appreciate your time and service coming today, but the

9    bottom line is the parties feel you have -- you know a

10   little too much about this case to serve on the jury.  We

11   appreciate your time and service.

12          PROSPECTIVE JUROR:  Thank you.

13               [Prospective juror out]

14          THE COURT:  Ms. Culver.

15               [Prospective juror in]

16          THE COURT:  Ms. Culver, how are you?

17          PROSPECTIVE JUROR:  Okay.  Thank you.

18          THE COURT:  We have juror No. 1818, Ruth

19   Ann Culver.  Welcome to the 283rd.  Have you had an

20   opportunity this morning to review the questionnaire that

21   you completed for us back in May?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  Have you had an opportunity

24   to read a couple of times the juror guide that I provided

25   for you, also?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  I know that's a lot of law to

3  give someone first thing Monday morning when you walk in the

4  door.  We don't expect you to understand it completely at

5  this time.  The attorneys are going to visit with you about

6  some of the answers that you provided and ask you to expound

7  upon those in your questionnaire, go over the law with you.

8  This is your opportunity to ask questions and understand the

9  law.

10          PROSPECTIVE JUROR:  Okay.

11          THE COURT:  At the end of the process my

12  job is twofold.  I have two questions to answer.  Number

13  one, do you understand the law?  Number two, if you

14  understand the law, can you follow the law?  That's the big

15  picture I have to look at.  Fair enough?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Only question I have for you

18  at this time is will you be able to serve this Court

19  beginning on November 10th for a period of two weeks?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  With that, I'll turn it over

22  there to Mr. Shook.

23          MR. SHOOK:  May it please the Court.

24          RUTH ANN CULVER,

25  having been duly sworn, was examined and testified as

1   follows:

2                    DIRECT EXAMINATION

3   BY MR. SHOOK:

4        Q.      Ms. Culver, my name is Toby Shook and I'm

5   going to be asking you questions on behalf of the State this

6   morning.

7        A.      Okay.

8        Q.      We just want your honest opinions and answers.

9   We go through a lot of people.  You have been very

10  forthcoming in your questionnaire.  I want to cover a few

11  things on the questionnaire and then talk about capital

12  murder.  Okay?

13       A.      Okay.

14       Q.      Let me get to one area because everyone is

15  unique and you've been very upfront and honest.  I think, it

16  was in 1993 you were in a traffic accident; is that right?

17       A.      Yes.

18       Q.      And had a closed head injury at that time

19  which you received some treatment for?

20       A.      Yes.

21       Q.      You said on your questionnaire that under

22  stressful situations sometimes that still causes you a lot

23  of stress at times and that sort of thing.  And what I want

24  to be sure of, because obviously you know this is a capital

25  murder case in which the State is seeking the death penalty.

1  And with that type of decision being made, a lot of jurors

2  in the past have told us it's pretty stressful in the

3  deliberation room.

4                    And I wanted to make sure before I went

5  any further with you, from what you know about your

6  condition, would that be a problem for you in this type

7  case, do you think?

8        A.    I really can't say.  The more stress I have, I

9  get migraines and they are less and less over the ten years,

10 but --

11       Q.    Okay.  I just looked at that.  Before I got

12 too far into it I wanted to ask you about that because, you

13 know, I don't know how stressful it is.  I just know what

14 jurors have told us before.  And, obviously, it's a decision

15 involving the possible execution of a human being.  So I

16 wanted to ask you about that because you said when dealing

17 with stress, you said sometimes you cry under stress or

18 pressure.  I wanted to make sure it wasn't going to, from

19 what you knew, it would be a problem or not?

20       A.    I can't answer that, having never done jury

21 duty or anything like this, no.

22       Q.    Okay.  Fair enough.  You grew up here in the

23 Dallas area?

24       A.    For the most part, yes.

25       Q.    Lived here most of your life?

1        A.      Yes.

2        Q.      You belonged to MADD for many years you said.

3   What led you to belong to MADD?

4        A.      Um, just teenagers racing on side streets

5   around our house and seeing the damage that they were doing

6   to their vehicles, not to mention themselves.

7        Q.      Okay.  Let me talk to you a little bit about

8   capital murder and how you feel about that.  We ask every

9   juror, we go into detail about that.  You put on your

10  questionnaire that you were in favor of it as the law.  Tell

11  me why you favor the death penalty in certain cases and what

12  purpose you feel it serves.

13       A.      I just think if someone does the crime, they

14  need to take their punishment.  If they take a life, they

15  need to be willing to give their own, unless, of course, it

16  were for self-defense or something along those lines.

17       Q.      Have you always believed in the death penalty

18  as a law since you were an adult?

19       A.      Yes.

20       Q.      Has there been any one experience or something

21  you have seen to cause you to feel that way or was it kind

22  of the way you were raised, perhaps?

23       A.      Neither, really.  Just through the years,

24  reading about murders and in the newspaper and everything,

25  and things that happened and the sentences that they get,

1    and then hearing later that they, you know, they are up for

2    parole after eight years or whatever.

3          Q.    Have you followed any cases in the media

4    locally or nationally that you thought were a death penalty

5    case or something to be considered for the death penalty?

6          A.    Since my accident in '93, I don't watch news,

7    period.

8          Q.    Why is that?

9          A.    Because for many months after I came home out

10   of my coma and everything, I would just see stuff and hear

11   stuff and just start crying and couldn't stop.

12         Q.    Okay.  It was just something you might see?

13   What type of news story would it be?  Could it be anything?

14         A.    Anything, especially accidents, car accidents,

15   or shootings or --

16         Q.    Traumatic experiences and that sort of thing?

17         A.    Yes.

18         Q.    Does that still occur from time to time?

19         A.    I don't watch enough.  I'll watch a few

20   minutes here and there, but I'm very picky about what I

21   watch.

22         Q.    So you just don't know?

23         A.    Right.

24               MR. SHOOK:  May we approach, Judge?

25               THE COURT:  Pass the witness?

1    MR. SHOOK:  Yes.

2    MS. BUSBEE:  Your Honor, we have reached

3  an agreement.

4    MR. SHOOK:  That's all the questions I'll

5  have.

6    THE COURT:  Ms. Culver, these cases

7  aren't for everybody and the parties have agreed that it

8  would probably cause a little more stress than you might

9  anticipate and we will excuse you from jury service.  Thank

10  you so much.

11    PROSPECTIVE JUROR:  Thank you.

12    [Prospective juror out]

13    THE COURT:  Mr. Harper.

14    [Prospective juror in]

15    THE COURT:  Thank you, sir.  Good

16  afternoon.  Please have a seat.  We have juror No. 1820,

17  Mr. Kevin Duane Harper.  Mr. Harper, thank you for being

18  here on time.  The Sheriff said you were here at 1:00.

19  Sorry we didn't start earlier, but we started on time.  It's

20  1:30.

21    I appreciate you having an opportunity to

22  read the questionnaire you filled out for us in May.  The

23  attorneys will go over those answers with you and may want

24  you to explain some of your answers or add to or simply just

25  enlighten them somewhat.

1    Did you have an opportunity to read a

2   couple of times the guide I provided for you?

3    PROSPECTIVE JUROR:  I just started

4   reading this part right here.

5    THE COURT:  If they have a question, such

6   as on page 3, look at the answer that you gave.  Did you

7   have time to look at the guide that I provided for you?

8    PROSPECTIVE JUROR:  Yes, I did.

9    THE COURT:  At the end of the process I

10  have two questions to answer.  Number one is do you

11  understand the law?  Number two, if you understand the law,

12  can you follow the law?  That's my big picture.  You don't

13  have to -- that's a lot to be able to digest in 30 minutes.

14  We don't expect you to understand it all.  The lawyers will

15  help you with that.

16    The only question that I have for you at

17  this time is will you be able to serve this Court for the

18  two weeks beginning on November 10th?

19    PROSPECTIVE JUROR:  It will be kind of

20  tough, but we'll see what we can do.

21    THE COURT:  Yes, sir.  I expect it to be

22  tough for anybody that's in this box.  So the way I

23  compensate for that is I tell you I would use your time as

24  best I can, which means I start on time, so we don't waste

25  it.

1    PROSPECTIVE JUROR:  Yes.

2    THE COURT:  Number one complaint we have

3    from jurors is the, you know, hurry up and wait.  Why are

4    you wasting my time?  I won't waste it.  I can promise you

5    that.  So with that I'll turn it over to Mr. Wirskye.

6    MR. WIRSKYE:  May it please the Court.

7    KEVIN HARPER,

8    having been duly sworn, was examined and testified as

9    follows:

10    DIRECT EXAMINATION

11    BY MR. WIRSKYE:

12    Q.    Mr. Harper, how are you this afternoon?

13    A.    Pretty good.

14    Q.    My name is Bill Wirskye and I'll be the

15    Assistant DA that will be visiting with you for the next few

16    minutes.  What I would like to do is talk a little bit about

17    your questionnaire and follow up on some of that

18    information, talk to you a little bit about your thoughts on

19    the death penalty, and then talk about some of the laws that

20    apply in a case like this where the State is seeking the

21    death penalty.

22    You said it would be hard for you to

23    serve for two weeks.  Tell us about that.

24    A.    I'm an independent contractor.  I'm -- the

25    only thing I was worried about is how I'm going to provide

1    for my kids.  If I take off, I make no money at all.

2          Q.     Okay.  And you have got four kids, is that

3    right, to support?

4          A.     Yes.

5          Q.     So if you were down here for two weeks, you

6    wouldn't get paid for two weeks; is that right?

7          A.     Exactly.

8          Q.     As the Judge told you, it's not a legal

9    disqualification, but sometimes both sides like to know

10   exactly what is going on with the person and that type

11   thing.  You have been down on jury duty once before; is that

12   right?

13         A.     Yes, sir.

14         Q.     Tell us about that case.

15         A.     On that particular case -- it's been a while,

16   so on that particular case the guy had -- he didn't really

17   get what I thought he deserved.  It was one person that seen

18   it completely different than everyone else.

19         Q.     How long ago was that?

20         A.     I would say last year.

21         Q.     Okay.  Was it -- what type of case was it?

22   What was the charge?

23         A.     Um, I couldn't remember exactly what the

24   charge was.  It was something with drugs.

25         Q.     Okay.  Did y'all end up reaching a verdict or

1   --

2       A.      It was a hung jury is what they said they call

3   it.

4       Q.      Okay.  So how did the deliberations go?  It

5   sounds like maybe you had one person that didn't see it the

6   same way?

7       A.      Yes, exactly.

8       Q.      Did you take a while or was it pretty heated

9   or how did it go?

10      A.      Yes, it was pretty heated up in there, to tell

11  you the truth.  We all talked to her, I think, individually

12  and asked her certain questions that we felt and explained

13  to -- each one of us, I think, talked to her and tried to

14  explain it to her how we felt and she just did not feel the

15  same way we did.

16      Q.      How long did you spend trying to convince her,

17  I guess?

18      A.      I think the whole thing was three days.  She

19  had her mind set when we walked in the door.

20      Q.      You spent three days deliberating?

21      A.      We were there for three days.

22      Q.      Anything about that experience -- I know you

23  have checked on your questionnaire was an unsatisfactory

24  experience, but anything about having had that experience

25  that gives you pause for concern going into this, maybe

1    being a juror on a death penalty case?

2           A.    I just kind of wonder if the system works

3    sometimes.

4           Q.    Because of that experience?

5           A.    Yes.

6           Q.    Okay.

7           A.    After seeing the whole thing, you know, on TV

8    is one thing, but when you are actually here, it's

9    completely different.

10          Q.    Okay.  And we always ask people what type of

11   contact they have had with the system.  Looks like you

12   indicated on your questionnaire that you may have had a DWI?

13          A.    Yes, sir.

14          Q.    Sometime in the '90s?  When was that?

15          A.    It was in the early '90's.  You know, I

16   learned my lesson, that's for sure.

17          Q.    Did you plead guilty or go to trial?

18          A.    Guilty.

19          Q.    Looks like you got probation?

20          A.    Uh-huh.

21          Q.    For a year or two?

22          A.    Actually, I think it was one year.

23          Q.    How did you feel you were treated during that

24   experience?

25          A.    Fairly.

1   Q.      You don't have an axe to grind with anybody at

2   the DA's Office?

3   A.      No, sir.

4   Q.      Happy with your lawyer that you had and

5   everything?

6   A.      Uh-huh.   I think he treated me real fair.

7   Q.      Okay.   Fair enough.   What did you think when

8   you found out you were going to have to come back for the

9   individual interview on a death penalty case when we first

10  notified you to come back?

11  A.      I just figured I must be on some special list

12  or something.

13  Q.      Feel like you were on a lucky list or unlucky

14  list?

15  A.      I don't know.   You never know.

16  Q.      You told us that you are generally in favor of

17  the death penalty; is that right?

18  A.      Yes, sir.

19  Q.      Why do you think we should have a death

20  penalty in our system?

21  A.      I think that some people that do heinous

22  crimes like this should be punished the same.

23  Q.      Okay.   Is there a particular case that comes

24  to mind when you think about an appropriate case for the

25  death penalty?

1        A.      Um, no, not really.  They are all different.

2        Q.      I notice you said "a case like this."  I

3   didn't know if you were specifically talking about this case

4   or just a case.

5        A.      Just a murder case in general, I guess.

6        Q.      Okay.  Any case you followed on TV or read

7   about in the media or anything like that that comes to mind?

8        A.      The O. J. Simpson was about the first one that

9   I ever paid any attention to, really, at a younger age.

10       Q.      Did you ever reach an opinion one way or the

11  other whether O. J. did it or not?

12       A.      No, not really.  It's a lot of media hype on

13  that one.

14       Q.      Probably like me you don't always trust

15  everything that you hear or see in the media; is that right?

16       A.      Exactly.

17       Q.      We ask people to kind of rank themselves on a

18  scale of 1 to 10 as to how strongly they feel about the

19  death penalty and it means different things to different

20  people and you gave yourself a 9.  I was kind of curious

21  what was going through your head when you gave yourself a 9

22  on a scale of 10 about the death penalty?

23       A.      On that I really firmly believe that -- my dad

24  was in the Korean War.  He was a pretty tough guy.  And the

25  way he brought us up is most people should pay for their

1　crimes.

2　　　　Q.　　Okay.　You probably know from looking at that

3　packet of law that in Texas, you know, we only reserve the

4　death penalty for murder cases and then only particular

5　types of murder cases.　There's a lot of very brutal, very,

6　you know, gruesome facts, that type of thing, those types of

7　murders, that don't qualify for the death penalty.

8　　　　　　　　One way to think about it is it has got

9　to be a murder plus something else, another aggravating

10　factor.　Murder of a police officer, a fireman, a prison

11　guard on duty, murder in the course of another felony like

12　robbery, burglary, rape, that type of thing.　Mass murder,

13　serial murder, if you kill a young child, child under six,

14　those are the type cases that we reserve the death penalty

15　for.　Does that pretty much fit with your view --

16　　　　A.　　Yes, sir.

17　　　　Q.　　-- to have it available for those type crimes?

18　　　　A.　　Yes, sir.

19　　　　Q.　　Let me kind of take you to the next level with

20　you.　You know, we talk to a lot of people, a lot of them

21　that are very strongly in favor of the death penalty.　But

22　when you start talking about particular aspects of the law,

23　they start to draw some lines.

24　　　　　　　　And what I mean by that is this.　I think

25　when we think about a capital murder, usually the first

1    thing that pops in your head is just maybe one guy going in

2    like a 7-Eleven, holding up the 7-Eleven, shooting and

3    killing the clerk and getting off with the money, that type

4    thing.

5              But oftentimes crimes are committed by

6    more than one person.  Groups or gangs of people can commit

7    a crime.  And the law allows us to prosecute everybody that

8    was actively involved in a crime, whether it be shoplifting

9    all the way up to capital murder.

10             And when you are talking about capital

11   murder, you may have a situation where you have got, for

12   lack of a better word, the triggerman, the person that

13   actually pulled the trigger, that actually caused the death

14   of the individual.  And then you may also have

15   nontriggermen.  You may have heard them called accomplices,

16   people that are accomplices to the crime.  They may have

17   actively participated, but they didn't actually pull the

18   trigger.

19             And some people who believe in the death

20   penalty, kind of like I said, draw a line and they would

21   just reserve the death penalty for that triggerman, the

22   person that actually caused the death.  And if it were up to

23   them, they wouldn't have the death penalty option available

24   for the accomplice.  You know, they may want to lock them up

25   for life and get them off the streets, but they don't

1  necessarily feel that a death penalty is justified for the

2  accomplice, you know, for religious, moral, ethical reasons,

3  you know. Some people tell us, you know, it's not

4  justified, unless you actually took the life yourself. And

5  they would draw that line and just reserve the death penalty

6  for the actual triggerman. What do you think about that?

7       A.     I think if they are all involved in it, they

8  should all pay the same.

9       Q.     Okay. That's pretty much what the law is. In

10  Texas, as long as you actively participate, you can be held

11  accountable. Just to give you a quick example of how the

12  law works, let's say Mr. Shook and I decide we're going to

13  rob a bank. The plan is for him to go in with a gun and

14  hold up the tellers. I don't have a gun, but I'm going to

15  bring in a bag and kind of collect the bank's money. We're

16  going to take off with it. And that's kind of the plan to

17  do that bank robbery.

18       And as we go in to do that bank robbery,

19  for whatever reason, say one of the tellers looks at

20  Mr. Shook the wrong way or he sees them going for a silent

21  alarm, or I tell him, hey, they are going for the alarm, he

22  shoots and kills a bank teller. Okay?

23       And obviously he's committed capital

24  murder. He's the triggerman. He actually caused the death.

25  He can be convicted of capital murder and ultimately face

1  the death penalty.  But the law says that me, the

2  accomplice, the nontriggerman, could also be held

3  responsible.  Depending on the facts and circumstances, I

4  could also receive the death penalty.  Does that make sense

5  to you?  The law?

6       A.     Yes, sir.

7       Q.     Okay.  And basically there's two ways to get

8  there.  In Texas we call an accomplice a party to an

9  offense.  And I don't -- most people think of accomplices,

10  but we call them parties to an offense.  You know, if I

11  direct, aid, encourage, Mr. Shook to actually commit that

12  capital murder, that legally I'm just as guilty and could

13  face the death penalty.

14            Or going back to our example under the

15  law of conspiracy, Mr. Shook and I conspire to commit a bank

16  robbery, just means we get together and agree to commit a

17  bank robbery, and a murder happens during that bank robbery

18  in furtherance of the bank robbery, then I could be found

19  guilty as an accomplice, if I should have anticipated that a

20  life could be taken, you know.  Does that make sense to you?

21       A.     Yes.

22       Q.     When you think back to the example, somebody

23  in my shoes, you know, the jury may find that I should have

24  anticipated by going in the bank with that loaded gun,

25  Mr. Shook could have committed a capital murder and caused

1   the death.  Does that make sense to you?

2         A.     Yes.

3         Q.     Is that kind of where you are in your own

4   personal beliefs?

5         A.     I feel that the key word that you said was a

6   "plan".  If you talked about it, you discussed it, you knew

7   he came in with a gun, I think that you should both be held

8   responsible.

9         Q.     So you can kind of see the wisdom in the law

10   of having the death penalty available for accomplices or

11   nontriggermen, that type thing?

12         A.     Yes.

13         Q.     The reason I spend so much time on this, just

14   to be up front with you, we are prosecuting Mr. Murphy under

15   the law of accomplices as a nontriggerman.  And that's why

16   it's important that we talk to people like you about these

17   issues in depth because we don't want to put anybody over in

18   the jury box that has some issues or concerns or hesitations

19   about the law.  But it sounds like you understand the law

20   that we have in Texas and understand how an accomplice could

21   be prosecuted and ultimately receive the death penalty?

22         A.     Yes, sir.

23         Q.     Okay.  Like almost everybody we've talked to,

24   you have, I believe, indicated that you have heard something

25   about this case?

1    A.    Yes.   I know it was all over the media for a

2  while.

3    Q.    But what do you remember about hearing about

4  this case?

5    A.    Well, when this started I remember the first

6  day that it actually started when they talked about they had

7  escaped.  Supposedly they went to Irving, was seen there

8  somewhere, something like that.  And we just kind of

9  followed it until they caught -- they caught a couple of

10  them and then they caught the remainder and stuff like that,

11  mostly just from TV and stuff like that.

12    Q.    Do you feel like you have a good feel for the

13  details of the crime or just kind of generally the news

14  coverage?

15    A.    I don't know who was the triggerperson until

16  you had said it wasn't him, so he's an accomplice.  So I

17  didn't know if he was that person or an accomplice until

18  today.

19    Q.    So you just had the general sense of the case

20  from the media?

21    A.    Uh-huh.

22    Q.    As we have already discussed, you are not the

23  type person that believes everything they hear on TV?

24    A.    Exactly.

25    Q.    Have you kept up with any of the other trials?

1          A.     No, sir.

2          Q.     Okay.  You know -- obviously, you know, when

3   you are on a case like this, we can't expect to have a jury

4   full of people that haven't heard anything about the case

5   and the law recognizes that.  What the law requires is that

6   jurors just make their decision on what they hear in the

7   courtroom.  You know, obviously as we've talked about, that

8   is the best evidence, not what they hear on TV, just the

9   evidence they hear in the courtroom from the witness stand.

10                So we always ask each juror if they would

11  be able to follow the law in that respect.  So the question

12  becomes, if you are selected to be a juror in this case, do

13  you think that you could kind of push to the back of your

14  mind whatever you have heard, not forget about it, we can't

15  ask anybody to forget about it, but kind of put it to the

16  back of your mind and just base your verdict on the facts

17  and evidence that you hear in the courtroom?

18         A.     Yes.

19         Q.     Okay.  Let me also ask you another question

20  that I had on your questionnaire.  We kind of ask in general

21  your feelings about the criminal justice system.  And you

22  said that it doesn't always work.  I'm curious if you had

23  some particular case in mind when you said that?

24         A.     No, not really.  It was just my opinion of,

25  you know, one case, O. J., you never know for sure.  It just

1   was never brought to 100 percent in my mind that he was

2   guilty or he was not guilty.

3        Q.    Okay.  Just kind of generally in every

4   criminal trial, and this trial in particular, the trial is

5   broken down into two different parts.  We call the first

6   part the guilt/innocence part.  That's where you, as a

7   juror, get to hear the facts of the crime and we ask you at

8   that point whether the State, you know, proved their case,

9   basically did we meet our burden of proof?  Is the guy good

10  for it?  Is he guilty or not of capital murder?

11             And if the jury decides during that first

12  phase that he's guilty of capital murder, then we move into

13  the second phase of trial.  And the rules of evidence kind

14  of broaden out a little bit.  You get to hear evidence of

15  his character and background, criminal history, if it

16  exists, that type of thing.

17             And we allow jurors to hear this extra

18  information because in that second phase of the trial we ask

19  them to answer these Special Issues.  And we let the answers

20  to these Special Issues -- they are basically questions, we

21  let the answers to the questions determine the appropriate

22  sentence.  We don't ask the jury to write in, you know, on

23  their verdict form, life sentence or death sentence.  We

24  just ask them to answer these questions and, depending on

25  the answers to the questions, that determines the

1    appropriate sentence.

2              Basically, if you find somebody is a

3    future danger, that they anticipated that a life would be

4    taken, and that there's nothing mitigating, nothing that

5    lessens his blame, the Judge at that point would have no

6    discretion.  He would sentence the defendant to death.

7    That's kind of our scheme that we have.

8              Does that make sense to you?  And we'll

9    talk about it more --

10        A.    Yes.

11        Q.    -- in a little bit.  Does that make sense to

12   you?

13        A.    Yes, sir.

14        Q.    You have told us you believe in the death

15   penalty.  You see the logic in having the death penalty

16   available for an accomplice.  You believe that's a good part

17   of our law.  And it's one thing, I think, to talk about

18   these things kind of generally, kind of in the abstract,

19   maybe a philosophical way, sitting around and talking about

20   it, but I know sometimes it gets to be a different sort of

21   thing when you actually get down here and you get in this

22   point in the process and you may actually be one of the

23   twelve jurors who is called on to make that life or death

24   decision.

25              I know different jurors feel differently

about it, so I want to make sure with you, before we go any

further in this process, that you don't have any hesitation,

that you feel like you are the type person, given the

evidence, you know, answer these questions, take pen in hand

and answer these questions and maybe ultimately answer them

in such a way that they would result in the execution of

another human being.  Do you feel like you are the type

person that could participate in that process?

A.    Yes.

Q.    Okay.  If you would, let's talk about these

questions for a second.  If you could, just kind of take a

minute or two.  I know you have looked at them before, but

they are phrased a little bit differently on the wall.  If

you would, just take a few minutes and read those questions.

A.    (Prospective juror complies.)

Q.    Again, those are the three questions, if you

get to that second part of the trial, that you get to

answer.  What the law -- kind of how it's set up is, when

you start that second phase, we ask jurors to start that

second phase with an open mind, that is, that they haven't

automatically answered any one of these three questions

based on what they heard in the first part of the trial.

And that's because, very frankly, you are going to hear

extra evidence, most likely, in the second phase of the

trial.  And it wouldn't be fair to either side if you

1  started that second phase with a closed mind.  Does that

2  make sense to you?

3          A.    Yes, sir.

4          Q.    Okay.  Looking at question No. 1, or Special

5  Issue No. 1, we ask whether there's a probability that the

6  defendant would commit criminal acts of violence that would

7  be a continuing threat to society.  You can kind of see how

8  that question asks a juror to make a prediction?

9          A.    Yes.

10         Q.    Do you feel like you could make that type of

11 prediction, if you got the appropriate information?

12         A.    Yes.

13         Q.    What do you think might be important to you

14 when you answer that type of question?

15         A.    I think that the fact that the man was already

16 in trouble and he committed more crimes after the fact that

17 he was already in trouble, I don't think the man knows when

18 to stop.

19         Q.    Okay.  So a person's criminal history, that

20 type of thing?

21         A.    Yes.

22         Q.    When you see that word "probability", there's

23 a couple of words in there that, unlike most things we do

24 down here, we don't have a technical legal definition.  We

25 just kind of leave it up to the jurors' good common sense.

1    When you see the word "probability", what

2   does that mean to you?

3    A.    Probability, well, enough evidence that the

4   defendant would commit another crime or something.

5    Q.    That's typically what we hear.  We don't have

6   a complete definition, but it's something more than a

7   possibility.

8    A.    Yes.

9    Q.    Because anything would be possible.  But it's

10   not quite a certainty.

11    A.    Yes.

12    Q.    Most people think about it, more likely than

13   not or a likelihood or 51 percent of the evidence, kind of

14   tilts that way.  Does that make sense to you?

15    A.    Yes, sir.

16    Q.    Okay.  Then it also talks about criminal acts

17   of violence.  And when you see that phrase "criminal acts of

18   violence", what does that mean to you?

19    A.    Well, criminal acts of violence, I just think

20   that, you know, the person is knowingly and willingly to

21   commit these offenses.  I mean, it's not something that he

22   didn't understand what he was doing or he wasn't in his

23   right mind, like I think he understood exactly what he was

24   doing.

25    Q.    Is there any particular type of crime that

1  comes to mind when you see that criminal acts of violence?

2      A.    You know, no, not really, not anything that

3  stands out.

4      Q.    Okay.  Assaults?  Rapes?

5      A.    Assault, rape, you know, any of those.

6  Nothing really stands out more than any others.

7      Q.    The key point I want to make to you, the law

8  doesn't require that we prove to you, you know, that he's

9  going to take another life or be involved in another capital

10  murder.  It's just some type of criminal act of violence.

11  Does that make sense to you?

12      A.    Yes.

13      Q.    Finally, the last word in that question talks

14  about society.  I'm just curious how you would define

15  "society"?

16      A.    Society, just being regular people like me.  I

17  think that if the guy is locked up and he broke out and did

18  something again, then I think that there's a threat that he

19  will do it again.

20      Q.    Okay.  When you talk about society, would you

21  kind of make it broad in the sense that anybody and

22  everybody he may come into contact with?

23      A.    Yes.

24      Q.    Okay.  Either in the free world or back behind

25  bars?

1      A.      Exactly.

2      Q.      I want to make sure you realize as we talk

3   about these things, we're talking about them hypothetically.

4      A.      Uh-huh.

5      Q.      We're not talking about this case.

6      A.      Exactly, I understand that.

7      Q.      Again, what you may have heard may not be the

8   facts.  You have to keep that open mind and listen to the

9   facts and evidence in the courtroom and even if you

10  convicted him of capital murder, again the law would require

11  that before you start answering these questions, that you

12  would, again, have that open mind.

13     A.      Yes.

14     Q.      That you haven't automatically answered

15  Special Issue No. 1 yes just because you found him guilty of

16  capital murder.  Does that make sense to you?

17     A.      Yes.

18     Q.      Some people tell us they can't follow the law

19  in that respect.  They say, you know, the fact that I found

20  somebody guilty of capital murder, that just automatically

21  answers Special Issue No. 1 for me, that when I start that

22  second phase, I don't have that open mind because I'm

23  automatically going to think every time if I have convicted

24  someone of capital murder, they are always going to be a

25  future danger.

1          And there's a certain amount of logic to

2    it.  But the law really wants you to have that open mind,

3    because you may hear extra evidence.  That's why it wouldn't

4    be fair to prejudge that starting the second half.  Does

5    that make sense to you?

6          A.    Yes.

7          Q.    And you may, when you answer Special Issue No.

8    1 or that first question, you get to go back and look at the

9    facts of the crime.  You may not have to think about it very

10   long.  You may come to an answer quickly.  But,

11   nevertheless, in order to be qualified you have to be able

12   to tell us you can keep that open mind for each of these

13   questions.  Does that make sense?

14         A.    Yes.

15         Q.    Each question is an independent inquiry.  Just

16   because you have answered one question one way, doesn't

17   necessarily help you answer any other questions

18   automatically.  Does that make sense?

19         A.    Yes.

20         Q.    Okay.  Special Issue 1 starts out with a no

21   answer.  That's kind of the default setting.  It's the same

22   for Special Issue No. 2.  Those two start out with a no

23   answer and it's up to us to prove to you beyond a reasonable

24   doubt that the answer should be yes.

25              So there's situations if we don't prove

1    it to you, you would have to be stuck with that no answer.

2    Does that make sense?

3         A.    Yes.

4         Q.    You would require us to prove -- bring you

5    evidence beyond a reasonable doubt that each of those

6    answers should be yes?

7         A.    Yes.

8         Q.    Let's talk about Special Issue No. 2 again.

9    And that deals with kind of what we've already talked about.

10   Where you kind of have this nontriggerman or accomplice

11   situation.  And just kind of focusing in on the last part of

12   that question.  See, it says anticipated that a human life

13   would be taken.

14            If you remember what we talked about a

15   moment ago, in order to convict someone of capital murder,

16   an accomplice, me in the example, you would have had to have

17   found that I should have anticipated that a life would be

18   taken.  You know, maybe when we went in there and did that

19   bank robbery, if you think I should have anticipated, then

20   you can find me guilty of capital murder.

21            By the time we get to the second or the

22   punishment phase of the trial, the law says there's a little

23   higher burden on us.  We not only have to prove that the guy

24   should have anticipated, but we have got to prove that they

25   did anticipate.  And they say it's a little higher burden

1   and there's a distinction between those two.  Does that kind

2   of make sense to you?

3         A.     Uh-huh.

4         Q.     Do you see kind of the distinction between

5   should have and actually did anticipate?

6         A.     Yes.

7         Q.     Okay.  One example that's come to mind is like

8   when I first got my first car.  I guess I was 16 and I was

9   driving around and I would do stupid things in it.  And I

10  ended up tearing it up.  You know, my dad came home and was

11  real mad at me and said, you idiot, you should have

12  anticipated that if you drove like that, you would tear the

13  car up.  But I guarantee you that I didn't.  I didn't

14  actually anticipate it because I was too young and too

15  stupid.  I probably should have, but I didn't, you know,

16  looking back on it now.  Does that distinction kind of make

17  sense to you?

18        A.     Yes.

19        Q.     So it's a higher hurdle that we have to cross

20  before the death penalty could be imposed.  That question

21  starts off with a no answer.  If we don't prove it to you

22  beyond a reasonable doubt, then it stays a no answer.  Does

23  that make sense?

24        A.     Yes.

25        Q.     And, again, you know, answering that Special

Issue, you may look back at the facts of the crime. You may

look at any other information that you have learned about it

to help you answer that question.

If you answer both of these questions

yes, then we move to kind of this last question. And it's

kind of the last stop in the process. Okay? Some people

think of these questions as like a system of funnels. You

take people and you take facts and run them through these

three funnels to make sure at the end the people that get

the death penalty are the people that are truly deserving of

it.

So one way to think of these is a system

of filters or funnels, that type thing. But this is the

last stop, Special Issue No. 3. And we kind of ask a juror

at this point to step back, take a deep breath, and look at

everything they have heard in both phases of the trial, the

facts of the trial, what you have learned about the

defendant's character and background, what you think his

personal moral culpability is, that is, you know, what blame

does he personally bear for what happened?

We ask you to look at those and see if

there's anything mitigating, anything that might lessen his

blame, such that his life should be spared and that he

should get a life sentence instead of a death sentence.

Does that question make sense to you?

1     A.    Yes.

2     Q.    Again, it's the last stop in the process.  It

3 can't be answered automatically.  We really want the jurors

4 to think about this stuff.  Do you see the sense in having

5 this type question, even that late in the process?

6     A.    Yes.

7     Q.    Okay.  What sense do you think it makes?

8     A.    Well, I think that if, you know, if the guy

9 maybe didn't want to be in the situation he was in, you

10 know, might have said, hey, this is it and walked out, given

11 up, maybe then I would take into consideration the guy

12 really didn't want to go to the next step.

13          But if he stayed in with the gang and

14 decided that's what they should do, then he's guilty.

15     Q.    You know, the law really requires that jurors

16 see the value in that, that they wouldn't have a closed

17 mind.  Some people, very frankly, tell us at this point,

18 they say, Mr. Wirskye, I've convicted him of capital murder,

19 I have found he's a future danger, I found he anticipated

20 that a life would be taken.  My mind is just closed to

21 mitigation.  There's nothing I'm ever going to find that

22 would cause me to give him a life sentence, other than a

23 death sentence.  And if you feel that way, that's fine.  But

24 those people wouldn't be qualified.  They wouldn't be able

25 to follow the law.

87

1          So that's why we need to ask you, even at

2   this late stage in the process, could you keep an open mind

3   to that mitigation?

4        A.    Yes.

5        Q.    Okay.  Is there anything that pops into your

6   mind, other than the example you have given us, of something

7   that might be mitigating?

8        A.    Well, I think that if the guy knew that the

9   other guy had a gun when he went in there, that, you know,

10  he pretty much knew what could possibly happen and he was

11  willing to take that step and go and follow through with

12  what they were doing.

13       Q.    Some people, when we talk about mitigation,

14  they say things like this.  If the guy had -- when he was a

15  child, had an abusive background, you know, maybe there's a

16  history of physical or emotional abuse when he was a child.

17  That may be potentially mitigating.  That may somehow lessen

18  his blame.  Other people say, no.  I don't consider that

19  mitigating.  You know, at some point in their life,

20  everybody can make choices, regardless of their background.

21  But those are the type things.  Does that make sense to you?

22       A.    Yes, it does.

23       Q.    Where do you kind of fall on that issue?

24       A.    I've been in trouble before and I learned my

25  lesson.  So, yes, you can change.  I turned my own son in.

1    Q.    Okay.  Some people tell us sometimes like drug

2  or alcohol abuse, that may be mitigating.  They think that

3  was mitigating.  Other people say, no, that actually is

4  aggravating.  It makes it worse.  You got drunk, you got

5  high, and you did this crime, that type of thing.

6             And we can't require you to think of

7  anything right now that's mitigating.  The law does not even

8  require you, as a juror, to consider any particular factor

9  mitigating.  You don't even have to agree with the other

10 jurors.  All the law says is that you have to be able to

11 keep that open mind.  If you hear something, you could

12 consider it.  If the evidence is there, you can assess a

13 life sentence.  If it's not there and there's no mitigation,

14 you could answer that question no, resulting in a death

15 sentence.  Does that make sense to you?

16   A.    Yes, it does.

17   Q.    Okay.  And, again, I kind of feel like I'm

18 beating a dead horse, but I want to make sure that the

19 scheme we have is clear in your mind.  You start that second

20 phase with that open mind.  No question is answered

21 automatically.  You always have to keep that open mind and

22 it's up to us to prove it to you, Special Issue No. 1 and

23 Special Issue No. 2, to you beyond a reasonable doubt.  That

24 last question, neither side has the burden of proof.  We

25 just kind of leave it up to the jury.

1     A.    Okay.

2     Q.    Do you think that you could keep an open mind

3 if you convicted someone of capital murder, you found they

4 are a future danger, and you found they anticipated, even at

5 that late step in the process, do you think that you could

6 keep that open mind?

7     A.    Yes.

8     Q.    Okay.  Fair enough.  Any questions about how

9 this system works, that type of thing?

10     A.    No.

11     Q.    Let me talk to you, and you are probably

12 familiar with this because you have been on jury duty

13 before, some of the general rules that apply.

14             We talked about the burden of proof.  The

15 burden of proof is always on this table, the State of Texas.

16 We have got to prove that he's guilty and prove 1 and 2 to

17 you beyond a reasonable doubt.  These guys don't have to do

18 a thing.  You know, actually legally they could sit there

19 and do crossword puzzles and not do a thing.  And they are

20 fine lawyers and you probably expect they will do something,

21 but the point is they don't have to.  It's up to us.  If we

22 don't meet our burden, you can't help us out.  You can't

23 expect them to do anything.  You have always got to look to

24 us for the proof.  Does that make sense to you?

25     A.    Uh-huh.

Q.    Okay.  As a part of that you probably remember from your prior jury service, criminal defendants do not have to testify in their own defense.  It's the Fifth Amendment.

A.    Okay.

Q.    No one can force a criminal defendant to testify, if he doesn't want to.  The flip side of that is, if he wants to, no one can stop him.  But what the Judge will tell you, and what the law is, if a person doesn't testify, you cannot consider that in your deliberations.  It's just simply a nonfactor.  You can't hold it against him.  Does that make sense to you?

A.    Yes.

Q.    Do you think that you can follow that law?

A.    Uh-huh.

Q.    Okay.  As part of our burden of proof, we have to prove each and every element of the crime.  I don't know if you got a chance in your packet to look at that back page, the back of the last page.

A.    Okay.

Q.    You see that?  It says indictment, "True Bill of Indictment"?

A.    Yes.

Q.    Okay.  That's how we have alleged the crime happened.  And crimes are kind of broken down into elements.

1    A certain person on or about a certain date in a certain

2    county committed a certain crime in a certain way.  And what

3    the law says is part of our burden of proof is we have to

4    prove each and every one of those elements to a jury beyond

5    a reasonable doubt to get a guilty.  You know, we don't get

6    partial credit.  A juror can't help us out.  We don't get to

7    go nine for ten or eight for ten.  We have to hit them all

8    beyond a reasonable doubt.  Does that make sense to you?

9         A.    Yes.

10        Q.    You see the logic in that?

11        A.    Uh-huh.

12        Q.    As a part of that, the law says that no one

13   element is more important than the others.  Just to give you

14   a far out example.  I don't anticipate this will ever come

15   up, but to give you an example, let's say we try a capital

16   murder case that happened in Grand Prairie, Texas.  The

17   police don't do their work.  It gets down to the DA's

18   Office.  We fall asleep on the job.  We don't do our

19   homework.  And we allege that the capital murder happened in

20   the Dallas County part of Grand Prairie, you know, because

21   Grand Prairie is half Dallas and half Tarrant.

22              We get down to trial and you may have no

23   doubt that the guy is good for it, that he committed that

24   murder.  We may have proven to you nine of the ten elements,

25   but that one element, what county it happened in, you know,

1   the evidence shows it happened in Tarrant County.

2               And that's kind of an extreme example,

3   but under that example the law would require you to find the

4   person not guilty because we missed an element.

5        A.      Uh-huh.

6        Q.      People wouldn't be happy about it.  They would

7   call our boss.  We would get fired, lose our jobs.  You may

8   think it's a technicality.  But it's very -- one person's

9   technicality is another person's constitutional right,

10   basically.

11               So the law would require a jury under

12   that situation to find the person not guilty, because we

13   missed an element.  Does that make sense to you?

14        A.      Yes, it does.

15        Q.      Maybe we allege the person died because they

16   were shot with a pistol.  The medical examiner comes in here

17   and testifies that they actually died as a result of a stab

18   wound.  You may be convinced we got the right guy that did

19   the murder, but we didn't do our homework.  We allege they

20   got shot.  The evidence showed it was a knife.  There's one

21   element we didn't prove up.  You would have to find the

22   person not guilty.  Does that make sense to you?

23        A.      Yes.

24        Q.      Is that a law you think you could follow?

25        A.      Yes.

1   Q.    Okay.  You know, obviously looking at that

2   indictment, we have alleged a police officer has been shot.

3   We can't get into the facts of the case, but you can

4   probably expect that you are going to hear from police

5   officers.

6           A lot of people have different thoughts

7   and feelings about police officers, one way or the other.

8   But what the law says is that every witness, whether they

9   are a police officer or not, starts out with the same level

10  of credibility.  A lot of people think highly of police

11  officers, kind of want to give them a leg up right off the

12  bat.  You can't do that.  You have to start every witness

13  with that same level of credibility.  You can't give him a

14  leg up, just because he comes in with a badge and a gun.

15  Does that make sense to you?

16  A.    Yes.

17  Q.    Do you think that you would have any problems

18  or hesitations following that aspect of the law?

19  A.    No.

20  Q.    Okay.  Oftentimes in these cases you may hear

21  from like a psychiatrist or psychologist.  The defense may

22  call them and the State might even call them to kind of help

23  you in that second phase of the trial, maybe to answer

24  Special Issue No. 1 or Special Issue No. 3, a future danger

25  question or the mitigation question.

1    I'm just kind of curious.  A lot of

2  people have different opinions one way or the other on

3  psychiatrists and psychologists.  Kind of where do you come

4  down on those type of witnesses?

5    A.    I think the psychiatrists or psychologists

6  have studied real hard to understand a person by their

7  emotions and feelings and I would, you know, I think that if

8  I could -- if they could persuade me to believe something, I

9  would, you know, I would go with what they say.

10    Q.    Okay.  It's just kind of like anything else

11  like the police officers or keep an open mind.  As long as

12  you can keep an open mind to that witness and start them

13  with the same level of credibility.  If they come in here

14  and make sense, you go with them.  If they don't, you don't.

15    We don't want jurors to come in here with

16  a closed mind or don't like them and wouldn't listen to

17  them, or the flipside of that is we don't want jurors who

18  come in here and think that they walk on water, and every

19  word that comes out of their mouth is goldplated, that type

20  thing.  We're looking for people who are in the middle and

21  just keep an open mind and start them there.  That kind of

22  sounds like where you are at.

23    A.    Yes.

24    Q.    One way to look at this scheme that we have is

25  to think about it this way.  Once you convicted somebody of

1  capital murder in that first phase, they are sitting on a

2  life sentence.  Okay?  The only way you get to the death

3  penalty is if the questions are answered yes, yes, and no.

4  Okay?  Because the life sentence is one of the options in

5  this case.

6          Because, you know, you may hear about

7  parole laws, people getting out on parole.  The law tells

8  you this, that a life sentence in a capital murder case

9  means a person serves forty years, day for day, you know,

10  forty calendar, forty hard years, day for day, before they

11  become eligible for parole, before they see their first

12  Parole Board.  A person could do forty years and make parole

13  right off the bat, or a person may never make parole, may

14  actually do that hard life sentence, a true life sentence.

15  Kind of see what I'm talking about?

16      A.      Yes, sir.

17      Q.      Because we don't know what will happen, it's

18  beyond the control of anybody in this courtroom, and too far

19  off in the future, we ask jurors to kind of presume that a

20  life sentence means a life sentence, not to consider the

21  parole law, just to assume life means life.  You kind of see

22  the sense in that?

23      A.      Yes.

24      Q.      Is that something that you think you can do?

25      A.      Yes.

1    Q.    All right.  Let me talk to you about one other

2  area of the law.  We call these things, called lesser

3  included offenses.  Lesser included offenses.  I don't know

4  if it's going to come up in this case, but sometimes in the

5  first stage of the trial the jury may have an option of

6  finding somebody guilty of a lesser offense.  Okay?  Not

7  capital murder, maybe aggravated robbery.

8          Say we allege murder in the course of

9  robbery and you are not convinced about the murder part, but

10  you are convinced that the guy is guilty of aggravated

11  robbery.  You may have an option, then, of finding him

12  guilty of aggravated robbery.

13    A.    Yes.

14    Q.    You see how that works?  Again, if that

15  happens, you kind of throw this scheme out the window.  And

16  at that point we ask a jury to set punishment somewhere in

17  the punishment range.  And the punishment range for

18  aggravated robbery is anywhere from five years in the

19  penitentiary all the way up to life.

20          And we basically require to be qualified

21  as a juror that you tell us now that you could keep an open

22  mind for five years all the way up to 99 or life.  Basically

23  what we're asking you is if you hear an aggravated robbery

24  case that you think calls for a life sentence, you could do

25  it.  Or if you hear an aggravated robbery case that you

1   think calls for only five years, you could consider and

2   assess that five-year penalty.  Does that make sense to you?

3            A.      Yes.

4            Q.      Do you think that you could keep an open mind

5   to the full range of punishment in an aggravated robbery

6   case?

7            A.      Yes.

8            Q.      Okay.  Are you about tired of me talking to

9   you about the law?

10           A.      No, it's pretty interesting.

11           Q.      Anything that we've kind of gone over that

12  maybe doesn't make sense or any questions about kind of the

13  system or the scheme we have down here?

14           A.      The technicality thing you said, technicality,

15  is what I've always heard.  But I don't really believe that

16  someone should be let go because it was a wrong address on

17  there or something like that, if they did the crime, just

18  because you put the wrong address on there does not mean

19  that they did not do the crime.

20           Q.      One way to think about it is, one element of

21  any crime is proving identity, that we got the right person.

22  If we don't prove that element of identity, we have missed

23  an element.  The guy walks.  He's found not guilty.  And the

24  law says there's no distinction between elements.  We're not

25  talking about something as specific as an address.  We're

1  talking about what county it happened in.  And, like I said,

2  if we make a mistake that big, we're going to lose our jobs.

3  We're going to be out on the street, unemployed.

4          I just kind of gave that example to show,

5  you know, sometimes you take the most far out examples just

6  to kind of illustrate the type of mental discipline it

7  requires to be a juror.  And that's why we kind of talk to

8  you about it.  Like I said, some people get angry about it.

9  They wouldn't like doing it.  They think it's a

10  technicality.  But if they followed their oath and followed

11  the law that the Judge gave them, they would have to find

12  the person not guilty, if it happened in another county.

13          Does that kind of make sense to you?  Do

14  you see the wisdom behind it?

15      A.      I understand it, completely.

16      Q.      Do you think that you could do it?  You may

17  not like it.

18      A.      I could do it.

19      Q.      Once you do it, you may go upstairs and find

20  my boss and get me fired.

21      A.      I wouldn't like it, but, yes, I could do what

22  needed to be done.

23      Q.      Again, it kind of illustrates the kind of

24  mental discipline that we ask you to use to keep an open

25  mind and follow the law and that type thing.  Any other

1    questions about the scheme that we have?

2          A.    No, sir.

3          Q.    Mr. Harper, what do you like to do in your

4    free time?

5          A.    I do satellite home theater and that's kind of

6    a hobby that I grew into and that's what I do in my spare

7    time as well.

8          Q.    My cable company was supposed to come and fix

9    my cable between 8:00 and 11:00 Saturday and they never

10   showed up, so I'm going to satellite.  So is that a good

11   thing?

12         A.    Satellite is better, anyway, so --

13         Q.    I figured you might be prejudiced in that

14   direction.

15         A.    Picture quality.

16         Q.    They say that better customer service, too.

17         A.    That depends on the person that's giving the

18   service.

19         Q.    Thanks for your time, Mr. Harper.

20              MR. WIRSKYE:  That's all the questions

21   that I have, Judge.

22              THE COURT:  Ms. Busbee?

23              CROSS-EXAMINATION

24   BY MS. BUSBEE:

25         Q.    Hello, Mr. Harper.  I'm going to ask you some

1    questions.  Mr. Wirskye and sometimes Mr. Shook, they get to

2    talk to the jurors and they tell them, educate them about

3    what the law is.  But, you know, often we sense and I sense

4    in you that you want to talk about it a little more.

5    Believe me, we're satisfied that you can follow the law.

6    You did it in the past when you were down here as a juror.

7                    And, you know, you saw all these people

8    who were there in the morning and out of all of those people

9    that you sat with that morning, we probably selected maybe

10   100 or fewer to talk to, maybe 70.  So, you know, the

11   people, when we read their questionnaires, they didn't love

12   them, we didn't love them necessarily, but they were right

13   down the middle of the road to us.  And -- but even then, we

14   do this for a long time.

15                   And the reason that we do this, I think

16   you will appreciate it, since you've been on a hung jury

17   where there was dissension, is that a case where someone's

18   life is going to be taken also involves a case where

19   someone's life has been taken.

20                   And so we recognize that people, it isn't

21   like balancing your checkbook.  It's not cut and dried.

22   People are obviously going to have emotions tugging them in

23   both directions sometimes.

24                   And you get to tell us how you feel

25   because when you talk to somebody that's been on a hung

1  jury, they express a lot of frustration, usually, because

2  there was somebody back there that either didn't answer the

3  question when they were talked to back in the big panel --

4  remember how that was?  You sat out there and a few of you

5  were brought up here?  That process takes an hour and a half

6  of lawyer talking during the day.  And even then we have

7  that down pretty much to a science to hit all the questions

8  that you can ask people in an ordinary case.

9            And when you get a hung jury, usually you

10  have someone who wasn't forthcoming about their feelings.

11  Now, see, this is your opportunity to tell us how you really

12  feel.  If you have some feeling one way or the other about

13  something and it -- and say, for instance, the scheme as

14  it's been explained to you, if you just wouldn't feel

15  comfortable, I'm satisfied that you would try, attempt to

16  follow whatever law, speaking in generalities, now.

17            But if it bothers you or you think it

18  would bother you, we can't really tell you what the facts

19  are here.  You might have an idea.  It's been publicized.

20  But if it would bother you, you have a problem with the law,

21  you can tell us.

22            We have a lot of people.  We have a lot

23  of people that we've talked to and we picked several jurors.

24  And we have several more to go.  So we don't want to

25  make this uncomfortable for you.  We want to make it fair to

1   both sides, obviously.

2                   So I'm going to ask you some questions

3   and let you talk to me.

4        A.    Okay.

5        Q.    I say -- after I've talked to you like four

6   minutes, but in any event, at this point what's your feeling

7   about the death penalty law?

8        A.    Death penalty, you know, the way I've been

9   brought up that, you know, people should pay for their

10  actions.  I mean, I see it and sometimes it, you know, you

11  sit there and think that's just not right.  I mean, I can go

12  either direction.  It depends on what I see and what is

13  explained to me and if I understand it correctly.

14       Q.    Okay.

15       A.    I mean --

16       Q.    You said that you hadn't really followed what

17  happened on any of the other cases that were associated with

18  this one.  Have you thought about it since you were asked to

19  come back down?  Thought anything about it?

20       A.    I thought about it all night last night.

21       Q.    Was this anything like what you thought it

22  would be?

23       A.    Um, you know, I really didn't know what was

24  going to happen so I kind of came up here to find out.

25       Q.    Okay.  What were you concerned about?

1      A.      Just how long it was going to take and if, you

2   know, again, if justice was going to be served.

3      Q.      Okay.  Well, it will be.  We hope, if we do

4   this all right, that's exactly what the outcome will be.

5   Have you formed any opinions about this case, I mean, just

6   based on what you have heard in the past?

7      A.      It's one thing to watch the TV and stuff like

8   that, but, again, I'm not really going to form an opinion

9   until I see the proof.  I don't know enough about the case

10   to actually say, you know.  I don't really have anything in

11   my mind of what is written in stone or anything on what

12   could happen.  I mean, there's lots of things that could be

13   showed to me that would change my mind.  If they could prove

14   to me that this guy didn't want to be there, maybe he was

15   just along for the ride and didn't have any other choice,

16   maybe somebody was pressuring him and proof of that, then I

17   would be willing to listen to the other side and weigh out

18   my options and see what, you know.

19      Q.      Yeah.  That sounds fair.  When you are talking

20   about things that would factor into your decision, are you

21   talking about guilt/innocence or life or death, which --

22   guilt/innocence first, then life or death is a simple way to

23   put that.

24      A.      Guilt/innocence first.

25      Q.      Okay.  You are like most people.  You

1 understand pretty well, particularly having been on a jury

2 before, about the guilt/innocence and the burden of proof

3 and all that.  But, I guess what my question is, is would

4 you need to hear something from us over at this table to

5 decide whether he was innocent of the capital murder?

6      A.     More or less you would have to prove him

7 guilty to me.  You would have to show me the facts that he

8 did this crime or anyone did a crime.  If you could prove to

9 me that they actually did it, then they are deserving of the

10 punishment.  But if there's, you know, there's a doubt that

11 this person or whatever didn't do something, then, of

12 course, it's -- I'm not going to force something to happen

13 that might not be.

14      Q.     Sure, sure.  Let's go on to the second part,

15 then.  Let's assume that you are on a jury, capital murder

16 jury, and you have already had it established to you beyond

17 a reasonable doubt that the person is guilty.  Obviously,

18 because you might not have experienced this, but the way

19 this works is they find guilt and then the jury comes back

20 and does the punishment part.  It's like two trials.  Even

21 in the simplest case, it's done that way, and it's certainly

22 done that way in this type of case.

23           So let's put you on that hypothetical

24 jury and you have already made a determination somebody is

25 guilty of the offense of capital murder.  So you are coming

1  in to just consider these three additional questions.  I

2  think you made some comment when you were talking to

3  Mr. Wirskye about somebody who has committed a capital

4  murder, you know, that makes them pretty dangerous.

5        A.    Uh-huh.

6        Q.    Right?

7        A.    Yes.

8        Q.    I don't want to put words in your mouth, but

9  would you, in order to answer that Special Issue No. 1, in

10 order to say, well, that person wouldn't be a danger in the

11 future, would you need to hear something from the defense to

12 make you feel more comfortable?

13              THE COURT:  You mean the future?  You

14 said past.  Would you like to read back the question?

15              MS. BUSBEE:  No, I believe you.

16       Q.    (By Ms. Busbee)  Would you need to hear

17 something from us at this table, the defense, to show you

18 that he wouldn't be dangerous?

19       A.    I think that, you know, I don't know -- I

20 don't really know how to answer that.  I think if a person

21 has done something like this before and he's obviously has

22 done it again, then I would think that that person would

23 commit a crime again, and I wouldn't want them out on the

24 streets.

25       Q.    See, and that is what people, a lot of people

1  come down here, say, quite frankly, Mr. Wirskye, Ms. Busbee,

2  quite frankly, that may be that you have to prove it to me

3  beyond a reasonable doubt.  But I really pretty much feel

4  that way, anyway.

5            So, see, that kind of -- that's not what

6  the law is, but that's how you feel about it?

7       A.     Uh-huh.

8       Q.     What the law says is that we have to have

9  jurors who, quite honestly, quite frankly, can tell us that

10  they have not already decided that first one before they get

11  here.  It doesn't make you a bad person, but that's what I

12  thought I heard you say when you were talking to

13  Mr. Wirskye.

14            So I guess I'm just asking you to tell

15  me, do you really feel like Special Issue No. 1 is kind of

16  really predecided for you personally?

17       A.     You know, I don't know if someone could, I

18  mean, I'm not going to have a set mind on something.  I

19  would be willing to listen to everything that anyone has to

20  tell me about the case, even after we found he was guilty.

21  The sentencing part of it, I think that if you could prove

22  that he needed -- I mean, I guess I would need to know, to

23  have some comfort in knowing that this guy is deserving of a

24  lesser sentence or something.  I mean, you know, even though

25  you try to set everything aside, you know, you are not

1    setting stuff in stone.  When you come into this, you want

2    to have an open mind.  But I think a person's feelings will

3    come out, given certain questions and things, and certain

4    things can change.

5           Q.    That's -- my question is, in reality, and all

6    your cards on the table here, you said it several different

7    ways, are you saying that, really, Special Issue No. 1 is

8    the sort of thing that you, a hypothetical case, you already

9    having found someone guilty of capital murder, you already

10   would be thinking he was a future danger unless you heard

11   something to make you think that he wasn't?

12          A.    Uh-huh.

13          Q.    Is that what you are saying?

14          A.    Yes.

15          Q.    Okay.  Now, you know, that's not the way it

16   works.  The law doesn't do it that way.  But your thinking

17   is that way?

18          A.    Exactly.

19          Q.    Okay.  Because I thought I heard you say that

20   earlier and there's nothing wrong with that.  But that's the

21   sort of thing that we need to know, so we can have the

22   proper jurors in the case.  So you understand the law, you

23   would like to follow the law, but in reality you really feel

24   like Special Issue No. 1 -- would you need to hear something

25   to ease your mind from the defense to answer that no?

1   A.  Yes.

2   Q.  Okay.  Fair enough.  What about Special Issue

3 No. 2?

4   A.  Whether the defendant actually caused the

5 death of the deceased?

6   Q.  That's the way it's written, but I don't think

7 that anybody is -- we're not even so concerned about that.

8 It's that anticipated.  And I think Mr. Wirskye explained to

9 you that anticipated is different than what you have already

10 decided in the first part of things.

11   A.  Uh-huh.

12   Q.  I like that car analogy.  You know, some

13 people might have, should have known, sort of like a

14 reasonable person's standard in that first part because you

15 can't, obviously, get into someone's head to know exactly

16 what they knew or didn't know.  But common sense tells you

17 that that person should have anticipated something.

18      For instance, you used an example of

19 taking guns someplace.  In your mind that's pretty good

20 evidence that someone should have anticipated violence?

21   A.  Uh-huh.

22   Q.  And that's what you would have decided on the

23 first part.  From the second part, the genius legislators

24 who drafted this thing have this a different standard, not

25 should have, but did anticipate.

1    What sort of things -- first of all, does

2  that make sense to you?

3    A.    I think so.  I think I understand exactly what

4  it --

5    Q.    I have to stop talking when you talk.

6    A.    I'm sorry.

7    Q.    It's not for me or you.  It's for her because

8  she can't write down what we're both saying at the same

9  time, so I'm sorry.

10    What sort of things would you need to

11  hear to know someone did anticipate?

12    A.    Well, I think that this was -- if this was a

13  plan to go in and do something, again, I think that he knew

14  what could happen and he's not going in there thinking or

15  not knowing what could happen.  I think that if you walk in

16  with a gun and you are planning on robbing a place or

17  something like that, why would you have a gun, if you didn't

18  anticipate something like this happening?  And why would you

19  carry the gun, if you didn't intend on using it or pulling

20  it out and getting shot yourself, you know.

21    Q.    Would you -- would you make that a higher

22  standard that someone would have to anticipate instead of

23  like what a normal person would have thought?  This really

24  goes to what did that person actually anticipate, not should

25  he have, but that he did anticipate.

1    A.    I understand the difference between the two.

2  And if it could be proven that he did anticipate, I could go

3  with that.

4    Q.    Okay.  Would you need to hear anything from us

5  over here to help you make that decision?

6    A.    Well, I always want to hear both sides of the

7  story to make sure I'm given the correct answer.

8    Q.    Some people say, you know, I have to hear, you

9  know, what the defendant had to say about that in order to

10  -- would you need to hear from the defendant on that issue?

11    A.    I would like to hear as much as possible from

12  either direction.

13    Q.    Okay.  Well, you know, that's why we have

14  these individual conversations because we need to know how

15  you feel about things.  What -- the real law is that this

16  side may not even put anything on, on that issue.  Would you

17  need to hear from us before you could answer that question

18  no?

19    A.    I think that it would be very helpful to hear

20  both sides before I made, you know -- if one person sits

21  here and tells you everything that happened and somebody

22  else doesn't stick up for them or you don't hear another

23  side of the story, it's kind of hard to give the answer to

24  the question, you know, if they are guilty or not guilty.

25  Well, if you don't hear the other side, then there's -- you

1  know, you just don't know the whole story.

2        Q.      Okay.  That's true.  And we're not talking

3  about what the law is right now, just how you feel about it.

4  Would you need to hear from us over here before you could

5  answer that Special Issue No. 2 no?

6        A.      Yes.

7        Q.      Okay.  And that's not the law, of course.  The

8  law says that we don't have to say anything as a practical

9  matter.  And I see you as a practical individual, you would

10 want to hear from the defense something, even though it's

11 not our job --

12       A.      Uh-huh.

13       Q.      -- before you could answer that question no?

14       A.      Yes, I do understand that.  I would like to

15 hear, you know, the defense before I made my decision.

16       Q.      Okay.

17                   MS. BUSBEE:  I'll pass the juror.

18                   THE COURT:  Thank you, sir.  If you would

19 stand down and step outside, I'll have you back in a minute.

20                   [Prospective juror out]

21                   THE COURT:  What says the State on juror

22 No. 1820, Mr. Kevin Duane --

23                   MR. WIRSKYE:  State has no challenge for

24 cause.

25                   THE COURT:  -- Harper?

1    MS. BUSBEE:  We do challenge this juror

2  for cause, Your Honor.  He has expressed an inability to

3  follow the law as far as shifting the burden of proof on the

4  defense on Special Issue No. 1 and Special Issue No. 2.

5    MR. WIRSKYE:  State's response?

6    THE COURT:  Yes.

7    MR. WIRSKYE:  Judge, when I talked to the

8  juror and fully and completely explained the law to him

9  several times on all the Special Issues, once the law was

10  explained to him, he told me numerous times he could follow

11  the law, he could be fair, and he understood the wisdom of

12  the law.  And the defense question, he, again, expressed the

13  desire not to prejudge anything and to be fair.  With

14  respect to shifting the burden, all he ever said was he

15  would like to hear from both sides.  He thought that would

16  be prudent.  The law was never explained to him and he never

17  said that he would put the burden on the defendant.

18    Talking about Special Issue No. 1, his

19  first answer when we got into the subject, he fed himself

20  facts.  He said if somebody has done this in the past and

21  done it again, then I would answer Special Issue No. 1 yes

22  automatically.  Again, no law was ever given to him on

23  Special Issue No. 1.  He was never asked if he could follow

24  the law.  He was only talking about his personal thoughts

25  and feelings.  That's not enough to disqualify this juror.

1    As the Court saw, he was a fairly

2  intelligent juror.  He seemed to understand the scheme.  He

3  seemed to understand all the law.  And just sneaking up on

4  him with these kind of broad, openended questions, isn't

5  enough to disqualify a juror.  And we think he's qualified.

6    THE COURT:  The Court on direct heard

7  several of his answers that implied to me that he was

8  assuming guilt.  On cross the issue was put fairly plainly

9  that he would need to hear from the defendant or hear

10  evidence from the defendant to -- in order for him to be

11  able to answer these questions in the negative.

12    The Court finds the juror, No. 1820,

13  Mr. Kevin Duane Harper, not qualified.

14    MR. SHOOK:  Judge, then we would like to

15  lodge an objection from here on out that the defense be

16  required to state exactly what the law is when they ask the

17  question.  Just saying the general, asking this guy about

18  four times, and he says, yeah, I would like to hear from

19  him, which is what a normal person would say, and then just

20  a general statement, that's not the law, because I don't

21  think that that disqualifies him.

22    You have got to tell him, well, the law

23  is this, sir, and you state what the law is.  Can you follow

24  the law or not?  This general word game we play with them

25  doesn't disqualify him.  He's just giving normal answers,

1    yeah, I would like to hear both sides.

2              And as far as his answers at the

3    beginning, we are talking about punishment issues most of

4    the time.  This is the kind of guy that would listen to both

5    sides.  And I don't think that just getting him to say what

6    would you like to hear?  I would like to hear from him, and

7    then just throw out a general thing, that's not really the

8    law.

9              The fact -- I will find a case for it

10   when I can and bring it down.  They have to explain the law

11   to them, not just say that's not the law.  They have to

12   explain the law to them.  The Garcia case -- and I can get a

13   copy of it and we can look at that -- but from here on out,

14   then, I think the defense needs to fully explain the law.

15   Because we explain the law and he can follow it.  They never

16   explain the law to him.

17             So I think in those situations, the juror

18   is still qualified.  It comes down to their demeanor, of

19   course.  But from here on out we would ask the Court to

20   require the defense to fully explain the law.

21             THE COURT:  Yes, Mr. Shook, I agree with

22   that.  But also the notes that I made during his direct,

23   just the tone and tenor of his voice, answers, and the whole

24   examination, my first initial impression was he was shifting

25   the burden and he got worse versus better.

1      MR. SHOOK:  I'm just talking about in the

2  future, Judge.

3      THE COURT:  She did real -- given this

4  particular individual with a tenth-grade education, she, you

5  know, got close enough that it allowed the Court to be able

6  to make this decision.  I appreciate the State's position.

7  And your next person up has a degree, so I'm quite sure she

8  will do much better.  Ask Mr. Harper to come back in.

9                  [Prospective juror in]

10      THE COURT:  Mr. Harper, thank you for

11  your time this afternoon.  I'm going to inform you, you

12  shall not be selected to sit on this jury.  Thank you very

13  much.

14      PROSPECTIVE JUROR:  Thank you.

15                  [Prospective juror out]

16      THE COURT:  Lankford.

17                  [Prospective juror in]

18      THE COURT:  Good afternoon.

19      PROSPECTIVE JUROR:  Good afternoon.

20      THE COURT:  We have juror No. 1831, Loma

21  Lankford.

22      PROSPECTIVE JUROR:  Yes.

23      THE COURT:  Good afternoon, Ms. Lankford.

24  Sorry for the delay in getting you in.  Obviously, you had

25  enough time to read the guide I provided for you and hope

1  you had an opportunity to refresh your memory from the

2  answers you provided on the questionnaire back in May.  I

3  don't expect you to understand it all right now.  The

4  attorneys will go over that in more detail with you.  A lot

5  of law to give someone kind of cold.  You don't have to

6  understand how it all relates at this point, but they are

7  going to go through that with you and give you examples to

8  help you understand how it all works.

9              The big picture that I have, at the end

10  of the process I have to answer two questions.  Number one

11  is do you understand the law?  Second question is, if you

12  understand the law, can you follow the law?  It's just,

13  that's my job.

14              Only question that I have for you at this

15  point is will you be able to serve this Court for two weeks

16  beginning on November 10th?

17              PROSPECTIVE JUROR:  I should be able to,

18  yes.

19              THE COURT:  Thank you so much.

20  Mr. Shook?

21              MR. SHOOK:  May it please the Court.

22              LOMA LANKFORD,

23  having been duly sworn, was examined and testified as

24  follows:

25              DIRECT EXAMINATION

BY MR. SHOOK:

    Q.    Ms. Lankford, my name is Toby Shook.  I'm going to ask you questions on behalf of the State today.  As the Judge said, there aren't any right or wrong answers.  We just want your honest opinions.  You have been pretty straightforward on your questionnaire, so I don't anticipate any problems in that area.

        We appreciate you taking the time to fill that out.  It's given us a lot of information.  And what I'm going to do is follow up on some of that and also speak to you about capital murder, the death penalty, and some of the laws and rules that apply and just how you feel about that.  All right?

    A.    Okay.

    Q.    I see from your questionnaire that you were born here in Dallas and have stayed here your whole life; is that right?

    A.    Yes.

    Q.    What area of Dallas did you grow up in?

    A.    The Irving area.

    Q.    Did you?

    A.    Yes.

    Q.    What high school did you go to?

    A.    Irving High.

    Q.    What year did you graduate from Irving?

A.      1974.

Q.      Okay.  I went to Woodrow Wilson, so I always -- the longer I'm here the less you see people that actually grew up and were raised here.  Let me ask you about your prior jury service.  I see that a couple of years ago you were on a DWI case?

A.      Yes, sir.

Q.      What do you recall about that case?

A.      It was two or three days, two days.

Q.      You indicated on the questionnaire that he was found guilty and placed on probation?

A.      Yes.  It was a first-time offense.  It was a young lady.

Q.      Was it a pretty straightforward case?

A.      Yes.

Q.      How did the deliberations go?  Any major disagreements between the jurors?

A.      No.  They had her on videotape, so it was very evident on -- the evidence was fairly clear.

Q.      Okay.

A.      Most of the discussion was on the punishment phase of it.

Q.      So the jury actually determined the punishment, too?

A.      Yes, sir.

Q.     And it was a first offense?

A.     Yes, sir.

Q.     Okay.  Over all, was it a pretty positive experience?

A.     Yes, it was very interesting.  This is kind of a very interesting experience.  You have to try all kinds of different things.  You see it on TV and you kind of want to --

Q.     Yes, it's different from TV.

A.     Yes.  Kind of get the feel of it, I guess.

Q.     Yeah.  And you work in sales for your company; is that right?

A.     Yes, sir.

Q.     Tell us what you do kind of on a day-to-day basis.

A.     I work out of my home.  My office is in Dallas, but I visit manufacturing plants.  I sell machine tools and cutting tools, the things that they use to make, you know, appliances, air conditioners, car parts, those types of things.

Q.     And you have been with the company about 16 years?

A.     Yes, sir.

Q.     Okay.  Did you get an opportunity to look over the witness list?

1    A.      Yes, sir, I did.

2    Q.      I know there's a whole lot of names there, but

3  did you see anything that you recognized?

4    A.      No, not a one.

5    Q.      Okay.  Let me talk to you for a minute about

6  the death penalty, capital murder.  You know from what the

7  Judge has told you that this is a capital murder case in

8  which the State is seeking the death penalty.  And you put

9  on your questionnaire that you are in favor of the law.

10            And I would like you to kind of explain

11  in your own words why you favor the law and the purpose you

12  feel the death penalty serves.

13    A.      I favor the law in that, you know, as a

14  society we try to build on behaviors and I think we, as a

15  group, determined this by a majority and we have to have

16  some type of boundaries that we all agree upon.  And the

17  death penalty is one of the choices we, as a society, make

18  as a punishment and a deterrence.

19    Q.      Okay.  What types of cases from your own

20  personal point of view do you feel should be considered for

21  the death penalty?

22    A.      Well, murder.

23    Q.      Any particular type of murder case?

24    A.      Well, I think one that's with intent where

25  they intend to murder that person.  I'm not sure of in an

accident.

      Q.     Right.

      A.     Where you run somebody over by accident?

      Q.     But they have to have that intent to kill and do so.

      A.     I would think that they really wanted to hurt that person, yes.

      Q.     How about any other crimes, other than murder? If it were up to you, would you have the death penalty for crimes, some other type of violent crimes, that do not involve actually taking someone's life?

      A.     No.

      Q.     Okay.  So you would reserve it for some types of intentional killings?

      A.     Yes, I would.  I would think of that as being the very extreme.

      Q.     Have you ever followed any cases in the media, locally or nationally, that you thought were appropriate for the death penalty?

      A.     I probably have over the years.

      Q.     Do you recall any of the names at all?

      A.     The only one that I can remember is the Manson trial.  That dates me some.  But that one -- but nothing that I can take off the top of my head.  I'm very news oriented.  I like the newspapers and news shows, but I can't

1    think of anything.   I'm very proactive that way, I guess.

2        Q.     While we're on that subject, let me bring this

3    up, then.  Obviously, this case got a lot of publicity when

4    it occurred and some afterwards.   And most of the jurors,

5    most of the jurors have read or seen something on TV about

6    it.   What do you recall seeing about the case?

7        A.     The only thing that I can really off the top

8    of my head recall other than -- is when we were looking for

9    the seven and they found them in Colorado.   That's basically

10   the thing that I can remember.   As far as any specific

11   evidence or anything like that, I mean, a lot has happened

12   since then.

13       Q.     Sure.   Have you followed any of the

14   proceedings since that time?

15       A.     No, not unless I just catch something on the

16   news.   It's not something that I watch for.

17       Q.     The bottom line is, as the law goes, the fact

18   that you have seen something on TV or read something in the

19   newspaper doesn't mean you are ineligible to be a juror.

20   You have to be able to assure the Court you can decide the

21   case on what you hear in the courtroom, not something you

22   have read in the newspaper.

23               We can't ask you to forget those things.

24   But we can ask you to just make your decisions based on what

25   you hear in the courtroom from the witnesses and that sort

1   of thing.  Kind of a common sense proposition, since,

2   obviously, your better evidence is going to come from the

3   real witnesses, rather than something you might read in the

4   newspaper.

5        A.     You can interpret many things out of the

6   newspaper.

7        Q.     Do you feel like you can follow that law if

8   you were chosen as a juror, decide this case based on what

9   you hear in the courtroom?

10       A.     Yes, sir.

11       Q.     Okay.

12       A.     I feel like I can do that.

13       Q.     All right.  In Texas the capital murder

14  statute is just reserved for certain types of killings.  We

15  have a lot of brutal murders which don't even fall under the

16  prosecution.

17              I can take a gun out now and maybe I

18  don't like the tie Mr. Wirskye is wearing, maybe he said

19  something that got on my nerves.  I could empty the gun into

20  him, laugh about it in front of everyone, very callous

21  killing, but I couldn't get the death penalty for that.  I

22  could get a life sentence, perhaps, but not the death

23  penalty.

24              The death penalty is reserved for

25  intentional killings, kind of like you described.  A person

1   has an intent to murder and he acts upon it.  It may only

2   take a second to form the intent, but it must be an

3   intentional killing, not an accident, not a self-defense.

4                   And it has to occur with another

5   aggravating fact, such as a murder that occurs during the

6   course of a felony.  If I go into a 7-Eleven and pull a gun

7   and shoot the clerk during a robbery, that could be a death

8   penalty case.  Murder during the course of breaking into

9   someone's home.  That could be a death penalty case or

10  during an arson or rape or kidnapping.

11                  Also specific victims, such as a police

12  officer on duty, fireman on duty, or a prison guard on duty,

13  fall under the statute.  A child under the age of six also

14  falls under the statute.  And murder for hire, someone does

15  it for money, a hitman-type situation or mass murder, serial

16  killer situation.  But those are the specific types of cases

17  which fall under the statute for consideration of the death

18  penalty.

19                  Does that make -- does that list make

20  sense to you from your point of view?

21       A.    Yes, sir.

22       Q.    Okay.  The trial -- well, let me go over this

23  issue.  When we think of capital murder, we normally think

24  of examples, like I gave the example of someone robbing a

25  7-Eleven, and we think of the triggerman.

1    But capital murder, like any other crime,

2  can sometimes have more than one individual commit the

3  crime.  Sometimes groups of individuals, or accomplices is

4  the more common term we use, commit a crime.  Some are more

5  actively involved in the crime than others.  The law says

6  that they can all be held responsible and they all could be

7  convicted and they can all be punished, depending on the

8  facts and their involvement.

9    And that's true with capital murder.  You

10  may, in some cases, have just one triggerman who causes a

11  murder, but he may have some accomplices that helped him

12  pull off that crime.  And under certain facts they may be

13  found guilty and could ultimately receive the death penalty.

14    An example we give is a bank robbery.

15  Let's say Mr. Wirskye and I decide we want to rob the bank

16  that's down the street.  I go in there and our plan calls

17  for me to pull a gun on the tellers.  He's in there with me.

18  He has a big bag.  I get them to hold their hands up.  He

19  then starts loading the money up from the trays.

20    During the course of that robbery I point

21  the gun at one of the tellers.  Maybe I don't like the way

22  they are looking at me.  Maybe he tells me they are about to

23  push a silent alarm and I shoot them intentionally.  We get

24  away, but are caught soon after.

25    Obviously, I can be prosecuted for the

1  capital murder and I could receive the death penalty,

2  depending on what the jury says.  The law says that

3  Mr. Wirskye can also be prosecuted for capital murder

4  because he's actively involved in that case as an

5  accomplice, even though he didn't pull the trigger or cause

6  anyone's death.

7          And we ask jurors for their gut reaction

8  to that or how they personally feel, disregarding what the

9  law is, because certain jurors come down one way or the

10  other on that.  They draw a line.  They are for the death

11  penalty for the triggerman or person that causes the death,

12  but they may draw the line there for an accomplice.  They

13  might reserve a life sentence for him or 99 years, but not a

14  death penalty.  Just don't think that's quite fair.

15          People feel differently, but there aren't

16  any right or wrong answers.  How do you feel about the law

17  in that regard, as far as prosecution of accomplices in a

18  capital murder scenario?

19      A.    I would think that's fair.  They helped

20  precipitate the event.  So if they weren't there helping

21  that along, the robbery along, then the other crime wouldn't

22  have happened, or the murder wouldn't have happened, I don't

23  think.

24      Q.    Do you think an accomplice, a nontriggerman,

25  could receive the death penalty in a capital murder case?

A.     I feel they went in knowing what was going to

happen or an option that could happen, what was, you know,

what could happen, and they made that choice.

Q.     Okay.  So you agree with the law in that

regard?

A.     Yes.

Q.     I can't go into the facts of the case.  I can

tell you that that is the theory of law that we're

prosecuting this case under, that Mr. Murphy is an

accomplice and not the actual triggerman.  And you have no

problems with that?

A.     I don't have any problems with that at all.

Q.     The law of parties, that's what it's called.

The law of parties actually works two ways.  We either prove

that he aided, directed, helped, commit the crime or that he

conspired.  We call it conspiracy.  Conspired to commit one

crime and during the course of committing that crime, one of

his co-conspirators committed another crime.

In my scenario that I gave, Mr. Wirskye

and I agreed to commit a robbery and during the course of

pulling that robbery off, I murdered one the victims.

And he could be held responsible as an accomplice, if the

jury believes he should have anticipated a life could be

taken.  He may never have had the intent a life be taken,

but because of the facts he should have anticipated.  He can

be found guilty under that theory of law.  To get to the

death penalty, what we have to prove is he actually did

anticipate a murder would occur.  And that's how we get to

the death penalty under the law of parties.

Now, we can't stop and open someone's

mind up and show you their intent.  What we can do is just

put on all the relevant evidence before, during, and after

the crime.  And a juror is allowed to use their common sense

to draw reasonable inferences or reasonable deductions from

the evidence to determine the person's intent.  The old

saying, actions speak louder than words, and that sort of

thing.

But we're not necessarily going to be

able to bring you a big meeting they have ahead of time and

say this is what our intent is going to be, obviously.  We

just have to be able to present all the relevant evidence.

Do you feel as a juror that you could

decide those issues and determine a person's intent just

from all the relevant evidence that is submitted to you?

A.    Yes, I think I could.

Q.    Okay.

A.    I mean, I think that I could be fair and look

at the evidence and get a feel for what I feel might be

going on.

Q.    Okay.  And you feel that the death penalty

1  could be appropriate for an accomplice, even though he

2  didn't actually cause the death of the person?

3       A.    Yes, sir.

4       Q.    And I believe you stated it earlier.  You

5  think it's fair because if someone actively participates in

6  the crime, then they should be held responsible?

7       A.    Yes, sir.  He helps precipitate it.

8       Q.    Okay.  Now, a capital murder case is divided

9  into two parts.  Your trial was divided into two parts,

10 also, on your DWI.  You had the guilt/innocence stage and

11 then you had the punishment stage and that's the same thing

12 here.

13            The difference is that in the capital

14 case you will get these Special Issues.  In the punishment

15 phase you can hear additional evidence and then the Court

16 submits to you these Special Issues and we will go over

17 those in a little more detail in a minute.

18            But basically what the State has to do is

19 prove to you beyond a reasonable doubt that the defendant

20 would be a continuing danger to society, that he anticipated

21 that a life would be taken, and that there's not sufficient

22 mitigating evidence that a life sentence should be imposed

23 rather than a death sentence.  And they are simply yes or no

24 questions.

25            Now, if you answer yes, yes, and no to

those questions, the Judge would have no choice.  He would

have no discretion.  He would sentence the defendant to

death.  If they are answered any other way, again he would

have no discretion.  He would sentence the defendant to

life.  But those are the two choices that are made.  It's a

death sentence or a life sentence and the jury doesn't

actually write in death or life, but the sentence is done

according to how the jury answers the questions.  Is that

clear to you?

        A.      Yes, sir.

        Q.      Are you familiar with the method of execution

in Texas?

        A.      Lethal injection, yes.

        Q.      That's right.  Growing up here you probably

have read numerous stories.  I think you have said you read

the news a lot?

        A.      Yes, sir.

        Q.      Oftentimes executions are covered in the

newspapers, sometimes on TV, depending on the particular

case and if it was local or not or where the crime

originally occurred.  But they are covered frequently and

the rules and procedures are the same in each case.  They

would be the same in this case.

                If the defendant is found guilty and

these questions are answered yes, yes, and no, the Judge

1  would sentence him to death and he would be placed on death

2  row.  At some point in time, I couldn't tell you exactly

3  when, but Judge Cunningham would actually give him a date of

4  execution.

5          The day prior to that date he would be

6  moved from death row to downtown Huntsville to a prison unit

7  there.  You have probably seen it on TV.  It has a big clock

8  on the outside of it.  He would be housed about 18 feet from

9  the death chamber.

10         On the date of his execution he would be

11 given time with family members.  He will be given time with

12 a minister, religious leader of his choice.  He would be

13 given a last meal.  But at 6:00 p.m. the executions take

14 place by law.  He would be moved, about ten minutes prior to

15 that, down that hallway.  He would be placed on a gurney

16 that you have probably seen photos of.  He would be secured

17 with leather straps, by force if necessary.  Needles would

18 be placed in his arms, tubes going into another room where

19 the executioner sits.

20         After he is secured, witnesses will be

21 brought in, witnesses from the victim's family.  There's

22 another room for witnesses from the defendant's family.  The

23 warden then allows him to make a last statement, and these

24 are quite frequently reported.  They can talk about being

25 innocent, being wrongly charged.  They can protest their

execution.  They may ask for forgiveness.  It varies with each execution.

After he makes that statement, the warden simply signals the executioner who will inject substances which shut down his lungs, his heart, and then he would lapse into a coma.  The whole process would take maybe 15 seconds.

Those are the descriptions.  And I don't mean to be morbid to go over that, but it's one thing for us to talk about it philosophically and another when you get down here and you realize, I might be participating in this type of case in which the man I'll be watching during the trial will be executed someday.

We can't go over the facts, but I can tell you this.  The State of Texas feels we have the type and quality of evidence to convince a jury of this man's guilt and that these questions will be answered in such a way that he will lie dead on a gurney in Huntsville, Texas, some day.  The defense takes the opposite view.

What I need to know is this.  You have told us philosophically you are for the death penalty in certain cases.  Do you feel that you are the type of person who could actually take pen in hand and if the State of Texas has proved these things, as we think we can, answer these questions in a way, knowing that the defendant here

1    would be executed in the method I have described?

2         A.    Yes, I think I could.

3         Q.    Why do you think that you could do that?

4         A.    I think that, again, back to what I said

5    earlier, in that we have boundaries and laws and ways

6    society is set up.  And this is the process we follow and I

7    take -- I guess I have my trust in the system to know the

8    direction we need to go and the steps to follow and the

9    procedure.  And I feel that everything is going to be done

10   possibly to keep that from happening to that gentleman. And

11   if not, then I can sign that, I guess, like you say, yes,

12   yes, no.

13        Q.    Like I said, we can't preview the facts.  And

14   I know you have never been in this situation before.  But as

15   best you know yourself, you feel confident in your ability

16   to do that?

17        A.    Yes.

18        Q.    Let's talk a minute about these Special

19   Issues.  If you will take a moment just to read Special

20   Issue No. 1 to yourself.

21        A.    (Prospective juror complies.)

22        Q.    Question No. 1 asks the jurors to make a

23   prediction.  You are guessing how the defendant, or

24   answering how you think the defendant will behave in the

25   future.  Do you feel comfortable making that kind of

1  decision, if you are given sufficient evidence?

2      A.    Yes.  If I was given sufficient evidence of

3  maybe like a prior background, that type of thing.

4      Q.    Okay.  That's what I was going to ask you --

5      A.    Framework.

6      Q.    -- what kind of things you would want to hear

7  if you were a juror?

8      A.    Background, maybe their feelings, what other

9  types of crimes, maybe if I can hear that.

10     Q.    That type of evidence is admissible at this

11 portion of the trial, if it exists.  If the person has been

12 tried and convicted before, you get to hear about that.  You

13 could even hear from the witnesses.  You could hear what

14 type of sentence he received and that sort of thing.  You

15 could hear good things.  You could hear bad things about the

16 person.  Kind of, "This Is Your Life," kind of a whole

17 history of a person.

18     A.    I would probably look at how that person

19 reacted to that, too, and if he took ownership and tried to

20 turn himself around and tried to make a change or it was

21 just a continual thing, just the next step is going to the

22 next place and continuing on.

23     Q.    That would be real important to you?

24     A.    Yes.

25     Q.    See if there's a history or a pattern, that

1  sort of thing?

2        A.      Right.  And try to better himself and change

3  that in any way.

4        Q.      All right.  You also get to consider the facts

5  of the case.  Obviously their role in it, you get to look at

6  that again.  You would have heard that in the

7  guilt/innocence stage.  You could use that evidence itself.

8              Do you feel that would be valuable

9  information to you on whether a person is dangerous or not,

10  their role in the particular crime?

11        A.      Yes, sir.

12        Q.      That question starts out with a no answer and

13  we have to prove to you beyond a reasonable doubt it should

14  be answered yes.  It asks whether there's a probability that

15  the defendant would commit criminal acts of violence.  What

16  does "probability" mean to you?

17        A.      More than likely.

18        Q.      Okay.  You kind of hit the nail on the head

19  there.  That is the guidance the courts have given us on

20  what probability should mean.  Obviously, we could never

21  prove a certainty, but it's more than a possibility.  The

22  courts use the term "more than likely".  Are you comfortable

23  with that?

24        A.      Yes.

25        Q.      We have to prove that the defendant would

1   commit criminal acts of violence.  What does "criminal acts

2   of violence" mean to you?

3        A.     Would be back to, again, a similar crime.

4   Right now the murder, maybe assault, rape, that type of

5   violence, physical violence.

6        Q.     Physical violence or threats of physical

7   violence to another human being?

8        A.     Yes.

9        Q.     And then constituting a threat to society.

10  What does "society" mean to you?

11       A.     I think that, you know, society as a whole

12  needs to be protected and that's just everyone's everyday

13  living.

14       Q.     Okay.  Could it mean anybody and everyone the

15  defendant may come into contact with?

16       A.     Yes.

17       Q.     And in whatever context?

18       A.     Yes.  Everyday, living, people being at the

19  grocery store buying something, going down the street, going

20  to the bank, whatever.

21       Q.     Could it also include people in the penal

22  system?  Inmates, guards --

23       A.     Yes.  That would be his world, I guess.

24       Q.     Do you feel Special Issue No. 1 kind of goes

25  to a person's mind and what they're capable of, their

1    propensity for violence, and that sort of thing?

2         A.    Yes.

3         Q.    Okay.  Special Issue No. 1 is there's no

4    automatic answers under the law.  What you have to do is

5    just because you found him guilty, you have to be able to

6    wait and listen to the additional evidence you hear in the

7    punishment stage and then determine if you think Special

8    Issue No. 1 should be answered yes.  Do you feel that you

9    could do that?

10        A.    Yes, sir.

11        Q.    Okay.  Special Issue No. 2, I want to go on to

12   that next and if you will take just a moment to read that to

13   yourself.

14        A.    (Prospective juror complies.)

15        Q.    Question No. 2 has to do with that accomplice

16   and law of parties that we talked about.  The first part of

17   the question asks whether the defendant actually caused the

18   death.  Now, if you believe from the facts he was the actual

19   triggerman or murderer, then obviously the question is

20   answered that way.

21              But the other part of the question calls

22   for those parties or accomplice situations.  They did not

23   actually cause the death of the deceased, but intended to

24   kill the deceased.  Maybe it would be clear from the facts

25   that they had the intentions for them to die or another, or

1  anticipated that a human life would be taken.  And that's

2  what we talk about in the first part of the guilt/innocence

3  stage.  What we have to prove is he should have anticipated.

4  And here you look at the same evidence and then any

5  additional evidence you have heard from their background,

6  and determine did the State prove that they actually

7  anticipated?

8         But do you see the difference between

9  should have anticipated and actually anticipated?

10         A.    Yes, sir.

11         Q.    Okay.  Mr. Wirskye uses the example,

12  sometimes, in showing the difference in that.  When he was

13  16 his dad gave him a used car and he drove it kind of

14  recklessly.  Took him a couple of days before he wrecked it.

15  And his dad went over his driving habits with him and said,

16  didn't you see what you were doing?  And he said, I guess I

17  should have, but he actually, at 16, didn't.  And upon

18  reflection now at his more mature years, he probably should

19  have anticipated what would happen in that situation.

20         So there's a difference there.  And it

21  may be the same exact evidence that you have heard already,

22  but the jury just has to look at it from this different

23  angle.  Do you feel that you can do that?

24         A.    Yes, sir.

25         Q.    Again, it's just going to depend on the facts

1    of the case.  We can't necessarily bring you a statement

2    from him saying, here are my intentions.  It's something

3    that you use your common sense and draw from what their

4    actions were during the crime and that sort of thing.

5                    Again, that question starts out with a no

6    answer and the State has to prove to you it should be

7    answered yes.  You look at that question independently of

8    the other questions and make that determination and then go

9    on to Special Issue No. 3.

10                   If you will take a moment now to read

11   Special Issue No. 3 to yourself.

12        A.        (Prospective juror complies.)

13        Q.        Let me say this, the Legislature wrote these

14   questions, we didn't.  We've had a few English teachers come

15   in and criticize these questions.

16        A.        I imagine.

17        Q.        So we let jurors know that we probably would

18   have written them a little different.  It tends to run on.

19   But this question is the last one you get to.  You don't get

20   to it unless you have found the defendant guilty, you found

21   he's a continuing danger, and you found he anticipated that

22   a life would be taken.

23                   But it allows the jurors to look at

24   everything they have heard in the person's background and

25   the crime, and determine if they think a life sentence

1    should be imposed rather than a death sentence.  It allows

2    you to show some mercy.

3                      Now, what mitigating evidence is, I can't

4    tell you.  It's going to be up to you and the other jurors.

5    You don't even have to agree with the other jurors.  You

6    just have to be able to keep your mind open to it.

7                      An example I give is you may have a

8    capital case where the defendant went to Harvard and got

9    four degrees.  One juror might think, you know, that's

10   pretty positive.  I might think that's mitigating.  Another

11   juror actually would hold that against him.  Someone that

12   smart shouldn't put themselves in that situation and commit

13   those kind of crimes.  So it can cut either way with jurors.

14                     As you sit there today, does anything

15   come to mind as what you might view as potentially

16   mitigating evidence?

17        A.      Maybe if they tried to, you know, stop some of

18   the circumstances, maybe still was involved in the

19   situation, but tried to maybe alter what ended up happening

20   or maybe a mental situation.

21        Q.      Some type of mental defect?

22        A.      Yes.  Some type of mental illness of some

23   sort, there again, showing in the past that they have tried

24   to change things around and have a positive spin to their

25   life.

Q.    Okay.

A.    Tried to do something different, maybe got swallowed up into it, things like that.

Q.    Okay.  Sometimes we hear about a person's background, maybe they grew up in a poor family, maybe a broken home, maybe physically or mentally abused as a child. And some jurors have told us they view that as mitigating. We've had other jurors say, I might sympathize with them, but once you are an adult, you have to be held accountable for things.  A lot of people are in those situations and they don't commit capital murder crimes.

How do you feel about that type of background information?

A.    That would be, you know, something to look at, to consider.

Q.    Okay.  What would be important about that?

A.    How that affected that person and how they tried to cope with that.

Q.    Okay.  You also hear sometimes a person may have used drugs, alcohol, in their life.  Again, that's not a legal defense, but some jurors feel that can be mitigating.  Other jurors say, no, it actually might be aggravating to them.

Do you have an opinion one way or the other about that type?

1          A.      I feel it's no excuse.

2          Q.      Sometimes you hear a case where someone is

3    very young or very old and jurors feel differently about

4    that.  When I say young, you have to be 17 or above to be

5    prosecuted for the death penalty in Texas.  But some people

6    would feel a younger age might be mitigating or a very old

7    defendant might be mitigating.  Do you feel one way or the

8    other about that?

9          A.      I think that could be mitigating.

10         Q.      Both -- from both sides?

11         A.      Sure.

12         Q.      Just depending on the facts?

13         A.      Yes.

14         Q.      Anything else come to mind that you might

15    consider as possibly mitigating?

16         A.      I think that pretty much covers it.

17         Q.      I know you probably don't sit around thinking

18    about these things.

19         A.      No.

20         Q.      Oftentimes in the punishment stage of a

21    capital trial you hear from psychiatrists or psychologists

22    from one side or the other.  The defense might call one.

23    They might give an opinion about future dangerousness, maybe

24    even Special Issue No. 2.  A lot of times you hear experts

25    testify about this mitigation question, their theories as to

1  why a person may have turned out the way they were, that

2  sort of thing.  They explain their behavior.

3           Some jurors put a whole lot of stock in

4  those kind of experts.  They think they know the human mind

5  pretty well and they would really value that type of expert.

6  We have other jurors tell us they really wouldn't value it

7  that much.  They think you can probably find an expert to

8  say what you wanted, if you looked hard enough.  And we have

9  other jurors that are right down the middle.  They would

10  factor that in, but it couldn't carry any particular weight

11  more than anything else.

12           Do you have any feeling about how you

13  would perceive those type of experts?

14      A.      I feel they are important.

15      Q.      Okay.

16      A.      And what they have to say I would listen to

17  very carefully.  There again, I would take their observation

18  and put it in how I see that person reacting to that, you

19  know, in their situations.

20      Q.      Okay.  Again, this is a last question.  Just

21  because you found a person guilty, found they're a future

22  danger, found they anticipated a life would be taken, you

23  still have to be able to keep your mind open, and if you

24  think a life sentence should be imposed, you would answer

25  the question yes.  And if you don't think there is

1   sufficient mitigating evidence, you would have to answer the

2   question no.

3                 Do you feel that you can do that and keep

4   your mind open?

5        A.     Yes, sir.

6        Q.     Okay.  Let me talk to you about a couple of

7   rules that apply.  One is the burden of proof.  The burden

8   of proof is with the State of Texas and never leaves this

9   table.  That burden of proof never shifts to the defense.

10   You may anticipate that these lawyers might ask questions.

11   You might anticipate they will put on evidence or make

12   arguments.  But they don't have to because the burden of

13   proof never leaves this table.

14                 Could you follow that rule of law and

15   require the State of Texas to prove this case beyond a

16   reasonable doubt?

17        A.     Yes.

18        Q.     And along with the law, too, the law requires

19   you not to shift the burden to them and require them to

20   prove his innocence to you or anything like that.  Could you

21   follow that rule of law?

22        A.     Sure.

23        Q.     Presumption of innocence.  The defendant is

24   presumed to be innocent.  The fact that he's been arrested,

25   charged, or we're even going through this process is no

1    evidence of his guilt.  You have to start him out with that

2    presumption and require the State to prove it to you beyond

3    a reasonable doubt that he's guilty.  Could you do that?

4         A.    I could have an open mind for that, yes.

5         Q.    Okay.  The Fifth Amendment applies in each

6    criminal case.  If a defendant wants to testify, no one can

7    stop him.  He can get up there and tell his story.  He can

8    be judged just like any other witness at that point in time.

9    But if he chooses not to testify, the Court would instruct

10   you, you can't hold that against him, because there could be

11   a lot of reasons why someone may not want to testify.  They

12   have -- they may be very shy.  Maybe they have a speech

13   impediment.  They may look guilty when they're not.  They

14   may not be very well educated.  They may be just following

15   their lawyer's advice who tells them not to testify, or they

16   could be real guilty and we can make them look even more

17   guilty.  It could be any number of reasons.

18              So the Court takes care of that by simply

19   telling you, you can't consider that.  You must consider the

20   case just based on what you hear from the witness stand.

21   Could you do that?

22        A.    Yes, sir.

23        Q.    That burden of proof goes to each and every

24   element of the indictment.  We have to prove to you every

25   part beyond a reasonable doubt or the defendant is entitled

1  to a not guilty verdict.

2              Let me give you an example.  We have to

3  prove the identity of the defendant, obviously.  If you have

4  a reasonable doubt about who committed this crime, at the

5  end of the case you would find him not guilty.  But that

6  burden of proof even goes to the county that it happened in,

7  Dallas County.  At the close of our evidence, if you had a

8  reasonable doubt about that, you would be required to find

9  him not guilty.  I don't anticipate that would happen.

10             But maybe this -- let's say the facts

11  showed the case happened along the borderline.  Maybe you

12  believed from the evidence it actually happened in Tarrant

13  County.  Under the law that's just as important as the

14  person's identity to the crime.  You may not like it and we

15  obviously would be very poor prosecutors in our preparation,

16  if that were true, and we will lose our jobs, but you can't

17  help us out and give us a leg up.  You would have to find

18  the defendant not guilty in those situations.

19             Could you follow that particular law and

20  require the State to prove every portion of the indictment?

21        A.    Yes.

22        Q.    Okay.  Since you went to Irving High School, I

23  want to go over a couple of names with you, just to make

24  sure.  Did you ever know any Jenny Renee Kay?

25        A.    No.

1    Q.    Or any Kays in Irving?

2    A.    Not that I know.

3    Q.    Or Kearneys, Donald Kearney?

4    A.    No.

5    Q.    You don't recall anybody of that last name?

6    A.    No, sir.  I haven't lived in Irving for --

7    since I was 19.

8    Q.    Okay.

9    A.    So, I mean, I've lived in North Dallas and I

10   lived in Mesquite.  I have lived in Mesquite 16, 17 years

11   now.

12   Q.    All right.  Police officers often testify in

13   these cases.  A lot of people respect the job they do, but

14   you cannot start them out ahead of the other witnesses.  You

15   would have to wait until they testify and then make your

16   judgments on them.  You can't start them out way ahead.

17   There's good police officers, bad police officers, like any

18   other profession, and the law requires you to start them out

19   like you would any other witness.  Could you follow that

20   rule of law?

21   A.    Yes, sir.

22   Q.    Okay.  I've gone over a lot of the law.  I

23   think that I have covered just about everything.  Do you

24   have any questions over anything we have gone over?

25   A.    No, sir.

1    Q.    Okay.

2              MR. SHOOK:  Judge, I believe that's all

3    we have.

4              THE COURT:  Mr. Sanchez?

5                   CROSS-EXAMINATION

6    BY MR. SANCHEZ:

7    Q.    Good afternoon, Ms. Lankford.  How are you

8    doing?

9    A.    Doing very well.  How are you?

10   Q.    Fine.  My name is Juan Sanchez.  I'm going to

11   ask you some questions.  Mr. Shook has done a good job in

12   explaining the law.  I'm going to ask you your feelings

13   about the law.  The reason we ask those things is because I

14   think when all of us are posed the question, can you follow

15   the law, we all say yes.  I don't know many people that

16   would say no.  But sometimes when we start thinking about

17   how the law might play in reality, sometimes I get a little

18   hyped up.  But let me slow down a little bit.

19              When we're put in reality in the real

20   world, facing real facts, at that time we may have a problem

21   following the law.  And that's the reason we ask questions

22   now, because once you get on the jury and you start having

23   those problems, it's too late.  We only want to try this

24   thing once.

25   A.    Right.

1    Q.    So that's why we ask the questions that we do.

2  But before I start, I notice that one of your hobbies was

3  fishing?

4    A.    Yes.

5    Q.    Where do you fish?

6    A.    I like to fish Lake Tawakoni.

7    Q.    You do that quite often?

8    A.    Well, yes, quite often.

9    Q.    That's how you relax?

10   A.    Yes.

11   Q.    Believe it or not, I have never been fishing.

12   A.    You should try that.

13   Q.    And I grew up in an area where everybody

14 fished.  I guess I was playing too much sports.  You

15 mentioned when Mr. Shook was asking you questions that you

16 had trust in the system.  You know that the Legislature has

17 written up this system and that you had trust in it that it

18 would work out the way it was supposed to work out.

19              And I want to impress upon you, once you

20 are a juror you are going to be part of that system.  In

21 other words, you will be the one making the decision that

22 makes that system function.  It's not the kind of situation

23 where, you know, the formula is plugged in and it

24 automatically happens.  It's going to be decisions that are

25 going to be made by you and the 11 other jurors that

1    determine someone's life.

2                          And I want to impress that upon you while

3    I'm going over this.  And the reason I preface with that is

4    that you have indicated that you did hear something about

5    that case in the media, correct?  And you have indicated

6    that it wouldn't affect you on being a fair juror.

7                          But the question I want to ask is have

8    you formed any opinions based on what you have heard through

9    the media on this case?

10        A.       It was so long ago, at the time I probably

11   thought it was a horrible thing.  They were on the loose.  I

12   was scared just like anybody else was.  And basically that's

13   all.

14        Q.       Okay.  Did you form any opinions as to the

15   guilt or innocence of Mr. Murphy as he sits here today?

16        A.       No, not a particular person, no.

17        Q.       I wanted to ask that and make sure.

18        A.       Yes, sir.

19        Q.       You also indicated that you were in favor of

20   the death penalty.  And as Mr. Shook talked, explained to

21   you, not all cases are death penalty cases.  Basically the

22   way the law is set up, is that you can't have the death

23   penalty for everything that happens in this world.  So the

24   Supreme Court of the United States, said you have to limit

25   it somehow.  You have to have a scheme that allows the death

1   penalty to be given in only certain situations.

2            So basically the way the law works is

3   that the law favors the death penalty not be given unless

4   the State can prove beyond a reasonable doubt that they are

5   guilty of it and unless they prove beyond a reasonable doubt

6   Special Issues 1 and 2 to be answered yes.  Of course, the

7   third issue, there's no burden on the State or on the

8   defense.  And then that still gives you a way to assess

9   somebody a life sentence instead of a death penalty.

10           So, you know, we're looking for jurors

11  that haven't prejudged this case.  We're looking for jurors

12  that not only are down the middle as far as how they would

13  vote in the case, but those that would actually presume them

14  to be innocent and hold the State to their burden.  It

15  sounds like to me you are the type of juror that could do

16  that.

17           Sometimes we have a concern that some

18  people think the State of Texas is asking me to do

19  something, then I'm going to go ahead and do it.  You don't

20  sound that way to me, do you?

21       A.    No, not that way at all.

22       Q.    Are you the type of person that even though

23  there's been media coverage on this case and even though the

24  State of Texas is asking you to do something, if they

25  haven't proven it to you beyond a reasonable doubt or you

1   don't think it's the right thing to do based on Special

2   Issue No. 3, are you the type of juror that could take pen

3   in hand and tell the State no?

4        A.      I feel that I'm a fair person, that I'll look

5   at what needs to be looked at, what is put in front of me,

6   and I will make my open mind up which is what I feel is

7   right.

8        Q.      And I think this was explained already, but

9   I'm just going to cover it a little bit more.  The

10  guilt/innocence part of the trial and these Special Issues,

11  they are all independent inquiries.  In other words, just

12  because you have answered one way in one part of the trial,

13  doesn't automatically make that next answer a certain thing.

14              I don't know if I'm making myself clear.

15  But one answer doesn't affect the next question.

16       A.      Each is on its own.

17       Q.      Each is on its own.

18       A.      Okay.

19       Q.      And Special Issue No. 1, you know, some jurors

20  have told us, well, you know, once I find somebody guilty of

21  capital murder, then No. 1 automatically is going to be a

22  yes for me.  If I found them guilty of capital murder,

23  automatically Special Issue No. 1 is going to be a yes.  I

24  find he's a continuing threat to society, just solely on the

25  fact that I found him guilty of capital murder.  How do you

feel about that?

A.      I feel I'm a fair person.  I would look at
each segment on its own.  I don't think that I'm a person
that will jump to conclusions.

Q.      And that's what the law anticipates should
happen.  And Special Issue No. 2, we're talking about what a
person is thinking.  As Mr. Shook said, we can't open up
somebody's head and find out what they were thinking.  Did
they actually anticipate that a human life would be taken?
So we've had some jurors that have told us, you know, in
order for me to decide that issue, I may have to hear from
the defendant himself and have him tell me what he did or
did not anticipate.  What do you think about that?

A.      I don't think that I have to hear from the
defendant, necessarily, but I think I would look at what is
put in front of me, you know, as far as like a past history,
what type of person I feel that person is, how they have
taken control of their life, what direction they are in,
some of their past thinking by some of their past reactions.
I can look at that.

Q.      The reason I ask is some jurors have told us,
you know, I would have to hear from him and if I didn't hear
from him, I would count that against him.

A.      No, I wouldn't.

Q.      The reality of the law says the State has to

1  prove that to you beyond a reasonable doubt.

2       A.       Right.

3       Q.       And, again, are you the type of juror that if

4  that wasn't proven to you beyond a reasonable doubt, you

5  could answer that no?

6       A.       If it wasn't beyond a reasonable doubt, yes.

7       Q.       And especially that you have already found him

8  guilty of capital murder and answered that he was a

9  continuing threat to society, you would still hold the State

10 to their burden on Special Issue No. 2?

11      A.       Yes, each one by itself.

12      Q.       And, of course, Special Issue No. 3, that's

13 the last step, obviously.  Do you see any value in Special

14 Issue No. 3 yourself?

15      A.       Yes, I do.

16      Q.       Can you explain what -- how do you -- what

17 kind of value do you see?

18      A.       Well, it gives the jury itself and also that

19 defendant, an opportunity to maybe make that change, give

20 them that opportunity to -- their background, the mitigating

21 circumstances, maybe they have been working towards some

22 things, but just had some bad luck along the way and it

23 still has that opportunity to give them -- to kind of spare

24 them from the death penalty.

25      Q.       You can see that's kind of a safety net?

1    A.    Yes, sir.

2    Q.    Sometimes jurors can get in a position where

3 they say, I found him guilty of capital murder.  That was

4 proven.  I found he was a continuing threat to society and I

5 found that he did anticipate that, but there's just

6 something about this case, something about the person,

7 something about the situation, the way it happened, their

8 background, that I think does not warrant the death penalty,

9 and that gives you the opportunity to do that.

10    A.    Yes, sir, it gives you that back door.

11    Q.    So you would seriously consider Special Issue

12 No. 3?

13    A.    Yes.

14    Q.    As the law would require?

15    A.    Uh-huh.

16    Q.    Okay.

17    A.    Not everything is black and white.

18    Q.    Exactly.  Is there anything that either

19 Mr. Shook or myself haven't asked you in the correct way

20 that somehow would affect you being a fair juror on this

21 case?

22    A.    No, sir.

23         MR. SANCHEZ:  That's all the questions I

24 have, Your Honor.

25         THE COURT:  Thank you so much, Ms.

156

1   Lankford.  Wait for us outside and we'll have you back in,

2   in just a minute.

3                           PROSPECTIVE JUROR:  Yes.

4                           [Prospective juror out]

5                           THE COURT:  What says the State?

6                           MR. SHOOK:  We have no challenges for

7   cause, Judge.

8                           THE COURT:  What says the defense?

9                           MR. SANCHEZ:  We have no challenge for

10  cause.

11                          THE COURT:  Would you like to step into

12  your office?

13                          MR. SANCHEZ:  Yes.

14                          (Recess)

15                          THE COURT:  Mr. Wirskye?

16                          MR. SHOOK:  State will exercise a

17  peremptory.

18                          THE COURT:  State wants a peremptory.

19                          [Prospective juror in]

20                          THE COURT:  Ms. Lankford, I want to thank

21  you for your time and participation today.  I want to inform

22  you that you shall not sit on this jury.  You have been

23  excused from jury service.

24                          PROSPECTIVE JUROR:  Thank you.

25                          [Prospective juror out]

1          THE COURT:  Mr. Nash.

2               [Prospective juror in]

3          THE COURT:  Good afternoon, sir.  How are

4     you?

5          PROSPECTIVE JUROR:  Pretty good.

6          THE COURT:  Juror No. 1863, Mr. George

7     Nash.  Mr. Nash, sorry for the delay in getting you in.  We

8     never know if we're going to speak to someone for a few

9     minutes or an hour and a half, and today we spoke to both

10    folks ahead of you almost the entire period of time.  I

11    apologize for the delay.  I have to balance one person

12    waiting versus 15 people waiting.  You came out on the short

13    end of the stick.  But some days we wait.  I appreciate your

14    patience.

15         Obviously, you had enough time to read

16    the guide I provided for you, hopefully more than once?

17         PROSPECTIVE JUROR:  Uh-huh.

18         THE COURT:  And to try to understand how

19    all of this is going to relate.  You don't have to be able

20    to give it back to us right now on an exam.  It's just we

21    want you to begin thinking about the law we're going to be

22    talking about.  The lawyers will explore your thoughts more

23    fully.

24         Did you have an opportunity to review

25    your questionnaire that you provided for us back in May?

1    PROSPECTIVE JUROR:  Yes.

2    THE COURT:  And the lawyers may want to

3  follow up on a few of your answers that you provided for

4  them at that time.  Two questions that I have to answer at

5  the end of the process is, number one, do you understand the

6  law?  And, number two, can you follow the law?  That's my

7  responsibility here today.

8    Only question I have for you at this time

9  is will you be able to serve this Court for a period of two

10  weeks beginning on November 10th?

11    PROSPECTIVE JUROR:  Yes.

12    THE COURT:  Thank you very much.

13  Mr. Wirskye?

14    MR. WIRSKYE:  May it please the Court.

15    <u>GEORGE NASH</u>,

16  having been duly sworn, was examined and testified as

17  follows:

18    <u>DIRECT EXAMINATION</u>

19  <u>BY MR. WIRSKYE</u>:

20    Q.    Mr. Nash, how are you this afternoon?

21    A.    Pretty good.

22    Q.    Thank you so much for bearing with us as this

23  afternoon is dragging on.  But my name is Bill Wirskye and

24  I'm the Assistant DA that will be visiting with you for the

25  next few minutes.  And what I would like to do is maybe

1   follow up on some of the information that you were kind

2   enough to give us in that long, long questionnaire, talk to

3   you a little bit about what you think about the death

4   penalty, and maybe visit with you a little bit about some of

5   the laws and rulings that apply in this type of case where

6   the State is seeking the death penalty.

7              What did you think when you got notified

8   to come down here for an individual interview?

9       A.    This last time?

10      Q.    Yes.

11      A.    Well, I'm kind of nervous.  I didn't know what

12  was going to take place.  I didn't have too good of an idea.

13      Q.    Were you nervous because it was a case that

14  involved the death penalty?

15      A.    That's got just a little something to do with

16  it, yeah.

17      Q.    Okay.  You work at Sears; is that right?

18      A.    Yeah.

19      Q.    How long have you worked there?

20      A.    Thirty-one years.

21      Q.    Okay.  And you work at their auto center?

22      A.    Yes.

23      Q.    What did you do before that?

24      A.    I was in the military for a couple of years.

25      Q.    I think I saw the Marine Corps; is that right?

1    A.    Yeah, I was there two years.

2    Q.    What do you do in your free time?

3    A.    I mainly just -- sometime I walk and, you

4    know, watch a lot of TV.

5    Q.    Okay.

6    A.    Spend some time with my grandkids.

7    Q.    How many grandchildren do you have?

8    A.    I have three.

9    Q.    Okay.  Well, you have told us you are

10   generally in favor of the death penalty; is that right?

11   A.    Yes.  If found -- if guilty, yeah, right.

12   Q.    Why do you think we should have a death

13   penalty?

14   A.    Well, I think, you know, if you take

15   somebody's life and you prove them guilty, you should be,

16   you know, I'm not saying an eye for an eye, but I think you

17   should have to, you know, suffer, I mean, the consequences

18   for taking a life, I mean.

19   Q.    Have you followed any cases that come or any

20   cases come to mind when you think about an appropriate case

21   for the death penalty?

22   A.    No, not -- I can't think of any.

23   Q.    Okay.  I think you mentioned in your

24   questionnaire something about the Carla Faye Tucker case?

25   A.    Oh, yeah, yeah.

1   Q.   Did you follow that when it happened?

2   A.   Some, yeah, on TV on the CBN radio series on

3   it.

4   Q.   What did you think about that, how that ended

5   up?

6   A.   Well, I think she, you know, got -- what she

7   done and all, I think it was fair, you know, the case and

8   everything.

9   Q.   Okay.  In Texas we just limit the death

10  penalty to murder cases and then in only particular types of

11  murder cases, kind of a subset of murder case.  You have to

12  have murder under certain circumstances or murder of certain

13  people in order to qualify for the death penalty.  You can

14  commit a very bad or very violent and brutal murder and it

15  may not be subject to the death penalty.

16            You may get a life sentence for it, get

17  locked up for a long time, but, you know, if I turn and

18  shoot my partner here because I don't like the tie he's

19  wearing, I shoot him ten times in the head in front of

20  everybody in a court of law, you can lock me up for life,

21  but that couldn't be a capital crime.  Okay?  Does that make

22  sense to you?

23  A.   Uh-huh.

24  Q.   Just to --

25            THE COURT:  You need to answer yes or no.

1          PROSPECTIVE JUROR:  Yes.

2          Q.      (By Mr. Wirskye)  Just a murder or killing

3    alone doesn't qualify.  It has to be murder in the course of

4    a robbery, burglary, rape, murder of a police officer,

5    fireman, or prison guard, a young child under six, mass

6    murderer, or serial murderer, that type thing.

7                 Does that pretty much agree with you and

8    what you believe the death penalty, to kind of limit it to

9    those crimes?

10         A.      Yes, yeah, that's what I believe.

11         Q.      Okay.  Now, you have told us a little bit that

12   I think like just about everybody that we talked to, you

13   have heard a little bit about this case or you know about

14   this case?

15         A.      Yes.

16         Q.      You know what case you are down here on?

17         A.      Yes.

18         Q.      What have you heard about this case?

19         A.      Well, I just seen on TV, you know, back when

20   they were trying to find the seven men.  I watched some of

21   that on television.

22         Q.      Okay.

23         A.      And some when it first happened, when they

24   killed the officer.

25         Q.      Okay.  Have you followed any of the court

1  proceedings that have gone on so far from these cases?

2         A.    No, no.

3         Q.    Okay.  Do you remember any details of the

4  crime?

5         A.    No -- yes, I remember about the officer was

6  run over.  I knew he was shot and then run over.

7         Q.    Okay.  I know you have been on a jury before,

8  I think maybe back in the '80s; is that right?

9         A.    Yeah.  I was on a criminal -- I mean, they

10  call it -- it was involved with a burglary.

11         Q.    Breaking into somebody's house or garage?

12         A.    Church, yeah.

13         Q.    Okay.  You know, this case is a little

14  different from those type of cases.  Usually, when you come

15  down for jury duty, you don't know what case you are down

16  here on.  This one, just about everybody we've talked to has

17  heard something about the case and it kind of affects

18  different people differently, you know, knowing something

19  about the case.

20                How do you think it might affect you, if

21  you were picked to be a juror in this case, knowing, you

22  know, what you have heard about it so far?

23         A.    I think I'm a little nervous over being here

24  and being on that.  You know, if I was picked, I would try

25  to do my best.

1    Q.    Okay.  Do you think that you might be

2    influenced over anything you have heard or how do you think

3    that might affect you?

4        A.    No, I don't think I would be influenced.

5        Q.    Okay.  Are you nervous because you know about

6    the case or nervous just because it's a death penalty case?

7        A.    A little of both.

8        Q.    Okay.  If you were picked to be a juror in

9    this case, do you think that you could base your verdict

10   just on what you hear in the courtroom?

11       A.    No, I would have to hear, you know, some other

12   -- I mean, I don't --

13       Q.    You know, if you are a juror you get to hear

14   the witnesses and evidence here in the courtroom and that's

15   how you make your decision.  This case is a little different

16   because people know a little bit about it before they even

17   come into the courtroom.  So some people tell us it would,

18   you know, it would be hard for them, because they know about

19   the case, to base their verdict just on what they hear in

20   the courtroom.

21            Do you think that you can do that or do

22   you think that you might have a hard time with it, or what

23   do you think?

24       A.    I believe I could do it.  And the evidence, I

25   mean, that's shown, you know.

1      Q.    What do you remember about your past jury, the

2  jury you were on, the burglary case?

3      A.    I remember we was about three days, we were

4  there at the Allen, I think, building over here.  The man

5  had other offenses and he broke into a church and the pastor

6  had caught him and he had called the police and they went

7  chasing him and they caught up with him and all.  I remember

8  the guy looking at all of us like, you know, he was going to

9  get even, looking at all the jurors.

10      Q.    I guess you found him guilty?

11      A.    Yeah.

12      Q.    Did you set his punishment?

13      A.    The Court set his punishment.

14      Q.    Okay.  Do you remember what he got?

15      A.    I believe it was three years.

16      Q.    Okay.  That seem --

17      A.    It's been a while ago.

18      Q.    Did that seem fair to you?

19      A.    Yeah, yes.

20      Q.    Give me a second, Mr. Nash.

21           MR. WIRSKYE:  Judge, that's all the

22  questions I have.  Pass the juror.

23           THE COURT:  Ms. Busbee?

24           MS. BUSBEE:  We have no questions.  We

25  have reached an agreement.

1        THE COURT:  Mr. Nash, I want to thank you

2   for your time and attention and coming in today.  The

3   parties have agreed to excuse you from this jury, so you

4   shall not serve on this case.  You are free to go.

5                    [End of Volume]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF TEXAS          *

COUNTY OF DALLAS          *

   I, NANCY BREWER, Official Court Reporter for the 283rd Judicial District Court, do hereby certify that the above and foregoing constitutes a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

   WITNESS MY OFFICIAL HAND on this the 4 day of _____ March , 2004.

NANCY BREWER, CSR, NO. 5759
Expiration Date:  12-31-04
Official Reporter, 283rd JDC
Frank Crowley Crts. Bldg. LB33
133 No. Industrial Blvd.
Dallas, TX 75207
(214)653-5863

REPORTER'S RECORD

**74851**

VOLUME 20 OF ___ VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FILED IN**
**COURT OF CRIMINAL APPEALS**

MAR  9 2004

Troy C. Bennett,

On the 23th day of September, 2003, the following
proceedings came on to be heard in the above-entitled and
numbered cause before the Honorable Vickers L. Cunningham,
Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

A P P E A R A N C E S

<u>APPEARING FOR THE STATE</u>

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


<u>APPEARING FOR THE DEFENDANT</u>

Ms. Brook Busbee
Attorney at Law
SBOT: 03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT: 00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Ronna Braggs | 4 | 5 | 41 | 20 |
| Sandra Paredes | 45 | 47 | | 20 |
| Stephen Owens | 67 | 69 | | 20 |
| Angel Chinuntdet | 71 | 73 | 95 | 20 |
| Jeffry Wingate | 99 | 100 | 135 | 20 |
| Sharon Hudgens | 143 | 144 | 181 | 20 |

P R O C E E D I N G S

1
2          THE COURT:  Ronna D. Braggs.

3                    [Prospective juror in]

4          THE COURT:  Good morning.  How are you?

5          PROSPECTIVE JUROR:  Fine, thank you.

6          THE COURT:  For the record we have juror
7  No. 1922, Ms. Ronna D. Braggs.  Ms. Braggs, welcome to the
8  283rd.  Thank you for being on time this morning.  Actually,
9  you were scheduled to be No. 2.  But you were here early so
10  you get to come in first, so you saved some time being here
11  early.  We appreciate that.

12          I have provided you this morning with a
13  guide.  You have had time to read that a couple of times,
14  read through your questionnaire.  Your questionnaire is
15  there for your review.  If the lawyers want to ask you about
16  one of your answers or what you were thinking when you made
17  the statement, that gives your answers that you provided for
18  us.

19          This morning there is no way that you can
20  fail this test, only truthful answers.  We appreciate your
21  opinions.  The attorneys want to share that with you -- want
22  you to share that with them.  They are going to go over the
23  law with you in more detail so you have a better
24  understanding.

25          At the end of the process I have two

1  questions to ask.  Number one, do you understand the law?

2  And, number two, can you follow the law?  That's my role

3  here.  That's the big picture I have to look at.

4                    I know many people come in and it's kind

5  of intimidating.  You walk in and you are the focus of

6  attention versus being able to hide with 700 people in the

7  Central Jury Room.  This is as informal a process as we can

8  manage.  And we just want you to kind of don't be worried

9  about it.  I know it's kind of intimidating.  If you would,

10 give your attention to the attorneys that are going to ask

11 you some questions.

12                    The only one I have for you is will you

13 be able to serve this Court for two weeks beginning November

14 10th?

15                    PROSPECTIVE JUROR:  Yes.

16                    THE COURT:  Mr. Wirskye?

17                    MR. WIRSKYE:  May it please the Court.

18                    RONNA BRAGGS,

19 having been duly sworn, was examined and testified as

20 follows:

21                    DIRECT EXAMINATION

22 BY MR. WIRSKYE:

23         Q.    Ms. Braggs, how are you this morning?

24         A.    Fine, thank you.

25         Q.    My name is Bill Wirskye.  I'll be the

1   Assistant DA that would be visiting with you for the next

2   few minutes.  What I want to do is follow up on some of the

3   information that you were kind enough to provide in the

4   lengthy questionnaire that you filled out a couple of months

5   ago, talk to you a little bit about your thoughts and

6   feelings about the death penalty and visit about some of the

7   laws and rules that apply in a case like this where the

8   State is seeking the death penalty.

9                    You told us you are an administrative

10  assistant in a doctors's office; is that correct?

11       A.    That's correct.

12       Q.    What is a normal day like for you?  What do

13  you do on a day-in, day-out basis?

14       A.    I do lots of things.  I help run the clinic.

15  I do credentialing of the doctors, advertising for the

16  clinic, any correspondence that needs to be distributed, I

17  do that.  Various things as they come up.  I cover the front

18  desk, help get the patients checked in, whatever is needed

19  to be done.

20       Q.    A little bit of everything?

21       A.    Uh-huh, yes.

22       Q.    Field complaints and that type thing?

23       A.    Yes.

24       Q.    Deal with angry people?

25       A.    Yes.

1    Q.    What do you do in your free time?

2    A.    Spend time with my kids.

3    Q.    You have two young ones, right?

4    A.    Uh-huh, two boys.

5    Q.    Okay.  What did you think or what went through

6    your mind when you got the phone call or the letter that you

7    were going to have to come down for an individual interview

8    in a death penalty case?

9    A.    That's just my luck.

10   Q.    You nervous one way or another about maybe

11   being a juror in a case where the death penalty is an

12   option?

13   A.    No.

14   Q.    Okay.  And you have told us that you generally

15   believe in the death penalty.  I believe you circled, you

16   believe the death penalty is appropriate in some murder

17   cases; is that right?

18   A.    Yes.

19   Q.    Why do you think we should have a death

20   penalty or what value do you see to having a death penalty

21   in our society?

22   A.    Well, I think that if someone takes the life

23   of another, that they deserve to die or pay for that.  Um, I

24   believe it would keep others from doing the same thing.  I

25   mean, you shouldn't just get slapped on the wrist is what I

1    believe.

2         Q.    I know you told us in the questionnaire that

3    you followed some cases in the media, quite a few, I think

4    you told us.

5         A.    Um, from this case or --

6         Q.    Not this case, just other cases?

7         A.    Yeah, some I've watched.

8         Q.    Is there any other case that you have heard or

9    read about that comes to mind when you think that is an

10   appropriate case for the death penalty or that would be a

11   person who is a good candidate for the death penalty?

12        A.    The last one that I can think of was -- what's

13   her name?  Susan Smith, that drowned her children.

14        Q.    In South Carolina?

15        A.    Yes.

16        Q.    Any others?

17        A.    O. J.

18        Q.    How did you come down on the O. J. case?

19        A.    Well, I thought he was guilty and I thought he

20   should have been found guilty.  I was upset that he wasn't.

21        Q.    Okay.  Fair enough.  You have been on two

22   juries before?

23        A.    Yes.

24        Q.    One of them looked like it was maybe an

25   eviction-type deal?

1      A.     There was one that, yeah, somebody wouldn't

2  leave their house and they needed to be evicted, I guess.

3  And the other was, I believe, driving under the influence.

4  It's been a while ago.

5      Q.     Was that here in this building?

6      A.     I'm sorry, I don't remember.  I don't remember

7  which one.  I think it probably was.  I don't think that

8  I've served anywhere other than here.

9      Q.     Was it a six-person jury?

10     A.     Yes.

11     Q.     Okay.  Let's see, looks like you found the

12 person not guilty; is that right?

13     A.     That's correct.

14     Q.     How did the case go?  I mean, was the evidence

15 pretty straightforward in your opinion?

16     A.     Well, the only evidence that was presented was

17 the videotape of the defendant and the jury didn't feel that

18 he looked or acted under the influence of alcohol.

19     Q.     Okay.  Was the jury pretty much in agreement?

20     A.     Yes.

21     Q.     Okay.  Deliberations went pretty smoothly?

22 Didn't take a long time or anything?

23     A.     No.

24     Q.     Looks like you checked that you participated

25 more than other jurors and think you might have had more

1    influence than the other jurors; is that right?

2         A.    I think so.

3         Q.    Why did you check that?  From what you

4    remember about the deliberations?

5         A.    I seem to be very opinionated, always speak

6    what's on my mind and I think from what I remember, there

7    were just a couple of jurors that just sat and really just

8    said yes or no.  And I gave my feelings on the evidence that

9    was presented.

10        Q.    Okay.  Let's see, we also asked you, sometimes

11   it turns out to be a silly question.  It's on page 5 of your

12   questionnaire, if you want to look at it.  The first thing

13   that pops in your mind when you think about police,

14   prosecutors, and defense lawyers.  You said, the first thing

15   that pops in your mind on prosecutors is do-gooders.  I

16   didn't know what that meant, if that was a compliment or

17   what were you thinking?

18        A.    It is a compliment.  Those are the people who

19   do our society good.  They go after the bad guys.  So that's

20   the first thing I thought.

21        Q.    Fair enough.  We also ask everybody what

22   contact they have had with the system, jury service, or that

23   type thing or if you know anyone that's been in the system,

24   maybe charged with a crime.  And you told us your

25   ex-husband, I guess back in '91, had a theft of a motor

1    vehicle case; is that right?

2         A.    Yes.  Actually, he was with the person who

3    stole the car.

4         Q.    But he was riding in the car, I guess, when

5    the police pulled them over, that type of thing?

6         A.    That's what I've been told, yes.

7         Q.    You look a little skeptical.

8         A.    You never know what to believe with him.

9         Q.    Did you know him during that time?

10        A.    Yes.

11        Q.    Okay.  Did you think he was treated fairly

12   based on what you knew about the case?

13        A.    I think so.  I think he was put on probation

14   and I think that was appropriate in that case.

15        Q.    Okay.  And you also mentioned that you had a

16   brother, Daniel Hill, looked like, at least had served some

17   time in jail; is that right?

18        A.    I know he's been in and out a little bit.

19        Q.    Okay.  Do you know that type of charges or

20   anything like that?

21        A.    Honestly, I don't -- I don't know.  Again, I

22   just know what I've been told.  And what I know, he used to

23   batter his wife, so that might have been one of the charges.

24   It could also have been DWI or warrants.  I'm not really

25   sure.

Q.     Based on what you know about those cases, do you think that he was treated fairly?

A.     Yes.

Q.     Obviously, either side doesn't want somebody over in the jury box that has a hidden agenda and is angry at one side or the other, and we just kind of trust you to be honest about your true feelings and see if you are the type person that can participate in something like this.  Of course, it's especially important when you are talking about a case like this where the death penalty is a sentencing option.

So let me talk to you a little bit about the death penalty.  We kind of ask people to rank themselves on a scale of 1 to 10 how strongly they feel about the use of the death penalty and you gave yourself a 10, which is the most.

And I know that means different things to different people.  I'm just curious what that 10 means to you?

A.     Well, like I stated before, I believe somebody takes the life of another, they deserve to die, no matter to me what the circumstances were, if they intentionally took the life of someone else, they should die.  So I strongly believe in the death penalty.

Q.     From what you have told us and what you

1  indicate in the questionnaire, it sounds like you also can

2  see that the death penalty is not automatic, in your

3  opinion, shouldn't be imposed in every case?

4       A.    That's correct.

5       Q.    It just depends on the facts and

6  circumstances?

7       A.    Yes.

8       Q.    Okay.  You got a chance to look at the packet

9  of law that the Judge gave you.  I know a lot of people

10  don't really know, necessarily, what the law is.  And in

11  Texas we reserve the death penalty just for murder cases,

12  and then only for kind of certain murder cases, like a

13  subset of murder cases.  There could be very brutal or very

14  cruel sets of facts in murder cases that don't qualify, are

15  not eligible to be punished by the death penalty.  You may

16  have heard of some.  A man that killed his wife, I think cut

17  her throat in front of two young children over in University

18  Park a few years ago.  You may or may not have heard of it.

19  A particularly brutal crime, but he wouldn't be eligible for

20  the death penalty.

21           I could turn and shoot my buddy,

22  Mr. Shook, ten times in the head in front of everybody in

23  the courtroom and laugh about it after I do it, you know,

24  and may have been to prison three or four times, but that

25  would not qualify for the death penalty.  You know, I could

1  get a life sentence, maybe, but not a death penalty.

2              In order to be a capital case in Texas, a

3  case that's eligible for the death penalty, if you kill a

4  particular person like a police officer on duty, fireman,

5  prison guard, if you commit an intentional murder during the

6  course of a robbery, burglary, or rape, that type of thing,

7  if you kill a child under six, if you commit a mass murder

8  of more than one person or a serial murder, you kill a

9  series of people, those are the type crimes that we reserve

10  the death penalty for in Texas.

11              Is that something that you are kind of

12  generally in agreement with?

13      A.      Somewhat.

14      Q.      Okay.  Would you, if you were Governor for a

15  day, would you expand the list or shrink the list?

16      A.      I would definitely expand.

17      Q.      Sounds like you would have that option

18  available for any intentional murder case?

19      A.      Yes.

20      Q.      Okay.  We talk to quite a few people down here

21  and some who feel, I think such as you do, kind of strongly

22  about using the death penalty in the appropriate case.  But

23  sometimes those people draw some lines.

24              What I mean by that is this, that

25  oftentimes crimes are committed by more than one person.

1  And we can prosecute everyone that's actively involved in a

2  crime, you know, down to the smallest shoplift up to capital

3  murder.  The law allows us to prosecute everyone who

4  actively participated in the crime.  It may be your

5  ex-husband's situation.  He wasn't actually driving the car,

6  but he was riding along with it, that type of thing.

7              And when you talk about a capital murder

8  scenario, you may have a situation where only one person

9  pulled the trigger or maybe only one person caused the

10  death.  For lack of a better term we call them the

11  triggerman.  But there may also be accomplices who didn't

12  pull the trigger, who didn't cause the death, but were

13  otherwise actively involved in the crime.

14              And some people who believe in the death

15  penalty would kind of draw a line between those two sets,

16  and they believe in the death penalty for the person that

17  pulled the trigger and actually caused the death.  They

18  believe it's warranted for that person.  But when it comes

19  to the accomplice, the person who didn't actually cause the

20  death, who didn't pull the trigger, you know, they may want

21  to lock them up for life, but they don't feel that the death

22  penalty is appropriate for an accomplice, that type of

23  thing.  Where do you come down on that issue?

24      A.      Well, I feel like it depends on the

25  accomplice's intention.  If it can be proven that it was

premeditated and conspired, I think that person should

receive the death penalty, just like the triggerman or

person.  If the defendant did not know it was going to

happen, I feel like it probably should end in life, if the

person is found guilty, and not the death penalty.

Q.    Okay.  Sounds like you are kind of where the

law is.  But let me explain the law to you and I'll use an

example and see if I can make it clear.  Let's say Mr. Shook

and I decide we're going to rob a bank.  Okay?

And we get together and agree on a plan

that he's going in with a pistol.  He's going to hold up the

tellers.  And I'm going to come in with him.  I'm not going

to have a gun, but I'm going to collect the money.  I'm

going to be the bagman.  Okay?

And we have a third friend who kind of

drives us up there.  He's the getaway car driver.  He's not

going in the bank.  He's going to sit out there and look for

the police.

We go in to do the bank robbery and, for

whatever reason, Mr. Shook shoots and kills the teller.  He

maybe didn't like the way one of them was looking at him or

he may have seen them going for a silent alarm, or I may

have told him, Toby, he's going for the alarm.  But he

shoots and kills that teller.

He's committed a capital murder, an

1    intentional murder during the course of a robbery.  He could

2    be found guilty of capital murder and ultimately receive the

3    death penalty, depending on what the jury thinks.  But the

4    law allows, also, the person in my shoes, the accomplice,

5    depending on the facts and circumstances, to also be

6    convicted of capital murder and potentially face the death

7    penalty as well.  What do you think about that?

8        A.      I think in that case that you probably should

9    receive the death penalty.  You went in knowingly, carrying

10   a weapon to hold up the person, knowing that it could

11   possibly end up in the death of someone.  So I think that

12   that is intentional and you ought to receive the death

13   penalty along with him.

14       Q.      It sounds, again, like you are right where the

15   law is.  And what the law is, is this, when you are talking

16   about accomplices.  In Texas we call them a party to the

17   offense.  A person is a party to an offense rather than an

18   accomplice.

19               But when you are talking about parties,

20   someone in my situation in that example, there's two ways

21   that I can be convicted of capital murder.  One is, you

22   know, if I actively encouraged him, directed him, solicited

23   him, to commit that capital murder, you know, maybe I told

24   him, hey, Toby, she's going for an alarm, shoot and kill

25   her, that type of thing, I could be found guilty as an

1    accomplice or party.

2                          Or if the law says, you know, even though

3    I didn't have any intent that a person would die, if I

4    should have anticipated that a death could have occurred,

5    okay?  In our example, people think, you know, I should have

6    anticipated a death would occur because I went in with a guy

7    that had a loaded gun to do a bank robbery.

8                          What the law says is if I should have

9    anticipated that a death could occur, then I could be

10   convicted of capital murder.  Does that make sense to you?

11        A.    Yes.

12        Q.    Sound likes that's exactly where you are and

13   you kind of see the wisdom in the law and that type of

14   thing?

15        A.    Yes.

16        Q.    Okay.  When you are talking about capital

17   murder, any criminal trial in Texas, the trial is broken

18   down into two different parts.  The first part would be --

19   and this is the part you may remember from your DWI -- we

20   call the guilt/innocence part.  And there you are basically

21   just concerned with whether the person is guilty.

22                          Did the State prove to you, as a juror,

23   beyond a reasonable doubt that the person is guilty of the

24   crime?  Is the person guilty of capital murder?  If the

25   State meets its burden, the jury thinks the person is guilty

of capital murder, then you would move into the second phase

of the trial, which would be the punishment phase of the

trial. You would get to hear a little bit more, hear about

his past, whether he's been a good person, a bad person,

whether he has a criminal history, that type of thing.

And we give you this extra information

because in a death penalty case we ask a jury to answer

these Special Issues. We don't ask the jury at the end of

the death penalty case to just write in life sentence or

death sentence. We ask them to answer these questions based

on the evidence they have heard in the first part and the

second part and we let the answers to these questions

determine what the appropriate sentence is.

And just looking at them quickly, I know

you had a chance to read over them in the booklet. The

first question -- and we'll talk about them more in a

minute. But the first question asked, is he a future

danger? Okay. The second question kind of deals with the

situation we already talked about where you have an

accomplice or party to an offense. If you find a person is

a future danger, if you find at the punishment phase he

actually anticipated that a life would be taken, then you

get down to the third question. And we ask a juror is there

anything mitigating? Is there any reason that his life

ought to be spared, basically?

1           If the first two questions are answered

2    yes and the last question is answered no, the Judge has no

3    discretion.  He will sentence the defendant to death.  And

4    that's kind of how our scheme works.  Does that make sense

5    to you?

6           A.    Yes.

7           Q.    A lot of times when we talk to people we find

8    some people who are very strongly in favor of the death

9    penalty, kind of in a theoretical or abstract sense.  But

10   when they get down here, sitting where you are sitting, and

11   got a good chance of maybe getting over in the jury box and

12   actually being a juror in a death penalty case, they start

13   developing some hesitation and start saying, I may believe

14   in it, I'm just uncomfortable actually participating in the

15   process, you know, that could result in the execution of the

16   man down at the end of the table being executed.  Like I

17   say, it's an entirely different thing when it's no longer

18   philosophical or no longer in the abstract.

19          So before we go any further, I want to

20   make sure that you feel like you are the type person that

21   could participate in this process and that you are the type

22   person that could take pen in hand, look at the evidence,

23   and answer those questions and maybe answer them in such a

24   way that would result in the man down at the end of the

25   table being executed and lying dead in Huntsville?

1          And, very frankly, that's our goal in

2 this case. We feel that we have the type evidence that is

3 going to convince a jury that he's guilty, that the

4 questions should be answered yes, yes, and no. Obviously,

5 the other side takes a different view, and that's why we

6 have a trial.

7          But I want to make sure that you at least

8 have no hesitations, again, that you feel like you are the

9 type person that could take pen in hand and answer those

10 questions in such a way that a death sentence would result?

11    A.    Unfortunately for me, I think, yes, I could.

12    Q.    Okay. You seem like a pretty strong

13 opinionated person.

14    A.    I am.

15    Q.    Okay. Let me ask you this. Almost everybody

16 we talk to in this case, Ms. Braggs, has heard something,

17 probably 99 percent of the people we talk to has heard

18 something about this case. What the law says on that is

19 that, you know, you are not automatically disqualified, just

20 because you may have heard, read, or seen something in the

21 media about this case.

22          What the law says is that we need jurors,

23 in order to be qualified, jurors have to tell us that they

24 could base their verdict just on the facts and evidence they

25 hear in the courtroom. I think that the law kind of

1  recognizes that the best source of information is what

2  happens in the courtroom and maybe not what you heard on TV

3  or what you think you read in the paper years ago, that type

4  of thing.

5          We can't ask you to forget about it.

6  That's kind of unnatural, but we ask you to kind of push it

7  to the back of your mind and base your verdict only on what

8  you hear in the courtroom.

9          Do you think that you are the type person

10  that can do that?

11      A.    Yes.

12      Q.    What do you remember hearing about this case?

13      A.    I remember that seven guys escaped from

14  prison.  And a couple of days later they were at an Oshman's

15  or something like that in Irving and went with the

16  intention, I think, of robbing the store or, I guess,

17  robbery would be the right term.  And I remember hearing

18  that Officer Hopkins -- what's his name?  Hawkins?  Kind of

19  intervened and was shot and run over three times or

20  something like that.  And then they fled to some other

21  state.

22      Q.    Have you kept up with any of the other court

23  proceedings that have happened?

24      A.    No.

25      Q.    Okay.  And, again, you feel like you can just

1   base your decision only on what you hear in the courtroom?

2        A.    Yes.

3        Q.    You wouldn't be influenced by anything that

4   you have heard, seen, or read or anything like that?

5        A.    I think that I would just take into

6   consideration what was presented in the courtroom versus

7   what the media portrayed.

8        Q.    If you are like me, you are sometimes

9   skeptical of the media.  You hear one thing on one channel

10  and flip over and hear something else on the other channel.

11       A.    Yes.

12       Q.    That's what the law recognizes.  It's only

13  fair to both sides that you base your verdict on what you

14  hear in the courtroom and it sounds like you can do that.

15  Let's talk a little more about these Special Issues.  I

16  don't know why they call them Special Issues.  They are

17  basically questions.  They weren't particularly written for

18  this case.  They apply in all the death penalty cases.

19              I know that you have had a chance to look

20  at them in your booklet, but they are phrased a little bit

21  differently up on the wall.  If you will take a minute or

22  two and read over those three questions to yourself, so we

23  can talk about them.

24       A.    (Prospective juror complies.)  Okay.

25       Q.    Looking at that first question, Special Issue

1  No. 1, again, that's what we call the future danger

2  question.  And we ask a jury, is there a probability that

3  the person would commit criminal acts of violence such that

4  he would constitute a continuing threat to society?  We

5  don't really have definitions of the words in that question,

6  so we always kind of ask people what their own common sense

7  definitions of some of those words are.

8                 But do you see how that question asks you

9  to make kind of a prediction about future behavior?

10      A.    Yes.

11      Q.    Is that something if you had enough

12  information that you feel comfortable that you could make

13  that sort of prediction?

14      A.    If I was given the past history of the

15  defendant, yes.

16      Q.    That's what people tell us.  The past history,

17  obviously, would be important to them.  Anything else you

18  want to know to help you answer that question, to make that

19  prediction?

20      A.    I mean, it's probably just going to depend on

21  what I hear in the trial, also.  What he did in this

22  particular case and --

23      Q.    Uh-huh, okay.  When you see that word

24  "probability", again, it's not necessarily defined for us.

25  But what does that mean to you when you see "probability"?

1    A.    Um, well, a strong possibility.

2    Q.    Okay.  That's pretty much what the law says.

3 It gives us a little guidance.  It's obviously not a

4 certainty, because we could never prove to somebody that

5 something is certainly going to happen.  But it's more than

6 a possibility, because anything is possible.

7         A lot of people say a likelihood or more

8 likely than not or 51 percent of the evidence.  Is that

9 something that you are comfortable with?

10   A.    Yes.

11   Q.    Okay.  It also talks in terms of criminal acts

12 of violence.  When you see that phrase "criminal acts of

13 violence", what does that mean to you?

14   A.    Well -- violent acts.

15   Q.    Okay.

16   A.    Um --

17   Q.    Any particular type crime comes to mind?

18   A.    Well, sure, of course, murder, and assault,

19 battery, rape.

20   Q.    Crimes involved with violence or the threat of

21 violence?

22   A.    Right.

23   Q.    The law doesn't necessarily require that we

24 have to prove to you he's going to kill again or be involved

25 in another capital murder or that type of thing, just

1  criminal acts of violence, like you said, assault, battery,

2  that type of thing.  Does that make sense?

3      A.    Yes.

4      Q.    Finally, the last word in that question,

5  "society."  How would you define "society" or what does

6  "society" mean to you?

7      A.    Society is everyone around you, I mean,

8  everyone.

9      Q.    That's typically what we hear.  You know, when

10  you talk about in terms of a person, anyone and everybody he

11  may come into contact with.  Does that make sense to you?

12      A.    Yes.

13      Q.    Okay.  Both kind of out here in the free world

14  and behind bars, locked up in prison?

15      A.    Yes.

16      Q.    The wardens, guards, teachers, nurses, other

17  prisoners, that type of thing?

18      A.    Yes.

19      Q.    Okay.  Special Issue No. 1 starts off with a

20  no answer.  Okay?  That's kind of a default setting.  And

21  the question stays a no answer unless we, the State, prove

22  to you beyond a reasonable doubt that the answer ought to be

23  yes.  Okay?

24           The question 2 is the same way.

25  Basically, we have the burden of proof to prove to you, as a

1   juror, beyond a reasonable doubt that the answer to those

2   first two questions should be yes.  If we don't prove it to

3   you, the answer stays no.  Does that make sense to you?

4        A.    Yes.

5        Q.    And you can't -- and we'll talk about it in a

6   second.  But as a part of the burden of proof you can't look

7   to these guys, the defense, to bring you anything because

8   they have no burden.  So the answer just stays a no unless

9   we meet our burden.  Does that make sense?

10       A.    Yes.

11       Q.    What the law also envisions and contemplates

12  is that even though you found somebody guilty of capital

13  murder in the first part of the trial, that you start that

14  second phase of the trial with an open mind.  Okay?  Because

15  you are going to hear other evidence and it's only fair to

16  both sides, very frankly, that you have that open mind.

17             Just because you found somebody guilty of

18  capital murder does not automatically answer any of these

19  three questions for you.  Does that make sense to you?

20       A.    Yes.

21       Q.    We want people to be fair and have that open

22  mind and be able to look at the extra evidence that you may

23  hear in the second phase to help answer those questions.  I

24  mean, you may go back and look at what happened in the first

25  phase, and that certainly is going to help you answer those

1   questions.  You may not think about it very long, but as

2   long as you have that open mind in the second phase when

3   answering these questions, you would be a qualified juror.

4   Sounds like that's something that you can do?

5        A.    Yes.

6        Q.    A lot of people, very frankly, tell us, they

7   say, listen, if I found somebody guilty of capital murder,

8   Special Issue No. 1 is answered for me.  You know, it's

9   automatic.  If I found him guilty of capital murder, I'm

10  always automatically going to think they are a future

11  danger.  I don't care what I may hear in the second phase.

12  It's automatically answered.

13                   And if you feel that way, that's fine.

14  But you wouldn't be a qualified juror and you wouldn't be

15  able to sit on the jury.  Does that make sense to you?

16       A.    Yes.

17       Q.    You wouldn't automatically answer those

18  questions like that; is that right?

19       A.    No.

20       Q.    Okay.  Again, moving on to that second

21  question, Special Issue No. 2, this is the question that

22  deals kind of with the situation we've already talked about.

23  You have more than one person or accomplice, a party, to the

24  offense.

25                   In order for the death penalty to be

imposed, the jury has to find that either they actually

caused the death, that they were the triggerman, that they

intended to kill the deceased or another, or, finally, the

last question, anticipated that a human life would be taken.

      Just to be very frank with you, we talked

about, you know, accomplices quite a bit.  The reason we

have is, although I can't go into the facts of this case, I

can tell you that it's -- we are prosecuting Mr. Murphy

under that theory of accomplice or party liability.  And

that's why we spend so much time talking about this.

      If you notice on that last line, it talks

about anticipated that a human life would be taken.  And if

you will remember when we talked a little while ago about

finding somebody guilty, the standard there is should have

anticipated.  By the time we get to the second phase of

punishment, in order to execute someone, to give them the

death penalty, the law says there's a little higher

standard.  Not only should have, but actually anticipate,

did they anticipate?  Does that make sense to you?

A.     Yes.

Q.     It's kind of a little higher standard.  It's a

tough distinction sometimes.  The example I give sometimes

to show you, you know, a person that should have

anticipated, but didn't actually anticipate, is my first car

that my dad got me.  He gave it to me about 16 and I drove

1   it like a mad man.  Finally, after about a month or so, I

2   wrecked out and he was mad at me.  He goes, you should have

3   anticipated that you were going to do that, driving that

4   way.  And, you know, I really didn't actually anticipate it

5   because I was too young and too dumb.  But when I look back

6   on it now, if I was a juror, I probably would find that I

7   should have anticipated, but I didn't actually anticipate.

8   It was not what was in my mind.  Does that distinction make

9   sense to you?

10           A.       Yes.

11           Q.       Again, it's a little higher standard before we

12   can carry out the death penalty.  One way to think about the

13   scheme that we have is that if you convict a person of

14   capital murder, at that point they are sitting on a life

15   sentence.  Okay?  Automatically they get a life sentence at

16   that point.

17             The only way that we, the State, get to a

18   death penalty is if the questions are answered yes, yes, and

19   no.  That's one way to think about the scheme that we have.

20   But, again, that Special Issue starts off with that no

21   answer.  It's our burden of proof to prove it to you that it

22   should be yes and if we don't meet it, the answer stays no.

23   And all that really means is if one of those is answered no,

24   that the person gets that automatic life sentence.

25             So I think that you can see how a person

that may feel strongly about the death penalty, like you, if
they really keep that open mind and kind of use that mental
discipline and work through the evidence and work through
the questions, may actually end up with a life sentence in a
case because we let the questions decide what's the
appropriate sentence.  Does that make sense to you?

     A.     Yes.

     Q.     Okay.  Finally, we get to Special Issue No. 3.
It's kind of the last step in the process.  It's a little
bit different than the first two questions, in that neither
side has the burden of proof.  We just kind of leave it up
to the jury's good judgment.  The State doesn't have to
prove it to you beyond a reasonable doubt that the answer
should be no.  These guys don't have to prove that the
answer should be yes.

              But it's like I said, the last step in
the process.  I think the law envisions that a juror at this
point kind of step back, take a deep breath, look at
everything they have heard in the first phase of the trial,
the second phase of the trial, the facts of the crime, the
facts of the person that you may have heard about, and ask
yourself, is there anything that I've heard that is
mitigating?

              And by mitigating we mean anything that
kind of lessens a person's blame or blameworthiness, what

1   moral responsibility they bear.  Is there anything

2   mitigating that I have heard?  And if there is, is it

3   sufficiently mitigating that his life ought to be spared,

4   that he ought to get that life sentence instead of the death

5   sentence?  Does that make sense to you?

6       A.    Yes.

7       Q.    Even at this late step in the process, do you

8   see the value in that question?

9       A.    Definitely.

10       Q.    Some people tell us, again, you know, I've

11   convicted him of capital murder.  I have found they are a

12   future danger.  I found they anticipated a life would be

13   taken.  When I get this far in the process my mind is shut

14   down.  It's closed.  I'm never going to find anything

15   mitigating.  It's over after Special Issue No. 2.

16             If you feel that way, it's fine.  You

17   just wouldn't be qualified to be on the jury.  So we really

18   need to make sure that the jurors see the kind of value in

19   that last question and even at that late stage keep an open

20   mind.

21             Is there anything that strikes you as

22   mitigating off the top of your head?  Any particular factor

23   that you may hear about a capital murder case?

24       A.    Someone with a mental retardation, perhaps, or

25   multiple personality schizophrenia.  Sure, those would all

1   be mitigating circumstances to me.

2          Q.     A lot of people tell us that.  Some sort of

3   mental defect.  Obviously, they know right from wrong or we

4   wouldn't be in this process, not necessarily mental

5   retardation, but some type of defect.  And we hear that

6   quite a bit.  Some people talk about the way a person was

7   raised.  If there was kind of an early history of physical

8   or emotional abuse that was documented, some people feel

9   that may be mitigating.  Some other people say, no, I'm

10  sorry about kind of the way you were raised, but you are old

11  enough to have free will and make choices.  And they don't

12  consider that mitigating.  Where do you come down on that

13  one?

14         A.     I think I would tend to agree with the people

15  who say that circumstances definitely lead to actions.  So,

16  I mean, I think that what happened to a child or person

17  early in life could definitely sway which way they're going

18  to go in life.

19         Q.     I know you indicated in your questionnaire

20  when we talked about the death penalty that the person's age

21  was important to you.

22         A.     Yes.

23         Q.     Maybe a person's youth or something.  Explain

24  to me that -- or follow up on that with me.

25         A.     Well, I believe that young people are very

1  influenced by society and by what's going on in their lives.

2  And I think that someone that's, you know, under, say, 18 or

3  maybe in my mind it should be like 16, you know, or they're

4  too young to fully understand what they are doing.  Like I

5  said, it just depends on the crime.  I just -- I think that

6  someone younger probably should not be punished as severely

7  as an older defendant who knows what they're doing.

8       Q.       In your mind we're talking about somebody 14,

9  15, 16, 17, 18-type range?

10      A.       Possibly.  It just depends on the person.

11      Q.       In Texas, I can tell you, the law is that a

12  person must be 17 or older in order to be tried for the

13  death penalty.

14               So, again, the law doesn't require that

15  you consider any specific fact or factor mitigating.  In

16  fact, you are not even required now to give us an example of

17  something that you think is mitigating.  If you get back

18  with the other jurors, you are not even required to agree

19  with them what's mitigating.

20               The bottom line is just, you know, that

21  you can keep that open mind, listen for something, and if

22  you hear something that's mitigating, consider it.  And if

23  it's sufficient, you will give that life sentence.  If not,

24  you will say no.  Does that make sense to you?

25      A.       Yes.

1    Q.    When you talk about kind of the way a person

2  was raised, what's important to you when you think about

3  that?  What factors?

4    A.    Um -- well, the way they were treated by their

5  parents.  Well, I don't know much more than -- or by --

6    Q.    Physical abuse or neglect?

7    A.    Well, both.  You know, of course, all mental,

8  physical, you know, a child that is belittled and talked

9  down to all their lives, you know, may grow up to feel like

10  taking their aggression out on someone.  And there's lots of

11  things that that means to me.

12    Q.    Okay.  Would it be automatic for you, if you

13  had some type of evidence like that?

14    A.    No.  I would need to weigh what type of abuse

15  or behavior they --

16    Q.    But at some point you think a person gets old

17  enough to kind of say, okay, that's no longer an excuse?

18    A.    I feel that way.  But it doesn't necessarily

19  mean that everybody is capable of letting go of the past.

20    Q.    Sure.  Okay.  Does this scheme kind of make

21  sense to you that we have?

22    A.    Yes.

23    Q.    Again, the bottom line is, and I keep coming

24  back to it, you can't prejudge anything.  You can't do it

25  automatically.  You have to keep that open mind.

1          Let me talk to you a little bit about

2    some of the witnesses you may hear.  Obviously, we have

3    alleged that a police officer has been killed in this case.

4    You probably guess that you are going to hear from police

5    officers.

6          So what the law says is you have got to

7    start out a police officer just like anyone else in terms of

8    credibility.  You can't give them an automatic leg up just

9    because they are a cop.  Does that make sense to you?

10         A.    Yes.

11         Q.    Okay.  Do you think that you can follow that

12   law?

13         A.    Yes.

14         Q.    You may also hear from like a psychiatrist or

15   psychologist.  The defense may call them or the State may

16   even call them to help you answer some of these questions in

17   the punishment phase.  I'm just kind of curious off the top

18   of your head what your impression is of those type folks,

19   psychiatrists and psychologists?

20         A.    Um, I don't have one either way.  I think that

21   they typically honestly judge the person's character and

22   their mental status.  So, I mean, I think that that would be

23   a good witness in the case, you know, or someone to

24   question.

25         Q.    Okay.  We talk to people and some people tell

1  us, you know, I just -- I'm biased against them.  I don't

2  believe a word out of their mouth.  Kind of the opposite end

3  of the spectrum is, hey, you know, I believe everything they

4  say is goldplated, you know, they walk on water.  And then

5  there's a group kind of in the middle that just, you know,

6  if what they say makes sense, I think they are credible,

7  I'll go with them.  If they are not, I won't.  Is that kind

8  of where you are?

9       A.    Yes, I fall into the last category.

10      Q.    Let me talk to you a little bit about what a

11 life sentence means in one of these cases.  A capital life

12 sentence in Texas means a person will actually serve forty

13 years, day for day, before they would be eligible for

14 parole.  Okay?  They may make parole that first time they

15 see a Parole Board after forty years.  They may never make

16 parole and actually serve a real life sentence.

17            Because we don't know what will happen

18 and nobody here has control over it, we ask a jury, when

19 they consider that, to just assume a life sentence means a

20 life sentence, because it may actually turn out that way.

21 Does that make sense to you?

22      A.    Yes.

23      Q.    Is that something that you feel like you can

24 do?

25      A.    Yes.

1    Q.    Sometimes in these cases a juror may be given

2 an option of finding a defendant guilty of a lesser included

3 offense. What I mean by that is, say you have a reasonable

4 doubt that a murder happened, but you think the person is

5 guilty of robbery, aggravated robbery, in the bank example.

6 You might find him guilty of aggravated robbery.

7          The punishment range in Texas for

8 aggravated robbery is anywhere from five years in the

9 penitentiary all the way up to life or 99 years.  And we

10 just require at this point, because we don't know if it's

11 going to come up, that a juror be able to say they have an

12 open mind to the full range of punishment.  Does that make

13 sense to you?

14    A.    Yes.

15    Q.    Some of the things you are probably familiar

16 with from your DWI, a person is always presumed innocent.

17 The burden is always over here.  These people never have a

18 burden.  They don't have to prove anything to you.

19          He's got a right not to testify, Fifth

20 Amendment right.  If he doesn't testify, you, as a juror,

21 will be instructed you can't hold that against him, simply

22 be a nonfactor in the case.  Does that make sense to you?

23    A.    Yes.

24    Q.    Is that a rule you think that you can follow?

25    A.    Yes.

1  Q.     Okay.  Finally, I'm getting down to one last

2  thing I want to cover with you.  All these crimes that we

3  prosecute down here are broken down into elements.  And I

4  think you saw in the packet what we call the indictment in

5  the case, where we actually tell you or allege how we think

6  the crime happened and what we think we are going to prove.

7  And they are broken down into different elements.

8            What the law says is as a part of our

9  burden of proof we have got to prove to you each and every

10  element beyond a reasonable doubt.  And if we miss just one

11  element, the jury will be instructed to find the person not

12  guilty.  That's the law.  The elements are that a certain

13  person on or about a certain day in a certain county killed

14  a certain person in a certain way, kind of roughly like

15  that.

16            If we miss one, we have got the wrong

17  person, for instance, you would find them not guilty,

18  because we missed that element of identity.  To give you

19  kind of a far out example to show you kind of what we expect

20  of jurors in terms of mental discipline, you know, if we

21  allege a crime happened in Dallas County, but the proof

22  shows it actually happened in Tarrant County, for instance,

23  you may think the guy is good for it and we've proved he's

24  good for it, but you think that we have the wrong county.

25  The law would require that you find the person not guilty.

1              A lot of people don't like that.  They

2  say it's a technicality.  Of course, one person's

3  technicality is another person's constitutional right.  The

4  police would get in trouble.  They didn't do their job.  We

5  would get fired because we didn't do our job.  You wouldn't

6  be happy about it.  But the law would require that you,

7  nevertheless, find the person not guilty because we didn't

8  prove each and every element.  Does that make sense?

9         A.    Yes.

10         Q.    Or maybe we get the wrong murder weapon.  We

11  think the person was shot and the medical examiner comes in

12  and says, no, the person was stabbed, that type of thing.

13  Even though you are convinced that they committed the

14  murder, we didn't get it right.  We didn't prove what we

15  said we were going to prove and you would have to find them

16  not guilty.

17         A.    Yes.

18         Q.    That makes sense to you?

19         A.    Yes.

20         Q.    And you can follow the law?

21         A.    Yes.

22         Q.    We've covered quite a bit.  Let me talk to my

23  partner here.  I think that's about it.  Any questions for

24  me?

25         A.    No.

1          Q.     I appreciate your patience.  Thank you, ma'am.

2                 THE COURT:  Mr. Sanchez?

3                      CROSS-EXAMINATION

4    BY MR. SANCHEZ:

5          Q.     Good morning, Ms. Braggs, how are you?

6          A.     Good morning.  Fine, thank you.

7          Q.     My name is Juan Sanchez.  I'm going to just

8    visit with you a little bit about some of your answers that

9    you have given today and some of the things you put in your

10   questionnaire.

11                But the first thing I want to start off

12   with is that a lot of times we're given the proposition, can

13   you follow the law?  And all of us say yes.  Very few people

14   say, I really can't follow the law, when it's just plainly

15   put that way.  And what I need to know is your true

16   feelings.  That's why we have this process, because

17   sometimes our true feelings when we put them up against the

18   law, they conflict.  And sometimes those feelings are too

19   strong in order to follow the law the way we thought we

20   could.  Does that make sense to you?

21         A.     Yes.

22         Q.     Okay.  And what I want to visit with you is

23   your feelings about the death penalty.  And when you first

24   sat up there, you said, I think someone is convicted of an

25   intentional murder, then they should give their own life or

1    at least you said something to that effect.

2          A.    Yes.

3          Q.    What do you think now that the State has

4    spoken to you about the fact that life is an option for

5    somebody in a case where someone is convicted of capital

6    murder?  What do you think about that?

7          A.    I think it definitely depends on the

8    circumstances of the case.  To me life in prison is

9    definitely something to consider.  I mean, it depends on a

10   person's future possibility or probability based on their

11   mitigating circumstances.  Definitely life is an option to

12   me that's --

13         Q.    Did that surprise you in any way that that was

14   an option as to -- for somebody who is convicted of capital

15   murder?

16         A.    No, no.

17         Q.    All right.  Because we've had some people who

18   come in and said, I didn't know that could happen.  Once I

19   convict somebody of, like in this case, the intentional

20   killing of a police officer, then it should be death.  I

21   don't care what the Special Issues are.  I don't hear you

22   saying that right now.

23         A.    No, no, I don't.

24         Q.    You had indicated, also, something about the

25   slap on the wrist.  You indicated -- is life in prison to

1    you, like a slap on the wrist --

2         A.    No.

3         Q.    -- in a capital murder case?

4         A.    No.

5         Q.    I wanted to explore that, just because that

6    was written somewhere in your questionnaire.  So you are

7    telling this Court, then, that a life sentence would be an

8    option in your mind where someone is convicted of a capital

9    murder case?

10        A.    Yes.

11        Q.    Okay.  Now, we talked, it was covered a little

12   bit, about media coverage.  And everybody that has walked in

13   here has said they heard something about the case.  But the

14   question I wanted to ask you is based on what you have

15   heard, have you formed any opinions about what happened or

16   what may have happened in this case?

17        A.    I think, yes, I think that everybody kind of

18   has formed an opinion.

19        Q.    What opinion is that?

20        A.    You would ask me that.  Well, honestly, when I

21   was filling out the questionnaire and even beforehand, I

22   felt like there was one triggerman and I felt like the poor

23   officer was in the wrong place at the wrong time.  And I

24   don't feel like the seven went in with the intent to kill

25   someone.  So honestly, you know, I don't know that I would

1  sentence the accomplice to death.  But, I mean, I certainly

2  could if the evidence swayed me that way.

3      Q.    So you formed an opinion that the seven of

4  them went into the -- somehow went in and intentionally

5  committed a murder.  Is that what I'm hearing you say?

6  You're honestly -- you say -- honestly, what is it that you

7  actually formed an opinion to?

8      A.    I feel like the seven did not intend to murder

9  Aubrey Hawkins when they went in.  That's my initial opinion

10  on the case without having heard any of the evidence, other

11  than media coverage.

12      Q.    And do you feel the fact that you formed that

13  opinion, do you think somehow that would keep you from

14  giving either side a fair trial in this case or you can keep

15  that out of your mind or do you think that would always be

16  there when you are sitting on a jury?

17      A.    No.  Like I said, the media presents facts of

18  the, quote, unquote, facts one way, when they may be totally

19  different when brought before the jury.

20      Q.    Okay.

21          THE COURT:  Any further questions?

22          MR. SANCHEZ:  No.  That's all I have.

23          MR. WIRSKYE:  I believe the parties have

24  reached an agreement.

25          MS. BUSBEE:  Yes, we have.

1              MR. SANCHEZ:  Yes, sir.

2              THE COURT:  Ms. Braggs, we appreciate

3  your time and service here today.  The parties have agreed

4  to excuse you from jury service in this case.  Your opinions

5  -- we appreciate your honesty.  You know a little too much

6  about this case for them to be able to put you on.  Thank

7  you very much for coming down.

8              PROSPECTIVE JUROR:  You're welcome.

9                [Prospective juror out]

10             THE COURT:  Ms. Paredes.

11              [Prospective juror in]

12             THE COURT:  Good morning.  How are you?

13             PROSPECTIVE JUROR:  Fine.

14             THE COURT:  We've got juror No. 1927, Ms.

15  Sandra Lee Paredes?

16             PROSPECTIVE JUROR:  Paredes.

17             THE COURT:  Paredes?

18             PROSPECTIVE JUROR:  Uh-huh.

19             THE COURT:  Paredes.  Thank you for

20  coming in this morning and being on time.  Have you had the

21  opportunity to read the guide that I provided for you?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  And did you have an

24  opportunity to look over the questionnaire that you filled

25  out back in May?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  That's a lot of law to hit

3    someone with first thing in the morning.  We don't expect

4    you to give it back to us verbatim.  This is an opportunity

5    for the attorneys to visit with you and educate you further

6    on the law and how it relates.  The only thing they are

7    looking for is your honest opinions and just -- you can't

8    fail this test.

9          PROSPECTIVE JUROR:  Okay.

10          THE COURT:  All right.  Many people come

11   in and are a little nervous when you walk in the door.

12   That's normal.  This is as informal a process as we can make

13   it.  It's a whole lot better than having you out there one

14   of 700 people.  There's no way we can have any interaction

15   that's meaningful, so that's why we go through this

16   individually.

17          The only questions, the two questions

18   that I have to answer at the end of the process are twofold

19   fold.  Number one, do you understand the law?  And, number

20   two, can you follow the law?  That's what my role is here.

21          The only question that I have before I

22   let the attorneys begin is will you be able to serve this

23   Court for two weeks beginning on November 10th?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Thank you.  Mr. Shook?

1          MR. SHOOK:  May it please the Court.

2          SANDRA PAREDES,

3    having been duly sworn, was examined and testified as

4    follows:

5                    DIRECT EXAMINATION

6    BY MR. SHOOK:

7          Q.    I'll be talking to you on behalf of the State.

8    My name is Toby Shook.  As the Judge said, there aren't any

9    right or wrong answers.  We just want your honest opinions.

10   And what I want to do is go over some of the information

11   that you provided us on the questionnaire and talk to you at

12   length on capital murder and some of the rules and laws that

13   apply in these types of cases.

14         A.    Okay.

15         Q.    Looking at your background, you work for

16   Silver Leaf Resorts; is that correct?

17         A.    Yes.

18         Q.    Tell us what you do on a day-to-day basis as a

19   manager.

20         A.    I review employee performance.  I monitor

21   phone calls.  I take inbound and make outgoing phone calls.

22   I run reports regarding my staff.  I handle regulatory

23   complaints.  I work with attorneys in certain cases.  I

24   guess that's pretty much it.  Question and answer from my

25   employees.

1   Q.   You do a lot of stuff?

2   A.   Yeah, pretty much.

3   Q.   I see that your brother-in-law is an FBI

4   agent?

5   A.   That's correct.

6   Q.   Does he work here in Dallas?

7   A.   No, in New York.

8   Q.   Okay.  Did he ever discuss his cases with you

9   or anything like that?

10   A.   No.

11   Q.   Nothing about that relationship, I take it,

12   would cause you to be biased against one side or the other,

13   then?

14   A.   No.

15   Q.   And we also asked you, you know anybody at the

16   courthouse, and I believe you put you knew Matt Arnold?

17   A.   Uh-huh.

18   Q.   The prosecutor with the DA's Office?

19   A.   Yes.

20   Q.   How do you know him?

21   A.   He is married to a friend of my ex-husband's.

22   Q.   Okay.  When is the last time you spoke with

23   Matt Arnold?

24   A.   Early May.

25   Q.   Okay.  Nothing about your relationship with

1  Mr. Arnold would cause you to be fair or unfair to either

2  side, would it?

3      A.   No.

4      Q.   Okay.  We always ask about if you know anyone

5  with a criminal history, had any, and you had, I believe it

6  was a UCW case?

7      A.   That's right.

8      Q.   What were the facts behind that case?

9      A.   What were the facts?

10     Q.   Yes.  How long ago was that?

11     A.   Over ten years ago.  I don't know the exact

12  date.

13     Q.   Okay.  A while back then?

14     A.   Yes.

15     Q.   Was that here in Dallas County?

16     A.   Um, I'm not sure.  It was at the airport.

17     Q.   Okay.  So it was one of those you check in the

18  airport and you don't know you have --

19     A.   Exactly.  I purchased a gun because my father

20  was in -- called up for Operation Desert Storm, so I moved

21  to his house and it's in Oak Cliff and I lived alone.  So I

22  had it for my protection and I went to pick somebody up at

23  the airport and forgot it was in my purse.

24     Q.   And you went through the deal and alarms go

25  off?

1    A.    Yeah.

2    Q.    Anything about that experience would cause you

3  to be biased in any way?

4    A.    No.

5    Q.    Okay.  Do you feel -- did that kind of -- did

6  they give you the standard probation for those types of

7  offenses?

8    A.    Yes.

9    Q.    Let me then move and talk to you about the

10  death penalty.  You know from what the Judge has told you in

11  the questionnaire that this is a capital murder case in

12  which the State is seeking the death penalty.  So we talk to

13  each juror how they feel about it.  As far as the law goes,

14  from your own personal point of view, do you believe in the

15  death penalty as a law?

16    A.    Yes.

17    Q.    What purpose do you think the death penalty

18  serves society?

19    A.    What purpose?

20    Q.    Yeah.

21    A.    To prevent other crimes being committed.

22    Q.    Okay.  What types of crimes do you feel should

23  come into consideration for the death penalty?

24    A.    Murder, violent crimes.

25    Q.    Any other crimes other than murder?

1  A. No.

2  Q. Okay.  Have there been any cases in the media

3 that you followed nationally or locally that you thought

4 were the type of case that should be considered for the

5 death penalty or cases that were actually being prosecuted

6 for the death penalty?

7  A. No.

8  Q. Any criminal cases in general that you have

9 ever followed?

10  A. No.

11  Q. Do you have a copy of your questionnaire?

12  A. Yes.

13  Q. On the first page we kind of give about six

14 different statements that you can choose the one that best

15 represents you, and they mean different things to different

16 people, obviously.  Back when you filled this out, way back

17 in May, you circled No. 3?

18  A. Uh-huh.

19  Q. That although I don't believe the death

20 penalty ever ought to be invoked, as long as the law

21 provides for it, I could assess it under the proper

22 circumstances.

23   Tell us a little more what you were

24 thinking there when you decided to choose 3.

25  A. Um, I wouldn't automatically say that somebody

1  should receive the death penalty.  I think that it would be

2  based on the circumstances regarding the crime.

3        Q.     Okay.  And then on page 4 we asked a whole lot

4  of questions, just trying to get people's gut reaction.  We

5  ask towards the top of the page if you believe in using the

6  death penalty, how strongly.  We kind of give a scale of 1

7  to 10 and you put a 5.  And everybody has a different reason

8  for the number they choose.

9                  I don't know if you remember now, but

10  from what you recall, what were you thinking when you

11  decided to choose a 5?

12        A.     I think because I'm just in the middle of the

13  road, either way.

14        Q.     So it was kind of down the middle, so you

15  chose it?

16        A.     Exactly.

17        Q.     All right.  Makes sense.  Let me talk to you

18  about the types of cases that come into consideration for

19  the death penalty in Texas.  They can only be for murder

20  cases, but then only certain types of murder cases, one with

21  certain aggravating facts, such as a murder that occurs

22  during a felony.

23                  If I go in and rob a 7-Eleven and I

24  commit a murder during the course of that robbery, that

25  could be a death penalty case.  Also, if I broke into a

home, murder someone in the house, that could be a death

penalty case.  Or during a rape or arson or kidnapping, also

murder of specific individuals, such as a police officer on

duty, prison guard, or fireman on duty.  That could be a

death penalty case, as well as murder of a child under the

age of six.  Murder for hire.  If someone does it for money,

that sort of thing, a hitman situation, that could come into

play.  And also a mass murder, serial killer situation.

But those are the only types of cases in

which the death penalty could possibly be used.  That's

what's been reserved by our laws.  That list I've gone over,

from your personal point of view, is that a list that you

agree with?  If it were up to you, would you cut it down any

or would you expand it some?

A.      I would agree with it.

Q.      Okay.  Do you think it's right about the way

it is from the description of those types of crimes?

A.      Yes.

Q.      Okay.  Now, when we think about the death

penalty or any type of crime, whatever you name it, it's

only natural that you think of an example in your head of

the crime.

And, for instance, I use the example of

robbing a 7-Eleven, shooting the clerk.  When we're thinking

of capital murder, we're thinking the triggerman, generally.

1    But let me go down another area.  We often have accomplices

2    that help commit crimes.  Any type of crime you can have an

3    accomplice on.  Sometimes there are several people that

4    commit a crime.  And some have greater roles that the

5    others, but they are all participating in the actual event.

6                In a capital murder situation sometimes

7    you have one person that actually commits the murder, say

8    the triggerman, and then you have accomplices that may help

9    him carry out that crime.  Again, they may have different,

10   various roles.  The law says that all can be held

11   accountable, if they are actively participating, even for

12   capital murder.

13               The example we use, let's say we have

14   three men who decide they want to rob a bank.  And they have

15   a gun.  So they decide one will go in.  He'll pull the gun

16   out on the tellers and cover them, get them to hold their

17   hands up.  Another one will have a large sack and he's going

18   to gather up the money out of the teller's bank drawer.  The

19   other one will be waiting outside in the car.  But they all

20   know this.  They are all working together.

21               The shooter, the man with the gun, might

22   shoot one of these tellers, perhaps he didn't like the way

23   they are looking at him or how it's going down, or perhaps

24   he thinks they are going to hit an alarm, but he shoots

25   them.  And they leave, but they are arrested.

Obviously, the triggerman could be prosecuted for the death penalty, because he actually murdered someone during the course of a robbery.  The law says that the accomplices can also be prosecuted for capital murder and depending on the facts could even receive the death penalty.

But people feel differently about this. And we want to get every juror's honest opinion, because there are some people that believe in the death penalty, but they would reserve it just for the triggerman, the person that actually takes a life.  That is what they feel is fair. They wouldn't reserve it or have it on the books for an accomplice, because that wouldn't be fair to them.  No life was taken by that individual.  Maybe a life sentence or 70 years or whatever, a long prison term, but not an actual death penalty.

Other jurors think accomplices should be held accountable in that manner and even executed, even though they didn't cause the death.  But people feel differently and there aren't any right or wrong answers.

But I want to ask you your honest opinions on accomplices and capital murder situations.

A.    Um, I think based on the circumstances and their active role in the crime itself would warrant them -- me considering the death penalty for them.  I think in the

1    situation that you gave me, as far as the three people, I

2    think that during the course of the crime that they probably

3    could kill somebody to rob the bank or whatever the case may

4    be. So I think that the accomplices would also be held

5    accountable based on what the circumstances are.

6           Q.    Why do you think it's good, I guess let's say,

7    public policy for the State to be able to prosecute

8    accomplices for the death penalty and ultimately receive the

9    death penalty for an accomplice?

10          A.    Could you repeat the question again?

11          Q.    Why do you think it's a good policy that we be

12   able to prosecute these accomplices for the death penalty,

13   also?

14          A.    Because then it would send a message to, if

15   you are involved in a crime then you, too, can be held

16   accountable and also face death.

17          Q.    Deter others that might participate in these

18   crimes and that sort of thing?

19          A.    Yes.

20          Q.    All right.  Now, every juror has heard a

21   little bit about this case.  It received a lot of publicity.

22          A.    Uh-huh.

23          Q.    And we asked about that in the questionnaire

24   and you put TV and newspaper, you recall the coverage.  You

25   are the same as every other juror.  But we want to go in a

little more detail.  I know it's been a while, but what

exactly do you recall reading or seeing on TV?

     A.    I remember the seven Texas escapees and the

officer shot at Oshman's in Irving.

     Q.    Okay.  Do you remember anything else after the

crime occurred?  Any of those news stories?

     A.    No.

     Q.    The bottom line is, as far as jurors go, that

doesn't make you ineligible as a juror.  But the law is you

can't let anything you have read or seen on TV influence you

in any way.  We all form opinions about what we've seen, but

we can't let those opinions influence in our decisionmaking

process, if we are on the jury.

     Some people can do that and some people

can't.  I think you can see the common sense in it.

Obviously, the best evidence is going to come from the

witness stand.  But do you feel that you could follow that

particular rule of law?

     A.    The rule as far as not --

     Q.    Not considering or letting those opinions you

may have had about the news coverage influence your

decision?

     A.    That's right.

     Q.    Okay.

     A.    That's correct.

1   Q.   All right.  There's one other area I wanted to

2   get into is on page 5.  We, again, give some statements for

3   you to strongly agree all the way down to strongly disagree.

4   You see that portion of the deal?

5   A.   Yes.

6   Q.   The first one, we asked, the statement we gave

7   is most criminals are actually victims of society's problems

8   and you put agree.  If you could, just kind of follow up on

9   us with that and kind of tell us where you were coming from.

10   A.   Most criminals are actually victims of

11   society's problems?

12   Q.   Yes.

13   A.   Um, I feel that environment plays a key role

14   in people's -- how they turn out, I guess.  And I think that

15   a lot of the criminals don't necessarily choose to be a

16   criminal.  They had no other alternative, but to rob, steal,

17   whatever.

18   Q.   Just because of the way they were raised or

19   the background they came out of, that sort of thing?

20   A.   Yeah.

21   Q.   Okay.  And did you form that opinion just

22   based on, I guess, growing up and observing people, that

23   sort of thing?

24   A.   Yes.

25   Q.   Okay.  We'll get into that in more detail in a

1    minute because that comes into play sometimes in the

2    punishment portion of a capital trial.  A capital trial is

3    divided into two portions.  There's the guilt/innocence

4    stage and the punishment stage.  In the guilt/innocence

5    stage we have to prove the indictment beyond a reasonable

6    doubt.  In the punishment stage, if we reach it --

7    obviously, if it's a not guilty, we would never reach it.

8              But if we reach it, you can hear

9    additional evidence.  At that point in time, at the close of

10   that, you get these Special Issues.  And basically what the

11   Special Issues are, the State has to prove to you beyond a

12   reasonable doubt that the defendant is a continuing danger

13   to society, that he anticipated that a life would be taken,

14   and that there is not sufficient mitigating evidence to

15   warrant a life sentence.  A yes, yes, and a no to those

16   questions equals a death sentence.  You don't write death or

17   life in.  But that's how the Judge would sentence.  He

18   wouldn't have any discretion.  If they are answered any

19   other way, it would equal a life sentence.  So the only two

20   possible options in the death penalty case are death or

21   life, and that depends on how the jury answers those

22   questions.  Is that clear to you?

23        A.    Yes.

24        Q.    Are you aware of the method of execution in

25   Texas?

1      A.      Lethal injection, I believe.

2      Q.      That's correct.  It's covered quite often in

3  the newspapers and sometimes on the TV, depending on who is

4  being executed.  But you probably know from growing up here

5  in Texas that Texas does lead the nation in executions.

6  There's some states that have it on the books, that

7  prosecute it, even have a lot of people on death row, but

8  they never really carry out their executions.  But in Texas

9  it does actually occur.  So it's a very real punishment.

10          I can't go into the facts of this case,

11  but I can tell you from the State's point of view we feel

12  that we have the type of evidence that would convince a jury

13  of this defendant's guilt, and that these questions will be

14  answered in a way that the Judge will ultimately sentence

15  him to death.

16          The procedures in any capital case are

17  the same.  If the defendant were sentenced to death in this

18  case, he would be placed on death row.  At some point in

19  time Judge Cunningham would actually give him a date of

20  execution.  On that date or actually the day prior to that,

21  he would be moved from death row to downtown Huntsville,

22  where all executions take place, according to law.

23          On the date of his execution he would be

24  given time with family, friends, a minister, a last meal.

25  All these things are often reported.  At 6:00 p.m. the law

1  dictates that the execution will begin.  They actually move

2  him to the execution room.  About ten minutes prior to that

3  they place him on a gurney.  They secure him with leather

4  straps.  They put needles in his arm and tubes go to another

5  room where the executioner is.  There's witnesses that can

6  come in.  There's a room for witnesses for the victim's

7  family, as well as the defendant's family.

8            And after they are assembled, the warden

9  asks him to make a last statement in which he can say

10  anything he wants.  And that is covered in the papers quite

11  often.  It can go from I'm innocent, don't do this to me, or

12  I beg for forgiveness for what I've done.

13            After that the substances are injected

14  into him and they simply shut down his lungs and heart and

15  he lapses into a coma after about 15 seconds.  The process

16  happens very quickly and it happens the same in each case,

17  and that's the process that would happen in this case.

18            It's one thing, though, to fill out a

19  questionnaire or talk about the death penalty kind of in a

20  philosophical way, and it's quite another when we start

21  thinking about it, and jurors come down here and sit in the

22  same room as the defendant and realize, I might be asked to

23  make that decision.

24            And people feel very differently about

25  that, because we have some people that when we call them

1  down are against the death penalty for religious reasons and

2  can never serve, and we have some people that are very

3  adamantly for it and they couldn't be fair.  And we have

4  others that are for it and can make that decision.  We have

5  others who reflect about it and think about making a life or

6  death decision and tell us, quite honestly, I'm not

7  comfortable making that decision.  If it was a prison

8  sentence, fine, if it was a civil case, fine, but not a

9  death penalty.  That's fine if they feel that way.

10        But I take some extra time here with

11  every juror because I want to make sure you realize how

12  serious the matter is.  I think most people do, because once

13  you make it on the jury, there's really nothing we can do.

14  So we want to explore your honest opinions before you make

15  it to that jury box.

16        After reflecting upon it, filling out the

17  questionnaire, and talking with us today, do you really feel

18  you are the type of person who, if the State proves these

19  things to you, could take pen in hand and answer the

20  questions in a way knowing the person would be executed?

21        A.    Yes.

22        Q.    Why do you think that you could make that type

23  of decision?

24        A.    Again, it would be based on the circumstances.

25  I feel that in my own personal situation, if I was a victim

1  of a crime where a death did occur in my family, then I

2  would expect the jury to make the appropriate decision based

3  on the facts of the case.

4        Q.    Okay.  Let's talk about the Special Issues for

5  a minute.  If you would, take a moment just to read Special

6  Issue No. 1 to yourself and we'll go over it.

7        A.    (Prospective juror complies.)

8        Q.    This question asks the defendant -- how the

9  defendant is going to behave in the future.  It's kind of

10  predicting the future for that particular defendant.  Do you

11  feel comfortable answering that question, if you are given

12  enough information?

13        A.    Yes.

14        Q.    What kind of things would be important to you?

15        A.    Um, past criminal history.

16        Q.    Okay.

17        A.    Level of education.

18        Q.    What's important about level of education?

19        A.    Well, maybe if a person isn't fully educated,

20  then they really didn't -- they had obstacles in front of

21  them that would prevent them from being a successful person.

22        Q.    Okay.

23        A.    I think that's it.

24        Q.    All right.  And in this scheme let me follow

25  up on some other things.  It's in the punishment phase that

you brought up something that comes up sometimes about criminals are victims of society, that is, they really didn't have a choice, maybe by their background. And this comes up in the Special Issues a lot of times, a person's background and the way they were raised. Sometimes people come from broken homes or they weren't given opportunities, maybe like you said, no education.

Also, they could be physically or mentally abused as children, which, obviously, could have an effect on them. And a lot of people, especially sometimes in Special Issue No. 1 and oftentimes in Special Issue No. 3, when they talk about mitigating evidence, which would mitigate the crime into a life sentence, they look at that. That would be real important to them.

We have other jurors that really don't think that's important. They think that people can make decisions when they are adults and they don't think it's important. But jurors vary on that, on the person's background and about how they were raised and the environment they came from.

How do you think about that, mitigating issues and the life and death decisions about how a person was raised or maybe their background and abuse and that sort of thing?

A.      Can you ask me the question again?

1    Q.    How important do you think that kind of

2  background would be to you when you consider all these, the

3  punishment, in a capital murder case?

4    A.    Um --

5    Q.    When you are weighing all the options?

6    A.    I mean, it would be an option I would

7  consider, but it would also -- I still believe that people

8  make their own decisions and at some point make the decision

9  to do right or wrong.

10    Q.    Okay.  Oftentimes you hear about psychiatrists

11  and psychologists called by one side or the other.  They can

12  give opinions as to whether someone is dangerous or whether

13  someone did have mitigating circumstances in their life by

14  the way they were raised or their background.  Sometimes

15  there's what they call mitigation experts that can offer

16  explanations to the jury and that sort of thing.

17          We have some jurors who put a lot of

18  faith in those types of experts because of their experience

19  and background.  They would value their opinions highly.  We

20  have other jurors who would tune them out and they don't

21  think much of those types of experts.  And we have other

22  jurors that kind of stand in the middle.

23          Do you have any opinions about those

24  types of experts, how much you would value their opinions

25  and that sort of thing, from what you know about them?

1      A.    I would assume that they would make their

2 statements based on analyzing the person or talking with the

3 person, whatever the case may be.  So, yes, certainly what

4 they said would be considered.

5      Q.    Okay.  Do you think those are valuable types

6 of experts to have in these cases?

7      A.    Yes.

8      Q.    Okay.

9             MR. SHOOK:  May I have one moment, Judge?

10 Could we approach the bench for a moment, Judge?

11             THE COURT:  You may.

12                 (Bench conference)

13             MR. SHOOK:  I will pass the witness.

14 Thank you.

15             MS. BUSBEE:  I believe we have made an

16 agreement on this juror.

17             THE COURT:  Ms. Paredes, thanks for your

18 time and service to this Court today.  The parties have

19 agreed they are not going to seat you on this jury, so you

20 are now excused.

21             PROSPECTIVE JUROR:  Thank you.

22               [Prospective juror out]

23             THE COURT:  Mr. Owens.

24                [Prospective juror in]

25             THE COURT:  Good morning, sir.  How are

1  you?

2                    PROSPECTIVE JUROR:  Pretty good.

3                    THE COURT:  We've got juror No. 1921,

4  Stephen W. Owens.  Mr. Owens, welcome to the 283rd.

5                    PROSPECTIVE JUROR:  Thank you.

6                    THE COURT:  Good to have you here.  Have

7  you had an opportunity to review the guide I have provided

8  for you?

9                    PROSPECTIVE JUROR:  Yes.

10                    THE COURT:  And also your questionnaire?

11                    PROSPECTIVE JUROR:  Yes.

12                    THE COURT:  I know you didn't remember

13  much.  It was filled out in May.  That's why we gave you a

14  copy of it.  The attorneys may want to visit with you about

15  your answers.  This can be somewhat -- people come in kind

16  of nervous a little bit and we don't mean to do that.  It's

17  just that this is the only way that we can talk to you

18  individually.  It's not meant to be intimidating by any

19  means.  The only way that we can do it, is this is as

20  informal as we can do it.

21                    The objective this morning is that you

22  understand the law and be able to follow the law.  That's

23  the questions that I have to answer at the end of the

24  process.  I gave it to you.  The attorneys will go over with

25  you in detail and help you understand how it relates.  And

1   at the end of the day can you follow the law that you now

2   understand?

3                   The only question that I have for you

4   before we begin is do you have any problem serving this

5   Court for two weeks beginning on November 10th?

6                   PROSPECTIVE JUROR:  I'm not sure in the

7   future, but right now I have a doctor's note from my doctor,

8   because I've been having stomach problems for a year, so

9   they've been trying to figure out my problems.

10                  THE COURT:  Stomach problems in what way?

11                  PROSPECTIVE JUROR:  I've been going back

12  and forth to the hospital for a year.  In fact, I was at the

13  hospital about a week or two ago for two days because I've

14  been having severe pains in my stomach.

15                  THE COURT:  Diverticulitis or Crohn's

16  Disease?  What is your illness?

17                  PROSPECTIVE JUROR:  They don't know the

18  illness.  They are still trying to figure out.  It's a

19  problem I've been going through for a year.  So I'm not

20  quite sure what the problem is.

21                  THE COURT:  Comes and goes?

22                  PROSPECTIVE JUROR:  Yes.

23                  THE COURT:  Doing all right, right now?

24                  PROSPECTIVE JUROR:  Bothering me a little

25  this morning, but it might be because I'm just a little

1   nervous.

2               THE COURT:  Yes.  It's your nerves.

3   Butterflies will get you stirred up real good.  We deal with

4   all kinds of ailments.  I have back problems, neck problems,

5   and you just have to keep going.  That's just the way it is.

6   With that, I will turn it over to Mr. Shook.

7                       STEPHEN OWENS,

8   having been duly sworn, was examined and testified as

9   follows:

10                    DIRECT EXAMINATION

11  BY MR. SHOOK:

12       Q.    Mr. Owens, let me ask you, in the last year

13  how many times have you been in the hospital for that

14  condition?

15       A.    Probably more than ten.

16       Q.    Okay.  So it's something that you actually

17  have to check into the hospital at times?

18       A.    It does, because the pain is so severe.

19       Q.    Is it an intestinal type thing or stomach or

20  do you know?

21       A.    I know just last Monday I had an MRI CP on my

22  pancreas because they believe it's an internal problem on my

23  stomach maybe.

24       Q.    So they don't know what's going on?

25       A.    Unfortunately not.  They have me on medicine

1 like Prevacid (phonetic) and I'm also taking a medicine

2 called Levacid (phonetic).

3       Q.    When these attacks occur, I guess you can't

4 concentrate on anything else but your ailment; is that

5 right?

6       A.    Yeah.  I'd be in that much pain.

7       Q.    And you don't know when they will occur.  They

8 are frequent over --

9       A.    They occur sometimes -- most of the time I get

10 them in the mornings or at night, so I have trouble sleeping

11 at night.

12       Q.    Okay.  And back when you filled out the

13 questionnaire, I don't think that you were employed at that

14 time; is that right?

15       A.    Right.

16       Q.    Is your status still the same?

17       A.    Yes.

18       Q.    Does that have to do with your medical

19 condition?

20       A.    Yes, sir.

21       Q.    Okay.  And you don't know if that's going to

22 change anytime soon?

23       A.    I'm hoping it does.  I know Thursday I'm

24 supposed to go do a procedure where they are supposed to

25 something like, something -- I can't pronounce it.  He just

1  told me yesterday he believes it's something in my stomach

2  like a little virus or something, so he's going to have me

3  do a procedure on Thursday to see if I eat stuff or certain

4  foods I'm eating or my bowel system or something that's

5  maybe causing it.

6       Q.    Still up in the air, though.  Causes you quite

7  some concern, I take it?

8       A.    It's causing me some, me and my family,

9  because I've been dealing with it for a year and I got

10  released from my job.

11              MR. SHOOK:  Judge, I believe we can

12  agree.

13              MS. BUSBEE:  We have no problem putting

14  this man through that.

15              THE COURT:  Mr. Owens, you can tell I

16  have a real solid legal standard.  I'm not going to let you

17  off, but the parties have agreed to excuse you from jury

18  service.  And I appreciate you coming down.  So you are free

19  to go.

20                  [Prospective juror out]

21                  (Recess)

22              THE COURT:  Ask Ms. Angel Chinuntdet.

23                  [Prospective juror in]

24              THE COURT:  Good afternoon.  Thank you.

25  You may be seated.  For the record we have juror No. 1950,

1  Ms. Angel Chinuntdet.  We were taking a poll on how to

2  pronounce your name.  Thank you.  Welcome to the 283rd.

3  Have you had enough time this afternoon to review the guide

4  I provided for you?

5                    PROSPECTIVE JUROR:  Yes.

6                    THE COURT:  And look over your

7  questionnaire that you filled out back in May?

8                    PROSPECTIVE JUROR:  I'm pretty sure I

9  don't forget any part of that.  It was 17 pages.

10                   THE COURT:  They may want to ask you a

11 question and want you to expand on that answer.  So it's

12 easy to have it there in front of you so you can refer to

13 it.

14                    I know, ma'am, that's a lot of law to

15 give someone and you are not expected to understand it

16 completely at this point.  The attorneys will go over that

17 with you in detail, try to see if you understand how it all

18 relates.

19                    At the end of the process I have two

20 questions I must answer.  First one is do you understand the

21 law?

22                    PROSPECTIVE JUROR:  Okay.

23                    THE COURT:  And the second one is can you

24 follow the law?

25                    PROSPECTIVE JUROR:  Okay.

1    THE COURT:  That's the big picture.

2  That's my end of the program.  The only question that I have

3  for you at this point is will you be able to serve this

4  Court for a period of two weeks beginning on November 10th?

5    PROSPECTIVE JUROR:  Yes.

6    THE COURT:  With that, I'll turn it over

7  to Mr. Wirskye.

8    MR. WIRSKYE:  May it please the Court.

9    ANGEL CHINUNTDET,

10  having been duly sworn, was examined and testified as

11  follows:

12    DIRECT EXAMINATION

13  BY MR. WIRSKYE:

14    Q.    How are you, ma'am?

15    A.    I'm fine, thank you.

16    Q.    My name is Bill Wirskye and I'm the Assistant

17  DA that will be visiting with you for the next few minutes.

18  We apologize with the setup that we have here.  We know it

19  makes people feel they are on trial.  Since this is a death

20  penalty case, we get to talk to jurors individually and this

21  is the best way that we have found to do it.  We know it's a

22  little unnatural, but, hopefully, any nervousness will wear

23  off in a few minutes.

24    What I'd like to do is maybe follow up on

25  some of the information that you were kind enough to provide

1   us in the 17-page questionnaire, talk to you a little bit

2   about your thoughts and feelings about the death penalty,

3   and, finally, talk about some of the laws and rules that

4   apply in a case such as this.

5                   What went through your mind when you got

6   notified that you had to come down for the individual

7   interview?

8           A.      Um, just that I was expecting it, to be honest

9   with you.  As I was filling out the questionnaire I just

10  felt like the whole time that I was going to get chosen, to

11  be honest with you.

12          Q.      Just a bad feeling?

13          A.      No.  Just that, you know, I don't know.  Not

14  to be immodest, but I'm fairly intelligent and I am logical

15  in that I'm a math teacher, as I'm sure you know, and so

16  things have to be proven to me.  And so I just felt like the

17  whole time that I was filling it out that this was going to

18  happen, so it really wasn't that big of a shock or anything.

19          Q.      Okay.  Just off the top of your head what are

20  your feelings about possibly being a juror in a death

21  penalty case?

22          A.      A couple of things.  I mean, obviously, the

23  disruption of my life, that sort of thing.  That's a little

24  annoying.  But the bigger picture would be that, um, I trust

25  myself.  I mean, this is, obviously, very important.  This

1  is a man's life, and that I would rather have me on the jury

2  than someone else.

3          Q.      Okay.  Fair enough.  We know you teach at

4  Ursuline, right?

5          A.      Uh-huh.

6          Q.      And you are also taking some graduate classes;

7  is that right?

8          A.      Yes.

9          Q.      Are you in school right now?

10         A.      Actually, I decided not to take anything this

11  semester just because of this possibility.

12         Q.      So we won't be disrupting anything other than

13  your normal, I guess, 8:00 to 5:00 job?

14         A.      Right.

15         Q.      And that's something that you think you can

16  work with, if you had to?

17         A.      The school has already told me that it

18  wouldn't be a problem, other than missing my class and being

19  away from my students for two weeks, that they would have a

20  sub for me and we would deal with that, if it came.

21         Q.      And you lived in Dallas County, I guess, for

22  the last six years, right?

23         A.      That sounds right.

24         Q.      Went to school at Rice down in Houston?

25         A.      Uh-huh.

76

1    THE COURT:  I know it's common to --

2    PROSPECTIVE JUROR:  Yes, I'm sorry.

3    THE COURT:  She has to record everything.

4    Q.    (By Mr. Wirskye)  Originally from West

5    Virginia?

6    A.    Yes.

7    Q.    What do you think about Dallas?

8    A.    I like it.  It has -- it's a big city.  I come

9    from a little small town, so it has a lot of things that I

10   grew up with.  But we traveled a lot, so I got to see a lot

11   of different cities.  So I knew I wanted to settle down in a

12   big city.

13   Q.    Do you plan on staying in education as a

14   field?

15   A.    Yes.

16   Q.    Just teach in the general kind of high school

17   math classes, that type of thing?

18   A.    Yes.  I teach algebra II, statistics, AP

19   statistics.

20   Q.    One thing that bothers me.  You said you were

21   a fan of "Boom Town"?

22   A.    Yes.

23   Q.    I saw it like twice.  The first time I saw it,

24   the DA got really drunk and I think threw up and passed out

25   in court and the second time he manufactured some evidence

1  and tried to convict someone falsely.  So I want to make

2  sure that you have a more balanced view about what we do at

3  this table, other than what you may have seen on "Boom

4  Town".

5       A.    I'm sure you saw the other shows that I watch,

6  too.  "Boom Town" is just kind of a -- I don't know.  I

7  don't know how real it is, but it's an entertaining show.

8       Q.    Based on the two episodes I've seen, it's not

9  very real at all.

10      A.    I'll keep that in mind.

11      Q.    The same goes for "Law And Order" and all

12 those type shows.  I know you followed the O. J. trial?

13      A.    Yes.

14      Q.    I couldn't --

15      A.    A little bit.

16      Q.    Where did you come down on that one?

17      A.    Actually, during the whole -- I guess, when

18 the whole thing happened, I happened to be in Europe at the

19 time.  So when we came back, what my friends and I wanted to

20 know the most is who had won the NBA championship, and

21 nobody could tell us because the O. J. thing was so huge.

22          Honestly, I think that he was guilty.  I

23 think that the trial got out of hand.  I didn't watch it

24 like -- but I had heard enough about it that you really

25 didn't have to watch it to see it, I mean, to know what

1   happened.  And that the jurors were -- I don't know if they

2   were attentive, but it didn't sound like they were, so --

3          Q.     The prosecution probably didn't do the best

4   job in my opinion.

5          A.     I didn't want to get into that.

6          Q.     That's okay.  I think we all recognize it.

7          A.     Well, and, honestly, I think that the Judge

8   let it get out of hand, too.  I think he did a very poor job

9   of keeping perspective of having the, you know, trial be a

10  trial and not a show, not like "Law And Order" or whatever.

11  So --

12         Q.     You told us generally, I guess,

13  philosophically you are in favor of the death penalty,

14  right?

15         A.     Yes.

16         Q.     I think we asked you to rank yourself from 1

17  to 10 how strongly you feel about it and you gave yourself a

18  10, which is the most.  I know that means different things

19  to different people sometime.  I'm just curious about what

20  it means to you.

21         A.     I just think in certain cases the crime is so

22  bad and so heinous that there is no other punishment than

23  to, you know, have them die in return for what they did.

24         Q.     I notice at one point in your questionnaire

25  you said that you believe logic kind of dictates that we

1  have a death penalty.

2       A.     Yeah.

3       Q.     I wonder if you would expand on that a little

4  bit?

5       A.     Not exactly an eye for an eye, but I know that

6  is what it kind of sounds like.  But this person, whoever,

7  you know, whatever crime they did that warranted the death

8  penalty, I don't know that we -- I mean, as a human race, as

9  a society, should be supporting them, continuing their

10 lives, the possibility of them, you know, doing other like

11 breaking out, causing havoc, or whatever they are going to

12 do because they have nothing to lose once they are in that

13 position.  So I think it's just logical.

14      Q.     We always ask people about, you know, any

15 religion they were raised in or church they attend, that

16 type thing.  And you mentioned that you were a Buddhist, at

17 least followed the philosophy or the way of life.

18             And not to show my ignorance, but I'm

19 kind of curious, does it teach anything with respect to the

20 capital punishment or the death penalty?

21      A.     Actually, I grew up in West Virginia and my

22 parents were the only Buddhists in probably like a 100-mile

23 radius.  So we didn't grow up with Buddhism as a religion.

24 We grew up with it more as a philosophy of life of you do

25 unto others.  It's very Christian-like in a lot of its

1   values and things, even the idea of karma that later on your

2   good works will come back to you, and that sort of thing.

3   And vice-versa, your bad things will come back and revisit

4   you, if not in this life, then the next life.

5                And so, anyway, we didn't grow up with

6   any of the, I guess, very formal things of religion.  So I

7   think in some ways -- like I know Buddhism teaches that all

8   life is precious, that sort of thing.  So in some ways we

9   kind of missed out on some of that, because we didn't have,

10  I guess, the structure of the church and the monks and that

11  sort of thing.

12       Q.     Sure.  Do you think it would affect you, if

13  you were a juror in a death penalty case?

14       A.     No.  I mean, obviously -- actually, my two

15  views of the logic of the death penalty and my Buddhism

16  background are opposing.  And to me, I guess for me, logic

17  again dictates that the death penalty is a necessary

18  punishment.

19       Q.     Okay.  Let me ask you this.  Obviously, we

20  talk to a lot of people.  We talk to a lot of people that

21  are strongly in favor of the death penalty under the

22  appropriate circumstances.  But sometimes people draw a line

23  on certain types of cases.

24                And what I mean by that is this.

25  Oftentimes crimes are committed by more than just one

1  person, a group or gang of individuals that commit a crime.

2  The law allows us to prosecute each individual that was

3  actively involved in a crime, anything from shoplifting all

4  the way up to capital murder.

5          And when you are talking about that type

6  situation in a capital murder, frequently you may have a

7  person that actually took the life, pulled the trigger, the

8  triggerman, for lack of a better word.

9      A.    Okay.

10     Q.    And you may have other people that were

11 actively involved, but didn't actually cause the death.  You

12 may have heard them referred to as accomplices.

13     A.    Yes.

14     Q.    In Texas we call them parties to an offense.

15 Some people, if it were up to them, would kind of draw a

16 line and make a distinction between those two types of

17 individuals.  They believe, maybe very strongly, that the

18 death penalty is appropriate for the person that took the

19 life, for the triggerman, but when it comes to the

20 accomplices, they may want to lock them up for life, but

21 they don't think, for whatever reason, religious, moral, or

22 ethical, that the death penalty is justified for those

23 people, for those accomplices.

24          I'm wondering how you kind of come down

25 on that issue?

1    A.    Honestly, I guess, it would have to be -- I

2    would have to see specifically the exact situation you are

3    talking about, because I think to a certain extent the

4    person who was not involved is just as guilty as the person

5    who pulled the trigger.  And I think in other cases, not so

6    much.

7                And so, I mean, I hate to say that, but I

8    think that it really depends on the actual case that you are

9    talking about.

10   Q.    Okay.  As you sit there right now, you don't

11   have any objection?  You wouldn't just automatically take it

12   off the table for accomplices or nontriggermen?

13   A.    No.

14   Q.    And that's kind of basically what the law is.

15   It depends on the facts.  And just to give you a

16   hypothetical to illustrate the law, say Mr. Shook and I, the

17   other DA, decide we're going to rob a bank.  The plan is

18   he's going to take a gun in and hold up the tellers.  I'm

19   going to come in with a bag and try to collect all the money

20   while he holds them up.

21                At some point during the bank robbery,

22   for whatever reason, maybe one of them looks kind of funny

23   at Mr. Shook and he doesn't like it or I see one of them

24   going for a silent alarm and I tell him and he shoots and

25   kills them, but in any event, he commits an intentional

1  murder --

2       A.       Uh-huh.

3       Q.       -- during the course of a robbery, which you

4  know from reading the pamphlet now, is one of the cases we

5  reserve for consideration of the death penalty in Texas.

6  Obviously, he could be convicted of capital murder.  He

7  could receive the death penalty, depending on how the jury

8  answers the three questions.  But the law also says that I

9  could, too.  Does that make sense to you?

10      A.       Yes, it does.

11      Q.       Okay.  What do you think about that scenario?

12      A.       Again, it would -- I would have to know

13  exactly -- I mean, I know that you were busy taking the

14  money.  If he acted completely alone, then, yes, he is

15  obviously responsible for his own actions and that is that.

16               But if you egged him on or if you had a

17  chance to stop him and you didn't stop him, or something to

18  that effect, I mean, something that was -- something by your

19  action or inaction let him cause the, you know, have to

20  murder somebody, then you would be as guilty as him.

21      Q.       Okay.  Actually under our law there are two

22  different ways that an accomplice, like me in that

23  hypothetical, could be found guilty.  The first is if I aid,

24  encourage, direct, or solicit him to commit that capital

25  murder.  Maybe I see the teller going for a silent alarm and

1   I say, Toby, shoot that teller, she's going for the police.

2   Obviously, under that theory of parties, I would be guilty

3   and could face the death penalty.  Sounds like you agree

4   with that?

5           A.      Yes.

6           Q.      The second way to get there is what we call

7   under the law of conspiracy.  Basically, we entered into a

8   conspiracy to commit bank robbery.  That's what we planned

9   or agreed to do.  And the law says if, during the course of

10  committing one crime, another crime is committed, in this

11  case murder, and it's in furtherance of the original crime,

12  in furtherance of the bank robbery, I could be found guilty,

13  the accomplice, even though I didn't have any intent that

14  somebody die, if the jury thinks that I should have

15  anticipated that a life could be taken.

16                  What do you think about that aspect of

17  the law, the conspiracy aspect?

18          A.      I can understand that.  I mean, if you went

19  into a bank with guns with bullets, you had every intention

20  of using them, if need came up, in your -- I mean, in your

21  opinion.  So him seeing the teller move for the button or

22  whatever, could have just as easily have been you in that

23  case and I can see that.  And I could understand that.  And

24  I could see convicting you of murder along with your friend

25  there.

1    Q.    How about the death penalty for me?

2    A.    I guess, again, I would really have to know

3 exactly the extent of your involvement, I guess, and I don't

4 know -- I mean, it's -- but then it's the law, too.

5    Q.    We don't want to put anybody, put them in a

6 situation where what they believe in conflicts with the law

7 that they have to follow, and that's why we're talking to

8 you now.  So once we get you in the jury box, it's too late.

9         And one of the reasons I go into this in

10 such detail, just to be open with you, we are prosecuting

11 Mr. Murphy as an accomplice or a party to the offense --

12    A.    Okay.

13    Q.    -- under the theories of law that we're

14 talking about.  That's why it's really important that we

15 find out how you feel.

16         I guess, going back to my example, it

17 could be a situation where I actually had no intent that

18 anyone get hurt.  I just signed up for a bank robbery.  I'm

19 just curious kind of that second way to find me guilty under

20 the conspiracy law, exactly what you think about it?

21    A.    Again, I think -- I mean, I guess the thing

22 is, is that I know I'm not supposed to bring this into my

23 consideration, but he was already in jail at some point and

24 when he broke out he had an intention of breaking out.  And

25 when they killed or when he or his friend or whatever killed

1   this person in the act of robbery, then I think that he's

2   not stupid.  I think that he knew somewhere in his mind that

3   this could be a possibility.

4        Q.    Okay.  I want to make clear that, you know, to

5   the extent possible we try to keep it to hypotheticals.  But

6   neither side can go into the facts of this case.  We're not

7   allowed to preview the facts of the case.  But I want to

8   make sure that you are completely comfortable with that

9   aspect of the law, finding an accomplice guilty either as a

10  party or as a conspirator, either way.  Does that make sense

11  to you?

12       A.    Yes.

13       Q.    You have already kind of alluded to it, that

14  you know something of the facts of this case.

15       A.    Just a little bit, just, you know, headlines,

16  TV.

17       Q.    Could you tell us what you remember?  You told

18  us some already, but --

19       A.    Just that these guys broke out and they were

20  running around, and they went to Oshman's and were, I guess,

21  robbing the place or getting things that they needed, and in

22  that act an officer who was off duty, from what I

23  understand, was probably a security officer of some sort for

24  Oshman's on his off time, was killed.

25       Q.    Okay.  I think you also mentioned that you had

1    kept up with some of the other trials in this case?

2         A.      No, I don't think, no.

3         Q.      Okay.  What the law is, you know, obviously,

4    everybody we talk to -- I was looking on page 3.  Obviously,

5    everyone we talk to in a case like this, a high profile

6    case, has heard something about it.

7         A.      Just that they have gone to trial and that I

8    knew that they had been, I think, all convicted at that

9    point.  And so that was all that I knew.  I didn't know of

10   any, like, the details or anything individually.

11        Q.      Like I said, everybody we talk to knows

12   something.  It differs in the amount of detail they may

13   know, and it differs in how that might affect them.  It's a

14   little bit different than an ordinary criminal case where

15   you come down and you don't know anything about the facts

16   until you start hearing the evidence.

17        A.      Right.

18        Q.      And what the law says is that in order to be a

19   qualified juror, you don't have to forget what you have

20   heard, but you have to put it to the back of your mind.

21   Even if you have formed some impression or opinions, put

22   those to the back of your mind and be able to tell us that

23   you would just base your verdict in the case solely on the

24   evidence and the facts that you hear in the courtroom.  Is

25   that something that you think you can do?

1    A.    Yes, absolutely.

2    Q.    Okay.  No hesitations about doing anything

3 like that?

4    A.    No.

5    Q.    Okay.  In Texas all trials, and this trial

6 would be the same, are conducted in two parts.  The first

7 phase of the trial is where we're concerned with whether the

8 person is guilty, did he do it.  Did the State prove to you

9 beyond a reasonable doubt that someone is guilty of capital

10 murder?

11           If we meet our burden and you are

12 convinced that he's guilty beyond a reasonable doubt, then

13 we move into the second phase of trial which we call the

14 punishment phase.  The rules of evidence broaden out.  You

15 get to hear a little more different types of evidence,

16 background, character, whether he has a criminal history,

17 other facts, good or bad, about his life, if they exist.

18           And we do that because we ask a jury in

19 these type cases to answer these three questions.  We don't

20 ask a jury at the end of the punishment phase to write in

21 life sentence or death sentence.

22    A.    Okay.

23    Q.    We ask them to work through these questions

24 and we kind of let the answers to these questions determine

25 the appropriate sentence.  Just briefly, the first question,

1   you know, we ask a jury is, is the person a future danger?

2   The second question deals with that kind of accomplice

3   scenario that we've already talked about.

4        A.     Okay.

5        Q      Basically, whether a person anticipated that a

6   human life would be taken, a little bit higher standard than

7   should have.  But if both of those are answered yes, you go

8   to the final question, which is the mitigation question.

9   Basically, that means is there any reason to spare this

10  person's life, give them a life sentence, instead of the

11  death sentence?

12              If the questions are answered yes, yes,

13  and no, then the Judge has no discretion.  He will sentence

14  the defendant to death.  And that's kind of the scheme we

15  have.  Does that make sense to you?

16       A.     Yes.

17       Q.     And the procedures are the same in every case.

18  They would be the same in this case.  If a person is

19  sentenced, they are immediately taken down to death row

20  where, at some point in the future, Judge Cunningham would

21  issue a date of execution.  I can't tell you how long or

22  when.

23              On that date he would be taken to a

24  holding cell in downtown Huntsville, Texas, where all

25  executions take place.  He will be given time to visit with

1 friends, family members, spiritual advisors, be given a

2 chance for a last meal, that type thing.

3          As it got close to 6:00 p.m., which is

4 the time the law mandates all executions take place in

5 Texas, he would be removed from his holding cell and taken

6 into the death chamber, voluntarily or involuntarily.  The

7 guards would force him to go, if he did not want to.

8          You may have seen the death chamber on TV

9 or the media with the gurney and leather straps.  He would

10 be taken there, strapped down.  An IV would be started.

11 There would be witnesses there, his witnesses.  There would

12 be friends, family members, maybe, of the victim, as well.

13          He would be given a chance by the warden

14 to make a last statement and he may beg for forgiveness.  He

15 may proclaim his innocence, be very angry.  Once he's given

16 that chance to make a last statement, the warden nods to the

17 executioner.  The poisons are released into the IV.  Very

18 quickly his heart and lungs shut down and he loses

19 consciousness and goes into a coma and eventually dies soon

20 thereafter.

21          I don't want to be morbid about it, but

22 those are the kind of details that are often reported in the

23 press and some people tell us they just don't want that on

24 their conscience, knowing that.  They tell us sometimes, you

25 know, to be for it in a philosophical or abstract way is one

1    thing, but when I get down here and it becomes very real and

2    I see a living, breathing, individual, knowing, very

3    frankly, it's the State's goal that he be executed some day,

4    and it just hits a little close to home.

5              And before we go any further, I want to be

6    sure that you believe that you are the type of person that

7    could participate in this process, the type of person that

8    could take pen in hand and answer those questions in such a

9    way that it may result in the execution of another human

10   being.

11             A.    Yes.

12             Q.    Okay.  Fair enough.  Let's talk a little bit

13   about these Special Issues.  If you could, just take a

14   second and re-read -- I know you have read them once, but

15   re-read that first Special Issue or that first question.

16   It's phrased a little bit differently than it is in your

17   book.

18             A.    (Prospective juror complies.)  Okay.

19             Q.    Again, that's the future danger question.  We

20   ask jurors kind of to make a prediction if there's a

21   probability of that future danger.  Is that something that

22   you would be comfortable doing, if you had enough

23   information, making that sort of prediction?

24             A.    Yes.

25             Q.    What do you think would be important to you as

1  you try to make that prediction or answer that question?

2      A.      I guess past behavior.  But, I mean, I know to

3  a certain extent you probably can't enter some of that in,

4  but obviously the acts that led up to this trial, that led

5  up to the murder.

6      Q.      Okay.  Those are the type things people

7  typically tell us and those are the type things you would

8  hear in that second phase of the trial.

9              There are some words in that Special

10  Issue that aren't necessarily -- they don't necessarily have

11  legal definitions like so many other things we deal with.

12  But the word "probability" -- I almost hate to ask this to a

13  math teacher.  We ask it to everybody else.  But I'm curious

14  what your definition of "probability" would be?

15      A.      I'm assuming you mean something to the effect

16  that that's a decent chance that the defendant would commit

17  another crime of some sort.

18      Q.      Less than a certainty, more than a

19  possibility?

20      A.      Yes.

21      Q.      More likely than not?

22      A.      I'm not going to spout out statistics at you.

23      Q.      Thank you very much.  I didn't do well in that

24  class.  It's something less than a certainty?

25      A.      Yes.

1    Q.    More than a possibility, obviously?

2    A.    Yes.

3    Q.    And we have that phrase "criminal acts of

4    violence".  I'm kind of curious what that means to you when

5    you see that phrase?

6    A.    I would assume that meant bodily harm to

7    another as a crime or in the act of a crime.

8    Q.    Okay.  Assaults?

9    A.    Yeah, anything that would be, I guess,

10   hurtful, intentionally hurtful, to someone else.

11   Q.    Okay.  I think the bottom line is the law

12   doesn't necessarily require us to prove to you that he's

13   going to kill again or be involved in a capital murder or

14   that type of thing.

15              And then, finally, that last word in that

16   question, "society"?

17   A.    Uh-huh, yes.

18   Q.    What does that mean to you?

19   A.    I guess that just means in general the world,

20   I mean.

21   Q.    Anybody and everybody he may come into contact

22   with, that type thing?

23   A.    Yes.  Including the other criminals he would

24   be with in prison, if he would be a possible threat to them.

25   Q.    Exactly.  Okay.  Give me just a second, ma'am.

1    A.    Sure.

2    Q.    Just to point out, we've had some people

3 criticize the grammar in some of these questions.  The

4 Legislature drafted them, we didn't.  They are the same for

5 every case.  It's not anything specific for this case.

6         Again, that Special Issue No. 2 kind of

7 deals with what we've already talked about, the accomplice

8 scenario.  There's a little bit higher standard when we get

9 to punishment.  We have to prove not only they should have

10 anticipated, but they did anticipate.  And those two

11 questions are alike in the sense they start off with a no

12 answer.

13    A.    Okay.

14    Q.    And it's up to us, it's part of our burden of

15 proof, to prove to you as a juror that the answer should be

16 yes.  And if we don't meet that burden of proof, and we

17 don't prove it to you, the answer would be no.

18         One way to look at this whole scheme is,

19 if you convict someone of capital murder, they are sitting

20 on a life sentence, and only if the questions are answered

21 yes, yes, and no, that's when the death penalty comes into

22 play.  Does that make sense to you?

23    A.    Yes.

24    Q.    And, finally, the mitigation question that we

25 kind of already touched on.  No one has the burden of proof

```
 1   on that.  We kind of leave it up to the jurors.  If the
 2   question, again, the questions are answered yes, yes, and
 3   no, again, it would be the Judge would have no discretion.
 4   It would be a death sentence.
 5              Does that scheme we have kind of make
 6   sense to you?
 7        A.   Yes.
 8        Q.   Do you have any questions about anything we've
 9   talked about?  I know we've covered quite a bit.
10        A.   No, it's pretty clear to me.
11        Q.   Okay.  Anything else we need to know about you
12   maybe possibly being a juror in a death penalty case?
13        A.   Just that if I'm not chosen, I might be a
14   little offended.
15        Q.   If what?
16        A.   If I'm not chosen, I might be a little
17   offended, but other than that.
18        Q.   All right.  Thank you for your time, ma'am.
19              MR. WIRSKYE:  That's all I have, Judge.
20              THE COURT:  You're only halfway through
21   the deal here.
22                    CROSS-EXAMINATION
23   BY MS. BUSBEE:
24        Q.   I wanted to ask you a few questions.
25        A.   Sure.
```

1    Q.    Obviously, you have given this some thought --

2    A.    Yes.

3    Q.    -- since you filled out the questionnaire.

4    And you were talking earlier about your thoughts on the fact

5    that you have heard that these gentlemen had escaped from

6    the penitentiary.  Would you elaborate on that a little bit

7    about the escape?

8    A.    Oh, that's just all I know, to be honest with

9    you, is just that they were already in jail for something

10   and escaped prison.

11   Q.    And sounds like that factored in somewhat for

12   you as far as the intent question is concerned?

13   A.    Yes, it does a little bit, because if they

14   were going to, I guess, just serve their time and be done

15   with it, then they wouldn't have broken out.  I think when

16   they broke out, that was an intent on their part to say that

17   they were -- had other plans than being good citizens, than

18   being rehabilitated and being good citizens.

19   Q.    Right.  Well -- and I felt that that was

20   brought up when we were talking about the anticipating or

21   should have anticipated issues on whether or not a life was

22   going to be taken.  Was that the context in which we were

23   talking about the particular facts of this case?

24   A.    Yes.  I think -- if I understand what you are

25   asking, yes, that they broke out of jail together, they

1   stuck together the whole time, I mean, that they were out

2   and they committed robbery together, and they obviously had

3   weapons, or something of some sort, that they were ready to

4   use.

5          Q.    Okay.

6          A.    And so it might have been an off-duty police

7   officer.  It might have been someone walking on the street.

8          Q.    But based on what you know about this case,

9   you pretty much decided that there was a propensity for

10  violence, just based on what you have already heard about

11  the case?

12         A.    I think so.  I mean, I think -- I think the

13  logic dictates that from what I know of the case.  But,

14  again, like the Judge said when we were here last spring, we

15  don't even know -- we can't even scratch the surface of what

16  we know in public and I understand that.  I mean, I know

17  myself enough that I could see the evidence logically,

18  objectively, without putting in my opinions from before,

19  because I've had to do that before in classes and in, you

20  know, in proofs and math things, I mean, just because that's

21  the way you have to approach those things.

22         Q.    You know, we probably wouldn't have gone into

23  the facts -- I mean, we're not necessarily supposed to

24  discuss the particular facts of the case, but you brought

25  that up and I just wanted to ask you some questions about

1          that.

2                              MS. BUSBEE:  That's all the questions

3          that I have, Your Honor.  We've reached an agreement.

4                              THE COURT:  Ms. Chinuntdet --

5                              PROSPECTIVE JUROR:  Yes.

6                              THE COURT:  -- I want to compliment you.

7          You are one of the only ones, if not ever, folks that --

8          I've read the questionnaires, include the judges in the list

9          of folks that ought to be protected by the death penalty, as

10         far as where it should be expanded.  That's not the law.  I

11         can be murdered and they can't prosecute that individual for

12         the death penalty.

13                             So I appreciate your intelligence in

14         including me in the list, but the Legislature chose not to

15         do so.  I'm afraid that -- we don't mean to offend you, but

16         the parties have agreed that you know too much about this

17         case.

18                             PROSPECTIVE JUROR:  Okay.

19                             THE COURT:  And they have excused you

20         from jury service.  So please don't leave thinking, I'm

21         offended because I didn't get chosen.

22                             PROSPECTIVE JUROR:  No, I understand.

23                             THE COURT:  As intelligent as you are and

24         of all the people we've talked to, have formed some pretty

25         sure opinions and they're just -- this is not your case.

1    PROSPECTIVE JUROR:  I understand that.

2    THE COURT:  So the next time you come

3    around, you put the Judge right back in that slot when you

4    get the next questionnaire and we'll hopefully find you a

5    trial that you don't know much about.  Thank you very much.

6    PROSPECTIVE JUROR:  You're welcome.

7    [Prospective juror out]

8    THE COURT:  Mr. Wingate.

9    [Prospective juror in]

10    THE COURT:  Good afternoon, sir.  Please

11   have a seat.  Welcome to the 283rd.  We have juror No. 2032,

12   Mr. Jeffery Wingate.  Welcome.  You have obviously had

13   enough time to review the guide I provided for you.

14    PROSPECTIVE JUROR:  I did.

15    THE COURT:  And did you look over your

16   questionnaire that you filled out for us back in May?

17    PROSPECTIVE JUROR:  Yes.

18    THE COURT:  Please don't think you have

19   to understand all that law and be able to give it back to

20   us.  This is what this time is for, for the lawyers to visit

21   with you and explore how it works, how it relates, and,

22   hopefully, you will gain the understanding.

23    And then at the end of the process I have

24   two questions that I have to answer.  Number one is do you

25   understand the law?  And, number two, can you follow the

1   law?  That's my big picture.

2                       There are no right or wrong answers.  I

3   know people are nervous when they come in.  This is as

4   informal a process as we can do and all I can tell you is

5   just give truthful, honest answers.

6                       The only question that I have for you at

7   this time, will you be able to serve this Court for a period

8   of two weeks beginning on November 10th?

9                       PROSPECTIVE JUROR:  Yes.

10                      THE COURT:  Thank you, sir.  Mr. Shook?

11                  JEFFERY WINGATE,

12  having been duly sworn, was examined and testified as

13  follows:

14                  DIRECT EXAMINATION

15  BY MR. SHOOK:

16      Q.      Mr. Wingate, my name is Toby Shook.  I'm going

17  to be asking you questions on behalf of the State.  As the

18  Judge said, we're just looking for your honest opinions.

19  There aren't any right or wrong answers.

20                      I'm going to go over some of the

21  information on your questionnaire and then talk to you about

22  capital murder, the death penalty, your opinions on that,

23  some of the rules that apply to this case.

24                      Looking at your questionnaire, I see that

25  you work for USDA Nutrition?

1     A.     Yes.

2     Q.     And you are a systems accountant?

3     A.     That's correct.

4     Q.     What do you do on a day-to-day basis there?

5     A.     I do financial reviews of state agencies.  We

6  have five state agencies that we manage, Texas, Louisiana,

7  Arkansas, Oklahoma, and New Mexico.  And I look at their

8  Food Stamp Program.

9     Q.     Okay.  And I notice we asked if you know

10  anyone in law enforcement and you do have a close friend

11  that's with the Dallas Police Department; is that correct?

12     A.     That's correct.

13     Q.     Who is that?

14     A.     Jim Chandler.

15     Q.     And how do you know him?

16     A.     I know him through my daughter.  My daughter

17  and his daughters go to school together and that's how we

18  met him.  He was in the band.  We were in the band together

19  and he was the band president.

20     Q.     Okay.  Does he ever discuss his cases with

21  you, what he works on, that sort of thing?

22     A.     No.

23     Q.     So I take it from that, then, you wouldn't be

24  influenced one way or the other against either side because

25  of the relationship you have with him as a police officer?

1    A.    No, I would not.

2    Q.    Also, back in 19 -- you had a friend that was

3 convicted of bank robbery back in 1977?

4    A.    That's correct.  Well, it's the brother of a

5 friend.

6    Q.    Brother of a friend.  Did you know him very

7 well at all?

8    A.    No, not really well.

9    Q.    All right.  That shouldn't influence you one

10 way or the other, then, either, should it?

11    A.    No.

12    Q.    Let me talk to you a little bit about capital

13 murder.  Obviously, you know from what the Judge has told

14 you in the questionnaire, that this is a case in which the

15 State is seeking the death penalty.  So we want to talk with

16 each one how they personally feel about it.  You put on the

17 questionnaire that you favored it as a law and I would like

18 you to kind of follow up on that and just tell us in your

19 own words why you favor it and maybe the purpose you feel it

20 serves.

21    A.    I favor it because I think it is somewhat of a

22 deterrent to some people, maybe not to all people, but to

23 some people, that see the possibility of them losing their

24 life or taking somebody else's life, that it may help

25 influence them to do the right thing and not take someone's

1    life.

2         Q.       Okay.  Have you ever followed any cases

3    locally or nationally in the media that you thought were

4    death penalty cases or should come under consideration of

5    the death penalty or actually being tried as capital murder

6    cases?

7         A.       No, I have not.

8         Q.       From your own personal point of view, what

9    types of cases do you think should be considered for the

10   death penalty?

11        A.       Well, I guess a case where a person just

12   intentionally kills someone -- I would say not just a random

13   event, but someone who was planning to do it or somehow or

14   another ended up killing someone, but making sure that they

15   were dead, not just wounding them, just --

16        Q.       Okay.  Formed the intent to kill and acted

17   upon it?

18        A.       Yes.

19        Q.       A lot of jurors tell us that.  They will use

20   words like "premeditation."  There is no requirement of

21   premeditation, but you do have to have an intent.  It can't

22   be an accident.  You have to have the specific intent to

23   murder someone and act upon it for it to be a murder case or

24   even a death penalty case.  It may only take a few moments

25   or seconds to form the intent, but it has to be there.

1    Do you agree with that as far as the

2  death penalty case, that it may only take a few seconds to

3  form that intent?

4    A.    Certainly.

5    Q.    Okay.  If it were up to you, would you have

6  the death penalty, at least the option of the death penalty,

7  for crimes other than murder?

8    A.    Yes.

9    Q.    What types of crimes would those be?

10    A.    Rape of a minor.

11    Q.    Okay.  Let me turn to page 4 on your

12  questionnaire.  At the -- about the third question down, we

13  asked if you believed in the death penalty, how strongly you

14  believe in it, and we gave you a scale of 1 to 10 and you

15  put an 8.  We ask every juror that, because that means

16  different things to different people.

17    When you chose 8, what do you remember

18  thinking or where were you going with that?

19    A.    I think if you look at my answer right above

20  that, it depends upon the age of the person that committed

21  the crime and the mentality, the mental capacity of the

22  person.

23    Q.    Okay.  What would be important to you about

24  the age and the mental capacity?

25    A.    Well, if a young child committed a murder,

1  let's say under ten years old, they know some right or wrong

2  and they may not know the full impact of what they're doing.

3  And along with the mental capacity, if someone doesn't

4  really understand what they've done or they know that they

5  could -- they have committed some type of act, but they

6  didn't know all the rights and wrongs and don't understand

7  those.

8       Q.    We ask that question about the youthfulness

9  real openended to kind of get your first reaction.  I can

10 tell you the law now is you have to be 17 and above to be

11 prosecuted for the death penalty in Texas.  Under 17, you

12 can be prosecuted, you just couldn't ever receive the death

13 penalty.  But that's the cutoff line that they have chosen.

14           Also, on the mental capacity, the

15 standard is knowing right from wrong.  Obviously, you have

16 some people that are slower than others.  Mental retardation

17 has been recently ruled by the Supreme Court is somebody who

18 is legitimately mentally retarded, and a jury finds so, they

19 couldn't receive the death penalty.  They may be punished by

20 a long term of years.

21           But the right and wrong, if someone does

22 not have that ability to know right from wrong, then that is

23 a defense, also.  So you are pretty much on point with the

24 law.

25           Do you have any problem with the cutoff

1    age of 17, 18 years old?

2        A.    I'm thinking it may be a little bit too old.

3    Sometimes you can see that minors will commit acts because

4    they know they can get away with it.

5        Q.    And I've heard some people say, you know, 15

6    or 14 today is a little different from 30 years ago, 40

7    years ago.

8        A.    That's correct.

9        Q.    They are a lot more sophisticated and can be

10   quite dangerous, actually.  If it were up to you, then, you

11   might lower that age a little bit, at least for

12   consideration?

13       A.    At least for consideration.

14       Q.    Okay.  Okay.  One of the other questions we

15   asked is the next to last one.  We just ask you an openended

16   question, what would be important to you?  And you say how

17   it was done and why it was done and does the person who

18   committed the crime show any remorse.  And it sounds to me

19   like you kind of want to know all the facts?

20       A.    Yes.

21       Q.    And then a lot of people tell us about

22   remorse.  What did you mean by that?

23       A.    I guess if they were -- if it happened on the

24   spur of the moment where someone plotted to do it and it

25   actually occurred, and then afterwards they realized what

1  they had done.  This would be, I guess, someone -- a young

2  person that had no real intention.  Well, if they had

3  intention of doing it at one time, but after they thought

4  about it for a length of time, they realized that they

5  shouldn't have done that and then they show remorse that

6  they shouldn't have done it, apologetic.

7       Q.    How would you think that you could really

8  determine if it was true remorse?

9       A.    That will be very hard.  I guess you would

10 just have to base it on actions of the person.

11      Q.    Actions after the crime?

12      A.    Actions after the crime, you know, correct.

13      Q.    Okay.  Before they were arrested, after they

14 were arrested, that sort of thing?

15      A.    Yes.

16      Q.    I've had some jurors say it would be

17 important, I guess, to know their role, but then afterwards

18 what their conduct was.  I've had jurors say that would be

19 more telling after they were arrested.  One guy had been in

20 the Army and talked about foxhole conversions.  Obviously,

21 after someone was caught, then it would be much harder to

22 tell.  But he did feel that he could tell a lot about a

23 person's conduct afterwards, before, if you can know.

24            But you feel that you can judge a

25 person's actions and then kind of draw, possibly be able to

1  draw, if they have true remorse and that sort of thing?

2       A.    Yes.

3       Q.    Okay.  Let me talk to you kind of about the

4  scheme we have.  In Texas right now the capital murder is

5  reserved just for murder cases that are intentional

6  killings, not an accident, not self-defense.  And a lot of

7  our murder cases don't fall in the death penalty statute.

8  We have a lot of brutal murders.

9            To get to the death penalty it has to

10 occur with some aggravating facts, murder during the course

11 of another felony, such as if you commit a murder during the

12 course of a robbery.  Like go into a 7-Eleven or a

13 convenience store and shoot the clerk during the robbery,

14 that could be a death penalty case.  Or break into someone's

15 home and they commit murder while doing that, that could be

16 one.  Committing arson or murder someone during a kidnapping

17 or during a rape, one of those types of felonies, could be a

18 death penalty case.

19           And, in addition, victims such as a

20 police officer on duty, a fireman on duty, or a prison guard

21 on duty, if they are murdered, that could be a death penalty

22 case, and a child under the age of six.  You also have the

23 mass murder situations where there's more than one victim,

24 or serial killer situation.  And, finally, murder of someone

25 for profit, hitman situation, someone does it for money.

1          But those are the specific types of

2   situations in which the death penalty comes into

3   consideration.  As far as that list goes, do you think that

4   is a good list or would you agree with that list?

5          A.    I think that's a good list.

6          Q.    If it were up to you, would you cut it back

7   any?  Would you expand it some?  Or does it sound right?

8          A.    I think I would leave it the way it is.

9          Q.    Okay.  You believe that the death penalty

10  should be considered for the murder of police officers on

11  duty, that sort of thing?

12         A.    Yes.

13         Q.    Okay.  Now, when we think of the death

14  penalty, we naturally think of -- examples come to mind to

15  illustrate our point.  Capital murder is no exception.

16  Obviously, I think when we talk about capital murder, we

17  think of the triggerman.

18              Capital murder, like any other crime, may

19  be committed by more than one person.  You may have groups

20  of people that commit a crime.  Some may have a greater role

21  than others, but they all might be acting together.  And the

22  law says that if people are acting together, they call it

23  the law of parties.  It's more commonly known by the jurors

24  as accomplices.

25              If the person is an accomplice, more than

1  one person committing a crime, they can all be held

2  accountable.  And that's true for capital murder, too.

3                  An example I often use is say Mr. Wirskye

4  and I want to rob a bank.  We agree to do that.  Our plan

5  calls for me to go in with a loaded gun.  I point it at the

6  teller and tell them to put their hands up.

7                  And while I hold them at bay, he goes

8  through the tellers' drawers and starts loading up the cash.

9  Something happens during that, maybe I don't like the

10  teller, maybe I don't like the way he's looking at me, maybe

11  he says someone is going for an alarm and I shoot them.  I

12  kill them.  It's an intentional act.

13                  We get away, but we're caught.

14  Obviously, I can be prosecuted for capital murder.  I could

15  even receive the death penalty.  The law says that he can be

16  -- also can be prosecuted for capital murder, could even get

17  the death penalty, depending on the facts and his

18  involvement.

19                  But some jurors feel differently about

20  that.  We want to get your honest opinion.  Some people

21  would have the death penalty, if it were up to them, for a

22  shooter, a triggerman, or the person that actually causes

23  the death, but they would draw a line at that point and

24  reserve a different punishment for the accomplices, because

25  the accomplice didn't actually cause the death.  They think

1    it might be more fair to give them prison time.

2                    Other jurors tell us, no.  I guess it

3    would depend on the facts, but accomplices should be held

4    accountable in these situations and ultimately could receive

5    the death penalty, even though they didn't pull the trigger.

6                    But people feel differently about that,

7    and there aren't any right or wrong answers, but we like to

8    ask every juror their gut reaction to that law, the

9    prosecution of accomplices, and how you feel about that?

10        A.    I guess I would have to almost know all the

11   facts of what went on in the instance, but if the way that

12   you explained it, I kind of feel that the person that was

13   filling up the cash bags might not be -- should not receive

14   the death penalty.

15        Q.    And why is that?

16        A.    It's like you explained where the other guy

17   was the triggerman.  I know that they're committing the

18   crime together, but the intention was to commit the crime.

19   He may not have known that his partner was going to go ahead

20   and fire the weapon, even though it was loaded.  And so

21   maybe he shouldn't be held responsible for what his partner

22   has done.

23        Q.    In your mind that might be more of a prison

24   time situation, but not a death penalty?

25        A.    Correct.

Q.      Okay.  Fair enough.  Like I said, there aren't any right or wrong answers.  We just look for your honest answers.  The law says that the way the law is written is we could enter into a conspiracy and that's just an agreement to commit one crime.  And if, let's say, I commit another crime to promote that crime, in this case shooting someone, they can all be held accountable, even if Mr. Wirskye here didn't have the intent for that to happen, a person could be found guilty, if the jurors believe they should have known that that could have happened, they should have anticipated that that could happen.  He doesn't have to have the intent that someone die to be found guilty of capital murder, necessarily.

And some people disagree with that.  They think that before someone could be found guilty of capital murder, their intent should be there that a person should die.  They think that's fair.  If it were up to them in those situations, if the person doesn't actually have the intent for someone to die or the State could not prove that, then find him guilty of aggravated robbery, the crime they set out on, but not capital murder, and then reserve the capital murder conviction for that person who actually intended that person to die.

Now, do you feel that way as far as the law goes or do you think a person who didn't pull the

1  trigger could be, even if they didn't have that intent?

2      A.     That was kind of confusing.  I guess if it is

3  conspiracy, they're going to do some type of act, and even

4  though the other person didn't pull the trigger, they had

5  the knowledge that that was going to occur, then yes.

6      Q.     Okay.

7      A.     I do believe that it could be a capital murder

8  for both people.

9      Q.     And do you feel from your own personal point

10  of view, then, that an accomplice, a nontriggerman, could

11  receive the death penalty for a crime like that where they

12  didn't actually cause the death?

13      A.     Yes.

14      Q.     What kind of -- why do you think -- again, the

15  purpose of that would be for society to be able to prosecute

16  a nontriggerman or an accomplice for the death penalty?

17      A.     I think that would also be a deterrent to try

18  to get them to not commit crimes.  Of course, it's not

19  always effective, as we know, in our society.

20      Q.     Okay.  So kind of similar as the regular

21  triggerman, a deterrence?

22      A.     Yes.

23      Q.     And you would not, from your own personal

24  point of view, then, take the death penalty off the table if

25  the person being prosecuted were an accomplice?

1       A.      That's correct.

2       Q.      Okay.  I can't preview the facts.  The defense

3  can't preview the facts.  We can tell you that the theory

4  we're prosecuting this case under is that of the law of

5  parties or accomplices, that we're not alleging that Mr.

6  Murphy caused the death, but he was a party or accomplice to

7  this offense.  And that's why I go into such detail of those

8  type of situations.

9               You, like every juror, has heard

10  something about this case.  And that doesn't make you

11  ineligible.  We just have to talk to you about that.

12      A.      Sure.

13      Q.      Because I think everybody, except maybe one or

14  two, have heard something or followed it on the news because

15  of the amount of publicity.  You told us in the

16  questionnaire that you remember watching it on the TV and

17  hearing something on the radio.  What is it exactly that you

18  remember from the news broadcast?

19      A.      I remember the Christmas Eve broadcast where

20  they did the robbery and the police officer being reported

21  as being killed.  And I remember the capture, and I think it

22  was in Colorado where they surrounded the trailer that they

23  were in, and brief bits about the escapades across the

24  country and sightings.

25      Q.      While they were out and that sort of thing?

1      A.      That's correct.

2      Q.      What about after the capture in Colorado?  Did

3  you follow the cases anymore?  Any subsequent court

4  proceedings?

5      A.      No, I did not.

6      Q.      Haven't looked on the Internet or anything

7  like that --

8      A.      No.

9      Q.      -- over the past year or two?

10      A.      No.

11      Q.      Okay.  The law is the fact that you have seen

12  something on the news doesn't make you ineligible.  It's

13  whether you could not allow that to influence you.  You

14  would have to just judge the case based on the witnesses you

15  hear in the courtroom and not judge the case based on any

16  opinions you formed from the news events.

17              And that comes down to the individual

18  juror, and we depend on your honesty in that regard, what

19  you tell us.  Some have read more than others.  Do you feel

20  that you can follow that rule of law and if you were chosen

21  as a juror, just decide the case on what you hear in the

22  courtroom, and be able to disregard what you heard on the TV

23  and the radio?

24      A.      Yes.

25      Q.      Okay.  The way this trial is set up, it's in

1  two parts.  There's the guilt/innocence stage in which we

2  must prove to you beyond a reasonable doubt that the

3  defendant is guilty.  If we fail to do that, it would be a

4  not guilty finding.

5              If we are able to do that, we move to the

6  punishment phase where you may hear additional evidence.

7  And at the close of that evidence you get these Special

8  Issues or questions.  Kind of in a nutshell, we'll go over

9  it in more detail in a minute, but in a nutshell, the State

10 must prove in the punishment phase is the defendant is a

11 continuing danger, that they anticipated that a life was

12 taken or would be taken, and that there's not sufficient

13 mitigating evidence for a life sentence to be imposed, or is

14 there sufficient evidence, actually.

15             Basically, the first two questions to the

16 danger and the anticipating a life, if those are answered

17 yes and yes, and the mitigation question is answered no,

18 then the Judge would have no choice or discretion.  He would

19 sentence the defendant to death.  If they are answered any

20 other way, again, he would have no choice, but he would

21 sentence the defendant to life.  The jury doesn't write in

22 death or life, but the Judge sentences according to how they

23 answer those questions.

24             And you are entitled to know what the

25 sentence would be, based on how you answer those questions.

1    But those are the only two possible outcomes, once we reach

2    the punishment stage.  Is that clear to you?

3              A.     Yes.

4              Q.     Now, are you familiar with the method of

5    execution in Texas?

6              A.     I believe it's lethal injection.

7              Q.     That's right.  I don't know if you ever read

8    any of the accounts of executions in the papers or seen it

9    on TV?

10             A.     No, I have not.

11             Q.     On occasion they do cover those quite well.

12   The procedures are the same in each case.  They would be the

13   same in this case, if the defendant were found guilty.  If

14   those questions are answered that way, the Judge would

15   sentence him to death and he would be placed on death row.

16   At some time down the line, Judge Cunningham would actually

17   issue a date of execution.

18                    The day prior to that actual date he

19   would be moved from the death row unit and be placed in a

20   prison unit in downtown Huntsville where, by law, all

21   executions take place.  On his date of execution the

22   procedures are the same.  He would be given time with family

23   members, maybe a minister, a last meal, but at 6:00 p.m. all

24   executions begin.

25                    He would be taken to that chamber by

force, if necessary.  He would be placed on a gurney which often appears in the newspaper.  There's leather straps constructed on it and he's secured, obviously.  There's needles placed in his arm and tubes which go to another room where the executioner sits.

At that point in time witnesses are brought in, witnesses for the victim's family and witnesses for the defendant, who will view the execution.  Once they are in place, the warden simply announces that the condemned may make a last statement and that's often reported in the news.  They can proclaim their innocence, ask for forgiveness, whatever.

After that is done, he simply signals the executioner.  And if there is no further legal proceedings, the execution takes place.  And it's simply an injection of poisons which, while he's conscious, causes his heart to stop, collapses his lungs, and he lapses into a coma 10 to 15 seconds later.

That's the method that would be carried out in this case, and it's the method that is carried out in every case.  And, quite frankly, that's our goal.  We have the type and quality of evidence, we believe, to convince a jury of this man's guilt and that those questions should be answered in a way which would result in his execution.  The defense takes the opposite view.

1        It's one thing for us to talk about the
2   death penalty in a philosophical sense, and then it's
3   another when you start thinking about actually participating
4   in this type of trial where you make a decision where
5   another human being will be executed someday.

6        And people feel differently about that.
7   Some people can do it and some people can't.  And we just
8   want to explore every juror's honest opinions on it.  I go
9   into detail because it is a real event.  Obviously, here in
10  Texas it's no secret that Texas leads the nation in
11  executions, that executions actually take place.  And that's
12  the goal of the State in this case.

13       You have told us from a philosophical
14  point of view, your personal point of view, that you do
15  believe in the death penalty.  You do believe in it for
16  accomplices.  And what I need to know is this.  As best you
17  know yourself, do you feel that you could make these
18  decisions, if the State proves it to you, could you actually
19  take pen in hand and answer those questions in a way knowing
20  that the defendant here in the courtroom would be executed
21  someday?

22       A.     Yes.

23       Q.     Why do you feel you are that type of person
24  that could do that?

25       A.     Well, I think that I'm the type of person

120

1   because I can look at information and compile it into

2   something reasonable and make a decision based on all the

3   facts.

4        Q.    Okay.  Let me talk to you now about these

5   Special Issues.  I want to go over these kind of one at a

6   time.  And what I would like you to do, you have probably

7   read them already, but just review question No. 1 and read

8   that one to yourself.

9        A.    (Prospective juror complies.)

10       Q.    That question asks the jurors to make a

11  prediction about how the defendant would behave, whether he

12  would be a continuing danger.  First of all, let me ask you

13  this.  Do you think that you could make that type of

14  prediction, if you are given enough information?

15       A.    Yes.

16       Q.    What kind of information would you want to

17  know?

18       A.    I guess you would want to know about the

19  person's history, have they shown anything towards changing

20  that pattern that they have in their life.

21       Q.    What types of things would you be looking for

22  there?

23       A.    For the changing of the pattern?

24       Q.    Yes.

25       A.    Maybe some religious belief, starting some

1  type of -- belonging to a religious community or going to

2  church or something like that where they are actually

3  changing some of their beliefs.

4       Q.     Okay.  Would that be something you would be

5  looking at after the crime or before the crime?

6       A.     It would be something that you have to look at

7  after the crime, but it also would have to be something that

8  you looked at throughout their life.  If they continually

9  had the same pattern, commit the crime, be convicted of the

10  crime, get religion, and commit a crime, do the same thing,

11  then they're still doing a pattern of events.  It's not

12  changing them.

13      Q.     So you have to see if it's a true conversion?

14      A.     That's correct.

15      Q.     Or one of those foxhole conversions?

16      A.     Correct.

17      Q.     What you said about past events, if that type

18  of evidence is available, that can come in.  Past crimes,

19  actual witnesses, that sort of thing, you can hear good

20  things or bad things about a person's character, and then

21  you also get to consider their role in the crime and the

22  evidence you heard in the guilt/innocence stage when you

23  answer that question, and then make that decision.

24           The words you see in Special Issue No. 1,

25  they will be left up to you and the other jurors, the

1   definitions.  So I want to talk to you about a couple of

2   them.  We have to prove that there's a probability that the

3   defendant would commit criminal acts of violence.  What does

4   "probability" mean to you in the context of that question?

5        A.    I guess probability would be that they would

6   possibly do it again or do something similar to what they

7   have done in the past.

8        Q.    Okay.  We get some guidelines.  We don't have

9   to prove a certainty because I don't think that we ever

10  could prove a certainty.  And then we have to prove more

11  than just a possibility, because anything could be possible.

12  They use the word "probability".  Another term that is used

13  by the courts is more likely than not by a lot of jurors.

14            Does that make sense to you, that -- as

15  far as that particular --

16       A.    Yes.  I guess it would also be based on

17  historical events.

18       Q.    Right.  You could weigh what you have seen in

19  the past and his character and then decide that way.  We

20  have to prove to you that he would commit criminal acts of

21  violence.  What do "criminal acts of violence" mean to you?

22       A.    Some type of violent act of beating, stabbing,

23  knifing, something that --

24       Q.    All right.  Any type of violence to another

25  human being?

1    A.    That's correct.

2    Q.    And then a continuing threat to society, what

3    does "society" mean to you?

4    A.    Society would be like everyday people, the

5    community on the outside, or even if he was in prison,

6    community in the prison.

7    Q.    So if he's out in everyday's society, would he

8    be a dangerous human being, as well as whether you consider

9    him dangerous in prison?

10   A.    That's correct.

11   Q.    Just kind of his mindset and what his

12   propensity for violence is, that sort of thing?

13   A.    Yes.

14   Q.    That question is answered separately and it

15   starts out with a no answer, and we have to prove to you

16   beyond a reasonable doubt it should be answered yes.  Just

17   because you found him guilty of capital murder, doesn't mean

18   you automatically answer yes.

19         What the law contemplates is a jury would

20   wait, listen to the evidence, and then make their decision.

21   Do you think that you could follow that rule of law?

22   A.    Yes.

23   Q.    Okay.  Now, No. 2.  If you would, take a

24   moment and read that one to yourself.

25   A.    (Prospective juror complies.)

Q.    This question has to do with that party
situation, the accomplice situation I talked about earlier.
The first part of the question asks whether the defendant
actually caused the death.  If you believe from the evidence
he actually caused the death, it's pretty simple.

          But the second part of the question goes
into the accomplice situation.  If they did not actually
cause the death of the deceased, but they intended to kill
the deceased, they had that intention there, that could be a
situation where you could answer it yes, or another person,
either the deceased, or if they had the intention to kill
someone, or they anticipated that a human life would be
taken.

          To get a person guilty we have to prove
that they should have anticipated.  And then to get to this
question, we have to prove that they did anticipate.  May be
the same exact evidence.  You have to look at it from that
different angle from should have to did anticipate.

          We can't open a person's mind up and show
you what their intentions are, what they anticipated.  We
just have to be able to present all the relevant evidence,
their role in the crime, and the jury can use their common
sense and reasonable deductions from the evidence to infer a
person's intent from their actions.  You can also use their
past sometimes.

1          And I guess that would be relevant, but

2   many times it comes down to their role in the crime.  Do you

3   feel that you could do that as a juror, determine a person's

4   intent, anticipation, or intent to kill, based on just their

5   actions from the crime?

6          A.     Yes.

7          Q.     And why do you feel that you can do that?

8          A.     If you look at all the evidence that you are

9   going to present or the defense is going to present, that

10  based on the actions that they have taken that there was the

11  intent, then I think a reasonable person should be able to

12  form an opinion.

13         Q.     Okay.  Again, this is a situation involving an

14  accomplice, at least the second part of the question is.

15  They didn't actually pull the trigger.  Perhaps they even

16  had the intent or they anticipated that a human life would

17  be taken.  And if we can prove that, you can answer it yes.

18             We talked a little bit about the death

19  penalty for an accomplice, I think kind of a gray matter

20  coming down to the actual facts.  But I want to cover that

21  again with you in these situations where the State is

22  prosecuting someone not as a triggerman, but solely as an

23  accomplice.

24             Again, we get to this part of the trial,

25  do you think it's fair that we prosecute someone for the

1    death penalty in this area that didn't actually cause the

2    victim's death?

3         A.    Yes.

4         Q.    And do you think this question accurately

5    addresses that type of issue?

6         A.    Yes.

7         Q.    What's important to you about anticipating

8    that a human life would be taken?

9         A.    Knowing that you are going to anticipate it or

10   planning to do it, a reasonable person probably wouldn't

11   want to take someone else's life.  But someone who is

12   planning to do it or anticipating, knows it's going to

13   occur, just to make sure that they can get away.

14        Q.    Okay.  Now, are you talking about where they

15   say situations where that's the plan from the beginning or

16   are you talking about situations that might arise?

17        A.    It could be both.

18        Q.    Okay.  And you feel both, either one, could be

19   fair as far as a death penalty situation goes?

20        A.    Yes.

21        Q.    Okay.  Again, this question starts out with a

22   no answer and has to be answered yes by the State, proving

23   the case by the same facts from the guilt/innocence stage

24   and any additional evidence you learn about their past or

25   their character.

1      We have to prove to you beyond a

2  reasonable doubt it should be answered yes.  And just

3  because you found him guilty, just because you answered yes

4  to Special Issue No. 1, does not mean you automatically

5  answer Special Issue No. 2.  You have to look at the

6  questions separately and then determine, have we proven it

7  to you beyond a reasonable doubt?  Could you do that?

8      A.      Yes.

9      Q.      Now, this last Special Issue is the mitigation

10  question.  You don't get to it unless you have found the

11  defendant guilty, unless you found he's dangerous, unless

12  you found he anticipated a life would be taken.  It kind of

13  runs on.  And I'll tell you right now, we didn't write this

14  sentence.  Someone in the Legislature did a long time ago.

15      But if you would, take a moment and read

16  that one to yourself.

17      A.      (Prospective juror complies.)

18      Q.      See what I mean, how it kind of runs on?

19      A.      Yes.

20      Q.      It's kind of a catchall.  It allows the jurors

21  to look, after they have determined these things, at

22  everything in a person's past, all the circumstances of the

23  offense, his character and background, and their personal

24  moral culpability, and then decide is there sufficient

25  mitigating evidence where you think a life sentence should

1   be imposed, rather than a death sentence.  They don't get

2   off.

3                      You would have to -- but we can't require

4   you to tell us what mitigating evidence is.  You are not

5   required to sit there and tell us what you think it would

6   be.  All you are required under the law is to be able to

7   keep your mind open to it, and if you think there is

8   sufficient mitigating evidence, you can answer it so the

9   person will get a life sentence.

10                     Do you feel this is a good question to

11  have in this type of case?

12          A.      Yes.

13          Q.      Okay.  As you sit there today, does anything

14  come to mind or strike you as potentially mitigating

15  evidence, any type of evidence that comes off the top of

16  your head?

17          A.      Let's say someone commits a crime and they had

18  all the intents, and anticipated it, but they did show some

19  remorse after it occurred, and they tried to help the

20  person, even though it all occurred at one time.

21          Q.      Okay.  You bring up an example I sometimes use

22  to demonstrate.  Maybe they were there helping and the

23  murder occurs and they stay behind to aid the individual.

24  That might be a point of true remorse, I guess, as opposed

25  to after they are arrested.

1        A.      Yes.

2        Q.      And very remorseful and that sort of thing.

3  So it may be a situation like that that you saw?

4        A.      Correct.

5        Q.      Okay.  Sometimes we talk about a person's

6  background.  In a capital case you may hear that a person

7  had a negative background.  Maybe they grew up in a broken

8  home.  Maybe they had a poor upbringing.  Maybe they even

9  had physical and mental abuse as a child.

10                And people feel differently about that.

11  You know, we have jurors that tell us that would really

12  strike a chord with me because that was not their fault.  We

13  have other jurors that say, yeah, I feel bad for them, but

14  once you are an adult making decisions and choices, you

15  still have to be held accountable.  You can't use that bad

16  past experience as an excuse.

17                How does -- what is your gut reaction on

18  that type of background information?

19        A.      My gut reaction is that, yes, I would feel

20  sorry for a person that did have a bad past, but, like you

21  have said, they're an adult.  They need to take control of

22  their own life and not shove off responsibility onto what --

23  their upbringing.

24        Q.      Okay.  Other people sometimes bring up young

25  age or old age.  And I kind of already touched on that issue

1   with you.  The younger age would not affect you as

2   mitigating necessarily, unless they were very young, I

3   think.  And that younger age, you're talking about 10 or 11?

4        A.      Yeah.

5        Q.      But 17, 18 year old, you feel those people are

6   acting as adults?

7        A.      I believe so.

8        Q.      Okay.  Again, we can't get into the facts, but

9   many times in these situations in the punishment stage, you

10  hear from experts like psychologists or psychiatrists.  They

11  may be called by the defense, maybe the prosecution, maybe

12  both sides.  They can give you information in their opinions

13  on any of these questions, the future danger, the second

14  question, whether a person anticipated, you can hear from a

15  mitigation expert that might tell you this is why this

16  person acts this way or reacts in situations because of

17  their past.  They can give you all these kinds of opinions.

18  And it's just based on their experience and degrees in these

19  fields.  And it's usually either a psychologist or

20  psychiatrist.

21              People feel differently about these

22  experts.  There's no right or wrong answers.  We have people

23  that really respect those fields and those types of experts

24  and would really value those opinions highly when

25  considering these Special Issues.  And we have other jurors

1  that actually those -- some of them call them the soft

2  sciences. They think if you look hard enough or have enough

3  cash, you could find someone that would say just about any

4  theory. And you have other jurors that kind of say, I'll

5  listen to it, but I'm not going to weigh it any way one way

6  or the other. I'm going to look at it along with the facts

7  of the offense and their past history. It's another piece

8  of the pie for me, but I don't hold them out to be, you

9  know, the most significant piece, but I wouldn't ignore them

10  either. It's something that I put in with everything else.

11              How do you feel about those types of

12  experts and those types of situations?

13      A.    I feel that they are pieces of the evidence

14  and you just have to weigh them equally with everything

15  else. Like you said, there are people that the more cash

16  you pay, the more results you get, or the favoritism that

17  you may have based on their opinion. But they are just an

18  opinion and you have to weigh that with everything else.

19      Q.    It would just depend, I guess, on the

20  particular expert?

21      A.    Not necessarily particular expert, but what

22  they are saying and whether I felt that was believable.

23      Q.    Okay. Come down to that particular person,

24  then, and their credibility and what they said?

25      A.    Correct.

1    Q.    Okay.  Let me go over just a couple of things.

2    And I'm pretty sure these -- you have heard these before.

3    The presumption of innocence.  Everyone charged with a crime

4    is presumed to be innocent and you as a juror have to start

5    the defendant out with that presumption and require us to

6    prove beyond a reasonable doubt that he's guilty.  Could you

7    do that?

8    A.    Yes.

9    Q.    That burden of proof is on the State and never

10   shifts to the defense.  You may believe that they -- you may

11   believe they are going to prove his innocence or try to or

12   these questions should be answered a certain way, but they

13   are not required to under the law and you can't require them

14   to have a burden to you.  The only requirement on a burden

15   stays here with the State.  Can you follow that rule of law?

16   A.    Yes.

17   Q.    The Fifth Amendment.  If someone wants to

18   testify in their trial, they can.  You would then judge them

19   like any other witness.  But if they choose not to, you

20   couldn't hold that against them.  There could be many, many

21   reasons why a person may not testify and the Court would

22   simply instruct you, you can't consider not testifying as

23   evidence.  Just base your decision on what you have heard

24   from the other witnesses.  Could you do that?

25   A.    Yes.

1   Q.   The parole laws, we often read about our

2   parole laws.   The Court will tell you that in a capital

3   murder situation, someone convicted, doing a capital life

4   sentence, means they will serve forty calendar years, day

5   for day, before they are eligible for parole.   But you could

6   also not consider that in your deliberations in any way.

7   That would be -- you just have to consider a life sentence a

8   life sentence.   Could you do that?

9   A.   Yes.

10   Q.   I meant to ask you this.   We always ask you if

11   you have seen any movies, TV shows, or books on the death

12   penalty and you had seen one, you couldn't remember the

13   title, about a teacher put to death for a murder?

14   A.   Yes.

15   Q.   Was that a fictional movie or one of these

16   documentaries?

17   A.   It was a fictional movie.

18   Q.   Pretty recent or did --

19   A.   It came out, I guess, about a year and a half

20   ago.

21   Q.   Is that the one with --

22   A.   I can't think of his name.   He played "K-Pax,"

23   the movie, "K-Pax."

24   Q.   I know which one.   "The Life of David Gale"?

25   A.   That's it.

134

1    Q.    I didn't see that one.  If they are about

2  Texas, I don't, because I get too mad at the unrealistic

3  nature of them.  But most people just view them as

4  entertainment.  What were your views on it?  As I recall

5  when I was reading that at the store, it looked like he had

6  been a teacher or professor against the death penalty and

7  someone had conspired to --

8    A.    Yes, it was a whole conspiracy --

9    Q.    Yes.

10   A.    -- against the death penalty.

11   Q.    Okay.  Any thoughts on that?

12   A.    Well, it was entertainment.

13   Q.    Okay.  You don't think we're conspiring or

14  anything?

15   A.    No.

16   Q.    Usually, that's what those shows have.  They

17  have these big conspiracies and I've been doing this almost

18  20 years and I've never seen one pulled off myself.  But

19  they are pretty good entertainment.

20         Going over a lot of stuff.  Do you have

21  any questions over anything we've gone over?

22   A.    Not right now.

23   Q.    Okay.  You feel, though, you could make these

24  decisions, keep your mind open to everything, and if the

25  evidence falls one way or the other, you could answer those

1    questions honestly?

2           A.     Yes.

3           Q.     Okay.  I appreciate your patience.

4                  MR. SHOOK:  That's all we have, Judge.

5                  THE COURT:  Mr. Sanchez?

6                  MR. SANCHEZ:  Thank you, Your Honor.

7                       CROSS-EXAMINATION

8    BY MR. SANCHEZ:

9           Q.     How are you, Mr. Wingate?

10          A.     Fine.

11          Q.     Tired of answering questions yet?

12          A.     Yes.

13          Q.     I'm not going to be as long as Mr. Shook,

14   because he's done a good job of explaining the law.  Do you

15   want any water before we go on?

16          A.     No, I'm fine.

17          Q.     I notice that you spent a large part of your

18   life in Tucson?

19          A.     Yes.

20          Q.     Did you go to high school there?

21          A.     Yes.  Palo Verde.

22          Q.     I've only been through Tucson.  Do they still

23   have the Toros, the baseball people?

24          A.     Yes.

25          Q.     The minor league team?

1   A.    As far as I know.  I haven't been back a

2   number of years.

3   Q.    Did you see them when you were growing up?

4   A.    Yes, I did.

5   Q.    I remember them, because I think they were the

6   minor league team for the Oakland A's when I was a kid, and

7   Burt Campanero was one of my favorite players.  And I got to

8   see him, because I grew up in Sacramento and the Toros would

9   come play there all the time.  So I thought -- a little

10  insight for you.

11          Let me get to why we're here.  Of course,

12  you were brought up here because we looked at a lot of

13  questionnaires and there were some people that said, I could

14  never give the death penalty under any circumstances.  They

15  are not going to be on the jury.  And we're not even going

16  to talk to them.  And there's other people that say, I would

17  give it in every single crime, every single murder, and

18  that's just the way I believe, and those people can't be

19  fair to both sides, so we're not going to bring them up and

20  talk to them.

21          But we looked at your questionnaire and

22  we said, this is somebody that we need to talk to because he

23  seems fair.  And that's what this whole process is about,

24  having twelve people on that jury who can look at the

25  evidence and not prejudge the case, and have not already

made up their mind about certain things, and base your decisions solely on what they hear in the courtroom.  Okay?

And, actually, the stance of the law is that you, as a juror, to be a fair juror, you have to sit in the jury box and say, the way I'm sitting here right now, I'm going to presume him to be innocent and I'm going to find him not guilty unless the State can prove it to me beyond a reasonable doubt that he is guilty.  Does that make sense to you?

A.     Yes, it does.

Q.     Do you agree with that?

A.     Yes, I do.

Q.     And if I do find him guilty, it doesn't mean I'm going to give him the death penalty.  It means all he is, is sitting on a life sentence.  Okay?  And unless you can prove those issues to me to be -- Special Issue No. 1, to be yes, Special Issue No. 2 to be yes, and Special Issue No. 3 to be no, then and only then will the death penalty be given.

In other words, you have to be fair, but at the same time as a juror you have to sit there and hold the State to their burden before anyone can receive the death penalty.  What do you think about that?

A.     I think that's correct, that the State should have to prove their case.

1    Q.    Because we get some people who come in here

2 and say, once I have found somebody guilty of capital

3 murder, why are we even talking about these Special Issues?

4 It's the death penalty.  That's the way it should be.  Do

5 you think that way at all?

6    A.    Well, no.  I think that they have to prove

7 those circumstances.

8    Q.    All right.  We talked a little bit about media

9 coverage and you said that you had heard something about it?

10    A.    Yes.

11    Q.    And one thing we always ask people is, we know

12 they have heard about it and they say they can put it out of

13 their mind and decide the case solely on what they hear in

14 the courtroom.  But the question I would like to ask is,

15 based on what you have heard, have you formed any opinions

16 as to guilt or innocence or what may have happened?

17    A.    The only opinion that I guess I have is that

18 there was a police officer killed and the events that led up

19 to it or that occurred at that time, there weren't -- they

20 were not really explicit in the newspaper or on television

21 that I saw.  And I always take everything that the TV and

22 the newspaper puts out with a big grain of salt because they

23 like to glamourize.

24    Q.    I agree with you on that.  But I have to ask

25 that because sometimes people say, well, based on what I

1   have heard, I have already formed the opinion that he may be

2   guilty or formed an opinion that it happened this way.  And

3   once I sit on the jury, I'm going through that thought

4   process.  But you wouldn't do that?

5            A.      No, I would not.

6            Q.      Like Mr. Shook said, the burden is always on

7   the State.  Us, at the defense table, people use the example

8   all the time, we can sit here and do a crossword puzzle

9   while the trial is going on and it wouldn't affect the

10  burden on the State.  In other words, you have to look to

11  them in order to convince you.  You can't look at the

12  defense in order to prove someone's innocence.  What do you

13  think about that?

14           A.      I think that's correct.

15           Q.      And that extends throughout the trial, not

16  only in the guilt/innocence portion of the trial, that

17  extends into the punishment phase in answering these Special

18  Issues.  And the reason I ask that, because sometimes jurors

19  will say, you know, now that we're in the punishment stage,

20  we're deciding whether somebody gets life in prison or the

21  death penalty, I may need to hear from the defendant or I

22  may need to hear from the defense to somehow convince me

23  that I shouldn't give him the death penalty.  What do you

24  think about that?

25           A.      Well, you know, I think the burden is always

1  on the State, like we've already discussed.  It may not hurt

2  to have the defendant say something, but that doesn't

3  necessarily mean he has to.

4        Q.     So you wouldn't require it?

5        A.     No.

6        Q.     And that's what we have to ask.  There's some

7  people who say at this point, if he doesn't say anything or

8  if the defense doesn't present any evidence, then they are

9  telling me that they may agree that he should get the death

10  penalty or something to that extent.  Some people think

11  that, not saying you would.

12        A.     Right.

13        Q.     That's why I ask those questions.  And as Mr.

14  Shook explained to you, all those issues are supposed to be

15  answered independently of one another.  In other words, just

16  because you find someone guilty of capital murder, doesn't

17  necessarily answer those Special Issues in any certain way.

18  Some jurors believe, well, I found him guilty of capital

19  murder.  I found him guilty of killing a police officer.

20  Then the Special Issue No. 1 to me has been answered, just

21  solely on the fact that I found him guilty of capital

22  murder.  What do you think about that?

23        A.     As our Special Issues -- so they would have to

24  present information regarding each one of the Special

25  Issues.

1    Q.    And you would answer that independently of

2 your verdict?

3    A.    That's correct.

4    Q.    And, again, Special Issue No. 2, we're talking

5 about what somebody actually was thinking in their mind,

6 what their intent was.  You wouldn't require the defendant

7 to get up on the stand and say, I didn't anticipate, before

8 you could answer that question?

9    A.    No.  I would not require the defendant to get

10 up on the stand.

11    Q.    You would be able to tell the State, you have

12 to prove that to me beyond a reasonable doubt?

13    A.    Correct.

14    Q.    And Special Issue No. 3, you see value in that

15 question?

16    A.    Yes, I do.

17    Q.    What value do you see?

18    A.    Well, the moral culpability, sufficient

19 mitigating circumstances, those reasons for why maybe this

20 should be a no answer -- or a yes instead of a no.

21    Q.    The way a lot of times it's characterized is

22 that is the last step.  That's the safety net.  Jurors can

23 get involved in finding someone guilty of capital murder,

24 find they are a future danger, find that they anticipated,

25 you know, that a life would be taken, but they still see

1   something about the person, about the situation, about

2   something that you may have never thought about that you

3   would say to yourself, this person should not receive the

4   death penalty.   That's usually the way people characterize

5   it.   I guess that makes sense to you, also?

6         A.    Yes.

7         Q.    Feel that way, too?   Okay.   So basically, I

8   mean, as I'm sitting here at this table, are you the type of

9   person that can sit on this jury, listen to the case,

10  knowing that it may or may not receive media attention,

11  knowing that the State's efforts are going into getting

12  their questions to be answered the way they want them to,

13  but if they weren't proved to you beyond a reasonable doubt,

14  are you the type of person that could answer them --

15        A.    Yes.

16        Q.    -- in a way that would result in a life

17  sentence?

18        A.    If I believe that's what should be, yes.

19              MR. SANCHEZ:   I have nothing further.

20  Thank you.

21              THE COURT:   Thank you, Mr. Wingate, wait

22  for us outside and I'll have you back in just a minute.

23              [Prospective juror out]

24              THE COURT:   What says the State?

25              MR. SHOOK:   We have no challenges for

1  cause.

2                              MR. SANCHEZ:  No challenge for cause.

3                              THE COURT:  Would you like to step into

4  your office?

5                                  (Recess)

6                              THE COURT:  What says the State?

7                              MR. SHOOK:  We'll use a strike.

8                              THE COURT:  Bring him back in.

9                          [Prospective juror in]

10                             THE COURT:  Mr. Wingate, thank you for

11 your time and service to this Court.  I'm going to inform

12 you that you shall not be seated on this jury.  Thank you so

13 much.  You are free to go.

14                         [Prospective juror out]

15                             THE COURT:  Sharon Lynn Huggins.

16                         [Prospective juror in]

17                             THE COURT:  Good afternoon.  We have

18 juror No. 2042, Ms. Sharon Lynn Huggins.  Is that pronounced

19 correctly?

20                             PROSPECTIVE JUROR:  Yes.

21                             THE COURT:  Welcome to the 283rd.  Sorry

22 we're delaying in getting you in, but you knew you were in

23 for at least half a day jury service.  We don't know if

24 we're going to talk to someone for a couple of hours or 30

25 minutes and it's hard to predict.  So I have to weigh the

1  balance between 15 people waiting or one.  So you were the

2  one.  I'm sorry.

3              PROSPECTIVE JUROR:  That's fine.

4              THE COURT:  At least you had enough time

5  to read the guide I have provided for you?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  I hope you reviewed your

8  questionnaire that you filled out for us in May.  The

9  attorneys are going to go over that in more detail and

10 hopefully you will have a better understanding of how all

11 that law relates.  It can be complicated at this point.  All

12 you have to do is have an open mind.

13             And at the end of the process I have two

14 questions to ask.  Number one is, do you understand the law?

15 Number two, can you follow the law?  That's my big picture

16 here.  Only question I have for you at this time is, will

17 you be able to serve this Court for two weeks beginning on

18 November 10th?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  Thank you.  Mr. Wirskye?

21             MR. WIRSKYE:  May it please the Court.

22             SHARON HUGGINS,

23 having been duly sworn, was examined and testified as

24 follows:

25             DIRECT EXAMINATION

BY MR. WIRSKYE:

     Q.    Ms. Huggins, how are you today?

     A.    Very good, thank you.

     Q.    Again, thanks for waiting.  Kind of
unfortunate, but you are the last person today.  So what I
would like to do is take some time and follow up on some of
the information with you on your questionnaire that you were
kind enough to provide us in our 17-page questionnaire, talk
to you a little bit about your thoughts and feelings about
the death penalty, and then talk about some of the rules and
some of the laws that apply in any criminal case, and, more
particularly, a death penalty case like this.

              What did you think when you got notified
that you had to come down for an individual interview on a
death penalty case?

     A.    I wasn't -- I didn't know that it would be
individual.  I didn't really realize.

     Q.    It's quite a setup we have for you, isn't it?
We stick you up on the witness stand.  You feel like you are
on trial.  Because it's a death penalty case, the law says
that we talk to each juror individually and it's kind of the
best way to make use of the courtroom.  I know it's not real
natural and some people find it intimidating, but I
apologize for that.

              But any particular thoughts about

1   potentially being a juror on a death penalty case?

2          A.     No.  I've thought a lot about it since I

3   filled out the questionnaire and I think it's probably the

4   most difficult jury service you have to do, but --

5          Q.     Undoubtedly it is.  A lot of people typically

6   reflect on it once they come down here and fill out the

7   questionnaire and then get the call to come back.  What else

8   have you thought about?

9          A.     Well, I thought about some of the questions

10  that were in the questionnaire and thought about how I would

11  feel, if I was really a juror on this case.

12         Q.     How would you feel?

13         A.     I think it's a very serious responsibility and

14  I think that you have to really go in it with an open mind

15  and really review the evidence.  And I think for the justice

16  system to work, you have got to give the person the benefit

17  of the doubt and go into it openminded and try to make a

18  judgment based on the evidence and do the best that you can

19  as a juror to make the system work.

20         Q.     We realize, I think both sides, that this

21  isn't necessarily everyone's cup of tea.  Some people would

22  be fine on juries on any other case other than a death

23  penalty case.  And we're going to talk about that more in

24  just a minute.  But do you have any concerns or hesitations

25  that this might not be the perfect case for you to be a

1  juror on?

2      A.      I don't know that there is a perfect case, but

3  I don't have any reservations about being a juror on this

4  case.

5      Q.      Okay.  Fair enough.  I know you work at TI; is

6  that right?

7      A.      Yes.

8      Q.      What do you do at TI?

9      A.      I'm a process engineering technician, so I do

10 a lot of data analysis.  It's hard to explain what I do, but

11 it's a wafer fab, so we do semiconductor manufacturing.  We

12 are making integrated chips that go into cell phones and

13 digital cameras and things like that, so we actually make

14 the devices that go in there and control them.

15     Q.      Okay.  Is a normal day for you looking at a

16 computer, looking at data, talking to people, or all of the

17 above?

18     A.      Yeah.  I spend a lot of time in the fab doing

19 training with our other technicians.  I do special projects,

20 so I do a lot of training with the manufacturing people who

21 actually run the equipment.  And I do a lot of data

22 analysis, going through and monitoring our process as it

23 goes -- our material, as it goes through and making sure

24 it's all correct.

25     Q.      Okay.  And what plant do you work at?  North

148

1  Central?  Forest Lane?

2      A.      I work at the DMOS VI, which is at the main

3  campus off 635.

4      Q.      The reason I ask is my dad was at TI for 25

5  years.  And when I was in undergraduate school for a summer,

6  he got me a job as an unpaid intern in the quality assurance

7  in the defense systems group.  And it was enough to convince

8  me that I needed to go to law school or do something else,

9  other than quality assurance in that type of business.  And

10  you are new to Texas, aren't you?

11      A.      I've been in Texas for a long time.  I just

12  moved to Dallas.

13      Q.      Moved to Dallas.  That's right.  You were in

14  Corpus Christi?

15      A.      Uh-huh.

16      Q.      What brought you to Dallas?

17      A.      There's not a lot of semiconductor

18  manufacturing in Corpus, so I moved up here to get more in

19  -- better potential for jobs in manufacturing engineering.

20      Q.      Let's see.  Kind of getting back to your

21  questionnaire just a little bit.  On the death penalty you

22  told us you are generally in favor of the death penalty?

23      A.      Yes.

24      Q.      What purpose do you see or why do you think we

25  should have it available as an option in our society?

1          A.     I think that some people are not going to

2    respond to being in prison.  I don't think -- I think there

3    are some people that just are not rehabilitatable and that

4    they should -- that is a -- it's also a deterrent to other

5    people.

6          Q.     Sure.  That's what we commonly hear.  I know

7    the first page of your questionnaire you talk about some

8    crimes warrant the death penalty.  I'm just curious in your

9    mind what comes to mind when you think about an appropriate

10   type of crime for the imposition of the death penalty?

11         A.     I think if it's premeditated, if you intended

12   to do this, if you planned on doing it, I think that

13   warrants a stricter punishment.

14         Q.     Would you limit the death penalty just to

15   cases where a life was taken, just murder cases?

16         A.     I think so, yes.

17         Q.     Okay.  And you have had a chance to read our

18   packet.  That's how we have it in Texas.

19         A.     Yeah.

20         Q.     You can only get a death penalty for a murder

21   case and then only certain types of murder cases.  Are there

22   any cases that you followed in the media, maybe, heard

23   about, read about, that come to mind, a particular case when

24   you think about an appropriate case for the death penalty?

25         A.     Not offhand.

Q.    Okay.  Fair enough.  Like I said, the type

cases we reserve it for in Texas, an intentional murder in

the course of another felony like a robbery, burglary, or

rape.  If you kill a certain person, a child under six, a

police officer, a fireman, prison guard, that type of thing.

If you commit mass murder, serial murder, murder for hire,

hire somebody to kill your spouse or your business partner,

something like that.

Does that pretty much comport or in

agreement with how you see the system should work in terms

of what types of cases the death penalty should be available

for?

A.    Yes.

Q.    Okay.  Let me kind of take you now to the next

level with you.  We talked to quite a few people in favor of

the death penalty.  But in certain circumstances I know some

people draw a line.  What I mean by that is this.

Oftentimes crimes are not committed by

just, you know, one person.  You have groups or gangs of

people that commit a crime.  The law in Texas allows us to

prosecute everybody that was actively involved in the crime,

whether it be a shoplift, all the way up to a capital

murder.

When you are talking about something like

a capital murder with multiple people involved, it may be a

1   situation where you just have one person that actually

2   caused the death, one person that pulled the trigger, for

3   lack of a better term, the triggerman, the guy that caused

4   the death.  You may have -- another word you have probably

5   heard of, accomplices, that are actively involved, but

6   didn't actually pull the trigger, the nontriggermen.

7               A lot of people we talk to when it comes

8   to the death penalty would just reserve the death penalty

9   for the triggerman, the person that caused the death.  And

10  if it were up to them, they would completely take the death

11  penalty off the table for that group of accomplices.  For

12  whatever reason, religious, moral, ethical, they just don't

13  think for an accomplice the death penalty is warranted.

14              Other people, you know, would keep the

15  death penalty available as an option for both types of

16  people, triggermen and nontriggermen.  I'm curious where you

17  come down on that issue?

18      A.      I think it would depend on the circumstances.

19  If it was a planned robbery, for instance, and everyone

20  involved was aware that there were weapons, they all had

21  weapons, for instance, then I think that there has to be

22  some thought that they might use those weapons.  So I think,

23  depending upon the circumstances, it could be either way.

24      Q.      Okay.  And that's kind of what the law says.

25      A.      Yeah.

Q.    It depends on the circumstances.

A.    Yes.

Q.    And I'll be very frank with you, the reason I go into it is we're prosecuting this case under that theory, that Mr. Murphy is an accomplice, a nonshooter.  In Texas we call it parties to an offense, which you probably know it as an accomplice.

And that's why we talk to people, because there are some people who, if it were up to them, they would -- just wouldn't have the death penalty as an option at all for these accomplices.  Kind of what I hear you saying is that it would just be a case by case determination when it comes to accomplices; is that correct?

A.    Yes, I believe so.

Q.    And that's pretty much what the law says. Just to kind of follow up on your example, say Mr. Shook and I, the other prosecutor, decide we're going to rob the bank. The plan is we've got one pistol.  He's going to take it in, hold up all the tellers.  I'm going to come in with a bag and kind of empty the money drawers while he holds everybody up.

During the course of that bank robbery, for whatever reason, maybe somebody looks funny at him or I see somebody going for an alarm and I tell him, hey, somebody is going for a silent alarm, he intentionally

1    shoots and kills the teller.  He's committed a capital

2    murder, an intentional murder in the course of the robbery.

3    He can be convicted of that and ultimately, potentially face

4    the death penalty.  Under our laws I could, too, the bagman,

5    the accomplice.

6              What do you think about that type of

7    scenario under the law?

8         A.    I think that it's probably appropriate.  I

9    mean, you are committing the offense together, then I think

10   the punishment should, if you plan it together, then you

11   probably discussed what you are going to do and whatever.

12   It's --

13        Q.    Going back to our example.  And the law, you

14   know, if I actively aid him, direct him, recruit him,

15   solicit him, to commit a capital murder, I can be found

16   guilty as an accomplice.  Under my example, under the law of

17   conspiracy, we got together and conspired to commit a bank

18   robbery, which just means we agreed to commit a bank

19   robbery, and if a murder happens during the course of that

20   bank robbery, if I should have anticipated that a life would

21   be taken, then I could be found guilty of capital murder.

22              And that sounds like where you are.  You

23   know, a lot of people say, well, I was the accomplice, I

24   went in, and I knew the gun was loaded, I should have

25   anticipated that this could happen, that a life would be

1   taken in the course of that robbery.  It's kind of what I

2   hear you saying; is that right?

3        A.    Yes.

4        Q.    And that's what the law is.  You can convict

5   someone of capital murder, if they should have anticipated

6   that a life would be taken.

7             Let me talk to you generally about some

8   of the procedures we have.  All criminal trials in Texas,

9   even capital murder, are done in two different phases.  The

10  first phase of the trial is the guilt/innocence phase.

11  That's where you just mainly are concerned about whether the

12  guy is guilty, whether he committed the crime we charged him

13  with, whether we have proven to you beyond a reasonable

14  doubt the person is guilty.

15            If you find the person guilty of capital

16  murder, then you move into the second phase of the trial,

17  which is the punishment phase.  And that's where these three

18  questions come in that I know you had a chance to look at.

19  They are called Special Issues.  They are basically three

20  questions.  Just kind of in a nutshell, the first one asks

21  whether the person is a future danger.  The second one kind

22  of deals with the situation we just talked about, where you

23  have an accomplice, the person that doesn't actually cause

24  the death.  And the third one deals with mitigation.  Is

25  there anything mitigating?

1    If the questions are answered yes,

2  there's that future danger, and, yes, at least he

3  anticipated a human life would be taken, and, no, there's

4  nothing mitigating, then that would call for a death

5  sentence.  We don't ask a juror to, you know, write in death

6  sentence or write in life sentence.  We kind of let the

7  answers to these questions determine the appropriate

8  sentence.  Does that make sense to you?

9    A.    Yes.

10    Q.    And one of the reasons I go into this is

11  because I know you talked -- we talk to a lot of people who

12  are, I guess, are philosophically in favor of the death

13  penalty and we talk about it in the abstract, it's one

14  thing.  But when you get down here to this point, it becomes

15  a little more real and you are actually looking at somebody

16  charged with capital murder, a living, breathing human.

17    Being very frank, you know, it's our

18  goal, we feel that we have the nature and type of evidence

19  that we're going to convince a jury he's guilty and convince

20  a jury those questions should be answered in such a way that

21  he will ultimately be executed one day.

22    We know sometimes when you get down to

23  this point of the process, it kind of becomes, again,

24  something very different.  It's not everyone's cup of tea.

25  Frequently -- growing up in Texas, you probably know that

1  Texas routinely leads the states, year after year, in the

2  numbers of executions.  Juries assess the death sentence and

3  it's actually carried out in Texas.  It's frequently

4  reported, you know, in the newspaper.

5          The procedures in all death penalty cases

6  in Texas are the same.  Those are the type of details you

7  see reported in the paper.  If the questions are answered

8  yes, yes, and no, the Judge has no discretion.  The person

9  is sentenced to death.  He would be taken immediately down

10  to death row, which is in the Livingston Unit down in

11  southeast Texas.  He would wait there until at some point in

12  the future, I can't tell you when, at which time Judge

13  Cunningham would issue a date of execution.

14          And on that date he would be taken from

15  death row to the main prison in Huntsville, Texas, where all

16  executions take place.  He would be kept in a holding cell

17  outside the death chamber.  On that date he would be given a

18  chance to meet with friends, family members, loved ones, a

19  spiritual advisor, that type thing.  He would be given a

20  last meal.

21          As it got close to 6:00 p.m. in the

22  afternoon on that day, which is the time that all executions

23  take place in Texas, he would be moved from that holding

24  cell to the actual death chamber, whether he wanted to go or

25  not, voluntarily or involuntarily.  The guards are trained

to take him in.  You may have seen pictures of the death

chamber.  It's got a gurney on it and he will be taken in

and strapped down, again, voluntarily or involuntarily.

An IV would be started.  There would be

witnesses, people there for him and also people there for

the victim to witness the execution.  Once the IV was

started, the warden would come in and give him a chance to

make a last statement.  He may beg for forgiveness.  He may

proclaim his innocence.  He may be meek.  He may be defiant.

At some point after the statement is

over, the warden will nod to the executioner, the

substances, lethal substances, would be released into the IV

that would very quickly shut down his heart and lungs.

Quickly after that he would lose consciousness and fall into

a deep coma and ultimately die.

I go through that not to be morbid, but

just to let you know kind of the details that are reported

in the press and just kind of what you are getting into.  We

have some people that tell us, you know, gee, I just don't

want that on my conscience.  I'm not cut out for this, you

know.

So, again, before we go any further, I

want to make sure that you are comfortable that you are the

type person that could take pen in hand and answer those

questions in such a way that will ultimately result in the

1    death of another human being?

2         A.    Yes.

3         Q.    Okay.  Fair enough.  Just about everybody we

4    talked to, you have indicated that you have heard something

5    about this case.

6         A.    Yes, I have.

7         Q.    It's typical in a high profile case like this.

8    What the law says is that, you know, it doesn't require us

9    to look for twelve people that haven't heard a word about

10   this case.  Otherwise, we would never get a jury in cases

11   like this.

12              What the law says is, for a juror to be

13   qualified, even if they may have heard something about the

14   case, even if they may have formed some impressions or some

15   opinions, as long as they can kind of set them aside or push

16   them to the back of their mind and just base their verdict

17   in the case based on the facts and evidence they hear in the

18   courtroom, they would be able to be a qualified juror, as

19   long as what they have heard wouldn't influence their

20   verdict, basically.  Does that make sense to you?

21        A.    Yes, it does.

22        Q.    Is that something that you think you can do?

23        A.    Yes, I could.

24        Q.    What do you remember, exactly, hearing about

25   this case?

1     A.     I remember the reports when Officer Hawkins

2  was killed.  I've heard a few reports on trials beginning or

3  ending.  I remember some of the reports from the search.

4     Q.     Okay.  So you feel like you have any grasp of

5  the details or kind of generally what you hear on the media?

6     A.     Just a general overview of what happened,

7  nothing specific.

8     Q.     You have followed some of the subsequent court

9  proceedings?

10     A.     Only hearing when the trial started and ended.

11     Q.     Okay.

12     A.     Not any of the details of --

13     Q.     Do you think if you were selected as a juror,

14  you could be fair and give both sides a fair trial?

15     A.     Yes, I think I could.

16     Q.     Okay.  I know you mentioned on the last page

17  of your questionnaire it might be difficult for you to be

18  away from work for two weeks.  Do you think if we're far

19  enough out, if you could get selected as a juror, you could

20  make arrangements and could do that now?

21     A.     Yes.  I'm just an incurable workaholic, so.

22     Q.     You are kind of like our Judge in that

23  respect.  He makes us work business hours.  You have access

24  to a phone.  Unless you are in the middle of deliberations,

25  you won't be sequestered or taken to a hotel or something

1  like that.  You will be away from work during the day, but
2  sounds like you could make arrangements and get through
3  that; is that correct?
4        A.     Yes, I could.
5        Q.     Let's go back and talk about the Special
6  Issues in a little more detail.  I know you have had
7  probably an hour and forty-five minutes to read that packet
8  of law, but they are phrased a little bit differently up on
9  the wall.  If you could, just take a moment or two and read
10 through those Special Issues.
11       A.     (Prospective juror complies.)
12       Q.     Have you had a chance to read through them?
13       A.     Yes.
14       Q.     Special Issue 1, again, that's the future
15 danger question.  We ask kind of a juror to decide whether
16 there's a probability that the defendant would commit
17 criminal acts in the future that would constitute a threat
18 to society, the future danger question.  Do you see how that
19 question kind of asks you to make a prediction about future
20 behavior?
21       A.     Yes.
22       Q.     Is that something that you think you can do,
23 given enough information to make that type of prediction?
24       A.     Yes.
25       Q.     Okay.  What type of information do you think

1    you would want to know in order to answer that question?

2         A.     I think something in the history of the

3    person.

4         Q.     Criminal history, if it exists, that type of

5    thing?

6         A.     Yes.

7         Q.     That's frequently what people tell us.

8    Anything else you can think of?

9         A.     Um, if someone can testify to his character

10   and his actions in the past, not necessarily criminal

11   actions, but activities he's been involved in, things like

12   that.

13        Q.     Typically those are the type of things, if

14   they exist, that you get to hear in that second phase.  The

15   rules of law are broader and allow you to hear that type of

16   evidence to answer those questions.

17              A lot of the words and terms in these

18   questions are not necessarily defined for us.  The law kind

19   of relies on jurors just to give them the everyday common

20   sense meaning.  I'm just curious, when you look at the word

21   "probability", kind of how would you define that word?

22        A.     I think if the character of the person and the

23   actions, the previous actions, indicate that they are --

24   there's a -- like a continuation of a certain type of

25   behavior, then you had a probability.

1  Q.   That's what a lot of people tell us, that, you

2  know, more likely than not, if there's a likelihood that

3  that could continue, that type of thing.  Does that make

4  sense to you?

5  A.   Yes.

6  Q.   All the guidance the law gives us is something

7  less than a certainty.  We could never prove anything to a

8  person to a certainty, but something more than a

9  possibility, because, again, anything is possible.  Sounds

10  like that's something that you are comfortable with?

11  A.   Yes.

12  Q.   When you see that phrase "criminal acts of

13  violence," what kind of things come to mind for you?

14  A.   Um, sexual assault, rape, someone beats

15  another person.

16  Q.   Okay.  Sounds like anything that maybe

17  involves assaultive behavior?

18  A.   Yes.

19  Q.   Threats or threats of force, that type of

20  thing?

21  A.   Yes.

22  Q.   We don't necessarily have to prove to you that

23  he's going to kill again or kill someone else or be involved

24  in another capital murder, just that, you know, there's a

25  probability that there'd be criminal acts of violence.  Does

1    that make sense to you?

2          A.     Yes.

3          Q.     Okay.  Finally, the last word in that

4    question, "society."  Again, that's not necessarily defined.

5    The law kind of leaves it up to each individual.  I'm just

6    curious how you would define "society"?

7          A.     The community you are in, the people you are

8    around.

9          Q.     Okay.  Everybody and anybody you might come

10   into contact with?

11         A.     Yes.

12         Q.     When you are talking about a defendant in a

13   criminal case, would you include society behind bars, prison

14   society?

15         A.     Yes.

16         Q.     Wardens, guards, teachers, that work behind

17   bars, that type of thing?  Okay.  This question starts off

18   with a no answer.  That's kind of the default setting on

19   this.  And the second question also starts out with a no

20   answer.  And as part of our burden of proof as the State to

21   prove to you as a juror that the answer to those questions

22   should be yes.  Okay?

23                The answer starts off with a no and

24   basically stays with a no, unless we meet our burden, unless

25   we can prove to you the answer should be yes.  Does that

1    make sense?

2         A.    Yes.

3         Q.    And basically what the law contemplates, I

4    think, even though you may have found somebody guilty of

5    capital murder in the first phase of the trial, that you

6    start that second phase of the trial with an open mind, that

7    you don't have any -- you have not automatically jumped to

8    conclusions and answered any of these three questions.  Does

9    that make sense to you?

10        A.    Yes.

11        Q.    Because, very frankly, some people tell us

12   that they couldn't follow the law in that respect and they

13   say, hey, if I found somebody guilty of capital murder, you

14   know, when I know I'm supposed to have that open mind, but

15   when I get to that second phase, my mind is closed.  I'm

16   always going to think they are a future danger because I've

17   convicted them of capital murder.  I'm always going to

18   answer that yes.  It's automatically answered for me every

19   time.

20                    If you feel that way, that's fine.  You

21   wouldn't be able to be a qualified juror, because you

22   wouldn't be able to have that open mind.  Does that make

23   sense to you?

24        A.    Yes, it does.

25        Q.    Of course, you may go back and look at the

1  facts of the crime and that may really help you answer that

2  first question.  You may not think about it long, but

3  nevertheless kind of the overarching point is you have to

4  have that open mind and just can't do anything

5  automatically.  Does that make sense?

6      A.    Yes, it does.

7      Q.    Okay.  Special Issue No. 2, again, that's the

8  situation we talked about with the accomplices.  It's kind

9  of a wordy question.  We didn't write these questions.  Your

10  state Legislature did.  Some people have complained about

11  the grammar in the questions.  We apologize.

12          That question basically breaks down into

13  three different parts.  If you think he actually caused the

14  death, if you think he's the triggerman, it's easy to

15  answer.  Or if you think he intended to kill that person or

16  another person, you would answer yes.  Or, in this case,

17  kind of what we already talked about, that last line,

18  anticipated that a human life would be taken as the

19  standard.

20          And, if you will recall, in order to

21  convict someone of capital murder, the standard is that you

22  had to find that person should have anticipated that a life

23  would be taken.  By the time we get to the second phase of

24  the trial, you are talking about the death penalty, the law

25  imposes a little higher burden on us, and we have to prove

1   not only that they should have anticipated, but they did

2   anticipate.   You see kind of the distinction between those

3   two?

4       A.     Yes, I do.

5       Q.     A lot of people, you know, don't see much of a

6   distinction between them.  But I can give you this example,

7   at least.

8               When I was 16, my dad bought me a car,

9   and for about three or four weeks I drove it like a madman.

10  I had no business having a car at 16.  But as you can well

11  guess, I tore it up and wrecked it out after a month.

12              My dad was real mad at me and he said,

13  you know, you should have anticipated the way you were

14  driving, this would happen.  And I should have anticipated,

15  looking back on it.  But I didn't actually anticipate it.  I

16  was too young and too dumb.

17              So I think that may be a good example of

18  the distinction between should have and actually

19  anticipated.  Does that make sense to you?

20      A.     Yes.

21      Q.     Again, that starts off with a no answer.  It's

22  up to us to prove to you that the answer should be yes

23  beyond a reasonable doubt.  If those two issues are answered

24  yes, then you move to the final one, Special Issue No. 3,

25  the mitigation question.

1            And, again, what this kind of is, is the
2   last step in the process.  You can think of it as a safety
3   net.  The law kind of asks you as a juror to step back, take
4   a deep breath, look at everything you have heard from the
5   first phase through the second phase, the facts of the
6   crime, what you found out about him, the character,
7   background, and look at what sort of personal or moral
8   culpability he has, how much blame does he bear for the
9   crime, and ask yourself if there's anything mitigating, if
10  there's anything that lessens his blame?  And if there is,
11  is it sufficient that his life ought to be spared, that he
12  ought to be given a life sentence instead of the death
13  sentence?  Does that question make sense to you?

14       A.       Yes, it does.

15       Q.       Can you see why we have that question?  Do you
16  see the value in that question?

17       A.       Yes, I do.

18       Q.       Okay.  Again, some people tell us, you know,
19  especially at this late stage of the process, they say, hey,
20  I found somebody guilty of capital murder, I found they are
21  a future danger, I found they anticipated a life would be
22  taken, when I get that far in the process my mind is closed
23  to No. 3.  You know, at that point I'm never going to find
24  anything mitigating.

25            If you feel that way, again, that's fine.

1    You just wouldn't be qualified to be the juror because you

2    didn't have that open mind.  So I want to make sure you see

3    the value in it and that you would be able to tell us, even

4    at that last stage, that you could keep an open mind to that

5    question?

6         A.    Yes, I could.

7         Q.    I know you don't sit around thinking about

8    these things, or at least I hope you don't, but is there

9    anything that strikes you as potentially mitigating in these

10   type cases, capital murder cases?

11        A.    Nothing offhand, but I know that every case is

12   different and there are circumstances that would make that

13   answer different.

14        Q.    And that's the most common response we get,

15   because I don't think you sit around thinking about this.

16   But the law says you don't have to come up with anything

17   that is particularly mitigating.  The law says you don't

18   have to necessarily consider any one factor mitigating or

19   not.  We just kind of leave it up to you as an individual

20   juror.  You could get back there in the jury room and

21   disagree with the other jurors as to what you think is

22   mitigating.

23            Some people tell us maybe a person's age.

24   You know, if they were young, that may be potentially

25   mitigating.  Other people think, no, you know, you are old

1  enough to make choices.  You're an adult.  You know the

2  difference between right and wrong.  A person's age is not

3  mitigating.  Where do you kind of fall on that issue?

4        A.     I think that depends on the person, as well.

5  Some people are very mature at 15 and some are not very

6  mature at 22.  So, I mean, I think it depends on the

7  individual and the circumstances surrounding what's

8  occurred.

9        Q.     Some people tell us maybe if they had a bad

10  upbringing like an abusive childhood, physical or emotional,

11  that that could be potentially mitigating in their view.

12  Other people, kind of the opposite end of the spectrum, say,

13  no, my heart goes out to you that you had a bad upbringing,

14  but at some point you have to get past it and you have free

15  will.  You can make choices, that type of thing.  And I

16  don't consider that mitigating.  Where do you kind of fall

17  on that issue?

18        A.     Probably more toward you have to get past

19  that.  I think there's some people who have had things

20  happen.  Everybody has things happen as they are growing up.

21  I think that there probably are cases that are very severe

22  that would warrant that as being mitigating circumstances,

23  but I don't think it by itself in every case warrants it

24  being a mitigating circumstance.

25        Q.     Okay.  Sounds like you just kind of have to

1    hear.  You would keep that open mind --

2         A.    Yes.

3         Q.    -- and hear it if it was there; is that right?

4         A.    Yes.

5         Q.    And that's kind of what the law contemplates

6    in terms of keeping that open mind.  And that's the bottom

7    line in any of this.  Can you keep that open mind and follow

8    the law?  Will you not answer these questions automatically,

9    just because you have some preconceived notions, something

10    like that, and I think that makes sense to you.

11                Looks like, hopefully, you understand

12    kind of the scheme we have in Texas.  Do you have any

13    questions about it?

14         A.    No, I don't.

15         Q.    Any comments?  Sound like a pretty good scheme

16    or --

17         A.    I think it's -- it's better with the special

18    circumstances, yeah.

19         Q.    One way to look at it, really, is if you

20    convict a person of capital murder, they are sitting on a

21    life sentence, okay?  We only get to the death penalty if

22    the questions are answered yes, yes, and no.  That's kind of

23    one way to think about it.  Does that make sense to you?

24         A.    Yes, it does.

25         Q.    Okay.  Let me talk to you a little bit about

1   the parole law.  You may have heard about it.  I think you

2   mentioned it somewhere in your questionnaire.  Mentioned it

3   on page 2.  Life in prison does not mean in prison until you

4   die.

5          A.    Yes.

6          Q.    In Texas we -- every offense we have, every

7   sentence we give, is subject to parole at some point.

8          A.    Yes.

9          Q.    When you are talking about a capital murder,

10  what a life sentence means is forty calendar years.  That's

11  forty years, day for day, before a person sees their first

12  Parole Board, before they become eligible for parole.

13         A.    Yes.

14         Q.    They may make parole that first time up after

15  forty years and they may never make parole and actually

16  serve a life sentence.  Because that's beyond the control of

17  anyone in this courtroom, we kind of -- we tell jurors what

18  the law is and then we ask them to presume that life means

19  life, because, again, the person may actually do a life

20  sentence.

21         A.    Yes.

22         Q.    Does that make sense to you?  We don't want

23  people to say, gee, forty years, that's not long enough.

24  I'm not going to take a chance he ever gets out, so I'm

25  going to answer the questions in such a way that he gets a

1   death sentence, because that wouldn't be fair.  You wouldn't

2   be using the mental discipline to work through the

3   questions.  Conversely, we don't want people to say forty

4   years, that's long enough, so I'm just going to answer the

5   questions in such a way that he gets a life sentence.  Does

6   that make sense?

7          A.     Yes.

8          Q.     So you can presume a life sentence means a

9   life sentence?

10         A.     Yes.  And the parole part of it is part of the

11  criminal justice system.  I mean, it's part of what we do.

12  And there's another hearing to see if this person should be

13  released on parole, so that, I think, is just another step

14  in the process.

15         Q.     And because, I guess, it's so far in the

16  future, none of us may be involved in that.  That's why we

17  ask jurors to presume a life sentence means a life sentence.

18                Another thing I need to visit with you

19  about, I don't know if it will come up, but we need to talk

20  about it, are these things called lesser included offenses.

21  What that basically means is this.  Say we charge somebody

22  with murder in the course of a robbery, the bank robbery

23  example, and you have a reasonable doubt about whether the

24  person committed the murder, but you are convinced that they

25  committed the robbery part.  Okay?

1    A.      Uh-huh.

2    Q.      So you may find them not guilty of capital

3  murder and you may find them guilty of a lesser included

4  offense of aggravated robbery.  If that happens, then this

5  whole scheme is kind of out the window and we ask a jury to

6  set punishment somewhere in the punishment range for

7  aggravated robbery, which is anywhere from five years up to

8  life or 99 years in prison.  And, again, kind of the same

9  rules apply.

10              We just ask you, you know, as you sit

11  there now, can you keep an open mind to the full range of

12  punishment in an aggravated robbery case, which basically

13  means, if you hear an aggravated robbery case that you think

14  a life sentence is appropriate, could you consider it and

15  assess it?  Or if you hear an aggravated robbery case where

16  you think five years is appropriate, could you consider it

17  and assess it?  Just could you keep that open mind?

18    A.      Yes.

19    Q.      Okay.  That's something that you think you can

20  do?

21    A.      Yes.

22    Q.      You have never been on a jury before, have

23  you?

24    A.      No.

25    Q.      Some of the kind of general rules that apply

1    in every criminal trial, even if you haven't been on a jury,

2    they are probably somewhat familiar to you.

3                    We talked about the burden of proof.  The

4    burden of proof is always on this table.  We have got to

5    prove to you he's guilty.  We have to prove Special Issues

6    Nos. 1 and 2 to you, as well.  What that means is, you can't

7    expect or require these guys to bring you anything.  Legally

8    they could sit there and do crossword puzzles and not say a

9    word.  I don't anticipate that's going to happen.  They are

10   very fine lawyers.  But it kind of illustrates the point

11   that the burden of proof always stays on this table and

12   never shifts.  Does that make sense to you?

13       A.    Yes.

14       Q.    And as a part of that, criminal defendants in

15   our system are presumed innocent.  As he sits there right

16   now, he is presumed innocent.  For whatever reason the trial

17   ended now with no testimony or anything like that, he would

18   be found not guilty.  That presumption of innocence only

19   goes away if we can meet our burden of proof, which is

20   beyond a reasonable doubt.  Does that make sense to you?

21       A.    Yes, it does.

22       Q.    Okay.  He also has a Fifth Amendment right to

23   not testify.  Criminal defendants in our system cannot be

24   forced to testify in their own defense and there's a lot of

25   reasons for that, maybe on the advice of his lawyer.  Maybe

1  he's guilty and maybe he's not a good public speaker.  He

2  may get nervous talking, you know, up on the witness stand,

3  things like that.

4              So what the law requires is that if a

5  person does not testify, you can't hold it against them.

6  You can't consider it.  It's just a nonfactor.  And that's

7  the law that the Judge would give you.  Does that make sense

8  to you?

9        A.    Yes, it does.

10       Q.    Do you think that you can follow that area of

11  the law?

12       A.    Yes, I can.

13       Q.    As another part of our burden of proof, the

14  laws says that we have to prove each and every element of a

15  crime.  And I think on the back page of that packet of law,

16  you flip to it, or you may remember it.  There's a document

17  called the "True Bill of Indictment."  That's kind of how we

18  have alleged this crime.

19              We have actually alleged the crime in two

20  different ways, the murder of a police officer on duty, and

21  then a murder in the course of a robbery.  The crimes break

22  down into different elements, basically, that a certain

23  person on or about a certain day in a certain county killed

24  a certain person in a certain way.  Very roughly, those

25  would be the elements of the crime.

1      The law says that we have to prove each
2  and every one of them to you.  We can't go nine for ten.  We
3  can't go eight for ten.  The jurors can't give us partial
4  credit to get us there.  They can't help us out.  You have
5  to hold us to our burden of proof.  If we miss an element,
6  even one element, you have to find under the law the person
7  not guilty.  Does make sense to you?

8      A.      Yes, it does.

9      Q.      One way to think about it is identity is
10  always an element in a crime.  Do we have the right person?
11  You know, if you weren't convinced at the end of the trial
12  that we have proven to you beyond a reasonable doubt we had
13  the right person, then we missed that element and you would
14  find the person not guilty.

15      A more extreme example of that point
16  would be -- and it's -- I don't anticipate this would ever
17  happen.  It's kind of a far-out example.  But let's say you
18  listen to a murder case and you are convinced the person
19  committed the murder, but we allege the murder happened in
20  Dallas County.  Well, the evidence was that it was actually
21  just over the county line in Tarrant County.  It happened in
22  Grand Prairie, which is half in Dallas County and half in
23  Tarrant County.

24      So you are convinced the person is good
25  for it, you are convinced of nine of the ten elements, but

1    the tenth element, the county it happened in, you are just

2    not convinced beyond a reasonable doubt, you know.

3    Obviously at that point it's kind of ridiculous.  The police

4    wouldn't have done their jobs.  We didn't do our jobs.  We

5    would be fired.  The law would require you to find the

6    person not guilty.

7                    Some people may consider it a

8    technicality.  You may not be happy about it.  You may go up

9    immediately to our boss and demand our jobs, but that's what

10   the law would require, that sort of mental discipline.

11                   Is that something that you think you can

12   do?

13        A.       Yes.

14        Q.       And it's even a situation if we allege a

15   person has been shot with a pistol, something like that, and

16   the evidence shows, you know, the medical examiner comes in

17   and says, no, they were actually stabbed with a knife,

18   something like that.  If we got it wrong, we got it wrong.

19   You can't help us out.  You would have to find the person

20   not guilty.  Does that make sense?

21        A.       Yes, it does.

22        Q.       Let's talk a little bit about some of the

23   witnesses you may hear from.  Typically in these cases the

24   defense or even the State or both may call like a

25   psychiatrist or psychologist, someone like that, in the

1    punishment phase of the trial to try to shed some light on

2    some of the Special Issues for the jury.

3                    We talk to a lot of different people who

4    have a lot of different thoughts and feelings, obviously,

5    about people who work in that field, the mental health

6    field.  I'm curious if you have any thoughts or feelings

7    about those types of individuals?

8         A.     I think that they have -- a lot of them do a

9    lot of good for a lot of people.

10        Q.     Okay.  We kind of -- everybody we talk to kind

11   of runs the gamut.  You have the people down here who don't

12   really think it's a science and if you look hard enough and

13   pay enough money, you can find one of them to say anything.

14   And we have the people over here who think that they walk on

15   water and every word out of their mouth is goldplated.

16                   I guess kind of what the law envisions,

17   and what we're asking for, is people kind of in the middle,

18   you know, who will listen to the testimony.  If it sounds

19   credible, go with it.  If it doesn't, they won't.  Is that

20   kind of where you are?

21        A.     Yes.

22        Q.     It's what the law envisions is that you kind

23   of start every witness off on the same level of credibility.

24   You don't give them a leg up just because they are a

25   psychiatrist.  You don't give them a leg up just because

1   they are a police officer.  A lot of people may respect the

2   job police officers do and we hope they do, but you can't

3   automatically give them a bump up in credibility just

4   because they are police officers.  Does that make sense?

5       A.    Yes, it does.

6       Q.    And you can follow that law and start

7   everybody out on the same level of credibility?  Are you

8   kind of tired of your legal lesson yet?

9       A.    No.

10      Q.    We kind of run through a lot of law.  Anything

11  that you have questions about, Ms. Huggins?

12      A.    No.

13      Q.    We oftentimes ask people this, since you have

14  had a chance to think about it and you have had a chance to

15  look at your questionnaire, is there any answer that you

16  would change or qualify or answer differently or you kind of

17  read it and you were, oh, my gosh, I said that?

18      A.    Actually, there was one.

19      Q.    Okay.  Most people are like that.  Some people

20  towards the end get a little punchy and kind of --

21      A.    Yeah, I had a few of those at the end, but,

22  no, there's one on page 7.

23      Q.    Okay.

24      A.    The question about have you, your spouse, or

25  any family members or close friends ever had training in law

1    enforcement.   That should be yes.

2         Q.      Okay.

3         A.      My husband's uncle who is a licensed Assembly

4    of God preacher and performed my wedding ceremony is a

5    retired deputy sheriff.   And I just didn't think of him when

6    I answered that question.

7         Q.      Here in Dallas County?   Deputy sheriff?

8         A.      No, it was in Nueces County.   But I looked at

9    that today and went, oh, that's not right.   But I think of

10   him as a minister, so it's kind of --

11        Q.      Having spent the last few minutes talking to

12   me, you probably know why we ask this on the questionnaire,

13   because we want to make sure that we don't have people who

14   are biased for or against any class of witnesses.

15        A.      Yes.

16        Q.      Anything about having that experience or

17   knowing that person --

18        A.      No.   Like I said, I think of him more as a

19   minister than a retired deputy sheriff, so --

20        Q.      Anything else on your questionnaire kind of

21   jumps out at you?

22        A.      No.

23        Q.      Okay.   I appreciate your time, patience, and

24   attention.

25                    MR. WIRSKYE:   That's all I have, Judge.

1          THE COURT:  Ms. Busbee?

2              CROSS-EXAMINATION

3    BY MS. BUSBEE:

4        Q.      Good afternoon, Ms. Huggins.  I won't take as

5    long as Mr. Wirskye did, because I don't have to explain

6    anything to you, necessarily.  It's complex and I can tell

7    that you have given this a lot of thought, even before you

8    knew just exactly how this was conducted in Texas.

9              As they explained the law to you, in

10   fact, actually, we've done this so many times by now that

11   I'm almost starting to zone out because -- and it's nothing

12   against the State.  It's just that they are required to tell

13   it over and over again and it's late in the afternoon and

14   I'm la, la, la.

15             You mentioned -- I got the impression

16   that you had some thoughts on not so much finding someone

17   guilty of the offense of capital murder when that person was

18   a party, but not an active participant in the actual murder,

19   and I think that's fair.  That's our law as far as if you

20   are part of a conspiracy experience, if you are part of a

21   scheme.  If one gets killed or anybody in your group of

22   people when you are acting together commits an offense, you

23   are guilty of what they have done.

24             But the punishment may be different.  And

25   that's what's contemplated here where we have -- the State's

1  prosecuting Mr. Murphy as an accomplice, if you will.  We

2  feel better saying accomplice, even though that word is not

3  used in Texas law, because people understand that better

4  than party.  Party sounds like they are engaged in a

5  contract of some kind.

6         But I'll just interchange those words

7  with your consent.  What is your -- not whether you can

8  follow the law, what is your gut feeling on non -- for lack

9  of a better word, a triggerman, a nontriggerman, a death

10  penalty in that type of situation?

11      A.    I really think it depends upon the

12  circumstance, how the person ended up in the situation with

13  the other person.  I mean, I think if two people are sitting

14  down and they decide that they are going to blow something

15  up, right, and this guy is going to take the stuff in, but

16  they planned it together, they know what's going on, they

17  intended to do this, I think they are both just as guilty of

18  the crime.

19         I don't think that it -- just because

20  this guy walked in and actually did it, this guy knew what

21  was going on, so he intended for that to occur, as well.  So

22  I think that if the intent is there, whatever the crime,

23  whoever does the actual crime, that if they have done it

24  together, they planned it together, then they are both

25  subject to the same punishment.

1    Q.    Okay.  So your thinking is if there was a plan

2  to commit a murder?

3    A.    Yes.

4    Q.    Okay.

5    A.    Well, if -- it doesn't necessarily have to be

6  that they planned to do that.  But I think that if the crime

7  was committed together, that they intended to do the crime

8  together, that whatever happens, that they are both

9  responsible.

10   Q.    They are.  But here's where I'm splitting a

11  hair with you and I apologize.  But responsibility is

12  culpability, so that's guilt.  And then what this question

13  really goes to, what the appropriate punishment is for that

14  person.  You see what I'm saying?

15   A.    Yes.

16   Q.    I acknowledge that a person under our law is

17  guilty of what his codefendant did, but then guilty is the

18  first question that a jury would be asked, and that is

19  actually one trial, if you will.

20        And then the same jury and the same

21  participants conduct a second trial.  And my question is how

22  do you feel about during the second trial where the

23  nontriggerman is on trial for his life, what your feelings

24  are as far as punishing that person with the death penalty?

25   A.    I think depending on the circumstances that

1   they're just as -- the punishment should be the same.

2        Q.      And what circumstances do you have in mind

3   when you say that?

4        A.      Like I said, if they -- if it was a planned

5   thing, certainly.  I think that if they're -- I don't know

6   what all cases it could cover, but if the intent was there,

7   if they planned to do this act together, then I think that

8   they are just as -- they are subject to the same punishment.

9        Q.      Okay.

10        A.      If there's no way that they could have known

11   that the situation would have ended as it did, then

12   certainly that would be a different situation.

13        Q.      Sure.  Well, and, you know, I hate to put you

14   on the spot like this, because what we do is we give you the

15   test and then we tell you the answers after you have taken

16   the test.  But it's kind of designed to get your gut feeling

17   because this is -- this is not like any other jury service.

18   You have gone to the head of the class on your first time

19   down here, because a life has been taken and a life may be

20   taken.  So we don't expect everybody, as Mr. Wirskye

21   explained to you, to be comfortable doing it or tell you

22   that you have to do it, if you don't want to.

23              And the reason I'm saying this is you

24   seem perfectly reasonable to me.  I won't get in an argument

25   with you because you are close to being on this jury,

```
1   perhaps.   I just wanted to give you an opportunity to tell
2   us yea or nay whether you are comfortable with the way the
3   legal scheme is?
4        A.      Yes.   I think that our laws are fair for the
5   most part.   I don't agree with everything in our legal
6   system, certainly.   But I think that if you look at the way
7   the things are set up, that I think defendants get every
8   opportunity that they should have, certainly better than a
9   lot of other places you could be.
10                I don't -- and you have to have some
11  confidence that what we're doing is right and that it works.
12       Q.      Right.   And that's why we're so careful on
13  picking jurors that can be impartial and truly impartial.   I
14  don't think that you were asked this.
15                You know a little bit about this case,
16  like most people do.   Have you made any opinions about it or
17  any feelings about what happened in this case that might
18  affect you, if you sat on the jury?
19       A.      No.
20       Q.      I hate to ask you this.   Usually the State
21  asks you all the personal questions and I get to talk about
22  philosophy.   But you mentioned in here that your stepfather
23  was shot and I wanted to -- if you don't mind telling me a
24  little bit about that?
25       A.      I was 12 when it happened.   He was
```

1   accidentally shot.  His gun went off and it went through his

2   side and came out his neck and it happened to hit his artery

3   and he bled to death before they could get him to the

4   hospital.  So it was -- it was not like somebody shot him.

5        Q.   Okay.  That's kind of what I was curious

6   about.  We had someone in here one day that had someone in

7   their family killed and they were just dying to come down

8   here and get some vengeance because they didn't think they

9   had gotten justice.

10       A.   No.  His was totally accidental.

11       Q.   All right.  Was there something that you

12  thought you would be asked about or wanted to tell us about

13  serving on this jury or serving on a death penalty case in

14  general?  Sometimes we ask everything but the most obvious

15  question.  And this is actually just your opportunity to

16  tell us how you feel about it.

17       A.   I think it's a very serious responsibility.  I

18  take civic duty pretty seriously in general.  But, like I

19  said, once I had been down here and realized that I was in a

20  jury pool for a capital punishment case, I really spent a

21  lot of time thinking about how I would feel either way,

22  being on this jury.  And I don't think that it's an easy

23  thing to do.  But I think that, like I said, this is all a

24  part of this system and for it to work, we have to do our

25  part.

1     Q.    Well, do you think that you are the sort of --

2  sort of despite the fact that you would have found someone

3  guilty of capital murder and found the Special Issues Nos. 1

4  and 2 to be true, do you think that would -- that without

5  talking about what that might be, because we don't know at

6  this point, that you could still answer Special Issue,

7  question -- Special Issue No. 3, yes.  I'm sorry -- yes.

8  I'm so tired, I forgot what the answer was.  You could take

9  your pen in hand and say this particular individual should

10  have received a life sentence?

11     A.    Yes, I could.

12           MS. BUSBEE:  I don't have any more

13  questions of this juror.

14           THE COURT:  Ms. Huggins, if you would,

15  wait for us outside.  We'll have you back in a few minutes.

16             [Prospective juror out]

17           THE COURT:  What says the State?

18           MR. WIRSKYE:  State has no challenge for

19  cause.

20           MS. BUSBEE:  Defense has no challenge for

21  cause.

22           THE COURT:  Would you like to step in

23  your office?

24             (Recess)

25           THE COURT:  What says the State?

1    MR. WIRSKYE:  State will accept the

2  juror.

3    MS. BUSBEE:  We'll accept the juror.

4    THE COURT:  Ask Ms. Huggins to come back

5  in.

6    [Prospective juror in]

7    THE COURT:  Ms. Huggins, as Ms. Busbee

8  said, you were real close to being on this jury.  You are

9  on.  Now the hard part begins.  You think this interview

10  process was somewhat stressful, the hard part is going to be

11  when you go back to work because they know where you are

12  today, don't they?

13    PROSPECTIVE JUROR:  Yes, they do.

14    THE COURT:  Sure they do.  The hard part

15  is going back to work and not talking about it.  What do I

16  mean by that?  Well, the lawyers are satisfied with your

17  opinions, your understanding of the law, and your promises

18  and testimony here today that you are going to follow the

19  law and make a decision based on the evidence presented to

20  you from that witness chair, because you would be over there

21  in the jury box.  So when you go start talking about it,

22  then I'm quite sure your coworkers will offer their

23  opinions, won't they?

24    PROSPECTIVE JUROR:  Yes, they will.

25    THE COURT:  So only way you can prevent

1  that is simply not talk about it.  Obviously, you are going

2  to have to inform your supervisor.  That's why we're doing

3  this far enough out that you are going to inform the

4  supervisor, I need two weeks off beginning November 10th for

5  jury duty.  Leave it at that.  What case are you going to be

6  on?  No, ma'am.  Say, the Judge has instructed me I cannot

7  talk about it.

8         Now, I believe -- I don't know if it was

9  you or someone else, you were told that you will not be

10 sequestered during this trial, comma, provided the jury can

11 follow my instructions.  Now, I haven't -- that's just very

12 rare. .But I'm not saying it couldn't happen, but it's very

13 rare that it would.

14         When might you be sequestered?  If the

15 jury is unable to reach a verdict at the end of the day --

16 once the trial is over with, the attorneys have argued to

17 the jury, and the jury goes out with the charge and they are

18 in the jury room, at that point you cannot separate.

19         What that means is if it were to carry on

20 for the entire day and at night we would quit, you would go

21 to the hotel.  And, obviously, you will have plenty of time

22 to prepare for that opportunity should it arise.

23         So what am I telling you?  Normal

24 business hours.  We start at 8:30 and quit somewhere between

25 4:30, 5:00, depending on the witnesses.  If I have witnesses

1  come in from out of town and we could work ten minutes to

2  5:00, I'm going to finish that.   I balance people's time.

3  If we see it's going to be three more hours, we'll see you

4  in the morning.   You follow me?

5                    PROSPECTIVE JUROR:  Yes, sir.

6                    THE COURT:  You will be able to use the

7  phone during the day.   We take reasonable breaks.   I've even

8  had jurors say, please give us more of a break.   They call

9  me a workaholic.   I can sit here and drink all day long.   I

10  can sit here all day, because it's my job.   But I have to be

11  mindful of the people in the box, because they are not used

12  to it.

13                    So, what am I telling you?   We have a

14  reasonable schedule and we'll work around it.   Fair enough?

15                    PROSPECTIVE JUROR:  Yes, sir.

16                    THE COURT:  Provided I can get my printer

17  to work, I have a couple of other things to provide for you

18  that the Sheriff will go over with you in the back and just

19  to verify the information that I have in my computer system

20  is correct.

21                    This information is maintained by myself

22  and the Sheriff.   The copy of your questionnaire, I printed

23  that this morning.   So the bottom line is, until I get an

24  order from the Court of Criminal Appeals, your information

25  is safe with me.   The only way you can get it is to have the

1  password which is right here.  Okay?  So do you have any

2  questions of me?

3                    PROSPECTIVE JUROR:  No, sir.

4                    THE COURT:  Hardest thing you can do is

5  don't talk about it.  You will find instructions that I'm

6  going to provide you is you have already told us you have

7  not looked on the Internet or done any outside

8  investigation.  Don't.  Don't even think about this until

9  you walk in the door on Monday morning, November 10th.

10                    And that brings me to one more issue.  At

11  some point when I get this jury constituted, and I don't

12  know what day that will be, you will receive another letter

13  from me and we will have about a one-hour orientation.  I

14  would like to do it the week before the trial begins.  There

15  are certain things that I cannot discuss with the folks

16  until I get everybody here and there's procedures to go

17  through.

18                    The reason I do that is so that on Monday

19  morning, the 10th of November, the jury will be in the box

20  at 8:30, the State will present their indictment and we will

21  proceed to trial.  The last thing I want to happen on Monday

22  morning is for you to race down here through traffic and

23  then be told to wait in the jury room a couple of hours.  It

24  won't work.  It won't work.

25                    So we do a quick orientation and you come

1  down, somewhat casual, and basically the time just to go

2  through some required items and then from that we'll start.

3  Fair enough?

4               PROSPECTIVE JUROR:  Yes.

5               THE COURT:  If you would, retire to the

6  jury room.  The Sheriff has some items to go over with you

7  and I'm going to print this information sheet.

8               [End of Volume]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF TEXAS          *

COUNTY OF DALLAS        *

I, NANCY BREWER, Official Court Reporter for the 283rd Judicial District Court, do hereby certify that the above and foregoing constitutes a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

WITNESS MY OFFICIAL HAND on this the 4 day of _____ March , 2004.

NANCY BREWER, CSR, NO. 5759
Expiration Date:  12-31-04
Official Reporter, 283rd JDC
Frank Crowley Crts. Bldg. LB33
133 No. Industrial Blvd.
Dallas, TX 75207
(214)653-5863