No. <u>74851</u>

# PATRICK HENRY MURPHY, JR.

APPELLANT

## <u>CAPITAL MURDER</u>

OFFENSE

## <u>DEATH</u>

PUNISHMENT

## <u>DALLAS</u>

COUNTY

CONTENTS: RR VOLS. 21 - 26

74851

nREPORTER'S RECORD

VOLUME 21 OF *61* VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

**FILED IN**
**COURT OF CRIMINAL APPEALS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MAR  9 2004

Troy C. Bennett, Jr.

On the 24th day of September 2003, the following
proceedings came on to be heard in the above-entitled and
numbered cause before the Honorable Vickers L. Cunningham,
Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT: 03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT: 00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

PROSPECTIVE JUROR INDEX

| JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Burley Morvant,Jr. | 4 | 5 | | 21 |
| William Hodges | 16 | 17 | | 21 |
| Flora Williams | 31 | 29 | | 21 |
| Johnny Silva | 43 | 41 | | 21 |
| Gary Danaher | 58 | 56 | | 21 |

P R O C E E D I N G S

1
2          THE COURT:  Mr. Morvant.
3                    [Prospective juror in]
4          THE COURT:  Good morning, sir.  How are
5  you?
6          PROSPECTIVE JUROR:  Good morning, sir.
7  How are you?
8          THE COURT:  Juror No. 2082, Mr. Joseph
9  Burley Morvant, Jr.  Is that pronounced correctly?
10         PROSPECTIVE JUROR:  You got it.
11         THE COURT:  Mr. Morvant, welcome to the
12  283rd.  Have you had enough time this morning to review the
13  guide I provided for you?
14         PROSPECTIVE JUROR:  Yes, sir.
15         THE COURT:  That's where the attorney is
16  going right now, to make some copies of your questionnaire
17  that you filled out for us in May.  I'll get it to you in
18  just a second.  That way if the attorneys refer to a
19  question that you answered back in May, you can look at your
20  answer and try to refresh your memory.
21         PROSPECTIVE JUROR:  Yeah, I forget those.
22         THE COURT:  Because you were here first
23  this morning, you get to go first.  I appreciate people
24  being on time.  So that's the way it works.  I think you see
25  that we do start on time because we're using your time.  Not

1      too bad, is it?

2                        PROSPECTIVE JUROR:  I like that.

3                        THE COURT:  There are no wrong answers.

4      You can't make anything of this, other than just an

5      opportunity for the lawyers to visit with you about the law.

6      The objective is for you to understand how it all relates,

7      and then my questions that I ask you at the end of the

8      program are twofold.  Number one, do you understand the law

9      and, number two, can you follow the law?

10                       PROSPECTIVE JUROR:  Right.

11                       THE COURT:  That's the big picture that I

12     have to look at.  Only question I have for you at this time

13     is will you be able to serve this Court for a period of two

14     weeks beginning on November 10th?

15                       PROSPECTIVE JUROR:  Yes, sir.

16                       THE COURT:  Mr. Shook?

17                       MR. SHOOK:  May it please the Court?

18                       JOSEPH MORVANT, JR.,

19     having been duly sworn, was examined and testified as

20     follows:

21                       DIRECT EXAMINATION

22     BY MR. SHOOK:

23          Q.     Is it Mr. Morvant?

24          A.     Yes, sir.

25          Q.     All right.  My name is Toby Shook.  I'm going

1   to talk to you on behalf of the State this morning and, like

2   the Judge said, we're only interested in your honest

3   opinions.  Usually when we talk to jurors, it's in a big

4   panel, but because it's a capital murder case, the procedure

5   is to do it one on one in an interview.

6               You've given us a lot of information in

7   your questionnaire which, believe it or not, actually saves

8   you some time.  But we're just looking for your honest

9   opinions.  You've been very straightforward on the

10  questionnaire, so I don't anticipate that you'll have any

11  problem with that.  If you have any questions at any time,

12  feel free to ask.  Okay?

13          A.      Okay.

14          Q.      Now, looking at your questionnaire you work at

15  the Rent-A-Center as a manager; is that right?

16          A.      Yes, sir, account manager.

17          Q.      Kind of tell us what you do on a day-to-day

18  basis.

19          A.      Basically just call customers, try to collect

20  the accounts, keep them current, and deliver and pick up

21  merchandise.

22          Q.      Okay.  And the Judge gave you the time the

23  trial will be, two weeks in November?

24          A.      Right.

25          Q.      Pretty firm on that.  With this much advance

1   notice, you shouldn't have a problem with that?

2       A.      No, sir.

3       Q.      All right.  Let's talk to you, then, kind of

4   how you feel about capital murder.  You know, we can't get

5   into the facts, but you know from what the Judge told you,

6   it's a capital murder case in which the State is seeking the

7   death penalty.  On your questionnaire you said you favor the

8   death penalty.  Tell us kind of in your own words why you

9   favor the death penalty and the purpose you feel it serves.

10      A.      Let's see.  Well, I favor it to a point,

11  depending on the situation given.  I mean, the person comes

12  out and just kills somebody just to kill them, just to take,

13  just to do it, then yes.  Some people, given a certain

14  circumstance, being human, usually there's a break because

15  of their situation, like if a husband caught his wife or

16  something like that.

17      Q.      Okay.  A crime of passion-type situation is

18  what you mean?

19      A.      Right.  We're just human, I mean, you just

20  catch them and you lose it, so you do something that you

21  don't really realize you're doing.  But if a person just

22  comes out and kills them just to kill them, knowing that

23  they're going to do it, then I think they ought to pay for

24  what they did.

25      Q.      Do you think it's then just punishment, kind

1  of punishment for punishment's sake for certain crimes

2  because of the brutality, that sort of thing?

3          A.    Uh-huh, yes, sir.

4          Q.    Okay.  Have you ever followed any cases in the

5  media locally or nationally, murder cases that you thought

6  might be deserving of the death penalty or at least that

7  should be an option?

8          A.    Yes.  I can't remember which ones or what it

9  was, but I know I have.

10         Q.    Okay.  You know, you put in the questionnaire,

11  we asked if you've known anything about this case.  We can't

12  get into the details, but we had a couple of paragraphs

13  about this crime occurring back in Irving on Christmas Eve

14  of 2000, involving the murder of a police officer at an

15  Oshman's.  Did that jar any memory at all to you seeing

16  anything on the news regarding it?

17         A.    I kind of remember hearing something about it,

18  but not much.

19         Q.    Okay.

20         A.    Just like a little recall.

21         Q.    Okay.  But you didn't follow the case closely

22  at all?

23         A.    No.

24         Q.    All right.  If it were, is there any crimes

25  other than murder that if it were up to you, that you might

1    have the death penalty for?

2         A.     Um, no.

3         Q.     Okay.  In Texas, the death penalty is reserved

4    for murder cases, but only certain types.  You have to have

5    an intentional killing.  And it has to be unjustified.  It

6    can't be in self-defense.  It can't be, you know, an

7    accident.  It has to be a person forms an intent to kill and

8    then they do so.  May only take a few seconds to form that

9    intent or they can think about it for days on end.

10              But not every murder case falls in the

11   statute.  You know, you can have some brutal killings.  I

12   may not like the way my partner here wore his tie today or

13   said something to me.  I could pull a gun out and shoot him,

14   laugh about it, callous killing, but I couldn't get the

15   death penalty.  I could get life, but I couldn't get death.

16              To get the death penalty, or at least be

17   available, you have to have an intentional murder with some

18   other aggravating fact such as committing a murder during

19   the course of another felony.  Murder during a robbery is

20   one example.  If I go into a 7-Eleven and shoot the clerk

21   down intentionally during the robbery, that could be a death

22   penalty case.  Breaking into someone's home, burglary, that

23   could be a death penalty case, if I murder someone.  If I

24   murder someone during a rape, during an arson, or during a

25   kidnapping.

1    Also, murder of specific individuals like

2 police officers on duty, firemen on duty, prison guards on

3 duty, can be a death penalty case.  Murder for hire, someone

4 does it for money like a hitman situation.  Murder of a

5 child under the age of six, that can be one, and also mass

6 murders or serial killer situations.  But those are the

7 specific situations.

8    That list, does that, as far as your

9 personal views, do you agree with those types of crimes

10 being available for the death penalty?

11    A.    Yes.

12    Q.    Okay.  Now, let me ask you this.  When we

13 think of capital murder or any crime, we usually think of an

14 example in our head, like I gave you that example of

15 shooting the 7-Eleven clerk, and we think of the triggerman.

16 But many times accomplices help carry out crimes and that's

17 true for capital murder.  You may have more than one person

18 or group of individuals commit a crime.  Some have a greater

19 role than others, perhaps, but they're all actively

20 participating in the crime.

21    Sometimes in capital murder situations,

22 you have only one triggerman, but you may have others

23 helping him commit the crime in varying degrees.  And people

24 feel differently about that as far as what the punishment

25 should be.  Some people don't have a problem at all giving

1  the death penalty to the actual man that causes the death,

2  the triggerman.  But they might have a problem with the

3  accomplice, someone that's just there assisting, but doesn't

4  actually cause the death.

5           And people feel differently.  Some are

6  against that.  They draw a line and reserve a prison time

7  maybe for an accomplice, but not the death penalty because

8  he didn't actually cause the death.  Other jurors do think

9  that accomplices deserve the death penalty, depending on the

10 facts.  How do you feel about that?

11      A.      Depends on the person.  If he knew that person

12 was going to actually kill that person and didn't bother to

13 stop him and let him keep on doing it, he should deserve the

14 same because he intended to murder anyway.

15      Q.      Okay.  An example I often give is, let's say

16 Mr. Wirskye and I here wanted to rob a bank.  And our plan

17 was for me to take a gun in there and I'm going to point it

18 at the tellers, hold them at bay, threaten them.  And then

19 he's going to load up all the money in the cash drawers.

20 During the middle of that, I decide to kill one of the

21 tellers.  Maybe I don't like the way they look at me.  Maybe

22 he says one is going for an alarm, but I shoot them, and

23 then we flee the bank and we're caught.

24           Obviously, I can be prosecuted for

25 capital murder.  I could receive the death penalty.  The law

1    says he could, too, because he was actively involved.  And

2    if the jury believes that he should have anticipated that a

3    death could occur in that situation, he could be found

4    guilty.  Ultimately, he may even receive the death penalty,

5    even though he didn't urge me necessarily to kill anybody.

6                  But if the jury believes from the facts

7    that he should have anticipated that a life could be taken,

8    he could be found guilty.  How do you feel about that law?

9         A.     I don't think it should be a capital, because

10   he didn't know that the guy was going to kill him.  I mean,

11   he didn't have no -- any idea that he was going to do it.

12   Just because the guy, whoever, looked at him funny that he

13   didn't intend to kill anybody, so, no, because somebody else

14   done it.

15        Q.     So from your own personal point of view, you

16   disagree with that aspect of the law?

17        A.     Right, yes, sir.

18        Q.     All right.  I appreciate your honesty in that

19   and that's what we do.  We kind of want to get your honest

20   opinions and sometimes jurors agree with different parts of

21   the law and sometimes they disagree with others, because

22   that's the kind of key the jurors have problems with.

23                  To get someone guilty, and we call it the

24   law of conspiracy, that accomplice doesn't necessarily have

25   that intention that, you know, let's go in and kill someone.

1  Maybe he should have known, you know, the guy could do

2  something like that, but there was no plan for that.  But

3  the law allows for that guilty finding even if, you know,

4  hey, man, you should have known a guy like that.  You knew

5  his personality and what he was prone to do, but maybe they

6  didn't have the plan.  But the law would still allow a jury

7  to find him guilty.

8              But from your own personal point of view,

9  you don't think that capital murder conviction should stand

10 against the accomplice?  Maybe another crime like robbery or

11 something like that?

12       A.     Yes, sir.

13       Q.     Okay.  And that comes down to the -- because

14 there was no direct plan or direct intent, actually, from

15 that accomplice himself?

16       A.     Right.

17       Q.     Okay.  Fair enough.  If you found someone

18 guilty of capital murder and you believe they intentionally

19 killed someone, let's say during a felony, at that point in

20 time you get to the punishment stage.  And we get these

21 Special Issues where you have to look at additional evidence

22 and decide if someone is a continuing danger.

23              That first question asks whether there's

24 a probability the defendant would commit criminal acts of

25 violence that would constitute a continuing threat to

1  society.  You don't get to it unless you have found someone

2  guilty, if it was proven to you beyond a reasonable doubt.

3  Then you go to the punishment phase.

4                    Now, the law says that at that point in

5  time you have to wait, and if there's more information about

6  the person's background or something, look at that.  And

7  then look at the evidence you heard in the guilt/innocence

8  stage and decide is he a continuing danger or not?

9                    Some jurors tell us, quite honestly,

10  this, though.  If I have already determined in my mind that

11  the State's proven to me beyond a reasonable doubt that he

12  is guilty of capital murder, that tells me all I need to

13  know about how dangerous he is.  I've reached that

14  determination.  Someone would commit a capital murder.

15  They're going to be a danger to society and they wouldn't

16  need any additional information.  They quite frankly tell us

17  that my decision is made and that's going to be a yes

18  answer, you know?

19        A.      Right.

20        Q.      No if's, and's, or but's about it.  Other

21  people say no, that wouldn't be the situation.  But we want

22  to get every juror's honest opinion on that.  If you found

23  someone guilty beyond a reasonable doubt, would that be the

24  situation where you think they're dangerous, if it's an

25  intentional killing during the course of a felony?

1    A.    Um, not really.  I need to know more about the

2    person himself.

3    Q.    What would be important to you?

4    A.    His background, what he was before, if he'd

5    done anything like that before.

6    Q.    Okay.  And if he had -- I take it that would

7    --

8    A.    Right.

9    Q.    -- mean more to you?

10    A.    That would mean more, yes, because if he had

11    done it before, then yes.

12    Q.    When you say "done it before."  Would it have

13    to be an actual murder or something --

14    A.    Murder or if he's been violent or threatening

15    in any way.

16         MR. SHOOK:  All right.  Can I have just a

17    moment, Judge?

18         THE COURT:  Yes, sir.

19         MR. SHOOK:  May we approach the bench,

20    Judge?  That's all the questions I have.

21         MS. BUSBEE:  Your Honor, we can pass the

22    questions.  I think we've reached an agreement.

23         THE COURT:  Mr. Morvant, we appreciate

24    your time and service to this Court.  The parties have

25    agreed to excuse you from this case.  That's it.  Thank you,

1   sir.

2                    [Prospective juror out]

3                    THE COURT:  Mr. Hodges.

4                    [Prospective juror in]

5                    THE COURT:  Good morning, sir.  How are

6   you?

7                    PROSPECTIVE JUROR:  Good.

8                    THE COURT:  Juror No. 2138, Mr. William

9   Burnett Hodges; is that correct?

10                   PROSPECTIVE JUROR:  Yes, sir.

11                   THE COURT:  Mr. Hodges, welcome to the

12  283rd.  Have you had an opportunity this morning to review

13  the guide I provided for you?

14                   PROSPECTIVE JUROR:  Yes.

15                   THE COURT:  And I also provided a copy of

16  your questionnaire that you filled out for us back in May.

17                   PROSPECTIVE JUROR:  Yes.

18                   THE COURT:  The attorneys may want to

19  review that with you or have you expound on some of the

20  answers you gave.  And just to give you an idea, to get you

21  in the mindset of where we are this morning, the attorneys

22  are going to visit with you about the law in this case and

23  try to, you know, bring you up to speed so you can figure

24  out how it all relates.  It gets kind of complicated, so it

25  takes a while to bring people up to speed.

1           The best thing about this is there are no

2   wrong answers, just your honest opinions.  If you would, the

3   only question I have for you at this time is will you be

4   able to serve this Court for a period of two weeks beginning

5   on November 10th?

6           PROSPECTIVE JUROR:  Yes, sir.

7           THE COURT:  At the end of the process I

8   have two questions to ask you.  Number one is do you

9   understand the law, and, number two, can you follow the law?

10  That's the big picture.  That's for me.  So with that, I'll

11  turn it over to Mr. Wirskye.  He has a few questions for

12  you.

13          MR. WIRSKYE:  May it please the Court?

14          <u>WILLIAM HODGES</u>,

15  having been duly sworn, was examined and testified as

16  follows:

17          <u>DIRECT EXAMINATION</u>

18  <u>BY MR. WIRSKYE</u>:

19      Q.    Mr. Hodges, how are you this morning?

20      A.    Good.

21      Q.    My name is Bill Wirskye and I'll be the

22  Assistant DA that will be visiting with you for the next few

23  minutes.  What I'd like to do is follow up on some of the

24  information that you gave us in that questionnaire.

25      A.    Okay.

1    Q.    Talk to you a little bit, get your thoughts

2  and feelings about the death penalty and capital punishment,

3  and then maybe talk to you a little bit about the laws and

4  the rules that apply in a case like this where the State is

5  seeking the death penalty.  What did you think when you got

6  notified to come back for the individual interview?

7    A.    Just that they needed a followup on some more

8  information, possibly.

9    Q.    Okay.  Do you have any concerns or hesitations

10  in possibly being a juror in a death penalty case?

11    A.    No.

12    Q.    Okay.  Let's see.  You've lived in Dallas all

13  your life; is that right?

14    A.    Yes, sir.

15    Q.    Okay.  Born in Austin, but I guess you got

16  here pretty quickly?

17    A.    Yes.

18    Q.    Okay.  Tell us what you do for a living.

19    A.    Currently I'm a chef instructor.

20    Q.    Okay.  At El Centro, right?

21    A.    Yes, sir.

22    Q.    And how long have you been doing that?

23    A.    Approximately two and a half years.

24    Q.    Okay.  Just out of curiosity, what's a normal

25  day like for you?

1    A.    Normal day I've got generally a couple of

2  classes each day, one class on Friday which is an all-day

3  situation.

4    Q.    What type of problems, if any, would it cause

5  you if you had to take two weeks out of your schedule to be

6  a juror in this case in November?

7    A.    It would somewhat be an inconvenience for the

8  director.  I have been talking to her, told her that I had a

9  case coming up, or, you know, potential juror.  It would

10  cause her some hardship, but it, you know, I don't know what

11  -- I mean, if I'm chosen, I'm chosen.  And there's, you

12  know.

13    Q.    Okay.  Somebody could work around it, if they

14  had to?

15    A.    It could be worked around, yes.

16    Q.    Okay.  Great.  When we kind of ask people

17  questions in this questionnaire, sometimes we're never sure

18  exactly what their answers mean because it means such

19  different things to different people.  It's so subjective

20  sometimes, no matter how hard we try.

21    A.    Right.

22    Q.    But I think you've got on your questionnaire

23  on page 5, just to follow up a little bit with you.  Towards

24  the middle to the bottom of the page we give you these

25  series of statements and ask whether you agree, disagree, or

1  are uncertain.  And just to follow up on that first one.  We

2  had most criminals are actually victims of society's

3  problems and you put you agree.  And I know that

4  particularly means different things to different people.

5  Have you found it yet?

6          A.    There's no -- oh, page 5, okay.

7          Q.    You see that very first statement?

8          A.    Somewhat.  You don't know what people's

9  background is and teaching I get a lot of people with a lot

10  of different backgrounds, a lot of problems, but, you know,

11  everybody has got problems.

12          Q.    Okay.

13          A.    Concerns.

14          Q.    The last statement that we gave you, criminal

15  law treats criminal defendants too harshly.  You said you

16  were uncertain about that.  I'm just curious what you were

17  thinking when you answered that.

18          A.    Some I think are and some aren't.  It just

19  depends on the circumstances of an individual case, I guess.

20          Q.    Okay.  What are your just kind of general

21  overall impressions of the criminal justice system that we

22  have here in Texas?  I know you said in your questionnaire

23  it was too slow, but kind of beyond that.

24          A.    Well, I haven't had much experience, other

25  than coming down for jury duty.  But, you know, it just

1    seems like it moves a little slow sometimes.

2         Q.    Okay.  Have you ever actually made it on a

3    jury or --

4         A.    No, sir.

5         Q.    Been down here waiting in the halls and all

6    that stuff?

7         A.    Yes.

8         Q.    I certainly understand why you think it moves

9    too slow, then.

10        A.    Well, I, yeah, I --

11        Q.    Let me ask you this.  We also ask people kind

12   of to rank themselves on a scale of 1 to 10, 1 being the

13   least and 10 being the most, on how strongly they feel on

14   the use of the death penalty.  And I think if I remember

15   looking at your questionnaire, I don't know if it didn't

16   turn out on my copy, but I didn't see anything.

17        A.    What page was that on?

18        Q.    Page 4.  I was just kind of curious where you

19   would kind of rank yourself on that scale.

20        A.    Well, I would hope that the death penalty

21   would deter things from happening, but --

22              THE COURT:  No, his question is page 4,

23   if you believe that in using the death penalty, how strongly

24   on a scale of 1 to 10 do you hold that belief?  See that

25   question?  Page 4.

1           PROSPECTIVE JUROR:  Oh, probably a 10.

2           Q.    (By Mr. Wirskye)  Okay.  Fair enough.  I think

3   you've already told us you hope it would be a deterrent for

4   others?

5           A.    I would hope it would be, but --

6           Q.    You think a lot of people know --

7           A.    Some people, you know, I don't know the

8   circumstances.

9           Q.    Let me ask you this.  We talk to a lot of

10  people that, such as yourself, that believe in the death

11  penalty and may believe in it very strongly like you, you

12  know, giving yourself a 10.  But we kind of deal with

13  different situations down here.  Sometimes we talk about

14  capital murder and some people tend to draw lines on when

15  they think it's appropriate and when not.  And what I mean

16  by that is this, that you know oftentimes crimes are

17  committed by more than one person.

18          A.    Right.

19          Q.    A group of individuals can commit a crime.

20  The law allows us to prosecute for that crime everyone that

21  was actively involved in the crime.

22          A.    Okay.

23          Q.    Whether it's something like shoplifting, all

24  the way up to capital murder.  And when you get to a crime

25  like capital murder, oftentimes you may have one person in

1    the group who is the actual triggerman --

2         A.    Yes.

3         Q.    -- for lack of a better term.  He caused the

4    death.  He pulled the trigger of the gun.  You may have

5    other non-triggermen, accomplices is a word you've probably

6    heard, who could also be found guilty of capital murder.

7              A lot of people tell us, even those that

8    are very strongly in favor of capital punishment, that while

9    they think it's appropriate in the case of the triggerman,

10   if it were up to them, they would not have the death penalty

11   available for the accomplices, for whatever reason,

12   religious, moral, or ethical, or maybe their sense of

13   proportion.  You know, they may want to lock the accomplices

14   up for life, but they don't think the death penalty is

15   appropriate for the accomplice.  Where do you kind of fall

16   down on that issue?

17        A.    See, I don't know what brought this group

18   together.  I don't know their connection, so I -- but if

19   they were just there and didn't actually do it, then I would

20   have to maybe look and see, you know, their circumstances

21   around that.

22        Q.    Okay.  Maybe a case by case basis?

23        A.    Yes.

24        Q.    Okay.  Well, let me give you a hypothetical or

25   an example to explain kind of how the law works in Texas

1    when we're talking about accomplices.

2          A.     Okay.

3          Q.     Say the prosecutor and myself decide that we

4    are going to rob a bank.

5          A.     Okay.

6          Q.     We get together and the plan is for Mr. Shook

7    here to take the gun in and hold up the tellers.  And while

8    he's doing that, I'm going to take a bag in and kind of go

9    through the cash drawers and collect all the money and we're

10   going to get away from our bank robbery.  And that's our

11   plan.

12               But say as we go in, for whatever reason,

13   maybe one of them looks at Mr. Shook the wrong way or we see

14   one of them going for a silent alarm for the police and I

15   tell him that, Mr. Shook shoots and kills, intentionally

16   kills, one of those tellers.  He's committed capital murder,

17   an intentional murder in the course of a robbery, which I

18   know you read could be one of the situations where we use

19   the death penalty in Texas.

20         A.     Yes.

21         Q.     He could, obviously, be convicted of capital

22   murder and ultimately face the death penalty, depending on

23   how the jury answers those Special Issues.  The law also

24   allows it for me, the accomplice, depending on the facts and

25   circumstances.  What do you think about it in that type

1 scenario?

2       A.     Well, going in with a plan like that, I mean,

3 obviously, some thought was put into what needs to be done

4 to get in and get what you want to do and get out, so

5 something was planned.

6       Q.     Okay.

7       A.     There was some preplanning of it.

8       Q.     Okay.  The level of planning would be very

9 important to you?

10       A.     Yes.

11       Q.     Why is that?

12       A.     You know, if you had to think about something

13 that hard to steal something or, you know, what have you,

14 something had been planned, I mean, so there was some -- if

15 you saw them and said there's somebody over there.

16       Q.     Okay.  So you wouldn't automatically?

17       A.     It would almost seem to me that you might as

18 well have pulled the trigger.

19       Q.     And that's one of the ways that we can

20 prosecute an accomplice.  If I did say, hey, Mr. Shook, he's

21 going for the silent alarm, shoot and kill him.  At that

22 point I have directed him, basically, and assisted him in

23 committing a capital murder.

24       A.     Yes.

25       Q.     The other way we can get there for an

1  accomplice is under the law of conspiracy.  You know, we

2  conspired or agreed to commit that bank robbery and even

3  though I didn't have any intent that someone would get hurt

4  -- let's go back to the first scenario where somebody just

5  looks at him the wrong way and he takes it upon himself to

6  shoot and kill someone.

7              Under those facts I wouldn't have any

8  intent that anyone get hurt.  I didn't aid or direct him to

9  do it, but yet the law says nevertheless I could still be

10  found guilty of capital murder and potentially face the

11  death penalty, if I should have anticipated that a life

12  could have been taken during that crime.  What do you think

13  about that?

14       A.     I feel as though if one person has a gun and

15  both of you go in, I mean, that there's obviously a plan, I

16  mean, whether you flipped the coin to see who carried the

17  gun in or what.

18       Q.     Okay.

19       A.     There was a plan.

20       Q.     Sounds like maybe you agree with that law,

21  kind of that standard of they should have anticipated?

22       A.     Yes.

23       Q.     Then they could potentially face the death

24  penalty?

25       A.     Yes.

1    Q.    Okay.  Fair enough.  Mr. Hodges, like
2  everybody we talked to, you've heard something about this
3  case.

4    A.    Yes.

5    Q.    It was in the media, fairly high profile case.

6    A.    Yes.

7    Q.    And we know, having done this for a while, it
8  affects different people differently and different people
9  have different levels of knowledge about the case.  I'm just
10 curious what you've heard about the case or what do you know
11 about the case?

12   A.    It had been quite a time ago and to be quite
13 honest with you, what I hear on the news, I mean, you hear
14 short snippets and it doesn't give you a whole lot of,
15 doesn't give you a really big picture.  I mean, they try to
16 sensationalize a lot of stuff so it doesn't -- the news is
17 just kind of noise and it just, you know, unless it's
18 something that directly affects me --

19   Q.    Have you kept up with any of the subsequent
20 court proceedings in these cases?

21   A.    Not really.  I haven't really been interested.

22   Q.    Okay.  Do you think if you were selected to be
23 a juror on this case anything that you might have heard,
24 read, or seen would influence your verdict in any way?

25   A.    No, sir.

1    Q.    Okay.  Fair enough.  You said in your free

2  time you like to watch Nascar?

3    A.    Yes, sir.

4    Q.    Who is your favorite driver?

5    A.    It depends week to week.  Depends on who is

6  being bad.

7    Q.    Okay.  What do you think about Jimmy Spencer?

8    A.    He's okay, but he's just one of the guys.

9  He's not really one of the -- he's, I guess, kind of runs in

10  the pack and doesn't really do a whole lot.

11    Q.    Yeah.  He's my favorite guy.  He never wins,

12  but he always tends to wreck and take other people out.  As

13  long as Jeff Gordon doesn't win, I'm usually fairly happy.

14    A.    Yeah, a lot of people feel that way.

15         MR. WIRSKYE:  I think that's all I have,

16  Judge.  I'll pass the witness.

17         MS. BUSBEE:  Your Honor, I believe we've

18  reached an agreement on this juror.

19         THE COURT:  Mr. Hodges?

20         PROSPECTIVE JUROR:  Yes, sir?

21         THE COURT:  The parties have agreed this

22  case is not for you.

23         PROSPECTIVE JUROR:  Is not for me?

24         THE COURT:  Is not for you.

25         PROSPECTIVE JUROR:  Okay.

1              THE COURT:  So we appreciate your time

2  and service to this Court and you are free to go.

3                   [Prospective juror out]

4              THE COURT:  Ms. Williams.

5                  [Prospective juror in]

6              THE COURT:  Good morning, how are you?

7              PROSPECTIVE JUROR:  I'm fine.  How are

8  you doing?

9              THE COURT:  I have juror No. 2140, Flora

10  Dean Williams.

11              PROSPECTIVE JUROR:  Yes.

12              THE COURT:  How are you?

13              PROSPECTIVE JUROR:  I'm fine.

14              THE COURT:  Welcome to the 283rd.  I'm

15  glad you were able to come in this morning.  We felt that

16  would probably be a little easier on your schedule than this

17  afternoon.

18              PROSPECTIVE JUROR:  Right.

19              THE COURT:  That shows you that we do

20  listen and we do try.

21              PROSPECTIVE JUROR:  Okay.

22              THE COURT:  Have you had an opportunity

23  this morning to review the guide that I provided for you?

24              PROSPECTIVE JUROR:  Some of it.

25              THE COURT:  Okay.  And you were provided

1  a copy of your questionnaire that you filled out back in

2  May?

3                    PROSPECTIVE JUROR:  Right.

4                    THE COURT:  The objective this morning is

5  the lawyers will go over with you and visit with you about

6  the law in this case and bring you up to speed on how it all

7  relates.  At the end of the program my job is to determine

8  two things, one, do you understand the law, and, two, can

9  you follow the law.  That's my big picture.  The only

10  question I have for you at this time is will you be able to

11  serve this Court for two weeks beginning on November 10th?

12                    PROSPECTIVE JUROR:  No.

13                    THE COURT:  Why?

14                    PROSPECTIVE JUROR:  I keep children

15  during the day.

16                    THE COURT:  Now, the law provides if you

17  have legal custody of a child of the age of ten or under,

18  you may claim an exemption.  Do you have legal custody of

19  these children?

20                    PROSPECTIVE JUROR:  My grandson, yes.

21                    THE COURT:  I understand, but do you have

22  legal custody?  You may keep them or babysit, but that's not

23  legal custody.

24                    PROSPECTIVE JUROR:  No.

25                    THE COURT:  You do not have an exemption.

1    Mr. Shook, would you like to inquire?

2             MR. SHOOK:  I will inquire, Judge, thank

3    you.

4                    FLORA WILLIAMS,

5    having been duly sworn, was examined and testified as

6    follows:

7                  DIRECT EXAMINATION

8    BY MR. SHOOK:

9         Q.    Ms. Williams, as the Judge said, we're just

10   interested in your honest opinions.  And from reading your

11   questionnaire, you seem to me to be the type of person that

12   does that.  You just tell us what's on your mind and you are

13   very honest; is that right?

14        A.    Yes.

15        Q.    Okay.  Let me talk about this situation with

16   your children.  Everyone has different things going on with

17   their life.  And back in May on your questionnaire you said

18   you have children you are keeping in your home and no one to

19   oversee them, if you go away.  Do you have more than one

20   child you have to care for?

21        A.    Yes.

22        Q.    How many children are there?

23        A.    I have two.

24        Q.    Okay.  And one of them is your grandson?

25        A.    No.  One stay with me, but I keep two in the

1    daytime that is not in school.

2         Q.      So the one that stays with you, is that your

3    --

4         A.      That's my grandson.

5         Q.      And does he stay with you at night, also?

6         A.      Yes.

7         Q.      So he's there at your house at all times?

8         A.      Right.

9         Q.      How long has he been living with you?

10        A.      Five years.

11        Q.      Okay.  And how old is he?

12        A.      Five.

13        Q.      So you've been raising him since he was a

14   baby?

15        A.      Yes.

16        Q.      And for all intents and purposes, then, have

17   you been acting as his mother, raising him, feeding,

18   clothing, providing for him?

19        A.      Well, his father stay there, too, also.

20        Q.      Okay.  Is his father there during the day?

21        A.      No.

22        Q.      Okay.  So during the day are you the only one

23   there to care for him?

24        A.      Right.

25        Q.      And that's where your concern comes from?

1    A.    Yes.

2    Q.    If you were -- had to be on the jury for that

3  two-week period, would there be anyone else that could

4  possibly take care of him or would it be a situation where

5  he could be left unattended or left with someone that you

6  didn't know that well or something like that?

7    A.    He's in school.

8    Q.    When does he get out of school?

9    A.    2:45.

10    Q.    Okay.  Well, the trial, you'd be down here

11  until 4:30 or 5:00, then.  Would there be anyone there to

12  care for him at 2:45, or --

13    A.    No.

14    Q.    That's what you do?

15    A.    Right.

16    Q.    Would it be a situation, then, if, and this is

17  a hypothetical situation, if you were placed on a jury,

18  then, obviously, there would be no one there to care for the

19  child; is that right?

20    A.    Right.

21    Q.    I believe your husband has some type of

22  disability; is that right?

23    A.    Right.

24    Q.    So he's unable to do that?

25    A.    Right, correct.

1    Q.    Okay.  Obviously, then, that would cause you

2  some concern, if that were the situation, if he didn't have

3  the proper care?

4    A.    Right.

5    Q.    You would be unable to concentrate on the case

6  in that situation?

7    A.    Not unless I can get me a babysitter.

8    Q.    Okay.  And that would cause you a lot of

9  concern?

10   A.    Right.

11   Q.    Additionally, on your questionnaire you put

12 that you are not in favor of the death penalty.  From your

13 point of view, you are against it; is that right?

14   A.    Somewhat, yes.

15   Q.    Is that a religious belief --

16   A.    No.

17   Q.    -- on your part or what type of belief?  What

18 is that based on?

19   A.    It's just based on my feelings.

20   Q.    Okay.  But it's something that you're really

21 not for --

22   A.    Right.

23   Q.    -- as a law?

24   A.    Right.

25   Q.    And why is that?

A.    Well, I just don't believe a life should be taken for a life.  I mean, I would have to hear the case first to see if the death penalty would be, you know, satisfactory and what happened to the person.

Q.    Okay.  Well, ma'am, let me ask you this.  We brought down like a thousand people because everyone feels differently.  We've got some people that are against the death penalty for religious reasons or moral reasons or personal reasons and they tell us that, honest with us, and that's fine.  That's fine.  And they couldn't ever render a decision which would take another person's life.  It would bother them too much or their beliefs would prevent them from doing that and they tell us that and that's fine.  We excuse them and they go on to another case somewhere down the line.

We have other people that are just adamantly for it.  They really can't be fair either, and they tell us that, and we excuse them, also.  And that's why we bring so many people down because people feel differently.  You don't know what kind of jury you're going to be brought down on when you come down here.  It might be a DWI case, a divorce case, or it could be a capital murder in which the State is seeking the death penalty.  It's just -- it's not your choice, obviously.

But when we, we have to question you and

1    then we, by law, have to ask you these questions under oath.

2    Do you really think, then, now that you know it's a capital

3    murder case in which the State is seeking the death penalty,

4    and you have reservations or some objections from your

5    personal point of view against taking a life, would this be

6    really the type of case you could sit on as a juror or would

7    you be better suited for another type of case that did not

8    involve the death penalty?

9         A.    I think I would be best suited for another

10   case.

11        Q.    And that's because of the potential of taking

12   a life of another human being?

13        A.    Right.

14        Q.    And that's where your objection comes from?

15        A.    Right.

16        Q.    And you, I take it you feel strongly about

17   your objections about taking a life.  It's something you've

18   thought about; is that right?

19        A.    Exactly.

20        Q.    And you're not going to be able to put those

21   feelings aside, will you?

22        A.    No.

23        Q.    And that might interfere with your ability to

24   objectively look at things, obviously, if you're thinking

25   about that; is that right?

1   A.  Right.

2   Q.  Coupled with your problem with the child care

3 also might interfere with your concentration?

4   A.  Right.

5        CROSS-EXAMINATION

6 BY MS. BUSBEE:

7   Q.  Ms. Williams, are you telling us that you just

8 couldn't really give the State a fair trial on a death

9 penalty case?  I think that's what he was asking you.

10   A.  Right.

11   Q.  Because they're entitled to rely on the law

12 and if that's the case, then I think we could probably agree

13 on it.  I just wanted to get you to tell me that, if that's

14 your true feeling.

15   A.  Yes.

16   Q.  So you just wouldn't give anybody the death

17 penalty as a practical matter?

18   A.  Exactly.

19   Q.  All right.  I guess we can agree on that.  I

20 appreciate your honesty.  Well, actually I don't, but they

21 do.

22      MR. SHOOK:  Judge, I believe we have an

23 agreement.

24      THE COURT:  Ms. Williams, the parties

25 have agreed to excuse you.  You saw very quickly that I

1   wouldn't, right?

2                    PROSPECTIVE JUROR:  Right.

3                    THE COURT:  I mean, I have a legal

4   framework I have to go through.  Either you are or you're

5   not and you weren't.  So I'm going to -- I'm not going to

6   let you go.  But they are much more sympathetic than I am.

7   So they have excused you from jury service.  We appreciate

8   you coming down, but you will not serve on this jury.  Thank

9   you so much.

10                   PROSPECTIVE JUROR:  Okay.  Thank you.

11                        [Prospective juror out]

12                        (Recess)

13                   THE COURT:  Ms. Johnson.

14                        [Prospective juror in]

15                   THE COURT:  Good afternoon.  Please have

16  a seat.  We have juror No. 2143, Lisa L. Johnson.  Good

17  afternoon, Ms. Johnson.  How are you?

18                   PROSPECTIVE JUROR:  I'm fine.  How are

19  you doing?

20                   THE COURT:  Have you had enough time to

21  review the guide I provided for you?

22                   PROSPECTIVE JUROR:  Yes, this here?  Yes.

23                   THE COURT:  We've also given you a copy

24  of the questionnaire that you filled out for us in May.  The

25  attorneys may want to visit with you about some of the

answers or have you expound upon what you have already given

us.  If necessary, you may refer to it, if you need it.

The process here today is designed to give you a better understanding of the law.  It's a lot to give someone when they first walk in the door and we don't expect you to understand how it all relates at this point. That's what the discussion is about.

The objective at the end of this interview process is I have two questions I must ask, one, do you understand the law, two, if you understand the law, can you follow the law?  That's the big picture that I have to look at.

PROSPECTIVE JUROR:  Yes.

THE COURT:  Before I turn it over to the lawyers, is there any reason why you cannot serve us for the two weeks beginning on November 10th?

PROSPECTIVE JUROR:  Yes.  I'm a full-time -- I have a full-time job and I'm a full-time student.

THE COURT:  I can't help you with the full-time job.  There is an exemption under the Government Code for a full-time student.  Can you tell me more about what you are doing?

PROSPECTIVE JUROR:  As far as the school? Yes, I'm taking 16 hours.  I'm completing my bachelor's degree in December, going full-time.

1          THE COURT:  And where do you attend?

2          PROSPECTIVE JUROR:  I go to Northwood

3    University in Cedar Hill.

4          THE COURT:  Sixteen hours?

5          PROSPECTIVE JUROR:  Uh-huh.

6          THE COURT:  And what will your degree be?

7          PROSPECTIVE JUROR:  It will be Bachelor's

8    of Business Administration, Business Management.

9          THE COURT:  I believe you put that on

10   your questionnaire, but we never know exactly if you are

11   full-time or part-time or whatever.  I do remember reading

12   that.  And you indicated that you would be through in

13   December, but we didn't know if it was night school or what

14   was your situation.  So you're telling me that you wish to

15   claim the exemption?

16         PROSPECTIVE JUROR:  Right.

17         THE COURT:  Any objection by the State?

18         MR. SHOOK:  No, sir.

19         THE COURT:  Defense?

20         MS. BUSBEE:  No, Your Honor.

21         THE COURT:  Ms. Johnson, you do have an

22   absolute exemption.  It will be the last semester you will

23   be able to claim that, so maybe we'll catch you the next

24   time around.  Thank you very much for coming in.  We wish

25   you well.

1      PROSPECTIVE JUROR:  Thank you.

2          [Prospective juror out]

3      THE COURT:  Mr. Silva, please.

4          [Prospective juror in]

5      THE COURT:  Good afternoon, sir.  How are

6  you?

7      PROSPECTIVE JUROR:  Just fine, sir.

8      THE COURT:  Welcome to the 283rd.  We've

9  got juror No. 2172, Mr. Johnny J. Silva.  Mr. Silva, thank

10  you for being here on time and have you had an opportunity

11  to read the guide I provided for you this afternoon?

12      PROSPECTIVE JUROR:  Yes, sir.

13      THE COURT:  I gave you a copy of the

14  questionnaire that you filled out in May to let you refresh

15  some of your thoughts and the answers you provided for us at

16  that point.  I give you a lot of law to think about.  The

17  idea of this interview process now is for the attorneys to

18  go over that law with you in more detail and give you a

19  better frame of reference so you can understand how it all

20  relates.  And ultimately I have two questions to answer at

21  the end of the process.  Number one is, do you understand

22  the law, and, number two, can you follow the law?  That's

23  the big picture I have to look at.

24      PROSPECTIVE JUROR:  Yes, sir.

25      THE COURT:  So there are no wrong

1  answers.  Some people feel kind of intimidated when you come

2  in and you're the focus of attention, but it's a whole lot

3  better than having all 700 people down there at one time.

4  You recall it was a hot morning and all stuffed in there.

5  So this is a little more intensive, but also we try to make

6  it as informal as we can.  There are no wrong answers, just

7  honest opinions.  Okay?

8                    PROSPECTIVE JUROR:  Yes, sir.

9                    THE COURT:  Only question I have for you

10  at this point before we begin, will you be able to serve

11  this Court for a period of two weeks beginning on November

12  10th?

13                    PROSPECTIVE JUROR:  Well, something has

14  come up at work that we've scheduled a big national meeting

15  in Florida, starting actually November the 12th.  And it's

16  like a five-day meeting.  So that might be a problem for me

17  to miss that meeting.

18                    THE COURT:  Can you tell me a little bit

19  about your work?

20                    PROSPECTIVE JUROR:  I work for the Post

21  Office for the southwest area.  I'm manager of budget for

22  the area which encompasses five states, Texas, Oklahoma,

23  Arkansas, Louisiana, and Albuquerque.  This national meeting

24  is a meeting of all the finance managers at the area level

25  and all of the districts that we have in our five-state

1  area, including other areas like the Chicago area, the

2  Pittsburgh area, and the Florida area.

3  THE COURT:  Mr. Silva, I know that

4  anybody that's on this jury will have conflicts at work or

5  at home and business reasons are not allowed to let someone

6  off of jury service.  The reason we're doing this, this far

7  enough out in advance, is if you are selected to sit on this

8  jury, you will be able to work around that and have someone

9  take your place at that meeting.

10  Especially for the post office, I know

11  that you want to think that you're indispensable, but it's

12  something that I know they would be able to work around.  So

13  I can't excuse you from jury service for that.  We'll just

14  have to deal with it.

15  PROSPECTIVE JUROR:  I understand that.

16  THE COURT:  Thank you, sir.  Mr. Shook,

17  would you like to inquire?

18  MR. SHOOK:  Yes, sir.

19  JOHNNY SILVA,

20  having been duly sworn, was examined and testified as

21  follows:

22  DIRECT EXAMINATION

23  BY MR. SHOOK:

24  Q.    Mr. Silva, my name is Toby Shook.  I'll be

25  asking questions on behalf of the State this afternoon.  As

1  the Judge said, there aren't any right or wrong answers to

2  any of our questions.  We're just looking for your honest

3  opinions.  I believe you've been down on a couple of juries

4  before; is that right?

5       A.     Yes.  I've been on one murder jury before,

6  yes, I have.

7       Q.     Usually some of the rules we'll talk about,

8  you will be familiar with them because they apply to those

9  types of cases.  Of course, you recall when you were

10 selected that last jury the lawyers probably talked to you

11 in a group.  But because it is a capital case in which we

12 seek the death penalty, we have this procedure where we talk

13 to each juror individually.

14             I'm going to ask you a few things off

15 your questionnaire and then talk to you about capital

16 murder, some of the rules and laws that apply.  Kind of just

17 as a followup with what you were talking about with the

18 Judge, in your day-to-day duties with the postal service,

19 you manage the budget for several -- this particular area?

20      A.     Yes.  I have a five-state area, which

21 encompasses -- we have an operating budget of about 5.6

22 million dollars.  Excuse me, 5.6 billion dollars, with the

23 revenue of about five billion dollars.  So that's what we

24 manage, yes.

25      Q.     Okay.  And that's what your meeting is about

1  in November?

2  A.     It encompasses that in general.  I mean, we

3  have other things that we cover.  We also cover our

4  accounting issues.  I mean, we have several new systems that

5  we're bringing in, you know, on line this year and those

6  things will be, you know, gone over.

7  Q.     Okay.  Let me talk to you a little bit about

8  that case you sat on, which was a murder case, I believe?

9  A.     Yes, sir, it was.

10  Q.     About how long ago was that?

11  A.     That was in 1998.

12  Q.     Okay.  Kind of fill us in on the facts as you

13  recall, kind of generally what kind of case it was.

14  A.     In general, it was an individual who just came

15  upon another individual in the public streets and just shot

16  him for no apparent reason.  I mean, there wasn't theft or

17  anything like that.  But, I mean, it was --

18  Q.     Just shot him with a handgun?

19  A.     Just shot him with a handgun and shot him, I

20  believe it was five or six times.

21  Q.     Okay.  And they apparently didn't know each

22  other prior to that?

23  A.     No.

24  Q.     Okay.  Did the defendant testify in that case?

25  A.     No.

1    Q.    Okay.  And you put in the questionnaire that
2  he was found guilty and your assessment was 60 years that
3  you recall?

4    A.    That's correct.

5    Q.    Anything as far as the deliberations go, were
6  there, was it heated at all?  Was there any major arguments
7  or was it a pretty open-and-shut case?

8    A.    It was a pretty open-and-shut case, as far as
9  the guilt part of the verdict.

10    Q.    How about punishment?

11    A.    The punishment was a little difficult.  There
12  was quite a bit of conversation in the punishment.  Most
13  wanted to go for the, I believe it was 99 years or life,
14  whichever the case was, you know.  And there was a couple of
15  us that kind of leaned toward a lesser punishment.  And I
16  think we ended up compromising on a 60 year.

17    Q.    Okay.  What was going through your thought
18  processes?  We have a section in the questionnaire.  I don't
19  know if you remember it.  It asks if you served on a jury,
20  how much did you participate and we give you a choice of
21  more than others or less and you put less, but you said you
22  had more influence.

23    A.    Well, I'm a quiet person in general and I like
24  to listen and evaluate the facts and that's, I think that's
25  what I was thinking of at the time.  But I think once I made

1  up my mind, you know, then I communicated a little bit more

2  and I think that did influence somewhat.

3            Q.       What was going through your mind, then, on

4  what you were determining what the proper punishment was in

5  that case?

6            A.       Well, I was trying to evaluate several things.

7  I mean, to me, you know, it appeared that this was just not

8  premeditated in any way and it was just an emotional thing

9  that the gentleman had just, for whatever reason, you know,

10 it just came upon him to do this and I think most of the

11 jurors were influenced by the fact that five or six rounds,

12 you know, that he let off and, you know, it was a small

13 handgun.  And I was thinking, you know, I used to shoot guns

14 a long time ago, that a gun can get away from you sometimes

15 and you don't realize how many times you're pushing, you

16 know, pulling the trigger so to speak.

17            And that kind of came into my thoughts

18 because their big issue was, you know, he shot him five

19 times.  And I said, you know, I don't think it makes any

20 difference if you shot him one time or five times, you know.

21 And they wanted to go with a longer sentence because of the

22 five times.  I believe that was the biggest thing.

23            Q.       What type of weapon was it?

24            A.       Like I said, it was a small handgun, like a

25 .22 pistol or something.

1    Q.    All right.  Now, did the -- was there any

2    prior record shown in the case, any previous convictions,

3    anything like that?

4        A.    I don't recall that.

5        Q.    Okay.  We ask also in the questionnaire about

6    if you followed any cases.  And you, like a lot of jurors,

7    put the O. J. Simpson case.

8        A.    Yes.  That did interest me, yes.

9        Q.    Because I guess we couldn't get away from that

10   one.  What opinions did you draw from the O. J. case, what

11   you saw and followed in that case?

12       A.    Well, as I followed the case, I thought he was

13   going to be guilty.

14       Q.    Were you surprised when they came out with a

15   not guilty?

16       A.    Yes, I was.

17       Q.    Did you think from what you knew about the

18   case that that was not a fair or just decision?

19       A.    I did not think so.

20       Q.    Okay.  And I believe we also asked about if

21   you've known anyone that's gone through the justice system,

22   and you did have a brother-in-law that had a drug case and

23   spent some three months in jail in 2000; is that right?

24       A.    I think it was around 2000, yes.

25       Q.    Did you know what the facts were involved in

1   that case?

2       A.    No, I did not.

3       Q.    Okay.  So as far as, you know, was he treated

4   fairly by the criminal justice system or do you know?

5       A.    I do not know.

6       Q.    Okay.  Let me ask you about the capital murder

7   and the death penalty.  You know from what the Judge has

8   said, that the State is seeking the death penalty.  So we

9   want to talk with each juror, how they feel about it.  Are

10  you in favor of the death penalty as a law?

11      A.    Yes.

12      Q.    Okay.  Can you just tell us in your own words

13  why you favor it, the purpose you feel it serves society?

14      A.    I think the main purpose is it's a deterrent

15  from others committing similar crimes.

16      Q.    What types of crimes do you think that are

17  appropriate for the death penalty?

18      A.    Well, like anything involving a firearm or

19  basically if you, like, a police officer-type situation, a

20  public servant.

21      Q.    Public servant killed in the line of duty?

22      A.    Yes.

23      Q.    That sort of thing?

24      A.    Yes.

25      Q.    Okay.  As far as your adult years, have you

1  always believed in the death penalty?

2       A.    As far as I can remember, yes.

3       Q.    It wasn't any specific event that caused you

4  to feel that way?  It's just the way you were raised or

5  brought up or opinions you formed?

6       A.    Just opinions I formed.

7       Q.    Okay.  In Texas there's only certain types of

8  cases which are eligible for the death penalty.  It has to

9  be a murder case.  It has to be an intentional case.  A lot

10  of murder cases, like the one you sat on, can be brutal, but

11  you can't get the death penalty.  You have to have a murder

12  plus something else, another aggravating fact, such as a

13  murder that occurs during a felony.

14            Murder during robbery, if someone goes in

15  and robs a 7-Eleven and kills the clerk, that could be.

16  Murder during a burglary, during a rape, arson, kidnapping,

17  those are the types of cases.  Also murder of specific

18  individuals like a police officer, fireman, or prison guard

19  on duty, murder of a child under the age of six, murder for

20  hire, someone does it for money, and then your serial killer

21  situations, more than one victim.

22            But those are the types of crimes that

23  have been reserved for the death penalty in Texas.  As far

24  as that list goes, are there any of those on the list that

25  you disagree with from the standpoint of being considered

1    for the death penalty?

2            A.      No.

3            Q.      Okay.  If it were up to you, would you expand

4    that list at all to include other types of crimes?

5            A.      Um, I can't recall, I mean, I don't -- nothing

6    is coming to mind.

7            Q.      It sounds all right to you?

8            A.      It sounds pretty fair, the items that you

9    discussed.

10           Q.      Okay.  Now, when we talk about capital murder,

11   usually we think of an example, that's natural, and we

12   usually think of the actual man, the triggerman, causing the

13   death, like the guy who goes into a 7-Eleven, shoots the

14   clerk.

15                   But sometimes a capital murder is carried

16   out by more than one individual.  There might be several.

17   The common term used for that is accomplices, people that

18   assist in the crime, but maybe they don't actually cause the

19   death.  Maybe there is one triggerman, that sort of thing.

20                   And people feel differently about that as

21   far as prosecution of capital murder for the death penalty

22   for an accomplice as opposed to a triggerman.  Some folks,

23   as far as from their personal point of view, they believe

24   the death penalty can be assessed against the triggerman,

25   someone that actually intentionally murders someone in a

1   capital murder situation.

2                 But they have a different view when it

3   comes to an accomplice who assists in some way.  Other

4   jurors feel that maybe an accomplice should be prosecuted

5   for the same crime and held accountable, just like the

6   triggerman.  But everyone differs.  And we want to ask every

7   juror your honest opinion on how you feel about the

8   prosecution of an accomplice in a capital murder situation,

9   a death penalty case?

10      A.    I think I would be against that, an

11   accomplice.  Naturally, it would depend on the degree, you

12   know, that, I mean, if he just sat in the car or something,

13   that would be different.

14                But if he was there with him and he could

15   have maybe probably prevented the murder from taking place,

16   then under those circumstances, there could be a possibility

17   that I would, you know, vote for that death penalty.  But in

18   general it would be difficult for me to say to give a death

19   penalty for an accomplice.

20      Q.    Okay.  So in the general point of view, you

21   would feel you would reserve the death penalty just for the

22   triggerman?

23      A.    That's correct.

24      Q.    And the accomplice situation you would be much

25   less likely or unlikely to, especially a situation you said

1   if they were in a car or something like that?

2          A.      Yes.

3          Q.      What did you mean by that?  They still knew

4   about the crime or --

5          A.      Just happened to be, you know, either a

6   passenger in the car as maybe the murderer was going by and

7   shot someone or something, he just happened to be a

8   passenger.  That's what I was referring to.

9          Q.      Let me go over the part of the law of

10  conspiracy and I just want to get your honest opinion on it.

11  Under the conspiracy law, two people can agree to commit one

12  crime and if they are committing that crime and one of the

13  conspirators, one of the criminals, commits another crime in

14  furtherance of that original conspiracy, they can all be

15  held accountable, even if they didn't really intend for that

16  crime to occur.

17              In a capital murder situation, if

18  Mr. Wirskye and I decided we want to rob a bank and I had a

19  gun and our plan was for me to go in and rob it and he was

20  going to help load the money up, and then in the middle of

21  the robbery I start shooting people and I kill one of the

22  tellers.

23              I can, obviously, be prosecuted for

24  capital murder, even get the death penalty.  But he, as an

25  accomplice under the conspiracy law, could conceivably also

be prosecuted, even if he didn't have the intentions for someone to die.

To get someone guilty of capital murder, what we have to prove is we agreed to commit the crime and another murder was committed by myself, and the jury believes he should have anticipated that a murder could occur. And the difference there is someone maybe should have anticipated, but they didn't actually want a crime to occur, the murder to occur. But from all the facts and circumstances from the juror's point of view, they should have anticipated that.

So a person can actually be convicted under the law, if they did not intend someone to die of capital murder. And some jurors agree with that. Other people would put more emphasis if it were up to them on the intent. I mean, if he's in there encouraging the person to die, maybe directing him, like, you need to shoot him now, that sort of thing. That's one thing.

But the guy didn't even intend for that person to die, maybe he could be held accountable as a robbery, get a lot of years for bank robbery, but not capital murder conviction.

How do you feel about that law where the person doesn't even actually have to have that intent to get a conviction on the accomplice?

A.      If they didn't have that intent, I don't think I could give that death penalty.

Q.      A lot of jurors feel that way and that's why I cover the law that way because I want to get your true feelings.  To get to the death penalty, we do have to actually prove that he anticipated a person would die, but to the conviction it's different.  And it could be just should have.  And then that's where some people would draw a line and go, look, I know what the law is there, but I can't convict someone unless they have that intent for that person to die, too, because that's the key, the intent.  They don't pull the trigger, but their intention is to die, then that would be the key factor for me.  But if he doesn't have the intent, then I couldn't do it, and they just disagree with that portion of the law.

And it's fine if you agree with that, feel that way.  That's why we kind of go over the questions this way.  And that's how you feel, if the person didn't have the intent, then you couldn't convict him under the conspiracy law that way?

A.      That's correct.

Q.      Okay.  Let me talk to you for a minute about these Special Issues.  Special Issue No. 1 you don't get to until the punishment phase.  And it asks whether there's a probability that the defendant would commit criminal acts of

1  violence that would constitute a continuing threat to

2  society.

3           MR. SHOOK:  One moment.  Judge, I think

4  based on the juror's last answers then we can, I can -- I

5  can finish with my questions.

6           MS. BUSBEE:  We've reached an agreement,

7  Your Honor.

8           THE COURT:  Mr. Silva, I appreciate your

9  time and service here to the Court today and the parties

10 have agreed to excuse you.  You will not serve on this jury.

11 Thank you so much.

12          PROSPECTIVE JUROR:  Thank you.

13          THE COURT:  Now you don't have to worry

14 about your meeting.

15               [Prospective juror out]

16          THE COURT:  Dr. Danaher.

17               [Prospective juror in]

18          THE COURT:  Please have a seat.  Good

19 afternoon.

20          PROSPECTIVE JUROR:  Good afternoon.

21          THE COURT:  Juror No. 2077, Dr. Gary

22 Michael Danaher.  Thank you, sir, for -- I believe we had a

23 lady this morning that was scheduled this afternoon and you

24 were scheduled this morning and it turned out that you had a

25 meeting that you needed to have this morning, so it worked

1  out best for both of you.  Thank you for being here.

2             PROSPECTIVE JUROR:  It worked out.

3             THE COURT:  Have you had an opportunity

4  to read the guide I provided for you?

5             PROSPECTIVE JUROR:  I have.

6             THE COURT:  We also gave you a copy of

7  your questionnaire that you filled out for us back in May.

8  The attorneys may want to refer to some of your answers and

9  you'll have it there --

10            PROSPECTIVE JUROR:  I do.

11            THE COURT:  -- to refresh your

12  recollection.  I don't expect you to understand all the law

13  that I have given you so far.  That's what this opportunity

14  is, to visit with you about the law, give you some time to

15  think about, it and understand how it all relates.

16            At the end of the process the Court has

17  to make two, answer two questions.  Number one, do you

18  understand the law and, number two, can you follow it?

19  That's my big picture.

20            The only question I have for you at this

21  point is will you be able to serve this Court for the period

22  of two weeks beginning on November 10th?

23            PROSPECTIVE JUROR:  As far as I know at

24  this time, I could.

25            THE COURT:  Thank you, sir.  Mr. Wirskye,

1  would you like to inquire?

2                    MR. WIRSKYE:  May it please the Court?

3                    GARY DANAHER,

4  having been duly sworn, was examined and testified as

5  follows:

6                    DIRECT EXAMINATION

7  BY MR. WIRSKYE:

8        Q.    How are you doing this afternoon, sir?

9        A.    Very well.

10       Q.    Good.  My name is Bill Wirskye.  I'll be the

11  Assistant DA that will be visiting with you for the next few

12  minutes.  What I'd like to do is follow up on some of the

13  information that you provided for us in your questionnaire,

14  talk to you a little bit on your thoughts and feelings about

15  the death penalty, since this is a case where the State is

16  seeking the death penalty, and, finally, maybe talk to you a

17  little bit about some of the laws and rules that apply in

18  cases like this.

19                    Hopefully some of that will be somewhat

20  familiar to you, because I know you served on a criminal

21  jury before; is that right?

22       A.    Yeah.  It was a drunk driving type situation.

23       Q.    Okay.  How long ago was that?

24       A.    In my notes I think it was around '95.  That's

25  approximate.  It was a situation -- shall I elaborate?

Q.   Sure.

A.   The gentleman was conceding that he was -- was conceding guilt.  It was a deal where we had to assess punishment and it was his fifth arrest for drunk driving, fifth conviction, and apparently he had to have a jury to get him off.  There was mandatory jail time, if he didn't have a jury, if I understood correctly.

Q.   All right.

A.   So he was hoping that the jury would allow him back on the streets.

Q.   You said that was back in '95?

A.   It was in the mid '90's.

Q.   Okay.  Was that the only criminal case you served on?

A.   Only criminal case.  I've been called a couple of other times and come close, but --

Q.   It looks like you were the foreman on that case?

A.   Yes, sir.

Q.   Okay.  What range of punishment did y'all have or what were your options in that case?

A.   The option was to let him walk or the outside was two years in county jail or state jail -- county jail, I think, at the time, and cash of maybe $10,000.  You would be more knowledgeable about the limits on that.  There was

1  options in there and we did assess some money and I believe

2  we gave him 18 months.

3       Q.    Okay.  And you were also on a civil jury more

4  recently; is that right?

5       A.    Yes.

6       Q.    Tell us about that.

7       A.    That dealt with a car accident.  One vehicle

8  struck another from the rear in some heavy traffic and there

9  was a physical injury, one of the drivers, that appeared

10  over time.

11       Q.    Okay.  And looks like y'all awarded about

12  roughly $93,000?

13       A.    Which was substantially what the -- what the

14  plaintiff was looking for in terms of his actual out of

15  pocket losses for hospital bills and lost wages.

16       Q.    Okay.  Did both of those deliberations go

17  pretty smoothly or were they long, drawn out any time or

18  anybody get angry or loud or vociferous?

19       A.    No, there were, well, yeah.  I think back to

20  the first one with the drunk driver.  They were basically

21  wanting to hang the guy.  We were a little more reasonable

22  about things.  The more recent one was interesting to me

23  because there were a couple of people on the trial who

24  didn't remember on the second day what had occurred on the

25  first, which concerned me.  But -- and they were really just

1  kind of wanting to get out quick, wanting to get to the bus

2  drive.

3       Q.     Having had those experiences and being foreman

4  on both a civil and a criminal jury, do you have any

5  thoughts or hesitations or concerns maybe going into another

6  jury service in a death penalty case?

7       A.     I can't imagine anybody wanting to.

8       Q.     We probably wouldn't want anyone that wanted

9  to.

10      A.     No.

11      Q.     But I didn't know how those, being on those

12 two juries, how it might affect you or what kind of

13 impressions you walked away with about the system.

14      A.     I've got a degree in political science.  I

15 kind of understand what the system's about, but it was a

16 long time ago, too.  I understand how it works and I

17 understand the necessity for it.  And in my career I've had

18 to make a lot of judgments.  I was building level school

19 principal for a long time, so you see little kids with the

20 same sort of problems as big people do, except it's not

21 quite as grave.

22      Q.     Okay.  Let me kind of just go over some of the

23 stuff in your questionnaire.  I think you've got it in front

24 of you, maybe direct your attention to page 5.  We kind of

25 gave you a series of statements and asked whether you

1   agreed, disagreed, things like that, with respect to

2   particular statements.

3                    Almost the very bottom of page 5 we have

4   the statement, criminal laws treat criminal defendants too

5   harshly and you checked that you strongly agreed with that

6   statement.  And I'm just kind of curious what your opinion

7   is or what led you to check that you strongly agreed with

8   that.

9        A.    I think I misread it.

10       Q.    Okay.

11       A.    Well, I'm sure I did.  Criminal laws treat

12  criminal defendants too harshly.  No, I misread that.

13       Q.    Okay.  Would you have strongly disagreed or

14  where would you have come down on that?

15       A.    All right.  I'll elaborate.  Probably disagree

16  in that instance, not necessarily strongly disagree.  I

17  think there's situations with every -- every situation is

18  unique and has its own characteristics and the law has to be

19  written, its nature, to cover all situations.  So that's why

20  there's a jury.

21       Q.    Okay.  Now you have told us, I guess in a

22  general sense or philosophically, at least, that you agree

23  with the death penalty; is that right?

24       A.    Generally, yes.

25       Q.    Okay.  What purpose do you think it serves in

1  society or why do you think we should have it available as

2  an option?

3      A.    I know a lot of people think it's a deterrent.

4  I don't know that it's a deterrent for some.  God in heaven

5  knows why some people don't commit a crime.  It may be a

6  deterrent because we'll never know about the cases that

7  don't occur.  As a citizen I want some assurance that a

8  person who commits a violent crime upon another isn't going

9  to have an opportunity to do it again.  And that may or may

10 not involve the death penalty.  If you've got assurances

11 that the guy is going to be put away where he can't get out

12 and perform crime on others, maybe that's best alternative.

13      Q.    Just looking through your statement, it looked

14 like maybe parole would be a concern to you or I think you

15 call it the early release system?

16      A.    My problem is, yeah, people commit crimes and

17 maybe they are sentenced to 10 or 20 years and they get out

18 in short terms.  And not, certainly not a good many of these

19 people wind up committing other crimes.  And had they served

20 the full term, they wouldn't have been out available to

21 commit that crime.

22      Q.    Do you think maybe knowing that some people or

23 some jurors are more likely to assess a death sentence

24 because they are worried about the person getting back out

25 on the street?

1        A.     I would hope that that wouldn't be the cause

2   for it.  I would hope that with the death sentence, yes,

3   there's probably a fraction of it there, but I think it's

4   society's statement towards that individual that the crime

5   committed was so grievous and heinous against the community

6   that it cannot possibly be tolerated nor can anybody else be

7   tolerated in this situation.

8        Q.     Okay.  What types of crimes come to mind when

9   you think about an appropriate case for the death penalty?

10       A.     A situation in which it's obviously

11  premeditated, they thought out what they're going to do.

12  Without bringing up any specifics, you might have a parent

13  who kills children and does it having thought out, having

14  worked out the details of when to do it, how to do it, what

15  to do later.  That's particularly heinous.

16       Q.     I know premeditation is important to a lot of

17  people we talk to.  It sounds like it's important to you.

18       A.     Yes.

19       Q.     Would you just reserve the death penalty for

20  those types of premeditated crimes?

21       A.     No.  I think in the sense that if you

22  sometimes anticipate, if you know you're walking into a

23  situation and something is likely to happen, as a rational

24  adult you should anticipate various options of occurrences.

25  And a reasonable person should anticipate that if you, if

1   you're armed or if you do something to another person,

2   something could happen.

3        Q.    Okay.  Let me ask you this.  You make the

4   statement on the first page of your questionnaire, you

5   believe there are some crimes there are deserving to protect

6   society, but I'm also aware there have been innocent

7   defendants who were later exonerated and the death penalty

8   must meet a very high standard.  And we hear that from a lot

9   of the jurors.

10            Obviously, they want that high comfort

11  level before, I guess, the ultimate penalty is imposed.  And

12  I guess, you may know this, I guess to a certain extent,

13  even our Supreme Court kind of treats death cases or death

14  penalty cases different.  You know, they acknowledge the

15  difference between a regular criminal case.  And I'm just

16  curious when you said hold us to a very high standard, what

17  did you have in mind?

18       A.    Well, back in May I suppose the situation in

19  Illinois was on my mind when I was filling this out, which

20  -- how many?  A large number of people were exonerated

21  because of DNA evidence.  A lot of people were on death row

22  in the State of Illinois based upon circumstantial evidence,

23  eyewitnesses, and that sort of evidence which may or may not

24  be accurate.  And upon scientific proof they were proven not

25  to be at the scene or they didn't commit the crime, anyway.

1    It would bother me terribly as a citizen

2    if I knew, if we executed a prisoner and later it was

3    determined that he, in fact, was innocent of the crime

4    accused.  There's no fixing it.  If you've got him in a jail

5    cell for 20 or 30 or 40 years and you later determine he was

6    innocent of the crime accused, he's lost an awful lot of

7    time and much of his life, but he still can breathe and

8    that's an out for him.

9    It beats the death penalty in that

10   situation.  Death penalty is a good punishment for black and

11   white, cut and dry.  You know for sure you've got the right

12   person.

13   Q.    Let me ask you this.  You know, again, we talk

14   to a lot of people and hear a lot of different things and I

15   think we all acknowledge when you're dealing with the death

16   penalty case, it's a little different.  As you probably

17   recall, the burden of proof in your civil case was a, you

18   know, preponderance, 51 percent of the evidence.  In a

19   criminal case you heard DWI is beyond a reasonable doubt.

20   And actually, that's the standard in this case, beyond a

21   reasonable doubt.

22   But we talked to a lot of people, again,

23   and kind of following along the lines that death is

24   different, the death penalty is different, and just for me

25   personally to assess that death penalty, you know, I can't

1   have any doubt, reasonable or not reasonable.  You know, I

2   just want to feel better about it than I would in a normal

3   standard, a normal case.  It should be higher, that type

4   thing.  Does that make sense to you?

5         A.     Yes.

6         Q.     Okay.  How do you come down on that?

7         A.     I tend to agree with that.  It's, once again,

8   if there was an error in the prosecution, an error in the

9   defense, something was overlooked, if there's room for an

10  appeal later and maybe it could be reintroduced, maybe it

11  can't be.  But if the death penalty is performed, there's no

12  more appeals after that point.  There's no fixing that.

13        Q.     Sounds like you, like so many people we talk

14  to, would just, you know, not want any doubt, I guess,

15  reasonable or otherwise, before they actually impose the

16  ultimate penalty?

17        A.     Well, there's probably going to be a

18  percentage of doubt beyond a reasonable doubt and I suppose

19  the definition of reasonable has to come into play.

20        Q.     Well, we actually don't have one in Texas.  We

21  just leave it up to the jury's good common sense.  I just

22  want to make sure, obviously, from our perspective, we talk

23  to a lot of jurors that very frankly hold us to a higher

24  burden in a case like this, a death penalty case, because so

25  much is at stake, and they think it should be treated a

1   little bit differently than all the rest of the criminal

2   cases. And they tell us, very frankly, I want to hold you

3   to the highest standard there is, something beyond beyond a

4   reasonable doubt.

5        A.    Well, in the DA's Office I would hope that you

6   would hold yourselves to a very high standard on a DWI case

7   in the same sense you have a capital murder case. Maybe it

8   doesn't at times, but I would hope so.

9        Q.    Do you think in your heart of hearts you might

10  hold us to that higher standard?

11       A.    Well, I'd hold you to a high standard, yes.

12  Would I expect the prosecution in a case like this to do the

13  best job possible? You bet. Would I expect the defense to

14  do the best possible job? You bet.

15       Q.    Are you going to hold us to a higher standard?

16       A.    Higher standard, not to a higher standard, to

17  a very high standard. Does that make sense?

18       Q.    Somewhat, I guess. We'll just move on to

19  another issue. Let me ask you this. A lot of times in

20  these capital murder cases we get in situations where we

21  talk about people, for lack of a better term, triggermen

22  versus non-triggermen, or accomplices. You know, the law

23  allows us to actively or to prosecute every person who was

24  actively involved in a crime, whether it be shoplifting,

25  whether it be a capital murder.

1    And when you're talking about the capital

2 murder context, you may have a situation where you have a

3 group of people and only one of the people actually pulled

4 the trigger, actually caused the death.  The rest can be

5 considered nontriggerman accomplices.  We call them parties

6 in Texas.  But I think most people know them as accomplices.

7    And there are a lot of people who are

8 strongly in favor of the death penalty, but in cases such as

9 that where they have nontriggermen accomplices, they start

10 drawing some lines.  You know, they may be strongly in favor

11 of the death penalty for the person that actually caused the

12 death.  But if it were up to them, they would kind of take

13 the death penalty off the table for the accomplice.  They

14 may want to lock him up for a long time, lock him up for

15 life.

16    But they simply don't believe, for

17 whatever reason, religious, moral, or ethical, that the

18 death penalty would be justified for an accomplice, a person

19 that didn't take the life.  I'm curious where you come down

20 on that.

21    A.    That's something we have to lose sleep over, I

22 suppose.  If the accomplices, I'm assuming we have one

23 triggerman and everybody else in the group is an accomplice,

24 it's an arbitrary situation.  If all of the accomplices knew

25 up front that the intent was for the triggerman to commit

1  the crime to kill somebody or to wound somebody and they

2  went along with it, knowing that that was the situation,

3  then they are probably just as guilty as the person who

4  pulled the trigger, because they had an opportunity to stop

5  the activity before it occurred.

6          Q.    Okay.   What about the death penalty for those

7  people?

8          A.    Well, as I say, if they're just as guilty as

9  the triggerman in that situation, then the death penalty

10  would probably apply to them as well, because they had an

11  opportunity to stop it.

12              Even if somebody has already committed

13  another crime, let us say drunk driving or something, and

14  something else comes up, everybody has a conscience and

15  everybody has a moral line in the sand.  And you might -- it

16  might be okay for one guy to rob a liquor store, but he's

17  not going to attempt to kill the liquor store owner.

18              There's a difference there.  And he might

19  be with somebody else who says I'm going to go in and kill

20  the liquor store owner and this other fellow says, I'm not

21  up to that, fellow.  I'm going to walk.

22          Q.    Okay.  Let me ask you, since we're kind of

23  moving along from the death penalty, let me ask you about

24  this case in particular.  You, like just about everybody

25  we've talked to, indicate they have heard something about

1    this particular case.

2            A.      Oh, yeah.

3            Q.      And, you know, it was hard to miss there for a

4    while.

5            A.      It's in the news.

6            Q.      A high profile case.  And I'm just curious

7    what you've heard about this case.

8            A.      All the particulars, or --

9            Q.      Yes, sir.

10           A.      Well, okay.  Firstly, when I look at the news,

11   I just understand that it's the news and it's from a

12   particular perspective and it may or may not be factual.

13   And having worked for a government agency, I'm aware that

14   things are said in the news that bear little or no

15   resemblance to fact.

16                   But the situation, as I understand, was a

17   group of guys had escaped from the state prison and had

18   stolen vehicles and weapons and made it to Irving where they

19   held up the store at gunpoint for whatever it was, cash,

20   more weapons, whatever it is they were looking for.  And

21   sometime during the evening or during the events, whether an

22   officer had been called or just happened to be there, he was

23   killed by one or more of the prison escapees.

24           Q.      Okay.  Did you keep up with the manhunt or --

25           A.      Yes, sort of, in that it got to Colorado and

1   my inlaws are retirees in Colorado Springs, so I have a

2   mental picture of what goes on.  And I used to go fishing

3   with my father-in-law up on Highway 24 beyond where they

4   were caught.  So when that happened, I've been by there.

5           Q.     Yeah.

6           A.     But it's like, it's a bit surreal.

7           Q.     Have you followed any of the subsequent court

8   proceedings?

9           A.     No.  You hear it in the news somebody has been

10  convicted and sentenced and that's the sum of it.

11          Q.     To be very frank with you, you probably know

12  more about this than most people we talk to, and, you know,

13  we never know how that's going to affect a potential juror.

14  We just kind of leave it up to the juror to be honest with

15  us and look in their heart of hearts and really kind of rely

16  on them to be honest one way or another whether this would

17  actually affect you, if you were to serve as a juror in this

18  case, knowing what you know or maybe being able to conjure

19  up that mental image of Highway 24 in Colorado.

20          A.     Well, that's after the fact, though.  Is this

21  case going to deal with all that stuff or is it primarily

22  the thing in Irving?

23          Q.     I would expect you'd hear complete evidence on

24  everything.

25          A.     The whole thing?  I don't perceive that it's

1    an issue.  It's no worse than somebody in Dallas County

2    living in Irving and having driven past the store where the

3    other portion of the crime was committed.

4         Q.    Okay.  So you think you could base your

5    verdict just on the evidence that you hear in the courtroom?

6         A.    I'm quite sure I could.  I'm not really

7    volunteering for this by any stretch, but I have dealt with

8    these kinds of things through my career.

9         Q.    With death penalty cases?

10        A.    No, no, no, just dealing with children and

11   problems, who beat up who, and who stole this from who, and

12   that sort of silliness and -- but it's not --

13        Q.    Okay.  Well, I guess this is a little bit more

14   than silliness.

15        A.    Oh, yeah, this is quite different.  This is

16   serious.

17        Q.    Okay.  Give me just a second, I think that's

18   all I have.  That's all I have, Mr. Danaher.  Thank you.

19        A.    Thank you.

20             MR. WIRSKYE:  I think we have an

21   agreement, Your Honor.

22             MS. BUSBEE:  Yes, we do, Your Honor.

23             THE COURT:  Dr. Danaher, I appreciate you

24   coming down today.  The parties have agreed to excuse you

25   from this jury service and so thank you and you're free to

1   go.

2                                [Prospective juror out]

3                                [End of Volume]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF TEXAS            *

COUNTY OF DALLAS          *

    I, NANCY BREWER, Official Court Reporter for the 283rd

Judicial District Court, do hereby certify that the above

and foregoing constitutes a true and correct transcription

of all portions of evidence and other proceedings requested

in writing by counsel for the parties to be included in this

volume of the Reporter's Record, in the above-styled and

numbered cause, all of which occurred in open court or in

chambers and were reported by me.

    WITNESS MY OFFICIAL HAND on this the ___4___ day of

_____March_____, 2004.




NANCY BREWER, CSR, NO. 5759
Expiration Date:  12-31-04
Official Reporter, 283rd JDC
Frank Crowley Crts. Bldg. LB33
133 No. Industrial Blvd.
Dallas, TX 75207
(214)653-5863

REPORTER'S RECORD

74851

VOLUME 22 OF _6_ VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FILED IN**
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 25th day of September 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

1        A P P E A R A N C E S

2   APPEARING FOR THE STATE

3   Mr. Toby Shook
    SBOT NO. 18293250
4   And
    Mr. Bill Wirskye
5   SBOT NO. 00788696
    Assistant District Attorneys
6   133 No. Industrial Blvd.
    Dallas, Texas 75207
7   Phone:  214/653-3600

8

9   APPEARING FOR THE DEFENDANT

10  Ms. Brook Busbee
    Attorney at Law
    SBOT:  03488000
11  703 McKinney Ave. Ste. 312
    Dallas, TX 75202
12  214/754-9090

13  Mr. Juan Sanchez
    Attorney at Law
14  SBOT:  00791599
    5630 Yale Blvd.
15  Dallas, TX 75206
    214/365-0700

16

17

18

19

20

21

22

23

24

25

PROSPECTIVE JUROR INDEX

| JUROR | CRT. | STATE | DEFENSE | VOL. |
|-------|------|-------|---------|------|
| Susan Braley | 4 | 5 | | 22 |
| Scott Mattinely | 25 | 26 | 38 | 22 |
| Judy Liston | 48 | 45 | 89 | 22 |
| Walter Thomas | 103 | 104 | 138 | 22 |
| Bradley Versteeg | 144 | 145 | | 22 |

P R O C E E D I N G S

1

2        THE COURT:  Ask Ms. Braley to come in.

3            [Prospective juror in]

4        THE COURT:  Good morning.

5        PROSPECTIVE JUROR:  Hi.

6        THE COURT:  We have juror No. 2231, Ms.

7   Susan K. Braley; is that correct?  Welcome to the 283rd.

8   Thank you for being here early this morning and I take the

9   first one in, so you were the first one in this morning.

10        PROSPECTIVE JUROR:  I was?

11        THE COURT:  Yes, ma'am.  I appreciate you

12   being here early, so we can get you in and get you on the

13   program.  Have you had enough time to review the guide I

14   provided for you?

15        PROSPECTIVE JUROR:  Yes.

16        THE COURT:  I also provided a copy of

17   your questionnaire to refresh your memory on what you looked

18   at back in May.  As I said in my guide, there are no wrong

19   answers, just honest ones.

20        PROSPECTIVE JUROR:  Okay.

21        THE COURT:  People come in a little

22   nervous, don't know what to expect.  It can be intimidating.

23   This is as informal a process as we can manage.  It's a

24   whole lot better than having 700 people out in the

25   auditorium where it's all full and hot and bothered.  So

1   this is an opportunity for the attorneys to visit with you,

2   try to help you understand how the law relates.  It's

3   complicated, so you've got to figure out how it all works

4   together.

5           At the end of the process I have two

6   questions I must ask.  One, is do you understand the law?

7   Two, can you follow the law?  That's the big picture for me.

8   Only question I have for you before we begin is will you be

9   able to serve this Court for a period of two weeks,

10  beginning on November 10th?

11          PROSPECTIVE JUROR:  As far as I know it

12  will be fine.

13          THE COURT:  Nobody has a crystal ball.

14  Thank you very much.  Mr. Shook, would you like to inquire?

15          MR. SHOOK:  Yes, Judge.

16          SUSAN BRALEY,

17  having been duly sworn, was examined and testified as

18  follows:

19          DIRECT EXAMINATION

20  BY MR. SHOOK:

21      Q.    Ms. Braley, my name is Toby Shook.  I'm going

22  to ask you questions on behalf of the State and, as the

23  Judge said, there aren't any right or wrong answers.  We

24  just want your honest opinions.

25      A.    Okay.

1      Q.      I'm going to go over some of the things in

2  your questionnaire and follow up on that and then we'll talk

3  about capital murder, how you feel about that, and some of

4  the rules and laws that apply to these types of cases.

5      A.      Okay.

6      Q.      And looking at your questionnaire I know you

7  are the assistant to the CFO; is that right?

8      A.      Uh-huh.

9              THE COURT:  I'm sorry, ma'am, you've got

10 to say yes.  She records everything we're saying.

11             PROSPECTIVE JUROR:  Yes, I forgot.  Yes.

12     Q.      (By Mr. Shook)  For Board for Expanded

13 Learning.  What kind of company is that?  Kind of tell us

14 what you do on a day-to-day basis.

15     A.      It's an education company.  We develop reading

16 programs for struggling readers and sell them to public

17 sectors.

18     Q.      Okay.  And in reviewing your questionnaire, I

19 saw -- we always look to see if you've had any prior jury

20 service.  It looked like you had been on some type of civil

21 case; is that right?

22     A.      Yes.

23     Q.      What do you recall about that case?

24     A.      Not that much.  Someone had been injured in a

25 car wreck and they were suing and we all agreed to pay him

1   for his medical bills, but nothing further.

2        Q.      Okay.  And you said everyone pretty much

3   agreed.  It wasn't any great controversies back there or

4   anything like that?

5        A.      No.  It was a real quick deliberation and

6   decision.

7        Q.      Okay.  And then another area I wanted to talk

8   to you about is we always ask if you've known anyone that's

9   been through the criminal justice system and it looked like

10  you had a nephew, as well as a son-in-law and a niece, that

11  had had some type of problem.

12       A.      Correct.

13       Q.      And the nephew looked like got some type of

14  probation?

15       A.      Yes.

16       Q.      What did that involve, if you know?

17       A.      From what I know, he's in Houston, not here.

18  From what I know he had gotten, he and some kids had gotten

19  a videotape and they were with some friends and some girls

20  had flashed the camera and then they took the video and were

21  passing it around and making copies and he got in trouble

22  for that.

23       Q.      Okay.  Okay.  And then the son-in-law had some

24  type of hot check case?

25       A.      Yes.  That was, of course, before he was my

1   son-in-law, it was years ago.  But I just know about, not

2   exactly, he just, and that was, you know, he got probation.

3         Q.     And then the niece was accused of some type of

4   bullying?

5         A.     Yes, that was -- and that got dropped.  That

6   was just really kidstuff.  They say her and a girl didn't

7   like each other and she took a -- I guess they had been

8   calling each other and she told her to leave her alone and

9   she was going to, you know, threatened her in some way like

10  she was going to beat her up and she turned it in to the

11  police.  It was --

12        Q.     Okay.  So nothing, it doesn't sound like any

13  of those were too serious?

14        A.     No.

15        Q.     Okay.  It wouldn't affect you one way or

16  another as a juror, I wouldn't think.

17        A.     No, uh-huh.

18        Q.     Okay.  Let's talk for a minute about capital

19  murder in general.  You put on the questionnaire that you

20  are in favor of it as a law.  And I'd like to ask you how

21  you feel about it as a law.  If you are in favor of it, why

22  you think we need it and the purpose it serves society.

23        A.     Yes, I am in favor.  Well, as a punishment for

24  people who commit crimes of capital murder, I think it's

25  appropriate.  And I think it's a deterrent.  And I think

1    it's important for the person to be punished for that crime.

2         Q.    Okay.  What types of cases from your personal

3    point of view do you think should at least come into

4    consideration for the death penalty?

5         A.    Um, well, racial killing, random killing,

6    where it's just, you know, not a crime of passion or someone

7    they know or some extenuating something.  It's just killing

8    someone.

9         Q.    Stranger on stranger?

10        A.    Right.  Just where, you know, someone goes

11   into Taco Bell and kills someone or someone kills an

12   officer, or --

13        Q.    Okay.  Have you always been for the death

14   penalty since you were an adult?

15        A.    Yes.

16        Q.    Has there been any one event that caused you

17   to feel that way or is it something you just formed an

18   opinion as growing up?

19        A.    Just formed that opinion.

20        Q.    Okay.  Have there been any cases that you

21   followed, either locally or nationally in the media, that

22   you thought were death penalty type cases or any cases that

23   caught your interest involving the death penalty?

24        A.    Not really.  You know, I've seen cases like O.

25   J., you know, all the big media cases, you know.  The lady

1   where she drowned her kids, you know, all those kind of

2   cases. You just can't help but see them on the TV. I saw

3   this case on the TV.

4       Q.    Okay. Yeah, we'll talk about that, then,

5   because everyone has probably seen a little bit of this case

6   because it did get a lot of publicity when it occurred.

7       A.    Right.

8       Q.    On the radio, TV, and newspapers. What do you

9   recall seeing or hearing about this case?

10      A.    What I recall is that some people broke out of

11  prison. Somehow they were in Dallas, something about

12  robbery, an officer was killed, and they were caught in

13  Colorado.

14      Q.    Okay. Did you follow the cases after they

15  were caught at all? Any subsequent court proceedings,

16  anything like that?

17      A.    No.

18      Q.    Okay. Just because you have seen something,

19  doesn't make you ineligible to be a juror. The rule is you

20  can't let any newspaper reports or TV shows that you've seen

21  influence you in your opinions on the case. You have to

22  just base your decisions on what you hear in the courtroom.

23                  We can't expect you to forget what you've

24  seen, but we just have to ask you to have that mental

25  discipline to decide the case based on the facts that are

1    brought forth in the courtroom from the witnesses.  Do you

2    feel you'd be able to do that?

3         A.     I guess so, yes.

4         Q.     Okay.  It just comes down to as best you know

5    yourself.  Obviously, I think you see the common sense point

6    of view is the newspaper stories, the TV interviews, or

7    reports, may not be that accurate and more accurate

8    information is going to come from what is produced in the

9    courtroom.

10        A.     Yes, I understand that.

11        Q.     Okay.  And so would you have any problem

12   following that rule and just deciding the case based on the

13   evidence you hear in the courtroom?

14        A.     No.

15        Q.     Okay.  If it were up to you would you reserve

16   the death penalty or at least have it for consideration for

17   any other crimes other than murder?

18        A.     Nothing that I can think of I would think

19   would be applicable.

20        Q.     Okay.  So it would be the types of murders you

21   talk about is when it comes under review.  In Texas there's

22   only, that's what the death penalty encompasses, it's only

23   murder cases and then only certain types of murder cases.

24   It's an intentional killing without justification, nothing

25   done in self-defense, not an accident.  But you have to have

1  murder, plus another aggravating fact, such as murder that

2  occurs during the course of another felony.

3          Examples would be a murder that occurs

4  during a robbery.  Someone goes into a convenience store and

5  shoots the clerk while robbing it.  That could be a death

6  penalty case.  Murder that occurs during a burglary, someone

7  breaks into someone's home and kills someone in the house.

8  That could be a death penalty case.

9          Murder during a rape, obviously,

10 kidnapping or arson, also murder of specific individuals,

11 such as police officers, firemen on duty, a child under the

12 age of six would qualify.  Murder of more than one victim

13 like a serial killer situation or a mass murder situation.

14 And then murder for hire, someone does it for money or

15 profit.

16     A.     Okay.

17     Q.     But those are the specific situations that

18 have been reserved for consideration of the death penalty.

19 As far as that list goes, are those the types of cases you

20 feel should come under consideration?

21     A.     Yes.

22     Q.     Okay.  When we talk about the -- any crime,

23 but in particular capital murder, it's always natural to

24 think of an example in our head such as the convenience

25 store killing I brought up.  And we naturally think of the

1  actual triggerman committing the crime.

2            However, capital murder, like any crime,

3  might have more than one person.  You might have accomplices

4  that help carry out a crime, some having greater roles than

5  others.  There might be several accomplices.  And under the

6  law if you are assisting in a crime as an accomplice, you

7  can be prosecuted and found guilty of that particular crime.

8  And this is true for capital murder, too.

9            Some people feel, and we want to ask the

10 jurors' natural reaction to that, because as far as the

11 death penalty goes, we have many people that tell us they

12 are in favor of the death penalty and feel individuals that

13 actually pull the trigger or cause the death, the actual

14 murderer, should be prosecuted for the death penalty and can

15 receive it, depending on the facts.  But if they have an

16 accomplice who is just helping them commit the crime,

17 someone that is assisting, that they should not get the

18 death penalty.

19            The law says that they may under certain

20 circumstances, but some people draw a line.  They might

21 reserve that penalty, you know, a long prison term for an

22 accomplice, but they, from their personal, moral point of

23 view, don't feel it's quite fair to prosecute someone for

24 capital murder or for them to receive the death penalty, if

25 they didn't actually murder the individual.  They reserve

1    that just for the actual triggerman.  And jurors feel

2    differently about that.  How do you feel about that

3    particular area of the law?

4         A.     I haven't really thought about it, but I guess

5    depending on if they could show that he was participating

6    and it was a joint thing, I would think that you could

7    consider that.

8         Q.     Okay.  That has a lot to do with it.

9    Obviously, we can't preview the facts, but the law says, if

10   someone is actively participating in the crime, that they

11   can be found guilty and ultimately receive the death

12   penalty.

13             An example I give to demonstrate the law

14   is let's say Mr. Wirskye and I, we want to rob the bank down

15   the street.  Our plan calls for me to have a gun.  He's got

16   a big bag and we go in there and I pull the gun out and

17   threaten everyone.  And while their hands are in the air, he

18   starts ransacking all the cash drawers.

19             During the middle of that I shoot one of

20   the tellers intentionally.  I don't like the way they're

21   looking at me or he may say they may be going for an alarm,

22   so I shoot them to prevent them from doing that.  We leave

23   and we're caught.

24             Obviously, I could be prosecuted for

25   capital murder.  I could receive the death penalty,

1  depending on what the jury decides.  But the law says

2  Mr. Wirskye could also be prosecuted for capital murder,

3  even though he didn't have anything to do with shooting.  He

4  was there helping me, actively participating in that.  From

5  your own personal point of view, do you think, then, it's

6  fair that the law, that we could prosecute Mr. Wirskye for

7  capital murder?

8        A.   I think it's fair that you could prosecute him

9  for it, but I think that naturally, as a jury, you would

10  take into consideration that he didn't actually kill that

11  person.

12        Q.   Right.  And that goes back to my original

13  point, because some jurors will say maybe prosecute him, but

14  as far as a penalty goes, the death penalty would be off the

15  table for me.  I would reserve that for the triggerman.

16  Life sentence, 99 years, 50 years maybe for someone that's

17  helping, a bank robbery conviction, but not a death sentence

18  in those situations.  Other jurors tell us they may do that,

19  you know, depending on the participation.

20        A.   I think after hearing the evidence, if you

21  felt like he was much of a participant and it was his

22  intent, too, then I guess you would just have to decide at

23  that point.  But I do, you know, he didn't commit the

24  murder, so I guess there is a difference in my mind.

25        Q.   Okay.  Would it be such a difference that from

1  your own personal point of view, you don't think a death

2  sentence should be imposed on parties?  That's what we call

3  them, parties or accomplices, in these situations?

4      A.    No.

5      Q.    Okay.  It would just depend on the facts?

6      A.    Right.

7      Q.    You brought up the word "intent," and let me

8  go over one of the theories we can prosecute the case under.

9  It's called conspiracy.  The law says that if one or more

10  persons enter into a conspiracy to commit one crime, and one

11  of the conspirators commits a different felony in order to

12  further the conspiracy, they can all be held responsible,

13  even though they didn't intend for that other crime to

14  occur, if a jury believes they should have anticipated that

15  could happen.  Now, in our situation a conspiracy is simply

16  our agreement to commit bank robbery.

17      A.    Uh-huh.

18      Q.    And during the course of that bank robbery, I

19  committed this capital murder by shooting the teller to

20  further that bank robbery.  The law says that Mr. Wirskye

21  could be found guilty, even though he didn't intend for that

22  to happen, didn't want that to happen.  But the facts show

23  he should have anticipated that could happen.

24             In other words, to even get him guilty of

25  capital murder, he doesn't have the intent for that person

to die.  But if the facts show, well, you should have

anticipated that could happen, you can be found guilty under

the law.

            And some people have a problem with that

aspect, you know.  Their key on an accomplice would be, I

think you can convict someone of capital murder, if they're

not the triggerman, if that was their true intention, they

wanted that person to die, that sort of thing.  But under

the conspiracy law we don't even have to prove that

intention to get a guilty verdict.  And sometimes we have

jurors go, well, from my personal point of view, I disagree

with that particular area.  How do you feel about that?

    A.      I could see that point, because if you're

going in some place, robbing some place, and you have a gun

that's loaded --

    Q.      Okay.  Then you could see where someone could

be convicted, even though they didn't have the intention?

    A.      Yeah.  If I walked in some place and had a gun

loaded and I was robbing someone, then something can happen.

    Q.      Okay.  So you can see areas where, even if

someone didn't have the intent, necessarily, or wasn't

urging, that they could be found guilty of capital murder?

    A.      Yes.

    Q.      Okay.  The trial in a capital murder case

is divided into two parts.  There's the guilt/innocence

stage and then the punishment stage.  Guilt/innocence stage,
we have to prove that indictment to you beyond a reasonable
doubt.  If we fail to do that, obviously, it's a not guilty
finding.  But if we do, then we go on to the punishment
phase where you may hear additional evidence.  And at the
close of that evidence, you get these Special Issues, which
we'll go over more in a minute.

But basically what the State has to do is
prove to you beyond a reasonable doubt that the defendant
would be a continuing danger to society, that he did
anticipate a life would be taken, and thirdly, that there is
not sufficient mitigating evidence to warrant a life
sentence.

If the questions are answered yes,
yes, and no.  The Judge has no discretion.  He would
sentence the defendant to death.  The jury doesn't actually
write death or life in their verdict form, but they answer
those questions and the Judge sentences according to how
they answer them.  If they're answered any other way, other
than the yes, yes, and no, then he would sentence the
defendant to life.

But those are the only two possible
outcomes, a death or life sentence, once someone's been
found guilty.  The procedures are the same in each case.
Are you familiar with the method of execution in Texas?

1    A.    Um, no.

2    Q.    Okay.  It's by lethal injection.  And from

3  living here you probably are aware that the death penalty is

4  actually carried out.

5    A.    You mean that we have death penalties carried

6  out in Texas?

7    Q.    Right.

8    A.    Yes.

9    Q.    You may have followed those in the news.

10   A.    I can't think of one, but I'm sure I've seen

11  something, yes.

12   Q.    Texas actually leads the nation in executions.

13  Almost every year Texas leads all states in executions.

14  There have been probably close to 20 executions this year

15  alone.

16           The procedures are the same in each

17  case.  They'd be the same in this case, if the defendant

18  were found guilty and those questions were answered in a

19  yes, yes, no.  The defendant would be placed on death row.

20  I can't tell you when, but at some point in time the Judge

21  would actually give him an execution date.  The day before

22  that date he would be taken off death row and put in

23  downtown Huntsville where there's an old prison where all

24  executions take place by law.

25           On the date of his execution he's given

1   time with family members, if he desires, religious person of

2   his choosing.  He's given a last meal, if he can eat it or

3   chooses to eat it.  But at 6:00 p.m. all executions take

4   place.

5           The procedures are the same in each case.

6   He would be taken shortly before 6:00 p.m. into the

7   execution chamber, put on a gurney which is constructed of

8   leather straps, secured on that gurney, and needles are

9   placed in his arm.  After that is in place, witnesses are

10  brought in from the victim's side as well as the defendant's

11  side in separate rooms.

12          The warden is there and he's given an

13  opportunity to make a last statement, and that's often

14  covered in the news.  You may have read that at some point

15  in time.  They usually kind of make a big deal about that.

16  The person may ask for forgiveness.  He may proclaim his

17  innocence.  You often have quotes from family members, that

18  sort of thing.

19          But after that statement is made, the

20  warden simply signals the executioner who then injects

21  lethal substances which act quickly upon the body.  They

22  collapse the lungs which forces the air out, stops the

23  heart, and within about 15 seconds he will lapse into a

24  coma.  Death occurs soon after that.  That's the method

25  that's been used in every execution so far in Texas since

1   1976 and it would be used in this case.

2              It's one thing to talk about the death

3   penalty, kind of philosophically with your friends or family

4   or filling out a questionnaire here and then coming down,

5   and then once you start going through this process, it

6   becomes kind of a different situation we found with jurors,

7   because the seriousness of the situation sets in.  And I

8   don't mean to be morbid to go into detail, but we want every

9   juror to realize what's about to happen, because this case

10  isn't for everyone.  That's why we brought about a thousand

11  people down.

12             Some people are against the death penalty

13  totally and that's fine.  They tell us that, they're honest

14  with us and we send them on their way.  They'll come down on

15  another case.  We have a few that are for it all the time

16  and they can't be fair.  We have others that are for it and

17  feel they can sit and make these decisions.

18             We have others that philosophically are

19  for it, think it should be used, but, quite frankly, once

20  they sit down and start thinking about it, it would weigh

21  too much on their conscience to make a decision which would

22  end in another human being's life.  And if they feel that

23  way and are honest about it, that's fine, too.  We don't

24  force them on the jury, either.

25             But this is the opportunity we use to

1    talk to each juror individually how they personally feel,

2    because we can't preview the facts and you certainly haven't

3    been in a situation like this before, we know that.  But

4    upon all the reflection you've given it, I know you believe

5    in it as a law.

6                Do you feel you're the type of person

7    who, if you sit on the jury and we prove these things to you

8    the way we believe we will, that you can actually take pen

9    in hand and answer the questions in a way knowing that this

10   man at the end of the table will be executed some day in the

11   method I described?

12        A.    It's very difficult.  I mean, it's not

13   something someone would want to do, but yes, I do think I

14   could.

15        Q.    Okay.  And what is it, why do you believe you

16   could do it?

17        A.    Well, that's a lot for someone who, I mean, if

18   someone committed capital murder and was proven, it's a lot

19   lighter death than -- I've had relatives die of cancer that

20   have suffered tremendously and haven't gotten to have that.

21   So, I mean, it's, you know, in comparison I've seen people

22   suffer a lot more during their death than what you

23   described.

24        Q.    Okay.  So in a way you think it wouldn't be

25   that bad of a death, actually?

1    A.    Well, I mean, I don't relish it or think it's,

2  you know, sounds good.  But I'm just saying, you know,

3  seeing my uncle suffer with bone cancer and it was horrible.

4  I would have loved for him to be able to be put out of his

5  suffering, so.

6    Q.    We've had people tell us that.  And as far as

7  you know from your own point of view, then, you could make

8  that decision?

9    A.    I've never been put in that position, but

10 that's my --

11   Q.    As best you know yourself?

12   A.    That's my feeling on it.

13   Q.    Okay.  You put in the questionnaire at one

14 point, I want to get into another area, that we make a

15 statement that most criminals are actually victims of

16 society's problems, and we ask people if they agree,

17 disagree, or are uncertain, and you put uncertain on that.

18 And people put, they answer it differently for different

19 reasons, and if you would kind of follow up on us with that.

20   A.    Well, I don't really know any criminals, so I

21 don't really know.  I haven't been involved in the justice

22 system, so that I really know or studied that in any way.

23 So, you know, I assume that there's reasons such as, you

24 know, maybe a bad upbringing or drugs or maybe mental

25 problems.  I don't really know.  But it's just not something

1    I've ever really paid that much attention to personally.

2        Q.      You brought up bad upbringing, because that

3    comes up in these Special Issues.  The last question is the

4    mitigation question that we look at.  You don't get to it

5    unless the defendant has been found guilty and it's already

6    been proven that you think he's a continuing danger and that

7    he anticipated that a life would be taken.  But then you get

8    to review all the facts of the person, their life, and

9    decide if you think there is sufficient mitigating evidence.

10                And mitigating evidence could be

11   anything.  Sometimes that's brought up, a bad upbringing,

12   maybe a broken home or they were physically or mentally

13   abused, that sort of thing.  And jurors look at that.  But

14   jurors feel differently about it.  Some think it could

15   really be potentially mitigating and others really don't.

16                Do you have any thoughts or feelings

17   about that type of background evidence and how you might

18   view that?

19       A.      Well, I do think that your upbringing does

20   have something to do with the kind of person you are, so I

21   do think it can change, set your course for life.  I do

22   think that, if that's what you're asking.  Now, I think

23   there's other people who rise above that background and make

24   their own way in life.

25       Q.      Okay.

1    MR. SHOOK:  May I have just one moment,

2    Judge?

3    THE COURT:  Go ahead.

4    MR. SHOOK:  Judge, can we approach the

5    bench for a moment?

6    THE COURT:  You may.

7    [Bench conference]

8    MR. SHOOK:  I'll pass the witness, Judge.

9    MS. BUSBEE:  No questions, Your Honor.

10   We have reached an agreement.

11   THE COURT:  Ms. Braley, I need to inform

12   you that the parties have agreed to excuse you and you shall

13   not serve on the jury.  Thank you so much for coming down.

14   [Prospective juror out]

15   THE COURT:  Mr. Mattinely.

16   [Prospective juror in]

17   THE COURT:  Good morning.  We have juror

18   No. 2197, Mr. Scott Allen Mattinely, is that pronounced

19   correctly?

20   PROSPECTIVE JUROR:  Yes.

21   THE COURT:  Welcome to the 283rd.  Have

22   you had an opportunity this morning to review the guide I

23   provided for you?

24   PROSPECTIVE JUROR:  Yes, I did read it.

25   THE COURT:  A lot of law to give someone

1  first thing in the morning.  We don't expect you to

2  understand it completely.  I also provided a copy of your

3  questionnaire for your review, again, taking some of the

4  issues the attorney will visit with you about.  They may

5  want you to explain further some of your answers.

6              This is as informal a process as we can

7  make it.  Sometimes people come in a little intimidated.

8  You are the focus of attention versus hiding amongst the 600

9  or 700 people we had downstairs.  The best thing about this

10  is there are no wrong answers.

11              PROSPECTIVE JUROR:  Okay, yes.

12              THE COURT:  Just honest answers.  The

13  only question I have for you before we begin is will you be

14  able to serve this Court for a period of two weeks beginning

15  on November 10th?

16              PROSPECTIVE JUROR:  I can, yes.

17              THE COURT:  Thank you, sir.  Mr. Wirskye?

18  Mr. Shook?

19              MR. SHOOK:  I'd like to begin, Judge.

20              SCOTT MATTINELY,

21  having been duly sworn, was examined and testified as

22  follows:

23              DIRECT EXAMINATION

24  BY TOBY SHOOK:

25      Q.    Mr. Mattinely, my name is Toby Shook.  I'm

1    going to be asking questions on behalf of the State this

2    morning.  And as the Judge said, there aren't any right or

3    wrong answers.  I'm just going to go over some of the things

4    in your questionnaire and then talk to you generally about

5    capital murder and the law that applies.  I see from your

6    questionnaire that you work as electrical engineer for --

7    and my copy is not as clear.  Is it --

8         A.    Osteo-Med Corporation.

9         Q.    Okay.  What do y'all do out there?

10        A.    We're a manufacturer for surgical drill

11   implements and surgical fixation devices.

12        Q.    Okay.  And what would you do there on a

13   day-to-day basis?

14        A.    I manage the assembly area where we construct

15   the surgical drills and also do some project level

16   engineering for some of those devices.

17        Q.    Okay.  And you -- your father, I believe, was

18   a police officer; is that right?

19        A.    Correct.

20        Q.    Where was he a police officer?

21        A.    City of Dallas.

22        Q.    How long was he?

23        A.    He retired just a few years ago, but he

24   started in 1977, I believe.

25        Q.    Okay.  What division was he in?

A.      Southwest.

Q.      All right.  Just a patrol officer?

A.      Yes.

Q.      Okay.  I'm sure you grew up, then, hearing stories about the job he did and that sort of thing, cases he had.  We have a lot of people that come down that are either related directly to police officers or know them, but that doesn't necessarily make you disqualified as a juror, either.  In fact, sometimes it makes you more qualified in certain ways.  Nothing about that, though, would automatically bias you, do you think?  You could still view any case you hear as a juror objectively and just listen to the facts?

A.      I believe so.

Q.      Okay.  That's kind of what we're coming from and your background as an engineer kind of illustrates the point.  A juror in any case, but especially a capital murder case, has to be able to assure the Court that they will wait, listen, and weigh all the evidence before they make a decision in the guilt/innocence stage, and then listen to the additional evidence that's produced in the punishment stage.

And then prior to answering these Special Issues, weigh all that new additional evidence and then look at each issue separately from a different angle, which is

1   probably what you do every day in your line of work as far

2   as your projects or managing the company there.  You get all

3   the information possible, then make your decisions.

4               Same thing on a jury of this nature.  Do

5   you feel you are the type of person that could do that and

6   follow those types of rules?

7         A.    I believe so.

8         Q.    Okay.  Also, this case got a lot of publicity.

9   I think every juror heard something about it on TV or saw it

10  in the newspaper.  Again, that doesn't make you ineligible

11  to be a juror in this type of case.  If that were true, we

12  could never seat a jury in a high publicity case.

13              The bottom line is this.  Again, you have

14  to assure the Court that you could be the type of person who

15  would just listen to the facts from the witnesses on the

16  witness stand and not make your decision based on what you

17  have seen on TV or the newspapers.  Common sense deal, as

18  you probably know from reading newspaper reports, that sort

19  of thing, is that they can often be highly inaccurate.  The

20  better evidence is going to come from the actual witnesses

21  who were there, who will testify in front of the jury.

22              And that's what the jurors have to do.

23  We can't ask you to forget what you've seen.  We can only

24  ask you to make your decisions from what you hear and see

25  here in the actual courtroom.  Do you feel you could do

1  that?

2          A.      I believe so.

3          Q.      Okay.  Now, Mr. Mattinely, you said that you

4  favor the death penalty as a law.  Have you always felt that

5  way?

6          A.      I don't recall ever feeling different about

7  it.

8          Q.      Okay.  What types of crimes do you feel could

9  be appropriate for the death penalty?

10         A.      You know, if it's a life that's taken.

11         Q.      Okay.  Would it all depend on the brutality of

12 the crime, the facts of the crime, and the intentions in the

13 crime?

14         A.      Certainly.

15         Q.      Okay.  On the questionnaire itself, we -- on

16 the first page, we list certain statements how people might

17 feel about the death penalty and you put No. 2, which, I

18 know you wouldn't know this, but that's our most popular

19 answer for people that believe in the death penalty.  You

20 put you believe in the death penalty as appropriate in some

21 murder cases and you could return a verdict in the proper

22 case, which is to access the death penalty.

23                 That answer calls for the kind of the

24 common sense approach that it would depend on the case.

25 Some murder cases may call for it and others may not.  You

are just going to have to hear the facts.  Is that how you feel?

A.    Yes.

Q.    Okay.  We also under the law have the law of parties or accomplices.  You have a triggerman, oftentimes, in a capital murder that commits the murder, but you also have accomplices that might assist him in that, but they didn't actually cause the death.  But under the law they can be convicted.  They can even receive the death penalty.  It all depends on how actively they're participating in that crime.

If they are actively involved, participating in the crime, then the law says they can be convicted and ultimately even receive the death penalty under certain circumstances.  How do you feel about that law?  Do you think it's fair to prosecute accomplices in capital murder situations?

A.    I think it's appropriate.

Q.    Okay.  And even appropriate for a death sentence to occur with an accomplice, depending on the facts and their involvement in the crime?

A.    Depending on the facts, yes.

Q.    Okay.  Let me talk to you a little bit about these Special Issues and they're over here on this board. You don't get to those, unless you found someone guilty, but

1  that doesn't mean the trial is over.  People that are found

2  guilty of capital murder either receive a life sentence or a

3  death sentence depending on how you answer these questions.

4                Special Issue No. 1 asks the jurors

5  whether there is a probability that the defendant would

6  commit criminal acts of violence that constitute a

7  continuing threat to society.  Now, that question asks

8  jurors to make a prediction.  Do you feel confident that you

9  can make that prediction, if you're given enough

10  information, enough facts?

11      A.    Well, given enough information, I believe so.

12      Q.    Okay.  In this part of the trial you may hear

13  about a person's background, if they've been convicted of a

14  crime, that sort of thing.  You can get that information

15  from the actual witnesses.  You may can hear good things,

16  you can hear bad things, good character evidence, bad

17  character evidence.  It's just kind of a catchall where you

18  get to hear all their background and then you get to

19  reconsider what you heard in the guilt/innocence stage when

20  you look at this question and answer the question.

21                The question starts out with a no answer.

22  And you as a juror are required to require the State to

23  prove to you beyond a reasonable doubt that it should be

24  answered yes.  You do that by using the evidence you have

25  already heard in the guilt/innocence stage and then this new

1  information you may hear in the punishment stage, and then

2  you answer the question yes or no, depending on the

3  evidence.

4              But it's our burden of proof to prove to

5  you that it should be answered yes.  Do you feel you could

6  do that?

7          A.     Yes.

8          Q.     Do you feel that you could require the State

9  to prove to you beyond a reasonable doubt it should be

10  answered yes?

11          A.     Yes.

12          Q.     Okay.  And you could answer it yes or no, it's

13  just going to depend on the facts of the case?

14          A.     Right.

15          Q.     Okay.  This second Special Issue question has

16  to do with that area of law about the accomplices, someone,

17  the nontriggerman it asks whether the defendant actually

18  caused the death of the deceased or did not actually cause

19  the death of the deceased, but intended to kill the deceased

20  or another or anticipated that a human life would be taken.

21              The second part of the question has to do

22  with that accomplice.  If they didn't actually cause the

23  death, they can still -- you can still answer this question

24  yes, if they intended a person to die or, from all the facts

25  and circumstances, they anticipated that a life would be

1    taken.

2              And that's just going to depend on the

3    facts and the person's intent and using your common sense,

4    drawing on what their intent is.  Do you feel you could

5    answer that question if you're given enough information?

6         A.    Yes.

7         Q.    Okay.  Now, the rules apply that this starts

8    out with a no answer and, again, we have to prove to you

9    beyond a reasonable doubt it should be answered yes.  You

10   have to look at this question separately from the others,

11   analyze it, and then answer the question.  Do you feel you

12   could do that?

13        A.    Yes, I can answer that.

14        Q.    Okay.  And then the last question is the

15   mitigation question.  It's kind of a catchall question.  It

16   allows jurors to review everything they know about the

17   defendant from his background, the way he was raised,

18   growing up, his role in the crime, what actually happened,

19   his past history, that sort of thing, and determine if you

20   think there's sufficient mitigating evidence to impose a

21   life sentence, rather than a death sentence.

22              I can't tell you what mitigating evidence

23   is.  It's going to be up to you and the other jurors.  You

24   are not required by law to sit here today and tell us this

25   is what mitigating evidence is to me.  You just have to keep

1   your mind open to it and if it exists, you can answer the

2   question yes.  If you don't believe it exists or not

3   sufficiently that a life sentence should be imposed, you'd

4   answer it no.

5                    But you just have to wait until all the

6   evidence is in and then look at the question fairly and

7   answer it the way you think it should be answered, according

8   to the facts of the case.  Do you feel you could do that?

9        A.    Yes.

10        Q.    Okay.  A couple of rules of law that apply in

11   each case, and I'm sure you'll be familiar with these,

12   growing up here in the United States, is the presumption of

13   innocence.  Anyone charged with a crime starts out with that

14   presumption of innocence.

15                    Just because he's been arrested, charged,

16   indicted, is no evidence of his guilt.  The State must prove

17   to you with witnesses here in the courtroom that he's guilty

18   from the evidence.  And jurors must start out with that

19   presumption and require us to prove this case beyond a

20   reasonable doubt.

21                    Could you follow that rule of law and

22   require us to prove this to you beyond a reasonable doubt?

23        A.    Yes, I can certainly follow that.

24        Q.    Okay.  The Fifth Amendment comes into play

25   many times.  If someone is charged with a crime and wants to

1  testify, they can.  No one can stop them.  But if they

2  choose not to, the Judge will instruct you that we have a

3  Fifth Amendment that you can't hold that against a citizen.

4  You can't use it as evidence against him in a trial.

5       Now, most jurors would want someone to

6  testify that's on trial.  You want to hear all the evidence.

7  But there could be many reasons why a person chooses not to

8  testify.  He could be real guilty and we could make him look

9  guilty.  He may be following his lawyer's advise who tells

10 him I don't think you should testify and he does what his

11 lawyer tells him.  He may be poorly educated.  He may have a

12 speech impediment.  He may not perform well in front of

13 people and may be innocent, but look guilty.  He may not be

14 able to hold up his own against a trained prosecutor.

15       There could be several reasons.  So the

16 Court takes care of that by telling the jurors, if a person

17 doesn't testify, you can't hold it against him.  You can

18 make your decision simply on what you hear in the courtroom

19 from those witnesses.  Could you follow that rule of law?

20       A.    Yes.

21       Q.    Okay.  And finally, as far as police officers

22 go, no doubt you've known a lot of police officers and you

23 were raised by a police officer.  A lot of people respect

24 the job they do, but you can't start them out ahead of other

25 witnesses.  You have to wait until they testify and then

1    judge their credibility, recognizing that there's good
2    police officers, there's some bad police officers, and you
3    just have to wait until they testify and then you judge
4    their credibility, like you would any other witness.  Do you
5    feel you could do that?
6            A.    Yes.
7            Q.    Okay.  Bottom line, again, Mr. Mattinely, is
8    you have to be able to keep your mind open to everything and
9    then make your decisions.  We can't preview the facts of
10   this case.  We can only ask you to keep your mind open to
11   it, follow these rules, and then make your decisions based
12   on the facts of the case.  Do you feel you could do that?
13           A.    Yes.
14           Q.    Okay.  We know it's an inconvenience,
15   obviously, to be away from your work.  That's true with
16   every juror.  But if you were called to testify, you could
17   serve the two weeks --
18                 THE COURT:  Testify?
19           Q.    (By Mr. Shook)  I mean, to sit as a juror, you
20   could serve and then make your decisions.  Is that true?
21           A.    Yeah.  I don't think it will be too big a
22   problem.
23           Q.    Okay.  Well, we appreciate your patience.
24                 MR. SHOOK:  And that's all the questions
25   I have at this time, Judge.

THE COURT:  Ms. Busbee?

CROSS-EXAMINATION

BY MS. BUSBEE:

Q.    Good morning, Mr. Mattinely.  What did you think when you were asked to come down here?  Were you -- were you surprised?

A.    I was surprised.  I really expected that I was going to be excluded, based on my father's police career.

Q.    Well, not necessarily, although, of course, that gives us concern because, as you know, it's one of the allegations in the indictment.  I notice you said your father had inspired you to become an engineer.  How did he inspire you to take a different career path from what he had taken?

A.    Well, he was actually, prior to the Dallas police officer, he was a Navy pilot.  And I was always intrigued by the planes that he flew.

Q.    So he, obviously -- he has an engineering talent as well?

A.    Yeah, he has an engineering degree as well.

Q.    I know that Mr. Shook touched upon this and obviously you admire police officers.  Do you think that you, I mean, just in your heart of hearts, could be completely unbiased and unaffected by the facts as they have been explained to you in this case?  We can't go into the

1    facts, but we do know that a police officer was killed.

2        A.      Honestly, I can't say that I could not be

3    completely unbiased.  I just can't say for sure that I would

4    not be completely unbiased.

5        Q.      Okay.  See, the problem is we just -- we have

6    to pin people down.  Do you think you might be able to set

7    it aside?  We recognize people have biases.  We couldn't

8    find people who didn't have biases necessarily.  But if you

9    could, the question would be if you could set, recognize

10   that you may have one and set it aside and be completely

11   fair to the defendant in this case?

12       A.      I believe I can.

13       Q.      Okay.  What, are there anything, concerns that

14   you have?  You know, this questionnaire asks a lot of

15   questions, but sometimes you just don't get a feel for a

16   person from a questionnaire.  Is there anything that you

17   want to share with us or your feelings about the death

18   penalty or serving on this jury?

19       A.      For me, I just look at it as a matter of

20   justice, a matter of law.  It's just a necessary part of our

21   justice system, I suppose.

22       Q.      Right.  And would you feel as comfortable

23   finding the defendant not guilty, if the State failed to

24   prove their case as you would finding him guilty, if they

25   did?

1          A.      Certainly.

2          Q.      And it would be the same question for the

3    second portion of the trial.  If you had found the defendant

4    guilty of the offense of capital murder, would you feel as

5    comfortable answering questions that would give a life

6    sentence, if the State failed to prove their case or if you

7    felt Special Issue No. 3 called for a life sentence, as you

8    would giving a death sentence, if you felt that they proved

9    their case and didn't?

10         A.      Yes.

11         Q.      All right.  Fair enough.

12                 MS. BUSBEE:  I have no more questions of

13   this juror, Your Honor.

14                 THE COURT:  Thank you, Mr. Mattinely.  If

15   you would, wait for us outside and we'll have you back in

16   just a minute.

17                      [Prospective juror out]

18                 THE COURT:  What says the State on juror

19   No. 2197, Scott Mattinely?

20                 MR. SHOOK:  State has no challenges for

21   cause.

22                 MS. BUSBEE:  Defense has no challenges

23   for cause.

24                 MR. SHOOK:  State would accept the juror,

25   Your Honor.

1    MS. BUSBEE:  We will exercise a
2  preemptory challenge against juror No. 2197.
3    THE COURT:  Ask Mr. Mattinely to come
4  back in, please.
5    [Prospective juror in]
6    THE COURT:  Mr. Mattinely, thank you so
7  much for coming in today.  You are not going to be seated on
8  this jury.
9    PROSPECTIVE JUROR:  Okay.
10    THE COURT:  So, that's all I can tell
11  you.  Thank you very much.
12    [Prospective juror out]
13    (Recess)
14    THE COURT:  Mr. Chance.
15    [Prospective juror in]
16    THE COURT:  Good morning.
17    PROSPECTIVE JUROR:  Good morning, Your
18  Honor.
19    THE COURT:  We have juror No. 672,
20  Mr. Kenneth Lewis Chance.  Mr. Chance was rescheduled from
21  his initial appearance today due to the fact that he was out
22  of the country.  Let the record reflect that when -- the
23  letter was received, but no one had called back, the Court
24  made contact via a female with an associate of Mr. Chance's.
25  Copies to counsel in this matter.

1    Everything on e-mail was copied to the

2    lawyers, so they understand there was no ex parte

3    communication with anybody in this matter, other than to

4    secure the appearance of Mr. Chance here today for voir

5    dire.  I scheduled him in today to replace juror No. 2231,

6    the lady who had moved to Missouri and was no longer a

7    resident of Dallas County.

8    Having said that for the record,

9    Mr. Chance, have you had an opportunity this morning to

10    review the guide I provided you with?

11    PROSPECTIVE JUROR:  Yes, Your Honor.

12    THE COURT:  I also gave you a copy of

13    your questionnaire that you filled out for us in May.

14    That's to help you refresh your memory on some of the

15    answers that you have given.  Maybe the lawyers want to have

16    you further expound upon what you were thinking at the time

17    you made those answers.

18    The bottom line here today is you've got

19    a lot of law in front of you.  The lawyers are going to try

20    to explain it to you and help you understand how it relates.

21    At the end of the process I have two questions to ask.

22    Number one, do you understand the law?  Number two, can you

23    follow the law?

24    PROSPECTIVE JUROR:  All right, sir.

25    THE COURT:  At this point, I've read your

1  questionnaire.  We all understand where you're employed.

2  I'm quite sure they're going to ask you some more questions

3  about that.  But what is your availability to attend this

4  trial for two weeks beginning on November 10th?

5                    PROSPECTIVE JUROR:  Your Honor, I'm

6  working back with Dynacorp, recruiting.  In May we had been

7  delayed a little bit by the violence overseas in Iraq, sir.

8  Honestly, we just got word Friday to start preparing.  I got

9  my first group going to get e-mailed Saturday and I'm going

10  to be second.  I was second Kosovo, second Bosnia, I'm going

11  to be second Iraq, but I'm going to be the second group

12  probably leaving two weeks after this next group goes next

13  week, Your Honor.

14                    THE COURT:  Are you going to be deployed

15  in October?

16                    PROSPECTIVE JUROR:  Yes, sir.

17                    THE COURT:  How long is your deployment?

18                    PROSPECTIVE JUROR:  One year, Your Honor.

19                    THE COURT:  You'll be gone for a year?

20                    PROSPECTIVE JUROR:  At least.

21                    THE COURT:  And what will you be doing

22  for the United Nations?

23                    PROSPECTIVE JUROR:  United Nations?  No.

24                    THE COURT:  Dynacorp?

25                    PROSPECTIVE JUROR:  We used to be police

1   missions.  The first three were.  I was once in Bosnia,

2   twice in Kosovo, with the United Police.  This is going to

3   be American right now.  There's a lot of haggling over who's

4   going to run it.  The U.N. is trying to get their nose in

5   it, but we're going to send over a thousand American police

6   officers, corrections, a few defense attorneys, prosecutors,

7   judges, to go over there and hopefully, hopefully, help them

8   rebuild their judicial law enforcement system.

9              THE COURT:  So the bottom line is you are

10  preparing and you fully expect that you will be deployed,

11  beginning in October 2003?

12             PROSPECTIVE JUROR:  I honestly do, Your

13  Honor.

14             THE COURT:  You seem to be real upset

15  about this.

16             PROSPECTIVE JUROR:  Well, it's my duty to

17  come here and I hate saying I don't know because, you know,

18  I'm honest.  In May I was supposed to leave the first group

19  May 6, and that was delayed.  I came here in May and I said

20  I'm available because I knew it was going to be delayed, but

21  it's my duty to come here as an American citizen and I just

22  got word Friday we're starting to ready to bail out.

23             THE COURT:  All right.  Mr. Shook?

24             MR. SHOOK:  I think we can come to an

25  agreement, then, sir.

1    MS. BUSBEE:  Yeah, we obviously don't

2   want to mess up your service, sir.

3    THE COURT:  We have to go through this

4   process when the lawyers question individuals.  I will track

5   them down all over the world to get them here, so we can put

6   it on the record.  We appreciate your time and service to

7   this Court and especially this country.  We wish you well

8   and a safe return.

9    PROSPECTIVE JUROR:  Thank you.  What I'm

10   going to try and do over there is help them get what we've

11   got here.  Thank you all very much.

12    [Prospective juror out]

13    THE COURT:  Ms. Liston.

14    [Prospective juror in]

15    THE COURT:  Good afternoon.

16    PROSPECTIVE JUROR:  Hi.

17    THE COURT:  How are you?

18    PROSPECTIVE JUROR:  I'm fine.

19    THE COURT:  We've got juror No. 2376, Ms.

20   Judy K. Liston, is that pronounced correctly?

21    PROSPECTIVE JUROR:  Yes.

22    THE COURT:  Ms. Liston, welcome to the

23   283rd.  Thank you for being here early.  You were actually

24   scheduled to be the third one this afternoon.  But I like

25   for people to be on time and be early, so you will be out of

1   here several hours earlier than you should have been.

2                      PROSPECTIVE JUROR:  Thank you.

3                      THE COURT:  So, I just tell people the

4   way we work.  First one here gets to go first.  Did you have

5   enough time to review the guide that I provided for you?

6                      PROSPECTIVE JUROR:  Yes.

7                      THE COURT:  I also provided a copy of the

8   questionnaire that you filled out for us in May.  The

9   attorneys may want to further explore some of your answers,

10  and hopefully you looked at it and can, once again, think of

11  the issues on trial here.  No, there's no way you can

12  understand all the law I've given you so far.  That's why

13  the lawyers will visit with you about the law and help you

14  understand how it all relates.

15                     At the end of this process there are two

16  questions that I must ask you.  Number one, do you

17  understand the law?  And, number two, can you follow the

18  law?  That's the big picture that I have to answer, okay?

19  Only question that I have for you at this time is will you

20  be able to serve this Court beginning on November 10th for a

21  period of two weeks?

22                     PROSPECTIVE JUROR:  The only issue I have

23  is I have a flight coming in November 10th at 5:30 in the

24  morning.  And I did put on there that I would be out of town

25  the 5th through the 10th.

1      THE COURT:  What is the nature of your

2  trip?

3      PROSPECTIVE JUROR:  We go to Las Vegas

4  every year to the PBR finals, and I've had tickets since

5  last October for those.  And I did bring a copy of my

6  itinerary, if you wanted to see it.

7      THE COURT:  No, I want to go to the

8  rodeo, too, no question about it.  Is there any way that --

9  I mean, I know finals are Sunday night.

10      PROSPECTIVE JUROR:  They're Sunday noon.

11  They will be Sunday at 12:00.  And our flight is due to

12  leave out of Las Vegas at, I believe, 12:30 in the morning.

13  And I'm supposed to be in Dallas by 5:00, which would allow

14  me time to get here.

15      THE COURT:  Is there any way you can move

16  that flight up a little bit?

17      PROSPECTIVE JUROR:  I don't know.  I

18  could check and see.

19      THE COURT:  I mean, you're -- obviously,

20  you'll have a great time in Vegas, but coming in that Monday

21  morning, you'll be dragging pretty good.

22      PROSPECTIVE JUROR:  Yes, sir.

23      THE COURT:  If you get put on this jury,

24  it would behoove you to move that flight forward as best you

25  could.  You might miss a half a day of whatever you might be

1    doing there in Vegas, but --

2                    PROSPECTIVE JUROR:  I don't do much

3    gambling.

4                    THE COURT:  But the bottom line is you

5    could make yourself available for this trial?

6                    PROSPECTIVE JUROR:  Yes, I can call and

7    see if I could make the changes.

8                    THE COURT:  With that, I will turn it

9    over to Mr. Wirskye.  He has some questions for you.

10                   MR. WIRSKYE:  May it please the Court?

11                        JUDY LISTON,

12   having been duly sworn, was examined and testified as

13   follows:

14                     DIRECT EXAMINATION

15   BY MR. WIRSKYE:

16        Q.     Ms. Liston, how are you this afternoon?

17        A.     Fine.

18        Q.     My name is Bill Wirskye and I'll be the

19   Assistant DA that will be visiting with you for the next few

20   minutes.  What I would like to do, maybe, is follow up on

21   some of the information that you were kind enough to give us

22   in that long questionnaire, talk to you a little bit about

23   your thoughts and feelings about the death penalty, then

24   maybe talk about some of the death penalty type laws that

25   apply, and some of the rules that apply in any criminal

1   case.

2              I know it's a little unnatural, we've got

3   you up on the witness stand.  You may feel like you are on

4   trial, but it's just kind of the best way that we had to do

5   it.  Because it's a death penalty case, the law says that we

6   talk to everybody individually, and this is kind of, like I

7   said, the best way we've found to do it.  It sounds like

8   you're a rodeo fan?

9        A.   Yes, sir.

10       Q.   Okay.  Or at least PBR, right?

11       A.   Yes, sir.

12       Q.   I've been trying to go for the last three

13   years, but I've never made it, so.  Y'all spend the whole

14   week down there, or --

15       A.   We leave usually the day before or the day of

16   the starting of them.  We've gone every year since 1996.

17       Q.   Oh, okay.  Was that the first year they had

18   it?

19       A.   That was the second year.

20       Q.   You have a favorite rider?

21       A.   Um, Adriano Morias.

22       Q.   Okay.  My wife lets me get about as far as

23   Mesquite, so that's about the only rodeo I get to take in.

24   But, tell us what you do for a living.  It looks like you're

25   in the semiconductor field?

1   A.    Yes, sir.

2   Q.    Okay.  You used to be TI and I guess TI --

3   A.    Got sold to Raytheon and then Raytheon had to

4   sell off our particular group to Triplant, but I've

5   basically been in the same location now for 30 years.

6   Q.    Okay.  What do you do, like, what's a normal

7   day like for you?

8   A.    I'm a shipping manager.  I'm responsible for

9   doing all the shipping that goes out of our company daily.

10  Q.    Okay.  Let's see, you also said, another one

11  of my hobbies, you like to fish?

12  A.    Yes.

13  Q.    What kind of fishing do you do?

14  A.    Anything I can catch.

15  Q.    Okay.  Any particular lake y'all frequent, or

16  --

17  A.    Um, Tawakoni.

18  Q.    Okay.  Now, you told us generally you are in

19  favor of the death penalty; is that right?

20  A.    Yes, sir.

21  Q.    Okay.  Why do you think we ought to have the

22  death penalty available for at least some murder cases?

23  A.    Depending on the circumstances and if it's

24  premeditated, if the person is aware, has all of his senses

25  about him, and he still chooses to take someone's life.

1    Q.   Okay.  We talk to a lot of people and they

2 always mention premeditation as, I guess, being a factor or

3 circumstance that would be important to them.  In Texas we

4 don't really require premeditation.  We just require that

5 intent.  You know, intent can be formed in an instant, a

6 split second.  I think, you know, when most people think of

7 premeditation, they think of planning or something that is

8 thought out.  Is that kind of where you are?

9    A.   Yes, sir.

10    Q.   Okay.  Would you limit the death penalty only

11 to those cases that were premeditated, where somebody

12 planned it out or thought about it, that type thing?

13    A.   No.

14    Q.   Okay.  Are there any other factors that you

15 think would be important when you look at a murder case in

16 deciding whether it was a case that may call for the death

17 penalty?

18    A.   Well, I would believe the law.  If the law

19 states that that is something that requires the death

20 penalty.

21    Q.   Okay.  What we have in Texas, and you may have

22 had a chance to look through that kind of packet of law that

23 we gave you, I know it's sometimes not the easiest thing to

24 read through, the way it's structured.  But in Texas we just

25 have the death penalty for murder cases and then only

1  certain types of murders.  If you kill a certain person,

2  like a child under six, a police officer or fireman on duty,

3  a prison guard, that type of thing.

4                    Or if you commit a murder, an intentional

5  murder, in the course of another crime, maybe robbing

6  somebody, or breaking into their home, committing burglary,

7  or murder during a rape, that type of thing, mass murders or

8  people that are serial murders, that commit quite a few

9  murders.  That's kind of what we limit the death penalty for

10  in Texas, consideration in those types of crimes.

11                    Does that kind of agree with you or if

12  you were Governor for a day is that kind of, would you

13  expand the group or shrink it, or what do you think?

14        A.      I think that's, pretty well would cover what I

15  would agree with.

16        Q.      Okay.  Is there a particular type of case that

17  comes to mind?  I know you mentioned the Darlie Routier

18  case.

19        A.      Yeah.

20        Q.      Any other case that you can think about that

21  comes to mind when you think about a death penalty case?

22        A.      Not really.

23        Q.      Okay.

24        A.      That one came to mind because it was so close

25  to where I live.

Q.     And it sounds like you came to the opinion that she did actually do it; is that right?

A.     Yes.

Q.     Okay.  Did you have, obviously, she got the death penalty for it.  Did you think that was an appropriate punishment?

A.     Yes, since she was found guilty.

Q.     Okay.  Let me ask you another question on your questionnaire here.  Let's see.  I'm looking at page 5.  I think you have it in front of you.  We kind of ask people, we give them all these statements and ask them kind of what they think about these statements, whether they agree, disagree, or uncertain about it.  And that very first statement there about halfway down on page 5, says most criminals are actually victims of society's problems.  And you marked that you were uncertain about that.  I'm just curious what you were thinking when you marked that.

A.     I was thinking more about the crimes they commit.  I think that there is circumstances in people's lives that can make them make poor decisions, bad decisions, quick decisions, and that was the reason, depending on the case or the crime.

Q.     Okay.  When you said there are circumstances in their life that may make them or lead to them doing that, what did you have in mind?  What type of circumstances?

54

1      A.      The type of way they were raised, environments

2  in which they were raised.

3      Q.      Okay.

4      A.      I think environment has a lot to do with the

5  way people live their lives and it influences.  They have

6  poor self-esteem, and it definitely influences a person's

7  decision and the way they live their lives.

8      Q.      Okay.  I think we asked you a question about

9  that.

10      A.      Similar to that.

11      Q.      In the questionnaire on page 9, almost halfway

12  down that page.  I guess it's kind of what you told us, life

13  affects decisions we make.  But looking at that question, is

14  that something that you feel you would look at in a death

15  penalty case in deciding whether a person deserved the death

16  penalty, the genetics, the circumstances of birth, and

17  upbringing, and things like that?

18      A.      I think it would just have to be what I was

19  looking at.  You know, I would have to know specifics.  Not

20  everything in your life would make you take someone else's

21  life, and I would just have to look at each scenario.

22      Q.      Okay.  That's pretty much what the law is and

23  we'll probably visit about that more in just a second.  And

24  we always ask everybody that comes down here if they have

25  had any experience with the system or known anybody that's

1   gone through it, and I think you mentioned that your

2   ex-son-in-law had a DWI a few years ago?

3        A.    And he's still serving in and out for, I think

4   probation violations.  I don't have anything to do with him,

5   though.

6        Q.    Okay.  Has he been to prison for that charge?

7        A.    Yes.

8        Q.    Okay.  Based on what you know, do you think he

9   was treated fairly?

10       A.    Yes, I think more than fairly.

11       Q.    Okay.  Also, finally, I think on page 4 I had

12   a question.  Halfway down we asked you this question, do you

13   think spending a lifetime in prison is equivalent to the

14   death penalty?  And you marked yes, and then said, in some

15   cases.  I was just curious what your thought was on that

16   question, if you remember.  I know it's been a while since

17   you filled this out.

18       A.    Let's see.  That was on page 4 or page 5?

19       Q.    Page 4 about halfway in the middle of that

20   page.

21       A.    Oh, okay, I see it.  I think what I was

22   thinking about was the type of case and what was the crime

23   itself.

24       Q.    Okay.  Just kind of, again, depending on the

25   facts of each case?

1    A.    Yes.

2    Q.    Okay.  You told us, I guess, generally or

3  philosophically you are in favor of the death penalty --

4    A.    Yes, sir.

5    Q.    -- in the appropriate type case.  And we talk

6  to a lot of people, a lot of people who are very strongly in

7  favor of the death penalty, as you may be, in an appropriate

8  case.

9          But some people under certain

10 circumstances make distinctions about people.  And what I

11 mean by that is this.  You know, oftentimes crimes are

12 committed by more than one person.  You may have a group or

13 a gang of people that commit a crime.  What the law says is

14 that we can prosecute everybody that was actively involved

15 in the crime, you know, whether it's shoplifting or all the

16 way up to capital murder.

17         And when you get up to capital murder,

18 you may have a situation where only one of that group of

19 people who was involved in the crime actually pulled the

20 trigger and actually took the life, okay?  You may have the

21 other people that were involved as accomplices is a word we

22 often hear, that were involved but didn't actually pull the

23 trigger and take the life.  Does that make sense to you?

24   A.    Yes, sir.

25   Q.    Between kind of the triggerman and the

nontriggerman?

A.    Yes, sir.

Q.    And a lot of people tell us, you know, I'm strongly in favor of the death penalty for the triggerman. I could see that and I understand it. But if it was up to me, when it comes to those accomplices who didn't actually cause the death, I would just kind of take the death penalty off the table. You know, I may want to lock them up for life, but I take that death penalty off the table.

They sometimes think it's not deserved, maybe the religious, moral, or ethical reasons, something like that, since the accomplices didn't actually take the life. Some people say, hey, it just kind of depends on the facts and circumstances. I'm wondering what you think about that scenario, the death penalty for accomplices?

A.    Well, that's a hard question to answer.

Q.    I know it's not something people think about normally.

A.    No. I think sometimes people can be at the wrong place at the wrong time, and I also feel that you can't always control everyone that's there. If there's a group and it's a stronger person, a more domineering person, another person, an accomplice or a person with them could not stop what happened.

Q.    Okay.

1    A.    And I guess that would depend on the

2  circumstances that whether or not, you know, what happened

3  at the time.

4    Q.    Okay.  Let me give you kind of a hypothetical

5  or a made-up set of facts to explain how the law works, the

6  law of accomplices, and get your thoughts on that.

7    A.    Okay.

8    Q.    Let's say Mr. Shook and I, the other

9  prosecutor, decide we're going to rob a bank and we get

10  together and agree that the plan is that he's going to take

11  a pistol in and hold up the tellers and hold them off while

12  I come in with the bag.  I'm not going to have a gun.  And

13  I'm kind of going to empty out all the cash drawers as he's

14  got everybody held up.

15    And let's say we go to do that bank

16  robbery and during the bank robbery, for whatever reason,

17  maybe one of them looks at Mr. Shook funny or I see one of

18  them going for a silent alarm and I tell him that, he shoots

19  and kills that teller, okay?  He's committed an intentional

20  murder during the course of a robbery.  He could be found

21  guilty of capital murder and ultimately face the death

22  penalty.

23    The law also says under, depending on the

24  facts and circumstances, I could also be found guilty of

25  capital murder and may potentially face the death penalty as

1   well.  What do you think about the law in that type of

2   scenario?

3        A.    If that's the law, then we have to go along

4   with the law.  My personal opinion on that was you have no

5   control over what he did.

6        Q.    Okay.

7        A.    Now, if you were aware that he had the gun and

8   was going in and would use it and you've known that he has

9   used it in the past, maybe the circumstances would be

10   different.

11        Q.    Okay.

12        A.    But I don't think you would have had control

13   over it.

14        Q.    Okay.  So under the set of facts I gave, you

15   don't see giving the death penalty to the accomplice?

16        A.    To you, no.

17        Q.    Okay.  Let me kind of look at it one more

18   level down in analysis.  The law actually says there's two

19   different ways for us to convict an accomplice, okay?  The

20   first way is if the accomplice, me in the example, actively

21   encourages, directs, or solicits him to commit a capital

22   murder.  And that would maybe be a situation like I see

23   somebody going for that silent alarm and I turn to him and

24   say, Toby, quick, shoot her before she can get that alarm.

25        You know, at that point I directed him to

1 commit a capital murder.  Even though I didn't pull the

2 trigger, I could be found guilty as an accomplice, what we

3 call a party to an offense in Texas, and maybe receive the

4 death penalty.  That sounds like something you agree with;

5 is that right?

6          A.     Yes.

7          Q.     The other way to convict an accomplice is kind

8 of what we call under the law of conspiracies.  And this is

9 where some people, you know, personally kind of differ with

10 the law.  And I want to run it past you and see what you

11 think.

12                You know, let's go back to that example

13 and say just maybe one of them looked at Mr. Shook funny,

14 and for whatever reason he decided to shoot and kill them.

15 I didn't say anything, I didn't encourage him or direct him

16 to do anything.  The law says that if I should have

17 anticipated, okay, by going in and doing that bank robbery,

18 that a death could occur, whether I intended it or not, I

19 could have no intent that anybody get killed.  But the law

20 says if I should have anticipated it, then I could be found

21 guilty of capital murder and ultimately face the death

22 penalty.

23                And a lot of people we talk to kind of

24 draw a distinction between that first situation where I'm

25 kind of directing him and obviously I had the intent.  And

1  the second situation, law of conspiracy, where me as the

2  accomplice, I didn't have any intent.  And a lot of people,

3  that's kind of where they differ with the law.  What do you

4  think about that second way, that conspiracy where the

5  accomplice didn't have any intent?

6       A.    You were aware of his past and that he had

7  committed this type before?

8       Q.    Well, I mean, that was the plan we did was to

9  take a loaded gun in to do a bank robbery.

10       A.    If that was the law, then I would have to find

11  you guilty.

12       Q.    Okay.  Even though I didn't intend for anybody

13  to get hurt?

14       A.    Yes.

15       Q.    What about the death penalty under that

16  circumstance, under the law of conspiracy, for me?

17       A.    It's a hard decision.  But I guess, if we're

18  directed and found you guilty and the law says that, then

19  that would be how I would have to go with it.

20       Q.    Well, the law says you can consider it.  You

21  know, the law doesn't say you have to do it.  That's kind of

22  why we talk to people now because we don't want to put

23  anybody over there whose personal beliefs kind of conflict

24  with the law.

25       A.    Yes, sir.

1    Q.    That's why we talk about it now before you get

2  over in the jury box.  Because if it is a situation where

3  you don't believe in the death penalty for the accomplice

4  under conspiracy like we talked about, then, obviously, it

5  would be difficult for you or might impair you from being a

6  juror in this case if you don't really think the law is

7  right in that situation.  What do you think about that?

8    A.    I guess a lot of it just has to do with the

9  circumstances of the whole case and what happened at that

10  time when you're there.  And I don't know that I disagree

11  with the law or I agree with it.  I guess I just feel like

12  it's my responsibility to listen to all the circumstances

13  and then if I agree that the accomplice was there and was --

14  did feel like the accomplice knew that a death could occur,

15  then, yes, I'm responsible.

16    Q.    Okay.  So you wouldn't automatically take the

17  death penalty off the table for an accomplice?

18    A.    No.

19    Q.    Just because he didn't have that intent?

20    A.    No.

21    Q.    Okay.  You would be able to look at the law

22  and see whether I should have anticipated that a death would

23  occur?

24    A.    Yes.

25    Q.    And depending on the facts and circumstances,

1    you could consider the death penalty for me?

2        A.    Yes.

3        Q.    Okay.  The reason I spend so much time on it

4    is that is the theory of law that we're proceeding under in

5    this case.  I can't get into the facts of this case, but we

6    are prosecuting Mr. Murphy as an accomplice and that's why

7    we spend so much time on it, because we don't want somebody

8    over there in the jury box whose personal opinion would kind

9    of interfere with their ability to follow the law.  Does

10   that make sense to you?

11       A.    Yes, sir.

12       Q.    Okay.  And you don't think your personal

13   beliefs would interfere or impair you in any way from

14   sitting in this type of case?

15       A.    I don't think so.  I mean, I've only been on

16   one case in my whole life and it was a sentencing that he

17   pleaded guilty, so --

18       Q.    Okay.  Well, let me ask you this.  Almost

19   everybody we talked to has heard something about this case.

20       A.    Yes.

21       Q.    You know, through the media, read about it,

22   seen about it.  And you indicated you had as well.

23       A.    Yes.

24       Q.    I'm just curious, what have you heard about

25   this case?

1    A.    I saw the chase and when they were looking for

2  them.  I guess just everything that was on the news that

3  came on.  I don't watch the news every night.  I did see

4  some of the arrest.  I didn't realize the name.  I didn't

5  recognize the name.

6    Q.    Sure.

7    A.    I recognized Aubrey Hawkins' name when I read

8  the questionnaire, but I didn't follow details.

9    Q.    Okay.  Have you kept up with or heard about

10  any of the subsequent court proceedings?

11    A.    I've heard of some.  I don't remember what all

12  they got.  I know that they've had one not too long ago.

13    Q.    Okay.  We ask different jurors about that and

14  how that may affect them because in a case like this so many

15  people have heard so much about it.  What the law kind of

16  requires is that you're able to put that out of your mind

17  and just listen to what you hear in the courtroom.

18             Some people tell us, very frankly, I've

19  heard too much about it.  I can't tell you for sure.  I

20  think it might affect me based on what I've heard.  And if

21  that's the case, that's fine with those people.  You know,

22  they just wouldn't be the right juror in this case.  They

23  could get another juror summons on down the line.  But some

24  people say, you know, even though I've heard about it, I can

25  kind of put it to the back of my mind and just kind of give

1    a fair trial to both sides.

2                    And, you know, we have to rely on you to

3    look in your heart of hearts and tell us and just be honest

4    with us, if that's something you think you can do.

5         A.    Like I said, I, you know, I didn't follow it

6    day in and day out, and I may have followed it more than I

7    realized.  When I start hearing some of the testimony, it

8    may come back to me.  But I'm not a person that follows

9    these kind of cases.

10        Q.    Okay.  You think as you sit there right now

11   that you could assure both sides and the Judge that you

12   could just base your verdict on what you hear in the

13   courtroom and even if you remember something during the

14   course of the trial, that you wouldn't let it influence your

15   verdict in any way?

16        A.    I don't think it would.

17        Q.    Okay.  Fair enough.  All trials in Texas --

18   the one you sat on was a little bit different because y'all

19   just did sentencing.

20        A.    Yes, sir.

21        Q.    But all criminal trials in Texas, even capital

22   murders, are in two parts.  The first part would be the

23   guilt/innocence phase.  I know you've gotten a chance to

24   look at our indictment in that case.  And that's where the

25   jury decides whether we've proved that he's guilty.  Did we

1   bring you enough proof beyond a reasonable doubt that he's

2   guilty of capital murder.

3                    And if you find that he did or we did,

4   then you move into the second phase of the trial which is

5   the punishment phase.  And that's where you get to hear more

6   about the background, the history, good or bad, of the

7   person that's charged and some additional-type information,

8   to help you answer these three questions that are up on the

9   wall.

10                   And that's kind of how we do a death

11  penalty case.  We don't ask a juror to write in, you know,

12  death sentence or life sentence.  We ask a jury to answer

13  these three questions, and depending on the answers to those

14  questions, that determines the appropriate sentence in the

15  case.

16                   And just very briefly, in a nutshell,

17  we'll come back to it in a second, but the first question

18  asks is he a future danger to society?  If that's answered

19  yes, then you move on to that second issue, or second

20  question, which kind of deals with the situation we've

21  already talked about, the accomplices.  Basically asks, you

22  know, did the person anticipate that a human life would be

23  taken?

24                   And if that's answered yes, then we move

25  to Special Issue No. 3, which is what we call the mitigation

question.  It basically asks a juror to see if there's

anything in his past or background or something that kind of

mitigates against the death penalty.  Is there something

sufficient in what you've heard in the evidence to spare his

life and not give him the death penalty?  And, again, if

that question is answered no, then the death sentence is

automatic.  The Judge imposes it.

And I know it's one thing -- you've told

us kind of philosophically in the abstract you believe in

the death penalty.  And some people we talk to, even though

they may believe in the death penalty in certain

circumstances, this just isn't their cup of tea.

What I mean by that is once they get down

here, they see the individual here in the court, even though

they may believe in the death penalty, they realize this is

probably just -- I'm not necessarily cut out for this.  It's

a little too real at that point.  It's no longer in the

abstract or philosophical, you know, because if those

questions are answered yes, yes, and no, the Judge sentences

the person to death.

They're taken immediately down to death

row where they wait.  At some point in the future, I can't

tell you how long, but Judge Cunningham would issue a date

of execution.  On that date the person would be moved from

death row to a holding cell in downtown Huntsville, the main

prison.   That person would wait there that day, get a chance

to meet with friends, family, spiritual advisors, have a

chance for a last meal, that type thing.

As it got close to 6:00 in the afternoon,

which is the time that is mandated by law that all

executions take place, he'd be moved from that holding cell

down the hall to the execution chamber.   Whether he wanted

to go or not he'd be taken against his will, if need be.

And you may have seen the execution chamber on TV, I don't

know.   It's got that gurney with the arms and straps.

He'd be taken in there and strapped down

against his will, if need be.   An IV would be started in his

arm.   There would be witnesses there both from his side and

also maybe victims or friends of the victim of the crime to

witness the execution.   The warden would give him a chance

to make a last statement.   He may proclaim his innocence,

you know, up to the very end.   He may beg for forgiveness,

you know.

Once he's given a few minutes to make

that last statement, the warden would signal to the

executioner.   Lethal substances would be released into that

IV.   Very shortly after that the heart would shut down, the

lungs would collapse, he would lose consciousness, and then

drop into a deep coma and ultimately die in a very short

time.

1        And I go through that not to be morbid

2   with you, but just kind of to let you know kind of what the

3   end result of this process may be, because there's people

4   that tell us, you know, they know those type details that I

5   just shared with you are oftentimes reported on the TV or in

6   the newspaper, that type thing.  And there are people that

7   tell us, you know, I just, I don't know if I could live with

8   that.  I wouldn't want that on my conscience, knowing that

9   was on down the line.

10       And we recognize that not everyone is cut

11  out for this.  But we kind of leave it up to you.  You know,

12  only you can answer whether you think you're the type person

13  that could take pen in hand and maybe answer those three

14  questions in such a way that it may actually result in the

15  execution of an individual, a person you've gotten a chance

16  to see in court maybe for two weeks.  Do you think you're

17  the type person that could participate in that process?

18       A.     I don't know.  It's very difficult.  I mean,

19  yes, I do believe in the death penalty and, you know, if I

20  had a choice, I'd just as soon somebody else do it.

21       Q.     That's kind of the analogy that I use is these

22  guys that wash the windows downtown on those skyscrapers.

23  I'm deathly afraid of heights.  I understand it

24  intellectually up here, somebody's got to do it, and I'm

25  glad somebody does.  But you couldn't get me up there.  I

1    just, I couldn't do it.

2              And a lot of people feel that way about

3    the death penalty.  They think it's a good thing for

4    society, they think somebody should do it, they're glad

5    people can do it and serve as jurors, but they tell us it's

6    just not my cup of tea.  I'm not cut out for it.  It's

7    something that if you put me over there would make me so

8    uncomfortable, you know, it just may impair my ability to be

9    a fair juror to both sides.  We kind of leave it up to you

10   to tell us whether you think you're that type of person.

11        A.    Like I said, I've never done that, so I don't

12   know.  I know that I will have to be proven within a

13   reasonable doubt that he is responsible before I could vote

14   on those questions, and I would have to know that, and I

15   would have to feel that in my heart.

16        Q.    Okay.

17        A.    And if I didn't, I don't believe that anyone

18   could convince me to change my mind.

19        Q.    Okay.

20        A.    Um --

21        Q.    I'll just tell you generally, what we call the

22   burden of proof in Texas, the burden that the State has to

23   prove.  It's the same in every criminal case.  It's beyond a

24   reasonable doubt.  Whether you are talking about the

25   shoplifter or you're talking about that capital murder.  And

1  some people think that, you know, death penalty cases are a

2  little different.  In fact, the Supreme Court says death

3  penalty cases are different in a sense.

4                     But some people feel that, you know, it's

5  so important when you're talking about that life and death

6  decision, that they tell us, you know, the standard, the

7  burden, ought to be a little higher on the State in a death

8  penalty case.  You just have to prove it to me beyond any

9  doubt, reasonable or otherwise.  And, again, it's fine.  We

10  understand that people feel that way.  But what do you think

11  about that?

12       A.     I wouldn't, I couldn't have a doubt.  I would

13  have to feel like, I just couldn't take somebody's life,

14  otherwise.  If it wasn't proven to me that he was guilty, he

15  did go into that place, or come out or wherever, and he did

16  that with the intent and knew that that was going to happen,

17  that a life was going to be taken, I would have to, it would

18  have to be proven to me.

19       Q.     What I hear you saying is -- I don't want to

20  put words in your mouth, is you just couldn't have any kind

21  of doubt in order to actually participate in this type of

22  process or find somebody guilty and sentence them to death?

23       A.     I don't know.  I just don't know.  I can't, I

24  can't really say either way, depending on the circumstances

25  and the testimonies, and what I consider reasonable doubt

1   and no doubt.  I don't know.

2        Q.     Okay.

3        A.     I can be honest with you.  I just don't know.

4        Q.     I hope you understand why I'm going --

5        A.     I understand and I know it's very important

6   and I'm trying to answer.  It would be real easy for me to

7   say yes, I could do it, or no, I couldn't do it, because I

8   really don't know.  I've never been in the situation.  But I

9   would have to feel like the circumstances and the law met

10  together.

11       Q.     If you think we proved the case to you beyond

12  a reasonable doubt and proved these Special Issues to you

13  beyond a reasonable doubt, do you think, just beyond a

14  reasonable doubt, not beyond all doubt, but beyond a

15  reasonable doubt, do you think you could answer the

16  questions in such a way that would result in a death

17  penalty?

18       A.     Yes.

19       Q.     Okay.

20       A.     I think I could.

21       Q.     Okay.  We've talked a little bit about these

22  questions, these Special Issues.  I know you've gotten a

23  chance to read them, but they're phrased a little bit

24  differently up on the wall.  If you'd just take a minute or

25  two and look at those so we can visit about them briefly.

1          A.      (Prospective juror complies.)

2          Q.      Did you get a chance to look at those, Ms.

3    Liston?

4          A.      Yes.

5          Q.      Okay.  These are the questions, again, that

6    you get to in that second phase of the trial, the punishment

7    phase.  That first issue basically deals with whether the

8    person is a future danger.  The question says whether there

9    is a probability that they would commit criminal acts of

10   violence that would constitute a continuing threat to

11   society.  Does that question kind of make sense to you as

12   you look at it?

13         A.      Yes.

14         Q.      Do you see how it kind of asks a juror to make

15   a prediction about future events?

16         A.      Yes.

17         Q.      Okay.  Do you feel like you're the type person

18   that could make that prediction?  Some people tell us they

19   can, some people tell us they can't, they're not

20   comfortable, kind of, I guess, predicting future behavior.

21   But what do you think about yourself?

22         A.      You predict the future behavior on the past

23   behavior?

24         Q.      If you had enough information, maybe past

25   history.

1      A.      Yes.

2      Q.      Okay.  What does that word "probability" mean

3  to you?  It doesn't necessarily have a legal definition, so

4  we ask each juror kind of how they define that word

5  "probability."

6      A.      If there's any chance that a criminal act

7  would be performed again.

8      Q.      Okay.  And we hear that a lot.  The law gives

9  us a little bit of guidance.  It says, you know, it's

10 something less than a certainty, because we could never

11 prove anything to be a certainty.  But it's something more

12 than just a possibility, I guess, because everything is

13 possible.  You said, you know, a chance it would happen

14 again.  Does that make sense to you, that type of

15 definition?  Are you comfortable with that?

16     A.      Probability, chance, yeah, yes.

17     Q.      Okay.  When you see that phrase, kind of in

18 the middle sentence or in the middle line, "criminal acts of

19 violence."  Again, that law doesn't necessarily define about

20 which type of crimes or what type of acts that means.  So we

21 ask every juror kind of as you sit there and look at that

22 phrase, "criminal acts of violence," what does it mean to

23 you?

24     A.      Breaking the law.

25     Q.      Okay.

1        A.       Whether it be rape, whether it be theft,

2    robbery, aggravated assault, breaking the law.

3        Q.       Okay.  And then finally the last word in that

4    question, "society."  Again, that's not really defined for

5    us legally.  We ask everybody to kind of how you would

6    define "society".

7        A.       Society is whoever you are in contact with,

8    whether it be the people you work with or the people you

9    live with, the people you're around.

10        Q.       Everybody and anybody you may come into

11    contact with?

12        A.       Yes.

13        Q.       What about people behind bars?  You know,

14    prison guards, wardens, that type thing?

15        A.       Yes.

16        Q.       Okay.  That makes sense to you?

17        A.       Yes.

18        Q.       Okay.  You told us earlier when you look at

19    that question, I guess it would be important to know the

20    past history.

21        A.       Yes.

22        Q.       Anything else you think might be important as

23    you're trying to answer that question?

24        A.       I guess the types of violence that was

25    involved, whether they pleaded guilty, whether they were

1    involved with other people in the acts and the crimes.

2          Q.      Okay.   The law says when you get to answer

3    these questions, you know, you can go back and look at what

4    happened in the first part of the case, the crime they're

5    charged with.   And in the second part, you know, you get to

6    hear about his history and that type of thing to help you

7    answer that.

8                A lot of people tell us when we talk

9    about this question that, you know, hey, if I've convicted

10   someone of capital murder, okay, if I've already decided in

11   that first phase that they're guilty of capital murder, that

12   first question, Special Issue No. 1, is answered to me.   If

13   I've convicted him of capital murder, I'm always going to

14   think there's that probability of a future danger.   In a

15   sense it's kind of a common sense proposition.   You kind of

16   see what I'm saying?

17         A.      Yes.

18         Q.      What do you think about that?

19         A.      I think somebody could kill somebody by

20   accident and it be a capital murder case and it be a

21   first-time incident.

22         Q.      Okay.   Let me stop you right there.   If you

23   are talking about a death that's caused accidentally?

24         A.      Yes.

25         Q.      If you accidentally kill someone, that's not a

crime of any type.

A.     In carrying out another crime?

Q.     Well, you would have already probably found him guilty of capital murder at this point. See what I'm saying?

A.     Yes, sir.

Q.     I don't know.  What situation do you have in mind?  I'm not sure we're on the same wavelength.

A.     Well, I was thinking about past criminal acts. If this was the first time, say it was negligent or they were drunk and they ran over a police officer and killed him.

Q.     Okay.  Let me back up just a little bit and maybe this will help our discussion.  Murder in Texas is the knowing or intentional taking of a life without legal justification or excuse, okay?  If you kill somebody in self-defense, it's not murder.  If you kill somebody accidentally, it's not murder, okay?

A.     Okay.

Q.     So the situation you described probably wouldn't be murder.  It sure wouldn't be capital murder. Does that make sense?

A.     Yes.

Q.     We're always talking about that knowing or intentional taking of a life, not in self-defense, not

1  accidentally.  That's where capital murder starts.  We've

2  got to prove that and prove some other element, like, say,

3  in the course of a robbery.  Does that kind of clear things

4  up for you a little bit?

5        A.    Yes, I guess.  But if they were an accomplice

6  to that case and they wasn't actually involved in another

7  case.

8        Q.    Okay.  So if they were an accomplice in the

9  capital murder and they didn't have any criminal history?

10        A.    Yes.

11        Q.    Okay.  You could see where you might answer

12  that question no?

13        A.    Yes.

14        Q.    Okay.  And that's kind of what the law

15  anticipates, that you keep an open mind to all these

16  questions in the second phase.  The answer to that question

17  starts off with a no and it's up to us to prove it to you

18  that it should be a yes.  That second Special Issue, that

19  kind of deals with kind of what we've already talked about,

20  that accomplice situation.

21        Just to focus your attention on that last

22  line in that question, anticipated that a human life would

23  be taken.  If you remember what we talked about a second

24  ago, in order to find an accomplice guilty of capital

25  murder, we'd have to prove to you that they should have

1   anticipated, you know, a life would be taken, okay?  Should

2   have anticipated.  When we get to punishment, what the law

3   says, and we've got to prove to you not only that they

4   should have anticipated, but they actually anticipated.

5              And the law says that's a different

6   standard and a higher standard.  And there's some people,

7   very frankly, that said, you know, should have anticipated

8   and anticipated to me are pretty much the same thing.  I'm

9   wondering if you kind of see a distinction between those two

10  or where you are on that issue.

11       A.    I think that would be the State's

12  responsibility to prove to me that he did anticipate it.

13       Q.    And that's what we have to prove in

14  punishment.  But do you see a difference between the two

15  standards, between should have anticipated and actually

16  anticipated?

17       A.    Not really.

18       Q.    Okay.  A lot of people tell us that.  They say

19  you're kind of playing word games or parsing words with me.

20  The law says there's a difference.  It says it's actually a

21  higher standard.  Some people, like you, say that to me, for

22  all intents and purposes, it's the same standard.  If the

23  State has proven to me in the first part of the trial that

24  they should have anticipated, then that question is already

25  answered for me, because I think should have anticipated and

1    did anticipate are the same thing.

2                      That's kind of what I hear you saying.

3    And I don't want to put words in your mouth.  Is that what

4    you"re saying?

5         A.    Yes.

6         Q.    Okay.  So if you found somebody should have

7    anticipated death in the first part of the trial, because

8    there's no difference between the standards, you would have

9    already answered that question in your mind?  They did

10   anticipate; is that right?  That question would already be

11   answered for you?

12        A.    Yes.

13        Q.    Okay.  Fair enough.  If those two questions

14   are answered yes, then we kind of move to this third issue,

15   which is kind of the mitigation question.  We kind of

16   already touched on it a little bit, what it means,

17   background, and that type of thing.  And we just kind of ask

18   a juror to step back, look at everything they've heard, the

19   crime, everything they've heard about the person, and see if

20   there's something there that kind of reduces his moral blame

21   such that his life ought to be spared, and he shouldn't be

22   given the death sentence.  Does that kind of make sense?

23        A.    Yes.

24        Q.    Okay.  Some people tell us very frankly,

25   because this is the last step in that process towards the

1  death penalty, some people tell us, hey, I found a person

2  guilty of capital murder in the first phase.  I found he's a

3  future danger.  I've answered No. 1 yes.  I found he should

4  have anticipated and did anticipate.  No. 2, I've answered

5  that yes.

6            By that time, by that kind of late point

7  in the process, my mind is pretty much made up.  That's it.

8  You know, if we've gotten this far in the process, there's

9  nothing kind of that's going to turn me around, that I'm,

10  you know, going to consider a life sentence instead of a

11  death sentence at that point.  What do you think about that?

12       A.    I think I would have to hear all the

13  circumstances.

14       Q.    Okay.  That's pretty much what the law says.

15  You can keep an open mind.  Do you kind of see a value in

16  that question or having that question?

17       A.    Yes.

18       Q.    Okay.  Is there anything that pops into your

19  mind that you would consider mitigating?

20       A.    I just, I really believe that an environment

21  and how a person was raised and placed determines their

22  outcome of their life.

23       Q.    Okay.  What do you think about a person's age?

24  By that, I mean, some people think that it might be

25  mitigating, if a person was fairly young when they committed

1  the crime.  Some people say it's not.  You're old enough to

2  make a choice.  It's not mitigating.  I'm just curious what

3  you think about that.

4      A.      This day and time, there's an awful lot of

5  young people making very poor decisions and committing very

6  serious crimes.  And I think it depends on the individual.

7  Some people are a lot more mature and have been raised in an

8  environment where they have the opportunity and the -- what

9  they need to make better decisions and some are not.

10           A person is raised in a violent

11  environment, sees things that they do, I believe, in

12  everyday life as norm; whereas, people that are not raised

13  in that do not see it as norm.

14      Q.      When you're answering a question like that,

15  looking into a person's background, do you think you might

16  want to hear from that person, the criminal, the person

17  charged?  Do you think that would be helpful?

18      A.      It might.

19      Q.      Okay.  Would you need to hear from him?  I

20  mean, I guess we would all want to, but would you need to

21  hear from him in answering that question?

22      A.      I feel like that's the attorney's

23  responsibility to give me the circumstances.

24      Q.      And that's basically what the law is.  You

25  know, the State always has the burden of proof.  These folks

1  don't have to do a thing.  The person charged with the crime

2  doesn't have to testify, you know, on his behalf.  But you

3  feel comfortable answering those three questions, even if he

4  doesn't testify; is that right?

5          A.     Yes.

6          Q.     Okay.  Let's see.  Any questions about this

7  scheme we have, kind of how it's set up or what the

8  definition of murder is again?  I don't know if I was real

9  clear on that.

10         A.     I read through it and I know what the law is.

11 But -- and I know when I go back to some of my questions

12 here -- and I understand the law is if it's a police

13 officer, it's an automatic capital.  I don't know that I

14 believe that should automatically be.  I don't know that I

15 believe a police officer's life is more important than an

16 individual, any individual's life.

17         Q.     Okay.  A lot of people tell us that.

18         A.     And I think that that's one of the problems in

19 our system, whether somebody chooses to go into law

20 enforcement and we do appreciate that they're in law

21 enforcement.  But that does not make them a better person,

22 obviously, by some of the things that have come out lately.

23 Just because they are in that, does not mean they are better

24 people.

25         Q.     Okay.  Fair enough.  When you think of a death

1   penalty case, what do you have in mind?  I know we talked

2   about Darlie Routier's case.  Taking that out, maybe taking

3   the policeman aspect out, what kind of case do you have in

4   mind?

5         A.    I think, well, intention.  When they go in and

6   they make the decision to take a life at that time when

7   there's another decision that could be made.

8         Q.    Okay.  You'd want that intent?

9         A.    Yes.

10        Q.    Okay.  I kind of -- I hate to backtrack on

11   you.

12        A.    I know.

13        Q.    You're going to think it's a lawyer playing

14   word games and I hate that, but, I mean, we kind of get back

15   to that conspiracy deal with the accomplice that didn't have

16   any intent.

17        A.    Yes.

18        Q.    You know, you told us you kind of, I guess if

19   you were Governor for a day, you wouldn't just single out

20   police officers.  If you were Governor for a day, would you

21   kind of take that conspiracy aspect out and make it to where

22   the only person who'd be eligible for the death penalty is

23   somebody that intended a death?  That intent sounds

24   important to you.

25        A.    Intent is important to me.

1  Q.   Okay.  Was that the way you could write the

2  law?  If we left it up to you, would you have this

3  conspiracy business with no intent or --

4  A.   Well, I think if a person, in conspiracy I

5  think of maybe somebody that goes out and says, I want you

6  to take this person's life.  They definitely should be, get

7  the death penalty right along with the person that pulled

8  the trigger.

9  Q.   And we have -- we call that the law is murder

10  for hire.

11  A.   Okay.

12  Q.   I want to hire somebody to kill my wife or my

13  business partner.  And that is a capital murder case.  But

14  that's something a little bit different than conspiracy.

15  A.   Yeah.  Well, I guess maybe mine, I'm not

16  involved with the law.  I've never been in jail or anything,

17  so I don't know a lot of the laws, but, you know, that was

18  my perception of it.

19  Q.   It's a good thing you don't have more

20  experience in this area.  I'm just trying to really feel,

21  get a feel from you if you're comfortable in a case like

22  this where you're talking about an accomplice and conspiracy

23  and possibly giving the death sentence to somebody that had

24  no intent, somebody who didn't pull the trigger and had no

25  intent.  That's kind of really the bottom line question and

1  only you can answer that.

2  A.    I don't think I could give them the death

3  penalty, if it was proven that they did not have the intent

4  and they did not pull the trigger and it was not proven to

5  me that they pulled the trigger.  I think I would have a

6  difficult time giving them the death penalty.

7  Q.    Okay.  It sounds like something, now that

8  you've thought about it, you kind of believe very strongly

9  about.

10  A.    Well, I've always, taking a life is not easy,

11  whether for me would it be the death penalty and it's the

12  law and they're sentenced, it would be very difficult, even

13  though I do believe in the death penalty.

14  Q.    Sure.

15  A.    I still feel that I would have to be -- you

16  would have to present a good enough case to me so that there

17  was no reasonable doubt that he had the intention when they

18  went in there and that they knew that a murder could result.

19  Q.    Okay.  When you're talking about an accomplice

20  like a conspiracy that didn't have any intent.  It sounds

21  like that's something you disagree with, kind of

22  intellectually and morally; is that right?

23  A.    Yes.

24  Q.    And it sounds like that's something that

25  would, I guess, substantially impair your ability to be a

1   juror in this case, just because you really don't believe in

2   that aspect of the law?  It would be hard for you to

3   sentence somebody to death and that would just kind of

4   impair you, if you were to be a juror on this case; is that

5   right?

6       A.    If you did not prove to me that he had that

7   intent, I could not give him the death penalty.  You would

8   have to prove your case to me.

9       Q.    Okay.  So just somebody that was a

10  conspirator, that didn't have any intent, you just couldn't

11  give them the death penalty; is that right?

12      A.    Yeah.  If you didn't prove it to me, I

13  couldn't give them the death penalty.

14      Q.    Okay.  Didn't prove to you that he had intent

15  that somebody die; is that right?

16      A.    That he had that intention and that he knew of

17  that that someone was going to take a life when they went in

18  there or came out.

19      Q.    That kind of premeditation, I guess we're

20  going back to?

21      A.    Yes.

22      Q.    You'd want to see premeditation on somebody's

23  part, whether it was the triggerman or the nontriggerman

24  before you could assess a death sentence?

25      A.    The accomplice would have -- I think the

1  accomplice would have to, if he was aware that this person

2  had committed these type of crimes in the past and he knew

3  that it could happen again, especially if they had guns,

4  then that is, would be to be proving it, he had that

5  intention, he knew that, he could make that decision, he's a

6  person that could chose to stay with those people, to be

7  with those people at that time, knowing that something could

8  happen.

9       Q.    Okay.  Again, I don't want to put words in

10 your mouth.

11      A.    I know.  And I'm trying to answer as honest as

12 I can with you, because I know it's critical.

13      Q.    I know.  It sounds like unless we prove to you

14 beyond a reasonable doubt that that accomplice had the

15 intent that somebody die, you could not return a death

16 sentence.  I think cutting through --

17      A.    Yes.

18      Q.    That's kind of what you are saying?

19      A.    Yes.

20      Q.    Okay.  Fair enough.  I almost hate to ask

21 this, but do you have any questions of me?

22      A.    No, I don't think so.

23      Q.    Okay.  Let me check with my buddy here real

24 quick.  Ms. Liston, thanks for your time.  That's all I

25 have, Judge.

1          MR. SANCHEZ:  May I proceed, Your Honor?

2          THE COURT:  Mr. Sanchez.

3          MR. SANCHEZ:  Thank you.

4          CROSS-EXAMINATION

5     BY MR. SANCHEZ:

6          Q.     Ms. Liston, are you tired of answering

7     questions already?

8          A.     No, I'm just nervous.

9          Q.     You want me to stop talking?

10         A.     No, just nervous, because I want to answer

11    truthfully and honestly with you.

12         Q.     We know you've been truthful up to this point

13    and I'm sure you're still going to be truthful.  And I don't

14    want you to feel bad because of the things you've been

15    telling us.  I mean, sometimes people think they're, you

16    know, they're sitting up there and they're on trial.  But,

17    you know, this process is to find out what you think about

18    the law.

19               But I also want to, you know, just tell

20    you that, you know, a lot of the way that you feel is the

21    way the law is set up.  In any criminal case, I mean, you're

22    not supposed to take somebody's liberty unless the State

23    proves their case to you beyond a reasonable doubt.  And it

24    sounds to me that's the way you feel, right?

25         A.     Yes.

1    Q.    Before you would convict anybody of capital

2  murder, the State would have to have a good case and

3  convince you beyond a reasonable doubt that they're guilty,

4  just the way they have alleged it; isn't that correct?

5    A.    Yes.

6    Q.    And that's what the law is.  And that's what

7  the Judge would tell you, you have to do.  You have to sit

8  in that jury box and be basically unconvinced until they can

9  convince you otherwise.  And it sounds to me that that's

10  your posture, especially in a case like this where the death

11  penalty may be involved.  Would I be fair in saying that?

12    A.    Yes.

13    Q.    That's the way you feel?

14    A.    Yes.

15    Q.    Okay.  And naturally the death penalty law,

16  the scheme is set up so it's not an automatic death penalty

17  every time someone is convicted of a capital murder.  In

18  other words, the law favors life sentences instead of death

19  penalty sentences unless, like you said, the State proved to

20  you these Special Issues No. 1 and 2 beyond a reasonable

21  doubt.  So, what I hear from you is basically the way the

22  law is set up.  But -- so don't feel bad about it, the way

23  you've been answering your questions, okay?

24         I did want to go over a couple of things,

25  though, that you talked about.  You had indicated that you

1  may not see the distinction between should have and actually

2  -- should have anticipated or actually anticipated.  To you

3  that may not be a big difference or you couldn't see the

4  distinction.

5         And the way I explain it sometimes, I

6  have three boys at home, okay?  They're five and a half,

7  three and a half, and one is a three month old, so he can't

8  get in trouble yet.  But one day I was walking in, I heard

9  -- I was walking by their room and I heard something like

10  the little one is called -- his name is Sammy and the oldest

11  one is Nico.  And I heard Nico saying, are you ready, Sammy?

12  Are you ready?  And it didn't sound right, so I kind of

13  walked in there and I saw the oldest one on top of a book

14  shelf.  And as soon as I walked in, he jumps off the book

15  shelf right onto the little one who's laying down on the bed

16  like they were wrestling or something.

17         He put the knee right into his ribs.  And

18  I was like, I just ran in there and I said, what are you

19  doing?  And the oldest one was just startled and said, what

20  did I do wrong?  And the little one is crying by that point

21  because he's hurt.  And I said, can't you see that was going

22  to hurt him?  Didn't you anticipate that that was going to

23  hurt him when you jumped on him?  And he was like, no, I

24  didn't think it would hurt him.  I really did not

25  anticipate.  And I said, well, you should have anticipated,

1    okay?

2                         And I tell that story just to kind of

3    show you what the difference is between should have

4    anticipated and actually anticipated.  In his mind he

5    probably should have anticipated that was going to hurt him,

6    like most people who are grown up.  But in his mind, he

7    didn't anticipate.  You see the difference now?

8         A.    Yes.

9         Q.    Between actually anticipating and should have

10   anticipated?  And it's the same thing in this case, in

11   answering Special Issue No. 2, and also in finding someone

12   guilty of capital murder as an accomplice.  In other words,

13   to find somebody just guilty of capital murder as an

14   accomplice they have to prove to you that they should have

15   anticipated that a life would be taken.  Does that make

16   sense?

17        A.    Yes.

18        Q.    Okay.  And, but, in order for them to get you

19   to answer Special Issue No. 2 as yes, they have to prove to

20   you that that person actually anticipated that a life would

21   be taken.  You see how that's a different question that they

22   have to prove to you beyond a reasonable doubt?  Can you see

23   the distinction on that?

24        A.    Yes.

25        Q.    Okay.  So if you were placed on this jury,

1  then you could make that distinction?

2       A.     I think so.  But like in your story, you said,

3  you're dealing with a child that does not always know right

4  from wrong and has not grown up, whereas an adult would know

5  that that would hurt a child.

6       Q.     But you can see the distinction that they

7  would have to prove?

8       A.     Yes.

9       Q.     Okay.  And you can follow that law?

10      A.     Yes.

11      Q.     Okay.  And Special Issue No. 3, you've also, I

12  think you basically told us that you do see value in that

13  question; is that correct?

14      A.     Yes.

15      Q.     The way the scheme is set out that's basically

16  the last step before someone would receive the death

17  penalty.  And it's kind of like a safety net.  In other

18  words, you know, just because you found somebody guilty of

19  capital murder, just because you found that they're a

20  continuing threat to society, and just because you found

21  that they anticipated a human life would be taken, Special

22  Issue No. 3 allows you to find something in the case,

23  something about the person, something about their

24  background.

25            I mean, I can't tell you what that would

1   be, but something maybe in the way the actual capital murder

2   occurred.  Who knows?  It might be something that you hear

3   that tells you, well, yeah, I find all these questions to be

4   answered that way, but I find something that's mitigating

5   sufficiently that I'm going to spare this person's life.

6   And that's the way Special Issue No. 3 is basically set up.

7   And I think you've told us that you find a lot of value in

8   Special Issue No. 3?

9        A.    Yes.

10       Q.    Okay.  I do want to clear up one thing.  The

11  State was asking you about you needing the intent to give

12  somebody the death penalty as an accomplice.  I want to just

13  explore that a little bit more.  Would you need that intent

14  to find somebody guilty of capital murder to begin with?

15             In other words, there was an accomplice

16  situation under a conspiracy theory, like they were

17  explaining to you, that, would you need the intent just to

18  find him guilty or would you need that intent to decide

19  whether they are deserving of the death penalty or not?

20       A.    I don't really understand your question.

21       Q.    I know, I --

22       A.    I don't understand what you're getting to.

23       Q.    It doesn't make sense to me either.  Why don't

24  you explain to me as far as what you thought was important

25  as far as intent in deciding a case like this.  Explain that

1    to me, because I think the problem is I didn't understand

2    what your feelings were as far as that was concerned.

3         A.    As an accomplice?

4         Q.    Yes.

5         A.    That the accomplice went in with the intent or

6    knowingly that someone had the intent or would, there's a

7    possibility that a life would be taken.  I think that's part

8    of intent.

9         Q.    Okay.

10         A.    That it's a decision a person is making and

11    choosing to make at that point.

12         Q.    Okay.  So you could follow the law, then, the

13    way it's been explained to you up until this point as far as

14    that's concerned?

15         A.    Yes.

16         Q.    Do you have anything you want to ask me or you

17    want me to just step down?

18         A.    No, no, no, no.

19         Q.    I think those are all the questions I have

20    here.

21         A.    I would like to say to both and to the Judge

22    that this would be a very difficult decision for me to make.

23    I feel like I could make the decision, but it wouldn't be

24    something that I took lightly, but that it would be a

25    difficult decision.  Just like other people, it's better to

1  let somebody else do it and you sit back and say you believe

2  it.  But to take a life is very critical and very important.

3  That's all I have to say.

4                    THE COURT:  Ms. Liston, I have a question

5  for you.

6                    PROSPECTIVE JUROR:  Yes, sir?

7                    THE COURT:  Looking at the whole scheme

8  of things, I want to listen to you talk a little bit more.

9  If someone is found guilty of capital murder, and there are

10 eight different examples of capital murder, what are the two

11 possible outcomes for punishment?

12                    PROSPECTIVE JUROR:  The death penalty or

13 life in prison.

14                    THE COURT:  And how does one end up with

15 a death penalty?

16                    PROSPECTIVE JUROR:  That they went into

17 this crime knowing that a life could be taken or they took a

18 life.

19                    THE COURT:  What mechanism do we use to

20 impose the death penalty?  What does a jury, what are the

21 mechanics of how the sentencing goes?

22                    PROSPECTIVE JUROR:  They're found guilty

23 beyond a reasonable doubt and then we go to the three

24 questions.

25                    THE COURT:  All right.  Who has the

1   burden of proof on Special Issue No. 1 and Special Issue No.

2   2?

3                    PROSPECTIVE JUROR:  I feel like the

4   State.

5                    THE COURT:  All right.  And you've told

6   -- you've given me a couple of different answers.  That's

7   why I'm asking, just to clarify.  I'm not going to put words

8   in your mouth at all.  Explain Special Issue No. 2 to me.

9                    PROSPECTIVE JUROR:  That the person went

10  into this crime with the understanding that a life could be

11  taken or that in the execution of the crime that there was a

12  possibility of a life could be taken.

13                   THE COURT:  Now, that's where we're

14  having a little problem.

15                   PROSPECTIVE JUROR:  Yeah, I'm having a

16  little problem with it, too.

17                   THE COURT:  You used the words "could be"

18  and "possibly taken."  I need to have you focus on the

19  actual language of No. 2.

20                   PROSPECTIVE JUROR:  Okay.  To me, if the

21  person went in, and it's easy to say if he went in with a

22  gun and shot him, he intended to kill the person.

23                   THE COURT:  There are three parts to

24  Special Issue No. 2.  The first part is easy.

25                   PROSPECTIVE JUROR:  That's easy.

1          THE COURT:  He went in, he was the

2     gunman, that's done.

3          PROSPECTIVE JUROR:  Or he went in and the

4     other person went in with a gun and knew that there was a

5     possibility that someone would be killed, but intended to

6     kill the deceased or another person intended to kill a

7     person.  And then the anticipated that a human life could be

8     taken, if they go in with guns and they're there in a crime

9     and someone confronts them, a reasonable person should

10    realize that a life could be taken and should anticipate

11    that there's life that could be taken.

12         THE COURT:  So you understand there are

13    three different categories?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  You understand on Special

16    Issue No. 3 there's -- no one has the burden to bring you

17    evidence on that?  You can look at the whole trial.  The

18    defense may present evidence.  They're not required to.  The

19    State doesn't have to prove it to you.  It's just a step

20    back, look at everything again, take into consideration all

21    of the evidence.

22         PROSPECTIVE JUROR:  All the testimony and

23    evidence.

24         THE COURT:  So let me ask a global

25    question.  If you have found someone guilty of capital

1   murder, as a hypothetical juror, could you return a life

2   sentence, if the facts warranted it?

3                    PROSPECTIVE JUROR:  Yes.

4                    THE COURT:  If you were a juror in a

5   capital murder case where the jury found the defendant

6   guilty of capital murder and the facts dictated it, could

7   you return a death sentence, answering those issues in such

8   a way that would result in a death sentence?

9                    PROSPECTIVE JUROR:  I believe I could.

10                   THE COURT:  I believe.  Now, we've been

11  through this for an hour and a half.  You have told us it

12  would be very difficult.  I'm not comfortable.  This is the

13  one and only question.  Either you can follow the law or you

14  can't follow the law.

15                   PROSPECTIVE JUROR:  I can follow the law.

16                   THE COURT:  And if the law resulted in a

17  death sentence, you're telling me you could do that?

18                   PROSPECTIVE JUROR:  Yes.  If the law and

19  the State proved it beyond a reasonable doubt, I could.

20                   THE COURT:  Thank you, Ms. Liston.  If

21  you will wait for us outside just for a few minutes and

22  we'll have you back in.

23                   [Prospective juror out]

24                   THE COURT:  What says the State with Ms.

25  Liston?

1   MR. WIRSKYE:  The State challenges

2   Ms. Liston on several grounds, Your Honor.  Number one, as a

3   vacillating juror.  When we get to Special Issue No. 2,

4   talking about whether she sees a distinction between should

5   have and did actually anticipate.  She answered me one way,

6   was very clear in her answers.  She answered Mr. Sanchez

7   another way.

8   And I believe, especially based on her

9   demeanor and the Court observing her and her grasp of the

10  Special Issues and the issues involved and the precise legal

11  definitions, we believe she's disqualified under 2.  She

12  can't see that distinction.

13  We also believe her views on the death

14  penalty are such that she is substantially impaired in

15  returning a death verdict, kind of unsolicited at the end of

16  the defense voir dire, she made that point to everyone in

17  the courtroom, and especially looking at the prosecution.  I

18  believe she told me she'd be substantially impaired in

19  returning a death verdict based on her beliefs on the death

20  penalty.

21  Then, finally, we challenge her on an

22  inability to follow the law, an aspect of the law, upon

23  which the State is entitled to rely, that means,

24  specifically, the parties conspiracy.  She told me in order

25  to convict and get a death penalty, that she would need

1 intent on the part of the accomplice. And we believe she's

2 holding the State to a higher burden than that, which is not

3 the law when it comes to the parties conspiracy. We

4 challenge her on those grounds, Your Honor.

5 　　　　　MR. SANCHEZ: Would you like me to

6 respond, Judge?

7 　　　　　THE COURT: Go ahead.

8 　　　　　MR. SANCHEZ: First of all, when it came

9 to her distinction between should have anticipated and

10 actually anticipated, the law was never explained to her at

11 that point. Distinction was never made as to what the State

12 had, which one the State had to prove under Issue No. 2. I

13 think once we questioned her, she indicated that she saw the

14 distinction. And we asked her if the State had to prove to

15 you that the person actually anticipated to you a life would

16 be taken, she understood that and she said she could do it.

17 　　　　　As far as her feelings for the death

18 penalty, the only thing she indicated was that she wouldn't

19 take it lightly. She never said it would impair her being a

20 fair juror. As a matter of fact, that's the kind of juror

21 you need, is someone who wouldn't take it lightly and take

22 it seriously, just as the law does. So, as far as that

23 goes, she just said it's something she wouldn't like doing,

24 but if she had to, she would, and she could follow the law.

25 　　　　　As far as the law of parties, I think the

1  Court did a good job in getting her to explain what she

2  believed and I think the Court straightened that out and she

3  could follow the law in that regard, also.

4              THE COURT:  The Court, in looking at all

5  these jurors, obviously would like to have someone very well

6  educated and understand the law when they walk in the door

7  or we wouldn't need this process.  I think the record is

8  quite clear, at the end of the day, I'm looking at the

9  juror's comprehension of the entire package, asking a juror

10 if they can give it back to me.

11             Though she struggles with the issues, she

12 was able to give it back to me, understanding there are

13 differences and the State is required to prove those

14 differences to her.  Once again, only a marginal juror, but

15 I do find this juror to be qualified.

16             MR. WIRSKYE:  State will exercise a

17 preemptory, Your Honor.

18             THE COURT:  Yes, sir.  Please ask Ms.

19 Liston to come back in.

20                  [Prospective juror in]

21             THE COURT:  Ms. Liston, you get to enjoy

22 the rodeo and not have to worry about coming back on that

23 red-eye flight that Monday morning.  You are excused.  Thank

24 you very much.

25             PROSPECTIVE JUROR:  Thank you very much.

1            [Prospective juror out]

2            THE COURT:  Mr. Walter W. Thomas.

3            [Prospective juror in]

4            THE COURT:  Good afternoon, sir.  How are

5   you?

6            PROSPECTIVE JUROR:  Doing fine, sir.

7            THE COURT:  We've got juror No. 2330,

8   Mr. Walter W. Thomas.  Good afternoon, Mr. Thomas.

9            THE COURT:  How are you doing, sir?

10           THE COURT:  Doing fine.  Sorry for the

11   delay in getting in.  I take people as they come in order

12   and you were number two getting in this afternoon, so we put

13   you on second and that's just the best we can do.  We don't

14   know if we're going to visit with someone for a long time or

15   what, so I apologize for the delay.  We have to balance

16   about fifteen people against three, so you see where I am.

17   We'll be here all day, I can assure you.

18           PROSPECTIVE JUROR:  I understand.

19           THE COURT:  Mr. Thomas, did you have an

20   opportunity to read the guide I provided for you?

21           PROSPECTIVE JUROR:  I did.

22           THE COURT:  I know that's a lot of law we

23   give you.  And I also gave you a copy of the questionnaire

24   that you filled out in May to help you begin to think about

25   these issues once again.  And we don't expect you to

1  understand everything at this point.  That's what the

2  lawyers are going to visit with you about and help you

3  understand the law and how it all relates.

4           At the end of the process I have two

5  questions to ask you.  Number one is do you understand the

6  law?  And, number two, can you follow the law, big picture.

7           PROSPECTIVE JUROR:  Okay.

8           THE COURT:  That's what this whole

9  process is all about.  Now, the only question I have for you

10  at this time from the Court is will you be able to serve

11  this Court for a period of two weeks beginning on November

12  10th?

13           PROSPECTIVE JUROR:  Yes.

14           THE COURT:  Very well.  Mr. Shook, would

15  you like to inquire?

16           MR. SHOOK:  Yes, Judge.

17           WALTER THOMAS,

18  having been duly sworn, was examined and testified as

19  follows:

20           DIRECT EXAMINATION

21  BY MR. SHOOK:

22       Q.   Mr. Thomas, my name is Toby Shook.  I'm going

23  to speak to you on behalf of the State this afternoon.  And,

24  as the Judge said, there aren't any right or wrong answers.

25  We just want your honest opinions.  I'm going to follow up

1   with some of the information you provided for us in the

2   questionnaire, talk to you about capital murder, the death

3   penalty, some of the rules that apply in these types of

4   cases.

5               Looking over your questionnaire, I see

6   that you're retired and you used to work for British

7   Petroleum; is that right?

8       A.      Yes.  Amoco, which was bought by British

9   Petroleum, yes.

10      Q.      Okay.  So, what exactly did you do with Amoco?

11      A.      I was in the information technology area in

12  various capacities of programming, project management,

13  supervision.

14      Q.      Okay.  I notice that you've lived different

15  places, several different places in Texas, I know.  What  --

16  did you ever live overseas?

17      A.      Only while deployed in the Navy, I was

18  overseas.  And that's the only time I've actually -- I

19  wasn't actually living there at the time.  I was --

20      Q.      The rest of the time you've been in various

21  cities in Texas?

22      A.      Texas, Oklahoma, and Tulsa for quite a few

23  years.

24      Q.      Okay.  All right.  And now, what brought you

25  to Dallas?  I see you've been in Dallas the last couple of

1  years?

2      A.    About three, it looks like now, close to

3  three.

4      Q.    How did you wind up here in Dallas?

5      A.    Well, my wife grew up here for one thing.  My

6  mother lives here.  My children live here.  My sister lives

7  here.

8      Q.    So all your family?

9      A.    Most of my family was here.

10     Q.    Had already made it here before you?

11     A.    They got here before I did.

12     Q.    Okay.  And I see that some of your hobbies,

13 one of the types of things you do is volunteer work.  And I

14 flipped the page over and it said with the Red Cross.  What

15 do you do with them?

16     A.    Well, I had been helping them out with -- they

17 had a program where they install for elderly people or

18 invalids where they would have this medical device that they

19 would attach to them.  And all they had to do was push a

20 button and I helped them by installing that for them on a

21 volunteer basis.

22     Q.    I saw in 1975 you had been on a jury.  Is that

23 the only jury you've been on?

24     A.    Yeah.  And that was -- I don't even remember

25 what year it was, but it was quite a few years ago.  That

1    was in Tulsa.

2           Q.     Well, you estimated about 1975.

3           A.     That's probably close.

4           Q.     It was a child molestation case and the

5    punishment was forty years?

6           A.     It was a child molestation.  They were found

7    guilty.  The sentencing was out of our hands.

8           Q.     Okay.

9           A.     It was a third time.  After the sentencing, or

10   after the guilt and innocence, the Judge then, it was a

11   three-time loser.  Sentencing was done by the Judge.

12          Q.     Okay.  Was that in Texas or Oklahoma?

13          A.     That was Oklahoma.

14          Q.     Okay.  How did that experience go with you?

15   Was there any problems with the evidence or discussions in

16   the jury room, any major arguments or disagreements?  Or did

17   it go pretty smoothly?

18          A.     There was quite a bit of discussion.  I don't

19   know that there was arguments, per se.  I presume it was

20   after quite a bit of discussion we arrived at a decision.

21          Q.     Not, I take it, then, it wasn't a negative

22   experience on your part?

23          A.     No.  I mean, it was my first experience in

24   participating in a court setting and I found it interesting.

25          Q.     Okay.  Let's talk for a minute, then, about

capital murder.  You put on your questionnaire that you feel that the death penalty, you're in favor of it as a law, and I'd like you to kind of expound on that.  Tell us in your own words why you favor the death penalty as a law, the purpose you feel the death penalty serves society.

A.     Well, it's --for one thing they will never be out on the street again.  I mean, once they've committed an offense that deserves the death penalty, I'd like to make sure, if I were in a position to do so, make sure they never have another opportunity to do so.

Q.     Okay.  So a deterrence?

A.     Deterrence is probably a big part of it, yes.

Q.     Okay.  Has it been a law that you've been in favor of ever since you've been an adult as far as you can recall?

A.     When I was young I'm not sure I felt one way or the other.  I didn't think about it much, I guess. Probably as I've gotten older I may have clarified in my mind, you know, that, how I felt about it.

Q.     From your own personal point of view, what types of crimes do you think should come into consideration for the death penalty?

A.     Um, that's a tough one there now, but I would assume they'd have to be a crime that deprived somebody of their life, you know.  That would be obviously one thing.

1   If they knowingly take someone else's life, I feel like

2   society has a right to take theirs.

3        Q.    Okay.  If it were up to you, would you have

4   the death penalty or at least consideration of the death

5   penalty for crimes other than murder or when a life is

6   taken?

7        A.    Can you rephrase that question?

8        Q.    If it were up to you.

9        A.    If it were up to me?

10       Q.    Would you have the death penalty as an option

11  in some crimes other than murder?  Some people tell us

12  sometimes in a child molestation case, sometimes in a rape

13  case, just depending on the facts.  Other people would

14  reserve it just when a life is taken.

15       A.    I'm not sure I can rule out other things,

16  although the murder is the first thing that comes to mind

17  where I feel like it's deserved, but --

18       Q.    Have you ever followed any cases in the media

19  locally, nationally, that you thought should be considered

20  for the death penalty or perhaps were being pursued as a

21  death penalty case that you can recall?

22       A.    That I felt should be the death penalty?

23       Q.    Should be or at least considered or an option

24  or something of that nature?

25       A.    I don't recall any specifically right now.

1    Well, okay, I guess I take that back.  I can recall one case

2    there.  I don't know whether it was a death penalty

3    situation or not, but there was certainly a case that was in

4    the news, heard in California, that the defendant got off.

5         Q.    Is that the O. J. case?

6         A.    That is O. J. Simpson.

7         Q.    Almost every juror we talk to when we ask them

8    of a case they may have followed and O. J. comes up quite

9    often, obviously, because it was saturated.  And many people

10   feel that he actually got away with murder based on what

11   they saw from the media coverage and that sort of thing.

12   And I take it from what you learned, you thought that maybe

13   that was not the right decision made in that particular case

14   from what you know about it?

15        A.    Well, of course, obviously, I didn't hear all

16   the evidence, but I had some concerns about the decision on

17   that one, yes.

18        Q.    Okay.  In Texas, the death penalty as it

19   exists today is reserved just for murder cases and then only

20   certain types of murder cases.  It used to be more

21   expansive.  But under our rules now it just qualifies in

22   certain types of murder cases with some aggravating facts.

23   And when we say murder cases, we're talking about

24   intentional killings, unjustified killings.  It can't be

25   self-defense.  It can't be an accident, that sort of thing.

The aggravating facts have to be something like a murder that occurs during another felony. Someone robs a store, a convenience store, shoots the clerk. That can be a death penalty case. Breaking into someone's home, murdering someone in the home, murder during a rape, during a kidnapping or arson, also specific victims, such as a police officer on duty, fireman on duty, prison guard on duty, or a child under the age of six. Those types of murders come under a death penalty option.

And then more than one victim for a serial killer situation or a mass murder situation fall into the death penalty statute as well as murder for hire, if someone does it for money or profit. But those are the specific situations which come under consideration.

From your personal point of view, does that list make sense? Is that the kind of cases that you feel should be considered?

A.      Sounds like a pretty good list to me.

Q.      Okay.  Now, let me get into another area.  Any type of crime can have more than one individual involved, same for capital murder.  You may have several individuals involved in the capital murder.  And the law says that they can all be held accountable.  You, in fact, may have only one person that actually causes the death and he may have some accomplices.  One person may have more active

involvement than others.

One example I give for that is Mr. Wirskye and I, let's say, we decide we want to rob the local bank down the street from us.  Our plan calls for me to go in with a loaded gun.  He's going to help me.  He's going to carry a bag.  I'm going to get everyone under control and I'm going to pull the gun, threaten them, and get their hands in the air, and then he's going to go in and grab all the money from the bank drawers.

We do this, but during the course of this robbery, I decide to intentionally kill someone.  Maybe I don't like the way one of the tellers looks at me.  Maybe he tells me they're going for an alarm, but I shoot them and we run away, but we're caught soon afterwards.

Obviously, I could be prosecuted for capital murder.  I could receive the death penalty because I caused the death.  Mr. Wirskye could also be prosecuted for capital murder.  He could even receive the death penalty under certain facts, if he's heavily involved and the jury answers these questions in a certain way, as just an accomplice.

People feel differently about that aspect of the law as far as the accomplice goes.  Some people tell us they believe in the death penalty, but if it were up to them, they would reserve it just for the triggerman and they

1  would kind of draw a line there.  They, for an accomplice,

2  no, because they didn't cause the death, maybe a long term

3  of years in prison, but not the death penalty.

4          We have other jurors that tell us, no, I

5  think an accomplice can be held accountable for capital

6  murder and could even receive the death penalty.  It's going

7  to depend on the facts and their involvement, but they feel

8  that is a just sentence in an accomplice situation,

9  depending on the facts.

10          Like I said, everyone has a different

11  viewpoint and we want to ask every juror their kind of gut

12  reaction to that, how they personally feel about the law of

13  accomplices being prosecuted for the death penalty.  How do

14  you feel?

15     A.     Well, he, if he goes in with you with intent

16  of robbing that place and he has, he doesn't know you are

17  going to shoot it, but he knows that could be a situation

18  that you might, then he's participated in that process.  But

19  I guess I'd have to look at the individual situation whether

20  he, well, it's --

21     Q.     Well, you kind of --

22     A.     It's kind of a hard situation to answer

23  theoretically.

24     Q.     Right.

25     A.     You almost have to look at the specifics to --

1    Q.    You kind of touched on it, I think, on your

2    own words.  You said if he went in there, maybe he just

3    wanted to rob the place, but knew, you know, a gun was

4    involved and maybe he should have known something like that

5    would happen.  In those situations do you feel that it's

6    fair to prosecute someone for capital murder, if they knew

7    something like that could happen?

8    A.    Again, it's the individual specific

9    circumstances would have to be, you know, be considered

10   there.  But certainly some situations he could be, in my

11   mind.

12   Q.    Okay.  Well, the law is this.  It's kind of

13   two theories that you can go under.  One is that you're

14   actively involved in the crime, you are assisting,

15   directing, aiding in some way, you can be found guilty as an

16   accomplice.

17              And the other is the law of conspiracy.

18   If we conspire to commit one crime, which is merely an

19   agreement to commit, in the example I gave, robbery, and one

20   of the conspirators, during the course of that, carrying out

21   that crime, commits another one to further it.  And in this

22   case that would be murder, my part, shooting the teller.

23   Everyone in the conspiracy, the accomplices, can be found

24   guilty of that crime, if the jury believes they should have

25   anticipated something like that could occur.

A.      Okay.

Q.      Looking at all the facts.  They don't even have to have the intent that anyone die to be found guilty. The jury just must believe from all the surrounding facts that they should have anticipated a death could occur during the course of that crime.  And we can get a person guilty of capital murder that way.  To get them to the death penalty, one of the questions we then have to step forward to is not only should they have anticipated, but they did anticipate that a life could be taken.

But the first part, the guilt stage, they don't even have to have that intent to kill, it's just should have.  Again, it goes to the situation where the accomplice is not the actual triggerman, but all the facts show that he should have anticipated a life could occur. And it's those situations in which we can get a guilty.  And under certain facts, even get a death penalty for an accomplice.

And what I want to know from your own personal point of view, do you think, do you agree with the law in that you think it's fair that an accomplice can be prosecuted in a capital murder situation and ultimately receive the death penalty?

A.      I think it could be fair if the situation is right.  Again, to what degree he should have been able to

1  anticipate that, I guess, in my mind, is what I'm trying to

2  sort out here, and it's --

3       Q.    Right.  How do you -- and that can be

4  troubling sometimes for jurors.  How do you think you could

5  determine as a juror whether a person anticipated someone

6  might die?

7       A.    Well, I certainly can't read his mind, so

8  you've got to base it on his actions and what he does.  And

9  just in general, the circumstances of whether a normal

10 person should have been able to anticipate that, I guess --

11      Q.    Okay.  You kind of took the words right out of

12 my mouth.  We can't open up his mind and show you his

13 intent, it's just a reasonable deduction from all his

14 actions preceding the crime, during the crime, and after the

15 crime itself.

16      A.    Yes.

17      Q.    And you feel, then, an accomplice, then,

18 could, it might be a just sentence for him to receive the

19 death penalty, even though he didn't cause the death,

20 depending on the facts again?

21      A.    Could be, I guess, under the right

22 circumstances.

23      Q.    Okay.  And why do you think, you kind of told

24 us that the death penalty in general you think is a good law

25 because it stops that particular person from ever committing

1   a crime like that again.  Do you think that's true with an

2   accomplice, also, the death penalty on an accomplice, the

3   same goal could be achieved that would prevent them from

4   helping commit these types of crimes?

5        A.    It would certainly accomplish the goal of him

6   not being able to do it again, whether it's -- I mean, that

7   certainly deters it from happening again, yes.

8        Q.    Okay.  Are you familiar with the method of

9   execution in Texas?

10       A.    In vague generalities, I know it's injection

11  with chemicals.

12       Q.    Right.  Lethal injection.  And the procedures

13  are the same in each case.  An execution is often covered in

14  the media, the newspapers.  To get to the death penalty,

15  we'll go over these in a little more detail, the State has

16  to prove in the punishment stage that the defendant is a

17  continuing danger to society, that they did either intend

18  someone to die or that they anticipated that a life would be

19  taken and there's not sufficient mitigating evidence to

20  warrant a life sentence.

21            But a yes, yes, and a no equals a death

22  sentence.  The jury doesn't write life or death in, but

23  that's what would occur, if the questions fall that way.

24  The Judge has no choice.  He would sentence the defendant to

25  death.  And if they're answered any other way, it would be a

life sentence.  But those are the only two possible

outcomes, once a defendant has been found guilty of capital

murder.

A.   Okay.

Q.   The method of execution is the same, the

procedures are the same.  They would be the same in this

case, if the defendant were found guilty and the questions

were answered yes, yes, and no.

He would be sentenced to death, placed on

death row, and, at some point in time down the line,

actually taken down to the downtown unit in Huntsville where

every execution takes place.  He'd be put on a gurney.  He

would be secured there by leather straps, needles placed in

his arm, and after given an opportunity for a last

statement, would have substances injected which would stop

his heart, shut down his lungs, cause him to die within

about ten to fifteen seconds.

Quite frankly, that's our goal in this

case.  The State feels we have the type and quality of

evidence to convince a jury of this defendant's guilt and

that these questions should be answered in such a way that

would result in his execution.  The defense takes the

opposite view.

You've told us from your personal point

of view that you do believe in the death penalty as a law.

1    It should be carried out.  You've grown up, lived in Texas

2    most of your life or Oklahoma.  You probably know, then,

3    that Texas leads the nation in executions.

4        A.    Yes.

5        Q.    That it is a state where the penalty is

6    actually carried out.  So it's a very real thing.  It's not

7    something we talk about philosophically.  Now that you've

8    had more time to reflect upon participating in this type of

9    jury, this type of case, we just need to know this.

10            Do you feel that you're the type of

11   person who could actually participate and take pen in hand,

12   and, if we prove these issues to you, write in the verdict,

13   knowing that the defendant would be executed in the manner

14   that I described?

15       A.    If the evidence, you know, if in my judgment

16   the evidence supports it, I could, yes.

17       Q.    Okay.  And I took the time to talk so much

18   about the accomplice and what we have to do is because we

19   can't get into the facts of the case, but I can tell you

20   that's the theory of law that the State is proceeding under,

21   that we're trying Mr. Murphy as an accomplice and seeking

22   the death penalty under that theory of law.

23            I think you've told me from your personal

24   point of view that you have no objection to the law, you

25   agree with the law, and it would just depend on the facts

```
 1   and circumstances?

 2            A.      That's correct.

 3            Q.      Okay.  Let's talk about these Special Issues

 4   for a minute in a little more detail.  You don't get to them

 5   unless you have found a defendant guilty and then you might

 6   hear additional evidence.  At the close of that you get

 7   these issues.  And I'd like you just to review Special Issue

 8   No. 1 by reading that to yourself very quickly and we'll go

 9   over that.

10            A.      (Prospective juror complies.)  Okay.

11            Q.      That question asks the jurors to make a

12   prediction about how the defendant would behave in the

13   future.  Do you feel you could answer that question, make

14   that type of prediction, if you are given sufficient

15   evidence?

16            A.      Yes.

17            Q.      What types of information or facts would you

18   want to know about a person before you answered that

19   question?

20            A.      Well, the facts surrounding the crime itself,

21   I guess, whether it would indicate that.  I mean, if people

22   do certain things without regard to human life once, they

23   very well are going to do it again, you know.  They could do

24   it again in the right circumstances, so --

25            Q.      Okay.  Certainly that's one of the areas that
```

1  you can consider, the facts you've already heard in the

2  guilt/innocence stage, you get to reconsider.  You just have

3  to look at it from the point of view of this question and

4  not guilt.  And one of the jurors told us the most important

5  factors they would look at, their role in the crime, the

6  brutality of the crime, that sort of thing, their actions

7  even after the crime.

8       You may, and if this type of evidence

9  exists, you can hear about a person's background, if they've

10  been in trouble with the law before.  You can even hear from

11  those particular witnesses involved in prior crimes.  You

12  can hear about their punishments they received, just the

13  general background.  You can hear good things, you can hear

14  bad things, kind of a general "This is Your Life."

15       All that can go into consideration of

16  question No. 1, also.  Do you feel that that type of

17  information would be valuable to you?

18       A.       Pattern of behavior is certainly relevant,

19  yes.

20       Q.       Okay.  The language here in question No. 1,

21  you're not going to get legal definitions.  You'll get

22  plenty of definitions in the first part of the trial.  But

23  as far as these questions go, the Legislature and the courts

24  have not given us legal definitions.  The definitions will

25  be the common usage that the jurors decide upon.

1     A.    Okay.

2     Q.    So I want to talk to you a little bit about

3 that. We have to prove that there's a probability that the

4 defendant would commit criminal acts of violence. When you

5 see "probability" in that sentence, what does that mean to

6 you?

7     A.    That there's some likelihood that he would do

8 it again. I mean, based on, again, the evidence of the case

9 itself and his overall pattern of behavior.

10    Q.    Okay. Just kind of his mindset and that sort

11 of thing, his, how he's conducted his life so far?

12    A.    How he's conducted his life so far and if

13 there have been no major intervening event that has changed

14 his life which, you know, can happen, but doesn't happen too

15 often where somebody suddenly takes 180 degrees.

16    Q.    Right. The only guidelines the courts have

17 given us is on one end, it's not a certainty. Probability

18 is not a certainty. We could never prove a certainty, I'm

19 sure. But it's more than a possibility, because anything

20 could be viewed as possible and then the question would

21 really have no meaning then. Courts often say more likely

22 than not, that sort of thing. Are you comfortable with that

23 type of language in the question?

24    A.    Sure.

25    Q.    Okay. We have to prove that the defendant

1   would commit criminal acts of violence.  The words "criminal

2   acts of violence," what types of acts do you come to mind in

3   terms of that question?

4        A.    Murder, any crime in which there's physical

5   violence, I guess, would certainly be.

6        Q.    Any type of physical violence to other human

7   beings?

8        A.    Sure.

9        Q.    Threats, assaults, that sort of thing?

10       A.    Um, well, if the threat is a serious threat,

11  yes.

12       Q.    And finally we have to prove that he would

13  constitute a continuing threat to society.  What does

14  "society" mean to you in terms of that?

15       A.    That's me and you and everyone else, that's --

16       Q.    Anyone and everyone he may come into contact

17  with?

18       A.    Sure.

19       Q.    And could it include people in the

20  penitentiary system, guards or inmates?

21       A.    Yes.

22       Q.    Police?

23       A.    Yes.

24       Q.    All right.  The question, again, starts out

25  with a no answer.  We have to prove to you it should be

124

1  answered yes.  Again, we do that by you reviewing the

2  evidence in the guilt/innocence stage, once again, just from

3  the viewpoint of that question, and also the new information

4  you may have heard in the person's background.

5              And then if we prove it to you beyond a

6  reasonable doubt, you can answer it yes.  If we don't, you'd

7  leave it as a no answer.  Do you feel you could follow that

8  law, require the State to prove it to you beyond a

9  reasonable doubt?

10     A.     I can follow that law.

11     Q.     Okay.  There's no, it's not an automatic yes

12  because you find someone guilty.  There wouldn't be any

13  point to the question if the jury simply went back there and

14  said we found him guilty, let's write in a yes.  The law

15  contemplates that the jury would wait, listen to the new

16  evidence, and then determine if the State has proven it.  Do

17  you feel you can do that?

18     A.     I can do it.

19     Q.     Let me backtrack for one minute.  I meant to

20  ask you this up front.  We talk to every juror about this.

21  This case got a lot of publicity when it first occurred on

22  the TV and radio and newspaper.  And you, like all jurors,

23  almost all jurors, that is, told us in the questionnaire

24  that you had heard it, followed some of it on TV, which

25  doesn't make a person ineligible to be a juror.  But we just

1  have to explore that.  What do you recall hearing or on TV

2  or seeing in the newspaper regarding the facts of the case?

3       A.   Well, I guess the first thing I recall was I

4  don't remember exactly, I think I heard about a prison break

5  first on the news.  And then the news, there were news

6  accounts of a robbery and a death of Officer Hawkins.  And

7  then I think it tied it -- I don't recall exactly how, but

8  somehow, that was tied to the convicts who had escaped.  And

9  ultimately they were tracked up to Colorado, I believe it

10 was.

11      Q.   All right.  Did you follow anything after

12 that, the subsequent court proceedings, that sort of thing?

13      A.   Not that I recall anything specific, no.

14      Q.   Okay.  The bottom line is this.  The fact that

15 you've read something, seen something in the media, doesn't

16 make you ineligible as a juror.  However, if you sit on the

17 jury, you have to be able to assure the Court that you can

18 make your decisions just based on what you hear in the

19 courtroom from the witnesses, the evidence introduced.  You

20 can't base it on what you've seen on TV or read in the

21 newspaper prior to this.  You can't let that influence you.

22           We know very well we can't tell you to

23 forget about it, but you can't let that influence your

24 decision.  It's just a common sense proposition, recognizing

25 that the most accurate information is not going to be from

1   the media.  Oftentimes they don't get it correct.  The more

2   accurate information will come from the actual witnesses

3   that come to court and testify.  Do you feel you could

4   follow that rule of law?

5           A.      I can follow that rule.

6           Q.      Okay.  Now, let's talk about Special Issue No.

7   2.  It also starts out with a no answer and the State must

8   prove to you it should be answered yes.  And if you'd just

9   take a moment to review that to yourself.  That's the

10  question which involves that issue of the accomplice.

11              To get a person guilty, again, under that

12  conspiracy theory we only have to prove that they should

13  have anticipated that a life occur.  And here we talk about

14  anticipation as they actually did anticipate.  So there's a

15  difference there.  It might be slight in a person's mind,

16  but there is a difference between should have and did

17  anticipate.

18              Now, it may be the same exact evidence.

19  Kind of like the guilt/innocence stage when you look at

20  Special Issue No. 1.  And it may be the same exact evidence.

21  You just look at it from that different viewpoint of

22  question No. 2.  And you can use any additional information

23  about the person's past which, if that would help you in

24  answering question No. 2, also.  But it kind of covers all

25  situations.

 1              The first part of the question asks if
 2    the defendant actually caused the death.  If you believe
 3    they were the triggerman or the person that caused the death
 4    from the evidence, then, obviously, that would answer that
 5    part of the question.  But the latter part talks about these
 6    accomplice situations.  If they didn't actually cause the
 7    death, but you believe from the evidence that they intended
 8    to kill the deceased or another person, or they anticipated
 9    that a human life would be taken, then you would answer it
10    yes.

11              And, again, we can't open the defendant's
12    mind up.  You can't read his mind.  But a jury can use their
13    common sense and make reasonable deductions from the
14    evidence from their actions, their role in the crime, how
15    the crime was carried out, from their actions after the
16    crime, which can aid you in determining their intent.  Do
17    you feel comfortable in answering a question like that with
18    that type of evidence?

19         A.    If I have the evidence I could, yes, I feel
20    comfortable.

21         Q.    Okay.  Again, just because you found someone
22    guilty, just because you found they're a continuing danger
23    to society, it doesn't mean that's an automatic yes.  You
24    have to look at the questions separately, analyze the
25    evidence from the point of view of that question, and then

1  answer it, and require the State to prove it to you beyond a

2  reasonable doubt.  Do you feel you could do that?

3      A.   Yes.

4      Q.   Okay.  And this last question is the

5  mitigation question.  It's a little different in that

6  neither side has the burden of proof.  We don't have to

7  prove it should be answered no.  The defense doesn't have to

8  prove that it should be answered yes.  It's just the jurors

9  have to look at all the evidence and background and

10 determine if they think there's sufficient mitigating

11 evidence.

12      It's kind of the catchall.  It allows the

13 juries to show mercy in a case, if they believe that's the

14 right thing to do based on what they see in the evidence and

15 based in their heart.  You don't get to the question unless

16 you have found someone guilty of capital murder, unless you

17 think they are a continuing danger, and you feel that they

18 anticipated that a life would be taken.

19      But there might be some facts in their

20 background, the way they -- something in the background of

21 the crime that would tell you a life sentence is the right

22 thing to do.  What mitigating evidence is, you don't have to

23 tell us.  You're not required under law to think of an

24 example or tell us what it is.  You just have to be able to

25 assure the Court that you can keep your mind open to it.

And if you think there's sufficient mitigating evidence, you could answer it yes.  If you don't think there is sufficient mitigating evidence, you could answer it no.  Do you feel you could do that?

A.    I can do it.

Q.    Okay.  Now, I told you, you don't have to think of anything that is mitigating, but I always like to ask you to kind of get your gut reaction.  As you sit there today, does anything come to mind that you might view as potentially mitigating evidence?

A.    Top of my head, I really can't think of anything, no.

Q.    Okay.  Good.  You're like most of the jurors, then.  Kind of scares us when someone can.  We don't anticipate that you sit around thinking about these things.  But we have talked to jurors about different areas.  We go into the questionnaire on an area of a person's background.

Oftentimes you hear about a person's background in a capital murder case.  Sometimes they come from a poor background.  Sometimes they come from a broken home.  They may have been physically abused as a child.  Maybe they were mentally abused, maybe both.  Could have had just a bad childhood.

Some people view that as potentially mitigating, especially if it's severe, something they'd

1  consider in the question.  Other jurors tell us, I'd feel

2  bad for them, sympathy, but I know people or I've seen

3  people that come from a bad background and they don't commit

4  capital murders.  If you're an adult, then you should be

5  held accountable.

6                    People kind of feel differently about

7  that.  Do you have any views about a person's background, a

8  bad background, that sort of thing?

9       A.    Well, I think everyone is responsible for

10  their own choices, period.  I mean, some, certainly

11  background can, your background can take you one way or the

12  other, but ultimately you have a choice to either do

13  something or not do something, and we as humans have that

14  choice.

15       Q.    A lot of people tell us that.  And mitigation

16  can be anything.  Some people view it as young age, some

17  old.  A lot of times people tell us mental capacity.

18  Obviously, a person has to know right from wrong to be

19  prosecuted.  But some are slower than others.  There may be

20  some mental defect.  It's not really their fault and they

21  could look at that area.

22                    But, really, you're not, and again, you

23  don't have to tell us what it would be, just that you can

24  keep your mind open to it, see value in that question, and

25  if you think or you see sufficient evidence that's

1  mitigating, you would answer it that way.  And if you don't,

2  you could answer it no.  Kind of just let the chips fall

3  where they may.  You feel you could do that?

4        A.      I believe I can.

5        Q.      Okay.  Let's talk a little bit about some

6  rules that apply to each case.  You'll probably be familiar

7  with most of these rules because they apply to every

8  criminal case.  They came into play in the last jury you sat

9  on and they're going to be things you kind of grew up with

10  in school.

11             The presumption of innocence, every

12  defendant starts out with the presumption of innocence.  The

13  fact that he's been arrested, charged, indicted, or that

14  we're even going through this process, is no evidence of his

15  guilt.  The State has to prove his guilt by putting on

16  witnesses and overcoming that presumption.

17             But as we start, all jurors must give the

18  defendant that presumption of innocence and require us to

19  prove the case beyond a reasonable doubt.  Do you feel you

20  could do that?

21        A.      I can do that.

22        Q.      The burden of proof is on the State of Texas

23  and it never leaves.  It never shifts to the defense.  It

24  always stays at this table.  You might anticipate or believe

25  through common sense that the defense may put on witnesses

1  or ask questions or make arguments.  But legally under law

2  they have no obligation to.  I'm sure they will.  They're

3  good lawyers.  But the law says that you can't shift the

4  burden to them.  They don't have to prove his innocence.

5  The burden stays right here on the State of Texas.  Could

6  you follow that rule of law?

7      A.    I can follow that rule.

8      Q.    Okay.  You probably, I'm sure, have heard of

9  the Fifth Amendment.  Every person charged with a crime, if

10 they choose to testify, they can.  No one can stop them.

11 And then you would judge them like any other witness.  But

12 if they choose not to testify, the Court would instruct you

13 that you cannot hold that against them.  The fact that they

14 didn't want to testify, can't be used as evidence in any

15 way.  You can only make your decision based on the witnesses

16 that you heard.

17          There could be numerous reasons why

18 someone may not testify.  They may be poorly educated.  They

19 may be very, might not speak well in front of other people,

20 too nervous, they might look guilty when they're not.  They

21 may not do well against a lawyer.  They could be very guilty

22 and look bad.  They could be following just the advice of

23 their lawyer that tells them not to testify.  They kind of

24 take care of that by just explaining to the jury and

25 instructing them for the Court's charge that you can't hold

1    that against them.  Do you feel you could do that?

2         A.     I can do that.

3         Q.     Okay.  Jurors tell us, hey, I want to hear

4    from him, I want to hear everything about the case.  But you

5    can't hold it against him, if he chooses not to.

6              The burden of proof from the State of

7    Texas goes to each and every element of the offense.  And

8    what I mean by that element is each part of the indictment,

9    and if we fail on just one element, you're obligated under

10   law to find the defendant not guilty.

11             Let me give you an example.  We have to

12   prove who committed the crime.  If you had a reasonable

13   doubt at the close of the evidence about who committed the

14   crime, then obviously you're going to find him not guilty.

15   But that goes to even the county.  We have to prove this

16   happened in Dallas County.  Perhaps the evidence may show

17   that this may have actually happened in Tarrant County, it

18   was over in Grand Prairie or something.

19             And I don't anticipate something like

20   that would happen, but just to kind of use it as an example.

21   That would show very poor preparation, no doubt, on the

22   prosecution's point of view, if you believe the evidence

23   really showed it happened in Tarrant County.

24             But that would be a reasonable doubt and

25   under the law that's just as important as the defendant's

1   identity.  As a juror you can't help us out and kind of give

2   us that one or say it's a technicality.  You have to adhere

3   to the law and would have to find the defendant not guilty.

4   You probably wouldn't like it.  You would go upstairs and

5   have us fired, I'm sure.  But you can't go on the State's

6   side and give us one of the elements just because you feel

7   bad for us or anything like that.

8               Again, I don't anticipate that to happen,

9   but that's an example we give to demonstrate how that burden

10  of proof goes to each and every element of the offense.  Do

11  you feel you could follow that rule of law and require us to

12  prove each and every element?

13          A.     Yes.

14          Q.     Okay.  Police officers testify in criminal

15  cases.  That's kind of common sense.  People respect the job

16  police officers do, but you can't start them out ahead of

17  other witnesses.  They have to, you know, there's good

18  police officers and there are bad police officers.  You have

19  to judge them like anyone else and once they hit the witness

20  stand, you judge their credibility.  If you feel they're a

21  good witness, then you judge them accordingly.  If you feel

22  they're bad, you judge them that way.

23              But you can't automatically start them

24  out ahead.  You have to start them out like you would any

25  other witness.  Do you feel you could follow that rule of

1  law?

2           A.      Yes.

3           Q.      Okay.  Sometimes jurors find defendants guilty

4  of lesser included offenses.  Lesser included offense of

5  capital murder is aggravated robbery.  That penalty range

6  goes from life all the way down to five years in prison and

7  anywhere in between.

8                   The law simply requires the jurors to

9  keep their mind open to that full range of punishment, and

10 if you think, after all the background evidence is in and

11 their role in the crime, that a life sentence should be

12 imposed, you could do that.  If you think as little as five

13 years in prison should be imposed, you could do that, or

14 anywhere in between.  Do you feel you can keep your mind

15 open to that full range of punishment?

16          A.      Yes.

17          Q.      Parole laws sometimes come up in the news, the

18 media.  The Judge would instruct you in a capital murder

19 case that a capital life sentence equals forty calendar

20 years before a person can become eligible for parole.  But

21 he would also instruct you that you can't consider our

22 parole laws in any way in your deliberations.  You must

23 simply consider a life sentence a life sentence.  Do you

24 feel you could follow that rule?

25          A.      I can follow it.  It's hard to take that out

1  of your mind, I mean, and totally dismiss that when you know

2  it.

3        Q.   And the Court will even instruct you what the

4  parole law is.  The reason the courts don't want the jurors

5  to deliberate is the Court has no control over the parole

6  laws.  The jurors have no control over it.  It's something

7  that may change.  It's something that no one has a decision.

8  He can just simply tell you that it's forty calendar years

9  and then that's when they become eligible, not necessarily

10  that they would be paroled.

11        So the jurors simply, when they look at

12  the life sentence, consider that as a life sentence and

13  can't enter that into the deliberations.  Might cause --

14  someone else makes those decisions.  They don't want jurors

15  to make determinations based on what someone else may do.

16  Could you follow that rule of law?

17        A.   I could follow it.

18        Q.   One other area I want to go over in these

19  Special Issues.  Sometimes you hear from experts like

20  psychologists and psychiatrists from one side or the other.

21  Sometimes the defense calls them.  Sometimes the prosecution

22  calls them.  They can render opinions about a future

23  dangerousness.  They can talk to you about mitigation, how

24  they feel or why they feel a person reacts the way they do.

25        Some jurors put a lot of faith in those

1    type of experts.  They really think they have a lot of

2    value.  We have other jurors that really don't put any faith

3    at all in those.  I've heard them called the soft sciences.

4    They feel you can, if you look hard enough, you will find

5    one to come up with any theory.

6                    And then we have other jurors that say, I

7    can look at it like I would any other piece of evidence.

8    It's not going to -- from the beginning I'm not going to

9    give it any greater weight, but I'll look at it as another

10   piece of the pie.  How do you feel about that type of

11   expert?

12        A.      Well, I think there's a lot of, in almost all

13   cases in my observation, if one side puts an expert on, the

14   other side is going to put an expert on that says exactly

15   the opposite.  So you've got to use your judgment, I guess,

16   as to the credibility and who do you believe.

17        Q.      Just make your judgment once they testify and

18   then judge their credibility?

19        A.      Judge their credibility based on what you

20   hear, and if it makes sense to you as a juror.

21        Q.      Okay.  Well, I've covered a lot of areas, and

22   I think I'm just about finished.  Do you have any questions

23   over anything we've gone over?

24        A.      I don't believe so.

25        Q.      All right.  Well, I appreciate your

1  cooperation and I appreciate your patience.

2         MR. SHOOK:  That's all the questions I

3  have, Judge.

4         THE COURT:  Mr. Thomas, can we get you

5  anything?  You're about halfway through.

6         PROSPECTIVE JUROR:  I'm fine, sir, thank

7  you.

8         THE COURT:  Ms. Busbee?

9         MS. BUSBEE:  Thank you, Your Honor.

10                    CROSS-EXAMINATION

11  BY MS. BUSBEE:

12     Q.    Mr. Thomas, I'm not going to take as long as

13  Mr. Shook did because he had the job of explaining

14  everything to you.  I notice that you're a mathematician by

15  education and like a lot of mathematicians you appreciate a

16  formula.  And in some respects this is a formula, so I'd

17  like to talk to you a little bit about that.

18         But before I even start in on that, do

19  you have any comments on the law as it's been explained to

20  you, things that, you know, you like or things that wouldn't

21  be in it, if you were writing it?  How do you feel about it?

22     A.    I wouldn't presume to tell them how to write

23  the law.

24     Q.    Okay, good.  Well, you know, some parts of

25  this are precise and some parts are imprecise.  And I'm

1  satisfied that you understand our statutory scheme here.  I

2  notice on page 9 of your questionnaire, the very last

3  question, it talks about whether or not regardless of what a

4  Judge says the law is, the jurors should do what they

5  believe is the right thing.  I don't really find this a

6  really instructive question, but at least it's a place to

7  start the discussion.

8              If any of the things that you would be

9  asked to do as a juror here would violate your conscience, I

10  get the impression here that you would go with what you felt

11  was the right thing to do?

12      A.      Well, I believe in the law.  I believe in

13  following the law.  I can't really envision any circumstance

14  where I would -- I forgot how I answered that, to tell you

15  the truth.  But, I guess I would consider that if I felt

16  some grave injustice was being done.  But the odds are

17  pretty long against that, I guess.

18      Q.      Well, and the reason I'm leading up to this,

19  there's no other type of jury selection in the world like

20  this jury selection because a life has been taken,

21  obviously, and a life may be taken.  And so, these are

22  things that are kind of outside what we would ordinarily

23  expect a citizen to do.

24              And that's why we ask you these

25  questions, because lots of people, even though technically

1  would be eligible for jury duty, they tell us that they are

2  simply uncomfortable in these situations once they

3  understand what the law is.

4          Some people have said or expressed some

5  reservations about the death penalty for someone who's a

6  party.  Other people have, you know, had other problems with

7  the law.  We're just giving you an opportunity at this point

8  to tell us if there are things here that you feel

9  uncomfortable with, because as you saw, we had a lot of

10  folks and we have a lot of folks left to talk to.

11          And if there was anything about this

12  scheme that you felt might cause you to have to make a

13  decision that you weren't comfortable with in your

14  conscience, you can just tell us.  It doesn't, of course,

15  make you a bad person.  It just makes you someone who has a

16  different set of values than what this scheme contemplates.

17      A.    Well, I feel like I can, could do it.  I'll

18  just flat tell you that whatever my decision would be, if I

19  were in that circumstance, would be consistent with what my

20  conscience tells me.

21      Q.    Sure, sure.

22      A.    So --

23      Q.    And as long as you're telling us that your

24  decisions on these issues would be based on finding them

25  beyond a reasonable doubt, based on what the State has

1   proven, then that's fine with us, too.  That's fine with us,

2   too.

3               Here's a question that I thought of that

4   might in particular be interesting to ask you because you

5   pointed out that, you know, this question, the expert

6   witnesses, and as I think Mr. Shook called them the soft

7   sciences.  The way we have this scheme for punishment,

8   having found a person guilty of the offense of capital

9   murder, you'd have to find Special Issue No. 1 true or yes

10  beyond a reasonable doubt, and 2, yes, beyond a reasonable

11  doubt.

12               But then we get down to this Special

13  Issue No. 3, which has no real burden of proof or has no

14  real, you know, numbers to punch in or any definite standard

15  that has to be established by either side.  I call it a

16  touchy/feely question.  It's also been called a safety

17  valve.

18               My question is, having decided that

19  someone answered yes to the first two Special Issues, do you

20  see any value in having a question that, despite all of

21  that, do you think that the person should be given the death

22  penalty?

23       A.      Any value in considering Special Issue 3?

24       Q.      Yes, sir.

25       A.      I see value, yes, in doing it.  Now, whether

1  that would override the first two, you know, again, it's

2  you're going to have to look at, make judgment calls here.

3      Q.    Well, and, you know, and believe me, we could

4  have talked to one juror a week if we went into all the fact

5  situations and, of course, the law won't let us.  Are you

6  the sort of person who would consider answering that

7  question yes, if you heard that evidence?  Or would your

8  mind be closed to a life sentence?

9      A.    I don't think my mind is closed to anything at

10  this point, but --

11      Q.    So not having heard it and which I realize

12  that this is a dumb question to most people because it is

13  actually a dumb question, but it's the way it has to be

14  asked.  Having -- without knowing what that might be, you

15  could give someone a life sentence, if you heard something

16  that made you think they should not be put to death, despite

17  the fact that you'd answered these other questions in a way

18  that would put them to death?

19      A.    It's conceivable that I could.  Again,

20  probability is probably pretty narrow here, but I won't rule

21  it out completely.

22      Q.    Right.  And I appreciate that.  That makes you

23  qualified.  Let me see if there's anything else on my list.

24  You know, I didn't, I'm sure Mr. Shook asked you this, but I

25  didn't cross it off my list yet, so let me just reiterate

1    it.  And if he hasn't, that's fine, too.  Based on what you

2    know about this case, have you formed any opinions about it

3    or what should happen in this case?

4         A.    This particular case?

5         Q.    Yes, sir.

6         A.    No.

7              MS. BUSBEE:  Those are all the questions

8    I have of this juror, Your Honor.

9              THE COURT:  Sir, if you would be so kind

10   as to wait for us outside and we'll have you back in just a

11   few minutes.

12                   [Prospective juror out]

13             THE COURT:  What says the State regarding

14   juror No. 2330, Mr. Walter W. Thomas?

15             MR. SHOOK:  We have no challenges for

16   cause.

17             THE COURT:  What says the defense?

18             MS. BUSBEE:  No challenge for cause, Your

19   Honor.

20             THE COURT:  Step in your office?

21             MS. BUSBEE:  I'm ready.

22             MR. SHOOK:  We'll accept the juror.

23             MS. BUSBEE:  We'll exercise a preemptory

24   challenge on this juror.

25             THE COURT:  Ask Mr. Thomas to come back

1    in, please.

2                      [Prospective juror in]

3                      THE COURT:  Mr. Thomas, thank you so much

4    for coming in today.  It's a pleasure to have someone with

5    such thoughtful reflections in discussing these issues.  I'm

6    just going to inform you, sir, that you are not going to be

7    on this jury.  Thank you, sir.

8                      [Prospective juror out]

9                      (Recess)

10                     THE COURT:  Ask Mr. Versteeg to come in.

11                     [Prospective juror in]

12                     THE COURT:  Good afternoon, sir.

13                     PROSPECTIVE JUROR:  Hi.

14                     THE COURT:  Please have a seat.  Juror

15   No. 2364, Bradley J. Versteeg.  Welcome to the 283rd.  Sorry

16   to get you in here at 3:46 in the afternoon.  I take them as

17   they come.  We have three people in the morning and three in

18   the afternoon and whoever is here first goes first.  That's

19   just the way it is.

20                     PROSPECTIVE JUROR:  That's fine.

21                     THE COURT:  Obviously, you've had plenty

22   of time to read, hopefully more than once, the guide I

23   provided for you?

24                     PROSPECTIVE JUROR:  Yes, sir.

25                     THE COURT:  I also gave you a copy of the

1    questionnaire that you filled out in May to help you again

2    think about the issues we're going to be discussing to

3    refresh your memory as to the answers you provided.  And the

4    objective here is we don't expect you to understand all the

5    law at this point, but the lawyers are going to visit with

6    you to help you understand the law, how it relates to this

7    process.

8              Two questions I'll have at the end of the

9    interview session will be, number one, do you understand the

10   law?  Number two, can you follow the law?  That's the big

11   picture I have.  Only question I have for you at this time,

12   sir, will you be able to serve this Court for a period of

13   two weeks beginning on November 10th?

14             PROSPECTIVE JUROR:  Yes.

15             THE COURT:  Thank you.  Mr. Wirskye?

16             MR. WIRSKYE:  May it please the Court?

17             BRADLEY VERSTEEG,

18   having been duly sworn, was examined and testified as

19   follows:

20             DIRECT EXAMINATION

21   BY MR. WIRSKYE:

22        Q.    Mr. Versteeg, how are you this afternoon?

23        A.    Great, thank you.

24        Q.    My name is Bill Wirskye and I'll be the

25   Assistant DA that will be visiting with you for the next few

1   minutes.  Thanks for waiting as the afternoon has dragged

2   on.  I couldn't help but notice you hesitated a little bit

3   in answering the Judge.  And I know by looking at your

4   questionnaire, you may have some issues with your job.

5   Looks like it's kind of a two-person shop; is that right?

6        A.      That's correct.

7        Q.      Okay.  Tell us what you do for a living.

8        A.      Less than a year ago we started a restaurant

9   supply company and there's two of us, my wife and myself.

10  And on a daily basis we take sales orders.  I pick up

11  supplies and deliver supplies to our customers as well as

12  running a 24-hour, 7-day-a-week emergency ice service.  So

13  that's what we're currently doing.

14       A.      You're on call 24/7?

15       A.      Yes.

16       Q.      And it's kind of a new start-up business?

17       A.      Yes, it is.

18       Q.      What type of impact -- obviously, the Judge

19  can't let you go for legal reasons, everybody that has a job

20  excuse.  But the lawyers like to know kind of what impact or

21  what effect it may have, because, you know, we don't want a

22  juror over there that's worried about what's going on, you

23  know, back at the shop.

24              What type of impact do you think it would

25  have on you, if you had to come down here for two weeks and

1  be a juror?

2          A.      Well, there would be a financial impact, but

3  there would also be -- I would have to close the door at

4  times to be here.

5          Q.      Okay.

6          A.      Of my business.

7          Q.      You know, legally the Judge can't let you go,

8  because it would be a financial hardship.  The one

9  qualification to that is sometimes we have people that have

10 so many things going on in their personal life, whatever it

11 is, somebody ill or job, school, whatever, and sometimes

12 those people tell us, you know, in all honesty in my heart

13 of hearts I just could not really concentrate on what was

14 going on in the courtroom because I might be too worried

15 about what's going on back in my personal life, professional

16 life, outside the courtroom.

17                 Is your situation something that you

18 think might affect you in that way or what do you think?

19         A.      I really couldn't tell you, unless I was in

20 that situation.

21         Q.      Okay.  Do you have concerns as you sit there

22 now that that could possibly come up?

23         A.      I do have some concerns, yes, sir.

24         Q.      I guess the 24-hour hotline went off or the

25 pager?

1           THE COURT:  You're not going to be

2    worried about ice in November, are you?

3           PROSPECTIVE JUROR:  Yes.  December.

4    Malls are extremely busy and their machines can't keep up.

5           THE COURT:  In December?

6           PROSPECTIVE JUROR:  In December, yes,

7    sir, the shoppers for Christmas.  I've already been

8    forewarned by a couple of companies that have slowed down

9    now to be ready for them in December.

10          Q.    (By Mr. Wirskye)  While you were talking to

11   the Judge, I had a chance to visit with Ms. Busbee, the

12   other lawyer, and before I give you some good news, I do

13   want to emphasize this.  You had some comments on

14   prosecutors that said there were too many money hungry to

15   sue for any reason.  I think you may be confusing us with

16   claims lawyers who chase ambulances, I'm not sure.

17          We make a decent living.  We don't make a

18   whole lot of money.  I drive an old truck.  We don't

19   actually sue people.  We just -- the crimes that come to us.

20   But anyway, the next time you -- that thought slips into

21   your mind about lawyers, just remember that these two,

22   defense lawyer and prosecutor, agreed to let you go.  How is

23   that?

24          A.    Well, I appreciate that.

25          Q.    Okay.  Thank you, sir.

1            MR. WIRSKYE:  That's all I have, Judge.

2 We have an agreement.

3            THE COURT:  Mr. Versteeg, you can tell I

4 don't spend much time on -- either you are or you're not.

5 I'm not going to let you off.  But the lawyers have agreed

6 to.  They are -- I have a very strict standard and either

7 you fit or you don't and I just call it the way it is.  They

8 have excused you, so you don't have to worry about your

9 business and you are free to go.  Thank you, sir.

10           PROSPECTIVE JUROR:  Okay.  Thank you.

11          [Prospective juror out]

12          [End of Volume]

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF TEXAS              *

COUNTY OF DALLAS           *

I, NANCY BREWER, Official Court Reporter for the 283rd Judicial District Court, do hereby certify that the above and foregoing constitutes a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

WITNESS MY OFFICIAL HAND on this the 4 day of March, 2004.

NANCY BREWER, CSR, NO. 5759
Expiration Date:  12-31-04
Official Reporter, 283rd JDC
Frank Crowley Crts. Bldg. LB33
133 No. Industrial Blvd.
Dallas, TX 75207
(214)653-5863

74851

REPORTER'S RECORD

VOLUME 23 OF 61 VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 26th day of September 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT:  03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT:  00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Cathryn Mitchell | 4 | 5 | 43 | 23 |
| Diane Courtney | 54 | 55 | | 23 |
| Michael Smith | 92 | 93 | 122 | 23 |

P R O C E E D I N G S

THE COURT:  Cathryn Mitchell.

[Prospective juror in]

THE COURT:  Good morning.

PROSPECTIVE JUROR:  Good morning.

THE COURT:  Welcome to the 283rd.  I appreciate you being here early and on time.  We like to put three people up in the morning and the first one here gets to go first, and we appreciate you being here.  We've got juror No. 2426, Ms. Cathryn Lynn Mitchell; is that correct?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Ms. Mitchell, have you had an opportunity this morning to review the guide I provided for you?

PROSPECTIVE JUROR:  I have.

THE COURT:  And also a copy of your questionnaire that you filled out for us back in May?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Please don't think that you've got to understand all the law.

PROSPECTIVE JUROR:  Good.

THE COURT:  I give you a lot of law the first thing in the morning and this is the process by which the attorneys are going to explain this to you and for you to have an opportunity to figure out how it all relates and

1  ask questions and understand the law.  At the end of the

2  process I have two questions I must answer.  Number one is

3  do you understand the law?  Number two, can you follow the

4  law?  That's my big picture here.

5              There are no wrong answers.  And many

6  people come in and are somewhat intimidated.  You walk in

7  and you are the only one.  You can hide within 700 people

8  downstairs.  Here you're the focus of attention.  We're

9  sorry if you feel that way.  It's the only way we can do it.

10  And it's as informal as we can get.  But there are no wrong

11  answers, so don't worry about that, just honest answers.

12              The only question that I have for you at

13  this time is will you be able to serve this Court for a

14  period of two weeks beginning November 10th?

15              PROSPECTIVE JUROR:  I will.

16              THE COURT:  Thank you very much.

17  Mr. Wirskye?

18              MR. WIRSKYE:  May it please the Court?

19              CATHRYN MITCHELL,

20  having been duly sworn, was examined and testified as

21  follows:

22              DIRECT EXAMINATION

23  BY MR. WIRSKYE:

24      Q.      Ms. Mitchell, how are you this morning?

25      A.      I'm good, thank you.

1    Q.    Kind of feel like you're on trial?

2    A.    Yeah, I've never been in this place before.

3    Q.    As the Judge said, because this is a death

4    penalty case, we do this individually and we kind of figured

5    out the best place to put a juror is up on the witness

6    stand, but we know it's a little intimidating.

7              My name is Bill Wirskye and I'll be the

8    assistant DA that will be visiting with you for the next few

9    minutes.  What I'd like to do is follow up on some of the

10   information on your questionnaire that you were kind enough

11   to give us in that lengthy questionnaire, talk to you a

12   little bit about your thoughts and feelings about the death

13   penalty, and then follow up with some of the rules and some

14   of the laws that apply in death penalty cases and make sure

15   you understand it.

16             What did you think when you got the call

17   to come back for an individual interview on a death penalty

18   case?

19   A.    Well, when I asked the guy, I said now, how

20   many got called back?  And he told me.  And I said, so

21   you're telling me that a thousand people didn't get this

22   call?  And I was like, so it was -- it was -- it was just

23   interesting.

24   Q.    What we do, just to let you know, everybody

25   that was down with your group and then we had another group

1    in the afternoon, fills out questionnaires.  The lawyers get

2    together and read them and we kind of figure out who we

3    think might be the best jurors, who could be fair to both

4    sides.  And then we bring those people down, those select

5    few, for the individual interview.  So, in a sense you've

6    already made one cut.  So, are you nervous at all because

7    this is a case involving the death penalty?

8           A.     No, not because of that.

9           Q.     Okay.  Is there another reason?

10          A.     Just, just the responsibility of serving on

11   any kind of a jury, and so just that, that if chosen, that I

12   would have the wisdom and the discernment to understand and

13   take in everything that is being presented.

14          Q.     Okay.  Looks like you were on a jury not too

15   long ago; is that right?

16          A.     Yes.

17          Q.     Driving while intoxicated case?

18          A.     Correct.

19          Q.     Okay.  How did that go?  What are your

20   impressions of that experience?

21          A.     Um, in what manner?  You mean, like what the

22   verdict was or --

23          Q.     Was the evidence pretty straightforward or --

24          A.     I felt it was, yes.

25          Q.     Okay.  It looks like in your questionnaire the

1  person was found guilty?

2       A.      Correct.

3       Q.      How did the deliberations go?  Were they kind

4  of smooth or long and drawn out?

5       A.      They were pretty drawn out.  You know, I felt

6  that it would probably be a pretty quick thing and it

7  lasted, I think, three days.

8       Q.      Really?

9       A.      And most of that time was in deliberations.

10      Q.      Okay.  Did it ever get heated back there?

11      A.      A little bit.

12      Q.      Okay.  I notice we asked you to kind of rank

13 yourself whether you participated more or less than other

14 jurors and you said, well, probably about equally, but you

15 thought you may have had more influence?

16      A.      I felt that he was guilty and there were

17 several that couldn't, couldn't come to that point.  And so

18 we deliberated quite a bit and came back and, you know, I

19 had given my reasons and there were other people who had

20 given their reasons and -- but I just felt that what we had

21 seen and what we had heard went that direction.  And so, I

22 think that had I said, yeah, I'll go along with you, he's

23 not guilty, that's fine, that it would have ended much

24 sooner.

25                  And so, you have that incredible sense of

1   responsibility.  And so when they brought us back in and

2   afterwards the Judge went through and shared with us the

3   rest of the story, I was like, oh, thank you.

4          Q.     Okay.  Y'all found out something else from the

5   Judge?

6          A.     Exactly.

7          Q.     What did you find out?

8          A.     That there had been many prior convictions as

9   well and, you know, that, you know, I mean, and he was

10  really good.  He said, know that you've done the right

11  thing.  And so, I just was like, oh.

12         Q.     Were there six people on your jury or twelve,

13  do you remember?  Felony or misdemeanor case?

14         A.     Um, there were twelve.

15         Q.     Twelve?  So it was a felony case, as far as

16  you remember?

17         A.     Yeah, I'm sorry.

18         Q.     That's okay.  I know most people try to put

19  jury service out of their minds as soon as they leave the

20  courthouse.  And you work for Advocare International?

21         A.     Correct.

22         Q.     Is that right?

23         A.     Uh-huh.

24         Q.     What type of business is that?

25         A.     Nutritional supplements.

1    Q.    Okay.  And what do you do kind of on a day-in

2  and day-out basis?

3    A.    I'm like an administrative assistant to the

4  director of distribution.

5    Q.    Okay.  And before that, looks like you were in

6  the travel industry for a while?

7    A.    Yes.

8    A.    Okay.  Hopefully your prior jury service

9  experience will give you a leg up in a sense in this.  Some

10  of the things we'll talk about, hopefully will be familiar,

11  that apply to any criminal case, whether it's a DWI or a

12  capital murder.  But -- and you told us you generally agree

13  with the death penalty; is that right?

14    A.    Correct.

15    Q.    Could you tell us why you hold that opinion or

16  what purpose do you think it serves to have that death

17  penalty option available?

18    A.    Um, I feel that in circumstances where it's a

19  capital offense as defined, you know, and I have never read

20  this before that talked, you know, that determines what is a

21  capital offense.

22    Q.    Most people have no idea exactly what a

23  capital offense is.

24    A.    Yeah.  And so, when I read it and I went,

25  well, yeah, that makes sense.  But where it's a crime that

1  is senseless, you know, where it is -- it's not just an act

2  of rage, but it is --it is against another individual with

3  malice, you know, intended.  That -- that that is the --

4  that is the ultimate judgment that that person can receive.

5  And rather than them just sitting in a jail cell for the

6  next 50 years, I don't see the purpose.

7        Q.     Okay.  Is this kind of an opinion you have

8  held most of your adult life?

9        A.     Yes.

10        Q.     Or is it a conclusion you have come to, or is

11  it based kind of, I guess, on religious, moral, ethical

12  grounds, or that type thing?

13        A.     Probably.

14        Q.     Okay.  And, as I said, most people have

15  absolutely no idea what technically constitutes a capital

16  murder.

17        A.     Right.

18        Q.     In Texas, capital murder or the death penalty

19  is limited only to murder cases and then only a certain

20  group or certain type of murder cases.  If you murder a

21  certain type of person, a police officer, fireman, prison

22  guard on duty, or if you commit an intentional murder in the

23  course of committing another felony, like robbery, burglary,

24  rape, that type thing, mass murders, serial murders, murder

25  for hire, those type scenarios.  It's just what we reserve

the death penalty for in Texas.

Looking at your questionnaire, I know you didn't know the law before you walked in here, but it looks like if it were up to you, and a lot of people feel this way, they might expand the available groups of crimes. I know, I noticed you mentioned rape as a potential crime and I guess in your view could call for the death penalty; is that right?

A.     Right.

Q.     Okay. If you were kind of Governor for the day, you may, you know, a lot of people say they'd make it apply to all murder cases or they would include rape or child abuse, that type of thing. Is that kind of where you fall, or --

A.     Probably not. I mean, I think it would depend on each individual case.

Q.     Okay. Are there any particular cases that you followed in the media that come to mind when you think about, you know, an appropriate case for the death penalty? You may have heard or read about it and think, gee, that person deserves a death penalty or that type thing?

A.     Now, of course, my mind goes totally blank.

Q.     We understand.

A.     Um, I'm sure there -- there have been, um.

Q.     Let me ask you this, just one question about

your questionnaire kind of following up on your experience,

recent experience, on the jury.  On page 5, I think you have

the questionnaire in front of you.  Kind of the bottom part

of the page, we give people these statements and ask whether

they agree, disagree, or unsure.

A.      Are you going to ask about the second one?

Q.      Yes, ma'am.

A.      Because I read over this whole thing and I

went, why did I do that?  I mean, that is the one I picked

out and went, well, so that's interesting, because I

thought, I don't agree with that.

Q.      Okay.  You just marked it wrong?

A.      (Prospective juror nods head.).

Q.      Okay.  I was worried because you had just been

on a jury and then --

A.      Exactly.  I mean, that's -- because that is

the one I picked out and went, why did I say that?

Q.      Was there anything else when you reviewed your

questionnaire that was like, you know, why did I say that?

A.      No, nothing popped out like that.

Q.      Okay.  I guess you feel fairly strongly about

the death penalty.  And I say that because we ask people to

rank themselves on a scale of 1 to 10 on how strongly they

feel and you gave yourself an 8, which is kind of towards

the high end.  But I know it means different things to

1  different people.  What did that 8 mean to you?

2       A.     It just meant that it's not something that I'm

3  afraid of.  It's not something that, um, you know,

4  discussions about the death penalty have never really

5  entered into my day-to-day, you know, conversations.

6       Q.     Usually don't with people.

7       A.     Yeah.  And there was a circumstance several

8  years ago where there was a woman who had been convicted of

9  murder and was receiving the death penalty and prior to that

10  had made a profession of Christian faith and it made the

11  headlines.

12       Q.     I think that was Carla Faye Tucker?

13       A.     Yeah, I couldn't remember her name.  And, you

14  know, during that time, you know, there was a lot of

15  discussion going on about the death penalty.  And even

16  through that all, it was never that she hadn't committed the

17  crime.  And if that was the consequence of that and if she

18  had made a profession of faith, the worst thing that was

19  going to happen to her was not death, you know, that was

20  stepping into a new life.  So even at that, I didn't feel

21  that the death penalty was the wrong, wrong thing.

22       Q.     Okay.  You thought, I guess, Governor Bush at

23  that time made the right decision?

24       A.     Oh, I didn't even realize it was him.  Yeah,

25  you know, but it would have been just as fine with me had he

1    overturned it, you know.

2         Q.    Sure.

3         A.    But --

4         Q.    But I guess it didn't offend you that the

5    sentence was carried out?

6         A.    No.

7         Q.    Okay.  Let me kind of take it, your thoughts

8    and views on the death penalty to another, kind of the next

9    level of analysis, I guess.  And many people probably hadn't

10   ever thought about this and we know that.  But, you know,

11   oftentimes crimes are committed by more than one person.

12        A.    Uh-huh.

13        Q.    You have a group or gang of individuals that

14   commit crime.  The law allows us to prosecute everybody that

15   was actively involved in a crime, every active participant,

16   whether it be something like a shoplift or all the way up to

17   capital murder.

18              And, frequently, when you are talking

19   about murder or capital murder you may have a situation

20   where you just have one person that actually pulled the

21   trigger maybe.  One person that actually caused the death.

22   For lack of a better word we call them the triggerman.  But

23   you may have other people who were actively involved as

24   well.  You may have heard the term "accomplices"?

25        A.    Uh-huh.

1    Q.    You may have accomplices to that crime who

2  didn't actually cause the death.  And the law allows,

3  depending on the facts and circumstances, for both the

4  triggerman and the nontriggerman accomplices to be

5  prosecuted for capital murder and ultimately receive the

6  death penalty.  And a lot of people kind of draw some

7  distinctions on those, those type of facts.

8          A lot of people who are very strongly in

9  favor of the death penalty say, you know, I believe in the

10  death penalty for the triggerman, but, you know, if it was

11  up to me, if I was Governor for a day or religious, morally,

12  or ethically, I don't see the death penalty for the

13  accomplice, because they didn't actually cause the death.

14  You know, I may want to lock them up in prison for life, but

15  I just don't think the death penalty is justified.

16          Other people think differently.  Looking

17  on the facts and circumstances, they could see maybe where

18  the death penalty would be justified for the accomplice.

19  But I'm just kind of wondering where you come down on that

20  issue.

21    A.    I don't know.  I think that each person is

22  tried individually on its own merits.  I'd just have to

23  hear.

24    Q.    Okay.  Let me kind of explain to you how the

25  law works and let me use an example or hypothetical and try

1  to illustrate how the laws works.  Let's say the other

2  prosecutor, myself and Mr. Shook, decide we're going to rob

3  a bank.

4            The plan we come up with is for him to

5  take a loaded gun in.  He's going to hold up all the

6  tellers.  And while he's holding them up and holding them at

7  bay, I'm going to come in unarmed with a bag and clean out

8  the cash drawers and collect all the money.  Let's say when

9  we go to do that bank robbery, for whatever reason, maybe

10 one of them looks at Mr. Shook funny or maybe I see one of

11 them going for a silent alarm to call the police and I tell

12 him that, but for whatever reason he shoots and kills the

13 teller, an intentional murder in the course of a robbery.

14            He's the triggerman.  He could,

15 obviously, be prosecuted for capital murder and ultimately

16 sentenced to death, depending on what the jury thinks.  But

17 the law also allows me, the accomplice, the nontriggerman in

18 that scenario, depending on the facts and circumstances, to

19 also be prosecuted for capital murder and ultimately maybe

20 face the death penalty.  What do you think about that?

21       A.    I agree.

22       Q.    Okay.  You see kind of the sense in maybe

23 keeping that option open for the accomplice?

24       A.    Yes.

25       Q.    Okay.  What purpose do you think that serves,

1  being able to prosecute an accomplice, I guess, for capital

2  murder or for the death penalty?

3       A.    Well, if we're looking at your example.  You

4  each had the same amount of responsibility.  You each

5  planned the act together.  You knew exactly what you were

6  going to do and you went at it as a team.

7       Q.    Okay.  That's frequently what people tell us.

8  Sounds like you're exactly where the law is.  What the law

9  says is for an accomplice like me to be convicted of capital

10 murder and ultimately face the death penalty, there's two

11 ways for that to happen.

12            One is if I actively encourage or direct

13 or solicit, in my example, Mr. Shook, to commit that murder,

14 of course, I would be guilty.  The second way would be is if

15 we conspire together to commit one crime, the bank robbery.

16 We just made an agreement to commit that, you know, murder

17 happens during that crime, and the law says if the jury

18 thinks that the accomplice should have anticipated that a

19 life could be taken during that bank robbery, then I could

20 be found guilty of capital murder and ultimately face the

21 death penalty.  Does that make sense to you?

22       A.    Yes.

23       Q.    You just kind of, I guess, look at the facts

24 and circumstances and look to see under that conspiracy law

25 whether you think, you know, in my example, whether I should

1  have anticipated, based on what happened, that a life could

2  be taken.  Does that make sense to you?

3        A.    Yes, it does.

4        Q.    Okay.  The reason I go into that kind of in

5  detail is just to be up front with you and put all our cards

6  on the table.  We are prosecuting Mr. Murphy as an

7  accomplice and that's why we spend so much time going over

8  that aspect of the law and making sure that potential jurors

9  are comfortable with that aspect of the law, because we need

10  to talk to you about it now, because once you get over in

11  the jury box, it's kind of too late.

12           And we never want to put anybody in a

13  position where, you know, maybe what their conscience or

14  moral or religious or ethical base dictates is kind of at

15  loggerheads with the law.

16        A.    Right.

17        Q.    And that's why we go into it.  Let me switch

18  gears real quick.  You indicated, like just about everybody

19  we talked to, in fact, almost everybody we talked to, 99.9

20  percent of the people, that you had heard something about

21  this case.  We know it was a high profile case in the media.

22  We recognize that.  And the law recognizes those type of

23  situations.

24           What the law says is just because you

25  have heard about the case in the media, you are not

1    disqualified from being a juror.  I mean, obviously, if that

2    were the law, we would never get a jury in these type of

3    cases.  But what the law says is in order to be a qualified

4    juror, as long as you can kind of put to the back of your

5    mind what you've heard, even if you may have formed some

6    impressions or opinions about the case, as long as you can

7    kind of put them to the back of your mind and just base your

8    verdict on the case on the facts and evidence that you hear

9    in the courtroom, you'd be a qualified juror.

10                       And I hope you agree with me, usually the

11   best source of information is not the media.  It's what

12   comes in the courtroom.  So that's kind of the bottom line

13   question for every juror.  Do you think you can just base

14   your verdict on what you hear in the courtroom?

15            A.     Yes.

16            Q.     Okay.  You wouldn't let anything you have

17   heard influence you or anything like that?

18            A.     No.

19            Q.     Okay.  Do you remember what you have heard

20   about this case?

21            A.     Since May?  You know, once May came and we

22   found out, then all of a sudden you start hearing things.

23   But prior to that, nothing except right in the midst of it,

24   you know, that when they had escaped --

25            Q.     When it was happening --

1    A.    And the hunt for them and that they had gotten

2  to Colorado and they had been caught and then brought back.

3  And really, after that --

4    Q.    Just kind of the big picture or the broad --

5    A.    Yeah.

6    Q.    Not a lot of details?

7    A.    Yeah.

8    Q.    Have you heard something different since May?

9    A.    No.  Well, actually, I did, that I didn't

10  realize that one of them had committed suicide or had died

11  in Colorado during that.  And I'm sure I had heard that at

12  the time, but it didn't --

13    Q.    Didn't click?

14    A.    It didn't -- yeah, I didn't remember that

15  until --

16    Q.    Okay.  Have you kept up with any of the

17  subsequent court proceedings in the case or heard anything

18  about those?

19    A.    Not really.

20    Q.    Okay.  So it sounds like really you don't have

21  a whole lot of details that might influence your verdict in

22  this case?

23    A.    No.

24    Q.    You'll just listen to the facts and evidence

25  and whatever that be?

1    A.    Right.  Whatever that be.

2    Q.    Okay.  You know, like I said, we talk to a lot

3    of folks who are in favor of the death penalty, some very

4    strongly, philosophically or in the abstract, you know, when

5    you talk about it.  I think for a lot of people when they

6    get down here at this point in the process, it becomes a

7    little more real, not quite so abstract, not quite so, you

8    know, philosophical.  You are actually in the courtroom.

9    You are looking at a person.

10          The State, you know, to be frank with

11   you, it's our goal because we feel we have the type of

12   evidence that's going to convince a jury that he be

13   convicted of capital murder and answer those questions in

14   such a way that he'll receive the death penalty.  But I

15   think when you get in this point of the process, it becomes

16   something a little different for a lot of people.

17   A.    Right.

18   Q.    So I want to make sure that, you know,

19   comfortable is probably a bad word, but at least you don't

20   have any hesitation about participating in this process that

21   may ultimately end up taking a life.

22          We talk to some people who say, you know,

23   I don't want that on my conscience.  I don't want that in

24   the back of my mind.  The media typically reports some

25   details of executions.  You read about them in the paper and

1  maybe hear about them on the news, like you did with Carla

2  Faye Tucker.  Some people tell us, you know, I just don't

3  want that on my conscience.  I believe in the death penalty.

4  I'm just not the right type person to do it for whatever

5  reason.

6              And so we always ask people, because we

7  know it's not everybody's cup of tea.  Just to let you know

8  the procedures that are followed in a death penalty case,

9  having spent some time in Texas you know we're typically the

10 leader among states in executions.

11        A.    Oh, I didn't know that.

12        Q.    The death penalty is very real here.  Our

13 juries assess it, it's carried out.  Again, we typically

14 lead the nation in the number of executions.  The procedures

15 are the same in any case.  Are you familiar with our method

16 of execution in Texas?

17        A.    Injection.

18        Q.    Yeah, exactly, by lethal injection.  The

19 procedures are same.  If a jury finds a person guilty of

20 capital murder and these three questions that you see up

21 here are answered in a certain way, the Judge has no

22 discretion.  He will sentence the defendant to death.  The

23 person will be taken immediately to death row where he will

24 wait for Judge Cunningham to issue a date of execution at

25 some point in the future.

1    I can't tell you when or how long it will
2 be, but on that date of execution he would be moved from
3 death row to a holding cell in the main prison of
4 Huntsville, Texas, where the death chamber is.  And on that
5 last day he'd be given a chance to meet with friends,
6 family, spiritual advisors.  He'd be able to eat a last
7 meal, if he wanted to, or if he could.

8    But as it got close to 6:00 p.m., which
9 is the time that's mandated for executions in Texas, he'd be
10 moved from that holding cell into the death chamber, either
11 voluntarily or involuntarily.  He would be forced to go, if
12 he didn't want to.  You may have seen a picture of that
13 death chamber, I don't know.  Sometimes the media shows it.
14 It's a gurney with leather straps.  But he'd be taken in
15 there, strapped down to the gurney, and an IV would be
16 started in his arm.

17    There'd be witnesses for his side.  There
18 would also be witnesses for the victim's side.  The warden
19 would come in and give him a chance to make a last statement
20 for a few minutes.  He may beg for forgiveness, you know,
21 much as I guess Carla Faye Tucker did, certainly.  Or he may
22 proclaim his innocence to the very end.

23    But after he's given that chance to make
24 that last statement, the warden would signal the
25 executioner.  The executioner would release poisons into the

IV.  Very quickly his heart and lungs would stop.  He'd

become unconscious and fall into a deep coma and die very

quickly after that.

And I go through that, not to be morbid

about it, but just so you know kind of what you're getting

yourself into, because those are the type details that are

typically reported in the press.  I want to make sure that

you feel, you know, as you sit there right now, that you are

the type of individual who can take pen in hand and maybe

answer these questions in such a way that would lead to the

execution of an individual.  Do you think you're the type

person that could do that?

A.      Would I want to do it?  No.

Q.      I don't think we'd want anybody who wanted to

do it.

A.      Um, yes, I could.

Q.      Okay.  Why do you say that?

A.      Um, I don't ever want to sit in judgment of

another individual, but I also feel that if ever I was

sitting and needing to be defended and needing twelve people

to hear my case, I want people who are there who feel that

they are there not just out of obligation, but they are

there to exercise that wisdom and that discernment and to be

able to hear each side.  Because I would want to have the

courage to say no, I don't believe that he deserves this, as

1    well as the courage to say, yes, he does.

2         Q.    Okay.  So you feel you're the type person that

3    could participate in this process?

4         A.    Yes.

5         Q.    Okay.  Just to give you some background.  Did

6    you, on the jury you were on, did y'all set punishment for

7    the individual?

8         A.    No.

9         Q.    The Judge did that?

10        A.    Yes.

11        Q.    In Texas, all criminal trials are kind of

12   broken down into two parts.  The first phase, being the

13   guilt/innocence, which is what you heard on your case.

14        A.    Yeah.

15        Q.    The focus there is whether the State proved to

16   you what's in the indictment.  And I think you've had a

17   chance to look at the indictment in this case.

18        A.    Right.

19        Q.    Which is where we allege what we think

20   happened.  And if the jury feels the State has met their

21   burden, if they've proved the guilt beyond a reasonable

22   doubt for each and every element in that indictment, then he

23   will be found guilty of capital murder.  Then the second

24   phase, the punishment phase, of the trial, will start.

25              The rules of evidence in that second

1  phase broaden and you get to hear extra information to help

2  you answer these three questions.  And we kind of let the

3  answers to those questions determine the proper verdict.  We

4  don't ask a jury to make a decision, you know, to write in a

5  life sentence versus a death sentence.  We ask them to

6  answer these three questions.  And that's what I want to

7  talk about with you for the next few minutes.

8            I know you've looked at them before, but

9  if you could look at them up on the wall, they are phrased a

10 little bit differently.  And if you could just take a moment

11 or two and read those to yourself.

12           A.     (Prospective juror complies.)

13           Q.     Did you get a chance to look at those?

14           A.     Yes.

15           Q.     Okay.  These are the three questions.  They're

16 called Special Issues, but they're really questions.  Some

17 people made the comment, they're poorly drafted from a

18 grammatical sense.  Your legislature did that.  The lawyers

19 here didn't.  The Judge didn't.  So, if you have any

20 critique of that, it's not for us.

21           That first question -- these are

22 questions you'll be asked to answer again in punishment.

23 What the law pretty much envisions is, even though you found

24 a person guilty of capital murder, you start the second

25 phase of the trial kind of with an open mind, go back and

1  look at the evidence you've heard in the first phase, look

2  at whatever you've heard in the second phase, basically,

3  that you don't have any preconceived notions or prejudgments

4  to the answers to these questions.

5         But the first question is basically what

6  we call the future danger question.  We ask the jury to

7  decide whether there's a probability that the person would

8  commit criminal acts of violence that would constitute that

9  continuing threat to society.  You see how that question

10 kind of asks a juror to make a prediction?

11        A.    Now, you said though that after, after the

12 guilt or innocence is determined, that the Judge will give

13 you further information.  Is that further background

14 information?

15        Q.    Typically, what happens, if you find a person

16 guilty of capital murder, it's kind of like a second trial

17 in a sense.  Both sides, the State and the defense -- of

18 course, the defense doesn't have to, because they never have

19 to do anything.  They don't have a burden.  But typically

20 you hear extra information about a person's past, criminal

21 history if it exists, good things he's done, bad things he's

22 done, character witnesses, reputation witnesses.

23        And at the end of that evidence in the

24 second phase, then the Judge would give you these questions

25 to answer.

1  A.  Okay.

2  Q.  That's kind of how it works.  But do you see

3 how that question kind of asks for you to make a prediction

4 about future behavior?

5  A.  Yes.

6  Q.  Is that something you think you would be

7 comfortable doing?

8  A.  Based on further information, yes.

9  Q.  Sure.  What type of further information do you

10 think you'd like to hear?

11  A.  Well, if the violent crime was one of many,

12 you know, previous incidences, that it's, you know, it

13 wasn't a one-time-only occurrence.

14  Q.  Okay.  A person's criminal history, if it

15 exists?

16  A.  Right.

17  Q.  That type thing.  And again, you can go back

18 and look at the evidence you heard in the first phase, the

19 crime that he's been convicted of, to help you answer that.

20      A lot of these words in these Special

21 Issues aren't necessarily defined.  The law kind of leaves

22 the definitions up to the jurors' common usage and good

23 common sense.  So we typically ask jurors kind of what comes

24 into their mind or how they would define a certain term.

25 And see that word "probability"?

1    A.    Yes.

2    Q.    What comes to mind when you think of the

3   definition of that word?

4    A.    That there is a chance that they would commit

5   a violent act again.

6    Q.    Okay.  We hear that a lot.  The little

7   guidance the law gives us is, obviously, a probability is

8   not a complete, you know, or not beyond all doubt.  It's not

9   a certainty because we could never prove anything to a

10  certainty.  But it's something more than a possibility,

11  because anything is basically possible.  A lot of times we

12  hear more likely than not, or a likelihood, that type thing.

13  Is that a definition you are comfortable with?

14   A.    Yes.

15   Q.    Okay.  Then you have that phrase in the middle

16  line, "criminal acts of violence."  What comes to mind when

17  you think about that phrase, what type of acts?

18   A.    To me, a criminal act of violence is against

19  an individual.

20   Q.    Okay.

21   A.    And it says to me that that individual acts

22  out in a rash manner with, and it's like I said, just

23  against an individual.

24   Q.    Any particular type of crimes or acts that

25  come to mind when you think about that phrase, "criminal

1  acts of violence"?

2         A.      Um --

3         Q.      Obviously, I guess, murder?

4         A.      Obviously, murder.  I mean, anytime that it's

5  against another individual to me is a criminal act of

6  violence.

7         Q.      Assaults, rapes?

8         A.      Yeah.

9         Q.      Threats of violence, that type of thing?

10  Okay.  Finally the last word in that question, "society."

11  How would you define it or what do you think of when you

12  think of society?

13         A.      People as a whole.

14         Q.      Just everybody?

15         A.      Yeah.

16         Q.      Everybody and anyone he may come into contact

17  with?

18         A.      Right.

19         Q.      Okay.

20         A.      I mean, if it's in prison, that's his society.

21         Q.      Okay.  Like the prison guards or the teachers

22  or ministers that work in prison, that type thing?

23         A.      Right, yes.

24         Q.      Okay.  Special Issue No. 1 kind of starts off

25  with a no answer, okay?  That's kind of the default setting.

And as part of our burden of proof, we have to prove to you as a juror beyond a reasonable doubt that the answer should be yes, okay?  So unless we prove to you beyond that reasonable doubt, that answer stays no.  Does that make sense to you?

A.     Yes.

Q.     The second question is exactly the same.  It starts off with that no answer and it's part of our burden of proof to prove it to you beyond a reasonable doubt that the answer should be yes.  That second question deals kind of with the scenario that we've already talked about where you have an accomplice.

There's really three parts to that question.  If you think the person actually caused the death, he was actually the triggerman, it would be pretty easy to answer that first part of that question.  Or if you think he intended to kill the deceased or another, didn't actually pull the trigger, but intended to, then you'd answer it yes.  Or, finally, that last line, if you found that he anticipated that a human life would be taken.  And that's kind of what we've already talked about.

I want to point out one distinction to you, though.  If you'll recall, in order to convict an accomplice or find him guilty of capital murder, the jury would have to be convinced that the person should have

1   anticipated that a life would be taken, okay?  That gets

2   them to guilty.  In order to get through these questions and

3   to get to the death penalty, the law requires that we prove

4   to you that not only the person should have anticipated, but

5   they did actually anticipate, that they did anticipate.

6   Does that make sense?

7        A.     Yes, it does.

8        Q.     The law draws a distinction there.  It's a

9   little bit higher burden and it's important to be qualified

10  that you kind of see that distinction.

11            One example I use sometimes to point out

12  a situation where somebody should have anticipated, but

13  didn't, was my first car that my dad got me at 16.  I drove

14  it like a madman for about a month before I managed to wreck

15  it.  And he got very mad at me and he said, what were you

16  doing?  You should have anticipated the way you were

17  driving, this would happen.  And I was so young and dumb, I

18  didn't actually anticipate, but certainly I should have,

19  looking at what I was doing with that car.  So does that

20  make sense to you?

21       A.     Yes, it does.

22       Q.     Okay.  And again, that question starts off

23  with a no and it's up to us to prove it to you, it should be

24  a yes.

25            Special Issue 3 is a little bit

1  different.  This is kind of the last question or the last

2  step in the process.  But neither side has the burden on

3  that question.  It doesn't start off with that no answer.

4  We just leave it up to the jurors' good common sense.

5              This is what we call the mitigation

6  question.  And we kind of ask jurors to go back and look at

7  the facts and circumstances of the offense, look at what you

8  may have learned about his past, his background, and what

9  kind of blame he bears for the crime, and ask yourself is

10  there anything mitigating?  Is there anything that kind of

11  lessens his moral blameworthiness?  And if there is, is it

12  sufficient that his life ought to be spared, that he should

13  be given a life sentence, rather than a death sentence.

14  Does that make sense to you?

15        A.    Yes.

16        Q.    Okay.  What do you think about having a

17  question like that?

18        A.    I think it covers all the, all the

19  possibilities.  I don't -- I don't know what mitigating

20  circumstances could be, you know, until you hear them.  But

21  I'm real glad that that is there.

22        Q.    I guess it's basically a chance for a jury to

23  show mercy, if they think it's appropriate.

24        A.    Yeah.

25        Q.    And you are kind of right on track with the

1    law.   The law doesn't require you, as you sit there right

2    now, to tell us something you think is mitigating.   You

3    don't have to consider any potential piece of evidence

4    mitigating.   But as you've had a chance to kind of reflect

5    on that question for a few minutes, does anything pop into

6    your head that you might think is mitigating in a case such

7    as this?

8            A.     No, because I don't know enough about it to --

9            Q.     Okay.   That's the most common answer we get.

10   Again, I hope, you know, you don't sit around thinking about

11   what is mitigating in a death penalty case.

12                  But oftentimes people tell us that maybe

13   the way a person was raised, you know, maybe if they had a

14   bad upbringing, mental, physical, emotional abuse, if they

15   were abused, that type of thing, they may consider that

16   mitigating.   Other people tell us, you know, I may feel very

17   sorry for them, but, you know, you're kind of a moral free

18   agent at some point.   You can make choices and you've got to

19   be held accountable for them.   Where do you kind of come

20   down on that type of issue?

21           A.     That we're responsible for the choices that we

22   make.

23           Q.     Okay.   Some people talk about age.   Just to

24   let you know, you have to be 17 or over to be prosecuted for

25   the death penalty in Texas.   Some people think if a person,

1  or the defendant, is very young, that may be mitigating.

2  Again, other people say, you know, at some point you're old

3  enough to make your own decisions and have to be held

4  accountable.  What do you think in a situation like that?

5       A.    Well, it's interesting, because one of the

6  questions in here was about youthful, and, you know, well,

7  define --

8       Q.    And we never defined it for you.

9       A.    Yeah.  Yeah.

10      Q.    Yeah, I know.  It's unfair.

11      A.    You know, and so, I still think that, you

12  know, if the age that the law has set is 17, then they're

13  just as responsible of making the right choice as someone

14  who is over 65.

15      Q.    And that's what a lot of people tell us.  The

16  main point, in order to be a qualified juror, is that you

17  can just tell us that you can keep an open mind.  You don't

18  have to tell us what it is, but you will keep an open mind

19  and listen for it, and if it exists.  You will consider it.

20            And that's basically what the law

21  requires, basically, that you see value to that question,

22  having kind of that last step in the process to, I guess,

23  give a jury a chance to show mercy, if they feel it's

24  appropriate.  Does that make sense to you?

25      A.    Yes, it does.

1    Q.    Okay.  And kind of the bottom line with just

2 about everything we're talking about, but particularly these

3 Special Issues, you just have to keep that open mind.  You

4 can"t prejudge.  Some people tell us, very frankly, they

5 tell us, you know, if I found somebody guilty of capital

6 murder, it's going to influence how I answer these questions

7 automatically.  You know, just because I found somebody

8 guilty of capital murder, I'm automatically going to answer

9 1 yes or I'm automatically going to answer No. 3 no, that

10 type thing.

11         If you feel that way, that's fine, you're

12 just simply not a qualified juror, because the law really

13 envisions and contemplates, I think, a thoughtful,

14 deliberate juror who will keep that open mind, even to that

15 last step in the process.  Does that make sense to you?

16    A.    Yes, it does.

17    Q.    And, of course, you can go back and look at

18 that, the crime, and it may help you answer it.  And you may

19 not think about it long, but as long as you can tell us, you

20 have that open mind, you'd be qualified.  Does that make

21 sense?

22    A.    Yes, it does.

23    Q.    Okay.  Let's visit a little bit about some of

24 the laws and rules that apply in every criminal case.

25 Hopefully, these will be familiar to you from your past

1   experience.  But the defendant is always presumed innocent.

2   That's another way of kind of holding us to our burden of

3   proof.  If we all packed up and went home right now, he'd be

4   found not guilty.

5               The State has to present evidence and we

6   have to prove it to you beyond a reasonable doubt that he's

7   guilty of capital murder and that No. 1 and 2 should be

8   answered yes.  And if we don't do that to you, we simply

9   fail to meet our burden of proof, and, you know, you might

10  be required to find him not guilty, or answer 1 and 2 no.

11  Does that make sense to you?

12      A.      Yes, it does.

13      Q.      Okay.  You've always got to look to this table

14  for the proof.  You can't require these folks to do

15  anything.  They can sit there and do crossword puzzles and

16  never do a thing, legally, if they wanted to.  Now, they're

17  very fine lawyers and I don't anticipate they're going to do

18  that.  But the point is, you just can't look to that table

19  for any sort of proof.  You always have to look to us.  Does

20  that make sense?

21      A.      Yes, it does.

22      Q.      Okay.  You probably remember a person's Fifth

23  Amendment right.  A person that's charged with a crime has

24  an absolute right not to be forced to testify.  If he

25  doesn't want to testify, no one can force him.  Conversely,

1    if he wants to testify, no one can stop him.

2              But if he does not testify, you will be

3    instructed by the Judge, and this is what the law is, that

4    you can't consider that against him.  It's just simply a

5    nonfactor.  You can't hold it against him or even consider

6    it during your deliberations.  Does that make sense to you?

7         A.    Yes, it does.

8         Q.    It's just kind of another way of holding us to

9    our burden of proof and that type thing.  Let's talk a

10   little bit about the type of witnesses that you may hear.

11   This is a criminal case, so you can probably guess you're

12   going to hear from police officers.  I know you indicated

13   you had a friend who at one point was a Carrollton police

14   officer?

15        A.    Uh-huh.

16        Q.    But what the law says is you can't start a

17   witness out or give them a leg up, just because of what they

18   do for a living, even police officers, even though a lot of

19   people respect them.  You've got to start them off on that

20   same level of credibility.  Is that something you think you

21   could do?

22        A.    Yes.

23        Q.    Okay.  Sometimes you hear from psychiatrists

24   or psychologists.  The defense or even the State or

25   sometimes both sides will call them to try to give the jury

1  some insight into answering these three questions.  What are

2  your feelings generally about those type of folks?

3       A.    I think that they're definitely needed.  As

4  far as a witness, what do I think about them?

5       Q.    Uh-huh.

6       A.    Um, unless they've had time to actually spend

7  time with the defendant and, you know, and can speak from

8  that experience.  I mean, if they're just coming in saying,

9  oh, as I've, you know, read about this case, then, you know,

10  I don't know that they have a whole lot of credibility.

11       Q.    Okay.

12       A.    But if they have, you know, a personal, have

13  spent personal time with them, then --

14       Q.    And that's what we hear frequently.  Again,

15  the law says you've got to treat them like any other

16  witness.  You know, a lot of people are just closeminded

17  because they don't trust those people.  A lot of people

18  believe every word out of their mouth.  The law says you

19  start them at the same level of credibility.  If they make

20  sense, go with them.  If they don't, they don't.

21            As part of our burden of proof, as I

22  said, we've got to prove each and every element to you.

23  Kind of a ridiculous example to illustrate that point, is

24  one of the elements we have to prove is the county the crime

25  happened in.  If we get the county wrong, obviously we've

1  been horribly negligent and we'd be fired and rightly so at

2  that point.  But, you know, if we got the wrong county, the

3  Judge would instruct you we missed an element.

4           No element is more important, legally

5  speaking, than another element, and you would be instructed

6  to find the person not guilty.  A lot of people don't like

7  that.  They think it's a technicality, and I kind of agree

8  with them.  But, nevertheless, it's the law and you'd be

9  required to do it.  Does that make sense to you?

10        A.      Yes, it does.

11        Q.      Okay.  Just a couple more things I want to

12  touch on, my time is kind of winding down here with you.

13  I'm sure you're happy about that.  But let's talk a little

14  bit about the parole law.  You hear about this.  As I said,

15  there are two options for capital murder, the death sentence

16  and a life sentence.

17           What a capital life sentence in Texas

18  means is that the person serves forty years, day for day,

19  before that person becomes eligible for parole.  They may

20  make parole right then after forty.  They may never make

21  parole and actually serve a life sentence.  Because those

22  decisions are kind of beyond and in the future and beyond

23  anyone's control, we ask that a jury presume that life means

24  life, that type thing.  Does that make sense to you?

25        A.      Yes.

1    Q.    Do you think you could do that?

2    A.    Yes.

3    Q.    Okay.  One last area and then we'll wrap it

4  up.  These things we call lesser included offenses.

5  Sometimes in that first phase, the guilt phase, let's say

6  you didn't think the State proved the murder to you.  But

7  you thought they proved the robbery.  You may have the

8  option of finding a person guilty of aggravated robbery,

9  because we didn't prove the murder.

10              In that situation these questions are

11  kind of thrown out the window and we just ask a jury to

12  sentence someone anywhere between five years all the way up

13  to life, depending on the facts and circumstances.  And we

14  just ask a juror to be able to keep an open mind before they

15  know anything about the case to that full range of

16  punishment.  Is that something you think you could do?

17    A.    Yes.

18    Q.    Okay.  Any questions for me?  I know we've

19  covered quite a bit real fast.

20    A.    No.

21    Q.    Okay.  Thank you so much for your time,

22  Ms. Mitchell.

23    A.    Thank you.

24              THE COURT:  Mr. Sanchez.

25              MR. SANCHEZ:  Thank you, Your Honor.

<u>CROSS-EXAMINATION</u>

<u>BY MR. SANCHEZ</u>:

Q.     How are you doing today, ma'am?

A.     I'm fine, thank you.

Q.     Do you need some water or anything?  I know you've been up there for a while.

A.     No, I'm fine.

Q.     Okay.  All right.  My name is Juan Sanchez and I'm going to ask you some questions here on behalf of Mr. Murphy and the defense.  And before I start, like, I just want to let you know again that, you know, you made the cut, like Mr. Wirskye said, and once you get down here, though, I mean, we -- they explain the law to you and it's our job to explore areas of where you may have problems with the law or where your honest feelings may conflict with the law.

And, you know, I think when people are asking you to follow the law, everybody says yes.  But then when you're asked about certain situations or they're put in a certain situation, somehow maybe their personal beliefs, their moral beliefs, conflict with the law and they may have a problem following the law in those instances.

I've tried many jury trials and some things you talk to jurors afterwards and, you know, they told you they could follow the law, but then they say, well,

1    but in this instance I really had a big problem, and maybe

2    if it was asked a certain way before, I would have told you

3    that, but -- so that's the reason we're going to ask you all

4    these questions.   Okay?   Is that all right?

5         A.      That's fine.

6         Q.      Okay.   You've indicated on your questionnaire

7    and in questioning today, you know, your feelings are pretty

8    strong for the death penalty.   And one of the concerns we

9    may have is that sometimes jurors can get on these trials as

10   a juror and in their mind, you know, a life sentence may not

11   even be appropriate in a capital murder case.

12            They may think, well, you know, once I

13   find him guilty of capital murder, then the game is over.

14   Unless somebody proves to me otherwise, unless they can show

15   me why I should give him a life sentence, I'm probably going

16   to give them a life sentence -- I mean a death sentence, or

17   answer the questions in a way that will result in death.

18   What do you think about that?

19        A.      I would never presume death for anyone.

20        Q.      Okay.

21        A.      Um, it would definitely have -- I'd have to

22   hear every bit of the testimony and all mitigating

23   circumstances.

24        Q.      All right.   And your posture, then, would be,

25   then, first of all, I'm going to start off presuming him to

1   be innocent, unless the State can prove to me otherwise?

2       A.      Correct.

3       Q.      Then that's where he'll stay.  Is that your

4   posture?

5       A.      Yes, it is.

6       Q.      All right.  Because I guess you had made a

7   comment before saying some crimes are so heinous, or

8   heinous, I can't even talk today.  It's early in the

9   morning.  I hope I'm not speaking fast.  The Court Reporter

10  hasn't looked at me yet, so.

11              But you had made a comment that, you

12  know, some crimes are so heinous that you don't see any

13  reason why they should sit in jail.  We should just go ahead

14  and give them the death penalty.  And that's the reason I

15  ask that question.  Based on that comment you made, would

16  you like to explain that a little further or what did you

17  mean by that?

18      A.      I think that's obvious.  I mean, you know, we

19  can all think of, you know, serial crimes and different

20  types of crimes that, you know, you can't really even think

21  about because they are so awful.  And, you know, that would

22  be really hard for me to sit on a jury like that, just

23  because of the type of information that you would be hearing

24  and seeing during that time.  But that person who is sitting

25  would still start presumed innocent.

1    Q.    Well, as you know, here the allegation is that

2 the death of a police officer.  Some people say that's,

3 well, I can keep an open mind as to a life sentence, if it

4 involves another type of capital murder.  But when it comes

5 to the killing of a police officer, in that instance I may

6 not be a fair juror and I may, you know, start that person

7 off with a death penalty in my mind, and then I'd have to be

8 convinced otherwise.  Would that change in any way what you

9 think?

10    A.    I don't think I would start out with the death

11 penalty in my mind for anyone.  I mean --

12    Q.    Okay.  Mr. Wirskye talked to you a little bit

13 about media coverage, and, of course, everybody has heard

14 something about this case.  And they always ask you what you

15 heard and can you put that aside.  But the question I always

16 like to ask is, you know, have you formed any opinions based

17 on what you heard?  Have you formed any opinions as to what

18 happened or guilt or innocence of anybody based on what you

19 have heard from the media?

20    A.    No, I mean, just the facts that, you know,

21 that there was a prison break, there was a search, then

22 there was the crime, and then, you know, then they were

23 apprehended.

24    Q.    Uh-huh.  When you say you have formed the

25 opinion that there was a crime, obviously --

1     A.    Well, yeah.

2     Q.    Of course, you know, we say can you put that

3  out of your mind.  But sometimes people sit on the jury and

4  that keeps coming up, based on what they heard before the

5  trial, even, right when the trial was starting.  And, you

6  know, that puts -- that puts a person who is being tried for

7  this at a disadvantage, if they've already decided that

8  something -- they're guilty of something.

9     A.    I have no idea who the triggerman was.  You

10  know, until May, I had never heard his name.  You know, so

11  as far as those opinions go, I have --

12     Q.    Okay.  Well, let me ask you this.  Since you

13  said that from after May, you learned that something else

14  had happened that you weren't aware of before you came down

15  to fill out this questionnaire.  How did you learn that?

16     A.    When somebody, you know, when you tell them

17  that you filled out the 17-page questionnaire and then they

18  were like, oh, well, I got called to, you know, to fill out

19  the questionnaire on another one of them.  And, you know,

20  until that point, I hadn't even heard that anybody had been

21  tried yet.  You know, that there had been other, you know,

22  the other trials had even happened.

23     Q.    Okay.  And did they talk to you about the

24  trial or did that person make it on the jury?

25     A.    No, they did not.

1   Q.   Did you do any kind of reading or research on

2   the Internet --

3   A.   No.

4   Q.   -- to try to find out more things?

5   A.   No.

6   Q.   One thing I did want to ask you about was the

7   -- when you were talking about the Carla Faye Tucker

8   situation.

9   A.   Uh-huh.

10  Q.   You said something about, I don't know, tell

11  me again what you said.  I think you said something like,

12  that wasn't such a bad thing compared to what could have

13  happened in the afterlife or something to that extent.

14  Could you explain that a little bit to me?  It wasn't too

15  clear.

16  A.   As a Christian, and that's what she had come

17  to profess, that, you know, we spend this much time on

18  earth, but we spend this much time in eternity.  And so the

19  worst thing that could happen to a believer is not death,

20  you know.  If her sentence had been overturned and been

21  commuted to life, you know, maybe that, you know, eternity

22  in heaven was a much better eternity than spending however

23  many years she would have in prison.  That's just

24  speculation, I mean.  That is --

25  Q.   Okay.  Does that belief some way in your mind

1   maybe diminish a little bit the severity of the death

2   penalty --

3          A.   Oh, no, not at all.

4          Q.   -- or anything like that?

5          A.   Oh, no.

6          Q.   Would that belief in any way affect your

7   deliberations in deciding and holding the State to their

8   burden on the Special Issues in the punishment stage?

9          A.   No.

10         Q.   Okay.  One thing I did want to talk to you

11  about.  I mean, you -- it looked like you understood the

12  Special Issues fairly well, better than most people that

13  come down here.  And -- but sometimes people don't

14  understand that.  They hear about the Fifth Amendment.  They

15  hear the fact that, you know, somebody has a right not to

16  testify and it can't be held against them.  But they --

17  somehow they think that once someone is convicted of capital

18  murder, that that right may not extend into the punishment

19  stage, or somehow changes things.  And I want to cover that

20  a little bit with you.

21              Special Issue No. 2, we're dealing with

22  what somebody is thinking.  Would you agree with me on that?

23  What the person who is accused, the person you found guilty

24  of capital murder, what they're thinking at the time it

25  happened?

1    A.    Right.

2    Q.    Because you have to make a determination

3  whether that person actually anticipated that a human life

4  would be taken, okay?  And, you know, some people say, well,

5  you know, for me to answer that question, for me to figure

6  out what he was actually thinking, I probably would have to

7  hear from him.  I'd have to have him get up on the stand and

8  say either I was or I wasn't, for me to answer that question

9  in his favor.  What do you think about that?

10   A.    You know, when it was mentioned a while ago

11  about the Fifth Amendment, I had not even taken into account

12  that it would be a possibility we would actually hear from

13  the defendant.  That -- I mean, I didn't even think about

14  that even being a possibility.  So as far as would that have

15  entered in my mind as what he was thinking, you know, I

16  hadn't -- I hadn't given that any thought.  Um --

17   Q.    How do you feel now?  Now that --

18   A.    Now that I know that?  Whether -- ask the

19  question again.

20   Q.    Okay.  In other words, would you -- would you

21  need to hear from that person in order to answer that

22  question?

23   A.    Would I hold it against him, if he didn't

24  testify?

25   Q.    Exactly.

1      A.      No.

2      Q.      Okay.  You would make the State prove it to

3  you?

4      A.      Right.

5      Q.      Just one last question, or actually, two last

6  questions.  Lawyers keep asking questions when they say

7  they're only going to ask one more.  As far as Special Issue

8  No. 3, you said you found value in it and you said you are

9  glad that's there.

10     A.      Yes.

11     Q.      But, you know, and sometimes people, you know,

12 in reality, and once you've convicted somebody of killing a

13 police officer and you found him to be a continuing threat

14 to society and you found that they actually anticipated that

15 a human life would be taken, how open would your mind be to

16 Special Issue No. 3?  After you've done, after you got all

17 the way down to that point, how open would it be?

18     A.      I guess it would depend on whatever had been

19 presented.

20     Q.      Okay.

21     A.      That would be a mitigating circumstance.

22     Q.      And in order for you to answer Special Issue

23 No. 3, would you want the defense to present evidence in

24 favor --

25     A.      I would want to hear every bit of evidence

1    that was applicable to the case.

2          Q.    Okay.  And, but would you want the defense to

3    present evidence for you to answer Special Issue No. 3?

4          A.    If it's truthful.

5          Q.    Would you require the defense to offer some

6    type of evidence --

7          A.    No.

8          Q.    -- in order to answer that?

9          A.    (Prospective juror shakes head.)

10         Q.    All right.  I guess the only other question I

11   would have, then, would be is there anything -- well, is

12   there anything based on your background, based on your

13   religious beliefs, that somehow conflicts with the law,

14   conflicts with something possibly in this case that would

15   keep you from being fair to either side?

16         A.    No.

17         Q.    I believe those are all the questions I have.

18   Thank you.

19               THE COURT:  Ma'am, would you be so kind

20   as to give us a few minutes and wait outside and we'll have

21   you back.

22               [Prospective juror out]

23               THE COURT:  What says the State with

24   juror No. 2426, Ms. Cathryn Mitchell?

25               MR. WIRSKYE:  State has no challenge for

53

1  cause.

2              THE COURT:  Mr. Sanchez?

3              MR. SANCHEZ:  No challenge for cause.

4              THE COURT:  You need a few minutes?

5              MS. BUSBEE:  Yes, please.

6                  (Recess)

7              THE COURT:  Wirskye, what says the State?

8              MR. WIRSKYE:  State will accept the

9  juror.

10             THE COURT:  Sanchez?

11             MR. SANCHEZ:  We will exercise a strike,

12  Your Honor.

13             THE COURT:  That's strike No. 9.  Would

14  you be so kind to ask Ms. Mitchell to come back in.

15                  [Prospective juror in]

16             THE COURT:  Ms. Mitchell, we want to

17  thank you so much for coming down today.  I will inform you

18  that you shall not sit on this jury.  Maybe it's a burden

19  off your shoulders.  But we appreciate your very thoughtful

20  reflection upon these issues and very honest answers.  It's

21  a pleasure having you here, but you will not serve on this

22  jury.

23             PROSPECTIVE JUROR:  Thank you very much.

24                  [Prospective juror out]

25             THE COURT:  Ms. Courtney.

1          [Prospective juror in]

2               THE COURT:  Good morning.

3               PROSPECTIVE JUROR:  Good morning.

4               THE COURT:  Welcome to the 283rd.  We

5    have juror No. 2527, Ms. Diane Marie Courtney; is that

6    correct?

7               PROSPECTIVE JUROR:  Yes.

8               THE COURT:  Thank you for being here.

9    Sorry for the delay.  We take the first one in, in the

10   morning, we put three people on the docket and the first one

11   in and then the second and the third and so forth.  So you

12   were number two checking in this morning so we'll get you in

13   as number two.

14              Obviously, you have had time to review,

15   hopeful more than once, the guide I provided for you?

16              PROSPECTIVE JUROR:  Yes.

17              THE COURT:  It's a lot of law to give

18   someone first thing in the morning.  I hope you had a cup of

19   coffee and are ready to go.

20              PROSPECTIVE JUROR:  Yes.

21              THE COURT:  I also provided a copy of

22   your questionnaire that you filled out back in May, so you

23   can review some of your answers and the issues that the

24   attorneys will be discussing this morning.

25              The bottom line, as I said in the guide,

1   there are no wrong answers in this process.  This whole

2   process is designed to give you a better working

3   understanding of how all this law relates in the real world,

4   not just writing on a piece of paper.  The only question

5   that I have to answer at the end of the process is twofold.

6   Number one is do you understand the law?

7                    PROSPECTIVE JUROR:  Yes, I think so.

8                    THE COURT:  And, number two, can you

9   follow the law?

10                    PROSPECTIVE JUROR:  Yes.

11                    THE COURT:  Those are the questions I

12   have to have answered at the end of this process.  The only

13   question I have for you right now is will you be able to

14   serve this Court for a period of two weeks beginning on

15   November 10th?

16                    PROSPECTIVE JUROR:  Yes.

17                    THE COURT:  Thank you very much.  With

18   that, I shall turn it over to Mr. Shook.

19                    MR. SHOOK:  Thank you, Judge.

20                    DIANE COURTNEY,

21   having been duly sworn, was examined and testified as

22   follows:

23                    DIRECT EXAMINATION

24   BY MR. SHOOK:

25        Q.    Ms. Courtney, my name is Toby Shook.  I'm

1   going to be asking questions on behalf of the State this

2   morning.  And as the Judge said, there aren't any right or

3   wrong answers.  We just want your honest opinions.  I'm

4   going to go over some of the information you put on our

5   questionnaire and then follow up some of your feelings about

6   capital punishment and some of the rules that apply to this

7   type of case.  And if you have any questions at any time

8   feel free to ask, okay?

9        A.     Yes.

10       Q.     All right.  I see from your questionnaire that

11  you grew up in Michigan and I think you said the first 22

12  years or so, were you in -- is it Manistee?  Am I

13  pronouncing that right?

14       A.     Yes, Manistee.

15       Q.     Where is Manistee?

16       A.     It is between Ludington and Traverse City,

17  right on Lake Michigan in the lower peninsula.

18       Q.     Okay.  Get pretty cold up there in the winter?

19       A.     Very cold.

20       Q.     Okay.  What brought you down here to Texas?

21       A.     My husband's job.

22       Q.     Okay.  And you've been down here for quite

23  sometime, then?

24       A.     About 15 years.

25       Q.     How do you enjoy Texas compared to Michigan?

57

1      A.      We really like Texas, and our children are

2 here and married and so we're going to be Texans.

3      Q.      Okay.  Quite a difference, I guess, in the

4 climates?

5      A.      Uh-huh.

6      Q.      Which can be good and bad, I guess.  Some of

7 the summers get a little hot here, but winters are much,

8 much, much more pleasant, at least temperature-wise.  I also

9 saw that, looking at your questionnaire, that you were a

10 part-time student, about two and a half hours a week, at

11 least you were back in May.  Is that still going on?

12      A.      Yes, yes.

13      Q.      Tell us a little bit about that.  What are you

14 studying?

15      A.      Well, I'm going to the Biblical School at the

16 University of Dallas, and it's a four-year program, and I'm

17 in my second year.  And it is -- I'm not taking it for

18 credit, but it can be taken for credit.  And it is in the

19 IRPS program, the Institute of Religious and Pastoral

20 Studies.

21      Q.      Okay.  And what are your goals to take from

22 that?

23      A.      I guess just learning more about God.

24      Q.      Okay.  What types of classes are you taking

25 this year?

1    A.    Just the one class and that's New Testament
2  this year.  Last year it was Old Testament.  And it's an
3  overview of the New Testament.
4         Q.    Okay.  And that's one day a week?
5         A.    Yes.
6         Q.    Okay.  The fact if you were placed on this
7  jury for a two-week period, then, might possibly mean you
8  would miss two of those classes.  But I take it that
9  wouldn't cause a problem for you?
10        A.    I have the ability to go to an evening class.
11        Q.    All right.  So you could switch at least at
12  that point in time?
13        A.    Yes.
14        Q.    Okay.  Let's talk a little bit about capital
15  murder and the death penalty and how you feel about that.
16  You know from listening to the Judge's comments and reading
17  the materials, that this is a capital murder case in which
18  the State is seeking the death penalty.  So we like to talk
19  to each juror how they personally feel about it.  As a law,
20  are you in favor of the death penalty?
21        A.    Well, I am Catholic, and I do pretty much
22  understand what the Catholic church's, you know, view is on
23  it.  And, therefore, I guess in my answers in the way I feel
24  is that I, yes, I feel that capital punishment is necessary
25  at times, because I feel that even though we are such a

59

1  sophisticated country, we can't seem to keep, you know,

2  criminals locked up.

3        Q.     Uh-huh.  Okay.  I know you said that on the

4  questionnaire.  I remember you asking or saying that you do

5  understand the church's true teaching, and I have talked to

6  a lot of jurors and talked to a lot of jurors who were

7  raised Catholic or active in the Catholic faith, and they

8  have different viewpoints on that, or I've seen different

9  viewpoints.

10       I know the -- I think it was the Governor

11  of Oklahoma, I believe, is Catholic and he has commented on

12  that.  And I was watching a program once where he was

13  talking about that.  And some have told me that the Catholic

14  church is totally against the death penalty, and then I have

15  others say no, in certain circumstances, it is actually not.

16  Have you ever studied that, or as a --

17       A.     Well, I've read it in the catechism of the

18  Catholic church.  But it is a document that's written for

19  the world church.  And so you are talking about other

20  countries that do not have the facilities that we have.

21       But one of the -- one of the parts of the

22  document says that if you can keep a person, if you have the

23  ability to keep a person locked up for the desired amount of

24  time, and that person is no longer a menace to society or to

25  other prisoners or guards or whatever, that in that case the

1   death penalty would not be acceptable.  But in the case

2   where they are in danger of -- they are dangerous to other

3   people, including inmates and guards, then it is acceptable.

4   That's my understanding.

5          Q.     And I remember you mentioned that in the

6   questionnaire a couple of times, and I believe you said from

7   what you knew about the legal system, that that wasn't

8   possible, and that kind of went into your belief system

9   about capital murder; is that right?

10         A.     I kind of feel that way.  I feel we have a

11  very liberal view of circumstances these days, in that

12  people, you know, it's always someone else's fault or, gee,

13  got in the way of my bullet, or something like that.  So I

14  have, you know, I hope it's the correct view, because I very

15  much want to obey my church's, you know, direction.  But

16  that's my -- that's my feeling.

17         Q.     Right now, though, you don't feel any conflict

18  with the church's doctrine about how you feel about capital

19  punishment or the death penalty?

20         A.     No.

21         Q.     Okay.  What purpose do you think the death

22  penalty serves our society?

23         A.     See, I tend to agree that it is a deterrent,

24  and I know that that goes against everything else.  I feel

25  that we can't keep people locked up.  I think people get off

1  for -- I think they get off for circumstantial reasons.  And

2  so, I just, you know, I -- it's just, you know, I'm not

3  sure.  And I'm not sure that it would -- that -- I'm not

4  sure that the law protects me as much as it protects the

5  criminal.

6        Q.      Right.

7        A.      If that makes any sense.

8        Q.      Right.

9        A.      You know, sometimes I feel that way.

10       Q.      From your personal point of view, what types

11  of crimes do you feel the death penalty should be considered

12  for or used as a possible option?

13       A.      Definitely for murder.

14       Q.      Okay.

15       A.      And I guess there probably aren't too many

16  more than that.

17       Q.      So you would reserve it for some type of

18  murder case or --

19       A.      Yes.

20       Q.      Okay.  That's how it is in Texas right now.

21  There are only certain types of murder cases, in fact, that

22  are reserved for the death penalty.  We have some brutal

23  murders that can occur and can only get a life sentence.  In

24  Texas for the death penalty to become an option, it has to

25  be murder plus some other aggravating fact.

First of all, it has to be an unjustified homicide.  It can't be self-defense, not an accident, an intentional murder.  You might have to form the intent or could form the intent in a split second, but you still have to have that intent to murder someone and actually carry it out.

A murder during the course of a felony -- I think these were in the materials, but I want to go over them real quickly.  Like someone that robs a store, a convenience store, and they murder the -- or shoot the teller, or the clerk there.  That could be a death penalty case.

Also, murder, if someone breaks in a home, a burglary, and murders someone in the home, that could be.  During a rape, kidnapping, or arson, those types of crimes.

Also, murder of specific individuals such as a police officer on duty, fireman on duty, prison guard on duty, murder of a child under the age of six, murder for hire, if someone does it for money like a hitman situation.  And then murder of more than one victim in either a serial killer situation or a mass murder situation.

But those are the specific types of crimes that have been reserved for the death penalty in Texas.  As far as that list goes, does that, from your own

1  personal point of view, do you feel those are the

2  appropriate types of crimes that should be considered?

3       A.   Yes.

4       Q.   Okay. Now, when we talk about capital murder,

5  we usually think of an example involving the actual

6  triggerman. That's just natural. But capital murder, like

7  any other crime, might involve some accomplices, other

8  people that don't actually cause the death, but assist or

9  are helping to commit the crime. There might be several

10 people involved in the crime, some more involved than

11 others.

12      And the law says that if you are actively

13 participating, aiding, directing, or something like that in

14 the commission of a crime, you can be held responsible, even

15 if you are not the main perpetrator. And the same is true

16 in a capital murder. You can have one triggerman and you

17 might have other accomplices. We call them parties in

18 Texas, but I think we all, I grew up watching "Dragnet" and

19 "Perry Mason," and it was accomplices. They can be held

20 accountable, too.

21      But when it gets to the death penalty,

22 some people have a -- have a -- they would draw a line

23 there. They're for the death penalty, as long as it's

24 applied to people that actually cause the death, the

25 triggerman or the actual murderer. If someone is assisting

1    them that didn't actually cause the death, they may reserve

2    that crime for prison time.  We have other jurors that tell

3    us, no, I think accomplices could receive the death penalty

4    and should be held responsible in certain situations,

5    depending on the facts of the case.

6              But people feel differently about that

7    and we just want to get your honest opinion on that.  How do

8    you feel about accomplices being prosecuted in a death

9    penalty-type situation?

10        A.    Well, I think you -- I think I would have to

11   know more of the circumstances.  I think that, I'm from the

12   old school.  Tell me who your friends are and I'll tell you

13   who you are.

14        Q.    Okay.

15        A.    I mean, I can't -- I feel that when you set

16   out to do something, that you better know who you are doing

17   it with.  And the possibility that if there's a gun or he's

18   capable of having a gun, I mean, I think that you -- there's

19   certain things that you are aware of, you know, that -- so I

20   think that in that case, it would depend on, you know, on

21   the information I received.

22        Q.    Okay.  So it's just going to depend on the

23   facts of the case?

24        A.    Right.

25        Q.    Let me give you an example to illustrate the

law.  There's two theories of law that a person can be
prosecuted as an accomplice.  And we use this example often.
Mr. Wirskye and I, let's say we decide we want to rob the
bank down the street.  And my plan calls for me to go in
with a gun, a loaded gun, and he's going to come in with a
big bag.  I'm going to pull the gun out and threaten
everyone and get them to raise their hands.  And then he's
going to go through and take all the money out of their cash
drawers.

During the course of that robbery, I
decide to shoot one of the tellers intentionally.  Maybe I
don't like the way they looked at me, I don't think they're
cooperating fast enough, maybe he said they're going for an
alarm, but I shoot them intentionally.  And then we flee the
bank, but we're caught soon afterwards.

Now, obviously I could be prosecuted for
capital murder.  I could receive the death penalty from a
jury, because I'm the actual triggerman.  The law says that
he could, too, if the jury believes, or one theory is, he's
actively involved in the crime.  He's aiding and directing,
helping to commit the crime.  He could be held responsible,
even though he didn't cause the death.

Or, under the theory of conspiracy, if we
conspire to commit one crime, in this case if we agreed to
commit bank robbery, and during the course of committing

that bank robbery, one of us commits another felony to
further the conspiracy, in this case it would be me shooting
someone, then everyone involved could be held responsible,
including him, even though he didn't have the intent.  He
doesn't even have to have the intent someone would die, if
the facts show and the jury believes that he should have
anticipated a life could be taken from the facts.  Kind of
like, I think, some of things you were saying.  Show me who
your friends are and I'll show you who you are.  And their
involvement, what they knew about the crime.

                If the jury believes from all the facts
that they should have anticipated, even though maybe he
didn't intend anyone to die, he can be found guilty.  And to
get the death penalty, the jury has to believe not only that
he should have anticipated, but he did anticipate.  But
those are the two theories.

                And, like I say, some jurors would take
the death penalty off the table, if it were a nontriggerman.
Other jurors tell us, no, I think it is fair to prosecute
someone for the death penalty, even if they're a
nontriggerman or an accomplice, and ultimately that they
receive the death penalty.  It just depends on their
involvement and the facts.

                I feel kind of from what you told me that
you are in agreement with that area of the law, that

1    accomplices can be prosecuted and ultimately could receive

2    the death penalty, depending on the facts?

3          A.    Yes.

4          Q.    Okay.  Let's talk about these Special Issues.

5    You don't get to a death penalty unless first you find the

6    defendant guilty and then the second phase of the trial you

7    get some Special Issues.  The second phase of the trial you

8    get to hear additional evidence and at the close of that

9    evidence you get these questions.  And we'll go over these

10   in more detail in a moment.

11              But basically the questions ask this.

12   Would the defendant be a continuing danger to society?  Did

13   he intend the person to die or did he anticipate that a

14   person would die?  And is there sufficient mitigating

15   evidence that a life sentence should be imposed rather than

16   a death sentence?

17              If the questions are answered yes, yes,

18   and no, the Judge wouldn't have any discretion.  He would

19   sentence the defendant to death.  If they're answered any

20   other way, again, he wouldn't have any discretion.  He would

21   sentence the defendant to life.  But those are the only two

22   possible outcomes, once a defendant is found guilty.  It's a

23   death or life sentence.

24              Are you familiar with the method of

25   execution in Texas?

1      A.      Um, I think so.  I'm not --

2      Q.      Lethal injection.

3      A.      Uh-huh.

4      Q.      Yes.

5      A.      Yes.

6      Q.      Since the death penalty was reinstituted, that

7   has been the method of execution.  And the procedures are

8   the same in each case.  Since you've lived in Texas a number

9   of years, you probably are aware that Texas actually does

10  carry out executions.

11     A.      Uh-huh.  Yes.

12     Q.      They're frequently in the news, have been in

13  the newspaper, on TV, depending on the person or what is

14  going on.  But you often will read about these, especially

15  after they've been carried out.  Some states have the death

16  penalty on the books and they never -- they never prosecute

17  it or never carry it out.  Texas actually does.  In fact,

18  Texas leads the nation in executions.

19             The procedures are the same in each case.

20  If this defendant were found guilty and the questions were

21  answered in a way in which he would be sentenced to death,

22  he would be placed on death row.  He would wait there a

23  number of years, and at some point in time the Judge would

24  give him a date of execution.  The day prior to that date,

25  he would be moved from death row into downtown Huntsville.

1          There's a prison there that has an old

2  clock on it, and often it's shown on the news by protestors

3  out there or a spokesperson out front.  And that's where

4  executions take place.  On the date of his execution, the

5  prison allows him to have time with family or friends or a

6  minister, a last meal.  But at 6:00 p.m. by law the

7  execution will take place.  He would be taken down the

8  corridor, placed in that room that's often shown on TV,

9  where there is a gurney, put on the gurney, secured there by

10  leather straps.

11          Needles would be placed in his arm.

12  Tubes go to another room where the executioner sits.  At

13  that point in time witnesses are brought in.  They have

14  witnesses for the victim's family as well as the defendant's

15  in different rooms.  He's allowed then to give a last

16  statement, and that's often reported, the details are, in

17  the news.  He may ask for forgiveness, he may claim his

18  innocence, he may be very defiant.

19          At the end of that statement the warden

20  simply signals the executioner, who then injects lethal

21  chemicals which immediately collapse the lungs, shut the

22  heart down.  He lapses into a coma and within about 15

23  seconds will be dead.  Those are the procedures in each

24  case.  They're reported like that.

25          And, quite frankly, our goal in this case

1   is to have the defendant executed.  We believe we have the

2   type and quality of evidence to convince a jury of his

3   guilt, and that those questions should be answered in such a

4   way that result in the execution.  We bring a lot of people

5   down here, we have them fill out these questionnaires, we

6   interview them about their feelings on the death penalty,

7   and everyone feels a little bit different.

8           Some people are opposed to the death

9   penalty on religious or moral grounds and could not serve in

10  good conscience.  Some people are too, almost too adamantly,

11  for the death penalty and couldn't be fair.  We have other

12  people that are for it and could serve and could make these

13  decisions.  And we have some people that, even though

14  they're for it philosophically, when it gets down to it,

15  it's too much of a burden on them.  It would weigh too much

16  on their conscience to make a life and death decision.

17          We can't preview the facts for you and

18  you certainly haven't been in this situation before.  But

19  all's we can ask you is to reflect upon yourself.  And as

20  best you know yourself, do you feel you are the type of

21  person that could sit on a jury of this nature and make

22  these decisions, if the State proves it to you, take pen in

23  hand and answer those questions in a way, knowing the

24  defendant would be executed some day?

25          A.    Yes.

1    Q.    Okay.  Why do you feel you're that type of

2  person?  What do you know about yourself that you feel you

3  could make that decision?

4    A.    Um, I guess I have some, you know, real, I

5  have some views about society and I have certain -- I'm very

6  conservative.  I try to familiarize myself with things, you

7  know, that I believe in, like, you know, going to school

8  just to learn more about the Bible and things like that.

9  But I'm not -- but I don't know how to answer that.

10              I just think I can listen.  I think I

11  can.  I think I have good discernment.

12    Q.    Okay.

13    A.    I think I have a good conscience.  I think I

14  was brought up that way and I think I've lived that way all

15  my life.  And I think I -- I may not like certain things,

16  but I'm able to obey them, if it's necessary to be obeyed.

17  And I just feel like I have a good, a good discernment.

18    Q.    All right.  Now, we ask in the questionnaire

19  and some -- and we ask again when you get down here about

20  whether you have heard anything about this case.  We can't

21  get into the facts, but we can tell you basically that the

22  crime occurred December 24th of 2000 at the Oshman's on

23  Christmas Eve, involving the murder of a police officer by

24  the name of Aubrey Hawkins in Irving, Texas.

25              Do you recall seeing any of these, the

1   news coverage?  It got a lot of publicity back when it

2   occurred, I know.  Do you remember seeing any of that on TV

3   or radio or newspaper?

4          A.      Yes, I did.  But I didn't remember.  I

5   remembered the group that had escaped from prison and I

6   remember Hawkins.  I remember that name.  But I didn't

7   really follow it closely in the paper.

8          Q.      Okay.  You just remember it when it occurred?

9   Do you remember any details you read about how it occurred

10  or anything like that?

11         A.      No, no, I don't remember that.

12         Q.      Did you follow it any after the -- any court

13  proceedings or anything like that?

14         A.      No, I have not.

15         Q.      Okay.  Just because you have seen something on

16  TV, doesn't make you ineligible to be a juror.  The test or

17  the rule is this.  Jurors have to be able just to make their

18  decisions on what they see or hear in the courtroom.

19  Obviously, you can't let an article you've read influence

20  you or make your decision, because the best evidence is

21  going to come from the actual witnesses here at the trial.

22                  We can't ask you to forget about what you

23  have seen or read, but we have to be able -- or you have to

24  be able to tell the Court, I'm not going to let that

25  influence me.  I'll just make my decision based on the

1  evidence that is produced here in the courtroom.  Do you

2  feel you could do that?

3       A.     Yes.

4       Q.     Okay.  Let's talk about these Special Issues

5  for a moment.  I want to go over them with you -- with them

6  with you one at a time.  So if you would just read Special

7  Issue No. 1 to yourself.

8       A.     (Prospective juror complies.)

9       Q.     That question under the law starts out with a

10 no answer.  You don't get to it unless you have found the

11 defendant guilty.  It starts out with a no answer and the

12 State must prove to you beyond a reasonable doubt that it

13 should be answered yes.  You may hear additional evidence in

14 the punishment stage.  But you see how that question asks

15 the jurors to make a prediction about how the defendant will

16 behave in the future?

17      A.     Yes.

18      Q.     Do you feel comfortable in making that

19 prediction or answering that question, if you're given

20 enough information?

21      A.     If I was given enough information, I could.

22      Q.     What types of things would you want to know

23 about the defendant before you answered that question?

24      A.     Well, I probably do know that he was in

25 prison.  I'd probably want to know the reason he was there,

1  although it doesn't necessarily lend itself to the fact that

2  he did or didn't do this.  I guess I would want to listen to

3  some psychologist or psychiatrist reports.  Witnesses would

4  be really important.  How he was acting, I mean, probably

5  the circumstances which I didn't follow, you know, of what

6  he might have done or didn't do when he -- when he did get

7  out of prison, or how, what the circumstances were of his,

8  of his getting out, you know, what he did.

9        Q.      Okay.  Now, you don't get to this unless

10  you've already found him guilty.  So you would have heard

11  about the crime itself at that point in time.  In fact, you

12  would have determined that he's guilty beyond a reasonable

13  doubt of capital murder.  And you get to review that same

14  evidence, the role in the crime, how the crime occurred,

15  obviously, when you're looking at that question.

16              Also, a person's background that you

17  mentioned gets to come in at that point in time.  If they've

18  had a previous crime, the background of that crime.  The

19  actual witnesses can come forward and you can hear them

20  describe that crime, the type of punishment he received and,

21  also, hear good things, good things, bad things, as far as

22  character goes.  Any extraneous offenses that occurred, any

23  events that happened surrounding the crime, after the crime,

24  that sort of thing, also come into play.

25              And you need to consider all of that in

1    this decision.  And then you make your determination.  We

2    have to prove that there's a probability that the defendant

3    would commit criminal acts of violence.  What does

4    "probability" mean to you?

5            A.     I guess how he reacts to questions or certain

6    tests that he might have had.  You know, I'm not even sure

7    what I mean by that.  But it would probably be what he, if

8    he testifies, what he says, how he seems to appear based on

9    a psychological examination.

10           Q.     Okay.  When we talk about probability that he

11   would commit criminal acts of violence, what does that mean

12   to you, if there's a probability he would commit that?  Is

13   there a percentage you'd give to that, greater than 50

14   percent, less than 50 percent, in terms of that question?

15           A.     Maybe 50 percent.

16           Q.     Okay.  The only direction I can give you is,

17   obviously, we don't have to prove a certainty he would be a

18   continuing danger to society.  But, obviously, we have to

19   prove that it's more than a possibility.

20           A.     Uh-huh.

21           Q.     And a lot of people tell us more likely than

22   not, that sort of thing.  Are you comfortable with that?

23           A.     Say that again.

24           Q.     That probability would be more likely than not

25   he would commit criminal acts of violence.

1          A.     Do you mean I would already make a --

2          Q.     In terms of that question.  When we say

3     probability he would commit criminal acts of violence, are

4     you comfortable with it's more likely than not, greater than

5     50 percent chance, let's say, or so, that that's what the

6     State has to prove to you, that he would commit criminal

7     acts of violence in the future?

8          A.     They wouldn't necessarily have to prove that

9     he would.  I guess I would go on some of his past behavior.

10          Q.     Right.  You can do that.

11          A.     Or what he did during the -- what the crime he

12     committed, what his part in it was, you know.

13          Q.     You can use all of that in your determination.

14     Past history, his role in the crime, what, how he acted

15     afterwards, all of that could come into play.  One of the

16     things we have to prove to you is that he would commit

17     criminal acts of violence.  When you see the words "criminal

18     acts of violence," what does that mean to you?

19          A.     Murder, I guess just being violent enough that

20     bringing someone to near death, you know, by beating them or

21     intimidating them to such a degree that they can't function,

22     you know.

23          Q.     Okay.  So some type of threat or assault or

24     violence to another human being?

25          A.     Yes.

1    Q.    Okay.  And we have to prove he would

2  constitute a continuing threat to society.  What does

3  "society" mean to you?

4      A.    It's all of us.  It's you and I and other

5  people that maybe I wouldn't associate with, but just people

6  in general, you know, just, society just means all of us.

7    Q.    Okay.  Could it also include people in the

8  prison system?

9    A.    Yes.

10    Q.    All right.  Now, let me ask you this.  You

11  said some interesting stuff in your questionnaire about your

12  -- you've had some pretty strong views about a life sentence

13  and true life sentences and kind of, liberal views, you

14  think, sometimes this justice system has had which has

15  affected your own viewpoints.

16            In a capital murder case, once you get to

17  this point, he gets an automatic life sentence.  And then if

18  these questions are answered in a way, it's going to be a

19  death penalty.  But at the very bottom line, he would be

20  doing this life sentence.  And then these questions call for

21  the juries to determine if you think he's a continuing

22  danger and he anticipated a life would be taken.

23            The law says this.  The Judge would give

24  you this instruction.  As far as capital murder goes, a

25  capital life sentence means they have to serve forty

1     calendar years before they become eligible for parole.  We

2     don't have the life without parole, but you have to serve

3     these forty calendar years.  And then that would

4     automatically make him eligible.

5              But he would also instruct you that this,

6     give you this instruction, that you can't consider that or

7     any of the parole laws.  You just have to be able to

8     consider a life sentence a life sentence.  You can't

9     consider that a person will maybe come up for parole or that

10    sort of thing in your deliberations.  And some people

11    sometimes have a problem with that because of what they've

12    read or they know about the parole laws.

13             And you had mentioned that, so I wanted

14    to take a little extra time with you and talk to you about

15    that, because you knew, it seems like you may have read or

16    know something about the system and made some comments about

17    that.

18             Do you think you could follow that rule

19    of law, as far as the Court's instruction goes, about the

20    life sentence and you have to consider it a life sentence?

21       A.      I think I could follow it.

22       Q.      Okay.  Also, I want to make sure of this.

23    Once you've found him guilty beyond a reasonable doubt, we

24    get to these questions.  Do you believe you could answer the

25    questions in a way which would give a person a life sentence

1  or do you feel that if it's a situation where he got the

2  death penalty, that it's always going to be a death penalty

3  situation, knowing how you feel about some of the parole

4  laws, or at least how you feel about the judicial system?

5        A.    I guess if the Judge and my -- you know, if

6  they gave me, I have to believe that if a person is put in

7  prison for life, be that 40 years or whatever, that they

8  will remain there, that their only chance of getting out

9  would be parole at the end of that period of time.  Okay?  I

10  would believe that, because that's the law.  So I guess I

11  would have to believe it.  You know, and --

12        Q.    Okay.  So you think you can follow that

13  instruction?

14        A.    Yes.

15        Q.    Okay.  I just want to make sure of that before

16  I went any further with you, because I know you had

17  mentioned that in your questionnaire.  Now also, with this

18  question you mentioned psychologists or psychiatrists.

19  Sometimes we do hear from those type of experts who can then

20  give you opinions about whether you think someone is a

21  future danger or not.  Sometimes the defense calls them to

22  give -- so they can give their opinions.  Once in a while

23  the State does, too.  Do you feel that those type of experts

24  would be important to you?

25        A.    They'd be important, but I'd listen very

1   carefully, because I don't always -- sometimes I think

2   personal opinion gets in and, of course, that's really not a

3   science.  It's kind of an art, you know.

4       Q.      Right.

5       A.      So I would listen to it, of course, because

6   they are an authority.  But I would -- and I would weigh

7   that in and I would trust that you would bring people in

8   that knew what they were talking about.  But I think I

9   could.  I think I could see beyond someone trying to

10  manipulate certain things.  And I don't know what those

11  things are.

12      Q.      Okay.  This question starts out with a no

13  answer.  We have to prove it should be answered yes.  And

14  the fact that he's been found guilty of capital murder

15  doesn't mean it would be an automatic yes.  You'd have to,

16  as a juror, wait and listen to all the evidence and then

17  make your decision and require the State to prove to you

18  beyond a reasonable doubt it should be answered yes.  Do you

19  feel you could do that?

20      A.      Yes.

21      Q.      Okay.  Now let's look at the second Special

22  Issue.  That has to do with the accomplice situation we

23  talked about earlier.  If you'll take a moment and read that

24  to yourself.

25      A.      (Prospective juror complies.)

Q.     That question, you remember we talked in the
guilt/innocence stage that the State, if it's an accomplice
-- and the reason I'm spending all this time is I can't
preview the facts, but that's the theory of law we're
prosecuting this case under, is that the defendant is an
accomplice in this case, not the actual triggerman.  So
that's why this question is important.

The first part of the question asks
whether the defendant actually caused the death of the
deceased.  In cases where you believe he's the actual
triggerman, the question is answered at that point in time.
But if it's an accomplice situation, you go to the second
part and it asks, if they didn't actually cause the death of
the deceased, but they intended to kill the deceased or
another.  So if the evidence shows you they had that
intention that someone would die or they anticipated that a
human life would be taken, to get to a guilty we have to
prove he should have anticipated.

You talked about the crime, the facts, if
they, you know, what they should have known could happen.
And here we have to prove that he did anticipate.  And
oftentimes it's the same evidence.  It also might be
additional evidence you hear from their background, too,
that could help you aid in that.  And that's what we have to
prove to you.

1              So if a situation involves an accomplice,

2     we can't open his mind up and show you his intent.  All's we

3     can do is put on all the relative evidence and as a jury you

4     can use your common sense and you can draw reasonable

5     deductions and determine a person's intent from their

6     actions and their involvement in the crime.  Do you feel you

7     could do that as a juror?

8              A.      Yes.

9              Q.      Okay.  Just kind of a common sense approach.

10    That question starts out with a no answer and, again, the

11    State has to prove to you that it should be answered yes.

12    The fact that you found the defendant guilty, found that

13    he's a continuing danger to society, doesn't mean you would

14    automatically answer that question yes.  You just have to

15    relook at that issue from its own point of view and

16    determine if the State has proven it to you.  Do you feel

17    you could do that?

18             A.      Yes.

19             Q.      The last Special Issue is the mitigation

20    question.  You don't get to that unless you have found the

21    defendant guilty, found that he's a continuing danger, found

22    that he anticipated that a life would be taken.  And then it

23    lets you look at all the evidence.  And if you'll take a

24    moment to read that to yourself.

25             A.      (Prospective juror complies.)

Q.     I always like to tell jurors that we didn't

write these questions.   Someone in the Legislature did.

They kind of run on a little bit.

                     But it's kind of a catchall question.

You see that it allows the jurors to look at a person's

background, their role in the crime, everything involved.

And then if they believe a life sentence should be imposed,

they could answer the question that way.   If they don't

think there's sufficient mitigating evidence, then they

could make it a no answer and then the person would receive

the death penalty.

                     But it's kind of a safety valve.   It lets

you look at all the evidence again and decide if you think

it's appropriate to give a life sentence.   You have to base

your decision based on some evidence, obviously.   What

mitigating evidence is, is up to you and the other jurors.

You're not required under law to tell us what mitigating

evidence is, just that you'd keep your mind open to it and

give it sufficient weight.   And if you think it reaches that

level, you could answer it that way.

                     As you sit there today, does anything

come to mind which you might view as potentially mitigating

evidence?

      A.     Um, I guess I didn't follow you with the last

part of your sentence, your question.

1    Q.    Just sitting there today -- and I was just,

2  again, trying to get your gut reaction.  Does anything come

3  to mind as -- can you think of anything that you might view

4  as potentially mitigating evidence?

5    A.    I guess, you know, his -- his part in the

6  crime and what -- maybe even his part in the group, you

7  know, once they became a group.

8    Q.    Uh-huh.  What would be important to you about

9  that?

10    A.    Well, you know, was he the leader?  Was he the

11  one who called all the shots?  Was he the one that decided,

12  you know, we're going to go in here?  He probably, he may

13  not have -- I don't know if I'm going in the right

14  direction.  He may not have pulled the trigger, but he may

15  have been the leader or the one who enabled them to get as

16  far as they did or go to that place that evening, that might

17  be --

18    Q.    As opposed to a follower or something like

19  that?

20    A.    Yeah, that might, that might be something that

21  --

22    Q.    I take it from your comments, being the

23  leader, though, wouldn't be something you'd view as

24  mitigating?

25    A.    No, no.  No, right, I was answering it the

1   opposite way.

2         Q.    But no, I understood what you meant.  So

3   someone that a follower might be, that might be what you

4   might view as potentially mitigating?

5         A.    Yes.

6         Q.    Okay.  Now, another area people bring up

7   sometimes is how a person was raised.  Maybe they -- maybe

8   they grew up in a poor household or a broken home or maybe

9   they were physically or mentally abused.  Some people view

10  that as potentially mitigating, if it were severe.  Other

11  jurors tell us, no, I'd feel bad for them, but, you know,

12  you've got to make your decisions in life as an adult.  You

13  have to be held accountable.  You can't use that as an

14  excuse.

15              Jurors feel differently about that type

16  of background information, but oftentimes it comes up in

17  these cases.  How do you feel about that type of evidence?

18        A.    I'm not quite sure what we should do with that

19  type of evidence.  I mean, I think that it might enter into

20  it, but I'm not quite sure -- I mean, that seems to be the

21  direction we take in everything.  And I'm not quite sure

22  what we're trying to do.  It seems like we want to blame

23  everybody, but the person, their parents.  And maybe if

24  that's the case these days, then maybe we need to hold

25  parents and guardians responsible and maybe they'll take it

1   more seriously.

2                    You know, if they know that, hey, this

3   man's going to, you know, he's forty years old and kills

4   somebody, and you're going to be held responsible if you

5   don't treat him, you know, well -- and I guess in the

6   society, I can't imagine a person not being able to go to

7   school, not being able to get some sort of help, you know.

8   And so, if that's the direction we're going in, then, you

9   know, I guess you need to consider, because that seems to be

10  the direction we're going in.  So you need to consider his

11  background, his childhood, and the way he was raised.

12       Q.    Okay.  Again, you might hear from experts on

13  this question.  You know, we have mitigation experts that

14  offer their opinions about why a person acts the way they do

15  because of the way they were raised or their circumstances,

16  that sort of thing.  Jurors feel differently about that.

17                    You have jurors that really want to hear

18  that type of evidence.  Other jurors think, you know, you

19  could probably find an expert to say just about anything, if

20  you look hard enough.  Other jurors tell us, it would just

21  be another piece of the puzzle for me.  It wouldn't really

22  hold one way or the other as far as weight goes.

23                    Do you feel -- do you have any opinions

24  about that on those type of experts as of this particular

25  issue, the mitigation issue?

1   A.   I think it would be another piece of the
2  puzzle, but I wouldn't, you know, it wouldn't necessarily
3  hold more ground.  It might hold a little less ground than
4  some of the actual facts.
5   Q.   Okay.  Now, let me talk to you a little bit
6  about some of the rules that apply, see if you can follow
7  these rules.  These are rules you'll probably be familiar
8  with.
9   One is the presumption of innocence.
10 When a defendant starts out in a criminal case, he has to be
11 presumed to be innocent by the jurors.  The fact that he's
12 been arrested or indicted or that we're even going through
13 this process, is no evidence of his guilt.  The evidence
14 comes from actually putting on the witnesses.
15   Could you follow that rule of law and
16 give the defendant that presumption of innocence?
17   A.   Yes.
18   Q.   Okay.  That burden of proof is on the State.
19 It never leaves this table.  We have to prove the case
20 beyond a reasonable doubt and you can't require the defense
21 to prove his innocence.  The burden of proof never shifts
22 over to that side.  Do you feel you could follow that rule
23 of law?
24   A.   Yes.
25   Q.   The burden of proof goes to each and every

1    element of the indictment.  We have to prove every part of

2    it.  If we fail on even one part, if you have a reasonable

3    doubt on one element of the indictment, then you're

4    obligated to find the defendant not guilty.

5                    One of the elements, obviously, will be

6    the identity.  If we -- if you had a reasonable doubt about

7    who committed the crime, obviously, you're going to find him

8    not guilty.  But just as important under the law is the

9    element of Dallas County.  We have to prove where this crime

10   occurred.  If, maybe the facts showed it happened near the

11   borderline and you believe really it happened in Tarrant

12   County, and if that actually occurred and you had a

13   reasonable doubt about Dallas County, you would have to find

14   him not guilty.  Just as you would if you had a reasonable

15   doubt about his identity.

16                   And some people view that as a

17   technicality, but under the law it's not.  It's viewed just

18   the same.  You may not like it, but the jurors have to act

19   as kind of neutral referees.  You can't give us one of the

20   elements as a technicality.  Would you be able to follow

21   that rule of law and if you had a reasonable doubt, even

22   about something as what some people view as insignificant or

23   a technicality, but it's not under the law, as Dallas

24   County, could you find the defendant not guilty?

25          A.      On something that technical?  I don't know.

1    It would depend upon the technicality.  But if it was that

2    it happened in Tarrant County versus Dallas County, I don't

3    see any relationship to what happened.  I just think then

4    we'll move it to the Tarrant County Court and we'll, you

5    know, find out why it was placed in this court.  And if

6    somebody didn't do their paperwork right, we would say,

7    okay, you're going to be fired or something like that.  But

8    I don't see that I --

9         Q.    Well, I don't anticipate any of that to

10   happen.  And obviously if it did, you could have us fired,

11   because that would be pretty poor preparation on our part.

12   But under the law, it is viewed just as important.

13                   And you would have to be able to tell the

14   Court, you know -- I say I don't anticipate it would happen,

15   but it's a real test in that you'd have to be able to tell

16   the Court, I could find someone not guilty, if they didn't

17   prove any, just one of the elements, and one of the elements

18   is Dallas County.  And the Court will instruct you, you'd

19   have to be able to do that.

20                   And we're just asking you what your

21   honest opinion is, which you've given us so far, if you

22   could follow that rule?

23        A.    I would be very upset with you, but I guess I

24   -- I guess if that's the law.  But it would -- that would be

25   -- it would just be very hard for me to do, especially in a

1   capital murder case.  It would be very hard for me to, you

2   know, if it was as technical, as minute, as that, then --

3         Q.     Well, let me give you one more test, just to

4   see.  Here's another example.  We have to prove the manner

5   and means how the crime occurred.  We may have alleged that

6   the person was shot.  That's how he died.  And we have to

7   prove that once we write it in the indictment.  The evidence

8   might show that he was actually shot and stabbed.  In fact,

9   after the medical examiner testified, he may say actually

10   what this man died of were stab wounds.  The shot wound was

11   kind of superficial.

12         Again, that would be very poor

13   preparation on our point of view.  We probably should have

14   said he was shot and stabbed or stabbed to death, is what we

15   should have put, but we didn't.  Again, you wouldn't have a

16   doubt about who committed the crime.  Maybe not where they

17   committed the crime.  We've proven to you beyond all doubt

18   maybe that the defendant committed it.  But you'd have a

19   reasonable doubt about how it happened, and that's because

20   the indictment says shooting and you thought it was

21   stabbing.

22         That's another technicality, but, again,

23   the law says if you have a reasonable doubt on any of it,

24   you have to find the defendant not guilty.  Might be tough,

25   but you'd have to do that.  That's another tough test we

1  give jurors to see if they could really follow that rule of

2  law, just like the county.

3               THE COURT:  Let me add one little thing.

4  The prosecutor is the one who writes the indictment and they

5  present that to the Grand Jury.  So they draft the

6  indictment.  That's so they're bound by what they draft.

7  Does that help you somewhat?

8               PROSPECTIVE JUROR:  Yes.

9               THE COURT:  Okay.

10      Q.     (By Mr. Shook)  So it would be our fault,

11  obviously.  We have to prove what we allege.  Again, you can

12  have us fired.  And some jurors, quite frankly, couldn't do

13  that.  They just say, no, Judge, I'm not doing that.  Other

14  jurors tell us, yeah, I could do it.  And we just want your

15  honest opinion on that issue.

16      A.     I don't -- I, um, it would have to be -- it

17  would have to be more -- well, I don't know that I could do

18  that.  I don't know that I could.

19      Q.     You're having some problems with it, I can

20  see.

21      A.     Yeah.  I just don't know if I could.

22               MR. SHOOK:  Judge, I think the juror has

23  been as honest as she can with this and that's all the

24  questions I have.

25               PROSPECTIVE JUROR:  Okay.

1      MS. BUSBEE:  The parties have reached an

2  agreement on this juror.

3      THE COURT:  Ma'am, we appreciate your

4  time and service today and don't think that you have caused

5  a problem, because you haven't.  You have been honest.  And

6  that's all we require.  The parties have agreed to excuse

7  you from this case.  You will not serve, okay?  Thank you so

8  much.

9      [Prospective juror out]

10      (Recess)

11      THE COURT:  Mr. Smith.

12      [Prospective juror in]

13      THE COURT:  Good morning.

14      PROSPECTIVE JUROR:  Good morning.

15      THE COURT:  Welcome to the 283rd.  We

16  have juror No. 2516, Michael G. Smith.  Sorry for the delay,

17  Mr. Smith.  We take them three in the morning and three in

18  the afternoon and you were the third one to check in this

19  morning, so that's the way it goes.

20      PROSPECTIVE JUROR:  It's all right.

21      THE COURT:  We have to balance the

22  fifteen people waiting, versus a couple of people waiting.

23  So that's -- I don't have a better way to do it, so I'm

24  sorry for the delay.

25      PROSPECTIVE JUROR:  I understand.

1    THE COURT:  Obviously, you've had enough

2 time to read the guide I provided for you a couple times

3 through.  I also provided your questionnaire that you filled

4 out in May.  Hopefully you looked at that and began to think

5 about some of the issues the attorneys will discuss with you

6 this morning.

7    I certainly don't expect you to

8 understand everything at this point.  They will visit with

9 you and help you understand how the law relates to the

10 issues before the Court.  There are no wrong answers, just

11 truthful ones.  The only question I have for you at this

12 time before we begin is will you be able to serve this Court

13 for two weeks beginning on November 10th?

14    PROSPECTIVE JUROR:  Yes.

15    THE COURT:  Thank you, sir.  Mr. Shook,

16 would you like to inquire?

17    MR. SHOOK:  Yes, Judge.

18    MICHAEL SMITH,

19 having been duly sworn, was examined and testified as

20 follows:

21    DIRECT EXAMINATION

22 BY MR. SHOOK:

23    Q.    Mr. Smith, my name is Toby Shook.  I'm going

24 to speak to you this morning on behalf of the State.  And,

25 as the Judge said, there aren't any right or wrong answers.

1  We just want your honest opinions.  You've been very honest

2  on your questionnaire, so I don't anticipate a problem with

3  that.

4         Feel free to ask us questions at any

5  time.  And what I'll do is go over a few things in your

6  questionnaire and then talk to you about how you feel about

7  capital murder, the death penalty, and some of the rules and

8  laws that apply.

9         I see from your questionnaire that you

10  have been at Southwest Airlines for, what, about 13 years or

11  longer now?

12       A.     Yes.

13       Q.     And you're a technical writer there?

14       A.     Yes.

15       Q.     What exactly does a technical writer do for

16  Southwest?

17       A.     In my capacity I maintain the flight

18  attendants' manual and issue communications to them from the

19  executives.

20       Q.     Okay.  And you went to the University of

21  Texas; is that right?

22       A.     Yes.

23       Q.     Where you were a journalism major?

24       A.     Yes.

25       Q.     How is it that you got into the field that

1    you're in now from the journalism major?  Tell us that.

2         A.     I had returned to Dallas from Washington to

3    start work on a new publication, but it never got off the

4    ground.  So I took a temporary job at Southwest and liked

5    the environment and stayed there.

6         Q.     Okay.  I see that you had been involved -- we

7    always ask if you've ever been involved in any political

8    campaigns, and I believe you worked in the campaign for the

9    railroad commissioner and maybe some others?

10        A.     Yes.

11        Q.     What did you do in those campaigns?

12        A.     I was -- I worked a phone bank for Governor

13   Clements.  That kind of low level work, yard sign assembly.

14        Q.     Okay.  Were you a student then?

15        A.     I was a student in my early -- yes, early

16   endeavors.

17        Q.     Okay.  And I'm just curious.  From reading

18   your questionnaire, you appear to be probably pretty, I

19   would say, conservative, if I were to label someone.  I

20   don't like labeling people.  But you have a conservative

21   background on some of your views.  But then I met some other

22   journalist majors from the University of Texas and they were

23   at the opposite end.

24                How was that experience out at UT?

25   Because I know you have, obviously, all sorts of people in

1   journalism, but usually they're not as conservative.  Did

2   that -- were you as conservative then or did that cause some

3   debates when you were down there at UT, or --

4        A.    Yes.

5        Q.    Okay.

6        A.    I didn't fit in too well at the student paper.

7        Q.    I was wondering.  That's one thing that struck

8   me when I read your questionnaire.  I had one juror who was

9   very conservative once and he worked at Half Price Books.

10  And I like going to Half Price Books.  But when you look at

11  the people that work in Half Price Books, they're usually

12  what, if I were to guess, wouldn't be considered

13  conservative.  And he said, yes, he was the exception to the

14  rule there.

15             But, so, I had similar thoughts when I

16  read what your major was down there.  Also, you had a high

17  school friend that was a victim of a -- it looked like a

18  murder case down in Houston that might have had some

19  notoriety; is that right?  Back in 1983?

20       A.    Yes, I think probably the term "acquaintance"

21  would be more appropriate.  We knew of each other and we had

22  met.  We hadn't, for example, gone to lunch with each other

23  or met each other's families.

24       Q.    Okay.  Anything about that experience which

25  might cause you to be biased in any way?  It was 20 years

1   ago.

2          A.     No, it was just my first exposure to a

3   particularly brutal crime of someone I knew.

4          Q.     Okay.  Then another interesting aspect from

5   your questionnaire was your -- you have a, is it a cousin

6   that's an assistant DA up in Colorado?

7          A.     Yes.

8          Q.     Who may have participated in the extradition

9   process in these particular cases?

10         A.     That's what my father told me.

11         Q.     But you haven't actually discussed that with

12  him at all?

13         A.     No.

14         Q.     Okay.  I take it that wouldn't be a problem

15  for you at all?

16         A.     No.

17         Q.     All right.  Let me talk to you how you feel

18  about the death penalty from your personal point of view.

19  From your questionnaire you said you were in favor of it as

20  a law.  And I'd like you to just kind of expound on that and

21  tell us why you favor it, maybe the purpose you feel it

22  serves.

23         A.     For the crime of capital murder, it is

24  proportional.  It's -- I could expound on that, I guess.  It

25  depends on how --

1     Q.    Do you feel, then, it's just a just sentence

2  for certain crimes, the type of crime that, the victim, and

3  that sort of thing?

4     A.    Yes.  The word "just" in its whole meaning, I

5  think, applies in this case, applies to that crime and the

6  punishment.

7     Q.    Your viewpoints on the death penalty, did you

8  develop those as you grew up?  Anything you've read in

9  particular or just the way you were raised, do you think?

10     A.    I inherited a lot of knowledge and

11  understanding from my family.  I questioned that belief and

12  over time and through learning, I found it to be valid.

13     Q.    Okay.  It looks like from reading your

14  questionnaire that you've had some serious discussions about

15  it, maybe philosophical discussions.  You had mentioned that

16  you had recently had a discussion with a friend about it,

17  and his views had changed.  I think ultimately you said that

18  you agreed that it's still just in the big picture that its

19  administration is somewhat cumbersome.

20         Tell us a little bit more about that

21  discussion and what your feelings were.

22     A.    This was a friend I know and respect and have

23  for many years.  And it surprised me when he asked me what

24  do we get out of the death penalty, talking politically

25  speaking.  And I said, well, I'm not really sure what you

1    mean.  And he said, well, it's -- it takes so many resources

2    and time to make it happen and perhaps it should.  Is it

3    worth it?  Is there not something else we could do with

4    those convicted of capital murder that would be -- that

5    would free up resources for other things that may need our

6    attention more?  And I found that to be a rather persuasive

7    viewpoint.  However, I acknowledge that that is a question

8    for legislatures and for society to decide, not for juries.

9        Q.    Okay.  From your own personal point of view,

10   let me ask you this.  What types of crimes do you feel

11   should there be an option for the death penalty?

12       A.    I agree with the law as I understand it, which

13   is capital murder, premeditated murder, murder in the

14   commission of another crime, murder of a peace officer.  I

15   think that about covers it.  I've thought those over in my

16   mind and they seem to all be valid.

17       Q.    Okay.  Would you from your own personal --

18   let's say we can make you Governor for a day, a Governor who

19   has a little more power than a Governor of Texas has.  You

20   could make up whatever laws you wanted on the books.  If it

21   were up to you, then, would you have the -- would you keep

22   the death penalty on the books or would you have a death

23   penalty statute?

24       A.    I think I would keep it.

25       Q.    Okay.  Would you have a similar scheme as at

1  least to the type of offenses considered under the death

2  penalty statute as it now exists?

3      A.    I wouldn't change that.

4      Q.    Okay.  You mentioned the process, that it

5  takes so long, and am I right in assuming you are talking

6  about the long appellate procedures and that sort of thing?

7      A.    Yes, the over-all.  As I understand, just from

8  what little I know, sometimes it can take a decade or more.

9      Q.    Right.  Actually, in recent years they've

10 changed the law, somewhat, to speed that process up.  And

11 actually it seems to have worked.  Now, older cases still

12 take longer and some cases may take longer than others,

13 depending on the particular appellate issues.

14          But there have been, there was a

15 significant law change just a few years ago and we have seen

16 an increase in the speeding up of the appellate process.

17 But as far as ultimately your discussions with your friend

18 and your thoughts on the death penalty, you still feel from

19 your own personal point of view that we should have the

20 death penalty and it's a law that should be enforced?

21     A.    Yes, I do.

22     Q.    Okay.  Let me ask you this.  You've got a good

23 grasp on the types of crimes that should be considered.  And

24 when we think of a capital murder or a death penalty

25 situation, we always think of fact situations.  You know, if

you think of murder during a robbery, we think of a guy that
goes into a 7-Eleven, let's say, and shoots the clerk during
a robbery or something like that.  And it's natural to think
of the actual triggerman.

But capital murder, like other crimes,
can have several people commit the crime.  You may have only
one triggerman.  You may have other individuals who assist
in committing that crime.  And the law says that under any
crime, these accomplices can be held accountable, can be
found guilty of that same crime as the triggerman.  They can
also receive the same punishment, depending on the facts.
And the same is true in a death penalty situation.

People feel differently about that from
their own personal point of view.  Some people believe in
the death penalty, but if it were up to them, they would
reserve it just for the triggerman.  They feel it's only
just for that.  If it were an accomplice involved, they
might reserve a long prison sentence for them, but they
don't feel it's fair to administer the death penalty to
them.  Other jurors feel that an accomplice can be found
guilty and should ultimately receive the death penalty,
also, depending on his involvement and the facts of the
crime.

But, again, people kind of fall one way
or the other on that.  And there aren't any right or wrong

answers.  We just want to ask each juror their honest

opinion about that.  How do you feel about the prosecution

of accomplices in a death penalty situation?

A.     I would favor the latter position you

described.  If you had an opportunity to prevent a capital

murder and you failed to take it, that's as good as

committing it in my view.

Q.     Okay.  There's two theories of law in which a

person can be found guilty.  One is the evidence shows that

they were actively involved, that they participated, aided,

directed, encouraged the crime to occur, even though they

didn't actually pull the trigger.

The second is called conspiracy.  We, if I

conspire with other individuals to commit one crime and

during the course of that, committing that crime, someone in

the group commits another felony, murder, in a capital

murder situation, to further the conspiracy, then we can all

be held accountable and found guilty, if a jury believes

that we should have anticipated that a life would be taken.

And then that's just going to depend on the facts.

An example we give of the law is if Mr.

Wirskye and I decide we want to commit bank robbery, and the

plan calls for me to take a loaded gun in and threaten the

bank tellers.  After I get their hands in the air and them

under control, he starts ransacking their drawers, putting

the money in a big sack.

During the middle of that robbery, I decide to shoot one of the tellers.  I don't like the way they're looking at me, maybe he says one is going for an alarm, but I shoot them intentionally and we flee.  We're caught soon after.

I could be prosecuted for capital murder and I could receive the death penalty.  Mr. Wirskye could also be prosecuted because he assisted me in that and a jury might believe from the facts that he should have anticipated a death could occur.  It's just going to depend on the facts.

But to get him guilty, he doesn't even have to have that intent.  To get to the death penalty, we do have to prove that he did anticipate.  But that's the conspiracy end of the law.

From your own personal point of view, then, do you agree with the law that someone, a nonshooter or an accomplice, can be prosecuted and could ultimately receive the death penalty?

A.     It can.  It depends on the facts, as you said.

Q.     Okay.  What's important to you about the prosecution of an accomplice in your own mind, as far as fairness or the reason the State should or has a legitimate reason to prosecute an accomplice for the death penalty?

1    A.    It's a difficult question to answer.  The word

2  "accomplice" could mean many things, an accomplice in the

3  murder, an accomplice in the robbery.  An accomplice -- I'm

4  not sure I can really answer the question the way it's been

5  phrased.

6    Q.    Okay.  I try to keep them kind of openminded.

7  But what I'm looking for is maybe factors you think is

8  important when considering an accomplice --

9    A.    Uh-huh.

10    Q.    -- that sort of thing.

11    A.    Was the accomplice voluntary?

12    Q.    Okay.  That's a good point.  If it is

13  something in a duress, then that would be a defense.  And

14  let me tell you this.  Just because someone is present at

15  the crime, doesn't make him an accomplice.  If we dupe,

16  let's say, someone to drive us there to the crime, they

17  didn't know we were committing a crime while we were inside,

18  that, obviously, would not be the situation.  They have to

19  be participating in the crime and know what's going on.

20    A.    Uh-huh.

21    Q.    Active involvement in the crime, though, do

22  you feel that's an important factor to you?

23    A.    Yes.

24    Q.    Okay.

25    A.    Yes, I do.

1    Q.    It comes down to the actual fact situation and

2    we can't preview the facts to you.  But I can tell you that

3    that is the theory of law that we're prosecuting this case

4    under, that Mr. Murphy is an accomplice, not the actual

5    triggerman.  And that's what we're pursuing this case under.

6    And that's why we take so much time to make sure the juror

7    doesn't have personal objections to that theory of law and

8    agrees with the law.  I take it from your answers you do

9    agree with the prosecution in a death penalty case of an

10   accomplice?

11   A.    I do.

12   Q.    Okay.  Are you familiar with the method of

13   execution in Texas?

14   A.    Yes.

15   Q.    By lethal injection?

16   A.    Yes.

17   Q.    Growing up here, going to school here, living

18   here, I'm sure you're aware that Texas is a state that

19   actually does not only prosecute death penalty cases, but

20   actually carries out the death penalty?

21   A.    Yes, I am.

22   Q.    Leads the nation in executions.

23   A.    I was aware we were among the leaders, if not

24   the leader.

25   Q.    We are the leader.  Don't lead every year, but

1   have many times.  The method is the same, as you know, by

2   lethal injection.  And it's often covered in the media all

3   the way down to the last words of the defendant or his

4   family.  They often print all of that in the newspaper.

5            And, quite frankly, that's our goal in

6   this case.  We believe that we have the type and quality of

7   evidence to convince a jury of the defendant's guilt, that

8   these questions should be answered in such a way that he

9   would be executed.  The defense takes the opposite view.

10           We get all kinds of jurors down here,

11  obviously.  Some are radically opposed to the death penalty.

12  Some are adamantly for it.  Others are for it in certain

13  instances and feel they can make that decision.  We have

14  others that are for it philosophically, but when it gets

15  down to it, they honestly tell us, they don't feel

16  comfortable making that decision.  It would weigh on them

17  too much.

18           You've told us philosophically you do

19  believe in the death penalty and it should be enforced.  Do

20  you feel you're the type of person who could sit on this

21  type of jury and make those decisions, if the State proved

22  it to you beyond a reasonable doubt?

23       A.    Yes.

24       Q.    Okay.  Let's talk for a moment about these

25  Special Issues.  I'd like you to just kind of read Special

 1   Issue No. 1 to yourself.

 2           A.    No. 1 or all three?

 3           Q.    Let's take it one at a time.

 4           A.    (Prospective juror complies.)  Okay.

 5           Q.    No. 1, have you read that one yet?

 6           A.    Yes.

 7           Q.    That question is the first one you get.  You

 8   don't get to it, unless you've found the defendant guilty.

 9   Then you may hear additional evidence and then you get these

10   questions.  It's asking the jurors to make a prediction

11   about the defendant's behavior in the future.

12                   First of all, do you feel comfortable or

13   do you feel you could answer that question, if you are given

14   enough information?

15           A.    Yes.

16           Q.    What types of things would be important to you

17   in answering a question like that?

18           A.    Past behavior.

19           Q.    Okay.  That type of information is available.

20   If someone's been convicted of a crime, committed any

21   crimes, bad acts, that's available, and those witnesses can

22   be produced and the jury can hear from that.  A lot of

23   jurors tell us they'd like to see if there's a pattern, that

24   sort of thing.

25                   You also get to review what their role

1    was in the crime itself.  You get to look at that, what

2    you've already heard in the guilt/innocence stage, and then

3    make your decision based on the new evidence as well as what

4    occurred in the guilt/innocence stage.  It starts out with a

5    no answer and the State has the burden of proof to prove to

6    you beyond a reasonable doubt it should be answered yes.

7                    Just because you found him guilty,

8    doesn't automatically mean you should answer it yes.  If it

9    were an automatic yes, there would be no reason for the

10   question, obviously.  The law calls for the jurors to wait

11   for the new evidence to come in and then deliberate on that

12   evidence and then answer that question.  Do you feel you

13   could do that?

14            A.      Yes.

15            Q.      The second question, that has to do with the

16   accomplice situation we've already talked about, and if

17   you'll take a moment just to review that.

18            A.      (Prospective juror complies.)  Okay.

19            Q.      That question, it's kind of in two parts and

20   we tell all jurors this, we didn't write the question.

21   Someone in the Legislature did a long time ago.  They kind

22   of run on a bit.  But question No. 2 starts out with a no

23   answer.  Again, we have to prove to you beyond a reasonable

24   doubt, it should be answered yes.

25                    The first part of the question asks if

1  the defendant actually caused the death.  So if he's the

2  triggerman or the one that did the murder, obviously, the

3  question is answered at that point.

4          But the latter part of the question has

5  to do with the situations of an accomplice.  If we were able

6  to prove to you from all the facts that he didn't actually

7  cause the death, but intended to kill the deceased or

8  another person, I guess the major point there is the

9  intention, or that he anticipated that a life would be

10  taken.

11          I talked to you about the guilt/innocence

12  stage.  From all the facts, to get to the guilt, we have to

13  prove that he should have anticipated and here we have to

14  prove that he did anticipate.

15          We can't stop a person and, obviously,

16  open up the top of his head and show you what his intent

17  was.  We have to prove that by putting on all the evidence

18  of what happened prior, during, and after the crime.  And

19  then jurors can make reasonable deductions using their

20  common sense what a person's intent is, from their actions

21  in the crime, whether they anticipated that a crime would

22  occur.

23          Some jurors can do that.  Some tell us

24  they really don't feel comfortable judging a person's

25  intent.  Other jurors tell us they feel they can, they do

1  that in their everyday lives.  Do you feel you could answer

2  that question in regard to a person's intent?  That is, you

3  could judge from their actions and all the relevant evidence

4  and make that type of determination?

5      A.      Yes, I believe I could.

6      Q.      Okay.  Again, it just depends on the facts.

7  You can use the evidence of the crime itself and their role

8  in it, and also anything you've heard from their criminal

9  past or good past.  You get to hear all the good and bad to

10  determine the answer to that question.

11          And then this last question is a little

12  different in that we don't have the burden of proof and

13  neither does the defense.  It's the mitigation question.

14  Just take a moment to read that question.

15      A.      (Prospective juror complies.)  Okay.

16      Q.      It's kind of a catchall.  You know, you don't

17  get to that question unless you have found someone guilty,

18  that you've found they're a continuing danger, and that they

19  either intended the death, caused the death, or they

20  anticipated that a life would be taken.  It allows the

21  jurors to look at everything, the crime itself, the person's

22  background, the circumstances, and then determine if they

23  think there's sufficient mitigating evidence to give that

24  life sentence.

25          You don't have to tell us what mitigating

1  evidence is.  We don't give you a definition and you're not

2  required under law to tell us what it is.  You're just

3  required to be able to assure the Court you will keep your

4  mind open to it, and if you see sufficient mitigating

5  evidence, you could answer it yes.  If you don't, you could

6  answer it no.

7            Do you feel you could do that, keep your

8  mind open to that issue at the end of the trial?

9       A.    Yes.

10      Q.    As you sit there today, does anything come to

11 mind or do you have a gut reaction on anything you might

12 consider as potentially mitigating evidence?

13      A.    The phrase "moral culpability," to me that

14 means that the person didn't understand the consequences of

15 his actions.

16      Q.    Okay.

17      A.    And that is something I would have to consider

18 carefully.

19      Q.    Okay.  You don't have to even agree with the

20 other jurors.  You just have to be able to keep your mind

21 open to it.  An example I give of that is maybe you will

22 have a case where the defendant went to Harvard, has got

23 four or five degrees, you know.  You may have one juror who

24 views that as potentially mitigating, thinks they made

25 something out of their life.  You may have another juror

1    that takes the opposite view.  That's aggravating.  Someone

2    with that opportunity and that intelligence, actually they

3    may view it as quite dangerous, hold it against them more.

4                        But that just serves as an example how

5    it's just from your own perspective.  Now, we often hear in

6    capital murder cases evidence of a person's background, how

7    they were raised.  Maybe they had a bad upbringing, broken

8    home, poor upbringing, or maybe they were physically or

9    mentally abused.

10                       Some jurors view that as mitigating.

11   Other jurors take a sympathetic view of it, but actually say

12   they know a lot of people that come from that background and

13   they overcome it.  They don't get involved in capital murder

14   situations.  They really wouldn't view that as mitigating,

15   once the person is an adult making these decisions.  But

16   people feel differently about that type of background

17   evidence.

18                       How do you feel about that?  Do you have

19   any thoughts or opinions in that regard?

20       A.     I think we would have to use great care in

21   decisions based on Special Issue No. 3, because we have to

22   be careful not to create an exempted class of defendant who

23   is not held ultimately responsible, versus others who are,

24   based on things beyond their control.  There's a typo.

25   Sorry, I'm a technical writer.

1    Q.    That's fine.  We always kind of give the -- we

2 didn't write these.  So we've had a lot of English teachers

3 correct them before.

4              THE COURT:  How did I do on my guide?

5              PROSPECTIVE JUROR:  On the what?

6              THE COURT:  How did I do on my guide?

7              PROSPECTIVE JUROR:  I think it was all

8 right.  I didn't catch it until just now.

9    A.    Have I answered your question?

10    Q.    (By Mr. Shook)  Yeah, I think so.  I mean, I

11 take it from your answer, then, you necessarily wouldn't

12 look at that as though it might be bad as a potentially

13 mitigating situation because you wouldn't want to just make

14 -- if you've had a bad background, then you're not going to

15 get the death penalty, that sort of thing?

16    A.    There are many people with bad backgrounds

17 who, nonetheless, make sound judgments.

18    Q.    Okay.  Oftentimes you will hear from experts

19 in this part of the trial, the punishment phase,

20 psychologists, psychiatrists, who can give opinions.

21 Sometimes the defense calls them.  Sometimes the State will

22 call them.  But they will offer opinions about future

23 danger.  They'll -- a lot of times you'll hear a mitigation

24 expert talk about his opinions as to why the defendant acts

25 a certain way or reacts or maybe their background and that

1    sort of thing.

2              Again, it's almost always a psychologist

3    or a psychiatrist background.  Jurors feel differently about

4    those experts.  Some put a lot of faith in them.  They

5    really see value in that and think those people can really

6    see into human behavior.  Other jurors take kind of the

7    opposite view.  They're a little cynical, believe that you

8    could probably find an expert to say whatever theory you

9    wanted to, if you looked hard enough or paid them enough

10   money.

11             And then we have other jurors that tell

12   us, I would look at it more or less as another piece to the

13   puzzle or pie, but I wouldn't put a whole lot of stock in it

14   or not believe in it automatically.  It's just going to be

15   another piece of evidence I look at.  But people view --

16   they have different views on that.

17             Do you have any opinions about those type

18   of experts, one way or the other?

19        A.     I would agree with your third description that

20   we can learn a lot from people who study us, but we can't

21   regard them as infallible.  So I would be willing to listen

22   to that sort of testimony, but I wouldn't automatically

23   accept it --

24        Q.     Okay.

25        A.     -- as the honest truth.

Q.     All right.  Some rules that apply in every

capital murder case are -- or not every capital, every

criminal case, the presumption of innocence.  A person

that's at the beginning of the trial the jury has to presume

him to be innocent.  The fact that he's been arrested,

indicted, or even that we're going through this jury

selection process, is no evidence of his guilt.  Jurors have

to start out with that presumption and the State must

overcome that by presenting the evidence.  Do you feel you

could follow that rule of law?

A.     Yes.

Q.     Now, this case received a lot of publicity.

Every juror, virtually every juror, has read or heard

something about it, so we ask every juror about that.  What

do you recall seeing on the TV or following the news when

this happened?

A.     I remember there being a jail break and those

who had broken out had been pursued for days, if not weeks.

And I believe that they were implicated in a robbery, as the

paperwork we've seen states, of a sporting goods store, and

that a police officer responding was killed.  And the

escapees were later captured in Colorado and returned.

Q.     Did you follow any of the subsequent court

proceedings on any of the cases or any of the other

defendants?

1          A.      No.

2          Q.      Okay.  The bottom line is this.  The jurors

3    cannot -- it doesn't make you ineligible to be a juror

4    because you have seen something on TV or read something in

5    the paper.  Otherwise, we couldn't get a jury in high

6    publicity cases, if that were the rule.  But you have to

7    only make your decisions based on what you hear in the

8    courtroom from the witness stand.  We can't ask you to

9    forget about what you have read or heard, but we have to ask

10   you not to let that influence you in any way.

11               People form opinions about what they

12   read, but they can't let those opinions influence their

13   decisions in the case they are sitting on.  And that's just

14   a common sense approach.  Obviously, it's not always the

15   most accurate version of what happens when it's reported in

16   the newspapers right away.  The -- is going to be more

17   accurate when a witness actually testifies.

18               But the bottom line is we just ask each

19   juror how they honestly feel.  Only you can tell us, if you

20   can follow that particular rule of law.  Do you feel you

21   could sit as a juror in this case, if chosen, and make your

22   decisions just based on what you hear in the courtroom and

23   not let what you have seen or heard prior to this influence

24   your decisions?

25          A.      Yes.  I don't pay a lot of attention to the

1  news.  I try to avoid it.  It depresses me.  So I don't come

2  into this with a lot of knowledge of this case, only the top

3  line.

4      Q.      The burden of proof in this case is on the

5  State of Texas as in every criminal case and it never shifts

6  to the defense.  You might want to hear from the defense,

7  would anticipate they'll put on a case, but they're not

8  required to under law and you, as a juror, can't require

9  them to prove their client's innocence, because the burden

10  of proof never leaves this table.  Could you follow that

11  rule of law?

12      A.      Yes.

13      Q.      The burden of proof goes to each and every

14  portion of the indictment.  We have to prove every element.

15  We write the indictments.  We're responsible for it.  If we

16  fail on any portion of the indictment, you have a reasonable

17  doubt, you are obligated under law to find the defendant not

18  guilty.  Could you follow that rule of law?

19      A.      Yes.

20      Q.      That includes even the county.  We give an

21  example of Dallas County.  That under the law is as

22  important as who committed the crime or how they committed

23  the crime or who they murdered.  If you have a reasonable

24  doubt about Dallas County, perhaps it was a case that

25  occurred near the border.  You believe the evidence showed

1    it may happen in Tarrant County.

2                         That would show poor preparation on our

3    part, but as a juror you can't give us one of the elements.

4    You have to, if you had a reasonable doubt, even about that

5    element, you'd be obligated to find the defendant not

6    guilty.  Could you do that?

7         A.      I'm a little bit confused about that and what

8    it encompasses.

9         Q.      Well, what the indictment -- what we basically

10   have to do is prove who committed the crime, how they did

11   it, who they murdered, and where.  And some people view the

12   "where" as kind of a technicality.  You know, they look, the

13   important part is who did the murder and who did they kill

14   and can you prove it to me.  But the way -- and the reason

15   it comes down that we have to prove jurisdiction is every

16   county has their own District Attorney.  And we can only

17   prosecute the cases in our county.

18                         And I use that example because -- and I

19   don't anticipate it will happen, but it's a good example to

20   demonstrate how the law forces the State to prove every

21   portion of that indictment, not just who committed the

22   murder, but every portion of it.  And if you had a

23   reasonable doubt, not, you know, maybe we proved everything

24   in your mind about who committed the murder, how they did,

25   the date, but you believe this thing happened, you had a

1    reasonable doubt about it happening in Dallas County, the

2    evidence may have showed it happened in Tarrant County,

3    under the law you would then be obligated to find the

4    defendant not guilty, because you would have a reasonable

5    doubt on just one of the elements.

6              Again, I don't anticipate that to happen,

7    but I use that example just to demonstrate how the law

8    works.  If that did happen, I'm sure we would be out of our

9    jobs the next day and you would have every right to, you

10   know, go demand we be fired.  But you can't help us out as a

11   juror.  You'd have to -- it's kind of like being a referee

12   or an umpire in a baseball game.  You just have to call the

13   balls and strikes as you see them.

14             Do you feel you could follow the law in

15   that regard and require the State to prove to you each and

16   every element, even Dallas County, beyond a reasonable

17   doubt, and if we failed in that, could then find the

18   defendant not guilty?

19        A.    Yes.

20        Q.    Okay.  Fifth Amendment often comes up.  If

21   anyone is charged with an offense, they have an absolute

22   right to testify and no one can stop them.  But if they

23   choose not to, if they choose to exercise their Fifth

24   Amendment privileges, the Judge would instruct you that you

25   can't hold that against him in any way.

1                You can't consider that as evidence

2   because there could be numerous reasons why someone may not

3   testify.  They may not do well in front of people.  They may

4   be poorly educated.  May have some type of speech

5   impediment, I don't know.  They might look guilty when

6   they're not.  They could be just following their lawyer's

7   advice.  They could be very guilty and would look worse.

8                The law takes care of that by instructing

9   the jurors not to consider that in any way.  Do you feel you

10  could do that?

11         A.       Yes.

12         Q.       Oftentimes parole laws come up in the media.

13  The Judge would instruct you --

14         A.       What?

15         Q.       Parole laws.

16         A.       Parole laws, okay.

17         Q.       In a capital murder situation, the Judge would

18  instruct you that a capital life sentence means a defendant

19  would have to serve forty calendar years before they became

20  eligible for parole.  Then that doesn't even mean they would

21  be paroled.  But then he would also tell you that you can't

22  consider that or any of the other parole laws in your

23  decisionmaking process.  You can't come into your

24  deliberations because we and he and the jury doesn't have

25  any control over the parole laws.  You just have to consider

1  a life sentence, a life sentence, during your deliberations.

2  Could you follow that rule of law?

3      A.    Yes, I could.

4      Q.    Okay.  Obviously, police officers often

5  testify.  The law says and people respect the job they do,

6  but you can't start them out ahead of other witnesses.  You

7  have to wait for them to testify and then base your

8  decisions on their credibility.  Do you feel you could

9  follow that rule of law?

10      A.    Yes.

11      Q.    Okay.  The bottom line on these questions is

12  you have to wait, listen until all the evidence is in, and

13  then make your decisions.  There aren't any automatic

14  answers.  We've gone over that.  It's that the law

15  contemplates that the jurors will wait, weigh them all, and

16  answer them separately, and I believe you said you could do

17  that.

18      A.    Yes.

19          MR. SHOOK:  I'd like to have just one

20  moment, Judge.

21      Q.    (By Mr. Shook)  Well, we covered a lot of

22  ground.  Do you have any questions over anything we've gone

23  over?

24      A.    No, I don't.

25      Q.    Okay.  Well, I appreciate your patience.

1          MR. SHOOK:  That's all the questions I

2   have.  And we'll pass the juror, Your Honor.

3          THE COURT:  Ms. Busbee?

4          CROSS-EXAMINATION

5   BY MS. BUSBEE:

6      Q.   Good morning, Mr. Smith.  Usually we don't

7   take so much time with all the jurors we have in the

8   morning, but we've been doing it today, and I appreciate

9   your patience with us.  It's kind of tedious to be asked

10  questions about something that, we're just now informing you

11  of what the law is after having asked you all these

12  questions back in May.

13          I have some questions about some things

14  you had in your questionnaire and some things that you

15  discussed with Mr. Shook.  First of all, I don't know

16  exactly how you put it, but you were asked if you had always

17  had this opinion about the use of the death penalty and you

18  had some -- you mentioned something about what you had

19  learned in your family or through your family.  Could you

20  elaborate on that?

21     A.   I can't recall specifics, but I believe at one

22  time, at many times, one or another of my parents, who, of

23  course, influenced me, as all of our parents did, were

24  believers in capital punishment.  The subject arose.  I

25  don't recall them ever expressing any doubt about it.

1    Q.    Okay.  And while we're talking about your

2  family, your cousin who was a District Attorney in Colorado,

3  what county?  Is it a he?

4    A.    She.

5    Q.    A she.  What county does she work in?

6    A.    I don't know.

7    Q.    Okay.  And you never had any discussion with

8  her about this particular case?

9    A.    No.  I was told by my father that she had

10  appeared on television.

11    Q.    How often do you see this cousin?

12    A.    I can't remember the last time I saw her.

13    Q.    What else did your father say?  Anything that

14  she may have said or --

15    A.    No.  I believe he called her to tell her he

16  had seen her on television.

17    Q.    But you didn't know anything else about her

18  appearance?

19    A.    No.

20    Q.    Okay.  What's her name?

21    A.    First name is Janelle.  I don't know her last

22  name.  I'm not even certain if she's married.

23    Q.    Okay.  Not real close.  Okay.  You know, you

24  used an interesting word because it's a word that the

25  Supreme Court of the United States has used in discussing

1  certain death penalty issues and that was "proportionate."

2  And I'm not sure what you mean by that, because you are very

3  precise in your language.  But that, you just put

4  proportionate.  Could you elaborate on that or expand on

5  that a little bit?

6        A.     That grew from a conversation, probably more

7  of a debate, that I had at a dinner table with someone who

8  believed that the death penalty would be appropriate for

9  someone convicted of rape.  And while I understood her

10  feelings on the subject, I couldn't quite square that in my

11  mind.

12             And later I learned from an article I

13  read that the argument there is if you have the death

14  penalty for a crime that is not the actual deliberate

15  killing of someone, then you introduce disproportionality.

16  In other words, if a rapist knew he would be executed for

17  his crime, it would give him another incentive to kill his

18  victim to eliminate what is usually the only witness.  And I

19  saw that there was a certain proportionality involved there

20  in the punishment.

21        Q.     Okay.  And that leads me right into my next

22  question.  I mean, we had discussed with you, and the State

23  has indicated to you, that they are prosecuting this case as

24  an accomplice, as opposed to someone who actually committed

25  the murder.  And you had some thoughts about that.  But I

1  don't think that anybody let you tell us your whole feeling

2  about it.  And I'm not asking you at this point as to

3  whether or not that person may be guilty of capital murder.

4         It's a pretty commonly held belief that

5  if you are a party, in other words, you participate, aid,

6  abet, encourage, assist -- I can't remember all the words in

7  the statute.  But if you're involved in a case and not, you

8  know, just an innocent bystander or a duped bystander in

9  their example, would you share the same guilt for the

10  commission of that offense?

11         My question goes to the punishment issue.

12  What would make a death penalty in your mind in the proper

13  proportion, if you will, for an accomplice?

14     A.    I would have to answer the question, did the

15  accomplice know that there was a possibility that a murder

16  would be committed?

17     Q.    Okay.  Well, and that brings me, of course, to

18  Special Issue No. 2.  The law requires that the State prove

19  that they did anticipate, as opposed to should have or ought

20  to have.  And if you are uncomfortable with that, you can

21  tell us.  There's no right or wrong answers.  The reason

22  that we spend this time, so much time with people, is that

23  it's a very important decision.

24         And because it involves life or death

25  issues, people's emotions are more involved than they would

1   be in deciding whether someone had written a hot check or

2   driven drunk.  So, in your scheme of things, it wouldn't

3   need to be proved to you that they actually did anticipate

4   that a life would be taken.  Is that what you're telling us?

5        A.      You are doing some fine parsing of definitions

6   here.

7        Q.      Doesn't it?

8        A.      There does seem to be a lot of burden on the

9   State to show anticipation rather than, for example,

10  possibility.

11       Q.      Right.

12       A.      In my view, if one knows that something could

13  happen and fails to take action to prevent it, knowing that

14  it's a bad thing, then one's guilty.

15       Q.      Okay.  And you would in your scheme of things

16  would -- would authorize the death penalty for that?

17       A.      In a case of capital murder, yes.

18       Q.      Okay.  I thought that's what I was hearing,

19  kind of between the lines, if you will, of the discussion

20  you were having with Mr. Shook.  But --and lots of jurors

21  say that to us, not as well as you have, but some in the

22  same vein.  If I have determined that somebody is guilty as

23  a party to the offense, of the offense of capital murder,

24  you have already decided that that person should have known,

25  because that's one of the things that you have to decide to

1    find them guilty.

2              You're telling me that in the way that

3    you think of the proper case, should have anticipated that a

4    life would be taken is enough.  You don't need to hear that

5    they, or have it proved to you, that they did anticipate?

6         A.    The difference between should have anticipated

7    and did anticipate, I think, depends on the facts, and the

8    knowledge available to --

9         Q.    Certainly.

10        A.    -- to the defendant.

11        Q.    But I'm probing you so painfully about this

12   because if, in your feelings, I'm not comfortable with that,

13   but it's the best way to put it, if your gut feeling is, if

14   I found out or found that they should have anticipated, you

15   don't have to prove to me necessarily anymore that they did

16   anticipate.  They should have anticipated and did

17   anticipate.  I'm not really asking that right.

18             They have to prove to you that they did

19   anticipate.  You have said to me in your scheme of things,

20   if someone should have anticipated.  So the law says they

21   have to prove to you more in order to answer that question

22   yes, which would affect, you know, affect the death

23   sentence.

24             You're saying to you, should have

25   anticipated is enough?

128

A.      On further thought here, I'm seeing the distinction you're making.  And if the State has to prove that one did anticipate that a life would be taken, then I have to go with the State on that, with what they are required to do.

Q.      In other words, you would make them prove to you?

A.      Yes.

Q.      Okay.  Fair enough.  My throat is dry today is why I'm drinking so much water.  I know you know something about this case, everyone does.  And I just have to ask you, because you've been honest with us in everything else that you've told us, if you haven't kind of predecided whether or not you think that the defendant would be a future danger, based on what you know of the case?

A.      No.  I know -- I know nothing about the defendant.

Q.      Okay.  Fair enough.  I want to talk to you a little bit about this mitigation issue.  And you made really an interesting comment because you -- most people have not given the death penalty much thought, even in between filling out this questionnaire and coming down here.  It sounds to me like you have given it some thought, even prior to the time that you filled out the questionnaire.

But in our scheme and in our hypothetical

```
1   capital murder that we're grilling you about, after having
2   found the defendant guilty of the offense of capital murder
3   and finding a future danger and that that person did
4   anticipate that a life would be taken, would your mind be
5   closed to giving a life sentence?
6         A.   Don't we have one more?
7         Q.   Well, and that's the question.  Would there be
8   any way that you would give that person a life sentence?
9         A.   I can't rule that out.  I just can't rule that
10   out.
11         Q.   Okay.  What -- I know we asked you or the
12   State asked you some questions about whether you thought
13   this, that, or the other was mitigating.  And having been
14   here another 30 minutes, can you think of some things that
15   you might consider as mitigating?
16         A.   I haven't given enough thought to give you an
17   answer to that question.
18         Q.   You mentioned something having to do with the
19   personal moral culpability of the defendant.  Could you
20   expand on that a little bit more?
21         A.   Well, I believe each of us has the ability to
22   understand the consequences of our actions.  We have the
23   ability, whether we choose to practice it or not, is up to
24   us.  If one, perhaps, from a mental defect does not have
25   that capability, and the only examples I can think of would
```

1  be people who are probably in institutions now because

2  they've shown that they don't have that ability and they get

3  into trouble because of it, that would be a factor if one

4  doesn't understand the consequences of one's actions.

5        Q.    Well, now, let me take you there, then.

6  Someone who doesn't understand the difference between right

7  and wrong, wouldn't be here, because they would or someone

8  who is mentally retarded would not be here.  So that's not

9  really the class of people that we're talking about in this

10  consideration.

11              So other than that, would there be any

12  kind of mitigation that would -- that you would ever

13  consider that would -- that would cause you to vote for a

14  life sentence as opposed to a death sentence?

15        A.    I can't rule out that there would be something

16  that I would consider, just because those things have not

17  been presented to me in the past.

18        Q.    Certainly.  Well, we're actually -- we're

19  probably not supposed to suggest any of these things to you,

20  but it's almost impossible to ask someone about this

21  without, you know, discussing possibilities, because it's

22  such a vague question and you can't see what you are going

23  to receive in the future.  But, you know, the defense is

24  entitled to a juror who is open to that.  And that's kind of

25  why I'm asking you that, because you seem kind of reluctant

1   to consider anything in mitigation.  Is that a fair

2   statement?

3        A.    I'm 38 years old.  And as I've gotten older,

4   I've learned that there's a lot I don't know and there's a

5   lot I do know.  And so I don't come in here in the belief

6   that I know all I need to know to make a decision.  And so I

7   guess what I'm trying to tell you is, I'm willing to listen

8   to the case and I'm willing to listen to what you and as

9   well as the State believe are these mitigating

10  circumstances.  I don't have prejudgments on those things.

11       Q.    So you are telling us that you could vote for

12  a life sentence, as opposed to a death sentence?

13       A.    I could do that.

14       Q.    Just one more thing, Mr. Smith.  You seem

15  bothered by some questions that the district attorney asked

16  you about what he's calling technicalities, but let me pose

17  this to you.  If you heard a case where the State -- the

18  person was clearly guilty, and -- but the State had, through

19  inadvertence or maybe because a witness testified to

20  something that maybe they hadn't anticipated, but there was

21  a reasonable doubt as to something they were required to

22  prove, would you say, well, this just doesn't seem like

23  justice, but the law requires me to say not guilty.  Could

24  you do that?

25       A.    Yes, I could.

1   Q.   Now, is there anything you want to say to us

2   about this scheme or anything that you think we may find

3   important, either side?  We got to ask you a lot of

4   questions.  I'm just curious.

5   A.   I'll probably have lots of questions on the

6   drive home.

7   Q.   You are doing a whole lot better than most

8   people do, because -- I don't know if you speak for a living

9   or are just comfortable expressing your views.  But some

10  people are just like deer in the headlights and they aren't

11  able to talk very much.  Well, I appreciate your time, sir.

12              MS. BUSBEE:  There's all the questions I

13  have of this juror.

14              THE COURT:  Thank you, Mr. Smith.  If you

15  will stand outside for just a few moments, we'll have you

16  back.

17                   [Prospective juror out]

18              THE COURT:  What says the State?

19              MR. SHOOK:  State has no challenges for

20  cause.

21              MS. BUSBEE:  Defense has no challenge for

22  cause.

23              THE COURT:  Would you like a moment?

24              MS. BUSBEE:  Not really.

25              THE COURT:  State will accept the juror.

1    MS. BUSBEE:  We'll exercise a preemptory

2    challenge, Your Honor.

3    THE COURT:  Ask Mr. Smith to come back

4    in, please.

5    [Prospective juror in]

6    THE COURT:  Mr. Smith, we want to thank

7    you for your very thoughtful and very honest and open

8    answers.  The parties have agreed they are not going to seat

9    you on this jury.  Our jobs would be a whole lot easier, if

10   we had enough people like you to come in and understand the

11   issues as quickly, but this case is not going to be for you.

12   THE COURT:  Next juror is juror No. 3822,

13   Maurene Hill.  Mr. Shook?

14   MR. SHOOK:  Judge, we can agree on juror

15   Maurene Hill, letting her go.

16   MS. BUSBEE:  We do.

17   THE COURT:  The Court does not appreciate

18   scheduling jurors down to the court and then having the

19   parties agree especially -- further review these

20   questionnaires before we run into a problem.  And I hate the

21   aggravation of bringing these folks down.  I will

22   reluctantly allow the parties to agree to excuse juror No.

23   3822.

24   Juror No. 2746, currently scheduled for

25   Tuesday, September 30, at 1:30, Ms. Lela Allison, has been

1  in contact with the Sheriff.   Sheriff Cook, would you please

2  state on the record your conversation with Ms. Allison?

3                          SHERIFF COOK:   Ms. Allison contacted the

4  Court about three and a half weeks ago to inform us that she

5  was currently being treated for pneumonia by her doctor.

6  She had already been to the hospital once.   And upon talking

7  with Ms. Allison yesterday, which was some three and a half

8  weeks after my first discussion with her, she has been

9  hospitalized again since that day and is still being treated

10  by her doctor for pneumonia and is not improving.

11                          THE COURT:   What says the State?

12                          MR. SHOOK:   State can agree to excuse the

13  juror.

14                          MS. BUSBEE:   As can the defense.

15                          THE COURT:   Be so kind as to call

16  Ms. Allison back and tell her to get well.

17                          SHERIFF COOK:   We will do that.

18                          [End of Volume]

19

20

21

22

23

24

25

STATE OF TEXAS            *

COUNTY OF DALLAS          *

I, NANCY BREWER, Official Court Reporter for the 283rd Judicial District Court, do hereby certify that the above and foregoing constitutes a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

WITNESS MY OFFICIAL HAND on this the ___4___ day of ___March___, 2004.

NANCY BREWER, CSR, NO. 5759
Expiration Date:  12-31-04
Official Reporter, 283rd JDC
Frank Crowley Crts. Bldg. LB33
133 No. Industrial Blvd.
Dallas, TX 75207
(214)653-5863

REPORTER'S RECORD

VOLUME 24 OF 6( VOLUMES  74851

TRIAL COURT CAUSE NO. F01-00328-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

INDIVIDUAL VOIR DIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

FILED IN
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 30th day of September 2003, the following
proceedings came on to be heard in the above-entitled and
numbered cause before the Honorable Vickers L. Cunningham,
Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

## A P P E A R A N C E S

<u>APPEARING FOR THE STATE</u>

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:   214/653-3600


<u>APPEARING FOR THE DEFENDANT</u>

Ms. Brook Busbee
Attorney at Law
SBOT: 03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT: 00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Nelda Pitts | 4 | 5 | | 24 |
| Sandra Geeslin | 14 | 17 | | 24 |
| Gayle Melara | 19 | 20 | | 24 |
| Carol Cunningham | 29 | 31 | 69 | 24 |
| Bonny Martin | 97 | 99 | | 24 |
| Jan Anderson | 112 | 116 | | 24 |

P R O C E E D I N G S

THE COURT:  Ms. Nelda Pitts.

[Prospective juror in]

THE COURT:  Good morning, how are you?

PROSPECTIVE JUROR:  Good morning, sir.

THE COURT:  We have juror No. 2558, Nelda Charline Pitts.  Good morning, Ms. Pitts.  Thank you for being here early.  We take -- we schedule three people in the morning and three in the afternoon and whoever is first gets to go first.  So we'll be out of here long before the others get started.  Have you had enough time to read the guide I prepared for you?

PROSPECTIVE JUROR:  I did read it, yes.

THE COURT:  You're not supposed to understand it all right now.  That's what this opportunity this morning is, is for the attorneys to visit with you and help you understand how all this law relates.  And if you have questions, this is the time we want you to ask questions, so you'll begin to understand the scheme we're talking about.

Did you also have time to review the questionnaire that you filled out for us back in May?

PROSPECTIVE JUROR:  I got about halfway through it.

THE COURT:  All right.  Once again, the

1  idea is if they ask you a question, what were you thinking

2  about when you answered this back in May, you can review it

3  and think about that again.

4            There are no wrong answers today, just

5  honest ones.  Please, if you don't understand a question,

6  people come in that are kind of a little nervous, this is a

7  whole lot more stressful for folks than the jury service

8  downstairs where you were one of 700 people.  This is the

9  most informal way we can do it, but it's the only way that

10  we can properly bring you up to speed as to the law.

11            At the end of the process I have two

12  questions I have to ask you.  First question is, do you

13  understand the law?  Second is, can you follow the law?

14  That's the big picture I have for you.

15            The only question I have for you at this

16  time is will you be able to serve this Court for two weeks

17  beginning on November 10th?

18            PROSPECTIVE JUROR:  Yes.

19            THE COURT:  Thank you very much.

20  Mr. Shook?

21            MR. SHOOK:  May it please the Court?

22            NELDA PITTS,

23  having been duly sworn, was examined and testified as

24  follows:

25            DIRECT EXAMINATION

BY MR. SHOOK:

    Q.    Ms. Pitts, my name is Toby Shook.  I'm going to be asking you questions on behalf of the State this morning.  And, as the Judge said, there aren't any right or wrong answers.  We're just looking for your honest opinions.  I want to go over some of the things that were on your questionnaire, do some followup there, and then talk about the capital murder situation, your opinions on that, and some of the rules and laws that might apply to this case.  If you have any questions at any time feel free to ask, okay?

           Looking at your questionnaire, I see you were born and raised in Wichita Falls and have lived there, looks like 50 years, and you've lived in Dallas County for about the past six years or so?

    A.    Yes, I believe so.

    Q.    What caused you to come to Dallas County?

    A.    My little mother moved to the Dallas area and she's way up in years, and I thought it best.

    Q.    Okay.  Kind of keep watch over her, that sort of thing?

    A.    (Prospective juror nods head.)

    Q.    And you work for, is it, Inverness --

    A.    Yes.

    Q.    -- Corporation?  What do you do with them?

1    A.    This is a branch of a jewelry company based

2 out of the United Kingdom, and I'm in the ear piercing

3 division.

4    Q.    Okay.  And you've been with them for some

5 seven and a half, I guess close to eight years?

6    A.    Somewhere about.

7    Q.    All right.  Have you been down on jury duty

8 before and actually served on a jury?

9    A.    Yes, I have.

10    Q.    What type of case was that?

11    A.    It was several years ago across the way over

12 here, and it was, gosh, I really don't know what type you

13 would call it, but a man had bought a business and was --

14 some things were misrepresented.

15    Q.    Okay.  Some type of civil lawsuit?

16    A.    I assume so, yeah.

17    Q.    Did the jury actually reach a verdict?

18    A.    Yeah.

19    Q.    Okay.  How did that come out?

20    A.    In his favor.

21    Q.    Okay.

22    Q.    How did the deliberations go?  Was it

23 something where y'all argued a bunch or did the case seem

24 pretty cut and dried to you?

25    A.    Well, there was some arguing, but I don't

1    think it went on and on.

2         Q.    Okay.  Nothing too unpleasant or anything like

3    that?

4         A.    No.

5         Q.    Sometimes we talk to jurors and the last thing

6    they want to do is be on another jury because of the

7    horrible jury experience they've had, arguing, and that sort

8    of thing.  But it doesn't sound like you had that situation.

9    You've never been down on a criminal case, though?

10        A.    No.

11        Q.    Okay.  We ask in the questionnaire about if

12   you've known anyone that's been a victim of violent crime,

13   and you made a note about an aunt that had been murdered a

14   number of years ago.

15        A.    (Prospective juror nods head.)

16        Q.    Tell us a little bit about that situation.

17        A.    Gosh, it was mid-40's, so before you were

18   born.  She was murdered by her husband.

19        Q.    Okay.

20        A.    And he was sent to the penitentiary.

21        Q.    Do you recall how long he was sent to the

22   penitentiary?

23        A.    Well, he served nine years.  He was given 99.

24        Q.    Okay.  And did that occur, where did that

25   occur, here in Texas?

1       A.      Wichita Falls, Texas.

2       Q.      Okay.  Did y'all ever have any contact with

3   him after he was released, anything like that?

4       A.      You mean personal contact or knew where he

5   was?

6       Q.      Any, did you ever come across him anymore?

7   Have to deal with him at all?

8       A.      No.

9       Q.      Okay.  I take it you think that the sentence

10  was fair, but his early release may have been a problem, if

11  he only served nine years on that type of thing?

12      A.      Absolutely.

13      Q.      Okay.  Those laws have changed somewhat over

14  the years and I'll talk about that in a little while as it

15  applies to a capital murder case, because that comes up.

16  People have opinions on the parole laws from time to time.

17              Let me talk to you a little bit about how

18  you feel about capital murder.  As far as the law goes, do

19  you favor the death penalty as a law?

20      A.      Yes, I do.

21      Q.      Can you tell us in your own personal

22  viewpoints on it why you favor it, the purpose you feel it

23  serves society?

24      A.      I just strongly believe in it.  I can't think

25  of any real reason why I believe in it.

Q.    Do you think it's a just sentence for certain crimes?

A.    Just sentence?  Absolutely.

Q.    Has it been a law you've believed in your entire adult life?

A.    Most of my life, yes.

Q.    Okay.  You said in your questionnaire that you did follow a lot of some crimes, local and national crime stories.

A.    Well, the high profile things.

Q.    Any of them come to mind, names of the defendants or the particular crimes recently that you followed in the past couple of years?

A.    Well, I don't know any names.  One thing that I remember was the case where the gal drove the guy in the windshield home.

Q.    Right over there in Ft. Worth?

A.    Uh-huh.

Q.    Okay.  And, obviously, this case received a lot of publicity when it occurred and I think almost every juror, except maybe one or two, have in their questionnaires said that they've read or seen something on TV, which doesn't make you ineligible to be a juror.  Obviously, if that were true, then we could never seat a jury.

But we like to ask each juror what they

1  recall about hearing about the case, what they saw on TV.

2  What is it of the details you recall at this time about what

3  you saw when it occurred?

4        A.     What we were just discussing, this particular

5  case?

6        Q.     On this, on this case here involving the Texas

7  Seven case, involving the officer that was shot at the

8  Oshman's.

9        A.     Oh, what do I recall about it?

10        Q.     Yes, ma'am.

11        A.     Well, the fact that they escaped from prison,

12  had someone set them up with a vehicle at a Wal-Mart parking

13  lot, the incident in Irving, ending up in Colorado.

14        Q.     Did you follow any of the subsequent court

15  proceedings after the Colorado arrest?

16        A.     No, no, nothing.

17        Q.     And as I said, most of the jurors have read or

18  seen something on TV about this story, which doesn't make

19  you ineligible to be a juror.  The rule of law that applies

20  in these cases is if you were to sit on a jury, you'd have

21  to make your decisions just based on what you hear in the

22  courtroom from the witness stand, not on something you saw

23  on TV or read in the newspaper.

24        Obviously, we can't ask you to forget

25  what you've seen, but you have to be able to tell the Judge

that you're not going to let that influence your opinions, that you'll make your decisions based on the evidence and the witnesses that are actually here in the courtroom.  Just common sense will tell you that's where your better evidence is going to come.  The newspapers aren't always accurate.  The TV shows aren't accurate.  Your more accurate evidence will come from the actual witnesses when you get to hear them testify and judge their credibility.

Will you be able to follow that rule of law?  And if you were chosen as a juror and right now, of course, we have to deal with it hypothetically, but if you were chosen as a juror, would you be able to make your decisions just based on the testimony you hear here in the courtroom?

A.     Sir, I'm not sure.

Q.     Okay.  What -- and what are you not sure about?

A.     In my mind I may have already made my decision.

Q.     Okay.  As far as the guilt, or --

A.     Yes.

Q.     Okay.  And that's the bottom line is, we just have to depend on each juror to tell us.  Some can follow that rule of law and tell the Court, I'll wait and make my decision based on the witnesses.  Others tell us sometimes

no, I think I've already formed an opinion that's going to

influence my decision before I hear any evidence.

And that's the bottom line is, obviously,

we have to have twelve jurors who are not going to have

their opinions influenced by anything they've read or heard

on TV, that can wait and make their decisions based on the

actual evidence.  But only you can tell us that.  As best

you know yourself, do you feel that you could follow that

rule of law and make your decision just based only on the

witnesses here in court?

A.      I probably have already made my mind up.

Q.      Okay.  And that's as far as the guilt of the

defendant?

A.      (Prospective juror nods head.)

Q.      Is that based on what you've already seen in

the news coverage and that sort of thing?

A.      Yes.

Q.      Okay.

MR. SHOOK:  Judge, that's all the

questions I have.

MS. BUSBEE:  I believe we have reached an

agreement on this juror.

THE COURT:  Ms. Pitts, thank you for

being honest, very much so.  But we can't seat you on this

jury because you know too much.  Okay?  Thank you much.  You

1    are free to go.

2                    [Prospective juror out]

3                THE COURT:  Ms. Geeslin.

4                    [Prospective juror in]

5                THE COURT:  Good morning.  How are you?

6                PROSPECTIVE JUROR:  I'm fine.

7                THE COURT:  We've got juror No. 2559,

8    Sandra Lavell Geeslin, is that pronounced correctly?

9                PROSPECTIVE JUROR:  Yes, sir.

10               THE COURT:  Welcome to the 283rd.  Thank

11   you for being here on time this morning.  Have you had

12   enough time to review the guide I provided for you?

13               PROSPECTIVE JUROR:  I'm sorry?

14               THE COURT:  Have you had enough time to

15   review the orientation guide I provided for you?

16               PROSPECTIVE JUROR:  Yes, sir.

17               THE COURT:  I also provided a copy of

18   your questionnaire that you filled out for us back in May.

19   The attorneys may want to refer to a question that you've

20   answered and ask you to explain or expound upon your

21   answers.

22                    People come in and they're kind of

23   nervous when they come in this morning like a deer in the

24   headlights, when all of a sudden you might think you're

25   coming in to another group meeting of about 700 or so people

1   downstairs and all of a sudden you find that you're the

2   focus of attention.  Please try not to be nervous.  The best

3   thing about this is there are no wrong answers, just honest

4   ones.

5                     At the end of the process I have two

6   questions I have to ask.  Number one is do you understand

7   the law?  And number two, can you follow the law?  I've

8   given you the law up front.  It's a lot to understand and

9   the attorneys are going to visit with you about that and

10  help you understand how it relates to this process.  And

11  then please, please ask questions, if you don't understand.

12  This is your opportunity to understand what the law is.

13  Fair enough?

14                     PROSPECTIVE JUROR:  Fair enough.

15                     THE COURT:  Okay.  With that,

16  Mr. Wirskye, would you like to inquire?  Oh, I have a

17  question, I'm sorry, I didn't ask.  Will you be able to

18  serve this Court for a period of two weeks beginning on

19  November 10th?

20                     PROSPECTIVE JUROR:  No, sir, I won't.

21                     THE COURT:  And why not?

22                     PROSPECTIVE JUROR:  Just recently, in

23  fact, last week, I have a sister which is 79 that just had

24  two strokes and she is not able to wait on herself.  I have

25  a brother-in-law that just also got out of the hospital and

1  he has a heart problem.  His heart is at 40 percent.  He's

2  also disabled to wait on theirself.  And at this time I have

3  a nurse staying with them until the lady -- I have a lady

4  next door that I pay that stays with them during the day

5  while I work.

6              But I have to be with them at night

7  because I have no one to stay with them at night and they

8  have to have 24-hour care at this time.  I also have to take

9  -- be able to take them to the doctor for their

10  appointments.  I'm the only one.  I live with them, so I'm

11  the only one that can do that.

12              THE COURT:  Ms. Geeslin, where do you

13  work, ma'am?

14              PROSPECTIVE JUROR:   I work for First

15  American Tax Service.

16              THE COURT:  And do you work full time?

17              PROSPECTIVE JUROR:  I work full time,

18  yes, sir.

19              THE COURT:  Well, I've got good news for

20  you.  We work business hours here and you will be able to go

21  home at 4:30 in the afternoon.

22              PROSPECTIVE JUROR:  Okay.

23              THE COURT:  So that won't interfere with

24  your ability to care for your family members.

25              PROSPECTIVE JUROR:   Okay.  What about

1  their doctor's appointments?

2              THE COURT:  Well, you'll just have to,

3  you know, work around that for the two weeks we're here,

4  just like you do at work.  I mean --

5              PROSPECTIVE JUROR:  Would I be able to

6  take them to their doctor's appointments?

7              THE COURT:  Well, not during those two

8  weeks you wouldn't be able to.  But as it gets further along

9  in the process, I can give you a better idea as to timing.

10 At this point I just need you to schedule the two weeks out,

11 and if you work normal business hours, then this won't

12 interfere.  It will interfere with your work, but it won't

13 interfere with your family obligations.

14             PROSPECTIVE JUROR:  Okay.

15             THE COURT:  All right?  Mr. Wirskye.

16             MR. WIRSKYE:  May it please the Court?

17                  SANDRA GEESLIN,

18 having been duly sworn, was examined and testified as

19 follows:

20                  DIRECT EXAMINATION

21 BY MR. WIRSKYE:

22      Q.    Ms. Geeslin, how are you this morning?

23      A.    I'm pretty good.  You'll have to speak up a

24 little loud.  I have a hearing problem a little bit.

25      Q.    Okay.

1       A.      If someone has their back toward me, I can't

2   hear as well.

3       Q.      Okay.  It sounds like you've got quite a bit

4   going on in your life right now?

5       A.      I do have my hands full.

6       Q.      And probably the last thing you need is to be

7   a juror on a death penalty case; is that right?

8       A.      Well, that would be the last thing.  But I

9   feel like it's my duty.

10      Q.      And we understand that and the Judge is under

11  certain restrictions.  He can't excuse you because of what

12  you've told him, your personal situation, but the lawyers

13  can get together and agree to excuse a person, if they've

14  got a lot going on like you do.  And I think both sides have

15  agreed to excuse you.  We know you've got other things you

16  need to be doing right now.  But we appreciate you coming

17  down, okay?

18      A.      Okay.  And thank you.

19      Q.      Thank you, ma'am.

20              MR. WIRSKYE:  Judge, that's all I have.

21              MS. BUSBEE:  For the record, we agree.

22              THE COURT:  Ms. Geeslin.

23              PROSPECTIVE JUROR:  Yes, sir?

24              THE COURT:  The attorneys can be a lot

25  nicer than I can.  But I sympathize with your family

19

1   situation and I hope they do recover, and they have agreed

2   to let you go.

3                       PROSPECTIVE JUROR:  Okay.  Thank you.

4                       THE COURT:  All right.

5                       PROSPECTIVE JUROR:  I'm sorry this

6   happened.

7                       THE COURT:  You can't help that.

8                       PROSPECTIVE JUROR:  Thank you.

9                       [Prospective juror out]

10                      THE COURT:  Ms. Melara.

11                      [Prospective juror in]

12                      THE COURT:  Juror No. 2583, Ms. Michelle

13  Gayle or Gayla Melara?  How do you pronounce it?

14                      PROSPECTIVE JUROR:  Gayle.  Gayle.

15                      THE COURT:  Gayle Melara?

16                      PROSPECTIVE JUROR:  Uh-huh.

17                      THE COURT:  Good morning, Ms. Melara.

18  How are you?

19                      PROSPECTIVE JUROR:  Fine.

20                      THE COURT:  Have you had an opportunity

21  to read the guide I provided for you?

22                      PROSPECTIVE JUROR:  Yes.

23                      THE COURT:  And did you review your

24  questionnaire?

25                      PROSPECTIVE JUROR:  Yes.

1    THE COURT:  Well, I know that's a lot of

2  law to give someone first thing in the morning.  You don't

3  have to understand it all at this time.  The attorneys will

4  visit with you about that and help you get up to speed and

5  understand how it all relates to the process that we're in

6  the middle of.  There are no wrong answers, just honest and

7  truthful answers.  The only question I have for you at this

8  time is will you be able to serve this Court for a period of

9  two weeks beginning on November 10th?

10    PROSPECTIVE JUROR:  Yes.

11    THE COURT:  Thank you very much.

12  Mr. Shook, would you like to inquire?

13    MR. SHOOK:  Yes, Judge, thank you.

14    MICHELLE MELARA,

15  having been duly sworn, was examined and testified as

16  follows:

17    DIRECT EXAMINATION

18  BY MR. SHOOK:

19    Q.    My name is Toby Shook.  I'm going to ask you

20  questions on behalf of the State.  And, as the Judge said,

21  there aren't any right or wrong answers.  We just want your

22  honest opinions on these things, not a test of citizenship

23  or anything like that.  We bring a whole lot of people down

24  from the panel, as you probably recall, because people feel

25  differently about capital murder, the death penalty, and

21

1     this type of case.

2                    So, we just stress that you give us your

3     honest opinions, and if you have any questions at any time,

4     this is the time to ask, okay?

5                    Now, reviewing your questionnaire, you

6     were born and raised here -- well, not born, but raised here

7     in Dallas; is that right?

8          A.     Yes.

9          Q.     And how are you employed?

10         A.     Sonic Drive-in.

11         Q.     Okay.  What do you do with them?

12         A.     I'm partial owner.

13         Q.     Okay.  What type of company is that?

14         A.     It's a restaurant.

15         Q.     Okay.  And how often -- how many hours a week

16    are you working there?

17         A.     Thirty-five, forty.

18         Q.     Okay.  What hours is it open?

19         A.     What hours is the restaurant open?

20         Q.     Uh-huh.

21         A.     From 5:30 to 12:00.

22         Q.     What if you were -- our trial date is in

23    November.  If you -- and what we do is, the Judge, he runs a

24    pretty tight ship, whereas you'd be down here basically from

25    8:30 to 5:00 or so, or 9:00 to 5:00 during the week from

1    Monday through Friday.  What -- as far as your work

2    situation goes, would you be able, then, to leave that and

3    concentrate fully on this case at that point in time, as the

4    owner of that business?

5         A.    Um, I could.  My partner wouldn't like it very

6    much, but I could.

7         Q.    Okay.  It's inconvenient, obviously, for

8    everyone.  But we always run it by them, the fact that,

9    obviously, when we get the jurors down here, we have to have

10   them be able to concentrate on the evidence once you're down

11   here.

12        A.    I understand.

13        Q.    You feel you could do that?

14        A.    Yes.

15        Q.    Okay.  Let's -- I want to talk to you about

16   your questionnaire just a little bit.  I know it's been a

17   long time, so you probably don't remember your answers.

18        A.    Yeah.

19        Q.    But we like to follow up on some of them.  And

20   one of the kind of openended questions we ask at the very

21   last on the last page is how you would feel being chosen as

22   a juror.  And we get all kinds of different answers for

23   that.  But you said thrilled.  So I wanted to follow up with

24   that.

25        A.    I was being more sarcastic because I was tired

1  of sitting in that room for three hours.  I wouldn't mind

2  if, you know, I had to.  But, I mean, like you said, it is

3  an inconvenience.

4       Q.    Okay.  So you were just kind of kidding around

5  a little bit?

6       A.    I was being kind of sarcastic, yeah.

7       Q.    All right.  Also, talking about police

8  officers, you said that you -- the job's protecting the

9  community and you respected them for that, but you also had,

10  said sometimes they can be bossy and pushy.  And I was

11  wondering if that came from any personal experience, some

12  kind of negative experience you had with a police officer?

13       A.    Not really necessarily with me, just their

14  attitudes in general.

15       Q.    Is that from observing them?

16       A.    Yeah.

17       Q.    Or any particular incident comes to mind?

18       A.    Just hearsay, basically, and observing.

19       Q.    Okay.  Another question we ask is if the

20  criminal justice system fairly protects the rights of

21  persons accused of committing a crime.  And we asked if you

22  agree or disagree or if you're uncertain, and you put

23  uncertain on that.  And that means different things to

24  different people.  What did you mean by that, if you recall?

25       A.    Can you repeat that question?

Q.    The criminal justice system fairly protects the rights of the accused of committing a crime, the person on trial.

A.    I guess I put that because, you know, I'm not up to date on the laws and, you know.

Q.    Okay.

A.    Everything, so --

Q.    Let me ask you how you feel about capital murder in general.  Do you favor the death penalty as a law?

A.    In certain cases, in certain circumstances.

Q.    Okay.  What types of cases do you favor the death penalty?

A.    I think if somebody went out and murdered somebody on purpose and, I guess I'd say, a certain way, then the death penalty should be.

Q.    Brutal crimes?

A.    Yes.

Q.    That sort of thing?

A.    Uh-huh.

Q.    Have there been any cases you've followed in the media that you thought were appropriate for the death penalty, could be appropriate?

A.    None that I can recall.

Q.    Okay.  If it were up to you, would you have the death penalty for any crimes other than a brutal murder?

A.      Um, probably not.

Q.      Okay.   In Texas the capital murder statute has the death penalty reserved just for certain types of murder cases, murders that occur during a felony like robbing a clerk in a 7-Eleven, you shot the clerk, that could be a death penalty case.   During a burglary, during a rape, kidnapping.   Also, murder of a police officer on duty, a fireman on duty, could be a death penalty case.   Murder of a child under the age of six, murder of more than one victim, like a serial killer situation or mass murder.   And then murder for hire, someone does it for money.   Those could be death penalty type situations.

When we think of the death penalty, we usually think of an example in our mind, you know, of the actual triggerman.   But in a capital murder situation, more than one person sometimes commits that crime.   You can have accomplices.   You can have one triggerman, but you may have several people helping him at some point of the crime, just like you can in any crime.   Some may have a greater role than others.

But the law says in a capital murder, accomplices, if they are actively participating in the crime, could actually be held accountable, found guilty, and could even receive the death penalty, even though they didn't actually cause the death.

1               An example we use, it's kind of a bank

2 robbery example.  Let's say my partner and I, Mr. Wirskye,

3 decide we wanted to rob a bank.  We go to the bank and I

4 have a gun and I go in there, and the plan is for me to

5 point the gun at the tellers, and while I hold them at bay

6 and get their hands up, he's going to run through with a

7 sack and load up the money.

8               During the middle of that robbery, I

9 start shooting and kill one of the tellers.  Maybe I don't

10 like the way they're looking at me or he tells me one is

11 going for an alarm or something, and I intentionally murder

12 one of them.  And we get caught.

13               Now actually, obviously, I could be

14 prosecuted for the death penalty.  I could receive it.  But

15 the law says he's my accomplice and if he's actively

16 involved, he, too, could be prosecuted, could be found

17 guilty of capital murder, could actually receive the death

18 penalty, depending on the facts.

19               But jurors feel differently about that.

20 We have some jurors that are for the death penalty, but if

21 it were up to them, they would reserve it only for the

22 actual triggerman in a case who caused the death.  And for

23 the accomplice they might reserve a different type of

24 punishment, maybe a term of years in the penitentiary for

25 bank robbery or something like that.  But they don't feel

it's fair to prosecute an accomplice for the death penalty,
since they didn't actually cause the death.  They'd reserve
that punishment just for the murderer.

Other jurors feel differently.  Some of
them feel, no, an accomplice should be prosecuted for the
death penalty and ultimately could receive it.  But as the
Judge said, there aren't any right or wrong answers, and we
just kind of want to get your gut reaction to that.

How do you feel about the prosecution in
a death penalty situation on an accomplice, the
nontriggerman?

A.      I think they should be tried separately.  Not
with the death penalty, because he had intentions of robbing
the bank, and you did, too, at first.  But you changed your
mind and went balistic on the people, so.

Q.      So from your personal point of view, you would
reserve the death penalty just for the actual triggerman?

A.      Yes.

Q.      Okay.  And a lot of people feel that way.
That's why I kind of ask that openended question.  And let's
say we could make you Governor for a day.  First of all, if
you had the death penalty, you would reserve it only for the
actual triggerman; is that right?

A.      Yes.

Q.      And for an accomplice situation, you would

1    reserve some type of other punishment, prison time or

2    something, for that?

3          A.    Yes.

4          Q.    And is that something you feel pretty strongly

5    about?

6          A.    Yes.

7          Q.    Okay.  And the reason I ask that that way is

8    you can disagree with parts of the law.  You don't have --

9    that's why we kind of do this voir dire because some jurors

10   disagree.  And if you can't follow or agree with certain

11   parts of the law and you feel strongly enough about it, then

12   that would just simply cause you not to be a juror on this

13   type of case.  You could be a juror on another type of case

14   down the line.

15          And that's why we just want your honest

16   opinions.  So, if we were prosecuting -- I can't get into

17   the facts.  But if we were prosecuting this defendant as an

18   accomplice for capital murder, from your personal point of

19   view, that's just something you couldn't convict anyone of

20   if they're the nontriggerman and certainly couldn't consider

21   the death penalty for?

22         A.    Well, like I said, he didn't have intentions

23   of killing anybody.  But if there's a group together and

24   they have intentions of actually going to murder somebody

25   and they're all in on it, then I agree with the death

1   penalty for the accomplice.  But he wasn't going in there to

2   kill somebody.

3          Q.     Okay.

4                 MR. SHOOK:  Okay, Judge, I believe that's

5   all the questions we have.

6                 MS. BUSBEE:  Your Honor, we've reached an

7   agreement on this juror.

8                 THE COURT:  Ma'am, we thank you for

9   coming down.  The parties have agreed to excuse you.  You

10  will not serve as a juror in this case.

11                PROSPECTIVE JUROR:  Okay.  Thank you.

12                    [Prospective juror out]

13                    (Recess)

14                THE COURT:  Ms. Cunningham, please.

15                    [Prospective juror in]

16                THE COURT:  Thank you.  You may be

17  seated.  Good afternoon.  How are you?

18                PROSPECTIVE JUROR:  I'm fine, thank you.

19  And yourself?

20                THE COURT:  Doing pretty good.  We've got

21  juror No. 2780, Ms. Carol J. Cunningham.  Begs a question.

22  Any relations?

23                PROSPECTIVE JUROR:  No, sir.

24                THE COURT:  Where is your family from?

25                PROSPECTIVE JUROR:  I was born in Odessa.

1  Have lived in Ft. Worth most of my life, went to school

2  there.

3              THE COURT:  My family is from Paris on

4  the Cunningham side, so I don't believe we're related in any

5  way.

6              PROSPECTIVE JUROR:  I know we're not.

7              THE COURT:  Oh, okay.  You have to know

8  in small towns, you could very well be related.  We

9  appreciate you being here.  You were No. 3 scheduled this

10  afternoon, but we take whoever comes in first, goes first.

11  So you probably saved about an hour and a half, two-hour

12  wait by being here early.

13              PROSPECTIVE JUROR:  I was early.

14              THE COURT:  Did you have enough time to

15  read the guide I gave you?

16              PROSPECTIVE JUROR:  Yes, sir.

17              THE COURT:  I also gave you a copy of

18  your questionnaire so you can begin to think about the

19  issues that we're going to be dealing with, refresh your

20  answers that you gave the Court back in May.  And the

21  attorneys may want to follow up with you and explore a

22  little deeper your answers that you provided, so it's there

23  for you to refer to.

24              Please, ma'am, don't think you've got to

25  understand all the law right now.  That's what this period

1  of time is for.  The attorneys will visit with you, help you

2  understand how all this relates with what we're doing.

3  There are no wrong answers, just honest and truthful

4  answers.  If you don't understand, we'll take as long as it

5  takes to get you to the point where you do understand what

6  the law is.

7            There are two questions I have to answer

8  at the end of the day.  Number one is do you understand the

9  law?  Number two, can you follow it?  That's the big picture

10  I have to look at.  Fair enough?

11            PROSPECTIVE JUROR:  Yes, sir.

12            THE COURT:  Is there any reason why you

13  cannot serve this Court for the period of two weeks

14  beginning on November 10th?

15            PROSPECTIVE JUROR:  No reason.

16            THE COURT:  Thank you very much.

17  Mr. Wirskye, would you like to inquire?

18            MR. WIRSKYE:  May it please the Court?

19            CAROL CUNNINGHAM,

20  having been duly sworn, was examined and testified as

21  follows:

22            DIRECT EXAMINATION

23  BY MR. WIRSKYE:

24       Q.    Ms. Cunningham, how are you this afternoon?

25       A.    I'm fine, thank you.

Q.     My name is Bill Wirskye and I'll be the
Assistant DA that will be visiting with you for the next few
minutes.   I know sometimes it's a little bit intimidating
because we bring you in and put you up on the witness stand.
But because this is a case where the State is seeking the
death penalty, the law allows us to talk to jurors
individually, and that's why we do it this way in the
courtroom.   So to the extent possible, try not to feel like
you are on trial.

            What I'd like to do is maybe follow up on
some of the information that you were kind enough to give us
in that long questionnaire that you filled out back in May,
talk to you a little bit about your thoughts and feelings
about the death penalty, and then maybe visit with you a
little bit about some of the laws and some of the rules that
apply in criminal cases, and more specifically death penalty
cases.

            What went through your mind when you
found out that you had to come back for the individual
interview on a death penalty case?

Q.     A.     I thought, oh, no.

Q.     Why did you think that?

A.     Well, I just, I couldn't believe I had been
selected for this portion of it.

Q.     Okay.   Why did you think that?

1    A.    Because I guess I -- there was a question or

2    two in here that I did not fully understand, and I think I

3    specifically stated that.  And I didn't know, I guess you

4    never know how you're going to come across to other people

5    when you answer things like this.

6    Q.    Okay.  What we do, you know, we had that big

7    group down with you.  We had a morning group and an

8    afternoon group.  The lawyers got together and read all the

9    questionnaires and we kind of came to an agreement on who

10   we'd actually talk to individually, someone that, at least

11   on paper, both sides thought could be a good juror for this

12   type of case.  And so, in a sense you've already made one

13   cut to get to where you are.  You've had a chance to look at

14   your questionnaire; is that right?

15   A.    Yes, sir.

16   Q.    Okay.  What particular questions, going back

17   and looking at it, did you think you didn't understand or do

18   you remember which questions those were?

19   A.    Let's see, the bottom of page 4.

20   Q.    Okay.

21   A.    In the law in the State of Texas is voluntary

22   intoxication does not constitute a defense to the commission

23   of a crime.  Do you agree with this law and I said, yes.

24   And then I wrote, if a person voluntarily gets themselves in

25   this condition, they shouldn't be defended.  I don't believe

I understand this question.

Q.   Okay.  Basically, it's not a defense.  You can't come into court if you commit a crime and say, hey, I just did it because I got drunk, you know, voluntarily.  I was down voluntarily at the bar drinking beers.  That's not a defense to you being charged or convicted of a crime. Does that make sense to you?

Somebody puts something in your drink or slips you a Mickey or something, involuntarily intoxicates you, that would be a defense, because, you know, you didn't voluntarily choose to get drunk.  But if you voluntarily do it, it's not a defense to crime in Texas.  Does that make sense to you?

A.   Yes.

Q.   Okay.  And that's something that sounds like you agree with?

A.   (Prospective juror nods head.)

Q.   Or having a hard time or --

A.   Well, I had checked yes and I agree with what you said.

Q.   Okay.  Let me ask you this.  You are an administrative assistant; is that right?

A.   Yes, sir.

Q.   At Rockwell College?

A.   Yes, sir.

1    Q.    What do you do kind of on a day-in, day-out

2    basis?

3    A.    I basically set up travel, monthly reports,

4    filing, just do whatever needs to be done.

5    Q.    Okay.  And exactly what type of business is

6    that?  I've heard of it, but I'm not sure --

7    A.    We're in the telecommunications business.  We

8    do communications for the President's plane, Air Force One,

9    other types of, we deal with Lockheed and Boeing.

10   Q.    Okay.  Looks like you have three children; is

11   that right?

12   A.    Yes, sir.

13   Q.    And maybe a grandchild on the way or a new

14   grandchild?

15   A.    She's three months old.

16   Q.    Okay.  Have you been to see her yet?

17   A.    No, I have a flight set up for mid-October and

18   I've already checked with the bailiff about that.

19   Q.    Okay.  And you know we start -- if you're

20   selected as a juror, we would start the week of November

21   10th.  So I wouldn't anticipate that would be a problem for

22   you.

23            Getting back to your questionnaire a

24   little bit.  We always kind of ask people if they have had

25   any contact with the criminal justice system or known anyone

1   that's had any contact.  I believe you indicated you had a

2   friend, a John Bryant?

3         A.    Yes, sir.

4         Q.    That back in the nineties, a savings and loan

5   type situation?

6         A.    Yes, sir.

7         Q.    What do you know about that?

8         A.    He was like a surrogate father to my son.  And

9   my son, Mark, and myself were called to be -- and there was

10  one other person, called to be a witness for the defense in

11  that case.

12        Q.    Like a character witness type thing?

13        A.    Yes, sir.

14        Q.    Okay.  Was that a -- do you know if it was a

15  state trial or a federal trial, or --

16        A.    It was in Sherman.  That's all I remember.

17        Q.    Okay.  How was that experience for you,

18  testifying as a character witness?

19        A.    Well, it was my privilege to do that for my

20  friend and I certainly did believe in his innocence.

21        Q.    Okay.  Looks like the outcome of that charge

22  was he got probation?

23        A.    Yes, sir.

24        Q.    Okay.  Has he successfully completed that

25  probation?

1      A.      Well, he did and he did pass away about three

2  years ago from an aneurysm.

3      Q.      Okay.  It sounds like you believed he wasn't

4  guilty of that crime; is that right?

5      A.      Oh, I don't believe he was with all my heart.

6      Q.      Okay.  How do you think he was treated in the

7  system?  Do you think he was treated fairly, or --

8      A.      The man that he was partners with, I believe

9  he had a -- he got a jail sentence.  And my friend, John,

10 was given probation.  So I guess in that light, he was

11 treated fairly.  There were several hundred of us who did

12 write letters to the Judge expressing our concern about a

13 possible jail sentence for him.

14     Q.      Okay.  Having had that experience with

15 someone, I guess you obviously admired very much, how do you

16 think that might affect you, if you were to be a juror on

17 another case, a criminal case, having had that experience?

18     A.      I don't see how it could affect me, because

19 these are -- that would be an entirely separate thing.

20     Q.      Okay.  Obviously, both sides, I think one of

21 our greatest fears is to get somebody over on the jury box

22 that kind of has maybe a hidden agenda or an axe to grind

23 with either side.  So that's why we ask these type

24 questions.  And you also mentioned your grandson, a great

25 grandchild, I believe had some kind of incident maybe over

1    like seven dollars or something?

2         A.      Yes, something like that.

3         Q.      Okay.  Tell us about that, what you know about

4    that.

5         A.      This is my daughter's son.  From what I

6    understood he had come to my daughter and her husband's

7    house, had visited one evening and left around 10:00 or

8    11:00 that night.  And he lives in Corsicana with his --

9    Streetman is the name of the city, with his dad.

10                    And he was running -- he needed air in

11   his tires and he stopped to get air.  And there was a money

12   box open and I guess the temptation was too great and he

13   reached in there.  And the police happened to be there at

14   the same time.  So I don't think we will ever understand

15   exactly what went on, but they did release him the next

16   morning.

17        Q.      Okay.  He didn't actually get charged or

18   convicted of anything that you know of?

19        A.      I can't remember what it was.

20        Q.      Okay.

21        A.      But he did not break into the box.

22        Q.      Something minor probably?

23        A.      Yes, uh-huh.

24        Q.      Okay.  You've also been on a jury before, is

25   that right, I think you indicated?

1    A.    This was one in Richardson years and years

2  ago.  A woman had run a traffic light.  She defended herself

3  and we did find her guilty.

4    Q.    Okay.  Also, looking at your questionnaire --

5  if you want to look at it, it's on page 5, I believe,

6  towards the top of the page.  We kind of right under

7  criminal justice system, we asked you, what are your

8  feelings in general about the system?  You said sometimes

9  it's unfair, but as imperfect people, we do the best we can

10  with our God-given abilities.

11        I was just wondering if sometimes unfair,

12  does that come from your experience with your friend,

13  Mr. Bryant, or some other episode or experience you've had?

14    A.    I think it's just different things that I have

15  heard or read about, even though I've had no proof of what

16  the verdict should have been.  It's just from different

17  things you hear from different people.

18    Q.    Okay.  Innocent people getting convicted or

19  guilty people being let go?

20    A.    Yes, both.

21    Q.    Okay.  Both ways?

22    A.    Uh-huh.

23    Q.    Let me ask you, you told us, I guess,

24  generally you're in favor of the death penalty for certain

25  crimes?

1        A.      Yes.

2        Q.      Why do you feel we should have a death penalty

3  available as an option in certain cases?

4        A.      I believe people need to be punished for the

5  crimes that they commit and sometimes that is the only way

6  to punish people.

7        Q.      Okay.  When you think about an appropriate

8  type of case for the death penalty, you know, a situation or

9  a set of facts that sounds appropriate for the death

10  penalty, what comes to mind?

11        A.      I always remember that Charles Manson.  I

12  think he's still alive, but --

13        Q.      I think he is still locked up.  Are there any

14  other cases that come to mind that you may have heard about

15  or read about, following the media?

16        A.      I can't think of any offhand.

17        Q.      Okay.  Kind of we asked you to rank yourself

18  on a scale of 1 to 10 how strongly you feel, you know, about

19  the death penalty and you gave yourself a 9, which is kind

20  of towards the high end.  But we know it means different

21  things to different people.  And I was just kind of curious

22  what your thought process was when you kind of assigned

23  yourself that No. 9?

24        A.      I just, I believe in the death penalty, if

25  it's needed.  It needs, we need to follow through with that.

1  And I think it could in some ways be a deterrent for other

2  people.

3          Q.     Okay.  In Texas, as you may have read in that

4  packet of law that the Judge gave you, we reserve the death

5  penalty just for murder cases and then only certain types of

6  murder cases.  There are some sorts that are very brutal and

7  very bad murder cases where a person could get up to life in

8  prison, but the death penalty is not an option.

9                  We reserve it for cases where a

10 particular person is killed, a child under six, a police

11 officer or fireman during the course of their duties, or

12 intentional murder that's committed during the course of

13 another felony like robbery, burglary, rape, that type

14 thing, or mass murder, serial murders, those type

15 situations.  But that's the kind of the set of crimes we

16 limit the option of a death penalty for in Texas.  Is that

17 something that you generally agree with?

18         A.     Yes.

19         Q.     That set of crimes?

20         A.     Yes.

21         Q.     Okay.  And let me ask you this question.  I

22 know a lot of people sometimes haven't given this some

23 thought, but you kind of mentioned it in your questionnaire.

24 Sometimes when we talk to people, even people that are, you

25 know, strongly in favor of the death penalty, people tend to

1   draw some lines sometimes in the type of cases where they

2   feel it's appropriate.

3               What I mean by that is this.  You know,

4   oftentimes crimes are committed by more than one person.  A

5   group of individuals can commit a crime.  And the law allows

6   us to prosecute everyone that's actively involved in a

7   crime, actively participates in a crime, whether it be

8   shoplifting all the way up to capital murder.  And

9   frequently when you're talking about a capital murder, you

10  may have a situation where just one person actually pulls

11  the trigger with a gun, let's say.  One person actually

12  causes the death of the individual.

13              But you may have other, I think you used

14  the word, people commonly know it as accomplices.  You may

15  have a set of accomplices who didn't even actually cause the

16  death, they could still be found guilty of capital murder

17  and may ultimately face the death penalty.

18              And some people we talk to, if it were up

19  to them, you know, they may feel very strongly in favor of

20  the death penalty for the triggerman, the guy that pulled

21  the trigger.  But if it was up to them, they wouldn't have

22  the death penalty available as an option for those

23  accomplices.  For whatever reason, religious, moral, or

24  ethical, they just don't feel a death sentence would be

25  justified for those accomplices that didn't actually take

1    the life.

2              And some people feel differently, you

3    know.  They would keep that option available for both the

4    triggerman or the nontriggerman.  Where do you kind of come

5    down on that issue?

6         A.    Well, I don't know if this is a valid reason

7    or not, but if you accompany somebody who does pull the

8    trigger, to me you are equally as capable of doing that,

9    even though you may not have done it at that time.

10        Q.    Okay.  So, you wouldn't automatically take the

11   death penalty off the table for the accomplice, the person

12   that didn't actually cause the death.  Is that kind of what

13   I hear you saying?

14        A.    Right, yes, sir.

15        Q.    Okay.  And that's pretty much what the law is.

16   In fact, I think, you know, when you think about the Charles

17   Manson case, you know, he didn't actually kill anyone, he

18   just had people do it, I guess, at his direction.  And the

19   law in Texas allows, depending on the facts and

20   circumstances, for both the triggerman and the accomplice to

21   ultimately maybe face the death penalty.

22              Let me give you an example of that and

23   see if it makes sense to you.  Let's say Mr. Shook and I

24   decide we're going to rob a bank.  And the plan is for

25   Mr. Shook to take the gun in and hold up the tellers.  While

1  he's doing that, I'm going to go in with a bag.  I'm not

2  going to have a gun, but I'm going to go in with a bag and

3  kind of collect all the money out of the cash drawers.  And

4  that's our plan to rob the bank.

5                    Let's say when we go in there, for

6  whatever reason, Mr. Shook intentionally shoots and kills

7  one of those tellers.  Maybe one of them looked at him funny

8  or I saw one of them going for the silent alarm and I tell

9  him that, but he shoots and kills someone.  Now, he's

10  committed an intentional murder during the course of a bank

11  robbery which, you know, is capital murder.

12                    He could be convicted of capital murder

13  and ultimately sentenced to the death penalty.  Again, the

14  law in Texas is that me, the accomplice, I, also, could be

15  convicted of capital murder and potentially face the death

16  penalty.  What do you think about that?

17        A.       It's the same scenario that you just gave me.

18        Q.       Okay.

19        A.       The same rule applies.

20        Q.       You could see, depending on the facts and

21  circumstances, maybe convicting me of capital murder --

22        A.       Yes.

23        Q.       -- as the accomplice and potentially giving me

24  a death sentence?

25        A.       Yes, sir.

Q.      Okay.  And that's basically what the law is.
You know, if I aid or assist or direct Mr. Shook to commit
capital murder, kind of like Charles Manson did, I'd be just
as guilty and could face the death penalty.

Or, under the law of conspiracy, the
second way an accomplice could be found guilty, is if
Mr. Shook and I conspire, which means just agree to commit
that bank robbery, and during the bank robbery somebody gets
killed, the law says if I should have anticipated that that
death would have occurred, that I could be found guilty of
capital murder.  Does that make sense?

A.      Yes, sir.

Q.      And a lot of people say, you know, I should
have anticipated somebody get killed because my partner took
in a loaded gun to the bank robbery, that kind of thing.
Does that make sense to you?

A.      Yes, sir.

Q.      Okay.  Let me ask you this.  I think, like
almost everybody we talk to, you indicated on the
questionnaire that you had heard at least something about
this case, this particular case we're here on?

A.      Yes, sir.

Q.      Could you tell us what you remember hearing
about this case?

A.      The only thing I remember is that, it was on

television, that's where I heard about it.  It happened in
Irving, I believe.  And, what was it, a year or two later I
think they were found in Colorado.  And that's all I know
about it.

Q.    Okay.  Sounds like you don't have a lot of
knowledge of the details or the crime allegations?

A.    No.  In May after I had been up here, I
certainly was curious enough.  I went to my computer and
pulled up the Texas Seven and --

Q.    A lot of people did that.

A.    I did see a picture of him and there was a
little writeup there.

Q.    Okay.  What do you remember reading from the
Internet?

A.    About the only other thing I remember about
that was it seems like that he had a history of previous
offenses, and I can't remember what they were.

Q.    Okay.  Having kind of gotten that additional
or extra knowledge about, I guess the case, and about Mr.
Murphy in specific, how do you think that may affect you, if
you were to be a juror on this case?

A.    I don't think that would have any bearing on
the case.

Q.    Okay.  What the law requires is that, even
people such as yourself, who may have heard or read or seen

1   things about the case, even people who may have, you know,

2   developed some opinions or formed some impressions, as long

3   as they can kind of put that aside and not necessarily

4   forget it, but put it aside and be able to assure the Court

5   that they can base their verdict just on the testimony they

6   hear in the courtroom, they would be a qualified juror.

7              And honestly some people tell us, you

8   know, I know too much about the case and I know too much

9   about the individual.  I'm just not sure I could do that.

10  Other people say, you know, I could do that, just base my

11  verdict on what I hear in the courtroom.  Do you think you'd

12  be able to do that?

13       A.    Put it aside?  Yes.

14       Q.    Okay.  We talk, like I said, talked to quite a

15  few people, some that feel very strongly about the death

16  penalty.  We realize that a lot of people kind of, you know,

17  being philosophically in favor of the death penalty, being

18  in favor of the death penalty in the abstract, is something,

19  you know, quite different than when you actually come down

20  here as a juror and you are at this point in the process,

21  and you are actually looking at the lawyers and looking at

22  the defendant and you kind of understand, you know, the

23  State's goal in this case.

24              Very frankly, that is our goal.  We feel

25  we have the nature, the type, and the quality of evidence

1  that's going to cause a jury to find him guilty of capital

2  murder and answer those Special Issues in such a way that

3  he'll ultimately receive the death penalty and it would

4  ultimately be carried out.

5          And we know that's just not everyone's

6  cup of tea sometimes.  They may be strongly in favor of the

7  death penalty philosophically, but when it gets to this

8  point, they become a little unsure whether they're the type

9  person that they feel in their heart of hearts could

10  actually participate in this type of process.  You know,

11  some people tell us, you know, details of executions are

12  often reported in the media, on the TV, in the paper.

13  Living in Texas, you know that this is a state where the

14  death penalty is assessed by jurors.  It's carried out.

15  Texas frequently leads all the states in the numbers of

16  executions from year to year.  The death penalty is a

17  reality in this state.

18          The procedures are the same in any case.

19  They'd be the same in this case.  If he was sentenced to

20  death, he would be taken immediately down to death row where

21  he would wait for some period of time.  I can't tell you how

22  long or when it would be, but at some point Judge Cunningham

23  would issue a date of execution.  And on that date he would

24  be moved from death row down to the main prison in downtown

25  Huntsville where he would be kept in a little holding cell

1  right outside the death chamber.

2              And on that last day, he would be given a

3  chance for a last meal.  He would be given a chance to meet

4  with friends, family members, spiritual advisors.  But as

5  the clock got down towards 6:00 in the afternoon, which is

6  the time that all executions in Texas are carried out, he

7  would be moved from that holding cell right down the hall to

8  the death chamber, either voluntarily or involuntarily,

9  if he didn't want to go.

10             You may have seen pictures on the media

11 of that death chamber.  It's got the gurney with the leather

12 straps on it.  But he would be taken there, strapped down

13 against his will, if need be, with those leather straps.  An

14 IV would be started in his arm.  There would be witnesses

15 there from his side and also be friends, family members, of

16 the victim there to witness the execution.

17             The warden would give him several minutes

18 to make a last statement.  He may, you know, confess his

19 guilt and beg for forgiveness, or he may proclaim his

20 innocence up to the very last.

21             But at some point after the last

22 statement the warden would signal to the executioner and the

23 executioner would release different chemicals into that IV

24 that would very quickly stop his heart and lungs and he

25 would eventually lose consciousness, fall into a deep coma,

1   and eventually die.

2              I go through that not to be morbid with

3   you, but those are the type of details that are often

4   reported when you talk about executions.  And some people

5   tell us, very frankly, again, I don't think I'm cut out for

6   this.  I don't want that weighing on my mind.  You know, I

7   may be a good juror in a different type of case, but not a

8   death penalty case.  Even though I believe in it

9   philosophically, at this point I'm just uncomfortable

10  participating in the process.

11             And we kind of leave it up to the

12  individual, because you know yourself better than anyone.

13  But I want to make sure, before we go any further, that you

14  feel like you are the type of person that could take pen in

15  hand and answer these three questions that you'd be asked to

16  answer and answer them in such a way that may lead to the

17  execution of another human being.  Do you feel like you are

18  the type person that could participate in that process?

19        A.     Yes, sir.

20        Q.     Okay.  Why do you feel that way?

21        A.     I just -- I just have strong convictions about

22  that.  It's not an opinion that I have, but a conviction.  I

23  think life is very precious.  But there are consequences to

24  all of our actions and it's just the way I feel about it.

25        Q.     Okay.  Fair enough.  Let's talk a little bit

about some of the procedures.  All criminal cases in Texas, even a death penalty case, the trial is basically broken down into two different parts.  The first part of the trial we call the guilt/innocence phase.  And that's where the jury would get to hear just the facts and evidence generally surrounding the crime.

And we ask the jury to make a decision whether the person is guilty or not guilty at that point, basically, whether the State proved to you beyond a reasonable doubt that he's guilty of capital murder.  If we do that and he's found guilty of capital murder, then in a sense that second stage starts, or that second phase of the trial.

The rules of evidence broaden out.  You get to hear a little more details about his past, good or bad, his criminal history, if it exists, character witnesses like that, that type of thing, if they exist.  And we basically ask a jury in that second phase of the trial to answer these three questions.  I know you looked at them in your packet, but there's these three questions up on the wall.

And we kind of let the answers to those questions, or we do let the answers to those questions, determine what the proper sentence is.  We don't ask a jury to write in a life sentence or write in a death sentence.

1 We just ask the jury to kind of look at these questions and

2 answer them and see what the evidence is.  Does that make

3 sense to you, kind of the process that we have?

4   A.  Yes, sir.

5   Q.  Okay.  If you'd take a second and just,

6 they're phrased a little bit differently up on the wall,

7 take a second and just read through those three questions

8 real quick so we can talk about those.

9   A.  (Prospective juror complies.)

10   Q.  Did you get a chance to look at all those?

11   A.  Uh-huh, yes, sir.

12   Q.  Okay.  Again, these are the questions that we

13 ask a jury to answer at the end of that second phase, after

14 they've heard all the evidence in the second phase of the

15 trial.  And you can go back and look at the evidence you

16 heard in the first phase with any additional evidence to

17 help you answer those questions.

18       Kind of what the law contemplates,

19 though, is a juror being able to start the second phase kind

20 of with no preconceived notions.  That is, they can't start

21 that second phase and kind of automatically answer any of

22 these questions.  We kind of ask a jury to, even though they

23 convicted someone of capital murder, to keep that open mind

24 in the second phase of the trial.  Does that make sense to

25 you?

53

1        A.      Yes, sir.

2        Q.      Okay.  The first Special Issue, or I just call

3   them questions, kind of deals with the situation what we

4   call the future danger question.  We ask a juror if there's

5   a probability that the defendant would commit acts of --

6   criminal acts of violence, such that they would be a

7   continuing threat to society.  You kind of see how that

8   question asks you to make a prediction about the future?  Is

9   that something you think you could do --

10       A.      Yes, sir.

11       Q.      -- given enough information?

12       A.      Yes, sir.

13       Q.      What type of information would be important to

14  you in answering that question?

15       A.      It would probably be -- it might have to do

16  with his background in that and into No. 3.

17       Q.      Okay.  That's frequently what we hear, the

18  background.  You said also No. 3.  What did you mean by

19  that?

20       A.      The background, his character and background.

21       Q.      Okay.  Certainly you can consider that when

22  you get down to question 3 as well.  But if you have that

23  sort of information, that background, do you feel

24  comfortable answering Special Issue No. 1?

25       A.      Yes, sir.

1    Q.    Okay.  A lot of the phrases that we get or

2    words that we get in this phase of the trial are not

3    defined.  So we kind of leave it up to jurors to use their

4    good common sense what words and phrases mean to them.  See

5    that word "probability" in that first question?

6    A.    Yes.

7    Q.    What does that mean to you, "probability"?

8    A.    A chance, maybe a good chance.

9    Q.    That's what people tell us, good chance, or a

10   likelihood, or more likely than not, that type of thing.

11   Does that make sense to you?

12   A.    Yes, sir.

13   Q.    The law says, obviously, it can't be a

14   certainty, because we could never prove anything to you as a

15   certainty.  But it's got to be something more than just a

16   possibility, because anything is possible.  So a lot of

17   people, more likely than not, or a good chance, sounds like

18   what you're comfortable with.

19   A.    Yes, sir.

20   Q.    In that middle sentence, you see that

21   "criminal acts of violence," that phrase?

22   A.    Yes, sir.

23   Q.    What type of acts or crimes come to mind when

24   you look at that phrase?

25   A.    Murder.

1    Q.     Anything else?  Any other types of crimes,

2 criminal acts of violence, assaults, or rapes, or that type

3 thing?

4    A.     Yes, sir.

5    Q.     Okay.  Again, there's no definition.  The law

6 says we don't necessarily have to prove to you that he's

7 going to be involved in another capital murder or that he's

8 going to kill someone.  It's just anything that the jury

9 thinks constitutes criminal acts of violence, that type

10 thing.  Does that make sense to you?

11    A.     Yes, sir.

12    Q.     Okay.  And, finally, the last word in that

13 sentence, we have "society."  What do you think of when you

14 think of "society"?  Or how would you define that?

15    A.     Mankind.

16    Q.     Okay.  Everyone or anyone that he may come

17 into contact with?

18    A.     Yes, sir, general populace.

19    Q.     Okay.  And what about the population behind

20 bars, other inmates, guards?

21    A.     Yes, sir.

22    Q.     Okay.  Special Issue No. 1 and Special Issue

23 No. 2 are similar in the sense that they both start out with

24 a no answer, okay?  That's kind of a default setting on

25 those questions.  Starting out, the answer is no, and a jury

1  can only answer them yes, if the State proves to you beyond

2  a reasonable doubt that the answer should be yes.  Does that

3  make sense to you?

4       A.    Yes, sir.

5       Q.    It's part of our burden of proof to prove it

6  to you that he be that future danger.  If we don't do that

7  to you, the answer stays no.  Does that make sense?

8       A.    Yes, sir.

9       Q.    And, again, the law requires that you kind of

10  start looking at these Special Issues with an open mind.

11  You know, some people tell us, very frankly, hey, you know,

12  if I have convicted someone of capital murder, my mind is

13  kind of closed to Special Issue No. 1, because I'm

14  automatically always going to think that the answer to that

15  should be yes.  I'm always going to think they are a future

16  danger.

17       And there's a certain amount of common

18  sense to that.  But what the law envisions, again, is the

19  jurors have that open mind.  Even though you may have

20  convicted him of capital murder, you step back, take a deep

21  breath, look at all the evidence, what you heard in the

22  first phase, what you heard in the second phase, and answer

23  that question.  Does that make sense to you?

24       A.    Yes.

25       Q.    Is that something you think you could do, keep

1  an open mind to these questions?

2       A.      Yes, sir.

3       Q.      Okay.  Special Issue 2, again, starts out no.

4  We've got to prove it to you the answer should be yes.  And

5  this question kind of deals with that situation we've

6  already talked about, Ms. Cunningham, I guess where more

7  than one person or accomplice is involved.  And there's

8  really three parts to that question.

9            If you find the defendant actually caused

10  the death of the person, you know, that they were the

11  triggerman, you answer it yes.  If you think that they

12  intended to kill the deceased or another, but didn't

13  actually do it, then you'd answer the question yes.  Or,

14  kind of the scenario we've been talking about, that last

15  line, if you find that they anticipated that a human life

16  would be taken, you would answer that yes.  Does that kind

17  of make sense to you?

18       A.      Yes, sir.

19       Q.      Okay.  And if you'll remember, in order to

20  convict someone of capital murder, an accomplice, like in my

21  example, the jury would have to be convinced that I should

22  have anticipated that a life would be taken, okay?  That's

23  the standard to find somebody guilty of capital murder.

24            When you go to this second phase of the

25  trial, the law says the standard is a little bit higher.

And the standard in the second phase of the trial is, you
know, is more than should have anticipated, it's actually
anticipated.  Did the person actually anticipate that a
human life would be taken?  It's kind of a little bit higher
standard before we can get to the death penalty.  Does that
make sense to you?

     A.    Yes, sir.

     Q.    Okay.  You kind of see that distinction
between should have anticipated and did anticipate?

     A.    Yes, sir.

     Q.    Quick example, I think I tell some people
sometimes.  I got my first car when I was 16 years old.  My
dad gave it to me and I drove it like a madman for about a
month.  And, of course, I finally ended up wrecking it
within about a month.  My dad was real mad and he said, you
know, boy, you should have known, you should have
anticipated driving it that way, that you were going to
wreck it.

          And he was right, I should have.  But I
never actually did, because I was just too young and too
stupid.  Even though I should have anticipated, I didn't
actually anticipate.  I think that's kind of one example
that points to that different standard.  Does that make
sense to you?

     A.    Yes, sir.

Q.   Okay.  And you would only answer that yes, if we prove it to you that the answer should be yes.  Then, finally, moving to that last question, Special Issue No. 3.  This is kind of what we call the mitigation question.  It's the last stop in the process.  It's kind of a safety net when you're talking about a death penalty case.

It's a little bit different than the first two questions.  Neither side has the burden of proof on that question.  It doesn't start off with a no answer.  We just kind of leave it up to the jurors to answer it as they see fit.  But this question asks you to step back, take a deep breath, look at everything you've heard, the facts of the crime, you know, what you know about his background, his past, his character, and look at what sort of personal moral blame he bears in what happened.

And ask yourself, is there anything mitigating?  Is there anything that lessens his personal blame for the crime?  And if there is, is it sufficient that his life ought to be spared, that he ought to be given that life sentence instead of a death sentence?  Does that make sense to you?

A.   Yes, sir.

Q.   Okay.  You kind of see why we have that question?  I guess it's a chance for a jury to show mercy, if they feel it's appropriate.

A.      Yes, sir.

Q.      Okay.  Do you think that's a valuable question to have?

A.      Yes, sir, I do.

Q.      Even at that late stage of the process?

A.      Yes, I do.

Q.      And some people tell us, you know, if I've convicted a person of capital murder, if I think they're a future danger, if I think they anticipated a life would be taken, there's never going to be anything that would cause me to answer that last question no.  You know, there's never going to be anything mitigating.  And their mind wouldn't be open to it at that point.  They wouldn't be qualified.  But from what you're telling me, you would go into that third question with an open mind?

A.      Yes, sir.

Q.      Okay.  As you sit there right now, is there anything that comes to your mind that might be mitigating when you think about a death penalty case?

A.      And you mean by the term "mitigating" --

Q.      Mitigating would be something -- it's not defined, but the Courts have given us some guidance.  It would be something that would lessen his personal moral blameworthiness.  It's kind of the opposite of aggravating.  I mean, you know, I guess something especially bad would be

1   aggravating.  Something mitigating would be the opposite end

2   of that spectrum.  Does that make sense to you?

3        A.     Yes, sir.

4        Q.     Okay.  Could you think of anything that might

5   be potentially mitigating?

6        A.     Not off hand.

7        Q.     Okay.  That's the most common answer we get,

8   Ms. Cunningham.  Don't feel bad.  We hope the people don't

9   sit around thinking about these type of things in their

10  normal life.  And that, you know, the law doesn't require

11  that you tell us what you think is mitigating.  The law

12  doesn't require that you consider any particular factor

13  mitigating.  The law just requires that you kind of keep

14  that open mind and if you hear something that you think is

15  mitigating, you'll consider it and give it the weight that

16  you think is appropriate.  Does that make sense to you?

17       A.     Yes, sir.

18       Q.     Some people have told us, you know, maybe a

19  person's background as a child.  You know, how they were

20  raised, if they had mental abuse, physical, emotional abuse,

21  that type thing, that may be potentially mitigating.  Other

22  people tell us, no, that's not really mitigating.  You kind

23  of at some point you get old enough to be responsible for

24  your actions and get past whatever may have happened to you.

25  How do you kind of fall down on that issue?

1          A.      I can see both sides of that.  I can

2   understand why a background would be detrimental, a bad

3   background could be detrimental to a child's good potential

4   growth and development.

5          Q.      Okay.  Some people tell us maybe a person's

6   age.  You know, if they were very young when they committed

7   the crime, that may be mitigating.  Just to let you know, I

8   know you've read the questionnaire, and we don't tell you

9   what the age is, but you have to be 17 years or over in

10  Texas in order to receive a death sentence.

11                  So we're talking, you know, maybe young

12  people, 17, 18, 19, 20.  Some people think that young age

13  may be mitigating.  And, again, the opposite end of that

14  spectrum, some people say, you know, you're old enough to

15  make your own decisions.  You've got to face the

16  consequences and that is not mitigating.  Where do you kind

17  of fall on that issue?

18         A.      On that issue I don't feel like age is an

19  excuse.

20         Q.      Okay.

21         A.      Seventeen is old enough to know right from

22  wrong.

23         Q.      Okay.  Any questions about kind of the scheme

24  that we have or the three questions we ask you in

25  punishment?

63

```
 1        A.      No, sir.

 2        Q.      Okay.  Do you kind of see how it works?  We

 3   let the answers determine the sentence and keep that open

 4   mind all the way through and wouldn't prejudge or

 5   automatically answer any of these questions just based on

 6   what you heard in the first part of the trial or that type

 7   thing.  That make sense to you?

 8        A.      Yes, sir.

 9        Q.      Okay.  Let me talk to you a little bit about

10   maybe some of the types of witnesses that you will hear

11   from.  Obviously, we've alleged a police officer has been

12   killed.  You know this is a criminal case.  You can probably

13   expect to hear from police officers in this case.

14                And a lot of people admire the work they

15   do and think highly of them.  But what the law says is if

16   you are a police officer and you are a witness, that they

17   have to start off with kind of that same level of

18   credibility.  A juror can't give a police officer witness a

19   leg up, just for the simple fact that he's a police officer.

20   Does that make sense to you?

21        A.      Yes, sir.

22        Q.      Okay.  Is that a law you think you can follow?

23        A.      Yes, sir.

24        Q.      Okay.  You may also hear from a psychiatrist

25   or psychologist.  Typically sometimes in these cases they
```

1   testify for the defense or maybe even for the State or both,

2   to try to give the jury some guidance to answer, you know,

3   question No. 1 or question No. 3.  And we kind of hear all

4   sorts of answers about how people feel about those type of

5   people, psychiatrists or psychologists.  I think -- is your

6   daughter a school psychologist?

7         A.     Yes, my baby is.

8         Q.     Okay.  What do you think about those type

9   witnesses?

10        A.     I would have no problem with any of that.

11        Q.     Okay.  You could keep an open mind?

12        A.     Yes.

13        Q.     And listen to their testimony?

14        A.     Yes, sir.

15        Q.     Some people tell us, you know, my mind is

16  closed.  I just don't believe in that stuff.  And kind of

17  the opposite end of the spectrum, people say, you know, I

18  believe every word out of their mouth, you know.  They're

19  great people and never give a bad opinion, that type thing.

20  So we kind of want somebody in the middle.  Is that kind of

21  where you fall?

22        A.     Yes.

23        Q.     Okay.  Just some general things that apply in

24  any criminal trial.  You're probably familiar with a lot of

25  this.  A person is always presumed innocent, the defendant.

1   It's always our burden to prove to you he's guilty and prove

2   to you those two answers.   This table, the defense, never

3   has a burden.   They don't have to do anything.   You can

4   never look to them for proof in a criminal case.

5                       As a part of that, a person has a Fifth

6   Amendment right not to testify.   No one can force a person

7   to testify in their own defense.   A lot of times, obviously,

8   people want to hear from a person charged.   But the law says

9   that, if a person chooses not to testify, the jurors

10  couldn't hold that against them in any way.   They just

11  couldn't consider it in their deliberations.   Does that make

12  sense to you?

13          A.      Yes, sir.

14          Q.      Okay.   And you can follow the burden of proof,

15  the Fifth Amendment, that type thing?

16          A.      Yes.

17          Q.      Okay.   Also, let me talk to you a little bit

18  about what a life sentence means.   You know, you've heard

19  some talks about the parole laws, I'm sure, in Texas, and

20  when a person is eligible or when he gets paroled.   In

21  Texas, in a capital murder, if a person doesn't get death,

22  if they get that life sentence, the person must serve forty

23  years, day for day, before they become eligible for parole.

24                  Now, they may make parole right at that

25  40-year mark, or they may never make parole and actually end

1  up doing a life sentence.  Because those decisions are so

2  far in the future and beyond the control of anybody in this

3  courtroom, we ask a juror to kind of presume that a life

4  sentence means an actual life sentence.  Does that make

5  sense to you?

6       A.    Yes, sir.

7       Q.    Is that something you think you could do?

8       A.    Yes, sir.

9       Q.    Okay.  Also, let me talk to you a little bit

10  about the elements of the crime.  As part of our burden of

11  proof, we've got to prove to you each and every element of

12  the crime.  And, basically, that is that a certain person on

13  or about a certain day in a certain county killed a certain

14  person in a certain way, okay?

15            And we have to prove all of that to you.

16  We've got to have 100 percent batting average or thousand

17  percent batting average.  We can't miss one.  We don't get

18  partial credit.  If we only prove nine out of the ten,

19  you've got to find the person not guilty.  And the law says

20  that one element is no more important than another element.

21  Does that make sense to you?

22       A.    Yes, sir.

23       Q.    Okay.  And you think that's a law you can

24  follow?

25       A.    Yes, sir.

1    Q.    Just to give you kind of a far out example of

2 that, say we try a capital murder case that happened in

3 Grand Prairie.  Some of Grand Prairie is in Tarrant County

4 and some is in Dallas County.  And we allege as an element

5 of the crime that that capital murder happened in Dallas

6 County.  The police didn't do their job, the DA's Office

7 didn't do their job.

8         When we get down here to trial, the

9 evidence shows it actually happened in Tarrant County, okay?

10 We would have missed an element of the crime.  And under the

11 law, because one element is no more important than another,

12 the jury would be required to find the person not guilty,

13 because we missed that element.

14         A lot of people aren't happy about it.  A

15 lot of people think it's a technicality.  But that's kind of

16 the mental discipline that it requires to be a juror.  And I

17 guess one way to look at it is one person's technicality is

18 another person's constitutional right.  Does that kind of

19 make sense to you?

20    A.    Yes, sir.

21    Q.    I don't expect that to ever happen.  It's kind

22 of a far out example.  But I think it illustrates the point

23 that we've got to prove each element.  And it sounds like

24 that's a law that you believe you could follow?

25    A.    Yes, sir.

Q.      Okay.  Finally, there's these things called
lesser included offenses.  I don't know if they're going to
come up in this case, but we kind of have to talk about
them.  And just to give you an example of what a lesser
included offense is, let's say we allege that somebody
committed an intentional murder during the course of a
robbery.

And at the end of the evidence in that
first phase of the trial you have a reasonable doubt about
whether they committed the murder, but you think they
committed the robbery, okay?  You might have an option to
find that person guilty of the lesser included offense of
aggravated robbery, because you don't believe they
necessarily did the murder.  Does that make sense to you?

A.      Yes, sir.

Q.      If that happens you would throw out this whole
scheme with the questions, and the law would just ask you to
set whatever you believe an appropriate sentence to be,
somewhere between five years all the way up to 99 years or
life, wherever you think is appropriate in that range.  The
law just requires that you keep that open mind to the entire
range of punishment.  Does that make sense to you?

A.      Yes, sir.

Q.      Okay.  Is that something you think you can
keep an open mind to, that range of punishment?

1    A.    Yes.

2    Q.    Okay.  We've covered quite a bit pretty fast.

3  You probably feel like you've had a day in law school with

4  all this talk.  Any questions that you have about anything

5  that we've covered, Ms. Cunningham?

6    A.    I can't think of any right now.

7    Q.    Okay.  Again, the bottom line is just, we're

8  looking for jurors that can keep that fair and open mind and

9  be qualified.  You know, don't do anything automatically or

10  have any preconceived notions, that type of thing.  I

11  appreciate your time.  Thank you very much.

12    MR. WIRSKYE:  That's all I have, Judge.

13    THE COURT:  Mr. Sanchez.

14    MR. SANCHEZ:  Thank you, Your Honor.

15                  CROSS-EXAMINATION

16  BY MR. SANCHEZ:

17    Q.    How are you doing, Ms. Cunningham?

18    A.    I'm fine, thank you.

19    Q.    Good.  Are you tired of talking up there and

20  answering questions?

21    A.    Well, I think he's done most of the talking.

22  I'm in pretty good shape, I think.

23    Q.    Okay.  Well, that's why I'm going to ask you

24  to talk when I ask you questions.  And he's given you the

25  law and you pretty much said you could follow it, but I want

1    to know your feelings about the law, because sometimes we

2    have feelings that conflict with the way the law is written

3    or with the way we expect somebody to follow the law.  And

4    those conflicts will affect us in being a fair juror in

5    certain cases, okay?

6                    You have indicated that you have strong

7    feelings for the death penalty, and the reason I'm going to

8    ask you all these questions is because, you know, we have

9    some people that come in here and they can't wait to get on

10   the jury and give somebody the death penalty.  Well, you

11   know, somebody like that may not be a fair juror because

12   he's already made up his mind what he wants to do.  Or he

13   would, you know, act in a way that's contrary to the capital

14   murder scheme, the way it's been explained to you.

15                   We have other people who come in here and

16   they, you know, they just couldn't give the death penalty in

17   any situation.  Well, somebody like that is really not

18   qualified because they can't give both sides a fair trial.

19   So, you know, I want to get your feelings on what you think

20   about all these laws that have been explained to you and

21   then you let me know whether, you know, you have a problem

22   with them and whether that would affect you some way, okay?

23   Is that fair enough?

24          A.      Yes, sir.

25          Q.      You indicated earlier that, you know, you feel

1   that people need to pay for their actions.  And you also now

2   learned that the way the death penalty scheme is laid out,

3   that it favors a life sentence rather than a death penalty

4   sentence, unless the State can prove their case beyond a

5   reasonable doubt that they're even guilty of capital murder.

6   And then they prove Special Issue No. 1 and No. 2 to you

7   beyond a reasonable doubt.

8                    What do you think about that?  What do

9   you think about the fact that the first choice is really not

10  the death penalty and that it's a life sentence is really

11  the first choice, unless they can prove those issues to you

12  beyond a reasonable doubt?  What do you think about that?

13       A.     Well, if it's capital murder, I think the

14  death penalty should be given.

15       Q.     Okay.  So, in your mind is the death penalty,

16  should that be the first choice in your mind, if you find

17  somebody guilty of capital murder?

18       A.     It might be my first choice, but I would have

19  to take into account the Special Issues.

20       Q.     Okay.  Okay.  And, but in your mind would you

21  already be -- would you already have those questions

22  answered in a way that the death penalty would result and

23  then maybe somebody would have to prove to you why that

24  person should receive a life sentence instead of the death

25  penalty?

1       A.     You mean before the person was convicted?

2       Q.     No, after they were convicted of capital

3  murder.

4       A.     After they were convicted?  Would you mind

5  repeating that, please?

6       Q.     Okay.  Let me just take you to the

7  hypothetical trial and your hypothetical jury.

8       A.     Okay.

9       Q.     Let's say you hear all the evidence in the

10  first part of the trial, because the way the trial works is

11  first is the guilt/innocence stage.  And the only thing you

12  determine there is whether the person is guilty or not

13  guilty of capital murder the way the State has alleged it.

14  You would hear all the evidence, arguments, you would go

15  back in the jury room and you would deliberate.  And you

16  would decide whether the person is guilty or not guilty,

17  only that, okay?

18            You are not going to decide punishment.

19  You are only deciding guilty or not guilty.  If you find the

20  person not guilty, then the trial is over.  Everybody goes

21  home, okay?  If you find the person guilty, you come back

22  into the courtroom and the second part of the trial, which

23  is the punishment stage, would begin.  Okay.  So the way I'm

24  asking you is let's assume that you have gone back in the

25  jury room and you have found somebody guilty of capital

1   murder, or like in this case, guilty of killing a police

2   officer.

3                    At that point when you come back into the

4   room, would your mind already be leaning towards the death

5   penalty because of your strong feelings or would it be

6   staying at life until the State can prove to you the Special

7   Issues beyond a reasonable doubt?  How would you feel at

8   that point?

9        A.     So does the State have to prove anyway?

10       Q.     Yes.

11       A.     Guilty or --

12       Q.     Yes.  First they have to prove to you beyond a

13  reasonable doubt that he's guilty of capital murder the way

14  they have alleged it.  Can you hold them to that burden?

15       A.     Yes, I would.

16       Q.     Okay.  Now, when you come back in on the

17  punishment stage, your mind can't be made up yet, okay?  But

18  there's, you know, there's some people, because their

19  feelings are so strong about the death penalty, that in

20  their minds, once they come back to hear the punishment

21  stage, those Special Issues, especially Special Issue No. 1

22  and 2, in their mind is already answered in a way that would

23  result in the death penalty.  Is that the way you might go?

24  Because if you do --

25       A.     No.

1    Q.    That's fine, we just need to know about it.

2    A.    Uh-huh, I don't think so.  I could keep an

3  open mind about that.

4    Q.    Okay.  When you say you could keep an open

5  mind, would you be -- would you state -- would your posture

6  be that it should be a life sentence, unless that could be

7  proven beyond a reasonable doubt on Special Issue No. 1 and

8  Special Issue No. 2?

9    A.    Yes, uh-huh.

10    Q.    Okay.  And that's why I have to ask these

11  questions, because, you know, there are some people who, you

12  know, once they've proven capital murder, then, you know,

13  they're going to have, somebody is going to have to prove to

14  them why they shouldn't get the death penalty.  And that's

15  not really the way the law is set out.

16              So, you can -- you're telling me, then,

17  that you would be in a posture where it would be a life

18  sentence, unless the State can prove Special Issue No. 1 and

19  Special Issue No. 2 to you beyond a reasonable doubt, and

20  then also take after that, considering the Special Issues --

21  I mean Special Issue No. 3, I'm sorry.

22    A.    Well, if they could prove that beyond a

23  reasonable doubt that he did kill somebody, I would be in

24  favor of the death penalty.

25    Q.    Okay.  So, at that point you would already be

1  leaning toward the death penalty, once you found somebody

2  guilty of capital murder?

3       A.     Yes, sir.

4       Q.     Okay.  And the Special Issue No. 1 and Special

5  Issue No. 2, that would have to be proved to you in the

6  negative in order for that person to really receive a life

7  sentence?

8       A.     Yes.

9       Q.     Okay.  You understand, though, it's -- the law

10  would require you to have those issues, Special Issue No. 1

11  and Special Issue No. 2, to be answered no, unless the State

12  could prove them to you beyond a reasonable doubt.  You

13  understand that, right?

14       A.     Okay.  Why am I --why did I understand him and

15  I'm not understanding you?

16       Q.     Maybe because I'm not understanding myself

17  sometimes.

18       A.     No, I'm sorry, it's nothing against you.  It's

19  just --

20       Q.     No, no, that's all right.  Let me just ask you

21  much simpler.  What I'm hearing from you is that once you

22  have convicted somebody of capital murder, that in your mind

23  they should already receive the death penalty before we've

24  even got to the Special Issues.  Am I correct in saying

25  that?

1    A.    Right, yes, sir.

2    Q.    Okay.  Okay.  But you understand that the way

3 the death penalty scheme is set up, that if you find

4 somebody guilty of capital murder, they are sitting on a

5 life sentence and they can't receive the death penalty.

6    A.    Oh, I see what you're saying.

7    Q.    See what I'm saying now?

8    A.    Yes, sir.

9    Q.    So, you know, tell me your true feelings.  I

10 mean, you're the only one that can tell us what you really

11 think.

12    A.    Well, I agree with the way the laws works.

13    Q.    Okay.  And that would be -- in your

14 understanding, what would that be?

15    A.    That they need a life sentence until they're

16 proven that they need the death penalty.

17    Q.    Okay.  That's why I wanted to ask that,

18 because what I heard from you at first was, maybe it was the

19 way that I was asking it, was that you would already be

20 leaning toward somebody receiving the death penalty before

21 these Special Issues were even answered.  But is that wrong?

22 I was wrong in saying it, I think.

23    A.    I was contradicting myself.  You heard me

24 right.

25    Q.    Okay.  All right.  Well, let me ask you this.

1    You talked a little bit about what you have heard about this

2    case.  You heard on the television, radio, or whatever media

3    you listened to, or watched.  But you came down here in May

4    and you filled out the questionnaire and you went out and

5    educated yourself more about the case; is that correct?

6         A.     From --

7         Q.     You got on the Internet?

8         A.     It was a one-page thing on the Internet

9         Q.     Okay.

10        A.     I'm sure there are lots of websites, but I

11   just clicked on one of them.

12        Q.     Okay.  Clicked on what, was it like the Texas

13   Seven Internet site?  Is that what you had said?

14        A.     I think I just typed in Texas Seven and

15   several things popped up and I just clicked on one.

16        Q.     And was that like a news site, or what was it?

17        A.     Sir, I have no idea.  It was just a little

18   picture of him at the top.  Well, first it was a list of

19   those involved.  And I remembered the name and I clicked on

20   his name and it brought up a little picture of him and a

21   couple of paragraphs.

22        Q.     And what -- what did you learn from that,

23   again, if you remember?

24        A.     I remember that I think he had a beard in the

25   picture.  Not a bad looking gentleman.  And that he, I can't

1  remember what was mentioned, but he had some previous

2  trouble.

3          Q.    Do you remember what that was?

4          A.    No, sir, I don't.

5          Q.    Okay.  Was it -- in your mind was it some

6  serious trouble or -- or do you remember?

7          A.    Well, it was some offenses.  I don't know if

8  he'd been in jail before or not.  I can't remember.  But it

9  was --

10         Q.    But did you learn if it was more than one

11 offense?

12         A.    Yes, sir.

13         Q.    You said some offenses?

14         A.    Yes, sir.

15         Q.    Many offenses?

16         A.    I don't know how many.

17         Q.    Okay.  And, of course, now you have that

18 knowledge in your mind, correct?  Based on what you learned,

19 I mean, what opinions have you formed about Mr. Murphy or

20 about this case?

21         A.    I guess I was just curious.  I think I had

22 heard that there were a couple who had given themselves up,

23 and I didn't know who was who and I just wanted to find out

24 if he was one of those or if he had been taken or I was just

25 curious.

1      Q.    Okay.  Well, and based on what you found out

2  as part of your curiosity, what opinions have you formed

3  about him before we even start trial?

4      A.    I really didn't, I just didn't have any

5  opinions.

6      Q.    Have you formed the opinion that he has been

7  in lots of trouble before?

8      A.    I don't know about lots, but --

9      Q.    But some?

10      A.    That's what I read.

11      Q.    Okay.  And before you start the trial, of

12  course, you know, it's going to be hard to get that out of

13  your mind.  You're going to know that going in and you're

14  going to be thinking that while you're listening to the

15  evidence.

16      A.    Well, I think, I don't mean to make a blanket

17  statement, but I think a lot of people who are guilty of

18  things like that, probably have been involved in other

19  things in previous, you know, previous years, could have.

20  So that's not anything surprising or shocking to me.

21      Q.    Of course, some of this is also based on what

22  you've learned, of course.  And I'm not trying to say, you

23  know, you're doing something bad or anything.  It's just,

24  you know, I need to know these things --

25      A.    Yes.

Q.      -- before we can put you on this jury.

A.      Yes.

Q.      And, you know, it sounds to me like you have already formed at least some opinion about Mr. Murphy before we've even started this case.  Would I be fair in saying that?

A.      I guess you could say that.

Q.      And, of course, you would, you know, it's kind of hard to unring the bell, once you've heard something.  I mean, that would, you'd know that once you were sitting over there in the trial and it could affect you in some way.  We don't know now how it could, but it could.  Would that be fair to say?

A.      Yes, sir.

Q.      Okay.  And there's nothing wrong with that.  I mean, that's why we ask these questions.  Okay?

A.      Yes, sir.

Q.      Now, let me ask you a little bit, also, about some things that the State had talked to you about, whether you could hold the -- as you know, you've read in the -- I don't know if you got to look at the indictment in this case before you walked in here today.  Did you get it as part of your reading material?

A.      Yes.  Yes.

Q.      And every indictment has to be proven by the

1  State, like they told you.  Every element in there has to be

2  proven to you.  They've given you the example of not proving

3  the right county, which is one of the elements that they

4  would have to prove.  And if they couldn't, then you would

5  have to find Mr. Murphy not guilty.  And you said you could

6  do that.

7              But they also, not only do they have to

8  prove capital murder, they have to tell you, they have to

9  prove to you how they say it happened.  They have to prove

10 the manner and means of the capital murder.  One example

11 sometimes that's given is the indictment says that the

12 officer was murdered by being shot, being shot with a gun.

13 And if you're sitting in trial and the evidence shows you

14 that he didn't die that way, that wasn't the manner and

15 means of his death, that he died from a stabbing with a

16 knife, that would be different than what they put in their

17 indictment and the law would require you to find him not

18 guilty, because there's a variance in what they have alleged

19 and what was proved, okay?

20              You know, frankly, some jurors say, well,

21 you know what, you proved the murder to me either way.  I'm

22 not going to find somebody not guilty.  I'm not going to let

23 somebody walk just because of that little mistake.  What do

24 you think about that?

25        A.    Well, if that's the law, I mean, that's the

1    way it has to be.

2          Q.    Would you find him not guilty?

3          A.    Yes, if there was a discrepancy in the

4    variancy that you talked about.

5          Q.    Okay.  And you wouldn't have a problem with

6    that?

7          A.    No, sir.

8          Q.    Okay.  All right.  This issue, I hate to keep

9    going back to the issues, but, of course, you know, that's a

10   large part of what we have to talk about.  And I think they

11   covered a little bit, but I want to ask you again.  These

12   decisions you make, you know, the verdicts that you make in

13   this case, the verdict of whether someone is guilty or not

14   guilty in the first part of the trial, and these Special

15   Issues, they're all supposed to be answered independently of

16   one another.

17              What I mean by that is whatever you

18   answer in one question shouldn't affect what you answer in

19   the next question.  You might be looking at all the same

20   evidence, but it shouldn't dictate what your answer should

21   be in the next one, okay?  And Special Issue No. 1, we've

22   had jurors that say, well, once I find somebody guilty of

23   capital murder, then I'm automatically always going to

24   believe that he's a continuing threat to society, just based

25   on the fact that I've already convicted him of capital

1    murder.  See what I'm trying to say?

2         A.    Yes, sir.

3         Q.    What do you think about that?  What do you

4    think about people who do that?  Are you in that category?

5         A.    I don't believe I am.

6         Q.    Okay.  So the fact that you found somebody

7    guilty of capital murder, that wouldn't automatically answer

8    Special Issue No. 1 for you, yes, that he's a continuing

9    threat to society?

10        A.    I would believe he would be a continuing

11   threat.

12        Q.    Okay.  And would that be based solely on the

13   fact that you convicted him of capital murder or based on

14   other things that you have learned before the trial, or --

15        A.    I believe it would be based on the conviction

16   of capital murder.

17        Q.    Now, just to nail down your answer, the law

18   would tell you that you can't do that.  But you're telling

19   us right now that that's -- that would be your thinking?

20        A.    Okay.  So what's the law's position, once

21   again?

22        Q.    Now, the law says that Special Issue No. 1

23   should not be answered yes, just because you found somebody

24   guilty of capital murder, that there should be an

25   independent inquiry, or you're supposed to look at that

1  question independently.  Like I said, you may be looking at
2  the same evidence.

3              But some people say, once I convict
4  somebody of capital murder, then Special Issue No. 1, the
5  question of whether he's a continuing threat to society, in
6  my mind would already automatically be answered yes, just
7  because I found him guilty of capital murder.  And you told
8  us that you would already think he was a continuing threat
9  to society, just because you found him guilty of capital
10 murder.

11             MR. WIRSKYE:  Excuse me, Your Honor.  I'm
12 going to object.  She asked what the law was, and I don't
13 believe Mr. Sanchez actually fully explained the law to her.
14 I object on those grounds.

15             THE COURT:  Sustained.  Ms. Cunningham,
16 let me try to come down the middle between all the lawyers,
17 okay?  Tell me in your mind what you believe the law to be
18 regarding Special Issue No. 1?  Here's my question.  Who has
19 to prove it to you?

20             PROSPECTIVE JUROR:  The State.

21             THE COURT:  If you have found someone
22 guilty of capital murder, and I believe in the guide there
23 were eight different ways to be found guilty of capital
24 murder, if you recall, killing a police officer, fireman,
25 child under six, during the course of a robbery, rape, other

1  felony.  You understand that scheme?

2                    PROSPECTIVE JUROR:  Yes, sir.

3                    THE COURT:  It's two separate trials, if

4  you will.  Jury could find the person guilty or not guilty

5  in the first trial.  If they have found someone guilty of

6  capital murder, here's the question for you.  What are the

7  two possible punishments, if someone is guilty of capital

8  murder?

9                    PROSPECTIVE JUROR:  Life imprisonment or

10  the death penalty.

11                    THE COURT:  Okay.  Going to the second

12  phase of the trial, that's the decision before the jury.

13                    PROSPECTIVE JUROR:  Yes, sir.

14                    THE COURT:  First question the jury must

15  answer is called Special Issue No. 1.  You have already told

16  me you understand the State has to prove it to you.

17  Question, are you going to be able to answer that issue both

18  yes and no after -- this is hypothetical.  If you were a

19  juror and you had found someone guilty of capital murder of

20  one of the eight different ways, are you going to be able to

21  listen to the second phase of the trial?

22                    They may present more evidence.  They may

23  not.  They may say, jury, please go reconsider everything

24  you've already heard.  Or the State may present more

25  evidence to you in trying to assist the jury in answering

1    that question.

2                    Mr. Sanchez wants to know, are you going

3    to be able to back up and make an independent investigation

4    of everything that you've heard and answer that question yes

5    or no?

6                    PROSPECTIVE JUROR:  Yes, sir.

7                    THE COURT:  You already said, I'm

8    predisposing, I'm a little tending toward the death penalty.

9    But if you answer that question no, what would be the

10   sentence?

11                   PROSPECTIVE JUROR:  I could certainly go

12   with life imprisonment, if we looked at the facts again.

13                   THE COURT:  So you would be able to

14   answer that question independently of anything else we're

15   doing?  Yes or no?

16                   PROSPECTIVE JUROR:  Yes, sir.

17                   THE COURT:  Thank you very much.

18   Mr. Sanchez?

19        Q.     (By Mr. Sanchez)  Okay, Ms. Cunningham.

20        A.     I'm sorry I took so long trying to weed all

21   that out.

22        Q.     That's okay.  It's okay.  Sometimes I don't

23   explain things well.  It's right after lunch, too, you know.

24   Let me ask you this.  Special Issue No. 2, as you can see

25   there, you're going to have to decide, or you and the jury

1  are going to have to decide, whether if someone is convicted

2  as an accomplice, like the State had talked to you about,

3  whether that person actually anticipated that a human life

4  would be taken.  You remember talking about that?

5       A.    Yes, sir.

6       Q.    And, as you can see, you are going to have to

7  decide what the defendant, or the person who is on trial, is

8  actually thinking.  Would you agree with me on that?

9       A.    Yes, sir.

10       Q.    Some jurors have told us, well, you know, it's

11  hard for me to decide that question or I can't get in

12  somebody's mind to figure out what they were actually

13  anticipating, unless I hear from that person.  What do you

14  think about that?

15       A.    I can understand why they would say that.

16       Q.    Okay.  What are your feelings about that?

17       A.    I feel the same way.  The fact, if they were

18  involved in it, comes -- actions speak pretty loud.

19       Q.    Okay.  Okay.  Well, you know the Fifth

20  Amendment right not to testify or to testify, not only is it

21  -- does it run through the guilt/innocence stage of the

22  trial, it also applies to the punishment stage of the trial,

23  okay?  So, in other words, nobody can force Mr. Murphy up on

24  the stand and explain to you or tell you whether he

25  anticipated or didn't anticipate or what he thought at that

1    moment.

2            There's some jurors that say, well, you

3    know what, in order for me to answer that question no, I

4    would have to hear from him, because, otherwise, I've

5    already answered it yes in my mind.  What do you think about

6    that?

7            A.    He doesn't have to do anything, unless he

8    wants to.

9            Q.    Exactly.  But there's some jurors that say,

10   unless I hear from him, then somehow I'm going to take that

11   as a sign or evidence that maybe he did anticipate.  You

12   wouldn't do that?

13           A.    No.  To me that would have no bearing on --

14           Q.    It wouldn't have any bearing on it?

15           A.    No, sir.

16           Q.    Okay.  All right.  And as Mr. Wirskye

17   explained to you about should have and actually anticipated,

18   you saw the distinction in those two standards, right?

19           A.    What were the two standards?

20           Q.    To find somebody guilty as a party of capital

21   murder in the first part of the trial, all the State has to

22   prove to you is that that person should have anticipated

23   that a human life would be taken, okay?  But in order for

24   them to get you to answer Special Issue No. 2, they have to

25   prove to you beyond a reasonable doubt that the person

1    actually anticipated that a human life would be taken.  Do

2    you see the distinction there?

3        A.    Yes, sir.

4        Q.    Okay.  There are some people that tell us,

5    well, once I found that he should have anticipated that a

6    human life would be taken, then in my mind that's almost the

7    same thing as that he actually anticipated that a human life

8    would be taken.  In other words, I wouldn't make the State

9    prove to me that higher burden.  It would already be

10   answered in my mind, once I convicted him of capital murder.

11       A.    I think they would have to prove that.

12       Q.    Okay.  So you would make the State do that?

13       A.    I believe so.

14       Q.    Okay.  When you say you believe so, I mean, I

15   hate to pin you down, but, I mean, would you?

16       A.    Yes.

17       Q.    Okay.  Okay.  And, again, on Special Issue No.

18   3, you know, it's the last step.  That's the last question

19   you have to answer and you would only get there, if you

20   answered Special Issue No. 1 and Special Issue No. 2 yes,

21   the last step before the death penalty could be imposed.

22   You appreciate that, right?

23       A.    Yes, sir.

24       Q.    Okay.  There's some people that say, you know,

25   my feelings about the death penalty are so strong, that once

1  I've convicted somebody of capital murder, once I found that

2  they're a continuing threat to society, and once I've

3  decided that they actually did anticipate that a human life

4  would be taken, Special Issue No. 3, you know, wouldn't have

5  much value in my mind.

6  I mean, once I'm that far in the thought

7  process, I mean, there's not going to be anything that I can

8  hear that would keep me from giving somebody the death

9  penalty or answering that their life should not be spared.

10  What do you think about that?

11  A.    I believe that life imprisonment needs to be

12  taken into consideration.

13  Q.    Okay.  Are you the type of juror -- can you

14  tell us today, if you are the type of juror that can take

15  pen in hand and look at all the evidence and even after

16  you've convicted somebody of capital murder and answered

17  Special Issue No. 1 and Special Issue No. 2 yes, that you

18  could actually sit there and write an answer in Special

19  Issue No. 3 that would result in a life sentence?

20  A.    Yes, sir.

21  Q.    Okay.  And you wouldn't have to worry about

22  explaining yourself to anybody or worry about any outside

23  pressure or social climbing or anything like that?

24  A.    No, sir.

25  Q.    Thank you for answering all my questions.

1    A.    You're welcome.

2              MR. SANCHEZ:  That's all I have right

3    now, your Honor.

4              THE COURT:  Thank you, Ms. Cunningham.

5    If you would be so kind to wait for us out in the hall.

6    We'll have you back in just a few minutes.

7              PROSPECTIVE JUROR:  Okay.  Thank you,

8    sir.

9              [Prospective juror out]

10             THE COURT:  Mr. Wirskye, what says the

11   State?

12             MR. SHOOK:  State has no challenge for

13   cause.

14             THE COURT:  Mr. Sanchez?

15             MS. BUSBEE:  Your Honor, over at this

16   table we think that this juror has obviously and quite

17   clearly stated bias in favor of the death penalty over a

18   life sentence in a capital case.  Anytime the juror has

19   stated bias concerning the law that we're entitled to rely

20   on, I think that they're subject to challenge for cause.

21             THE COURT:  Obviously, I listened very

22   carefully, but when the respective juror herself said, well,

23   Mr. Sanchez, you're confusing me, and Mr. Sanchez says,

24   well, I can't ask a decent question and get her all confused

25   and then I ask a very openended, tell me what the law is and

1    she gets it right, I do not find that she has a bias, once
2    she understands the law.
3                        MS. BUSBEE:  Okay.  Well, I'm -- because
4    I'm talking about the totality of the voir dire.  But I have
5    another one.  She has told -- she told us in a response to
6    Mr. Wirskye's question that as far as she was concerned, if
7    the major actor, that is, for example, in their
8    hypothetical, the triggerman, had formed an intent that she
9    would consider the parties to have the same intent based on
10   the actions of the triggerman.
11                       That's -- what she is saying is, is that
12   it won't matter what evidence that has, what evidence
13   reflects upon the defendant's intent, she will consider him
14   to have had the intent of the primary actor.
15                       THE COURT:  Mr. Wirskye?
16                       MR. WIRSKYE:  Judge, I think the law is
17   real clear on this.  The juror's personal predisposition one
18   way or another to life or death is irrelevant.  It's whether
19   they can follow the law and hold the State to the burden of
20   proof.  And when they look at the Special Issues, this juror
21   said she could do that repeatedly.  Whether she has a
22   personal predisposition towards life or death is really
23   irrelevant.  She's a qualified juror, because she would
24   follow the law and hold to us our burden.
25                       THE COURT:  The totality of her

1   examination reveals to the Court that she was, one, she was

2   wanting to understand what the program was.  She was

3   thoughtful in her answers.  When asked or given a statement

4   that had two questions and an opinion on the back end of it,

5   what do you think, I mean, I'd have a hard time answering

6   some of these questions that were asked.

7              I believe the Court's opinion she has a

8   reasonable understanding of the law, has instructed the

9   Court that she can follow the law, and I find this juror to

10  be qualified.

11             MS. BUSBEE:  And I have yet another one.

12  And may I apprise the Court, as always these challenges for

13  cause are offered pursuant to Article 1, Section 10 of the

14  Texas Constitution, Article 6 and 14 of the United States

15  Constitution.

16             And I apprise the Court that these three

17  challenges for cause are subject or pursuant to those

18  provisions she, subsequent to filling out this

19  questionnaire, after she was under oath and instructed by

20  the Court not to make inquiries about this case, she has

21  admitted to this Court that she has made inquiries by doing

22  an Internet search and she has read about the defendant's

23  record.

24             And she said to the Court, and I'm

25  paraphrasing here, frankly, I feel that there's more, always

1   more there, and that she has formed an opinion as to the

2   defendant's criminal record, and that she didn't say that

3   she would set that aside.  She just said that was her

4   opinion.

5           And I think that she has -- she's

6   violated the rules that the Court set forth at the voir dire

7   proceeding which we had in May.  And, therefore, she has

8   formed an opinion as to the facts of this case and as to the

9   defendant's prior criminal history, which, of course, is not

10  admissible under most circumstances in the first part of

11  this trial, guilt and innocence.

12          THE COURT:  Well -- my previous trials

13  which the jury will know at some point that there was a

14  prison escape.  So that in and of itself doesn't take a

15  rocket scientist to go over that hurdle.  That there was

16  some history, she has indicated.

17          Now, specifically, Ms. Busbee, I have

18  stayed away from instructing the jury, if I recall, in my

19  special voir dire in May, I certainly didn't instruct them

20  to not investigate.  I didn't say anything at all, if I

21  recall.  Just like today, I didn't say anything about media.

22  I didn't say anything about the case.  Let the questionnaire

23  speak for itself.  Because it's one of those things I don't

24  want to call attention to the situation to where someone

25  might go out.  Oh, the Judge says don't do this; therefore,

1    I'm going to go look and see why I'm not supposed to do it.

2                    I believe that she was quite honest in

3    her proffer that, hey, after the questionnaire, I did go

4    look on the Internet and find out his name and recognized

5    his picture with the beard.  But, you know, I can set that

6    aside.  If she is on the jury, obviously, I will instruct

7    her, as I have done in the past in writing and today, that

8    she's not to look at anything further, from any source or

9    don't discuss this case with anyone.  I believe she

10   understands that.

11                   She said that she could make a decision

12   based on the evidence she hears in open court.  She is --

13   once again, once she understood the law she, said, yes, I

14   could set that aside and base my decision on the evidence I

15   heard in court.  Am I wrong in my remembering of what we did

16   in May?

17                   MS. BUSBEE:  I thought you said that,

18   Your Honor, but I -- the record will show.  I'm sure you

19   know better than I do, but it seemed to me that they were

20   told that.  But, it'll be what it was.

21                   THE COURT:  Mr. Shook, can you discern

22   the difference between this morning and what we did in May?

23                   MR. SHOOK:  No, sir.  Of course, May was

24   a long time ago.

25                   THE COURT:  I understand.  We've only had

1  two trials since then.  I mean, let me tell you this.  I can

2  have Nancy look and that's a fairly short portion of the

3  voir dire, my remarks --

4                  MR. SHOOK:  Judge, regardless of that, I

5  think what the woman said was, she read something, but

6  didn't remember.  I mean, every juror --

7                  THE COURT:  I'm not worried about that.

8  My comment is, if I instructed the panel that she was on not

9  to make any investigation, not to inquire over the Internet

10 and she did so, I would, you know, be short of holding her

11 in contempt, that would be where I would end up on the deal.

12                 MS. BUSBEE:  What about this.  What if,

13 hypothetically, if we used a strike and then you later find

14 out that that was said, you could give us an additional

15 strike?

16                 THE COURT:  That would be a wonderful

17 reason to give you an additional strike.

18                 MS. BUSBEE:  Right.  So that way we

19 wouldn't have to stop.

20                 THE COURT:  Sounds good to me.  You've

21 got your built-in strike.  The Court, having found Ms.

22 Cunningham qualified, what says the State?

23                 MR. WIRSKYE:  State will accept the

24 juror.

25                 MR. SANCHEZ:  We will exercise a strike,

1    Your Honor.

2              THE COURT:  Strike No. 11.  Please ask

3    her to come back in.

4                   [Prospective juror in]

5              THE COURT:  Ms. Cunningham, I want to

6    thank you for your very thoughtful time and attention to

7    this Court, very careful deliberation on these issues.  I

8    will instruct you that you are not going to be seated on

9    this jury.  So thank you for your time and you are free to

10   go.

11             PROSPECTIVE JUROR:  Thank you, sir.  It's

12   been an education today.

13             THE COURT:  Probably more than you

14   wanted.

15             PROSPECTIVE JUROR:  Good luck to all of

16   you.

17                  [Prospective juror out]

18             THE COURT:  Ms. Martin.

19                  [Prospective juror in]

20             THE COURT:  Good afternoon.

21             PROSPECTIVE JUROR:  Good afternoon.

22             THE COURT:  We have juror No. 4245,

23   Bonnie Jean Martin.  Good afternoon, Ms. Martin, how are

24   you?

25             PROSPECTIVE JUROR:  Just fine.

1    THE COURT:  Sorry for the delay in

2    getting you in.  Have you had an opportunity to read the

3    guide I provided for you?

4    PROSPECTIVE JUROR:  Yes.

5    THE COURT:  And also a copy of your

6    questionnaire that you filled out for us back in May?

7    PROSPECTIVE JUROR:  Yes.

8    THE COURT:  I know that's a lot of law to

9    give someone.  We don't expect you to understand it all

10   right now.  The objective here is for the attorneys to visit

11   with you and discuss the law and the issues and for you to

12   understand how it all relates.  There are no wrong answers,

13   just truthful and honest answers.  And really this is the

14   only way we can do it.  And some people come in and they're

15   kind of nervous or uneasy.  This is as informal a process as

16   we can have.

17   If you would, just think about these

18   issues and visit with the lawyers.  At the end of the day I

19   have two questions I must ask.  One is, do you understand

20   the law?  No. 2, can you follow the law?  That's the big

21   picture I have to make the decision on.  The only question I

22   have for you is will you be able to serve this Court for a

23   period of two weeks beginning on November 10th?

24   PROSPECTIVE JUROR:  Yes.

25   THE COURT:  Thank you very much.  If you

1   would, please give your attention to Mr. Shook.

2               MR. SHOOK:  May it please the Court?

3                       BONNIE MARTIN,

4   having been duly sworn, was examined and testified as

5   follows:

6                    DIRECT EXAMINATION

7   BY MR. SHOOK:

8        Q.    Ms. Martin, my name is Toby Shook.  I'm going

9   to be asking questions on behalf of the State this

10  afternoon.  And, as the Judge said, there aren't any right

11  or wrong answers, just honest ones is all we're looking for.

12  I'm going to finish -- I'm going to go over a few things on

13  your questionnaire and then talk about capital murder, the

14  law that applies to this case and see how you feel about

15  that.  But if you have any questions at any time, feel free

16  to ask, okay?

17       A.    Yes.

18       Q.    I see by your questionnaire you now work in

19  market as a market research analyst?

20       A.    Yes.

21       Q.    If you would, just tell us a little more what

22  you do on a day-to-day basis.

23       A.    On a day-to-day basis I do corporate

24  intelligence and market analysis for a very small niche

25  industry, which is Postal Automation.

1        Q.    Okay.  And I saw in the -- somewhere in the

2  past that you worked as a paralegal for some time.  How long

3  ago was that?

4        A.    That was about ten years ago.

5        Q.    Okay.  Now, you didn't do any criminal law; is

6  that right?

7        A.    No.  I worked for a plaintiff's attorney, solo

8  practitioner.

9        Q.    How long did you work with him?

10       A.    Three years.

11       Q.    All right.  Is that when you decided to go

12  into this market research analysis after that?

13       A.    I had an opportunity to join this company and

14  work on contracts.  And then the division that I went into

15  was closed, and so I applied for and got the next job.

16       Q.    I also see from your questionnaire that you

17  have sat on one jury back in 1990; is that right?

18       A.    Yes.

19       Q.    It was some type of burglary case?

20       A.    Yes.

21       Q.    If you would, tell us what you remember about

22  the facts, if you do remember much.  I know it's been a

23  while.

24       A.    The defendant burglarized or robbed a

25  business.  And at the punishment phase of the trial they

said that there had been a gun involved.

    Q.    Okay.  So there was some evidence of a weapon involved?

    A.    Yes, there was a weapon involved.

    Q.    Do you recall if the defendant actually testified in that trial?

    A.    No, the defendant did not.

    Q.    Okay.  Was there a previous criminal record shown at all?

    A.    Not until later.

    Q.    Okay.  Did the jury sentence the defendant?

    A.    Yes.

    Q.    What was the sentence, if you recall?

    A.    That, I don't recall.

    Q.    A term of years in prison or probation, or --

    A.    Years in prison, but I don't remember the time.

    Q.    All right.  How did that service go?  Was it, over all, a pleasant experience?  Were there a lot of arguments back in the jury room or was it pretty cut and dried in your mind, or what do you recall about that?

    A.    Well, it's always, I think, something that makes you a little nervous to have that kind of responsibility, and it took some time back in the jury room to come to a decision.

1    Q.    Was that in the punishment phase or the

2 guilt/innocence stage?

3    A.    In the guilt/innocence phase.

4    Q.    From your own point of view, did you have

5 trouble coming to a decision or was it just trying to get

6 others to come to a decision, convince others?

7    A.    It was more getting the entire group to come

8 together.

9    Q.    All right.  Did you participate a lot in the

10 discussion itself?

11    A.    Yeah, probably.

12    Q.    Would you feel the experience was positive or

13 negative, or could you say?

14    A.    It's both.  You know, you learn, you learn

15 from it.

16    Q.    All right.  Let's talk to you for a little bit

17 about how you feel about capital murder and the death

18 penalty.  Are you in favor of the death penalty as a law or

19 as a punishment in our society?

20    A.    Yes.

21    Q.    Okay.  In your own words, tell us why you

22 favor the law or why you feel we need a death penalty or

23 what purpose it serves.

24    A.    Well, I favor it because at this point, living

25 in Texas, it is the law in Texas and that is how they settle

things.  It also, hopefully, serves as a deterrent or at
least some type of deterrent for other crimes.  And I think
that there are crimes that are committed that are so heinous
that there has to be a large punishment.

Q.    Okay.  What types of crimes would those be in
your mind, when you think of a crime that's just so bad that
the death penalty would be the correct punishment?

A.    Crimes against -- horrible crimes against
children, horrible crimes against anyone, taking a life.

Q.    Okay.  You said you favor the law right now
because you know that that's how the law works right now in
Texas.  A lot of times we like to ask a question this way.
We want to make you Governor of Texas for a day, let's say.
And we give you a lot of power and you get to decide which
laws are on the books and which laws aren't.  You don't have
to consult the Legislature or anything.  It's all up to you.
We could even make you queen of Texas for a day, let's say.
Sometimes we put it that way.  But if you could decide and
it were up to you personally, would you have a death penalty
statute?

A.    I'd have to think long and hard before I would
remove it, yes.

Q.    Okay.  Have you ever followed any cases in the
news, locally or nationally, that you thought was a death
penalty case, or one that at least should be considered as

1  an option?

2  .       A.      Well, I do a tremendous amount of reading, so,

3  and follow a lot of things with my work.  So, yes, I mean, I

4  see them.  I know of them.

5          Q.      Do you recall any that you could describe to

6  us that we might recognize or any of the defendants' names

7  or anything like that?

8          A.      No.

9          Q.      Okay.  While we're on that subject, let me ask

10  you this.  Almost every juror that filled out the

11  questionnaire was asked about the publicity in this

12  particular crime, and almost all had seen or read something

13  about it.  And so we ask each juror what they recall hearing

14  about the case.  I know it was a while back, but as best you

15  can remember, what details do you recall about the case?

16          A.      Well, I remember that it was a group of people

17  who had broken out of prison.  And I think they had spent

18  some amount of time other places before they came to the

19  Dallas area.  That crime was committed and then they left

20  the State and were somewhere else.  But timelines or

21  anything like that, I don't recall.  And I have access, I

22  could probably pull all of those things up again, but I

23  chose not to.

24          Q.      Okay.  The law is this.  Just because you've

25  seen something on TV or read something in the newspaper or

1  on the Internet, doesn't mean you are ineligible as a juror.

2  But to be qualified as a juror, you have to be able to

3  assure the Court that you could, if chosen, listen to the

4  evidence in the courtroom, listen to the witnesses, and make

5  your decisions based on that testimony and not anything that

6  you have read outside the courtroom.

7           We can't ask you to forget about what

8  you've seen or read, but we can ask you to tell us honestly

9  whether that would influence you or not, because, obviously,

10  we have to have jurors who could make their decisions on the

11  actual testimony and not let anything they've read outside

12  the courtroom influence them in any way.

13           And it will just depend on your own

14  honesty and knowing how you feel about it for that

15  particular part of this.  As best you know yourself, would

16  you be able to follow that rule of law?

17       A.     Yes.

18       Q.     Okay.  On page 4 of the questionnaire, and,

19  you know, we asked a whole lot of questions.  But at the top

20  -- in fact, I think it's the third question down, we asked

21  one question that if you do believe in using the death

22  penalty, how strongly?  And we say on a scale of 1 to 10,

23  how do you hold that belief, 10 being the most.  And you

24  left that one blank.  And I didn't know if that was an

25  oversight or you just couldn't decide, because that

particular question, people answer it for different reasons.

    A.      Okay.  I think that was just an oversight.

    Q.      Okay.  Kind of as a gut reaction, now that you have seen the question, how do you think you would answer that?

    A.      I would hold to at least an 8 or a 9.

    Q.      Okay.  You know from reading the material the Judge has given you, that the death penalty in Texas is reserved just for certain types of murder cases.  It's not self-defense situations or accidents.  It's an intentional killing and murder cases with some other aggravating fact. We have lots of murder cases, brutal murder cases, that don't fall under the death penalty statute.

           To get to the death penalty statute, you have to have an intentional murder, plus another aggravating fact, such as a murder that occurs during the course of a felony, for instance, robbery.  If I go into a 7-Eleven store and pull a gun out and shoot the clerk during a robbery, that could be a death penalty case, murder during a burglary.  If I break into someone's home, burglary during a rape, or kidnapping, or arson.

           Also, murder of specific individuals, such as a police officer on duty, fireman on duty, that could be a death penalty case, child under the age of six. Murder for hire, if you kill someone for money or personal

gain.  Murder of more than one person, such as a serial
killer situation or mass murder.

　　　　　　　Those are the specific situations that
have been reserved for consideration of the death penalty.
As far as those types of crimes go, do you feel those are
the types of crimes from your own personal point of view
that you feel should come under consideration for the death
penalty?

　　　A.　　Yes.

　　　Q.　　Okay.  Now, when we think of capital murder,
we normally always envision a fact situation and usually
that of the actual triggerman or the person that causes the
death.  That's only natural.  But capital murder, like other
crimes, can be carried out by more than one individual.
There could be accomplices involved as a contract.  We call
that the law of parties in Texas.

　　　　　　　But if several people are involved in the
crime, they can all be held accountable, if they are
actively involved or aiding, directing, and encouraging each
other in committing that crime.  The same is true of capital
murder.

　　　　　　　An example we often use is if Mr. Wirskye
and I decide we want to rob our neighborhood bank.  Our plan
calls for me to go to the bank and I'm going to have a gun.
And I'm going to go in there, draw the gun out, threaten the

1   tellers, get their hands in the air.  And after I do that,

2   he will go in with me and he will put the money from their

3   cash drawers into a bag and round up all the money.

4                   Now, during the course of that robbery,

5   if I shoot one of the tellers intentionally, maybe I don't

6   like the way they're looking at me, maybe he tells me one is

7   going for a silent alarm, I would kill them intentionally.

8   We would flee and be caught.  Obviously, I could be

9   prosecuted for capital murder and I could receive the death

10  penalty from a jury.  The law says that he could also be

11  prosecuted, if the jury believes he's actively involved and

12  could ultimately receive the death penalty.

13                  But people feel very differently about

14  that area of the law.  And, as the Judge has said, there are

15  no right or wrong answers.  Some people believe in the death

16  penalty, but if it were up to them, they would reserve it

17  for those fact situations just involving the actual

18  triggerman, the man that causes the death.  If it were an

19  accomplice situation, someone who didn't actually cause the

20  murder, they would reserve some other type of punishment,

21  some long prison term, some kind of bank robbery conviction,

22  and that sort of thing.  They don't think it's fair that the

23  death penalty be administered to accomplices.

24                  Other jurors tell us they do think it's

25  fair that the death penalty could be prosecuted in an

1    accomplice situation and an accomplice could receive the

2    death penalty, depending on their involvement. And that's,

3    people come down on different sides of that particular

4    issue, and we just wanted to ask you, honestly, how you feel

5    about the prosecution of an accomplice in a death penalty

6    situation?

7        A.    It's a hard question, but I feel that when

8    people enter into a situation where they know that they are

9    going to commit a crime and either one of them could be

10   responsible for shooting something, that they're both --

11   they both have put that in their mind that that is what

12   could happen, and either one of them could be the person

13   that would carry that out.

14       Q.    Okay. So you feel that as far as the law

15   goes, an accomplice could be prosecuted for the death

16   penalty and ultimately could receive it?

17       A.    Yes. It would depend on what you hear during

18   the trial, also, I think.

19       Q.    What types of factors are important to you in

20   that situation?

21       A.    Well, I suppose if you had one person that

22   didn't even approach the scene and was, stayed blocks away

23   as a lookout or something, maybe that would change my mind.

24   But if those that are at the scene probably have discussed

25   their actions or what they would do.

1    Q.    Okay.   Now, let me ask you this.   You told us,

2  quite honestly, back in that burglary case that that did

3  bother you somewhat, making that type of decision involving,

4  affecting someone's future, I guess.   It's only natural, I

5  think you said.   This situation involves the actual

6  execution of another human being.   You probably know, you

7  read the news a lot, that executions in Texas actually do

8  take place.

9              Some states have the death penalty on the

10  statute, yet they never carry it out.   But, you know, coming

11  from Texas, it is a punishment that is sought and also

12  carried out, that Texas, in fact, leads the nation in

13  executions.   So we're talking about a very real punishment.

14              And people feel differently about

15  actually sitting on these types of cases.   We have people

16  that believe in the death penalty sometimes, but when it

17  comes down to making that decision, they are too

18  uncomfortable with it, because it does involve the taking of

19  another human's life and they, quite frankly, tell us they

20  don't want that type of responsibility and wouldn't be

21  comfortable making that situation.   And their -- those

22  feelings would interfere with their decision-making process.

23              Other people can.   And that's why we call

24  so many people down here, because some people do have

25  problems with it.   I can tell you -- are you familiar with

1   the method of execution in Texas?

2       A.      Yes.

3       Q.      Lethal injection?

4       A.      Yes.

5       Q.      That, quite frankly, is our goal in this case.

6   We feel we have the type and quality of evidence to convince

7   a jury of the defendant's guilt and that the questions would

8   be answered in such a way that some day he will be executed

9   by lethal injection.  And, again, you know from living here,

10  that that's a very real punishment.  You can fully expect

11  that to happen, if those were the findings in this case.

12              How do you personally feel about sitting

13  as a juror?  Do you think this is something, a decision you

14  could make, if it's proven to you or would you have some

15  reservations about making that decision, an actual

16  life-and-death decision?

17      A.      I think that I could make that decision.  It

18  is an uncomfortable situation for anyone, I think, to say

19  that it would be an easy decision or an easy thing to deal

20  with.  But I think that I could make the decision based on

21  what was presented.

22      Q.      Okay.  If you'll take a moment to read Special

23  Issue No. 1 to yourself.

24              MR. SHOOK:  Judge, actually I think

25  that's all the questions I have at this time.

1    MS. BUSBEE:  Your Honor, if it please the
2  Court, we've reached an agreement in this matter on this
3  juror.

4    THE COURT:  Ms. Martin, I want to thank
5  you for your time and service today.  The parties have
6  agreed that you are not going to be seated on this jury.  So
7  you can be excused.  Thank you so much.

8    PROSPECTIVE JUROR:  Thank you.

9    [Prospective juror out]

10    THE COURT:  Ms. Anderson.

11    [Prospective juror in]

12    THE COURT:  Good afternoon.

13    PROSPECTIVE JUROR:  Good afternoon.

14    THE COURT:  Please have a seat and make
15  yourself comfortable as best you can.

16    PROSPECTIVE JUROR:  Okay.

17    THE COURT:  Juror No. 2691, Ms. Jan Marie
18  Anderson; is that correct?

19    PROSPECTIVE JUROR:  Yes.

20    THE COURT:  Welcome to the 283rd.  Sorry
21  for the delay in getting you in.  We never know exactly how
22  long we are going to speak with someone.  The first lady was
23  almost an hour and a half, the second lady was just a few
24  minutes.  So I have to balance 15 people wait or one or two.
25  So as my letter told you, you were signed up for half a day

1   anyway, so if we get you out by 5:00 we've done our job.

2                   PROSPECTIVE JUROR:  Okay.

3                   THE COURT:  So I apologize for getting

4   you in, but it's one of those things.  I just have to take

5   it as it comes.

6                   PROSPECTIVE JUROR:  Okay.

7                   THE COURT:  I take it you -- have you --

8   obviously, you've had enough time to read that guide,

9   probably two or three times, enough to be confused, haven't

10  you?  Right?

11                  PROSPECTIVE JUROR:  Yes.

12                  THE COURT:  Okay.  We've also provided a

13  copy of your questionnaire to help you refresh your memory

14  on the answers that you provided.  And, also, if the

15  attorneys would like to ask you to further elaborate on an

16  answer or to look at and explain the answer, sometimes it

17  helps to have that in front of you.

18                  PROSPECTIVE JUROR:  Okay.

19                  THE COURT:  Bottom line is there are no

20  wrong answers, just truthful.  And I know people come in and

21  they get kind of nervous and you walk in and everybody is

22  looking at you and, you know, downstairs you can hide.  You

23  were one of 700 people.  Up here you can't.  So you get the

24  best seat in the house.

25                  If you would, at the end of the process,

1  I have two questions I must ask you.  Number one is, do you

2  understand the law?  Number two, can you follow the law?

3  That's the big picture here.  Those are the questions that I

4  have to answer at the end of this process.  Only question I

5  have for you at this time is will you be able to serve this

6  Court for a period of two weeks beginning on November 10th?

7              PROSPECTIVE JUROR:  Well, we have tickets

8  to California that my inlaws have already bought and we

9  leave the 21st.

10             THE COURT:  Of?

11             PROSPECTIVE JUROR:  Of November.

12             THE COURT:  That's Thanksgiving.

13             PROSPECTIVE JUROR:  Friday, November

14  21st, is when we leave.

15             THE COURT:  So you're leaving

16  Thanksgiving week?

17             PROSPECTIVE JUROR:  For that week, yeah.

18             THE COURT:  I do not anticipate that

19  Friday being an issue.  That would be the second Friday of

20  the week of trial.  Yes, that would be the second Friday.  I

21  do not anticipate that will be in play, but it could be.

22             Let me give you a hypothetical.  Say the

23  jury were still out making decisions on that Friday, you

24  would have to either, A, delay your flight, or catch up on

25  Saturday your, or whatever.  I know that they've already

1  prepaid.  I can tell you that airlines have obeyed a court

2  order before and allowed a party to change their flight to a

3  later date and time.

4           PROSPECTIVE JUROR:  Well, on a personal

5  level, it's my inlaws' 40th wedding anniversary which

6  they're celebrating Saturday, the 22nd.  And that's why

7  we're going that week.  So it would be a shame, I mean, I'd

8  hate to miss it.

9           THE COURT:  I understand and I -- like I

10  said, I don't have a crystal ball.  But I don't think it's

11  going to be a problem.  I'm telling you, if it became a

12  problem that I have done as much as fax a letter to the

13  airlines and they make accommodations for the juror.

14           PROSPECTIVE JUROR:  I can obey a law, so

15  whatever you tell me to do, I'll do.

16           THE COURT:  I just don't think it will be

17  a problem.  And if it were to become a problem, then I think

18  we can still get you there by Saturday evening.

19           PROSPECTIVE JUROR:  Okay.

20           THE COURT:  Okay?  With that, Mr. Shook.

21           MR. SHOOK:  Thank you, Judge.

22               JAN ANDERSON,

23  having been duly sworn, was examined and testified as

24  follows:

25               DIRECT EXAMINATION

BY MR. SHOOK:

Q.   Ms. Anderson, let me, well, we appreciate you filling out this questionnaire.  I'm going to follow up on it just a little bit, but you have been very forthcoming. And, as the Judge said, we're only interested in your honest opinions.  And from reading your questionnaire, you look like a pretty straightforward person, so I think we'll get those from you.  But if you have any questions at any time, feel free to ask, all right?

A.   Okay.

Q.   Looking at your questionnaire, you mentioned this twice and this is not really related to your travel issue, but you do pick up your children from school, at least you did last May.  Is that still the situation?

A.   Yes.

Q.   What time do you pick them up?

A.   3:30.

Q.   Okay.  And are you the sole person that can do that or if we give you -- because what the Judge does, is the jurors are usually here about 8:30 til 4:30 or 5:00. It's like business hours.  It kind of works like clockwork. The only time that he can tell you that you won't be out by that time, is if you were in deliberations, either in the guilt/innocence stage or the punishment stage.

And we do feel that the trial will last

just that two-week period.  Would that present a problem for

you, your child care issues?

A.   Yes, because we don't have any family that

lives nearby.  I don't know.  We don't have anybody nearby I

could think of to pick them up.

THE COURT:  How old are your children?

PROSPECTIVE JUROR:  Eleven and twelve.

THE COURT:  Well, see, the law didn't

give you an exemption.

PROSPECTIVE JUROR:  I know.

THE COURT:  I mean, I understand your

personal situation, but I, either it fits the law or it

doesn't.  So, you know, somebody is going to have to help

out, if that would be the case.  I know he's trying to

inquire, but --

Q.   (By Mr. Shook)  Yeah, the -- really what it

gets down to this is if you, because the law has to make

certain categories, but if something is going on in your

life where you would be unable to concentrate, if you were

placed on a jury because of something personal going on in

your life, we, obviously, would want to know that, too.

A.   Right.

Q.   Because everyone is different.  And that's the

only situation why I asked for that reason, if you'd be able

to make those arrangements or is it going to be a situation

1   where they'd be on their own for a couple of hours.  And if

2   that were the situation, is that going to cause you a lot of

3   worry so that you wouldn't be able to concentrate on the

4   case.  But only you can tell us your own personal situation.

5   But we brought you in early and that's why we want to

6   inquire.

7          A.     It may, because my daughter was just recently

8   diagnosed with diabetes, and so I know I would probably be

9   thinking of that.  But if it's only an hour or two, I mean,

10  they are 12 and 11, they could stay home.

11         Q.     Okay.  All right.  Well, like I said, we just

12  want to -- you know your situation best, so we depend on

13  your answers there.

14         A.     Right.

15         Q.     Will she be getting any followup treatment

16  around that time in November or do you know?

17         A.     My daughter?

18         Q.     Yes.

19         A.     Not that I know of.

20         Q.     Okay.  All right.  Let me ask you a few

21  questions on your questionnaire.  You had said and I'll turn

22  -- I know there's lots of questions.  But on page 5 when we

23  asked about the criminal justice system, we asked kind of an

24  openended question about what your feelings in general are

25  about the criminal justice system and you said that you

1   believe there are some horrible problems that must be fixed,

2   if we're ever to have justice.  I would like you to kind of

3   expand on the problems you foresee in the system.

4        A.     Well, I just feel like occasionally trials go

5   on too long.  I've -- again, I mentioned the only one I ever

6   really followed was O. J.  I thought that was horrible, you

7   know.  It went on way too long.  It was ridiculous.  And I

8   don't know, but it doesn't seem to me as if justice was

9   really done.

10          You know, I think there are instances

11  where people get out on probation far too early and repeat

12  the same crime over and over again and I think that's an

13  issue, especially with pedophiles, proven, where they redo

14  it over and over again.  I just don't feel that they're

15  safe, that we're safe, when that occurs.

16       Q.     Let me ask you your -- oh, there was another

17  question I wanted to ask on your questionnaire is you said

18  your husband had been looking for another job?

19       A.     Yes.

20       Q.     Is that still the same situation?

21       A.     Yes, he's still looking.

22       Q.     Okay.  Because I know y'all have moved around

23  quite a bit.  But as you foresee it, you're not going to be

24  moving out of town in November or anything like that?

25       A.     So far, not that we know of.  Nobody seems to

1   want to pay for relocation right now, so.

2       Q.   Okay.  Let me ask you how you feel about the

3   death penalty as a law.  Is that a law that you believe in

4   and feel should be enforced?

5       A.   Yes.

6       Q.   Can you tell us in your own words why you

7   believe in the death penalty and the purpose you feel it

8   serves society?

9       A.   Well, it just seems to me that, logically

10  speaking, if you know that you are going to receive death

11  for doing something, it seems to me that would be a logical

12  deterrent.

13      Q.   Just a good deterrence for those, for anyone

14  that may considering breaking the law?

15      A.   Yes.

16      Q.   Do you also feel it could be a just punishment

17  for certain crimes?

18      A.   Yes.

19      Q.   Okay.  What types of crimes do you think from

20  your own personal point of view would be appropriate for

21  consideration of the death penalty?

22      A.   Obviously, premeditated murder.  I even

23  believe, you know, if they're repeatedly perpetrating a

24  violent act against a woman through rape or a child through

25  molestation, it might be called for, too.

Q.    A lot of people tell us that, in severe abuse
cases, child abuse cases, and also serial rapists in that
situation.

A.    Yes.

Q.    Now, in Texas, there are only -- right now,
the death penalty is just reserved for murder cases and then
only certain types, murders that occur with what we call
another aggravating fact, such as a murder during a felony.

A.    Yes.

Q.    Someone murders someone during the course of a
robbery, burglary, rape, or kidnapping, or arson.  Also
murder of specific victims such as a police officer, fireman
on duty, murder of a child under the age of six, murder of
more than one victim, and then a hitman situation, someone
does it for money.  But those are the specific situations
that have been reserved for consideration of the death
penalty.

But another area of the law I want to
talk to you about is what we call the law of parties, which
is more commonly known as accomplices.  Sometimes you have
more than one individual commit a crime.  A capital murder
is no exception.  The law says that if someone is an
accomplice, if they are helping, actively participating in
the crime, that they can be held accountable.

An example we give in the capital murder

situation is this, using myself and Mr. Wirskye.  We decide

we want to rob a bank and our plan calls for me to go in

there with a gun.  I'll hold the tellers up, I'll threaten

them and get them to raise their hands.  And he goes in with

a bag and he fills the money up while I'm keeping the gun

covering them.

    During the course of that robbery, if I

intentionally shoot one of them, maybe I don't like them,

maybe he tells me they're going for an alarm, and I kill

them.  We flee.  We're arrested.  Obviously, I can be

prosecuted for capital murder and I could receive the death

penalty because I am the actual murderer.

   A.  Uh-huh.

   Q.  The law says, though, that Mr. Wirskye could

also be prosecuted for capital murder, and a jury could

ultimately find him guilty and even assess the death

penalty, depending on his involvement and what they view in

the facts, even though he didn't cause the death.  People

feel differently about that.

    Some people tell us, I believe in the

death penalty, but I would reserve it for the triggerman.  I

think it's just in those situations and I don't believe in

the death penalty for an accomplice, because they didn't

actually cause the murder.  They might reserve a long prison

term for some other crime, bank robbery, or whatever, for

1    that particular individual.

2                    We have other jurors that tell us they do

3    think accomplices should be held accountable and should be

4    prosecuted and could ultimately receive the death penalty,

5    depending on the facts.

6                    But everybody feels differently and we

7    just want to get your honest opinion on that area of the

8    law.  How do you -- how do you feel about the prosecution of

9    an accomplice in a death penalty situation?

10        A.      I suppose I'd need to know what that

11   accomplice actually did.  For instance, if the accomplice

12   held the person while the person was getting killed or

13   helped hide the body, or, you know, was active in that way,

14   I would say possibly yes.  But if the accomplice was saying,

15   no, don't do that, don't do that, you know, I mean, I guess

16   it depends upon the instance.

17        Q.      Okay.  Well, there's two ways that can be --

18   you can get a conviction.  One is if they encourage, direct,

19   aid.  That might cover some of the situations you gave.  If

20   they said, yeah, kill them, or I want you to go do this,

21   that sort of thing, we are entitled to a conviction of

22   capital murder.  But, also, there's another theory called,

23   we call it the conspiracy theory.

24        A.      Okay.

25        Q.      Basically what that is, is this.  If two or

1   more people enter into a conspiracy to commit one felony and

2   one of the conspirators commits another one to help carry

3   that conspiracy out, then all could be held accountable,

4   even if they don't have the intent to commit that other

5   crime.

6          A.     Uh-huh.

7          Q.     If they should have anticipated that that

8   could happen.  Now, the example I gave, the bank robbery,

9   the conspiracy would be Mr. Wirskye and I agreed to commit

10  bank robbery.

11         A.     Right.

12         Q.     And even though he didn't pull the trigger, he

13  could be found guilty if a jury believes he should have

14  anticipated that could occur.  In fact, to get him guilty of

15  the crime under that law, he doesn't even have the intent

16  for that person to die.  He could have the opposite

17  situation of the example you gave.  He could be saying, well

18  -- he could be saying, don't shoot them, don't shoot them.

19         A.     Uh-huh.

20         Q.     But if a jury believes he should have

21  anticipated, then he could still be found guilty of capital

22  murder.

23         A.     Okay.

24         Q.     Okay?  And some people disagree with that area

25  of the law.  If that accomplice didn't have any intent to

1  kill and was even expressing that or whatever, they don't

2  think that's fair that he's convicted of capital murder.

3  How do you feel about that situation?

4       A.     Well, it would probably also depend.  If he

5  were carrying a gun, then I would know that he could prepare

6  to kill as well.  So, therefore, if he had no gun, I suppose

7  I'd have to hear.

8       Q.     Just going to depend on the facts?

9       A.     I think so.  Yeah, that's a tough one.

10      Q.     Well, we can't preview the facts.  But all I

11  can ask you, then, really, after describing the law to you,

12  explaining the law, do you feel then an accomplice could be

13  prosecuted for the death penalty and ultimately receive it,

14  depending on his involvement in the facts?

15      A.     Well, if that's the law, then yes.

16      Q.     Okay.  From your own personal point of view,

17  do you agree with the law?

18      A.     I think motive has a -- weighs in the decision

19  for me.

20      Q.     Okay.

21      A.     But if they are carrying a gun and robbing

22  somebody, to me that shows that they are prepared to --

23      Q.     Okay.

24      A.     -- intervene violently, so, yes.

25      Q.     So that goes to their motive and that sort of

1   thing?

2          A.      Uh-huh, yeah.

3          Q.      All right.  Fair enough.  Let me ask you this.

4   Now, there's a part on the questionnaire where, on page 3,

5   we ask if you've heard about the case.  And this case is a

6   situation that received a lot of publicity and almost every

7   one of the jurors has.  And you said you heard about it on

8   the TV news.

9          A.      Uh-huh, yes.

10         Q.      If you would, just tell us what you remember

11  about the case.

12         A.      Actually, not much.  Actually, the day that it

13  happened we were shopping in the area and saw a bunch of

14  activity in front of the store and thought, gosh, what

15  happened, you know.  And went home and saw it that evening

16  on the news, and that's all I know.  I don't know a lot of

17  -- I never followed up.

18         Q.      Did you ever, you didn't see what happened

19  afterwards?  How any arrests were made, anything like that?

20         A.      I didn't follow it, no.

21         Q.      Because you've seen something on TV doesn't

22  necessarily make you ineligible to be a juror.  The bottom

23  line is this, jurors have to be able to assure the Court

24  that if they are chosen to sit on a jury, they can make

25  their decisions just based on the testimony they hear in the

1  courtroom and not anything they've seen on TV.

2          A.      Right.

3          Q.      Do you feel you could do that?

4          A.      Yes, because I don't even remember much that I

5  saw on TV, so.

6          Q.      All right.  Now, let's talk a little bit about

7  the procedures in the case.  A capital murder trial is

8  divided into two parts.  There's the guilt/innocence stage

9  and then there's the punishment stage.  The guilt/innocence

10 stage, we have to prove the indictment to you beyond a

11 reasonable doubt.  If we fail to do that, then it's a not

12 guilty finding.

13         A.      Okay.

14         Q.      If we are able to do that, we move to the

15 punishment phase where you may hear additional evidence.

16 And at the close of that evidence, you then get to these

17 Special Issues, which I'll go over in a little more detail

18 in a minute.

19                 But, basically, the Special Issues are

20 this.  The State must prove beyond a reasonable doubt that

21 the defendant is a continuing danger, that he either

22 intended the person to die or anticipated that they would

23 die, and that the jury doesn't believe there is sufficient

24 mitigating evidence to warrant a life sentence.

25                 If they are answered yes, yes, and no,

1   the Judge has no discretion.  He would sentence the

2   defendant to death.  If they are answered any other way,

3   again, he has no discretion.  He would sentence the

4   defendant to life.  But those are the only two possible

5   outcomes, once someone has been convicted, the death

6   sentence or a life sentence, and that's determined by how

7   the jury answers those questions.  Is that clear to you?

8        A.     Yes.

9        Q.     Okay.  Are you familiar with the method of

10  execution in Texas?

11       A.     No.

12       Q.     Okay.  It's by lethal injection.

13       A.     That's what I thought, but I was not sure.

14       Q.     It used to be by electrocution, but the law

15  changed and it's now by lethal injection.  The procedures

16  are the same in each case.  They would be the same in this

17  case, if the defendant were found guilty and these questions

18  were answered yes, yes, and no.  The Judge would sentence

19  him to death and he would be placed on death row.

20                   At some point in time Judge Cunningham

21  would actually issue a date of execution.  The day prior to

22  that date, he would be moved from death row to downtown

23  Huntsville, where by law all executions take place in a

24  prison there.  The procedures are the same.  On the date of

25  execution, he's housed near the death chamber.  He's given

1  an opportunity to have a last meal.  He's given an

2  opportunity to meet with family or friends or a religious

3  counselor of his choosing.

4                          At 6:00 p.m. by law all executions take

5  place.  There's a room there that you may have seen on TV

6  that has a gurney.  This is much like a gurney you'd see in

7  a hospital, except that it has leather straps constructed to

8  it.  There are two rooms there.  There are the viewing rooms

9  where friends of the defendant can view the execution and

10 also friends of the victim, the victim's family.

11                         About ten minutes prior to 6:00 p.m. he

12 would be taken into that room.  He would be placed on that

13 gurney, by force, if necessary, and secured by those leather

14 straps.  Needles would be placed in his arms.  The tubes

15 from those needles go to another room where the executioner

16 sits.  The visitors or the witnesses are then brought into

17 their respective viewing rooms.

18                         At that point in time, the warden gives

19 the defendant an opportunity to make a last statement and

20 these are often reported in great detail in the media.  They

21 may proclaim their innocence, they may ask for forgiveness,

22 they may condemn the death penalty as a process.  But

23 oftentimes jurors in former cases even read about these

24 things.  The general public does.

25                         And then the execution takes place, which

is simply the signaling of the warden who will inject lethal
substances, the executioner will, substances which cause the
heart to stop immediately and collapse the lungs.  He would
be conscious during this process.  It takes about 15 to 20
seconds.  He would then lapse into a coma and die.

That's the procedure in each case.
That's the procedure in this case.  And I must be quite
frank with you.  I don't mean to be morbid.  But it's one
thing to talk about the death penalty philosophically and
another once you come down here and realize you may be on
this jury.

A.     Yes.

Q.     But to lay all our cards on the table, that's
our goal in this case.  We feel we have the type and quality
of evidence that would convince a jury of this man's guilt
and that these questions would be answered in a way that
would result in his execution.

We bring a lot of people down here,
because people feel differently.  We have some that are
opposed to the death penalty on moral or religious grounds
and can never make that decision.  We have other persons
that are so adamantly for it, that they could never be fair.
We have some people that are for it, but can't make the
decision.

We have other people that tell us, I'm

for it, I feel we need it as a law, but I could not

personally make that decision.  It would bother me too much,

they tell us, quite frankly, to have someone's life in my

hands.  It's something that would bother me for the rest of

my life and that would interfere with my decision-making

process.

And if they honestly tell us that, then

that's fine, too.  We have plenty of other jurors to talk

to.  As best you know yourself, how -- you mentioned in your

questionnaire, that was the last question, that it would be

a possibly difficult decision for you.

A.      Definitely it would be difficult.  I don't

know, you know, is it -- I guess it's the jury, then, that

answers those three?

Q.      That's right.

A.      So, the jury is the one that's going to decide

and not the Judge?

Q.      The Judge won't decide and the jury doesn't

write death or life in.  But if you have a yes, yes, and a

no, it will result in a death sentence.  The Judge has no

discretion.  So essentially, the jury, obviously, does make

that determination.

A.      I think it would be very unsettling and

difficult, but yet I am for the death penalty and I'm for

the law.  I think it's a good law.  So I think by law I

1   could do it.  But I certainly don't want to.

2        Q.    Most people don't want to.  But we just want

3   to make sure that you're okay and feel, as best you know

4   yourself, that you could make that decision when it came

5   down to it.  We can't preview the facts, obviously, we can't

6   --

7        A.    I've never been placed in that position

8   before.  So I, um, I believe if I'm convinced that he was

9   very guilty and all those questions that we asked, if I

10  believe he did that, then I could -- I could make that

11  verdict.

12       Q.    All right.  Let's talk a little bit about

13  these Special Issues.  If you'd take a moment and read

14  question No. 1 to yourself.

15       A.    (Prospective juror complies.)  Okay.

16       Q.    That's the question that the jury is first

17  asked.  It starts out with a no answer and we have to prove

18  beyond a reasonable doubt it should be answered yes.

19       A.    Uh-huh.

20       Q.    It asks the jurors to make a prediction about

21  how the defendant would behave in the future.

22       A.    Right.

23       Q.    Do you feel comfortable making that type of

24  prediction, if you are given sufficient evidence?

25       A.    Well, that's another thing, what I was saying

1    about the justice system.  I mean, do they bring up what he

2    was incarcerated for before and past history?  I mean, that

3    -- if I'm given all the evidence, then yes.  But do they

4    exclude some?

5         Q.    That's my -- that was the point of my next

6    question.

7         A.    I don't know, you know.

8         Q.    What you think -- what kind of information

9    would you want?  And I take it a past history would be one

10   of them.

11        A.    Sure, because you can't judge that, unless you

12   know what there is a pattern of.

13        Q.    That type of evidence is admissible in this

14   portion of the trial in Texas.  If a person has been

15   convicted before, they committed crimes, you can hear about

16   that.  You can even hear from the witnesses.  You can hear

17   what type of sentence they had.  You can hear good things

18   about that person, also.

19        A.    Right.

20        Q.    So, you hear good and bad, and you do get to

21   hear about their background.  And, obviously, you get to

22   consider their role in the crime itself and that type of

23   thing, and get to reconsider what you heard in the

24   guilt/innocence stage.  If you heard all that, then you feel

25   you could make that assessment, if you are given enough

1 information?

2      A.     You can make a guess.

3      Q.     Okay.  Some people tell us, I could never

4 guess or predict how a person is going to behave in the

5 future.  Then other jurors tell us, if I'm given enough

6 information about their background or their role in the

7 crime, then yes, I do feel comfortable answering that

8 question.  You feel you could?

9      A.     Gosh, it's hard.  Yeah, I suppose.  I suppose.

10      Q.     Well, would you be uncomfortable answering

11 that type of question about whether a person would be -- you

12 would consider them a continuing danger?

13      A.     It's hard for me to sit here and say, no, I

14 couldn't do it, because I tend to be very judgmental, or I

15 think that, you know, certain people shouldn't be let out

16 again to do it again, you know, and that kind of thing.  So

17 I probably could, would say -- lean one way or the other.

18      Q.     Okay.

19      A.     Yeah.

20      Q.     Let me go over this area of the law.  You

21 don't get to this question until the second part of the

22 trial.  In other words, you have already determined that the

23 person is guilty beyond a reasonable doubt of capital

24 murder.  And then you get to the punishment issues, on

25 whether someone is a continuing danger to society.

And, obviously, you get to consider the
evidence in the guilt/innocence stage.  Now, the law is
that, you know, you need to wait and listen to all the
evidence that's in the punishment phase and then determine
if the State's proven to you beyond a reasonable doubt that
the person is a continuing danger to society.

A.      Okay.

Q.      We have some people that tell us this, quite
honestly, though, if I have in my own mind found him guilty
beyond a reasonable doubt of capital murder, that answers
question No. 1 for me.  In other words, if I think he's a
capital murderer and it's proven to me beyond a reasonable
doubt, then he is dangerous.

A.      Sure.

Q.      The law contemplates that you may have some
capital murderers that are a continuing danger and some
aren't.  In fact, it starts out with a no answer.  Some
people can follow that law and some people tell us, quite
honestly, if I have reached the level of finding him guilty,
then the question is answered.  Other jurors tell us, no, it
wouldn't be answered for me.  I'd have to listen to all the
evidence and then make that determination.  How do you feel
about that?

A.      I would probably need to listen to all the
evidence.  I mean, just for me, personally, I would think if

1  somebody did that, and murdered somebody, how could they

2  ever do it again?  Yet, some can.  To me I would think it

3  would be repulsive and horrible so as never to do it again,

4  and I guess it would.  You would have to judge how that

5  person is, you know, if they are remorseful or, I suppose I

6  would have to see evidence.

7        Q.    You would have to hear more about their

8  background and their role in the crime?

9        A.    We're still on No. 1, right?

10       Q.    Yes.

11       A.    Yes.

12       Q.    Okay.  We have to prove whether there's a

13  probability the defendant would commit criminal acts of

14  violence.  When you see the word "probability" there, what

15  does that mean to you?

16       A.    They may or may not.

17       Q.    Okay.

18       A.    Or they may, the probability is they may.

19       Q.    Okay.  The law gives us some guidance.  We

20  don't have to prove it's a certainty, because I don't think

21  we could ever do that.

22       A.    You can't, yeah.

23       Q.    It's more than a possibility, though.  In

24  fact, the law is often -- the courts have directed in saying

25  more likely than not.

1    A.    Uh-huh.

2    Q.    Are you comfortable with that type of

3  definition?

4    A.    Yes.

5    Q.    Okay.  We have to prove that the defendant

6  would commit criminal acts of violence.  When you see

7  "criminal acts of violence," what types of offenses do you

8  think of?

9    A.    Well, again, rape, molestation, murder,

10  assault.

11    Q.    Okay.  Any type of threats or violence to

12  another human being?

13    A.    Sure.

14    Q.    And we have to prove, he would constitute a

15  continuing threat to society.  What does "society" mean to

16  you?

17    A.    Society?  People, you know, who you are

18  relating with.

19    Q.    Okay.  Anyone and everyone he may come into

20  contact with?

21    A.    Yes.

22    Q.    Including people in the penitentiary system?

23    A.    Yes.

24    Q.    Okay.  Guards, administrators, inmates, that

25  sort of thing.  Let me now go to question No. 2.  That has

1  to do with that law of parties.  If you would, read that to

2  yourself.

3       A.    (Prospective juror complies.)  Okay.

4       Q.    That question has to do with that law of

5  parties situation that we talked about.  To get someone

6  guilty, we have to prove that they should have anticipated.

7  Now, we go a step further in the second part.  The question

8  asks whether the defendant actually caused the death of the

9  deceased or did not actually cause the death of the

10  deceased, that's the second part.  If they didn't actually

11  cause it, but they intended to kill the deceased, so they

12  had that intent there, or another person, or they

13  anticipated that a life would be taken.

14            So if you don't believe the evidence

15  shows that he actually was the triggerman or the murderer,

16  you could still answer the question yes, if you believe that

17  they intended to kill the deceased or another, or they

18  anticipated that a life would be taken.  Do you feel that's

19  a good question to have in a death penalty situation?

20       A.    Yes.

21       Q.    You see how that relates to the accomplice

22  situation we talked about?

23       A.    Yes.

24       Q.    Now, to get someone guilty, we have to prove

25  that they should have anticipated.  But to get to the death

1   sentence, we have to prove that they did anticipate.

2        A.     Uh-huh.

3        Q.     And, again, it could be all the evidence you

4   heard in the guilt/innocence stage, their role in the crime,

5   plus any additional facts about their background, you can

6   consider.  We can't open a person's mind up and show you

7   their intent, but you, as a juror, can infer their intent --

8        A.     Sure.

9        Q.     -- from their actions.  You feel you could do

10   that?

11        A.     Yes.

12        Q.     Okay.  That question starts out with a no

13   answer and then it should be answered yes, if the State

14   proves to you beyond a reasonable doubt that it should be

15   answered yes.  Do you feel you could do that?

16        A.     Yes.

17        Q.     Okay.  Special Issue No. 3, if you'd take a

18   moment to read that to yourself.

19        A.     (Prospective juror complies.)  Okay.

20        Q.     That is the last question you get in a death

21   penalty situation.  You don't get to this question, unless

22   you've found someone guilty.  You would have already found

23   they're a continuing danger to society.  And then you felt

24   that they anticipated a life would be taken.  And then you

25   get to consider if there's any mitigating evidence in the

1    case.

2                    What mitigating evidence is, I can't tell

3    you.  It's up to you and the other jurors.  It's -- you just

4    have to be able to tell the Court that you can keep your

5    mind open to it, and if you feel there is sufficient

6    mitigating evidence where you think a life sentence should

7    be imposed, you could do that.  If you don't think there is

8    sufficient mitigating evidence, you can answer the question

9    no, knowing that that would then result in a person's

10   execution.  As you sit there today, can you think of

11   anything that you feel could be mitigating?

12        A.    Well, regarding this one or just over all?  I

13   need an example.

14        Q.    Just your overall feelings.

15        A.    Where a life would be more -- would be better

16   than the death penalty?

17        Q.    Yes, ma'am.

18        A.    Um, sorry, these are hard questions.

19        Q.    Well, we know you haven't -- hopefully, you

20   haven't thought about them before.

21        A.    Never thought about them before.  I just don't

22   think a life sentence -- really, if there was more

23   rehabilitation, it might be a better option, you know, if I

24   felt like --

25                    THE COURT:  Ma'am, I don't think you

1  understand the question.  The question is, can you think of

2  anything that would be mitigating?

3                    PROSPECTIVE JUROR:  Okay.  I suppose if

4  he went in and, let's say, and there was a murder and he

5  said no, no, no, don't do it, don't do it, and he wasn't

6  carrying a gun, perhaps then, that would be an example. Is

7  that right, Judge?

8                    THE COURT:  No wrong answers.  You can't

9  get it wrong.

10       Q.    (By Mr. Shook)  No wrong answers.

11                    MR. SHOOK:  Judge, I believe that's all

12  the questions I have.

13                    THE COURT:  Ms. Busbee?

14                    MS. BUSBEE:  Yes, may it please the

15  Court?  We've reached an agreement on this juror, Your

16  Honor.

17                    THE COURT:  Ms. Anderson, I guess that

18  was the wrong answer.  They've excused you.  No, it was an

19  honest answer.  They have agreed to excuse you, and I know

20  you are relieved.

21                    PROSPECTIVE JUROR:  Thank you, yes.

22                    MS. BUSBEE:  We were worried about your

23  kids.

24                    PROSPECTIVE JUROR:  Thank you, thank you.

25                    THE COURT:  And you have child care

1   problems and your husband is out of work and you have so

2   much going on in your life.  We want to thank you for your

3   time and service here today and you are free to go.

4               PROSPECTIVE JUROR:  All right.  Thank

5   you.

6               [Prospective juror out]

7               [End of Volume]

STATE OF TEXAS          *

COUNTY OF DALLAS        *

I, NANCY BREWER, Official Court Reporter for the 283rd

Judicial District Court, do hereby certify that the above

and foregoing constitutes a true and correct transcription

of all portions of evidence and other proceedings requested

in writing by counsel for the parties to be included in this

volume of the Reporter's Record, in the above-styled and

numbered cause, all of which occurred in open court or in

chambers and were reported by me.

WITNESS MY OFFICIAL HAND on this the _4_ day of

_____ March , 2003 4

NANCY BREWER, CSR, NO. 5759
Expiration Date:  12-31-04
Official Reporter, 283rd JDC
Frank Crowley Crts. Bldg. LB33
133 No. Industrial Blvd.
Dallas, TX 75207
(214)653-5863

1

REPORTER'S RECORD

74851

2

VOLUME 25 OF 61 VOLUMES

3

TRIAL COURT CAUSE NO. F01-00328-T

4

STATE OF TEXAS                    *        IN THE DISTRICT COURT

5

VS.                               *        DALLAS COUNTY, TEXAS

6

PATRICK HENRY MURPHY, JR.   *        283RD DISTRICT COURT

7

8

9

10

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FILED IN**
COURT OF CRIMINAL APPEALS

11

GENERAL PANEL QUESTIONNAIRES

MAR 9 - 2004

12

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Troy C. Bennett, Jr., Clerk

13

14

15

On the 30th day of September, 2003, the following

16

proceedings came on to be heard in the above-entitled and

17

numbered cause before the Honorable Vickers L. Cunningham,

18

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

19

Proceedings reported by machine shorthand.

20

21

22

23

**ORIGINAL**

24

25

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT: 03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT: 00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

PROCEEDINGS

THE COURT:  Welcome to the 283rd Criminal District Court.  This is Cause No. F01-00328, the State of Texas versus Patrick Henry Murphy, Jr.

I'll introduce the parties at this time. Mr. Toby Shook, Mr. Bill Wirskye, both representing your elected District Attorney, Bill Hill.  They are Assistant District Attorneys assigned to this case.  Ms. Brook Busbee, Juan Sanchez, representing the defendant, Mr. Murphy.

The Court Reporter here is Nancy Brewer. She has to record everything that we say.  And understand we won't be asking for any responses, but please understand that I have to make a record in this case.

You have been impaneled to this case. You come in and you will see there's a questionnaire in front of you.  Please don't write anything down on there yet.  I will go through that in detail in a few minutes. What we need to do, I need you to pay attention for a brief voir dire from the Court and then we will excuse you to fill out those questionnaires for us.  I will read the law to you and tell you what we are doing and why we're doing it.  I'll read it straight out of the Code and explain it to you.

"Article 35.17, Section 2.  In a capital felony case in which the State seeks the death penalty, the Court shall propound to the entire panel of prospective

1  jurors questions concerning the principles as applicable to

2  the case on trial of reasonable doubt, burden of proof,

3  return of indictment by the Grand Jury, presumption of

4  innocence, and opinion." Those five things I am required to

5  go over with you by law at this time. Then on demand of the

6  State or the defendant, either is entitled to examine each

7  juror on voir dire individually and apart from the entire

8  panel and may further question the juror on the principles

9  propounded by the Court.

10  Let me tell you what all that means.

11  I've got to go through the five issues with you today. That

12  will take me about 15, 20 minutes. Then I'm going to have

13  you return to the hallway to fill out that questionnaire.

14  Then after these questionnaires are submitted, the parties

15  also read them, and then you will be called back to the

16  Court for an individual voir dire. I think my next day is

17  October 15. So it will be two weeks out you will come back

18  to court for an individual opportunity to visit with us

19  about these issues. So that's the game plan.

20  I see a lot of people are like deer in

21  the headlights. I understand it's a lot to hit you with the

22  first thing on Tuesday morning, but that's the way it is.

23  I'll jump right into it.

24  Reasonable doubt. Our country and our

25  criminal justice system is based on the presumption of

1   innocence and reasonable doubt.  The State has to prove

2   their case to a jury, any jury in this State, in this

3   country, beyond a reasonable doubt.

4                We don't have a definition on reasonable

5   doubt, but I like to use Cunningham's definition.  It's a

6   doubt based on reason and I use common sense.  It's not in

7   the definition.  There is no definition.  But, folks, use

8   your brain.  Reasonable doubt.  The State has to prove

9   certain elements to you in the indictment that's been

10  returned by the Grand Jury, which I will go over in a

11  minute.  Those elements have to be proven beyond a

12  reasonable doubt.

13               How does all that relate in the scheme of

14  things?  Well, in a civil case you typically argue about

15  money or a contract or some sort of tort that one party has

16  done or not done to another party.  You go to a civil

17  courtroom and the burden of proof is on the plaintiff, the

18  person seeking the money or the relief, is by a

19  preponderance of the evidence.  You have got to prove your

20  case by 50 plus something percent.  If you can just tilt the

21  scale in your favor, you prevail in a civil case.  Why?  The

22  issue is typically going to be money.

23               The intermediate standard is a clear and

24  convincing standard.  What type case would that be used for?

25  For example, if the State files a lawsuit to terminate your

1   parental rights to your children, it's a much more serious

2   case.  You might lose your children.  They might be placed

3   with the State and ultimately adopted by someone else

4   against your will.  Unfortunately, we have a case that

5   nobody will forget in Dallas County.

6           Do you remember the family that had five

7   children where they locked the little girl in that nasty

8   closet for two years?  How could you forget that case?

9   Well, they had five children.  They didn't abuse the other

10  four, but they lost the rights to all five children.  That

11  was the right thing to do.  There's no question about that.

12  That was clear and convincing evidence.

13          Highest burden in our courts is in a

14  criminal case.  It's beyond a reasonable doubt because you

15  stand to lose your life or liberty as a result of a

16  conviction.  As I have said, the defendant here is on trial

17  for the offense of capital murder.  If a person is found

18  guilty of capital murder, there are only two possible

19  punishments, life in prison, or if we go through this

20  procedure, the death penalty is an option for the jury to

21  consider.

22          We have a long way to go before we get

23  there as far as having you understand the law, but that's if

24  you are convicted of capital murder, the State can prove

25  their case beyond a reasonable doubt, there's only two

1  possible punishments, life or death.  They have to prove

2  their case beyond a reasonable doubt.  So that gives you an

3  idea of the spectrum on how this case fits in.  It's not

4  beyond all possible doubt.  And it's certainly not proof of

5  one hundred percent.

6           Think about the logic in that.  If you

7  require the State to prove their case to you beyond all

8  possible doubt, I want to be one hundred percent sure before

9  I make a decision, you would have to be a witness to that

10 offense and you could not be a juror.  Does that make sense?

11 Sure it does.  So you have to be able to listen to a witness

12 tell you something and you put the pieces all together and

13 at the of the day the State has removed their doubt in the

14 case, then you have to find the defendant guilty.  If the

15 State has not met that burden, you must find him not guilty.

16           Reasonable doubt.  Burden of proof, the

17 burden of proof is always on the State and never shifts to

18 the defense.  The easy way to say it, those who are doing

19 the accusing have to do the proving.  It's real simple.  The

20 defendant can sit here and they can do crossword puzzles

21 today and when you come back a couple of weeks from today,

22 they can finish the crossword puzzle and read a book.  They

23 don't have to do anything.  That's how the situation is set

24 up.  We got through fighting a war in the Middle East about

25 how injust the Saddam Hussein regime was.  If you made one

1  of his party, Bathe party members, mad they put you in a

2  hole somewhere and left.

3          It doesn't work that way, folks.  The

4  State has to prove through an independent, unbiased panel of

5  jurors their case beyond a reasonable doubt.  Not like,

6  well, you have got to come in and prove you didn't do it.

7  You have to come in and prove you shouldn't get the death

8  penalty.  No, it doesn't work that way.  In China they will

9  execute you for tax evasion, unless you can prove that you

10  paid your taxes or have enough money to buy your way out of

11  the system.  We don't want that, do we?  Okay.

12          Return of the indictment by the Grand

13  Jury.  The Grand Jury of Dallas County impaneled by a

14  district court heard this case and returned a true bill of

15  indictment.  I will ask a few questions to give you an idea

16  of where we are in the system.  Just open this up.

17  Whoever's name it falls on, who is Neil Fredreco Bloan

18  (phonetic).  Yes, sir, how many cases do you think the

19  Dallas County Grand Jury returned indictments last year?

20  How many indictments do you think they returned?

21          PROSPECTIVE JUROR:  You mean, a

22  percentage?

23          THE COURT:  In Dallas County, how many

24  cases do you think they returned indictments, charging

25  instruments, for felonies like murder, rape, robbery, drug

1  cases, theft?

2                    PROSPECTIVE JUROR:  I have no idea.

3                    THE COURT:  Give me a guess.

4                    PROSPECTIVE JUROR:  A thousand.

5                    THE COURT:  Thousand.  Okay.  Christina

6  Millison (phonetic), how many cases do you think the Grand

7  Jury returned?

8                    PROSPECTIVE JUROR:  I can't say, sir.

9                    THE COURT:  His guess is a thousand.

10  He's low.

11                    PROSPECTIVE JUROR:  Okay.  I'll say two

12  thousand.

13                    THE COURT:  James Peyton.

14                    PROSPECTIVE JUROR:  Three thousand.

15                    THE COURT:  Cynthia Armstrong?

16                    PROSPECTIVE JUROR:  Seven thousand.

17                    THE COURT:  Seven thousand.  Wolbert

18  Searcy (phonetic).

19                    PROSPECTIVE JUROR:  Six hundred fifty.

20                    THE COURT:  Low.  Lisa Green.

21                    PROSPECTIVE JUROR:  Five thousand.

22                    THE COURT:  Seven is low, going the wrong

23  direction.  James Lewis.

24                    PROSPECTIVE JUROR:  Ten thousand.

25                    THE COURT:  Diane Nguyen.

PROSPECTIVE JUROR:  Ten thousand.

THE COURT:  Low.  Andrew Lawson.

PROSPECTIVE JUROR:  Fifteen thousand.

THE COURT:  Low.  Debra Lawson.

PROSPECTIVE JUROR:  I would say 75 percent of the cases.

THE COURT:  She's how many were actually indicted versus presented, that's low.  Brenda Hall.

PROSPECTIVE JUROR:  Ninety-nine percent.

THE COURT:  No.  I want to know how many cases, not the percentage of the indictments.  Fifteen thousand is low.

PROSPECTIVE JUROR:  I would say probably thirty-five thousand.

THE COURT:  Somewhere right around 25,000, maybe 25 and 30.  I haven't seen the actual numbers. I didn't look it up before I came in today.  I give you that perspective and the reason I like hearing from you is that it helps you in what this statement means.

Simply by being arrested, confined, or otherwise indicted or charged with an offense gives rise to no inference of guilt at his trial.  If you take the amount of time the Dallas County Grand Jury has to meet on each case, divided by the number of cases they returned indictments on or heard, they have about three minutes per

1    case to listen to.  So when I tell you that there's been no

2    one no independent panel in Dallas County to review the

3    evidence in this case to any degree, that's exactly what I

4    mean.

5          So you can't come in with the idea of,

6    well, he's been indicted for capital murder.  He's good for

7    something.  Where there's smoke, there's fire.  That simply

8    will not work.  An indictment is simply a charging

9    instrument, a roadmap, by which the State files with the

10   Grand Jury and says we believe we have evidence to prove X,

11   Y, and Z.  And if it meets the certain constitutional

12   requirements down there, they stamp it true bill and then it

13   comes to a court.

14         So does that give you a perspective of

15   what we're dealing with here?  Okay.  Presumption of

16   innocence, as I already said, and I can't say this enough

17   because in these cases, well, we know we have an indictment.

18   He must be good for something.  Wrong.  I'll say this again.

19   The presumption of innocence alone is sufficient to acquit

20   the defendant unless and until the State can prove their

21   case beyond a reasonable doubt.  Simply by being arrested,

22   confined, or otherwise charged with an offense, gives rise

23   to an inference of guilt at their trial.  Period.

24         You also have to factor into that, and

25   it's not required that I go through that with you at this

1  time, is the defendant has an absolute right under the Fifth

2  Amendment of the United States Constitution and the Texas

3  Constitution that he does not have to testify.  That goes

4  back to the fact they don't have to do anything at their

5  trial because the State has the burden.  Mr. Murphy can say

6  I am not going to testify and there could be a thousand

7  different reasons why that may or may not occur.  It's his

8  right to do so.  Advice of counsel.  Maybe the State has

9  failed to prove your case.  Do not testify.  You don't know

10 why.  So you cannot go back to the jury room and speculate

11 why.

12          People tell us in a case where the State

13 is seeking the death penalty, well, if he didn't testify, I

14 can't answer these special issues.  Well, he's not required

15 by law to testify.  In fact, he's -- the law says he does

16 not have to testify.  And if he elects to not testify, I

17 will instruct you that you cannot consider that for any fact

18 or circumstance whatsoever against the defendant.  That goes

19 back to the burden of proof is always on the State.  It

20 makes sense when you look at the big picture.  Presumption

21 of innocence, burden of proof never shifts.

22          Last thing is opinion.  And that's where

23 we get down to the opinion on these questionnaires is we

24 need your honest and truthful opinions.  Were you all sworn

25 in downstairs in the Central Jury Room?  I will remind you

1   of your oath that you and each of you do solemnly swear that

2   you will give true answers to all questions concerning your

3   qualifications as a juror in this court.   You have already

4   sworn to that.

5                    This questionnaire is 17 pages.   I know

6   you hate to look at that.   It asks what your name is, where

7   were you born, and what happened next. It's pretty

8   comprehensive.   Honest and true opinions on those

9   questionnaires will be very helpful.   You think how in the

10  world can this help in this case.   Well, you will be

11  surprised when you answer these questions.   It gives the

12  attorneys a whole lot of insight and will cut down on the

13  amount of time that you will have to come back and spend in

14  this case.   Think of it, if they had to ask individually,

15  orally, all of these questions and how long it would take to

16  go through it with all the 65 of you, it would take a while.

17  So that's what we mean.

18                    Now, I need to take any questions at this

19  point concerning your qualifications.   You should have been

20  asked downstairs.   It's extremely important.   If you have

21  been arrested for anything, this goes to everybody, make a

22  disclosure on the questionnaire.   I don't care if it was for

23  public intoxication 30 years ago when you were in college.

24                    Why is it so important?   You must be

25  qualified to sit in this case.   If we were to put someone on

1  the jury who was not qualified and later found out in this

2  case was a guilty verdict and later on appeal we found out

3  the person was not qualified, we would have to try the case

4  all over again.

5        I know this information that's being

6  requested of you can be very personal at times.  There's no

7  other way around it.  I can assure you that the

8  questionnaire will remain in the custody of the Court.  The

9  parties are able to read it.  Then they turn the

10 questionnaires back over to the Court.  And the only way,

11 the only way, that a copy of these questionnaires will be

12 made public would be upon an order from the Court of

13 Criminal Appeals.

14       And the only way that is made is these

15 are all digitized.  And I had one order from the Court in

16 Austin and I sent them a disk.  It's all on a CD and it goes

17 down to the Clerk of the Court in Austin with protective

18 software.  That only they can get access to it.

19       So what am I telling you?  That your

20 personal information will be kept in the confines of this

21 courtroom in this case.  So I know that people are concerned

22 about that.  So I'm telling you that I keep a very tight lid

23 on it.  At the end of the day the Sheriff will come around

24 and collect the questionnaires that we're completed.  I

25 print them in the morning you come back and you will get a

1  copy of it and it is still warm.  I copy it from the bench.

2  You will have it there and I shred it at the end of the day.

3          I'm very sensitive with the personal

4  information.  And we use the proper controls to manage this

5  process.  So I'm going to call the names of the individual

6  jurors.  We have an extra person here.  And now I want you

7  to take your questionnaire and then at the top right-hand

8  corner on your questionnaire, there will be a place for the

9  juror number.  When I call your name, I want you to raise

10  your hand and I'll give you the number to put on there and

11  immediately go and put the number on each page, front and

12  back.  There should be pens placed on the clipboard.

13          The idea is I have 65 people times 17

14  pages and there's a lot of pages.  They are not stapled.

15  They are cliped.  You lose a few clips and it's a mess, if

16  they get mishandled.  So if you will, he's going to pass out

17  the pens.  I'm going to call the names of the individuals.

18  I'll give you your juror number.  Write the juror number on

19  the top right-hand corner of the page and each page front

20  and back, because these will be scanned, each page, the

21  number.  Okay.

22                  [Off the record]

23                  THE COURT:  Counsel, please approach.

24                  (Bench conference)

25                  THE COURT:  All right, folks.  What I

1   want to admonish you, please, please, put that number on

2   each page right now before you go any further with answering

3   your questionnaire, so we don't lose it.

4                    You will be receiving a letter from the

5   Court with a date by which to appear.  I will try to give

6   you as much notice as I can.  If you have e-mail, I would

7   prefer to contact you via e-mail, so please write clearly

8   and legibly your E-mail address.  As you can see, I'm kind

9   of a computer geek.  I understand that.  But I can E-mail

10  you and give you as much notice as we can.

11                   If you are invited to come back, we

12  schedule people in the morning and the afternoon.  So your

13  next down -- the next time down here will be no more than a

14  morning or afternoon.  We start at 8:30 or at 1:30.  So that

15  would be the next opportunity for you to come back down

16  here.  Please write legibly.  The quickest way to get back

17  down here is not to fill out your questionnaire legibly or

18  completely, they can't read it.

19                   So please come in and tell us what you

20  were thinking about.  I know that you are uncomfortable

21  packed back in here, so I would invite you to go back out in

22  the hallway and spread out in the hall.  And when you have

23  completed your questionnaire, give it to the Sheriff and

24  then you are free to go, subject to recall by this Court.

25  Any questions?  Great.  Thank you.

[End of Proceedings]

1  STATE OF TEXAS          *

2  COUNTY OF DALLAS          *

3      I, NANCY BREWER, Official Court Reporter for the 283rd

4  Judicial District Court, do hereby certify that the above

5  and foregoing constitutes a true and correct transcription

6  of all portions of evidence and other proceedings requested

7  in writing by counsel for the parties to be included in this

8  volume of the Reporter's Record, in the above-styled and

9  numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11      WITNESS MY OFFICIAL HAND on this the 4 day of

12  _____ March , 2004.

13

14

15

    NANCY BREWER, CSR, NO. 5759
16  Expiration Date: 12-31-04
    Official Reporter, 283rd JDC
17  Frank Crowley Crts. Bldg. LB33
    133 No. Industrial Blvd.
18  Dallas, TX 75207
    (214)653-5863

19

20

21

22

23

24

25

283RD JUDICIAL DISTRICT COURT 214/653-5863
NANCY BREWER, OFFICIAL COURT REPORTER

REPORTER'S RECORD

*74851*

VOLUME 26 OF 61 VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| STATE OF TEXAS | * | IN THE DISTRICT COURT |
|---|---|---|
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 1st day of October, 2003, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Vickers L. Cunningham, Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

1      A P P E A R A N C E S

2    APPEARING FOR THE STATE

3    Mr. Toby Shook
     SBOT NO. 18293250
4    And
     Mr. Bill Wirskye
5    SBOT NO. 00788696
     Assistant District Attorneys
6    133 No. Industrial Blvd.
     Dallas, Texas 75207
7    Phone:  214/653-3600

8

     APPEARING FOR THE DEFENDANT
9
     Ms. Brook Busbee
10   Attorney at Law
     SBOT: 03488000
11   703 McKinney Ave. Ste. 312
     Dallas, TX 75202
12   214/754-9090

13   Mr. Juan Sanchez
     Attorney at Law
14   SBOT: 00791599
     5630 Yale Blvd.
15   Dallas, TX 75206
     214/365-0700

16

17

18

19

20

21

22

23

24

25

<u>PROSPECTIVE JUROR INDEX</u>

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Grace Evans | 4 | 5 | 36 | 26 |
| Linda Rowell | 41 | 43,95 | 75,96 | 26 |
| Mark Poole | 99 | 100 | 136 | 26 |
| Hardy Walker, Jr. | 145 | 146 | 177 | 26 |
| Sandra Barron | 194 | 196 | 236 | 26 |
| Nancy Wilkey | 241 | 242,271 276 | 261,274 290 | 26 |

<u>P R O C E E D I N G S</u>

1                THE COURT:  Ms. Grace Evans.

2                    [Prospective juror in]

3                THE COURT:  Good morning.

4                PROSPECTIVE JUROR:  Good morning.

5                THE COURT:  How are you?

6                PROSPECTIVE JUROR:  Okay.

7                THE COURT:  We have juror No. 2816, Ms.

8 Grace A. Evans; is that correct?

9                PROSPECTIVE JUROR:  That's right.

10               THE COURT:  Ms. Evans, welcome to the

11 283rd.  I see that you have the guide.  Have you had enough

12 time to read that a couple of times through?

13               PROSPECTIVE JUROR:  Oh, sure, uh-huh.

14               THE COURT:  And we also provided a copy

15 of the questionnaire that you filled out for us back in May.

16 Please don't think you've got to understand it all right

17 now.  This is an opportunity for the attorneys to visit with

18 you about these issues, go over the law, and help you

19 understand how it all relates.  There are no wrong answers,

20 just honest truthful answers.

21                 And if you have any questions, please ask

22 us.  This is the only time that we have to visit with you

23 individually.  Some people come in a little nervous and

24 that's expected.  This is as informal a process as we can

25 have.  It's a whole lot better than having you out one of

1    700 people.  There's no meaningful way that we can have voir

2    dire with that.

3              So, if you would, just try to -- the big

4    picture I've got to have at the end of this interview is do

5    you understand the law and can you follow it?  That's the

6    questions I have to ask at the end.  The only question I

7    have for you at this time is will you be able to serve this

8    Court for a period of two weeks beginning on November 10th?

9              PROSPECTIVE JUROR:  As far as I know.

10             THE COURT:  Thank you very much.

11   Mr. Wirskye, would you like to inquire?

12             MR. WIRSKYE:  May it please the Court?

13             GRACE EVANS,

14   having been duly sworn, was examined and testified as

15   follows:

16             DIRECT EXAMINATION

17   BY MR. WIRSKYE:

18        Q.   Ms. Evans, how are you this morning?

19        A.   I'm okay.

20        Q.   Okay.  Thanks for bearing with us.  My name is

21   Bill Wirskye and I'll be the Assistant DA that will be

22   visiting with you for the next few minutes.  I know it's a

23   little bit unnatural, since we have you up on the witness

24   stand.  People tend to think that they're the one on trial.

25   But since this is a case where the State is seeking the

1    death penalty, the law allows us to talk to jurors

2    individually, and this is just kind of the best system we

3    have, so, to the extent possible, relax.  There are no right

4    or wrong answers.

5         A.     Okay.

6         Q.     What I'd like to do with you is follow up on

7    some of the information in your questionnaire, talk to you a

8    little bit about your thoughts and feelings on the death

9    penalty, and then, finally, talk to you about the law, make

10   sure you understand the law, and can follow the law.  If you

11   have any questions at all or if I'm ever unclear, just stop

12   me and let me know and I'll try to rephrase.  You're a

13   teacher at Berkner, right?

14        A.     Well, I left Berkner.  I retired this summer

15   and now I'm at Lake Hill Prep.

16        Q.     Oh, okay.

17        A.     I'm still teaching, but --

18        Q.     What do you do at Lake Hill Prep?

19        A.     I'm teaching biology.

20        Q.     Okay.  We know it's an inconvenience, if you

21   had to be down here for two weeks in November, but looks

22   like from what you told the Judge, you could do it if you

23   had to?

24        A.     I mean, I can get a substitute.

25        Q.     Okay.  No one is ever happy about it, but, you

1    know, I think most people understand it is their duty --

2         A.     Right.

3         Q.     -- if they're chosen, so.  You have a son

4    that's an attorney; is that right?

5         A.     Yes.

6         Q.     What type of law does he practice?

7         A.     He's in health law.

8         Q.     Okay.  Does he work here in Dallas?

9         A.     He's in Houston.

10        Q.     Okay.  He doesn't do any type of criminal law

11   or anything like that?

12        A.     No.

13        Q.     And you have a daughter that's an FBI analyst,

14   right?

15        A.     Right.

16        Q.     Where is she based out of?

17        A.     She's here in Dallas.

18        Q.     Okay.  What does she do for the FBI?

19        A.     She's an analyst.  That's really all I know.

20        Q.     Like physical evidence, like trace evidence,

21   or just more intelligence analyst?

22        A.     I think she does data base, that kind of

23   thing, a lot of computer work.

24        Q.     Okay.  And your husband is retired FBI?

25        A.     Yes.

1      Q.    Okay.   How long has he been retired from the

2  FBI?

3      A.    I think it's seven years now.

4      Q.    Okay.   And looks like y'all may have moved

5  around a bit.   Was that due to --

6      A.    We did, we did.   We enjoyed that for a long

7  time.

8      Q.    Going to different field offices, that type

9  thing?

10     A.    Right.   Right.

11     Q.    Okay.   He's retired now and is a private

12  investigator?

13     A.    Uh-huh.

14     Q.    What type of work does he do now?

15     A.    He does background investigations pretty much

16  for the State Department and the Air Force.

17     Q.    Oh, okay.   So he's still working kind of on

18  contract, I guess?

19     A.    Right.   Right.

20     Q.    Okay.   Is there anything about having a son

21  that's an attorney and a daughter that works at the FBI and

22  a husband that used to work at the FBI that would --

23  anything about that that would make it difficult for you to

24  be fair and impartial to both sides?

25     A.    I don't think so.

1      Q.      Okay.  Obviously, I think one of the concerns

2  of both sides is that we get somebody over there in the jury

3  box that has some sort of hidden agenda and can't be fair,

4  and, you know, it wouldn't be fair to either side, very

5  frankly.

6      A.      I understand.

7      Q.      So that's why we ask the questions.

8      A.      Sure.

9      Q.      You told us generally you were in favor of the

10 death penalty for certain crimes; is that right?

11     A.      Uh-huh.

12     Q.      What purpose do you think it serves or why do

13 you think we should have the death penalty for certain cases

14 in our society?

15     A.      Well, I think there has to be an ultimate

16 consequence for some things.

17     Q.      Okay.  When you think about an appropriate

18 type of case for the death penalty, does a particular

19 scenario or fact situation come to mind, a particular type

20 of crime?

21     A.      Pretty much harm to a child would be something

22 that would trigger me.  And murder, it would be the

23 circumstances of the murder.  But I can certainly see that

24 it could be.

25     Q.      Is there any particular crime you may have

followed, a high profile, high media case, that you may have
heard, read about, seen about, that comes to mind when you
think about the death penalty?

A.     Nothing really comes to mind.  If you ask me,
I'm sure I would remember.

Q.     If it were up to you, would you reserve the
death penalty just for murder cases?

A.     Well, mistreatment of a child would go in
there, also.

Q.     Okay.  In Texas, and you've had a chance to
look at it now, although sometimes the way it's laid out is
kind of confusing in that packet, the law, but we reserve
the death penalty just for murder cases and then only a
certain subset or group of murders.

One way to think about it is it's always
a murder plus something else.  If you murder a police
officer or fireman, prison guard on duty, a child under six.
If you commit an intentional murder during the course of
committing another crime, like burglary, rape, robbery, that
type of thing.  Those are capital crimes.

Mass murder, serial murder, murder for
hire, you kill somebody for money, or you hire somebody to
kill your spouse or business partner, those type crimes are
what we reserve the option of the death penalty for in
Texas.  Does that list or group kind of meet with your

1  approval, I guess?  Does that sound like a pretty fair list

2  to you?

3       A.    Well, again, I just, it would be the

4  circumstances involved.  But I can see, you know, the

5  rationale.

6       Q.    Okay.  I know we asked people how strongly

7  they feel about the death penalty on a scale of 1 to 10, and

8  you gave yourself an 8, which is towards the high end.  And

9  we kind of know that that means different things to

10 different people.

11      A.    Right.

12      Q.    But it sounds like, depending on the

13 circumstances, you could keep an open mind.  You could see

14 giving a life sentence for a capital murder, I guess?

15      A.    Probably could.

16      Q.    Is there a particular circumstance that might

17 be important --

18            THE COURT:  Ma'am, I'm sorry to

19 interrupt.  You've got to speak up a little bit, number one.

20 And, number two, you've got to say yes or no and make a

21 verbal response, because she's recording everything that we

22 say.

23            PROSPECTIVE JUROR:  All right.  I'll do

24 better.

25      Q.    (By Mr. Wirskye)  You know, talking about

1  those circumstances, is there a particular circumstance that

2  you have in mind when you think about the death penalty?

3       A.    Repeat.  I lost your focus.  I lost focus.

4       Q.    Okay.  We were talking about, you know,

5  depending on the circumstances, I guess, would decide in a

6  capital case, and is there something particular you have in

7  mind, a particular circumstance, or particular factor?  I

8  know we talked about crimes against children, but --

9       A.    Certainly premeditated murder, that would be

10  something that to me would justify the death penalty.

11      Q.    Okay.  Probably like me you grew up hearing

12  about premeditated murder.  In Texas, what we have is

13  intentional murder, which means, you know, that it was the

14  conscious objective or desire to do something.  And in

15  Texas, intent can be formed in an instant.

16               I think when most people think about

17  premeditation, they think about somebody that planned or

18  thought about it, that type thing.  And that's certainly a

19  factor you can take into account when you look at a case.

20  But it's not necessarily a prerequisite for murder or

21  capital murder, that type thing.

22               Let me ask you this.  I think when we

23  think of capital murder, we think of just maybe the lone

24  individual going in and robbing a 7-Eleven, maybe killing

25  the clerk or that type thing.  But as you can probably well

1  imagine, oftentimes crimes are committed by more than one

2  person.  A group of individuals can commit any crime, you

3  know, all the way from shoplifting all the way up to capital

4  murder.  And the law allows us to prosecute everyone that

5  was actively involved in a crime for that crime.

6  And when you're talking about a capital

7  murder, you may have a scenario where you just have one

8  person that, say, actually pulled the trigger of the gun.

9  Call him the triggerman, the person that actually caused the

10  death.  And you may have other people that were actively

11  involved, accomplices, nontriggermen that could also be

12  prosecuted for that case.

13  And some people we talk to kind of make a

14  distinction between those two classes, the triggerman and

15  the nontriggerman accomplice, and if it were up to them, you

16  know, they may believe very strongly in the death penalty

17  for the triggerman, but if it were up to them, they would

18  take the death penalty off the table for the accomplices.

19  For whatever reason, religious, moral, ethical, they just

20  don't ever think a death sentence would ever be justified

21  for an accomplice who didn't actually cause the death.

22  Some people tell us no, you know, it just

23  kind of depends on the facts and circumstances.  But what do

24  you think about that type of situation, the triggerman

25  versus the accomplice?

A.      I think they would all be responsible.

Q.      Okay.

A.      So would that be a yes answer?

Q.      Okay.  Would you automatically take the death penalty off the table for the accomplice?

A.      No.

Q.      Okay.  Why do you say that?

A.      If it was a plan and they were all involved, then they are all responsible.

Q.      Okay.  And that's pretty much what the law is. Just to give you an example to kind of illustrate the law we have in Texas, how those accomplices can be held, be found guilty of capital murder and ultimately face the death penalty, say the other prosecutor and myself, Mr. Shook, decide we're going to rob a bank.  The plan is for him to go in with a gun.  He's going to hold the tellers at bay while I go in unarmed, kind of with a big bag, and empty out the cash drawers.  I'm going to be the bag man.

        And we go and do that bank robbery and, say, for whatever reason, maybe one of them looks at Mr. Shook funny or we see one of them kind of going for a silent alarm, and I tell him that, but for whatever reason he shoots and kills one of the tellers.

        He's committed an intentional murder in the course of a robbery.  He can be found guilty of capital

1    murder and ultimately face the death penalty.  And the law

2    says I could as well, depending on the facts and

3    circumstances.  And that kind of sounds like where you are

4    in that situation; is that right?

5         A.    Yes.

6         Q.    Okay.  The law says if I actively help him,

7    direct him, encourage him to participate in the crime, I'm

8    just as guilty.  I could face the death penalty.  Or, also,

9    kind of under the law of conspiracy, since we conspired or

10   agreed to commit a bank robbery, and during that bank

11   robbery somebody gets killed, the law says if the accomplice

12   should have anticipated that a life could be taken, then he

13   can be found guilty of murder.  Does that kind of make sense

14   to you?

15        A.    Yes.

16        Q.    And a lot of people say, you know, we made

17   this plan, your buddy, to go into a bank robbery with a

18   loaded gun.  I should have anticipated that somebody could

19   get killed.  Does that make sense?

20        A.    Yes.

21        Q.    Okay.  The reason I go into it at length, to

22   be very frank with you, is that is the theory of law that

23   we're prosecuting this case under, Mr. Murphy, as an

24   accomplice.  And that's why we spend so much time talking to

25   people, to make sure they understand the law and they agree

1  with the law and can follow the law.

2            Obviously, if we get somebody over there

3  in the jury box who has some reservation about that

4  particular aspect of the law, it's too late at that point.

5  But it sounds like you could at least keep an open mind and

6  be able to follow that law of accomplices, that type of

7  thing; is that right?

8       A.    Correct.

9       Q.    Okay.  Now, I know you've been on a jury

10  before.  I think it was a while ago, maybe '85; is that

11  right?

12      A.    As best I can remember.

13      Q.    A robbery case?

14      A.    Uh-huh.

15      Q.    What do you remember about that case?

16      A.    It was a person at Baylor Hospital that was

17  going in rooms and taking patients' personal items.

18      Q.    Okay.  Did you find the person guilty?  Do you

19  remember?

20      A.    Yes.

21      Q.    Okay.  In your opinion was the evidence pretty

22  straightforward?

23      A.    Yes.

24      Q.    Did the person testify in their own defense?

25      A.    No.

1    Q.    Okay.  Was the jury asked to set punishment

2  for the person?

3    A.    No.

4    Q.    Okay.  I guess the Judge did that?

5    A.    Uh-huh.

6          THE COURT:  Once again, ma'am, I know

7  you've probably never been on the witness stand before.  But

8  "uh-huh", she can't write that.  It's normal, but --

9    A.    Oh, all right.  My answer is yes.

10   Q.    (By Mr. Wirskye)  Now, anything about that

11 experience that in the back of your mind you're thinking, I

12 don't want to do that again, I don't want to go through that

13 again, or anything about that jury duty?

14   A.    No.  No.

15   Q.    Okay.  Let me talk to you a little bit about

16 the publicity in this case.  I think, like almost everybody

17 we talked to, you've heard something about this case.  It

18 was, obviously, a high profile case.  And we talk to

19 everybody to see how that may affect them.

20          Just because you've heard about the case

21 through the media or otherwise, does not automatically

22 disqualify you as a juror.  In order to be qualified, kind

23 of what we ask a juror to do, even though they may have

24 formed some opinions or formed some impressions about the

25 case, as long as they can kind of push that to the back of

1    their mind, not forget about it -- we can never ask you to

2    forget about it.

3                    But as long as you could push that to the

4    back of your mind and be able to tell us that you could base

5    your verdict in this case just on the evidence that you hear

6    in the courtroom, because, obviously, that is the best

7    source of information in a case.  If you could do that, you

8    would be a qualified juror.

9                    Is that something you think you could do,

10   just base your verdict on the evidence that you hear in the

11   courtroom?

12         A.      I come from scientific training, so I hope I

13   can do that.  My answer would be yes.

14         Q.      Okay.  What do you remember hearing about this

15   case?

16         A.      Well, I read the paper.  I certainly remember,

17   you know, it was about Christmas time maybe, just, you know,

18   outrage from the community that this had happened and they

19   were trying to find the guys.

20         Q.      Okay.  Do you remember hearing any of the

21   details of the crime or the capture or anything like that?

22         A.      I believe they found them in Colorado.

23   They've been there.  That's about all I remember.

24         Q.      Okay.  Have you kept up with any of the

25   subsequent court proceedings?

1          A.     Just, I remember guilty, guilty, a lot of

2    guilty verdicts.

3          Q.     Okay.  Sounds like you don't have a lot of

4    details of the crime or details about particular people or

5    that type thing; is that right?

6          A.     No.  No.

7          Q.     Nothing real detailed that might affect you

8    potentially in your ability to be fair to both sides and

9    just listen to the evidence and base a verdict just on that

10   evidence?

11         A.     Correct.

12         Q.     Okay.  In Texas, all trials, even capital

13   murder trials, are kind of done in two parts.  The jury that

14   you sat on, you just participated in the first part.  But

15   the first part is guilt/innocence.  And that's when a jury

16   decides whether we prove to you what we allege the crime

17   was, if we prove to you what's in our indictment, whether

18   the person is guilty or not of that crime.

19                 And that's the portion you served on in

20   your trial.  If the person is found guilty of capital

21   murder, then we move to the second phase of trial, which is

22   the sentencing phase.  The rules of evidence broaden out a

23   little bit.  You get to hear extra, additional information,

24   about his background, character, reputation, criminal

25   history, if it exists, good things, bad things.  And we let

1  you hear this extra information, because we ask you to

2  answer three questions to determine the sentence in this

3  type of case.

4            The only possible sentences for capital

5  murder in Texas are a life sentence or a death sentence.

6  And we don't ask a juror to write in life sentence or death

7  sentence.  What we do is ask the jury to answer those three

8  questions that I think you looked at and they are up on the

9  board here.  And just to run over them briefly, I'll talk to

10  you more about them in a little while.

11            But that first question we ask a juror,

12  is the person basically a future danger to society?  If

13  that's answered yes, then you move on to the second Special

14  Issue, which is kind of the accomplice scenario that we

15  talked about, where you have to find at the very least that

16  they anticipated that a human life would be taken.  And if

17  that's answered yes, you move on to the final Special Issue

18  which is what we call the mitigation question.

19            It's basically a chance for a jury to

20  step back, look at everything, and see if there's some

21  reason there that his life ought to be spared.  It lets a

22  jury exercise mercy, I guess, is one way to look at it.  And

23  if that's answered no, that there is nothing mitigating,

24  then the Judge has no discretion.  The person will be

25  sentenced to death.  It's the same way in every case.

1            Sometimes we talk to people who are very

2     strongly in favor of the death penalty philosophically or in

3     the abstract, and when they get down here it kind of becomes

4     a little more real to them.  And we realize this is not

5     necessarily everyone's cup of tea to participate or to be on

6     a death penalty jury.  And we want to make sure that at

7     least before people go into the process, they have no

8     hesitations about participating in the process.

9            Obviously, no one wants to.  Obviously,

10    no one is, you know, comfortable doing it.  But we want to

11    make sure there's not any hesitations and that type of

12    thing.  Are you familiar with our method of execution in

13    Texas?

14         A.    I'm thinking the gas chamber.

15         Q.    It's lethal injection.

16         A.    Lethal injection.

17         Q.    Actually, the law changed a few years ago and

18    we have lethal injection.  The procedures are the same in

19    every case as I said.  They'd be the same in this case.  If

20    those questions are answered yes, yes, and no, the Judge

21    would have no discretion.  He would sentence the person to

22    death.

23            The person would be taken immediately

24    down to Texas death row where he'd wait until some point in

25    the future.  I can't tell you how long or when, but at some

1  point in the future Judge Cunningham would issue a date of

2  execution.  On that day the person would be taken from death

3  row to Huntsville, Texas, where our main prison is, and be

4  held in a small holding cell outside the death chamber for

5  that day.

6            He would be given a chance to meet with

7  friends, family members, a spiritual advisor.  He'd be given

8  a chance for a last meal, if he can eat it.  As it got close

9  to 6:00 in the afternoon, he'd be taken from that holding

10 cell to the death chamber, voluntarily or involuntarily.

11 Guards are trained to take them, if they don't want to go.

12            You may have seen the death chamber.

13 It's oftentimes shown in the media, a small room with a

14 gurney.  He'd be taken in there, strapped down to the gurney

15 with leather straps.  An IV would be placed in his arm.

16 There would be witnesses for his side.  There'd also be

17 witnesses there for the victim's side.

18            The warden would give him a chance to

19 make a last statement.  He may be very defiant, proclaim his

20 innocence to the very end.  He may be very contrite, and beg

21 for forgiveness for his crime.  But after he's given a

22 chance to make that statement, the warden would signal the

23 executioner who would release a series of chemicals into the

24 IV that would very quickly shut down his heart and lungs.

25 He'd lose consciousness and fall into a coma and die very

1    shortly after that.

2                And I kind of go over those details, not

3    to be morbid with you, but those are often the type of

4    details that are reported in the paper.  Some jurors worry

5    about that, having that on their conscience, looking forward

6    to that day, if it ever happened.  And that's why we go

7    through this again, to make sure that you're not only

8    comfortable with the death penalty philosophically, but you

9    have no hesitation about participating in this process.

10               And only you know yourself better than

11   anyone.  We just want to make sure that you feel you're the

12   type person who could take pen in hand and answer those

13   three questions in such a way that would ultimately result

14   in the death of another human being.

15        A.      It would be very hard.

16        Q.      Do you think you're the type that could

17   participate in that process?

18        A.      I think out of civic responsibility, I could.

19        Q.      Okay.  And that's why we ask it.  Again, we

20   know it's not everyone's cup of tea and we want to make sure

21   that, you know, there's no hesitation going into it.  From

22   what I hear you say, you could do it, if called upon to

23   serve; is that right?

24        A.      Yes.

25        Q.      Okay.  Let's talk a little bit about these

Special Issues, kind of in a little more detail.  As I said, the jury only considers these at the very end of the trial.  If you found the person guilty of what they're charged with, capital murder, you go into that second phase.

          The law envisions that all jurors kind of start that second phase with an open mind.  Even though you found him guilty, you've got to have an open mind to these questions.  You can't go in with any preconceived answers or automatically answer these questions until you've heard the evidence in the second part of the trial.  Does that make sense to you?

          A.     Yes.

          Q.     And we give you that extra evidence to help you answer these questions.  And if you could take a second, I know you've looked at them in the packet, but if you could take a moment or two and read through those three questions just to yourself.  They're phrased a little bit differently.

          We always tell people we did not draft these questions, your Legislature did in Texas.  They're a little lengthy and wordy, but if you could just look at those real quick.

          A.     Talk to me a little bit about No. 2.

          Q.     I'm sorry?

          A.     No. 2, I'm not clear about that one.

          Q.     No. 2, again, remember we talked about that

1    accomplice scenario?

2         A.      Uh-huh.

3         Q.      And that's what that question deals with.

4    Basically that question boils down to three different parts.

5    If you think the person actually pulled the trigger in our

6    example, actually caused the death, you would answer it yes.

7    That's the first part of the question.  Or if you think the

8    person didn't actually cause the death, but intended that

9    that person or another die, okay?

10        A.      Okay.

11        Q.      You would answer yes.  You know, maybe in my

12   scenario, if I said, Mr. Shook, she's going for the alarm,

13   shoot and kill her.  Obviously, I intended that death, but I

14   didn't actually cause it.  And finally that last clause

15   there, that last line, anticipated that a human life would

16   be taken.  That's kind of a followup to what we've already

17   talked about.

18              If you'll recall, in order to find an

19   accomplice guilty of capital murder, the law is that the

20   person should have anticipated that a life would be taken.

21   In order to answer this question, the law imposes a little

22   bit higher burden and says not only did they should have

23   anticipate, but did they actually anticipate that a death

24   would happen.  And if you believe through the evidence that

25   the person actually anticipated that a death would happen,

1   then you would answer that question yes.  Does that kind of

2   make sense to you?

3        A.    Yes.

4        Q.    Okay.  And, obviously, you know, we can't, you

5   know from your past experience, a person can't be forced to

6   testify in his own defense.  You may not hear from the

7   person.  There's not a machine to kind of read people's

8   minds, what exactly they were thinking or what they were

9   anticipating.

10             You just kind of look, I guess, at the

11  actions, that type of thing, and draw some inferences or

12  conclusions based on that evidence to answer that question,

13  whether you think they anticipated.  Does that make sense to

14  you?

15       A.    Yes.

16       Q.    Do you kind of see that distinction between

17  should have anticipated and did anticipate?

18       A.    Yes.

19       Q.    A quick example I give on that sometimes is

20  when my dad bought me my first car at 16.  I drove it like a

21  madman for about a month before I ultimately wrecked it.

22  And he was really mad at me and said, you know, you fool,

23  you should have anticipated driving like that, you were

24  going to wreck that car, which is true.  Looking back I

25  should have anticipated, but I didn't actually anticipate,

1    because I was too young and too stupid.

2              And I sometimes use that to point out

3    that difference between should have anticipated and actually

4    did. It's just a little higher standard before we get to

5    the death penalty. Is that something you're comfortable

6    with?

7         A.    Yes.

8         Q.    Okay. Question 2 and Question 1 are similar

9    in this sense. They both start out with a no answer.

10   That's kind of the default setting on those questions, and

11   the answer to those questions remains no, unless the State

12   can prove to you beyond a reasonable doubt that the answer

13   should be yes, okay? It's part of our burden of proof to

14   prove to you that both of those questions should be answered

15   yes. If you don't feel we've proved it, if you don't feel

16   we've met our burden of proof, the answer stays no. Does

17   that make sense to you?

18        A.    Yes.

19        Q.    Okay. Let's look at Special Issue No. 1 real

20   quick, whether there's a probability that the person would

21   commit criminal acts of violence, such that they'd be a

22   continuing threat to society. You see how that question

23   kind of asks a jury to make a prediction about future

24   behavior?

25        A.    Yes.

1    Q.    Is that something you think you're comfortable

2  with, making that sort of prediction, given enough

3  information?

4    A.    I don't know that I can give a yes or no

5  answer.

6    Q.    Is there something you think you'd like to

7  hear, some type of evidence to help you answer that

8  question, if you had to?

9    A.    Well, you know, usually it does seem that

10  behavior does continue in a certain pattern, but that's not

11  an absolute.

12    Q.    Sure.  A lot of people tell us that.  I guess

13  the best predictor of future behavior is past behavior.

14  They may want to hear about the person's past, his criminal

15  past, if he has one, that type thing, to help them answer

16  that question.  Assuming you're given that type of evidence

17  in the second part of the trial, do you feel comfortable

18  making that sort of prediction?

19    A.    I don't know that I'd feel comfortable, but I

20  think I could.

21    Q.    Okay.  A lot of the words in these questions

22  aren't necessarily defined for us in law, like so many other

23  things are, so we kind of just rely on the jurors to use

24  their good common sense and kind of give it the everyday

25  definition.  You know, we always ask jurors, when you see

1   that word "probability," I almost hesitate to do it with

2   you, since you're a math science type teacher, but what does

3   the word "probability" mean to you?

4        A.    Well, that you are looking at, the

5   preponderance of the data.

6        Q.    That's exactly right.  And we hear that, you

7   know, preponderance, more likely than not, a likelihood.

8   Obviously, we don't have to prove to a certainty.  We could

9   never do that.  But it's got to be something more than a

10  mere possibility.  A lot of people say preponderance, 51

11  percent of the evidence, that type thing.

12              The phrase, kind of in the middle line of

13  that question, "criminal acts of violence."  Again, that's

14  not specifically defined or limited to certain type of acts

15  or crimes.  But I'm just curious what comes to mind when you

16  see that phrase?  What type of acts or what type of crimes?

17       A.    Well, if this is a murder trial, I guess I

18  would think murder.

19       Q.    Murder, obviously would be one.

20       A.    Robbery, rape.

21       Q.    That's kind of what we commonly hear.  Any

22  type of violent crime or the threat of violence, a crime

23  that involves that, that type thing.  Does that make sense

24  to you?

25       A.    Yes.

Q.    Okay.  The law doesn't necessarily require that we prove to you that he's going to commit another murder or be involved in another capital murder, just that there's that probability of some type of violent criminal act.  Does that make sense to you?

A.    Yes.

Q.    Okay.  Then finally the last word in that question, "society."  When you see that word, what does it mean to you, or how would you define it?

A.    Oh, goodness.  Words don't come to me.  The people at large, the community.

Q.    Okay.  That's typically what people say, I guess, everyone.  Everyone and anyone that the person may come into contact with?  Does that make sense to you?

A.    Yes.

Q.    Okay.  Even if they are behind bars?  Other inmates, prison guards, wardens, teachers, that type of thing?

A.    Yes.

Q.    Okay.  And, again, if you -- that question starts off with a no answer and we have to prove to you that it's a yes answer.  If you answer No. 1 yes and you answer No. 2, which we've already talked about, yes, then you move to the third question, Special Issue No. 3.  That question is a little bit different in this sense.  It doesn't start

1  off with that no answer.  Neither side has the burden of

2  proof on that.  We just leave it up to the jury to decide

3  whether they think, you know, what they think the answer

4  should be.

5           Basically, this question asks you to kind

6  of stop, look back at all the evidence you heard in the

7  first part of the trial, the second part of the trial.  Look

8  back at the facts of the crime, the facts you've learned

9  about the defendant and his character and background, look

10  at what sort of personal moral blame he bears for the crime,

11  and ask yourself, is there anything mitigating?  Is there

12  anything that lessens his personal moral blameworthiness?

13           And if there is, is it sufficient that

14  his life ought to be spared, that he should be given that

15  life sentence instead of a death sentence?  Does that

16  question make sense to you?

17      A.      Yes.

18      Q.      Okay.  You kind of -- does it make sense to

19  you why we have that question?

20      A.      Yes.

21      Q.      Okay.  As you sit there right now, is there

22  anything that comes to mind that would be potentially

23  mitigating in these type of cases?

24      A.      No, I can't come up with anything.

25      Q.      Okay.  That's the most common answer we hear.

1 Hopefully, you don't sit around thinking about what would be

2 mitigating in a death penalty case.  But some people tell us

3 maybe a person's background, you know, if they had a bad

4 childhood, physical, mental, emotional abuse, some type of

5 -- something like that.  Some people might consider that

6 potentially mitigating.

7            Other people are kind of the opposite end

8 of the spectrum.  They say, you know, my heart goes out to

9 you, you had a bad childhood, but at some point you are old

10 enough to be responsible for your actions, and I just don't

11 consider that mitigating.  I don't consider that an excuse.

12 Where do you kind of fall down on that issue?

13      A.      I would be on the side where there comes a

14 point where you are responsible.

15      Q.      Okay.  We commonly hear that.  The law doesn't

16 require that a juror tell us what they think would be

17 mitigating at this point, or be able to envision anything

18 mitigating.  You don't even have to agree with the other

19 jurors, you know.  You may think one thing is mitigating and

20 another juror may not.

21            All the law requires is that you're able

22 to keep an open mind and if you are hear something

23 potentially mitigating, your mind won't be closed, you could

24 listen to it, and give it whatever weight that you think is

25 appropriate, that type of thing.  Is that something you

1    think you could do?

2         A.    Yes.

3         Q.    Okay.  Any questions about kind of the scheme

4    we have, the sentencing scheme?

5         A.    No.

6         Q.    Okay.  And, again, the only way we get to the

7    death penalty is a yes, yes, and no answer.  If the

8    questions are answered any other way, that person is

9    sentenced to a life sentence.  Just to let you know what a

10   life sentence means in Texas in this type of case, you may

11   wonder about parole.  Every criminal offense in Texas is

12   parolable.  There's no such thing as life without parole in

13   Texas.

14            In a capital case like this, a death

15   penalty case, if a person is sentenced to life, that person

16   must do forty years, day for day, before they would be

17   eligible for parole.  Now, they may make parole that first

18   time up after forty years, or they may never make parole.

19   They may actually serve a legitimate life sentence.

20            We don't know that.  It's something that

21   happens way in the future that no one here has control over.

22   So, we kind of ask a jury just to, just to assume life means

23   life when they think about it.  Does that make sense to you?

24        A.    Yes.

25        Q.    Is that something you think you could do?

1    A.    Yes.

2    Q.    Okay.  Some things that may be familiar to you

3  from your past jury service, the burden of proof is always

4  on this table.  The defense doesn't have to bring you

5  anything.  They can sit there and do crosswords, if they

6  wanted to.  I don't think they will, they're fine lawyers,

7  but, nevertheless, you've always got to look to the State to

8  bring the evidence.

9              As you can imagine, we have alleged that

10  a police officer has been killed in the line of duty.

11  You're probably going to hear from people in law

12  enforcement, and I know you have extensive ties, I guess, to

13  people in law enforcement.  What the law says with those

14  type of witnesses is that jurors have to start them out on

15  the same level of credibility.

16              You can't give someone, as a juror, an

17  automatic leg up just because they have a badge and a gun.

18  You know, once you start listening to them testify, and

19  they're credible, then you can give them the credit they

20  deserve.  But you just can't automatically start them out a

21  little bit higher.  Does that make sense to you?

22    A.    Yes.

23    Q.    Okay.  Is that a law you think you could

24  follow?

25    A.    Yes.

1     Q.     Okay.   Sometimes in these cases the defense or

2  maybe even the State or both sides may call a psychiatrist

3  or psychologist to try to give the jury some insight in one

4  of these, how to answer question No. 1 or question No. 3.

5  So, we're always curious to kind of get people's gut

6  reaction to those type of witnesses.  I'm just curious what

7  comes to mind when you think about those type of witnesses

8  in a case like this.

9     A.     Well, I said in this that I thought that they

10 would probably be biased one way or the other.

11    Q.     Okay.

12    A.     I think that's probably what I would think.

13    Q.     Going into it with that view, do you still

14 think you could kind of keep an open mind and listen to

15 whoever you heard, go with them if they made sense, not go

16 with them if they didn't make sense, that type thing?

17    A.     I would listen objectively.

18    Q.     Okay.  And that's all the law requires.  Do

19 you have any questions of me, Ms. Evans?  I know we have

20 gone through quite a bit.  I want to make sure you really

21 understand how the sentencing scheme works.  Any questions

22 at all about that?

23    A.     Not that I can think of.

24    Q.     Okay.  Let me take a minute to look through

25 your questionnaire.  Ms. Evans, thank you so much for your

36

1   time, I appreciate it.

2                   MR. WIRSKYE:  Judge, that's all I have.

3                   THE COURT:  Ms. Busbee?

4                        CROSS-EXAMINATION

5   BY MS. BUSBEE:

6        Q.    Thank you, Ms. Evans.  I don't have to take so

7   long, because Mr. Wirskye explained everything to you.  I

8   just want to talk to you, frankly, about what we're looking

9   for here in a juror.  You saw, oh, gosh, how many people?

10  You were in the afternoon.  We had that many people in the

11  morning.  We've already gone through that list.  And we've

12  got, what, nine or ten jurors, so we've still got jurors to

13  select.

14                  We read these questionnaires and we get

15  an idea about people because, you know, they're designed to

16  test your gut reaction to things before we tell you how it

17  really works.  And it doesn't seem fair, but it really kind

18  of gives us an idea of your attitude.  And, you know, I see

19  -- I wrote on my questionnaire when I read it, husband FBI,

20  daughter FBI, and at the bottom I put, but she's very

21  reasonable.

22                  And then, you know, we come in here and

23  we see you and sometimes our reactions to the questionnaires

24  are correct and most times they're not.  That's why we ask

25  you down here to talk to you.  But -- so you can understand

1  why we would be a little concerned that your -- you've got

2  people in your family that are in law enforcement.  But I'm

3  not reading from you that you think you have a mandate to be

4  on the side of the State or the defense.  Is that a fair

5  statement?

6        A.     That's fair and I think that's true.

7        Q.     Okay.  Obviously, it's a horrible thing when a

8  police officer gets killed, and the reason we like to talk

9  to people about these issues is, obviously, you wouldn't be

10  here, if you weren't a reasonable, lawabiding person.  But

11  someone has died and someone else may die as a result.  And,

12  so, obviously, emotions are involved, and we just kind of

13  like to make sure that both sides get a fair hearing from

14  the jurors.

15              And that's why we ask you these questions

16  and you, like most people, kind of gulp when you think, you

17  know, think about you might actually have to do it.  The

18  State has indicated to you that they're seeking the death

19  penalty in this case for someone who is not -- a nonshooter,

20  an accomplice.  And we can't go into the facts of the case,

21  because that wouldn't be fair.

22              But I would like to hear your general

23  impressions of what would be important to you as far as, not

24  guilt or innocence, anybody who participates as a party to

25  an offense is guilty of that offense, so I'm not talking

about that aspect of it.  I'm thinking more of what
participation of a party in your mind would be more worthy
of a death sentence?  Am I asking that properly?  I'm asking
you, because you said it, you know, it would really depend
on the circumstances.

        A.      Uh-huh.

        Q.      And I'm just wondering if you had any
circumstances in mind?

        A.      Well, if this person, you know, was totally in
on planning the robbery, and helped get all the setup and
participated in that, but did not have any connection with
the actual, you know, death of the officer, I would be
curious about, you know.

        Q.      Well, and that's kind of what a lot of people
say.  I just wanted to kind of -- it's hard to get people up
on the witness stand, tell them what the scheme is, and then
ask them to spit back at you something you haven't had any
time to think about it.  I think, you know, some of those
things, some of those issues, go into that third question,
the personal moral culpability and circumstances of the
offense.

                So, I guess my question, you've really --
some of the questions I had to ask you, you answered for
Mr. Wirskye in such a way that I don't really need to go
over that with you.  I did have a question about whether or

1  not you approved of this scheme.  Do you think this is the

2  proper way to --

3       A.     This scheme?

4       Q.     Yes, ma'am.

5       A.     Yes, I think it's fairly, it's logical.

6       Q.     Okay.  It is almost like a chemistry formula

7  in a sense, except that it calls for some subjective

8  conclusions.

9       A.     Yes.

10      Q.     You have to take step one in the process and

11 if you answer that no, of course, you don't go any further.

12 But if you -- if that step is accomplished, you go into

13 Special Issue No. 2, step 2 in the formula.  And if that

14 answer is no, then there's no need to go on to the third

15 question.  But, but they do go in that logical progression.

16 One, and if 1, then 2, and if 2, then the final question.

17 Even considering that you have answered Special Issue No. 1

18 yes and 2 yes, you would still be open to giving a life

19 sentence?

20      A.     You're asking that to me?

21      Q.     Yes, ma'am.

22      A.     Yes, I would be open to that.

23      Q.     Do you have any comments for us, either side,

24 about anything we haven't asked you about or concerns?

25      A.     You would have to have all the jurors to agree

1    to, on this?

2         Q.    The Judge will give you the instructions on

3    that.

4         A.    I would just think that would be very

5    difficult to get agreement on something like this.

6         Q.    Well, as they told you, well, you know, that's

7    the State's burden to prove things beyond a reasonable

8    doubt.  And if it isn't proved beyond a reasonable doubt,

9    then the answer to Special Issue 1 and 2 would be no.

10                But as to Special Issue No. 3, as

11   Mr. Wirskye explained, you don't have to come to a consensus

12   as to why you don't think the death penalty should be

13   imposed, just that, for some reason, you personally don't

14   believe that it should be.  Is that a fair statement?

15        A.    I understand, yes.

16        Q.    Okay.  Well, you are much easier to educate

17   than a lot of people that come down here, so I'm not going

18   to take up any more of your time.

19                MS. BUSBEE:  No more questions of this

20   juror, Your Honor.

21                THE COURT:  Thank you, ma'am.  If you

22   would be so kind as to wait for us out in the hallway.

23   We'll have you back in just a moment.

24                [Prospective juror out]

25                THE COURT:  What says the State with

1    juror No. 2816, Ms. Grace A. Evans?

2                    MR. WIRSKYE:  State has no challenge for

3    cause.

4                    MS. BUSBEE:  Defense has no challenge for

5    cause.

6                    THE COURT:  Would you like to step in

7    your office?

8                    MS. BUSBEE:  Yes, please.

9                         (Recess)

10                   THE COURT:  What says the State?

11                   MR. WIRSKYE:  State will exercise a

12   preemptory.

13                    [Prospective juror in]

14                   THE COURT:  Ms. Evans, I want to thank

15   you for your time and very thoughtful attention to this

16   Court.  I inform you that you shall not be a juror in this

17   case.

18                   PROSPECTIVE JUROR:  Thank you very much.

19                   THE COURT:  All right.  You are free to

20   go.

21                    [Prospective juror out]

22                   THE COURT:  Ms. Rowell.

23                    [Prospective juror in]

24                   THE COURT:  Good morning.  Please have a

25   seat.  Juror No. 2899, Ms. Linda Sue Rowell?

1      PROSPECTIVE JUROR:  Yes, like Powell,

2  only Rowell.

3      THE COURT:  Rowell.  Welcome to the

4  283rd.

5      PROSPECTIVE JUROR:  Thank you.

6      THE COURT:  I see you have had enough

7  time this morning to read the guide I provided for you?

8      PROSPECTIVE JUROR:  Yes.

9      THE COURT:  That's a lot of information

10  to give someone first thing in the morning.  And I also

11  provided a copy of your questionnaire that you filled out

12  for us back in May --

13      PROSPECTIVE JUROR:  Yes.

14      THE COURT:  -- for you to refer to, to

15  begin to let you think about the issues both the attorneys

16  will discuss with you.  I see you've got some caffeine this

17  morning, so looks like you're ready to go.

18      PROSPECTIVE JUROR:  Ready, yes, sir.

19      THE COURT:  This is our only opportunity

20  to visit with you about how this all relates and how this

21  type of trial will proceed.  There are no wrong answers.

22  The objective here is for you to learn.  And at the end of

23  the process I have two questions I must ask.  Number one is

24  do you understand the law?  And number two, can you follow

25  the law?  That's the big picture I have to have.  Only

1  question I have for you at this time is will you be able to

2  serve this Court for a period of two weeks beginning on

3  November 10th?

4                        PROSPECTIVE JUROR:  Yes.

5                        THE COURT:  Thank you very much.  Mr.

6  Shook?

7                        MR. SHOOK:  May it please the Court?

8                        LINDA ROWELL,

9  having been duly sworn, was examined and testified as

10 follows:

11                       DIRECT EXAMINATION

12 BY MR. SHOOK:

13      Q.     Ms. Rowell, my name is Toby Shook.  I'm going

14 to ask you questions on behalf of the State.  And as the

15 Judge has said, there's no right or wrong answers to any of

16 our questions.  We just want your honest opinions.  You've

17 been down on jury duty before, I think.  This one is a

18 little different, because it's a capital murder case in

19 which the State is seeking the death penalty.

20                       The procedure is we interview each juror

21 individually.  We don't mean to make you feel like you're

22 the one on trial.  Sometimes jurors feel that way because

23 they're on the witness stand.  But we have found it's a

24 pretty good way of getting information and you can ask us

25 questions at any time, so don't hesitate to do that.

1          I'm going to follow up on some of your

2    answers in your questionnaire and then I'll talk to you

3    about capital murder, the death penalty, how you feel about

4    that, and some of the rules and laws that apply in these

5    types of cases.  I see you are originally from Ponca City?

6          A.    Yes, sir.

7          Q.    And you've lived several places, but I believe

8    you said that most of your life you spent in Ponca City; is

9    that right?

10         A.    Yes.

11         Q.    Okay.  And you've done a little bit, looked

12   like a little bit of everything.  You were a teacher, Jr.

13   High?

14         A.    Yes, sir.

15         Q.    What subject did you teach there?

16         A.    Jr. High.

17         Q.    Okay.  Just several subjects, or --

18         A.    No, sir, I was the physical education teacher.

19         Q.    Okay.  And then you've been a counselor as

20   well as a travel agent?

21         A.    Yes.

22         Q.    And then now, you have one of the more

23   interesting jobs we came across, as a house mother?

24         A.    Yes, sir.

25         Q.    What brought you down to Dallas?  Was that

that particular job or --

A.      I was a house mother at the University of
Oklahoma.  My niece had a baby and I have no children, so I
kept running down to Dallas to see the baby and I was
wearing out my tires, so I asked to come to SMU.

Q.      Okay.  And you've been there ever since?

A.      Yes.  Same house.

THE COURT:  Which house?

PROSPECTIVE JUROR:  Chi Omegas.

Q.      (By Mr. Shook)  The Judge went to SMU.  He may
have snuck around the Chi Omega house.

A.      If he's a man, he has.

MS. BUSBEE:  Let the record reflect the
Judge is getting very red.

THE COURT:  Yes, I did.

Q.      (By Mr. Shook)  Now, what are your duties
there as the house mother on the daily basis?

A.      On a daily basis I oversee the household for
forty girls.  I have two cooks.  I have two housekeepers.  I
oversee the guard and the maintenance, and I write their
bills, keep them out of debt, and I've got people over me
that I have to report to.

Q.      With this much notice, if you were chosen to
be on the jury in November, I take it you'd be able to make
other arrangements or be able to -- it's an inconvenience,

1  obviously, to everyone, but you'd be able to handle that

2  inconvenience?

3      A.     I mean, I wouldn't be sleeping here, would I?

4      Q      No.  No, the Judge lets everyone go home

5  around 4:30 or 5:00.  The only time you might be sleeping

6  here -- it wouldn't be here, but at a hotel, would be if you

7  were sequestered during deliberations.

8      A.     I see.  I'm sure that the Chi Omegas would

9  allow that.

10     Q.     Okay.  All right.  Let me talk to you -- well,

11 let me, as far as law enforcement goes, you had a niece

12 whose husband is a DEA agent?

13     A.     Yes, sir.

14     Q.     Is he still a DEA?

15     A.     No, sir.

16     Q.     All right.  Did he ever relate his stories --

17     A.     Oh, no.

18     Q.     -- to you or anything like that?

19     A.     I would like -- personally didn't want to know

20 about them, either.

21     Q.     Okay.  So that shouldn't cause you a problem

22 --

23     A.     No.

24     Q.     -- being biased in any way.  Let me ask you

25 about how you feel about the death penalty as a law.  Are

1    you -- you're in favor of it as a law?

2          A.      Yes, sir.

3          Q.      Can you tell us in your own words why you

4    favor it, maybe the purpose you feel it serves society?

5          A.      I think that there are some people, that if

6    proven so, should definitely have the death penalty.

7          Q.      Okay.

8          A.      I just feel that way.

9          Q.      Has it been -- have you believed in the death

10   penalty as a law since you've been an adult?

11         A.      All my life I've felt that way.

12         Q.      Is it just kind of --

13         A.      We don't discuss it in my family.  You know, I

14   may feel differently, if I had had a family member that was

15   involved in it.  But I have no waivering points on that.

16         Q.      Okay.  What, when you think of an appropriate

17   case for the death penalty or the type of crime, from your

18   own personal point of view, what types of crimes do you

19   think?

20         A.      Taking the life of another person is wrong as

21   far as I'm concerned.

22         Q.      Okay.  Have there been any --

23         A.      It doesn't matter whether they've been on

24   drugs, either.

25         Q.      All right.  That's one of the questions we

1    ask.  It's not a legal defense to be on drugs, especially if

2    it's --

3         A.    No.

4         Q.    -- voluntary.

5         A.    Because in the first place, it's their choice

6    to be on them.

7         Q.    All right.  Have there been any cases that

8    you've followed in the media locally or nationally that you

9    thought were death penalty occasions?

10        A.    O. J.

11        Q.    O. J.  Almost everyone followed the O. J.

12   case.  What were your thoughts on that?

13        A.    I'm not sure they proved it, but I think he

14   was guilty.

15        Q.    Okay.

16        A.    That's my thought.

17        Q.    A lot of people tell us that.

18        A.    Yeah.

19        Q.    And, obviously, I think the prosecution did

20   have some problems or they did something wrong.

21        A.    Uh-huh.

22        Q.    And, of course, in California, I don't know

23   what goes on out there, but they seem to try cases a lot

24   different.

25        A.    I think so.  It's different than a lot of

1   states, California.

2          Q.     Yeah.  They take about eight months to try a

3   case and we don't have that problem here.

4          A.     No, I'm glad.

5          Q.     In this case it probably won't take more than

6   two weeks, as the Judge has said.  If it were up to you, and

7   you talk about murder cases, which is the most common

8   answer, would you ever have the death penalty for some

9   crimes other than murder?

10         A.     I would have to read the case.

11         Q.     Okay.

12         A.     I'd be openminded to it.

13         Q.     All right.  In Texas, right now, and you

14  probably know from looking at the packet the Judge gave you,

15  the death penalty is just reserved for certain types of

16  murder cases.  We have some brutal killings which can get

17  life in prison, but they can't get the death penalty because

18  of the way the statute is set up.

19                One case that jurors often bring up is a

20  case that happened in Highland Park several years ago with

21  the accountant killed his wife in front of the children.  I

22  think his name was Timothy Richardson.  And that was a lot

23  of publicity.  It was a brutal crime, but he couldn't

24  receive the death penalty for it.

25                The death penalty is reserved for

1  intentional murders on an unjustified homicide.  Not in

2  self-defense, not an accident, but with some other

3  aggravated circumstances such as a murder that occurs during

4  the course of a felony.

5           For instance, if I go and I rob a

6  7-Eleven store and I shoot the clerk.  That could be a death

7  penalty case.  Murder during a burglary, someone breaks in

8  the home, that could be a death penalty case.  Murder of --

9  during the commission of a rape, or a kidnapping, or an

10  arson, during those types of felonies.

11          Also, murder of a police officer or

12  fireman on duty can be a death penalty case, murder of a

13  child under the age of six, as well as murder of more than

14  one victim, a serial killer situation, or the mass murder.

15     A.    Why do you say at the age of six and not all

16  children?

17     Q.    I don't know why the legislature chose that

18  age.  I think what it is, they had to choose one age and not

19  just say children.  In other words, the courts said we've

20  got to have some guidelines.  And for whatever reason they

21  chose age 6.  I think a lot of jurors and a lot of citizens

22  would like to have that moved up.

23     A.    Uh-huh.

24     Q.    Obviously, what's the difference in a 6 year

25  old and a 7 year old?  But in their infinite wisdom, for

1    some reason, they chose age 6.

2         A.       Okay.

3         Q.       But -- but I've never been given an

4    explanation on it.  I know a lot of people would rather have

5    like 15 or under or something like that.

6         A.       Uh-huh.

7         Q.       And then the only other situation that I can

8    think of right now would be the, a murder for hire, if

9    someone does it for money, like your hitman situation.  But

10   those are the -- what they set out right now.  As far as

11   that list of types of crimes, do you agree that those are

12   the types of crimes that you think should at least be

13   considered for the death penalty?

14        A.       Yes, sir.

15        Q.       Okay.  Now, another area I want to talk to you

16   about is what we call the law of parties, which is more

17   commonly known as accomplices, at least that's the word I'm

18   more familiar with.  But they named it the law of parties in

19   Texas.  If more than one person commits a crime, they can

20   all be held responsible.

21                 And that's true in a capital murder

22   situation, even if some of the people involved didn't

23   actually cause the death.  If you are all acting as a team,

24   acting together, participating in the event, the law says

25   that they can be found guilty, and in a capital murder

1  situation, an accomplice could, under certain facts, receive

2  the death penalty.

3               An example I often give is, let's say,

4  Mr. Wirskye and I decide we want, as a team we're going to

5  commit bank robbery.  Our plan calls for me to go in there

6  with a loaded gun and I'm going to point it at the tellers.

7  I'm going to have them put their hands up.  I'll threaten

8  them.  And then while they're being held at bay, he'll go in

9  and unload the cash into a big sack, go through the drawers.

10               Now, during the course of that robbery, I

11  might shoot someone.  Let's say I intentionally shoot one of

12  the clerks because I don't like the way they're looking at

13  me or he tells me one may be going for an alarm.  I kill

14  him.  We flee.  But we're arrested.

15               Now, obviously, I can be prosecuted for

16  the death penalty because I murdered someone during the

17  course of a robbery, and I could get the death penalty,

18  depending on the jury.  The law says, also, that he could be

19  held accountable and found guilty of capital murder, also,

20  and depending on the facts, he could ultimately get the

21  death penalty, even though he's not the triggerman.

22               And people feel differently about that as

23  far as the law goes.  Some people are strongly in favor of

24  the death penalty for someone who actually causes the death,

25  the triggerman, or the murderer.  But they would draw a line

from their own personal point of view as far as an
accomplice goes.  They don't think that's quite fair that
someone gets the death penalty, if they didn't actually
cause the death, maybe a long term of years, but not the
death penalty.

Other jurors tell us, no, I feel an
accomplice should be held accountable and could receive the
death penalty, again, depending on the facts.  But they do
think it's fair for the prosecution in a death penalty case
of an accomplice.

But everyone feels differently and we
just want to get your honest opinion on how you feel about
the prosecution of a death penalty case on an accomplice.

A.     I think that if he went in as an accomplice
and it took place, you could be accountable, and I could
vote yes.

Q.     Okay.  Would it just depend on the facts of
the case?

A.     Yes.

Q.     What types of factors do you think would be
important to you in those situations?

A.     Not having ever heard any facts and being in
the case, you would just have to prove it to me.  And I
can't tell you.

Q.     It's just -- but as far as a philosophical

1   point of view, you wouldn't take the death penalty off the

2   table.  You'd feel it could be a fair punishment?

3         A.     I do.

4         Q.     Depending on those factors?

5         A.     Yes.

6         Q.     All right.  Now, there's two theories of law

7   on that.  One is the law would say that if someone is

8   actively participating, encouraging, aiding, directing in a

9   crime, they can be found guilty as an accomplice, as a

10  party.

11              The other theory is conspiracy.

12  Basically, it says if more than one person conspired to

13  commit one crime and while they are carrying that out, one

14  of the conspirators commits another to further the

15  conspiracy, they all could be held accountable, even if they

16  didn't have the intent to commit that other crime, if they

17  should have anticipated it could occur.

18              And in a capital murder situation, the

19  example I gave, conspiracy is simply me and Mr. Wirskye

20  agreeing to commit this bank robbery, and while we're

21  carrying it out, I commit the other felony of murdering one

22  of the clerks, he can be found guilty, if the jury believes

23  that he should have anticipated a death could occur, based

24  on those particular facts.

25              In that situation he doesn't even have to

1  have the intent that someone die.  If the jury believes from

2  all the surrounding facts, well, he should have anticipated

3  something like that could occur in that situation, he could

4  be found guilty.

5              And, again, people feel differently about

6  that, that a person necessarily doesn't have to have the

7  intent if they -- if the facts show that he should have

8  anticipated that.  How do you feel about that particular

9  area of the law?

10        A.     Well, I think that someone has done a lot of

11  spin and if you decide to go down that road, then you should

12  suffer the consequences.

13        Q.     Okay.  Again, it's going to depend on each

14  case.

15        A.     Yes.

16        Q.     It's just going to depend on the facts of each

17  case.

18        A.     Uh-huh.

19        Q.     Now, are you familiar with the method of

20  execution in Texas?

21        A.     No, sir.

22        Q.     It's by lethal injection.

23        A.     Okay.

24        Q.     Which I believe is the same in Oklahoma, also.

25  Most states have that now.

1    A.    I don't know that rule either.

2    Q.    Okay.  Hopefully, you don't want to spend a

3    lot of time --

4    A.    No.

5    Q.    -- learning about that stuff.

6    A.    No.

7    Q.    But the laws and the procedures are the same

8    in each case.  In the punishment phase, the trial is divided

9    into two parts.  You have the guilt/innocence stage.  You

10   find someone guilty, you then move to the punishment phase.

11   At that point in time, you get these Special Issues, these

12   questions.

13        The State has to prove to you that the

14   defendant would be a continuing danger to society, that they

15   either intended the person to die or that they anticipated

16   that someone would die, and, finally, the jury decides if

17   there's sufficient mitigating evidence to call for a life

18   sentence or a death sentence.

19        But if the questions are answered yes,

20   yes, and no, the Judge wouldn't have any discretion.  He

21   would sentence the defendant to death.  If they are answered

22   any other way, again, he would have no discretion.  He would

23   sentence the defendant to life.  But those are the only two

24   possible choices, once you get to the punishment phase.

25   It's a death or life sentence and it all depends on how the

1    jury answers those questions.

2         A.    Okay.

3         Q.    The procedures are the same.  They would be

4    the same in this case.  If the defendant were found guilty

5    and the questions are answered yes, yes, and no, the Judge

6    would sentence him to death.  He'd be placed on death row.

7              I couldn't tell you when, but at some

8    point in time the Judge would give an actual date of

9    execution.  On that date or the day before, he'd be moved

10   from death row to downtown Huntsville, where oftentimes

11   there's news crews out there.  You will see this on the news

12   of this prison unit, and the clock outside, protesters,

13   things of that nature, depending on what's going on, I

14   guess, in the news.

15             On the date of the executions, he's

16   always given a last meal.  He's given time with family or

17   friends or a religious person of his choosing.  But at 6:00

18   p.m. the execution takes place.  There's a room there that's

19   often photographs appear on the news.  It has a gurney with

20   leather straps.  He's placed on that gurney.  He's secured.

21   There's needles placed in his arm.  There would be

22   witnesses, witnesses from the family's side that can go into

23   a room, witnesses from the defendant's side.

24             After they're there, the warden gives him

25   a chance to make a last statement, which is often reported.

He can claim his innocence, protest the death penalty, he may ask for forgiveness.  After that statement, the warden simply signals the executioner, who injects chemicals which will stop the heart, the lungs.  He will lapse into a coma and die within about 15 seconds.  That happens like clockwork in every execution.

We can't preview the facts, obviously, and ask you for your verdict on what would happen, but we can tell you that in this case it's our goal, we believe we have the type and quality of evidence to convince a jury of this man's guilt, that these questions will be answered in such a way that he will be executed in the method I have described.

We bring a lot of jurors down and everyone has their own viewpoints.  And it's one thing to talk about the death penalty kind of in a philosophical viewpoint, and another when you get down here and it's a situation where you may be actually making these decisions. Some people can do that and some people can't.  It just depends on the person.

You have told us, philosophically, you do believe in the death penalty.  You do believe it should be carried out.  I don't know if you know this, but Texas leads the nation in executions, so it's a punishment that actually is carried out.

1          Now that you've told us that you do

2    believe in it, are you the type of person who could actually

3    take pen in hand, if these questions are proven to you, you

4    could answer them in a way knowing that the defendant would

5    be executed someday?

6          A.    Yes.

7          Q.    Okay.  Let's talk about these Special Issues

8    for a moment.  You don't get to them, unless you've found

9    the defendant guilty.  Then you may hear additional evidence

10   and then you'd get these questions.  If you'd take a moment

11   just to read Special Issue No. 1 to yourself.

12         A.    (Prospective juror complies.)

13         Q.    It starts out with a no answer.  And the State

14   must prove to you beyond a reasonable doubt it should be

15   answered yes.  We do that by the evidence from the

16   guilt/innocence stage, which you look at again, and any

17   additional evidence you hear in the punishment phase.  Just

18   looking at that question, you see how it's asking the jurors

19   to make a prediction about how the defendant would behave in

20   the future?

21         A.    Yes.

22         Q.    Do you feel comfortable in answering a

23   question like that, if you're given sufficient information?

24         A.    Yes.

25         Q.    What types of information would you personally

1  want to know about a person before you answer that question?

2      A.    Background.

3      Q.    Okay.  That type of information is available

4  in that portion of the trial, if they've had a past history,

5  if they committed a crime before, if those witnesses can be

6  found and brought forth, you can even hear from them, the

7  type of sentence they received, and that sort of thing.  You

8  can hear bad character evidence, you can hear good --

9      A.    Situation.

10      Q.    Okay.  When you say situation, you mean with

11  the crime or their background?

12      A.    Just, I'd have to know all the facts.

13      Q.    Okay.

14      A.    If I got them, the answer would be yes.

15      Q.    All right.  The -- it kind of is like a "This

16  Is Your Life."  Remember that old show where they bring

17  someone out?

18      A.    Uh-huh.

19      Q.    You can hear from people that can say good

20  things or bad things about a person.  So you can hear all

21  about their background.  And then, again, you get to look at

22  the facts and their role in the crime and determine that.

23  Obviously, that will give you valuable information whether

24  they'd be dangerous.

25          The law is this, though, just because you

1   found someone guilty, that's not an automatic yes answer.

2   It might be yes or no, depending on the evidence in the

3   case.   The jurors have to be able to tell the Judge that I

4   will wait and I'll listen and I'll gather all the evidence,

5   all the facts, and I'll look at anything new that's

6   introduced in the punishment phase from either side, and

7   then I'll look at that question and I'll require the State

8   to prove it to me beyond a reasonable doubt.

9               If they were automatic answers, just

10  because you found someone guilty, there wouldn't be any

11  reason to have the question.   The law contemplates that some

12  of these capital murders are going to have death sentences,

13  some of them are going to have life sentences, just

14  depending on the facts of each case.

15              Do you feel you could follow that area of

16  the law and wait until all the evidence is in?

17      A.      Yes, sir.

18      Q.      And then you would make the decision?

19      A.      Yes.

20      Q.      It's kind of a common sense principle,

21  something you do every day in your job.   You weigh all the

22  facts before you make a major decision.   Same thing here.

23  Then you look at that question independently and you answer

24  it.

25              The second question has the same rules.

1    It starts out with a no answer and, again, the State must

2    prove to you beyond a reasonable doubt it should be answered

3    yes.  And, again, you use the evidence you've heard in the

4    guilt/innocence stage and then any additional information

5    you've heard in the punishment phase in answering that

6    question.  And this question No. 2 is that accomplice

7    situation, or covers that accomplice situation.

8                   The first part of the question asks

9    whether the defendant actually caused the death of the

10   deceased.  Now, if you believe from the facts he's the

11   actual triggerman or the murderer, then that part of

12   question is answered then.

13                  But the second part of the question

14   covers that area of a nontriggerman.  If he did not actually

15   cause the death of the deceased, but intended to kill the

16   deceased or another, or anticipated that a human life would

17   be taken.  So that's the situation where you believe either

18   from the facts his intentions were someone would die, even

19   if he didn't cause it, or another person, or that he

20   anticipated that a life would be taken.

21                  A little difference is, is to get someone

22   guilty the State must cross a hurdle where we prove he

23   should have anticipated.  And here you look at the same

24   evidence and any new evidence and ask yourself, has the

25   State proven that he did anticipate?

1          We can't open a defendant's head up and

2   peer into him and determine his intent.  All we can do is

3   produce all the surrounding facts, his role in the crime,

4   and juries use their common sense to determine someone's

5   intent from their actions.

6          Some people aren't comfortable doing

7   that.  Most people, they do that in their everyday life and

8   are comfortable.  But I just want to make sure you're

9   comfortable with making that type of decision on a person's

10  intent.  You feel --

11       A.    I am, and yes.

12       Q.    Okay.  You feel you could determine that from

13  a person's actions and all the surrounding facts?

14       A.    Yes.

15       Q.    Okay.  You see the difference from what the

16  State has to prove in the guilt/innocence stage that he

17  should have anticipated, and here we have to go to the level

18  of he did anticipate.  You see a difference there?

19       A.    I see the difference.

20       Q.    And you feel you could apply that?

21       A.    Yes.

22       Q.    Again, it might be the same exact evidence

23  you've used in the first part of the trial, but you just

24  have to look at it from the point of view of this question.

25  There's no automatic answers, again.  You have to be able to

tell the Judge, I'm going to wait, I'm going to listen to all the new evidence that comes in, then I'm going to answer this question, based on everything I've heard.  Do you feel you could that?

A.      Yes, sir.

Q.      Okay.  Now, this last question is slightly different in that we don't have to prove to you beyond a reasonable doubt it should be answered no.  There's no burden of proof for us or burden of proof on the defense.  It's the mitigation question.

Just take a moment to read it.  It kind of runs on, and I'll tell you now, though, that we didn't write this question.  Someone down at the Legislature did.  We get questions about it sometimes.  It kind of covers everything.

A.      (Prospective juror complies.)  Yes.

Q.      You don't get to it unless you, until you've found someone guilty, you determine that they're a continuing danger, you determine that they intended or anticipated someone would die.  But it allows the jurors to look at all the background, all the facts, and if they feel sufficient mitigating evidence exists, they can assess a life sentence rather than a death sentence.

Sometimes we call that a safety net or safety valve.  It allows jurors to show mercy.  He doesn't

1    get off.  He has to serve a life sentence.  But it allows

2    them to do that, if they think that's the right thing to do,

3    based on the evidence and based on their heart.

4                    Now, what mitigating evidence is, is up

5    to you and the other jurors.  We can't tell you what it's

6    going to be.  All you have to be able to do is tell the

7    Judge, I can keep my mind open to it.  If I think something

8    is sufficiently mitigating, I'll answer the question yes.

9    And if don't, I'll answer it no.  Do you feel you could keep

10   your mind open to that type of evidence?

11        A.    Yes.

12        Q.    Okay.  Now, as you sit there today, again, I

13   just want to kind of get your gut reaction.  Does anything

14   come to mind that you would view as potentially mitigating

15   evidence?

16        A.    No, sir.

17        Q.    Okay.  That's 99 percent of our jurors tell us

18   that.  Again, hopefully, folks don't sit around thinking of

19   these type issues.

20        A.    No.

21        Q.    Different things come up in different trials.

22   We can't preview these things to you, but oftentimes there

23   are talks about a person's background.  You may hear about a

24   person's upbringing.  Sometimes people come from broken

25   homes, sometimes poor environments, sometimes they've been

1    abused, physically or mentally.

2                        Jurors feel differently about that type

3    of background.  Some of them are very sympathetic, feel that

4    could be mitigating.  Other jurors are sympathetic, but feel

5    that you have to take, you know, account of yourself, that

6    you can't use that as an excuse once you become an adult.

7    How do you feel about potentially that kind of background

8    information?

9         A.    I personally feel that it's up to each

10   individual, and they cannot just say, I came from a bad

11   family.

12        Q.    Okay.  Most people feel that way.  Sometimes

13   you hear about someone who is very young when they commit

14   the crime, and -- or very old.  Jurors could view that

15   potentially as mitigating.  We have other jurors who tell

16   us, if they're acting as an adult, then I think they should

17   be held responsible.  Do you have any feelings about that?

18        A.    My position is, if they're acting that way,

19   they should be accountable.

20        Q.    Okay.

21        A.    Twelve year olds are older than they were when

22   I was in high school.

23        Q.    Okay.  Now, the law is this now.  The cut-off

24   age they've chosen is 17.  You can be prosecuted and receive

25   the death penalty, if you are 17 years or above.  You can

1   get a life sentence, if you are below that, but that's,

2   that's the age that they chose.  Again, we can't tell you

3   what mitigating evidence is.  You just have to be able to

4   keep your mind open to it.

5           You don't get to the question until you

6   have already found them guilty, they are a continuing

7   danger, and anticipated this life would be taken.  But the

8   law contemplates there may be some facts which would allow

9   you to give a life sentence.  What they are, you don't have

10  to tell us, just as long as you can keep your mind open to

11  it.

12          I had one juror describe it from his

13  point of view as, he viewed it as kind of a window closing.

14  If someone is found guilty, question 1, question 2, that

15  window got closed a little lower, but he still said his

16  window was open somewhat when he got to question 3.  He

17  would look into it.  That's the best way I've seen that you

18  can really describe it.

19          Again, I can't tell you what it is, but

20  you just have to be able to keep your mind open to it.  Do

21  you feel you could do that?

22      A.      Yes, sir.

23      Q.      Okay.  Now, oftentimes in the punishment

24  phase, you might hear from psychiatrists or psychologists

25  called by one side or the other.  They may give you opinions

1   on a future danger or whether -- or their opinions on why

2   someone acts the way they do, mitigating evidence, that sort

3   of thing. Some jurors put a whole lot of stock in those

4   type of experts, think they walk on water.

5           Other jurors really don't even trust them

6   at all.  They think you can look hard enough, pay them

7   enough money, you can find someone to give an opinion.  And

8   other jurors tell us, I'd look at that.  It wouldn't weigh

9   particularly one way or another with me, it would just be

10  another piece to the puzzle.  Do you have any opinions about

11  those types of experts?

12      A.      I think psychiatrists are important, but I

13  think -- I'm not frightened of their answers, and I would

14  listen to them.

15      Q.      Okay.

16      A.      But just because it's a psychiatrist, I

17  wouldn't make a decision.

18      Q.      Be just another piece of the puzzle for you?

19      A.      Correct.

20      Q.      Okay.  Let me kind of go over some rules that

21  apply to each criminal case, including a death penalty case.

22  You are going to be familiar with most of these, I think.

23  The presumption of innocence.  Anyone charged with a crime

24  starts out with that presumption.  The fact that you've been

25  arrested, charged, or we're going through this process, is

1     no evidence of guilt.

2                 Each juror must start the defendant out

3     with that presumption and the State must prove to you beyond

4     a reasonable doubt that he's guilty.  Could you follow that

5     rule?

6        A.     Yes, sir.

7        Q.     Now, we've got publicity in this case.  Almost

8     everyone heard or read something about this case.  That

9     doesn't make you ineligible to be a juror.  If it did, then

10     we could never get a jury in a high publicity case.  We ask

11     each juror what you recall from any details you may have

12     seen on TV or read in the newspaper.  Do you remember

13     reading some about this?

14        A.     I did not know until this morning what case it

15     was in that room.

16        Q.     Okay.

17        A.     And I remember hearing it on the television,

18     and I can remember where the young men were, up in Colorado,

19     only because I used to go to Chipita Park, Colorado, so I

20     knew the area.

21        Q.     Okay.

22        A.     Other than that --

23        Q.     Okay.  Just general details?

24        A.     Yes, sir.

25        Q.     All right.  Again, that doesn't make you

1  ineligible to be a juror.  We can't ask you to forget what

2  you've read, but what the law requires is the jurors would

3  only make their decision based on the witnesses in the

4  courtroom, and not something they've read or seen outside

5  the courtroom on TV or in the newspaper.

6      A.      Uh-huh.

7      Q.      Kind of, again, a common sense approach, the

8  better evidence is going to come from the actual witnesses.

9  Do you feel you could follow that rule of law and make your

10  decision just based on what you hear in the courtroom?

11      A.      Yes, sir.

12      Q.      Okay.  The burden of proof is on the State of

13  Texas, as you know.  And it never leaves this table.  It

14  never shifts to the defense.  They don't have a burden of

15  proving him innocent or that those questions should be

16  answered in such a way.

17              Common sense will tell you, most jurors

18  tell us, they anticipate the defense may put on evidence,

19  ask questions, try to prove his innocence.  But you can't

20  require them to have that burden of proof.  If you have a

21  reasonable doubt after we rest our case and they don't say a

22  word, you would have to find him not guilty, because that

23  burden of proof never leaves the State.  Could you follow

24  that rule of law?

25      A.      Yes, sir.

Q.     Okay.   The burden of proof goes to every part

of the indictment.   We write the indictment, each and every

element of it.   And we have to prove each and every element

to you beyond a reasonable doubt.   If we fail on any, just

one element, you are obligated under the law to find the

defendant not guilty.

Let me give you a couple of examples.   An

easy one is the identity.   We, obviously, have to prove who

committed this crime.   And at the end of the case, if you

had a reasonable doubt about that, you'd find the defendant

not guilty.   It's pretty much a no-brainer.

However, another example is the county.

We also have to prove where this happened, Dallas County.

The law says that that element is just as important as the

identity.   Maybe it's a case that happened near a

borderline.   We didn't do our homework.   The evidence shows

it looks like, in your mind, it happened in Tarrant County.

Now, we would've really fumbled the ball

on that kind of case.   We would probably get fired, if we

screwed it up that bad.   And I'm using it kind of as a way

out example.   But if you had a reasonable doubt, even about

that element, the law says you would have to find him not

guilty, because you can't give us a hand.   You can't help us

out.

Again, I just use that as an example to

demonstrate how that burden of proof goes to every element.
Do you feel you could follow that rule of law?

      A.    Yes, sir.

      Q.    Fifth Amendment, you've probably heard, you know that if someone wants to testify, they can.  No one can stop them.  But if they choose not to testify, the Judge would instruct you that you can't hold that against them. You can't use that as evidence.

      There could be a lot of reasons why someone may not want to testify.  They may not be very well educated.  They may not do well in front of people.  They may look guilty when they're not.  Their lawyer may be advising them not to testify and they simply follow his advice.  And they may be very guilty and could look real guilty, if they testify, and get hurt.

      The law takes care of that by just explaining to the jury you can't consider that.  If they choose not to testify, you'd have to make your decision just based on all the evidence you've heard in the case.  Could you follow that rule?

      A.    Yes, sir.

      Q.    Police officers are involved in criminal cases.  Jurors usually respect the job they do, but you can't start them out ahead of the other witnesses.  You have to wait until they testify and then judge their credibility

1    like you would any other witness.  Do you feel you could do

2    that?

3         A.      Yes, sir.

4         Q.      Okay.  Another issue that may or may not come

5    up is what we call lesser included offenses.  Sometimes

6    jurors find defendants guilty of lesser included offenses.

7    And a lesser included offense of capital murder could be

8    robbery, aggravated robbery.

9              Aggravated robbery, penalty range carries

10   a life sentence all the way down to five years in prison and

11   anywhere in between.  Again, the law is pretty simple as far

12   as punishment goes.  A jury has to keep their -- a juror has

13   to keep their mind open to the full range of punishment,

14   wait until all the evidence is in about the person's

15   background, good and bad, and then determine what they think

16   the fair sentence is.

17              If you think a life sentence is fair

18   based on the evidence, you could do that.  If you think as

19   little as five years in prison is fair, you could do that,

20   or anywhere in between.  It's just going to depend on the

21   facts and the evidence of each case.  Do you feel you could

22   keep your mind open to that full range of punishment?

23        A.      Yes, sir.

24        Q.      One last area is the parole laws.  They come

25   -- they're covered in the news.  People have strong opinions

1  on the parole laws.  The Judge would instruct you in a

2  capital murder situation, that a capital life sentence means

3  that a person would serve forty calendar years before they

4  become eligible for the death penalty (sic).  And then that

5  doesn't mean they'd be paroled.

6          The Judge would also instruct you that

7  the jurors cannot consider our parole laws in making any of

8  their determinations, because the parole laws are subject to

9  change, something that we don't control them.  You just have

10  to consider a life sentence a life sentence.  Do you feel

11  you could do that?

12          A.    Yes, sir.

13          Q.    Okay.  Again, the bottom line is keeping your

14  mind open, waiting for all the evidence is in before you

15  determine guilt/innocence or before you determine any of

16  these questions.  And you've indicated a few times, now,

17  that you feel you could do that.

18          A.    Yes, sir.

19          Q.    Okay.  Do you have any questions over anything

20  we've covered?  I've kind of run over a lot of ground here.

21          A.    Not at this time.

22          Q.    Okay.  Well, I appreciate your honesty with me

23  and your patience.

24          MR. SHOOK:  And that's all I have then,

25  Judge.

1                     THE COURT:  Mr. Sanchez?

2                     MR. SANCHEZ:  Thank you, Your Honor.

3                     CROSS-EXAMINATION

4  BY MR. SANCHEZ:

5        Q.     How are you doing this morning, Ms. Rowell?

6        A.     Good.

7        Q.     Are you tired of answering questions?

8        A.     No, I do it all day long.

9        Q.     Good.  Good.  That Pepsi is looking real good

10 up there right now, to me.  Didn't have enough caffeine

11 today.  I notice from your questionnaire that, we like to

12 look at what people do on their off-time, or their hobbies,

13 and I notice that you golf?

14       A.     Yes, sir.

15       Q.     You golf quite often?

16       A.     Not at this time.  I'm too busy.

17       Q.     In the summer do you golf a lot?

18       A.     Yes.

19       Q.     Every day, or --

20       A.     I used to do it every day.

21       Q.     Oh, really?  I'm always interested in that.  I

22 just took up golf three years ago, and --

23       A.     And I used to teach it down at Camp Waldomire

24 (phonetic).

25       Q.     Oh, you did?  I'm going to have to take some

1    lessons, then, because I need them.  I can't break 100.

2    What -- as you know, I mean, you were called, what did you

3    think when you got the letter or phone call to come down

4    here and answer questions in front of us?

5            A.     I wasn't surprised, and yet I thought possibly

6    you wouldn't call me, because I kept saying you have to

7    prove it to me.

8            Q.     Okay.  And you think the State may not want

9    you down here because you said that?  Or do you think maybe

10   the prosecutors wouldn't want you down here because you kept

11   saying that?

12           A.     Right.

13           Q.     Well, I mean, you know, that could be a sign

14   that you are real fair.  I mean, because the way the law

15   works is that it has to be proven to the jurors.

16           A.     Uh-huh.

17           Q.     We get some people that say, well, you know,

18   the allegation is enough for me, or based on what I heard on

19   the media is enough for me.  And I would come into this

20   trial --

21           A.     I don't particularly believe everything the

22   media says, thank you.

23           Q.     And I'm glad you feel that way.  But, I mean,

24   you know, we get some people in here that think that way.

25   And, you know, the posture of the law is that before

1    anybody's liberties or life can be taken away, the State or

2    the government has to prove that case beyond a reasonable

3    doubt.  And only then can those liberties be affected.  What

4    do you -- it sounds like you agree with that proposition?

5         A.    I do agree with that.

6         Q.    And, you know, we look at all the

7    questionnaires and we bring people in that actually have a

8    shot at making it on the jury.  They haven't said something

9    in their questionnaire that automatically disqualifies them.

10   But we still get you in, because we want to probe some of

11   your answers and get your true feelings on things, you know.

12             The State, they explain the law to you

13   and they say, can you follow it?  You know.  And everybody

14   says yes.  But then when we ask them their true feelings

15   about the law, some people say, well, you know, yeah, I can

16   follow it, but maybe not in that situation, or maybe I do

17   have a problem with it, the law, in a way that it might

18   affect being a fair juror.  So that's why we're going to ask

19   you all these questions.  Is that all right?

20        A.    That's fine.

21        Q.    Okay.  What do you think about a life

22   sentence, generally?  What do you think about somebody

23   receiving a life sentence in any case?

24        A.    If it warrants the time, I agree.

25        Q.    Okay.  How about in a capital murder case?

1   How about in a case where someone's been convicted of

2   capital murder?  Or, as in this case, the allegation is the

3   killing of a police officer.  What do you think about a life

4   sentence in that situation?

5          A.     Depends on the situation and what's been

6   proven.  It would be an open situation for me and I would

7   weigh it.

8          Q.     You think it could be appropriate?

9          A.     Yes.

10          Q.     Depending on the circumstances?

11          A.     Depending.

12          Q.     The reason I ask that is because some people

13  say, well, you know, I don't even think it would ever be

14  appropriate in this type thing.

15          A.     It could be appropriate.

16          Q.     What would be important to you, what would be

17  a factor in deciding whether it's appropriate or not?  I

18  know it's a very openended question, but, you know, does

19  anything come to mind that would be appropriate?

20          A.     No.

21          Q.     Okay.  But you could foresee --

22          A.     It would depend on the situation and what you

23  are trying to prove.

24          Q.     Okay.  All right.  Another thing I wanted to

25  talk to you about was I think the question about

1  conspiracies, about an accomplice who may not have the

2  intent that that occur, but once they were in the conspiracy

3  they could be held responsible, if they could foresee that a

4  death may happen.  Do you remember that?

5       A.    Yes.

6       Q.    And you made a comment about once you went

7  down that road you must suffer the consequences.  Could you

8  expand on that a little bit, what you meant by that?

9       A.    Well, I just feel that the law at times has

10 provided a loophole for people to get off of a sentence and

11 I think that if we carried them out, that it would be more

12 likely to follow the rules.

13      Q.    Okay.  So, in your mind, if a person is

14 involved in a conspiracy, and if one of the parties had the

15 intent that someone die, then that would be enough for you

16 to prove?

17      A.    Unless you proved it differently to me.

18      Q.    Unless who proved it?

19      A.    The defense.

20      Q.    Okay.  So, in your mind, if you found somebody

21 guilty of capital murder under the conspiracy theory, you

22 would require the defense to prove to you that that wasn't

23 their intent?

24      A.    That's correct.

25      Q.    So you would put the burden on us?  Okay.  You

1  know, we hear that a lot, you know.  So you're not alone

2  with people saying that, even though the law would tell you

3  that we don't have to prove anything to you.  Once you've

4  convicted somebody of capital murder, in your mind, you

5  would require us to prove to you that that wasn't their

6  intent or that they didn't anticipate that that would

7  happen.  Would that be --

8       A.    Wait.  It could be that you could prove that

9  to me.  Probably not.  But you could.  I've got to let you

10  work on it.

11       Q.    Okay.  But you would want us to do that?

12       A.    Yes.

13       Q.    Okay.  And if we didn't do that to you, then

14  you would automatically find -- if we didn't prove that to

15  you, that the person didn't anticipate that someone's life

16  would be taken or that they didn't want that to happen, then

17  you would automatically say, well, then, you must have

18  intended that, if you haven't proved it otherwise?  Would

19  that be fair in saying that?

20       A.    I would have to, honestly, before I answered

21  that question you just gave me, because you went around

22  Robin Hood's barn.  I would have to read it before I would

23  know exactly how to answer you.

24       Q.    Well, just bottom line, you would require the

25  defense to prove to you --

1      A.      Yes.

2      Q.      That he didn't intend that a life --

3      A.      Yes.

4      Q.      -- would be taken?  Okay.  And nothing wrong

5  with saying that, okay?

6      A.      Oh, I don't feel bad in saying that.

7      Q.      Okay.  But, of course, you understand that the

8  law or the law says that, you know, we have no burden to

9  prove anything to you?

10      A.      I understand that, too.

11      Q.      Okay.  But you would still require that?

12      A.      Yes.

13      Q.      Okay.  As far as media coverage is concerned,

14  I mean, you said you heard a little bit about it?

15      A.      No.  First I heard, well, on television last

16  year or whenever it was.

17      Q.      Okay.  And were you in Oklahoma when you heard

18  that?

19      A.      No, I was here.  I've been here for six years.

20      Q.      Oh, okay.  I'm sorry.  What did you hear this

21  morning that, uh, or did you read something?

22      A.      The gentleman that was in there, I said I

23  didn't know anything about this and he said he thought most

24  of them had been already tried.

25      Q.      And who was that, one of the other jurors?

A.       Yes.

Q.       Okay.

A.       And he just happened to mention Colorado, and I said, oh, I remember.

Q.       And what exactly did he explain to you about that?

A.       He didn't say anything other than that, what I just said to you.

Q.       Well, just based on what you have heard, have you formed any opinions?

A.       No, sir, I have not.

Q.       Okay.  Because you can understand that somebody sitting on a jury, we don't want somebody over there who has prejudged the case or already decided something, that would have an open mind, that should have an open mind as to what is proven or not proven in the case.

So that's why we ask that question. Because there's people that say, well, you know, based on what I've heard I've already formed the opinion that he's guilty.  But then they say, I can keep an open mind, but I've already formed that opinion, you know.  But somebody like that probably wouldn't be fair, would you agree?

A.       Yes, sir.  I deal with that on a daily basis.

Q.       Okay.  Well, sometimes we don't phrase questions the right way or sometimes we don't ask the right

1     question.   But is there anything about this case, anything

2     about yourself, that you think might affect you being a fair

3     juror?

4          A.     Would affect me what?

5          Q.     Being a fair juror to both sides?

6          A.     No, sir.

7               MR. SANCHEZ:   That's all I have, Your

8     Honor.

9               THE COURT:   Thank you, Ms. Prowell.   If

10    you would wait for us outside in the hall, we'll have you

11    back in just a minute.

12               PROSPECTIVE JUROR:   All right.

13               [Prospective juror out]

14               THE COURT:   What says the State?

15               MR. SHOOK:   Judge, we have no challenges

16    for cause.   As far as this last issue goes, I believe when

17    we went over the law, she was quite clear that she would

18    require the State to prove this and not the defense.   And I

19    think the confusion comes from the fact, the way the

20    question is phrased, she believes, well, if it's already

21    been proven by the State, would the defense have to prove

22    something, and that's what she's thinking.

23               And if it has been proven and we have

24    reached our burden of proof, then I think anyone with common

25    sense would, yeah, you're going to have to prove it to me

1  otherwise, then, if it's been proven by the State beyond a

2  reasonable doubt.

3              And I think that's where the confusion

4  is.  I think when she was given the law, as the burden of

5  proof is here, she was very strong the State's got to prove

6  these things to me.  That's her mindset.  And I think she

7  may be confused from the defense questions in that they were

8  phrased, once it's been proven to you that this has

9  happened, then would the defense have to prove it?  And

10  she's thinking that the State has proven all of this,

11  because, again, she may be confusing the guilt/innocence

12  with the punishment phase.

13              And I think that may be the confusion

14  there, because when I went over the differences on the

15  questions and the difference, and she had no problem seeing

16  the difference.  But we didn't make that distinction with

17  the defense.  And, after talking a while, the juror became

18  confused.

19              MS. BUSBEE:  Well, actually, it's Mr.

20  Sanchez's juror.

21              MR. SANCHEZ:  Your Honor, she didn't

22  really expand --

23              MS. BUSBEE:  Well, there was not anybody

24  as confused as Mr. Shook, who has responded to a challenge

25  for cause that has not yet been made.

1          MR. SHOOK:  Oh, well, then I could

2    challenge for cause, then.

3          MS. BUSBEE:  Yeah, we're going to make a

4    challenge for cause.

5          THE COURT:  He was anticipating

6    correctly.  I, also, had the same direction that Mr. Shook

7    was implying that what I believed that she understood the

8    question to be.  That's why I wanted to have her leave so we

9    could discuss this, so Mr. Sanchez, you can run at her

10   again.

11              Because it was the same tenor is what I

12   understood to the point that if the jury has answered

13   Special Issue No. 1 yes, and if the evidence by the State

14   has proven No. 2 to be yes, then maybe you're going to have

15   to show me something to show me no.  That's the angle that I

16   believe she was answering from.  I may be incorrect, that's

17   why I wanted her to leave.

18          MS. BUSBEE:  The question was after you

19   found him guilty, not -- wasn't that your question?

20          MR. SHOOK:  But you don't do that without

21   explaining the law to them first.

22          MS. BUSBEE:  He did explain it to her,

23   and she said yes, I know, but I would require that.

24          MR. SHOOK:  No, no.  The way the question

25   is asked is after you get them saying that, then you go,

1  well, the law is this.  You don't say there's two separate

2  parts and the State -- the law is not explained first and

3  then the question is asked.

4              MS. BUSBEE:  It's our position, he said,

5  you know, that's not what the law is.  The law doesn't

6  require us to prove anything and she said, yes, I know that,

7  but I would.

8              THE COURT:  And I also heard that as

9  well.  But I think she had some initial confusion on this

10  question.  I'm on this side right now.  I'm leaning toward a

11  challenge for cause, but also I want to focus the issue.

12  Either I'll let you ask it or I'll ask it.  But it was -- I

13  had the same impression Mr. Shook had in that I believe that

14  was what she was understanding the question to be.

15             MS. BUSBEE:  Okay.  Well, we'll ask her.

16             MR. SHOOK:  And we'd like an opportunity

17  to ask her, too.

18             THE COURT:  That's why I have excused the

19  juror so we could have --

20             MS. BUSBEE:  Let me talk to my co-counsel

21  a minute before we call her back in.

22             THE COURT:  Ask Ms. Rowell to come back

23  in.

24                  [Prospective juror in]

25             THE COURT:  Thank you.  You may be

1   seated.  We have a few more questions for you.  Mr. Sanchez?

2                 MR. SANCHEZ:  Thank you.

3        Q.      (By Mr. Sanchez)  Okay, Ms. Rowell.  I just

4   want to explore, again, the area of the law that we were

5   talking about in which you've indicated that you would

6   require the defense to prove to you that the person didn't

7   anticipate or intend that someone die.  Okay?  Remember we

8   were talking about that a while ago?

9        A.      Yes, sir.

10       Q.      Okay.  Once you found somebody guilty of

11  capital murder, okay?  Of course, that's the only time we

12  get to these Special Issues.  Does that make sense to you?

13       A.      Yes, sir.

14       Q.      In other words, before we even consider these

15  Special Issues, you have to find somebody guilty and if it's

16  in a conspiracy situation that you find them guilty, you've

17  already found that, that the answer to a conspiracy to

18  commit one offense, okay, and that a death occurred as part

19  of that conspiracy, okay?

20       A.      Yes.

21       Q.      Even though that person may have not had the

22  intent that somebody die, you found him guilty as a

23  co-conspirator.  Does that make sense to you?

24       A.      Yes.

25       Q.      Okay.  Now, after you get past Special Issue

1    No. 1, and you get to Special Issue No. 2, in which you

2    would have to believe that the person actually anticipated

3    that a human life would be taken when that crime was

4    committed, okay?  See that in Special Issue No. 2?

5         A.    Yes.

6         Q.    Okay.  What I heard from you was that once you

7    convicted them of capital murder and you found them guilty

8    as a party or as a co-conspirator, that in your mind you

9    would already have believed that that person actually

10   intended that a life would be taken or anticipated that a

11   life would be taken.  Is that the way I heard it?

12        A.    Repeat the question one more time.

13        Q.    Okay.

14        A.    I have a difficulty following you.

15        Q.    Okay.  If Special Issue No. 2 --

16        A.    Yes.

17        Q.    -- once you've convicted somebody of capital

18   murder, okay?

19        A.    Is this this person over here and now we're

20   going to talk about a second person?

21        Q.    No.  We're talking about the person.

22        A.    All right.

23        Q.    And you found him guilty as either a

24   co-conspirator or as an accomplice.

25        A.    Yes.

1    Q.    Both ways that the State explained to you.  In

2  Special Issue No. 2, in order to answer that question yes,

3  you're going to have to be convinced that the person

4  actually anticipated that a human life would be taken.

5    A.    Yes.

6    Q.    Okay.  Now, you've told us before that once

7  you've convicted them of capital murder, that you would

8  automatically believe that that person anticipated that a

9  human life would be taken; is that correct?

10    A.    Going down that road, yes.

11    Q.    And you would require the defense to prove to

12  you that he actually didn't anticipate that a human life

13  could be taken?

14    A.    I'm saying that you could prove it to me that

15  he didn't.  I'm not saying you have to.

16    Q.    Okay.  But you would automatically already

17  believe that; is that correct?

18    A.    Right.  Yes.

19    Q.    Just solely based on the fact that you found

20  him guilty of capital murder in the first part of the trial;

21  is that correct?  In other words, when you are looking at

22  Special Issue No. 2, in your mind, that already would be

23  answered when you convicted him of capital murder?

24    A.    But then you turn right around and say, it's

25  not up to you to prove it to me.

1    Q.    No, it's not.  It's not.  But if you feel that

2  way, you can tell us.

3    A.    I'm saying that you could prove it to me that

4  they didn't intend to.  I'm looking at all the facts.

5    Q.    But in your mind, would that already be

6  answered yes?

7    A.    You mean when I first start?  No, everyone is

8  innocent when you first start.

9    Q.    Okay.  I'm talking after you have convicted

10  somebody of capital murder and we're now -- we're in the

11  punishment stage.

12    A.    Yes.

13    Q.    Special Issue No. 2, in your mind, would that

14  already be answered yes because you found him guilty of

15  capital murder?  You already -- would you in your mind

16  already think that they actually anticipated that a human

17  life would be taken before you even got to talk about

18  Special Issue No. 2?

19    A.    I'm not sure.  I don't know whether or not you

20  are trying to catch me up on something, because you're just

21  going around and around and around as far as I'm concerned.

22        THE COURT:  Ms. Rowell, let me try to

23  come right down the middle of it.  Lawyers do go round and

24  round.

25        PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Okay.  Let me ask you a

2   question and let me just get your thoughts.  Do you

3   understand there is a difference in the level of proof

4   required to find someone guilty of capital murder and

5   ultimately going to the death issue on Special Issue No. 2?

6   You understand there's a higher level of proof required?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Can you explain to me in your

9   own words that the difference is?

10          PROSPECTIVE JUROR:  No, sir, I can't

11   explain to you, but it could be proven to me.

12          THE COURT:  Let me give you the law, once

13   again.

14          PROSPECTIVE JUROR:  Say it again?

15          THE COURT:  I'm going to give you the

16   law, once again.

17          PROSPECTIVE JUROR:  All right.

18          THE COURT:  In order to find someone

19   guilty of capital murder as a party or as a conspiracy --

20   let's talk about conspiracy.  You and I agree to commit a

21   felony.

22          PROSPECTIVE JUROR:  Uh-huh.

23          THE COURT:  We're going to go burglarize

24   the Chi Omega house because you've got the floor plan.

25          PROSPECTIVE JUROR:  Okay.

1          THE COURT:  We agree to that.  We're

2    going to commit a felony.  During the commission of the

3    felony, someone ends up getting killed.

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  I pulled the trigger.  You

6    are there with me.  You are burglarizing with me.  We had a

7    conspiracy to do that.  At that point you could be found

8    guilty of capital murder, death during the commission of

9    another felony.  Does that make sense?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Now the issue becomes, you

12    knew I had a gun going in on a burglary.  You should have

13    anticipated a death might occur.  What's the difference

14    between that and Special Issue No. 2?

15          PROSPECTIVE JUROR:  I don't think there's

16    really too much difference in either one of them.

17          THE COURT:  Too much difference?  There

18    is a difference.  Should have anticipated.  Look at the last

19    line.  Now, you're the defendant.  Did you actually cause

20    the death of the deceased, or did not actually cause the

21    death of the deceased, but intended to kill the deceased, or

22    another, or anticipated that a human life would be taken.

23    Do you see there's a difference in the level of proof

24    required?

25          PROSPECTIVE JUROR:  I think when you and

1    I discussed it and you've got a gun in your hand, I should

2    realize that a death could occur.  And I --

3                    THE COURT:  Could occur?

4                    PROSPECTIVE JUROR:  Could occur, if he

5    had a gun.  And if I chose to go with you, I'm responsible.

6                    THE COURT:  No question.  That's for

7    guilt.

8                    PROSPECTIVE JUROR:  Uh-huh.

9                    THE COURT:  A death could occur.  He

10   should have anticipated a death could occur.

11                   PROSPECTIVE JUROR:  Right.

12                   THE COURT:  That question is asking, the

13   State has to prove that I anticipated or you anticipated,

14   not -- in his example of the car --

15                   PROSPECTIVE JUROR:  Well, sir, as far as

16   I'm concerned, I would anticipate if I'm -- if you've got a

17   gun, I would anticipate that something could happen.  And if

18   I chose to go with you, I'm just as guilty as you are,

19   whether I have the gun in my hand.

20                   THE COURT:  You don't really see any

21   mental distinction between should have anticipated and did

22   anticipate?

23                   PROSPECTIVE JUROR:  Not really.

24                   MR. SHOOK:  Judge, we object.  On those

25   particular facts, they can be the same thing.

1          THE COURT:  I understand they can be.

2          MR. SHOOK:  And her answer is yes, if I

3   know you have a gun, then that is the same thing.  And under

4   the law, the juror can see it that way, because those are

5   specific facts.

6          THE COURT:  Can you think of a difference

7   between should have anticipated and anticipated a human life

8   would be taken?

9          PROSPECTIVE JUROR:  Should have

10  anticipated and --

11         THE COURT:  And did anticipate that a

12  human life would be taken.  There's a difference there.  Do

13  you understand the difference?  I gave you an example trying

14  to bring it down.  We try to stay away from examples,

15  because you draw the wrong conclusions.

16         PROSPECTIVE JUROR:  Yes, uh-huh.

17         THE COURT:  There is a difference.  Do

18  you understand it?

19         PROSPECTIVE JUROR:  I understand.  My

20  logic is you should have and maybe they did not anticipate

21  it.

22         THE COURT:  There could be a fact pattern

23  that could result in --

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Who has to prove to you that

1  an individual did anticipate that a human life would be

2  taken in this case?

3                    PROSPECTIVE JUROR:  The prosecutor.

4                    THE COURT:  Mr. Sanchez?

5        Q.    (By Mr. Sanchez) Bottom line, Ms. Rowell, now

6  that you know or that you've been explained the law, do you

7  feel before you could answer no to Special Issue No. 2, that

8  the defense would have to counter with some evidence before

9  you could answer that no?

10       A.    You would have to, you could bring up issues

11  that would make me think through the situation.

12       Q.    Would you have to have evidence from us in

13  order to answer that question no, honestly, just honestly?

14       A.    Yes.

15                   MR. SANCHEZ:  That's all I have, Your

16  Honor.

17                   THE COURT:  Thank you.  Mr. Shook, would

18  you like to redirect?

19                   REDIRECT EXAMINATION

20  BY MR. SHOOK:

21       Q.    You would always keep the burden of proof on

22  the State of Texas, would you not?

23       A.    Yes.

24       Q.    If it has been proven to you beyond a

25  reasonable doubt, though, you could keep your mind open to

facts and arguments and could answer the question either

way, depending on the evidence?

     A.    That's correct.

          MR. SHOOK:  That's all we have.

          RECROSS EXAMINATION

BY MR. SANCHEZ:

     Q.    You understand when you say that you would

want us to put on some evidence that somehow you're shifting

the burden to us.  Do you understand that?

     A.    I understand that, but I don't think that -- I

think a defense lawyer has a reason for being there.

     Q.    And that's what you would want us to do, is

counter with some evidence?

     A.    Well, what I'm trying to say to you is that

you could bring up something that would make me think

differently.  I can't tell you what it would be, but I'm

going to listen to both sides and you want me to say, well,

I don't want to be in charge of proof.

     Q.    No, no, but in order for you to answer that

question no, you would want something from the defense; is

that correct?  I mean, just honestly, I mean, if that's your

-- honestly how you feel, would you -- would you want some

evidence --

     A.    My answer to that question is yes, too.  You

could bring up something that would make me think no.

1   Q.   And if I didn't, it would stay as yes?

2   A.   Yes.  He doesn't want to prove it (inaudible).

3   Q.   I'm sorry, I didn't hear that.

4   A.   Nothing.

5   Q.   That's all I have.

6           THE COURT:  Thank you, Ms. Rowell, wait

7   outside for us one more time.

8               [Prospective juror out]

9           THE COURT:  Same positions?

10          MS. BUSBEE:  Yes, sir, Your Honor.

11          MR. SHOOK:  Yes, Judge.  I think from her

12  additional answers, it's obvious, I mean, if you give her

13  facts, she says yes, that could be.  But the bottom line for

14  her is she'll follow the law, require the State to prove,

15  and -- but she'll keep her mind open to it.  And then they

16  use leading questions such as, well, you'd require the

17  defense.  She's thinking I can listen to evidence, sure.

18          And the bottom line with her is when the

19  law is explained, she'll follow the law.  But she's also

20  told us time and time again she's going to keep her mind

21  open to it, which means she's qualified.

22          THE COURT:  Well, see, at the end of the

23  program, I've got a lady that's confused.

24          MR. SHOOK:  I don't think she's confused,

25  once the law is explained to her.

1          THE COURT:  And I jumped in the middle of

2   it and tried to bring it down on her level and give an

3   example that she doesn't really understand, is too specific,

4   and I make it worse.

5          MR. SHOOK:  Well, I don't think you made

6   it worse, Judge.  It's the example is what most people would

7   think.  If you guys plan a big crime and you've got loaded

8   guns going in there, that "should have" and "did" could mean

9   the same thing, the same evidence, because basically that's

10  how it works.  It's the same exact evidence.  It's just

11  going to depend on the particular facts.

12          But when explained who has the burden of

13  proof, time and time again, the State does, and she's not

14  going to require them.  But when they start asking would you

15  want us to, which sometimes they ask, and then you would

16  require that, that can confuse any juror, no matter what

17  their education level.  But this woman's personality, she

18  makes her decisions based on all the facts, and she follows

19  the law.

20          THE COURT:  I don't want to.  She, at the

21  end of the day, was very frustrated, made a comment under

22  her breath.  I didn't hear what it was.  It was derogatory

23  to the defense.  And I'm simply not going to qualify someone

24  who is confused to such a level that she's frustrated.  I'm

25  not going to qualify this juror.  Ask Ms. Rowell to come

1    back in, please.

2                    [Prospective juror in]

3                    THE COURT:  Ms. Rowell, I want to thank

4    you for your time and attention to the Court today.  I'm

5    going to inform you that you shall not be placed on this

6    jury.

7                    PROSPECTIVE JUROR:  Say that again, sir?

8                    THE COURT:  You didn't make the jury.

9                    PROSPECTIVE JUROR:  Okay.  Thank you.

10                   [Prospective juror out]

11                   THE COURT:  Mr. Pool.

12                   [Prospective juror in]

13                   THE COURT:  Good morning, sir.  How are

14   you?

15                   PROSPECTIVE JUROR:  Good, how are you?

16                   THE COURT:  Please have a seat.  We have

17   juror No. 2975, Mr. Mark Christopher Pool.  Mr. Pool, sorry

18   for the delay in getting you in this morning.  We don't know

19   exactly how long we're going to speak with folks.  We have

20   to balance 15 people against one, and your letter clued you

21   in it was for half a day, so I apologize for the delay.

22                   PROSPECTIVE JUROR:  Okay.

23                   THE COURT:  You are now the focus of our

24   attention.  I know that you are somewhat nervous when you

25   come in.  Please don't worry too much about this process.

1    This is the only opportunity that the attorneys have to

2    speak with you to talk about these issues.

3                    The Court has given you a guide.  I know

4    you've probably read it a couple of times, so you can begin

5    to think about these issues.  I also provided a copy of your

6    questionnaire so you can review some of your answers.  They

7    may want to have you expound upon them.

8                    At the end of the day I have a question I

9    must answer.  One is do you understand the law?  And number

10   two, can you follow the law?  That's the big picture I have.

11   The only question I have for you at this time is will you be

12   able to serve this Court for a period of two weeks beginning

13   on November 10th?

14                    PROSPECTIVE JUROR:  Yes.

15                    THE COURT:  Thank you, sir.  Mr. Wirskye?

16                    MR. WIRSKYE:  May it please the Court?

17                    <u>MARK POOL</u>,

18   having been duly sworn, was examined and testified as

19   follows:

20                    <u>DIRECT EXAMINATION</u>

21   <u>BY MR. WIRSKYE</u>:

22        Q.    Mr. Pool, how are you this morning?

23        A.    Good.

24        Q.    Thanks for bearing with us again.  My name is

25   Bill Wirskye.  I'll be the Assistant DA that will be

1    speaking with you for the next few minutes.  To the extent

2    possible, try to relax.  I know it's a little weird being up

3    there on the witness stand, and if you're over about six

4    foot, it's really uncomfortable to get in and out of there,

5    I know, so.

6                 What I'd like to do is follow up with

7    some of the information in your questionnaire, which is -- I

8    know this questionnaire's -- in a sense it's a little

9    unfair, because we ask you how you feel about things and we

10   kind of lock you down on paper and then we bring you down

11   here and tell you what the law is and try to get you to

12   disqualify yourself.

13                The bottom line question as we go through

14   this, whatever your personal thoughts and feelings are, to

15   the extent that they may conflict with the law, as long as

16   you can set them aside, tell us you can follow the law, be

17   fair to both sides, you'd be a qualified juror.

18                I'll talk to you a little bit about your

19   thoughts and feelings on the death penalty, and then,

20   finally, talk about some of the laws and rules that apply in

21   the death penalty case.  Do you have any questions before we

22   get started?

23        A.    No, sir.

24        Q.    Okay.  You are a manager of B. C. Sports

25   Collectibles; is that right?

1     A.     Yes, sir.

2     Q.     Okay.  Tell -- I think I know what kind of

3  business that is, but tell us.

4     A.     It's autographed memorabilia and cards.  It's

5  a retail store, also.  We do clothing and just other

6  collectible things, also.

7     Q.     Okay.  What's a normal day like for you, if

8  there is a normal day for you?

9     A.     It varies, but, you know, most of the time we

10  spend our day just taking care of customers and making sure

11  we get, you know, finding autograph memorabilia they might

12  want, or, you know, going through different resources to try

13  to get the things that they need, but mostly just retail

14  management, basically.

15     Q.     Okay.  In your free time, I know you've got, I

16  guess, a now two year old, but --

17     A.     Yes.

18     Q.     -- which takes a lot of time?

19     A.     That's about it.

20     Q.     Okay.  I've got my first one on the way, so I

21  can only imagine how my life is going to change in a few

22  months.  Let me ask you this.  You told us that you

23  generally believe in the death penalty?

24     A.     Yes.

25     Q.     Could you tell us why you believe that?

1     A.     I guess it's just my belief that if somebody

2   is convicted for murder, you know, just taking somebody

3   else's life, I just, I think you should be held accountable

4   for that and I think the death penalty is the best way to be

5   held accountable for that.

6     Q.     Okay.  And that's something, a belief you've

7   held most of your, I guess, at least your adult life, that

8   type thing?

9     A.     Yes, sir.

10    Q.     Looks like from your questionnaire you may

11  have some brother-in-laws that might disagree with that,

12  maybe?

13    A.     Yes, sir.

14    Q.     Tell us about that.

15    A.     They're just maybe a little more, I guess

16  maybe just their upbringing maybe, maybe where they went to

17  school, maybe just their viewpoints on -- they're a little

18  more lenient, I guess, as far as on things like that, you

19  know, maybe just a little more, not quite as conservative as

20  I am on things like that.  They're a little more liberal.

21    Q.     You know, we kind of ask you to rank yourself

22  on how strongly you favor the death penalty in certain

23  cases, and you gave yourself a 10 out of 10, which I know is

24  the highest.  But it means different things to different

25  people.  But at the same time you also told us -- I mean,

1   you could keep that open mind and envision a capital murder

2   case where you may feel a life sentence is appropriate; is

3   that right?

4       A.      Uh-huh, yes, sir.

5       Q.      Let me talk to you a little bit about what we

6   call accomplices.  Oftentimes crimes are committed by more

7   than one person.  You may have a situation, a capital

8   murder, where you may just have one person, I guess, for

9   lack of a better term, as a triggerman, the person that

10  actually causes the death.  You may have another group of

11  individuals who, although they were actively involved in the

12  crime, they didn't actually pull the trigger.  They're

13  nontriggermen.

14              What the law in Texas is, depending on

15  the facts and circumstances, not only can a triggerman be

16  convicted of capital murder and potentially face the death

17  penalty, but again, depending on those facts and

18  circumstances, the nontriggermen accomplices can also be

19  convicted of capital murder and potentially face the death

20  penalty.

21              Some people disagree with that.  They

22  would draw a line and only reserve the death penalty for

23  just the persons that actually pulled the trigger.  For

24  whatever reason, religious, moral, or ethical, I guess they

25  believe the death penalty is only justified for the person

1    that actually took the life.

2              And some people feel differently and

3    could keep an open mind and based on the facts and

4    circumstances, consider a death sentence for an accomplice.

5    I'm just curious kind of where you fall down on that issue?

6         A.    I think if there was a plan involved and they

7    had, you know, if there was a collective agreement that they

8    were going to commit the murder, you know, maybe if it was

9    just one person, but collectively they all decided that's

10   what needed to happen for them to, you know, do whatever

11   they were doing, I can see sentencing somebody to death for

12   that, too.

13        Q.    Okay.  And that's pretty much what the law is.

14   Just to give you a quick example to illustrate how the law

15   works with respect to accomplices, let's say Mr. Shook and

16   I, the other prosecutor, decide we're going to rob a bank.

17   The plan is for him to take a gun in to hold up the tellers.

18   While he's doing that, I'm going to go in with a bag and

19   collect the money from everybody.

20             During the course of this crime, for

21   whatever reason, maybe one of them kind of looks at him

22   funny or we see one of them going for a silent alarm, he

23   shoots and kills one of the tellers.  He's committed a

24   capital murder.  You got a chance to read the packet of law.

25   That would be a murder in the course of a robbery, which is

1   one of those cases that we reserve the death penalty for in

2   Texas.

3                   He could be convicted of that and

4   potentially face the death penalty, depending on how the

5   jury answers these three questions that you read.  The law

6   also says that I could, depending on the facts and

7   circumstances.  Does that make sense to you?

8         A.    Uh-huh, yes, sir.

9         Q.    Okay.  You could see how that would work?

10        A.    Yes, sir.

11        Q.    Okay.  There are basically two different legal

12  theories for me to face the death penalty, the accomplice.

13  One is if I actively encouraged him, directed him, to commit

14  that capital murder.  You know, if I turned to him and said,

15  Toby, one of them is going for that silent alarm, shoot and

16  kill her.  Obviously, I directed him to commit the crime.

17  I'm just as guilty as he is, could potentially face the

18  death penalty.

19                  The other aspect of the law is what we

20  kind of call the law of conspiracy.  And that simply means

21  that Mr. Shook and I conspired or agreed to commit bank

22  robbery.  During the course of that crime, somebody got

23  killed, okay?  The law says that the accomplice should have

24  anticipated that that death could have occurred.  Then I

25  could be found guilty of capital murder.  Does that make

1    sense to you?

2         A.     Yes, sir.

3         Q.     And a lot of people feel, you know, hey, I

4    knew what I was signing up for.  I knew I was going in with

5    a guy with a loaded gun.  I should have anticipated that

6    that death could have occurred.  Does that make sense to

7    you?

8         A.     Yes, sir.

9         Q.     And under those facts, of course, the jury, if

10   they thought I should have anticipated, could convict me of

11   capital murder, then we kind of move into the sentencing

12   portion of the trial.

13              But those are the two different ways that

14   accomplices could be found guilty of capital murder.  It

15   sounds like that's a law you agree with?

16        A.     Yes, sir.

17        Q.     Okay.  Let me talk to you a little bit about

18   publicity surrounding this case.  Like everybody, just

19   about, that we talked to, you've indicated that you know at

20   least something about the facts of the case.  That doesn't

21   disqualify you in any way from being a juror.

22              What the law says is even if jurors have

23   heard something about a case, even if it's detailed, or even

24   if the jurors maybe formed some opinions or formed some

25   impressions, as long as they can tell us that they will base

1    their verdict in this case just on the evidence that they

2    hear in the courtroom, they'd still be a qualified juror.

3    You know, we can't ask a juror to forget what they've

4    already heard, obviously.  We just kind of ask you to put it

5    in the back of your mind.

6              And, you know, I don't know if you're

7    like me, but sometimes I'm a little skeptical about what I

8    hear in the media sometimes.  They don't always get it

9    right.  And I think the law recognizes that and we just ask

10   jurors to be able to tell us that they could base their

11   verdict just on what they hear in the courtroom, since that

12   is the best source of information.  Is that something you

13   feel like you could do?

14        A.    Yes, sir.

15        Q.    Okay.  What have you heard about this case?

16        A.    From what I remember -- from what I remember,

17   I thought that he was part of the Texas Seven that escaped.

18   And I can't remember, I think it was at an Oshman's maybe,

19   that they ended up killing a police officer.  And then I

20   think they caught the rest of them in Colorado, is basically

21   what I remember.  I think one of them killed themselves

22   there, or something.

23        Q.    Have you kept up with any of the results of

24   the other trials?

25        A.    No, sir.

1    Q.    Okay.  Sounds like you just kind of have a

2    broad view or broad strokes of maybe what the facts are; is

3    that right?

4        A.    Yes, sir.

5        Q.    Do you think you could kind of push that to

6    the back of your mind and just base your verdict on what you

7    hear in the courtroom?

8        A.    Yes, sir.

9        Q.    Okay.  Did you get a chance to meet the juror

10   that we just talked to?

11       A.    Yes.

12       Q.    Ms. Evans?  Okay.  Did y'all discuss this case

13   at all?  She said y'all may have just briefly talked about

14   it.

15       A.    Um, I think we basically just talked about him

16   being one of the Texas Seven, I think, was about all we

17   talked about.

18       Q.    Nothing past that?

19       A.    No, sir.  I think maybe where -- I think she

20   was saying she thought she knew the place in Colorado where

21   they captured them.  But I think that's where we ended it.

22       Q.    Okay.  She didn't give you any sort of extra

23   information or secret information that's going to cause you

24   to be unfair in this trial or anything like that?

25       A.    No, sir.

Q.     Okay.  Fair enough.  Let me explain to you a little bit, kind of give you the broad view of the procedures.  All trials in Texas are broken down into two different parts.  The first phase of the trial is what we call the guilt/innocence phase.  And that's where the jury decides whether we've proven what's in our indictment, basically, is the person guilty of the crime they're charged with?

And I think you got a chance to look at our indictment.  Basically, did we meet our burden of proof?  Did we prove it to you as a juror beyond a reasonable doubt that he's guilty?  And if we do that, then we move into the second phase of the trial.

In that second phase of the trial you get to hear extra, additional information.  The rules of evidence are more -- are broader, more expansive.  You get to hear character evidence, reputation evidence, criminal history, if it exists, good and bad things one way or another.  And we give you a chance to hear this extra information, because at the end of the second phase we ask a jury to answer these three questions.

The only two possible punishments for capital murder in Texas are a life sentence or a death sentence.  And we don't ask a jury to kind of choose between those and write in a life sentence or write in a death

1  sentence.  We ask a jury to work through these questions,

2  based on all the evidence they've heard in both phases of

3  the trial.  And we let the answers to these questions kind

4  of determine the appropriate sentence.  Does that make sense

5  to you?

6       A.      Yes, sir.

7       Q.      And what the law basically envisions in that

8  second phase is, even though you may have found him guilty

9  of capital murder, the law contemplates that we have jurors

10  who are able to start that second phase with an open mind to

11  the answers to these three questions.

12             We don't want jurors who say, you know,

13  just because I found him guilty of capital murder, I'm going

14  to answer that first question in a certain way or the second

15  question in a certain way or the third question.  We want

16  jurors who will kind of wait, hold off on their decisions

17  until they've heard all the evidence, in order to be fair to

18  both sides, very frankly.  Does that make sense to you?

19       A.      Yes, sir.

20       Q.      And that's the kind of mental discipline we

21  ask a juror to apply in this case.  And to a certain extent,

22  it may be a little unnatural, but that's -- I think most

23  people understand those are the rules and I think most

24  people can follow them, if they are explained to them.

25             But we let the answers to those questions

determine the appropriate sentence.  And, very briefly --
we'll go over them more in a second, but the first question
asks whether the person is a future danger to society.  If
the answer to that is yes, we move to the second question,
which deals basically kind of with that accomplice scenario
that we've already talked about.

We basically ask you at that point
whether the person actually anticipated that a human life
would be taken, a little bit higher standard from the should
have anticipated.  And we'll visit a little bit more about
that in a second.

Then, finally, the last step in the
process, the last question, is the mitigation question.
Basically, this is our chance, or your chance as a juror, to
show mercy based on the facts of the crime and the facts of
the background of the person, to see whether a life sentence
is warranted rather than a death sentence.

And if those questions are answered yes,
yes, and no, then the Judge has no discretion.  The person
will be sentenced to death.  Does that make sense to you?

A.     Yes, sir.

Q.     Okay.  Now, you've told us you're generally in
favor of the death penalty.  But I want to make sure, you
know, a lot of times we talk to people who are
philosophically are in favor of the death penalty in the

1  abstract.  And to a lot of people when they get down here,

2  it becomes a little more real to them.  They're actually

3  sitting here and they're looking at a person.  They know

4  there's a chance that they'll be involved in the process in

5  the trial.

6              And some people, very frankly, tell us,

7  you know, I may be in favor of the death penalty, but I

8  don't really feel like I'm the type of person.  I don't feel

9  like I'm cut out for this process.  I'm in favor of it

10  philosophically, but I'm not sure I'm the type person that

11  could take pen in hand and answer these questions in such a

12  way that it may result in the death of another human being.

13              And, very frankly, that's our goal in

14  this case.  We feel we have the quality and the quantity of

15  evidence that's going to convince a jury that he's guilty of

16  capital murder and convince a jury that those questions

17  should be answered in such a way that one day he will

18  ultimately be executed in Huntsville, Texas.

19              So, before we go any further, I want to

20  ask you, do you feel that you're the type person who could

21  take pen in hand and answer those questions, based on the

22  evidence that you've heard, in such a way that would result

23  in the execution of another human being?

24  A.       Yes.

25  Q.       Okay.  Why do you feel that way?

1    A.    If it, I guess it more or less depends on how

2  the murder occurred.  If it was any kind of premeditated or,

3  I guess -- I guess that's more or less my overall view, is

4  if it's something somebody else didn't ask for, if it's

5  premeditated, it's just -- it's just, you know, no concern

6  for human life, something, you know, like that.

7                 If it's just something, somebody trying

8  to get away with something, stop at nothing, you know, to

9  get away with something, you know, to take another human

10  being's life for absolutely no reason at all.  I have a big

11  problem with that.  I think that definitely deserves a death

12  penalty.

13    Q.    Okay.  From the aspect of actually

14  participating or being a juror in a death penalty case, you

15  don't have any hesitations heading into the process?

16    A.    No, sir.

17    Q.    Okay.  Let me back up just a second and talk

18  to you.  In Texas, we reserve the death penalty, the option

19  of the death penalty, just for murder and then only for a

20  certain subset of murder.

21                 The murder in the course of committing

22  another felony like robbery, burglary, rape, if you kill a

23  police officer on duty, fireman, prison guard, if you kill a

24  young child under six, if you commit a mass murder, a serial

25  murder.  Murder for hire, you hire somebody to kill your

1    spouse, that type thing.

2              Those are the only type cases that are

3    eligible for the death penalty in Texas.  It sounds like

4    something you pretty much agree with, based on what you've

5    told us?

6         A.    Yes, sir.

7         Q.    Okay.  Murder in Texas, you know, if you're

8    like me, you grew up talking about premeditation, which to

9    me means you kind of planned it.  In Texas, premeditation is

10   not a legal requirement for murder or capital murder.  What

11   we require is intent, just that it's an intentional act.

12             And intent can be formed in a split

13   second.  You know, I can turn to him right now and decide I

14   don't like his tie, pull out a gun and shoot him.  It would

15   be an intentional act.

16        A.    Sure.

17        Q.    Not necessarily premeditated, but certainly

18   that premeditation factor is something that you could take

19   into account, as you take that evidence and kind of run it

20   through these three questions, or run it through the filter

21   of these three questions.  Does that make sense to you?

22        A.    Yes, sir.

23        Q.    Okay.  And, again, I want to just emphasize

24   this.  Because there's only two possible punishments for

25   capital murder.  Once you've convicted somebody of capital

1  murder, one way to think about it is, they're sitting on a

2  life sentence at that point, okay?  The only way they get

3  the death penalty is if those questions are answered yes,

4  yes, and no, okay?

5              So, you can see, I guess, you know, a

6  juror that uses that mental discipline that we talked about,

7  if they really worked through the questions, even though

8  they may very strongly be in favor of the death penalty, as

9  you've told us you are, but if they use that mental

10  discipline and work through the questions, they may answer

11  one of those questions in such a way that actually gives the

12  person that life sentence.  Does that make sense to you?

13       A.    Yes, sir.

14       Q.    Okay.  Does that seem fair to you?

15       A.    Yes, sir.

16       Q.    Okay.  You wouldn't have any qualms about

17  doing that, as long as it was based on the facts and the

18  evidence?

19       A.    No.

20       Q.    Okay.  Because we don't want jurors who come

21  out of that guilt phase and say, gee, this is a death

22  penalty crime I just heard.  I don't care what the facts and

23  evidence is in the second phase, I'm just going to answer

24  those questions in such a way to ensure that this guy gets a

25  death sentence.

1      And that's what we want to avoid.  We

2 want jurors to really work through the process, you know,

3 and let the chips fall where they may, so to speak, with

4 regards to the answers to the questions.  Does that make

5 sense to you?

6      A.      Yes, sir.

7      Q.      Okay.  Let's go through and talk one by one

8 about these Special Issues.  If you could take just a minute

9 to read those three to yourself.  They're phrased a little

10 bit differently than they were in the booklet and we can

11 visit about them.

12      A.      (Prospective juror complies.)

13      Q.      Did you get a chance to look at those?

14      A.      Yes.

15      Q.      Let's talk about the first one, Special Issue

16 No. 1.  And, as I said, that's what we call the future

17 danger question.  In a sense, we ask a jury to kind of make

18 a prediction about future behavior.  We ask a jury, is there

19 a probability that this guy is going to be dangerous in the

20 future, basically, is that question.

21      Is that a type of question that you're

22 comfortable asking -- or answering?  And by that, I mean,

23 you feel comfortable making that prediction, as long as you

24 have enough facts and information in front of you?

25      A.      Yes.

1    Q.    Okay.  What type of evidence or facts do you

2    think would be important to you when you answer that

3    question?

4    A.    Um, maybe past criminal history, maybe.

5    Q.    That's typically what we hear.  And, again, if

6    it exists, that's something that you get to hear in that

7    second phase of the trial.  You know, a lot of people tell

8    us, I guess, that the best judge of future behavior is past

9    behavior, that type of thing.  Anything else you can think

10   of?

11   A.    (No answer).

12   Q.    The question also talks in terms of

13   probability.  And what does that word "probability" mean to

14   you?

15   A.    Like a chance of, that it could happen again.

16   Q.    And that's what a lot of people tell us.  The

17   law gives us a little guidance.  It says, you know, it's not

18   a certainty.  We could never prove anything to you as a

19   certainty.  But it's something more than a mere possibility,

20   because anything is possible.  A chance or likelihood or

21   more likely than not, that type of thing.  Is that something

22   you're comfortable with?  That definition?

23   A.    Yes, sir.

24   Q.    Okay.  Then we have that phrase "criminal acts

25   of violence."  And the law doesn't necessarily restrict or

1    limit or define that phrase for us.  So we always ask

2    everybody kind of what pops into their head, what type of

3    crimes, what type of acts, when they see that phrase,

4    criminal acts of violence?

5         A.     What pops into my head?

6         Q.     Yeah, what type of behavior?

7         A.     Um, assault.

8         Q.     Assaultive type offenses?

9         A.     Yeah, rape.

10        Q.     Okay.  Anything, I guess, that involves

11   violence or the threat of violence?

12        A.     Yes, sir.

13        Q.     Okay.  Kind of, I guess, the bottom line point

14   is the law doesn't necessarily require that we prove to you

15   that he's going to kill again or be involved in another

16   murder again, just that there's that potential for, I guess,

17   those assaultive acts, those crimes of violence, that type

18   thing.  Does that make sense to you?

19        A.     Yes, sir.

20        Q.     Okay.  And finally that word "society," how

21   would you define that?

22        A.     Just --

23        Q.     Everybody and anybody he would come into

24   contact with?

25        A.     Yeah, your own neighborhood, just --

1       Q.     Okay.  How about society behind bars, like

2  other prisoners, wardens, teachers.  You see how that could

3  include that society as well?

4       A.     Yes, sir.

5       Q.     Okay.  And that's basically the question that

6  we ask, the future danger question.  What's important to

7  remember about that question is, and the same thing with

8  question 2, they both start off with a no answer, okay?  And

9  it's up to us, the State, as part of our burden of proof, to

10  prove to you as a juror that the answer to both of those

11  questions should be yes.

12                 They start off with that no answer.

13  That's the default setting, basically.  And you only answer

14  those questions yes, if the State has proved to you beyond a

15  reasonable doubt that the answer should be yes.  Does that

16  make sense to you?

17       A.     Yes, sir.

18       Q.     Okay.  You can't look to this table to bring

19  you anything or require him to testify.  You've just got to

20  look to us always, and ask, did we meet our burden of proof?

21  And those two questions are very similar in that respect.

22                 And, again, we kind of ask the juror to

23  go into this with an open mind and work through each of

24  these questions, kind of as an independent inquiry.  You

25  know, just because you found a person guilty, doesn't

1    necessarily answer any of these questions for you.  Or just

2    because you have answered question No. 1 in a certain way,

3    doesn't necessarily automatically answer question 2 and 3

4    for you.

5                We ask you to work through each

6    individually, kind of in a vacuum in a sense, and just work

7    through the questions.  Does that make sense?

8        A.    Yes, sir.

9        Q.    Sometimes we run into problems with people

10   that tell us, you know, they say, very frankly, if I found

11   somebody guilty of capital murder and, you know, I believe

12   you proved it to me beyond a reasonable doubt that he's

13   guilty of capital murder, I'm always going to feel that he's

14   a future danger.  And I'm always going to answer that

15   question yes.  It's just automatic for me.

16               And to the extent, I guess, there's a

17   little bit of common sense into that.  But, again, that law

18   requires you to keep an open mind.  And I could probably sit

19   here and give you a thousand different hypotheticals where

20   you would probably find somebody guilty of capital murder,

21   but, you know, when you got to Special Issue No. 1, you

22   might not necessarily think they are a future danger.  You

23   see kind of how that works?

24       A.    Yes, sir.

25       Q.    You know, you've got a small child and I'm

about to have one, so I'll use this example.  You know, I

come home from work one day and find out my neighbor has

done something really bad to my daughter or son.  I think

about it for a few days.  I go next door, kick in his door,

commit burglary, and kill him because of what he's done to

my child.

I've committed capital murder.  The jury

would find me guilty.  But a jury may think, you know, hey,

you've lived a spotless life.  You were just getting even

for what he did to your child.  You're never going to be a

future danger, that type thing.  Does that make sense to

you?

A.      Yes.

Q.      Okay.  So, you know, the bottom line is we

just ask you to keep that open mind.  Moving to question 2,

again, this is the Special Issue of punishment that deals

with that accomplice scenario.

That question basically breaks down into

three different parts.  If you feel the person actually

pulled the trigger, they actually caused the death, you

would answer it yes.  If you feel they didn't actually cause

the death, but intended the death of that person or another,

you would answer it yes.

Or, finally, that last line, if you find

beyond a reasonable doubt that the person anticipated that a

1  human life would be taken, you could answer that question

2  yes.

3          And I want to kind of back up for just a

4  second with you.  Remember, in order to convict an

5  accomplice of capital murder, the jury has to think that

6  they should have anticipated that a life would be taken.

7  When we get to punishment, there's a different standard.

8  Instead of should have anticipated, it's actually

9  anticipate, okay?  We've got a little higher standard as we

10  run the facts through these sets of filters.  Does that make

11  sense to you?

12       A.    Yes, sir.

13       Q.    You may go back and very well look at the same

14  evidence.  You know, a juror very well could believe, going

15  back to our scenario, not only should I have anticipated

16  that a life would be taken, but I actually anticipated it,

17  because he took a gun in.

18          It's a little bit higher standard, but,

19  you know, you just have to be able to kind of see that

20  difference between the two standards.  Does that make sense?

21       A.    Yes, sir.

22       Q.    The best example I can think of is my first

23  car, okay?  My dad gave it to me when I was 16.  And I drove

24  it like a madman for about a month until I wrecked it.  I

25  missed a corner and ran into a street pole.  My dad was mad

1  at me, obviously.  And he said, you know, you such and such,

2  you should have anticipated, driving a car like this, you

3  were going to wreck it, which, looking back, is true.  But,

4  I guarantee you, I didn't actually anticipate it.

5              So that might be a situation, you know,

6  where a jury could think somebody should have, but they

7  didn't actually.  Does that make sense to you?

8       A.    Yes, sir.

9       Q.    Okay.  And when you're talking about

10  anticipation, you know, a person always has a right not to

11  testify, so you may not hear from that person to tell you

12  what he anticipated.  And, you know, we can't open up a

13  person's head and kind of, you know, read their mind.  So we

14  just kind of have to look at their actions and based on

15  their actions draw some conclusions or some inferences as to

16  what they actually anticipated.  Is that something you feel

17  comfortable doing?

18       A.    Yes, sir.

19       Q.    Okay.  Again, it starts off with a no answer.

20  If, and only if, we've proven it to you beyond a reasonable

21  doubt, do you move on to question No. 3.  Again, this

22  question No. 3 is the last step in the process.  It's what

23  we call the mitigation question.

24              We kind of ask a juror to step back, take

25  a deep breath, look at all the evidence they've heard in

both phases of the trial, look at the facts of the crime,

look at the defendant's character and background, what you

know about him, and look at what sort of personal moral

blame he bears, what culpability he bears in the offense.

And we ask you, looking at all of that,

is there something mitigating?  And by mitigating we mean

something that lessens his personal moral blameworthiness,

okay?

A.      Okay.

Q.      And if there is something there, is it

sufficient that we ought to show him some mercy and his life

should be spared, that he should get a life sentence rather

than the death penalty.  Does that make sense to you?

A.      Yes, sir.

Q.      Okay.  Do you kind of see the, I guess, the

logic in having that question as kind of the last stop or

the failsafe question?

A.      Sure.

Q.      Okay.  Do you see some value in having that

question?

A.      Yes, sir.

Q.      Okay.  Because some people tell us, very

frankly, and this is where we run into a problem with some

people, they say, listen, you know, I found somebody guilty

of capital murder.  I found they're a future danger.  I

found they anticipated that a life would be taken.  When I

get that far in the process, it's over.  He's getting a

death penalty.  There's no value in that question 3 for me.

And if you feel that way, that's fine.

You just wouldn't be a qualified juror.  But we basically

ask people to keep that open mind to question 3.  It sounds

like that's something you feel you could do?

A.    Yes, sir.

Q.    Okay.  As you sit there, is there anything

that kind of pops into your head that might be potentially

mitigating in a case like this?  I know that's a tough

question.  I hope you don't sit around thinking about

mitigation in a death penalty case, but --

A.    That's something that might keep somebody from

getting the death penalty?

Q.    Yes, sir.

A.    Maybe something in their background, maybe,

you know, something that happened to them when they were a

kid.  I don't --

Q.    And some people tell us that.  Some people

feel that, you know, if a person had a bad background.

A.    Their upbringing.

Q.    Maybe, you know, physical, mental, emotional

abuse, that type thing.  That could potentially be

mitigating, based on the severity or that type thing.  Other

people think, you know, hey, my heart goes out to you.  You had a bad upbringing, but at some point you're an adult and you're responsible for your own actions.  Where do you kind of fall on that end of the spectrum?

A.    I guess in a case like that, I could probably answer yes to both of the first two, you know, if somebody had a really bad upbringing, you know, a lot of abuse or something like that.  And then, you know, maybe for No. 3, I would -- I'd probably have to -- I would think a life sentence would be probably more appropriate than the death penalty.

O.    Okay.  So you could keep, you know, an open mind to that mitigation?

A.    Yes.

Q.    Okay.  Actually, the law doesn't require you, as you sit there now, to tell us what you consider potentially mitigating one way or another.  Some people tell us maybe a person's age.  Just to let you know what the law in Texas is, you can only be prosecuted for capital murder and get the death penalty if you are 17 years of age or older.  You can be prosecuted for capital murder as a 15 or 16 year old, but you can't get the death penalty.

Some people tell us, you know, hey, if a person is fairly young, 18, 19, 20, that might be mitigating.  Other people, again, say, you know, they are

1  adults, they can make decisions, that may not be mitigating.

2  What do you think about that?

3       A.    I guess I think a younger person, that could

4  be mitigating.  But I guess it would still depend on the

5  circumstance, to tell you the truth.  I would go one way or

6  the other, just depending on the evidence.

7       Q.    And, again, that's what the law requires,

8  before you've heard any facts.  You know, we can't go into

9  this case, obviously, so -- but as long as you can keep an

10  open mind at this point.  You don't even have to agree with

11  the other jurors what would be mitigating.  One juror may

12  think something is mitigating and you may not agree.

13            The bottom line, again, is just that you

14  can consider it, if it exists, and give it, you know, be

15  able to weigh it one way or another and see some value in

16  that question, which you've told us you can.

17            Any questions at all about this scheme we

18  have, kind of how it works, or do you feel like you have a

19  good grasp of, you know, kind of, I guess, what to expect,

20  if you were a juror in this case?

21       A.    I think I have a pretty good understanding.

22       Q.    We've got that first phase, you look to us.

23  Did we prove it to you beyond a reasonable doubt that he's

24  guilty of capital murder?  If the answer is yes, and he's

25  guilty, then you hear that extra evidence in the second

1  phase of the trial.

2          You keep that open mind, work through

3  each one of these questions individually, independently,

4  with no kind of preconceived notions or automatically

5  answering them.  You'd just, again, let the chips fall where

6  they may and let the answers to the questions determine the

7  appropriate sentence.  Does that make sense to you?

8      A.    Yes, sir.

9      Q.    Okay.  Oftentimes in these type of cases, you

10 know, you're obviously probably going to hear from police

11 officer witnesses.  A lot of people admire police officers

12 greatly for what they do and that's understandable.  We're

13 glad of that.  But what the law says is that you can't start

14 a police officer, you can't give them an extra leg up in

15 credibility, just because they're a police officer.

16          Basically, you have to start every

17 witness on that same level of credibility.  Just because he

18 walks in wearing a badge and a gun, you know, you can't

19 automatically believe him just because he's a cop.  Does

20 that make sense to you?

21     A.    Yes, sir.

22     Q.    Okay.  Do you think you could start all

23 witnesses off on that same level of credibility?

24     A.    Yes, sir.

25     Q.    Okay.  Oftentimes in these cases you may hear

1    from the defense, from the State, maybe both sides, from a

2    psychiatrist or psychologist in the punishment phase to try

3    to, you know, possibly give you some insight into question 1

4    or question 3.  So, we always like to kind of get people's

5    gut reaction on those type of witnesses, psychiatrists,

6    psychologists, that type of thing.  What do you think about

7    those type witnesses?

8         A.    I mean, I think they can be helpful to jurors

9    to let them know kind of the mental health of whoever is

10   being tried, I would assume.

11        Q.    Okay.  You wouldn't, I guess, you know, we

12   talk to some people who kind of automatically close their

13   mind and just don't feel that's a real science or wouldn't

14   listen to them at all.  But, you know, as long as you can

15   kind of -- kind of like police officers, start them on that

16   same level of credibility, you'd be qualified.  Sounds like

17   something you could do?

18        A.    Sure.

19        Q.    Okay.  You know, as I've told you, if the

20   questions aren't answered yes, yes, and no, the person gets

21   that life sentence.  What a life sentence in a capital

22   murder case in Texas means is that a person has to do forty

23   years before they're eligible for parole.  We don't have a

24   life without parole in Texas.  It just doesn't exist.  But

25   in a capital case, a person has to do forty calendar years,

1  day for day, before they see their first Parole Board.

2              Now, they may make parole first time up

3  after 40 years, or they may never make parole and actually

4  serve a life sentence.  Because those decisions are kind of

5  beyond our control here in the courtroom and so far in the

6  future, we tell the juror what that means, but then we ask

7  them kind of to assume that a life sentence means a life

8  sentence, just to be fair to both sides, because we don't

9  know how it's going to end up.

10      A.      Yes.

11      Q.      So, is that something you feel you could do is

12  just presume a life sentence actually means a life sentence?

13      A.      Yes, sir.

14      Q.      Okay.  Let me visit with you quickly about

15  these things called lesser included offenses, lesser

16  included offenses.  This may come up in that first phase of

17  the trial, the guilt phase.

18              Let's say we're trying a case, murder in

19  the course of robbery, kind of going back to our example,

20  and you feel, for whatever reason, that the State didn't

21  prove it to you beyond a reasonable doubt, that maybe

22  Mr. Shook is guilty of that murder, maybe somebody else

23  committed it.

24              But you feel he's guilty of the robbery,

25  okay?  So you may have a choice after that first phase of

the trial.  As a juror, you know, you can find somebody guilty of capital murder or guilty of the lesser included offense of aggravated robbery or find them not guilty.  Does that kind of make sense to you?

A.    Yes, sir.

Q.    Okay.  In that situation, if you do find someone guilty of aggravated robbery, or in any situation where you find somebody guilty of aggravated robbery, these Special Issues don't apply.  At that point we just ask a jury to set punishment somewhere in the punishment range.  The punishment range for aggravated robbery in Texas is anywhere from five years in the penitentiary all the way up to 99 years or life.

And it's kind of the same question we asked all along.  You are probably sick of hearing me say open mind.  But we ask you as you sit there now, in order to be a qualified juror, just in a given aggravated robbery case, could you keep an open mind to that full range of punishment?

A.    Yes.

Q.    Okay.  Another way of asking that is, is if you heard an aggravated robbery case where you thought the right thing to do was a life sentence, could you do it?  And if you heard an aggravated robbery case where you thought the right thing to do was five years, could you do it?

1      A.      Yes.

2      Q.      Okay.  As long as you have that open mind, you

3  would be qualified.  Let me talk to you, generally, a little

4  bit about some of the rules that apply in any criminal case.

5  We kind of touched on this already.  A person that's accused

6  of a crime, a criminal defendant, can't be forced to

7  testify.  They have a Fifth Amendment right not to testify.

8              You know, no one can force him to get up

9  there and tell his side of the story.  You may want to hear

10  it.  It's natural for people to kind of want to hear that.

11  But you can't require him to.  You can't force him to.

12              If he doesn't testify, the Judge will

13  instruct you, this is what the law is, that you just can't

14  consider it in any way.  You can't hold his failure to

15  testify against him.  It's just a nonfactor.  Does that make

16  sense to you?

17      A.      Yes, sir.

18      Q.      Okay.  Is that something you think you could

19  do?

20      A.      Yes, sir.

21      Q.      And, again, that's part of enforcing our

22  burden of proof.  You always have to look to this table to

23  see if we have met our burden.  These folks over here don't

24  have to do anything.  Legally, they can sit there and do

25  crossword puzzles, not ask a question, not call a witness.

1  That's not going to happen.  They're good lawyers.  But that

2  kind of illustrates the point that you always have to hold

3  us to our burden of proof.

4                    Part of that, again, is the presumption

5  of innocence.  As we sit here right now, Mr. Murphy is

6  presumed innocent.  If for some reason we all quit this

7  trial right now and went home, he would be found innocent.

8  And the only way that presumption goes away is if we meet

9  our burden of proof, of proving each and every element of

10  the crime beyond a reasonable doubt.

11                    When you looked at that indictment, and

12  we actually draw up that indictment, we draft it.  And it's

13  kind of broken down into elements.  Very basically, you know

14  that a certain person on or about a certain day in a certain

15  county killed a certain person in a certain way.  Those are

16  kind of basically the elements of the crime.

17                    And the law says that we have to prove

18  each and every element to you beyond a reasonable doubt and

19  that no one element is more important than another element.

20  Okay.  Obviously, we've got to prove identity to you, the

21  person that committed the crime.  If we don't do that, we

22  haven't proven an element.  You'd find him not guilty.

23                    Kind of an extreme example of that

24  principle, which I don't think will come up, but

25  nevertheless, I'll give it to you.  You know, say you hear a

1  capital murder case and we've alleged as an element that it

2  happened in Dallas County.  But when you hear the case, you

3  think it happened in Tarrant County.  The cops didn't do

4  their job.  We didn't do our job.  We were grossly

5  negligent.

6            In that case we would have failed to

7  prove an element.  No one element is more important than

8  another.  It's just like identity.  The law would require

9  you to find that person not guilty.  Some people say that's

10  a technicality.  You missed the county.

11            You know, I don't anticipate this would

12  ever come up.  If it did, you could have our jobs.  We would

13  be fired.  And some people consider that a technicality.

14  But, you know, one person's technicality, I guess, is

15  another person's constitutional right.  So is that a law you

16  feel like you could follow?

17        A.    Yes, sir.

18        Q.    And, again, you know, say we allege that a

19  person was shot to death with a gun.  The evidence shows

20  that he was actually knifed to death, cut.  We missed it.

21  We missed an element of the crime.  You would have to find

22  him not guilty.  Does that make sense to you?

23        A.    Yes, sir.

24        Q.    Okay.  Any questions we've kind of gone over?

25  Seems like I've been doing all the talking.  Do you have any

1   questions of me?

2        A.    No, sir.

3        Q.    You know, kind of the burden is on me to cover

4   all these legal points and to make sure you understand them.

5   Again, the bottom line is no matter how you may feel

6   personally or, you know, kind of in the -- in your other

7   life, when you come in here as a juror, you've got to take

8   an oath that you can follow the law, even if you may have to

9   set aside some of your personal views.

10             If you can do that and keep that open

11  mind and follow the law, you'd be a qualified juror.  Hold

12  on just a second.  Any questions, Mr. Pool?

13       A.    No, sir.

14       Q.    Okay.  I appreciate your time.  Thank you.

15             MR. WIRSKYE:  That's all I have, Judge.

16             THE COURT:  Ms. Busbee?

17             MS. BUSBEE:  Thank you, Your Honor.

18                   CROSS-EXAMINATION

19  BY MS. BUSBEE:

20       Q.    Thank you for coming down, Mr. Pool.

21       A.    You're welcome.

22       Q.    We've talked to, gosh, many dozens of people

23  now and we still don't have a jury.  And we didn't talk to

24  -- I don't know what the percentage is, but it's, let's say

25  it's a tenth of the people that come down or fewer, and we

1   still don't have a jury.

2            And that, you've got a puzzled look on

3   your face, but the reason for that is, is that you can see

4   this is more complicated than most things we'd ask someone

5   to do.  And it doesn't make you a bad citizen, if you

6   disagree or don't feel comfortable with some of these

7   concepts.  It makes you a good citizen, if you just tell us

8   how you feel about things.

9            We often use the example of laws people

10  don't like, like say, the income tax law.  I might be kind

11  of liberal, if I was on a federal jury talking about some

12  income tax law.  That's just because when you are in private

13  practice, you don't have any withholding and it's a big --

14  well, you've been self-employed, I think, before.  You know

15  what that's like.

16           So there are no right or wrong answers.

17  And you haven't been drafted, because if, you know, if

18  forced to do so, I know you'd do your best.  And Mr. Wirskye

19  has gone over some principles of law and has asked you if

20  that makes sense to you.  Of course, it does.  That's the

21  law that makes sense.

22           I want to ask you a little bit more about

23  some personal feelings.  I see you going different ways in

24  different directions, like a lot of people do, because

25  nobody wants you to violate your conscience or to do, you

1   know, we'll just explore these things, if there are any

2   problems, because it's kind of like a job interview for a

3   job you really don't want.  I suppose it would disrupt your

4   life a little bit to have to be down here for two weeks.

5   Are you prepared to do that?

6          A.     Yes, ma'am.

7          Q.     Okay.  Well, first thing I'm going to ask you

8   about is, you made a comment, and let me preface this by

9   saying, we ask you all these questions without telling you

10  what the law is first.  So you're not bound to these things.

11  You made the comment that you thought the death penalty was

12  used too little.  Could you expound on that?

13         A.     Just from the -- just from what you see on TV,

14  maybe some pretty brutal crimes that you might see on TV, it

15  seems like some people get some that, you know, in some

16  cases where you would think that they might get a death

17  penalty, you're always kind of a little taken aback that

18  they might not get as severe a punishment as you would

19  think, just from what you see in the media.  But that's --

20         Q.     Right.  Sometimes we use this example of this

21  case that cut close to home, I think, for everybody, this

22  man in Park Cities who killed his wife in front of his kids

23  a few years ago.  Do you remember that?  That's not a death

24  penalty case under the law.  It's one of those things that,

25  as disgusting as it may be, is not a death penalty case.

1    A.    Sure.

2    Q.    It just doesn't fall under that class.  We

3  asked you some questions about your brothers and sisters.  A

4  lot of people don't do this.  I'm just curious as to what --

5  your sisters live here?  Do they have jobs?  What, for

6  instance, your sister Sheila, does she live in town?

7    A.    Yes, well, she lives over in the Lake

8  Highlands area in Dallas.

9    Q.    And is she one of the sisters whose husband

10 may be a bit on the liberal side?

11   A.    No.

12   Q.    She's not related to the Hawkins' that are the

13 subject of this case, is she?

14   A.    No.

15   Q.    Okay.  Just curious.  Well, I had to ask.

16 What about Michelle?

17   A.    She works for the Dallas Community College

18 District.  But she lives in Lake Highlands, also.

19   Q.    Okay.  Does she teach or --

20   A.    She works in continuing education.

21   Q.    What about, is it Desiree?

22   A.    Desiree.  She works for the City of Dallas.

23 She's a teacher.

24   Q.    Okay.

25   A.    Elementary school teacher.

Q.     You're kind of in between, aren't you?  Did
anybody in your family have any law enforcement background,
that kind of thing?

A.     No.  Sheila's husband, he's a fireman for the
City of Garland.  But prior to that he did work down at Lew
Sterrett for a while.  I think he was a jailor down there, I
believe.

Q.     Have you had any conversations with your
family or the people at work about the fact that you were
coming down for this case?

A.     Just mostly just with my wife.

Q.     Now, you were asked this question about did
you keep up with what had gone on in some of these cases.
Did you know what the results were in some other cases?

A.     I don't.  I don't remember seeing -- honestly,
I'd almost forgotten about it until I -- until I got called
for jury.  I didn't even realize that everybody hadn't
already been tried, or --

Q.     Okay.  Do you remember making the comment to
the juror in the back that some others had been convicted?
Do you remember telling her that?

A.     I remember -- what did I say?  I had thought
that they had already, that one had committed suicide and
that maybe the rest of them had already been tried and
convicted.

1    Q.    Okay.

2    A.    Or that I didn't think there was any -- I

3    thought that everybody else was -- that this was the last

4    person to be tried for the crime.

5    Q.    Okay.  We've talked to you about the

6    principles of law in general.  But everybody knows a little

7    bit about this case.  Have you formed an opinion as to what

8    should happen in this case?

9    A.    I don't have an opinion, to tell you the

10   truth.

11   Q.    Fair enough.  I guess my thinking on this is

12   you've been asked whether you, um, these laws make sense.

13   But in your mind, and you're the only person that knows

14   yourself, you understand that once someone has been

15   convicted of capital murder, the law says that's a life

16   sentence.  Can you feel that way and follow that?

17   A.    Yes, ma'am.

18   Q.    Okay.  It's a life sentence.  And it's only a

19   death sentence, if 1 is proved beyond a reasonable doubt,

20   and 2 is proved beyond a reasonable doubt.  And despite

21   those factors, you still think a death sentence should be

22   imposed.  That's the only way that happens.  And we don't

23   really have any way -- you seem to be sincere to me and I

24   think that you are.  I just want to hear it from you that

25   you would give this side a fair trial, if you were seated on

1    this jury.

2         A.    Yes, ma'am.

3         Q.    Because we don't have to put on anything.  And

4    we shouldn't have to put on anything.  But, you know, it's

5    going to be vigorously litigated, I anticipate.

6         A.    Sure.

7         Q.    So -- and having asked you that, you made some

8    mention about the fact that you would be interested in a --

9    in a typical death penalty case, about a person's childhood.

10   Could you expand on that?  How did you, why is that

11   important to you?

12        A.    I guess it's probably more so, now that I have

13   a little daughter and just, I don't know.  The way kids are

14   raised or whatever, I think that has a definite influence on

15   how their -- the type of person they're going to be when

16   they're older.

17              I think if somebody is just mentally,

18   physically abused growing up, that that's -- I mean, not

19   that you shouldn't be held accountable in some way or

20   another for your actions later on, but I still think that,

21   you know, the degree of the sentencing, I would think that

22   that should play a factor in it.

23        Q.    And it is a factor and certainly not the only

24   one, and it may not be persuasive.  It just depends on the

25   facts.

1          What do you, do you have any comments

2 you'd like to make about this process or something that you

3 think I should know or maybe the State should know, your

4 feelings at this time?

5          A.     I don't think so.

6          Q.     Let me consult with my co-counsel here.  Since

7 this is your last moment to speak, I'm going to see if there

8 is anything I missed on your questionnaire.  Is there

9 anything that you're curious about that we haven't talked

10 about?

11         A.     I don't think so.  I don't know anything about

12 this so --

13         Q.     Good.  Well, I mean, we don't want an ignorant

14 jury.

15         A.     Sure.

16         Q.     We want, but we do, we like to prefer, or like

17 to think people are a blank slate.

18                MS. BUSBEE:  I'll pass the juror, Your

19 Honor.

20                THE COURT:  Thank you, Mr. Pool.  If you

21 would be so kind and wait for us outside, we'll have you

22 back in just a few minutes.

23                PROSPECTIVE JUROR:  Yes, sir.

24                [Prospective juror out]

25                THE COURT:  What says the State with

144

1   juror No. 2975, Mr. Mark Christopher Pool?

2                   MR. WIRSKYE:  No challenge for cause,

3   Your Honor.

4                   MS. BUSBEE:  The defense has no challenge

5   for cause.

6                   THE COURT:  Would you like to step into

7   your office?

8                   MS. BUSBEE:  Yes, please.

9                      (Recess)

10                  THE COURT:  What says the State?

11                  MR. SHOOK:  State accepts.

12                  THE COURT:  State accepts.  What says the

13  defense?

14                  MS. BUSBEE:  We'll exercise a challenge

15  -- I mean a strike, sorry.

16                  THE COURT:  Ask Mr. Pool to come back in.

17                     [Prospective juror in]

18                  THE COURT:  Mr. Pool, come on up.  We

19  appreciate your time and service today and we'll inform you

20  that you are not going to be seated on this jury.  Thank you

21  for your time and attention and you are free to go.

22                     [Prospective juror out]

23                  THE COURT:  Mr. Walker.

24                     [Prospective juror in]

25                  THE COURT:  Good afternoon, sir.  How are

1  you?

2  PROSPECTIVE JUROR:  Doing fine, thanks.

3  THE COURT:  We have juror No. 3151, Hardy

4  Tom Walker, Jr.  Welcome to the 283rd.  Thanks for being

5  here on time or a little early.  As you see, unlike what you

6  perceived, we do start on time.  We're using your time and

7  we appreciate you being here.  Did you have enough time to

8  review the guide I provided for you?

9  PROSPECTIVE JUROR:  Yes, sir.

10  THE COURT:  I also provided a copy of

11  your questionnaire.  I hope you looked at that as well.  The

12  objective here this afternoon is to bring you up to speed

13  and try to get you to understand how all the law relates.

14  It can be complicated.  The attorneys will visit with you

15  and try to help you understand how it all works.

16  At the end of the process, I have two

17  questions I must ask you.  Number one, do you understand the

18  law?  And, number two, can you follow the law?  That's the

19  big picture I have to look at.  Only question I have for you

20  at this time is will you be able to serve this Court for a

21  period of two weeks beginning November 10th?

22  PROSPECTIVE JUROR:  Yes, sir.

23  THE COURT:  Thank you, sir.  Mr. Shook?

24  MR. SHOOK:  May it please the Court?

25  HARDY WALKER,

1   having been duly sworn, was examined and testified as

2   follows:

3                  DIRECT EXAMINATION

4   BY MR. SHOOK:

5        Q.    Mr. Walker, my name is Toby Shook.  I'm going

6   to be asking you questions on behalf of the State this

7   afternoon.  As the Judge said, there aren't any right or

8   wrong answers.  Just -- we just want your honest opinions.

9   I'm going to follow up with some of the information you put

10  in your questionnaire, talk about capital murder, and the

11  rules and laws that apply to this case.

12                From reading your questionnaire, it looks

13  like you've been down on jury duty a lot over the years.  So

14  you are probably familiar with the system.  This is a little

15  different, because it's a capital case in which the State is

16  seeking the death penalty.  We do this one-on-one interview.

17                We don't mean to make you feel like

18  you're the one on trial, putting you up on the witness

19  stand, but we have found it's a pretty good procedure for

20  getting information and you can ask questions at any time.

21  I see from your questionnaire that you work at Allstate?

22       A.    Yes, sir.

23       Q.    You're the property manager.  And just kind of

24  tell us on a day-to-day basis what your duties are.

25       A.    I work with offices across the state of Texas

1   for Allstate.   Over the years I've leased the office space,

2   furnished them with equipment needed, put the signs up and

3   get the office up and running.

4        Q.      Okay.  And you've been doing that for a number

5   of years; is that right?

6        A.      Yes, sir.

7        Q.      Okay.  Also in your questionnaire, you've been

8   down a lot of times, and in '99 you said you served on a

9   robbery case?

10       A.      My wife did.

11       Q.      Your wife did, okay.  Have you ever gotten to

12   a jury, sat and listened?

13       A.      No, sir.

14       Q.      Okay.  You got to go and listen to them talk,

15   but no one has ever -- you never had the privilege of

16   getting up and going through the whole process?

17       A.      Correct.

18       Q.      Okay.  One area we get into is if you have

19   known anyone that has been through the criminal justice

20   system.  And you said, I believe, it was your stepson

21   involving a DWI; is that right?

22       A.      DWI and other assorted drunk and disorderly

23   charges.

24       Q.      All having to do with alcohol?

25       A.      Pretty much.

1     Q.    Okay.  Did you know or are you familiar with

2   the facts of those cases?

3     A.    Not really.

4     Q.    Okay.  My concern is just this.  Bottom line,

5   do you feel he was treated fairly by the criminal justice

6   system?

7     A.    Yes.

8     Q.    Okay.  So you bear no grudge against any

9   police agency, DA's Office, or judge, or anything like that?

10     A.    No.

11     Q.    Okay.  Let me talk to you a little bit about

12   capital murder.  You know from what the Judge has told you

13   in the questionnaire that this is a capital murder case, so

14   we talk to each juror about their personal feelings about

15   it.  How do you feel about the death penalty?  Are you in

16   favor of it as a law?

17     A.    Yes, sir.

18     Q.    What purpose do you think it serves society?

19     A.    A deterrent, hopefully.

20     Q.    Okay.  Has it been a belief you've held your

21   entire adult life?

22     A.    Yes, sir.

23     Q.    When you think of what's an appropriate death

24   penalty case, what types of crimes come to mind?

25     A.    Premeditated murder, murder for hire, murder

of a police officer.

Q.     Okay.  If it were up to you, would you have the death penalty for any crimes other than murder?

A.     I can't think of any.

Q.     Okay.  In Texas, the system is set up just for certain murder cases, and not every murder case qualifies as a death penalty case.  You have to have murder, which is an intentional killing.  You mentioned the word "premeditated," which a lot of jurors do.  We really don't have premeditation as part of our law.

But we have intentional killing, which means the person has the intent to murder and they act upon that intent.  They have that specific intent, which is probably similar.  You can have that intent forming over days at a time, which I think a lot of people describe premeditation to us.  Or it could just take a few seconds.

But you have to have that intent to kill.  It can't be an accident or anything like that.  Also, you have to have murder plus something else, such as a murder that occurs during a felony.  If someone goes in and robs a convenience store and shoots the clerk, that could be a death penalty case.  Murder during the felony of a burglary, breaking into someone's home and murder someone, during a kidnapping, rape, or arson.

Also, murder of specific victims such as

1   a police officer on duty, which you have already named,

2   fireman, also, and prison guards, murder of a child under

3   the age of six, murder for hire, again, which you named, a

4   hitman situation, someone does it for money or some other

5   type of purpose, compensated in some way, and then more than

6   one victim, either your mass murder situation or the serial

7   killer situation.

8            But those are the only types of cases

9   which have been reserved for consideration of the death

10  penalty at this time.  That list, generally speaking, from

11  your own personal point of view, do you agree with that list

12  as the types of cases that you feel should be reviewed for

13  the death penalty?

14       A.    Yes.

15       Q.    Okay.  Now, when we talk about the death

16  penalty, we usually conjure up some example in our own mind,

17  usually involving the actual triggerman.  But the capital

18  murder case is like any other crime.  You may have more than

19  one individual committing an offense.  You can have groups

20  of individuals committing a crime.  You'd have accomplices.

21  Some people might be more involved than others, but they all

22  might be participating to some extent in a criminal

23  transaction.

24            The law says that if you do actively

25  participate, know what's going on, you can be found guilty

1    and can be punished.  The same is true of capital murder.

2    If you had one triggerman, you may have accomplices.  They

3    all may be, under the facts, could be prosecuted for capital

4    murder.

5              An example I often give is, let's say Mr.

6    Wirskye and I decide we want to rob the neighborhood bank.

7    Our plan is for me to go in there with a loaded gun.  He's

8    going to accompany.  He's going to have the bag.  Once I

9    pull the gun out and threaten the tellers, get their hands

10   in the air, he goes in and starts loading the bag up with

11   money from the drawers.

12             During the course of that robbery, I

13   shoot one of the tellers intentionally.  Maybe I don't like

14   the way they're looking at me, maybe he tells me one of them

15   is going for an alarm, but I shoot them intentionally.

16   We're caught leaving the scene, let's say.

17             Obviously, I could be prosecuted for the

18   death penalty and I could receive the death penalty,

19   depending on the facts, because I'm the actual triggerman.

20   The law says Mr. Wirskye could also be prosecuted for

21   capital murder as an accomplice.  He could even receive the

22   death penalty under some circumstances or facts.

23             People feel differently about that.  We

24   have some people that are for the death penalty, but if it

25   were up to them, they would reserve it just for the

1  triggerman.  They feel it's only appropriate for the person

2  that causes that death.

3  If it were an accomplice, they would

4  reserve a different punishment, maybe a different crime,

5  some type of prison term.  They just think that's fair.

6  Other jurors feel the other way.  They feel that an

7  accomplice in a capital murder situation should be held

8  accountable, can be found guilty, and ultimately could even

9  receive the death penalty, even though they didn't actually

10  cause the death.

11  And people feel differently.  They fall

12  one way or the other.  We just want to get every juror's

13  honest opinions on that law.  How do you feel about the

14  prosecution of an accomplice under a death penalty

15  situation?

16  A.  I guess a lot would be how the law was

17  presented to me on that case.

18  Q.  Okay.  From your own personal point of view,

19  do you think it's fair to prosecute an accomplice for

20  capital murder?

21  A.  If that's what the law says, then yes.

22  Q.  Okay.  Do you think it's fair that they could

23  get a death penalty?

24  A.  Once again, if that's what the law says, yes.

25  Q.  Okay.  The law is this, that there's really

1   two ways you could do it.  One, if they are actively

2   involved, they direct, aid, help, solicit, encourage, the

3   crime.  They are not the triggerman.  They can be found

4   guilty, could get the death penalty.

5               The other theory is called conspiracy.

6   If one or more persons conspire to commit one felony and

7   then someone in the event commits another felony to further

8   along the conspiracy, then everyone in the conspiracy can be

9   found guilty, if the jury believes that they should have

10  anticipated that a death could occur.

11              They may not -- they don't even have to

12  have the intent that someone die, if you believe from all

13  the surrounding facts that they should have anticipated

14  that, to get someone guilty.  Again, the law, applied to the

15  fact situation I gave you, Mr. Wirskye and I entered into a

16  conspiracy, which is simply an agreement to commit robbery

17  of that bank, and while we're pulling that robbery off, I

18  commit another felony by shooting and murdering one of the

19  tellers.

20              He can be held accountable for that, even

21  if he didn't intend for me to do that or didn't intend for

22  anyone to die, if the jury believes from the facts he should

23  have anticipated someone could get killed, me going in there

24  with a gun, that sort of thing.

25              So he doesn't necessarily even have to

1 have that intent to be found guilty.  Now, to get to the

2 death sentence, you'd have to have a situation where they

3 did anticipate someone would die, and it would all depend on

4 the facts.

5 Under those two theories of law is how we

6 can get someone convicted of capital murder.  Is that a law

7 that you agree with and think could be fair, depending on

8 the facts?

9 A. Yes.

10 Q. Okay.  Another way we have of asking is this.

11 If we can make you king for a day of Texas, give you a lot

12 of power, would you have a law on the books, as far as

13 capital murder goes, where an accomplice could receive the

14 death penalty, depending on the facts of the case?

15 A. Yes.

16 Q. Okay.  Why do you think that would be

17 important to have that type of law?

18 A. To keep people from putting themselves in the

19 situation where things like that could happen.

20 Q. Okay.  Deter groups of people committing those

21 types of crimes?

22 A. Yes, sir.

23 Q. Are there any factors you think would be

24 important to you from the standpoint of the prosecution of

25 accomplices in a death penalty situation?

1        A.      I guess everything around it would be

2    important.

3        Q.      All the surrounding facts?

4        A.      Yes, sir.

5        Q.      Okay.  Their role, their knowledge of the

6    plan, that sort of thing?

7        A.      Yes.

8        Q.      Okay.  Now, the way a capital case is set up,

9    it's divided into two parts.  You have the guilt/innocence

10   stage and the punishment stage.  The guilt/innocence stage,

11   we have to prove to you the indictment beyond a reasonable

12   doubt.  If we fail to do that, the jury finds the defendant

13   not guilty, and everyone goes home.

14            If we are able to meet our burden of

15   proof, though, the trial is not over.  You move to the

16   punishment phase and you can hear additional evidence at

17   that time.  And then you get these questions which we call

18   Special Issues, which we'll talk in a little more detail in

19   a minute.

20            But to put it somewhat succinctly, the

21   State has to prove in the punishment phase that the

22   defendant would be a continuing danger to society, we have

23   to prove that he either caused the death or anticipated that

24   a death would occur, and that there is not sufficient

25   mitigating evidence to warrant a life sentence rather than a

death sentence.

But a yes, a yes, and a no to those questions equals a death sentence.  The Judge would have no discretion.  If the jury answered that way, he would then sentence the defendant to death.  If you answered them any other way, again, he would have no discretion.  He would sentence the defendant to life.

But those are the only two possible outcomes once a defendant has been found guilty of capital murder, death or life.  And it all depends on how the jury answers those questions.  Is that clear to you?  Is that clear to you?

A.    Yes, sir.

Q.    Okay.  Are you familiar with the method of execution in Texas?

A.    Lethal injection.

Q.    That's correct.  You probably know from living here that Texas is actually a state that not only prosecutes the death penalty, but actually carries it out.  Texas, in fact, leads the nation in executions.  There are some states that have it on the books, yet they never prosecute it, or if they do, they never actually carry it out.  But we do here in Texas.  So we're talking about a very real punishment.

The laws and rules and procedures in a

1   death penalty are the same in every case.  If the defendant

2   in this case were found guilty and the questions were

3   answered in that way, he would be sentenced to death, and he

4   would be housed on death row.  At some point in time the

5   Judge would actually give him a date of execution.  The day

6   before that date, he would be moved to downtown Huntsville,

7   where all executions take place by law in a prison unit

8   there.

9             On the date of his execution, he's given

10  time with family, friends, a minister.  He's given a last

11  meal.  But at 6:00 p.m. by law the execution takes place.

12  He's taken into that chamber, which often there's photos of

13  it that appear in the news.  You may have seen it.  There's

14  a gurney there with leather straps.  He's secured there.

15  Needles are placed in his arm.  Tubes go into an adjacent

16  room where the executioner sits and then witnesses are

17  brought in.

18             You have one side of the room, it's a

19  divided room, that has the victim's family or friends, and

20  the other side, the defendant's family or friends.  After

21  they're assembled, the warden allows him an opportunity to

22  make a last statement, which is frequently carried in the

23  news or newspapers.  He may proclaim his innocence, he may

24  ask for forgiveness, it could be anything.

25             But after that, the signal is given and

1   lethal substances are injected into his body, which would

2   cause the heart to stop, the lungs to shut down, and he

3   would lapse into a coma within ten to fifteen seconds.

4   That's the procedure that occurs in every case.  It would

5   happen in this case.

6           And, quite frankly, that's our goal in

7   this case.  We feel we have the type and quality of evidence

8   to convince a jury of the defendant's guilt, convince them

9   that these questions should be answered in such a way that

10  he would be executed in the manner I described.

11          Now, you've told us philosophically from

12  your own personal point of view, you do believe in the death

13  penalty as a law, and it should be prosecuted, that you

14  believe in it as far as the law of accomplice goes, that it

15  could be prosecuted and be fair for an accomplice to receive

16  the death penalty.

17          We get all kinds of folks down here.  You

18  remember a lot of people in that room, I'm sure, when you

19  filled out the questionnaire.  Everyone feels different, but

20  what I need to know is, do you feel you're the type of

21  person, as you know yourself best, who could actually, after

22  listening to the evidence, take pen in hand and answer these

23  questions in a way, knowing that the defendant would be

24  executed some day, if you answer them yes, yes, and no?

25          A.    Yes.

1    Q.    Okay.  Fair enough, then.  Let's talk for a

2  minute about these Special Issues.  If you'll take a moment

3  just to read Special Issue No. 1 to yourself and we'll go

4  over that one.

5           Let me back up one moment.  You know, on

6  the questionnaire we have one question about publicity.

7  This case received an awful lot of publicity and almost

8  every juror read something in the newspaper or heard

9  something on the radio or saw something on TV.  And I

10  believe you were no exception to that.

11           That doesn't make you ineligible to be a

12  juror, but we like to explore with each juror what they

13  recall hearing about the case.  What facts do you remember

14  about the case when it was covered?

15    A.    As I recall there were seven criminals, I

16  think in Huntsville, that escaped and ended up in Irving, I

17  think committing a robbery of an Oshman's.  And Irving

18  police officer Aubrey Hawkins, I guess, came upon them and

19  there was a gunfight and he was killed.  And then they

20  disappeared for a while and were eventually apprehended, I

21  think in Colorado.

22    Q.    Okay.  Did you follow any of the proceedings

23  after their apprehension?

24    A.    I maybe read a piece or two in the paper, but

25  not in depth.

1    Q.    Okay.  You sound like most other jurors.  You

2  remember some general details.  And, again, that doesn't

3  make you ineligible to be a juror.  The rule is this, kind

4  of just a common sense rule.  As a juror you have to make

5  your decisions just based on what you hear in the courtroom,

6  from the witness stand and from any other evidence.  You

7  can't rely on any newspaper reports or what you saw on TV to

8  influence you in any way.

9          We can't very well ask you to forget or

10  blank that out of your mind.  That's impossible.  But what

11  the Court requires of the jurors is to be able to make their

12  decisions just based on the evidence, and not let any

13  outside influences from the news media come into their

14  deliberations, recognizing that the best source is going to

15  be the direct source from the witnesses.

16          The news media, as you probably know, are

17  not always accurate.  They are not always reliable and

18  that's why we must require the jurors to make their

19  decisions just based on the evidence here in the courtroom.

20  Do you feel you could do that, if selected as a juror?  And

21  these are all hypothetical situations, but as selected as a

22  juror, could you just make your decisions based on the

23  evidence you hear and the witnesses that testify here in the

24  courtroom?

25    A.    Yes.

1       Q.    Okay.  Now, this first Special Issue, you

2  don't get to unless you have found the defendant guilty.

3  Again, that doesn't mean the trial is over.  You may hear

4  additional evidence at this point in time and then you get

5  these questions.  Special Issue No. 1 starts out with a no

6  answer.  And the State has to prove to you beyond a

7  reasonable doubt it should be answered yes.  We have the

8  burden of proof on it.

9           Looking at Special Issue No. 1, you see

10  where that question is asking you to make a prediction about

11  how the defendant would behave in the future.  Do you feel

12  you could make that type of prediction, if you were given

13  sufficient evidence and facts?

14       A.    Yes.

15       Q.    Okay.  What types of things would you want to

16  know before you answered that question?

17       A.    Prior bad acts.

18       Q.    Okay.  You can hear that type of evidence, if

19  it's available.  Prior crimes, you can even hear from the

20  witnesses.  You can hear good things and/or bad things, just

21  all of a person's life, in making that determination, as

22  well as reviewing, again, the facts you heard in the

23  guilt/innocence stage, the facts of the crime, and the

24  defendant's role in it.

25           And you get to use all that information

1  to answer that question.  The question asks if there's a

2  probability the defendant would commit criminal acts of

3  violence.  What does "probability" mean to you in terms of

4  that question?

5       A.      There's a decent chance that it could happen.

6       Q.      Okay.  That wording will be, the definitions

7  are actually left up to you and the other jurors.  The

8  guidelines the Court has given us is this.  On probability,

9  it doesn't mean a certainty, because I don't think we could

10  ever prove a certainty on anything in a court of law.  And,

11  also, it's obviously more than just a possibility.

12             You said -- you used -- well, one of the

13  terms the courts use is more likely than not, language like

14  that, obviously, a lot more than a possibility, but less

15  than a certainty.  Does that make sense to you?

16       A.      Yes.

17       Q.      Okay.  We have to prove that he would commit

18  criminal acts of violence.  When you see "criminal acts of

19  violence" there, what does that mean to you?

20       A.      Murder, aggravated robbery, assault, rape.

21       Q.      Any type of threat or harm to another human

22  being?

23       A.      Yes.

24       Q.      Okay.  Now, this question is answered

25  separately.  The fact that you've found someone guilty does

1   not mean that's a yes answer, because if you'll recall, it

2   starts out with a no answer.  The law contemplates that some

3   capital murderers, someone who has been convicted, are going

4   to get a death sentence, and some are going to get a life

5   sentence.  It all depends on the evidence and the facts

6   unique to their case.

7             There are no automatic answers.  You

8   don't automatically check in the yes because you found them

9   guilty.  What you're going to have to do as a juror is wait

10  and listen to the evidence, and then determine what you

11  think is the right thing to do, and if the State has proven

12  this to you beyond a reasonable doubt.

13            We can't preview the facts.  We give

14  examples sometimes.  One would be, let's say it was a

15  situation where I was being prosecuted for capital murder.

16  My children had been harmed by someone in the neighborhood.

17  I knew that and I knew who it was.  But maybe they were the,

18  let's say, the mayor's son or the police chief's son, so

19  nothing was happening to them.

20            And out of frustration after several days

21  of thinking about it, I go kick his door in and I kill him,

22  because I know, I'm afraid, you know, my children are going

23  to get hurt, or I'm mad about what happened.  The breaking

24  in and killing someone in their home is a capital murder.

25            But maybe I have a spotless record, and

1   taking in those circumstances in which I did that, a jury

2   might look at question No. 1 and say, he's guilty of capital

3   murder, but this is just a one-time incident in his life,

4   and it involved his kids.  He's not a continuing danger to

5   society.

6            Other situations might show me with a

7   prison record a mile long.  I'm a selfish, greedy person,

8   and killing out of just grief.  So it depends on the facts

9   of each case.

10           What the law requires is each juror will

11  wait, listen to the new evidence that would come in the

12  punishment stage concerning the person's background, both

13  good and bad, and then the guilt/innocence evidence, and

14  then make that determination.  Do you feel you could do

15  that?

16       A.    Yes.

17       Q.    Okay.  It's kind of a common sense approach,

18  again.  It's something I'm sure you'd apply in your personal

19  life, in your business life, before you make a major

20  business decision.  You, obviously, probably gather all the

21  facts in from all sources and then make that decision.

22  That's what the law contemplates here.  No automatic

23  answers.  You'll wait and evaluate it from its own point of

24  view after all the evidence is in.

25           Special Issue No. 2, that's the situation

involving the law of parties.  If you'd look at that just for a moment.  That's the question when we first talked about the law of parties, to get someone guilty, we have to prove to you that they should have anticipated that a life would be taken.  And here it's still parties, an accomplice situation.  We have to go a step further and prove to you that they did anticipate.

And it covers several areas.  The first part asks whether the defendant actually caused the death.  If you think they're the actual triggerman, let's say, that part of the question is answered.

The second part of the question comes into the accomplice situation.  If they didn't actually cause the death of the deceased, but intended to kill the deceased, you could answer it yes, if that's what their intentions were, or another, or anticipated that a life would be taken.  That "anticipated" is the area we've gone over before.

To get him guilty we have to prove that he should have anticipated and to get the answer to that second question is he actually did anticipate.  And it may be the same exact evidence or it may be additional evidence you learn about their background.  But you have to be able to look at the difference and see the difference and apply that difference.

1          One example we give sometimes is you may

2    have a young teenager gets his car for the first time when

3    he's 16.  And you know how teenagers can be.  They may drive

4    that car a little recklessly.  After a couple of weeks, he

5    may wreck that car.  Father comes to him, what were you

6    thinking, driving over, you know, going cross country,

7    driving over curbs, that sort of thing.  Didn't you realize,

8    if you drove that way, it could break the car?

9          Well, maybe at 16 he didn't.  But,

10   obviously, years later, if he drove it that way, he would

11   have anticipated.  And he should have anticipated, but

12   perhaps he didn't.  And what we look at is, the first part

13   is the "should have."  But to get to that death sentence

14   it's a step longer.  Not only should they have anticipated,

15   but they actually did.  You see the difference there?

16        A.    Yes.

17        Q.    Okay.  Again, it might be the same evidence.

18   And we can't open a person's mind up to show you their

19   intent.  But what a jury does is use their common sense,

20   make reasonable deductions from the evidence, and try to

21   determine a person's intent, just from their actions and

22   their role in the crime.  Do you feel you could do that?

23        A.    Yes.

24        Q.    Okay.  The question starts out with a no

25   answer.  We, again, have to prove to you beyond a reasonable

1   doubt it should be answered yes.   The same rules apply.

2   You'd wait until all the evidence is in and then make your

3   decision.   No automatic yes, just because you found him

4   guilty or answered yes to No. 1.   You would look at it

5   independently.   Do you feel you could do that?

6          A.      Yes.

7          Q.      Okay.   And then this last question is the

8   mitigation question.   If you'd just take a moment to read

9   that to yourself.   It gets a little lengthy, but it covers

10  just about any situation that might come up.   You don't get

11  to it, unless you've found him guilty.   You've already found

12  he's a continuing danger, and you've already found that he

13  either caused the death or intended someone to die.

14              But what the law says, that even despite

15  those findings, you keep your mind open and review all the

16  evidence of the case, all their background, all their

17  character evidence, and if you think there's sufficient

18  mitigating evidence where the fair thing to do is to give a

19  life sentence, you could do that.   And if you don't think

20  it's there, you could answer it no.

21              We don't have the burden of proof on this

22  particular question and they don't have the burden of proof.

23  You just kind of have to call it as you see it after

24  reviewing all the facts.

25              As a juror today you don't have to tell

1   us what you think mitigating evidence would be.  You're not

2   going to get a definition of it.  You just have to be able

3   to promise the Court, I can keep my mind open to it.  If I

4   think something is sufficiently mitigating in a person's

5   background or their role in the crime, then I can answer the

6   question that way.  If not, I'll answer it no.  Do you feel

7   you could do that?

8           A.      Yes, sir.  But I have a question.

9           Q.      Okay.

10          A.      So no one presents any evidence on this

11  whatsoever, character reference --

12          Q.      No.  We may be presenting evidence, but we

13  don't have a burden of proof like we do on these other

14  questions.

15          A.      Okay.

16          Q.      You can anticipate that the defense will, if

17  they think something is mitigating, they may put on an

18  expert.  They may put on some character witnesses, some

19  background witnesses.  And we, obviously, will put on

20  witnesses which might cut against that mitigation.  I think

21  common sense-wise you will realize we're going to be arguing

22  one way and they will be arguing another.

23                  But the difference in that question is,

24  the first two we have the burden of proof and this one we

25  don't.  And it could be, you know, one juror might look at

1   something we brought up and think that's mitigating.

2   Another juror might think it's something that the defense

3   brought up.  The bottom line is you just have to keep your

4   mind open to it.  Do you feel you could do that?

5           A.     Yes, sir.

6           Q.     Okay.  Just as a gut reaction, we ask every

7   juror this.  As you sit there today, does any type of

8   evidence come to mind that you might view as potentially

9   mitigating?

10          A.     No, sir.

11          Q.     Okay.  Most people tell us that, which kind of

12  reassures us, because I don't think most people hopefully

13  aren't sitting around in their free time thinking of these

14  type things.  But mitigating could be anything.  Sometimes

15  you hear about a way a person was raised, maybe they came

16  from a bad background, maybe they were abused, physically or

17  mentally, maybe they have a poor background.

18                 Some jurors feel that could be mitigating

19  if it's severe enough.  Other jurors tell us, I'd feel bad

20  for the person, sympathy, but once you're an adult you have

21  to be held accountable.

22                 Do you feel one way or the other about

23  that type of background information?

24          A.     Um, I believe that people in general should be

25  held responsible for their actions.

1    Q.    Okay.  A lot of people feel that way.  Might

2  be something about their mental background, maybe they're

3  slower than others, through no fault of their own.  That

4  could be something that some people view as mitigation,

5  things like that.  It could be just really anything.

6              But the bottom line is if your mind is

7  open to it and if you think it is sufficiently mitigating

8  you can answer the question that way.  It's another process

9  of waiting until all the information is in and then making

10  the decision.  Do you feel you could do that?

11    A.    Yes.

12    Q.    Do you feel that's a fair question in a death

13  penalty situation to be able to grant someone a life

14  sentence, depending on the facts?

15    A.    Yes.

16    Q.    Okay.  That's all the law really contemplates.

17  Let me go over a few rules that apply to each case and these

18  will be familiar to you, because we're kind of raised up on

19  these rules in our schooling.

20              Presumption of innocence.  Every

21  defendant is presumed to be innocent at the beginning of the

22  trial.  The fact that they've been arrested or indicted or

23  that we're going through this process, is no evidence of

24  their guilt.  The State has to overcome that presumption by

25  presenting evidence and witnesses.  But at the beginning of

1  the trial, you must presume him to be innocent.

2           Could you follow that rule, presume him

3  to be innocent, and require us to prove our case to you?

4       A.     Yes.

5       Q.     Okay.   The burden of proof never leaves this

6  table.   It never leaves the State of Texas.   It's always on

7  the State of Texas and it never shifts.   The defense is not

8  required to prove his innocence to you.   You may anticipate,

9  it's common sense, that they are going to try hard, they're

10  going to present evidence, they will make arguments or ask

11  questions.   But they're not -- they don't have to under our

12  law because the burden of proof never leaves this table and

13  shifts to them.

14           If at the close of the trial they didn't

15  ask any questions, but you had a reasonable doubt based on

16  the evidence we presented, you'd simply find the defendant

17  not guilty.   You can't turn around and go, okay, they had

18  their shot, now you prove his innocence, because that burden

19  of proof never leaves that table -- this table.

20           Do you feel you could follow that rule of

21  law, require us to prove our case beyond a reasonable doubt,

22  and not require the defense to prove innocence to you?

23       A.     Yes.

24       Q.     Okay.   The burden of proof goes to each and

25  every element of the indictment.   We write the indictment;

1  therefore, we have to prove every bit of it beyond a

2  reasonable doubt.  If we fail on just one part of the

3  indictment, then the jury is obligated under law to find the

4  defendant not guilty.

5          Let me give you a couple of examples.  We

6  have to prove who committed this crime.  At the close of the

7  trial, if you had a reasonable doubt about the identity of

8  the killer, common sense would tell you it would be a pretty

9  quick not guilty.  That's one of the elements of the crime.

10  However, just as important under the law is where the crime

11  occurred, such as Dallas County.  We have to prove that to

12  you beyond a reasonable doubt.

13          Now, I'll give an example which I don't

14  anticipate happening, but it demonstrates this point.  If we

15  prove -- put on a case and at the end of it, let's say the

16  crime occurred near the county line.  And you felt that the

17  crime actually occurred way over in Tarrant County.  That

18  would be a reasonable doubt.  Now, that would also indicate

19  we're pretty bad prosecutors and bungled the case in our

20  preparations.

21          But a juror can't help us out and say,

22  you know what, I'm going to give them that, and that's a

23  technicality to me.  I don't care where it happened.  You

24  have to, if you have a reasonable doubt about any portion,

25  even Dallas County, find the defendant not guilty.

1          You may not like it, you may have us

2    fired that day, probably.  But you can't help us out.  Could

3    you follow the law in that respect and require the State to

4    prove its case beyond a reasonable doubt on each and every

5    element of that indictment?

6          A.     Yes.

7          Q.     Okay.  The Fifth Amendment comes up from time

8    to time.  If someone is charged with a crime, they can

9    testify and no one can stop them.  You judge them like any

10   other witness.  But if they choose not to testify, the Judge

11   would instruct you that you can't hold that against them.

12   It can't be used as evidence against them.  You can only

13   base your decision based on the evidence you've already

14   heard.

15          There could be a number of reasons why

16   someone may not testify.  They may not be very well

17   educated.  They may not perform well in front of people.

18   They may be very nervous and look guilty when they're not.

19   They may simply be following their lawyer's advice.  The law

20   takes care of that by instructing the jurors you can't hold

21   that against them and can base your decision based only on

22   the witnesses you heard.  Could you follow that rule of law?

23          A.     Yes.

24          Q.     Okay.  Police officers often testify in

25   criminal cases.  People have respect for the job they do,

1    but you can't start them out ahead of other witnesses.   You

2    have to wait and judge them like you would any other

3    witness, recognizing there are good police officers and bad

4    ones.   You just have to wait and judge them like you would

5    any other witness.   Could you do that?

6            A.      Yes.

7            Q.      Finally, the parole laws are sometimes brought

8    up in the news.   The Judge would tell you in a capital

9    murder situation, a capital life sentence means the

10   defendant would have to serve forty calendar years before

11   they became eligible for parole.   Even then, that doesn't

12   mean they'd be paroled.   And he would also instruct you that

13   you can't consider the parole laws at any time in your

14   deliberations.   You must simply consider a life sentence, a

15   life sentence.   Do you feel you could do that?

16           A.      Yes.

17           Q.      Okay.   I don't know if this would happen or

18   not, but sometimes there are lesser included offenses that

19   are considered by a jury, and sometimes they find the

20   defendant guilty of a lesser included offense.   A lesser

21   included offense in a capital murder situation is aggravated

22   robbery.   If you found the defendant guilty of aggravated

23   robbery, the penalty range changes.   You don't get these

24   questions.   It's simply a matter of years that come into

25   play.

1          The law contemplates that you would wait

2     and listen, again, for all the punishment evidence, good and

3     bad, to come in, and then make a decision on the term of

4     years.   It can be anywhere from a life sentence all the way

5     down to as little as five years in prison.

6          If you feel it's appropriate that a

7     five-year sentence be given, based on the crime and the

8     background evidence, you could do that.  Or as much as 99

9     years or life in prison, you could do that, or anywhere in

10    between.

11         Do you feel you could keep your mind open

12    to that full range and assess the proper punishment based on

13    what you feel the evidence shows?

14         A.     Yes.

15         Q.     Okay.  That's kind of the bottom line, and I

16    know I've been repeating myself, but certain people won't do

17    that.  You seem to be the type of person that is able to

18    have that mental discipline to keep their mind open, require

19    the State to prove these things, and look at these questions

20    and these issues all separately, which is what the law

21    contemplates.  Do you perceive any problem in doing that at

22    all?

23         A.     No.

24         Q.     Okay.  We've gone over a lot of different

25    information and rules and laws that apply.  Do you have any

1    questions over anything that we've gone over?

2         A.    No, sir.

3         Q.    Okay.  Let me check a few more things and I

4    may be done.  Oh, there is one area I left out.  In the

5    punishment phase you sometimes hear from psychologists or

6    psychiatrists from the defense side, sometimes from the

7    prosecution side, sometimes from both.  They can offer

8    opinions about a person's future danger.  They may offer

9    opinions about mitigation, why a person acts that way.

10   Sometimes they don't testify, sometimes they do.

11                Now, sometimes jurors look at that, at

12   psychologists or psychiatrists, and they put a lot of faith

13   in them.  They actually think that's very valuable

14   information, would follow their opinions pretty much.  Other

15   jurors kind of are the opposite way.  They think that's --

16   they term it a soft science.  They think if you look hard

17   enough, long enough, paid enough money, you're going to find

18   someone that's going to come up with a theory that helps

19   you.

20                Then you have other jurors that say, I

21   would look at it, but it's not going to weigh of any

22   particular importance to me.  It's going to be another piece

23   of the puzzle.  I'll weigh it as well as all the other

24   evidence I hear.  Do you have any opinions one way or the

25   other about those types of experts?

1  A.  I would want to hear their credentials and

2 what they have to say.

3  Q.  Okay.  Would you just want to listen to them

4 like you would any other witness in the case, then?

5  A.  Yes.

6  Q.  Okay.  You feel they might be credible and

7 then, again, they may not, it's just going to depend on that

8 individual witness and what they know?

9  A.  Yes.

10  Q.  Okay.  Fair enough, then.  Well, I appreciate

11 your patience with me.  I know I've covered a lot, but

12 that's all I have, and I'll turn you over back to the Judge.

13       MR. SHOOK:  Thank you, Your Honor.

14       THE COURT:  Mr. Sanchez?

15       MR. SANCHEZ:  Thank you, Your Honor.

16         CROSS-EXAMINATION

17 BY MR. SANCHEZ:

18  Q.  How are you doing today, Mr. Walker?  Or Mr.

19 Hardy, oh, Mr. Walker, I'm sorry.  I wanted to call you

20 Mr. Hardy.  Do you ever get that or am I the only person

21 that's ever done that?

22  A.  Once in a while.

23  Q.  Okay.  Mr. Walker, you know when Mr. Shook,

24 here, was speaking to you, he's asking you a lot of

25 questions and asking for a yes or no answer.  And you've

1    told us you can follow the law.  And, you know, what I want

2    to know is what you think about the law.  A couple of times

3    you said, well, if that's what the law says.

4                        And so, what I really want to explore

5    with you is, what do you think about the law?  Because

6    sometimes there's people that say, I can follow the law, and

7    the more we ask them questions, you know, we get the sense

8    that they can't, or put in a certain situation they may not

9    agree with the law.  But when we just ask it like that, in

10   an abstract, everybody can say they can follow the law.

11                       There's no right or wrong answers, you know.

12   I just want to get your true feelings as to what you think,

13   okay?  Is that fair enough?

14        A.    Yes, sir.

15        Q.    Okay.  I see you live in Irving.  Do you still

16   live there right now?

17        A.    Yes.

18        Q.    Okay.  And you lived in Dallas County for 33

19   years.  Has that always been in Irving?

20        A.    No.

21        Q.    What other places have you lived in?

22        A.    Initially Dallas proper, Garland, and Irving.

23        Q.    Okay.  How long have you lived in Irving this

24   time?

25        A.    Seventeen years, plus or minus.

1        Q.      Okay.  So it would be fair to say that in

2  Irving, I guess this was big news when you heard about it,

3  probably.

4        A.      Yes.

5        Q.      Because it happened in Irving, obviously, the

6  allegations are that it happened in Irving, and there's no

7  way to get around, sometimes, the media's coverage of it or

8  people talking about it.  And that's why, you know, when

9  we're sitting here asking questions, you know, we have to

10  know, you know, what kind of opinions you've formed about

11  this case, if you have any opinions that you've formed.

12              So what do you think about that?  Have

13  you formed any opinions already before you've heard any

14  evidence or based on what you heard from the media?

15        A.      It was a terrible thing that happened.

16        Q       Okay.  Have you formed any opinions as to Mr.

17  Murphy's guilt or the guilt of the people who were involved?

18  Because if you have --

19        A.      Based on evidence, no.  Based on the media,

20  you know that it happened.

21        Q.      Okay.  And when you say that, I mean, does

22  that mean that you have already maybe formed an opinion

23  going into this trial that this person may be guilty or not

24  guilty?

25        A.      I don't know what his part was in this.  I do

know that someone was killed.

Q.     Okay.  But you have not formed any opinions as to his participation, if he participated at all?

A.     I don't know what happened.

Q      Okay.  All right.  Mr. Shook talked to you about a sentence of life in prison, you know, we hear that a lot.  Did it surprise you at all that that was an option in a capital murder case where it involves the death of a police officer, that life would even be an option?

A.     No.

Q.     Okay.  And life in prison, what do you think about that?  I mean, is that a harsh sentence for you?  I mean, we've had people come up here and say, well, you know, that's a slap on the wrist for some people.  What do you think about that?  What do you think about the sentence of life in prison?

A.     I'm not sure it's not worse than the death penalty.

Q.     Okay.  So you wouldn't see it as a slap on the wrist?  Not that I'm saying you should.  I'm just saying that sometimes we've had people that tell us that, and that's why I ask that question.  And they say because I consider it to be a slap on the wrist, in this type of case, I could probably, I probably couldn't even consider it in a capital murder case.  But you're telling us today, then,

1   that you -- it would be a consideration for you?

2        A.      Yes.

3        Q.      Okay.  And that's kind of the way the law is

4   set up, okay?  We have jurors that come in here and are

5   surprised at the, you know, the death penalty scheme is set

6   up the way it is, the way it's been explained to you quite

7   well by the State.  You know, they come in here thinking,

8   well, you know, once someone is found guilty of capital

9   murder, why are we even dealing with these Special Issues?

10  Shouldn't it just be an automatic death penalty?  So they're

11  surprised to hear those kind of things.

12            And the reason the law is set up that way

13  is because the law favors that a life sentence be imposed

14  over a death penalty, unless these Special Issues are

15  answered the way Mr. Shook told you they would be answered

16  for the death penalty being imposed.  Does that make sense

17  to you?

18        A.      Yes, sir.

19        Q.      Okay.  You can look at it a couple of ways,

20  but one way is, you know, these are hurdles that have to be

21  overcome before a death penalty could be imposed.  Do you

22  think that's fair?

23        A.      Yes.

24        Q.      Okay.  And the reason we ask all these

25  questions is because, you know, there are some jurors that

those Special Issues may not have that much value to them.
Once they find somebody guilty of capital murder, you know,
they'll look at them, may not consider them as much as the
law contemplates they should, because in their mind those
are things that get in the way of granting the death
penalty.  What do you think about people like that?

A.      They shouldn't do that.

Q.      Okay.  And that's what the law says, you know.
And what I hear from you is that you would consider them,
give them serious consideration, and have the State prove
them to you the way they told you they would have to?

A.      Yes.

Q.      Okay.  When people talk about the Fifth
Amendment right not to testify, everybody agrees, you know,
we've grown up hearing about it, you know, the Fifth
Amendment.  But sometimes people have different views when
it comes to these type of cases, okay, especially in
answering these Special Issues.

For example, you know, we've had some
jurors come in here and say, well, you know, if your client
doesn't get up there and testify, then that, in some way I'm
going to hold that against him, because if that was me, I'd
be up there, you know, arguing for my life.  What do you
think about that?

A.      I don't think that's what the law says.

Q.     Okay.  What do you think?

A.     I think a person doesn't have to testify.

Q.     Okay.  And that's the way it is.  That's the way the law tells us that you are not supposed to allude to it in any way or consider it in any part of your deliberations.

But we have some people sometimes that say, well, you know, I understand the Fifth Amendment right applies during the guilt/innocence stage, you know, while they're trying to prove whether he's guilty or not of capital murder.  But once we get to the punishment stage, well, you know, things may change.

For example, Special Issue No. 2, I know you've looked at it a couple of times already, but here, you know, the jury is trying to determine whether the person who is on trial actually anticipated whether, anticipated that a human life would be taken.  And what you're asked to do is, like Mr. Shook said, is get in somebody's mind and figure out what they were thinking.  Do you agree with me?

A.     That's how I understood it.

Q.     And, you know, there are some people that believe, well, you know, at this point I would require that Mr. Murphy get on the stand and tell me exactly what he was thinking for me to answer that in his favor.  What do you think about that?

A.      That would be up to him and his attorneys.

Q.      Okay.  And, but, what I need to know from you is, you know, would you need that to happen?  Would you require that somebody get up there and tell you what they were --

A.      No.

Q.      -- actually anticipating?

A.      No.

Q.      You would ask the State to prove that to you and if they couldn't, then you would answer it no?

A.      That's correct.

Q.      Okay.  All right.  Also, when it comes to the punishment issues, sometimes we've had jurors, and we actually had a juror, I think today, tell us that before she could answer any of those questions in favor of Mr. Murphy, she would have to hear some evidence from us.

And, as you know, the law is, you know, we're not required to do anything, as Mr. Shook has explained to you.  But -- and she understood that, but she would still want that and would hold it against us somehow if that didn't happen.  What do you think about somebody like that?

A.      I don't think that's the right way to look at it and that's not how the law has been explained.

Q.      And do you agree with that law?

1       A.      Yes.

2       Q.      Okay.  You've told Mr. Shook that, you know,

3  you agree with the fact that an accomplice could be

4  convicted for capital murder and potentially face the death

5  penalty.  And you thought that was a good law to have, is

6  that what you said?

7       A.      I think maybe I said it was a fair law.

8       Q.      It was a fair law.  What do you think about

9  that?  What kind of factors would be important to you in

10  deciding that somebody is guilty as an accomplice to capital

11  murder?  They've given you some examples, but what would be

12  an important factor to you?

13      A.      The crime they are involved in, the extent to

14  which they're involved in it, any prior knowledge of the

15  other person and their habits.

16      Q.      Okay.  Would intent mean anything to you, what

17  that person's intent was?

18      A.      Which person?

19      Q.      The accomplice that's on trial.

20      A.      Yes.

21      Q.      Okay.  And in what way would that be important

22  to you?

23      A.      I think it would be very important to know

24  what their intent was.

25      Q.      Okay.  If that person had no intent that

1   someone die, would that mean something to you?

2          A.     If that could be proven, sure.

3          Q.     And who would you require to prove that to

4   you?

5          A.     Oh, the guilt has to be proven by the

6   prosecuting attorney.

7          Q.     Okay.  The law requires, obviously, that the

8   State prove that that person had some form of intent, right?

9          A.     Correct.

10         Q.     Would you require them to prove that the

11  intent was there or would you have them somehow prove -- I

12  mean, I was getting a little confused.  How about somehow

13  prove that there was no intent?

14         A.     I think they would have to prove there was

15  intent.

16         Q.     Okay.  And if they didn't, then you would find

17  it as no intent?

18         A.     Right.

19         Q.     Okay.

20                MR. SHOOK:  Judge, if he, if the defense

21  attorney is explaining the law that we have to prove intent

22  in the guilt/innocence stage under the law of conspiracy,

23  then we object, since that person doesn't have intent.  It's

24  that they should have anticipated.

25                THE COURT:  Sustained.

1    Q.    (By Mr. Sanchez)  What I was talking about was

2  intentional behavior, doing something intentionally.  You

3  know, someone can't do something by accident and be guilty

4  of it.  You have to intend to do something for you to be

5  guilty of a crime.  That's what I was talking about, not so

6  much as accomplices were involved or conspiracies.  Can I

7  have a moment?

8         Really, what the bottom line is on

9  speaking to jurors here in these cases is that, you know, we

10  need somebody who's going to be right down the middle and

11  hold the State to their burden.  And we're going to need a

12  juror that can get up there, sit in that box, and make the

13  State prove the case to them, and not give them any help.

14         This case has had a lot of media

15  attention.  The social climate sometimes concerning these

16  cases affects people.  And, you know, you need to tell us

17  and the Court that you're the type of juror that if the

18  State didn't prove their case to you beyond a reasonable

19  doubt, that you would be able to take pen in hand and write

20  a verdict of not guilty on a document that would lead to him

21  being freed of this charge.  Are you the kind of person that

22  can do that?

23    A.    Yes.

24    Q.    Okay.  Also, if you were to find someone

25  guilty, we need to find or have jurors, and you should have

1   to tell the Court that you'd be the type of person that if

2   you didn't feel he was a continuing threat to society, could

3   actually write no as an answer to Special Issue No. 1.  Are

4   you the type of person that can do that?

5        A.    Yes, sir.

6        Q.    Okay.  And the reason I ask that is because

7   sometimes people, there's outside influences, what people

8   say, what people, you have learned through the media and

9   things like that, that would maybe keep them from doing

10  that.  They wouldn't feel right, even though the case wasn't

11  proven to them beyond a reasonable doubt.

12             So, what I need to hear from you is, are

13  you the type of person, also, that on Special Issue No. 3,

14  once you've gotten that far in the process, could really

15  give Special Issue No. 3 consideration?  And if you felt

16  there was something in the case or about the person that was

17  mitigating enough, that you could actually answer that

18  question as yes and spare the death penalty for that person.

19  Can you do that?

20       A.    Yes, sir.

21       Q.    And you wouldn't have any problems explaining

22  yourself to anybody outside the courtroom about it or any

23  concerns about having to explain your actions?

24       A.    No, sir.

25             MR. SANCHEZ:  That's all I have, Your

1    Honor.

2                        THE COURT:   Thank you, sir.   Mr. Walker,

3    if you would, please wait for us outside and I'll have you

4    back in just a few moments.

5                        [Prospective juror out]

6                        THE COURT:   What says the State?

7                        MR. SHOOK:   We have no challenges for

8    cause.

9                        MR. SANCHEZ:   We have no challenge for

10   cause.

11                       THE COURT:   Do you want to step in your

12   office?

13                       (Recess)

14                       THE COURT:   What says the State of Mr.

15   Walker?

16                       MR. WIRSKYE:   We'll accept.

17                       MR. SANCHEZ:   We'll accept the juror,

18   Your Honor.

19                       THE COURT:   Invite Mr. Walker back in,

20   please.

21                       [Prospective juror in]

22                       THE COURT:   Mr. Walker, thank you for

23   giving us a minute.   We have answered the two questions and

24   I inform you that you shall be placed on this jury.

25                       PROSPECTIVE JUROR:   That's a sobering

1  thought.

2            THE COURT:  A sobering thought.  Now

3  comes the hard part.  When you go back to the office and

4  they probably know where you are, don't they?

5            PROSPECTIVE JUROR:  Yes.

6            THE COURT:  You go back to the office and

7  say, well, I'm going to be on this jury.  What are they

8  doing to do?  They're going to talk to you about it and

9  they're going to share their opinions with you.  And the

10 lawyers are satisfied with your opinions, no one else's.  So

11 I know you have to arrange it.  That's why we're doing this

12 far enough out in advance so that you can arrange your

13 schedule accordingly.

14            You're a professional.  You will need to

15 be able to use this phone here during the trial.  It's no

16 problem.  You won't be sequestered at night.  We work normal

17 business hours.  I think that you have seen when I say we

18 start at 1:30, you were in the chair at 1:30.

19            I can promise you I will not waste your

20 time.  In fact, I've been told by jurors, Judge, please give

21 us a break.  You're working us too hard.  So I try to

22 balance everybody's needs the best we can.  But it's

23 extremely important.

24            Now, I'm going to give you a written

25 instruction form and ask you to go over that with the

1    Sheriff, as well as a supplemental contact information

2    sheet.  As you can tell, I'm a computer geek and I

3    understand that.   I make notes the whole time through this

4    trial and the information that you provide on the

5    questionnaire is stored digitally in my computer.

6              The only way that anyone outside this

7    courtroom -- the attorneys and myself are the only ones that

8    have access to this information.  The only way that this

9    information will be released is by a written court order

10   from the Court of Criminal Appeals in Austin.  Short of

11   that, it's not leaving my control.  I can assure you that.

12             Now, once again, you have to tell your

13   office you're going to be on jury duty, block out two weeks

14   for me November 10th, and don't talk about it any further.

15   After the trial is over, you can talk all you want about it.

16   But before and during the trial, you've got a gag order.

17             PROSPECTIVE JUROR:  Okay.

18             THE COURT:  Like I said, we'll do the

19   best we can on allowing you to make phone calls on morning

20   breaks and we'll have lunch breaks for you, so you won't be

21   shut down.  The only time you may be sequestered, that means

22   staying in a hotel overnight, would be during deliberations.

23             After the jury has received the charge

24   from the Court, which is the written jury instructions, and

25   the attorneys have argued, the jury goes back to deliberate.

1   At that point they cannot separate.  So if it takes you, you

2   know, half a day, one day, two days, or like California,

3   four months, we'll wait.

4                   So that people like to know that you will

5   not be sequestered, provided the jury can follow my rules.

6   And that hasn't been a problem in the last 15 years that I

7   know of, so I don't anticipate it being an issue.  Now, do

8   you have any questions of me?

9                   PROSPECTIVE JUROR:  No, sir.

10                  THE COURT:  You will think of them as

11  soon as you walk out the door.

12                  PROSPECTIVE JUROR:  I'm sure.

13                  THE COURT:  The Sheriff will be visiting

14  with you here in the back for a few minutes.  Now, we will

15  be getting back together at some point when I have this jury

16  complete.  I can't tell you what day that will be.  But I

17  will be issuing a notice for you to reappear for a one to

18  one and a half hour morning session prior to the 10th of

19  November.

20                  I don't know what day that will be.  I

21  will try to do it a week ahead of time, but it all depends

22  on when I get this jury completed.  The reason I do that is

23  there are certain things that I cannot go through until I

24  have everybody here.  We'll be getting a lot of information

25  out of the way this afternoon, but I can't get it all done

1    until I have everybody in the box.

2                    So for your planning schedule, two weeks

3    beginning November 10th, you will have that in writing.  She

4    will give it to you later.  Two weeks, November 10th, and

5    you will get another letter from me for another court

6    appearance prior to that.  Fair enough?

7                    PROSPECTIVE JUROR:  Yes, sir.

8                    THE COURT:  Any questions, you can ask

9    her today, I can try to answer along with the parties, but

10   after today I can't talk to you.

11                   PROSPECTIVE JUROR:  Okay.

12                   THE COURT:  We have that appearance of

13   impropriety.  It's kind of like the certain public figures

14   in the newspaper, it just looks bad if you see it.  So if

15   you see me in the hallway in the back, I'm not going to talk

16   to you.  I'm not going to say good morning, I'm not going to

17   say hello, how are you, the weather is nice.  I'm not going

18   to say anything.  I'm going to be rude.

19                   The reason for that is the appearance of

20   impropriety, because if somebody is observing us from a

21   distance, they don't know what we're talking about.  That's

22   the Sheriff.  That's her job.  She's supposed to take care

23   of the jury.  She can answer some questions, some she

24   cannot.  So that's the rule.

25                   You, I mean, I'm real, real strict about

1   that, because I don't want anybody to say that Judge

2   Cunningham was improper.  That's just not going to happen.

3   So I want you to understand, going in, that I'm going to be

4   rude.  So will the lawyers when they see you, they just

5   can't have any contact with you.

6                    The idea is that everything that you will

7   make your decision on will come from that witness stand and

8   that witness stand alone.  No media, no Internet no friends,

9   anything.  Fair enough?

10                    PROSPECTIVE JUROR:  Yes, sir.

11                    THE COURT:  If you would, retire to the

12  jury room with the Sheriff and she'll go through some more

13  documents with you.  Thank you, Mr. Walker.

14                    [Prospective juror out]

15                    THE COURT:  Sandra G. Barron.

16                    [Prospective juror in]

17                    THE COURT:  Good afternoon.

18                    PROSPECTIVE JUROR:  Hi.

19                    THE COURT:  We have juror No. 3092,

20  Sandra G. Barron; is that pronounced correctly?

21                    PROSPECTIVE JUROR:  That's right.

22                    THE COURT:  Good afternoon, Ms. Barron.

23  Sorry to keep you waiting.  We start at 1:30 and we catch

24  the first one in the door and go from there.  We have to

25  balance, we don't know if we'll talk to someone for just a

1    few minutes or an hour and a half, so I have to balance 15

2    people waiting or one or two people waiting.  So I apologize

3    for the delay.

4                    PROSPECTIVE JUROR:  Okay.

5                    THE COURT:  Obviously, you had enough

6    time to read the guide that I provided for you?

7                    PROSPECTIVE JUROR:  Yes.

8                    THE COURT:  And hopefully you reviewed

9    your questionnaire that you filled out for us in May?

10                   PROSPECTIVE JUROR:  Yes.

11                   THE COURT:  I know it can be complicated

12   and this is the opportunity for the attorneys to visit with

13   you and bring you up to speed and help you understand how

14   all this law relates to the particular case at hand.  And

15   the bottom line is there are no wrong answers.

16                   PROSPECTIVE JUROR:  Okay.

17                   THE COURT:  People come in a little

18   nervous sometimes.  And try to relax and just tell them

19   what's on your mind, give your honest opinions.  Only

20   question I have for you at this point is will you be able to

21   serve the Court for a period of two weeks beginning on

22   November 10th?

23                   PROSPECTIVE JUROR:  I don't know why I

24   shouldn't.  I did just start a new job and that is my only

25   concern.

196

1          THE COURT:  And work is always a concern

2   and it's one of those things like paying taxes, nobody wants

3   to do it, and it's just one of those things we have to do

4   sometimes.  We will be able to use the phone during the day,

5   so you will be able to at least keep up with your office, if

6   you need to be able to contact them.  We do work normal

7   business hours.  So if you had to run by in the afternoon to

8   kind of pick up the pieces, if you will, you would have time

9   to do that.

10          So the only questions I have to answer at

11  the end of the process would be, number one, do you

12  understand the law?  And, number two, can you follow the

13  law?  That's the big picture I'm looking for this afternoon.

14  So that's what the attorneys will help you with.  At this

15  time I will turn it over to Mr. Wirskye.

16          MR. WIRSKYE:  May it please the Court?

17          SANDRA BARRON,

18  having been duly sworn, was examined and testified as

19  follows:

20          DIRECT EXAMINATION

21  BY MR. WIRSKYE:

22     Q.    Ms. Barron, how are you this afternoon?

23     A.    Fine.

24     Q.    Okay.  My name is Bill Wirskye and I'll be the

25  Assistant District Attorney that will be visiting with you

1    for the next few minutes.   I appreciate your patience as the

2    afternoon has kind of drug on.

3              What I'd like to do is follow up on some

4    of the information in your questionnaire with you, talk to

5    you a little bit about your thoughts and feelings on the

6    death penalty, how you might feel if you were selected to be

7    on a death penalty jury, then maybe talk a little bit about

8    some of the laws and rules that apply in a criminal case

9    and, most particularly, a death penalty case such as this.

10   You said you just started a new job?

11        A.   Yes.

12        Q.   Where are you working?

13        A.   It's for a company called Extria (phonetic)

14   and it's in Richardson.

15        Q.   And I know you were in the field of technical

16   writing?

17        A.   Yes.

18        Q.   What are you doing for them?

19        A.   I'm doing the same thing, online help and

20   documents for computer systems.

21        Q.   Okay.   We had a technical writer in here I

22   guess last week, and he found three or four errors in all

23   our paperwork.   I think when we get around to looking at

24   that big board over on the wall you may find a few

25   misspellings and a few things like that.   How long have you

1  been working there?

2        A.      Since July 7.

3        Q.      Okay.  And what type of hardship do you think

4  it would be for you?  Obviously, it's not a legal excuse

5  but, you know, the parties need to know kind of what is

6  going on with everybody.

7        A.      I would be able if -- I'm sure I could work in

8  the evenings and catch up.  I am the only person that does

9  that type of job there, so -- but my employer didn't seem to

10  have any problems or have any extra questions about, you

11  know, my coming here today.

12        Q.      Okay.  You know, legally we can't excuse you,

13  just because it's a hardship.  It's, I guess, a hardship to

14  everybody.  Sometimes we tell us, or people tell us, that

15  whatever they have going on in their professional or

16  personal life is so pressing to them or would be, I guess,

17  to the forefront of their mind so much, they express a

18  concern about, you know, being able to listen to all the

19  evidence and give the trial their full attention.

20                And if they feel that way, that's fine.

21  We understand.  It's just, obviously, something we need to

22  know.  And how do you think it might affect you?

23        A.      Oh, I don't think it would be -- it'd be a

24  distraction.

25        Q.      Okay.  Fair enough.  You were kind enough to

1  fill out this long questionnaire for us.  You know, we ask

2  just about everything we can think of.  One of the things

3  that I always find fascinating and I don't know if it's

4  really helpful, but on page 15, if you want to follow along,

5  we asked you to kind of list publicly known people you most

6  and least respect.

7          And you had two names on there for women

8  you most respect.  And I think I recognize the names, but

9  I'm not sure exactly how I recognize them.  And the first

10  was Sarah Weddington.  Is that an attorney?

11      A.      Yes, from Austin.

12      Q.      That's what I thought.  Tell me why you

13  respect her.

14      A.      Sarah Weddington, Rowe vs Wade.

15      Q.      Okay.  That's where I've heard it.  Okay.  And

16  the one after that, I guess?

17      A.      Veletta Lill.

18      Q.      Who is that?

19      A.      Okay.  Who is your city council

20  representative?

21      Q.      That's a good question.

22      A.      No, I might not have spelled her name

23  correctly, so you might not have recognized it because of

24  that.

25      Q.      In all fairness, I don't live in the city of

1   Dallas.

2        A.     Okay.

3        Q.     Okay.  Fair enough.  Let's talk a little bit

4   about the death penalty.  I know we asked you on that first

5   page if you were in favor of the death penalty and you

6   marked yes, but you kind of acted like you weren't one

7   hundred percent sure.  You said, I'm not sure I favor the

8   death penalty over other types of punishment.  Explain to me

9   kind of what is going on with your thoughts and feelings

10  about the death penalty.

11       A.     I don't know that I think it's a better type

12  of punishment than life in prison.  But I think that it can

13  certainly be considered.  I don't know how if, are you in

14  favor of anything like that, I don't know.  I guess I think

15  of it in my own terms, no, I don't want to die, and no, I

16  don't want to go to prison.

17       Q.     Do you think that you could consider it as a

18  possible punishment for another human being?

19       A.     Yes.

20       Q.     Okay.  Why do you feel that way, that you

21  could consider that type of punishment?

22       A.     I think for cases there is times that that's,

23  that's a fair, or, penalty.  I know it's -- the State of

24  Texas recognizes it.  I don't, you know, I don't know that

25  it's -- I don't come in here thinking that everybody should

1    be put to death.  But I don't come in here thinking that no

2    one should be.

3         Q.     Uh-huh.  You know, we have some people that

4    tell us, you know, if it's the law in the State of Texas, I

5    could follow the law.  And I think personally they're very

6    conflicted inside.

7         A.     Oh, I see.  So you're trying to figure out if

8    I -- no, I could give someone the death penalty.

9         Q.     Okay.  When you talked about certain types of

10   cases, what comes to mind?  What type of case comes to mind

11   for you?

12        A.     Well, certainly a murder and a violent crime.

13        Q.     I know you put in your questionnaire, I think

14   maybe rape, maybe certain rape cases?

15        A.     Right.  I think those are crimes of violence.

16        Q.     Okay.  In Texas, as you probably got a chance

17   to read in the packet, we reserve the death penalty for

18   consideration just in murder cases and then only a certain

19   subset or certain type of murder case.

20                    Murder of a police officer, fireman on

21   duty, murder in the course of another crime like burglary,

22   robbery, rape, mass murder, serial murder, murder of a child

23   under six, that type thing.  Is that a list that's pretty

24   much in accord with your feelings about the type crimes that

25   should be considered?

1    A.    Yes.

2    Q.    Okay.  Is there any case that you may have

3  followed in the media, heard about, read about, seen on TV,

4  that comes to mind and you think, you know, gee, that person

5  deserved the death penalty, or that's a worthy candidate for

6  the death penalty?

7    A.    I don't keep up with the news as I should.

8  And I can't think of any of the names.  But I think anywhere

9  a child was killed or -- I'm sorry, I just can't think of

10  any.

11    Q.    Okay.  I notice on, I think it was on maybe

12  page 3, you know, we asked you a couple of questions about

13  do you have any moral, religious, or personal beliefs that

14  would prevent you sitting in judgment of another human being

15  and you marked no.  And you said, I know it will not be

16  easy, but I can do it.  Is that something you are really

17  comfortable with?  Kind of --

18    A.    Well, that's how I feel.  I don't think you

19  could make that decision very easily without -- you'd have

20  to have some consideration and -- and you are taking

21  somebody else's life.  I mean, I -- but that's just about

22  how I feel.  It's not easy.

23    Q.    Okay.  And we asked you the best argument in

24  support of the death penalty is.  And, basically, what you

25  wrote, I think, you know, an eye for an eye type idea.  And

1    I was just curious if that's something you subscribe to, the

2    eye for an eye philosophy?

3         A.    I don't think it's always equal.  I mean, not

4    everyone who murders somebody should be put to death.  But I

5    suppose I do subscribe to it.  I wrote it down.

6         Q.    Okay.  And, you know, we asked the best

7    argument against the death penalty and you put it is

8    inhumane.  Is that something you personally subscribe to,

9    that idea of the death penalty or at least the process or

10   how we do it is inhumane?

11        A.    Well, it is inhumane, but sometimes it's

12   deserved.

13        Q.    Okay.  I guess, to be more specific, what

14   particular aspect of it do you believe would be inhumane?

15        A.    Well, no one wants to die early.  No one wants

16   to.  I've -- I don't know.  It's not something you do every

17   day.  It's not --

18        Q.    Okay.  Finally, we asked people to kind of

19   rank themselves on a scale of 1 to 10 kind of where they

20   come down on the death penalty, 10 being the most and 1

21   being the least.  And I think you gave yourself an 8.

22        A.    Eight.

23        Q.    And I know that means different things to

24   different people, but I was kind of curious because I sense

25   some hesitation in the questionnaire and in talking with

1    you, but 8 is kind of towards the high end of the scale.   I

2    was just curious what that 8 meant to you?

3          A.      Well, it didn't mean a perfect 10.   But I do

4    think that there's times that the death penalty is fair.

5          Q.      Okay.

6          A.      Or deserved.

7          Q.      Let me kind of follow up and take it kind of

8    down to the next level of analysis, because we talk to so

9    many people, and, as you can imagine, we have the entire

10   spectrum of beliefs on the death penalty.   People that never

11   believe in it, people that believe in it too strongly, and,

12   of course, those ends of the extreme wouldn't be fair and

13   wouldn't be the right juror for a case.

14                But we always ask people how they feel

15   about this aspect of the law.   You know, oftentimes crimes

16   are committed by more than just one person, whether it be

17   something from a shoplift all the way up to a capital

18   murder.   And the law says that we can prosecute every

19   individual that's actively participating in a crime.

20                And when you're talking about that in the

21   context of capital murder, you may have a situation where

22   you just have one person who actually pulled the trigger,

23   who caused the death.   We'll call them the triggerman for

24   lack of a better word.

25                You may have other people, other

accomplices, is the word we typically use, who are actively

involved in a crime, but didn't actually cause the death,

didn't actually pull the trigger, the nontriggermen.

And some people we talk to, you know,

they may be in favor of the death penalty for that person

that pulled the trigger.  They believe it would be justified

in that case for whatever reason.  Usually because that

person has taken a life, they consider it might be a just

punishment to take theirs.

But they tend to draw a line sometimes

and they say with respect to the accomplices, the

nontriggermen, you know, I may want to punish them and hold

them accountable and give them a life sentence, but I just

don't believe in my heart of hearts that the death penalty

is appropriate or justified for those accomplices, because

they didn't actually take a life, that type thing.  How do

you see that issue?

A.     I think you'd have to ask, did the person who

didn't shoot the gun, would he have done it if he had the

opportunity?  Um, and I guess that's a question I'd ask.

Q.     Okay.  Let me kind of explain what the law is

to you to make sure because, you know, the worst fear on

both sides is that we put somebody over in the jury box and

we try to put them in -- we put them in a hard position.  We

didn't want them to violate any moral or any matter of

1  conscience for them.  So that's why we go into detail on

2  certain aspects of the law.

3                  What the law is, is this, and I'll just

4  give you an example to kind of illustrate it.  Let's say Mr.

5  Shook and I, the other prosecutor, decide we're going to rob

6  a bank.  We get together and agree and plan that he's going

7  to take the pistol in.  He's going to hold up the tellers.

8  And while he does that, I'm going to come in with a bag and

9  kind of clean out the cash drawers.

10                 And that's the plan we make.  No one is

11  supposed to get hurt.  And we go in to do that bank robbery.

12  And as he's holding those tellers at bay with the pistol,

13  for whatever reason, maybe one of them looks at him funny or

14  we see one of them going for a silent alarm to summon the

15  police, he shoots and kills, intentionally shoots and kills

16  one of those tellers.

17                 Now, obviously, he's committed an

18  intentional murder in the course of a robbery.  He could be

19  convicted of capital murder and potentially face the death

20  penalty.  The law says, depending on the facts and

21  circumstances, that I could, too.  Whether, even if I didn't

22  have any intent that somebody get killed, even if I was

23  unarmed.  I'm just curious what you think about that aspect

24  of the law?

25          A.      Then I would say you could get the death

penalty, too.  I mean, I wouldn't have any trouble if

somebody ended up dead in all that and you helped plan it.

I would think that probably y'all didn't have a big

discussion about who would die and who wouldn't.

Q.     I mean, that was the plan.  We were -- you

know, I just signed up for a bank robbery, you know.  I had

no intent anyone could get hurt.  In fact, I could have

stood there and said, you know, Mr. Shook, don't shoot them,

and he could have shot them anyway and killed them.  But the

law says, depending on the facts and circumstances, I could

still be subject to the death penalty.

             And that's where a lot of those people

draw the line, because I think, to them, and maybe such as

yourself, that intent is very important.

A.     Uh-huh.

Q.     You know, if the accomplice had the intent

that a capital murder happen or somebody would die, they see

that as a very clear case where the accomplice could get the

death penalty.

             But I think, again, a lot of people draw

that line with the accomplice's intent.  And I think where

some people have moral objections to it is the situation

where the accomplice didn't have the intent that someone

die.  And I'm just curious what you think about that

particular situation?

1    A.    Well, if he just happened to be there, I

2  guess, and, and, but, I don't know, I think that he would -- the

3  death penalty, if the law says it can be considered, then it

4  needs to be considered.  Could I tell you how I'd vote?  And

5  I don't know.

6    Q.    And, obviously, you know, we can't get into

7  the facts of this case and we can't ask you how you'd vote

8  in this case.  Again, we just want to make sure that, you

9  know, the people we get on the jury box, we don't ask them

10  to violate their conscience.  We don't want them to hold a

11  belief that would somehow impair them from being able to

12  follow the law that applies in the case as a matter of

13  simple fairness for both sides.

14    And to be very frank with you, the reason

15  I go into it is we are prosecuting this case under that

16  theory of accomplice liability, that Mr. Murphy was an

17  accomplice in this case.  And that's why we spend so much

18  time.  And we know these are not matters that most people

19  think about routinely.  You probably never considered this

20  issue, until just a few minutes ago.

21    And that's why I want to give you enough

22  time to really think it through, because once you get over

23  there in that jury box, it's too late.  This is the time to

24  kind of work through those kind of meddlesome issues and

25  make sure that you, I guess, agree with the law, especially

1    under that scenario where the accomplice didn't have any

2    intent.

3         A.     Um, I agree with it, I mean, I can see both

4    sides.  I can see that if you're plotting to just, you just

5    want some money, you didn't want to kill anybody.  And you

6    guys go in, then maybe you shouldn't be responsible.  But,

7    by the same token, you were there and you agreed to do this.

8    You knew it would be a crime.  I mean, you must have

9    considered the risks or you wouldn't have taken a gun or

10   your friend wouldn't have taken a gun.

11        Q.     Uh-huh.  How would you personally feel about

12   being involved in a case where that is the situation, where

13   an accomplice is possibly facing the death penalty?

14        A.     Well, it's not something a person looks

15   forward to.

16        Q.     Sure.

17        A.     But I think I could be a fair-minded person.

18   And I think I could consider the evidence.

19        Q.     Okay.

20        A.     I didn't look forward to being on the rape

21   trial, but I think I was fair on that.

22        Q.     Okay.  I want to visit with you about that in

23   just a minute.  But just to kind of wrap up our discussion

24   about accomplices.  What the law is, is if a jury finds

25   that, even though I didn't have any intent that someone die,

1    if the jury feels that I should have anticipated that a life

2    could be taken, then I could be convicted as an accomplice

3    and potentially face the death penalty. Does that make

4    sense to you?

5        A.    So you're saying that the person should have

6    known that he would be in a situation -- I'm sorry, I guess

7    I was thinking about something else.

8        Q.    Going back to our example. If the jury feels

9    that, you know, even though I didn't have any intent for

10   Mr. Shook to shoot and kill someone and commit a capital

11   murder, if the jury thinks that I should have anticipated

12   that a life could be taken during that bank robbery, then

13   they could convict me of capital murder and I could face the

14   death penalty.

15       A.    Oh, so if the jury thinks that you should have

16   anticipated that, then the jury can convict you. Um, that

17   makes sense.

18       Q.    Why do you think that makes sense?

19       A.    Well, you should know what you're walking

20   into. And you should know things don't always play out the

21   way you think they will.

22       Q.    Do you think, knowing in your heart of hearts

23   how you feel about the situation, that you could ever assess

24   the death penalty for an accomplice that didn't have that

25   intent, depending on the facts and circumstances?

1      A.      I think I could assess a death penalty.

2  Otherwise, I wouldn't have said that.

3      Q.      Okay.   Fair enough.   Let's talk a little bit

4  about, you mentioned you were on a rape trial.   And when was

5  that?

6      A.      It was about 1989.

7      Q.      Okay.   It looked like there were a couple of

8  different cases or a couple of different counts; is that

9  right?

10      A.      He was charged with three counts of rape.

11      Q.      Do you remember the facts of that case?

12      A.      Yes.   Um, the defendant would go to apartment

13  complexes and find the cute girls who were showing

14  apartments and say, gee, I want to rent an apartment.   And

15  then, this was when, of course, it had happened years before

16  it ever came.   And so they weren't very careful about

17  getting the names of people that they took up to the

18  apartments.   And then he would put, get somebody in a

19  compromised, you know, he'd corner them somehow, and rape

20  them in the vacant apartment and leave.

21      Q.      Did the person use a weapon?

22      A.      No.

23      Q.      Okay.   From what you remember, do you feel, I

24  think they found him guilty; is that right?   On all the

25  charges?

1          A.      Yes.

2          Q.      Was the evidence pretty straightforward in

3   your opinion that he was guilty?

4          A.      Yes.  It was pretty straightforward.

5          Q.      Okay.  And I think you were also called upon

6   in those cases to set the punishment --

7          A.      Yes.

8          Q.      -- for the person.  Do you remember what that

9   person got?

10         A.      Yes.  Because that was the biggest part of the

11  discussion.  There were three counts.  And on the first

12  count we gave him 55 years, on the second count 65, and the

13  third count 75.

14         Q.      Okay.  How did y'all arrive at that?

15         A.      Because two people thought that he should get

16  probation because -- or he should have some sort of feeling

17  that he could get out of jail at some point, I don't know.

18         Q.      It sounds like you weren't one of those

19  people.

20         A.      I was not one of those people.

21         Q.      Okay.

22         A.      So, anyway, there were other people that

23  thought it should be life.  So we decided at 8:00 at night,

24  55, 65, and 75.

25         Q.      Did the person charged testify in that case,

1   do you remember?

2        A.      No.

3        Q.      Okay.  When you got to the second part of the

4   trial, the punishment phase, did you -- were any prior

5   convictions or criminal history, were they introduced or

6   anything like that?

7        A.      I don't know if that came out during the

8   punishment phase.  After it was over they did tell us that

9   he was charged in Denton County with the same thing.  But I

10  don't think that came up during the trial, but --

11       Q.      Okay.  Having had that experience, how has

12  that kind of shaped your views about the criminal justice

13  system, serving on that type of case?

14       A.      Well, you meet all kinds.  Twelve people can

15  certainly have different opinions after they hear the same

16  story.

17       Q.      It sounds like if it were up to you, you might

18  have given him more time, or --

19       A.      Yes, but I was satisfied.  I agreed.

20       Q.      Okay.  I assume going into that case, you knew

21  nothing of what you were getting yourself into?

22       A.      No.

23       Q.      Okay.  Let me follow up on this case because

24  you, like everybody we've talked to, has indicated they've

25  heard something about this case --

1       A.      Yes.

2       Q.      -- which is a little unusual.  You know, in

3  your case everybody went in with a clean slate, not knowing

4  anything.  In this case, you know, almost everybody we

5  talked to knows something.  Some know a lot, some don't know

6  much, some have done some research, some haven't.  And it

7  affects different people differently.  But, tell us what you

8  know about this case.

9       A.      Well, I don't read every article in the

10 newspaper.  But I know Aubrey Hawkins was killed by the

11 Texas Seven, I think they were called.  And it was at

12 Oshman's in Irving.  And then they were -- nobody could find

13 them until they were up in Colorado.  And I believe that the

14 other defendants have received the death penalty.

15              But I will tell you, I know that because

16 that's what my father said to me, not because -- and I have

17 been wondering if that's true, but I don't really know.  And

18 I haven't -- I just haven't taken the time to find out.

19      Q.      I guess typically people share with their

20 loved ones what they're coming down for, jury duty, and it

21 sounds like you got in that discussion with your dad; is

22 that right?

23      A.      Yeah, I mean --

24              THE COURT:  Ms. Barron, if you would,

25 could you give us a minute and wait for us outside and we'll

1  have you right back, okay?  We need to take a quick break.

2                    PROSPECTIVE JUROR:  Pardon me?  You want

3  me to leave?

4                    THE COURT:  Yes, ma'am.

5                    PROSPECTIVE JUROR:  Okay.

6                    THE COURT:  We need to take a quick

7  break.  If you would, I need you to wait outside.

8                    [Prospective juror out]

9                    THE COURT:  Let the record reflect the

10  potential juror Sandra G. Barron is excused.  I need to make

11  a disclosure to the parties in this matter.  I didn't

12  realize who it was.  I haven't seen her in probably 20

13  years.  Her mother and father are family friends and her

14  mother actually had a fundraiser party for me at -- in their

15  neighborhood.

16                    I believe, if I recall correctly, that my

17  father and mother were 50-year friends of her parents.  And

18  then when her -- she said her dad, then it all snapped

19  together.  She probably doesn't remember who I am and I was

20  not going to make that disclosure.  But I didn't want to sit

21  here after I realized who she was.

22                    MS. BUSBEE:  You scared her.

23                    THE COURT:  As soon as she said her dad

24  and her dad's name is Dale, I think.

25                    MS. BUSBEE:  Well, I don't see any

1    reason, if she doesn't recognize it, to go into it, do you?

2              THE COURT:  I just wanted to put that out

3    there so --

4              MR. WIRSKYE:  If I can inquire of the

5    Court, does the Court recall having any conversation with

6    Ms. Barron's father about these cases?

7              THE COURT:  Oh, no.  I haven't -- I

8    haven't seen her mother -- her mother is Patricia.  I

9    haven't seen Patricia for probably two years.  And it was at

10   a Republican deal.  But they did have a fundraiser for me.

11   So, I mean, that's just --

12             MS. BUSBEE:  Well, but you're a neutral

13   party in this issue.

14             THE COURT:  I am.  I just, I just didn't

15   want it to come back later and say, well, you know,

16   Cunningham put a ringer on the jury.

17             MS. BUSBEE:  Oh, no, no, no, no, no.

18             THE COURT:  I'm just making the

19   disclosure.  You can do with it what you will.

20             MS. BUSBEE:  We appreciate that, Your

21   Honor.  Thank you.  We thought maybe it was the banging over

22   here.

23             THE COURT:  No, I didn't hear that.  I

24   was looking at her and listening to the voice and she's my

25   brother's age.  And I've been in their home and that type of

1   deal, but it's been a while.  And then I realized that she

2   has never married, so.

3                   MS. BUSBEE:  That's suspicious.  I'm just

4   kidding.

5                   THE COURT:  So that's why I wanted to

6   make the disclosure.  So if you would, invite Ms. Barron

7   back in, please.

8                   [Prospective juror in]

9                   THE COURT:  I'm sorry for the

10  interruption.

11                  PROSPECTIVE JUROR:  That's okay.

12                  MR. WIRSKYE:  May I proceed?

13                  THE COURT:  Yes, sir.

14       Q.    (By Mr. Wirskye)  Okay.  Ms. Barron, I want to

15  assure you that you didn't do anything wrong to cause that

16  delay.  More importantly, I want to assure you I didn't do

17  anything wrong.  Judge Cunningham, who it turns out you may

18  have heard of or may know, or have met, in keeping with the

19  legal procedure, I think realized that he probably, his

20  parents know your parents, and they may have had a

21  fundraiser for him, and --

22       A.    Well, I don't -- I mean, yeah, I know you.  I

23  know your dad's -- I think your dad's Bulldog or you're

24  Bulldog, one of you.  Anyway --

25       Q.    They both have a similar countenance.

1       A.      Anyway, I don't remember any fundraisers or

2   anything.  But, yeah, your name is familiar to me, but --

3       Q.      I was just curious when you talked with your

4   dad, and did he mention that he knew whose court you were

5   coming down to or had had a fundraiser for Judge Cunningham?

6       A.      Oh, no.  He didn't mention fundraisers or

7   anything like that.  But he just, he probably said, yeah,

8   you remember Bulldog Cunningham, excuse me, and I said, no,

9   Daddy, I don't remember, you know.  But I'm not denying

10  that, I mean, I know the McKinneys live down the street from

11  us and my sister was a friend of Tammy McKinney, so.

12      Q.      Okay.  Well, as I said, different people have

13  different exposure in different ways to this case and it

14  affects people differently.  But it sounds like you

15  obviously have a connection at least to the Court and have

16  heard about --

17      A.      Probably, I know Judge Cunningham.  I know

18  more about him than I would know somebody else, but --

19      Q.      Well, we probably need to talk later, then.

20  But, I guess, you know, we always ask people to kind of look

21  in their heart of hearts.  It sounds like you know some of

22  the details of the crime, the capture, and what's gone on in

23  some of the subsequent court cases.

24              You know, like I said, it is a very

25  unique deal.  It's not like the last case you served on

where you start with that clean slate.  And I think both

sides worry sometimes that jurors have too much knowledge

and they don't start with that clean slate.  And I'm just

curious.  How do you think that would affect you?

A.      About what I know?  I don't know.  I don't

feel like I know as much as some of the other people that

really read the paper real closely.  And I'm embarrassed to

admit that I don't read the paper that closely.

Q.      Have you formed any opinions about what

happened?

A.      Well, I mean, I --

Q.      It's only natural to feel --

A.      Yeah, I think he was killed when those seven

people robbed that store and I know they went to Colorado

and one of them committed suicide.  And have I formed an

opinion?  Well, he hasn't been tried.  I mean, I'll try to

be fair about it.  I'm not walking in saying he's guilty.

Q.      Sure.  And I think everybody, you know, wants

to think they can be fair.  This case just is so kind of

unusual because of the amount of publicity and we have

jurors, such as yourself, that know about the facts and the

outcomes of the other trials and, you know, we just kind of

leave it up to you.

We know everybody wants to say they can

be fair and we admire that, but not everyone is a perfect

1  juror for a perfect type case.  Obviously, in the rape case,

2  since you didn't know anything about it, it sounds like you

3  were a good juror from our perspective.  But I'm just

4  concerned maybe that you're not the perfect juror for this

5  case, based on what you've heard.  And only, you know, you

6  can tell us.

7              What the law says is that, you know, you

8  kind of have to put those opinions out of your mind and just

9  base your verdict on the facts that you hear in the

10  courtroom.  And I think the concern from both sides is that,

11  you know, you may have heard something, read something,

12  gotten a snippet word of mouth from your father, and you'd

13  kind of, that would be in the back of your head and

14  potentially influence your verdict.  How do you feel about

15  that?

16      A.     Well, some things my father says are not in

17  the back of my head.  But I think I could be honest.  I

18  mean, I would walk in here with the idea the man is innocent

19  and listen to the evidence.  Now, I don't know if I would be

20  a perfect juror or not.

21      Q.     Okay.  You know the law, sometimes we kind of

22  have to deal in absolutes and yes or no's, and sometimes I

23  think doesn't read real well, if somebody has to read the

24  record on down the line.  But do you think you can base your

25  verdict in this case, knowing what you know, just based on

1  what you hear in the courtroom and not based in any way on

2  what you may have heard outside the courtroom?

3       A.      Yes.

4       Q.      Okay.  Fair enough.  Let's talk a little bit

5  about these Special Issues.  These are what you get to, if

6  you found a person guilty of capital murder.  The answers to

7  these three questions determine the appropriate sentence in

8  the case.  We don't ask a juror to write in life sentence or

9  write in death sentence.  We ask a juror to answer these

10 questions and let those answers determine the sentence.

11           If they are answered in such a way, well,

12 basically just kind of in a nutshell, we'll visit about them

13 more in a minute, but that first question asks if the person

14 would be a future continuing threat to society.  If that's

15 answered yes, then you move to the second question which

16 asks, basically, it's kind of the accomplice situation, did

17 a person anticipate that a human life would be taken?  If

18 that question is answered yes, then we move to the final

19 question which, basically, is mitigation.

20           Is there some reason in the facts of the

21 crime, the facts of the background of the person, the blame

22 he bears, that his life should be spared?  And if that

23 question is answered no, then the Judge has no discretion

24 and the defendant will be sentenced to death.  If the

25 questions are answered any other way, they're looking at a

1  life sentence.  You look like --

2       A.     So if all three are answered no, then the

3  death penalty is the result?

4       Q.     If the first two are answered yes --

5       A.     Oh, the first two, and last one is no?

6       Q.     Yeah.  If you think he's a future danger and

7  you think at the very least he anticipated that a life would

8  be taken, and the third one is answered no, there's nothing

9  mitigating, then a death sentence would result.  If the

10 questions are answered any other way, then the person would

11 be sentenced to a life sentence, which are the only two

12 possible punishments for capital murders.  Does that kind of

13 make sense to you?

14      A.     Yes.

15      Q.     Okay.  Take a second and read those questions

16 again.  I know you're a technical writer, so you'll probably

17 read for form and content, but --

18      A.     Well, I'm not going to let you read everything

19 I've written either, so.  You can find some type-o's in my

20 work.

21      Q.     They're phrased a little bit differently than

22 they are in the packet and we can visit about them after you

23 read them.

24      A.     Okay.  I forgot your question, I'm sorry.

25      Q.     Oh, I just wanted you to look at the questions

1    so we can talk about them.  That first question asks, if

2    there is a probability that the defendant would commit

3    criminal acts of violence such that they'd be a continuing

4    threat to society.

5              Do you see how that question kind of asks

6    you to make a prediction about future behavior?

7         A.    Right.

8         Q.    Is that something you think you'd be

9    comfortable in doing?

10        A.    Yes.

11        Q.    Okay.  To answer that question or make that

12    sort of prediction, is there some particular type evidence

13    that you would think you'd need to make that prediction?

14        A.    Well, I mean, based on previous actions kind

15    of tells you what somebody is like.

16        Q.    And that's what a lot of people tell us most

17    commonly, you know, that I guess the past is the best

18    indicator of the future.  You know, a leopard doesn't change

19    his spots, that type of thing.  Then you have that phrase,

20    "criminal acts of violence."  What type of crimes or what

21    type of acts come to mind when you see that phrase?

22        A.    Well, I mean, obviously, murder and,

23    obviously, the situation where they were in a, robbing a

24    store.  Any other, um, I don't know, you could beat somebody

25    to death, I suppose, and take their car or something.

1          Q.      Okay.   Rape, the type of case you sat on.

2     What the law requires when we get to these Special Issues is

3     that a jury doesn't, I guess, automatically answer them

4     based on what they did in the first phase of the trial.

5               A lot of people tell us they'd have a

6     difficult time doing that, keeping that open mind.  And they

7     tell us this, they say, you know, I know I'm supposed to

8     keep an open mind when I get to that first question, but,

9     you know, you are kind of asking me to go against common

10    sense because I just found the person guilty of capital

11    murder.

12              I think if I do that, then I'm probably

13    going to think they're a future danger.  You know, I'm going

14    to already have that question answered, you know, just

15    because I found him guilty of capital murder.  What do you

16    think about that?

17         A.      Well, that would be difficult.  I mean, if

18    somebody commits capital murder, it's pretty hard to say

19    that they wouldn't be violent.

20         Q.      A lot of people feel that way.  That's kind of

21    a common sense proposition.  The law actually is that you

22    can't automatically answer that question, just based on

23    finding them guilty of capital murder.

24              That, very frankly, a lot of people tell

25    us they couldn't do that, that they couldn't keep that open

1  mind, that if they had found somebody guilty of capital

2  murder, that question is always going to be answered yes,

3  because they're always going to think a person capable of

4  capital murder is always going to have that probability that

5  he'd be a future danger to society.

6      A.    I guess the only other option, I mean, the

7  argument is that the -- in those circumstances, if the

8  circumstances had been different, it might not have

9  happened.  Therefore, if circumstances are different when

10 they're out of jail or when they're, you know, out in

11 society, might not be faced with the same circumstances;

12 therefore, it wouldn't happen.

13     Q.    Okay.  Run me through that again, I think I

14 lost you.

15     A.    Well, I don't know.  I guess I'm tired, too.

16 But I was just thinking that, yes, it's true, if you could

17 find somebody guilty of capital murder, you would -- it

18 would be easy to answer that first question that yes, they

19 are a danger to the -- only looking at it from the other

20 perspective, though, you could say, well, in those

21 circumstances that the murder was committed, that might have

22 been more the part of the probability and maybe in other

23 circumstances the person might not do it.  I don't know.

24     Q.    Now, I've had people tell me that, you know,

25 based on what they know about this case, because they've had

1  some background through the media, that that question is

2  always going to be answered yes for them.

3           You know, the combination, I guess, of

4  finding somebody guilty of capital murder and then what they

5  know about the case would just be too much and they'd answer

6  that question yes.  It's kind of already answered for them,

7  if they find them guilty in this case.  I see you shaking

8  your head, nodding along.

9      A.     I mean, everything you say makes sense.  If I

10 was chosen, if I was on the jury, I would hope that I would

11 have the open mind to say, to look at it differently.

12     Q.     And, I mean, that's what the law contemplates,

13 very frankly, but a lot of people tell us they just can't do

14 it.  If you can do it, fine.  If you can't, fine, too.  You

15 know, you can move along and we get you -- you get another

16 jury notice on down the line and probably be on another case

17 that you didn't know anything about and probably not a death

18 penalty case.  But we just kind of leave it up to you

19 whether you can do that or not or whether it's too much a

20 matter of common sense.

21     A.     Uh-huh.  I think I could.

22     Q.     Okay.  Well, that question starts off with a

23 no answer.  We've got to prove it to you that the answer

24 should be yes.  If we do that, then you move on to the

25 second Special Issue.  And this kind of deals with what

1    we've already talked about where there's an accomplice.    In

2    order to actually give an accomplice a death penalty, when

3    we get to the punishment phase, the law imposes a little bit

4    different standard, a higher standard, than just finding him

5    guilty.

6                     In order to find an accomplice guilty,

7    you'll remember from our discussion a few moments ago, that

8    the jury has to find that the person should have anticipated

9    that a life would be taken.

10                    What the law says in Special Issue No. 2

11   is before a person can get the death penalty, the jury must

12   feel that the person actually anticipated, okay?  Did

13   anticipate that a life would be taken, which to some people

14   is kind of the same thing.  To some people it's not.  Some

15   people see that distinction, some don't.  I'm curious.  What

16   do you think about "should have" versus "did anticipate"?

17        A.    I see the distinction.

18        Q.    You know, some people tell us it's just a

19   matter of semantics, you know.  I will tell you we didn't

20   draft these questions, the Legislature did.  So, if you're

21   thinking we --

22        A.    And they were lawyers like you.

23        Q.    Yeah.  Probably why they don't make any sense.

24        A.    I can see the distinction where you expect a

25   person would, should, think things through and should, but

the other question is they did anticipate it.

Q.       Uh-huh.

A.       As if they had a plan, as if they had weighed whatever cost or risks or whatever, like software plans.

Q.       And some people see the distinction, but they say, listen, if I think a person should have anticipated, I think they did anticipate.  You've just drawn too fine a distinction, you're playing word games, it's semantics, and as a practical manner, I may see the distinction theoretically.  But practically, I just really don't see a distinction.  I'm just curious --

A.       I can see that there's a line between that. In my own project plans, you know, there's things I should consider, but I can certainly argue the point that I didn't consider them.

Q.       Okay.  Fair enough.  That question also starts off with a no answer.  It's part of our burden of proof to prove it to you that it should be answered yes.  If questions 1 and 2 are answered yes, then you move on to that third Special Issue.

We ask you to kind of go back, look at the facts of the crime, look at what you've learned about the defendant's character and background -- you'll notice defendant is misspelled the second time you see it in that question -- and we ask you to look at their personal moral

culpability, what sort of blame they bear, and ask yourself
is there any reason their life should be spared?  You know,
basically, is there anything mitigating?

The law kind of, again, contemplates that
even at this late stage in the process, a juror have an open
mind.  Where we run into problems sometimes, is some jurors
said, okay, I found them guilty of capital murder, I kept my
open mind through Special Issue No. 1, but I answered it
yes.  I kept my mind open to Special Issue No. 2, but I
answered it yes.

You know, they're a future danger, they
should have anticipated, and they committed capital murder.
And they tell us, you know, basically, when it gets to
Special Issue No. 3, it's too far along in the process.  I
don't really see any value to it.  At that point there's
nothing there that's going to cause me to spare his life.

Some people say, no, I could keep that
open mind.  I do see value to having that question, even
though it's the last stop in the process.  What do you think
about that?

A.    I think this might be a time when it's easier
to keep an open mind.  Maybe you'd, if you are looking for a
reason not to give somebody a death penalty, you could maybe
find their childhood or something.

I, um, it reminds me of all the

1  discussion about the mentally retarded people and whether

2  they should be, you know, someone who is found guilty who is

3  mentally deficient in some way can't be given the death

4  penalty.  Well, I don't agree with that.

5      Q.    Okay.  Why not?

6      A.    Because if the case has been tried and they've

7  been sentenced to death, if they, whatever mental capacity

8  they had enabled them to kill somebody, then, you know, I'm

9  sorry.  I don't like the situation and I wish we could do

10  something to prevent it, but --

11      Q.    Do you think at this stage, you know, feeling

12  that way that you do about that mental retardation factor --

13  and you may know that the Supreme Court fairly recently

14  ruled that states cannot execute people that are found

15  mentally retarded.

16            But having had the opinion that you hold

17  personally, do you think there'd ever be anything mitigating

18  for you in these type of cases, death penalty cases?  You

19  mentioned background, but I didn't know if you thought that

20  was maybe mitigating or --

21      A.    Well, I don't know if it's true in this case,

22  but maybe somebody just got in with the wrong crowd and

23  couldn't get out, or, um --

24      Q.    Okay.  So you can see a situation where there

25  might be something mitigating, then?

1    A.    Uh-huh.

2    Q.    Fair enough.  Let me ask you this.  Sometimes

3 when we talk about death penalty cases, people kind of

4 impose a little higher burden on us.  Normally, in any

5 criminal case, our burden is beyond a reasonable doubt.

6 That's what it is, even in a death penalty case, whether

7 you're trying a shoplifting case or a death penalty case.

8         Some people who are for the death penalty

9 say, fine, I'm for it.  And I realize that your burden is

10 beyond a reasonable doubt, but for me to actually execute

11 somebody, it's going to have to be beyond any doubt,

12 reasonable or otherwise.  What do you think about that?

13    A.    Everybody would like to be one hundred percent

14 sure.  And I don't know that that's always possible.

15    Q.    Okay.  Would you hold us to a higher burden

16 because it's a death penalty case or just beyond a

17 reasonable doubt?

18    A.    I would hold you to a reasonable doubt.

19    Q.    Okay.  Let me talk to you a little bit about

20 some of the things that apply or the type witnesses you may

21 expect to hear.

22         You may hear from police officers,

23 obviously.  This is a capital murder case where we've

24 alleged a police officer has been killed.  Different people

25 feel differently about police officers as witnesses.  I'm

1  just curious if you have any gut reaction to police officers

2  as witnesses?

3       A.    No.  I stop if they stop my car.

4       Q.    Okay.  How about psychiatrists or

5  psychologists?  Sometimes in these cases either side or both

6  sides will call one of those type of individuals to try to

7  give the jury some insight on Special Issue 1 or Special

8  Issue 3.  What are your gut reactions to those type of

9  witnesses?

10      A.    I'm sorry, did you say do I object to it?

11      Q.    Just your gut reaction.

12      A.    Oh, my gut reaction?  I would listen to what

13  everybody had to say.

14      Q.    Okay.  You wouldn't just automatically close

15  your mind because it was somebody from the mental health

16  field?

17      A.    No.

18      Q.    Okay.  As part of our burden of proof, the law

19  says not only, you know, we have to prove our case beyond a

20  reasonable doubt.  But we have to prove each and every

21  element of the crime beyond a reasonable doubt.

22            I know you got a chance to look at the

23  indictment and that indictment basically breaks down into

24  different elements, you know, that a certain person on or

25  about a certain day in a certain county killed a certain

person in a certain way.  And, very roughly, those would be the elements of a murder case.

The law says we have to prove each and every element of that to you beyond a reasonable doubt.  And if we fail in proving even one element, obviously, you'd have to find the person not guilty.  And I think to a lot of people, that makes sense when you're talking about maybe the element of who-dun-it, you know, the identity.  Did the State get the right guy?  Obviously, if you have a reasonable doubt that we don't have the right guy, you'd find him not guilty.

But what the law says, interestingly enough, is that no one element is more important than another legally.  Where some people have difficulties with applying this law, just to give you an example, say we allege a murder happened in Grand Prairie.  Part of Grand Prairie is in Dallas County, part is in Tarrant County.

We allege in our indictment as an element that it happened in Dallas County.  But the cops don't do their homework.  We don't do our homework.  The evidence actually shows you that the crime happened in Tarrant County.  You don't have any doubt about the other nine elements.  You know we got the right guy and he did the murder.  But we just didn't do our job, we got the wrong county.

1        The law would require, even in that

2   situation, for the jury to find the person not guilty, even

3   if they were convinced he did the crime, because we failed

4   to prove that one element.

5        A lot of people don't like that, and they

6   just can't do it.  They think it's a technicality, and

7   they're just not comfortable maybe letting a murderer go

8   free under that situation, or finding him not guilty at the

9   least.  What do you think about that?

10   A.     Well, you know, if -- now, do you think that

11  somebody on the jury would figure it out or do you think

12  that it happened in Tarrant County, I mean --

13   Q.     The evidence would come out.

14   A.     Well, I mean --

15   Q.     A defense lawyer may bring it out, you know,

16  our indictment said Dallas County and you may feel from the

17  evidence and all the physical evidence, the crime scene

18  photos, that it actually happened on the Tarrant County side

19  in Grand Prairie.

20   A.     Um, well, if that's what the law says, then

21  that's what you, you know, I mean, it -- I'm sure that the

22  poor guy would be tried in Tarrant County, then, or

23  something.

24   Q.     Okay.  So you feel you could follow that

25  particular aspect of the law?

A.      Yes.

Q.      Okay.  Ms. Barron, give me just a second.  Do you have any questions for me?  I know we've --

A.      No.  Are you the only one that's going to ask me questions?

Q.      No, no, no.  You were also on a civil case; is that right?

A.      Yes.

Q.      How did that go?

A.      Well, that was a workman's comp case and we did not award the man whatever he wanted.  I can't remember what that was.  That was so long ago.

Q.      Okay.  I'm probably about finished.  I'm tired of talking.  It's late in the day.  But any concerns or hesitations you have about possibly ending up on a jury in this case?  Anything you think we need to know or that you hadn't told us or you were afraid we were going to ask, but didn't?

A.      No, when I saw -- I could even remember Mark Cuban and Don Nelson.  I would ask myself about the state of mind I was in, but I think the Mavs must have been nearing the playoffs or there was a contract.  I think it was a contract stuff.

Q.      Okay.  But you are good to go, if you are selected in this case and could assess a death penalty?

1          A.      If you just can't find 12 other people that

2    you like better.

3          Q.      All right.  Thanks for visiting with me, Ms.

4    Barron.  I appreciate it.

5          A.      Okay.

6                      THE COURT:  Ms. Busbee?

7                         CROSS-EXAMINATION

8    BY MS. BUSBEE:

9          Q.      You know we're just kidding.  They get to ask

10   some questions, we get to ask some questions, that's it.

11   And he has gone over so much with you, that I'm not going to

12   ask you very many questions.  But what we do is we ask you

13   your opinions about a lot of things on these questionnaires,

14   but we don't tell you what the law is.  And I think that we

15   do that on purpose so we get your bare reactions to things.

16                      But once, you know, once you came up here

17   to talk to Mr. Wirskye and he asked you some questions, it

18   seemed to me like your essential common sense kind of

19   follows what the scheme is.

20                      In other words, you're perfectly all

21   right with the fact that an accessory, which is not the

22   legal definition we use in Texas, but an accomplice, could

23   be found guilty of capital murder, if the facts were there.

24   You have to say yes or no.  Is that yes?

25         A.      Yes.  I wasn't sure you were finished.  If the

facts are there, yes.

Q.      And then, of course, once a person is found guilty of the offense of capital murder, it is not automatically a death sentence.  There are some additional questions that have to be answered to the jury's satisfaction before a death penalty would be imposed.  And if they're not, it's a life sentence.  And I'm hearing from you that you think that's a good scheme and you can follow that law?

A.      Yes.

Q.      Okay.  Because the State is required to prove these issues to you beyond a reasonable doubt and all you have to tell me is that you will make them do that and let the chips fall where they may.  And you can follow the law.  And I don't think that you're going to answer Special Issue No. 1 yes, just because you found the defendant guilty of the offense of capital murder.  If you understand it, you're not supposed to.

A.      I think that's fair.

Q.      Okay.  And that you're not going to -- you would make the State prove Special Issue No. 2 to you beyond a reasonable doubt.  You know, we can't go into the facts and that's -- if you tell me that you can follow the law and you understand it, then I'm satisfied on that point.

A.      Uh-huh.

238

1    Q.    Okay.  Now, but I do want to explore with you

2  this question about the Special Issue No. 3.  I don't want

3  to talk about if someone is retarded or, you know, they were

4  raised in a closet, or, you know, any of these things that

5  might come into mind.

6            My question is, in a death penalty case,

7  if you've been on a jury and you decided that someone may be

8  a future danger and you find that they did anticipate a

9  human life would be taken, if you would still be able to sit

10  back and give effect to this question and ask yourself

11  whether the person should receive a life sentence instead of

12  a death sentence, based on something that you've heard about

13  the case or the background of the person convicted?

14    A.    So, can I -- so if I thought that this person

15  probably would commit another crime and that he was,

16  intended to kill the other guy --

17    Q.    Well, that's --

18    A.    If I say yes to the first two and then the

19  third one, I say --

20    Q.    Well, that's -- the scheme is, is that there

21  is still -- a juror has to still be able to consider a life

22  sentence --

23    A.    Uh-huh.

24    Q.    -- based on whatever you have heard,

25  background, the circumstances, perhaps their participation

1    in what happened in the crime.  So many things can come in

2    and I don't, A, want to precommit you, or, B, have you

3    commit to me.  But just tell me that you would still be open

4    to giving a life sentence under those circumstances.

5         A.    It would be hard, but I think I could do it.

6         Q.    Okay.  Do you have any questions for me?

7    You're tired of talking, I'm sure.  We've been doing this

8    all day long.

9         A.    No, I don't.  I was just thinking, as

10   stressful as this is, I don't think it's as stressful as

11   being on that jury.

12        Q.    On the jury that you were on?

13        A.    No, I think being on -- I mean, maybe I

14   shouldn't have said that, but --

15        Q.    You can say whatever.  Well, you can say

16   whatever you want.  See, that was all.

17        A.    Okay.

18        Q.    And nobody else is going to ask you any

19   questions, I don't anticipate, at this point.

20              MS. BUSBEE:  Your Honor, I have no other

21   questions of this juror.

22              THE COURT:  Thank you, Ms. Barron.

23   Please wait for us one more time and we'll have you back in

24   a few moments.

25              PROSPECTIVE JUROR:  Okay.  Thank you.

1          THE COURT:  Wait for us outside.

2               [Prospective juror out]

3          THE COURT:  What says the State on juror

4  No. 3092, Sandra G. Barron?

5          MR. WIRSKYE:  Much to the State's

6  chagrin, we could not find a challenge for cause, Your

7  Honor.

8          MS. BUSBEE:  We have no challenge for

9  cause, Your Honor.

10         THE COURT:  Would you like to step into

11  your office?

12         MS. BUSBEE:  I don't think so.

13         MR. WIRSKYE:  State would like to

14  exercise a preemptory challenge, Your Honor.

15         THE COURT:  Have Ms. Barron step back in.

16  State No. 8.

17              [Prospective juror in]

18         THE COURT:  Ms. Barron, thank you so much

19  for coming in today.  Your stress will now decrease

20  significantly.  I will inform you that you shall not sit on

21  this jury.  And we thank you for coming down.

22         PROSPECTIVE JUROR:  Well, thank you.

23              [Prospective juror out]

24         THE COURT:  Good afternoon.  For the

25  record we've got juror No. 3116, Ms. Nancy Carlene Wilkey;

1    is that pronounced correctly?

2              PROSPECTIVE JUROR:  Wilkey, uh-huh.

3              THE COURT:  Sorry for the delay getting

4    you in.  We line up three people in the morning and three in

5    the afternoon and we don't know exactly how long we will

6    speak with one person.  I have to balance the 15 against the

7    one or two, so we're here all day and I just try to be as

8    considerate of your time as I can.  I'm sorry for the delay.

9              PROSPECTIVE JUROR:  Thank you.

10             THE COURT:  Obviously, you've had enough

11   time to read the guide I prepared for you, hopefully more

12   than once?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  And also your questionnaire

15   that you filled out back in May?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  With those two items in mind,

18   this process will involve the attorneys going over the law

19   with you and helping you understand how it all relates.  At

20   the end of the day the Court has to answer two questions.

21   Number one is do you understand the law?  And, number two,

22   can you follow the law?  That's the big picture I have to

23   look at.  The only question I have for you at this time is

24   will you be able to serve this Court for a period of two

25   weeks beginning on November 10th?

1    PROSPECTIVE JUROR:  Yes.

2    THE COURT:  Thank you so much.

3  Mr. Shook?

4    MR. SHOOK:  Thank you, Judge.

5    NANCY WILKEY,

6  having been duly sworn, was examined and testified as

7  follows:

8    DIRECT EXAMINATION

9  BY MR. SHOOK:

10    Q.    It's Wilkey; is that right?

11    A.    Wilkey.

12    Q.    My name's Toby Shook.  I'm going to ask you

13  questions on behalf of the State.  And as the Judge said,

14  there aren't any right or wrong answers.  We just want your

15  honest opinions.  You have been pretty straightforward on

16  the questionnaire, so I don't anticipate any problems in

17  that area.  And if you have any questions at any time, feel

18  free to ask, okay?

19    A.    Okay.

20    Q.    Let me go over one thing.  You know, we ask a

21  whole lot of people down here.  You remember that jury room

22  was full because people feel differently and have different

23  things going on with their lives.  And we can't always just

24  make decisions based on the questionnaires, so we have to

25  have people come down to do some follow up.

1              The thing that I wanted to ask you about

2   is, we ask if there is anything that would cause you to, any

3   reason you could not sit as a juror in this trial and be

4   absolutely fair to either side, and you had rather a unique

5   problem in that you don't drive and you live out in

6   Mesquite.

7         A.    Yes.

8         Q.    And the problem is the lack of public

9   transportation.

10        A.    Yes.

11        Q.    And this is kind of a -- it's a more lengthy

12   trial than most of the trials we have down here.

13        A.    Yes.  I could have -- it could be a hard time.

14        Q.    Okay.  -- a situation?

15        A.    Yes.

16        Q.    Regarding that situation, then, that's still

17   the same situation you'd have to have --

18        A.    I would have to have transportation back and

19   forth, if it's on a daily basis.  It would have to be --

20        Q.    It would be approximately a two-week basis.

21        A.    Yes.

22        Q.    And I take it your husband, he's going to be

23   at work?

24        A.    Well, yes, and we've always worked it out, you

25   know.  He works -- he could, I mean, like, if I had to

1   serve, I could do it.  I have friends.  My husband could

2   drop me off before he goes to work and that kind of thing.

3   And then I can get the DART over close enough to my

4   neighborhood to where friends and things could come pick me

5   up.

6          Q.     Okay.  I take it from that, though, it would

7   be a pretty tremendous inconvenience?

8          A.     Yes, it would be.

9          Q.     Okay.  Let me ask you this.  Mr. Wirskye just

10  asked me to go into this area.  Do you remember about three

11  years ago, were you a victim in a robbery of a dry cleaners?

12         A.     Yes, I was.

13         Q.     Do you remember being interviewed?

14         A.     Well, actually it was attempted.

15         Q.     Okay, attempted.

16         A.     Yeah.

17         Q.     Do you remember being interviewed by a big

18  tall prosecutor?

19         A.     Um, well, yes, now, but I didn't recognize

20  him.

21         Q.     Okay.  Yeah, that particular defendant is

22  doing a life sentence now.

23         A.     Oh, is he?  Well, very good.

24         Q.     But Mr. Wirskye recognized you.

25         A.     Oh.

1    Q.    He remembers interviewing you.

2    A.    Uh-huh, yes, he did come in.

3    Q.    We didn't know that, obviously, at the time

4    you filled out the questionnaire until now.  Knowing that,

5    do you think that might influence you some way now that

6    you've --

7    A.    Oh, no.

8    Q.    You don't think it would?

9    A.    No.

10   Q.    Fair enough.  Let me ask you how you feel

11   about the death penalty in general.  Do you favor it as a

12   law?

13   A.    I don't know that I favor it or -- it is the

14   law.  And I guess as long as it is a law, yes, I would favor

15   it as a law.

16   Q.    If it were up to you, if we can make you queen

17   of Texas, would you have the death penalty statute?

18   A.    Do what?

19   Q.    If we could make you queen of Texas and you

20   could decide the laws, and the decision had to be made as to

21   whether you'd have a death penalty statute, would you have

22   one?

23   A.    I would rather not have one.

24   Q.    Okay.  What kind of law would you have in its

25   place?

246

```
 1          A.     Well, now, that, I wouldn't know.  I couldn't
 2   answer that.  I just, I mean, I don't like the fact of there
 3   having to be a death penalty.
 4          Q.     Because someone's life would be taken?
 5          A.     Yes, it's --
 6          Q.     Okay.  Let me get into one other thing before
 7   I get into that because you put down details on the
 8   questionnaire that you have heard or read something about
 9   the case, which most jurors have.
10          A.     Yes.
11          Q.     What details do you recall about the case?
12          A.     Well, when I wrote that down, it was just the
13   basics, because I really, I haven't kept up with each trial
14   or anything as it's gone on in the news except for, you
15   know, little snippets that you hear.
16          Q.     Right.
17          A.     But I remember pretty much on when it happened
18   and --
19          Q.     What do you remember about the details about
20   what happened?
21          A.     I just remember that a police officer was shot
22   at an Oshman's and that it was a group of people that had
23   broken out of prison, and that he was -- I don't know
24   exactly.  My details are just the basics is how I remember
25   it.
```

1      Q.      Do you remember where they were arrested?

2      A.      I remember, yes, but they were -- everyone was

3  looking for them and, yeah, I remember that.

4      Q.      Was it something you followed pretty closely

5  at the time?

6      A.      Well, at the time it was something that was on

7  all the time.  But then after it died down some, I really

8  didn't -- didn't hear as much about it as the trials started

9  coming up.

10     Q.      What about subsequent trials that have been

11  had?  You mentioned that you had seen some snippets.

12     A.      It was -- well, just -- now just since this

13  last one that I remembered.  But they had very little on the

14  news about it at all.  The first one, I can remember the

15  interviews with the mother of the police officer and things

16  like that.  And -- but that's really it, pretty much.  I'm

17  not really much on keeping the TV on, watching TV.

18     Q.      Just tell us, honestly, do you think seeing

19  those stories would affect you in any way as a juror?

20     A.      No.  I think that, well, I've heard those

21  stories and, like I say, it's like an individual basis on --

22  my problem is as far as being, you know, as far as the

23  shooter, who did it, that was my feeling on it is it might

24  be hard for me to, you know, separate.

25     Q.      I lost you there.

1    A.    I don't think that watching, as far as what

2    happened on the news, I don't think that that affects me,

3    because that's just the story you're hearing and I don't

4    know details.  So my only problem, you know, with -- that's

5    all I've got to say.

6         Q.    Do you have a problem?

7         A.    I don't have a problem.  I mean, I've seen

8    what's on TV.  I don't think it would affect me.  I think I

9    would really want to hear the story myself.  It would be

10   something that I would have to hear, as far as it went down,

11   you know, how things happened and that kind of thing.

12        Q.    Okay.  Let me -- do you have your

13   questionnaire there?

14        A.    Yes.

15        Q.    If you can turn to page 9.

16        A.    Page 9?

17        Q.    Yes.  I know it's 17 pages.

18        A.    Yes.

19        Q.    That last question there is a statement we ask

20   people to agree or disagree with it.  It asks about,

21   regardless of what the Judge says the law is, the jurors

22   should do what they believe is the right thing and you said

23   yes and gave us a pretty honest answer, I have to live with

24   my decision.

25        A.    Yes.

1    Q.    The bottom line is from your personal point of

2    view, you've got to live the rest of your life with your

3    decision, and --

4    A.    Yes, because I know, in a sense, I am sending

5    someone to death.  It's a decision that would be a very

6    important decision that you make.  And I would not -- not

7    want to make the wrong one.

8    Q.    Okay.

9    A.    And, so, yeah, it would be very thought -- I'd

10   have to think about.

11   Q.    A lot of people feel that way.  That's why we

12   ask that question.  And you -- and all we can do is depend

13   on your honesty and you look like you've been pretty

14   straightforward with that answer, and that you're -- you

15   seem to be a pretty straightforward person.

16         What that question gets at, is sometimes

17   the Judge goes, here is the law, and you've got to follow

18   the law.  Some jurors go, I know that, but I've got to live

19   with myself and I can't do it, I can't follow your

20   instructions in those situations.  And if that situation

21   comes up, I'm going to go with what I believe is the right

22   thing to do, because I've got to live with my conscience the

23   rest of my life.  Is that how you feel?

24   A.    Yes, I mean -- but, I mean, if it's within the

25   law, then my conscience would be okay, though.

1    Q.      What if you disagree with the law?

2    A.      Well, I mean -- but, I could still disagree

3    with it, but it would still be the law.  And if, as long as

4    -- I mean, it's just like the death penalty.  As long as

5    there's a death penalty, it's --

6    Q.      Well, we've got people that will tell us,

7    quite honestly, I don't believe in the death penalty.  I

8    don't think we should kill people and execute them.  And

9    they know that's the law, but they tell us with all honesty,

10   honesty which I admire, personally, that say, this ain't my

11   kind of case.  I've got to tell you right now.

12   A.      Yeah.

13   Q.      And they believe strongly and honestly and

14   they'll tell us, that's not going to leave my mind.  I'm not

15   a human windsock.  That's just going to ignore my

16   conscience.  And they tell us that honestly.  And that's

17   fine.  That's why we have about a thousand people that come

18   down here.

19   A.      Yeah.

20   Q.      They may be fine on a DWI case or burglary

21   case --

22   A.      Exactly.

23   Q.      -- or something else like that.  But you can't

24   very well, if they really are against the death penalty,

25   obviously, you can't expect them to put that out of their

1   mind and then you ask them to answer questions that are

2   going to result in someone getting killed.

3        A.       Yes.

4        Q.       That's not human.  I mean, unless they were a

5   person who didn't have any convictions, of course, I guess.

6   But, you know, there's nothing wrong with disagreeing with

7   different aspects of the law.  That's why we go through the

8   questionnaire.  So I think sometimes people feel like they

9   have to say, well, if it's the law, I could follow it,

10   because they feel they're a bad citizen.

11       A.       Well, it depends on the crime.  I mean,

12   really, the way I understand it is the law and that -- and

13   not that I'm, you know, the death penalty.  I just -- it

14   would be hard to make that decision and it would be a big

15   decision to have to make.  But I think that I could, if I

16   had to.

17       Q.       Okay.  But from your own personal point of

18   view, then, you don't favor the death penalty?

19       A.       Um, I favor it in some things, I mean, I think

20   it is justified in --

21       Q.       What types of crimes do you think it is

22   justified?

23       A.       Well, I think it is in killing someone, taking

24   another life.

25       Q.       Okay.

1    A.    And I think that in like sexual, rape, and

2    things like that, I think it might.  But like violent kind

3    of things, it would be.

4    Q.    Rape cases, even without a life being taken?

5    Do you think some of those?

6    A.    No.  But I think that's -- for a woman to be

7    raped violently like that, that is like a life sentence for

8    her that she'll have to live with all her life.  And so it's

9    something that never goes away for her, so.

10   Q.    Do you think a death sentence could be

11   justified in some of those situations?

12   A.    On some of them, yes, when they have been as

13   violent as --

14   Q.    Okay.  Any other crimes you think could be

15   deserving of the death penalty?

16   A.    Not that I can think of.

17   Q.    Okay.  How about the murder of a police

18   officer?  Do you think that's the type of crime that could

19   be appropriate?

20   A.    Well, yes, that's -- I mean, I think the

21   murder of anyone should.

22   Q.    I guess what's important to you is the

23   intentional taking of a life?

24   A.    Yes.

25   Q.    Okay.  If someone is murdered intentionally,

1  that is, if someone has the specific intent to murder and

2  they form that intent and they act upon it and then they

3  kill that person, acting on that intent, is that the type of

4  situation that you think the death penalty is deserved in?

5      A.    Yes.

6      Q.    Not an accident, obviously?

7      A.    No.

8      Q.    Not in self-defense?

9      A.    No.

10      Q.    Not defending a third person, your family, but

11  unjustified murder.  Those would be the situations?

12      A.    Yes.

13      Q.    And then possibly some type of rape cases and

14  that sort of thing?

15      A.    Yes.

16      Q.    Okay.  The way a death penalty case is set up

17  is there is two parts.  There's the guilt/innocence stage,

18  where we have to prove to you beyond a reasonable doubt that

19  the defendant is guilty.  If we don't, obviously, it's a not

20  guilty.  But if we do, we then go to these questions.

21              And, see, that first question asks

22  whether there is a probability that the defendant would

23  commit criminal acts of violence that would constitute a

24  continuing threat to society.  It's asking you if you think

25  the defendant is a continuing danger to society.

And that's the second part of the trial. It's a yes or no question, obviously, and the State has to prove to you beyond a reasonable doubt it should be answered yes. It starts out with a no answer.

But I think the key is this. This is what some people tell us. If you're sitting as a juror and the State has proven to you beyond a reasonable doubt that this person is guilty of capital murder, intentionally taking a life during the course of a robbery, police officer, during a rape, whatever, and you've determined that in your mind that they are guilty of that offense, that tells you all you need to know about question 1 at that point in time.

A.     Yes.

Q.     That's how you feel?

A.     Uh-huh.

Q.     Once you make that determination that they committed that type of act, then they are a continuing danger and would be a continuing danger to society?

A.     Yes.

Q.     And that would answer question 1 for you at that point in time?

A.     Uh-huh.

Q.     Okay.

A.     Yes.

Q.     Fair enough.  Is that something you feel pretty strongly about, when we talk about the intentional murder of another?

A.     That's the way I feel about it.  And that's, a continuing, you know, threat to society, you know.

Q.     That's the kind of situation you are talking about?

A.     Uh-huh.

Q.     Okay.  Let me go into another area that comes up sometimes.  When we talk about capital murder, we often -- we always think of an example of the triggerman, usually, let's say, the person that actually causes the death.  But you can have some situations where an accomplice is involved, someone that didn't actually cause the murder, but they helped.  That can happen in any crime and it can happen in a capital murder situation.

A.     Yes.

Q.     For instance, you know, you can have a situation where someone is helping, they're encouraging, directing, aiding, they may help someone.  But they don't actually cause the murder, groups of people committing these crimes.  The law says that these people, accomplices, can be held accountable under certain situations and could even get the death penalty, even though they didn't cause the death.

       But people tell us different things.  You

1  have people that believe very strongly in the death penalty,

2  but from their point of view they talk about the people that

3  cause the murder, the triggerman.  If you intentionally

4  cause someone and murder someone in those situations, that's

5  when the death penalty is justified.

6        They would draw a line from their

7  personal point of view on an accomplice, someone that didn't

8  actually cause the murder, but was helping the crime, they

9  might reserve that punishment, a different type of

10 punishment, maybe a life sentence or 99 years or 50 years,

11 but not necessarily a death penalty.

12       They don't think it's quite fair to give

13 the death penalty to an accomplice when they didn't actually

14 cause the death.  From their point of view, the death

15 penalty should be reserved just for the actual murderers.

16 Other people tell us no, they think accomplices should get

17 the death penalty.

18       But there aren't any right or wrong

19 answers on that issue, and we ask each juror their own gut

20 reaction on how they feel about that.  How do you feel about

21 the accomplice situation, the person that didn't cause the

22 murder?

23    A.    That's what makes it hard to -- I mean, if the

24 person did not actually do the shooting, that's what makes

25 it a hard decision to make.

Q.     Okay.

A.     But if he had intent, that it could have been him, just as well as the other guy, then I think it's justified.

Q.     Okay.  So if they prove, we prove intent as a party situation, then you feel that that is a death penalty?

A.     Yes.  It could have been him as well as the other one.  You know, it doesn't matter, it wouldn't have mattered.

Q.     And in those situations, then, if someone is found guilty under those circumstances, again, we go back to that continuing danger.

A.     Yes.

Q.     That tells you all you need to know about that individual.

A.     Yes.

Q.     Okay.  Now, there's another situation with parties called conspiracy.  An example I'll give you is let's say me and Mr. Wirskye decide we're going to go rob a bank.  I go in there and the plan is I'll have a gun.  He's going to have his big bag.  I'm going to point the gun and threaten everyone.  They'll hold their hands up and then he's going to start ransacking the cash drawers, getting the money.  During the course of that, I intentionally murder someone.

1      I could, obviously, be prosecuted for the

2  death penalty, I'm the murderer.  The law says he can, too,

3  under a conspiracy theory.  Because we conspired or agreed

4  to commit bank robbery, the law says that he can be found

5  guilty of capital murder, even if he didn't have the intent

6  that I shoot anybody.  He could stand there and say, don't

7  shoot anyone, don't shoot anyone.  He can still be found

8  guilty under that law, if you believe he should have

9  anticipated someone should die.

10      So he doesn't have to have that intent to

11  be found guilty under the conspiracy theory.  There could be

12  other situations, which you brought up, where he maybe was

13  directing it, said kill these people, that sort of thing.

14  But under the conspiracy theory, he doesn't even have to

15  have that intent.

16      And some people have a problem with that

17  aspect of the law in a death penalty situation.  They don't

18  think it's fair that someone could be tried and convicted of

19  capital murder, if they never had that particular intent.

20  Other people feel you can.  Again, I just want to --

21      A.    If they're both going in armed, then they have

22  the intent.

23      Q.    Okay.  So you feel in those situations, then,

24  a person could be --

25      A.    It could be.

1    Q.      -- convicted?  And then once you convict them

2    and believe beyond a reasonable doubt of the killing and

3    their participation in it, we go back to your strong

4    feelings about that.  That's when they are a danger to you,

5    as far as a person that's willing to commit those types --

6    A.      Yes.

7    Q.      Okay.  Talking about these Special Issues,

8    Special Issue No. 1, obviously, I think what's most

9    important to you is that it's been proven beyond all

10   reasonable doubt that they are guilty of committing a

11   capital murder.  We know what your answer would be there.

12   It's going to be yes?

13   A.      Yes.

14   Q.      That last Special Issue, the mitigation

15   question, it asks the jurors to look at all the evidence,

16   everything involved, and if they see any sufficient

17   mitigating evidence, they can give a life sentence rather

18   than a death sentence.

19            But the problem is this.  You don't get

20   to that question unless you've already found that he's a

21   continuing danger to society, and question No. 2 says that

22   either they caused the death, if you believe that, or they

23   intended that person to die, that's kind of on par with your

24   own personal definition, if they had that intent that that

25   person die, if they are the accomplice, or they anticipated

1    that a human life would be taken, so you would also have

2    determined beyond a reasonable doubt that either they did

3    the killing themselves or they intended that person to die.

4                    Some people tell us, you know, once I've

5    reached that point and you told me and I know that they are

6    a continuing danger to society and that they intended that

7    the victim die, there's really no way I could give someone a

8    life sentence because they're going to always be dangerous.

9                    I couldn't in good conscience give them a

10   life sentence at that point in time because I have reached

11   the point where they are a capital murderer and they are

12   also a dangerous human being.  Other people are able to do

13   that.

14                   But I just wanted to know your feelings

15   about, if you've reached the point where someone is guilty

16   and they are a continuing danger and you believe they

17   intended someone to die, does that kind of do it for you, as

18   far as the death penalty goes?

19        A.     That does.  But when you say intended, it's

20   like the accomplice thing, because the accomplice may not

21   have intended for anyone to die.  That would be a --

22        Q.     Well, on the accomplice thing, what we have to

23   prove is they anticipated someone would die.

24        A.     Okay.

25        Q.     And, so, again, you wouldn't get to this

1    question, unless you believe beyond a reasonable doubt that

2    they anticipated someone would die.

3       A.     Okay.

4       Q.     And if that were the situation, then, is that

5    a death penalty situation for you?

6       A.     Yes.

7       Q.     If it's been proven, also, that they

8    anticipated?

9       A.     Yes.

10         MR. SHOOK:   Judge, that's all the

11    questions I have at this time.

12         THE COURT:   Ms. Busbee?

13            CROSS-EXAMINATION

14   BY MS. BUSBEE:

15       Q.     Ms. Wilkey, I'm going to ask you some

16    questions, too, but primarily about some of the things that

17    Mr. Shook asked you about.   I think you have expressed to us

18    an attitude that we, like at this table, which is the death

19    penalty is serious and not to be given to someone lightly.

20       A.     Exactly.

21       Q.     And you have also been honest and said, you

22    know, common sense tells me certain things.   Let me talk to

23    you about what the law is and particularly the law having to

24    do with the life or death decision.   And Mr. Shook explained

25    it to you rather well, I think, about the ways someone could

be found guilty of capital murder.

We call them parties in Texas.  Most people, including those here at this table, have been using the word "accomplice", because people are more accustomed to using that word, so I'll use the word "accomplice" when I'm talking to you about this.

I don't think anyone has a problem saying if you are a group of people who engage in activity, commit a crime, each person is guilty of that crime.

A.    Yes.

Q.    Where we come down to the shades of gray is in the various punishments that can be given.  And that's true of someone who writes a bad check all the way up to someone who is accused of capital murder.  You have stated that you feel certain ways.  I just want to talk to you about what the law is and ask if you can follow the law.

A.    Okay.

Q.    The law is that once a jury has determined that a person is guilty of the offense of capital murder, that's a life sentence.  That is a life sentence with a special provision which says that that person cannot receive or be considered for parole before forty actual calendar years, day for day, have passed.  And that's a severe sentence.

A.    Yes.

1    Q.    But when the State seeks the death penalty and

2    if they are asking the jury to consider the death penalty,

3    then certain other questions have to be considered pretty

4    much from the start.   In other words, yes, most people would

5    say to themselves, if you committed a capital murder, you

6    are a dangerous person.   But if you are on the jury, you

7    have to say, I'll set that aside and consider that question

8    anew.

9              In other words, I'm not going to

10   give the State any help on this.   If they can prove that to

11   me beyond a reasonable doubt and I answer that question

12   separately from the evidence, you may not hear any

13   additional evidence, and you may be able to answer that

14   question just based on what you've heard at the first part

15   of the trial.

16             But you have to say that you can consider

17   that anew and make the State prove that to you beyond a

18   reasonable doubt, or be satisfied beyond a reasonable doubt,

19   that that answer is yes.   Could you do that?

20   A.    If it's been proven to me?

21   Q.    Yes, ma'am.

22   A.    Yes.

23   Q.    Okay.   In other words, you're not going to

24   automatically decide that once you understand what the law

25   says, you have to consider that question anew?

1    A.    No, it's going to be for me.

2    Q.    You can follow that instruction then?

3    A.    Yes.

4    Q.    Okay.  And as for Special Issue No. 2, these

5 are questions that, you know, you wouldn't expect to come

6 down here and have to answer, and we're not going to go into

7 the facts of this case or some hypothetical case.  But if it

8 was proved to you beyond a reasonable doubt that a person

9 had anticipated that a life would be taken and that you were

10 satisfied beyond a reasonable doubt that had been proven to

11 you, could you answer that question yes?

12    A.    Repeat that again now.

13    Q.    Well, I'm just asking you, if it's proved to

14 you beyond a reasonable doubt, could you say yes, that they

15 did anticipate that a life would be taken?

16    A.    Yes.

17    Q.    Okay.  And, on the other side of that, if you

18 weren't satisfied that it had been proved to you beyond a

19 reasonable doubt, you could answer that no, even though in

20 the first part of the trial, you'd answered a question

21 somewhat similar to that having to do with should have

22 anticipated?  And the sticking point for most people is,

23 well, a lot of the law that they've never heard of before.

24    A.    Exactly.

25    Q.    And the second thing is, is that should have

1    anticipated is like sort of a standard that a reasonable

2    person would have anticipated such a thing.  But when we get

3    down to are we going to kill that person, you have to go a

4    little extra step to say, not only should have, but did.

5              And that's a distinction.  And if you see that

6    and you can follow that law, then you're a qualified juror.

7    So you do see that distinction?

8         A.    Yes.

9         Q.    Okay.  And would you require the State to

10   prove that to you beyond a reasonable doubt?

11        A.    Well, yes.

12        Q.    And if they did, you could answer that

13   question yes?

14        A.    Yes.

15        Q.    And if they didn't, you will say no?

16        A.    Right.

17        Q.    Fair enough.  Now, as to this third Special

18   Issue, that's just -- that's not a question that you can say

19   beyond a reasonable doubt that the defense has showed me he

20   shouldn't die, beyond a reasonable doubt the State has

21   proved some other things that proves that he should.  It's

22   sort of a safety valve.  It says, I've heard some things

23   that make me think this individual should not receive the

24   death penalty.

25              It could be anything.  It could be the

1  participation in the offense.  It could be, you know,

2  certain things you heard one way or the other about anything

3  at all in this case.  Would you still be open to giving a

4  life sentence under those circumstances?

5       A.    Well, I think so, because I, just would, you

6  know, like I said, it's a big decision.

7       Q.    Well, I'm satisfied that you understand the

8  law and that you could follow it.  And the reason we ask

9  your opinions about things is not so much to see if you

10  could follow the law, but just to figure out, you know,

11  whether one side or the other would want you more than the

12  other.  I think that's a fair -- but I'm satisfied you can

13  follow the law.

14            Is there anything that you've heard today

15  about the scheme that we have here in Texas that would cause

16  you some -- make you unable to -- or let me put this the

17  correct way.  Which violates your conscience to follow the

18  law, if you're placed on this jury?

19       A.    No, I don't think so.

20       Q.    Do you have any questions or concerns or --

21       A.    Not that I can think of at the moment.

22            MS. BUSBEE:  Well, I have no more

23  questions of this juror at this time, Your Honor.

24            THE COURT:  Ms. Wilkey, I'm going to

25  circle back around to the very first question that was

1   asked, regarding transportation.

2                       PROSPECTIVE JUROR:  Yes.

3                       THE COURT:  Is there a particular reason

4   why you do not drive a vehicle?

5                       PROSPECTIVE JUROR:  No particular reason,

6   just never have.  I don't have a driver's license, never

7   have.

8                       THE COURT:  I mean, it's just -- it's

9   just hard to believe.

10                      PROSPECTIVE JUROR:  I know, everyone --

11  it's an odd thing that --

12                      THE COURT:  My grandmother didn't drive

13  until she was 65.

14                      PROSPECTIVE JUROR:  People just cannot

15  believe that I don't drive.  But it's just -- I've always

16  been real nervous and it's always made me nervous.  I'm not

17  a nervous passenger.  I'm just a very nervous driver.

18                      And I married a husband who, I think his

19  mother was killed driving a vehicle when he was 11, and I

20  think that's why he's so understanding.  Normally when you

21  get married and your husband would force you to go drive,

22  but he never has.

23                      THE COURT:  Okay.  Let me share with you

24  a concern that I have, if you end on this jury.  I start at

25  8:30 in the morning.

1          PROSPECTIVE JUROR:  Uh-huh, see, I would

2     have to be here around 7:00 waiting somewhere around here,

3     because I would have to be here before my husband goes to

4     work.

5          THE COURT:  Where does he work?

6          PROSPECTIVE JUROR:  He works at EDS.

7          THE COURT:  And that's in --

8          PROSPECTIVE JUROR:  Plano.

9          THE COURT:  So you would come from

10    Mesquite.  Would he would drop you off here?

11         PROSPECTIVE JUROR:  Yeah, he would just

12    drop me, because he's worked around all through here.  He

13    knows all the ends and outs, so.  He's an elevator mechanic

14    and he's worked on elevators and stuff in a lot of these

15    buildings.

16         THE COURT:  I mean, you understand that I

17    have a concern.

18         PROSPECTIVE JUROR:  Yes, and I

19    understand.  I mean, because this is, you know, a little

20    ways away.

21         THE COURT:  If you tell me you can be

22    here at 7:00 waiting on us --

23         PROSPECTIVE JUROR:  If y'all told me I

24    had to be here, that would be the only reason.

25         THE COURT:  It's just that when we get

1   into this process, there'll be a lot of people that are

2   lined up.

3                    PROSPECTIVE JUROR:  Yes.

4                    THE COURT:  And I've been told I've been

5   too rigid and I try to do the best I can.

6                    PROSPECTIVE JUROR:  Yes.

7                    THE COURT:  There are a lot of people

8   that are depending on us starting on time.

9                    PROSPECTIVE JUROR:  Yes.

10                   THE COURT:  So as long as you can tell me

11  you can be here on time, that's all I need to know.  Please

12  wait for us outside and I'll have you back in a few minutes.

13                   PROSPECTIVE JUROR:  Okay.

14                   [Prospective juror out]

15                   MR. SHOOK:  Judge, since you didn't ask

16  any questions about everything she is disqualified on, I'd

17  like to continue my voir dire, if you don't, if you think

18  she's qualified.  I have a lot more to ask her.

19                   THE COURT:  I figured you would have a

20  few objections here and I wanted to hear them and then I

21  would make a decision.

22                   MR. SHOOK:  Well, I think she's, um, was

23  pretty matter of fact and said once she found someone guilty

24  of an intentional killing, she's going to -- she's going to

25  find them dangerous.

1          THE COURT:  I heard that.

2          MR. SHOOK:  And answer those questions.

3     I thought she was pretty honest in that.  As well as on

4     question No. 2, as well as in the law of parties, if you

5     think they anticipated, she would also answer question No. 1

6     yes.  So I think she's disqualified in those three ways.

7          And I also believe she said on Special

8     Issue No. 3, if she found Special Issue No. 1 and Special

9     Issue No. 2 beyond a reasonable doubt, that then Special

10    Issue No. 3 is not going to be an option.  He's going to get

11    the death penalty.  So I think in those four ways, she's not

12    qualified.

13          THE COURT:  I heard each one of those and

14    I wondered why y'all hadn't agreed up front and then

15    Ms. Busbee was able to get her to follow her end of the

16    spectrum.

17          MR. SHOOK:  That's right.  But we had a

18    juror early this morning which followed our end of the

19    spectrum and the Court found that juror unqualified.

20          THE COURT:  I understand.

21          MR. SHOOK:  I think from her demeanor,

22    she, obviously, is going to -- is disqualified because once

23    she finds them guilty and that's what she said.

24          THE COURT:  It's a classic vacillating

25    juror.

1          MS. BUSBEE:  Your Honor, I don't --I --

2     if I may be heard on this?

3          THE COURT:  Yes, ma'am.

4          MS. BUSBEE:  We're now in this reverse

5     position of having to say what we've been accused of, which

6     is we didn't explain them the law.  The law was not

7     explained to her.  She was asked for her gut reactions to

8     things without being told what the law was and once I told

9     her what was law was, she admitted that she would and

10    acknowledged that she would follow it.  I don't think she

11    vacillated at all.  She wasn't told what the law required.

12         THE COURT:  I'm inclined to let Mr. Shook

13    have a redirect and see if she sticks to her position that

14    she now holds.  If she does, fine, and if she doesn't, fine.

15    I'm going to stay out of it.  And if you wish to circle back

16    around again, we'll do it until we're satisfied.  Ask her to

17    come back in, please.

18                    [Prospective juror in]

19         THE COURT:  We have a few more questions

20    for you.

21         PROSPECTIVE JUROR:  Okay.

22                    REDIRECT EXAMINATION

23    BY MR. SHOOK:

24         Q.    Ms. Wilkey, a few more questions.  Let me make

25    sure, I was -- again, we appreciate your patience.  As far

1    as your answers to me about how you personally feel about

2    the death penalty and intentionally taking someone's life

3    being a situation that calls for the death penalty, do you

4    still feel that way?

5              A.    Yeah, I --

6              Q.    Just your honest opinions?

7              A.    Yes.

8              Q.    Okay.  I didn't think you'd changed your mind,

9    but --

10             A.    No.

11             Q.    The law has been explained to you.

12             A.    Uh-huh.

13             Q.    But from your personal point of view, if it's

14   proven to you beyond a reasonable doubt that someone has

15   intentionally taken a life during the course of a felony or

16   capital murder, murder of a police officer, whatever the

17   situation may be, and that's been proven to you beyond a

18   reasonable doubt, at that point in time do you feel in an

19   intentional murder situation such as that, that means in

20   your mind that person is a continuing danger to society?

21             A.    Yes, beyond a reasonable doubt, if it's

22   proven, yes.

23             Q.    Once it's been proven that it's an intentional

24   killing beyond a reasonable doubt, that's what satisfies you

25   as far as a continuing danger to society?

1      A.      Yes.

2      Q.      And question No. 1 would be yes at that point

3  in time, once it's been proven to you --

4      A.      Yes.

5      Q.      -- beyond a reasonable doubt?

6      A.      Yes.

7      Q.      Okay.  Same thing is true in an accomplice

8  situation, once it's been proven to you that they either

9  intended that person to die or they anticipated that that

10 person should die or should have anticipated that person

11 should die, again, then you feel that's a situation where

12 they will be a continuing danger to society?

13     A.      Yes.

14     Q.      And then once you determine that guilt and

15 it's been proven to you beyond a reasonable doubt, you'd

16 feel they'd be a continuing danger to society?

17     A.      Yes.

18     Q.      Okay.  I thought you felt that way, but I just

19 wanted to make sure.  You were pretty honest up front when I

20 talked with you.

21     A.      Yeah.

22     Q.      And I wanted to make sure you still felt that

23 way.

24     A.      Yes.

25     Q.      Because we've talked about the law and all

1       that and you're just giving us your true feelings?

2            A.    Yes.

3                  MR. SHOOK:  I could inquire into a lot of

4       other issues, Judge, but I will stop at that moment, and

5       then we can go on from there.

6                       RECROSS EXAMINATION

7       BY MS. BUSBEE:

8            Q.    Ms. Wilkey, this is why people hate lawyers.

9       Did you understand that what Mr. Shook was asking you was

10      whether or not, after you found someone guilty of the

11      offense of capital murder, you would already have decided

12      these punishment issues against the defendant without having

13      to hear any additional evidence?

14           A.    Well, now, I wouldn't agree with that.  I

15      think that there would be, I mean -- I can -- I could find

16      him guilty, but it would have to be -- you may be saying

17      beyond a reasonable doubt with the evidence that I could

18      give him the death penalty.  But I may would want to, you

19      know, it would be like an overview on the whole.  It would

20      not just be the death penalty would be.

21           Q.    Right.  So you understand that what he was

22      asking you, and I'm not accusing him of confusing you,

23      because this is confusing.

24           A.    Yes.

25           Q.    We don't have to make it any more confusing.

1    I think you're telling us the same thing, but when we ask

2    you, we think we're getting different answers.

3        A.    Sometimes I feel like I'm getting --

4        Q.    This is the deal.  As basic as I can make it.

5    The law is, if you found someone guilty of the offense of

6    capital murder, intentional party, conspiracy, all those

7    different ways, you get to this second part of the trial.

8            The law says no matter what your feelings

9    might be, if you can set them aside and have the State prove

10   to you these Special Issues beyond a reasonable doubt, that,

11   of course, it would be 1 and 2, then you are qualified to

12   sit as a juror.  Everybody has opinions and feelings.

13       A.    Uh-huh.

14       Q.    But if you can make the State meet their

15   burden on those before you'd find those things to be a yes

16   answer, then you can follow the law and you are okay.  You

17   are qualified.

18       A.    I can follow the law.  I mean, if these are

19   the yes, they have to be yes answers, and that's what I've

20   got to be looking for to see if I get those answers.

21       Q.    And you'd make the State prove that to you?

22       A.    Yes.

23       Q.    Okay.  And then this second question is kind

24   of a -- I call it a touchy feely thing.  It's -- you can't

25   necessarily know what it would be, but if you saw it, you

1   would certainly -- your mind is not closed to giving a life

2   sentence.

3         A.     No, my mind is not closed to a life sentence.

4         Q.     So I appreciate your honesty, because most

5   people would say, yeah, that's how I feel.  But -- and then

6   most people would also say, like you do, but if the law says

7   I need to make the State prove that to me beyond a

8   reasonable doubt, I'll set my feelings aside and make them

9   prove it.

10        A.     Yes.

11        Q.     Fair enough.

12                     REDIRECT EXAMINATION

13  BY MR. SHOOK:

14        Q.     So you would be able to set your feelings

15  aside is what you are saying?

16        A.     Yes, I think I -- yeah, because it's not my

17  feelings, I mean, it's the law.  It's -- I mean, I can't go

18  by -- I mean, I know my feelings.

19        Q.     Well, you said in your -- on page 9 again, I

20  have to live with my decisions.

21        A.     Exactly, I would have to live with my

22  decision.  But if it's -- I mean, my decision, I mean, it's

23  like the law of the land decision, I guess.  It's not -- and

24  I can live with that.  I mean, I would not make that

25  decision lightly, not at all.  I mean, it would be a big

1  decision to make.  But I would want to make sure I was

2  making the right decision.  And so I would -- it would be an

3  overview of it all before I would make a decision like that.

4       Q.     A decision like what?

5       A.     Capital, I mean, a death sentence.

6       Q.     So if we proved to you beyond a reasonable

7  doubt that he's guilty of intentionally taking a life and

8  you're satisfied with that in your mind --

9       A.     If you proved to me that he has taken a life,

10  I still would have to go down to the circumstances and all

11  of that and, I think, before I could give a death penalty.

12       Q.     Okay.  Ms. Wilkey, let me ask you, do you want

13  to be on this jury?

14       A.     Not really.

15       Q.     Okay.  Are you familiar with the method of

16  execution in Texas?

17       A.     Lethal injection?

18       Q.     That's right.

19       A.     Yes.

20       Q.     Have you read about it or covered any, seen

21  any news stories?

22       A.     I've just heard here and there.

23       Q.     Okay.

24       A.     I've not really --

25       Q.     You do know that Texas actually does carry out

1   the death penalty?

2       A.    Oh, yes.

3       Q.    Okay.  Some states have it and they never do.

4       A.    Uh-huh.

5       Q.    But Texas is a state that does.  In fact, it

6   leads the nation in executions.  There have been 20

7   executions so far this year.  But we -- since the death

8   penalty was reinstituted, we lead the nation.  And the

9   procedures are the same in each case.  We've kind of gone

10  over the scheme with you.

11             If someone's found guilty, you get these

12  Special Issues.  If they are answered yes, yes, and no, then

13  the Judge doesn't have any discretion.  He would sentence

14  the defendant to death.  You don't write life or death in.

15  It's all determined by how you answer those questions.  If

16  you answer them any other way, it's going to be a life

17  sentence.  But those are the only two possible outcomes.

18  Does that make sense to you?

19      A.    Uh-huh.  So the answers to those have to be

20  yes, yes, and no?

21      Q.    Would equal a death sentence.

22      A.    Would equal a death sentence.

23      Q.    And if they're answered any other way, it

24  would be a life sentence.  But those are the only two

25  possible outcomes.  Now, if it is a yes, yes, and a no, then

the Judge would sentence the defendant to death and he'd be placed on death row.

The laws and procedures are the same in each case.  He would wait there.  I can't tell you how long he would, but at some point in time the Judge would actually issue a date of execution.  On that date or the day before, he would be moved from death row to downtown Huntsville.  There's a prison unit there.  You sometimes see it on TV.  It's got that big clock.  Have you seen that on the news?

A.      I've seen them when they're down there.

Q.      They protest sometimes.

A.      Yes, uh-huh.

Q.      That's probably where you've seen it.

A.      Yes.

Q.      In that prison by law is where executions take place.  Now, on the date of his execution under our procedures he will get time with some family members, he'll get time with a religious, maybe a minister, he would get a last meal, if he could eat it.

At 6:00 p.m. executions take place.  He'd be taken about 18 feet down to the death chamber and laid on a gurney and secured by leather straps.  Once in a while one of them resists, but there's guards there trained to prevent that.  He'd be secured down.  Needles would be placed in his arm and then tubes go to another room where the executioner

1    sits.

2                    And at that point in time they bring in

3    relatives of the deceased who can sit in one viewing room

4    and relatives of the defendant.  After they are assembled,

5    the warden allows the condemned to make a last statement and

6    these are often reported in the media.  You may hear that

7    I'm innocent, I don't know why you're doing this to me, I

8    didn't commit this thing.

9                    You may hear about them begging for

10   forgiveness.  You may hear about their relatives discussing

11   what happened and how wrong it is.  The media likes to cover

12   those in detail.  You've probably read some of those

13   accounts.

14        A.    Yes.

15        Q.    They even have it on a website.  After he

16   makes that statement, the warden then signals the

17   executioner which simply injects three types of lethal

18   chemicals.  They react very quickly.  While he is conscious

19   they collapse his lungs, which forces the air out.  It's

20   almost an involuntary reflex to try to catch that breath.

21                    Oftentimes reporters talk about someone

22   snorting, making noises.  That's the air escaping.  The

23   heart suddenly stops.  And within a few seconds they

24   generally fall into unconsciousness, knowing what's

25   happening to them.  Within a few moments they are pronounced

1    dead.

2            That's the procedure that happens in each

3    case and that's the procedure that would happen in this

4    case.  And we can't go into the facts, obviously, but we

5    have the -- feel we have the type and quality of evidence to

6    convince a jury to answer those questions in a way that

7    would result in the execution in that method I've described.

8            I don't mean to be morbid, going into it,

9    but it's one thing when we talk about it philosophically

10   here and it's quite another when we talk about sitting on a

11   jury and making these decisions of life and death.

12           Because some jurors come down here,

13   they're opposed to the death penalty on religious reasons

14   and they tell us, matter of factly, I'm opposed to it.  I

15   couldn't live with myself in making that decision and I

16   can't make that decision.  We have some jurors that are

17   adamantly for the death penalty and really can't be fair.

18   We have other jurors who are for it and could make the

19   decision.

20           We have other jurors who are for it

21   philosophically and think it's necessary in some cases, but

22   when it gets down to it, it would weigh on them too much.

23   It would interfere with their decision because they would be

24   thinking about this person they saw every day, living,

25   breathing, maybe even hear them talk, and they couldn't.

1    That would weigh on them too much.

2    And it's fine if they feel that way.  I

3    kind of use an example of these buildings downtown when I

4    see these window washers up 50 floors.  I'm glad someone

5    will do it.

6        A.    Uh-huh.

7        Q.    But I would never get out there.  Some people

8    feel that way about the death penalty.  Now, we can't put

9    you in this situation and preview the facts and see how you

10   are going to come out.  But you have, quite honestly,

11   expressed some reservations to us about the law itself and

12   that type of decision.

13   As you sit here today and after we've

14   talked to you and after you've seen this man living and

15   breathing in the same room with you, is this actually the

16   type of case you feel you could sit on and make these

17   decisions, knowing he would be executed someday?

18       A.    Well, I don't know, unless I were to do it.

19   And I don't know how I'll handle it at the moment.  Right

20   now it's kind of surreal, you know.  It's -- so I'm not

21   really sure how I'll handle it.  But I think that I -- I

22   could, you know, listen to the evidence and make a decision.

23       Q.    Do you think you can make a decision that

24   would result in his execution?

25       A.    If it's beyond a reasonable doubt.

1    Q.    I just want to make sure because I've had

2    people and we've had situations where they get on here and

3    they say, I can't do this.  And then we've had other people

4    that tell us, I have too much hesitation.

5    A.    I can't tell you how I feel at the moment when

6    I'm here doing it.

7    Q.    Do you think you might have some hesitation?

8    A.    Well, it's possible I could.  You know, I

9    might get here and have a whole different feeling on it when

10   I'm hearing everything, and so.

11   Q.    Okay.  Let me go into some other areas of law,

12   then.  The State has to prove to you each and every element

13   of the case beyond a reasonable doubt.  The law says that if

14   we are unable to prove and you have a reasonable doubt on

15   any element, any part of the indictment, then you'd have to

16   find him not guilty.

17                That includes an element called Dallas

18   County, for instance.  If we proved to you beyond a

19   reasonable doubt who did this killing, how they did the

20   killing, and who they murdered, and under what

21   circumstances, and you believed that beyond a reasonable

22   doubt, but from the evidence you had a doubt about what

23   county it happened in.  Maybe you believed it actually

24   happened in Tarrant County.  You would be obligated under

25   the law to find him not guilty.

1              Some jurors can do that and some can't.

2  Some tell us, I think the important part is proving who did

3  it and who they murdered and maybe how they murdered, but

4  who did it and who they murdered.  And when you start

5  talking about the county it happened in, that's not really

6  an important detail and they disagree with that area of the

7  law.

8         A.    Well, I do, too.

9         Q.    And they're honest with us and say, look, you

10 get to the point where you've proven this particular person

11 is the one that did it and who they murdered.  That's what I

12 need to know.  That's important.  And the county where it

13 happened is really a technicality.  And that doesn't make

14 sense that I'd have to find them not guilty, if I had a

15 reasonable doubt about that.

16        A.    That's true.

17        Q.    And is that how you feel?

18        A.    Yes.

19        Q.    And that doesn't make you a bad citizen

20 necessarily.  It just makes you an honest one, if that's

21 truly how you feel.  Because the law says no, you've got to

22 find him not guilty.  And we've had people that say, all

23 right, I would.

24              And we have other jurors that say, look,

25 Judge, I've got to live with myself, and if I know beyond a

1  reasonable doubt who committed the crime and how they

2  committed it, who they murdered, then the State has proven

3  its case to me and he's guilty.  And I'm not going to cut

4  him loose so he can go back out in society on a technicality

5  about what county it happened in.  Just as a practical

6  matter, I can't do that.  I can't follow that area of the

7  law.  In good conscience, I can't.  I can't violate my own

8  conscience.

9        A.     Yeah.

10       Q.     If you feel that way, that's fine, because as

11 I said before, some people can follow that particular area

12 of law and some people, who are good citizens, can't.  But

13 they're honest with us and say they can't.

14       A.     Well, I don't think it should be an issue,

15 what county.  We're here and we're --

16       Q.     A lot of people feel that way.  And are you

17 telling me, honestly, that's one area of the law which we

18 talked about earlier about as far as I have to live with

19 myself, kind of a common sense deal, that if that were the

20 law, you'd disagree with that part of the law and that'd be

21 one of those areas that you could not follow?

22       A.     That might be the case, yes, because I would

23 find that kind of frivolous.

24       Q.     Okay.  A lot of people feel that way.  The law

25 is the other way and some people can follow it and some

people can't.  And, again, it doesn't make you a bad

citizen.

                    But you seem pretty upfront on that one,

page 9, and that's why I went back to it is the Judge tells

you one thing, but your conscience tells you another, would

you be able to follow it?  And that's why we ask that

question.

          A.     Yes.

          Q.     And you said, matter of factly, back in May, I

have to live with my decision.

          A.     Yes.   Whatever decision I make is what I have

to live with.

          Q.     And some people tell me, I couldn't do that.

I couldn't cut a guy loose, a capital murderer, in that

situation, in that trivial of a situation.  That doesn't

make sense to me.

          A.     No.

          Q.     And if you can't follow that area of the law,

that's fine.  That's why we bring a thousand people down.  I

take it from your answers then, in that one particular area

of the law, that's one part of the law that you do disagree

with?

          A.     Yes.

          Q.     And that's one area of the law that you

wouldn't be able to follow it strictly, if you -- if you, in

1  fact, it's not going to matter in the county, it's the other

2  areas that are important to you?

3      A.      That's right.  I mean if it -- what county it

4  happened in affects, you know, what happens, then yes, I

5  don't agree with it.

6      Q.      Okay.  Fair enough.  That's one area of the

7  law you do disagree with?

8      A.      Yes.

9      Q.      Okay.  We've had a lot of others feel the same

10 as you, so you're not alone.  The presumption of innocence,

11 you know, jurors have to give a person that presumption of

12 innocence at the beginning of the trial.  The fact that

13 you've been arrested and charged, indicted, is no evidence

14 of guilt.

15              Now, some people will tell us, quite

16 honestly, either from what they've read in this case or the

17 fact that we are going through this process, they'll say

18 where there's smoke, there's fire.  They not necessarily --

19 I don't know if they could start the defendant out with that

20 presumption of innocence.  People feel differently about

21 that.  How do you feel about the law in that area?

22     A.      Explain it again now?

23     Q.      Anyone charged with crime is supposed to start

24 out with the presumption of innocence from the jury.

25     A.      Yes.

1    Q.    And some jurors can give them that

2    presumption.  Others think if he's been arrested, indicted,

3    if we're going through all this process, there's got to be

4    something else there.  There's got to be something to it,

5    and I couldn't start him out with that absolute presumption

6    of innocence.  But people feel differently about it.

7    A.    When I come in here, I know I'm supposed to be

8    listening.  I mean, it's what happens in here is what I

9    should be basing it on.

10    Q.    Exactly.  Do you think you could follow that

11    area of the law?

12    A.    Yes.

13    Q.    So that is one area that you could follow the

14    law?

15    A.    Yes.

16    Q.    Okay.  Fair enough.  People agree on different

17    parts.  That's one part you could agree?  Okay.  Let me ask

18    you just how you feel about this other area.  If a person is

19    charged with a crime, a defendant, he has an absolute right,

20    if he wants to, he can testify and tell his side of the

21    story.  But sometimes defendants choose not to testify.

22    They exercise their Fifth Amendment rights.

23          In those situations the Judge would say,

24    you can't hold that against them.  It can't be evidence

25    against them.  That's what the law is.  Sometimes jurors in

1  capital murder situations have trouble with that aspect of

2  the law.

3          They would say -- they kind of look at it

4  -- the way it's been explained to me is, look, if I didn't

5  commit a capital murder and the State is coming after me

6  with a death penalty and I didn't commit that crime, wild

7  horses couldn't keep me off that stand.

8          So common sense tells them, if he's not

9  on the stand, that means he's guilty or he's done something

10 wrong.  It's going to hurt.  And they couldn't follow that

11 aspect of the law.  Others can follow that area of the law

12 and would not hold that against a person, if they testify.

13         I just want your gut reaction on that

14 area of the law as the Fifth Amendment in a capital murder

15 case.  If someone didn't testify, do you think that would

16 enter into your decision-making process?

17 A.      Well, it might for a moment.  I would be, I

18 would try to think of why he wouldn't want to testify, if he

19 was innocent.  But then I know that sometimes words don't

20 come out the way that you think they will when you're up

21 talking to people, and I can understand why some people

22 would not want to, because what they say may not be what

23 they mean.

24 Q.      So do you feel that you could follow that

25 particular area of the law?

1    A.      Probably, yeah, I probably could.

2    Q.      Okay.  And do you, in fact, agree with that

3 area of the law?

4    A.      Yeah.  I think you have the right to speak or

5 not.

6    Q.      All right.  So you don't have a problem with

7 that.  You agree with that area.  And the other area we

8 talked about, it's that other part that you have honestly

9 told me you disagree with the law as far as --

10    A.      Oh, yes.  I didn't realize that was a law.

11    Q.      Most people don't.  And that's why a lot of

12 people, like you, have told us, look, when it gets down to

13 it, I'm not going to violate my conscience.  I just couldn't

14 follow that particular area of the law.  Well, I appreciate

15 your honesty in those answers.

16    A.      Thank you.

17            MR. SHOOK:  That's all we have at this

18 time, Judge.

19            MS. BUSBEE:  I have a few more questions,

20 Your Honor.

21            RECROSS EXAMINATION

22 BY MS. BUSBEE:

23    Q.      Ms. Wilkey, first of all, I hear you saying

24 that this is a hard decision to give a death penalty.

25    A.      Yes.

1    Q.    But as you understand the law, you could sit

2    on this jury.  And if it was proved to you, you could answer

3    those questions in such a way that the death penalty could

4    result?

5    A.    It could, yes.

6    Q.    Yeah.  But how do you know how?

7    A.    Exactly.

8    Q.    Okay.  Let me ask you this question and put it

9    in context, because I don't think you've ever been on a jury

10   before.

11   A.    No.

12   Q.    Okay.  Well, you took a -- you swore to tell

13   the truth when you filled out the questionnaire and that, of

14   course, carries over to here.  But when you -- and if you

15   are selected as a juror, you will take an oath to true

16   answers give according to the law and the evidence.  And

17   that's what the jury, that's the vow the jury takes.

18   A.    Uh-huh.

19   Q.    And I think you called Mr. Shook's example

20   frivolous, and, of course, sometimes we give silly examples

21   about things, just to kind of make the point very clear.

22            Now, it's the defense that is entitled to

23   have every single element proved beyond a reasonable doubt.

24   And if, for instance, in this example, which is out there

25   and highly unlikely to happen, but it illustrates a point.

1          If, in that example, you sat on a jury

2    and you have taken the vow to answer, to follow the law and

3    give true answers according to the law and the evidence, and

4    the State proved the wrong county, they've alleged Dallas

5    and the proof came out that it was Tarrant County, would you

6    really not follow the law?

7          A.    I can't say not being there, but, yeah, I

8    would be -- I would have to think about it.  I mean, it

9    would be -- there would be the chance that I would not

10   follow the law.

11         Q.    Okay.  But you understand that you would be

12   swearing that you would follow the law?

13         A.    Well, I understand that.  But see, like I say,

14   I didn't even know that was a law.  I don't know what kind

15   of law it's pertaining to, but I just think that if that is

16   the case and it is a murder trial, it's not about what

17   county, then yes, I would have a problem with it, because

18   why waste all this time and go through all of this over a

19   county issue?

20         Q.    Well -- and, see, that's the, that's -- you're

21   being logical and we're being obscure.  We use this silly

22   point to illustrate the larger points.  If you would hold

23   the State to their burden of proof on that, you would hold

24   them to the burden of proof on the more important matters.

25   But in each, each charge in this state and in every state I

1   know of, alleges a jurisdiction, like a county or, say, a

2   parish in Louisiana.

3                    And that's one of the things that the

4   State is required to prove, as well as, you know, who the

5   owner was, if a car was stolen, or where the residence was

6   located, if a house was broken into.  It's one of the things

7   they have to prove.  And I'm just asking you, because I

8   think you didn't understand what you were being asked, would

9   you make the State prove every element beyond a reasonable

10  doubt before you would find it?

11                   And if the evidence wasn't there, would

12  you find for the State without the evidence on any of these

13  elements, including a county?  And I realize it's a

14  ridiculous example, but it clarifies your thinking to know

15  that each thing has to be proved by law.

16       A.     Yes.  Maybe I need to know the laws.  I don't

17  agree with all of them.

18       Q.     Well, you don't agree with them, but would you

19  follow them?

20       A.     I --

21       Q.     It would make you mad, I know.

22       A.     Yes, it would.  And I would think that I

23  really shouldn't be having to follow that law.  That just

24  sounds, I mean, as ridiculous as that one is, it just -- you

25  know, I would -- I would be thinking we were wasting all our

1   taxpayers' money for all of this and I would be thinking

2   there was no need to do that for --

3        Q.   Right.  Because when you think of it

4   practically, you go, no way.  But once you realize that that

5   is something that they have to prove to you beyond a

6   reasonable doubt, you would follow the law and in this

7   example, which is a silly example, but in this example --

8             MR. SHOOK:  Judge, I'll object to calling

9   it a silly example.

10            MS. BUSBEE:  Well --

11            MR. SHOOK:  I don't think it's a silly

12   example.  It's the law.

13            THE COURT:  Sustained.

14            MS. BUSBEE:  All right.

15       Q.   (By Ms. Busbee)  In this example, it's an

16   element as important as identity.  Would you, if it was not

17   proved to you beyond a reasonable doubt, find it not too --

18   and if it was, say it wasn't so --

19       A.   I'll say I believe the same way I did from the

20   start.  I just think that would be a silly thing and I would

21   be thinking that, you know, we're here for a bigger cause.

22       Q.   Right, and I understand that.  Everybody would

23   say that.  I'd say that.  But my question is, despite all

24   the thinking how crazy that would be, would you follow the

25   law?

1   A.    I can't tell you that I would.

2   Q.    Can you tell me that you wouldn't?

3   A.    No, I couldn't tell you either way, but, like

4   I say, it could go either way.

5   Q.    Depending on the evidence that you heard?

6   A.    Exactly.

7   Q.    And how strong that evidence was?

8   A.    Exactly.

9   Q.    So what you're saying is, is that you would

10  make the State prove their case beyond a reasonable doubt?

11  A.    Yes, I would.

12  Q.    Each and every element?

13  A.    Yes.

14  Q.    I mean, other than this county issue, is there

15  any other element of this case that you would think would

16  be, you know, silly or ridiculous to not be proved?

17  A.    No, no, I can't, no, just the county thing was

18  just kind of --

19  Q.    Out there?

20  A.    Yeah.  But no, I can't, like I say, I don't

21  know all the laws, so I couldn't tell you from one law to

22  the other.

23  Q.    And I'm sorry to have to pin you down about

24  this, but I really would like your honest answer.  If the

25  State fails to prove any element of the case to you beyond a

1  reasonable doubt, any element, now you know what these

2  elements consist of.  It's everything alleged in the

3  indictment.  If they failed to prove that to you beyond a

4  reasonable doubt, would you follow the law?

5       A.     Yeah, I'll follow the law, I mean, to me, like

6  I say, I have to live with my conscience.  It's going to be,

7  you know, there's the law and then --

8       Q.     It would offend you, I suppose, if it was the

9  county, but would you follow the law?

10      A.     I think I would.

11      Q.     And make them prove it to you beyond a

12 reasonable doubt?

13      A.     Yes.

14             MS. BUSBEE:  I have no more questions of

15 this juror at this time, Your Honor.

16             THE COURT:  Thank you, Ms. Wilkey.

17 Please wait for us one more time outside.

18             PROSPECTIVE JUROR:  Okay.

19                 [Prospective juror out]

20             THE COURT:  Court does not believe that I

21 need any further arguments on this issue.  I will rule,

22 unless you wish to expound further because she's all over

23 the map.

24             MS. BUSBEE:  You are looking at me when

25 you're saying that.  It's our position that she's qualified.

1          THE COURT:  She's gone several different

2   directions on me and after an hour and -- it started at 3:45

3   and it's 5:00, she's still going back and forth and I'm not

4   going to seat somebody on this jury that just doesn't, A,

5   understand the law, and, B, tells me, well, I think I can

6   follow the law.

7          MS. BUSBEE:  May I inquire of the Court

8   as to which, what area the Court thinks that she's

9   disqualified?

10          THE COURT:  She's given me different

11  answers, depending on who is asking the questions, is why I

12  stayed out of it.  And then Mr. Shook tied her down real

13  good and tight on the element issue, and then you came back

14  around and you did an excellent job on rehabilitating her.

15          MS. BUSBEE:  Well, Your Honor, it's my

16  position that once she understands that she would be asked

17  to follow the law, she would do it.  She -- but when asked a

18  question in a general sense, she gives her common sense

19  answer.  So I would like the Court to inquire.  You said

20  you'd stay out of it, but if she's vacillating, perhaps the

21  Court could make a better inquiry, if that -- I don't think

22  she's vacillating.

23          THE COURT:  Well, I've made enough notes

24  in my mind that she's simply not either, A, understanding,

25  or, B, trying to answer the person asking the question to a

1 degree to get off the stand.  So I'm not going to find her

2 to be qualified.

3                    MS. BUSBEE:  And did you say which area

4 you felt she was unqualified in?  Which law you felt she was

5 unable to follow?

6                    THE COURT:  She's all over the page.  Ask

7 Ms. Wilkey to come back in.

8                         [Prospective juror in]

9                    THE COURT:  Ms. Wilkey, thank you for

10 giving us all afternoon, especially with your transportation

11 issues.  I'm sorry to put you out in the 5:00 traffic on

12 foot.

13                    PROSPECTIVE JUROR:  I know, but I'm not

14 driving.

15                    THE COURT:  You're not going to be on

16 this jury.

17                    PROSPECTIVE JUROR:  Thank you.

18                    THE COURT:  So I appreciate your time and

19 service to this Court.  Thank you.

20                         [End of Volume]

21

22

23

24

25 STATE OF TEXAS              *

COUNTY OF DALLAS          *

    I, NANCY BREWER, Official Court Reporter for the 283rd Judicial District Court, do hereby certify that the above and foregoing constitutes a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

    WITNESS MY OFFICIAL HAND on this the 4 day of _____March_____ , 2004.




               _Nancy Brewer_
NANCY BREWER, CSR, NO. 5759
Expiration Date:  12-31-04
Official Reporter, 283rd JDC
Frank Crowley Crts. Bldg. LB33
133 No. Industrial Blvd.
Dallas, TX 75207
(214)653-5863