No. <u>74851</u>

# PATRICK HENRY MURPHY, JR.

APPELLANT

## CAPITAL MURDER

OFFENSE

## DEATH

PUNISHMENT

## DALLAS

COUNTY

CONTENTS: RR VOLS. 27 - 33

REPORTER'S RECORD

74851

VOLUME 27 OF 4 VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

STATE OF TEXAS                    *          IN THE DISTRICT COURT

VS.                               *          DALLAS COUNTY, TEXAS

PATRICK HENRY MURPHY, JR.         *          283RD DISTRICT COURT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FILED IN**
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 2nd day of October, 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

## A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT: 03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT: 00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

| PROSPECTIVE JUROR INDEX | | | | |
|---|---|---|---|---|
| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
| Robin Sterling | 4 | | | 27 |
| Jennifer Dillon | 10 | 12 | | 27 |
| Sandra Landers | 21 | 23 | 45 | 27 |
| Dee Dee Wheeler | 47 | 48 | | 27 |
| Julia Laux | 55 | 57 | | 27 |

P R O C E E D I N G S

1

2          THE COURT:  Ms. Sterling.

3                  [Prospective juror in]

4          THE COURT:  Good morning.  Keep that

5   coffee right on top there.  Don't worry about it.

6          PROSPECTIVE JUROR:  Okay.

7          THE COURT:  We have juror No. 3250, Ms.

8   Robin K. Sterling; is that correct?

9          PROSPECTIVE JUROR:  That's correct.

10         THE COURT:  Good morning.  How are you?

11         PROSPECTIVE JUROR:  Good.  How are you

12  doing?

13         THE COURT:  Welcome to the 283rd.  We're

14  doing just fine.  We appreciate you being here on time.  We

15  schedule three people in the morning and three in the

16  afternoon and whoever comes in first, goes first.

17         PROSPECTIVE JUROR:  Well, I'm glad I came

18  in first, then.

19         THE COURT:  How's that?

20         PROSPECTIVE JUROR:  Good!

21         THE COURT:  That way you don't have to

22  wait for an hour to get on the stand.  You can be nervous

23  all at one time.

24         PROSPECTIVE JUROR:  That's right.

25         THE COURT:  You don't have to sit there

1  and wait.  We understand people are nervous when they come

2  in and that's to be expected.  This is probably the first

3  time you've ever been through this process or known anyone

4  who has been through this process.  And the best part about

5  it is there are no wrong answers.

6                    PROSPECTIVE JUROR:  Great.

7                    THE COURT:  Just truthful.  Did you have

8  an opportunity to go through the guide I provided?

9                    PROSPECTIVE JUROR:  Yes, I did.

10                    THE COURT:  And we also provided a copy

11  of your questionnaire that you filled out for us back in

12  May.  I did that so that you can begin to think of the

13  issues that the attorneys are going to visit with you about

14  and also to provide the answers so that they may want you to

15  expand upon them or what were you thinking when you said X,

16  things of that nature.  The whole process here is geared

17  toward having you learn and understand the law.

18                    PROSPECTIVE JUROR:  Right.

19                    THE COURT:  Please ask questions.  If you

20  don't understand, say rephrase it, give me another example,

21  does it work this way?  We want you to have a functional

22  understanding of the law.  At the end of the process, I have

23  two questions I must ask.  Number one is do you understand

24  the law?  And, number two, can you follow the law?  That's

25  my big picture here.

1    PROSPECTIVE JUROR:  Okay.

2    THE COURT:  The only question I have for

3 you at this point before we begin is will you be able to

4 serve this Court for a period of two weeks beginning on

5 November 10th?

6    PROSPECTIVE JUROR:  Well, um, I had spoke

7 with your Deputy Sheriff earlier because I was concerned

8 about that.  I'm scheduled to undergo some medical

9 procedures right about exactly at that time.  Unfortunately,

10 they are of the nature that we're not sure when they are

11 going to fall, on what day.  It is infertility related, so

12 I'm already being treated right now and it just depends on.

13    THE COURT:  Depends on when the day is?

14    PROSPECTIVE JUROR:  Right, how things

15 progress.

16    THE COURT:  Now, I don't want to get too

17 personal --

18    MS. BUSBEE:  We'll agree, Your Honor.

19    THE COURT:  You will agree?

20    MS. BUSBEE:  Yes.  We don't want to put

21 her through that.

22    THE COURT:  Mr. Wirskye's wife is going

23 through some issues.  They're further along than you are, so

24 they have agreed and we hope that you have all the best of

25 luck.

1    PROSPECTIVE JUROR:  Well, thank you very

2  much.  I'm sorry to waste any of your time.  I appreciate

3  your help, thank you.

4    [Prospective juror out]

5    THE COURT:  Mr. Rodriguez.

6    [Prospective juror in]

7    THE COURT:  Good morning, sir.  How are

8  you?

9    PROSPECTIVE JUROR:  Fine.

10    THE COURT:  We've got juror No.

11  3282, Steve Jerome Rodriguez; is that correct?

12    PROSPECTIVE JUROR:  Yes, sir.

13    THE COURT:  How are you doing this

14  morning?

15    PROSPECTIVE JUROR:  Doing great.

16    THE COURT:  Welcome to the 283rd.  Did

17  you have enough time this morning to review the guide I

18  provided for you?

19    PROSPECTIVE JUROR:  Yes, sir.

20    THE COURT:  And also did you look at your

21  questionnaire that you filled out for us back in May?

22    PROSPECTIVE JUROR:  Yes, sir.

23    THE COURT:  Good.  A little nervous so

24  far?

25    PROSPECTIVE JUROR:  A little bit.

1    THE COURT:  Normal.  This is as informal

2    a process as we can go through to visit with you.  The

3    opportunity here is for you to learn the law.  The attorneys

4    are going to visit with you about how it relates to this

5    process and we want you to ask questions.  We want you to

6    understand the law.  That's the big issue here.

7         At the end of the process I have two

8    questions I must ask.  Number one, do you understand all the

9    law and how it works?  And, number two, can you follow the

10   law?  That's the big picture for me.

11   PROSPECTIVE JUROR:  Yes, sir.

12   THE COURT:  Okay.  No wrong answers, just

13   honest, truthful answers.  Don't let the lawyers trick you

14   up, either.  If they don't ask a good question or you don't

15   understand it, say I don't understand it.  Make them back up

16   and do it again.  All right?  Fair enough?

17   PROSPECTIVE JUROR:  Yes, sir.

18   THE COURT:  Only question I have for you

19   at this point is will you be able to serve this Court for a

20   period of two weeks beginning on November 10th?

21   PROSPECTIVE JUROR:  Well, no.

22   THE COURT:  Why not?

23   PROSPECTIVE JUROR:  Well, my best friend

24   is getting married in Mexico and we already have plans to

25   go.

1          THE COURT:  What days?

2          PROSPECTIVE JUROR:  The 8th, 9th, 10th,

3  11th, and 12th.

4          THE COURT:  When will the wedding

5  actually be?

6          PROSPECTIVE JUROR:  Saturday, the 8th.

7          THE COURT:  I mean, that's -- you can

8  come back on Sunday, the 9th, can't you?

9          PROSPECTIVE JUROR:  Well, we have a

10  package deal that, you know, I'm there for five days.

11  There's 20 of us going, me and my fiance, and everything.

12          MR. SHOOK:  Package deal.  Is that how

13  you got the better rate?

14          PROSPECTIVE JUROR:  Yes, uh-huh.

15          MR.SHOOK:  And the five-day deal?

16          PROSPECTIVE JUROR:  Uh-huh, it's normally

17  --

18          THE COURT:  Mr. Rodriguez, this is, you

19  know, I can balance the issues from the Court.  I can make

20  you change your reservations.  But if you're traveling with

21  20 people for a celebration of that nature, the parties have

22  agreed.

23          MR. SHOOK:  Yes, sir.

24          THE COURT:  Mr. Rodriguez, you know, I'm

25  not going to let you out of it.  But they just have.  So,

1    enjoy your wedding.

2                    PROSPECTIVE JUROR:  Okay.  Thank you,

3    sir.

4                    THE COURT:  Okay.

5                    [Prospective juror out]

6                    THE COURT:  Ms. Dillon.

7                    [Prospective juror in]

8                    THE COURT:  Good morning.

9                    PROSPECTIVE JUROR:  Morning.

10                   THE COURT:  How are you?

11                   PROSPECTIVE JUROR:  Good, thank you,

12   nervous.

13                   THE COURT:  We have juror No. 2338, Ms.

14   Jennifer Ruth Dillon.  Welcome to the 283rd.  And you have

15   already said you are nervous, that's to be expected.  This

16   is a procedure you have probably never thought about being

17   in the middle of or ever talked to anybody who has been in

18   the middle of anything like this.

19                   PROSPECTIVE JUROR:  No.

20                   THE COURT:  And this is an opportunity

21   this morning for you to learn the law, and ultimately

22   understand the law.  I know you came in a little late.  Did

23   you have time to go through that questionnaire --

24                   PROSPECTIVE JUROR:  Yes, yes, I did.

25                   THE COURT:  -- that you filled out and

1  also the guide I provided for you?

2                    PROSPECTIVE JUROR:  The guide, yes.  The

3  questionnaire, I started to go back through, but I'll

4  reference it.

5                    THE COURT:  If the attorneys have a

6  question about one of your answers, they will say, look at

7  page so and so, and what were you thinking when you made

8  this answer.  Just to give you an idea to begin to think

9  about the issues that are going to be presented here today.

10                   PROSPECTIVE JUROR:  Okay.

11                   THE COURT:  The objective here, as I

12  said, is for you to learn the law.  The attorneys will visit

13  with you about that and give you examples and ask you what

14  your feelings are.  At the end of the program, my question I

15  have to answer is, number one, do you understand all the

16  law?  Secondly, can you follow the law?  That's my big

17  picture here.

18                   PROSPECTIVE JUROR:  Okay.

19                   THE COURT:  Only question I have for you

20  at this time is will you be able to serve this Court for a

21  period of two weeks beginning on November 10th?

22                   PROSPECTIVE JUROR:  Yes, it would be

23  difficult with my work schedule, but other than that.

24                   THE COURT:  Yes, ma'am, everybody put in

25  their box, work schedule.

1            PROSPECTIVE JUROR:  I'm sure, but, yes.

2            THE COURT:  That's why we're doing it

3  this far out, so that you'll have time to arrange your

4  schedule accordingly.

5            PROSPECTIVE JUROR:  Sure.  Okay.

6            THE COURT:  With that, I'll turn it over

7  to Mr. Shook.

8            MR. SHOOK:  May it please the Court?

9               JENNIFER DILLON,

10  having been duly sworn, was examined and testified as

11  follows:

12               DIRECT EXAMINATION

13  BY MR.SHOOK:

14      Q.    Ms. Dillon, my name is Toby Shook.  I'm going

15  to ask you questions on behalf of the State this morning.

16  And, as the Judge has said, there aren't any right or wrong

17  answers.  We just want your honest opinions.

18      A.    Okay.

19      Q.    I see that you were born in Arlington, but

20  didn't stay there long.  Looks like you grew up in

21  California?

22      A.    I did, yes.

23      Q.    San Francisco?

24      A.    Uh-huh, and Orange County, also.

25      Q.    Orange County.  What brought you back to

13

1  Texas?

2      A.    Two reasons, family, my mom had originally

3  come here and so I wanted to follow suit with her, and also

4  we wanted to buy a house, and we couldn't afford anything in

5  California.  So this is the place to come for that.

6      Q.    And you -- now you're a manager at the

7  Lenscrafters?

8      A.    Right.  Yes.

9      Q.    Okay.  We, obviously, are going to spend a lot

10  of time talking to you about how you feel about the death

11  penalty, but I did want to finish up on a couple of things

12  --

13      A.    Sure.

14      Q.    -- from the questionnaire.  I know your

15  hobbies are reading?

16      A.    Uh-huh.

17      Q.    And you said you like fiction mostly?

18      A.    Right.

19      Q.    What type of fiction?

20      A.    I read, gosh, anything, really.  But mostly,

21  more, I guess you'd say, your trashy fiction, like Sandra

22  Brown, and things like that, so.

23      Q.    Okay.  We all -- sometimes we get people that

24  are really into the detective novels and stuff.

25      A.    Okay.  Yeah, generally not.  More romance, but

1   more, I guess you'd say, more detective-type suspense.

2          Q.      Okay.  I just always want to caution them that

3   generally that isn't how it works in real life.

4          A.      Absolutely.

5          Q.      Some people think that, but I think most

6   people realize that.  And you're, also one of your other

7   pastimes is theater?

8          A.      Uh-huh.

9          Q.      What, exactly, do you do in theater?

10         A.      Yeah, I've always been interested in theater

11  and drama.  I did a lot of drama through high school and

12  musicals and things like that.

13         Q.      Do you participate in that now?

14         A.      No, not currently.  Working.

15         Q.      All right.  Let me ask you, generally, how you

16  feel about the death penalty as a law.  Do you agree with

17  it?

18         A.      I do.  I do.

19         Q.      What purpose in your mind do you think the

20  death penalty serves society?

21         A.      Well, as limited as my knowledge, I guess, is

22  on it, I guess my basic mentality for it is if somebody is

23  going to commit an act of murder to somebody else, I guess

24  an eye for an eye, then that person can get the same thing

25  done to them, so.

1    Q.    What -- how did you come to your support of

2    the death penalty?  Is it just the way you were raised, or

3    --

4    A.    No, not necessarily, no.  Just my own

5    personal, I guess, take on it.  I think it's different once

6    you are in a situation though, where you actually have to

7    pass judgment on somebody.  It's real easy to say, yeah, I

8    believe in it, or no, I don't, but.

9    Q.    Yeah.  We talk about that a lot with jurors,

10   that in a philosophical sense, it's easy to talk about.

11   A.    Sure.

12   Q.    And then once you realize you're coming down

13   here and what type of case it is, it's just kind of pot luck

14   when you're called down.

15   A.    Exactly.

16   Q.    And then you're informed that it's a death

17   penalty case or a case in which the State is seeking the

18   death penalty, then it puts everything in a whole 'nother

19   light.

20   A.    Right, right.

21   Q.    And that's why we call a thousand people down,

22   because some people, even though they believe in the death

23   penalty, really can't participate in this type of case.

24   A.    Right.  Well, I remember when I was filling

25   out this and Judge had mentioned that it was a capital

1  punishment, I was like, oh, my gosh.  Yeah, it's very easy

2  to say.  But, like I said, when the situation is actually in

3  front of you, it's a little bit different, I think.

4       Q.    Have you thought about it more about how you

5  feel about the death penalty, since you filled out the

6  questionnaire?

7       A.    Not too much, but in some ways, yeah, I guess

8  I have a little bit, because I think that that's an out that

9  you can take.  But then also, in some ways, it may be an

10  easy out in the sense that somebody is given the death

11  penalty, but also if there were things to make them think

12  about their crime, although I think that they think about

13  that probably every day, I would think, maybe in some

14  instances.  But such as, like, just life in prison or

15  solitary confinement, I don't know if that's cruel, but

16  other than that, not too much.

17       Q.    When you think from your own personal point of

18  view about the death penalty, what types of crimes do you

19  feel the death penalty should be imposed for?

20       A.    I think I believe pretty firmly that only if

21  it's -- if that crime is done to somebody else, like if that

22  person actually killed somebody else, then they would in

23  turn get that.

24       Q.    So the actual triggerman?

25       A.    Right.

1    Q.    That's going to, you're one step ahead of me.

2    That's fine.  You're into my second area I go into.  Because

3    that's what people think of normally, when you think of

4    capital murder, the actual murderer that causes the death,

5    obviously.

6                 But there are some situations in which an

7    accomplice can help commit a crime.  They don't actually

8    cause the murder, but they participate in the crime and are

9    helping, but they are not the actual triggerman, let's say.

10   And under the law and some facts, that person can actually

11   be prosecuted for capital murder and could even receive the

12   death penalty, even though they didn't actually cause the

13   death.

14                 And that causes some jurors problems.

15   They'll tell us quite honestly they believe in the death

16   penalty, but from their point of view they believe in the

17   death penalty, if it's for the actual murderer, the

18   triggerman.  They feel that's just, they took a life.

19   A.    Right.

20   Q.    And their life could be taken.  But from, they

21   kind of draw a line there and they say, now, if it's an

22   accomplice who's assisting in the crime, but didn't actually

23   cause the death, they think that's kind of unfair.  Now,

24   they may put that person, if it were up to them, life in

25   prison or 50 years or some severe term like that.

18

1      A.      Uh-huh.

2      Q.      But they necessarily, they don't think it's

3  fair to assess a death penalty to a nonkiller, a

4  nontriggerman.  Other jurors feel differently.  They do

5  think it's just for an accomplice.  But there aren't any

6  right or wrong answers.  We just -- people fall on one side

7  of that issue, one way or the other, and we'd like to get

8  your honest opinion on that.  How do you feel about the

9  accomplice situation?

10     A.      It's kind of guilt by association.  I mean,

11 you're -- what's the word I'm looking for here?  You're part

12 of the company that you keep, so to speak.  But I still do

13 feel that unless you're the one that actually committed the

14 crime, I think there's other punishments that in that case,

15 if it was an individual who didn't actually commit the

16 crime, but it was guilt by association, I would probably be

17 more in favor of like life in prison or something like that.

18     Q.      Okay.  If it were up to you and you were

19 deciding the laws, then, I take it you would have a death

20 penalty statute on the books, but --

21     A.      Right.

22     Q.      -- but under your scheme the death penalty

23 would be reserved for the actual triggerman or the person

24 that actually took a life?

25     A.      Yes.  And possibly things that come into play

1  in the case may then weigh my thought process, but on a

2  general speaking term, yes.

3      Q.   Okay.  There's another theory involving

4  conspiracy where if we conspire to commit one crime and one

5  of the co-conspirators, while they're committing that crime,

6  commits another crime, all conspirators can be found guilty,

7  if they should have anticipated a crime could occur.  But

8  they don't have to have the intent.

9          And in a capital murder situation, let's

10 say Mr. Wirskye and I decided to rob a bank.  And I went in

11 there with a gun and while we were robbing the bank, on my

12 own I started shooting people.  And he didn't want that to

13 happen.  He didn't intend for that to happen.  He could

14 stand up there and yell, no, don't do that.  That wasn't

15 part of the plan.  He could still be found guilty under that

16 theory of law, if the jury believes he should have

17 anticipated that could happen, even though he didn't have

18 that intent.

19          And some people disagree with that aspect

20 of the law.  Again, they might say, you can find him guilty

21 of aggravated robbery, bank robbery, all day long, but not

22 -- it's not capital murder, if that's not his actual

23 intentions.  And they think that aspect of the law is unfair

24 or the jurors feel it's unfair.  But again, there aren't any

25 right or wrong answers.  How do you feel about that area of

1  the law?

2      A.      If I'm understanding correctly, like if you

3  were going to rob a bank, say, and the gentleman next to you

4  was in on it with you --

5      Q.      Right.

6      A.      -- well, right there, I feel, again, it's

7  guilt by association because you've obviously talked about

8  it.  You've obviously planned something out because you are

9  going to carry out something you've talked about.  So you go

10 there, but then as an individual, you decide to do something

11 a little bit further than what the other does.

12             Then for the other gentleman there, it's

13 still guilty because he's involved in something with you.

14 Granted he didn't know what you were going to do, so,

15 therefore, I feel that maybe the punishment shouldn't be the

16 same for that person, because I think an individual should

17 be accountable for themselves.

18             And if this person is going to say, hey,

19 we're going to do this, and we're going to go and this is

20 the plan, but then you get there and emotion or spur of the

21 moment, you decide to do something else.

22     Q.      Okay.

23     A.      Yeah, I don't feel that that same person

24 should be accountable for that.

25     Q.      Fair enough.

1        MR. SHOOK:  May I have one moment, Judge?

2   That's all the questions I have, Judge.  Thank you.

3        MS. BUSBEE:  Your Honor, we've reached an

4   agreement on this juror.

5        THE COURT:  Ma'am, we want to thank you

6   for coming down today.  You can reduce your stress level a

7   little bit.  The parties have agreed to excuse you from jury

8   service.

9        PROSPECTIVE JUROR:  Thank you.

10       THE COURT:  Thank you.

11            [Prospective juror out]

12            (Recess)

13       THE COURT:  Ms. Sandra Jean Landers.

14            [Prospective juror in]

15       THE COURT:  Good afternoon.

16       PROSPECTIVE JUROR:  Hi.

17       THE COURT:  How are you?

18       PROSPECTIVE JUROR:  Fine, thanks.

19       THE COURT:  Welcome to the 283rd.  We've

20  got juror No. 3685, Sandra Jean Landers; is that correct?

21       PROSPECTIVE JUROR:  Yes, that's correct.

22       THE COURT:  Thank you for being here on

23  time.  Did you have enough time to review the guide I

24  provided for you?

25       PROSPECTIVE JUROR:  Yes, I did.

1    THE COURT:  And also we gave you a copy

2  of your questionnaire to help you begin to think about some

3  of the issues the attorneys will visit with you about this

4  afternoon.  There's a lot of law.  You don't need to

5  understand it all right now.  That's what this interview

6  process is all about.

7    The attorneys will go over the law with

8  you, give you examples, help you understand how it all

9  relates.  That's the objective here.  At the end of the

10  process I have two questions I have to ask.  Number one, is

11  do you understand the law?  Number two, can you follow the

12  law?  That's the big picture I have to look at.

13    PROSPECTIVE JUROR:  Okay.

14    THE COURT:  I know people are nervous

15  when they come in.

16    PROSPECTIVE JUROR:  Yes.

17    THE COURT:  That's normal.  But this is

18  as informal a process as we can have.  But it does sometimes

19  get -- just do your best.  There are no wrong answers, just

20  honest answers.  The attorneys will do a good job.  The only

21  question I have for you at this point, Ms. Landers, is will

22  you be able to serve this Court for a period of two weeks

23  beginning November 10th?

24    PROSPECTIVE JUROR:  Yes.

25    THE COURT:  Thank you very much.  If

1   you'll give your attention to Mr. Wirskye.

2                    MR. WIRSKYE:  May it please the Court?

3                    SANDRA LANDERS,

4   having been duly sworn, was examined and testified as

5   follows:

6                    DIRECT EXAMINATION

7   BY MR. WIRSKYE:

8        Q.     Ms. Landers, how are you this afternoon?

9        A.     Fine, thanks.

10       Q.     My name is Bill Wirskye.  I'll be the

11  Assistant DA that will be visiting with you for the next few

12  minutes.  What I'd like to do, to the extent possible, is

13  just kind of make this a conversation.  I know it's a little

14  difficult since you're up on the witness stand looking at a

15  bunch of lawyers.  But, to the extent possible, we hope you

16  become more comfortable as we go along.

17                   What I'd like to do is follow up on some

18  of the information in your questionnaire that you were kind

19  enough to provide in that 17 pages, talk to you a little bit

20  about your thoughts and feelings on the death penalty, and

21  then finally talk a little bit about some of the laws and

22  some of the rules that apply in criminal cases, and more

23  particularly death penalty cases such as this.  I know you

24  are the financial director for Senior Citizens of Greater

25  Dallas, right?

1      A.      That's correct.

2      Q.      Okay.  I think I know, but tell me exactly

3  what type organization that is.

4      A.      It's a non-profit, social service agency.

5      Q.      Okay.  And you've been with them how long?

6      A.      Approximately 13 years now.

7      Q.      Okay.  What's a normal day like for you, if

8  you do have, I guess, normal days, but --

9      A.      Accounting, bookkeeping type, data entry.

10      Q.      Okay.  And before you were with that

11  organization, what did you do?

12      A.      I was Assistant Financial Director with the

13  YWCA.

14      Q.      Okay.  What went through your mind when you

15  got the notice to come back for the individual interview in

16  a death penalty case?

17      A.      I just thought, you know, it happens every so

18  often for me, so I didn't, I really didn't have any opinion.

19  I was surprised when I came in that it was this type of

20  case.

21      Q.      Okay.  When you came in initially?

22      A.      Uh-huh.

23      Q.      Okay.  And you've been on a jury before; is

24  that right?

25      A       Yes, uh-huh, I was on a DWI jury.

1      Q.    And that was what, '97, '98?

2      A.    '98.

3      Q.    Okay.  Tell us about that.  What were the

4 facts of that case, if you can recall?

5      A.    I can't recall very much.  I remember that the

6 gentleman had been drinking at a bar and had been involved

7 in an accident and he was eventually -- we eventually did

8 convict him of DWI, but the details escape me.

9      Q.    Do you remember, at least from what you can

10 recall, was the evidence pretty straightforward in your mind

11 to your way of thinking?

12      A.    Pretty straightforward, yes.  I do remember

13 during that case that the defense had a witness, a doctor,

14 who specialized in some kind of study.  And at the time the

15 prosecutors wanted to get more information about that,

16 because they questioned the study.  But, again, the details

17 have escaped me.

18      Q.    Okay.  Were the deliberations, did they go

19 fairly smoothly?

20      A.    Yes, very much.

21      Q.    Okay.  And I guess the Judge ultimately set

22 the punishment for the person?

23      A.    That's correct.

24      Q.    Okay.  We always ask people what sort of

25 contact they have had with the criminal justice system,

1  their thoughts, their opinions, if they know somebody that

2  works in the criminal justice system.  And I think you

3  indicated you had a brother?

4      A.      My brother is a probation officer in Arizona.

5      Q.      Okay.  What type of case load does he have or

6  what do you know about his job?

7      A.      I know very little about it, other than he's a

8  probation officer.

9      Q.      Okay.  Do you know if he works with, like,

10  violent felons, or --

11      A.      I don't really know that.  We don't see each

12  other that often.

13      Q.      Okay.  And I know when we asked you, just so

14  you can follow along, I guess I'm on page 5 of your

15  questionnaire.  We asked kind of toward the top of the page,

16  what are your feelings, in general, about the criminal

17  justice system?  You answered that there are flaws, but it's

18  the fairest system.  I was just curious what comes to mind

19  when you think of the flaws in the criminal justice system?

20      A.      Well, I think of the flaws as being people

21  whose cases have been overturned because of DNA evidence and

22  things like that.  But I do believe that this is the fairest

23  system we have and I just think because of the human

24  influence, that there will always be flaws.

25      Q.      Okay.  Is there a particular case that comes

1   to mind when you think about a case that has been

2   overturned, or --

3          A.     No, actually not.

4          Q.     Okay.  And I guess the page before that on

5   page 4, kind of following up on that, I believe you kind of

6   gave a similar answer.  We asked, do you think the death

7   penalty has ever been misused and you answered about the DNA

8   evidence.  But -- and I apologize, part of my copy is cut

9   off.  I don't know if yours is, but it says also, there are

10  crimes that have been sensationalized by the media.  And I

11  can't read the rest of your answer.

12         A.     And I said which could contribute to a more

13  aggressive desire for the death penalty.

14         Q.     Okay.  Explain to me what you mean by that.

15         A.     Well, I think that there have been certain

16  trials that have just been sensationalized by the media.  I

17  think the Kobe Bryant case, for example.  And I think once

18  you get that type of emotion and the media is responsible

19  for it, I think people have a tendency to want to be more

20  harsher.  That's all I meant by that.

21         Q.     Okay.  And you have that concern in the

22  context of a capital case or a death penalty case?

23         A.     I think any capital murder case has got some

24  media attention and I think you just need to be -- people

25  need to be aware of that, if they are serving on a jury.

Q.     Okay.  Kind of just the question, I guess, two below that, do you feel the death penalty in Texas is used too often or too seldom.  I know you didn't -- weren't born in Texas, but you've been here quite a while.

A.     Right.  Well, I really don't have an opinion on that.  I think that, I don't think you can generically make a statement about that.  I think it has to be a case by case issue and I just, that's what I believe in.

Q.     Okay.  As you may or may not know, Texas is probably the most active state, using the death penalty.

A.     I do know that.

Q.     We've executed more people since the death penalty was reinstated.  We typically lead the nation every year in numbers of people executed.  It gets a lot of media coverage and most people know that and different people feel differently about it.  And I'm just wondering off the top of your head, you know, what are your impressions of that, with Texas, I guess, being the leader in the death penalty?

A.     I came from a state where there was not a death penalty and I guess maybe ten years or 15 years ago or even 20, I probably would have been against the death penalty.  But as I get older, I really question the rehabilitation of certain people.  And I, also, as I get older, am more concerned about seriousness of some crimes, and some crimes being very horrendous.

1            And so, I think with age I've just come

2    to feel like if the evidence is there and that the death

3    penalty is appropriate for some cases, not for every case,

4    but for some cases.

5            Q.    Sure.  Is there a particular type of case or

6    set of facts that come to mind when you think of an

7    appropriate type of case for the death penalty?

8            A.    Well, I think child killers.  I mean, that's

9    just the first thing that comes to my mind.

10           Q.    We hear that quite a bit.

11           A.    Someone that would kill a child, I just -- I

12   can't in my mind think of any reason why someone would do

13   that.  And -- but that's the first thing that comes to my

14   mind.

15           Q.    Okay.  Any other?  Would you reserve the death

16   penalty just in cases where someone has been killed?

17           A.    What do you mean?  I mean, what do you mean by

18   that?

19           Q.    In Texas, just to let you know, we reserve the

20   death penalty just for murder cases and then only a certain

21   type of murder case or a certain subset.

22           A.    Right.

23           Q.    There are some states that rape, for instance,

24   I think in Louisiana now, can be considered as a capital

25   offense, depending on the facts and circumstances.  And

1  different people feel differently.  I guess some people have

2  a religious, moral, or ethical belief that, I guess, the

3  ultimate penalty, the taking of someone's life through the

4  death penalty, is only justified when an innocent life has

5  been taken.  And some people would limit it just to those

6  murder cases where someone has lost their lives.

7      A.     I think I would have to go with that.  I would

8  have to agree with that, too.  I can't see getting the death

9  penalty for -- I don't know what other crime you would have

10 that would enable you to get the death penalty, unless you

11 did kill someone.

12     Q.     Okay.  Fair enough.  That sounds like that's

13 an important factor, then, the taking of a life, for you, in

14 order to trigger, I guess, or at least lead to consideration

15 for the death penalty; is that right?

16     A.     Right.  And I do believe people are

17 accountable for their actions, so.

18     Q.     Okay.  Is there a media case you may have

19 followed?  You mentioned Kobe Bryant, which, of course,

20 isn't a murder case.

21     A.     Right.

22     Q.     But a media case that you followed, heard,

23 read, or seen, that comes to mind when you think that person

24 should have gotten the death penalty or that's a good case

25 for the death penalty?

1    A.    Well, I'm following vaguely now the Peterson

2  case, but I really don't have any position, other than the

3  fact that it seems that situations or events change.  I

4  mean, there's more information coming, so I really don't

5  have -- to me it's interesting to see the things that are

6  coming about through this case.  But, you know, I don't have

7  an opinion on whether he should or should not get the death

8  penalty.  I'm more interested in some of these other things

9  that are coming out.

10    Q.    Let me ask you this.  Whoever committed that

11  crime, whether it was the husband or somebody else, would

12  you consider that the type of case, based on what you know,

13  where the death penalty should be considered?

14    A.    Absolutely.

15    Q.    Okay.  And, again, like so many people we talk

16  to that, you know, favor the death penalty just for murder

17  cases, we always kind of follow up with this question.  You

18  know, oftentimes crimes are committed by more than one

19  person.  You can have a group or a gang of individuals that

20  will commit a crime, whether it be something like

21  shoplifting all the way up to capital murder.

22          The law allows us to prosecute everyone

23  that was actively involved in a crime for that crime.  And

24  when you're talking about a situation like capital murder,

25  you may have just one person of that group that actually

1   caused the death, maybe that pulled the trigger of the gun.

2   For lack of a better term, we'll call him the triggerman.

3                      You may have other people who were

4   actively involved in that capital murder, but who didn't

5   actually take a life.  Typically, I think we refer to them

6   as accomplices, nontriggermen accomplices.  Does that make

7   sense to you?

8        A.      Yes, uh-huh.

9        Q.      And we always ask people, because different

10  people feel differently.  Some people who are in favor of

11  the death penalty for murder cases, would draw a line and

12  they believe the death penalty should just be reserved for

13  the person that actually took the life.

14                     And when it came to the accomplices who

15  didn't actually pull the trigger or take the life, you know,

16  they may want to punish them very severely and lock them up

17  for the rest of their life, but for whatever reason, again,

18  religious, moral, or ethical, they don't believe the death

19  penalty is an appropriate sentence for those nontriggermen

20  accomplices.  What do you think about that?

21       A.      Well, if they were all involved in the crime

22  and if they were all part of it, then I think they should

23  all be accountable.

24       Q.      And the law allows, you know, the accomplices

25  could be convicted of capital murder.  I guess my question

1   goes more toward, there are some people that would just take

2   the death penalty completely off the table.  They say, yeah,

3   they should be held accountable.  They should be convicted

4   of capital murder.  I may want to lock them up for the rest

5   of their life.  I just don't feel that the death penalty is

6   appropriate for a person that didn't actually take a life.

7        A.    Right.  Well, I mean, I think it's up to the

8   lawyers to present that argument.  I mean, if that -- if

9   that is a legitimate sentence, then I think it's up to the

10  lawyers to present it like that.  I mean, I just, you know,

11  I believe that if you are in a group and someone is murdered

12  and, you know, I think everybody is accountable.  It doesn't

13  matter who pulled the trigger.  I mean, if you were all part

14  of that, you are one and the same in my opinion.

15       Q.    Okay.  Do you see the sense in having a law

16  where an accomplice to a capital murder could actually

17  receive the death penalty?

18       A.    Yes.

19       Q.    Okay.  Why is that?

20       A.    Because, like I said, I think people need to

21  be accountable and I think if you are involved in a crime

22  with other people, if that is the end result, you are

23  accountable.

24       Q.    Okay.  So you wouldn't automatically take the

25  death penalty off the table for an accomplice who didn't

1   pull the trigger?

2       A.     No, uh-huh, no.

3       Q.     Okay.  And our law in Texas, again, depending

4   on the facts and circumstances, those nontriggermen

5   accomplices can be convicted of capital murder and

6   ultimately face the death penalty, depending on the facts

7   and circumstances and how the jury answers these three

8   questions.

9         Just to give you an example of how that

10   law may work, let's say Mr. Shook and I decide we're going

11   to rob a bank.  The plan is for him to take a gun in and

12   hold up the tellers.  And I'm going to go in unarmed.  I'm

13   going to have a big bag to collect the money.  And while he

14   holds the tellers at bay, I'm going to go through the cash

15   drawers and collect all the money.

16         And that's the plan we make.  No one is

17   supposed to get hurt.  Let's say we go to do that bank

18   robbery, and for whatever reason, maybe one of the tellers

19   gives Mr. Shook a funny look or maybe we see one of them

20   going for a silent alarm, he shoots and kills one of the

21   tellers.

22         He's committed an intentional murder in

23   the course of a robbery, which, you probably read now, is

24   one of those situations where -- a capital murder situation

25   in Texas.  He could be convicted of that crime and

1  ultimately face the death penalty.  The law says I could,

2  too, depending on the facts and circumstances.  What do you

3  think about that, someone in my position?

4      A.      Well, you were, you were engaged in committing

5  a crime, I mean, so you are a part of that unit that was

6  committing the crime.  And even though you weren't the

7  triggerman, you were part of that.  I mean, you were doing

8  something illegal.  So, yes, I mean, I think that should be

9  on the table.

10     Q.      Okay.  Even though I didn't have any intent

11 that someone get hurt?

12     A.      Well, yeah, I mean, yeah.

13     Q.      Okay.  Well, a lot of people find that, you

14 know, intent is very important to them when they talk about

15 the death penalty.  And, you know, I think a lot of people

16 may look at an accomplice who had the intent that the person

17 get killed, for instance, if I turned to him and said, shoot

18 and kill that teller, she's going for the silent alarm, a

19 lot of people would understand that scenario.

20             But kind of the second scenario when I

21 didn't have any intent and he just kind of acted on his own,

22 some people have some questions or hesitations about that

23 scenario, because I didn't have the intent as an accomplice.

24     A.      Yeah, but you were with -- I mean, you were

25 performing an illegal act and you had a gun, or, I mean,

1    yeah.

2         Q.     Okay.  And, again, it depends on the facts and

3    that's the law.

4         A.     Yeah.

5         Q.     Let me ask you this.  We talked a little bit,

6    I guess, about media publicizing or sensationalizing a case,

7    and you, like everybody we talked to, has heard something

8    about this case.

9         A.     Uh-huh, yes.

10        Q.     It was a very high profile case and I'm just

11   -- and different people have different levels of knowledge.

12   It affects different people differently, but I was curious

13   if you could tell us what you remember hearing about this

14   case.

15        A.     I remembered hearing that it was -- and I

16   didn't really hear about the case until maybe a day or two

17   after, that some gentlemen had escaped from jail, had gone

18   to an Oshman's and shot a security officer, a policeman.

19   And then they had fled and they were somewhere in Colorado

20   where they were captured.

21        Q.     Okay.  Do you remember any of the details of

22   the crime that you may have heard in the media?

23        A.     Actually not, no.

24        Q.     Have you kept up with any of the subsequent

25   court proceedings in these cases?

1    A.    I do know that five or six -- well, this is

2  the last gentleman to be on trial, and the previous ones had

3  been found guilty and received the death penalty.

4    Q.    Okay.  A lot of people we talk to don't

5  actually, you know, they remember it when it happened, but

6  haven't really kept up with the court proceedings.  Having

7  had that knowledge about the verdicts in the other cases,

8  how do you think that might affect you, if you were chosen

9  to be a juror in this case?

10    A.    I believe that I would try not to have that

11  influence me.  I mean, I would take this very seriously and

12  I truly believe that it's the lawyers' responsibility to

13  convince me to make my decision.  So I know enough about

14  myself that I do believe that I can be -- well, I don't know

15  what I'm trying to say, but, you know, I'd -- like, have a

16  clear slate, I mean, I don't --

17    Q.    You know, our concern just is, I guess, you

18  know, in contrast to your DWI case where you got down there

19  and had no idea what you were about to hear, jurors in this

20  case, and people that have heard the facts of the crime,

21  maybe to a certain extent, or kept up with the other

22  verdicts, you know, they don't go into a trial necessarily

23  with that clean slate.

24    They have heard some things, may have

25  some preconceived notions, and that's kind of what we're

1   worried about, both sides, very frankly.  And that's why

2   we're asking the questions.

3                  What the law requires is that you be able

4   to tell us, you know, despite what you may have heard, even

5   if you've formed some opinions, in order to be qualified,

6   you need to be able to tell us now that you could base your

7   verdict just on the evidence that you hear in the courtroom

8   and you wouldn't be influenced by anything you've heard

9   previously or heard outside the courtroom.

10        A.     Absolutely.  I mean, my feeling is that it's

11  up to the lawyers to convince me and I truly do believe

12  that.  There's a lot of media stuff going on and, I mean,

13  you take, humans have taken lots of stuff.  But I really do

14  have faith that I can be a juror to the best of my ability,

15  you know.

16        Q.     Okay.  Let me go into one other area with you.

17  We realize, you know, you mentioned you were a little bit, I

18  guess, surprised or taken aback when you found out it was a

19  death penalty case you were down on.

20        A.     Right.

21        Q.     And we realize this is not everyone's cup of

22  tea, necessarily.  And, of course, no one wants to be on

23  this type of case, but I think there are certain people who

24  are very uncomfortable about serving on these types of

25  cases.

39

1    Even people who may very firmly and very

2 strongly favor the death penalty, they just don't

3 necessarily feel that they're the type person that can

4 participate in the process.  They have some hesitation about

5 actually making some decisions that would lead to the

6 execution of another human being.

7    I guess that's a long way to say a lot of

8 people are philosophically in favor of the death penalty.

9 When you get down here, it becomes a little more real when

10 you are staring at a person charged with the crime.  And you

11 know, very frankly, it's our goal, because we feel like we

12 have the quality and the quantity of evidence that's going

13 to convince a jury that he's going to be found guilty and

14 convince a jury that he should get the death penalty.

15    Knowing it's our goal that he be executed

16 one day, you know, it becomes a whole different, I guess,

17 ballgame for a lot of folks.  One analogy that we've heard

18 used is those guys that wash windows on the skyscrapers

19 downtown.  You know, it's an important job.  It needs to be

20 done.  But if it were up to me, I couldn't do it.  I'm too

21 afraid of heights.  You'd never get me up there.

22    And I think a lot of people feel that way

23 when it comes to serving on a death penalty jury.  They

24 worry, you know, what they may hear on down the line in the

25 media.  The media typically reports sometimes in very

explicit details the executions in death penalty cases.

They report on the procedures that are used, I guess, in

cases.

And the procedures are the same in every

case.  They'd be the same in this case.  If these questions

were answered in such a way, very briefly, the first

question that he's a future danger, if that's answered yes.

And secondly, the jury thinks that the person anticipated

that a human life would be taken, and that's answered yes.

And finally, if the last question is answered no, that

there's nothing mitigating, the Judge would have no

discretion.  He'd sentence the defendant to death.

The person would be taken immediately to

Texas death row, which is in the Livingston Unit now in

southeast Texas.  They'd wait there until sometime in the

future.  I can't tell you when or how long, but at some

point in the future, Judge Cunningham would issue a date of

execution.

On that day he would be moved from death

row to the main prison in Huntsville, Texas.  You may have

seen pictures of the outside of that.  There are frequently

protests that go on with every execution.  He'd be taken to

a small holding cell right outside the death chamber.  He'd

stay there for that day.  He'd be given a chance to meet

with friends, family members, a spiritual advisor.  He'd be

1    given a chance for a last meal, if he could eat it.

2                          As the time got closer to 6:00 p.m.,

3    which is the time that the law mandates in Texas that all

4    executions must be, must take place, he'd be moved from that

5    holding cell down a short hall to the execution chamber,

6    either voluntarily or involuntarily.  If he didn't want to

7    go, there are guards there that are trained to force him to

8    go.

9                          And you may have seen a picture of the

10   death chamber.  It's frequently in the media.  It's got a

11   gurney with leather straps in a small room.  He'd be taken

12   in there, strapped down with those leather straps, an IV

13   would be started in his arms with needles and tubes.

14   There'd be witnesses there for his side.  There'd be

15   witnesses there for the victim's side.

16                          The warden would give him a chance to

17   make a last statement.  And these are frequently reported in

18   the media in great detail, often read about the day after

19   the execution.  He may beg for forgiveness, admit his guilt,

20   he may not.  He may be very defiant, proclaim his innocence,

21   and be very angry at that point.

22                          But after the few minutes that he's

23   allotted for his last statement, the warden would signal to

24   the executioner.  The executioner would release different

25   poisons, different substances, into that IV.  Very quickly

his heart would stop, his lungs would shut down.  He'd still

be conscious, but very quickly he'd lose consciousness, fall

into a coma, and very shortly after that, be dead.

                    And I go through that, not to be morbid

with you, but those are the type of details that are

frequently reported in the media.  And it affects different

people differently.  We've had people tell us that they

don't want that in the back of their mind or on their

conscience.  Or if they were on a case, they wouldn't want

to look forward to that day when they had to hear those type

of details, especially after sitting in a courtroom for two

weeks looking at a person, that type thing.

                    So before we go any further, I want to

ask you this question, make sure that you feel like you're

the type of person that could take pen in hand and answer

those questions in such a way that it would ultimately

result in the execution of another human being?

        A.      I would not want, if I had my druthers, I

would not want to be in here right now.

        Q.      Sure.

        A.      But the fact is, I am.  And I understand the

seriousness of this.  And I also understand that it is a

responsibility for, I truly believe it's a responsibility

for a citizen who I reap all the benefits of this system.

So I do believe it's a duty and you're right, I wouldn't

1  want -- I don't, you know, this is not my druthers.  But I

2  do believe it's very, very serious, and I would take it as

3  such, very serious.

4       Q.     Yeah.  I don't think either side -- I think

5  we'd be a little scared of anybody that wanted to be on this

6  jury.  We just want to make sure before we put somebody over

7  there in that jury box that they are, to the extent

8  possible, they have no hesitations about participating in

9  the process, because once they get over there, it's too

10 late.  You know, this is the time we have to talk to you.

11              And we don't want to, you know, force

12 anyone to violate their conscience or put anyone in a hard

13 spot morally, ethically, based on their religion or whatever

14 reason.  And that's why we ask that question.

15      A.     Right.  But I also think that as a juror, if

16 you have all the information and the decision you make is

17 the one that you're comfortable with, you're not dealing

18 with the conscience.

19      Q.     Okay.  Fair enough.  Let's talk a little bit

20 about these Special Issues that you get to in the punishment

21 phase of the trial.  I know you've had a chance to look at

22 them in the packet, but if you could just take a moment or

23 two and review them again up on the board -- they're phrased

24 a little bit differently -- so we can visit them, visit

25 about them.  Do those kind of make sense to you, the three

1   questions that we have?

2        A.     The third one is a little hard to understand.

3        Q.     Your Texas legislature drafted that, so you

4   can't blame the lawyers in the courtroom for that.  It's

5   kind of a long run-on question.  What that basically is, is

6   kind of the last step in the process.

7             It basically allows a jury to show mercy

8   if they feel it's -- if there's something mitigating in the

9   case.  Based on the facts of the crime, based on the facts

10  that you may have learned about him and his background,

11  based on what kind of moral blame he bears, and what

12  happened.  Does that kind of give you a better feel for it?

13       A.     Yes, uh-huh.

14       Q.     It's the last step in the process.  If you

15  feel there's something there that kind of lessens his moral

16  responsibility sufficiently such that his life ought to be

17  spared, you'd answer that question yes.

18            And the first question is basically,

19  again, is the person a future danger?  If that question is

20  answered yes, you move to Special Issue No. 2, which pretty

21  much deals with the situation we've already discussed where

22  there is more than one person involved.

23            If you think he actually pulled the

24  trigger you would answer it yes.  If you think he didn't

25  pull the trigger, but he intended it, you would answer it

1  yes.  Or if you think that he didn't pull the trigger, but

2  he anticipated that a human life would be taken, you'd

3  answer yes.

4                    And if those questions are answered yes,

5  yes, and no, again, the Judge wouldn't have any discretion.

6  He'd be forced to sentence the defendant to death.  Any

7  questions kind of about that scheme we have?

8        A.    No.

9        Q.    Okay.  Any questions at all or anything that

10 you think the lawyers ought to know before I turn you over

11 to the defense lawyer?

12       A.    No.

13       Q.    Okay.  Thank you, ma'am.

14                    MR. WIRSKYE:  That's all I have, Judge.

15                    CROSS-EXAMINATION

16 BY MS. BUSBEE:

17       Q.    Sorry, Ms. Landers, I can't seem to clear my

18 throat this afternoon.  Before we go any further at all,

19 here's a concern that I have.  When, obviously, this is very

20 very, important.  We're talking to dozens and dozens of

21 people and there's no stigma attached to not getting on this

22 jury.  Anyone that would be, to be on the jury is just so

23 important and it's such a big decision.

24                    And there were some things that you

25 discussed with us that I'd like to ask you before we go any

further.  You knew what had happened to the other

individuals?

A.    Right.

Q.    And you said that you would try not to let

that influence you.  In a case like this it would be

important to really err on the side of caution in these

matters, because it's just the fair thing to do.  And if a

lot of people don't have any idea what happened to the

others and if you think that there's a chance or any

hesitation in your mind at all this would influence you or

would be in the back of your mind, I would like to hear it,

so we could discuss it, and --

A.    I don't know what to tell you.  I mean, I

understand the seriousness.  I read the Dallas Morning News.

I try to keep up with current events.  And I believe that I

would not, with the information that I know, prejudice.

But, you know, it's your call, I mean, it's really your

call.  I can talk to you about this until I'm blue in the

face, but the fact is, I mean, that's how I feel, and that's

how I will present myself.  I mean --

Q.    Okay.  Maybe I kind of lost track of that.

You have the knowledge, but you can or cannot guarantee that

it might play a factor in your service on this jury?

A.    I have the knowledge.  I would hope that it

would not affect.  I can't guarantee anything.

1      Q.      Okay.

2                  MS. BUSBEE:   Your Honor, the parties have

3      reached an agreement.

4                  THE COURT:   Ms. Landers, thank you for

5      your honesty and your opinions here.   As she said we've got

6      a lot of people that don't have as much knowledge as you do.

7      And nobody is saying you're not suited for this.   It's just

8      that we have a lot of other people who are probably better

9      suited.

10                 PROSPECTIVE JUROR:   I understand.

11                 THE COURT:   Thank you so much.

12                 [Prospective juror out]

13                 THE COURT:   Ms. Wheeler.

14                 [Prospective juror in]

15                 THE COURT:   Good afternoon.

16                 PROSPECTIVE JUROR:   Hello.

17                 THE COURT:   How are you?

18                 PROSPECTIVE JUROR:   Good.

19                 THE COURT:   We have juror No. 3298, Ms.

20     Dee Dee Wheeler.   Welcome to the 283rd.   Sorry for the delay

21     getting you in.   Did you have enough time to read the guide

22     that I provided for you?

23                 PROSPECTIVE JUROR:   Yes.

24                 THE COURT:   And also look at your juror

25     questionnaire?

1    PROSPECTIVE JUROR:  Yes.

2    THE COURT:  You look like you are a

3    little nervous.  That's normal.

4    PROSPECTIVE JUROR:  Uh-huh.

5    THE COURT:  Try to relax a little bit.

6    This is an opportunity for the attorneys to visit with you,

7    and I've given you a lot of law.  You don't have to

8    understand it all right now.  That's what this process is

9    about, to give you an opportunity to listen and learn and

10    understand how all this law relates to the process that

11    we're going through.

12    The best thing you can do is listen and

13    ask questions so that you understand.  At the end of the

14    process I have two questions I must ask.  Number one is, do

15    you understand the law?  And, number two, can you follow the

16    law?  That's the big picture I have to look at.  The only

17    question I have for you at this time is will you be able to

18    serve this Court for two weeks beginning on November 10th?

19    PROSPECTIVE JUROR:  Yes.

20    THE COURT:  Thank you so much.  Please

21    give your attention to Mr. Shook.

22    MR. SHOOK:  May it please the Court?

23    DEE DEE WHEELER,

24    having been duly sworn, was examined and testified as

25    follows:

<u>DIRECT EXAMINATION</u>

<u>BY MR. SHOOK:</u>

Q.    Ms. Wheeler, my name is Toby Shook.  I'm going to talk to you on behalf of the State this afternoon and, as the Judge said, there aren't any right or wrong answers to any of our questions.  We just want your honest opinions. We're going to follow up on some of the information you put in your questionnaire and then also ask you about the death penalty, the laws and rules that apply, and how you feel about them.

Looking over your questionnaire, at that time you had said that there was a possibility of relocation because I believe your fiance was in the Army.  You didn't know at that time if he was going to be deployed overseas or elsewhere.  What is the situation?

A.    Not until January.

Q.    Okay.  So that shouldn't present any type of problem at all.  Also, I believe you were having a baby over the summer?

A.    Uh-huh.

Q.    And all went well with that, I take it?

A.    Yeah.

Q.    So that shouldn't be any problems from that standpoint?

A.    No.

1    Q.    Are you still working as a nurse there at --

2  is it Doctor's Hospital?

3    A.    Yes.

4    Q.    Okay.  Still doing that?

5    A.    Yes.

6    Q.    What do you do on a day-to-day basis there?

7    A.    Recovery, surgery recovery.

8    Q.    Okay.  Let me talk to you a little bit, then,

9  about capital murder.  You put on your questionnaire that

10 you are in favor of it as a law, the death penalty.  And we

11 like every juror to kind of just in your own words tell us

12 why you favor the death penalty, maybe the purpose you feel

13 it serves society.

14    A.    The only purpose, probably, would just for the

15 family of the victim, some, I mean, for their sake.

16    Q.    Okay.  Do you feel it's a just sentence for

17 certain crimes?

18    A.    Yes.

19    Q.    What, as far as your favoring the death

20 penalty, has it been something you've been in favor of your

21 entire adult life?

22    A.    Yes.

23    Q.    How did you form that opinion?  Is it just

24 something you were raised on, I believe raised in, or did

25 you form it after just kind of maturing in years, or --

1     A.     Just from years of, just living in a high

2   crime state.

3     Q.     Okay.  Have you followed any cases in the

4   media locally or nationally that you thought might be a

5   death penalty type case or anything like that?

6     A.     Um, no.

7     Q.     Okay.  When you think of crimes which might be

8   appropriate for the death penalty, what types of crimes come

9   to mind from your point of view?

10     A.     Any crime that was committed just for money or

11   anything involving a child.

12     Q.     Okay.  Killing for money?

13     A.     Or drugs.

14     Q.     Greed?

15     A.     Yeah.

16     Q.     Or a child victim?  Things of that nature?

17     A.     (Prospective juror nods head.)

18     Q.     Okay.  In Texas, what we've set up is the

19   capital murder system calls for the death penalty only in

20   certain types of murder cases.  We have a lot of brutal

21   murders that don't actually, cannot under law be prosecuted

22   as the death penalty.  You can get the life sentence, but

23   you can't get the death penalty.

24            We've reserved the death penalty, or at

25   least the consideration of the death penalty, for

1  intentional killings that occur during a felony, such as a

2  robbery.  Someone goes in the 7-Eleven and shoots the clerk

3  during a robbery.  That could be a death penalty situation,

4  during a burglary, breaking into a home, during a rape,

5  arson, or kidnapping.

6            Also murder of specific individuals, like

7  a police officer on duty, fireman on duty, prison guard on

8  duty, murder of a child under the age of six, several

9  victims like a serial killer situation, or mass murder

10  situation, and also murder for hire, someone does it for

11  some type of money or profit.  But those are the specific

12  situations that have been reserved for consideration of the

13  death penalty.  As far as that list goes, do you feel that's

14  a fair list from your personal point of view?

15       A.    Yes.

16       Q.    Do you believe in the prosecution of

17  individuals for the death penalty in situations for murder

18  of a peace officer?

19       A.    Yes.

20       Q.    Okay.  One other area I want to get into has

21  to do with what we call the law of parties, more commonly

22  known, I think from citizens, is accomplices.  You know, you

23  have more than one person commit a crime.  And the term, at

24  least when I was growing up, you heard on the TV shows was

25  an "accomplice."

1    And in a capital murder situation, you

2    may have one person that actually commits the murder, but

3    you may have some people helping you, some accomplices

4    helping him accomplish that crime in some way.  Some may be

5    more involved than others.  The law says that an accomplice

6    for a crime can be found guilty and even in a death penalty

7    situation ultimately receive the death penalty, possibly.

8    An example we give in an accomplice

9    situation in a capital murder situation would be, let's say

10   Mr. Wirskye and I here decide we wanted to rob a bank.  We

11   go in there and the plan calls for me to have a loaded gun.

12   I'm going to go in and point it at the tellers, I want to

13   get their hands in the air.  He's going to come in, then,

14   and have a big sack and he'll go behind the counter and

15   start loading the money up while I keep them at bay.

16   Then during the course of that robbery, I

17   point and shoot the gun at one of the tellers with the

18   intent to murder them and I do.  Maybe I didn't, you know,

19   like the way they were looking at me, maybe he told me one

20   was going for an alarm, so I shot them.  But I killed them.

21   We escape, but are captured.

22   Now, obviously, I could be prosecuted for

23   the death penalty because I'm the triggerman.  But the law

24   says that he could, too, under certain fact situations, even

25   though he didn't cause the death.  But people feel

1    differently about that.

2              We have some people that are in favor of

3    the death penalty from their own personal point of view, but

4    if it were up to them, they would reserve the death penalty

5    just for the triggerman, a person that causes a murder.  An

6    accomplice, they would not.  They would reserve some other

7    type of prison term or something for them.  They don't think

8    that's fair.

9              But we have other jurors that tell us

10   they do think it's fair to prosecute an accomplice in a

11   capital murder situation and for an accomplice to ultimately

12   get a death penalty, a nontriggerman, just depending on his

13   facts and involvement.

14             People feel differently about that and we

15   just want to ask each juror their honest opinion on how they

16   feel about it.  As far as that situation, an accomplice

17   being tried in the death penalty situation, how do you feel

18   about that?

19        A.    Um, in that exact situation, yes.

20        Q.    Okay.  And so you, if it were from your

21   personal point of view, you think it's fair to prosecute an

22   accomplice for the death penalty and ultimately he'd receive

23   it, depending on the facts?

24        A.    In that situation, yes.  If the accomplice had

25   been waiting in the car, maybe had not been, had not entered

1    the bank with the other robber, maybe not.  But if he, if

2    they both went in together --

3          Q.    Okay.  So it's just going to depend on the

4    involvement and that sort of thing?

5          A.    Uh-huh.

6          Q.    All right.

7                MR. SHOOK:  May I have one moment, Judge?

8                THE COURT:  You may.

9                MR. SHOOK:  I believe that's all the

10   questions I have, then, Judge.

11               MS. BUSBEE:  May it please the Court?

12   We've reached an agreement on this juror.

13               THE COURT:  Ms. Wheeler, short interview,

14   that's all we have for you, and the parties have agreed not

15   to seat you on this jury.  You didn't do anything wrong.

16   It's just okay.  Thank you so much.  You are free to go.

17                    [Prospective juror out]

18               THE COURT:  Next juror, Julia D. Laux.

19                    [Prospective juror in]

20               THE COURT:  Good afternoon.  Please have

21   a seat.

22               PROSPECTIVE JUROR:  Good afternoon.

23               THE COURT:  Juror 3405, Julia D. Laux.

24               PROSPECTIVE JUROR:  Yes.

25               THE COURT:  Good afternoon.  Welcome to

the 283rd.  Sorry for the delay in getting you in.  We

schedule three people in the morning and three in the

afternoon and we don't know if it's going to be 1:30 or

4:30.  Yesterday we worked until 5:00, so you are in a

little early, being it's 3:00.  Did you have enough time to

review the guide I provided for you?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Also, I gave you a copy of

the questionnaire, so hopefully you read over that and began

to think about some of the issues and look over your

answers.  The attorneys may want to visit with you about

those answers or have you further explain something where

they didn't allow enough room.

The objective here is for you to

understand all the law and how it relates.  Please don't

think that you have to understand it all now.  That's what

they're going to talk to you about.  At the end of the

process I have two questions I need to ask.  Number one, is

do you, in fact, understand the law and how the law works?

And, number two, can you be fair and follow the law?

PROSPECTIVE JUROR:  Yes.

THE COURT:  The only question I have for

you at this point is will you be able to serve the Court for

a period of two weeks beginning on November 10th?

PROSPECTIVE JUROR:  Yes.

1           THE COURT:  At this time I'll turn it

2   over to Mr. Wirskye.

3           MR. WIRSKYE:  May it please the Court?

4                    JULIA LAUX,

5   having been duly sworn, was examined and testified as

6   follows:

7                 DIRECT EXAMINATION

8   BY MR. WIRSKYE:

9      Q.    Ma'am, how are you this afternoon?

10     A.    Just fine.  How are you?

11     Q.    Good.  My name is Bill Wirskye and I'll be the

12  Assistant DA that will be visiting with you for the next few

13  minutes.  What I'd like to do is maybe talk a little bit

14  about some of the answers on your questionnaire, follow up

15  on that.  And then maybe talk about some of your thoughts

16  and feelings on the death penalty and then maybe talk a

17  little bit about some of the law that applies in a death

18  penalty case or any criminal case.  Do you have any

19  questions for us before we get started?

20     A.    No.

21     Q.    Okay.  One thing I noticed on your

22  questionnaire, I'll just go right to it.  I think it's on

23  page 7.  We had asked you if you had been interested in the

24  outcome of a criminal case, either personally or through the

25  media, and you said yes on the case of the little girl

1   locked up in the closet.  And I think almost everyone knows

2   about --

3        A.     Yes.

4        Q.     And then you said the officer that was

5   murdered, Murphy.  What case was that?

6        A.     Mr. Hawkins, Officer Hawkins.

7        Q.     This case?

8        A.     Yes.

9        Q.     Okay.  I wanted to make sure we were talking

10  about the same case.

11       A.     Okay.

12       Q.     And then you mentioned in your next question,

13  in your opinion the parents should have been given the death

14  penalty and the same for the Murphy case on this case; is

15  that right?

16       A.     Yes.

17       Q.     Okay.  You know this case is a little

18  different in a sense that, you know, usually when we pick a

19  jury the jurors come in and they have absolutely no idea of

20  the facts of the case.  But this case, you know, received so

21  much media attention.  I guess you saw some of that

22  attention?

23       A.     Yes.

24       Q.     You saw the story.  That, you know, oftentimes

25  jurors come in kind of having already formed opinions or

1   impressions about a person's guilt and what should happen in

2   the case.  And it kind of sounds like that's what you've

3   already done in this case; is that right?

4        A.     Yes.

5        Q.     Okay.  And we realize because of the nature of

6   these cases, again, that's why we talk to so many people.

7   It's not every person is a perfect juror in every case, you

8   know.  It sounds like you already have some opinions in this

9   case and you probably wouldn't be the best juror to serve in

10  this particular case; is that right?

11       A.     Yes.

12       Q.     Okay.  But we may see you back before too long

13  on another criminal case.

14       A.     Okay.

15       Q.     All right.  Hold on just a second.

16              MR. WIRSKYE:  That's all I have, Judge.

17              MS. BUSBEE:  I believe we've reached an

18  agreement on this juror, Your Honor.

19              THE COURT:  That was a quick one.  They

20  have agreed to let you go.  Thank you so much.

21                       [Prospective juror out]

22                       [End of Volume]

23

24

25

STATE OF TEXAS          *

COUNTY OF DALLAS        *

    I, NANCY BREWER, Official Court Reporter for the 283rd

Judicial District Court, do hereby certify that the above

and foregoing constitutes a true and correct transcription

of all portions of evidence and other proceedings requested

in writing by counsel for the parties to be included in this

volume of the Reporter's Record, in the above-styled and

numbered cause, all of which occurred in open court or in

chambers and were reported by me.

    WITNESS MY OFFICIAL HAND on this the 4 day of

_____ March _____, 2004.


NANCY BREWER, CSR, NO. 5759
Expiration Date:  12-31-04
Official Reporter, 283rd JDC
Frank Crowley Crts. Bldg. LB33
133 No. Industrial Blvd.
Dallas, TX 75207
(214)653-5863

REPORTER'S RECORD

**74851**

VOLUME 28 OF 61 VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

GENERAL PANEL QUESTIONNAIRES

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FILED IN**
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 2nd day of October, 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO.  00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT:  03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT:  00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

PROCEEDINGS

THE COURT: Welcome to the 283rd. Thank you all for coming down on a Thursday morning. I appreciate your jury service. I'm sorry you had to wait down in the jury room all morning. You sat down and read and why am I here and summoned and having to sit down in the jury room?

Thursdays are is reserved, typically, for competency issues. And I normally don't have a jury call on Thursday. And this Court had to wait until the misdemeanor courts didn't need a jury for various reasons this morning. So that was what the delay was. We had to let the courts that summoned you use you first. So you were about to be turned loose. And we didn't want to waste your time and the taxpayers money to summon a new panel, so that's what we're doing this morning.

So this is a case, Cause No. F0-10032, the State of Texas versus Patrick Henry Murphy, Jr. I'll introduce the parties at this time. Mr. Toby Shook, Mr. Bill Wirskye, are both Assistant District Attorneys that work for your elected District Attorney Bill Hill. Ms. Brook Busbee and Mr. Juan Sanchez, who present the defendant Mr. Patrick Henry Murphy, Jr.

We're here today on a case involving capital murder is the allegation contained in the indictment. I need to go through the law with you. I have

1   highlighted.  I read to you the law right out of the book

2   and tell you what I'm doing and how we're going to do it.

3                      "In a capital felony case in which the

4   State seeks the death penalty, the Court shall propound to

5   the entire panel of prospective jurors questions concerning

6   the principles as applicable to the case on trial of these

7   issues I have to cover.  Reasonable doubt, burden of proof,

8   return of indictment by the Grand Jury, presumption of

9   innocence and opinion.

10                     I will go through these issues with you

11  and then we'll have you fill out that questionnaire.  What's

12  going to happen is that you fill out this questionnaire and

13  then you will be summoned back to Court sometime -- I think

14  my last date I have scheduled right now, I'm up to October

15  15th, 14th or 15th, is when you may be summoned to come back

16  to Court.  That's the game plan.

17                     Let me start on where I need to be as far

18  as the Code of Criminal Procedure.  It's real simple.  Our

19  criminal justice system is based on the presumption of

20  innocence and requiring the State to prove their case beyond

21  a reasonable doubt.  I think each of you have grown up in

22  this system.  It's one of the best in the world, certainly

23  not perfect, but it's absolutely the best.  I will give you

24  a statement that you can hang your hat on in any court in

25  this land.

1      Reasonable doubt is a doubt based on

2  reason and I like to use common sense.  There's no

3  definition at all we can give you.  Reasonable doubt is what

4  you think it is.  Reasonable doubt is a doubt based on

5  reason and I like common sense as to what the State is

6  required to prove to you by law.  They have to prove

7  evidence to a certain standard.  I can't give you a

8  definition because there isn't one.  But I can tell you what

9  it's not.

10      The standard we use in a civil case is by

11  preponderance of the evidence.  You go to a civil court to

12  argue about usually money or contract disputes or having a

13  party do or not do something, 50 plus something.  If you get

14  into a car wreck and you want to prove the other person

15  liable for damages and you want money to fix your car, you

16  have to prove your case by 51 percent.  You just tilt the

17  evidence in your favor, you prevail.  The issue is money.

18      The intermediate standard is clear and

19  convincing.  Unfortunately, I have a very bad example that

20  was quite true, if you remember.  The State files a lawsuit

21  to terminate your parental rights to your children, then

22  that standard in that case is by a clear and convincing

23  standard.

24      Let me give you an example.  You may

25  remember we had a case about two years ago where a family

had five children and they locked the little girl in the

closet for two years.   Remember that nasty hub they lived in

and the little girl, the trailer?   Those parents had five

children.   Well, they abused one of them.   The State filed a

lawsuit to terminate the parental rights to all five

children.   The jury looked at that and determined by clear

and convincing evidence these were unfit parents and they

terminated the rights to the children and placed them in

custody of the State.   And you may remember that the child

was adopted by the people who tried too adopt her before.

It was a good result for the little girl.   But it was the

mechanism that you get there.   Clear and convincing

evidence.

The highest standard in our courts is

beyond a reasonable doubt.   It's not beyond all doubt.   It's

not proof of one hundred percent.   It's a doubt based on

reason and, you know, use some common sense behind it.

Cunningham's definition, I want you to be alive and thinking

and using your brain as to what the State must prove.   Why

do we have the highest burden in our criminal courts?   Well,

you stand to lose your liberty or your life as a result of a

conviction.

Now, some people say, Judge, I have to be

absolutely sure before I could find someone guilty of any

crime, much less a capital murder that is alleged here in

the indictment.  Well, all I can tell you is if you have to

be absolutely sure, you would have to be a witness to the

crime.  Think about that.  If you think I have to be one

hundred percent, I have to be absolutely sure, you would

have to be a witness to a crime and you couldn't be a juror.

So you see, that's not a workable standard.  The standard by

the Supreme Court and Texas courts is beyond a reasonable

doubt.  So that's what the law requires.

Burden of proof.  The burden of proof is

always on the State.  The State has, we like to say, done

the accusing.  They have got to do the proving.  They have

filed an indictment with the Grand Jury.  The Grand Jury

looked at it briefly.  We will go through that in a minute.

And they return the indictment to Court for a jury to look

at it in great detail.  They have the burden of proof.  They

are bringing the charges.  They have to prove it.

The defense can sit over here and do

crossword puzzles, if they want to, if they believe that the

State has failed to meet their burden of beyond a reasonable

doubt.  They don't have to present any evidence.  At any

given time they may choose to do so, they may question

witnesses that are brought by the State, but they don't have

to present any evidence.

Why?  It's so simple.  If you just

understand our basic concepts of our criminal justice

1  system, the fact that a person may have been arrested,

2  confined, or otherwise charged with an offense, gives rise

3  to no inference of guilt at their trial.  The presumption of

4  innocence alone is sufficient to acquit the defendant unless

5  and until the State can prove their case beyond a reasonable

6  doubt.

7  You can take that to the bank, folks.

8  That's why we just got through having a war over in Iraq.

9  You got on the bad side of Saddam Hussein and one of his

10  family members or party members, they just put you in a jail

11  somewhere in China.  They execute people for tax evasion.

12  They simply say, you didn't pay enough taxes to prove you

13  didn't.  Have you read about that?  All right.

14  So, I mean, our system is the best in the

15  world.  The State has to prove it.  They are bringing the

16  case.  Mr. Murphy doesn't have to do anything.  You cannot

17  shift the burden.  You can't say, well, if he didn't

18  testify, he might da, da, da.  I'm not even going to fill in

19  the blank because if you understand the concept, you

20  understand the Fifth Amendment right against

21  self-incrimination, you do not have to provide evidence

22  against yourself.  Period.  The burden of proof is always on

23  the State.

24  Return of indictment.  I like to ask

25  people questions on this because I like to see where you are

coming from.  Grand Jury.  Anybody here served on the Grand

Jury before?  Anybody know what the Grand Jury is?  Yes,

ma'am, front row.

PROSPECTIVE JUROR:  The Grand Jury is the

body that listens to the initial evidence to decide if

there's enough evidence to take the case to trial.

THE COURT:  Probable cause, yes, ma'am,

perfect.  It's a group of twelve citizens.  Anybody who

wants to volunteer, we will sit you on a jury.  It meets for

90 days a term, three-month term, and they return

indictments on all kinds of felony offenses.

I'll pick someone from random.  Who is

Carrie Fieldon (phonetic)?  Yes.  Take a guess how many

cases of murder, rape, robbery, drug cases, felony cases,

were heard by the Dallas County Grand Jury this last year?

PROSPECTIVE JUROR:  The whole year?

THE COURT:  Yes, ma'am.

PROSPECTIVE JUROR:  Seven thousand five

hundred.

THE COURT:  Seven thousand five hundred.

Henry Hernandez?  Mr. Hernandez, how many cases do you think

the Grand Jury heard? Seven thousand five hundred is low.

PROSPECTIVE JUROR:  Twenty-five thousand.

THE COURT:  Twenty-five thousand is low.

Darren Dunn (phonetic).

1      PROSPECTIVE JUROR:  Yes, sir?  Forty

2  thousand.

3      THE COURT:  High.  Twenty-seven thousand.

4  I gave you that.  That's kind of a shocking number.  Geez.

5  I bet, Mr. Hernandez, did you think that was a pretty high

6  number?  You just threw it out there.  He threw it out there

7  and it still wasn't high enough.  I got a report and it just

8  came in.  Twenty-seven thousand and some change.  So what am

9  I telling you?  If you take the number of indictments --

10  that's just the number of indictments returned.  That's not

11  the number of cases they hear.  They probably return 80

12  percent or 90, depends on individual terms.

13      If you take the amount of time the Grand

14  Jury meets and divide that by the number of cases they hear,

15  they have about twenty-three minutes per case.  So when I

16  tell you that the twelve people that will sit in this case

17  to hear this evidence will be the first twelve people who

18  have heard anything about this case at any length at all is

19  exactly what I mean.

20      So that's why I want to go back to the

21  statement, simply by being arrested, confined, or otherwise

22  indicted for an offense gives rise to no evidence at his

23  trial is exactly what I mean.  It's simply a charging

24  instrument the State has filed.  They have to prove it.

25  Fair enough?  So that's the indictment is no evidence.

1    I've already covered presumption of

2    innocence and presumption of innocence alone is sufficient

3    to acquit the defendant.  Presumption of innocence alone is

4    sufficient to acquit the defendant unless and until the

5    State can prove his guilt beyond a reasonable doubt.

6         The last thing is opinion and that's

7    where we come into the questionnaire.  The parties want your

8    honest opinions to these issues.  Each of you were sworn in

9    downstairs; is that correct?  You have been sworn in as a

10   venire juror to tell the truth.  You probably didn't know

11   you were going to have to do as much truthtelling this

12   morning.  That is 17-page questionnaire, asks your name,

13   when you were born, and what happened next.

14        People are concerned with the amount of

15   information that we request.  Believe it or not, it will

16   save you time when you come back for your individual

17   interview.  It is quite necessary.  We have to be absolutely

18   sure a juror is qualified to sit in this type of case.

19        So I know that there are concerns about

20   the disclosure of some information on these questionnaires

21   and I can assure you of two things.  Number one, the

22   attorneys only will have access to this information, the

23   district attorneys and the defense attorneys and the Court.

24   What happens to it after you fill this out today?  These

25   questionnaires will be scanned.  I keep them on my computer.

1  As you can tell, I'm a computer geek.  I understand that's

2  the way it is, but I have access to each of the

3  questionnaires and the attorneys, I give them a copy.

4              What happens at the end of the day?  They

5  are shredded.  Only upon an order from the Court of Criminal

6  Appeals in Austin, the highest Court in this state, will I

7  turn over an electronic copy that is password protected to

8  the justices down in Austin, if they need it for any issue.

9              So what am I telling you?  I'm going to

10  keep your records secure.  Fair enough?  Okay.

11              I have heard the Sheriff tell you out in

12  the hallway I need you to put a different number on your

13  questionnaire.  So I'm going to call out your name and give

14  you the number.  Simply just raise your hand to make sure we

15  have everybody here.  And if you would, put the number at

16  the top right-hand corner and in the bottom right-hand

17  corner of each page.  These are double sides.  Once again,

18  I'm trying to save paper.  So each page has got to have the

19  number on there because what happens is I have a thousand,

20  seventy-five pieces of paper out there, and they are not

21  stapled together.  And all you have to do is have one get

22  loose on you and you have a mess.  So that's what is going

23  to happen.

24              [Off the record]

25              THE COURT:  Folks, please, if you would,

1    if you have an E-mail address, write that very legibly big

2    enough where I can read it.  I would prefer to contact you

3    both by letter and E-mail.  If the time gets short, the

4    objective is to allow you as much time as possible to come

5    down for an individual interview on your next go around.

6              So if I give you a week to ten days'

7    notice, I would like to be able to do that.  The last thing

8    I want to do is call you the day ahead of time and say,

9    okay, Mr. Smith, I need you down here tomorrow morning at

10   8:30.  That's not fair.  So if you can give us as much

11   contact information so we can get the information to you as

12   quickly as possible.

13             Now, your time is your own.  I'm going to

14   recess you to the hallway and the Sheriff will be out there

15   and you can fill out.  Spread out among the pews in the

16   hallway and get the questionnaire filled out and then you

17   are free to go.  That way your time is your own.  It will

18   take you a while to get through all of that.

19             Once again, honest, fair answers will do

20   you a great deal of service.  Smart answers, we've had some

21   answers that made very inappropriate answers.  That will

22   cause a problem.  So truthful answers you are sworn to tell.

23   Thank you so much.  We'll see you down the road.  If you

24   will, retire to the hallway.

25             [End of Proceedings]

STATE OF TEXAS            *

COUNTY OF DALLAS         *

I, NANCY BREWER, Official Court Reporter for the 283rd

Judicial District Court, do hereby certify that the above

and foregoing constitutes a true and correct transcription

of all portions of evidence and other proceedings requested

in writing by counsel for the parties to be included in this

volume of the Reporter's Record, in the above-styled and

numbered cause, all of which occurred in open court or in

chambers and were reported by me.

WITNESS MY OFFICIAL HAND on this the 4 day of

March , 2004.


NANCY BREWER, CSR, NO. 5759
Expiration Date:  12-31-04
Official Reporter, 283rd JDC
Frank Crowley Crts. Bldg. LB33
133 No. Industrial Blvd.
Dallas, TX 75207
(214)653-5863

74851

REPORTER'S RECORD

VOLUME 29 OF 61 VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

STATE OF TEXAS            *        IN THE DISTRICT COURT

VS.                      *        DALLAS COUNTY, TEXAS

PATRICK HENRY MURPHY, JR.  *        283RD DISTRICT COURT


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 3rd day of October, 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

ORIGINAL

1                        A P P E A R A N C E S

2     APPEARING FOR THE STATE

3     Mr. Toby Shook
      SBOT NO. 18293250
4     And
      Mr. Bill Wirskye
5     SBOT NO. 00788696
      Assistant District Attorneys
6     133 No. Industrial Blvd.
      Dallas, Texas 75207
7     Phone:  214/653-3600

8

      APPEARING FOR THE DEFENDANT
9
      Ms. Brook Busbee
10    Attorney at Law
      SBOT: 03488000
11    703 McKinney Ave. Ste. 312
      Dallas, TX 75202
12    214/754-9090

13    Mr. Juan Sanchez
      Attorney at Law
14    SBOT: 00791599
      5630 Yale Blvd.
15    Dallas, TX 75206
      214/365-0700

16

17

18

19

20

21

22

23

24

25

## PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Roberto Ramirez | 4 | 6 | | 29 |
| Lisa Taylor | 24 | 26 | | 29 |
| Donna Hyde | 43 | 45 | | 29 |
| Derek Lackey | 54 | 56 | | 29 |

P R O C E E D I N G S

1              THE COURT:   Concerning a scheduled venire
2  juror, Linda J. Gooch, juror No. 4707.  Sheriff, did she
3  contact you?
4              MR. COOK:   Yes, sir, Judge.  The
5  potential juror, Linda Gooch, contacted me yesterday
6  afternoon and informed me that she had undergone major
7  surgery on September 29th and was confined to the bed by her
8  physician until October 13th, at which time she was supposed
9  to go back to the doctor for her first postsurgery checkup.
10             THE COURT:   She wouldn't be available
11  until much later after that, correct?
12             MR. COOK:   It would be sometime after the
13  13th of October before she might be available.
14             THE COURT:   What says the State?
15             MR. SHOOK:   We can agree to let that
16  juror go.
17             MS. BUSBEE:   Yes, sir, we can agree.
18             THE COURT:   Sheriff, would you be so kind
19  to contact her and tell her she's been excused from jury
20  service.  Mr. Ramirez.
21             [Prospective juror in]
22             THE COURT:   No. 3751, Roberto Gaytan
23  Ramirez.  Good morning, Mr. Ramirez.  How are you?
24             PROSPECTIVE JUROR:   Good morning.  Fine.

1    THE COURT:  Welcome to the 283rd.

2    PROSPECTIVE JUROR:  Thank you.

3    THE COURT:  Have you had enough time this

4  morning, to review the guide I provided for you?

5    PROSPECTIVE JUROR:  Yes.

6    THE COURT:  And look over your

7  questionnaire that you filled out for us back in May?

8    PROSPECTIVE JUROR:  Yes.

9    THE COURT:  I know that's a lot of law to

10  give someone first thing in the morning.  You don't have to

11  understand it all right now.  This is the opportunity we're

12  going to provide for you.  The lawyers will visit with you

13  about the law and how it all relates and help you understand

14  it.  At the end of the process I have two questions I must

15  ask.  Number one is, do you understand the law?

16    PROSPECTIVE JUROR:  Yes.

17    THE COURT:  Number two is, can you follow

18  the law?

19    PROSPECTIVE JUROR:  Yes.

20    THE COURT:  Those are the questions we'll

21  answer in a few minutes.  The only question I have for you

22  right now, sir, is will you be able to serve this Court for

23  a period of two weeks beginning on November 10th?

24    PROSPECTIVE JUROR:  No, I don't think I

25  can.  I would have to get with my employer because I just

1  got promoted and I'm a store manager.

2              THE COURT:  Store manager?

3              PROSPECTIVE JUROR:  Yes, sir.  So I'm

4  involved -- I'm in charge of the whole store operations.

5              THE COURT:  Which store?

6              PROSPECTIVE JUROR:  Auto Zone.

7              THE COURT:  Auto Zone?

8              PROSPECTIVE JUROR:  Uh-huh.

9              THE COURT:  Well, as much as I understand

10 it would be an inconvenience for you at work --

11             PROSPECTIVE JUROR:  I understand.

12             THE COURT:  -- it's something that I

13 cannot excuse for business reasons.  And since now you're a

14 manager, you'll just have to manage and plan ahead.  That's

15 why we give over a month's notice.

16             PROSPECTIVE JUROR:  Yes, sir, I

17 understand that.

18             THE COURT:  Very well, thank you, sir.

19 Mr. Wirskye?

20             MR. WIRSKYE:  May it please the Court?

21                  ROBERTO RAMIREZ,

22 having been duly sworn, was examined and testified as

23 follows:

24                 DIRECT EXAMINATION

25 BY MR. WIRSKYE:

1    Q.    Mr. Ramirez, how are you this morning?

2    A.    Good, how are you?

3    Q.    Good.  My name is Bill Wirskye and I'll be the

4    Assistant DA that will be talking with you for the next few

5    minutes.

6    A.    Okay.

7    Q.    What I'd like to do is visit with you about

8    some of that information that you put down in that

9    questionnaire, talk to you a little bit about your thoughts

10   about the death penalty, and then maybe talk about some of

11   the laws that apply in a case like this where the State is

12   seeking the death penalty.

13         Let me follow up a little bit more about

14   -- you said you just got promoted, so you are a store

15   manager now?

16   A.    Yes, sir.

17   Q.    Okay.  And how long ago did you get that

18   promotion?

19   A.    About a month ago.

20   Q.    Okay.  So fairly recently?

21   A.    Yes, sir.

22   Q.    Okay.  And what store is that?

23   A.    Up in Carrollton, Texas, Auto Zone.

24   Q.    Okay.  Do you think given enough notice that,

25   I guess, your boss could find somebody to cover for you for

1  two weeks?

2      A.    I believe so.  It was just within my thought.

3  I know we can probably work around it, or he can.

4      Q.    Okay.  I know at least back in May when you

5  filled out your questionnaire, you indicated that it might

6  be a financial hardship for you as well?

7      A.    Yes, sir.

8      Q.    At least at that time I guess your wife wasn't

9  working?

10     A.    Yeah.  She has been employed for the last

11 month or so, so that shouldn't be a problem.

12     Q.    Okay.  Obviously, you know we can't let

13 everybody go that has hardships, work, or financial, that

14 type thing?

15     A.    I understand.

16     Q.    The one thing we do need to be sure of,

17 though, is that it's not a situation where you have so much

18 going on in your life that if you were picked to be a juror

19 that, you know, your mind may wander or you would be

20 thinking about something else and miss some of the evidence,

21 something like that.  Is that -- would that be a concern of

22 yours, if you were to be a juror on this case?

23     A.    I do not think so, sir.

24     Q.    Okay.  You'd be able to --

25     A.    I can pretty much set my mind clear on

1     something that I'm doing at that particular time or moment,

2     so.

3          Q.     Okay. Fair enough. We always ask people when

4     they come down, if they've known anyone that had any contact

5     with the system or gone through the system, that type thing.

6     And I believe you indicated you had an uncle --

7          A.     Yes.

8          Q.     -- that a couple of years ago, a child

9     molestation case; is that right?

10         A.     Yes.

11         Q.     Can you tell us what you know about that case?

12         A.     He was actually living with me and my wife at

13     the time, my current wife. And after we moved to a

14     different apartment, I seen conflicts, I would say a few

15     weeks later. That's when they had him arrested because he

16     was like a maintenance person at that place, so -- and his

17     mother was, the kid's mother, was the one that filed charges

18     on him.

19         Q.     Okay.

20         A.     And the same mother, his wife with the two

21     kids, also claimed that he molested, you know, his own kids.

22     So after that, I'm not sure. My parents were the ones that

23     have spoke to him.

24         Q.     Okay. Is that case still pending, or is it --

25         A.     No, sir. He's been in prison for the last few

1   years.

2          Q.     Okay.  Did he go to trial or did he plead

3   guilty?

4          A.     I believe so.  After the case itself, I'm not

5   sure.

6          Q.     Okay.  You didn't come down to the courthouse?

7          A.     No, sir.  The family was kind of wanting to

8   separate from that.  I guess they were kind of embarrassed

9   with that, so.

10         Q.     Okay.  Based on what you know, do you think he

11  was -- your uncle was treated fairly or do you know enough

12  to have an opinion?

13         A.     I don't know enough to have an opinion.

14         Q.     Okay.  Do you know what type of sentence he

15  received?

16         A.     No, sir.

17         Q.     Okay.  Anything about that experience make it

18  difficult for you to be completely fair to either side in

19  this case?

20         A.     No.

21         Q.     Okay.  We always worry that, you know, we get

22  somebody over in the jury box that's not completely truthful

23  with us and may have an axe to grind for one side or the

24  other.

25         A.     No, I wouldn't think so.

1    Q.    Okay.  I hope you understand why we ask the

2  questions.

3    A.    Yes, sir.

4    Q.    Let me also ask you, we in the questionnaire,

5  ask kind of your first impressions when you thought about

6  prosecutors.  And I think you put down smooth talkers.  And

7  I was just curious.

8    A.    It's nothing really bad.  I mean, it's --

9    Q.    I didn't know if it was bad or good.

10   A.    No.  It's just something that I understand

11  that y'all are taught to do that and y'all do it well,

12  because that's part of your job.  So, I mean, it's nothing,

13  really.  I haven't had no experience with the law or

14  anything with attorneys myself, so.

15   Q.    Okay.  I just wanted to make sure it wasn't a

16  bad thing.  Also, on that same page, I think it's page 5, if

17  you want to look at the questionnaire, almost the very last

18  question on that page, we give, I guess, a series of

19  statements on page 5 and ask you if you agree, disagree, or

20  uncertain about them.  And one statement was criminal laws

21  treat criminal defendants too harshly.  And you put you

22  agreed with that.  And I just kind of wanted to follow up on

23  that answer.

24   A.    Okay.

25   Q.    You see where I'm talking about?

1    A.    Yes, sir.

2    Q.    Okay.

3    A.    Well, it's to what I've seen through news and,

4  you know, newspapers.  I've seen some cases that I would

5  feel they would deserve more time or harsher penalty than

6  others that are, you know, actually killing people or rape,

7  you know, items like that that have happened, so.

8    Q.    Okay.  So let me make sure.  I don't want to

9  put words in your mouth.  I guess there's some violent

10  crimes that in your opinion don't get punished enough while

11  some nonviolent crimes get punished too much; is that right?

12    A.    Yes, sir.

13    Q.    Okay.  Fair enough.  Now, you told us you are

14  generally in favor of the death penalty; is that right?

15    A.    Yes.

16    Q.    Okay.  And we ask every person kind of why

17  they feel that way or why that you think we should have a

18  death penalty in our society.

19    A.    Well, it's just like a person would want to

20  take a person's life, I feel that theirs should be taken, if

21  the actual crime was actually that harsh or, you know,

22  coldblooded.  That's why I feel that.

23    Q.    When you think about a harsh crime or a

24  coldblooded crime for the death penalty, what type of facts

25  come to mind or what type of situation?

1    A.    Um, stabbings, rapes and stabbings, for

2    example, kids being killed and dropped off in ditches, you

3    know, I mean, things like that is what, really, I don't

4    understand why people would want to do something like that,

5    take a human life, you know.

6    Q.    And that's what a lot of people tell us.  Is

7    there a particular case that you may have read about or

8    heard about, seen in the paper or on TV that comes to mind

9    when you think about, you know, an appropriate case for the

10   death penalty?

11   A.    There's been several.  I like to watch like

12   A&E, you know, shows like that that always give

13   documentaries of unsolved mysteries and things like that.  I

14   mean, there's been several that I've seen that kidnap a kid

15   and, you know, leave them somewhere out in the woods.  And

16   pretty much what really bothers me is cases like that.

17   Q.    Okay.  We ask people on the questionnaire, if

18   they believe in the death penalty, to kind of rank

19   themselves on a scale of 1 to 10 how strongly they favor it,

20   and I think you gave yourself a 10 out of 10.

21   A.    Yeah.

22   Q.    Which is the most, but I know it means

23   different things to different people.  So I just wanted to

24   follow up on that and kind of have you explain to us why you

25   gave yourself a 10.

1     A.     A 10, the reason being because, like I say,

2  you know, depending on the crime itself, and I just feel if

3  a person takes a person's life, it's deserved upon himself

4  because they usually know what they go and do themselves.

5  So that's why I feel that way.

6     Q.     Okay.  A person that does something

7  intentionally, I guess, is important to you?

8     A.     Yes, sir.

9     Q.     And it sounds like, from looking at your

10 questionnaire, your wife may not agree with the death

11 penalty or may not agree with you on that; is that right?

12    A.     Yeah.  But, we really didn't discuss this or

13 anything.  I mean, it's been a few months ago since I last

14 came, so -- but, you know, my opinions are my opinions and I

15 don't go by her opinions, I mean, on instances like this.

16    Q.     Okay.  You know, sometimes we don't want to

17 cause problems for people at home --

18    A.     I understand.

19    Q.     -- when spouses disagree.  It doesn't sound

20 like that would be a problem.

21    A.     No, sir.

22    Q.     Okay.  As you probably read in that packet, in

23 Texas, we reserve the death penalty just for murder cases,

24 and then only certain types of murder cases.

25              If you kill a police officer or fireman

1 or prison guard while they're on duty, if you commit an

2 intentional murder during the course of a robbery, burglary,

3 rape, arson, that type thing, if you kill a young child

4 under six, if you're a mass murderer, kill a few people or a

5 serial murder, kill people in a series of murders.

6             Those are the type crimes that we just

7 reserve the death penalty for in Texas.  Is that something

8 that kind of agrees with your own kind of personal list of

9 what type crimes should be considered?

10      A.    Yes, sir.

11      Q.    Okay.  Because there are very, you know,

12 brutal and senseless intentional murders in Texas that just

13 aren't subject to the death penalty.

14      A.    Yes.

15      Q.    For instance, I could, you know, I could have

16 been to prison five times and I walk in and turn to

17 Mr. Shook and don't like the tie he's wearing this morning,

18 and, you know, stab him a hundred times in front of

19 everybody.  The most that could happen to me is a life

20 sentence under those facts.  That wouldn't be eligible for

21 the capital murder.  Does that make sense to you?

22      A.    Yes.

23      Q.    Okay.  Let me touch on another issue with you.

24 I think when we think of a capital murder like maybe

25 somebody going in and robbing a 7-Eleven and then shooting

1   the clerk or the person working the counter and killing them

2   and maybe making off with the money.   But a lot of times

3   crimes are committed by more than one person.   A group or a

4   gang of individuals can commit a crime.   And the law says

5   that as long as those people are actively involved in the

6   crime, that we can prosecute all of them for the crime,

7   whether it's a shoplifting or whether it's a capital murder.

8              But when you are talking about a capital

9   murder in a death penalty case, you may have a situation

10  where there's only one person that actually pulled the

11  trigger.   You know, you may just have one triggerman.   You

12  may have other people who are actively involved in the crime

13  who didn't actually cause the death of the victim.   Commonly

14  they're called accomplices.   You may have heard that word.

15       A.      Yes.

16       Q.      So you may have that situation with one

17  triggerman and some nontriggermen accomplices.   And some

18  people, even those who are very strongly in favor of the

19  death penalty, sometimes make a distinction or see a

20  difference between those two types of individuals.

21              You know, they may be very strongly in

22  favor of the death penalty for the person that actually

23  pulled the trigger.   But when it comes to the nontriggermen

24  accomplices, you know, they may want to lock them up for the

25  rest of their lives, but they just don't feel necessarily

1  that the death penalty is appropriate for that person.

2  Because they didn't take a life, they don't believe their

3  life should be taken, maybe on religious, moral, or ethical

4  grounds.

5           And some people would just take that

6  death penalty option away for those accomplices.  What do

7  you think about that type situation?

8       A.    Well, like, I go back to my answer before.  If

9  they took a life, I believe they should be, you know, their

10 life should be taken.  And if they were just accomplices, I

11 believe they should do the time and think about what they

12 did, if it's life.

13      Q.    Okay.  So, it sounds like for the person who

14 actually pulled the trigger, you have no hesitation at all

15 about that person getting the death penalty?

16      A.    No.

17      Q.    When it comes to the other accomplices who

18 were involved in the case, but who didn't actually cause the

19 death, you wouldn't want the death penalty for those people?

20 Or you may want to lock them up for life, but --

21      A.    No, I wouldn't want it for them.

22      Q.    Okay.  Because they didn't actually take a

23 life?

24      A.    Yeah.  Yes.

25      Q.    Okay.  And actually, you know, they could, I

1  guess, it's a situation where they didn't have the intent

2  that that person die, which I know is important to you?

3       A.     Yes.

4       Q.     The intent aspect, it sounds like.  Is that

5  something you feel pretty strongly about, just reserving the

6  death penalty just for the person that actually pulled the

7  trigger?

8       A.     Yes.

9       Q.     Okay.  I can tell you what our law is.  The

10  law allows, depending on the facts and circumstances, for an

11  accomplice who didn't actually cause the death to be

12  prosecuted for the death penalty, even though that

13  accomplice didn't have that intent.

14              And a lot of people, such as yourself, I

15  think, disagree with that and, you know, don't feel it's

16  justified religiously, morally, or ethically.  The law

17  allows us to do that and this is kind of why we talk to

18  everybody because we don't want to put anybody in a hard

19  spot where their own personal beliefs that they strongly

20  hold kind of dictate one thing and the law says another.

21              It wouldn't be fair to the juror, you

22  know.  You may be a good juror in a robbery case, a burglary

23  case, or a regular murder case.  But when you're talking

24  about a case like that where accomplices are involved, it

25  just may be something that you hold that belief so strongly

1    that you wouldn't be able to necessarily follow the law.

2    Does that make sense to you?

3         A.    Yes, sir.

4         Q.    Okay.  Is that kind of where you are in a case

5    involving that accomplice with no intent?

6         A.    Yes.

7         Q.    Okay.  You would just, if it were up to you,

8    you would take the death penalty off the table?

9         A.    Yes.

10        Q.    Okay.  And even knowing that's the law, it's

11   something that, I guess, would impair you or substantially

12   impair you from being able to follow that law, your beliefs;

13   is that right?

14        A.    Yes.

15        Q.    Okay.  Fair enough.  Let me also ask you about

16   publicity.  You indicated, like everybody we talked to, that

17   you have heard something about this case.  It was,

18   obviously, in the media, it was a high profile case.

19   Different people have kind of heard different amounts.  Some

20   have heard quite a bit.  Some haven't heard much.  What do

21   you remember hearing about this case?

22        A.    Um, just the -- I believe, seven guys had

23   broken out of prison, and what I remember, robbing the store

24   itself.  That's when the policeman, you know, tried to

25   contravene (sic) and that's when he shot him.  That's what I

1    remember vaguely.

2        Q.    Okay.  Did you remember anything about the

3    capture or the manhunt looking for the individuals?

4        A.    Very vaguely.  I understand that they did,

5    were loose for a few weeks and that's what I remember, that

6    last capture and murder when he killed the police officer.

7        Q.    Okay.  Have you kept up with any of the court

8    proceedings that have gone on?

9        A.    No.

10       Q.    Okay.  Have you seen anything on A&E, or --

11       A.    No.

12       Q.    -- the Learning Channel or anything like that?

13       A.    No.

14       Q.    Okay.  This case is a little bit different.

15   Usually when you come down for jury duty, you know nothing

16   about a case.  You have no idea what you're kind of getting

17   yourself into.  This case is different because jurors have

18   heard quite a bit about this case and sometimes it's hard to

19   ask a juror to forget about that or not to be influenced by

20   what they've heard about a case.

21                And we just kind of leave it up to the

22   individual to tell us, honestly, how that might affect them,

23   if it's a situation where they could, I guess, not be

24   influenced by what they've heard.  What do you think about

25   that?

1    A.    I don't think I would be influenced by the

2 media.  I would want to look at the actual evidence and

3 facts.

4    Q.    Okay.  Nothing you've heard would kind of, I

5 guess, inhibit your ability to just base your verdict on the

6 evidence that you hear in the courtroom?

7    A.    I would go by the evidence in the courtroom,

8 not by media or nothing, I would think.

9    Q.    Okay.  I think you got a chance to read these

10 Special Issues and we have a copy of them up on the wall.

11 Those are the three questions we ask a jury that kind of

12 determines whether a person gets a life sentence or a death

13 sentence.  They're phrased a little bit differently up on

14 the wall.  If you would, kind of take a minute or two and

15 just read through those three questions again.  Those kind

16 of make sense to you, those questions?

17    A.    Yes.

18    Q.    I wanted you to take a chance to look at them,

19 because we're going to talk about them, hopefully, in a

20 little more detail in just a second.  One thing, while you

21 were reading those, I wanted to follow up a little bit on

22 what we talked about.  You know, you told us you feel, I

23 guess, very strongly that accomplices who don't cause the

24 death, shouldn't be subject to the death penalty?

25    A.    Yes.

1    Q.    And I told you that's -- the law allows that.

2  And you've told me, I guess, your personal beliefs would

3  kind of inhibit your ability to completely follow that law

4  in a certain case when you are talking about an accomplice;

5  is that right?

6    A.    Yes.

7    Q.    Okay.  And I just want to be clear on that and

8  let you know what the law is.  The law is if a person aids,

9  assists, or directs, or promotes, a person to commit capital

10 murder, then they can be found guilty of capital murder and

11 ultimately face the death penalty, even though they didn't

12 actually cause the death.

13    Another way an accomplice can face the

14 death penalty, and I think this may be the way that it looks

15 like you disagree with or have some problems with, would be

16 this way.  If people, two or more people, agree to commit

17 one crime, say, a robbery, and during the course of that

18 robbery, a murder is committed.

19    The person that didn't commit the murder,

20 the accomplice, could face the death penalty, even though he

21 didn't pull the trigger, even though he didn't have any

22 intent, if a jury believes he should have anticipated that a

23 life would be taken.  Does that kind of make sense to you?

24    A.    Yes.

25    Q.    Want me to run through it again?

1      A.      Yeah.

2      Q.      It may be a situation, Mr. Shook and I go in

3   to commit a robbery.  He's got a gun.  He's going to shoot

4   and kill someone.  I don't have any intent that anyone get

5   hurt, you know.  I just agree to do a robbery with him.  You

6   know, I could even stand there and say, don't shoot him,

7   don't shoot him.

8           But if he shoots and kills him, and if

9   the jury believes I should have anticipated that, then I

10  could be on the hook for capital murder and potentially face

11  the death penalty, even though I didn't have that intent.

12  That's kind of what the law is.  Does that make sense to

13  you?

14     A.      Yes, sir.

15     Q.      Okay.  And it sounds like that that's the

16  aspect of the law that you have some concerns about, some

17  serious concerns?

18     A.      Yes.

19     Q.      That would make it difficult for you to, I

20  guess, completely, fully carry out your duties as a juror,

21  if that law applied in the case; is that right?

22     A.      Yes.

23     Q.      Okay.  Mr. Ramirez, I think that's all I have.

24  I appreciate your time.  Hold on just a second.

25           MR. WIRSKYE:  Judge, I'll pass the juror.

1    MS. BUSBEE:  Your Honor, we've reached an

2  agreement on this juror.

3    THE COURT:  Sir, I really appreciate your

4  time and service to this Court.  The parties have agreed to

5  excuse you and you won't have to worry about your new job.

6  I appreciate you coming down.

7    PROSPECTIVE JUROR:  Okay.  Thank you.

8    [Prospective juror out]

9    THE COURT:  Lisa M. Taylor.

10    [Prospective juror in]

11    THE COURT:  Good morning.

12    PROSPECTIVE JUROR:  Hello.

13    THE COURT:  For the record we've got

14  juror No. 3743, Ms. Lisa Taylor; is that correct?

15    PROSPECTIVE JUROR:  That's correct.

16    THE COURT:  Welcome to the 283rd.  Did

17  you have enough time this morning to read the guide I

18  provided for you?

19    PROSPECTIVE JUROR:  Uh-huh, yes.

20    THE COURT:  I also gave you a copy of

21  your questionnaire so you can begin to think about some

22  issues we're going to discuss this morning.  Please don't

23  think that you've got to understand everything right now.

24  It's quite complicated and the lawyers will go over the law

25  with you in detail and help you understand how it all

relates.

             The best thing about this, there are no
wrong answers.  I know you're -- you look a little nervous,
and it is a little unnerving.  So you just come in and try
to relax.  They want you to understand and be able to
comprehend and ask questions to be sure you understand the
scheme of things.

             At the end of the process I've got two
questions I must ask.  Number one is, do you understand all
the law?  Number two, can you follow the law?  Big
questions.  Only question I have for you at this time is
will you be able to serve this Court for a period of two
weeks beginning on November 10th?

             PROSPECTIVE JUROR:  I could, but it would
create a financial hardship because I work contracts.  So if
I don't work, I don't get paid.

             THE COURT:  Yes, ma'am.  I understand.

             PROSPECTIVE JUROR:  I know, you told me
all that when I was in the room.

             THE COURT:  I told you all that.  And,
trust me, ma'am --

             PROSPECTIVE JUROR:  And I didn't put it
down in this paper.

             THE COURT:  It's one of those things that
anybody we put in that box, it's going to be a financial

1  hardship.  And the way I respond is that when I do ask for

2  someone's time to do their civic duty, I respond in like

3  fashion.  I will not waste your time.  In fact, I've been

4  accused of by the jurors of working them too hard.  Let us

5  have a break, you know.  The worst thing that we can do is

6  to have a jury sitting back in the jury room burning time

7  when I know it's costing you money.  So that won't happen.

8              You will be able to use the phone during

9  the day.  You will have a break at lunch and a break in the

10 afternoon, and we do work business hours.  So I'm not saying

11 you will be shut down from your business.  You will be away

12 from it for a reasonable period of the day, but no more.

13 Fair enough?

14             PROSPECTIVE JUROR:  Fair enough.

15             THE COURT:  With that, Mr. Shook, would

16 you like to inquire?

17             MR. SHOOK:  Yes, Judge.

18             LISA TAYLOR,

19 having been duly sworn, was examined and testified as

20 follows:

21             DIRECT EXAMINATION

22 BY MR. SHOOK:

23     Q.    Ms. Taylor, my name is Toby Shook.  I'm going

24 to ask you questions on behalf of the State this morning.

25 And, as the Judge said, there aren't any right or wrong

1    answers.  We just want your honest opinions.

2         A.    Okay.

3         Q.    We'll go over some of the information in your

4    questionnaire, follow up with how you feel about capital

5    murder, some of the laws and rules that apply to these types

6    of cases.  I want to follow up on what you just spoke to the

7    Judge about, about your financial hardship.  Under the law

8    there's no automatic refusal under that, as you well know,

9    but different situations sometimes call for that.  So let me

10   explore that a little further with you.

11        A.    Okay.

12        Q.    If you're not at work, then you don't get

13   paid.  Kind of go into a little more detail with us how that

14   works as far as your --

15        A.    I work contract for a mortgage insurance

16   company and I'm on site at a mortgage company.  I'm an

17   underwriter.  And so I'm paid by the hour and, I mean, I

18   accumulate some time off, but I don't have vacation time, so

19   to speak.

20        Q.    Okay.  The trial, we believe, will just last

21   the two-week period, but it will be probably that solid two

22   weeks.  Different jurors have different problems as far as,

23   a lot of jurors get paid.  Their employer will pay.  Others

24   are self-employed and can't, but can serve.  Others are in

25   such a situation in their personal life and not getting

1   paid, it creates quite a hardship.

2             The bottom line, as far as the Judge is

3   concerned and the courts are concerned, is this. As best

4   you know yourself, if you're in a situation where you're

5   under a financial strain or sitting on a jury for, as in

6   this case, a two-week period, would cause you problems which

7   would, which might be a distraction to you, then that is

8   something we need to talk about, because, obviously, we need

9   jurors who are going to be able to pay attention and make

10  their decisions based on what they hear.

11            And if something might be going on in

12  your life where you couldn't honestly tell us that, but,

13  yeah, I might be distracted because of the pay situation or

14  something else.  Then, obviously, that might be a situation

15  where it wouldn't be a good idea to put you on the jury.

16  But only you can tell us that.

17       A.    Well, I haven't discussed this with my

18  employer because I really didn't anticipate getting called

19  back.  But I haven't discussed it with them, you know, to

20  see if there was an advance I can take or whatever.

21       Q.    Okay.  So you don't -- it might be a situation

22  that could be taken care of?

23       A.    Perhaps.

24       Q.    Okay.  And the Judge, as he said, on regular

25  days is out by 4:30 or 5:00.  That would, I know you have, I

29

1  think you have an 8 year old?

2        A.     That's right.

3        Q.     Is that going to cause any problems, as far as

4  --

5        A.     No, that wouldn't be a problem, as long as

6  it's not sequestered, and that would be a problem.

7        Q.     The only time you might be sequestered would

8  be during deliberations.  But during the regular hearing of

9  evidence, you would not be.

10        A.     Okay.

11        Q.     Let me kind of go over some of your

12  background.  You were born and raised here in Dallas?

13        A.     Uh-huh.

14        Q.     What part of Dallas were you raised in?  What

15  high school did you go to?

16        A.     Richardson High School.

17        Q.     Okay.  And you stayed here except for about

18  three years.  I think you said you were in Colorado?

19        A.     Oregon.

20        Q.     Oregon.  I saw that you've been down on jury

21  duty some years ago.  Did you ever, have you ever made it on

22  a jury?

23        A.     No, I have not.

24        Q.     Okay.  And another area we get into is if you

25  have known anyone that's ever been involved in the criminal

1   justice system.  I believe you said you had a friend that

2   had some type of theft case?

3        A.    Well, I worked with him, uh-huh.

4        Q.    Yes.  Did you know anything about the details

5   involved in that case?

6        A.    I think that it was a, like a theft from the

7   company he owned, like, I guess, embezzlement kind of thing.

8        Q.    Okay.  But you didn't know a whole lot of the

9   details or anything like that?

10       A.    Oh, no.

11       Q.    Nothing about that, then, would cause you to

12   be biased?

13       A.    No.

14       Q.    From what you know about it, he was treated

15   fairly?

16       A.    That was -- it had all happened before I knew

17   him.

18       Q.    Okay.  Let me talk to you a little bit about

19   how you feel about the death penalty.  Obviously, you know

20   from what the Judge has said and the questionnaire, that

21   this is a case in which the State is seeking the death

22   penalty, so we explore that with each juror.  You said that

23   you didn't expect to get called back down here.  Why was

24   that?

25       A.    Well, I guess, I assumed because I do believe

1   in the death penalty that I wouldn't be wanted on the --

2        Q.    Well, it winds up there's usually twelve

3   people on the jury that do believe in the death penalty, but

4   everyone has different viewpoints on it.  The ones that are

5   against the death penalty, don't make it on the jury,

6   generally, because they usually feel so strongly about it

7   that they can't actually make those types of decisions.

8             But then, again, we have other people

9   that believe in the death penalty philosophically, but they

10  tell us after getting down here they actually couldn't ever

11  make that decision, either, because it's a life or death

12  decision.  So it just depends on the individual person.

13            Kind of tell me from your personal view

14  why you believe in the death penalty?  Why you -- the

15  purpose you think it serves society?

16       A.    Well, I think if you've got habitual

17  criminals, you know, what's the point of us paying to keep

18  them alive until they die?

19       Q.    Okay.

20       A.    You know, if they have been given

21  opportunities to rehabilitate and haven't proven able to do

22  so, if they keep winding up back in prison.

23       Q.    Okay.  What types of crimes do you think

24  should be eligible for the death penalty from your own

25  personal point of view?

1    A.    Murder.

2    Q.    Okay.  Any particular type of murder?

3    A.    Murder is murder, isn't it?

4    Q.    Well, you have barroom killings, you have --

5    A.    You have what?

6    Q.    Sometimes you have barroom killings, you have

7    guys who go out and stalk people and murder them.  I mean,

8    you have a million different ways to murder people and some

9    people tell us certain types of killings, they would reserve

10   for it.  Other people think it should be available, at least

11   for consideration, anytime a life is taken intentionally.

12   A.    Well, that's -- I feel that way.

13   Q.    And then it would just depend on the

14   individual facts.  Do you think it could be a penalty that

15   is deserving in crimes other than murder?  Other types of

16   crimes?

17   A.    Repeat sex offenders, I think.

18   Q.    Okay.  Serial rapists, that sort of thing?

19   A.    Uh-huh.

20   Q.    All right.

21   A.    Pedophiles.

22   Q.    Yeah.  Have you followed any cases in the news

23   that were death penalty cases, either locally or nationally?

24   A.    I don't recall.

25   Q.    Okay.  On the questionnaire, did you get a

1   chance to go over the questionnaire?

2   　　　　A.　　　Uh-huh.

3   　　　　Q.　　　Okay.  On page 4, of course, we like to ask a

4   lot of openended questions.  And we usually follow up on

5   this one.  It's the third question down from the top.  When

6   we asked if you believe in the death penalty, how strongly

7   you believe in it, and we put a scale there of 1 to 10, and

8   you put a 10.  And that means different things to different

9   people, if you could just kind of elaborate on why you chose

10  10 on that particular question.

11  　　　　A.　　　Well, I guess because I believe in the death

12  penalty, and if somebody is given the death penalty, I think

13  they should get the death penalty, if they're sentenced.

14  　　　　Q.　　　It ought to be that once they received it, it

15  should be something that is ultimately carried out?

16  　　　　A.　　　Correct.

17  　　　　Q.　　　And some people complain that it takes too

18  long because people sit around for years in prison and it

19  doesn't do much good, if you're not going to carry out the

20  sentence.  Is that how you feel?

21  　　　　A.　　　It seems like there is a lot of time in

22  between conviction and carrying out the death penalty, but I

23  feel like sometimes that time might be needed especially

24  with, you know, DNA finding that certain people have been

25  convicted and sentenced to death that weren't guilty.

1        Q.      Okay.  Now, in Texas, right now there's only,

2    the death penalty is just reserved for certain types of

3    murder cases.  We have some brutal murder cases that aren't

4    eligible under the statute.  One example we bring up that

5    jurors have brought up is the Timothy Richardson case, which

6    was -- I don't know if you recall it, the man that murdered

7    his wife a few years ago in Highland Park in front of the

8    children.

9        A.      Oh, yes.

10        Q.      Remember, it received quite a bit of

11    publicity.  But the facts of that particular case didn't

12    even bring it under the death penalty statute.  But a lot of

13    jurors bring that up as an example of the kind of case they

14    think should be, because just the brutality and the fact

15    that it was done in front of children, that sort of thing.

16                To be a case that is considered under the

17    death penalty, you have to have a murder case.  It's not

18    self-defense.  It's not an accident.  An intentional

19    killing.  You form the intent.  It may only take you a few

20    seconds, but you have that intent and you act upon it.

21                But you have to have something else,

22    another aggravating fact, such as murder that occurs during

23    a felony.  For instance, if I go in and rob a convenience

24    store, shoot the clerk intentionally.  That could be a death

25    penalty case.  Murder during a burglary, someone breaks in a

1  home and murders someone there in the house, that could be a

2  death penalty case.

3                        Murder during a rape, during a

4  kidnapping, or during an arson.  Also, murder of specific

5  individuals such as a police officer, prison guard, or

6  fireman on duty.  Murder of a child under the age of six,

7  murder for hire, someone does it for money or profit, and

8  then a serial killer situation, or mass murder where there's

9  more than one victim.

10                        But those are the general areas that come

11  under our death penalty statutes right now as the laws exist

12  today.  As far as that list goes, the types of crimes, do

13  you feel those are the types of crimes that should be

14  considered for the death penalty?

15      A.      Yes.

16      Q.      Okay.  Another area I want to ask you about is

17  what we call the law of parties.  I think it's more commonly

18  known as accomplices.  You have in any type of crime a

19  potential of more than one person committing the crime.  One

20  may have a greater role than the others, but you may have

21  accomplices helping with different aspects of the crime.

22                        And the law says that they can all be

23  held accountable, can all be convicted.  Same is true in a

24  capital murder situation.  You can have one triggerman, but

25  you may have some accomplices.  They can be prosecuted for

1  capital murder and under certain facts, even get the death

2  penalty.

3             A fact situation we use as an example,

4  let's say Mr. Wirskye and I decide we want to get together

5  and rob a bank.  We decide we'll commit that crime together.

6  We get another friend.  We bring him into the plan.  Our

7  plan calls for us to go there.  Our friend is going to drive

8  us and act as the getaway driver.  He'll wait outside, keep

9  the car running, look out.

10             I'll go in.  I'll have a gun and

11  Mr. Wirskye will have a big sack.  I'll pull the gun out and

12  threaten everyone, get their hands in the air, and then

13  he'll start running through and gathering all the money up

14  out of the drawers.

15             Sometime during the execution of that

16  plan, I decide to shoot one of the tellers.  I intentionally

17  murder them.  Maybe I don't like the way they're looking at

18  me or he tells me one is going for an alarm and I shoot them

19  and kill them.  We run, we get in the car, we drive off, but

20  we're captured soon after that.

21             Now, obviously, I could be prosecuted for

22  the death penalty because I'm the actual triggerman.  The

23  law says, though, that the other accomplices, Mr. Wirskye

24  and the other man who is driving, can also be arrested and

25  prosecuted for capital murder, and depending on the facts,

1   they, too, could get the death penalty.

2                   But people feel differently about that

3   aspect of the law.  Some people believe in the death

4   penalty, but if it were up to them, they would reserve it

5   just for the triggerman, the man that caused the death.

6   They think that's fair.  They don't think it's fair for an

7   accomplice to get the death penalty, if they didn't actually

8   kill the person.  Maybe a long prison term, something like

9   that, but not the death penalty.

10                  Other jurors feel it is fair that the

11  accomplice be prosecuted and could get the death penalty.

12  They think that they should be held accountable, also.

13  People feel differently about that, so we ask everyone just

14  their honest opinion from their personal point of view, how

15  they feel about that as far as the prosecution of an

16  accomplice for the death penalty.  How do you feel about

17  that?

18          A.      Well, I think you're guilty by association.

19  Like I said in my questionnaire, you know, you make choices,

20  you put yourself in a situation that, you know, you pay the

21  price of it.

22          Q.      So you feel that it's fair in that the law

23  should allow the prosecution of accomplices in this

24  situation and ultimately that they may even receive the

25  death penalty?

1    A.    Yes, I do.

2    Q.    Okay.  What factors would be important to you

3  in that accomplice situation when you are considering a life

4  or death sentence?

5    A.    Well, the willingness to participate in the

6  first place.

7    Q.    Okay.  Knowing what's going on and

8  participating in the plan?

9    A.    Right.  You participate in the plan and then

10 you make a decision whether you're in or you're out.

11   Q.    Okay.  The law calls for two theories under

12 that.  One is as an accomplice you are actively involved,

13 you encourage, direct, or aid in committing the offense, you

14 can be found guilty.

15        The other one is what we call the

16 conspiracy theory.  If we conspire to commit one crime, we

17 agreed to commit bank robbery in that example, and one of

18 us, while we're committing that crime, commits another

19 felony to further it, in this example, I shoot someone, then

20 everyone involved in the crime can be held accountable, even

21 if they didn't have the intent to kill that person, the

22 accomplice.

23        But if the jury believes from all the

24 facts that they should have anticipated someone could die

25 from what was going on, then they can be found guilty.  And

then to get to the death penalty, the question that must be

answered is not only should they have anticipated, but did

they anticipate?

Again, all we can do is present all the

surrounding facts.  But it goes to what that person should

have known and what they should have anticipated.  Do you

feel that's fair?

A.     I do think that's fair.

Q.     Okay.  Kind of goes along with, I think, what

you've already told us as far as your thought process, if

you're -- you decide if you're in or out and if you're in,

then you suffer the consequences for what may occur during

the crime.

A.     Right.

Q.     Now, a trial is divided into two parts.

There's the guilt/innocence stage where we have to prove to

you beyond a reasonable doubt the indictment.  If we fail to

do that, obviously, it's a not guilty and everyone goes

home.  But if we do do that, we move to the second phase.

And I can't preview the facts of the case

at all for you or any other juror.  I can tell you, though,

that we are prosecuting this case under that law of parties

or the accomplice, that Mr. Murphy is being considered an

accomplice, and we are prosecuting it as a death penalty

case under those facts.

1          I believe what you have told me from your
2    personal point of view you feel that's fair under the law
3    and you have no objection to that?
4          A.     That's right.
5          Q.     Okay.  Now, every juror that filled out a
6    questionnaire has heard something about this case.  You
7    know, it got a lot of publicity and you were no exception.
8    And that doesn't mean you are ineligible to be a juror,
9    necessarily.  But we have to explore that with you.  As best
10   you recall, what details do you remember seeing on the news
11   about this case?
12         A.     I remember them.  I can't remember if we knew
13   about them breaking out of jail first or if it was the
14   murder first, then found out that they had broken out of
15   jail, and then went on the lam and were, you know, being
16   looked for, for a couple of weeks or something.
17         Q.     What about the crime itself do you recall?
18         A.     An Oshman's or some sporting goods store in
19   the parking lot.
20         Q.     Okay.
21         A.     Late at night, I think.
22         Q.     Did you follow the case after that involving
23   any arrests or anything like that?
24         A.     I don't recall the arrest part.  I did pay
25   attention to what had happened to those that were caught as

1    they were sentenced and stuff.

2          Q.     Okay.   You followed some of the trials and

3    court proceedings?

4          A.     Just headline stuff.

5          Q.     What do you recall about that?

6          A.     That I think one guy killed himself and the

7    rest of them, I think, have been sentenced to -- I think

8    they got the death penalty.

9          Q.     Okay.   You may have followed it a little more

10   than some of the other jurors.   Again, that doesn't make you

11   ineligible to be a juror.   But the bottom line test is this.

12   The fact that you've seen something on TV or in the

13   newspaper, doesn't necessarily make you ineligible, but the

14   law contemplates that a jury will make its decisions based

15   on the evidence and witnesses they hear in the courtroom.

16         Obviously, common sense deal is that the

17   news isn't always accurate, so that's why we have to have

18   the jurors be able to do that.   We can't ask you to forget

19   what you've read or seen on TV.   Obviously, we can't ask you

20   to blank it out.

21         But the test is whether that would

22   influence you in any way.   You have to be able to honestly

23   tell the Court that it would not influence me, that I could

24   make my decisions based solely on what I hear in the

25   courtroom and not what I have seen on TV.   People form

1  opinions all the time on what you've seen and read.

2              And sometimes jurors tell us, quite

3  honestly, look, I've read too much.  I've formed an opinion

4  in the case already and it might influence me or it would

5  influence me.  Other people tell us, no, I've read some

6  things, I may have formed opinions while I read them, but I

7  could decide this case just based on what I hear in the

8  courtroom.

9              But we just depend on the honesty of each

10 juror to be able to tell us if they would be able to follow

11 that particular rule.  Would you be able to do that in this

12 case?

13      A.      Doubtful.

14      Q.      Because of everything you've read already?

15      A.      No.

16      Q.      And it's not something you could just honestly

17 tell the Court one hundred percent you could do that, I take

18 it?

19      A.      I can't get past the fact that they broke out

20 of prison in the first place.

21      Q.      Okay.  Well, we appreciate your honesty.  We

22 don't know, obviously, the answers to all these questions.

23 That's why we have so many people come down.

24              MS. BUSBEE:  We've reached an agreement

25 on this juror, Your Honor.

```
 1                  THE COURT:  Ms. Taylor, once again, I
 2   appreciate your time and service to this Court.  As
 3   Mr. Shook told you, you know a little too much about this
 4   case and we appreciate you coming down.  Thank you.
 5                  PROSPECTIVE JUROR:  I shouldn't read the
 6   paper.
 7                  THE COURT:  No.  We need an informed
 8   community.  So don't worry about that.
 9                       [Prospective juror out]
10                  THE COURT:  Ms. Hyde.
11                       [Prospective juror in]
12                  THE COURT:  Good morning.  For the record
13   we have juror No. 3734, Ms. Donna J. Hyde.  Good morning.
14   How are you?
15                  PROSPECTIVE JUROR:  Good morning.
16                  THE COURT:  Welcome to the 283rd.  Sorry
17   for the delay in getting you in.  Did you have an
18   opportunity to read a few times the guide I provided for
19   you?
20                  PROSPECTIVE JUROR:  Yes.
21                  THE COURT:  Also, I see you got a copy of
22   your questionnaire.  I hope you looked at that.
23                  PROSPECTIVE JUROR:  Yes.
24                  THE COURT:  The attorneys may want to
25   follow up on some of your answers and you may want to begin
```

1   to think about these issues while you are waiting to come

2   in.  I know it's an awful lot of law to give someone first

3   thing in the morning.  And this is an opportunity for the

4   attorneys to visit with you about the law and how it

5   relates.

6                   At the end of the program there are two

7   questions I must ask.  Number one is, do you understand the

8   law?  And, number two, can you follow the law?  That's the

9   big picture I have to look at.  The only question I have for

10  you at this time is will you be able to serve this Court for

11  a period of two weeks beginning on November 10th?

12                  PROSPECTIVE JUROR:  Yes, I mean, I guess.

13                  THE COURT:  Anything major?

14                  PROSPECTIVE JUROR:  I do work, but I

15  assume --

16                  THE COURT:  Everybody works, and I know

17  it would be a pain to work here and miss work at your

18  business, but that's just a necessary obligation we have as

19  citizens in this free country.  I know that would be an

20  imposition, but we will just have to use your time wisely

21  while you are here.  Fair enough?

22                  PROSPECTIVE JUROR:  Yes.

23                  THE COURT:  Mr. Wirskye?

24                  MR. WIRSKYE:  May it please the Court?

25                  DONNA HYDE,

1  having been duly sworn, was examined and testified as

2  follows:

3              DIRECT EXAMINATION

4  BY MR. WIRSKYE:

5      Q.    Ms. Hyde, how are you this morning?

6      A.    Just fine, thanks.

7      Q.    My name is Bill Wirskye and I'll be the

8  Assistant DA that will be visiting with you for the next few

9  minutes.

10            What I'd like to do is follow up on some

11 of the information that you were kind enough to provide for

12 us in that 17-page questionnaire, talk to you a little bit

13 about your thoughts and feelings about the death penalty,

14 and then, finally, talk to you about some of the laws that

15 apply and some of the rules that apply in a case like this

16 where the State is seeking the death penalty.

17            I know it's a little unnatural to be up

18 there on the witness stand with all these people looking at

19 you and I apologize for it.  I know you've been on a jury

20 before; is that right?

21      A.    Yes.

22      Q.    And usually we talk to potential jurors as a

23 big group and you can kind of hide when the spotlight is not

24 on you, but because this is a death penalty case, again, the

25 law allows us to talk to people individually.  And the best

1   way we know how to do it is to put them up on the witness

2   stand. So I know it's uncomfortable.

3           A.      All right. It's fine.

4           Q.      Okay. What do you think about all of this,

5   coming down for an individual interview in a death penalty

6   case?

7           A.      Well, I don't, I would really prefer that I

8   weren't called down, called back, let me put it that way.

9   But I don't know, and I don't know if my feelings that I put

10  in here are accurate or I don't know if I really have

11  defined feelings about this.

12          Q.      Okay. Follow up on that with me.

13          A.      Okay.

14          Q.      What are you concerned about, what you put in

15  the questionnaire?

16          A.      Well, no, but, I mean, if you ask me

17  specifically about something, you know.

18          Q.      Okay.

19          A.      I mean these forms are hard to fill out. I

20  mean, when you're filling it out, you just want to hurry and

21  get through so you can leave.

22          Q.      I understand. When you put on the last page

23  of your questionnaire your thoughts about being chosen as a

24  juror, I would not, underline, like it.

25          A.      Right.

1    Q.    So, I didn't know if that was just kind of an

2    expression of everyone's general discomfort with being a

3    juror, or being a juror in a death penalty case, or if there

4    was something more there.

5    A.    Well, no, there's not.  I mean, I don't have

6    any underlying, deep, you know, resentment about being here.

7    Q.    Okay.  Now, you told us on the first page that

8    you are in favor of the death penalty; is that right?

9    A.    Um, yes, I mean, I don't know exactly, you

10   know, I'm not exact.  I mean, to me it's real hard to put

11   down yes or no, but --

12   Q.    Okay.  Why is it hard, you think, to put down

13   yes or no?

14   A.    Well, I just hate to think that I would be in

15   control of someone's destiny or whatever.

16   Q.    And a lot of people feel that way and that's

17   why we talk to so many people and bring so many people down.

18   That's why we have this long questionnaire and this process.

19   We, both sides, know this is not everyone's cup of tea.

20   We're not here, either side, to try to force anybody over in

21   that jury box and say that you have to be a juror on a death

22   penalty case.

23                Most of the people we talk to are

24   excused, like the two people you saw this morning walked out

25   the front door for various reasons.  And we know it affects

1    different people differently.  There's some people that are

2    too adamantly opposed to the death penalty and they couldn't

3    be a fair juror.  There are people that are too in favor of

4    the death penalty in every case.  They wouldn't be a fair

5    juror.

6              There's people that kind of are in favor

7    of it on a case-by-case basis or are kind of unsure what

8    they think about it, and some of those people tell us very

9    frankly, you know, regardless of what I think about it, I'm

10   just not the type person that's cut out to participate in

11   this process, because I'm too uncomfortable with maybe

12   holding another person's fate in my hands.

13        A.     Right.

14        Q.     I think it's one thing, even if you do agree

15   with the death penalty, to talk about it philosophically or

16   in the abstract, but we know, and a lot of people tell us

17   when they get down here, that it's quite a different thing

18   when you're sitting up there on the witness stand, you're

19   looking at somebody charged with capital murder, knowing the

20   State is going to be asking for a death penalty, that that

21   person be executed one day.

22              We know it's something, you know, it's

23   quite a different feeling at that point.  And some people

24   tell us they just couldn't do it because of their thoughts

25   or their feelings or whatever they have going on inside.

1   They say, I know what the law is, I'm just too

2   uncomfortable.  Whatever I've got going on inside of me

3   would just make it difficult for me to fully and fairly

4   perform as a juror in this type of case.

5          A.     Right.

6          Q.     You know, call me back on a burglary case,

7   call me back on a drug case.  But I'm just not cut out for a

8   death penalty case.  Is that kind of, I see you shaking your

9   head.  Is that kind of --

10         A.     Well, I do somewhat feel that way, but I don't

11  know.  I mean, I'm not going to -- I don't think I want to

12  just make that flat statement that I don't think I could

13  handle it.  But I would -- I think I would definitely want

14  to feel like that person was guilty, so.

15         Q.     Okay.  In a case where you felt the person was

16  guilty, are you in favor of the death penalty for capital

17  type crimes?

18         A.     So, is -- I guess I need to ask is -- so is

19  there going to be a choice, then, on that question?  If we

20  found him guilty, then we have to decide if --

21         Q.     What -- just to give you a general overview.

22  The death penalty in Texas is reserved for murder cases and

23  then only certain types of murder cases.  You murder a

24  particular person, a police officer, fireman, prison guard

25  on duty, a child under six, you hire somebody to kill your

1  spouse or your business partner, murder for hire, you commit

2  an intentional murder during the course of a robbery, rape,

3  burglary, mass murder, serial murder.

4          All those types of murders are subject to

5  consideration for the death penalty in Texas.  That's what

6  we call capital crimes.

7          A.    Okay.

8          Q.    And what the procedure is, trials will be

9  broken down into two different parts.  The first part would

10  be concerned with whether we've proved what's in our

11  indictment.

12          A.    Right.

13          Q.    Is the person guilty of the crime?  If a jury

14  finds beyond a reasonable doubt the person is guilty of the

15  crime, then you move into the second phase of trial, which

16  is the punishment phase.  And you get to hear a little bit

17  more about the person's background, good or bad, criminal

18  history if it exists, character, reputation witnesses, good

19  or bad, that type thing.

20          And we give you that information because

21  we ask a juror to answer these three questions, these

22  Special Issues.  And depending on the answers to those

23  questions, that determines the sentence in a case.  Once a

24  person is convicted of capital murder in Texas, they are

25  either looking at a life sentence or a death sentence.  The

1  answers to those questions determine that.

2       A.    Okay.

3       Q.    What do you kind of think about that scheme?

4  You just look real uncomfortable and unsure, and I'm trying

5  to figure out what's going on inside.

6       A.    Well, no, I don't know.  I still don't know

7  what to say.  So if I say I couldn't say that I was for the

8  death penalty, then you don't want me to serve?

9       Q.    Well, let me put it this way.  Whatever your

10 thoughts and feelings may be, if they're to the extent that

11 they would substantially impair you from being able to fully

12 and fairly perform your duties as a juror in a death penalty

13 case, then under those, under that circumstance, then you

14 would not serve in this particular case.

15      A.    Okay.

16      Q.    And that's kind of what I hear you saying.  It

17 looks like you just conflict inside about this whole

18 process.

19      A.    Well, I mean, I'm really not going to say

20 that.  But, you know, I don't know.  I just don't know how I

21 would.

22      Q.    Is part of your discomfort maybe the publicity

23 that surrounded this case?  Because you've told us that you

24 knew something about this case, like most people we talked

25 to.

52

1    A.    Well, yeah, I think that everybody in Dallas

2  County would know about it for sure.

3    Q.    It's hard to miss it and it affects different

4  people differently, you know.  It's unlike any other

5  criminal case for the most part in the sense that the people

6  we call down as potential jurors in a normal case know

7  nothing about the case they are about to hear.  In this

8  particular case that's simply not true, almost everybody

9  knows something.

10         And it affects different people

11  differently.  It makes people nervous.  Some people already

12  have some opinions or have formed some impressions about the

13  case that it would be difficult for them to overcome that

14  and really start with the clean slate that the law requires

15  in order to give both sides a fair trial.  What do you think

16  about that?

17    A.    Well, I mean, it still doesn't, as far as I'm

18  concerned, it still doesn't change the death penalty issue,

19  you know, to me, but --

20    Q.    Okay.  The death penalty issue is the big

21  issue for you?

22    A.    Well, I suppose so, yeah.

23    Q.    Tell me the best you can, why you are

24  conflicted?

25    A.    Well, I just hate to take control of somebody.

1    I just, I don't know.  But I think I can be fair, though.

2         Q.    Sure.  And this is not a test to see who can

3    be fair or who not, who can.  But there are some people --

4    we've all been doing this a number of years and every time

5    we pick a jury, there are a certain number of people that

6    are just flat too uncomfortable sitting in judgment of

7    another human being, especially in this case when the stakes

8    are so high, when you're talking about a life-and-death

9    decision.

10            And if you're just frankly that

11   uncomfortable and you can't do it, and like I said, it would

12   impair your ability to be a juror in a case, then that would

13   be it, you'd be excused and maybe we'd see you back on the

14   next case.

15        A.    Okay.  Whichever.  Whatever.

16        Q.    Well, is that how you feel?

17        A.    Well, no, not really, but, I mean, I'm

18   perfectly willing to go.

19        Q.    Do what?

20        A.    I'm willing to go, to leave.

21        Q.    I know, we need to talk to people and find out

22   what they really think and feel.  And so far all I know is

23   that you're conflicted, and I'm trying to get to the issue

24   why you're conflicted.

25        A.    Well, I don't know how to explain it to you

1    any other way, I mean.

2        Q.    Okay.  Let me ask you this.  Do you think

3    you'd be a better juror in another type case?

4        A.    Perhaps.

5        Q.    Okay.  I'm just not going to be able to pin

6    you down on anything, am I?

7        A.    (No answer.)

8        Q.    Okay, Ms. Hyde.  I think we have some good

9    news for you.  The parties have agreed to excuse you.

10            MR. WIRSKYE:  Judge, that's all I have.

11            PROSPECTIVE JUROR:  Great.  Thanks.

12            THE COURT:  Thank you for coming down.

13                 [Prospective juror out]

14                 (Recess)

15            THE COURT:  Mr. Derek Lackey.

16                 [Prospective juror in]

17            THE COURT:  Please have a seat.  Let the

18    record reflect we have juror No. 3934, Mr. Derek N. Lackey;

19    is that correct?

20            PROSPECTIVE JUROR:  That's correct.

21            THE COURT:  Good afternoon, Mr. Lackey.

22    Welcome to the 283rd.

23            PROSPECTIVE JUROR:  Thank you.

24            THE COURT:  Did you have enough time to

25    review the guide I provided for you?

1    PROSPECTIVE JUROR:  I did, yes.

2    THE COURT:  And, also, I gave you a copy

3 of the questionnaire you completed back in May for

4 reference.  Many times the attorneys like to ask you to

5 refresh your thoughts on maybe a question and so you'll have

6 it before you.  It's an awful lot of law to give someone and

7 we don't expect you to understand it all right now.  That's

8 what the attorneys are going to go over with you, how the

9 law relates and help you get a better working understanding

10 of this process here.

11    At the end of the voir dire I would have

12 two questions I need to ask.  Number one is, do you

13 understand the law?  And number two, can you follow the law?

14 That's the big picture I'm looking for.  The only question I

15 have for you at this time is will you be able to serve this

16 Court for two weeks beginning on November 10th?

17    PROSPECTIVE JUROR:  Based on your

18 statements at the previous site, yes.  I will.  I'm a

19 grocery store manager, so it's a tough time of the year, but

20 --

21    THE COURT:  Yeah, it's a tough time for

22 everybody who works.

23    PROSPECTIVE JUROR:  I know it is.

24    THE COURT:  And we understand that.  All

25 I can do is promise you that I will use your time very

1  wisely.  With that, I'll turn it over to Mr. Shook.

2                    MR. SHOOK:  Thank you, Judge.

3                    <u>DEREK LACKEY</u>,

4  having been duly sworn, was examined and testified as

5  follows:

6                    DIRECT EXAMINATION

7  BY MR. SHOOK:

8       Q.    Mr. Lackey, my name is Toby Shook.  I'll be

9  asking questions on behalf of the State this afternoon.  I

10 know you've been down to jury duty a few times.  Usually the

11 jury, we speak to them as a group, but because it is a

12 capital murder case in which the death penalty is being

13 sought, we have this procedure one on one.  Some jurors feel

14 like they're on trial because they're up on the witness

15 stand and we're all down here, but we don't, we don't mean

16 to make you feel that way.  It's a pretty good procedure for

17 getting information.

18                    What I'll do is go over some of the

19 things in your questionnaire, talk about capital murder, the

20 rules and laws that apply, and we're just looking for your

21 honest opinions.  If you have any questions at any time,

22 feel free to ask, okay?

23      A.    Okay.

24      Q.    You are a manager with Kroger and you've been

25 with them for some time; is that right?

A.      About 21 years.

Q.      Okay.  Looks like you started out, worked your

way up through the ranks.  Where is the store that you

manage now?

A.      I'm at MacArthur and 6th Street in Irving,

Texas.

Q.      Okay.  As a day-to-day basis, I guess you're

doing a little bit of everything at that store?

A.      That's correct.

Q.      Okay.  We know it will be inconvenient for

anyone to miss work for two weeks.  The Judge is very

efficient.  We don't anticipate it will take longer than two

weeks.  We know sometimes these trials in California go on

for months.  That won't be the situation here.  But bottom

line is you feel that if you are called down here, you would

be able to concentrate on the evidence and the witnesses for

that two-week period?

A.      Yes, I would.

Q.      Okay.  Now, you said you were born in Austin,

and I was checking, I didn't have time to go through it

thoroughly.  I know you've been in several cities and you've

been up here for a while.  Did you grow up in Austin?

A.      I grew up in Nacogdoches, Texas.

Q.      Okay.  And then you went to school at Stephen

F. Austin?

1    A.    I did.

2    Q.    Okay.  We asked if you've ever had any

3  experience with the criminal justice system, and back in

4  1985 it looked like you had some type of criminal mischief

5  case that you pled nolo contendere to.

6    A.    That's correct.

7    Q.    What all did that involve?

8    A.    I was in a car with some guys that took some

9  hubcaps.  And we were together in a car.  So we were, I

10  guess, all victims, or all perpetrators of the crime.

11    Q.    Okay.  What city did that take place in?

12    A.    Nacogdoches.

13    Q.    Okay.  Were you -- how old were you at that

14  time?

15    A.    I was 18, 18 years old, maybe 17.

16    Q.    Okay.  Just out of high school or finishing up

17  high school or in high school?

18    A.    Just out of high school.

19    Q.    Okay.  And the charge ultimately was criminal

20  mischief?

21    A.    That's correct.

22    Q.    And you served probation?

23    A.    Uh-huh.

24    Q.    Was it deferred probation?

25    A.    It was a -- we actually washed police cars and

1    cleaned cells for six weeks on Saturday.

2        Q.     And successfully completed that program?

3        A.     Yes.

4        Q.     So it was more of a kind of a community

5    service type punishment?

6        A.     That's correct.

7        Q.     Let me ask you, how do you feel you were

8    treated by the judicial system, fairly?

9        A.     Fairly.

10       Q.     Didn't hold any grudges against the police,

11   the way they --

12       A.     No, I did not.

13       Q.     -- that whole process went?

14       A.     No.

15       Q.     Just kind of a mistake 17 year olds make

16   sometimes?

17       A.     Right.

18       Q.     All right.  Let me kind of turn your attention

19   to how you feel about capital murder and the death penalty.

20   We, obviously, want to go over that closely with every

21   juror.  On the questionnaire you said you were in favor of

22   the death penalty.  And I'd like you to kind of expound on

23   that, why you favor the death penalty, maybe the purpose you

24   feel it serves.

25       A.     I think it's the ultimate deterrence to

1  crimes.

2       Q.    Okay.  From your own personal point of view,

3  what types of crimes do you think should come into

4  consideration for the death penalty?

5       A.    Crimes in which other individuals' lives are

6  taken, especially those that are asked to stick their neck

7  out for the public, like peace officers, innocent, truly

8  innocent lives like children.

9       Q.    Okay.

10       A.    I guess that's --

11       Q.    All right.  Your belief in the death penalty,

12  is that something you believed in your entire adult life as

13  far as you know?

14       A.    Yes.

15       Q.    Was there any one event that caused you to

16  think that way or is it just something you developed as you

17  matured?

18       A.    Just an opinion I formed over time.

19       Q.    Okay.  Interesting, I saw that your father

20  teaches psychology, does he not, in college?

21       A.    He does.

22       Q.    Have you ever had any discussions with him

23  about the death penalty?

24       A.    I can't think of any specific examples, but

25  I'm sure we have.

1       Q.      Okay.  A lot of times people develop their

2  ideas on the proper punishment and things from their

3  parents, but most of them don't have fathers who teach

4  psychology.  And I was just wondering if that was ever the

5  -- if you'd ever had any discussion, you know, along those

6  lines?

7       A.      I can't cite any specific examples, but I'm

8  sure we have.

9       Q.      Okay.  Have you ever followed any cases in the

10  media, any murder cases, or death penalty cases, or cases

11  that you thought would be appropriate for the death penalty,

12  in the local or national media?

13      A.      Absolutely, yes.

14      Q.      Do you recall any of the names of the types of

15  cases they were?

16      A.      None come to mind, no.

17      Q.      Okay.  This case received quite a bit of

18  publicity, as you know.

19      A.      Uh-huh.

20      Q.      And almost every one of the jurors we've

21  spoken to has heard something about the case, which doesn't

22  make you ineligible to be a juror.  If that were the case,

23  we could, obviously, never get a jury in a high publicity

24  case.  But we have to ask everyone what they recall, what

25  they saw on the news, kind of what they, what they remember

1  at the time or what they've followed since then.  What do

2  you remember hearing and seeing about this case?

3         A.      I remember that a group of individuals escaped

4  from a Texas penitentiary, and I don't remember how or why,

5  but they, at one point they broke into an Oshman's in

6  Irving, and during the course of that robbery they, a police

7  officer was killed.

8         Q.      Okay.  Did you follow any of the events after

9  that?

10        A.      I believe they made their way to Colorado,

11  were eventually found and brought back to Texas.

12        Q.      Did you follow any of the court proceedings

13  after they were brought back?

14        A.      I have heard the results of some of the court

15  proceedings.

16        Q.      Okay.  Again, that doesn't make you ineligible

17  to be a juror.  We can't ask you to forget what you have

18  read or seen on TV.  We can't ask you to block it out of

19  your mind.  But as a juror, it's kind of a common sense

20  rule.  Obviously, we have to have twelve jurors who will

21  make their decisions in the case just based on the evidence

22  they hear in the actual courtroom.

23              Obviously, the media, we all watch it,

24  but we realize, also, that it's not always the most accurate

25  information, and the more accurate information will come

1  from the actual witnesses.  What you have to be able to do

2  is be able to tell the Judge that you won't let anything

3  you've read or seen on TV influence your opinions in any

4  way.  You can form opinions about what you've seen before,

5  but you have to develop your own opinions on the evidence

6  from what you hear in the courtroom.

7              And it's just a matter of mental

8  discipline.  Some people can do it; some people can't.  But

9  we depend on your honesty in telling us whether you can

10  follow that particular rule of law.  Do you feel you could

11  follow that rule of law if you were seated on this jury and

12  make your decisions just based on the witnesses here in the

13  courtroom?

14      A.      I have to be honest.  I think I have a bias.

15  I think I have preconceived ideas and notions.

16      Q.      Okay.  And what types of notions are those?

17      A.      Based on the previous trials and the sentences

18  that have been handed down, this fellow being with the rest

19  of the group, I guess I've already formed the opinion that

20  he probably should get the same.

21      Q.      Okay.  And do you feel that those opinions

22  that you formed could or would influence your -- any

23  decisions if you were placed on the jury?

24      A.      I can listen and make intelligent decisions,

25  yes.

1   Q.   Okay.  But knowing what you know, you said

2  you've already formed opinions of maybe what the appropriate

3  punishment is from what you've read or heard, do you think,

4  can you promise the Court that that's not going to influence

5  your decisions?  Or do you know for sure?

6   A.   It kind of goes against the, you know,

7  presumed innocent until proven guilty, but I think it would

8  be difficult, yes.

9   Q.   Okay.  Well, then I believe that will be all

10  the questions I have.

11   MS. BUSBEE:  We've reached an agreement

12  on this juror, Your Honor.

13   THE COURT:  Mr. Lackey, I appreciate your

14  honesty.  A lot of people wouldn't be as honest and open as

15  you are and it's very important that we have a fair jury.

16  And this is simply not the case for you.  We'll catch you

17  next time around.  Thank you very much.

18   PROSPECTIVE JUROR:  Thank you.

19   [End of Volume]

20

21

22

23

24

25

1  STATE OF TEXAS            *

2  COUNTY OF DALLAS          *

3      I, NANCY BREWER, Official Court Reporter for the 283rd

4  Judicial District Court, do hereby certify that the above

5  and foregoing constitutes a true and correct transcription

6  of all portions of evidence and other proceedings requested

7  in writing by counsel for the parties to be included in this

8  volume of the Reporter's Record, in the above-styled and

9  numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11      WITNESS MY OFFICIAL HAND on this the 4 day of

12  _____ March _____, 2004.

13

14

15  _____
    NANCY BREWER, CSR, NO. 5759
16  Expiration Date:  12-31-04
    Official Reporter, 283rd JDC
17  Frank Crowley Crts. Bldg. LB33
    133 No. Industrial Blvd.
18  Dallas, TX 75207
    (214)653-5863

19

20

21

22

23

24

25

74851

1          REPORTER'S RECORD

2       VOLUME 30 OF 64 VOLUMES

3     TRIAL COURT CAUSE NO. F01-00328-T

4  STATE OF TEXAS              *        IN THE DISTRICT COURT

5  VS.                         *        DALLAS COUNTY, TEXAS

6  PATRICK HENRY MURPHY, JR.   *        283RD DISTRICT COURT

7

8

9

10            ***********************          **FILED IN**
                                          COURT OF CRIMINAL APPEALS

11            INDIVIDUAL VOIR DIRE              MAR 9 - 2004

12            ***********************        Troy C. Bennett, Jr., Clerk

13

14

15       On the 6th day of October, 2003, the following

16  proceedings came on to be heard in the above-entitled and

17  numbered cause before the Honorable Vickers L. Cunningham,

18  Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

19       Proceedings reported by machine shorthand.

20

21

22              **ORIGINAL**

23

24

25

283RD JUDICIAL DISTRICT COURT 214/653-5863
NANCY BREWER, OFFICIAL COURT REPORTER

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:   214/653-3600


APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT: 03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT: 00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

| PROSPECTIVE JUROR INDEX | | | | |
|---|---|---|---|---|
| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
| James Sartor | 4 | 5 | | 30 |
| Land Marshall | 11 | 14 | | 30 |
| Keith Rabuse | 19 | 21 | | 30 |
| Andrea Canady | 37 | 38 | | 30 |
| George Navarro | 44 | 47 | 81 | 30 |
| Marisela Alaniz | 87 | 89 | | 30 |

P R O C E E D I N G S

1

2          THE COURT:  Mr. Sartor.

3                    [Prospective juror in]

4          THE COURT:  Please have a seat.  Good

5   morning, sir.  We have juror No. 3830, Mr. James Clyde

6   Sartor.  Is that pronounced correctly?

7          PROSPECTIVE JUROR:  Yes, sir.

8          THE COURT:  Welcome to the 283rd.

9          PROSPECTIVE JUROR:  Thank you, sir.

10         THE COURT:  On Monday morning first

11  thing, did you have enough time to read the guide I provided

12  for you this morning?

13         PROSPECTIVE JUROR:  Yes, sir.

14         THE COURT:  I also provided you a copy of

15  the questionnaire that you filled out for us back in May.

16  Hopefully, you had an opportunity to review that.  The

17  attorneys may want to refer to a question and an answer that

18  you provided and the thinking -- logic behind the answer,

19  whatever.  That's just to help you understand the issues

20  that we're going to discuss with you today.

21              I know that's a lot of law to give anyone

22  the first thing in the morning and you're not expected to

23  have a complete understanding at this point.  The attorneys

24  will visit with you about the law, the concepts, and give

25  you examples to help you understand how it all relates.

1          My job is at the end of the process and I

2     have two questions I must ask.  First one is, do you

3     understand the law?  And the second is, can you follow the

4     law?  I'm looking at the big picture here.  This is an

5     opportunity for you to ask questions to get to a point where

6     you have a working understanding and knowledge of the law.

7     That's what this is all about.

8          People come in and say, I'm a little

9     nervous, because most people have never been through this

10    type of jury selection where you're the focus of attention,

11    versus being able to hide out there.  So I know it's -- it

12    can be a little unnerving, but this is the best that we know

13    how to do it.

14          So with that, I only have one question

15    for you at this time.  Will you be able to serve this Court

16    for a period of two weeks beginning on November 10th?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Thank you, sir.  Mr. Shook?

19          MR. SHOOK:  Thank you, Judge.

20          <u>JAMES SARTOR</u>,

21    having been duly sworn, was examined and testified as

22    follows:

23          <u>DIRECT EXAMINATION</u>

24    BY MR. SHOOK:

25          Q.    Mr. Sartor, my name is Toby Shook.  I'm going

1    to ask you questions on behalf of the State this morning.

2    As the Judge said, there aren't any right or wrong answers.

3    We're just looking for your honest opinions.  I'll follow up

4    on a few things off your questionnaire and we'll talk about

5    capital murder, the death penalty, how you feel about those

6    things, and some of the rules and laws that apply.

7                    I see from your questionnaire that back

8    in the '80s you were, I think, on the City Council.  Was it

9    in Big Lake, or --

10         A.      Yes, sir.

11         Q.      And you came to know some police officers at

12   that time and actually sometimes went on patrol or rode

13   along with them; is that right?

14         A.      Yes.

15         Q.      How often did that occur?

16         A.      Over a period of two years, probably a couple

17   of times a month, sometimes more often, sometimes less.

18         Q.      Did you ever witness them make arrests --

19         A.      Yes.

20         Q.      -- that sort of thing?  Okay.  Since you

21   probably know or have seen the police officers, got to know

22   them a little better than most jurors, one of the questions

23   we always have is that, obviously, would affect you in any

24   way as a juror in this case involving the murder of a police

25   officer?

1              Your background is a little bit more than

2    most of the jurors we talk to.  That exposure you had back

3    in the '80s, do you think that would affect you one way or

4    the other or do you feel that you could be fair to both

5    sides?

6         A.     It would have to affect my judgment to some

7    extent, because I got to know the people behind the badge.

8    So to that extent, it would have to affect it, yes.

9         Q.     Okay.  Do you feel you can still view the

10   evidence objectively, though, as far as --

11        A.     Evidence?  Yes.

12        Q.     Okay.  The other area I wanted to get into, I

13   think you may have answered it, is we ask about if you have

14   any health problems that might prevent you from

15   concentrating and you have some arthritis problems.  You

16   said, I believe if you were able to take some breaks,

17   though, it shouldn't bother you too much?  Is that right?

18        A.     Yes.  If I sit still for a long period of

19   time, the hips tend to lock up, so as long as I can get up

20   and move around occasionally.

21        Q.     How often do you need a break, would you say?

22        A.     Good days not very often; bad days, regularly.

23   But, in answer to your question, probably, you know, every

24   couple of hours would be probably okay.  Or if I can shift

25   around a little bit.

1      Q.      That should fit in well with how the Judge

2   takes breaks.  He runs the court pretty much like clockwork,

3   takes a morning break, an afternoon break, that sort of

4   thing.  So that shouldn't be a problem.

5      A.      Right.

6      Q.      All right.  Now, this case received a lot of

7   publicity and almost every juror has heard something about

8   the case, read something about it in the past, and we follow

9   up on that with each juror and ask them to tell us what they

10  remember reading or seeing on the TV about the case.  What

11  do you recall?

12     A.      Television, I remember seeing the report of

13  the incident.  I remember followup stories during the course

14  of time that -- the eventual capture of the fugitives.  I

15  remember reading in the paper about the people that were in

16  it, the people that were being looked for, and eventually

17  their capture.

18     Q.      Okay.  All right.  Do you remember any details

19  about the crime itself?

20     A.      ' As I understand correctly, they escaped from

21  prison and had gone into this place, in this place of

22  business, I assume to obtain money and other things.  During

23  the course of that robbery, a police officer was shot and

24  killed while trying to handle the situation.

25     Q.      Okay.  Did you -- after the capture, did you

1   follow any of the stories after they were brought to Texas

2   or any subsequent court proceedings?

3       A.      Not so directly.  Of course, on news every

4   once in a while I would hear mention that they -- that one

5   or the other was up for trial and this and that and the

6   other, but nothing specific.

7       Q.      All right.  As I said before, there is nothing

8   unusual about that.  Almost every juror has read or seen

9   something, some more than others.  But the bottom line,

10  though, is if you are selected as a juror, you have to be

11  able to judge this case just on the facts that you hear in

12  the courtroom.

13              Obviously, common sense says you can't

14  let what you have read in the newspapers or seen on TV

15  influence you in any way.  They aren't always accurate in

16  the media, so the better evidence is going to come in

17  through the actual witnesses.

18              I can't ask you to forget it or blank it

19  out of your mind.  We can just ask you to make your

20  decisions based on the evidence you hear in the courtroom,

21  and not let what you have already read or seen influence you

22  in any way.  People form opinions about what they've read

23  and seen.  That's fine.  You just can't let those opinions

24  come into the jury box.

25              Some people can do that and some people

1   can't.  But we usually start out our voir dire asking

2   people, as best they know themselves, if they would be able

3   to follow that particular rule.  If you were seated on this

4   jury, do you think you can make your decisions solely on

5   what you hear here in the witness stand and not let what

6   you've already seen or heard about the case influence you in

7   any way?

8        A.      Not -- honestly, I could judge the evidence

9   based on -- make a judgment based on the evidence.  But to

10  be honest about it, I don't really have a lot of doubt.  He

11  was there, he broke out of jail, he was there, it occurred,

12  it occurred in the commission of a felony.

13       Q.      Okay.  And as far as what, are you telling us,

14  then, that you think you have already formed an opinion as

15  to his guilt and that might influence your decisions in this

16  case?

17       A.      I think it would be the opposite of what it is

18  supposed to be.  It would be an uphill battle.  Because,

19  like I say, from what I can gather from what I've seen, and

20  I'm not saying that they're totally credible, but just

21  generally from the information presented, he escaped, he was

22  there, it occurred.

23              And, like I say, I feel like it would be

24  an uphill battle.  Instead of presuming him innocent, I

25  would be on the other end of it, saying, well, you know, if

1  you can show me some reason why he wasn't there or if he

2  didn't participate, then, okay.  Does that make sense?

3          Q.     It does.  It does.  And I appreciate your

4  honesty.

5              MR. SHOOK:  Judge, I believe that's all

6  the questions I have then.

7              MS. BUSBEE:  Your Honor, the parties have

8  reached an agreement on this juror.

9              THE COURT:  Mr. Sartor, I appreciate your

10  honesty, very much so.  You could have come in and

11  sandbagged this Court and be on this jury and that would be

12  a travesty of justice.  I appreciate that very much.

13  Hopefully, we will find a better jury for you to be on next

14  time.  Thank you, sir.  You are free to go.

15              PROSPECTIVE JUROR:  Thank you.

16              [Prospective juror out]

17              [Prospective juror in]

18              THE COURT:  Good morning.  I'm sorry, I

19  didn't get your name.

20              PROSPECTIVE JUROR:  Lana Marshall.

21              THE COURT:  We've got juror No. 3868,

22  Ms. Lana Marshall.  Good morning, Ms. Marshall.  How are

23  you?

24              PROSPECTIVE JUROR:  Hi.  Good.

25              THE COURT:  A little nervous?

1          PROSPECTIVE JUROR:  Yeah.

2          THE COURT:  That's to be expected.

3          PROSPECTIVE JUROR:  Feels weird being in

4    court.

5          THE COURT:  Did you have enough time this

6    morning to review the guide I provided for you?

7          PROSPECTIVE JUROR:  Uh-huh.

8          THE COURT:  That's a lot of law to give

9    someone first thing on Monday morning.

10          PROSPECTIVE JUROR:  Uh-huh.

11          THE COURT:  You don't have to understand

12   it completely at this point.  That's what this process is

13   all about, is for you to have an opportunity to visit with

14   the lawyers.  They're going to give you examples and help

15   you understand how all this law relates.  And please ask

16   questions.  This is an opportunity for you to get a working

17   understanding.

18          I also provided a copy of your

19   questionnaire -- you can look at that -- that you filled out

20   for us back in May.  They may want to have you expound upon

21   some of your answers or what were you thinking when you gave

22   this answer, that type of situation.

23          At the end of the process, I have two

24   questions I must ask.  No. 1 is do you understand the law?

25   Second question is, can you follow the law?  That's the big

1    picture I have to look at.  The only question I have for you

2    at this time is will you be able to serve this Court for a

3    period of two weeks beginning on November 10th?

4                    PROSPECTIVE JUROR:  It is hard for me,

5    because I own my own business.  So it's hard for me to get

6    away.

7                    THE COURT:  I'm certainly very

8    sympathetic of that and I'm sorry I didn't get to read your

9    questionnaire.  What type of business are you in?

10                   PROSPECTIVE JUROR:  Um, I have an antique

11   showroom down the street in the design district.

12                   THE COURT:  Do you have employees?

13                   PROSPECTIVE JUROR:  Well, usually I'm

14   there by myself.  It's my family's business, but usually I'm

15   there by myself Monday through Friday.

16                   THE COURT:  So you could have somebody

17   down there for you?

18                   PROSPECTIVE JUROR:  Well, I guess I'd

19   have to.

20                   THE COURT:  You would have to.  We

21   understand when you put twelve people in the box, everybody

22   has got something better they would like to do.

23                   PROSPECTIVE JUROR:  Yeah.

24                   THE COURT:  It's like paying taxes.  You

25   don't want to do it, but it's one of those things that

1   you've got to do.  This is a civic duty.  Business reasons

2   are not something that I can excuse someone for.

3                    PROSPECTIVE JUROR:  Right.

4                    THE COURT:  You are fortunate in two

5   things.  One is you are right down the street.  So you

6   could, if you had to, run there.  We work normal business

7   hours.  We let people use the phone during the day.  We take

8   a lunch break.  You can use the phone then and you won't be

9   sequestered at night.  So you can run by the store in the

10  afternoon.

11                   PROSPECTIVE JUROR:  Right.

12                   THE COURT:  So that's the best I can do

13  for you and promise you that we will use your time wisely.

14  It won't be like in California where they kept jurors locked

15  up for three months, or four months, working on a verdict.

16  We use your time wisely, because I know I'm costing people

17  money.  Fair enough?

18                   PROSPECTIVE JUROR:  Yes.

19                   THE COURT:  With that, I'll turn it over

20  to Mr. Wirskye.

21                   MR. WIRSKYE:  May it please the Court?

22                   LANA MARSHALL,

23  having been duly sworn, was examined and testified as

24  follows:

25                   DIRECT EXAMINATION

BY MR. WIRSKYE:

Q.    Ms. Marshal, how are you this morning?

A.    Hi. Okay.

Q.    Really?

A.    Yeah.

Q.    You look a little nervous.

A.    Yeah, it's kind of nervous.

Q.    Okay.  My name is Bill Wirskye and I'll be the Assistant DA who'll be visiting with you for the next few minutes.  Because this is a case where we're seeking the death penalty, the law allows us to talk to jurors individually and, unfortunately, the best way that we've found to do it, is to put people up on the witness stand. And we know it's uncomfortable and kind of makes you feel like you're on trial.

But we apologize for that.  But to the extent possible, try to relax.  What I'd like to do is follow up on some of the information in your questionnaire, maybe talk to you a little bit about how you feel about the death penalty, and then maybe discuss some of the laws that apply.

Let me follow up a little bit on what the Judge was speaking with you about, your work situation.

A.    Uh-huh.

Q.    As the Judge said, obviously, it's a hardship

1    for anybody to come down here and be off work for two weeks,

2    and the Judge can't let you go for that.

3                    There is a certain provision, though,

4    that basically boils down to this.  You know, we need people

5    that can pay attention to what's going on in the courtroom.

6    And oftentimes we talk to people who have so much going on

7    in their personal or professional life that they really are

8    concerned that they wouldn't be able to give the trial their

9    full attention, just because whatever is going on at home,

10   whatever is going on at work.

11                   And if that's the case, that's fine.  We

12   just kind of need to know about it.  Is that kind of where

13   you put yourself -- or, I mean, we kind of leave it up to

14   the person to tell us because you are the only one that can

15   tell us how that other stuff outside the courtroom will

16   affect you.

17        A.     To be honest, it's not even the work thing.  I

18   just don't, this would be, I'm kind of emotional right now,

19   even -- I mean, if you can't tell.  I think it would be

20   very, very stressful.  I don't know.

21        Q.     Okay.  I read your questionnaire and it looked

22   like you had some real concerns about whether you --

23        A.     I do, it's hard, it's hard.

24        Q.     It looks like you had some real concerns for a

25   lot of reasons whether you were the right type person to

1    maybe be on a death penalty case.

2        A.     I mean, I can -- I know you read this

3    questionnaire.  I mean, I can tell you personally,

4    obviously, I don't think that I would be good in this

5    situation.

6        Q.     Well, let me follow up on that.  I mean, we

7    have to bring down all those people that we talk to and we

8    know this is not everyone's cup of tea, to serve in a trial

9    where, you know, basically, the State is asking you or the

10    State's goal is that that man down at the end of the table

11    be executed one day.

12        A.     Yeah.

13        Q.     And we know that's not for everybody.  And

14    some people just can't do it.  They've got too much stress

15    going on, like I said, in their personal or professional

16    life, or they just know that they're not the type person to

17    really sit in judgment.  And that's kind of what I hear you

18    saying; is that right?

19        A.     Uh-huh.

20        Q.     Yes?

21        A.     Yeah.  I don't think that I could judge

22    fairly.

23        Q.     Okay.  Just because the whole situation is too

24    overwhelming for you?

25        A.     Yeah.

1   Q.    Okay.   Your inability to judge, I guess, is

2   just based on your anxiety and your stress level, kind of

3   what, a little bit of what we're seeing right now; is that

4   right?

5       A.    But if it was a different type of case, I

6   could judge fairly.  But since you're seeking the death

7   penalty, it's hard for me to separate this man's guilt from

8   my beliefs.  And after reading, going through this again,

9   some of my questions kind of make me -- or some of my

10  answers, excuse me, kind of make me -- I just answered them.

11  It seems strange that I answered the questions the way I did

12  now.

13      Q.    Okay.  Do you believe in the death penalty?

14      A.    I could never -- if I was on this jury, I

15  could never personally say that this man needs to die.  I

16  couldn't, because it makes me emotional.

17      Q.    Okay.  So you -- let me kind of cut down, cut

18  to the chase.  Based on your personal beliefs and as best

19  you know yourself, your beliefs would substantially impair

20  you from being able to fully and fairly perform your duties

21  as a juror in this type of case; is that right?

22      A.    Yeah, exactly.  That's what I'm trying to say.

23  I mean, I've gone to Catholic school for 12 years of my life

24  and this just --

25      Q.    Okay.

1          MR. WIRSKYE:  That's all I have, Your

2   Honor.

3          MS. BUSBEE:  Your Honor, the parties have

4   reached an agreement on Ms. Marshall.  You don't have to do

5   this.

6          THE COURT:  Ms. Marshall, I appreciate

7   you coming down.  You can tell they can agree on excusing

8   you where I cannot.  They have done so.  You won't have to

9   worry about your business.  We appreciate you coming down

10  and you are free to go.

11              [Prospective juror out]

12          THE COURT:  Mr. Rabuse.

13              [Prospective juror in]

14          THE COURT:  Good morning.

15          PROSPECTIVE JUROR:  Good morning.

16          THE COURT:  We have juror No. 4702,

17  Mr. Keith Richard Rabuse.  Is that pronounced correctly?

18          PROSPECTIVE JUROR:  It's Rabuse.

19          THE COURT:  Rabuse.

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Welcome to the 283rd.  I see

22  you have the guide with you.  Did you have enough time this

23  morning to read the guide I provided for you?

24          PROSPECTIVE JUROR:  Yes, I did.

25          THE COURT:  I also gave you a copy of

1    your questionnaire and I could tell immediately on the front

2    page that you're an architect, because we can read your

3    writing, and we appreciate that as well.

4                    At this point, the guide I prepared is

5    for you to have an opportunity to begin to think about the

6    issues that the lawyers are going to visit with you about.

7    And this is the only time that you get to talk back and

8    forth where you can get a working understanding of how this

9    law all relates.

10                   And the best thing is there are no wrong

11   answers.  They just want to get your opinions and bring you

12   up to speed on the law.  If they have a question about some

13   of these issues that you gave us in May, that's why I gave

14   you the questionnaire, you can review the answers you gave

15   on those.

16                   At the end of the process I have two

17   questions I must ask.  Number one is, do you understand the

18   law?  Number two is, can you follow the law?  That's the big

19   picture I have to look at.  The only question I have for you

20   at this time is can you serve this Court for a period of two

21   weeks beginning on November 10th?

22               PROSPECTIVE JUROR:  Yes.

23               THE COURT:  Thank you, sir.  Mr. Shook?

24               MR. SHOOK:  Thank you, Judge.

25               KEITH RABUSE,

1   having been duly sworn, was examined and testified as

2   follows:

3                       DIRECT EXAMINATION

4   BY MR. SHOOK:

5        Q.    Mr. Rabuse, my name is Toby Shook.  I'm going

6   to ask you questions on behalf of the State.  As the Judge

7   has said, we're just looking for your honest opinions.

8   There aren't any right or wrong answers.  I'll follow up on

9   some of the information you provided in your questionnaire

10  and we'll talk about capital murder and some of your

11  feelings about that.  If you have any questions at any time,

12  feel free to ask, okay?

13                  Looking at your questionnaire, I see that

14  where you grew up, I think in Minnesota; is that right?

15       A.    That's correct.

16       Q.    Went to school in Iowa?

17       A.    Iowa State.

18       Q.    And then you came down here.  What brought you

19  down here to Texas?

20       A.    The economy.  The economy was good here and

21  not good up in the midwest.

22       Q.    Okay.  You enjoy it down here in Texas?

23       A.    Um, yes, overall.

24       Q.    A little different on the climate, I guess,

25  especially in winter?

1          A.     Right, a little bit.

2          Q.     I see by the questionnaire that your brother

3    is a lawyer?

4          A.     Yes.

5          Q.     Where does he practice?

6          A.     Um, he's in private practice.  He's a partner

7    in a firm.  He's had different roles.  He has done

8    construction law.  He was, for a while, a lawyer at

9    Honeywell in corporate law.  And now, he has a really

10   diverse practice.

11         Q.     Did he ever do criminal law?

12         A.     He has people in his firm that have done

13   criminal law.

14         Q.     But he, himself, doesn't?

15         A.     He does mostly corporate-type cases.

16         Q.     Okay.  You said at work you oversee a lot of

17   the projects.  We anticipate this trial will last two weeks.

18   And the Judge gave you that date in November.  You don't

19   have any conflicts with any deadlines at that time, do you?

20         A.     Well, right now I would say no.  I just, you

21   know, never know the way things come up.

22         Q.     Okay.

23                THE COURT:  Which law firm is your

24   brother with?

25                PROSPECTIVE JUROR:  It's Luthgard and

1  Rabuse, is the name of the firm.

2              THE COURT:   Thank you.

3          Q.     (By Mr. Shook)   That's not here in Texas, is

4  it?

5          A.     No, it's in Minnesota.

6          Q.     Okay.  But as far as you know right now,

7  you'll be fine on that?

8          A.     Yes.

9          Q.     Okay.  Now, we -- one thing I want to talk to

10  you about is publicity.  You know, this case -- from reading

11  the questionnaire, you know a little bit about it and we

12  can't get into the facts.  But, obviously, this case

13  received a whole lot of publicity.  So almost every juror

14  has noted on their questionnaire that they've seen it on TV

15  or the newspaper or radio, or all three.

16              So we follow that up with asking each

17  juror how much they saw, what they recall of the details.

18  Looking back on it, what do you recall watching on TV as far

19  as the news goes?

20          A.     Um, well, I know there was an escape from

21  prison in Texas and there was a group of men, I don't

22  remember the exact number, five or six, and they, I guess,

23  were caught in -- I guess it was -- I believe it was

24  Arlington.  There was a store there that there was a murder

25  that took place of a police officer and they were eventually

1    captured in Colorado.

2        Q.    Okay.  Did you follow any of the court

3    proceedings after they were captured?

4        A.    Um, not really.  I believe there was a

5    gentleman convicted, but I have not followed it much since.

6        Q.    Okay.  The next question we follow up with is,

7    if you feel that would influence you in any way as a juror?

8    Just because you've seen something, doesn't necessarily make

9    you ineligible.  It's kind of up to each juror, how they

10   feel and how much they've seen.

11              Obviously, the rule is this.  If you're

12   on the jury, you'd have to make your decisions just based on

13   what you hear in the courtroom from the witnesses, because

14   that's going to be more accurate.  We can't ask you to

15   forget what you've seen or heard.  We just ask you to make

16   your decisions based solely on the witnesses and evidence

17   you hear in the courtroom.  You can't let those opinions you

18   have may have formed on any news stories you've seen

19   influence you in any way.

20              And it kind of comes down to the

21   individual juror, if they're able to tell us that they would

22   follow that particular rule of law.  Some can and some

23   can't.  It just depends on how much they've seen and what's

24   going on in their own mind.

25              But it just comes down to you and your

1   honesty and what you can tell us honestly about what you

2   have seen and heard on TV and whether you think that would

3   influence you or not.

4       A.      I don't think it would influence me without

5   hearing the case.  I don't think that would impact my

6   influence.

7       Q.      Okay.  That's what the law is.  Now, let me

8   talk to you a little bit about how you feel about capital

9   murder and the death penalty.  Are you in favor of the death

10  penalty as a law?

11      A.      Yes.

12      Q.      Okay.  Tell me why you favor it, maybe the --

13  and the purpose you feel it serves.

14      A.      I think there's certain cases where the crime

15  is so severe, that it is equal justice.

16      Q.      Okay.  What types of cases come to mind which

17  you think should be, the death penalty should be considered

18  for the death penalty?

19      A.      That's a tough question.  Well, I -- certainly

20  a death of a police officer would be one or another

21  government official is an example and even a private citizen

22  as well, depending upon the case, too.

23      Q.      Okay.  Have you followed any cases in the

24  media, locally or nationally, that you thought could be

25  appropriate for the death penalty?

1    A.    One doesn't come to mind right off the top of
2  my head, no.

3    Q.    How long have you believed in the death
4  penalty, if you know?  Has it been something as an adult you
5  have --

6    A.    I probably have formulated the belief since,
7  say, jr. high, high school, so.

8    Q.    Okay.  So it's just as you've been raised,
9  grown, seen things, matured?

10   A.    Right.

11   Q.    It wasn't one event that caused you to --

12   A.    No.

13   Q.    We ask a whole lot of questions about -- a
14  bunch of openended questions on the questionnaire.  Did you
15  have a chance to review any of the questionnaire?

16   A.    I went through most of it again before I came
17  in, so.

18   Q.    Sometimes people are surprised by what they
19  wrote.  Other people are not.  Questions, obviously, a
20  little openended, kind of designed that way, some of them.
21  On page 4 we ask if you feel that the death penalty is used
22  too often or too seldom, and you said too often in measure
23  of the other states.  And I'd like you to just kind of
24  follow up on that.

25   A.    Well, I think it's fairly well publicized in

1  the press that the State of Texas has more executions than

2  other states.

3     Q.    Right.

4     A.    So as a measure of other states, I would say

5  that they are at the very top of the list.  I would say that

6  they use it probably too often.

7     Q.    Okay.  And you also, looking at the top about

8  a third down, we asked on a scale of 1 to 10 how much you

9  believe in the death penalty and how strongly, and you put

10  an 8.  And that means different things to different people.

11  When you placed an 8 there on your belief in it, what were

12  you thinking of?

13     A.    Um, well, I think that it's -- as I mentioned

14  before, it's a -- potentially a fair and just means of

15  justice, so I lean towards the belief.

16     Q.    All right.  Now, on the next page on page 5 at

17  the bottom, we, again, give some statements and ask if --

18  they go from strongly agree to strongly disagree and in the

19  middle is uncertain.  And the last statement is, criminal

20  laws treat criminal defendants too harshly, and you put

21  uncertain on that.  And any time I see an uncertain, I

22  always ask the jurors to just kind of follow up to see what

23  they were thinking.

24     A.    Um, I guess the question is so openended, it's

25  such a broad brush question, it was hard to say agree or

1  disagree from my case.

2      Q.    Now, you said your father, in the

3  questionnaire you mentioned that he was a constable?

4      A.    Right.  He served in a community of about 300

5  and just out of the Saint Paul area.  It's a suburb, a small

6  suburb, and he served in a nonpaid position as a constable

7  for probably 15 to 20 years.

8      Q.    And is that the same as law enforcement, even

9  though it's not paid?

10      A.    Yeah.  It was -- he was armed.  I mean, if he

11  needed to be, and it was a sworn-in position.

12      Q.    Okay.  So, he was a sworn peace officer?

13      A.    Yes.

14      Q.    Make arrests, that sort of thing?

15      A.    Yes.

16      Q.    Was it kind of like a voluntary position?

17      A.    Yes.

18      Q.    An auxiliary force, that sort of thing?

19      A.    Right.

20      Q.    Did you ever go on patrol with him or help him

21  in any of those --

22      A.    Um, I actually think I was in the car with him

23  once when, if I remember, I was young, when I think he

24  actually had to apprehend someone, so.

25      Q.    Okay.  And I guess he talked to you about some

1   of his cases or things that happened on the job?

2        A.    Um, not very often.  I think -- I remember one

3   case he discussed where he had encountered someone who was

4   threatening him.  And I think it was the only time that he

5   actually had to basically pull his gun from his holster,

6   basically, so.

7        Q.    Okay.  Do you think that factors into some of

8   your beliefs in the death penalty, your father's kind of law

9   enforcement background, or that sort of thing?

10       A.    Um, I don't -- I don't think so.  I think if

11   he was not in that position, I think my position wouldn't be

12   really much different.

13       Q.    The same?  Okay.  There was another -- you

14   mentioned a couple of times, one on page nine when we asked

15   if you or your spouse's or close family member's views

16   changed in the last five years and you said less inclined to

17   support the death penalty due to studies on influence of

18   race.  And I think you mentioned that at the beginning on

19   disparity of application.  And, if you would, just elaborate

20   on that a little bit.

21       A.    Well, the one argument I have read about and

22   discussed, I think in college and whatnot, is that race is a

23   measurement, is something you can actually measure, is

24   something that is shown statistically to affect the outcome

25   of a trial.  And if there was any argument against it, it

1   would be that issue.

2        Q.   Okay.  Do you think that would affect you in

3   any way, if you sat on this particular jury?

4        A.   No.

5        Q.   Okay.  Let me, you've looked at the guide the

6   Judge gave you.  And in Texas the death penalty is reserved

7   just for certain types of murder cases.  We have a lot of

8   murder cases, brutal crimes, for which you can't receive the

9   death penalty; you can get a life sentence.

10            And what we've done is reserved it just

11   for specific types, certain types of murders, murders we

12   generally classify as some other aggravating fact, such as a

13   murder that occurs during the course of a felony.  A robbery

14   situation, someone goes in and robs the clerk in a

15   convenience store and shoots them during the robbery, that

16   could be a death penalty situation.

17            Murder during a burglary, someone breaks

18   into someone's residence and kills someone in the home, or

19   murder during a rape, kidnapping, or arson.  Also, murders

20   of specific individuals, such as a police officer on duty,

21   fireman on duty, prison guard on duty, murder of a child

22   under the age of six, multiple murders or several victims in

23   a serial killer situation, or a mass murder situation.  And

24   then murder for hire, if someone is doing it for money or

25   profit.

1           But those specifically are generally the

2   types of cases that come into the death penalty statute.   As

3   far as that list goes, from your personal point of view, do

4   you agree with that list as being the types of crimes you

5   think should come under consideration?

6           A.      Yes.

7           Q.      Okay.  Let me go into another area.  You know,

8   when we talk about the death penalty or crimes deserving of

9   it, we generally think of an example in our head such as the

10  guy that goes in and robs the convenience store and maybe

11  commits a killing.  We think of the triggerman.  Capital

12  murder, like other crimes, sometimes is caused or pulled off

13  by several, several people, more than one.  You can have

14  accomplices involved.

15          You may have only one triggerman, but you

16  may have some other people involved in the crime.  And under

17  the law those people could be found guilty of capital

18  murder.  They could even receive the death penalty under

19  certain facts under the law.

20          People feel differently from a personal

21  point of view about accomplices, a nontriggerman, being

22  prosecuted for the death penalty.  Some people are very much

23  in favor of the death penalty, but if it were up to them,

24  the situations they'd reserve it for is the person who

25  actually causes the death, the triggerman, if you will.

1   They feel it's a just sentence in those situations,

2   depending on the facts.

3                    As far as an accomplice goes, they don't

4   feel that it's just in those situations.  They might reserve

5   a life sentence or a long prison term for someone that's

6   aiding in the crime.  But if they didn't actually cause the

7   murder, then they don't feel the death penalty would be

8   justified.

9                    Jurors feel differently about that.  So

10  we ask each one to just kind of honestly tell us how they

11  fall on that particular issue, the death penalty involving

12  an accomplice.

13       A.    So you're saying that the law allows an

14  accomplice to be convicted of capital murder?

15       Q.    Under certain circumstances.

16       A.    Okay.

17       Q.    And I'm not really getting into the issue of

18  whether you could follow the law.  What we like to ask

19  jurors is from your own personal point of view, if you think

20  that's fair, regardless of what the law is.

21       A.    Depending upon the circumstance, it can be

22  fair.

23       Q.    Okay.  What's important to you in those fact

24  situations, as far as an accomplice goes?  What kind of

25  comes to mind?  Why do you think that would be fair?

1     A.      Um, well, if they had full knowledge, full

2     participation, you know, if they premeditated it with the

3     group.

4         Q.      Okay.  When you talk about premeditate, are

5     you talking about the actual killing?

6         A.      Yes.

7         Q.      Okay.  Let me kind of go over a scenario.

8     I'll give you an example.  One example could be Mr. Wirskye

9     and I, we decide to go on and commit a bank robbery.  The

10    plan calls for me to go in there with a gun.  He comes in to

11    help me.  He's going to have a bag.  We've got a getaway

12    driver outside.  We go in.  The getaway driver is waiting,

13    keeping the car running.  He may yell if someone comes.  I

14    pull the gun out and I threaten everyone.

15             Once I get their hands up, Mr. Wirskye

16    goes in behind and starts loading the cash out of the

17    drawers.  Then in the middle of all that, I intentionally

18    murder one of the tellers.  Maybe I don't like the way

19    they're looking at me, maybe he tells me one is going for an

20    alarm, but I shoot them down.  We get out and get in the

21    car, but as we're going away, let's say the police are able

22    to capture us.

23             Now, obviously, I can be prosecuted for

24    the death penalty because I'm the murderer, right?  I caused

25    the death.  The law says that they also, the two

1   accomplices, could also be prosecuted for the death penalty,

2   could be convicted, and could even receive the death

3   penalty.

4                    One theory of law is if they are actively

5   involved and directed, aided, helped, pull off the event.

6   The other one is conspiracy.  The law says that if one or

7   more people conspire to commit one felony, in this case bank

8   robbery, and during the course of committing that felony,

9   one of the conspirators commits another felony to further

10  the conspiracy, in this case me shooting the teller, then

11  everyone can be found guilty, even if they didn't have the

12  intention of that happening, if the jury believes they

13  should have anticipated that could occur.

14                    So he doesn't necessarily under that law

15  can have that premeditation or agreement ahead of time.  He

16  may not even want or intend that person to die.  He can

17  stand there and say, don't shoot anybody.  The law allows

18  under that scenario for him to be convicted of capital

19  murder.

20                    And jurors sometimes agree with that and

21  sometimes they don't.  They feel it's fair on an accomplice

22  if they have that intent to kill, if that agreement were

23  ahead of time.  They don't think it's fair for the situation

24  from the facts that they really didn't have that intention.

25  People feel differently about that.  How do you feel about

1   that aspect of the law?

2       A.    So what you are saying is if there was an

3   anticipation that something could happen, that that --

4       Q.    If that's what the jury believes, that even if

5   you don't have the intent, an accomplice didn't have the

6   intent for that person to die, if he should have anticipated

7   a murder could occur, then they can be found guilty.  So it

8   doesn't actually under that theory come down to their

9   intent.  It comes down to, well, should you have anticipated

10   a murder could occur.

11            And that's where some jurors have a

12   problem with the law.  They think it's fair to convict

13   someone, if they have that intent.  They don't think it is,

14   if they didn't have that intent, even if they should have

15   anticipated.

16       A.    So your question is whether I would see that

17   as -- that I could see that as a potential conviction?  Or

18   do I see it as do I disagree with the law?

19       Q.    Well, whether you disagree or from your

20   personal point of view, do you think that's fair, regardless

21   of the law.

22       A.    Depending upon the circumstance, I could view

23   it either way.  It just depends upon, I guess, the degree of

24   motivation in the case.

25       Q.    Motivation from the accomplices?

1          A.      The accomplices and their degree of

2    involvement and participation.

3          Q.      Okay.  You see how the fact scenario I gave

4    you, and we can't go into the facts, but it involves these

5    other people in various degrees?  And that's kind of what it

6    comes down to, the individual facts in each case.  But to

7    get someone convicted, we don't necessarily have to prove

8    they intended that another person should die, only that they

9    should have anticipated.

10              Do you feel you could convict someone

11    under those circumstances, if you believe from your point of

12    view that's what the facts show?

13          A.      Yes, I could.

14          Q.      Okay.

15              MR. SHOOK:  Judge, could I have one

16    moment?  Judge, that's all the questions I'll have.

17              MS. BUSBEE:  Your Honor, we've reached an

18    agreement on this juror.

19              THE COURT:  I know I'm not pronouncing it

20    correctly, is it Rabuse?

21              PROSPECTIVE JUROR:  Raybuse (phonetic).

22              THE COURT:  We thank you for your time in

23    court this morning.  The parties have agreed to excuse you

24    from this case.

25              PROSPECTIVE JUROR:  Okay.  Thank you.

1          THE COURT:  Thank you, sir.

2                  [Prospective juror out]

3                  (Recess)

4          THE COURT:  Ms. Canady.

5                  [Prospective juror in]

6          THE COURT:  Please have a seat.  Good

7  afternoon.  We have juror No. 3993, Ms. Andrea Canady.  Is

8  that pronounced correctly?

9          PROSPECTIVE JUROR:  That is.

10         THE COURT:  Welcome to the 283rd.

11         PROSPECTIVE JUROR:  Thank you, sir.

12         THE COURT:  Have you had enough time this

13 afternoon to read the guide I provided for you?

14         PROSPECTIVE JUROR:  Yes, sir.

15         THE COURT:  I also gave you a copy of

16 your questionnaire that you filled out back in May to help

17 you refresh your memory on some of the answers that you have

18 provided, and also to give the attorneys, if they want to

19 ask you a question, you can look at your answer so you can

20 expound upon what you've already given.

21         I know people come in and they're a

22 little nervous.  They don't know exactly what to expect.

23 It's normal.  This process is about interaction, so you can

24 learn what the law is all about and how it relates.  The

25 attorneys will visit with you about the law and give you

1  examples to help you understand.

2              At the end of the process I have two

3  questions that I have to ask.  Number one, do you understand

4  the law?  And then, second, can you follow the law?  That's

5  the big picture for me.  The only question I have for you at

6  this time is will you be able to serve this Court for a

7  period of two weeks beginning on November 10th?

8              PROSPECTIVE JUROR:  Yes, sir.

9              THE COURT:  With that, I'll turn it over

10  to Mr. Shook.

11              MR. SHOOK:  May it please the Court?

12              <u>ANDREA CANADY</u>,

13  having been duly sworn, was examined and testified as

14  follows:

15                   <u>DIRECT EXAMINATION</u>

16  <u>BY MR. SHOOK:</u>

17      Q.    Ms. Canady, my name is Toby Shook.  I'm going

18  to be asking questions on behalf of the State.  As the Judge

19  said, there aren't any right or wrong answers.  We just want

20  your honest opinions.  This process is a little different.

21  You've been on juries before and know that we usually speak

22  to the jurors all in one group or panel.  Because it's a

23  death penalty case, our procedure is to speak with every

24  juror individually.

25              We don't mean to make you feel like

1  you're the one on trial or anything, but we found it's a

2  pretty good process for getting information.  And if you

3  have any questions at any time, feel free to ask, okay?

4      A.    Yes, sir.

5      Q.    All right.  Let me ask you.  As you know from

6  reading the questionnaire and the Judge's comments, this is

7  the case -- this is a case in which the State is seeking the

8  death penalty.  And you said on your questionnaire that you

9  are in favor of it as a law.  And I'd like you to just kind

10  of expand on that and tell us why you're in favor of it and

11  the purpose you feel it serves.

12      A.    I guess a lot of it has to do with my faith.

13  I believe pretty much an eye for an eye, a tooth for a

14  tooth, especially if it's something premeditated.

15      Q.    Okay.

16      A.    I believe anytime an officer is involved and

17  -- well, I don't know, I guess, I have a best friend that

18  was murdered.

19      Q.    How long ago was that?

20      A.    In '85.

21      Q.    Okay.  Was that here in Dallas?

22      A.    No, sir.

23      Q.    Where did that occur?

24      A.    It was in California.

25      Q.    Okay.  And that man was captured, prosecuted?

1        A.       Um, that I do not know.

2        Q.       Okay.  A lot of people feel the way you do,

3    pretty strong about violent crime, murder of a police

4    officer, that sort of thing.  That's what the law covers in

5    Texas, intentional murders.  Not every murder qualifies as a

6    potential death penalty case.  We have a lot of brutal

7    murders that you can only receive a life sentence for.

8              Under the law there's only certain types

9    of murders that can be considered.  Murders of police

10   officers or firemen on duty, murder that occurs during a

11   felony like a robbery, or a burglary, kidnapping, rape,

12   murder of a child under the age of six, murder for hire,

13   murder of more than one victim.  Those are the specific

14   types of cases.

15             And under our procedure the law says that

16   not everyone convicted of those crimes actually receives the

17   death penalty.  It depends on the facts of each case and the

18   background of every individual.  Some will be convicted, and

19   because of the way the questions are answered, they will get

20   life sentences, capital life sentences.  And others, based

21   on the facts of each case, will get death sentences.

22             So the guilt is not the determining

23   factor.  We have a separate punishment hearing in which we

24   can hear the entirety of the person's background on both

25   good and bad in determining all aggravating circumstances

1    and mitigating circumstances.

2                    And that's kind of how the system works,

3    so that not every murder case is a death penalty case and

4    not every capital murder case results in the death penalty.

5    If they are convicted, it may be a life sentence; it may be

6    a death sentence.  It's just going to depend on the facts.

7                    Does that sound like a fair system to you

8    to have that some will get death, some will get life, just

9    depending on all the evidence produced at trial?

10       A.    Well, what's fair with me and what, you know,

11   the law is, that's hard for me to say because, you know, I

12   feel like unless it's something that's self-defense, you

13   know, by taking someone's life, but we have to accept the

14   law.

15       Q.    Okay.  Now, you read some about this case or

16   saw something on TV like virtually every juror in this case,

17   which doesn't make you ineligible to be a juror.

18       A.    Right.

19       Q.    If that were true, obviously, in a high

20   publicity case we could never get a juror.  What do you

21   recall seeing on TV about the news coverage?

22       A.    Oh, man, I followed it from the beginning to

23   the end.  So -- and also, you know with Internet access,

24   even checked it out there.  So pretty familiar with -- I

25   couldn't tell you step by step what happened, but just, you

1  know, what the -- what the ones that were involved, and --

2      Q.     What do you recall as best you can recall?

3  What details do you remember?

4      A.     Without naming names, or --

5      Q      If you can name names, that's fine.  If you

6  can't, that's all right.

7      A.     Well, I do recall where Mr. Murphy was

8  responsible for being the one who stole the weapons from the

9  prison, for how they tricked the guard, you know, they had

10 so much trust in the guards, how they were allowed to kind

11 of run freely within the prison there.  Um, and then once,

12 of course, they got to Irving, how with the robbery, how

13 that all went down, and then unfortunately how the officer

14 was brutally shot down.

15     Q.     You said you saw some of this on the Internet;

16 is that right?

17     A.     Yes, sir.

18     Q.     When did you -- when were you able to look

19 that information up?

20     A.     Well, we've checked it on several occasions.

21 But once that, to be honest with you, once I came down and

22 it just clicked in my mind what this was, I even checked it

23 out then to refresh my memory.

24     Q.     Did you check Mr. Murphy's name in particular?

25     A.     No, sir, I checked them all.

1    Q.    Okay.  From what you've read or seen in the

2  case, basically the rule is this.  To sit as a juror, you'd

3  have to be able to make the decisions in the case based

4  solely on the witnesses and the evidence you hear in the

5  courtroom.

6    A.    Right.

7    Q.    Not based on anything you may have read on the

8  Internet or in the newspaper or seen on TV.  You have to be

9  able to not let that influence your opinions in any way.

10  Some people can do that; some people can't.  Kind of depends

11  on how much they're exposed to it.  And it's really only

12  something you can tell us, whether you can follow those

13  instructions or not.

14         How do you feel about that?  Would you be

15  able to follow that particular rule in this particular case

16  as far as being able to base your decisions simply on what

17  you hear in the courtroom?

18    A.    I don't know if I could do that or not.

19    Q.    Do you feel you may be influenced by the TV

20  coverage as well as your Internet research?

21    A.    No, sir.  I think what would probably more

22  associate it with would be with the -- what is the phrase

23  I'm looking for?  Just the affiliation.  In my opinion that

24  it may not have been premeditated to gun down the officer,

25  but, obviously, that thought was there or, you know, to,

1    maybe not him, but someone, because there were weapons taken

2    and just the circumstances.  So I just, I don't know that I

3    could give a fair -- I don't know that I could give a fair

4    trial.

5              MR. SHOOK:  I believe that's all the

6    questions we have, then.

7              MS. BUSBEE:  Your Honor, in appreciating

8    her candor, we've reached an agreement on this juror.

9              THE COURT:  Thank you, ma'am.  We

10   appreciate you coming down.  The case, you knew a little too

11   much about it.  Thank you so much.

12                   [Prospective juror out]

13                   [Prospective juror in]

14             THE COURT:  Please have a seat.  Welcome,

15   Mr. Navarro.  How are you?

16             PROSPECTIVE JUROR:  I'm fine.

17             THE COURT:  We have juror No. 3885,

18   George S. Navarro.  Mr. Navarro, have you had an opportunity

19   to read the guide I provided for you?

20             PROSPECTIVE JUROR:  Yes, sir.

21             THE COURT:  I also gave you a copy of

22   your questionnaire, so you reviewed that.

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Sir, I've given you a lot of

25   law and the opportunity now is for the attorneys to visit

1  with you, go over the law, and then have an opportunity to

2  ask questions.  And they may give you examples to help you

3  understand how it all relates.  At the end of the process, I

4  have two questions I must ask.  Number one is, do you

5  understand the law?

6              PROSPECTIVE JUROR:  Somewhat.

7              THE COURT:  At the end of the process,

8  that's the big question.  And then if you understand the

9  law, can you follow the law?  That's what I have to answer

10  at the end of the process.  The only question I have for you

11  now is will you be able to serve this Court for a period of

12  two weeks beginning on November 10th?

13              PROSPECTIVE JUROR:  No.

14              THE COURT:  Why not?

15              PROSPECTIVE JUROR:  I've got a new

16  position at work and it requires my full attention.  If it

17  only lasted for a few days, that would be fine, but two

18  weeks is extensive.

19              THE COURT:  And, sir, where do you work?

20              PROSPECTIVE JUROR:  I work for a company

21  here in Dallas called the Mailbox, Incorporated.

22              THE COURT:  DPS?

23              PROSPECTIVE JUROR:  Yes.  Alliance Data

24  System.  We're a subsidiary of this company.

25              THE COURT:  And what is your new

1   position?

2                   PROSPECTIVE JUROR:  Last April I became a

3   service technician and we're pretty slim in that department

4   right now.

5                   THE COURT:  I understand what a service

6   technician does, because I have to become my own to keep my

7   computers working.  Let me just share with you, the fact is

8   that I can't let people off for business reasons.

9                   PROSPECTIVE JUROR:  I understand.

10                   THE COURT:  And it might be an

11   imposition, just like paying taxes or fighting wars or

12   whatever.  This is just one of the public duties that we

13   have to perform.  We'll be able to tell you that you will

14   not be sequestered.  You will be able to talk on the phone

15   all day long.  If you need a computer link, I can probably

16   make that happen, if you do remote service, during the

17   break, if you had to check on e-mail or something like that.

18                   You can use the phones.  We certainly

19   work normal business hours and you'd leave at 4:30, no later

20   than 5:00 each day.  So you would be able to get access to

21   your network.  And you could certainly run by there in the

22   afternoon to put out a fire, if you had to.

23                   Understanding that, I can't let you off,

24   just because of being inconvenient.  That's why we're doing

25   it this far out so your company will be able to wire around

1    it and provide you time to do it.  Fair enough?

2                        PROSPECTIVE JUROR:  Fair enough.

3                        THE COURT:  Thank you, sir.  Mr. Wirskye,

4    would you like to inquire?

5                        MR. WIRSKYE:  May it please the Court?

6                        GEORGE NAVARRO,

7    having been duly sworn, was examined and testified as

8    follows:

9                        DIRECT EXAMINATION

10   BY MR. WIRSKYE:

11        Q.     Mr. Navarro, how are you this afternoon?

12        A.     I'm doing well.

13        Q.     Okay.  My name is Bill Wirskye and I'm the

14   Assistant DA that will be visiting with you for the next few

15   minutes.  What I would like to do is follow up on some of

16   the information in your questionnaire, talk to you a little

17   bit about your thoughts on the death penalty, since this is

18   a case where the State is seeking the death penalty, and

19   then, finally, talk to you a little bit about the law, make

20   sure you understand the law, and can follow the law,

21   basically.

22                       You know, we talked to a lot of different

23   people whose beliefs kind of run the gamut, as you can well

24   imagine, on what they believe when it comes to the death

25   penalty.  The bottom line is basically no matter what you

1  believe, you know, everyone is entitled to their own

2  opinion.  To the extent it may conflict with the law, could

3  you set that aside and be able to follow the law, that type

4  thing.

5         So that's pretty much where I'd like to

6  spend my time with you.  Just to follow up a little bit on

7  what the Judge talked about, obviously, he cannot let

8  people, everyone that has a work conflict or work problem

9  off of jury duty, just for financial hardship.

10        The kind of one exception to that is

11 this.  We realize that sometimes there are people that have

12 so much going on in their personal life and their

13 professional life, that if they were to be a juror for two

14 weeks, their mind may wander, you know.  They'd have so much

15 on their mind that it would be difficult for them to promise

16 us that they can pay full attention to the evidence and the

17 facts they hear in the courtroom.

18        And we kind of leave it up to the

19 individual to tell us, if it's that type of extreme case.

20 And it sounds like starting a new job, obviously, that's a

21 concern of ours.  So I'll just ask you, I mean, do you think

22 if you were selected to be a juror and be down here about

23 two weeks, which is our best guess of what the trial will

24 last, do you think what's going on back at work may affect

25 you at all or what do you think about that issue?

1    A.    I'm highly depended upon every day where I'm

2    at right now.  And I can probably take two weeks off, but it

3    would definitely hurt the department I work in.

4    Q.    Okay.  And that's our best estimate, two

5    weeks.  It may be shorter than that.  But do you think if

6    you had to be down here for two weeks, that you could assure

7    us, both sides, obviously, that you could just listen to the

8    facts and the evidence that you hear in the court and your

9    mind wouldn't wander back to what's going on back at the

10   office or anything like that?

11   A.    I will give you a yes.

12   Q.    Okay.  You can do that?

13   A.    Yes.

14   Q.    Okay.  Let's see, you've told us that you're

15   generally in favor of the death penalty; is that right?

16   A.    Yes.

17   Q.    Okay.  Could you explain to us a little bit

18   more about that and what purpose you think it serves or why

19   you are in favor of it?

20   A.    It's basically what I hear reading the

21   newspaper, watching the news, is that it's so expensive

22   keeping a prisoner in our penitentiary for so many years.

23   It's just the -- the cost is just phenomenal.

24   Q.    Okay.

25   A.    And, it just -- if they committed a crime or a

1    murder, you know, it's just best, I guess, for everybody

2    just to eliminate.

3         Q.    Okay.  And we hear that quite a bit.  People

4    that have, I guess, economic concerns --

5         A.    Yes.

6         Q.    -- or waste of taxpayers' money, that type

7    thing?

8         A.    Yes.

9         Q.    Just to let you know what the law is in Texas,

10   we reserve the death penalty just for murder cases, but then

11   only certain murder cases.  There are some very brutal, very

12   heinous murder cases, that don't qualify under our statute

13   to be considered for the death penalty.

14                  If you kill a certain person like a

15   police officer, a fireman or prison guard on duty, that

16   could be capital murder.  If you commit an intentional

17   murder during the course of committing another crime like

18   robbery, rape, or burglary, that's capital murder.

19                  If you hire someone to kill your spouse

20   or your business partner, murder for hire, or if you are the

21   person that got hired, you kill for money, those are capital

22   murder type cases.  Child under six, mass murder, serial

23   murder, that type thing.

24                  You know, I could turn to Mr. Shook right

25   now and say, gee, you know, I don't like his tie and shoot

1  him ten times in the head in front of the Judge and all the

2  bailiffs.  Very brutal crime, maybe I've been to prison five

3  times.  But the most I could get in that case is life.  It

4  doesn't qualify as capital murder.  Are those types of

5  crimes that I described to you that we reserve the option of

6  capital murder for, is that pretty much in accord with your

7  beliefs?

8          A.    Yes.

9          Q.    Okay.  And what we do, we don't ask a jury in

10  a capital murder case, once they've convicted a person of

11  capital murder, to decide between a life sentence or a death

12  sentence.  We don't ask them to write it in.  What we do, as

13  you may know from looking at that packet, is we ask them to

14  answer these three questions.  And there's a copy of them up

15  on the wall.  And depending on the answers to those three

16  questions, that determines the appropriate sentence in the

17  case.

18               One way to think about it is this,

19  Mr. Navarro.  If you're convicted of capital murder in the

20  first phase of the trial, you're sitting on an automatic

21  life sentence at that point.  And only if these three

22  questions are answered in such a way do you actually get a

23  death sentence.  Does that make sense to you?

24          A.    Yes.

25          Q.    Okay.  And you can see, I guess, now that

1    you've kind of had the scheme explained, how somebody that

2    might be convicted of capital murder can end up with a life

3    sentence; is that right?

4         A.    That's right.

5         Q.    Okay.  And you could keep an open mind and

6    consider that?

7         A.    Yes.

8         Q.    Okay.  We'll come back and talk about those in

9    just a second, but let me run another scenario by you.  I

10   think oftentimes when we think of murder or capital murder,

11   I think we think of the lone individual or the lone person

12   committing a crime.  As you can well imagine, crimes are

13   oftentimes committed by more than one person.  A group or a

14   gang of individuals can commit any crime, from shoplifting

15   all the way up to capital murder.

16              And when you're talking about a capital

17   murder scenario, you may have a situation where only one of

18   those people who was involved in the crime actually pulled

19   the trigger or actually caused the death.  And, like I said,

20   we talk to a lot of people and some people in that scenario

21   make some distinctions.

22              Some people who may feel very strongly

23   about the death penalty would just reserve the death penalty

24   for the triggerman, for lack of a better word.  And if it

25   were up to them, if they were Governor of Texas for a day,

1   when it came to a nontriggerman or the accomplices who are

2   actively involved, but, nevertheless, didn't actually cause

3   the death, you know, they may give them a life sentence, but

4   they don't feel the death penalty is justified for those

5   nontriggerman accomplices.

6                   And other people tell us, you know, it

7   just kind of depends on the facts and circumstances.  Where

8   do you come down on that issue?

9           A.      Basically, you know, in this situation, you

10  abetted a felon, and just being around the wrong place at

11  the wrong time to me.  He was there, he committed a felon,

12  and that's where I stand.

13          Q.      Okay.  You're talking about this case in

14  particular?

15          A.      Yes.

16          Q.      Okay.  And you indicated to us, like everyone

17  we talked to, that you've heard something about the case.

18          A.      Yes, like I said.

19          Q.      Looks like you live pretty close to the scene

20  of the crime?

21          A.      I was within a mile from that particular

22  Oshman store.

23          Q.      Okay.  Obviously, just knowing or having heard

24  about the case through the media, TV, that type of thing, is

25  not an automatic disqualification.  As you can imagine, if

1    that were the case, we would never get a jury in cases like

2    this, high profile cases.

3        A.    That's true.

4        Q.    The law says that even if you've heard

5    something about the case, as long as you can kind of push

6    that to the back of your mind.  You know, we can't ask you

7    to forget about it, obviously.  But as long as you can push

8    that to the back of your mind and start the trial kind of

9    with a fresh slate, clean slate, and with an open mind, and

10   just, again, be able to base your verdict on the facts and

11   evidence you hear in the courtroom, you would be qualified.

12            And, you know, we leave, again, leave it

13   up to the individual.  You know yourself better than anyone.

14   Is it a situation where you think you could do that?

15       A.    Yes.

16       Q.    Okay.  What have you heard about the case?

17       A.    Basically, what comes on the news.  I mean, it

18   was saturated, the whole three networks that we watch.  And

19   the newspaper covered it practically every day.  And I've

20   seen Aubrey Hawkins.  Since I'm a resident of Irving, I've

21   crossed his path a few times.  I didn't know the man, but I

22   knew who he was and that's the extent of it.

23       Q.    Okay.  But despite all of that, you have no

24   concerns about your ability, if you were selected as a

25   juror, to start with that open mind and just base your

1   verdict on what you hear in the courtroom?

2          A.       Yes, I can do it.

3          Q.       Okay.  Fair enough.  Let me get back to this

4   issue of the accomplices.  You've told us, I guess, that

5   depending on the facts and circumstances, you could see a

6   situation where a nontriggerman accomplice may ultimately

7   face the death penalty; is that right?

8          A.       Right.

9          Q.       And that's pretty much what the law is in

10   Texas.  The law says depending on the facts and

11   circumstances, those accomplices can be convicted of capital

12   murder and ultimately face the death penalty.

13                  Just to give you an example of how that

14   may work, Mr. Shook and I decide we're going to rob a bank.

15   We get together and come up with a plan that he's going to

16   take the gun in and hold up the tellers.  While he's holding

17   them at bay, I'm going to come in with a bag and kind of

18   gather all the money from the cash drawer, that type thing.

19   And we're going to make our getaway.

20                  And that's what we agree to do.  And say

21   during the course of this robbery, for whatever reason,

22   maybe one of them looks at Mr. Shook funny or I see one of

23   them going for a silent alarm for the police and tell him

24   that, he shoots and kills one of the tellers.  Okay?  He's

25   committed an intentional murder during the course of a

1    robbery, which, you will recall, is capital murder in Texas.

2              He could be convicted of capital murder

3    and face the death penalty, depending on the answers to

4    these three questions.  The law says so could I, even though

5    I didn't pull the trigger, even though I may have not had

6    any intent, you know, that a life be taken.  Does that make

7    sense to you?

8         A.    Yes.

9         Q.    Okay.  Is that a law you think you agree with?

10        A.    Yes.

11        Q.    And could follow?

12        A.    Yes.

13        Q.    Okay.  Basically, it comes down to this.

14   There's two different ways for me, in that example, the

15   accomplice, to be found guilty of capital murder.  One is if

16   I direct, encourage, or solicit him to actually commit

17   capital murder.

18              Going back to our example, if I see one

19   of them going for a silent alarm, I turn to him and say,

20   Mr. Shook, shoot and kill her before she gets to the police,

21   obviously, I'm just as guilty.  I had that intent that that

22   capital murder happen.

23              The second way I could be guilty is what

24   we call under the law of conspiracy.  We agree to commit the

25   bank robbery.  A murder happened in the course of the bank

1  robbery.  And if a jury thinks that I should have

2  anticipated that a life could be taken, they can find me

3  guilty of capital murder, and, depending on the answers to

4  those questions, I may face the death penalty.  Does that

5  make sense to you?

6      A.    Yes.

7      Q.    And a lot of people tell us, you know, you

8  should have anticipated that murder could happen because you

9  and your buddy went in, you know, with a loaded gun to do a

10 bank robbery, that type thing.  But that's the situation

11 where that accomplice could be found guilty, even though I

12 didn't actually have the intent, you know, that that teller

13 be killed.  That law make sense to you?

14     A.    Yes.

15     Q.    Okay.  And do you think it's a good law or a

16 good thing that we have that on the books?

17     A.    Yes.

18     Q.    Okay.  As I told you, we let the answers to

19 these three questions kind of determine what the appropriate

20 sentence is.  Just very briefly in a nutshell, the first

21 Special Issue asks you if you think the person is a future

22 danger, based on what you heard in that first phase of trial

23 about the guilt and any additional evidence you hear in the

24 second phase.

25              If that question is answered yes, you

1    move to the second question.  That deals with the accomplice

2    scenario that we've already talked about.  You've got to

3    find that the person intended or anticipated that a human

4    life would be taken.  If that question is answered yes, then

5    you move to this final question, which is the mitigation

6    question.

7              And we basically ask a juror to step back

8    and take a deep breath and look at everything and see if

9    there's any sufficient reason that his life should be

10   spared, that he should be given a life sentence rather than

11   a death sentence.  It's kind of the last stop in the

12   process.  It's a jury's chance to show mercy, even at that

13   late stage in the process.  Does that scheme kind of make

14   sense to you?

15        A.    Yes, it does.

16        Q.    Okay.  And again, the first part of the trial

17   is devoted to whether we've proved what we've alleged in the

18   indictment.  Is the person guilty or not guilty?  Did we

19   prove it to you beyond a reasonable doubt?  If the answer is

20   yes, then the law envisions that you start that second phase

21   of the trial.

22             The rules of evidence expand, you get to

23   hear good things, bad things, about the man's past, criminal

24   record, that type thing, if it exists.  And we give you this

25   extra information to ask the jury to answer these questions.

1          And what the law envisions, is even

2   though you've convicted someone of capital murder, you'd be

3   able to tell us, in order to be qualified, that you'd start

4   that second part of the trial with an open mind, that you

5   haven't automatically answered any of these questions just

6   -- or merely because you found the person guilty of capital

7   murder.  Does that kind of make sense to you?

8          A.    Yes.

9          Q.    Okay.  Is that a law you think you could

10  follow?

11         A.    Yes.

12         Q.    Okay.  Do you think you're the type person

13  that could participate in this process?

14         A.    Yes.

15         Q.    Okay.  And ultimately answer those questions

16  that may result in the execution of an individual?

17         A.    Yes.

18         Q.    Okay.  Let's talk a little bit more about

19  these Special Issues.  I know you had a chance, probably, to

20  look at them in that packet.  They're phrased a little bit

21  differently up on the wall.  If you can just take a minute

22  or two and look at those and we'll kind of take it one by

23  one and talk a little more in detail about what each one

24  means.  Did you get a chance to look at those?

25         A.    Yes, I read it.

60

1    Q.    I'm sorry.  You're a faster reader than most

2 people we get in here.  The first question, again, we call

3 it the future danger question.  It asks whether there is a

4 probability that the person would commit criminal acts of

5 violence such that they would be a continuing threat to

6 society.

7              Again, the law contemplates, you know,

8 even though you found a person guilty of capital murder, you

9 don't automatically answer this question because you found

10 him guilty of capital murder.  And, very frankly, that's a

11 problem we run into sometimes with some people.  They tell

12 us, you know, in all honesty, if I've convicted someone of

13 capital murder, I'm always going to answer that question

14 yes.  I'm always going to feel like they are a continuing

15 threat to society.

16              And I guarantee you, I could sit here and

17 probably give you a hundred different hypotheticals where

18 you wouldn't feel that way, you know, because the law

19 envisions that you have that open mind.  Does that make

20 sense to you?

21    A.    Yes.

22    Q.    Okay.  Do you think that would be a problem

23 for you or would you be able to have that open mind going

24 into this question?

25    A.    I would have an open mind.

1          Q.    Okay.  And that's basically all it takes to be

2     qualified.  No matter what you feel like in your personal

3     life, what your personal views are on the law, if you can

4     tell us you can follow the law and keep that open mind, you

5     would be qualified.

6               A lot of these words in these Special

7     Issues are not defined necessarily, like a lot of things we

8     do in the law, so we are always curious to kind of ask the

9     jurors what their gut reaction -- or how they would define

10    certain terms.  When you see the word "probability" in that

11    first question, what does that mean to you?

12         A.    Probability is a sort of a somewhat to me, you

13    know.

14         Q.    Okay.  A lot of people tell us like a more

15    likely than not, I guess --

16         A.    Yeah.

17         Q.    -- a likelihood, 51 percent of the evidence,

18    that type thing.  The law gives us a little guidance.  It

19    says, obviously, it's something more than a possibility,

20    because everything is possible, anything is possible.  But

21    it's something less than a certainty, because, obviously, we

22    could never prove to you anything to a certainty, that type

23    thing.  Is that a definition you are comfortable with?

24         A.    Yes.

25         Q.    Okay.  That phrase in the middle line,

1    "criminal acts of violence."  What does that mean to you?

2         A.    That what he did was beyond moral standards.

3         Q.    Okay.  Another murder, that type of thing?

4         A.    Yes.

5         Q.    Robberies, assaults, violent crimes?

6         A.    Yes.

7         Q.    Okay.  And, again, that's not necessarily

8    defined.  It's not necessarily limited.  You know, we don't

9    necessarily have to prove to you that there's a probability

10   that he'll kill someone else or be involved in another

11   murder.  It's just those violent acts that are criminal in

12   nature.  Does that make sense to you?

13        A.    Yes.

14        Q.    Okay.  And, finally, that word "society."

15   Again, that's not necessarily defined for us.  How would you

16   define society?

17        A.    We, the people.

18        Q.    Okay.  Anyone and everyone he may come into

19   contact with?

20        A.    Yes.

21        Q.    Okay.  Both out here in the free world and

22   back behind bars?

23        A.    Yes.

24        Q.    Guards, inmates, wardens?

25        A.    Yes.

```
 1        Q.      That kind of thing.  Okay.  One thing to
 2   remember about Special Issue No. 1, it starts off with a no
 3   answer.  That's kind of the default setting of the question.
 4   Question No. 2, Special Issue 2, is exactly the same way.
 5   They both start off with a no answer.  And it's part of our
 6   burden of proof to prove it to you, the juror, that the
 7   answer should be yes.  And if we don't meet our burden, then
 8   that answer stays no.  Does that make sense to you?
 9        A.      Yes.
10        Q.      And if either of those are answered no, the
11   only effect is that the person would not receive the death
12   penalty, they'd receive that life sentence.
13               Again, once they've been convicted of
14   capital murder, they're pretty much sitting on a life
15   sentence, and only if these questions are answered, you
16   know, yes, yes, and no, that's how you get to the death
17   penalty.  Does that make sense?
18        A.      Yes.
19        Q.      Okay.  Special Issue No. 2, again, this is the
20   situation we've already talked about with the accomplices.
21   That question basically boils down to three different parts.
22   If you think they are the person that actually caused the
23   death of the deceased, then you'd answer it yes, you know,
24   if you think they are the triggerman in my example.
25               Or if you think they didn't actually
```

1   cause the death, that they intended to kill the person, you

2   would answer that yes.  Or, finally, if you feel that they

3   anticipated that a human life would be taken, okay?  And

4   recall, in order to convict an accomplice of capital murder,

5   the jury has got to find that the person should have

6   anticipated that a life would be taken.  That's the standard

7   to convict.

8           When you get to punishment, in order to

9   get to the death penalty, the law imposes a little bit

10  higher standard on us.  And what it says is not only do you

11  have to prove that they should have anticipated, but they

12  actually anticipated, that they did anticipate that a life

13  would be taken.  It's a little bit higher standard before we

14  get to the death penalty.  Does that make sense to you?

15      A.      Yes.

16      Q.      Okay.  Do you see the distinction between

17  those two?

18      A.      Yes.

19      Q.      Okay.  One example I give sometimes is I guess

20  when I was 16 and first got my license.  My dad bought me a

21  car.  I drove it like a madman for about a month before I

22  eventually couldn't make a corner and wrecked it out.  He

23  got mad at me and said, you know, you idiot, you should have

24  anticipated driving that way that you were going to wreck

25  the car out.

1    And that's true, I should have

2  anticipated, but I didn't actually anticipate.  I guess I

3  was too young and too stupid.  But it's important that you

4  see the distinction between those two.  So again, it's just

5  that little higher standard before we get to the death

6  penalty.

7    A.    Yes.

8    Q.    Again, the default setting on that one is no.

9  It's up to us to prove to you beyond a reasonable doubt the

10  answer should be yes.  If both of those are answered yes,

11  then you move to the final Special Issue, or the final

12  question.  Again, that's the mitigation question, kind of

13  the jury's opportunity to show mercy towards the person.

14    We ask you, even at this late part, late

15  date in the process, to step back, take a deep breath, look

16  at the facts of the crime, look at the facts that you may

17  have heard about him in that second phase of the trial, look

18  at what sort of personal moral blame he bears for what

19  happened.

20    And ask yourself, is there anything

21  mitigating?  Is there anything that lessens that personal

22  moral blame?  And if there is, is it sufficient that his

23  life ought to be spared and that he should be given a life

24  sentence rather than a death sentence?  Does that make sense

25  to you?

1      A.      Yes.

2      Q.      Okay.  Do you see having -- do you see the

3  value in having that question?

4      A.      Yes.

5      Q.      Okay.  Some people tell us, I've convicted

6  someone of capital murder, I've found they're going to be a

7  future danger, I found they at least anticipated that a life

8  would be taken, my mind is closed.  There's nothing that's

9  going to spare his life at that point.  I don't care what it

10  is.

11              So that's why we need to make sure that

12  people like you can, at least, keep that open mind to

13  something that is potentially mitigating.  It sounds like

14  that's something you can do?

15      A.      Yes.

16      Q.      Is there anything that comes to mind when you

17  think of something that may be mitigating?

18      A.      Not right now, but, um.

19      Q.      And that's typically the answer we get.  We

20  ask every juror.  We hope you don't sit around thinking

21  about what's mitigating in a capital murder at home.  But

22  some people tell us like a person's background, the way they

23  were raised, and I think we have a question on our

24  questionnaire about it.

25              Some people feel if there's some abuse,

1    mental, physical, emotional, as a young child that could

2    potentially be mitigating.  Other people feel that, you

3    know, at a certain point at a certain age you're responsible

4    for your actions.  And my heart may go out to you for your

5    background, but you're kind of responsible for your own

6    actions at that point, and it's not mitigating.  Where do

7    you kind of fall down on that spectrum?

8         A.    I just -- would just try to keep an open mind.

9         Q.    Okay.

10        A.    Listen to my -- the other peers, see what

11   their thoughts are.

12        Q.    I know I found that question, some people feel

13   genetics, circumstances of birth, upbringing, or environment

14   should be considered when determining the proper punishment

15   of someone convicted of a crime.  And I think you answered,

16   upbringing and environment play a big part in punishment?

17        A.    Yes.

18        Q.    What do you mean by that, just to kind of

19   follow up on that?

20        A.    Oh, since, being my age, you know, I've seen a

21   lot going through my lifetime and how you've been raised is

22   -- it influences what you become.  And, but in this case,

23   I'm willing to keep an open mind.

24        Q.    Okay.  Do you think that is something that

25   could potentially be mitigating on that Special Issue No.

1  3?

2       A.      Yes.

3       Q.      In a capital murder case?

4       A.      Yes.

5       Q.      Okay.  Is that something you think is

6  automatically mitigating?

7       A.      Yes.

8       Q.      Okay.  What about a person's age?  Some people

9  tell us if a person is young, that may be mitigating.  And

10 just to let you know, that you have to be 17 or over in

11 Texas in order to be eligible for the death penalty.  Some

12 people feel that young age may be mitigating, you know, a

13 person 17, 18, 19.

14              Other people, again, think that you are

15 old enough to do the crime, you are old enough to do the

16 time.  Where do you come down on that?

17      A.      Age plays a big factor in my decision.

18 Anything less than 17, I would consider a lot in their fate.

19      Q.      Okay.  And, of course, just so I was clear,

20 you know, you can be convicted of capital murder under 17,

21 but you have to be 17 or over in order to be eligible for

22 the death penalty.

23      A.      I agree.

24      Q.      Okay.  The law doesn't require that you

25 necessarily consider any particular factor or any particular

1    piece of evidence mitigating.  We just leave it up to you.

2    You don't even have to agree with the other jurors.

3    Somebody may think one thing is mitigating and you may think

4    another thing is mitigating.

5                        Again, you just have to be able to tell

6    us that if you hear something that's mitigating, you can

7    keep that open mind and consider it, and if you think it's

8    sufficiently mitigating, you could answer that question yes.

9    Does that make sense to you?

10         A.    Yes.

11         Q.    Okay.  It sounds like that's something you can

12   do?

13         A.    Yes.

14         Q.    Okay.  Any questions about the sentencing

15   scheme we have in capital murders --

16         A.    No.

17         Q.    -- in Texas?  Now, you've been on a jury

18   before; is that right?

19         A.    Yes.

20         Q.    What kind of jury was that?

21         A.    The first one was a robbery that happened,

22   again, in Irving, Texas, involving a young, very young kid.

23   And that was it.  We found him guilty.

24         Q.    Okay.  Was the evidence in that case pretty

25   straightforward?

1        A.     Yes.

2        Q.     Okay.  Did -- were y'all called upon to set

3    punishment in that case?

4        A.     No.

5        Q.     Okay.  The Judge did it?

6        A.     Yes.

7        Q.     Okay.  You mentioned that was your first one.

8    Have you been on more than one?

9        A.     It was kind of a civil lawsuit against DART.

10       Q.     Okay.  How did that come out?

11       A.     We sort of awarded the contractor a fair

12   amount to pay.

13       Q.     Okay.  Anything about those two experiences

14   that you're just sitting there thinking, gee, I don't want

15   to go through that again, I don't want to be a juror on

16   another case?

17       A.     It just dragged on for a long time.

18       Q.     The case did?

19       A.     Yes.

20       Q.     How long did it take?

21       A.     Both of them about three days.

22       Q.     Okay.  Well, you know, our best estimate on

23   this is two weeks.

24       A.     Yes.

25       Q.     Do you have any concerns about that?  A

1  two-week trial?

2      A.    I don't know yet.  This will be my first.

3      Q.    Okay.  Well, hopefully because you've been a

4  juror on a criminal case before, some of this stuff, kind of

5  the general rules that we have to follow, will be familiar

6  with you -- be familiar to you.

7              The burden of proof is always on this

8  table.  You always have to look to us to prove to you the

9  person is guilty beyond a reasonable doubt and that Special

10  Issue 1 and 2 should be answered yes.  The burden never

11  shifts.  These folks never have to do anything.  Legally,

12  they could sit there and do crossword puzzles and not ask a

13  question.  Obviously, that's not going to happen.  They are

14  fine lawyers.  But it kind of serves to make the point that

15  you always have to look to this table for the burden of

16  proof.

17              The person charged with a crime is always

18  presumed innocent, you know.  And he remains that way unless

19  and until we prove to you his guilt beyond a reasonable

20  doubt.

21              A person charged has a Fifth Amendment

22  right not to testify in his own defense.  No one can force

23  him to testify.  Conversely, no one can keep him off the

24  stand, if he wants to testify.  If he does not testify, you

25  will be instructed by the Judge that you cannot consider

1   that in your deliberations.  Does that make sense to you?

2          A.    Yes.

3          Q.    Okay.  Is that a law you think you could

4   follow?

5          A.    Pardon me?

6          Q.    Is that a law you think you could follow?

7          A.    Yes.

8          Q.    Okay.  In the robbery case that you heard, did

9   that person testify?  Do you remember?

10         A.    No.

11         Q.    Okay.  So it's obviously something you've been

12  through before and, you know, you may remember that you were

13  instructed not to consider that in your robbery case?

14         A.    That's right.

15         Q.    Okay.  As part of our burden of proof, the law

16  requires that we prove each and every element of the crime

17  that we've alleged in our indictment.  The law says that you

18  can't give us partial credit, you know, as a juror.  If we

19  allege ten elements and that's what's in our indictment,

20  we've got to prove ten elements.  The law also says that no

21  one element is more important than another element.

22                  I know you've had a chance to look at the

23  indictment in this case.  Just kind of in a hypothetical

24  case, we'd have to prove to you that a certain person on or

25  about a certain day in a certain county killed another

1   person in a certain way, basically.  Those would be the

2   elements of a murder case, a hypothetical murder case.

3                    And, again, we'd have to prove each and

4   every one of those to you beyond a reasonable doubt to be

5   entitled to a guilty.  Obviously, one of those elements is

6   the person's identity, you know.  We've got to make sure

7   we've got the right guy.  If you had a reasonable doubt

8   about that element, you'd have to find the person not

9   guilty.

10                    Because the law says that no one element

11  is legally more than important than another, that law also

12  applies to the county that it happens in.  Just to kind of

13  give you a far out example.  Let's say we try a murder case

14  that happened in Grand Prairie.  Part of Grand Prairie is in

15  Tarrant County and part is in Dallas County.  Cops don't do

16  their job, DAs don't do our job, and we allege in our

17  indictment as an element that it happened in Dallas County.

18                    The trial comes around and the proof

19  shows that it actually happened in Tarrant County.  You

20  would have a reasonable doubt about that element of the

21  crime and even in that kind of bizarre far out example,

22  you'd have to find the person not guilty.

23                    A lot of people don't like that.  They

24  think it's a technicality.  Of course, one person's

25  technicality is another person's constitutional right.  But

1    even in that extreme example, you would have to find the

2    person not guilty.  Does that make sense to you?

3        A.    Yes.

4        Q.    Is that a law you think you could follow?

5        A.    Yes.

6        Q.    Okay.  And, again, it even applies to the

7    method, the manner, and means in which a person is killed.

8    If we allege a person was shot and the evidence turns out

9    that he was actually stabbed, you would have a reasonable

10   doubt about an element and you'd have to find the person not

11   guilty, even though you may have no doubt that the person

12   caused the death.

13              Basically, we draft our indictment, we

14   draft the elements, and it's up to us to prove what we say

15   we're going to prove.  Does that make sense to you?

16       A.    Yes.

17       Q.    Okay.  Typically in these cases, obviously,

18   police officers testify.  A lot of people hopefully feel

19   very strongly about the police officers, maybe respect and

20   admire the job they do.  What the law says is that you've

21   got to start a police officer witness, you've got to start

22   them out just like any other witness.

23              You can't give them a leg up in

24   credibility just because they walk into the courtroom

25   wearing a badge and a gun.  You've got to treat them like

1   any other witness.  You know, once they open their mouth and

2   start testifying and you hear about their training,

3   background, and experience, you can find them credible.  But

4   you at least have to start them out on that same level.

5   Does that make sense to you?

6        A.     Yes.

7        Q.     Is that a law you think you can follow?

8        A.     Yes.

9        Q.     Okay.  Typically in these cases, sometimes the

10  defense, even the State, or sometimes both sides will call

11  like a psychiatrist or a psychologist in that second phase

12  of the trial to kind of maybe give the jury some potential

13  guidance on question 1 or question 3, the future danger and

14  mitigation questions.

15             So we always ask everybody kind of what

16  their general impression is of those type witnesses in these

17  type cases.  And what comes to mind when you think about

18  that?

19        A.     Using a psychiatrist?

20        Q.     Psychiatrist or psychologist in these type of

21  cases.

22        A.     I think it's helpful towards the case.

23        Q.     Okay.  You can imagine we talk to some people

24  that don't believe in it.  They think it's a soft science.

25  They think if you look hard enough, you can probably find

1  somebody to say whatever you want as an expert witness.

2              The opposite end of that spectrum is some

3  people think, you know, every word out of every

4  psychologist's or psychiatrist's mouth is golden, you know,

5  they walk on water.  Again, the law says you've got to start

6  them off with that same level of credibility.  If they make

7  sense, you go with them.  If they don't, you just disregard

8  it.  Does that make sense to you?

9       A.    Yes.

10      Q.    Okay.  We've talked a little bit about the

11  life sentence.  Just to let you know, a capital life

12  sentence in Texas means that a person will serve forty years

13  day for day before they will become eligible for parole.

14  Okay?  We don't have -- there's no such thing as life

15  without parole in Texas.  What life in this case means,

16  forty years before they see a Parole Board.  They may make

17  parole that first day up after forty years.  They may never

18  make parole and actually serve a true life sentence.

19              Because those decisions are so far in the

20  future and beyond the control of anyone in this courtroom,

21  we ask a juror to presume that a life sentence means an

22  actual life sentence, even though we tell them what the law

23  is.  Is that something you think you could do?

24      A.    Yes.

25      Q.    Presume a life means life?

1          A.    Yes.

2          Q.    Okay.  Sometimes in these cases we have these

3    things called lesser included offenses.  What I mean by that

4    is this.  Say you try a capital murder case, murder in the

5    course of robbery, okay?  And at the end of the first phase,

6    there may be some doubt in your mind whether the person

7    committed the murder.

8              You think they're guilty of the robbery,

9    but you're not sure about the murder during the robbery.  So

10   you'd find them not guilty of capital murder and find them

11   guilty of the lesser included offense of aggravated robbery.

12   Does that make sense to you --

13         A.    Yes.

14         Q.    -- if you just think they're good for the

15   aggravated robbery?  If that is the case, then you kind of

16   throw this scheme out the window and you just set a person's

17   punishment somewhere between five all the way up to 99 years

18   or life in the penitentiary, whatever you personally think

19   is appropriate in that type case.

20             I don't know if it will come up, but in

21   order to be qualified now, you need to be able to tell us

22   that you could keep an open mind to that full range of

23   punishment in an aggravated robbery case from the low of

24   five all the way up to 99 years or life.  Is that something

25   you think you could do?

1        A.      Yes.

2        Q.      Okay.  You kind of hesitated on me there.

3        A.      Yeah.

4        Q.      Why is that?

5        A.      I don't know.  It's -- it could possibly

6    happen.

7        Q.      And that's all it is.  Basically, what the

8    question is, is this, Mr. Navarro, if you heard any

9    aggravated robbery case where you thought the right thing to

10   do was to give someone five years, you could consider it and

11   assess five years.  Or if you heard an aggravated robbery

12   case where you thought the right thing to do was a life

13   sentence, you could consider and assess a life sentence.

14   Does that make sense, a little more sense?

15       A.      Yes.

16       Q.      Obviously, again, we just need people, you

17   know, you may listen to a hundred aggravated robbery cases

18   and never hear that one that you give five years on.  But as

19   long as your mind is not closed to that, you would be a

20   qualified juror.  And it sounds like that's something you

21   think you can do?

22       A.      Yes.

23       Q.      Okay.  Any questions about anything we've

24   talked about?

25       A.      No.

1    Q.    Okay.  Let's see.  Hold on just a second.  Let

2  me ask you one other question I did have, kind of getting

3  back to this mitigation issue.  I think, you've got your

4  questionnaire in front of you?

5    A.    Yes.

6    Q.    On page 5 I believe it is, a little more than

7  halfway down the page, we give you a series of statements,

8  ask whether you agree, disagree, strongly agree.  The very

9  first one we ask you most criminals are actually the victims

10  of society's problems.  And you marked that you agreed with

11  that statement.

12            And I know from doing this for a while,

13  that that means different things to different people.  I'm

14  just curious what you were thinking when you marked that.

15    A.    Well, when we came in that day, it was a rough

16  day for me and it was basically trying to finish this as

17  quickly as I possibly can.

18    Q.    I got you.

19    A.    And when it asks for an actual victims of

20  society problems, you know, I just bang, bang, agree, you

21  know.  That's what it basically amounts to.

22    Q.    Okay.  I wanted to ask that to kind of follow

23  up on Special Issue 3 when we talked about the background

24  and upbringing.  I want to make sure, number one, that you

25  can keep an open mind to that type of evidence.

1      A.    Yes.

2      Q.    Or kind of the opposite end of the spectrum,

3 number two, if you hear that type of evidence, you won't

4 automatically think that's mitigating.  Is that a fair

5 statement?

6      A.    Yes.

7      Q.    Okay.  What type of fishing do you do, to kind

8 of change the subject with you real quick.

9      A.    I usually take small children out and throw

10 the bait in the water and hope we catch something.

11      Q.    Do you ever?

12      A.    Yes.

13      Q.    Good.  Where do you go?

14      A.    I usually go to the local lakes like Joe Pool,

15 Lewisville, Grapevine, Lake Tawakoni.  But the funny thing

16 about it, I don't like fishing.

17      Q.    Why don't you like fishing?

18      A.    It's boring.  It takes all day.  A waste of

19 time.

20      Q.    What kind of crosswords do you do?

21      A.    I do the commuter on the Dallas Morning News.

22 That is my favorite.

23      Q.    Do you ever do the New York Times?

24      A.    I'm not capable of doing the New York Times.

25 It's beyond my capacity.

1    Q.    I'm glad to find somebody else that's in the

2  same boat as I am with the New York Times.

3    A.    Yeah, I'm one of them.

4    Q.    Okay.  Well, thanks a lot for your time, Mr.

5  Navarro.  I appreciate it.

6    A.    Well, thank you.

7        MR. WIRSKYE:  That's all I have, Judge.

8        THE COURT:  Ms. Busbee has a few

9  questions from the defense side.

10        CROSS-EXAMINATION

11  BY MS. BUSBEE:

12    Q.    And it's not so rough to talk to me because

13  he's -- Mr. Wirskye's told you everything about the law and

14  I just want to ask you more general things about how you

15  feel about things.  You wouldn't be here, if we didn't think

16  that you were reasonable.  I mean, you saw all the folks

17  that came down with you that afternoon.  Well, we talked to

18  that many people, or we had that many people in the morning,

19  and we still haven't picked a jury.

20        So it's quite a process.  And we only

21  bring people down that we have read their questionnaires and

22  we feel like they're, you know, potentially acceptable to

23  both sides.  And even then when we get people down here,

24  there's this, that, or the other, that, oh, you know, one

25  side doesn't like or the other side doesn't like or it makes

1    us nervous or, so, you know.

2                   We're satisfied that you can follow the

3    law and Mr. Wirskye has laid it out for you.  And it's never

4    what people anticipated that it would be.  It's a little bit

5    more complicated.  But you understand it and I'm not going

6    to belabor the point as to what the law is.  I'm more

7    interested in some other things.

8                   I sit here and watch your face and watch

9    body language and I read, you know, the tone of your voice

10   and things like that.  And Mr. Wirskye asked you if you

11   understand the law and you think you can follow the law, and

12   I believe you when you say that you can.  But naturally I'm

13   concerned that you live nearby and that you were at least

14   acquainted with the victim in this case.  Did you attend the

15   funeral?

16        A.     No.

17        Q.     Okay.  What did you think when this happened?

18   I mean, what was your gut reaction?

19        A.     I think my first reaction, is that it happened

20   so close to where I lived.  Of all the places in Texas, it

21   happened within a mile from my home.  And that's what struck

22   me the strongest.

23                  Officer Aubrey was somebody that was very

24   -- that roamed our streets quite often.  And it was just --

25   uh, and he happened to be at the school.  I didn't know him

1    personally, but you would see him at the grocery store or

2    local schools and patrolling the streets.

3            Q.    Sure.  I don't think we've had anyone here to

4    date that knew him, actually.

5            A.    I didn't know him, actually, just somebody

6    that you see and --

7            Q.    I mean to the extent that you do.

8            A.    Yeah.

9            Q.    So that's just interesting.  And part of this

10   process is not so much, at least for me, it's not so much

11   knowing how well you can follow the law as whether or not

12   you're comfortable doing it in this case.  And I noticed

13   that when Mr. Wirskye was talking to you, you said, well, in

14   this case I'm okay with that.

15              Do you remember when he was asking you

16   about the law of parties as to whether one person would be

17   responsible for what someone else had done?  Can you

18   elaborate on that?

19           A.    About the group of men that committed the

20   crime and one actually pulled the trigger where the others

21   were sort of a bystander?

22           Q.    Yes, sir.

23           A.    Is that what you want me to --

24           Q.    Well, you said in this case.  I just wanted to

25   know what your thoughts were on it.

1      A.      Well, I didn't learn until later on that it

2   involved so many men and that there was a few that actually

3   fired the guns and not all of them committed the crime.

4      Q.      Okay.  Well, there's two questions here really

5   -- well, many questions, but two issues I want to ask you

6   about.  I don't think many people have a problem with saying

7   that if you are a party to an offense, you are guilty of

8   that same offense.  Where a lot of questions come in for

9   people is on the question of punishment.

10              You may be guilty of the offense of

11  capital murder, but as Mr. Wirskye explained to you, that

12  means that you get a life sentence.  And some people say,

13  well, if you were not the triggerman, so to speak, I would

14  not be able to assess a death punishment in that type of

15  case.

16              My question is, in this particular case,

17  have you already formed an opinion as to what the proper

18  punishment should be in this case?

19      A.      Have I formed an opinion?  No, I have not

20  formed an opinion on this case.

21      Q.      Okay.  Well, what do you think about that, the

22  punishment for someone who is a nontriggerman?

23      A.      It could go either way with me.

24      Q.      Okay.  And does this scheme seem fair to you?

25      A.      Oh, yes.

Q.    What I'm concerned about is, because you know the facts of this case and what the circumstances were, maybe a little bit more than some other people, that in this case, once you found him guilty of capital murder, if you do, that on Special Issue No. 1 you would have already decided that he does pose a future danger?

A.    True.

Q.    Okay.  Well, that's what I thought I heard you say.  I mean, you like to think that you might be able to leave your knowledge outside, but in this particular case, do you feel like you have predecided whether this individual is a future danger?

A.    No.

Q.    Okay.  So what did you mean when you said true?

A.    You asked the question, if I can make a decision?

Q.    Uh-huh.

A.    To give him either a life sentence or the death?

Q.    Uh-huh.

A.    And the answer is yes, I could make a decision on that.

Q.    Okay.

A.    Based on the evidence.

1    Q.    Well, maybe I'm -- maybe this is what I'm

2  asking you.  That question is not asked that way to the

3  jury.  They have to reach these three Special Issues.

4  Special Issue 1 yes or no, then Special Issue 2 yes or no,

5  and then Special Issue 3 yes or no.  So my question is, is

6  for you on Special Issue No. 1, is that question in your

7  mind in this case already yes?

8    A.    Yes, it is.

9    Q.    Okay.  Because of what you know about the

10 facts?

11   A.    Yes.

12   Q.    Okay.  Now, I need to tell you, the law says

13 that to be a qualified juror you really have to say that you

14 would require the State to prove that to you beyond a

15 reasonable doubt before you would say yes.  But what I'm

16 hearing from you is, quite frankly, you already have made up

17 your mind on that issue?

18   A.    Yes.

19   Q.    Okay.  I appreciate your honesty.  So --

20        MS. BUSBEE:  We've reached an agreement

21 on this juror.  And I appreciate your honesty, sir.

22        PROSPECTIVE JUROR:  Thank you.

23        THE COURT:  Mr. Navarro, it takes a very

24 honest person to say yes, I understand the law, but I've

25 already made up my mind and this is something that we

1  appreciate you being honest. The Court cannot qualify you

2  and the parties have agreed to excuse you. So I will make

3  that ruling. So now you don't have to worry about your

4  network problems. But I appreciate you coming down and

5  being a part of the process. We appreciate your views and

6  your honesty.

7                    PROSPECTIVE JUROR:  Thank you.

8                         [Prospective juror out]

9             THE COURT:  Ready for Ms. Marisela

10  Alaniz.

11                         [Prospective juror in]

12             THE COURT:  Good afternoon.

13             PROSPECTIVE JUROR:  Good afternoon.

14             THE COURT:  How are you?

15             PROSPECTIVE JUROR:  Doing fine, and you?

16             THE COURT:  A long day, but we're doing

17  fine. Looks like you are a little nervous?

18             PROSPECTIVE JUROR:  Yes, I wasn't

19  expecting this my first time.

20             THE COURT:  Everybody that comes in here

21  it's their first time, so it's okay. And we anticipate you

22  being nervous. We've got juror No. 3903, Marisela Alaniz.

23             PROSPECTIVE JUROR:  Marisela Alaniz.

24             THE COURT:  Alaniz. Ms. Alaniz, welcome

25  to the 283rd. Sorry for the delay in getting you in. We

 1   don't know exactly how long we will speak with one

 2   individual.  We have to get everybody in here and somebody

 3   has to wait, so we're sorry for that.  And now it's your

 4   turn.

 5               And when you came in, we gave you the

 6   guide.  You've obviously had time to read that.  And we gave

 7   you a copy of your questionnaire, so you can review that.

 8   The attorneys may want to go over those answers with you in

 9   more detail.  The best part about this is there are no wrong

10   answers, just truthful answers.

11               They are going to visit with you about

12   the law.  This is an opportunity for you to ask questions

13   about the law.  The objective here is to get you up to

14   speed, so that you understand it.  I have two questions I

15   have to ask at the end of the process.  Number one is, do

16   you understand the law and how it relates?  And number two,

17   can you follow the law?  That's the big picture I have to

18   look at.

19               The only question I have for you at this

20   time is will you be able to serve this Court for a period of

21   two weeks beginning on November 10th?

22               PROSPECTIVE JUROR:  I'm not sure.

23               THE COURT:  Not sure?

24               PROSPECTIVE JUROR:  No, I'm going to

25   school, so --

1          THE COURT:  Where do you go to school?

2          PROSPECTIVE JUROR:  Richland Community

3   College.

4          THE COURT:  Full-time?

5          PROSPECTIVE JUROR:  No, I work full-time

6   and then I go to school.  I have two classes.  I go Mondays

7   and Wednesdays.

8          THE COURT:  What time?

9          PROSPECTIVE JUROR:  5:20 to 8:05.

10          THE COURT:  We work normal business hours

11   and we don't anticipate that that will be a problem.

12          PROSPECTIVE JUROR:  Okay.

13          THE COURT:  Okay?  Thank you very much.

14   If you would like to turn your attention to Mr. Shook, he

15   has a few questions.

16          MR. SHOOK:  Thank you, Judge.

17          <u>MARISELA ALANIZ</u>,

18   having been duly sworn, was examined and testified as

19   follows:

20          <u>DIRECT EXAMINATION</u>

21   BY MR. SHOOK:

22      Q.    Ms. Alaniz, my name is Toby Shook.  I'll be

23   asking questions on behalf of the State.  And, as the Judge

24   said, there aren't any right or wrong answers.  We just want

25   your honest opinions.  Okay?

1    A.    Okay.

2    Q.    If you have any questions at any time, you can

3  ask.  All right?

4    A.    Okay.

5    Q.    Usually when we do jury selection, we talk to

6  the jurors in a big panel.  But because it's a capital

7  murder in which the State is seeking the death penalty, we

8  have this procedure where we talk to every juror one on one.

9         And we don't mean to make you feel like

10  you are the one on trial up there.  Some jurors feel that

11  way, and, obviously, most jurors are pretty nervous.  But

12  we've found it's a good way to get information.  We're going

13  to follow up on some of the stuff you put down in your

14  questionnaire, ask you about some of the laws on capital

15  murder, and how you feel about them, and go over some of the

16  rules that apply to these cases.

17         Following up on what you talked about

18  with the Judge, you're taking a couple of classes this fall.

19  What type of classes are those?

20    A.    Developmental writing and sociology.

21    Q.    Okay.  What type of degree are you working on?

22    A.    I still don't know.

23    Q.    Okay.  So you are just getting the general

24  courses out of the way, that sort of thing?

25    A.    Yes.

1    Q.    How long have you been doing that?

2    A.    I've been on and off from school.

3    Q.    Okay.  And as the Judge said, he works pretty

4  -- He gets the jurors out of here about the same time every

5  day.  So if he's able to get you out of here in time to make

6  the class, you don't anticipate any problems for that time

7  period in November; is that right?

8    A.    Yes.

9    Q.    Okay.  You work for Silver Leaf Resorts; is

10 that right?

11   A.    Yes, that's correct.

12   Q.    What do you do with them?

13   A.    I'm just a clerical assistant for the

14 marketing and accounting department and its Dallas corporate

15 office.

16   Q.    Is it a pretty big company?

17   A.    I think so, not really huge, but it has a lot

18 of resorts and, like I said, I'm just a clerical assistant

19 there, just do basic stuff.

20   Q.    Okay.  We had another juror we talked to that

21 worked for them.

22   A.    Oh, really?

23   Q.    I know.  It was a Sandra Paredes.  Do you know

24 her?

25   A.    Yes.

1    Q.    How do you know her?

2    A.    She works in another department.  I think

3  she's a manager or supervisor for one of the departments,

4  but I don't really talk to her.  I just, you know, take her

5  some research.  Whenever I'm working with research, I go

6  ahead and take it to her.  It's like, hi, how are you doing,

7  and bye.

8    Q.    You haven't discussed this case with her or

9  jury duty or anything like that?

10   A.    No, I didn't even know.

11   Q.    So you didn't know until --

12   A.    Until right now, yes, correct.

13   Q.    I just thought it was a coincidence and I

14  didn't think it was that big a company, so you might have

15  known her.  You don't remember seeing her down here on jury

16  day, did you?

17   A.    No.  I believe I saw her earlier this morning.

18  I'm not sure if it was her or not.  I think it was her.

19   Q.    Okay.  Let me go over, get your feelings about

20  how you feel about the death penalty.  You put it down on

21  the questionnaire and we, obviously, ask all the jurors

22  about this, that you are in favor of it as a law.  And if

23  you would just kind of expound on that, why you believe in

24  it, the purpose you think it serves, that sort of thing.

25   A.    Well, I believe when somebody commits a crime,

1   they should be put the death penalty.  It would be a waste

2   of time for them to be in jail and it's a waste of money,

3   too.  I see it in that way.  I mean, I don't really know

4   everything.  I'm not well educated in a lot of areas,

5   politics or anything like that, but I strongly believe if

6   they commit a murder or they, you know, rape, murderers, or

7   rapists, they should put -- they should have the death

8   penalty.

9        Q.    Well, we found that it -- really, a person's

10  education doesn't matter down here.  It's your common sense

11  is probably the most important thing and life experiences.

12  And your beliefs in the death penalty, is that just based

13  kind of on the way you were raised and how you feel about

14  what the -- a just sentence is in certain crimes, that sort

15  of thing?

16       A.    Well, not really, because my mama doesn't

17  really believe in the death penalty, especially now that

18  she's a Christian.

19       Q.    Okay.  What do you think formed your beliefs

20  on the death penalty?

21       A.    I'm sorry?

22       Q.    What do you think you got your beliefs from,

23  just watching how crimes --

24       A.    The news.  A lot of crimes they -- you know,

25  some of them are there for years and they let them out early

1    because of their conduct.  And then what do they do?  They

2    go back and do the same thing most of the time, so.

3         Q.    Have you ever followed any cases in the media,

4    locally or nationally, that were murder cases or capital

5    murder cases, anything like that?

6         A.    Not really.  I have just a little bit here and

7    there, but not really paid much attention to, you know.  It

8    just upsets me when they, you know, either they escape or

9    they were let go because of good conduct, like I said.

10        Q.    Okay.  Everyone, and I think you're no

11   exception, but everyone that was called down saw something

12   of this on the news and I think you said in your

13   questionnaire you remember seeing something about this case

14   on TV?

15        A.    Yes, just briefly.

16        Q.    Okay.  What is it you recall you saw on TV?

17        A.    Let me see, I think it was when they were in

18   the parking lot and I believe there was police cars and all

19   that stuff going on, but I don't really remember exactly

20   what they were talking about or what they said and all that.

21        Q.    Did you follow the case after that at all in

22   the news?

23        A.    No, not really.

24        Q.    Have you followed any of the court proceedings

25   or anything like that?

1      A.      Huh-huh.

2      Q.      The rule that -- it doesn't make you

3   ineligible, if you've seen something on TV.  What jurors

4   have to do is just base their decision on what they hear in

5   the courtroom, not on what they've seen on TV, because

6   common sense will tell you that the best evidence is going

7   to come from the witnesses and that sort of thing.  Do you

8   feel you could follow that particular rule of law?

9      A.      I think so.

10      Q.      Okay.  When you think of the types of crimes

11   that should be considered for the death penalty, what types

12   of crimes come to mind?

13      A.      First one rapist, or just during robberies or

14   whatever, anything like that.

15      Q.      Okay.  Brutal murders, that sort of thing?

16      A.      Yes.

17      Q.      As far as rapists goes, do you feel that to be

18   a just punishment based on that crime, even without a life

19   being taken?

20      A.      Yes.

21      Q.      Okay.  A lot of people feel that way.  Same

22   way they feel about child abusers and that sort of thing.

23      A.      Yes.

24      Q.      In Texas, what the law, as it is now, is it's

25   reserved -- the death penalty is just reserved for murder

1  cases and then only certain types of murder cases.  They're

2  intentional killings, not in self-defense, not an accident,

3  but an intentional killing that occurs with another

4  aggravating fact, like a murder that occurs during a felony.

5              Someone goes into the 7-Eleven store and

6  shoots the clerk down.  That could be a death penalty case.

7  Or someone that breaks into someone's home and kills someone

8  in the house, someone that murders someone during a rape or

9  kidnapping or during an arson.

10             Also, murder of specific victims like a

11  police officer on duty, fireman on duty, those could be

12  death penalty cases.  Or a child under the age of six,

13  murder of more than one person like a serial killer

14  situation, or mass murder also fall.  And then murder for

15  hire, a hitman situation, someone that does it for money.

16             But those are the specific types of cases

17  that have been reserved for consideration of the death

18  penalty, as the law stands right now.  As far as that list

19  goes generally, are those the types of cases you think

20  should be considered for the death penalty?

21        A.    Yes.

22        Q.    Okay.  Now, when we think of capital murder, I

23  think the first thing we think of is the actual triggerman

24  when we think of an example, like I gave you the example of

25  someone who went in the 7-Eleven and shot the clerk.  That's

1    only natural.

2                    But a capital murder case can also

3    involve a trial of someone that we call an accomplice.  We

4    call it the law of parties.  But an accomplice is someone

5    that helps commit the crime.  They're involved in it and

6    they help pull the crime off.

7                    An example I use in a capital murder

8    situation is, let's say me and Mr. Wirskye, here, decide we

9    want to rob a bank.  That's the crime we want to commit.

10   The plan calls for me to have a gun and him to get a big bag

11   and we're also going to have a getaway driver.

12                   And we all go together to the bank.  The

13   getaway driver waits out, has the car running, he's going to

14   yell and pull off.  If he sees someone or something wrong,

15   he'll yell out for us.  But he'll be ready to take off when

16   we're finished.

17                   We'll run into the bank and I'll pull the

18   gun out and threaten everyone.  After I get everyone's hands

19   up, he'll run back there and start going through the drawers

20   and start loading money up.

21                   During the course of doing all that,

22   let's say I decide to intentionally kill someone.  Maybe I

23   don't like the way a teller is looking at me, maybe he warns

24   me that one of them hit an alarm, so I shoot them.  We run

25   out, jump in the getaway car, we take off, but we're caught

1  by the police a little while later.

2                    I can be prosecuted for capital murder.

3  I could even receive the death penalty because I'm the

4  triggerman.  I caused the death.  The law says that

5  Mr. Wirskye, as well as that getaway driver, could also be

6  prosecuted for capital murder because they were an

7  accomplice.  They were aiding and assisting me, that sort of

8  thing.

9                    So even though they didn't cause the

10  death, they could even get the death penalty.  And jurors

11  feel differently about that issue.  Some of them agree with

12  the death penalty for the actual triggerman, but if it were

13  up to them, they wouldn't have it for an accomplice, maybe a

14  life sentence or something like that.

15                    But other jurors tell us they do think

16  it's fair and they do think the death penalty should be

17  given to accomplices, depending on their involvement, that

18  sort of thing.  But everyone feels differently and we ask

19  every juror their honest opinion how they personally feel.

20  How do you feel about a death penalty prosecution in an

21  accomplice situation?

22        A.        Well, I think it depends if they were all,

23  say, the three men were all involved, that there was going

24  to be maybe a murder, and then they should.  But if they

25  were planning, even though I know it's wrong and they were

1  just going to rob the place and then a life sentence or

2  anything else, but not the death penalty.

3      Q.   Okay.  Here's another area of the law.  It's

4  called conspiracy.  We can agree to commit one crime,

5  conspire to, me and Mr. Wirskye, like the example I gave of

6  a bank robbery, and if while we're committing it, one of us

7  commits another felony to further that conspiracy, now in

8  this case it would be me shooting down the clerk, everyone

9  can be held responsible if the facts show that he should

10  have anticipated someone could die, even though he didn't

11  cause the death.

12          In fact, the law says that to get him

13  convicted of capital murder, he doesn't have the intent for

14  that person to die.  You know, he could sit there and yell,

15  don't shoot them, don't shoot them.  You know, I don't want

16  this to happen.  But I'm a real mean guy and I take my gun

17  out and I do shoot them.  If the jury believes from those

18  facts that even though he didn't intend the person to die,

19  but he should have anticipated that they would, then he can

20  get convicted.

21          And some jurors have a problem with that

22  because the intent is real important to them.  And they

23  think if an accomplice intended and planned for someone to

24  die, then, yes, he should be held responsible and could be

25  convicted of capital murder.  But if he didn't have that

1  intent, then he shouldn't.  Other jurors are on par with the

2  law that if he should have anticipated, even if he actually

3  didn't intend, that they understand he could be convicted.

4              But, again, jurors feel differently about

5  that.  And I wanted to ask you if you feel that's fair or

6  because the person didn't intend that they die, do you not

7  think it's fair that they get the capital murder, maybe a

8  different type of crime?

9       A.    Okay.  I think I got a little confused.  You

10  were saying you two were planning to commit the crime and

11  you two agree there was going to be maybe a murder?

12       Q.    No.  There may not be an agreement to have a

13  murder.

14       A.    Okay.  That's where I got confused.

15       Q.    Conspiracy.  He may not have the -- we may

16  never agree that there would be a murder, but I'm going in

17  there with a loaded gun, I'm robbing people, maybe he knows

18  how mean I am.  He may not want that person to die, but if

19  the jurors think, well, he should have anticipated someone

20  could die, then he could be convicted.

21              Some people agree with that law and other

22  people don't think that's quite fair, if he didn't have that

23  actual intent.

24       A.    That's kind of tough right there.

25       Q.    Do you have any feelings one way or the other

1    or does it hit you one way or the other, just from your gut

2    instincts?

3         A.    Well, if -- I guess not the death penalty.

4         Q.    Okay.  Why do you think that's fair in those

5    situations?

6         A.    Because, like you mentioned, that if he's

7    trying to stop you from doing it, that -- I don't know, to

8    me that means something.  He realizes he's doing wrong and

9    that maybe he wasn't expecting it, so.

10        Q.    Okay.  Do you think, though, from your own

11   point of view that an accomplice could get the death

12   penalty, even though they didn't ever cause the death?

13        A.    I'm sorry?

14        Q.    Do you think that an accomplice should get the

15   death penalty in some situations, even if they didn't

16   actually murder the person?

17        A.    Yes.

18        Q.    Why do you think that's fair?

19        A.    Well, the only time I think it would be fair

20   -- let me be sure I'm understanding, is that if you two had

21   planned ahead of time, you know, that there was going to be

22   more than just robbery.  And then I think they should both

23   get the death penalty.

24        Q.    Okay.  So if they had planned for a murder to

25   occur ahead of time?

1       A.      Yes.

2       Q.      Then in those situations you do think the

3  death penalty could be appropriate?

4       A.      Yes.

5       Q.      If that's not the situation, then your opinion

6  should not be?

7       A.      True.

8       Q.      Okay.

9               MR. SHOOK:  Judge, I think, then, that's

10  all the questions we have.

11               MS. BUSBEE:  Your Honor, we have reached

12  an agreement on this juror.

13               THE COURT:  They have agreed to excuse

14  you.  Don't think that you have done anything wrong.  We

15  wanted your honest opinions.  As Mr. Shook said, common

16  sense is what we need down here.  Obviously, you are a very

17  intelligent person and desire to continue with your

18  education, so don't ever shortchange yourself on that.  But

19  this case is probably not the best one for you.  We

20  appreciate you coming down.  You are free to go.

21               PROSPECTIVE JUROR:  Thank you.

22                    [Prospective juror out]

23                    [End of Volume]

24

25

103

1   STATE OF TEXAS      *

2   COUNTY OF DALLAS     *

3      I, NANCY BREWER, Official Court Reporter for the 283rd

4   Judicial District Court, do hereby certify that the above

5   and foregoing constitutes a true and correct transcription

6   of all portions of evidence and other proceedings requested

7   in writing by counsel for the parties to be included in this

8   volume of the Reporter's Record, in the above-styled and

9   numbered cause, all of which occurred in open court or in

10   chambers and were reported by me.

11      WITNESS MY OFFICIAL HAND on this the _____ day of

12   _____March_____ , 2004.

13

14

15

NANCY BREWER, CSR, NO. 5759
16   Expiration Date:  12-31-04
Official Reporter, 283rd JDC
17   Frank Crowley Crts. Bldg. LB33
133 No. Industrial Blvd.
18   Dallas, TX 75207
(214)653-5863

19

20

21

22

23

24

25

REPORTER'S RECORD

74851

VOLUME 31 OF _6_ VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

STATE OF TEXAS &ast; IN THE DISTRICT COURT

VS. &ast; DALLAS COUNTY, TEXAS

PATRICK HENRY MURPHY, JR. &ast; 283RD DISTRICT COURT

&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;

QUESTIONNAIRES

GENERAL PANEL

&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;

FILED IN
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 7th day of October, 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

ORIGINAL

1          A P P E A R A N C E S

2   APPEARING FOR THE STATE

3   Mr. Toby Shook
    SBOT NO. 18293250
4   And
    Mr. Bill Wirskye
5   SBOT NO.  00788696
    Assistant District Attorneys
6   133 No. Industrial Blvd.
    Dallas, Texas 75207
7   Phone:  214/653-3600

8

    APPEARING FOR THE DEFENDANT
9
    Ms. Brook Busbee
10  Attorney at Law
    SBOT:  03488000
11  703 McKinney Ave. Ste. 312
    Dallas, TX 75202
12  214/754-9090

13  Mr. Juan Sanchez
    Attorney at Law
14  SBOT:  00791599
    5630 Yale Blvd.
15  Dallas, TX 75206
    214/365-0700

16

17

18
19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          THE COURT:  Welcome to the 283rd.  Thank

3    you all for being here this morning.  Sorry for the delay in

4    getting you in.  At least when we called you up, we wanted

5    you to come right on in.  We want you to know that.  We

6    don't want to waste your time.

7          We have called a jury up on the case of

8    the State of Texas versus Patrick Henry Murphy, Jr., Cause

9    No. F01-00328.  I'll introduce the parties at this time.

10   Mr. Toby Shook, Assistant DA who works for your elected

11   District Attorney Bill Hill.  This is Brook Busbee, Mr. Juan

12   Sanchez, attorneys who represent the defendant, Mr. Murphy.

13          Very short introduction.  I need to jump

14   right into the mix of the voir dire this morning.  I have by

15   obligation the law under Article 35.17, voir dire

16   examination.  I need to go through several issues with you.

17   I like to read it to you right out of the book and tell you

18   what I'm doing and why I'm doing it.

19          "In a capital felony case in which the

20   State seeks the death penalty, the Court shall propound to

21   the entire panel of prospective jurors questions concerning

22   the principles as applicable to the case on trial of

23   reasonable doubt, burden of proof, return of indictment by

24   the Grand Jury, presumption of innocence, and opinion.  Then

25   on demand of the State or the defendant either is entitled

1    to examine each juror on voir dire individually and apart

2    from the entire panel and may further question the juror on

3    the principles propounded by the Court."

4                           So what am I telling you?  This is a case

5    where the State has filed an indictment against Mr. Murphy

6    for the offense of capital murder.  The State is seeking the

7    death penalty.  That causes these procedures to go into

8    place.  I'm going to speak to you briefly on these issues

9    and then I'm going to have you fill out this short, 17-page

10   questionnaire.  It's a rather comprehensive questionnaire.

11   It's basically what is your name, where were you born, and

12   what happened next?

13                           And people look at that and go, geez.

14   But it actually, if you will give very thoughtful and

15   deliberative answers, it will help shorten the process in

16   the amount of time that you might be on individual voir dire

17   down in the future.

18                           What we're going to do is after you

19   finish these questionnaires, you will be invited back to the

20   court individually.  I believe my date right now is

21   scheduling October.  So that's why I am -- that's what you

22   are in for on this particular case.  It's kind of pot luck.

23   You could have gotten a DWI or theft by check or burglary or

24   murder or capital murder.  And you got capital murder this

25   morning.  So that's what we're going to do.

1               I'm not going to spend a lot of time,

2   but, as I said, I'm required by law to do this as a group

3   and I want you to think about some of the issues that we're

4   going to be talking about.

5               Everyone knows that our system of

6   criminal justice in this country is based on the presumption

7   of innocence and having the State prove their case beyond a

8   reasonable doubt.  We don't have a definition of beyond a

9   reasonable doubt.  What is it and what is it not?

10              I can better explain to you what it is

11  not than what it is.  As I have said, the State has to prove

12  their case against a citizen accused beyond a reasonable

13  doubt.  And we have a different type of cases, we have

14  different levels of proof, that are required.

15              In a civil case, if you are in a lawsuit

16  against another party or corporation or two corporations are

17  suing each other, you go to a civil courthouse and you

18  typically want money or you want the other party to do or

19  not do something.  Car wreck, you hit my truck, I sue you in

20  civil court.  I want damages for the vehicle and maybe

21  medical, if I was injured.

22              I have to go to that court and prove my

23  case by a preponderance of the evidence or the greater

24  weight and degree of credible evidence.  If I can just tilt

25  the scale in my favor, we like to say 51 percent, then I

1   prevail in a civil case.  Why?  The issue is typically

2   money.  The lower standard for money issues.

3              The intermediate standard is by a clear

4   and convincing standard.  Very few people have heard of that

5   standard.  You certainly don't see it on TV.  I'll give you

6   an example, and I hope I never have another example like

7   this, but you may recall in Dallas County about two years

8   ago there was a family that was charged with locking their

9   little girl up in that closet, that nasty trailer, for two

10  years and almost starving her to death.  They had three or

11  four other children and the State filed a lawsuit to

12  terminate their parental rights to all five children,

13  although they only abused one.

14             In that type case the evidence has to be

15  clear and convincing before a jury can find the parent unfit

16  and terminate their parental rights and place the custody of

17  the children to the State.  That way they can be adopted.

18  There has to be some legal mechanism by which to take

19  children away from unfit parents and place them up for

20  adoption.  The standard in that type case is clear and

21  convincing.

22             The standard we use in a criminal case,

23  which is the highest standard in our courts, is beyond a

24  reasonable doubt.  Why?  A person stands to lose their life

25  or their liberty as a result of a criminal conviction.

1    So that makes some sense when you look at

2    the scale of what you stand to lose.  You look at the high

3    standard.  It's beyond a reasonable doubt.

4    Now, what is it not?  It's not beyond all

5    possible doubt.  And it's certainly not proof of one hundred

6    percent.  If you required the State to prove a case to you

7    beyond all possible doubt, which is I want to be 100 percent

8    sure, no doubt whatsoever, that's not a workable standard

9    because you would, in fact, be a witness to a particular

10    crime and you could not be a juror.  Does that make sense?

11    You see, it's a workable standard.  Has the State met their

12    burden of proof on what they are required to prove to you

13    beyond a reasonable doubt, is the mindset that you need to

14    have.  The State has to prove certain elements to you beyond

15    a reasonable doubt.  So that's the workable standard.

16    And I like to use Cunningham's definition

17    is beyond a reasonable doubt or a doubt based on reason and

18    common sense.  Folks, we want you to bring your common sense

19    into the courtroom when you evaluate the evidence.  If it

20    doesn't add up, find him not guilty.  It's real simple.  The

21    State meets their burden, they bring good quality evidence

22    and they cross the T's and dot the I's, they're entitled to

23    a conviction.  It's simple.

24    Burden of proof.  The burden is always on

25    the State and never shifts to the defendant.  They have the

1  burden to prove their case beyond a reasonable doubt and

2  that never shifts to the defense.  You might say, Judge, I

3  watch TV and I see the defense.  They always put on

4  something.  Well, yeah, they might ask questions, but the

5  counsel can sit here and do crossword puzzles, play on the

6  computer.  And if they believe that the State has failed to

7  meet their burden, Ms. Busbee and Mr. Sanchez, we have no

8  questions of this witness and they could let the State put

9  on all their evidence and they could close right behind

10  them.  And they could argue to the jury, folks, the State

11  has wholly failed to meet their burden of proof required in

12  this case.  And if that is true, they are entitled to a not

13  guilty.  Its that simple.

14           So don't confuse asking questions or

15  challenging a witness as the defendant requiring them to put

16  on evidence.  That dovetails into the defendant's right not

17  to testify.  Listen to this statement and see if you really

18  understand what it means.

19           A person may be arrested, confined, or

20  otherwise charged with an offense gives rise to no inference

21  of guilt at their trial.  The presumption of innocence alone

22  is sufficient to acquit the defendant unless and until the

23  State can prove their case beyond a reasonable doubt.  You

24  understand that concept of the presumption of innocence.  He

25  doesn't have to testify.  You understand the program.

1          Some people come in and say, Judge, if I

2     were on trial for a DWI or burglary or for murder or capital

3     murder, I would get up on that witness stand and defend

4     myself.   That may be your opinion and you are entitled to

5     that as a citizen, but you can't require him to do that.

6     You can't require them to put on any evidence.   Whose burden

7     is it?   The State's.

8          I can't drive that home any more, other

9     than give you an example.   We just got through fighting a

10    war on the other side of the earth behind people not having

11    any rights.   Part of the reason.   And you make Saddam

12    Hussein or one of his buddies or the Bathe party, they stuck

13    you in a hole somewhere until you buy your way out because

14    you are guilty, if they say you are guilty.   Do you think

15    that's fair?   No.

16          In China their program is, for example,

17    they execute people for tax evasion over there.   I mean, if

18    you have -- how do you disprove a negative?   The government

19    says, you didn't pay us enough money.   They just put you in

20    jail until your family can ransom you out.   If you read

21    about it, they will execute you over there and not tell the

22    family they did it.   They just call you and say too bad.

23          We don't want that system, folks, we

24    don't want anything close to that.   I can't stress that

25    enough.   The defendant has no burden.   Do not shift the

1  burden.  Don't come in here and say the State must do X, Y,

2  and Z, but if the defendant doesn't counter that, he must be

3  guilty.  No, it doesn't work that way.  The burden of proof

4  never shifts from the State.

5              Return of indictment by the Grand Jury.

6  Some people say, Judge, I'm not stupid, where there's smoke,

7  there's fire.  Mr. Murphy must have done something to get

8  here, if he's charged by indictment by the Dallas County

9  Grand Jury.  Well, I will tell you this.  Simply by being --

10  once again I'm repetitive, but it really means what it says.

11  Simply by being arrested, confined, or otherwise charged

12  with an offense, gives rise to no inference of guilt at his

13  trial.

14              What does that mean really mean?  Anybody

15  here ever served on the Grand Jury before?  I see no hands.

16  You would know.  You would serve for 90 days.  I will take

17  volunteers, if you would like to serve.  What does a Grand

18  Jury do?

19              Let me ask.  I'm going to start down the

20  list.  I don't have anybody's name.  Maria Castillo, how

21  many cases do you think that the Dallas County Grand Jury

22  last year heard and returned indictments for the felony

23  offenses of drugs, rape, robbery, burglary, murder, those

24  types of felony offenses?  How many cases do you think that

25  the Grand Jury heard and returned indictments last year in

1  Dallas?

2          PROSPECTIVE JUROR:  I don't have a clue.

3  Probably thirty thousand.

4          THE COURT:  Thirty thousand.  Let me see

5  here.  Who is Diana Cortez?  Yes, ma'am.  How many do you

6  think?

7          PROSPECTIVE JUROR:  I have no idea.

8          THE COURT:  Give me a ballpark.

9          PROSPECTIVE JUROR:  I don't know.  Close

10  to what they said, twenty thousand cases.

11          THE COURT:  Twenty thousand.  Marilyn

12  Evans, where are you?  I'm just picking people out.

13          PROSPECTIVE JUROR:  Close to one hundred

14  thousand.

15          THE COURT:  Okay.  Victoria Bailey.  Yes,

16  ma'am?

17          PROSPECTIVE JUROR:  Ten thousand.

18          THE COURT:  Actually, y'all are very

19  good.  Ma'am, I asked this question every day and usually I

20  start around the two, three, four, give thousand level and

21  thirty thousand is real close.  Last year they returned

22  indictments of twenty-seven thousand and ten.  I actually

23  looked it up.  I wanted to get my current figure.  We just

24  got our physical numbers out.  We anticipate we will be up

25  over twenty-eight thousand this year.

1          I see you shaking your heads, because

2   that's a real number.  The lady that said one hundred

3   thousand, ma'am, if you include all the class A and B

4   misdemeanor cases that occur in Dallas County that are

5   prosecuted, we're not talking about the number of crimes.

6   We're talking about prosecuted.  We're almost at one hundred

7   thousand.  Wow.

8          When I tell you that and you look at the

9   number of days that the Grand Jury meets, look at the amount

10  of time they have to meet, and you divide that by the number

11  of cases they return, they spent about three minutes on this

12  case, because very few people understand the magnitude of

13  the criminal justice system in Dallas County.

14         So what am I telling you?  That the

15  twelve people, that independent jury on this case, will be

16  the first citizens of Dallas County that are impartial,

17  never heard anything about this case.  So you can't say the

18  Grand Jury indicted, there must be something here.  Well,

19  yes, there is.  There's a file mark that the Grand Jury

20  believes there is some evidence to go to a trial.

21         So once again, the statement simply by

22  being arrested, confined, other otherwise charged with an

23  offense gives rise to no inference of guilt at his trial,

24  that's exactly what it means.  Anybody here want to hang

25  your hat on the indictment and say that's worth something

1   other than a charging instrument?  Okay.

2                    Presumption of innocence.  I have already

3   covered extensively and anybody have a problem with

4   presumption of innocence?  Anybody here hold it against any

5   defendant if they elect not to testify at their trial?

6   If they do elect to testify, hey, all bets are off.  They

7   are a witness like anybody else.  You can choose to believe

8   some, all, or none of their testimony.  You weigh them with

9   the same yardstick as anybody else.  We don't care what

10  measure you use, as long as you use the same measure for all

11  witnesses.  Is that fair?

12                    Last thing is the most important.  It's

13  opinion.  Everyone was sworn in downstairs as a juror.  Do

14  you recall being sworn in?  Anyone not sworn in downstairs?

15                    PROSPECTIVE JUROR:  I was not and I'm

16  agnostic and I will not take an oath under God.

17                    THE COURT:  You have put that on the

18  questionnaire?

19                    PROSPECTIVE JUROR:  I did.

20                    THE COURT:  You have a 17-page

21  questionnaire and put that on there.  What you have done is

22  you have told us you are going to tell the truth.  Opinion

23  is your opinion on this questionnaire is what the attorneys

24  need to hear.

25                    Now, I'm going to ask you to be

1   thoughtful, deliberative, and write neatly because we have

2   got to read these things.  You say, Judge, how long does it

3   take?  I have exactly 1,170 pieces of paper out there.  I've

4   done this a few times.  And we've all got to read these

5   things.  I'll ask you to please, please, write legibly.

6   Because the first thing you do is if they can't read it, you

7   are going to come back down here and spend a lot more time

8   explaining your answers.  If we can read these up front, we

9   can eliminate a whole lot of time and questions.

10                  Now, as I have said, what we're going to

11  do is I will notify you when to come back.  I can notify

12  you.  I will send a letter.  If you have an e-mail address,

13  please write it legibly.  Because e-mail is not usually a

14  good spelling, you have to really look at it and be sure

15  that you get all the punctuation correct.  I'm a computer

16  geek.  I understand that.  But I communicate with you and

17  give you as much notice when to return and be as considerate

18  as possible.  So I really need your e-mail.

19                  Security.  Judge, the first page asks for

20  a lot of information.  Yes, it does.  Why is that necessary?

21  It's required by law.  Got to have it.  We have to do a

22  record check to make sure everybody is qualified to sit on

23  this panel.

24                  Now, what can I do in return for that?

25  Only upon a written court order from the Court of Criminal

1   Appeals in Austin, that's the highest criminal court in this

2   state, will I supply them with a copy of your questionnaire.

3   Your questionnaire will remain in the custody of this Court

4   and Sheriff.  The attorneys will get a copy of it.  They get

5   to review that and when it's done, they turn them back into

6   the court right here and then they are shredded.

7            Now, I keep a digital copy.  That way the

8   only one we keep is the original and it's under lock and

9   key.  I have a digital copy here.  The attorneys get two

10  paper copies and they turn them in when they are done.  Only

11  upon an order will I give it to the Court of Criminal

12  Appeals.  And then they get it on a CD and it's password

13  protected.  They have to call me to get the password.

14           So what am I telling you?  I will protect

15  your personal information.  I understand people are

16  concerned about that and you should be and I respond

17  appropriately.  Fair enough?  Okay.

18           Now, I've done a lot of talking and

19  anybody have any questions?  Mr. Shook, did I miss anything?

20           MR. SHOOK:  No, sir.

21           THE COURT:  Ms. Busbee?

22           MS. BUSBEE:  No, sir.

23           THE COURT:  Now, I'll have you write a

24  number.  I heard the Sheriff tell you I have to have a

25  number on each page.  These are not stapled and I have

16

1   twelve hundred pages of paper.  And if they get pulled

2   apart, we're in trouble.  I will call the name of the

3   individual and give you a number.  I want you to put the

4   number on the top right and bottom right-hand corner of each

5   page.  Stand when your name is called so we can identify who

6   you are and I'll give you the number.

7                          [Off the record]

8                    THE COURT:  Anyone here I did not call

9   your name?

10                   PROSPECTIVE JUROR:  Barbara Moffitt.

11                   THE COURT:  Do you know what your

12  original juror number was?

13                   PROSPECTIVE JUROR:  2515.

14                   THE COURT:  Wrong panel.  Judge, would

15  you send her back downstairs.  You didn't make this one,

16  ma'am.  You ended up in the wrong court.  Tell them you

17  learned all about it, but you want something else.  Okay.

18                   Now, my part is done.  You have got a

19  little while ahead of you to finish that up.  We're going to

20  let you go out in the hallway and spread out a little bit,

21  so you can fill out these questionnaires thoughtfully.

22                   Do two things for me.  Number one, they

23  are not stapled so you can pull them apart and they're two

24  sides.  I'm saving your taxpayer's money printing them side

25  by side.  When you finish them, put them back in order.

1   They are going through the scanner and if they are not in

2   order, it takes them longer to put them back together to

3   scan them.  And you multiply that times 65 and all of a

4   sudden it's an eight-hour job that could take 30 minutes.

5          So two things.  Front and back, number

6   each page, and then when you are through, put them back in

7   the correct order.  Make them nice where we can get these

8   things done and get them back to you.

9          So I thank you for your time that you

10  have already given us and the thoughtful questionnaires and

11  we'll see you in a couple of weeks.  Thank you so much.

12          [End of Proceedings]

13

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF TEXAS          *

2  COUNTY OF DALLAS        *

3      I, NANCY BREWER, Official Court Reporter for the 283rd

4  Judicial District Court, do hereby certify that the above

5  and foregoing constitutes a true and correct transcription

6  of all portions of evidence and other proceedings requested

7  in writing by counsel for the parties to be included in this

8  volume of the Reporter's Record, in the above-styled and

9  numbered cause, all of which occurred in open court or in

10 chambers and were reported by me.

11     WITNESS MY OFFICIAL HAND on this the  4  day of

12 _____March_____, 2004.

13

14

15     _____
       NANCY BREWER, CSR, NO. 5759
16     Expiration Date:  12-31-04
       Official Reporter, 283rd JDC
17     Frank Crowley Crts. Bldg. LB33
       133 No. Industrial Blvd.
18     Dallas, TX 75207
       (214)653-5863

19

20

21

22

23

24

25

REPORTER'S RECORD   **74851**

VOLUME 32 OF _6l_ VOLUMES

TRIAL COURT GAUSE NO. F01-00328-T

| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

INDIVIDUAL VOIR DIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**FILED IN**
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 7th day of October, 2003, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Vickers L. Cunningham, Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

1                    A P P E A R A N C E S

2    APPEARING FOR THE STATE

3    Mr. Toby Shook
     SBOT NO. 18293250
4    And
     Mr. Bill Wirskye
5    SBOT NO. 00788696
     Assistant District Attorneys
6    133 No. Industrial Blvd.
     Dallas, Texas 75207
7    Phone:  214/653-3600

8

9    APPEARING FOR THE DEFENDANT

10   Ms. Brook Busbee
     Attorney at Law
     SBOT:  03488000
11   703 McKinney Ave. Ste. 312
     Dallas, TX 75202
12   214/754-9090

13   Mr. Juan Sanchez
     Attorney at Law
14   SBOT:  00791599
     5630 Yale Blvd.
15   Dallas, TX 75206
     214/365-0700

16

17

18

19

20

21

22

23

24

25

PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Andrea Miller | 4 | 6 | | 32 |
| Margaret Rasmussen | 24 | 26 | | 32 |
| Lawrence Bosworth | 53 | 54 | 89 | 32 |
| James Grace | 99 | 100 | 129 | 32 |
| Lynda Abbott | 144 | 145 | 152 | 32 |
| Elvin Slette | 155 | 157 | | 32 |

4

P R O C E E D I N G S

1

2 THE COURT:  Ms. Miller.  Juror 3910,

3 Andrea Miller.

4 [Prospective juror in]

5 THE COURT:  Good morning.

6 PROSPECTIVE JUROR:  Good morning.

7 THE COURT:  How are you?

8 PROSPECTIVE JUROR:  I'm doing well.

9 THE COURT:  I see you brought your book,

10 but you won't have time to read it this morning.

11 PROSPECTIVE JUROR:  Yeah, I didn't know

12 if I was going to be the first one in or not.

13 THE COURT:  We like to run a pretty tight

14 ship and not waste your time.

15 PROSPECTIVE JUROR:  Okay.

16 THE COURT:  Did you have enough time to

17 read the guide I provided for you?

18 PROSPECTIVE JUROR:  I did.

19 THE COURT:  And, also, did you get a copy

20 of your questionnaire?

21 PROSPECTIVE JUROR:  I did.

22 THE COURT:  We give that to you so you

23 can begin to think about the issues the attorneys will visit

24 with you about and review your questionnaire.  They may ask

25 you to expound upon an answer that you gave back in May or

1  simply just continue the thought.

2          Bottom line is there are no wrong answers

3  here.  The attorneys want to visit with you to have you

4  understand all the law, how it relates.  Please ask

5  questions.  This is your opportunity to have interaction

6  with the attorneys, I don't understand this, would you

7  explain it another way?  We want you to have a functional

8  understanding of the law.

9          PROSPECTIVE JUROR:  Okay.

10         THE COURT:  At the end of the process

11  there are two questions I must ask.  Number one is, do you

12  understand the law?  Number two, can you follow the law?

13  That's the big picture I have.

14         PROSPECTIVE JUROR:  Okay.

15         THE COURT:  The only question I have for

16  you now is will you be able to serve this Court for a period

17  of two weeks beginning on November 10th?

18         PROSPECTIVE JUROR:  I will be able to.  I

19  have children in elementary school that get out at 3:30.

20  Right now I pick them up every day at 3:30.  If it was going

21  to run later than that, then I would have to find alternate

22  arrangements.

23         THE COURT:  We do run until 4:30.  And

24  it's one of those things, if I have a witness that's out of

25  town or something like that and we can conclude their

1   testimony by 5:00, I'll go ahead and carry that one on,

2   because I have to weigh everybody's time requirements.  But

3   I haven't worked past 5:00 in ten years, unless it's an

4   extraordinary circumstance, because I know that people have

5   school, families, business, life, that they have to leave

6   soon.  Yeah, you'd have to arrange pickup for a couple of

7   weeks after school.  Other than that, no problems?

8                    PROSPECTIVE JUROR:  No problems.

9                    THE COURT:  Thank you very much.

10  Mr. Shook, would you like to inquire?

11                   MR. SHOOK:  Thank you, Judge.

12                   ANDREA MILLER,

13  having been duly sworn, was examined and testified as

14  follows:

15                   DIRECT EXAMINATION

16  BY MR. SHOOK:

17       Q.    Ms. Miller, my name is Toby Shook.  I'm going

18  to be speaking to you on behalf of the State this morning.

19  As the Judge said, there aren't any right or wrong answers

20  to our questions.  We just want your honest opinions.  What

21  I'll do is go over some of the things in your questionnaire

22  and, obviously, talk to you about capital murder and some of

23  the other laws and rules that apply to these cases and your

24  feelings on that, and that sort of thing.

25       A.    All right.

1    Q.    And if you have any questions at any time,

2  feel free to ask.  You've never served on a jury before?

3    A.    I have not ever served on a jury, no.

4    Q.    Okay.  I think your husband has on some type

5  of case, but you haven't had the pleasure of sitting over

6  here yet?

7    A.    I have not, no.

8    Q.    Okay.  Well, this one is a little different

9  and that's why we do this individual jury selection.  We

10  don't mean to make you feel like you are the one on trial.

11  Sometimes jurors feel that way --

12    A.    Right.

13    Q.    -- because you are on the witness stand.  But

14  we found it's a pretty good way of getting information.

15  Looking at your questionnaire, I see that you work as a

16  sales manager, is that for Sava (phonetic) Software?

17    A.    Sava (phonetic) Software.  It's a human

18  performance improvement software company.  I resigned July

19  22nd and I am presently -- I don't have another job and I'm

20  not looking for another job.  I plan on resuming working in

21  January.

22    Q.    Okay.  Are you planning on going in the same

23  type of field?

24    A.    Yes.

25    Q.    Okay.  You're not originally from Texas and I

1   was looking -- it looked like you lived in Germany and

2   England and then I saw that your father was an Air Force

3   pilot, so.

4       A.      I was going to split hairs with you and say

5   that I am a Texan and happened to be born in Las Vegas,

6   Nevada.

7       Q.      And I guess you moved around a bit growing up

8   in Air Force bases, that sort of thing?

9       A.      Yes.   Right.

10      Q.      What brought you to Texas, or --

11      A.      I graduated from college, did my tour of

12  Europe, and then came right back to Dallas.  My father is

13  from Goliad, Texas, and my mother is from Winsboro, Texas.

14  And all of my family, with the exception of me, has been

15  born in Texas.

16      Q.      So you really are a true blue Texan?

17      A.      Yeah.

18      Q.      It took you a while to get back here.

19      A.      Uh-huh.

20      Q.      One of the things we ask is if you've ever

21  known anyone that's been through the criminal justice system

22  and you had an answer that I hadn't ever seen before.

23      A.      What's that?

24      Q.      That your grandmother had on a perjury charge.

25      A.      Yeah.   Yes.

1     Q.    But I hadn't seen that before.

2     A.    She was working for an insurance company and

3 the owner of the insurance company had committed some kind

4 of crime and, you know, with it, and she lied on the witness

5 stand.

6     Q.    Okay.  What happened with her case?

7     A.    She went to jail.

8     Q.    Really?

9     A.    Yeah.

10     Q.    Where did that happen?

11     A.    In Beeville, Texas, I think.

12     Q.    Wow.

13     A.    Yeah.

14     Q.    And that was back in the '70's?

15     A.    Uh-huh.

16     Q.    How long did she have to go to jail?

17     A.    I don't think very long.  You know, I was

18 young and my parents kind of kept it from me, so I'm not

19 sure.

20     Q.    Okay.  Well, that is interesting.  Nothing

21 about that would cause you to be biased in any way in a case

22 like this?

23     A.    No.

24     Q.    Okay.  Let me talk to you a little bit, then,

25 about how you feel about the death penalty.  We ask each

1   juror, we go a little bit in depth with that on your

2   personal feelings.  And on the questionnaire you put you

3   were in favor of it.  And I'd like you to kind of expound on

4   that.

5        A.    I think the death penalty is a very hard

6   thing.  I think that standing in moral judgment of somebody

7   and convicting them to death -- I'm a Christian.  I go to

8   church, you know, at least once a week.  So it's very hard.

9              But I also think that if somebody is

10  committing a felony and I've written in my thing for

11  financial gain and for some reason that makes a difference

12  to me.  If they're trying to make money and in the process

13  they think it's worth killing somebody over, I don't know

14  that there's -- you know, in that case I think that the

15  death penalty may be the right choice.

16       Q.    Okay.  Have you always believed in the death

17  penalty since you were an adult, as far as the law goes?

18       A.    Yeah.  In fact, I was telling -- asked a

19  friend of mine who is a lawyer, mainly for social work type

20  cases, how to say voir dire, and she said why?  And I told

21  her and she said, oh, it's a death penalty case?  And I

22  said, yeah, and she said, well, that would be easy for me, I

23  would tell them that my religion keeps me from being able to

24  ever convict, give somebody the death penalty.

25             I thought about that and I thought, I

1    don't know that I can answer that.  I know that it's a hard

2    -- it's a hard thing to pass judgment on somebody and

3    knowing that you could be sentencing them to death, but I

4    think there are times when that, it may be warranted.

5         Q.     Well, that's what we kind of get into and

6    that's kind of my -- one of my next areas.  In Texas, and

7    you've read the materials, the death penalty is just

8    reserved for certain types of murder cases.

9         A.     Right.

10        Q.     Murders, plus what we call some aggravating

11   facts.  We have a lot of brutal murders which you can't

12   receive the death penalty for.  And under the law right now,

13   what it is reserved for is intentional murders, not

14   self-defense, not an accident --

15        A.     Right.

16        Q.     -- that occurs during the course of a felony

17   like a robbery, the situation you said for gain, burglary,

18   someone breaks into someone's home and murders them, or

19   arson, if you murder someone during burning down a building,

20   during a kidnapping, or also during a rape.

21             Also, murder of specific individuals,

22   like police officers and firemen on duty, could call for the

23   death penalty, and murder of a child under the age of six.

24   We don't know why they chose that particular age, but they

25   had to, so they chose six.  Murder of more than one

1   individual, like a serial killer situation or mass murder

2   situation, and then murder for hire, again, if someone is

3   doing it for money.

4                       That list of types of offenses, do you

5   agree with those types of crimes that should be considered

6   for the death penalty?  Are there any on that list that you

7   disagree with?

8        A.    I think that the age for the children ought to

9   be higher.

10       Q.    Okay.

11       A.    I have 10-year-old twins, so I would think it

12   ought to be at least 11, you know, but --

13       Q.    Most people feel that way.  If there was

14   anything they would enlarge, it would be that one particular

15   aspect of the law.  But as far as the other categories, do

16   you feel those are appropriate for consideration?

17       A.    Yeah.  The only one I would have a little bit

18   of a question about was the arson, in burning down a

19   building.  I guess I would have to know more about that one.

20       Q.    Well, and again, that one, that one is rarely

21   used and that's -- it still has to be an intentional act,

22   not an accident, like if they didn't know a person was in

23   there, that sort of thing.  That would still be a murder

24   case, but it wouldn't be a capital murder case.

25       A.    Right.

1    Q.    But, obviously, if you tied someone up and put

2    them in a house and set them on fire, that might be.

3    A.    Another one that I saw in here, I think, that

4    you didn't mention, was if the person had escaped jail.

5    Q.    Yeah, during the course of that escape, that

6    could be a situation.

7    A.    Yeah.

8    Q.    But you feel those are the types of cases, at

9    least from a philosophical point of view, that might deserve

10   it, just depending on the facts?

11   A.    Uh-huh.  Yes.

12   Q.    Okay.

13   THE COURT:  She has got to record

14   everything, and head nods and nonverbal responses, she can't

15   record.

16   A.    She can't record.  Okay.

17   Q.    (By Mr. Shook)  Now, the way we've set it up

18   is, the trial is divided into two parts.  There's the

19   guilt/innocence stage in which we have to prove the

20   defendant's guilt.  If we are unable to do that, then,

21   obviously, we all go home with a not guilty finding.  But if

22   we are able to do that, the trial is not over.  We move to

23   this punishment stage.

24   And that's where you get additional

25   evidence, at times, and at the close of that you get these

14

1    questions.  And we'll go over these in more detail in a

2    minute.

3         A.     Okay.

4         Q.     But, basically, what the State has to prove is

5    that the defendant would be a continuing danger to society,

6    that he either caused the death or he intended or

7    anticipated that a death would occur, and that there's not

8    sufficient mitigating evidence to warrant a life sentence.

9         A.     So all three would have to be against him to

10   get the death penalty in this case?

11        Q.     Yes.  And the way they're answered is a yes,

12   yes, and a no, equals a death sentence.

13        A.     Okay.

14        Q.     If they're answered any other way, it would be

15   a life sentence.  The jury doesn't actually write death or

16   life in, but the Judge sentences according to how those

17   questions are answered, and the ones that get the death

18   sentence are yes, yes, and no.  He doesn't have any

19   discretion, either.  If he disagrees with the jury, he still

20   has to sentence the defendant one way or the other.

21               But those are the only two possible

22   outcomes, once a defendant has been found guilty of capital

23   murder.  It's a death or life sentence, depending on how

24   these questions are answered.  Now, are you familiar with

25   the method of execution in Texas?

1      A.      No.

2      Q.      It's by lethal injection.   Years ago it was by

3   the electric chair.   Since they reinstituted the death

4   penalty, the manner is by lethal injection.   You probably

5   know from living here, that Texas is a state where the death

6   penalty is actually carried out.

7      A.      More so than any other place on Earth, I

8   believe.

9      Q.      Well, I don't know about on Earth, but in the

10  United States it is.   I think in Iraq and China they carry

11  it out --

12     A.      Perhaps, right, yeah.

13     Q.      But they don't give us the stats over there as

14  accurately.   But of all the states, it does lead the nation

15  and usually leads it every year.   I know we've had about 20

16  executions this year.   There are some states that have it,

17  but do not -- on the books, but they don't ever carry it

18  out.

19              You know, California has about 600 people

20  on death row, but rarely do they ever execute anyone.

21  Whereas, Texas, I think the citizens can anticipate, it's a

22  case that prosecutors, type of crime they prosecute, and

23  ultimately is carried out.   Which is different, because,

24  like you said, it's one thing kind of to talk about this

25  philosophically and then it's another thing to talk about it

1    when you start thinking about, I might be in a case where I

2    make these decisions where someone is actually executed.

3         A.      I have to tell you that, that coming here this

4    morning I thought, boy, if I, you know, could have picked

5    any other type of a case to be on, I would have.  To know

6    that I'm going to potentially be part of a decision that

7    somebody gets sentenced to death is a hard thing to think

8    about.

9         Q.      It's pot luck when you come down here.  You

10   can be on a civil case, you can wind up on a DWI, a

11   burglary, even a murder case, or a capital murder in which

12   the State is seeking the death penalty.  I think most

13   jurors, if they had their choices, obviously, wouldn't

14   choose this one.

15        A.      Right.

16        Q.      But the ones that did, we'd probably have a

17   problem with.  But let me be frank with you.  The method of

18   execution is the same in each case.  The procedures are the

19   same.

20               In this case, and we can't preview the

21   facts and ask you what your decision would be, obviously,

22   but if the jury did find the defendant guilty and answered

23   these questions yes, yes, and no, the Judge would sentence

24   him to death.  And under our laws he would then be placed on

25   death row.

17

1    A.    Can I ask you a question about point 2?  If he

2  was robbing, if there was a group of people and he was one

3  of the ones robbing, but not the one that pulled the

4  trigger, what would be the answer to 2?

5    Q.    To 2?  Well, it would depend on the facts.

6  That's another area I want to get into, because capital

7  murder, like any other crime, can be pulled off sometimes by

8  more than one person.  You have accomplices.  You may have

9  only one triggerman, one person that actually causes the

10  death, but you may have other people involved that actually

11  help carry the crime off.

12            And that can be true in any type of

13  crime.  But the law says that if you are actively involved,

14  encouraging, directing, aiding in a crime, then you can be

15  found guilty of that crime.

16    A.    Okay.

17    Q.    Which is still true in capital murder.  And in

18  certain situations an accomplice could even receive a death

19  sentence.

20            Now, the example I give is, let's say,

21  Mr. Kirlin and I here decide we want to go rob a bank.  And

22  my plan calls for me to take a gun.  I'm going to go in

23  there with him.  We're going to have a guy, our other friend

24  who's in on it, we say, you're going to be our getaway

25  driver, you know.  Park outside, keep this car running.

1  Whistle real loud, if someone is coming.

2          We run in there, I pull the gun out, I

3  have everyone hold their hands up, and he takes a big bag

4  and starts loading the money up behind the counters.  In the

5  middle of that robbery, suddenly I decide I want to kill

6  somebody.  Maybe I don't like the way one of the tellers

7  looks at me, maybe he tells me one is going for an alarm,

8  but I intentionally shoot them.  Then we flee.  We jump in

9  the car, we take off, but we're caught a few blocks away.

10          Obviously, I can be prosecuted for

11  capital murder because I murdered someone during the course

12  of a robbery.  Mr. Kirlin could also be prosecuted, as well

13  as the getaway driver, because they were participating in

14  that plan and might even get the death penalty, depending on

15  the facts.

16          But what I like to ask, what we ask every

17  juror is their gut reaction on that, because some folks come

18  in and they tell us, I believe in the death penalty, but my

19  personal belief is it's appropriate when someone is actually

20  doing the killing.  In other words, it's a just sentence if

21  you take a life.  If someone is assisting in the crime, I

22  might prefer a life sentence.  I think that's more fair.  I

23  don't think it's fair they get the death sentence, if they

24  didn't actually take the person's life.

25          We have other jurors who say they think

1    it is fair for an accomplice to be prosecuted and ultimately

2    receive the death penalty, even though they didn't actually

3    cause the death.  And people feel differently.  They kind of

4    come down one side or the other on that issue.  And there's

5    not a right or wrong answer.  It's another one of those,

6    what we like to do is get your gut reaction to it.  How do

7    you feel about that type of prosecution?

8        A.    It would probably make a difference, once I

9    was involved in the case.  But from a theoretical

10   perspective, what I would say is I would look at the law and

11   follow the law as it reads, thinking that somebody a lot --

12   somebody thought a lot longer and harder than I would be

13   able to, about what would be the appropriate sentence.

14       Q.    It's always good.  And we like jurors that

15   would be able to follow the law.  But we do like to get

16   their personal opinions, too.  Because once you get in

17   there, sometimes you have a conflict.

18       A.    Well, I would think it would be harder to

19   sentence somebody to death that had no -- that didn't

20   actually pull the trigger, that there are two kinds of

21   cases.  There are the cases where they're actively yelling

22   shoot, and there's the cases where somebody got involved in

23   something and didn't realize how bad it was going to go.

24       Q.    That's another point in the law, too.  If you

25   have the situations you described where they are directing,

1    saying, you need to shoot that person --

2         A.    Yeah.

3         Q.    That's a pretty simple --

4         A.    Easier, right.

5         Q.    I think a lot of people would bite off on that

6    concept.  But under the law, also, we have what this is

7    called, under the law of conspiracy.  And I'll use the same

8    example.  The law says that if Mr. Kirlin and I conspire to

9    commit one crime, and all that is, is an agreement, we

10   decide we're going to go rob the bank.

11        A.    Right.

12        Q.    And during the course of committing that

13   crime, one of us commits another felony to further it along,

14   in this case it's me shooting down somebody, everyone in the

15   conspiracy can be found guilty.

16        A.    Equally guilty?

17        Q.    Right.  Even if they didn't have that intent

18   for that other crime to happen, if the jury believes from

19   all the facts they should have anticipated that could occur.

20   So Mr. Kirlin could sit there and say, don't, hey, hey,

21   don't.  You've got that look in your eye, don't shoot, don't

22   shoot anyone.  And then I said, well, I'm going to, and I

23   kill them.

24               He doesn't even have to have that intent

25   to be found guilty under that law, if you believe from the

1   facts we should have anticipated.  And some people have a

2   problem with that.  They don't have a problem if he has that

3   intent, wants that to happen, yet he can be found guilty of

4   capital murder, but they would under the law, if that intent

5   is not there.  They don't think that's quite fair.  Maybe a

6   bank robbery conviction or something like that, but not

7   capital murder.  How do you feel about that?

8        A.    I'm not sure, actually.  I'm smiling because I

9   would have to probably, you know, I'm trying not to think of

10  the specific case at hand and what I've seen on the news and

11  what I've read in the newspaper, but certainly people that

12  have escaped from prison and are on Christmas Eve robbing,

13  you know, robbing a retail establishment and a police

14  officer comes.

15            It's hard for me.  I can't give you -- I

16  can't give you an answer, a gut.  I would -- the death

17  penalty is pretty final.  And, but, you know, but somebody's

18  father is dead, you know, and a police officer was shot

19  down.  So I guess I would have to lean on the law and look

20  at the way that the law was written to make a decision on

21  how it ought to be.

22       Q.    Let me ask you, because you brought this up,

23  too, and I was going to get to this.  This case got a lot of

24  publicity.  Every juror has read or seen something on it,

25  some more than others.  What do you remember as far as the

1  details go of what you saw on the news?

2      A.      I read the newspaper every day, front to back.

3  I watch the news every evening, so, yeah, I saw it, but --

4      Q.      You watched it, you followed it pretty

5  closely?

6      A.      I was going to say, but I didn't follow this

7  story any more closely than any of the other stories.  And

8  there have been, you know, a thousand days, I think, or so

9  between then and now, and I didn't recognize the gentleman's

10  name when I came down here initially.  And I --

11      Q.      Did you follow any of the other court

12  proceedings?

13      A.      Didn't follow any of the other court

14  proceedings.  I did read recently that he is the last of the

15  prison escapees to go to court.

16      Q.      The bottom line on the law is, obviously, just

17  because you have read something, seen something on TV,

18  doesn't necessarily make you ineligible to be a juror.

19      A.      Right.

20      Q.      The law requires the jurors to make their

21  decisions just based on the evidence they hear in the

22  courtroom and not anything they've seen in the news.  But,

23  like I said, some have read more than others.  And you have

24  to be able to tell us whether you feel that would influence

25  you in your decisions.  Obviously, we can't have jurors

1  whose decisions would be influenced by what they've read.

2        A.     Right.

3        Q.     Not everyone can tell us that, honestly.  Some

4  would and some can.  But it comes down to what you know and

5  what you can personally tell us about yourself, whether you

6  can follow that aspect of the law.

7        A.     I think that I could be unbiased.

8        Q.     Okay.

9              MR. SHOOK:  Can I have one moment, Judge?

10  That's all the questions I have, Judge.

11              MS. BUSBEE:  Your Honor, we've reached an

12  agreement on this juror.

13              THE COURT:  Ms. Miller, I want to thank

14  you for your time and service today.  It's awful hard to

15  find someone as intelligent as yourself that hasn't read the

16  paper every day, and doesn't have as much opinion as you do,

17  and I think that's why the parties have agreed.  We

18  appreciate your time and service to the Court.

19              PROSPECTIVE JUROR:  Good.  So I'm not

20  going to be on the jury?

21              THE COURT:  You are not going to be on

22  the jury.

23              MR. SHOOK:  I know we made her happy.

24              PROSPECTIVE JUROR:  You know, I'd have to

25  say that when you were asking me that question, I thought,

1   this would be a really great opportunity for me to go, yeah,

2   I'm biased, that's it, and I'd get to go, but I thought, no,

3   I'm not going to say that.

4                        [Prospective juror out]

5                   THE COURT:  Ms. Rasmussen.

6                        [Prospective juror in]

7                   THE COURT:  Juror No. 4090, Ms. Margaret

8   Rasmussen, is that pronounced correctly?

9                   PROSPECTIVE JUROR:  That's correct.  Yes.

10                  THE COURT:  Good morning, welcome to the

11  283rd.

12                  PROSPECTIVE JUROR:  Thank you.

13                  THE COURT:  Did you have enough time to

14  read the guide I provided for you this morning?

15                  PROSPECTIVE JUROR:  I did.

16                  THE COURT:  We also provided a copy of

17  your questionnaire for you that you filled out for us back

18  in May, to help you begin to think about some of the issues

19  we're going to be dealing with this morning.  I know that's

20  an awful lot of law to give someone when they first walk in

21  the door.

22                  We don't expect you to have a working

23  knowledge of it right now.  That's what this opportunity is.

24  It's for the attorneys to visit with you, for you to ask

25  questions, for you to have a working understanding of the

1   law.  That's what we're dealing with here.  No wrong

2   answers, the attorneys just want your honest opinions.  You

3   can't fail it.

4                    PROSPECTIVE JUROR:  Okay.

5                    THE COURT:  Some people are nervous when

6   they come in.  This is as informal a process as we can have.

7   And all I can tell you is try to relax a little bit.  You

8   came in like a deer in the headlights.  That's expected.  We

9   understand that.  Please, if you would, give yes or no

10  answers because she has to record everything we say.

11                    At the end of the process, I have two

12  questions I have to ask.  Number one is, do you understand

13  the law?  Number two, can you follow the law?  That's the

14  big picture I have.  The only question I have for you right

15  now is will you be able to serve this Court for a period of

16  two weeks beginning on November 10th?

17                    PROSPECTIVE JUROR:  Starting November

18  10th?

19                    THE COURT:  Yes, ma'am.

20                    PROSPECTIVE JUROR:  Yes.

21                    THE COURT:  Thank you so much.

22  Mr. Shook?

23                    MR. SHOOK:  May it please the Court?

24                    <u>MARGARET RASMUSSEN,</u>

25  having been duly sworn, was examined and testified as

1   follows:

2                   DIRECT EXAMINATION

3   BY MR. SHOOK:

4        Q.    Ms. Rasmussen, my name is Toby Shook.  I'll be

5   asking you questions on behalf of the State this morning.

6   And as the Judge said, there aren't any right or wrong

7   answers.  We just want your honest opinions.

8                   We've gone over your questionnaire, which

9   has provided us with a lot of information.  I know it took a

10  while to fill out, but it, believe it or not, saves you some

11  time.  And I'll follow up just on a few things there and

12  then we'll talk about capital murder in general and just

13  kind of get your feelings about that and some of the other

14  types of laws and rules that apply.  All right?

15       A.    All right.

16       Q.    If you have any questions at any time, feel

17  free to ask.  I see that you were born and raised in

18  Nebraska?

19       A.    That's correct.

20       Q.    And you've lived here the past 30 some-odd

21  years?

22       A.    Yes.

23       Q.    What brought you down here to Texas?

24       A.    My husband got transferred in his work.

25       Q.    Okay.  And you're retired now?

1      A.      Yes.

2      Q.      What type of work did you do prior to

3  retiring?

4      A.      Did I do?

5      Q.      Yes, ma'am?

6      A.      Um, for the most part I was a stay-at-home

7  mom, but when I worked, it was accounting, general office

8  type, clerical work.

9      Q.      All right.  And you've been on, is it a civil

10  case, the type of jury you served on before?

11      A.      Yes.  I believe it was -- I get mixed up

12  between civil and criminal.  It was an assault, whichever

13  that is.

14      Q.      Okay.  Did you come down to this courthouse

15  and serve or was it another courthouse?

16      A.      It may have been George Allen.  It was quite a

17  few years ago.

18      Q.      Okay.

19      A.      It was, I think, I'm not sure.  It was either

20  here or over at George Allen.

21      Q.      Okay.  Do you remember what the facts were

22  about it all?

23      A.      It had to do with the police being called out

24  at 3:00 in the morning to a disturbance, and the couple

25  involved, the man had already had a trial.  This was the

1   woman's trial and she had assaulted the officer.  She was

2   quite a big woman who jumped on the officer's back.  And her

3   husband had a weapon inside of his boot.  And we were to

4   find out if she was guilty of assault, I believe.

5          Q.      And did you have a guilty finding in that

6   case?

7          A.      Yes.

8          Q.      But I think you said the Judge set punishment

9   or did the jury?

10         A.      I think he did.  I don't remember that we had

11  anything more to do with it.

12         Q.      How did the deliberations go?  Were they

13  pretty smooth or were they contentious at all?

14         A.      Not contentious.  In fact, there was not much

15  disagreement.

16         Q.      Okay.  So a pretty cut and dried case?

17         A.      Right.

18         Q.      Nothing really unpleasant about the

19  experience?

20         A.      No.

21         Q.      Okay.  Let me, let me ask you, then -- let me

22  turn my attention to capital murder and the death penalty

23  and ask you how you feel about that.  I believe you, on your

24  questionnaire, said you are in favor of it as a law and I'd

25  like you to just kind of expound on that, tell us why you

1  favor the death penalty, the purpose you think it serves

2  society?

3       A.     Well, it would prevent that person from

4  hurting anybody else, would be my main idea that it will,

5  reason it was a good idea.

6       Q.     Okay.  What types of cases from your personal

7  point of view do you think would be deserving of the death

8  penalty or come into consideration of the death penalty?

9       A.     Well, probably not, unless they had actually

10  murdered somebody else, taken another life.

11       Q.     Okay.  Themselves actually, or a murder being

12  involved in the crime?

13       A.     Oh, dear, I guess I haven't thought about

14  that.

15       Q.     Okay.  That's another -- well, and that's

16  because most people do just think of the actual triggerman

17  or the person that causes the death.  But capital murder,

18  like other crimes, may have accomplices involved, people

19  that help them commit the crime.

20              And the law says that those individuals

21  could be prosecuted, also, and be held accountable.  And in

22  a capital murder situation they may even receive the death

23  penalty, depending on the facts.  You can have more than one

24  person commit a crime, more than one person involved.  Some

25  may have a greater role than others, but you may have only

1    one person that actually causes the death.

2    An example I use is, let's say Mr. Kirlin

3    and I, we decide we want to rob a bank, and we recruit our

4    other friend to drive us there and be the getaway driver.

5    And he waits outside and has the car running.  He's going to

6    take off real fast when we're finished.

7    But we go in and our plan calls for me to

8    have a gun.  And then I go in and point the gun at the

9    tellers and after I get their hands up in the air, he goes

10   behind the counters and starts loading up the money in a big

11   bag, and we're doing this together as a team.

12   Then during the middle of that, I begin

13   shooting, and I kill one of the tellers intentionally for

14   whatever reason.  Maybe I don't like the way they are

15   looking at me or he told me they're going for an alarm, but

16   I kill them intentionally.  And then we escape and we're

17   caught soon afterwards.

18   Obviously, I can be prosecuted for the

19   death penalty, because I actually murdered someone.  The law

20   says that if he's assisting me, actively involved, then the

21   accomplices also could be prosecuted for capital murder and,

22   depending on the facts, they may even get the death penalty.

23   People feel differently about that.  Some

24   of them are fine with the death penalty, if it's the actual

25   triggerman or the person that causes the death.  They don't

1   think it's fair to actually prosecute or give the death

2   penalty to an accomplice, someone that didn't actually cause

3   the death, maybe a long prison term, but not the death

4   penalty.

5                    Then others jurors tell us they do think

6   it's fair and that the law should allow the prosecution of

7   accomplices and even give the death penalty to them,

8   depending on the facts.  But people go one way or the other

9   on that and we like to get every juror's kind of gut

10   reaction on how they feel about the fairness of that or if

11   they think that's appropriate for that type of law.  How

12   about your reaction to that law?

13          A.      Oh, boy, that's a tough one.  And it's

14   strange.  I haven't really given that a lot of thought.

15   You're talking about the getaway driver.  Could he be given

16   the death penalty if found guilty?

17          Q.      Getaway driver or Mr. Kirlin, either one, any

18   of the accomplices involved.

19          A.      Um.

20          Q.      Like I say, there's not a right or wrong

21   answer.

22          A.      I know.

23          Q.      We just like to get your gut reaction on how

24   you feel about that.

25          A.      Probably my gut reaction would be that the

1    person that walked into the bank with you would -- I

2    wouldn't have any objection maybe to the death penalty.  I'm

3    not sure about the getaway driver.

4         Q.    What hesitation do you have there?

5         A.    Because he himself did not actually take a

6    life.

7         Q.    Okay.

8         A.    He helped somebody else to do it, um.

9         Q.    Well, we hope you haven't sat around the house

10   in your retirement thinking of these issues.  It's not --

11        A.    I have not, I really have not, and I am not

12   sure.  I wish I could tell you cut and dried how I feel

13   about it, except that I -- right now as I sit here, I

14   probably would.  It would be my gut reaction that to just

15   give him a real long sentence.

16        Q.    Okay.  Now, one other area I want to get into

17   is what you've actually heard about this case, because

18   almost every juror we talked to saw it on the news or

19   followed it in the paper, that sort of thing.  And you put

20   down a lot of details.  So I take it you followed it some

21   and recall the events.

22        A.    Well, I was totally aghast, like everybody

23   else.  But as I remember, this Officer Aubrey Hawkins was

24   having dinner, it was real close to Christmas, at a

25   restaurant closeby, was called because of this robbery or

1    suspicious people, and went over there immediately, I got

2    the impression during his meal, and was caught offguard or

3    in my words, I didn't read this, like ambushed by these

4    people --

5         Q.    Okay.

6         A.    -- this carload of people.  And when he got

7    out, first, I think, when he first got out of his car, they

8    shot him more than once, I mean, maybe many times.  And it

9    seems like they dragged him and ran over him or something.

10        Q.    Okay.

11        A.    And, um, then another officer was on the way

12   or was coming and he went around to the back or went to a

13   different place, but Officer Hawkins was by himself.

14        Q.    Did you follow the case after the crime?  The

15   arrest or apprehension?

16        A.    Well, yes.  These seven men were finally

17   caught in Colorado Springs at a mobile home park of some

18   sort, pretending to be religious people and they didn't --

19   they were in two different groups, as I remember, four and

20   three, and didn't put up any -- too much of a fight.

21        Q.    Did you follow any of the subsequent court

22   proceedings?

23        A.    Not that I can remember specifically, each

24   person.

25        Q.    Okay.  Did you follow --

1    A.    Just in general.  I thought they were, I think

2    they were all convicted and I'm pretty sure at least two got

3    the death penalty and I'm not sure even about the rest of

4    them.  And one committed suicide right away.

5    Q.    Well, I would say you probably followed it a

6    little more than most people, or at least you remember more

7    than most people as far as your details go.  And, like I

8    said, most jurors have followed it a little bit, some more

9    than others, you probably more than others.  But we,

10   obviously, inquire about that with every juror because of

11   the high publicity.

12                And the bottom line is this.  As a juror,

13   if you were placed on the jury, we can't ask you to forget

14   what you have seen or heard.  Obviously, that would be

15   impossible.  But a jury has to be able to make their

16   decisions just based on what they hear in the courtroom and

17   not base it on anything that they've seen or read or

18   followed in the media.  They can't let that influence them

19   in any way.

20                And some jurors can do that and some

21   can't.  Oftentimes it depends on how closely they followed

22   the case and that sort of thing.  But we just depend on

23   everyone's honesty on that question, because you are the

24   only ones that can really tell us that, whether you -- that

25   may influence you, as far as your opinions go, in the

1    guilt/innocence or punishment or any issues.

2             And this is something we ask every juror.

3    How do you feel about that?  Having followed the case

4    closely, do you think that would possibly influence your

5    verdict in some way?

6         A.    Um, no.  I think I would base my verdict on

7    what I heard in the courtroom.

8         Q.    Okay.  And the fact that you followed the

9    cases closely, you don't feel would influence you, then, and

10   you can assure the Court that you'd make your decisions just

11   based on the evidence?

12        A.    Well, right.  See, I don't know what part this

13   person played in all of this.  So I just know the general

14   outline.  I don't really know the details of each specific

15   participant in this thing.

16        Q.    Okay.  Let me talk about parties just a little

17   bit more, the law of parties.

18        A.    Talk about what?

19        Q.    The law of parties, which is the accomplice

20   situation, someone that didn't actually cause the death, but

21   participated in the crime.

22        A.    Okay.

23        Q.    You didn't have a problem with the person that

24   went in the bank in the example I gave, as far as being

25   prosecuted and maybe even receiving the death penalty; is

1  that right?

2          A.      That's correct.

3          Q.      And I just want to get your reaction on that.

4  Why -- what were your thoughts on that, as far as fairness

5  goes, in the prosecution of that particular accomplice?

6          A.      You mean, why would both these two people be

7  treated the same or -- I'm not understanding.

8          Q.      Yeah, I mean, I understand on the triggerman,

9  but the other person that was in the bank assisting him.

10          A.      Okay.  Because it's obvious to me that he has

11  every intention of -- if he -- he obviously knows the other

12  person has a gun, the two are working together.  He

13  obviously has the intent to hurt somebody.

14          Q.      Okay.  Because he's present during the crime?

15          A.      Well, that, but, also because of his

16  intentions.  He obviously doesn't have a problem with

17  hurting somebody, and that scares me.

18          Q.      Okay.  What about the situation with the

19  getaway driver?

20          A.      See, he's in a little different category in my

21  mind.

22          Q.      Why is that?

23          A.      Why is that?  I don't know.

24          Q.      Well, if you believe that he did have the same

25  type of intentions, but is out in the car, as far as wanting

1   to hurt or believe that may happen, would that change the

2   scenario for you?

3        A.    It may.

4        Q.    The law under conspiracy is if we agree to

5   commit one crime, let's say Mr. Kirlin and I and this

6   getaway driver, and in this case it was bank robbery, and

7   while we're pulling that crime off, one of us commits

8   another crime to further it along, in this example, me

9   murdering someone to get away or whatever reason, then

10  everyone could be found guilty under the law, if the jury

11  believes that they should have anticipated someone could

12  die.

13           They don't have to have the intent,

14  necessarily.  Mr. Kirlin could have sat in the bank and

15  said, hey, don't shoot anybody, but I go ahead and do it,

16  anyway.  He knows I have a loaded gun and I gun someone

17  down.  He doesn't necessarily have to have that intent

18  someone to die.  But under that law, if the jury believes,

19  well, he should have anticipated someone could die, he could

20  be found guilty.

21           Do you see the difference there between

22  having that actual intent, wanting someone to die and not

23  having that, but from all the facts and circumstances, the

24  objective point of view would be, well, you should have

25  anticipated that could happen?

1   A.      Yeah, I think he should have anticipated that.

2   And that's too bad, if he --if he didn't, because he's

3   there.  He's with the guy that's got the gun, and --

4   Q.      So you would agree with that aspect of the law

5   and you think that's fair?

6   A.      Yes.

7   Q.      Okay.  What about applying that should have

8   anticipation to the guy who's the getaway driver who's in on

9   the plan, but his role is to stay outside?

10   A.      I think I would have to hear all the -- all

11   the facts before I could answer that.

12   Q.      Okay.  Well, you're doing a good job of -- I

13   know we're putting you in these little fact situations, but

14   I appreciate your candor.

15               Let me go to a different area.  The trial

16   is divided into two parts.  There's the guilt/innocence

17   stage and the punishment stage.  The guilt/innocence stage,

18   we have to prove the indictment beyond a reasonable doubt.

19   If we fail to do that, then everyone would go home.  It

20   would be a not guilty finding.  But if we do prove our case

21   beyond a reasonable doubt, we then move to the punishment

22   phase where you can hear additional evidence.

23               At the close of that punishment phase you

24   get these questions.  Basically, what the State has to do is

25   prove to you beyond a reasonable doubt that the defendant is

1   a continuing danger to society, that he either intended the

2   death to occur or anticipated that a death would occur, and

3   there's not sufficient mitigating evidence to grant a life

4   sentence.

5               If the questions are answered yes, yes,

6   and no, then the Judge would sentence the defendant to

7   death.  If they are answered any other way, it would be a

8   life sentence.  But those are the only two possible

9   outcomes, once someone has been found guilty.  Are you

10  familiar with the method of execution in Texas?

11          A.      Yes, it's injection.

12          Q.      That's right, lethal injection.  And the laws

13  and procedures are the same in each case.  They would be the

14  same in this case.  If the defendant were found guilty and

15  these questions were answered yes, yes, and no, the Judge

16  would sentence him to death and he would be placed on death

17  row.

18              At some point in time in the future, I

19  can't tell you when, the Judge would actually give him a

20  date of execution.  On that day, or actually the day prior

21  to that, he would be moved from death row down to downtown

22  Huntsville, where all executions take place by law.  You may

23  have seen some of these executions or at least the protests

24  or activity outside the prison on TV.  Sometimes, they film

25  that.

1              Under our law the procedures are the

2    same.   The executions take place at 6:00 p.m.   On that day

3    he's given time with family or a religious person.   He's

4    given a last meal.   But at 6:00 p.m. he's moved to the

5    execution chamber, placed on a gurney which you've probably

6    seen on TV, the photographs of it, secured by leather

7    straps, needles placed in his arms.   Tubes go to another

8    room where the executioner sits.

9              And at that point in time, witnesses

10   would be brought in from the victim's side, as well as from

11   the defendant's side.   After that, the condemned is allowed

12   a last statement and when he concludes that, the warden

13   simply signals the executioner, who then injects lethal

14   substances, which immediately collapse his lungs, stop his

15   heart, and within about ten to fifteen seconds he will fall

16   into a deep coma and die.

17              Those are the procedures and that's how

18   an execution occurs virtually in every case.   And that,

19   quite frankly, is our goal in this case.   We feel we have

20   the type and quality of evidence to convince a jury of this

21   man's guilt and that these questions would be answered in

22   such a way that he'd be executed someday in Huntsville,

23   Texas.

24              Defense takes the opposite view, which is

25   why we're talking to every juror.   It's one thing to talk

1    about it kind of philosophically, about the death penalty,

2    and how you feel about it, should it be enforced.  And it's

3    quite another, once you get down here and realize you might

4    be actually making these decisions.

5         A.    I understand that.

6         Q.    And we can't preview the case and ask you how

7    you would find and, obviously, you've never been in this

8    situation before.  We have some people that we talk to that

9    are against the death penalty and could never serve because

10   they couldn't ignore their beliefs and couldn't make that

11   decision.  And that's fine, we let them go on their way.

12        We have other jurors who are adamantly

13   for the death penalty and really couldn't be objective.  We

14   have other jurors that are for it and could make the

15   decision, if the evidence is there.  And then we have other

16   jurors that are philosophically for the law, think it should

17   be prosecuted, but upon reflection couldn't actually make

18   that decision.  It would bother them too much to make a

19   life-and-death decision and they in good conscience couldn't

20   tell us if they could do that.  And that's fine, if they

21   feel that way, also.

22        But all we can do is -- I want to,

23   obviously, put all my cards on the table.  That is our goal.

24   And I think you've reflected upon that and realize how

25   serious the situation is.  You've told us philosophically

1    you do believe in the death penalty.  Do you feel you're the

2    type of person who could make these decisions and take pen

3    in hand, if it's proven to you, and answer the questions in

4    a way, knowing he would be executed someday?

5        A.      Well, I think I wrote in my questionnaire the

6    adverse part of me and the death penalty would be me having

7    to live with myself, knowing that I had helped to find

8    somebody guilty and given the death penalty.  And, um, I

9    could do it.  I don't know what kind of effect it would have

10   on me, if any, afterwards.

11       Q.      Okay.  You feel you could make the decision,

12   though?

13       A.      I feel I could make the decision.

14       Q.      Okay.  If you would, just take a moment and

15   read Special Issue No. 1 to yourself.  That question is

16   asking the jurors to make a prediction about how the

17   defendant would behave in the future.  Do you feel you could

18   answer that question, if you were given enough information?

19       A.      I could give my opinion.

20       Q.      Okay.  Could you -- some people tell us I

21   could never answer the question yes, because it's

22   predicting.  Other people tell us, yeah, if I'm given enough

23   facts, I think, I'm comfortable making that type of

24   decision.

25       A.      Yeah.  All I could do is give an opinion.

1    Whether that opinion came true after all was said and done,

2    it would be something else, but I can --

3         Q.    What would be important to you in making that

4    decision?

5         A.    I'm sorry, I don't understand.

6         Q.    What type of information would you want to

7    know before you answered that question?

8         A.    Oh.  Well, I would have to know a lot about

9    his character, what he's done in the past.

10         Q.    Prior criminal record is admissible, you know.

11    We can put on his crimes, that sort of thing.  You can even

12    hear from the witnesses.  Learn what type of punishment he

13    received.  You can hear good things, also.  It's kind of

14    "This Is Your Life."  Obviously, you get to consider their

15    role in the crime, the type of crime they committed, because

16    you don't get to this question, unless you have found the

17    defendant guilty --

18         A.    Uh-huh.

19         Q.    -- of capital murder beyond a reasonable doubt

20    and then you may get this additional evidence.  The law says

21    that the question starts out with a no answer and then it

22    should be answered yes.  The State has to prove to you

23    beyond a reasonable doubt it should be answered yes.

24              The fact that he's been found guilty,

25    doesn't mean there's an automatic answer that it should be

1    answered yes.  You have to wait and listen to all the new

2    evidence and then make that decision.  Do you feel you could

3    do that?

4         A.    Yes.  I -- um, I know that all of these people

5    had been convicted of something or they wouldn't have been

6    in prison to begin with, and it must have been -- I don't

7    know what they were convicted of, but it must have been

8    pretty bad for them to be in prison.  So that would color my

9    thoughts.

10        Q.    How would it color your thoughts?  In what

11   way?

12        A.    Well, knowing that before all of this

13   happened, they were found guilty of whatever it was they

14   were found, they were bad guys.

15        Q.    And you have read that in the --

16        A.    Well, I just know they were in prison.

17        Q.    Okay.

18        A.    I don't know what for.

19        Q.    Do you think that would influence you, what

20   you know about them from being in prison, in your

21   decision-making process before we even --

22        A.    It would enter into the first question, this

23   Special Issue 1.

24        Q.    Okay.

25        A.    My answer to that.

1      Q.      Okay.  And would that make you more prone to

2   believe that they would be a danger to society?

3      A.      Going in, unless it was proven to me

4   otherwise, yes.

5      Q.      Okay.  Well, the State has to prove to you

6   that it should be answered yes.  And we may do that by

7   putting on those facts.  But the requirement is that we have

8   to prove that to you beyond a reasonable doubt.  I mean, if

9   you never heard -- again, this case is kind of difficult,

10   because you've seen a lot of it on TV.

11      A.      Yes.

12      Q.      But, again, the rule is you have to make your

13   decisions just based on what you hear in the courtroom.

14      A.      Right.

15      Q.      And if that was never proven to you, well, the

16   point I'm getting at is, you have to wait for the actual

17   evidence to come on, not what you have heard on TV or

18   anything.  Do you feel you could do that?

19      A.      Well, did you say that the fact that they had

20   been in prison could be included in --

21      Q.      Any criminal background could be brought up.

22      A.      So the answer to your question is yes.

23      Q.      Okay.  So you would wait and then require the

24   State to prove its case beyond a reasonable doubt?

25      A.      Yes.

1      Q.    And if we did that, you could answer it yes,

2  if we meet our burden of proof?

3      A.    Yes.

4      Q.    Okay.  Because the defense is never required

5  to prove that it should be answered no.  Now, I anticipate

6  they'll make arguments and may put on witnesses, but you

7  can't ever shift that burden and require them to.  The

8  burden of proof always has to stay on the State.

9      A.    Right.

10      Q.    You feel you could do that?

11      A.    (Prospective juror nods head.)

12      Q.    Okay.  Now, if you'd look at Special Issue No.

13  2 for a moment and read that to yourself.

14      A.    (Prospective juror complies.)

15      Q.    That's that question that has to do with the

16  accomplice situation.  It kind of runs on.  We like to let

17  every juror know we didn't write the questions.  Someone

18  down in the Legislature did, because they get kind of

19  confusing.

20            But the first part of the question asks

21  whether the defendant actually caused the death of the

22  deceased.  Now, if he's the actual triggerman, the question

23  is answered there.  The rest of the question has to do with

24  that accomplice situation.  They didn't actually cause the

25  murder, in my example, the guy that helped fill up the money

1   or the getaway driver.

2          If they didn't actually cause the death,

3   but intended to kill the deceased, they had that intent

4   there, or another, or anticipated that a human life would be

5   taken, then the jury would answer that question yes.  Do you

6   remember, to get someone guilty, we had to prove that they

7   should have anticipated, whether they had that intent or

8   not.

9          And here we have to go another step and

10   prove that they actually did anticipate.  It might be the

11   same facts.  The jury looks at it from an objective point of

12   view, because we can't open someone's head up and say,

13   here's what his intent was.  But we can present all the

14   surrounding facts and circumstances and you can determine

15   with your common sense, make reasonable deductions, what a

16   person's intent is from his actions and from the evidence.

17          And that's what jurors have to do with

18   that question.  Do you feel comfortable making that type of

19   decision and answering that type of question, if you are

20   given enough facts?

21      A.     I think so.

22      Q.     Okay.

23      A.     I know that's not a yes or no.

24      Q.     Well, you know, when we ran that one example

25   by you, you didn't really have much of a problem, especially

48

1  with the guy that was in there, even though he didn't cause

2  the death.  And I don't know what all the facts would be,

3  but it would be all the surrounding facts, as well as

4  anything you might learn about them in the punishment phase,

5  in their criminal background, that sort of thing.  That

6  might help you, too.

7                  Again, this is a question which calls for

8  an accomplice, someone that didn't actually cause the death.

9  If that question is answered yes, and then that last

10  question is answered no, they would then be executed.  And

11  they didn't ever actually cause the death.

12                  But that's the accomplice question.  And

13  bottom line that I need to ask you is, if you feel

14  comfortable answering that question and feel that you could,

15  if you were given enough facts and circumstances?

16      A.      I think so.

17      Q.      Okay.  Do you have some hesitation on that?

18      A.      Well, it's like you say, it's hard to know

19  what somebody's anticipating.  And I would have to -- I

20  would have to feel like he knew or planned that this would

21  happen.

22      Q.      Okay.  When you say planned, that they said

23  we're going to kill someone when we commit this crime, or

24  what do you mean exactly?

25      A.      Well, the word "anticipated," I'm just kind of

1   putting in my word "planned."

2          Q.      Okay.   How about planning for the possibility

3   that might occur?   Would that also come in your personal

4   definition?

5          A.      I would think so.

6          Q.      Okay.   Okay.   Let's look at Special Issue No.

7   3.   That's the last question you get to and that one is even

8   longer.   So take a moment to read that.   It's a little

9   different from the others.

10         A.      (Prospective juror complies.)

11         Q.      What is mitigating?

12         Q.      Well, that's the main point of that question.

13  We can't tell you what mitigating is.   It can be anything,

14  actually.   It's anything that lessens, we say oftentimes, a

15  person's moral culpability.   What mitigating evidence is, we

16  can't tell you.   It can be anything a juror thinks should be

17  mitigating.   You don't even have to agree with the other

18  jurors.

19                 You know, an example I give is you may

20  hear a capital murder case where a defendant went to Harvard

21  and had four degrees.   One juror might think that's

22  mitigating because he's smart or has some degrees.   Another

23  juror might actually think that's aggravating.   Someone that

24  smart shouldn't get themselves in that kind of trouble.

25                 But it's up to the individual juror.   And

1   it could be any type of evidence.  Anything in the crime,

2   their role, or anything in their background.  Either side

3   can put it on, but no one is required to prove that to you

4   one way or the other.  You just have to be able to keep your

5   mind open to it.

6              Do you, as you sit there today, does

7   anything come to mind that you might view as potentially

8   mitigating evidence?

9        A.     I'm still confused as really, mitigating, does

10   that mean it has an effect on?

11        Q.     Yeah, it could.  Well, I'll give you an

12   example.  Sometimes we talk about someone's background,

13   maybe the way they were raised.  You know, maybe they had a

14   harsh background.  Maybe they were abused as a child,

15   physically, mentally.  Some jurors have told us, well,

16   that's mitigating to me, or it could be.

17              Other jurors say, it might be mitigating

18   a little bit, but then again, people have to be, you know,

19   responsible for their actions when they are an adult.  Lots

20   of people it's happened to and they turn out just fine.

21              So there isn't a just, you know, this is

22   mitigating.  It could be anything like that.  But oftentimes

23   you hear about a person's background, by the way they were

24   raised, and that sort of thing.  Does that strike you one

25   way or the other about the person's background?

1    A.    I'm sorry?

2    Q.    Do you think that's the type of -- do you have

3    any opinions on that type of background evidence as far as

4    mitigation goes?  A person's upbringing and that sort of

5    thing?

6    A.    Okay.  First of all, I need to get clear in my

7    mind.  The word "mitigating" means like could change or

8    could have an effect on the circumstances that you are

9    looking at?  Mitigating?

10    Q.    Well, mitigating is, you don't get to it until

11    you have already found they're guilty and they're a

12    dangerous human being and they intended someone to die.

13    They're well on their way to a death sentence at that point

14    in time.  And then mitigating is something in their

15    background where you think, well --

16    A.    You're going to give them a break?

17    Q.    I'm going to give them a break, show some

18    mercy --

19    A.    Okay.

20    Q.    -- that sort of thing, even though you think

21    he's dangerous and intended someone to die.

22    A.    I see.  Okay.  Okay.  Oh.  In other words, can

23    you blame this on his background or something that's

24    happened to him in the past or, and --

25    Q.    Exactly.

1     A.     Okay.  Well, at that point I don't think so.

2     Q.     And why is that?

3     A.     Because they're already found guilty and just

4 because they had something bad happen to them, or they, you

5 know, whatever, parents were mean to them, or whatever,

6 that's no excuse.  They're adults now.

7     Q.     Okay.  So at that point, if you've gone down

8 that far where they're guilty and in your mind they are a

9 continuing danger to society and did anticipate or intend

10 someone to die, then at that point, as you said, it really

11 doesn't matter?

12     A.     That's correct.

13     Q.     Okay.

14          MR. SHOOK:  Judge, that's all the

15 questions I have at this time.  I appreciate your candor

16 with us.

17          PROSPECTIVE JUROR:  Sure.

18          MS. BUSBEE:  We've reached an agreement

19 on this juror, Your Honor.

20          THE COURT:  Ms. Rasmussen, we want to

21 thank you for your jury service this morning to the Court.

22 The parties have agreed to excuse you.  And don't worry

23 about it, there are a lot of people that don't make this

24 jury.  We appreciate you coming down and have a safe trip

25 back.

1          PROSPECTIVE JUROR:  Thank you.

2               [Prospective juror out]

3               (Recess)

4          THE COURT:  Mr. Bosworth.

5               [Prospective juror in]

6          THE COURT:  Good afternoon, sir.

7          PROSPECTIVE JUROR:  Good afternoon.

8          THE COURT:  We have juror No. 4343,

9  Mr. Lawrence Edward Bosworth.  Welcome to the 283rd,

10  Mr. Bosworth.  Have you had enough time to read the guide I

11  provided for you this afternoon?

12          PROSPECTIVE JUROR:  Yes, sir.

13          THE COURT:  I know it's a lot of law to

14  give anybody and we don't expect you to understand it all at

15  this point.  The lawyers will go over all of this with you.

16  This is your opportunity to have a question and answer with

17  the attorneys, so you ultimately do understand the law.

18          I also gave you a copy of the

19  questionnaire.  Hopefully, you reviewed that.  I see that

20  you did and they may want you to expound upon an answer that

21  you provided back in May.  It helps to get you thinking

22  about the issues that are before the Court.

23          At the end of the process I have two

24  questions I must ask.  Number one is, do you understand the

25  law?  And, number two, can you follow the law?  That's the

1   big picture I have.

2               The only question I have for you at this

3   point before we begin is will you be able to serve this

4   Court for a period of two weeks beginning November 10th?

5               PROSPECTIVE JUROR:  Yes, sir.

6               THE COURT:  Thank you.  Mr. Shook, would

7   you like to inquire?

8               MR. SHOOK:  Yes, Judge.

9               LAWRENCE BOSWORTH,

10  having been duly sworn, was examined and testified as

11  follows:

12               DIRECT EXAMINATION

13  BY MR. SHOOK:

14       Q.     Mr. Bosworth, my name is Toby Shook.  I'll be

15  asking questions on behalf of the State this afternoon.

16  And, as the Judge said, there aren't any right or wrong

17  answers.  We just want your honest opinions.

18               Because this is a capital murder case, we

19  talk to each juror individually which sometimes jurors have

20  told us they feel like they are kind of on trial because

21  they're up on the witness stand.  And we certainly don't

22  mean for them to feel that way, but we understand.  But it's

23  a pretty good process for getting information.  And if you

24  have any questions at any time, feel free to ask.  I'm going

25  to --

1      A.      I have one now, if you want me to ask it.

2      Q.      Sure.

3      A.      I was reading the handout that the Judge gave

4   me and I'm looking at No. 5B under 19.03 capital murder.

5   And I had a question of what participate in a combination or

6   in the profits of a combination.  Does that mean a

7   combination of the points made above or what exactly does

8   combination mean in that sense?

9      Q.      Well, I don't have the handout in front of me,

10  perhaps the Court could enlighten him.  It's his handout.

11              THE COURT:  We haven't looked at it in

12  several months, I don't think.  If you would --

13              PROSPECTIVE JUROR:  It's on the top of

14  page 3, I believe, the first line there.

15              THE COURT:  Okay.  The specific question

16  is under 19.03 capital murder, Section 5, the person, you

17  can commit capital murder on a person while they are

18  incarcerated in the penal institution, murders another, (a)

19  who is employed in the operation of the penal institution,

20  that would be like a jailor or anyone who is employed there

21  in the penal institution, or (b) with the intent to

22  establish and maintain or participate in a combination or

23  profits of the combination.

24              That is going to go with the conspiracy

25  portions of the law that I've also provided you under the

1   penal institution situation.  So you can have a combination

2   of two or more inmates that combine for a murder inside the

3   penal institution.

4                    PROSPECTIVE JUROR:  Okay.

5                    THE COURT:  Does that make sense?

6                    PROSPECTIVE JUROR:  Yeah.

7                    THE COURT:  Mr. Shook, does that satisfy

8   the --

9                    MR. SHOOK:  Sounds good to me, Judge.

10       Q.    (By Mr. Shook)    Combination can also mean

11   organized criminal activity, covering all kind of things

12   like gang activities, other types of organized criminal

13   activity.

14       A.    I see.

15       Q.    I'll start off with a few things from the

16   questionnaire.  I saw you walk in here and I see that you

17   used to play football and I was wondering if you had started

18   up this past weekend and had gotten an injury, or what?

19       A.    No, I don't play anymore.

20       Q.    Okay.  Is that a recent injury you had?

21       A.    No.  It's a medical condition that goes back

22   about six, seven, or eight years.

23       Q.    Okay.  Would you be able to, because of your

24   injury, be able to concentrate on the evidence and the

25   witnesses, if you had to sit here all morning --

1      A.      Yes, I would.

2      Q.      -- and afternoon?

3      A.      I'd be all right.

4      Q.      You're given breaks during the day and that

5   sort of thing.

6      A.      I'd be fine.

7      Q.      Okay.  I see you are from Connecticut

8   originally, and then came down here to Texas and you've been

9   down here --

10      A.      Ever since.

11      Q.      -- ever since.  What brought you down here?

12      A.      Graduate school.

13      Q.      Okay.  And have you been in the Dallas area

14   since that time?

15      A.      Yes, I have.

16      Q.      Okay.  And you currently work for Web Link and

17   you -- what exactly do you do with them on a day-to-day

18   basis?

19      A.      I sit in front of a computer.  I'm a network

20   -- I maintain -- we were a pager company and I sit in front

21   of a computer with a telephone and I talk to techs.  I

22   recognize if a site or transmitter goes down, I have to call

23   a tech to dispatch them to fix the problem.

24      Q.      Okay.

25      A.      Things like that.  I have to maintain the

1    network, is what it is, basically.

2            Q.      Okay.   And several years back I saw that you

3    had several leadership positions with MADD?

4            A.      Yes, sir.

5            Q.      It looked like you probably got involved

6    because your mother-in-law was actually killed by a drunk

7    driver?

8            A.      Yes, sir.

9            Q.      Are you still a member of MADD?

10           A.      Well, every victim is.   I'm considered a

11   victim, so every victim is a member for life, although I

12   don't per se pay dues or anything.

13           Q.      Okay.   And you haven't held office?

14           A.      No.   I'm still -- I'm like on the peripheral

15   of it.

16           Q.      Okay.   Anything about that experience or

17   membership with MADD or the experience with your

18   mother-in-law do you think might cause you to be biased in

19   any way at all in this type of case?

20           A.      No, not in this type.

21           Q.      Okay.

22           A.      It would if it was a DWI.

23           Q.      Okay.   I figured that, but I just wanted to

24   make sure, because --

25           A.      No.   This, it wouldn't make any difference.

1    Q.    Because I know you've been pretty involved.

2    A.    Yeah.

3    Q.    Let's talk a minute about capital murder and

4 the death penalty and how you feel about that.

5    A.    Okay.

6    Q.    Are you in favor of the death penalty as a

7 law?

8    A.    Yes.

9    Q.    Tell us kind of in your own words why you are

10 in favor of it and the purpose you think it serves.

11    A.    Well, I think it's, um, I think it's wrong to

12 kill somebody and it's like an eye for an eye.  I think if

13 you -- if you kill somebody, then it's only fair that you

14 should answer to the consequences.  And if you were -- it's

15 just a question of whether you thought about it, what you

16 were doing before you did it, or whether it was just a spur

17 of the moment.  And the only justification I see for

18 actually killing anybody is whether it's your life or

19 theirs.

20    Q.    Self-defense situation?

21    A.    Yeah.

22    Q.    How long have you believed in the death

23 penalty?  Has it been something your whole adult life or

24 something you just came to believe in as you grew up?

25    A.    Um, I think it was probably just something I

1    came to believe in as I grew up.

2          Q.     Okay.  Not any one event or anything like

3    that?

4          A.     No, I don't think so, sir.

5          Q.     From your own personal point of view, what

6    types of crimes do you feel could be appropriate for the

7    death penalty?

8          A.     Murder, killing a child, innocent, you know, a

9    small child.  Those are the big two that I can think of

10   right now.

11         Q.     Any crimes other than murder, if it were up to

12   you, you might put up for consideration of the death

13   penalty?

14         A.     Maybe rape, would depend on circumstances and

15   what happened afterwards, and --

16         Q.     The death penalty in Texas is reserved for

17   just certain types of crimes, you know.  Right now it's

18   murder cases and then just certain murder cases.  We call

19   them murder plus something else.  You have to have an

20   intentional killing.  Someone forms the intent and it may

21   only take a few seconds to do that, but they have to have

22   the specific intent to kill, not self-defense, not an

23   accident.  Self-defense would be a legal defense.

24                So we talk about it as being an

25   unjustified homicide, I guess you could say, plus some other

1  aggravating facts, such as murder in the course of a felony,

2  such as a situation if someone went in and robbed a 7-Eleven

3  and shot the clerk down intentionally.  That could be a

4  death penalty case.  Or murder during a burglary, breaks in

5  the home.  Murder during an arson or kidnapping, murder

6  during a rape.  Also, murder of child under the age of six.

7  The Legislature chose that age.  I think a lot of people,

8  when we talk to them, would like to have that moved up, but

9  they had to choose some age.

10            Murder of a police officer on duty,

11  fireman on duty, murder for hire, your serial killer

12  situation, more than one victim.  Those are generally the

13  types of cases which call for consideration of the death

14  penalty.  From your personal point of view, are those the

15  types of cases you feel could be appropriate for the death

16  penalty?

17      A.      Yes, sir.

18      Q.      Okay.  Another area is what we call the law of

19  parties, which is more commonly known as accomplices.  You

20  know, you oftentimes have more than one person that may

21  commit a crime.  Sometimes several individuals together go

22  to commit a crime, and some may have a greater role than

23  others.  Same is true with capital murder cases.

24            When we think of a capital murder

25  situation, we generally think of the triggerman.  The

1   example I gave is someone going into a 7-Eleven and shooting

2   the clerk.  But you can also have accomplices that, if they

3   don't actually commit the killing themselves, they may help

4   with the crime, are actively involved in the crime.  And the

5   law says that they, too, under certain facts can be

6   prosecuted, could even receive the death penalty under

7   certain facts.

8                An example I like to give is let's say

9   Mr. Kirlin and I here decide we wanted to rob a bank.  We

10  recruited another guy to help us because he's got a fast

11  car.  He's going to be our getaway driver.  Our plan calls

12  for him to drive us there, keep the car running right

13  outside the bank, warn us if anyone is coming.

14               We run in and I have a loaded gun.  I

15  threaten everyone with it, they raise their hands in the air

16  and while I have them subdued, Kirlin goes in and loads up

17  all the money in a bag.  So we're all actively involved.  We

18  have different roles in the crime.

19               Then during the course of that robbery, I

20  intentionally murder one of the clerks, the tellers.

21  Perhaps I just don't like the way they're looking at me or

22  Kirlin tells me this one is going for an alarm, but I shoot

23  them down and then we leave.  We're caught three blocks

24  away.

25               Obviously, I could be prosecuted for the

1  death penalty because I murdered that individual during the

2  course of a robbery.  But the law says because they were

3  actively involved, they could also be prosecuted, might even

4  receive the death penalty, depending on all the facts.

5          But jurors feel differently about that

6  concept.  We have some that agree with the death penalty, if

7  it's a situation involving the actual triggerman.  They

8  think that's fair and just, if you take a life, then you may

9  have to give yours up.

10          They feel differently about an

11  accomplice.  They don't think that's fair that someone who

12  didn't actually cause the death being prosecuted for capital

13  murder or receiving the death penalty.  If it were up to

14  them, they would reserve maybe a long prison sentence under

15  a different crime, but not the death penalty.

16          And then other jurors do feel it's just

17  to prosecute accomplices for various reasons.  But they feel

18  it is fair and that a nontriggerman can get the death

19  penalty in certain fact situations.  But everyone feels

20  differently.  You know, people fall one way or the other.

21          And we like to get your gut opinions,

22  every juror's kind of gut reaction to that on how you feel

23  about the prosecution of accomplices in a death penalty

24  situation.  What are your thoughts on that?  Do you feel

25  that's fair?  Do you agree with that?  Or do you feel a

1    different type of punishment should be reserved for an

2    accomplice?

3          A.     Well, um, I think it's fair because if he was

4    involved, he knew what he was getting into to start with.

5    And although he should know that during the course of

6    events, many times things don't happen the way they are

7    supposed to happen.  So he should take that into account

8    before he gets involved.  And if it's a possibility, then he

9    should be able -- he should think about it, you know, as a

10   possibility, and so that would put him basically, you know,

11   in the same position as what happened inside.

12         Q.     And do you feel that, then, it would be a fair

13   and just punishment, depending on the particular facts for a

14   death sentence in those situations, too?

15         A.     Yeah, it would depend on what the facts were.

16         Q.     Okay.  Well, we always like to get your gut

17   opinion, but your opinion is right in line with the law.

18   There's two theories, as far as the prosecution of

19   accomplices.  One is if you are directing, aiding, carrying

20   out the crime, you can be found guilty as what we call a

21   party.  It's actually an accomplice.

22                And the other is the conspiracy theory.

23   Basically, using my example, if more than one person

24   conspires to commit one crime, and that merely means, you

25   know, we agree to commit it, me and Kirlin agreed to commit

1    the bank robbery along with the other guy, and one of us,

2    while we're committing that crime, commits another felony to

3    further that conspiracy along, me shooting the clerk, then

4    everyone can be found guilty and be held accountable, if

5    they should have anticipated that that could occur.  And

6    that kind of correlates with what you said, should have

7    known.

8         A.    Yeah.

9         Q.    The law says, even if you don't have the

10   specific intent as an accomplice to kill, if, from all the

11   facts you should have anticipated a death would occur, you

12   could be found guilty.  And to get to that death sentence,

13   we have to go one other step.  And maybe it's the same

14   evidence and maybe it's additional evidence, that it goes

15   that you did anticipate.

16              But I think it goes along with your

17   reasoning is from all the facts, should they have known or

18   should they have anticipated?

19        A.    Yeah.

20        Q.    And I can't get into the facts of the case,

21   but that's the legal theory we're prosecuting this case

22   under.  And I take it from your answers, you don't have any

23   disagreement with that, as far as that area of the law?

24        A.    No, I don't.

25        Q.    Okay.  Now, a capital murder case, like all

1 criminal trials, is divided into two parts. There's the

2 guilt/innocence stage where we have to prove the indictment.

3 If we fail to do that, it's a not guilty and the trial ends.

4 If we are able to prove beyond a reasonable doubt the guilt,

5 we then move to the punishment phase, where you may hear

6 additional information.

7          At the close of that, you then get these

8 Special Issues, which we'll go over in more detail in a

9 minute. Special Issues, basically, what the State has to

10 prove, is that the defendant would be a continuing danger to

11 society, that he either caused the death or intended the

12 death to occur, or anticipated that a death would occur.

13          And, lastly, the jury reviews mitigation

14 evidence and if you don't, if there is not sufficient

15 mitigating evidence to warrant a life sentence, you would

16 answer it no. If there is, you'd answer it yes. But if the

17 first two questions are answered yes and the mitigation

18 question is answered no, then the Judge would sentence the

19 defendant to death. And if they're answered any other way,

20 it would be a life sentence.

21          But those are the only two possible

22 outcomes, once we have gotten to the punishment stage. The

23 jury doesn't write life or death in, but it's determined by

24 how you answer those questions. Is that clear to you?

25      A.      Yes, sir.

1        Q.      Are you familiar with the method of execution

2   here in Texas?

3        A.      I believe I am.

4        Q.      Lethal injection?

5        A.      Lethal injection, yeah.

6        Q.      It's been that way for quite some time and the

7   procedures are the same.  You probably know from living here

8   for the past 20 some-odd years that Texas actually does

9   execute defendants, in fact, leads the nation in executions.

10  Some states have the death penalty on the books.  They

11  either never prosecute it or if they do, they don't carry

12  out the executions.  But Texas is one of those states that

13  actually does.

14                 It's one thing to talk about it

15  philosophically.  It's another thing to talk about it where

16  you may actually be on a jury where you make these

17  decisions.  But we always want to emphasize the fact, and I

18  think once you're down here, obviously, you realize that

19  this is a very real situation in which executions do take

20  place.

21                 The procedures are the same.  If the

22  defendant were found guilty and the questions answered yes,

23  yes, and no, the Judge would sentence him to death.  He'd be

24  placed on death row and at some point in time get a date of

25  execution.  On that day or shortly before, he'd be moved to

1   the Huntsville prison where you may have seen on the news,

2   they protest sometimes outside of that big clock tower?

3       A.      Yes, sir.

4       Q.      On the date he gets a last meal.  He gets time

5   with family, a minister.  But at 6:00 p.m. by law the

6   execution takes place, where he's taken to that room,

7   secured on the gurney, needles placed in his arm.  Then

8   there's witnesses brought in.  Two viewing rooms, one for

9   the victim's side, witnesses for the defendant's side, and

10  he's given a time to make a last statement.

11          They often carry those in the paper.  He

12  may proclaim his innocence.  He may protest the death

13  penalty.  He may ask for forgiveness.  But at the conclusion

14  of that statement, the warden simply signals the executioner

15  who injects chemicals which will shut down his lungs, his

16  heart.  He will lapse into unconsciousness and die within 10

17  to 15 seconds.

18          I don't mean to be morbid to go over all

19  of that, but that is our goal in this case, to be quite

20  frank with you.  We feel we have the type of evidence that

21  will convince the jury of his guilt and these answers will

22  be answered in that way, which will result in his execution.

23          You have told us from a philosophical

24  point of view, your personal point of view, that you believe

25  in capital punishment, believe in the death penalty, in

1   certain situations.  Do you feel, as best you know yourself,

2   that you are the type of person who could sit on this jury

3   and if it's proven to you, take pen in hand and make these

4   decisions, knowing the defendant would be executed someday?

5        A.      Yes, I do.

6        Q.      Okay.  Let's talk for a minute about these

7   Special Issues then, and I'd like you just to for a moment

8   read that first one to yourself.

9        A.      (Prospective juror complies.)

10       Q.      That question asks -- it asks the jurors to

11  kind of make a prediction about how the defendant would

12  behave in the future.  Do you feel comfortable answering a

13  question like that, if you are given enough information?

14       A.      Yeah, I could.

15       Q.      What types of information would you want to

16  know before you answer that question?

17       A.      Um, well, I would want to know probably

18  something about his past, how he grew up, where he grew up,

19  you know, what his parents were like, his childhood.  Um,

20  when did he start, is this the first violent thing that he

21  did or was he violent before, looking for a pattern maybe.

22  You know, of course, according to the evidence of the trial,

23  you know, what he did to get arrested this time.

24       Q.      Okay.

25       A.      You know, I mean, his participation in the --

1    Q.    His role in the events?

2    A.    His role in the events or whatever.

3    Q.    All that information is available to the jury,

4  if it exists.  If a person has been prosecuted before,

5  committed criminal acts, you could even hear from those

6  particular witnesses.  You can hear about the sentence

7  they've had.  You can even hear about bad acts that they

8  haven't been prosecuted, if it can be proven to you.

9    A.    Yeah.

10   Q.    You can hear good things.  You can hear bad

11 things.  It's kind of an entire background, as well as the

12 information you heard in the guilt/innocence stage about the

13 crime itself, their role in it.  It all goes into answering

14 that question.

15       The question starts out with a no answer.

16 Just because you found the defendant guilty, you don't

17 automatically answer yes.  What the law requires the jurors

18 to do is to wait and listen to all the evidence, any new

19 information about the person's background, and that sort of

20 thing, may come in at that point in time.  Then you go back

21 in the jury room and answer that question.

22   A.    Right.

23   Q.    You must require the State to prove it to you

24 beyond a reasonable doubt, based on all the evidence.  Do

25 you feel you could do that?

1    A.    Yeah.

2    Q.    Okay.  Now, you, like most of our jurors,

3  heard something about this case.  It received quite a lot of

4  publicity.

5    A.    Yes, sir.

6    Q.    And that doesn't make you ineligible to be a

7  juror.  If that were true, then we'd never get a jury in

8  these high publicity cases.  But we like to ask each juror

9  what they recall seeing in the news, what they've read in

10  the paper, that sort of thing.  What is it you recall about

11  the events that you followed?

12    A.    Well, it was a long time ago, but probably the

13  first I heard about it was when they escaped from prison.

14  And then, of course, the fact that they were at large for a

15  while.  Then there was the incident at the sporting goods

16  store that put them in our area of north Texas.  And then I

17  believe the newspaper had a little bit of background on each

18  one, but I don't remember.

19    Q.    Okay.

20    A.    I wasn't interested in -- oh, I mean, I read

21  about it, but I've -- it's been so long that I don't know, I

22  don't remember it.  And then the -- then there was a

23  capture, I believe in Colorado or some place, in a trailer

24  on the way to -- some of them were arrested at a store, and

25  one person committed suicide, killed himself.

1    Q.    Okay.

2    A.    Everything I got, basically, was from either

3  the TV or the newspaper.

4    Q.    Okay.  Do you recall, did you follow any of

5  the subsequent court proceedings?

6    A.    Not really.

7    Q.    Okay.  The bottom line is this.  Even though

8  you've seen something on TV, followed the news, doesn't mean

9  you are ineligible.  We can't ask you to forget what you've

10  seen, obviously.  You've seen things and formed opinions on

11  that.  But as a juror you have to be able to judge the case

12  just on the facts from what's produced in the courtroom from

13  the witnesses and other evidence.

14         You can't be influenced by anything you

15  have read or seen.  You have to make your decisions based

16  solely on the evidence you hear in the courtroom.  It's kind

17  of a discipline thing, obviously.  And we depend on each

18  juror to tell us, quite honestly, if they would be able to

19  follow that rule of law or not, because only you can tell

20  us, if you'd be able to do that.

21         It's kind of a common sense rule that the

22  media, obviously, doesn't get things right all the time.  So

23  your more accurate information is, obviously, going to come

24  from the witness stand.  We could cite lots of examples

25  where the media has gotten it wrong.  But it's kind of just

1    a common sense principle.

2              How do you feel?  Would you be able to

3    follow that particular rule of law and if chosen and placed

4    on this jury, make your decisions just on what you hear here

5    in the courtroom?

6         A.    Yeah, I think I would.  I don't think I really

7    know that much about it, you know, other than things that

8    were publicized, the big things that were publicized.

9         Q.    Just general facts?

10        A.    Yeah.

11        Q.    All right.  Going back to question No. 1 then,

12   you know, you don't get legal definitions for any of these

13   words in these Special Issues.  The definitions will be left

14   up to you and the other jurors.  So let's go over a few of

15   those.  We have to prove there's a probability the defendant

16   would commit criminal acts of violence.  When you see

17   "probability" in that question, what does that mean to you?

18        A.    That means -- that means -- well, it's like

19   the scales of justice, one way or the other, you know.

20   Whether there's more on the side that he would or there's

21   more on the side that he might not.

22        Q.    Okay.  That's a good way to put it.  The

23   Courts have given us some direction.  They've used the term

24   more likely than not.

25        A.    Yeah.

74

1       Q.      Which correlates with that.  The only other

2  direction they've given us is we don't have to prove it's a

3  certainty.  I don't think we could ever prove that.

4       A.      Yeah.

5       Q.      And it's certainly more than a possibility,

6  because anything is possible.  We have to prove that he'd

7  commit criminal acts of violence.  What does criminal acts

8  of violence mean to you?

9       A.      That would mean probably another murder,

10  something with a gun or knife, or violence, rape, maybe,

11  acts like that.

12      Q.      Okay.  Any type of violence to --

13      A.      Violence to a human being.

14      Q.      -- another human being?

15      A.      Yeah.

16      Q.      Could it be threats of violence, also?

17      A.      I don't know if I would go with threats of

18  violence, unless there was a gun or something else involved.

19      Q.      Okay.  When you see acts of violence that

20  would constitute a continuing threat to society, what does

21  that mean to you, threat to society?

22      A.      That means human, whatever a human would be.

23  That's against a human being.

24      Q.      Okay.

25      A.      Basically.

1    Q.    Could it mean anyone the defendant may come

2  into contact with?

3    A.    Yes.

4    Q.    On the street or as well as in prison,

5  inmates, guards, school teachers that might be there, that

6  sort of thing?

7    A.    I wasn't really thinking about in prison.  I

8  was thinking more of on the streets and in public places

9  like that, although the guards are actually -- you know, I

10  wasn't really thinking of other inmates, to tell you the

11  truth.

12    Q.    More or less the guards and the civilians?

13    A.    General society, yeah.

14    Q.    Okay.  Again, that question starts out with a

15  no answer.  We have to prove to you beyond a reasonable

16  doubt it should be answered yes.  You have to look at it

17  independently of the guilt question.

18        In other words, just because you found

19  him guilty, you don't say, well, if he's guilty of capital

20  murder, he's a danger.  That very well may be true, but

21  there might be situations or facts that show you he's not a

22  danger.  It's just something you have to base on the

23  individual facts of each case.  Do you feel you could do

24  that?

25    A.    Yes, sir.

1    Q.    This second Special Issue, Special Issue No.

2   2, if you'd take a moment and read that to yourself.

3    A.    (Prospective juror complies.)

4    Q.    That has to do with the accomplice situation

5   we've already talked about.  It covers about three different

6   situations.  It starts out with a no answer, also.  You use

7   the facts of the case in guilt/innocence to resolve that, as

8   well as any additional information in the person's past or

9   background which might help you.

10              It may be the same exact facts you looked

11   at in the guilt/innocence stage.  You're just looking at it,

12   kind of from a different angle.  But the first part of the

13   question asks whether the defendant actually caused the

14   death of the deceased.  That's pretty simple, if you think

15   he's the triggerman and the evidence showed it, you would

16   answer it yes.

17              The other part of the question covers

18   that accomplice situation.  He didn't actually cause the

19   death of the deceased, but intended to kill the deceased or

20   another, if you believe from all the facts he had those

21   intentions, or anticipated that a life would be taken.

22   And that last part is what we've already talked about.  We

23   used the language should have known, and here it is not only

24   did they should have known, but did anticipate.

25              And there's a slight difference there

1   maybe from should have anticipated and did anticipate.   And

2   as I said before, it may be the same exact evidence you look

3   at.   But you have -- you'd be able to answer that question

4   if, looking at all the facts and the person's background,

5   that the State was able to prove that to you.

6          A.     Yes.

7          Q.     You know, we can't stop and open someone's --

8   top of their head up and show you their intent, obviously.

9   But we can put on all the relevant evidence and you can use

10  your common sense and draw reasonable deductions to

11  determine a person's intent.   People do that in every type

12  of trial.   Do you feel you could do that in this type of

13  case?

14         A.     Yes.

15         Q.     Okay.   The question is answered separately.

16  Just because you found someone guilty or you found that

17  they're a continuing danger to society, doesn't mean you

18  would automatically answer Special Issue No. 2 yes.   Again,

19  you'd have to look at that question separately and look at

20  all the evidence and then determine if we have proven it or

21  not.

22                  Do you feel you could follow that rule of

23  law and require the State to prove that to you beyond a

24  reasonable doubt?

25         A.     Yes, sir.

1    Q.    Okay.  And then this last Special Issue

2   question, if you'd take a moment to read that one.

3    A.    (Prospective juror complies.)

4    Q.    That's the mitigation question.  That covers a

5   lot of areas and I always like to tell jurors that we didn't

6   write these questions, the Legislature did.  That one gets a

7   little confusing, I think.

8           But it covers, I guess, a little bit of

9   everything, you know.  You don't get to it, unless you have

10  found him guilty.  You've already determined he's a

11  continuing danger and already determined he intended or

12  anticipated that a life would be taken.  But it allows

13  jurors to take a step back, and sometimes we call it a

14  safety net, sometimes a safety valve.

15          But it allows you to show mercy.

16  Somewhere in their background, if there is something that

17  you think is sufficiently mitigating where a life sentence

18  should be imposed rather than a death sentence, you can

19  answer the question that way.  Now, I can't tell you what

20  mitigating evidence is.  In fact, you're not required to

21  think of what mitigating evidence is.

22          The only thing you're required under law

23  is keep your mind open to that and if you think something in

24  the case shows you sufficient mitigation, you could answer

25  the question yes.  Neither side has a burden of proof.  Of

1   course, you can, I think, common sense, anticipate one will

2   be arguing one way or the other.  But we don't have the

3   burden of proof like we do in these other questions.  As you

4   sit there today, does anything come to mind which you might

5   view as potentially mitigating?

6          A.      No.  I'd have to take into account all the

7   evidence.

8          Q.      Okay.

9          A.      Right off the top, I can't.

10         Q.      Most people don't tell us.  That's the normal

11  answer.  In fact, we kind of hope that most people haven't

12  sat around thinking about these things.  But that's what the

13  law contemplates, that you'd have to listen to it.  And if

14  you saw it, it can cover lots of different areas, you know.

15                 We've asked, one of the questions on

16  the questionnaire is background, genetics, or the way

17  someone was raised.  And I believe you said that if that

18  would be important, you also said, I think that's on page 9,

19  that would be important, but also the circumstances of the

20  case, yeah, which led to the crime.  It's about four

21  questions down.  People sometimes bring up a person's

22  background.

23         A.      Yeah.

24         Q.      Maybe they came from a broken home or a poor

25  environment.  Maybe they were physically abused, maybe

1  mentally abused.  Some jurors say that could be mitigating

2  if it were severe.  Other jurors have told us, I'd feel bad

3  for the person, but you do have to take responsibility once

4  you are an adult.  There's lots of folks that have gone

5  through bad things and they don't commit capital murders.

6                 But people feel differently about that

7  type of background evidence.  Do you have any opinions about

8  that one way or the other?

9       A.     No, I don't think about it much.

10      Q.     Okay.

11      A.     I probably just, depending on the situation,

12  what I've heard, and what's there.

13      Q.     You'd just have to listen to it --

14      A.     Yeah.

15      Q.     -- and make the decision?

16      A.     Yeah.

17      Q.     Oftentimes in the punishment phase you may

18  hear, you may hear from an expert, a mitigation expert or a

19  -- usually a psychologist or a psychiatrist who may offer an

20  opinion on future dangerousness.  They may offer an opinion

21  about a person's mitigation.  They may oftentimes come from

22  the defense, sometimes from the prosecution.  They can give

23  opinions about why a person acts a certain way or why they

24  feel that, that sort of thing.

25                 Some jurors put a lot of stock in those

1    types of experts.  They really think they bring value and

2    hold their opinions in very high regard.  We have other

3    jurors that actually kind of go the other way.  They think

4    you could find an expert, if you look hard enough, that will

5    say just about any opinion you need them to, if you've got

6    the cash or look hard enough to find them.

7                        And we have other jurors who say, I would

8    look at it.  It wouldn't hold any particular weight.  I'd

9    have to judge it like I would any other witness, but I'm not

10   going to look at it as, you know, something that's going to

11   carry a lot of weight right away or something I'd ignore.

12   It's just another piece to the puzzle.

13                       Do you have any opinions on that, those

14   types of experts in these situations?  Or how you might

15   value those opinions?

16        A.     I wouldn't -- I probably wouldn't value it any

17   more than any other type of expert in any other field.

18        Q.     You'd just look at it --

19        A.     I'd just look at it in the whole context and I

20   wouldn't put more emphasis on a psychiatrist or a

21   psychologist or he'd be just another type of witness --

22        Q.     Okay.

23        A.     -- with an opinion.

24        Q.     All right.  Again, you know you don't get to

25   this question, unless you've found someone guilty.

1    A.    Yeah.

2    Q.    You've already gone down the road of where

3 he's a continuing danger and intended someone to die, but

4 the law contemplates there might be a situation where a life

5 sentence could be imposed.  It's just going to depend on the

6 particular facts of that particular case.

7              And as a juror you have to keep your mind

8 open to it.  You seem like the type of person that can do

9 that and would want all the information in before you made

10 that decision.

11   A.    Yes, sir.

12   Q.    And then whichever way the evidence falls, you

13 could answer it that way?

14   A.    Yes, sir.

15   Q.    If it's yes and called for a life sentence,

16 you could do that?

17   A.    I could.

18   Q.    If it's no, you could do that, knowing the

19 defendant would be executed someday?

20   A.    Yes, sir.

21   Q.    Okay.  Let's talk about just a few rules that

22 apply to all cases and these will be pretty familiar to you.

23 Presumption of innocence.  At the beginning of each trial,

24 anyone charged with an offense is entitled to that

25 presumption of innocence.  And the fact that someone has

1  been arrested, indicted, or even going through this process,

2  is no evidence of their guilt.  We have to overcome that

3  presumption by putting on the evidence and proving them

4  guilty.  Could you follow that rule of law?

5     A.     Yes.

6     Q.     Okay.  The burden of proof is on the State and

7  never leaves this table.  It never shifts to the defense.  I

8  think you can anticipate they will do their best and may

9  call witnesses, but they are not required to prove anything

10  to you.  That burden of proof always stays here.  And if we

11  ever fail in our burden of proof, then you are obligated to

12  find the defendant not guilty.

13     A.     Yes, sir.

14     Q.     You can follow that?

15     A.     Yes, sir.

16     Q.     The burden of proof goes to each and every

17  element of the indictment.  We write the indictment and we

18  have to prove every element of it to you beyond a reasonable

19  doubt.  If we fail in just one portion of it, then, again,

20  you are obligated under law to find the defendant not

21  guilty.

22                 And let me give you a couple of examples

23  of that.  One is easy.  We have to prove who committed this

24  crime.  You know, at the close of the evidence, if you had a

25  reasonable doubt about that, then it's going to be a quick

1    not guilty.

2              But just as important under the law is

3    where it happened.  We also have to prove it happened in

4    Dallas County.  We can prove everything else to you, and I

5    don't anticipate this would happen, but I always use this

6    example, you know, we could prove to you beyond a reasonable

7    doubt who committed the crime and who they murdered.

8              But at the close of the evidence maybe if

9    it's one of those cases that happens near the border.  Maybe

10   the evidence really shows in your mind it happened in

11   Tarrant County.  That's just as important under the law as

12   the identity of the person.  And if you had a reasonable

13   doubt about that issue, you'd be obligated to find him not

14   guilty.

15             Now, the fault would lie with us.  That

16   would show we had pretty poor preparation and we'd probably

17   lose our jobs.  But you couldn't help us out and give us

18   one, help us out there, give us a leg up.  You'd be

19   obligated to find him not guilty.  And I just use that

20   example to demonstrate how the law goes to each and every

21   element.

22             Would you be able to follow that

23   particular area of the law and require us to prove each and

24   every element of the indictment beyond a reasonable doubt?

25        A.    Yes, sir, I think I would.

1      Q.     Okay.  Fair enough.  Now, the Fifth Amendment

2   comes into play sometimes.  Anyone charged with a crime, if

3   they want to testify, they can.  No one can stop them.  If

4   they choose not to testify, you can't hold that against

5   them.

6              You can't -- anyway, there could be a

7   number of reasons why someone may choose not to testify.

8   They may not be very well educated.  They may be very

9   nervous under that type of pressure and look guilty when

10  they're not.  They may simply be following their lawyer's

11  advice.  They may be real guilty and could look even more

12  guilty, if they testify.

13             The law takes care of that by simply

14  instructing the jury, if they do not testify, you can't hold

15  that against them in any shape or form.  Could you follow

16  that rule of law?

17     A.     Yes, sir.

18     Q.     Okay.  Police officers testify often.  Most

19  jurors regard them in high regard.  They like the job they

20  do.  But you can't start them out ahead, before they

21  testify, of any other witness.  You have to wait and judge

22  them like any other witness, recognizing there are good

23  police officers and bad police officers.

24             You can't start them out and say, I'm

25  going to believe this one over the others.  You have to wait

86

1   and then judge their credibility once they're on the witness

2   stand.   Could you do that?

3          A.      Yes, sir.

4          Q.      Okay.   The Judge will instruct you, and we

5   often hear about our parole laws, that in a capital murder

6   situation that a capital life sentence means the defendant

7   would serve forty calendar years before they became eligible

8   for parole, and even then they may not be paroled.

9                  But he would also instruct you that you

10  can't consider the parole laws, whether someone will be

11  paroled, anything like that, in any part of your

12  deliberations, guilt/innocence stage or punishment stage.

13  You just have to consider a life sentence, a life sentence.

14  Do you feel you could do that?

15         A.      Yes, sir.

16         Q.      Okay.   One situation which may or may not come

17  up is lesser included offenses.   Sometimes jurors find

18  defendants guilty of lesser included offenses.   One of the

19  lesser included offenses of capital murder is aggravated

20  robbery, which involves the robbery, threatening someone

21  with a deadly weapon and taking their property.

22                 The punishment range for that is

23  different.   There's no Special Issues and it's a term of

24  years.   It goes from life to 99 years on the harshest end

25  all the way down to five years in prison on the small end

1    and anywhere in between.

2                      What a juror has to do is be able to tell

3    the Court they can keep their mind open to that full range

4    of punishment.  You have to wait and listen to all the

5    background evidence that would come in, in the punishment

6    stage, and then determine what you think is appropriate.  If

7    you think a life sentence is appropriate, you could do that.

8    If you think as little as five years in prison is

9    appropriate, you could do that, or anything in between.

10                     It's just something that you have to base

11   on all the information and keep your mind open to that full

12   range.  Do you feel you could do that?

13        A.     Yes, sir.

14        Q.     Okay.  One other area on your questionnaire I

15   wanted to ask real quick.  It involved, on page 5 we give

16   kind of a series of statements and I'm sure you don't

17   remember all of these, but we ask you to either disagree,

18   agree, or be uncertain, and we always follow up on some of

19   these.  One is criminal laws treat criminal defendants too

20   harshly, and you put agree on that one.

21        A.     Yeah.

22        Q.     I was wondering what your thought process was?

23        A.     I was looking at that in the back before I

24   came out here and I was thinking maybe I shouldn't have

25   answered it the way I answered it.

1    Q.    Okay.

2    A.    I misread it or something.

3    Q.    Well, that happens a lot, sometimes people,

4    because it is pretty lengthy.

5    A.    I saw that when I was in the back.

6    Q.    Okay.  And then the one above it, police

7    officer enforcing laws in a professional and fair way, and

8    you put uncertain on that.

9    A.    Yeah, I -- well, I -- to tell you the truth, I

10   don't think I've been involved enough with police officers

11   to determine whether -- what is really fair.  I could

12   probably judge professional, but I don't know fair or not.

13   Q.    Okay.  So it's not, you weren't basing that on

14   any experience you've had or something on TV.  You just

15   don't think you have sufficient information?

16   A.    No.  I don't have sufficient information.

17   Q.    Okay.  Well, I've covered a lot of areas here

18   real quick.

19   A.    Yeah.

20   Q.    I see you like Dale Hansen.  I always enjoy

21   his comments on Sunday nights.

22   A.    Yeah, well, you know, he's -- the job with

23   them, their job is to -- is like Rush Limbaugh, is to

24   provoke one way or the other.

25   Q.    Yeah.  Do you have any questions over anything

1    we've gone over?

2        A.      No, not really.

3        Q.      Okay.  I know you had the first one.  I

4    appreciate the attention you've given us and that concludes

5    all the questions I have, but thanks for your patience.

6        A.      Okay.  Thank you.

7                THE COURT:  Mr. Sanchez?

8                MR. SANCHEZ:  Thank you, Your Honor.

9                        CROSS-EXAMINATION

10   BY MR. SANCHEZ:

11       Q.      How are you, Mr. Bosworth?

12       A.      Pretty good.

13       Q.      Do you need some water up there or anything?

14       A.      No, not right now.

15       Q.      You doing okay?

16       A.      Yeah.

17       Q.      All right.  Well, I'm not going to ask as many

18   questions as Mr. Shook did, only because he's done a good

19   job at explaining the law.  But I, you know, I just want to

20   go over some things and concepts of the law that, you know,

21   that concern us on this side of the table.

22       A.      Yeah.

23       Q.      Okay.  As you know, and, you know, when you

24   went down there to fill out this questionnaire, it was quite

25   a bit of people down there with you, remember that?

90

1    A.    Yes.  It was full, standing room only.

2    Q.    The room got hot all of a sudden, didn't it?

3    A.    Standing room only, yeah.

4    Q.    Well, all those people filled out

5  questionnaires and we didn't get to look at all of them, but

6  we looked at the ones that we thought had a good shot of

7  making it on the jury, that could be fair to both sides.

8  Okay?

9              And for this system to work, for these

10  type of trials to work, we need jurors that can sit there

11  and not prejudge, not have made up their mind based on media

12  coverage or what they think about the death penalty, and

13  decide the case only on the evidence that's presented here

14  in court.  You can appreciate that, right?

15    A.    Yes, sir.

16    Q.    And we get people that come in here and they

17  say, well, you know, I'm surprised that the capital murder

18  scheme is set up the way it is, you know, I always thought

19  it was eye for an eye.  Once I found someone guilty of

20  capital murder, I thought the death penalty just followed

21  it, automatic that way.

22              Did that surprise you in any way that the

23  death penalty scheme is set up the way it is with these

24  Special Issues?

25    A.    Well, I didn't know about that, the Special

1    Issues, really.

2         Q.    What do you think about that?  Do you think

3    that's a good thing?

4         A.    I think the more thorough, the better.

5         Q.    Okay.  And that's the way the law is set up.

6    I mean, the Supreme Court of the United States told the

7    states, basically, you have to do something with your death

8    penalty statute, so not just every single case that comes

9    before the Court ends up in the death penalty.

10        A.    Yeah.  I think the more thorough, the better,

11   and we've seen, of course, in Illinois where the DNA has

12   made a difference, so --

13        Q.    Okay.  And it's good to have those

14   protections, don't you agree?

15        A.    Yes.

16        Q.    Okay.  And that's the way it's set up.  It's

17   set up where when someone is tried on a death penalty case,

18   I mean, the -- it's not a forgone conclusion that that

19   person is guilty of what they're charged with.  And the only

20   time you can find them guilty is until the State has proven

21   their indictment beyond a reasonable doubt to you.

22        A.    Yes.

23        Q.    Just like you said in your questionnaire,

24   what's the first thing that comes to mind when you think of

25   prosecutors?  They have to prove everything.

1      A.      Yes.

2      Q.      And that's what, basically, as a juror, you

3  have to be able to tell this Court is that you would require

4  the State or the prosecutors to prove everything in their

5  indictment beyond a reasonable doubt.

6      A.      Uh-huh.

7      Q.      And you have already told Mr. Shook that you

8  could do that.  You haven't changed your mind, right?

9      A.      No.

10     Q.      Okay.  And you also have to be able to tell

11  the Court that life in prison is an option in a death

12  penalty case.  As a matter of fact, that's the way the law

13  is set up.  If you find somebody guilty of capital murder,

14  they are sitting on a life sentence, and they will stay on a

15  life sentence, unless these Special Issues are proven to you

16  beyond a reasonable doubt or answered in a certain way that

17  would lead to the death penalty.

18              I guess one way of looking at it is these

19  could be hurdles or filters that would keep every single

20  case from ending up in the death penalty.  Do you agree with

21  that?

22     A.      Yes, I do.

23     Q.      Okay.  One thing I want to know, first of all,

24  it looks like you understood these Special Issues.  Do you

25  have any questions about any of those?

1          A.       I don't think so.

2          Q.       Okay.  I think Mr. Shook went over it

3    thoroughly, but one way to look at it is that you have four

4    verdicts you have to come up with in a case like this.

5    First of all, whether he's guilty or not guilty of capital

6    murder.

7          A.       Yeah.

8          Q.       Like he said, if you have a reasonable doubt

9    as to his guilt, then you find him not guilty, and you won't

10   even get to these Special Issues.

11         A.       Yes, sir.

12         Q.       And that would happen with, you know, evidence

13   being presented on the guilt/innocence portion of the trial.

14   The jury would go back in the deliberation room, decide

15   whether he's guilty or not guilty.  If he's not guilty,

16   everybody goes home.

17                   If you do decide that it's been proven to

18   you beyond a reasonable doubt that he's guilty of capital

19   murder as an accomplice or as a primary actor, then you

20   would come out and hear maybe more evidence from the State,

21   or, as you know, the defense is not required to put on any

22   evidence.  But, you know, maybe you will hear more evidence.

23                   And then you would go back again and

24   decide these Special Issues independently of the decision

25   you already made when you found him guilty of capital

murder.  Does that make sense to you?

A.      Yes, sir.

Q.      Okay.  Because sometimes there's a danger that one of these issues will be automatically answered by some jurors, just because they found him guilty of capital murder.

A.      Yeah, I understand.

Q.      And it sounds to me like you understand that that's not to happen, right?

A.      Yes, I understand that.

Q.      There's some people that say, if I find him guilty of capital murder, then Special Issue No. 1 will always be yes to me.  I know that the law says that it's supposed to start off as no and stay there unless the State can prove it to me beyond a reasonable doubt.

A.      Yes.

Q.      But because I found him guilty of capital murder, then I'm always going to answer that yes, no matter what.  But it doesn't sound to me like that's what you would do.  You would make the State prove it to you?

A.      Yes.  I would make a decision based on what I've heard.

Q.      Okay.  And Special Issue No. 2, we're talking about what a person intended or what they anticipated and that, basically, involves what a person is thinking based on

1   the evidence.  Would you agree with me?

2        A.     Yeah.

3        Q.     Okay.  You know, Mr. Shook said, you know, we

4   can't get in someone's mind --

5        A.     Exactly.

6        Q.     -- and decide that, and sometimes there's a

7   danger that Special Issue No. 2, that some jurors would say,

8   well, in order for me to answer that in the defendant's

9   favor, he might have to get up there and tell me something.

10              And, as you know, that comes in direct

11  conflict with the Fifth Amendment.  And you would have to be

12  able to answer that question without requiring the defense

13  to put on any evidence or the defendant get on the stand.

14  Do you think that's fair?

15       A.     I think I could do it, yeah.

16       Q.     And, I mean, you would have to guarantee us

17  you could.

18       A.     Yeah.

19       Q.     You could do that?

20       A.     I think so.

21       Q.     Okay.  And again, Special Issue No. 3, that's

22  the last step.  That's -- some people call it a safety net.

23  You know, some people say, well, that's where you step back

24  and take a breath, because you can see the danger where

25  something could start snowballing, you know, the way the

1   jury thinks, we found him guilty of capital murder, we think

2   he's a continuing threat to society, we think that he

3   anticipated, actually did anticipate that a human life would

4   be taken, and, you know, why are we even, you know, just

5   steamroll over Special Issue No. 3.  Could you see that

6   danger --

7        A.      Yes, I can --

8        Q.      -- same way for why, what value does this

9   question have at this point?

10       A.      I can see that danger.

11       Q.      Okay.  But the law would require you to stop,

12  look back, look at the whole situation, the circumstances

13  involved with this person.  You know, it's going to be up to

14  you to decide what's mitigating.  We can't tell you exactly

15  what that is and you don't have to tell us.  It's just,

16  you'll know it when you hear it.

17              It could be like you said someone's

18  background, it could be their role, either major or minor in

19  the offense.  I mean, it could be many things that you can't

20  -- wouldn't even foresee right now, that in your mind would

21  be mitigating.

22              But you have to be able to tell us that

23  Special Issue No. 3 would still be, still have some value to

24  you.  In other words, you could say, well, even though I

25  found all these other issues to be that way, I can still

1  answer that question yes, that there is something mitigating

2  that would spare this man's life.  Can you do that?

3       A.     Yes, sir.

4       Q.     Okay.  And in cases like this, you know, there

5  is a lot of emotion.  There's a lot of effort by the State,

6  the social climate, things that are outside the evidence

7  that sometimes jurors tell us it would be hard for me not to

8  give him the death penalty because, you know, I might have

9  to answer to people outside the courtroom, to my family,

10  friends, people I know.

11          But in order for you to be a juror on

12  this case you have to be able to keep that away and if the

13  case isn't proven to you beyond a reasonable doubt, you

14  could find the person not guilty or answer the Special

15  Issues no, or, if you find something mitigating, answer that

16  question yes, and impose a life sentence.

17       A.     Uh-huh.

18       Q.     Can you do that?

19       A.     Yes, sir.

20       Q.     Okay.  I've done all the talking it seems

21  like.  Is there any comments you want to make or any

22  questions that we may need to answer or anything that you

23  haven't told us that would keep you from being fair to

24  either side?

25       A.     No, I don't think so.

1    Q.    Okay.  Well, thank you very much.

2    A.    Okay.

3              MR. SANCHEZ:  That's all I have, Your

4    Honor.

5              THE COURT:  Sir, if you will be so kind

6    to wait for us outside in the hall and I'll have you back in

7    just a minute.

8              PROSPECTIVE JUROR:  Okay.

9                   [Prospective juror out]

10             THE COURT:  What says the State with

11   Mr. Bosworth, juror No. 4343?

12             MR. SHOOK:  State has no challenges for

13   cause.

14             THE COURT:  Defense?

15             MR. SANCHEZ:  We have no challenge for

16   cause.

17             THE COURT:  Step in your office?

18                  (Recess)

19             MR. SHOOK:  We'll use one of our

20   peremptories, Judge.

21             THE COURT:  Be so kind as to ask

22   Mr. Bosworth to come back in.

23                  [Prospective juror in]

24             THE COURT:  Mr. Bosworth, I want to thank

25   you for your time and attention you have given this Court,

1   and your very thoughtful and careful deliberation on these

2   issues and the answers that you provided.  However, I'm

3   going to inform you that you shall not be seated on this

4   jury.  We appreciate your time and you are free to go.

5                    PROSPECTIVE JUROR:  Thank you, sir.

6                    [Prospective juror out]

7                    THE COURT:  Mr. Grace, please.

8                    [Prospective juror in]

9                    THE COURT:  Good afternoon.

10                   PROSPECTIVE JUROR:  Good afternoon.

11                   THE COURT:  Juror No. 4254, James Scott

12  Grace.  Welcome to the 283rd, Mr. Grace.

13                   PROSPECTIVE JUROR:  Thank you.

14                   THE COURT:  Sorry for the delay in

15  getting you in.  Obviously, you've had enough time to look

16  at the juror questionnaire and review your answers that you

17  gave us back in May on your questionnaire.

18                   PROSPECTIVE JUROR:  Yes, sir.

19                   THE COURT:  There is a lot of law to give

20  someone.  We don't expect you to understand it all right

21  now.  That's what the attorneys will visit with you about.

22                   PROSPECTIVE JUROR:  Okay.

23                   THE COURT:  And the -- this is the only

24  opportunity you have to ask questions, to, you know, work at

25  understanding the law.

1          PROSPECTIVE JUROR:  Okay.

2          THE COURT:  There are no trick questions

3    and you can't give a wrong answer.  They just want your

4    honest opinions.  At the end of the process, I have two

5    questions I must ask.  Number one is, do you understand the

6    law?  And, number two, can you follow the law?  That's the

7    big, big issues that I have to look at.  Only question I

8    have for you at this time is will you be able to serve this

9    Court for a period of two weeks beginning on November 10th?

10          PROSPECTIVE JUROR:  Yes, Your Honor.

11          THE COURT:  With that I shall turn it

12   over to Mr. Kirlin?

13          MR. SHOOK:  No, I will, Judge.

14                    JAMES GRACE,

15   having been duly sworn, was examined and testified as

16   follows:

17                DIRECT EXAMINATION

18   BY MR. SHOOK:

19       Q.    Mr. Grace, my name is Toby Shook.  I'll be

20   asking questions on behalf of the State this afternoon.

21   And, like the Judge said, there aren't any right or wrong

22   answers.  We just want your honest opinions.

23       A.    Okay.

24       Q.    I'll go over some of the things in your

25   questionnaire and ask you about capital murder, the death

1   penalty, how you feel about that, some of the laws and rules

2   that apply, that sort of thing.

3           A.      Okay.

4           Q.      If you have any questions at any time, feel

5   free to ask.  Okay?

6           A.      Thank you.

7           Q.      Now, you work for, is it Arch Wireless?

8           A.      For Arch Wireless, yes, sir.

9           Q.      What do you do with them?

10          A.      I'm a senior business analyst for their call

11  center operations.  So software application deployment,

12  process improvement type work.  We have approximately four

13  centers in the eastern United States and locally.

14          Q.      All right.  Looks like you were born in

15  Kansas, but you spent most of your life here in Texas; is

16  that right?

17          A.      Thankfully so, yes.

18          Q.      When did you move down here as a --

19          A.      I was still an infant when we moved down here.

20  I was born in Wichita, Kansas, spent about a year, year and

21  a half up there, and my dad was a police officer up there at

22  the time.  After having me, my mom convinced him to head to

23  Texas and a slightly different line of work.  And he went to

24  work for the Internal Revenue Service at that point.  So we

25  started in Houston and kind of progressed through Austin, up

1   in the D.C. area and back here.

2        Q.     Okay.  And then you were in Plano for ten

3   years and you've lived in Dallas County for the past 15

4   years?

5        A.     Yes, I have.

6        Q.     Okay.  He was a police officer, but I guess

7   when he quit the force you were about one year old?

8        A.     About one, one and a half, so I haven't had a

9   lot of conversation about that.

10       Q.     He didn't relay his old police days with you

11   much growing up or anything like that?

12       A.     Sure didn't.

13       Q.     Okay.  Let's talk a little bit about capital

14   murder.

15       A.     Okay.

16       Q.     You know from the Judge's comments and the

17   questionnaire that this is a case in which the State is

18   seeking the death penalty, so, obviously, we inquire how

19   everyone feels about that.

20       A.     Yes, sir.

21       Q.     You put on your questionnaire that you are in

22   favor of it.  Tell me, just kind of expound in your own

23   words, why you favor the death penalty.

24       A.     Well, number one, it's a punishment provided

25   for by law, and, of course, with the type of upbringing that

I had, you didn't deviate from that too much.  So I think part of my beliefs on it have to do with the fact that it is a provision provided for by law and the society in which we live here in the State of Texas.  And, number two, I personally believe that some crimes are of the nature that it has to serve not only as a form of punishment, but also as a form of deterrent.

Q.    Okay.  Then from your personal point of view, if we put you in charge, sometimes we do that, make you Governor for a day, would you have a death penalty statute on the books?

A.    Yes, I would.

Q.    Okay.  What types of crimes, from your personal point of view, do you think are appropriate for consideration of the death penalty?

A.    Well, being somewhat familiar with the law and especially having read it here, certainly those -- kind of any crime or murder involving a police officer, a Government official, when it was known to the person committing that, that it was, indeed, one of those individuals.

I think anything involving somebody of -- typically people who have a more difficult time caring for themselves, somebody who is young, somebody who is old, somebody who's disabled or in a disadvantaged position, I would be in favor of it.  Or if the circumstances are the

1   way in which a person's life was taken was very extreme.

2       Q.      Okay.  Brutal or torture?

3       A.      Extremely brutal, torture, something along

4   those lines, exactly.

5       Q.      Now, you -- I'd say 99.9 percent of the jurors

6   we've spoken to or reviewed questionnaires have heard

7   something about this case.

8       A.      Yes, sir.

9       Q.      It got a lot of media attention, which doesn't

10  make you ineligible to be a juror.  If that were true, we

11  couldn't ever seat a jury.  But we, obviously, inquire as to

12  each juror what they recall about the case, what they

13  remember following in the news.  What type of details do you

14  remember?

15      A.      In all honesty, I don't.  I do remember it.  I

16  don't remember a lot of detail past what we were originally

17  provided in the questionnaire.  I do know that it occurred,

18  I believe, on Christmas Eve.  It did occur at the Oshman's

19  in Irving, and really, that a group of people were accused

20  of having committed this crime or this murder.  Quite

21  frankly, I couldn't tell you who the people were or who

22  exactly was accused of doing what particular thing.

23      Q.      Okay.  You didn't follow any court proceedings

24  afterwards or anything like that?

25      A.      No, I certainly didn't.

1    Q.    Okay.  Well, the test is, bottom line is,

2  whether, if you were seated as a juror, you could just make

3  your decisions based on what you hear in the courtroom.

4    A.    Yes.

5    Q.    Obviously, the news is often inaccurate and

6  the better evidence is going to come from the actual

7  witnesses.

8    A.    Uh-huh.

9    Q.    And that's the rule.  But only you can tell

10  us.  Do you feel that if you were chosen to sit on this

11  jury, you could just make your decisions based from the

12  witnesses, from the witness stand, as well as any other

13  evidence?

14    A.    Yes, sir, I do.

15    Q.    Okay.  On page 4 -- and you got a chance to

16  review the questionnaire, didn't you?

17    A.    Yes, sir.

18    Q.    Okay.  Go ahead and turn to it.

19    A.    All right.

20    Q.    We usually ask a few followup questions.  One

21  is, uh, and a lot of these are openended.  They mean

22  different things to different people.

23    A.    Okay.

24    Q.    We asked at the top of the page, about the

25  third question down, if you believe in the death penalty,

1   how strongly, and put a scale from 1 to 10 on it and you put

2   an 8.  And that does mean different things to different

3   people.

4        A.      Sure.

5        Q.      Expound on that for us.

6        A.      Well, I think I believe very strongly in the

7   death penalty.  I think the only thing that holds me back is

8   knowing that there have probably been circumstances in the

9   past where the punishment was not applied appropriate to the

10  crime.

11              I think in really reviewing the

12  questionnaire and thinking it through again, if I had to

13  answer that, I think my feeling would be a little bit

14  stronger for it, simply because I think the technology that

15  we have today allows us to make better determinations in

16  taking a look at evidence and so forth, depending on the

17  case, as to whether or not to apply it.

18              But I guess my only hesitation is that I

19  would hope that it is a rare instance where it was applied

20  incorrectly in a particular -- however, I would hope that,

21  you know, a jury situation like this would remove the

22  majority of chance of error.

23       Q.      You seem pretty familiar with the proceedings

24  and you reviewed the materials for the types of cases that

25  are for consideration.  It's got to be a murder case and

1   then only a few murder cases fall under the death penalty

2   statute.

3        A.     Yes.

4        Q.     Murder during the course of a felony, during a

5   robbery, rape, kidnapping, that sort of thing, murder of a

6   police officer or fireman on duty, murder for hire, the mass

7   murderer or serial killer situation, and the murder of a

8   child under the age of six is kind of a quick rundown of

9   that.

10            When we think of a death penalty case or

11   capital murder case, we generally conjure up or think of an

12   example of the actual triggerman.  Capital murder, though,

13   like any crime, may have more than one individual involved.

14   You may have one triggerman, but you may have some other

15   persons involved, which I think the common term is

16   accomplices, that may help carry out the crime.  And the law

17   says that accomplices can also be prosecuted for whatever

18   crimes occur and can be found guilty.  The same is true of

19   capital murder.

20            An example I give is, let's say Mr.

21   Kirlin and I, and we get one other person, three of us

22   decide we want to rob a bank.  The plan calls for the -- our

23   buddy has a good, fast car, so we include him in this

24   robbery.  And he's going to drive up and keep the car

25   running and warn us if anyone is coming up and be ready to

1   speed off.

2          We go in and our plan has me to go in

3   with a loaded gun and I point it at everyone.  I subdue them

4   and get their hands in the air, and then Mr. Kirlin goes in

5   and starts loading the money up from the cash drawers.  At

6   some point in time during the robbery, I intentionally

7   murder someone.  Maybe I don't like them, maybe they do

8   something I don't like, maybe he tells me they're about to

9   hit an alarm, so I shoot them intentionally.  We flee, we're

10  caught soon afterwards.

11         Obviously, I can be prosecuted for the

12  death penalty because I'm the actual triggerman.  The law

13  says that Mr. Kirlin and the getaway driver could also be

14  prosecuted, and under certain facts, could even get the

15  death penalty.

16         Jurors feel differently about that.  We

17  like to get everyone's gut opinion on it.  Some people are

18  for the death penalty, but if it were up to them, they think

19  it's fair if it's the actual triggerman being prosecuted.

20  They take a life and they can give up their life.

21         They would draw a line when it comes to

22  accomplices.  Maybe a long prison term would be more

23  appropriate, a different type of offense, bank robbery.

24  They don't think it's fair to give the capital murder or the

25  death penalty in an accomplice situation.

1          Other jurors do feel that's fair, that

2    accomplices are prosecuted for the death penalty and even

3    receive the death penalty.

4          A.     Uh-huh.

5          Q.     Again, there aren't any right or wrong

6    answers, but we want to get everybody's gut reaction on how

7    they feel about that.

8          A.     Personally, I feel that if it is proven that

9    the group, however many there were, were acting together,

10   that they were acting with the same intent, and that there

11   was a loaded gun involved, regardless of who was carrying

12   that gun, I feel that all parties should have been aware

13   that the potential of that gun going off, regardless of

14   whose hands it was in, was high and that as such there would

15   be a joint responsibility, regardless of whoever's finger

16   was on the trigger.

17          There was a joint effort, if there was

18   collaboration and there was a proven common intent that they

19   were all aware of and it did involve a gun and other people,

20   then I think that the punishment should be handed out

21   consistently, regardless of who may have been the actual one

22   holding the gun or pulling the trigger.

23          Q.     Okay.  A lot of people feel that way and you

24   used the -- some language that is similar to the law.

25   There's actually two theories we can prosecute an accomplice

1   under.  One is they are actively involved, aiding,

2   directing, perpetrating the crime, they can be found guilty.

3   And, also, under the law of conspiracy using the example I

4   gave.

5            If we conspire, the three I gave an

6   example, to commit one crime, bank robbery, that means we

7   just agree to commit it, and during the course of that

8   robbery, one of us commits another crime to further the

9   conspiracy, in my example that would be me murdering

10  someone, then all the conspirators, everyone involved, can

11  be found guilty, even if they didn't have the intent that

12  that person should die, if the jury believes they should

13  have anticipated that could happen.

14           You gave the example of going in with

15  loaded guns and knowing what potentially could happen.

16  Again, if all the facts show that they should have

17  anticipated, then they can be found guilty.

18       A.     Uh-huh.

19       Q.     To get an actual death sentence, we have to

20  prove that they did anticipate or had that intent to happen.

21  They don't actually have to cause the death, but they have

22  to have -- should have anticipated to get guilty, did

23  anticipate to get a death penalty, which I think kind of

24  goes along with your personal point of view.

25       A.     Yes, sir.

1      Q.      I can't get into the facts of the case,

2  obviously --

3      A.      Sure.

4      Q.      We can give different types of hypotheticals,

5  but I can tell you that the theory of law that we're

6  prosecuting this case under is that accomplice law which we

7  call the law of parties, that is, we are prosecuting Mr.

8  Murphy for capital murder and the death penalty under that

9  law of parties and intend on proving our case in that manner

10 in the guilt/innocence, as well as the punishment phase.

11     A.      Okay.

12     Q.      Now, I take it from your answers that you

13 don't have any problem with that area of the law.  You feel

14 that it is appropriate and just that the State can prosecute

15 someone under that law of parties as an accomplice?

16     A.      Yes, sir, I do.

17     Q.      And a person can receive the death penalty.

18 You think that's fair depending on the particular facts?

19     A.      That would be correct, yes, sir.

20     Q.      Okay.  Fair enough.  A capital murder case is

21 divided into two parts.  There's the guilt/innocence stage,

22 which we have to prove the indictment beyond a reasonable

23 doubt.  And then there's the punishment phase.  If we don't

24 prove guilt, obviously, we would all go home.  The trial

25 would be over.

A.      Sure.

Q.      But if we do, we go to that punishment phase where you can hear additional evidence.  And at the close of that, you get these Special Issues.  And I'm going to go over these in a little more detail in a moment.

But, basically, if we prove that he's a continuing danger to society, that he either intended the death, caused the death, intended the death, or anticipated that a life would be taken, if we answer those two yes, and a no to the mitigation question, that is there's not sufficient mitigating evidence to warrant a life sentence, then the Judge would sentence him to death.

If those questions are answered any other way, it's a life sentence.  You don't write death or life in, but the Judge sentences according to how the jury answers those questions.

A.      Okay.

Q.      But those are the only two possible alternatives, once someone has been found guilty, death or life sentence, depending on those questions.

A.      Okay.

Q.      Are you familiar with the method of execution in Texas?

A.      Yes, I am.

Q.      By lethal injection?

1    A.    Yes, sir.

2    Q.    Growing up here, you probably know that Texas

3  is a state that actually does execute people on death row.

4  There are some states that have it, they have a death row,

5  but it's never carried out.  But you know Texas leads the

6  nation in executions.

7    A.    Yes, sir.

8    Q.    It's one thing to talk about it

9  philosophically and another, once you get down here and you

10  are realizing you are on a jury that may actually make

11  decisions which would end a person's life.

12         The procedures are the same in each case.

13  They would be the same in this case, if the defendant were

14  found guilty.  If those questions are answered yes, yes, and

15  no, the Judge would sentence him to death where he would be

16  placed on death row, and at some point in time the Judge

17  would give him a date of execution.

18         I don't know when that would be, but on

19  that date or prior to it, he would be moved to downtown

20  Huntsville where you may have seen the news coverage, the

21  executions take place.  There's an orange brick building

22  there with a clock and protesters are often out there.

23    A.    Yes, sir.

24    Q.    He's given a last meal that day.  He's given

25  time with family, friends, a minister.  But at 6:00 p.m.

1   executions take place.  He's taken to that room, placed on a

2   gurney, secured by leather straps.  Needles are placed in

3   his arms.

4                    Witnesses are brought in.  There's two

5   rooms, one from the victim's side and one from the

6   defendant's.  And at that time he gives a last statement,

7   which could be anything, proclaiming his innocence,

8   protesting the death penalty, maybe asking for forgiveness.

9   But after that statement, the warden simply signals the

10  executioner, who then injects chemicals which will stop his

11  heart, collapse his lungs.  He will lapse into a coma within

12  ten seconds and die.

13                    Quite frankly, that's our goal in this

14  case.  We feel we have the type and quality of evidence to

15  convince a jury of this man's guilt and those questions will

16  be answered in such a way that he will die by that method of

17  execution that I've described.

18                    You've told us from a philosophical point

19  of view, your personal point of view, that you believe in

20  the death penalty as a law and it should be prosecuted.  We

21  know you've never been in this situation, obviously, and we

22  can't preview the facts.  But as best you know yourself, do

23  you feel you are the type of person who could take pen in

24  hand and if the State proves these issues to you, answer

25  those questions in a way, knowing the defendant would be

1   executed?

2        A.     Yes, sir, I do.

3        Q.     Okay.  Let's talk for a minute about these

4   Special Issues.  I'd like you just to kind of read Special

5   Issue No. 1 to yourself.

6        A.     Okay.

7        Q.     Question No. 1 asks the defendant to, asks the

8   jury to make a prediction about the defendant.  How is he

9   going to behave in the future?  Do you feel you could make

10  that type of prediction, if you are given enough

11  information, enough facts?

12       A.     I feel if given the appropriate facts, yes,

13  sir.

14       Q.     What kind of things would be important to you

15  before you made that decision?

16       A.     Being very behavior focused, I think what

17  would probably be most important to me was any evidence

18  about past behavior.  And I know that -- certain can and

19  cannot be allowed as part of a trial, but I think past --

20  past history, past behavioral type evidence, any type of

21  evidence that would show either compliance to or deviation

22  between personal values and those that are commonly

23  exercised amongst what we would consider lawabiding and

24  acceptable values and behaviors.

25       Q.     Okay.

1    A.    But, yes, I think that if the appropriate --

2  it's kind of hard to say, too, because, you know, what is

3  the appropriate evidence?  Unfortunately, I don't know that

4  I could answer that until actually being in this particular

5  situation and make that kind of determination.

6    Q.    You told us some similar things that other

7  jurors have said and I can tell you a person's criminal

8  background, criminal history, is admissible in this portion

9  of the trial.

10    A.    Okay.

11    Q.    If they've been convicted of crimes before,

12  you can hear about that in punishment.  You can even hear

13  from the witnesses, if they're available.  You can hear

14  about bad acts that they haven't been convicted of, if those

15  witnesses are available.

16    A.    Okay.

17    Q.    Bad character evidence, you can hear good

18  things about the person, too.

19    A.    Sure.

20    Q.    It kind of goes by that old TV show, "This Is

21  Your Life."  You get to hear their whole background, good

22  and bad.  Obviously, you get to consider their role in the

23  crime and the facts from the guilt and innocence stage, too.

24  And all that goes into question No. 1.

25    A.    Okay.

1     Q.    It starts out with a no answer, and we have to

2 prove to you beyond a reasonable doubt that it should be

3 answered yes.  We do that by putting on any new information

4 we have and then, also, you evaluating the evidence in the

5 guilt/innocence stage, just from this point of view.

6         But the fact that you found someone

7 guilty does not automatically mean you would answer that

8 question yes.  If it was an automatic yes, there would be no

9 reason for having the question.

10    A.    Sure.

11    Q.    The law requires the jurors to wait, listen to

12 any new, additional evidence, and then make this

13 determination based on what they have already heard and the

14 new evidence they have, and then require the State to prove

15 it to you beyond a reasonable doubt it should be answered

16 yes.

17         The law contemplates that some capital

18 murderers, once they're convicted, are going to get life

19 sentences and some are going to get death.  It's all going

20 to depend on the facts of each case.

21         Do you feel you could follow that rule of

22 law and require the State to prove to you beyond a

23 reasonable doubt that this question should be answered yes?

24    A.    Yes, sir, I do.

25    Q.    Okay.  Now, the words there, you're not going

1  to get the legal definitions.  In the guilt/innocence part

2  and some of the issues in punishment you'll get plenty of

3  legal definitions in the Court's charge.  But the

4  Legislature has left the definition of these words up to the

5  jurors, so I want to go over a few of those.

6      A.      Sure.

7      Q.      We have to prove there's a probability the

8  defendant would commit criminal acts of violence.  When you

9  see "probability" in that question, what does that mean to

10  you?

11      A.      That evidence has been presented that would

12  make the jury believe that more likely than not something

13  along this line would occur again.

14      Q.      Okay.  You have used the exact words the

15  courts have used, more likely than not.  We don't have to

16  prove it's a certainty.  We could never do that.  But we

17  have to prove more than a possibility and kind of the

18  guideline language they use is more likely than not.  And

19  you feel comfortable with that in terms of that question?

20      A.      Yes, sir.

21      Q.      We have to prove the defendant would commit

22  criminal acts of violence.  What do "criminal acts of

23  violence" mean to you?

24      A.      To me, a criminal act of violence is an act

25  where a person was either put at danger, the likelihood

1   existed that they would be put in danger, or that they were

2   actually harmed.

3       Q.      Okay.  And when you say putting people in

4   danger or actually harm, that would be any individuals they

5   may come into contact with?

6       A.      That would be correct.

7       Q.      Either on the street, could it be people in

8   prison, also?

9       A.      Yes, sir.

10      Q.      Okay.  Let me move on to question No. 2.  And

11  if you'll just take a moment to read that one to yourself.

12      A.      (Prospective juror complies.)  Okay.

13      Q.      That question starts out with a no answer,

14  also.  We have to prove to you beyond a reasonable doubt it

15  should be answered yes.  The question tends to do with that

16  accomplice situation.  Well, the first part, whether the

17  defendant actually caused the death of the deceased, that

18  has to do with if you believe from the evidence he actually

19  murdered the individual.

20              The rest of the question has to do with

21  the accomplice situation we've talked about.  If they did

22  not actually cause the death of the deceased, but intended

23  to kill the deceased or another, then you would answer it

24  yes, or anticipated that a human life would be taken.

25              Remember, in the guilt/innocence stage we

1    have to prove that he should have anticipated.  Here, we

2    have to prove that he did anticipate.  So there's a

3    difference there.  It might be slight, that's kind of up to

4    you.  But you have to be able to see the difference and

5    apply that difference.

6          A.     Yes, sir.

7          Q.     It may be the same exact evidence that you've

8    already decided the first guilt/innocence on, that should

9    have anticipated and indeed, from everything you see, he did

10   anticipate.  It's going to require all the facts,

11   surrounding facts of the offense, and any additional

12   information in his background may help you on what happened

13   before or after the crime, that sort of thing.

14                We can't open a person's mind up and show

15   you what their intent was.  We have to just put on all the

16   surrounding facts and evidence and you can, as a juror, use

17   your common sense to draw reasonable deductions from a

18   person's intent of what they intended, based on their

19   actions.  Do you feel you could do that?

20         A.     Yes, sir, I do.

21         Q.     Okay.  And most people do that in their

22   everyday life, obviously.

23         A.     Yeah.

24         Q.     And it's no different here.  It has to start

25   out with a no answer.  The State has to prove to you beyond

1    a reasonable doubt it should be answered yes.  If we do

2    prove beyond a reasonable doubt, you could answer it yes,

3    and then you move on to that last Special Issue.  If you can

4    just take a moment to read that and I'll ask you a couple

5    more questions.

6         A.    (Prospective juror complies.)  Okay.

7         Q.    This is the mitigation question.  This

8    question, you don't get to, unless you have found someone

9    guilty, you have found that he's a continuing danger, and

10   you found that either he caused the death or intended a

11   death to occur.

12              But it still allows the jurors to take a

13   step back, look at all the background information, and

14   determine if they think a life sentence is appropriate

15   rather than a death sentence.  It allows you to show mercy.

16   The guy doesn't get off.  It's still a life sentence.

17        A.    Sure.

18        Q.    It's kind of a safety valve.  Now, what

19   mitigating evidence is, I can't tell you.  You're not

20   required as a juror to think of what mitigating evidence is.

21   You're just required as a juror to keep your mind open to

22   it, and if you see any mitigating evidence and you think it

23   reaches that sufficient level where a life sentence should

24   be imposed, you can answer the question yes.  If you don't

25   think there's sufficient mitigating evidence, you can answer

1   it no.  Do you feel you could keep your mind open to this

2   type of question in this type of case?

3        A.     Yes, sir, I do.

4        Q.     Okay.  Again, the fact that he's already been

5   found guilty, he's a continuing danger to society, that he

6   intended someone to die, doesn't mean that jurors will be

7   closed to this.  Some have told us that.  But you still have

8   to be able to keep your mind open to it.

9        A.     Sure.

10       Q.     As you sit there today, does anything come to

11  mind as what you might view as potentially mitigating

12  evidence?

13       A.     Actually no, not at this point.

14       Q.     Most jurors tell us that.  We don't anticipate

15  you're sitting around thinking of these things.

16       A.     No.

17       Q.     At least I hope you're not.  Sometimes -- and

18  we mention a few things on the questionnaire, background

19  evidence comes in, obviously, the way a person was raised.

20  Maybe they came from a poor environment, maybe a broken

21  home, maybe they were abused physically, mentally, that sort

22  of thing.

23             Now, we have some jurors that tell us

24  that could be mitigating, if it's severe, especially the

25  abuse.  We have other jurors that say, I'd feel bad for a

1  person, but I know people that have come from that

2  background and they still don't commit these murders.  You

3  can't use that as an excuse once you are an adult.  People

4  feel differently about that.  Do you feel one way or the

5  other about that type of background information?

6          A.      I -- certainly, and as we're speaking

7  generalities here, wouldn't completely dismiss it, but I

8  feel that unless a person has a -- been proven to have a

9  mental defect by law, that as adults, particularly, we

10  basically know the difference between right and wrong, and

11  regardless of socioeconomic factors, we know that doing

12  certain things are going to result in certain actions

13  towards us, so.

14          Q.      Okay.  So I take it you're more of the school

15  of thought that, hey, you'd feel bad about it, but you've

16  got to take responsibility once you are an adult?

17          A.      That would be correct.

18          Q.      All right.  Now, you bring up another good

19  point, as far as a mental defect goes, because that's

20  another potential mitigating factor.  And I'm not talking

21  about insanity, obviously, or mental retardation, really.

22  But it may be something wrong with them from a mental

23  standpoint.  Maybe they are slower, but it's not a mental

24  retardation situation, which might, might, cause a problem.

25                  And that's the type of thing people have

 1   said, I'd look at that, because it's not their fault.  And,

 2   again, it's going to depend on the degree.  But I think

 3   that's the type of information we're talking about in that

 4   last question.

 5        A.      Correct.

 6        Q.      Okay.  Again, you don't have any problem

 7   answering it one way or the other, just depending on the

 8   facts?

 9        A.      That is correct.

10        Q.      Okay.  Let's talk a little bit about the rules

11   of law.  You are going to be familiar with these because you

12   grew up in this country and the Judge has gone over it, but

13   one is the presumption of innocence.  Everyone starts out in

14   a case, any defendant starts out, he's presumed to be

15   innocent.  You have to give him that presumption.  And the

16   State must overcome that presumption by putting on evidence.

17   Could you follow that rule of law?

18        A.      Yes, sir, I can.

19        Q.      The burden of proof is on the State.  You must

20   require the State to prove it to you and that burden of

21   proof never shifts to the defense.  You may anticipate they

22   are going to ask questions, put on witnesses.  But they

23   don't have to under the law, because they never have the

24   burden of proof.  If you ever have a reasonable doubt, you

25   are obligated under the law to find the defendant not

1    guilty.  Could you do that?

2        A.      Yes, sir, I could.

3        Q.      The burden of proof goes to each and every

4    element of the indictment.  We wrote the indictment, so we

5    have to prove every part of it.  If we fail on just one

6    portion, then you are obligated as a juror to find the

7    defendant not guilty.

8                A couple of examples, we have to prove,

9    to illustrate that point, we have to prove who committed the

10   crime.  If you have a reasonable doubt about the identity,

11   then, obviously, you're going to find him not guilty.

12   That's kind of a no-brainer situation.

13       A.      Sure.

14       Q.      We also have to prove, and under the law it's

15   just as important, to prove where this occurred, Dallas

16   County.  If we prove to you beyond a reasonable doubt who

17   did the killing, how and where, but you had a reasonable

18   doubt about the county, maybe it was one of those crimes

19   that occurs near the county line and you thought it happened

20   in Ellis County or Tarrant County, you would be obligated

21   under the law to find the defendant not guilty.

22               And that's tougher on some jurors and I

23   illustrate that, I don't anticipate it will happen.  But it

24   just demonstrates the law that they don't see any difference

25   between any of the elements.  Now, if that were the

1    situation, I'm sure we would be fired as prosecutors because

2    that would show absolute poor preparation.  But as a juror,

3    you can't help us out.

4         A.     Sure.

5         Q.     It's kind of like being a referee, you know,

6    you've got to -- or an umpire, you've got to just call the

7    balls and strikes as you see them.  Could you follow that

8    rule of law and require us to prove our indictment beyond a

9    reasonable doubt on each and every element?

10        A.     Yes, sir, I could.

11        Q.     Okay.  The Fifth Amendment, if anyone is

12   charged with a crime and they want to testify, they can.

13   You can't stop them.  But if they choose not to testify, you

14   can't hold that against them.

15               There can be a lot of reasons why someone

16   chose not to testify.  They may not have a lot of education.

17   They may be very nervous under that situation and might look

18   guilty when they're not.  They may be just simply following

19   the advice of their attorney.  Or they could be very guilty

20   and look even more guilty under cross-examination.  And the

21   law takes care of that by simply instructing the jurors not

22   to consider that in any way.  Do you feel that you could do

23   that?

24        A.     Yes, sir, I do.

25        Q.     The parole laws sometimes come into play.  In

1  a capital murder situation, the Judge would instruct you

2  that a capital life sentence means a person must serve forty

3  calendar years before they become eligible.  But he would

4  also instruct you that you must consider a life sentence, a

5  life sentence, and you can't consider the parole laws in any

6  way.  Do you feel you could do that?

7        A.    Yes, sir, I could.

8        Q.    One other area that may or may not come up is

9  lesser included offenses.  The lesser included offense of

10  capital murder in some situations is aggravated robbery.  If

11  you found someone guilty of aggravated robbery, it carries a

12  penalty range from five years in prison all the way to life,

13  or 99 years.

14              Now, as a juror you'd have to keep your

15  mind open to that full range, listen to all the mitigating,

16  as well as aggravating evidence, and decide what you think

17  is appropriate.  If you think it's a life sentence, you can

18  do that.  If you think it's as little as five years in

19  prison, you can do that, or anything in between.  Again,

20  it's a situation where you'd wait and listen to everything.

21  Do you feel you could do that?

22        A.    Yes, sir, I do.

23        Q.    Okay.  Finally, police officers testify in any

24  criminal case, generally.  A lot of people have respect for

25  the job police do, but you can't start them out ahead of

128

1   other witnesses.  Common sense will tell you there is going

2   to be good police officers and bad ones.  You just have to

3   judge them like you would any other witness once they hit

4   the witness stand.  Do you feel you could do that?

5        A.     Yes, sir, I do.

6        Q.     Okay.  Now, do you have any questions over

7   anything we've gone over?  I know I've gone over this pretty

8   quickly.  Anything at all about any of the rules?  Sounds

9   like you've got them down pretty good, but do you have any

10  questions at all over any of these areas?

11       A.     I think the information has been very thorough

12  up to this point and I don't have anything further at this

13  time.

14       Q.     Anything you would, you think, this is kind of

15  an openended question we ask a lot of times, anything you

16  think either party should know about you that might be

17  important, if you were sitting at either one of these

18  tables?  Anything like that?

19       A.     I don't believe so.

20       Q.     Okay.

21       A.     I sure don't.

22       Q.     We covered a little bit of everything.  I know

23  you like varied interests.  Looks like you do a lot of home

24  remodeling, that sort of thing?

25       A.     When you have an old house, you tend to do a

1  lot of that, yeah, actually so.

2       Q.     Do some motorcycle riding?

3       A.     I certainly do.

4       Q.     And also hockey.  Do you play hockey yourself

5  or just watch it?

6       A.     I don't play myself, but you can, every time

7  they're here -- I've had season tickets for about the last

8  three years.  So I'm a staple at the American Airlines

9  Center on those nights, yes, sir.

10       Q.     Okay.  I haven't made it out there to the new

11  place yet.  Is it a better venue for watching the games than

12  the old one?

13       A.     Well, it's kind of like going to see hockey in

14  a mall, you know, like in a Willow Bend Mall.  I kind of

15  liked the old Reunion Arena and how close you were to the

16  ice, but, yeah, it's nice, very much so.

17       Q.     All right.  That's, uh, that's all the

18  questions I have.  I appreciate your patience and

19  cooperation.

20       A.     Thank you very much.

21              THE COURT:  Ms. Busbee?

22              MS. BUSBEE:  Thank you, Your Honor.

23              CROSS EXAMINATION

24  BY MS. BUSBEE:

25       Q.     What did you think when we asked you to come

1   down here?  Were you -- do you have any thoughts on it?

2       A.      Um, I didn't realize at first.  I thought the

3   process might be a little sooner after the questionnaire.  I

4   know when we completed that, Judge, I believe at the time,

5   gave some timeframe and I had kind of, you know, the time

6   had kind of come and gone and I thought, wow, you know,

7   they're getting close to what they had originally scoped as

8   a trial date, so I thought, you know, I guess, you know, I'm

9   not going to be called any further.

10              And then lo and behold, you know, the

11  envelope shows up and you look at it at first and you are a

12  little taken back.  It's kind of like, where did this come

13  from?  And, what's this about?  And then it's like, oh,

14  yeah, I have a feeling.  So, yeah, it was a -- good to be

15  included, I guess, in the process and be able to continue on

16  as a potential juror.

17      Q.      Well, it's interesting because some people are

18  going oh, no, oh, no.  So at least you're enthusiastic about

19  it.  Well, let me explain that to you a little bit.

20      A.      Sure.

21      Q.      We didn't actually start, we had those two big

22  panels.  You were in the afternoon.  We went by number, the

23  1 through 2,500, although, of course, not that many people

24  showed up, but that's how many people were summoned, in the

25  morning, and then 2,500 through 5,000 more or less in the

1  afternoon.  And you're towards the end of that afternoon

2  panel.  Of course, we didn't speak with all of those folks.

3          A.      Sure.

4          Q.      We looked at the questionnaires and winnowed

5  out people who were obviously disqualified by what was

6  written down.  And then we met and said, kind of traded and

7  said, you know, these people are this far side of the

8  spectrum, this side, this side, let's try to get people

9  right down the middle that are reasonable.  And believe me,

10 it would bother you considerably to see what your fellow

11 voters and people that actually showed up would write in

12 questionnaires.

13          But in any event, you know, everybody

14 here is satisfied that you are reasonable and intelligent

15 enough, obviously, to understand the law because it's more

16 complicated than most.  So that's not really the issue at

17 this point because Mr. Shook has the burden of explaining

18 everything to you, and then when the juror's passed to us,

19 we kind of get to get more up close and personal.

20          Maybe we saw you had some concern over an

21 answer, maybe we thought you had more to say, so I get to

22 just kind of pick and choose and jump around and that kind

23 of thing.

24         A.      All right.

25         Q.      My first concern is you say, what I think a

1  lot of people think, but don't say, which is -- well,

2  there's going to be some evidence that we aren't going to be

3  allowed to see.  I think that's in the back of jurors' minds

4  sometimes.  You referred to that.

5           But I'm going to tell you in this sort of

6  case, the State, because the questions are of this nature,

7  you know, guess what's going to happen in the future, do you

8  think that this person, you know, might be dangerous in the

9  future?  Well, they're entitled to go back into things, even

10 things for which someone may not have been convicted or even

11 charged.  So there's probably very little that the jury

12 wouldn't be allowed to hear about in this type of a case.

13           But having said that, I just want to ease

14 your mind about this process and, of course, sometimes when

15 you're not allowed to hear evidence, if you're not, it's

16 because the law has determined it might not be completely

17 credible.

18      A.    Sure.

19      Q.    So I always try to make a point of that.  The

20 law is gone over very quickly on, you know, when we get you

21 down here because, even though this is a lengthy process, it

22 would be much more lengthy, if we stopped and gave you a

23 test on it after the voir dire.

24           But there are two parts to this case, and

25 I think most people would agree that, and maybe I just think

1    it's so simple because it's always been the law in Texas,

2    that if you participate in a crime with other people, even

3    though you may not be the person, say, who breaks the window

4    in a car, but you're the lookout in a burglary of a vehicle,

5    or, um --

6        A.    Uh-huh.

7        Q.    Gives the plans to the vault in a bank

8    robbery, or bank burglary, you were considered guilty of

9    that offense, just like the person who entered the car or

10   entered the bank.  That's a basic principle of law.  But

11   guilt is one thing and then punishment is another.

12       A.    Uh-huh.

13       Q.    And there's never so much a dichotomy as there

14   is in this sort of case.  So I'm satisfied that you can be

15   fair on the issue of guilt or innocence.  And I'm not saying

16   you can't be fair on the other part, but --

17       A.    Sure.

18       Q.    -- I'd like to talk to you about that a little

19   bit, because, as Mr. Shook pointed out to you, if you are on

20   a jury and you found someone guilty of the offense of

21   capital murder, the law decrees that that is a life

22   sentence, as he has described, a slightly different life

23   sentence than other life sentences in our law because it

24   requires 40 calendar years to be served before that person

25   could even be considered for probation.  In other words, 40

1   years by the calendar, no good time, nothing else.

2        A.      Okay.

3        Q.      And that's how it's going to be in this type

4   of case, unless the jury answers these questions as we've

5   explained to you.  My question is, because you know a little

6   bit about this case or have heard a little bit about this

7   case, do you think that in this case you would require or

8   could actually require the State to prove these things to

9   you beyond a reasonable doubt?  Or do you think that you,

10  because of what you think you may know, you may have already

11  made up your mind on these matters?

12       A.      No.  I think it has to be proved beyond a

13  reasonable doubt.

14       Q.      Okay.  That's what I wanted to know.  Now, as

15  to Special Issue No. 2, and now I'm going to get kind of

16  hypertechnical with you, and we've said this and talked to

17  so many people about this that sometimes I get confused

18  about what jurors have said because we've discussed it so

19  many times.  It's really kind of out there as far as the

20  concept is concerned.

21       A.      Okay.

22       Q.      To find someone guilty of capital murder in

23  the scheme that we've discussed, we're talking -- we're

24  going back to guilty now, the original crime, you will have

25  said the State has proved to you beyond a reasonable doubt

1  that this individual should have anticipated that a murder

2  would have occurred.

3              And, you know, when you were talking

4  originally before we talked to you just about the specifics

5  of the law, that was something that was important to you,

6  that someone should have anticipated.  I tried to write down

7  what you said, if they were personally acting together, then

8  they had the same intent.

9        A.     Uh-huh.

10       Q.     Okay.  Well, that's not the way that the law

11  is written, but it's close enough for how that works on

12  guilt or innocence.  When we get to punishment, that's an

13  entirely different ballgame.  And since nobody had talked to

14  you about these specific questions when we were just asking

15  your general impressions, I want to let you clarify that for

16  me now.

17       A.     Okay.

18       Q.     It's a lot -- well, I shouldn't say it's a lot

19  harder.  It's a different question now when you get to this

20  point.  The question is not should he have anticipated.

21  It's did he anticipate?  And, I mean, very specifically, and

22  not what necessarily the main actor anticipated.  In other

23  words, you can't transfer that intention to the person on

24  trial, if you will, because the question doesn't ask what

25  another person anticipated.  It's specific to that

1  individual.  Do you think you could do that in this sort of

2  case?

3        A.      Yes, ma'am, I do.

4        Q.      And not say that, well, this party was acting

5  with, acted, you know, apparently acted intentionally,

6  anticipated.  I would have to have it proven to me beyond a

7  reasonable doubt that this individual did anticipate.  And

8  not putting you on the spot, but can you think or have you

9  thought of some ways that it might be established for you

10  that someone did anticipate that a life would be taken?

11        A.      If there was proof of direct discussion about

12  that, I mean, that's the one that off the top of my head

13  that would be in my opinion pretty clear cut.  If there was

14  some sort of proof that an actual discussion amongst the

15  group, and including that individual, occurred where that

16  was verbalized as such.

17        Q.      Okay.  And, of course, that is the State's

18  burden, not the defense, and so that does make it a little

19  harder under these circumstances.

20        A.      That's correct.

21        Q.      Okay.  Well, let me go on to this last issue.

22  And this is the sticky point.  In a case where you are

23  sitting on a hypothetical jury and you've determined,

24  because it's been proved to you beyond a reasonable doubt

25  that someone is dangerous and will be a future danger, that

that person did anticipate that a life would be taken.  And

you, you know, you stated to us your feelings are strong for

the death penalty.

A.      Uh-huh.

Q.      Would there be anything, would you -- would

there be anything that would make you answer Special Issue

No. 3 yes, that a life sentence should be imposed instead of

a death sentence?  Or as a practical matter, would there be

anything that would make you say that, realizing that you

can't, but the question is would you be able to say

notwithstanding that these other two questions are answered

in the affirmative, I will not -- I will vote that a life

sentence be imposed instead of the death penalty?

A.      I'm going to go back to what I said earlier,

and that is that I can think of very few situations off the

top of my head at this point.  And, again, it is a difficult

question to answer because I've never been in a position to

have to consider this before.  But I can think of very few

reasons that personally I would be able to say, yes, I would

impose a life sentence over the death penalty, if the law

called for the death penalty and all the elements that were

proven fit within the letter of the law.

Q.      Okay.  Well, No. 1, to nitpick with you a

little bit, the law would not yet call for the death penalty

until this Special Issue No. 3 was answered.  But you are

1   saying exactly the same thing I asked you, so that's not

2   fair.

3                    But you're telling us that you don't know

4   what that case would be, but your mind is not automatically

5   shut to voting for a life sentence, if you heard -- if you

6   heard evidence that made you, there would be something, your

7   mind would be open to it, you just can't say what it is, and

8   you don't have to say.

9        A.      That would be a -- that would be a fair

10  statement, absolutely.

11       Q.      Okay.  Now, you made some -- to make this

12  crystal clear --

13       A.      Sure.

14       Q.      -- you said something about a mental defect.

15  Certain mental defects, like mental retardation, you

16  wouldn't even get here.  If they were so mentally defective

17  that they didn't know the difference between right and

18  wrong, they wouldn't be here.  Does that encompass all the

19  mental detects that you might be considering, or --

20       A.      That probably would, not knowing things quite

21  like you folks do out there.

22       Q.      So that kicks those out --

23       A.      Yeah.

24       Q.      -- as far as, because you wouldn't be there,

25  if those mental -- we wouldn't be in a death penalty case,

1   if those mental defects were present.

2        A.    That's correct.

3        Q.    So knowing that, is there anything -- would

4   your mind still be open to a life sentence instead of a

5   death sentence under these circumstances?

6        A.    I'm not going to say, although I can't

7   specifically think of right now, not being in the situation,

8   what might cause me to feel otherwise about imposing a life

9   sentence as opposed to a death sentence.  I don't want to

10  say that I would not come in without the capacity to

11  consider something, if it was presented, and I thought or

12  felt that it was compelling enough to have affected the

13  events or the outcome of the particular situation.

14       Q.    Okay.

15       A.    But, again, based upon personal beliefs, you

16  know, it's difficult for me not being in that situation to

17  figure out what it would be at this point.

18       Q.    Well, you're a scientist and you're logical,

19  and this is kind of a crazy way to pick a jury, but we can't

20  start giving you a list of things --

21       A.    Sure.

22       Q.    -- and say is this, is this, is this, because

23  we'd be committing you to things and you haven't even heard

24  any evidence yet.  So you can tell us that your mind would

25  be open and you could give a life sentence, decide Special

1    Issue No. 3 yes, if you heard the proper case, and that your

2    mind would be open to it?

3         A.    It would at least be open to considering

4    circumstances or information before making a determination.

5         Q.    Okay.  And one of the things that's considered

6    is the role in the offense.  That might be something that

7    you might find important.

8         A.    Um, it -- uh, I still go back to, again, what

9    we were talking about a little earlier, if they were, and,

10   you know, I've seen bits and pieces of the law.  So I -- you

11   know, I'm talking without the information I'm sure that we

12   would have when we were actually trying to reach a verdict

13   on this.  But, um, if -- if the role, regardless of what

14   role the individual played, if the law specified that they

15   were to receive the same consideration as somebody who

16   played what might be viewed as a greater role, then I'm not

17   sure that that would sway.

18        Q.    Okay.  Now, that's something I did want to

19   talk to you about.

20        A.    Okay.

21        Q.    When we're talking about what the other people

22   may or may not have done in a capital murder case, that has

23   something to do with guilt or innocence.

24        A.    Uh-huh.

25        Q.    But punishments, obviously, are very, very,

1    personal in nature, which is why these are separate trials.

2                    MR. SHOOK:  Well, Judge, I'd object to

3    that in that what of the other roles of the individuals does

4    come under Special Issue No. 2.

5                    MS. BUSBEE:  I was coming to that.

6                    THE COURT:  I'll hold my ruling.

7         Q.    (By Ms. Busbee)  Okay.  You're saying you

8    can't punish C simply because A got a certain punishment.

9    Because that's -- you understand that wouldn't really be

10   fair.  You're not saying that, are you?

11        A.    No, ma'am.

12        Q.    Okay.  The death penalty scheme that we have

13   here, I can't imagine that it would be more individually

14   tailored.  And I guess I'm asking you if you can consider --

15   are you telling me you would not be able to tailor it to the

16   individual --

17        A.    I think what I was doing was mixing two

18   things, the guilt or not along with the punishment phase.

19   If your question is can I look at each individual and their

20   role in the event and deliver my opinion of punishment

21   individually, yes, I feel I can do that.

22        Q.    Okay.  Has anything that we've said raised a

23   question in your mind or why didn't they ask me this or I

24   would like to tell them that I feel this way about that,

25   because this is -- will really be your last opportunity to

1  express yourself before you either are or are not selected

2  for the jury.

3       A.    Not that I can think of.  I mean, the line of

4  questioning is very interesting in that, you know, in

5  helping you keep the two different phases of it separate and

6  I think that's what is important to remember going into it

7  is that you do have the phase by which you find somebody

8  guilty or innocent and then you have the phase by which, and

9  although they connect, you know, the circumstances that need

10 to be considered in each one will vary and tailoring it to

11 the individual as you were talking about there.  So I think

12 that's kind of helped define some of the questions that I

13 would have.

14            No, I think the questions that you've

15 asked, plus the information that you have on the

16 questionnaire that I filled out, I feel are pretty much, are

17 a very accurate indication of who I am and my thought

18 process and how I feel I would perform as a juror on this

19 case, so.

20       Q.    Let me consult with my learned colleague and

21 see if he has thought of any question to ask you.

22       A.    Okay.

23            MS. BUSBEE:  That's all we have, Your

24 Honor.

25            THE COURT:  Would you be so kind, sir,

1    and wait for us outside and we'll have you back in a few

2    minutes.

3                    PROSPECTIVE JUROR:  Okay.  Thank you very

4    much.

5                         [Prospective juror out]

6                    THE COURT:  What says the State on juror

7    No. 4254, Mr. Grace?

8                    MR. SHOOK:  State has no challenges for

9    cause.

10                   MS. BUSBEE:  Defense has no challenge for

11   cause.

12                   THE COURT:  Take a few minutes?

13                        (Recess)

14                   THE COURT:  What says the State on juror

15   No. 4254, Mr. Grace?

16                   MR. SHOOK:  We'll accept the juror.

17                   MS. BUSBEE:  We'll exercise a preemptory

18   challenge.

19                        [Prospective juror in]

20                   THE COURT:  Mr. Grace, thank you so much

21   for your time and service here to the Court today.  I'm

22   going to inform you that you shall not be seated on this

23   jury.  We greatly appreciate your honesty and if everybody

24   was as quick a study as you were, we'd be through this a

25   whole lot faster.  But we're not going to be able to have

1  you on this jury.  Thank you so much.

2                    PROSPECTIVE JUROR:  Thank you very much,

3  Your Honor.

4                    [Prospective juror out]

5                    (Recess)

6                    THE COURT:  Ms. Abbott.

7                    [Prospective juror in]

8                    THE COURT:  Good afternoon.

9                    PROSPECTIVE JUROR:  Hi.

10                    THE COURT:  We have juror No. 4438, Ms.

11  Lynda A. Abbott; is that correct?

12                    PROSPECTIVE JUROR:  Yes, sir.

13                    THE COURT:  Ms. Abbott, welcome to the

14  283rd.

15                    PROSPECTIVE JUROR:  Thank you.

16                    THE COURT:  Sorry for the delay in

17  getting you in.  We don't know exactly how long we're going

18  to talk to someone, so we have to balance, you know, 15

19  people against three, so somebody is going to have to do

20  some waiting and I'm just sorry it had to be you.

21                    PROSPECTIVE JUROR:  That's fine.

22                    THE COURT:  Obviously, you've had enough

23  time to review the orientation guide I provided for you?

24                    PROSPECTIVE JUROR:  Yes.

25                    THE COURT:  And also a copy of the

1  questionnaire that you were kind enough to fill out for us

2  back in May.  The process at this point will be for you to

3  go over the law with the lawyers.  And that's a lot of law

4  to give someone and we don't expect you to understand it all

5  right now.  They are going to visit with you and give you

6  examples, talk to you about it.  And the objective is for

7  you to have a functional working understanding of the law.

8            At the end of the process I have two

9  questions I must ask.  Number one is, do you, in fact,

10 understand the law?  And, number two, can you follow the

11 law?  That's the big picture I have to look at.  The only

12 question I have for you now is will you be able to serve

13 this Court for a period of two weeks beginning on November

14 10th?

15           PROSPECTIVE JUROR:  Yes, sir.

16           THE COURT:  With that, I shall turn it

17 over to Mr. Shook.  You may inquire.

18           MR. SHOOK:  Thank you, Judge.

19                  LYNDA ABBOTT,

20 having been duly sworn, was examined and testified as

21 follows:

22              DIRECT EXAMINATION

23 BY MR. SHOOK:

24      Q.    Ms. Abbott, I'm going to ask you questions on

25 behalf of the State.  And, as the Judge said, there aren't

1  any right or wrong answers.  We just want your honest

2  opinions.  And then if you have any questions at any time,

3  feel free to ask.

4          You know from filling out the

5  questionnaire that this is a case in which the State is

6  seeking the death penalty.  So we're going to inquire a lot

7  about, you know, how you feel about that, some of the rules

8  and laws that apply to those types of cases, and whether you

9  agree with some of those laws and get your thoughts on

10  those, also.  But, as he said, there aren't any right or

11  wrong answers.  Let me ask you first, do you believe in the

12  death penalty as a law?

13          A.    Yes.

14          Q.    And if you could just kind of tell us in your

15  own words why you believe in it and the purpose you feel it

16  serves.

17          A.    Well, I believe in the death penalty because I

18  don't believe that it is worth the taxpayers' money to have

19  someone in jail that has committed an offense in accordance

20  with the law that allows the death penalty.  I would rather

21  have my tax money spent in other ways.

22          Q.    Okay.  As far as your personal belief on the

23  types of crimes that should come into consideration for the

24  death penalty, what would those be?

25          A.    Excuse me, I'm learning how to wear contacts

1    today and it's not going well.

2         Q.    Okay.  I know how you feel, I wear contacts

3    myself.

4         A.    Would you ask that again, please?

5         Q.    From your personal point of view, what types

6    of crimes do you think could be appropriate for the death

7    penalty?

8         A.    Murder, child abuse, repetitive spousal abuse,

9    crimes that take human lives for granted.

10        Q.    Okay.  Now, you, like most jurors, have read

11   and followed this case in the news.  It had a lot of

12   publicity.  And so we ask each juror about that, what they

13   read, what they saw on TV.  As best you recall, what details

14   do you remember about this case?

15        A.    You know, really very little, unfortunately.

16   I come home from work at the end of the day, throw on

17   dinner, and sit in front of the news and read my mail.  So

18   I'm kind of not even paying attention.  The thing that I

19   remembered when I came on May 16 was the name Aubrey.  It

20   was just a unique name and that's what caught my attention.

21   The other thing that comes to mind is, and I may be wrong,

22   but I think it happened around Christmastime and that a

23   policeman was killed, and that's about it.

24        Q.    Anything about what you saw on the news or

25   what you remembered might influence you as a juror or would

1  you be able to make your decision based on the facts or the

2  witnesses you hear in the courtroom?

3      A.      I have very little information, so I would

4  need a lot of the facts to make my decision.

5      Q.      Okay.  The way the Statute is set up is the

6  trial is divided into two parts.  There's the

7  guilt/innocence stage, as well as the punishment stage.

8  Once you find him guilty, if you do, beyond a reasonable

9  doubt, we move to the punishment phase.  And you get these

10  Special Issues.

11          You see that first question asks whether

12  there's a probability that the defendant would commit

13  criminal acts of violence that would constitute a continuing

14  threat to society.

15      A.      Yes.

16      Q.      It asks the jurors to make a prediction about

17  whether he would be a continuing danger in the future.  Now,

18  you don't get to that question, unless you would have found

19  him guilty beyond a reasonable doubt.  Then you go to the

20  punishment phase and you may hear evidence about his

21  background, that sort of thing, before you answer that

22  question.

23          The law says that that question will

24  start out with a no answer and we have to prove to you

25  beyond a reasonable doubt it should be answered yes.  The

1    fact that you found him guilty beyond a reasonable doubt,

2    doesn't mean that it should be automatically yes.  It could

3    be answered either way based on the evidence, and the State

4    must prove to you beyond a reasonable doubt that it should

5    be answered yes.  That's what the law is.

6              What we need to know is if you could

7    follow that particular aspect of the law.  Some jurors can

8    and would require the State, once we got to the punishment

9    phase, to prove this beyond a reasonable doubt under what

10   the law's guidelines are.  Other jurors tell us from their

11   personal point of view, if someone is convicted, if they

12   believe proven beyond a reasonable doubt a capital murder,

13   at that point in time question No. 1 is answered yes, that

14   is a continuing danger to society.  And that would be a yes

15   answer to them.

16              In other words, they would have made

17   their decision, once they decided in their mind that he was

18   guilty of that particular offense.  And we just need to know

19   if you could follow that area of the law or does the

20   guilt/innocence finding answer that question for you?

21        A.    No, I would follow the area of the law.

22        Q.    Okay.  You could answer it yes or no,

23   depending on the facts?

24        A.    Right.

25        Q.    All right.  Now then, let me talk to you about

1    accomplices.  When we think of capital murder, we generally

2    think of the type or the person that actually causes the

3    death, go into a 7-Eleven and rob the 7-Eleven clerk and

4    shoot them.  You could be prosecuted for the death penalty.

5    But capital murder, like any other law, may have other

6    people involved.  Accomplices is the common term.  We call

7    it the law of parties, but other people involved in a crime.

8                    And under the capital murder law, you can

9    be prosecuted for the death penalty for capital murder, if

10   you are not the actual triggerman and you can even receive

11   the death penalty, depending on the facts.  People feel

12   differently about that.

13                   Some people are for the death penalty,

14   but they are opposed to the concept that an accomplice, the

15   nontriggerman, get the death penalty.  If they had the death

16   penalty, they'd reserve it just for the killers, not the

17   accomplice that helped in the act, with the crime in some

18   way.

19                   Other people are for the death penalty in

20   accomplice situations.  They feel that is appropriate and a

21   just sentence, depending on those particular facts.  How do

22   you feel about that?  What is your kind of gut reaction on

23   the prosecution in the death penalty situation of an

24   accomplice?

25            A.     I feel if an accomplice is present with the

1  willingness to achieve whatever they were out to achieve,

2  that it's irrelevant who actually shot the person.  It could

3  be that the accomplice would have, in fact, under a

4  different circumstance, a slightly different circumstance,

5  have been the one to pull the trigger.  I mean, I would have

6  to hear the facts.

7      Q.    Okay.  So you would wait and listen to the

8  facts, but the fact that someone is not -- someone might be

9  an accomplice, you still feel could be deserving of the

10  death penalty, depending on the facts?

11      A.    He was part of the plan, I would guess, if he

12  was there.

13      Q.    Okay.  Now, this last question, it's a Special

14  Issue question.  It's kind of lengthy.  I'll go over it.  It

15  asks whether taking into consideration all the evidence,

16  including the circumstances of the offense, the defendant's

17  character and background, and the personal moral culpability

18  of the defendant, there's a sufficient mitigating

19  circumstance or circumstances to warrant that a sentence of

20  life imprisonment rather than a death sentence be imposed.

21             You don't get to this question, unless

22  you have found someone guilty, you've found they are a

23  continuing danger, you've found that they intended that

24  someone should die, and then you get this mitigation

25  question.  The law requires jurors not to think of what

1  mitigating evidence is, but to keep their mind open to it.

2  Do you feel you could keep your mind open to that type of

3  evidence?

4      A.    Yeah, I'd be open to all the facts for all the

5  questions.

6      Q.    As you sit there today, does anything come to

7  mind which you might deem to be mitigating evidence?

8      A.    Well, as I said in my questionnaire, if there

9  is a measurable -- if there's measurable, clinical evidence

10 that this person was mentally ill, genetically mentally ill,

11 and I think I referenced uneducable, that that would make me

12 think that this person didn't know right from wrong.  But if

13 this person was of average intelligence, I can't think of

14 anything.

15     Q.    Okay.

16           MR. SHOOK:  May I have just one moment,

17 Judge?

18           THE COURT:  You may.

19           MR. SHOOK:  I think that's all the

20 questions from the State.  We'll turn it over to the

21 defense.  Thank you.

22              CROSS-EXAMINATION

23 BY MS. BUSBEE:

24     Q.    I know it's late in the day for you,

25 Ms. Abbott, and we've already talked to a lot of people and

1    we've talked to dozens before you, so I just want to make

2    sure that we've got this scheme clear in your mind.  First,

3    there is guilt or innocence.

4                   And the guilt or innocence that -- you've

5    seen a copy of the indictment, has to do with either murder

6    in the course of an aggravated robbery or, an alternative

7    theory, murder of a police officer in the lawful discourse

8    of his official duties.  Either one of those things may be

9    what the State, or both, may be what the State relies on or

10   is alleging for a conviction in this case.  And that --

11   those both, of course, are capital murder offenses.

12                  You've indicated that in your mind

13   someone who has been found guilty of the offense of capital

14   murder, that it's for you one of the major factors that

15   weighs in for you is cost, cost to society, that you think

16   the tax dollars might be spent in a better fashion.

17       A.      Yes.  Let me add purpose to that as well, what

18   would be the purpose?

19       Q.      Okay.  And, you know, some people say that.

20   And I think maybe more people think that than actually do

21   say that, and I appreciate your telling us that.  But -- and

22   having said that, there's -- if that is in your mind in

23   considering some of these other questions, it might -- do

24   you think that it might be in the back of your mind in

25   considering what would be the proper punishment in a death

1 penalty case?

2     A.    No, the facts would.

3     Q.    Okay.  Well, and I've done this again, we

4 confuse jurors, because I'm talking about after you found

5 that person guilty.

6     A.    Uh-huh.

7     Q.    Then we would get to the second part and that

8 would be what is the proper punishment.  Now, the law is

9 actually different than what your scheme of things would be,

10 if you could write it, because the law says that someone

11 who's guilty of a capital murder, gets an automatic life

12 sentence.  They don't get less than life.  They don't get

13 death, necessarily.  It's an automatic life sentence.

14     And then certain other things have to be

15 established to the jury beyond a reasonable doubt before a

16 sentence of death could be returned.  You have told us that

17 in your mind one of the major factors in considering

18 punishment, once someone has been found guilty -- I mean,

19 you have, of course, considered the facts of the case,

20 having made that determination of guilt, would be that it

21 would be costly to imprison somebody.

22     A.    Am I understanding you to say that there are a

23 series of parameters that would make this person eligible

24 for the death penalty versus life in prison?

25     Q.    Yes, ma'am.

1    A.    Okay.  So then what I'm saying is if, in fact,

2  the person met the criteria after all the facts were given,

3  he was determined to be guilty, then I would lean towards

4  the death penalty.

5    Q.    Okay.  And that's fair enough.  So in your

6  mind, once someone is guilty, it's death for you, unless

7  it's proved to you that life should be the proper sentence?

8    A.    Yes.

9    Q.    Okay.

10    MS. BUSBEE:  Your Honor, I think we've

11  reached an agreement on this juror.

12    Q.    (By Ms. Busbee)  I appreciate your candor,

13  ma'am.

14    THE COURT:  Ms. Abbott, we want to thank

15  you for your time and service you have given to the Court.

16  The parties have agreed to excuse you from this case.

17  That's it.  You are free to go.  Thank you.

18    [Prospective juror out]

19    [Prospective juror in]

20    THE COURT:  Good afternoon.  Please be

21  seated.  We've been working on your name.  I think nobody

22  has come to a consensus.  It's Elvin Slette?

23    PROSPECTIVE JUROR:  Slette, yes, sir.

24    THE COURT:  Slette.  All right.  We've

25  been working on it.  Welcome to the 283rd.  We've got juror

1   No. 4279, Mr. Slette.  Obviously, I'm sorry for the delay in

2   getting you in.  You've had an opportunity to read the guide

3   I provided for you?

4                    PROSPECTIVE JUROR:  Yes, sir.

5                    THE COURT:  And also a copy of your

6   questionnaire that you filled out for us back in May.

7                    PROSPECTIVE JUROR:  Yes, sir.

8                    THE COURT:  The objective here this

9   afternoon is for you to understand and have a working

10  understanding of the law involved in this case.  And this is

11  the only time that you get an opportunity to talk to these

12  lawyers.  And if you have any questions, we'll answer them.

13  At the end of the process, I have two questions I must ask

14  you.  Number one is, do you understand the law?  And, number

15  two, can you follow the law?

16                    PROSPECTIVE JUROR:  Yes, sir.

17                    THE COURT:  That's the big question I

18  have.  The only question that I have for you at this time is

19  will you be able to serve this Court for a period of two

20  weeks beginning on November 10th?

21                    PROSPECTIVE JUROR:  Yes, sir.

22                    THE COURT:  Thank you.  Mr. Kirlin?

23                    MR. KIRLIN:  Judge, I think Mr. Shook is

24  going to take this.

25                    MR. SHOOK:  I'll take this.  It's been a

1  long day.

2              ELVIN SLETTE, III,

3  having been duly sworn, was examined and testified as

4  follows:

5              DIRECT EXAMINATION

6  BY MR. SHOOK:

7       Q.    As the Judge said, there aren't any right or

8  wrong answers.  We're just looking for your honest opinions.

9  And what we'll do is kind of cover some of the stuff on your

10  questionnaire, as well as how you feel about the death

11  penalty.

12       A.    Yes, sir.

13       Q.    You have one of the more interesting

14  questionnaires we've gone over.  It's very varied, so I've

15  got a few categories I wanted to follow up on.

16       A.    Okay.

17       Q.    You still teaching at Nimitz High School?

18       A.    Yes, sir.

19       Q.    Still teaching Latin, it looks like all these

20  different, Logics, Sociology, all those different subjects.

21  Are you, or just a few right now?

22       A.    No, sir.  I'm teaching Latin, but I'm also in

23  charge of ISS which is the in-school suspension.

24       Q.    Okay.  Okay.  But -- well, let me ask you

25  this.  This was interesting.  We get all kinds of answers on

1   these questions, as you can imagine.

2        A.    Sure.

3        Q.    And you, it looks like you have a pretty

4   interesting aunt who was a lawyer and is she now a judge in

5   Tarrant County at the current time?

6        A.    I don't think she's an elected judge.  I think

7   she's doing mediation.

8        Q.    Okay.

9        A.    But she's a traveling judge.  I think she does

10  a lot of stuff in Houston.

11       Q.    Okay.  So she travels around and does the

12  mediation thing?

13       A.    I think.  I know she's trying to start her own

14  individual mediation, but I think she was a circuit judge or

15  I don't know what the actual title is, but she spends a lot

16  of time driving to Houston and back to her home in the area.

17       Q.    Okay.  I know a lot of people are getting into

18  mediation, because that's the alternative in civil cases.

19  She did not, though, ever do any criminal law?

20       A.    I think she only practiced family law.

21       Q.    Okay.  Now, you were on a jury?

22       A.    Yes, sir.

23       Q.    What type of case was that?

24       A.    I'm not sure what it's called, but it was a

25  vice cop and he purchased a pornography from New Fine Arts

1    and was trying to charge the person who rang him up with, I

2    think, obscenity charges.  Is that what it is?

3         Q.    I know they try those sometimes in misdemeanor

4    court.

5         A.    I don't know if it was misdemeanor or what.

6         Q.    And how did the deliberations go or what did

7    you view of the evidence in that case?

8         A.    Well, we watched the video and I think we had

9    to decide if it were obscene or not, and I think we agreed

10   that we didn't care for the video, but that it wasn't, the

11   guy just scanned it, you know, he wasn't the one responsible

12   for the charges.  Five of us agreed with that.  One was kind

13   of a holdout, but the judge had said that -- I think he put

14   the things, if it's absolutely, something about how the

15   decision had to be like worth your greatest thing.

16        Q.    Right.

17        A.    And so I knew that she had a newborn child or

18   a young child and so I asked her if this decision would be

19   worth her child, and she said, you know, she wanted to

20   convict the guy, but then she said no.  And so we acquitted

21   him.

22        Q.    Okay.  Now, your views on the death penalty,

23   do you favor it as a law?

24        A.    I mean, I like, you know, vengeance as much as

25   the next person, I suppose.  I'm not opposed to it.  Like I

said in the questionnaire, I do some research.  I've been

reading a lot about Jewish tradition and they are hesitant

to kill a person because not only do you kill the person,

but you kill all the descendants.  But I'm elitist enough to

think that there are too many shallow gene pools out in the

road anyway, and so, you know, that the wrong people are

reproducing.

     Q.     Okay.

     A.     And so, I'm not opposed to it.

     Q.     Do you think it's the type of case you could

sit on and make a decision, life and death decision?

     A.     Yes, sir.

     Q.     Why do you think you could do that?

     A.     Well, for one, I don't see death as being that

big a deal.  The grief in losing someone is a big deal, but

death itself, it's not anything to be upset about or

surprised.  Like the thing with the towers, everyone got

upset and everything.  But it's like, you know, 3,000 people

die every day.  It was just odd that it was on TV and that

it was -- all happened at once.

          I always think it's silly when people get

upset when people die, like they weren't expecting it.

Almost if they were to go to a movie and get upset when the

credits start rolling because, like, we expect it to go on

forever.  You know, it's like -- no, I mean, we got what we

1  got, a finite.  So death and that stuff, that's -- I mean,

2  I'm not going to be pulling the trigger or you know,

3  whatever, dropping the gas pellets or however it's done.

4              But I do know that I'm the -- that even

5  whatever my personal opinions, that's not my job.  My job is

6  to, as a juror, would be to see did the State make its case.

7  And if the State didn't make its case and if the killer goes

8  free, that's not shame on me.  That's shame on the State.

9       Q.    But you feel if we did make our case, you

10  could make that decision?

11      A.    Yes.

12      Q.    Okay.  Now, I want to make sure, because

13  everyone -- we asked an openended about how you feel about

14  cops, prosecutors, defense attorneys.

15      A.    Yes, sir.

16      Q.    You put "Law and Order," because, obviously,

17  that's on, I guess, every day now.

18      A.    Yeah.

19      Q.    And also puppets of the State.

20      A.    Yes.

21      Q.    What were you thinking when you said puppets

22  of the State?

23      A.    Well, I think that just -- I mean, as a

24  teacher I'm also somewhat of a puppet of the State in the

25  sense of that police are only there to enforce the law.

1  Whether the law is right or wrong, they're there to enforce

2  it.  And so they're -- I see police as to be more on the

3  level of like the infantry of the Army, the privates.  You

4  know, theirs is not to -- what is it?  Theirs is not to stop

5  and think.  Theirs is but to swim or sink.

6              You know, they're not there to, am I

7  doing what's right?  They're being told what their superiors

8  are being told to do.  And so I think that's how -- and I

9  think that they can also be manipulated, with the thing with

10 the democrats up in, I think, Ardmore, Oklahoma, when they

11 -- didn't the Texas Rangers or something get involved in

12 that?

13     Q.     Oh, there was some talk about trying to get

14 them involved.

15     A.     Yeah.  And that's politicians, you know,

16 manipulating.  It's like, you know, the rich wage, the rich

17 declare war, but it's the poor who fight it.  So that's how

18 I see the police.  I mean, they make less than I do.  And I

19 don't have to wear Kevlar to work.

20     Q.     Yeah.

21     A.     You know?  So that's what I was referring to.

22     Q.     Now, a lot of people don't like lawyers.

23     A.     Uh-huh.

24     Q.     I don't like a lot of lawyers myself, but --

25     A.     I don't blame you.

1    Q.    You had a good, I thought, interesting

2  comment.  I don't really care for lawyers.  That's why I

3  didn't go to law school.  I think it's --

4    A.    I like having a soul.

5    Q.    I like having a soul.

6    A.    Yeah.  My aunt really wanted me to go to law

7  school.  She wanted me to go to the University of Houston

8  and become a lawyer like she was.  But I think lawyers have

9  to do some things sometimes that are really despicable.  A

10  defense attorney, you know, has to let a -- or defend a

11  child rapist or, you know, something like that, even though

12  you know he's guilty.  But because of formality, I mean,

13  it's the system that takes prevalence, not the people.

14             And as a human you can only do that so

15  long after a while until it starts getting to you.  Also,

16  you know, I don't think that the adversarial, I think that

17  the court was originally established so that you could have

18  a pro and a con and eventually the truth would emerge.

19             But now it's becoming more to the point

20  of stroking your ego and who's got the bigger portfolio and

21  whatever.  And so, lawyers, I've been told, will do sneaky

22  things to win their cases.  And that's not, I don't know,

23  that's not noble.

24    Q.    Okay.  Well, I appreciate your candor with us.

25  That's all the questions I have then, Judge.

1    MS. BUSBEE:  I think we've reached an

2    agreement on this juror, Your Honor.

3    THE COURT:  Thank you, sir, for your time

4    and service to the Court.  The parties have agreed that you

5    shall not sit on this case.  Thank you so much.

6    PROSPECTIVE JUROR:  Okay.  Thank you.

7    [Prospective juror out]

8    THE COURT:  We have juror No. 4493

9    scheduled for tomorrow, October 8.  Her name is Marjorie

10   Jane Kile Hart; is that correct, Sheriff?

11   MR. COOK:  That's correct.

12   THE COURT:  And you made contact with her

13   and she called you and what happened?

14   MR. COOK:  The prospective juror called

15   me to inform me that she had been involved in some type of

16   accident.  She didn't clarify exactly what it was, but she

17   sustained a back injury.  She is confined at home under pain

18   medication and is under doctor's orders not to drive a

19   vehicle anyway until she's had an M.R.I. done, which is

20   supposed to be today or tomorrow, and diagnosis made for

21   treatment of her back injury.

22   THE COURT:  Let the record reflect that

23   Ms. Hart was born in 1935 so that would make her 68 years

24   old.

25   MR. COOK:  That's correct.

1          THE COURT:  Would you like to reschedule

2     her to a later time or would you like to agree?

3          MS. BUSBEE:  I would be ready with

4     agreeing on her.  I took a look at it this morning.

5          MR. SHOOK:  We'll agree on her.

6          [End of Volume]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 STATE OF TEXAS              *

2 COUNTY OF DALLAS            *

3   I, NANCY BREWER, Official Court Reporter for the 283rd

4 Judicial District Court, do hereby certify that the above

5 and foregoing constitutes a true and correct transcription

6 of all portions of evidence and other proceedings requested

7 in writing by counsel for the parties to be included in this

8 volume of the Reporter's Record, in the above-styled and

9 numbered cause, all of which occurred in open court or in

10 chambers and were reported by me.

11   WITNESS MY OFFICIAL HAND on this the 4 day of

12 _____March_____, 2004.

13

14

15 _____
NANCY BREWER, CSR, NO. 5759

16 Expiration Date:  12-31-04
Official Reporter, 283rd JDC

17 Frank Crowley Crts. Bldg. LB33
133 No. Industrial Blvd.

18 Dallas, TX 75207
(214)653-5863

19

20

21

22

23

24

25

74851

1       REPORTER'S RECORD

2       VOLUME 33 OF 6 VOLUMES

3       TRIAL COURT CAUSE NO. F01-00328-T

4  STATE OF TEXAS              *        IN THE DISTRICT COURT

5  VS.                         *        DALLAS COUNTY, TEXAS

6  PATRICK HENRY MURPHY, JR.   *        283RD DISTRICT COURT

7

8

9

10                  *********************

11              INDIVIDUAL VOIR DIRE

12                  *********************

**FILED IN**
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

13

14

15        On the 8th day of October, 2003, the following

16  proceedings came on to be heard in the above-entitled and

17  numbered cause before the Honorable Vickers L. Cunningham,

18  Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

19        Proceedings reported by machine shorthand.

20

21

22

23                                          **ORIGINAL**

24

25

1                   A P P E A R A N C E S

2    APPEARING FOR THE STATE

3    Mr. Toby Shook
     SBOT NO. 18293250
4    And
     Mr. Bill Wirskye
5    SBOT NO. 00788696
     Assistant District Attorneys
6    133 No. Industrial Blvd.
     Dallas, Texas 75207
7    Phone:  214/653-3600

8

     APPEARING FOR THE DEFENDANT
9
     Ms. Brook Busbee
10   Attorney at Law
     SBOT: 03488000
11   703 McKinney Ave. Ste. 312
     Dallas, TX 75202
12   214/754-9090

13   Mr. Juan Sanchez
     Attorney at Law
14   SBOT: 00791599
     5630 Yale Blvd.
15   Dallas, TX 75206
     214/365-0700

16

17

18
19

20

21

22

23

24

25

PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Michael Nichols | 4 | 5 | 42 | 33 |
| Micheaux Glosson | 69 | 70 | | 33 |
| Virginia Brown | 78 | 81 | | 33 |
| Scott Albright | 85 | 86 | 125 | 33 |
| Maribel Willis | 138 | 140 | 162 | 33 |

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Mr. Nichols.
 3                    [Prospective juror in]
 4              THE COURT:  Good morning, sir.
 5              PROSPECTIVE JUROR:  Good morning.
 6              THE COURT:  Welcome to the 283rd.  Sorry
 7    for the delay in getting started.  I had one of those
 8    unavoidable situations, a meeting downstairs.  And I usually
 9    start right on time, and I couldn't get here.  And it was my
10    fault.  I was downstairs.  I'm just telling you what
11    happened.
12              PROSPECTIVE JUROR:  No problem.
13              THE COURT:  We've got juror No. 4730,
14    Michael Jeff Nichols.  Mr. Nichols, have you had an
15    opportunity this morning to read the guide I provided for
16    you?
17              PROSPECTIVE JUROR:  Yes, sir.
18              THE COURT:  I also gave you a copy of
19    your questionnaire that you filled out for us back in May.
20    The objective this morning is to get you up to speed on the
21    law.  It's a lot to give someone and it's all complicated
22    how, you know, it all interrelates.  The bottom line is the
23    attorneys will visit with you about the law and help you
24    understand it.  And at the end of the program, I have two
25    questions I need to ask.  Number one is, do you understand
```

1  the law, and have a working knowledge of it?  And, number

2  two, can you follow the law?  That's the big picture.

3            The only question I have for you at this

4  time is will you be able to serve this Court for a period of

5  two weeks beginning on November 10th?

6            PROSPECTIVE JUROR:  Yes, sir.

7            THE COURT:  Thank you very much.  If

8  you'll turn your attention to Mr. Wirskye.

9            MR. WIRSKYE:  May it please the Court?

10           MICHAEL NICHOLS,

11 having been duly sworn, was examined and testified as

12 follows:

13           DIRECT EXAMINATION

14 BY MR. WIRSKYE:

15      Q.    Mr. Nichols, how are you this morning?

16      A.    Good.  How are you?

17      Q.    Good.  Thanks for joining us.  My name is Bill

18 Wirskye.  I'll be the Assistant DA that will be visiting

19 with you for the next few minutes.  You may see my partner

20 come in here in just a few minutes.  His name is Toby Shook.

21           What I'd like to do is follow up on some

22 of the information in your questionnaire, talk to you a

23 little bit about your thoughts and feelings on the death

24 penalty, and then talk to you a little bit about the laws

25 and the rules that apply in a case like this where the State

1   is seeking the death penalty.  Let's see, you're a buyer for

2   the Sport Supply Group; is that right?

3       A.      Correct.

4       Q.      Okay.  Tell us what you do kind of on a day-in

5   day-out basis?

6       A.      I'm responsible for merchandise that we bring

7   in.  I work for a -- oh, it's probably an 80, 90 million

8   dollar company.  We have a 190 thousand square foot

9   warehouse.  We bring merchandise in and I'm responsible for

10  all the apparel, clothing, that is bought for that company.

11      Q.      Okay.

12      A.      And I bring that merchandise in and, you know,

13  replenish stock, and do some other things, but that's

14  basically what it is.

15      Q.      Okay.  Do you travel a lot or is that --

16      A.      No, no, no.

17      Q.      Okay.  You live out in Coppell; is that right?

18      A.      Correct.

19      Q.      Okay.  Do you have a copy of your

20  questionnaire in front of you?

21      A.      Yes, uh-huh.

22      Q.      Let me just ask you, we ask a really confusing

23  question on very last page.  I just want to make sure, it's

24  kind of the question right above your signature.  Like I

25  said, we ask it in a very confusing way.  I've never been

1  convicted of a felony as an adult or a juvenile,

2  shoplifting.  And then we ask you is this statement true and

3  correct, if it applied to you.  I just wanted to make sure I

4  was -- understood what your answer was.

5       A.    As I understand it is that I've never been

6  convicted of a felon, that would be no; is that correct?

7       Q.    Okay.  That's what I thought.  But the way the

8  question is worded, it's just confusing.  I guess that's a

9  long way of asking you if you are a felon.

10      A.    I understand.

11      Q.    Okay.  Let me talk to you.  You told us

12  generally, I guess, you are in favor of the death penalty;

13  is that right?

14      A.    Uh-huh.

15      Q.    Okay.  Can you tell us why you are in favor of

16  it or what purpose you think it serves in our society?

17      A.    I just think that if a person takes the life

18  of someone, that the punishment would that be -- would be

19  that they would lose their life.  I feel strongly about

20  that.  My wife feels strongly about that.  Probably my whole

21  family feels strongly about that.

22      Q.    Okay.  Is there a particular type of case that

23  comes to mind when you think about an appropriate case for

24  the death penalty?

25      A.    Um, not particularly.  I just think if someone

1    takes the life of another person that, you know, when the

2    death penalty is opposed, that I just feel strongly about

3    that.  No particular case.

4         Q.    Okay.  You haven't followed a case in the

5    media or anything like that?

6         A.    Um, you know, I mean, I occasionally see some

7    things on TV that, you know, you kind of follow just because

8    you're interested in it.

9         Q.    Okay.  Did you get a chance to look at the

10   packet of law that the Judge gave you?

11        A.    Uh-huh.

12        Q.    I know it's a little confusing sometimes, but

13   just to kind of run through it briefly.  In Texas, we

14   reserve the death penalty just for murder cases.  And then

15   only certain types of murder cases, a subset of murder

16   cases.

17              If you kill a particular type of person,

18   a child under six years of age, policeman or fireman, prison

19   guard on duty, if you commit an intentional murder during

20   the course of another felony like robbery, burglary, or

21   rape, mass murder, serial murder, murder for hire, you hire

22   somebody to kill your spouse or your business partner, that

23   type thing.

24              Those are the only type cases that are

25   available for consideration of the death penalty in Texas.

1  Knowing that, does that kind of comport with your view on

2  what the appropriate type of case is?

3      A.    Yes.

4      Q.    Okay.  Sounds like if it was up to you, you

5  may expand it a little bit just to any murder case, or --

6      A.    Um, not knowing the exact law, after you maybe

7  explained it a little bit more, it would probably be to that

8  extent.

9      Q.    Okay.  Just that certain types of murder

10  cases?

11      A.    Yes.

12      Q.    The bad ones?  You can have a murder case that

13  has particularly bad facts that is not subject to the death

14  penalty.  If I turn to Mr. Shook here and I've been sitting

15  next to him for weeks now and decide I just, you know, don't

16  like his tie and shoot him ten times in the head in front of

17  all the bailiffs and the Judge.  Maybe I've been to prison

18  five times.  That's not a capital crime.  The worst I could

19  do is get that life sentence.  The death penalty wouldn't be

20  an option.  Does that make sense to you?

21      A.    Uh-huh.

22      Q.    Okay.  And I noticed --

23      A.    Yes, Yes, I'm sorry.

24              THE COURT:  She was fixing to ask you to

25  speak up.  She cannot record a nonverbal response.

1    PROSPECTIVE JUROR:  They told me that, I

2    apologize.

3    Q.    (By Mr. Wirskye)  And I know you checked on

4    your questionnaire that you do realize there are situations

5    where, even though the death penalty may be an option, it

6    may not be the appropriate sentence in that case; is that

7    right?

8    A.    Yes.

9    Q.    Depending on the facts and circumstances?

10    A.    Yes.

11    Q.    Okay.  Let me ask you another scenario that

12    comes up.  Oftentimes crimes are committed by more than one

13    person.  You can have a group or a gang of individuals that

14    commit a crime, anything from shoplifting all the way up to

15    capital murder.  The law allows us to prosecute everyone who

16    is actively involved in the crime for that crime.

17    And when you're talking about a capital

18    murder scenario, you may have a situation where if only one

19    person actually pulled the trigger, one person actually

20    caused the death.  For lack of a better term, we'll call him

21    the triggerman.

22    You may have other individuals who are

23    actively involved in the crime who didn't actually cause the

24    death.  The term you commonly hear is accomplice, I think.

25    So you may have the triggerman and the nontriggerman

1    accomplices.  Some people who believe in the death penalty

2    tend to draw a line or make a distinction between those

3    types of people.

4                    They may feel the death penalty is

5    justified for the person that pulled the trigger, but they

6    don't necessarily feel it's justified for those

7    nontriggerman accomplices.  For whatever reason, religious,

8    moral, or ethical, they would just take the death penalty

9    off the table as an option for those accomplices.  You know,

10   they may want to lock them up for life, but they just don't

11   personally feel that it would ever be appropriate for

12   someone that didn't actually pull the trigger.

13                   And some people kind of disagree with

14   that and say, you know, depending on the facts and

15   circumstances, I could see where an accomplice may deserve

16   the death penalty.  I'm just kind of curious where you come

17   down on that issue?

18        A.      A little mixed emotions about that.  You know,

19   I understand what you said about the triggerman and a person

20   that actually pulled the trigger.  Yes, I would feel

21   strongly about that.  But an accomplice, I might tend to

22   draw the line a little bit.  It just depends, you know, on

23   the circumstances that were involved.  So I could --

24        Q.      Okay.  And that's the most common answer.

25        A.      I could be -- there's a lot of influences that

1  would go into that, so I would maybe have a little bit of

2  mixed emotions about that.

3     Q.   Okay.  As you sit there right now, though, you

4  wouldn't automatically take that death penalty option off

5  the table for the accomplices?

6     A.   No.

7     Q.   Okay.  Let me run you through a fact situation

8  to kind of help you explain what the law is in Texas.  It

9  sounds like your feelings are exactly what the law is.

10          Say Mr. Shook and I decide to rob a bank.

11  The plan is that Mr. Shook is going to take our one pistol

12  in and he's going to hold up the tellers and kind of hold

13  them at bay.  And I'm going to go in unarmed with a bag and

14  kind of collect the money out of the cash drawers.

15          And we go and do this robbery.  Let's

16  say, for whatever reason, Mr. Shook shoots and intentionally

17  shoots and kills one of the tellers.  Maybe one of them

18  looked at him funny or maybe I saw one of them going for a

19  silent alarm and told him what I had seen.  But he shoots

20  and kills one of those tellers.

21          He's committed capital murder, that

22  intentional murder in the course of robbery.  He could be

23  found guilty of capital murder and face the death penalty,

24  depending on what the jury thinks.  The law also says that I

25  could, the accomplice, depending on the facts and

13

1    circumstances, be convicted of capital murder and face the

2    death penalty.  What do you think about that type of

3    scenario?

4           A.      That's tough, you know.  I probably would feel

5    pretty strongly about the death penalty for even an

6    accomplice in that case.

7           Q.      Okay.  And what the law is, is basically,

8    there's two ways that an accomplice like me could be found

9    guilty of capital murder and face the death penalty.  One is

10   we call it the law of parties.  We don't call them

11   accomplices in Texas for some reason.  We call them parties

12   to an offense.

13           But if I direct him to commit a capital

14   murder, saying, you know, they are going for the silent

15   alarm, shoot and kill her, then, obviously, I would be just

16   as guilty of capital murder and could face the death

17   penalty.

18           The second way that I can be found guilty

19   of capital murder and face the death penalty is under the

20   law of conspiracy.  And that simply means that we conspired

21   or we agreed to commit that bank robbery.  During the course

22   of that bank robbery, that murder happened.  And the law

23   says that if the jury feels that I should have anticipated,

24   if the accomplice should have anticipated that a life could

25   be taken, then I could be convicted of capital murder and

1    face the death penalty.  Does that make sense to you?

2           A.     Yes, uh-huh.

3           Q.     Is that kind of where you are?

4           A.     Yes.

5           Q.     It sounds like you are in line with the law,

6    even though, as an accomplice, I didn't actually have that

7    intent.  Does that make sense?

8           A.     Yes.

9           Q.     Okay.  Let me ask you this.  Like everybody

10   we've talked to, you've indicated that you at least have

11   heard something about the facts of this case.

12          A.     Yes.

13          Q.     That does not automatically disqualify you

14   from being a juror.

15          A.     Correct.

16          Q.     Obviously, if that were the case, we'd never

17   get a jury in cases like this, the high profile cases.  What

18   the law is very simply, is despite what you may have heard,

19   read, or seen, despite any opinions or impressions you may

20   have formed about the case, as long as you can kind of set

21   those aside, not necessarily forget about them, but just set

22   them aside and base your verdict in the case just on the

23   facts and evidence you hear in the courtroom, you'd be a

24   qualified juror.

25                 And I don't know if you're like me, but

1    you may not trust everything you see or hear in the media

2    these days.   But I think that the law recognizes that, that

3    the best source of information comes from the courtroom.

4    But is that something you think you could do?   Just base

5    your verdict on what you hear in the courtroom?

6         A.      Yes.

7         Q.      Okay.   What do you remember hearing about this

8    case?

9         A.      I just remember kind of basically when it

10   happened, you know, it was all over TV that, you know,

11   supposedly someone got shot in an Oshman's parking lot and

12   it was a police officer and, you know, the news media and

13   papers really followed that, you know, pretty -- so that's

14   basically just like any other person that watches TV

15   probably saw something about that.

16        Q.      Okay.   Sounds like you kind of have more of a

17   broad overview of the case instead of any real details?

18        A.      Pretty much, yeah.   I don't know quite any

19   details, but just what I saw on the TV and newspaper.

20        Q.      And, again, we talk to some people who know

21   quite a bit of the details, and, obviously, they would have

22   a hard time setting that aside.   But it sounds like you've

23   just kind of got the broad strokes of the big picture.   Have

24   you followed any of the subsequent court proceedings in

25   these cases?

1    A.    A little bit, yes.

2    Q.    Okay.  Are you aware of any of the verdicts in

3    the other cases?

4    A.    Yes.

5    Q.    Okay.  And what are you aware of or what have

6    you heard that they are, the verdicts?

7    A.    What, you talking about the previous?

8    Q.    Yes, sir.

9    A.    That they -- if I understand it right, they

10   all received the death penalty.

11   Q.    Okay.  Knowing that, do you think that would

12   influence your verdict or would you still be able to just

13   base your verdict on what you hear in the courtroom?

14   A.    I could just base it on what I heard in the

15   courtroom.

16   Q.    Okay.  Again, we can't ask you to forget those

17   things, but, you know, we just -- to be fair to both sides,

18   we want people that'll just listen to what happens from the

19   witness stand and the evidence they see.  Again, the media

20   sometimes is not a good source of information.

21         Just to give you kind of a broad overview

22   of the process.  Trials in Texas, even capital murder

23   trials, are broken down into two different phases.  I don't

24   believe you have ever been a juror on a case; is that right?

25   A.    No, sir.

1    Q.    Okay.  The first phase of the trial is what we

2   call the guilt/innocence phase.  And that's where the jury

3   is concerned with whether we have proved to you what we have

4   alleged in the indictment.  Basically, is the person guilty

5   or not guilty of capital murder.  I think you got a chance

6   to see the indictment in that packet?

7    A.    Uh-huh.

8    Q.    That's what we allege happened in this case.

9   And if we prove that to you as a juror beyond a reasonable

10  doubt, you find the person guilty of capital murder.  And

11  then we'd enter the second phase of the trial, which is

12  called the punishment phase.

13         The rules of evidence are a little

14  broader.  You get to hear additional or extra information

15  about a person's background, history, you know, both good

16  and bad, criminal history if it exists, that type of thing.

17  And the reason we let you hear this information is because

18  we ask a jury to answer these three questions, what we call

19  the Special Issues.

20         You know, we don't ask a jury to decide

21  between life and death and write in that verdict.  We ask a

22  jury to answer these questions, and depending on the answers

23  to the questions, that determines the appropriate verdict in

24  the case.  Does that make sense to you?

25   A.    Yes.

1    Q.    Okay.  So, you know, that's kind of the

2  procedure and how it works in a death penalty case.  And we

3  know for a lot of people you may be strongly, I guess,

4  philosophically or in the abstract in favor of the death

5  penalty.  When they get to this point in the process, it

6  becomes a little more real to them.

7              You are actually sitting here in a

8  courtroom, you know.  You may actually make it over to the

9  jury box some day soon.  You are looking at a living,

10  breathing human being who, very frankly, it's the State's

11  goal because we feel we have the type of evidence that, you

12  know, he be convicted of capital murder and one day

13  executed.

14              We know that changes things for some

15  people, and we want to make sure, before we go any further

16  in this process, that it's something that you don't have any

17  hesitation about.  Basically, that you feel you're the type

18  person that could listen to the facts and evidence and at

19  the end of the trial take pen in hand and answer these three

20  questions in such a way that it may result in the death of

21  another human being, may result in that execution.  Do you

22  think you are the type person that could do that?

23    A.    I think so, yes.

24    Q.    Okay.  And why do you say that?

25    A.    Just by hearing the facts that I could make a,

1   you know, reasonable judgment on hearing all the issues, the

2   facts in the case, that I would make a judgment on hearing

3   the facts.

4        Q.    Okay.  Any, uh, we know it's never a

5   comfortable situation, but no hesitation at all, this being

6   a capital case, a case where the State is seeking the death

7   penalty?

8        A.    I don't think so.  But when you did say, you

9   know, I could see where, you know, not being a juror before,

10  coming and, you know, seeing an accused party here and, you

11  know, it might make you feel a little uncomfortable.  But

12  still knowing that the facts or the facts that you could

13  make a judgment based on what you hear in the courtroom.

14       Q.    Okay.  Fair enough.  Let's talk about these

15  Special Issues a little bit.  I know you had a chance to

16  look at them in the packet.  They're phrased a little bit

17  differently up on the wall.  There are basically three

18  questions.  The Legislature drafted them.

19            They apply in every type of capital case

20  we talk about, so don't think we're the ones that used the

21  bad English when we drafted these questions.  But if you

22  could take just a moment or two and actually read back

23  through those three so we can talk about them.

24       A.    (Prospective juror complies.)

25       Q.    Those are the three questions, again, that we

1  ask a juror to answer at the end of the process to determine

2  the appropriate sentence.  It kind of, again, going back to

3  the scheme and how it works, you would only get to these, if

4  you found somebody guilty of capital murder.  And what the

5  law envisions is, or contemplates, even though you found

6  somebody guilty of capital murder, in order to be a

7  qualified juror, you need to be able to tell us that you

8  could start that second phase of the trial with an open

9  mind.

10       In a sense it requires a sort of mental

11  discipline for jurors.  Basically, what we don't want is

12  someone who, just because they found someone guilty of

13  capital murder, will automatically answer one of those

14  questions in a certain way.  Obviously, those people

15  wouldn't be able to do that mental discipline or keep that

16  open mind and they wouldn't be a qualified juror.  Does that

17  make sense to you?

18       A.    Yes.

19       Q.    And as we go through this process, I'll be

20  asking you that, I'm sure, until you're sick of hearing it,

21  about the open mind and the mental discipline, but that's

22  all that it boils down to.

23       Because we have some people, very

24  frankly, that tell us, I know what the law is, I just don't

25  think I can do it.  If I found someone guilty of capital

murder, I'm always going to answer Special Issue No. 1 a

certain way, or always going to answer No. 3 a certain way.

And if you feel that way, that's fine.  You just simply

wouldn't be a qualified juror.  And I make that point before

we kind of dive into this just to kind of let you know what

the law is.

                     But looking at Special Issue No. 1.

That's basically what we call the future danger question.

It asks if there is a probability that the defendant would

commit criminal acts of violence such that he would

constitute a continuing threat to society.  Does that

question kind of make sense to you --

          A.     I think so.

          Q.     -- when it asks you to make a prediction about

the future?

          A.     Uh-huh.

          Q.     Is that something you're comfortable with,

making that sort of prediction?

          A.     Yes.

          Q.     Okay.  Is there a particular type of evidence

or particular things that you would like to hear that you

would think would be helpful in answering that question?

          A.     No.

          Q.     Okay.  A lot of the words in these questions

aren't necessarily defined for us.  We just kind of leave it

1  up to the jurors to kind of use their everyday common sense

2  interpretation or definitions of these words.  And we always

3  ask people kind of what -- how they would define certain

4  words and phrases.  But when you see that word "probability"

5  in the first question, what does that mean to you?

6      A.     Just means that there's, I guess, a sense that

7  something could be done.  There's a chance of possibly

8  something happening, future, you know.

9      Q.     That's typically what we hear, you know, a

10  likelihood or a greater than not chance that something would

11  happen.  The law gives us a little bit of guidance.  It

12  says, you know, it's -- probability is something short of a

13  certainty, because we can never prove anything to you, you

14  know, to that certainty.

15              Something less than a certainty, but

16  something more than a possibility, because anything could be

17  possible.  So, I guess, the more likely than not, greater

18  than not, 51 percent of the evidence, that type thing.  Are

19  those definitions you are comfortable with?

20      A.     Yes.

21      Q.     Okay.  The phrase "criminal acts of violence"

22  in the second line, what comes to mind when you see that

23  phrase?

24      A.     Criminal acts of violence to me, robbery,

25  murder, something like that, I mean, that's pretty violent

1  acts to me.

2      Q.      Okay.  Assaults, threats of violence, that

3  type thing?

4      A.      Yes.

5      Q.      Okay.  And, again, it's not necessarily

6  limited.  We don't have to necessarily prove to you that

7  he's going to kill someone else or be involved in another

8  murder, just that there's that probability for the criminal

9  acts of violence, like you said, robbery, murder, assaults,

10 that type thing.  Does that make sense to you?

11     A.      Yes.

12     Q.      Okay.  And finally the last word in that

13 question, "society."  Again, it's not defined.  But when you

14 see that word, what does it mean to you?

15     A.      What we live in.

16     Q.      Okay.  Anyone and everyone he may possibly

17 come into contact with?

18     A.      Uh-huh.

19     Q.      To include people outside of prisons and

20 people inside prisons?

21     A.      Yes.

22     Q.      Okay.  Guards, wardens, teachers, nurses, that

23 type thing?

24     A.      Yes.

25     Q.      Okay.  An important thing to remember about

1    Special Issue No. 1 and Special Issue 2 is exactly the same
2    way.  They both start off with a no answer, okay?  That's
3    kind of the default setting for those two questions.  And
4    it's part of our burden of proof at this table to prove to
5    you, that -- a juror, beyond a reasonable doubt, that the
6    answer should be yes.  Okay?  And if we don't prove it to
7    you, if we don't meet our burden, the answer stays no.  Does
8    that kind of make sense to you?

9          A.    Yes.

10         Q.    One way to think about this is, you know,
11   there is only two possible punishments for capital murder in
12   Texas, a life sentence and the death sentence.  And if you
13   convict someone of capital murder, one way to look at it is
14   they're sitting on that life sentence at that point.  They
15   are going to get a life sentence unless and until these
16   questions are answered in such a way that calls for the
17   death penalty.  Does that make sense to you?

18         A.    Yes.

19         Q.    Okay.  If that first question is answered yes,
20   that future danger question, then you move to the second
21   Special Issue.  And, again, these kind of require that you
22   keep an open mind.  An independent inquiry, the law
23   contemplates, should be made for each question.

24              Sometimes we run into problems with
25   people.  Some people tell us, you know, very frankly, I

1  can't keep that open mind to No. 1.  If I've found somebody

2  guilty of capital murder, I'm always going to think, you

3  know, they are a future danger.  That question is already

4  answered for me before I hear any evidence in the second

5  phase of the trial.  I just, I don't have that mental

6  discipline to keep that open mind.  I'm just always

7  automatically going to answer that question yes, just

8  because I found him guilty of capital murder.

9              And if you feel that way, that's fine.

10 But that's kind of the situation we run into with some

11 people.  They can't keep that open mind and wouldn't be a

12 qualified juror.  But is that something you think you could

13 do, is not, I guess, automatically prejudge question one

14 just because you found somebody guilty of capital murder?

15      A.      I think so, yes.

16      Q.      Okay.  I mean, there is a certain amount of

17 common sense.  I think I know what people are thinking when

18 they say that.

19      A.      Uh-huh.

20      Q.      But, you know, just to give you an example.

21 Let's say I come home one day, found out my next door

22 neighbor has sexually abused my young daughter.  I think

23 about it overnight and the cops aren't doing anything.  I

24 get madder and madder about it.  I wake up the next morning,

25 kick in his door, and kill him.

1          I've committed murder during the course

2   of a burglary, capital murder.  But -- and I'd be convicted

3   of it.  But when you got down to these Special Issues, the

4   jury may feel that, even though I've been convicted of

5   capital murder, that I wouldn't be that future danger.  I

6   may have led a spotless life or it's a one-time situation.

7   In a sense I was somewhat justified morally in doing that.

8   Does that make sense to you?

9          A.    Yes.

10         Q.    And since we never know, we can't preview the

11  facts of the case, that's why the law requires that you keep

12  that open mind.  So -- but moving on to Special Issue No. 2

13  again, it starts off with that no.  We have to prove it to

14  you it's a yes.

15              This is the question that deals with that

16  scenario we talked about, about accomplices.  The question,

17  basically, boils down to three different parts.  If you

18  think the person actually caused the death, that is, if you

19  think he's the triggerman, you would answer it yes.  If you

20  think he intended to kill the deceased or another, but

21  didn't actually do it, you know, you would answer yes.

22  Maybe going back to my scenario where I directed him to

23  shoot and kill someone.  I, obviously, had the intent.  I

24  just didn't actually do it.

25              And then, finally, that last phrase in

1   that question, the third part about it.  You answer that

2   question, if you think the accomplice anticipated that a

3   human life would be taken.

4                     I want to point out something really

5   important to you.  That's a little bit different standard

6   than what we talked about earlier.  If you will recall, in

7   order to be convicted of capital murder as an accomplice,

8   the jury has got to feel that I should have anticipated that

9   a life would be taken.

10                     When we get to punishment in Special

11  Issue No. 2, the standard is a little bit higher.  The jury

12  has got to feel that there was actual anticipation, that I

13  actually anticipated that a life would be taken.  And it's a

14  higher standard.  And it's important that jurors be able to

15  see the distinction between them in order to be qualified.

16  Does that make sense to you?

17          A.       Yes.

18          Q.       Okay.  Is that a distinction that in your mind

19  you can see between should have anticipated and did

20  anticipate?

21          A.       Yes.

22          Q.       The best example I can think of is when I was

23  16 my dad bought me my first car.  And I just drove it like

24  a wild man for about a month before I, of course, missed a

25  corner and wrecked it out.

1      My dad was really mad at me.  And he

2  said, you know, you should have anticipated driving that way

3  that you were going to wreck that car, which is true.  I

4  should have anticipated, but I didn't, because I was young

5  and dumb.  I had no actual anticipation.  But, obviously,

6  looking at it, I should have anticipated.  But it's

7  important that jurors see that distinction.

8      Again, it starts off with a no.  We've

9  got to prove it to you that the answer should be yes.  If

10  both of those questions are answered yes, then we move to

11  the kind of the last step in the process or the last

12  question, which is Special Issue No. 3.

13      This question is a little bit different

14  than the first two in the sense that neither side has the

15  burden of proof.  We just leave it up to the juror to answer

16  it however they feel, whether it be a yes or a no answer.

17      And, basically, this question asks a

18  juror to kind of stop, take a deep breath, look back at all

19  the facts and evidence they heard, the facts of the crime,

20  the facts of the defendant's character and background, what

21  sort of blame he bears in the crime, and ask yourself is

22  there anything mitigating?

23      Is there anything that, by mitigating,

24  lessens his personal moral culpability, lessens his blame in

25  the incident.  And if there is something there, is it

1    sufficient that his life ought to be spared, that he ought

2    to be given that life sentence rather than a death sentence.

3              If that question is answered no and the

4    first two are answered yes, if you have a yes, yes, and a

5    no, that there's nothing mitigating, then a death sentence

6    is automatic, and that's what the Judge would impose.  He

7    has no discretion at that point.  Again, if any of these

8    questions are answered in any other way, it just means that

9    person gets that capital life sentence.  Does that make

10   sense to you?

11        A.    Yes.

12        Q.    Okay.  When you think about something that

13   might be mitigating, something that might lessen a person's

14   moral blame, is there anything that comes to mind when you

15   talk about a situation like this?  I know it's a tough

16   question.  We ask everybody this.

17        A.    Nothing.

18        Q.    I can tell you the most common response is

19   nothing, I guess.  We hope jurors don't sit around thinking

20   about what is mitigating in a death penalty case.

21        A.    No.

22        Q.    Sometimes jurors tell us a person's

23   background, maybe their environment, if they were

24   physically, mentally, emotionally abused, or how they were

25   raised.  Some people think that could be potentially

1  mitigating.  Other people say, you know, may have had a bad

2  upbringing or a bad childhood, but, you know, at some point

3  you are an adult, you make your own choices and have to be

4  held accountable.  Where do you kind of come down on that

5  question?

6       A.      You know, you -- I think you're, you know,

7  responsible for your own actions.  And, you know, I

8  understand sometimes things happen that you -- maybe an

9  upbringing that's maybe not good.  Maybe your, you know, had

10  some troubles and, you know, so I can understand that a

11  little bit that maybe that has some involvement on, you

12  know, where you may stand.

13       Q.      Okay.  Sounds like you're kind of in the

14  middle of the two extremes, just, I guess, depending on the

15  facts --

16       A.      Correct.

17       Q.      -- of what it actually may be?  And that's

18  actually all the law requires is that you keep an open mind.

19  You don't have to consider anything necessarily mitigating.

20  You don't even have to agree with the other jurors, if you

21  think something is mitigating and they don't or vice versa.

22              You just have to be able to tell us, in

23  order to be qualified, that you'd keep that open mind.  If

24  you heard mitigating evidence, you would weigh it and make

25  the appropriate decision.  It sounds like something you

1  could do; is that right?

2          A.      Correct.

3          Q.      Okay.  Do you see the value in kind of having

4  this question as kind of the last stop in the process?  I've

5  heard people describe it as kind of the jury's chance to

6  show mercy, if they feel it's appropriate.  But do you see

7  the value in having that type question?

8          A.      Yes.

9          Q.      Because, again, we run into the problem

10 sometimes with people that tell us, you know, I know what

11 the law is, I know I'm supposed to keep that open mind all

12 the way down to the third question, but, you know, very

13 frankly, I've convicted someone of capital murder, I found

14 they are a future danger, I found they anticipated that a

15 life would be taken, and they tell us at that point my mind

16 is closed.  I believe he should get a death sentence and

17 there is just never going to be anything that I would

18 consider mitigating.

19                  If you feel that way, again, that's fine.

20 You just wouldn't be able to -- you wouldn't be a qualified

21 juror, because you couldn't keep that open mind.  But it

22 sounds like that's something you could do, is keep that open

23 mind even this late in the process; is that right?

24         A.      Correct.

25         Q.      Okay.  Again, I'll go back to it, I mean, it's

1   so very important at this phase in order to be qualified

2   that you don't do anything automatically.   Just because you

3   found somebody guilty of capital murder, does not

4   necessarily automatically answer any of these questions for

5   you, in order to be a qualified juror.

6                    You know, obviously, you can go back and

7   look at the facts you heard in the first part of the trial

8   and you may not think about your answer very long, but you

9   just need to be able to tell us you have that open mind and

10  that you would hold us to our burden of proof on those first

11  two questions.   Is that something you think you can do?

12           A.      Correct.

13           Q.      Okay.   Let me talk to you a little bit about

14  just some of the general rules that apply in a criminal

15  case.   The burden of proof is always on the State.   It's

16  always on this table.   You could never look at these folks

17  to bring you anything.   They have no burden of proof at all.

18  You know, you may want to hear from them, it may be nice,

19  but you can't hold that against them, if they don't.   You've

20  always got to look to us to see if we've met our burden of

21  proof.

22                    As a part of that, a person is always

23  presumed innocent.   You know, if we quit this trial right

24  now and all went home, Mr. Murphy would be found not guilty.

25  You only find him guilty of capital murder when we've met

1   our burden of proof and prove to you he's guilty beyond a

2   reasonable doubt.  You only get to the death penalty, again,

3   if we meet our further burden of proving those first two

4   questions to you.  As a part of that, you may have heard of

5   a person's Fifth Amendment right not to testify?

6       A.    Correct.

7       Q.    No one can force him to testify, if he doesn't

8   want to.  Conversely, if he wants to testify, no one can

9   keep him off the stand.  But if he does not testify, you

10  will be instructed by the Judge that the law is that you

11  cannot consider that in your deliberations.  It's simply a

12  nonfactor.

13            Obviously, as human beings, I think we

14  all would like to hear from the person charged.  That's kind

15  of a natural reaction.  But, nevertheless, you can't require

16  that or you can't hold it against the defense, if the person

17  doesn't testify.

18            There may be a lot of reasons somebody

19  doesn't testify.  They may be guilty, they may not be good

20  public speakers, or they may be following their lawyer's

21  advice, that type thing.  But you can't hold it against

22  them, if they don't testify.  Does that make sense to you?

23      A.    Yes.

24      Q.    Okay.  Is that a law that you think you could

25  follow?

1      A.      Yes.

2      Q.      Okay.  Knowing this is a criminal case in

3   which we've alleged a police officer has been murdered, you

4   can probably anticipate you are going to hear from police

5   officer witnesses.

6               What the law is, is that you cannot give

7   a police officer witness an automatic head start in

8   credibility.  You know, you can't just jump them up

9   automatically because they walk in the courtroom wearing a

10   badge and a gun.

11               You've got to start them off with that

12   same level of credibility as every other witness.  You know,

13   if you listen to them and hear about their training and

14   their background and what they say makes sense, you can go

15   with it.  If not, you won't.  Does that make sense to you?

16      A.      Yes.

17      Q.      Okay.  You're not going to automatically

18   believe a police officer, just because he's a police

19   officer?

20      A.      No.

21      Q.      Okay.  Another area that I think kind of

22   points out again that mental discipline that jurors need is

23   when we talk about the elements of the crime.  As part of

24   our burden of proof, the law says that we need to prove each

25   and every element to a jury beyond a reasonable doubt.  And

1   that indictment that you looked at, that we draft,

2   basically, is our version of how the crime was committed.

3                    It's our responsibility to write it and

4   it kind of breaks down into different elements.  The law

5   says we have to prove each and every element.  We can't go

6   nine for ten or eight for ten.  We don't get partial credit.

7   Jurors can't help us out, if we miss an element.  Very --

8   kind of basically, the elements of a murder case would be

9   that a certain person on a certain day, on or about a

10  certain day, in a certain county, killed another person in a

11  certain way.

12                   Those would very roughly be the

13  elements of the crime.  Obviously, if we didn't prove to you

14  that we had the right person, you have a question about that

15  element, you'd find the person not guilty.  Interestingly,

16  the law says legally that one element is no more important

17  than another.

18                   Just to show you kind of an extreme

19  example of kind of the mental discipline we need, you know,

20  that element of the county is just as important as identity.

21  Let's say we -- you're our juror and we try a case to you, a

22  murder case, that we say happens in Grand Prairie.  Part of

23  Grand Prairie is in Tarrant County and part is in Dallas

24  County.  We allege it happened in Dallas County.

25                   We don't do our homework.  Cops don't do

1   their job.  We're just flat negligent.  We get to trial, you

2   have no doubt the person is good for it, and that nine for

3   ten, got all those elements except that one, the county.  We

4   got the county wrong.  You think it happened in Tarrant

5   County.  The law would require that you find the person not

6   guilty at that point, even if you think he committed a

7   murder.

8                    A lot of people don't like that.  They

9   think it's a technicality.  You know, I guess one person's

10  technicality is another person's constitutional right.  But

11  nevertheless, in order to follow the law and to be that

12  qualified juror, under that situation you would have to find

13  the person not guilty, basically, because we didn't do our

14  job.

15          A.    Right.

16          Q.    You would probably find him not guilty and run

17  up and find our boss and get us fired immediately.  But is

18  that something you think you could do is follow that

19  particular aspect of the law?

20          A.    Yes.

21          Q.    And, again, we've got to prove how a person

22  was killed.  If we allege a person was shot with a gun, the

23  evidence turns out that it was a knife, that's what the

24  medical examiner says.  You may have no doubt the person

25  killed the other person, but you would still have to find

1    him not guilty because we didn't do our job.  Again, you may

2    not like it, but it's something that the law would require.

3    Is that something you think you could do?

4        A.    Yes.

5        Q.    Okay.  Sometimes in these cases the defense or

6    even the State or both sides may call like psychiatrists or

7    psychologists to testify in that second phase, the

8    punishment phase of trial, to kind of help give a juror, I

9    guess, some insight on Special Issue No. 1, future danger,

10   or No. 3, the mitigation question.

11             And we always ask jurors kind of what

12   their impression is of those type of witnesses in these type

13   cases, you know, those mental health professionals.  What do

14   you think about that type of scenario, that type of witness?

15       A.    I think they probably maybe can give you some

16   maybe inside information of maybe what the person thinks,

17   the background, maybe some, you know, interesting things

18   that would maybe pertain to the case or that would help you

19   influence, you know, the way, how if you were having trouble

20   understanding something, it would shed some light on it to

21   make it clear for you.

22       Q.    Okay.  You could at least keep an open mind to

23   that part of it, those type of witnesses?

24       A.    Yes.

25       Q.    There's some people that say they just don't

1  flat believe in that type of stuff.  They think it's a soft

2  science.  Or some people, I guess, believe when it comes to

3  expert witnesses, if you look far enough and pay enough

4  money, you could find someone to say anything.  The opposite

5  end of that spectrum is we find people that think, you know,

6  just because they are a psychologist or a psychiatrist,

7  every word out of their mouth is golden, you know, they walk

8  on water.

9                    And we can't have either ends of those

10  extremes.  We've got to have the people in the middle.  But

11  that's kind of where you sound like you are; is that right?

12          A.      Correct.

13          Q.      Okay.  Let me talk to you a little bit.  You

14  know, we talked about the two possible punishments for

15  capital murder, that life sentence and then the death

16  penalty, if the questions are answered yes, yes, and no.

17  Let me tell you what a life sentence means in a capital case

18  in Texas, and you'd be instructed this, if you were a juror.

19                    A life sentence in a capital murder case

20  means the person would serve forty years, day for day, hard

21  40 years, before they would become eligible for parole.

22  Okay?  That's the first time they are going to see a Parole

23  Board.  They may make parole right at forty years or they

24  may never make parole and actually serve an actual life

25  sentence.  Okay?

1    We don't have life without parole in

2  Texas.  So that's what a life sentence in these cases means

3  in Texas.  The law tells you what it means and then it asks

4  you to kind of disregard that.  And the reason is this.  You

5  know, those decisions are so far in the future and beyond

6  the control of anyone in this courtroom, that we kind of ask

7  jurors just to presume that a life sentence means a life

8  sentence.

9    You know, we don't want people who don't

10  have that mental discipline to say, you know, forty years,

11  that isn't long enough, I'm not taking a chance he's going

12  to get out on the streets in 40 years, so I'm going to kind

13  of blow off the evidence and just answer these questions in

14  such a way that he, you know, gets that death sentence.

15    And, conversely, we don't want jurors to

16  say 40 years is long enough.  I'm just going to answer these

17  questions in such a way that he gets that life sentence.

18  It's really another vehicle of making the juror work through

19  the evidence and work through the questions.  Does that make

20  sense to you?

21    A.    Yes.

22    Q.    Okay.  That sounds like a law you could follow

23  and you could presume that a life sentence means a life

24  sentence?

25    A.    Correct.

1    Q.    Okay.  One other area we need to talk about, I

2  don't know if this will come up, but we always kind of do it

3  just in anticipation if it does, and these are these things

4  called lesser included offenses.  Okay?  Lesser included

5  offenses.

6          Just to give you an example what that is,

7  say there's a capital murder case, murder in the course of a

8  robbery.  Okay?  And you, as a juror, at the end of all the

9  evidence in the first phase, you get to the point where you

10 have a reasonable doubt that the person actually committed

11 the murder.  Okay?  There's no doubt in your mind he's good

12 for the robbery, but you just are unsure about the murder.

13         You may have an option at that point of

14 finding the defendant guilty of a lesser included offense,

15 which would be aggravated robbery.  Does that make sense to

16 you?

17    A.    Yes.

18    Q.    If that happens, then you throw this scheme

19 out the window.  And the law just lets you in that second

20 phase, set a punishment somewhere in the punishment range

21 for aggravated robbery, which would be anywhere from five

22 years in prison all the way up to life or 99 years.

23         Again, the law requires, in order for you

24 to be a qualified juror, that you would be able to tell us

25 as you sit there right now in any capital -- or any

1   aggravated robbery case, that you could keep an open mind to

2   that full range of punishment, whether it be five years or

3   whether it be life.  Is that something you think you can do?

4        A.     Yes.

5        Q.     Basically, what we're asking you is if you

6   heard an aggravated robbery case where you thought life was

7   the right thing to do, could you assess life?  If you heard

8   an aggravated robbery case where you thought five years was

9   the right thing to do, could you give five years?  And it

10  sounds like that's something you could do?

11       A.     Correct.

12       Q.     Okay.  You about tired from the legal lesson?

13       A.     I learned a little bit.

14       Q.     I hope so.  I hope I was clear.  It's always

15  tough when you go first because we have to explain all the

16  law.  These guys get to have a little more fun, just kind of

17  visiting with you.  But, are there any questions that you

18  have, Mr. Nichols, about any of this scheme or anything we

19  have gone over or --

20       A.     No.

21       Q.     Or any hesitation you have or question you

22  have about possibly being a juror in this case?

23       A.     I don't think so.

24       Q.     Okay.  Just give me a few seconds here.  I

25  think that's about all I have.  I'll just emphasize one last

```
 1   time, you're probably sick of hearing me say open mind and
 2   mental discipline, but that's what we require from jurors,
 3   to be fair and not prejudge anything, and really work
 4   through the questions and work through the evidence.  And I
 5   appreciate your time.  Thank you very much.
 6        A.    Thank you.
 7              MR. WIRSKYE:  That's all I have, Judge.
 8              THE COURT:  Mr. Sanchez?
 9              MR. SANCHEZ:  Thank you, Your Honor.
10                      CROSS-EXAMINATION
11   BY MR. SANCHEZ:
12        Q.    How are you doing, Mr. Nichols?
13        A.    Great.
14        Q.    Need some water or anything --
15        A.    No.
16        Q.    -- before we go on?
17        A.    No, I'm fine.
18        Q.    My name is Juan Sanchez.  I'm going to ask you
19   a few questions concerning some of your answers.  But I did
20   notice that one of the, one of the persons that you wrote
21   down that you admire was Cal Ripken, so I guess you are a
22   baseball fan?
23        A.    Yeah.  I do some umpiring.
24        Q.    Oh, you do some umpiring?  Little League?
25        A.    I do some umpiring, so I'm a baseball fan,
```

1  yeah, Little League umpire, yeah.

2          Q.      Well, as my co-counsel knows, I could probably

3  sit here and talk baseball with you all day.  But I'm not

4  going to do that.  Okay?  We'll save that for a later date.

5                  You know, when Mr. Wirskye asked you

6  questions, you know, they -- sometimes they phrase them, in

7  order for you to be a qualified juror, in order for you to

8  make it on this jury, you have to do certain things.  And,

9  you know, our first reaction, I think, nobody wants to say

10 that they are unqualified to be a juror.  And, of course,

11 you know, when you are asked a question that way, your first

12 answer is always, of course, I could do that to be

13 qualified.

14                 But, you know, sometimes when you're

15 sitting on a jury or become a juror, in order to uphold the

16 law or follow the law, sometimes you may have to do things

17 that you don't agree with in upholding that law.  Sometimes

18 you may have to decide in a way that goes against what you

19 believe or what you think.

20                 And, you know, that's why we need to ask

21 you a lot of questions and find out if there is any

22 conflicts with the law and what you would do, if you were

23 put in that situation.  So that's why we have to explore

24 some of your answers.  And Mr. Wirskye asked you a lot of

25 questions where it only required you to give a yes or no

1  answer.  But I would like you to speak a little more and

2  tell us what your true feelings are about things.  Is that

3  okay?

4       A.    Yes.

5       Q.    Okay.  And you can understand why we would

6  have to do something like that, right?

7       A.    Yes.

8       Q.    Because, you know, we want jurors who can be

9  fair and who could follow the law, even if it might go

10  against what they think is right.  Okay?  You had indicated

11  that you had very strong feelings for the death penalty.

12      A.    Correct.

13      Q.    And everybody in your family felt the same

14  way.  Nothing wrong with that.  You know, I think most

15  people that walk in here tell us those things.  But as you

16  have now learned, I mean, you know, life, a life sentence

17  could be an option in a capital murder case and that

18  surprises a lot of people.

19                 Sometimes a question is asked, you know,

20  if we could make you Governor of Texas for a day or king of

21  Texas for a day, what would you do in a certain situation,

22  or would you change a certain law?  And, you know, I just

23  want to ask you, you know, based on your feelings about

24  capital murder and the death penalty, if you were Governor

25  for a day, would you make life an option in a case like

1  this?

2       A.    I don't think so.

3       Q.    You wouldn't?

4       A.    No.

5       Q.    In your mind, once somebody is convicted of

6  capital murder, it should be the death penalty.  Is that

7  what I -- I kind of got that feeling when you were up there

8  speaking.

9       A.    Yeah, that's the way I feel.

10      Q.    Okay.  And what do you think about, you know,

11 the way the death penalty scheme is set up where life is an

12 option?  What do you think about that?

13      A.    Um, not really sure what you're asking me.

14      Q.    Well, because as you can see, as the law was

15 explained to you --

16      A.    Uh-huh.

17      Q.    -- you know, life is actually the first

18 option.

19      A.    Uh-huh.

20      Q.    And, actually, it's the only option unless the

21 State can prove their Special Issues the way they told you

22 they have to do it.  What do you think about that?

23      A.    I kind of feel strongly about the death

24 penalty and, you know, I pretty much, you know, would be

25 able to render that verdict, if that's all the evidence

1   would show that.  So that's kind of how I feel about it.

2          Q.     Well, and, you know, and why I'm asking this

3   is because, you know, there are some jurors that are just

4   honest.  We leave it up to you to be honest with us.  And

5   only you can tell us, that, you know, once it was proven to

6   you beyond a reasonable doubt that this person was a capital

7   murderer, you know, I'd start off with the death penalty

8   being the first option.

9          A.     Uh-huh.

10         Q.     And have somebody else convince me that it

11  shouldn't be that way, that the death penalty should not be

12  imposed.  Do you feel that way?

13         A.     Yes.

14         Q.     Okay.  So, I mean, just being honest, I mean,

15  just go ahead and tell me if the State proved to you that

16  Mr. Murphy was a capital murderer, guilty of capital murder,

17  would these Special Issues already start against him or in a

18  way where he would be receiving the death penalty and it

19  would be up to the defense or somebody to show you why he

20  should receive the death penalty?

21                MR. WIRSKYE:  I object, Your Honor.  They

22  haven't given this juror the law.  They're just asking

23  questions in a vacuum without telling him what the law is.

24  We believe it's unfair to the juror.

25                MR. SANCHEZ:  Your Honor, I haven't

1   gotten that far yet.

2                    THE COURT:  Overruled.  You understand

3   he's asking for your opinion at this point?

4                    PROSPECTIVE JUROR:  I'm not really sure

5   what he's really asking, to be honest with you.

6        Q.    (By Mr. Sanchez)  Okay.  You told us in your

7   mind that if, you know, if you were Governor for a day or

8   whatever, that life may not, shouldn't be an option if you

9   were able to write the capital murder laws; is that correct?

10       A.    Uh-huh, yes.

11       Q.    Okay.  So what I'm asking is, just honestly,

12  and, of course, we leave it up to you to be honest with us,

13  if the State proved to you that Mr. Murphy was guilty of

14  capital murder, they proved it to you beyond a reasonable

15  doubt, and then you got to these Special Issues over here,

16  would the answers already start off for you in a way that

17  would result in the death penalty?

18                   MR. WIRSKYE:  Judge, I'm going to object.

19  He's not asking personal opinions, he's injecting facts.

20                   THE COURT:  Sustained.

21       Q.    (By Mr. Sanchez)  Personally?

22       A.    I mean, I think that he would -- I mean, my

23  idea would be that, you know, that he would receive the

24  death penalty.  And I understand those questions there that,

25  I mean, I, basically, may not know really what he's asking

1    me, just basically my opinion?

2                        THE COURT:  Yes, sir.  He's asking your

3    opinion.

4         Q.    (By Mr. Sanchez)  Exactly.  That's what I was

5    asking you.  And, you know, the law says, though, that you

6    start off Mr. Murphy at a life sentence.

7         A.    Correct.

8         Q.    And you wouldn't even get to the death

9    penalty, unless they could prove the Special Issue No. 1 to

10   be yes, Special Issue No. 2 to be yes, and that you would

11   answer Special Issue No. 3 no.  You understand that that's

12   what the law is?

13        A.    Yes, uh-huh.

14        Q.    But in reality, in your mind, and just being

15   honest with us in the court, you may have already started

16   him off at Special Issue No. 1 to be yes before it's even

17   proven to you, or Special Issue No. 2.

18                       THE COURT:  You are asking four different

19   questions here.  Break it up.

20        Q.    (By Mr. Sanchez)  Okay.  Just being honest

21   with us, would you already on Special Issue No. 1 already

22   decided that it should be answered yes, based on the fact

23   that you found him guilty of capital murder?

24        A.    I wouldn't necessarily say it would be

25   answered yes, but I mean, you know, once the facts were

1  presented I would, you know, my idea, I'm not necessarily

2  saying that I've already answered the question yes, but in

3  just my opinion, more than likely that would be a yes, yes,

4  no. But, I mean, I don't -- I can't answer that question.

5          Q.     And when you say in your opinion, what do you

6  mean by that?  Would you already be leaning that way or --

7          A.     Not necessarily, but, you know, if he was

8  convicted of capital murder, then that might be in my mind.

9  I may have a clear view of that, that question would be a

10  yes.

11          Q.     Okay.

12          A.     That's just my opinion.

13          Q.     Okay.  On Special Issue No. 2, Mr. Wirskye

14  explained to you that in order to find somebody guilty of

15  capital murder as an accomplice or as a co-conspirator, they

16  would have to prove to you beyond a reasonable doubt that he

17  should have anticipated that a human life would be taken.

18  You understood that?

19          A.     Uh-huh, yes.

20          Q.     But in order for them to have you answer

21  Special Issue No. 2 yes, they would have to prove to you

22  beyond a reasonable doubt that he actually did anticipate

23  that a human life would be taken.  You know, we've had some

24  jurors that say, well, you know, once they've proven to me

25  that he should have anticipated that a human life would be

1    taken, you know, that would be good enough for me.  What do

2    you think about that?

3         A.    He probably could have maybe anticipated that

4    a human life would have been taken.  I would agree with

5    that.

6         Q.    Okay.  Now, if they proved to you that he

7    should have anticipated that a human life would be taken,

8    would they have to prove to you, then, that he actually did

9    anticipate that a human life would be taken before you could

10   answer Special Issue No. 2 yes?

11        A.    I don't think so.

12        Q.    They wouldn't have to prove that to you?

13        A.    Well, no, I'm sorry.  They would have to prove

14   that to me, but --

15        Q.    Okay.  Because, you know, we have some jurors

16   that say, well, once I found that he should have

17   anticipated, well, that just leads me to the answer that he

18   actually did.  So how do you feel about that?

19        A.    I feel strongly about that, that he probably

20   should have anticipated that.

21        Q.    Okay.  What I'm asking you is would you

22   require them to prove that next step to you?

23        A.    Um, yes.

24        Q.    And could you answer that question no, if you

25   had a doubt as to whether he actually anticipated that a

1    human life would be taken?

2         A.      Could you repeat that again?

3         Q.      Okay.  Let's say you are in the first part of

4    the trial.  Okay?  And you have been convinced beyond a

5    reasonable doubt that Mr. Murphy should have anticipated

6    that a human life would be taken.  Okay?  And that's in the

7    first part of the trial where you find him guilty or not

8    guilty.  But you've been convinced beyond a reasonable doubt

9    that as a party he should have anticipated that a human life

10   would be taken.

11              Then you get into the second phase of the

12   trial where you are to decide not only should he have

13   anticipated, but did he actually anticipate.  Okay?  Let's

14   say that you are sitting there and you say, well, I may have

15   a reasonable doubt as to what he actually thought, whether

16   he actually in his mind anticipated that a human life would

17   be taken.  How would you answer that question?

18        A.      I don't know.  He could have probably maybe

19   anticipated that, but that, there could be some doubt as to

20   whether he anticipated that a life would be taken or not.

21   That's -- that's hard to say.

22        Q.      And if you have that doubt as to him actually

23   anticipating that a human life would be taken, could you

24   answer that question no?

25        A.      I think so.

1      Q.     Okay.  Before we jump into Special Issue No.

2  3, I just want to backtrack, because I kind of got off track

3  on what I was going to ask you.  You had indicated that you

4  had heard something about this case in the media?

5      A.     Correct.

6      Q.     And heard something about the prior verdicts.

7  How does that affect you, what you know at this point?

8      A.     Um, I don't know, nothing particular.  You

9  know, I know that they supposedly received the death

10 penalty.  I just vaguely heard that and, you know, I saw

11 when that came out.  But it doesn't -- I don't know, affect

12 me really any way one or the other.  I feel like maybe they,

13 you know, if they were found guilty of that, that the proper

14 punishment was delivered.

15     Q.     Have you formed any opinions as to or based on

16 what you've heard so far?  Just honestly, have you formed

17 any opinions?

18     A.     Not really.

19     Q.     Either way?

20     A.     Not really.

21     Q.     The fact that you learned that the other ones

22 were found guilty, does that somehow lead you to think that

23 that's what should happen in this case?

24     A.     You would think that.  Most people would

25 probably think that.  I wouldn't necessarily say that's a

1    given truth, but maybe a little bit of influential thinking

2    that this may be the case.  But I wouldn't necessarily say

3    that's a --

4         Q.    I mean, could you guarantee the Court, though,

5    that that wouldn't play a part in your deliberations?

6         A.    It wouldn't.  That wouldn't play a part.

7         Q.    Now, Mr. Wirskye talked to you about the fact

8    that, you know, that they have to prove everything in their

9    indictment, all the elements of an offense.  And that's

10   under the notice requirement, you know, the Constitution.

11   In order to charge somebody with an offense, you have to

12   give them notice of what they're charged with.

13              And, you know, they get to write up the

14   indictments any way they want.  But when you give somebody

15   notice, you know, we don't want people to be tried by

16   ambush.  In other words, you give them notice of one thing

17   and you prove the case another way and still expect a

18   conviction.  And we talked about, you know, not proving the

19   right town, you know.  That's always an easy one for jurors.

20              But we also have the situation, you know,

21   where manner and means, they have to prove -- they don't

22   just have to prove a capital murder, they have to give them

23   notice of how they say that capital murder happened.  And he

24   gave you the example of, you know, a stabbing instead of a

25   shooting, you know.

1          I always ask jurors to think about that,

2   reflect upon it, about how they would hold the State to

3   their burden.  Because, you know, I think a lot of us say,

4   you know, I can follow the law when I like the results.  But

5   I may not be able to follow the law when I don't like the

6   results.

7          And, you know, we've had jurors that

8   honestly tell us, you know, if I've been convinced beyond a

9   reasonable doubt that this person is a capital murderer, and

10  the only reason I'm being asked to find this person not

11  guilty is because they've proved a stabbing instead of a

12  shooting, I just quite honestly couldn't let a capital

13  murderer walk based on that.  You know, I want to do the

14  right thing and I just wouldn't feel like I'm doing the

15  right thing, if I did that.  What do you think about that?

16  What are your feelings about that?

17          A.     Uh, I think that they would have to prove all,

18  like you said, all ten out of ten, you know, decisions or

19  that everything would have to be proved to show that that

20  was committed and everything was perfect or correct.  That's

21  how I feel about that.

22          Q.     You may not like the result, but you could

23  still do that.  Is that what you are telling me?

24          A.     Correct, uh-huh.

25          Q.     Because, you know, we've had a lot of jurors

1   say, you know, I know that's what the law is, but I just, I

2   wouldn't feel right coming out here and telling the

3   courtroom full of people that he's not guilty, even though

4   I'm convinced that he's a capital murderer.  You could still

5   do that?

6        A.    Yes.

7        Q.    Now, let's get back to Special Issue No. 2.

8   As you can tell -- I mean, and as we've talked about, you,

9   as a juror, have to decide what a person is thinking, right?

10   Because you have to decide whether he actually anticipated

11   that a human life would be taken.

12             And a lot, you know, some jurors say,

13   well, you know, I may need to hear from Mr. Murphy, you

14   know.  In order for me to decide that question, I need to

15   have him up on the stand, telling me what he actually was

16   thinking.  And, of course, that conflicts with the Fifth

17   Amendment right not to take the stand or not to say

18   anything.  What do you think about that?

19        A.    I wouldn't necessarily have to hear that's

20   what he was thinking from him, personally.  But it wouldn't

21   necessarily be that I would have to hear from him.

22        Q.    Okay.  So you could answer that question

23   without having to hear from him?

24        A.    Correct.

25        Q.    Okay.  We've also had other jurors on that

1    issue tell us, well, you know what, in order for me to

2    answer that question -- once I found him guilty of capital

3    murder, in order for me to answer that question in his

4    favor, or as a no, I need to hear something from the

5    defense.  I mean, I may need some proof offered by the

6    defense.  What do you think about that?

7         A.    I wouldn't necessarily need to hear that.

8         Q.    And -- or some say, if he didn't offer some

9    proof, then, you know, I don't think I could ever answer

10   that question in his favor.

11        A.    No.

12        Q.    No?  Fair enough.  Special Issue No. 3, of

13   course, is, as Mr. Wirskye explained to you, that's the last

14   step.  Okay?  If you answer -- if you get to question No. 3,

15   it's because you've answered Special Issue No. 1 and Special

16   Issue No. 2 yes.  In other words, if you answer Special

17   Issue No. 1 no, that's where it stops, and it's an automatic

18   life sentence.

19               So if you get to Special Issue No. 3, you

20   have already convicted him of capital murder, you already

21   felt he was a continuing threat to society, and answered yes

22   to Special Issue No. 1, and you've already decided that he

23   anticipated that a human life would be taken.  Okay?  You've

24   already gotten that far in the process.

25               And some people say, you know, once I've

57

1   done all of that, Special Issue No. 3 really doesn't have

2   much value for me.  I'm not going to listen to any excuses.

3   I'm not going to give that question as much thought because

4   I've already done all these things.  You know, why are we

5   even dealing with this right now?  What are your feelings

6   about that?

7       A.      I can see that.  You know, I can understand

8   after you are answering both questions yes, that maybe you

9   get to the last question and maybe there are some mitigating

10  circumstances, but, you know, I'd feel strongly about with

11  both questions being answered yes that, you know, that maybe

12  that doesn't necessarily make as much difference.  But there

13  could be some circumstances that, you know, could be to

14  that.  But if both of the other questions were answered yes,

15  then I could see where it might not be as big of an issue.

16      Q.      Okay.  And, you know, we have to ask that

17  because, you know, sometimes there's that snowball effect,

18  you know.

19      A.      Correct.

20      Q.      Once you get the ball rolling on capital

21  murder, Special Issue No. 1 and Special Issue No. 2, Special

22  Issue No. 3 just gets kind of steamrolled.

23      A.      Correct.

24      Q.      And the law, you know, requires that that

25  seriously be considered.  And in your mind you would give it

1 a thought?

2   A.  Correct.

3   Q.  When Mr. Wirskye explained to you that an

4 accomplice, nontriggerman, could be eligible for the death

5 penalty.  You expressed some -- was it some surprise or you

6 said that would be a tough call?  Could you expound upon

7 that?  I mean, what your feelings are about that?

8   A.  I just think, you know, maybe if somebody, you

9 know, pulled a trigger and killed somebody and maybe that,

10 you know, somebody else was, obviously, an accomplice to it,

11 but didn't actually fire the pistol that, you know, I could

12 maybe draw a little bit of a line between, you know, give

13 you a little bit of a doubt of, you know, what somebody

14 maybe was thinking.  That's just kind of how I feel about

15 that.

16   Q.  Okay.  And when you say draw a little bit of a

17 line, what do you mean by that?

18   A.  Well, just, you know, I know that he maybe not

19 necessarily pulled the trigger, but, you know, I just feel

20 like maybe that there would be room that, you know, maybe

21 that he didn't have an intent or something or knew about it

22 or something to that effect.  That's as much as I can tell

23 you.

24   Q.  And, you know, Mr. Wirskye asked you if

25 drawing that line, would that somehow affect your feelings

1   on whether that person should receive the death penalty or

2   not?

3         A.    I don't think so.  I don't think so.

4         Q.    So that would be important to you in deciding

5   whether you are even guilty of capital murder?

6         A.    Correct.

7         Q.    And you might think to yourself, well, if

8   they're not a triggerman, then I might have a doubt whether

9   they even actually had the intent, is that what --

10        A.    It's possible, but it just, with all the facts

11  given and maybe I, that would be hard for me to make that

12  judgment or decision.

13        Q.    Okay.  And just revisiting, again, your

14  feelings about the death penalty and the fact that you may

15  not want it, you personally would feel that a person should

16  receive a life sentence, if they were found guilty of

17  capital murder.  Would that play into your decision-making

18  in this case?

19        A.    I don't think so, no, sir.

20        Q.    Because what I hear you saying is, you know,

21  you may not want life to be an option.  I mean, can you

22  truly tell this Court that life would be something that

23  would be in your mind or result of a life sentence?

24        A.    For capital, I don't think life would be.  It

25  would be the death penalty.  I don't think life would be an

1  option.

2       Q.      Okay.  And you are being honest with us?

3       A.      I'm trying to be honest, correct.

4       Q.      And so going into this case, I mean, life

5  wouldn't be a real option for you as a juror?

6       A.      I don't think so, no, sir.

7       Q.      Okay.  Even though the law says that it's set

8  up in a way where life is an option and actually the first

9  option, you're being honest with us and telling us that if

10  you sat on this jury, then it would be hard for you to

11  answer these questions in a way that --

12       A.      It may be a little hard.  It may be a little

13  hard.

14       Q.      Okay.  You understand that the law is set up,

15  though, where life is actually the first option?

16       A.      Correct.

17       Q.      And it stays that way.  But if you sat on this

18  jury.  That really wouldn't be an option for you, would it?

19       A.      I don't think so.

20       Q.      So based on that answer in this particular

21  case, you really couldn't return a verdict that would result

22  in a life sentence?

23       A.      It would be hard for me to say that I could,

24  but I don't really think so.  But, you know, without -- not

25  hearing all the facts and details of it, I would say

1    probably not.

2             Q.     Okay.

3                    THE COURT:  Counsel, please approach.

4                    (Bench conference)

5        Q.     (By Mr. Sanchez)  Sorry for that interruption.

6        A.     No problem.

7        Q.     But based on what you have been telling us, I

8    get the feeling that you really couldn't be fair in a case

9    of this nature, in a death penalty case.  Is that -- would

10   that be fair to say?

11       A.     I don't think, yeah, that's correct.

12       Q.     It would be correct in saying that based on

13   the fact that this involves capital murder and your strong

14   feelings about capital murder, you really couldn't be fair

15   as a juror?

16       A.     I don't think so.

17       Q.     You couldn't be fair?

18       A.     I could not be fair.

19       Q.     Okay.  Maybe this might be the kind of case

20   that maybe you are probably better off on another type of

21   case where you could be fair to the defense.  But in this

22   case you probably couldn't be fair to the defense?

23       A.     Correct.

24       Q.     Basically, I'm going the long way to ask you

25   just the basic question, is that you'd be biased against the

1  defense before we even started this case based on the fact

2  that it's a capital murder case and your feelings about

3  capital murder?

4      A.      You know, it's possible, yeah, I would say so.

5  You know, I'm thinking that, you know, with capital murder

6  that I would probably be -- I probably couldn't.

7      Q.      You just couldn't be fair?

8      A.      I couldn't be fair, in my own opinion.  You

9  guys are asking me that.  That's my own opinion.

10     Q.      I went a long way to ask you that question,

11  didn't I?

12     A.      Yeah.

13     Q.      Okay.  Thank you for being honest about that.

14              MR. SANCHEZ:  That's all I have, Your

15  Honor.

16              THE COURT:  Thank you, Mr. Nichols.  If

17  you would --

18              MR. WIRSKYE:  Judge, may I inquire of the

19  juror?

20              THE COURT:  Yes, sir, you may.

21     Q.      (By Mr. Wirskye)  Mr. Nichols, I'm sorry to

22  keep you up here and batting you back and forth.  I'm a

23  little bit confused.  When you say you couldn't be fair to

24  the defense, what do you mean by that?

25     A.      Well, you know, I guess in my mind I'm

1  thinking that, you know, first of all to be honest with you,

2  you know, I'm a little overwhelmed because this is a little

3  bit confusing, especially for someone who has never served

4  on a jury before, and, you know, being up here with several

5  people asking questions.  So there's a little bit of

6  confusion and I don't know if that's an intent to confuse me

7  or not.  I don't know.

8       Q.    Well, that's what I'm trying to figure out, if

9  you are confused.  Because when we visited, you know, I was

10  able to explain the law and it sounded like --

11      A.    I understand.

12      Q.    And you said that you could follow the law and

13  be fair.  And now it kind of sounds like whether you are

14  confused or not, I kind of get a different answer.  And I

15  just thought --

16      A.    Well, I guess maybe a little bit, but, you

17  know, I do believe in the death penalty.  But maybe that --

18  maybe my mind is already made up, you know, I don't know.

19  I'm just trying to think that maybe I couldn't be partial

20  towards, you know, just serving a life sentence without --

21      Q.    Well, I mean, would you be able to work

22  through these Special Issues and, I mean, you understand --

23      A.    I think so, but, yeah, I should be able to.

24      Q.    I mean, it's just based on the evidence --

25      A.    Correct.

1    Q.    -- would be your answers, no matter how you

2   personally feel.

3    A.    Sure.

4    Q.    You feel like you could follow the law as it's

5   been explained to you?

6    A.    Yeah, I think I could follow the law, yeah.

7   Just, you know, somewhat, to be honest with you guys, I'm a

8   little confused about what I've been asked, and, you know,

9   like --

10    Q.    That's what I thought.

11    A.    Sure.

12    Q.    And I want to make sure that the law is clear

13   to you, that you tell us you can follow it.  If you can't

14   follow the law, that's fine, too.

15    A.    It is -- it is clear.  I mean, I'll be less

16   than tell you that I'm a little bit in the dark of some of

17   the questions and stuff, and how they're interpreted, but

18   not that, you know, with -- you know, being here that I, you

19   know, wouldn't be able to, you know, make a decision and

20   stuff about it based on the facts.

21    Q.    Well, you're not going to, due to your beliefs

22   and your personal opinions on the death penalty, you're not

23   going to answer these questions in such a way to insure that

24   he gets the death penalty, regardless of the evidence, are

25   you?

65

1          A.      No.

2          Q.      Okay.  Then that's not -- I didn't think

3    that's what I heard you say.

4          A.      Right.

5          Q.      What I hear you telling them is, hey, you

6    probably don't want me as a juror because I'm pretty stiff

7    on the death penalty.

8          A.      Sure.

9          Q.      But, nevertheless, I could follow the law?

10         A.      I would think I could follow the law.

11         Q.      And base my verdict on the facts and evidence

12   that I hear in the courtroom?

13         A.      Sure.

14         Q.      Okay.  Thank you, Mr. Nichols.

15                 MR. WIRSKYE:  That's all I have, Judge.

16                 MR. SANCHEZ:  I have nothing further.

17                 THE COURT:  Mr. Nichols, I have two

18   questions that I asked you at the beginning of the process.

19   I have to answer them now.  Number one is, is do you

20   understand the law?  And you just gave me the answer that

21   it's kind of confusing, but you understand that you've got

22   these three Special Issues here.

23                 PROSPECTIVE JUROR:  I think I understand

24   them.  You know, I'm a little -- to be honest with you,

25   Judge, I'm a little -- you know, it's a little confusing a

1  little bit to me.  And I'm not saying I'm probably not any

2  different than anybody else, but I'm just being honest with

3  you.

4          THE COURT:  That's all we want.  Let me

5  try to give you a different spin, if you will.  They have

6  spun it one way and the defense spins it another.  This

7  capital murder scheme in Texas is designed to be a filter,

8  if you think about the concept.  Mr. Wirskye came up with an

9  example.  You can have a horrible gruesome murder that is

10  not even eligible for the capital scheme.  And Wirskye can

11  shoot Busbee, chop her up with a chainsaw and put her

12  through a tree chipper.  I mean, this is as bad as it can

13  get.  Murder.  Life sentence is as maximum as it can get.

14          We get to the next level, if you commit

15  capital murder, by one of those eight ways I showed you in

16  the guide.

17          PROSPECTIVE JUROR:  Sure.

18          THE COURT:  Then here comes the filtering

19  system.  If you have found someone guilty of capital murder,

20  then the State has to prove to you these issues, whether or

21  not there will be a probability the defendant will commit

22  criminal acts of violence in the future.  We call that the

23  future danger issue.  Who has to prove that to you?

24          PROSPECTIVE JUROR:  The prosecution.

25          THE COURT:  The next filter is, okay, if

1   we have found someone guilty of capital murder and if we

2   find beyond a reasonable doubt that they are going to be a

3   future danger, then the next issue becomes intent.  We're

4   going to reserve the death penalty for those people who

5   intended to kill or anticipated that a life would be taken.

6   You see the difference there?

7                   PROSPECTIVE JUROR:  Uh-huh.

8                   THE COURT:  And we found them to be a

9   future danger.  So you filter it some more.  And then the

10  last filter is, okay, if we've gone that far, you step back

11  and look at all the evidence that's in the trial, again, to

12  determine whether or not, that's what that is, whether or

13  not taking into consideration all the evidence, including

14  the circumstances of the offense, the defendant's character

15  and background, and the personal moral culpability of the

16  defendant, backing up, looking at everything again.

17                  You start out with a life sentence.

18  Under our scheme, if you get to Special Issue No. 1 and you

19  filter it down, yes, and the next one, if you filter down

20  some more, and you find he either intended or anticipated,

21  yes, and you filter it some more.  Well, no, we don't want

22  to spare his life.  You see how you have a funnel?  That's

23  what the law requires you to do.

24                  Now, here is the question that you have

25  to answer and I need a yes or a no, straight up or down,

1    35.16 (a)(9), here's the question.  Have you formed a bias

2    or prejudice in favor of or against the defendant, Mr.

3    Murphy, this man here on the end, understanding the law

4    before we begin this trial, can you look at him and say, you

5    know -- if you have a bias, just say yes, sir, and that's

6    fine with me.

7                    PROSPECTIVE JUROR:  Yes, sir.

8                    THE COURT:  Thank you so much.  Please

9    wait for us outside.

10                   [Prospective juror out]

11                   THE COURT:  Mr. Wirskye?

12                   MR. SHOOK:  The State has no challenge

13   for cause.

14                   THE COURT:  Mr. Sanchez?

15                   MR. SANCHEZ:  We have challenge for

16   cause, Your Honor, based on the fact that this juror has

17   already formed a bias against Mr. Murphy before we start

18   this trial.

19                   THE COURT:  The Court finds the juror not

20   to be qualified.  Ask Mr. Nichols to come back in.

21                   [Prospective juror in]

22                   THE COURT:  Mr. Nichols, I want to thank

23   you for your honesty and thoughtfulness in going through

24   these issues.  We appreciate your service to the Court, but

25   you shall not be seated on this jury.

```
1              PROSPECTIVE JUROR:  Thank you.

2              THE COURT:  All right.

3                   [Prospective juror out]

4                   (Recess)

5              THE COURT:  Mr. Glosson.

6                   [Prospective juror in]

7              THE COURT:  Good morning, sir.  How are

8   you?

9              PROSPECTIVE JUROR:  How are you doing?

10             THE COURT:  We've got juror No. 4363,

11  Mr. Micheaux Glosson; is that correct?

12             PROSPECTIVE JUROR:  Micheaux Glosson.

13             THE COURT:  Micheaux?

14             PROSPECTIVE JUROR:  Micheaux.

15             THE COURT:  Micheaux.  Welcome to the

16  283rd.  Did you have an opportunity this morning to read the

17  guide I provided for you?

18             PROSPECTIVE JUROR:  Yes, sir.

19             THE COURT:  And did you get a look at the

20  copy of your questionnaire that you filled out for us back

21  in May?

22             PROSPECTIVE JUROR:  Yes, sir.

23             THE COURT:  At this point in time the

24  attorneys are going to visit with you.  The objective is

25  that you get a working understanding of the law we're
```

1  dealing with and how it relates to this case.  And at the

2  end of the day, I have a question to ask you, is, number

3  one, do you understand the law?  And the second is, can you

4  follow it?  Before I let the attorneys ask you anything

5  else, will you be able to serve this Court for a period of

6  two weeks beginning on November 10th?

7                    PROSPECTIVE JUROR:  Um, between what

8  hours?  What hours are we talking about?

9                    THE COURT:  Normal business hours.

10                    PROSPECTIVE JUROR:  Yeah, I think so.  I

11  mean, I work at night.  I work a night job.

12                    THE COURT:  Where do you work?

13                    PROSPECTIVE JUROR:  At Superior Rental

14  (phonetic).  I work for a temp service, at Mary Kay.

15                    THE COURT:  A temp service for Mary Kay?

16                    PROSPECTIVE JUROR:  Uh-huh.

17                    THE COURT:  Mr. Glosson, I need you to

18  sit forward in that chair and speak into the microphone.

19  You're very soft-spoken.  And I need you to be sure to say

20  yes or no to any questions because she has to record

21  everything that you say.

22                    PROSPECTIVE JUROR:  Okay.

23                    THE COURT:  Mr. Shook?

24                    MR. SHOOK:  Thank you, Judge.

25                    MICHEAUX GLOSSON,

1  having been duly sworn, was examined and testified as

2  follows:

3  <u>DIRECT EXAMINATION</u>

4  <u>BY MR. SHOOK:</u>

5  Q.    Mr. Glosson, I'm going to ask you questions on

6  behalf of the State.  And all's we're interested in are your

7  honest opinions.  There aren't any right or wrong answers.

8  I've looked over your questionnaire and you appear to be the

9  type of person that does give us kind of your -- you'll tell

10  us the way you feel.  Am I reading you right?

11  A.    Yes, sir.

12  Q.    Okay.  That's all we're interested in.  That's

13  why we bring so many people down and talk to so many people,

14  because people feel strongly about these matters.  But the

15  law requires us to talk to you individually.  You got a

16  chance to look over your questionnaire?

17  A.    Yes, sir.

18  Q.    Okay.  There's one question on page 10 at the

19  top, we just ask people kind of how they feel about things,

20  if you feel you're correct.  And we give you about five

21  categories there and you put, always hold my ground when you

22  feel you are correct, which we get from a lot of folks.  But

23  I take it from that, that if you feel you're right about

24  something or if you believe strongly in something, if you

25  have a conviction about it, you're the type of person who

1    will stand by it; am I reading you right?

2         A.    Yes, sir.

3         Q.    Okay.  Fair enough.  That's the kind of people

4    we like talking to because we can trust what you say.

5    Everyone feels differently about the death penalty.  In your

6    questionnaire you said -- we just asked if you are in favor

7    of it and you said no, that you are not in favor of it.  And

8    you said that, I don't think it's a proper way to punish a

9    criminal.  That's what you have jails for.  So I take it

10   from your answer that from your personal point of view, you

11   are opposed to the death penalty; is that right?

12        A.    No, not really.  I mean, it depends on the

13   case.  It depends on, you know, the evidence and the facts.

14        Q.    Well, then, when we asked you the question,

15   are you in favor of the death penalty, why did you check no?

16        A.    I mean, well, it depends.  You know, I mean it

17   could be a yes or no.  I tried to explain it the best way I

18   could.  But, I mean, it depends on the case.

19        Q.    Well, you said I don't think the proper way to

20   punish the criminal, that's what we have jails for.

21        A.    That's on the first page?

22        Q.    Yes, sir.

23        A.    Well, I mean, it depends on the case.  Just

24   like you got to, you know what I'm saying, an adult killing

25   a child or something, I mean, it depends on the case.  See

1  what I'm saying?

2          Q.      All right.  Let's go, then, to, let me ask

3  you, on page 3, about halfway down, a little below halfway

4  down, we ask, do you have any moral, religious, or personal

5  belief that would prevent you from sitting in judgment of

6  another human being?  You see that question?

7          A.      Uh-huh.

8          Q.      Okay.  And on the yes or no you checked yes.

9  You explained your answer, I don't feel it's right for a man

10  to judge another man, especially in sentencing him to death.

11          A.      I think it's for religious reasons, probably.

12  You know, I mean, just -- I don't think it's right for a man

13  to judge another man, I mean, left to the man upstairs.

14          Q.      Is that a religious --

15          A.      I'm not a real religious person.  I mean,

16  that's just what I was taught coming up.

17          Q.      Okay.  Is that the way you were raised to

18  believe?

19          A.      That's the way I was raised, pretty much.

20          Q.      Okay.  We have -- that's the reason we ask

21  that question, because some people come down and say, I was

22  raised in a home by my parents --

23          A.      I wasn't raised real religious, though, you

24  know.

25          Q.      Well, how were you raised?

1    A.    I was raised in a religious family, but, you

2    know -- but, I mean, they -- what I know about church and

3    things like that, they taught me.  I learned on my own, but,

4    you know, they didn't just make me go to church, you know.

5    Q.    So you came up with those decisions on your

6    own?

7    A.    Yes, you know, pretty much, what I learned

8    growing up and learned from my family.

9    Q.    But that's -- you were telling us the truth

10   when you said that?

11   A.    Uh-huh.  Yes.

12   Q.    Okay.  And is that something you feel strongly

13   about?

14   A.    Not exactly.  I mean, like I say, I'm not a

15   real religious person, you know.

16   Q.    Well, your answer, I don't feel it's right for

17   a man to judge another man, especially sentence him to

18   death.  Were you telling us the truth then?

19   A.    Yes, that's the truth, yes, sir.

20   Q.    Is that how you feel?

21   A.    That's how I feel.

22   Q.    Okay.  So in a death penalty type case, you

23   are not the type of person who could sit in judgment and

24   judge whether someone could die?

25   A.    We're dealing with real life here, though.  I

1   mean, you know --

2       Q.      I'm sorry?

3       A.      We're dealing with real life.  I mean, if it

4   had to be done, then, you know, I mean, we judge people

5   every day.  It's society, you know, I mean.

6       Q.      So are you saying you lied when you told us

7   this?

8       A.      I mean, it's something I wouldn't like to do.

9   I mean, I wouldn't enjoy judging a person, but people judge

10  every day.

11      Q.      Would you be able to do that?

12      A.      Yes, I would be able to do it, I mean, if

13  that's what has to be done.

14      Q.      Okay.  Well, then, tell me why you said the

15  exact opposite on this questionnaire?

16      A.      Um, I couldn't explain that right now.  It's

17  just how I felt at the time.  It's how I felt at the time.

18  Like I said, I'm not a real religious person, you know.

19      Q.      Well, whether you're religious or not, you

20  said on that day that you couldn't sit in judgment of

21  another human being.

22      A.      I said, I feel it's not right.  It's just how

23  I felt at the time.  I don't think it's right.  But if

24  that's what has to be done, then.

25      Q.      So you think you could sit in judgment?

1    A.    I could, I mean, just, you know, I could judge

2  a person.  But that's, you know, I just was taught that a

3  man is not supposed to judge a man, you know.

4    Q.    You've been taught you're not supposed to

5  judge?

6    A.    Yeah, well, you know, a human being really

7  ain't supposed to judge another human being.  That's just

8  what I was taught growing up, you know, you leave that to

9  the man upstairs, but we judge people every day, so.

10    Q.    Well, we have people that come in here every

11  day and they feel exactly as you do and they tell you, I was

12  raised and I can't judge someone, especially in a death

13  penalty case.  And we say, that's fine if you really feel

14  that way.  And they tell us, I do, and then we excuse them.

15  And we have other people that just can't wait to judge

16  people.  You know, but it's no right or wrong answers.

17    A.    I don't think it's a problem with me, though.

18  I mean, it's probably, you know, some judges feel the same

19  way about that that I feel, you know.

20    Q.    No, I don't think there's any judge that feels

21  that way or they wouldn't be a judge.

22    A.    You're right.  Well, it's not a problem, no.

23    Q.    It's not a problem?

24    A.    It's not a big problem.

25    Q.    Well, then, should we go over every question

1   in this questionnaire?  Because so far you're changing every

2   answer when I'm asking you about it.

3        A..   Okay.  We can proceed.

4        Q.    I mean, are you standing by these answers or

5   are they all going to be different?

6        A.    I mean, that's what I was feeling.  How long

7   ago was this that I filled out the questionnaire?

8        Q.    Back in May.

9        A.    I mean, I've been through a lot since May, so.

10       Q.    Okay.  What have you been through since then?

11       A.    I've been to Georgia and back, and, you know,

12   a lot of financial problems, and I've been through a lot

13   since May.  I lost a friend.  I've been through a lot since

14   May.

15       Q.    Has that caused you to change your feelings?

16       A.    No, I'm the same person, you know, nothing has

17   changed.  But, I'm just saying I go through things every

18   day, man, and it's not going to change me, though, know what

19   I'm saying?  I may not feel the same way I felt on this date

20   when I filled out these questions --

21       Q.    So have you changed?  Because you were under

22   oath --

23       A.    -- you're just trying to interrupt me, because

24   I was trying to --

25       Q.    You were under oath when you filled this out

1   the first time, and now your answers are all different.

2        A.      It's not different.  I'm just trying to, you

3   know, reading through all the, you know, trying to explain

4   my answers pretty much, trying to explain myself.  I mean, I

5   put I don't feel it's right for a man, you know, that's just

6   what I feel.  But if that's what has to be done, that what

7   has to be done.

8                MR. SHOOK:  Judge, I believe that's all

9   the questions I have.

10               MS. BUSBEE:  We've reached an agreement

11  on this juror, Your Honor.

12               THE COURT:  Thank you, Mr. Glosson.  The

13  parties have agreed to excuse you.  You are free to go.

14                    [Prospective juror out]

15                    (Recess)

16               THE COURT:  Ms. Brown.

17                    [Prospective juror in]

18               THE COURT:  Good afternoon.

19               PROSPECTIVE JUROR:  Good afternoon.

20               THE COURT:  We have juror No. 4516,

21  Virginia Ruth Brown.

22               PROSPECTIVE JUROR:  Uh-huh.

23               THE COURT:  Ms. Brown, how are you?

24               PROSPECTIVE JUROR:  I'm fine today, how

25  are you?

1        THE COURT:  Doing all right.  Did you
2   have an opportunity to have enough time to read the guide I
3   provided for you?

4        PROSPECTIVE JUROR:  Yeah, I read it, you
5   know, most of it.

6        THE COURT:  Also, I gave you a copy of
7   your questionnaire.  Did you have time to look over that?

8        PROSPECTIVE JUROR:  Yes.

9        THE COURT:  That way you can remember
10  some of the answers you gave us back in May.

11        PROSPECTIVE JUROR:  Some of them.

12        THE COURT:  Some of them.  That's why I
13  gave it to you, so you can refer to it, if necessary.  They
14  may want to ask you to further explain some of your answers.
15  This is an opportunity for you to be able to understand and
16  have a working knowledge of the law we're talking about, be
17  able to visit with the lawyers, and please ask questions.

18        PROSPECTIVE JUROR:  Okay, I sure will.

19        THE COURT:  This is an opportunity for
20  you to learn.

21        PROSPECTIVE JUROR:  Okay.

22        THE COURT:  At the end of the process I
23  have two questions I must ask.  Number one is, do you
24  understand the law?  Number two, can you follow the law?
25  That's the big picture I have.

1          PROSPECTIVE JUROR:  Okay.

2          THE COURT:  The only question I have for

3  you, ma'am, is will you be able to serve this Court for a

4  period of two weeks beginning on November 10th?

5          PROSPECTIVE JUROR:  Well, yes.  Only

6  situation I have is I've got a 90-year-old daddy at home.

7  And as long as I wouldn't have to be sequestered.

8          THE COURT:  No, ma'am, you won't be.

9          PROSPECTIVE JUROR:  But other than that,

10  you know, because I work every day and he's, um, I be at

11  home with him about 6:00.

12          THE COURT:  We have normal business hours

13  here, meaning we start at 8:30 and we quit between 4:30 and

14  5:00, no later than 5:00.  The only time that you could

15  possibly be sequestered is if the jury were trying to make a

16  decision on the case.

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  At that point the jury cannot

19  separate.  So that would only be maybe at the end of the

20  trial.  But you would certainly have plenty of notice about

21  it.

22          PROSPECTIVE JUROR:  Yes, okay.

23          THE COURT:  Is that something that you

24  can work with?

25          PROSPECTIVE JUROR:  Yes.

1    THE COURT:  Very well.  Mr. Shook, would

2  you like to inquire?

3    MR. SHOOK:  Yes, Judge.

4    VIRGINIA BROWN,

5  having been duly sworn, was examined and testified as

6  follows:

7    DIRECT EXAMINATION

8  BY MR. SHOOK:

9    Q.    Ms. Brown, my name is Toby Shook and I'll be

10  asking you questions on behalf of the State this afternoon.

11  And, like the Judge said, there aren't any right or wrong

12  answers.  We just want your honest opinions, okay?

13    A.    Okay.

14    Q.    I'm going to go over some of the stuff on your

15  questionnaire and then we'll talk about capital murder in

16  general and some of the rules and laws that apply to these

17  types of cases, and get your opinions about that, also.

18    A.    Okay.

19    Q.    We always ask about prior jury service and I

20  believe you put that you've been on a jury before and you

21  described it as a murder case; is that right?

22    A.    Yes.

23    Q.    How long ago was that?

24    A.    Oh, it's been quite a while, almost 12 years.

25    Q.    Was that here in Dallas County?

1      A.     Yes, it was.

2      Q.     Here at this courthouse?

3      A.     Yes.

4      Q.     Okay.  What do you recall, I think you said

5 they found him -- you found the defendant guilty; is that

6 right?

7      A.     Yes.

8      Q.     And what was the punishment?

9      A.     Death penalty.

10     Q.     Okay.  What do you remember about the facts?

11     A.     Of the case that I was on?

12     Q.     Yes, ma'am.  I know it's been a while, but --

13     A.     Yeah.  How do you want me to, you know,

14 explain it?

15     Q.     Do you remember anything about what the case

16 was about, the facts involved, about how the killing

17 occurred, anything like that?

18     A.     Oh, strangulation.

19     Q.     Okay.  Did the defendant testify at all?

20     A.     No.

21     Q.     All right.  How did the deliberations go?

22 Were they pretty smoothly or did y'all argue or was it a

23 pretty cut and dried case?

24     A.     We just had all different opinions, on account

25 of his age and, you know, stuff like that.  He was a young

1  guy.

2       Q.    Did you think it was a fair sentence in the

3  end?

4       A.    Yes, I do.

5       Q.    And has it bothered you at all since that

6  time?

7       A.    No.

8       Q.    Okay.  Also, did you work in law enforcement

9  at Parkland at some point in time?

10      A.    Yes, I did, 12 years.

11      Q.    Twelve years?

12      A.    Uh-huh.

13      Q.    What were your duties there?

14      A.    I was in security and we were deputized by the

15  county.

16      Q.    All right.  Ever involved in any arrests out

17  there?

18      A.    Yes.

19      Q.    Okay.  Did you ever have to come testify?

20      A.    No, huh-huh.

21      Q.    Okay.  The fact, well, we can't go into the

22  facts of this case but we can tell you that a law

23  enforcement officer, a police officer, was killed.  That's

24  why it's a capital murder case.

25      A.    Yes.

1        Q.     The fact that you were in law enforcement for

2  some 12 years, do you think that might affect you in some

3  way?  Could you be totally impartial, the fact that it was a

4  law enforcement officer that was murdered?

5        A.     No.

6        Q.     Why is that?

7        A.     Would it affect me because he was --

8        Q.     A law enforcement officer was the victim in

9  the case.

10       A.     Yeah.  Yeah, it would, yes, it would.

11       Q.     And that's because it is a law enforcement

12  officer?

13       A.     Yes.

14       Q.     And your background and that sort of thing?

15       A.     Yes.

16          MR. SHOOK:  That's all the questions I

17  have, then, Judge.  I appreciate your candor.

18          MS. BUSBEE:  Ms. Brown, I hope you don't

19  think we've wasted your time, but we did need to talk to

20  you.  But, Your Honor, we've reached an agreement on this

21  juror.

22          THE COURT:  Ms. Brown, I want to thank

23  you for your time and service today.  I appreciate you

24  coming down.  I understand your father needs your attention,

25  so you won't have to be on this trial.  Okay?

NANCY BREWER, OFFICIAL COURT REPORTER

1    PROSPECTIVE JUROR:  Okay.  All right.

2    [Prospective juror out]

3    THE COURT:  Mr. Albright.

4    [Prospective juror in]

5    THE COURT:  Good afternoon, sir.  How are

6    you?

7    PROSPECTIVE JUROR:  Good.

8    THE COURT:  We have Scott Russell

9    Albright, juror No. 4544.  Mr. Albright, have you had enough

10   time to read the guide I provided for you?

11   PROSPECTIVE JUROR:  I have.

12   THE COURT:  And I also gave you a copy of

13   your questionnaire that you were kind enough to fill out for

14   us back in May.  If the lawyers want to have you refer to a

15   question, you'll have it in front of you, and they may ask

16   you to expound upon your answers, what were you thinking at

17   the time that you gave that answer?

18   PROSPECTIVE JUROR:  Okay.

19   THE COURT:  This is the opportunity for

20   you to be able to ask questions and we want you to get a

21   working knowledge of this law that we're dealing with.  And

22   there are no wrong answers, just thoughtful insight and your

23   honest opinions is what the attorneys want.

24   At the end of the process I have two

25   questions I must ask.  Number one, do you understand the

1   law?  Number two, can you follow the law?  That's the

2   questions that I ask, the big picture, at the end of the

3   process.  Only question I have for you at this time, sir, is

4   will you be able to serve this Court for a period of two

5   weeks beginning on November 10th?

6                    PROSPECTIVE JUROR:  I will.

7                    THE COURT:  Thank you, sir.  Mr. Wirskye?

8                    MR. WIRSKYE:  May it please the Court?

9                    SCOTT ALBRIGHT,

10  having been duly sworn, was examined and testified as

11  follows:

12                    DIRECT EXAMINATION

13  BY MR. WIRSKYE:

14       Q.    Mr. Albright, how are you this afternoon?

15       A.    Fine.

16       Q.    My name is Bill Wirskye and I'll be the

17  Assistant DA that will be speaking with you for the next few

18  minutes.  What I'd like to do is follow up on some of the

19  information in your questionnaire, talk to you a little bit

20  about your thoughts and feelings about the death penalty,

21  since, as you know, this is a case where the State is

22  seeking the death penalty, and then, finally, talk about

23  some of the laws and the rules that apply in a death penalty

24  type case.

25       A.    Okay.

1    Q.    Do you have any questions before we get

2  started?

3        A.    No.

4        Q.    Okay.  What went through your mind when you

5  got notified you had to come back for an individual

6  interview in a death penalty case?

7        A.    I wasn't expecting it, I guess.  It's, I mean,

8  I did think about it a little bit more than when I

9  originally filled out the questionnaire, just because, you

10 know, it is such a, you know, big responsibility.

11       Q.    Sure.

12       A.    So --

13       Q.    Having thought about it more and having a

14 chance to go back over your questionnaire, is there anything

15 that, I guess, if you had a chance to fill out the

16 questionnaire again, you'd say it a little differently, or

17 add to it, or --

18       A.    No.  I only got through page 7, so I didn't go

19 through the entire thing.  For the parts that I was looking

20 at, I guess the only thing that I do remember when I did

21 fill it out was there was quite a few yes or no only

22 questions, which didn't allow for any explanation.  So I

23 sometimes felt like there needed to be an "it depends", but,

24 no.

25       Q.    Okay.  Fair enough.  And you are a management

1  consultant with IBM, right?

2       A.      Correct.

3       Q.      Okay.  What is a normal day like for you, if

4  there is such a thing?

5       A.      Currently, my normal day is in Los Angeles.  I

6  travel with my job.  It's to various locations.  So I travel

7  every week.  And for me, I -- right now, I'm currently

8  managing a project of about 50 different people.  It's

9  essentially going to meetings, putting processes in place,

10 trying to resolve issues, problems that occur.

11      Q       Okay.  But with enough notice you can make

12 time in your schedule to serve two weeks as a juror?

13      A.      Yes, correct.

14      Q.      And you've got a one year old at home?

15      A.      I do, 19 months.

16      Q.      Okay.  Keeps you pretty busy when you're not

17 at work?

18      A.      He does.  He does.

19      Q.      Let me ask you, I guess the first yes or no

20 question we asked is if you are in favor of the death

21 penalty, and you indicated yes.  And I just kind of wanted

22 to follow up on that.  You know, you are in favor of the

23 death penalty, I guess?

24      A.      Yes.

25      Q.      Okay.  Why do you think we should have one or

1   what purpose do you think it serves, having that option

2   available?

3        A.   I think just like I wrote here, I think that

4   one, it can serve as a deterrent to people.  I know, you

5   know, there is oftentimes or studies may say it's not a

6   deterrent.  I find that hard to believe.  You know, it's a,

7   it seems as if it would be a deterrent to people.  I think

8   that the death penalty is probably the gravest punishment

9   that we could really weigh on people or punish people with.

10  So I think that it is an effective deterrent.  You know, I

11  think that there are certain crimes where it may actually

12  fit the crime itself.

13       Q.   Okay.  When you say certain crimes, do you

14  have something in mind, certain types or facts?

15       A.   Yeah, I mean, I would say, you know, something

16  where a child was murdered, you know.  I don't think that

17  it's always the case.  I don't think that if, you know, any

18  child was murdered that it's automatically something that

19  the death penalty would apply to, but I think that, you

20  know, the taking of a young innocent life like that could

21  warrant that.

22       Q.   Okay.  Any other type cases come to mind?

23       A.   Yeah, I guess anything where, I don't know,

24  serial murders, something, you know, just very heinous

25  crimes.

1      Q.     Okay.  And, hopefully, you've had a chance to

2  read the packet of law that the Judge gave you.  In Texas we

3  reserve the death penalty just for murder cases and then

4  only a subset of all murder cases.

5             A child under six, for instance, police

6  officer, fireman, prison guard on duty, serial murder

7  situation you mentioned, mass murder, murder for hire, an

8  intentional murder committed in the course of another crime,

9  like a robbery, burglary, or rape.  Is that pretty much in

10 accord or pretty much jive with where you are personally?

11     A.     Yes.

12     Q.     And the type crimes that should be considered?

13     A.     Right.

14     Q.     Okay.  Now, I notice you mention, I think

15 maybe once, maybe twice, in the questionnaire, I think we

16 asked a question about misuse on page 4.  And you said it

17 may disproportionately be applied to minorities.

18     A.     Right.

19     Q.     And I just wonder if you could follow up on

20 that.

21     A.     Well, I know that there has been some studies,

22 you know, against the death penalty, and one of the things

23 it seems is that statistically the number of -- the number

24 of defendants that have, or that are in a court case where

25 the death penalty is a potential punishment, that minorities

1    are more often judged guilty or actually given the death

2    penalty.

3          Q.    Okay.

4          A.    So, I think, you know, those are the facts

5    that I had read and, you know, that's obviously a concern.

6          Q.    You say it's a concern, I guess.  How is it a

7    concern or how does it play into your opinion about the

8    death penalty?

9          A.    Like I said in here, that, you know, that the

10   biggest argument against it is it's an irreversible

11   punishment.  You know, if somebody is in life in prison and

12   then, you know, you do find that indeed something is wrong

13   or they didn't commit the crime, etc., then you could

14   somewhat rectify that.  With the death penalty you can't.

15   So if we're finding it's disproportionately applied, then,

16   you know, it may not be something that's fair.

17         Q.    Okay.  Would that be a concern of yours going

18   into this case where, you know, I guess at least

19   procedurally you are pretty close to making the jury on a

20   death penalty case?

21         A.    Right.  I don't -- I don't think so, because

22   one of the things that I would or I'd believe myself is that

23   I'm not -- I'm not prejudiced, and I wouldn't, I don't

24   think, I think I could be impartial, so I wouldn't -- I

25   don't think I would apply it any differently, you know, to

1    one person versus another.

2         Q.   Just be able to look at the individual case?

3         A.   Correct.

4         Q.   And whatever was called for, you would do?

5         A.   Correct.

6         Q.   Okay.  Let me follow up, also.  It says, as

7    you probably read in the questionnaire, that this case that

8    we're here on got some media coverage, and it involves the

9    death of an Irving police officer, Aubrey Hawkins, on

10   December 24, 2000, in an Oshman's Sporting Goods Store in

11   Irving.  And I think you had checked that you weren't aware

12   of any of the coverage this case may have received.  I'm

13   looking at page 3.  And I was just curious if that was still

14   the case?

15        A.   Um, you know, I was looking at that again, and

16   after we were in here, I know that there was this sheet here

17   about Aubrey, or the notice about Aubrey Hawkins, and I do

18   recall.  I do recall now hearing about that around

19   Christmas, you know.  And essentially, you know, what I know

20   is that there was a police officer that was shot, you know,

21   it was around Christmas, and that's really it.

22        Q.   Any other facts you can recall from the

23   coverage you saw?

24        A.   No.

25        Q.   Okay.  So it sounds like you don't even know

1   enough, really, I guess, to be affected if you were to be a

2   juror on this case; is that right?

3         A.      Right.

4         Q.      And that's the standard.  Even if you may have

5   heard something about the case, as long as you can assure us

6   that you'll base your verdict just on what you hear in the

7   courtroom, you would be a qualified juror.  And I see you

8   shaking your head.  That sounds like something you could do?

9         A.      Right.

10        Q.      Okay.  One more question before we kind of

11  move on.  On page 5 we ask people, I guess, starting about

12  halfway down, we give a series of statements and see where

13  they agree, disagree, that type thing.  And I don't know how

14  useful it is sometimes, because it means different things to

15  different people.  But that first statement we gave you,

16  most criminals are actually victims of society's problems.

17  And you marked that you agree with that statement.  And,

18  again, I know it means different things to different people,

19  but if you could follow up on that for me.

20        A.      Well, and I think this kind of ties in to do I

21  believe, you know, crime's on the increase or decrease.  You

22  know, I wrote that I think it's on the decrease because, you

23  know, I think there's certain factors that play into people

24  committing crimes.  I think that, you know, having better

25  education, you know, having better economic times where

1    people can, you know, find work and, you know, can try to

2    become or have the ability to become productive members of

3    society.

4                        I think that when people don't have those

5    options, I think that crime increases and so, ultimately, I

6    guess, I don't think that people are, you know, doomed or

7    destined to commit crimes, I just think that on the

8    aggregate or whole that you would find that.  I think that

9    people that, you know, have those options and can become

10   productive members of society are less likely to commit

11   crimes.

12        Q.     Okay.  You're not from, I guess, the

13   determinist school that says, you know, it's kind of

14   preordained they're going to turn out this way?

15        A.     No, no.

16        Q.     Okay.  Fair enough.  And you told us you had

17   some friends that were attorneys, right?

18        A.     Right.

19        Q.     Corporate attorneys?

20        A.     Corporate.

21        Q.     Okay.  No criminal attorneys --

22        A.     No.

23        Q.     -- or anything like that?

24        A.     No.

25        Q.     Okay.  You also gave yourself an 8 on the

1   death penalty when we kind of asked you to rank yourself

2   from 1 to 10 how strongly you are in favor of the death

3   penalty.  And, again, we know that kind of means different

4   things to different people.  But what were you thinking when

5   you gave yourself an 8?

6        A.    I guess I just took that as to how sure am I,

7   you know, that I support the death penalty.  And, you know,

8   given the fact that I think it's a deterrent and in certain

9   cases that is a punishment that can fit the crimes, you

10  know, I'm 8 out of 10 in supporting that.

11       Q.    Okay.  Fair enough.  Let me run another fact

12  scenario by you.  We, obviously, talk to a lot of people in

13  this process and many of them, they're strongly in favor of

14  the death penalty, but sometimes people, I guess, draw

15  lines, depending on a person's role in the crime.  And what

16  I mean by that is this.

17            Oftentimes crimes are committed by more

18  than one person, they have a group or a gang of individuals

19  that commit a crime, whether it's shoplifting or capital

20  murder.  The law says that we can prosecute everybody who

21  was actively involved in a crime, again, whether it's

22  shoplifting or capital murder.

23            Sometimes in a capital murder context you

24  may have a situation where you have got one person who

25  pulled the trigger, for lack of a better term, the

1  triggerman, who actually caused the death.  You may have

2  another group of people who were actively involved in the

3  crime, we commonly refer to them as accomplices, who were,

4  again, actively involved in the crime, but didn't actually

5  take a life.

6          And some people who are in favor of the

7  death penalty, kind of draw a distinction between those two

8  groups of people.  And while they may be strongly in favor

9  of the death penalty for the triggerman, they feel that the

10  death penalty should be off the table for the accomplices.

11  For whatever reason, religious, moral, ethical, they just

12  don't think it's justified for the accomplice.  You know,

13  they may lock them up for life.

14      A.      Right.

15      Q.      But they don't feel the death penalty is

16  appropriate, even for any consideration.  And some people we

17  talk to just kind of say, well, it depends on the facts and

18  circumstances.  Where do you kind of fall down on that

19  issue?

20      A.      I would say it depends on the facts and the

21  circumstances.  I mean, if the person was an accomplice and,

22  you know, allowed this to occur, then, yes, I would support

23  the death penalty for them.

24      Q.      Okay.  So you wouldn't automatically take it

25  off the table for a nontriggerman?

1    A.    No.

2    Q.    Okay.  Let me try to give you an overview of

3  what the law is in Texas and I'll do that by using an

4  example.  Say Mr. Shook and I get together and decide we're

5  going to rob a bank.  The plan calls for him to take our one

6  gun in.  He's going to hold up the tellers and hold them at

7  bay.  I'm going to come in unarmed with a bag and kind of

8  clean out the cash drawers while he's covering everybody.

9            And let's say when we go to do that, for

10  whatever reason, maybe one of them looks at him in a funny

11  way or maybe I see one of them going for a silent alarm and

12  I tell him that, he shoots and kills one of the tellers.

13  Now, he's committed an intentional murder during the course

14  of a robbery.  He could be convicted of capital murder and

15  ultimately face the death penalty, depending on what the

16  jury thinks.

17            The law says depending on the facts and

18  circumstances I could, too, as the accomplice.  What do you

19  think about that type of scenario?

20    A.    Yeah, I agree or support that.

21    Q.    Okay.  You could see giving an accomplice a

22  death penalty?

23    A.    Yes.

24    Q.    Okay.  And, basically, what the law is, I

25  think most people are familiar with the term accomplices,

1   but in Texas we kind of call it the law of parties for some

2   reason.  Basically, if I help, aid, encourage, direct, or

3   solicit him to commit capital murder, I could be found

4   guilty of capital murder.

5              The second way an accomplice can be found

6   guilty of capital murder is under the law of conspiracy,

7   which just simply means an agreement, the agreement we had

8   to go into that bank.  If, during the course of committing

9   that bank robbery, the jury thinks that the accomplice, me

10  in the example, should have anticipated that a life would be

11  taken, then I could be found guilty of capital murder and

12  face the death penalty.  That kind of sounds like where you

13  are?

14          A.    I agree.

15          Q.    Okay.  And a lot of people say, you know, just

16  the fact that we were planning a bank robbery and I knew he

17  had a loaded gun, you know, people feel that I should have

18  anticipated that this murder could have happened.  Does that

19  make sense to you?

20          A.    Yes.

21          Q.    Okay.  Just to kind of give you an overview of

22  the procedures in the case, you have never been on a jury

23  before; is that right?

24          A.    No.

25          Q.    Okay.  All criminal cases in Texas, even

1   capital murders, the trial is divided into two different

2   phases.  The first phase is what we call the guilt/innocence

3   phase where the jury is just concerned about whether the

4   person is guilty or not.  Basically, did the State prove to

5   you, as a juror, beyond a reasonable doubt everything we

6   have alleged in our indictment?  Are they guilty of capital

7   murder or not?

8        A.     Right.

9        Q.     If the jury finds them guilty, then we move

10  into the second phase of trial, which is the punishment

11  phase.  The rules of evidence are a little broader.  You get

12  to hear extra or additional information about the person's

13  past, good or bad, character, reputation, criminal history,

14  if it exists.  And we let the jurors get this information,

15  because we ultimately ask that they answer these three

16  questions.

17            We don't ask a jury at the end of the

18  process to write in, you know, life sentence or death

19  sentence.  We ask them to answer these three questions.

20  Just kind of in a nutshell, the first question asks, is

21  there a probability that the person is going to be a future

22  danger to society?  If that's answered yes, then you move to

23  the second Special Issue.

24            That deals with the accomplice situation,

25  again, the person that didn't actually pull the trigger.  If

1   that question is answered yes, then you move to Special

2   Issue 3, which is the mitigation question.

3                Basically, we allow a juror a chance to

4   show mercy, if they think it's fitting under the facts.  If

5   that question is answered no, then a death sentence is

6   automatic.  The Judge has no discretion, and he will

7   sentence the defendant to death.

8                We know from doing this and talking to a

9   lot of people that there are a lot of people who may be very

10  strongly in favor of the death penalty philosophically or in

11  the abstract.  But when they get down here, it's kind of a

12  little bit different.

13       A.       Right.

14       Q.       It becomes more real to them.  We're in a

15  courtroom.  You know what the State's goal is.  You get to

16  see a living, breathing human being down at the end of the

17  table that we feel we have the facts and evidence to

18  convince a jury that he's guilty of capital murder and

19  should one day be executed.

20                And we understand it's not everybody's

21  cup of tea.  But before we go any further, I just want to

22  make sure in your mind that there's no hesitation on your

23  part about potentially being involved in this process, that

24  is, that you feel that you are the type person who could

25  take pen in hand and answer those questions in such a way

1  that it may one day lead to the execution of another

2  individual?

3       A.     Yes.

4       Q.     Okay.  And why do you say that?

5       A.     I think that, like I said before, when I was

6  called back I thought about, you know, how important this is

7  not only to the defendant, to the State, you know, and it's

8  just, it's really an awesome responsibility and that doesn't

9  mean that, you know, doesn't mean that you are hesitant

10 towards doing it or that you're, you know, anxious to go do

11 it.  It just means that, you know, you need to, you need to

12 make the right decision.

13            You know, I think that -- I think that I

14 have to do certainly nothing with such grave importance, but

15 it's something I have to do every day, you know, at my job

16 and at work.  I have to listen, listen to what people say,

17 and it's oftentimes it's opposing views.  You know, I have

18 to listen to that, I have to digest it, and then, you know,

19 make a decision based on -- based on that information.

20      Q.     It sounds like, you know, unlike a lot of

21 people we talk to based on your position, it's something you

22 kind of do every day.  I think it's going to help you out

23 when we start talking about these Special Issues, the kind

24 of process a juror goes through.

25            If you could take a minute or two and

1   just read through those three Special Issues.  I know you've

2   seen it, read them in the packet.

3        A.     Right.

4        Q.     But they're phrased a little bit differently.

5   And if you could read through those three and we'll talk

6   about them each in turn.

7        A.     Okay.

8        Q.     These are the three questions, again, we ask a

9   jury to answer.  They're questions the Legislature drafted.

10  We didn't draft them specifically for this case.  Kind of

11  what the law envisions, again, if you find a person guilty

12  of capital murder, you start that second phase.  You get to

13  hear that extra information.

14              Once you hear that extra evidence,

15  looking at that, looking at what you heard in the first part

16  of the trial, you answer these three questions.  And the law

17  really envisions that a juror kind of have the mental

18  discipline to when they start that second phase of the trial

19  to have an open mind about the answers to these questions.

20              Some people tell us, you know, I found

21  somebody guilty of capital murder, so the questions are

22  automatically answered in a certain way.  If you feel that

23  way, that's fine, you just wouldn't be a qualified juror.

24  The law really contemplates that you keep that open mind and

25  don't prejudge anything or don't answer anything

1    automatically.

2         A.    Right.

3         Q.    Does make sense to you?

4         A.    Yes.

5         Q.    Is that something that you feel like you can

6    do?

7         A.    Yes.

8         Q.    Okay.  Special Issue No. 1, that starts off

9    with a no answer.  The second question does as well.  That

10   no answer is kind of the default setting on that question.

11   It's part of our burden of proof as the State to prove to

12   you beyond a reasonable doubt that the answer ought to be

13   yes.  And the question basically asks, again, is there a

14   probability that the defendant would commit criminal acts of

15   violence such that he would be a continuing threat to

16   society?  You see how that question kind of asks a juror to

17   make a prediction?

18        A.    Right.

19        Q.    Okay.  Is that something that you are

20   comfortable with, making that prediction?

21        A.    Yes.

22        Q.    I would assume you would be in your line of

23   work.  But what type of information would be important to

24   you or would you like to know in answering that question?

25        A.    That you would have to provide?  I think that

1   you'd need to -- you would need to show what the defendant's

2   past was, you know, had they committed criminal acts before,

3   these types of criminal acts before.  That would be one

4   thing.

5                  I think that you would also have to show,

6   you know, not just that they had done it in the past but,

7   you know, some other argument aside from just that they had

8   done it in the past would they be likely to do it in the

9   future as well.

10   Q.    Okay.  Again, a lot of the words in these

11   questions aren't necessarily legally defined, a lot of

12   things we deal with.  We just kind of rely on the jury to

13   use their good common sense definitions.  When you see that

14   word "probability," how would you define that in that

15   question?

16   A.    In terms of percentage or how would you --

17   Q.    Sure.

18   A.    Um, gosh, I guess for me that would be, I

19   mean, it would be a low probability.

20   Q.    Okay.  What a lot of people tell us is like a

21   likelihood.

22   A.    Yeah.

23   Q.    A greater than not chance, 51 percent of the

24   evidence, maybe.

25   A.    Nah, I don't know about that, no.  I'm not

1   sure, 50 percent or more, less than 50 percent.  And I

2   guess, well, it does say criminal acts of violence, so,

3   yeah, less than 50 percent.

4       Q.    Okay.  And the only guidance the law really

5   gives us is probability is something less than a certainty,

6   because we could never prove anything to you to a certainty.

7       A.    Right.

8       Q.    But it's, obviously, something more than just

9   a mere possibility, because anything is possible.

10      A.    Yeah.  I would agree with that.  I agree with

11  that, right.

12      Q.    Okay.  So it sounds like you are right where

13  the law is.

14      A.    Right.

15      Q.    We talked about that phrase "criminal acts of

16  violence."  What type of acts come to mind or what type of

17  crimes come to mind when you see that phrase?

18      A.    Murder, robbery, rape or sexual assault, like

19  assault and battery, you know, those types of --

20      Q.    In a sense it's kind of self-explanatory.

21      A.    Right, yeah.

22      Q.    I guess the bottom line point is that we don't

23  necessarily have to prove to you he's going to kill someone

24  else --

25      A.    No.

1      Q.    Be involved in another murder?

2      A.    No.

3      Q.    Just anything, I guess, that involves

4  violence?

5      A.    Yeah, something where somebody would be

6  physically harmed, or --

7      Q.    Okay.  Fair enough.  Then, finally, the last

8  word in that question, "society."  What do you think of when

9  you think of "society" or how would you define that?

10     A.    Society is, you know, everybody.  It's

11  everybody.

12     Q.    Everybody?

13     A.    To me it's everybody.  It's people, people,

14  you know, in jail, people here, it's, you know, everybody is

15  a part of society, period.  If you are alive, you are part

16  of society to me.

17     Q.    People outside of prison, then prison guards,

18  other inmates, that type of thing?

19     A.    Correct.

20     Q.    Okay.  Again, that question starts off with

21  that no answer.  The only way you get to answer it yes, is

22  if we prove to you beyond a reasonable doubt that should be

23  the answer.

24     A.    Okay.

25     Q.    And, again, the law envisions you go into this

1  with an open mind, that you don't automatically prejudge,

2  preanswer Special Issue 1, just based on what you did in the

3  first phase of the trial.

4       A.       Right.

5       Q.       And, very frankly, that's where we run into

6  some problems with jurors.  Some people tell us, you know, I

7  know the law says I'm supposed to keep an open mind and be

8  fair, but if I found someone guilty of capital murder, I'm

9  always going to think there's that probability of future

10 danger, so I'm automatically going to answer that question

11 yes.  And if you feel that way, that's fine.  You just

12 wouldn't be a qualified juror because you couldn't keep that

13 open mind.

14      A.       Right.

15      Q.       I could probably give you a hundred different

16 examples of where you might find someone guilty of capital

17 murder, but not necessarily think they're going to be that

18 future danger.

19      A.       Right.

20      Q.       You know, I find out my next door neighbor

21 sexually assaulted my little daughter.  I don't feel the

22 police are doing enough about it.  I think about it.  I go

23 next door, I kick in his door, and kill him.  I've committed

24 murder in the course of burglary, guilty of capital murder.

25 But the jury may think I'll never be a future danger.

1      A.      Right.

2      Q.      They may feel in some sense it was morally

3  justified and I would never do it again.  Does that make

4  sense to you?

5      A.      Yes.

6      Q.      Okay.  And it kind of --it's a little extreme

7  example, but I think it serves to show the mental discipline

8  that we require of jurors.

9      A.      Right.

10     Q.      You know, obviously, you get to go back and

11  look at the evidence you heard in the first part and the

12  second part.  You may not have to think about it long to

13  answer it.  But as long as you haven't prejudged it, you

14  would be qualified.

15     A.      Okay.

16     Q.      Special Issue 2, again, starts off with a no

17  answer.  The only way we get to yes, is if we prove it to

18  you beyond a reasonable doubt.  This is the question that

19  deals with that accomplice type situation that we talked

20  about.

21              And that question kind of, it's a

22  three-part question.  If you think that the person was

23  actually the triggerman, that they caused the death of the

24  deceased, you'd answer it yes.  Or if you think if they

25  didn't actually cause the death, but they intended to kill

1    the person, you would answer it yes.

2              Maybe going back to our scenario, if I

3    tell Mr. Shook they're going for the alarm, shoot and kill

4    that person, obviously, I had the intent for the death.  I

5    just didn't actually cause it.  You would answer it yes.

6              Or, finally, that last line, if you think

7    that a person anticipated that a human life would be taken.

8    And if you will recall, in order to convict an accomplice of

9    capital murder, the standard is they should have anticipated

10   that a life would be taken.

11             When we get to the punishment phase,

12   before we get to the death penalty, the law imposes a little

13   higher burden, and that is actually anticipate.  Did the

14   person really anticipate that a life would be taken?  Do you

15   kind of see that distinction?

16        A.    Yes.

17        Q.    And sometimes it's a fine distinction to some

18   people.  The best example I can think of is when I was 16 my

19   dad gave me a car.  I drove it like a madman for a month and

20   finally, inevitably, wrecked it out.  He got mad at me and

21   said, you know, you idiot, you should have anticipated that

22   you were going to wreck this car, which is true, I should

23   have.  But I didn't actually anticipate it.

24        A.    Okay.

25        Q.    Too young and too dumb, that kind of thing.

1    A.    Okay.

2    Q.    Does that make sense to you?

3    A.    Yes.  And, is it just, those are separate,
4  though?  I mean, just to clarify, so either the defendant
5  actually caused the death is one of the criteria.  If the
6  answer was yes, then the answer to the question is yes.  If
7  you intended to kill the deceased, then the answer is yes to
8  the entire question?  Or finally, if you anticipated that a
9  human life would be taken --

10   Q.    Exactly.

11   A.    -- it's yes?  So yes to either one of those
12  three parts is yes to the entire question?

13   Q.    If you feel that we have proven any one of
14  those three ways, you'd answer the question yes.

15   A.    Okay.  Okay.

16   Q.    Okay?  I want to make sure you see that
17  distinction between should have and actually anticipated?

18   A.    Yes.  Right.

19   Q.    Now, obviously, as you probably know, the
20  person has a right not to testify in their own defense.  So
21  I doubt it's not necessarily going to be a situation where
22  someone is going to tell you what they should have
23  anticipated or did actually anticipate, and we can't crawl
24  into their heads, just have to draw some inferences and
25  conclusions based on evidence and acts, that type thing.

1       A.      Okay.

2       Q.      Is that something that you think you are

3   comfortable doing?

4       A.      Yes.

5       Q.      Okay.  And, again, this question stands alone.

6   It's separate like all the questions.  You make that

7   independent, fresh inquiry to answer the question.  Just

8   because you found someone guilty or because you have

9   answered No. 1 yes, doesn't necessarily help you answer

10  Special Issue No. 2 yes.

11      A.      Okay.

12      Q.      And you may not get any extra evidence on it.

13  You may just go back and look at the evidence you heard in

14  the first phase to help you answer that to whether the

15  person actually anticipated.  But as long as you see that

16  distinction and could wait until the second phase to answer

17  that higher standard, you could qualify.

18      A.      Okay.

19      Q       Okay.  If both of those questions are answered

20  yes, then we move on to Special Issue No. 3.  It's a little

21  bit different than the first two in the sense that neither

22  side has the burden.  It doesn't start off with a default

23  answer.  We just leave it up to the jury to answer it yes or

24  no, depending on the evidence.

25              This is kind of the last step in the

1  process.  We kind of ask a juror at this point to step back,

2  take a deep breath, go back and look at the facts of the

3  crime, look at the facts that you have learned about the

4  defendant and his history, and look at what sort of personal

5  moral blame he bears for the crime, and ask yourself, is

6  there anything mitigating?  By mitigating, is there anything

7  that lessens his personal moral culpability or his

8  blameworthiness?

9            And if there is something mitigating, is

10  it sufficient that his life ought to be spared and he

11  shouldn't be given the death penalty?  Does that kind of

12  make sense to you?

13       A.       Uh-huh.

14       Q.       Again, as I told you earlier, it's kind of the

15  jury's chance to, if they think the facts call for an

16  exercise in mercy, this is your chance to give mercy to the

17  person.  Do you kind of see the value of having that

18  question?

19       A.       Yes.

20       Q.       As kind of the last stop in the process?

21       A.       Yes.

22       Q.       Because, again, where we run into some

23  problems sometimes, some people tell us, you know, by the

24  time I've convicted someone of capital murder, I found they

25  are a future danger, I found at the very least they

1  anticipated that a life would be taken, there's just nothing

2  that I could ever think of that would be mitigating.  My

3  mind is closed.  They're going to get a death sentence at

4  that point.

5                  And, again, they would have prejudged the

6  answer to question 3.  If they feel that way, that's fine.

7  They simply wouldn't be qualified to be a juror.  But do you

8  think you can keep that open mind to Special Issue No. 3?

9       A.     Yes.

10      Q.     Okay.  Is there anything that pops into your

11  head that might be potentially mitigating in these type

12  cases?

13      A.     I don't know.  I mean, I guess there's, there

14  could be a number of things, I mean, it's --

15      Q.     It's a tough question.  We ask everybody that.

16  The most common answer is no one can think of anything

17  because we at least hope you don't sit around thinking about

18  what is mitigating in a death penalty case.

19      A.     Right.

20      Q.     But some people tell us maybe a person's

21  background could potentially be mitigating.  And I know we

22  have a question in the questionnaire about it.  If you

23  could, turn to page 9 for me real quick and I'll just ask

24  you about that.

25      A.     Okay.

1     Q.    We ask, I guess about the middle of the page,

2  some people feel genetics, birth, upbringing, that type

3  thing should be considered.  And you answered, upbringing

4  and environment may be items to consider.  However, genetics

5  and circumstances of birth should not.

6     A.    Right.

7     Q.    I just, follow up on that with me, what you

8  were thinking.

9     A.    And, now maybe I would change my answer

10  slightly.  For upbringing and environment, I do think that

11  there are things to consider, how somebody, you know, what

12  their past was, I mean, just as much as it would be

13  important for Special Issue No. 1 on whether they might

14  commit another crime.  I mean, the same thing could be said

15  as to it being a mitigating factor as well.

16          So that's why I think upbringing and the

17  environment that the person is in should be considered.  I

18  guess the part where that I may change would be genetics.  I

19  mean, I guess from some standpoint, if somebody was, you

20  know, mentally retarded, then, you know, I guess, you know,

21  looking back, even if that person could stand trial for such

22  a crime, then, yeah, that would be another item that I would

23  consider now.

24     Q.    Okay.  Just to let you know, the Supreme Court

25  has recently ruled that capital punishment doesn't apply to

1    those people who are mentally retarded, so it shouldn't be

2    an issue in this case.

3         A.    Okay.  So, yeah, I think that there could be a

4    number of factors.  I doubt -- I mean, for me I think it's

5    really for Special Issue No. 3, it's probably a weighing of

6    multiple factors, you know.  You are looking at a complete

7    set of circumstances and character and background all

8    together.  I'm not sure.  I guess there could be one

9    mitigating factor.  But to me it would seem like it may be

10   more of a collection.

11        Q.    Okay.  And I think that's pretty much what the

12   law envisions, that you keep that open mind to listen to

13   that type evidence.  You know, you're not required to tell

14   us now what you think would be mitigating.  You are not even

15   required to agree with the other jurors on what may be

16   potentially mitigating, one way or another.  As long as you

17   can tell us you can keep that open mind and if you hear

18   something potentially mitigating, you will weigh it and

19   consider it in your decision.  That sounds like that's

20   exactly where you are?

21        A.    Yes.

22        Q.    Okay.  Any questions about kind of the scheme

23   we have and how the sentencing works in a capital murder

24   case in Texas?

25        A.    No.

1    Q.    One way to think of it is this.   There's two

2  possible punishments for capital murder in Texas, a life

3  sentence or a death sentence.   If a person is convicted of

4  capital murder, basically they are sitting on that life

5  sentence.   Okay?   They have gotten that.   And only if the

6  questions are answered yes, yes, and no, that's the only way

7  we get to the death penalty.

8    A.    Okay.

9    Q.    Does that make sense to you?

10    A.    Yes.

11    Q.    Okay.   Let's talk a little bit about some of

12  the general things that apply in a trial.   We kind of

13  touched on some of them already.   The burden of proof is

14  always on the State and it never leaves this table.   You can

15  never look to these folks to bring you anything or present

16  any evidence.

17                Legally, technically, they can sit there

18  and work crossword puzzles and not ask even a question or

19  call a witness.   I don't anticipate that will happen, they

20  are fine lawyers.   But it serves to make the point that you

21  always look here for the burden.   We've got to prove he's

22  guilty and we've got to prove Special Issue 1 and 2 to you

23  beyond that reasonable doubt.

24                A person always starts off presumed

25  innocent.   You are probably familiar with that.   If we all

1    went home right now, he would be found not guilty.

2         A.    Right.

3         Q.    That presumption never goes away unless and

4    until we prove to you beyond a reasonable doubt that he's

5    guilty of the offense.  Does that make sense to you?

6         A.    Yes.

7         Q.    The Fifth Amendment, again, no one can require

8    him to testify in his own defense.  Conversely, if he wants

9    to testify, no one can keep him off the stand.  And I, you

10   know, I think it's human nature sometimes to want to hear

11   someone testify.  But what the law says is human nature

12   aside, if the person does not testify, you can't hold it

13   against him.  It just shouldn't be a factor in your

14   deliberations.  That's what the Judge will instruct you.

15   Does that make sense to you?

16        A.    Yes.

17        Q.    Is that a law you think you could follow?

18        A.    Yes.

19        Q.    Okay.  You're not going to need to hear from

20   him to answer that anticipation issue --

21        A.    No.

22        Q.    -- or any of the facts?  Okay.  As part of our

23   burden of proof, the law says that we have to prove each and

24   every element of a crime to the jury beyond a reasonable

25   doubt.

1    If you've looked at the indictment in

2  this case, I know you got a chance to look at it.  That's a

3  document we draft.  It basically breaks down into different

4  elements.  Very roughly, you know, that a certain person, on

5  or about a certain day, killed another person in a certain

6  way.  Those would be the elements in just a murder case.

7    A.    Okay.

8    Q.    The law says we have to prove each and every

9  one of those to you beyond a reasonable doubt.  You can't

10  give us partial credit.  You can't help us out.  If we go

11  nine for ten, it's not good enough.  Obviously, one element

12  is the identity, make sure we've got the right person.  If

13  you had a reasonable doubt about that, you would find him

14  not guilty.

15    Curiously enough, the law says that one

16  element is no more important than another, legally.  One of

17  the elements is the county in which it happened.  I don't

18  anticipate this would ever happen in this case, but, you

19  know, say you listen to a murder case and you are convinced

20  by all the evidence that the person committed the murder.

21    We mess up when we draft our indictment

22  and we allege as one of our elements it happened in Dallas

23  County.  The evidence actually shows it happened in Tarrant

24  County.  The law would require you to find the person not

25  guilty because you have a reasonable doubt about an element.

1    We didn't do our job.

2                    You may not like it.  You may immediately

3    run upstairs and get us fired.  We would be fired, if we

4    were that negligent in our job.  But it serves to illustrate

5    that point, the kind of mental discipline that's needed in

6    order to be a juror.  Some people think it's a technicality.

7    But, you know, one person's technicality is another person's

8    constitutional right.

9           A.     Right.

10          Q.     Is that a law you think you could follow?

11          A.     Yes.

12          Q.     Okay.  It even applies to the manner and means

13   of the death.  Again, if we don't do our job and we say, we

14   allege in our indictment the person was shot to death, the

15   proof turns out that we got it wrong and the person was

16   stabbed to death, even though you don't have any doubt the

17   person committed the murder, we didn't get the manner and

18   means elements correct, and you'd be forced under the law to

19   find the person not guilty.  But it sounds like that's

20   something you think you can do if you had to?

21          A.     Yes.

22          Q.     Again, pretty far out examples.  I don't think

23   they will come up.  But it kind of illustrates the point.

24                    You can probably imagine in a criminal

25   case where we have alleged the victim was a police officer,

1   you are probably going to hear from police officer

2   witnesses.   The law says that you have to start those

3   witnesses off on the same level of credibility.   You can't

4   automatically give a leg up to a police officer just because

5   they walk in wearing a badge and a gun.

6        A.      Right.

7        Q.      A lot of people respect what they do, but you

8   can't just kind of give them that automatic nudge or a step

9   up.   Does that make sense to you?

10       A.      Yes.

11       Q.      You know, once they start testifying, if

12  they're credible, you can go with them.   But you just can't

13  start them up there automatically.

14              Another type of witness you may hear from

15  in these cases, sometimes the defense or the State or both

16  sides call like a psychiatrist or a psychologist to testify

17  in punishment, to maybe potentially give the jury some

18  insight on Special Issue 1 or Special Issue 3, the future

19  danger or the mitigation question.

20              So we're always curious to kind of get

21  the person's impression of those type of witnesses in this

22  type of case.   What do you think about that type of

23  testimony?

24       A.      I think just, you know, like what happens to

25  me every day.   I mean, I think you have to listen to them.

121

1   You know, there's opposing views always.  And you just have

2   to really weigh it and, you know, go with what you feel is

3   the correct answer.

4        Q.    Again, I think you're right where you need to

5   be with what the law contemplates.  You know, sometimes we

6   have people that say, you know, if you look hard enough and

7   pay enough money, you can find an expert to say this, and I

8   just don't believe in it.  It's a soft science.

9           And, you know, at the other end of the

10   spectrum is you have these people that will believe every

11   word out of their mouth, just because they're a psychiatrist

12   or a psychologist.

13        A.    Right.

14        Q.    But, you know, as long as you can start with

15   that open mind and judge their credibility, you'd be fine.

16   We talked a little bit about a life sentence in a capital

17   case.

18        A.    Uh-huh.

19        Q.    You will be instructed by the Judge that a

20   life sentence in Texas means forty calendar years before a

21   person is eligible for parole.  We don't have life without

22   parole in Texas, no such thing.  What that means is a person

23   does forty hard years before they see their first parole

24   board.  And they may make parole after forty, they may never

25   make parole and serve a hard life sentence.

1    Because those decisions are so far in the

2  future and beyond the control of anyone here, we tell a jury

3  what a life sentence means, but we ask them to presume in

4  their deliberations that a life sentence really means a life

5  sentence, an actual life sentence.  Does that make sense to

6  you?

7    A.    Yes.

8    Q.    Again, it's another device to really make sure

9  that the jury focuses on the evidence and the questions.  We

10  don't want people to come in and say, you know, forty years,

11  that's not enough, so I'm just going to blow off the

12  evidence and answer these questions in such a way that he

13  gets death.

14    A.    Right.

15    Q.    Or a person to say forty years, that's long

16  enough.  Forget the evidence, I'm just going to answer it in

17  such a way that he gets life.  So as long as you can presume

18  life means life, you would be qualified, and you told us you

19  could.

20    A.    Yes.

21    Q.    Another area that I need to cover, I don't

22  know if it will come up, are these things called lesser

23  included offenses, okay?  Lesser included offenses.  Just to

24  give you an example.  Say, you are a juror on a capital

25  murder case, murder during the course of a robbery.  And at

1 the end of the evidence in the first phase of the trial, you

2 have a reasonable doubt about the murder, but not the

3 robbery. You would have the option of finding the person

4 guilty of the lesser offense, the lesser included offense,

5 of aggravated robbery.

6            If you found a person guilty of that, you

7 throw this scheme out the window and the law would require

8 you to set the person's punishment somewhere between the

9 punishment range of five all the way up to 99 years or life

10 in prison.  In order to be qualified now, you need to be

11 able to tell us that you could keep an open mind to that

12 range of punishment in any aggravated robbery case.

13       A.    Yes.

14       Q.    Okay.  Basically what we're asking you, you

15 know, if you heard an aggravated robbery case where you

16 thought life was the right thing to do, you could do it.  Or

17 if you heard an aggravated robbery case where you thought

18 five years was the right thing to do, you could do five

19 years.  You may never hear that case or it may be one in a

20 hundred cases, but as long as you have that open mind, that

21 possibility, you would be a qualified juror.

22       A.    Okay.

23       Q.    Does that make sense to you?

24       A.    Yes.

25       Q.    It's kind of the same way with these Special

1    Issues.  I've heard it described before as kind of, the

2    punishment phase with these issues is kind of an open

3    window.  Special Issue 1 is answered yes, the window closes

4    a little bit more.  Special Issue 2 is answered yes, the

5    window comes down a little farther.  And when you get to 3,

6    you know, it may not be a big gap, but as long as it's open,

7    as long as you have that open mind, that's kind of what the

8    law envisions.  Does that make sense to you?

9         A.    Yes.

10        Q.    And that's the bottom line to all of this,

11   Mr. Albright.  Regardless of what your personal thoughts,

12   feelings, or opinions are, obviously, everybody is entitled

13   to them, as long as you can kind of set those aside and

14   follow the law, as long as your personal feelings aren't so

15   strong that they would somehow impair your ability to follow

16   the law or be a fair juror, you would be a qualified juror.

17   Any questions of me?

18        A.    No.

19        Q.    Are you tired of your law school legal lesson?

20        A.    No, it's interesting.

21        Q     Really?  Okay.

22        A.    I've learned some things I didn't know.

23        Q.    I know, and you went to U.T., right?

24        A.    I did.

25        Q.    Undergrad and grad school?

1    A.    Yes.

2    Q.    So you probably learned more law today than

3    any law student out at U.T.

4    A.    I take it you did not go there?

5    Q.    No, they wouldn't let me in.  I'm still bitter

6    about it.  I'm an SMU guy.  Any concerns before I pass you

7    over to these folks to talk to -- that you'd be anything

8    other than a full and fair juror in this trial?

9    A.    No questions.

10   Q.    Any concern about some aspect of the law that

11   you're uncomfortable with or don't think you can follow?

12   A.    No.

13   Q.    Give both sides a fair trial?

14   A.    Yes.

15   Q.    Okay.  Thanks, Mr. Albright.  I appreciate it.

16         MR. WIRSKYE:  That's all I have, Judge.

17         THE COURT:  Ms. Busbee?

18              CROSS-EXAMINATION

19   BY MS. BUSBEE:

20   Q.    Hook'em horns.

21   A.    Especially this week.

22   Q.    They accidentally let me in U.T. Law School,

23   but it's been a long, long time ago.  In any event, I don't

24   have to talk to you as long as Mr. Wirskye did.  I just

25   really am pretty satisfied with your answers for the most

1    part.  But there's just some things that I want to clarify.

2         A.     Okay.

3         Q.     We're competitors.  They want a juror that's

4    going to agree with everything they say.  I want a juror

5    that's going to agree with everything we say.

6         A.     Right.

7         Q.     We're not going to get that person.  That's

8    why we do this.

9         A.     Right.

10        Q.     And I just need to go over some of these

11   Special Issues.  I think you're pretty clear on the law and

12   we've done this at least a hundred times in this case,

13   talked to people, and so we know a quick study when we see

14   one.  But we may be brushing over some things that I want to

15   discuss with you, because I think if they are explained to

16   you and you had a problem with it, you'd tell me.

17        A.     Okay.

18        Q      Um, let me just go over these specific things

19   and then I'll go over some more general while they're in my

20   mind.  We talked to you -- or Mr. Wirskye talked to you,

21   about the probability question?

22        A.     Right.

23        Q.     And we asked your definition.  But the truth

24   of the matter is, while many people might say any

25   possibility would give them some concern, the law says it

1   really has to be more likely than not.

2        A.     Okay.

3        Q.     And I would call that over a 50 percent

4   chance, whatever that might be, but it would have to be more

5   likely than not.

6        A.     Okay.

7        Q.     So understanding that, I assume your answer

8   would still be that you would require them to prove that to

9   you?

10       A.     That's correct.

11       Q.     All right.  Fair enough.  This is an

12   interesting question and I don't think that we really got

13   into this with you when the State was talking to you.  But

14   this difference between should have, and we see that a lot

15   in criminal law, what somebody should have known, and

16   essentially that's what a reasonable person under the same

17   circumstances, you know, because we can all put ourselves in

18   someone else's shoes.

19       A.     Right.

20       Q.     If you're on the jury, we're assuming you're a

21   reasonable person.  Would a reasonable person have

22   anticipated this?  That's just to say that he's guilty.  But

23   it's an entirely different question here.  It's did

24   anticipate.  And I think the State has indicated to you that

25   they're trying this case under a parties theory.  So I'm

1    just curious as to what sort of things, you know, just off

2    the top of your head, you might consider to be important to

3    you in making a determination beyond a reasonable doubt that

4    someone anticipated an event?

5              A.      For this, that someone anticipated that a

6    human life would be taken?

7              Q.      Uh-huh.

8              A.      Um, some of the evidence would be, did they

9    talk about it ahead of time?  You know, did they make any

10   comments, did anyone else make any comments, you know, that

11   a life would be taken?  Did they, um.

12             Q.      Well, that kind of answers my question.  I am

13   hearing from you that you would have to actually hear

14   something or have some evidence, and you wouldn't assume it,

15   just based on participation?

16             A.      Right.  I wouldn't say based on participation.

17   I mean, I don't want to say that it would also only be

18   limited to hearing.  I mean, it could be, I mean, certainly

19   that would qualify, but other actions that, you know, that

20   they had taken.

21             Q.      Okay.  Fair enough.  I'm just trying to put it

22   in your mind that it is a different question.

23             A.      Okay.

24             Q.      And it requires proof beyond a reasonable

25   doubt as well.

1    A.    Yeah.

2    Q.    Because the way the scheme is set up, whether

3    you are the shooter or are not the shooter, once a jury has

4    found somebody guilty of the offense of capital murder, that

5    is a life sentence.  And then it is a whole 'nother burden

6    on the State to get past that.

7    A.    Okay.

8    Q.    And as long as you're telling me that you'll

9    make them prove that to you, and --

10   A.    Yes.

11   Q.    And, you know, sometimes we have jurors in

12   here that go, who quite frankly will say, you're going to

13   have to prove the negative, which is wrong, of course --

14   A.    Right.

15   Q.    -- we don't have to prove anything.  But I'm

16   hearing from you and I believe you, that you would make them

17   prove this?

18   A.    That's correct.

19   Q.    Okay.  Fair enough.  They didn't teach me how

20   to read my own handwriting, so I'm going, what am I talking

21   about?  Oh, this is interesting to me.  You were in that

22   first group of people back in May.  We're still talking to

23   those people, although we've almost got a complete jury.

24   And you mentioned in your questionnaire and you mentioned in

25   your discussion with the district attorney about studies

1        about the death penalty?

2                A.      Uh-huh.

3                Q.      Have you -- do you have an interest in it, or

4        -- because you had already done that before you came down.

5                A.      Yeah, yeah, I had --no, I just -- I had read

6        about it.  There was something, I think, in the news at one

7        point, and I remember it may have been when -- I don't know,

8        when they had said that Texas was -- that Texas had

9        executed, you know, more people.  I don't know when that

10       was, a couple of years ago.  It's like they had executed a

11       record number of people or at least for some time.  And I

12       think that, you know, it was around that time.

13               Q.      Okay.  So you just remember that from the

14       paper?

15               A.      Right.

16               Q.      I notice that you had, you know, kind of a

17       surprise, just like everybody does, response to the fact

18       that someone who actually did not physically commit a murder

19       could be convicted of capital murder and then could face the

20       death penalty.  And you said it would depend on the

21       circumstances.  Could you elaborate on that for me a little

22       bit?

23               A.      Um.

24               Q.      Well, let me back up before I say that.

25               A.      Yeah.

1    Q.    You said that before we talked to you about

2   these questions.  Do these questions and what they ask you

3   to decide, does that make it easier for you to discern, you

4   know, when a party might be eligible for the death penalty

5   in your mind and not -- I mean, it's a scheme that makes

6   sense to you?

7    A.    Yeah, yes, it does, it makes a lot of sense.

8    Q.    All right.  Because, obviously, a party, you

9   know, if you did anticipate a murder, would be -- that would

10  make you more morally culpable which, of course, pours into

11  the third question.

12   A.    Right.

13   Q.    We just need to make sure that you would be --

14  you wouldn't have any hesitation to answer these questions

15  in a way that would result in a life sentence, if the

16  evidence failed to prove to you some of these questions?

17   A.    I would have no hesitation.

18   Q.    And that you would have an open mind.  And I'm

19  -- I feel good about the fact that you could consider

20  Special Issue No. 3 fairly.

21   A.    Yes.

22   Q.    Okay.  Let me consult with my co-counsel here

23  and see if he's thought of anything to ask you.

24   A.    Okay.

25   Q.    Now, it's your turn.  If you have anything

1    you'd like to say to me or to the Judge, anything on your

2    mind?  Really, speak now or forever hold your peace.  Do you

3    have any concerns or thoughts?

4         A.    No.

5         Q.    Okay.  Well, I'm sure I have forgotten to ask

6    you something, but --

7              MS. BUSBEE:  These are all the questions

8    I have of this juror, Your Honor.

9              THE COURT:  Thank you, sir, Mr. Albright.

10   If you would, wait for us outside and we'll have you back in

11   just a few minutes.

12              PROSPECTIVE JUROR:  Okay.

13                   [Prospective juror out]

14              THE COURT:  What says the State on juror

15   No. 4544, Mr. Scott Albright?

16              MR. WIRSKYE:  State has no challenge for

17   cause.

18              MS. BUSBEE:  Defense has no challenge for

19   cause.

20              THE COURT:  Take a few minutes and

21   discuss your decision.

22                   (Recess)

23              THE COURT:  Mr. Shook?

24              MR. SHOOK:  We'll accept the juror.

25              MS. BUSBEE:  The defense will accept this

1  juror.

2           THE COURT:  Ask Mr. Albright back in.

3  Mr. Albright, I need to inform you that you have been seated

4  on this jury.  Now the hard part is fixing to start.  I have

5  printed some written instructions for you.  The Sheriff will

6  go over those instructions with you and I have no problem at

7  all with your ability to follow and understand the law.  The

8  attorneys are satisfied with your opinions and your ability

9  to be fair and impartial in this case.

10          Now, what's going to happen when you go

11  back to the office and tell your coworkers I've been

12  selected to sit in a capital murder case?

13          PROSPECTIVE JUROR:  Right.

14          THE COURT:  What are they going to tell

15  you?

16          PROSPECTIVE JUROR:  I don't know.

17          THE COURT:  They're going to offer their

18  opinions, aren't they?

19          PROSPECTIVE JUROR:  That's possible,

20  yeah.

21          THE COURT:  Sure it is.  They're human,

22  they are going to.  So, obviously, we're putting this case

23  far enough in advance for you to have time to schedule your

24  business around this trial.  Obviously, you are going to

25  have to tell supervisors.

1          PROSPECTIVE JUROR:  Right.

2          THE COURT:  And project managers and

3 whomever between here and Los Angeles that you need those

4 two weeks.

5          PROSPECTIVE JUROR:  Right.

6          THE COURT:  You can leave it at I have

7 been seated on a jury and I need two weeks away from the

8 office.  And you will be able to use the phones back here.

9 We're not going to cut you off.  You're not going to be

10 sequestered at night, as long as the jury can follow my

11 instructions.  You have told us that you would make the

12 decision based on the evidence that you will receive from

13 that very witness stand that you are sitting in right now.

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  And nowhere else.

16          PROSPECTIVE JUROR:  That's correct.

17          THE COURT:  That's why I put this in

18 writing.  You don't go back and look on the Internet, don't

19 do any kind of research.  Just leave here today and the only

20 thing you need to do is schedule two weeks for me in

21 November.

22          Now, the only time that I anticipate you

23 could be sequestered, that means you are locked up with the

24 other jurors at a hotel -- I mean, you can't -- the public

25 can't have access to you for the very reason we don't want

1  outside influence.  It would be if the jury is unable to

2  reach a decision in one day and need to work the next day.

3                    PROSPECTIVE JUROR:  Okay.

4                    THE COURT:  So you could have one night

5  in a hotel.  Now, if that were to occur, you would have

6  plenty of notice of what day that might be.  So it's not

7  going to be you show up one day, and oh, I can't go home.

8  That won't happen.

9                    The Sheriff is going to go over several

10  things with you.  I'm going to try to print another

11  supplementary juror information sheet and that's for my

12  records only.  Everything is digitized and it's all password

13  protected, so it's not going to get out to unauthorized

14  people.  It's between me and the Sheriff.

15                    PROSPECTIVE JUROR:  Okay.

16                    THE COURT:  I think I've anticipated all

17  of your questions.  We will be having -- once we get the

18  jury completed, we'll have everybody back down here at some

19  point.  And I would anticipate it's going to be a week to

20  ten days before the trial begins, so it would be sometime in

21  November.

22                    PROSPECTIVE JUROR:  Okay.

23                    THE COURT:  And the reason why I do that

24  is once I get everybody down here, there are certain things

25  I cannot do until I get all the jurors here at one time.  So

1  it will be a short meeting in the morning.  I would

2  anticipate a Thursday or Friday a week before the trial.  I

3  can't tell you what that day is because I don't know how

4  long we're going to be doing this.  As you know, we started

5  in May.

6          PROSPECTIVE JUROR:  Right.

7          THE COURT:  So it's just one of those, I

8  just -- I'll see it when it gets here.  And I will send you

9  another letter.  Do you have any questions of me?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Okay.  When you get back with

12  the Sheriff, at this point we're all friendly, you know, how

13  are you doing, do you like baseball, dada, dada, dada.  But

14  from this point forward, if you see myself, the lawyers, the

15  Court Reporter, we're going to be rude to you.  I mean, just

16  downright rude.

17          You will see me in the back, in the

18  hallway, as well as the Court Reporter.  Ms. Brewer is real

19  friendly, maybe, but she's not going to talk to you.  If you

20  ask me what time of day it is, I'm not going to -- I can't

21  answer you.  Why do we do that?  It's the appearance of

22  impropriety.  If someone else sees a conversation between a

23  juror and myself or the juror and one of the lawyers and

24  they don't hear the conversation, they don't know what we're

25  talking about.

1      So, I mean, that's the Sheriff's job.

2  She can communicate to the jury or the other Sheriffs over

3  here.  The bailiffs are in the back.  That's what their job

4  is.  If the juror has a question, they bring it to open

5  court and we discuss it where there's no secrets about it.

6  It's not anything unusual.  I mean, jurors have questions.

7  You simply can't contact, have any contact with myself or

8  any of the other people involved in this ex parte.  Does

9  that make sense?

10      PROSPECTIVE JUROR:  Yes.

11      THE COURT:  So this is the last time

12  until the trial is over that we can all talk to you.  But if

13  you see me, I'm going to be flat out rude.  Now, I will

14  print the sheet.  If you have any questions from this point

15  forward, you may certainly ask the Sheriff.  She can get

16  them to me and we can deal with it.

17      PROSPECTIVE JUROR:  Okay.

18      THE COURT:  Fair enough?

19      PROSPECTIVE JUROR:  Yes.

20      THE COURT:  So, no more.  Don't even

21  think about it, no Internet, no newspaper, no friends.  You

22  need to tell your wife, hey, I'm going to be on this jury.

23  I mean, sure, you can tell her that you're going to be on

24  jury duty, but it's going to be awful hard not to talk about

25  it, though.

1          PROSPECTIVE JUROR:  Right.

2          THE COURT:  She will give you her

3     opinion, too.  If your wife is anything like mine, she will

4     give you her opinion, right?

5          PROSPECTIVE JUROR:  Right.

6          THE COURT:  So just don't share it with

7     her.

8          PROSPECTIVE JUROR:  Okay.

9          THE COURT:  After it's over with, you can

10    tell her all about it.  So with that, Sheriff, here's this

11    first sheet, the other one -- so, I'll print that in a

12    minute.

13               [Prospective juror out]

14          THE COURT:  Ms. Willis.

15               [Prospective juror in]

16          THE COURT:  Good afternoon, please have a

17    seat.  For the record, this is juror No. 4511, Ms. Maribel

18    Willis; is that correct?

19          PROSPECTIVE JUROR:  Correct.

20          THE COURT:  Welcome to the 283rd.

21          PROSPECTIVE JUROR:  Thank you.

22          THE COURT:  I'm sorry for the delay in

23    getting you in.  We never know exactly how long we are going

24    to speak with someone.  That first lady was just a few

25    minutes and the next gentleman about an hour and a half.  So

1  we don't know exactly how long, so make yourself

2  comfortable.

3                    Looks like you're a little nervous.

4  That's to be expected.  The best thing about this is there

5  are no wrong answers.  This is an opportunity for you to

6  visit with the attorneys about the law.  I see you have

7  obviously had time to read the guide I provided for you and

8  I assume you reviewed your questionnaire.  You don't need to

9  understand all the law at this point.  You can ask

10 questions.  They are going to give you examples to help you

11 have a working functional understanding of the law we're

12 dealing with.

13                    At the end of the process there are two

14 questions I have to ask.  Number one is, do you understand

15 the law?  Number two, can you follow the law?  That's the

16 big picture I have to look at.

17                    PROSPECTIVE JUROR:  Okay.

18                    THE COURT:  Before we begin, I do have

19 one question for you.  Will you be able to serve this Court

20 for a period of two weeks beginning on November 10th?

21                    PROSPECTIVE JUROR:  Yes.

22                    THE COURT:  With that, I will turn it

23 over to Mr. Shook.  You may inquire.

24                    MR. SHOOK:  May it please the Court?

25                    MARIBEL WILLIS,

1    having been duly sworn, was examined and testified as

2    follows:

3                           DIRECT EXAMINATION

4    BY MR. SHOOK:

5         Q.    Ms. Willis, my name is Toby Shook.  I'm going

6    to be asking questions on behalf of the State this

7    afternoon.  And, as the Judge said, there aren't any right

8    or wrong answers.  We just want your honest opinions, okay?

9         A.    Uh-huh.

10        Q.    I'll talk a little bit on some of the

11   information you put in your questionnaire, and, obviously,

12   we'll talk about capital murder and the laws and rules that

13   apply.  Looking at your questionnaire, I see that you have

14   been down on jury duty before and you have actually served

15   on a jury; is that right?

16        A.    Yes.

17        Q.    What type of case was that?

18        A.    It was a drunk driving case.

19        Q.    About how long ago was that?

20        A.    Maybe two years ago.

21        Q.    Okay.  What was the verdict in that case?

22        A.    We found innocent.

23        Q.    Okay.  What do you remember about the facts?

24        A.    The facts were not conclusive, so the verdict

25   was based on that.

1    Q.    Okay.  Did the --

2          THE COURT:  Ms. Willis, I'm sorry, ma'am,

3    you are going to have to speak up a little bit.  You are

4    very soft spoken.

5          PROSPECTIVE JUROR:  Okay.

6          THE COURT:  If you would, I know that

7    chair doesn't move, but speak into that microphone or adjust

8    it over towards you more, you know.

9          PROSPECTIVE JUROR:  Okay.

10   Q.    (By Mr. Shook)  Were the deliberations very

11   long?

12   A.    No.  It was about, maybe about two and a half

13   hours.

14   Q.    Okay.  You just feel there was too many

15   inconsistencies, that sort of thing?

16   A.    Right.

17   Q.    All right.  Also, well, you've worked the last

18   three years or so at -- is the company name Intermix

19   (phonetic) Corporation?

20   A.    Yes.

21   Q.    What do you do with them exactly?

22   A.    I do billing and claims.

23   Q.    Okay.  We asked one question about if you've

24   known anyone that's ever been through the criminal justice

25   system.  And you did have a friend, I think in '95 or so,

1   that had some trouble involving an auto theft or car theft;

2   is that right?

3        A.      Yes.

4        Q.      Did you know personally what the facts were in

5   that case?

6        A.      No, it wasn't until later.

7        Q.      Later you found out?

8        A.      Yes.

9        Q.      What type of sentence was it?

10       A.      He's currently serving -- served seven years

11  and it's -- was released about two and a half years ago and

12  is serving probation.

13       Q.      Was that person -- how are you related to

14  them?

15       A.      He's a friend of -- he's the son of a friend

16  of mine.

17       Q.      Okay.  From what you know about the case, do

18  you feel he was treated fairly?

19       A.      Yes.

20       Q.      Okay.  Have you ever spoken to him about his

21  experiences in prison, or --

22       A.      Yes.

23       Q.      What has he told you about that?

24       A.      That they tried to just mete out the sentence

25  as fairly as they possibly can.  And it's also mainly up to

1  you and your attitude that also contributes to your, whether

2  you get parole or your treatment, as well.

3       Q.    Okay.  Let me talk to you a little bit about

4  how you feel about capital murder.  Do you favor it as a

5  law?

6       A.    Yes.

7       Q.    Can you tell us kind of in your own words why

8  you favor it, kind of the -- what you feel the purpose is

9  that it serves society?

10      A.    Well, I feel that it contributes, as far as

11  just eliminating those people from society, if they are not

12  rehab, I mean, if they have recurrent offenses and that they

13  escalate, so, therefore, they need to be removed.

14      Q.    What types of crimes do you think should be

15  available for the death penalty?

16      A.    I think in the case of murdering somebody.

17  Whether if you have -- if you are in a group or something,

18  you know that you are doing wrong and you don't -- you cause

19  somebody's life to be in jeopardy or have injured somebody,

20  you ought to lose your life, yes.

21      Q.    Okay.  All right.  You said in the

22  questionnaire that you did follow some cases in the news.

23  In fact, I think you mentioned a couple that, the Yates

24  case?

25      A.    Yes.

1    Q.    And, also, the Darlie Routier case?

2    A.    Yes.

3    Q.    What were your impressions of those cases that

4    you followed?

5    A.    My impression was that -- just from the news

6    themselves, is that -- that they were -- that the sentences

7    they received were fair, based on some of the actions that I

8    --

9    Q.    That you viewed?

10   A.    -- that I viewed.

11   Q.    All right.  Also, obviously, this case

12   received quite a bit of publicity and you, like most jurors,

13   put on the questionnaire that you did follow it on the

14   radio, TV, newspaper?

15   A.    Yes.

16   Q.    That doesn't necessarily make you ineligible

17   to be a juror, obviously.  In a high publicity case, if that

18   were the rule, we could never seat a jury.  But we do ask

19   each juror what they recall about the details.  Can you tell

20   us a little bit about what you remember, what you saw on the

21   news?

22   A.    As far as details, I just heard that they had

23   escaped from prison and they had kept together and they had

24   gone into the store to take some arms and during that time

25   was when they were -- the officer had been there and the

1   officer had been shot.

2       Q.      Okay.

3       A.      And then they still left there and still kept

4   running together and it wasn't until later that they

5   disbanded.

6       Q.      All right.  Do you remember or did you follow

7   any of the news after they were captured?  Follow any of the

8   court proceedings, that sort of thing?

9       A.      As far as with the court proceedings, no.  I

10  just kept up with the newspapers about, I guess, the most

11  prominent one was the Mr. Rivera's (sic) case.

12      Q.      All right.  The rule of law is this.  A juror

13  has to be able to make their decisions in the case just

14  based on what they hear in the courtroom from the witness

15  stand, from the evidence introduced.  The fact that you have

16  read something or seen something on TV doesn't make you

17  ineligible.  You can even have opinions on those things, but

18  you can't let that influence you in any way.

19                  We can't ask you to forget about it, but

20  we can't let you -- what you've seen or read influence any

21  of your decisions, because the more accurate information is,

22  obviously, going to come from the witness stand.  But we

23  depend on each juror to tell us if they will be able to

24  follow that particular rule.  It's kind of up to you, right?

25  We won't ever know for sure.

1    But you know what you've read, you know
2    how it affected you, and we have to depend on you whether
3    you can honestly tell us that won't affect me and I can make
4    my decisions just based on the evidence that I hear here in
5    the courtroom.  So we run that down through every juror and
6    then ask them honestly to tell us, do you think you can
7    follow that particular rule of law and make your decision
8    just based on what you hear in the courtroom and not let
9    what you have already seen influence your decision?

10    A.    I can follow what's been in the courtroom,
11    presented, and keep objective.

12    Q.    All right.  Fair enough then.

13    THE COURT:  Ms. Maribel, you're going to
14    have to speak up.

15    PROSPECTIVE JUROR:  I'm sorry.

16    Q.    (By Mr. Shook)  Now, one other area I want to
17    get into, and you've touched on this, I think, is capital
18    murder.  When we normally think of capital murder, we think
19    of the actual triggerman or the murderer.  But a capital
20    murder case can involve several people.  It can involve a
21    triggerman, plus some accomplices.  Groups of people commit
22    these crimes.

23    And under the law they can all be held
24    accountable.  An accomplice who doesn't commit the murder,
25    depending on his participation, can even be eligible for the

1   death penalty and could receive the death penalty, based on

2   the particular facts.

3                    Some jurors agree with that aspect.  They

4   feel that accomplices should be held accountable and they

5   think it's fair that they could get the death penalty, even

6   though they didn't actually cause the murder.  We have some

7   other jurors who, from their personal point of view, would

8   reserve the death penalty just for the actual triggerman.

9   They think it's fair to assess the death penalty, if you are

10  the actual murderer, but not if you are an accomplice.  They

11  might reserve some other prison sentence for that type of

12  person.

13                    But people feel differently about that.

14  How do you feel about the prosecution of an accomplice in a

15  death penalty case?

16         A.     He's just as guilty as the triggerman.

17         Q.     Okay.  It kind of goes back to what you said

18  earlier, if you are in a group and you are participating and

19  that sort of thing.

20         A.     Yes.

21         Q.     Now, the fact that you are just present at a

22  scene, that doesn't make you an accomplice.  You have to

23  know why you are there, you have to actively participate in

24  the crime.  Mere presence alone doesn't make you an

25  accomplice.  But if you know it's going on and you are

1  helping out, aiding, directing, assisting, then you can be

2  found guilty and you can even receive the death penalty.

3  And I take it from your answers you feel that's a fair and

4  just law?

5          A.    Yes.

6          Q.    Okay.   Now, a trial is divided into two parts.

7  There's the guilt/innocence stage in which we have to prove

8  the guilt.   And if we do that, we move to the punishment

9  phase.   In the punishment phase you may hear additional

10 evidence and at the close of it, you get these questions.

11               What we have to do is prove to you beyond

12 a reasonable doubt that he's a continuing danger to society,

13 that he anticipated that a life (sic) could occur, and that

14 there is not sufficient mitigating evidence to warrant a

15 life sentence.

16               If the questions are answered yes, yes,

17 and no, the Judge has no choice.   He would sentence the

18 defendant to death.   If they are answered any other way,

19 it's a life sentence.   But those are the only two possible

20 outcomes.   Are you aware of the method of execution in

21 Texas?

22         A.    Yes, injection in the arm.

23         Q.    Exactly right.   You are probably also aware

24 that Texas leads the nation in executions?

25         A.    Yes.

1      Q.    Some states have the death penalty on the

2  books, they even have people on death row, but they never

3  carry out their executions.  But Texas does, so it's a very

4  real punishment.

5      And the procedures are the same in each

6  case.  They would be the same in this case, if the defendant

7  were convicted and these questions were answered in a way

8  that would result in a death sentence.

9      He would be placed on death row and at

10  some point in time the Judge would actually give him a date

11  of execution.  The day before that date, he would be moved

12  from death row to Huntsville where there is a prison.  He

13  would be given on his date of execution a last meal.  He'd

14  be given time with family and friends, with a minister.  But

15  at 6:00 p.m. under our laws the executions always take

16  place.

17      He would be taken to the death chamber.

18  He would be put on that gurney, you may have seen it on the

19  news, that has the leather straps.  And he would be secured

20  there.  Witnesses would be brought in into two different

21  rooms, one for the friends of the victim, one for the

22  friends of the defendant.

23      But at that point in time the warden

24  allows the defendant to make a last statement, which is

25  often reported.  He could profess his innocence.  He may ask

1   for forgiveness.  But when he finishes that, the warden

2   signals the executioner who then injects lethal poisons,

3   poisons which shut down his lungs, stop his heart, and cause

4   him to lose consciousness.  Within about 15 seconds he will

5   probably die.

6            That's the procedures in this case, each

7   case, and that's what would happen in this case.  And, quite

8   frankly, our goal in this case is to have the defendant

9   executed.  We feel we have the type and quality of evidence

10  to convince a jury of his guilt and that these questions

11  should be answered in such a way that he will be executed in

12  the manner I've described.

13           Now, you've told us that from your

14  personal point of view, you do agree with capital murder and

15  the death penalty?

16       A.    Yes.

17       Q.    Let me ask you this.  Do you feel you are the

18  type of person who could sit in judgment of someone in this

19  type of case, and, if the State proved these issues to you,

20  you could take pen in hand and answer these questions in a

21  way knowing that the defendant would be executed?

22       A.    Yes.

23       Q.    Okay.  Let's talk about these Special Issues

24  for a minute.  If you would, turn and look at that Special

25  Issue No. 1 and just read that to yourself, and I'm going to

1  ask you some questions.

2      A.    (Prospective juror complies.)  Okay.

3      Q.    You see where that question is asking you to

4  predict the future, how the defendant would behave in the

5  future?  Do you think you could make that prediction, if you

6  are given enough evidence?

7      A.    Yes.

8      Q.    What types of things would you want to know

9  before you answered that question?

10     A.    Whether or not he would -- was trying to

11 separate himself from that situation or whether or not he

12 would try to stop it in any way.

13     Q.    Okay.

14     A.    Influence the other ones to not to cause any

15 harm.

16     Q.    Okay.  All that background information is

17 available, as well as if a person had a prior criminal

18 history and that sort of thing.

19     A.    Uh-huh.

20     Q.    You know, if they've done good things, if

21 they've done bad things, you can even hear from the

22 witnesses.  You can hear all about their background in

23 deciding that question.  The question starts out with a no

24 answer.  Okay?

25     A.    Uh-huh.

1        Q.    And the State must prove to you beyond a

2  reasonable doubt that it should be answered yes.  We do that

3  by putting on additional evidence in the punishment stage

4  and then you get to review everything you have heard in the

5  guilt/innocence stage, because you don't get to this

6  question, unless you have found the defendant guilty.

7              Now, that doesn't mean it's an automatic

8  yes finding, just because you find someone guilty of capital

9  murder.  Under our laws someone found guilty of capital

10  murder can either get a death sentence or a life sentence

11  and it all depends on how the jurors answer those questions.

12  If it were an automatic yes, then there wouldn't be any

13  reason for having the question, obviously.

14              What the law requires is that a juror

15  will wait and listen to all the additional evidence, then go

16  into the jury room and look at these questions separately,

17  and require the State to prove question No. 1 to you beyond

18  a reasonable doubt.  If we can't do that, you will leave it

19  as a no answer.  But if we can, you will answer it yes.  Do

20  you feel that you could do that?

21        A.    Yes.

22        Q.    And just because you found someone guilty,

23  doesn't necessarily mean you would answer yes.  Is it just

24  going to depend on the facts of the case?

25        A.    It would depend on the facts of the case.

1    Q.    Okay.  Some facts may show you it's a yes

2  answer, some facts may show you it's a no answer.  But each

3  case could be different.  And that's why the law requires

4  you to wait and listen to all the evidence and then make

5  your decision.  Do you feel you could do that?

6    A.    Yes.

7    Q.    Okay.  Now, look at Special Issue No. 2 for me

8  and read that to yourself.

9    A.    (Prospective juror complies.)

10   Q.    That question, again, starts out with a no

11  answer and we have to prove to you beyond a reasonable doubt

12  it should be answered yes.  That's the accomplice question

13  we talked about.  We prove whether the defendant actually

14  caused a death.  If you think he actually was the

15  triggerman, then that question is answered.

16        If you don't think he's the actual

17  triggerman, we can still prove the question by proving to

18  you that he intended to kill the deceased, he had that

19  intent, or another person, or that he anticipated that a

20  human life would be taken.

21        We do that by putting on all the

22  evidence, you know.  We can't open a person's mind up and

23  show you what his intent was.  All we can put on is all the

24  relevant facts and you, as a juror, can use your common

25  sense just to kind of, what we say, draw reasonable

1  deductions, and deduce what a person's intents were.  You've

2  heard the old saying, actions speak louder than words?

3      A.    Yes.

4      Q.    That's kind of what happens here.  I mean,

5  people don't go around shouting out what their intent is and

6  that sort of thing.  But you in your everyday life

7  experiences often, I'm sure, determine what you think a

8  person's intentions are just by how they act and how they

9  respond in situations; is that right?

10     A.    Yes.

11     Q.    Okay.  And that's the type of evidence we put

12 on here.  You know, sometimes when we ask jurors what they

13 want to know, they always ask, well, did they plan it out,

14 was there a big meeting where they all agreed this may

15 happen.  And I think that's a common sense example of what

16 people think of.  But we don't know, you know, we have to

17 prove this case, but we're usually not invited to those

18 meetings, obviously.  So we don't know, if there's a

19 meeting.

20              But we can put on all the relevant

21 evidence of how the crime occurred and their role in it from

22 what we know from independent witnesses and then we can

23 argue and try to prove a person's intent.  And, hopefully,

24 the jurors will just use their common sense to determine if

25 someone anticipated that a life, a loss of life, could

```
1    occur.  Do you feel you could do that?
2         A.    Yes.
3         Q.    And you think that's a fair question?
4         A.    Yes.
5         Q.    Again, you don't get to this question, unless
6    you have found him guilty already and you believe he's a
7    continuing danger.  But the law says that a juror must wait
8    and look at that question independently.  You kind of view
9    these questions like hurdles you have to jump over.  And
10   they're all separate hurdles.
11              The first one to get over is the
12   guilt/innocence, and the second hurdle is going to be that
13   question No. 1, and then this would be the third hurdle
14   you'd have to jump over.  But you look at all the evidence
15   you have already heard and you also review anything new
16   about his background and then determine has the State proven
17   this beyond a reasonable doubt?  Do you feel you could do
18   that?
19        A.    Yes.
20        Q.    And if you think it's a no answer, you could
21   leave it at no.  But if you think we have proved it yes, you
22   can answer it yes, just, again, depending on the facts of
23   each case?
24        A.    Yes.
25        Q.    Okay.  Now, this last question, it's the
```

1   mitigation question and neither side has the burden of

2   proof.  Okay?  You can anticipate we're going to argue it

3   one way or the other, but it allows the jurors to show

4   mercy.  You have already found him guilty.  You would

5   already think he's a continuing danger to society and

6   anticipated that a life (sic) would occur, but there might

7   be something in his background or something in the case

8   which tells you, I think a life sentence should be imposed

9   rather than a death sentence.

10                   It allows you to show mercy, if you

11  believe that's the right thing to do.  Do you feel that's a

12  fair question to have in this type of case?

13          A.      Yes.

14          Q.      Okay.  The question asks whether taking into

15  consideration all the evidence, including the circumstances

16  of the offense, the defendant's character and background,

17  and the personal moral culpability of the defendant, is

18  there sufficient mitigating evidence, mitigating

19  circumstance or circumstances to warrant the sentence of a

20  life imprisonment rather than a death sentence.

21                   So it lets you look at everything, his

22  background, his character, and the offense itself.  What

23  mitigating evidence is, I can't tell you.  It's going to be

24  up to you and the other jurors.  You just have to be able to

25  keep your mind open to it.

1          Do you feel you could do that and keep

2    your mind open to the evidence at this point in time and

3    then make that determination?  If you think there is

4    sufficient mitigating evidence where you think a life

5    sentence is warranted, you could do that?

6          A.    Yes.

7          Q.    And if you don't, you could leave it as a no,

8    knowing that the defendant would be executed someday?

9          A.    Yes.

10         Q.    Okay.  As you sit there today, can you think

11   of anything you might view as potentially mitigating?

12         A.    No.

13         Q.    Okay.  Well, don't feel bad because every

14   other juror tells us that, too.  We don't anticipate,

15   obviously, you're thinking about these issues.  You just

16   have to be able to tell the Court you can keep your mind

17   open to it.  And you feel you could do that?

18         A.    Okay.

19         Q.    Again, it's just a situation of you will wait

20   until all the information is in and then you'll make your

21   decisions just based on the facts.  Not that you found him

22   guilty, and not even that you have answered these other

23   questions a certain way, but you will wait and look at each

24   question independently and then determine their facts.  Do

25   you feel you could do that?

1      A.     Yes.

2      Q.     Okay.  A few more rules that apply to each

3 case.  And these apply -- you will be familiar with these,

4 because these applied in the DWI case you sat on.  Anyone

5 charged with a crime starts out with that presumption of

6 innocence.  And the fact that they've been arrested or

7 charged or that we're even going through this, is not

8 evidence of their guilt.

9               The evidence comes from the witness stand

10 and you have to start out the defendant with that

11 presumption of innocence.  Do you feel that you could do

12 that?

13      A.     Yes.

14      Q.     Okay.  The burden of proof is on the State and

15 it never leaves this table.  We have to prove the case to

16 you beyond a reasonable doubt.  If we fail to do that, you

17 have to find the defendant not guilty, which is what you've

18 already done in the DWI case.  You just had a reasonable

19 doubt; is that right?

20      A.     Right.

21      Q.     You found him not guilty and everyone went on

22 their way.  That burden of proof is, again, never leaves

23 this table.  It never shifts to the defense and you can

24 never require them to prove his innocence.  I mean, you may

25 want them to put on evidence.  You may anticipate they may,

1   but you can't put a burden of proof on them.  The burden of

2   proof always stays on the State.  Could you follow that rule

3   of law?

4        A.     Yes.

5        Q.     The burden of proof goes to each and every

6   element of the indictment.  We write the indictment and if

7   you have a doubt on any part of it, you are obligated under

8   law to find the defendant not guilty.

9               Let me give you a couple of examples.  We

10  have to prove who committed this crime.  Now, at the end of

11  the trial, if you had a reasonable doubt about who committed

12  it, you are probably not going to have any trouble finding

13  him not guilty.  That's a pretty important element.  But

14  just as important under the law is the county where it

15  happened, Dallas County.  If you had a reasonable doubt

16  about the county, where it occurred, then you would have to

17  find the defendant not guilty.

18              Some people view that as a technicality,

19  but it's not viewed that way under the law.  You would have

20  to be able to find the defendant not guilty.  Now, that

21  would be our mistake.  It's something we would have bungled

22  in our preparation.  It'd show pretty poor preparation, and

23  I don't anticipate that happening.  But it's an example I

24  use to demonstrate how that burden of proof goes to every

25  portion.

1      A.      Uh-huh.

2      Q.      Do you feel you could follow that rule of law?

3      A.      Yes.

4      Q.      Okay.  The Fifth Amendment, if a person wants

5  to testify at their trial, they can, and no one can stop

6  them.  The defendant in your DWI trial, did he testify?

7      A.      No.

8      Q.      Okay.  Then you received this same

9  instruction.  You can't hold it against them.  You can't use

10  it as evidence against them.  You can only base your

11  decisions on the evidence that you heard, which I take it

12  that's what you did in the DWI trial?

13      A.      Yes.

14      Q.      And you could do that here in this case, if

15  the defendant failed to testify?

16      A.      Yes.

17      Q.      Okay.  You may hear about our parole laws.

18  The Judge would tell you that a capital life sentence means

19  that someone must serve forty calendar years in prison

20  before they become eligible for parole.  He would also

21  instruct you, you can't consider our parole laws in any

22  shape or form.  You just have to consider a life sentence, a

23  life sentence.  Could you do that?

24      A.      Yes.

25      Q.      Okay.  And then, finally, you may -- sometimes

16

1  jurors find defendants guilty of lesser included offenses.

2  The lesser included offense of capital murder is aggravated

3  robbery.  The penalty range for aggravated robbery is life

4  in prison all the way down to five years in prison and

5  anywhere in between.  So it's a very broad range, because

6  there could be a million different fact situations, very

7  aggravating fact situations, mitigating, and you have to, as

8  a juror, keep your mind open to that full range.

9              If you think the fair thing to do is to

10  give a life sentence, you could do that, or as little as

11  five years in prison, you could do that.  Do you feel you

12  could keep your mind open to that full range and then make

13  your decision?

14       A.    Yes.

15       Q.    Okay.  The bottom line in all these questions,

16  I know I said it, is each case depends on its own facts.

17  And you have to, as a juror, wait until all those facts are

18  in.  And then look at every one of these issues separately

19  and then make your decisions.  The fact that you don't like

20  violent crime, the fact that you support the death penalty,

21  doesn't make you an unfair juror in any way.

22              What you have to be able to do as a juror

23  is just make your decisions based on the particular facts of

24  the case and kind of let the chips fall where they may.  Do

25  you feel you could do that?

1     A.     Yes.

2     Q.     Okay.  Do you have any questions over anything

3 we've gone over?

4     A.     No.

5     Q.     If I could have just one moment, Judge.  I

6 believe, I was looking over your questionnaire.  You do have

7 a brother that's a bailiff in another state; is that right?

8     A.     Yes.

9     Q.     Okay.  He's in law enforcement.  Do you feel

10 that would affect you in any way at all or could you be fair

11 to both sides, just by the fact that your brother's in law

12 enforcement?

13     A.     Yes, I can be fair.

14     Q.     Okay.  Police officers often testify in these

15 cases.  As a juror you have to judge them like you would any

16 other witness.  You can't start them out ahead.  There is

17 going to be good police officers and bad police officers and

18 you have to wait and judge them on the witness stand like

19 you would anyone else.  Do you feel you could do that?

20     A.     Yes.

21     Q.     Well, Ms. Willis, I appreciate your patience.

22     MR. SHOOK:  That's all the questions I

23 have and we'll pass the juror.

24     THE COURT:  Ms. Busbee?

25     CROSS-EXAMINATION

BY MS. BUSBEE:

Q.   Well, thank you, Ms. Willis, for coming down and waiting and being patient.  As the Judge said, there's no wrong answers, just your honest opinion is all we're here for.  I notice from your questionnaire, and it's a theme throughout your questionnaire, that you have high standards and you are a deeply religious woman.  And I just want to ask you some questions, because you did make reference to this in some of the things in your questionnaire.  First of all, there was a question, could you turn to page 3, please.

A.   Okay.

Q    That's kind of just in the middle of everything that you didn't answer, and it asks you if you are in favor of the death penalty in some cases, do you agree that a life sentence rather than the death penalty would be appropriate under the proper circumstances in some cases.  What is your answer to that question?

A.   The answer would be yes.

Q.   Okay.

A.   I missed it.  I looked at that right there.

Q.   Oh, believe me, your questionnaire is much more complete than most people's.  These are -- it's a bit -- one fellow wrote that he had not previously had plans to move out of Dallas County, but since he saw the questionnaire, he was going to.  So we know it's a pain to

1    answer.  So there's nothing wrong with not answering a

2    question.

3                      But, obviously, that's an important

4    question to us over here because that's what we're asking

5    you about.  That is the core issue.  When you found out that

6    you were going to be coming back down here, did you give any

7    more thought to some of your answers or some of your

8    thoughts about the death penalty?

9         A.    No.

10        Q.    Did you talk to your husband or your family or

11   maybe your clergyman about coming down here?

12        A.    No.

13        Q.    So you didn't tell them anything about coming

14   down here, or --

15        A.    I just told them I had to appear in court

16   today for preselection.

17        Q.    Okay.  I'm looking for it here in your

18   questionnaire.  You made some mention about that your

19   religion calls for imposing the death penalty under -- and

20   I'm referring to page 4 now.

21        A.    Uh-huh.

22        Q.    When you had found beyond a reasonable doubt

23   or without a doubt that someone was intentionally killed and

24   you were a party in an agreement to kill someone -- wait.

25   I'm sorry.  That's not it.  I beg your pardon, I thought I

1   marked this better.

2                    But at some point in your questionnaire,

3   let me find it here, you talk about your feeling is that

4   it's called for in a murder case, if it's an intentional

5   murder, words to that effect.  Okay.  It's page 14, I'm

6   sorry.  It's when we asked you what church you go to.  Could

7   you elaborate on that and tell us a little bit more about

8   your personal beliefs?  It is on page 14, I'm sorry.

9       A.    Well, after I filled out this questionnaire, I

10  did talk to our pastor about this and I have to say he is a

11  Dallas police officer.  We came -- not that he changed my

12  mind about the death penalty, but he said he believes, just

13  like I do in the Bible, that if you commit a murder that is,

14  therefore, you have to answer to it.

15      Q.    Okay.  And what do you mean by answer to it?

16      A.    If you do it intentionally and brutal and, in

17  other words, just not to get, just to get them out of the

18  way, then yes, you deserve to face that consequence.

19      Q.    And when you say that, do you mean the death

20  penalty?

21      A.    Yes.

22      Q.    Okay.  So what's your minister's name?  We may

23  know him.

24      A.    Blaine Norfleet.

25      Q.    Norfleet?

1        A.        Yes.

2        Q.        And how long, so he's got kind of two hats.

3   He runs the church and he's a --

4        A.        Pastor.

5        Q.        Okay.  And a Dallas police officer?

6        A.        Yes.

7        Q.        Do you know what kind of work he does?

8        A.        He's a bicycle policeman.

9        Q.        Oh?

10                    THE COURT:  I'm sorry, he does what?

11                    PROSPECTIVE JUROR:  He's a bicycle

12   policeman in the downtown area.

13        Q.        (By Ms. Busbee)  Did he talk to you, anything

14   else?  What else did he say to you about?

15        A.        Well, that was just it.

16        Q.        Okay.

17        A.        That was just my comment about, that I was

18   about the questionnaire and what we thought.

19        Q.        Okay.  Because, you know, the reason that we

20   talk to so many people is people have strong feelings about

21   a case like this.  A life has been lost, another life may be

22   taken.  And so, you know, we see the whole gamut, all sorts

23   of people.

24                    Some people, their personal opinions and

25   their personal feelings conflict with what the law is and

1    that, you know, doesn't make you a bad person.  We just need

2    to hear about it because, obviously, we need people who can,

3    you know, be straight down the middle and just, and won't

4    have this emotional or maybe, what word am I trying to say,

5    strong feelings that go against their conscience in

6    following the law.

7                        And in your questionnaire many times you

8    talk about the death penalty for an intentional killing.

9    But as Mr. Shook has explained to you, the death penalty is

10   certainly not an automatic decision in a case like this.

11        A.      Right.

12        Q.      Okay.  In fact, the law says that the decision

13   is life.  It is a life sentence for the conviction of

14   capital murder, unless -- is that the way you would make the

15   law, if you were writing the law?

16        A.      I'm not sure what you are --

17        Q.      Well, I mean, that's the law as it is written

18   now.  But of your own personal opinion, would you make the

19   law that way, that if a death penalty couldn't be assessed,

20   unless other and additional proof was given to you after you

21   have convicted someone of capital murder?

22        A.      Yes.

23        Q.      Okay.  And why would you, why would you feel

24   that more proof was needed?

25        A.      Why would I feel more proof was needed?

1    Q.    Uh-huh.

2    A.    I guess that if, not so much that much more

3    proof is needed, but is that if the law is written that if

4    he automatically gets a life sentence, then why put in the

5    choice of death penalty?

6    Q.    Okay.  Well --

7    A.    I guess, I'm not sure --

8    Q.    That's a good question --

9    A.    But I still believe that if, I mean, since

10   that is part of the process, then, and if that merits that,

11   then the death penalty should be carried out.

12   Q.    Okay.  Let's talk about that.  Look at Special

13   Issue No. 1 again, please, and tell me what would be

14   important to you?  I got -- you said something to Mr. Shook,

15   but I'd like to explore that.  What is important to you in

16   Special Issue No. 1, as far as deciding whether someone will

17   commit criminal acts of violence in the future?

18   A.    Just -- I think just the fact that he broke

19   out of prison and then followed the people he broke out with

20   and still committed another crime, that maybe some -- his

21   pattern is set.

22   Q.    Well -- and you do know about this case

23   somewhat more, maybe, than some other people do.  Have you

24   already formed an opinion as to whether or not he will be a

25   future danger?

1    A.    No.

2    Q.    Okay.  So we're not talking about the facts of

3 this case.  I'm just asking you in general.  What kind of

4 thing would be important to deciding if someone would be a

5 future danger?

6    A.    Well, I guess it would depend on his -- his

7 demeanor, I guess.  I mean, how he would present himself and

8 what his actions have been since his captivity.  What -- I

9 mean, has he been a model citizen?  Has he, I guess, also,

10 an evaluation of whether there's psychiatrists or whatever

11 other professionals there are.

12    Q.    Okay.  Fair enough.  Now, talking about

13 question No. 2, let's go to the last part of that question,

14 as to a juror would have to determine whether or not a

15 person did anticipate that a human life would be taken.

16 What kind of things would you need to, or would you find

17 necessary to be proved to you to show that someone had

18 anticipated a life would be taken?

19    A.    That they had anticipated a life to be taken?

20    Q.    Yes.

21    A.    Just the circumstances that they were in.

22    Q.    Okay.

23    A.    They were, I mean, I guess it's like some

24 people, they feel like their back is against the wall, so,

25 therefore, they have to fight.  Whether that means somebody

1    getting hurt or getting them out of the way, if he feels

2    like he's backed up and he's fighting for himself, even

3    though he's -- he's already, I guess, in trouble.

4         Q.    Okay.  So are you talking about like a

5    self-defense issue or --

6         A.    Well, I guess it's a self-preservation type of

7    issue where it comes more natural.

8         Q.    Okay.  So --

9         A.    But it's not, I guess in some cases it can be

10   self-defense, if you call it that.

11        Q.    Okay.  So Special Issue No. 2 to you is the

12   issue of, what, how much pressure the person was under or

13   whether they needed --

14        A.    Yes.

15        Q.    -- felt the need to -- would be evidence that

16   would factor into that question?

17        A.    Yes.

18        Q.    Okay.  Now, assuming that you are sitting on a

19   hypothetical death penalty jury, which can be more real for

20   you, I think, since you have already served on a jury.  If

21   you have voted and the State has established to you beyond a

22   reasonable doubt that this person is guilty of a capital

23   murder and you have voted, because it's been proved to you

24   beyond a reasonable doubt, that they will be a future danger

25   in Special Issue 1, and that they anticipated that a human

1  life would be taken, as answered in Special Issue No. 2, and

2  you know yourself better than anybody, would you still

3  consider a life sentence or are your feelings in support of

4  the death penalty so strong that you wouldn't really

5  consider Special Issue No. 3 and assess a life sentence

6  instead of a death sentence?

7      A.    No, I would consider it.

8      Q.    Okay.  What things would be important to you

9  in assessing a life sentence as opposed to a death sentence,

10  if you can think of anything?

11      A.    I think just based on what the facts were.

12      Q.    Okay.  Um, you know, you said something in

13  your questionnaire about serving on this jury and you

14  expressed some frustration about people who couldn't base

15  their decision on the facts presented.  What were you

16  talking about?  Because we don't know what happened back in

17  the jury room.

18      A.    Um, I guess a lot of people, well, just based

19  on what my past jury experience was, a lot of people put a

20  lot of their feelings based on what they feel they've had

21  against, confrontations, where their past, you know,

22  experience with either getting caught in a DWI or past

23  experience with police officers, and those other kind of

24  things, rather than just basing their decision on the facts

25  of the case.

1    Q.    Okay.

2    A.    And I guess, also, in some ways the newspapers

3    also just try to tug at, you know, at your heart strings, I

4    guess, kind of go askew of what the law actually says.

5    Q.    Okay.  I'm sure you have had time to look over

6    your questionnaire before, since you had to wait about an

7    hour and a half.  You have expressed a couple of times

8    frustration with the death penalty scheme having to do with

9    -- you used the words "it moves too slowly", or words to

10   that effect.  Can you tell us what your impression of that

11   is?

12   A.    I just think that if all appeals are exhausted

13   and there is beyond a shadow of a doubt that the person is

14   guilty, then there is no reason for them to wait 15 years,

15   20 years.

16   Q.    Okay.  Do you have any reason or know why any

17   of those delays happened or it's just something that you

18   have observed reading the paper?

19   A.    Just things that I have observed, I guess, in

20   the paper and just, I mean, I don't know all the

21   circumstances, obviously, of all the cases, why it takes

22   that long.

23   Q.    Well, you know, you have a -- you, obviously,

24   have a wonderful police officer pastor at your church, I'm

25   sure you respect and admire, and then your brother is

1  involved, and I think he's probably closest in age to you,

2  isn't he?

3       A.    No, he's my oldest brother.

4       Q.    No, that's a law enforcement officer, too.

5  Can you assure us in your heart of hearts that you can be

6  fair to an individual who is charged in a case where a

7  police officer has been killed?

8       A.    Yes.

9       Q.    Okay.  And why is that?

10      A.    Why?  Because it's, my relationship with any

11 of them does not -- not influence, but it doesn't deter what

12 I believe.

13      Q.    Well, sitting there as you are now, would you

14 be as comfortable assessing a life sentence in a capital

15 murder case as you would with a death sentence?

16      A.    If I have a doubt, then I would do a life

17 sentence.

18      Q.    Okay.  If you had a doubt about what?

19      A.    Had a doubt about his -- any of the evidence

20 presented or --

21      Q.    Well, see, that's what I thought you were

22 telling us before.  And because once somebody is convicted

23 of capital murder, it's not for us to show the doubt.

24      A.    Right.

25      Q.    You might want us to, but it's really for the

1   State to prove it to you.

2          A.      Right.

3          Q.      Okay.  So -- but that doesn't mean that that's

4   the way you would feel about it.  That's why we're here is

5   to find out if you really feel like, well, if he's convicted

6   of capital murder, I really would need to hear something not

7   to give him the death penalty.  It seems to be the theme of

8   what you said.

9                  MR. SHOOK:  Judge, I'll object to that.

10  The juror didn't say that at all.  She said she had a doubt.

11  We're talking about these Special Issues.  But she didn't --

12  the theme of what she said, I would disagree with it.

13                 MS. BUSBEE:  It's a question, Your Honor.

14                 THE COURT:  Overruled.  Please restate

15  the question.

16                 MS. BUSBEE:  Okay.

17         Q.      (By Ms. Busbee)  You stated when I asked you

18  what you -- whether you would feel comfortable with a life

19  sentence as a death, and you said, well, if I had a doubt

20  about something, I would give life.  Right?  Is that what

21  you said?

22         A.      Correct.

23         Q.      Okay.  Would we need to show you anything?

24         A.      No.

25         Q.      Okay.  What would you need to have a doubt

about?

   A.   Well, if the State didn't prove something that you are saying that he is innocent on, that they didn't prove that he was guilty, then there's where the doubt is.

   Q.   Okay.  So you would give life instead of death if he wasn't proved guilty beyond a reasonable doubt?

   A.   Correct.

   Q.   Okay.  Well, what I'm actually asking you is after guilty, because it's two parts.  After guilty, you found him guilty of capital murder --

   A.   Okay.

   Q.   -- would you feel as comfortable giving a life sentence as a death?

   A.   Yes.

   Q.   Okay.  And because the question of death or life is not in the first part of the trial.  So you would have already found that person guilty beyond a reasonable doubt.  Maybe that -- because we tell people so much law at one time, and we have done it so many times, that we don't make it clear.  But you didn't go into the second part of your trial because the defendant was found not guilty.

   A.   Right.

   Q.   Okay.  And a DWI, which is, of course, a lesser offense, but it's the same as this one.  You would have found the individual in a capital case guilty beyond a

1   reasonable doubt of capital murder before we got to these

2   Special Issues.  So if he was, you had a doubt, you would

3   have to find him not guilty, not just give him a life

4   sentence.  Does that make sense to you?

5          A.    Yes.

6          Q.    Okay.  Then when we get to the -- we're

7   talking about these Special Issues.  We're taking you

8   forward in time in a pretend case that you have already

9   found someone guilty on.  Now, let me just re-ask that.

10                  If you are sitting, and I'm not talking

11  about this case, I'm talking about your feelings in general,

12  would you need to hear from the defense before you would

13  give life because your feelings about the death penalty are

14  so strong?

15                  MR. SHOOK:  I'd object to her not

16  explaining the law to her, Judge.  Not a fair question.

17                  THE COURT:  Sustained.  Ask it again.

18                  MS. BUSBEE:  Well, I'm trying, I wasn't

19  asking her a question about the law, I was asking her a

20  question about her feelings about it, which I think I'm

21  entitled to do in order to make decisions about

22  peremptories.

23                  THE COURT:  Ask one question.  I think

24  you asked two, confusing me as well.

25          Q.    (By Ms. Busbee)  If you have already found

1   someone guilty of the offense of capital murder, the law is

2   that person gets a life sentence.

3        A.    Okay.

4        Q.    And then you have to make other determinations

5   to give them a death sentence.  And those other

6   determinations are these Special Issues we've been

7   discussing.  The law says that life is automatic, unless

8   these Special Issues are answered this way.  I think I hear

9   you saying that your feelings are that if you wrote the law,

10  the death sentence would be automatic, and it would have to

11  be proved that the person should get life.  Is that a fair

12  statement?

13       A.    No.

14       Q.    Well, you wrote in your questionnaire --

15       A.    I know what I answered.  I misunderstood the

16  question on that.  But the law says that if you find him

17  guilty, you automatically get a life sentence, but there

18  should be other extenuating circumstances that should merit

19  -- mete out the death penalty.

20       Q.    Right.

21       A.    Good.

22       Q.    Now, in your heart of hearts do you think that

23  you can do that and really give him a life sentence, if the

24  State failed to prove any of these things?

25       A.    If the State failed to prove, yes.

1    Q.    Okay.  And would you make them prove these to

2  you beyond a reasonable doubt?

3    A.    Yes.

4    Q.    Okay.  Now, I'll go back to Special Issue No.

5  2.  And explain to me, again, what is important.  What do

6  you think that question asks you?  What do you think you are

7  being asked to decide in that question?

8    A.    Well, it asks if he contributed to the death

9  of somebody or did not actually cause the death.

10    Q.    Okay.  And if that person didn't actually

11  cause the death, what are you called upon to decide?

12    A.    Called upon to decide whether yes or no, he's

13  innocent or guilty.

14              THE COURT:  She's using the words

15  innocent or guilty and yes and no interchangeably --

16              MS. BUSBEE:  I think so, too.

17    Q.    (By Ms. Busbee)  It's yes or no.

18    A.    Yes or no.

19    Q.    Okay.  Now, what are you going -- is your

20  understanding of what you are being asked to answer yes or

21  no to on Special Issue No. 2?

22    A.    Whether or not he intended to kill or take the

23  life of somebody else.

24    Q.    Okay.  And this anticipated, because I think

25  the State has made clear to you in their portion of the voir

1   dire that they're relying on a parties theory of this case

2   and so the jury may be asked to decide whether that person

3   anticipated that a human life would be taken.  When I asked

4   you about that earlier, you said that whether or not their

5   back was to the wall would be important to you on that

6   question?

7        A.    Right.

8        Q.    Okay.  Could you elaborate on that a little

9   bit?  Why would that show you that someone had anticipated a

10  life would be taken?

11       A.    I don't think it would be anticipation, there

12  would be -- it would, well, hold on.  I don't think anybody

13  anticipates on killing or intentionally doing that kind of

14  act.  But if you are familiar with that act or have no

15  qualms, I mean, then that means that would come out without

16  you ever anticipating to do that act.

17       Q.    Okay.  So you wouldn't require them to show

18  that he actually anticipated it.  Is that what you are

19  saying?

20       A.    No.

21       Q.    What --

22       A.    I mean, I don't think that it's -- I think it

23  has to be at the moment caught up in the -- to me

24  anticipation means that you in your mind, that you've

25  already thought of the things that will happen and can

1    happen before something is -- before you are in that

2    situation.

3          Q.    Right.  And that's right.  You would have

4    thought that this could happen.  And that's -- but that's

5    not did think that it would happen.  So that's why I'm

6    asking.

7                MR. SHOOK:  I'll object, Your Honor.  It

8    could be that same exact evidence and that could answer

9    question No. 2, if you anticipate that could happen, that

10   can happen.

11               THE COURT:  Sustained.

12         Q.    (By Ms. Busbee)  I'm still at a loss as to --

13   as to why someone being placed in a stressful -- or

14   situation where they might have to defend themselves, why

15   that would make them -- make you know that they had

16   anticipated that a life would be taken.

17         A.    I guess, um, to me, I don't think anybody

18   anticipates taking another life.  But I also believe that if

19   you are familiar with those types of acts, then the

20   anticipation is there.

21         Q.    So if someone is familiar with killing, then

22   in your mind they did anticipate that?

23         A.    It means because they haven't, they know no

24   other way.  They have a choice of whether or not to stand

25   down or to say, I give up, take me in, and not fight.

1  Q.   Okay.  So someone who -- I just -- I really

2  don't understand how that proves to you or factors in on

3  whether they anticipated or not.  Could you tell me --

4           MR. SHOOK:  Judge, we'll object.  This

5  question has been asked and answered a number of times and

6  we'll object to her keep asking the same answer the juror is

7  trying to answer and we'll object for her asking the same

8  question over and over again and badgering the juror.

9           MS. BUSBEE:  Well, she's given different

10  answers.

11           THE COURT:  Overruled.

12  Q.   (By Ms. Busbee)  So the Judge says that you

13  can answer that question.

14           MR. SHOOK:  Well, Judge, I'll object.  I

15  don't know if she can ever explain to Ms. Busbee, because

16  that's not a requirement of the juror.

17           MS. BUSBEE:  Well, we don't know until

18  she answers.

19           MR. SHOOK:  This is about the fourth time

20  we've gone over this.

21           THE COURT:  Ma'am, do you know what the

22  question is?

23           PROSPECTIVE JUROR:  I guess I don't

24  understand what she's wanting to know as far as for

25  anticipating, I guess.  I'm trying to answer that is, if you

1    anticipate, that means you've already somehow planned it in

2    your mind that you expect a certain result, then you've gone

3    through some of the steps in your mind, whether or not it

4    has physically happened or not.

5            Q.      (By Ms. Busbee)  Okay.  So that business about

6    the self-defense was kind of a side issue?

7            A.      Yes.

8            Q.      What does Intermix -- what kind of company is

9    that?

10           A.      We distribute plastics.

11           Q.      What would be important to you in assessing

12   someone's moral culpability in a case where you've got more

13   than one person in a crime?  Like the example, I think, that

14   you heard the State use about one person shoots and one

15   person does not, but participates in other aspects of the

16   crime.  What's important to you as far as answering question

17   No. 3, whether the personal moral culpability --

18           A.      Whether he tried to distance themselves from

19   the action that was happening or tried to do -- or stop it.

20           Q.      Fair enough.  Just because of some of the

21   questions, the things you've raised in your questionnaire,

22   honestly, do you have an opinion as to what should happen in

23   this case?

24           A.      No.

25           Q.      Okay.  Fair enough.

183

1       MS. BUSBEE:  No more questions, Your

2   Honor.

3       THE COURT:  Ms. Willis, if you would,

4   wait for us out in the hall.  We'll have you back as soon as

5   we can.

6           [Prospective juror out]

7       THE COURT:  What says the State?

8       MR. SHOOK:  We have no challenge for

9   cause.

10      MS. BUSBEE:  Your Honor, we will

11  challenge this juror for cause.  I think throughout her

12  questionnaire and throughout her answers during questioning

13  that she doesn't understand this law.  She stated

14  unequivocally that she would give life, if she had a doubt

15  as to whether or not he was guilty or not.

16      THE COURT:  I cleared that one up because

17  she was using the word "guilty" and "not guilty"

18  interchangeably with "yes" and "no."  And that's why I

19  clarified that, because I believe that was what she was

20  using and we were misinterpreting those responses.  That's

21  why I asked that question.

22      MS. BUSBEE:  Well, I think that's where

23  she -- I -- it's just my opinion that she made that

24  statement and that she knew what she was talking about,

25  because she said a reasonable doubt as to, you know, if they

1   haven't proved the case to her beyond a reasonable doubt.

2   It's clear from her responses that she doesn't understand

3   the law and I don't think that we can be sure that she can

4   follow a law that she doesn't actually comprehend.

5            THE COURT:  I noticed after I asked the

6   question, you know, after the objections back and forth,

7   what does that mean to you, and she gave the best definition

8   of anticipate we've heard in the last month.

9            MS. BUSBEE:  I knew she had it in her.

10           THE COURT:  So as far as my ruling on

11  does she understand the law, not only has she been on a jury

12  before and found someone not guilty, she certainly

13  understands that.  That person did not testify.  And she

14  gave us the best definition of -- she's very soft spoken.

15  You have to listen very carefully.  And -- but, no, I find

16  that she understands the law and I find that she's

17  qualified.

18           MS. BUSBEE:  Okay.  I guess we'll have a

19  little meeting then.

20                (Recess)

21           THE COURT:  Court having found juror No.

22  4511, Maribel Willis, qualified, what says the State?

23           MR. SHOOK:  We'll accept the juror.

24           MS. BUSBEE:  We're going to have to

25  exercise a strike on her.

1      THE COURT:  Please ask Ms. Willis to come

2  back in, please.

3                  [Prospective juror in]

4      THE COURT:  Ms. Willis, thank you so much

5  for your time and attention to the Court today.  We will

6  inform you that you shall not be on this jury.  So your

7  stress level can go down a little bit.  We appreciate your

8  time in coming down, okay?  Thank you.

9                  [End of Volume]

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF TEXAS              *

2   COUNTY OF DALLAS            *

3       I, NANCY BREWER, Official Court Reporter for the 283rd

4   Judicial District Court, do hereby certify that the above

5   and foregoing constitutes a true and correct transcription

6   of all portions of evidence and other proceedings requested

7   in writing by counsel for the parties to be included in this

8   volume of the Reporter's Record, in the above-styled and

9   numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11      WITNESS MY OFFICIAL HAND on this the 4 day of

12  _____ March, 2004.

13

14

15  _____
    NANCY BREWER, CSR, NO. 5759
16  Expiration Date:  12-31-04
    Official Reporter, 283rd JDC
17  Frank Crowley Crts. Bldg. LB33
    133 No. Industrial Blvd.
18  Dallas, TX 75207
    (214)653-5863
19

20

21

22

23

24

25