No. <u>74851</u>

# PATRICK HENRY MURPHY, JR.
APPELLANT

## <u>CAPITAL MURDER</u>
OFFENSE

## <u>DEATH</u>
PUNISHMENT

## <u>DALLAS</u>
COUNTY

CONTENTS: RR VOLS. 34 - 40

REPORTER'S RECORD

VOLUME 34 OF 61 VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

74851

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 9th day of October, 2003, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Vickers L. Cunningham, Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

```
 1                    A P P E A R A N C E S

 2   APPEARING FOR THE STATE

 3   Mr. Toby Shook
     SBOT NO. 18293250
 4   And
     Mr. Bill Wirskye
 5   SBOT NO. 00788696
     Assistant District Attorneys
 6   133 No. Industrial Blvd.
     Dallas, Texas 75207
 7   Phone:  214/653-3600

 8
     APPEARING FOR THE DEFENDANT
 9
     Ms. Brook Busbee
10   Attorney at Law
     SBOT:  03488000
11   703 McKinney Ave. Ste. 312
     Dallas, TX 75202
12   214/754-9090

13   Mr. Juan Sanchez
     Attorney at Law
14   SBOT:  00791599
     5630 Yale Blvd.
15   Dallas, TX 75206
     214/365-0700
16

17

18

19

20

21

22

23

24

25
```

1
## PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Angela Hacker | 4 | 5 | | 34 |
| Jay Gossage | 27 | 29 | | 34 |
| Dominga Saucedo | 52 | 53 | | 34 |
| Brian Simmons | 66 | 67 | 92 | 34 |
| Roger Gordon | 96 | 98 | 120 | 34 |

1                    P R O C E E D I N G S

2                    THE COURT:  Ms. Hacker.

3                         [Prospective juror in]

4                    THE COURT:  Good morning.

5                    PROSPECTIVE JUROR:  Good morning.

6                    THE COURT:  Would you be Angela Hacker?

7                    PROSPECTIVE JUROR:  That's me.

8                    THE COURT:  Welcome to the 283rd.  Juror

9  No. 4731, Ms. Hacker.  Did you have enough time to read the

10 guide I provided for you this morning?

11                   PROSPECTIVE JUROR:  Yes, sir, I did.

12                   THE COURT:  I also gave you a copy of

13 your questionnaire that you filled out for us back in May to

14 try to help you get up to speed on all the law that we're

15 going to be dealing with here today.  I know it's a lot to

16 give someone first thing in the morning.  And then you come

17 in and people are generally nervous when they walk in the

18 door, because you haven't been through this before.

19                   PROSPECTIVE JUROR:  No.

20                   THE COURT:  That's to be expected.  And

21 you will find out it's not that bad.  The objective here is

22 for you to have a functional understanding of the law.

23                   PROSPECTIVE JUROR:  Okay.

24                   THE COURT:  The attorneys are going to

25 visit with you about the law, help you understand it, and at

1  the end of the process I have two questions that I have to

2  ask.  Number one is, do you, in fact, understand the law?

3  And, number two, can you follow the law?  I have a big

4  picture here.  The only question that I have for you at this

5  time is will you be able to serve this Court for a period of

6  two weeks beginning on November 10th?

7                    PROSPECTIVE JUROR:  Yes.

8                    THE COURT:  With that, I shall turn it

9  over to Mr. Shook.  You may inquire.

10                    MR. SHOOK:  Thank you, Judge.

11                    ANGELA HACKER,

12  having been duly sworn, was examined and testified as

13  follows:

14                    DIRECT EXAMINATION

15  BY MR. SHOOK:

16       Q.    Ms. Hacker, my name is Toby Shook.  I'm going

17  to ask questions on behalf of the State.  And as the Judge

18  said, there aren't any right or wrong answers.  We just want

19  your honest opinions.

20       A.    Okay.

21       Q.    Have you ever been on a jury before?

22       A.    No, sir.

23       Q.    Okay.  Usually we talk to jurors in one big

24  group, but because it's a death penalty case, we have this

25  procedure of talking to everyone individually.  And we don't

1    mean to make you feel like you're the one on trial, since we

2    put you on the witness stand.  Sometimes jurors feel that

3    way.  But we found it's a good way to get information.  And

4    if you have any questions at any time, feel free to ask.

5    Now, the bailiff mentioned -- we wanted to get you in here

6    first because you have a sick child today?

7              A.     Yeah, I just got a phone call.

8              Q.     Okay.  So you need to get back and attend to

9    that?

10             A.     Uh-huh.

11             Q.     All right.  That doesn't look like it's going

12   to be anything prolonged, though?

13             A.     No.  He's got the usual, you know, he's in the

14   nurse's office at the moment.  He's fine.

15             Q.     Okay.  So you have to go to school?

16             A.     And pick him up.

17             Q.     All right.  Let me ask you a little bit about

18   your job.  You said you've always been in magazine sales and

19   you are currently with, is it, Co-Mag Marketing Group?

20             A.     Right.

21             Q.     What do you do with them on a daily basis?

22             A.     We are the national distributor publisher of

23   like 300 titles and we distribute them through the local

24   wholesalers to everywhere you buy magazines on the

25   newsstand.

1   Q.   So on a daily basis, do you travel or are you

2   just in the office every day on the phone or --

3   A.   Um, actually, I just got a promotion

4   yesterday.

5   Q.   Oh, congratulations.

6   A.   Thank you.  It will require travel once a

7   quarter to San Antonio, but that's going to be up to me to

8   schedule.

9   Q.   Okay.  All right.  We asked one question, if

10  you have known anyone that's been through the criminal

11  justice system that's close to you.  And you had a sister

12  that looked like she had some trouble back in '97, '98.

13  What all did that entail?

14  A.   Well, she was arrested for, I think it was

15  credit card abuse, stolen credit card, with the intent to

16  buy jewelry and hock it for drugs.  She was addicted to

17  methamphetamines.

18  Q.   Okay.  And she wound up getting probation?

19  A.   Uh-huh.

20  Q.   And rehab?

21  A.   Right.  And moved back to Arkansas.

22  Q.   Okay.  From what you know about the case, do

23  you feel she was treated fairly?

24  A.   I do.

25  Q.   Okay.  All right.  Let's talk a little bit

1    about how you feel about the death penalty.  On your

2    questionnaire we asked that at the beginning and you said

3    you are in favor of it in certain cases where it's

4    appropriate.  So I take it as far as the law goes, you do

5    favor the death penalty?

6         A.    Correct.

7         Q.    Kind of tell us, you know, in your own words

8    why you favor it and the purpose you feel it serves society.

9         A.    Um, well, like I said, I think in certain

10   cases that it is -- it's necessary.  I, you know, like I

11   said, I've never, there are certain things I don't even

12   discuss.  I just discuss them with close friends, and that

13   would be one of them, the politics.  And I understand we

14   discuss it here, but -- and, obviously, my husband and I

15   discuss it.  We don't share the same views.  But I do think

16   it's necessary for certain instances, crimes.

17        Q.    Okay.

18        A.    I do.

19        Q.    What types of crimes come to mind when you

20   think it could be appropriate in?

21        A.    Um, well, ones that come to mind to me are

22   children, you know, kidnapped and abused and murdered.  That

23   would definitely be one that I would lean to.  Intentional,

24   intentional death of another person.  I believe that that's

25   a legitimate consequence for the actions.

1       Q.      Okay.  Have you followed any cases in the

2   media locally or nationally that involved a capital murder

3   case or death penalty case?

4       A.      I don't really follow any of it.  I'm -- with

5   three children, and I don't use this as an excuse, I try not

6   to have any of that at home.

7       Q.      Pretty busy, I guess?

8       A.      Exactly.  Well -- and I just don't want my

9   children exposed to certain things on the news and TV.  So I

10  don't per se follow everything.  I can't tell you that I

11  haven't heard mention of certain cases.  At this moment I

12  honestly can't think of a specific name.

13      Q.      Nothing that closely?

14      A.      No, no.

15      Q.      Now, obviously, every one, almost every one of

16  our jurors has heard something about this case.

17      A.      Sure.

18      Q.      And we ask that about -- it got a lot of

19  publicity when it occurred and some afterwards.  So we ask

20  each juror what they remember seeing on TV or the news.

21  What details do you recall?

22      A.      Um, like I stated in this questionnaire, just

23  Mr. Hawkins' name, obviously, and Patrick Murphy's name and

24  him coming out of the -- I guess it's when they arrested him

25  in the trailer.

1      Q.    Right.

2      A.    I do remember that.

3      Q.    Okay.

4      A.    That they had, it was a negotiation, and they

5 came out.

6      Q.    Did you follow any of the subsequent court

7 proceedings at all here in Texas?

8      A.    No.

9      Q.    Okay.  What we -- the bottom line we have to

10 ask is if you think that would affect you in any way?

11     A.    I don't think it would.

12     Q.    Okay.  The jurors just have to be able to make

13 their decisions based on what they hear in the courtroom.

14     A.    Sure.  That's my plan.  That's what I would

15 to.

16     Q.    Okay.  Now, as far as your views on the death

17 penalty, how do you think those were formed?  Was it just as

18 you grew up over time?  Is it something that you have always

19 believed in since you were an adult or was there something

20 in your past that caused you to believe this way, one event,

21 or is it just something you matured into?

22     A.    I think it's something I've matured into.

23 Just, you know, through seeing things that I've seen and

24 coming into my own, my own beliefs, you know.  I wasn't

25 raised in a house where it was something that they both

11

1  believed.  My parents didn't.  But I think it's just

2  something I have matured into.

3        Q.    Okay.  And we asked the one question about if

4  anyone close to you disagrees with it or how they feel about

5  it and you said your spouse actually takes the opposite

6  view?

7        A.    Right.

8        Q.    Have y'all ever had any detailed discussions

9  about it?

10        A.    Well, we do, but we choose to allow the

11  disagreement.  I understand his views and he can have his

12  and I can have mine.

13        Q.    What are his views on it?

14        A.    He doesn't think that it's necessary.  He

15  doesn't think that it's a deterrent.  He thinks that there

16  are innocent -- not innocent, that the chance of innocent

17  people being put to death should outweigh, you know, the

18  death penalty of those that are guilty.

19        Q.    Okay.

20        A.    He's for, you know, lifetime incarceration.

21        Q.    All right.  Have you talked to him now -- you

22  know, when you got called down for the big panel, he knows

23  you're on a death penalty case.  It's always a concern of

24  ours.  We don't want to break up any marriages --

25        A.    Right.

1          Q.      -- or cause any strife.

2          A.      You wouldn't.

3          Q.      And then people do believe, you know, they

4     have strong opinions on the death penalty.  Do you think

5     that would cause any conflict, if you were seated on this

6     type jury?

7          A.      I don't think so.  Like I said, we allow each

8     other our own opinions.  And we're married, but we're also

9     individual thinkers.

10         Q.      Okay.  We want to make sure of that.  We don't

11    want to cause any domestic issues.

12         A.      No.  I don't think there would be.

13         Q.      Okay.  In Texas -- you have seen the packet

14    there.  There's only certain murders that qualify in our

15    death penalty statute.  They have to be intentional

16    killings.  You know, it's not in self-defense.  It's not an

17    accident.

18         A.      Right.

19         Q.      So it's an unjustified homicide plus something

20    else.  I mean, we have a lot of brutal killings that you

21    can't get the death penalty for.  I could turn here and if I

22    don't like the tie Mr. Wirskye's wearing or he's gotten on

23    my nerves and I could take a gun out and just execute him,

24    laugh about it, I couldn't get the death penalty.  I could

25    get life in prison, but not the death penalty.

13

1        The death penalty is an intentional

2  killing and the examples are that it occurs during another

3  felony, such as a robbery.  If I go into a 7-Eleven and

4  shoot the clerk down, burglary, come into someone's home,

5  murder during a rape, during a kidnapping, that sort of

6  thing, during an arson.  Also, murder of specific

7  individuals such as a police officer on duty, fireman on

8  duty, murder of a child under the age of six, murder of more

9  than one victim, like a serial killer situation, or mass

10  murder situation, or murder for hire, someone does it for

11  money or profit.

12        A.     Okay.

13        Q.     As far as that list goes, do you feel those

14  are the types of crimes you feel are appropriate for

15  consideration?

16        A.     I do.

17        Q.     Okay.  Now, another area I want to talk to you

18  is what we call the law of parties.  And it's more commonly

19  known, I think, as accomplices.  Any crime can be pulled off

20  by more than one person.  Sometimes several people get

21  together and commit a crime.  Some of them have more of a

22  role than others and the law says that if you are actively

23  participating in a crime, you can be held accountable.

24        And capital murder is no exception.  You

25  may have some situations where the actual, you may have one

1    triggerman or the one person that murders the individual,

2    but you may have several others that have assisted at some

3    point in the crime.

4              An example I give is let's say

5    Mr. Wirskye and I and a third man decide we want to rob a

6    bank in our neighborhood.  And we get together a plan.  It's

7    going to call for this third guy to be our getaway driver.

8    He'll drive us up, keep his car running right outside the

9    bank, and yell if anyone is coming.  And we'll run in.  I

10   have a gun.  I point it at everyone and get their hands in

11   the air.  And once I have them subdued, Mr. Wirskye is going

12   to run in there and get behind the tellers' counters and

13   start loading the cash up in a big bag.

14             Then during the course of that robbery, I

15   intentionally kill one of the tellers.  Maybe I don't like

16   the way she looks at me or maybe one of the tellers is going

17   for an alarm and Mr. Wirskye warns me, so I shoot them.  We

18   leave and we're caught soon afterwards.

19             Obviously, I can be prosecuted for the

20   death penalty because I intentionally murdered someone

21   during a robbery.  The law says, though, that Mr. Wirskye

22   and the getaway driver could, also, if the jury believes

23   they are actively involved in the crime as parties or as

24   accomplices.  In fact, under certain facts, they could even

25   get the death penalty.

1    People feel differently about that aspect

2  of the law.  And we like to get everyone's gut opinion, no

3  matter what the law is.  Some people come in and tell us, I

4  believe in the death penalty, but from my personal point of

5  view, I think it's a just punishment for the actual killer,

6  the person that causes the death.  If there is an accomplice

7  there that didn't actually cause the death, I would reserve,

8  if it were up to them, maybe a life sentence or a long term

9  of years, a different type of crime, robbery, but not the

10  death penalty.  I don't think it's fair, if you don't take a

11  life, to have your life taken.

12    Other jurors take the opposite view and

13  feel that it's fair that an accomplice could be prosecuted

14  and could get the death penalty.  But people feel

15  differently about that and we ask every juror their honest

16  opinions about how they personally feel about that.

17  A.    Well, I would think a willing accomplice and

18  the circumstances could be -- I mean, and should be,

19  probably, if the circumstances, I would have to know them

20  but like the scenario you set up, willingly going into that

21  situation and contributing, if you will, I would think that

22  that would be justified.

23  Q.    So the accomplices in my example are the types

24  you feel it could be justified because they willingly

25  participated in the process?

1          A.     You know, I will go a little further.  I'm not

2     sure about the -- it's kind of a gray.  I'm not sure about

3     the driver.  Does that make sense?  If your accomplice was

4     in there, I would think the one in, that's just my opinion.

5     That comes to mind at the moment.

6          Q.     Why do you think that's fair about the one in

7     there?

8          A.     Again, it's a choice to participate.  And

9     being involved in this case, the murder of that teller, but

10    that's just my opinion on that one.

11         Q.     Could the actual getaway driver be someone you

12    think could be deserving, if there were other facts

13    involved, that sort of thing?

14         A.     I guess there could be, you know, if the facts

15    were there.

16         Q.     Okay.  What types of factors do you think is

17    important about an accomplice?  The fact that they are

18    actively participating in it or what?

19         A.     You know, um, I don't know.  I'm kind of going

20    back and forth on this one.  I know I've never even thought

21    about it.  I guess he's involved in it, also, but maybe --

22    and this sounds silly, but the proximity to the murder and

23    being in there, like I said, willingly and knowing what was

24    going on and what they were doing.  That's just the way I

25    would lean.

1      Q.      Okay.   Now, the trial is divided into two

2   parts.  There's the guilt/innocence stage where we have to

3   prove the indictment.   And if we do do that, we move to the

4   punishment phase where you'd get additional evidence.   At

5   the close of that evidence is when you get these questions,

6   and we'll go over these in a little more detail in a minute.

7                But, basically, what the State must prove

8   is that the defendant would be a continuing danger to

9   society, that he either caused the death or anticipated that

10   a death would occur, and that there's not sufficient

11   mitigating evidence to warrant a life sentence.

12                If those questions are answered yes, yes,

13   and no, then the defendant would receive the death penalty.

14   If they are answered any other way, it would be a life

15   sentence.   But you don't write death or life in, but it's

16   determined by how the jury answers those questions.

17      A.      Right.

18      Q.      Are you familiar with the method of execution

19   in Texas?

20      A.      Um, lethal injection, correct?

21      Q.      That's right.   That's right.   You probably

22   know from living here that Texas actually does execute

23   inmates from death row.   Some states have it and never

24   impose it really, but Texas does.   In fact, Texas leads the

25   nation in executions.

1          A.     Right.  I do know that.

2          Q.     They are often publicized, the details of

3    them.  And the laws and procedures are the same in each

4    case.  And they would be the same in this.  If the defendant

5    were sentenced to death, the Judge would -- he would be sent

6    to death row and at some point in time given a date of

7    execution.  Under our procedures on that date or the day

8    before, he's moved to downtown Huntsville where all

9    executions take place.

10              On the date of his execution he's given

11   time with family, friends, a minister, a last meal.  But at

12   6:00 p.m. by law all executions take place.  And you've

13   probably seen photographs of that room that often appear on

14   the news or in the newspaper, that gurney which has leather

15   straps.  There are visitors that are brought in to witness

16   the execution.  There's one room for witnesses from the

17   victim's side and one for the defendant's.

18              The defendant would be brought in by

19   force, if necessary, placed on that gurney, secured by

20   straps, needles are placed in his arm.  Tubes go to another

21   room where the executioner sits.  And at that point in time

22   the warden allows him a last statement, which is often, you

23   may have read some of them in the paper.  He may ask for

24   forgiveness.  He may protest the death penalty.  He may

25   proclaim his innocence.

1        But after that statement is given the

2   warden will signal the executioner who injects three lethal

3   chemicals which will collapse his lungs, stop his heart, and

4   then cause him to lapse into a coma.  The process takes

5   about 15 seconds, and at the end of it he will lay dead on

6   that gurney.

7        Now, I don't mean to be morbid to go into

8   that, but it's one thing to talk about it, as you said, with

9   friends or family members philosophically, and quite another

10  when you realize you may be on a jury making these

11  decisions.

12        We have some folks we talk to that are

13  against the death penalty on religious or moral grounds and

14  can't serve.  They would be fine on a different case.  We

15  have others that are very much for the death penalty and

16  they really can't be fair.  We have others that are for it

17  and can serve.  And we have others that are philosophically

18  for it, but upon reflection they really aren't comfortable

19  and can't make these decisions.  And that's fine, too, we

20  send them on to other cases, eventually.

21        You have told us that you do believe in

22  the death penalty in certain types of cases.  We know we

23  can't preview the facts, and you've never been in this

24  situation, but as best you know yourself, do you feel you're

25  the type of person who could make these decisions, if the

1    State proves this to you beyond a reasonable doubt?

2         A.     I do.

3         Q.     And why do you feel that?

4         A.     Well, like I say, I do believe in it with --

5    if I saw all the facts and that was the decision that we

6    came to, but we would just have to go through with it, you

7    know.  And what you described is very disturbing, but, I,

8    you know, I can handle that.  I would be fine and make the

9    decision that I best -- that I thought was best in this

10   case.

11        Q.     And I can't get into the facts, obviously, but

12   I talk about that accomplice situation because that's the

13   theory of law we are prosecuting this case under, that the

14   defendant is not the triggerman, but we're prosecuting him

15   under that law of parties.

16              Do you feel, then, from how you feel

17   about the law that you could make a decision about ending a

18   person's life that is not the actual triggerman?

19        A.     I feel I could make the decision.

20        Q.     Okay.  Let's talk for a minute about these

21   Special Issues and I want you to take a minute to read

22   Special Issue No. 1 to yourself.

23        A.     Okay.

24        Q.     This question asks the jurors to make a

25   prediction about the future, how he's going to behave in the

1  future.  Do you feel that you could answer that question, if

2  given enough information?

3          A.    I do.

4          Q.    What kind of things would you want to know

5  before you answer that question?

6          A.    Um, how the past, his past, his --I guess you

7  would call it a record or -- that would be a huge

8  determining factor in my opinion.

9          Q.    Okay.  That type of information is available

10  and admissible in this portion of the trial.  If they've

11  ever been convicted, you can even hear from the witnesses.

12  All their background, good and bad, can come forward.  And

13  then, of course, you get to look at the crime itself and

14  their role in and reevaluate that again.

15               It starts out with a no answer and then

16  must be proven beyond a reasonable doubt that it should be

17  answered yes.  You have to under the law reevaluate the

18  evidence and then determine if the State has proven its

19  case.  Do you feel you could do that?

20          A.    I do.

21          Q.    Okay.  Then, if you would, just read Special

22  Issue No. 2 to yourself.  That's the Special Issue question.

23  That asks -- it kind of goes in three parts.  If you believe

24  from the facts the defendant actually caused the death, then

25  you would answer it yes.  But if it's an accomplice

1   situation, you can still answer it yes, if they intended to

2   kill the deceased or another or anticipated that a human

3   life would be taken.

4                           And that's how that works.  Now, we

5   can't open up someone's mind and tell you what they intended

6   in an accomplice situation.  But we can put on all the

7   relevant facts and you can draw reasonable conclusions about

8   their -- from their actions.

9        A.    Right.

10       Q.    Do you feel you could do that?

11       A.    I do.

12       Q.    Okay.  That starts out with a no answer and

13  the State must prove it should be answered yes.  Then this

14  last question is a Special Issue.  It's the last question

15  you get.  You don't get to it, unless you have found the

16  defendant guilty, you've found that he either intended the

17  death to occur or did cause the death, and then you look at

18  this Special Issue question.  If you'd take a moment to read

19  that to yourself.

20       A.    (Prospective juror complies.)

21       Q.    That question, you see, covers a little bit of

22  everything.

23       A.    Uh-huh.

24       Q.    And you are not required to be able to tell us

25  what mitigation evidence is and we can't tell you.  There's

1   no definition for it.

2          A.     Right.

3          Q.     You just have to be able to keep your mind

4   open to it.

5          A.     Right.

6          Q.     But as you sit there today, does anything come

7   to mind that you might view as potentially mitigating

8   evidence?

9          A.     I can't think of anything at the moment, not

10  particularly.

11         Q.     Most jurors tell us that, so don't feel bad.

12  We hope you don't think about these issues.  But sometimes

13  background comes up in these types of cases.

14         A.     Uh-huh.

15         Q.     The way a person was raised, maybe they came

16  from a bad home, maybe a poor environment.  Maybe they were

17  physically or mentally abused.  Some jurors tell us, I would

18  view that as mitigating, if it were severe.

19         A.     Right.

20         Q.     We have other jurors tell us, no, I know a lot

21  of people or I've heard of people that come from that

22  environment and they don't commit capital murders.

23         A.     Right.

24         Q.     And actually really wouldn't view that.  Do

25  you feel one way or the other about that type of background

1   information?

2        A.    I guess I would tend to -- I mean, you know,

3   all of us have had some sort of dysfunction in our lives.

4   And I'm not sure that that should be a reason and excuse for

5   continued repeated behaviors, detrimental behaviors.

6        Q.    Okay.  Again, you just have to keep your mind

7   open to it.  Now, sometimes you hear from psychiatrists or

8   psychologists in this portion of the trial.  They can be

9   called by one side or the other.  They can give you opinions

10  about future danger, oftentimes about mitigation, why a

11  person they feel acts a certain way or something in his

12  background caused him to act that way.

13             Some people view those experts, they give

14  a lot of value to their opinion, really respect them, think

15  they can give a lot of insight.  Other jurors almost ignore

16  them.  They don't value them.  They don't think they -- you

17  know, kind of hokus-pokus-type things.  And then other

18  jurors tell us, I'd look at it, but it wouldn't have any

19  particular weight, just like any other witness.  How do you

20  feel about those types of experts?

21       A.    Well, I'd have to hear their opinions and

22  then, you know, judge them on what they said at that moment,

23  and my -- and not opinion of them, but their credibility,

24  what their opinions are versus mine.  But I think I could,

25  you know, be open to hearing it.

1    Q.    Okay.  Let me go back to your questionnaire

2  just for a moment.

3    A.    Okay.

4    Q.    One of my favorite pages is page 15 because

5  that's the one where we ask everybody who they like or

6  dislike on men and women.  And I don't know if it really

7  does us any good, but it always gets interesting answers,

8  and sometimes we ask a follow up.  Some of them are obvious.

9  But you had, it looked like, various interests to me.  You

10 had Collin Powell, who a lot of people put him down, and

11 Rudy Giuliani has gotten a lot since September 11.

12   A.    Sure.

13   Q.    And then Van Morrison.  Why did you choose

14 him?

15   A.    Well, I'm Irish.  Actually my middle child is.

16 They share the same birthday by design.  It was a scheduled

17 Caesarean.  But, anyway, I just -- he's a poet.  He's a --

18 you know, writes from his heart.

19   Q.    Okay.

20   A.    That's why I chose Van.

21   Q.    Ann Richards, a lot of people put her down.

22   A.    Really?

23   Q.    Because they like her, I guess, you know,

24 she's --

25   A.    It's her spunk.

1    Q.    Spunk, exactly.  Maya Angelou, again, a lot of

2   people put her down because of, you know, her works.  And --

3   but I haven't seen a lot of Emmylou Harris, maybe, different

4   parts of Texas I probably would.

5    A.    Yeah, well, my life and, you know, from early

6   on to now is very music -- music is involved in everything

7   that I do really, daily.  And my children, my first was

8   named after Dylan, Bob Dylan.  I know this is crazy.  You'll

9   think I'm really nuts.  My daughter Julia is after my

10  favorite Beatles song that John Lennon wrote.

11   Q.    Oh, okay.

12   A.    My whole life is just -- it's just been the

13  one constant and I can relate everything to it.

14   Q.    Now, do you have a dog?

15   A.    A dog?  I have two dogs.

16   Q.    What are their names?

17   A.    Sadie and Sam.  They're named after --

18   Q.    No, that's okay.  I take it, then, you don't

19  like Eminem's music?

20   A.    Oh, no, no.  I'm more old school.

21   Q.    All right.

22   A.    Even before my time.

23   Q.    That's all the questions I have at this time.

24  Do you have any questions of us?

25   A.    I don't at the moment.  Thank you.

1     MS. BUSBEE:  This has nothing to do with

2  what you just said.  Your Honor, we've reached an agreement

3  on this juror.

4                    THE COURT:  Okay.  Ms. Hacker?

5                    PROSPECTIVE JUROR:  Yes, sir.

6                    THE COURT:  The parties have agreed to go

7  ahead and excuse you from service in this case, so that way

8  you can take care of your sick child.

9                    PROSPECTIVE JUROR:  Okay.  Thank you.

10                    [Prospective juror out]

11                    THE COURT:  Mr. Gossage.

12                    [Prospective juror in]

13                    THE COURT:  Good morning, Mr. Gossage.

14  How are you?

15                    PROSPECTIVE JUROR:  Good morning.

16                    THE COURT:  We've got Jay Anthony

17  Gossage, juror No. 4656.  Sir, I understand that you were

18  the first one here this morning?

19                    PROSPECTIVE JUROR:  Yes.

20                    THE COURT:  Thank you so much.  We wanted

21  to get Ms. Hacker in.  She had a sick child at school that

22  she needed to go pick up, so --

23                    PROSPECTIVE JUROR:  Oh, okay.

24                    THE COURT:  I usually take the first one

25  in, unless I've got something like that and thought I'd just

```
1   give her an extra 30 minutes to take care of her because it
2   could be another hour and a half for her to wait, so --
3                    PROSPECTIVE JUROR:  Yeah.
4                    THE COURT:  I apologize for having you
5   wait, but at least you understand why.  Mr. Gossage, have
6   you had an opportunity to read the guide I provided for you
7   this morning?
8                    PROSPECTIVE JUROR:  Yes.
9                    THE COURT:  Also, I gave you a copy of
10  your questionnaire that you filled out back in May.
11                   PROSPECTIVE JUROR:  Yes.
12                   THE COURT:  That's for you to refer to or
13  if any of the attorneys want to follow up and have you
14  expound on some of your answers, you'll have it before you
15  to refer to.  This is a process by which you can ask
16  questions.  We want you to get up to speed and have a
17  functional understanding of the law that we're dealing with.
18  You are certainly not expected to understand it all and give
19  it all back to me at this point.
20                   But after this interview we hope that you
21  will be able to understand it and that's, in fact, the
22  question that I have to ask at the end is, number one, do
23  you understand the law?  And, number two, can you follow the
24  law?  That's the big picture I have to look at.
25                   The only question I have for you at this
```

1   time, sir, is will you be able to serve this Court for two

2   weeks beginning on November 10th?

3                      PROSPECTIVE JUROR:  I guess so, yes.

4                      THE COURT:  Thank you, sir.  Mr. Wirskye?

5                      MR. WIRSKYE:  May it please the Court?

6                      JAY GOSSAGE,

7   having been duly sworn, was examined and testified as

8   follows:

9                      DIRECT EXAMINATION

10  BY MR. WIRSKYE:

11       Q.    Mr. Gossage, how are you this morning?

12       A.    Okay.

13       Q.    Good.  Thanks for waiting, as the Judge said,

14  and bearing with us.  My name is Bill Wirskye and I'll be

15  the Assistant DA that will be visiting with you for the next

16  few minutes.

17                     What I would like to do is follow up on

18  some of the information that you were kind enough to provide

19  for us in that 17-page questionnaire, talk to you a little

20  bit about your thoughts about the death penalty, since this

21  is a case where we are seeking the death penalty, and then,

22  finally, talk to you a little bit about some of the laws and

23  rules that apply in a capital punishment case like this.  Do

24  you have any questions before we get started?

25       A.    No.

1    Q.    Okay.  You, I guess, own your own company or

2  work for yourself; is that right?

3    A.    Yes.

4    Q.    What do you do kind of on a day-in, day-out

5  basis, or what does your business consist of?

6    A.    I do contract computer programming.

7    Q.    Okay.  We always know it's a financial

8  hardship for anybody to, especially those that are

9  self-employed, to be down here for two weeks.  But based on

10  your answer to the Judge, it sounds like something you could

11  do, if you had to?

12    A.    Yes.

13    Q.    Probably wouldn't want to?

14    A.    Right, correct.

15    Q.    Okay.  And I think on the last page of your

16  questionnaire you told us, we asked you what your feelings

17  were about being chosen as a juror and you said, I would not

18  like it.  Is that from the business reason, or --

19    A.    No, I just don't, don't like it.

20    Q.    Why not?

21    A.    I guess I don't like conflict that much.  I'm

22  not that kind of person.

23    Q.    Okay.  It looks like you were on a jury

24  several years ago?

25    A.    Yeah, a long time ago.

1    Q.    In the '70s?

2    A.    Yeah.

3    Q.    And that was a murder case?

4    A.    Yes.

5    Q.    What do you remember about that case?

6    A.    It was a robbery of a Stop 'n Go on Lemmon

7    Avenue.  A 19-year-old boy killed a 17-year-old boy.

8    Q.    Okay.

9    A.    The clerk at the store.

10   Q.    Okay.  The State -- was the State seeking

11   death in that case?

12   A.    No.  I guess the death penalty didn't apply

13   then.

14   Q.    Okay.  Based on what you remember, was the

15   evidence pretty clear?

16   A.    Yes.

17   Q.    Looks like you found the person guilty?

18   A.    Yes.

19   Q.    Did the jury set punishment in that case?

20   A.    Yes.

21   Q.    And I think you put in your questionnaire it

22   was 99 years?

23   A.    Yeah.

24   Q.    Was there any conflict on the jury about

25   coming up with --

1          A.     Oh, yeah, oh, yeah, very definitely.

2          Q.     Tell us about that.

3          A.     Um, I know there was a lot of people that -- I

4    was younger at that time.  And there was some people there

5    that had kids about that age and they were -- they were

6    opposed to -- you know, they wanted to give him a lesser

7    sentence.  The guilty, finding him guilty or not, there were

8    -- there was some who thought the police officers had beaten

9    the confession out of him, you know, and they were very

10   adamant about that, and so there was a lot of discussion

11   about that.

12         Q.     Okay.  Was that an unpleasant experience for

13   you?

14         A.     Absolutely.

15         Q.     Are you siting there right now thinking you

16   don't want to go through that again?

17         A.     Yes.  That's exactly what I'm thinking.

18         Q.     Well, do you think you could, if you were

19   called upon?

20         A.     Yes.

21         Q.     Okay.  Now, you've told us you are in favor of

22   the death penalty; is that right?

23         A.     Yes.

24         Q.     Why do you think we should have a death

25   penalty?

1      A.      To prevent another death.

2      Q.      Okay.  And by that you mean a person can't get

3 out and do it again?

4      A.      That's right.

5      Q.      Okay.  Is there a particular type of case that

6 comes to mind when you think about an appropriate death

7 penalty case?  I know from your questionnaire it looks like

8 you watch "Forensic Files" or "Cold Case Files"?

9      A.      Yeah.

10     Q.      Is there any case like that that you have

11 heard or seen or a set of facts that come to mind in your

12 mind for the appropriate case for the death penalty?

13     A.      Disregarding the law.  After reading this, I

14 see that it's a lot more clear.  But in my mind it would be,

15 you know, a murder of a child is the first thing I think of.

16     Q.      Okay.  And I guess, you know, we asked you to

17 kind of rank yourself on a scale of 1 to 10 how strongly you

18 favor the death penalty and you gave yourself an 8, which we

19 know means different things to different people.  And I'm

20 just curious what that meant to you.

21     A.      I can't -- well, even after reading the law,

22 it appears that if there are extenuating circumstances, I

23 think is what it said.  If somebody -- if somebody could

24 cause you to go to such rage, and I could feel that that

25 could happen to me, then I might not -- you know, I might

1   not be for the death penalty in that case.

2        Q.     Okay.

3        A.     Maybe somebody's hurting my family or

4   something like that.

5        Q.     Okay.  But as an 8, I guess, if you feel it's

6   appropriate, you're pretty strongly in favor of it?

7        A.     Yes.

8        Q.     Okay.  We also ask people, you know, if they

9   know anyone that's had any experience in the system and I

10  think you indicated your son?

11       A.     Correct.

12       Q.     Tell us about that.

13       A.     Well, it was -- now, this is my son's side of

14  the story.  They were out at the lake and he got in some

15  kind of argument over a girl and it was this guy's

16  girlfriend and he was supposedly going to drown my son.  He

17  was after my son.  He was -- he was pretty old, about 18 at

18  that time.  And according to my son, one of his friends hit

19  the guy with a pole and the guy said my son did it.  And I

20  guess he never did contest that, so that's what it was.

21       Q.     Okay.  Based on what you know about it, do you

22  think your son was treated fairly?

23       A.     Um, yes.

24       Q.     Okay.  That particular -- having that in your

25  life wouldn't affect you in this case in any way?

1      A.      No.

2      Q.      Okay.  Let me also run another scenario by

3 you.  You know, we talk to so many people that are in favor

4 of the death penalty.  Sometimes people draw lines when they

5 talk about a particular type of case.  And what I mean by

6 that is this.  Oftentimes, as you can well imagine, crimes

7 are committed by more than one person.  You could have a

8 group or a gang of individuals that commit a crime, whether

9 it be shoplifting or capital murder.

10              The law says that we can actively or we

11 can prosecute anybody that was actively involved in a crime.

12 Sometimes you hear about it called the law of accomplices, I

13 think, is commonly what people think about it.  When you are

14 talking about a capital murder, you may have a situation

15 where just one of those people involved actually pulled the

16 trigger or actually took the life.  You may have some other

17 accomplices who didn't actually cause the death, the

18 nontriggermen accomplices.

19              Sometimes when we talk to people who are

20 in favor of the death penalty, they may be very strongly in

21 favor of the death penalty for the triggerman, the guy that

22 actually caused the death.  But if it were up to them, they

23 would draw a line and they'd take the death penalty option

24 away for the nontriggermen accomplices.

25              For whatever reason, religious, moral,

1  ethical, they just don't feel the death penalty is justified

2  for the people that didn't actually cause the death, the

3  accomplices.  You know, they may want to lock them up for

4  life, but they just don't feel the death penalty is

5  appropriate.

6                And some people we talk to say, you know,

7  it just kind of depends on the facts and circumstances of

8  the crime, you know, that type thing.  But where do you come

9  down on that issue, the death penalty for, I guess,

10  nontriggermen accomplices?

11       A.    Well, that's -- well, I would say there would

12  definitely be cases where I wouldn't want to do the death

13  penalty for the nontriggerperson, if they were just hanging

14  out with them, maybe were unaware that, you know, that this

15  was going to happen.

16       Q.    Okay.  Let me kind of give you a set of facts

17  to help you explain what the law is.  It sounds like you

18  wouldn't automatically take the death penalty off the table.

19  You'd just kind of have to hear the facts?

20       A.    Right, correct, yes.

21       Q.    Okay.  Just to give you an example.  Let's say

22  a buddy of mine and I decide we're going to rob a bank.

23  Okay?  The plan is he's going to take a gun in.  He's going

24  to hold up the tellers.  I'm going to come in unarmed, no

25  weapon, and I'm going to have a bag.  And while he's holding

1  up the tellers, I'm going to clean out the cash drawers.

2  And we're going to make our get-away.  And that's the plan.

3  No one is supposed to get hurt.

4              We go in to do that bank robbery and as

5  my friend is holding that pistol on the tellers, for

6  whatever reason, maybe one of them looked at him funny or we

7  see one of them going for a silent alarm for the police and

8  I tell him that, but for whatever reason he shoots and kills

9  one of those tellers.  Okay?

10             Obviously, I think you know now from

11  reading the law, he's committed a murder in the course of a

12  robbery.  That's capital murder in Texas.  He can be

13  convicted of capital murder and face the death penalty,

14  depending on what the jury thinks.

15             The law also says, depending on the facts

16  and circumstances, I could be convicted of capital murder

17  and potentially face the death penalty, even though I had no

18  intent, you know, that that person was going to get killed.

19  What do you think about that type of scenario?

20      A.     Well, I agree with the law.  I mean, if you

21  had intent and you went in there and you had a gun, whether

22  you had it or somebody else had it, it's -- you know.

23      Q.     Okay.

24      A.     That's good enough.

25      Q.     Just to be clear, I mean, I had no intent that

1    that person would get killed.

2         A.    But you had intent to rob.

3         Q.    Had an intent to rob.

4         A.    And you knew there was a gun.

5         Q.    Okay.  And to you that's important?

6         A.    Yes.

7         Q.    Okay.  And that's basically that the law is.

8    There's two ways for an accomplice like me to be found

9    guilty of capital murder.  One is if I actively direct or

10   encourage or solicit someone to commit capital murder.  You

11   know, maybe I turned to my buddy and said, shoot her, shoot

12   her dead, she's going for an alarm.  Obviously, I would be

13   guilty.  I had the intent.

14             The second way is the situation we talked

15   about under the law of conspiracy.  My buddy and I agreed or

16   conspired to commit one crime.  The murder happened during

17   that crime.  If the jury thinks, like I think you did, that

18   I should have anticipated that a life would be taken, then I

19   could be found guilty of capital murder.

20        A.    Yes.

21        Q.    That sounds like where you are?

22        A.    Yes.

23        Q.    Exactly what the law is.  Let me ask you this.

24   Like so many people we've talked to, you have indicated that

25   you have heard something about the facts of this case?

1      A.     Sure.

2      Q.     And, like I said, just 99 percent of the

3 people we talk to indicate that.  The law is that you are

4 not automatically disqualified just because you have heard

5 something about the case.  You may have even formed some

6 opinions or impressions about the case.

7               But as long as you can tell us that you

8 can set those aside, you know, not forget about them.  We

9 could never make anybody forget.  But set them aside and be

10 able to base your verdict just on what you hear in the

11 courtroom, you would be able to be a qualified juror in the

12 case.  Is that something you think you could do?

13      A.     Yes.

14      Q.    Okay.  What do you remember hearing about the

15 case, Mr. Gossage?

16      A.    Oh, they broke out of prison and there was a

17 big hunt for them, and they stayed in Carrollton someplace

18 and that's where I live, so --

19      Q.    Okay.  So it kind of hit close to home to you,

20 I guess?

21      A.    Yes.  And I knew they robbed a store in

22 Irving, I think, and a police officer was killed.

23      Q.    Okay.

24      A.    And I think they even ran over him, if I

25 remember that correct.  And I think they caught them in

1    Colorado, if I remember right.

2         Q.    Yes, sir.

3         A.    And that's about all I remember.

4         Q.    Did you -- have you kept up with any of the

5    other court proceedings that have gone on in these cases?

6         A.    No.

7         Q.    Okay.  And, again, you don't think any of that

8    would affect your ability to just base your verdict on what

9    you hear in the courtroom?

10        A.    No.

11        Q.    Okay.  As you probably remember, trials in

12   Texas are kind of broken down into two parts, the

13   guilt/innocence part and the punishment part.  It would be

14   the same in this case.  It sounds like the same as the case

15   you served on in the mid '70s.

16             The first part of the trial you are just

17   concerned with whether the person is guilty or not.  You

18   know, did the State prove to you beyond a reasonable doubt

19   that indictment that we set out.  You know, did we prove to

20   you what we alleged, basically.

21             And if you found that we did prove it to

22   you beyond a reasonable doubt, the person is found guilty of

23   capital murder, we move into that second phase of the trial,

24   the punishment phase.  And this time is a little bit

25   different than the trial you sat on.  You don't just get to

1   choose a number or choose life or death.  We ask you to

2   answer these three questions.  And those three questions,

3   depending on the answers, determines whether the person gets

4   a life sentence or a death sentence.  Does that kind of make

5   sense to you?

6        A.    Yes.

7        Q.    And that's kind of the scheme we have.  As you

8   may recall, in the punishment phase of the trial you may get

9   to hear extra evidence about a person's past, his character,

10  his reputation, whether he has a criminal history, that type

11  thing.  And we let you listen to that type of information to

12  help you answer these questions.

13              And that's kind of the scheme we have.

14  Again, we don't ask you to write in life or death.  We just

15  ask you to answer the questions.  Does that make sense to

16  you?

17       A.    Yes.

18       Q.    Okay.  Sometimes when we talk to people and we

19  get them down here, people that, I guess, philosophically

20  are in favor of the death penalty, see a need for it, glad

21  that it's still around, but sometimes when we talk to these

22  people and they down to this point when it becomes a little

23  more real and you are actually in the courtroom and you may

24  actually make the jury, you know, in a few minutes, and you

25  are looking at a living, breathing human being down at the

1    end of the table, knowing that, you know, very frankly, it's

2    our goal that that person be convicted and one day executed,

3    you know, it becomes something a little bit different to

4    them.

5                    It's no longer abstract.  It's very real.

6    And some people, I think, are uncomfortable doing that or

7    they have some grave hesitation about being a juror in a

8    case like that, where so much is at stake, where you have to

9    make that life or death decision.

10                   So before we go any further, I want to

11   make sure that you at the very least go into this process

12   with no hesitation about your ability to, you know, to take

13   pen in hand and answer these questions in such a way that

14   may ultimately result in the execution of another human

15   being.  Do you think you're that type person?

16        A.      Yes.

17        Q.      Okay.  And why do you say that?

18        A.      I just -- I think I could do it.

19        Q.      Okay.  I just want to make sure, because, you

20   know, you expressed some concern about being on another jury

21   and the conflict --

22        A.      Right.

23        Q.      And, obviously, this is the most serious type

24   of case in our criminal system.

25        A.      Right.

1    Q.    And that's why I asked.  I want to make sure,

2    obviously, no one wants to.  No one is comfortable doing it.

3    We probably wouldn't want anybody that wanted to do it.  But

4    we want to make sure that, you know, based on your past

5    experience that you feel like you are the right type person

6    for this case.

7    A.    Yes.

8    Q.    Okay.  Fair enough.  Let's take a second and

9    talk about these Special Issues.  I know you have got a

10   chance to look at them before.  If you could just go over

11   them again one more time.  They are phrased just a little

12   bit differently.  And once you have had a chance to read

13   through all three, we'll talk about each one.

14   A.    (Prospective juror complies.)  Okay.

15   Q.    Did you get a chance to look at them?  Those

16   are the three questions.  They're called Special Issues.

17   The Legislature drafted them for capital cases.  They

18   weren't specifically drafted for this case.  And, again,

19   kind of what the law envisions is if you find somebody

20   guilty of capital murder, you'd start that second phase of

21   the trial with an open mind as to the answer to these

22   questions.

23          You hear the extra information in the

24   second phase of the trial and then you go about answering

25   these questions.  But the law really requires or

1   contemplates that a juror be able to have the mental

2   discipline to keep that open mind, you know.  Even though

3   you may have found someone guilty of capital murder, you

4   still have to give them a fair shake in the second part of

5   the trial and start out with that open mind.  Does that make

6   sense to you?

7        A.     Yes.

8        Q.     Okay.  The first question up there, actually,

9   is what we call the future danger question.  Basically, it

10  just asks the juror to kind of predict whether there's a

11  probability that the person would continue or would commit

12  criminal acts of violence such that they would be a threat

13  to society.  Does that kind of make sense to you?

14       A.     Oh, I didn't read it that way.  Okay.

15       Q.     How did you read it?

16       A.     It just looked like it said, would he do it,

17  but you are saying, would he do it again?

18       Q.     Well, the question is, is there a probability

19  that the person would commit criminal acts of violence, not

20  necessarily the same crime, but just some criminal act of

21  violence such that he would be a threat to society, okay?

22  Basically, is the person a future danger to society?

23       A.     Okay.

24       Q.     Do you think there's a probability of that?

25  Does that make sense to you?

1    A.    Yes.

2    Q.    Okay.  Do you see how it kind of asks a juror

3    to make a prediction about the future?

4    A.    Yes.

5    Q.    Okay.  Is that something you are comfortable

6    doing?

7    A.    Yes.

8    Q.    What type of information do you think you

9    would like in order to answer a question like that?

10   A.    Um, knowing his past would definitely be one

11   thing.

12   Q.    That's what most people tell us.  And again,

13   you'd get to hear that type evidence in the second phase of

14   the trial.  Anything else you can think of?  Most people

15   tell us that's the most helpful.

16   A.    Yeah.

17   Q.    You know, I guess they feel the best predictor

18   of future behavior is past behavior, a leopard doesn't

19   change his spots, that type of thing.

20   A.    Yes.

21   Q.    Okay.  A lot of the terms in that question

22   aren't necessarily defined for us, so we always ask each

23   juror kind of how they would define certain words in that

24   question.  See that word probability?

25   A.    Yes.

1          Q.      How would you define that?

2          A.      Is there a good possibility that he would do

3     it?

4          Q.      A good possibility?  A likelihood?

5          A.      Yes.

6          Q.      Okay.  And that's pretty much what a lot of

7     people tell us, a greater than not chance, that type thing.

8     The law says, you know, probability is something more than a

9     possibility because anything is possible, but something

10    short of a certainty.  We could never prove it to you a

11    certainty --

12         A.      Yes.

13         Q.      -- that he would be that future danger.  Is

14    that something you're comfortable with?

15         A.      Yes.

16         Q.      Okay.  Then, also, it talks about those

17    criminal acts of violence.  And as I said, that phrase is

18    not necessarily restricted to, you know, proving to you that

19    there's a probability that he would kill again or be

20    involved in another murder, that type thing.  It's just

21    whatever type of acts or crimes that the juror feels

22    constitutes violence.  You know, threats, assaults, that

23    type thing.  Is that something you are comfortable with?

24         A.      Yes.

25         Q.      Okay.  And then, finally, that word "society."

1    How would you define that or what does that mean to you when

2    you look at "society"?

3          A.    People.

4          Q.    Okay.  Anyone and everyone he may come into

5    contact with?

6          A.    Yes.

7          Q.    Okay.  Both out here walking around with us

8    and people behind bars?  Other inmates, guards, wardens,

9    teachers, that type of thing?

10         A.    Yes.

11         Q.    Okay.  That question, Special Issue 1, starts

12   off with a no answer.  That's the default setting on the

13   question, okay?  It's a part of our burden of proof in the

14   second part of the trial to prove to you as a juror that the

15   answer to that should be yes, okay?  Does that make sense to

16   you?

17         A.    Yes.

18         Q.    Unless we meet that burden, unless we prove it

19   to you, the answer stays no, okay?  Again, the law envisions

20   or contemplates that a juror bring an open mind to that

21   second phase of the trial, bring an open mind to these

22   questions.

23               Sometimes we talk to people that tell us,

24   you know, very frankly, they say, if I have found someone

25   guilty of capital murder, I'm always in every case

1    automatically going to think that there's that probability

2    of future danger, and that question is already answered for

3    me.  I know I'm supposed to keep an open mind.  I just

4    can't, that type thing.

5                    And if you feel that way, that's fine.

6    You just simply wouldn't be a qualified juror.  What do you

7    think about that?  Do you think you could keep that open

8    mind?

9         A.    Yes.

10        Q.    Okay.  Even that late in the process?

11        A.    Yes.

12        Q.    Okay.  Take just a second again and read

13   Special Issue No. 2.  That's a real confusing question.

14        A.    (Prospective juror complies.)

15        Q.    That question, Mr. Gossage, deals like with

16   the scenario we've already talked about, about, you know,

17   accomplices.

18        A.    Yes.

19        Q.    There's basically three parts to it.  If you

20   think a person actually caused the death, if they were the

21   triggerman, you would answer it yes.  If you think they

22   didn't actually cause the death, but they intended that

23   death, you know, in our situation where I told my buddy, go

24   ahead and shoot and kill her.  I obviously intended it, but

25   I didn't do it.  You would answer it yes.  Or, finally, if

1 you think that the person anticipated that a human life

2 would be taken.   Kind of what we've talked about earlier.

3       A.     Yes.

4       Q.     Remember, you can convict me of capital murder

5 as an accomplice, if you feel that I should have anticipated

6 that a life would be taken.   By the time we get to

7 punishment, the law has a little higher standard.   They said

8 not only is it should have anticipated, but it's did

9 anticipate, you know, did the person actually anticipate.

10 You know, it's not just looking at it to see what they

11 should have anticipated, but did the person actually

12 anticipate?

13       A.     I see.  Okay.

14       Q.     Does that make sense to you?

15       A.     Yes.

16       Q.     Okay.  And, again, that question starts off

17 with that no answer, that default answer, and it's up to us

18 to prove it to you the answer should be yes.   And if both of

19 those questions are answered yes, then you move to the third

20 and last question.   It's the mitigation question.

21       We ask a juror to kind of go back and

22 look at all the facts of the crime, look at the facts they

23 have learned about the person, and ask if there is anything

24 mitigating there.   Is there anything that lessens his

25 personal moral blame such that his life ought to be spared

1  and he shouldn't be executed, but he should be given that

2  life sentence?  Does that make sense to you?

3       A.      Yes.

4       Q.      Okay.  Do you think it's good we have that

5  type of question --

6       A.      Yes.

7       Q.      -- even that far in the process?  I guess some

8  people call it a chance for the jury to show mercy, if they

9  feel the facts justify it.  As you sit there right now, is

10  there anything that kind of comes to mind that you would

11  consider mitigating in a case like this?

12       A.      Like in this case?

13       Q.      Not particularly this case, just any capital

14  murder case.  You know, we can't talk about the facts of

15  this case.  Have you already formed an opinion about that in

16  this case?  I saw you kind of smiling.

17       A.      Well, I --

18       Q.      If you have, that's fine.  A lot of people

19  have, because they have heard a lot about the case.  Have

20  you already formed an opinion about that in this case?

21       A.      Not definitely, no, no, I have not.

22       Q.      Okay.

23       A.      Yes, you know, it says -- I guess the intent

24  is the word, if he definitely had the intention.

25       Q.      Okay.

1    A.     If he didn't, you know, that might be -- if he

2  honestly -- you know, if I honestly believed that he had no

3  intention of hurting anyone, then that would be definitely

4  --

5    Q.     Mitigating?

6    A.     -- mitigating, mitigating circumstances.

7    Q.     Okay.  And I think it's that type thing that

8  the law wants you to keep an open mind when you look for.

9  But any other questions about this scheme we have in the

10  death penalty cases in Texas?

11    A.     No.

12    Q.     Okay.  Give me just a second.  Mr. Gossage, I

13  think that's all I have.  Thanks for your patience, and

14  Judge, I'll pass the juror.

15              MS. BUSBEE:  Okay.  We have reached an

16  agreement on this juror, Your Honor.

17              THE COURT:  Mr. Gossage, the parties have

18  agreed to excuse you from jury service.  So you don't have

19  to worry about being on another contentious jury.

20              PROSPECTIVE JUROR:  Wonderful.

21              THE COURT:  Thank you, sir, and you are

22  free to go.

23              PROSPECTIVE JUROR:  Thank you very much.

24                   [Prospective juror out]

25              THE COURT:  Ms. Saucedo.

1          [Prospective juror in]

2          THE COURT:  Good morning.

3          PROSPECTIVE JUROR:  Good morning, how are

4  you doing?

5          THE COURT:  How are you?

6          PROSPECTIVE JUROR:  Okay.  How about you?

7          THE COURT:  Doing fine.  We've got juror

8  No. 4558, Ms. Dominga Saucedo; is that correct?

9          PROSPECTIVE JUROR:  Correct.

10          THE COURT:  Welcome to the 283rd.

11          PROSPECTIVE JUROR:  Thank you.

12          THE COURT:  Have you had an opportunity

13  to read the guide I provided for you?

14          PROSPECTIVE JUROR:  Yes.   .

15          THE COURT:  I also gave you a copy of

16  your questionnaire for your review.  The attorneys may want

17  you to look at a particular question and what were you

18  thinking when you made that answer.  It gives you an

19  opportunity to review that before you come in and begin

20  thinking about the issues we're going to be discussing.

21          PROSPECTIVE JUROR:  Okay.

22          THE COURT:  The objective here is for you

23  to have a functional understanding of the law.  This is an

24  opportunity for you to ask questions to get yourself up to

25  speed where you can be competent to sit as a juror in this

1   case.  Does that make sense?

2                        PROSPECTIVE JUROR:  Uh-huh.

3                        THE COURT:  No wrong answers.

4                        PROSPECTIVE JUROR:  Okay.

5                        THE COURT:  We just want you to learn,

6   understand, and able to use it.  Fair enough?

7                        PROSPECTIVE JUROR:  Uh-huh.

8                        THE COURT:  Only question I have for you

9   at this time is will you be able to serve this Court for a

10  period of two weeks beginning on November 10th?

11                       PROSPECTIVE JUROR:  Um, I should.  I

12  think so.

13                       THE COURT:  I see some hesitation there.

14  I didn't ask you did you want to serve the Court for two

15  weeks.  My question is could you?

16                       PROSPECTIVE JUROR:  Yes.

17                       THE COURT:  Okay.  Thank you so much.

18  Mr. Wirskye?

19                       DOMINGA SAUCEDO,

20  having been duly sworn, was examined and testified as

21  follows:

22                       DIRECT EXAMINATION

23  BY MR. WIRSKYE:

24       Q.     Ms. Saucedo, how are you this morning?

25       A.     Okay, so far.

1      Q.     So far?  Are you expecting trouble any minute?

2      A.     No.  It's just I'm not used to, you know, a

3   lot of people.

4      Q.     My name is Bill Wirskye and I'll be the

5   Assistant DA that will be talking with you for the next few

6   minutes.

7      A.     Okay.

8      Q.     Because this is a death penalty case, we do

9   jury selection a little bit differently.  We talk to people

10  individually and that's why you're up here on the witness

11  stand, probably feeling like you're on trial.

12     A.     Yeah.

13     Q.     A little bit nervous, but try not to be.  It's

14  just -- to the extent possible, just try to make it a

15  conversation.

16     A.     Okay.

17     Q.     I've got some questions for you about some of

18  the information that you were kind enough to give us in that

19  long questionnaire that you filled out, talk to you a little

20  bit about your thoughts and feelings about the death

21  penalty, and then maybe talk to you a little bit about the

22  law that applies in a death penalty case.

23     A.     Okay.

24     Q.     What went through your mind when you got

25  notified that you had to come back for an individual

55

1   interview in a death penalty case?

2        A.      Nervous.

3        Q.      Okay.  Why are you nervous?

4        A.      I don't know, I don't know.

5        Q.      Okay.  Now, you told us, have you gotten a

6   chance to look at your questionnaire?

7        A.      I did.

8        Q.      Okay.  You told us on the first page that you

9   are not in favor of the death penalty; is that right?

10       A.      Correct.

11       Q.      Okay.  Tell us why not.

12       A.      Well, at the time, I wasn't.

13       Q.      Okay.

14       A.      I changed my mind since then.

15       Q.      You changed your mind?

16       A.      Yeah.

17       Q.      Okay.  Tell us about that.  What caused you to

18  change your mind?

19       A.      Well, just depending, you know, anything that

20  affects --towards my family, then that probably would be a

21  lot different, compared to a friend or somebody else.

22       Q.      Okay.  So if one of your close friends or

23  family member was the victim, then you could consider the

24  death penalty, that type of case?

25       A.      Yeah, definitely a close family.  Yeah.

1    Q.    Okay.  You understand in that type of case you

2  couldn't be a juror.  We're obviously talking about cases

3  where, you know, you don't really know anything about or you

4  don't know anyone involved --

5    A.    Uh-huh.

6    Q.    -- necessarily.  In those type cases, do you

7  think you could be in favor of the death penalty?

8    A.    Um, yeah.

9    Q.    Okay.  How come?

10    A.    Well, they killed somebody.  I mean, I would

11  think they would have to serve some kind of time or

12  punishment.

13    Q.    Okay.  Do you remember back in May why that

14  you checked that you didn't favor the death penalty?  What

15  was going through your mind when you answered it that way

16  back in May?

17    A.    Um, no, I don't.

18    Q.    Okay.  Like just about everybody that we

19  talked to, you indicated that you know something or heard

20  something about this case.

21    A.    Uh-huh.

22    Q.    It was in the media.  It was a high profile

23  case.

24    A.    Uh-huh.

25    Q.    And everybody we talk to knows something about

1    it.   What do you remember hearing about this case?

2            A.       Um, I know it happened in the winter.   He went

3    to some kind of store and then whatever happened, shot, he

4    got shot.

5            Q.       Okay.   Do you remember anything that happened

6    after the shooting?

7            A.       Um, they took off and left.

8            Q.       Okay.   Did you follow the arrest or anything

9    like that?

10           A.       Um, where they located them later, several

11   weeks later, yeah.

12           Q.       Okay.   Have you followed any of the court

13   proceedings that have gone on in these cases?

14           A.       I'm sorry?

15           Q.       Any of the subsequent trials or court

16   proceedings, that type of thing?

17           A.       I'm still not understanding the question.

18           Q.       Okay.   Have you heard anything about other

19   trials in this case?

20           A.       No.

21           Q.       Okay.   Based on what you have heard about this

22   case, have you already got some idea in your mind what

23   happened?

24           A.       About the incident?

25           Q.       Yes, ma'am.

1       A.     Yeah.

2       Q.     Okay.  Have you already formed some

3  conclusions one way or another about what happened and who

4  is responsible, that type of thing?

5       A.     Um, kind of.

6       Q.     Okay.  And a lot of people tell us that.

7  Different people know different amounts about the case and

8  one reason we talk to so many people is quite a few people

9  come down here and because this was such a high profile

10  case, they tell us, you know, I've just heard too much.  I

11  have already formed some opinions or conclusions, like

12  you've told us you have, and I just really couldn't be fair.

13  I just know too much about it.  I've already got some ideas

14  or some notions about the case.

15       A.     Uh-huh.

16       Q.     You know, this case is different than almost

17  any other case that you would come down here on jury duty.

18  If you come down here on another murder case, you probably

19  wouldn't know a thing about the facts and you would be able

20  to sit over in that jury box with kind of an open mind, a

21  clean slate in your mind, not knowing anything.

22             But in this case, obviously, you have

23  told us you've heard about it, you've formed some

24  conclusions.  Do you think you are really the best type

25  person to be on this case?

```
 1        A.     Um, I don't think so.

 2        Q.     Okay.  Why not?

 3        A.     Um, I don't know.  I've got mixed emotions

 4   about it.

 5        Q.     Are part of those mixed emotions because

 6   you've heard so much about the case and already have some

 7   opinions about the case?

 8        A.     Um, pretty much.

 9        Q.     Okay.  Would it, based on what you know and

10   the opinions you have formed, could you be fair to the

11   person charged, the defendant in this case, in all honesty?

12        A.     I'm sure I can, yeah.

13        Q.     Okay.  Could you be fair to the State?

14        A.     Yes.

15        Q.     Okay.  What opinions have you formed about

16   this case?

17        A.     What opinions?

18        Q.     Yes, ma'am.

19        A.     Um, about the killing?

20        Q.     Yes, ma'am.

21        A.     Um, I'm sorry, I'm not too sure what I need to

22   say.

23        Q.     That's okay.  I just -- do you have in your

24   mind an opinion one way or another, whether he's guilty as

25   we sit here right now?
```

1    A.    I'm not too sure if he actually did it.  I

2 mean, I know there was more than one person involved,

3 correct?

4    Q.    Uh-huh.

5    A.    Yeah.

6    Q.    Does that make a difference to you that there

7 was more than one person involved?

8    A.    No.

9    Q.    Okay.  But do you have any opinions as you sit

10 here right now whether he's guilty or not?

11    A.    If he did it, yeah, I mean, if --

12    Q.    Do you have an opinion that he did or -- I

13 guess I'm not following you.

14    A.    I'm sorry.  Could you rephrase that?

15    Q.    I tell you what.  I'll move on to something

16 else.  How is that?

17    A.    Okay.

18    Q.    Let me ask you this.  We talked to quite a few

19 people, a lot of people that are in favor of the death

20 penalty.  Probably not so many that have just, I guess,

21 recently become in favor of the death penalty like you.

22          But we talk, nevertheless, to quite a few

23 people who are in favor of the death penalty and they tell

24 us it's one thing to kind of, in their own personal life or

25 outside the courtroom, be in favor of the death penalty or

1    think about a situation maybe where they could impose the

2    death penalty, you know, maybe your situation with a close

3    friend or family member, but they tell us it gets a little

4    bit different when they get down here --

5         A.    Uh-huh.

6         Q.    -- because they are very close to being on a

7    jury in a death penalty case.  They know it's the State's

8    goal that we're going to ask the jury to find him guilty and

9    impose the death sentence.

10        A.    Uh-huh.

11        Q.    They get a chance to actually look at the

12   person that's charged, knowing that the State is asking you

13   to one day sentence that person to death.  And they tell us

14   that at that point it's different for them.  It's no longer

15   philosophical or in the abstract.  It becomes very real.

16        A.    Uh-huh.

17        Q.    And it becomes almost a little too personal

18   for them and they just don't feel like they are the type

19   person that could participate in this process.  And that's

20   kind of what I hear you saying.

21        A.    Okay.

22        Q.    Am I right on that?  Is that kind of what I

23   hear?

24        A.    Yeah.

25        Q.    A little hesitation?

1          A.      Yeah.

2          Q.      Are you familiar with the method of execution

3    in Texas?

4          A.      Um, no.

5          Q.      Okay.   It's by lethal injection.

6          A.      Okay.

7          Q.      Does that ring a bell now that you have heard

8    it?

9          A.      Yeah, uh-huh.

10         Q.      The procedures in every case are the same.

11   They would be the same in this case.

12         A.      Okay.

13         Q.      If the jury sentenced him to death, answered

14   these three questions in such a way that the Judge would

15   have no discretion, he would be sentenced to death.

16         A.      Okay.

17         Q.      He would be immediately taken down to death

18   row, which is in the Livingston Unit in southeast Texas.   He

19   would wait there.   I can't tell you how long.

20         A.      Yeah.

21         Q.      But at some point in the future, Judge

22   Cunningham would issue a date of execution.

23         A.      Uh-huh.

24         Q.      On that date he'd be moved from death row to

25   downtown Huntsville to the main prison.   That's where all

1    executions take place in Texas.

2         A.    Okay.

3         Q.    He would be kept in a small holding cell

4    outside the death chamber.  On his last day he would be

5    given a chance to meet with friends, family members, a

6    spiritual adviser.  He would be offered a last meal, if he

7    could eat it.  As it got close to 6:00, 6:00 p.m., which is

8    the time that the law mandates executions take place in

9    Texas, he'd be moved from that holding cell a short distance

10   down the hall to the death chamber.

11        A.    Uh-huh.

12        Q.    And that would be voluntarily or

13   involuntarily.  If he didn't want to go, there are guards

14   there that are trained to make him go.  And you may have

15   seen a picture of the death chamber.  It's a small room with

16   a gurney on it and the gurney has leather straps.

17        A.    Uh-huh.

18        Q.    He would be taken in there voluntarily or

19   involuntarily, strapped down to that table.  An IV would be

20   started in his arm with needles and tubes.  There'd be

21   people there to view the execution.  Some from his side and

22   some from the victim's side, the victim's friends and family

23   members.  The warden would give him a chance to make a last

24   statement.  He may admit his guilt and beg for forgiveness

25   or he may not.  He may proclaim and profess his innocence

1  and be very angry, defiant, about what is about to happen.

2      A.      Uh-huh.

3      Q.      But after he was given that chance to make

4  that last statement, the warden would signal the

5  executioner.  The executioner would release lethal

6  substances into that IV.  They'd go in through his arm.

7  Very shortly his lungs would stop, his heart would stop, and

8  briefly he'd still be conscious.  Eventually he would lose

9  consciousness, go into a coma, and very shortly after that,

10 die.

11          And I go through that not to be morbid

12 with you, but those are the type details that are frequently

13 reported in the paper.  The death penalty is a reality in

14 Texas.  Texas juries give it and it's actually carried out.

15 And you could expect one day, if you were on a jury that

16 sentenced a person to death, that that execution would be

17 carried out.

18          A lot of people are uncomfortable with

19 that, like I said.  They don't feel that they are the type

20 person that could participate in that process because at

21 this point, knowing what you know, and the things I've just

22 described, it just becomes too personal for them and they're

23 just too uncomfortable and couldn't do it.  And that's kind

24 of what I hear you saying; am I right?

25      A.      Yeah.  Yes, I'm sorry.

1      Q.     Okay.  It sounds like from what you are

2   telling me, you are not the type person that could

3   participate in this process?

4      A.     Correct.

5      Q.     Even though you may have recently become in

6   favor of the death penalty, just in your own heart of hearts

7   your beliefs would substantially impair you from being able

8   to fully and fairly be a juror in a death penalty case; is

9   that right?

10     A.     Correct.

11     Q.     Okay.  Thank you for your honesty, ma'am.  I

12  appreciate it.

13            MR. WIRSKYE:  Judge, that's all I have.

14  I'll pass the juror.

15            MS. BUSBEE:  I think we're reached an

16  agreement on this juror, Your Honor.

17            THE COURT:  Ms. Saucedo, we appreciate

18  your time coming down here today, but the parties have

19  agreed to excuse you, so you are free to go.

20            PROSPECTIVE JUROR:  Okay.  Thank you.

21            THE COURT:  Thank you.

22            [Prospective juror out]

23            (Recess)

24            THE COURT:  Mr. Simmons.

25            [Prospective juror in]

1              THE COURT:  Good afternoon.

2              PROSPECTIVE JUROR:  Good afternoon.

3              THE COURT:  We have Mr. Brian Kevin

4    Simmons, juror No. 4769.  Welcome to the 283rd.

5              PROSPECTIVE JUROR:  Thank you.

6              THE COURT:  How are you doing?

7              PROSPECTIVE JUROR:  Doing all right for a

8    Thursday.

9              THE COURT:  For a Thursday, a rainy

10   Thursday.  We appreciate you being here and did you have

11   enough time to review the guide I provided for you?

12             PROSPECTIVE JUROR:  Yes, sir, I did.

13             THE COURT:  I also gave you a copy of

14   your questionnaire so you can refer to that and begin to

15   think about some of the issues once again.  I know you

16   probably haven't looked at it since May.  This is an

17   opportunity for you to ask questions and the attorneys will

18   be visiting with you about the law and for you to get a

19   really good functional understanding of how this process

20   works.

21             At the end of the interview, I have two

22   questions that I must ask.  Number one is, do you understand

23   the law?  And, number two, can you follow the law?  That's

24   the big picture that I have to look at.  The only question I

25   have for you at this time is will you be able to serve this

1    Court for a period of two weeks beginning on November 10th?

2                          PROSPECTIVE JUROR:  Yes.

3                          THE COURT:  Thank you very much.  With

4    that, I'm showing Mr. Shook inquiring.

5                          MR. SHOOK:  Thank you, Judge.

6                          BRIAN SIMMONS,

7    having been duly sworn, was examined and testified as

8    follows:

9                          DIRECT EXAMINATION

10   BY MR. SHOOK:

11        Q.    Mr. Simmons, my name is Toby Shook.  I'll be

12   asking you questions on behalf of the State.  As the Judge

13   said, there aren't any right or wrong answers.  We just want

14   your honest opinions.  We've learned a lot of information

15   from the questionnaire and we thank you for taking the time

16   to fill that out.  It, believe it or not, shortens your

17   time, actually.

18                    I'll go over just a couple of things on

19   it and then we'll talk about capital murder, some of the

20   rules and laws that apply, and how you feel about that.  You

21   work at the -- what was the name of it?  Associate --

22        A.    Ascension Group Architects.

23        Q.    Ascension Group Architects.  What do you do

24   with them on just a day-to-day basis?

25        A.    I'm a project coordinator, which basically

1    means I'm in charge of pulling together information for the

2    construction documents on hospitals.

3          Q.     Okay.  Okay.  And you grew up in Texas and

4    went to Texas A&M; is that right?

5          A.     Yes, sir.

6          Q.     Okay.  This case involved some publicity.  And

7    I would say 99.9 percent of all the jurors on that big

8    panel, obviously, saw some news coverage.  It doesn't make

9    you ineligible to be a juror.  But we inquire as to every

10   juror about what details they remember when they saw it on

11   the news.  What do you recall at this time?

12         A.     The only thing I recall is what I just, you

13   know, on the news reports.  Generally, the night it happened

14   and, basically, that some inmates had escaped from, I

15   believe it was Huntsville, and came up to this area and were

16   in the process of robbing an Oshman's Sporting Goods store

17   when an Irving police officer came to stop them and in that

18   altercation he was shot.

19         Q.     Okay.

20         A.     And then they were basically -- and then they

21   basically fled.

22         Q.     Okay.  Did you remember recalling any of the

23   subsequent court coverage or proceedings?

24         A.     No.  I didn't really give it that much of a

25   mind, because I don't --

1     Q.     Sounds like your knowledge is kind of very

2  general, that sort of thing?

3     A.     (Prospective juror nods head.)

4     Q.     All right.  That's about what it is with the

5  other jurors.  And, again, just because you have seen

6  something on the news doesn't make you ineligible.  If that

7  were true, we couldn't seat a jury in high publicity cases.

8           We can't ask you to forget what you've

9  seen, obviously.  You can even form opinions on what you've

10 seen.  But as a juror, if you were chosen to sit on this

11 jury, you'd have to be able to tell the Court that you could

12 make your decisions just based solely on the witnesses and

13 the evidence that was produced here in the courtroom, not on

14 anything you've seen on the news.

15          You can't let that influence you in any

16 way, because common sense will tell you the more accurate

17 information will come from the courtroom itself.  The news

18 often gets things wrong.  Their information isn't always

19 accurate.  Would you be able to follow that particular rule

20 of law?

21    A.     Yes, I would.

22    Q.     Just make your decisions based on the

23 witnesses here?

24    A.     Yes.

25    Q.     Okay.  Let's talk a little bit about the death

1   penalty.  You put on the questionnaire that you are in favor

2   of it as a law.  And I would like you to just kind of tell

3   us why and what purpose you feel it serves.

4        A.     I am in favor of the death penalty because I

5   feel that somebody, you know, it's somebody -- it's not

6   their right to take another person's life.  And as a

7   deterrent to that, the death penalty is -- it's the old

8   adage, an eye for an eye.

9        Q.     Okay.  A lot of people feel that way.  They

10  think it's a just punishment for an extremely brutal crime,

11  that sort of thing.  Is it something you've believed in your

12  whole adult life?

13       A.     Yes, sir.

14       Q.     Something you were brought up on, perhaps?

15       A.     Yes, sir.

16       Q.     Okay.  In Texas, not every murder case is

17  eligible for the possibility of the death penalty.  We have

18  -- in fact, most murders aren't.  We have a lot of brutal

19  murders where you could get a life sentence, but not the

20  death penalty.

21            To go to the level of the death penalty,

22  you have to have an intentional murder plus some other

23  aggravating fact.  And it can't be in self-defense,

24  obviously.  That's an absolute defense to a murder charge.

25  And it's not an accident.  It's an intentional killing with

1    another aggravated fact, such as a murder that occurs during

2    the course of a felony.

3                    If I go into a 7-Eleven and rob the clerk

4    and shoot them, that could be a death penalty case.  Go into

5    someone's home, break into the home and murder someone in

6    the home during the course of that burglary, that could be

7    one, as well as murder during a rape, arson, or kidnapping.

8                    In addition to that murder of specific

9    individuals like a police officer on duty, fireman on duty,

10   and prison guard on duty, or a child under the age of six.

11   And then mass murder or a serial killer situation or more

12   than one victim qualifies, and murder for hire, someone does

13   it for money.

14                   But those are generally the types of

15   cases that come under this statute.  Does that list make

16   sense to you as the types of cases that should be

17   considered?

18        A.        Yes, sir.

19        Q.        Then under our system not every person that's

20   convicted of capital murder automatically gets a death

21   sentence.  It just depends on the facts of each case and the

22   way the jury answers the questions.  Some cases, after

23   they're convicted, do result in a death penalty.  Others

24   result in a capital life sentence.

25                   And, again, it's determined by each

1   individual set of facts for each particular case.  Does that

2   sound like a good system to have to you as far as each case

3   being tried individually?

4       A.    Yes, sir.

5       Q.    Okay.  Let me go into one other area.  You

6   know, when we talk about capital murder, we always envision

7   a set of facts, generally.  Usually it involves a person who

8   is the actual triggerman, but sometimes more than one person

9   can commit a crime.  The common term for it is

10   "accomplices."  We call it the law of parties in Texas.

11           And if you do assist in committing a

12   crime, you can be found guilty and be punished, even if

13   someone who is also committing the crime has a greater role

14   in it.  Now, in a capital murder situation, you may have

15   only one triggerman, but you may have some accomplices.

16           An example I give is a bank robbery.  Say

17   Mr. Wirskye and I decide we want to rob a bank.  We get

18   another friend to help us.  He drives us there, is going to

19   act as our getaway driver, our lookout.  He keeps the car

20   running right outside.  He'll shout out if some danger comes

21   along.  Mr. Wirskye and I, we go in there.  I've got a gun.

22   I point it at the tellers, get their hands in the air, and

23   then he starts ransacking the cash drawers.

24           At some point in time I intentionally

25   murder one of the tellers.  Maybe I don't like the way they

1    look or he tells me that one of them is going for the alarm.

2    We escape, but we're caught soon afterwards.

3                     Now, obviously, I could be prosecuted for

4    the death penalty because I intentionally murdered someone.

5    The law says, though, that because he and the other

6    accomplice were actively participating in the crime, they

7    could, also, be found guilty of capital murder and could

8    ultimately receive the death penalty, depending on the

9    facts, even though they didn't actually cause the death.

10                    Some people have dispute with that.  From

11   their own personal feelings, they feel that -- they're fine

12   with the death penalty for the actual triggerman, the

13   murderer.  But they don't think it's fair for an accomplice

14   to get the death penalty, if they didn't actually cause the

15   death themselves, maybe a long prison term, but not the

16   death penalty.

17                    Other jurors think it is fair that an

18   accomplice could be prosecuted, could be found guilty of

19   capital murder, and ultimately could receive the death

20   penalty, depending on the facts and their involvement.  But

21   they think that's a fair concept.

22                    And we ask each juror their gut reaction

23   of that.  How you personally feel about the prosecution of

24   an accomplice in a death penalty situation?

25        A.      I didn't actually know that that was the law,

1    and now that you've explained it, I can see that and I don't

2    have a problem with an accomplice, because ultimately you

3    are responsible for your own actions.

4            Q.     All right.  So you think it is fair that an

5    accomplice could be prosecuted for the death penalty?

6            A.     Yes.

7            Q.     And could ultimately receive it, even though

8    they didn't cause the death?

9            A.     Yes.

10           Q.     Why do you think that's a good, I guess,

11   public policy or a good law to have?

12           A.     I would think that it would be more of a

13   deterrent that, you know, if you are in -- you know, just

14   because you are with, you know, a large group of people,

15   that you still are responsible as a group for the actions.

16           Q.     Okay.

17           A.     And as a deterrent, it would stop me.

18           Q.     Okay.  There's two ways we can prove that.

19   Either if you are actively involved, directing, aiding,

20   helping the crime to be committed.  Also, under a conspiracy

21   theory, Mr. Wirskye and I conspire to commit one crime, we

22   agree to commit bank robbery in that example, and during the

23   course of that, one of us commits another crime to further

24   the conspiracy, in my example I murder someone, then

25   everyone in the conspiracy can be found guilty, if the jury

1  believes from the facts that they should have anticipated

2  that a death occur.

3                He doesn't even actually have the intent

4  that a death occur, but from all the surrounding facts,

5  common sense kind of point of view, he should have

6  anticipated.  Does that make sense to you?

7        A.    Yes, sir.

8        Q.    Okay.  Now, are you familiar with the method

9  of execution in Texas?

10        A.    I believe it's lethal injection.

11        Q.    That's right.  The procedures are the same in

12  each case.  The trial is divided into two parts.  There's

13  the guilt/innocence stage.  If we don't meet our burden of

14  proof, it's a not guilty finding and we all go home.  But if

15  we do meet our burden of proof, the trial is not over.

16  Again, it goes to the punishment phase where you can hear

17  additional evidence and then you get these questions.

18                The questions, basically, ask is the

19  defendant a continuing danger to society, did he intend the

20  death of another human being, and is there sufficient

21  mitigating evidence to warrant a life sentence?  But if

22  they're answered yes, yes, and no, the Judge has no choice

23  but to sentence the defendant to death.  Any other way is a

24  life sentence, what we call a capital life sentence.  But

25  those are the two possible outcomes.

1    If he were sentenced to death, he would

2   be placed on death row and at some point in time the Judge

3   would give him that date of execution.  The methods and

4   procedures are the same in each case.  On the date of his

5   execution he would be given time with a family member, a

6   last meal.  But at 6:00 p.m. all executions take place.

7    He would be placed on a gurney.  You've

8   probably seen the photographs.  Needles placed in his arm.

9   Witnesses are brought in.  After he gives a last statement,

10  the chemicals are injected and they shut down his heart and

11  lungs.  It happens very quickly.

12    But that's our goal in this case.  We

13  feel we have the type and quality of evidence to convince a

14  jury of this man's guilt and that these questions should be

15  answered in such a way that would result in his execution.

16    You've told us from a philosophical point

17  of view that you agree with the death penalty.  You feel it

18  should be prosecuted.  Do you feel you are the type of

19  person who, if you were placed on the jury and the State did

20  prove these things to you beyond a reasonable doubt, you

21  could actually take pen in hand and answer these questions?

22       A.    Yes, sir.

23       Q.    Okay.  Let's talk about these Special Issues

24  for a moment.  If you would, just take one moment to read

25  Special Issue No. 1.

77

1          A.      (Prospective juror complies.)

2          Q.      That question asks the jurors to make a

3    prediction about how the defendant would behave in the

4    future.

5                  And as I went back before and told you

6    that not everyone convicted of capital murder receives the

7    death penalty.  Our system sets up a situation where we have

8    to convince a jury to answer these questions, and then that

9    way some result in a life sentence and a death sentence, and

10   it's just going to depend on the individual facts of the

11   case.

12                 As a juror you are required to wait and

13   listen to all the evidence, get all the information in, and

14   then look at these questions separately.  Does that system

15   make sense to you?

16         A.      Yes, sir, it does.

17         Q.      Okay.  You, in your line of work, probably

18   gather a lot of information.  I knew when -- I went to

19   school out at Tech, so there was a lot of architect people.

20   And I knew -- lots of them were my buddies and, you know, I

21   would go over and -- something I could never do, but you

22   know how they put those big projects together, a lot of

23   information going on.  I remember them doing a whole lot of

24   research on buildings, layout, and had eight million

25   different drawings and views and that sort of thing.  But

1    it's a kind of an information gathering field, obviously.

2             And that's kind of how this is.  What it

3    requires is jurors that have mental discipline to wait and

4    listen to everything to come in and then analyze the

5    information.  There's no automatic answers to these

6    questions.  Just because you find someone guilty, you don't

7    automatically answer yes, he's a continuing danger.  There

8    may be some situations where, yeah, the evidence will show

9    he's a danger to society and he's a capital murderer.  There

10   may be some where you don't think he is.

11            You know, we give some strange examples

12   to demonstrate that.  You may have a situation, let's say,

13   I'm living in a neighborhood and I believe someone -- I know

14   someone molested my child.  But the police won't do anything

15   about it.  Maybe he's the -- sometimes I make him the

16   Mayor's son or something like that.

17            I'm mad about it, but I also don't want

18   it to happen again.  I wait a few days and I kick his door

19   in and I kill him.  That's capital murder.  Now, if I'm

20   tried, I could be convicted of capital murder because I

21   murdered someone during a burglary.

22            But looking at all the facts and

23   circumstances, a jury might not see me as a continuing

24   danger in that situation, as opposed to someone who may have

25   been to the penitentiary 20 times, something like that,

1   could be another situation.  But you see how the individual

2   facts change the answers to those questions?

3        A.   Yes.

4        Q.   Okay.  Now, this question asks whether there's

5   a probability the defendant would commit criminal acts of

6   violence that would constitute a continuing threat to

7   society.  What types of things would you want to know before

8   you answered that question?

9        A.   Well, I would want to know prior, well, what

10  he did prior to being incarcerated.

11       Q.   Okay.

12       A.   Which would lead to factors of just -- if it's

13  petty burglary or, you know, stealing a car and joyriding,

14  or was it, you know, assault.

15       Q.   Okay.

16       A.   It's just those types of actions.

17       Q.   That type of background evidence is admissible

18  at this point in the trial.  If someone has been convicted

19  you get to hear about that conviction, the sentence.  You

20  can even hear from the witnesses.  You can hear good things

21  and bad things.  It's kind of "This Is Your Life."  Then you

22  also get to consider what the person's role in the crime was

23  in the guilt/innocence stage.

24            But what you do is, just because you

25  found him guilty, again, it's not an automatic yes answer.

1  The State has to prove that to you beyond a reasonable doubt

2  by putting on the new evidence and then arguing what you

3  have already heard.  It goes all into that question.  And

4  then you'd have to answer it yes, if we prove it beyond a

5  reasonable doubt.  And if we don't, you'd leave it as a no

6  answer.

7          Do you feel you could do that and require

8  the State to prove that to you beyond a reasonable doubt?

9          A.    Yes, sir.

10         Q.    Could you wait for all the evidence to come in

11  and then make your decision?

12         A.    Yes, sir.

13         Q.    And would you be able to follow the rule that

14  it's not an automatic yes answer just because you found him

15  guilty.  You'd have to wait and listen to all the facts and

16  then make that decision.

17         A.    Yes, sir.

18         Q.    Okay.  Fair enough.  Special Issue No. 2, you

19  don't get to that unless you answer the first one yes.  And

20  then you look at that.  It starts out with a no answer and

21  we have to prove to you beyond a reasonable doubt it should

22  be answered yes.  Again, you can use the same evidence, what

23  their role in the guilt/innocence stage was, and also any

24  new information about their background that might help.

25          That question deals with that law of

parties or that accomplice situation we were talking about.
The first part of the question asks whether the defendant
actually caused the death of the deceased.  If you believe
he's the triggerman, let's say, the question is going to be
answered for you.

　　　　　But the second part of the question deals
with that accomplice situation.  If he didn't actually cause
the death of the deceased, but intended to kill the deceased
or another, or anticipated that a human life would be taken.
So if he's just an accomplice, but you believe from all the
evidence he intended the person to die or that he
anticipated that a human life would be taken, you can answer
that yes.

　　　　　Now, in the guilt/innocence stage, what
we have to prove is he should have anticipated.  And here we
go a little further and have to prove that he did
anticipate.  There's a difference there.  It might be slight
in your mind, but you have to be able to see that difference
and apply it.  Do you feel you could do that?

　　　　A.　　Yes, sir.

　　　　Q.　　Okay.  One example we give sometimes is,
Mr. Wirskye uses this example.  When he was 16 his dad gave
him a car.  And being a 16 year old he drove it pretty fast
around the neighborhood when his dad wasn't around, which
resulted in him wrecking the car.  His dad found out about

1  it and asked him how it happened and he told him and he

2  jumped on him pretty good.  And he may have used different

3  language, but, basically what he said, you know, didn't you

4  anticipate what was going to happen?

5              Well, being a 16 year old, he probably

6  didn't.  Now, if he were driving around, obviously, he not

7  only should he have anticipated, he would have anticipated.

8  A 16 year old may not in those situations.  But that's the

9  difference.  And it may be the same evidence you heard in

10  the guilt/innocence stage.  You just have to look at it from

11  this different angle and determine from everything you have

12  heard about him, his role in the crime, as well as his

13  background, did he actually anticipate that a death would

14  occur?

15              If you believe that beyond a reasonable

16  doubt, you can answer it yes.  If you don't believe it, you

17  can leave it as a no answer.  Again, it's just going to

18  depend on the particular facts.  And the Judge requires the

19  jurors to wait and listen to all the evidence that's in and

20  then make this decision and look at the questions

21  separately.  Do you feel you could do that?

22      A.      Yes, sir.

23      Q.      And the State has the burden.  You have to

24  require us to prove that to you beyond a reasonable doubt.

25  The defense doesn't have to prove.  They are not under a

1  burden of proof to prove these things to you.  You can

2  anticipate, common sense will tell you, they will be arguing

3  that way, and they may put on evidence.  But you can't

4  require them to.  Your requirement must be on the State of

5  Texas to prove that to you.  And you feel that you could do

6  that?

7        A.     Yes, sir.

8        Q.     This last question, the Special Issue, neither

9  side has the burden of proof.  It's what we call the

10  mitigation question.  It asks whether taking into

11  consideration all the evidence, including the circumstances

12  of the offense, and the defendant's character and

13  background, and the personal moral culpability of the

14  defendant, there is a sufficient mitigating circumstance or

15  circumstances to warrant that a sentence of life

16  imprisonment rather than a death sentence be imposed.

17            See how that question kind of covers

18  everything?  It's the last question you get to.  You

19  wouldn't answer it, unless you found him guilty, you believe

20  he's a continuing danger, you believe he intended a death to

21  occur.  But it allows the jurors to show some mercy, if you

22  think that's the right thing to do, if there's something in

23  his background, something about his role in the crime, that

24  tells you a life sentence is more deserving than a death

25  sentence.

1    He doesn't get away with it.  He has to

2 serve a capital life sentence.  But it's just something you

3 make a decision based on your heart and your brain.  You

4 don't have to tell us what you think mitigating evidence

5 would be.  It's up to you and the other jurors.  All you

6 have to do is have the mental discipline to keep your mind

7 open to it, look at the question, and determine which way it

8 should be answered based on the evidence.

9    One way, there's a guy -- we were picking

10 a case in east Texas and a juror, he kind of described it

11 best, I thought.  He looked at these questions like an open

12 window being shut.  You know, after we, if he was convinced

13 that Special Issue No. 1 was yes, his window would be a

14 little lower.  Special Issue No. 2, a little lower.  But it

15 was still open to Special Issue No. 3 now.  He said my

16 window is not open a whole lot at that point, but it's still

17 open.  And if we convinced him that was a no answer, then

18 that window would be closed.  If we didn't, it would still

19 be open.  But that's the kind of metaphor he used.

20    These are -- another way we describe it

21 is hurdles we have to get over before we can get to the

22 death penalty.  But as a juror you have to be able to keep

23 your mind open to it.  You don't have to tell us what it

24 would be, because you don't know what it would be, you

25 haven't heard any facts yet.

1            You can't assume the worst all the time.

2   There may be something out there.  And you have to be able

3   to tell the Judge, I'll wait, I'll weigh it, and I'll answer

4   it one way or the other, just depending on the individual

5   facts.  Do you feel you could do that?

6        A.    Yes, sir.

7        Q.    Okay.  Do you think that's a good question to

8   have in a death penalty situation?

9        A.    Yes, sir.

10       Q.    I mean, you may be dealing with someone who is

11  guilty of capital murder and they may be dangerous, but

12  there also might be something in their background which

13  might tell you a life sentence would be the right thing to

14  do in the case.  It's just up to each juror and each case

15  and the individual facts.

16            Let's go over some of the rules that

17  apply in this case, as well as any other criminal case.  And

18  these concepts will be pretty familiar to you because you

19  learned these in school, I think, most of them.

20            The presumption of innocence.  Anyone

21  charged with a crime is presumed to be innocent.  They start

22  out with that presumption.  And the fact that he's been

23  arrested or tried or going through this process is not

24  evidence of his guilt.  The evidence comes from the actual

25  witnesses and we have to prove it.

1          Can you start out the defendant with that

2   presumption of innocence and require us to prove our case

3   beyond a reasonable doubt?

4        A.     Yes, sir.

5        Q.     Okay.  The burden of proof, we kind of talked

6   about this.  It never leaves this table.  It's on the State,

7   the prosecutors, and it never shifts to the defense.  You

8   can't require them to prove his innocence, nor can you

9   require them to prove any of these questions.  Again, you

10  might anticipate they would, but they're not required to

11  under law.  And you can never shift that burden of proof to

12  them.  It must stay here.  Could you follow that rule of

13  law?

14       A.     Yes, sir.

15       Q.     That burden of proof goes to each and every

16  element of the indictment.  We write the indictment.  We

17  have to prove it.  If we fail on just one portion, then you

18  are obligated under law to find the defendant not guilty.

19          An example of that would be the identity.

20  We have to prove who committed this crime.  At the close of

21  the evidence, if you had a reasonable doubt about that,

22  you'd find him not guilty.  That's kind of an easy example I

23  give.

24          To further demonstrate that, though, I

25  like to give an example of the county where it happened.  We

1    have to write in there what county, Dallas County.  We're

2    under the same obligation to prove to you beyond a

3    reasonable doubt what county it occurred in as we are who

4    committed the crime.  If you had a reasonable doubt about

5    the county, you would be obligated to find him not guilty.

6                    Maybe it was one of those fact cases

7    where it happened near the county line and, in fact, you

8    believed the evidence showed it happened in Tarrant County.

9    That would be a reasonable doubt, maybe on just one portion

10   of the indictment, but still a reasonable doubt.  And the

11   law sees no difference in that.

12                    That would be our fault.  That would be

13   poor preparation on our part.  We could probably lose our

14   jobs over that, but you can't help us out.  A juror is kind

15   of like an umpire at a baseball game.  He has to call the

16   balls and strikes as he sees them and he can't give us one,

17   if he thinks we have failed in our burden.

18                    Could you follow that rule of law and if

19   we fail on our burden of proof on any element, find the

20   defendant not guilty, if you have that reasonable doubt in

21   your mind?

22        A.      Yes, sir.

23        Q.      Okay.  The Fifth Amendment, just because --

24   well, if someone is charged with a crime and they choose not

25   to testify, you can't hold that against them.  There could

1  be many reasons why a person may not want to testify.  They

2  may be very nervous in front of people and look guilty when

3  they're not.  They may be very poorly educated and not

4  perform well, look guilty, again and not -- they may just be

5  following the advice of their lawyer, who tells them not to

6  testify.  Or they may be real guilty and would look guilty,

7  if cross-examined.

8            The law takes care of that by telling the

9  jurors and instructing them that you can't hold that against

10 them, if they choose not to testify.  You have to make your

11 decisions just based on the evidence that you have heard.

12 Could you follow that rule of law?

13      A.    Yes, sir.

14      Q.    Okay.  Oftentimes police officers testify in

15 these criminal trials.  Common sense will tell you that.

16 You can't start a police officer ahead of any other witness.

17 You have to judge them like any other witness.  There are

18 some good police officers, there are some poor police

19 officers.  And you have to wait until they take the witness

20 stand and then judge their credibility.  Could you do that?

21      A.    Yes, sir.

22      Q.    Okay.  The burden of the -- a situation may or

23 may not come up of a lesser included offense.  Sometimes

24 jurors find defendants guilty of lesser included offenses.

25 In the situation such as a capital murder, that might be

1    aggravated robbery.  The penalty range on aggravated robbery

2    is a life sentence on one hand and all the way down to five

3    years in prison and anywhere in between.

4                         And, again, the law requires the jurors

5    to have the mental discipline to keep their mind open.  You

6    weigh all the punishment evidence that comes in, good and

7    bad, and then decide what to give.  If it's a life sentence,

8    they could do that, or if it's as little as five years in

9    the penitentiary, they can do that, or anywhere in between,

10   just what you think is the right thing to do based on the

11   evidence.

12                        Do you feel you could keep your mind to

13   that full range of punishment, open to it, and assess either

14   the minimum five, maximum life, or anything in between?

15        A.    Yes, sir.

16        Q.    Another law the Judge will probably instruct

17   you on is the parole laws.  You know, sometimes they are in

18   the news.  He can tell you and will tell you that if someone

19   gets a capital life sentence, they have to serve 40 calendar

20   years.  They are not eligible for parole until then.  But he

21   would also tell you, you can't use the parole laws, you

22   can't consider them in your deliberations.  You must

23   consider a life sentence, a life sentence.  Could you do

24   that?

25        A.    Yes, sir.

1    Q.    Okay.  Again, it's just a matter of using

2  mental discipline, waiting for all the facts to come in, and

3  then making your decisions based on those facts.  Sometimes

4  it's going to result in a death sentence and sometimes it's

5  going to result in a life sentence.  But you have to just

6  kind of let the cards fall where they may and answer the

7  questions based on all the evidence you hear in both sides

8  of the trial.  And you feel you could do that?

9    A.    Yes, sir.

10    Q.    Okay.  Well, I've done a lot of talking.  Do

11  you have any questions over anything we've gone over?

12    A.    Well, actually, you answered my question in

13  your last statement about the difference between a capital

14  life sentence and a life sentence.

15    Q.    A life sentence, let's say, for murder, the

16  Judge would instruct you a defendant must stay in 30

17  calendar years before they become eligible.  A capital life

18  sentence is even more.  It's 40 calendar years.  And even

19  then they are not necessarily going to be paroled.  That's

20  the first time they can even be considered for it.  So

21  that's the main difference.

22                Capital life sentence is the longest

23  sentence under our parole laws you can serve.  And, again,

24  the Judge would instruct you, you just must consider it a

25  life sentence.  And for all practical purposes, it is.  Any

1   other questions over -- we've covered a whole bunch of

2   stuff, I know.

3          A.    Um, well, the admissible evidence, would it be

4   the trial of the other, his accomplices, was that

5   admissible?

6          Q.    Anything relevant to the crime involving

7   everyone involved, their roles in the immediate crime, can

8   come in.  A lot of that may come in in the immediate

9   guilt/innocence stage as well as in the punishment stage,

10  background evidence, if it involves the other accomplices.

11             Now, many times in punishment, though, a

12  person's history might not involve the guilt/innocence stage

13  at all.  It's going to cover -- it could be going back to

14  elementary school.  I've seen trials where that's happened.

15  But that type of evidence may come in.  In fact, it may be

16  the same, because if people commit a crime together, then,

17  obviously, a lot of the evidence in the guilt/innocence

18  stage would be the same.  Any other questions?

19         A.    No, sir.

20         Q.    Okay.  Well, those were good, insightful

21  questions.  I think you've got a good feel of the process.

22  It's kind of a common sense deal, like I said, just waiting

23  for the evidence to come and then make your decisions.

24             You sound like the kind of person that

25  can do that, kind of coolly wait on the evidence, and then

1  decide if the State has proven its case.  If they can, you

2  don't have any hesitation finding in such a way that would

3  result in a person's execution?  But, also, if it's the

4  other way, you don't have any hesitation that would result

5  in a life sentence; is that right?

6           A.      No, sir, I don't.

7           Q.      You could do it either way?

8           A.      Yes, sir.

9           Q.      Okay.  Fair enough.  That's all the questions

10  I have.  I appreciate your patience with me.

11          A.      Thank you.

12                          CROSS-EXAMINATION

13  BY MS. BUSBEE:

14          Q.      Sorry, Mr. Simmons, I've got all these stacks

15  of things here, I lost track of it.  Um, inquiring minds

16  want to know what happened to your trip to Jamaica?  Never

17  mind.

18          A.      Actually, um, it's interesting.  That, the

19  wedding was called off.

20          Q.      I'm sorry.

21          A.      So --

22          Q.      Well, was that sometime ago?  You filled this

23  questionnaire out a long time ago.

24          A.      It happened, roughly, probably two and a half

25  months ago.

1    Q.    Um, and it's not going to be any problem for

2  you on your work to come down here, if you are selected?

3    A.    No, ma'am.

4    Q.    You nodded your head a lot because the State

5  has to tell you a whole lot of things.  Is there anything

6  about this scheme that surprised you?

7    A.    No, ma'am.

8    Q.    Okay.  And you understand that the way the law

9  is written, a conviction for capital murder is an automatic

10  life sentence?

11    A.    Yes, ma'am.

12    Q.    Does that seem like the right way to handle

13  this?

14    A.    Yes, ma'am.

15    Q.    Okay.  Sometimes people are so -- such

16  advocates, I should say, of capital punishment that they

17  think it should be a life, I mean, a death sentence and then

18  maybe somehow convince the jury that it should be life

19  instead.  But you don't feel that way?

20    A.    No, ma'am.

21    Q.    You had asked whether or not evidence of what

22  happened in other people's trial would be offered into

23  evidence.  What were you curious about?

24    A.    Well, I was just -- that it just -- I'm trying

25  to understand the -- you know, what the group was doing, if

1  any of that evidence was admissible in the trial.

2       Q.   Well, actually, I think you know what comes

3  out in these things is what everybody did.  But you can see

4  that they have to be tried individually.  But I think just

5  based on what I have seen before, the full picture would

6  come out on each trial.  Do you play ice hockey or just

7  watch it?

8       A.   I play and I coach developmental hockey.

9       Q.   You coach what age group?

10      A.   Ranging anywhere from probably sixth graders

11 through high school.

12      Q.   Seems like an injury prone sort of sport to

13 me.

14      A.   Um, well, the hockey that I play isn't.  It's

15 a beer league.  There's no contact involved in that.  I

16 can't see a bunch of 32-year-old men slamming into each

17 other.  But the younger kids, it's a full-contact league.

18 And I've seen two bodies going full speed run right into

19 each other.

20      Q.   See, I used to years ago date a guy whose son

21 played hockey.  And I thought the hockey dads were more

22 dangerous than the kids.  True?

23      A.   True.  The kids are usually out there to have

24 fun.

25      Q.   Yeah.  Do you have any other comments to make

1  for us about service on this jury?

2      A.    No, ma'am.

3      Q.    Okay.  Fair enough.

4          MS. BUSBEE:  Those are all the questions

5  I have, Your Honor.

6          THE COURT:  Thank you, sir.  If you would

7  be so kind and wait for us outside and we!ll have you back

8  in just a few minutes.

9          [Prospective juror out]

10        THE COURT:  What says the State?

11        MR. SHOOK:  We have no challenges for

12  cause.

13        THE COURT:  Defense?

14        MS. BUSBEE:  We have no challenge for

15  cause.

16        THE COURT:  Do you need a moment?

17        MS. BUSBEE:  No, sir.

18        MR. SHOOK:  We will accept the juror

19        MS. BUSBEE:  We'll exercise a preemptory

20  challenge on him.

21        THE COURT:  No. 15.  Will you kindly ask

22  Mr. Simmons to come back in, please.

23          [Prospective juror in]

24        THE COURT:  Mr. Simmons.

25        PROSPECTIVE JUROR:  Yes, sir?

1          THE COURT:  I appreciate your time and

2   service to this Court and we have to inform you that you

3   shall not be seated on this jury.  So you don't have to

4   worry about work.  And thank you so much for coming down.

5          PROSPECTIVE JUROR:  Thank you.

6              [Prospective juror out]

7          THE COURT:  Five minutes.

8              (Recess)

9          THE COURT:  Roger Allen Gordon.

10              [Prospective juror in]

11          THE COURT:  Good afternoon, sir.

12          PROSPECTIVE JUROR:  Hello.

13          THE COURT:  We have juror No. 4778, Roger

14   Allen Gordon.  Mr. Gordon, welcome to the 283rd.

15          PROSPECTIVE JUROR:  Thank you.

16          THE COURT:  I see you brought a book.

17          PROSPECTIVE JUROR:  Yeah, I didn't know.

18          THE COURT:  You didn't know how much

19   reading you would be able to get through.

20          PROSPECTIVE JUROR:  Which was none.

21          THE COURT:  I'm glad you read the guide.

22   Did you understand everything I put in there?

23          PROSPECTIVE JUROR:  Yes, uh-huh.

24          THE COURT:  We're going to visit with you

25   about that for a few minutes.  The attorneys want you to ask

1  questions and have a functional understanding of the law.

2  And this is the only time that you get to ask questions and

3  we would like to inquire -- the attorneys may inquire

4  further about the answers you provided in the questionnaire.

5  That's why we give you a copy.

6                    PROSPECTIVE JUROR:  Right.

7                    THE COURT:  So if they say, would you

8  look at this answer, what were you thinking-type issue, so

9  this is as informal a process as we can have.  Many people

10  are nervous when they come in.  And there are no wrong

11  answers.

12                    PROSPECTIVE JUROR:  Okay.

13                    THE COURT:  I have two questions I need

14  to ask at the end of the process.  Number one, do you

15  understand the law?  Number two, can you follow the law?

16  That's the big picture I've got.  The only question I have

17  for you at this time, sir, will you be able to serve this

18  Court for a period of two weeks beginning on November 10th?

19                    PROSPECTIVE JUROR:  If I have to, yeah,

20  I'll be here.

21                    THE COURT:  Yes, sir.  Mr. Wirskye?

22                    MR. WIRSKYE:  May it please the Court?

23                    ROGER GORDON,

24  having been duly sworn, was examined and testified as

25  follows:

1                    DIRECT EXAMINATION

2    BY MR. WIRSKYE:

3          Q.     Mr. Gordon, how are you this afternoon?

4          A.     I'm doing fine.

5          Q.     Okay.  My name is Bill Wirskye.  I'll be the

6    Assistant DA that will be visiting with you for the next few

7    minutes.  What I'd like to do is follow up on some of the

8    information in your questionnaire that you were kind enough

9    to give us in that 17 pages, talk to you a little bit about

10   your thoughts and feelings about the death penalty, and

11   then, finally, talk to you about some of the law that

12   applies in a case like this where the State is seeking the

13   death penalty.

14                    All kidding aside, would you be able to

15   come down here and serve for two weeks?  We know it's an

16   imposition on everyone, but --

17         A.     Yes, I believe that would be my duty.  If

18   called, I would be here.

19         Q.     Okay.  And it looks like you are a claims

20   adjustor; is that right?

21         A.     Actually, now I'm a team leader.  I just got a

22   promotion about three weeks ago.

23         Q.     Oh, good.  What does it mean to be a team

24   leader or what's kind of a normal day for you?

25         A.     Oh, I -- well, I supervise six people in our

1    office, five claims adjustors, one clerical employee, at

2    Side's (phonetic) Auto Appraisals.  It's a commercial

3    casualty insurance claims office.

4         Q.    Okay.

5         A.    So, you know, I sign losses in the morning and

6    review files, provide guidance to the adjusters, read mail,

7    that type of thing.

8         Q.    Okay.  I know you indicated you work, I guess,

9    pretty closely with attorneys, at least you're involved with

10   some litigation or trial monitoring?

11        A.    Yes, I have quite a few civil defense

12   attorneys.

13        Q.    And I'm always a little leery of people that

14   just know civil litigation attorneys.  I think both sides

15   will agree they're a little bit different from the type of

16   folks like us that just do criminal law.

17        A.    I'm sure they are, yeah.

18        Q.    I hope you won't hold that against us --

19        A.    Oh, no.

20        Q.    -- any past dealings you've had with those

21   civil litigators.  Let's see.  And what do you do in your

22   free time?  It looks like you're a birdwatcher?

23        A.    Well, backyard, yeah.

24        Q.    Okay.

25        A.    You know, I do my gardening and try to run

1    three or four times a week.  I like to go hiking in national

2    parks.

3            Q.      Okay.  Where do you go?  What parks?

4            A.      The last national park I went to was Crater

5    Lake in Oregon.  It was last summer.  Then in, oh, I guess

6    it was this summer, two years ago.  This summer we were at

7    the Buffalo River in Arkansas.  Did some hiking there, hiked

8    out to Whitaker Point.

9            Q.      Have you been out to the Big Bend?

10           A.      Yeah, I was there.  I guess I was there last

11   March.

12           Q.      I always want to go there.

13           A.      Got snowed on.

14           Q.      Oh, really?

15           A.      Yes, it was pretty -- I wasn't anticipating

16   that.

17           Q.      My dad and I have been saying for about five

18   years we're going to, you know, take a few weeks off and go

19   out there, but it seems like we just never have the time.

20   You live in Irving; is that right?

21           A.      Yes, that's correct.

22           Q.      And I know you indicated, like everybody we

23   talked to, that you've heard something about this case.

24           A.      Oh, yeah, yeah.

25           Q.      And, of course, I think you indicated you live

1    fairly close to --

2        A.      That's correct.

3        Q.      -- I guess, the crime scene.  Just because you

4    have heard about the case or live in that area, does not

5    disqualify you as a juror.  If that were the case, we'd

6    never get a jury in high profile cases like this.

7                What the law is, is no matter what you

8    have heard or, you know, even if you have formed some

9    opinions or formed some impressions about the case, that's

10   okay, as long as you can kind of set them aside, not

11   necessarily forget about them, but just set them aside and

12   be able to tell us that you can base your verdict on this

13   case just on the evidence and the facts you hear in the

14   courtroom.

15       A.      Yes.

16       Q.      Is that something you think you could do?

17       A.      Yes.

18       Q.      And I think the law recognizes, kind of a

19   common sense, that the best source of any information is

20   going to be what happens in court.  You may be like me and

21   be a little skeptical sometimes of what you see on the TV or

22   read in the newspaper, that type thing.

23       A.      Uh-huh.

24       Q.      What do you remember hearing about this case?

25       A.      Well, of course, I heard about it, I guess,

1    the night it happened or the next day on the TV.  Recognized

2    it's a couple of miles from my house, the Oshman's that I go

3    to.  Heard that it was a group of escapees.  I don't

4    remember the number, five or six, apparently were robbing

5    the store and in the process shot Mr. Hawkins.

6         Q.    Okay.  Did you keep up with any of the events

7    after the crime?

8         A.    Not, not too much.  You know, when they came

9    up, you know, the trials and the verdicts.  But I don't even

10   know if I could, I don't know any of the, remember any of

11   the names of the participants or anything like that, other

12   than Mr. Hawkins.

13        Q.    Okay.  Are you aware of the verdicts in the

14   other cases or --

15        A.    Excuse me?

16        Q.    Are you aware of the verdicts in the other

17   cases?

18        A.    Um, yeah, I think, seems like they were all

19   guilty.  I don't really -- if I remember correctly, that's

20   what I remember.

21        Q.    Okay.  And any of that going to affect you,

22   your ability to be fair and impartial in this case?

23        A.    No, I don't believe so.

24        Q.    Okay.  And as I said, you know, we talk to a

25   lot of people, some who know more than you, some who know

1   less, you know.  It's okay even to have formed some opinions

2   based on what you've heard, but as long as you can just kind

3   of have that mental discipline to listen to the facts and

4   evidence and just base your verdict on that, what happens in

5   the courtroom, you would be qualified.  And it sounds like

6   you can do that.  You told us generally you are in favor of

7   the death penalty in some cases?

8        A.     Yes, sir.

9        Q.     Okay.  And why is that?  What purpose do you

10  think it serves in our society?

11       A.     Well, I just feel like there is some

12  individuals that need to be removed from society for the

13  acts they have committed or might commit in the future.

14       Q.     Okay.  When you think about those types of

15  individuals or those type of crimes, what type people or

16  what type crimes come to mind?

17       A.     I would say murder, capital murder, child

18  molesters, perhaps, of course, that would -- I think that

19  would have to be under the circumstances.

20       Q.     Okay.

21       A.     That's -- I can't really think of any others.

22       Q.     And we talk to a lot of people that feel the

23  way you do.  I think a lot of people are surprised.  A lot

24  of people think maybe the death penalty could be an option

25  in cases that are not murders or in any murder cases.  But

1   actually you probably got a chance to read the law in Texas.

2   We just reserve the option of the death penalty only for

3   murder cases and then only for a certain type of murder

4   case, a certain subset of murders, that type thing.

5              I think a lot of people we talk to, if

6   they were Governor for a day and could write the laws, would

7   kind of expand that available list of crimes.  But,

8   nevertheless, that's the law we have.  And is that something

9   you think, knowing what the law is now, and knowing your

10  personal views, that you could follow that law?

11          A.     Yes, I believe I could.

12          Q.     Look at those type of cases?

13          A.     Yes.

14          Q.     Capital murder is always a murder plus

15  something else, is one way to think about it.  If you kill a

16  certain person, a child under six, a police officer,

17  fireman, or prison guard on duty, if you commit an

18  intentional murder during the course of another felony like

19  a robbery, burglary, rape, that type of thing, that would be

20  capital murder.

21              Murder for hire, if you hire somebody to

22  kill your spouse or your business partner, mass murder,

23  serial murder, those type things, those are the type of

24  crimes in Texas that we reserve that option for the death

25  penalty for.  And I think a lot of people, again, I think

1  that's a surprise to some people when they get down there.

2              Because there are some very brutal, very

3  heinous crimes that just don't qualify for the death

4  penalty.  You know, we can lock them up for life, give them

5  a life sentence.  But that death penalty is not an option.

6  Does that make sense to you kind of how the law is in Texas?

7       A.     Yes, yeah, it should be reserved for the most

8  heinous crimes, I believe.

9       Q.     And I think most people can generally agree on

10  that.  Let me ask you about another aspect of the law.  It's

11  what we call generally the law of accomplices.  I think you

12  probably are aware that any crime can be committed by more

13  than just one person alone.  There can be a group or a gang

14  of people that commit crimes, whether it be shoplifting or

15  whether it be capital murder.  And the law says that we can

16  prosecute everybody who's actively involved in a crime, even

17  capital murder.

18              Scenarios that sometimes come up in the

19  capital murder, we'll have a situation where maybe only one

20  person, one of the people involved, pulls the trigger.

21  Maybe one person actually causes the death of the victim.

22  The other people, the other accomplices, although they are

23  actively involved, they didn't necessarily take that life.

24              Some people who are very strongly in

25  favor of the death penalty, when faced with that scenario,

1    sometimes draw a line, and they would reserve the death

2    penalty just for that person that pulled the trigger, the

3    triggerman.

4              And if it were up to them, they'd take

5    the death penalty option off the table for the nontriggermen

6    accomplices.  You know, they may want to lock them up for

7    life.  But for whatever reason, religious, moral, or

8    ethical, they don't think a death penalty would be justified

9    for those nontriggermen accomplices.

10             Other people kind of take a different

11   view of that and say, you know, it really kind of depends on

12   the facts, depends on the situation, the circumstances.  I

13   wouldn't just necessarily take that death penalty off the

14   table.  And we always ask everybody kind of where they come

15   down on that issue when you're talking about the accomplices

16   and the death penalty.

17        A.    I would have to hear the evidence for each

18   individual to really make that decision.

19        Q.    Okay.  So you --

20        A.    I wouldn't take it off until I heard the

21   evidence.

22        Q.    Okay.  So, you wouldn't just as a blanket rule

23   automatically take that death penalty option off --

24        A.    No.

25        Q.    -- for a nontriggermen?  Okay.  And that's

1    pretty much what the law is, you know, based on the facts

2    and circumstances of every case.

3                    Just to give you kind of a hypothetical

4    example to explain the law, let's say Mr. Shook and I, my

5    partner, decide we're going to rob a bank.  We get together

6    and come up with the following plan.  He's going to take our

7    one pistol in and he's going to hold up the tellers in the

8    bank, kind of hold them at bay.  I'm going to go in unarmed

9    with a bag.  While he's holding everybody up, I'm going to

10   clean out the cash drawers and we're going to make our

11   getaway from the bank robbery.

12                   Let's say we go to do that crime and when

13   Mr. Shook has his gun out, for whatever reason, maybe one of

14   them looks at him funny or maybe he sees -- or we see one of

15   them going for a silent alarm to call the police, but for

16   whatever reason he shoots and kills the teller.  Okay?

17                   He's committed an intentional murder in

18   the course of a robbery, which is capital murder in Texas.

19   He could be convicted of capital murder and potentially face

20   the death penalty, depending on what the jury thinks.  The

21   law also says, depending on the facts and circumstances,

22   that I could, too, the nontriggermen accomplice.  What do

23   you think about that type of scenario?

24        A.        Well, if you were both involved in the

25   planning and executing of the robbery, you would definitely

1    be an accomplice and, therefore, subjected to the penalty.

2         Q.   Okay.  You could see the death penalty for a

3    person in my situation?

4         A.   I think so.

5         Q.   Okay.  And that's basically what the law is.

6    There's two different ways, I guess, to convict an

7    accomplice of capital murder, such that they would face the

8    death penalty.  One is, in Texas, we call it the law of

9    parties.  I don't know why.  Instead of an accomplice to an

10   offense, we call a person a party to an offense.

11             But if I direct, solicit, encourage, or

12   direct Mr. Shook to commit a capital murder, then obviously

13   I could be found guilty of it.  Or in our situation, if the

14   jury thinks that we conspired together to commit that bank

15   robbery and the jury feels that I should have anticipated

16   that a life could be taken, then they could convict me of

17   capital murder.  Does that make sense to you?

18        A.   Yes, it does.

19        Q.   It's kind of a common sense rule.  You know,

20   you look at the accomplice.  What should that person have

21   anticipated?  A lot of people think that somebody in my

22   shoes should have anticipated that a death would happen,

23   because we took a loaded gun to a bank robbery, that type

24   thing.  Is that pretty much where you are with respect to

25   the law?

1        A.      Yes, I believe that's true.

2        Q.      Okay.  Just generally, in Texas, capital

3    murder trials or any criminal trials break down into two

4    different phases or two different parts.  The first phase we

5    call the guilt/innocence phase.  There the jury is just

6    concerned with whether the person is guilty or not.  Whether

7    we proved to you beyond a reasonable doubt what we said in

8    our indictment, the allegations in our indictment.

9    Basically, is he guilty of capital murder or not?

10              If we prove that to you and you find the

11    person guilty of capital murder, then you move into the

12    second phase of the trial, which we call the punishment

13    phase.  The rules of evidence broaden out.  You get to hear

14    additional evidence about the person, his background,

15    criminal history, good, bad, character, reputation type

16    evidence, that type thing.  And we let you listen to that

17    evidence because we ask a jury to answer these three

18    questions.

19              And we let the answers to these three

20    questions determine the appropriate sentence in a case.  We

21    don't ask a jury at the end of the process to, you know,

22    write in life sentence or write in death sentence.  We ask

23    them to work through these questions based on the evidence

24    they've heard in both phases of the trial.  And depending on

25    the answers to these questions, that determines the

1  appropriate sentence, whether it's a life sentence or the

2  death sentence.  Does that kind of make sense to you in kind

3  of a general way?

4       A.      Yeah, uh-huh.

5       Q.      And we'll talk about them more in just a

6  second.  But just in a nutshell, basically, that first

7  question, do you think the person is going to be a future

8  danger to society?  You would answer it yes.  The second

9  question kind of deals with that accomplice scenario that

10 we've talked about.  If you think, you know, they actually

11 pulled the trigger or intended or anticipated that a life

12 would be taken, you'd answer that yes.

13             Then, finally, the third question is the

14 mitigation question.  Basically, it's a jury's chance to

15 show mercy, if they feel like, you know, it's the right

16 thing to do based on the facts.  Is there anything

17 mitigating in the case?

18             Now, if that question is answered no, you

19 have a yes, yes, and a no, it's an automatic death sentence

20 at that point.  The Judge has no discretion, he will

21 sentence the defendant to death.  If the questions are

22 answered any other way, he'll get that life sentence.

23             One way some people look at it is this.

24 If a person is convicted of capital murder, they are sitting

25 on that life sentence.  The only way that you get to the

1    death penalty is if the State proves to you, you know, the

2    first two answers should be yes and the juror feels there's

3    nothing mitigating in the case.   Then and only then do you

4    get the death penalty.   Does that kind of make sense to you?

5         A.    Yes.

6         Q.    Okay.   Do you think that's a good system?   You

7    probably haven't been exposed to it before today, I'm sure.

8         A.    Not criminal questions, no.   I believe the

9    system works fairly well.

10        Q.    And you kind of get some structure to the

11   process and, you know, we really rely on the jury to kind of

12   keep that open mind and look at the facts, look at the

13   evidence, and use their best judgment in answering those

14   questions, and let the chips fall where they may, very

15   basically.

16              Sometimes when we get people down here,

17   some people who, I guess, philosophically or in the abstract

18   are in favor of the death penalty, once they get down here

19   in this point of the process, it gets a little more real to

20   them.   They are sitting in the courtroom.   They're a few

21   steps away from making the jury.   They see a living,

22   breathing human being defendant in the courtroom.

23              And, you know, very frankly, it's our

24   goal in this case.   We feel we have the quantity and the

25   quality of evidence that's going to cause a jury to convict

1  him of capital murder, answer those questions in such a way

2  that he will be sentenced to death and one day executed.

3              I think when you get to this point in the

4  process, it kind of takes on a different feel for a lot of

5  jurors.  It's much more real.  It's not so much abstract and

6  philosophical anymore.  Are you aware of our method of

7  execution in Texas?

8         A.    It's lethal injection.

9         Q.    Exactly.  Lethal injection.  The procedures

10  are the same in any case.  They would be the same in this

11  case.  If he was sentenced to death, he'd be taken

12  immediately to death row.  In Texas it's the Livingston

13  Unit.  He would wait there some amount of time.  I can't

14  tell you how long, but at some point Judge Cunningham would

15  issue a date of execution.

16              At that date he'd be moved from death row

17  down to the main prison in Huntsville, Texas, where all

18  executions take place.  You may have seen a picture of it.

19  It's where the death chamber is.  He would be held in a

20  small holding cell outside that death chamber for that day,

21  be given a chance to meet with friends, family members, a

22  spiritual advisor, be given an opportunity to eat a last

23  meal, if he can.

24              As the time got closer to 6:00 p.m.,

25  which is the time that's mandated that executions take place

1  in Texas, he'd be moved, you know, either willingly or

2  against his will, into the death chamber.  And you may have

3  seen the picture of -- the media loves to show it, that

4  gurney with the leather straps.  He would be taken in there,

5  strapped down to the gurney, a needle and an IV would be

6  started in his arm.

7        There would be witnesses there from his

8  side, witnesses there from the victim's side.  He'd be given

9  a chance to make a last statement.  He may proclaim his

10  innocence, be very defiant.  He may beg for forgiveness and

11  accept the blame for what he's done.  But after that

12  opportunity, the warden would signal the executioners and

13  lethal substances would be released into the IV.  Very

14  quickly his heart and lungs would shut down, he'd lose

15  consciousness, fall into a coma, and die very soon after

16  that.

17        And I go into that detail, not to be

18  morbid with you, but those are the type of details that are

19  often reported in the media.  You know, living here in Texas

20  for a while, you probably know we're routinely among the

21  leaders in executions of all the states.  The death penalty

22  is a reality here.  Juries assess it.  It's actually carried

23  out.

24        If you were to serve on a jury where a

25  death sentence was handed down, you can fully expect that

1    sentence to be carried out one day.  And because we know

2    this is not everyone's cup of tea, we always, at this point

3    in the process, we want to make sure that jurors don't have

4    any hesitation about participating as a juror in a death

5    penalty case.

6                    And only you can tell us.  And we want to

7    make sure that you feel you are the type of person who could

8    take pen in hand and answer these questions in such a way

9    that it may ultimately result in the execution of another

10   human being.  Do you think you're that type of person?

11        A.     Yes.  If the facts I felt warranted it, yes, I

12   believe I am.

13        Q.     Okay.  Fair enough.  Let's talk a little bit

14   in detail about these Special Issues.  If you could take

15   just a moment or two and kind of read them.  I know they

16   were in the booklet, but they're phrased just a little bit

17   differently up on the wall.  And we'll talk about each of

18   them in turn.

19        A.     (Prospective juror complies.)

20        Q.     Again, those are the three questions that are

21   called Special Issues.  They weren't drafted specifically

22   for this case.  The Legislature drafted them.  So sometimes

23   they are grammatically a little incorrect, I think, at some

24   times.

25                    But that first question, basically,

1   again, is the future danger question.  It kind of asks a

2   juror to make a prediction about the person's -- the

3   probability of the person being a future danger to society.

4   You see how it kind of asks a juror to make that prediction?

5       A.    Yes, uh-huh.

6       Q.    Okay.  Is that something that you think you'd

7   be comfortable doing, making that sort of prediction?

8       A.    Yes, I would be.

9       Q.    Okay.  What type of evidence or what would you

10  like to hear to help you make that type of decision?

11      A.    Well, I'd need to know what his past history

12  was.

13      Q.    And that's what most people tell us, I guess.

14  We've heard quite a bit that, you know, the best predictor

15  of future behavior is past behavior, that type of thing.

16  The answers to Special Issue No. 1 and Special Issue No. 2,

17  as well, start off with a no answer.  That's kind of a

18  default setting for those two questions.  And it's part of

19  our burden of proof from the State to prove to you that

20  those questions should be answered yes.  Unless we prove

21  that to you, the answer stays no.  Does that kind of make

22  sense to you?

23      A.    Yes.

24      Q.    Okay.  And again, as I said, the law envisions

25  or the law contemplates that even though you have convicted

1   someone of capital murder, that you'd be able to look at

2   these questions with an open mind, with a fresh set of eyes,

3   and kind of make an independent inquiry into each of these

4   three questions.

5                    And what I mean by that is this.

6   Sometimes we have people tell us, you know, hey, if I've

7   convicted someone of capital murder, I'm always going to

8   think there's that probability that they're going to be a

9   future danger.  I've automatically answered that question.

10  It just makes sense to me.  I've kind of prejudged it.

11                   And if they feel that way, that's fine.

12  They simply wouldn't be a qualified juror, because, again,

13  you never know what you are going to hear in that second

14  phase of the trial or how it may affect the outcome to those

15  questions.  Does that make sense to you?

16       A.    Uh-huh, yes.

17       Q.    And, of course, you can go back and look at

18  what you heard in the first part of the trial, along with

19  what you hear in the second part to help you answer those

20  questions.  It may not take you long to answer that

21  question.  You may not have to think about it very long.

22  But the point is, you have to be able to keep that open

23  mind.  Is that something you think you could do?

24       A.    Yes, sir.

25       Q.    Okay.  Special Issue No. 2, again, starts off

1    with a no answer.  We've got to prove it to you the answer

2    should be yes.  There's basically three parts to that

3    question.  If you think the defendant actually caused the

4    death of the deceased, you know, if you think they were the

5    triggerman, you'd answer it yes.

6            If you think they didn't actually cause

7    the death of the deceased, but you think they intended that

8    that person die, you'd answer it yes.  Or, finally, that

9    last line is kind of what we touched on already.  If you

10   think that even though they didn't have the intent that the

11   person die, but they anticipated that a human life would be

12   taken, you'd answer that question yes.

13           One important distinction to remember, if

14   you'll recall, in order to convict an accomplice of capital

15   murder, the standard is that the person should have

16   anticipated that a life would be taken.  When we get to the

17   second phase of the trial, before you can get to the death

18   penalty, the law says the standard is a little higher.

19   Instead of should have anticipated, it's actually

20   anticipated.  You know, did the person in their mind

21   anticipate that a life could be taken.  You see that

22   distinction between the two standards?

23       A.     Yes.

24       Q.     Between should have and did?  And that's,

25   basically, again, a little bit higher hurdle before we get

1   to the death penalty.  But if you believe we have proven

2   that to you beyond a reasonable doubt, you would answer that

3   question yes.  The final question, Special Issue No. 3, is a

4   little bit different in that neither side has the burden of

5   proof on this.  Again, this is kind of the mitigation

6   question.  It's the last stop in the process.

7              We ask a juror to step back, take a deep

8   breath, look at everything they've heard in both phases of

9   the trial, the facts of the crime, the facts of the person,

10  and what sort of personal moral blame the person bears for

11  the crime.  And taking all that into consideration, we ask a

12  juror, you know, is there anything mitigating there?

13             And by mitigating we mean anything that

14  lessens his personal moral blame.  And if there is, is it

15  sufficient that his life ought to be spared, that he should

16  get that life sentence rather than a death sentence?  Again,

17  it's basically a jury's chance to show mercy at that point,

18  even at that late point, if they feel the facts warrant it

19  or justify it.  Does that make sense to you?

20        A.     Yes.

21        Q.     Okay.  Do you see the value in having that

22  question, even that late in the process?

23        A.     Well, yes, I'm sure there might be

24  circumstances that you would want to take into consideration

25  in this important of a decision.

1      Q.      Exactly.  And the law doesn't require you as

2  you sit there now to think of anything.  You don't have to

3  consider any particular factor mitigating.  We just leave it

4  up to the good common sense of the jurors.

5              As long as you can tell us you'd have an

6  open mind to that type of evidence, and if you heard it, you

7  would weigh it one way or another, you would be qualified to

8  serve as a juror.  As long as you can tell us there's some

9  value for you in that question, you would be qualified to

10  serve.  And it looks like to me you see the value in that

11  third question?

12      A.      Yes, I do.

13      Q.      Okay.  Again, I can't emphasize it enough, you

14  know, just because you've found someone guilty, doesn't

15  necessarily help you answer any of these questions

16  automatically.  Just because you have answered Special Issue

17  1 a certain way, doesn't automatically lead you to another

18  answer in Special Issue 2 or 3.  Each is independent and we

19  kind of require you to start with that open mind and work

20  through it to the proper answer.  Does that make sense to

21  you?

22      A.      Yes.

23      Q.      Okay.  Any sense about or any questions about

24  this sentencing scheme that we have in Texas?

25      A.      No.

1     Q.     Okay.  Is that something you're comfortable

2  with, kind of the process, and how we --

3     A.     You mean these questions?

4     Q.     Yes, sir.

5     A.     No.  I don't have any questions about those.

6     Q.     Okay.  Give me just a second, Mr. Gordon.  Mr.

7  Gordon, thanks for your time.  I appreciate it.

8              MR. WIRSKYE:  Judge, I'll pass the juror.

9                   <u>CROSS-EXAMINATION</u>

10 <u>BY MS. BUSBEE:</u>

11     Q.     Thank you, sir.  I just have a few questions

12 myself.  I know that this happened nearby your house.  Did

13 you know -- do you know any Irving police officers?

14     A.     No, I don't.

15     Q.     Okay.  Well, of course, that's a good thing

16 probably.  Most people don't come into contact with police

17 officers, except under negative situations.  At the time

18 that this happened, did you yourself or fear for yourself or

19 your family from the people involved?

20     A.     Well, initially, I mean, before they were

21 caught, I guess there might have been a little fear when you

22 first see a newsflash about something that is happening that

23 close to your home, yeah, I would say, yeah.  But it was

24 very shortlived.

25     Q.     And do you think that that would have any

1   effect in the back of your mind on deciding this case

2   because it happened so close to your house?

3        A.    I don't believe so.

4        Q.    You know, you said a number of times something

5   about, well, it would just really depend on the facts, I

6   mean, having to do with whether or not a party in your mind,

7   a party to an offense, which Mr. Wirskye explained ably,

8   whether that person would be in your mind a candidate for

9   the punishment of death.  Could you elaborate on what you're

10  thinking about when you say that?

11       A.    Well, I don't know, I've not given it any

12  thought, actually.

13       Q.    I know, it's just that we tell you the law and

14  then demand you tell us what you think about it.

15       A.    Are you saying what type of circumstances

16  would I think an accomplice --

17       Q.    Just off the top of your head.

18       A.    Um, I would say, you know, if he was with a

19  group of folks or if he was an accomplice, not necessarily a

20  group, if he had actually actively planned the situation and

21  if, you know, anytime you're in a situation where you are

22  committing a criminal act, when you have weapons, I think

23  there is always a possibility that something wrong,

24  something could go wrong, somebody could be injured or

25  killed.

1     Q.     Okay.  In determining whether or not you would

2  say, for instance, answer this Special Issue No. 2 or

3  Special Issue No. 3, having really to go directly to the

4  defendant, what the defendant thought in Special Issue No.

5  2, or trying to determine if you want to grant some mercy in

6  the case, would it be important to you, do you think you

7  need to hear from the defendant in that case?

8     A.     (No answer)

9     Q.     And when I ask that, I want to make it clear

10  to you the law says he doesn't have to testify.

11     A.     Right.  He didn't have to testify.  I

12  understand that.

13     Q.     Some people say, man, I really would like to

14  hear from him as a practical matter, Ms. Busbee, and that's

15  the law.

16     A.     I don't think I would have to hear from him.

17  That would certainly be within his right to choose whether

18  he wants to testify or not.

19     Q.     Okay.  Fair enough.  Is there anything about

20  this law that we've explained to you -- and I'm satisfied

21  that you understand it and what not.  Is there anything that

22  you would like to comment on, that you'd change, if you were

23  writing it?

24     A.     No, huh-huh.

25     Q.     So does this just kind of go along with the

1   way that you would be thinking, even before you knew what

2   the law was?

3       A.   I believe so, yes.

4       Q.   Okay.  Fair enough.

5            MS. BUSBEE:  Your Honor, we have no more

6   questions of this juror.

7            THE COURT:  Thank you, sir.  If you would

8   be so kind as to wait for us out in the hall and I'll have

9   you back in just a minute.

10           [Prospective juror out]

11           THE COURT:  What says the State on juror

12  No. 4778, Mr. Gordon?

13           MR. WIRSKYE:  State has no challenge for

14  cause.

15           MS. BUSBEE:  Defense has no challenge for

16  cause.

17           MR. WIRSKYE:  State will accept the

18  juror.

19           MS. BUSBEE:  Your Honor, the defense has

20  run out of the strikes that are granted us under the Code of

21  Criminal Procedure in a capital case.  I would exercise a

22  peremptory challenge on this juror, if I could, based on his

23  answers and demeanor on the witness stand.  And I'm

24  petitioning the Court to grant us additional peremptory

25  challenges in order to do so and to form a fair jury to

1   effect the provisions of Article 1, Section 10, of the Texas

2   Constitution, and the Sixth and Fourteenth Amendments of the

3   United States Constitution, in that we had three challenges

4   for 'cause that were denied by the Court, juror No. 1339,

5   1643, and what I believe is going to be in the number system

6   of the Court, Ms. Willis yesterday, juror No. 2511.  And I

7   would ask the Court for an additional strike in order to

8   exercise it against -- Mr. Simmons?  Mr. Gordon.

9                   THE COURT:  What page under the Code of

10  Criminal Procedure allows me to provide you with additional

11  strikes?

12                  MS. BUSBEE:  Is it Article 35.16?  I

13  don't know, Judge.  I don't know that it's codified, Your

14  Honor.  I believe that it's constitutional.  It's been -- it

15  was granted.  It's been granted in the past by courts.  It's

16  been granted in the past by this Court.

17                  THE COURT:  Mr. Sanchez, where are you on

18  this issue?

19                  MR. SANCHEZ:  I'm on the same page as

20  Ms. Busbee.

21                  THE COURT:  Ms. Busbee, you can look all

22  day.  It's not in that book.  You are wishing me to rule

23  under equity; is this correct?

24                  MS. BUSBEE:  Yes, Your Honor.  Why are

25  you torturing me like this?  Yes, sir, in order to effect

1  due process and --

2              THE COURT:  And just being fair to Mr.

3  Murphy, because that's the bottom line.

4              MS. BUSBEE:  In fairness, that we may

5  have a fair jury in this case.

6              THE COURT:  That's been my whole thread

7  through the whole process, is to be fair to everybody.

8  Defense 16 shall be granted.

9                   [Prospective juror in]

10             THE COURT:  Mr. Gordon, we want to thank

11  you for your time.  We appreciate you coming to court today.

12  I'm sorry you didn't get time to read your book.  But we are

13  not going to seat you on this jury.  You are excused.  Thank

14  you, sir.

15             PROSPECTIVE JUROR:  Thank you.

16             THE COURT:  We have one other matter to

17  take care of today's docket.  We've got juror 4738,

18  Mr. Alton Boyce.  Mr. Boyce was mailed a letter.  He did not

19  come back to the court.  He has not responded to the

20  Sheriff.  Upon this information being made known to the

21  Court yesterday, I directed the Sheriff to attempt

22  contacting him and would you please state for the record

23  your efforts to contact Mr. Boyce.

24             MS. DURON:  Judge, I contacted Lancaster

25  P.D. and talked to a sergeant that was willing to go out to

1   the residence, the address on the questionnaire, and he said

2   that he would leave him some type of note or service to

3   contact this Court immediately and what it would be in

4   regards to, his appearing today.

5               THE COURT:  And we've not yet heard from

6   Mr. Boyce by letter or phone or person.  Do the parties wish

7   for me to issue a writ of attachment and have the Sheriff go

8   out and sit up on the house and see if we can find

9   Mr. Boyce?

10              MS. BUSBEE:  Your Honor, I have reviewed

11  his questionnaire and I am not going to be asking the Court

12  for a writ of attachment.

13              THE COURT:  You know I'll track them down

14  on the other side of the earth like we did with that other

15  gentleman that was in Albania.

16              MS. BUSBEE:  Yes, Your Honor, but we

17  don't request that.  In fact, we request that you not do it.

18              THE COURT:  State?

19              MR. SHOOK:  No, Judge, we'll make no such

20  request.  We can agree to excuse the juror.

21              THE COURT:  The parties have agreed to

22  excuse Mr. Boyce.  Mr. Boyce will be excused.

23              THE COURT:  Monday morning?

24              MS. BUSBEE:  Yes, sir.

25                      [End of Volume]

1   STATE OF TEXAS          *

2   COUNTY OF DALLAS        *

3       I, NANCY BREWER, Official Court Reporter for the 283rd

4   Judicial District Court, do hereby certify that the above

5   and foregoing constitutes a true and correct transcription

6   of all portions of evidence and other proceedings requested

7   in writing by counsel for the parties to be included in this

8   volume of the Reporter's Record, in the above-styled and

9   numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11      WITNESS MY OFFICIAL HAND on this the 4 day of

12  _____March, 2004.

13

14

15  _____
    NANCY BREWER, CSR, NO. 5759

16  Expiration Date:  12-31-04
    Official Reporter, 283rd JDC

17  Frank Crowley Crts. Bldg. LB33
    133 No. Industrial Blvd.

18  Dallas, TX 75207
    (214)653-5863

19

20

21

22

23

24

25

74851

REPORTER'S RECORD

VOLUME 35 OF 61 VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

STATE OF TEXAS              *        IN THE DISTRICT COURT

VS.                        *        DALLAS COUNTY, TEXAS

PATRICK HENRY MURPHY, JR.   *        283RD DISTRICT COURT


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FILED IN**
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk


On the 13th day of October, 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.


**ORIGINAL**


283RD JUDICIAL DISTRICT COURT 214/653-5863
NANCY BREWER, OFFICIAL COURT REPORTER

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT:  03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT:  00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

3

| | PROSPECTIVE JUROR INDEX | | | |
|---|---|---|---|---|
| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
| Nathaniel Williams | 5 | 6 | | 35 |
| Kenny Martin | 4 | 6 | | 35 |
| Elaine Crooks | 22 | 23 | | 35 |
| Jan Sims | 26 | 28 | 68 | 35 |
| Edward Campbell | 77 | 79 | 109 | 35 |

1                    P R O C E E D I N G S

2           THE COURT:  Mr. Martin.

3               [Prospective juror in]

4           THE COURT:  Good morning, sir.

5           PROSPECTIVE JUROR:  Good morning.

6           THE COURT:  For the record we have juror

7 No. 4993, Mr. Kenny Martin.  Mr. Martin, welcome to the

8 283rd.  Thank you for being here.  I normally go through one

9 drill and then the Sheriff was telling me you have some

10 information that you would like to share with this Court

11 after reading the guide that I provided for you.

12           PROSPECTIVE JUROR:  Yes, I was not aware

13 of this back in May, but something just came up and I'm to

14 have surgery on November 13th and this is not elective

15 surgery.  It's surgery that I must have.

16           THE COURT:  Well, I'm certainly aware you

17 can't predict what your medical situation is going to be,

18 and I appreciate you coming down here today.  The parties

19 have agreed to excuse you, so you can be worried about your

20 health and not this trial.  So we wish you the best and

21 that's it for today.  We'll let you go.

22           PROSPECTIVE JUROR:  Okay.  Thank you,

23 Judge.

24           THE COURT:  Thank you so much.  Hope

25 everything works out okay.

1          PROSPECTIVE JUROR:  Thank you.  I

2  appreciate it.

3              [Prospective juror out]

4          THE COURT:  Nathaniel Williams.

5             [Prospective juror in]

6          THE COURT:  Good morning, sir.

7          PROSPECTIVE JUROR:  Good morning, sir.

8          THE COURT:  We've got juror No. 5013,

9  Mr. Nathaniel Robert Williams; correct?

10         PROSPECTIVE JUROR:  That's correct, yes,

11  sir.

12          THE COURT:  Mr. Williams, good morning.

13  Welcome to the 283rd.  Have you had an opportunity to read

14  the guide I provided for you?

15         PROSPECTIVE JUROR:  Yes, sir, I have.

16         THE COURT:  I also gave you a copy of

17  your questionnaire that you filled out back in May to help

18  you begin to think about the issues that the attorneys are

19  going to visit with you about.

20         It's a lot of law to give someone first

21  thing on Monday morning.  We understand that.  You don't

22  have to understand it all right now.  That's what this

23  opportunity is for you to visit with the attorneys and talk

24  about these issues, get a good working knowledge and

25  understanding of the law to be used in this case.

1      At the end of the process I have two

2  questions that I must ask.  Number one is, do you, in fact,

3  understand the law?  Second, can you follow the law?  Those

4  are the questions that I have to answer.  First question I

5  have for you, sir, is will you be able to serve this Court

6  for a period of two weeks beginning on November 10th?

7                  PROSPECTIVE JUROR:  Yes, sir, I would be.

8                  THE COURT:  Thank you, sir.  Mr. Shook,

9  would you like to inquire?

10                 MR. SHOOK:  Thank you, Judge.

11                 NATHANIEL WILLIAMS,

12  having been duly sworn, was examined and testified as

13  follows:

14                 DIRECT EXAMINATION

15  BY MR. SHOOK:

16      Q.    Mr. Williams, my name is Toby Shook.  I'll be

17  asking you questions on behalf of the State this morning.

18  If you have any questions of me, just feel free to ask, all

19  right?

20      A.    All right, sir.

21      Q.    We're just looking for your honest opinions,

22  as the Judge said.  I'm going to go over a few things here

23  in your questionnaire and then talk about capital murder and

24  the death penalty, and how you feel about that.

25      A.    All right, sir.

1    Q.    I see you have been with Verizon for quite

2    some time; is that right?

3    A.    Yes, sir, almost 25 years.

4    Q.    All right.  Tell us what you do on just a

5    day-to-day basis with them?

6    A.    I'm a floor supervisor in a call center.  We

7    take customer telephone repair calls and then issue trouble

8    reports that are sent to the field for action as

9    appropriate.

10    Q.    Okay.  And it looked like on your

11    questionnaire that you have lived in Dallas County for about

12    the past ten years and lived in a lot of Texas cities.

13    A.    Yes, sir.

14    Q.    Have you moved around because of the company?

15    A.    Partly because of the company.  Also, I was in

16    the Coast Guard for about 14 years before I joined Verizon.

17    Q.    Oh.  Okay.

18    A.    And got introduced to Texas when I was in the

19    Coast Guard.

20    Q.    All right.  So that's how you came to Texas,

21    through the Coast Guard?

22    A.    Yes, sir.

23    Q.    All right.  And you've been down on jury duty,

24    but you've never served on a jury before?

25    A.    Never even been close to jury duty, no, sir.

1    Q.    Okay.  Well, this jury duty selection is a

2  little different from normal.  Because it's a capital murder

3  case, the law allows us to speak to every juror

4  individually.  And we found that it's a good way to get

5  information from, and as I said before, if you have any

6  questions at all, feel free to ask.

7    A.    All right, sir.

8    Q.    Obviously, you know from what the Judge has

9  said and from the questionnaire, that this is a case in

10 which the State is seeking the death penalty.  So we speak

11 to every juror for some length about how they feel about it

12 as a law.  On your questionnaire I believe you said that you

13 favor the death penalty as a law and I'd like you to just

14 kind of expand on that, tell us why you do, and the purpose

15 you feel it serves society.

16    A.    Right.  The main reason I'm for the death

17 penalty to a large extent is because it is one way to

18 permanently remove certain individuals that really have no

19 contribution to make to society based on their actions.

20    Q.    Okay.  What types of crimes do you feel the

21 death penalty should be available for?

22    A.    Basically, those where it takes a life of

23 another human being under egregious circumstances.  That

24 sums it up.

25    Q.    All right.  If it were up to you, would you

1   ever have the death penalty for a crime other than murder or

2   would you just reserve it for certain types of murder cases?

3           A.     I can't think of anything else, except

4   possibly treason.

5           Q.     Okay.  The way the law is set up in Texas is

6   the death penalty is reserved only for murder cases and then

7   only certain types of murder cases.  For a murder case, you

8   have to have an intentional murder that is unjustified, not

9   in self-defense, not an accident.

10              But not every murder case is a death

11   penalty case.  In fact, the great majority aren't.  We have

12   a lot of brutal killings that wind up, what we just call for

13   lack of a better word, regular murder cases.  You can get 99

14   years or a life sentence, but you couldn't receive the death

15   penalty.

16              In order to qualify under that death

17   penalty statute, they have to be intentional killings with

18   some other aggravating facts, such as a murder that occurs

19   during the course of a felony, for instance, robbery.  If I

20   go in and rob a 7-Eleven store, shoot the convenience clerk,

21   that could be a death penalty case.

22              Murder during a burglary, someone breaks

23   in a home, kills someone in the house, murder during a rape,

24   during a kidnapping, or arson, murder of specific

25   individuals like police officers or firemen on duty, murder

1  of a child under the age of six, could be a death penalty

2  case.  Mass murder or more than one victim, like a serial

3  killer situation, murder for hire, if someone does it for

4  money or profit.

5            But specifically those are the types of

6  cases that have been reserved for consideration of the death

7  penalty and then not every one of those cases will call for

8  it.  It all depends on the individual facts.  The list I've

9  gone over, is that the kind of the type of crimes from your

10  own point of view that you feel could be, should be eligible

11  for the death penalty?

12       A.     Yes, sir.

13       Q.     Okay.

14       A.     I agree with that.

15       Q.     Now, let me get into another area.  When we

16  think of capital murder, we always come up with examples in

17  our mind and we usually think of the actual killer or the

18  triggerman, we often say.  I think that's just natural.  But

19  capital murder, like other crimes, sometimes is committed by

20  more than one person.  You have accomplices.  People can be

21  prosecuted, even if they are not the actual triggerman for

22  capital murder.

23            An example I use is, let's say

24  Mr. Wirskye and I decide we want to go rob a bank.  We

25  recruit another friend.  He's going to be our getaway

1  driver.  He's going to drive us there, he's got a fast car.

2  He waits right outside, keeps the car running.  He's going

3  to yell out, if someone is coming.  We run in while he's

4  waiting outside for us.  I've got a gun.  I hold everyone

5  up, get their hands in the air.  And after I do that,

6  Mr. Wirskye gets behind the counters and starts loading up

7  all the money in a sack.

8            During the middle of that robbery, for

9  some reason, I intentionally murder one of the bank

10  employees.  Maybe I don't like the way one of them is

11  looking at me or perhaps he warns me that one of them is

12  going for an alarm, and I shoot them.  We escape, but we are

13  caught, let's say, a few blocks away.

14            Now, obviously, in that example I could

15  be arrested and prosecuted and even could receive the death

16  penalty because I'm the actual triggerman.  The law says,

17  though, that people that assist, aid, help commit a crime as

18  an accomplice can be also prosecuted for that same crime,

19  and even under the law could receive the death penalty.

20  Mr. Wirskye and that getaway driver could be prosecuted.

21            One thing we like to do with each juror

22  is ask your gut opinion about accomplices, because some

23  people will tell us from their own personal point of view

24  they feel the death penalty is appropriate, but they would

25  only use it against people that actually murder the

1   individuals, the actual triggerman, or caused the death.

2   They think it's fair in those situations.

3                    As far as an accomplice goes, they have a

4   problem with that.  They don't think it's fair to try to

5   take their life when they didn't take a life.  They might

6   reserve a very lengthy prison sentence for an accomplice,

7   but not a death penalty.  Then other jurors from their

8   personal point of view, do feel that it is fair to prosecute

9   accomplices for the death penalty and for them to receive

10  the death penalty, depending on the facts.  But they agree

11  and think that's a fair proposition.

12                    But everyone feels differently.  From

13  your own personal point of view, your gut reaction to that,

14  how do you feel about the prosecution of an accomplice in a

15  death penalty situation?

16       A.    Gut reaction, basically, has to do with what

17  part as a facilitator that person may have played.  I think

18  you would really have to look at each individual issue

19  involving that person.  I would have some reservation, I

20  think.

21       Q.    Okay.  What's important to you about the

22  individual person or what types of factors come into play

23  from your mind?

24       A.    One of the things possibly would be, would

25  that crime have been committed if that person declined to go

1    as a partner in the crime.  It may, also, be to some extent

2    what was the circumstances around the events that led up to

3    the murder and, in a sense, I'd have to probably look at

4    what part that person played and how important his role was

5    to the entire event.

6         Q.    Okay.  If it was just a minor role, then you

7    may not feel the death penalty is important?

8         A.    I would say that would be accurate, yes.  I

9    may not feel he would be somebody I would want to give the

10   death penalty to, if I were asked that.

11        Q.    Okay.  Then the opposite view, though, you do

12   feel that some situations, the accomplice may be deserving

13   of the death penalty?

14        A.    Absolutely.  Sometimes the accomplice may be

15   the person that actually initiated the crime itself, and I

16   would hold him as directly responsible.

17        Q.    Okay.  You certainly could have situations

18   where maybe you'd have a boss that is determining things,

19   and I think a lot of people would agree in those situations

20   that might be a death penalty situation.  But you, also,

21   have situations where the accomplices are just there as a

22   team working together.  May or may not be the boss

23   necessarily, but they have an important role.

24             From your personal point of view, do you

25   feel the prosecution of accomplices should only be from

1    someone who is directing events or do you feel it could,

2    also, be used for someone that's there just acting as part

3    of the team?

4         A.      I would say that the prosecution should,

5    basically, be even across the board.  I think they should

6    present that as a capital crime.  But I think it would be up

7    to the individual circumstances to determine what the actual

8    outcome would be for that individual.

9         Q.      Okay.  So you wouldn't take the death penalty

10   off the table in an accomplice situation?

11        A.      No, no.

12        Q.      And you do feel that it is appropriate in

13   certain situations.  It's just going to come down to the

14   facts?

15        A.      Yes.  Yes.  Absolutely.

16        Q.      All right.  What the law says is the way we

17   can prove that is one of two ways.  If someone is actively

18   involved, aids, directs, helps out, then they can be found

19   guilty.  The other is through the conspiracy law.

20                The law says that if more than one person

21   conspired to commit one felony, in my example Mr. Wirskye,

22   I, and the guy we got to be our driver, we all agreed to

23   commit bank robbery.  And, while in the course of committing

24   that crime, one of us commits another felony to further the

25   conspiracy, again, in my example, I shoot someone during our

robbery, then everyone involved in the conspiracy can be found guilty, even if they, the nonshooters, didn't have the specific intent for anyone to be murdered, if the jury believes from the facts that they should have anticipated that a death could occur.

So to get someone guilty of capital murder under that legal theory, the accomplices don't even have that intent that someone die if, from all the surrounding facts, though, the jury sees it as a situation where they should have anticipated that could occur.

How do you feel about that law? Do you think it's fair that someone could be found guilty when they didn't have the actual specific intent for someone to die?

A. Yes, I believe so. I think intent is something that when you, I think it has to do with free will to some extent. If you choose to do something that may result in harm to another individual, at some point you have to take that responsibility --

Q. Okay.

A. -- when something goes wrong. So in their eyes, it goes wrong.

Q. So getting back to the example I used, if you believe from the surrounding facts of those accomplices, even if they didn't have the specific intent to murder that individual, if they should have anticipated or, a lot of

1  people told us, should have known something like that could

2  happen, you feel that it's fair for them to be found guilty

3  of that particular crime?

4       A.     I would say probably, yes.  Again, I go back

5  to what you learn about the circumstances leading up to it

6  and whether the crime could have occurred, if they chose to

7  participate and so on.  But I think you'd have to really

8  look at the scenario that was involved.

9       Q.     Okay.  And when you say the crime could have

10  occurred if they did participate, do you mean -- what do you

11  mean by that?  That it couldn't have been pulled off without

12  them, or --

13       A.     Well, maybe just kind of an off-the-wall

14  example, but using your example, let's say that you were

15  unable to drive, period.  And this gentleman offered to

16  assist and drive.  If he declined to do that, would the

17  crime have occurred?  No.

18       Q.     Okay.

19       A.     So I would hold him equally responsible.

20       Q.     Okay.  Okay.  And I can't get into the

21  specific facts, but we can tell you that that's the legal

22  theory we are prosecuting this case under and seeking the

23  death penalty, that of the accomplice rule, what we call the

24  law of parties in Texas.

25       A.     Okay.

1    Q.    That you're a party to an offense.  And from

2  your personal point of view you don't have any objection to

3  that?

4    A.    No, sir, I don't.

5    Q.    Okay.  Now, this case generated a lot of

6  publicity, as you well know, and, in fact, almost every

7  juror, except one or two we've talked to, saw or read

8  something about this case, which doesn't make you ineligible

9  to be a juror.  But, obviously, we want to inquire as to

10  each juror what they remember seeing about the case and on

11  the coverage, news coverage.  What details do you recall at

12  this time?

13    A.    Looking back on it, I would say a lot of

14  things are probably a little bit hazy, and there was a lot

15  written about it.  I would say that I recall the

16  circumstances surrounding the death of Officer Hawkins, the

17  capture in Colorado -- was it Colorado?  See, I'm even a

18  little bit -- I'm pretty sure it was Colorado.

19    Q.    All right.

20    A.    I saw a -- I don't want to call it a

21  documentary, because what we see on TV oftentimes is a

22  two-step version, you know, to make it interesting --

23    Q.    Right.

24    A.    -- that involved a case to some degree, but

25  even that's a little fuzzy to some extent.  It seems like

1   there was a couple that were captured separately from the

2   main group that got away.  That's about all that I remember,

3   I guess.

4        Q.      Did you follow any of the subsequent court

5   proceedings after the arrests?

6        A.      Not on any high interest level.  I remember

7   reading the results, I think, the outcome of a couple of the

8   trials.  I think it was the first one I remember, the first

9   person.  But I don't remember too much about the others.

10       Q.      You don't remember the others?  Okay.  Like I

11  said, almost everyone has read or heard something about it.

12  The law says this.  That doesn't make you ineligible to be a

13  juror.  If that were true, we couldn't ever seat a jury in a

14  high publicity case.

15               What the law contemplates is, though,

16  that jurors have to make their decisions based only on what

17  they hear in the courtroom, because the best evidence,

18  obviously, is going to come from the actual witnesses as

19  they testify and the evidence that's introduced in court,

20  and not in the news.  As you, I think, accurately stated, a

21  lot of times it gets juiced up or is inaccurate and that

22  sort of thing.

23               We can't ask you to forget what you have

24  seen or heard already because that would be impossible.

25  What you have to be able to do as a juror is be able to tell

1   the Court that you will make your decisions, if seated on

2   the jury just based on the evidence you hear, and you

3   wouldn't be influenced by anything that you've already read

4   or seen on TV.  And it comes down to just what you are able

5   to tell us, honestly, if you can do that.  It comes down to

6   each individual juror.  We depend on your honest answers, if

7   you feel you could follow that rule of law.

8            Do you feel that you could, if seated on

9   this jury, make your decisions just based on what you hear

10  in the courtroom?

11       A.    Um, I probably feel like I could listen to the

12  evidence and make the conclusions based on that.  I do have

13  a preconceived feeling of the guilt or innocence,

14  unfortunately, but that's something I've felt through the

15  media exposure and the other circumstances.  But in all

16  honesty, I would still feel like I could keep a reasonably

17  open mind, if I had to serve.

18       Q.    Well, it's -- it comes down to this,

19  obviously.  You can't be influenced by those things and

20  you've seen a lot.  But everyone who has been charged with a

21  criminal offense does have that presumption of innocence at

22  the beginning of trial.  And the State must overcome that

23  presumption by putting on the evidence.

24            And as a juror in this case, you'd have

25  to be able to give that defendant that presumption of

1    innocence, presume him to be innocent and require us to

2    prove beyond a reasonable doubt that he is guilty.  In other

3    words, you can't start him out as guilty and then see if we

4    go along and put a little bit of evidence on.  You can't do

5    that.

6               If we, you know, fail in our burden of

7    proof, you'd have to find him not guilty, no matter that you

8    may have followed the case in the news and the media.  But

9    you have to be able to tell the Court that you could start

10   him out with that presumption of innocence.

11        A.    Right.

12        Q.    Do you think you could do that?

13        A.    I -- that's probably one of those things I've

14   thought about ever since I filled out the questionnaire.

15   But, yeah, the presumption of innocence, I think, is a

16   critical element of giving the person a fair hearing.  But

17   at the same time, being a human being that I am, there was a

18   lot of anguish on my part, because I really feel like my

19   feeling at the moment is he's starting out presumed guilty

20   in my heart.

21        Q.    Okay.

22        A.    But I don't know how to work around that too

23   much.  I know I could listen and possibly be somewhat

24   objective, but at the same time I'd be starting out a little

25   bit on the biased side, quite frankly.

1      Q.    Okay.  Bottom line is, you can't assure the

2 Court 100 percent that you wouldn't be able to give him that

3 presumption, just because of the amount of publicity you

4 have seen?

5      A.    Yes, sir.

6      Q.    All right.

7            MR. SHOOK:  All right, Judge.  I believe

8 that's all I have.

9            MS. BUSBEE:  Your Honor, reluctantly and

10 sadly, the parties have reached an agreement on this juror.

11            THE COURT:  Mr. Williams.

12            PROSPECTIVE JUROR:  Yes, sir.

13            THE COURT:  I appreciate your honesty.

14 You sound like you would be a real good juror in any other

15 capital case, but you have, obviously, formed an opinion

16 that is not fair to the defendant and I appreciate that.

17            PROSPECTIVE JUROR:  I am a tainted

18 person, I'm afraid to say.  But I want to be honest about

19 that.

20            THE COURT:  Well, you could have sat

21 there and not shared that with us and you had a real good

22 chance of being on this jury, so I appreciate that.  You can

23 leave here understanding that you probably did more for jury

24 service than you ever did by sitting in that box.

25            PROSPECTIVE JUROR:  I appreciate that.

1          THE COURT:  So you are free to go.  Thank you

2     so much.

3               PROSPECTIVE JUROR:  Thank you, sir.

4     Thank you.

5                    [Prospective juror out]

6                    (Recess)

7               THE COURT:  Ms. Crooks.

8                    [Prospective juror in]

9               THE COURT:  Good afternoon.

10              PROSPECTIVE JUROR:  Good afternoon.

11              THE COURT:  How are you doing?

12              PROSPECTIVE JUROR:  Fine.

13              THE COURT:  For the record we have juror

14    No. 5095, Francile Crooks.  Is that pronounced correctly?

15              PROSPECTIVE JUROR:  Bad name, isn't it?

16              THE COURT:  No.  I just want to be sure

17    it's pronounced correctly.

18              PROSPECTIVE JUROR:  It's Crooks.

19              THE COURT:  Ms. Crooks, have you had

20    enough time this afternoon to read the orientation guide I

21    provided for you?

22              PROSPECTIVE JUROR:  Yes, sir.

23              THE COURT:  I also gave you a copy of

24    your questionnaire that you filled out for us back in May to

25    help you begin to think about some of these issues.  It's a

1    lot of law to give someone.  And, please, you don't have to

2    understand it all right now.  That's what these interview

3    sessions are for.  The attorneys will go over the law with

4    you, give you examples to help you have a working

5    understanding of the laws that will have to do with this

6    case.

7                    The only thing I have for you at this

8    time is will you be able to serve this Court for a period of

9    two weeks beginning on November 10th?

10                   PROSPECTIVE JUROR:  If I'm chosen, I can

11   be here.

12                   THE COURT:  Very good.  I need you to be

13   sure that you make a yes or no answer.  What we were

14   communicating, she has to write it down.  That's her job.

15   Everything we say she writes down.  So if you would, please

16   make a verbal response to the attorneys when they ask you

17   questions.  Fair enough?

18                   PROSPECTIVE JUROR:  Fair.

19                   THE COURT:  Great.  Mr. Wirskye, would

20   you like to inquire?

21                   MR. WIRSKYE:  May it please the Court?

22                   FRANCILE CROOKS,

23   having been duly sworn, was examined and testified as

24   follows:

25                   DIRECT EXAMINATION

1   BY MR. WIRSKYE:

2          Q.     Ms. Crooks?

3          A.     Yes, sir.

4          Q.     How are you this afternoon?

5          A.     Fine.

6          Q.     My name is Bill Wirskye and I'll be the

7   Assistant District Attorney that will be asking you

8   questions for the next few minutes.  What I'd like to do is

9   follow up on some of the information in your questionnaire,

10  and then get some of your thoughts and feelings about the

11  death penalty, and then maybe talk a little bit about the

12  law that applies in a case like this where the State is

13  seeking the death penalty.  Do you have any questions before

14  we get started?

15         A.     No, sir.

16         Q.     Okay.  Unless I misread you, you don't look

17  very happy to be here.

18         A.     I'm not happy to be here.

19         Q.     Okay.  Tell us why?

20         A.     Well, I followed the trials of the rest of

21  them in the court or in the papers.

22         Q.     You know, we talk to quite a few people and

23  that's one of the reasons we do it.  These cases are a

24  little bit unique in a sense that normally when a juror

25  comes down, they know nothing about the cases.  But we

1   talked to quite a few people that tell us that they followed

2   the cases closely and know about the other verdicts and they

3   just don't really think that, based on everything they know,

4   they can be a fair juror in this type of case.  They just

5   know too much about it.  If that's true, then we thank them

6   for coming and send them out the front door.  Is that kind

7   of what I'm hearing from you, that you may know too much

8   about it?

9          A.     Well, I've read it, I've read it, and I've

10  listened to it on TV from start to finish.

11         Q.     Okay.  And you are aware of the verdicts in

12  the other cases?

13         A.     Yes, sir.

14         Q.     Okay.  How do you think that might affect you

15  in this case?

16         A.     He's the last one.  They all have guilty, so

17  he's guilty to my way of thinking.

18         Q.     Okay.  And that's just an opinion you formed

19  because you followed the cases so closely?

20         A.     Yes.

21         Q.     Okay.  And based on that, you are probably not

22  the right juror for this case; is that right?

23         A.     I wouldn't think so, but --

24         Q.     Okay.  You already have an opinion about his

25  guilt, right?

1          A.     Yes, sir.  All the rest of them were guilty.

2          Q.     Okay.

3                 MS. BUSBEE:  I think we've reached an

4    agreement, Your Honor.

5                 MR. WIRSKYE:  That's all I have, Judge.

6                 THE COURT:  Thank you, Ms. Crooks.

7    That's a pretty short voir dire.

8                 PROSPECTIVE JUROR:  That's the way I

9    felt.

10                THE COURT:  I appreciate it.  We will

11   excuse you.  You are free to go.

12                     [Prospective juror out]

13                THE COURT:  Ms. Sims.

14                     [Prospective juror in]

15                THE COURT:  Good afternoon.  Please have

16   a seat.

17                PROSPECTIVE JUROR:  Okay.

18                THE COURT:  We've got juror No. 5156, Jan

19   Rene Sims.  Is that pronounced correctly?

20                PROSPECTIVE JUROR:  That's correct.

21                THE COURT:  Welcome to the 283rd.

22                PROSPECTIVE JUROR:  Thank you.

23                THE COURT:  Did you have enough time to

24   read the orientation guide I provided for you?

25                PROSPECTIVE JUROR:  Yes, sir.

1          THE COURT:  Also a copy of the

2    questionnaire?

3          PROSPECTIVE JUROR:  Yes, sir.

4          THE COURT:  Did you review that?  Good.

5    That's a lot of law to give someone.  I don't expect you to

6    understand it all right now.  That's what this process will

7    be about, is the attorneys will visit with you, help you

8    understand how all this law relates, give you a good working

9    foundation.  Would you please ask questions?

10          PROSPECTIVE JUROR:  Okay.

11          THE COURT:  Believe me, the lawyers can

12    make things that are very simple very complicated.

13          PROSPECTIVE JUROR:  Okay.

14          THE COURT:  All lawyers do.  Anyway, ask

15    questions.  We want you to understand the law that you're

16    going to be using.

17          PROSPECTIVE JUROR:  Okay.

18          THE COURT:  Fair enough?

19          PROSPECTIVE JUROR:  Yes, sir.

20          THE COURT:  At the end of the process, I

21    have two questions I must ask.  Number one is, do you, in

22    fact, understand the law?  Number two, can you follow the

23    law?  That's the big question.

24          The only thing I have to ask you now is

25    will you be able to serve this Court for a period of two

1   weeks beginning on November 10th?

2                       PROSPECTIVE JUROR:  Yes, sir.

3                       THE COURT:  Very well.  With that, I'll

4   turn it over to Mr. Shook.  You may inquire.

5                       MR. SHOOK:  Thank you, Judge.

6                          JAN SIMS,

7   having been duly sworn, was examined and testified as

8   follows:

9                       DIRECT EXAMINATION

10  BY MR. SHOOK:

11          Q.      Ms. Sims, my name is Toby Shook.  I'll be

12  asking questions on behalf of the State this afternoon.

13  What I'm going to do is go over some of the information in

14  your questionnaire --

15          A.      Okay.

16          Q.      -- and talk to you about capital murder and

17  how you feel about that, and some of the other laws and

18  rules that apply to these types of cases.  And if you have

19  any questions at any time, feel free to ask.

20          A.      Okay.

21          Q.      As the Judge said, there aren't any right or

22  wrong answers.  We just want your honest opinions.  I think

23  you've been on a couple of juries before?

24          A.      Yes, sir.

25          Q.      From that experience you know, then, this is a

1   little different procedure.

2        A.      Yes, sir.

3        Q.      It's a death penalty case, so the law has the

4   procedure that we talk to each juror individually.

5        A.      Okay.

6        Q.      We don't mean to -- sometimes jurors feel like

7   they're the ones on trial because we put them on a witness

8   stand.  We try not to make them feel that way, but we have

9   found it is a pretty good procedure for getting information.

10        A.      Okay.

11        Q.      I see from the questionnaire that you grew up

12   in Lubbock; is that right?

13        A.      Yes, sir.

14        Q.      I went to school out there so and enjoyed it

15   quite a bit, but I never will forget the springs with all

16   the duststorms.

17        A.      Dust.

18        Q.      And sometimes when the wind would blow, that

19   certain aroma you would get from the stockyards.

20        A.      Yes.

21        Q.      I went back for one of the A&M games a while

22   back and it just happened to blow in that one day, and I

23   said, oh, I remember that.  Looks like Lubbock has grown up

24   quite a bit in the last few years.  Have you been back

25   lately?

1    A.    I'm probably back about one to two times a

2  year.

3    Q.    Okay.  I saw a lot of new construction there.

4    A.    There is a lot of new construction, yes.

5    Q.    In fact, they had a whole new area there at

6  one end of town with all kinds of new restaurants and stuff

7  that had been put in.

8    A.    Probably on what, the loop?  South of the

9  loop?

10    Q.    Uh-huh.  Uh-huh.  So it's growing up.  From

11  your questionnaire you said you were on two cases?

12    A.    Yes, sir.

13    Q.    What types of cases were those?

14    A.    The first one was a civil case and it involved

15  an individual who had injured other patron of the bar with a

16  glass bottle and I believe that the -- they were wanting to

17  know whether the bar would be liable for some of the

18  damages.

19    Q.    What happened with that case?

20    A.    They decided that the bar was not held liable

21  for the situation.

22    Q.    Okay.  And what was the other case?  What did

23  that involve?

24    A.    The other one involved an individual who

25  assaulted a truck driver.  I believe that was actually a

1    criminal case.

2         Q.    Okay.

3         A.    At the market downtown early one morning.

4         Q.    Okay.

5         A.    And I believe that they actually decided -- we

6    didn't ever -- well, I believe we found him guilty, as a

7    matter of fact, yeah.

8         Q.    Did the jury assess punishment in that case or

9    do you recall?

10        A.    No, sir.  I don't recall.

11        Q.    All right.  How did those cases go as far as

12   deliberations?  Were they pretty smooth or were they real

13   contentious, or --

14        A.    No, they were really very smooth.  The second

15   one, in particular, was very quick and I think we made a

16   verdict within 30 minutes.

17        Q.    Oh, with the criminal trial?

18        A.    Yes.

19        Q.    Okay.  Sometimes we talk to jurors and they

20   just don't want to ever relive that experience, because it

21   was such bad arguments and things like that.  And then

22   others --

23        A.    The first one, there was some differing, you

24   know, opinions.  But within probably two hours we decided,

25   you know, all together, that we agreed on an opinion.

1      Q.      Okay.  You work now for the, is it North Texas

2  Women's Health Care Associates?

3      A.      Yes, sir.

4      Q.      What do you do with them on a day-to-day

5  basis?

6      A.      I'm a woman's health care nurse practitioner,

7  so I provide primary health care to women.

8      Q.      Okay.  Is it a facility they have out there or

9  --

10     A.      It's -- well, actually, we're currently moving

11 to Keller.  It's an OB/GYN office.  So we will be practicing

12 in Keller and Grapevine.

13     Q.      All right.  And you have been in that field

14 for what, some --

15     A.      Since '96, which was about seven, eight years.

16     Q.      Okay.  I was looking at your work history.

17 You started out at Parkland?

18     A.      Yes, sir.

19     Q.      What did you do at Parkland?

20     A.      I was a labor and delivery nurse.

21     Q.      Okay.  Okay.  You didn't work the emergency

22 room or anything like that?

23     A.      No.  No.

24     Q.      All right.  And then next, was that a private

25 practice?

1      A.      Yes, sir.

2      Q.      Okay.  And then the -- then at UT Southwestern

3  Medical Center?

4      A.      Yes, that's where I practiced as a nurse

5  practitioner.

6      Q.      Okay.  And then Planned Parenthood.  What did

7  you do with them exactly?

8      A.      I was also a nurse practitioner there.

9      Q.      Okay.  And I had another -- I almost finished

10  with your questionnaire.  This, believe it or not, all this

11  information saves you time.

12      A.      Okay.

13      Q.      We'd be actually, I guess, asking all this and

14  it would take forever.  But hobbies, I always -- we're

15  always interested in a person's hobbies because that is

16  something you choose to do.

17      A.      Okay.

18      Q.      You've got art, drawing.  What type of art do

19  you like?

20      A.      Well, I'm a member of the Dallas Museum of Art

21  and I just like to study art.  I like to draw.  I like to --

22  you know, just pursue anything in the art field in general.

23      Q.      Okay.  Let me turn your attention now and ask

24  you about capital murder.  Obviously, you know from what the

25  Judge told you in the questionnaire, that this is a case

1  seeking the death penalty.  And we ask a lot of questions

2  about the death penalty.  You put on your questionnaire that

3  you are in favor of it as a law?

4       A.    Yes, sir.

5       Q.    I'd like you to kind of tell us why you are,

6  in your own words, and tell us what purpose you think it

7  serves society.

8       A.    Okay.  Well, I think that in certain

9  situations, if an individual has committed a murder, that

10 that person should go before a jury of his peers and be

11 assessed to whether they are still a member of the society

12 that can function as a member without doing harm to others.

13 And I think that in a situation where a person is found not

14 to be able to be a part of the community, who would do harm

15 to others, then that would be an appropriate assessment.

16      Q.    All right.  When you think of a death penalty

17 case or at least a case for consideration of the death

18 penalty, what types of crimes come to mind?

19      A.    Murder.

20      Q.    Is there any particular type of murder case?

21      A.    One where there was intent.

22      Q.    Okay.  An intentional murder, that sort of

23 thing?

24      A.    Right.

25      Q.    Okay.  Any other crimes, other than murder or

1  where someone's life was taken would you ever consider?

2       A.    Well, in the situation where a person is

3  committing a crime and somebody is accidentally murdered,

4  then I think it's appropriate to at least evaluate that

5  person for that.

6       Q.    I know one case you put on the questionnaire

7  that you took an interest in, a lot of people did, was that

8  case where the little girl was locked in that closet.

9       A.    Uh-huh.

10       Q.    Some people tell us sometimes severe child

11  abuse cases like that, they may consider the death penalty.

12  Have you ever thought about cases such as that?

13       A.    Well, certainly if that little girl had died,

14  I would definitely think that that was an appropriate thing.

15       Q.    Have there been any other cases in the media,

16  other than that one that you followed involving murder or

17  severe crimes?

18       A.    O. J. Simpson, that one comes to mind always.

19       Q.    You couldn't get away from that one.  What

20  were your opinions about the O. J. case?

21       A.    That -- well, it's, you know, it's hard to

22  know not being a juror and not being there, so -- but in my

23  opinion, he was probably guilty of the crime.

24       Q.    Okay.

25       A.    Obviously, the person that was responsible for

1  those two murders should have been held accountable.

2        Q.      Okay.  A lot of folks feel that way.  In

3  Texas, as far as the death penalty goes, and you have read

4  the packet, it is reserved just for murder cases and then

5  only certain types.  There are a lot of murder cases that

6  actually are pretty brutal, but you can't receive the death

7  penalty, because they don't fall under this scheme.

8                First of all, you have to have an

9  intentional killing.  The intent may be formed in just a

10  split second, but you have to have that specific intent.

11  But you, also, have to have another aggravating factor, such

12  as a murder in the course of a felony, such as a robbery.

13  If I go into the 7-Eleven store and shoot the clerk during a

14  robbery, that could be a death penalty case.

15        A.      Uh-huh.

16        Q.      A murder during a burglary, I break into

17  someone's home and kill someone in the house.  Murder during

18  a kidnapping or rape, murder during an arson, an intentional

19  killing, also, murder of specific individuals like a police

20  officer on duty, fireman on duty, a prison guard on duty,

21  and murder of a child under the age of six, murder of more

22  than one victim, like a serial killer situation or a mass

23  murder situation, spree killer, that could be the situation,

24  or murder for profit like a hitman situation, doing it for

25  money.

1    But those are generally just the types of

2  cases that have been reserved for consideration of the death

3  penalty.  As far as that list goes, is that -- from your

4  personal point of view, do you agree with those cases?

5    A.    Yes, sir.

6    Q.    Let me go over another area which we call the

7  law of parties, but I think it's more commonly known as

8  accomplices.  You know, more than one person can commit a

9  crime and sometimes groups of people commit crimes.  The law

10  says that all those individuals, if they are actively

11  participating in the event, can all be held accountable,

12  even though some may have a greater role.

13    And the same is true with capital murder.

14  In fact, you may have one triggerman, but you may have other

15  individuals helping commit the crime and they could be held

16  accountable.

17    Let me give you an example.  The one I

18  use is Mr. Wirskye and I and another individual, three of us

19  get together and we decide we want to rob this bank.  We

20  plan it out.  And what we're going to do is, I'm going to go

21  in with a loaded gun.  Mr. Wirskye is going to go in with a

22  big bag.  And the other individual is going to be our

23  getaway driver.  He'll pull up outside, keep his car

24  running, look for trouble, warn us if it comes.  But he'll

25  keep it running, so we can get away quickly.

1      I take the loaded gun.  I run in there.

2  I point it.  Everyone gets their hands up.  Once I have them

3  under control, Mr. Wirskye comes in and he starts loading

4  the cash up.  And then for some reason during the course of

5  it, I intentionally murder someone in the bank, an employee.

6  Maybe I don't like the way they're looking at me or he warns

7  me that one is going for an alarm and I shoot them.  We

8  leave, we start to get away, but we're caught, let's say, a

9  few blocks away.

10      Now, obviously, under that scenario, I

11  could be prosecuted for the death penalty because I'm the

12  triggerman.  I caused the murder during a robbery.  The law

13  says, though, that Mr. Wirskye and the getaway driver could,

14  also, be prosecuted for capital murder and, depending on the

15  facts, even get the death penalty.

16      Now, we like to ask every juror how they

17  feel and their gut reaction on the situation where an

18  accomplice is prosecuted, because people feel differently.

19  You have some folks that tell us, I, from a personal point

20  of view, agree with the death penalty.  I would, also, just

21  reserve it for the triggerman or the person that causes that

22  death.  If an accomplice is involved, I might reserve a

23  strong prison punishment for him, but I don't think it's

24  fair to take a life, if they did not take one.

25      A.      Uh-huh.

1    Q.    You have other jurors who tell us, I'm for the

2    death penalty against the triggerman, but I can also feel

3    it's justified against an accomplice, also, depending on the

4    facts.  But I think it's just to be able to prosecute a man

5    and even for them to receive the death penalty.  People feel

6    differently.  There's no right or wrong answer, but we like

7    to get your reaction, regardless of what the law is, on how

8    you feel about that issue.

9    A.    Well, I think that if the accomplice made the

10   decision to go with the person who was going to carry a gun

11   into a situation and that risk is already there, then that

12   person should be held liable for the death penalty, too.

13   Q.    Just like the triggerman?

14   A.    Correct.

15   Q.    And when you say that risk is there, do you

16   mean the risk of him using it on someone?

17   A.    Right.

18   Q.    Okay.  The law allows us to prosecute an

19   accomplice in two ways.  One theory is if they're actively

20   involved and they are directing, aiding, or committing the

21   offense, although they're not the triggerman, they can be

22   found guilty.  The other kind of has similar languages to

23   what you brought out.  It's called conspiracy.

24        If people conspire, like my example, the

25   three of us, agree to commit bank robbery, and during the,

1    committing that crime, one of us commits another felony to

2    further it, and in my case, me shooting the teller, then

3    everyone involved in the crime can be found guilty, even if

4    they didn't have that specific intent like Mr. Wirskye

5    didn't have that specific intent to murder or the getaway

6    driver, they can still be found guilty, if the jury believes

7    they should have anticipated a death would occur.

8         A.    Uh-huh.

9         Q.    And you used the word that "risk" was there,

10   but I think that's probably what you're saying.

11        A.    That's exactly what I mean, yeah.

12        Q.    From all the facts, if they should have

13   anticipated a death could occur, then they can be found

14   guilty.  Now, they don't even have to have the specific

15   intent that that person die.  Now, to get to the death

16   penalty we do have to prove that they did anticipate.

17        A.    Uh-huh.

18        Q.    And, again, it's just the surrounding facts.

19        A.    Uh-huh.

20        Q.    But from your personal point of view, you

21   don't object to that, and I guess you would agree with the

22   law that that should be a viable option for the State?

23        A.    Yes, I'd agree.

24        Q.    Okay.  I can't get into the specific facts of

25   our case or what I think the facts will show, but I can tell

1    you that that's the type of law we are prosecuting this case

2    under, under the law of parties or this particular defendant

3    as an accomplice.

4         A.    Okay.

5         Q.    You don't have a problem with that or sitting

6    on a jury, if that's the type of case?

7         A.    No, I don't.

8         Q.    Okay.  Now, in Texas, a trial is divided into

9    two parts for a criminal case.  There's the guilt/innocence

10   stage and there's the punishment phase.  And in a death

11   penalty case, the jury decides the punishment.  The trial

12   you sat on, the judge may have.  There's an option there

13   that the jury or judge might.  But in these cases the jury

14   always decides punishment.

15              The guilt/innocence stage we have to

16   prove the indictment to you beyond a reasonable doubt.  If

17   we fail to do that, obviously, we all go home with a not

18   guilty finding.  But if we do prove it to you, we then move

19   to the punishment phase.

20              At that point in time you can get

21   additional evidence and then you get these questions, which

22   I'm going to go over more in detail in a minute, but

23   basically the State has to prove to you that the defendant

24   is a continuing danger to society, that he either caused the

25   death or anticipated that a death would occur, and there's

1   not sufficient mitigating evidence to warrant a life

2   sentence.

3                       But if the questions are answered yes,

4   yes, and no, then the Judge has no choice, he has no

5   discretion.  He would sentence the defendant to death.  If

6   they are answered any other way, again, he has no

7   discretion, he would sentence the defendant to life.  The

8   jury doesn't write death or life, but that's the outcome.

9   The Judge sentences just according to how they answer those

10  questions.

11          A.      Okay.

12          Q.      But those are the only two possible outcomes.

13  Is that clear to you?

14          A.      Yes, sir.

15          Q.      Are you familiar with the method of execution

16  in Texas?

17          A.      Injection.

18          Q.      Right, lethal injection.  You probably know,

19  also, from growing up here in Texas, that it's a punishment

20  that is actually carried out.

21          A.      Yes, sir.

22          Q.      Texas leads the nation in executions from all

23  the states.  You know, some states have it and don't enforce

24  it, or they put people on death row and they rarely, rarely

25  carry out executions for various reasons, but Texas does.

1          The procedures are the same in each case.

2    They would be the same in this case in that, if the

3    defendant were found guilty, those questions were answered

4    yes, yes, and no, the Judge would sentence him to death and

5    he would be placed on death row.

6          At some point in time, I couldn't tell

7    you when, the Judge would actually give an actual date of

8    execution.  And the day prior to that date, he would be

9    moved from death row and taken to downtown Huntsville where

10   there's the Walls Unit, and that's where all executions take

11   place by law.  You may have seen it on the news.  They

12   sometimes have protests out there.  There's a tower with a

13   clock.  I know I've seen it.

14          On the date of his execution, he's

15   allowed time with family, friends, a minister.  He's allowed

16   a last meal, but at 6:00 p.m. the executions always take

17   place.  There would be witnesses there.  There's a room for

18   witnesses from the victim's side, as well as visitors and

19   witnesses from the defendant's side in a different room.

20          Shortly before 6:00 p.m. the defendant

21   would be taken into the execution chamber which, again, is

22   often seen in photographs on the news, placed on a gurney,

23   secured there by straps, needles placed in his arm which

24   tubes go to another room where the executioner sits.  Once

25   the witnesses are brought in, he's given an opportunity for

1    a last statement and you may have read about these in the

2    paper or heard about these on newscasts.

3                        He can protest the death penalty, he may

4    yell out for his innocence, he may ask for forgiveness for

5    what he's done.  But the press, obviously, likes to play

6    that up quite a bit.  You may read about that, if you were a

7    juror in this case.

8                        But after that statement is read, the

9    warden simply signals the executioner, who then injects

10   three different types of lethal substances which force the

11   lungs to collapse, stops the heart, and he lapses into a

12   coma.  The process takes 10 to 15 seconds, the process you

13   probably may be familiar with, obviously, with your

14   background.  It's quite mechanical when they apply it.

15        A.      Uh-huh.

16        Q.      And I don't mean to go into that in that much

17   detail to be morbid, but, you know, it's one thing to talk

18   about the death penalty in a philosophical sense, and

19   another once you get on this panel and fill out a

20   questionnaire and you are called down here and you realize

21   you may be close to getting on a jury that makes those

22   decisions, because everyone feels differently about the

23   death penalty.

24                        We have some folks that are against it on

25   grounds and they can't serve and that's fine.  We send them

1  on.  We have other people that are really too much biased

2  for it.  We have others that are for it and feel they can

3  make the decision.  And we have others that are for it

4  philosophically, but are bothered by it, don't feel they

5  could make that decision.

6  　　　　A.　　　Uh-huh.

7  　　　　Q.　　　We can't preview the facts.  All we can do is

8  ask you from your own personal point of view, as best you

9  know yourself, do you feel you are the type of person that

10 if you sat on this type of jury and these things were proven

11 to you, that you could make that decision?  You could take

12 pen in hand and answer the questions in a way, knowing that

13 the defendant here would be executed someday?

14 　　　　A.　　　I think that I could make the decision.  I

15 think it would be with a great deal of thought, though.

16 　　　　Q.　　　Okay.  It wouldn't be something, I guess, you

17 would want to do?

18 　　　　A.　　　I wouldn't take it lightly, no.

19 　　　　Q.　　　Most jurors don't.  In fact, the ones that do,

20 we usually send on their way.  But you do feel, as best you

21 know yourself, you could make that decision?

22 　　　　A.　　　Yes.

23 　　　　Q.　　　Okay.  And would you be able to make that

24 decision, again, in a situation in which the State were

25 prosecuting the defendant in an accomplice situation?

1        A.      Yes, sir.

2        Q.      Okay.  We just kind of go into that detail,

3   because we want to know and let folks reflect.  But you seem

4   like the type of person that has thought about it, knows

5   yourself pretty well, and you are pretty confident you could

6   do that, then?

7        A.      Yes, sir.

8        Q.      Okay.  Anytime I get someone kind of from your

9   background, we always ask, because you've been in an

10  occupation that helps people --

11       A.      Correct.

12       Q.      -- especially from the medical profession.

13       A.      Uh-huh.

14       Q.      And sometimes people of your background do

15  have some objections to that.  But they usually let us know

16  that way ahead of time.

17       A.      Yeah.

18       Q.      But that's not your situation?

19       A.      Well, again, I would not take a decision like

20  that lightly.  It's not something that would -- I think in a

21  situation like that, you really have to separate your

22  emotions from the decision you are making.  So that's

23  something that would have to be done.

24       Q.      Okay.  Now, this case generated quite a bit of

25  publicity when it occurred and most of the jurors recall

1   seeing something about it in the radio or television or in

2   the newspaper, which doesn't make you ineligible to be a

3   juror.  But we always inquire as to what you recall about

4   the facts.

5        A.    I just vaguely remember the case.  I remember

6   the person who was killed was named Aubrey Hawkins.  I

7   remember seeing news reports.  I remember seeing his mother

8   on TV.  I remember the defendants, I believe, had broken out

9   of jail and there was a nationwide hunt.

10       Q.    Okay.  Do you remember anything about the

11  arrests?

12       A.    No, I don't.

13       Q.    Anything about any subsequent court

14  proceedings, anything like that?

15       A.    No, sir.

16       Q.    Okay.  Did you have any strong reaction to any

17  of that when it occurred, seeing the mother on TV or the

18  incident itself?

19       A.    No more so than I would on any other news

20  report.

21       Q.    Okay.  Again, just because you have seen

22  something on the media, doesn't mean you are ineligible.

23  What the rule comes down to is this.  If you are seated on

24  the jury, you have to make your decisions just on what you

25  hear in the courtroom from the witness stand, either the

1    witnesses or the evidence introduced.

2              We can't ask you to forget what you have

3    seen, obviously, but we can ask you and what you have to be

4    able to promise the Court you can do, is make your decisions

5    just based on the evidence.  In other words, you can't let

6    what you have already seen influence you in any way.  Do you

7    feel you could do that?

8         A.    Yes, sir.

9         Q.    Okay.  Let's talk for a minute, then, about

10   these Special Issues and I'd like you to just take a moment

11   to read Special Issue No. 1 to yourself.

12        A.    (Prospective juror complies.)

13        Q.    Question No. 1 asks the jurors to make a

14   prediction about the defendant, how they are going to behave

15   in the future.

16        A.    Uh-huh.

17        Q.    Do you feel that you can make that kind of

18   prediction, if you're given enough facts?

19        A.    Yes, sir.

20        Q.    What types of things would you want to know

21   before you answered that question?

22        A.    What the person's history is, had he ever

23   committed another crime before?

24        Q.    Okay.  Would that kind of show you a pattern,

25   that sort of thing?

1       A.      Yes, sir.

2       Q.      Okay.  Any other information you think would

3  be valuable to you?

4       A.      I guess the mental status of the person

5  involved.

6       Q.      Okay.  You mentioned such as, I know in the

7  questionnaire, severely mentally retarded individuals would,

8  obviously, cause a factor in it.

9       A.      Uh-huh.

10      Q.      And, in fact, I can tell you, severely

11 mentally retarded folks can't be prosecuted for the death

12 penalty now.  So that probably won't be an issue.  You may

13 have some people that are less educated, or slow, but that

14 level I think you are talking about, that probably wouldn't

15 be an issue.

16      A.      Okay.

17      Q       Well, you are right about background.  In this

18 portion of the trial, the punishment stage, if that type of

19 evidence exists, it is admissible.  If someone has committed

20 a prior crime, you can even hear from the witnesses, if they

21 are available.  You can hear about the type of sentence they

22 received, that sort of thing.  You can also hear good things

23 about that individual.  It's kind of good and bad, all their

24 background growing up.

25                 You, also, obviously, get to reconsider

1  the evidence of the crime itself and their role in the

2  crime, because you don't get to this question, unless you

3  found the defendant guilty.

4       A.     Okay.

5       Q.     Under the law that question starts out with a

6  no answer, and the State has to prove to you beyond a

7  reasonable doubt it should be answered yes.

8       A.     Okay.

9       Q.     Again, by you considering the evidence you

10  already heard and, also, by additional evidence you hear in

11  the punishment stage.  The words you see there, you're not

12  going to get legal definitions in that portion of the trial,

13  at least not on these questions.  So the words and their

14  meaning will be left up to you and the other jurors.

15            So we talk to everyone, how they view

16  that, some of the language.  We have to prove in that

17  question whether there's a probability the defendant would

18  commit criminal acts of violence.  What does "probability"

19  mean to you?

20       A.     That the person would be likely to commit the

21  crime again.

22       Q.     Okay.  Obviously, we don't have to prove a

23  certainty, because I don't think anything can be proved to a

24  certainty.  And we have to go more than a possibility,

25  obviously, because if it was as low as possibility, anything

1    would be possible.

2         A.    Uh-huh.

3         Q.    We have to prove he would commit "criminal

4    acts of violence."  When you see that in terms of that

5    question, what types of acts or crimes do you -- come to

6    mind?

7         A.    Criminal acts of violence would be involving

8    something where he injured another individual or killed

9    another individual.

10        Q.    Okay.  And then, finally, constituting a

11   continuing threat to society.  What does "society" mean to

12   you?

13        A.    The community that we live in.

14        Q.    Okay.  Could it be anyone and everyone the

15   individual comes in contact with?

16        A.    Yes.

17        Q.    Including people in the prison system?

18        A.    Yes.

19        Q.    Okay.  Do you feel that question No. 1 has a

20   lot to do with a person's, I guess, mind, how they, their

21   intent, that their mind is dangerous or not?  In other

22   words, they have the potential to act out, if they are given

23   that opportunity?

24        A.    Yeah, or their will.

25        Q.    Okay.  And, again, I guess from one of your

1    answers you feel a lot of that could be discovered, if you

2    see a continuing pattern and that sort of thing?

3         A.   Correct.

4         Q.   All that evidence can be used.  And what the

5    law requires is that there's no automatic answers.  In other

6    words, just because you found someone guilty, doesn't mean

7    that would be a yes.  You have to wait, reevaluate the

8    evidence, look at anything new, and then decide if it should

9    be answered yes.  Do you feel you could do that?

10        A.   Yes, sir.

11        Q.   All right.  Let's look at question No. 2 and

12   just take a moment to read that to yourself.

13        A.   Okay.

14        Q.   This is that question that has to do with that

15   law of parties or the accomplice situation.  It also starts

16   out with a no answer and you use the evidence in the

17   guilt/innocence stage, as well as any new background

18   evidence you hear about the individual, to make this

19   decision.

20             It covers -- well, the first part of the

21   question asks whether the defendant actually caused the

22   death of the deceased.  If you think they are the actual,

23   let's say, triggerman, or caused the death, obviously, the

24   question is answered that way.

25             But the rest of the question covers that

1    accomplice situation we've gone over.  That is, if they

2    didn't actually cause the death of the deceased, but

3    intended to kill the deceased or another.  So if they had

4    that intent or they anticipated that a human life would be

5    taken, you would answer that question yes.

6                    Now, as you recall in the guilt/innocence

7    stage, we have to prove or the facts would show that they

8    should have anticipated.  And here we see language that they

9    did anticipate, so there's a difference there.

10         A.    Okay.

11         Q.    What that difference is, is kind of up to you

12   and the other jurors.  You just have to be able to see a

13   difference and view the question that way.  Do you feel you

14   could do that?

15         A.    Yes, sir.

16         Q.    Again, it kind of goes back to what you said

17   in the fact situation we were looking at and what you

18   thought was important about accomplices.  If there was a

19   risk there that a life could be taken, you felt that, yes,

20   the death penalty could apply.

21                    We can't stop and open a person's mind

22   and show you what their intent was, obviously.  All we can

23   do is put on all the relevant evidence, show you what their

24   role is, maybe from independent witnesses, maybe from other

25   sources, and you can draw inferences what a person's intent

1  is.  You can use your common sense.

2       A.       Uh-huh.

3       Q.       We call making, sometimes we say, using

4  reasonable deductions.

5       A.       Uh-huh.

6       Q.       Basically, it's just using your common sense

7  to determine what a person's intent is from their actions

8  and all the surrounding facts.  Do you feel you could do

9  that?

10      A.       Yes.

11      Q.       That's something you probably do in your

12  everyday life, determining a person's intent, and nothing

13  different here with all that, you know.  What kinds of

14  things do you think would be important about determining a

15  person's intent in this --

16      A.       I didn't hear what you said.

17      Q.       What do you think would be important to you or

18  what could be potentially important in determining a

19  person's intent in these situations?

20      A.       Repeat the question one more time.

21      Q.       Any ideas about what you might view as types

22  of factors would be important to you in determining a

23  person's intent in the situation of question No. 2?  I know

24  we talked about if the risks were there.

25      A.       Well, I think if the person decided to put

1   himself in that place at that time with those individuals,

2   that would be something that I would want to know.

3       Q.   Okay.  If it was a voluntary act?

4       A.   Right.

5       Q.   How involved they were with the other

6   individuals?  How well he knew the other individuals, that

7   sort of thing?

8       A.   Yes.

9       Q.   Okay.

10      A.   Or the reason why he was there in the first

11  place.

12      Q.   Okay.  Sure.  That would go a lot to their

13  intent.  You know, sometimes we have jurors tell us, well, I

14  would like to know if they had a meeting ahead of time.

15      A.   Uh-huh.

16      Q.   Which I guess everybody would, but usually the

17  State is not called to those meetings, so we usually can't

18  produce that type of evidence.  And that's why we rely on

19  inferring intent from actions.  And you feel comfortable

20  doing that?

21      A.   Uh-huh.

22      Q.   Okay.  Now, this last question is a little

23  different.  We don't have the burden of proof.  It can,

24  neither side has the burden of proof, actually, and it

25  allows the jurors to look at everything.  If you'd just take

1   a moment to read that question to yourself.  That question

2   gets kind of lengthy.

3         A.     (Prospective juror complies.)  Yes.

4         Q.     And I should have told you beforehand, I

5   always like to kind of give everyone notice that we didn't

6   get together and write these questions out.  The Legislature

7   did.  Because that one, I read it a thousand times and it

8   still gets me confused sometimes.  But it has the jury --

9   the jury doesn't get to it, unless you have already found

10  the guy guilty, found that he's a continuing threat, and

11  found that he either caused the death or had that intention

12  or that anticipation.

13              But it does allow a jury to look at a

14  person's background and their role in the crime, and if you

15  think that a life sentence should be served rather than a

16  death sentence, you can answer the question that way, if you

17  think there is sufficient mitigating evidence.  He doesn't

18  walk free, obviously.  He has to serve this life sentence.

19              What mitigating evidence is, is going to

20  be up to you.  I can't tell you what it's going to be and

21  the Court is not going to tell you what it's going to be.

22  It's up to you and the other jurors.

23        A.     Okay.

24        Q.     You don't even have to tell us what you think

25  mitigating evidence is.  You just have to be able to promise

1   the Court you can keep your mind open to it.

2        A.    Uh-huh.

3        Q.    As you sit here today, though, we like to

4   always get a gut reaction.  Can you think of anything as you

5   sit there that you might view as potentially mitigating

6   evidence?  Or types of evidence you might view as

7   potentially mitigating?

8        A.    Well, when you say mitigating, do you mean

9   evidence that would cause me to change my opinion about the

10  death penalty?

11       Q.    Yes.  Evidence that would cause you to say,

12  well, I know this person is dangerous, but I think maybe a

13  life sentence --

14       A.    Would be more appropriate.

15       Q.    -- would be the right thing to do in this

16  case.

17       A.    If the person was found not to have any choice

18  in where he was or who he was associating with or that type

19  thing, in other words, if he was not there by his own free

20  will.

21       Q.    Okay.  That's a point a lot of jurors have

22  brought up and I should have gone over this ahead of time.

23  If a person is not there by his own free will, then that

24  might be a defense, actually.

25              And in that case it wouldn't be

1   mitigating, because we probably would, if that were the real

2   fact situation, we probably wouldn't have gotten a guilty,

3   because if it could actually have been proven on a juror's

4   mind they believe they were there by coercion, such as a

5   hostage situation, then there probably wouldn't be a guilty.

6   That would be a defense, so that would actually be a

7   different situation.  But other jurors have told us, maybe

8   if the person had a lesser, you know, maybe --

9        A.     Background.

10       Q.     You brought up mitigating as far as

11   substantially mental retardation.  You may not have that

12   far, but you may have someone who is a lot slower --

13       A.     Uh-huh.

14       Q.     -- and not as actively involved, and that

15   might be a situation.

16       A.     Mitigating, I see.

17       Q.     But, again, you are not required to think of

18   it.  In fact, most jurors tell us they can't.  They actually

19   don't sit around thinking about these situations, at least

20   we hope they don't.  Background does come up, obviously.

21       A.     Uh-huh.

22       Q.     And, again, jurors don't have to agree.

23   Sometimes in these cases you hear about the way a person was

24   raised, maybe they came from a poor background or a broken

25   home.  Maybe they were physically abused, mentally abused,

1   maybe both, could be severe.

2              We've had -- some jurors will tell us,

3   you know, abuse like that I might view as potentially

4   mitigating, if it's severe.  We have other jurors say, I

5   feel really bad for that person.  But once you are an adult,

6   you have to make decisions and there are certainly plenty of

7   people that come from a bad background and they don't commit

8   capital murder.  But there's no right or wrong answer.  Do

9   you have any opinions about that type of background?

10       A.    I don't think that that would sway the -- I

11  don't think that would be mitigating.

12       Q.    Okay.  A lot of people tell us that, because

13  there have been so many examples of people overcoming that.

14  But, again, it's just -- depends on what it is.  You know,

15  it may be something the State shows you, maybe something the

16  defense shows you.

17              But wherever it comes, you have to be

18  able to keep your mind open to it and if you think it rises

19  to that level of mitigation, you can answer it so that a

20  person's life would be spared.  It allows you to show some

21  mercy.

22       A.    Okay.

23       Q.    Do you feel you can keep your mind open to

24  that type --

25       A.    Yes.

1      Q.      And give a yes answer if you thought that was

2  the right thing to do?

3      A.      Absolutely.

4      Q.      Okay.  Vice-versa, if you thought that there

5  wasn't sufficient mitigating evidence, would you be able to

6  answer no, knowing when you did that, it would be a death

7  sentence?

8      A.      Yes.

9      Q.      Okay.  Fair enough then.  You feel like you

10 could keep your mind open to it and give it fair weight?

11     A.      Yes.

12     Q.      Okay.  Sometimes in the punishment phase you

13 hear from experts.  Sometimes the defense calls them,

14 sometimes the State even calls them.  These experts are

15 usually psychologists, psychiatrists.  They can give

16 opinions about whether they think someone is a future

17 danger.  They may give opinions about mitigation.  Maybe

18 they specialize in that or they will have opinions about why

19 a person acts a certain way because of their background.

20              Some jurors give a whole lot of weight to

21 those experts.  They really think they have a lot of value

22 and would really follow their advice.  We have other jurors

23 that really don't put a whole lot of stock in it.  They feel

24 you could probably, they call it, I think the term is a

25 "soft science" --

1    A.    Uh-huh.

2    Q.    Feel if you looked hard enough or had enough

3  money, you could find someone that would render an opinion

4  one way.  And then we have other jurors that would just look

5  at that like any other witness, not necessarily give them

6  greater weight or less weight, but just another piece of the

7  puzzle.

8    A.    Uh-huh.

9    Q.    How do you feel about those types of experts?

10    A.    I think I would fall into that third category

11  you described.  You know, certainly, if you've got a person

12  who's dealt with these situations or what he -- is an

13  educated person in his area, his opinion is something that's

14  going to be important, but I don't think that it's

15  necessarily going to sway you one way on the other.

16    Q.    Have you had much dealings with these types of

17  experts in your field?

18    A.    I've known people who served as expert

19  witnesses.

20    Q.    What types of expert witnesses were they?

21    A.    Medical doctors.

22    Q.    Okay.  But not psychologists or --

23    A.    No.

24    Q.    Okay.  Do you also feel that there could be

25  some people in these fields that they just -- they make a

1  living doing this and --

2       A.     Yes.

3       Q.     And make a good profit from it and you

4  wouldn't value as much?

5       A.     Right.  You'd consider their motivation.

6       Q.     Just going to depend on the individual

7  witness?

8       A.     Yes.

9       Q.     Okay.  That's kind of what the law conceives

10 jurors to do, keep their mind open to it.  Obviously, you

11 can have your opinions one way or the other, but you feel

12 you can keep your mind open to that, as well as any other

13 evidence?

14      A.     Yes.

15      Q.     Okay.  The whole idea, I guess, is you would

16 be able to keep your mind open to all these issues, wait for

17 all the evidence to come in, and then make sure the State

18 has proven the first two to you beyond a reasonable doubt,

19 and then fully look at the last issue and can answer it yes

20 or no, just based on the evidence?

21      A.     Yes.

22      Q.     Do you feel you could do that?

23      A.     Yes.

24      Q.     All right.  Do you have any questions over

25 anything we've gone over?

1    A.    I don't think I do.

2    Q.    Okay.  I went over it pretty quick, but you

3  followed it very well.  Is there anything -- one question we

4  like to ask at the end is if is there anything we may have

5  missed that you think would be important for the parties,

6  we'd want to know about you, if you were sitting here on

7  either side of the table?

8    A.    Um, no, sir.

9    Q.    We covered it pretty good here in the

10 questionnaire, I know, so.

11   A.    It's been thorough, yes.

12   Q.    Let me go over one other area.  These apply to

13 all criminal cases and you will be familiar with these

14 because you have sat on a criminal trial before.

15 Presumption of innocence.  Just because someone has been

16 arrested or we're going through this process is not evidence

17 of their guilt.  A jury must start out that defendant with

18 that presumption and the State must overcome it.

19   A.    Uh-huh.

20   Q.    Do you feel you could do that?

21   A.    Yes, sir.

22   Q.    Okay.  The burden of proof is on the State --

23   A.    Uh-huh.

24   Q.    -- and it never leaves the State.  In other

25 words, it never shifts to the defense.  You might anticipate

1   they may prove or put witnesses on, but you can't require

2   them to.  At the end of the trial, if they didn't put on any

3   witnesses and you had a reasonable doubt, you would have to

4   find the defendant not guilty because that burden of proof

5   never shifts.

6          A.     Okay.

7          Q.     Do you feel you could do that?

8          A.     Yes.

9          Q.     And that burden of proof goes to each and

10  every element of the indictment.  We write the indictment as

11  prosecutors and then we're required by law to prove to you

12  beyond a reasonable doubt that each element has been proven

13  to you.  If we fail in just one element, under the law you

14  are obligated to find the defendant not guilty.

15         A.     Okay.

16         Q.     An example I give is, an easy one is, we have

17  to prove the identity, who committed this murder.  If you

18  had a reasonable doubt about that, obviously, you would find

19  him not guilty.  But just as important under the law is the

20  county.  Let's say Dallas County.  If we proved everything

21  else to you, but maybe it was one of those cases that

22  happened near the border and you thought it was in Tarrant

23  County or Ellis County, that would be a reasonable doubt.

24         A.     Uh-huh.

25         Q.     And if you had a reasonable doubt even on that

1   element, you would have to find him not guilty.  Now, you

2   may not like it.  Some people view it as a technicality, but

3   under the law it's not.  And as a juror you can't go out and

4   help us out.  You have to be kind of like an umpire in a

5   baseball game, call the balls and strikes as you see them.

6             We could probably be fired, if we bungled

7   the case that badly.  But you wouldn't be able to help us

8   out.  And I don't anticipate that to happen.  But that's the

9   example I use, just to demonstrate that concept.

10       A.    Okay.

11       Q.    Do you feel you can follow that particular

12  rule of law?

13       A.    Yes.

14       Q.    Fifth Amendment rights.  Anyone charged with

15  an offense, if they want to testify, they can, no one can

16  stop them.  But if you choose not to testify and you are a

17  defendant, the Court would instruct you that you can't hold

18  that against them, because there could be many reasons why a

19  person may choose not to testify.

20            He may be poorly educated or very

21  nervous, maybe not perform well in front of folks, might

22  look guilty when he's not.  He may be following the advice

23  of his lawyer who simply instructs him not to and he doesn't

24  want to quarrel with the lawyer.  They should know better.

25  He may be real guilty and look real guilty under cross.  So

1  there's a lot of reasons.  The law takes care of that by

2  telling the jurors you can't hold that against him.

3          A.      Okay.

4          Q.      Do you feel you could do that?

5          A.      Yes, sir.

6          Q.      Police officers often testify in criminal

7  cases.  And I think most jurors respect the job they do, but

8  you can't start them out ahead of any other witness.  You

9  have to wait and judge them like you would anyone else once

10 they testify.  Do you feel you could do that?

11         A.      Yes, sir.

12         Q.      And, finally, our parole laws, you may have

13 heard, they get in the news sometimes.  And the Judge would

14 instruct you in a capital case that a capital life sentence

15 equals forty calendar years before a person becomes

16 eligible.  And that doesn't mean they would be paroled at

17 that point in time.

18                 But he would also instruct you that you

19 can't consider that or any other parole laws in your

20 deliberations.  You just have to consider a life sentence, a

21 life sentence.  Do you feel you could do that?

22         A.      Yes.

23         Q.      Okay.  Well, Ms. Sims, I have, I think,

24 exhausted everything I can talk to you about.  But I

25 appreciate your patience with me.

1      A.      Thank you.

2              THE COURT:  Ms. Busbee?  You're only

3  halfway done.

4              PROSPECTIVE JUROR:  Oh, okay, I'm sorry.

5              CROSS-EXAMINATION

6  BY MS. BUSBEE:

7      Q.      Well, actually, you're more than halfway done.

8  Mr. Shook gets to explain a lot of things to you, which

9  makes my job easier and less lengthy because you already

10 know the scheme.  What did your son study in college?

11 What's he taking?

12     A.      Well, he spent two years at Texas Tech and

13 studied some basics, English, and that type thing, but has

14 not continued to go to college.

15     Q.      Is he planning on a career?

16     A.      He is.  He's joined the Naval Reserve and he's

17 thinking about aeronautics.

18     Q.      I notice that your father is an architect and

19 your husband is a CPA, so did he get that numbers ability

20 from him?

21     A.      No, I think he shies away from that.

22     Q.      Oh, I understand that.  Um, I know, I can tell

23 by seeing you and actually most people do, that you gave

24 this a lot of thought before you came down here.  And you

25 seemed kind of worried when you walked in.

1          We don't tell people how this works, I

2   guess by design, before we ask them their opinions because

3   how your gut feels about a certain thing, in a case like

4   this, we're not talking about do you pay the money or, you

5   know, do you get probation or do you do some time in jail.

6   This is just emotional.  I think you said something about

7   that either in your questionnaire or otherwise.  Um -- and

8   on balance it seems like you understand it.

9          Most people when we start talking to them

10  before we explain it to them, they are under the impression

11  that when someone is convicted of capital murder, that it's

12  a death penalty.

13          A.     Uh-huh.

14          Q.     But in actuality the law is it's a life

15  sentence and it's automatic and the law favors that.

16          A.     Uh-huh.

17          Q.     And I guess what I'm going to be asking you,

18  or the theme of these questions, just to lay it on the table

19  is, if you can set aside whatever feelings you had about it

20  before, and I may be over characterizing them, and give

21  effect to this scheme as a juror on this case, because

22  there's no problem with it, if you really are so strong a

23  proponent of the death penalty punishment that you would

24  have trouble doing it.  And if you tell me that you would

25  not have trouble dealing with it, doing that, I would

1  believe that as well.

2                        So I guess that's my question.  Sitting

3  on a hypothetical death penalty jury, if, once you found

4  someone guilty of the offense of capital murder, would you

5  be able to give effect to the law?  In other words, know

6  that, knowing and follow the law that a life sentence is

7  what that individual will receive unless the State proves to

8  you these additional elements?

9       A.    I would be comfortable with that, yes.

10      Q.    Okay.  Good enough.  And, actually, I'm just

11  kind of following up on this, because sometimes Mr. Shook

12  asks questions as, did that seem right to you or do you

13  think you can follow that?  But I'd like to pin you down a

14  little bit more, if I could.

15      A.    Okay.

16      Q.    Sitting on a hypothetical death penalty jury,

17  having decided with your peers that Special Issue No. 1 and

18  2 were yes beyond a reasonable doubt, could you give effect

19  to Special Issue No. 3?  In other words, really consider a

20  life sentence based on things that you heard in the trial?

21      A.    Yes.

22      Q.    Okay.  That's fair enough.  Now, asking

23  generally, more specifically, do you feel like you have

24  formed any opinions about what should happen in this case

25  before you have heard any evidence?

1      A.      No.

2      Q.      Okay.   You understand why we have to have --

3  these questions are so individual to a person, it really

4  requires a separate jury to just determine the ins an outs

5  of every issue and each individual actor in a death penalty

6  case.

7      A.      Uh-huh.

8      Q.      Okay.   Fair enough.   Well, see, I told you it

9  wasn't going to be as long.   I just wanted to make sure in

10 my mind that I had heard your answers correctly and it seems

11 to me like you will make the State prove their case and

12 follow the law and that's all we can ask for, so --

13             MS. BUSBEE:   Your Honor, I have no more

14 questions of this juror at this time.

15             THE COURT:   Ma'am, if you will be so kind

16 and wait for us outside the courtroom and we'll have you

17 back in just a few moments.

18             PROSPECTIVE JUROR:   Yes, sir.

19                  [Prospective juror out]

20             THE COURT:   What says the State on juror

21 5156, Ms. Sims?

22             MR. SHOOK:   We have no challenges for

23 cause.

24             MS. BUSBEE:   We have no challenge for

25 cause, Your Honor.   Could I have a minute with my client

1    here?  Your Honor, cognizant of the -- wait, we haven't done

2    this part, have we?  We haven't done the strikes yet, have

3    we?

4                        THE COURT:  No.

5                        MS. BUSBEE:  Okay.  Sorry, got ahead of

6    myself.

7                        THE COURT:  Mr. Shook, what says the

8    State?

9                        MR. SHOOK:  We'll accept the juror.

10                       MS. BUSBEE:  Your Honor, cognizant of the

11   fact that we have exhausted our preemptory challenges, an

12   additional one the Court has granted us, we petition the

13   Court for an additional preemptory challenge in order to

14   exercise it against Ms. Sims pursuant to the grounds I

15   requested on Thursday which would be the first, Article 1,

16   Section 10, of the Texas Constitution, and Sixth and

17   Fourteenth Amendments of the United States Constitution and

18   in the spirit of equity.

19                       THE COURT:  Let me see counsel in my

20   office.

21                       (Recess)

22                       THE COURT:  Ms. Busbee, Mr. Murphy, your

23   motion for additional challenges is denied.  Ms. Sims shall

24   become juror No. 12 on this case.  Have Ms. Sims come in,

25   please.

1                    [Prospective juror in]

2                    THE COURT:  Thank you.  You may be

3    seated.  Ms. Sims?

4                    PROSPECTIVE JUROR:  Yes, sir.

5                    THE COURT:  I'll instruct you that you

6    have been placed on this jury.

7                    PROSPECTIVE JUROR:  Okay.

8                    THE COURT:  Now the hard part comes.  You

9    get worried about coming down here and participation for the

10   voir dire and now you're leaving here, knowing that you are

11   going to be actually sitting on this jury and making a

12   decision in this case.  What you are going to have to do is

13   go back and tell your employer that you're going to need two

14   weeks off beginning on November 10th.  Now, what will happen

15   if you share with them what you are going to be doing?

16                   PROSPECTIVE JUROR:  Well, I will have to

17   cancel my schedule, basically, and --

18                   THE COURT:  I understand, but if you tell

19   them, I'm going to be a juror in this particular case, they

20   will typically offer their opinions, or if you tell your

21   friends or even your husband, because the lawyers are very

22   satisfied with your opinions.  What we do not need is anyone

23   else's opinion, or, well, let me tell you what I would do,

24   dada, dada, dada.

25                   We just cannot, you have to put the

1    blinders on.  And you have told us -- you have taken an oath

2    thus far to tell the truth as a juror, that you would

3    truthfully answer all questions propounded to you concerning

4    your qualifications to serve this Court.  The next oath you

5    will take is, I will swear to make my decisions from the

6    evidence that I hear from the witness stand, let nothing

7    from the outside have any influence on me whatsoever.

8    That's why they went through the drill about the meeting.

9                    Everything that you learn about this case

10   comes from that witness stand.  So I have given you some

11   written instructions there that you will take with you today

12   and I have another document that will be printed in just a

13   moment from my office, since my computer is not

14   communicating well, and you will spend some time with the

15   Sheriff going through some other things to get you up to

16   speed on.

17                    The bottom line is, I will not waste your

18   time when we get in the trial.  I will have you down here

19   for one more short session, most likely the week before this

20   trial shall begin.  I cannot do that until we have all 12

21   members in this jury box.  I have to have everybody here all

22   at once to go through certain things, the last preliminary

23   hearing we will have.

24                    The reason I do that is so that Monday

25   morning, the 10th, you will be here and know everything that

1   is going to happen and you will be in that box and we'll

2   start the trial at 8:30.  How many times have you -- you've

3   been on a jury twice before?

4                   PROSPECTIVE JUROR:  Yes.

5                   THE COURT:  Especially a civil jury, how

6   much time do they waste over at that courthouse?

7                   PROSPECTIVE JUROR:  Uh-huh.

8                   THE COURT:  Right?

9                   PROSPECTIVE JUROR:  Yes.

10                  THE COURT:  You won't find it over here.

11                  PROSPECTIVE JUROR:  Okay.

12                  THE COURT:  In fact, I've been told that

13  I work too much and even had jurors go, please, let us have

14  a break.  Because I'm going to -- I work.

15                  PROSPECTIVE JUROR:  Okay.

16                  THE COURT:  We're using your time, so I'm

17  not going to waste it.

18                  PROSPECTIVE JUROR:  Okay.

19                  THE COURT:  In return I ask you to follow

20  some rules.  And the number one rule is, just don't talk

21  about this case, period.

22                  PROSPECTIVE JUROR:  Okay.

23                  THE COURT:  After it's all over, you can

24  talk to whomever as long as you want.  Now, on that line of

25  thought, from this point forward, if you see me or the

1    lawyers involved in this case in the back, in the hallway,

2    wherever, we're going to be rude to you.  And you're not

3    going to get so much as a good morning or hello out of me.

4                          There's a reason for that.  It's called

5    the appearance of impropriety.  Because if someone were to

6    view myself or anyone else having a conversation with a

7    juror and wasn't able to hear like, well, what time is it,

8    or, you know, we're going to have a lunch break today, it

9    may be completely benign, but if they were unable to hear

10   and they see us communicating, then it's open for

11   speculation.  So you won't even see me communicate with a

12   juror, period.  I want you to understand why I'm being rude,

13   same as the lawyers.  There's a reason for it.

14                          Now, who you do communicate with is the

15   Sheriff.  The bailiff, Ms. Duron, over here, she takes care

16   of the jury better than anybody else down here.  So she's

17   going to visit with you in the back about some other things.

18   And as soon as I get this document printed, she will have

19   that to go over with you.

20                          And as soon as I know, because I don't

21   have this jury completed yet.  As soon as we know what day,

22   we'll give you plenty of notice and have you back down here

23   for probably about an hour.  And we'll start Monday morning,

24   November 10th, okay?

25                          PROSPECTIVE JUROR:  Okay.

1    THE COURT:  Now, I know I've given you a

2  lot to think about.  Do you have any questions of me or

3  concerns?

4    PROSPECTIVE JUROR:  Not at this point.

5    THE COURT:  You know you will as soon as

6  you walk out.

7    PROSPECTIVE JUROR:  I'm sure I will.

8    THE COURT:  And you've got Sheriff Bryan

9  Cook's phone number, the one that was on the letter I sent

10  you.  You can communicate with the Sheriff, but not the

11  Court.

12    PROSPECTIVE JUROR:  Okay.

13    THE COURT:  So if you would, retire to

14  the jury room and I'll have that document printed in just a

15  moment.

16    [Prospective juror out]

17    THE COURT:  Back on the record.  The

18  Court, now having seated twelve jurors in this matter,

19  pursuant to Article 33.011, the Court intends to seat two

20  alternate jurors pursuant to Article 35.15 of the Code of --

21  35.15(d), Code of Criminal Procedure, each side is entitled

22  to one additional preemptory challenge in addition to those

23  otherwise allowed by law, if I seat one or two alternate

24  jurors.  Does the State concur?

25    MR. SHOOK:  Yes.

1          THE COURT:  Defense?

2          MS. BUSBEE:  Yes, Your Honor.

3          THE COURT:  Sheriff, would you be so kind

4    as to ask Mr. Campbell to come in.

5                    [Prospective juror in]

6          THE COURT:  Good afternoon, sir.  How are

7    you?

8          PROSPECTIVE JUROR:  Good afternoon, I'm

9    fine.

10          THE COURT:  For the record, we've got

11    juror No. 5120, Edward M. Campbell, Sr.; is that correct?

12          PROSPECTIVE JUROR:  That is correct, Your

13    Honor.

14          THE COURT:  Mr. Campbell, have you had an

15    opportunity to review the guide I provided for you this

16    afternoon?

17          PROSPECTIVE JUROR:  Yes, sir, I have.

18          THE COURT:  I also see you have looked at

19    your questionnaire and folded it up and ready to move on; is

20    that correct?

21          PROSPECTIVE JUROR:  Yes, sir.

22          THE COURT:  All right.  Good.  The

23    attorneys are going to visit with you about that

24    questionnaire and they may ask you to explain some of your

25    answers or to expound on them.  The law I gave you is to

1   help you to begin to think about the issues that are

2   concerning this case.

3              You don't have to have a complete

4   knowledge of it at this point.  That's what this interview

5   is all about, as the attorneys will visit with you about the

6   law.  At the end of the process, we want you to have a good,

7   working, functional understanding of the law.  If you don't,

8   then we need to back up and try again.

9              The Court has two questions that I must

10  ask at the end of this session.  Number one is, do you, in

11  fact, understand the law?  And number two, can you follow

12  the law?  That's the big picture I have to look at.  The

13  only question I have for you now, sir, is will you be able

14  to serve this Court for a period of two weeks beginning on

15  November 10th?

16             PROSPECTIVE JUROR:  Unfortunately, yes,

17  Your Honor.

18             THE COURT:  With that, I'll turn it over

19  to Mr. Wirskye.

20             MR. WIRSKYE:  May it please the Court?

21             EDWARD CAMPBELL, SR.

22  having been duly sworn, was examined and testified as

23  follows:

24                 DIRECT EXAMINATION

25  BY MR. WIRSKYE:

1        Q.      Mr. Campbell, how are you this afternoon?

2        A.      I'm fine, sir.

3        Q.      Thank you for bearing with us as the afternoon

4   is growing long, but we appreciate your patience.  My name

5   is Bill Wirskye.  I'll be the Assistant DA that will be

6   visiting with you for the next few minutes.

7                        What I'd like to do is follow up on some

8   of that information that you were kind enough to provide in

9   that lengthy questionnaire we had you fill out, talk to you

10  a little bit about your thoughts and feelings about the

11  death penalty, then maybe talk to you a little bit about

12  some of the laws and the rules that apply in this sort of

13  case where the State is seeking the death penalty.

14                       So tell us what line of work you're in.

15  I know you said you sold fiber optic lighting?

16       A.      Basically, I have downsized from the fiber

17  optic lighting company.  I started a small installation

18  company a couple of years ago, so I'm semi-retired.

19       Q.      Okay.  And do you work a full day, or --

20       A.      No.

21       Q.      Okay.  What do you do on a day-in, day-out

22  basis?

23       A.      I sit on my boat.

24       Q.      Okay.  What kind of boat do you have?

25       A.      Forty-four foot houseboat.

1      Q.     Okay.  What lake?

2      A.     Lake Grapevine.

3      Q.     Okay.  Let's see.  We also ask people, you

4  know, if they've known anyone that has had any contact with

5  the system.  And I think you indicated that you had a

6  brother, Bill Campbell, back in 1979 in Indiana --

7      A.     That's correct.

8      Q.     -- had a drug case.  What do you remember

9  about that?

10     A.     I really don't know that much about that

11 particular situation.  He was caught in Indiana with a large

12 amount of Valium, I think.  He passed away eight, ten, years

13 ago, so --

14     Q.     Okay.  As far as you know at the time he was

15 treated fairly by law enforcement, that type thing?

16     A.     To the best of my knowledge, yes.

17     Q.     Okay.  Now, you told us you're generally in

18 favor of the death penalty; is that right?

19     A.     In certain situations, yes.

20     Q.     Okay.  What type of certain situations come to

21 mind when you think about an appropriate case for the death

22 penalty?

23     A.     I probably would have to say in a case that

24 involved murder or anything of very severe instances against

25 children.

1        Q.      Okay.  And we hear that quite a bit, murder

2   cases and child abuse cases, that type thing?

3        A.      That's correct.

4        Q.      Also, if you could, I know you've got your

5   questionnaire in front of you, on the bottom of page 3 we

6   asked a question, and it's not the most clearly worded

7   question, I know, but the very last question, do you agree

8   with the law in the State of Texas that a murder while in

9   the course of robbery is a capital offense, one for which

10  you can get the death penalty, and you marked no.  And I was

11  just kind of curious to follow up with you up on that.

12       A.      Well, I was curious when I reread that why I

13  did that myself.  I do not have a good answer for that one.

14       Q.      It's a confusing question.  I know you got a

15  chance to look at the packet of the law that the Judge has

16  given you.  Obviously, in Texas, hopefully it's clear from

17  the packet, that we reserve the death penalty just for

18  murder cases and then only a certain subset or certain type

19  of murder case.

20              If you kill a police officer, a fireman,

21  prison guard on duty, murder in the course of another felony

22  like robbery, burglary, rape, mass murder, serial murder, if

23  you kill a child under six, those are the type cases in

24  Texas that we reserve the option of the death penalty for.

25              Is that something that is pretty much in

1    agreement or are you in accord with that list of the type

2    offenses?

3         A.     I am.  And if I had this to do over again,

4    that was just a quick trying to get out of the room answer

5    to my questions.

6         Q.     I certainly understand that with the 17-page

7    questionnaire.  Also, on page 4, the very next page, we

8    asked you, a little above the middle of the page, do you

9    ever think the death penalty is misused, and you checked

10   yes.  I just kind of wanted to follow up with you on that.

11        A.     You know, just I had heard some things through

12   the television and media where people had been charged with

13   the death penalty or incarcerated and then, through some

14   process, were able to prove DNA or whatever to get them out.

15        Q.     Any specific case that you are thinking of?

16        A.     No, no specific cases at all.

17        Q.     Okay.  Would that be a concern of yours

18   possibly being a juror on a capital case like this?

19        A.     No, it would not.

20        Q.     Okay.  And then, finally, I guess the second

21   to the last question, we asked what would be important to

22   you in determining whether a person received a death or a

23   life sentence in a capital case and you said his or her

24   proven involvement.  And I was just kind of curious to

25   follow up with you on that, what exactly you meant by that.

1     A.     Excuse me, where are we?

2     Q.     Page 4, second to last question.

3     A.     Oh, page 4, you said second to last question,

4 so I went to the end of the book.

5     Q.     Page 4, second to the last question, what's

6 important to you in deciding whether a person receives life

7 or death?

8     A.     I don't follow directions very well,

9 apparently.  Oh, I guess I was trying to say is, I mean, if

10 there was proof that there was involvement, then I would be

11 much in favor of it.

12     Q.     Okay.  Let me ask you one more question to

13 kind of follow up on that answer, but on the next page, page

14 5, we asked you kind of the first thing that pops into your

15 head when you think of prosecutors and defense lawyers, and

16 it looked like you had the same answer for both.  You said

17 tangled truth tellers.  I'm just kind of curious, asking for

18 both sides of the attorneys here, just kind of what you

19 meant by that?

20     A.     I think you gentlemen and ladies have tough

21 jobs, and I think when you have your jobs, you have to

22 stretch the truth in certain areas to make your points

23 across, and you have to sell your side of it.  And sometimes

24 I think it has to be very difficult on all your parts.

25     Q.     Okay.  Is that something if you were a juror

1   in this case, you would expect from both sides, a little bit

2   of the truth stretching?

3        A.    Well, I think it's more of a debate at that

4   point.  I mean, you can take one side of it today and she

5   can take the other side of it tomorrow and then have to swap

6   places the next week.  So I think I understand what you

7   ladies and gentlemen have to do for a living.

8        Q.    Well, I think, you know, speaking for both

9   sides, obviously, we're concerned, we don't want somebody

10  over there in the jury box that thinks we're stretching the

11  truth for either side.

12       A.    You know, that was just a candid response.

13  You know, it's just I think attorneys have to defend people

14  that are, you know, that they know are guilty, and you are

15  trying to make sure that they get a fair shake.

16       Q.    You can imagine the variety of responses we

17  get on these questionnaires.

18       A.    I can.

19       Q.    Let me follow up with you a little bit on the

20  death penalty.  You had mentioned, you know, proof of the

21  person's involvement.  And one area we always talk to every

22  potential jury about is, basically, the law of accomplices.

23  We call it the law of parties in Texas, but, basically, it's

24  this.  You know, oftentimes crimes can be committed by more

25  than one person.  A group or a gang of individuals can

1  commit a crime.

2          The law allows us to prosecute everyone

3  for that crime that's actively involved in the crime.  And

4  when you take a scenario like capital murder where more than

5  one person is actively involved in a crime, you may have a

6  situation where just one person was the actual triggerman,

7  or the shooter, for lack of better terms.  One person

8  actually caused the death during the commission of that

9  capital murder.

10          And you may have some other people who

11  didn't actually cause the death, but were otherwise actively

12  involved in the crime.  "Accomplices" is the word most

13  people think of.

14          Some people we talk to who may feel very

15  strongly about the death penalty would reserve the option of

16  the death penalty just for the person that actually pulled

17  the trigger, just for the person that actually took the

18  life.  And if it were up to them, the death penalty simply

19  wouldn't be an option for those accomplices who didn't take

20  a life.  You know, they may want to lock them up in prison

21  for a long time, but for whatever reason, religious, moral,

22  or ethical, they don't think the death penalty is

23  appropriate for those accomplices.

24          And some people feel differently.  They

25  just say, you know, I wouldn't automatically take the death

1   penalty off the table for the accomplices, it just kind of

2   depends on the facts and circumstances.  And we ask

3   everybody this.  And I'm just curious kind of where you come

4   down on that issue.

5         A.    As far as the accomplices, I understand only

6   maybe possibly one person actually fired the killing blow,

7   but the parties involved were all there as a team.

8         Q.    Okay.  Would you envision or could you see

9   having the death penalty maybe for a nontriggerman

10  accomplice?

11        A.    I think it would have to be a very rare

12  situation where someone held a gun to his head to make him

13  be involved in the situation.

14        Q.    Okay.  Explain that to me a little bit more.

15  I'm not sure I'm following you.

16        A.    If one of the team members forced somebody

17  else to be party in this project and they were really doing

18  it against their will.

19        Q.    Okay.  That's a situation where you wouldn't

20  consider the death penalty for an accomplice?

21        A.    That possibly could be, correct.

22        Q.    Okay.  I think you are probably where the law

23  is in Texas, but let me give you a quick example to explain

24  the law.  Say Mr. Shook and I, the other prosecutor, decide

25  we're going to rob a bank.  We get together and plan that

1   he's going to carry a gun in. He's going to hold up the

2   tellers. And while he holds them at bay, I'm going to go in

3   with a bag and kind of empty out the cash drawers. I'm

4   going to be unarmed.

5          And, let's say, as we go to do that bank

6   robbery, for whatever reason, maybe one of them looks at him

7   funny, maybe I see one of them going for a silent alarm and

8   I alert him to that fact, or for whatever reason, he shoots

9   and kills one of the tellers. He's committed a capital

10  murder. He could be prosecuted for it and ultimately

11  receive the death penalty.

12          The law says, depending on the facts and

13  circumstances, that I could, too, even though I was unarmed

14  and even though I didn't cause the death, the accomplice.

15  What do you think of that type of law and that type of

16  scenario?

17      A.     Not knowing any more facts about the scenario

18  you're trying to give, I would have to say that you would

19  also be eligible for the death penalty.

20      Q.     Okay. What would be important to you in

21  making that decision? What fact or factors?

22      A.     Well, you were going to gain in the reward of

23  it.

24      Q.     Okay. Anything else you can think of that

25  would be important?

1      A.      I think the two of you are a team at that
2   point.

3      Q.      Okay.  Fair enough.  Let me ask you this.
4   Just like everybody we've talked to, you've indicated that
5   you've heard some of the publicity or you know a little bit
6   about the facts of this case; is that right?

7      A.      Through the media, yes.

8      Q.      Okay.  Can you tell us what you know about the
9   case?  What you've heard?

10      A.      Well, I think once the parties all broke out
11   of prison, I think it was a fear factor for everybody in the
12   state.  And the closer that we were to Irving -- I reside in
13   Coppell.  It did bring a danger point to all of us.  And
14   then the availability of them escaping as far as they were
15   able to escape and become national.  It just made it that
16   much more magnified of what type of individuals that the
17   system was dealing with.

18      Q.      Okay.  Do you remember hearing any of the
19   facts of the crime?

20      A.      Facts of the crime that they committed at the
21   Oshman's Sporting Goods store?

22      Q.      Yes, sir.

23      A.      I would say, yes.

24      Q.      Okay.  What is it that you recall?

25      A.      That they were inside the store, getting guns

1  and radios or something of that nature.  And when they came

2  out were approached by a police car and then somebody just

3  started randomly shooting to get away.

4       Q.     Okay.  Have you kept up with any of the other

5  court proceedings or maybe other trials in these cases?

6       A.     None.  Not, not intentionally.

7       Q.     Sure.

8       A.     But through the media, I think this is the

9  last one that's available.  Is it?

10      Q.     Okay.  Are you aware of the verdicts in the

11 other cases?

12      A.     To the best of my knowledge, I am.

13      Q.     Okay.  Like I said, we talk to a lot of people

14 and that is partially one of the reasons we do it because

15 this case did generate so much publicity.  We know it

16 affects different people differently.  You are not

17 automatically disqualified, just because you have heard

18 something about the case or just because you formed some

19 impressions or conclusions about what you have heard.

20               The test is in order to be qualified,

21 that you will be able to assure the Judge that you would

22 base your verdict in this particular case just on the

23 evidence and the facts you hear in the courtroom and not on

24 anything you may have gotten from any other media sources or

25 anything like that.  Is that something you think you could

do?

    A.    I know I could do that.

    Q.    Okay.  And why do you say that?

    A.    I know myself.  I mean, from my upbringing through military and Boy Scouts and fatherhood and there's right and there's wrong, and --

    Q.    Okay.  Okay.  You could put that out of your mind and just base your verdict on what you hear?

    A.    Yes.

    Q.    Okay.  Fair enough.  Again, you know, we do talk to quite a few people.  A lot of people may be very strongly in favor of the death penalty in the right case or the certain circumstance such as yourself.

          But I think when we get to this point in the process with those people, when you are no longer talking about the death penalty philosophically or in the abstract, I think it becomes a little more real to some people and some people at this point have some hesitations about possibly being on a jury that makes those life and death decisions in a capital murder case.

          In Texas we don't ask a jury at the end of all the evidence to write in a life sentence or write in a death sentence.  We ask them to answer these three questions up here.  And just very quickly in a nutshell, and we'll talk about them more in a minute, the first question

1   asks whether the person is a future danger, whether they are

2   a continuing threat to society.

3                If that's answered yes, then we move to

4   the second Special Issue, which deals with that accomplice

5   scenario that we've already talked about.  Basically, did

6   the person intend a human life to be taken or did they

7   anticipate a human life would be taken?

8                And if that is answered yes, then you

9   move to the third question, which asks is there anything

10   mitigating, is there anything based on the facts that a jury

11   thinks the person's life ought to be spared and they should

12   be given a life sentence rather than a death sentence.

13                And if that's answered no, then a death

14   sentence is automatic.  The Judge has no discretion.  But we

15   kind of let the answers to these three questions determine

16   what the appropriate sentence is.  So before we go any

17   further, I just want to make sure that you feel, knowing

18   yourself as you do, that you're the type person that could

19   participate in that process, that could be on a jury in a

20   capital case and take pen in hand and answer these questions

21   in such a way that it may ultimately result in the execution

22   of another human being?

23      A.      Yes, sir, I do.

24      Q.      Okay.  And why do you feel that way?

25      A.      It gets to be my own philosophy.  Because I'm

1  an Eagle Scout and I've raised two young men through the

2  teenage/adult statues.  They've both been members of the

3  military.  I think as a single parent, we had a strict set

4  of guidelines that we -- I chose to bring my two guys up in

5  and --

6       Q.    Okay.  Okay.  So you feel like you are the

7  type person that could make those type of decisions --

8       A.    Yes, sir.

9       Q.    -- those questions?  Okay.  One final question

10 I wanted to ask you.  We always ask everybody on the

11 questionnaire to kind of rank themselves on a scale of 1 to

12 10 if you are in favor of the death penalty, how strongly do

13 you feel about it?  And I think you gave yourself a 9 out of

14 10.  And I know that means different things to different

15 people and I'm just kind of curious what that 9 meant to

16 you?

17      A.    I would say I'm very strongly, um, believe in

18 it in those very certain situations where lives are taken or

19 there's abuse or something to a child.

20      Q.    Okay.  And, again, you'd feel comfortable

21 looking at the death penalty, depending on the facts and

22 circumstances in a situation where an accomplice is

23 involved?

24      A.    I don't think that I would be comfortable.

25 But I think that I would be qualified.

1    Q.    Okay.  You at least have no hesitation about

2  it?

3    A.    That's right.

4    Q.    Okay.  And I'll be very honest.  The reason we

5  cover that accomplice in such detail is that is the theory

6  of law we're prosecuting this case under, the law of

7  accomplices or the law of parties.  So that's why we spend

8  so much time making sure everyone at the very least has no

9  hesitations about it.

10              Let's talk a little bit more about these

11 questions kind of in some detail.  I know you had a chance

12 to look at them just for a second earlier and you probably

13 read a version of them in the packet you had, but if you

14 could, just take a moment or two and read through those

15 three real quickly so we can talk about them in turn.

16    A.    (Prospective juror complies.)  Yeah, I think

17 I've read them three times.

18    Q.    Okay.

19    A.    I was in my room for a while.

20    Q.    You probably got a little claustrophobic back

21 there?

22    A.    Yes, I did.

23    Q.    Yeah, that room seems to have --

24    A.    It needs to have a window in there.

25    Q.    -- seems to have that effect on people.  What

1   the law envisions is, basically, all trials in Texas, even

2   capital murder trials, are in two parts.  The first part of

3   the trial is the guilt/innocence phase where you are just

4   concerned with whether the person is guilty or not of

5   capital murder.  Did we prove to you what is in our

6   indictment?

7                  If you think we have proven his guilt to

8   you beyond a reasonable doubt, you'd find him guilty of

9   capital murder and move to the second phase of the trial,

10  which is the sentencing phase, where you are called upon to

11  answer these three questions.

12                 Before you are given these three

13  questions to answer, you get to hear extra or additional

14  information in that second phase, the sentencing phase, of

15  the trial.  You get to hear evidence about the person's

16  criminal history, if it exists, his reputation, his

17  character, background, good or bad, that type thing.  And,

18  again, we let you hear this sort of evidence so you can

19  answer these three questions.

20                 And the law really contemplates or

21  envisions that just because you found someone guilty of

22  capital murder, you'd be able to start that second phase of

23  the trial with an open mind as to the answer to these three

24  questions.

25                 You know, very frankly, we have some

1    people that tell us, you know, I just can't do that.  If I

2    found somebody guilty of capital murder, it's automatically

3    always going to cause me to answer one of these questions in

4    such a way -- for instance, question No. 1, I'm always going

5    to think they are a future danger.  And if you feel that

6    way, that's fine.  You simply wouldn't be a qualified juror.

7             But in a sense, I guess, the law requires

8    that jurors use that little bit of mental discipline and be

9    able to have an open mind as they start that second phase of

10   the trial.  Does that make sense to you?

11        A.    Yes, it does.

12        Q.    Okay.  Is that something that you think you

13   could do?

14        A.    Yes, I do.

15        Q.    Okay.  Again, that first question, whether

16   there's a probability the defendant would commit criminal

17   act of violence such that they would be a continuing threat

18   to society, that question starts off with a no answer.  It's

19   part of our burden of proof to prove it to you beyond a

20   reasonable doubt that that question should be answered yes.

21   It's not answered yes, unless we meet our burden of proof

22   and prove to you that there's that probability that exists.

23             The words in these questions are not

24   necessarily defined legally, like a lot of things we deal

25   with.  So we always are curious to ask each juror kind of

1   how they would define or what certain terms mean to them.

2   And when you see that word "probability," how would you

3   define that or what pops into your head?

4        A.    Is there a possible chance that being

5   reincarcerated, he could eventually come out and do

6   something else to somebody else?

7        Q.    Okay.

8        A.    Or while he's in prison, be able to do

9   something to somebody else.

10       A.    Okay.  When you think about probability, do

11   you think about a likelihood or greater than not chance or

12   when you think about that word "probability"?

13       A.    Into this particular individual or into -- are

14   we looking at it as an individual standpoint or are we

15   looking at it as the wording here?

16       Q.    No.  We're not talking about this case

17   specifically.  Obviously, we can't go into this case or

18   preview the facts.

19       A.    Okay.  So --

20       Q.    Just in general in a hypothetical capital

21   murder case.  And, again, the law doesn't give us a

22   definition.  It gives us a little bit of guidance.

23       A.    And I think at that point I would have to go

24   through the trial and believe that there would be a

25   probability issue there, yes.

1        Q.      Okay.  And, again, the law says, you know,

2    we're talking about in terms of a probability, not a

3    certainty.  We could never prove anything to you to that

4    level of certainty.  But a probability would be something

5    more than just a mere possibility.

6        A.      That's correct.

7        Q.      Because anything would be possible.

8        A.      Anything we're reading in these questions,

9    we're actually not even looking at the particular case

10   involved?

11       Q.      You would be given these questions at the end

12   of all the evidence, after you --

13       A.      But in your interrogation right now, we're

14   really not looking at this particular case at all.

15       Q.      No.  No, sir.

16       A.      We're just looking at this in generality

17   terms?

18       Q.      Yes.  We can't -- neither side can go into the

19   facts.  Neither side can try to convince you on how you'd

20   vote in this particular case.  We just like to kind of get

21   people's gut reactions.  For most people, you may be like

22   most people.  This whole kind of capital sentencing scheme

23   is new to them.  You know, most people really have no idea

24   what the scheme is in Texas, unless, you know, you are in

25   our line of work.  So that's why we go through this.

1              That phrase "criminal acts of violence"

2  in that second line.  What comes to mind when you think of a

3  criminal act of violence?

4       A.    I would say, you know, it could be something

5  as simple as just fighting, you know, being incarcerated,

6  causing a disturbance to the point of making the prison life

7  even unsafe.

8       Q.    Okay.  And I think you're following up on my

9  next point.  We always ask people, you know, how they would

10 define "society" and I think most people would define it not

11 only the society out in the free world, you know, where we

12 walk around, but also life behind bars.

13      A.    Correct.

14      Q.    It sounds like that's where you are going?

15      A.    Yes.

16      Q.    You could be a danger to, I guess, other

17 inmates, guards, nurses, that type thing?

18      A.    Correct.

19      Q.    Okay.  Again, that starts off with a no

20 answer.  It's part of our burden to prove it to you that it

21 should be yes.  Special Issue No. 2 is exactly the same way.

22 It starts off with a no answer.  That's kind of the default

23 setting on those two questions.  And it's up to us to prove

24 it to you beyond a reasonable doubt that the answer should

25 be yes.  And, again, this issue deals with what we've

1  already talked about, the accomplice situation.

2         A.     Accomplices.

3         Q.     There's really three parts to that question.

4  If you think he's the triggerman, he actually caused the

5  death, you can answer it yes.  If you think he didn't pull

6  the trigger, but he intended to kill the person, you would

7  vote yes.  Or the last line, if you think the person

8  anticipated that a human life would be taken, you would vote

9  yes.

10            In order to convict someone of capital

11  murder as an accomplice in Texas, the law is that the person

12  should have anticipated that a life would be taken.  Going

13  back to my example, a lot of people feel that, you know, the

14  mere fact that my teammate went in with a loaded gun, I

15  should have anticipated that a life would be taken.

16            When you get to this question in the

17  punishment phase, the law imposes a little higher standard

18  before we can get to the death penalty.  Instead of should

19  have anticipated, it's actual anticipation.  You know, did

20  the person anticipate that a life would be taken.  And it

21  may be the exact same evidence that you go back and look at

22  to decide that or you may take into account, you know, his

23  criminal history, if he has one, to help you answer that

24  question.

25            But it's important, I think, that jurors

1    see that the law makes that distinction and you see some

2    sort of distinction between those two standards, "should

3    have" and "did anticipate."  Does that make sense to you?

4         A.     Yes, it does.

5         Q.     Okay.  Again, that's part of our burden of

6    proof to prove it to you.  If both of those questions are

7    answered yes, then you move to this third Special Issue.

8    That's kind of the last stop in the process.  We call it the

9    mitigation question.

10                It basically asks a jury to, you know,

11   step back, take a deep breath, look back at all the evidence

12   you've heard in both phases of the trial, the facts of the

13   crime, the facts of the defendant's character and

14   background, and what sort of personal moral blame he bears

15   in what happened, and ask yourself is there anything that

16   lessens his personal blame?  And if there is, if there's

17   something there that's mitigating, is it sufficiently

18   mitigating that his life ought to be spared?

19                Some people say it's the jury's chance to

20   show mercy at that phase of the trial, if they think it's

21   deserved based on the facts.  Does that make sense to you?

22        A.     Yes, it does.

23        Q.     Okay.  Do you see the value in having that

24   question, even that late in the process?

25        A.     Yes, I do.

1    Q.    Okay.  And, again, you know, the law requires,

2  as with each of these, that the juror make kind of an

3  independent inquiry into each question, that you don't

4  answer No. 1 yes automatically just because you found him

5  guilty.  Or, conversely, you don't answer No. 3 no, just

6  because you found him guilty and found 1 and 2 yes.  But you

7  keep that open mind and let the chips fall where they may,

8  depending on the evidence.

9              Looking at question 3, is there anything

10  that comes to mind to you that might be potentially

11  mitigating, again, in kind of that hypothetical capital

12  murder case?

13    A.    I guess there could always be.  But I would

14  give that it's fair due upon hearing the evidence that one

15  of you would have presented.

16    Q.    And this question is different, because

17  neither side has the burden of proof.  We don't have to

18  prove it to you that the answer should be no.  They don't

19  necessarily have a burden to bring you any evidence.  That

20  mitigation evidence could actually come from our evidence,

21  you know, based on the facts of the crime.

22              We always ask people that question, if

23  they can think of anything mitigating.  The most common

24  answer is no.  We hope you don't sit around thinking about

25  these type things.  The law says you don't have to consider

1   any particular fact or factors mitigating.

2                        To be a qualified juror, you just have to

3   be able to keep an open mind.  And if you hear something

4   that you think might be mitigating, you will listen to it

5   and give it the credibility that you think it deserves.

6   Does that make sense to you?

7        A.     Yes, it does.

8        Q.     Some people tell us maybe a person's

9   background, you know, if there's kind of an early

10  well-documented history of mental, physical, or emotional

11  abuse.  Some people say that might be potentially

12  mitigating.  Other people say, you know, my heart may go out

13  to you, but at some point you're an adult.  You have to get

14  over your past and you are responsible for your own

15  decisions, that type thing.  Where do you kind of fall on

16  that spectrum with that issue?

17       A.     You know, I hate to play right in the middle,

18  but unfortunately I'm going to have to say I'm right in the

19  middle, depending on the circumstances of that particular

20  situation.

21       Q.     Okay.  And I think that's all the law

22  requires, you keep an open mind.  You know, we are not

23  allowed, again, to commit you on a certain fact or factors

24  or the facts of this case.  But as long as you can keep an

25  open mind to each of these three issues, you would be a

1  qualified juror.  And it sounds like that's something that

2  you think you would be able to do?

3          A.    Yes, it is.

4          Q.    Okay.  Oftentimes in these cases, you may hear

5  from expert witnesses in the punishment phase, the second

6  phase of trial, psychiatrists or psychologists may be called

7  by the defense or the State or even both sides to kind of

8  help give a jury guidance to Special Issue No. 1 or Special

9  Issue No. 3.  And we're always curious to get people's kind

10  of gut reaction on those type of witnesses in these type of

11  cases.

12                Some people think they can be helpful.

13  Some people just consider it, I guess, a soft science and

14  they just wouldn't put any stock at all in a paid expert

15  witness.  But where do you kind of come down on that issue

16  of the expert witness?

17          A.    I have a hard time, sometimes, with expert

18  witnesses, from litigation beyond this type of situation, in

19  liability suits.

20          Q.    Okay.

21          A.    I think some of those can be very out of the

22  blue.

23          Q.    Okay.  Would it be a situation where you just

24  automatically close your mind to that type?

25          A.    No.

1     Q.     You'd just listen to it?

2     A.     Yes.

3     Q.     Okay.  And I think you indicated that you had

4  been involved in some business civil litigation; is that

5  right?

6     A.     Primarily most of mine have been divorce

7  courts.  I've been in the swimming pool business for 30 some

8  years, so there's been a lot of diving board instances that

9  I've been associated with, but never participated in.

10     Q.     Okay.  Fair enough.  You can probably, also,

11  anticipate police officers are going to testify.  The law

12  simply requires that you start a police officer out at the

13  same level of credibility, that you don't give them an

14  automatic leg up, just because he walks in wearing a badge

15  or a gun or that type thing.  Is that something you think

16  you could do?

17     A.     I know I can do that.

18     Q.     Okay.  Let me run through some kind of basic

19  constitutional protections.  Many of these you are probably

20  familiar with.  The burden of proof, we kind of touched on

21  it already, is always on this table.  We've got to prove to

22  you the person is guilty.  We've got to prove to you Special

23  Issue No. 1 and 2.  You can't ever look to these folks or

24  this table to bring you any proof or bring you any evidence.

25                    Legally, they can sit there and do

1  crossword puzzles the whole trial.  They're not going to do

2  that.  They're fine lawyers.  But it serves to make the

3  point that you always have to look to us and you can't

4  require them to bring you any proof.  Is that a law you

5  think you could follow?

6       A.    I know it is.

7       Q.    Okay.  As a part of that, a person is always

8  presumed innocent.  That presumption does not go away unless

9  and until we prove a person guilty beyond a reasonable

10 doubt.

11      A.    Beyond a reasonable doubt.

12      Q.    Exactly.  A person also has a Fifth Amendment

13 right not to testify in their own defense.  No one can force

14 him to take the stand in his defense, unless he wants to.

15 Conversely, if he wants to take the stand, no one can stop

16 him.

17            If you are a juror in a case where he

18 doesn't testify, the Judge would instruct you that you

19 simply cannot hold that against him.  It can't be held as a

20 circumstance against him.  There may be many reasons why he

21 doesn't testify.  He may not be a good speaker, he may be

22 guilty or he may just be acting on his lawyer's advice.  Do

23 you think you could follow that law?

24      A.    I know I can.

25      Q.    Okay.  Also, another area we talk to people

```
1    about, I know you've gotten a chance to read our indictment
2    in the case.  Our indictment, basically, breaks down into
3    different elements of the crime.  The law says we have to
4    prove to you beyond a reasonable doubt each and every
5    element of the crime that we have alleged.
6                    And the law says, curiously enough, that
7    one element is no more important than another legally.  The
8    elements kind of in a hypothetical murder case would be that
9    a certain person on or about a certain day in a certain
10   county killed another person in a certain way.  Those would
11   roughly be the elements of the crime that we'd have to prove
12   to you.  And if you had a reasonable doubt about any of
13   those elements, the law would require you to find the person
14   not guilty.  Does that make sense?
15        A.     Yes, it does.
16        Q.     Just kind of an extreme example of that to
17   kind of show you the mental discipline sometimes we require
18   of jurors, I don't think this would ever happen, but one of
19   those elements would be the county the case happened in.
20                    Say we didn't do our jobs, we didn't
21   investigate or research the case properly.  You were a juror
22   on a murder case.  We allege the murder happened in Dallas
23   County.  You're convinced the guy is guilty.  You think he's
24   good for the murder, but you think the murder happened in
25   Tarrant County.  Again, we screwed up.  You would have a
```

1    reasonable doubt about that one element, the county.  And

2    the law would require you to find a person not guilty.

3                    You may not like it.  You may think it's

4    a technicality.  But that's what the law requires.  I guess

5    one way to look at it is, you know, one person's

6    technicality is another person's constitutional right.  Is

7    that a law you think you could follow if you had to?

8          A.    I know it is.

9          Q.    Okay.  One way to kind of look at this capital

10   murder scheme that we have, is once a person is convicted of

11   capital murder, they are sitting on a life sentence.  Okay?

12   And the only way we get to the death penalty is if these

13   questions are answered yes, yes, and no.  I think we've

14   covered that.

15                   Just to let you know what a life sentence

16   for capital murder means in Texas, and the Judge would tell

17   you this if you were a juror, it means forty calendar years

18   before a person becomes eligible for parole.  Okay?  There's

19   no life without parole in Texas.  But it would be forty

20   calendar years before a person would see that first Parole

21   Board.

22                   Since those decisions about parole are so

23   far in the future, you know, and the person may make parole

24   after forty years or they may never make parole and actually

25   serve that life sentence, we kind of require that jurors at

1   this point just assume that a life sentence means an actual

2   life sentence.  Is that something you think you could do?

3        A.    Yes.

4        Q.    Okay.  Do you have any questions at all about

5   this kind of sentencing scheme that we've gone over or

6   anything like that?

7        A.    I really don't at this time.

8        Q.    Okay.  Does it seem --

9        A.    I mean I understand the basics and I'm sure

10  there are areas that I'm not sure of, but --

11       Q.    Okay.  Again, kind of the bottom line to all

12  of this, no matter what your personal views may be, as long

13  as you can set them aside and tell us that you can follow

14  the law and, importantly, kind of keep that open mind with

15  respect to all the three Special Issues until all the facts

16  and evidence are in to make your decision, and I think you'd

17  be a qualified juror.

18            Let me check with my co-counsel just a

19  moment.  Okay.  Mr. Campbell, thank you, I appreciate it.

20            MR. WIRSKYE:  Judge, that's all I have.

21            THE COURT:  Halfway through.

22            PROSPECTIVE JUROR:  Oh, halfway through?

23            THE COURT:  Yes, sir.

24            PROSPECTIVE JUROR:  Aye!

25            THE COURT:  You know how lawyers are,

1    they all want to talk to you.

2                      PROSPECTIVE JUROR:  Yeah, okay.

3                      CROSS-EXAMINATION

4    BY MS. BUSBEE:

5         Q.      Now, Mr. Campbell, what kind of system would

6    it be if only the State got to talk to you?

7         A.      It would not be a fair system, I apologize.

8         Q.      That's right, I know.  But I don't have to

9    talk to you as long, because I don't have to tell you

10   anything so much.  I just have to ask questions.  They've

11   already laid the scheme out for you, so I just have some

12   questions.  I notice one of your sons is a firefighter?

13        A.      Yes, he is.

14        Q.      Where is that?

15        A.      Farmers Branch.

16        Q.      Farmers Branch.  So he's closeby?

17        A.      Yes, he is.

18        Q.      And where is your other son?  I notice he's in

19   college.  What is he studying?

20        A.      Right now, he's studying bartending.

21        Q.      Okay.  And --

22        A.      He's not going to college, but he was going to

23   college when I wrote this.  He has since gone to be a

24   bartender.

25        Q.      Okay.  Is that just a hiatus from his

1    education?

2           A.      That's what I've been told.

3           Q.      You hope so.  What was he planning on doing

4    and you planned on him doing?

5           A.      Computer technologies.

6           Q.      Okay.  I'm sure that it makes parents nervous,

7    but they often do come back and do just fine.  Where is he

8    bartending?

9           A.      In Coppell, Texas.

10          Q.      In Coppell.  Okay.  Well, he's closeby.

11          A.      Yes, he's right down the street.

12          Q.      All right.  Fortunately, you had a chance to

13   read over these Special Issues and, obviously, are a quick

14   study, so I don't necessarily want to go over them in detail

15   with you.  I did have some questions, though.

16                 Just like anyone who comes down here and

17   the State explains to them that people can be convicted of

18   capital murder and then considered for the death penalty, if

19   they are what we've been referring to as a nontriggerman,

20   you expressed some surprise and then you set forth a

21   scenario in which case, and I'm not even sure what you were

22   talking about, because I think it was asked you two ways.

23   Were you talking about somebody being forced into the

24   commission of a crime?

25          A.      I believe that's the area you are referring

1  to, that's what I was referring to, if someone was being

2  forced into becoming involved in this.

3       Q.    Okay.  And under those circumstances you would

4  be inclined to not consider a death penalty.  That's what I

5  didn't understand.

6       A.    I would say that would be correct.

7       Q.    Okay.  Well, now, then, I must tell you that

8  if someone was forced into committing whatever acts were

9  involved in the capital murder, they wouldn't be guilty at

10 all, because that would be duress.  So I need to kind of

11 backtrack a little bit.  We're going to be talking here

12 about somebody who didn't have the defense of being forced

13 into doing it.  We don't prosecute people who don't have a

14 choice about doing things.  So --

15      A.    I -- actually, that's why I made that

16 statement, because I was not using any of what this

17 particular case had involved.

18      Q.    Okay.

19      A.    We're looking at this as a blank scenario.

20      Q.    Right.  Okay.  And I'm using that as -- I

21 don't like using examples because people think that they're

22 being asked that fact situation when really we're asking

23 this in the rare ether of a hypothetical situation.  So in a

24 hypothetical case where someone has been convicted of the

25 offense of capital murder -- and you now know that that is a

1    life sentence and not a death sentence?

2         A.     Yes.

3         Q.     And we're talking about here in a hypothetical

4    case where someone is an accomplice to the death penalty, I

5    mean, to the capital murder.

6         A.     Yes.

7         Q.     What are your thoughts on applying or

8    administering a death verdict to an accomplice under those

9    circumstances?

10        A.     I would have to say I would be in favor of

11   that because he would have been receiving the good side, if

12   there is such a good side, of the benefits of what they were

13   doing.

14        Q.     Okay.  Okay.  So I guess --

15        A.     Now, as I said, it wasn't a good side, there's

16   no good side to that.

17        Q.     No.

18        A.     But in their rationale thinking.

19        Q.     Okay.  So what I hear you saying, that in your

20   feelings on the death penalty and participation in a capital

21   murder are strong enough that in reality you really favor a

22   death sentence over a life sentence?

23        A.     I probably would in situations where there has

24   been a life taken.

25        Q.     Okay.  Fair enough.  You get to say what you

1    think in this situation.  And let me hark back to that a

2    minute, because when you were speaking with Mr. Wirskye

3    about this probability issue, and you said -- you said,

4    well, hypothetically, but not in this case.  Have you had

5    some thoughts about the future dangerousness in the case at

6    hand?

7            A.     Future dangerousness as far as --

8            Q.     In this particular case?

9            A.     -- danger to whom?

10           Q.     Well, as it is expressed in Special Issue No.

11   1.

12           A.     Well, I would say that there is, I mean, I

13   haven't sat and thought about it a lot.

14           Q.     I'm sure.

15           A.     I think there could be a continuing threat, if

16   someone has been involved in a crime of this nature.

17           Q.     Okay.  You have made some comments to

18   Mr. Wirskye about, well, maybe not in this case, but as a

19   theoretical.  What were you referring to there?

20           A.     And, again, we're in a theoretical situation,

21   I'm not referring to anything in particular.  It would have

22   to be proven to me beyond a reasonable doubt that everything

23   that was being charged was convincing to me and it would

24   depend on that particular court.

25           Q.     Okay.  Well, this is where we get out of the

1   theoretical and we're talking about this case, because it's

2   no secret.  And we've talked to all jurors about things that

3   they have heard about the events that transpired in this

4   case.  And I'm asking you now, specifically in this case, do

5   you think that you have formed an opinion as to the future

6   dangerousness in this case?

7        A.     I would say I possibly have formed a further

8   continuous danger issue in this particular case.

9        Q.     Okay.  Could you explain that a little bit

10  more for me, what you mean by that?

11       A.     Well, what I'm saying is apparently the

12  gentleman was in prison and broke out.  And then went on out

13  and performed another act that caused other deaths.

14       Q.     Right.  And now -- so in this case you think

15  that there's Special Issue No. 1 is probably going to be

16  answered yes for you?

17       A.     Yes.

18       Q.     Okay.  And, you know, you just tell us what

19  you think.  There's no right or wrong answer.  Is that an

20  opinion that you have formed, just based on what you have

21  heard from the media?

22       A.     I think it's in reading Special Issues, just

23  as the verbiage that's there.  Not necessarily looking at

24  this particular case, in those situations I think I would

25  make the decision predicated on what I was led to form my

1    opinion from here in the court.

2        Q.   Okay.  Well, but I'm asking about this

3    particular case.

4        A.   Okay.

5        Q.   You said that you think you have formed an

6    opinion about this case.  Is that because of what you have

7    heard in the past or what you know about this case?

8        A.   I'd say it's what I feel has happened in this

9    situation.

10        Q.   Okay.  It's not -- there's nothing wrong with

11    that.  I'm just trying to get you to tell me what you -- how

12    you feel based on what you know, now that you know that this

13    question is one of the questions you'd be asked.  If you

14    could tell me that.

15        A.   I feel personally in a situation pertaining to

16    this particular case, that the person involved, if proven

17    beyond a reasonable doubt of guilt, then it would be in the

18    best interest of the United States of America, Texas, and

19    all of us around, for him not to have the opportunity of

20    continuing out the possibility of getting back out in the

21    outside world.

22        Q.   Which, I think you're saying that means that

23    you would be inclined to vote for a death sentence in that

24    case?

25             MR. WIRSKYE:  Judge, I'm going to object.

1    He said based upon proof beyond a reasonable doubt.  Shows

2    he can follow the law.  I think it's misleading to the

3    juror.

4                    THE COURT:  Well, rephrase your question.

5    I sustain the objection.

6         Q.    (By Ms. Busbee)  Okay.  I don't even remember

7    what my question was before I was interrupted.  Do you

8    remember what it was?  I asked you if, no, I remember what

9    you said to me, and that's what prompted me to ask that.

10   You said that based on what you know already about this case

11   that you felt like the proper verdict would be death.  Does

12   that, paraphrased, is that what you were telling me?

13        A.    I'm saying in any situation right now, if I

14   was involved in any litigation where someone had been

15   involved in the act of murder, I would be -- it would be my

16   recommendation that a death penalty would take place, yeah.

17        Q.    Okay.  So -- and your feelings I'm hearing

18   from you are very strong about assessing the death penalty

19   where a murder has occurred?

20        A.    If it is proven beyond a reasonable doubt with

21   the evidence in the court, then I would go to the full

22   extent of the law.

23        Q.    Okay.  And while these Special Issues are

24   required to be answered in these cases, your feelings are

25   strong enough that we'd actually have to convince you not to

1  give death, as opposed to the State having to convince you

2  to give --

3      A.    No, that's not what I'm saying.  I'm saying

4  the defense side -- the prosecution side of it has to prove

5  to me that all of this stuff did happen.

6      Q.    Right.

7      A.    And if all of this stuff did happen, then I

8  would propose the maximum sentence that the person could

9  get.

10      Q.    Okay.  Well, and that's where I'm taking you.

11  I'm dragging you past.  You've already found someone guilty

12  of capital murder.

13      A.    Okay.

14      Q.    Really, your feelings for the death penalty

15  are these Special Issues that the Legislature wrote are

16  fine, but your feeling is that death is an appropriate

17  punishment?

18      A.    No, I -- well, I think we go back to question

19  No. 2, or whatever that was, where we get the attorney

20  situation opinions.  No.  I think there probably are

21  situations possible that I would not automatically impose a

22  death sentence.  But in certain situations, I think we have

23  to justifiably take some actions so this stuff doesn't

24  continue happening.

25      Q.    Okay.  Fair enough.  Well, the way it's set up

1    is, it's an automatic life sentence.

2          A.     Yes.

3          Q.     But you're telling me in your gut it's an

4    automatic death sentence, and you would need to be convinced

5    that a life sentence is appropriate instead of --

6          A.     I don't believe I said that.  If I did, I

7    apologize.  I said if it's proved to me beyond a reasonable

8    doubt in that court, then I would go for the maximum

9    sentence.

10         Q.     Okay.  That's where we're having the problem.

11   You are saying, if he was proved to be guilty?

12         A.     Yes.

13         Q.     Okay.  I'm asking you after a person has been

14   proved guilty.

15         A.     Okay.  After he's proven guilty --

16         Q.     What are your feelings?

17         A.     I would just as soon -- we didn't have to put

18   people to death, but I don't know how we can get around it

19   right now.  I think there are probably some circumstances,

20   he's been proven guilty, that he did something not

21   necessarily involved in this, but he did have mental

22   retardation or didn't have the brains of a six year old,

23   then I possibly would have compassion from that standpoint.

24         Q.     Okay.

25         A.     Does that answer --

1    Q.    Well, no, because you are skipping to Special

2  Issue No. 3.

3    A.    Okay.

4    Q.    What I think you're telling me is, I mean, in

5  as plain a language as you can, that once you have found

6  somebody guilty of the offense of capital murder, you have

7  already decided that they are going to be a future threat

8  without having to hear or consider anything, other than that

9  they're guilty.  And the anticipation of a human life, that

10  question, I think you told us if the other -- if you are

11  with some people and that happens, that's -- you should have

12  known better, to paraphrase what you've said.

13          These are questions that the law requires

14  a jury to consider, but you've said every time, I think, to

15  me, and if it's your opinion, that's fine, that that doesn't

16  really matter to you, that you favor a death sentence over a

17  life sentence?

18    A.    I don't believe I said that.  I said, I wish

19  we didn't have to put people to death.  But there are

20  mitigating circumstances, whatever you want to refer to them

21  as, especially in a situation where they had already been

22  incarcerated, broke out of jail and went and killed

23  somebody.  If we want to look at the exact case, then I

24  would have to look at it as the most penalty they can get.

25    Q.    Okay.  So in this particular case you've

1   formed an opinion that the death penalty would be the proper

2   punishment?

3        A.     I don't really -- have an exact statement

4   made.  You are wanting me to make one.  But I haven't gone

5   through -- you are telling me he's guilty, okay --

6        Q.     Yeah, but after finding --

7        A.     -- or you are making the assumption that he is

8   guilty and that these gentlemen have proved that point to me

9   beyond a reasonable doubt.  And if they have done their job

10  --

11       Q.     Yes, sir.

12       A.     -- and proved to me beyond a reasonable doubt

13  that all of the stuff that they said happened, happened,

14  then I would be in favor of the death penalty.

15       Q.     Okay.  Irrespective of the other questions

16  that have to be answered?

17       A.     Exactly.

18       Q.     Okay.  So in this particular case you are

19  saying that if the defendant was found guilty, was proved to

20  you beyond a reasonable doubt to be guilty of the offense of

21  capital murder, that you have formed an opinion that the

22  correct punishment would be death?

23       A.     I would say the maximum punishment that is

24  applicable would be what I would vote for.  And at this

25  particular situation, apparently, it is death.

1    Q.    Okay.  Because there are just two options.

2    A.    Correct.  Either life in prison or death.

3    Q.    Okay.  And I think that you are being frank.

4  That's just your opinion, even though the law says that

5  there are some additional steps that should be gone through.

6    A.    Maybe I'm not aware of the additional steps

7  that should be gone through, if we have already established

8  the case is over and the gentleman or lady has been proved

9  beyond a reasonable doubt that is guilty, and the situation

10 being a scenario as we're talking about it, there was an act

11 that took a police officer or a fireman or somebody else in

12 prison, as I'm understanding it, then they would be, maximum

13 penalty would be death.  And I think that's the way it

14 should be.

15   Q.    Okay.  All right.  Now, directing your

16 attention to these Special Issues.

17   A.    Okay.

18   Q.    Is your opinion so strong that the State

19 wouldn't have to prove to you beyond a reasonable doubt in

20 this case that there was a probability of future acts of

21 violence or would that already be decided for you in this

22 case?

23   A.    I'm sorry, would you repeat that question?

24   Q.    Would you, directing you to Special Issue No.

25 1, in this case have you already formed an opinion as to --

1    after the person has been found guilty, we ask you this

2    after a finding of guilty.

3         A.    Okay.

4         Q.    Have you already formed an opinion that in

5    this case the defendant is likely to commit criminal acts of

6    violence that would constitute a continuing threat to

7    society?

8         A.    If we're assuming that the case is complete --

9         Q.    Yes, sir.

10        A.    -- and they have proved to me beyond a

11   reasonable doubt that he did do what was charged, I must say

12   I probably have got a preprejudiced decision, because they

13   -- I don't have a preprejudiced decision until they have

14   proved it, but you are asking me to assume that they have

15   already done their job.

16        Q.    Right.  Because there's two parts.  They have

17   to prove him guilty.

18        A.    Okay.

19        Q.    And he's guilty of capital murder beyond a

20   reasonable doubt when we come back to you with Special Issue

21   No. 1.  And that's what I thought you said, originally, was

22   in this case you already feel that that is yes, that he is a

23   continuing threat.

24        A.    I don't believe I said that and I'm not sure.

25   I think I said that once the court case came through without

1   a reasonable doubt in my mind at all, that this did happen,

2   then I would be in favor of the death penalty.

3        Q.   Okay.  And it wouldn't matter to you.  That's

4   what I'm saying.  Guilty is already done.  Guilty is a done

5   deal.

6        A.   Okay.

7        Q.   Okay.  If a person has been found guilty

8   beyond a reasonable doubt of capital murder, Special Issue

9   No. 1 has been decided in your mind as yes?

10        A.   As he would be a potential harm to other

11   people around him, and my answer, again, if we're assuming

12   all these other things, I'm assuming I would make my answer

13   then yes.

14        Q.   Okay.  Well, now, in that situation, would I

15   have to prove to you something to answer that question no?

16   Would there be anything that could be in your mind make you

17   answer that question no?

18        A.   If the Court has already proved beyond a

19   reasonable doubt that everything is yes, my answer would

20   have to be yes.

21        Q.   Okay.  I'm not talking about -- I'm talking

22   about the second part, not the first part.  You have already

23   found the person guilty.

24        A.   Right.

25        Q.   And now we're answering these questions yes or

1    no.

2         A.      Okay.

3         Q.      If you found him guilty on Special Issue No. 1

4    --

5         A.      Yes.

6         Q.      Have you -- in your mind is that already a yes

7    answer because they were guilty of the offense of capital

8    murder?

9         A.      My answer would be yes, if we're into yes or

10   no's.

11        Q.      All right.   Yes, sir.   Yes or no, that's what

12   I thought you were saying.   The law says that they have to

13   prove that to you beyond a reasonable doubt and it's no, but

14   I think what you are telling me is if you found someone

15   guilty of the offense of capital murder, that answer is yes.

16   And particularly in this case that you have an opinion that

17   the answer would be yes.   We can't ask you these questions

18   in between the guilt part and the punishment part is why we

19   kind of have to ask you now.

20        A.      Well, that's why -- that's what -- I was

21   trying to answer your question.   If one side has already

22   proved beyond a reasonable doubt that it did happen and

23   everything that the witnesses brought up were true and it

24   did happen and everything else, I would have to say in

25   Special Issue No. 2 that I would believe the death penalty

1  would be the appropriate sentence.

2      Q.    Okay.  So someone who is guilty of capital

3  murder in your mind, you've already decided that they're a

4  continuing threat to society?

5      A.    No, ma'am.  You asked me to assume that this

6  particular case, they had proved it to me.

7      Q.    Right, but --

8      A.    I am not saying in every case, if someone has

9  committed murder, that it's automatically a death sentence.

10     Q.    Sir, my question is if you found him guilty of

11 the offense of capital murder, capital murder, guilty --

12     A.    Yes.

13     Q.    -- and then you are saying guilty, but I'm

14 saying on Special Issue, would you automatically answer that

15 yes?

16     A.    I am saying I would automatically answer that

17 question yes, if it had already been proved beyond a

18 reasonable doubt.

19     Q.    The guilt?

20     A.    The guilt.

21     Q.    Okay, but --

22     A.    The punishment phase of it would automatically

23 go for the maximum sentence, from my opinion.

24     Q.    Okay.  Fair enough.  So even though the law

25 says life, your real feelings are such that you couldn't

1   really consider a life sentence or consider answering

2   Special Issue 1 or 2 no.  In order to effect a life sentence

3   we'd have to -- we over here would have to change your mind

4   in some form or fashion?

5           A.     If this side had already proved to me during

6   that process that everything is done, there really isn't a

7   whole lot, I guess, this side could do to convince me not

8   to.

9           Q.     Okay.  Well, I'm trying to save you from

10  getting batted back and forth by the tangled lawyers, but --

11          A.     Okay.

12          Q.     You are saying if he's guilty, punishment is a

13  foregone conclusion?

14          A.     Foregone conclusion, if he's guilty.  His

15  conclusion automatically is life in prison, correct?

16          Q.     Yes.

17          A.     Okay.  I would rather instead, in this

18  particular situation, instead of him staying in prison for

19  life, which apparently is forty consecutive calendar years,

20  I would rather not have him be a threat to other inmates

21  sitting in the Texas prison system until the year 2050.

22          Q.     Okay.  I appreciate that.  So you are saying

23  in this case you have predecided or have an opinion that the

24  -- if he's guilty beyond a reasonable doubt, he should

25  receive the death penalty?  Is that, again, I'm trying to

1  save you from being batted back and forth.

2      A.   Well, I don't think you are saving me from

3  that.   But if we have gone through the whole judicial

4  process and we've gotten to the point that the person is

5  automatically everything guaranteed, proven guilty, and his

6  minimum sentence is life imprisonment for forty calendar

7  years, I would rather propose the death sentence than the

8  forty calendar years.

9      Q.   Right.  So are you telling us you have --

10  these Special Issues are -- now that you understand, but in

11  this instance you wouldn't follow them.  You've already

12  decided that death would be the proper punishment?

13      A.   I haven't made any predisposed decisions when

14  I walked in here.  We have made me make assumptions.  They

15  haven't even proved to me that the gentleman did it yet.

16      Q.   Okay.  But I have to take you to that point,

17  because I can't --

18      A.   If you take me to that point --

19      Q.   Right.

20      Q.   -- and they've done their job and they've

21  proved it to me, I would rather not have the gentleman

22  sitting in the prison system for forty calendar years.

23      Q.   Okay.  So in this particular case you are just

24  saying you couldn't really be fair to the defendant and

25  follow this particular law because you would prefer that a

1   death sentence over a life sentence?

2        A.    Yes.

3        Q.    Okay.  And while you might be a perfectly good

4   juror on a case, another capital murder case, in this case

5   you have an opinion as to what the proper punishment should

6   be?

7        A.    I don't believe I'm actually saying that.  I

8   believe you are asking me to assume --

9        Q.    That he's guilty.

10        A.    -- that all this stuff is true --

11        Q.    Well, that's right, because I'm asking --

12        A.    See, if I go through the fantasy process that

13   you are asking me to go through, and these gentlemen have

14   proved to me beyond a reasonable doubt --

15        Q.    And I am -- I'm way past you found him guilty.

16   That's where we are now.  And if you found him guilty --

17              MR. SHOOK:  Judge, my objection is the

18   way these questions are being asked is she has him assume

19   all the facts of this case and give his personal opinions,

20   and then tries to disqualify him in general.

21              MS. BUSBEE:  Well, I've asked it two

22   different ways in general and I am entitled to ask if he's

23   got an opinion and I believe he's expressed it, Your Honor.

24              MR. SHOOK:  By assuming that all these

25   facts are true of specific facts.

1          MS. BUSBEE:  Well, he's seen the

2   indictment, he knows that the charge is.

3          MR. SHOOK:  But the way the questions are

4   asked, what are your personal opinions --

5          MS. BUSBEE:  Can we retire the juror for

6   this conversation, if it's going to be --

7          THE COURT:  I believe that would probably

8   be the best thing to do.  Mr. Campbell, would you be so kind

9   as to wait for us outside?

10                  [Prospective juror out]

11          MR. WIRSKYE:  Judge, our argument is that

12   you can't ask the juror to assume everything they think

13   about this case is true, then ask them if they have an

14   opinion about it, then turn around and disqualify them

15   because they have an opinion about this case.  It's

16   circular.  You've asked them to assume it's all true.

17          MS. BUSBEE:  No.  Well, what he does, I

18   cannot control.  But, Your Honor, what I've asked him is in

19   this case would he give effect to these Special Issues, and

20   he's told us 82 different ways if he finds someone guilty in

21   this case, he wants to give a death sentence.  I can't see

22   how he could be less qualified.

23          THE COURT:  Mr. Shook?  Mr. Wirskye?

24          MR. WIRSKYE:  Like the juror last week,

25   that's confusing guilt with our getting through all this.

```
 1                    MS. BUSBEE:  Well, I explained --
 2                    MR. WIRSKYE:  He's prefacing everything
 3    on --
 4                    MS. BUSBEE:  Oh, he understands it, he
 5    says the same thing once you --
 6                    MR. SHOOK:  If you'll recall, the way the
 7    defense counsel went into this, it starts asking we just
 8    want your opinions on what you remember about this case and
 9    the punishment, then we can talk real generally about the
10    law.  And then all of a sudden you start plugging the two
11    in.  He thinks she wants to know all about his opinions on
12    the case and how he's going to answer the questions.  And he
13    says, assuming all that is true, then I guess it'd be a yes.
14    She can get his personal opinions all she wants, and, you
15    know, if he's saying on his personal opinions on the facts
16    that I know and they've been described in this case, if you
17    want, and he even said that once, how I would answer on this
18    case?  Well, from the facts I know, yeah, I would answer
19    that first one yes, or it would be a death penalty.
20                    THE COURT:  Mr. Shook, understanding
21    sometimes people's perceptions are a function of how they
22    perceive things, as well as what they anticipate they
23    perceive.  And he's just as much of a tangler in this mess
24    as the lawyers are.  I certainly understand where the State
25    is coming from, but I made my own notes.  Even on the
```

1  State's direct, I noted there was a bias leaning toward the

2  defense before they even got started on it.

3             MR. SHOOK:  Okay.  Well, that's fine.

4             THE COURT:  The bottom line is that in

5  measuring him against the other people we've talked to and

6  qualified, he's not even close.

7             MR. SHOOK:  That's fine, Judge.  But a

8  while back I objected when she started asking about personal

9  opinions.  And she said, I just want to know his personal

10 opinions, and that's fine.  But then if you come back and

11 then try to cause people on that, I have a problem with

12 that.

13            THE COURT:  I'm not going to go there

14 because he was close just on direct.  And I have to measure

15 him by the other folks.

16            MR. SHOOK:  Yeah, I understand why you

17 ruled on this particular juror, although it would be nice to

18 have Jack Nicholson on the jury.

19            MS. BUSBEE:  He thinks he's Jack

20 Nicholson.

21            THE COURT:  I can see that.  But, no, I

22 certainly understand where the State is coming from, and I'm

23 not going to let the defense bait the trap on opinion to

24 cause a qualification issue.  So do you wish to agree or do

25 you wish me to find him not qualified?

```
 1              MR. SHOOK:  Oh, we can agree to it.

 2              MS. BUSBEE:  We agree.  We're all just

 3   sweetness and light now.

 4              THE COURT:  Would you ask Mr. Campbell to

 5   come back in?

 6                   [Prospective juror out]

 7              THE COURT:  Mr. Campbell, thanks so much

 8   for coming down.  I have some news for you.  You will be

 9   able to sit on your boat.  You're not going to be a juror on

10   this case.

11              PROSPECTIVE JUROR:  Okay.

12              THE COURT:  Thank you, sir.

13                   [End of Volume]

14

15

16

17

18

19

20

21

22

23

24

25
```

1   STATE OF TEXAS            *

2   COUNTY OF DALLAS          *

3        I, NANCY BREWER, Official Court Reporter for the 283rd

4   Judicial District Court, do hereby certify that the above

5   and foregoing constitutes a true and correct transcription

6   of all portions of evidence and other proceedings requested

7   in writing by counsel for the parties to be included in this

8   volume of the Reporter's Record, in the above-styled and

9   numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11       WITNESS MY OFFICIAL HAND on this the 4 day of

12  _____March, 2004.

13

14

15  _____
    NANCY BREWER, CSR, NO. 5759
16  Expiration Date:  12-31-04
    Official Reporter, 283rd JDC
17  Frank Crowley Crts. Bldg. LB33
    133 No. Industrial Blvd.
18  Dallas, TX 75207
    (214)653-5863

19

20

21

22

23

24

25

74851

1            REPORTER'S RECORD

2        VOLUME 36 OF _6_ VOLUMES

3        TRIAL COURT CAUSE NO. F01-00328-T

4   STATE OF TEXAS            *      IN THE DISTRICT COURT

5   VS.                       *      DALLAS COUNTY, TEXAS

6   PATRICK HENRY MURPHY, JR.  *      283RD DISTRICT COURT

7

8

9

10            *********************

11        INDIVIDUAL VOIR DIRE       **FILED IN**
                                    COURT OF CRIMINAL APPEALS

12            *********************       MAR 9 - 2004

13                                    Troy C. Bennett, Jr., Clerk

14

15        On the 14th day of October, 2003, the following

16   proceedings came on to be heard in the above-entitled and

17   numbered cause before the Honorable Vickers L. Cunningham,

18   Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

19        Proceedings reported by machine shorthand.

20

21

22

23                          **ORIGINAL**

24

25

1          A P P E A R A N C E S

2   APPEARING FOR THE STATE

3   Mr. Toby Shook
    SBOT NO. 18293250
4   And
    Mr. Bill Wirskye
5   SBOT NO. 00788696
    Assistant District Attorneys
6   133 No. Industrial Blvd.
    Dallas, Texas 75207
7   Phone:  214/653-3600

8

    APPEARING FOR THE DEFENDANT
9
    Ms. Brook Busbee
10  Attorney at Law
    SBOT:  03488000
11  703 McKinney Ave. Ste. 312
    Dallas, TX 75202
12  214/754-9090

13  Mr. Juan Sanchez
    Attorney at Law
14  SBOT:  00791599
    5630 Yale Blvd.
15  Dallas, TX 75206
    214/365-0700

16

17

18

19

20

21

22

23

24

25

| | | | | |
|---|---|---|---|---|

<center>PROSPECTIVE JUROR INDEX</center>

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Deloris Ellis | 4 | 5 | | 36 |
| Timothy Becher | 9 | 10 | 49 | 36 |
| John Henderson | 65 | 66 | | 36 |
| Kathy Fitzgerald | 77 | 79 | 102 | 36 |
| Sylvester Patton | 112 | 114 | | 36 |

```
1                    P R O C E E D I N G S

2              THE COURT:  Ready for Ms. Ellis.

3                  [Prospective juror in]

4              THE COURT:  Be seated.  Good morning.

5              PROSPECTIVE JUROR:  Good morning.

6              THE COURT:  How are you?  We have juror

7  No. 4803, Deloris Ellis; is that correct?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Ms. Ellis, welcome to the

10 283rd.  Looks like you are a little nervous this morning.

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  It's okay.  Most people are a

13 little nervous coming in because you have never been through

14 a process like this before.

15             PROSPECTIVE JUROR:  No.

16             THE COURT:  The best thing about it is

17 there are no wrong answers.  No wrong answers at all.  Did

18 you have enough time this morning to go through the guide I

19 provided for you?

20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  And also a copy of your

22 questionnaire?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  I did that so you can refresh

25 your memory and begin to think about the issues that we're
```

1    going to be dealing with and review your answers.  The

2    attorneys may want you to explain an answer or expand upon

3    an answer that you gave us back in May.  The whole process

4    here is designed to have you gain a working knowledge of the

5    law.  We want you to be able to understand and work the law

6    in this case.  Ask questions.  That's what this is all

7    about.

8                    The only thing I'm going to be able to

9    ask you at this point is will you be able to serve this

10   Court for a period of two weeks beginning on November 10th?

11                   PROSPECTIVE JUROR:  Yes.

12                   THE COURT:  At the end of the process I

13   will have two questions for you that I have to answer

14   myself.  Number one is, do you, in fact, understand the law?

15   And, number two, can you follow the law?  That's the big

16   picture I have to have.  Fair enough?

17                   PROSPECTIVE JUROR:  Okay.

18                   THE COURT:  Mr. Shook, would you like to

19   inquire?

20                   MR. SHOOK:  Yes, Judge.

21                   DELORIS ELLIS,

22   having been duly sworn, was examined and testified as

23   follows:

24                   DIRECT EXAMINATION

25   BY MR. SHOOK:

1   Q.    Ms. Ellis, my name is Toby Shook.  I'm going

2   to be asking questions on behalf of the State this morning,

3   and as the Judge says, there aren't any right or wrong

4   answers.  We just want your honest opinions.

5   A.    Okay.

6   Q.    I'll follow up on some of the information on

7   your questionnaire and then we'll talk about the capital

8   murder death penalty and how you feel about that.  Okay?

9   A.    Okay.

10   Q.    Now, on the questionnaire you said you worked

11  at GMAC; is that right?

12   A.    Yes.

13   Q.    What do you do with them?

14   A.    I work in the accounting department.  I

15  handle, like, suspended payments.

16   Q.    Okay.  And have you ever been down on a jury

17  before?

18   A.    Yes.

19   Q.    What type of case did you serve on?

20   A.    Um, it was a murder case.

21   Q.    Okay.  Do you recall about how long ago that

22  was?

23   A.    Um, it's been about ten years.

24   Q.    Okay.  I notice in your questionnaire you said

25  something about a murder case involving a teenager that was

1   shot.  The question we asked, was there anything that upset

2   you about your prior jury service, and was that -- the

3   victim of the crime was a teenager?

4        A.      Yes.  It was just a little much for me, a

5   little disturbing.  It was real intense.

6        Q.      Okay.  Pretty intense jury?

7        A.      (Prospective juror nods head.)

8        Q.      Do you remember what the sentence was?

9        A.      I believe he got 99 years.

10       Q.      Okay.  What do you remember about the facts?

11       A.      Um, um, according to like what they talked

12   about in the case?

13       Q.      Yes, ma'am.

14       A.      Just the pictures that they showed of the

15   incident.

16       Q.      Of the body and things like that?

17       A.      Yes.

18       Q.      Was it pretty upsetting to you?

19       A.      Yes, it was a little much.

20       Q.      Okay.  Obviously, you don't get to choose what

21   type of juries you come down on.  You have been down on a

22   murder case already.  And now with this one you find out you

23   are on a capital murder case, which involves another death.

24   And oftentimes, you know, there's, obviously, a lot of

25   graphic photos, a death involved, that sort of thing.

1          Do you think from the experience you have

2     had previously that that might, might affect you or may

3     bother you to sit on another case similar in nature?

4          A.    Yes.

5          Q.    Is it something that you don't feel you can go

6     through again?

7          A.    No.

8          Q.    You are pretty positive about that?

9          A.    Yes.

10         Q.    Okay.

11              MR. SHOOK:  Your Honor, I believe that's

12    all the questions we have then.

13              MS. BUSBEE:  We've reached an agreement

14    on this juror, Your Honor.

15              THE COURT:  Ms. Ellis, you can reduce

16    your stress level a little bit.  They have agreed to excuse

17    you.

18              PROSPECTIVE JUROR:  Okay.

19              THE COURT:  Okay?  Thank you so much.

20    You are free to go.

21              PROSPECTIVE JUROR:  Thank you.

22                  [Prospective juror out]

23              THE COURT:  Mr. Becher.

24                  [Prospective juror in]

25              THE COURT:  Good morning, sir.  We have

9

1   juror No. 4424, Mr. Timothy D. Becher; is that pronounced

2   correctly?

3                    PROSPECTIVE JUROR:  Becher.

4                    THE COURT:  Becher.  Good morning,

5   Mr. Becher.  Welcome to the 283rd.  Did you have an

6   opportunity to read the guide I provided for you this

7   morning?

8                    PROSPECTIVE JUROR:  Yes, I did.

9                    THE COURT:  I also gave you a copy of

10  your questionnaire that you filled out for us back in May so

11  you can begin to think about some of the issues that the

12  attorneys will discuss with you.  This process is designed

13  to provide you with a working knowledge and understanding of

14  the law that we're dealing with in this case.  Please ask

15  questions.  That's how you will learn.

16                   If I recall, I e-mailed -- you were in

17  London last week; is that correct?  That's why we had to

18  reschedule you backwards to get you here.

19                   PROSPECTIVE JUROR:  Yes, that's correct.

20                   THE COURT:  That's all I remember is why

21  you are out of order.  And will you be able to serve this

22  Court for a period of two weeks beginning on November 10th?

23                   PROSPECTIVE JUROR:  Yes, I will.

24                   THE COURT:  I didn't know if your travel

25  schedule would allow that.  Good.  Have you recovered from

1    your jet lag?

2                          PROSPECTIVE JUROR:  No, I'm still

3    recovering.

4                          THE COURT:  It's what, three o'clock in

5    the afternoon for you, isn't it?

6                          PROSPECTIVE JUROR:  That's right.

7                          THE COURT:  You should be up bright and

8    early this morning ready to go.  I appreciate you coming in

9    right after a return from London.  If you would, at the end

10   of the process I have two questions I must ask.  Number one

11   is, in fact, do you understand the law?  And, number two,

12   can you follow the law?  That's the big picture I have for

13   you.  So with that I will turn it over to Mr. Wirskye.  You

14   may inquire.

15                          MR. WIRSKYE:  May it please the Court?

16                          TIMOTHY BECHER,

17   having been duly sworn, was examined and testified as

18   follows:

19                          DIRECT EXAMINATION

20   BY MR. WIRSKYE:

21        Q.      Mr. Becher, how are you this morning?

22        A.      Good.

23        Q.      My name is Bill Wirskye and I'll be the

24   Assistant DA that will be visiting with you for the next few

25   minutes.  What I'd like to do is follow up on some of the

1    information in your questionnaire, talk to you a little bit

2    about your thoughts and feelings about the death penalty,

3    and then, finally, talk to you about some of the rules and

4    laws that apply in a case like this where the State is

5    seeking the death penalty.  Were you in London for business

6    or pleasure?

7         A.    Business.

8         Q.    Okay.  And you are an auditor; is that right?

9         A.    That's correct.

10        Q.    Okay.  What do you do kind of on a day-in,

11   day-out basis?

12        A.    Well, we have some legislation that was passed

13   last year and being an international company, I have to

14   travel to all of our subsidiaries and make sure that they

15   are in compliance with that new legislation.

16        Q.    Okay.  Do you travel quite a bit?

17        A.    Quite a bit, about forty percent of the time.

18        Q.    Okay.  But with enough notice I guess you can

19   serve as a juror for those two weeks, if you needed to in

20   November?

21        A.    Yes.  That wouldn't be a problem.

22        Q.    Okay.  And you are originally from California;

23   is that right?

24        A.    Well, I was born in Los Angeles, but I moved

25   to New Mexico when I was 3.  So I don't remember very much

1    about it.

2         Q.    Okay.  How long have you been in Texas?

3         A.    Two and a half years.

4         Q.    Okay.  What do you think about Texas so far?

5         A.    I like it.  I can do without the humidity, but

6    I enjoy it for the most part.

7         Q.    Wait until you get a little bit older.  It

8    gets tougher.  Let's see.  You told us generally you are in

9    favor of the death penalty; is that right?

10        A.    That's correct.

11        Q.    Okay.  Why do you think we should have the

12   death penalty or what purpose do you think the death penalty

13   serves in our society?

14        A.    I think it's a deterrent to commit murder.  I

15   think that that's the only way that you can -- I think if

16   you kill someone, then you should be put to death, if you

17   are convicted of that crime.

18        Q.    Okay.  Did you get a chance to read the packet

19   that the Judge provided for you?

20        A.    Yes, I did.

21        Q.    Some of the law?  Just generally, and I think

22   this surprises a lot of people, at least in Texas the death

23   penalty is only available for certain types of murder cases.

24   It's always got to be an intentional murder plus some other

25   aggravating factor.  There are a lot of very brutal and very

1  bad murder cases that, because they don't fit into that

2  criteria, the death penalty is simply not an option.  You

3  can get up to life in prison, but the death penalty would

4  never be on the table.

5  I know that surprises a lot of people, or

6  a lot of people, personally in their opinion, they would

7  have that death penalty option available for any murder

8  case.  And that kind of sounds like where you're at; is that

9  right?

10  A.  Um, I think I would probably be in agreement

11  with the laws of Texas.  I think if you kill someone in

12  self-defense, I think there would have to be special

13  circumstances to warrant the death penalty.

14  Q.  Basically, just to touch on self-defense, when

15  you are talking about capital murder, it's always the taking

16  of a life without legal justification or excuse.  It's not

17  self-defense.  If you kill someone in self-defense, you

18  would be guilty of no crime.  Or if you kill somebody

19  accidentally, you would be guilty of no crime.  So it's

20  always that intentional taking of a life without legal

21  justification or excuse.

22  When you are talking about the types of

23  cases where you can have the death penalty, if you kill a

24  certain person like a police officer, fireman, or prison

25  guard on duty, if you kill a child under six, if you commit

1    a murder during the course of another felony, like robbery,

2    rape, or burglary, mass murder, serial murders, those type

3    things.  Those are the type cases that we just reserve for

4    consideration for the death penalty.  And it sounds like

5    that's kind of what you are in agreement with, right?

6         A.    Yes.

7         Q.    But just to let you know the self-defense

8    scenario, or the accident scenario, is just simply not an

9    issue, usually, in a capital murder case.

10        A.    Okay.

11        Q.    And we ask people always to kind of rank

12   themselves on a scale of 1 to 10 that if they are in favor

13   of the death penalty, how strongly they are in favor of it.

14   And I think you gave yourself an 8.  And I know that means

15   different things to different people.  And I was just kind

16   of curious what that meant to you.

17        A.    I don't believe that a life sentence is

18   justified in the case of capital murder.  I think if you

19   take the life of someone without provocation for your own

20   purposes, then I think you should be put to death.  I don't

21   -- I just don't see how you can kill someone under certain

22   circumstances and be sentenced to life in prison.  I don't

23   -- I just don't think that's fair.

24        Q.    Okay.  And we talk to a lot of people that

25   that's their personal opinion.  I'll be up front with you.

1    That's not the law.  Just to, again, give you kind of a

2    brief overview of capital murder and how it works in Texas,

3    you have got to have one of those particular cases, you

4    know, murder of a certain person, murder under certain

5    circumstances, to get to capital murder.  If a person is

6    found guilty of that capital murder, then there's a whole

7    second phase of the trial, the sentencing phase.

8                    And that's where we ask a jury to answer

9    these three questions, and they are up on the wall there.

10   You may have gotten a chance to look at them.  And,

11   basically, what we do is we don't ask a jury to write in a

12   life sentence or a death sentence.  What we ask the jury to

13   do is answer these three questions and depending on the

14   answers to those questions, that determines whether the

15   person gets that life sentence or gets a death sentence.

16                   One way to look at it is, if you are

17   convicted of capital murder, one of those murders under a

18   special circumstance, if you are convicted in the first

19   phase, you are, basically, sitting on a life sentence at

20   that point.  Okay?  The only way you get to a death penalty

21   at that point during that second phase of the trial are if

22   these questions are answered in such a way that the death

23   sentence would be automatic.  Does that make sense to you?

24        A.      Yes.

25        Q.      And I know a lot of people feel if you have

1  been convicted of capital murder, death is always the

2  appropriate sentence.  But that's just not the law in Texas.

3  You know, we have to -- we ask a jury to answer these

4  Special Issues.  It's, basically, kind of a set of filters

5  to make sure that those people that are convicted of capital

6  murder and actually get death are the people that really

7  deserve it.  Does that kind of make sense to you?

8       A.    Yes, sir.

9       Q.    Is that a law you think you could follow?

10      A.    Yes.

11      Q.    Okay.  Despite your personal opinions, you

12  think you could, I guess, exercise the mental discipline and

13  work through these questions?

14      A.    Yes.

15      Q.    Okay.  Because we don't want people, very

16  frankly, who, if they convict someone of capital murder,

17  they just kind of disregard or blow off the evidence in the

18  second phase of the trial and just answer these questions in

19  such a way to ensure a death sentence.  We really want

20  jurors to kind of work through the issues.

21      A.    Understood.

22      Q.    Is that something you think you could do?

23      A.    Yes, I could.

24      Q.    Okay.  When you think about an appropriate

25  type, just again, your own personal opinion, not what the

1    law is, but your own personal opinion, when you think of an

2    appropriate type of case for the death penalty, is there a

3    particular case that comes to mind?

4         A.    Um, I think probably rape if that -- I would

5    say if getting into specifics, if I were with my wife and we

6    were carjacked or somebody put us in a situation where the

7    perpetrator just wanted to rape my wife and he had to kill

8    me to do that, I think that person would definitely be or

9    should be put to death.

10        Q.    Okay.

11        A.    I think if a person breaks into a house with

12   the intent to steal something for their own benefit and they

13   automatically go to the master bedroom and kill the people

14   in the house just to take the property, I think that would

15   warrant the death penalty.

16        Q.    Right.  I think both of those circumstances

17   you described would probably qualify as capital murder in

18   Texas.  I noticed in your questionnaire you also mentioned,

19   I guess, the sniper case, the D.C. snipers, I guess, Malvo,

20   and I can't remember the other guy's name, but --

21        A.    Yeah.  I think there's no, absolutely no

22   reason for them to kill without provocation.  I would think

23   that the death penalty would be -- well, I would probably be

24   on the fence with that one.

25        Q.    Why is that?

1      A.      I don't understand their motivations for

2  killing, and -- but from where I'm sitting, if you kill that

3  many people with no motivation, I would think that that

4  would probably be appropriate.  I would have to learn more

5  about the case, probably, before I can make that decision.

6      Q.      Kind of thinking about that sniper case, let

7  me touch on another issue that we talk to every juror about,

8  and that's, basically, the law of parties we call it in

9  Texas.  It deal with accomplices, okay?  When more than one

10  person commits a crime.  Kind of like you had in the sniper

11  situation.

12              The law says if more than one person

13  commits a crime, they can all be prosecuted for that crime

14  as long as everyone is actively involved.  When you are

15  talking about a capital murder type scenario, you may have a

16  situation where just one of the people is the actual

17  shooter, you know, the triggerman.  Only one person actually

18  caused the death.

19              You may have other accomplices who

20  actively participate in that capital murder, but,

21  nevertheless, they didn't actually cause the death.  Some

22  people who are very strongly in favor of the death penalty

23  tend to draw some lines sometimes.  And what I mean by that

24  is they would only reserve the death penalty just for the

25  triggerman.

1          You know, they may feel very strongly for

2   the guy that actually caused the death.  But if it were up

3   to them, when it comes to the accomplices, they would simply

4   take the death penalty off the table, and the death penalty

5   wouldn't be an option for the accomplices.  Other people we

6   talk to kind of feel differently.  They say, you know, it

7   depends on the facts and circumstances.  I'd have to know

8   the facts before, you know, I could consider the death

9   penalty for an accomplice.  Where do you come down on that

10  issue?

11         A.    I would have to know the facts.  I think if

12  you -- well, that's a pretty difficult issue.  I think if

13  there are two people that are going to commit a robbery and

14  they go in with the intent to murder the store clerk and

15  just one of them does it and the other one takes the money

16  from the register, then I would think if they had that

17  mindset going in, then they would definitely both be liable

18  for that death, I think.

19         Q.    Okay.  So you can see the death penalty in

20  that case for the person that didn't actually pull the

21  trigger?

22         A.    Yes, I could.

23         Q.    Okay.  I guess it's kind of like the sniper

24  case where I guess the older guy directed the young guy to

25  actually pull the trigger, that type thing?

1    A.    You know, I would definitely like to see all

2  of those, the issues, and all the facts that would come out

3  before I would make a consideration like that, but I think

4  it all comes down to the intent.  If they went into a

5  situation with the intent to kill and both parties knew that

6  that was the goal, that was what they wanted to do, then I

7  would think both parties would be liable.

8    Q.    Okay.  And, we know, we talk to so many people

9  that intent is very important.  Let me follow up on your

10  example real quick and just to show you kind of how the law

11  of parties operates in Texas.

12         Let's say Mr. Shook and I decide we're

13  going to rob that bank, and we get together.  Our plan is

14  just to rob the bank, okay?  The plan is he's going to go in

15  with the gun.  He's going to hold up the tellers.  I'm going

16  to go in unarmed and I'm just going to clear out the money

17  drawers while he holds everyone at bay.  Okay?  And that's

18  our plan.  That's what I sign up for.

19         During the course of that robbery, let's

20  say Mr. Shook decides to shoot and kill one of the tellers.

21  Maybe one of them looks at him funny or, you know, he sees

22  somebody going for a silent alarm or I tell him somebody is

23  going for a silent alarm, nevertheless, he shoots and kills

24  someone.  He commits an intentional murder during the course

25  of a robbery.  He can be convicted of capital murder.  He

1  could face the death penalty depending on the answers to

2  these questions.

3              And the law says, depending on the facts

4  and circumstances, I could, too, be convicted of capital

5  murder and potentially face the death penalty, even though

6  in my example I never had any intent, you know, for him to

7  pull that trigger.  You know, I just signed up for the bank

8  robbery.  And, again, some people view that scenario a

9  little bit differently because the accomplice doesn't have

10  the intent, you know.  What do you think of that situation?

11     A.     I could definitely see the death penalty for

12  the shooter.  I would be on the fence for the accomplice.

13  I'm not sure if, um, if that was a reaction of one person

14  and I don't know if I could hold the accomplice liable for

15  that.

16     Q.     What would be important to you, thinking

17  through that scenario?  Any particular facts or factors when

18  you are talking about giving me, the accomplice, the death

19  penalty?

20     A.     I would go -- that's a tough question.  I

21  think if you go in with the intent that if somebody foils

22  our plan and we have to kill someone, then so be it.  We're

23  going to accomplish what we need to accomplish and take this

24  money, then I would probably consider it for you.  But if it

25  so happened that everything went crazy, the situation, and

1    Mr. Shook shot and then both ran, I would have to look very

2    carefully at all of those facts.  I don't -- I would say

3    that I would probably not be in favor for you, if you didn't

4    actually pull the trigger.

5         Q.    Okay.  What the law says is a person can be

6    convicted, an accomplice like me, who didn't have the intent

7    that a death happen, but they can be convicted and face the

8    death penalty, if the jury thinks that I should have

9    anticipated that a death would happen.  You know, by the

10   fact that we went in armed or he went in armed during that

11   bank robbery.

12              You know, it could even be a situation

13   where we get in there and, you know, I'm begging him not to

14   shoot, you know, but he does it anyway.  If the jury thinks

15   that I should have anticipated that a life would be taken,

16   then I could potentially face the death penalty.  What do

17   you think about that?

18        A.    I agree with that.

19        Q.    Okay.

20        A.    If, yeah, that's, if you should have

21   anticipated it, then I would probably say that you would be

22   liable for the death penalty.

23        Q.    Okay.  And that's what a lot of people tell

24   us.  Maybe, you know, the fact that he carried a loaded gun

25   to a bank robbery, the accomplice maybe should have

1    anticipated.

2         A.    Yeah.

3         Q.    In fact, before we can get to the death

4    penalty the law says not only, you know, the jury has to

5    find that I should have anticipated, but did I actually

6    anticipate?  And that's kind of the law before we get to the

7    death penalty.

8         A.    Okay.

9         Q.    Any questions about those kind of scenarios,

10   those accomplice scenarios?

11        A.    No.

12        Q.    And the reason I touch on them at length is,

13   to be very honest with you, that's the theory of law we're

14   prosecuting this case under, is an accomplice.  And that's

15   why it's so important for us to find out what people really

16   think about that and whether they're comfortable following

17   the law as it is in Texas with that "should have

18   anticipated."  Is that something that you are comfortable

19   with?

20        A.    Yes.

21        Q.    Okay.  Mr. Becher, like everybody we talked to

22   just about, you've indicated that you've heard something

23   about this case or know something of the facts through the

24   media, that type thing.  Can you tell us what you remember

25   hearing about this case?

1      A.      Um, seven inmates, they escaped from prison

2  and then to, I guess, finance their travels or whatever,

3  they went into an Oshman's in Irving and they were

4  interrupted by an officer that was called to the scene and

5  when he got there shots were fired into his car and he was

6  killed, then he was ran over, I guess, to make sure that he

7  was dead.

8              And then they went with the money that

9  they obtained from the robbery and then, I think they also

10  robbed a Radio Shack where no one was killed, and then went

11  to Colorado and they were at a trailer park and they were --

12  stayed there for a few weeks, I believe.  And then they were

13  discovered and six of them -- six were apprehended and one

14  took his own life.

15      Q.      Okay.  Is this something that you got through

16  the newspaper or watching TV or documentary or --

17      A.      The newspaper and Internet.

18      Q.      Okay.  Is it something, anything that you have

19  looked at recently or is this something back from the time

20  it happened, or --

21      A.      I did look at the case a little bit more

22  closely after I was called in for the jury duty.

23      Q.      Sure.

24      A.      I just pulled up some information on the

25  Internet to look at.

1   Q.   Did you become aware of any of the results of

2   any other court proceedings or cases regarding this case?

3   A.   I know that Mr. Rivas was found as the

4   ringleader.  He was found guilty of capital murder and

5   sentenced to death.

6   Q.   Okay.  You know, we always ask people and we

7   kind of rely on each juror to kind of really be honest with

8   us.  It's kind of an unusual case because most criminal

9   cases we try down here people come in with absolutely no

10  knowledge of the case.  They have no idea what the case is

11  going to be until they get in the jury box.

12          Obviously, on a high profile case like

13  this people have heard different amounts of things.  Sounds

14  like you have a pretty good detailed grasp of the facts.  So

15  we just kind of rely on people to kind of tell us how they

16  think that may affect them, if they were selected as a juror

17  in this case, knowing what you know.

18  A.   Um, I think that I would wait until I was in

19  discovery of all of the facts before I could make any

20  decisions.  I know that there's been a lot of media

21  coverage, but I don't think that I would be influenced by

22  that at all.  I mean, being an auditor, I like to look at

23  all of the evidence right in front of me before I make any

24  determination.

25  Q.   What the law is, you know, you are not

1  automatically disqualified just because you have heard about

2  the case. You know, if that were the case, we would never

3  get a jury in high profile cases. But the law requires that

4  if you are going to be a juror on the case, regardless of

5  what you have heard or any opinions or conclusions you may

6  have formed, as long as you can put that to the back of your

7  mind.

8          You know, we can't ask you to forget it,

9  obviously, but put it to the back of your mind and be able

10 to tell us that you can base your verdict just on the facts

11 and the evidence you hear in the courtroom and not anything

12 you may have heard outside or previously. As long as you

13 could do that, you could be a qualified juror. Is that

14 something you think you can do?

15         A.     Yes.

16         Q.     Okay. You know, a lot of people, I guess,

17 philosophically or in the abstract are in favor of the death

18 penalty. Sometimes when people come down here it affects

19 them a little differently, because the whole process becomes

20 a little more real. You're in a courtroom looking at

21 lawyers, looking at the person down at the end of the table,

22 knowing, very frankly, it's our goal that, you know, he be

23 found guilty of capital murder because we believe we have

24 the evidence, and that one day, you know, not to put too

25 fine a point on it, but one day he'd actually be executed

1  and be lying dead on a gurney in Huntsville, Texas.

2  But I think to a lot of people when they

3  get to this point in the process, you know, even though they

4  are philosophically in favor of the death penalty, they are

5  not completely comfortable or they have some hesitation

6  about potentially participating in the process, being one of

7  the jurors to make those life and death decisions.

8  And we always ask people if they think

9  they are the type person that could make those decisions

10  and, again, we rely just on you and knowing yourself like

11  you do.  But do you think you are the type person that could

12  take pen in hand and answer these three questions in such a

13  way that it may ultimately result in the execution of

14  another human being?

15  A.  Yes, I could.

16  Q.  Okay.  Why do you say that?

17  A.  I believe in our justice system and I believe

18  that death penalty is appropriate in some cases, and I'm,

19  obviously, not familiar with the law where it's warranted,

20  but I think that our government has a good system of

21  following the steps, discovering the facts, to see if a

22  person should be put to death.  And I'm in favor of the

23  death penalty and I would not have a problem going through

24  that process, evaluating all the evidence.

25  Q.  Okay.  Fair enough.  I don't want you to think

1   that, you know, almost everybody that walks in here unless

2   they're a lawyer or does what we do for a living, most

3   people don't know what the scheme is in Texas and how it

4   works or what particular crimes it is available for.  So

5   don't feel bad about that at all.  And we know everybody

6   comes with different opinions and different thoughts in

7   their own personal life.

8              And it's fine to have whatever feelings,

9   thoughts, or opinions you have in your personal life.  The

10  bottom line is always going to be, regardless of those

11  opinions, can you set them aside and follow the law that we

12  have in Texas.  And that's, like I said, is the ultimate

13  question for everything we talk about, so.

14             Let's take a second and talk about these

15  three Special Issues.  Again, these are the questions that

16  would determine whether that person gets the life sentence

17  or whether they actually get the death sentence and this

18  would be during the second phase of the trial, the

19  sentencing phase, after you have already found somebody

20  guilty of capital murder.

21             The law requires that you start that

22  sentencing phase with an open mind, you know, no automatic

23  answers just because you found someone guilty of capital

24  murder.  You listen to the extra evidence that you get to

25  hear in sentencing, background evidence, reputation,

1    criminal history, that type stuff, both good and bad, if it

2    exists.

3                    And we let you listen to that type of

4    information to help you answer these three questions.

5    Is that scheme kind of making sense now, the way we have it?

6         A.    Yes.

7         Q.    Okay.  Take a moment or two and just read

8    through those three questions and we'll kind of run through

9    them and talk about each one of them.

10        A.    Okay.

11        Q.    Again, those are the three questions that we

12   ask the jury to answer at the end of the process.  Again,

13   one way to look at it, if you've convicted someone of

14   capital murder, they are sitting on a life sentence.  The

15   only way to get to the death penalty is if these questions

16   are answered in a certain way.

17                    And, again, the law contemplates that a

18   juror be able to start that second phase of the trial with

19   an open mind.  Sometimes we run into people that tell us,

20   you know, very frankly, Mr. Wirskye, you know, if I found

21   somebody guilty of a capital murder, when I look at Special

22   Issue No. 1, that talks about whether they are going to be

23   that continuing threat to society, just because I found him

24   guilty of capital murder, I'm always going to answer that

25   question yes.  Okay?  I'm always going to think every

1  capital murderer is going to constitute a continuing threat

2  to society.

3          If you feel that way, that's fine.  You

4  just wouldn't be qualified, because the law requires that

5  jurors be able to keep that open mind when they start out.

6  No preconceived notions of doing anything automatically.

7  Does that make sense to you?

8          A.   Yes.

9          Q.   Okay.  Special Issue No. 1, again, talks about

10  that continuing threat to society.  There's some terms and

11  words and phrases in there that aren't necessarily defined

12  legally.  The law kind of allows jurors just to use their

13  own good common sense and definitions of words.

14          We always ask every juror kind of to

15  define some words for us just so we can get a feel for where

16  you are coming from.  That word "probability" that you see

17  in the first question, what does that mean to you,

18  "probability"?

19          A.   Good chance, if I think it will happen again,

20  most likely.

21          Q.   More likely than not?

22          A.   Right.

23          Q.   A likelihood?

24          A.   Right.

25          Q.   That's typically what people tell us.  It's,

1    obviously, something short of a certainty, because, you

2    know, you could never be certain about anything in the

3    future.

4         A.    Right.

5         Q.    And something less than that and something

6    more than a mere possibility, because anything could be

7    possible, that type thing.  When you see that phrase in the

8    middle line "criminal acts of violence", what type of crimes

9    or what type of acts come to mind when you look at that?

10        A.    Murder, burglary, violence, I think of

11   assault.

12        Q.    That's typically what people tell us,

13   assaultive type crimes or crimes that involve the threat of

14   violence, that type thing.  Is that something you're

15   comfortable with?

16        A.    Yes.

17        Q.    Okay.  And then, finally, that word in there,

18   "society."  What does that mean to you or how would you

19   define society?

20        A.    Society, I would think of members that are

21   contributing to the economy, you and I working every day to

22   try and make money for our family.

23        Q.    Okay.  Would you limit it just to include

24   those people that are not locked up?  Or would you, you

25   know, kind of expand it to include those people behind bars?

1    A.    Yeah, I would.

2    Q.    You know, other prisoners, guards, wardens,

3    that type of thing?

4    A.    Yes.

5    Q.    Everyone and anyone he may come into contact

6    with?

7    A.    Yes.

8    Q.    Okay.  Do you see how that question kind of

9    asks a juror to make a prediction about the future?

10   A.    Uh-huh.

11   Q.    Is that something that you are comfortable

12   doing?

13   A.    Yes.

14   Q.    Okay.  What type of information do you think

15   would be important to you in answering that question?

16   A.    Um, I would think probably background, prior

17   incidents, criminal record.

18   Q.    Okay.  Look for a pattern, that type of thing?

19   A.    Right.  And I would, also, look at the case

20   itself.  I mean, obviously, it doesn't apply in this case,

21   but if there were a case where an individual committed one

22   act of murder where they were completely wronged and there

23   were special circumstances why they committed the murder --

24   Q.    Sure.

25   A.    -- they didn't have a history of burglary.

1      Q.    See, let me tell you two things.  I want you

2  to realize, very frankly, we're not talking -- we're talking

3  about a hypothetical capital murder case.  I know you may

4  know a little bit of the facts of this case.  But we're

5  always talking in the hypothetical.

6      A.    Okay.

7      Q.    I'm not asking you to answer these three

8  questions based on what you know about this case.

9      A.    Okay.

10     Q.    You know we talked about how the law kind of

11  requires you to keep that open mind?  Just because you have

12  convicted someone of capital murder, you don't automatically

13  answer that question without looking at the evidence.  Kind

14  of, I think an example you were going towards.

15         You know, say, I come home and find out

16  my neighbor's done something awful to my little daughter,

17  you know, sexually abused her.  I think about it overnight.

18  The next day, get up, go kick in his door, commit burglary,

19  and kill him, because I don't think the police are going to

20  do anything about it.

21         I've committed capital murder during a

22  burglary.  I could be convicted of it, but a jury may think

23  I'm never going to be a future danger, that type thing.

24     A.    Right.

25     Q.    And it's those type of -- because, you know,

1    we can't get into the facts of this case.  We're always

2    talking hypothetically.  But I think that is why the law

3    contemplates that everybody be able to keep that open mind

4    and not answer anything automatically or prejudge before

5    they've heard all the evidence.  Does that make sense to

6    you?

7            A.    Yes.

8            Q.    Okay.  Special Issue 1, one last point about

9    it.  It starts off with a no answer, okay?  That's kind of

10   the default setting for that question.  It's part of our

11   burden of proof to prove to you as a juror that the answer

12   should be yes.  Okay?  We've got to prove he's guilty of

13   capital murder and we've got to prove to you the answer to

14   No. 1 should be yes.

15               And No. 2 is the exact same way.  We've

16   got to prove that that answer should be yes as well.  That

17   starts off with a no.  It's our burden of proof to prove it

18   to you yes.  Does that make sense?

19           A.    Yes.

20           Q.    If we don't bring you that evidence or if you

21   don't think we've met that burden, then the answer stays no.

22   And, very frankly, the effect of answering either of those

23   no would be a life sentence.  We wouldn't be able to get to

24   that death penalty.  Does that make sense to you?

25           A.    Yes.

1    Q.    Even somebody such as yourself that believes

2  strongly in the death penalty, do you see how if you really,

3  you know, are conscientious and work through these

4  questions, that somebody could end up with a life sentence?

5    A.    Yes.

6    Q.    Okay.  Moving on to Special Issue No. 2, it

7  starts off with that no answer.  This is the question that

8  deals with that kind of accomplice scenario that we've

9  already talked about.  If you think the person actually

10  caused the death of the deceased, you'd answer it yes.  If

11  you didn't think they actually caused it, but they intended

12  to kill the deceased or another, you would answer yes.

13  Maybe that sniper type scenario where somebody is directing

14  another to kill.

15    A.    Right.

16    Q.    Obviously, they had the intent, but they

17  didn't actually pull the trigger.  Or, very finally, the

18  last line, anticipated that a human life would be taken.  We

19  kind of already touched on that, but I want to go back over

20  it one more time.

21          In order to convict an accomplice of

22  capital murder, like me in our example, the jury would have

23  to find that I should have anticipated that a life would be

24  taken.  Okay?  When we get to the punishment phase in the

25  questions, the law imposes a little bit higher standard on

1   us before we can get to the death penalty.  We have to prove

2   to a jury that he actually anticipated, that he did

3   anticipate a life would be taken.  And sometimes it's a fine

4   distinction.  Do you see the distinction between "should

5   have" and "did"?

6          A.     Yes.

7          Q.     One thing I think of -- and I tell people

8   sometimes, when I was 16 my dad gave me a car.  And I didn't

9   know what I was doing at 16 and I drove it crazy like a, you

10  know, a madman.  And after about a month I wrecked it out.

11  My dad came back to me and he was very angry and said, you

12  know, you such and such, you should have anticipated if you

13  drove like that you were going to wreck that car out.

14              And he's right, I should have.  But I

15  didn't actually anticipate.  I was too young and too dumb at

16  the time.  So I think that's a good example between should

17  have and did.  Does that make sense to you?

18         A.     Yes.

19         Q.     Okay.  And, again, you may go back and look at

20  the evidence you heard in the first part of the crime to

21  help you answer that question.  You may find out about his

22  past history in the second phase of the trial to help you

23  answer that anticipation question.

24              You know, obviously, we can't pull off

25  the top of someone's head and climb in and see, you know,

1  what they actually anticipated. We just kind of have to

2  look at the facts and the acts that people did and draw

3  conclusions or inferences from that to determine that

4  anticipation. Does that make sense to you?

5       A.    Yes, it does.

6       Q.    Okay. Is that something you think you could

7  do?

8       A.    Yes.

9       Q.    Okay. Some people tell us, you know, to

10 answer that question I would have to hear from the

11 defendant, you know. I'd have to hear what he actually

12 anticipated. The problem with that is the defendant always

13 has a Fifth Amendment right not to testify in his own

14 defense. We'll talk about that more in a minute.

15            But do you think that you are comfortable

16 answering that question without him testifying and just

17 looking at the facts of the crime and the facts of the

18 person and their background?

19      A.    Yes.

20      Q.    Okay. Again, those two questions 1 and 2

21 start off with a no. We've got to prove it to you. If we

22 don't meet our burden of proof, you've got to keep it yes,

23 or keep it no. And, again, the practical affect of that is

24 the person gets a life sentence rather than a death

25 sentence. If both 1 and 2 are answered yes, then you move

1   to Special Issue No. 3.

2                    That's kind of the last stop in the

3   process.  This is what we call the mitigation question.

4   Some people think of it as a jury's chance to show mercy

5   based on the facts, if they think it's appropriate.  We ask

6   a juror to kind of step back, take a deep breath, look at

7   all the facts and evidence they have heard in both phases of

8   the trial, and see if there's anything that is mitigating.

9                    And by mitigating we mean something that

10  kind of lessens a person's personal blame for what happened,

11  okay?  Kind of the opposite of aggravating is mitigating.

12  And we ask a juror is there anything there, is there

13  anything that lessens that moral blame, and if there is, is

14  it sufficient that his life ought to be spared, that he

15  should be given that life sentence and not a death sentence.

16  Does that make sense to you?

17       A.      Yes.

18       Q.      Okay.  Do you see the value in having that

19  type of question, you know, and kind of the jury's chance to

20  show mercy based on the facts?

21       A.      Yes.

22       Q.      Okay.  Because some people tell us, you know,

23  if I'm this far in the process, if I found somebody guilty

24  of capital murder, if I found they were a future threat to

25  society, and at the very least they anticipated that a life

1  would be taken, my mind is closed at that point.  There

2  could never, ever be anything mitigating in my mind.

3                    And they tell us that question has no

4  value for them.  If you feel that way, that's fine.  You

5  just simply wouldn't be a qualified juror.  But based on

6  what you have told us, you do kind of see the value in that

7  question; is that right?

8        A.    Yes.  I think that if, once again, looking at

9  past experience and if there were certain incidents that

10  occurred in childhood that would have a really bad effect on

11  someone, and maybe that would be where I would consider

12  insanity, if they were considered insane by --

13        Q.    Okay.  Let me just stop you there real quick

14  and clear up one point.  And most people are not aware of

15  this.  If a person is legally judged insane, we wouldn't be

16  in this case.

17        A.    Okay.  Understood.

18        Q.    The person wouldn't know the difference

19  between right and wrong, and at that point, you know, they

20  wouldn't be held responsible in this sort of way.  Does that

21  make sense?

22        A.    Yes.

23        Q.    But I know you expressed some concern in your

24  questionnaire, kind of what you talked about a person's

25  upbringing.  And a lot of people tell us that.  They say,

1    you know, it may be potentially mitigating if a person had,

2    you know, a bad childhood, was physically, emotionally

3    abused as a child, a bad environment, that type thing.   I

4    would consider that to be maybe potentially mitigating,

5    depending on the other facts.   That's kind of what I hear

6    you saying; is that right?

7          A.      Yes.

8          Q.      Okay.   Anything else you can think of that

9    might be potentially mitigating?

10         A.      Um, to use your example, if someone murdered

11   my wife, I mean, after they sexually assaulted her, then I

12   would consider that, well, this individual hasn't performed

13   murders in the past, they've never had a criminal record,

14   and they, you know, performed this one act of murder, then I

15   would say maybe that would be mitigating circumstances.

16         Q.      Something that's just totally out of

17   character, based on their past history?

18         A.      Right.

19         Q.      Sure.   The evidence may actually come from our

20   evidence.   This question is a little bit different.   Neither

21   side has the burden of proof.   It doesn't start off with a

22   no answer.   We just rely on the jurors to answer it as they

23   see fit.

24               You know, again, we're always talking

25   about hypotheticals and giving examples, but, you know,

```
1   maybe a circumstance where somebody commits a capital murder
2   and they instantly feel remorseful.  They pick up the phone
3   and call 911 or try to give CPR to the victim before they
4   die.  You know, that type of thing.  That may be mitigating.
5   Does that make sense to you?
6        A.    Yes.
7        Q.    It may come from the State's evidence as well.
8   The law doesn't require that you consider anything, any
9   particular factor, mitigating.  We just leave it up to you.
10  You don't even have to agree with the other jurors what you
11  think is mitigating, as long as you can tell us that you
12  have that open mind this late in the process, and if you
13  hear something mitigating, you will consider it.  As long as
14  you do that, you would be a qualified juror.  It sounds like
15  that's something you can do?
16       A.    Yes.
17       Q.    Any questions about this scheme?  Because I
18  know, you know, just from talking to you these last few
19  minutes and talking to -- doing this day in and day out,
20  most people don't realize kind of how the scheme works.  But
21  any questions about it?
22       A.    No, I understand it.
23       Q.    Okay.  They may be answered at the end of all
24  the evidence in both phases of the trial.  And that's why
25  it's important, I guess, that we don't go on with those
```

1  preconceived notions, but do you see how a person that is

2  maybe strongly in favor of the death penalty like you are

3  for capital crimes could actually end up giving a life

4  sentence, you know, based on the facts and answering these

5  questions?

6          A.    Yes.

7          Q.    Okay.  Let's talk a little bit about some of

8  the general rules that apply in any criminal case.  We have

9  kind of touched on a lot of these already.  You may remember

10 them from school.

11             The burden of proof is always on this

12 table.  We have to bring you evidence to prove to you beyond

13 a reasonable doubt that the person is guilty of capital

14 murder, that the answer to 1 and 2 should be yes.  You can

15 never look at these guys to bring you anything or require

16 them to bring you anything.

17             Legally they can sit there and do

18 crossword puzzles the whole trial and never ask a question.

19 It's not going to happen.  They are good lawyers.  But it

20 kind of illustrates the point that you've always got to look

21 here for the burden of proof.

22         A.    Right.

23         Q.    As a part of that the person is presumed

24 innocent.  As we sit here right now, he's presumed innocent.

25 The only way we -- he is found guilty is if we bring you

1    proof beyond a reasonable doubt and that's when that

2    presumption of innocence disappears.  Does that make sense

3    to you?

4         A.    Yes.

5         Q.    Again, the Fifth Amendment, no one can force

6    him to testify.  If he wants to testify, no one can keep him

7    from testifying.  If he doesn't testify, the Judge would

8    tell you, you just simply couldn't consider it.  It's a

9    nonfactor.  You couldn't hold it as a circumstance against

10   him because there may be very many, you know, quite a few

11   reasons why he may not testify.

12              He may not be a good public speaker.  He

13   may be guilty.  He may be relying on his lawyer's advice who

14   told him to stay off the stand.  Because there's so many

15   reasons, you just can't consider it or hold it against him,

16   if he doesn't testify.  Does that make sense to you?

17        A.    Yes.

18        Q.    Okay.  Did you get a chance to look at our

19   indictment?  I think it's in the back on the last page in

20   the booklet.  See where it says indictment?

21        A.    I didn't look at the last page.

22        Q.    The back of the last page.  True Bill of

23   Indictment.

24        A.    Oh, okay.

25        Q.    That's what we call the charging instrument.

1    That's what we write as DA's where we allege what we think

2    happened in the crime.  And that's, basically, what we have

3    to prove in order to get a guilty in the case.

4                        Those crimes kind of break down into

5    different elements.  Okay?  As part of our burden of proof,

6    the law requires that we prove to you each and every element

7    of the crime that we've alleged beyond a reasonable doubt.

8    You know, we can't, we don't get partial credit.  We can't

9    go nine for ten or eight for ten.  We've got to hit them

10   all.  If we alleged it, we've got to prove it.

11                       The law says one element is no more

12   important than another element.  Okay?  Obviously, one

13   element of a crime is proving we've got the right person,

14   the person's identity.  If you had a reasonable doubt that

15   we proved that element to you, you would be required to find

16   that person not guilty.  Okay?

17                       Kind of an extreme example of how that

18   works is another element of every crime is the county in

19   which the crime happened.  Okay?  In this case we have

20   alleged Dallas County.  Say in a hypothetical murder case we

21   alleged Dallas County.  We don't do our jobs.  We don't do

22   our homework.  The proof comes out at trial that it actually

23   happened in Tarrant County, across the border.

24                       You are convinced the guy did the murder.

25   You're convinced he's good for it.  But we just messed up.

45

1   We got the wrong county.  We didn't prove what we alleged in

2   our indictment.  You'd have a reasonable doubt about an

3   element.  The law would require you to find the person not

4   guilty.

5                   You may not like it.  You may find it

6   distasteful.  You may think it's a technicality.  But that's

7   kind of the mental discipline that the law requires of

8   jurors.  Is that something you think you could do?

9        A.      Yes.

10       Q.      Okay.  Or, you know, one of the elements that

11  we allege is the manner and means in which the crime was

12  committed.  We may allege a person was shot to death with a

13  gun.  It turns out the medical examiner says he was actually

14  stabbed to death.

15                  You may have no doubt about any other

16  element of the crime, but if we didn't get that element

17  right, you would have to find the person not guilty and very

18  simply we just wouldn't be doing our jobs.  You can go up

19  and get us fired, you know, that day.  But is that a law you

20  think you could follow?

21       A.      Yes.

22       Q.      Okay.  Let's talk a little bit about the

23  witnesses that you may hear from.  You probably imagine in a

24  criminal case that you are going to hear from police

25  officers.  The law says that you've got to initially treat

1    police officer witnesses just like any other witness.

2                    You have to start them out at that same

3    level of credibility.  You can't give them an automatic leg

4    up, just because they walk in carrying a badge and a gun.

5    You've got to listen to what they say to see if they're

6    credible or not.  You can't give them that automatic head

7    start.  Is that something you think you could do?

8         A.    Yes.

9         Q.    Okay.  Sometimes in these cases during the

10   punishment phase with these issues you may hear from a

11   psychiatrist or a psychologist to try to help you answer

12   maybe Special Issue 1, the future danger question, or

13   Special Issue 3, the mitigation question.  So we're always

14   curious to kind of get people's gut reaction to those type

15   witnesses in these cases, you know, expert witnesses.  What

16   would you think of that type of testimony, those expert

17   witnesses, psychologists or psychiatrists?

18        A.    I would -- I would consider it.  I mean, I

19   would definitely listen to what was said about a credible,

20   someone that I would consider a credible witness, if they

21   were to say that there were definitely instances of abuse

22   that may have led to this behavior, something like that.  I

23   would consider that.

24        Q.    Okay.  And that's, basically, what the law

25   requires, again, that you keep that open mind.  Sometimes we

1   have people that would never believe them.  They think, you

2   know, you can find an expert witness, if you look hard

3   enough and pay them enough money to come in here and say

4   whatever you want.  Maybe they don't believe in psychology

5   or psychiatry, think it's a soft science.

6               At the other end of the spectrum you may

7   have people that believe too much in them.  They think

8   they're all geniuses and every word out of their mouth is

9   golden.  We're just kind of looking for those people in the

10  middle.  That kind of sounds like where you're at?

11       A.    Yes.  I would definitely take it under

12  consideration and consider the credibility of the witness.

13       Q.    We've talked, again, the two possible

14  punishments for capital murder in Texas, that life sentence

15  or the death sentence, if we work through these questions in

16  the proper way.  There is no life without parole in Texas.

17  So let me talk to you a little bit about the parole laws and

18  how that affects this case.

19               A life sentence in this case would mean

20  that a person would serve 40 calendar years, day for day,

21  before that person would see a Parole Board, before they

22  would become eligible for parole, okay?  Forty years down

23  the line they may see that first Parole Board and make

24  parole.  Or they may never make parole and actually serve an

25  actual life sentence.  That kind of make sense to you?

1      A.      Yes.

2      Q.      Because those decisions are so far in the

3   future and they are beyond the control of anyone here, the

4   Judge would instruct you that you just have to consider that

5   a life sentence actually means a life sentence when you are

6   deliberating.  Does that make sense to you?

7      A.      Yes.

8      Q.      Is that something you think you could do?

9      A.      Yes.

10     Q.      Okay.  Another thing that may come up, I don't

11  know if it will, but I need to talk to you about it before

12  we wrap up, are these things called lesser included

13  offenses, okay?  Lesser included offenses.

14              Let's say at the first stage of the trial

15  in a capital murder case, murder during the course of a

16  robbery, you may have a reasonable doubt about the murder

17  part.  You don't have any doubt that the guy is good for

18  aggravated or armed robbery.  You may have an option of just

19  finding him guilty of that lesser included offense of

20  aggravated robbery.

21              If you do that, then you throw this

22  scheme out the window and the law says that you set

23  punishment somewhere between five years all the way up to

24  life in prison.  That's the punishment range for aggravated

25  or armed robbery in Texas.  The law requires that you be

```
1   able to, as you sit there right now, in any hypothetical
2   aggravated robbery case, that you tell us you can keep an
3   open mind to the full range of punishment, five years all
4   the way up to 99 or life.  Is that something you think you
5   could do?
6           A.    Yes.
7           Q.    Okay.  Mr. Becher, we've run over a lot.  You
8   probably feel like you spent a day in law school, probably.
9   But any questions at all about any of this?
10          A.    No.
11          Q.    Okay.  Again, the bottom line always is can
12  you follow the law?  Can you keep that open mind, regardless
13  of what your personal thoughts or opinions are?  If you can
14  follow the law and give a fair trial to both sides, you
15  would be a qualified juror.  I appreciate your time.  Thank
16  you.
17                  MR. WIRSKYE:  That's all I have, Judge.
18                  THE COURT:  Mr. Sanchez?
19                  MR. SANCHEZ:  Thank you, Your Honor.
20                  CROSS-EXAMINATION
21  BY MR. SANCHEZ:
22          Q.    How are you doing today, Mr. Becher?
23          A.    Doing well.
24          Q.    Good.  Good.  I was looking at your
25  questionnaire.  I saw that you grew up in, is it Farmington,
```

```
 1    is that where --

 2         A.    Yes.

 3         Q.    Okay.  You lived there most of your life?

 4         A.    I did, until my sophomore year of high school.

 5         Q.    Okay.  And where did you move after that?

 6         A.    I moved to Roswell, New Mexico.  I was in

 7    military school for my last two years of high school and my

 8    first two years of college.

 9         Q.    And where did you go to college?

10         A.    I went two years at New Mexico Northeast

11    Institute and then I did two years at New Mexico State in

12    Las Cruces.

13         Q.    Oh, Las Cruces.

14         A.    Uh-huh.

15         Q.    Is that the Low Bossier or --

16         A.    No, that's --

17         Q.    Oh, that's A&M, right.  Okay.

18         A.    Low Bossier, yeah.

19         Q.    I know some -- I have some friends from New

20    Mexico and they went to A&M and actually I have a friend

21    from Farmington --

22         A.    Oh, really?

23         Q.    The Briones family.  I don't know if you are

24    familiar with them.  Tom Briones, he's a little older than

25    you are.
```

1    A.    No, I'm not familiar with them.

2    Q.    I think his father at one time was some kind

3 of state representative from that area, or senator, I don't

4 know what he was, but he was involved in politics up there.

5    A.    Okay.

6    Q.    I don't think Farmington is as big as Dallas,

7 so that's why I asked, if maybe you knew them.  But I think

8 they're much older than you are.  They're family attorneys

9 up there.

10    A.    I'm not familiar with the name.

11    Q.    Okay.  And I was wanting to know where you

12 went to school, because I know the Judge is real interested

13 in that with a lot of people.  So before he asked you, I

14 thought I'd ask.  Okay?

15              What did you think when Mr. Wirskye here

16 explained to you how this death penalty scheme works?  Were

17 you a little surprised or --

18    A.    Um, I wouldn't say I was surprised.  I would

19 say I was informed.  I mean, I didn't know a lot about the

20 process, so I definitely learned.  I think it's a good

21 process to follow.

22    Q.    You're like 99.9 percent of the people that

23 come in here.  I mean, we'd be a little leery if somebody

24 came in and had studied this and knew it before they walked

25 in here.  But, you know, some people come in here and they

1    have strong feelings about the death penalty and then

2    they're surprised that if someone is convicted of capital

3    murder, that it's not an automatic death sentence.  What do

4    you think about that?

5          A.     I think that it's a good process that we have

6    in place to follow --

7          Q.     Can you see how --

8          A.     -- and there are things to consider.

9          Q.     I'm sorry?

10         A.     That's okay.

11         Q.     I didn't mean to talk over you.  But can you

12   see how, you know, the law basically favors a life sentence?

13   And even if you find somebody guilty of capital murder, a

14   life sentence is what they would get, unless the State can

15   jump over these hurdles or meet their burden on these

16   questions.  Can you see that?

17         A.     Yes.

18         Q.     Okay.  And would you have a problem following

19   a scheme like that?

20         A.     No.

21         Q.     Okay.  I know you said that you could take pen

22   in hand and participate in a process that would end up in

23   the death penalty.  I just want to make sure from this side

24   of the table that you would be just as comfortable, if the

25   State didn't meet their burden on any of these questions and

1   answer them in a way which would result in a life sentence?

2          A.       I would be just as comfortable.

3          Q.       Okay.   Because we've had some people that, you

4   know, maybe don't want to disappoint the State or, you know,

5   have some kind of outside influence that would keep them

6   from answering it that way.   And I just want to make sure

7   that you are the type of juror that wouldn't have a problem

8   with it.

9                I mean, I know you are an auditor, and

10  like you said, you know, you don't want to prejudge things.

11  You want to -- when you audit companies, I'm sure you don't

12  make assumptions just because they are associated with

13  another company and how it's going to end up.   Would I be

14  correct in saying that?   You are that kind of person?

15         A.       Yes.   I think it's important to maintain an

16  attitude of independence and look at all of the facts in

17  front of you before you make any conclusions or

18  determinations.

19         Q.       And that's what the law requires for you to be

20  a juror on this case.   You would have to not prejudge

21  anything in this case, and, basically, come in with a blank

22  slate.   I know it's impossible to get rid of things that you

23  have heard of or seen or known in your life.   But you, as a

24  juror, your sole job is going to be to sit over there,

25  listen to what the State brings you, and decide whether they

1   have proven their case beyond a reasonable doubt or not.  Do

2   you think you would have any problems doing that?

3          A.    No.

4          Q.    Okay.  Another concept of the law is that --

5   Mr. Wirskye touched on it and talked a little bit about it,

6   is that, you know, over here on the defense on behalf of Mr.

7   Murphy, we don't have to do anything.  We don't have to

8   produce any evidence, we don't have to put on any witnesses.

9   As a matter of fact, we don't even have to ask any

10  questions.  I anticipate we will, but, I mean, that's just

11  to point out to you that in order for you to answer those

12  questions in any way that would favor Mr. Murphy, we don't

13  have to produce any evidence.  What do you think about that?

14         A.    I think that's fair.

15         Q.    And that's the way it should be done?  Is that

16  what you think?

17         A.    Yeah, I agree with that.

18         Q.    Okay.  Because, you know, we've had some

19  jurors that come in here and say, well, you know, once I've

20  convicted somebody of capital murder, in order for me to

21  answer these Special Issues in any way that would favor Mr.

22  Murphy or in any way that would end up in a life sentence, I

23  may need to have some evidence put on by the defense.  But

24  it doesn't sound to me like that's the way you thought or am

25  -- I correct?

1    A.    That's correct.  I don't -- I mean, obviously,

2  the burden of proof is for the prosecution and that's -- I

3  understand that.

4    Q.    Okay.  And just to explain to you a little bit

5  how, again, how the process works.  Sometimes jurors think

6  that they answer these Special Issues at the same time they

7  are answering whether someone is guilty or not of capital

8  murder.

9                And the way it really works is you would

10  sit on the jury.  The State would present their evidence in

11  the guilt/innocence phase of the trial.  If you found him

12  not guilty, if they didn't meet their burden, and you found

13  him not guilty, then you don't even get to these Special

14  Issues.

15                What you would do, you would hear the

16  evidence, you'd go back in a room, deliberate, decide

17  whether he's guilty or not guilty of capital murder.  That's

18  all you would decide.  Like I said, if you found him not

19  guilty, that would be the end of it.  If you found him

20  guilty, then the law would require you to come back and

21  maybe hear more evidence and then consider these Special

22  Issues separately from your verdict in the first part of the

23  trial.  Does that make sense to you?

24    A.    Yes.

25    Q.    And that's why Mr. Wirskye, when he explained

1   to you that these Special Issues are not to have an

2   automatic answer, just because you found him guilty of

3   capital murder.   You understand that?

4         A.      Yes.

5         Q.      What do you think about that?

6         A.      I think that's very fair.   I mean, going into

7   it, mitigating circumstances, and if it was an isolated act,

8   something that was maybe brought on by bad treatment in the

9   past, I would be able to find mitigating circumstances where

10  I could say, yes, he's guilty, but he doesn't deserve to

11  die.   I could do that.

12        Q.      I just want to make sure that you saw that,

13  because some jurors say, well, you know, once I found him

14  guilty of capital murder, I'm just going to -- I'm just

15  going to go over these Special Issues, but not that well --

16        A.      Right.

17        Q.      -- you know, I'm just going to steamroll

18  through them.   Because I found him guilty of capital murder,

19  it's not going to be that hard for me to answer them in a

20  way that will end up in a death penalty.

21        A.      Uh-huh.

22        Q.      The law would require you to look at those

23  Special Issues separately from one another.   In other words,

24  the way you answer one Special Issue shouldn't affect the

25  way you answer the next one.   Does that make sense to you?

57

1        A.      Yes.

2        Q.      Well, you know, it sounds to me like you could

3   be a fair juror, you could give both sides a fair trial.

4   Just before I stop asking you questions, I just want to say

5   is there anything that we just haven't asked you the right

6   way or anything on your mind that you think might keep you

7   from being fair in this trial?

8        A.      No.

9                MR. SANCHEZ:  That's all I have, Your

10  Honor.

11               THE COURT:  Thank you, sir.  If you would

12  be so kind and wait for us outside the courtroom and we'll

13  have you back in just a few moments.

14                   [Prospective juror out]

15               THE COURT:  What says the State on

16  Mr. Becher, juror No. 4424?

17               MR. WIRSKYE:  State has no challenge for

18  cause.

19               MR. SANCHEZ:  We have no challenge for

20  cause.

21               THE COURT:  All right.  Now we've

22  qualified another juror.  Now the issue becomes, I believe

23  if you'll check your numbers, that he will actually be ahead

24  of juror No. 12 which we seated yesterday because his number

25  is -- his number is 4424.  He will actually be ahead of

1  juror No. 11 as well.

2            MS. BUSBEE:  Well, I know, I thought

3  about that this morning that he is out of order and we've

4  already picked our jury.  Could we go off the record?

5            THE COURT:  Yes, ma'am.

6                 [Off the record]

7            THE COURT:  All right.  Back on the

8  record.  What is the pleasure of the parties with regard to

9  the order in which this potential person might be seated?

10            MR. WIRSKYE:  State has no objection to

11  seating this juror 1924 as the alternate.

12            MS. BUSBEE:  And the defense has no

13  problem with that, and we would like to do that that way.

14  May it please the Court.

15            MR. WIRSKYE:  The State would as well.

16            THE COURT:  So having that issue out of

17  the way, what says the State as far as accepting this

18  particular juror?

19            MR. WIRSKYE:  The State will happily

20  accept this juror as an alternate.

21            MR. SANCHEZ:  We accept the juror.

22            THE COURT:  Once again, I'm not going to

23  tell him nor should Sheriff Duron tell him that he's an

24  alternate.  He's simply a juror in this case and he'll be

25  instructed just like everybody else.

1    THE COURT:  Have Mr. Becher come back in,

2  please.

3                    [Prospective juror in]

4    THE COURT:  Thank you.  You may be

5  seated.  Mr. Becher, did I pronounce that correctly?

6    PROSPECTIVE JUROR:  Yes.

7    THE COURT:  Mr. Becher, I'm going to

8  inform you that you shall be seated on this jury.  It's a

9  big responsibility.  Now, let me give you some very clear

10 and direct instructions.  You have told us here today that

11 you, in fact, did look at the Internet after the voir dire

12 back in May.

13    PROSPECTIVE JUROR:  Yes.

14    THE COURT:  Because you have the

15 professional discipline and have demonstrated to these

16 attorneys here today and Mr. Murphy that you have the

17 discipline to judge this case from the evidence on the

18 witness stand, you absolutely cannot do any other

19 independent research or investigation, news articles,

20 discuss this case with anyone.

21    I mean, I can't make that any more

22 crystal clear.  In fact, I'm going to give you that in a

23 written order before you leave here today.  Now, you,

24 obviously, will have to inform your employer that you need

25 two weeks for jury duty.  And they probably know why you are

1   here today.  What do you think will happen when you go back

2   and tell them that you are on this case?

3                        PROSPECTIVE JUROR:  They'll understand.

4   They'll be fine with it.

5                        THE COURT:  They'll understand, but they

6   will be curious and want to offer their opinion as well.

7   Correct?  If you go in and broadcast to the office, I'm a

8   juror on a capital murder case, then they are going to share

9   their opinions with you.  And the parties are satisfied with

10  your opinions alone.  Follow me?

11                       PROSPECTIVE JUROR:  Yes, sir, I do.  But

12  I didn't inform anyone at work that I was selected for this

13  particular case.  I was talking about as far as the

14  responsibility of being away from work for two weeks.

15  They'll be okay.

16                       THE COURT:  Good.  Then don't inform them

17  which particular case.  Just say I've got jury duty for two

18  weeks beginning on November 10th.  Arrange my schedule

19  accordingly.

20                       PROSPECTIVE JUROR:  Okay.

21                       THE COURT:  And leave it at that.

22  Because what happens is it invites people to share their

23  opinions with you.  And that's what -- we're trying to shut

24  that down.

25                       PROSPECTIVE JUROR:  Okay.

1    THE COURT:  As you have said, I will

2  judge everything about this case from the evidence I hear

3  from that witness stand that you are in right now.

4    PROSPECTIVE JUROR:  (Prospective juror

5  nods head.)

6    THE COURT:  That's as crystal clear as I

7  can make it.

8    PROSPECTIVE JUROR:  (Prospective juror

9  nods head.)

10    THE COURT:  Now, I'm going to provide

11  those written instructions for you in a minute and also a

12  supplemental information sheet for the Court.  I keep those

13  records maintained in a digital format and shred them after

14  we have completed it.  So that if I have to make contact

15  just like I did -- did you get the e-mail when you were in

16  London?

17    PROSPECTIVE JUROR:  Yes.

18    THE COURT:  So, I mean, that's how I keep

19  that information, why I keep that investigation, is to make

20  contact for some emergency reason.

21    Now, at the time we have this jury

22  selection completed, I don't know when that will be, we'll

23  have everybody back in here and probably a week before

24  November 10th.  I don't know exactly what day.  I haven't

25  set it yet because I haven't gotten the jury selected.  I'll

1    have everybody back down here for about an hour or hour and

2    a half worth of additional orientation once we have the

3    jury.  I can't do it until I have everybody here in the box

4    at the same time.

5              So I'm trying to give you an idea of your

6    schedule.  We'll have one more day down here, just an hour,

7    hour and a half, and then we will start at 8:30 on Monday

8    morning, the 10th.  If there's any one thing you can count

9    on, is I'm going to be here on time and I'm going to go to

10   work.  And I've even been accused by the jurors, they say,

11   please, give us a break, because I am not going to waste

12   your time.

13             That you can count on, because that's the

14   number one complaint we have down here.  And for years I

15   have always told jurors, we start here, we take a break, we

16   have lunch, we have an afternoon break, and we quit at a

17   reasonable period of time, somewhere between 4:30 and 5:00.

18             If I have a witness who can complete

19   their testimony and be out of here and we can still leave at

20   5:00, I'll work past 4:30.  I'll balance that one person's

21   need to finish versus, you know, 15 people that have to wait

22   with everybody here.  So that's what I do.

23             You will not be sequestered during the

24   trial.  You know what that means?

25                  PROSPECTIVE JUROR:  Sequestered?

1    Questioned?

2                        THE COURT:  Sequestered.

3                        PROSPECTIVE JUROR:  No, I'm sorry, I

4    don't know.

5                        THE COURT:  You will not be held at a

6    hotel overnight during the trial.

7                        PROSPECTIVE JUROR:  Okay.

8                        THE COURT:  Provided the jury can follow

9    my written instructions and don't talk about it.  You might

10   be sequestered after the jury has heard the final arguments

11   from the lawyers and goes back and starts to deliberate.

12   Once that door closes and once you have the law in your hand

13   and the jury is working on the decision, at that point the

14   jury will not be allowed to separate, which means you would

15   be put in a hotel, if the jury spends all day long and is

16   unable to make a decision.  You will, obviously, have

17   several days advance notice that the Sheriff will probably

18   tell you to bring an extra change of clothes with you today.

19                        But it's just one of those things.  I

20   don't have a crystal ball, and sometimes it takes, you know,

21   a short period of time and sometimes, you know, in

22   California, a jury deliberated four months.  So -- but

23   that's California.  So I just give people up front, I don't

24   anticipate you being sequestered.  I just don't anticipate

25   it.  You might be.  But it would only be at the last part of

1    the trial.

2              Now, contact with the Court personnel.

3    If you see myself, the Court Reporter, the attorneys in this

4    back hallway where you are going to go in a few minutes, I'm

5    going to be rude to you.  I'm not going to say as much as

6    hello, because there's no way that I'm going to let anyone

7    have any opportunity to say that there was contact, because

8    it just -- I'm not going to go there.

9              It's the appearance of impropriety.  If

10   someone were to see that, they don't know if you're asking

11   what time it is or what's for lunch, something completely

12   benign.  But the problem is an outside observer might not

13   know what it was, because they didn't hear it.  So the best

14   way to do that, like I tell you with your coworkers and

15   family members, or whatever, just don't talk to them.

16             Who can you talk to?  The Sheriff over

17   here.  That's her job.  She's the one who's in charge of the

18   jury.  And she'll be able to answer some of your questions

19   and some of them she can't.  And if she can't answer, she'll

20   say, the Judge said I can't talk about it.  But I'm trying

21   to say, it's just the appearance of impropriety we avoid at

22   all costs.  After the trial is over, you can talk to anybody

23   you want to talk to, as long as you want to.

24             So that's -- those, again, those are the

25   rules.  If you will give me a few minutes when my printer

1    has decided to talk to the computer this morning, I will

2    print those two documents for you.  If you would like to go

3    with the Sheriff, she has some more information to go over

4    with you.

5                         PROSPECTIVE JUROR:  Okay.

6                         THE COURT:  Thank you very much, sir.

7                         [Prospective juror out]

8                         THE COURT:  John Henderson.

9                         [Prospective juror in]

10                        THE COURT:  Good morning, sir.  We have

11   John Robert Henderson; is that correct?

12                        PROSPECTIVE JUROR:  Yes, sir.

13                        THE COURT:  It's juror No. 5215.  Welcome

14   to the 283rd.

15                        PROSPECTIVE JUROR:  Thank you.

16                        THE COURT:  Sorry for the delay in

17   getting you in.  We never know exactly how long we're going

18   to speak with someone.  Obviously, you've had time to review

19   the guide I provided for you, hopefully more than once.  And

20   I gave you a copy of your questionnaire that you filled out

21   for us in May.

22                        PROSPECTIVE JUROR:  Okay.

23                        THE COURT:  And I hope that you began to

24   think about some of the issues that we're going to discuss

25   today.  And the objective here is for you to have a working

1    knowledge of the law.  That's what this whole interview

2    process is going to be about.  The attorneys are going to

3    give you examples, explain the law to you.

4                          And at the end of the process, I have two

5    questions I must ask.  Number one is do you, in fact,

6    understand the law?  And number two, can you follow the law?

7    That's the big picture I have to have.  The only question I

8    have for you at this time, sir, is will you be able to serve

9    this Court for a period of two weeks beginning on November

10   10th?

11                   PROSPECTIVE JUROR:  Yes.

12                   THE COURT:  Thank you, sir.  You may

13   inquire, Mr. Wirskye.

14                   MR. WIRSKYE:  May it please the Court?

15                   JOHN HENDERSON,

16   having been duly sworn, was examined and testified as

17   follows:

18                   DIRECT EXAMINATION

19   BY MR. WIRSKYE:

20        Q.    Mr. Henderson, how are you this morning?

21        A.    Good.  How are you doing?

22        Q.    Good.  Thanks for coming down.  Sounds like

23   letters got crossed or something and you just got your phone

24   call?

25        A.    Yeah.  I should listen to my wife more often.

1   Q.   I think I'm in that boat as well.   But thanks

2   for coming down on short notice.   My name is Bill Wirskye.

3   I'll be the Assistant DA that will be visiting with you for

4   the next few minutes.

5             What I'd like to do is follow up on some

6   of that information that you were kind enough to give us in

7   our extensive questionnaire, talk to you a little bit about

8   your thoughts and feelings about the death penalty, and

9   then, finally, talk to you about some of the laws and some

10  of the rules that apply in a case such as this, a death

11  penalty case.   Any questions before we get started about

12  what's going on or why you are here, or --

13  A.   No, sir.

14  Q.   I know it was kind of sudden to get that phone

15  call this morning, but it looks like you are the general

16  manager for Anderson Creative Expressions; is that right?

17  A.   Yes, sir.

18  Q.   What type of business is that?

19  A.   It's a furniture business.

20  Q.   Okay.   What do you kind of do on a day-in,

21  day-out basis?

22  A.   Monitor goings on in the warehouse,

23  deliveries, ordering of furniture, people's schedules, time,

24  things of that nature.

25  Q.   Okay.   Before that, you -- I think you put

```
 1   down you were a carpenter, self-employed; is that right?

 2          A.     Uh-huh.

 3          Q.     Okay.  How long did you do that?

 4          A.     Um, about five or seven years, just off and

 5   on.

 6          Q.     Okay.  So with enough notice you think you

 7   could schedule two weeks for us in November, if you had to?

 8          A.     Sure.

 9          Q.     Okay.  You are originally from south Texas; is

10   that right?

11          A.     Born, yes.

12          Q.     Okay.  And your dad was with the INS; is that

13   right?

14          A.     Yes.

15          Q.     What did he do with INS?

16          A.     He started as a border patrol officer and

17   worked his way up in INS, and he's retired.

18          Q.     Okay.  And, let's see, how long have you been

19   in Dallas?

20          A.     I moved into Dallas about four years ago.

21          Q.     Okay.  What do you think of Dallas so far?

22          A.     I like it.

23          Q.     Okay.  Um, let's see.  You told us, I guess,

24   generally, or I think you said in certain cases, you are in

25   favor of the death penalty; is that right?
```

1       A.      Depends on the case.

2       Q.      Sure.  Why do you think we should have a death

3  penalty or why do you think it should be an option in some

4  cases?  You know, what purpose do you think it serves

5  society?

6       A.      Sometimes it just fits the crime.  I mean, it

7  just depends on the case to me.  Some of those cases just --

8  it just seems like it's the right thing to do.  Why, you

9  know, let somebody sit in jail?  It's almost just an equal

10 amount of punishment, I believe, as to be sitting in jail

11 than it is to be put to death.  Sometimes it's a lighter

12 sentence in my opinion.

13      Q.      When you think of one of those types of cases

14 where the death penalty is appropriate, what type of case

15 are you thinking of or what facts or scenario do you

16 envision?

17      A.      Um, children, crimes of children, of course,

18 murder, you know, just sometimes it just depends on the

19 case, a murder case where it's unintentional, you know.  A

20 drunk driver hits somebody.  It's, of course -- it's, you

21 know, murder, but it just -- it just depends on the case.

22      Q.      Okay.  Would you limit the death penalty to

23 only those cases where a life is taken?

24      A.      Yes, I would say that.

25      Q.      Okay.  Just to let you know, in Texas we

1    reserve the option of the death penalty just for murder

2    cases.  And then only a certain type of murder or a certain

3    subset of murder cases, are the only ones that are eligible

4    for the death penalty.

5             If you kill a certain person, like a

6    police officer, a fireman, or prison guard on duty, child

7    under six, a young child, if you commit an intentional

8    murder during the course of a robbery, a burglary, rape,

9    that type of thing, or mass murder, serial murder, murder

10   for hire, you hire someone to kill your spouse or your

11   business partner, those are the only types of murders that

12   we reserve the option of capital punishment for.  Is that

13   pretty much, that list, in accord with your views of the

14   type cases?

15        A.    Yes.

16        Q.    Okay.  Let me ask you another situation we

17   always talk to people about, and it comes up frequently, is

18   what we call in Texas the law of parties.  I think you

19   probably -- it's most commonly known to most people as

20   accomplices, the law of accomplices.  Oftentimes crimes can

21   be committed, you know, by more than just one person.  A

22   group or gang of individuals can commit a crime.

23             When you are talking about a capital

24   murder type scenario, it may be a situation where only one

25   of those people who was actively involved in a capital

1   murder actually pulled the trigger.  For lack of a better

2   word, we can call him the triggerman.  There may be other

3   people who are actively involved in the crime, but didn't

4   actually cause the death of the victim, accomplices,

5   nontriggermen accomplices.

6                Some people who are in favor of the death

7   penalty would reserve the death penalty just for those

8   people that actually pulled the trigger.  And if it were up

9   to them, they'd take the death penalty off the table for the

10  accomplice.  I mean, they may want to lock them up for life

11  and make sure they never get out, but they just don't feel

12  for whatever reason that the death penalty is particularly

13  justified for the nontriggerman accomplice.

14                And other people feel differently, you

15  know, just depending on the facts and circumstances of the

16  case.  Where do you kind of come down on that issue with

17  respect to the accomplices?

18       A.      You, basically, answered it for me, just

19  depending on the facts and circumstances of the case, what

20  role they played in the murder.  And I don't know the facts

21  or circumstances of the case, so.

22       Q.      Okay.  So you wouldn't just automatically take

23  the death penalty off the table for those nontriggerman

24  accomplices?

25       A.      Not automatically.

1      Q.      Okay.  And I think the law is pretty much in

2   accord with where you are.  Let me give you a hypothetical

3   or an example --

4      A.      Okay.

5      Q.      -- to kind of illustrate the law.  Let's say a

6   buddy of mine decide that we're, you know, we get together

7   and agree we're going to rob a bank.  The plan is for my

8   buddy to take the pistol in, a loaded gun.  He's going to

9   hold up all the tellers.  I'm going to go in unarmed.  I

10  have a bag with me.  And while he's holding up the tellers,

11  I'm going to clean out all the cash drawers.  That's the

12  plan we come up with to rob the bank.

13              Let's say that at some point during that

14  bank robbery, for whatever reason, maybe one of the tellers

15  looks at him funny or, you know, I see one of them going for

16  a silent alarm to call the police and I tell him that, for

17  whatever reason he shoots and kills one of the tellers.

18  Okay?  And we make our getaway.

19              He's, obviously, committed capital

20  murder, an intentional murder in the course of a robbery.

21  He could be convicted of that and ultimately face the death

22  penalty, depending on what the jury thinks.  The law also

23  allows, depending on the facts and circumstances, me, the

24  nontriggerman accomplice in that case, to face the death

25  penalty.  What do you think about that type of scenario?

```
1        A.      And they could prove that that was the case, I
2   would have to say that I don't think that he should be tried
3   for the death penalty.
4        Q.      Okay.  In my example, me?
5        A.      In your example, yes, if that was proven.
6        Q.      Okay.  How come?
7        A.      Just because it's not premeditated.  I mean,
8   he didn't -- if the other man -- I can see the case where,
9   yeah, I would agree with trying him for the death penalty.
10  But the man without the gun and without the intent --
11       Q.      Okay.  I think you focus on what a lot of
12  jurors do.  Intent is very important for you?
13       A.      Uh-huh.
14       Q.      And, in my example, I had no intent that
15  anyone die.  Basically, what the law is in Texas, using that
16  example as an illustration, there are two ways for an
17  accomplice to be found guilty of capital murder, the guy in
18  my shoes.
19                   One of them would be if I aided,
20  directed, or encouraged him to commit capital murder.  You
21  know, maybe I turned to him and said, he's going for an
22  alarm, shoot and kill him.  Obviously, at that point I'd be
23  just as guilty.  I had the intent, which sounds like is
24  important to you.
25       A.      Uh-huh.
```

1    Q.    I could be found guilty of capital murder and

2    ultimately face the death penalty.  The second way, and a

3    lot of people have some concerns or hesitations about this

4    aspect of the law, is under the law of conspiracy.

5    Basically, if two people have conspired to commit bank

6    robbery, like we did, a murder happens during that bank

7    robbery, and if the jury feels that I should have

8    anticipated that murder could happen, the accomplice should

9    have anticipated a life could be taken, even though I had no

10   intent, I could still be found guilty of capital murder and

11   face the death penalty.

12              And there are a lot of people who feel

13   very strongly that that just shouldn't be the case, because

14   the person in my shoes in that second scenario had no

15   intent.  And I guess if it were up to them, they would only

16   reserve the death penalty for an accomplice that had intent.

17   Is that clear to you?

18        A.    Yeah.  Yes, it's clear to me.

19        Q.    Okay.  It sounds like that's kind of where you

20   are; is that right?

21        A.    Yes.

22        Q.    And unless an accomplice had that intent, you

23   would just take the death penalty off the table; is that

24   right?

25        A.    Well, if you could prove, I mean, he knew what

1   he was getting into.  It's not like he just jumped into the

2   crime not knowing that, you know, the personality of the

3   person he's robbing a bank with.  I mean, it just all

4   depends on the case.  I mean, it's -- if he knew, if you

5   could prove that he thought his buddy was never going to

6   pull the trigger, you know, that could be a different case

7   than if he knew this guy's past and his, you know.

8        Q.    Okay.  So even if the person didn't have any

9   intent, if he knew, I guess, who his partner was or knew his

10   partner was very violent?

11        A.    Uh-huh.

12        Q.    Then maybe you could see the death penalty for

13   that accomplice?

14        A.    Yes, I could see that.

15        Q.    Okay.  Fair enough.  Let me talk to you a

16   little bit about the pretrial publicity in this case.  You,

17   like almost everyone we've talked to, indicated they had

18   heard, I think, or read maybe some of the facts of this case

19   or what the media has reported.

20                    And we know it affects different people

21   differently.  It's not like the usual criminal case where

22   you come down for jury duty and you have no idea what case

23   it is.  But what do you remember hearing about this case?

24        A.    Um, if I'm correct, they escaped from prison.

25   That's what I heard, they escaped from prison, and they

1   robbed a sporting goods store or something, Oshman's?  And

2   allegedly escaped again.  They got away with that, and

3   killed a police officer or --  I can't remember all the --

4   it's been so long.  And then they got caught in Colorado or

5   something.  It's real vague.

6          Q.     Did you follow any of the court proceedings in

7   these cases?

8          A.     No.

9          Q.     Okay.

10         A.     I hardly watch the news.

11         Q.     Okay.  Knowing what you know about the case,

12  how do you think it might affect you, if you were picked to

13  be a juror on this case?  Because we know it affects

14  different people differently, because you don't really bring

15  up a clean slate, you know, to the trial, but how do you

16  think it would affect you?

17         A.     Knowing what I know, how would it affect me?

18         Q.     Uh-huh.

19         A.     I mean, you have to find some truth in it, you

20  know.  But like I said, you just don't know until you hear

21  all the details of the case.

22         Q.     Okay.

23         A.     I just don't know that much about it.

24         Q.     Do you think if you were selected to be a

25  juror on this case, that you could base your verdict just on

1    the facts and the evidence that you hear in the courtroom,

2    and not be influenced by what you may have heard during the

3    pretrial publicity?

4        A.    Yes.

5        Q.    Okay.  Fair enough.  Just a second,

6    Mr. Henderson.

7                MS. BUSBEE:  Your Honor, I believe the

8    parties have reached an agreement on this juror.

9                THE COURT:  Mr. Henderson, the parties

10   have agreed to excuse you from jury service in this case.

11               PROSPECTIVE JUROR:  Thank you.

12               THE COURT:  Appreciate you coming down,

13   and you are free to go.

14                    [Prospective juror out]

15                    (Recess)

16               THE COURT:  Kathy Fitzgerald.

17                    [Prospective juror in]

18               THE COURT:  Good afternoon.

19               PROSPECTIVE JUROR:  Hi.

20               THE COURT:  How are you?

21               PROSPECTIVE JUROR:  Great.  Thanks.

22               THE COURT:  Welcome to the 283rd.  Have

23   you had an opportunity to -- I see you brought your book.  I

24   hope you didn't have too much time to read that.

25               PROSPECTIVE JUROR:  I didn't.

1          THE COURT:  I hope you read the guide I

2   provided for you.

3          PROSPECTIVE JUROR:  I did.

4          THE COURT:  And the copy of the

5   questionnaire that you filled out for us back in May.  The

6   idea is there to have you begin to think about the law and

7   the issues that are before us in this case.  This is an

8   opportunity for you to visit with the attorneys and gain a

9   working knowledge of the law and how it relates.  Please ask

10  questions.  This is the opportunity for you to understand.

11          It's a lot of law to give someone.  There

12  are no wrong answers.  I know people come in and they're

13  kind of nervous, like you.  You've never been through this

14  before.  We understand that.  There will be two questions I

15  need to answer at the end of the process.  The first one

16  being, do you, in fact, understand the law?  Number two, can

17  you follow the law?  That's the big picture I have.

18          The only question that I have for you now

19  is will you be able to serve this Court for a period of two

20  weeks beginning on November 10th?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Thank you so much.  Please

23  turn your attention to Mr. Shook.  You may inquire.

24          MR. SHOOK:  May it please the Court?

25          KATHY FITZGERALD,

1   having been duly sworn, was examined and testified as

2   follows:

3                    DIRECT EXAMINATION

4   BY MR. SHOOK:

5          Q.    Ms. Fitzgerald, my name is Toby Shook.  I'll

6   be asking you questions on behalf of the State.  And, as the

7   Judge said, there aren't any right or wrong answers.  We're

8   just looking for your honest opinions.  Because it is a

9   death penalty case, we have this procedure where we talk to

10  every juror one on one.  We're not putting you on trial,

11  though it seems that way since you are on the witness stand.

12  But we found it's a good way to get information.  And if you

13  have any questions at any time, feel free to ask.  Okay?

14         A.    Yes.

15         Q.    I'll cover a couple of things in your

16  questionnaire and then we'll talk about capital murder and

17  some of the laws and rules that apply and get your opinions

18  on those.  I see from your questionnaire that you were born

19  and raised in Dallas?

20         A.    Yes.

21         Q.    What part of Dallas were you raised in?

22         A.    Oak Cliff.

23         Q.    Okay.  What high school did you go to?

24         A.    Kimball and then left Kimball and went to

25  Plano the middle of my sophomore year.

1    Q.    Okay.  I went to Woodrow.  It's rare and it

2  seems it gets rarer all the time to find someone who

3  actually grew up in Dallas that lives in Dallas now, but --

4  you work at Akin Gump and I know they don't really do

5  criminal law at all.

6    A.    No.

7    Q.    The last I checked, they didn't.

8    A.    Right.

9    Q.    What area of law do you work in with the

10  lawyers over there?

11    A.    I'm currently doing corporate.

12    Q.    Okay.  None of the lawyers you work with, do

13  they ever handle criminal law or involved in it in any way?

14    A.    No.

15    Q.    Okay.  Have you ever been down or sat on a

16  jury at all?

17    A.    Not actually on a jury, no.

18    Q.    Just a panel?

19    A.    No, I come to jury duty every six months.

20    Q.    Oh, you are one of those that get called all

21  the time?

22    A.    I'm one of the lucky ones, uh-huh.

23    Q.    Okay.  But you haven't made it on a jury yet?

24    A.    Right.

25    Q.    Okay.  We had one section of the questionnaire

1    that asks if you have heard about this case and we had a

2    brief paragraph about it.  Do you recall the case at all?

3         A.    I'm totally clueless.

4         Q.    Okay.

5         A.    I don't watch television, don't read the

6    newspapers.

7         Q.    All right.  Well, let me talk to you kind of

8    in general, then, about capital murder.  On the

9    questionnaire you said that you are in favor of the death

10   penalty as a law.  And I would like you to just kind of

11   expand on that and maybe tell us why you think we should

12   have the death penalty or the purpose you think it serves

13   society.

14        A.    Um, I feel if people do things bad enough or

15   even medium bad, repeatedly, they deserve to die for that.

16        Q.    Okay.  When you think of crimes that might be

17   appropriate or at least in consideration for the death

18   penalty, what types of crimes come to mind?

19        A.    Um, brutal murders, brutal, any type of brutal

20   thing that would hurt a person even permanently.

21        Q.    Okay.  So in your own personal opinion it

22   wouldn't necessarily have to have a life taken.  It could be

23   someone that's brutally injured?

24        A.    Correct.

25        Q.    Something like that?

```
 1            A.      Correct.

 2            Q.      Okay.  Have you always felt this way about the

 3   death penalty since you were an adult?

 4            A.      Uh-huh.

 5            Q.      Where do you think you formed your opinions?

 6   Just the way you were raised, do you think?

 7            A.      Um.

 8            Q.      Things you saw as you grew up?

 9            A.      I don't think that would be it.

10            Q.      Okay.

11            A.      I don't know if my parents believe in the

12   death penalty or not.  It's just --

13            Q.      Something you --

14            A.      Something I formed, I guess, over time.

15            Q.      Matured into over the years?

16            A.      Maybe.

17            Q.      Never been against the death penalty?

18            A.      Never.

19            Q.      Okay.  Have you followed any death penalty

20   cases at all in Texas?

21            A.      Never.

22            Q.      All right.  Just kind of -- you just kind of

23   base it on what is a just punishment?

24            A.      What I feel is fair.

25            Q.      Fair for whatever the particular facts?
```

1              A.     Right.

2              Q.     Okay.  Well, in Texas I know you kind of

3   looked at that packet probably?

4              A.     Uh-huh.

5              Q.     As the law is today, the death penalty is just

6   reserved for murder cases and then only certain types.  When

7   we talk about murder, we're not talking about self-defense

8   or an accident.  We're talking about an intentional killing.

9   But a lot of murder cases, intentional murders, don't fall

10  under the death penalty statute.  A person could get a life

11  sentence, but couldn't get the death penalty.

12             You have to have some other aggravating

13  fact, such as a murder that occurs during a felony, like if

14  I went in, in a robbery, robbed a 7-Eleven and murdered the

15  clerk.  That could be a death penalty case.  Murder in a

16  burglary, if I broke into someone's home and killed someone

17  in the house, or during a rape, during a kidnapping, during

18  an arson.

19             Also, murder of specific victims like a

20  police officer on duty, fireman on duty, or prison guard on

21  duty, as well as a child under the age of six.  I don't know

22  why they chose that age, but they had to choose an age.  But

23  that's where they are right now.  Murder of more than one

24  victim, serial killer situation, or a spree killer, and then

25  murder for hire, someone does it for profit, that sort of

1    thing.  But those are most of the examples or the areas that

2    are eligible for the death penalty.

3                     As far as that list goes, from your own

4    personal point of view, do you agree with those types of

5    cases, at least for consideration?

6           A.     I do.

7           Q.     None of them you would take off from your own

8    point of view?

9           A.     No.

10          Q.     Okay.  Now, another area of the law has to do

11   with what we call the law of parties.  I think it's more

12   commonly known as accomplices.  Sometimes we have more than

13   one person commit a crime.  The law says that if they are

14   involved, participate in the crime, then they can be held

15   accountable, even if some individuals have a greater role.

16                  The same is true in a capital murder

17   situation.  You may have more than one person that commits a

18   capital murder.  You may have, in fact, only one person that

19   is responsible for the murder, the triggerman, which he may

20   have accomplices.

21                  But an example I give is, let's say,

22   Mr. Wirskye and I and a third person we get, all agree to go

23   commit a bank robbery.  And our plan is for our friend to

24   drive us there because he has a fast car.  He's going to

25   wait outside, keep the car running, and warn us if anyone is

1   coming, and drive away quickly.  We go in, I've got a gun.

2   I point it, threaten everyone with it, get everyone's hands

3   in the air.  And after I have subdued them, Mr. Wirskye goes

4   in and he's got a bag and he starts loading up all the cash

5   out of the drawers.

6              During the course of that robbery I

7   intentionally murder someone.  Maybe I don't like the way

8   the teller is looking at me or he warns me one is going for

9   an alarm, but I shoot them.  We jump in the getaway car, he

10  speeds off, and we're caught, say, a few blocks away.

11             Obviously, I can be prosecuted for the

12  death penalty.  I think when most people think of a death

13  penalty case they come up with examples of the actual

14  triggerman.  That is natural.  The law says that Mr. Wirskye

15  and the getaway driver could also be prosecuted.  And if the

16  facts are they are actively involved in the crime, they

17  could be found guilty and could ultimately even receive the

18  death penalty.

19             People feel differently as far as

20  accomplices go, the nontriggerman.  Some people are

21  philosophically for the death penalty, but they feel it's

22  only right, if you use it for the triggerman, the person

23  that actually causes the death.  If it were up to them, they

24  may reserve a long term of years for the accomplice.  But

25  they don't feel the death penalty is appropriate for an

1   accomplice situation.

2                Other jurors feel that accomplices, if

3   they are involved, should be held accountable, can be found

4   guilty, and ultimately could receive the death penalty

5   because of their involvement.  But people feel differently

6   one way or the other.  We just like to get everyone's gut

7   reaction on that, the prosecution in the death penalty case

8   of an accomplice.  How do you feel about that area of the

9   law?

10       A.    I think they are just as responsible.

11       Q.    Okay.  If you are actively participating, then

12   you feel it's fair to be prosecuted and ultimately receive

13   the death penalty?

14       A.    Sure.

15       Q.    What factors do you think are important in

16   those situations?

17       A.    As far as?

18       Q.    As the accomplice and being appropriate for

19   the death penalty and that sort of thing.

20       A.    Well, if they are there, they know that they

21   are taking part in a crime to some degree and whether the

22   gun going off is an accident, on purpose, whatever, they are

23   just as responsible, or they shouldn't have been there.

24       Q.    Okay.  So if they knowingly know what is going

25   on and are participating in it, then you feel it's fair?

1      A.    Yes.

2      Q.    Okay.  That's where the law lies.  If you are

3  present and don't know what's going on, they call it mere

4  presence alone, doesn't make you an accomplice.  If we had

5  duped, let's say, the getaway driver and he didn't know what

6  we were doing when we said we were going to go cash a check,

7  wait outside.  Then, obviously, he wouldn't be an accomplice

8  to our crime under the law, because if that were the real

9  facts, he didn't know why we went in there.

10      A.    Right.

11      Q.    Now, if it was a situation where he did, was

12  in on the plan, then he can be held responsible.  But that's

13  the difference, is that active participation, knowing what

14  is going on.  In fact, there's two theories of law.  One is

15  if you are actively involved, knowingly, directing,

16  encouraging in any way, but you are not the actual

17  triggerman, you can be found guilty.

18      Or the other theory of law is, we call it

19  conspiracy.  If two or more people conspire to commit one

20  felony, in this case three of us conspire or agree to commit

21  the robbery, and one of us commits another one, murder, to

22  further it, then everyone can be held responsible, found

23  guilty, if the jury believes from the facts that they should

24  have anticipated that could occur.

25      I think that goes along with what you

1  said.  They knew the risks, someone is going in there with a

2  gun, that sort of thing.  And they could be found guilty

3  that way, even if they don't have the direct intent for a

4  death to occur.  To get to the death penalty, you know, the

5  first part is we have to prove that they should have

6  anticipated and then in the punishment phase we have to

7  prove that they did anticipate.  And, again, it's all the

8  surrounding facts, that sort of thing.

9                    I take it from your answers you are on

10 board with that as far as that could be appropriate, just

11 depending on the individual facts of each case?

12      A.    Yes.

13      Q.    Okay.  Now in Texas, a trial is divided into

14 two parts.  There's the guilt/innocence stage and then

15 there's the punishment phase.  If we don't meet our burden

16 of proof, then it's a not guilty finding and everyone goes

17 home.  If we do, the trial is not over.  You then go to the

18 punishment phase and you can hear additional evidence.  At

19 the close of that is when we get these Special Issues and

20 I'll go over those more in a moment.

21                    But, basically, what the State has to

22 prove is the defendant would be a continuing danger to

23 society, that they either caused the death or anticipated

24 that a death would occur, and there's not sufficient

25 mitigating evidence to warrant a life sentence.  But if

1   those questions are answered yes, yes, and no, the Judge has

2   no discretion.  He would sentence the defendant to death.

3   If they are answered any other way, it's going to be a life

4   sentence.

5               But those are the only two possible

6   outcomes, all determined by how the jury answers those

7   questions.  Now, are you familiar with the method of

8   execution in Texas?

9         A.    Lethal injection.

10        Q.    That's right.

11        A.    Uh-huh.

12        Q.    Growing up here in Texas, you probably know

13   that executions are actually carried out.  Texas, in fact,

14   leads the nation in executions.  Some states have it on the

15   books and they don't prosecute it, or if they do, they

16   rarely carry it out.  But that's not the situation in Texas.

17   The procedures are the same in each case and they would be

18   the same in this case.

19               If the defendant were found guilty and

20   those questions were answered in that way, he would be

21   sentenced to death.  He'd be placed on death row and at some

22   point in time would be executed by lethal injection, which

23   it's like clockwork now, the way they do it.

24               The date of execution he's given a last

25   meal, time with family, friends, a minister.  But at 6:00

1  p.m. the executions take place in Huntsville.  There's

2  witnesses there from both sides, the victim's side as well

3  as the defendant's.  He's placed on a gurney which, I don't

4  know, you may have seen photos, they show them on the news.

5  But it's just a regular gurney, secured there, needles

6  placed in his arm.  He's able to give a last statement.  But

7  after that, they simply signal the executioner who injects

8  lethal chemicals which stop the heart, stop the lungs, he

9  elapses into a coma.

10              Quite frankly, that's our goal in this

11  case.  We feel we have the type and quality of evidence to

12  convince a jury of the defendant's guilt and that those

13  questions will be answered in a way which would result in

14  his execution.  The defense takes the opposite view, which

15  is why we're going through this process.

16              You've told us philosophically you do

17  believe in the death penalty.  You do believe in its

18  prosecution and application under the appropriate facts.

19  Looking in your heart of hearts, do you feel you're the type

20  of person who, if you were placed on this type of jury, you

21  could make these decisions, if it were proven to you, and

22  actually take pen in hand and answer those questions,

23  knowing that if you do it a certain way, the defendant would

24  be executed?

25        A.    Definitely.

1    Q.    Okay.  Why do you feel that you are that type

2   of person?

3    A.    Um, I feel very strongly, first of all, I

4   don't feel like the people who do crimes like that get hard

5   enough punishments in a lot of cases.

6    Q.    Okay.

7    A.    And if they deserve it, they deserve it.

8    Q.    Okay.  Fair enough.  Now, the area of law that

9   you checked off is that you felt it was appropriate in some

10  murder cases.  The way the scheme is, just because you are

11  found guilty in a capital murder, doesn't mean the death

12  penalty.  Some situations you are going to get a life

13  sentence and some a death sentence.  It all depends on how

14  those questions are answered.

15          Do you feel that's a fair way to go

16  through the process, that the death sentence or a life

17  sentence could occur once you are found guilty?

18   A.    Sure.

19   Q.    Okay.  Again, it's just going to depend on the

20  facts of each case.

21   A.    Exactly.

22   Q.    If you would take a moment to read question

23  No. 1 and I'll go over these Special Issues with you.

24   A.    (Prospective juror complies.)  Okay.

25   Q.    That's the future dangerousness question.  It

1    asks you to make a prediction.  Do you feel you could make

2    that prediction about how someone will behave, if you are

3    given enough information?

4         A.    Yes.

5         Q.    What types of information would you want to

6    know before you answer that question?

7         A.    Well, I guess, not knowing any more about the

8    case than a police officer was unfortunately killed, and I

9    guess I would have to know more about what's happened to

10   lead to this point.

11        Q.    Okay.  All right.  And we can't give you any

12   facts, obviously, from the case.

13        A.    Right.

14        Q.    We're just kind of speaking in hypotheticals.

15        A.    Right.

16        Q.    But, obviously, you would get the facts of the

17   case.  You would have found him guilty.  But then you'd get

18   to review those facts again from the angle of that question

19   and if there's any background evidence on the person.  If

20   they've been in trouble before, if they've ever been

21   convicted of crimes, that information is available.

22              You can even hear from the witnesses.

23   You can hear good things about their background and bad

24   things, kind of "This Is Your Life".  You get to hear their

25   whole story.  And all that goes into that question, also.

1   So you will have the facts of the offense, as well as the

2   background information on the individual to make that

3   decision..

4              Do you feel that all would be helpful and

5   give you sufficient facts to render a decision one way or

6   the other?

7        A.   Um, yes.

8        Q.   Okay.  Now this question starts out with a no

9   answer under the law and the State must prove to you beyond

10  a reasonable doubt it should be answered yes.  We do that by

11  putting on additional evidence and, again, you go back and

12  review the guilt/innocence evidence, the person's role in

13  the crime, and then determine if we've proven it beyond a

14  reasonable doubt that he is dangerous.

15             What the law requires a juror to do is

16  wait for all the evidence to come in, then deliberate and

17  make their decision from the issue of that question.

18  There's no automatic answers, in other words.  If there was

19  an automatic yes if you found the defendant guilty, there

20  wouldn't be any need for a question or deliberation.  And

21  that just takes some mental discipline.

22             We do have some jurors who say, I know

23  what the law is, but if I found him guilty, in my mind he's

24  dangerous, and that's always going to be a yes, no matter

25  what the facts.  The law contemplates that there might be

1   facts which prove him to be dangerous and there may not.

2   It's just going to depend on each case.

3                   And as a juror you have to be able to

4   tell the Judge, just because I found him guilty, doesn't

5   mean it's a yes.  I'm going to have to wait and see what the

6   facts are and then make that decision.  Do you feel you

7   could do that?

8           A.      Yes.

9           Q.      And could you require the State to prove to

10  you beyond a reasonable doubt that it should be a yes

11  answer?

12          A.      Yes.

13          Q.      And if we fail in our burden of proof, you

14  could leave it as a no?

15          A.      Yes.

16          Q.      Okay.  Now, the second question has to do with

17  that accomplice situation we talked about.  The first part

18  of the question asked whether the defendant actually caused

19  the death.  If you think he's the triggerman, then that part

20  of the question is answered.  But the second part asks if he

21  didn't actually cause the death of the deceased, but

22  intended to kill the deceased or another, or anticipated

23  that a human life would be taken.

24                  So if it's an accomplice we have to prove

25  from the facts that either they had the intention to kill

1   the person or they did anticipate.   Remember, I told you in

2   the guilt/innocence we have to prove he should have

3   anticipated.   And here we have to go a step further and

4   prove that he actually did anticipate.   Do you see the

5   difference there?

6         A.   Uh-huh.

7         Q.   It might be slight in your mind, but you have

8   to be able to recognize that difference and give it that

9   application.   Now, it may be the same exact evidence.   You

10  just have to look at it from this angle here and then

11  determine if the State has proven it to you beyond a

12  reasonable doubt.   And you can use the additional evidence,

13  if you think it's relevant, regarding a person's background

14  to help you answer that question, also.

15              But all that goes into Special Issue No.

16  2.   But it is answered separately.   It starts out with a no

17  answer and the State is required under law to prove it to

18  you beyond a reasonable doubt that it should be answered

19  yes.   Do you feel you could do that?

20        A.   Yes.

21        Q.   And, again, if we fail to prove it to you,

22  would you be able to leave it as a no answer?

23        A.   Yes.

24        Q.   Okay.   The law, again, requires, they want

25  jurors to wait and look at these issues separately and weigh

1    them separately.

2                This last question is the mitigation

3    question.  Neither side has the burden of proof in this

4    issue.  It allows you to look at all the evidence and

5    determine to be able to use mercy, if you want to.  If you

6    think it's the right thing to do that he get a life sentence

7    rather than a death sentence, you could leave it that way.

8                And what's mitigating is going to be up

9    to you and the other jurors.  We can't tell you what it will

10   be.  You just have to be able to tell the Court that you can

11   keep your mind open to it, because it covers everything, you

12   know.

13               It asks, considering all the evidence,

14   all the circumstances in the offense, the defendant's

15   character and background, their personal moral culpability,

16   is there sufficient mitigating evidence.  It might be

17   something in his background, the way he was raised, you

18   know.  It might be something about his mental capacity, he

19   may be slower, could be something, who knows what.

20               I heard one juror, they came up with the

21   best description the way they described these issues is it's

22   like a window closing.  And if we prove Special Issue No. 1,

23   the window closes a little more, Special Issue No. 2, a

24   little more.  And it was still open for Special Issue No. 3.

25   He said it wasn't open much, but it was still open.

1    And that's going to vary on each juror.

2  But you have to be able to promise the Court that that

3  window would be open or your mind would be open to it and if

4  you see something sufficiently mitigating, you can answer it

5  yes.  If you don't, you can answer it no.  Do you feel you

6  can do that?

7    A.    Yes.

8    Q.    As you sit there today, can you think of

9  anything that you would look at as potentially mitigating?

10    A.    No.

11    Q.    Okay.  That's what most jurors tell us.  It's

12  kind of reassuring.  We don't expect you to sit around

13  thinking of these things.  But can you assure the Court that

14  your mind would be open to it?

15    A.    Definitely.

16    Q.    Okay.  Again, you don't get to the question

17  unless you have found him guilty, found he's a continuing

18  danger, found that he intended a death to occur, but there

19  still might be a situation that a life sentence should be

20  imposed.  And that's what the Courts have said is you have

21  to keep your mind open to it, give it the proper weight, and

22  then answer it yes or no, depending on the evidence.

23    Let me go over some rules and laws that

24  apply to each case, each criminal case.  You probably will

25  be familiar with most of these.  The presumption of

1   innocence.  Every defendant charged, whether they've been

2   arrested or even going through this jury selection process,

3   is presumed to be innocent at the beginning of the trial.

4                     And then the State must overcome that

5   presumption by putting on the evidence and putting on the

6   witnesses.  But you have to start him with that presumption

7   and require us to prove our case to you beyond a reasonable

8   doubt.  Do you feel you could follow that rule of law?

9        A.     Yes.

10       Q.     Give him that presumption and require us to

11  prove our case?

12       A.     Yes.

13       Q.     Okay.  The burden of proof is beyond a

14  reasonable doubt and it never leaves this table.  It never

15  shifts to the defense.  The defense, you might anticipate

16  they are going to put on evidence, that sort of thing, but

17  they don't have to.  If you, when we rest our case and a

18  reasonable doubt exists in your mind, you're obligated under

19  law to find him not guilty.  You can't require them to put

20  on some evidence.  Do you feel you can follow that rule of

21  law?

22       A.     Yes.

23       Q.     That burden of proof goes to each and every

24  element of the indictment.  If we fail to prove on just one

25  element, you are entitled under the law to find the

1   defendant not guilty.  One of the elements would be the

2   identity, obviously, of who committed this crime.  If you

3   had a reasonable doubt about that, you'd quickly find him

4   not guilty.

5                    But that burden of proof even goes to the

6   county where this occurred.  In fact, under the law it's

7   just as important.  If you had a reasonable doubt, maybe

8   it's one of those cases that occurs near the county line and

9   you think the case probably occurred in Tarrant County and

10  you had a reasonable doubt about it, again, you would be

11  obligated to find the defendant not guilty.

12                   That would be a tremendous screw up on

13  our part as far as our preparation and you could have us

14  terminated, I'm sure.  But you can't help us out as a juror.

15  You have to judge a case like an umpire and call the balls

16  and strikes as you see them.

17                   Do you feel you could do that and require

18  the State to prove to you their case on each and every

19  element beyond a reasonable doubt?

20        A.      Yes.

21        Q.      The Fifth Amendment, if someone wants to

22  testify, they can.  No one can stop them.  But if they

23  choose not to, you can't hold that against them.  There may

24  be a lot of reasons why someone may not testify.  They may

25  be poorly educated or not perform well in front of people.

1   They might look guilty when they're not.  They may just be

2   following their lawyer's advice.  They may be real guilty

3   and it would hurt them.

4                   The law takes care of that by simply

5   explaining you can't hold that against them.  You can only

6   judge the case on the witnesses that you have heard.  You

7   can't speculate as to why someone may not testify.  Can you

8   follow that rule of law and just, if someone does not

9   testify, not consider that in any way, just judge the case

10  on the evidence that you have heard?

11          A.      Yes.

12          Q.      Okay.  Sometimes parole laws come up in the

13  news.  The Judge would instruct you in a capital murder case

14  that a person who has been convicted and serving a life

15  sentence would have to serve forty calendar years before

16  they became eligible for parole.  And even then they may not

17  be paroled.

18                   But he would also instruct you that you

19  can't consider the parole laws at any time in your

20  deliberations.  You just have to consider a life sentence, a

21  life sentence.  Do you feel you could do that?

22          A.      Yes.

23          Q.      Okay.  Police officers often testify in

24  criminal cases.  Jurors respect the job they do.  But you

25  can't start them out ahead of other witnesses.  You have to

1   wait and judge them.  I mean, there are going to be good

2   police officers and bad police officers, just like any other

3   profession, and you'd have to wait and judge their

4   credibility once they testify.  Do you feel that you could

5   do that?

6          A.    Yes.

7          Q.    Okay.  Is there any questions over anything

8   we've gone over so far?

9          A.    No.

10         Q.    I've covered a lot of stuff pretty quickly.

11   But I think the principles are basic.  As a juror in this

12   type of case, you have to wait and let all the information

13   in the guilt/innocence stage and then also the punishment

14   stage and then decide if the State has proven these things

15   to you.

16              Do you feel you could do that?  You feel

17   strongly about capital murder and punishment, but you, also,

18   feel that if the State doesn't meet its burden of proof, you

19   have no problem with a not guilty?  You have no problem

20   assessing someone a life sentence or a death sentence, just

21   depending on what the facts are?

22         A.    Right.

23         Q.    Okay.  Fair enough.  I appreciate your

24   patience.

25              MR. SHOOK:  And that's all the questions

1  I'll have, Judge.

2                    THE COURT:  Ms. Busbee?

3                  CROSS-EXAMINATION

4  BY MS. BUSBEE:

5       Q.    Thank you, Ms. Fitzgerald, for coming down to

6  talk to us today.  I notice that you've written in your

7  questionnaire about how you feel about serving as a juror

8  that you would rather not.  What were you thinking there?

9       A.    Well, you know, when you get called for jury

10  duty every six months, it is a whipping.

11       Q.    It is.  What does your employer say about

12  that?

13       A.    His last words as he was running out of the

14  office to an 11:30 meeting this morning was, you better not

15  get picked.

16       Q.    I told you -- I told him he'd say that.

17       A.    That's exactly what was said.

18       Q.    Well, you know --

19       A.    I said I can't believe that I even got this

20  letter.

21       Q.    Well, really, I mean, if this makes you feel

22  any better, you should be flattered because only a small

23  percentage of people do we deem to be reasonable enough to

24  call down and talk to.  I mean, we don't -- a lot of these

25  we don't read because they've been culled out because their

1  numbers mean they wouldn't be qualified.  They would always

2  give the death penalty or they would never give the death

3  penalty, so they kind of fall outside the range.

4                    And then we have this whole stack of

5  people that fall within the range and we'll go in there and

6  we'll decide who we're going to talk to and we come out with

7  one this big, because of things people put in their

8  questionnaires.  So, I guess, if that makes you feel any

9  better, you are creme de la creme of the 5,000 people we

10 brought down.

11                   And, you know, and I hear from you, you

12 are very prodeath penalty.  Sometimes we get people here

13 that are antideath penalty, you know, in leanings within

14 those parameters.  But they tell us, those are my personal

15 feelings and nobody knows what this is, until they get down

16 here.

17                   But once they see this scheme, they say,

18 well, I'm not writing the law and I'm not going to write the

19 law.  I can follow this law, despite the fact that I'm a

20 very strong proponent of the death penalty or, you know, I

21 have questions about the death penalty.

22                   So that's the reason I'm asking you some

23 questions is to, since you've been so frank about your

24 support of the death penalty, are you all right with this

25 scheme?  Do you think that this is a fair scheme that you

1  could be comfortable with?

2        A.    I can be comfortable with it because it's the

3  way it is.  In my opinion I'm fair and unfair.  I think a

4  lot of people who get off, it's unfair, you know, or get

5  very light sentences for things that they do.  I think

6  that's unfair.

7        Q.    Right.

8        A.    But --

9        Q.    So what should I be worried about, if you're

10  on the jury?  You work for lawyers.  You can just tell me

11  what it is that bothers you or you think might be, you know,

12  less than ideal as a juror in this case.

13        A.    Um, not knowing the case, it's hard to say.

14        Q.    I don't want you to know the case.  I want you

15  to tell me why --

16        A.    When it comes down to deliberations, I will be

17  openminded, but I'll also give my opinion.

18        Q.    Uh-huh.

19        A.    And is my mind made up?  There's no sense

20  confusing me with the facts?  No.

21        Q.    Okay.

22        A.    That's not how it is.  But, um, I will state

23  how I feel about things and I will listen to another

24  person's perspective.  Twelve people sitting there could

25  hear things, the same thing, twelve different ways.

1    Q.    They do.

2    A.    Right.

3    Q.    That's kind of why we kind of poke around in

4    your psyche a little bit, just to see --

5    A.    Right.

6    Q.    Well, here's the situation.  I don't want to

7    go into the facts with you because that wouldn't be fair.

8    But you do know that this is a case where a police officer

9    was killed.

10   A.    Uh-huh.

11   Q.    And you brought that up.  So under those

12   circumstances, if you were on a jury and found someone

13   guilty of the offense of capital murder as is charged in

14   this case, do you think that you would be able to give a

15   life sentence, if the facts fail to establish something for

16   you as far as future dangerousness?

17   A.    Definitely.

18   Q.    Or whether or not that person intended that a

19   human life would be taken?

20   A.    Yes.

21   Q.    You could say the State hasn't proven it to

22   me, despite the fact that I'm furious that this officer

23   died, which is human nature.

24   A.    And I don't mean this disrespectful, I think a

25   person, whether it's a police officer, a fireman, me, or

1   you, if they die, it's the same thing.

2        Q.   Right.

3        A.   I just do.  A policeman knows what dangers

4   he's going through.  I know that I have to go deal with

5   attorneys every day when I show up at the office.  They know

6   they have to go deal with criminals every day when they hit

7   the street.  I don't think it's any different.

8        Q.   Okay.  So -- right.  Well, then, if you've

9   convicted someone of just a generic capital murder, you

10  would still be able to give a life sentence and make the

11  State prove their case to you before you would give a death

12  sentence?

13       A.   Definitely.

14       Q.   Okay.  Because it's actually like three little

15  trials; guilty, Special Issue No. 1, 2, and 3.  Okay?  And

16  you've never been on a jury after all this time coming down

17  here?

18       A.   No.  No.

19       Q.   Oh, my goodness gracious.  Maybe you should go

20  downstairs and have a talk with them.

21       A.   No, thank you.

22       Q.   No, I'm talking about the jury services.  It

23  seems like your name is stuck in the computer.

24       A.   I'll just quit driving and start riding the

25  bus.

1    Q.    Oh, that doesn't do any good.

2    A.    Isn't it the driver's license number?  For a

3  long time I wouldn't register to vote.

4    Q.    Voting, driver's license, utility bills.  Now

5  you could be getting popped, I think, maybe, dually, like on

6  your driver's license and voter registration.  But you'd

7  have to give up having a name in order to not get called

8  down here.  But I realize it's not fair.

9    A.    Right.

10    Q.    Just one more thing.  If you had found Special

11  Issue No. 1 and 2 to be true beyond a reasonable doubt, that

12  the person would be a future danger, the person intended or,

13  excuse me, anticipated that a human life would be taken, are

14  you the sort of person who, after having found those things,

15  could still keep an open mind about giving a life sentence?

16    A.    Sure.

17    Q.    All right.  I appreciate it.

18        MS. BUSBEE:  Your Honor, that's all the

19  questions I have of this witness.

20        THE COURT:  Ms. Fitzgerald, if you would

21  be so kind and wait for us outside in the hall, and we'll be

22  back with you in a few minutes.

23        [Prospective juror out]

24        THE COURT:  What says the State on juror

25  No. 5326, Ms. Fitzgerald?

1      MR. SHOOK:  We have no challenges for

2  cause.

3      MS. BUSBEE:  We have no challenges for

4  cause.

5      THE COURT:  Would you like to step into

6  your office?

7      MS. BUSBEE:  Yes, please.

8           (Recess)

9      THE COURT:  What says the State?

10      MR. SHOOK:  We accept the juror.

11      MS. BUSBEE:  We will exercise our meager

12  one preemptory challenge on Ms. Fitzgerald.

13           [Prospective juror in]

14      THE COURT:  Ms. Fitzgerald, I have some

15  bad news for you.  We're not going to seat you on this jury.

16  So your boss will be happy.  I know you would like to have a

17  normal forty-hour week, but we can't seat you on this jury.

18  Please, please, don't leave here thinking, well, that's just

19  one more shot at it that I didn't make the jury.

20      PROSPECTIVE JUROR:  Oh, no, no, I don't

21  feel that way.

22      THE COURT:  As Ms. Busbee says, getting

23  to this point and being considered is a compliment in and of

24  itself.  Both sides looked at your questionnaire and looking

25  at it you are a very thoughtful and honest person and we

1    appreciate that so much.

2                         As far as getting called every six

3    months, I can tell you the computer is very exact.  If your

4    driver's license and your voter's registration certificate

5    are not exactly the same, it doesn't see it as a duplicate

6    and you get two summons.  So you might want to check your

7    ID, your voter's registration, against your driver's license

8    and make sure they are exactly the same.

9                         PROSPECTIVE JUROR:  As far as address?

10                        THE COURT:  Full name and address because

11   --

12                        PROSPECTIVE JUROR:  Oh, it might not be.

13                        THE COURT:  Your computer goes in and if

14   it catches a duplicate, it throws one of them out.  So you

15   can be in there twice as much as other people.

16                        PROSPECTIVE JUROR:  Right.

17                        THE COURT:  That might help you somewhat.

18                        PROSPECTIVE JUROR:  Thank you.

19                        THE COURT:  All right.  Thank you so

20   much.  You are free to go.

21                        PROSPECTIVE JUROR:  Thank you.

22                        [Prospective juror out]

23                        THE COURT:  Ready for Flores.

24                        [Prospective juror in]

25                        THE COURT:  Good afternoon.  Please have

 1   a seat.

 2                    PROSPECTIVE JUROR:  Good afternoon.

 3                    THE COURT:  We've got Felix C. Flores,

 4   juror No. 5316.  Welcome to the 283rd.

 5                    PROSPECTIVE JUROR:  Thank you.

 6                    THE COURT:  And have you had an

 7   opportunity to read the guide I provided for you?

 8                    PROSPECTIVE JUROR:  Yes.

 9                    THE COURT:  I also gave you a copy of

10   your questionnaire for you to begin to think about some of

11   the issues we're going to discuss.  It's a lot of law to

12   give someone.  Please don't think you have to understand it

13   all right now.  This interview process was designed to help

14   you have a working understanding of the law we're talking

15   about and give you an opportunity to ask questions.  We want

16   you to ask questions because we want you to understand it.

17                    PROSPECTIVE JUROR:  Okay.

18                    THE COURT:  At the end of the process I

19   have two questions I must ask.  Number one is, do you, in

20   fact, understand the law?  Number two, can you follow the

21   law?  That's the big picture I have for you.  The only

22   question I have for you at this time, sir, is will you be

23   able to serve this Court for a period of two weeks beginning

24   on November 10th?

25                    PROSPECTIVE JUROR:  I've got some -- I'm

```
 1   going to be heading out of town in November.  I scheduled

 2   this -- I was supposed to be out of town during this month,

 3   but I cancelled it to be here.  But I'm a pastor of a

 4   church, that's why.  I have other churches to attend.

 5                    THE COURT:  You have other churches?  But

 6   that would just be on Sunday; is that correct?

 7                    PROSPECTIVE JUROR:  But all these are

 8   other -- in Mexico, I have other outings I need to be out of

 9   town on November.

10                    THE COURT:  Okay.  But you couldn't --

11   you couldn't -- it would not -- you'd be able to certainly

12   work on Sunday between the two weeks of trial, but you are

13   telling me that you could not, or you would prefer not, to

14   reschedule your time in November?

15                    PROSPECTIVE JUROR:  Well, my point is I

16   rescheduled this month.  I cancelled October to be in

17   November, to be here today, because I have another jury duty

18   on next Wednesday in Grand Prairie.

19                    THE COURT:  In Grand Prairie?  If you are

20   on this jury, I will take care of Grand Prairie for you.

21   That wouldn't be a problem.

22                    PROSPECTIVE JUROR:  But if I can, yes,

23   recancel, yes, reschedule.

24                    THE COURT:  I'm getting -- the parties

25   have raised the flag.
```

1      MR. SHOOK:  We will agree.

2      MS. BUSBEE:  We will agree, Your Honor.

3      THE COURT:  Mr. Flores, you see, I'm not

4  going to let you out of jury service.  But they have just

5  agreed to allow you to take care of it, so now you do have

6  to go to Grand Prairie next week.  Okay?

7      PROSPECTIVE JUROR:  Okay.

8      THE COURT:  I appreciate the service you

9  do for our community, and the parties have agreed to excuse

10 you.

11     PROSPECTIVE JUROR:  Okay.

12     THE COURT:  Good luck to you.  Thank you.

13          [Prospective juror out]

14     THE COURT:  Mr. Patton.

15          [Prospective juror in]

16     THE COURT:  Thank you.  You may be

17 seated.  No. 5306, Sylvester Patton, III; is that correct?

18     PROSPECTIVE JUROR:  Yes, sir.

19     THE COURT:  Mr. Patton, have you had an

20 opportunity to read the guide I prepared for you?

21     PROSPECTIVE JUROR:  Yes, sir.

22     THE COURT:  And also a copy of your

23 questionnaire that you filled out for us back in May?

24     PROSPECTIVE JUROR:  Yes.

25     THE COURT:  That's a lot of law to give

1   someone when you first walk in the door.  And that's for you

2   to begin to think about some of the issues before the Court.

3   This is an opportunity -- this interview is designed to

4   allow you to ask questions with the objective of being able

5   to reach a good working understanding of the law we're

6   dealing with.

7                       So, no wrong answers.  We just want you

8   to get up to speed and be able to understand it all.

9                       PROSPECTIVE JUROR:  Okay.

10                      THE COURT:  At the end of the process I

11  have two questions I must ask.  Number one is, in fact, do

12  you understand the law?  And number two, can you follow the

13  law?

14                      PROSPECTIVE JUROR:  Yes and yes.

15                      THE COURT:  That's the question I'll ask

16  you about an hour from now.

17                      PROSPECTIVE JUROR:  Okay.

18                      THE COURT:  At this point, the only

19  question I have for you, sir, is will you be able to serve

20  this Court for a period of two weeks beginning on November

21  10th?

22                      PROSPECTIVE JUROR:  Yes.

23                      THE COURT:  Very well.  With that I shall

24  turn it over to Mr. Wirskye.

25                      MR. WIRSKYE:  May it please the Court?

1              SYLVESTER PATTON, III,

2   having been duly sworn, was examined and testified as

3   follows:

4                DIRECT EXAMINATION

5   BY MR. WIRSKYE:

6        Q.    Mr. Patton, how are you this afternoon?

7        A.    I'm doing good.

8        Q.    Okay.  My name is Bill Wirskye.  I'll be the

9   Assistant DA that will be talking with you for the next few

10  minutes.  I understand, I guess there was a miscommunication

11  in getting you down here today, but we appreciate you coming

12  down here as fast as you could.

13             What I'd like to do is talk to you a

14  little bit about some of the information in your

15  questionnaire that you gave us, talk to you a little bit

16  about your thoughts and feelings about the death penalty,

17  since this is a case where the State is seeking the death

18  penalty, and then talk to you about some of the laws that

19  may apply and make sure you understand those laws.

20             What do you think about potentially being

21  a juror in a death penalty case?

22       A.    I -- it's an opportunity that I really -- you

23  don't wish to have in any way.  You want to be a part of

24  your government, helping your government out, but it's

25  something that I would rather not be a part of, but need be.

1    Q.    I think most people kind of share that

2    opinion.  You've only been in Dallas a year; is that right?

3    A.    Yes, sir.

4    Q.    Okay.  Is this the first time that you've been

5    summoned for jury duty since you moved here?

6    A.    Yes.

7    Q.    Okay.  And you went right to the big time with

8    the death penalty case, I guess?

9    A.    Yes.

10   Q.    What do you think about Texas so far?

11   A.    I love Texas.  I'm originally from Ohio.  I

12   like the weather and it's been great for me and my wife.

13   Q.    Okay.  And tell us what you do for a living.

14   It looks like you've got a couple of different jobs and a

15   student, too, right?

16   A.    Yes.  Right now I'm a student.  I'm two

17   classes -- well, one class away from my masters degree in

18   management and currently I work at Lifetime Fitness.  I just

19   got the job about a week ago.

20   Q.    Okay.  Would it inconvenience you either in

21   your job or in the classes you're taking to come down and be

22   a juror in this case for two weeks in November?

23           PROSPECTIVE JUROR:  It would

24   inconvenience my classwork.  If I can give them time in

25   advance to let them know.  I currently go to a campus

1    instead of online, which University of Phoenix really is an

2    online school.  So that could be a problem, but if I give

3    them advance notice --

4           Q.    Okay.  So you are actually taking a class on

5    campus this semester?

6           A.    On Wednesday evenings, yes, sir.

7           Q.    Okay.  Do you have finals scheduled for that

8    class?  Or do you know when those are?

9           A.    This is my last class, so I have a thesis

10   right now.  So there's no finals.

11          Q.    Okay.  Is that due anytime around November or

12   December?

13          A.    That will be due November the 19th,

14   approximately.  I'm not sure, but --

15          Q.    Okay.  We're scheduled to trial for the two

16   weeks starting November 10th and then that second week, I

17   guess, starting Monday the 17th through that week and,

18   obviously, you have your, I guess, your very last paper due

19   to get your degree?

20          A.    Yes, sir.

21          Q.    You know, we don't want to jam you up unless,

22   you know -- we don't want to cause undue problems for

23   people, unless we have to.  But I appreciate you coming

24   down.  I think that's all the questions I have, Mr. Patton.

25                  MR. WIRSKYE:  Judge, I'll pass the juror

1   and I think we have an agreement.

2                   MS. BUSBEE:  We've made an agreement,

3   Your Honor.

4                   THE COURT:  Mr. Patton, you raced down to

5   the courthouse to tell us this.  The parties have agreed.  I

6   mean, if you're in this trial, there is absolutely no way

7   you're going to be able to get a masters thesis turned in

8   during the middle of this trial.  There's just no humanly

9   way possible you could do that.

10                  I can't let you out of trial.  My deal is

11  just, you know, wait until next semester.  But the attorneys

12  are much more forgiving of people's circumstances than I can

13  be under the law.  So we thank you for your time and service

14  here today and they have agreed to excuse you so you can get

15  your masters finished.

16                  PROSPECTIVE JUROR:  All right.  Thank

17  you.

18                      [End of Volume]

19

20

21

22

23

24

25

1   STATE OF TEXAS          *

2   COUNTY OF DALLAS        *

3       I, NANCY BREWER, Official Court Reporter for the 283rd

4   Judicial District Court, do hereby certify that the above

5   and foregoing constitutes a true and correct transcription

6   of all portions of evidence and other proceedings requested

7   in writing by counsel for the parties to be included in this

8   volume of the Reporter's Record, in the above-styled and

9   numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11      WITNESS MY OFFICIAL HAND on this the 4 day of

12  _____ March, 2004.

13

14

15  _____
    NANCY BREWER, CSR, NO. 5759
16  Expiration Date:  12-31-04
    Official Reporter, 283rd JDC
17  Frank Crowley Crts. Bldg. LB33
    133 No. Industrial Blvd.
18  Dallas, TX 75207
    (214)653-5863
19

20

21

22

23

24

25

REPORTER'S RECORD

**74851**

VOLUME 37 OF *6* VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS
MAR 9 - 2004
Troy C. Bennett, Jr., Clerk

On the 15th day of October, 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT:  03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT:  00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

PROSPECTIVE JUROR INDEX

| PROSPECTIVE JUROR | CRT. | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| Nicholas Daigle | 4 | 5 | 25 | 37 |
| Lawrence Porter | 31 | 32 | 46 | 37 |
| Elizabeth Bastardo | 49 | 50 | | 37 |

1                    P R O C E E D I N G S

2              THE COURT:  Mr. Daigle.

3                    [Prospective juror in]

4              THE COURT:  Good morning, sir.  How are

5   you?

6              PROSPECTIVE JUROR:  All right.

7              THE COURT:  We have Nicholas Adam Daigle?

8              PROSPECTIVE JUROR:  Yes, sir.

9              THE COURT:  Am I pronouncing that

10  correctly?

11             PROSPECTIVE JUROR:  Yes, sir.

12             THE COURT:  Good morning, Mr. Daigle.

13  Welcome to the 283rd.  We have juror No. 5360.  Have you had

14  enough time this morning to review the guide I provided for

15  you?

16             PROSPECTIVE JUROR:  Yes, sir.

17             THE COURT:  I also gave you a copy of

18  your questionnaire.

19             PROSPECTIVE JUROR:  Yes, sir.

20             THE COURT:  I hope you've had time to

21  review that to get you in the frame of mind this morning to

22  think about the law we're going to be dealing with.  You

23  certainly don't have to understand it all right now.  That's

24  what this opportunity and interview is for, is for you to

25  ask questions.  The attorneys will explain the law to you,

1   give you examples to help you understand how the law works.

2   The objective at the end is for you to have a functional

3   working knowledge of the law.

4                       I have two questions that I must ask at

5   the end of the process.  Number one is do you, in fact,

6   understand the law?  Number two, can you follow the law?

7   That's the big picture I have to have.  The only question I

8   have for you at this time, sir, is will you be able to serve

9   this Court for a period of two weeks beginning on November

10  10th?

11                  PROSPECTIVE JUROR:  Yes, sir.

12                  THE COURT:  Thank you, sir.  If you'd

13  like to turn your attention to Mr. Shook, he has a few

14  questions for you.

15                  MR. SHOOK:  Thank you, Judge.

16                  NICHOLAS DAIGLE,

17  having been duly sworn, was examined and testified as

18  follows:

19                  DIRECT EXAMINATION

20  BY MR. SHOOK:

21       Q.    Mr. Daigle, my name is Toby Shook.  I'm going

22  to ask you questions on behalf of the State.  And as the

23  Judge said, there aren't any right or wrong answers.  We

24  just want your honest opinions.  I'll talk a little bit

25  about your information in the questionnaire and then we'll

1   talk about capital murder and that sort of thing and get

2   your opinions and talk about some of the rules that apply in

3   these types of cases.   How long have you been here in Dallas

4   now?

5        A.     A year.

6        Q.     A year.   What brought you to Dallas?

7        A.     Work.

8        Q.     Okay.   And you enjoy it here so far?

9        A.     Yes, sir.

10        Q.     Okay.   Did you grow up in Louisiana?

11        A.     Yes, sir.

12        Q.     What part of Louisiana?

13        A.     In Jennings.

14        Q.     Okay.   And I see that your father was a police

15   officer?

16        A.     Yes, sir.

17        Q.     Who was he a police officer with?

18        A.     Jennings.

19        Q.     Okay.   How long did he work there?

20        A.     Two or three years.

21        Q.     Okay.   So he wasn't a career officer there?

22        A.     No, sir.

23        Q.     How old were you when he was a police officer?

24        A.     Two or three years old.

25        Q.     Okay.   So you don't even remember those days?

1    A.    No, sir.

2    Q.    All right.  Anything about that which would

3  cause you to be unqualified?

4    A.    No, sir.

5    Q.    All right.  Tell us a little bit how you feel

6  about capital murder.  You put on your questionnaire that

7  you are in favor of it as a law?

8    A.    Yes, sir.

9    Q.    Could you tell us just kind of in your own

10  words why you favor it and the purpose you feel it serves?

11    A.    I just feel if you commit a crime, that you

12  should have to pay for it.

13    Q.    Okay.  You just think it's a just punishment

14  for certain cases?

15    A.    Yes, sir.

16    Q.    What types of cases come to mind when you

17  think might be deserving of it?

18    A.    Murder, killing of a child.

19    Q.    All right.  Brutal murders, that sort of

20  thing?

21    A.    Any of them.

22    Q.    Okay.  You checked No. 2 which the great

23  majority of people that are in favor of the death penalty

24  check, that you believe the death penalty is appropriate in

25  some murder cases, and could return a verdict of guilty.

1  That's what most people put and you also put on page 3 that

2  you agree that a life sentence should be appropriate under

3  some circumstances, also.  And that's kind of how the scheme

4  works in Texas.  In a death penalty case, if someone has

5  been found guilty, the punishment is either going to be a

6  death sentence or a life sentence.  And it all depends on

7  the facts and how the jury answers these Special Issues.

8              But some of the facts are going to show a

9  life sentence as the most appropriate in a capital murder

10  situation and some a death sentence.  And it all comes down

11  to the individual facts.  From reading your questionnaire,

12  it sounds like you are open to either alternative, depending

13  on what the facts of the individual case are?

14      A.      Yes, sir.

15      Q.      Okay.  Fair enough.  Let me get into another

16  area.  You know, when we think of capital murder in Texas,

17  the death penalty is reserved for intentional killings and

18  then not every intentional killing.  In fact, I guess, if we

19  looked at it, the great majority of murders would not even

20  fall under the death penalty statute.  There are intentional

21  murders that can be brutal.  You can get a life sentence,

22  but you can't get a death penalty.

23              The death penalty is reserved for

24  intentional murders that occur during the course of a

25  felony, such as robbery.  If I go in a 7-Eleven and shoot

1 the clerk during a burglary, during a rape, kidnapping, and

2 arson, also, murder of police officers, firemen, that sort

3 of thing, murder of more than one individual, murder of a

4 child under the age of six, but those specific

5 circumstances.

6 And then, as I said before, some of those

7 are going to be a life sentence and some are going to be a

8 death sentence.  It all depends on the individual facts.

9 There's another area that we call the law

10 of parties, which I think is more commonly known among folks

11 as accomplices.  You know, sometimes it takes more than one

12 person to commit a crime.  You have accomplices.  Some of

13 them have greater roles that others and the same is true of

14 capital murder.

15 You may have one triggerman, but you may

16 have other accomplices that help him commit the crime.  An

17 example I use is, let's say, Mr. Wirskye and I decide we

18 want to rob a bank.  We get another friend of ours and we

19 get him in on it.

20 Our plan calls for our buddy, he's got a

21 fast car, he's going to drive up there, keep the car

22 running, look out for the cops.  We're going to run in

23 there.  I'm going to pull a gun out and hold everyone up.

24 While I've got everyone threatened there, Mr. Wirskye is

25 going to start gathering the money up and putting it in a

1   sack.

2              Then during the course of that I shoot

3   one of the tellers.  Maybe I just don't like them or maybe I

4   think they are going for an alarm.  But I murder them.  We

5   escape, but we're caught later on.

6              Obviously, I can be prosecuted for the

7   death penalty because I murdered someone during a robbery.

8   The law says that Mr. Wirskye and the getaway driver could,

9   also, even though they didn't cause the death, because they

10  were actively involved in the crime, that they participated

11  in it.  And a juror, looking at all the facts, might find

12  them guilty and could even give them the death penalty.

13             So the law allows for that.  And people

14  feel differently.  Some are in favor of the death penalty,

15  but if it were up to them they would reserve it only for the

16  triggerman.  They might give, you know, a long prison term

17  to accomplices.  They just don't think the death penalty is

18  right for an accomplice.

19             Then other jurors tell us they do think

20  it could be right, that accomplices might ought to be held

21  accountable even to a death sentence, if they are

22  participating in the capital murder.  How do you feel about

23  that, the prosecution in a capital murder situation on an

24  accomplice?

25        A.    I think they should get life, if they didn't

1   make you pull the trigger.

2        Q.    All right.  And that's why we ask the question

3   that way, because there aren't any right or wrong answers.

4   Do you feel from your personal point of view that if it were

5   up to you, you wouldn't have the death penalty for an

6   accomplice.  You'd just keep it for a triggerman?

7        A.    I think it depends on the facts.

8        Q.    Okay.  What kind of facts would be important

9   to you?

10        A.    Did he force you to do it?  Did he shoot the

11   guy after you did?

12        Q.    What if it's a situation where you weren't

13   forced?  If someone forced you, then that's a defense, you

14   know, if you're doing it against your will.  We can only

15   talk about situations when it falls in a capital murder

16   where you are going along willingly, but you may not be the

17   actual killer.  You're just participating in the event.

18   What factors in those situations, where someone is there

19   voluntarily, are important to you?

20        A.    I guess it depends on why he was there.

21        Q.    Okay.

22        A.    If he did it willingly, then he should have to

23   pay.

24        Q.    Okay.  The law says that under, if, like the

25   example I gave, if we agree to commit robbery, and during

1   the course of that crime, one of us commits another felony,

2   such as murder in that situation, then everyone can be found

3   guilty, even if they didn't have the actual intent for that

4   person to die, the accomplices, if the jury believes they

5   should have anticipated that could happen, you know.  They

6   should have known that could happen.  They can be found

7   guilty.

8           So a person doesn't even have to have

9   that actual intent.  Some people agree with that and some

10  people don't.  Some people don't think that's right, that if

11  you don't have that specific intent to murder, that you

12  shouldn't be able to be found guilty of capital murder.  How

13  do you feel about that?

14      A.    I think it depends on the evidence.

15      Q.    Okay.

16      A.    But if he went along with the crowd, then I

17  guess it just depends on, are they going to be charging him

18  for murder?

19      Q.    Capital murder.  Do you think if he was there

20  voluntarily and participated in the crime, that it's fair

21  that he be found guilty of capital murder?

22      A.    Yes, sir.

23      Q.    Even if he didn't actually cause the death?

24      A.    (Prospective juror nods head.)

25      Q.    Because he's helping commit the crime?

```
 1          A.    Right.  He went along voluntarily.

 2          Q.    All right.  Do you feel from your own personal

 3    point of view that accomplices could get the death penalty

 4    --

 5          A.    They could, yes.

 6          Q.    -- if they are participating in the crime?

 7          A.    Yes, sir.

 8          Q.    Would the person's intent or what they wanted

 9    to happen be important to you?

10          A.    Yes, it would.

11          Q.    Okay.

12                THE COURT:  I'm sorry, you are going to

13    have to speak up.  I've got to listen and she's got to

14    record everything you say.

15                PROSPECTIVE JUROR:  Yes, sir.

16                THE COURT:  Thank you.

17          Q.    (By Mr. Shook)  Do you -- let me ask you this.

18    You know, Louisiana I know, actually carries out the death

19    penalty, and Texas leads the nation in carrying out

20    executions.  Some of these states have it and they never use

21    it.  But Texas does and I know Louisiana does.

22                Under the procedures, if someone is

23    sentenced to the death penalty, they would be placed on

24    death row.  After a number of years the Judge would give an

25    actual date of execution.  And on that date or the day
```

1  before he would be moved from death row to Huntsville,

2  Texas, where all executions take place by law.

3                  On the date of his execution he would be

4  given time with his family, friends, or a minister.  He

5  would be given a last meal.  But at 6:00 p.m. all executions

6  take place.  They'd take him from his cell, about 18 feet

7  away from the execution chamber.  They'd put him down in

8  that chamber, put him on a gurney, and they'd strap him

9  down.

10                  Witnesses would be brought in, some from

11  the victim's side and some from the defendant's in different

12  rooms.  After he's secured, they put needles in his arms.

13  The tubes go to another room where the executioner sits.

14  He's given a time to make a last statement, which you can

15  always read about.  He might proclaim his innocence, he

16  might rail against the death penalty, he might ask for

17  forgiveness.

18                  But at the conclusion of that, the warden

19  would signal the executioner.  He would then inject

20  substances which would collapse his lungs, stop his heart,

21  and within 10 to 15 seconds send him into a coma, which he

22  would not recover.

23                  That's our goal in this case.  We feel we

24  have the type and quality of evidence to convince a jury of

25  the defendant's guilt and these questions should be answered

1  in a way that result in his execution.  It's kind of one

2  thing to talk about the death penalty, I guess, in a

3  philosophical sense that you are for it, in favor of it.

4  Sometimes it's something else when you come down here and

5  you realize you might be on a jury that actually makes these

6  decisions, makes a decision if the State proves it, that

7  someone will be executed in the manner I've described.

8          Now, you've told us that you believe in

9  the death penalty.  And what I need to know now is this.

10 After you have thought about it, do you think that you are

11 the type of person that could make these decisions?

12      A.      Yes, sir.

13      Q.      Why do you feel that?

14      A.      I feel that if you kill somebody, especially a

15 police officer, that you should pay for it.  I had a friend

16 that was a cop and he went to the service and was shot.

17      Q.      Was he killed?

18      A.      (Prospective juror nods head.)

19      Q.      Okay.  What happened in his case?

20      A.      He shot another cop.

21      Q.      Okay.

22      A.      He was an ex-cop that went to one of his

23 friend's houses and they got into a big fight.  And when the

24 officer got there, he just opened up fire.

25      Q.      Was he prosecuted for the death penalty?

1    A.    Yeah.  He got the death penalty.  He's waiting

2  to be executed now.

3    Q.    All right.  And that was back in Louisiana?

4    A.    Uh-huh, yes, sir.

5    Q.    All right.  Now, our laws, once you find

6  someone guilty, it doesn't mean they get the death penalty.

7  Again, it might be a death or life sentence, it all depends

8  on these questions.  Question No. 1 asks whether there's a

9  probability that the defendant would commit criminal acts of

10  violence that would constitute a continuing threat to

11  society.  You see, that's asking the jurors to make a

12  prediction whether they think someone is dangerous.

13            Do you feel that you could answer that,

14  if you are given enough evidence?

15    A.    Yes, sir.

16    Q.    What types of things would be important to

17  you?

18    A.    Why he did it in the first place, what was his

19  --

20    Q.    Motivation?

21    A.    -- motivation.

22    Q.    All right.  That would be admissible as well

23  as the person's background, if they have been in trouble

24  before.  Now, the law says that that Special Issue starts

25  out with a no, just like someone is presumed to be innocent

1  and we have to prove to you beyond a reasonable doubt it

2  should be answered yes.  We do that by putting on any new

3  evidence we got in the punishment phase about the person's

4  background and then you look again at what you heard in the

5  guilt/innocence stage.

6          But there's no automatic answers, you

7  know.  Just because you find someone guilty, whether it's

8  murder of a police officer or any other capital murder

9  situation,, you don't automatically write in yes and try to

10  give him the death penalty.  We can think of a lot of

11  examples, you know.

12          It might be a situation where, let's say,

13  I was charged with capital murder because I broke into

14  someone's house and murdered them.  But the facts show that,

15  well, let's use the police officer situation.  Maybe it has

16  me murdering a police officer.  The facts actually show that

17  he was molesting children in the neighborhood.  But since he

18  was a policeman, no one would do anything about it.

19          So I took the law in my own hands and I

20  murdered him while he was on duty.  And you believe that's

21  why I murdered him.  My motivations, as you said, would be

22  so important to you.  Now, I'm guilty of capital murder,

23  obviously, under the law, because I murdered a police

24  officer.

25          But the motivation might tell the jury,

1  well, he's never done anything else wrong in his life and

2  his motivation was to protect children, so I don't think

3  he's a continuing danger to society.  You see how that

4  question could be answered either way?

5      A.    Yes, sir.

6      Q.    That's why the law doesn't allow jurors to

7  automatically answer yes to that, just because they found

8  someone guilty.  It just depends on the facts.  Do you feel

9  you can keep your mind open to that full range of punishment

10  --

11      A.    Yes, sir.

12      Q.    -- and answer that question yes or no

13  depending on the facts?

14      A.    Yes, sir.

15      Q.    And would you require the State to prove to

16  you beyond a reasonable doubt it should be answered yes?

17      A.    Yes, sir.

18      Q.    Okay.  Same thing on Special Issue No. 2.

19  That has to do with that accomplice situation.  And it asks

20  whether the defendant actually caused the death of the

21  deceased.  If you think he's the triggerman, then you'd

22  answer it yes.  If he didn't actually cause the death, but

23  intended to kill the deceased or another, that is, if he had

24  that intent, but maybe he's not the one that did the killing

25  or he anticipated that a life would be taken.

1        If you believe from all the facts that

2   his anticipation was there, you know, then you would answer

3   it yes. Again, it starts out with a no answer and the State

4   has got to prove to you, using all the background evidence

5   and anything about his role in the crime, that it should be

6   answered yes. If we don't prove that to you, it has to be

7   answered no, or left as a no. So, again, that question is

8   answered either way just by the evidence. Do you feel you

9   could keep your mind open to that?

10       A.     Yes, sir.

11       Q.     Just because you found him guilty, you

12   wouldn't automatically answer that question yes?

13       A.     No, sir.

14       Q.     It would just depend on the evidence you hear

15   in the punishment phase?

16       A.     Yes, sir.

17       Q.     Okay. And you can force the State to prove to

18   you beyond a reasonable doubt it should be answered yes?

19       A.     Yes, sir.

20       Q.     All right. And this last Special Issue,

21   neither side has the burden of proof. That's the mitigation

22   question. The mitigation question allows you to look at all

23   the evidence, the person's background, the way they were

24   raised, brought up, to see if you think there is sufficient

25   mitigating evidence.

1           And that simply means evidence where you
2    think a life sentence should be imposed rather than a death
3    sentence.  It allows you to show mercy, if you think that's
4    the right thing to do.  What you think mitigating evidence
5    is, is going to be up to you.  We can't tell you what it is.
6    All you have to do is promise the Court you could keep your
7    mind open to it.
8           A.     Yes, sir.
9           Q.     Do you feel you could do that?
10          A.     Yes, sir.
11          Q.     Just because you find someone guilty and you
12   think they are a continuing danger and you think they
13   intended someone to die, doesn't always mean they will get a
14   death sentence.  There could be some mitigating evidence,
15   something in their background, which tells you in your heart
16   that he needs a life sentence.  You're not required to think
17   what that would be, but you have to be able to promise the
18   Court that you can answer the question that way, if that's
19   what you believe the evidence showed.  Could you do that?
20          A.     Yes, sir.
21          Q.     All right.  You know, I had one juror explain
22   it pretty good.  He said these Special Issues are kind of
23   like a window.  It starts out with an open and every time we
24   convince him of one should be answered, it closes a little,
25   closes a little, and when he got to that last Special Issue,

1   it was still open.  It wasn't open a whole lot, but it was

2   still open.

3                And that's kind of how it should be.  In

4   your mind it's still open to something.  And if you

5   recognize it, you will answer at that way.  As you sit there

6   today does anything come to mind that you might view as

7   potentially mitigating?

8        A.     Not offhand.

9        Q.     All right.  That's what most jurors tell us.

10   We don't anticipate that you have thought about these

11   things.  You just have to be able to tell us that you can

12   keep your mind open to it.

13        A.     I can.

14        Q.     Okay.  A couple of other things, then.  These

15   rules apply to all criminal cases.  And you've grown up here

16   in the United States.  I'm sure you will be familiar with

17   these.  The presumption of innocence.  Everyone that starts

18   off a trial is presumed to be innocent by the jury.  You

19   have to give them that presumption.  And the fact that he's

20   been arrested or anything doesn't mean he's guilty.  We have

21   to prove him guilty by putting on witnesses.

22                 Can you start this defendant out with

23   that presumption of innocence?

24        A.     Yes, sir.

25        Q.     The burden of proof is on the State and it

1    never goes over to the defense.  They are not required to

2    put on witnesses or ask questions.  They probably will, but

3    they are not required to.  And you can't shift that burden

4    to them and require them to prove anything to you.  If you

5    have a reasonable doubt at any time in this trial, you'd

6    have to find the defendant not guilty.  Could you do that?

7         A.    Yes, sir.

8         Q.    The burden of proof goes to every element of

9    our indictment.  Our indictment is what we have to prove,

10   it's what we write.  And a juror is kind of like an umpire

11   in a baseball game.  You have to call balls and strikes as

12   you see them.  You can't give us a break, if one is kind of

13   close, but not quite there, you can't give us a break.

14                   For instance, we have to prove who

15   committed this crime.  If you had a reasonable doubt about

16   who committed it, that's a pretty easy decision.  You would

17   find him not guilty, right?

18        A.    Yes, sir.

19        Q.    But the law, also, goes to where this crime

20   happened.  This is an example I don't anticipate would

21   happen.  But we have to prove this happened in Dallas

22   County.  Let's say you heard a case and you feel it's one of

23   those close ones on the border and it actually happened over

24   in Rockwall or Ellis County or Tarrant County.

25                   That would mean you would have a

1  reasonable doubt.  And under the law you are obligated to

2  find the defendant not guilty.  And some people call that a

3  technicality, but it's not.  We would have bungled the case

4  then.  You could probably have us fired for being such bad

5  prosecutors in preparing our case, but you can't help us

6  out.  Again, you are the umpire, the neutral umpire.  And if

7  you have a reasonable doubt on any portion, even where it

8  happened, Dallas County, you'd have to find him not guilty.

9  Do you feel you could do that?

10        A.     Yes, sir.

11        Q.     Okay.  The Fifth Amendment, if someone wants

12  to testify, they can.  But if they choose not to, you can't

13  hold it against them.  There's a lot of reasons why someone

14  may not want to testify.  They may not be very well

15  educated, they may not perform well in front of people, may

16  be real nervous, look guilty when they're not.  They may

17  just simply be following their lawyer's advice.

18              Or it could be a situation where they are

19  real guilty and we'd make them look more guilty.  The law

20  takes care of that and the Judge says you can't hold that

21  against them or consider it in any way.  Do you feel you

22  could do that?

23        A.     Yes, sir.

24        Q.     Okay.  Police officers, we respect the job

25  they do, but as jurors you have to start them out on the

1  same foot as you would any other witness.  You probably know

2  there's good police officers and then there's bad police

3  officers.  And you have to wait and judge their credibility,

4  once they finally hit the stand.  Do you think you could do

5  that?

6          A.    Yes, sir.

7          Q.    The Judge would tell you on our parole laws

8  that anyone convicted of capital murder and receiving a

9  capital life sentence means they have to stay there forty

10 calendar years before they become eligible for parole.  He

11 would also tell you that you can't consider our parole laws

12 in any way in your deliberations.  You just have to consider

13 a life sentence, a life sentence.  Do you think you could do

14 that?

15         A.    Yes, sir.

16         Q.    All right.  The bottom line is you have to

17 keep your mind open to all these things and wait until all

18 the evidence is in, in the punishment phase before you make

19 these decisions.  There's no automatic answers.  You know,

20 just because you find someone guilty of any type of capital

21 murder, doesn't mean a death sentence.  You can have strong

22 feelings about the death penalty, but as a juror you have to

23 keep your mind open and then require the State to prove

24 everything to you.  Do you feel you could do that?

25         A.    Yes, sir.

1      Q.    All right.

2             MR. SHOOK:  That's all I have, then,

3  Judge.

4             THE COURT:  Ms. Busbee?

5             MS. BUSBEE:  Thank you, Your Honor.

6             CROSS-EXAMINATION

7  BY MS. BUSBEE:

8      Q.    Mr. Daigle, I'm not going to spend as much

9  time talking to you, probably, as Mr. Shook, but I'd like to

10  ask you some questions about you and about your service with

11  us here.  I know when you filled out this questionnaire, you

12  said that you didn't know anything about this case.  Have

13  you remembered anything about it since then?

14      A.    No.

15      Q.    This is my concern in this matter.  Could you

16  tell me a little bit about the friend that you lost that was

17  a police officer?

18      A.    What do you want to know about him?

19      Q.    Well, was he -- how close of a friend, that

20  sort of thing.

21      A.    We weren't real close.  We talked when he was

22  on duty.  We didn't go hang out or anything like that.  I

23  just knew him as a friend.

24      Q.    Okay.  Did you attend the trial?

25      A.    No, ma'am.

1    Q.    All right.  And you can understand my concern.

2  I mean, people come to us with all kinds of experiences in

3  their background and sometimes those experiences, just

4  because we're human beings, can bleed over into our service

5  as jurors.  And while you may be a perfectly fine juror on

6  one case, you might not be on another.  There's a Judge here

7  that uses the example of when her hubcaps were stolen off

8  her car and then later on that morning somebody came before

9  her who had stolen some hubcaps off a car, and she said, I

10  just couldn't be fair because I was so mad about what

11  happened to me that day.

12              And only you know if you can set aside

13  your grief or your stress over what happened to your friend

14  and be fair in a case where a police officer was killed.

15  And if you have some reservations about that, this is the

16  time that you can tell us that, you know, you just don't

17  think that -- of course, you don't know what you're going to

18  hear, but you do know that much, that that may affect you.

19    A.    It wouldn't.

20    Q.    It wouldn't?  You can just sit here and --

21    A.    Like you said, he's innocent until proven

22  guilty.

23    Q.    Okay.  And then there's -- of course, as

24  Mr. Shook explained, two aspects to this.  The second part

25  is the punishment.  And I think he's told you that they're

1  trying this case under an accomplice theory, if you will.

2  And so it's important to me to know that you'll set those

3  feelings aside and understand that this is an entirely

4  different individual.  Can you promise me that you can do

5  that?

6          A.    Yes, ma'am.

7          Q.    All right.  Is there anything else that you

8  would like to ask me about or have any questions about this

9  case or your service?

10         A.    No, ma'am.

11         Q.    Okay.

12               MS. BUSBEE:  Your Honor, I have no more

13  questions of this juror.

14               THE COURT:  Thank you, Mr. Daigle.  If

15  you will be so kind as to wait for us back out in the hall.

16  We'll have you back in a few minutes.

17               [Prospective juror out]

18               THE COURT:  Counsel, please approach.

19               (Bench conference)

20               THE COURT:  Ms. West.

21               [Prospective juror in]

22               THE COURT:  Good morning.

23               PROSPECTIVE JUROR:  Good morning.  How

24  are you?

25               THE COURT:  Just fine.  For the record we

1  have juror No. 4895, Barbara Jane West; is that correct?

2              PROSPECTIVE JUROR:  Yes, sir.

3              THE COURT:  Welcome to the 283rd.  Have

4  you had an opportunity this morning to read the guide I

5  prepared for you?

6              PROSPECTIVE JUROR:  I -- um, this, sir?

7              THE COURT:  Yes, ma'am.

8              PROSPECTIVE JUROR:  Yes.  This I have

9  read.  I didn't get to read my answers, though.  I didn't

10 have enough time.

11             THE COURT:  That's fine.  They may want

12 to refer to that.  They'll say, look at page, 4 what were

13 you thinking when you filled out that questionnaire?

14             PROSPECTIVE JUROR:  Oh, okay.

15             THE COURT:  The idea is to let you start

16 thinking about the issues we're going to be discussing.

17 This is an interview process.  We need to ask questions to

18 -- the objective is for you to have a functional

19 understanding of the law before the Court.

20             PROSPECTIVE JUROR:  Okay.

21             THE COURT:  There are no wrong answers.

22 They just want your honest opinions and for you to gain the

23 knowledge to be able to use this law.  At the end of the

24 process, I have two questions I must ask.  Number one is do

25 you, in fact, understand the law?  And number two, can you

1   follow the law?  Big picture.  The only question that I have

2   for you now, ma'am, is will you be able to serve this Court

3   for a period of two weeks beginning on November 10th?

4                       PROSPECTIVE JUROR:  I have to answer yes

5   or no?

6                       THE COURT:  Yes, ma'am.

7                       PROSPECTIVE JUROR:  Do I have a choice,

8   sir?

9                       THE COURT:  Well, if you -- I mean,

10  people don't want to serve for business reasons or --

11                      PROSPECTIVE JUROR:  Well, that's, my

12  problem is that I am the only full-time employee at a

13  nonprofit.  And I find -- I have two weeks away from my job

14  would be very difficult for me.

15                      THE COURT:  And anybody we put on this

16  jury is going to have the same business, work-related

17  problems.  I can assure you of two things.  Number one, I

18  will not waste your time.  I think you saw that.  When you

19  got here you barely had time to read your questionnaire.

20  We're going to have you in and we're going to have you out.

21  The trial will proceed on time.  You would have a break in

22  the morning, you'll have a lunch break, break in the

23  afternoon.  We quit between 4:30 and 5:00, depending on when

24  the witnesses break up.  So you won't be shut down.  You can

25  go by the office, if you need to, in the evening.

1              PROSPECTIVE JUROR:  Well, my problem is

2  there wouldn't be anybody there in the -- you know, in my

3  office to be -- essentially, it would be closed.  And I see

4  that as a problem.

5              THE COURT:  What is the name of your

6  nonprofit?

7              THE COURT:  It's the Creative Art Center

8  of Dallas.  It's a nonprofit school of art for adults.

9              THE COURT:  So you are it?

10             PROSPECTIVE JUROR:  I'm it.  The only

11  other person I have is a part-time accountant.  She's

12  sitting in for me this morning, but she's not able to be

13  there in my stead.

14             THE COURT:  Well, see, I can't let you

15  off for legal reasons.

16             PROSPECTIVE JUROR:  I understand.

17             THE COURT:  But the parties have just

18  raised a flag.  And they can be a lot nicer than I am.

19             PROSPECTIVE JUROR:  Okay.  I'm just being

20  honest, sir.

21             THE COURT:  Well, I appreciate that,

22  that's all we ask.  See, I can't let you off, but they can.

23  Is that correct, Mr. Wirskye?

24             MR. WIRSKYE:  That is correct, Judge.  We

25  have an agreement.

1          MS. BUSBEE:  We do, Your Honor.

2          THE COURT:  Ms. West, you have been

3   excused.

4          PROSPECTIVE JUROR:  Well, thank you very

5   much.  I appreciate it.  Thank you for considering me.

6              [Prospective juror out]

7          THE COURT:  Shall we look at Porter?

8          MS. BUSBEE:  Yes, sir.

9          MR. SHOOK:  Sure.

10              [Prospective juror in]

11          THE COURT:  Good morning, sir.  How are

12   you?

13          PROSPECTIVE JUROR:  Just fine, and you,

14   sir?

15          THE COURT:  For the record, we have juror

16   No. 5459, Lawrence B. Porter; is that correct?

17          PROSPECTIVE JUROR:  Yes, sir.

18          THE COURT:  Welcome to the 283rd, Mr.

19   Porter.  Did you have enough time this morning to read the

20   guide I prepared for you?

21          PROSPECTIVE JUROR:  Yes, sir.

22          THE COURT:  And, also, you got a copy of

23   your questionnaire.  I hope you looked at that.  The

24   objective here is for you to use this time to gain a working

25   understanding of the law.  The attorneys are going to visit

1   with you and provide you maybe with examples to help you

2   understand how all this law relates.  That's the objective

3   here.

4                    There are no wrong answers, just honest

5   ones.  The Court will have two questions I must ask at the

6   end of the process.  Number one, do you, in fact, understand

7   the law?  Number two, can you follow the law?  Big picture.

8   Only question I have for you now, sir, is will you be able

9   to serve this Court for a period of two weeks beginning on

10  November 10th?

11                   PROSPECTIVE JUROR:  Yes, sir.

12                   THE COURT:  Thank you.  Mr. Wirskye,

13  would you like to inquire?

14                   MR. WIRSKYE:  May it please the Court?

15                   LAWRENCE PORTER,

16  having been duly sworn, was examined and testified as

17  follows:

18                   DIRECT EXAMINATION

19  BY MR. WIRSKYE:

20       Q.    Mr. Porter, how are you this morning?

21       A.    Fine, thank you.

22       Q.    Good.  My name is Bill Wirskye and I'll be the

23  Assistant DA that will be visiting with you for the next few

24  minutes.  I'd like to talk about some of the information on

25  your questionnaire that you were kind enough to provide for

1    us, then talk to you and get your thoughts and feelings

2    about the death penalty and kind of explain to you the

3    scheme we have in Texas and get your thoughts and feelings

4    on that.

5                    What do you think about coming back for

6    an individual interview in a death penalty case?  Any

7    particular thought come to mind when you got notified to

8    come down?

9         A.    No.  I thought it was part of the process.

10        Q.    Okay.  Tell us what you do for a living.

11        A.    Um, right now, I'm the building materials

12   manager for Service Electronics.  Basically, what I do is I

13   reverse engineer computers.

14        Q.    Okay.  And it looks like you've been in that

15   type of work, computer related, for quite a while; is that

16   right?

17        A.    About eight and a half, nine years now.

18        Q.    Okay.  Would it cause any inconvenience or any

19   unusual, I guess, inconvenience for you to be down here for

20   a couple of weeks in the middle of November away from your

21   job?

22        A.    No more than going on a vacation or anything

23   would.

24        Q.    Okay.  You could plan around it with enough

25   advance notice?

1    A.    Yes.

2    Q.    Okay.  Now, you told us you are generally in

3  favor of the death penalty; is that right?

4    A.    Yes.

5    Q.    Can you tell us in your own words why you

6  favor it or why you think we should have it in our society?

7    A.    To me, capital punishment has always seemed to

8  be effective.

9    Q.    Okay.  When you say "effective," what are you

10  talking about?

11    A.    An effective deterrent.  Generally, places

12  that have capital punishment have -- seems like it's lower,

13  crime rates.

14    Q.    Okay.  And is that something that you, a

15  belief you've held most of your adult life?

16    A.    Yes.

17    Q.    Okay.  When you think about an appropriate

18  type of case for the death penalty, what type of cases come

19  to mind?

20    A.    Generally, violent crimes where the intent was

21  to carry out that crime through whatever means necessary.

22    Q.    Okay.  Would you limit the death penalty, the

23  option of the death penalty, just to cases where life, a

24  life was taken, murder cases?  Or would you maybe have it

25  for other cases like rape or severe child abuse, that type

1  thing?

2      A.     I could see it with -- where there is

3  sufficient justification.

4      Q.     Okay.  We always ask people on the

5  questionnaire to kind of rank themselves, if they are in

6  favor of the death penalty.  You know, rank themselves on a

7  scale of 1 to 10 how strongly they favor it.  And you gave

8  yourself an 8, which I know means different things to

9  different people.  But I'm just curious what it meant to you

10  when you assigned yourself that No. 8?

11     A.     Meant to me that I'm pretty much in favor of

12  the death penalty where it's justified.

13     Q.     Okay.  Let me run another aspect, kind of, of

14  the death penalty by you.  We do this to everybody and kind

15  of get your gut reaction to it.  You know, oftentimes crimes

16  are committed by more than one person.  You can have a group

17  or a gang of individuals who commit any crime, whether it's

18  shoplifting or capital murder.

19             The law allows us to prosecute for that

20  crime anyone who is actively involved in the crime.  Okay?

21  Accomplices, I think is the word you generally hear.  In

22  Texas, we call them parties to an offense instead of

23  accomplices, but most people are more comfortable with

24  accomplices.

25             But when you get to a capital murder type

1  scenario, you may have a situation where just one of those

2  people actually pulled the trigger or actually caused the

3  death of the individual during the capital murder.  You may

4  have other accomplices who are actively involved, but who

5  didn't actually cause the death of the victim.  And some

6  people who are in favor of the death penalty oftentimes make

7  distinctions between the triggerman and the nontriggermen

8  accomplices.

9            And while they may favor the death

10 penalty very strongly for the guy that actually pulled the

11 trigger, if it were up to them, when it came to the

12 accomplices, the nontriggermen, they'd simply take the death

13 penalty off the table.  They don't feel, for whatever

14 reason, religious, moral, or ethical, that the death penalty

15 is justified for those people that didn't actually take a

16 life.

17            Other people tell us differently, it just

18 kind of depends on the facts and circumstances of the crime,

19 the level of involvement, that type thing.  But how do you

20 come down on that issue?

21      A.      Um, I guess the best way for me to say it is

22 if there's a group of people and they all picked up a

23 weapon, then every one of them had the same intent, had

24 considered the same possibility of taking that life.

25      Q.      Okay.

1    A.    So --

2    Q.    So you wouldn't automatically take the death

3  penalty off the table for the nontriggermen?

4    A.    No.

5    Q.    Okay.  Let me give you an example, a factual

6  example, just to kind of illustrate how the law works when

7  we're talking about accomplices.  Let's say Mr. Shook and I

8  decide, we get together, that we're going to -- we agree to

9  commit a bank robbery.  The plan calls for Mr. Shook to take

10  in our one gun.  He's going to have the pistol.  He's going

11  to hold up the tellers.  And while he's holding them at bay,

12  I'm going to come in with a sack and kind of collect all the

13  money from the cash drawer.  And that's our plan.  That's

14  what we've agreed on, to do that bank robbery.

15          Let's say during the course of that bank

16  robbery, for whatever reason, maybe one of the tellers looks

17  at Mr. Shook in a funny way or I see one of the tellers

18  going to press a silent alarm to summon the police and I

19  tell him that.  But for whatever reason, he shoots and kills

20  one of the tellers.

21          He's committed an intentional murder

22  during the course of a bank robbery, which is capital murder

23  in Texas.  He could be convicted of that and face the death

24  penalty.  The law also says that under that set of facts,

25  depending on the circumstances that I, too, could be

1  convicted of capital murder and potentially face the death

2  penalty, even though I didn't necessarily have any intent

3  that anyone die, or even though I didn't necessarily have a

4  weapon.  What do you think about that type of scenario?

5       A.    I would think that you knew that the other

6  person was taking a weapon in, that there's a possibility

7  that somebody could get killed.  You decided to go ahead and

8  go on with it, with the knowledge that somebody could get

9  killed with this.  So I think I would lean toward going

10  ahead and --

11       Q.    For the death penalty for the accomplice?

12       A.    For the death penalty, yes.

13       Q.    And I think you have just actually done a

14  better job than I could even do of explaining the law.  What

15  the law, very frankly, is, when it comes to that person that

16  doesn't have the intent, the law says if the person should

17  have anticipated that a life would be taken.  I think you

18  said a possibility.

19            But if the person should have anticipated

20  that a life would be taken, then that accomplice could be

21  found guilty of capital murder.  And if, during the second

22  part of the trial, the sentencing phase, the jury thinks

23  that the accomplice not only should have anticipated, but

24  actually anticipated, then I could ultimately receive the

25  death penalty.  Does that make sense to you?

1          A.     Yes.

2          Q.     Okay.  Is that -- it seems like you are kind

3    of in accord with what the law is or kind of in agreement --

4          A.     I think I am.

5          Q.     -- on that aspect of accomplice?  The reason

6    we talk about it, very frankly, is we're prosecuting this

7    case under that theory of law, the accomplice theory of law.

8    And that's why we go into it in some detail, to make sure

9    that people understand the law and are comfortable with it.

10   It sounds like you are comfortable with that aspect of the

11   law?

12         A.     Yes.

13         Q.     Okay.  Let me, also, touch on another area.  I

14   think you indicated -- I'll double check -- that you, like

15   almost everybody we talked to, has heard something about

16   this case, the facts, I guess the pretrial publicity through

17   the media, that type thing.

18                And in that sense it's a little bit

19   different than most cases that you come down on in jury duty

20   where you have absolutely no idea kind of what case it is.

21   And we know it affects different people differently, but can

22   you tell us what you remember hearing about this case?

23         A.     I remember it being on the news where the

24   event happened.  I remember them saying they caught the

25   people and I remember hearing that a couple of the trials

1   went on, but I never really paid any attention or heard any

2   of the verdicts.

3        Q.    Okay.  So you are not aware of any of the

4   other verdicts in the cases?

5        A.    No.

6        Q.    Knowing what you know, how do you think it may

7   affect you, if you were to be a juror in this case?  We ask

8   everybody that because, I mean, you can tell us, you know,

9   we could never figure it out.  We just rely on people to

10  tell us exactly whether they could kind of bring that open

11  mind to this type of case where they have some previous

12  knowledge about the facts.

13       A.    Um, I don't think it would affect me much.

14       Q.    Okay.  What the law requires is that even if

15  you have heard something about the case, as long as you can

16  assure us and assure the Court that you can base your

17  verdict just on the facts and circumstances that you hear in

18  the courtroom, if you can do that, then you'd be a qualified

19  juror.  And it sounds like that's something that you think

20  you could do?

21       A.    Yes, I think so.

22       Q.    Okay.  Let me, also, ask you this.  You know,

23  we've been doing this process for a while and I talked to

24  quite a few people and we understand that even people who

25  come down who are kind of philosophically in favor of the

1  death penalty, or in the abstract are in favor of the death

2  penalty, when they get down here to this point in the

3  process, it becomes something a little bit different to some

4  people.

5             It's much more real.  You're sitting in a

6  courtroom, about to make it on a death penalty jury.  You're

7  looking at a living, breathing, human being defendant who,

8  you can probably figure out, it's the goal of the DAs at

9  this table, because we feel we have the type and quality of

10 evidence that we think he's going to be convicted of capital

11 murder.  We feel that we have the evidence, such that he's

12 going to be sentenced to death and one day will actually be

13 executed.

14             We know it's a different situation for

15 some people.  It becomes more real at this point in the

16 process.  And some people tell us they may be in favor of

17 the death penalty, but they're simply not completely

18 comfortable serving as a juror in this type of case.

19             They don't want to make those type of

20 important life or death decisions.  They don't want to live

21 with it, thinking about it, you know, after their verdict,

22 that type of thing.  Because, typically, details of death

23 penalty cases in Texas are often reported in the media.

24             You know living here for a while that we

25 are the most active state.  Our juries assess the death

1   penalty and it's actually carried out here, unlike some

2   other states that have it, but never use it.   It's a reality

3   in this state.   And the details of executions are often

4   reported in the media.

5                   The procedures are the same in every

6   case.   They'd be the same in this case.   If these three

7   questions that you have read about are answered, basically,

8   yes, No. 1, he's a future danger; No. 2, he at least

9   anticipated that a life would be taken; and No. 3, there's

10  nothing mitigating, there's no reason his life would be

11  spared, at that point the Judge would have no discretion.

12  He would be automatically sentenced to death.

13                   He would be immediately taken to death

14  row where he would wait.   At some point in the future, I

15  can't tell you how long, but at some point in the future

16  Judge Cunningham would issue a date of execution.   On that

17  date he'd be moved to the main prison in Huntsville, be kept

18  in a small holding cell on that day just a few feet away

19  from the actual death chamber.

20                   He could meet with friends, family, spiritual

21  advisors, could eat a last meal, if he wanted one.   As it

22  got close to 6:00, which is the time that the law mandates

23  in Texas all executions take place, he'd be moved from that

24  holding cell to the actual death chamber.   You may have seen

25  pictures of it.   The media typically shows pictures of that

1   gurney with the leather straps.

2                   But he'd be taken in there voluntarily or

3   involuntarily.  If he didn't want to go, the guards are

4   trained to take him.  He would be strapped down on that

5   gurney.  An IV would be started.  There would be witnesses

6   present from his side, also witnesses, friends, family

7   members from the victim.  The warden would give him a chance

8   to make a last statement.  He may beg for forgiveness and

9   admit his guilt.  He may proclaim his innocence, be very

10  angry and defiant.

11                  But after that, the warden would signal

12  to the executioner.  Lethal substances would be injected

13  into that IV.  Very shortly after that his heart and lungs

14  would stop and collapse.  He would fall into a coma and very

15  quickly die.

16                  And I go into that, not to be morbid with

17  you, but just to let you know those are the type details

18  that are often reported.  Those are the procedures in any

19  death penalty case and they'd be the same in this case,

20  depending on the verdict.

21                  But we want to make sure that each person

22  that sits where you sit feels like they are the type of

23  person who could take pen in hand and answer those questions

24  in such a way that it may ultimately lead to the execution

25  of another individual.  Do you feel that you are the type

1  person that could do that?

2       A.    Yes.

3       Q.    Okay.  Why do you say that?

4       A.    I'm sorry, I'm having a little trouble

5  answering that part of the question.

6       Q.    Sure.  We know it's a difficult question for a

7  lot of people.  It's not something you are normally faced

8  with in your everyday life.  We've kind of summoned you, I

9  guess, in a sense, against your will to kind of, at least at

10  this point in the process, participate.

11            But before we go any further in the

12  process, we want to make sure people are -- you know, no one

13  is going to be comfortable with it.  I don't think we would

14  want people that will be comfortable with it, but we want

15  people that, you know, don't have hesitation, that they're

16  the type person that actually could participate in the

17  process.

18            And that's why we ask the question.  Do

19  you feel that you are that type of person?

20       A.    Yes, I do.  I've thought about it over

21  different times and it's because I believe in the death

22  penalty and that if that's ultimately what has to be done,

23  then that's what has to be done.

24       Q.    Okay.

25       A.    I guess that's my best way to answer it.

1    Q.    Okay.  You feel like you could do your duty,

2  if you had to, I guess --

3    A.    Yes.

4    Q.    -- as a citizen?  Okay.  I know you got a

5  chance to look at these three Special Issues.  The only way

6  you'd answer these is if in the first part of the trial, you

7  found the person guilty of capital murder.  Then the second

8  phase of the trial would start where you'd get to hear extra

9  information about the person's past, his past history, good

10  or bad, and then at the very end of hearing all the

11  evidence, we ask a jury to answer these three questions.

12              Again, the first one asks, very

13  basically, if you think the person is a continuing threat to

14  society.  It's up to us to prove it to you the answer should

15  be yes.  If that answer is yes, then you move to the second

16  Special Issue, which kind of deals with the accomplice

17  scenario that we talked about.

18              You would answer it yes, if you think the

19  person was actually the triggerman.  Or if he wasn't

20  actually the triggerman, that he intended the person to die,

21  or if he anticipated that that life would be taken, you'd

22  answer it yes.  Again, it's part of our burden to prove that

23  to you.

24              The third Special Issue is a little bit

25  different.  Neither side has the burden.  Again, that's the

1  mitigation question.  It's kind of a jury's chance to show

2  mercy, if they feel it's justified based on the facts of the

3  crime and the facts of the person.  And if that question is

4  answered no, then that's how we get to the death sentence.

5  At that point it would be automatic.

6          One way to look at it is if a person is

7  convicted of capital murder, they're sitting on a life

8  sentence.  And the only way we get to the death sentence is

9  if these questions are answered yes, yes, and no.  Does that

10  kind of make sense to you --

11      A.    Yes, it does.

12      Q.    -- the scheme we have?  Okay.  Do you have any

13  questions at all about anything we've talked about or

14  anything you think we ought to know before we start making

15  decisions?

16      A.    No, I don't think so.

17      Q.    Okay.  I appreciate your time, Mr. Porter.

18          MR. WIRSKYE:  Judge, that's all I have.

19          THE COURT:  Mr. Sanchez?

20          MR. SANCHEZ:  Thank you, Your Honor.

21                    CROSS-EXAMINATION

22  BY MR. SANCHEZ:

23      Q.    How are you today, sir?

24      A.    Just fine, thank you.

25      Q.    You didn't expect to come down here and have

1   to answer questions like this today, did you?

2        A.    No.

3        Q.    Probably not the first thing you were thinking

4   of this morning, whether you could take pen in hand and

5   answer those questions in a way in which that would result

6   in a death penalty being given, did you?  You didn't think

7   that you would have to answer that question, did you?

8        A.    I hadn't thought about it, no.

9        Q.    All right.  Well, from this side of the table,

10  you know, our -- we have to ask questions and find out about

11  you, if you would be the kind of juror that could take pen

12  in hand and answer those questions in a way in which they

13  would result in a life sentence.

14              We have to find out if you are the kind

15  of person who would feel just as comfortable in signing or

16  answering those questions in a way in which somebody would

17  receive a life sentence instead of a death penalty when

18  they've been convicted of capital murder.  What do you think

19  about that?

20       A.    Would you re-ask the question?

21       Q.    Okay.  Well, basically, you know, you have

22  told the State that if you found somebody guilty of capital

23  murder, you'd be able to answer those questions in a way in

24  which that would result in the death penalty being given; is

25  that correct?

1      A.      That's correct.

2      Q.      Okay.  What I'm asking you is, assuming that

3  you find somebody guilty of capital murder, the way the

4  State has alleged it, could you feel just as comfortable

5  answering those questions in a way if the State hadn't

6  proved them to you beyond a reasonable doubt, in a way that

7  would result in a life sentence?

8      A.      Yes.

9      Q.      You wouldn't have any problems with that?

10      A.      No.

11      Q.      Okay.  Because, you know, there's some people

12  that come down here and they tell us, yeah, I can be fair,

13  if it results in the death penalty.  But it may not be as

14  fair, if I have to answer them in a way which it wouldn't

15  result in a death penalty.  You understand that?

16      A.      Yes.

17      Q.      Okay.  But you feel you can do that, if you

18  had to?

19      A.      Yes.

20      Q.      Okay.  I just want to make sure that you -- is

21  there anything that we just haven't asked you correctly or

22  phrased it the right way that would keep you from being fair

23  to either side in this case?

24      A.      I don't think so.

25      Q.      Okay.

 1              MR. SANCHEZ:  That's all I have, Your

 2    Honor.

 3              THE COURT:  Thank you, sir.  Mr. Porter,

 4    if you would, wait for us outside in the hall.  I'll have

 5    you back in a few minutes.

 6              THE COURT:  Ms. Bastardo.

 7                   [Prospective juror in]

 8              THE COURT:  Good morning.

 9              PROSPECTIVE JUROR:  Good morning.

10              THE COURT:  For the record we have juror

11    No. 5502, Elizabeth Bastardo?

12              PROSPECTIVE JUROR:  Bastardo.

13              THE COURT:  Welcome to the 283rd.  Have

14    you had time this morning to review the guide I provided for

15    you?

16              PROSPECTIVE JUROR:  Yes, sir.

17              THE COURT:  And also a copy of your

18    questionnaire?

19              PROSPECTIVE JUROR:  Yes, sir.

20              THE COURT:  The attorneys will visit with

21    you and the idea is for you to have a working functional

22    knowledge of the law.  And then at the end of the process I

23    have two questions I must ask.  Number one, do you, in fact,

24    understand the law?  And number two, can you follow the law?

25    That's the questions that I have to ask.

1          The only question I have for you at this

2   time, will you be able to serve this Court for a period of

3   two weeks beginning on November 10th?

4          PROSPECTIVE JUROR:  Actually, I don't

5   have the time, no.

6          THE COURT:  Well, nobody's got the time.

7   We understand that.  Do you have any legal reason why you

8   cannot serve?

9          PROSPECTIVE JUROR:  No.

10          THE COURT:  Thank you so much.

11   Mr. Shook?

12          MR. SHOOK:  Yes, Judge.

13          <u>ELIZABETH BASTARDO</u>,

14   having been duly sworn, was examined and testified as

15   follows:

16          <u>DIRECT EXAMINATION</u>

17   <u>BY MR. SHOOK</u>:

18      Q.    I want to ask questions on behalf of the

19   State.  And as the Judge said, we just need your honest

20   opinions.  One of the areas we go into is the death penalty,

21   obviously.  And we can't get into the particular facts.  But

22   we asked each juror how they feel about the law in general.

23   And I believe you put on your questionnaire that you favor

24   the death penalty as a law?

25      A.    Yes, sir.

1    Q.      Would you tell us kind of in your own words

2  why you favor the death penalty?

3    A.      Well, I feel that if somebody is heinously

4  killed or seriously hurt, that the accused should be

5  punished to death.

6    Q.      Okay.  What types of cases do you think are

7  appropriate for the death penalty?

8    A.      When someone is killed.

9    Q.      Any kind of murder case or is there a

10  particular kind?

11    A.      Maybe not any kind.

12    Q.      What kind of factors do you think are

13  important in those types of situations?

14    A.      A person that's killed, how they are killed.

15    Q.      Okay.  Have you followed any cases in the

16  media that you think would be a death penalty case or at

17  least consideration, either locally or nationally?

18    A.      Yes, I have.

19    Q.      What types of cases are those?

20    A.      This particular case.

21    Q.      This particular case?

22    A.      (Prospective juror nods head.)

23    Q.      What do you remember about this case?

24    A.      I've watched the whole thing on the Discovery

25  Channel a couple of times, so.

1      Q.      The documentary they had?

2      A.      Uh-huh.

3      Q.      Okay.

4      A.      And the local news as well.

5      Q.      All right.  Did you follow any of the cases as

6   they were actually tried?

7      A.      No, I just watched the whole -- the overall of

8   them on the Discovery Channel.

9      Q.      When it happened and the background they gave

10   on the Discovery Channel?

11      A.      I've seen the Discovery Channel thing twice

12   and then just, you know, clips on the local media whenever

13   they were being arrested.

14      Q.      Now, would that -- just because you have seen

15   something on TV, doesn't necessarily disqualify you.  But,

16   obviously, you may have seen more than other jurors.  Kind

17   of the bottom line is whether that would influence you in

18   your decisions ahead of time.  Because the rule is if you

19   make it onto the jury, obviously, you have to make your

20   decisions just based on what you hear in the courtroom.

21              We can't ask you to forget about what

22   you've seen, but we can ask you, and you are required by

23   law, to make your decisions only from what you hear from the

24   witness stand.  But only you know yourself best and know

25   what you've seen and the opinions you've formed.

```
1              From what you've seen on TV and the

2   Discovery Channel, do you feel that could influence your

3   decisions in the case?

4        A.    Yes, sir.

5        Q.    Okay.  And you can't assure the Court that you

6   could put those out of your mind?

7        A.    I don't think I could.

8        Q.    All right.  Fair enough, fair enough.  You

9   also said you knew some lawyers and judges?

10       A.    Yes, sir.

11       Q.    And I believe you have a cleaning service?

12       A.    Yes, sir.

13       Q.    Any criminal judges?

14       A.    Um, yes, my personal criminal judge -- I mean,

15  not judge, attorney.  I currently don't work for any judges.

16  I've worked for judges in the past.

17       Q.    All right.  Other than just your regular

18  personal attorney, then, that's the only one you know?

19       A.    I have another attorney that I work for as

20  well.

21       Q.    Okay.  But you -- and that's Scott Palmer?

22       A.    Yes, sir.

23       Q.    Who is down here quite a bit.  I think we all

24  know him.  But the bottom line is, can't tell the Court that

25  you could put the opinions you formed from what you have
```

1  seen on TV out of your mind?

2       A.    I don't think I could.  I've seen the

3  Discovery thing twice and they pretty much made my opinion

4  for me.

5       Q.    Would that be your opinion that the defendant

6  would be guilty?

7       A.    I believe he is.

8       Q.    Okay.  Fair enough, then.

9              MR. SHOOK:  That's all the questions I

10 have.

11             MS. BUSBEE:  No questions, Your Honor.

12             THE COURT:  The parties agree?

13             MR. SHOOK:  We can agree, yes, sir.

14             MS. BUSBEE:  Yes, sir.

15             THE COURT:  Ms. Bastardo, we appreciate

16 you coming down.  Until we actually visit with everybody, we

17 can't fully understand everything from the questionnaire and

18 we appreciate your time and service to this Court, but you

19 are not going to be seated on this jury.

20             PROSPECTIVE JUROR:  I appreciate it,

21 thank you.

22                  [Prospective juror out]

23             THE COURT:  For the people we've

24 interviewed this morning, the parties have agreed to excuse

25 juror No. 4895, the lady that worked for the nonprofit.  The

1   next juror in order is 5360, Mr. Daigle.  As far as

2   qualifications, what says the State as far as Mr. Daigle

3   being qualified?

4                   MR. SHOOK:  We feel the juror is

5   qualified.  We have no challenges for cause.

6                   MS. BUSBEE:  Defense has no challenge for

7   cause.

8                   THE COURT:  The Court finds Mr. Daigle to

9   be qualified.  What says the State?

10                  MR. SHOOK:  State will accept the juror.

11                  MS. BUSBEE:  We have no choice, Your

12  Honor.  We have no strikes left.  I petition the Court for

13  an additional strike.  I would strike this individual, if I

14  was given an additional strike pursuant to my previous

15  requests for strikes on the under the same grounds as I

16  previously requested extra strikes.

17                  THE COURT:  Motion denied.  Mr. Daigle

18  shall be seated as juror No. 14.  Once again, I'm not going

19  to inform him that he is an alternate.  He will be seated as

20  any other juror and will not know that.  I'm not even

21  telling him that the jury selection has been completed.  I

22  going to say we will continue and he'll receive a letter to

23  reappear.  Go off the record.

24                  [Off the record]

25                  THE COURT:  Ask Mr. Porter to come back

1  in.

2                    [Prospective juror in]

3            THE COURT:  Mr. Porter, we want to thank

4  you for your time and service to the Court today.  I'm going

5  to inform you that you shall not be seated on this jury.  So

6  your jury service is now concluded.

7                    [Prospective juror out]

8            THE COURT:  Mr. Daigle.

9                    [Prospective juror in]

10           THE COURT:  Thank you, you may be seated.

11  Mr. Daigle.

12           PROSPECTIVE JUROR:  Yes, sir.

13           THE COURT:  Sorry for the delay in

14  getting you back in, but we needed to talk to some other

15  folks this morning.  And I have some news for you.  You have

16  been seated on this jury.

17           PROSPECTIVE JUROR:  Yes, sir.

18           THE COURT:  Now the hard part begins.

19  You already told us that you don't know much about this

20  case, if any at all.  You need to keep it that way.

21           PROSPECTIVE JUROR:  Yes, sir.

22           THE COURT:  What do you think will happen

23  when you go back to work and tell them you have been seated

24  on a capital murder case?

25           PROSPECTIVE JUROR:  I've already talked

1    to them.  They knew I was coming up here.

2                    THE COURT:  They knew you were coming up

3    here for an interview, but they didn't know you were coming

4    up here to be potentially -- and now you are seated on this

5    jury.

6                    PROSPECTIVE JUROR:  Yes, sir.

7                    THE COURT:  What do you think is going to

8    happen when you go back and tell them I'm on a capital

9    murder case.  I need two weeks.

10                   PROSPECTIVE JUROR:  They will give it to

11   me.

12                   THE COURT:  I know they'll give it to

13   you, but they will also talk to you about it.

14                   PROSPECTIVE JUROR:  I don't know.

15                   THE COURT:  What I'm telling you, sir, is

16   these attorneys and the parties in this matter are satisfied

17   with your opinions.

18                   PROSPECTIVE JUROR:  Yes, sir.

19                   THE COURT:  You go back to the shop and

20   you start talking to the guys down there and they are going

21   to offer their opinions.

22                   PROSPECTIVE JUROR:  Uh-huh.

23                   THE COURT:  You see?  They are going to

24   say, well, if I were down there, I would do X.  Well,

25   they're not down here, they haven't been through the drill,

1   they haven't filled out the questionnaire, and they haven't

2   answered the attorneys' questions.  So we want you to

3   understand the law.  The law is you will judge this case

4   from evidence you hear from that witness stand that you are

5   sitting in right now.

6                    PROSPECTIVE JUROR:  Yes, sir.

7                    THE COURT:  That's it.  Period.  No

8   newspaper, no Internet, no visiting with friends, no

9   information from any other source, don't even talk about it.

10  When this case is over, you can talk to whomever you choose,

11  as long as you want to, about this experience.  Prior to

12  that, nothing.  It's real simple.

13                    Obviously, you are going to have to tell

14  your employer, the Judge has ordered me to return to court

15  for a trial beginning on November 10th.  Also, we're going

16  to have another hearing prior to that, once we get this jury

17  selection complete.  Once I have all the jurors in the box,

18  we're going to have everybody back down here on Halloween.

19  That's Friday, October 31st.  Probably be like at 10:00.

20                    It will be about a one-hour hearing.  And

21  the reason I do that is once I -- there are certain things

22  that I cannot do until I get everybody here.  So once I get

23  everybody in the box, then I will go through an additional

24  procedure from this trial.  Then the Sheriff will spend some

25  time with you after they get everybody together.

1   The reason I do that is twofold.  The

2   first day of trial people are nervous.  I don't know who --

3   you know, everybody, so this is really a jury orientation

4   day.  And it allows me to go through some legal procedures I

5   need to do.  Because when we hit the ground running on

6   Monday morning, November 10th, the jury will be in the box

7   at 8:30 and the State will present their indictment.

8   Not like you hear on TV where, you know,

9   the jury comes in at 8:00 and they don't start court until

10  10:00.  It won't happen.  I am not going to waste your time.

11  So that's what the additional hour will be on Halloween, is

12  I'm going to save a lot more time on that Monday morning.

13  Monday mornings are always tough.  So we get here and we get

14  started on time.

15  Now, I'm going to print some documents

16  for you here in a minute, some written instructions as to

17  what I just told you orally.  Don't have any communication

18  with the parties.  If you see one of the attorneys or the

19  Court Reporter or myself back here in the back hallway where

20  the jury room is, I will be rude to you.  You are not going

21  to get so much as a good morning out of me.

22  There's an absolute reason for that.

23  It's called the appearance of impropriety.  If I'm talking

24  to someone and another person oversees the conversation that

25  they can't hear, they don't know if I'm talking about the

1   case or you are asking, what's for lunch?  You follow me?

2                    PROSPECTIVE JUROR:  Yes, sir.

3                    THE COURT:  So it's just real, real

4   simple.  I avoid the appearance of impropriety completely.

5   Now, who do you get to talk to?

6                    PROSPECTIVE JUROR:  Nobody.

7                    THE COURT:  The Sheriff.  She's in charge

8   of the jury over here.  That's her job.  She will answer the

9   questions that she can.  If she cannot answer a question,

10  she will forward that question to me and I may be able to

11  answer the question.  But that's how we do this.  She's the

12  insulation, she's the barrier between the parties and the

13  jury.

14                   So that's what we're talking about.

15  That's how much -- I'm real serious about not having any

16  information about the case.  You have told us that you will

17  judge this case from the witness stand.  Sequestered, do you

18  know what "sequester" means?

19                   PROSPECTIVE JUROR:  Not really.

20                   THE COURT:  Many people are concerned

21  will they be going home at night?  You will not be

22  sequestered or locked up as a jury in a hotel during the

23  trial, provided the jury can follow my instructions.  If I

24  think jurors are not doing what they should be doing, then I

25  will put them in a hotel for two weeks.  You don't want

1    that.   And I don't foresee that to be a problem.

2                        Now, you might be sequestered overnight

3    after the jury has received the Court's charge.   What

4    happens is after the trial is over and the attorneys argue

5    their case to the jury, and the jury goes back with the

6    written charge in their hand, and the door is closed and you

7    begin to make a decision in this case, at that point before

8    the decision is made, the jury may not separate.

9                        So if it takes a jury, you know, all day

10   and then 5:00 rolls around and they are not through, then

11   the Sheriff will give you a warning to bring extra clothes

12   that day.   You will know what day that will be.   But at that

13   point you would not be allowed to separate.   So you could

14   potentially be sequestered on the last day of trial.

15                       Now, if it takes you one day or a week to

16   make a decision, that's your business.   Now, in California

17   they had a jury stay out four months.   So that's California.

18   That's -- I'm just trying to give you an idea to answer some

19   of your questions that you may have.   I do not anticipate

20   that you would be sequestered.   It's possible during the

21   deliberations, depending on how long it takes the twelve

22   people to make a decision.

23                       Now, I know we've given you a lot of

24   information and this is the last time you have an

25   opportunity to ask me a question.

1      PROSPECTIVE JUROR:  Is it required that

2  my job pay me while I'm out?

3      THE COURT:  It's not required by law, but

4  you can tell them that it's highly encouraged that your

5  employer does the right thing by your service to the

6  citizens of Dallas County.  You can use my words.  You can

7  say, the Judge highly encourages the employer to help in

8  this process.  There's no point in you having a financial

9  hardship for you being asked to do your civic duty.  Fair

10  enough?

11      PROSPECTIVE JUROR:  Fair enough.

12      THE COURT:  Good question.  Anything

13  else?

14      PROSPECTIVE JUROR:  Are they going to

15  send another letter showing that we have to come back on the

16  31st?

17      THE COURT:  Yes, sir.  You will receive

18  another letter.  I find that helps people with their work.

19      PROSPECTIVE JUROR:  Yes.

20      THE COURT:  And you will receive another

21  letter in the mail.

22      PROSPECTIVE JUROR:  What about for saying

23  that we've been chosen as for the jury?  Are they going to

24  give a letter for that?

25      THE COURT:  It'll be in the same letter.

1    The letter will state, you know, Dear Sir or Madam, you have

2    been impaneled as a juror in this case and we need a short

3    hearing on October 31st following -- preceding the trial

4    date of November 10th.  Please arrange your schedule

5    accordingly to be available for the Court for two weeks.

6    That way your employer can look at that and it will be

7    covered in all four corners and you're set to go.  Fair

8    enough?

9              PROSPECTIVE JUROR:  Fair enough.

10             THE COURT:  If you would be so kind as to

11   go with the Sheriff.  She has some information to provide

12   you and I'll get those documents for you in just a minute.

13             [End of Volume]

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF TEXAS            *

2  COUNTY OF DALLAS          *

3     I, NANCY BREWER, Official Court Reporter for the 283rd

4  Judicial District Court, do hereby certify that the above

5  and foregoing constitutes a true and correct transcription

6  of all portions of evidence and other proceedings requested

7  in writing by counsel for the parties to be included in this

8  volume of the Reporter's Record, in the above-styled and

9  numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11     WITNESS MY OFFICIAL HAND on this the 4 day of

12  March , 2004.

13

14

15                    NANCY BREWER, CSR, NO. 5759
16                    Expiration Date: 12-31-04
                       Official Reporter, 283rd JDC
17                    Frank Crowley Crts. Bldg. LB33
                       133 No. Industrial Blvd.
18                    Dallas, TX 75207
                       (214)653-5863
19

20

21

22

23

24

25

283RD JUDICIAL DISTRICT COURT 214/653-5863
NANCY BREWER, OFFICIAL COURT REPORTER

REPORTER'S RECORD

**74851**

VOLUME 38 OF _6_ VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

JUROR ORIENTATION

AND

PRETRIAL

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

FILED IN
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 31st day of October 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

1                      A P P E A R A N C E S

2    APPEARING FOR THE STATE

3    Mr. Toby Shook
     SBOT NO. 18293250
4    And
     Mr. Bill Wirskye
5    SBOT NO. 00788696
     Ms. Lisa Smith
6    Assistant District Attorneys
     133 No. Industrial Blvd.
7    Dallas, Texas 75207
     Phone:  214/653-3600

8

9    APPEARING FOR THE DEFENDANT

10   Ms. Brook Busbee
     Attorney at Law
11   SBOT:  03488000
     703 McKinney Ave. Ste. 312
12   Dallas, TX 75202
     214/754-9090

13

     Mr. Juan Sanchez
14   Attorney at Law
     SBOT:  00791599
15   5630 Yale Blvd.
     Dallas, TX 75206
16   214/365-0700

17

18

19

20

21

22

23

24

25

1

## WITNESS INDEX

2

| WITNESS | STATE | DEFENSE | VD | VOL. |
|---------|-------|---------|-----|------|
| 3 Randall Johnson | 48,68 88 | 55,89 | | 38 |
| 4 | | | | |
| 5 Patrick Murphy | 68,87 | 75 | 82 | 38 |

6

7

8

9

10

11

## EXHIBIT INDEX

12

| EXHIBIT | IDENT. | OFFER | ADMIT | VOL. |
|---------|--------|-------|-------|------|
| 13 ST.978 | PRIOR ARREST VOL.STMT. | 55 | 55 | 38 |
| 14 | | | | |
| 15 ST.979 | | 86 | 87 | 38 |
| 16 ST.980 | Cassette Tape | 84 | 84 | 38 |

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                THE COURT:  The Court has instructed all

3    the jurors to return today for their orientation as a whole.

4    For the parties' benefit, the Court will go over, once

5    again, the instructions.  I shall read the instructions to

6    them to be sure they understand the seriousness of following

7    the orders of the Court.  We'll go over the qualifications

8    of the jury service, once again, to be sure that none of

9    them have any issues relating to court qualifications.

10                    Prior to bringing in the jury, does the

11   State have anything to put on the record at this time?

12                MR. SHOOK:  No, sir.

13                THE COURT:  Ms. Busbee?

14                MS. BUSBEE:  Yes, Your Honor.  Just to

15   make the record abundantly clear, that juror No. 12 was

16   seated and she was considered by the defense an

17   objectionable juror, but we had run out of peremptory

18   challenges and my request for additional peremptory

19   challenges was denied by the Court.

20                THE COURT:  That's correct.

21                MS. BUSBEE:  And, Your Honor, we reviewed

22   the instructions that you plan to read to the jury and we

23   have no objections or additions or deletions.

24                THE COURT:  At this time I go through and

25   I open it up for any questions they may have.  Who knows

1  what they may bring up today, but I'd rather get it out of

2  the way today --

3                    MS. BUSBEE:  Than get it in a note.

4                    THE COURT:  Yeah, than get it in a note

5  later or something.  So we have time to cure.

6                    [Off the record]

7                    (Jury in)

8                    THE COURT:  Good morning.  Please be

9  seated.  Welcome back to the 283rd.  Sorry for the delay.

10  You know I like to get started on time and I will tell you

11  why we have a delay, so I can tell you why we're using your

12  time.

13                    We had previously had one of the jurors

14  tell us that he was out of town today and I knew about that

15  prior to this hearing.  And as I told you, we schedule a

16  day.  I couldn't tell you when it was and he was out of

17  town.  And the other man turned up that they had to move

18  their home today, being the last day of the month.  So he

19  couldn't be here, either.  But we didn't find that out until

20  this morning; otherwise, we would have been here at 10:00,

21  so we would not waste your time.

22                    So I hope that will be the last delay

23  that we have in this court, because that's why we bring you

24  in today.  I know you look at it, I missed half a day's

25  worth of work and I could be doing other things more

1  productive.  But I think when we do it individually, you

2  finally come together as a group, it gives you an

3  opportunity to meet each other and get those issues out of

4  the way before you come in day one under the pressure of the

5  trial.

6          There are a few things that I want to go

7  over with you this morning and then I will turn it over to

8  the Sheriff.  I know you will get tired of me saying this,

9  but that's the way it's going to be.  I have already given

10 you the instructions once in writing when you left here

11 individually.  I'm now going to read to you these

12 instructions aloud, so you can follow along, just so there

13 are no questions as to the instructions.

14          Do not mingle with or talk to the

15 lawyers, the witnesses, or parties or any other person that

16 might be connected with or interested in this case except

17 for casual greetings.  They will have to follow the same

18 instructions so you will understand it when they do.  I know

19 I told each of you that I would probably be rude to you if I

20 saw you in the back hallway and I will be rude until this

21 trial is over.  You might get a hello, but I doubt it.  And

22 you know why.

23          Do not accept from or give to any of

24 those persons any favors, however slight, such as rides,

25 food, or refreshments.  These are general instructions that

1  everybody gets.  We won't have those issues here.

2                    No. 3, do not discuss anything about this

3  case or even mention it to anyone whomsoever, including your

4  wife or husband, nor permit anyone to mention it in your

5  hearing until you are discharged as jurors or excused from

6  the case.

7                    I gave each of you those instructions

8  about work, family, people, offering their opinions to you.

9  Once again, at this point, if anyone attempts to discuss

10 this case, report it to me at once and that means report it

11 through the Sheriff because we can't talk.

12                   As I have already told you, don't tell

13 anyone you have been selected in a capital murder case.

14 Just arrange to have your schedule accommodated for this

15 trial to begin Monday the 10th.

16                   Do not even discuss this case among

17 yourselves until after you have heard all the evidence, the

18 Court's charge, the attorneys' arguments, and until I have

19 sent you to the jury room to consider your verdict.

20                   Now, what that means is you really can't

21 go in at the conclusion of any witness and start talking

22 about this case, just you can't do that.  You have to have a

23 complete picture.  That's what Ms. Brewer does is she

24 provides a transcript, if necessary, and we'll get to those

25 notes in just a minute.  You have to listen to everything

1   before you start talking about this case.

2              Do not make any investigations about the

3   facts of this case.  We have had, and I will say

4   occasionally, we have had a juror who privately seeks out

5   information about a case on trial.  This is improper.  All

6   evidence must be presented in open court so each side may

7   question the witnesses and make proper objections.  This

8   avoids a trial based upon secret evidence.  These rules

9   apply to the jurors the same as they apply to the parties

10  and to me.  If you know of or learn anything about this case

11  except the evidence admitted during the course of this

12  trial, you should tell me about it at once, once again,

13  through the Sheriff.

14              On Monday morning the 10th you will take

15  an oath that you will render a verdict on the evidence

16  submitted to you under my rulings.  Do not make personal

17  inspections, observations, investigations, or experiments,

18  nor personally view premises, things, articles, not produced

19  in court.

20              Do not make any investigation or conduct

21  any internet research on this or other cases involving

22  capital murder.  Do not let anybody else do any of these

23  things for you.

24              Do you want tell other jurors your own

25  personal experiences nor those of any other person nor

1    relate any special information.  A juror may have special

2    knowledge of matters such as business, technical, or

3    professional matters or may have expert knowledge or

4    opinions or he may know what happened in this or some other

5    lawsuit.  To tell the jurors any of this information is a

6    violation of these instructions.

7              Do not seek any information contained in

8    lawbooks, dictionaries, public or private records or

9    elsewhere which are not admitted into evidence.  At the

10   conclusion of all the evidence, I will submit to you a

11   written charge.

12             Since you will need to consider all the

13   evidence admitted by me, it's important that you pay close

14   attention to the evidence as it is presented.

15             Texas law permits proof of any violation

16   of rules of proper jury conduct.  By this I mean that jurors

17   or others may be called upon to testify in open court about

18   jury misconduct.  I'll read that again.  By this I mean that

19   jurors and others may be called upon in open court to

20   testify about jury misconduct.

21             I instruct you, therefore, to carefully

22   follow all these instructions that I have given you, as well

23   as others that you may receive while this case is on trial.

24             Once again, the contact information is on

25   the back of this sheet.  You have parking.  You can get your

1    parking validated today.  And you won't have an issue after

2    that.  And you say, well, why did you put general

3    qualifications for jury duty?  It's in the past we've had

4    jurors who have been arrested from the time they were

5    selected before we started the trial.  So I will go through

6    this again to be sure everybody is still qualified.

7                    I know each of you are 18.  Has anyone

8    moved outside of Dallas County?  Mr. Engles may be able to

9    avoid jury service if he moved outside of Dallas County.

10   Still qualified to vote in this county that you are going to

11   serve.  You don't have to be registered to vote.  You have

12   already gone over No. 4 of sound mind and good moral

13   character.  We know that you can read and write.  We know

14   you have not served on a jury.  But here's the key, nobody

15   has been convicted of a felony and no one is under

16   indictment or other legal accusation of misdemeanor or

17   felony theft or any other felony?

18                    Anybody been arrested since we talked to

19   you last time?  It has happened.  Okay.  Anybody have

20   qualification issues?  I see none.

21                    Okay.  Notes.  I believe I saw in the

22   jury room the Sheriff has provided a clipboard and notepads

23   for you.  I have always encouraged the jury to take notes.

24   Why?  What am I doing?  One of the things that you want to

25   know is what am I doing on this computer all day?  You saw

me on the computer when we were doing voir dire and I told

you, I'm not playing, you know, asteroids, as my brother

says, on the computer.  That doesn't happen.  I wish I could

turn it around.  It's not going to work.

I'm keeping notes all day long as -- she

keeps a word-by-word testimony.  She can read back word by

word of anything anyone says.  I'm keeping a summary of the

witnesses, so I can keep things straight in my mind as to

who has testified, a summary of their testimony, and then

I'm making my legal issues and summaries for my benefit when

I have to make rulings.

I encourage you to do the same thing,

however you want to do it.  Why?  It keeps you -- you're

focused, it helps you remember major points or whatever the

witnesses is testifying to.  We allow you to take notes as

long as they are your notes, which means you can't share

them with someone else.

Now, then you say, well, can I use them

in deliberations?  If the parties say, Judge, we want you to

take up the jurors' notes at the end of the trial, at the

end of the evidence that has been presented, the law is that

the parties say, we want you to take their notes up.

You say, Judge, why are you saying I

should take notes when you are taking them away from us?  I

don't know if they will be taken up.  They can be taken up,

1    because she is the official notetaker.  It may also help

2    you, you know, when you are looking at an issue, this is

3    something that I need to have answered.  I dispute as to the

4    testimony.

5                   The only way that we can provide

6    testimony to you, you can't say, well, Judge, we would like

7    to have witness X, her testimony read back to us.  It can't

8    happen.  What has to happen is the jury has to go back and

9    when they start talking about the case and they have a

10   dispute about the testimony or evidence that was presented

11   by a particular witness, you have to frame your question

12   this way.  We, the jury, are in dispute about was the truck,

13   you know, green or blue or brown or black or gray from

14   witness X's testimony.  And she has to go and search the

15   whole record, the whole testimony, and provide you the

16   answer to a very specific question.

17                   So even though we're computer literate

18   and we have a realtime record, you still cannot have a

19   general rereading of testimony.  So that helps you

20   understand the rules of what the jury is allowed to have

21   going into it.  So that's why I say you have to pay

22   attention.  Taking notes helps you pay attention.

23                   Should the jury have a dispute as to an

24   issue or the testimony, then you can have an answer provided

25   to a specific question.  But it has to be a very narrow,

1   specific question.  After a trial you can have your notes

2   back.  Some people want their notes back.  You are welcome

3   to have them.  But, there again, the parties control whether

4   or not you have the notes during deliberations, because

5   she's the official notetaker.  That way we have one accurate

6   record versus 14 people making their own individual notes.

7   So that's how that works.

8             For those of you who may not remember,

9   I'm going to introduce the parties again for you so you can

10  -- I've got a note from the Sheriff that you wanted copies

11  of the pictures, which I think is good.  I want you to get

12  to know each other.  We know who you are and that's why we

13  brought everybody together.

14             I'll introduce the parties again.  For

15  the State you have got Mr. Toby Shook, Bill Wirskye.  I

16  don't know if either or both were here at the time that you

17  were interviewed.  Lisa Smith is also an attorney for the

18  Dallas DA's Office.

19             Remember Brook Busbee, Juan Sanchez for

20  the defense, and John Tatum is here.  He's also an attorney

21  representing the defendant, Mr. Murphy, on the end.

22             So those are the folks that will be here

23  in trial.  That way you can see -- this is what you will see

24  when you walk in on Monday morning.  Once again, we'll start

25  at 8:30.  So whatever time the Sheriff tells you to be here

1    and ready to go, we'll have you in the box and the State

2    will -- at that time I will swear you in as a juror.  Then

3    the State will present their indictment and then the

4    attorneys will give an opening summation of what they

5    believe the evidence will show in this case.  And then they

6    will call a witness for the State and we'll proceed with

7    testimony.

8                         That's why we're doing all this now so

9    that when we go to work on Monday morning, we're not going

10   to waste any of your time.

11                        Now, this is the last time -- excuse me,

12   parties, anything I need to cover?

13                        MS. BUSBEE:  I'm satisfied, Your Honor.

14                        MR. SHOOK:  No, sir.

15                        THE COURT:  This is the last time you can

16   ask a question in open court.  They have to read your mind

17   from this point forward when they present their testimony.

18   If you have any questions of me, procedure, how things are

19   going to work, we're all ears.  But Monday morning it's just

20   we have got to read your mind.

21                        I know somebody has got to have a

22   question.  I haven't thought of everything.  I have 12 happy

23   people ready to go trick or treating tonight.  Okay.  Last

24   chance.  Anything that we -- yes?

25                        JUROR:  If we need to take a break, say

1    to go to the men's room or something, how do we -- how is

2    that handled?

3                      THE COURT:  Please, you know, flag the

4    Sheriff or get my attention.  You can see -- you will see I

5    drink water all day long and I can drink about two to three

6    of these and it doesn't phase me.  So I sit here all day.

7                      So you have got to tell me.  I usually

8    work about an hour and a half.  Give you an idea, we will

9    start at 8:30, take a break somewhere around 10:00, 10:20,

10   10:15 for 15 or 20 minutes and then work from 10:30 or

11   around that until noon or until the lunch caterer brings the

12   lunch in for you.

13                     So if I have a witness that's concluded

14   at 11:50, we'll go ahead and break early.  And if the

15   caterer brings the lunch in, I'll raise the flag and we will

16   break.  We will get you in and get you back out.  It takes

17   an hour or less for lunch.  That's why we bring it in.  And

18   we'll go back to work and take a break of 15 or 20 in the

19   afternoon.  And if you need one in between then, just get my

20   attention, get the Sheriff's attention, and we'll take a

21   quick one.

22                     But you have one in the morning and one

23   in the afternoon.  Anybody smoke?  Nobody smokes?  We

24   understand.  The Sheriff smokes, so they will have to take

25   you outside and get that, so we understand.  You will have a

1   smoke break in the morning and one at noon and one in the

2   afternoon.   Yes, ma'am?

3                         JUROR:  Can we bring bottled water in the

4   courtroom?

5                         THE COURT:  Please.  You will find the

6   Sheriff will provide refreshments for you in there.  Like I

7   say, I drink water all day.  So you are welcome to bring

8   water in the courtroom.  They will have coffee for you in

9   the back.  But we try not to bring -- I call them colored

10  drinks into the courtroom because water is easy to clean up,

11  and everything else is a mess.  And trying to get the county

12  to clean something up, it just doesn't happen.  So we just

13  bring water in.  Yes, you can bring bottled water into the

14  courtroom.  No problem.  Yes, ma'am?

15                        JUROR:  Will there be people in the

16  audience or is it just going to be these people?

17                        THE COURT:  Yes.  There will be people in

18  the audience and there -- I don't know.  I would anticipate

19  there may be media and I think I went over this, I don't

20  know how many times, but you can probably anticipate a news

21  report.  We call it a pretrial news article.  Don't read it.

22  Do not read it.

23                        If you see TV cameras in the courtroom, I

24  do allow cameras in the courtroom.  The rule is they may not

25  take your picture at any time.  If they take -- if they even

1    think about taking a juror's picture, that cameraman will be

2    held in contempt.  So I'm real serious about that.

3                         Also, if I have to refer to a juror on

4    the record at some point in time, I always just use the last

5    name.  That way we don't know if it's a male or female.

6    And, there again, it goes back to I'm being rude, but

7    there's a reason for that.  So I will say juror Smith.  So

8    that's a reason for that.  So there's no issue as to who it

9    might be.  I try to keep it as anonymous as we possibly can.

10                        The camera will be taking the testimony

11   of a witness.  But they will block it out and not get anyone

12   on the jury.  We have not had a problem in the past, so it's

13   not an issue.  Yes, it will be there and you are instructed

14   not to look at it.  Good question.

15                        Anyone else?  If you think of something

16   in the back, you can ask it today, but not Monday.  Okay.

17   Go with the Sheriff.  We appreciate you being here.  Sorry

18   for the delay in getting started and the Sheriff will have

19   other issues to go over with you.  Thank you very much.

20                        [Jury out]

21                   THE COURT:  We're on the record.  We'll

22   go through the motions filed by the defendant.  Motion No. 1

23   is a motion to quash the indictment.  Any oral arguments?

24                   MR. SHOOK:  No, sir.

25                   MR. TATUM:  I think it pretty well speaks

 1    for itself, Your Honor, other than it goes to the point of
 2    the burden of proof that the Supreme Court has placed on the
 3    State of Texas when they seek a death penalty, Enmund versus
 4    Florida, for nonshooters or people who do not actually
 5    engage in the killing act, that there's an additional burden
 6    of proof that the Supreme Court has placed on all the states
 7    is whether the defendant intended or contemplated that a
 8    life be taken and that the defense feels like that because
 9    of that burden of proof, it needs to be placed in the
10    indictment for adequate notice purposes and as part of their
11    burden of proof that should be there.

12                    THE COURT:  The Court has read the
13    motion.  Motion denied.  No. 2, Motion to Declare Capital
14    Sentencing to be Unconstitutional.  Very well written and
15    encompassing issues all Penry and a lot of other issues
16    here.

17                    Is there anything else, Mr. Tatum, that
18    you haven't put in this motion?

19                    MR. TATUM:  No, sir.

20                    THE COURT:  But on No. 2.

21                    MR. TATUM:  No.  I feel the State's
22    position, they need a subparagraph as to constitutional
23    arguments, Your Honor.

24                    THE COURT:  Motion 2 is denied.  Motion 3
25    to set aside the indictment because of the

1   unconstitutionality of the statute.  Any additional issues?

2                   MR. TATUM:  No additional issues, Your

3   Honor.

4                   THE COURT:  The Court has read and

5   researched that motion and motion 3 is denied.  Motion 3-A,

6   Motion to Hold Unconstitutional Article 37.071, Section 2(e)

7   and (f), basically special issues.  Anything else?

8                   MR. TATUM:  No, Your Honor.

9                   THE COURT:  Motion 3-A is denied.  Motion

10  4, Discover What Facts the State Intends to Rely Upon in

11  Seeking the Death Penalty Against a Party Defendant Who Did

12  Not Actually Kill the Deceased Aubrey Hawkins.  Once again,

13  your Enmund issue.

14                  Having not ruled on this particular

15  motion before, there are a series of cases.  What's the

16  State's position?

17                  MS. SMITH:  Your Honor, the State's

18  position is they're not entitled to notice of what facts we

19  intend to argue that show the necessary, the requisite

20  intent.  The indictment alleges intent.  They've been given

21  notice that we are proving up the indictment's allegations

22  and we've done all we're required to do by law.

23                  THE COURT:  Mr. Tatum, what would you

24  have the State do they have not done?

25                  MR. TATUM:  Disclose the difference

1    between this case and the rest of the cases as to what the

2    State relies upon to prove the additional burden of proof

3    presented by Enmund of the knowingly human life would be

4    taken, what the State intends to rely upon as far as either

5    statements or witnesses in particular, because that's an

6    element of the burden of proof that the state law doesn't

7    present, but the Supreme Court has grafted onto this type of

8    prosecution.

9                    THE COURT:  Mr. Tatum, you are always

10   very good at anticipating my questions.  But where in the

11   Code of Criminal Procedure in Texas is the defendant

12   entitled to this particular request?

13                   MR. TATUM:  This is a 9-1 (phonetic)

14   motion, Your Honor --

15                   THE COURT:  Yes.

16                   MR. TATUM:  -- in the sense that Texas,

17   unfortunately, has not addressed this issue adequately.

18   That's one of the reasons that we claim that the Texas law

19   is unconstitutional.  And having gone forward with that,

20   your overruling of that position, we feel like that it is

21   representing somebody who I think all parties agree the

22   evidence shows is a nonshooter, as the person is

23   characterized, is entitled to know what the State intends to

24   meet that burden of proof, if there was anything special for

25   that evidence for that particular issue.  Texas has not

1  dealt with it specifically.

2  THE COURT:  Well, as far as requiring the

3  State to pull either one of the thousand exhibits out and

4  require them to say this holds this meaning, I think that is

5  an issue for the jury to decide.  Having tried the case now

6  for the sixth time, I can't imagine there is any surprise

7  evidence that the State intends to put on Mr. Murphy that we

8  have not already heard.

9  MR. SHOOK:  I think, Judge, it will be

10 very similar to the other cases and we've turned over all

11 his background evidence, too, that might be used to the

12 defense.

13 THE COURT:  This issue goes on the front

14 end, as well as on the conspiracy, as well as the back end

15 for the Special Issues.  So there are so many things that

16 the Court can't simply order the State to say, okay, this

17 piece here is what we're going to use.  I think that you

18 have to look at it as a whole.  If they are holding back

19 anything, that's a different matter.

20 MR. TATUM:  I guess what we're looking

21 for is the State has been very generous in providing and

22 plus having the opportunity of viewing the other prior

23 trials, the State has provided ample discovery in

24 generality, especially with the other trials.

25 But this trial being significantly

1  different as a nonshooter, as opposed to the other people

2  who were characterized as shooters, we're just asking if

3  there is something else that we have not been made aware of,

4  other than what has already been presented.

5              THE COURT:  I believe the answer was no.

6  It would be similar in nature.  Motion 4 is denied.  Motion

7  5, Determine the Constitutionality of 37.071(2)(b)(2) of

8  Parties Charge.  I have reviewed the motion.  Do I hear any

9  additional issues?

10             MR. TATUM:  No, sir.

11             THE COURT:  Motion denied.  Motion 5-A,

12  motion to suppress evidence.  I anticipate it's the same

13  issues that I have heard before.  I anticipate that the

14  witnesses from out of state will be required to rule on this

15  motion.  May the Court carry this motion with the evidence?

16             MS. BUSBEE:  Yes, Your Honor, we have

17  agreed to do that.

18             THE COURT:  Motion 6, which is your

19  discovery and production and inspection of evidence.  You

20  have got several subissues here numbered.  I will go through

21  -- I have granted everything 1 through 8.  Or do you wish to

22  tell me what you and the State have agreed upon and I will

23  jump in where it's specific?

24             MS. BUSBEE:  Your Honor, as we went

25  through this this morning, I believe that the State has

1  given me numbered discovery and it's my belief that they

2  have complied with this, so that we can be in agreement on

3  everything except, as I said earlier off the record, No. 40

4  requests a hearing outside the presence of the jury for

5  admissibility.

6           I would -- I'm not asking the Court to

7  grant that at this time.  I just ask if I apprise the Court

8  that I would like to have a hearing, I'm sure he would grant

9  me one.

10           THE COURT:  Yes, ma'am.  Let me share

11  with you some of the issues that I saw when I read this.

12  The Court has noted that the witness list that I received

13  from the State was dated August 28, 2003.

14           Does the State have an updated witness

15  list or have you added anything to the witness list since

16  then?

17           MR. SHOOK:  I told the defense that we

18  would probably be filing an updated witness list next week.

19           THE COURT:  Once again, I'm unable to

20  tell that because I have an electronic file stamp when I

21  received the digital document that I printed for the jury

22  selection.  I would appreciate the same format, just

23  updated, and E-mailed to all the parties and a paper copy

24  file marked for the court file.  So that's an update.  We'll

25  certainly have any hearing upon any issue toward

1    admissibility outside the presence of the jury.

2                    Moving on to motion No. 7.  Motion for

3    Evidence Favorable to the Defendant.  Any issues that the

4    State agreed on?

5                    MR. SHOOK:  We agreed, Judge.

6                    MS. BUSBEE:  Your Honor, and Mr. Shook

7    has assured me that he understands this is an ongoing

8    obligation and if any of this should come to light before

9    and during the trial, he will bring that to our attention.

10                    THE COURT:  Motion granted.  Motion No.

11   8, Motion in Limine and for Discovery of Prior Bad Acts and

12   Extraneous Offenses 404-B and 609 issue.

13                    MS. BUSBEE:  Your Honor, there's a filing

14   with the Court dated September 17, where the State gave me

15   notice, 404-B, and so that's with the Court and we've gotten

16   that discovery.

17                    THE COURT:  Granted.  General Motion in

18   Limine No. 9.  It looks like you want to limine all the

19   evidence.

20                    MS. BUSBEE:  Why not?

21                    THE COURT:  Can you tell me what your

22   concern is?

23                    MS. BUSBEE:  Just I suppose this is what

24   you might call a prophylactic motion, as far as alerting the

25   State that we -- the Court has made a ruling that they can't

1   make these comments without having a ruling outside of the

2   presence of the jury.  Because, as you know, it's hard to

3   unring the bell.

4               THE COURT:  No. 4 jumps out at me and

5   I'll relay this for the benefit of the Court, any comment

6   the prosecutor knows of other evidence that can't be brought

7   up before the jury, in the last trial, arguments degraded

8   into political issues and that the State doing this

9   grandstanding and then Mr. Shook was allowed to answer that

10  issue that they knew that they had alleged -- they had

11  evidence that multiple discharge of weapons and they knew at

12  that point that they were going to seek a death penalty even

13  before they were arrested and any statements taken from the

14  defendants as far as -- it was the defense lobbed it into

15  the jury box and then I allowed the State to object to that

16  issue.  It was certainly an innuendo and it was, quote,

17  evidence that was not before the jury, but I allowed the

18  State to argue that because it was brought by the defense.

19              MS. BUSBEE:  I would not have done that.

20              THE COURT:  I understand you would not

21  have done that.  But I'm telling you that you can't do that

22  and then use this limiting issue over the head of the State

23  because it's not fair.

24              MS. BUSBEE:  No, sir.  And probably in

25  that circumstance, you discussed it outside the presence

1     anyway, didn't you?

2                      THE COURT:  Oh, no.  It was right in the

3     middle of final arguments.  They were throwing rocks at each

4     other, so it was typical for trial.  I just ducked and let

5     them go.

6                      MS. BUSBEE:  It's argument, Your Honor.

7     This really has -- if the door is opened, I would have no

8     complaint.  But if the door is not opened, we would ask the

9     Court to make this motion in limine.

10                     THE COURT:  Just telling you, I've got

11    all the doors locked as long as y'all leave it alone.

12                     MS. BUSBEE:  Fair enough.

13                     THE COURT:  I'll grant the motion subject

14    to a hearing.  No. 10, Motion in Limine is Guarantee of No

15    Violence.  Mr. Tatum, I have not visited this issue.  What

16    is the parties' positions?

17                     MR. TATUM:  I think this is a limine, I

18    think this is from a TDCLA suggested motion that we find

19    from a defense standpoint defending capital murder cases

20    around the state that sometimes they call certain expert

21    witnesses or other people who might testify about certain

22    issues presented in the motion, that at least there be a

23    hearing outside the presence of the jury to determine

24    their ability to testify about those issues.

25                     They may not apply so much to Dallas as

1    just to cover our situation.

2                      THE COURT:  You simply want a hearing?

3                      MR. TATUM:  Just a hearing.

4                      MS. BUSBEE:  Your Honor, I don't see that

5    an order was --

6                      THE COURT:  There is no order.  I'll just

7    hold that one.

8                      MS. BUSBEE:  I'll get you an order today.

9                      THE COURT:  No. 11.  Motion in Limine to

10   Suppress Reputation Evidence.  Need a hearing.  Granted.

11   Motion in Limine Regarding Matters Not Within the Personal

12   Knowledge of a Witness.  Obviously you will need to make a

13   specific objection upon that and we can have a hearing if

14   necessary.

15                     MR. TATUM:  Thank you.

16                     MS. BUSBEE:  So it will be granted upon

17   my request?

18                     THE COURT:  Yes.  Name calling by the

19   prosecution which is No. 13.  We haven't had any name

20   calling so far.

21                     MS. BUSBEE:  Well, except for Mr. Lizard.

22                     THE COURT:  I believe that was tattooed

23   on his body.

24                     MR. TATUM:  Still a name.

25                     THE COURT:  A man wants to publish it

1    where he published it, then I think it's fair game.

2                   MS. BUSBEE:  That's why we're talking

3    about a motion in limine, Your Honor, not prohibition.

4                   THE COURT:  We had a hearing on it.

5                   MR. TATUM:  That's all we ask for.

6                   THE COURT:  Motion in Limine Other

7    Proceedings.

8                   MR. TATUM:  Is that granted, Your Honor,

9    the name calling?

10                   THE COURT:  Yes.  No. 13 was granted.

11   No. 14 shall be granted.  No. 15 is Motion to Request Notice

12   of Prosecution's Attempt to Certify Copies of Official

13   Written Instruments.  This goes to particular evidence you

14   are going to focus on or the thousand exhibits?  Which one

15   are you talking about?

16                   MS. BUSBEE:  As we discussed this

17   morning, of course I've been given discovery some time ago

18   and it's my understanding this would be limited to anything

19   offered which I have already received, which includes the

20   defendant's prior criminal convictions and juvenile matters.

21   And I have received copies of that.  So it's documented what

22   I have copies of.

23                   But we're asking the Court to order them

24   at this time officially, if they have anything else that I

25   haven't received, to give us notice of that.

1    THE COURT:  Court orders the State to

2  produce any evidence that you have not given.

3    MR. SHOOK:  We've given it all to them,

4  Judge.

5    THE COURT:  Now, while I'm on point and

6  thinking about evidence.  In trial, concerning this many

7  exhibits, they will bring out a hundred photographs and they

8  will want to offer and admit all 100 photographs, but only

9  use four or five of them.  And in the past I've had

10  Mr. Shook or whoever take all these photographs up to the

11  witness.  They look through them real quick.  And then the

12  defense will say I want to have them tendered to me before

13  we, you know, allow them to be admitted.  And they will sit

14  there and look at them one by one, talk about them, and then

15  we all sit there and wait 10 minutes until a particular

16  lawyer looks at them.

17    MS. BUSBEE:  Your Honor, could I speak to

18  that?

19    THE COURT:  Yes, ma'am.

20    MS. BUSBEE:  It's always my practice to

21  say -- so the jury knows I've looked at them, I say, Your

22  Honor, I've had an opportunity to see these photos, no

23  objection, as long as there is no objection.  And if there

24  is an objection, I'll let you know.  Because the Court gave

25  me a comprehensive copy of all the exhibits that have been

1 admitted and I've already seen all the pictures. So we have

2 looked at the pictures. I don't like to do that, either. I

3 think it aggravates the jury.

4                    THE COURT: It does.

5                    MS. BUSBEE: But I want them to know that

6 I care about seeing the pictures. So I let them know I have

7 seen them.

8                    THE COURT: The Court has already ruled

9 previously on autopsy photographs and had the State remove

10 from their lists. So if you have any additional specific

11 objections over the last trial as to a particular

12 photograph, please bring that to my attention prior to the

13 jury being in the box.

14                    MS. BUSBEE: Yes, sir.

15                    THE COURT: That means before we start.

16                    MS. BUSBEE: Yes, sir.

17                    THE COURT: Okay. Motion to Disclose

18 Expert Witnesses. I believe both parties have filed that;

19 is that correct?

20                    MR. SHOOK: Yes.

21                    MS. BUSBEE: Yes, sir.

22                    THE COURT: Prior criminal record, No.

23 17. Do you -- I assume that you want a hearing on the first

24 phase of trial that issue should be relevant?

25                    MR. TATUM: Yes.

1          MS. BUSBEE:  Yes, Your Honor.  And

2   there's a motion coming up that has to do with opening

3   statement on punishment, having the Court rule prior to the

4   time that the District Attorney mentions them, if he plans

5   to, as to whether or not they are admissible before they are

6   mentioned to the jury.  So we'll be coming up on that here

7   in a minute, too.

8          THE COURT:  If I'm going to rule on

9   admissibility of that type of evidence when they are going

10  to use it in opening, I need to rule on that pretty quick.

11         MS. BUSBEE:  That would be opening as to

12  punishment.

13         THE COURT:  I understand.  But I don't

14  want to be in the middle of this trial and say, here, I want

15  you to look at these eight files here and tell me what you

16  think.

17         MS. BUSBEE:  Maybe we could discuss this

18  off the record and come to an agreement on that.

19         THE COURT:  That would be fine.

20         MS. BUSBEE:  Do you think we could?

21         MR. SHOOK:  Sure.

22         MS. BUSBEE:  Then we can put it on the

23  record.

24         THE COURT:  I'll hold No. 17.  No. 18,

25  Motion to Require Prosecution to Reveal Any Agreement on

1    Witnesses That Could Influence His Testimony.  Does the

2    State have any agreement with any witnesses?

3                    MR. SHOOK:  No, sir.

4                    MS. BUSBEE:  So that's granted and

5    answered?

6                    THE COURT:  Granted and answered.  No.

7    19, Motion to Require the State to Reveal Any Agreement

8    Entered Into by the State and Any Prosecution Witness Which

9    Could Conceivably Influence Their Testimony.

10                    MR. TATUM:  Somewhat of a duplication,

11   Your Honor.

12                    THE COURT:  Mr. Shook --

13                    MR. SHOOK:  Don't have any, Judge.

14                    THE COURT:  -- have you entered into any

15   agreement that could conceivably influence their testimony?

16                    MR. SHOOK:  I don't think so.

17                    THE COURT:  Let me go through this.  This

18   issue has come up.  There's a witness from Colorado who

19   testified at previous trials under a pseudonym and she

20   received a reward from whomever.

21                    MR. SHOOK:  Judge, I don't think she's

22   coming this time.

23                    THE COURT:  That was the only thing the

24   Court is aware of.  And I got in a trap on testifying under

25   false names, because I didn't know it was a pseudonym and

1    then I allowed the defense let one of their witnesses

2    testify under a false name and then he chose not to testify

3    under a false name, so I'm not going down that road anymore.

4    The only people that get to testify under a pseudonym as

5    required by statute is on a sexual assault case.  That's out

6    there, been down that road, and won't do that again.

7                    MS. BUSBEE:  But they're not coming, so

8    we won't have an issue with that.  Fair enough.

9                    THE COURT:  No. 20, Motion for Production

10   of Witnesses' Statements.  We have a bunch of them here.

11   Any issues on 1 through 7?

12                   MR. SHOOK:  No, sir.

13                   THE COURT:  Agreed?

14                   MR. SHOOK:  Yes.

15                   MS. BUSBEE:  So each is granted, then,

16   Your Honor?  Is that what we're saying?

17                   THE COURT:  I'm hearing the parties have

18   agreed, so the motion shall be granted.  No. 21, Motion in

19   Limine with Regard to Matters Concerning the Deceased.  I

20   have not yet heard any reputation or character evidence of

21   the deceased.  Any victim impact testimony is heard after

22   the trial has been concluded.

23                   The only issue that has come up prior is

24   the videotape that was in the officer's patrol car showing

25   the last traffic stop he made during the daylight hours and

1    the Court has previously ruled no audio.  The ruling was the

2    State is entitled to show how he appeared in his uniform and

3    where his -- the issue was which side did he wear his gun on

4    or how did he have his Sam Brown belt.  And it was a very

5    short 8 or 10 seconds.  The video just shows a full figure

6    and that's it.  That's all they have put on.

7                    MS. BUSBEE:  We wouldn't have any

8    objection to that.  And as long as this victim impact

9    happens after the verdict --

10                   THE COURT:  It will happen.

11                   MS. BUSBEE:  Oh, yes.

12                   THE COURT:  Granted.

13                   MS. BUSBEE:  Looking forward to it.  I've

14   been provided with an inventory and I actually at a previous

15   trial have been able to physically examine the evidence in

16   this case.  So we have been given the opportunity to do that

17   and what was it, an FBI inventory list?  We have that, Your

18   Honor, so that's been complied with.

19                   THE COURT:  All right.  No. 22 is

20   granted.  No. 23 Motion in Limine on Photographs.  I think I

21   have already covered that one.  Granted.  But you need to

22   bring any specific issues to my attention prior to trial.

23   No. 24, statements made by the defendant need a hearing.

24   Absolutely.

25                   Motion for Discovery of Corroborative

1    Evidence to Accomplice Testimony is motion No. 25.  I

2    haven't seen this one before.

3                        MR. SHOOK:  We don't plan on having any

4    accomplices testify, Judge.

5                        THE COURT:  That answers that question.

6    Granted.

7                        THE COURT:  No. 26, Daubert hearing.

8    Anything in particular you wish to turn the attention to the

9    Court?

10                       MS. BUSBEE:  The only thing that I'm

11   aware of, Your Honor, is that there might be a late-coming

12   DNA test and I'll let the Court know if we want a hearing on

13   that.  We haven't gotten the results on that yet.

14                       MR. SHOOK:  You won't want a Daubert

15   hearing on the medical examiner, will you?

16                       MS. BUSBEE:  No, I can't imagine why.

17                       THE COURT:  So you don't anticipate

18   anything at this point?

19                       MS. BUSBEE:  No, Your Honor.  If I would

20   like to urge this, I will urge it at the time.  If we could

21   hold it or whatever the Court pleases.

22                       THE COURT:  No. 27, 404(b).  I think that

23   you have already indicated the State has filed that notice

24   with the Court.

25                       MS. BUSBEE:  Yes.

1          THE COURT:  Granted.  No. 28, Written

2  Objection to Admissibility of Extraneous Offenses, Request

3  for Procedural Determination by the Trial Court for any

4  Finding of Facts and Conclusions of Law for a Limiting

5  Instruction.

6          There are so many offenses here, you need

7  to be -- can you point me to what you are concerned with?

8          MR. TATUM:  Basically, is this a

9  continuation of the other motions dealing with extraneous

10  that there be -- the jury be instructed as far as the

11  limiting effect on whatever the issue is, if there are

12  extraneous offenses that come into play, if they are

13  submitted for evidentiary purposes.

14          THE COURT:  I have read Mr. Murphy's

15  statement months ago.  Does his statement include other

16  offenses prior --

17          MR. SHOOK:  I don't believe it does.

18          THE COURT:  -- prior to Oshman's?

19          MR. SHOOK:  I believe his statement does

20  not -- it talks about Radio Shack, but didn't mention the

21  robbery.  It just says we got these things from Radio Shack,

22  which doesn't say it's a robbery.  And he mentions prison

23  once, but that's come in in the other trials, but he doesn't

24  mention, you know, any violence during the escape or

25  anything like that.

1          But we read it again this morning.  I

2   don't think it's mentioned any other crimes.

3          THE COURT:  I've made previous rulings

4   where on the written statements I have redacted extraneous

5   offenses that the State has not shown or proved up in their

6   case in chief.  The last trial, the defense wanted all that

7   stuff in.  So it's gone both ways.  So you need to raise the

8   flag on a particular piece of evidence that you are

9   concerned with and I can make a particular ruling.

10          MS. BUSBEE:  You know, I would just as

11   soon redact references to Radio Shack.

12          THE COURT:  I need to see --

13          MR. SHOOK:  It just says -- you can look

14   at the statement.  It doesn't mention any robbery or

15   anything.  It says --

16          MS. SMITH:  "I had a little small Radio

17   Shack, two way.  And I also had a Radio Shack radio scanner.

18   We had bought a book."

19          MR. SHOOK:  "We bought a book and it came

20   from Radio Shack."

21          MS. BUSBEE:  So that does seem pretty

22   benign.

23          THE COURT:  Because they have the actual

24   radio, so it's not like the jury is not going to see it.

25          MS. BUSBEE:  Okay.  I guess not.  We

1    won't request that that be redacted.

2                    MR. SHOOK:  I'm sure Ms. Busbee can look

3    over it in between time and we'll get together again next

4    week and see if she's seen anything that --

5                    MS. BUSBEE:  Your Honor, there is one

6    thing that we're going to request be redacted out of that

7    statement and that's the -- I think that's the last sentence

8    or couple of sentences having to do with the defendant

9    having an AR-15 weapon, because it's subsequent to the

10   commission of this crime and it's subsequent to the events

11   concerning the conspiracy.  And we would submit that that's

12   an extraneous that we would not like the jury to hear about

13   on guilt or innocence.

14                    MR. SHOOK:  That, Judge, obviously we

15   oppose that.  That -- those statements all have to do with

16   them getting away from the scene of the crime and clearly

17   goes to his intent, especially when he says he wants to

18   initiate a firefight.

19                    MS. BUSBEE:  It's our position that you

20   can't -- that this was subsequent to the offense and

21   therefore extraneous.  The offense -- the offense was

22   completed.

23                    THE COURT:  Mr. Shook was about to say

24   evidence of flight from the scene of the crime is

25   admissible, which it is.  Is that correct, Mr. Shook?

1    MR. SHOOK:  Yes, sir.

2    THE COURT:  And I'm trying to pull the

3  document -- that was a Defense Exhibit, wasn't it?

4    MR. SHOOK:  I don't know if this one.

5    MS. BUSBEE:  The last trial Bubba read it

6  to the jury.  Dramatically, I might add.

7    THE COURT:  Ms. Busbee, you are objecting

8  to this sentence, quote, "I got out" --

9    MS. BUSBEE:  Yes.

10    THE COURT:  "I got into the rear seat

11  behind the driver of the same truck.  Period.  My purpose

12  was to -- was to if pursued by the police I was to initiate

13  firefight with the AR-15."

14    MS. BUSBEE:  Right.  That -- let me

15  clarify my argument on this.  The defendant is indicted

16  under two theories, one aggravated murder in the course of a

17  robbery, and the other, murder of a police officer.  Murder

18  of the police officer had been concluded.  And so what

19  happened subsequent to that is extraneous.

20    Now, if they're going under the theory of

21  a robbery and they are going to argue that it's admissible

22  because it's evidence of fleeing, it's not evidence of

23  fleeing.  It's evidence of state of mind.  And we object to

24  its inclusion in front of the jury.

25    THE COURT:  Well, he talks about having

1   other weapons and he had .357s and whether it was an AR-15

2   or .357 or if it was before the motel or during, it's all

3   felons in possession of firearms.  I mean, I can't separate

4   out one firearm and not the others.  It's all -- it's all in

5   the same contextual evidence as a result of the commission

6   of a felony offense and flight therefrom.  I understand your

7   objection.

8              MS. BUSBEE:  Thank you for reminding me.

9   Let me also add the felon in possession of a firearm as an

10  extraneous that we would object to inclusion of the evidence

11  of guilt or innocence and ask that it be redacted from the

12  confession.

13             THE COURT:  I understand your issues and

14  I'm going to deny those motions.

15             MR. TATUM:  Thank you, Your Honor.

16             THE COURT:  I assume we're going to have

17  a detective on the admissibility from the State in a few

18  minutes?

19             MR. SHOOK:  Yes, I would have Detective

20  Johnson.

21             THE COURT:  No. 29.

22             MR. TATUM:  If the defendant were to take

23  the stand that there be a ruling as to what impeachment

24  evidence would be allowed.

25             THE COURT:  You are asking me to make a

1   precipitory ruling?

2                         MR. TATUM:  Yes.

3                         THE COURT:  Denied.  I would have a

4   ruling after the relevant hearing.

5                         MR. TATUM:  Thank you, Your Honor.

6                         THE COURT:  Motion to Define Beyond a

7   Reasonable Doubt.  You wish for me to overrule Judge Price

8   on the Court of Criminal Appeals on whether or not we should

9   have a definition or not?

10                        MR. TATUM:  Right.

11                        THE COURT:  I don't think I want to go

12  there.

13                        MR. TATUM:  They created it one time.

14  They may create one in the future.

15                        THE COURT:  Denied.

16                        MR. TATUM:  Thank you.

17                        THE COURT:  Motion No. 31 to hold

18  unconstitutional 37.071, Section 2(e) and (f), Failure to

19  Require Mitigation Be Considered.  This is a different twist

20  on the first two I ruled upon.  What is the different twist

21  here?

22                        MR. TATUM:  The failure to require the

23  mitigation be considered.

24                        THE COURT:  Motion denied.  No. 32,

25  Defendant's Motion in Limine Regarding Improper Burden

1    Shifting Through Misconstruing the Concept of Reasonable

2    Doubt.

3                        MS. BUSBEE:   This is one of those TDCLA

4    motions.   As you can see, it's quite long and involved in

5    which I think the motion pretty much speaks for itself in

6    argument.

7                        THE COURT:   I see a Keith Hampton motion

8    here.  Motion denied.  Mr. Shook, don't misconstrue the

9    concept of reasonable doubt and don't shift the burden to

10   the defense.

11                       MR. SHOOK:   Yes, Your Honor.

12                       THE COURT:   Motion No. 33, to Pretrial

13   Evidentiary Rulings to Determine Admissibility of Extraneous

14   Offenses.  Anything that we have not yet discussed?

15                       MS. BUSBEE:   This is what we talked about

16   earlier, Your Honor, having to do with -- maybe not, but

17   since we do know what these extraneous offenses are, we're

18   going to have a discussion with the Court about any

19   objections that we might have.  And if it becomes necessary

20   to put it on the record, we will do it prior to trial in a

21   timely fashion.

22                       THE COURT:   Granted.  No. 34, Motion to

23   Test the Qualification of Prosecution Character and

24   Reputation Witnesses.  I assume this would be in the second

25   phase of the trial?

1      MR. TATUM:  Yes.

2      THE COURT:  Having no crystal ball here,

3  do you anticipate any issues, Mr. Shook?

4      MR. SHOOK:  No, sir.

5      THE COURT:  Granted.  Motion in Limine

6  with Regard to Tattoos.  Do you have any tattoos, Mr.

7  Murphy?

8      MR. SHOOK:  I don't believe we will

9  introduce that type of evidence, Judge.

10      MS. BUSBEE:  That's just in case, like

11  jurors getting arrested and maybe somebody got a tattoo.  I

12  wasn't aware of any tattoos, but I haven't done my own

13  personal discovery.  So --

14      THE COURT:  Granted.  Motion in Limine

15  Character of Complainant Victim Impact.  I think that I have

16  already ruled on that.  That would be after the trial.

17  Granted.

18      MS. BUSBEE:  I don't guess that we need

19  to reach No. 37, if that's going to be done after the

20  verdict.

21      THE COURT:  Yes.  There is a very

22  specific procedure that if there is a victim impact

23  statement filed with the Court, after a verdict I'll allow

24  you to inspect it before the witness has an opportunity to

25  testify.  Motion granted.  I think you will find a copy of

1   the same one six times.

2                       Motion in Limine on Punishment Argument.

3   This is a boiler plate motion.  What is your specific issue?

4                       MR. TATUM:  One of those TDCLA motions,

5   Your Honor, cover situations to cover the defense

6   anticipating certain prejudicial argument or potential for

7   prejudicial argument.

8                       THE COURT:  Motion denied.  No. 39,

9   Motion to Exclude Evidence of Unadjudicated Offenses During

10  the Punishment Phase.  He's filed notice.  Is there any

11  particular issue that you have other than the notice he's

12  filed?

13                      MR. TATUM:  No.  I just preserve the

14  position of -- defensive position that these are

15  unconstitutional, the mention of other unadjudicated

16  offenses in general, contrary to the Texas Statute that

17  allows them.

18                      THE COURT:  Denied.  No. 40, Defendant's

19  Request for Notice of State's Intention to Introduce

20  Evidence of Other Crimes, 37.07.  We've already visited this

21  one how many times?

22                      MS. BUSBEE:  Three times.

23                      THE COURT:  Three times.  Granted.

24                      MS. BUSBEE:  At this time we don't know

25  that there will be additional motions.  They do seem

1  exhaustive, except having to do with the charge of the

2  Court. We've been given a charge of the Court. Of course,

3  we haven't heard all the evidence. There may be additional

4  motions having to do with requested charges. We ask -- the

5  Court has provided the defense with the record in the five

6  previous cases. We ask the Court, I'm not aware of, but we

7  tried to be as thorough as we could, if there were any

8  motions filed by the previous defendants and their counsel

9  that we have not covered here today, we would ask the Court

10 to consider those filed by the defense and argued by the

11 defense as they were done in previous trials and to consider

12 those as part of the record in Mr. Murphy's trial as well.

13             THE COURT: I'm glad you brought that up.

14 The Court did provide a copy of the charge to all the

15 parties several weeks ago upon your request. I'm surprised

16 that I've heard nothing from anyone. I wonder if you have

17 looked at it.

18             Mr. Sanchez, have you researched the

19 charges that I provided for you?

20             MR. SANCHEZ: Not yet, Your Honor.

21             THE COURT: I know Mr. Shook has not, but

22 Ms. Smith has.

23             MR. SHOOK: Ms. Smith has and discussed

24 it with me.

25             THE COURT: That's why she's here. Once

1   again, the reason I provided it is I worked several days on

2   modifying the charge to what I anticipate the evidence will

3   show in this case.  What I would like to have is y'all look

4   at it.

5              MS. BUSBEE:  I just gave it to Mr. Tatum.

6   He had an E-mail failure, too.  We need to work that system

7   out.  But in any event, I gave it to him --

8              MR. TATUM:  I have it now.

9              MS. BUSBEE:  He has it now and we've done

10   this and he's going to direct all his attention to that.

11             THE COURT:  Because what I don't want to

12   happen is standard deal, you know, we're ready for the jury

13   to come in and then come in at the last minute and I want

14   you to change these 8 pages --

15             MS. BUSBEE:  No, sir.

16             THE COURT:  -- and I will not be a happy

17   camper, if that were to occur.  Yes, ma'am.

18             MS. SMITH:  Did you request that all of

19   the previously filed motions in all the other trials be

20   incorporated into this?  Did I misunderstand that?

21             MS. BUSBEE:  No.

22             MS. SMITH:  I believe in Halprin you

23   actually directed defense counsel to actually make copies of

24   all those and file them.

25             THE COURT:  I haven't gotten to that

1    point.  But for the recordkeeping in this case, anything

2    that you want considered in this trial must be marked as an

3    exhibit or file marked under this heading because you have

4    to understand the huge task.  The Court Reporter must -- any

5    evidence that you want me to consider on a previous ruling,

6    anything that you want me to consider, I've got to have

7    specifically offered in this case.

8              MS. BUSBEE:  I understand that, Judge.

9              THE COURT:  Take notice of.

10             MS. BUSBEE:  You told me that you had

11   provided that to Mr. Tatum.  I wanted to put it in the

12   record we have that and that would be included in the record

13   of this case.

14             THE COURT:  I'm telling you, if you want

15   it included, you have got to bring it in, you have got to

16   have it marked, and you have got to have it in this record.

17   Because we're not going to go back and say refer to volume

18   38 of trial No. 2.  It won't work.

19             MS. BUSBEE:  We understand that.  We have

20   that and we will have that in the record.  We just wanted to

21   get it on this record that we're -- we're making the State

22   aware that we're doing that because we had told the Court

23   that we were doing that.

24             THE COURT:  Very well.  So are we ready

25   for some testimony?  Do you need a break?

1        MR. SHOOK:  No, I'm ready.

2              (Recess)

3        THE COURT:  Ready?

4              RANDALL JOHNSON,

5    having been duly sworn, was examined and testified as

6    follows:

7              DIRECT EXAMINATION

8    BY MR. SHOOK:

9        Q.    Would you tell us your name, please.

10       A.    Randall Johnson.

11       Q.    And how are you employed, sir?

12       A.    By the City of Irving Police Department.

13       Q.    And what are your duties with them?

14       A.    I'm a detective in the Crimes Against Persons

15   Section.

16       Q.    Let me ask you if you were one of the lead

17   detectives assigned to the capital murder that occurred at

18   the Oshman's involving Officer Aubrey Hawkins as a victim on

19   December 24 of 2000?

20       A.    Yes, sir.

21       Q.    Subsequent to that event, did you and some

22   other officers travel to the State of Colorado after some of

23   the suspects were located in that state in January of 2001?

24       A.    Yes, sir.

25       Q.    Do you recall -- I think you arrived there on

1    January 22nd of 2001?

2        A.      Yes, sir.

3        Q.      Okay.  Let me turn your attention to the next

4    day on January 23rd, in the evening hours, and ask if you

5    were notified that suspects Patrick Murphy and Donald

6    Newbury had been found in the city of Colorado Springs?

7        A.      Yes, sir.

8        Q.      What location were they at when you were

9    notified?

10       A.      At the Holiday Inn.

11       Q.      Was there a standoff situation at that time?

12       A.      They were in a room and were not coming out.

13       Q.      Did you and Detective Spivey go to the

14   location at that time?

15       A.      Yes, sir.

16       Q.      Sometime later in the early morning hours of

17   the 24th of January, did Colorado Springs -- did Mr. Murphy

18   and Mr. Newbury surrender to the Colorado Springs police

19   officers?

20       A.      Yes, sir.

21       Q.      Once Mr. Murphy surrendered to the police,

22   where was he taken at that time?

23       A.      To the Colorado Springs Police Department.

24       Q.      And did you also go to the Colorado Springs

25   Police Department at that time?

1    A.    Yes, sir.

2    Q.    What time approximately did you arrive there?

3    A.    Around 4:00 in the morning.

4    Q.    Okay.  Once you arrived at the Colorado

5 Springs Police Department, did you get a chance to meet with

6 Mr. Murphy?

7    A.    Yes, sir, I did.

8    Q.    Do you see Mr. Murphy in the courtroom today?

9    A.    Yes, sir, I do.

10   Q.    Would you point him out to the Judge, please?

11   A.    He's sitting at the defense table with the red

12 and black tie on.

13   Q.    And that's the man that you knew as Patrick

14 Henry Murphy?

15   A.    Yes, sir.

16         MR. SHOOK:  Your Honor, if the record

17 could reflect that the witness has identified the defendant.

18   Q.    (By Mr. Shook)  What -- where was it that you

19 first met Mr. Murphy down at the Colorado Springs Police

20 Department?

21   A.    In their interview room.

22   Q.    Who was present at that time?

23   A.    Myself and Lt. Paris.

24   Q.    Was he also with the Irving Police Department?

25   A.    Yes, sir.

1    Q.    And how were you dressed?

2    A.    In a suit.

3    Q.    Did you have any weapons on you?

4    A.    No, sir.

5    Q.    Okay.  And did Lt. Paris have his weapons on

6    him?

7    A.    Not that I'm aware of, no, sir.

8    Q.    Did you introduce yourself and identify

9    yourself to Mr. Murphy?

10    A.    Yes, sir.

11    Q.    At that point in time did you read him his

12    Miranda rights?

13    A.    I advised him of his Miranda rights.

14    Q.    Could you read them into the record or tell --

15    inform the Court of the Miranda rights you advised him of at

16    that time, just as you did on that occasion?

17    A.    Yes, sir.  I told the defendant Murphy that

18    you have the right to remain silent and not make any

19    statement at all.  Any statement that you make may and

20    probably will be used as evidence against you in your trial.

21    You have the right to have an attorney present to advise you

22    prior to or during any questioning.  If you cannot afford an

23    attorney, an attorney will be appointed to counsel with you.

24    And you have the right to terminate this interview at any

25    time.

```
 1          Q.     Did Mr. Murphy indicate that he understood his

 2    rights?

 3          A.     Yes, sir.

 4          Q.     And did he agree to waive his rights and speak

 5    to you?

 6          A.     Yes, sir.

 7          Q.     At approximately what time was it that he

 8    began to -- you began to interview Mr. Murphy?

 9          A.     Between 4:16 and 4:21 a.m.

10          Q.     A.M.?

11          A.     Yes, sir.

12          Q.     And as you began to talk with Mr. Murphy, did

13    you ask him if he would give you a written statement?

14          A.     Yes, sir.

15          Q.     And did that happen early on in the process?

16          A.     Yes, sir.

17          Q.     Did you discuss with him how the statement

18    would be taken, the procedure that you would use?

19          A.     Yes, sir.

20          Q.     And what procedure was decided upon?

21          A.     It was decided that I would write the

22    statement.

23          Q.     Okay.  And did you have a voluntary statement

24    form there with you?

25          A.     Yes, sir.
```

53

1   Q.   And as he -- he more or less dictated the

2   statement to you?

3   A.   Yes, sir.

4   Q.   Okay.  And how did that occur?  Would he talk

5   for a minute and you write it down?

6   A.   Right.  And then I would have to stop him and

7   let me catch up and I would say, okay, what then?  And we

8   continued on from there.

9   Q.   Now, at any time did he ever ask for any

10  refreshments, anything like that?

11  A.   I think we offered him and he wanted a Dr.

12  Pepper and that was given to him.

13  Q.   Okay.  At any time during the interview, did

14  he ever ask to take a restroom break?

15  A.   He wanted to go to the restroom twice and that

16  was also done.

17  Q.   Okay.  After the statement was taken from him,

18  you finished -- he finished dictating the statement to you,

19  what did you do then?

20  A.   I then asked him to read the whole statement

21  from the top and bottom, all nine pages, and see if there

22  was anything that we needed to add, change, or take out.

23  Q.   And did he do that?

24  A.   He did.

25  Q.   Okay.  In fact, in parts of the statement

1    there were some deletions or scratched out portions; is that

2    right?

3         A.     Yes, sir.

4         Q.     When that would occur, what would you have him

5    do?

6         A.     Initial those portions.

7         Q.     Okay.  After he had completely read the

8    statement and didn't want to make any more changes or

9    deletions, what did you do then?

10        A.     Then I had him sign the statement in front of

11   a witness, civilian witness.

12        Q.     Did he sign the statement freely and

13   voluntarily?

14        A.     Yes, sir.

15        Q.     Did you ever threaten or try to coerce him in

16   any way or force him to sign the statement?

17        A.     No, sir.

18        Q.     Did you ever promise him any benefit, reward,

19   probation, parole, any type of benefit at all, to induce him

20   to sign the statement?

21        A.     No, sir.

22        Q.     Did you have him sign each page of the

23   statement?

24        A.     Yes, sir.

25        Q.     Where did you have him sign that?

1        A.      On each page he signed right under the portion

2   that I wrote out and then also at the bottom right of each

3   page.

4        Q.      Let me show you what has been marked as State

5   Exhibit 978.  Is this the original statement?

6        A.      Yes, sir.

7        Q.      And it consists of nine pages; is that right?

8        A.      That's correct.

9        Q.      His signature is at the bottom of each page

10   where there is an area marked for a signature and also at

11   the bottom under the written portion; is that correct?

12        A.      That's correct.

13        Q.      And what is the portion of writing -- having

14   him sign his name at the bottom of each of the written

15   portions?

16        A.      So I cannot add anything else without his

17   knowledge.

18              MR. SHOOK:  Your Honor, at this time we

19   will offer State Exhibit 978 for purposes of this hearing.

20              MS. BUSBEE:  No objection for purposes of

21   this hearing, Your Honor.

22              MR. SHOOK:  We'll pass the witness.

23              THE COURT:  State 978 shall be admitted

24   for purposes of this hearing.

25                      CROSS-EXAMINATION

BY MS. BUSBEE:

Q.    Detective Johnson, did you take statements from any of the other codefendants in this case?

A.    Yes, ma'am.

Q.    All of them or some of them?

A.    Some.

Q.    Okay.  Whose statements -- what other people's statements did you take?

A.    Michael Rodriguez.

Q.    And you had done that the day before?

A.    Yes, ma'am.

Q.    Okay.  And this -- you said you were with Detective Spivey, but he was not the one that went in the interview room with you.  It was Detective Paris or Officer Paris?

A.    He was a lieutenant at the time, Lt. Paris.

Q.    Lt. Paris, and he's with the Irving Police Department?

A.    Yes, ma'am.

Q.    So were you and Paris and Murphy were the only people in this interview room?

A.    Yes, ma'am.

Q.    Was the civilian witness brought in subsequent to witness the signature?

A.    Before he signed the statement, yes, ma'am.

1    Q.    But not during the time that the statement was

2 taken?

3    A.    No, ma'am.

4    Q.    When you arrived at the Colorado Springs, is

5 that a detention facility?  Is that what they call it?

6    A.    It's their police department.

7    Q.    Police department?  Did you -- was your

8 arrival simultaneous with Mr. Murphy?  Did you get there

9 before?  Did you follow them?  I wasn't clear from your

10 testimony as to whether or not you had been at the scene

11 when they were taken from the hotel room or whether you just

12 met them at the police department.

13    A.    I met them at the police department.

14    Q.    Okay.  Were you there prior to the time that

15 they arrived or how did that work out?

16    A.    I don't recall if it was -- they left before I

17 left the hotel and I don't recall if I got there right after

18 they arrived or at what portion that occurred at.

19    Q.    Whose custody was he in before he was in your

20 custody?

21    A.    Colorado Springs Police Department.

22    Q.    Do you remember what officer?

23    A.    No, ma'am.

24    Q.    And these were uniformed officers?

25    A.    Yes, ma'am.

1    Q.    Were you present for the -- what for lack of a

2    better expression, would be the standoff prior to the time

3    that the two escapees surrendered?  Were you present for

4    that?

5    A.    During portions of it, yes, ma'am.

6    Q.    Are you aware of what time that began?

7    A.    No, ma'am.

8    Q.    Were you made aware later on what time that

9    began?

10    A.    I'm sure I was, but I don't recall up here

11    what time.

12    Q.    Do you remember approximately what time you

13    arrived at the scene?

14    A.    Close to midnight.

15    Q.    Okay.  And approximately what time was the

16    surrender?

17    A.    A little after 3:00, before 4:00.

18    Q.    All right.  Could you describe the scene for

19    the Court outside this hotel or motel?

20    A.    There were portions of the hotel were secured

21    with crime scene tape.  A lot of officers, a lot of news

22    civilians.  Portions of the hotel had been evacuated.

23    Q.    Were there special lighting brought in for --

24    to illuminate the scene?

25    A.    I don't recall that.

59

1    Q.    What sort of weapons were in evidence brought

2    there by the various law enforcement agencies?

3    A.    I'm not sure.

4    Q.    Did you see weapons?

5    A.    Yes, ma'am.

6    Q.    Did you see sharpshooters and people with

7    rifles?

8    A.    No, ma'am.

9    Q.    How many uniformed officers did you see at the

10   scene?  Not an exact, just the best that you can recall.

11   A.    Uniformed, I would say five or ten.  I just

12   stayed within one portion of the hotel.

13   Q.    All right.  And when you say one -- was this a

14   hotel with an exterior door that the door of the room went

15   to the great outdoors or there were interior halls?

16   A.    Interior hall.

17   Q.    All right.  So how were -- was law enforcement

18   communicating with the people in the room, the defendant and

19   Mr. Newbury?

20   A.    I believe through the telephone.

21   Q.    All right.  And at some point there was some

22   kind of a conversation with the media.  Was that done over

23   the telephone?

24   A.    Yes, ma'am.

25   Q.    Would the people in the room be able to see,

1  either through the peephole or a window in the room, what

2  was outside of that room?  Was there a window or patio door

3  to allow them to see what was outside that room as far as

4  law enforcement presence?

5         A.    I'm not sure what they could see from their

6  position.

7         Q.    Okay.  Where were you physically located?  In

8  the hallway or outside of the hotel?

9         A.    In the hallway sometimes and also in another

10  banquet room.

11         Q.    Okay.  How many police, marked police vehicles

12  were at the hotel?

13         A.    I don't have a number on that.

14         Q.    Were there more than five?

15         A.    I don't recall seeing that many.

16         Q.    What about plainclothes officers, how many

17  plainclothes officers were there at the hotel?

18         A.    I probably saw about 15 to 20.

19         Q.    Okay.  And were you aware of the fact that

20  they were officers because they displayed a badge on their

21  clothing?

22         A.    Yes, ma'am.

23         Q.    And was there a SWAT Team present at the

24  hotel?

25         A.    Yes, ma'am.

1   Q.   All right.  Could you describe that for us,

2   please?

3   A.   I didn't see them.

4   Q.   Where were they located?

5   A.   I don't know.

6   Q.   Was there a SWAT Team vehicle, some law

7   enforcement have, you know, an armored kind of van.  Was

8   that present?

9   A.   I don't know if it was or not, no, ma'am.

10   Q.   Was there anything, other communication, other

11   than through the telephone that you are aware of like

12   bullhorns or anything like that?

13   A.   I did not hear a bullhorn.

14   Q.   All right.  All right.  Now, so where were you

15   when you were apprized that these individuals had been

16   found?

17   A.   In my hotel room across the street.

18   Q.   Now, were you already staying in that hotel

19   when you had -- when the other escapees had been caught the

20   day before or had you moved to Colorado Springs because of

21   intelligence that made you think that these other people

22   would be in Colorado Springs?

23   A.   No.  That was the only hotel that we stayed

24   in.

25   Q.   So what time were you made aware that they had

1   been located?

2          A.     Before midnight.

3          Q.     But you don't remember what time?

4          A.     No, ma'am.

5          Q.     Okay.  So you go to the Colorado Police

6   Department at the same time, I guess, that the escapees were

7   transported there --

8                 THE COURT:  Colorado Springs?

9          Q.     (By Ms. Busbee)  Colorado Springs.  Of course

10  that's what I mean.  The Colorado Springs Police Department

11  more or less contemporaneously at the time that the escapees

12  were taken into custody; is that correct?

13         A.     I would say around the same time, yes, ma'am.

14         Q.     All right.  And were you aware where they were

15  taken when they were brought into the building?

16         A.     To the interview room.

17         Q.     All right.  Were you aware as to whether or

18  not there was a magistrate on duty at that time in Colorado

19  Springs?

20         A.     I'm not aware of that, no, ma'am.

21         Q.     All right.  Did you inquire as to whether a

22  magistrate was available?

23         A.     No, ma'am.

24         Q.     And when you were taken in this interview room

25  -- I take it some other officers went to talk to

1    Mr. Newbury?

2         A.      That's correct.

3         Q.      What officers were those?

4         A.      Sergeant Spivey and Investigator Burkett.

5         Q.      When you get to that location and you go into

6    the interview room, could you describe Mr. Murphy's

7    condition as far as whether or not he was handcuffed or

8    shackled or if you recall?

9         A.      I know he was handcuffed and I don't recall if

10   he was shackled or not.

11        Q.      And what was he wearing?

12        A.      I don't recall.

13        Q.      What was the weather like that day?  Was it

14   cold?  I know it was in January.

15        A.      To me it was cold.

16        Q.      Did he have on a jacket?

17        A.      I don't recall.

18        Q.      Do you recall that he was not wearing a shirt?

19        A.      I don't believe he had a shirt on, no, ma'am.

20        Q.      So about how long is it or ride is it from the

21   hotel to the Colorado Springs Police Department?

22        A.      I don't know.

23        Q.      Was it an hour or 10 minutes?

24        A.      It did not seem a long period of time, no,

25   ma'am.

1    Q.    Okay.  Now, when you entered the room with Mr.

2  Murphy, did you have any recording device?

3    A.    No, ma'am.

4    Q.    Did you take any tape recordings?

5    A.    No, ma'am.

6    Q.    Did you take any notes other than those that

7  you provided to the District Attorney?  And I'm not aware of

8  any notes having to do with your interview with him other

9  than this confession.  Were there any notes that you had

10  made about taking his confession that are not contained in

11  the confession?

12    A.    If there were notes, it's been supplied to the

13  DA's Office.

14    Q.    Do you recall whether you made any notes?

15    A.    No, ma'am, I don't recall.

16    Q.    And what about Detective Paris -- or Lt.

17  Paris, did he make any notes?

18    A.    Not that I'm aware of.

19    Q.    Now, is there videotaping equipment available

20  in this police department in these interview rooms?

21    A.    I believe so, yes, ma'am.

22    Q.    Did you utilize that?

23    A.    No, ma'am.

24    Q.    So there was no electronic recording of any

25  kind of any of the events surrounding his confession?

1    A.    That's correct.

2    Q.    Now, what was the condition of the defendant

3  as far as what his emotional state appeared to you?

4    A.    Seemed fine to me and didn't have any problems

5  conversing with me or answering my questions or carrying on

6  a conversation.

7    Q.    Did you -- was he crying or upset?

8    A.    No, ma'am.

9    Q.    Was he -- did you notice that he was

10  shivering?

11    A.    No, ma'am.

12    Q.    Did you ever give him a shirt or did anybody

13  ever provide him with any shirt or clothing to wear for this

14  interview?

15    A.    I don't recall if that was done.

16    Q.    So -- now, what was the reason that you wrote

17  the statement as it was dictated to you instead of having

18  the defendant write out?  I think some of the other people

19  wrote out their own statement.  What was the reason that it

20  was done this way in this case?

21    A.    It was the defendant's choice.

22    Q.    And did he state why he wanted you to write it

23  down?

24    A.    No, ma'am.

25    Q.    How long did it take for him to dictate this

1  statement to you?

2       A.      Roughly around two and a half hours.

3       Q.      Okay.  Did you write it down as he said it?

4  It's nine pages.  Why did it take so long?  What took so

5  long to --

6       A.      Just, it's nine pages and it just takes a

7  while to handwrite someone's statement as they talk.

8       Q.      Okay.  And did Mr. Murphy have on his glasses?

9       A.      I don't recall at this point.  I believe he

10  did, but I don't remember.

11       Q.      Was there ever anyone else present during this

12  two-and-a-half-hour period of time that came into the room

13  during that period of time say, for instance, to bring a Dr.

14  Pepper or for any other purpose that you remember?

15       A.      A Dr. Pepper was brought, but no one else came

16  in.  They left us alone.

17       Q.      Okay.  Now, were you aware that the defendant

18  had been awake for 20, 20 hours about 4:00 in the morning?

19  Were you aware of the fact that he hadn't had sleep for --

20       A.      No, ma'am.

21       Q.      Did you question him about that?

22       A.      No, ma'am.

23       Q.      Did you make any inquiries as to whether or

24  not a magistrate was on duty at that time?

25       A.      No, ma'am, I did not.

1      Q.    All right.  And having, you know, been through

2   a procedure similar to this in the other, I think it was

3   Teller County where these other inmates were arrested, were

4   you familiar with the procedures in Colorado for taking a

5   defendant before a magistrate?

6      A.    I know they were taken before a magistrate at

7   some time.

8      Q.    But that was subsequent to taking their

9   statements?

10     A.    That's correct.

11     Q.    And what was your understanding of the

12  procedure in Colorado for taking someone before a

13  magistrate?

14              MR. SHOOK:  We'll object to relevance,

15  Judge.

16              THE COURT:  Sustained.

17     Q.    (By Ms. Busbee)  Well, I guess my question is,

18  were you aware that a magistrate was available?

19     A.    No, ma'am, I was not.

20     Q.    Now, at some point during your interview of

21  the defendant were you apprized of the fact that there was

22  someone, an attorney, who wanted to speak with him?

23     A.    No, ma'am.

24              MS. BUSBEE:  I'll pass the witness, Your

25  Honor.

1              THE COURT:  Any redirect?

2                    REDIRECT EXAMINATION

3    BY MR. SHOOK:

4         Q.    Let me ask you this.  When you interviewed Mr.

5    Murphy, how long had you been up?

6         A.    Since 6:00 on the 22nd, so, 48 something

7    hours, something like that.

8         Q.    All right.

9              MR. SHOOK:  That's all we have.

10             MS. BUSBEE:  I have no recross, Your

11   Honor.

12             THE COURT:  Thank you, Detective.  You

13   may be excused.

14             MR. SHOOK:  That's all we have, Judge.

15             MS. BUSBEE:  Call the defendant for the

16   limited purpose of this hearing.

17                    PATRICK MURPHY,

18   having been duly sworn, was examined and testified as

19   follows:

20                    DIRECT EXAMINATION

21   BY MS. BUSBEE:

22        Q.    Please state your name for the record.

23        A.    Patrick Henry Murphy, Jr.

24        Q.    And are you the same person who is on --

25   indicted in Cause No. F01-00328?

1    A.    Yes, ma'am.

2    Q.    And Mr. Murphy, it's your statement that's the

3  subject of this Motion to Suppress Statement that you have

4  testified about, I believe it's No. 978 for record purposes,

5  and you are familiar with that statement?

6    A.    Yes, ma'am.

7    Q.    I want to ask you some questions about the

8  circumstances surrounding your giving that statement.  At

9  the time that you were taken into custody, you had been

10  awake for how many hours?

11    A.    At the time I was taken into custody, I think

12  I had been awake for about approximately 20 hours.

13    Q.    Okay.  And when was the last time that you had

14  taken any food or had anything to eat?  How many hours --

15  let me make that easier.  How many hours had it been since

16  you had eaten?

17    A.    Approximately 16 hours.  We had at one point

18  we had had breakfast from the room service, so that was the

19  last time we had eaten, at breakfast.

20    Q.    Was that 10:00 in the morning or 6:00 in the

21  morning?  Do you recall?

22    A.    I would say it was before 9:00 because the

23  hotel doesn't -- the room service doesn't bring breakfast

24  around after 9:00, I think.  I'm not sure.

25    Q.    Now, what time was it when you were made aware

1    that the police were there to arrest you?  Do you recall?

2         A.        I believe the first contact we had was in the

3    early evening.  I couldn't say definite what time it was,

4    but I believe it was in early evening.

5         Q.        So when you say early evening, are you saying

6    near or about 6:00, 7:00?  What's your definition of that?

7         A.        About 6:00 or 7:00, probably before 8:00.

8         Q.        And how were you made aware of that?

9         A.        There was a knock on the door and Mr. Newbury

10   went to look out the peephole and when he looked out the

11   peephole, he couldn't see anything.  It was totally blocked

12   off.  And he told me that he couldn't see and I walked over

13   there and looked and I said this is a police shield because

14   they had backed -- they took a step back into the hallway

15   and I could see that it was a shield.

16        Q.        So would you characterize what happened after

17   that as something of a standoff?

18        A.        Yes, ma'am.

19        Q.        How long did that -- how long did that last

20   before you surrendered?

21        A.        Well, I think we surrendered about 3:30 in the

22   morning, between 3:30 and 4:00 in the morning.

23        Q.        So there was at least nine hours or something

24   like nine hours that you were in a stressful situation.

25   What was your emotional state at the time that you were

1   taken into custody?

2        A.    I think my first concern was I was relieved

3   that it was over with.

4        Q.    What was your emotional state, what kind of

5   state were you in?

6        A.    Fatigued --

7        Q.    Okay.

8        A.    -- emotionally.

9        Q.    And was this a calm situation you had been

10  through the previous nine hours?  Was it an upsetting

11  situation?  Did it have any effect on your state of mind

12  once you were taken into custody?

13       A.    Yes, ma'am, it did.  Very stressful.  We went

14  from a near death situation standoff to life, you know.  And

15  it was very stressful for us at that time.

16       Q.    Okay.  And you testified that you were

17  fatigued.  All kinds of fatigue.  Could you be a little bit

18  more specific what you mean when you say you were fatigued

19  in this situation?

20       A.    We basically had been operating on adrenalin

21  for approximately 48 hours on very little rest and at the

22  time of the arrest, it was like I said, it was relief that

23  it was now over with and the general state of physical and

24  emotional fatigue from that.

25       Q.    Now, you have heard the testimony about being

1  taken to the police department.  Did you have any quarrel

2  with that?  Were you taken into the interview room as it was

3  described by Detective Johnson?

4       A.    No, ma'am.  It was pretty much.

5       Q.    And how were you -- were you shirtless?

6       A.    Yes, ma'am.

7       Q.    Were you cold?

8       A.    Yes, ma'am, I was.  This is Colorado and late

9  January.  There was snow on the ground.  I'm not sure what

10  the temperature was at that time.  But I was cold.  I was

11  shivering still.

12       Q.    And were you given anything to wear while you

13  were being interviewed?

14       A.    No, ma'am.

15       Q.    Were you offered anything to eat?

16       A.    I don't remember being offered any food.

17       Q.    Did you express to them a desire to have

18  something to eat?

19       A.    I can't say for certain, ma'am.  I did ask for

20  -- actually, I think I asked for a cup of coffee because I

21  was beginning to feel drowsy, very drowsy, so I was wanting

22  some caffeine.

23       Q.    Now, when were you advised of your Miranda

24  rights?

25       A.    The actual advising, I'm very vague.  That

1  period when I arrived and when my Miranda was actually

2  stated to me.

3      Q.    Why is that?

4      A.    I recall when the detectives came into the

5  room and -- but I can't recall how the conversation started,

6  whether it was -- proceeded as the detective stated and he

7  read the Miranda.  My first recollection of it was that they

8  asked me a question said, why was the officer run over?  And

9  I started crying.

10     Q.    Were you aware that you could stop this

11 interview?

12     A.    No, ma'am.

13     Q.    Do you remember being told that you could stop

14 the interview?

15     A.    I assume when he read me the Miranda, but it

16 just didn't -- it did not dawn on me that I could stop it.

17     Q.    So is that because you were lacking in

18 intelligence or was it because of the circumstances that you

19 found yourself in?

20     A.    I don't think it was because of lack of

21 intelligence.  I think it was my mental -- the mental

22 fatigue that I was experiencing.  I just wasn't registering

23 everything that was being said to me.

24     Q.    So you don't remember specifically him telling

25 you that and is it your testimony that it is just you simply

1  did not understand that you could stop that interview?

2       A.     I remember Miranda being read to me, but I'm

3  not sure when in the interview, whether it was when he first

4  came into the room as he stated or my recollection was after

5  the question after I had already started to cry.

6       Q.     Do you remember if you were told that you had

7  already started interviewing and you had to continue or

8  whether that was something that you thought was -- why did

9  you say that?

10      A.     Ma'am?

11      Q.     You just said that you thought you couldn't

12 stop the interview.  Was there anything that gave you that

13 impression?

14      A.     I was not aware of it that I could stop the

15 interview.

16      Q.     Could you detail for us why you maintain that

17 your statement was not voluntary?

18      A.     I don't think giving -- if I had had a chance

19 to rest or perhaps Miranda had been explained to me more in

20 detail, that I would have given a voluntary statement like I

21 had, like I did.

22      Q.     If you had access to an attorney, would you

23 have availed yourself of that opportunity to consult with an

24 attorney before you gave a statement?

25      A.     Yes, ma'am.

1    Q.    If you had been given the Miranda warnings by

2 a magistrate, would you have felt like you had the

3 opportunity to find out what they meant and ask questions?

4    A.    It would have depended if I had had a chance

5 to rest prior to it.

6    Q.    So it's just this particular circumstances in

7 which they questioned you when you had no rest and no food

8 and coming from this hostage -- not hostage, standoff

9 situation, it's your testimony that you were unable to

10 understand your Miranda warnings?

11    A.    Yes, ma'am.

12    Q.    And if you were able to understand them, you

13 would not have given this statement?

14    A.    Yes, ma'am.

15         MS. BUSBEE:   Pass the witness, Your

16 Honor.

17              CROSS-EXAMINATION

18 BY MR. SHOOK:

19    Q.    Mr. Murphy, so you are not saying that the

20 Miranda warnings weren't read to you, you are just saying

21 you didn't understand them?

22    A.    Yes, sir.

23    Q.    And you think that first you cried in regards

24 to some question about why the officer was run over and it

25 was after that that the Miranda warnings were read to you?

1    A.    That's the sequence that I'm familiar with,

2  yes, sir.

3    Q.    And then after the Miranda warnings were read

4  to you, is that when you started dictating the statement to

5  Detective Johnson in the manner he described where you would

6  talk some and he would write it down?

7    A.    Yes, sir.

8    Q.    So prior to him writing down what you were

9  saying, he had read the Miranda warnings at that point in

10  time?

11    A.    I believe so, sir, but I'm not certain.

12    Q.    Did the -- he was correct in the procedure

13  used.  You would talk and he would write?

14    A.    Oh, yes, yes, sir.

15    Q.    The signature on the exhibit, that's your

16  signature, isn't it?

17    A.    Yes, sir.

18    Q.    He never threatened you with anything, did he,

19  during the course of that interrogation?

20    A.    No, sir.

21    Q.    Didn't make any promises to you, did he?

22    A.    No, sir.

23    Q.    Basically, once he got in the room, he started

24  taking the statement and it took some, what, two, two and a

25  half hours to go through all that?

1      A.      Yes, sir.

2      Q.      He did allow you to go to the restroom on two

3    occasions?

4      A.      On two occasions, yes, sir.

5      Q.      And you were given a Dr. Pepper?

6      A.      Yes, sir.

7      Q.      And you didn't -- you don't recall requesting

8    food; is that right?

9      A.      No, sir, I don't.

10      Q.      So have you looked over the statement?

11      A.      Yes, sir, I have.

12      Q.      And he didn't go back and add anything in

13    there that wasn't written down at that time?

14      A.      No, sir.

15      Q.      And you did read over the statement before you

16    signed it?

17      A.      Yes, sir.

18      Q.      Now, you say that you just didn't quite

19    understand your Miranda rights because you had been up so

20    long?

21      A.      Yes, sir.

22      Q.      And you were awake, weren't you, during this

23    conversation with Detective Johnson?

24      A.      I believe at times I had actually did nod at

25    times.

1        Q.        While you were dictating the statement you

2   would --

3        A.        Yes, sir.

4        Q.        -- nod off and go to sleep?

5        A.        I believe so.  I wouldn't say I fell asleep.

6   But I would say I would nod out and then instantly come back

7   up.

8        Q.        You didn't think it was a pretty alert

9   situation there, being asked questions by a detective

10  concerning an incident that happened in Irving?

11       A.        Could you say that again, sir?

12       Q.        You weren't bored by the conversation?

13       A.        Oh, no, sir, I wasn't bored.  I was just

14  extremely tired.

15       Q.        You have heard the Miranda rights before,

16  haven't you?

17       A.        Yes, sir.

18       Q.        And you, in fact, have given voluntary

19  statements before, haven't you?

20       A.        In what instance, sir?

21       Q.        When you were arrested for burglary of a

22  building back in 1984 in Balch Springs, do you recall giving

23  a voluntary statement at that time?

24       A.        Yes, sir, I did.

25       Q.        Let me show you what has been marked as State

1    Exhibit 979 and ask you if you recognize that copy of the

2    voluntary statement from that incident in Balch Springs.   I

3    believe it was October 3rd -- no?

4         A.    No, sir, February.

5         Q.    February 23, 1984?

6         A.    Yes, sir.

7         Q.    Does that look like to be a copy of the

8    statement you gave about that burglary?

9         A.    Yes, sir.

10        Q.    And on that voluntary statement were some

11   Miranda warnings; is that right?

12        A.    Yes, sir, there is.

13        Q.    Do you recall being given the Miranda warnings

14   at that time --

15        A.    Yes, sir, I do.

16        Q.    -- before you gave the voluntary statement?

17   Did you understand your Miranda warnings at that time?

18        A.    Yes, sir.

19        Q.    And subsequent to this you were arrested for

20   aggravated sexual assault in 1984 out of Irving, Texas.   You

21   were given your Miranda warnings at that time, weren't you,

22   when you were arrested?

23        A.    Yes, sir.

24        Q.    You understood them at that time?

25        A.    Yes, sir.

1    Q.    In fact, at that time you declined to give a

2  statement; is that right?

3    A.    That's correct.

4    Q.    And prior to 1984 you had been arrested when

5  you were a juvenile, I believe; is that right?

6    A.    Yes, sir.

7    Q.    And on how many occasions?

8    A.    Several.

9    Q.    Okay.  When you were arrested on those

10  occasions, some involving, I believe, unauthorized use of a

11  motor vehicle, some theft, you were given Miranda warnings

12  at that time, were you not?

13    A.    I actually don't remember at that time, sir.

14    Q.    Okay.  But at least on these two occasions in

15  1984 you had been given your Miranda warnings and you

16  understood them at that time?

17    A.    Yes, sir.

18    Q.    Now, do you recall after you talked with the

19  Detective Johnson, talking to some other police officers

20  that day, or other law enforcement?

21    A.    I believe there was two other groups of

22  officers that I spoke to that morning.

23    Q.    Some Colorado Springs officers, as well as

24  some officers from the -- investigators from the Texas

25  Department of Corrections?

1    A.    Well, I do remember the officers from the

2  Texas Department of Corrections, yes, sir.

3    Q.    Do you recall them giving you -- they gave you

4  your Miranda warnings before you gave them a statement?

5    A.    I believe they did give me the Miranda

6  warnings, yes, sir.

7    Q.    Did you understand your Miranda warnings at

8  that time?

9    A.    I would say that I agreed to it, but I'm not

10 sure if I really understood them, because, once again, my

11 fatigue played a big factor at that time.

12   Q.    Okay.  So did you nod off or anything at that

13 point in time, also?

14   A.    I believe so, sir.

15   Q.    Would your fatigue have been noticeable?

16   A.    Yes, sir.

17   Q.    In other words, if anyone was talking to you,

18 you could tell that you were very, very fatigued?

19   A.    Yes, sir.

20   Q.    Mr. Murphy, do you recall when the

21 investigators from the prison system talked to you, they had

22 a recorder sitting there?

23   A.    Yes, sir.

24       MR. SHOOK:  Judge, I have a copy of the

25 tape and I think that we have a recorder back there that we

1  can play that --

2      Q.    (By Mr. Shook)   I'll play this tape and I

3  think it would be apparent that the voice is identified, but

4  if you have any disagreement whether that's you or not, will

5  you let me know right away?

6      A.    Yes.

7              MS. BUSBEE:  Before we do this, could we

8  have this exhibit sponsored by a witness who may actually

9  know what time it was taken and under what conditions?

10             MR. SHOOK:  I believe they state the name

11 and identify themselves on it.

12             THE COURT:  Give him an opportunity to

13 hear the beginning of the tape so he has an opportunity to

14 --

15             MR. SHOOK:  Judge, for the record, this

16 is State Exhibit 980.

17                    [At this time the tape was played by

18                      Mr. Shook.]

19             MS. BUSBEE:  May I take the witness on

20 voir dire?

21             THE COURT:  You may.

22                  VOIR DIRE EXAMINATION

23 BY MS. BUSBEE:

24     Q.    Mr. Murphy, this states on this tape this was

25 taken at 12:28 p.m.  Your confession was taken, I believe,

1    at 4:00.

2              THE COURT:   4:21 a.m.

3         Q.     (By Ms. Busbee)   Had you had an opportunity to

4    eat before this interview?

5         A.     I'm not sure what time the lunch was brought

6    around.   I know when I showed up at the detention facility I

7    did ask about food and I'm not sure if I was fed at that

8    time or not.

9         Q.     Were you given a cell and a place to sleep?

10        A.     Yes, ma'am.

11        Q.     Did you get an opportunity to sleep before

12   this interview?

13        A.     Approximately 12:30 in the afternoon, yes,

14   ma'am, they woke me up.

15        Q.     They woke you up for this interview?

16        A.     Yes, ma'am.

17        Q.     So you had an opportunity to have --

18        A.     For a couple of hours.

19        Q.     -- to have some sleep before this interview?

20   All right.

21              MS. BUSBEE:   Your Honor, I'm going to

22   object to this tape as irrelevant, the issue of his fatigue

23   since this happened after he had had an opportunity to get

24   some rest.

25              THE COURT:   I believe the issue put

1   before the Court is was he capable of understanding the

2   Miranda warnings and did he understand his Miranda warnings

3   at the time he made this statement.

4                    MS. BUSBEE:  Right.  So this is

5   irrelevant as to -- something that occurred hours later

6   after he slept is not relevant to this issue.

7                    THE COURT:  I believe it's highly

8   relevant and probative, so I will admit State 980.

9                    MR. SHOOK:  We'll offer 980.

10       Q.    (By Mr. Shook)  And, Mr. Murphy, that's your

11   voice that we are hearing on 980?

12       A.    Yes, sir.

13       Q.    And that is the -- sound like the interview

14   you were having with the officers around 12:30 p.m. on the

15   24th of January 2001?

16       A.    Yes, sir.  Could I request -- could you back

17   up just a little bit to where he started reading the

18   Miranda, please?

19                    [At this time the tape was backed up

20                    and replayed by Mr. Shook.]

21                    MR. SHOOK:  Judge, there is one portion

22   coming up that I think it will -- I don't know exactly where

23   to fast forward it to.  It's not long.

24       Q.    (By Mr. Shook)  That's you being informed that

25   there was a lawyer there for you and you agreed to continue

1    talking with the investigators; is that right?

2         A.    Yes, sir.

3         Q.    Okay.  Mr. Murphy, you sound on the tape, at

4    least from the sound of your voice, you don't sound too

5    fatigued.

6         A.    No, sir.  It was very refreshing, refreshed my

7    memory, and, no, I do not sound fatigued there.

8         Q.    Clearly you understood your Miranda rights and

9    what was being said to you and explained to you during that

10   interview?

11        A.    Yes, sir, because the investigator did clearly

12   go over each phase, each clause, of the Miranda with me and

13   made sure that I understood it.

14        Q.    Earlier when I first began asking you

15   questions, you said that you were just as fatigued during

16   this interview and didn't understand your Miranda rights the

17   same way you did when Detective Johnson was talking to you.

18        A.    Yes, sir, I did.  And the tape has refreshed

19   my memory.  It was approximately three years ago.

20        Q.    Could you also have been just as alert when

21   Detective Johnson was going over it with you?

22        A.    No, sir.

23        Q.    So it's clear for the record, the tape we just

24   listened to is all done in the same day, approximately 12:30

25   p.m. or so the same day that you had given the written

1  voluntary statement to Detective Johnson; is that right?

2      A.    Yes, sir.

3      Q.    I may have asked you this, but as far as the

4  actual contents of State Exhibit 978, you have read that

5  since then?

6      A.    Yes, sir, I have.

7      Q.    Everything in it was true and correct as you

8  dictated it to Detective Johnson?

9          MS. BUSBEE:  Your Honor, I object to him

10  stating whether or not what he put in his statement is true

11  and correct.  We're here for the purpose of whether or not

12  it's voluntary.

13          THE COURT:  I understand that, but he's

14  asking if there were any things that were not correct or had

15  been changed with regard to the statement, not to the

16  content of the statement.

17          MS. BUSBEE:  If we could make that clear,

18  because that's not how I heard the question.

19      Q.    (By Mr. Shook)  Has anything -- I think I

20  asked you this earlier, has anything been changed or added

21  into since you had written that -- or since it had been

22  dictated?

23      A.    I don't believe so.

24          MR. SHOOK:  And, Your Honor, we'll also

25  offer State Exhibit 979 for record purposes.

1    MS. BUSBEE:  No objection for record

2  purposes.

3    THE COURT:  No. 979 shall be admitted for

4  the record.

5    MR. SHOOK:  That's all the questions we

6  have.

7                    REDIRECT EXAMINATION

8  BY MS. BUSBEE:

9    Q.    Just a few more questions, Mr. Murphy.  This

10  interview that you had with the TDC officials, they talked

11  about some administrative regulations.  This interview had

12  to do with violations of inmate code.  Isn't that what this

13  interview -- this entire interview was not about this

14  offense for which you are on trial, but it's concerned with

15  collateral matters to the escape and other people's

16  participation; is that correct?

17    A.    Yes, ma'am.

18    Q.    And you did not sign a written statement?

19    A.    No, ma'am, I did not.

20    Q.    And you had had an opportunity to sleep?

21    A.    Yes, ma'am.

22    Q.    And the fact that you had an opportunity to

23  sleep and was your mental clarity different than it had been

24  at the time that you gave the statement to Detective

25  Johnson?

1          A.     Yes, ma'am.

2          Q.     All right.

3                 MS. BUSBEE:  Pass the witness, Your

4     Honor.

5                 THE COURT:  Thank you, Mr. Murphy.  You

6     may stand down.

7                 THE COURT:  Call your next witness.

8                 MS. BUSBEE:  We'll rest.

9                 MR. SHOOK:  We have nothing further,

10    Judge.  We'll call Detective Johnson briefly.

11                      RANDALL JOHNSON,

12    having been duly sworn, was examined and testified as

13    follows:

14                      DIRECT EXAMINATION

15    BY MR. SHOOK:

16         Q.     For the record are you the same Detective

17    Johnson that testified earlier?

18         A.     Yes, sir.

19         Q.     During your interview with Mr. Murphy, would

20    you describe his demeanor throughout the interview?

21         A.     Would I describe it?

22         Q.     Yes.

23         A.     Yes, sir.

24         Q.     Was -- did he appear awake or alert to you?

25         A.     Yes, sir.

1      Q.     Did he appear to be awake and alert during the

2  entire interview?

3      A.     Yes, sir.

4      Q.     Did he ever fall asleep during the interview

5  at all or at any time or look as if he was about to fall

6  asleep?

7      A.     No, sir.

8      Q.     Did he appear to understand all the warnings

9  that you gave him as far as the Miranda warnings go?

10     A.     Yes, sir.

11     Q.     That's all we have.

12                    CROSS-EXAMINATION

13  BY MS. BUSBEE:

14     Q.     Were these --

15            MS. BUSBEE:  I have no questions, Your

16  Honor.

17            MR. SHOOK:  That's all we have.

18            THE COURT:  Thank you, Detective.

19            MR. SHOOK:  We'll close.

20            MS. BUSBEE:  Close.

21                 (Recess)

22            THE COURT:  Defendant's Motion to

23  Suppress the voluntary statement made by the defendant on

24  the 24th day of January 2001, concluding at 4:21 a.m., the

25  Court, having received evidence on this issue, does the

1    State have any -- your motion, Ms. Busbee, would you like to

2    argue your motion?

3                        MS. BUSBEE:  Yes, Your Honor.  I think

4    that the evidence is clear that the defendant was -- it's

5    uncontradicted that they were in a standoff situation from

6    nighttime until early morning hours, that it was a tense

7    situation, that the defendant hadn't had sleep, obviously.

8    This caused him to have a decreased mental capacity because

9    of the sleep depravation and, obviously, they weren't

10   bringing him room service under these situations, so he

11   hadn't had anything to eat.  It was obviously great

12   emotional stress.

13                      There was some questions in the

14   defendant's mind as to whether or not he was going to live

15   or die immediately prior to the time that he was taken into

16   questioning.  And that those things factored into the fact

17   that he was not able to adequately understand the Miranda

18   warnings and to give them their constitutional effect.

19                      Anticipating the prosecution's argument

20   about prior statements made in 1984, I just point out to the

21   Court that these were made under different circumstances,

22   that the questioning given when he had had an opportunity to

23   rest, not under this situation, the last time he was asked

24   that question by law enforcement he declined to give a

25   statement.

1    And I think that that argument cuts more in

2  support of my Motion to Suppress than against it, because

3  well rested and in his right mind the last time he had been

4  asked to give a written statement, he declined to do so.

5    And I would ask the Court to suppress his

6  confession in this case based on the evidence and the law.

7    MR. SHOOK:  Judge, we feel the statement

8  is given voluntarily and he was fully apprized of his

9  Miranda rights and understood them.  Detective Johnson

10  testified that he was alert throughout the interview.  He

11  understood the rights and waived them.

12    Comparing his testimony versus the

13  defendant's, I think the defendant obviously has a long

14  arrest history.  You know in 1984 he was given his Miranda

15  rights on one occasion and he said he understood them and he

16  gave a voluntary statement.  On another occasion when he was

17  arrested for sexual assault, he understood the rights and

18  declined to give a statement.  He clearly knows what his

19  Miranda rights are.

20    On this particular case on this

21  particular day, he later gave an oral statement to prison

22  officials.  And you recall when I first asked him questions,

23  he said that he was just as fatigued as he was with

24  Detective Johnson and didn't understand his Miranda rights

25  at this time, but then clearly after the tape is played,

1  he's clearly not fatigued at all.  He's wide awake and

2  understands what is going on.  And at one point in the tape,

3  he even turns down talking to a lawyer so he can continue

4  talking to these detectives.

5              Clearly he knows what's going on.  He

6  says that he was without a shirt and shivering.  I don't

7  know about you, Judge, but when I'm cold and shivering, the

8  last thing that comes to me is sleep.  So I think that goes

9  to more of the fact that he was awake.

10             He was in a standoff situation, a lot of

11 adrenalin flowing.  I don't think that he's going to fall

12 asleep right after the confrontation he had with the police.

13 I think clearly the evidence as produced by the State shows

14 the statement was given freely and voluntarily.

15             THE COURT:  Mr. Murphy, I have obviously

16 had a lot of time to think about these issues as presented

17 here to the Court today.

18             The Court will make the following

19 observations and findings of facts, that the statement that

20 was recorded by Detective Johnson before Mr. Murphy

21 concluding at 4:21 -- started at 4:21 a.m. on the 24th day

22 of January, 2001, given your testimony and the testimony

23 that the Court has heard, that wasn't the standoff was 9

24 hour or 19 hours, this was very quickly after the individual

25 was in custody and really no delay in going to the interview

1   room, other than the procedural delays in transporting from

2   the arrest location to the secure jail facility.  But there

3   was no extensive delay.  It wasn't immediate, but it wasn't

4   -- it was processed in a timely manner.

5                    And, Mr. Murphy, your own testimony that

6   you had just come through a life or death situation, it

7   defies logic that your testimony would be that I was on an

8   adrenalin rush just an hour before and no longer able to

9   stay awake during this interview.

10                   In addition to that, the issue is did you

11  understand your warnings and were you capable of terminating

12  the interview.  The Court has to look at the totality of all

13  the evidence.  And looking at your previous history back --

14  I know it's 20 years ago, but 1984, you had an opportunity

15  to make one statement and you chose to do so and you had an

16  opportunity to make another statement and you chose not to

17  do so.

18                   Obviously you understood your rights then

19  and you understood your rights some eight hours after this

20  statement was begun when you chose to, on the audio tape,

21  when you chose to waive your rights and talk with the

22  investigators from TDCJ and, in fact, had an opportunity to

23  speak with a lawyer and chose to not avail yourself of that

24  opportunity, but continue with the interview.

25                   The Court finds that the defendant freely

1  and voluntarily made an informed decision to waive his

2  rights and to provide the statement and there was no threat,

3  no coercion, no promises made to the defendant in having him

4  make this statement.  The Court finds the statement will be

5  admissible before this jury.  That will conclude this

6  hearing.

7                    [End of Volume]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF TEXAS          *

2    COUNTY OF DALLAS         *

3        I, NANCY BREWER, Official Court Reporter for the 283rd

4    Judicial District Court, do hereby certify that the above

5    and foregoing constitutes a true and correct transcription

6    of all portions of evidence and other proceedings requested

7    in writing by counsel for the parties to be included in this

8    volume of the Reporter's Record, in the above-styled and

9    numbered cause, all of which occurred in open court or in

10   chambers and were reported by me.

11       WITNESS MY OFFICIAL HAND on this the ___4___ day of

12   _____March_____, 2004

13

14

15                        _Nancy Brewer_____
                          NANCY BREWER, CSR, NO. 5759
16                        Expiration Date:  12-31-04
                          Official Reporter, 283rd JDC
17                        Frank Crowley Crts. Bldg. LB33
                          133 No. Industrial Blvd.
18                        Dallas, TX 75207
                          (214)653-5863

19

20

21

22

23

24

25

REPORTER'S RECORD

**74851**

VOLUME 39 OF _6_ VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

**FILED IN**
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

HEARING ON JUROR QUALIFICATION

MARTY INGLE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 6th day of November, 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

1                    A P P E A R A N C E S

2    APPEARING FOR THE STATE

3    Mr. Toby Shook
     SBOT NO. 18293250
4    And
     Mr. Bill Wirskye
5    SBOT NO. 00788696
     And
6    Ms. Lisa Smith
     SBOT NO.
7    Assistant District Attorneys
     133 No. Industrial Blvd.
8    Dallas, Texas 75207
     Phone:  214/653-3600

9

10   APPEARING FOR THE DEFENDANT

11   Ms. Brook Busbee
     Attorney at Law
12   SBOT:  03488000
     703 McKinney Ave. Ste. 312
13   Dallas, TX 75202
     214/754-9090

14
     Mr. Juan Sanchez
15   Attorney at Law
     SBOT:  00791599
16   5630 Yale Blvd.
     Dallas, TX 75206
17   214/365-0700

18

19

20

21

22

23

24

25

WITNESS INDEX

| WITNESS | DIRECT | CROSS | VOL. |
|---------|--------|-------|------|
| Marty Ingle | 4 | 5 | 39 |

EXHIBIT INDEX

| EXHIBIT | IDENT. | OFFER | ADMIT | VOL. |
|---------|--------|-------|-------|------|
| Crt. 1 | Residence Info | 8 | 8 | 39 |

1                     P R O C E E D I N G S

2              THE COURT:  Ready for Mr. Ingle.

3                   (Prospective juror in)

4                   · THE COURT:  Good morning.  Please. have a

5     seat.  Let the record reflect we've got Marty Ingle, a juror

6     who has been seated on the trial of Patrick Henry Murphy,

7     Jr.  Mr. Ingle, I don't recall -- I can look up the date.

8     You were here a couple of months ago.  You were informed

9     that you had been selected to be on the jury.

10              We had a hearing last Friday, the 31st

11    day of October.  At that time we received a telephone call

12    from you that you were, in fact, unable to attend and, in

13    fact, moving.  It has been brought to the attention of the

14    Court that you may no longer be qualified to sit on this

15    case.  Mr. Shook, would you like to inquire?

16              MR. SHOOK:  Yes, sir.

17                        MARTY INGLE,

18    having been duly sworn, was examined and testified as

19    follows:

20                     DIRECT EXAMINATION

21    BY MR. SHOOK:

22         Q.    It's my understanding that you have, in fact,

23    moved to -- is it Rockwall County?

24         A.    Yes, sir.

25         Q.    And that's your residence as of when you moved

1    -- was it last week, week before last, the first -- 31st?

2         A.      It was something like that.

3         Q.      The 31st, yeah, of October.  So now you are no

4    longer a resident of Dallas County; is that right?

5         A.      That's correct, sir.

6         Q.      Okay.  And you anticipate you will be staying

7    there at least through the course of this trial, if not much

8    longer?

9         A.      Yes, sir.

10              MR. SHOOK:  That's all the questions that

11   I have.

12                      CROSS-EXAMINATION

13   BY MS. BUSBEE:

14        Q.      Mr. Ingle, did you provide your new address to

15   the Court so that they could verify that it was in Rockwall

16   County?  You don't have to tell it here in open court, but

17   did you do so?

18        A.      I don't know if did I or not.  I don't

19   recollect it.

20              THE COURT:  Do you have any documentation

21   showing a lease or closing statement or anything showing

22   that you have now moved to Rockwall County?

23              PROSPECTIVE JUROR:  Yes, sir.  Here's the

24   address and a settlement statement.

25              THE COURT:  We don't want to get too

1    personal.  I just need to verify.

2                         PROSPECTIVE JUROR:  Here's a survey plat,

3    if you need it.

4                         MR. SHOOK:  Judge, if we could --

5                         MS. BUSBEE:  Just for the record.

6                         MR. SHOOK:  Just for the record we will

7    make a copy of the first page.

8                         MS. BUSBEE:  Is that all right with you?

9                         PROSPECTIVE JUROR:  Sure.  If that's all

10   you need.  I have a survey plat, if you need it.

11        Q.    (By Ms. Busbee)  And that has Rockwall County

12   on it, doesn't it?

13        A.    Yes, ma'am.

14        Q.    We need to do everything right in this case to

15   make sure.

16                         THE COURT:  Mr. Ingle, sorry, but you

17   will be unable to serve on this jury.  I've heard a lot of

18   people trying to avoid jury service, but this is always a

19   first.  People move outside of Dallas County.  But when we

20   started in May, you never know where you are going to end

21   up.  We appreciate you are coming down.  I know it was an

22   inconvenience on your time.

23                         But, as Ms. Busbee said, we have to be

24   very careful.  We have to be sure our record is very clear

25   and very accurate.

1            Does the State have any objection to

2  excusing Mr. Ingle for lack of qualification?

3            MR. SHOOK:  No, sir.

4            THE COURT:  Defense?

5            MS. BUSBEE:  No, Your Honor.

6            THE COURT:  Mr. Ingle, you now are not

7  qualified to serve in this Court.  I shall be sure to inform

8  Judge Hall in Rockwall County that you are now a resident

9  and able to serve in his court.

10            PROSPECTIVE JUROR:  Did you say a

11  resident or arrested?

12            THE COURT:  A resident.

13            PROSPECTIVE JUROR:  After a while, I

14  might get arrested.

15            MS. BUSBEE:  Give this table a call when

16  you do.

17            THE COURT:  Off the record.

18              [Off the record]

19            THE COURT:  Back on the record.

20  Mr. Shook, would you mark that copy a Court's exhibit?  And

21  now, obviously, we're into our alternates.  Any objection to

22  seating Timothy Becher as juror No. 12?

23            MS. BUSBEE:  Your Honor, it's my

24  understanding that numerically and as far as the order that

25  we picked, he's the next juror; is that correct?

1      THE COURT:  That's correct.

2      MS. BUSBEE:  Then no objection.  I mean,

3  other than what has already been raised before the Court as

4  far as the selection process is concerned.  We agree that he

5  would be the next seated juror and since Mr. Ingle is not

6  qualified, it follows that he would be the twelfth juror.

7      THE COURT:  Mr. Wirskye, does the State

8  have any objection?

9      MR. SHOOK:  We have no objection.

10     THE COURT:  Now, the next issue is, are

11  we comfortable proceeding now with just one alternate juror?

12     MS. BUSBEE:  Works for me, particularly

13  considering who it is.

14     MR. SHOOK:  Yes.

15     THE COURT:  Otherwise, I will get on the

16  phone and round people up for tomorrow, if you want to talk

17  to some more folks.

18     MR. SHOOK:  No, I think we'll be fine.

19  And we've marked the residence information as Court's

20  Exhibit No. 1 and offer that for the record.

21     MS. BUSBEE:  No objection.

22     THE COURT:  Court's Exhibit 1 shall be

23  admitted for the record.  Anything else before we see each

24  other first thing early Monday morning?

25     MR. SHOOK:  Beginning at 8:30, Judge?

1          THE COURT:  Yes, sir.  Jury in the box at

2  8:30.

3          MS. BUSBEE:  I can't think of anything

4  that we would need to talk about before then.  If I do, I

5  will apprise you.

6              [End of Volume]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF TEXAS            *

2   COUNTY OF DALLAS          *

3        I, NANCY BREWER, Official Court Reporter for the 283rd

4   Judicial District Court, do hereby certify that the above

5   and foregoing constitutes a true and correct transcription

6   of all portions of evidence and other proceedings requested

7   in writing by counsel for the parties to be included in this

8   volume of the Reporter's Record, in the above-styled and

9   numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11       WITNESS MY OFFICIAL HAND on this the ____ day of

12  _____March____, 2003.4

13

14

15       _____Nancy Brewer_____
         NANCY BREWER, CSR, NO. 5759
16       Expiration Date:  12-31-04
         Official Reporter, 283rd JDC
17       Frank Crowley Crts. Bldg. LB33
         133 No. Industrial Blvd.
18       Dallas, TX 75207
         (214)653-5863
19

20

21

22

23

24

25

283RD JUDICIAL DISTRICT COURT 214/653-5863
NANCY BREWER, OFFICIAL COURT REPORTER

REPORTER'S RECORD

74851

VOLUME 40 OF 6| VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JURY TRIAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 10th day of November, 2003, morning session,
the following proceedings came on to be heard in the
above-entitled and numbered cause before the Honorable
Vickers L. Cunningham, Sr., Judge Presiding, held in Dallas,
Dallas County, Texas.

Proceedings reported by machine shorthand.

**ORIGINAL**

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT:  03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT:  00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

1

## WITNESS INDEX

2

| WITNESS | DIRECT | CROSS | VOL. |
|---------|--------|-------|------|
| Jayne Hawkins | 26,36 | 33 | 40 |
| Wes Ferris | 36,93 | 91 | 40 |
| Tim Cassout | 96 | 112 | 40 |
| Dennis Norton | 114 | 126 | 40 |
| Randall Johnson | 129 | | 40 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT INDEX

| EXHIBIT | IDENT. | OFFER | ADMIT | VOL. |
|---------|--------|-------|-------|------|
| ST.6 | PHOTO | 31 | 31 | 40 |
| ST.7 | PHOTO | 31 | 31 | 40 |
| ST.8 | PHOTO | 29 | 29 | 40 |
| ST.9 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.10 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.11 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.12 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.13 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.14 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.15 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.16 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.17 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.18 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.19 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.20 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.21 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.22 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.23 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.24 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.25 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.26 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.27 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.28 | PHOTO - OSHMANS | 43 | 43 | 40 |

| | | | | |
|---|---|---|---|---|
| ST.29 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.30 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.31 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.32 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.33 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.34 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.35 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.36 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.37 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.38 | PHOTO - OSHMANS | 43 | 43 | 40 |
| ST.39 | REVOLVER | 60 | 60 | 40 |
| ST.40 | RADIO | 60 | 60 | 40 |
| ST.41 | DEF.  LINEUP | 82 | 82 | 40 |
| ST.43 | DIAGRAM, OSHMANS | 37 | 37 | 40 |
| ST.44 | PHOTO | 51 | 51 | 40 |
| ST.45 | LINEUP | 83 | 83 | 40 |
| ST.46 | POSTER OF GUNS | 86 | 86 | 40 |
| ST.47 | POSTER OF GUNS | 86 | 86 | 40 |
| ST.48 | POSTER OF GUNS | 86 | 86 | 40 |
| ST.49 | PHOTO - EXPLORER | 44 | 44 | 40 |
| ST.50 | PHOTO - EXPLORER | 44 | 44 | 40 |
| ST.51 | PHOTO | 97 | 97 | 40 |
| ST.52 | PHOTO | 97 | 97 | 40 |
| ST.53 | PHOTO | 97 | 97 | 40 |
| ST.54 | PHOTO | 97 | 97 | 40 |

| | | | | |
|---|---|---|---|---|
| 1 | ST.55 | PHOTO | 97 | 97 | 40 |
| 2 | ST.56 | PHOTO | 97 | 97 | 40 |
| 3 | ST.57 | PHOTO | 97 | 97 | 40 |
| 4 | ST.58 | PHOTO | 97 | 97 | 40 |
| 5 | ST.59 | VHS TAPE | 121 | 121 | 40 |
| 6 | ST.61 | DISPATCH TAPE | 123 | 123 | 40 |
| 7 | ST.62 | GLOCK HANDGUN | 121 | 122 | 40 |
| 8 | ST.755 | POSTER OF MANAGERS | 38 | 38 | 40 |
| 9 | ST.756 | TRANSCRIPT | 123 | 123 | 40 |
| 10 | ST.757 | PHOTO-AUTOPSY | 124 | 124 (REC) | 40 |
| 11 | ST.978 | PRIOR ARREST VOLUNTARY STMT. | 148 | 148 | 40 |

1                    P R O C E E D I N G S

2                    THE COURT:  Prior to bringing in the jury

3    and swearing the jury, I have been tendered a motion from

4    the defense.  Ms. Busbee, would you like to argue your

5    motion on the record?

6                    MS. BUSBEE:  Your Honor, I think it

7    speaks for itself.  This morning and only this morning was

8    -- did the defense learn that over the weekend things have

9    been published in a local paper where the District Attorney

10   had violated the Court's gag order and in a rather blatant

11   fashion.

12                   I have asked in my motion for continuance

13   for a day in order to determine some of these matters that I

14   have put into the motion that is before the Court.  At this

15   point I don't know -- I don't have enough information to

16   know whether or not I should move to quash this panel or do

17   any other things that might guarantee my client a fair

18   trial.

19                   This Court and the appellate courts have

20   ruled in this case with this gag order that it's necessary

21   and vital and important to suppress our first amendment

22   rights to make statements about this case in order that a

23   fair trial might be held.

24                   And having made that prior ruling, I feel

25   that it's incumbent upon me to inquire into what happened,

1  what other statements may be out there ready to be

2  disseminated to the public and potentially to this jury, and

3  -- the necessity for the gag order was clear and upheld.

4  And when it's violated, I think that it's incumbent upon me

5  to inquire prior to the commencement of this case as to

6  whether or not constitutional violations have occurred and

7  as to whether or not this man can receive a fair trial and

8  to whether or not there should be sanctions.

9            And I don't know at this point without a

10  continuance whether I -- I'm going to have to move to quash

11  this panel based on this violation of the gag order without

12  having any further information.

13            THE COURT:  Ms. Busbee, this jury has

14  been instructed by myself no less than three times orally

15  and in writing at least twice, once of which I read to the

16  jury aloud on the record not to read any news coverage on

17  this matter.

18            So as far as quashing this panel at this

19  time, I will inquire if anyone has read anything in the

20  paper, violating the orders of the Court.  If no one

21  acknowledges they have done so, then I shall proceed.

22            As far as allowing you to present issues

23  on this motion, you may do so.  You may make a bill.  But

24  we're not going to delay this trial at this time, unless the

25  jury has violated my ruling.

1          MS. BUSBEE:  May I ask the Court to make

2    that inquiry, have you read anything in the newspaper,

3    instead of have you read anything in the newspaper in

4    violation of the Court order?

5          THE COURT:  Well, I probably would need

6    to narrow the question, have you read anything in the paper

7    since I instructed you not to do so?

8          MS. BUSBEE:  Furthermore, Your Honor, I

9    need -- I would like to have a hearing on this violation of

10   the gag order.

11         THE COURT:  You would be able to have a

12   hearing.

13         MS. BUSBEE:  Well, can the Court tell me

14   when that might be?

15         THE COURT:  Not while the jury is waiting

16   on us.

17         MS. BUSBEE:  Today perhaps?

18         THE COURT:  At the end of the day will be

19   fine.

20         MS. BUSBEE:  Would the Court issue some

21   subpoenas?

22         THE COURT:  All you have to do is prepare

23   them.

24         MS. BUSBEE:  I guess I will have to find

25   somebody on a break to do that for me.

1    Your Honor, at this time I'm going to ask

2  the Court officially to quash the panel.

3    THE COURT:  Motion denied.

4    MS. BUSBEE:  And I ask for the Court to

5  carry that motion through which -- and I assume this will be

6  on the record but outside the presence of the parties, this

7  inquiry into whether or not anything has been read and --

8  Your Honor, you nodded.  For the record you are giving me

9  permission to have that as a running request?

10    THE COURT:  Yes, ma'am.  Sheriff, we need

11  a jury.

12    [Off the record]

13    MS. BUSBEE:  I've just been apprised of

14  something else also contained in that motion, Your Honor, is

15  a second violation of the gag order.  The first -- State's

16  first witness will be a witness who has violated the gag

17  order.

18    And my client was sanctioned for

19  violation of the gag order and it had teeth in it at that

20  time.  And I'm asking the Court that this witness not be

21  allowed to testify because she has violated this Court's

22  order.

23    THE COURT:  Mr. Shook.

24    MR. SHOOK:  Judge, I don't think if Ms.

25  Hawkins did, in fact, violate a gag order, I don't think

1   that would prevent her being called as a witness in this

2   case. She's a fact witness. You have heard Ms. Hawkins'

3   testimony is short and brief, but obviously very essential.

4   And I don't think that in any way prevents her from being

5   called as a witness.

6           I was looking from Ms. Busbee's

7   attachment to see exactly -- where is it? I don't think

8   that would necessitate her being barred from testifying as a

9   witness. It looks like there's a quote from Mr. Murphy in

10   here, too. When it occurred, I don't know, but --

11           THE COURT: That's the problem. We've

12   been through this series of issues five times. So it's very

13   difficult to pull it out. Motion is denied. She may

14   testify.

15                    [Jury in]

16           THE COURT: Good morning, good morning.

17   If you would, before you are seated, I do have one question

18   for you. Has anyone read anything about this case since the

19   last time we had a hearing here on Halloween, October 31st?

20   Anything in the paper? I see everyone shaking their heads

21   no. Anybody yes? Very well.

22           If you would, please raise your right

23   hands. Now I need to swear each of you in as a juror in

24   this case.

25           [At this time the jury was sworn by

1                    the Court.]

2                    THE COURT:  Thank you.  You may be

3    seated.  Mr. Shook, is the State ready?

4                    MR. SHOOK:  State is ready.

5                    THE COURT:  Defense?

6                    MS. BUSBEE:  Subject to the previous

7    motion, we're ready, Your Honor.

8                    THE COURT:  Mr. Shook, would you like to

9    present your indictment?

10                   MR. SHOOK:  Folks, I would like to

11   reintroduce myself.  My name is Toby Shook and at this time

12   it's my duty to read to you the true bill of indictment in

13   this case which reads as follows.

14                   "True bill of indictment.  In the name and by

15   the authority of the State of Texas, the Grand Jury of

16   Dallas County, State of Texas, duly organized in the January

17   term A.D. 2001 of the 282nd Judicial District Court, Dallas

18   County, in said Court at said term do present that one

19   Patrick Henry Murphy, Jr., defendant, on or about the 24th

20   day of December A.D. 2000, in the County of Dallas and said

21   State, did unlawfully then and there knowingly and

22   intentionally cause the death of Aubrey Hawkins, an

23   individual, hereinafter called deceased by shooting the said

24   deceased with a firearm, a deadly weapon.  Said deceased was

25   a peace officer, namely City of Irving police officer, then

1  and there acting in the lawful discharge of an official duty

2  and said defendant then and there knew the said deceased to

3  be a peace officer.

4              "And further unlawfully then and there

5  intentionally caused the death of Aubrey Hawkins, an

6  individual, hereinafter called the deceased by shooting the

7  said deceased with a firearm, a deadly weapon, and the

8  defendant then and there was then and there in the course of

9  committing and attempting to commit the offense of robbery

10  of Wesley Ferris against the peace and dignity of the State,

11  Bill Hill, Criminal District Attorney of Dallas County,

12  Texas, and signed by the foreman of the Grand Jury."

13              THE COURT:  Mr. Sanchez, Ms. Busbee, how

14  does your client plead?

15              MR. SANCHEZ:  Not guilty, Your Honor.

16              THE COURT:  Opening remarks?

17              MR. SHOOK:  Yes, Your Honor.  May it

18  please the Court.

19              THE COURT:  Mr. Shook.

20              MR. SHOOK:  Members of the jury, on

21  Christmas Eve of 2000 there was a nine-year-old boy named

22  Andrew Hawkins who came to Irving, Texas, to the Olive

23  Garden Restaurant to have dinner with his father.  His

24  step-mother had to bring him to that restaurant because his

25  father was an Irving police officer named Aubrey Hawkins who

1   was on duty that evening.

2              He arrived there with the rest of his

3   family, had dinner with his father, and approximately 6:25

4   p.m. he said goodbye to him in that parking lot and watched

5   him drive away.  It's the last time Andrew Hawkins would see

6   his father alive.

7              Within ten minutes Aubrey Hawkins would

8   be lying behind an Oshman's Sporting Goods Store bleeding

9   from 11 gunshot wounds, shot during a robbery, a robbery

10  conducted by these seven men, this defendant, Patrick

11  Murphy, and his accomplices.

12             The evidence will show that he is

13  responsible under the facts and law for this crime.

14  We will prove to you over the course of the next several

15  days Mr. Murphy's guilt.  We will do so by bringing you

16  several witnesses from the Oshman's who can detail to you

17  how that crime occurred, the roles of the many people

18  involved.

19             We will do so by presenting physical

20  evidence to you which ties the defendant to this crime.  We

21  will do so by producing scientific evidence which will show

22  five different weapons were used in the murder of Officer

23  Hawkins.  And we will do so by the actual words of Patrick

24  Murphy by presenting his voluntary confession, a nine-page

25  confession, in which he details his role and his intentions

1  in this crime.

2              You will recall from jury selection that

3  we talked to you in great detail, each and every one of you,

4  about capital murder, how the law is applied, what the

5  procedures were.  That someone could be prosecuted for

6  capital murder if they were the actual triggerman and also

7  if they were an accomplice.  Each of you agreed with that

8  law.

9              We talked to you and explained how the

10  law works as far as accomplices and we told each and every

11  one of you that that was the theory of law that we were

12  prosecuting the defendant under.

13              As you recall we said that if someone is

14  actively participating in the crime, if they aid, direct,

15  attempt to aid a person committing the crime, then they can

16  be held responsible.  That's one theory.

17              The other theory is the law of

18  conspiracy.  If two or more people enter into a conspiracy,

19  an agreement, to commit one crime and during the course of

20  committing that crime, one of those conspirators commits

21  another crime to further it, all persons part of that

22  conspiracy can be held accountable, even if they didn't have

23  the intent to commit murder in this case, if the facts show

24  they should have anticipated that crime could occur.

25              Over the next several days we will

1    present facts to show beyond all doubt that Patrick Murphy

2    anticipated violence would occur out there.  And as this

3    evidence unfolds to you, it will be very apparent to you why

4    we have the law of parties, why the law allows us to

5    prosecute accomplices in a capital murder situation.  The

6    facts will show that this is a textbook example --

7                    MR. SANCHEZ:  Your Honor, I object at

8    this time, exceeding the scope of opening arguments.

9                    THE COURT:  Overruled.

10                   MR. SHOOK:  A textbook example of why

11   this law is prosecuted under the law of parties.  The facts

12   will show that on December 13th, eleven days before this

13   crime, Patrick Murphy, along with George Rivas, Michael

14   Rodriguez, Donald Newbury, Joseph Garcia, Randy Halprin, and

15   Larry Harper escaped from the Connally Unit, a prison unit

16   located about 60 miles southeast of San Antonio.

17                   When they made their escape they made off

18   with some weapons, a .12 gauge pump shotgun, an AR-15

19   assault rifle, and fourteen .357 revolvers, along with

20   ammunition.  These are the weapons that were later used to

21   murder Aubrey Hawkins.

22                   The evidence will show that they arrived

23   in this area.  Their goal and their intent was to look for a

24   sporting goods store so they could increase their armory.

25   They wanted a wide range of weaponry.  They finally settled

1    on the Oshman's Sporting Goods Store located in Irving,

2    Texas, just off Highway 183.

3                    The evidence will show that they didn't

4    pick this store on a whim, or they didn't drive by and

5    decide on this crime on the spur of the moment, but it was

6    carefully planned out over several days, that they looked at

7    that store and planned for every possible scenario which

8    might occur.

9                    The evidence will show that they actually

10   went to the store and cased it.  They got the layout of the

11   store.  The evidence will show that they went and got a

12   number of -- a count of how many employees they anticipated

13   would be there.

14                   They obtained radios, two-way radios, so

15   they all could communicate with each other during this

16   crime.  The evidence will show they even obtained a police

17   scanner and that Patrick Murphy himself programed that

18   scanner so that he would have every Irving police agency

19   frequency on there and could monitor the police activities.

20                   They obtained civilian clothes.  They

21   even went as far as to obtain clothes that looked like

22   security guards with a badge and a hat.  They had code names

23   that they would use over the radio.

24                   The evidence will show the planning is so

25   detailed that it would resemble a military operation, an

1  all-out assault on that store before it's all over, each one

2  acting with a specific role.  The evidence will show that

3  this crime could not be pulled off, could not be completed

4  without the complete cooperation of all seven men, acting as

5  a team, each with a specific role.  They went over their

6  roles and they prepared their weapons.

7              The plan called for at closing time on

8  Christmas Eve, 6:00 p.m., for them to take down 17

9  employees.  The first people in the store would be Randy

10  Halprin and Michael Rodriguez, posing as Christmas shoppers,

11  would go in before closing time to gather up clothing.

12  Several minutes later the plan called for Donald Newbury and

13  Joseph Garcia to go in and go to other parts of the store,

14  posing as shoppers.  All would be armed with .357

15  revolvers.  All would have two-way radios on them so they

16  could communicate, some with earphones.

17              Shortly before the store closed, George

18  Rivas and Larry Harper would then enter the store dressed as

19  security guards.  They had even taken the time to prepare a

20  fake photo lineup.  The story they would use on the managers

21  would be that they were looking at a grab-and-run gang and

22  needed to interview employees about possibly identifying

23  suspects or people that had been in that store.  They would

24  gather all the employees up.  Once they had them in one

25  place, pull their guns, search them, tie them up, take them

1   to another room, and then take the property they wanted from

2   the Oshman's.

3               The man with one of the most important

4   roles would be Patrick Murphy.  In fact, his code name would

5   be Angel for guardian angel.  And in his own words he was

6   the lookout and the backup.  He would wait outside the

7   store, monitor the radio activity, and communicate directly

8   with George Rivas and the others to let them know if any

9   police officers were arriving.  He would be armed with four

10  weapons, two .357 revolvers, a 12-gauge shotgun, and the

11  AR-15 assault rifle.

12              The evidence will show that they weighed

13  the pros and cons and Mr. Murphy himself was worried about

14  the amount of employees involved in this type of robbery and

15  the quick response team from the Irving Police Department,

16  which clearly shows his intention and his anticipation as to

17  the possible violence that could occur in a crime such as

18  this.

19              They arrived at the store about 20

20  minutes before closing, about the same time Officer Hawkins

21  was arriving at the Olive Garden Restaurant less than a mile

22  away on the other side of Highway 183.  He was meeting his

23  nine-year-old boy there, Andrew Hawkins, along with his

24  wife, Lori.  His mother was also joining them there with her

25  92-year-old mother, Aubrey Hawkins' grandmother.

1          They had Christmas dinner.  He was on

2   duty.  He was in uniform.  The evidence will show about 6:25

3   p.m. as he left that store, left that restaurant, he was

4   then summoned to the Oshman's.

5          Shortly before 6:00 Mr. Murphy and his

6   accomplices began to execute their plan.  And as planned,

7   Mr. Halprin and Mr. Rodriguez went into the store and began

8   gathering up items.  Soon after that, Mr. Newbury went to

9   the gun section and Mr. Garcia to the shoe section.

10          Right before closing, Mr. Rivas and

11   Mr. Harper go in and approach one of the managers.  You will

12   hear from one of those managers, Wes Ferris.  Wes Ferris

13   talked with George Rivas.  You will learn that George Rivas

14   is very smooth in his lies and his belief.  Told him that he

15   was there to investigate possible grab-and-run thieves and

16   wanted to know if the employees would look at some photo

17   lineups.

18          He was so smooth, in fact, that Wes

19   Ferris took him to the video room to show him how the

20   videotapes were made.  And once the store was locked up, Wes

21   Ferris made an announcement for all shoppers to come

22   forward, that the store was now closed.

23          At that point in time, all the employees

24   were gathered at the front.  The shoppers, all accomplices

25   in this crime had gathered up with the employees.

1  At that time George Rivas then pulled out

2  his .357, held it in the air and told all of the employees

3  that this was a robbery.  He told no one to resist.  Told

4  Wes Ferris not to move, that if he had to shoot one of them,

5  he was going to kill all of them.

6  The other accomplices at that time inside

7  the store pulled their weapons on the employees and they

8  were told to move forward to the counter to be searched.

9  George Rivas told them that he had someone outside watching.

10  And during the course of that robbery they heard him

11  communicate over the radio.  That man is Patrick Murphy who

12  informed him that the traffic was fine, that the police were

13  tied up at a wreck on Highway 183.

14  The employees were searched at the front

15  at that time and they were asked this question.  Is there

16  anyone out there that is here to pick you up?  And you will

17  hear from a man named Michael Simpson who told them yes.

18  His fiance, Misty Wright, was outside.

19  Misty Wright was sitting outside in the

20  car and she was nine months pregnant.  She was out against

21  doctor's orders.  And she looked into that store at that

22  time and saw the employees being searched and she knew

23  something was wrong.  But because of her medical condition,

24  she didn't trust her instincts.

25  Instead of calling the police at that

1   time, she drove over to the K-Mart and called her best

2   friend to ask her to come join her in front of the store,

3   which she did.

4              About that same time the employees were

5   rounded up and taken in one long line and placed back in the

6   employee's breakroom where they were searched and tied up.

7   Their property was taken.  And they were taunted and their

8   lives were threatened.

9              Wes Ferris left that breakroom in the

10  company of George Rivas.  He was taken to the front.  He

11  emptied out the cash registers for Mr. Rivas.  He was then

12  taken to the back office where he opened the safe for

13  Mr. Rivas.  Mr. Rivas removed $73,000 worth of cash, three

14  days' worth of store receipts.

15             He took the videotape tape from the

16  videotape monitors.  He took Wes Ferris' keys and told him

17  he was going to use his car, which was a white Ford Explorer

18  parked directly in front of that Oshman's.

19             He then was taken to the side of the

20  store near the gun section and went to the back to unlock

21  the gun safe where the handguns were kept.  After doing that

22  George Rivas had him go to the gun section and hand an

23  accomplice, Mr. Newbury, the keys to unlock the long guns,

24  the rifles and shotguns.

25             And he was then taken to the back of the

1   breakroom.  The entire time Mr. Rivas is in communication

2   with Mr. Murphy over his radio.  Once Mr. Ferris is placed

3   in that back room, he is kicked in the back of the legs,

4   forced down to the ground, and searched.  He can hear Mr.

5   Rivas communicating over his radio.  Mr. Rivas leaves, takes

6   his keys, goes out to the front.

7               Patrick Murphy has informed him that

8   there are people out front waiting on employees.  He goes to

9   one car and tells them they are conducting interviews about

10  shoplifters.  He then proceeds to go to Misty Wright's car,

11  whose friend has arrived at that time.  She becomes

12  frightened and drives off.  At that point in time she gets

13  on the phone and the operator -- is calling the 911

14  operator.

15              They watch George Rivas get into

16  Mr. Ferris' car and drive around to the back.  They report

17  to the operator that they see suspicious activity and this

18  is the call that Aubrey Hawkins is summoned to at the

19  Oshman's.

20              The evidence will show that Mr. Rivas

21  drives to the back of that Oshman's near the loading dock

22  and asks his men to come around, come to the back, gather up

23  the guns and the money and the other equipment.  Patrick

24  Murphy stays out front.  He's still monitoring the activity.

25  And he sees Aubrey Hawkins as he arrives at that store,

1   watches him cruise in front of the store and he immediately

2   notifies George Rivas that a police officer is there.

3                    At that point in time he stays on the

4   radio with Mr. Rivas and monitors his activities.  He

5   watches Aubrey Hawkins cruise to the front, pick up speed,

6   and go to the back of that Oshman's.  And then Patrick

7   Murphy does his job.  He sets up an ambush.  He tells them

8   Aubrey Hawkins is coming.  George Rivas tells his men, we

9   have company, come out back.  And they are waiting for

10  Aubrey Hawkins.

11                   The evidence will show that Aubrey

12  Hawkins drives to the back of that Oshman's and pulls behind

13  that Ford Explorer and he drives right into an ambush, an

14  ambush that was set up by this man.

15                   The witnesses will tell you that the

16  gunfire is rapid when it begins and it's continuous.  Over

17  20 shots are fired.  Officer Hawkins' car is hit from

18  various angles.  There are bullet holes on the hood of the

19  car from the driver's side, there are four bullet holes

20  coming from the passenger side of the front windshield, and

21  also the front windshield on the driver's side.

22                   The evidence will show that the driver's

23  window was shot out and struck by bullets.  The computer

24  inside the car is hit by bullets.  The Ford Explorer is hit

25  by two or three bullets into the door.  The trailers in the

21

1   back of the store are struck by bullets.  Over 20 shots will

2   be fired by five different weapons, all .357 revolvers.

3                        Officer Hawkins's body will be penetrated

4   by bullets 11 times.  You will know from the evidence that

5   he saw his attackers because he got his arm up in a

6   defensive posture and was struck three times.  He was shot

7   in the head six times.  His left eye is shot out.  He's shot

8   in the cheek and in the ear and in the throat.  He's shot in

9   the back of the shoulder and in the back a bullet which

10   penetrates his heart and was fired at extremely close range.

11                        After he is shot, his body is drug from

12   his squad car and thrown to the ground.  The vehicle goes

13   forward at some point in time and hits the back of that Ford

14   Explorer.  One of the accomplices gets in and removes his

15   squad car, wrecks into the back of one of the trailers in

16   the back.  The Ford Explorer then moves back, drives over

17   Officer Hawkins' body and drags it ten feet before it then

18   moves forward off his body.

19                        In the shooting frenzy George Rivas

20   himself is wounded twice through the fleshy part of his

21   stomach and thigh, flesh wound, and Randy Halprin is shot in

22   the foot.  They even shoot out the Ford Explorer window.

23   And they leave the back in a calm, cool manner.

24                        The evidence will show that they

25   continued to work as a team.  In fact, by the time Officer

22

1  Hawkins drove behind that Ford Explorer and he is shot and

2  murdered and his car is removed and they are leaving the

3  back of that parking lot, 47 seconds elapsed, just 44

4  seconds.

5            Patrick Murphy is out front.  They

6  communicate with him and say that -- George Rivas tells him

7  he's been hurt and he's told to meet at a rendezvous point.

8  The rendezvous point is an apartment complex directly behind

9  the Oshman's.

10           He secures his weapons, so they can't be

11  seen and then drives to that rendezvous point.  When he gets

12  there, the men are outside the car.  He's in a Suburban,

13  driving the Suburban, and he gets out.  Then Patrick Murphy

14  gets behind the driver's seat of the Suburban and gets out

15  the AR-15 assault rifle.

16           And he tells you clearly what his

17  intentions are then.  He says, my purpose was if pursued by

18  the police, I was to initiate a firefight with the AR-15,

19  clearly demonstrating his intentions and his anticipation of

20  violence out there that evening.

21           The items are loaded into the back of

22  that Suburban and they take off.  They make off with 44

23  guns, ten handguns, seven shotguns, and three rifles, lots

24  of ammunition.  They leave behind one of their weapons which

25  is traced back to the prison breakout.  They leave behind a

1   walkie-talkie.  They even take Officer Hawkins'

2   semiautomatic handgun.  And they leave behind Aubrey Hawkins

3   bleeding to death in the back of that parking lot.

4                        The police are summoned immediately.

5   They arrive shortly after and there's nothing they can do

6   for Aubrey Hawkins.

7                        The evidence will show that Mr. Murphy

8   and his accomplices then flee the state.  They go to

9   Colorado.  They wind up in a small town called Woodland

10  Park, which is located near Colorado Springs.  They reside

11  in an RV park in an RV.  The cover story is they are

12  Christian missionaries, traveling across the country.

13                       The evidence will show that eventually

14  someone in that RV park recognizes one or two of them.  And

15  they go to the Teller County Sheriff's Office and talk with

16  Sheriff Fehn and his deputies.  Other law enforcement is

17  called in.

18                       On January 22nd they set up surveillance

19  around that RV camp.  In the early morning hours around,

20  actually 10:00 a.m., George Rivas, along with Joseph Garcia

21  and Michael Rodriguez leave that RV park.  As they stop at a

22  convenience store, they are surrounded by a SWAT Team and

23  arrested.  They have 13 weapons in their possession,

24  including Officer Hawkins' handgun.

25                       They are taken into custody.  Sheriff

1  Fehn then moves into the RV park and surrounds the RV.

2  After forty-five minutes Randy Halprin surrenders.  Larry

3  Harper is also inside the RV.  He refuses to come out and

4  eventually takes his own life.

5                    A search of the RV will show many weapons

6  taken from the Oshman's as well as other property.  This is

7  the same RV that witnesses often spotted Patrick Murphy in.

8  Patrick Murphy and Donald Newbury are not at that RV park

9  and are still on the loose.  The police are searching for a

10 van and believe they are in the area.

11                   The evidence will show the next day that

12 that van, in fact, is found in Colorado Springs.  And that

13 evening they are located in a Holiday Inn where there is a

14 standoff.

15                   Eventually at 3:30 in the morning they

16 surrender to police.  A search of the hotel room they were

17 in will reveal ten guns, all taken from that Oshman's

18 robbery.

19                   After his surrender Patrick Murphy gives

20 a nine-page confession to Detective Randall Johnson

21 detailing his role in this offense, how they planned it, and

22 what his intentions were.

23                   The scientific evidence will show that

24 the .357 revolvers were found inside the RV disassembled.

25 They were reassembled and tested by a firearms expert here.

1   You will hear from that expert, Lannie Emanuel.  And he will

2   tell you that five different revolvers were used in that

3   shooting behind the Oshman's.

4                    At the close of the evidence, the

5   evidence will be clear that Patrick Murphy is guilty of

6   capital murder.

7                    MR. SANCHEZ:  We have reserved our

8   opening statement.

9                    THE COURT:  Defense reserves.

10                   MR. SHOOK:  Would you like me at this

11  time to bring in all available witnesses?

12                   THE COURT:  Bring in all available

13  witnesses, so I can swear them.

14                        [At this time all witnesses

15                         available were sworn by the Court.]

16                   THE COURT:  Will the Rule of evidence be

17  invoked?

18                   MS. BUSBEE:  We will invoke the Rule,

19  Your Honor.

20                   THE COURT:  You understand the Rule is

21  you may not discuss your testimony with anyone other than

22  the attorneys who are trying this case.  If you need to

23  discuss your testimony, be sure and do so in a room where no

24  one else can hear you.  Any questions?  No questions.  Who

25  will the State call first?

1      MR. SHOOK:  We'll call Jayne Hawkins.

2                    JAYNE HAWKINS,

3  having been duly sworn, was examined and testified as

4  follows:

5                 DIRECT EXAMINATION

6  BY MR. SHOOK:

7      Q.    Would you tell us your name, please.

8      A.    Jayne Hawkins.

9      Q.    Ms. Hawkins, are you the mother of Aubrey

10  Hawkins?

11      A.    Yes.

12      Q.    Is Aubrey Hawkins or was Aubrey Hawkins your

13  only child?

14      A.    Yes.

15      Q.    Could you tell the jury how old Aubrey Hawkins

16  was at the time of his murder?

17      A.    Twenty-nine.

18      Q.    Was he born and raised here in Dallas?

19      A.    Yes.

20      Q.    And did he have a family?

21      A.    Sorry.  Yes.  His -- Andrew is almost 12 now.

22  He was nine at the time.

23      Q.    That was his son?

24      A.    Yes.

25      Q.    Okay.  And was he married at the time?

1   A.   Yes.

2   Q.   And his wife's name is Lori Hawkins?

3   A.   Lori, uh-huh.

4   Q.   Did his son Andrew live with him?

5   A.   No.  Andrew lived with his mom one street

6   over.  Aubrey moved about a block away from Andrew.

7   Q.   Okay.  And how was your son employed?

8   A.   Aubrey was a police officer with the Irving

9   Police Department.

10   Q.   Do you recall how long he had had that job?

11   A.   No, I don't know, fourteen months, something.

12   Q.   Had he worked with other police agencies prior

13   to that?

14   A.   Yes.

15   Q.   Which agencies were those?

16   A.   He was with Kaufman.  He was with Harris

17   Medical.  He was with Saint Paul.

18   Q.   Okay.  And did your son enjoy being a police

19   officer?

20   A.   Oh, yes, yes.  He achieved his dream.  That's

21   what he always wanted to do was be with a big police

22   department.

23   Q.   Okay.  Let me turn your attention to Christmas

24   Eve of 2000 and ask if you had plans with your son that

25   evening?

1        A.     I'm sorry.  I don't know.  I'm so tired of

2   this.

3                 MS. BUSBEE:  Can we have a break?

4        A.     Okay.  I'm ready now.  Please go ahead.

5        Q.     (By Mr. Shook)  Had you made some plans with

6   your son?

7        A.     Yes.  My mom had called, Aubrey's grandmother,

8   and said that she was coming in for Christmas.  So I told

9   Aubrey and we had never had dinner when he was on duty

10  before.  So -- but he said he wanted to have Christmas Eve

11  dinner, so it was really a treat for us.  And so we made

12  plans to meet at a restaurant on 183.

13       Q.     Which restaurant was that?

14       A.     Lori chose the Olive Garden.

15       Q.     And what time did you arrive there at the

16  restaurant?

17       A.     I picked my mom up at the airport.  The plane

18  was late and I guess we got there maybe about ten to 6:00,

19  something like that.  We were late because of the plane.

20       Q.     How old was your mother at that time?

21       A.     Ninety-two.

22       Q.     And then, so you met your son there, Aubrey,

23  along with his wife?

24       A.     Yes.  We walked in and Andrew was sitting next

25  to his dad and then Lori was there.  She picked Andrew up

1    from his mom's house.

2         Q.    Was your son on duty at that time?

3         A.    Yes.

4         Q.    Was he in his police uniform?

5         A.    Yes.

6         Q.    Okay.  And did the dinner go well?

7         A.    Oh, yes.  We just had normal kinds of

8    conversation, you know, and he looked particularly handsome

9    that night.  I told him and it embarrassed him.  It was only

10   the second time that I had seen him in his uniform.  The

11   only other time was when he graduated from the academy.

12        Q.    Was his state of mind well at that time?

13        A.    His state of mind was wonderful.  He was there

14   with Lori and Andrew and he had just had his checkup and he

15   said that his triglycerides were down and he --

16              MR. SANCHEZ:  I have to object to

17   nonresponsive.

18        A.    Was healthy and felt good.

19              THE COURT:  Sustained.  Wait for the next

20   question.

21        Q.    (By Mr. Shook)  Around 6:25 or 6:20, did your

22   son have to leave?

23        A.    The radio started going off and I couldn't

24   hear it, but he would look down and listen, I guess, and

25   click it off and then it probably rang about three times.

1  And he looked across the table at me and he said, "Mom, I

2  have to go."

3                    And so, you know, I got the waitress over

4  and paid the check and we all walked to the parking lot.

5      Q.    Okay.  And once you went to the parking lot,

6  did he eventually go to his car?

7      A.    I'm sorry?

8      Q.    Did he make it to -- did you see him get in

9  his patrol car?

10     A.    Yes.  First he scooped up Andrew and then said

11  goodbye to Lori and put them in the car and they went away.

12  And then he said bye to my mom and he said, "I'll see you in

13  the morning, Mom, I love you."  And I said, "I love you.

14  See you in the morning."  And those were his last words.

15                    And then I got -- and then he put me in

16  the car and he motioned like this for me to follow him

17  because he didn't think I knew Irving very well, which I

18  didn't, quite frankly.  So he got in his car and turned

19  right on 183 and then we stopped at Esters and then we

20  turned left and went over the overpass and then I followed

21  behind him on the service road and then I sped up to get

22  onto the freeway.  So for a moment or two we were side by

23  side and we just (demonstrating), you know, waved like that.

24     Q.    All right.

25                    MR. SHOOK:  May I approach the witness,

1   Your Honor?

2   　　　　　　　　THE COURT:  You may.

3   　　　Q.　　(By Mr. Shook)  I want to show you a

4   photograph that's been marked State Exhibit 8.  Does that

5   show the Olive Garden Restaurant and the highway you last

6   saw your son driving that day?

7   　　　A.　　Yes.

8   　　　　　　　　MR. SHOOK:  We'll offer State Exhibit 8

9   at this time.

10   　　　　　　　　MR. SANCHEZ:  No objection, Your Honor.

11   　　　　　　　　THE COURT:  State's 8 shall be admitted.

12   　　　Q.　　(By Mr. Shook)  Ms. Hawkins, I want to turn

13   your attention so the jury can see on the monitor, the Olive

14   Garden is located actually in this area; is that right?

15   　　　A.　　Yes.

16   　　　Q.　　And this is Highway 183?

17   　　　A.　　Uh-huh.

18   　　　Q.　　And this would be the Oshman's store here on

19   the other side of the highway.  Now, later that evening did

20   you return with your grandmother to your home here in

21   Dallas?

22   　　　A.　　Yes.  Well, first we went to Eatsies.  Andrew

23   wanted cream brulee for dessert and Aubrey wanted chocolate

24   eclair, so that's where I went to buy it for Christmas

25   dinner.  And then mother and I went home and put on our

1   gowns.  And we decided to open our gifts to one another

2   because I had so many presents to take to Aubrey and Lori's.

3                        And so we opened our gifts and then I put

4   the presents from under the tree in shopping bags and put

5   them in front of the door, actually, and so they would be

6   ready to go in the morning because I wanted to get up and

7   get out and get over there as early as I could.  So --

8        Q.     Did sometime after that, did, in fact, Chief

9   Cannaday from the Irving Police Department come to your

10  home?

11       A.     Yeah.  I live in a high-rise building and the

12  doorman called upstairs and said there is somebody down here

13  flashing a badge and some woman named Rose.  And I said, oh,

14  FC, don't let people up here like that.  I hadn't connected

15  it at all.

16       Q.     Did they come?

17       A.     So then they rang -- they must have already

18  been on the elevator because the doorbell rang almost before

19  I could hang up the telephone.  And I leaned over those

20  packages and looked through the peephole and I saw a

21  chaplain and a uniformed officer and Chief Cannaday who I

22  had met once at Aubrey's graduation and Rose, who turned out

23  to be Chief Cannaday's wife, a woman, you know.

24       Q.     And at that time they informed you --

25       A.     No.  I said -- through the door I said, has

1  something happened to Aubrey?  And actually they yelled as I

2  remember and said, well, if you will open the door, we'll

3  tell you.  And then they walked in and I don't know what

4  they said.  I just knew he was gone.

5          Q.    I want to show you what has been marked State

6  Exhibit 6.  Is this your son, how he appeared in his

7  uniform?

8          A.    Yes.

9          Q.    And also State Exhibit 7, is this a photograph

10 of your son with his son, Andrew?

11         A.    Yes, that's Aubrey and Andrew.

12                MR. SHOOK:  Your Honor, at this time we

13 offer State Exhibit 6 and 7.

14                MR. SANCHEZ:  No objection, Your Honor.

15                THE COURT:  State's 6 and 7 shall be

16 admitted.

17                MR. SHOOK:  Pass the witness.

18                CROSS-EXAMINATION

19 BY MR. SANCHEZ:

20         Q.    Ms. Hawkins, I'm going to ask you a few

21 questions.  If you don't understand something, just let me

22 know, okay?

23         A.    Okay.

24         Q.    And I'll phrase it the right way.  Just let me

25 know, okay?

1    A.    Okay.

2    Q.    When you were at the Olive Garden, was Aubrey

3 receiving lots of calls or you indicated that he had been

4 looking down at his --

5    A.    They were annoying, I will say that.  So there

6 were enough of them to be very distracting for him.  I would

7 say maybe four, three or four.  I can't say truthfully.  I

8 don't know.

9    Q.    Were those on his radio that he was carrying

10 with him?

11    A.    Yes.

12    Q.    And would he answer them or would he just look

13 down?

14    A.    No, it seemed he would just look down and then

15 like listen a bit and then click it.

16    Q.    And that was happening throughout the dinner?

17    A.    No, not throughout, no, just toward the very

18 end when we were about to finish.

19    Q.    When those calls started, how long had you

20 been at the Olive Garden?

21    A.    I don't know.  I mean, gosh, we got there at

22 ten to 6:00 and left at 6:30 or so.

23    Q.    So it wasn't very long?

24    A.    It wasn't very long.

25    Q.    When he received the last call, did he seem in

1    a hurry to get out of there or sounds to me like you took

2    your time to get out --

3         A.    No, we didn't really take our time.  It wasn't

4    as though we was in a hurry, but we didn't take our time,

5    either.  I have no idea if it was that call that came.  I

6    don't know.

7         Q.    Do you know if some of those calls were to

8    just check up on him to get him back on duty or you have no

9    idea.

10        A.    I don't -- I haven't the vaguest idea.  He

11   just simply said to me, "Mom, I've got to go."  I mean, it

12   got to the point where he had to, I guess, go to work.

13        Q.    But it wasn't the type of situation where he

14   had to jump up and let you pay and leave you behind,

15   correct?

16        A.    Well, it was we needed to go, but it wasn't --

17   he wasn't -- Aubrey was never going to alarm me, ever,

18   because I always worried about his safety.  So he was not

19   going to do that.

20        Q.    So he got this call and he was able to help

21   you to your car?

22        A.    Well, yes, yes, I mean.

23        Q.    And you didn't run over there, at least you

24   walked over there, correct?

25        A.    Well, yes, uh-huh.

1      MR. SANCHEZ:  That's all I have, Your

2  Honor, I pass the witness.

3                REDIRECT EXAMINATION

4  BY MR. SHOOK:

5      Q.    Ms. Hawkins, you don't know if he was being

6  called to the Oshman's at that point in time or not, do you?

7      A.    No, I don't.

8          MR. SHOOK:  That's all we have, Judge.

9          THE COURT:  Thank you, ma'am.

10         MR. SHOOK:  May this witness be excused?

11         MS. BUSBEE:  Your Honor, subject to our

12  previous objections to which the Court is aware, we would

13  like to hold that decision off for a moment.

14         THE COURT:  Not at this time.

15         MR. SHOOK:  We'll call Wes Ferris.

16         THE COURT:  Let the record reflect this

17  witness has been sworn.

18              WES FERRIS,

19  having been duly sworn, was examined and testified as

20  follows:

21               DIRECT EXAMINATION

22  BY MR. SHOOK:

23      Q.    Tell us your name and spell your last name for

24  the Court Reporter, please.

25      A.    Wesley Ferris, F-E-R-R-I-S.

 1          Q.      And how are you employed, sir?

 2          A.      Currently employed with Dotson Grand Rental

 3   Station in Burleson, Texas.

 4          Q.      Do you have a family?

 5          A.      Yes, I do, wife, six children, and three

 6   grandchildren.

 7          Q.      Now, prior to your current job, where were you

 8   working?

 9          A.      Oshman's Sporting Goods in Irving, Texas.

10          Q.      And prior to working -- how long had you

11   worked at Oshman's?

12          A.      Just over six years.

13          Q.      Prior to that working for Oshman's, how were

14   you employed?

15          A.      I was in the United States Marine Corps for 20

16   years.

17          Q.      What was your rank there?

18          A.      I retired as a gunnery sergeant.

19          Q.      Let me turn your attention back to December

20   24th of 2000.  At that time you were employed with Oshman's;

21   is that right?

22          A.      Yes, sir, I was.

23          Q.      And what did you do with Oshman's?

24          A.      I was the department manager for the field and

25   stream department at the Oshman's Super Sports store in

```
1    Irving, Texas.

2         Q.    Let me show you, if you direct your attention

3    to the monitor, you see Highway 183 up here on the monitor?

4    Can we see that the Oshman's Superstore is located up here

5    in the top left-hand corner?

6         A.    Yes, sir, it is.

7         Q.    How long had you worked at that Oshman's store

8    back on December 24th of 2000?

9         A.    I had been there for three years.

10        Q.    And were you scheduled to work there on

11   Christmas Eve?

12        A.    Yes, sir, I was.

13        Q.    About what time did you arrive?

14        A.    I arrived there about 6:30 in the morning.

15        Q.    What time was Oshman's going to close that

16   evening?

17        A.    We were scheduled to close at 6:00 p.m.

18        Q.    You were there during the course of the entire

19   day, I take it?

20        A.    Yes, sir, I was.

21        Q.    Was it a busy shopping day for you?

22        A.    Yes, sir, it was at the beginning of the day,

23   but it kind of slacked off during the afternoon period.

24        Q.    Okay.  Did you have a lot of employees

25   scheduled to work that evening?
```

1    A.    When we opened that morning, we had 22

2    employees scheduled to work that day, but by the

3    midafternoon we had let all but 16 go home.

4    Q.    Okay.  Were there other managers on duty with

5    you also at that time?

6    A.    Yes.  There were three other managers there.

7    Q.    First let me show you what has been marked as

8    State Exhibit 43.  Is that a diagram of the Oshman's store?

9    A.    Yes, sir, it is.

10   Q.    And is it how the store was laid out on

11   December 24th of 2000?

12   A.    Yes, sir.

13   Q.    Would it help you explain your testimony to

14   the jury?

15   A.    Yes, it would.

16        MR. SHOOK:  Your Honor, at this time

17   we'll offer State Exhibit 43.

18        MR. SANCHEZ:  No objection, Your Honor.

19        THE COURT:  No. 43 shall be admitted.

20   Q.    (By Mr. Shook)  Let me show you what has been

21   marked State Exhibit 755.  Is this a list of the names of

22   managers and sales associates that you had working that

23   evening at closing time?

24   A.    Yes, sir, it is.

25        MR. SHOOK:  Your Honor, at this time we

1    offer State Exhibit 755.

2                    MR. SANCHEZ:  No objection, Your Honor.

3                    THE COURT:  No. 755 shall be admitted.

4        Q.    (By Mr. Shook)  Let me show the jury 755.  At

5    the top we have managers listed with your name as well as

6    three others; is that right?

7        A.    Yes, sir.

8        Q.    Were those the managers on duty that evening?

9        A.    Yes, sir.

10       Q.    And then the sales associates, are those all

11   the folks that worked the different sections of the store?

12       A.    Yes, sir.

13       Q.    As far as the sales associates go, what's the

14   average age of these employees?

15       A.    About 18 years old.

16       Q.    Some of them still in high school?

17       A.    Yes, sir.

18       Q.    Are they pretty much part-time employees?

19       A.    Yes, sir.

20                    MR. SHOOK:  Your Honor, could I have the

21   witness step down for a moment?

22                    THE COURT:  You may.

23       Q.    (By Mr. Shook)  Mr. Ferris, if you could come

24   over here and I want to go over this diagram with the jury.

25   I'll caution you to try not to block the view of the jurors.

1  But does that diagram show the general layout of the

2  Oshman's store?

3       A.      At that time, yes, sir.

4       Q.      Starting with the top, can you point to the

5  jury and show them where the entrance was?

6       A.      The entrance was right here.  This is the only

7  entrance to the building.

8       Q.      Okay.  Now, does this particular store have a

9  lot of windows in the front?

10      A.      Only right here at the entrance and exit

11  doors.

12      Q.      So if you are going to look into the building,

13  the only way you would be able to do that is look through

14  the entry or exit doors?

15      A.      Yes, sir.

16      Q.      As you come into the store, where are the cash

17  registers located?

18      A.      There's three cash registers located up here

19  and two up here at customer service.

20      Q.      And what is the customer service counter for?

21      A.      Customer service is where customers go up to

22  check out and also when they have returns, they bring the

23  returns to the customer service counter and the associates

24  behind the counter give the return.

25      Q.      Is there an intercom there that allows you to

1  make announcements throughout the store?

2        A.      Yes, sir, there is.  It's right next to this

3  register.

4        Q.      Now, if you would, just kind of starting, I

5  guess, if we're facing the diagram, looking at the left,

6  describe how the store is laid out.

7        A.      This area here is the shoe department.  From

8  the front of the store to the back of the store was the

9  self-service shoe department.  We have shoes out on the

10  floor where customers can try them on.  There were

11  associates there to assist, if there were any questions that

12  needed answered.

13            From there we went back here was the

14  exercise and athletic department.  The exercise mat where we

15  had displays of treadmills, weight benches, and any other

16  exercise equipment that we sold.  We went to these aisles

17  where we had the athletic bags, baseball, football, soccer,

18  basketball.  And this was the display area where we have the

19  displays of the basketball systems that we sold.

20            Further down was the bike department area

21  where we sold bicycles.  And we get down to this corner over

22  here, it's the golf and tennis departments where we sell

23  golf sets, the tennis rackets, restrung tennis rackets.

24            Moving on the right side here is the

25  field and stream department which was hunting, fishing,

1    camping, and sold firearms and ammunition, tents, camping

2    supplies, fishing licenses, and lures and reels.

3              And in this area in the center was the

4    apparel lots where at the time it was men's, children's, and

5    women's departments.

6         Q.    Now, you were over the, actually, the field

7    and stream department; is that right?

8         A.    Yes, sir, I was.

9         Q.    Oshman's did sell handguns, shotguns, and

10   rifles?

11        A.    Yes, sir, we did.

12        Q.    When the handguns were not out in the display

13   case, where were they kept?

14        A.    They were -- during the day they were kept in

15   the display cases right here.  At night we took them out of

16   the display cases and took them into the gunroom and locked

17   them in a safe back in the corner.

18        Q.    And the rifles and shotguns, did they stay out

19   here in the display area?

20        A.    They were on a wall, on a rack on the wall

21   behind the gun counter.

22        Q.    Now, this area in here, this office area, what

23   are these?

24        A.    The first one here is the general manager's

25   office.  This is our video room where we kept the

1    surveillance cameras for the store.  And this was the cash

2    office and supply room and this is the assistant general

3    manager's office.

4         Q.    Was the safe where you kept the store's money

5    located back here?

6         A.    Yes, sir, in the cash office.

7         Q.    As far as cameras and videotapes going, how

8    many were operating that evening?

9         A.    They were all operating that evening.  Only

10   one was actually recording.

11        Q.    Which one was recording?

12        A.    The one that was recording was the one right

13   here on the entrance and exit doors.

14        Q.    Okay.  Then in the back, what do we see here

15   down here in the back part of the store?

16        A.    Down here in this corner there's an entryway

17   here and that's a hallway back here that goes back to the

18   restrooms for the public and for the employees.  And there's

19   a door here that led back into the employee breakroom.

20   There were also offices back there for the regional

21   vice-president and regional loss prevention officer.

22        Q.    So the employees' breakroom is the very back

23   right-hand corner?

24        A.    Yes, sir, it is.

25        Q.    And then this area here, is this the back of

1    the store?

2         A.    This is the back parking area where the trucks

3    arrive to deliver our freight and we store it in this

4    warehouse right here.

5         Q.    There were several exit doors that led out to

6    this back loading dock area?

7         A.    Yes, there were.

8         Q.    And were there trailers out there at the time

9    in the back area?

10        A.    Yes, sir.  There was one backed up against

11   this door here and a couple parked out here in the parking

12   lot.

13        Q.    You can go ahead and have a seat.  Mr. Ferris,

14   let me show you some photographs that have been marked State

15   Exhibits 9 through 38.  Are these photographs of the -- some

16   aerial views of the Oshman's, as well as some interior shots

17   of the Oshman's and how the store appeared back on December

18   24th of 2000?

19        A.    Yes, they are.

20             MR. SHOOK:  Your Honor, at this time we

21   will offer State Exhibit 9 through 38.

22             MR. SANCHEZ:  Assuming these are the ones

23   that we've already seen, we have no objection.

24             THE COURT:  Nos. 9 through 38 shall be

25   admitted.

1      Q.      (By Mr. Shook)  Also, let me show you two

2  photographs which have been marked State Exhibits 49 and 50.

3  Are these photographs of the vehicle, your Ford Explorer,

4  that you drove to work that day?

5      A.      Yes, sir, it is.

6              MR. SHOOK:  We'll offer State Exhibit 49

7  and 50.

8              MR. SANCHEZ:  Again, Your Honor, we have

9  no objection.

10             THE COURT:  Nos. 49 and 50 shall be

11  admitted.

12     Q.      (By Mr. Shook)  Mr. Ferris, directing your

13  attention to the monitor, is this an overview of the parking

14  lot area for the Oshman's there where it's located right off

15  Highway 183?

16     A.      Yes, sir, it is.

17     Q.      And then in particular is this the Oshman's

18  located right here?

19     A.      Yes, sir.

20     Q.      What other types of shops were located in this

21  shopping center?

22     A.      Down on the far left right there next over

23  there was K-Mart and that's Hobby Lobby.

24     Q.      Okay.  What about these buildings here?

25     A.      There's a Staples and Comp USA over there on

1  that side.

2      Q.     And this parking lot behind the Oshman's, what

3  type of business is that?

4      A.     It's an automobile dealership.

5      Q.     Okay.  And then directly behind the Oshman's

6  on the other side is a field; is that right?

7      A.     Yes, sir, it is.

8      Q.     And then is this a group of apartments across

9  that field?

10     A.     Yes, sir.

11     Q.     This is a little closer photograph of the

12 Oshman's.  Was this the parking lot which you parked your

13 Ford Explorer in that evening?

14     A.     Yes, sir, it is.

15     Q.     Approximately where did you park your car?

16     A.     At closing time my vehicle was parked right --

17 just right there in that area right there by the light pole.

18     Q.     All right.  Again, this is a closer shot of

19 the front.  Is this the entrance and exit doors for the

20 Oshman's?

21     A.     Yes, sir, it is.

22     Q.     And if you were going to look into the

23 Oshman's, this would be the only area that you could do

24 that?

25     A.     Yes, sir.

1      Q.     Looking at State Exhibit 12, does this show

2  the back of the Oshman's?

3      A.     Yes, sir, it does.

4      Q.     What area are we seeing right here?

5      A.     That's the back parking area out behind the

6  receiving by the receiving bay of the store.

7      Q.     Are there some exit doors that are located in

8  this area and this area?

9      A.     Yes, sir.  There's one right there in the

10  corner where your beam is pointed right now and that's one

11  just down from there.

12      Q.     And you told the jury there were some trailers

13  back there at that time.  Is this the trailer that was

14  backed up to the warehouse?

15      A.     Yes, sir.

16      Q.     As well as two other trailers here?

17      A.     Yes, sir.

18      Q.     If you were to reach this back area, is it

19  possible to drive around the Oshman's from this direction

20  and come to the back?

21      A.     Yes, sir.

22      Q.     And then, again, what we're seeing here is the

23  back part of the car lot?

24      A.     Yes, sir.

25      Q.     Now, I want to show you what's been marked as

1  State Exhibit 13.  Is this a photograph of the inside area

2  of the Oshman's?

3          A.      Yes, sir, it is.

4          Q.      What part of the store are we looking at

5  there?

6          A.      That's taken right there in front of the

7  exercise mat, looking down to the north end of the store.

8          Q.      Okay.  I want to turn your attention to --

9  well, let me first start around 5:30 that night, did Darrin

10 Ojeda, one of the other managers, make an announcement?

11         A.      Yes, sir.  He did.  He made an announcement

12 from the phone up there at customer service that it was 5:30

13 and that Oshman's would be closing in 30 minutes.  He

14 thanked everyone for shopping at Oshman's and asked the

15 customers to make their final selections and make their way

16 to the front of the store to check out.

17         Q.      Were there many shoppers in the store at that

18 time?

19         A.      I didn't have an idea of how many were there

20 and I decided to walk the store after he made that

21 announcement.

22         Q.      And as you walked the store, what did you

23 observe?

24         A.      I noticed there were a few customers there.

25 As I walked the store I was walking to make sure the

1    customers were being taken care of and to direct any

2    associates that weren't helping customers to start getting a

3    good recovery of the store so we could get out of the store

4    as close to 6:00 as possible.

5         Q.    What part of the store did you notice

6    customers in?

7         A.    There were some in the shoe department, some

8    back by the exercise department, and some in the clothing

9    department.

10        Q.    Do you recall what they looked like at that

11   time?

12        A.    No, sir, I don't.

13        Q.    Did you have any conversations with them at

14   that time?

15        A.    No, sir, I did not.

16        Q.    Around 5:45 p.m. did you go over to the

17   section where the guns were sold, the field and stream

18   section?

19        A.    Yes, sir.  When I got back over there, there

20   was nobody over in there -- no customers in that area, so I

21   told the two employees back there to go ahead and put the

22   guns away.  While they put the guns away, I would close the

23   register and count the money.

24        Q.    And when you talk about the guns, you are

25   talking about the handguns?

1     A.     Yes, sir.

2     Q.     They are placed in that gun safe?

3     A.     Yes, sir.

4     Q.     Did you close out the register at that time?

5     A.     Yes, sir.  While they were putting the guns

6   away, I closed out the register and counted the money down.

7     Q.     Where did you go then?

8     A.     I started back to the front of the store to

9   put the money in the safe.

10    Q.     Okay.  Did you make it to the safe at that

11  time?

12    A.     No, sir, I did not.  On my way up to the

13  front, I received a page that I was needed at the exercise

14  mat.

15    Q.     Okay.  Did you go to the exercise mat area at

16  that time?

17    A.     I went to customer service and put the money

18  in a bin that we had behind customer service to -- that we

19  put the drawers in to wheel them all back to the office at

20  the same time.  And I received another page to go to the

21  exercise mat and I walked back to the exercise mat from

22  there.

23    Q.     And this is the exercise mat area, what we see

24  here on the monitor, right?

25    A.     Just off to the right of there, yes, sir.

1    Q.    Now, when you arrived at the exercise mat, who

2  was there?

3    A.    Tim Moore, the department manager for the

4  athletic department, was standing there talking to a

5  gentleman.

6    Q.    And how was that person dressed?

7    A.    He was well dressed.  He was wearing dress

8  shoes, black slacks, a light color, either white or light

9  blue shirt.  He was wearing a windbreaker-type jacket and he

10  had a ballcap on that said ADT on it.

11    Q.    And what is ADT?

12    A.    ADT is an alarm company that we used at the

13  store to monitor our store after we set the alarm in the

14  evenings.

15    Q.    Did you enter into a conversation with him at

16  that time?

17    A.    Yes, sir, I did.

18    Q.    Now, did you later come to know this man by

19  the name of George Rivas?

20    A.    Yes, sir, I did.

21    Q.    If you could look -- let me direct your

22  attention to the display of photographs right over your

23  shoulder; which I believe is marked State Exhibit 44.  Do

24  you see Mr. Rivas' photograph on that poster?

25    A.    Yes, sir.  He's on the top all the way over on

1  the left side.

2         Q.    Do you see other men on that poster which were

3  also involved in the robbery there of the Oshman's?

4         A.    Yes, sir.

5               MR. SHOOK:  Your Honor, at this time we

6  offer State Exhibit 44.

7               MR. SANCHEZ:  No objection, Your Honor.

8               THE COURT:  No. 44 shall be admitted.

9         Q.    (By Mr. Shook)  So the first person you

10  encountered was Mr. Rivas up there in the top left-hand

11  corner and he was dressed as a security guard at that time?

12        A.    Yes, sir.

13        Q.    Did he look a little different than he did in

14  the poster there?

15        A.    Yes, sir, he did.

16        Q.    How -- how did his face or hair look

17  different?

18        A.    He didn't have no facial hair and he had dark

19  hair and wore glasses similar to mine.

20        Q.    And what did Mr. Rivas ask of you at that

21  time?

22        A.    He said he and his partner --

23               MR. SANCHEZ:  I'll object to hearsay.

24               THE COURT:  Overruled.

25        A.    He said he and his partner had been to -- they

1    had been investigating a grab-and-run ring that had been

2    operating in the area and he asked if I could have the

3    employees look at some photographs that he had.

4         Q.     (By Mr. Shook)   Okay.   What's a grab-and-run

5    gang?

6         A.     It's a group of individuals that are working

7    together.   They enter the store.   Several of them enter the

8    store and they will grab some merchandise and run out one of

9    the exits without paying for it.

10         Q.     And did he, in fact, have some photographs?

11         A.     Yes, sir, he did.   He had an eight-by-ten

12    sheet of paper with six photographs on it.

13         Q.     What did you tell him?

14         A.     I told him I didn't have any objections to it.

15    And there were two employees there in the area, Sandra

16    Rodriguez and Tony Coronado, and I called them over and had

17    them look at the photographs.

18         Q.     Did you see any other men dressed as security

19    guards at that time?

20         A.     No, sir, I did not.

21         Q.     After Sandra Rodriguez and Tony Coronado

22    looked at the photographs, what happened then?

23         A.     Sandra identified that she thought at least

24    two of those individuals had been in the store earlier that

25    day.   Mr. Rivas asked if we had a video system and I told

1    him we did.  And he asked if he could look at the videotape.

2            Q.      What was Mr. Rivas' demeanor like at that

3    time?

4            A.      It was calm, well composed.  Didn't --

5            Q.      Didn't arouse your suspicions in any way?

6            A.      No, sir.

7            Q.      Did, in fact, you take him back to the video

8    room at that time?

9            A.      Yes, sir, I did.  I asked Sandra to come with

10   us and we went up to the video room.

11           Q.      Once you went to the video room, which I

12   believe we see in the next photograph, State Exhibit 14; is

13   that right?

14           A.      Yes, sir.

15           Q.      And that's located up towards the front

16   offices of the store?

17           A.      Yes, sir, it is.

18           Q.      What did you do once you came into the video

19   room?

20           A.      I sat down at the chair at the desk there and

21   I stopped the video from recording and I asked Sandra about

22   what time she saw the individuals in the store.  Then I

23   looked at the monitor and saw that the only camera recording

24   was the entrance and exit doors.  And I told Mr. Rivas that

25   and he said it wouldn't do him any good, but thanked me

1    anyway.

2          Q.      Did you then leave the video room with

3    Mr. Rivas at that time?

4          A.      We left the room.  I closed the door and I

5    went up to the customer service area.

6          Q.      Approximately what time was it at that point?

7          A.      It was pretty close to 6:00.

8          Q.      Did Mr. Rivas join you in the customer service

9    area?

10         A.      Yes, sir, he did.

11         Q.      State Exhibit 15, does this show the customer

12   service area?

13         A.      Yes, sir, it is.

14         Q.      It's at this counter here against the wall?

15         A.      Yes, sir.

16         Q.      And are these the actual checkout counters,

17   the three checkout counters, that are near the service area?

18         A.      Yes, sir.

19         Q.      Once you went to that service counter area,

20   what was going on at that time?

21         A.      Most of the employees had moved up front and

22   they were talking to another gentleman who was dressed as a

23   security guard.  I didn't get involved in any conversations

24   with him.  They were at the register 4 and he had some

25   copies of the photographs on eight-by-ten sheets of paper

1  laying there and they were talking about those.

2      Q.    Did they appear to be looking at the

3  photographs?

4      A.    Looking at the photographs and talking to him,

5  yes, sir.

6      Q.    Okay.  And most of the employees were gathered

7  up there at that time; is that right?

8      A.    Yes, sir.

9      Q.    Did you see any shoppers around at that time?

10     A.    No, sir, I did not.

11     Q.    What did you do then?

12     A.    I looked at my watch and it was just after

13  6:00.  I picked up the phone at customer service and I made

14  a PA announcement that it was 6:00, Oshman's was now closed.

15  Thanked everybody again for shopping with Oshman's and asked

16  any customer still in the store to make their final

17  selections and please come to the front to check out.

18     Q.    Was Mr. Rivas near you when you made that

19  announcement?

20     A.    He had moved -- I believe he had moved over to

21  -- as I was facing customer service, he moved over to the

22  right there back by that case.

23     Q.    Okay.  This area here?

24     A.    Yes, sir.

25     Q.    And where were you standing?

1      A.      I was standing just by that register on this

2   side of the counter.

3      Q.      So y'all were very close to one another at

4   that time?

5      A.      No more than five feet apart, yes, sir.

6      Q.      Once you made that announcement, what's the

7   next thing that happened?

8      A.      I turned around to face the store to see if

9   any customers had come up and to direct them to an open

10  register so they could check out.

11     Q.      Then what happened?

12     A.      While I was facing that way, Mr. Rivas said,

13  "Listen, everybody, this is a robbery."

14     Q.      Did he say that in a loud, clear voice?

15     A.      He said it in a loud enough voice for

16  everybody up in that area to hear it, yes, sir.

17     Q.      Did it get everyone's attention?

18     A.      Yes, sir, it did.

19     Q.      When you turned around, what was Mr. Rivas

20  doing?

21     A.      I turned around.  He had a gun.  He had it in

22  the air, facing -- pointing toward the ceiling.  And he

23  said, "Everybody does what they are told, everybody will go

24  home all right."

25     Q.      What did you think when you saw him out with

1   that gun, making those types of statements?

2          A.    At first I just thought he was trying to show

3   us how easy it would happen.  I didn't really believe it was

4   a robbery at that time.

5          Q.    Then what happened?

6          A.    I made a step toward him.  He dropped the gun

7   and pointed it directly at my chest and said, "Don't try it,

8   Wes.  If you do, I'll have to shoot you.  If I shoot you,

9   I'll have to shoot everybody."

10         Q.    Did you know he was serious at that point in

11  time?

12         A.    At that point I knew he was serious and I

13  stopped and said that I wasn't going to do anything.

14         Q.    What type of weapon was he pointing at you?

15         A.    He was holding a Smith & Wesson .357 Magnum

16  revolver.

17         Q.    After he made that threat to you, what's the

18  next thing that he said?

19         A.    He told the employees behind customer service

20  to get out from behind the counter and told everybody to put

21  their hands on the counter in front of us.

22         Q.    And did they comply with that?

23         A.    Yes, sir, they did.

24         Q.    Did you see any of the shoppers at that point

25  in time?

1      A.     He told us that all the customers were with

2  him.  And I stepped and I turned and I looked back over my

3  shoulder and I saw, I believe, six to eight men standing

4  there and they were all armed.

5      Q.     Did they have guns out?

6      A.     Yes, sir, they did.

7      Q.     What type of guns did they have?

8      A.     At that time, getting just a quick glance, I

9  believe some of them were armed with revolvers and some with

10  semiautomatics.

11      Q.     Let me show you the diagram quickly.  If you

12  could, show the jury where the employees were gathered up

13  and where these men with guns were gathered in the store.

14      A.     All the employees were standing along this

15  counter with our hands on the counter in front of us.  Mr.

16  Rivas was over in this area and the rest of them were behind

17  us in a semicircle.

18      Q.     And they had their guns out?

19      A.     And they had their guns out, yes, sir.

20      Q.     And you had originally talked to Mr. Rivas in

21  this area?

22      A.     Back here, yes.

23      Q.     As the employees moved forward, could you tell

24  -- did Mr. Rivas ever mention the fact that there were

25  people outside?

1      A.      Yes, sir, he did.  He said all the customers

2   were with him and there were others outside.

3      Q.      Did you, in fact, hear him communicate with

4   someone over a radio?

5      A.      Yes, sir.  He said over the radio he was

6   carrying, he asked if everything was okay outside and

7   somebody responded saying everything was fine, the police

8   were involved with an accident on 183.

9      Q.      You could actually hear them communicating

10  through radio?

11     A.      Yes, sir.

12     Q.      Could you see what type of radio it was?

13     A.      It was a little FRS radio that you can buy at

14  any supermarket or Wal-Mart.  We sold them there at

15  Oshman's.

16     Q.      Okay.  Let me show you two photographs which

17  have been marked State Exhibit 39 and 40.  Does 39, does

18  that look like the type of gun that George Rivas had pointed

19  at you?

20     A.      Yes, sir.

21     Q.      And State Exhibit 40, is that the type of

22  radio that was being used?

23     A.      Yes.

24              MR. SHOOK:  We'll offer State Exhibits 39

25  and 40.

1          MR. SANCHEZ:  No objection, Your Honor.

2          THE COURT:  Nos. 39 and 40 shall be

3   admitted.

4      Q.     (By Mr. Shook)  On the monitor is a photograph

5   of a .357 revolver; is that correct?

6      A.     Yes, sir.

7      Q.     That's the same type of weapon George Rivas

8   had pointed at you at that time?

9      A.     Yes, sir.

10     Q.     And then State Exhibit 40, shows a radio.  Is

11  this the type of radio he was communicating with?

12     A.     Yes, sir, it is.

13     Q.     As the employees gathered up there at the

14  service counter area, what happened at that point in time?

15     A.     They were going through -- several of the men

16  were going through our pockets and taking anything that they

17  considered might be used as a weapon.  Several of the

18  employees, including me, had pocket knives or multipurpose

19  tools.  And I heard one of the men say, "Oh, we've got a bad

20  boy.  Looks like he wants to try something.  Go ahead and

21  try something.  I want you to try something."

22     Q.     Did you look at that individual at that time?

23     A.     I stepped back and I looked down there and

24  Mr. Garcia was standing behind John Lindley.

25     Q.     Who is John Lindley?

1    A.    John Lindley was the department manager in

2    charge of shoes.

3    Q.    Was it Mr. Garcia that was making these

4    comments?

5    A.    Yes, sir, it was.

6    Q.    And what was he saying again?

7    A.    Says, "Looks like we have a bad boy here.

8    Looks like he wants to try something.  Go ahead.  I want you

9    to try something."

10    Q.    In what tone of voice was he using when he

11    said that?

12    A.    The tone of voice gave me the impression that

13    he wouldn't -- he was looking for an excuse to hurt

14    somebody.

15    Q.    Did that cause you some concern at that time?

16    A.    Very much so, yes, sir.

17    Q.    Were you taking Mr. Rivas' threats seriously?

18    A.    I was taking his threats seriously, but he

19    gave me the impression he really didn't want to hurt

20    anybody, but he would if it became necessary.

21    Q.    Did you try to keep all the employees calm

22    yourself?

23    A.    Yes, sir.  I told them just to do what they

24    were told and we would all go home for the holidays.

25    Q.    After Mr. Garcia made those threatening

1    statements, what was the next thing that happened?

2         A.    Mr. Rivas asked me if there was a room large

3    enough for all the employees to fit into.

4         Q.    And did you tell him there was?

5         A.    I told them there was the employee breakroom

6    back in the back of the store.

7         Q.    What did he do then?

8         A.    He told all the associates to turn to the

9    right, put our hands out in front of us, and everybody was

10   to follow me single file and I was to follow him back to the

11   -- was to lead the way back to the breakroom.

12        Q.    Now, before you went down there, was there

13   another employee that was brought to the front?

14        A.    Laura Fernandez was brought up from the back

15   of the store.

16        Q.    When did that happen?

17        A.    Just after we turned to the right and where he

18   asked me if we had a room large enough to put all the

19   employees in.

20        Q.    And where had she been or what area of the

21   store had she been in, if you know?

22        A.    I really don't know, but I believe she had

23   been back by the restrooms.

24        Q.    Did someone bring her up to the front?

25        A.    Another one of them did, men did, yes, sir.

65

1    Q.    Once she came to the front, what was her

2  physical condition?

3    A.    She was crying.  She was real upset and her

4  hands had been tied together.  She had zipties around both

5  her thumbs and they were tied together.

6    Q.    Was she complaining about that?

7    A.    Not at that point, no, sir.  She was still

8  scared and she was real upset.

9    Q.    After she was brought up front, what happened

10  then?

11   A.    Mr. Rivas told me to lead everybody back to

12  the breakroom and we started back to the breakroom.  We got

13  back by the tennis and golf department and Sandra asked if

14  we could take the ties off of Laura's hands because they

15  were cutting off the circulation.  Her thumbs were turning

16  blue.

17   Q.    As you went through the store, was Mr. Rivas

18  there with you?

19   A.    He was right there beside me.

20   Q.    Did he have his gun out?

21   A.    Yes, he did.

22   Q.    Did you see the other men out there with their

23  guns out at that time?

24   A.    They were back behind me.  I didn't look and

25  see if they were there.

1      Q.      Let me show you the diagram again and point to

2  the jury the direction you went through the store as you

3  were being led to the back.

4      A.      We started up at customer service and came

5  down this way through the apparel department and came back

6  over here to the golf and tennis department where Sandra

7  asked if we could cut the ties off.

8      Q.      And did you stop at that point in time?

9      A.      Yes, sir, we did.  Mr. Rivas asked what we

10  would use to cut them off.  I told him that on the tennis

11  stringing machine there, there was a pair of wire cutters.

12  We could use those to cut them off.

13      Q.      Did you do that at that time?

14      A.      He went and got the cutters and gave them to

15  Sandra.  I was watching it and Sandra was shaking real bad

16  and I thought she might cut Laura's hands, so I took the

17  cutters and I cut the ties off of Laura and gave them back

18  to Mr. Rivas.

19      Q.      Was anything else done at that time with the

20  other employees?

21      A.      At that point at least one of the employees

22  was told to take off -- Darrin Ojeda was told to take off

23  his red shirt and one of the other gentlemen put it on.

24      Q.      After that where were you led?

25      A.      He told me to take them on back to the

1  breakroom and we came in through this way into the

2  breakroom.

3       Q.    What happened once you were in the breakroom?

4       A.    We all got into the breakroom.  I was standing

5  up in this corner and everybody else was around this way.

6  And he told everybody to turn around and face the wall and

7  to be quiet.  And he told me to go with him.

8       Q.    How many -- when you left the breakroom, how

9  many people were back there with the employees?

10      A.    At least two that I know of.

11      Q.    Do you recall which ones were back there at

12 that time?

13      A.    It was George Rivas and -- or not Mr. Rivas.

14 Mr. Rivas was with me.  Mr. Garcia and Michael Gonzales --

15 or Rodriguez.

16      Q.    All right.  Michael Rodriguez?

17      A.    Michael Rodriguez and Joseph Garcia.

18      Q.    Where did you go with Mr. Rivas at that time?

19      A.    We started back to the front of the store,

20 back up to customer service.

21      Q.    And what happened up there?

22      A.    We come around this corner right here back up

23 by customer service.  I noticed one of them, one of the

24 other men up there at the store was wearing a red shirt of

25 the Oshman's employee.  Mr. Rivas asked me if we had a bag

1    large enough to put all the money in and I told him there

2    were, over by the exercise mat.

3         Q.     Okay.  Did you go back to the exercise mat

4    area at that time?

5         A.     He said, "Let's go get a bag," and we walked

6    back down to the bag wall.  This is the bag wall right here.

7    And I told him the bag wall is right there and he walked up

8    to it and pulled a blue Adidas bag off the wall.

9         Q.     Where did you go then?

10        A.     Then we went back up to customer service.

11        Q.     And what happened once you were at customer

12   service?

13        A.     We went to this register here first.  He asked

14   me if I opened up the drawer would it set off an alarm.  I

15   told him it would not set off the alarm.  He told me to open

16   the register.

17        Q.     Did you get the cash out at that time?

18        A.     I opened up the register.  He asked if I lift

19   up the tray would it sound off an alarm.  I told him no.  He

20   reached over and picked up the tray.  There was credit card

21   receipts and checks under there.  He said he didn't want

22   those and told me to put the cash in the bag.

23        Q.     What did you do then?

24        A.     I put all the cash in the bag out of those

25   drawers and the other register up there at customer service

1   and the cash drawer right there at the end.

2       Q.    What happened next?

3       A.    I started at the bin that I put the register

4   from the gun counter in and I stopped there and was putting

5   the money out of that drawer into the bag and he asked me

6   for my car keys.

7       Q.    And what did you say?

8       A.    "You're going to take my vehicle, too?"

9       Q.    What did he say?

10      A.    He said, "You'll get it back.  We're only

11  going to take it a couple of blocks or so."

12      Q.    Where did you go then?

13      A.    After I emptied all the registers, he said

14  that he wanted the videotape and we went back to the video

15  room.

16      Q.    Now, as you made your way back to the video

17  room, did you go in it at that time?

18      A.    No, sir.  As I was unlocking the door to the

19  video room, he noticed another door down at the end of the

20  hallway and he asked me what was behind that door.

21      Q.    Let me show you State Exhibit 22.  Does that

22  show the hallway?

23      A.    Yes, sir, it does.

24      Q.    And what went to that other door?

25      A.    I told him that the other door was just a room

1    where we store supplies, pens, and paper, paper clips,

2    staples, and he told me to open the door.

3        Q.    We're talking about the door here at the end

4    of the hallway?

5        A.    Yes, sir.

6        Q.    Okay.  And then you opened that door and what

7    was in that room?

8        A.    In that room, immediately in that room was the

9    supplies that I told him about, but there was also another

10   door that led into the cash office.

11       Q.    What did he say at that time?

12       A.    He told me to open the door.  When I opened

13   the door he saw the safe and he said, "Nice try."

14       Q.    And that's when the door is opened and that's

15   the safe?

16       A.    Yes, sir.

17       Q.    And he said, "Nice try," at that point in

18   time?

19       A.    Yes, sir.

20       Q.    And then what happened?

21       A.    He told me to open the safe.  And as I opened

22   up the safe he told me to put all the money in the bag.

23       Q.    Did you have a lot of cash in the safe at that

24   point in time?

25       A.    At that time we had a total of about $100,000

1    in cash in the safe.

2         Q.    Okay.   Did Mr. Rivas or did you take the cash

3    out of the safe?

4         A.    I was taking the cash out of the safe and

5    putting it in the bag.   He was standing behind me, looking

6    over my shoulder.

7         Q.    Did he say anything else to you at that time?

8         A.    There was a couple of boxes in there with cash

9    in it.   One of them was marked "employee fund."   And he told

10   me not to take the employee fund.   He was stealing from

11   Oshman's, not the employees.

12        Q.    And what did you say?

13        A.    I just turned and looked and told him he was

14   taking my vehicle.

15        Q.    What did he say at that point in time?

16        A.    He said, "I told you, you would get it back."

17        Q.    After he got all the cash out of the safe,

18   what happened then?

19        A.    He then said that he wanted to go back and get

20   the videotape.

21        Q.    Did he retrieve or did you retrieve the

22   videotape for him?

23        A.    We went out and I opened the door of the video

24   room and he stepped in and took the tape out of the VCR.

25        Q.    Where did you go then?

1      A.      And he said, let's go back to the gun

2  department and we started back to the guns.

3      Q.      Let me show you State Exhibit 24.  Is that as

4  you come out of the office area and head back towards the

5  gun department?

6      A.      Yes, sir, it is.

7      Q.      And State Exhibit 25, is that the area where

8  the guns are kept?

9      A.      Yes, sir.

10      Q.      Did you see anyone, any of the other robbers,

11  at that time back in the gun department?

12      A.      Yes, sir, I did.  I noticed one back there and

13  later identified as Donald Newbury.

14      Q.      Okay.  Where was he located?

15      A.      He was behind the counter, standing in front

16  of the rifles and shotguns.

17      Q.      Did Mr. Rivas take you over to him at that

18  time?

19      A.      We started back over there and we got about to

20  where those orange vests were and Mr. Newbury told him the

21  handguns were not in the cases.

22      Q.      Okay.  Then what happened?

23      A.      Mr. Rivas asked me where they were at and I

24  told him they were locked up in the gunroom in the safe.

25      Q.      Did he ask you to take him to that gunroom at

73

1    that time?

2              A.      Yes, sir, he did.

3              Q.      Let me show you State Exhibit 30.  Is this the

4    gunroom and the safe where the handguns are held?

5              A.      Yes, sir, it is.

6              Q.      State Exhibit 32, what do we see there on the

7    floor?

8              A.      Those are padded four-by-four sheets of wood

9    that we used or two-by-two sheets of wood that we use when

10   we put the guns in the safe.  We took them out of the case

11   and put them on those and took them back and put those

12   boards with the guns on them into the safe.

13             Q.      And when you took Mr. Rivas back there, were

14   the handguns loaded onto those boards inside the safe?

15             A.      Yes, sir, they were.

16             Q.      And then State Exhibit 31, is that a

17   photograph of the -- how the safe appears after the guns are

18   taken out?

19             A.      Yes, sir.

20             Q.      Okay.  After you opened that safe for him,

21   what did you do then?

22             A.      We went back out to the gun counter and we

23   started back there and he told Mr. Newbury that the safe was

24   open, the door was open, to go get the guns.

25             Q.      Let me show you State Exhibit 26.  Were y'all

1   actually at the gun counter at that time?

2        A.    We were walking back up there and Mr. Newbury

3   asked, said something about the rifles and shotguns being

4   locked.

5        Q.    Okay.  Is this the wall where the rifles and

6   shotguns are kept?

7        A.    Yes, sir.

8        Q.    After he made that statement, what happened?

9        A.    Mr. Rivas asked me where the key was to unlock

10  them.  I had it hanging on my belt loop.  I took it off,

11  handed him the key, and told him which one it was and he

12  gave it to Mr. Newbury.

13       Q.    Let me show you State Exhibit 27, a closer

14  view of that counter.  Does that appear to be your keys?

15       A.    Yes, sir, it is.

16       Q.    We see behind there various boxes.  What are

17  those boxes?

18       A.    It's ammunition for the guns that we sell.

19       Q.    Y'all have various kinds of ammunition there?

20       A.    Yes, sir.

21       Q.    And then State Exhibit 28, does that show the

22  rack of long guns with some of them actually missing?

23       A.    Yes, sir.

24       Q.    After you handed those keys over to -- and had

25  them placed on the counter, what happened then?

1    A.    Mr. Rivas told me to come with him and we went

2    back to the employee breakroom.

3    Q.    State Exhibit 33, is that the hallway leading

4    back to the breakroom?

5    A.    Yes, sir, it is.

6    Q.    And then 34, is that how the breakroom appears

7    when you first go into it?

8    A.    Yes, sir, it is.

9    Q.    What was going on in the breakroom when you

10   were taken back there?

11   A.    Mr. Garcia and Mr. Rodriguez had all the

12   employees and they were down on their -- either laying down

13   or down on their knees, facing the wall with their hands

14   behind their back.  They were going through their pockets,

15   taking personal belongings and tying them up.

16   Q.    Okay.  What was the demeanor of the store

17   employees back there?

18   A.    They were scared.  Some of them were crying.

19   Q.    Did you ever hear Mr. Rivas communicate over

20   that radio other than the time at the very front?

21   A.    After he left me in the breakroom and left,

22   yes, sir.

23   Q.    And when he took you, first took you into the

24   breakroom, did any of these other individuals have contact

25   with you?

1    A.    Yes, sir.  I stood and standing there by the

2  refrigerator, I was looking at the other employees seeing

3  what kind of -- how they were doing and everything.  And

4  Mr. Rodriguez came up to me, grabbed me on my left shoulder,

5  told me to turn around -- pushed me and told me to turn

6  around, kicked me behind my knees, and told me to get on the

7  floor and put my hands behind my back.

8    Q.    So he forced you onto your knees by kicking

9  you behind your knees?

10    A.    Yes, sir, he did.

11    Q.    And then you were on your knees, facing the

12  wall?

13    A.    Yes, sir.

14    Q.    Let me show you State Exhibit 35.  Is this a

15  view of the room of how it appeared at that time?

16    A.    Yes, sir.

17    Q.    State Exhibit 36, does this show some of the

18  ties that were used to tie the employees up with?

19    A.    Yes, sir.

20    Q.    Now, were you ever tied up yourself?

21    A.    No, sir, I was not.

22    Q.    After Mr. Rivas left, were the employees still

23  being searched and tied up at that time?

24    A.    Yes, sir.  He told them -- Mr. Rivas told them

25  to get everybody tied up.  He was going out front to get the

1    vehicle and he would meet everybody around back.

2    Mr. Rodriguez, after he forced me down, he went through my

3    pocket and took my wallet, took my house keys, and a couple

4    of dollars that I had in cash in my front pocket.

5           Q.    So he took your wallet, house keys, and any

6    cash that you had at that time?

7           A.    Yes, sir.

8           Q.    At that point in time Mr. Rivas had left the

9    back room?

10          A.    Yes, sir.

11          Q.    Okay.  Did you hear Mr. Rivas communicating

12   over the radio after that time?

13          A.    Yes, sir.  I heard over the radio, I heard him

14   telling them to come on, to hurry up and come on.  One of

15   them responded that they hadn't finished tying everybody up

16   yet.  He told them to get out.  They had company.

17          Q.    Said get out, they had company?

18          A.    Yes, sir.

19          Q.    Did they appear to be in a hurry after that?

20          A.    Yes, sir, they did.

21          Q.    Okay.  Did they leave the breakroom shortly

22   after that?

23          A.    Shortly after that one of them told us not to

24   move for ten minutes or they would be back and I heard the

25   door close and it was real quiet in the room.

1   Q.   Did you ever hear Mr. Rivas say anything about
2   a smoke grenade or alarm or anything like that?

3   A.   I believe I heard Mr. Rivas telling them to
4   set off the alarm in the back door when they went out.

5   Q.   So after Mr. Rivas said, hurry up, we have
6   company, they left shortly after that?

7   A.   Yes, sir.

8   Q.   And you heard the door close?

9   A.   Yes, sir.

10   Q.   Was it -- how long after that that they left
11   that you heard something outside the building?

12   A.   About 30, 25, 30 seconds later.

13   Q.   Okay.  You didn't have a stopwatch on it?

14   A.   I had my wristwatch on, but I didn't look at
15   it.

16   Q.   And then what's the next thing that you heard?

17   A.   I heard what I believed to be gunfire.

18   Q.   Where did the gunfire -- where did it sound
19   like it was coming from?

20   A.   It sounded like it was coming from out behind
21   the store.

22   Q.   What type of gunfire did you hear?

23   A.   It was rapid succession with short breaks.

24   Q.   Okay.  When it started, was it continuous?

25   A.   It was pretty continuous and then a short

1    pause and then more shots.

2          Q.     The first shots you heard, though, were they

3    one right after the other?

4          A.     Yes, sir,

5          Q.     Bang, bang, bang, bang, bang?

6          A.     Yes, sir.

7          Q.     And then there would be very short pauses?

8          A.     Yes, sir.

9          Q.     How long were the short pauses?

10         A.     Three or four seconds.

11         Q.     Okay.  How many shots did you think you heard?

12         A.     I estimated between 25 and 30 shots had been

13   fired.

14         Q.     Did you hear anything else besides the

15   gunshots going off?

16         A.     No, sir, I did not.

17         Q.     What was the demeanor of the employees back

18   there when they heard the gunshots going off?

19         A.     One of the male employees sitting right next,

20   sitting next to me asked me what it was.  I told him it

21   sounded like gunfire.  I had no idea what they were shooting

22   for.  Could be they were just trying to draw attention to

23   the store or they were celebrating that they had got away

24   with it.

25         Q.     Were you trying to keep the employees calm at

1   that time?

2       A.     I was trying to keep everybody calm. I told

3   them to stay still and calm down.

4       Q.     Okay. Now, do you know how long these events

5   took place from the time Mr. Rivas actually pulled the gun

6   out to the time that they left the back of that breakroom?

7       A.     When I made the announcement, it was just

8   about three minutes after 6:00. I looked at my watch to

9   make sure -- time was after -- and then after I heard the

10   gunfire, I turned -- I pulled my hand around and I looked at

11   my watch and it was about 6:36.

12       Q.     Okay. So we're talking about roughly 30

13   minutes?

14       A.     Yes, sir.

15       Q.     So now you had the employees back there and

16   you told them to be quiet. What's the next thing that you

17   did?

18       A.     I told them that I wasn't tied up. One of the

19   girls told me -- asked me not to go anywhere. I told her I

20   wasn't going anywhere. And I asked the other managers if

21   any of them still had their keys to the store.

22       Q.     Did any of them still have keys?

23       A.     Tim Moore still had the keys in his pocket.

24       Q.     What did you do then?

25       A.     I reached into his front pocket and took his

1    keys out and I untied the employee next to him and I told

2    him to start untying the other associates, to stay in that

3    room and be quiet.

4         Q.    What did you do then?

5         A.    Just off to by the breakroom there's a

6    separate office for the regional loss prevention office and

7    our key to the store would open that door.  I went in there

8    and used the private telephone line in there because it

9    wouldn't light up, up front because it was a separate line.

10   And they wouldn't know I was on the phone, if anybody was

11   still in the store.

12        Q.    Let me show you State Exhibit 37.  Is this a

13   photograph of that office you went to?

14        A.    Yes, sir, it is.

15        Q.    And that's the phone there that you used?

16        A.    Actually the one I used was behind the desk.

17        Q.    All right.  Did you call the 911 operator at

18   that time?

19        A.    I called the 911 operator, told her who I was,

20   and what had just happened and I hung up and I went out and

21   I finished helping untie the rest of the employees.

22        Q.    Okay.  Then what did you do?

23        A.    Then I went back into that room and I called

24   back the 911 operator and I stayed on the phone with them

25   until such time as the police came in.

1    Q.    Okay.  And in communicating with the police

2  did you receive instructions as to how you would be taken

3  out of the Oshman's?

4    A.    They just told me to bring all the employees

5  into that room, told everybody -- have everybody get down

6  and put their hands behind their head with their heads

7  between their legs.

8    Q.    And did you wait on the police, then, in that

9  room?

10    A.    Yes, we did.

11    Q.    Did that take some time?

12    A.    It was -- I would say it was over an hour

13  before they finally came in.

14    Q.    And how did they remove you from that room?

15    A.    They came through the door and they asked for

16  me first and then they asked if there were any bad guys in

17  the room.  And then they told everybody to stand up and they

18  patted everybody down individually and let everybody out

19  single file out the back door behind the store.

20    Q.    Okay.  Let me show you State Exhibit 38.  Does

21  this show the back of the store where you were let out?

22    A.    Yes, sir.  We came out under that door -- that

23  door under that light right there.

24    Q.    Okay.  Which direction did you go?

25    A.    We came out this way around behind the fire

1   truck and around the other side of the fire truck.

2        Q.    At that time did you see this squad car parked

3   kind of underneath this trailer?

4        A.    I did not notice it, no, sir.

5        Q.    After you made it out of the store, what did

6   you do then?

7        A.    We stood out there by that fire truck for

8   about forty-five minutes to an hour and they told me that

9   they were bringing a bus down to take everybody down to

10  police headquarters.

11       Q.    Did you go down to police headquarters at that

12  time?

13       A.    At that time, no, sir, I did not.  I was

14  placed in the back of a police car, a patrol car, and stayed

15  there at the scene while everybody else was taken down to

16  police headquarters.

17       Q.    On the patrol car did you talk or have a

18  conversation with Detective Randall Johnson?

19       A.    Yes, sir, I did.

20       Q.    What types of things were you telling him at

21  that time?

22       A.    I gave him a statement.  I dictated a

23  statement to him and he wrote it out.

24       Q.    Did it go over the same details that you have

25  given this jury this morning?

1    A.    Yes, sir.

2    Q.    After you were giving that statement, what did

3 you do then?

4    A.    We sat in the car -- I sat in the car until

5 about -- I guess it was about 11:30, 12:00, and he came in

6 and he took me down to the police headquarters.

7    Q.    What happened once you made it down to the

8 police headquarters?

9    A.    He took me into a room and there was an

10 eight-foot table there with some photographs on it.

11    Q.    Did they give you any instructions at that

12 time?

13    A.    They told me to look at the photographs, see

14 if I could identify any of those individuals as being the

15 ones in the store that evening, not to pay any attention to

16 things that could change, such as hair color, facial hair.

17 Look for things that don't change.

18    Q.    Let me show you what has been marked as State

19 Exhibit 41.  Is this a photograph of the photo lineup that

20 you looked at that evening?

21    A.    Yes, sir.

22         MR. SHOOK:  Your Honor, at this time we

23 offer State Exhibit 41.

24         MR. SANCHEZ:  No objection, Your Honor.

25         THE COURT:  No. 41 shall be admitted.

1    Q.    (By Mr. Shook)   Let me show you State Exhibit

2    45.   Does this look like the actual photographs that you

3    looked at in the same order that you viewed them that

4    evening on the tabletop?

5    A.    Yes, sir, it does.

6              MR. SHOOK:   Your Honor, at this time we

7    offer State Exhibit 45.

8              MR. SANCHEZ:   No objection, Your Honor.

9              THE COURT:   No. 45 shall be admitted.

10   Q.    (By Mr. Shook)   The monitor shows how the

11   photographs were displayed on the table.   Were they

12   displayed in the same order that we see in State Exhibit 45?

13   A.    Yes, sir.

14   Q.    Okay.   That evening were you able to make an

15   identification of some of the robbers that were there in the

16   store?

17   A.    I identified four positively -- four

18   positively and two tentative.

19   Q.    Who were the four positive that you identified

20   at that time?

21   A.    No. 4, No. 7 --

22   Q.    No. 4 would be George Rivas?

23   A.    George Rivas.   No. 7 is Rodriguez.

24   Q.    Okay.

25   A.    No. 15 is Garcia.   And No. 11.

1    Q.    Is that Donald Newbury?

2    A.    Yes, sir.

3    Q.    And who were the tentative identifications

4  that you made that evening?

5    A.    I believe it was No. 2.

6    Q.    Is that -- you later come to know his name as

7  Randy Halprin?

8    A.    Yes, sir.  And the other one was No. 9.

9    Q.    And that was later identified to you as Larry

10  Harper?

11    A.    Yes, sir.

12    Q.    Was Mr. Harper the other man that was dressed

13  in the security guard uniform?

14    A.    Yes, sir, I believe it was.

15    Q.    After making those identifications, did you

16  then go back to the Oshman's?

17    A.    Yes, sir.  We went back down to the Oshman's

18  store and waited for the building to be cleared.

19    Q.    Okay.  After the building was cleared, what

20  did you do then?

21    A.    Detective Johnson took me through the store

22  that evening and we walked through the chain of events that

23  happened earlier.

24    Q.    Did you explain the events and take him

25  through the store physically?

1    A.    Yes, sir.

2    Q.    All right.  Now, after you went through those

3  events with Detective Johnson, were you asked to make an

4  inventory of the weapons and other items that were taken

5  from the Oshman's?

6    A.    They asked me to make that inventory, yes,

7  sir, and Monday morning I came back into the store and I did

8  complete that inventory.

9    Q.    The weapons that you sell there, do you keep a

10  log as to the serial numbers, the type of weapons, and that

11  sort of thing?

12    A.    Yes, sir, we do.

13    Q.    Is there a unique serial number assigned to

14  each weapon?

15    A.    Yes, sir.

16    Q.    And were you able to determine the exact

17  number and which weapons had been stolen during the robbery?

18    A.    Yes, sir, I was.

19    Q.    And did you give that information over to the

20  Irving Police Department?

21    A.    The Irving Police Department as well as the

22  ATF.

23    Q.    Let me show you three posters which have been

24  marked State Exhibits 46, 47, and 48.  And do these appear

25  to be the -- a list of the weapons taken, the types of

1    weapons, along with their individual serial numbers?

2         A.     Yes, sir, it does.

3                    MR. SHOOK:  Your Honor, at this time we

4    will offer State Exhibits 46, 47, and 48.

5                    MR. SANCHEZ:  We have no objection, Your

6    Honor.

7                    THE COURT:  Nos. 46 through 48 shall be

8    admitted.

9         Q.     (By Mr. Shook)  Let me show you State Exhibit

10   46 for demonstrative purposes.  What do we see here on the

11   exhibit?

12        A.     That's a list of handguns and rifles and

13   shotguns that were taken that evening.

14        Q.     Okay.  The first category we see on the

15   exhibit, is that the manufacturer of the weapon?

16        A.     Yes, sir.  The first one up there is the

17   Berreta.

18        Q.     And then the next information is what?

19        A.     That's the specific model of that type of

20   Beretta handgun that was taken.

21        Q.     And then the information in blue, what was

22   that?

23        A.     That's the serial number assigned to that

24   individual weapon.

25        Q.     Okay.  So there was a total of 44 guns taken

1    from the Oshman's during the robbery?

2          A.     Yes, sir.

3          Q.     Thirty-four handguns?

4          A.     Yes, sir.

5          Q.     And then seven shotguns and three rifles?

6          A.     Yes, sir.

7          Q.     Was there also ammunition taken from the

8    Oshman's?

9          A.     Yes, sir.  Several boxes of .357 Magnum

10   ammunition, 9 millimeter, .45 caliber.

11         Q.     Okay.  What other types of items do you recall

12   being stolen during the robbery?

13         A.     They took some -- they took some nightvision

14   goggles and binoculars, sleeping bags, cold weather items,

15   jackets.

16         Q.     Did you ever determine the exact amount of

17   cash that was taken?

18         A.     There was right at $100,000 in cash taken that

19   night.

20         Q.     Now, your car, did you ever locate your car,

21   the white Ford Explorer?

22         A.     Yes, sir.  I learned it was later recovered

23   later that evening.

24         Q.     Let me show you State Exhibit 50.  Is that the

25   Ford Explorer?

1        A.     Yes, sir, it is.

2        Q.     These are your Marine stickers there on the

3   back of the vehicle?

4        A.     Yes, sir.

5        Q.     Was there any damage done to the inside of the

6   vehicle?

7        A.     Yes, sir, there was.  The driver's door had

8   two bullet holes on the inside.  There was quite a bit of

9   blood in the driver's seat.  The front door on the passenger

10  side, the window had either been broken out or shot out.

11       Q.     Okay.  State Exhibit 49, is that the front of

12  the vehicle?

13       A.     Yes, sir.

14       Q.     Did it appear that during the course of this

15  robbery that all the robbers together were working as a

16  team?

17       A.     Yes, sir.  They were all there working

18  together.  Mr. Rivas appeared to be the leader.

19       Q.     Okay.  Did they appear to each have an

20  individual role?

21       A.     Yes, sir.

22       Q.     And for the record is that Oshman's located

23  here in Dallas County and the State of Texas?

24       A.     Yes, sir, it is.

25              MR. SHOOK:  We'll pass the witness, Your

1    Honor.

2                    CROSS-EXAMINATION

3    BY MR. SANCHEZ:

4         Q.    Mr. Ferris, you had testified earlier that

5    Mr. Rivas had taken your keys and gotten your white

6    Explorer.  Did you see where he went after he did that?

7         A.    No, sir.  I was in the employee breakroom.

8         Q.    When that happened, did that happen before he

9    got any call that somebody was on the way or that they had

10   company?

11        A.    I was already in the breakroom when I heard it

12   over the radio that they had company, so I'm assuming he was

13   outside the building.

14        Q.    Okay.  Now, when the keys were taken from you,

15   though, was that before?

16        A.    That was before.

17        Q.    Do you remember how long before --

18        A.    It was --

19        Q.    -- before there was company or somebody was on

20   the way occurred?

21        A.    It would have been about 15 or 20 minutes,

22   because it was while I was emptying the registers up front.

23        Q.    After he took the keys from you, you didn't

24   see where he went or maybe even if he went outside.  Do you

25   recall?

1    A.    When he first took the keys from me, he was

2  with me for another 15 or 20 minutes, going through the

3  store and emptying the safe and emptying the gun safe and

4  then back to the employee breakroom.  And then he left and I

5  never saw him again.

6    Q.    You have testified that you felt that he was

7  the leader.  When he spoke could you tell that the other

8  people who were in the store you identified as the robbers,

9  did they listen to him or were they afraid of him?  Could

10  you tell?

11    A.    I don't think they were afraid of him.  But

12  they did listen to him.

13    Q.    Did he ever chastise them in your presence as

14  to doing something they shouldn't be doing?

15    A.    No, sir.

16    Q.    Of course, you were never tied up yourself?

17    A.    No, sir.

18    Q.    And he explained to you, if you did everything

19  he asked, no one would get hurt, correct?

20    A.    Yes, sir.

21    Q.    Okay.  Now, in the whole time you were with

22  Mr. Rivas, you said that you could hear over the radio

23  voices?

24    A.    Yes, sir.

25    Q.    Were they different voices?

1      A.     A couple of different voices, yes, sir.

2      Q.     At any time you were with him could you hear

3  or did you hear anybody say that somebody was near the

4  window or looking into the store or anything like that?

5      A.     No, sir.

6      Q.     And at times you were close enough you could

7  hear clearly what was being said over that radio, correct?

8      A.     Yes, sir.

9            MR. SANCHEZ:  That's all we have, Your

10  Honor.  Pass the witness.

11                   REDIRECT EXAMINATION

12  BY MR. SHOOK:

13      Q.     Mr. Ferris, just a couple more questions.

14  Now, he first took your keys while you were at the front of

15  the store; is that right?

16      A.     Yes, sir.

17      Q.     But at that point in time he didn't leave you

18  at that time, did he?

19      A.     No, sir.

20      Q.     Once Mr. Rivas took you to the back breakroom

21  and left you, you don't know where he went at that time; is

22  that right?

23      A.     No, sir, I don't.

24      Q.     Did he say anything where he was going at that

25  time?

1    A.    He told them to tie everybody up.  He was

2  going out to get the vehicle and he would meet them out

3  back.

4    Q.    He said that he would meet them out back?

5    A.    Yes, sir.

6    Q.    And at that point in time is where you were

7  forced to the ground and your wallet was taken?

8    A.    Yes, sir.

9    Q.    But you weren't tied up at that time?

10   A.    No, sir, I was not.

11   Q.    After you were forced to the ground, were they

12 continuing tying employees up and that sort of thing?

13   A.    Yes, sir.

14   Q.    And then was it Mr. Rivas that came over the

15 radio and was talking to the -- to Mr. Rodriguez and

16 Mr. Garcia in the breakroom sometime after that?

17   A.    Yes, sir.

18   Q.    And what is it again did he say at that time?

19   A.    He told them to hurry up, they had to go.  One

20 of them responded that they hadn't finished tying everybody

21 up.  And he said, we've got company.  We've got to go.

22   Q.    And then they left after that?

23   A.    Yes, sir.

24   Q.    Okay.

25             MR. SHOOK:  That's all we have, Judge.

1    MR. SANCHEZ:  That's all we have, Your

2  Honor.

3    THE COURT:  Witness subject to recall or

4  excused?

5    MR. SHOOK:  May this witness be excused

6  and we can have him on standby?

7    MR. SANCHEZ:  That's fine, Your Honor.

8    THE COURT:  Thank you, Mr. Ferris, you

9  may stand down.  You are on standby and you are still under

10  the Rule.

11    THE WITNESS:  Yes, sir.

12    THE COURT:  Folks, we'll take our morning

13  break until about 10:35.

14                    [Jury out]

15                    (Recess)

16    THE COURT:  All right.

17                    [Jury in]

18    THE COURT:  Thank you, you may have a

19  seat.  Mr. Shook, call your next witness.

20    MR. SHOOK:  We'll call Officer Cassout.

21    THE COURT:  Let the record reflect this

22  witness has been sworn.

23                  TIMOTHY CASSOUT,

24  having been duly sworn, was examined and testified as

25  follows:

<center>DIRECT EXAMINATION</center>

BY MR. SHOOK:

Q.     Would you tell us your name, please.

A.     Timothy Cassout.

Q.     And how are you employed, sir?

A.     As a police officer for the City of Irving.

Q.     How long have you been with the City of Irving?

A.     I've been there for five years now.

Q.     What are your duties?

A.     As a patrolman.

Q.     Okay.  Are you also a member of the Armed Forces?

A.     Yes, I am.

Q.     What branch are you in?

A.     The Army.

Q.     Okay.  The past couple of years, have you been on active duty?

A.     Yes, sir, I have.

Q.     What particular division do you work in with Irving Police Department?

A.     Patrol.

Q.     And what are your duties as a patrol officer?

A.     Respond to calls for service, enforce state laws, city ordinances.

1    Q.    Okay.  What shift do you work?

2    A.    Right now I'm working nights.

3    Q.    Okay.  And I take it you came directly from

4  off shift today to the courtroom; is that right?

5    A.    Yes, sir.

6    Q.    So you have been up for a while?

7    A.    Yes, sir.

8    Q.    All right.  Let me turn your attention back to

9  December 24th of 2000.  I'll ask if you had come on duty

10  that evening as a patrol officer?

11    A.    Yes, sir, I did.

12    Q.    Approximately what time did you come on duty?

13    A.    I think it was 3:45, sir.

14    Q.    Did you know another officer by the name of

15  Aubrey Hawkins?

16    A.    Yes, sir, I did.

17    Q.    Is that a photograph of Aubrey Hawkins in

18  uniform there to your left?

19    A.    Yes, sir, it is.

20    Q.    Did he come on duty at the same time you did

21  that evening?

22    A.    Yes, sir, he did.

23    Q.    What portion of the City of Irving were you

24  patrolling that evening?

25    A.    I was working 42 beat.

1    Q.    Okay.  Explain to the jury how your -- what

2    areas of the city you patrol, how that's laid out.

3    A.    The city is broken down into several different

4    beats.  My beat I was working that night was 42 beat.  It's

5    north of 183 between Beltline and the west city limits.

6    Q.    So all officers on patrol have a particular

7    beat they are assigned to?

8    A.    Yes, sir, they do.

9    Q.    If the dispatcher were going to notify you of

10   a call, does she use your beat number to talk to you?

11   A.    Yes, sir.

12   Q.    That evening what number would she have used?

13   A.    242.

14   Q.    Okay.  What does the 2 signify?

15   A.    Signifies which shift you are on, evening

16   shift in that case.

17   Q.    And do you recall what beat Officer Hawkins

18   was assigned to that evening?

19   A.    234.

20   Q.    I want to turn your attention now to about

21   6:30 that evening and ask where you were located in your

22   patrol car at that time?

23   A.    I was in a parking lot of the Irving Mall.

24   Q.    Okay.  Is that Irving Mall located across the

25   highway from the Oshman's Sporting Goods Store?

1    A.    Yes, sir, it is.

2    Q.    I want to show you what's been marked as State

3    Exhibit 51.  Actually, let me show you what has been marked

4    as State Exhibits 51 through 58.  Do these show some aerial

5    views of the Oshman's store as well as the area behind the

6    Oshman's as it appeared that night?

7    A.    Yes, sir, it is.

8          MR. SHOOK:  Your Honor, at this time we

9    offer State Exhibit 51 through 58.

10         MR. SANCHEZ:  We have no objection, Your

11   Honor.

12         THE COURT:  Nos. 51 through 58 shall be

13   admitted.

14   Q.    (By Mr. Shook)  State Exhibit 51, is that an

15   aerial view of the Oshman's as well as where you were

16   located at the mall?

17   A.    Yes, sir.

18   Q.    We see the Oshman's here kind of in the center

19   of the photograph?

20   A.    Yes, sir.

21   Q.    And what is this road we see here?

22   A.    That would be State Highway 183.

23   Q.    And this group of buildings here?

24   A.    Would be the Irving Mall.

25   Q.    If we could get a little closer up of the

1   Irving Mall area.  Now, is the mall open or closed at that

2   time?

3          A.     It was closed.

4          Q.     What part of the mall parking lot were you

5   located at?

6          A.     It would be to the extreme left of the

7   picture.

8          Q.     Down in this area?

9          A.     A little farther to the left, sir.

10         Q.     Over here?

11         A.     Yes, sir.

12         Q.     Okay.  And were you answering a call or were

13  you just sitting in the parking lot at that time?

14         A.     I was sitting in the parking lot.

15         Q.     Were you by yourself?

16         A.     Yes, sir, I was.

17         Q.     Were you on the phone?

18         A.     Yes, sir.

19         Q.     Okay.  How about your window, was it up or

20  down?

21         A.     It was down.

22         Q.     As you were sitting there around 6:30 that

23  evening, did you hear anything unusual?

24         A.     Yes, sir, I did.

25         Q.     What was that?

```
1        A.     Sounded like fireworks were going off.

2        Q.     Okay.  What type of fireworks?

3        A.     Firecrackers, a package of firecrackers.

4        Q.     As if someone had set off a string of

5  firecrackers?

6        A.     Yes, sir.

7        Q.     Did the pops or the bangs go one right after

8  the other?

9        A.     Yes, sir, in rapid succession.

10       Q.     Now, somewhere around that time were you

11  dispatched to a call after that?

12       A.     Yes, sir, I was.

13       Q.     What type of call was that?

14       A.     A suspicious persons call, sir.

15       Q.     Okay.  Now, had some units already been

16  dispatched to that call already?

17       A.     Yes, sir.  And where was that call located?

18       A.     It was at the Oshman's.

19       Q.     Okay.  You had monitored that call.  The

20  dispatcher had already sent some units there?

21       A.     Yes, sir.

22       Q.     How much prior to you hearing the

23  firecrackers, what you believed to be firecrackers, had that

24  occurred?

25       A.     It was a real short amount of time.  I
```

1    couldn't give you an exact time.

2         Q.    Okay.  Do you recall which units were sent to

3    the Oshman's prior to that?

4         A.    234 and I think 223, but I'm not sure on that.

5         Q.    You are sure on 234, though?

6         A.    Yes, sir.

7         Q.    Was 234 Officer Aubrey Hawkins?

8         A.    Yes, sir, it was.

9         Q.    So he had already been dispatched to the

10   Oshman's and then you heard this string of firecrackers?

11        A.    Yes, sir.

12        Q.    And shortly after that you were then also

13   dispatched?

14        A.    Yes, sir.

15        Q.    Who dispatched you to the Oshman's?

16        A.    Dispatch did.

17        Q.    Did they do that per instructions of any

18   supervisors?

19        A.    Yes, sir.

20        Q.    Who was that?

21        A.    It would be Sergeant Norton.

22        Q.    He asked for more units to go there?

23        A.    Yes, sir.

24        Q.    Okay.  Which direction or how did you get to

25   the Oshman's at that point in time?

103

1    A.    I took the north service road to 183 to

2 Esters, went across the highway on the overpass and came

3 back down on the south service road.

4    Q.    So you would have gone this way down the

5 service road?

6    A.    Yes, sir.

7    Q.    Gone down to Esters and then come back up this

8 way?

9    A.    Yes, sir.

10   Q.    And which direction did you come into the

11 Oshman's?

12   A.    I came in from the north on Willow Creek.

13   Q.    Is that Willow Creek the street located behind

14 the Oshman's?

15   A.    Yes, sir, it is.

16   Q.    Did you come this direction?

17   A.    Yes, I did.

18   Q.    All right.  Let me show you State Exhibit 52,

19 which shows a different angle.  Does this show Willow Creek

20 as you would have driven into the Oshman's?

21   A.    Yes, sir, it does.

22   Q.    And this is the back area of the Oshman's?

23   A.    Yes, sir, it is.

24   Q.    And what is this to your right, right here?

25   A.    It's a used car lot.

1      Q.    Okay.  And then this area here?

2      A.    It's an open field.

3      Q.    Okay.  State Exhibit 53, a side view, does

4  that show the area you were driving to at that time?

5      A.    Yes, sir, it is.

6      Q.    Coming from this direction here?

7      A.    Yes, sir, it does.

8      Q.    Okay.  Now, as you were making your way to the

9  Oshman's, did you have some concerns about that particular

10  call?

11      A.    Yes, I did.

12      Q.    What were those concerns?

13      A.    That they were checking on 34's status and he

14  wasn't answering the radio.

15      Q.    Explain to the jury what checking on a unit's

16  status is.

17      A.    An officer is dispatched to a call, if it's

18  something is real suspicious or a person is checked out for

19  a while, usually ten minutes, dispatch will call the officer

20  on the radio and ask them if they are all right and the

21  officer will respond.  If everything is okay, it's a Code 4

22  or respond otherwise, if he needs help or something.

23      Q.    As a patrol officer are you also equipped with

24  a radio that is attached to your belt?

25      A.    Yes, sir.

1    Q.    So you can talk to the dispatcher in the car,

2    as well as after you have exited the car?

3    A.    Yes, sir.

4    Q.    As you were making your way to the Oshman's,

5    was the dispatcher checking on Officer Hawkins' status?

6    A.    Yes, sir, she was.

7    Q.    And was he answering?

8    A.    No, sir.

9    Q.    And that aroused your suspicions?

10    A.    Yes, sir, it did.

11    Q.    How fast did you come in up Willow Creek

12    there?

13    A.    I got there pretty quick, sir.

14    Q.    Once you arrived did you notice anything

15    unusual?

16    A.    Yes, sir, I did.

17    Q.    What was that?

18    A.    I saw debris laying in the roadway and the --

19    his car was kind of backed up against a semitrailer.

20    Q.    Let me show you State Exhibit 56.  Kind of

21    shows a direct overview of the back parking lot area.  How

22    close or where did you park your car?

23    A.    The second entrance, I started to pull in --

24    that's it now, sir.

25    Q.    This way?

1    A.    There you go.  I started to pull in there.

2    Q.    All right.  Where did you stop your vehicle?

3    A.    Just as I was starting to make the turn, sir,

4 my Headlights would have been pointing directly towards the

5 building.

6    Q.    Okay.  And you saw some debris in the roadway?

7    A.    Yes, sir.

8    Q.    Where was that located?

9    A.    Come about if you go from the -- straight up

10 to the road from the trash compactors up to the road, around

11 that area.

12    Q.    Okay.  Now, did you see Officer Hawkins out

13 anywhere at that time?

14    A.    No, sir, I didn't.

15    Q.    You saw his squad car, though?

16    A.    Yes, sir, I did.

17    Q.    Where was that located?

18    A.    It was backed up against the back corner of

19 the semitrailer.

20    Q.    Let me show you State Exhibit 38.  Does that

21 show the position of Officer Hawkins' car?

22    A.    Yes, sir, it does.

23    Q.    Did that seem unusual to you?

24    A.    Yes, it was.

25    Q.    Once you stopped your car, what did you do?

1      A.      I stopped my car and I checked out.  I asked

2  if he had checked into a chase because of all the debris.

3  And I spotlighted the field to make sure there was nobody

4  running out there.

5      Q.      Did you see anyone running at all?

6      A.      No, sir.

7      Q.      Okay.  Then what did you do?

8      A.      Then I got out of the car -- or I started to

9  pull into, the rest of the way into the parking lot or the

10  loading bay and then I saw a person laying on the ground.

11      Q.      Where in the parking lot area did you see the

12  person?

13      A.      It was just to the north of the trash

14  compactor.

15      Q.      If we're looking at State Exhibit 38, would it

16  be back up in this area?

17      A.      Yes, sir.

18      Q.      Was the person lying face up or face down?

19      A.      Face down.

20      Q.      Could you tell who it was at that time?

21      A.      No, sir, I could not.

22      Q.      Did you start to approach the person on the

23  ground?

24      A.      Yes, I did.

25      Q.      In fact, did you communicate to the dispatcher

1   that you had someone down in the back?

2       A.      Yes, sir, I did.

3       Q.      As you got closer were you able to tell who it

4   was?

5       A.      Yes, sir, I was.

6       Q.      How were you able to tell that?

7       A.      I saw the patch on his shoulder.

8       Q.      The Irving police officer patch?

9       A.      This patch right here, sir.

10      Q.      What did you do then?

11      A.      I told dispatch that we had an officer down.

12  I went and made a quick check of his pulse.  I didn't feel

13  anything.  And then I backed off and took cover.

14      Q.      Where did you feel of his pulse?

15      A.      His wrist.

16      Q.      You didn't get any sign of a pulse at that

17  time?

18      A.      No, sir.

19      Q.      And why was it that you backed off and sought

20  cover?

21      A.      There was a lot of area I couldn't cover.  I

22  couldn't see.  It was an open door and I just wasn't safe

23  there in the open.

24      Q.      At that point in time you had no idea whether

25  the suspects were still around or not?

1    A.    No, sir.

2    Q.    Let me show you State Exhibit 58.  Does that

3  show the area where Officer Hawkins was lying?

4    A.    Yes, sir, it does.

5    Q.    Okay.  Now, at that time these orange boxes

6  weren't located there; is that right?

7    A.    That's correct.

8    Q.    Did other officers arrive soon after you?

9    A.    Yes, sir.

10   Q.    Who was that?

11   A.    It was Officer Hughes.

12   Q.    Okay.  What did Officer Hughes do once he

13  arrived?

14   A.    He took up a spot by a trash compactor,

15  covering an open door.

16   Q.    Did Sergeant Norton arrive soon after that?

17   A.    Yes, sir, he did.

18   Q.    What happened when Sergeant Norton arrived?

19   A.    First thing he did is we started doing CPR.

20   Q.    Were you able to roll Officer Hawkins over?

21   A.    Yes, we were.

22   Q.    Okay.  Did you help perform CPR?

23   A.    Yes, I did.

24   Q.    What did you do?

25   A.    I was doing the breathing portion.

1    Q.    And what was Sergeant Norton doing?

2    A.    He was doing the chest compressions.

3    Q.    Did you see any signs of life in Officer

4  Hawkins at that time?

5    A.    No, sir.

6    Q.    Could you tell or did you see where Officer

7  Hawkins had been wounded?

8    A.    It seemed he had head trauma, but I couldn't

9  actually see an entrance or exit wounds.  That's all I could

10  tell.  It was a lot of blood.

11    Q.    Was his face covered in blood?

12    A.    Yes, it was.

13    Q.    Did the paramedics arrive shortly thereafter?

14    A.    Yes, they did.

15    Q.    What happened when they arrived?

16    A.    They took over the life saving procedures and

17  I went on perimeter.

18    Q.    Did you notice any evidence near Officer

19  Hawkins' body when you arrived there?

20    A.    Yes, I did.  It was a revolver.

21    Q.    Okay.  Let me show you State Exhibit 39.  Is

22  that the revolver that you saw laying out there?

23    A.    Yes, sir.

24    Q.    Did you at any time move the revolver?

25    A.    No, sir.

1    Q.    Okay.  After they took Officer Hawkins away,

2   what did you do then?

3    A.    I was assigned to work or stand in the

4   perimeter.

5    Q.    Okay.  When you were first down trying to aid

6   Officer Hawkins, did you see whether his handgun was still

7   in the holster?

8    A.    Yes, I did, sir.  It was missing.

9    Q.    Okay.  It was missing out of the holster?

10   A.    Yes, sir.

11   Q.    Did you know what type of handgun he carried?

12   A.    I believe it was a Glock, sir, but I couldn't

13   be sure.

14   Q.    Is that a semiautomatic handgun?

15   A.    Yes, sir, it is.

16   Q.    And it was missing?

17   A.    Yes, sir.

18   Q.    Okay.  The rest of the evening what was your

19   assignment out there?

20   A.    To stand at the perimeter or watch the

21   perimeter.  I spent most of the time in the front of the

22   building.

23   Q.    Guarded the perimeter of the building?

24   A.    Yes, sir.

25   Q.    Were you ever -- did you ever interview

112

1    witnesses, anything like that?

2         A.    No, sir.

3         Q.    And you never touched any evidence nor

4    collected any evidence?

5         A.    No, sir.

6         Q.    For the record this Oshman's located in Dallas

7    County, State of Texas?

8         A.    Yes, sir, it is.

9              MR. SHOOK:  We'll pass the witness.

10                   CROSS-EXAMINATION

11   BY MR. SANCHEZ:

12        Q.    Officer, when you were sitting in the parking

13   lot there at the Irving Mall, what store were you close to

14   there?

15        A.    I believe it would be the Dillards, sir.

16        Q.    So in order for you to get over to where the

17   Oshman's was, you had to go toward the airport and cross

18   over Esters or you could go over to Beltline; isn't that

19   correct?

20        A.    Yes, sir.

21        Q.    And did you choose going down to Esters

22   because that was less traffic maybe on that street or was

23   Beltline busy at the time?  Do you recall?

24        A.    It's easier to take the service road than to

25   cut through the mall parking lot.  So it's quicker to go

1    down the service road toward Esters.

2         Q.    That's the choice you made.  Nobody told you

3    to take that route?

4         A.    Yes, sir.

5         Q.    And because you took that route, the first

6    place at the Oshman's you could get to would be the back; is

7    that correct?

8         A.    That's correct, sir.

9         Q.    You weren't instructed to go to the back, were

10   you?

11        A.    No, sir.

12        Q.    That was just the first possible place and the

13   fastest place that you could get to; isn't that correct?

14        A.    That's correct, sir.

15        Q.    Because if you would have taken Beltline, then

16   the front of the store would have been the closest place to

17   get to; is that correct?

18        A.    Yes, sir.

19        Q.    Now, when you were on the phone at the Irving

20   Mall, do you recall who you were talking to?

21        A.    It was an ex-girlfriend.

22        Q.    And do you recall at what time you were

23   dispatched over to the Oshman's?

24        A.    Not the exact time, sir, no.

25        Q.    Do you recall what time you heard what you

1  thought were fireworks?

2          A.     No, sir.

3                      MR. SANCHEZ:  That's all I have, Your

4  Honor.

5                      MR. SHOOK:  We have nothing further,

6  Judge.  May this witness be excused?

7                      MR. SANCHEZ:  We have no objection, Your

8  Honor.

9                      THE COURT:  The witness may be excused.

10                     MR. SHOOK:  Call Lt. Norton.

11                     THE COURT:  Let the record reflect this

12  witness has been sworn.

13                     DENNIS NORTON,

14  having been duly sworn, was examined and testified as

15  follows:

16                     DIRECT EXAMINATION

17  BY MR. SHOOK:

18          Q.     Would you tell us your name, please.

19          A.     Dennis Norton.

20          Q.     And how are you employed, sir?

21          A.     I'm a lieutenant with the Irving Police

22  Department.

23          Q.     How long have you been with the Irving Police

24  Department?

25          A.     Twenty-two years.

1    Q.    What division are you assigned?

2    A.    I'm in the Traffic Division now.

3    Q.    Let me turn your attention back to December

4   24TH of 2000 and ask what division you were assigned to at

5   that time?

6    A.    Patrol Division.

7    Q.    And at that point in time your rank was

8   sergeant; is that right?

9    A.    Yes, sir.

10    Q.    And what particular shift were you working?

11    A.    Evening shift.

12    Q.    As a sergeant over the Patrol Division, what

13   were your duties?

14    A.    To basically monitor calls for service and

15   take care of the officers in whatever aspect they would

16   need.

17    Q.    Do you actually go out on patrol yourself or

18   available to answer calls?

19    A.    Yes, sir, I did.

20    Q.    And then did you answer calls on a daily

21   routine?

22    A.    Yes, we did.

23    Q.    Let me ask you, did Officer Aubrey Hawkins

24   work under your command?

25    A.    Yes, he did.

1    Q.    And did he come on duty on that day?

2    A.    Yes, he did.

3    Q.    Is that a photograph of Aubrey Hawkins we see

4  to your left?

5    A.    Yes, it is.

6    Q.    Okay.  He was a patrol officer with Irving

7  Police Department?

8    A.    Yes, sir, he was.

9    Q.    The evening of the 24th of December 2000, was

10  Officer Hawkins on duty as an Irving police officer and

11  acting in his lawful discharge as an official duty?

12    A.    Yes, sir, he was.

13    Q.    What would Officer Hawkins' duties be as a

14  patrol officer?

15    A.    They would be go out and monitor calls on his

16  beat and patrol his beat.

17    Q.    Okay.  Now, I want to turn your attention to

18  around 6:29 that evening.  Let me ask you this first.  Do

19  you recall how long Officer Hawkins had been with Irving

20  Police Department?

21    A.    He had been there about a year and a half.

22    Q.    Okay.  And then around 6:29, were you

23  monitoring calls from the dispatcher to the various patrol

24  officers?

25    A.    Yes, I was.

117

1    Q.    Okay.  Did a particular call catch your

2  attention around that time?

3    A.    Yes, it did.

4    Q.    And what call was that?

5    A.    The suspicious circumstance call to Oshman's

6  Sporting Goods.

7    Q.    Had the dispatcher dispatched some units to

8  this call?

9    A.    Yes, she had.

10    Q.    The only information you had at that time were

11  suspicious persons at the Oshman's?

12    A.    Yes, sir.

13    Q.    Okay.  How many units had she dispatched to

14  the Oshman's?

15    A.    Originally two.

16    Q.    And was Officer Hawkins one of those units?

17    A.    Yes, he was.

18    Q.    Once you heard that Officer Hawkins had been

19  dispatched, did you speak to the dispatcher?

20    A.    Yes, I did.

21    Q.    And what did you tell her?

22    A.    I told her to send some additional units.

23    Q.    Why did you want additional units sent at that

24  time?

25    A.    It was a holiday season, closing time for the

1  store, and there was multiple people involved.

2        Q.      You felt that you wanted more officers there

3  to handle that situation?

4        A.      Right.  I was uneasy about it.

5        Q.      How many more units did you dispatch?

6        A.      Two more.

7        Q.      Did that include Officer Cassout?

8        A.      Yes, sir.

9        Q.      Did you continue to monitor the situation once

10  the additional officers had been dispatched?

11        A.      Yes, I did.

12        Q.      Did you have some concerns as you listened to

13  the radio traffic?

14        A.      It was confusing, but, yes, and I started that

15  direction.

16        Q.      Okay.  And you started going that way yourself

17  in your vehicle?

18        A.      Yes, sir.

19        Q.      As you headed that way, did you hear Officer

20  Cassout's transmissions about finding an officer down?

21        A.      Yes, I did.

22        Q.      And did you -- when you heard that

23  information, what did you do?

24        A.      I increased my response to code 3 and asked

25  for the paramedics to be dispatched.

1    Q.    Is code 3 when an officer puts on his sirens?

2    A.    Light and sirens, yes.

3    Q.    Lights and sirens.  Once you arrived there at

4  the Oshman's, what was going on at the location?

5    A.    When I first got there Officer Cassout was out

6  checking the area to see what he could find.

7    Q.    Okay.  And did you find Officer Hawkins there

8  at the location?

9    A.    Yes, we did.

10    Q.    Where was he lying?

11    A.    He was lying in the back loading dock area.

12    Q.    I want to show you what's been entered into

13  evidence as State Exhibit 58.  Does that show the area where

14  Officer Hawkins was lying?

15    A.    Yes, it does.

16    Q.    Was he lying face down or on his back?

17    A.    He was face down.

18    Q.    And which direction was his head pointing?

19    A.    South.

20    Q.    That would be pointing in this direction?

21    A.    Yes, sir, towards the loading dock.

22    Q.    Once you saw Officer Hawkins there on the

23  ground, what did you do?

24    A.    Myself and a couple of the officers went up

25  there and turned him over and started CPR.

```
1        Q.      What portion of the CPR did you work on?

2        A.      I did the chest compressions.

3        Q.      Were you able to find any signs of life in

4   Officer Hawkins?

5        A.      No, sir, not at that time.

6        Q.      Did the paramedics arrive soon after that?

7        A.      Yes, they did.

8        Q.      What happened once they arrived?

9        A.      Once they got there on the scene they took

10  over, started working on the officer, and started working

11  trauma on him.

12       Q.      Was he transported from the scene at that

13  time?

14       A.      Yes, he was.

15       Q.      Now, some of these items we see here, were

16  these items left by the paramedics?

17       A.      Yes, sir.

18       Q.      This area here where we see a large amount of

19  blood, is that the area where Officer Hawkins was lying in?

20       A.      Yes, it was.

21       Q.      Were there some other items laying out there

22  that you thought was potential evidence in the case?

23       A.      Yes, there was.

24       Q.      What items were those?

25       A.      A handgun, I think a satchel, some type of
```

1  ammo, and those type things.

2       Q.   Did you touch or move any of those items?

3       A.   No, sir, we did not.

4       Q.   Once Officer Hawkins was taken away, what did

5  you do?

6       A.   We secured the back of the store and started

7  the perimeter.

8       Q.   At the time did you know whether the suspects

9  were still in the store?

10      A.   We weren't sure.

11      Q.   You were acting under the assumption that they

12  were?

13      A.   Yes, it was a possibility.

14      Q.   In fact, is this one of the officers that we

15  see here guarding the perimeter or the open doors?

16      A.   Yes, sir.

17      Q.   After Officer Hawkins was taken away and the

18  scene was secured, did you come up with a plan to have the

19  hostages inside the store taken out?

20      A.   Yes, sir.  The Tactical Team arrived and we

21  came up with a plan to bring the people out of the store.

22      Q.   What was that plan?

23      A.   The TACT Team went in and secured the

24  employees and then brought them to the back door to us.

25      Q.   Here out the back?

1      A.    Yes, sir.

2      Q.    When they were brought out, were -- did you

3 take precautions not to have them disturb the evidence back

4 there?

5      A.    We brought them around the far side of the

6 generator there, yes, sir.

7      Q.    Okay.  Now, you saw Officer Hawkins' car out

8 there at that time; is that right?

9      A.    Yes, we did.

10     Q.    Are the Irving police cars equipped with

11 videotape cameras?

12     A.    Yes, they are.

13     Q.    And did you make an attempt to or did you

14 remove the video cassette from Officer Hawkins' car?

15     A.    With one of the investigators we removed it

16 from the trunk.

17     Q.    What was your purpose in doing that?

18     A.    They wanted to see what they could establish

19 on the video.

20     Q.    Do the officers sometimes record their traffic

21 stops?

22     A.    Yes, they do.

23     Q.    Did you learn at a later time that, in fact,

24 this particular incident was not recorded?

25     A.    Yes, sir.

123

1      Q.     Let me show you what has been marked as State

2  Exhibit No. 59.  Is that the tape that was removed from

3  Officer Hawkins' car?

4      A.     I believe it is.

5      Q.     Okay.

6          MR. SHOOK:  Your Honor, at this time we

7  offer State Exhibit 59.

8          MR. SANCHEZ:  No objection, Your Honor.

9          THE COURT:  No. 59 shall be admitted.

10     Q.     (By Mr. Shook)  Lt. Norton, did you -- every

11 patrol officer has a handgun with him when they are out on

12 duty; is that right?

13     A.     Yes, sir.

14     Q.     Did you consult the records of the Irving

15 Police Department and determine what type of gun Officer

16 Hawkins had, as well as his serial number?

17     A.     Yes, sir.

18     Q.     Let me show you what has been marked as State

19 Exhibit 62.  Does this poster indicate the information you

20 found on the type of weapon, as well as the gun and serial

21 number?

22     A.     Yes, it does.

23          MR. SHOOK:  Your Honor, at this time

24 we'll offer State Exhibit No. 62.

25          MR. SANCHEZ:  We have no objection, Your

1   Honor.

2                    THE COURT:  No. 62 shall be admitted.

3          Q.       (By Mr. Shook)  Lt. Norton, State Exhibit 62

4   shows a Glock Model 17 with CWU717.  Could you tell the jury

5   what type of weapon a Glock is?

6          A.       It's a semiautomatic handgun.

7          Q.       Lt. Norton, did you have a chance to review

8   the -- and listen to the dispatch tape of the events as they

9   occurred, the dispatch of the call to the Oshman's, as well

10  as the transmissions between the officers?

11         A.       Yes, sir, I did.

12         Q.       Let me show you a cassette tape that has been

13  marked State Exhibit 61.  I believe you have listened to

14  this outside the presence of the jury.  Was that a copy of

15  the dispatch tape for the transmissions for the Oshman's

16  call?

17         A.       Yes, sir, I believe it is.

18         Q.       Let me show you State Exhibit 756.  Is that a

19  copy of the transcript, an accurate copy of the transcript

20  of the call, the conversation between the dispatcher and the

21  police officers?

22         A.       Yes, sir, I believe it is.

23         Q.       Were you able to identify all the voices on

24  the tape as being either the dispatcher or the Irving police

25  officers under your command?

125

1     A.     Yes, sir.

2     Q.     And is it a fair and accurate copy of the

3   dispatch tape?

4     A.     Yes, sir, I believe it is.

5          MR. SHOOK:  Your Honor, at this time we

6   offer State Exhibit 61 and 756.

7          MR. SANCHEZ:  We have no objection, Your

8   Honor.

9          THE COURT:  State Nos. 61 and 756 shall

10   be admitted.

11          MR. SHOOK:  Your Honor, at this time may

12   we have permission to publish the tape for the jury?

13          THE COURT:  You may.

14          MR. SHOOK:  May we pass out copies of

15   State Exhibit 756 so the jury can follow along?

16          THE COURT:  You may.

17     Q.     (By Mr. Shook)  The voice we just heard, 234,

18   is that Officer Hawkins?

19     A.     Yes, sir, it is.

20     Q.     Officer Hawkins has just said, "10-4, I'm

21   out."  What does that mean?

22     A.     That means he's checked out at the location.

23     Q.     That means he's arrived there?

24     A.     Yes, sir.

25     Q.     And that was yourself wanting more units

1  dispatched to the Oshman's?

2          A.      Yes, sir.

3          Q.      Is that the -- what is the dispatcher doing

4  there?

5          A.      She's trying to raise him and check his

6  status.

7          Q.      When they are talking about 34, that's Officer

8  Hawkins; is that right?

9          A.      Yes, sir.

10         Q.      Lt. Norton, let me show you a black and white

11  photograph which has been marked State Exhibit 757.  Is that

12  a photograph of Officer Hawkins?

13         A.      Yes, it is.

14                 MR. SHOOK:  Offer State Exhibit 757 for

15  record purposes.

16                 MR. SANCHEZ:  No objection for record

17  purposes only.

18                 THE COURT:  State Exhibit 757 for record

19  purposes only.  Jury, what that means is you will not be

20  able to view that exhibit.

21                 MR. SHOOK:  I'll pass the witness.

22                 <u>CROSS-EXAMINATION</u>

23  <u>BY MR. SANCHEZ:</u>

24         Q.      Lieutenant, I notice from the dispatch records

25  that Officer Silva and Officer Hawkins were dispatched at

1   the same time to that Oshman's; is that correct?

2         A.     Yes, sir.

3         Q.     Were you able to determine where Officer Silva

4   was when he received this dispatch call?

5         A.     I don't know his exact location, no, sir.

6         Q.     Was he close to the area?

7         A.     He was not as close as Officer Hawkins, no,

8   sir.

9         Q.     Do you know how long it took him to get to the

10  Oshman's?

11        A.     I would just have to check the times on the

12  log.

13        Q.     Do you have that in front of you right now?

14  Would you like to refresh your memory and see if you recall

15  that?

16        A.     It probably took him about five minutes.  If

17  the call came out at 18:30, he looks like he's in the area

18  at 18:36.

19        Q.     So it took him about five minutes and it took

20  Officer Hawkins about how long, do you know?  Can you tell

21  from the dispatch records?

22        A.     About 30 to 45 seconds.  Apparently he was

23  fairly close.

24        Q.     Did Officer Silva ever make it to the back of

25  the Oshman's?

1        A.      Yes, he did.

2        Q.      And do you know -- can you tell by the records

3    in front of you whether when he arrived other officers were

4    already there when he arrived?

5        A.      We all started showing up about the same time.

6        Q.      Now, from hearing this tape here, it seems

7    like whoever was calling the police had got close enough to

8    the door to look inside; is that correct?

9        A.      Apparently we had several people, a couple of

10   people, calling.

11       Q.      So either people who were parked really close

12   to the door or somebody who had actually gone up to the

13   door; is that correct?

14       A.      I'm not sure of their distance, sir.

15       Q.      But it would be safe to say they were close

16   enough to where they could actually see something was going

17   on in there?

18       A.      They knew something was going on.

19       Q.      And referring to the Good Eats or Spring

20   Creek, are those restaurants in the same parking lot as the

21   Oshman's?

22       A.      Yes, they are.

23       Q.      Are they closer to Beltline than they are to

24   the Oshman's or how far are they?

25       A.      It's about midpoint, but they are probably a

1  little bit closer to Beltline.

2          MR. SANCHEZ:  I pass the witness, Your

3  Honor.

4          MR. SHOOK:  That's all we have, Judge.

5          THE COURT:  Thank you, Lieutenant, you

6  may stand down.

7          MR. SHOOK:  May this witness be excused?

8          MR. SANCHEZ:  No objection, Your Honor.

9          THE COURT:  You may be excused.

10          MR. SHOOK:  Call Detective Johnson.

11          THE COURT:  Have you been sworn?

12          THE WITNESS:  Yes, Your Honor.

13          THE COURT:  Yes.  This witness has been

14  previously sworn.

15          RANDALL JOHNSON,

16  having been duly sworn, was examined and testified as

17  follows:

18          DIRECT EXAMINATION

19  BY MR. SHOOK:

20      Q.   Would you tell us your name, please.

21      A.   Randall Johnson.

22      Q.   And how are you employed, sir?

23      A.   By the City of Irving Police Department.

24      Q.   And what do you do with the City of Irving

25  Police?

139

1      A.    I'm a detective.

2      Q.    What division are you assigned?

3      A.    Crimes Against Persons.

4      Q.    What are your duties as a detective in the

5  Crimes Against Persons Division?

6      A.    I investigate homicides, sudden deaths,

7  suicides, injury to children, shootings, stabbings.

8      Q.    How long have you been in that particular

9  division?

10      A.    Since '89.

11      Q.    Okay.  And how long have you been with the

12  Irving Police Department?

13      A.    Twenty-two years.

14      Q.    Let me turn your attention to December 24th of

15  2000 and ask if you were on duty on that day?

16      A.    No, sir.

17      Q.    Were you, in fact, working an extra job?

18      A.    Yes, sir.

19      Q.    While working that extra job, were you

20  monitoring radio traffic in the Irving Police Department?

21      A.    Yes, sir.

22      Q.    Did you hear a call go out to an Oshman's or

23  an incident that occurred at the Oshman's there in Irving,

24  Texas?

25      A.    Yes, sir, I did.

1   Q.   What did you do once you heard that call?

2   A.   After the call went on and found out that an

3   officer had been shot, then I talked with my sergeant and he

4   asked that I respond.

5   Q.   Where did you go then?

6   A.   I went to the Oshman's.

7   Q.   And you went to the Oshman's at that time as

8   part of your duties as an investigator in the Crimes Against

9   Persons Division; is that right?

10   A.   That's correct.

11   Q.   Were you assigned co-lead to that

12   investigation, along with Jeff Spivey?

13   A.   Yes, sir.

14   Q.   Once you arrived at the location, what was

15   going on?

16   A.   The employees were still inside the Oshman's.

17   The Irving police had the Oshman's surrounded.  We were not

18   sure if the defendants were still inside the store or not.

19   And that was trying to be coordinated, so it would be safe

20   to enter the store.

21   Q.   Were you present when the employees were taken

22   out?

23   A.   Yes, sir.

24   Q.   Had you made arrangements to transport the

25   employees to the Irving Police Department?

1       A.      Yes, sir.

2       Q.      How were they transported to the Irving Police

3  Department?

4       A.      They -- by the Irving Police Department, they

5  were all brought down to the Police Department.

6       Q.      Okay.  What was the purpose for bringing them

7  down there?

8       A.      For interviews and also to look at lineups.

9       Q.      Now, did you stay at the scene at that time?

10      A.      Yes, sir.

11      Q.      Did you keep any of the employees back with

12  you at the scene?

13      A.      Yes, sir, I did.

14      Q.      Who was that?

15      A.      Wes Ferris.

16      Q.      Is that the manager of the -- one of the

17  managers of the store?

18      A.      Yes, sir.

19      Q.      And what did you do with Mr. Ferris at that

20  time?

21      A.      I interviewed him.

22      Q.      Where did that interview take place?

23      A.      Some of it took place outside of the police

24  car, then eventually because of the weather we got into a

25  police car and eventually continued on to the police

1    department.

2              Q.    What were the weather conditions that evening?

3              A.    It was cold and drizzly and rainy.

4              Q.    Did you take a statement from Wes Ferris?

5              A.    Yes, sir, I did.

6              Q.    And at some point in time did you take him

7    down to the Irving Police Department?

8              A.    Yes, sir.

9              Q.    What was your purpose in doing that?

10             A.    For him to look at a lineup.

11             Q.    That evening after this incident, did you

12   develop seven suspects that could be involved in this case?

13             A.    Yes, sir.

14             Q.    And did other investigators put together a

15   photo lineup of those suspects?

16             A.    Yes, sir, they did.

17             Q.    Let me show you what has been marked as State

18   Exhibit 45.   Is that the type of lineup that was put

19   together, these black and white photos?

20             A.    Yes, sir.

21             Q.    Were you present when any of the photo lineups

22   were shown or did the other detectives do that?

23             A.    Other detectives showed the lineups.

24             Q.    Were those lineups shown to all the employees

25   of the Oshman's that were there that evening?

1      A.      Yes, sir.

2      Q.      And, in fact, were the suspects identified by

3 various employees that evening?

4      A.      Yes, sir.

5      Q.      Now, after Wes Ferris looked at the photo

6 lineups, did you take him back to the Oshman's?

7      A.      Yes, sir, I did.

8      Q.      What was your purpose in doing that?

9      A.      For him to do a walk-through through Oshman's

10 with us.

11     Q.      Did he do that at that time?

12     A.      Yes, sir, he did.

13     Q.      Were you present when any evidence was

14 recovered from the Oshman's?

15     A.      I was present, but I wasn't right there when

16 they were actually seizing the evidence.

17     Q.      Other officers were in charge of that?

18     A.      That's their job to seize the evidence for us,

19 yes, sir.

20     Q.      That would be Officers Hazard and Chism?

21     A.      Yes, sir.

22     Q.      Did you ever see what was later described as a

23 smoke grenade or smoke bomb in the Oshman's?

24     A.      No, sir.

25     Q.      Okay.  At a later date did Wes Ferris put

1    together an inventory of the items taken, including the guns

2    and serial numbers that were taken during the robbery?

3         A.    Yes, sir.

4         Q.    Did you, in fact, help prepare arrest warrants

5    for the seven suspects?

6         A.    Yes, sir, I did.

7         Q.    And did you also include information on the

8    types of weapons and the serial numbers that were taken?

9         A.    Eventually we did have that information, yes,

10   sir.

11        Q.    Was that information disseminated to law

12   enforcement throughout the nation?

13        A.    Yes, sir.

14        Q.    Then the next, well, I guess the next month,

15   were you and Officer Spivey, as well as other officers,

16   working on various leads that were coming in, in search of

17   the suspects?

18        A.    Yes, sir, we were.

19        Q.    Let me turn your attention now to January 22nd

20   of 2001, approximately almost a month later.  Did you on

21   that date receive information that the suspects had been

22   located in Colorado?

23        A.    Yes, sir.

24        Q.    About what time were you notified of that?

25        A.    Around noontime of the 22nd.

1    Q.    Did you and some other officers then go to

2  Colorado that day?

3    A.    Yes, sir.

4    Q.    Which officers accompanied you to Colorado?

5    A.    In the plane with me was Detective Jeff Spivey

6  and also Danny Delight with ATF.

7    Q.    About what time did you arrive in Colorado?

8    A.    It was in the evening and it was dark.

9    Q.    Where did you go?

10   A.    To the RV park.

11   Q.    What part of Colorado was this?  What major

12 city was near there?

13   A.    Colorado Springs.

14   Q.    And you, then, after arriving at the airport

15 in Colorado Springs went to an RV park?

16   A.    Yes, sir.

17   Q.    What was the name of the town the RV park was

18 located near, if you recall?

19   A.    I don't recall right now, sorry.

20   Q.    If you heard the name Woodland Park, is that

21 familiar?

22   A.    It's Woodland Park, yes, sir.

23   Q.    How far is Woodland Park from Colorado

24 Springs?

25   A.    I don't know, sir.

1     Q.     Was it a short drive?  Long drive?  Or do you

2  recall?

3     A.     It was a short drive.

4     Q.     And could you describe the area of Woodland

5  Park, what kind of terrain it is?

6     A.     It's an RV park and it was hilly and a lot of

7  trees, snow on the ground.

8     Q.     Once you arrived at the RV park, what was

9  going on at that location?

10     A.     There was a lot of police personnel at the

11  location.  The RV had been secured and everybody was -- or a

12  lot of people were mustering up in one of the rooms up there

13  to try to coordinate what we were going to do.

14     Q.     Had the RV been searched at that point in

15  time?

16     A.     No, sir.

17     Q.     Did you assist them in preparing search

18  warrants for the RV?

19     A.     Yes, sir.

20     Q.     After you left that location, did you ever go

21  into the RV that evening yourself?

22     A.     Eventually, I went into the RV, yes, sir.

23     Q.     Was there a body of one of the suspects

24  located in the RV?

25     A.     Yes, sir.

1        Q.    Who was that?

2        A.    That was Harper.

3        Q.    Larry Harper that we see on State Exhibit 44

4  there?

5        A.    Yes, sir.

6        Q.    And where was he lying in the RV?

7        A.    By the table on the ground.

8        Q.    Did it appear from what you saw that he

9  committed suicide?

10       A.    Yes, sir.

11       Q.    After you left the RV park, where did you go

12  then?

13       A.    We then went to the Teller County Jail.

14       Q.    Woodland Park located in Teller County,

15  Colorado?

16       A.    Yes, sir.

17       Q.    Once you made it to -- what was your purpose

18  in going to the Teller County Jail?

19       A.    Some of the defendants had been arrested and

20  were in custody in the Teller County Jail.

21       Q.    Do you remember which suspects were in custody

22  in the Teller County Jail?

23       A.    It was George Rivas, Michael Rodriguez, Joseph

24  Garcia, and Randy Halprin.

25       Q.    Had they been arrested earlier that day?

1      A.      Yes, sir.

2      Q.      And taken into custody?

3      A.      Yes, sir.

4      Q.      And, in fact, did you speak with Michael

5  Rodriguez that day?

6      A.      Yes, sir, I did.

7      Q.      And did you take a statement from him?

8      A.      Yes, sir, I did.

9      Q.      Now, were there two other suspects still at

10  large at that point in time?

11      A.      Yes, sir.

12      Q.      And who were they?

13      A.      It was Patrick Murphy and Donald Newbury.

14      Q.      Did you have any information about any type of

15  vehicle they might be in?

16      A.      I'm not sure at that time, no, sir.

17      Q.      Okay.  At that time, though, you didn't -- you

18  didn't know where they were located?

19      A.      No.  We did not know where they were at.

20      Q.      Let me turn your attention, then, to the next

21  day, which would be, I believe, the 23rd of January.  Were

22  they still at large on -- at that point in time?

23      A.      Yes, sir.

24      Q.      At some point in time was a van located in

25  Colorado Springs that Colorado police officers had been

1   looking for?

2        A.   Yes, sir.

3        Q.   Do you recall what date that was?

4        A.   The 23rd, I believe.

5        Q.   Okay.  And where was that located?

6        A.   Where the van was located?

7        Q.   Yes, sir.

8        A.   I don't recall.

9        Q.   In the city itself?

10       A.   Yes, sir.

11       Q.   Now, where were you staying once you reached

12  Colorado Springs?

13       A.   In a hotel.

14       Q.   In Colorado Springs itself?

15       A.   Yes, sir.

16       Q.   That evening of the 23rd, were you notified by

17  the police that the suspects Murphy and Newbury may have

18  been located?

19       A.   Yes, sir.

20       Q.   And where were they located?

21       A.   At the Holiday Inn across the street from the

22  hotel we were staying at.

23       Q.   So just right across the street?

24       A.   Yes, sir.

25       Q.   Did you and Officer Spivey go over there at

1  that time?

2          A.   Yes, sir, we did.

3          Q.   What was going on at that particular time?

4          A.   Negotiations were going on with two defendants

5  and the hotel was being secured and people were removed from

6  the hotel.

7          Q.   Now, you and Officer Spivey didn't participate

8  in trying to secure the suspects at that time, did you?

9          A.   No, sir, we did not.

10         Q.   You were just observers at that point in time?

11         A.   Yes, sir.

12         Q.   In the early morning hours around 3:30, did,

13 in fact, Mr. Murphy and Mr. Newbury surrender to the

14 Colorado Springs police?

15         A.   Yes, sir, they did.

16         Q.   Were you present at the hotel when that

17 happened?

18         A.   Yes, sir.

19         Q.   Do you see Mr. Murphy here in the courtroom

20 today?

21         A.   Yes, sir, I do.

22         Q.   Could you point him out to the jury, please?

23         A.   He's sitting at the defense table with the

24 blue shirt and yellow tie.

25              MR. SHOOK:  Your Honor, if the record

1    could reflect the witness has identified the defendant here

2    in open court.

3            Q.      (By Mr. Shook)   Did Mr. Murphy look a little

4    different that day?

5            A.      Yes, sir, he did.

6            Q.      How did he look different?

7            A.      His hair was dyed.

8            Q.      Looking at State Exhibit 44, the photograph

9    there, is that how he appeared on that day?

10           A.      Yes, sir.

11           Q.      We see a blondish tint to his hair?

12           A.      Yes, sir.

13           Q.      He also had a full beard that we see in the

14   photograph?

15           A.      Yes, sir.

16           Q.      Once he was taken into custody by the Colorado

17   Springs Police Department, where was he taken to?

18           A.      To the Colorado Springs Police Department.

19           Q.      Okay.  Did you go to their offices at that

20   time yourself?

21           A.      Yes, sir.

22           Q.      After you arrived there, did you come into

23   contact with Mr. Murphy?

24           A.      Yes, sir, I did.

25           Q.      And where did you meet him?

1        A.      In one of their interview rooms.

2        Q.      Once you met him, did you introduce yourself?

3        A.      Yes, sir, I did.

4        Q.      Did you identify yourself as an Irving police

5   officer?

6        A.      Yes, sir.

7        Q.      Was there anyone else there with you at that

8   time?

9        A.      Captain Paris.

10       Q.      Did you have any weapons on you?

11       A.      No, sir.

12       Q.      How were you dressed?

13       A.      In a suit and tie, but I didn't have a jacket

14   on.

15       Q.      And what was Mr. Murphy's appearance?  How was

16   he dressed?

17       A.      I don't recall what his dress was at that

18   time.

19       Q.      Okay.  After you introduced yourself and

20   identified yourself, did you read Mr. Murphy his Miranda

21   warnings?

22       A.      I advised him of his Miranda warnings, yes,

23   sir.

24       Q.      Would you tell the jury exactly the Miranda

25   warnings you advised him of.

1    A.    Yes, sir.  I told Mr. Murphy, I said, you have

2  the right to remain silent and not make any statement at

3  all.  Any statement you make may and probably will be used

4  as evidence against you at your trial.  You have the right

5  to have an attorney present to advise you prior to or during

6  any questioning.  If you cannot afford an attorney, an

7  attorney will be appointed to counsel with you and you have

8  the right to terminate this interview at any time.

9    Q.    Did Mr. Murphy appear to understand those

10  rights as you advised him?

11    A.    Yes, sir.

12    Q.    And did he indicate that to you?

13    A.    Yes, sir.

14    Q.    Did he agree to waive his rights and agree to

15  talk with you?

16    A.    Yes, sir.

17    Q.    After he agreed to talk with you, did you

18  discuss with him whether he would give you a written

19  voluntary statement?

20    A.    Yes, sir.

21    Q.    Did he agree to do that?

22    A.    Yes, sir.

23    Q.    Did you talk about the procedures or how you

24  would take that statement?

25    A.    Yes, sir, I did.

1    Q.    What did you ask him in regards to that?

2    A.    I gave him the option of either him writing

3    out the statement or me writing out the statement.

4    Q.    And what did he choose to do?

5    A.    That I write out the statement.

6    Q.    Okay.  And what procedure did you use in

7    writing out the statement?

8    A.    I told him that it would be his words on the

9    statement, that I write slow, and for him to take his time

10   and that I would have to stop him, let me catch up, and then

11   we would continue on.

12   Q.    So more or less he dictated the statement to

13   you?

14   A.    Yes, sir.

15   Q.    You have taken voluntary statements before in

16   the past; is that right?

17   A.    Yes, sir.

18   Q.    Is this an unusual procedure that they

19   actually choose you to write the statement for them?

20   A.    No, sir.

21   Q.    When you are taking a statement in this

22   manner, do you -- is it just you writing continuously or do

23   you stop and ask questions?

24   A.    Stop and ask questions and then write down the

25   words he says.

1      Q.     So this type of procedure can take some time;

2  is that right?

3      A.     Yes, sir.

4      Q.     Did you begin taking down the statement right

5  away?

6      A.     Pretty close to the beginning of the

7  interview, yes, sir.

8      Q.     Let me ask you this.  First of all, did you

9  later come to know the defendant's complete name as Patrick

10 Henry Murphy, Jr.?

11     A.     Yes, sir.

12     Q.     During the interview did you ask him if he

13 needed any refreshments, anything like that?

14     A.     I asked him if he wanted something to drink

15 and he wanted a Dr. Pepper and that was given to him.

16     Q.     So he was allowed a Dr. Pepper?

17     A.     Yes, sir.

18     Q.     During the course of your interview, did you

19 allow him breaks to use the restroom or anything else?

20     A.     Twice.

21     Q.     So twice he was able to take a bathroom break?

22     A.     Yes, sir.

23     Q.     When you take a voluntary confession or

24 voluntary statement, the words that are put down in the

25 statement, are those the words of the suspect in this case,

1   Mr. Murphy's?

2          A.    Yes, sir.

3          Q.    Whether you believe what is being said or not,

4   do you just put his statement down?

5          A.    It's his statement.  It's his words, yes, sir.

6          Q.    So all the language contained in the statement

7   is his version of what he wants put down in his statement?

8          A.    Yes, sir.

9          Q.    Let me show you what has been marked as State

10  Exhibit 978.  Is this the written statement you took from

11  Patrick Murphy?

12         A.    Yes, sir, it is.

13         Q.    Does it indicate on there what time you began

14  taking the statement from him?

15         A.    Yes, sir, it does.

16         Q.    What time is that?

17         A.    4:21 a.m.

18         Q.    Okay.  And what time did you complete the

19  statement?

20         A.    At 7:07 a.m.

21         Q.    So this statement took some time to dictate to

22  you, using the procedure you have already described; is that

23  right?

24         A.    That's correct.

25         Q.    And this included the two bathroom breaks,

1   also?

2         A.      Yes, sir.

3         Q.      The statement consisted of how many pages in

4   the end?

5         A.      Nine pages.

6         Q.      Okay.  And the writing there yourself is

7   yours.  You write pretty small; is that right?

8         A.      That's correct.

9         Q.      After he completed the statement, did you have

10  him read over the statement?

11        A.      Yes, sir.

12        Q.      Did he read all nine pages of the statement?

13        A.      Yes, sir, he did.

14        Q.      After he read the statement, did he wish to

15  make any changes or deletions or additions to the statement?

16        A.      No, sir.

17        Q.      As you were actually taking the statement,

18  would you have to mark out portions of the statement, if

19  mistakes were made?

20        A.      Yes, sir.

21        Q.      And when you do that, what would you have him

22  do?

23        A.      At the end of the statement, then I would go

24  back and have him initial those mistakes that I made.

25        Q.      So he would initial any mistakes or markouts

1    that you made a mistake?

2         A.      Yes, sir.

3         Q.      After he read it through and was satisfied

4    with it, what did you do then?

5         A.      Then we brought in a civilian witness to

6    witness the signing of the statement.

7         Q.      Okay.  And once that civilian witness is

8    brought in, did Mr. Murphy sign the statement freely and

9    voluntarily?

10        A.      Yes, sir, he did.

11        Q.      Did you ever threaten him or coerce him in any

12   way to get him to sign the statement?

13        A.      No, sir.

14        Q.      Did you ever promise him any benefit or reward

15   to try to entice him to sign that statement?

16        A.      No, sir.

17        Q.      Did he sign the statement in front of the

18   witness at that time?

19        A.      Yes, sir.

20        Q.      And would he sign each page?

21        A.      Yes, sir, he did.

22        Q.      The signature we see at the bottom, that's Mr.

23   Murphy's signature?

24        A.      Yes, sir, it is.

25        Q.      Did you also have him sign in another portion

1   of the document?

2        A.      Yes, sir.

3        Q.      And where was that?

4        A.      Under the portion where I wrote down the story

5   that he wanted to tell in a little blank.

6        Q.      What was your purpose in doing that?

7        A.      Just so that I cannot add anything else to his

8   statement without his knowledge.

9             MR. SHOOK:  Your Honor, at this time we

10  offer State Exhibit 978.

11            MR. SANCHEZ:  We would just reurge our

12  prior objection.

13            THE COURT:  Objections are overruled.

14  State Exhibit 978 shall be admitted.

15            MR. SHOOK:  May I publish to the jury,

16  Your Honor?

17            THE COURT:  You may.

18            MR. SHOOK:  May I have the Court's

19  permission to pass out copies of the statement, so they may

20  read along?

21            THE COURT:  Yes.

22        Q.      (By Mr. Shook)  First page of the statement

23  reads, "Irving Police Department, Irving, Texas, voluntary

24  statement dated 1-24-2001.  Time began 4:21 a.m.  Place,

25  Colorado Springs Police Department.  I, Patrick Murphy, am

1   39 years old.   Live at NA.   I am making this statement to

2   law enforcement Officer R. D. Johnson, No. 357, who before

3   he began questioning me, while I was under arrest and before

4   I began making this statement, warned me first that I have

5   the right to remain silent, not have to make any statement

6   at all.

7                       "Second, that any statement I make may

8   and can be used in evidence against me on my trial or trials

9   for the offense or offenses concerning which this statement

10  is made.

11                      "Third, that I have the right to employ a

12  lawyer to be present to advise me either before or during

13  any questioning.

14                      "Fourth, that if I am unable to employ a

15  lawyer, I have the right to have a lawyer appointed without

16  cost to me to counsel with me and advise me before and

17  during any questions.

18                      "Fifth, that I have the right to stop

19  answering questions at any time and may stop this interview

20  or making this statement at any time without answering some

21  questions or have some statements -- made some statements or

22  not.

23                      "I do not want to talk with a lawyer

24  before or during the answering of any questions or the

25  making of this statement and I do hereby knowingly and

1   voluntarily waive and give up my above-explained rights and

2   I do make the following voluntary statement of my own free

3   will without any promises or offers of leniency or favors

4   and through no fear, coercion, or threat of physical harm by

5   any person or persons whomsoever.

6             "On the 23rd of December we decided to

7   rob Oshman's in Irving.  We were looking for a sporting

8   goods store with a wide range of weaponry and clothing.  We

9   were trying to increase our arsenal and to get rid of the

10  weapons we stole from the prison.  It was discussed.  We

11  weighed the pro's and con's.  What I didn't like was so many

12  employees.  Being familiar to Irving I knew you all's

13  response was very quick.

14            "There was Larry Harper, Joseph Garcia,

15  Randy Halprin, George Rivas, Donald Newbury, and myself.  We

16  were pretty much equal.  This was at the Econo Lodge in

17  Farmers Branch.  It sat on the west side of the highway that

18  goes to Lake Dallas.  It was one room.  Larry Harper rented

19  the room.

20            "Larry Harper, George Rivas, and Joseph

21  Garcia went to look at the Oshman's.  I wouldn't go.  I was

22  afraid of being recognized.  It was a cooperative report

23  about the layout of the store.  They also did an employee

24  count.  It was 15.

25            "We prepared our weapons.  We discussed

1    our jobs.  Larry Harper and George Rivas posed as security

2    guards.  They were wearing uniforms.  We had acquired black

3    slacks, white shirts, and one of the shirts actually had ADT

4    Security.  I think the ADT shirt came from Goodwill.  They

5    had ballcaps.  I think one of the caps said "SECURITY."  I

6    think the other was a black cap.  It had a clipboard of

7    photos from the newspaper and the story was they were there

8    to interview employees about possibly spotting the suspects.

9               "One of the employees was gathered up --"

10   I'm sorry.  "Once the employees were gathered up in one

11   place, they realized that they were surrounded by gunmen.

12   Once the employees were tied and bound, the store was

13   searched again.

14               "I was in the parking lot.  I was in a

15   blue two-toned Suburban.  From the prison we went to

16   Wal-Mart in Kenedy, Texas.  Rivas was driving.  I was

17   approximately 150 yards in front of the door.  I was in

18   front of the K-Mart doors.  I was backup and lookout.  I had

19   a little small Radio Shack two way.  I also had a Radio

20   Shack radio scanner.  We had bought a book of police

21   frequencies.  It was like a telephone.  It came from Radio

22   Shack.  It's in the RV.  I looked up Irving police

23   frequencies and programed them into the scanner.  I did

24   everything listed for Irving.  It was like a dozen

25   frequencies.

1    "We were just doing radio checks.
2    Everyone had walkie-talkies.  Some had earphones.  I was the
3    only one with a scanner.  We went from the hotel room to the
4    Oshman's.  We were all in the Suburban.  I parked the truck
5    in that spot.  We watched Oshman's with binoculars.  I sat
6    there about -- we sat there about 20 minutes.

7    "The first two were Michael Rodriguez and
8    Randy Halprin.  They were to go in and act as Christmas
9    shoppers, getting clothing and loaded up with baskets.
10   Rodriguez and Halprin walked from the Suburban to the
11   Oshman's.  Five minutes later Garcia and Newbury walked to
12   the Oshman's.  They were gatherers.  Approximately five
13   minutes Harper and Rivas walked to the Oshman's.  They were
14   to pose as security.

15   "I could hear on the radio that they were
16   gathering up the employees.  At this time Harper or Rivas
17   called me and let me know it was going down.  I put them on
18   the radio, as they moved around the store, but couldn't tell
19   what was going on.  They would occasionally call me and see
20   if all was okay out front.

21   "I had called them a couple of times, but
22   there were two vehicles apparently waiting on someone.  Dark
23   gray SUV -- one was with a dark gray SUV.  As you look at
24   the Oshman's, it was to the right on the second row.  The
25   other car was a small white like a Chevelle, parked four or

five spaces to the left of the doors.

"Rivas came out of the store and actually went to the white car.  They were waiting on an employee.  Later Rivas told me that he went to the car and told them that he was conducting an employee interview, looking for shoplifters.  They said okay and rolled up the window.  He went from there to the SUV.  Rivas said that they had motioned for him to come over.  As he approached the vehicle and apparently thinking something was wrong, left.

"He then had the keys to an employee's vehicle.  It was a truck.  Rivas got into the vehicle and drove it around to the back of the store.  I heard Rivas on the radio say that, 'Let's back it up.'  It was about this time that Rivas saw the -- it was about this time that I saw the patrol car.  It entered from my right.  Immediately I heard on the scanner suspicious activity at the Oshman's.

"I got on the walkie-talkie, telling them to abort, the police were here.  I was on the radio continuously.  I never got off the radio.  I gave precious (sic) location of the patrol and the direction he was traveling.  He traveled from my right to my left.  He was just cruising.  He passed the Oshman's store and then picked up speed and went around to the back.  I radioed, 'He's coming around the corner.  Leave.  Leave.' When I got off the radio there was no response to my call.

1             "Approximately a minute, maybe not that

2   long, I was told, I think Harper, to go to the pick-up

3   point.  I started the truck.  First I secured my weapons.  I

4   was carrying two .357's with Magnum loads, revolvers.  I had

5   an AR-15 with approximately 60 rounds of ammunition and a

6   .12 gauge pump with ten rounds.  I made sure they were

7   laying flat on the floor.  That took me a minute or two.

8             "Suddenly civilian traffic showed up.  I

9   heard on the radio, Rivas, "Please hurry.  I'm hurt."  We

10  all had code names.  I was Angel for guardian Angel.  Rivas

11  was chief in Spanish.  We tried to use Spanish names to

12  mislead them.  I don't remember Harper.  Halprin was rat in

13  Spanish.  One was Guido.  Garcia was esse, Spanish for

14  friend.  My main concern was to remember Rivas' and mine.

15  No one else was supposed to be talking to me.  Rivas kept

16  calling, 'Hurry, Angel, I'm hurt.'

17            "When I went out of my space and drove to

18  the front of the K-Mart, the squad had stopped in front of

19  the K-Mart.  He got out.  He was walking toward the

20  Oshman's, but he hesitated like he heard something.  I

21  turned left to go out of the parking lot.  There was a small

22  service road at the end of the K-Mart and I turned right.  A

23  cross street, I turned left, went to Beltline, and turned

24  right.

25            "Rivas is steadily calling me.  I told

him I was coming.  I drove to Pioneer, the next right,
turned right on Pioneer.  Went down to the first set of
apartments.  On the right I turned into the apartment drive,
left around the office, and then there they were.  They were
on the other side of the paneled delivery truck.

"I went to the opposite side of the
truck.  I got out of the truck.  I got into the rear seat
behind the driver of the same truck.  My purpose was to, if
pursued by the police, I was to initiate a firefight with
the AR-15.

"While changing seats, the other men were
loading the bags in our truck.  We left and went back to the
hotel.  Rodriguez drove.  Randy Halprin and George Rivas
were hurt.  Randy was shot in the foot, I think the left.
Rivas was shot twice, once in the stomach and once in the
leg.

"We went -- we get back to the motel
room.  I had to slap Randy because he was really crying
about his foot.  We got two wounded men upstairs.  It was
there.  It was a three-story hotel.  Newbury was trying to
treat their wounds.  The rest of us brought up the stolen
merchandise.  We realized we didn't have first aid supplies.
I stayed at the hotel as guard.  Harper and Garcia left to
get first aid supplies.

We cleaned Halprin and Rivas up the best

1   we could.  Halprin was shot in the foot.  Three of his toes

2   were damaged.  Rivas was shot in the right leg by his groin.

3   The second shot was in his abdomen, in from the left, exited

4   the right.

5                   "When the supplies came up, we sewed up

6   Rivas with two stitches to each stomach wound.  Rivas and

7   Harper gave a combined story.  The officer came back to the

8   loading area.  It was Rivas or Harper wearing the white

9   uniform, approached the officer.  The officer stopped his

10  vehicle.  Rivas and Harper started to walk around to the

11  officer's door.  The officer, sensing something was wrong,

12  dove for his shotgun.  Rivas or Harper killed the officer.

13                  "Some of the others were actually on the

14  loading dock.  Newbury said he was still loading the bags

15  into the back of the truck.  Garcia said he had come around

16  the door and pulled the officer out of the vehicle.  They

17  had to move the vehicle.  Rivas said he removed the

18  officer's handgun.  He said he tried to remove the shotgun,

19  but couldn't get it to unlock.

20                  "All of us had .357s except Rodriguez and

21  Halprin.  At the motel room we gathered all our weapons we

22  used and did a count.  We found out a weapon had been

23  dropped.  It was Rodriguez'.  We checked ammo.  Halprin had

24  not fired his weapon.  Garcia, Harper, and Rivas' weapons

25  had been fired.  My own weapons were unfired.  We thought

1    Halprin had shot our buddies.   Newbury's weapons was

2    unfired.

3                   "We did an inventory of the things from

4    Oshman's.   We realized that they had left some ammo bag

5    behind.   We had an argument about that.   We had a

6    walk-through and then everybody had done and realized

7    Rodriguez had left the bag with ammunition.   Myself was

8    doing weapons.   Rodriguez was helping me.   Harper was

9    counting money.   Garcia was pulling off sales tags.   We

10   stayed there that night.

11                   "We had seen all the publicity on the

12   news.   I think the first count was $73,000 and some change.

13   Donald and I almost left that day."

14                   Each page signed by Patrick Murphy.   You,

15   yourself, did not conduct the searches at the Colorado

16   Springs hotel room or that particular RV; is that right?

17        A.     That's correct.

18        Q.     Were the items seized in that room and in the

19   RV and in the Jeep that George Rivas was arrested in

20   eventually turned over to the Irving Police Department?

21        A.     Yes, sir.

22        Q.     Were you able to account for every weapon that

23   had been taken from the Oshman's?

24        A.     Yes, sir.

25        Q.     Were you also able to recover Officer Hawkins'

1    handgun?

2            A.     Yes, sir.

3                       MR. SHOOK:  That's all we have, Judge.

4    We'll pass the witness.

5                       THE COURT:  Go ahead and take a lunch

6    break.  We'll stand in recess until 1:00.

7                           [Jury out]

8                           (Recess)

9                           [End of Volume]

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF TEXAS          *

2   COUNTY OF DALLAS        *

3       I, NANCY BREWER, Official Court Reporter for the 283rd

4   Judicial District Court, do hereby certify that the above

5   and foregoing constitutes a true and correct transcription

6   of all portions of evidence and other proceedings requested

7   in writing by counsel for the parties to be included in this

8   volume of the Reporter's Record, in the above-styled and

9   numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11      WITNESS MY OFFICIAL HAND on this the 4 day of

12  ___March___, 2007 4

13

14

15  ___Nancy Brewer___
    NANCY BREWER, CSR, NO. 5759

16  Expiration Date:  12-31-04
    Official Reporter, 283rd JDC

17  Frank Crowley Crts. Bldg. LB33
    133 No. Industrial Blvd.

18  Dallas, TX 75207
    (214)653-5863

19

20

21

22

23

24

25