No. <u>74851</u>

# <u>PATRICK HENRY MURPHY, JR.</u>

APPELLANT

## <u>CAPITAL MURDER</u>

OFFENSE

## <u>DEATH</u>

PUNISHMENT

## <u>DALLAS</u>

COUNTY

CONTENTS: RR VOLS. 41 - 46

REPORTER'S RECORD

**74851**

VOLUME 41 OF _6_ VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| STATE OF TEXAS | * | IN THE DISTRICT COURT |
|---|---|---|
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JURY TRIAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 10th day of November, 2003, afternoon session, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Vickers L. Cunningham, Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

ORIGINAL

283RD JUDICIAL DISTRICT COURT 214/653-5863
NANCY BREWER, OFFICIAL COURT REPORTER

```
 1                    A P P E A R A N C E S

 2    APPEARING FOR THE STATE

 3    Mr. Toby Shook
      SBOT NO. 18293250
 4    And
      Mr. Bill Wirskye
 5    SBOT NO. 00788696
      Assistant District Attorneys
 6    133 No. Industrial Blvd.
      Dallas, Texas 75207
 7    Phone:  214/653-3600

 8

      APPEARING FOR THE DEFENDANT
 9

      Ms. Brook Busbee
10    Attorney at Law
      SBOT:  03488000
11    703 McKinney Ave. Ste. 312
      Dallas, TX 75202
12    214/754-9090

13    Mr. Juan Sanchez
      Attorney at Law
14    SBOT:  00791599
      5630 Yale Blvd.
15    Dallas, TX 75206
      214/365-0700

16

17

18
19

20

21

22

23

24

25
```

1                    <u>WITNESS INDEX</u>

2    <u>WITNESS</u>                <u>DIRECT</u>        <u>CROSS</u>      <u>VOL</u>.

3    Randal Johnson            11              5          41

4    Misty Simpson            15,29            28         41

5    Michael Simpson           30              44         41

6    Marquis Washington       45,59            59         41

7    Steven Hazard            60,122           120        41

8    Curtis Chism             123

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        EXHIBIT INDEX

2    EXHIBIT        IDENT.           OFFER      ADMIT      VOL.

3    ST.65          PHOTO, APT.       46          46         41

4    ST.66          PHOTO, APT.       46          46         41

5    ST.67          DIAGRAMS, APT.    56          56         41
                    HANDDRAWN
6
     ST.68          DIAGRAMS, APT.    56          56         41
7                   HANDDRAWN

8    ST.69          DIAGRAMS, APT.    56          56         41
                    HANDDRAWN
9
     ST.70          DIAGRAMS, APT.    56          56         41
10                  HANDDRAWN

11   ST.71          DIAGRAMS, APT.    56          56         41
                    HANDDRAWN
12
     ST.72          DIAGRAMS, APT.    56          56         41
13                  HANDDRAWN

     ST.73          PHOTO - OSHMANS   64          64         41
14
     ST.74          PHOTO - OSHMANS   64          64         41
15
     ST.75          PHOTO - OSHMANS   64          64         41
16
     ST.76          PHOTO - OSHMANS   64          64         41
17
     ST.77          PHOTO - OSHMANS   64          64         41
18
     ST.78          PHOTO - OSHMANS   64          64         41
19
     ST.79          PHOTO - OSHMANS   64          64         41
20
     ST.80          PHOTO - OSHMANS   64          64         41
21
     ST.81          PHOTO - OSHMANS   64          64         41
22
     ST.82          PHOTO - OSHMANS   64          64         41
23
     ST.83          PHOTO - OSHMANS   64          64         41

24   ST.84              PHOTO - OSHMANS   64          64         41

25

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.85 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 2 | ST.86 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 3 | ST.87 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 4 | ST.88 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 5 | ST.89 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 6 | ST.90 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 7 | ST.91 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 8 | ST.92 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 9 | ST.93 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 10 | ST.94 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 11 | ST.95 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 12 | ST.96 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 13 | ST.97 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 14 | ST.98 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 15 | ST.99 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 16 | ST.100 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 17 | ST.101 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 18 | ST.102 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 19 | ST.103 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 20 | ST.104 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 21 | ST.105 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 22 | ST.106 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 23 | ST.107 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 24 | ST.108 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 25 | ST.109 | PHOTO - OSHMANS | 64 | 64 | 41 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.110 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 2 | ST.111 | PAPERWORK, RV | 64 | 64 | 41 |
| 3 | ST.112 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 4 | ST.113 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 5 | ST.114 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 6 | ST.115 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 7 | ST.116 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 8 | ST.117 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 9 | ST.118 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 10 | ST.119 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 11 | ST.120 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 12 | ST.121 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 13 | ST.122 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 14 | ST.123 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 15 | ST.124 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 16 | ST.125 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 17 | ST.126 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 18 | ST.127 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 19 | ST.128 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 20 | ST.129 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 21 | ST.130 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 22 | ST.131 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 23 | ST.132 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 24 | ST.133 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 25 | ST.134 | PHOTO - OSHMANS | 64 | 64 | 41 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.135 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 2 | ST.136 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 3 | ST.137 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 4 | ST.138 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 5 | ST.139 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 6 | ST.140 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 7 | ST.141 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 8 | ST.142 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 9 | ST.143 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 10 | ST.144 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 11 | ST.145 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 12 | ST.146 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 13 | ST.147 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 14 | ST.148 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 15 | ST.149 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 16 | ST.150 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 17 | ST.151 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 18 | ST.152 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 19 | ST.153 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 20 | ST.154 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 21 | ST.155 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 22 | ST.156 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 23 | ST.157 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 24 | ST.158 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 25 | ST.159 | PHOTO - OSHMANS | 64 | 64 | 41 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.160 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 2 | ST.161 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 3 | ST.162 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 4 | ST.163 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 5 | ST.164 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 6 | ST.165 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 7 | ST.166 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 8 | ST.167 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 9 | ST.168 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 10 | ST.169 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 11 | ST.170 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 12 | ST.171 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 13 | ST.172 | PHOTO - OSHMANS | 64 | 64 | 41 |
| 14 | ST.173 | DIAGRAM, CRIME SCENE | 65 | 65 | 41 |
| 15 16 | ST.174 | OSHMANS VIDEOTAPE | 70 | 70 | 41 |
| 17 | ST.174-B | COPY OF OSHMANS VIDEOTAPE | 70 | 70 | 41 |
| 18 | ST.175 | HAWKINS' BELT | 89 | 89 | 41 |
| 19 | ST.176 | HAWKINS' RADIO | 89 | 89 | 41 |
| 20 21 | ST.177 | HAWKINS' MAGAZINE CARRIER | 89 | 89 | 41 |
| 22 | ST.178 | REVOLVER | 76 | 77 | 41 |
| 23 | ST.179 | RADIO | 87 | 87 | 41 |
| 24 | ST.180 | SCREWDRIVER | 118 | 119 | 41 |
| 25 | ST.182 | FRAGMENTS | 110 | 110 | 41 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.183 | SHELL CASINGS | 112 | 112 | 41 |
| 2 | ST.184 | PACKAGE | 113 | 113 | 41 |
| 3 | ST.184 A-B | FRAGMENTS | 113 | 113 | 41 |
| 4 | ST.185 | PACKAGE | 116 | 116 | 41 |
| 5 6 | ST.185 A-D | BOTTLES, FRAGMENTS | 116 | 116 | 41 |
| 7 | ST.186 | PACKAGE | 117 | 117 | 41 |
| 8 | ST.186 A-C | FRAGMENTS | 117 | 117 | 41 |
| 9 | ST.187 | MAGNET POSTER | 76 | 77 | 41 |
| 10 | ST.484 | ENVELOPE | 118 | 118 | 41 |
| 11 | ST.484A-G | BULLET FRAGMENTS | 118 | 118 | 41 |
| 12 | ST.485 | ENVELOPE | 118 | 118 | 41 |
| 13 | ST.485A-C | BULLET FRAGMENTS | 118 | 118 | 41 |
| 14 | ST.486 | ENVELOPE | 117 | 117 | 41 |
| 15 | ST.486-A | PROJECTILES | 117 | 117 | 41 |
| 16 | ST.487 | SMOKE GRENADE | 119 | 119 | 41 |
| 17 | ST.488 | FRAGMENTS | 114 | 114 | 41 |
| 18 | ST.758 | ENVELOPE | 128 | 129 | 41 |
| 19 | ST.758 A-C | SHELLS | 128 | 129 | 41 |
| 20 | ST.759 | DIAGRAM | 109 | 109 | 41 |
| 21 | ST.760 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 22 | ST.761 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 23 | ST.762 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 24 | ST.763 | PHOTO, PAVEMENT | 124 | 125 | 41 |
| 25 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.764 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 2 | ST.765 | PHOTO, PAVEMENT | 124 | 125 | 41 |
| 3 | ST.766 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 4 | ST.767 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 5 | ST.768 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 6 | ST.769 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 7 | ST.770 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 8 | ST.771 | PHOTO, EXPLORER | 124 | 125 | 41 |
| 9 | ST.864 | VIDEO TIMETABLE | 71 | 71 | 41 |

<span style="text-align:center">P R O C E E D I N G S</span>

1

2    THE COURT:  Thank you.  You may be seated.

3 Sorry there was a delay in getting lunch in this afternoon

4 and that's why we're a little bit late getting started.  It

5 took about fifteen minutes to get everything sorted out, but

6 we'll try to be better tomorrow.

7    Mr. Sanchez, I believe you had a few

8 questions for Detective Johnson.

9    MR. SANCHEZ:  Yes.

10    THE COURT:  You may inquire.

11     CROSS-EXAMINATION

12 BY MR. SANCHEZ:

13   Q. Detective, based on your testimony you have

14 told us that you were the lead investigator on this case?

15   A. Co-lead.

16   Q. Who was the other leader?

17   A. Jeff Spivey.

18   Q. Jeff Spivey.  And both of you went out to

19 Colorado when you heard that these people might be out

20 there; is that correct?

21   A. That's correct.

22   Q. When you got there, had Rivas and the other

23 two been arrested before you got there or when you got

24 there, do you know?

25   A. Before we got there.

1    Q.    Before you got there?

2    A.    Yes, sir.

3    Q.    And at some point you were staying at the
4    Holiday Inn and you were informed by somebody that Mr.
5    Murphy and another person were in a Holiday Inn across the
6    street; is that correct?

7    A.    We weren't staying at the Holiday Inn.  The
8    other two were found in the Holiday Inn across the street,
9    yes, sir.

10   Q.    Do you recall about what the weather was like
11   around that time?

12   A.    It was cold, drizzly, and raining sometimes.

13   Q.    And you have indicated that you were not
14   involved in the negotiations for a peaceful surrender; is
15   that correct?

16   A.    That's correct.

17   Q.    At what point did you take over speaking to
18   Mr. Murphy?  Was it before you got in the vehicle?  At the
19   time of surrender?  What point did you take over?

20   A.    My first contact was with a -- when we went to
21   Colorado Springs Police Department after he was arrested and
22   brought up there for us.

23   Q.    Okay.  But were you present when Mr. Murphy
24   was finally -- when he finally came out of the Holiday Inn?

25   A.    No, sir.

1       Q.    So you had heard somebody -- somebody told

2  you, basically, that -- go on over to the Police Department;

3  is that correct?

4       A.    Correct.

5       Q.    Do you recall whether he was wearing a shirt

6  or not when --

7       A.    No, sir, I don't recall.

8       Q.    Was it possible he wasn't wearing a shirt?

9       A.    I don't recall what he was wearing, no, sir.

10      Q.    Would that be something that you would

11  remember?

12      A.    I don't remember, no.

13      Q.    And it's safe to say, then, that Mr. Murphy

14  had not slept during the negotiations?  Would it be safe to

15  say that?

16      A.    I wasn't in the room, so I don't know what he

17  was doing in the room.

18      Q.    Conversations were had between him and the

19  police --

20      A.    Yes, sir.

21      Q.    -- and the negotiating people --

22      A.    Yes, sir.

23      Q.    -- for a peaceful surrender?

24      A.    Yes, sir.

25      Q.    And you started interviewing him around 4:00

1   in the morning?

2          A.      A little after 4:00, yes, sir.

3          Q.      And it took you almost four hours to take down

4   his statement, correct?

5          A.      Somewhere in that neighborhood, yes, sir.

6          Q.      During the time when you were with him, he

7   didn't sleep anywhere, did he?

8          A.      Not with me, no, sir.

9          Q.      So he was up all night, basically, dealing

10   with you and the rest of the police; is that correct?

11          A.      Yes, sir.

12          Q.      When you took his statement down, the witness

13   who signed as a witness on this statement, were they in the

14   room during any portion of the interview?

15          A.      No, sir.

16          Q.      So the whole time you are interviewing Mr.

17   Murphy, it's you, Mr. Murphy, and another person?

18          A.      My lieutenant at the time.

19          Q.      And the person that served as a witness, is

20   that a civilian person or is that another police officer?

21          A.      Civilian.

22          Q.      Sometimes it's a clerk or something like that

23   that works out of the police department?

24          A.      Usually it's within the police department,

25   yes, sir.

1          Q.      And is this witness in the room when the

2     statement is read back to Mr. Murphy?

3          A.      The statement was not read to Mr. Murphy.  He

4     read it himself.

5          Q.      Was this person in the room when you handed

6     him the statement to read it?

7          A.      No, sir.

8          Q.      So, basically, the witness just comes in at

9     the very end and watches him sign a piece of paper?

10         A.      Witnesses his signature, yes, sir.

11         Q.      Now, do you have a copy of the statement there

12    in front of you?

13         A.      No, sir.

14                 MR. SANCHEZ:  May I approach the witness,

15    Your Honor?

16                 THE COURT:  You may.

17         Q.      (By Mr. Sanchez)  Let me show you a copy of

18    the statement, I believe was read to the jury already.  And

19    I've numbered these pages here just for my own benefit.  I'm

20    sure those numbers weren't on there when it was signed,

21    correct?

22         A.      That's correct.

23         Q.      I call your attention to page No. 5.  These

24    words here were words that he told you; is that correct?

25         A.      That's correct.

1    A.    In other words, when he used the words

2  "abort", when he used the words "leave, leave", those are

3  his own words?

4    A.    That's correct.

5    Q.    You in no way told him what to say?

6    A.    No, sir.

7    Q.    You didn't intimate what would be a good way

8  to write this or anything in that way?

9    A.    I don't understand your question, I'm sorry.

10    Q.    You in no way told him what would sound good

11  or what wouldn't sound good.  You just let him tell you and

12  you write it?

13    A.    Tell the story the way he wanted to tell it.

14    Q.    Also, while you were waiting for Mr. Murphy to

15  be transported to the jail, at some point did you make any

16  indication that you thought he had illusions of grandeur?

17    A.    No, sir.

18    Q.    Did you ever write anything in your

19  investigative notes that would indicate that you thought he

20  had illusions of grandeur?

21    A.    I don't recall that, no, sir.

22         MR. SANCHEZ:  May I approach the witness,

23  Your Honor?

24         THE COURT:  You may.

25    Q.    (By Mr. Sanchez)  Specifically, Detective, is

1    that your writing there?

2           A.     No, sir.

3           Q.     That's not your writing?

4           A.     No, sir, it's not.

5           Q.     Do you know who made these notes?

6           A.     It looks like Sergeant Spivey's writing.

7           Q.     Did you make any notes yourself as you were

8    preparing to talk to Mr. Murphy?

9           A.     Yes, sir.

10          Q.     Okay.  And you would have those with you if we

11   need to see those?

12          A.     No, sir.  I gave everything to the DA's

13   Office.

14          Q.     So Detective Spivey is the one that actually

15   wrote these documents here?

16          A.     That looks like his handwriting.

17                 MR. SANCHEZ:  I pass the witness, Your

18   Honor.

19                     REDIRECT EXAMINATION

20   BY MR. SHOOK:

21          Q.     Detective Johnson, did Mr. Murphy appear alert

22   during your interview with him?

23          A.     Yes, he did.

24          Q.     Did he appear alert the entire time that he

25   dictated the statement to you?

1    A.    Yes, he did.

2    Q.    He didn't doze off or fall asleep or anything

3  like that?

4    A.    No, sir.

5    Q.    You, yourself, had been up for quite some

6  time; is that right?

7    A.    That's correct.

8    Q.    You didn't have any problem with staying

9  awake?

10   A.    No, sir.

11   Q.    Let me turn your attention back to the actual

12 crime scene.  Looking at this photograph, which has been

13 marked State Exhibit 55, shows the back area of the

14 Oshman's.  There's, you see the car lot that's located

15 there?

16   A.    Yes, sir.

17   Q.    Was there a security camera on, on a portion

18 of that car lot?

19   A.    Yes, sir.

20   Q.    Were y'all able to secure a videotape from one

21 of those cameras?

22   A.    Yes, sir.

23   Q.    And was that tape turned over to Officer

24 Hazard, the physical evidence officer?

25   A.    It was placed in the property room for them,

1  yes, sir.

2         Q.     You actually got it from the car lot folks and

3  placed it in the property room for him?

4         A.     Yes, sir.

5         Q.     Now, back on, I believe it was February 27th

6  of 2001, did Mr. Murphy -- had he come back here to the

7  State of Texas?

8         A.     Yes, sir.

9         Q.     On that date did you take a buccal swab from

10 him pursuant to a warrant?

11        A.     Yes, sir.

12        Q.     Would you tell the jury what a buccal swab is?

13        A.     A buccal swab is basically our way of getting

14 a DNA sample from a suspect without drawing blood.  It is

15 two sterile Q-Tips that are in a package.  I tear them open

16 in front of the defendant or the suspect, have him pull out

17 both of those two cotton swabs, put one on each side of the

18 mouth, rub the inside of his mouth on the sides, and then

19 place it into a box.  That box is then sealed up, placed

20 into an envelope, and that is sealed up, and then it's sent

21 to the lab.

22        Q.     And you did that with Mr. Murphy; is that

23 right?

24        A.     Yes, sir.

25        Q.     And what lab did you send that to?

1      A.     The Southwestern Institute of Forensic

2 Sciences.

3      Q.     That's located here in Dallas County?

4      A.     Yes, sir.

5      Q.     And were buccal swabs taken of the other six

6 suspects, as well?

7      A.     The other five.

8      Q.     The other five?

9      A.     Yes, sir.

10     Q.     Once they arrived?

11     A.     Yes, sir.

12     Q.     Okay.  Now, looking at the voluntary

13 statement, I think it's on page 5 here.  I want to clear one

14 matter up.  About on the fourth line down, I wrote, "I gave

15 precious location of the patrol and the direction he was

16 traveling."  The word "precious", upon reflection, was that

17 the actual word used?

18     A.     No, sir.

19     Q.     What was the actual word used?

20     A.     "Precise."

21     Q.     "Precise."  Okay.  So it should read, "precise

22 location"?

23     A.     Yes, sir.

24     Q.     All right.

25           MR. SHOOK:  That's all we have, Judge.

1          MR. SANCHEZ:  We have nothing further,

2    Your Honor.

3          THE COURT:  Thank you, Detective.

4          MR. SHOOK:  Call Misty Simpson.

5          <u>MISTY WRIGHT SIMPSON</u>,

6    having been duly sworn, was examined and testified as

7    follows:

8                    <u>DIRECT EXAMINATION</u>

9    BY MR. SHOOK:

10         Q.    Would you tell us your name, please.

11         A.    Misty Simpson.

12         Q.    And Ms. Simpson, how are you employed?

13         A.    I work at Capital One.

14         Q.    How long have you worked with them?

15         A.    Four years.

16         Q.    And are you married?

17         A.    Yes.

18         Q.    Married to Michael Simpson?

19         A.    Yes.

20         Q.    And where does your husband work?

21         A.    He works at Oshman's.

22         Q.    Do you have any children?

23         A.    Yes, we do.

24         Q.    How many children do you have?

25         A.    Two.

```
 1          Q.      What are their ages?

 2          A.      Fixing to be three and four months.

 3          Q.      Let me turn your attention back to December

 4   24th of 2000 and ask you if your husband Michael Simpson was

 5   working at the Oshman's at that time?

 6          A.      Yes, he did.

 7          Q.      How long has he been working there at the

 8   Oshman's?

 9          A.      About five years.

10          Q.      Did you work there one time yourself?

11          A.      Yes, I did.

12          Q.      Is that where you met?

13          A.      No.

14          Q.      How long did you work at the Oshman's?

15          A.      For about five months.

16          Q.      Back on this date, though, you weren't working

17   at the Oshman's?

18          A.      No.

19          Q.      And what was your physical condition back on

20   Christmas Eve 2000?

21          A.      I was nine months pregnant.

22          Q.      Coming up very close to your due date?

23          A.      Yes.

24          Q.      And did you go to the Oshman's that day?

25          A.      Yes, I did.
```

```
 1        Q.     And what was your reason for going to the

 2   Oshman's?

 3        A.     To pick Michael up.

 4        Q.     I'm sorry?

 5        A.     To pick Michael up.

 6        Q.     What time was he scheduled to get off work

 7   that evening?

 8        A.     6:00.

 9        Q.     And what time did you arrive at the Oshman's?

10        A.     About 5:45.

11        Q.     What type of vehicle were you in?

12        A.     Jeep Cherokee.

13        Q.     Once you got to the Oshman's, where did you

14   park your car?

15        A.     In front of the exit doors.

16        Q.     Now, were you even supposed to be out driving

17   the car that day?

18        A.     No.

19        Q.     Why was that?

20        A.     Because I had hydronephrosis.  I had high

21   blood pressure.

22        Q.     Doctor's orders you were supposed to stay

23   home?

24        A.     Correct.

25        Q.     How was Michael going to get home that day?
```

1    A.    If I didn't pick him up, no way.

2    Q.    So you went out against doctor's orders to
3 pick him up?

4    A.    Correct.

5    Q.    You say you got there about, what, ten to
6 6:00?

7    A.    Ten to fifteen minutes before 6:00.

8    Q.    Did you have a conversation with -- at that
9 time he was your fiance; is that right?

10    A.    Correct.

11    Q.    Did you have a conversation with him at that
12 time?

13    A.    Yes.

14    Q.    What did you talk to him about?

15    A.    That they were going to be getting out right
16 at 6:00.  They weren't going to really close the store that
17 evening.

18    Q.    So did you stay at the location at that time?

19    A.    Yes.

20    Q.    Did you move the car at all at that point?

21    A.    At that point, no.

22    Q.    I want to show you what has been marked as
23 State Exhibit 10.  Looking on the monitor, does that show
24 the front of the Oshman's?

25    A.    Yes.

1    Q.    And I'm going to try to get a little closer

2  view of the front.  The exit and entrance doors are located

3  right here; is that right?

4    A.    Correct.

5    Q.    Where were you parked at the time you spoke

6  with your fiance?

7    A.    In the handicapped spot right in front of the

8  exit door.

9    Q.    On this side?

10    A.    To the left.

11    Q.    Over here?

12    A.    Yes.

13    Q.    Okay.  After he went back inside the building,

14  did he come out at 6:00 as you had thought he was?

15    A.    No.

16    Q.    What did you do when he didn't come out right

17  at 6:00?

18    A.    I was wondering why he wasn't coming out at

19  6:00.  And at that point then I moved my vehicle to the

20  entrance doors.

21    Q.    Is that on the other side over here?

22    A.    Correct.

23    Q.    So you reparked your car right here?

24    A.    Correct.

25    Q.    What was the purpose in doing that?

1    A.    Just because I wanted to get out of the

2  handicapped spot.

3    Q.    Now when you parked at this new location, were

4  you able to look through the doors and see the front part of

5  the store?

6    A.    Yes.

7    Q.    Could you see the counter, the cash registers,

8  that area?

9    A.    Yes.

10   Q.    What did you see when you looked in there?

11   A.    All of the employees came up to the front by

12 the registers.

13   Q.    Okay.  What's the next thing you saw them do?

14   A.    Then I saw the employees get patted down.

15   Q.    When you say patted down, like somebody was

16 searching them?

17   A.    Yes.

18   Q.    When you saw the employees being searched,

19 what did you think?

20   A.    I thought it was kind of different, but I

21 thought maybe just because of the Christmas holiday they

22 were making sure nobody was stealing anything.

23   Q.    What is the next thing that you saw?

24   A.    Then they all went out -- actually, out of my

25 sight.  They went to the customer service area and I

1    couldn't see them.

2          Q.     Did that cause you some concern at that point?

3          A.     Yes.

4          Q.     Why was that?

5          A.     Because it just didn't seem normal.  I thought

6    he was coming out right at 6:00.

7          Q.     So what did you do then?

8          A.     I sat there and just waited for a little bit

9    and then I saw them go to the back of the store in single

10   file.

11         Q.     You saw the employees go to the back of the

12   store?

13         A.     Correct.

14         Q.     And they were marching in a single file?

15         A.     Correct.

16         Q.     Did that seem strange to you?

17         A.     Yes.

18         Q.     Did you see any other people in there that you

19   didn't know?

20         A.     Yes.

21         Q.     Who was that?

22         A.     That would be the people that robbed the

23   store.  I don't know who they were.

24         Q.     What did they look like at that time?  What

25   were they doing?

1    A.    They were the ones that patted them down and

2 then they were just marching them back to the back of the

3 store.

4    Q.    Did you become concerned for your fiance's

5 safety at that point?

6    A.    Yes.

7    Q.    Did you call the police at that time?

8    A.    No.

9    Q.    What did you do?

10    A.    I then went to K-Mart and called my friend,

11 Sheila, to come up there.

12    Q.    Is K-Mart located kind of over on this side of

13 the Oshman's in this group of stores?

14    A.    Yes.

15    Q.    You drove over there and did you use a pay

16 phone?

17    A.    Yes.

18    Q.    And what did you ask Sheila to do?

19    A.    I asked her to come up there just to make sure

20 that I was seeing things correctly.

21    Q.    Why were you worried that you weren't seeing

22 things correctly?

23    A.    I didn't really want it to be happening, but I

24 just wanted to make sure I wasn't crazy.

25    Q.    Okay.  And did your friend, Sheila, agree to

1  do that?

2          A.    Yes, she did.

3          Q.    After you talked to her, where did you go

4  then?

5          A.    I went back between the Staples and the

6  Oshman's and parked and waited for her to arrive.

7          Q.    Did you park on the front row again or were

8  you parked --

9          A.    No, not right next to the building.  In that

10  area.

11          Q.    Somewhere in here?

12          A.    Yes.

13          Q.    How long did it take her to arrive?

14          A.    It took about five minutes.

15          Q.    When she arrived at the location, what did she

16  do?

17          A.    She parked her car and then got into mine.

18          Q.    Once she got in the car, did you explain to

19  her what was going on?

20          A.    Yes.

21          Q.    Did you -- were you able to look in and see

22  anything else going on inside the store?

23          A.    Not inside the store, no.

24          Q.    Did someone eventually come out of the store?

25          A.    Yes, they did.

1     Q.    And what did that person look like?

2     A.    I don't really remember any facial.  I just

3 remember a black hat and black shoes mainly.

4     Q.    Were they wearing a coat?

5     A.    Yes.  There was like a black security-type

6 jacket.

7     Q.    Okay.  Was it a man?

8     A.    Yes.

9     Q.    When he emerged from the store, where did he

10 go to?

11     A.    He went to a white vehicle and spoke with the

12 person in that vehicle.

13     Q.    After he spoke with them, what did he do?

14     A.    He started to walk toward a white Explorer.

15     Q.    The white Explorer, did you know whose car

16 that was?

17     A.    No.  I didn't know whose car that was at that

18 time.

19     Q.    When he started walking toward the white

20 Explorer, did anything turn his attention to your car?

21     A.    Yes.

22     Q.    What was that?

23     A.    Sheila sounded her alarm in her car.

24     Q.    Did she do that on purpose?

25     A.    She was just locking it.

```
1        Q.      So the car made a noise when she locked it up?

2        A.      Correct.

3        Q.      When that occurred what did this person that

4   you describe as kind of a security guard do?

5        A.      He started to walk towards my vehicle.

6        Q.      Okay.  When you saw him walking towards your

7   vehicle, what did you do?

8        A.      I drove off.

9        Q.      Were you frightened of him?

10       A.      Yes.

11       Q.      As you drove off, which direction did you go?

12       A.      I drove out towards the freeway, which was to

13  the right.

14       Q.      Okay.  This direction?

15       A.      Yes.

16       Q.      Once you did that, did you and your friend get

17  on a cell phone?

18       A.      Yes.

19       Q.      Did your friend, Sheila, had she brought a

20  cell phone with her?

21       A.      Yes, she did.

22       Q.      Did you call 911?

23       A.      Yes, she did.

24       Q.      Did you relate with the 911 operator what you

25  had seen at the Oshman's?
```

1        A.      Yes.

2        Q.      Where did you park your car at that time?

3        A.      We went out of the parking lot and then came

4 back by the restaurant Good Eats.

5        Q.      Is Good Eats Restaurant what we see right

6 here?

7        A.      Yes.

8        Q.      And where did you park near the Good Eats?

9        A.      At the back left corner.

10       Q.      In this area?

11       A.      Yes.

12       Q.      What did you do once you parked there?

13       A.      We sat there and just waited for the police.

14       Q.      Now, did you see this man that had been

15 walking toward you when you drove away, where did he go to?

16       A.      He went to the back of Oshman's.

17       Q.      Okay.  Did he get into that white Explorer?

18       A.      Yes, he did.

19       Q.      And which direction did he go to get to the

20 back of the Oshman's?

21       A.      He went to the left, the opposite direction

22 that we drove, and then turned right to go to the back.

23       Q.      Okay.  So this direction?

24       A.      Correct.

25       Q.      And then turned right here?

1      A.      Correct.

2      Q.      Did you report all that information to the 911

3  operator?

4      A.      Yes, we did.

5      Q.      The man in the white Explorer, driving to the

6  back?

7      A.      Correct.

8      Q.      What's the next thing that occurred once you

9  were sitting outside the Good Eats?

10     A.      Actually, we just sat there and waited for the

11 police to come.  We didn't do anything else until they took

12 us to the back of Oshman's.

13     Q.      Did some officers come and take you to the

14 back of Oshman's eventually?

15     A.      Yes.

16     Q.      After that time did they eventually take you

17 down to the Irving Police Station?

18     A.      Yes, they did.

19     Q.      What was their purpose in doing that?

20     A.      Just to give them a statement of what we saw.

21     Q.      Did you come to find out that your fiance was

22 actually inside the Oshman's?

23     A.      Yes.

24     Q.      For a long time inside there while the police

25 were waiting to try to get them out?

1    A.    Yes, he was.

2    Q.    When is the first time you were able to see

3 him?

4    A.    I didn't see him until probably about 10:00.

5    Q.    10:00 that evening?

6    A.    Correct.

7    Q.    What was your physical and mental condition at

8 that time?

9    A.    I was very shaken at that time.  They even had

10 to call the paramedics for me.

11    Q.    What did the paramedics want to do?

12    A.    They wanted to take me to the hospital.

13    Q.    Did you agree to do that?

14    A.    No.

15    Q.    Why was that?

16    A.    Because I didn't want to have my daughter that

17 day.

18    Q.    And when was your daughter born?

19    A.    She was born on December 26, 2000.

20         MR. SHOOK:  We'll pass the witness.

21              CROSS-EXAMINATION

22 BY MR. SANCHEZ:

23    Q.    Ma'am, you said that you saw somebody come out

24 in a black hat, get into the Explorer, and drive it away

25 from the front entrance; is that correct?

29

```
 1        A.      That is correct.

 2        Q.      And you could see which direction they were

 3   going in, correct?

 4        A.      Correct.

 5        Q.      And you saw it turn the corner?

 6        A.      Correct.

 7        Q.      And in your mind you felt they were going to

 8   the back of the store, going somewhere back there; is that

 9   correct?

10        A.      Correct.

11        Q.      From the time you saw that happen to when you

12   saw the police arrive, do you recall how long that took?

13        A.      Maybe five minutes.  I really don't know.

14        Q.      Okay.  So give or take a minute, five minutes

15   after you saw the Explorer go to the back of the store, did

16   you see a police officer arrive?

17        A.      We saw them go through the parking lot in

18   front of K-Mart, yes.

19                MR. SANCHEZ:  We pass the witness, Your

20   Honor.

21                REDIRECT EXAMINATION

22   BY MR. SHOOK:

23        Q.      Ms. Simpson, you don't know -- of the police

24   cars you saw, you don't know if Officer Hawkins' car was one

25   of those, do you?
```

1        A.    No.

2        Q.    You were parked on the other side of that Good

3   Eats?

4        A.    Correct.

5        Q.    You didn't have a view of the front of

6   Oshman's at that point in time, did you?

7        A.    We weren't really looking at the front of the

8   Oshman's.  We could have seen it, if we had been looking,

9   but we weren't.

10              MR. SHOOK:  That's all we have.

11              MR. SANCHEZ:  I have nothing further,

12   Your Honor.

13              THE COURT:  Thank you, Ms. Simpson.  You

14   may step down.

15              MR. SHOOK:  May this witness be excused?

16              MR. SANCHEZ:  We have no objection, Your

17   Honor.

18              THE COURT:  She may.

19              MR. SHOOK:  Call Michael Simpson.

20              MICHAEL SIMPSON,

21   having been duly sworn, was examined and testified as

22   follows:

23              DIRECT EXAMINATION

24   BY MR. SHOOK:

25        Q.    Would you tell us your name, please.

1    A.    My name is Michael Simpson.

2    Q.    And how old are you, sir?

3    A.    I'm 28 years old.

4    Q.    And how are you employed?

5    A.    I'm employed with Oshman's.

6    Q.    How long have you been with Oshman's?

7    A.    I've been at Oshman's for about five years

8    now.

9    Q.    And what do you do with them?

10   A.    I'm a department manager in the athletics

11   department.

12   Q.    Are you married and have a family?

13   A.    Yes, I do.

14   Q.    Your wife that just testified previously?

15   A.    Yes, sir.

16   Q.    And you have two children?

17   A.    Two children.

18   Q.    Let me turn your attention back to Christmas

19   Eve of 2000.  Were you working that day at Oshman's?

20   A.    Yes, I was.

21   Q.    Do you recall what time you arrived at work?

22   A.    I got there roughly around 10:00.

23   Q.    Okay.  What part of the store were you

24   assigned to that today?

25   A.    That day I was assigned to the athletics

1   department.

2       Q.      Was it a pretty busy day for shoppers that

3   day?

4       A.      Christmas Eve, it was pretty busy.

5       Q.      What time were you scheduled to get off work?

6       A.      I was scheduled to get off work at 6:00.

7       Q.      Was your fiancee, Misty, going to come pick

8   you up that day?

9       A.      Yes, she was.

10      Q.      What time did she arrive?

11      A.      She arrived about fifteen, ten or fifteen

12  minutes before we were supposed to get out of there at 6:00.

13      Q.      Did you go outside and talk with her at that

14  time?

15      A.      About five minutes before I was scheduled to

16  get off, I went outside and talked to her and I told her I

17  would be out in about five minutes.

18      Q.      You expected to come out right at 6:00?

19      A.      Right at 6:00.

20      Q.      Once you spoke with her, what did you do then?

21      A.      I proceeded to go back inside, walk around the

22  athletics department.

23      Q.      Were there shoppers still in the Oshman's at

24  that time?

25      A.      Yes, there were.

1    Q.    What location do you recall the shoppers being

2  in?

3    A.    I recall some shoppers in the clothing

4  department, the athletics department, and the HFC

5  department.

6    Q.    Did you actually have any interaction with

7  them at that time?

8    A.    No, sir, I did not.

9    Q.    After you went back to that athletic

10  department, where did you go then?

11    A.    After I left the athletic department, I just

12  continued to walk around the entire store.  I went around

13  the clothing department and went around the shoe department.

14    Q.    Okay.  Now, looking at that exhibit off to

15  your shoulder there, State Exhibit 44, do you see any of the

16  men that you thought were shoppers at that time?

17    A.    Um, at the current time, I believe this

18  gentleman right here, I thought he was a shopper.  That's

19  the only one that I really recognize.

20    Q.    Where do you remember seeing Michael

21  Rodriguez?

22    A.    I remember see Mr. Rodriguez in the clothing

23  department.

24    Q.    After the store closed or right when it

25  closed, did you go to the front of the store?

1     A.     Yes, I did.

2     Q.     And were the other employees gathering up at

3   that time?

4     A.     Yes, they were.

5     Q.     What area of the store were you gathered up

6   at?

7     A.     We were gathered up at the customer service.

8     Q.     Okay.  What was going on there at the customer

9   service station?

10     A.     A gentleman who was disguised in an ADT

11   security outfit had asked some of the employees to check out

12   a photo lineup for the simple fact that we thought that one

13   of our employees had their car broken into the other day,

14   the day before, so we thought that they were coming in to

15   just get a photo lineup and see if we recognized any of the

16   photos.

17     Q.     That's what you thought they were there for?

18     A.     That's what I thought they were there for.

19     Q.     Did you actually talk to any what you thought

20   were the security guards at that time?

21     A.     I believe I talked to one.  I talked to George

22   Rivas.

23     Q.     All right.  Once everyone was there looking at

24   the photographs, did George Rivas eventually take out a gun?

25     A.     Yes, he did.

1     Q.     When did he do that?

2     A.     Once he had all the employees gathered up at
3 the front, he stood at the front of customer service and
4 held up a gun and said that this was a robbery.

5     Q.     Okay.  How close were you to him when he said
6 that?

7     A.     I was about one register away from him when he
8 actually said the announcement.

9     Q.     Did he hold the gun up in the air at that
10 time?

11     A.     Yes, he did.

12     Q.     When you saw the gun in the air and he made
13 that statement, what did you do?

14     A.     My first initial reaction was I took one step
15 back.  But at that time somebody pointed a gun in my back.

16     Q.     Okay.  So out of reaction you stepped
17 backwards?

18     A.     I stepped backwards.

19     Q.     And then you had a gun in your back?

20     A.     Yes, I did.

21     Q.     Was the gun physically in your back?

22     A.     Not physically in my back.  It was just, once
23 I stepped back, he just jabbed me with it real quick to let
24 me know it was a gun.

25     Q.     Poked you with a gun?

1    A.    Yes.

2    Q.    Any doubt in your mind it was a real gun?

3    A.    There was no doubt in my mind that it was a
4  real gun.

5    Q.    Was this one of the men that just a few
6  moments before you thought was one of the shoppers?

7    A.    Yes.

8    Q.    Once you had that gun poked in your back, what
9  did you do?

10    A.    Once I had the gun pointed in my back, I
11  listened to everything that he said and just everything that
12  they told me to do, I did.

13    Q.    Were you scared at that point in time?

14    A.    Yes, I was.

15    Q.    What did they have the employees do then?

16    A.    Once they had all the employees gathered up at
17  customer service, we all rounded up at the front, very front
18  counter.  They made us put our hands on the front
19  countertops and they began to frisk us.

20    Q.    And were all the employees in the store, 16 or
21  17, gathered up in that one little area?

22    A.    Yes.

23    Q.    At some point in time do you remember if
24  another employee came up there?

25    A.    I believe it was a female employee of ours.

1   She was, I believe, at the time in the very back.

2          Q.      What else do you remember Mr. Rivas saying

3   while you were up at the counter?

4          A.      I remember he distinctly told the manager at

5   the time, Wes Ferris, not to try anything funny because he

6   told him that he had that look about him, that he might try

7   something.  So George Rivas told him not to try anything

8   funny, otherwise he would have to shoot him, and if he had

9   to shoot one person, he would have to shoot all of us.

10         Q.      Did you take those threats seriously?

11         A.      Yes, I did.

12         Q.      Did he tell you that the other men in the

13  store were with him?

14         A.      At the time he did, yes.

15         Q.      Okay.  Did he mention anything about

16  individuals outside the store?

17         A.      I didn't hear anything about individuals

18  outside the store.

19         Q.      Okay.  Now, did one of the men ask you whether

20  your fiancee was there or if anyone was there to pick anyone

21  up?

22         A.      There was a gentleman standing by the very

23  front doors, by the front exit doors.  He asked if anybody

24  had anybody coming to pick us up.  I told him at the time

25  that I had my girlfriend picking me up.

Q.      Once you said that, did you get a little worried?

A.      I got a little worried because I didn't know if they did have somebody outside.  I didn't know if the people that were inside were going to go outside and get her to bring her inside and take her hostage.

Q.      What was her physical condition at that time?

A.      At the time she was nine months pregnant and she was really supposed to be on bed rest.  She wasn't even supposed to be out of the house.

Q.      After you were searched, were you then taken to the back of the store?

A.      Yes.  We were led single file from customer service to the back in the breakroom.

Q.      Where were you in the line of employees?

A.      I was toward the end of the line.

Q.      Did you stop at any time as you were making your way back to the breakroom?

A.      We stopped by the bag counters.  There we noticed one of our managers, Darrin Ojeda, he was sitting on the floor with his shirt taken off.

Q.      They were taking his Oshman's shirt off?

A.      They had already taken his shirt off.

Q.      After that did you go into the breakroom?

A.      Yes, we did.

1    Q.    Once they put you in the breakroom, what did

2  they tell you to do?

3    A.    They had us put our hands on the wall and lean

4  our heads forward and they began to frisk us once again.

5    Q.    At any point in time do you remember Wes

6  Ferris leaving with George Rivas?

7    A.    Yes, he did.

8    Q.    Was that when you first went into the

9  breakroom?

10    A.    That's when we first went into the breakroom.

11    Q.    After they left how many robbers were left in

12  that room, if you can tell?

13    A.    At the time it sounded like three or four.

14    Q.    You said that they started searching everyone?

15    A.    Yes.

16    Q.    Frisking everyone?  Were threats made to you

17  back there?

18    A.    Yes, they were.

19    Q.    What types of threats were made?

20    A.    If we didn't cooperate that they would have to

21  shoot us.  We had some female employees that were crying at

22  the time.  They told them to shut up, otherwise they would

23  have to hurt them.

24    Q.    So some of the females were crying and they

25  were told to shut up?

1      A.      Yes.

2      Q.      Did you hear anyone getting roughed up back

3  there?

4      A.      I heard one of our employees thrown up against

5  the locker.

6      Q.      Were any comments made about the types of

7  watches or rings or jewelry that was being taken from the

8  employees?

9      A.      Um, the suspects, the robbers, they seemed

10  very frustrated with the amount of money that we had, the

11  type of jewelry that we had.  They were just disappointed,

12  it seemed like, because we didn't have what they were

13  expecting.

14      Q.      Did they make comments about that?

15      A.      They said something to the effect, damn,

16  people, don't you have anything better than this?

17      Q.      Okay.  At some point in time did Wes Ferris

18  come back into the breakroom?

19      A.      Yes, he did.

20      Q.      Did you hear any communication over a radio

21  after that time?

22      A.      Yes, I did.

23      Q.      What types of things did you hear?

24      A.      Types of things I heard was, "How are we

25  doing?  Are we all clear?  How much time do we have"?

1    Things of that nature.

2         Q.    All right.  After Wes Ferris came back to the

3    breakroom, did you hear anything -- did you hear anything

4    about on the radio transmissions about having to leave

5    quickly?

6         A.    Um, at one point in time I heard a radio

7    transmission saying, "Come on, we got to go.  We got to go.

8    We got company."

9         Q.    "We got to go, we got to go, we got company?"

10        A.    Yes.

11        Q.    Did the men in the back room leave quickly

12   after that?

13        A.    Yes, they did.

14        Q.    Could you hear them as they went out the door?

15        A.    Yes.  They were in a hurry.  They pretty much

16   grabbed all their belongings that they had off the table and

17   just ran out the door.

18        Q.    After they left the building, what's the next

19   thing that you heard?

20        A.    I heard gunshots.

21        Q.    Could you describe the gunshots?  When they

22   started, how quickly were they or how far apart were they?

23        A.    They were very quick, seemed like rapid fire,

24   very back to back, kind of like a pow, pow, pow, pow, pow.

25        Q.    One right after the other?

1          A.     One right after the other.

2          Q.     Were there any long pauses or did they more or

3  less just follow one another?

4          A.     They more or less just followed one another.

5          Q.     Now, you didn't have a stopwatch on or you

6  weren't timing this, right?

7          A.     No.

8          Q.     Do you know how long it was before the shots

9  went off after they left?

10         A.     I would say roughly about two minutes after

11 they left.

12         Q.     Again, that's an approximation?

13         A.     That's an approximation.

14         Q.     Do you know how many shots were fired out

15 there?

16         A.     At the time when I had so much going on in my

17 head, I said there were about 50 or 60 shots, which I know

18 wasn't possible, but that's what it sounded like to me when

19 I first heard it.

20         Q.     Sounded like a whole lot of gunshots to you?

21         A.     Sounded like a lot of gunshots.

22         Q.     One right after the other?

23         A.     One right after the other.

24         Q.     What was the demeanor of the other employees

25 back there when these gunshots were going off?

```
 1        A.      Um, a lot -- everybody was scared.  Um,

 2   everybody was really distraught.  They didn't know if the

 3   robbers were going to come back inside.  They didn't know if

 4   they were going to come and shoot us or take us hostage.  We

 5   didn't know what was going to go on.

 6        Q.      Were you also worried about your fiancee and

 7   your unborn child?

 8        A.      I was very worried about my fiancee.  I

 9   already knew what situation I was in, my situation, but I

10   had no clue on how she was doing, what her situation was.

11        Q.      Eventually, did Wes Ferris -- was he able to

12   make it out of that room?

13        A.      Yes, he was.

14        Q.      And summoned the police there?

15        A.      Yes, he did.

16        Q.      When you made it out of the Oshman's, where

17   were you taken to?

18        A.      Um, we were taken to the street directly

19   behind Oshman's and we were stationed near a fire truck.

20        Q.      Were you eventually taken down to the Irving

21   Police Department?

22        A.      Yes, we were.

23        Q.      And did you give a detective a statement

24   there?

25        A.      Yes, I did.
```

1      Q.      Now, did you actually see a photo lineup that

2   night?

3      A.      No, I did not.

4      Q.      When were you reunited with Misty?

5      A.      I would say about two or three hours after we

6   got to the police station.

7      Q.      What was her physical condition then?

8      A.      Um, they had a medical team check her out.  At

9   the time she had high blood pressure, she had preeclampsia,

10  which was a preconditioned, something with her pregnancy.

11     Q.      Y'all decided not to go to the hospital that

12  night?

13     A.      No, we did not.

14     Q.      And your baby girl was born on the 26th?

15     A.      Yes, she was.

16             MR. SHOOK:  We'll pass the witness.

17                      CROSS-EXAMINATION

18  BY MR. SANCHEZ:

19     Q.      Mr. Simpson, you testified that you heard a

20  voice say, "We have got to go.  We've got to go.  We have

21  company."  Could you tell who that was?

22     A.      I could not tell who that was.

23     Q.      Could you keep track of any of the voices that

24  you heard on those radio transmissions?

25     A.      No, I did not.

```
 1              MR. SANCHEZ:  Pass the witness, Your
 2   Honor.
 3              MR. SHOOK:  That's all we have, Judge.
 4              THE COURT:  Thank you, Mr. Simpson.
 5              MR. SHOOK:  May this witness be excused?
 6              MR. SANCHEZ:  We have no objection, Your
 7   Honor.
 8              THE COURT:  He may.
 9              MR. SHOOK:  Call Marquis Washington.
10                    MARQUIS WASHINGTON,
11   having been duly sworn, was examined and testified as
12   follows:
13                    DIRECT EXAMINATION
14   BY MR. SHOOK:
15        Q.    Would you tell us your name, please.
16        A.    Marquis Washington.
17        Q.    And how are you employed, sir?
18        A.    I'm a self-employed graphic designer.
19        Q.    Let me turn your attention back to Christmas
20   Eve of 2000.  Where were you working at that time?
21        A.    I was employed with the advertising agency
22   Brandy Catrell.
23        Q.    Still doing graphic design, that sort of
24   thing?
25        A.    Yes, sir.
```

1      Q.    Where were you living?

2      A.    I was living off of Estrada in Irving, Texas.

3      Q.    Is that in a house or apartment?

4      A.    Apartment.

5      Q.    Was that apartment complex located more or

6 less behind a shopping center complex where an Oshman's is

7 located?

8      A.    Correct.

9      Q.    Where is your apartment or where was it at

10 that time in relation to the Oshman's?

11      A.    It was west of the Oshman's across a field.

12      Q.    Let me show you what has been marked as State

13 Exhibits 65 and 66.  Is that 65 an aerial view of the back

14 of the Oshman's and your apartment complex?

15      A.    Yes, it is.

16      Q.    And is 66 a view of the Oshman's more or less

17 from the viewpoint of your bedroom window?

18      A.    Yes, it is.

19      Q.    Okay.

20      MR. SHOOK:  Your Honor, at this time

21 we'll offer State Exhibits 65 and 66.

22      MR. SANCHEZ:  No objection, Your Honor.

23      THE COURT:  Nos. 65 and 66 shall be

24 admitted.

25      Q.    (By Mr. Shook)  Mr. Washington, looking at the

1   monitor I believe these would be your apartments here at the

2   front; is that right?

3          A.     That's correct.

4          Q.     And back at that time which apartment were you

5   staying in?

6          A.     I was staying in the last apartment in the

7   complex, which would be where the pointer is now.

8          Q.     All right.  And then this is the back of the

9   Oshman's located right here?

10         A.     Correct.

11         Q.     And what is this area here?

12         A.     That's an open field.

13         Q.     Okay.  Now, back on December 24th, that

14   evening, around 6:30, were you there at your apartment?

15         A.     Yes, sir.

16         Q.     What were you doing there at that time?

17         A.     I was watching a bowl game or some type of

18   football game.

19         Q.     Were you there by yourself?

20         A.     Yes, I was.

21         Q.     Around 6:30 that evening did you hear anything

22   outside your apartment that caught your attention?

23         A.     I heard what I thought were gunshots.

24         Q.     What direction did the gunshots come from?

25         A.     They were coming from the field.  They were

1   coming from the open field between the Oshman's and my

2   apartment.

3        Q.    And when you heard the gunshots, what was your

4   first reaction?

5        A.    To get to the floor because my windows face

6   the field, which is looking east, so there was nothing

7   really there to stop any bullets, if they were to come

8   through.

9        Q.    How many gunshots did you hear at that time?

10       A.    I think it was five.  I felt it was five shots

11  coming.

12       Q.    Did the gunshots come in quick succession?

13       A.    Yes, they were.

14       Q.    When you heard them, were they one right after

15  the other?

16       A.    Yes, they were.

17       Q.    And that's when you got on the floor at that

18  time?

19       A.    Correct.

20       Q.    What did you hear next?

21       A.    About a second later I heard more gunshots.  I

22  think it was about seven.  It was a volley of shots, so it

23  was about seven.  I wasn't actually counting all of them,

24  but, yeah, it was a volley of shots.

25       Q.    It was an estimation on your part was

49

1    about seven the second time you hear shots?

2        A.    At least that.  It was more than the first

3    shots that were fired.

4        Q.    It was just a brief pause, you said, of about

5    a second between those?

6        A.    Yes, sir, it was about a second.

7        Q.    And as you heard that second volley of shots,

8    what did you do then?

9        A.    During that time I was already on the floor

10   and I was crawling towards my room.  And my room had a

11   window.  It has a window in it, but it has a window sill.

12   So it had a little more protection than just an open patio

13   window, because it was just a pane glass.  So during those

14   shots while they were being fired, I was already crawling

15   towards my room.

16       Q.    Once you got to your room or the window in

17   your room, what did you do then?

18       A.    I looked above the sill just to see out, to

19   look out to see what was happening, if someone was actually

20   in the field firing and which direction.

21       Q.    Where was your attention drawn first when you

22   looked out the window?

23       A.    I looked to the south, which is to my right

24   and actually gradually started looking towards the north,

25   which would have been to my left towards the Oshman's.

1    Q.    So you looked towards this area first?

2    A.    No.  I looked towards the south first, which

3  is there, correct.

4    Q.    And then looked this way?

5    A.    And then up towards the Oshman's.

6    Q.    Once you looked up toward the Oshman's, what

7  did you see?

8    A.    Right as I was looking south and gradually

9  turning to the left, I heard another shot or two and then it

10  brought my attention directly to the Oshman's loading dock,

11  loading area.

12    Q.    So you had already heard the first five shots

13  and then a one-second pause, about seven more shots, and

14  then as you looked out the window, you heard some more shots

15  at that time?

16    A.    Yes, sir.

17    Q.    And that's when you saw some activity behind

18  the Oshman's?

19    A.    Exactly.

20    Q.    What did you see going on behind the Oshman's?

21    A.    When I first looked out, I saw what appeared

22  to be about four guys just running around some of the

23  trailers and a truck that was there.

24    Q.    Okay.  Let me show you State Exhibit 66.  This

25  is a photograph taken at nighttime kind of from what your

1   viewpoint would have been as you looked out your window; is

2   that right?

3          A.     That's right.

4          Q.     Same kind of angle, that sort of thing?

5          A.     Yes, sir.

6          Q.     Now, a closer view, does that show the back

7   area where there is a trailer here and trailer in this area?

8          A.     Yes.

9          Q.     Is this the area you looked at and saw some

10  men running around?

11         A.     That's it.

12         Q.     The glare that we see in the photograph, is

13  there that type of glare when you are actually viewing it in

14  person?

15         A.     No, it's not.

16         Q.     We see a trailer here and a tree.  What area

17  did you see the men running around in?

18         A.     Right there where the trailer is on the south

19  and on the other side of the tree.

20         Q.     Did you see any type of vehicle parked out

21  there?

22         A.     It was a white Ford Explorer parked there.

23         Q.     Where was that located?

24         A.     It was to the left of the truck, which is

25  actually to the north of the truck, a few feet in front of

1  it.

2          Q.      Somewhere in this area?

3          A.      That's correct.

4          Q.      All right.  And where did you see the men?

5          A.      They were around the truck, a couple on the

6  other side of the Explorer and then there was one that I

7  couldn't see his entire body, because he was on the other

8  side of the trailer and I could just see his feet initially.

9          Q.      This trailer here?

10         A.      Correct.

11         Q.      And all you could see was the lower part of

12  his body?

13         A.      Right.

14         Q.      Okay.  What direction did you see the men

15  moving?

16         A.      Initially, they were just all moving in

17  several different patterns, but ultimately they moved off to

18  the left and went north.

19         Q.      Okay.  So they moved this direction

20  eventually?

21         A.      Correct.

22         Q.      Did they move out of your line of sight?

23         A.      That's right.

24         Q.      Now, there's some cars parked here.  Is that

25  at a parking lot where some used car lots?

1       A.    It's a car lot, yes, sir.

2       Q.    Did that block your view somewhat at that

3   time?

4       A.    It did.

5       Q.    Did you ever see -- did the men ever return to

6   your line of sight?

7       A.    They did a few seconds later.  And there were

8   fewer guys that came back than what actually left.  So it

9   appeared that someone ran off and they didn't come back or

10  whatever.  But it was like three guys that left and only

11  about two that came back.

12      Q.    Okay.  What did they do when they came back?

13      A.    They got into the truck.

14      Q.    Okay.  The Explorer?

15      A.    Into the Explorer, yes, I'm sorry.

16      Q.    And what did they do then?

17      A.    The truck slowly began to back up and the guy

18  that was over the guy that did not run, he was still

19  standing close to the trailer, he ended up getting into the

20  truck finally.  And then it backed up.  It was still facing

21  south as it, you know, as it reversed.  But then it pulled

22  off and went up the street.

23      Q.    Okay.  Let me show you State Exhibit 65 again.

24  Could you see the direction that the car went?

25      A.    Yes, it drove south.

54

1    Q.    This direction here?

2    A.    Correct.

3    Q.    And then which way did it go at that time?

4    A.    The street curves around and heads east, so

5    they had no choice but to go east.  And there's a stop light

6    at Beltline and there I couldn't tell which direction they

7    went.

8    Q.    Curves around this area and then goes on up to

9    Beltline?

10   A.    That's right.

11   Q.    Did you -- could you estimate how fast the

12   Ford Explorer was going?

13   A.    I would say about ten miles an hour.

14   Q.    All right.  Now, after you viewed that, did

15   you ever have any contact with the police that evening?

16   A.    Yes, sir.

17   Q.    And what type of contact did you have with

18   them?

19   A.    Well, a few of them, when they got to the

20   scene they were walking across the small creek that's there

21   behind the apartments and I told them actually what I saw.

22   And they instructed me to call the police department and

23   report it and, basically, that's what I did.

24   Q.    So you called a number there at the police

25   department?

1   A.      I called the direct line to the department,

2   right.

3   Q.      Did you go out later that evening?

4   A.      I went to dinner right after that.  I had a

5   dinner date or appointment, whatever.  And that was about

6   maybe 30 minutes later, so I left.

7   Q.      Okay.  When you returned from your dinner

8   date, did you go back by the Oshman's?

9   A.      Yes, I did.  That's when I spoke with the

10  officers that were at the creek.  They had informed me that

11  one of their officers had been shot, so I inquired about him

12  later that evening and the gentleman that I talked to at

13  that point, he instructed me to go to the department and

14  give a report.

15  Q.      Did you do that then?

16  A.      Yes, I did.

17  Q.      In fact, on another occasion did you execute

18  some drawings, some basic drawings, of what you had seen of

19  the activity behind the Oshman's?

20  A.      Yes, sir.

21  Q.      And at whose request did you do that?

22  A.      It was Detective Spivey.

23  Q.      Let me show you what has been marked as State

24  Exhibits 67 through 72.  Are these copies of the drawings

25  that you made for Detective Spivey?

1    A.    Yes, they are.

2    Q.    And the writing that's contained on them, is

3 that your handwriting?

4    A.    That is.

5    Q.    Describing what you see in those drawings?

6    A.    Uh-huh.

7         MR. SHOOK:  Your Honor, at this time we

8 offer State Exhibits 67 through 72.

9         MR. SANCHEZ:  We have no objection, Your

10 Honor.

11         THE COURT:  Nos. 67 through 72 shall be

12 admitted.

13    Q.    (By Mr. Shook)  Mr. Washington, these are more

14 or less kind of rough sketches of what you saw, is that

15 right?

16    A.    Correct.

17    Q.    When you do your regular work, you go into a

18 lot more detail; is that right?

19    A.    Yes, sir.

20    Q.    The area we're seeing now, is the same area

21 that we looked at on the photograph before?

22    A.    That's right.

23    Q.    The trailer that we saw on the photograph, is

24 that represented here?

25    A.    Correct.

1       Q.    And are these the other trailers here?

2       A.    They are.

3       Q.    As you looked out your window, after hearing

4  this series of shots and hearing more shots, what we're

5  seeing in 67, is that the first view that you had of these

6  men who were moving in the back of the Oshman's?

7       A.    Yes, this is.

8       Q.    And this is the Ford Explorer?

9       A.    Yes.

10      Q.    You mentioned one man who you could only see

11  his legs; is that right?

12      A.    Right.

13      Q.    Is that what we see right here?

14      A.    That's right.

15      Q.    Okay.  Then the next drawing, what does that

16  depict?

17      A.    That shows the men beginning to move north as

18  they were going out of my sight.

19      Q.    Okay.  You lost sight of them for a few

20  moments and then --

21      A.    Correct.

22      Q.    -- some of them came back?

23      A.    Right.

24      Q.    Then 69, does that show the men as they came

25  back and as they began to get into the vehicle?

1       A.      Yes.

2       Q.      Okay.  And then State Exhibit 70, what does

3   that show us?

4       A.      That shows the truck back up and began to

5   drive south.

6       Q.      Okay.  And then State Exhibit 71, would be the

7   vehicle as it began to drive down the Willow Creek

8   Boulevard?

9       A.      Correct.

10      Q.      And State Exhibit 72, does that show the

11  vehicle as it was turning?

12      A.      As it appeared to be turning, yes.  I never

13  actually saw it turn onto the street, but it seemed as

14  though it was about to turn.

15      Q.      That was your last view of it then?

16      A.      That was it.

17      Q       If you were to -- let me show you No. 51.  If

18  you were going to -- this is the street you finally saw the

19  Ford Explorer come down; is that right?

20      A.      Yes.

21      Q.      If you were going to come over to your

22  apartments, would you have to turn right and come down a

23  street this way to get into the entranceway?

24      A.      Correct.  You would turn right on Beltline and

25  then go up to Pioneer and take a right.

```
1        Q.      And take a right into the apartment complex
2    off Pioneer?
3        A.      Correct.
4                MR. SHOOK:  We'll pass the witness.
5                      CROSS-EXAMINATION
6    BY MR. SANCHEZ:
7        Q.      Mr. Washington, from looking at these drawings
8    that you made, did you ever see a police car back there?
9        A.      No, I didn't.
10       Q.      The whole time -- this is from your memory.
11   You saw at the most four men and no police car in front or
12   behind that white Explorer?
13       A.      No.
14               MR. SANCHEZ:  I pass the witness.
15                     REDIRECT EXAMINATION
16   BY MR. SHOOK:
17       Q.      But all the gunshots that you heard out there,
18   there was five and then a brief pause and then seven more.
19   How many more did you hear after that?
20       A.      Maybe about -- I'm going to say it was 25 over
21   all, so probably about another 15.
22       Q.      Okay.  Were they all pretty much in rapid
23   succession?
24       A.      Yes, they were.
25               MR. SHOOK:  That's all we have.
```

1              MR. SANCHEZ:  I have nothing further,

2   Your Honor.

3              THE COURT:  Thank you, sir.

4              MR. SHOOK:  May this witness be excused?

5              MR. SANCHEZ:  No objection, Your Honor.

6              THE COURT:  He may.

7              MR. SHOOK:  May we approach the bench,

8   Your Honor?

9              THE COURT:  You may.

10               (Bench conference)

11             THE COURT:  Members of the jury, we need

12  to take a very quick break.  If you would, go with the

13  Sheriff.

14               [Jury out]

15               (Recess)

16               [Jury in]

17             THE COURT:  Thank you.  You may be

18  seated.  Mr. Shook, call your next witness.

19             MR. SHOOK:  Call Officer Hazard.

20             STEVEN HAZARD,

21  having been duly sworn, was examined and testified as

22  follows:

23              DIRECT EXAMINATION

24  BY MR. SHOOK:

25       Q.  Could you state your name, please.

1       A.     It's Steven Hazard, H-A-Z-A-R-D.

2       Q.     How are you employed, sir?

3       A.     As a police officer for the City of Irving.

4       Q.     And how long have you been with the City of

5 Irving?

6       A.     Twenty-five years.

7       Q.     What division are you assigned?

8       A.     I'm currently in the Crime Scene Search

9 Section or Physical Evidence Section.

10      Q.     How long have you been assigned to that

11 division?

12      A.     Right at 17 years.

13      Q.     Do you have any particular -- let me ask you

14 first, what are your duties in that division?

15      A.     In that section we are the ones that deal with

16 any physical evidence.  We're the ones that take

17 photographs, video wherever it's necessary, basically just

18 seize any physical evidence.

19      Q.     Okay.  Do you have any special training,

20 education, or schools you have attended that have helped you

21 in collecting evidence?

22      A.     Yes, sir, I have.

23      Q.     What types of schools are those?

24      A.     I've been to numerous schools.  They've been

25 put on by the FBI, the State of Texas, and by this county,

1   and some other areas.  They all deal with various schools

2   that deal with fingerprinting, photography, video, physical

3   evidence, just blood spatter, basically anything that has to

4   do with this type job.

5          Q.     All right.  Let me turn your attention to

6   December 24th of 2000 and ask if you were called out to the

7   Oshman's store located just off Highway 183?

8          A.     Yes, sir, I was.

9          Q.     What about what time did you arrive there?

10         A.     Around 8:00.

11         Q.     And what was going on at the scene when you

12  arrived?

13         A.     When I arrived, there was already a lot of

14  officers out at the scene.  The -- they had set up an area

15  where they didn't let just anybody go up to the actual

16  store.  They had officers stopped at a certain area.

17                     I went up to that area where we were

18  stopped and we were kind of -- they had set up a perimeter.

19  We were just outside of the perimeter of the store, because

20  they were still searching the store.

21         Q.     When you arrived at the location, were the

22  store employees still inside?

23         A.     Yes, sir.

24         Q.     So the crime scene wasn't secured at that

25  point in time as far as for collection of evidence?

1       A.     Yes, sir.

2       Q.     What is the first thing you do when you are

3   beginning to process a crime scene?

4       A.     I usually start with photographs, because at

5   the same time I'm taking pictures of photographs, I can see

6   how large of an extent I've got of a crime scene, kind of

7   gives you an idea of it.

8       Q.     Was there a decision made that evening to

9   start processing the crime scene before all the employees

10  were taken out?

11      A.     Yes, sir.

12      Q.     And what led to that decision?

13      A.     It was basically two things.  The -- first

14  off, the fire department wanted to -- they needed one of

15  their fire trucks.  One of the fire trucks that had

16  responded initially was still in the roadway right across

17  from where this had occurred.  They wanted that fire truck

18  out of there, so they could use it.

19              We went down the roadway to check and

20  make sure that if they moved that fire truck, that they

21  wouldn't run over any evidence or destroy any evidence that

22  might be in the roadway.  At the same time I was doing

23  photographs of that.

24              When we got down there we noticed that

25  the weather was just -- it's just going bad on us.  It's

1   fixing to do the misty rain and all that, so we need to get

2   on in there and start doing our crime scene before we do

3   lose something.

4        Q.    And at that time you began processing and

5   photographing the crime scene?

6        A.    Yes, sir.

7        Q.    Let me show you some photographs which have

8   been marked.  You have seen these photographs outside the

9   presence of the jury; is that right?

10        A.    Yes, sir.

11        Q.    They've been marked State Exhibits 73 through

12   172.  Are these photographs that you took in and around the

13   crime scene at the Oshman's?

14        A.    Yes, sir.

15        Q.    Would they help you explain your testimony to

16   the jury?

17        A.    They will.

18              MR. SHOOK:  Your Honor, at this time we

19   offer State Exhibits 73 through 172.

20              MR. SANCHEZ:  We have no objection, Your

21   Honor.

22              THE COURT:  State's 73 through 172 shall

23   be admitted.

24        Q.    (By Mr. Shook)  Let me first show you what has

25   been marked as State Exhibit 73.  Does that show the crime

1    scene, I think, looking down Willowbrook at the officer's

2    police car here located by the trailer?

3         A.      It's Willow Creek Drive.  That's a fire truck

4    in the roadway.  That is Officer Hawkins' vehicle under the

5    trailer.  And then the other squad car in the street is one

6    of the responding officers.

7         Q       Okay.  And then this is the fire truck that

8    the fire department wanted to move; is that right?

9         A.      Yes, sir.

10        Q.      Did you also take measurements and make a

11   diagram or several diagrams of the crime scene?

12        A.      Yes, sir, I did.

13        Q.      Let me show you what has been marked as State

14   Exhibit 173.  Does this represent the diagram that you had

15   made of the crime scene?

16        A.      Yes, sir, it does.

17        Q.      Does it show where evidence was recovered and

18   would it help you explain your testimony to the jury?

19        A.      It does and it would help.

20             MR. SHOOK:  We'll offer State Exhibit

21   173.

22             MR. SANCHEZ:  No objection, Your Honor.

23             THE COURT:  State 173 shall be admitted.

24             MR. SHOOK:  Your Honor, could I have the

25   witness step down for a moment to explain the diagram?

1      THE COURT:  He may.

2          Q.      (By Mr. Shook)  Officer Hazard, let me caution

3  you to step back so all the jurors can see the diagram.

4  What is it we see here on the diagram itself?  What area of

5  the crime scene?

6          A.      What this is, is showing the back loading dock

7  area of the Oshman's store.  This is the loading dock area

8  right here.  This is the store, this gray building.  And

9  then this is the Willow Creek Drive.

10         Q.      We see a legend here on the right side.  Could

11 you explain what the legend represents?

12         A.      The legend shows what all items are labeled on

13 the diagram itself.  Like the -- it's got all the G's here

14 would be glass samples that we took at the scene.  All these

15 are -- all the G's are glass.  All the B's will be blood

16 samples that we took at the scene.  The T would be a tire

17 track that goes out of the parking lot.  It's -- it's a

18 bloodprint made every time the tire rotates, so it's in four

19 places.  We did take a sample of the best one at this point.

20             All the lettered items are objects that

21 are at the scene like a screwdriver, a two-way radio, a

22 weapon.  All the numbers that you see on here the 1, 2, 3,

23 4, 5, 6, those are all projectiles or pieces of bullets.

24         Q.      And these are all items that you eventually

25 collected; is that right?

67

1    A.    Yes, sir.

2    Q.    Now, when you went and started examining the

3 crime scene and looking at the area here in between this

4 trailer and trash dumpster, was it evident to you that there

5 had been some type of collision there between Officer

6 Hawkins' car and another vehicle?

7    A.    Yes, sir, there was.

8    Q.    In fact, was there another vehicle found that

9 evening near this location that you felt was involved in the

10 crime scene?

11    A.    Yes, sir.

12    Q.    What type of vehicle was that?

13    A.    It's a Ford Explorer.

14    Q.    Was that a Ford Explorer that belonged to Wes

15 Ferris, one of the managers?

16    A.    Yes, sir, it was.

17    Q.    And where was that located?

18    A.    That was located in an apartment complex

19 within sight of this scene, really.

20    Q.    Okay.  And did it appear to you that somewhere

21 in this area there had been a collision between Officer

22 Hawkins' car and that Ford Explorer?

23    A.    Yes, sir, right in this area.

24    Q.    Now, was a tape retrieved from a car lot which

25 is directly behind this Oshman's?

1          A.     Yes, sir, there was.

2          Q.     What type of tape was that?

3          A.     It's a surveillance tape that they have up on

4    a pole of a car lot where it's showing their cars in the

5    front of the parking lot to help, I guess, prevent theft.

6    It does catch part of this parking lot.

7          Q.     Okay.  What portion of the parking lot does it

8    catch?

9          A.     The -- it shows mostly the cars, but you do

10   get to see a little bit of this area.

11         Q.     Okay.  In fact, would you explain to the jury

12   how the video -- you have seen the videotape many times; is

13   that right?

14         A.     Yes, sir, I have.

15         Q.     Is it an actual moving motion picture of the

16   area?

17         A.     What it does is it tapes every few seconds.

18   So it's not a continuous video, but it tapes -- every few

19   seconds it takes a picture.  It also has the time on the

20   frame of the -- each frame.  It's in military time and it's

21   an hour off because they had not set it back yet.

22         Q.     So every few seconds the camera takes a

23   photograph of whatever is out in front of it?

24         A.     Yes, sir.

25         Q.     And you have viewed this videotape several

69

1  times?

2      A.      I've viewed it several times at different

3  speeds, frame by frame, a lot of times.

4      Q.      Okay.  By viewing the videotape, were you able

5  to determine the movements of the cars as they occurred back

6  there?

7      A.      Yes, sir.

8      Q.      And how were you able to do that?

9      A.      You can determine the movement of the cars by

10  their brake lights and by their headlights.  You can see

11  them coming down the road.  If you watch the tape at a

12  faster speed, you can see the silhouettes of the vehicles a

13  lot easier.  If you watch it at a slower speed, you can see

14  the brake lights of a vehicle a lot better.

15          The Ford Explorer has that third brake

16  light that's up high.  So you know whenever he's hitting his

17  brakes, you can always tell when his brakes are on and when

18  they're off.

19      Q.      And that's how you were able to determine the

20  movements of the cars?

21      A.      Yes, sir.

22      Q.      Now, was the tape of a quality that you can

23  ever see any individuals outside the cars walking around?

24      A.      No, sir.

25      Q.      You can really only see the brake lights and

1    taillights, that sort of thing?

2        A.       You can see the movement of the cars only.

3    You don't see any people in this parking lot and the only

4    way that you would is in the parking lot where the tape is

5    actually intended to shoot.

6        Q.       Were you able to determine the time of the

7    movement of the cars?

8        A.       Yes, sir.

9        Q.       And how were you able to do that?

10       A.       By each frame that it shows has that military

11   time with the minutes -- hours, minutes, and seconds down in

12   the lower corner.

13       Q.       Okay.  You may have a seat.  Let me show you

14   what has been marked as State Exhibit 174.  Is that the

15   original tape?

16       A.       Yes, sir, it is.

17       Q.       And State Exhibit 174-B is that a copy of the

18   tape which has been -- has real time as well as slow time on

19   it?

20       A.       Yes, sir, it is.

21              MR. SHOOK:  Your Honor, at this time we

22   will offer State Exhibits 174 and 174-B.

23              MR. SANCHEZ:  No objection, Your Honor.

24              THE COURT:  State 174 and 174-B shall be

25   admitted.

1      Q.      (By Mr. Shook)   Let me show you State Exhibit

2    864.   Is this a diagram that shows or reflects the times of

3    the various car movements that you observed on the tape?

4      A.      It is.

5      Q.      Would it help you explain your testimony to

6    the jury?

7      A.      It would.

8            MR. SHOOK:   We'll offer State Exhibit

9    864.

10           MR. SANCHEZ:   No objection, Your Honor.

11           THE COURT:   No. 864 shall be admitted.

12     Q.      (By Mr. Shook)   The diagram that was just

13   placed on the wall next to you, that actually shows some of

14   the time that you actually saw vehicle movement on the tape;

15   is that right?

16     A.      Yes, sir, it is.   On this diagram the time is

17   corrected.   On the tape it will show the military time an

18   hour off, but this has the correct time.

19     Q.      Let me start the tape and we'll pause it and

20   go over some things with the jury.   Okay?   Now, the tape

21   being on pause now, the majority of the tape you see is the

22   actual parking lot itself; is that right?

23     A.      Yes, sir, it is.   The area that I'm watching

24   for in this tape is in the very upper, left-hand corner of

25   the screen.

1    Q.    This is the area of the Oshman's, the back

2  area?

3    A.    Yes, sir.

4    Q.    Okay.  And this area here, is this Willow

5  Creek?

6    A.    That's Willow Creek Drive.

7    Q.    And by playing it at various speeds, you were

8  able to determine when the Explorer arrived, as well as when

9  Officer Hawkins arrived; is that right?

10    A.    Yes, sir.

11    Q.    The clock there, that's what we see down at

12  the bottom?

13    A.    Yes, sir.  That's the clock with the military

14  time at the bottom.

15    Q.    And this is the actual very quick speed; is

16  that right?

17    A.    Yes, sir.

18    Q.    There's another version we'll see in a moment

19  where you have slowed the tape down?

20    A.    Yes, sir.  The Explorer was just in there.

21  Officer Hawkins is in there.

22    Q.    The time we see down there 19:31 is actually

23  --

24    A.    6:31:03.

25    Q.    And what we're looking at now is the Explorer

1   and Officer Hawkins' car would be back there?

2         A.     Yes, sir.  And that -- it's over with now.

3         Q.     These are the various police cars arriving?

4         A.     Yes, sir.

5         Q.     Now, is this the tape on a slower speed?

6         A.     Yes, sir.

7         Q.     Okay.  And we're at approximately 6:27 p.m.;

8   is that correct?

9         A.     Yes, sir.

10        Q.     Now, the first time you noted on the diagram

11  is 6:27:42, which you saw the Explorer northbound on Willow

12  Creek; is that right?

13        A.     Yes, sir.  That's him right -- you can see the

14  headlights coming on Willow Creek Drive now.  They are about

15  the middle of the screen right there.

16        Q.     This would be the headlights of the Explorer?

17        A.     Yes, sir.

18        Q.     And when I take this off pause, you would be

19  able to see the Explorer as it goes into the back of the

20  parking lot?

21        A.     Yes, sir.

22        Q.     Your next time on there is 26:28:03.  Is that

23  the time that you notice the Explorer parks?

24        A.     Yes, sir.

25        Q.     That's the Explorer going in.  Now, we've had

1   to skip over a little bit of the time here, but the next

2   important time frame you put down is at 6:28:56, the brake

3   lights went off on the Explorer?

4          A.    Yes, sir.

5          Q.    So it had been parked almost a minute at that

6   point in time; is that right?

7          A.    Almost a minute.

8          Q.    Okay.  Then at 6:29:52 you noted that the

9   brake lights were back on and the Explorer moves to a second

10  position?

11         A.    Yes, sir.

12         Q.    So it actually moved one time before Officer

13  Hawkins arrived?

14         A.    Yes, sir.

15         Q.    And you were able to tell that, again, by the

16  brake lights?

17         A.    By the brake lights and also the silhouettes

18  of the vehicle.

19         Q.    Did it generally stay in the same area?

20         A.    Yes, sir.

21         Q.    And then the next time you put on there is

22  6:30:31 seconds, Officer Hawkins is northbound on Willow

23  Creek?

24         A.    Yes, sir.

25         Q.    Does he come from the same direction that the

```
 1   Explorer did?

 2         A.    He does.

 3         Q.    Would that be Officer Hawkins' car as we saw

 4   the headlights coming?

 5         A.    Yes, sir.  He's behind him now.

 6         Q.    The time you noted after looking at the tape

 7   was that he stopped behind the Explorer at 6:30:51 seconds?

 8         A.    Yes, sir.

 9         Q.    The next movement you saw was both cars moving

10   forward?

11         A.    Yes, sir.

12         Q.    How were you able to determine that?

13         A.    From the -- again, from watching the video you

14   can see the silhouettes and you can see the lights of both

15   of them move forward simultaneously.

16         Q.    And then at 6 hours, 31 minutes and 24 seconds

17   you saw both cars move backwards?

18         A.    Yes, sir.

19         Q.    Were you able to determine where Mr. Hawkins'

20   car went on the videotape?

21         A.    It goes out of view off the screen.

22         Q.    And then at 6 minutes 3 -- 6:31 and 38

23   seconds, the Explorer exits the parking lot?

24         A.    He leaves without his lights on.  That's him

25   leaving there.
```

1        Q.     That was the white car we saw leaving?

2        A.     Yes, sir.

3        Q.     So at the time that Officer Hawkins actually

4    parked behind the Explorer at 6 minutes -- 6:30 and 51

5    seconds, to the time that the Explorer actually leaves is

6    roughly, what, 47 seconds?

7        A.     Yes, sir.

8        Q.     And, again, you had to watch this tape a

9    number of times at different speeds to determine these exact

10   times?

11       A.     Yes, sir, over and over.

12       Q.     Okay.  You had another exhibit made of -- copy

13   of your exhibit, actually, that was metallic, is that right,

14   that had some magnets on it?

15       A.     Yes, sir.

16       Q.     Would it help you demonstrate the actual

17   movements of the cars as they occurred in the actual parking

18   lot?

19       A.     It would.

20       Q.     Let me show you State Exhibit 187.  Is this a

21   copy of your diagram which would assist you in showing the

22   jury the movement of the cars?

23       A.     It is and it would.

24              MR. SHOOK:  We'll offer State Exhibit

25   187.

1          MR. SANCHEZ:  We have no objection, Your

2   Honor.

3          THE COURT:  No. 187 shall be admitted.

4          MR. SHOOK:  Can the officer step down

5   again for a moment?

6          THE COURT:  Yes.

7      Q.     (By Mr. Shook)  Now, looking at the exhibit,

8   it's just a little bit of a smaller replica of the diagram

9   that the jury has already seen; is that right?

10     A.     Yes, sir.

11     Q.     We have the area of the trailer and dumpster

12  and where all the debris is located?

13     A.     Yes, sir.

14     Q.     Using this vehicle representing the Ford

15  Explorer and this vehicle representing Officer Hawkins' car,

16  I would like you to show to the jury exactly the areas you

17  believe you saw the Explorer park in, where it moved to, and

18  where the collision actually occurred.

19     A.     All right.  You want me to do it by the time?

20     Q.     Sure.

21     A.     At 6:27:42 when the Explorer is northbound on

22  this Willow Creek Drive, it's coming down this roadway here.

23  And then at 6:28:03, the Explorer parks in this area over

24  here.

25     Q.     So the original area was somewhere in this

1  area?

2          A.     Yes, sir.

3          Q.     And how long does it sit there?

4          A.     Let's see, it sits there for about a minute.

5  The brake lights are off then at 6:29:52, the brake lights

6  come back on and the Explorer starts to move to a second

7  position.

8          Q.     Okay.

9          A.     Okay.  Officer Hawkins at 6:30:31 is

10  northbound on Willow Creek Drive.  So he's coming up Willow

11  Creek.  You see him turn onto the road back down here and

12  he's coming up here as this car is moving into here.

13          Q.     Okay.

14          A.     Okay.  At 6:30:51 Officer Hawkins is stopped

15  behind the Explorer and he's in this area right about like

16  this.

17          Q.     You positioned Officer Hawkins' car a little

18  -- not the exact --

19          A.     Not exactly behind him.  He's just a little

20  bit to -- a little bit offset.

21          Q.     And how were you able to determine that exact

22  position?

23          A.     From the collision, from the damage on both

24  vehicles.

25          Q.     Okay.

1        A.     Okay.  And then at 6:31:09, both of these move

2  forward at the same time.

3        Q.     Okay.  And then what did you see next?

4        A.     The next thing you see at 6:31:24 is that both

5  vehicles move back.  This one, Officer Hawkins goes off the

6  screen.  You can't see it.  This one moves over to this area

7  or backs up to this area.  And then at 6:31:38, you see it

8  exit the parking lot.  He comes out this way and then heads

9  down Willow Creek with his lights off.

10       Q.     And that's the white car that we saw on --

11       A.     Yes, the white Ford Explorer.

12       Q.     So you believe the collision actually occurred

13  somewhere in this area?

14       A.     Yes, sir.

15       Q.     And the cars move forward?

16       A.     Yes, sir.  From the debris and the blood, this

17  is where the collision would have occurred.

18       Q.     We see on the diagram an area of blood and

19  then some other treadmarks; is that right?

20       A.     Yes, sir.

21       Q.     You examined the scene out there pretty

22  closely.  What did you determine what had occurred?

23       A.     What had occurred here is when the -- at the

24  time when both vehicles were -- had moved forward, Officer

25  Hawkins had already been shot.  He was removed from the car

1   in this area.  Someone had drug him about six feet.  There

2   was a six-foot drag mark on the pavement where they drug him

3   over to this area.

4                       And then you see when both cars move,

5   this one moves back to this area.  The Explorer backs over

6   Officer Hawkins.  He lodges under the front tire of the

7   vehicle and it drags him back to this area.  And then the

8   Explorer leaves out of the parking lot and Officer Hawkins

9   remains in that area.

10          Q.    How many feet did it drag Officer Hawkins?

11          A.    At least ten feet.

12          Q.    And how were you able to determine that?

13          A.    There's a six-foot drag mark on the pavement.

14   It's just a bloody object being drug by someone, not by a

15   car.  And there's at least ten feet of skidmark from the

16   front tire of the Explorer and Officer Hawkins' magazine

17   pouch where it's in contact with the ground and it's

18   grinding away his magazine pouch as he's being drug on the

19   pavement.

20          Q.    So actually the grinding of his magazine pouch

21   caused a skidmark as it went along?

22          A.    Right.  His magazine pouch caused a skidmark

23   on -- to be left, about ten-foot long, and the front tire of

24   the Explorer as Officer Hawkins is lodged against the front

25   tire, it won't let it turn.  And as the Explorer backs up,

1   it leaves a skidmark, also.

2        Q.    So they have identical skidmarks?

3        A.    Yes, sir.

4        Q.    You can have a seat.  I want to go over some

5   of the photographs that were at the scene about the areas

6   that we talked about.  First, State Exhibits 74 and 75, does

7   that show some of the debris that was out in the roadway?

8        A.    This is across the street from that parking

9   lot.  What you are seeing in that photograph is one of those

10  soft nylon kind of zip-up bags, athletic bags.  It's blown

11  across the road into the grass.

12       Q.    Another type of bag here was also out there?

13       A.    That's that same bag close up.  Close-up view

14  of it.

15       Q.    Still had its tags on it?

16       A.    Yes, sir.

17       Q.    Now, let me show you State Exhibit 76.  Is

18  this a photograph of the crime scene you were just talking

19  about, the area where the collision occurred and where

20  Officer Hawkins was left?

21       A.    Yes, sir, it is.

22       Q.    What are these police officers doing here?

23       A.    They are guarding that back door.  It's

24  because at the time, we were still thinking there may be

25  some hostages or still the store employees were in there and

1   maybe some -- still some of the ones that did this still in

2   there.  We're not sure who is still in the store.

3           Q.     So you were photographing the scene while the

4   officers were still guarding the doors?

5           A.     Yes, sir.

6           Q.     Hostages were still inside?

7           A.     Yes, sir.

8           Q.     What is it we see right down here in the

9   bottom of the photograph?

10          A.     That's Officer Hawkins' ballistic vest he

11  wears under his shirt.

12          Q.     This debris up here, what is this?

13          A.     That is some more of those soft athletic bags.

14  There's three of them up in that area.  One of them has got

15  a lot of ammunition in it.  There's at least forty boxes of

16  ammunition of various types that are in there.  There's some

17  binoculars in there.  There's a two-way radio up there.

18          Q.     Let me show you State Exhibit 77 taken from

19  another angle.  Does that show the bag that had various

20  items in it?

21          A.     Yes, sir.  That's the bag where, as you can

22  tell, it's been hit or run over and that's some of the

23  ammunition that's scattered on the pavement.

24          Q.     These are boxes of ammunition?

25          A.     Yes, sir.

1      Q.      Now, did you take Officer Hawkins' police car

2   to the Irving auto pound?

3      A.      Yes, sir.

4      Q.      For a closer examination?

5      A.      Yes, we did.

6      Q.      And did you also take the white Ford Explorer

7   there?

8      A.      Yes, sir.

9      Q.      State Exhibit 79, does that show the damage to

10  the front of Officer Hawkins' car?

11     A.      It does.

12     Q.      Is this the push bar on Officer Hawkins' car?

13     A.      It is.

14     Q.      State Exhibit 78, is this some of the debris

15  that you recovered?

16     A.      That is some of the debris that was at the

17  scene I had taken back to the office.  The fiberglass at the

18  top of the picture is put back together, pieced back

19  together, and the rest of it is all part of -- it's -- all

20  of that right there is part of Officer Hawkins' car.

21     Q.      State Exhibit 82, were you able to take

22  Officer Hawkins' car and match it up where you believe the

23  collision occurred with the Ford Explorer?

24     A.      Yes, sir.

25     Q.      And is that what we see here in this

1   photograph?

2         A.      What we're seeing here is the back bumper of

3   the Ford Explorer on the right and Officer Hawkins' front

4   push bar on the left of this picture and that's how they

5   lined up.

6         Q.      Okay.  And State Exhibit 81, does this show

7   where the angle of the cars would have been right before the

8   collision?

9         A.      Yes, sir.  This is how they lined up for that

10  damage to have occurred.

11        Q.      Let me go back to the area where that -- where

12  you believe Officer Hawkins was drug.  Let me show you State

13  Exhibit 84.  Do we see part of the drag mark there?

14        A.      Yes, sir.

15        Q.      What is this item here that's located near the

16  drag mark?

17        A.      That's another one of those soft -- it's like

18  a briefcase, really, but it's a soft one, zip-up bag.

19        Q.      Okay.  State Exhibit 85, does this show the

20  drag mark from a different angle?

21        A.      Yes, sir.

22        Q.      Do you believe Officer Hawkins was drug in

23  this direction?

24        A.      Yes, sir.

25        Q.      What do we see here?

1      A.      That's a Smith & Wesson .357 revolver,

2  four-inch revolver.

3      Q.      And did you collect that?

4      A.      Yes, sir.

5      Q.      Let me show you what has been marked State

6  Exhibit 178.  Do you recognize that?

7      A.      Yes, sir.

8      Q.      Is that the weapon, the .357 that you

9  recovered from behind the Oshman's?

10     A.      It is.

11             MR. SHOOK:  Your Honor, at this time

12  we'll offer State Exhibit 178.

13             MR. SANCHEZ:  No objection, Your Honor.

14             THE COURT:  No. 178 shall be admitted.

15     Q.      (By Mr. Shook)  Officer Hazard, could you

16  explain to the jury what type of weapon State Exhibit 178

17  is.

18     A.      This is a .357 Magnum revolver.  It's a

19  four-inch weapon, meaning the barrel is four inches.  When I

20  say it's a revolver, it has a cylinder that you open and you

21  load the bullets into the cylinder and then you close the

22  cylinder and you are able to fire the weapon.  This weapon

23  will shoot .357 Magnum bullets or .38 Special bullets.

24     Q.      Did you examine that gun to see if it had been

25  fired?

1    A.    Yes, sir.

2    Q.    And what did you find?

3    A.    This weapon had one of the bullets fired, the
4  one that was under the hammer, and then it had five that
5  were still live, had not been fired yet.

6    Q.    So from just examining the gun, there was one
7  spent round under the hammer and then five live rounds?

8    A.    Yes, sir.

9    Q.    Did you make an effort to fingerprint the
10  weapon?

11    A.    Yes, sir.  It was sent to the lab to be
12  fingerprinted.

13    Q.    Were any comparable fingerprints recovered?

14    A.    No.

15    Q.    Is that unusual to not recover fingerprints or
16  readable fingerprints from a handgun?

17    A.    That's not unusual at all.

18    Q.    Okay.  Did you make efforts to find out any --
19  determine any serial numbers on that particular gun?

20    A.    Yes, sir.

21    Q.    How were you able to do that?

22    A.    I took the grips off of it.  The serial number
23  that's supposed to be on the side is not there, but I took
24  the grips off and there's some numbers on the bottom of the
25  frame.

1    Q.    And at that point in time you were able to

2  determine the numbers and later match those to those taken

3  from the escape from the Texas Department of Corrections?

4    A.    Yes, sir.  They were numbers that the Texas

5  Department of Corrections engraves on their weapons.

6    Q.    Let me show you State Exhibit 187.  This

7  object we see down at the bottom, what is that?

8    A.    That's a little two-way radio.  That's not

9  Officer Hawkins' radio.  This is more like a walkie-talkie

10  that you would buy for your kids or something like that.

11    Q.    Let me show you State Exhibit 179.  Is this

12  the radio that you recovered that we see in the photograph?

13    A.    Yes, sir, it is.

14         MR. SHOOK:  Your Honor, at this time we

15  offer State Exhibit 179.

16         MR. SANCHEZ:  No objection, Your Honor.

17         THE COURT:  No. 179 shall be admitted.

18    Q.    (By Mr. Shook)  Again, is this the two-way

19  radio that says Radio Shack on it; is that right?

20    A.    Yes, sir.

21    Q.    Did you go out the next day to photograph the

22  drag marks that you previously explained to the jury?

23    A.    Yes, sir.

24    Q.    Let me show you State Exhibits 90 and 91.  Do

25  we see some chalk marks there on the photograph?

1      A.      Yes, sir.  It's a little faint on this, but in

2  the lower right you can see the tire mark and the magazine

3  skidmark.  I've outlined them with the chalk and then taken

4  photographs of it.

5      Q.      Is this the area where you saw the skidmarks?

6      A.      Yes, sir.

7      Q.      And State Exhibit 91?

8      A.      That's the same thing from a different view.

9      Q.      Is that the actual treadmarks on the tire

10  here?

11      A.      Yes, sir.

12      Q.      And then the magazine skidmark, is that

13  located right here?

14      A.      Yes, sir.

15      Q.      Did you later examine Officer Hawkins' belt?

16      A.      Yes, sir.

17      Q.      Let me show you what has been marked as State

18  Exhibit 175.  Is that his magazine pouch?

19      A.      Yes, sir.

20      Q.      State Exhibit 176, would this be Officer

21  Hawkins' radio?

22      A.      Yes, it is.

23      Q.      And then State Exhibit 177, is this Officer

24  Hawkins' Sam Brown belt?

25      A.      Yes, it is.

1          MR. SHOOK:  Your Honor, at this time we

2     offer State Exhibits 175, 176, 177.

3          MR. SANCHEZ:  We have no objection, Your

4     Honor.

5          THE COURT:  Nos. 175, 176, and 177 shall

6     be admitted.

7          Q.    (By Mr. Shook)  First of all, No. 176, is this

8     the type of radio an officer can carry on his belt so he can

9     be in contact at all times?

10         A.    Yes, sir, it is.

11         Q.    Did it appear to have some damage to it?

12         A.    Yes, sir, it does.

13         Q.    As far as possibly being drug or run over?

14         A.    Yes, sir.

15         Q.    All right.  Now, you said that you could

16    determine the skidmark from Officer Hawkins' body because of

17    his magazine pouch; is that right?

18         A.    Yes, sir.

19         Q.    Is that what we see here on State Exhibit 175?

20         A.    Yes, sir, it is.

21         MR. SHOOK:  Could I have the witness step

22    down to demonstrate the damage to the pouch?

23         THE COURT:  He may.

24         Q.    (By Mr. Shook)  If you would, Officer Hazard,

25    just go down the line with the jury and explain to them what

1  you see as far as the damages.

2      A.    All right.  This magazine pouch should look

3  similar to mine.  Mine has got complete sides.  This side

4  has been ground away and this is ground, along with the

5  flap.  That's from it being in contact with the ground or

6  the pavement.  It should look something similar to mine.

7      Q.    And that caused the ten-foot skidmark which

8  paralleled the skidmark that you saw from the tire; is that

9  right?

10      A.    Yes, sir.  Also, at the end of that skidmark

11  there's a loose magazine, like one of mine, laying on the

12  pavement.

13      Q.    Okay.  The belt itself, did it appear to have

14  some damage?

15      A.    Yes, sir.

16      Q.    Could you specifically show this to the jury?

17      A.    Okay.  This belt -- we do have a different

18  wear on our belt from time to time, but never something as

19  severe as this.  This is from this occurring, this crime.

20  This gouge in the belt.

21      Q.    Did you examine the underside of the Ford

22  Explorer?

23      A.    Yes, sir.

24      Q.    And did you discover evidence there that you

25  believe showed Officer Hawkins was, indeed, run over by the

1  car?

2        A.     Yes, sir.

3        Q.     What type of evidence was that?

4        A.     A piece of leather and some areas underneath

5  the vehicle that had been -- where the dirt had been wiped

6  and also some blood.

7        Q.     All right.  Let me show you State Exhibit 92.

8  Does this show the underside of the Ford Explorer?

9        A.     It does.

10       Q.     And are these the areas you saw that looked

11  like had been wiped at some point in time?

12       A.     Yes, sir.  On the left-hand part of the screen

13  where the shock absorber comes down where it mounts on the

14  bottom, there's a place on the bottom of that shock absorber

15  where the dirt has been wiped away.

16       Q.     Somewhere down in this area?

17       A.     Yes, sir, right in that area.

18       Q.     State Exhibit 93, we're seeing the same thing

19  on a different portion of the car?

20       A.     Yes, sir.  This is a crossmember underneath

21  the Ford Explorer and the dirt has been wiped away near

22  where you see that number.

23       Q.     This area here?

24       A.     Yes, sir.

25       Q.     And then State Exhibit 94, is this the area

1    where you saw the piece of leather that you believe

2    corresponded to the belt?

3         A.    Yes, sir.  This is -- that's the front tire on

4    the driver's side.  That's the fender up there and where you

5    have the light is a piece of leather that's hung on that

6    fender.

7         Q.    You believe this was the tire that Officer

8    Hawkins' body was hung up against?

9         A.    Yes, sir.  This is the tire that was causing

10   the skid where his body is against it when they are going

11   backwards.

12        Q.    You also said that there was blood evidence

13   under the car and on the tire; is that right?

14        A.    Yes, sir.

15        Q.    Does State Exhibit 95 show some of that blood

16   evidence?

17        A.    Yes, sir.  This is the back tire of the

18   Explorer on the driver's side and that's up -- that's some

19   blood in that area.

20        Q.    All right.  State Exhibit 96, does this show

21   some of the blood spatter on the side of the car?

22        A.    Yes, sir.  This is the -- that fender well of

23   the tire we just saw and that's some cast-off blood.

24        Q.    And then State Exhibit 97, we see more blood

25   here on the side of the car?

1    A.    Yes, sir.

2    Q.    Okay.  Let me show you State Exhibit 100.  Is

3    this the pistol we've already seen in evidence after it was

4    back at your offices?

5    A.    Yes, sir.

6    Q.    You said you had opened it.  State Exhibit

7    101, does that show the one round that had been fired?

8    A.    Yes, sir.  That top cylinder, you can see the

9    primer is indented on the bullet.

10   Q.    That's what we're seeing right here?

11   A.    Yes, sir.  That's the spent bullet and the

12   rest of them are still live.

13   Q.    And State Exhibit 102, does that show the

14   serial number you were able to recover?

15   A.    Yes, sir.  This is with the grips off the

16   weapon.

17   Q.    Okay.  Now, State Exhibit 103, does that show

18   another item you recovered out at the scene?

19   A.    Yes, sir.

20   Q.    What is that?

21   A.    That's a screwdriver that was left near that

22   area where all that debris was.

23   Q.    Some red paint appear on it?

24   A.    Yes, sir.

25   Q.    And the bag that was left had various types of

1   ammunition; is that correct?

2           A.      Yes, sir.

3           Q.      Is that what we see here in State Exhibit 104?

4           A.      Yes, sir.  What we've done is we've taken the

5   ammunition back to our office and we've kind of grouped it

6   to what caliber that they had taken.

7           Q.      You also took -- did an examination of Officer

8   Hawkins' car out there at the scene; is that right?

9           A.      Yes, sir.

10          Q.      Was it running at the time that you examined

11  it?

12          A.      His car was running, it was in reverse, and

13  the driver's door was open.

14          Q.      Okay.  Is there a shotgun in that car?

15          A.      There is a shotgun in the overhead rack that

16  was still there and it was locked.

17          Q.      Let me show you State Exhibit 110.  Is this

18  the -- Officer Hawkins' car back at your -- the Irving

19  police pound?

20          A.      It is.

21          Q.      Did you do a closer examination of it and

22  photograph the damage caused to it by gunfire?

23          A.      Yes, sir.

24          Q.      Here we see the back of the vehicle.  The back

25  windshield seems to be broken out; is that right?

1    A.    Yes, sir.

2    Q.    Could you determine at that time how that

3    occurred?

4    A.    Well, it's initially broke by some bullets

5    that passed through the back window.  And then it also

6    struck the trailer that it was under.  It's got a little bit

7    of damage to the back of the car there on that back corner

8    on the driver's side.

9    Q.    Okay.  Let me show you what has been marked as

10   State Exhibit 111.  Does this show some damage done by

11   bullets to the front of the car?

12   A.    Yes, sir.  It's showing the damage to the push

13   bumper and there's two bullet holes in the hood on the

14   driver's side and then two on the windshield on the driver's

15   side.  You can see four bullet holes on the passenger side.

16   Q.    The four bullet holes are here?

17   A.    Yes, sir.

18   Q.    Let me get a closer view of this on State

19   Exhibit 112.  These are the two bullet holes into the hood

20   of the car?

21   A.    Yes, sir.

22   Q.    And then there's another one here at the

23   bottom of the windshield?

24   A.    Yes, sir.

25   Q.    And then another one located here?

```
 1        A.      Yes, sir.

 2        Q.      And we have four more on this side?

 3        A.      Yes, sir.

 4        Q.      State Exhibit 113, did you try to trace the

 5   path or see what damage was caused under the hood?

 6        A.      Yes, sir.

 7        Q.      From these two bullets?

 8        A.      Yes, I did.

 9        Q.      What do we see in State Exhibit 114?

10        A.      This is showing the -- what one of the bullets

11   did.  You can see that dent on the drum behind the master

12   cylinder.  That's from one of the projectiles that went

13   through the hood and struck that and dented and probably

14   fell to the ground.

15        Q.      And No. 115, what do we see there?

16        A.      This is showing in the weather stripping where

17   one of the bullets had struck it, also.

18        Q.      All right.  Now, was there a bullet recovered

19   near that dashboard area, a projectile?

20        A.      Yes, sir.

21        Q.      Where was that recovered?

22        A.      Right behind the speedometer of the car.

23        Q.      Could you determine which -- where that bullet

24   had come from or which bullet hole into the windshield?

25        A.      That's from the one that's lowest in the
```

1    windshield, the lowest one near the VIN plate and the hood.

2          Q.     This area right here?

3          A.     Yes, sir.  That's the one that we found right

4    behind the speedometer.

5          Q.     So that would have been recovered somewhere in

6    this area?

7          A.     Yes, sir.

8          Q.     And was that submitted to the crime lab?

9          A.     Yes, it was.

10         Q.     Then we had one more bullet hole in this area?

11         A.     Yes, sir.

12         Q.     Now, I'm showing you State Exhibit 118.  Does

13   this show the rough angle, you think, where the bullet

14   struck the passenger side of the windshield?

15         A.     Yes, sir.

16         Q.     Here, here, and also at that top?

17         A.     Yes, sir.

18         Q.     State Exhibit 119, that's the -- shows the top

19   of the windshield.  What is this object here behind this

20   where this damage is done?

21         A.     That's a video camera that this car was

22   equipped with, a video camera.

23         Q.     Did it appear that the bullet had struck the

24   video camera?

25         A.     Yes, sir.

1          Q.      Is that what we see here in State Exhibit 120?

2          A.      Yes, sir, that's the video camera.

3          Q.      State Exhibit 121, does that show kind of an

4     inside view of what it would look like as far as the damage

5     caused by the bullets?

6          A.      Yes, sir, it does.

7          Q.      Let me show you State Exhibit 124.  This is

8     from the back window.  What damage do we see here?

9          A.      On that hump there at the back deck, there's a

10    bullet hole going in where your light is, and then one that

11    comes out to the left of it.

12         Q.      All right.  Did you examine the side of the

13    car, the driver's side, and see some damage caused to the

14    driver's window?

15         A.      Yes, sir.

16         Q.      Did it appear that the driver's window had

17    been shot out?

18         A.      Yes, it did.

19         Q.      Is that the damage that we see here in State

20    Exhibit 125?

21         A.      Yes, sir.  This is also showing that the

22    window was completely up and it has a place where a bullet

23    has struck on the door post and the top corner of it.

24         Q.      Is that what we see in 126?

25         A.      Yes, sir.

1      Q.    This area here?

2      A.    Yes, sir.

3      Q.    So that window would have to have been up for

4 that type of damage to occur?

5      A.    Yes, sir.

6      Q.    State Exhibit 127, what do we see there?

7      A.    This is the interior of Officer Hawkins' squad

8 car.  This is showing the driver's seat with the majority of

9 the glass there and then a computer that sits in the middle

10 of the car has a bullet projectile in the keyboard.

11      Q.    Okay.  Let me show you State Exhibit 130.

12 Does that show a closer view of the damage done to the

13 bullet there?

14      A.    Yes, sir.

15      Q.    We're talking about this area right here?

16      A.    Yes, sir.  That's where a bullet has struck

17 the keyboard.

18      Q.    Okay.  Now, after you photographed this, did

19 you find various bullet projectiles that you collected

20 throughout this crime scene?

21      A.    Yes, sir.

22      Q.    Let me show you State Exhibit 129.  Does that

23 show one of those projectiles or a piece of a bullet

24 fragment?

25      A.    Yes, sir.  On the back of that, that's a

1    fragment from a bullet.

2         Q.      Okay.  What types of fragments did you find in

3    the car and outside the car?

4         A.      Lead and copper.

5         Q.      Could you explain to the jury what a copper

6    jacketed bullet is.

7         A.      You can buy bullets that are just plain lead

8    or you can buy them that have a copper jacket surrounding

9    the lead.  The copper jacket kind of holds the bullet, makes

10   a stronger bullet.  So very often when they are fired, you

11   will find that they will come apart.  You will find the lead

12   in one area and the copper jacket in another.  Sometimes

13   they stay together and sometimes not.

14        Q.      Could you determine from looking at the car

15   whether Officer Hawkins had his seatbelt on at the time of

16   the incident?

17        A.      Yes, sir.

18        Q.      And what was your determination?

19        A.      That he did not have it on.

20        Q.      Why was that?

21        A.      Because there's blood and tissue on the

22   seatbelt buckle part, but there's a lack of the same on the

23   actual release button where it would snap into.  Also, he

24   carried a clipboard just below the release button and that

25   clipboard had a sheet of paper on it that had no blood on it

1  at all.

2      Q.     That's what we see here in State Exhibit 128?

3      A.     Yes, sir.  That's that clipboard, that's his

4  activity sheet, and you see the lack of any blood on it.

5      Q.     Let me show you what has been marked as State

6  Exhibit 135.  Do you see another bullet fragment there?

7      A.     Yes, sir.  That's on the front passenger seat.

8  Officer Hawkins carried an equipment bag.  He really carried

9  several equipment bags.  That's one that's in the seat and

10  that piece of copper jacket is laying in front of his

11  equipment bag.

12      Q.     Now, does 136 show the seat after that

13  equipment bag has been removed?

14      A.     Yes, it does.

15      Q.     And what type of object do we see there?

16      A.     There's a piece of copper jacket, but there's

17  also part of his -- he wore his award medals above his name

18  tag and one of his medals was struck by a bullet and part of

19  that medal came apart in the car.

20      Q.     And that's what we see right here?

21      A.     Yes, sir, part of that.

22      Q.     And State Exhibit 138, does that show another

23  bullet fragment that was removed from the side of the door?

24      A.     This is the front passenger side door and

25  that's that kick panel on the bottom part of the door where

1    a copper jacket is stuck in that carpet.

2        Q.    State Exhibit 139, is this a piece of cloth

3    that you took into evidence?

4        A.    Yes, sir.  That's the -- above the -- where

5    the driver sits on his seat, right above his shoulder.

6        Q.    Did that appear to you that that might be part

7    of one of the patches on his uniform?

8        A.    Yes, sir.

9        Q.    Did you find more bullet fragments in the back

10   seat of the car?

11       A.    Yes, sir.

12       Q.    State Exhibit 141, do we see some of the

13   fragments there?

14       A.    Yes, sir.  Near the I-bolt there's a lead

15   projectile right there.

16       Q.    As far as the lead projectiles and the copper

17   jackets, did you make careful note of where you recovered

18   these?

19       A.    Yes, sir.

20       Q.    And then you submitted all those to the crime

21   lab?

22       A.    Yes, sir.

23       Q.    And hoped to compare them to the weapons that

24   they recovered later?

25       A.    Yes, sir.

1    Q.    And State Exhibit 143, does this show the back

2  window as it had been knocked out?

3    A.    That's as it appeared at the scene.  It still

4  had the glass in it.  There's still glass on the deck.

5  Earlier when we saw the one where the bullet went through

6  the deck and went out, we had cleaned that glass off so we

7  could see it.

8    Q.    Now, the Ford Explorer itself, did you find

9  some bullet damage to it?

10    A.    Yes, sir.

11    Q.    Where was that?

12    A.    In the driver's door of the Ford Explorer.

13    Q.    Okay.  Let me show you State Exhibit 148, does

14  that show the driver's door as it was open?

15    A.    Yes, sir.

16    Q.    In what area of the car did you find some

17  bullet holes?

18    A.    Just below the window or door lock, there's a

19  bullet hole there.  And where the mirror control, where the

20  control button would be, there's a bullet hole there.

21    Q.    This area here?

22    A.    Yes, sir.

23    Q.    State Exhibit 149, does that show the door at

24  the angle it could have been open when it was struck?

25    A.    That's with the door all the way open, as far

1    open as it would go.  And what we've done is stuck some

2    metal flags in there that kind of show the angle that the

3    bullets entered.

4        Q.    And 150 shows the other angle the door could

5    have been at?

6        A.    That shows the minimum angle that you could

7    have had the door open and still have both of those bullet

8    holes in there from the outside.

9        Q.    Okay.  Now, there's some blood evidence inside

10   the Explorer; is that right?

11       A.    Yes, sir.

12       Q.    Let me show you State Exhibit 153.  Does this

13   show the blood that was on the driver's seat?

14       A.    Yes, it does.

15       Q.    And State Exhibit 154 shows another angle of

16   that?

17       A.    Yes, it does.

18       Q.    Did you collect that blood and submit it to

19   the lab?

20       A.    Yes.

21       Q.    What procedure did you use in collecting this

22   blood?

23       A.    This blood was wet enough that you can collect

24   it just directly.  We have a little plastic dish that has a

25   white cloth in it and what we do when we collect blood is we

1    put on some gloves and we take that little white cloth and

2    put it in the blood, if it's wet, and put it back in the

3    dish and label the dish as to where we got it.

4                    If the blood sample is dry, then we will

5    wet the cloth with some distilled water first and then hold

6    it on the blood until it soaks it up and then put it in the

7    dish and then label it and send it to the lab.

8         Q.    Did you find blood in various other parts of

9    the Ford Explorer?

10        A.    Yes, sir.

11        Q.    Where was that?

12        A.    There's some on the inside back door window on

13   the -- it's on the -- just behind the driver.  There's some

14   more that's on the back door on the passenger side.

15        Q.    Let me show you State Exhibits 155 and 156.

16   Does that show the area where that blood evidence was?

17        A.    Yes, sir.  That's the back door on the

18   passenger side and just above the armrest you can see a

19   little spot.  That's some blood right there.

20        Q.    Okay.  Is that a closer view?

21        A.    That's another view of that same spot.

22        Q.    All right.  State Exhibit 158?

23        A.    That's the handle that's above that and it's

24   got some blood on it.

25        Q.    Okay.  And then 157, what do we see here?

1      A.      That's some blood on the inside back door

2  window behind the driver.

3      Q.      Going back to the crime scene, there were two

4  trailers that are parked side by side out there; is that

5  right?

6      A.      Yes, sir.

7      Q.      Did you examine those and find some bullet

8  damage?

9      A.      Yes, sir, I did.

10      Q.      How many times did it appear the trailer had

11  been struck?

12      A.      Three times.

13      Q.      Let me show you State Exhibit 159.  Does that

14  show the trailer that was struck?

15      A.      Yes, it does.

16      Q.      Is that Officer Hawkins' car there underneath

17  the trailer?

18      A.      It is.

19      Q.      What areas of the trailer were struck by

20  bullets?

21      A.      Near that No. 2 on the left-hand side, there's

22  a bullet hole down there.  And then if you count up like

23  four seams from the bottom where you can see those lines,

24  there's another bullet hole and then one that's up high, all

25  of them on the left-hand side of that trailer, that door.

1    Q.    No. 160, does that show the bottom view of the

2  one --

3    A.    Yes, sir.  This is the one near the No. 2.

4    Q.    No. 161 actually shows a closeup of that?

5    A.    Yes, it does.  That's the hole there.

6    Q.    This area here?

7    A.    Yes, sir.

8    Q.    Then State Exhibit 163?

9    A.    This is showing the one in the hinge that was

10  about four seams up.

11    Q.    And then 164, is this taken inside the

12  trailer?

13    A.    It is.  Where that letter R is, there's a

14  bullet hole down there and, like I say, if you count up

15  about four seams on the right-hand side now, you can see a

16  bullet hole, a bullet comes through that behind that hinge

17  and then there's one on up above that.

18    Q.    And 165, does that show the bullet coming into

19  the trailer?

20    A.    Yes, sir, that's the bullet hole.

21    Q.    Did you also examine the area against the

22  Oshman's where you thought some bullet damage might have

23  occurred between the trash compactor and the trailer?

24    A.    Yes, sir.

25    Q.    State Exhibit 170, that shows the area -- this

1    would be the area where you think the cars had gone into

2    after the collision; is that right?

3           A.    Yes, sir.  This is -- when you saw both go

4    forward, this is where they would have been headed to.

5           Q.    Looks to be some type of chalk or arrow

6    pointing down to this area.  What is that?

7           A.    That's pointing at an impact place from the

8    bullet.

9           Q.    Okay.  State Exhibit 172?

10          A.    That's a closer up view of it.

11          Q.    Okay.  And then State Exhibit 171?

12          A.    That's another view of it.

13          Q.    How many times did it appear that wall may

14   have been impacted?

15          A.    Twice.

16          Q.    Now, you said that you collected bullet

17   fragments throughout the crime scene; is that right?

18          A.    Yes, sir.

19                THE COURT:  Mr. Shook, it's 3:15.  We

20   need to take our afternoon break.  The first one this

21   afternoon was not a break.  I need to go.  We'll take 20

22   minutes at this point and let him look through that box and

23   we'll have you back in 20 minutes.

24                        [Jury out]

25                        [Recess]

1                          [Jury in]

2                    THE COURT:  Thank you, you may be seated.

3    Mr. Shook?

4         Q.    (By Mr. Shook)  You recovered various bullet

5    fragments inside Officer Hawkins' car as well as from the

6    Ford Explorer and then around the crime scene; is that

7    right?

8         A.    Yes, sir.

9         Q.    Let me show you what has been marked as State

10   Exhibit 759.  Again, is this a diagram similar to the

11   diagram the jury has already seen, but has notations of

12   where you recovered various bullet fragments along with

13   State exhibit markers on them?

14        A.    Yes, sir.

15        Q.    And does it also include evidence recovered

16   from the Ford Explorer?

17        A.    It does.

18        Q.    And would it help you explain your testimony

19   to the jury?

20        A.    It would.

21                    MR. SHOOK:  We'll offer State Exhibit

22   759.

23                    MR. SANCHEZ:  No objection, Your Honor.

24                    THE COURT:  No. 759 shall be admitted.

25        Q.    (By Mr. Shook)  Again, this is the same layout

1    of the diagram the jury has already seen; is that right?

2         A.     Yes, sir.

3         Q.     There are different color-coded exhibit

4    markers which correspond with some of the exhibits which are

5    about to come into evidence?

6         A.     Yes, sir.

7         Q.     Let me first show you what has been marked as

8    State Exhibit 182, an envelope which contains a canister.

9    Is this the bullet fragment that you recovered from behind

10   the speedometer of Officer Hawkins' squad car?

11        A.     Yes, sir, it is.

12        Q.     If I could just have you step down with the

13   Court's permission to kind of take that bullet fragment out

14   and explain to the jury.

15                    THE COURT:  Did you say 182?

16                    MR. SHOOK:  No. 182.

17                    THE COURT:  No. 182 is not in evidence.

18                    MR. SHOOK:  Let me offer No. 182 at this

19   time.

20                    MR. SANCHEZ:  Your Honor, we just object

21   to improper foundation as to this exhibit.

22                    THE COURT:  Overruled.  No. 182 shall be

23   admitted.

24                    MR. SHOOK:  Could I have the witness step

25   down for a moment?

```
1            THE COURT:  You may.

2        Q.    (By Mr. Shook)  Can you explain to the jury,

3   this is the projectile that was taken from behind the

4   dashboard; is that right?

5        A.    Yes, sir.

6        Q.    It's located here on the diagram as 182; is

7   that right?

8        A.    Yes, it is.

9        Q.    What are we seeing there?

10       A.    This is the lead projectile that was recovered

11  from the dash.  It's the lead part of the bullet.

12       Q.    And when you recover these from a crime scene

13  such as this, you submit them to the lab; is that right?

14       A.    Yes, sir.

15       Q.    What is the purpose in doing that?

16       A.    Sometimes there's some striations or marks

17  left on the projectile that you can later match through a

18  particular weapon.

19       Q.    And that was your purpose in submitting those

20  to the lab?

21       A.    Yes, sir.

22       Q.    You don't conduct that particular test, do

23  you?

24       A.    No, sir.

25       Q.    There's a firearm expert at the lab that does
```

1   that?

2          A.      Yes, sir.

3          Q.      State Exhibit 178 is the revolver you

4   recovered from the crime scene?

5          A.      Yes, sir, it is.

6          Q.      You have already testified that there were

7   several rounds of ammunition left, five live rounds of

8   ammunition, in it; is that right?

9          A.      Yes, sir, there was.

10          Q.      Let me show you what has been marked as State

11   Exhibit 183.  Does that appear to contain the ammunition

12   that was recovered from 178?

13          A.      It does.

14                  MR. SHOOK:  We'll offer State Exhibit

15   183.

16                  MR. SANCHEZ:  No objection, Your Honor.

17                  THE COURT:  No. 183 shall be admitted.

18          Q.      (By Mr. Shook)  Let me show you a package that

19   has been marked State Exhibit 184 which contains three

20   canisters which would have been marked State Exhibit 488 and

21   184-A and 184-B.

22          A.      Yes, sir.

23          Q       Are those all bullet fragments that you

24   recovered from the crime scene?

25          A.      Nos. 184-A and B are bullet fragments.  No.

1   488 are two spent shell casings.

2        Q.    Okay.  Let's talk about 184-A and 184-B.  Are

3   they bullet fragments recovered from the crime scene?

4        A.    Yes, sir.

5        Q.    What portion of the crime scene?

6        A.    From the driver's door of the Ford Explorer.

7        Q.    Okay.

8              MR. SHOOK:  Your Honor, at this time I'll

9   offer 184-A and 184-B and 184.

10             MR. SANCHEZ:  No objection.

11             THE COURT:  No. 184, which is the

12  package; is that correct?

13             MR. SHOOK:  Yes, sir.

14             THE COURT:  No. 184-A and 184-B shall be

15  admitted.

16        Q.    (By Mr. Shook)  No. 184-A and B were bullet

17  fragments recovered from the actual door of the Ford

18  Explorer?

19        A.    Yes, sir.

20        Q.    And then 488, you said two spent rounds that

21  are found inside the Explorer?

22        A.    Yes, sir.

23        Q.    Where were they found in the Explorer?

24        A.    These are under the back seat on the driver's

25  side of the Ford Explorer.

1          MR. SHOOK:  We'll offer State Exhibit

2    488.

3          MR. SANCHEZ:  No objection.

4          THE COURT:  No. 488 shall be admitted.

5          MR. SHOOK:  May he step down to

6    demonstrate this piece of evidence?

7          THE COURT:  He may.

8          Q.    (By Mr. Shook)  Mr. Hazard, these are spent

9    shell casings?

10         A.    Yes, sir.

11         Q.    Explain to the jury what we see there.

12         A.    This is the bullets after they've been fired.

13   The shell casings are left behind.  The bullets -- the lead

14   part is missing from inside and the powder, also.  You can

15   see on the end where the primer has been struck.  That

16   ignites the powder and sends the bullet out.

17         Q.    If someone were going to reload a revolver,

18   such as you see in State Exhibit 178, how would they do

19   that?

20         A.    If -- to reload it?

21         Q.    Yes, sir, unload it and reload it.

22         A.    Okay.  This cylinder would normally be closed,

23   if it's loaded.  The cylinder would be closed.  It's been

24   made safe for the court with this plastic through there so

25   I'm not able to do it.

115

1         But if it was loaded or if you wanted to

2    unload it and load it again, you would first push this side

3    button and this allows the cylinder to swing out and then

4    that allows you to get to the shell casings.  It has an

5    ejector rod, this is the ejector rod, that pulls the shell

6    casings out.  And then you are able to take them out or drop

7    them and then you are able to reload it, put new ones in,

8    close this back up, and you are ready to fire it.

9         Q.   And these would be the rounds after they were

10   spent.  If you were to take them out of the revolver, this

11   is how they would be?

12        A.   Yes, sir.

13        Q.   And, again, what type of ammunition are these?

14        A.   .357s.

15        Q.   Okay.  Let me show you an envelope which is

16   marked State Exhibit 185 and show you four canisters which

17   have been marked State Exhibits 185-A through D.

18        A.   Yes, sir.

19        Q.   Do you recognize those?

20        A.   Yes, sir.

21        Q.   Are these bullet fragments that you collected

22   from the crime scene?

23        A.   Yes, they are.

24        Q.   And are they reflected here on State Exhibit

25   759?

1      A.      They are, 185, here's A, B, C, and D.

2      Q.      So they were found outside the car in various

3  parts of the parking lot?

4      A.      Yes, sir.  In the parking lot, parking lot,

5  185-C is in the wall of the trailer and D is also just

6  laying in the parking lot.

7              MR. SHOOK:  Your Honor, at this time we

8  offer the envelope, 185, along with State Exhibits 185-A

9  through D.

10             MR. SANCHEZ:  No objection.

11             THE COURT:  Nos. 185, 185-A through D,

12 shall be admitted.

13     Q.      (By Mr. Shook)  Let me show you an envelope

14 which has been marked State Exhibit 186 and ask you if you

15 can identify three canisters which have been marked 186-A,

16 186-B, and 186-C.

17     A.      Yes, sir.

18     Q.      Again, are those bullet fragments that you

19 recovered from the scene?

20     A.      Yes, sir.  They are from the squad car.  No.

21 185-A (sic) was from the right front seat; 185-B (sic) is

22 from the right rear floorboard; 186-C is from the computer.

23     Q.      This is all 186?

24     A.      Yes, sir.

25     Q.      So it's 186 is the envelope and the fragments

1   are 186 -

2          A.     A, B, C.

3          Q.     A, B, C?

4          A.     Yes, sir.

5                 MR. SHOOK:  Your Honor, at this time we

6   offer State Exhibits 186 and 186-A through C.

7                 MR. SANCHEZ:  No objection.

8                 THE COURT:  Nos. 186, 186-A through C

9   shall be admitted.

10         Q.     (By Mr. Shook)  While I have you up here,

11  Officer Hazard, let me show you an envelope marked 486 which

12  contains one canister marked 486-A.  Is that a bullet

13  fragment which was recovered from the crime scene?

14         A.     Yes, sir.

15                MR. SHOOK:  Your Honor, at this time we

16  offer 486 and 486-A.

17                MR. SANCHEZ:  No objection.

18                THE COURT:  Nos. 486 and 486-A shall be

19  admitted.

20         Q.     (By Mr. Shook)  Let me show you an envelope

21  marked State Exhibit 484, which contains seven canisters

22  marked 484-A through G.

23         A.     Uh-huh.

24         Q.     I believe, hold on.  Nos. 484-A through 484-G;

25  is that correct?

1      A.     Yes, sir.

2      Q.     Are they all bullet fragments recovered from

3  the crime scene?

4      A.     They are.

5             MR. SHOOK:  Your Honor, at this time we

6  offer State Exhibit 484 and 484-A through G.

7             MR. SANCHEZ:  No objections.

8             THE COURT:  Nos. 484 and 484-A through G

9  shall be admitted.

10     Q.     (By Mr. Shook)  Finally, Officer Hazard, let

11 me show you State Exhibit 485, an envelope which contains

12 three canisters marked 485-A through C.  Are these also

13 fragments recovered from the crime scene?

14     A.     Yes, sir, they are.

15            MR. SHOOK:  Your Honor, at this time we

16 offer 485 and 485-A through C.

17            MR. SANCHEZ:  No objection.

18            THE COURT:  Nos. 485 and 485-A through C

19 shall be admitted.

20     Q.     (By Mr. Shook)  Let me show you State Exhibit

21 180.  We saw this in a photograph earlier.  Is this the

22 screwdriver that was recovered from the back of the

23 Oshman's?

24     A.     Yes, it is.

25            MR. SHOOK:  We'll offer 180 for all

1    purposes.

2                    MR. SANCHEZ:  No objection, Your Honor.

3                    THE COURT:  No. 180 shall be admitted.

4        Q.    (By Mr. Shook)  Inside the Oshman's did you

5    recover some evidence near the back door?

6        A.    Yes, sir.

7        Q.    Let me show you State Exhibit 487.  Is this

8    the evidence that you recovered?

9        A.    Yes, it is.

10       Q.    What exactly is that?

11       A.    It's a smoke grenade.

12       Q.    And where was it sitting?

13       A.    It was sitting on some boxes right by the back

14   door.

15       Q     The back door here where you come out the

16   Oshman's?

17       A.    Yes, sir.  There's two back doors.  The one

18   that you would most likely use would be this one because

19   it's a direct.  This one you have to go through the

20   warehouse.  It's near this one.

21       Q.    Okay.

22                    MR. SHOOK:  Your Honor, at this time we

23   offer State Exhibit 487.

24                    MR. SANCHEZ:  No objection, Your Honor.

25                    THE COURT:  No. 487 shall be admitted.

1    Q.    (By Mr. Shook)   That is a smoke grenade?

2    A.    Yes, sir.

3    Q.    And it was just sitting on top of some boxes?

4    A.    Yes, sir.

5         MR. SHOOK:   That's all the questions we

6    have.  We'll pass the witness.

7                   CROSS-EXAMINATION

8    BY MR. SANCHEZ:

9    Q.    Officer, how many times did you have to watch

10   that tape from the used car lot in order to determine the

11   times and the actual cars that you saw?

12   A.    That would be hard to say how many times.

13   Q    More than once?

14   A.    Oh, yes, yes, a lot more than once.  I've

15   watched it, like I say, numerous times, and I have watched

16   it frame by frame also, where we looked at each frame.

17   Q.    And did you have to stop each frame and

18   sometimes blow it up to make sure what you were seeing in

19   that frame or was it always in that videotape?

20   A.    Well, it's always on the tape as you see it.

21   I don't know when you say blow it up, this is as blown up as

22   you will see it here, you know.

23   Q.    Is there any way that you can magnify it to

24   get a better picture of what's in that video?

25   A.    I sent it to the FBI in Quantico to see if

1  they could do anything with it and that's the best they

2  could do is what we're seeing now.

3      Q.    And based on what you saw on that video,

4  that's how you were able to determine which cars were

5  present at which time; is that correct?

6      A.    Yes, sir.

7      Q.    And in your detailed viewing of that video,

8  did you ever see more than those two cars?

9      A.    You see the cars come and go up the street,

10  you know, just normal traffic.  That's not a very, very used

11  street, but it does have some traffic on it.  So you do see

12  cars come and go.  But during this time, that's only two

13  cars you will see.

14     Q.    You didn't see a third car come up to that

15  back area and stop or do anything?  You just saw a Ford

16  Explorer and you saw a police squad; is that correct?

17     A.    Yes, sir.

18     Q.    And from looking at that video, you really

19  couldn't tell who was driving, who was in the car, or

20  whether anybody was even there, just from looking at the

21  video, correct?

22     A.    You can't make out any persons at all.

23     Q.    But, again, you did establish that the

24  Explorer came around first and parked and then almost

25  anywhere from between a minute and a half to two minutes is

1    when the police squad car came by and parked?

2         A.     I would have to look at the times, but that's

3    close.

4                    MR. SANCHEZ:  I pass the witness, Your

5    Honor.

6                    REDIRECT EXAMINATION

7    BY MR. SHOOK:

8         Q.     Officer Hazard, you couldn't blow it up frame

9    by frame, is that right, the tape that we saw?

10        A.     No, sir.

11        Q.     It's not like CSI that we see on TV where you

12   can develop very close and accurate pictures from the film

13   that you receive?

14        A.     No.  Well, first I took it to the ATF and then

15   I sent it to the FBI to see what they can do with it and

16   that's the best we got back.  All I could tell that they did

17   is they slowed it down for us a little bit on that second

18   viewing.

19        Q.     And the yellow tape that's on the pistol, is

20   that yellow tape that was on the pistol when it was

21   recovered?

22        A.     Yes, sir.

23        Q.     You didn't put it there or any other officers?

24        A.     No.  That's the way it was found.

25                    MR. SHOOK:  That's all we have.

1        MR. SANCHEZ:   I have nothing further,

2   Your Honor.

3        THE COURT:   Thank you, Officer, you may

4   stand down.

5        MR. SHOOK:   Call Officer Chism.

6                    CURTIS CHISM,

7   having been duly sworn, was examined and testified as

8   follows:

9                 DIRECT EXAMINATION

10  BY MR. SHOOK:

11      Q.      Would you tell us your name, please.

12      A.      Curtis Chism.

13      Q.      And how are you employed, sir?

14      A.      I'm a police officer with the City of Irving.

15      Q.      And what division are you assigned?

16      A.      The Criminalistic Section and the Crime Scene

17  Unit.

18      Q.      How long have you been in that particular

19  division?

20      A.      Eighteen years.

21      Q.      Could you tell the jury some of the training

22  you have had for the position that you hold there?

23      A.      The department sent me through numerous

24  schools sponsored by the FBI, the Texas Department of Public

25  Safety, the Sheriff's Office here, all related to everything

1    to do with evidence collection, photography, and

2    fingerprint, fingerprint identification.

3          Q.    Okay.  Let me turn your attention to December

4    24th of 2000.  Were you called out to a crime scene at the

5    Oshman's store?

6          A.    Yes, sir, I was.

7          Q.    What was your assignment out there?

8          A.    To process that crime scene for any evidence.

9          Q.    And did you and Officer Hazard work that crime

10   scene together?

11         A.    Yes, sir, we did.

12         Q.    At some point during the evening did you leave

13   the Oshman's crime scene and go to some apartments located

14   behind the Oshman's?

15         A.    Yes, sir.

16         Q.    And what was the reason you did that?

17         A.    They had located the white Explorer that had

18   belonged to the manager that had been taken.

19         Q.    Let me show you some photographs which have

20   been marked State Exhibits 760 through 771.  Are these

21   photographs of that Explorer and evidence recovered inside

22   of it?

23         A.    Yes, sir, they are.

24               MR. SHOOK:  Your Honor, at this time we

25   offer State Exhibits 760 through 771.

1          MR. SANCHEZ:  We have no objection, Your

2    Honor.

3          THE COURT:  Nos. 760 through 771 shall be

4    admitted.

5          Q.    (By Mr. Shook)  The photo we see on the

6    monitor, is that the parking space that the Explorer was

7    found?

8          A.    Yes, sir.

9          Q.    And State Exhibit 761 shows another angle of

10   that?

11         A.    Yes, sir.

12         Q.    Did it appear that the passenger window at the

13   front had been shot out?

14         A.    Yes, sir, the right front window.

15         Q.    Okay.  Let me show you State Exhibit 762.  Is

16   this an overview of the apartments where the Ford Explorer

17   was found?

18         A.    Yes, sir, it is.

19         Q.    These are the apartments that are located

20   behind the Oshman's?

21         A.    Correct.

22         Q.    Okay.  What part of the apartment complex was

23   the Ford Explorer found?

24         A.    In this photograph it's almost in the center

25   right where you are pointing right there.

1        Q.      This area right here?

2        A.      Yes, sir.

3        Q.      What would be -- let me show you State Exhibit

4    764. This shows the apartments in correlation with the

5    apartments and the Oshman's together?

6        A.      Yes, sir.

7        Q.      Can we see in this photograph if you were

8    going to drive from behind the Oshman's to get to where that

9    Ford Explorer was found, the route you would take?

10       A.      Yes, sir, you can.

11       Q.      And what's that?

12       A.      You would leave the Oshman's about where you

13   are at there on Willow Creek, follow the curve around back

14   towards the east to the first red light right there.  That

15   would be Beltline Road.  You would then turn right or to the

16   south and the very next light south would be Pioneer which

17   is right there.  You turn right or back to the west and then

18   there's an entrance to the complex right there.

19       Q.      And then the Explorer was found somewhere in

20   here?

21       A.      Yes, sir.

22       Q.      All right.  Let me show you State Exhibit 765.

23   What is that a photograph of?

24       A.      That's a cartridge that was on the ground on

25   the passenger side of the Explorer.

1    Q.    And could you explain to the jury what a

2 cartridge is?

3    A.    A cartridge is basically what you hear is a

4 bullet, an unfired bullet.

5    Q.    Okay.  And that was on the passenger side on

6 the ground?

7    A.    Yes, sir.

8    Q.    And you collected that?

9    A.    Yes, sir, I did.

10    Q.    Let me show you State Exhibit 770.  What do we

11 see there?

12    A.    That's another cartridge.  It's actually in

13 the seat back behind the right front, actually the right

14 rear seat, shoved down between the seat cushion and the seat

15 back.

16    Q.    And State Exhibit 771?

17    A.    Those are two .357 caliber shell casings or

18 fired rounds.

19    Q.    Okay.  I believe Officer Hazard already

20 testified to finding these.  Was this the exact location

21 they were found?

22    A.    Yes, sir, it is.

23    Q.    And then State Exhibit 767, does that show the

24 window that was shot out?

25    A.    Yes, sir.

1    Q.    And 768 show the inside where the glass was

2    found?

3    A.    Yes, sir.

4    Q.    Let me show you an envelope which has been

5    marked State Exhibit 758.  There's three canisters inside

6    which have been marked 758-A, B, and C.  Do you recognize

7    those?

8    A.    Yes, sir.

9    Q.    No. 758-A, was that the live round that was

10   found outside the Ford Explorer?

11   A.    Yes, sir, it is.

12   Q.    What type of bullet is that?

13   A.    It's a .38 caliber, basically just a plain

14   lead round.

15   Q.    And then 758-B and C, where were those

16   recovered?

17   A.    Which one is this -- 758-B is another one,

18   also a .38 round.  It's a different manufacturer than A,

19   but it was also on the ground on the passenger side of the

20   Explorer.  And 758-C is the one that was in the rear seat.

21   Q.    Okay.  So all three are live rounds found

22   either inside the Explorer or the outside?

23   A.    Correct.

24   MR. SHOOK:  Your Honor, at this time we

25   offer 758 along with 758-A through C.

1          MR. SANCHEZ:  We have no objection.

2          THE COURT:  Nos. 758 and 758-A through C

3  shall be admitted.

4     Q.    (By Mr. Shook)  So there were two live rounds

5  found outside?

6     A.    Yes, sir.

7     Q.    And this is .38 caliber ammunition?

8     A.    Yes, sir, it is.

9     Q.    Can .38 ammunition be fired in a .357

10  revolver?

11     A.    Yes, sir.

12          MR. SHOOK:  We'll pass the witness.

13          MR. SANCHEZ:  We have no questions of

14  this officer, Your Honor.

15          THE COURT:  Officer Chism, that will do

16  it for today for you.  May this witness be excused?

17          MR. SHOOK:  Yes, sir, Your Honor.

18          MR. SANCHEZ:  No objection.

19          THE COURT:  Members of the jury, I told

20  you all we try to quit between 4:30 and 5:00.  We never know

21  how long to schedule witnesses for.  We're through early

22  today.  I trust we have no complaints on your end.  We could

23  very well be in trial until 5:00, but we're to 4:00 today.

24          I know I told you I'm going to sound like

25  a broken record, but I'm going to do it again.  It doesn't

1 take a rocket scientist to figure out there has been media

2 coverage of this trial.  Do not, do not, don't watch the

3 evening news, any channels.  Don't read the newspaper.

4 Don't look at the Internet.  As far as the rest of your

5 life, this is a short trial.  You can do all these things

6 after the fact.  Okay?

7               Everything you learn about this case

8 comes from where?  Right there.  Because, as you know, the

9 media, they will take an entire day of testimony.  We had

10 six hours of testimony today and they will reduce that to a

11 30-second, maybe 40 or 45-second sound bite and that's after

12 the editors get through with it. The same with the

13 newspaper.  Don't read it.  Don't allow anyone to tell you

14 about it.

15               You will get the same instruction every

16 day.  That's exactly what I mean.  That allows you to go

17 about your business this afternoon, go to the office or work

18 or wherever you go.

19               Tomorrow morning, I know you were here

20 early.  First day as always we like to get started.  We will

21 be here tomorrow morning at 9:00.  So whatever time the

22 Sheriff has you arrive to be in the jury room ready to go to

23 work at 9:00, that would be between you and the Sheriff.

24 Fair enough?  Very good.

25               We'll see you tomorrow morning ready to

1    go to work at 9:00 a.m.

2                        [Jury out]

3                        THE COURT:  Let the record reflect the

4    jury has retired at approximately 4:05 this afternoon.  The

5    defense has made a motion for continuance this morning at

6    8:30 a.m. saying news articles have been published by the

7    Dallas Morning News and the Ft. Worth Star Telegram.

8                        The motion was denied.  But I instructed

9    the counsel we would have a hearing on her issue of the gag

10   order that was in place in this trial.  And do you have some

11   testimony which is to be considered at this time?

12                       MS. BUSBEE:  Yes, sir, Your Honor, but

13   could I just make a preface statement by asking the Court to

14   take judicial notice of the Order that was filed in this

15   case and I suppose -- I'm not quite sure of the number of

16   indictment, every case that was filed against the Texas

17   Seven contains a gag order which was served upon us and it

18   was signed and ordered by the previous Judge of this Court.

19   We had a hearing on February 2nd, 2001, and it looks like it

20   was signed on the 8th of February of 2001.

21                       And can the Court take judicial knowledge

22   of that order and state for the record that that is an Order

23   that applies to this litigation?

24                       THE COURT:  This is correct.  The Court

25   will take judicial notice.  It's a filed document.

1          MS. BUSBEE:  The Court is aware and I

2    attached my motion for continuance, copies of two newspaper

3    articles, one dated the 9th and one dated the 10th, which is

4    today.  I would like to call the two reporters to the

5    witness stand for the purpose of questions concerning these

6    two articles at this point.

7                    THE COURT:  Call your first witness.

8                    MS. BUSBEE:  Call Mr. Lee.

9                    MR. WILLIAMS:  Your Honor, may I be heard

10   on this?

11                   THE COURT:  Yes, sir.  Please state your

12   name and bar number for the Court Reporter.

13                   MR. WILLIAMS:  Yes, sir.  Your Honor, my

14   name is Tom Williams.  My state bar number is 21578500.  I

15   represent Mike Lee and the Ft. Worth Star Telegram.

16                   Your Honor, earlier today the defense had

17   Mr. Lee served with a subpoena to appear in stanter in this

18   case, I gather for this hearing now.  He is outside in the

19   hall.

20                   But, Your Honor, on behalf of Mr. Lee, we

21   would move to quash the subpoena.  There's been no showing

22   he knows anything that is relevant to this case.  And to put

23   Mr. Lee, who is the Ft. Worth Star Telegram reporter who has

24   been regularly covering this case, under a subpoena in a

25   case in which the Rule has been invoked serves no purpose,

1   except to disrupt the normal process of the Ft. Worth Star

2   Telegram, and we have to get somebody else here.

3                   I don't think there's been any suggestion

4   that he has anything to say about the facts of the case.  I

5   gather there may be an issue about whether something that

6   was said to him by someone else might possibly violate one

7   of the Court's previous orders.  It seems to me, Your Honor,

8   to the extent the newspaper article itself is relevant to

9   the defense motion -- by the way, I'm not too sure what

10  motion it is we're hearing, for that matter.  I understand

11  you denied the continuance, which I think is the only motion

12  I've heard reference to.

13                   THE COURT:  Let me bring you up to speed.

14  This morning she moved for sanctions on parties that

15  violated the gag order and to quash the jury panel as being

16  tainted by said violation of the gag order, which was

17  disseminated through the media.  Is that accurate,

18  ms. Busbee?

19                   MS. BUSBEE:  Yes, sir, Your Honor.  And I

20  might add that with the Court's permission, I intend to

21  inquire as to whether or not other statements have been made

22  that may pop up in the newspaper at some point for the

23  purpose of determining whether or not sequestration would be

24  a remedy that would need to be done.

25                   I know that we can't stop them from

1  printing what has been told to them, but if the gag order

2  has been violated and we continue to hear these -- read

3  things in the newspaper, the gag order itself and the

4  findings of the Court indicate that the risk of taint and

5  prejudice and unfair process is too great to take that risk.

6           So that's really -- the continuance was

7  simply to have more information to make these oral motions

8  I'm making now.

9           MR. WILLIAMS:  Your Honor, I appreciate

10 that.  Of course, those motions were made when I was not

11 here, so I appreciate that.

12           Let me speak to both of those.  As far as

13 a motion to quash the jury panel, the only thing the jury

14 panel might -- or the jurors might have seen are the

15 articles themselves as published.  A newspaper article is

16 self-authenticating and we don't need a newspaper reporter

17 to come in and prove it up.  If there is some issue about

18 whether a juror did or did not see an article, we don't need

19 Mr. Lee's testimony on that point.  He has nothing to add to

20 that, other than the article itself which can come into

21 evidence under the rules of evidence as a

22 self-authenticating article.

23           As far as the issue of some sanction,

24 first of all, it would seem to me that that is a completely

25 separate proceeding.  And I object to Mr. Lee being

1   subpoenaed in this trial, subjecting him to the invocation

2   of the Rule and precluding him from covering the remainder

3   of this trial.

4          MS. BUSBEE:  He's not subjected to the

5   Rule.  That was not the intention of anybody.  So if we

6   could make that clear.  Nobody wanted to bar him from the

7   courtroom.  We wanted him to come here and tell us about

8   what he had been told.  It has nothing to do with the facts

9   of this particular litigation.

10          MR. WILLIAMS:  Well, if it has nothing to

11  do with the facts of this particular litigation, he doesn't

12  need to be a witness in this litigation.  That's my point.

13  That is the only litigation he's been subpoenaed in.

14          Now, if they want to go file some

15  grievance or do something else or a separate contempt

16  proceeding, maybe in another form, we can argue about that.

17          MS. BUSBEE:  Which we would do, if we had

18  a continuance.  I'm just trying to keep this as fair and

19  above board as I can.  And we're in the trial.  We argued

20  about this after the fact.  The damage is done.  Excuse me,

21  I think I may have spoken out of turn.

22          THE COURT:  You're trying to make your

23  points and we're all trying to understand the law and what

24  we're doing.

25          The bottom line, if I understand it

1    correctly, is that the defense wants to know who Mr. Lee

2    talked to in preparation for his article; is that correct?

3    Number one.

4                    MS. BUSBEE:  Yes, sir.

5                    THE COURT:  And number two is what else

6    might be out there that he gained as a result of a potential

7    violation of the gag order?

8                    MS. BUSBEE:  And -- right.  If we

9    discover that, that's for the Court to determine what the

10   proper sanction is.  I think it's incumbent upon me to

11   inquire right now while we're in the middle of trial before

12   other -- it is not the fault of the news gathering

13   organization that someone violated the gag order.  They are

14   not, in my way of thinking, in trouble.

15                   But there's been a statement, certainly

16   in Mr. Lee's article, where he says that people have made

17   statements that I believe violate the gag order and I would

18   like to have -- I don't know that what is said in the

19   newspaper makes it admissible in court.  I think you have to

20   hear it from Mr. Lee.

21                   THE COURT:  No, it's self-authenticated.

22   You have already admitted it in your motion.  So it's before

23   the Court, as far as the record.

24                   Mr. Williams, let me put on my First

25   Amendment hat.  I've been down this road before, but it was

1    several years ago.  Am I correct that -- explain to me the

2    law as to whether or not a reporter must divulge their

3    source.

4                    MR. WILLIAMS:  Your Honor, in this case,

5    as I understand, there are -- it's not an issue of a

6    confidential source.  It's an issue of a source that was in

7    the paper.  But even, even in this case, where at least, as

8    I understand it having just found out about it this

9    afternoon, there's no issue of a confidential source.

10                   A reporter shall not be asked to divulge

11   anything about the news gathering process until at least

12   there's been some threshold showing of relevance, which

13   really should be required for any witness.

14                   But under Coleman versus State, Your

15   Honor, I think there has got to be a threshold showing that

16   the reporter and source that is to be -- or the information

17   that is to be divulged really has some bearing on the

18   outcome of this case.  And the defense counsel has said it

19   doesn't.

20                   MS. BUSBEE:  It has to do with the

21   conducting of the case.  It's ancillary, but it's definitely

22   important in my way of thinking.

23                   THE COURT:  The relevance that you

24   speak of under Coleman would be whether or not someone has

25   violated the gag order.

1          MR. WILLIAMS:  And Coleman is the

2   applicable authority, Your Honor, that is correct.

3          THE COURT:  So she's made the first

4   hurdle.  So speak to me about the second.

5          MR. WILLIAMS:  Well, again, first, Your

6   Honor, with all due respect, I don't agree she's made the

7   first hurdle as to this case in which the subpoena has been

8   issued.  Some other day we have a different proceeding in a

9   different form, that might be another argument.

10          But I will proceed, then, to the second

11   hurdle which is, it seems to me, can the defense really make

12   a showing that there is some critical evidence as to this

13   issue, the gag order issue, which can be obtained only from

14   Mr. Lee.

15          Now, as she has pointed out, if there's

16   been a violation, it's been committed by someone who might

17   have spoken to him and I think there are other ways to find

18   that out, primarily from the people who supposedly talked to

19   him.

20          MS. BUSBEE:  People who are potentially

21   going to be sanctioned are going to volunteer that

22   information?  This to me would be the obvious way to

23   determine that.

24          MR. WILLIAMS:  Your Honor, we are talking

25   about officers of the Court here.  It seems to me that there

1  initially should be some threshold showing that the defense

2  has reason to believe a violation of the Order has occurred.

3          Now, certain communication with the press

4  is perfectly all right, even under the strictest

5  interpretation of the gag order.  What time are court

6  proceedings going to occur, things of that nature.  I don't

7  think that -- absent some showing that there's a reason to

8  believe that a gag order has occurred and that the officers

9  of the Court or the law enforcement officers or whoever is

10  involved might not be candid with the Court about it, I

11  don't think that we get to the second level of going to the

12  reporter.

13          THE COURT:  Ms. Busbee, let me clarify

14  the complaint that you have.  On page 2 of 3 of the Star

15  article, I'll read it for the record.  He writes, Mr. Lee

16  writes, "Toby Shook, a Dallas County Assistant District

17  Attorney, comma, said last week that the Texas law clearly

18  allows Murphy to be executed.  Period.  Quote, "If you enter

19  into a conspiracy to commit one crime and someone is killed,

20  and everyone in the conspiracy can be found guilty," comma,

21  end quote, of capital murder, he said.  Is that the

22  complaint that you have --

23          MS. BUSBEE:  Yes, sir, one of two.

24          THE COURT:  We'll deal with the first

25  one, that one.  And then the second complaint, I believe you

1    complained of the statement, page 3 of 3, "Jayne Hawkins,

2    the dead officer's mother, comma, said Murphy had a role in

3    her son's death even if he didn't fire a shot."

4                       MS. BUSBEE:  Doesn't she go on to say --

5                       THE COURT:  Yes.  Then the second quote

6    to her, her quote is, "His intent was obvious.  Had he not

7    alerted them, it's very probable Aubrey would not have been

8    killed."  She said, "You don't have to pull the trigger to

9    kill somebody."

10                      So those I'm just clarifying for the

11   record, are the two quotes that you complained of?

12                      MS. BUSBEE:  Yes, sir, Your Honor, in

13   this case.

14                      THE COURT:  All right.  Now, let's just

15   look at it intelligently.  You said that you need to have an

16   opportunity to develop the issues to determine two things,

17   number one, whether we should have quashed this panel or B,

18   at this point, cause a mistrial?

19                      MS. BUSBEE:  That's the drastic.

20                      THE COURT:  Or third option would be to

21   sequester the jury from this point forward.

22                      MS. BUSBEE:  Yes, Your Honor.

23                      THE COURT:  The very first thing I asked

24   this jury this morning before I swore them in, had anyone

25   read anything since I instructed them both in writing or

1  orally in this courtroom on the 31st day of October, 2003.

2  Each juror answered in the negative.

3                    Bearing in mind the gag order, let's

4  first talk to Mr. Shook's quote.  Is that -- if it is

5  attributable to him, is there anything that is inaccurate

6  about the statement of the law that he provided?

7                    MS. BUSBEE:  Judge, that's not my

8  complaint.  My complaint is that he's not supposed to make

9  his comments.  May I also add for the record, subsequent to

10  filing my motion this morning, I had a discussion with

11  Mr. Shook.  Mr. Shook says he didn't say it as reported in

12  the newspaper, which made me feel a lot better, because I

13  couldn't imagine that he would do something so blatantly

14  contrary to what the Court has said.

15                    But I didn't have any time, as we

16  discussed, to conduct an investigation.  So whether it is

17  true or not is immaterial, as far as the concerns of the

18  Court for the gag order and the violation.

19                    THE COURT:  Yes.  Now, let me clarify for

20  the record before we get to the Morning News article.

21  Mr. Thorpe asked me directly.  I think he called me on the

22  phone.  My rulings have been with any media in any trial

23  that we've concluded that the parties may visit with the

24  media historically about the trials.  It's public record.

25  We've had testimony.  And they can talk about it to the

1    extent of history.

2              I told Mr. Thorpe the same thing, that

3    the parties cannot talk about the details and particulars of

4    this case.  I did not talk to Mr. Lee.  I have E-mailed back

5    and forth with him as to when we would begin trial.  I

6    haven't talked to Mr. Lee.  I saw him here this morning, but

7    I haven't talked to him in several months, I don't believe.

8              So there again, even if Mr. Shook -- even

9    if he did say that, if it was attributable last week, Texas

10   law, he's speaking of the law on that question.

11             So let's move on to Ms. Hawkins.  Is she

12   even covered by the gag order?

13             MS. BUSBEE:  Yes, sir, she most

14   definitely is.

15             THE COURT:  I didn't issue the gag order.

16   And she's been all over the news and TDCJ and Legislature

17   and --

18             MS. BUSBEE:  She hasn't said anything

19   about Mr. Murphy that I'm aware of until I read it in the

20   paper this morning because I was out of town yesterday.

21             THE COURT:  Yes.

22             MS. BUSBEE:  Yes, sir, she is most

23   definitely covered by this gag order.  And, Your Honor, if

24   you would take a look at it, I believe the complained of

25   statement that is attributed to Mr. Shook violates it as

1    well.

2                   MR. SHOOK:  Could I say something for the

3    record?

4                   THE COURT:  Yes, sir, Mr. Shook.  I

5    wondered how long you were going to be quiet.

6                   MR. SHOOK:  Well, y'all were talking, so

7    I didn't want to interrupt.  The quote that is attributed to

8    me in quotation marks, if you enter into a conspiracy to

9    commit one crime and someone is killed, then everyone in the

10   conspiracy can be found guilty, is a quote from me, but it

11   was in regard to a question about the law of parties.  And

12   that's an accurate quote.

13                  Now, the paragraph or the statement which

14   is not in quotations directly preceding that quote says,

15   Toby Shook, a Dallas County Assistant District Attorney,

16   said last week that the Texas law clearly allows Murphy to

17   be executed, I never said that to him.  That's not a quote

18   to me.  It's not in quotation marks.  And I never told him

19   that.

20                  My statement in that was in response to a

21   general question regarding the law of parties, which he had

22   asked me about, which I don't think violates the gag order.

23                  And the other questions as has been in

24   the past what the Court has already noted, talking to a

25   reporter about procedures, what is going to happen, dates,

1   and then historical information is all I've discussed.

2                   So the paragraph preceding is not

3   accurate as to the purpose of my statement there.

4                   THE COURT:  As far as, let me just

5   address that one issue.  The quoted statement there, he said

6   that to each juror 200 times in this courtroom.

7                   MS. BUSBEE:  Judge, you're talking about

8   practicalities.  I'm talking about something that's printed

9   in the newspaper directly contrary to the orders of this

10  Court.  If he's misquoted, then that's the reason we had the

11  gag order in the first place.

12                  I've never been apprized that there was

13  any easing up on this gag order.  So as far as I'm

14  concerned, the gag order in Mr. Murphy's case is the one

15  that I was served with in February of 2001 which is you do

16  not speak to the media at all, period.

17                  This is the problem that you have.  You

18  give them an inch, it's their job to take a mile.  And so

19  whether this -- I don't know that this was a purposeful or

20  who's wrong or who's right, but now we have something that

21  violates the gag order.

22                  And I'm asking the Court to address this

23  and do something about this now before it gets any worse.

24                  THE COURT:  Well, I'll make a ruling

25  without even talking to Mr. Lee.  Mr. Shook did not violate

1    the gag order.  He provided an accurate statement of the

2    law, which could be applicable to any case.

3                        Now, move on to Ms. Hawkins.  What do you

4    want me to do with her?

5              MS. BUSBEE:  Of course, I asked you not

6    to let her testify today.  I would like for her not to be

7    able to sit in this courtroom during this trial.

8              THE COURT:  Granted.

9              MS. BUSBEE:  Your Honor, what I would

10   like to know and ask the Court to inquire of people that

11   have written stories where they have talked to witnesses,

12   whether or not we can expect other stories, as far as the

13   Court would like to go or have me -- allow me to ask them if

14   we can expect further reports and with quotes from people

15   who are witnesses or participants in this trial, so that I

16   may urge the Court to sequester the jury in this case.

17             THE COURT:  Let me move on to

18   Mr. Thorpe's article, the Dallas Morning News.  Did you see

19   any violations or any problems with his article?

20             MR. WATLER:  May I approach?  My name is

21   Paul Watler.

22             THE COURT:  That's fine.  Let her ask the

23   question first.  You may not have to even say hello.

24             MR. WATLER:  I just wanted to make my

25   appearance that I'm here, since you were bringing up my

1  client.

2              MS. BUSBEE:  Okay.  Give me a second,

3  Your Honor.  Yes, sir, Your Honor.  There's some things in

4  here -- I actually have found out some things today about

5  this article.  But I would like to question as to who it was

6  that informed him that we might be calling the codefendant

7  as a witness.  As you know, that was something that we were

8  to keep to ourselves.

9              THE COURT:  I was surprised to see that

10  this morning in the newspaper, because I certainly haven't

11  said a word to anybody that should not be aware of.

12             MS. BUSBEE:  Right.

13             THE COURT:  There again, I'm quite sure

14  -- sir, now, this does speak to your source.  I'm sorry, now

15  you may introduce yourself.  Please state your name and your

16  bar card for the record.

17             MR. WATLER:  Paul Watler, W-A-T-L-E-R,

18  bar card No. 20913600.  And I represent the Dallas Morning

19  News and Mr. Thorpe.

20             And I did come in a little bit late

21  during Mr. Williams' argument.  But what I heard of

22  Mr. Williams' argument, I would adopt and it was very well

23  stated and I agree with the points.

24             THE COURT:  Sounded good to you, didn't

25  it?

147

```
 1                    MR. WATLER:  It did.  As usual, he was
 2   correct on the law.
 3                    THE COURT:  The bottom line is I know I
 4   can"t make a reporter give up their source.  Whether it be
 5   accurate or not, he has reported it in good faith and I
 6   can't go any further than that, whether or not a witness
 7   will or will not testify.
 8                    Now, where is Mr. Lee?
 9                    MR. WILLIAMS:  I think he's out in the
10   hall.
11                    THE COURT:  Have him come in.  Ms.
12   Busbee, I can summarize your issues and complaints and
13   arguments and motions.  Bottom line is, if the Court feels a
14   witness from this point forward -- with Ms. Hawkins, she's
15   the mother.  I can't do much with her.  This -- if a witness
16   violates the gag order, they will not be allowed to testify.
17                    MS. BUSBEE:  I appreciate that, Your
18   Honor, thank you.
19                    THE COURT:  If something is published in
20   the newspaper about their testimony, prospective,
21   prospective, they won't be allowed to testify.  That's why I
22   want Mr. Lee to hear this and Mr. Thorpe.  So that's just
23   the way it will be for either side.
24                    Mr. Shook, do you have any problem with
25   that?
```

1    MR. SHOOK:  Not at this time, Judge.

2    THE COURT:  I mean, just -- we're going

3    to try this case from the witness stand and not in the media

4    which is the whole idea behind the gag order.  You can

5    report everything that goes on.  I want you to report.  You

6    can have a front row seat for it.  But we have to be careful

7    that the media receives the correct information, the correct

8    law, and Mr. Thorpe's comments to me, if I'm correct, Mr.

9    Thorpe, is he wanted to be sure that -- his article was on

10   the issue of parties and he wanted to be sure he wrote an

11   accurate statement of the law and he was very diligent in

12   his efforts to try to get his article to reflect a very good

13   basic understanding of the law of parties, which I think is

14   what Mr. Lee was trying to do.

15        As far as Ms. Hawkins, her testimony is

16   going to be -- was the same in this trial as it was the

17   previous trials.  I don't see any harm there.

18        MS. BUSBEE:  As you know, the harm is not

19   in her testimony.

20        THE COURT:  Yes.

21        MS. BUSBEE:  It's in her extraneous

22   remarks.

23        THE COURT:  And that goes back to the

24   very first question of the jury this morning, they have -- I

25   drilled it into them, time and time and time again, they are

1   not to have any media exposure, period.  If I even get a

2   whiff that they have received inappropriate communications

3   or read anything about this case, then I will sequester the

4   jury.

5          MS. BUSBEE:  It's just that, you know, we

6   needed to talk about this after the reports the last two

7   days.  I appreciate your patience with us.

8          THE COURT:  I have no problem.  Anything

9   else?

10          MS. BUSBEE:  No, sir.  We'll be here at

11   9:00, unless something is published overnight, then we'll be

12   here at 8:30.

13          MR. WILLIAMS:  Your Honor, do I

14   understand, then, that Mr. Lee is released from the subpoena

15   and not covered by the Rule against witnesses?

16          THE COURT:  Motion to quash both the

17   subpoenas will be granted.

18                    [End of Volume]

19

20

21

22

23

24

25

1   STATE OF TEXAS            *

2   COUNTY OF DALLAS          *

3       I, NANCY BREWER, Official Court Reporter for the 283rd

4   Judicial District Court, do hereby certify that the above

5   and foregoing constitutes a true and correct transcription

6   of all portions of evidence and other proceedings requested

7   in writing by counsel for the parties to be included in this

8   volume of the Reporter's Record, in the above-styled and

9   numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11      WITNESS MY OFFICIAL HAND on this the  4  day of

12  _____March____, 2004.

13

14

15  _____
    NANCY BREWER, CSR, NO. 5759
16  Expiration Date:  12-31-04
    Official Reporter, 283rd JDC
17  Frank Crowley Crts. Bldg. LB33
    133 No. Industrial Blvd.
18  Dallas, TX 75207
    (214)653-5863
19

20

21

22

23

24

25

74851

1        REPORTER'S RECORD

2     VOLUME 42 OF 6 VOLUMES

3     TRIAL COURT CAUSE NO. F01-00328-T

4  STATE OF TEXAS              *        IN THE DISTRICT COURT

5  VS.                         *        DALLAS COUNTY, TEXAS

6  PATRICK HENRY MURPHY, JR.   *        283RD DISTRICT COURT

7

8

9                                            FILED IN
                                     COURT OF CRIMINAL APPEALS

10        *********************        MAR 9 - 2004

11             JURY TRIAL             Troy C. Bennett, Jr., Clerk

12        *********************

13

14

15        On the 11th day of November, 2003, the following

16  proceedings came on to be heard in the above-entitled and

17  numbered cause before the Honorable Vickers L. Cunningham,

18  Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

19        Proceedings reported by machine shorthand.

20

21

22                    **ORIGINAL**

23

24

25

2

                    A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT:  03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT:  00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

| WITNESS INDEX | | | |
|---|---|---|---|
| WITNESS | DIRECT | CROSS | VOL. |
| Jeffrey Barnard | 5,31 | 30 | 42 |
| Brett Mills | 32 | 46 | 42 |
| Timothy Sliter | 47 | 63 | 42 |
| David Spence | 64 | | 42 |
| James Garcia | 84 | | 42 |
| Steve Bode | 80 | 102 | 42 |
| Frank Fehn | 103 | 114 | 42 |
| Roddy Alford | 116 | | 42 |
| William Petoskey | 131 | 144 | 42 |
| James Mahoney | 145 | | 42 |
| Miles Gooderham | 188 | | 42 |
| Lannie Emanuel | 194 | 213 | 42 |

EXHIBIT INDEX

| EXHIBIT | IDENT. | OFFER | ADMIT | VOL. |
|---------|--------|-------|-------|------|
| ST.188 | PHOTO | 93 | 93 | 42 |
| ST.189 | PHOTO | 93 | 93 | 42 |
| ST.190 | | | | |
| ST.193 | AUTOPSY PHOTO | 8 | 8 | 42 |
| ST.192 | PHOTO | 8 | 8 | 42 |
| ST.194 | AUTOPSY PHOTO | 8 | 8 | 42 |
| ST.195 | AUTOPSY PHOTO | 8 | 8 | 42 |
| ST.196 | AUTOPSY PHOTO | 8 | 8 | 42 |
| ST.197 | AUTOPSY PHOTO | 8 | 8 | 42 |
| ST.198 | AUTOPSY PHOTO | 8 | 8 | 42 |
| ST.199 | AUTOPSY PHOTO | 8 | 8 | 42 |
| ST.201 | AUTOPSY PHOTO | 8 | 8 | 42 |
| ST.202 | AUTOPSY PHOTO | 8 | 8 | 42 |
| ST.203 | AUTOPSY PHOTO | 8 | 8 | 42 |
| ST.204 | AUTOPSY PHOTO | 8 | 8 | 42 |
| ST.205 | AUTOPSY PHOTO | 8 | 8 | 42 |
| ST.206 | AUTOPSY PHOTO | 8 | 8 | 42 |
| ST.207 | AUTOPSY PHOTO | 8 | 8 | 42 |
| ST.208 | AUTOPSY PHOTO | 8 | 8 | 42 |
| ST.209 | MANNEQUIN | 9 | 9 | 42 |
| ST.210 | FRAGMENTS | 32 | 32 | 42 |
| ST.211 | FRAGMENTS | 32 | 32 | 42 |
| ST.212 | FRAGMENTS | 32 | 32 | 42 |

| | | | | |
|---|---|---|---|---|
| ST.213 | FRAGMENTS | 32 | 32 | 42 |
| ST.214 | FRAGMENTS | 32 | 32 | 42 |
| ST.215 | FRAGMENTS | 32 | 32 | 42 |
| ST.216 | FRAGMENTS | 32 | 32 | 42 |
| ST.217 | FRAGMENTS | 32 | 32 | 42 |
| ST.218 | FRAGMENTS | 32 | 32 | 42 |
| ST.219 | FRAGMENTS | 32 | 32 | 42 |
| ST.220 | FRAGMENTS | 32 | 32 | 42 |
| ST.221 | PHOTO, LEATHER | 66 | 66 | 42 |
| ST.222 | PHOTO, LEATHER DEFECT | 66 | 66 | 42 |
| ST.223 | PHOTO BELT DEFECT | 66 | 66 | 42 |
| ST.224 | PHOTO, CLIP | 66 | 66 | 42 |
| ST.225 | PHOTO, BOOTS | 66 | 66 | 42 |
| ST.226 | PHOTO, BOOTS | 66 | 66 | 42 |
| ST.227 | PHOTO, VEST | 66 | 66 | 42 |
| ST.228 | PHOTO, VEST | 66 | 66 | 42 |
| ST.229 | PHOTO, VEST | 66 | 66 | 42 |
| ST.230 | PHOTO, VEST DEFECT | 66 | 66 | 42 |
| ST.231 | PHOTO, VEST DEFECT | 66 | 66 | 42 |
| ST.232 | PHOTO, VEST | 66 | 66 | 42 |
| ST.233 | PHOTO, VEST | 66 | 66 | 42 |
| ST.234 | PHOTO, VEST | 66 | 66 | 42 |
| ST.235 | PHOTO, CLOTHES | 66 | 66 | 42 |
| ST.236 | PHOTO, CLOTHES | 66 | 66 | 42 |

| | | | | |
|---|---|---|---|---|
| 1 | ST.237 | PHOTO, CLOTHES | 66 | 66 | 42 |
| 2 | ST.240 | VEST | 77 | 77 | 42 |
| 3 | ST.241 | PHOTO, OSHMANS, VEHICLE | 35 | 35 | 42 |
| 4-5 | ST.242 | PHOTO, OSHMANS, VEHICLE | 35 | 35 | 42 |
| 6 | ST.243 | PHOTO, OSHMANS, VEHICLE | 35 | 35 | 42 |
| 7-8 | ST.244 | PHOTO, OSHMANS, VEHICLE | 35 | 35 | 42 |
| 9 | ST.245 | PHOTO, OSHMANS, VEHICLE | 35 | 35 | 42 |
| 10-11 | ST.246 | PHOTO, OSHMANS, VEHICLE | 35 | 35 | 42 |
| 12 | ST.247 | PHOTO, OSHMANS, VEHICLE | 35 | 35 | 42 |
| 13 | ST.248 | DIAGRAM | 35 | 35 | 42 |
| 14 | ST.249 | DIAGRAM | 35 | 35 | 42 |
| 15 | ST.250 | DIAGRAM | 35 | 35 | 42 |
| 16 | ST.251 | DIAGRAM | 35 | 35 | 42 |
| 17 | ST.252 | DIAGRAM | 35 | 35 | 42 |
| 18 | ST.253 | DIAGRAM | 35 | 35 | 42 |
| 19 | ST.254 | DIAGRAM | 35 | 35 | 42 |
| 20 | ST.255 | DIAGRAM | 35 | 35 | 42 |
| 21 | ST.256 | DIAGRAM | 35 | 35 | 42 |
| 22 | ST.257 | DIAGRAM | 35 | 35 | 42 |
| 23 | ST.258 | DIAGRAM | 45 | 45 | 42 |
| 24 | ST.259 | DIAGRAM | 86 | 86 | 42 |
| 25 | ST.260 | POSTER | 86 | 86 | 42 |

| | | | | |
|---|---|---|---|---|
| 1 | ST.261 | PHOTO | 110 | 110 | 42 |
| 2 | ST.262 | PHOTO | 110 | 110 | 42 |
| 3 | ST.263 | PHOTO | 110 | 110 | 42 |
| 4 | ST.264 | PHOTO | 110 | 110 | 42 |
| 5 | ST.265 | DRAWING | 110 | 110 | 42 |
| 6 | ST.266 | PHOTO,RV PARK | 110 | 110 | 42 |
| 7 | ST.267 | PHOTO,RV PARK | 110 | 110 | 42 |
| 8 | ST.268 | PHOTO | 120 | 120 | 42 |
| 9 | ST.269 | PHOTO,AERIAL OF COACHLIGHT AREA | 120 | 120 | 42 |
| 10 | ST.270 | PHOTO,ARIEL | 120 | 120 | 42 |
| 11 | ST.271 | PHOTO,AERIAL OF COACHLIGHT AREA | 120 | 120 | 42 |
| 12 | | | | | |
| 13 | ST.272 | PHOTO,RV PARK | 120 | 120 | 42 |
| 14 | ST.273 | PHOTO,RV PARK | 120 | 120 | 42 |
| 15 | ST.274 | PHOTO,VEHICLE | 120 | 120 | 42 |
| 16 | ST.275 | PHOTO,RV PARK | 120 | 120 | 42 |
| 17 | ST.276 | PHOTO,RV PARK | 120 | 120 | 42 |
| 18 | ST.277 | PHOTO,RV PARK | 120 | 120 | 42 |
| 19 | ST.278 | PHOTO,RV PARK | 120 | 120 | 42 |
| 20 | ST.279 | PHOTO,RV PARK | 120 | 120 | 42 |
| 21 | ST.280 | PHOTO,RV PARK | 120 | 120 | 42 |
| 22 | ST.281 | PHOTO,RV PARK | 120 | 120 | 42 |
| 23 | ST.282 | DIAGRAM | 120 | 120 | 42 |
| 24 | ST.284 | RUGER PISTOL | 143 | 143 | 42 |
| 25 | ST.285 | BERRETTA GUN | 143 | 143 | 42 |

| | | | | |
|---|---|---|---|---|
| 1 | ST.286 | WALLET | 143 | 143 | 42 |
| 2 | ST.287 | POSTER OF GUNS | 143 | 143 | 42 |
| 3 | ST.288-A | HANDGUN | 154 | 154 | 42 |
| 4 | ST.289 | HANDGUN | 154 | 154 | 42 |
| 5 | ST.290 | HANDGUN | 154 | 154 | 42 |
| 6 | ST.291 | HANDGUN | 154 | 154 | 42 |
| 7 | ST.292 | HANDGUN | 154 | 154 | 42 |
| 8 | ST.293 | HANDGUN | 154 | 154 | 42 |
| 9 | ST.294 | HANDGUN | 154 | 154 | 42 |
| 10 | ST.295 | HANDGUN | 154 | 154 | 42 |
| 11 | ST.296 | HANDGUN | 154 | 154 | 42 |
| 12 | ST.297 | HANDGUN | 154 | 154 | 42 |
| 13 | ST.298 | HANDGUN | 154 | 154 | 42 |
| 14 | ST.299 | HANDGUN | 154 | 154 | 42 |
| 15 | ST.300 | HANDGUN | 154 | 154 | 42 |
| 16 | ST.301 | HANDGUN | 171 | 171 | 42 |
| 17 | ST.302 | HANDGUN | 171 | 171 | 42 |
| 18 | ST.303 | HANDGUN | 171 | 171 | 42 |
| 19 | ST.304 | HANDGUN | 171 | 171 | 42 |
| 20 | ST.305 | HANDGUN | 171 | 171 | 42 |
| 21 | ST.306 | HANDGUN | 171 | 171 | 42 |
| 22 | ST.307 | HANDGUN | 171 | 171 | 42 |
| 23 | ST.308 | HANDGUN | 171 | 171 | 42 |
| 24 | ST.309 | HANDGUN | 171 | 171 | 42 |
| 25 | ST.310 | HANDGUN | 171 | 171 | 42 |

| | | | | |
|---|---|---|---|---|
| 1 | ST.311 | SHOTGUN | 161 | 161 | 42 |
| 2 | ST.312 | RIFLE | 161 | 161 | 42 |
| 3 | ST.313 | SHOTGUN | 161 | 161 | 42 |
| 4 | ST.314 | RIFLE | 161 | 161 | 42 |
| 5 | ST.315 | SHOTGUN | 161 | 161 | 42 |
| 6 | ST.316 | SHOTGUN | 161 | 161 | 42 |
| 7 | ST.317 | RIFLE | 161 | 161 | 42 |
| 8 | ST.318 | RIFLE | 161 | 161 | 42 |
| 9 | ST.319 | SHOTGUN | 157 | 157 | 42 |
| 10 | ST.320 | HANDGUN | 187 | 187 | 42 |
| 11 | ST.324 | REVOLVER FRAMES | 192 | 192 | 42 |
| 12 | ST.325 | REVOLVER FRAMES | 192 | 192 | 42 |
| 13 | ST.326 | REVOLVER FRAMES | 192 | 192 | 42 |
| 14 | ST.327 | REVOLVER FRAMES | 192 | 192 | 42 |
| 15 | ST.328 | REVOLVER FRAMES | 192 | 192 | 42 |
| 16 | ST.329 | REVOLVER FRAMES | 192 | 192 | 42 |
| 17 | ST.330 | REVOLVER FRAMES | 192 | 192 | 42 |
| 18 | ST.331 | REVOLVER FRAMES | 192 | 192 | 42 |
| 19 | ST.332 | REVOLVER FRAMES | 192 | 192 | 42 |
| 20 | ST.333 | REVOLVER FRAMES | 192 | 192 | 42 |
| 21 | ST.334 | ITEM FROM JEEP | 182 | 183(REC) | 42 |
| 22 | ST.335 | | 168 | 168 | 42 |
| 23 | ST.336 | RECEIPTS, RV | 182 | 183(REC) | 42 |
| 24 | ST.337 | SCANNER | 168 | 168 | 42 |
| 25 | ST.338 | SCANNER | 182 | 183(REC) | 42 |

| | | | | |
|---|---|---|---|---|
| ST.339 | WALKIE-TALKIE | 168 | 168 | 42 |
| ST.341 | SMOKE GRENADE AND LIGHTER | 168 | 168 | 42 |
| ST.341-A | FREQUENCY GUIDE | 166 | 166 | 42 |
| ST.341-B | ITEM FROM RV | 168 | 168 | 42 |
| ST.342 | CAP | 168 | 168 | 42 |
| ST.342-A | ITEM FROM RV | | | |
| ST.343-A | PURSE | | | |
| ST.344 | CONTENTS, TORN PICTURES | 182 | 183 (REC) | 42 |
| ST.344-A | TEN COMMANDMENTS | | | |
| ST.345 | PKG. INSURANCE PAPERS | 182 | 183 (REC) | 42 |
| ST.346 | BANDOLIER | 167 | 167 | 42 |
| ST.347 | RADIO | 168 | 168 | 42 |
| ST.348 | PAPERWORK, JEEP | 177 | 183 | 42 |
| ST.349 | CLIPS, AMMO | 177 | 183 | 42 |
| ST.350 | FANNY PACK | 177 | 183 | 42 |
| ST.351 | PAPERWORK, JEEP | 177 | 183 | 42 |
| ST.352 | HOLSTER | 177 | 183 | 42 |
| ST.353 | HOLSTER, CLIP | 177 | 183 | 42 |
| ST.354 | ITEMS | 177 | 183 | 42 |
| ST.355 | CLIPS, AMMO BACKPACK | 177 | 183 | 42 |
| ST.356 | BAG OF AMMO | 177 | 183 | 42 |
| ST.358 | CONTENTS OF PKG. | 177 | 183 | 42 |
| ST.359 | HOLSTER | 177 | 183 | 42 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.359-A | NIGHT VISION SCOPE | 177 | 183 | 42 |
| 2 | ST.363 | BANDOLIER | 177 | 183 | 42 |
| 3 | ST.364 | PHOTO,RV | 177 | 183 | 42 |
| 4 | ST.364-A | PHOTO | 177 | 183 | 42 |
| 5 | ST.365 | PHOTO - RV PARK | 177 | 183 | 42 |
| 6 | ST.365-A | PHOTO | 177 | 183 | 42 |
| 7 | ST.366 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 8 | ST.367 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 9 | ST.368 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 10 | ST.369 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 11 | ST.370 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 12 | ST.371 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 13 | ST.372 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 14 | ST.373 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 15 | ST.374 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 16 | ST.375 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 17 | ST.376 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 18 | ST.377 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 19 | ST.378 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 20 | ST.379 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 21 | ST.380 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 22 | ST.381 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 23 | ST.382 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 24 | ST.383 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 25 | ST.384 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |

| | | | | |
|---|---|---|---|---|
| 1 | ST.385 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 2 | ST.386 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 3 | ST.387 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 4 | ST.388 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 5 | ST.389 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 6 | ST.390 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 7 | ST.391 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 8 | ST.392 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 9 | ST.393 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 10 | ST.394 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 11 | ST.395 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 12 | ST.396 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 13 | ST.397 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 14 | ST.398 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 15 | ST.399 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 16 | ST.400 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 17 | ST.401 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 18 | ST.402 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 19 | ST.403 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 20 | ST.404 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 21 | ST.405 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 22 | ST.406 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 23 | ST.407 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 24 | ST.408 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 25 | ST.409 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.410 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 2 | ST.411 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 3 | ST.412 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 4 | ST.413 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 5 | ST.414 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 6 | ST.415 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 7 | ST.416 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 8 | ST.417 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 9 | ST.418 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 10 | ST.419 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 11 | ST.420 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 12 | ST.421 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 13 | ST.422 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 14 | ST.423 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 15 | ST.424 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 16 | ST.425 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 17 | ST.426 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 18 | ST.427 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 19 | ST.428 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 20 | ST.429 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 21 | ST.430 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 22 | ST.431 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 23 | ST.432 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 24 | ST.433 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 25 | ST.434 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.435 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 2 | ST.436 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 3 | ST.437 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 4 | ST.438 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 5 | ST.439 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 6 | ST.440 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 7 | ST.441 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 8 | ST.442 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 9 | ST.443 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 10 | ST.444 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 11 | ST.445 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 12 | ST.446 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 13 | ST.447 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 14 | ST.448 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 15 | ST.449 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 16 | ST.450 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 17 | ST.451 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 18 | ST.452 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 19 | ST.453 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 20 | ST.454 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 21 | ST.455 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 22 | ST.456 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 23 | ST.457 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 24 | ST.458 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |
| 25 | ST.459 | PHOTO, RV&EVIDENCE | 177 | 183 | 42 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.460 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 2 | ST.461 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 3 | ST.462 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 4 | ST.463 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 5 | ST.464 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 6 | ST.465 | POSTER | 177 | 183 | 42 |
| 7 | ST.466 | POSTER | 177 | 183 | 42 |
| 8 | ST.467 | POSTER | 177 | 183 | 42 |
| 9 | ST.468 | WALLET | 177 | 183 | 42 |
| 10 | ST.469 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 11 | ST.470 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 12 | ST.471 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 13 | ST.472 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 14 | ST.473 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 15 | ST.474 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 16 | ST.475 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 17 | ST.476 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 18 | ST.477 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 19 | ST.478 | PHOTO,RV&EVIDENCE | 177 | 183 | 42 |
| 20 | ST.479 | GRIPS | 177 | 183 | 42 |
| 21 | ST.480 | CYLINDERS | 177 | 183 | 42 |
| 22 | ST.481 | BAG | 177 | 183 | 42 |
| 23 | ST.483 | FREQUENCY PAGE | 177 | 183 | 42 |
| 24 | ST.490 | PHOTO | 9 | 9 | 42 |
| 25 | ST.493 | DNA REPORT | 53 | 53 | 42 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.495 | POSTER,SERIAL NOS. | 211 | 211 | 42 |
| 2 | ST.496 | PKG.BULLET ROUNDS | 192 | 192 | 42 |
| 3 | ST.615 | BALLISTIC VEST RECEIPT | 182 | | 42 |
| 4 | | | | | |
| 5 | ST.772 | PHOTO | 93 | 93 | 42 |
| 6 | ST.773 | PHOTO | 93 | 93 | 42 |
| 7 | ST.774 | PHOTO | 93 | 93 | 42 |
| 8 | ST.775 | PHOTO | 93 | 93 | 42 |
| 9 | ST.777 | PHOTO | 110 | 110 | 42 |
| 10 | ST.778 | PHOTO | 110 | 110 | 42 |
| 11 | ST.779 | PHOTO | 110 | 110 | 42 |
| 12 | ST.780 | PHOTO | 110 | 110 | 42 |
| 13 | ST.846 | BAG | 193 | 193 | 42 |
| 14 | ST.985 | WALLET | 183 | 183 (REC) | 42 |
| 15 | ST.986 | WALLET | 183 | 183 (REC) | 42 |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

1                    P R O C E E D I N G S

2                    THE COURT:  Thank you.  Please have a

3    seat.  Mr. Shook, call your next witness.

4                    MR. SHOOK:  Call Dr. Barnard.

5                    JEFFREY BARNARD,

6    having been duly sworn, was examined and testified as

7    follows:

8                    DIRECT EXAMINATION

9    BY MR. SHOOK:

10        Q.    Would you tell us your name, please.

11        A.    Jeffery Barnard, B-A-R-N-A-R-D.

12        Q.    How are you employed, sir?

13        A.    The Chief Medical Examiner for Dallas County

14   and the Director for the Southwest Institute of Forensic

15   Sciences.

16        Q.    And what are your duties as the Chief Medical

17   Examiner?

18        A.    As the Chief Medical Examiner, I oversee the

19   Medical Examiner Section, so I oversee the determination of

20   the cause and manner of death in cases that come to the

21   Medical Examiner's Office here in Dallas.

22        Q.    Could you tell the jury your educational and

23   professional background you have for the position that you

24   hold?

25        A.    I attended Texas A&M University and received a

1    bachelor of science of medicine degree.  I attended Texas

2    A&M University College of Medicine and received my MD

3    degree.

4                    I served a general surgery internship at

5    Scott & White Hospital in Temple, Texas.  Served a four-year

6    combined anatomic and clinical pathology residence at Scott

7    & White Hospital.

8                    I served a one-year fellowship in

9    forensic pathology at the Medical Examiner's office in

10   Suffolk County, which is in Long Island, New York.

11                   I'm board certificated in anatomic

12   pathology, clinical pathology, and forensic pathology.  I

13   have a license to practice medicine in the State of Texas.

14   And I've been licensed in New York as well.  I'm a diplomate

15   to the National Board of Medical Examiners.

16                   As a resident on a part-time basis, I

17   worked as an emergency room physician for five and a half

18   years.  I'm also the Director of the Autopsy Service at

19   Parkland Hospital and I'm Professor of Pathology at U. T.

20   Southwestern Medical School.

21       Q.      Doctor, did you personally perform the autopsy

22   on the body of Aubrey Hawkins on Christmas Day ,2000?

23       A.      Yes.

24       Q.      How many autopsies have you performed in the

25   course of your career?

1    A.    Somewhere between 4,000 and 5,000, maybe even
2 more than that.
3    Q.    Could you explain to the jury what an autopsy
4 is.
5    A.    An autopsy is an external and internal
6 examination of the body.  The external examination is that
7 part of the exam prior to making incisions in the body
8 whereby any feature that characterizes that person that can
9 be seen on the skin surface, that's the time that you
10 identify that.  Also any injuries which can be seen on the
11 skin surface, that would be determined during the external
12 examination.
13         The internal examination is that part of
14 the exam in which appropriate incisions are made in the
15 body.  The organs which reside within the body cavities are
16 examined.  Any sort of injury or natural disease process can
17 be identified on the internal exam and then correlated with
18 whatever is seen on the external examination.
19         Fluids are removed for potential
20 toxicologic examination.  The organs are removed.  They are
21 examined again for any sort of injury or natural disease
22 process.  Small sections are taken.  The remainder of the
23 tissue and organs are placed back in the body for burial.
24    Q.    Each body that arrives there at your office,
25 are they assigned a unique number?

1    A.    Yes.

2    Q.    Does that number stay with them throughout the

3  process?

4    A.    Yes.

5    Q.    And are photographs taken of the wounds of the

6  body?

7    A.    When wounds are present, yes, sir.

8    Q.    And does that unique number, is it always

9  photographed with the wounds?

10    A.    Yes.

11    Q.    Let me show you some photographs which have

12  been marked as State Exhibits 193 through 199 and 201

13  through 208.  Are those photographs of autopsy photos of

14  Officer Hawkins' body as well as some of the clothing and

15  material that you retrieved from the clothing from Officer

16  Hawkins' autopsy?

17    A.    Yes, sir, they are.

18         MR. SHOOK:  Your Honor, at this time we

19  will offer State Exhibits 193 through 199 and 201 through

20  208.

21         MR. SANCHEZ:  Let me take a quick look at

22  them.  We have no objection, Your Honor.

23         THE COURT:  State Exhibits 193 through

24  199, 201 through 208, shall be admitted.

25    Q.    (By Mr. Shook)  Doctor, is State Exhibit 490 a

1 photograph of personal items that accompanied the body to

2 the Medical Examiner's Office?

3          A.     Yes, that's correct.

4               MR. SHOOK:  We'll offer State Exhibit

5 490.

6               MR. SANCHEZ:  We have no objection.

7               THE COURT:  No. 490 shall be admitted.

8          Q.    (By Mr. Shook)  Doctor, let me show you a

9 mannequin that has been marked State Exhibit 209.  Is this a

10 mannequin that you prepared yourself to demonstrate the

11 various angles to bullets that struck Officer Hawkins' body?

12         A.     Yes.

13         Q.     The dowel rods that are placed in the

14 mannequin, were they placed there by yourself?

15         A.     Yes.

16         Q.     And would that help you explain your testimony

17 to the jury?

18         A.     Yes.

19               MR. SHOOK:  Your Honor, at this time we

20 offer State Exhibit 209.

21               MR. SANCHEZ:  No objection.

22               THE COURT:  No. 209 shall be admitted.

23         Q.     (By Mr. Shook)  Let me ask you this first,

24 Doctor, did you examine the clothing that accompanied the

25 body?

1    A.    Somewhat superficially, but, yes, I looked at

2  it.

3    Q.    Did you find anything of significance there?

4    A.    Yes.

5    Q.    What was that?

6    A.    Well, I found a fragment of a bullet jacket on

7  the shirt, the police shirt, and then I also found a bullet

8  jacket loose within the clothing.

9    Q.    Let me show you State Exhibit 193.  Let me

10  give you this laser and feel free to use that if you feel it

11  necessary to help explain your testimony.  What do we see

12  there in State Exhibit 193?

13    A.    No. 193 is a photograph that shows Officer

14  Hawkins' shirt and that is where I'm putting the pointer is

15  a fragment of bullet jacket that is -- has the identifying

16  number under it.

17    Q.    Did that appear to be a copper jacket?

18    A.    Yes, sir, as best I could tell.

19    Q.    All right.  State Exhibit 194?

20    A.    No. 194 is another photograph that shows the

21  bullet jacket that I found loose within the clothing.

22    Q.    Did you also examine the ballistic vest that

23  accompanied the officer's body?

24    A.    Yes, again, some superficially, but I did.

25    Q.    Did you notice anything at that time?

1      A.      There appeared to be a couple of what I

2  thought were defects in it.

3      Q.      What did you do with the vest after you did

4  the superficial exam?

5      A.      Well, the vest was bagged and sealed and then

6  turned over to the Criminal Investigation Laboratory.

7      Q.      Now, as part of your examination you conduct

8  -- you measure the length of the body as well as the weight;

9  is that right?

10      A.      Yes, sir, that's correct.

11      Q.      What were Officer Hawkins' length and weight?

12      A.      The body was 74 inches or six foot two and 203

13  pounds.

14      Q.      What did your examination show as the types of

15  injuries that were present on Officer Hawkins' body?

16      A.      Well, there were several different types of

17  injury.  Most dramatically there were 11 gunshot wounds, but

18  there was also blunt force injuries and blunt force meaning

19  not sharp force injuries.  There were also some

20  punctate-type abrasions or puncture-type wounds as well.

21      Q.      Now, as far as the gunshot wounds, when you

22  are conducting an examination, do you number those for your

23  examination?

24      A.      Yes, I numbered them in this case.  You can

25  use lettering, if you want.  But it's some way to separate

1   out each wound from another wound.

2       Q.    In no way, you are not able to determine an

3   order of the shots that were fired into the body.  That's

4   not what you do when you are numbering the wounds, is it?

5       A.    That's correct.

6             MR. SHOOK:  Could I have the witness step

7   down, Your Honor?

8             THE COURT:  Yes, sir.

9       Q.    (By Mr. Shook)  I want to show you the

10  photographs and also allow you to use the mannequin to

11  demonstrate the types of wounds and your examination of the

12  body.

13            Gunshot wound No. 1, where was that

14  located?

15      A.    That was called No. 1, again, it's an

16  arbitrary designation, was a gunshot wound which entered

17  right at the left eyebrow region.  And that can be seen on

18  the mannequin with the dowel rod going in through the --

19  excuse me, the left eyelid, eyebrow area.

20            No. 1 is the gunshot wound, as I said,

21  that entered above the left eyebrow.  That can be seen on

22  the photograph that I'm pointing to the defect.  The bullet,

23  after it went through the left eyebrow area, went through

24  the left eye.

25            As it went through the left eye, it

1    fractured the orbital plate and the orbital plate is that

2    bone at the base of the skull that is above the left eye.

3    And when it fractured the skull, then it caused a bruising

4    of the undersurface of the left side of the brain as well as

5    hemorrhage.

6                        The bullet then went through the left

7    maxillary sinus.  It went through the soft palate which is

8    that soft part of the upper roof of the mouth.  It crossed

9    over and went through the right side of the tongue and then

10   it penetrated into the right side of the neck musculature.

11       Q.      Let me show you State Exhibit 196.  Does that

12   show the path of the bullet as it traveled through the left

13   eye?

14       A.      Yes, sir.  That shows the bruising of the

15   upper and lower eyelid, as well as the injury to the left

16   eye.

17       Q.      Now, during the course of your examination,

18   are you sometimes able to determine the range of fire?

19       A.      There are times that you can, yes, sir.

20       Q.      How are you able to do that?

21       A.      Well, if a gun has been close enough to the

22   body at the time of discharge, some of the components that

23   exit the barrel can be seen on the skin surface.  Not only

24   does the bullet exit, but powder will exit and then some of

25   that black smoke that sometimes you may have been able to

1   see on television, will also exit.  And if the gun is close

2   enough to the skin surface, some or all of those components

3   can also be deposited on the skin surface.  If the barrel

4   tip is directly in contact with the skin, if it's in a very

5   tight contact, the bullet, as well as the smoke or the -- we

6   call it soot -- and the powder all blown into the wound.  If

7   it's much looser, some of that blackish soot material may be

8   on the outer skin surface.

9              As you move the barrel tip farther away,

10  the soot is less aerodynamically stable so it will

11  eventually drop off and then the gun powder may carry as

12  well as the bullet.  So somewhere around three, three and a

13  half feet, maybe four feet, depending on the type of power,

14  you can get marking on the skin surface if it hits the skin

15  out to that range.  At some point you will move to a

16  distance which the gunpowder is no longer stable

17  aerodynamically and the only thing that you will see is the

18  entrance wound into the skin.

19      Q.    In particular on gunshot wound No. 1, did you

20  see any evidence of stiffling, anything of that nature?

21      A.    I saw no gunshot residue on the skin surface.

22      Q.    Could you explain to the jury what an

23  interposed target is?

24      A.    An interposed target is a term that is used

25  when the barrel tip and the target have some intervening or

1 separate object between them.  It could be a windshield.  It

2 could be a door.  It could be anything.  Even clothing in a

3 sense can be an interposed target.

4      Q.    If Officer Hawkins were sitting in his squad

5 car and he was struck by bullets that were passing through

6 either his driver's side window or windshield, could that

7 prevent stiffling from reaching his body?

8      A.    Right.  If a barrel tip or a gun was close

9 enough that without that intervening target, it would

10 deposit on the skin, then clearly a windshield or window

11 could block that from reaching the skin surface.

12      Q.    Let's go to gunshot wound No. 2.  Where is

13 that located?

14      A.    Gunshot wound No. 2 is a gunshot wound that

15 entered in the left ear.  It exited the left ear lobe and

16 then re-entered into the left side of the head, went through

17 the neck musculature and exited out the back of the neck.

18 And that can be seen in this diagram.  There's a large

19 defect and that is partially caused by gunshot wound No. 2.

20      Q.    And we may want to turn the mannequin a

21 little.

22      A.    This dowel rod would be representing gunshot

23 wound No. 2.

24      Q.    Was there any evidence of stiffling on that

25 particular wound?

1        A.      No, sir.

2        Q.      And gunshot wound No. 3?

3        A.      Gunshot wound No. 3 is a gunshot wound that

4  also entered in the same defect as gunshot wound No. 2,

5  which is part of why that's kind of a large, irregular

6  defect.  The other is because of the fact that the ear is an

7  irregular surface.  But, nonetheless, two gunshot wounds

8  entered into the left ear.

9               After the bullet exited the left ear,

10 then it penetrated into what is called the mastoid scalp,

11 which is just that scalp portion of the mastoid bone and a

12 bullet was recovered there.

13       Q.      The photograph that we see on the monitor,

14 does that show the exit wound and then re-entry wounds?

15       A.      Yes, sir.  The photograph shows a large defect

16 on the back part of the left ear.  Those are exit defects.

17 The lower -- there's a lower defect on the left side of the

18 neck, which would be from gunshot wound No. 2.  There is

19 then a subsequent defect above that which is the re-entrance

20 of gunshot wound No. 3.

21       Q.      And that bullet or bullet fragment was

22 actually recovered by you; is that correct?

23       A.      Yes, sir, that's correct.

24       Q.      When you recover these bullets, what do you do

25 with them?

1      A.      I inscribe them if there's a surface that I

2  would inscribe on that would not alter the ability for the

3  firearms examiner to look at matching them up or if there's

4  any rifling on it.  And then I put them in a labeled

5  envelope that I personally label.  And then they are

6  submitted to the crime lab.

7      Q.      Which is -- the crime lab is within your

8  building, also; is that right?

9      A.      That's correct.

10      Q.      Now, gunshot wound No. 4?

11      A.      No. 4 is a gunshot wound which is kind of an

12  irregular gunshot wound in the left --

13      Q.      Doctor, let me interrupt you here.  I have --

14  I got a little ahead of myself.  Does 199 show that exit

15  wound on No. 2?

16      A.      Yes, sir, it does.  That's for gunshot wound

17  No. 2.

18      Q.      Okay.  You can by examining a wound, can you

19  always tell which is the entrance and which is the exit?

20      A.      Not always, although based on experience and

21  training and seeing a lot of gunshot wounds, most of the

22  time you can.  But there are times, especially in view of

23  having some sort of interposed target, that the entrance

24  wound may be just as irregular as the exit wound.  But in

25  general, the entrance wound tends to be a little more round,

a little more regular.  It would have an abrasion

frequently, whereas an exit wound may not.  So in general I

can tell, but occasionally you can't.

    Q.    And on this particular wound, you were

confident that this is the actual exit?

    A.    No question about it.  Furthermore, you see

some tissue extruding through the back part.  And that shows

as the bullet passes through, the tissue will oftentimes

help give you some directionality.

    Q.    Okay.  Let me go back, then, to gunshot wound

No. 4.

    A.    Yes, sir.  Gunshot wound No. 4 is a gunshot

wound in the left premaxilla, which is kind of the cheek

area.  That was a kind of an irregular wound that I

recovered a bullet jacket just outside of the mucosa, the

oral cavity.  And that was kind of going in an anatomical

position from a back-to-front direction.  But it was, again,

just a fragment of a jacket.  And that would be seen on this

photograph with the laser pointing to that defect.

    Q.    And gunshot wound No. 5?

    A.    No. 5 is a gunshot wound which was in the left

cheek area.  That bullet then entered into the left jaw and

neck musculature and penetrated the left musculature where I

recovered a bullet fragment there as well.

    Q.    Again, did you see any stiffling present on

1    any of those wounds?

2         A.       No, sir.

3         Q.       And then gunshot wound No. 6?

4         A.       No. 6 is a very irregular wound, probably best

5    seen initially on this photograph that involves the left

6    cheek jaw area.  It also has an area that's discontinuous

7    with skin, that doesn't have any sort of abrasion.  And then

8    there's another abrasion and a defect.

9                      And as you put the body separated like

10   this, you have this kind of skip area of normal skin.  If

11   you approximate the chin and jaw together, it makes a

12   continuous track.  And so the bullet grazed the chin/jaw

13   area and then hit the neck and went into the chest where the

14   jacket appeared to separate and go into the pericardial

15   area, the sac area surrounding the heart.  The core or the

16   nonjacketed portion then went through the upper lobe of the

17   left lung and penetrated into the lower lobe of the left

18   lung.

19        Q.       Would that wound be consistent if Officer

20   Hawkins' were ducking his head into his chest?  Would it be

21   consistent if the bullet were fired down on him in that

22   manner?

23        A.       Yes, sir.  That would be reflected by this

24   dowel rod.

25        Q.       Okay.  Now, we see some other wounds to the

1   face that seem to be smaller?

2        A.    Yes, sir.

3        Q.    What types of wounds are those?

4        A.    These are punctate-type defects and they can

5   be caused by fragments of glass, fragments of metal.  I

6   wasn't able to recover anything, although there may have

7   been something very small that I couldn't find.  But that's

8   what it's consistent with and it's very consistent with an

9   interposed target.

10        Q.    If his window had been shot out and he was

11   shot while sitting in the car, that would be consistent with

12   the type of wounds he had received, if the glass were

13   shattering?

14        A.    Yes.

15        Q.    All right.  Gunshot wound No. 7, where was

16   that located?

17        A.    Gunshot wound No. 7 is a gunshot wound that

18   entered in the left back.  It went into the left chest

19   cavity, went through the upper lobe of the left lung and

20   went through the aorta, which is that large artery that

21   comes out of the left side of the heart that gives blood to

22   the rest of the body.  Went through the aorta and penetrated

23   into the right anterior chest muscle.  That would be

24   reflected with this dowel rod.

25        Q.    And the direction again was what?

1      A.      That is back to front.  It was going to go

2   from left towards the right and upward.

3      Q.      Now, when you conduct an autopsy you can't

4   tell exactly how the body was positioned when it was shot;

5   is that right?

6      A.      Correct.  You really can only get some idea of

7   where the gun is aimed in relationship to the body, but you

8   really can't tell, necessarily, what position the person

9   shooting was in or what position, necessarily, the victim

10  was in.

11     Q.      If Officer Hawkins were shot while in his

12  squad car, would his body most likely have to be positioned

13  over to achieve this particular shot?

14     A.      That certainly would be consistent with it,

15  yes, sir.

16     Q.      Or could it also be achieved if he were drug

17  from his squad car and placed on the ground face down and

18  then someone fired down?

19     A.      That could work as well.

20     Q.      Now, there was clothing over this particular

21  wound or that would be likely, if he was wearing his shirt;

22  is that right?

23     A.      Yes, sir, that's correct.

24     Q.      In fact, for the mannequin you actually did

25  use Officer Hawkins' actual shirt in lining up the wounds;

1    is that right?

2          A.     Yes.

3          Q.     Did you submit the clothing, the shirt, also,

4    to the trace evidence examiner?

5          A.     To the evidence registrar from the crime lab

6    who then distributed it to the trace evidence examiner, yes,

7    sir.

8          Q.     And he would conduct examinations about range

9    of fire and that sort of thing?

10         A.     Yes.  He would look for any sort of residue on

11   the clothing.

12         Q.     Okay.  Then gunshot wound No. 8?

13         A.     Gunshot wound No. 8 is a gunshot wound that

14   went through the back part of the left upper arm.  It went

15   through the head of the humerus and then exited out the left

16   shoulder area.

17         Q.     Roughly the same angle as gunshot wound No. 7?

18         A.     More or less.

19         Q.     All right.  And then gunshot wound No. 9?

20         A.     Gunshot wound No. 9 is a gunshot wound -- is a

21   gunshot wound that enters in the left forearm area on the

22   little finger side on the palm side and that penetrated into

23   the forearm muscles where a fragment was recovered.

24         Q.     Okay.  And then the next gunshot wound, No.

25   10?

23

1    A.    No. 10 is a gunshot wound that had two defects

2  that were connected.   One was on the palm side of the thumb.

3  The other was on the backside of the little finger.   That

4  track went through muscles, didn't go through any bone.   But

5  both wounds were irregular and I really couldn't tell by

6  looking just at the wound itself which one was the entrance

7  and which one was the exit.

8                    This photograph shows -- that's gunshot

9  wound No. 9.   That's one of the two defects of gunshot wound

10  No. 10.

11    Q.    And then gunshot wound No. 11?

12    A.    Gunshot wound No. 11 is a gunshot wound that

13  is what we call a graze wound.   That was on the backside of

14  the forearm and the thumb side.   But based on looking at the

15  wound and the way that some of the skin was altered, it

16  appeared to give a trajectory that indicated to me that the

17  bullet was coming from the inner aspect to the outer aspect

18  and going from above downward.

19    Q.    Is that what we see in this particular

20  photograph?

21    A.    Yes, sir.   That would be this area.

22    Q.    Would those wounds to the arm be consistent

23  with Officer Hawkins having his arm raised, if he were

24  sitting in his squad car?

25    A.    Certainly could be.

1    Q.    All right.  Now, as far as your examination of

2  the wounds, which of these particular gunshot wounds do you

3  believe were fatal injuries?

4    A.    Well, the fatal-type injuries or more rapidly

5  fatal -- some of the others could be fatal, but I would call

6  them potentially fatal.  That is, if that was the only wound

7  that somebody had, that there was no treatment, they could

8  cause bleeding, they can cause infection, so they could be

9  potentially fatal, but they wouldn't be rapidly fatal-type

10  injuries.

11            Gunshot wound No. 1 that caused the

12  injury to the brain, I would consider that to be a rapidly

13  fatal injury.  Gunshot wound No. 6 that went through the

14  chin area, went through the left lung, that would be a

15  rapidly fatal injury.  Gunshot wound No. 7 is a gunshot

16  wound that went through the aorta.  That would be the most

17  rapidly fatal injury of all of them.

18            And then the rest of them would be, if I

19  remember correctly, would be all potentially fatal.  For

20  example No. 9, if it went through an artery in the humerus

21  area, that could be a more rapidly fatal injury.  But I did

22  not identify that.  It's sometimes hard to find.

23    Q.    Talking about gunshot wound No. 7, the one

24  that penetrated the back, you said was the most rapidly

25  fatal?

1    A.    Yes, sir.

2    Q.    Why is that?

3    A.    Well, because it's going through the aorta and

4    the aorta is the large artery that provides oxygenated blood

5    to the body.  And it's, you know, like in the plumbing

6    situation where you have a pipe with pressure on it and you

7    punch a hole in it, then everything is going to go out that

8    area because that now has the least resistance and that's

9    the path it goes.

10          If you take an artery that is under

11   pressure as the heart beats and you punch a hole in it,

12   then when the heart contracts, the blood will go out that

13   defect before it can get to the rest of the body.

14   Q.    If Officer Hawkins, let's say hypothetically,

15   had received that wound at or near an emergency room, do you

16   feel that they could have saved him with that type of wound?

17   A.    No.

18   Q.    Now, you looked at some other wounds and

19   abrasions; is that right?

20   A.    Yes, sir.

21   Q.    Let me show you a photograph of Officer

22   Hawkins' chest which is 203.

23   A.    Yes, sir.

24   Q.    Let's talk about the one there that's as we

25   look at the photograph on the right first, which would be

1    his left.

2         A.      That would, I assume, be this wound.

3         Q.      Yes, sir.  Describe that wound for us.

4         A.      Well, that's an abrasion.  An abrasion is just

5    another term for a scrape.  If you fell down and hit the

6    skin surface, you scrape the outer surface of the skin, that

7    would be what we call an abrasion and everybody else calls a

8    scrape.

9         Q.      You saw that there was a defect in the

10   ballistic vest.  Did it look like it might be consistent

11   with a bullet which may have struck the ballistic vest?

12        A.      Could be.

13        Q.      Can you tell by looking at one of these

14   wounds, abrasions, whether Officer Hawkins was alive or not

15   at the time he received it?

16        A.      There are three abrasions that are visible in

17   this photograph.  Two of them in my opinion he was alive.

18   One, he would be -- it would be consistent with postmortem

19   injury.  It's the kind of abrasion that you get and this

20   will be the one in the middle, when the paramedics and

21   hospital are trying to use defibrillation.  They're really

22   kind of burns more than they are abrasions, but they have

23   the same appearance as an abrasion.

24                But those are much lighter in color.  And

25   it's the kind of thing that you see when the heart is no

27

1   longer profusing an area of injury well.  So although

2   ideally they could be in the dying phase, based on what I'm

3   seeing, it's more consistent with postmortem-type injury.

4        Q.     Now, the wound we see at the bottom, the

5   stitching across the chest, would that be efforts by the

6   emergency room?

7        A.     Yeah.  That would be a combined thoracotomy

8   incision.  What they do is they'll make an incision across

9   -- they see multiple gunshot wounds, so they make an

10  incision across the chest where they can open up and go into

11  the left chest cavity, the heart sac, and the right chest

12  cavity to see if there's anything that they could sew up, if

13  possible, to save him.

14       Q.     Now, there's another abrasion on the right

15  side of his chest?

16       A.     Yes, sir.  There's an abrasion.  There's a

17  little bit of a bruise around it as well.

18       Q.     In your opinion, how was that abrasion caused?

19       A.     In my opinion, it's most consistent with

20  gunshot wound No. 7.  I said earlier that the bullet was in

21  the right chest muscle and really it was pretty close to

22  underneath the skin.  So what I think it's most consistent

23  with is when the bullet was losing its energy, it couldn't

24  get out.  And so as the bullet tries to exit, the skin will

25  also kind of evert.  And if it strikes up against a rough

28

1    surface, it can cause a scrape as it exists.

2                         In this case the bullet didn't get out,

3    but it's right directly over where the bullet is that I

4    recovered.  So that's my opinion.

5         Q.    Now, there was some other abrasions to the

6    legs of Officer Hawkins; is that correct?

7         A.    Yes, sir.

8         Q.    I'll show you State Exhibit 207.  What do we

9    see there?

10        A.    These are abrasions.  One is on the left thigh

11   and the other is on the right thigh and then we call this

12   area the popliteal area, but it's kind of the opposite side

13   of the knee.

14        Q.    And did you have an opinion -- let me show you

15   State Exhibit 208.  Does that show the other abrasion better

16   on the other leg?

17        A.    That shows the thigh, left thigh, a little bit

18   better, yes, sir.

19        Q.    In your opinion was Officer Hawkins alive when

20   he received these injuries?

21        A.    Well, they certainly could be perimortem, in

22   the dying phase, but they certainly are consistent with

23   postmortem-type injuries.

24        Q.    So he would be either dead or dying at that

25   point?

1      A.      In my opinion, yes, sir.

2      Q.      Would these abrasions be consistent with being

3   run over by a car and drug?

4      A.      Yeah.  With the separation between the two,

5   that is what it appears to be.

6      Q.      Let me show you State Exhibit 490.  There was

7   some personal items that accompanied Officer Hawkins' body;

8   is that right?

9      A.      Yes, sir.

10      Q.      Is that what we're seeing here in 490?

11      A.      Yes, sir.

12      Q.      What type of items were those?

13      A.      There are quite a few.  I mean, you can see

14   some personal items like a memo pad, you can see some

15   change, you can see a small pistol, a clip, a loose bullet,

16   a holster for the small pistol, and then a couple of other

17   pens and a couple of other things with it.

18      Q.      And the photograph was taken just how they

19   appeared when they arrived at your office?

20      A.      Well, they were bagged and then we put them on

21   a white sheet of paper and photographed them.

22      Q.      Let me show you State Exhibit 757.  Is this an

23   identification picture of Officer Hawkins' autopsy?

24      A.      It's an identification picture of Officer

25   Hawkins, yes, sir.

1    Q.    Doctor, did you have an opinion as to the
2 cause of death?
3    A.    Yes, sir.
4    Q.    What was that?
5    A.    Died as a result of injuries from multiple
6 gunshot wounds.
7    Q.    And do you have an opinion as to the manner of
8 death?
9    A.    Yes.
10    Q.    What was that?
11    A.    The manner of death is homicide.
12              MR. SHOOK:  Pass the witness.
13                  CROSS-EXAMINATION
14 BY MR. SANCHEZ:
15    Q.    Doctor, just a few questions.  The bullet
16 fragments or the projectile fragments or jackets, those were
17 put together by you and given over to somebody at SWIFS.  Is
18 that how it worked?
19    A.    I don't know the word put together.  I
20 recovered them and as I recovered them, if they were large
21 enough that I could label the bullets, I labeled the
22 bullets.  And that's reflected in the report.  They were
23 then put in a labeled envelope by me and then they were
24 sealed and taken to the Criminal Investigation Laboratory,
25 which is part of our office.

31

1    Q.    And the purpose of that would be to try to

2    match those fragments up with some firearms, if they were

3    ever recovered, or just to do testing on them; is that

4    correct?

5    A.    That's the ultimate goal.  I mean, obviously,

6    my aspect would be to recover any sort of evidence that may

7    or may not be useful, but to recover it, that they could be

8    further examined.

9              MR. SANCHEZ:  I pass the witness.

10                  REDIRECT EXAMINATION

11   BY MR. SHOOK:

12   Q.    Doctor, in fact, let me talk to you about

13   those projectiles that you recovered.  Let me show you what

14   has been marked State Exhibits 210 through 213.  Are those

15   projectiles that you recovered from Officer Hawkins' body or

16   clothing?

17   A.    Yes, sir.

18   Q.    As well as State Exhibit 214 and 215?

19   A.    Yes, sir.

20   Q.    And 216 through 220?

21   A.    Yes.

22   Q.    And they are in individual packages.  Is it

23   your writing that's contained on the outside, detailing

24   where the bullets were recovered?

25   A.    Yes, sir.

```
1            Q.     And the number that you had given the bullets?

2            A.     That's correct.

3                   MR. SHOOK:  Your Honor, at this time we

4     will offer State Exhibits 210 through 220.

5                   MR. SANCHEZ:  No objection, Your Honor.

6                   THE COURT:  Nos. 210 through 220 shall be

7     admitted.

8                   MR. SHOOK:  We'll pass the witness.

9                   MR. SANCHEZ:  I have no further

10    questions.

11                  THE COURT:  Counsel, please approach.

12                       (Bench conference)

13                  THE COURT:  May this witness be excused?

14                  MR. SHOOK:  No objection.

15                  MR. SANCHEZ:  No objection, Your Honor.

16                  THE COURT:  Thank you, Doctor, you are

17    free to go.

18                  MR. SHOOK:  We'll call Brett Mills.

19                       BRETT MILLS,

20    having been duly sworn, was examined and testified as

21    follows:

22                     DIRECT EXAMINATION

23    BY MR. SHOOK:

24            Q.     Tell us your name, please.

25            A.     My name is Brett, B-R-E-T-T; Mills, M-I-L-L-S.
```

1    Q.    How are you employed, sir?

2    A.    I work for the FBI in the FBI laboratory, the

3  Firearms Toolmarks Unit.

4    Q.    Could you tell the jury what your professional

5  and educational qualifications are for the position you

6  hold.

7    A.    I have a bachelor of science degree from

8  Talliston State University and the training that I have

9  received from the Bureau is an in-house training program

10  approximately two years in duration, consisting of reading

11  literature, the theories behind firearms identification,

12  toolmarks identification.

13           We will go on factory tours.  We will

14  tour the firearms manufacturing facilities, ammunition

15  facilities, and tool facilities to see how marks that we're

16  looking on, bullets, cartridge cases, are imparted from a

17  barrel or from a tool and what causes these marks to be

18  unique.

19           We go back to the lab.  We wind up

20  working side by side with qualified examiners that are in

21  the laboratory itself.  We look at cases that they are

22  working on at the present moment.  We are given test cases,

23  different scenarios, different firearms shooting.

24           Then we go through an oral board process.

25  And the oral board process is basically just an oral test to

1    test my knowledge on my subject matter.  After that we work

2    what is called a mock trial, moot court, where we are given

3    a test case.  We work it from start to finish.  Then the

4    examiners in my unit will act as the judge, the prosecution,

5    and defense, and we'll have other unit members act as the

6    jury.  And this is to see if I can actually convey in a

7    clear and concise manner that's understandable to a jury.

8                        After that process, then I've been given

9    the blessing by the other examiners within the unit to be a

10   qualified examiner.

11       Q.    And how long have you been working in that

12   capacity with the FBI?

13       A.    In the laboratory?

14       Q.    Yes, sir.

15       A.    Approximately 15 years, sir.

16       Q.    And part of your duties, do you conduct

17   examinations and try to determine bullet trajectories at

18   crime scenes?

19       A.    Yes, sir.  That's a subdiscipline of firearms

20   identification.

21       Q.    Let me ask you, back in June of 2001 did you

22   come here to Dallas with other members of your team and

23   conduct some tests and calculations out at the Oshman's as

24   well as the Irving auto pound?

25       A.    That's correct, sir.

35

1    Q.    Let me show you some photographs which have

2  been marked State Exhibits 241 through 247.  Are those

3  photographs of the car you examined, as well as some

4  photographs of the scene from behind the Oshman's?

5    A.    Yes, sir, they are.

6    Q.    And then State Exhibit 248 through 257, are

7  these drawings that were made which demonstrate the

8  trajectory or the angle of shots fired into the vehicle

9  trailers there that were involved in this incident?

10   A.    Yes, sir, they are.

11   Q.    And would they aid you in detailing your

12 testimony to the jury?

13   A.    Yes, sir, they will.

14         MR. SHOOK:  Your Honor, at this time we

15 will offer 241 through 257.

16         MR. SANCHEZ:  We have no objection, Your

17 Honor.

18         THE COURT:  Nos. 241 through 257 shall be

19 admitted.

20   Q.    (By Mr. Shook)  Let me ask you first,

21 Mr. Mills, if you would explain to the jury the type of

22 testing that you came to Dallas to do in regards to these

23 trajectories?

24   A.    It's referred to as a bullet trajectory

25 reconstruction.  We are called to a crime scene, usually

1    it's either a house or a car, an inanimate object that

2    doesn't actually move, and we're asked to see if we can

3    determine the trajectory or flight path of a bullet to try

4    and find the actual position of an individual who was

5    holding a firearm as they are firing.

6          Q.    Okay.  Let me show you State Exhibit 241.  Is

7    this a photograph of Officer Hawkins' car?

8          A.    It's a photograph of a police car that I

9    examined, yes, sir.

10         Q.    And could you explain what we're seeing here

11   in the photograph?

12         A.    What you can see are yellow dowel rods

13   sticking out of holes that I have actually determined a

14   trajectory off of.

15         Q.    Mr. Mills, I think that I have a laser pointer

16   up there.  If that would aid you in any way, feel free to

17   use it, okay?

18         A.    Yes, sir.  Here you see in the hood of the car

19   you see a dowel rod and it's coming back out in this

20   direction and then on the passenger side of the patrol car

21   you actually see dowels, also.

22         Q.    What's the purpose of using these dowel rods?

23         A.    The dowel rods actually give us a point of

24   origin for us to determine the angles.  Once we determine --

25   if I can back up.  When I first approach a vehicle or a

1  house, I try and determine possible holes, bullet holes, and

2  possible bullet impacts.  And I would go start on the

3  outside, work my way all the way in.

4            Then I would try and determine if any of

5  the holes or bullets will match up into one individual

6  pathway.  After I have done that, I then will insert my

7  dowel rods to give me basically pointing your finger at a

8  direction.  I will then take protractors, angle finders, and

9  I will take my measurements off of the dowel itself, so it

10 gives me a firm reference point to use.

11      Q.    And here we're seeing the dowels inserted into

12 the car, which is all part of the process of you making

13 these determinations?

14      A.    That's correct, sir.

15      Q.    State Exhibit 242?

16      A.    Again, it's just another position of the

17 vehicle.  You can still -- it just gives you a different

18 perspective.  You can still see the dowels as they are

19 protruding out of the bullet holes.

20      Q.    And then 243, what does that show us?

21      A.    This is -- the hood has been raised and this

22 is one of the bullet holes as it's coming back in and

23 there's an impact down here in the rubber molding.

24      Q.    State Exhibit 244.

25      A.    This is from the driver's side.  Right along

38

1   here along the door post, you can see this blemish.   We

2   refer to it as a bullet wipe.   When usually a bullet is

3   either whether it's jacketed or if it's just a lead

4   projectile, even the jacket can split open and there's a

5   lead core inside and it leaves this gray material, basically

6   just rubbed off onto the surface.

7        Q.      And then State Exhibit 245?

8        A.      This is the rear position of the automobile.

9   Back down here in the bottom portion you see a webbing or

10  like a spider web effect of the glass itself and up into --

11  there's a little hump right across here.   I also had a

12  bullet hole that tracks back all the way up through the

13  front windscreen.

14       Q.      There's been testimony that the car was found

15  backed up under a trailer, which might have caused some

16  shattering of glass on the back window.   But also,

17  obviously, evidence of bullets passing through the car.

18  Could you determine just by looking at that glass, if the

19  back window was shot out by the bullets or could it have

20  been by the trailer?

21       A.      Um, the bullet itself would have already

22  started fracturing the glass itself and glass is very, very

23  unstable once you break the crystalline structure of it.

24  When we perform bullet trajectory schools, we actually will

25  shoot cars so that students can practice on them and just

1    anything from whether it's heat, moisture, anything like

2    that, glass can automatically just fall down or you could

3    actually just shoot one shot and the whole glass will fall

4    down.

5            But the bullet, if my understanding is

6    correct, if the bullet went through first, then the glass or

7    the pattern has already been broken, so that would have been

8    the major cause of the glass falling out.

9        Q.    I want to talk for a minute about your

10   diagrams that were made, State Exhibit 248.

11           MR. SHOOK:  Your Honor, if the witness

12   needs to step down to move around to demonstrate some of

13   these, will the Court give us permission for that?

14           THE COURT:  Yes, sir.

15       Q.    (By Mr. Shook)  What do we see here in 248?

16       A.    This is just giving you a perspective from the

17   driver's side of the front of the automobile.  What you see

18   along here with these individual posts is what I have

19   determined to be the pathway of the bullet as it's going

20   into the police car.

21           Over on the left side you see these big

22   cones.  And then in this direction over here, it's more of a

23   lateral.  What happened with these is they actually impacted

24   into the automobile glass and depending on the type of

25   material that we're testing at the moment, if a bullet goes

1   into a piece of wood, it's a very nice type hold, because

2   basically the cellular structure expands and after the

3   bullet passes through, it will contract back down.

4                       But when you have an item like metal

5   where you can have expansion and ripping and tearing or

6   glass, you might have a hole that's larger than the actual

7   caliber of the bullet.

8                       So what we do is we actually use cones.

9   And these cones -- we insert the dowel into the cone and the

10  cone into the hole itself.  And that places the dowel into

11  the center of the pattern -- or the hole in the pattern of

12  the glass.  But there's still some actual play in there.

13                      So that's what gives you this actual

14  bracket that you see up here.  When I put my dowel into it,

15  I cannot give you a flat line trajectory.  I can tell you it

16  was between those two points.

17                      So basically my pathway of the bullet

18  would be from this point here all the way up to this point

19  here.

20      Q.      Now, the angles of the bullets that are

21  hitting the hood there on the driver's side --

22      A.      Yes.

23      Q.      -- you were able to make precise

24  determinations for those angles; is that right?

25      A.      Yes, sir, that is correct.

1    Q.    Looking -- if we were to look at a photograph,

2  it might look like those bullets fired to the hood were

3  coming from the same exact angle.  But your actual

4  calculations show very different angles; is that correct?

5    A.    That's correct.  If you look at this one and

6  then if you can position the car and look at it from a side

7  view, you will see that the angles are actually changing.

8    Q.    Okay.  Let's look at State Exhibit 249.  What

9  does that show?

10    A.    This is just a side view.  Again, you can

11  actually see the cone on -- from the front of the hood.  You

12  can see a pathway that I've shown going all the way through

13  the police officer's car.  You see possible impacts which

14  are these right here with I numbers.  The F numbers are

15  describing the bullet holes that I pointed out into the

16  front.  And then in the rear you have the exit of -- I

17  believe it's 7 point -- 7 to 7.1 to 7.2.

18    Q.    State Exhibit 250?

19    A.    Just a perspective from the passenger's side.

20    Q.    Again, the cones represent the various angles

21  that those particular bullets passed through the car?

22    A.    That's correct.

23    Q.    And then we see on the side of the hood the

24  different angles that the bullets were striking the car?

25    A.    Yes, sir.

42

1    Q.     State Exhibit 251?

2    A.     It's just an overview perspective, again

3 showing the pathways.  There were four holes on the

4 passenger's side and I had four holes on the driver's side.

5    Q.     Now, there were also bullets that looked like

6 they came in through the driver's side window; is that

7 right?

8    A.     Yes, sir.  I had the one that I showed on the

9 driver's side post, which would be along here and then there

10 was a computer keyboard with a monitor.  There was actually

11 a bullet that had pierced into the computer keyboard itself

12 and created a furrow.  The problem is that by the time I had

13 come out to actually examine it, this is not a stationary

14 keyboard.  It would pivot back and forth and swivel back and

15 forth.  So I did not have an exact location of where this

16 was at the time.

17          But if it is only on the driver's side

18 position, then the bullet pathway would have come from the

19 driver's side.  I just couldn't give you a more definitive

20 answer.

21    Q.     You also examined a trailer that was out there

22 at the back of the Oshman's that had some -- that bullets

23 struck it; is that right?

24    A.     Yes, sir.  There was -- there were three holes

25 that we identified.

1    Q.    Let me show you State Exhibit 253.  What do we

2  see there?

3    A.    This is the rear of the trailer that we

4  examined out at Oshman's.  We had three entrances here, 1,

5  2, 3.  When we examined this trailer, there was nothing

6  inside of it.  We were informed that at one time or at the

7  time of the shooting that it was loaded with a lot of

8  material and stuff and all that material had been gone.

9          So I could not give you an impact point

10  of where it hit, because of the material had already been

11  removed.

12          No. 2 here, it is right along a hinge

13  strap that's used.  This is one of those rolling doors.

14  When you lift it up, the hinges will break down.  This one

15  actually hit the metal hinge and ricocheted, changing its

16  angle of deflection and exiting out here along the side of

17  the trailer.

18          No. 3 is through the plat wood and exits

19  out No. 4 up here.

20    Q.    Let me show you 254.  Does that show a top

21  view looking down on the trailer?

22    A.    Yes, sir.  You can actually see better here

23  how bullet hole No. 2 lines up with bullet hole No. 5 after

24  ricocheting off of the hinge strap.

25    Q.    And then State Exhibit 255, what do we see

1    there?

2         A.      It just gives you a side perspective from the

3    driver's side, showing the horizontal angle coming back and

4    downward.

5         Q.      And then finally 257?

6         A.      It gives you a rearward perspective, showing

7    how the lines would look if you could actually see through

8    them, the pathways of the bullets themselves.

9         Q.      Did you also examine part of the building to

10   see if you could determine if bullets had actually struck

11   the building?

12        A.      Yes, sir.  There were some possible impacts

13   along the back where the loading dock is.  And it would be

14   right down in this area underneath here.  The concrete was

15   chipped, looked like you had vaporous lead from the bullet

16   impacting and just pulverizing into small pieces.

17               So we took chemical test swabs and

18   processed them and we actually had one that did test

19   positive for lead.

20        Q.      So one of the two impact spots did test

21   positive?

22        A.      For lead, yes, sir.

23        Q.      Then there was one more diagram, I believe,

24   that helped demonstrate the angle of fire, which is on

25   diagram 258; is that right?

1    A.      Yes, sir, that's correct.

2    Q.      Would this diagram help you explain your

3 testimony as far as bullet trajectories in the back of the

4 Oshman's?

5    A.      Yes, sir.

6             MR. SHOOK:  We'll offer 258.

7             MR. SANCHEZ:  No objection, Your Honor.

8             THE COURT:  No. 258 shall be admitted.

9             MR. SHOOK:  May I have the witness step

10 down for a moment, Judge?

11            THE COURT:  He may.

12   Q.      (By Mr. Shook)  If you could step over here to

13 the diagram, Mr. Mills.  What are we seeing here on 258?

14   A.      This is a side profile of the Oshman's, rear

15 of the Oshman's parking lot.  To give you a perspective, the

16 loading dock is back up over here.  And this is where I had

17 the possible impacts up in here.  And then here is the

18 trailer parked back down through here and this is just

19 giving you a perspective of the bullet pathways.

20   Q.      The actual area behind the loading dock had

21 kind of an angle to it; is that right?

22   A.      Yes, sir.

23   Q.      If the Ford -- say, hypothetically, if a Ford

24 Explorer were leaving the loading dock area at this

25 location, and fired a gun out the passenger's side window,

```
 1   would that be consistent with the bullet angles that struck

 2   the trailer?

 3       A.     If I'm following correctly, if the Explorer

 4   was driving out here, I'm assuming coming out the exit here.

 5       Q.     Yes, sir.

 6       A.     Wherever that window lined up or the firearm

 7   itself sticking out the window, wherever it passes these red

 8   lines, yes, sir, then that could be a pathway of the bullet.

 9              MR. SHOOK:  Your Honor, we will pass the

10   witness.

11                    CROSS-EXAMINATION

12   BY MR. SANCHEZ:

13       Q.     Mr. Mills, were you ever asked to do an

14   analysis on a Ford Explorer?

15       A.     No, sir, I was not.

16       Q.     Were you ever shown one?

17       A.     No, sir, I was not.

18              MR. SANCHEZ:  Pass the witness.

19              MR. SHOOK:  Nothing further.

20              THE COURT:  Thank you, Special Agent, you

21   may stand down.

22              THE WITNESS:  May I please be excused?

23              MR. SHOOK:  No objection.

24              MR. SANCHEZ:  No objection.

25              THE COURT:  You may.
```

1                    TIMOTHY SLITER,

2    having been duly sworn, was examined and testified as

3    follows:

4                    DIRECT EXAMINATION

5    BY MR. WIRSKYE:

6           Q.      Can you tell us your full name, Doctor?

7           A.      My name is Timothy Sliter.

8           Q.      How are you employed?

9           A.      I am employed at the Southwestern Institute of

10   Forensic Sciences here in Dallas as the Supervisor of the

11   Forensic Biology Laboratory.

12          Q.      The institute is what we commonly call the

13   crime lab; is that right?

14          A.      Yes, sir.  It's the Dallas County Crime Lab.

15          Q.      What are your duties on a day-in, day-out

16   basis?

17          A.      I oversee all the testing activities that are

18   done in the lab on the case work that's submitted to the

19   laboratory.  That would include both the analyses which are

20   done on evidence items when they initially come into the

21   lab, which would be a searching for biological evidence,

22   such as blood or seminal fluid or other sorts of biological

23   material.  And then also the DNA testing that would be done

24   on those items eventually.

25          Q.      In fact, you did some DNA testing involving

1    this case we're here on today; is that right?

2         A.    Yes, I did.

3         Q.    What type of training and educational

4    background do you have that allows you to do your job?

5         A.    I have my doctorate degree in genetics.  I

6    have a number of years of postgraduate education and

7    training in the areas of physiology, molecular biology, and

8    genetics.

9              I taught for a number of years before I

10   held my current position at the undergraduate level and the

11   graduate level in the areas of genetics and physiology.  In

12   regard to the specific testing activities that I do on DNA,

13   I completed a training program in the techniques that we use

14   in our laboratory.

15             Before I started case work, I took

16   competency tests in those areas.  I have to take regular

17   proficiency tests in those techniques.  I have also had

18   training in DNA testing as it applies to forensics from

19   staff of the FBI and staff of the Armed Forces DNA

20   Identification Laboratory.

21        Q.    And briefly tell us, if you will, what DNA is.

22        A.    DNA is an abbreviation for a chemical material

23   that is located in all of the cells in our body.  It is

24   located in certain structures called chromosomes and it is

25   the genetic material that contains the information for

1   making us human.  And it's the material that is passed

2   between mothers and fathers and their children, each

3   generation.

4               DNA as it's used in forensics or criminal

5   investigations is used in what is referred to as human

6   identification.  Most of the DNA that we each have is

7   exactly the same as the DNA that everybody else has.

8   Ninety-nine point nine percent of the DNA that I have is the

9   same as anybody else.  Only one-tenth of one percent is

10  different and it's that one-tenth of one percent that is

11  responsible for what we can refer to as our individual

12  characteristics, our individual eye color, and hair color

13  and skin color and our individual biochemistries, the way we

14  work chemically, which can be related to diseases.

15              So it's that one-tenth of one percent

16  that we, as forensics scientists, are interested in because

17  it's the region or it's the portion of the DNA that is

18  different between people and would allow us to say that a

19  certain blood stain was either consistent with coming from a

20  particular person or was not consistent with that.

21        Q.    So you take known samples or known DNA

22  profiles and compare them against unknown or questioned

23  samples or profiles to determine there what is a match or an

24  exclusion; is that right?

25        A.    Yes.  That's essentially what we do.  We

1  compare a DNA profile from a known person.  Usually that

2  comes in the form of either a blood sample from that person

3  or a scraping of the cells from the inside of the mouth,

4  which is referred to as a buccal swab sample.

5              We get a DNA profile of that known person

6  and then we can compare that profile to DNA profiles that we

7  get from blood stains or other sorts of evidence that have

8  been collected from a crime scene or somehow in association

9  with a crime.

10             If you don't have a match, if you have an

11 exclusion, what are the implications of that?

12     A.     In the case of an exclusion, that known person

13 would be excluded as being a possible source of that

14 biological material.  That person would not be able to leave

15 that material.

16     Q.     You can say that without a question?

17     A.     Yes.

18     Q.     If you have a match, what are the implications

19 of that?

20     A.     In the case of a match, it -- matches can

21 range from very good matches to not so good matches.  So

22 what we would say in the case of a match is that that person

23 is not excluded as being a possible contributor of that

24 material; therefore, they are a possible source of the

25 material that was collected at the crime scene.

1          And then we would give a statistical

2    weight to that match.  We would provide a statistic which

3    would estimate how often that match would be expected to

4    occur from a randomly selected person.

5          Q.    So the numbers involved kind of give

6    significance to the match; is that right?

7          A.    Yes, yes.

8          Q.    Is there a particular type of method that you

9    used in this case when you talk about DNA testing?

10         A.    We used a type of DNA testing referred to as

11   short tandem repeat or STR DNA testing.

12         Q.    And this type of technology is generally

13   accepted in the scientific community as valid?

14         A.    Yes.

15         Q.    And that particular technique is also

16   generally accepted in the scientific community as valid?

17         A.    Yes.

18         Q.    The particular technique you used in this

19   case, was it applied properly?

20         A.    Yes, it was.

21         Q.    Let's talk about the known samples you had in

22   this case.  Looks like you had buccal swabs from six

23   individuals; is that correct?

24         A.    That is correct, yes.

25         Q.    George Rivas, Michael Rodriguez, Donald

1   Newbury, Patrick Murphy, Jr., Joseph Garcia, and Randy

2   Halprin; is that right?

3          A.     That's correct.

4          Q.     And you had an autopsy blood sample from Larry

5   Harper?

6          A.     That's correct.

7          Q.     You also had an autopsy blood sample from

8   Aubrey Hawkins; is that right?

9          A.     That's correct.

10          Q.     As far as the questioned items of evidence

11   that you looked at, you had quite a few; is that right?

12          A.     Yes.  Approximately 90 samples were tested.

13          Q.     You had, I guess, a 21-page report in front of

14   you that reflects your findings -- all your findings in this

15   case; is that right?

16          A.     That's correct.

17          Q.     I want to focus with you generally on four

18   different areas, some samples from some blood stains that

19   were taken from the parking lot of the Oshman's, some

20   samples of swabbings that were taken from a Glock revolver,

21   some swabbings that were taken from a Smith & Wesson

22   revolver, and finally some swabbings that were taken from

23   the Ford Explorer.  Okay?

24          A.     Uh-huh.

25                 MR. WIRSKYE:  May I approach, Your Honor?

1          THE COURT:  You may.

2          Q.    (By Mr. Wirskye)  We met earlier this morning,

3   is that right, Doctor?

4          A.     That's correct.

5          Q.     Let me show you this.  Let me show you a

6   report marked for identification as State Exhibit 493.  You

7   looked at that previously and that is an exact duplicate of

8   your original report; is that right?

9          A.     Yes, it is.

10          MR. WIRSKYE:  Your Honor, we offer

11   State's 493.

12          MR. SANCHEZ:  No objection, Your Honor.

13          THE COURT:  No. 493 shall be admitted.

14          Q.    (By Mr. Wirskye)  I also asked you to look

15   this morning at two different weapons, the first of which is

16   in evidence, marked State's 178.  Is that the Smith & Wesson

17   revolver that you did some testing on?

18          A.     Yes, this is.  And it is an item that was

19   received in our laboratory, item No. 16.  That's the way

20   it's described or referred to in my report.

21          Q.     And it's your understanding this is the

22   revolver that came from the crime scene at the Oshman's; is

23   that right?

24          A.     Yes, that is my understanding.

25          Q.     Let me also show you what is not in evidence

1    yet, but it's marked for identification as State 309.  It's

2    a Glock 17, Officer Hawkins' service weapon.  I'll ask you

3    to check your records and make sure that that item is the

4    Glock pistol that you looked at.

5         A.     Yes.  It has the same serial number as the

6    item that we analyzed and corresponds to our item No. 156.

7         Q.     Okay.  There's been testimony from the Irving

8    crime scene officers that they collected samples of blood, I

9    guess, or stained cloths that were taken from the crime

10   scene there at Oshman's, I believe your items 47 through 52?

11        A.     Yes, that's correct.

12        Q.     What were the results of your DNA analysis on

13   those items?

14        A.     Each of those items 47, 48, 49, 50, 51, and

15   52, in my report gave a DNA profile that matched the DNA

16   profile of Aubrey Hawkins.

17        Q.     Before you get to the DNA analysis, do you

18   also do a presumptive test for blood?

19        A.     Yes.  Initially all these samples would have

20   been received into the laboratory and would have been

21   screened for the presence of blood and that was specifically

22   the request for analysis that was made when the items were

23   submitted.

24             The analysis for blood is a two-step

25   process.  Initially, the samples are visually examined and

then they are tested with what is referred to as a

presumptive test for blood.  That is a simple chemical test

which, if it gives a positive result, would indicate that

there is a material there which shows certain chemical

characteristics which are consistent with blood.  It doesn't

definitively identify the material as blood, but it does say

that it has those presumptive characteristics.  And it

doesn't tell if it's human blood or animal blood.

The second step in the process would be a

confirmatory test which would be carried out, providing that

there's enough of the sample to test.  Sometimes the samples

we get are very small.  They are so small that we can only

do a presumptive test and then we have to reserve the rest

of the sample for DNA testing.

But if there's enough material to carry

out a confirmatory test, which will establish that the

material is human blood, if it is human blood.

Q.     Were the samples from the Oshman's parking

lot, did those come back as human blood?

A.     Each of those samples, 48 through 52, tested

positive for human blood.

Q.     Again, those were matched to Aubrey Hawkins?

A.     Yes.

Q.     Now, talking about the Glock revolver, which

is State's Exhibit 309, your item No. 156 --

1    A.    Yes.

2    Q.    -- looks like there were 4 different swabbings

3    that were taken from the different areas of that pistol; is

4    that right?

5    A.    That's correct.

6    Q.    What did your results show about the Glock

7    pistol?

8    A.    The four samples that were taken, RT-1, T-2,

9    T-3, and T-4, each gave a positive result with the

10   presumptive test for blood, but there was insufficient

11   material to perform the test for human blood.  So we can say

12   there's bloodlike material there, but we can't say for

13   certain that it's human blood.

14              We did for each of those samples,

15   however, obtain -- we did DNA testing and we obtained a

16   human DNA profile from those items, from the test samples.

17   And in each case there was a mixture of DNA from more than

18   one person.  And it's in each case it was a type of mixture

19   which we refer to as a major/minor mixture in the sense that

20   there was one contributor to it which was present at very

21   high levels and we can tell exactly what their DNA profile

22   was.

23              And in each of those samples the major

24   contributor to the sample had a DNA profile that matched the

25   DNA profile of Aubrey Hawkins.  And then each of the samples

1    also had some additional genetic markers at a lower level

2    which would indicate a contribution of DNA and biological

3    material from one or more other people.

4         Q.     Were one of those -- did you get a match on

5    one of the minor contributors back to George Rivas?

6         A.     There was one sample, a T-4 sample, in which

7    there were at least two minor contributors to it in addition

8    to a major profile which matched Aubrey Hawkins.  And all of

9    the genetic markers that we saw in the DNA profile of George

10   Rivas were seen in that mixture.  So we couldn't exclude him

11   as being a contributor of biological material.  So we would

12   conclude that he was a possible contributor.

13        Q.     Let me next ask you about that revolver,

14   State's Exhibit 178, your item 16.

15        A.     Yes.

16        Q.     Were there three swabbings that were done of

17   that revolver?

18        A.     Yes, there were.

19        Q.     And what were the results with respect to the

20   presumptive blood tests?

21        A.     Each of those samples tested positive with a

22   presumptive test and they also tested positive with a test

23   for human blood.

24        Q.     Okay.  With respect to the DNA on that

25   revolver, what did you find?

1    A.    Each of those samples gave a DNA profile of a

2  single male individual and it matched the DNA profile of

3  Aubrey Hawkins.

4    Q.    Finally, you were given some swabbings from

5  the Ford Explorer; is that right?  Your items 53 through 59?

6    A.    Yes.

7    Q.    Okay.  And what were the results of your

8  testing on those items?

9    A.    There were two stains that were submitted,

10  item -- our item No. 53 and 54, which gave a DNA profile

11  which matched the DNA profile of George Rivas.  There was

12  one stain, our item No. 55, which gave a DNA profile that

13  matched the DNA profile of Larry Harper.  And there were

14  three stains 56, 57, and 59, which gave a DNA profile which

15  matched the DNA profile of Aubrey Hawkins.

16    Q.    And all that came from within that Ford

17  Explorer; is that correct?

18    A.    That's the information which was given to us

19  -- well, I'm not sure if it came from inside.  Some of the

20  samples may have come from outside the vehicle.

21    Q.    Do your notes show where exactly those samples

22  came from within the Ford Explorer?

23    A.    Yes.

24    Q.    Could you run through that quickly?

25    A.    Our item No. 53, which matched George Rivas,

59

1   was -- the submittal information that was provided by Irving

2   Police Department, they indicated that that blood sample

3   came from the center of the left seat.

4               Item 54, which also gave a DNA profile

5   that matched George Rivas, that originated from the left

6   side of the left seat.  Item 55, which matched Larry Harper,

7   that originated from the inside of the right back door.

8               Item 56, which matched Aubrey Hawkins,

9   originated from the left front fender well.  So that's a

10  sample from the outside of the car.  Item 57, which also

11  matched Aubrey Hawkins, originated from the outer edge of

12  the -- on the submittal sheet it says BL tire, which

13  probably means back left tire.

14              And item 59, which also matched Aubrey

15  Hawkins, that originated from the inner side of the left

16  back door window.

17  Q.      Okay.  And you told us earlier that, I guess,

18  numbers give significance to these matches?

19  A.      Yes.  We would calculate -- any time that we

20  see a match between an evidence sample, a questioned

21  evidence sample, and a known person, we will calculate a

22  statistic that provides a weight for that match.  It's an

23  attempt to assess how significant it is.

24              And in order to do that calculation, we

25  have to utilize a data base that describes how frequently

the different genetic markers we look at are seen in the

human population.  And in this case we used a data base

which was put together by the Texas Department of Public

Safety in Austin for the three major population groups in

Texas, Texas Caucasians, Texas Hispanics, and Texas African

Americans.

          Q.     Generally, the greater the numbers, the more

significance to the match?

          A.     Yes.  The statistic that we calculate is what

is called a random match probability.  It takes the

evidence, the profile, the DNA profile, that is obtained

from the actual questioned evidence items and asks the

question, what's the probability that a randomly selected

person would be included as a possible source of that

material?

                    In the case of a mixture, it would be,

what's the probability that a randomly selected person would

be included as a possible contributor to that mixture.

Since there's more than one contributor to a mixture, the

numbers for mixtures are automatically much less than they

would be for single source samples, because there can be a

variety of people who contribute to a mixture.

          Q.     So you may have a match that's 1 in 7 and that

wouldn't be very significant, necessarily, as opposed to a

match that would be like 1 in 36 trillion, which would have

1    great significance?

2          A.     There would be a difference in their

3    significance, yes.

4          Q.     Okay.  And just briefly, the match that you

5    got for Aubrey Hawkins, the DNA match, what were the numbers

6    associated with that?

7          A.     The samples that I've described that matched

8    Aubrey Hawkins all were full complete profiles.  And they

9    were single source profiles.  So the numbers are very good.

10   In Texas Caucasians the random match probability is 1 in

11   20.1 trillion and African-Americans it's one in 19.1

12   trillion and in Hispanics it's one in 45.2 trillion.  And so

13   the conservative value is about 1 in 20 trillion.

14                To put that in context, the population of

15   the earth is about 6 billion.  So that number, what it would

16   mean, 1 in 20 trillion would mean that if I had a population

17   of people equal to slightly more than 3,000 times the

18   population of the earth, I would expect one person in that

19   population to have this exact profile.

20         Q.     With respect to George Rivas, what were the

21   numbers associated with that match?

22         A.     The samples that matched George Rivas that

23   were obtained from the Ford Explorer were single source

24   profiles.  And in Caucasians, the probability would be 1 in

25   6.47 trillion, in African Americans 1 in 26 -- one in 1.26

1   quadrillion and in Hispanics, 1 in 7.13 trillion.  So the

2   conservative value is the value seen in Caucasians of 1 in

3   6.47 trillion.

4                        And, again, to put that in context, six

5   billion people on the earth.  So if I had a population of

6   people of slightly more than a thousand times the population

7   of the earth, I would expect one person in that population

8   to have the profile.

9                        The profile from the Glock which was a

10  mixture that I couldn't exclude George Rivas as being a

11  contributor to, because it's a mixture the numbers are much

12  less, in Caucasians it was 1 in 1,550, in African Americans

13  it was 1 in 12,800 and in Hispanics it was one in 2,120.  So

14  the conservative number is the one seen in Caucasians 1 in

15  1,550.

16       Q.    And, finally, the number associated with the

17  match you got from Larry Harper?

18       A.    That was the sample from the Ford Explorer.

19  And in Caucasians that was a full profile.  And in

20  Caucasians it is 1 in 3.17 trillion and in African-Americans

21  1 in 216 trillion and in Hispanics, 1 in 7.31 trillion.  The

22  conservative number is seen in Caucasians, 1 in 3.17

23  trillion.

24                        So if I had a population of people equal

25  to about 500 times the population of the earth, one person

63

1    in that population would be expected to have that profile.

2         Q.   Doctor, just in general when your lab works a

3    case, are items of evidence often retained for future

4    testing?

5         A.   As a routine course, we would always only

6    consume a portion of a sample in order to do our testing and

7    we would retain sufficient samples so that another

8    laboratory could come back and do retesting.

9         Q.   Is that also for the simple reason that in the

10   future technology may advance?

11        A.   Certainly that's possible.

12        Q.   Okay.  Specifically with this case, were you

13   able to preserve different items of evidence to be retested,

14   if somebody disagreed with the results?

15        A.   Yes.

16        Q.   Okay.

17             MR. WIRSKYE:  I'll pass the witness, Your

18   Honor.

19                  CROSS-EXAMINATION

20   BY MR. SANCHEZ:

21        Q.   Sir, specifically with the items that you

22   testified about today, the matches were Aubrey Hawkins,

23   Larry Harper, and George Rivas; is that correct?

24        A.   Correct.

25             MR. SANCHEZ:  I pass the witness.

64

1      MR. WIRSKYE:  Nothing further, Your

2   Honor.

3      THE COURT:  Thank you, Doctor.  You may

4   stand down.

5      MR. SHOOK:  We would like to have him

6   subject to recall, Your Honor.

7      THE COURT:  Looks like you are subject to

8   recall.  It's 10:25.  We'll take a 20-minute break.

9                    [Jury out]

10                    (Recess)

11                    [Jury in]

12      THE COURT:  Thank you.  You may be

13   seated.

14      MR. SHOOK:  Call David Spence, Judge.

15                 DAVID SPENCE,

16   having been duly sworn, was examined and testified as

17   follows:

18              DIRECT EXAMINATION

19   BY MR. SHOOK:

20      Q.     Would you tell us your name, please.

21      A.     David Walker Spence.

22      Q.     And how are you employed, sir?

23      A.     As supervisor of the Trace Evidence Section at

24   the Southwestern Institute of Forensic Sciences here in

25   Dallas.

1    Q.    And what are your duties there?

2    A.    In addition to the supervision of the unit, I

3    also examine different types of physical evidence or trace

4    evidence.  Specifically, I examine items for the presence of

5    gunshot residues to determine either the distance between a

6    gun and a piece of clothing at the time shots are fired or

7    also to determine whether or not somebody has handled a

8    weapon or fired a weapon by examining for the presence of

9    primer gunshot residues.

10                I also examine paints, fibers, glass,

11   blood spatter interpretations, and many other types of trace

12   evidence examinations.

13   Q.    Were you asked to conduct some trace evidence

14   examinations involving the shooting of Aubrey Hawkins that

15   occurred on December 24th of 2000?

16   A.    Yes, I was.

17   Q.    And you did several different types of

18   examinations; is that correct?

19   A.    That is correct, yes.

20   Q.    Did you take some photographs of some of the

21   items that you examined?

22   A.    Yes, I did.

23   Q.    Let me show you what has been marked as State

24   Exhibits 221 through 237.  Are these photographs of some of

25   the items that you examined?

1    A.    Yes, they are.  No. 221 is a piece of leather,
2  small section of leather --
3    Q.    Let me go through them just -- all these items
4  are items that you examined?
5    A.    Yes.  Yes, they are.
6         MR. SHOOK:  I'll offer State Exhibits 221
7  through 237.
8         MR. SANCHEZ:  Your Honor, we have seen
9  those and we have no objection.
10         THE COURT:  Nos. 221 through 237 shall be
11  admitted.
12    Q.    (By Mr. Shook)  Now, I want to go through
13  these individually.  But first let me ask you, did you
14  receive into evidence a Sam Brown belt, along with some
15  clothing and then a piece of leather to compare to the Sam
16  Brown belt?
17    A.    Yes, I did.
18    Q.    What type of -- well, let me show you first
19  221.  Is this the piece of leather that was submitted to you
20  by the Irving Police Department?
21    A.    Yes, it is.
22    Q.    What type of examination were you conducting
23  in relation to that belt?
24    A.    I was asked to examine the piece of leather to
25  determine whether or not it originated from the Sam Brown

1    belt.

2         Q.    And what were the results of your examination?

3         A.    The results of the examination were that this

4    piece of leather, this leather fragment, originated from the

5    Sam Brown belt or the police officer's belt from Aubrey

6    Hawkins.

7         Q.    Let me show you State Exhibit 222.  Does this

8    show the portion of the Sam Brown belt that you compared the

9    leather to?

10        A.    Yes, it does.

11        Q.    We see redness there on the belt.  What is the

12   cause of that?

13        A.    The red coloration is a dye that is used to

14   enhance latent fingerprints.  It's called rhodamine,

15   rhodamine dye, which is used by the latent fingerprint

16   examiner.

17        Q.    And let me show you No. 223.  Does that show

18   the piece of leather kind of fitted into the belt?

19        A.    Yes, it does.

20        Q.    In addition to that, did you also compare a

21   portion of cloth that was recovered from Officer Hawkins'

22   car?

23        A.    Yes, I did.

24        Q.    And what type of comparison did you do there?

25        A.    There was a section of fabric submitted to me

1  and the request was to identify the source of that section

2  of fabric, so I performed fiber comparisons on it.

3      Q.    And what were your conclusions in regard to

4  that test?

5      A.    That the section of fabric consisted of many

6  different colors and types of fibers.  And those colors and

7  types of fibers were consistent with the patch on the left

8  sleeve of the uniform shirt from Aubrey Hawkins and that --

9  in fact, that was a piece of the patch, the shoulder patch,

10  from the uniform shirt.

11      Q.    Did you also compare some glass fragments that

12  were found at the scene and also taken from a -- near or in

13  a Ford Explorer?

14      A.    Yes, I did.

15      Q.    And did you compare those to known samples

16  from the Ford Explorer as well as Officer Hawkins' car?

17      A.    Yes, I did.

18      Q.    What were the results of your examination in

19  those tests?

20      A.    There were several glass fragments that were

21  recovered and compared to both the broken window in Officer

22  Hawkins' car as well as the Ford Explorer.  There were

23  several of the glass fragments consisted of the same color

24  of glass, the same thickness of glass, and same optical

25  properties as some of the glass fragments from the broken

1    window in Officer Hawkins' car as well as some of the glass

2    fragments from the scene also matched back to the Ford

3    Explorer, from the broken window of the Ford Explorer.

4         Q.    Mr. Spence, did you also conduct some

5    examinations on handwashings that were submitted to you by

6    the medical examiner?

7         A.    Yes, I did.

8         Q.    Could you explain to the jury what

9    handwashings are?

10        A.    Handwashings are a type of evidence that is

11   collected to determine whether or not somebody has fired a

12   weapon or been in close proximity to a weapon when a weapon

13   is fired.

14              What is done is a gunshot residue kit

15   consisting of cotton swabs, those cotton swabs are then

16   wetted with a dilute acid solution, and then the swabs are

17   then used to wipe the back of each hand and the palms of

18   each hand.   It would be a separate sample for each portion

19   of the hand.

20              Then we then analyze those swabs in a

21   laboratory to determine the presence of primer gunshot

22   residues.   The primer residues are the residues that

23   originate from within the primer cup of the cartridge case,

24   the primer cup being the ignition source for the firing of

25   the cartridge.

```
1        Q.      Are handwashings done routinely on bodies that
2    are submitted for autopsy at the Medical Examiner's Office?
3        A.      Yes.  They are routinely collected on any
4    gunshot victim submitted to the Medical Examiner's Office.
5        Q.      Was that done in the case of Aubrey Hawkins?
6        A.      Yes, it was.
7        Q.      What were the results of your examination on
8    the handwipings from Officer Hawkins?
9        A.      That there were traces of gunshot residues
10   detected on both hands of Aubrey Hawkins, specifically on
11   the palm and the back of the left hand as well as the palm
12   of the right hand of Aubrey Hawkins.
13       Q.      What would that be consistent with?
14       A.      It's consistent with either handling and
15   firing a weapon or being in close proximity to a weapon.
16   And finding residue on both of the palms could possibly
17   indicate a defensive posture where somebody is instinctively
18   putting their hands up when they see a gun.
19       Q.      If Officer Hawkins were seated in his squad
20   car when shots were fired or multiple shots were fired at
21   him and into his body and the evidence showed he may have
22   had an arm up, would that, then, be consistent with having
23   your hands up in close proximity to a firearm?
24       A.      Yes.  If he's within approximately five feet
25   from the muzzle end of the weapon, I would expect to find
```

1   gunshot residue on his hands.

2       Q.      Did you also examine the clothing of Officer

3   Hawkins to try to determine range of fire?

4       A.      Yes, I did.

5       Q.      Could you explain to the jury how you -- what

6   type of tests you conduct and how you are able to determine

7   a range of fire?

8       A.      Yes.  The first examination is a visual

9   examination of the clothing items.  We take a look at the

10  clothing just with the naked eye and determine the presence

11  of bullet defects or rips or tears which could potentially

12  be bullet defects.

13          The second step would be to further

14  examine the article of clothing under a stereo microscope or

15  low powered microscope and at that time we are examining for

16  the presence of gunshot residues, either burned or partially

17  burned flakes of gunpowder or some other gunshot residue,

18  such as what we refer to as a grease ring.  A grease ring

19  would be the residue that is picked up by a bullet as it

20  leaves the barrel of a weapon.  And then when the bullet

21  penetrates through the clothing, the residue then wipes off

22  onto the clothing, leaving a characteristic grease ring.

23          We also then perform different chemical

24  tests to determine the presence of chemical gunshot

25  residues, specifically lead, which originates from a lead

1  bullet or from the primer constituents.  And also nitrite

2  residue, which originates from the burning of the gunpowder.

3        Q.     What type of clothing was submitted to you

4  that Officer Hawkins was wearing?

5        A.     His uniform, consisting of a long-sleeved

6  uniform shirt as well as a long pair of uniform pants.  Also

7  a long john T-shirt and a white undershirt, short-sleeved

8  T-shirt, and a bulletproof vest, which consists of a front

9  and back ballistic panel.

10        Q.     Let's talk about the ballistic panel or

11  ballistic vest first.  Does State Exhibit 227 show the vest

12  as you received it?

13        A.     Yes, it does.

14        Q.     Is that ballistic vest actually contained in

15  some type of cover that the officer wears?

16        A.     Yes.  The blue -- the blue colored fabric is

17  what we refer to as a carrier.  It's simply -- it's like an

18  envelope that holds the ballistic panel inside.

19        Q.     Did it appear that the ballistic vest had been

20  hit by bullets or bullet fragments?

21        A.     Yes, it did.

22        Q.     How many defects did you find?

23        A.     There were three bullet defects in the

24  ballistic panel.

25        Q.     And approximately where were they located?

1    A.    One of the defects was located right here,

2  which is right at the base of the notch that would fit up

3  underneath the officer's chin.  There's another defect that

4  is a very small defect located approximately in this

5  position, a very small defect, which could have been caused

6  by a bullet fragment.

7               And then another bullet defect which was

8  over in this location, just on the left side of the --

9  there's an insert with a metal panel on the inside.  There's

10 a bullet defect in that location.

11   Q.    Let's talk about that defect.  State's Exhibit

12 228, does that show where the bullet would have entered the

13 outer portion of that vest or the covering of the vest?

14   A.    Yes.  Right here in the seam of this part of

15 the ballistic panel is a bullet defect.  A bullet penetrated

16 through here to the inner layers.

17   Q.    Now, showing State Exhibit 230, does that show

18 the -- after the vest -- after the covering has been

19 removed?

20   A.    Yes.  The vest consists of the blue outer

21 envelope and then on the inside there's a stacked layer of

22 kevlar fabric which was encased in a white ballistic-type

23 nylon fabric.

24   Q.    Are you able to tell the direction that this

25 bullet struck the vest?

1    A.    Yes.  It -- the bullet struck from a front to

2  back, left to right, trajectory.  The ballistic panel would

3  fit over the officer's chest and the bullet would have

4  entered from approximately this direction (demonstrating)

5  from the officer's left to right, front to back.

6    Q.    Let me show you State Exhibit 231.  Does that

7  show the actual bullet that you recovered from the vest?

8    A.    Yes, it is.  This is a bullet core or a lead

9  core.  This is the inner portion of a lead projectile with

10  the copper -- typically it would be a copper jacketed

11  projectile and the copper jacketing has been shed off the

12  bullet core.  So this is the inner portion of the bullet.

13    Q.    State Exhibit 233, does that show the defect

14  to the top of the vest near the --

15    A.    Yes, it does.

16    Q.    That's what we see there?

17    A.    Right here.  A bullet fragment or bullet

18  penetrated through the outer layers and nicked the inner

19  kevlar fabric, but did not penetrate through it.

20    Q.    Did that appear to be a direct hit or

21  something that was just nicked at the top?

22    A.    It was just nicked at the top, somewhat of a

23  glancing blow.

24    Q.    And let me show you State Exhibit 235.  Does

25  that show the tear on the other side of the vest?

75

1    A.    Yes.  This is the bullet impact or bullet

2  fragment impact on the -- would be on the upper right

3  portion of that jacket.

4    Q.    Now, going back to the first defect we talked

5  about where the bullet slug was actually taken out of the

6  vest, did you examine Officer Hawkins' long johns and

7  T-shirt to see if there were any corresponding defects to

8  that?

9    A.    Yes, I did.

10    Q.    And did you find any?

11    A.    Yes, I did.

12    Q.    And what did you find exactly?

13    A.    There were corresponding rips and tears in the

14  same general location on both the long john shirt and the

15  short-sleeved T-shirt, which were worn below the bulletproof

16  vest.  The bullet didn't actually penetrate through the

17  vest.  It was just the rips and tears in the underlying

18  shirt, long john shirt, and T-shirt, resulted from the

19  physical impact of the bullet on the bulletproof vest.

20    Q.    That would be consistent with those occurring

21  because of the bullet striking the ballistic vest and then

22  the impact also causes a defect on the garments below; is

23  that right?

24    A.    That is correct, yes.

25    Q.    Did you find the same types of defects on the

1    other defect that was in the ballistic vest on the other

2    side?

3            A.      No, I did not.

4            Q.      Now, I believe you stated in your opinion that

5    this particular defect on the ballistic vest may have been

6    caused by a fragment; is that right?

7            A.      That's correct, yes.

8            Q.      Can you explain why you believe that?

9            A.      This defect, obviously it penetrated through

10   the fabric and it left a very small mark on the surface of

11   the kevlar fabric, but it was not anywhere near the size of

12   what a complete intact bullet or projectile would have made.

13   This is what we normally would see in like a very small lead

14   fragment or copper fragment that may have shed off of the

15   original projectile, but it's a much smaller impact.

16           Q.      Did you examine Officer Hawkins' uniform for

17   defects and gunpowder residue?

18           A.      Yes, I did.

19           Q.      And did you find any that corresponded with

20   the same defects that were on the ballistic vest?

21           A.      Yes, I did.

22           Q.      Before I get into the range of fire

23   determinations, let me show you what has been marked as

24   State Exhibit 240.  Is this the actual ballistic panel that

25   you examined?

1      A.      Yes, it is.

2                  MR. SHOOK:  Your Honor, at this time we

3    will offer State Exhibit 240.

4                  MR. SANCHEZ:  No objection, Your Honor.

5                  THE COURT:  No. 240 shall be admitted.

6                  MR. SHOOK:  May we have the witness step

7    down for a moment?

8                  THE COURT:  He may.

9      Q.      (By Mr. Shook)  First of all, if you could

10   just show the jury where the defects were located on 240

11   that you just talked about?

12     A.      Okay.  There's -- the first defect is the

13   small blackish colored marking on the vest.  And that's

14   where I described that there was probably a bullet

15   projectile fragment that impacted with the vest right here.

16   The next one is -- it's been roughed up, but it's this

17   location right here.  There was a bullet impact that just

18   nicked the very edge of it.  It did not penetrate through

19   the bulletproof vest, but it did deflect across the top.

20   And this is the majority or the main impact where the bullet

21   core was recovered right here.

22     Q.      And then the other defect on the other side,

23   did it even make a mark on the actual --

24     A.      Yeah, there's actually -- well, there was at

25   the time of the analysis a small black skidmark that was in

1   this location here.

2        Q.    And how about the third defect, did that

3   actually make a mark on the --

4        A.    Yes.  There's a small mark and there are a few

5   frayed fibers in that location.

6        Q.    And if you could, using State Exhibit 209,

7   demonstrate how this would have sat on Officer Hawkins' body

8   in relation to how -- when the bullets were fired.

9        A.    These panels are designed to cover the entire

10  chest cavity.  And they typically, if you are sitting down,

11  they tend to ride up fairly high because the lap is pushing

12  up on them.  So they tend to ride up underneath the chin,

13  higher up on the chest, generally in this position.

14       Q.    The defect that we see at the top here, which

15  you said was kind of a nick?

16       A.    Yes.

17       Q.    Would that be consistent with bullet wound No.

18  6 that penetrated the chin and then went down into the neck

19  and into the chest cavity?

20       A.    Yes, it is.

21       Q.    Especially if Officer Hawkins had his chin

22  down toward his chest?

23       A.    Yes.

24       Q.    And then also where the slug was taken out

25  here, did that correspond with the defect that was in

1   Officer Hawkins' shirt?

2          A.      Yes, it did.

3          Q.      The torn defect here in the pocket?

4          A.      The defect in the shirt is located right here

5   in the pocket.  There's a bullet hole through the pocket

6   here which went through the ballistic carrier, the blue, and

7   into the vest.

8          Q.      Now, did you conduct an examination on this

9   shirt to try to determine range of fire?

10         A.      Yes, I did.

11         Q.      And would you tell the jury what the results

12   of your examination were?

13         A.      Yes.  First of all, I identified numerous

14   different bullet holes in the shirt.  One is a small defect

15   in the upper right where the bullet, the fragment, struck

16   the shirt.  There was one flake of gunpowder approximately

17   an inch and a half to two inches from that hole, which

18   really is insignificant as far as giving a range of fire.  A

19   single particle is not enough residue to give a range of

20   fire.

21                 But in this location there's a bullet

22   entry hole that was surrounded by a very or fairly dense

23   pattern of gunpowder residue, mostly to the left side of the

24   bullet defects.  Based on the analysis of the gunpowder

25   pattern, that would be consistent with a gunshot in the

1   range of approximately six inches to about a foot and a

2   half.   There are then numerous --

3        Q.     When you say six inches to a foot and a half,

4   are you talking about from the target where the bullet

5   struck to the muzzle of the weapon?

6        A.     Yes.  From the exiting portion of the barrel,

7   muzzle of the weapon, to the actual clothing.  So it's from

8   the end of the barrel to the clothing.

9        Q.     All right.

10       A.     There are then several bullet defects in the

11  left sleeve.  It's where a bullet or bullets pass through

12  folds in the fabric, leaving a pattern of multiple bullet

13  holes.  There's gunpowder surrounding those defects which

14  would also be in a range of approximately six inches to

15  about a foot and a half.

16                 There are bullet defects in this patch

17  over here.  There's a missing section of fabric, which was

18  compared to the -- earlier I talked about a piece of fabric

19  that was compared, came from over here.  Then in the back of

20  the shirt, there are two bullet entry holes.

21       Q.     Okay.  Let's talk about those for a moment.

22  Did you see a gunpowder pattern in relation to these two

23  bullets that struck the back of the shoulder and into the

24  back of the shirt?

25       A.     Yes.  There were two individual gunpowder

1  patterns surrounding each one of those defects.  A pattern

2  of gunpowder particles indicates a fairly close range of

3  gunshot.  And what I saw here would fall into a range of

4  about six inches to a foot and a half between the muzzle end

5  of the gun to the clothes.

6          Q.      That powder pattern that you saw, did you also

7  see that on the inner layer of the clothing?

8          A.      Yes, I did.

9          Q.      On the long johns as well as the T-shirt?

10         A.      Yes, I did.

11         Q.      In fact, in this particular situation in

12  regard to the gunshot wound in the back and the shoulder,

13  did that pattern increase on the undergarments?

14         A.      Yes.   There was actually more gunpowder on the

15  innermost T-shirt than there was on the outer uniform shirt.

16         Q.      And what does that tell you?

17         A.      That tells me that the gun was close enough to

18  the clothing so that the gunpowder exiting the weapon, it

19  comes out at a very high velocity.   It was able to impact

20  the uniform shirt and penetrate through the long john shirt

21  all the way into the inner T-shirt, which would tend to show

22  that that range of fire is actually to the closer end of the

23  six inches, rather than the foot and a half distance.

24         Q.      Using State Exhibit 178, if you could, show

25  the jury exactly what you are talking about on the range of

1    fire, close range of about six inches.  Let me ask you to

2    step around so all the jurors can see.

3         A.    As I said, the range of fire is from the end

4    of the barrel, which the muzzle end of the barrel, to the

5    fabric.  And for each one of these shots the range being

6    about six inches, between six inches and a foot and a half,

7    probably closer to six inches, would be probably in this

8    range right here.  Six inches here out to about a foot and a

9    half, which would be right here.  And that's for both this

10   hole and this hole.

11        Q.    And then, finally, did you check to see if

12   there was any residue here with this, what we now know is an

13   exit hole?

14        A.    Yes, I do.

15        Q.    What were your findings there?

16        A.    There was a partial pattern of gunpowder on

17   the left side of the bullet defects in this -- approximately

18   in this area here, which normally would indicate a bullet

19   entry hole, because the gunpowder, as gunpowder leaves the

20   weapon, it's going to deposit on the first interposed target

21   between the gun and the clothing or the victim.  So I've got

22   a gunpowder splatter here, which in my original examination

23   I believed to be a bullet entry hole, but subsequently found

24   out that that's a bullet exit hole from a shot coming

25   through Officer Hawkins' head.

83

1    Q.    What is another explanation, then, of how that

2    gunpowder residue would have been left in that area?

3    A.    That may have been overspray from one of the

4    other gunshots from somewhere over here or over here, the

5    gunpowder coming across the top of the shoulder depositing

6    on the back of the shoulder, the left shoulder.

7    Q.    Okay.  Now, you also examined Officer Hawkins'

8    uniform pants; is that correct?

9    A.    Yes, I did.

10    Q.    Did you find damage to the pants that would be

11    consistent with being run over by a vehicle?

12    A.    Yes, I did.

13    Q.    Let me show you State Exhibit 236.  What do we

14    see there?

15    A.    This is Officer Hawkins' uniform pants.  And

16    the pants are cut up.  That's typically what the EMS

17    personnel do.  But on the pants you can see these scuff

18    marks right here which would be up around the waistline and

19    then down here down the legs.  They are different scuff

20    marks.  They are rips and tears within the scuffed area.

21    Q.    No. 237, does that show the other side?

22    A.    Yes, it does.  And these scuff marks here as

23    well as here.

24    MR. SHOOK:  We'll pass the witness, Your

25    Honor.

1          MR. SANCHEZ:  We have no questions of

2    this witness, Your Honor.

3          THE COURT:  Thank you, sir.  You may

4    stand down.

5          MR. SHOOK:  May this witness be excused?

6          MR. SANCHEZ:  We have no objection.

7          THE COURT:  He may.

8          MR. SHOOK:  Call James Garcia.

9          <u>JAMES GARCIA</u>,

10   having been duly sworn, was examined and testified as

11   follows:

12                  <u>DIRECT EXAMINATION</u>

13   <u>BY MR. SHOOK</u>:

14        Q.    Would you tell us your name, please.

15        A.    James Daniel Garcia.

16        Q.    And how are you employed, sir?

17        A.    Employed with the Texas Department of Criminal

18   Justice.

19        Q.    What do you do with them?

20        A.    I'm a Sergeant.

21        Q.    How long have you been employed with the Texas

22   Department of Criminal Justice?

23        A.    Going on ten years now, sir.

24        Q.    What unit are you assigned?

25        A.    The John B. Connally Unit.

85

1   Q.   How long have you worked there?

2   A.   Approximately five years.

3   Q.   Sergeant Garcia, let me turn your attention

4   back to December 13th of 2000.  Were you employed at the

5   unit at that time?

6   A.   Yes, sir.

7   Q.   And what were your duties at that time?

8   A.   At the time I was the purchasing supervisor.

9   Q.   And on that date of December 13th, 2000, was

10  there an escape from the Connally Unit?

11  A.   Yes, sir, there was.

12  Q.   And does that involve seven inmates?

13  A.   Yes, it did.

14  Q.   Looking at the exhibit just over your right

15  shoulder, are those the photographs and names of the seven

16  individuals that escaped from the Connally Unit?

17  A.   Yes, it is, sir.

18  Q.   And did that include Patrick Murphy who we see

19  in the upper right-hand corner?

20  A.   Yes, sir.

21  Q.   All right.  As a result of that breakout, were

22  you asked to do an inventory of items that were taken during

23  the escape?

24  A.   Yes, sir, I was.

25  Q.   And was that part of your duties to maintain

1 inventory, that sort of thing?

2      A.   Yes, sir.

3      Q.   What types of items were taken during the

4 breakout?

5      A.   During the escape there was one Remmington 870

6 police Magnum shotgun, there was one Colt AR-15 assault

7 rifle, and there were 14 Smith & Wesson .357 revolvers.

8      Q.   Okay.  Now, do you maintain for any weapon

9 that's there at the prison, does it have serial numbers and

10 TDCJ identification markers on them?

11      A.   Yes, sir.  Each weapon is identified with two

12 numbers.

13      Q.   All right.  Let me show you what has been

14 marked as State Exhibits 259 and 260.  Are these -- do these

15 posters reflect the types of weapons that were taken and

16 their serial numbers and TDCJ numbers?

17      A.   Yes, sir, it does.

18      Q.   And this is information that you determined

19 yourself from the records there at the prison?

20      A.   Yes, sir.

21           MR. SHOOK:  Your Honor, at this time we

22 offer State Exhibits 259 and 260.

23           MR. SANCHEZ:  We have no objection, Your

24 Honor.

25           THE COURT:  Nos. 259 and 260 shall be

1    admitted.

2        Q.    (By Mr. Shook)  First let me show you State

3    Exhibit 259.  The information contained here, are these the

4    two long guns that were taken during the escape?

5        A.    Yes, sir.

6        Q.    No. 1, does that represent the AR-15 Colt

7    Sport Target model?

8        A.    Yes, sir.

9        Q.    There are two individual unique numbers that

10   were assigned to each weapon; is that right?

11       A.    Correct.  There's a manufacturer's serial

12   number, as well as an agency's property number.

13       Q.    And where would they be placed on the weapons?

14       A.    They are stamped physically on the body of the

15   weapon.

16       Q.    Okay.  Now, the AR-15 Colt Sport Target model,

17   what type of weapon is that?

18       A.    That's a 223 caliber assault rifle.  It's the

19   law enforcement version of the M16.

20       Q.    And then the other gun that was taken, the

21   long gun, was a Remington 870 P Express 12-gauge shotgun; is

22   that right?

23       A.    Yes, sir.

24       Q.    Did you also determine how much ammunition was

25   taken at the time for these two weapons?

1    A.    Yes, sir, we did.  The shotgun, there were

2   five rounds .12 gauge double aught buckshot.  And for the

3   assault rifle there were 15 rounds in the clip.  For the

4   revolvers there was 98 rounds of .38 caliber.

5    Q.    Let me show you State Exhibit 260.  Does this

6   poster reflect the 14 revolvers that were taken and their

7   individual serial numbers as well as TDCJ numbers?

8    A.    Yes, sir.

9    Q.    And they were all the same type of weapon; is

10  that right?

11   A.    Yes, sir.

12   Q.    And how much -- what type of ammunition was

13  taken along with that?

14   A.    There were .38 caliber plus P ammo.  There was

15  98 rounds taken.

16   Q.    I'll show you State Exhibit 178.  Does that

17  appear to be one or could be one of the .357s that was

18  taken, would be that type of weapon?

19   A.    Yes, sir, it is.

20   Q.    And there was a total of 98 rounds taken?

21   A.    98 rounds.

22        MR. SHOOK:  We'll pass the witness.

23        MR. SANCHEZ:  No questions, Your Honor.

24        THE COURT:  Thank you, Mr. Garcia.  You

25  may stand down.

```
 1                    MR. SHOOK:  May this witness be excused?

 2                    MR. SANCHEZ:  That's fine with us, Your

 3  Honor.

 4                    THE COURT:  He may.

 5                    MR. SHOOK:  Call Steve Bode.

 6                         STEVE BODE,

 7  having been duly sworn, was examined and testified as

 8  follows:

 9                    DIRECT EXAMINATION

10  BY MR. SHOOK:

11       Q.    Would you tell us your name, please.

12       A.    My name is Steve Bode.

13       Q.    And where do you reside, sir?

14       A.    Currently in Colorado Springs.

15       Q.    Okay.  Have you -- how long have you lived in

16  Colorado?

17       A.    Off and on since 1968.

18       Q.    Let me turn your attention to January of 2001.

19  Were you living up in Colorado then?

20       A.    Yes.

21       Q.    And what town were you living in?

22       A.    Woodland Park.

23       Q.    Where is Woodland Park located?

24       A.    Approximately 18 miles from Colorado Springs.

25       Q.    Okay.  And is it a big town?  Small town?
```

```
1         A.      It's a pretty small town.
2         Q.      Where were you living in Woodland Park at that
3    time?
4         A.      At the Coachlight Motel and RV Park.
5         Q.      And did you have a trailer there that you
6    lived in?
7         A.      Yes, sir.
8         Q.      And what were your duties or what was your
9    occupation back then at the RV park?
10        A.      I was the nighttime manager and caretaker.
11        Q.      Okay.  Because of that were you on the
12   property every day, both day and night?
13        A.      Yes, sir.
14        Q.      Did you have interaction with the people that
15   stayed there?
16        A.      Yes, sir.
17        Q.      And what type of folks would you have come
18   stay at the RV park?
19        A.      Mostly travelers and people that are traveling
20   in their RVs or just coming, bike tourists, and stuff like
21   that.
22        Q.      Is the RV park located kind of actually on a
23   mountainside there?
24        A.      Yes, sir.
25        Q.      How long would people stay there at the park?
```

1     A.     Well, I was there monthly, but basically

2   anytime from one day to a couple of months.

3     Q.     Okay.  Now, let me turn your attention to New

4   Year's Eve of 2000.  Did some individuals come in, in an RV

5   on that particular day?

6     A.     Yes, sir.

7     Q.     And were you present when they arrived?

8     A.     Yes, sir.

9     Q.     Looking at that exhibit over your right

10  shoulder, State Exhibit 44, are those the individuals that

11  came into the park on that day?

12     A.     Yes, sir.

13     Q.     And did, over the next three weeks, were they

14  staying in the RV park?

15     A.     Yes, sir.

16     Q.     Did you, in fact, that day assist them in

17  parking their RV and securing a spot for them?

18     A.     Yes, sir, I did.

19     Q.     Did you have interactions with all the

20  individuals at some point in time over the next three weeks?

21     A.     Yes, sir.

22     Q.     Now, who was it you dealt with mostly that

23  first day when they first came into the RV park?

24     A.     Mr. Harper and Mr. Rivas.

25     Q.     Okay.  And at that time -- and is that how

1   Mr. Harper and Mr. -- well, is that how Mr. Rivas looked at

2   that time?

3         A.    Yes, sir.

4         Q.    With the blond hair and that kind of goatee?

5         A.    Yes, sir.

6         Q.    What names were Mr. Harper and Mr. Rivas going

7   by at that time?

8         A.    George Rivas was going under Brother Luke and

9   Larry Harper was going under the name of Brother Jim.

10        Q.    Okay.  And why were they using the names

11  Brother Luke and Brother Jim?

12        A.    They claimed to be traveling missionaries.

13        Q.    Were the whole group supposed to be traveling

14  missionaries?

15        A.    Yes, sir.

16        Q.    And were they in any other types of cars, any

17  other cars, other than the RV that they were in?

18        A.    Yes, sir.

19        Q.    What types of cars were they?

20        A.    They had a two-toned blue, sort of bluish

21  silver Suburban or Chevy Suburban or GMC.

22        Q.    Okay.  Let me show you some photographs.

23  First of all, State Exhibit 188 and 189, do you recognize

24  those as photographs of being parts of the Coachlight RV

25  Park?

1    A.    Yes, sir.

2    Q.    And State Exhibit 772, is that an aerial view

3    of the park?

4    A.    Yes, sir.

5    Q.    And State Exhibits 773, 774, and 775, are

6    those vehicles that you recognize that these individuals

7    used while staying at the park?

8    A.    Yes, sir.

9         MR. SHOOK:  Your Honor, at this time we

10   offer 188, 189, as well as 772 through 775.

11        MR. SANCHEZ:  No objection.

12        THE COURT:  Nos. 188, 189, Nos. 772

13   through 775 shall be admitted.

14   Q.    (By Mr. Shook)  Let me show you No. 189 first.

15   Does this show the RV park just off the highway?

16   A.    Yes, sir, it does.

17   Q.    And what's the number on that particular

18   highway?

19   A.    It's US-24.

20   Q.    That's the highway that comes out of Colorado

21   Springs?

22   A.    Yes, sir.

23   Q.    Then the next photograph, does that show the

24   office for the RV park?

25   A.    Yes, sir.

```
 1          Q.      Now, where did the residents stay once they

 2   checked in?

 3          A.      Well, we have several spaces in the very front

 4   right there.  You can see part of them, and all the way up

 5   the hillside.

 6          Q.      So we can see one type of trailer or RV right

 7   at that location?

 8          A.      Yes, sir.

 9          Q.      Do the other spots just go up this

10   mountainside?

11          A.      Yes, sir.

12          Q.      Let me show you State Exhibit 772.  Is this an

13   aerial view of the RV park?

14          A.      Yes, sir, it is.

15          Q.      What's this road, highway, right here?

16          A.      That's US-24.

17          Q.      Okay.  And the entrance to the park is where?

18          A.      Back to your right there.

19          Q.      Okay.  These buildings here, what would that

20   be?

21          A.      That's the office and the motel is to the

22   left.

23          Q.      And is there a road that just meanders up the

24   mountainside?

25          A.      Yes, sir.
```

95

1    Q.    Kind of this direction?

2    A.    Yes.

3    Q.    All right.  And then the top of the RV park,

4 where is that located?

5    A.    Right about where your deal is, maybe a little

6 lower.

7    Q.    Okay.  Now, on the day that they drove in,

8 they were driving an RV, as well as, you said, a Suburban?

9    A.    Yes, sir.

10    Q.    Let me show you State Exhibit 775.  Is that a

11 photograph of the Suburban they came into the park with?

12    A.    Yes, sir.

13    Q.    Now, at a later time did they come into the

14 park with some other vehicles?

15    A.    Yes, sir, they did.

16    Q.    In fact, did they get rid of the Suburban?

17    A.    Yes, sir.

18    Q.    What type of vehicles did you see them driving

19 later on?

20    A.    They were driving a gray Jeep Cherokee and a

21 maroon Ford E-150 conversion van.

22    Q.    Let me show you State Exhibit 192.  Is this a

23 photograph of the RV that they were staying in?

24    A.    Yes, sir.

25                MR. SHOOK:  We'll offer State Exhibit

192.

             MR. SANCHEZ:  We have no objection, Your
Honor.

             THE COURT:  No. 192 shall be admitted.

        Q.    (By Mr. Shook)  Now, that's the photograph of
the actual RV as it appeared there in the RV camp; is that
right?

        A.    Yes, sir.

        Q.    Let me show you State Exhibit 773.  Is this a
photograph of the van that you saw them in?

        A.    Yes, sir, it is.

        Q.    And then the other vehicle, 774, is that the
Jeep Cherokee that you saw them in?

        A.    Yes, sir.

        Q.    In particular you see the photograph of
Patrick Murphy behind you?

        A.    Yes, sir.

        Q.    Was he one of the individuals that was staying
in the RV?

        A.    Yes, sir.

        Q.    Where would you see him in and around the
campsite?

        A.    Um, I saw him all over the campsite and a lot
of times I would see him and Donald Newbury driving in and
out of the park in the van.

1    Q.    Okay.  State Exhibit 773, is that the vehicle

2  you usually saw him in?

3    A.    Yes, sir.

4    Q.    And we see in the photograph there he has

5  blond hair, as well as a beard.  Is that how he appeared at

6  the time he was in the RV park?

7    A.    Yes, sir.

8    Q.    Do you see Mr. Murphy here today in the

9  courtroom?

10    A.    Yes, sir.

11    Q.    Could you point out where he's sitting,

12  please.

13    A.    Sitting at the end of the table.

14    Q.    The man in the gray suit with the yellow tie?

15    A.    Yes, sir.

16         MR. SHOOK:  Your Honor, if the record

17  could reflect the witness has identified the defendant here

18  in open court.

19    Q.    (By Mr. Shook)  Did you, in fact, you said

20  that you assisted them in parking their RV into one of the

21  spots on that first day; is that right?

22    A.    Yes, sir.

23    Q.    Let me show you State Exhibit 772.  What area

24  of the mountain did you park them?

25    A.    It was straight up the hill.  There's a

cottage approximately halfway up the hill on the left side
of the photograph, and they were straight across from that
cottage.

Q.    And how long did they park there?

A.    Between one and five days.

Q.    After that did they request to move to another
spot?

A.    Yes, sir.

Q.    And where was that?

A.    It was up the hill, the highest point that we
have.

Q.    The highest campsite?

A.    Yes, sir.

Q.    Do you remember the number?

A.    No. 17.

Q.    Did you help actually park their RV there?

A.    Um, no, sir.  I assisted in locating, in
relocating it for them.

Q.    Okay.  And Mr. Murphy and Mr. Newbury, you saw
them in that van many times driving in and out of the park?

A.    Yes, sir.

Q.    Did you, in fact, do some work on that
particular van?

A.    Yes, sir.

Q.    What type of work did you do?

99

1    A.      Helped tighten the power steering belt.

2    Q.      At some point in time did you -- did some of
3  the individuals leave the park for a few days?

4    A.      Yes, sir.

5    Q.      Who was that?

6    A.      Larry Harper and George Rivas.

7    Q.      While they were gone were you ever asked to
8  deliver a message to the others in the RV?

9    A.      Yes, sir.

10   Q.      And how many times did you do that?

11   A.      Twice.

12   Q.      Would you actually go up to the RV and speak
13  to them?

14   A.      Yes, sir.

15   Q.      Did you actually -- were you able to look into
16  the RV?

17   A.      Yes, sir.

18   Q.      When you delivered those messages, who was in
19  the RV?

20   A.      Patrick Murphy was sitting in the passenger
21  side seat and Donald Newbury was sitting on the floor of the
22  RV, just as you open the door.

23   Q.      Did you ever see the individuals outside
24  socializing at all at nights?

25   A.      Yes, sir.

1    Q.    And how many times did you see them do that?

2    A.    A couple of times.  There was one time when

3  they was partying.

4    Q.    When you say they were partying, what did you

5  see?

6    A.    They were sitting out at the picnic table

7  behind the RV park or behind the RV with a fire going and

8  drinking beer.

9    Q.    How do you know they were drinking beer?

10    A.    Because I cleaned up the camps and it was

11  pretty obvious.

12    Q.    All right.  Now, were you present on the day

13  that the police officers moved in and made some arrests?

14    A.    Not at that time, no.

15    Q.    Okay.  Prior to that were there sometimes

16  meetings held at the park on Thursday nights?

17    A.    Yes.

18    Q.    What types of meetings were those?

19    A.    Actually, I believe, it was Wednesday nights.

20  We had the Bible studies.

21    Q.    Where was the Bible study held?

22    A.    Upstairs above the office.

23    Q.    Did any of the individuals that were staying

24  in the RV come to any of those meetings?

25    A.    Just one.

1    Q.    Who was that?

2    A.    Larry Harper.

3    Q.    And how many meetings did he attend?

4    A.    Um, three, I believe.

5    Q.    Okay.  And did he take part in the Bible

6 study, that sort of thing?

7    A.    Yes.

8    Q.    Did any of the other individuals who were

9 supposedly there as Christian missionaries ever come to the

10 Bible meetings?

11    A.    No, sir.

12    Q.    And when you went and delivered this message

13 to the people in the RV and saw Mr. Murphy and Mr. Newbury,

14 did anything catch your attention when you delivered that

15 message?

16    A.    Yes, sir.

17    Q.    What was that?

18    A.    Mr. Newbury was sitting on the floor with his

19 slacks on, but he did not have a shirt on and I saw a lot of

20 tattoos on him.

21    Q.    Okay.  Why did that catch your attention?

22    A.    They didn't look like tattoos that a Christian

23 missionary would have.

24    Q.    All right.

25              MR. SHOOK:  That's all the questions that

1  I have at this time, Judge.

2                    CROSS-EXAMINATION

3  BY MR. SANCHEZ:

4       Q.    Mr. Bode, in the three weeks that you say

5  these individuals were at the camp, the RV park, how much

6  interaction did you have with Patrick Murphy?

7       A.    I had a little bit of interaction with him.  I

8  talked to him a couple of times.

9       Q.    More than once?  I mean, more than four times?

10      A.    Probably three or four times.

11      Q.    Three or four times over a three-week period?

12      A.    Yes, sir.

13      Q.    Did you have any problems with Mr. Murphy?

14      A.    No, sir.

15      Q.    Did he cause any trouble for anybody?

16      A.    No, sir.

17      Q.    Did you have any complaints about him?

18      A.    No, sir.

19            MR. SANCHEZ:  That's all I have, Your

20  Honor.  Pass the witness.

21            MR. SHOOK:  That's all the questions that

22  we have, Judge.

23            THE COURT:  Thank you, Mr. Bode, you may

24  stand down.

25            MR. SHOOK:  May he be excused, Your

1    Honor?

2                          MR. SANCHEZ:  That's fine with us, Your

3    Honor.

4                          THE COURT:  He may.

5                          MR. SHOOK:  Call Sheriff Fehn.

6                          FRANK FEHN,

7    having been duly sworn, was examined and testified as

8    follows:

9                          DIRECT EXAMINATION

10   BY MR. SHOOK:

11       Q.     Would you state your name, please.

12       A.     Frank Fehn, F-E-H-N.

13       Q.     And how are you employed, sir?

14       A.     I'm retired, sir.

15       Q.     Prior to your retirement, how were you

16   employed?

17       A.     I was the elected Sheriff of Teller County,

18   Colorado.

19       Q.     And how long had you been the elected Sheriff

20   for Teller County?

21       A.     I was elected in '98 and served 14 months

22   prior to that as an appointed Sheriff.

23       Q.     What were your duties as Sheriff?

24       A.     Law enforcement, civil process, and keeper of

25   the jail.

1          Q.      Have you had prior law enforcement experience

2    prior to being elected Sheriff?

3          A.      Yes, sir, I did.

4          Q.      What type of experience was that?

5          A.      I was a peace officer with the Police

6    Department, County of Nassau, New York, for 20 years, 8

7    years as a patrol officer, 12 years as a detective.  Of

8    those 12 years the last seven plus, I was a homicide

9    investigator.

10         Q.      And now going back to Teller County, where is

11   that in Colorado, geographically?

12         A.      It's about 105 miles south and west of Denver,

13   24 miles due west of Colorado Springs.

14         Q.      What is the county seat in Teller County?

15         A.      Cripple Creek.

16         Q.      Is it the cities or towns in Teller County are

17   very large or more of a rural area?

18         A.      It's more rural, a bedroom community for

19   Colorado Springs.

20         Q.      How large is your department, or how large was

21   your department at that time?

22         A.      Approximately 70-odd people.

23         Q.      Let me turn your attention to January 21st of

24   2001 on a Sunday, and ask if some citizens from Teller

25   County came to your offices on that afternoon?

1      A.      They came in that evening, sir.

2      Q.      Okay.  And is Woodland Park one of the towns

3  in Teller County?

4      A.      It's one of the cities.

5      Q.      Okay.  Is it a very large city?

6      A.      Approximately 7,000 people.

7      Q.      The Coachlight RV Park, is that actually

8  located in the city?

9      A.      It is not.  It's in the unincorporated portion

10  of the county.

11      Q.      That would be part of your jurisdiction as

12  Sheriff?

13      A.      Yes, sir.

14      Q.      Did you, in fact, come to your offices that

15  evening to speak with these residents of the RV park?

16      A.      Yes, sir.

17      Q.      Did they give you valuable information in

18  regards to some possible suspects that were out of Texas?

19      A.      They gave me information that I was not aware

20  of from the bulletins that had been issued by the State of

21  Texas and the Federal Government.

22      Q.      Okay.  Previous to them talking to you, were

23  you aware of seven men being wanted out of Texas for escape

24  charges as well as capital murder from Irving, Texas?

25      A.      We had received what we call a bolo, be on the

1  lookout for, and also notifications by the media of the

2  escapees from Texas.

3        Q.   Once you talked with them, you felt that they

4  had valuable information for you?

5        A.   Yes, sir.

6        Q.   What did you do then?

7        A.   My tactical sergeant, Sergeant Bright, and I,

8  got in an unmarked vehicle and responded to the Coachlight

9  RV Park.

10       Q.   In fact, did you contact any of the

11 authorities in Texas?

12       A.   Yes, sir.  We contacted the task force that

13 had been formed as a result of these escapees.

14       Q.   Okay.  Did you confirm there were warrants out

15 for those charges?

16       A.   Yes, sir.

17       Q.   Okay.  Then you went to the RV park that night

18 yourself?

19       A.   Yes, sir.

20       Q.   What was your purpose in going there?

21       A.   To find the location of their particular site

22 to see what it would be like to approach it tactically,

23 whether it would be easy, difficult.  We drove within

24 approximately 200 feet of it.  We observed that there was

25 only one vehicle there.  With the information we had

1    received was there should be two vehicles there.

2                    We then went to the east side of the RV

3    park to see if we could approach it that way.  We went to

4    the north side and found that it would be a tactical

5    nightmare to attempt to do this at night.

6         Q.    Okay.  What two vehicles were you looking for

7    that you felt would be at the RV?

8         A.    We were informed of a silver Jeep and an older

9    model brown with a stripe Ford van.

10        Q.    Was the van there at that time?

11        A.    It was not.

12        Q.    After making that determination that it would

13   be unsafe to assault the vehicle, the RV, that evening, what

14   did you do then?

15        A.    Went back to my office, contacted the Woodland

16   Park Police Department to tell them that we were going to

17   contain the RV park.  By that, I mean we're going to have

18   people at all the exits and entrances to see if the van came

19   back or whether the Jeep had left.

20        Q.    Did you call on other law enforcement agencies

21   to assist you in these matters?

22        A.    I did, sir.  I contacted the City of Colorado

23   Springs Police Department and the El Paso County Sheriff's

24   Office and the FBI from Denver.

25        Q.    And did members of those departments come to

1    your headquarters there at Teller County?

2         A.    Yes, sir.

3         Q.    That evening did you come up with a plan as to

4    how you were going to approach the suspects?

5         A.    We received information at least one or

6    possibly two of the suspects were in the habit of coming

7    down for coffee in the RV office.  So we decided that this

8    would be the best time for us to make an apprehension, if

9    possible, would be to separate them, take them if they came

10   down for coffee and then find out what conditions were

11   within the RV itself.

12        Q.    Okay.  What plan did you come up with to get

13   into the RV park?

14        A.    I have an RV of my own.  I decided that it

15   would be best if I went home, changed the license plates on

16   my RV from the State of Colorado, because information was

17   received that these folks had been in our county for about

18   20 something days.  They would be aware of what our local

19   license plates looked like.

20              I put state of Utah plates on my RV, came

21   back to the office, took 14 members of the FBI in the RV,

22   went back to the RV park, the Coachlight.  Seven members got

23   out of my RV into the office to wait for those that were

24   coming for coffee about 9:00.

25              Teller County was responsible for any

1  movement westward on the local highway, which is 24.  El

2  Paso County was responsible for any movement eastbound on

3  Highway 24.

4      Q.    Were you facing some problems as far as

5  communicating with all the officers, using the regular type

6  of communications you used on one of these missions?

7      A.    The information that we received was that the

8  individuals had radios with local law enforcement

9  frequencies.  We decided not to use radios.  We used

10 basically cell phone traffic.

11     Q.    Now, after you had gotten a place inside the

12 RV park, did any of the individuals actually come down for

13 coffee that morning?

14     A.    No, sir, they did not.

15     Q.    What's the next thing that happened there?

16     A.    At approximately 10:00, the Jeep exited the RV

17 park with three subjects in it.  It went out onto the

18 highway and it was apprehended approximately a mile to a

19 mile and a half east of the RV park by El Paso and Teller

20 County deputies.

21     Q.    Once that occurred did you get information

22 confirming that these were, indeed, the men you were looking

23 for?

24     A.    We received information back that individuals

25 by the name of Rodriguez, Garcia, and Rivas were occupants

1    in the vehicle and that there were two more occupants in the

2    RV.  We then went to the RV.  I drove my RV to within about

3    100, 150 feet of their RV and everybody exited and contained

4    and surrounded their RV.

5         Q.    Let me show you some photographs which have

6    been marked as State Exhibit 777, 778, and 779, as well as

7    780.  Are those photographs of how the RV was positioned

8    that morning when you secured it?

9         A.    Yes, sir.

10        Q.    Also, let me show you State Exhibits 261

11   through 267.  Do those also show photographs, aerial

12   photographs, as well as photographs of the RV and a diagram

13   of the RV park?

14        A.    Yes, sir, it does.

15             MR. SHOOK:  Your Honor, we'll offer State

16   Exhibits 261 through 267, as well as 777 through 780.

17             MR. SANCHEZ:  No objection.

18             THE COURT:  Nos. 261 through 267 and 777

19   through 780 shall be admitted.

20        Q.    (By Mr. Shook)  Let me show you State Exhibit

21   777.  As you approach the RV, is this as close as you got to

22   it at the time you parked your RV?

23        A.    Yes, sir, it is.

24        Q.    And then the FBI, as well as the other Teller

25   County deputies deployed from the RV?

1    A.    Yes, sir.

2    Q.    Once the officers were deployed around the RV,

3  were there any instructions shouted into the RV?

4    A.    Yes, sir.  Deputy Kerr from Teller County

5  identified ourselves as being representatives of the

6  Sheriff's Office, commanded them to come out of the RV with

7  their hands raised, that our intention was not to hurt them.

8  Our intention was to take them into custody.  And

9  subsequently a Mr. Halprin exited the RV.

10    Q.    Do you recall how long he was in the RV before

11  he exited?

12    A.    Fifteen minutes to a half hour.

13    Q.    And how did he exit the RV?

14    A.    He came out wearing trousers and a T-shirt.

15  He was told to stop, to raise his hands, to raise his

16  T-shirt, so we could observe the waistband of his trousers,

17  beltline.  He was then told to get on his knees, to come

18  backwards towards my location.  And when he got to my

19  location, he was taken to his feet and taken into custody.

20    Q.    Okay.  And Randy Halprin is the man in the

21  middle, I guess, on the bottom row; is that right?

22    A.    This one here, yes, sir.

23    Q.    The photograph we see on the monitor, does

24  that show the area where Randy Halprin made his way down?

25    A.    That's exactly where he was taken into

1  custody, between those trees.

2       Q.      And State Exhibit 267, does this show kind of

3  the road looking down from the RV?

4       A.      Yes, sir, it does.

5       Q.      That shed there, is that the area that you

6  were located in?

7       A.      Yes, it is.

8       Q.      Once he was taken into custody, did you speak

9  to him at all at that time?

10      A.      Yes, sir, I did.

11      Q.      And what information did you say to him?

12      A.      He informed me that Mr. Harper, who was still

13  in the RV, wanted to surrender to us with a condition, that

14  we contact his father and he wanted to speak to his father

15  on a cell phone before he would surrender.  And I observed

16  that he had only one shoe on and he had a sandal on his

17  other foot.  And he informed me that he had injured his

18  foot.  And so consequently I directed two of my deputies to

19  take him to a medical center for medical treatment.

20      Q.      On that same day was he returned from the

21  medical center and placed in the Teller County Jail?

22      A.      Yes, sir, he was.

23      Q.      After Mr. Halprin was taken into custody, what

24  was done with -- what efforts were made to try to get Larry

25  Harper to exit the RV?

1    A.    We continued to explain to him that we were

2  attempting to contact his father, that we would permit him

3  to use the cell phone.  And, again, we continued to tell him

4  to come out, that our intention was not to hurt him, that if

5  he surrendered, he would not be hurt.  And subsequently we,

6  depending upon a location you were in, I only heard one

7  gunshot, but others say they heard two gunshots.

8    Q.    Was entry eventually made into the RV?

9    A.    Yes, sir, it was.

10   Q.    And how was that done?

11   A.    An agent from the FBI discharged three tear

12 gas rounds by shotgun into the RV and then the -- waited a

13 moment or three for the tear gas to take effect, forced a

14 lock on the RV door and made entry.

15   Q.    At that time was the body of Larry Harper

16 found in the RV?

17   A.    Yes, sir, it was.

18   Q.    Did he appear to be deceased?

19   A.    Yes, sir, he was.

20   Q.    Was a search done of the RV at that time?

21   A.    No, sir, it was not.

22   Q.    Was the RV secured and then at a later time

23 did the FBI search team come there and do a thorough search?

24   A.    I directed everybody to exit the RV, placed

25 Deputy Saine (phonetic) to take custody of the RV and to

1    protect it and secure it until the FBI did their search.

2        Q.    So that evening you had Larry Harper deceased

3    in the RV and you had four suspects in your jail; is that

4    correct?

5        A.    Yes, sir.

6        Q.    That would be George Rivas, Michael Rodriguez,

7    Randy Halprin, and Joseph Garcia?

8        A.    That is correct, sir.

9        Q.    At that point in time, you still had two

10   suspects that were on the loose?

11       A.    Yes, sir.

12       Q.    Donald Newbury and Patrick Murphy?

13       A.    Yes, sir.

14       Q.    And then the van, you didn't know the

15   whereabouts of the van at that time?

16       A.    We did not.

17           MR. SHOOK:  We'll pass the witness.

18                    CROSS-EXAMINATION

19   BY MR. SANCHEZ:

20       Q.    Sheriff, when Rivas, Rodriguez, and Garcia

21   were apprehended, were they pulled over on the side of the

22   road or had they stopped somewhere?

23       A.    They had pulled into a convenience store gas

24   station to get gas.  And when they pulled up, they were

25   apprehended by the Tactical Team coming from front and rear.

1    Q.    Was that a fairly peaceful apprehension of

2    those three individuals?

3    A.    Well, if you call somebody staring down a

4    barrel of a shotgun and/or an automatic weapon peaceful, I

5    guess it was peaceful.

6    Q.    In other words, they didn't try to shoot back

7    or anything like that, correct?

8    A.    They were not given the opportunity, sir.

9    Q.    So they were taken without incident, correct?

10   A.    Correct.

11   Q.    And this other individual, Halprin, was --

12   also, he gave himself up when he came out?

13   A.    That's correct.

14   Q.    He wasn't armed at that time?

15   A.    Not at the time.

16   MR. SANCHEZ:  That's all I have, Your

17   Honor.  I pass the witness.

18   MR. SHOOK:  May this witness be excused?

19   MR. SANCHEZ:  That's fine with us, Your

20   Honor.

21   THE COURT:  Thank you, Sheriff, you may

22   stand down and be excused.  Counsel, please approach.

23   (Bench conference)

24   THE COURT:  We'll stand in recess for the

25   noon hour.  We'll stand in recess until 1:30.

1        [Jury out]

2        [Jury in]

3              THE COURT:  Please be seated.

4   Mr. Wirskye, call your next witness.

5              MR. WIRSKYE:  Call Roddy Alford.

6              RODDY ALFORD,

7   having been duly sworn, was examined and testified as

8   follows:

9              DIRECT EXAMINATION

10  BY MR. WIRSKYE:

11       Q.    Deputy, can you tell us your full name.

12       A.    Roddy Alford.

13       Q.    And how are you employed, sir?

14       A.    I'm with El Paso County Sheriff's Office in

15  Colorado Springs.

16       Q.    And where is -- El Paso County encompasses

17  Colorado Springs?

18       A.    That's correct.

19       Q.    Is Teller County your nextdoor neighbor up

20  there?

21       A.    Yes, it is.

22       Q.    How long have you been a deputy with El Paso

23  County?

24       A.    Ten years.

25       Q.    And where are you currently assigned?

1    A.    I'm assigned to the high school as a school

2 resource officer.

3    Q.    What do you do there as a school resource

4 officer?

5    A.    I'm liaison for the Sheriff's Office.  I

6 prosecute -- not prosecute, I take all the crimes that occur

7 in high school.

8    Q.    Do you also have another duty with the

9 Sheriff's Department?

10    A.    SWAT, SWAT member.

11    Q.    And how long have you been on the SWAT Team?

12    A.    Eight years.

13    Q.    Before joining the Sheriff's Office, you have

14 some military background; is that right?

15    A.    Yes.  I was in the military for five years.

16    Q.    What branch?

17    A.    Army.

18    Q.    Let me direct your attention back to January

19 21st of the year 2001.  I think it was a Sunday, but did you

20 get called out on your SWAT Team?

21    A.    Yes, we did.

22    Q.    Where were you when you got the call?

23    A.    I was at my residence in Colorado Springs.

24    Q.    How many people are on your SWAT Team?

25    A.    We have a total of 15 members.

1    Q.    And y'all frequently train on a regular

2    schedule, that type thing?

3    A.    Yes, we do.

4    Q.    What type of call did you get?

5    A.    At the time we didn't -- as we got the page,

6    they didn't tell us, inform us, what the call was until we

7    got there.  And jokingly one of the guys said, "What is it,

8    the Texas Seven sighting"?  And our lieutenant said, "Yes,

9    it is."

10   Q.    So it actually turned out to be the Texas

11   Seven?

12   A.    Yes, it was.

13   Q.    Once you got the call, where did y'all meet?

14   A.    We met at our law enforcement bureau and then

15   after we met there, we headed up to Teller County.

16   Q.    You and Teller County kind of have a

17   cooperative agreement for situations like this; is that

18   right?

19   A.    That's correct.

20   Q.    Once you got to Teller County, what happened?

21   A.    Once we got there, our commander in Teller

22   County, they got together and talked over their strategy,

23   their plan, and to the following day.

24   Q.    And some of the tactical officers went up and

25   surrounded an RV at the Coachlight RV Park; is that right?

1       A.      That's correct.

2       Q.      You were not one of those officers?

3       A.      No, I was not.

4       Q.      You were assigned to one of the vehicle

5  takedown teams?

6       A.      Yes, I was.

7       Q.      How many of those teams did you have out

8  there?

9       A.      Two.

10      Q.      Why did you have two different teams?

11      A.      Because of the area and one team was

12  responsible for them traveling west and we were responsible

13  for them, if they were traveling east.

14      Q.      Once you come out of that RV park, there is a

15  US-24; is that right?

16      A.      That's correct.

17      Q.      And you go eastbound or westbound?

18      A.      That's correct.

19      Q.      And I guess two different teams, depending on

20  which way suspects went?

21      A.      Yes.

22      Q.      How many individuals are on each team?

23      A.      Probably five.

24      Q.      And how -- what were y'all riding?

25      A.      Our team was in a conversion van, which is, I

1  guess, a luxury van that -- a normal van.  And our other

2  team was in our SWAT van that has all our other equipment

3  inside of it.

4      Q.    How were you and the other officers outfitted?

5      A.    We were carrying our M16 and our duty weapon.

6      Q.    What were you wearing?

7      A.    We were wearing our black fatigues with the

8  Sheriff's Office SWAT emblem on it.

9              MR. WIRSKYE:  May I approach, Your Honor?

10             THE COURT:  You may.

11     Q.    (By Mr. Wirskye)  Deputy, let me show you a

12 series of photographs and one diagram marked for

13 identification as State 268 through 282.  We went over these

14 outside the presence of the jury; is that right?

15     A.    Yes.

16     Q.    And these photos and diagrams depict the areas

17 we're going to be talking about concerning the arrest you

18 made; is that correct?

19     A.    That's correct.

20             MR. WIRSKYE:  Your Honor, we offer

21 State's 268 through 282.

22             MR. SANCHEZ:  We have no objection, Your

23 Honor.

24             THE COURT:  Nos. 268 through 282 shall be

25 admitted.

1    Q.    (By Mr. Wirskye)   Was there a command post out

2  there for all the law enforcement that was assembled?

3    A.    Yes, there was.

4    Q.    And where was that?

5    A.    It was located behind the Safeway on Highway

6  24 in a strip mall.

7    Q.    And that was right down from the RV park; is

8  that right?

9    A.    That's correct.

10    Q.    Let me show you State 269 and let me give you

11  a laser pointer as well.   If you could kind of, using the

12  laser pointer, orient the jury as to what we're looking at

13  in that photograph.

14    A.    Here's the intersection here.   And over to the

15  left would be the strip mall, the Safeway.   And you have the

16  west here and this direction would be east and then you have

17  north and you have your south.

18    Q.    Where is the RV park located?

19    A.    RV park is located west over in this area.

20    Q.    Back in those trees?

21    A.    Yes, somewhere up in there.

22    Q.    Where were the two vehicle assault teams

23  located?

24    A.    The first, the primary vehicle assault team

25  was located over in this area here.   And the secondary, the

1    one that I was involved in, we were located over here.

2         Q.    You were on the eastbound team?

3         A.    That's correct.

4         Q.    And about 11:00 in the morning of the 22nd,

5    that Monday, did y'all get word that a vehicle had left the

6    RV park?

7         A.    That's correct.

8         Q.    And what type of vehicle was that?

9         A.    It was a gray Jeep.

10        Q.    And where did that vehicle go after it left

11   the RV park?

12        A.    After it left the RV park, it went into the

13   Safeway strip mall and I guess they dropped off some movies.

14   And once they left there, they were headed east on Highway

15   24.

16        Q.    There's a Blockbuster located in that strip

17   mall; is that right?

18        A.    That's correct.

19        Q.    It's your understanding some movies were

20   returned?

21        A.    That's correct.

22        Q.    Once they started heading eastbound, what

23   happened next?

24        A.    One they started heading eastbound, our

25   commander gave us the go that if that vehicle passed us, to

1   go ahead and follow it and if it turned into a convenience

2   store, that we were to take that vehicle down.

3         Q.     How many vehicles did you have on your team?

4         A.     Two.

5         Q.     You later came to find out there were some FBI

6   personnel behind y'all; is that right?

7         A.     That's correct.

8         Q.     How far were you able to follow the Jeep?

9         A.     Probably about half a mile.

10        Q.     And did the Jeep stop at some point?

11        A.     Yes, it did, into the Western Convenience

12  Store.

13        Q.     And let me show you State's 272 and see if you

14  recognize that?

15        A.     That's the Western Convenience Store.

16        Q.     Can you show us where the Jeep pulled in?

17        A.     The Jeep pulled right in this island here and

18  that's where the takedown took place.

19        Q.     And let me show you State's 282.  Is that kind

20  of a diagram where everyone was located during the takedown?

21        A.     Yes, it is.

22        Q.     Using that diagram, State 282, can you kind of

23  walk us through the arrest?

24        A.     Okay.  You have SWAT one, which was -- that's

25  my lieutenant.  That's a blocking vehicle.  You have the

1    suspect vehicle here and you have another SWAT 3, this

2    vehicle here, they're to contain all the people here and

3    then you have the takedown vehicle, which I was in, here.

4                        And once that vehicle pulled in, we

5    pulled in right behind.  You have your ram blocker vehicle,

6    which is SWAT 1 here, stopping their movement forward.  And

7    we're stopping their movement back.  And all five of us

8    exited the vehicle and approached the Jeep, giving those

9    guys commands, getting their hands up, Sheriff's Office, let

10   us see your hands.  And during that time we proceed to take

11   down the vehicle.

12        Q.    And a vehicle takedown is something that you

13   and your team routinely train on?

14        A.    Yes, it is.

15        Q.    In general, how were you trained at that time

16   to take down the vehicle?

17        A.    The key to it is element of surprise.  The

18   quicker you can get there before they know what happens,

19   before they can react, will depend on how well the takedown

20   goes.  During that time it was five of us.  Two guys were

21   responsible for the driver's side, which would be the driver

22   and the passenger in the back.  And then you have two other

23   guys that are responsible for the passenger's side, front

24   and rear.  And then your fifth guy is responsible for the

25   trunk area of the vehicle.

125

1      Q.     That was the plan you used that day?

2      A.     Yes, it is.

3      Q.     How many people were in that Jeep?

4      A.     Three people.

5      Q.     And your primary responsibility was the

6 driver?

7      A.     Was the driver, correct.

8      Q.     Once you get out of your car, tell us what

9 happens.

10     A.     Once we get out, like I say, we approach the

11 vehicle.  I approached the driver's side.  And at that time

12 all three occupants had their hands up and the vehicle is

13 running.  And when I asked him, does he have the vehicle

14 running or is it still in gear and he said, yes, it is.  I

15 opened the door and I tell him to keep his hands where they

16 are at and I put the vehicle in park and then shut the

17 vehicle off.

18     Q.     The person you are talking about, the driver,

19 that's George Rivas?

20     A.     That's correct.

21     Q.     Obviously, you didn't use the same tone of

22 voice out there that you used in here?

23     A.     No, I didn't.

24     Q.     What type of commands are you giving them?

25     A.     We're giving them precise commands, keep your

```
1   hands up where I can see them, don't move, Sheriff's Office,
2   keep your hands up where I can see them.
3           Q.    By the time you get that far with the driver,
4   is the rest of the vehicle surrounded?
5           A.    Yes, it is.
6           Q.    Do you have a weapon out?
7           A.    I do.  I have an M16.
8           Q.    And where is the M16 pointed with respect to
9   George Rivas?
10          A.    Once I entered the vehicle, the weapon is
11  pointed to his chest.
12          Q.    And how does he react once he sees you?
13          A.    Um, surprised.  So he doesn't say anything.
14  He just followed my commands and then before I reached into
15  the vehicle, I asked him does he have any weapons on him and
16  he says, "Yes, I have a fanny pack."  And I said, "Well,
17  keep your hands up where I can see them."
18          Q.    What did you do at that point?
19          A.    At that point in time I reached in and put the
20  vehicle in park and turned the vehicle off.
21          Q.    How were you able to keep a gun on him and
22  also reach into the vehicle and turn it off?
23          A.    Um, as you can see up here, there's an M16,
24  which is a smaller version of what I carry.
25                MR. WIRSKYE:  May I approach, Your Honor?
```

1    THE COURT:   You may.

2         Q.      (By Mr. Wirskye)  Deputy, I think you are

3    pointing to a weapon that has been marked for identification

4    as State Exhibit 317; is that correct?

5         A.      That's correct.  The weapon I use is half this

6    size.  It's a lot smaller.  So when I had my weapon in one

7    hand, I'm able to put it to his chest, reach in and put it

8    in park, and turn it off at the same time.

9         Q.      Did you have your finger on the trigger?

10        A.      No, I didn't.

11        Q.      Why not?

12        A.      Because we're not trained to have our finger

13   on the trigger, unless we're ready to engage.

14        Q.      He told you he had a weapon in his fanny pack.

15        A.      Yes, he did.

16        Q.      If he had not complied with your commands or

17   made a move to the weapon, what were you prepared to do?

18        A.      I would have shot him.

19        Q.      So he tells you he has a weapon.  You reach in

20   and turn off the car.

21        A.      Yes.

22        Q.      What happens next?

23        A.      After that I take Rivas out of the vehicle and

24   I place him onto the ground.  And I believe there's two

25   Teller County deputies there, which I give them to him -- I

```
1    give him to them, so they take control of him and then I
2    proceed around to the passenger's side where Rodriguez is at
3    the back and we proceed to move Rodriguez out of the
4    vehicle.
5         Q.    So y'all take them out one by one?
6         A.    Yes, we do.
7         Q.    And I guess you have a secondary team that
8    takes control of the suspect?
9         A.    That's correct, the arrest team.
10        Q.    Did you actually search George Rivas?
11        A.    No, I didn't.
12        Q.    You said next you moved to the rear seat
13   passenger?
14        A.    Correct.
15        Q.    And that was --
16        A.    Rodriguez.
17        Q.    What happened when you got back there?
18        A.    I had officer Cole remove him out of the
19   vehicle and then once he was placed on the ground and the
20   arrest team took control of him, we proceeded to move to
21   Garcia.  And at that time I was going to reach in and grab
22   Garcia, but he had his hands up and he kept fidgeting,
23   making fidgeting motions.  So I told him, "You need to stop
24   and obey what I'm telling you."  And at that time Deputy
25   Callahan said, "Get another officer up here without a
```

1   weapon." And then he proceeded to move him out of the

2   vehicle.

3        Q.      How did you take those fidgety motions or what

4   did it mean to you?

5        A.      To me it was an aggressive movement to me

6   because he's waiting to see what was going to happen, did he

7   have enough time to reach for his weapon that was in his

8   fanny pack and the stare down that he gave me as if he's

9   deciding, should I make this move or not.

10       Q.      Obviously, he decided not to do anything at

11  that point?

12       A.      That's correct.

13       Q.      Once you got him out of the car, what

14  happened?

15       A.      Once we got him out of the car, the arrest

16  team took control of him and then at that time our job is

17  done there.  So the rest of the SWAT Team, we get back in

18  our vehicle and we head up to the trailer park.

19       Q.      The entire takedown of the vehicle from the

20  time you first approached it to the time you had three in

21  custody, how long did that take?

22       A.      Probably less than five minutes.

23       Q.      And you didn't personally search any of the

24  three individuals from that car?

25       A.      No, I didn't.

1       Q.      Let me show you State's 274 and see if you

2   recognize that photo?

3       A.      That's the vehicle that they ran.

4       Q.      And State's 275, another picture, does that

5   also depict the Jeep that they were in?

6       A.      Yes, this is.

7       Q.      Once you finished there, you said that you

8   went back up to the RV park?

9       A.      Yes.

10      Q.      At that point there were still individuals in

11  the RV?

12      A.      That's correct.

13      Q.      What did you do once you got up to the RV

14  park?

15      A.      We set up a perimeter around the RV park and

16  then, I believe, the negotiators came up and started talking

17  to one of the suspects that were inside.

18      Q.      To what do you attribute, I guess, the

19  successful peaceful arrest of the three suspects?

20      A.      I would say the element of surprise,

21  overtaking the vehicle before they knew what hit them.

22              MR. WIRSKYE:  I'll pass the witness, Your

23  Honor.

24              MR. SANCHEZ:  I have no questions, Your

25  Honor.

1       THE COURT:  Thank you, Deputy.

2       MR. WIRSKYE:  May he be finally excused,

3  Your Honor?

4       MR. SANCHEZ:  That's fine with us, Your

5  Honor.

6       THE COURT:  He may.

7       MR. WIRSKYE:  Call Special Agent

8  Petoskey.

9              WILLIAM PETOSKEY,

10  having been duly sworn, was examined and testified as

11  follows:

12              DIRECT EXAMINATION

13  BY MR. WIRSKYE:

14       Q.    Sir, could you tell us your full name.

15       A.    My name is William Petoskey.

16       Q.    And how are you employed?

17       A.    I'm employed as a Special Agent with the

18  Federal Bureau of Investigation.

19       Q.    How long have you been with the FBI?

20       A.    Approximately seven years.

21       Q.    Where are you currently assigned?

22       A.    To the Colorado Springs Resident Agency.

23       Q.    And what do you do there in Colorado Springs?

24       A.    I'm a Special Agent currently assigned to the

25  National Security Squad.  Prior to that I was assigned to

1    the Violent Crime Squad.

2         Q.     And you assigned to the Violent Crime Squad

3    back in January of 2001?

4         A.     Yes, I was.

5         Q.     What did you do prior to coming to the FBI?

6         A.     I was a high school teacher.

7         Q.     Let me direct your attention back to January

8    21st of 2001.  About 10:00 in the evening did you get a call

9    or a page to go to Teller County, Colorado?

10        A.     Yes, I did.

11        Q.     What was the nature of that call?

12        A.     I received a phone call from Special Agent

13   Dean Aker, who advised me that the Texas Seven -- or, excuse

14   me, fugitives from the state of Texas has been located in

15   Woodland Park, Colorado.

16        Q.     Did you know who he was talking about?

17        A.     Yes, I did.

18        Q.     Were people in law enforcement pretty familiar

19   with those individuals at that point in time?

20        A.     Yes, sir.

21        Q.     Once you got that call, what did you do?

22        A.     I left my residence and drove to Divide,

23   Colorado.

24        Q.     What is in Divide, Colorado?

25        A.     The Teller County Sheriff's Office.

1      Q.      Once you got there, what happened?

2      A.      I was briefed by other law enforcement

3  agencies to the information they knew about the fugitives

4  and proceeded to set up a surveillance near the Coachlight

5  RV Park.

6      Q.      And what was your specific job in terms of

7  keeping surveillance on the Coachlight RV Park?

8      A.      I was located east of the Coachlight RV Park

9  off Highway 24 to keep an eye on the entrance and any

10  traffic leaving the park that would head eastbound on

11  Highway 24.

12      Q.      Special Agent, let me show you a photograph,

13  State's 269, and see if you recognize that?

14      A.      Yes, I do.

15              MR. WIRSKYE:  May I approach the witness,

16  Your Honor?

17              THE COURT:  You may.

18      Q.      (By Mr. Wirskye)  Special Agent, if you could

19  take this laser pointer and just kind of orient the members

20  of the jury to where your position was for surveillance that

21  night.

22      A.      I was located off this road here, which is

23  located east of the Coachlight RV Park, which is located

24  right here.

25      Q.      And what time did you get in position for

1  surveillance?

2         A.      Approximately 2:00 a.m.

3         Q.      And how long did you stay out there on the

4  perimeter?

5         A.      Until approximately 5:00 a.m.

6         Q.      And we're into Monday, now, the 22nd?

7         A.      Yes, sir.

8         Q.      Anything happen between those hours?

9         A.      Nothing.

10        Q.      At about 5:00 a.m. did you get a call to go

11 somewhere else?

12        A.      Yes, I did.

13        Q.      Where was that?

14        A.      I went back to the Teller County Sheriff's

15 Office.

16        Q.      And why did you do that?

17        A.      I was told to help write a search warrant.

18        Q.      Soon after that did you get another call to go

19 somewhere else?

20        A.      Um, I actually stayed in the Teller County

21 Sheriff's Office for most of the morning, working on the

22 search warrant.

23        Q.      Okay.  Did you at some point attend a briefing

24 of all the law enforcement members that were at the scene?

25        A.      Yes, I did.

1     Q.     And where did that happen?

2     A.     At the Teller County Sheriff's Office.

3     Q.     Did y'all have another remote command post set

4   up close to the RV park?

5     A.     Yes, we did.   The command vehicles from the

6   law enforcement agencies were located behind the Safeway

7   grocery store.

8     Q.     Okay.   I just put up a photograph, State's

9   271.   Does that show the area of the Safeway in the strip

10   mall?

11     A.     Yes, it does.

12     Q.     Can you show the members of the jury where

13   that command post was set up?

14     A.     On the backside of the Safeway is a loading

15   dock area where the store receives its material.   It is

16   located from that area -- the RV park is actually located

17   across the street in this vicinity.

18     Q.     And that's Highway 24, US-24 there?

19     A.     Yes, sir, this is Highway 24.

20     Q.     And at some point did you make your way to the

21   command post behind the Safeway?

22     A.     Yes, I did.

23     Q.     While you were there, did y'all get word that

24   a vehicle had left the RV park?

25     A.     Yes, I did.

1    Q.    A gray Jeep?

2    A.    Yes, sir.

3    Q.    And what happened once that vehicle left the

4    RV park?

5    A.    I heard on the radio that a Jeep had left the

6    RV park, had proceeded a short ways down Highway 24, and had

7    entered the parking lot of the Safeway grocery store.

8    Q.    Did that cause some alarm for the law

9    enforcement members that were behind the Safeway?

10   A.    Yes, it did.  It was a very big concern

11   because the vehicles that were located back here were all

12   well marked as law enforcement agencies, command vehicles,

13   police units, and so they were all located behind here,

14   trying to find a way to get out of the area to not be

15   detected by the Jeep that had been located in the parking

16   lot.

17   Q.    For lack of a better term, a brief moment of

18   panic, I guess?

19   A.    Yes, sir.

20   Q.    Okay.  Did the suspects in the gray Jeep ever

21   see y'all?

22   A.    Not to my knowledge, sir.

23   Q.    What happened next?

24   A.    The gray Jeep exited the Safeway parking lot,

25   heading eastbound on Highway 24.  And I had heard through

1    overhearing on my radio that the Jeep had exited the parking

2    lot, headed eastbound on Highway 24.   From my vantage point,

3    this Safeway is located more up on a hill.   I could see the

4    back of the Jeep heading down the hill.

5         Q.    And did the FBI have a plane up in the air?

6         A.    Yes, we did.

7         Q.    Tell us about that.

8         A.    The FBI has a plane and a group of individuals

9    known as our Special Operations Group, SOG for short.   And

10   they will conduct aerial surveillance and they also enhance

11   our communication systems when we're in mountainous areas.

12        Q.    And that's who you heard on the radio

13   describing the path of the Jeep?

14        A.    Yes, sir.

15        Q.    Let me show you a photograph marked State

16   Exhibit 270.   See if you can recognize that as a realtime

17   digital photograph that your SOG plane took.

18        A.    Yes.   This is the Safeway itself.   This is

19   where we were located at the time the vehicle had entered

20   into the parking lot.   This, again, is eastbound Highway 24.

21        Q.    Okay.   And what happened when you got in

22   behind that gray Jeep?

23        A.    As the radio communication, again, I overheard

24   say the Jeep was heading westbound -- excuse me, eastbound.

25   And I visibly observed the Jeep going down here, myself and

1    my boss got into an SUV and proceeded out of the Safeway

2    parking lot onto eastbound Highway 24 in pursuit of the

3    Jeep.

4        Q.    At that point when you got in behind the Jeep,

5    did you have any idea that Teller County and El Paso County

6    had SWAT guys behind the Jeep, too?

7        A.    No, sir.

8        Q.    Why not?

9        A.    Because I had an FBI radio and I did not pick

10   up the Teller County or the El Paso County SWAT radios when

11   I was located behind the Safeway parking lot.

12       Q.    As y'all proceeded down 24, what happens next?

13       A.    The vehicle, the Jeep, is heading eastbound on

14   Highway 24 followed by, I believe, two sport utility

15   vehicles and also myself and my boss in a Chevy Tahoe.  It

16   proceeded eastbound on 24 until it pulled into a Western

17   Convenience Store.

18       Q.    Let me show you this diagram, State's 282, and

19   see if you recognize that as the convenience store.

20       A.    Yes, I do.

21       Q.    Did you observe the deputies take down that

22   vehicle?

23       A.    Yes, I did.

24       Q.    What was your role once you got to the scene?

25       A.    Specifically, stay out of the way.

1      Q.      Okay.  Kind of a secondary support role?

2      A.      Yes, sir.  As we pulled into the vehicle --

3   pulled into the parking lot of the Western Convenience

4   Store, the -- our vehicle was parked over here to the west

5   of where the subject vehicle, which is indicated by the

6   laser here.  Upon parking and stopping here, my boss

7   recognized that these other vehicles were tactical teams,

8   being involved in the takedown of the vehicle.

9      Q.      And y'all watched that takedown happen?

10      A.      Yes, sir.

11      Q.      Once those three individuals were in custody,

12   what was your role at that point?

13      A.      I was located back here and what was

14   determined at the time was that the vehicles, marked police

15   units, would pull up here.  The individuals would be removed

16   from the vehicle, brought back to me.  They would be put

17   into a marked unit and those marked police cars would

18   transport to the Teller County Sheriff's Office.

19      Q.      What contact did you specifically have with

20   George Rivas?

21      A.      Mr. Rivas was taken off of his -- out of his

22   vehicle and placed on the ground.  I observed the taking out

23   of the vehicle by the SWAT Team and, also, I observed

24   Colorado Springs Police Detective Delmar Wedge search Mr.

25   Rivas when he was located on the ground.  Mr. Rivas, while

1  being escorted by Police Detective Delmar Wedge brought him

2  back to a vehicle waiting right here.

3              As they walked by my location, Colorado

4  Springs Police Detective Delmar Wedge handed me a gun and

5  said, "This was taken off him.  Maintain custody of it."

6  And George Rivas was placed in a vehicle located behind mine

7  and was transported.

8         Q.   You had actually seen that gun come off Rivas?

9         A.   Yes, sir.

10        Q.   So you took possession of Rivas' weapon; is

11 that right?

12        A.   Yes, sir.

13        Q.   Did you have any contact with Garcia?

14        A.   Yes, I did.

15        Q.   Can you tell us about that?

16        A.   Mr. Garcia was removed from the vehicle and

17 was handcuffed and brought back to my location here.  As I

18 stood, again, by my vehicle, I had asked -- and I do not

19 recall who it was -- the escorting officers, if he had been

20 searched and they were not sure regarding how much or who

21 had searched him.  So I proceeded to pat down Mr. Garcia and

22 search him for anything that was on his person or property.

23        Q.   And what did you find when you searched

24 Mr. Garcia?

25        A.   Mr. Garcia was carrying a gun and also a

1  wallet.

2         Q.     Okay.  Do you remember where the gun was

3  located on him?

4         A.     I believe it was possibly in his front belly

5  band -- excuse me, front belly area, but I don't recall

6  specifically.

7         Q.     Okay.  Like a fanny pack type thing?

8         A.     I believe so, sir.

9         Q.     What else did you find other than that weapon?

10        A.     Other than the weapon and the wallet?

11        Q.     Yeah.  Describe the wallet for us.

12        A.     It was just a black leather wallet with IDs --

13  excuse me, a Texas drivers license and some social security

14  cards.

15        Q.     Did you have any conversation with Mr. Garcia

16  as you were searching him?

17        A.     Yes, I did.

18        Q.     Would you tell us about that?

19        A.     I removed the wallet from Mr. Garcia and found

20  a Texas drivers license in the name of Darrin Ojeda and I

21  took out the license and asked Mr. Garcia what his date of

22  birth was, trying to get an exact identification of who the

23  subject was in my custody.  And upon asking what his date of

24  birth was -- excuse me, I first asked him who he was and

25  Mr. Garcia said, "You know the fuck who I am."  And then

1   once I found the wallet, I asked, "Mr. Ojeda, what's your

2   date of birth?"  And he said, "I don't fucking know."

3          Q.     How would you describe his demeanor as he was

4   making these comments to you?

5          A.     He was very angry.

6          Q.     Did you have any further conversation with

7   him?

8          A.     No, sir, I did not.

9          Q.     Special Agent, let me show you two weapons.

10  First is a Beretta pistol marked for identification as

11  State's Exhibit 285 and we've looked at these outside the

12  presence of the jury; is that correct?

13         A.     Yes, we have.

14         Q.     Is State's 285, the weapon you took from

15  George Rivas?

16         A.     Yes, it is.

17         Q.     This is a second weapon, which is a Ruger

18  marked for identification as State's 284, and ask you to

19  look at that and see if that's the gun that you took from

20  Mr. Garcia?

21         A.     Yes, it is.

22         Q.     Also State 286, could you look at that and see

23  if that's the wallet that you took off Mr. Garcia?

24         A.     Yes, it is.

25         Q.     And it still contains the Texas drivers

143

1    license for Mr. Ojeda?

2        A.    Yes, it does.

3        Q.    Did you later come to find out that Darrin

4    Ojeda was one of the Oshman's employees back from Irving,

5    Texas?

6        A.    Yes, I did.

7            MR. WIRSKYE:  Your Honor, at this time we

8    offer State Exhibit 284, 285, and 286.

9            MR. SANCHEZ:  We have no objection, Your

10   Honor.

11           THE COURT:  Nos. 284 through 286 shall be

12   admitted.

13       Q.    (By Mr. Wirskye)  I'll also show you an

14   exhibit that was prepared, marked for identification as

15   State 287.  Does this just reflect the two guns from the

16   individuals who they were recovered from?

17       A.    Yes, it does.

18           MR. WIRSKYE:  Judge, we would offer

19   State's 287.

20           MR. SANCHEZ:  No objection.

21           THE COURT:  No. 287 shall be admitted.

22       Q.    (By Mr. Wirskye)  Was that the extent of your

23   involvement with these individuals out at the Western

24   Convenience Store?

25       A.    Yes, sir.

1    Q.    What did you do after you left the convenience
2    store?

3    A.    I went back to the Coachlight RV Park.

4    Q.    Did you assist in the resolution of that
5    situation?

6    A.    Yes, sir.

7    Q.    Finally a day or so later, did you also --
8    were you called out to Colorado Springs?

9    A.    Yes, I was.

10   Q.    And that was involving the apprehension of
11   Newbury and Murphy, those two of the Texas Seven; is that
12   right?

13   A.    Yes, sir.

14   Q.    And you assisted in searching a motel room in
15   Colorado Springs?

16   A.    Yes, I did.

17          MR. WIRSKYE:  I'll pass the witness, Your
18   Honor.

19          CROSS-EXAMINATION
20   BY MR. SANCHEZ:

21   Q.    Agent, at the convenience store you were able
22   to observe the takedown of Rivas, Rodriguez, and Garcia; is
23   that correct?

24   A.    Yes, sir.

25   Q.    And the whole time you were watching, was

1   there any resistance to that takedown?

2        A.      I was in a position far enough removed that I

3   could not make an assessment of if there was any resistance

4   regarding --

5        Q.      You didn't see anything happen to make you

6   think that anybody was in danger, that the officers who were

7   involved in the takedown?

8        A.      I apologize, I wasn't close enough to observe

9   any of those specific actions.

10              MR. SANCHEZ:  I pass the witness.

11              MR. WIRSKYE:  Nothing further, Your

12   Honor.

13              THE COURT:  Thank you, Special Agent, you

14   may stand down.

15              MR. WIRSKYE:  May this witness be finally

16   excused?

17              MR. SANCHEZ:  We have no objection, Your

18   Honor.

19              THE COURT:  He may.

20              MR. SHOOK:  Call Special Agent Mahoney.

21                   JAMES MAHONEY,

22   having been duly sworn, was examined and testified as

23   follows:

24                   DIRECT EXAMINATION

25   BY MR. SHOOK:

1    Q.    Could you tell us your name, please.

2    A.    James Mahoney.

3    Q.    How are you employed, sir?

4    A.    Special Agent with the FBI.

5    Q.    How long have you been with the FBI?

6    A.    Approximately 13 years.

7    Q.    And where are you assigned?

8    A.    Pueblo, Colorado.

9    Q.    Could you tell us what your duties are at that

10   particular office?

11   A.    At that office my duties are to investigate

12   any federal violations in the southern half of the state of

13   Colorado and, as an additional duty, I'm a member of the

14   Evidence Response Team out of Denver.

15   Q.    And as a member of the Evidence Response Team,

16   what are your duties with that team?

17   A.    My duties vary, depending on how many people

18   show up at a crime scene.  But basically the Evidence

19   Response Team is a crime scene investigation unit.  We have

20   16 members and our duties vary as we show up for a crime

21   scene, depending on who is there and how they are assigned.

22   Q.    Do you have any special training for the

23   duties that you have with the Evidence Response Team?

24   A.    I have some advanced crime scene training.  I

25   have 80 hours of the basic crime scene investigation

1  training that the FBI puts on and, in addition, I have some

2  advanced training in latent fingerprints and other areas.

3       Q.    Let me turn your attention to January 22nd of

4  2001 and ask if your team was notified to assemble at a

5  location in Colorado?

6       A.    Yes, we were.

7       Q.    What site were you told to come to?

8       A.    Well, we initially met in Colorado Springs and

9  then as soon as the crime scene up in Woodland Park was

10 secured, we reported up there.

11      Q.    And was your assignment that day to assist in

12 the search of an RV that was located in the Coachlight RV

13 Park?

14      A.    Yes, it was.

15      Q.    Now, on a particular search you may have a

16 different duty or a specific role; is that right?

17      A.    That's correct.

18      Q.    In this particular case what was your role?

19      A.    I was the evidence collection custodian,

20 making sure that all the evidence was collected properly and

21 taking it into custody.

22      Q.    Okay.  When you -- when your team searches an

23 area such as the RV, what is the procedure as far as

24 collection of evidence goes?

25      A.    We -- first we locate evidence.  We search for

1   it, locate it, we photograph it in place, we collect it, we

2   bag it, we mark the bag, and we mark an evidence log the

3   location where we found it.

4        Q.      And you are the one person who is in charge of

5   keeping a log and taking control or custody of the evidence?

6        A.      Yes, sir.

7        Q.      All right.  And that's what you did that day

8   or that evening and into the early morning hours of the 22nd

9   of January, 2001?

10       A.      Yes, it is.

11              MR. SHOOK:  At this time I want to offer

12   State Exhibits 981, 982, 983, and 984 for record purposes.

13              MR. SANCHEZ:  No objection just for

14   record purposes.

15              THE COURT:  Nos. 981 through 984 for

16   record only.  Once again, members of the jury, that means

17   that you would not be able to view those exhibits.

18       Q.      (By Mr. Shook)  Before evidence is collected

19   it's your procedure to photograph the evidence where it's

20   found in place; is that correct?

21       A.      Yes, sir, it is.

22       Q.      Were a number of photographs then made of the

23   outside of the RV, as well as the interior of the RV?

24       A.      Yes.

25       Q.      You have seen these photographs outside the

1    presence of the jury; is that correct?

2         A.    That's correct.

3         Q.    First of all, let me show you State's Exhibit

4    364. Does that show a photograph of the RV and a diagram of

5    it?

6         A.    Yes, it does.

7         Q.    And State Exhibit 364-A, is that a photograph

8    of a Jeep that you also participated in the search of?

9         A.    Yes, it is.

10        Q.    And 365-A is also a photograph of the Jeep?

11        A.    Yes.

12        Q.    And then 365 is a photograph of the RV itself?

13        A.    Yes, it is.

14        Q.    Then State Exhibit 366 through State Exhibit

15   464, are those all photographs of the RV, as well as the

16   search of the Jeep and the items taken from the Jeep

17   Cherokee?

18        A.    Yes, they are.

19             MR. SHOOK:  Your Honor, at this time we

20   offer those exhibits.

21             MR. SANCHEZ:  No objection, Your Honor.

22             THE COURT:  State Exhibits 364, 364-A,

23   and 365 and 365-A and 366 through 464 shall be admitted.

24        Q.    (By Mr. Shook)  Let me show you 365 first.

25   There's a laser up there that you can use whenever you feel

150

1   it's necessary to point out items to the jury.

2              Is this a photograph of how the RV

3   appeared just prior to your search?

4      A.      Yes, it is.

5      Q.      Was there any damage done to the outside of

6   the RV?

7      A.      Just looking at it from this picture, you can

8   see the window has been blown out here and the front door

9   was damaged.

10      Q.      Okay.  Let me show you State Exhibit 364.

11   Does this show the RV and kind of an overview diagram of how

12   the RV was laid out?

13      A.      Yes, it does.

14      Q.      Can you explain the diagram to the jury,

15   please?

16      A.      Okay.  This is the front door on the side of

17   the RV.  You walk in.  The driving console, driver's seat

18   here, passenger's seat here.  Console in the middle.  Right

19   straight across is a sofa.  This area right here is the

20   dinette.  You have two bench seats and a dining room table.

21   The galley or kitchen area right here.  Sink, stove,

22   refrigerator.

23              This is a storage closet where we located

24   some items of evidence.  This is a bathroom straight across

25   the hallway from it.  The toilet, tub, sink, and the

1  counter.  And then back in this back area is the master

2  bedroom.  You have two bunks back here with a table in

3  between.

4       Q.    Okay.  State Exhibit 366, does that show the

5  window that would be consistent with being damaged if a tear

6  gas grenade is lobbed into the vehicle?

7       A.    Yes, it is.

8       Q.    No. 367, does that show the other side of the

9  RV?

10      A.    Yes, it does.

11      Q.    No. 368, what do we see there?

12      A.    That's looking at the RV from the front.

13      Q.    Did it have curtains that could be pulled

14  forward to block out the sun and for more privacy?

15      A.    Yes.

16      Q.    And State Exhibit 369?

17      A.    The rear of the RV.

18      Q.    Now, does 370 show us the entry or how the RV

19  looks once you open the front door?

20      A.    Yes.

21      Q.    And State Exhibit 371, what do we see there?

22      A.    That's a trash can located right outside the

23  RV towards the front.

24      Q.    Was that also searched and some items removed?

25      A.    Yes, it was.

1    Q.      Let me show you State Exhibit 372.  What do we

2  see in this photograph?

3    A.      Okay.  This is a view if you just step inside

4  the RV and turn to the right.  This is the driver's console

5  here.  Passenger's seat right here.  You have got some

6  sleeping bags piled up, blankets, sleeping bags,

7  entertainment console here, TV, DVD player, VCR.  You have

8  tapes and movies up in this area here.

9    Q.      State Exhibit 373?

10    A.      Okay.  This is the sofa just across from the

11  front door.  Again you are looking up towards the driver's

12  console here.

13    Q.      And State Exhibit 374?

14    A.      This is stepping into the RV, turning to the

15  left, kitchenette here, kitchen here, back bedroom, and this

16  was the body of Larry Harper.

17    Q.      Okay.  The body was lying there near the

18  bathroom kind of in the hallway?

19    A.      Yes.

20    Q.      State Exhibit 375, is that a closer view of

21  the body?

22    A.      Yes, it is.

23    Q.      What is that securing his hands?

24    A.      It's a tie.  They are basically plastic

25  handcuffs.

1    Q.    Okay.  Are they placed -- is it standard

2 procedure that once entry is made into an area like this

3 that a body be secured like that, if they're suspected of

4 having a weapon?

5    A.    Yes.

6    Q.    And then I see something on his shoulders.

7 What type of apparatus is that?

8    A.    That was a gun harness.

9    Q.    Okay.  State Exhibit 376, does this show the

10 body in relation to the bathroom?

11    A.    Yes.  You can see the bathroom right to the

12 left here.

13    Q.    Is that a Bible that's open on the toilet?

14    A.    Yes, right up here.

15    Q.    State Exhibit 377, do you see an item in

16 Mr. Harper's pocket?

17    A.    Right there.  It's a magazine clip for a

18 semiautomatic pistol.

19    Q.    Okay.  There were a number of weapons that

20 were taken into custody; is that correct?

21    A.    Yes, sir.

22    Q.    Let me show you State Exhibit 379.  Is that

23 one of the handguns that was taken into custody?

24    A.    Yes, it is.

25    Q.    I believe what we see on the photograph is

1   State Exhibit 288-A; is that correct?

2        A.     Yes, it is.

3        Q.     There's some other weapons here in front of

4   you which have been marked State Exhibits 289 through 300.

5   Are those other handguns that were recovered from the RV?

6        A.     Yes, they are.

7             MR. SHOOK:  Your Honor, at this time we

8   will offer State Exhibit 288-A, along with 289 through 300.

9             MR. SANCHEZ:  No objection.

10            THE COURT:  No. 288-A, along with 289

11  through 300 shall be admitted.

12       Q.     (By Mr. Shook)  Special Agent Mahoney, as we

13  go through the weapons that you recovered, if you would make

14  note of -- say the exhibit number of that particular weapon

15  we may see on the photograph and identify it by the State's

16  exhibit marker.

17       A.     Okay.

18       Q.     This is 288-A, is that correct, that we see?

19       A.     Yes, it is.

20       Q.     And what do we see in that particular

21  photograph?

22       A.     That is somebody unloading this weapon.

23       Q.     Okay.  So the condition it was found, was it

24  fully loaded with a round in the chamber?

25       A.     Yes, it was.

```
 1        Q.      Let me show you State Exhibit 381.  Is that
 2   that dinette table you talked about?
 3        A.      Yes, it is.
 4        Q.      And is that the gun we see there on the bench?
 5        A.      Yes, it is.
 6        Q.      There's another weapon, I believe, on the
 7   table that we can see in State Exhibit 382.  Is that located
 8   there in front of you?
 9        A.      That would be State Exhibit 289.
10        Q.      Okay.  And what type of weapon was that?
11        A.      Heckler & Koch .45 caliber semiautomatic
12   pistol.
13        Q.      Did your notes reflect whether it was loaded
14   or unloaded?
15        A.      This was fully loaded with a round in the
16   chamber.
17        Q.      Okay.  Next moving to the bathroom, let me
18   show you State Exhibit 383.  Is that looking at the bathroom
19   counter, does that show another handgun?
20        A.      Yes, it does.
21        Q.      And was that taken into custody?
22        A.      Yes.
23        Q.      Which State exhibit is that?
24        A.      That would be State Exhibit 290.  It's a --
25   Bursa is the brand and .380 is the caliber.
```

1    Q.    Okay.  Let me show you 384.  Is that that

2    particular weapon after the clip has been taken out?

3    A.    Yes, it is.

4    Q.    Was it -- do your notes reflect if it was

5    fully loaded?

6    A.    My notes state that it had a full magazine,

7    but there was not any round in the chamber.

8    Q.    Okay.  Let me show you State Exhibit 385.

9    What's that a photograph of?

10   A.    That was some hair dye found on top of the

11   bathroom vanity.

12   Q.    Okay.  Then State Exhibit 387, what do we see

13   in that photograph?

14   A.    That's looking into the rear bedroom of the

15   RV.

16   Q.    There's two beds in the back of the rear

17   bedroom?

18   A.    Yes.

19   Q.    And did you find some items back in that

20   location?

21   A.    We did.

22   Q.    State Exhibit 388, does that reflect part of

23   where you found the shotgun in that area?

24   A.    Yes, it is.  It's the edge of the bed to the

25   right, right along the wall of the RV and you see the handle

1    of a shotgun sticking out right there.

2        Q.      State Exhibit 389 shows the shotgun after it's

3    been removed from that space?

4        A.      Yes, it does.

5        Q.      Okay.  And then State Exhibit 390, what do we

6    see in that photo?

7        A.      That's showing the shotgun after it's been

8    unloaded.  It shows that there were six chambered rounds.

9        Q.      Okay.  Let me show you what has been marked

10   State Exhibit 319.  Is this the shotgun that we see in the

11   photograph?

12       A.      Yes, it is.

13       Q.      It was the one that was taken into custody?

14       A.      Yes.

15              MR. SHOOK:  We'll offer State Exhibit

16   319.

17              MR. SANCHEZ:  No objection.

18              THE COURT:  No. 319 is admitted.

19       Q.      (By Mr. Shook)  Let me show you State Exhibit

20   391.  Does that show a bag that's on top of the bed there?

21       A.      Yes, it does.  It's a black bag right there.

22       Q.      And inside of the bag during the search were

23   some weapons found?

24       A.      Yes.

25       Q.      Let me show you State Exhibit 393.  What do we

158

1   see there?

2          A.      It's looking inside the black bag.  I'm having

3   a hard time seeing the weapon in this picture, but I think

4   that's what we're trying to show there.

5          Q.      Would 394 be one of the handguns that was

6   taken out?

7          A.      Yes, it would be.

8          Q.      And where is that reflected in the exhibits

9   before you?

10         A.      That would be State Exhibit 291.

11         Q.      Okay.

12         A.      Smith & Wesson .357 Magnum.

13         Q.      State Exhibit 395 shows the Smith & Wesson

14  after it's been unloaded?

15         A.      Yes, it does.

16         Q.      So it was fully loaded when it was recovered?

17         A.      Yes, sir.

18         Q.      And let me show you State Exhibit 396.  Does

19  that show another handgun that was recovered?

20         A.      Yes, it does.  That would be this handgun

21  here, State Exhibit 292.  It's a Walther PBK .32 caliber

22  semiautomatic pistol.

23         Q.      Was it loaded at the time it was found?

24         A.      It was loaded with a round in the chamber.

25         Q.      Okay.  And State Exhibit 397, do we see

1    another handgun?

2         A.      Yes, we do.

3         Q.      And what type of handgun is that?

4         A.      That is this State Exhibit 293.  It's a North

5    American Arms .22 caliber Derringer.

6         Q.      And was it loaded at the time it was found?

7         A.      It was fully loaded with five rounds.

8         Q.      And State Exhibit 398, what part of the RV is

9    that?

10        A.      Directly opposite of the bathroom was a

11   cabinet and that's what you are looking at there.

12        Q.      And were there some handguns and long guns

13   located in that cabinet?

14        A.      Yes, there were.

15        Q.      Looking first at the bottom of the cabinet,

16   let's show you State Exhibit 399.  Are those four handguns

17   that were taken into evidence?

18        A.      Yes, they are.

19        Q.      If you could show those to the jury with the

20   exhibit numbers.

21        A.      Okay.  The first one, State Exhibit 294, this

22   is a Ruger .22 caliber pistol or revolver.  State Exhibit

23   295, Smith & Wesson .357.

24        Q.      Do your notes indicate if those were loaded or

25   unloaded?

1      A.      Neither one of those were loaded.

2      Q.      All right.   State Exhibit 296?

3      A.      Smith & Wesson .22 caliber pistol.   This also

4  was not loaded.

5      Q.      And State Exhibit 297?

6      A.      It's a Browning .22 caliber pistol and my

7  notes do not indicate whether this was loaded.   I don't

8  believe it was.

9      Q.      Okay.   State Exhibit 400, what do we see

10  there?

11      A.      Those are some long guns that were found at

12  the rear of that same cabinet behind some clothing.

13      Q.      Okay.   Does 401 show the guns as they appeared

14  after the clothing has been removed?

15      A.      Yes.

16      Q.      And were those taken into custody?

17      A.      Yes, they were.

18      Q.      Let me show you some guns that they appear to

19  be the ones that you recovered from that closet.   I believe

20  they start at State Exhibit 311 and go to 317.   Do these

21  appear to be the same rifles and shotguns that you removed

22  and took into custody?

23      A.      Yes, they do.

24      Q.      If you would, let's go over these one at a

25  time and tell us if they were loaded or unloaded at the time

1    they were taken into custody.

2              THE COURT:  Are you going to offer those?

3              MR. SHOOK:  Yes, sir.  We'll offer them

4    at this time.

5              MR. SANCHEZ:  We have no objection.

6              THE COURT:  Nos. 311 through 317 shall be

7    admitted.

8         A.    Okay.  First Exhibit 311, Browning Gold Hunter

9    shotgun, there was no ammunition with this at the time I

10   found it.

11        Q.    (By Mr. Shook)  Okay.

12        A.    The second one is State Exhibit 318.

13        Q.    Is 318 another one of the rifles that you took

14   into custody?

15        A.    Yes, it is.

16             MR. SHOOK:  We'll offer 318 at this time.

17             MR. SANCHEZ:  No objection.

18             THE COURT:  No. 318 shall be admitted.

19        A.    This is a Ruger .22 caliber rifle.  It's -- my

20   notes state that there was a clip that contained ammunition

21   for this one.

22        Q.    (By Mr. Shook)  Okay.

23        A.    State Exhibit 313, a Remington shotgun, no

24   ammunition with that one.

25        Q.    All right.

1    A.    State Exhibit 314, Winchester .22 caliber

2  rifle, 12 rounds were chambered in this weapon.

3    Q.    Twelve rounds were chambered in that one?

4    A.    Yes.   State Exhibit 315 is a Winchester

5  shotgun.  I don't have any indication that this was loaded

6  at the time we found it; however, it was altered.

7    Q.    How was it altered?

8    A.    The barrel has been sawed off at the end.

9    Q.    Okay.

10   A.    State Exhibit 316, a Remington, it's a Magnum

11 shotgun.  Does not indicate that it was loaded; however,

12 this one also has had the barrel sawed off.

13   Q.    All right.

14   A.    State Exhibit 317, a Colt 223 rifle, was not

15 loaded at the time we found it.

16   Q.    And State Exhibit 312?

17   A.    A Remington model 97, was not loaded at the

18 time we found it.

19   Q.    Okay.  Now, for the AR-15, did you find a clip

20 that would fit that weapon also in that closet or in a

21 drawer?

22   A.    It was in a drawer below the closet.

23   Q.    Two of the shotguns had been altered because

24 the barrels had been sawed off?

25   A.    Yes, sir.

1      Q.      Let me show you State Exhibit 402.  Does that
2  show two shotgun barrels that you found in the RV?

3      A.      Yes, it is.

4      Q.      And State Exhibit 403?

5      A.      That's inside the closet showing some
6  ammunition that we found.

7      Q.      Okay.  And State Exhibit 404?

8      A.      One of the drawers below the closet that shows
9  additional ammunition as well as the clip to the AR-15.

10     Q.      Okay.  State Exhibit 405?

11     A.      That was a second drawer underneath the gun
12  cabinet with another pistol.

13     Q.      And is that gun located in the tray in front
14  of you?

15     A.      Yes, it is.  State Exhibit 298, it's a Bursa
16  .380 pistol.

17     Q.      And did it appear to be loaded?

18     A.      In the photograph there it shows that there is
19  a magazine in the magazine chamber.  I don't have it in my
20  notes whether it was loaded or not.

21     Q.      Let me show you the next photograph.  Does
22  that show the weapon after the clip has been taken out?

23     A.      Yes, it does.  And it shows that there was a
24  round in the chamber which was removed and then a loaded
25  clip right here.

1    Q.    Let me show you State Exhibit 407.  Does that

2  show another handgun that was taken into custody?

3    A.    Yes, it does.

4    Q.    And is that there on the tray?

5    A.    That would be State Exhibit 299.  It's a

6  Beretta, nine millimeter pistol.  This was not loaded at the

7  time.

8    Q.    State Exhibit 408, we're looking at the front

9  of the RV again.  There was a pack located in the chair.

10  Was the pack searched?

11    A.    Yes, it was.

12    Q.    State Exhibit 410 shows the pack after it's

13  been opened?

14    A.    Yes, it does.

15    Q.    First let me show you State Exhibit 413.  Does

16  that show a gun that was located in the pack?

17    A.    Yes.  You can see the gun right here.

18    Q.    Okay.  And is that weapon there in the tray

19  before you?

20    A.    That's State Exhibit 300.  It's a Browning .22

21  caliber pistol.

22    Q.    And was it loaded at the time?

23    A.    It was fully loaded with one round in the

24  chamber.

25    Q.    Now, you found cash in several places in the

1    RV, also; is that right?

2         A.    Yes, we did.

3         Q.    Let me show you in that particular pack, the

4    blue pack there, State Exhibit 411 and 412, are those

5    photographs of cash that was located?

6         A.    Yes, it is.

7         Q.    What was the amount of cash found in that blue

8    pack?

9         A.    In the silver container which you are looking

10   at right there, there was $4,672.  I'm showing another $188

11   that was located inside that backpack, also.

12        Q.    Let me show you State Exhibit 41 -- let me

13   stop there.  Was there cash found additionally in the RV?

14        A.    Yes, there was.  Back in the rear bedroom in a

15   black bag that we had located some weapons in, I believe, we

16   found 55 -- $5,510 in one location and $361 in another

17   location, and $900 in another location.

18        Q.    Now, looking at this photograph, what do we

19   see there?

20        A.    There's a Radio Shack emergency frequency

21   guide.  The purpose of that is to program scanners.

22        Q.    Okay.  That would contain frequency guides in

23   particular cities and different states?

24        A.    Yes.

25        Q.    Let me show you what has been marked as State

```
1   Exhibit 341-A.  Is this, in fact, the Radio Shack police
2   call frequency guide that we see in the photograph?
3          A.   Yes, it is.
4               MR. SHOOK:  We'll offer 341-A.
5               MR. SANCHEZ:  We have no objection.
6               THE COURT:  No. 341-A shall be admitted.
7          Q.   (By Mr. Shook)  Looking on page 194, were
8   there some blue markings there that had been placed there by
9   a pen?
10         A.   Yes, sir.
11         Q.   And where were they placed?
12         A.   They are placed marking the frequency guides
13  for the City of Irving, Texas.
14              MR. SHOOK:  Your Honor, could I have the
15  Court's permission to pass some of this evidence down the
16  jury box?
17              THE COURT:  Yes, sir.
18         Q.   (By Mr. Shook)  Let me show you State Exhibit
19  415.  What do we see in that photograph?
20         A.   It's another one of the drawers below the gun
21  cabinet.  That's showing a bandolier containing rounds of
22  shotgun ammunition.
23         Q.   Okay.  What types of rounds of shotgun
24  ammunition were contained in it?
25         A.   There's two different types shown in this
```

1   picture here.  The red are double aught buck, which is a

2   series of steel pellets that are scattered when the shotgun

3   is shot.  The other one, the green ones, are called slugs.

4   It's a single lead projectile that comes out of the shotgun.

5        Q.   Let me show you what has been marked as State

6   Exhibit 346.  Is this, in fact, the bandolier that we see in

7   the photograph?

8        A.   Yes, it is.

9             MR. SHOOK:  We'll offer 346 for all

10  purposes.

11            MR. SANCHEZ:  No objection.

12            THE COURT:  No. 346 shall be admitted.

13       Q.   (By Mr. Shook)  Agent Mahoney, the slug-type

14  ammunition, what is that used for?

15       A.   Well, it's more like a rifle bullet.  In law

16  enforcement it's a heavy takedown ammunition.

17       Q.   State Exhibit 416, does that show some damage

18  caused by a bullet?

19       A.   Yes, it does.

20       Q.   What type of -- is it believed that Mr. Harper

21  suffered a couple of self-inflicted gunshot wounds?

22       A.   Yes, it is.

23       Q.   State Exhibit 419, does that show one of the

24  shell casings that was recovered?

25       A.   Yes, it does.

1      Q.     And then State Exhibit 420 shows another one

2  of the casings?

3      A.     Yes, it does.  This one was located just

4  inside the bathroom.

5      Q.     And 424, do we see -- or did you find various

6  two-way radios and things like that throughout the RV?

7      A.     We did.

8      Q.     And is that reflected there in the photograph?

9      A.     Yes, I believe it is.

10     Q.     No. 423, is that a closer view of some of the

11 video films that were above the home entertainment center?

12     A.     Yes.

13     Q.     And then 425, what does that reflect?

14     A.     It was a Pachmayr.  It's a grip, stick-on

15 grip, that you can add to a weapon or tool.

16     Q.     Okay.  I want to show you a few more items

17 that were taken from the RV.  First of all, let me show you

18 State Exhibits 335 and 337, 338, 339, 341, 341-B, 342, and

19 347.  Are those items all taken from the RV?

20     A.     They are.

21            MR. SHOOK:  We'll offer those exhibits at

22 this time.

23            MR. SANCHEZ:  No objection, Your Honor.

24            THE COURT:  State Exhibits 335, 337, 338,

25 339, 341, 341-B, 342, and 347 shall be admitted.

1   Q.      (By Mr. Shook)  You said there were a lot of

2   two-way radios laying around?

3   A.      Yes, sir.

4   Q.      No. 335, is that one of the two-way radios you

5   recovered from the dashboard?

6   A.      Yes, it is.

7   Q.      And what do we see in State Exhibit 337?

8   A.      This contains a Radio Shack emergency radio

9   frequency scanner with headphones and stopwatch and antenna.

10  Q.      And does that indicate that that was found

11  inside the RV?

12  A.      Yes, it does.

13  Q.      Okay.  Is this the type of scanner that we see

14  the frequency book that you can program scanners in and

15  listen to police calls and that sort of thing?

16  A.      Yes, it is.

17  Q.      All right.  State Exhibit 338 --

18  A.      Is another scanner.

19  Q.      Okay.  Same type of scanner as the other one?

20  A.      Yes.

21  Q.      Now, State Exhibit 341, what is that?

22  A.      It's a smoke grenade with a cigarette lighter

23  attached to it.

24  Q.      Okay.  And where was that found?

25  A.      It was inside one of the black bags in the RV.

1    Q.    Okay.  And then State Exhibit 342, what is

2  that?

3    A.    This is a security baseball style hat found in

4  the black bag in the RV.

5    Q.    Also found in the black bag?

6    A.    Yes.

7    Q.    All right.  And then let me show you State

8  Exhibit 615.  Is this an item also found inside the RV?

9    A.    Yes, it is.

10         MR. SHOOK:  We'll offer State Exhibit 615

11  for record purposes.

12         MR. SANCHEZ:  No objection.

13         THE COURT:  No. 615 is for record only.

14  Once again, the jury will not be able to view that evidence.

15    Q.    (By Mr. Shook)  Now, you also searched the

16  gray Jeep Cherokee that was taken to the Teller County

17  Sheriff's Office; is that right?

18    A.    Yes.

19    Q.    First, let me show you State Exhibit 364-A.

20  Is this how the Cherokee appeared before you began searching

21  it?

22    A.    Yes, it is.

23    Q.    And were there some items in a garbage bag

24  there on top of the hood?

25    A.    Yes, there were.

1    Q.    Were there some weapons found in the Jeep?

2    A.    Yes.

3    Q.    Let me show you some exhibits which have been

4    marked State Exhibits 301 through 310.   Are these handguns

5    that were all recovered in different compartments from the

6    Jeep?

7    A.    Yes, they are.

8         MR. SHOOK:   Your Honor, at this time we

9    would offer State Exhibits 301 through 310.

10        MR. SANCHEZ:   No objection.

11        THE COURT:   State Exhibits 301 through

12   310 shall be admitted.

13   Q.    (By Mr. Shook)   Okay.   State Exhibit 428, is

14   that a weapon that was recovered, actually, from the garbage

15   bag?

16   A.    Yes, it is.

17   Q.    And is that reflected there in the tray?

18   A.    That's State Exhibit 301.   It's a Beretta

19   Tomcat.

20   Q.    At the time it was taken into custody, was it

21   loaded?

22   A.    My notes don't indicate.   I believe -- I'm not

23   quite sure looking at the picture, either.

24   Q.    Does that appear to be a clip, some type of

25   clip above it?

1    A.    Okay.  From what I can see from the picture,

2  this is the clip that was removed from it and I believe this

3  is a round that would have been removed from the chamber.

4    Q.    And then 429?

5    A.    Okay.  It's a weapon, State Exhibit 302, Smith

6  & Wesson Chief Special.  And this was in that plastic bag on

7  the hood of the Jeep.  My notes don't indicate the condition

8  of it at the time.

9    Q.    Okay.  Let me show you State Exhibit 430.

10  Does that show some additional property that was found in

11  the bag?

12    A.    Yes, it does.

13    Q.    And do we see kind of a badge with an ID

14  there?

15    A.    Yes, we do.

16    Q.    Let me show you State Exhibit 433.  What do we

17  see in that photograph?

18    A.    I'm not certain.

19    Q.    Does that appear to be some type of scanner or

20  -- and down at the bottom one of the handguns that was

21  seized?  I don't know if you can see it.

22    A.    I can't see it real clearly up here to be able

23  to tell you for sure.

24    Q.    Okay.  Let me show you 436.  There's some bags

25  located in the back.  Were these also searched and guns

1   retrieved from them?

2         A.      Yes, they were.

3         Q.      No. 438, does that show one of the bags as it

4   was opened?

5         A.      Yes, it does.

6         Q.      We see some cash there.  Was cash recovered

7   from the -- from different packs or bags in the Jeep?

8         A.      Yes, there was.

9         Q.      How much money was recovered from the Jeep?

10        A.      Okay.  There was a wallet on the hood of the

11  Jeep with $29 and an additional $2.37 in that bag.  There

12  was a black fanny pack on the driver's side floor with

13  $150.82 in it.  There was a black bag in the rear passenger

14  compartment.  It had $5,200 in it.  There was a blue

15  backpack which may be the one we're looking at here,

16  contained $5,670.  And that's all the cash that I recorded.

17        Q.      State Exhibit 439, does that show some -- a

18  weapon that was recovered from the bag as it appeared when

19  you first opened the bag?

20        A.      Yes, it does.

21        Q.      What type of -- which weapon was that?

22        A.      I believe that was State Exhibit 303.  It's a

23  Ruger.  I'm not quite sure of the caliber.  Looks like a

24  nine millimeter.

25        Q.      State Exhibit 440?

1     A.     The same weapon, I believe.

2     Q.     Okay.

3     A.     My notes don't indicate the condition of that

4  one at the time.

5     Q.     What was the next gun that was recovered?

6     A.     State Exhibit 304, it's a Charter Arms .38

7  Special revolver.

8     Q.     That's what we see in 441?

9     A.     Yes.

10    Q.     Was that --

11    A.     This weapon was loaded.

12    Q.     Okay.  What's the next weapon that you

13  recovered?

14    A.     State Exhibit 305 it's a Berreta nine

15  millimeter pistol.  The pistol was loaded with one round

16  chambered.

17    Q.     I want to show you one other gun that wasn't

18  in that tray, which has been marked as State Exhibit 309.

19    A.     Yes.

20    Q.     Is that another one of the guns that was taken

21  into custody?

22    A.     It is.

23    Q.     We may have offered, but I don't think that I

24  offered that last one.  At this time I will offer State

25  Exhibit 309 for all purposes.

1          MR. SANCHEZ:  We have no objection.

2          THE COURT:  No. 309 has been previously

3  admitted.

4     Q.     (By Mr. Shook)  Okay.  No. 305, was that found

5  in the bag, also?

6     A.     It was in a blue and black Northface backpack.

7  This was next.

8     Q.     All right.  State Exhibit 306, where was that

9  found?

10    A.     This was found in a green Pro Source bag

11  behind the passenger's seat.

12    Q.     Okay.  Is that the gun after it was taken out?

13    A.     Yes, it is.

14    Q.     Did it appear to be loaded?

15    A.     Yes, it does.

16    Q.     Okay.  The next handgun you took into custody?

17    A.     It would be State Exhibit 307.  It's a Beretta

18  .22 caliber pistol.

19    Q.     The next photograph shows it after the clip

20  has been taken out?

21    A.     Yes.  It shows that it was fully loaded with a

22  round chambered.

23    Q.     And then the next exhibit?

24    A.     The next one is Exhibit 308.  It's a Beretta

25  nine millimeter pistol.

1    Q.    And was it loaded or unloaded?

2    A.    My notes don't indicate.  I see a magazine

3  with it in that photograph there.

4    Q.    Okay.  And then the next handgun?

5    A.    State Exhibit 310.

6    Q.    Where was that found?

7    A.    This was also found in a green Pro Source bag

8  behind the passenger's seat.

9    Q.    And State Exhibit 309, do you recall where

10  that was found?

11    A.    This was also found in that same green bag

12  behind the passenger's seat.

13    Q.    And was it loaded?

14    A.    I don't have that in my notes.

15    Q.    Okay.  Let me show you what has been marked as

16  State Exhibit 62.  Is that type of weapon, I believe you

17  have seen that gun outside the presence of the jury on a

18  previous occasion, does it match the information that we see

19  on State Exhibit 62?

20    A.    Yes, Glock Model 17, Serial No. CWU717.

21    Q.    I want to show you some more exhibit items

22  that you seized from the Jeep itself.  I want to show you

23  what has been marked as 348, 349, 350, 351, 352, 353, 354,

24  355, 356, 358, and 483.  Are those all items that you took

25  from the Jeep?

1      A.      Yes, they are.

2              MR. SHOOK:  At this time we offer those

3 exhibits.

4              THE COURT:  We'll stand in recess until

5 3:20.

6                    (Recess)

7                    [Jury out]

8      Q.      (By Mr. Shook)  Special Agent Mahoney, 342-A

9 and 344-A, were these items found in the RV?

10     A.      Yes.

11     Q.      And 342-A actually found in the trash can we

12 saw in the photograph?

13     A.      Yes.

14     Q.      And 344-A was actually found in the RV itself?

15     A.      Yes.

16     Q.      All right.

17             MR. SHOOK:  Those would be the items that

18 we would offer, along with, for all purposes, 615.

19             MS. BUSBEE:  Could we see them?

20             MR. SANCHEZ:  Your Honor, we would object

21 to these exhibits.  They haven't been linked to Mr. Murphy

22 at all.  We also think that they are irrelevant to this

23 proceeding.  And if you think they are relevant, I think

24 under 403 balancing that they shouldn't come in on

25 guilt/innocence, Your Honor.

1          THE COURT:  Let me see the -- I know the

2    "Spec War" is not coming in.

3          MS. SMITH:  May I speak to that before

4    you make your ruling?

5          THE COURT:  Yes, you may.

6          MS. SMITH:  Unlike other trials, in this

7    case the issue is parties.  Therefore its value in this case

8    is more so than it was in the other ones, because the intent

9    of the mental state of the parties to the crime is very

10   important and the "Spec War" sheet goes to -- regardless of

11   who brought it in, it could be any of the parties, it goes

12   to their mental state and reflects on the intent.  And

13   intent is going to be an issue -- is the issue in this case

14   and intent of the parties is an issue.

15         MS. BUSBEE:  Your Honor, I don't know how

16   anything that was found a month after the offense which is

17   on trial here could possibly be said to be linked to the

18   defendant's mental state when it hasn't been linked to him.

19         MS. SMITH:  It's not just the defendant's

20   mental state that we're trying to prove here.  We're trying

21   to prove the mental state of the other members of the Texas

22   Seven.  Mr. Bode did state this morning that Mr. Murphy was

23   in the RV where one of the "Spec War" sheets was located, so

24   we have linked it.

25         MS. BUSBEE:  On a date uncertain.

1          THE COURT:  Help me with the dates of the
2    arrest of the folks in the RV.
3          MS. SMITH:  The 22nd.
4          MR. SHOOK:  The 22nd.
5          MS. SMITH:  And the two were arrested
6    elsewhere on the 24th.
7          MS. BUSBEE:  And I think that the
8    evidence has shown in previous trials that they had been in
9    Colorado Springs for several days before they were arrested.
10         MS. SMITH:  We don't have to link it to
11   Mr. Murphy.  It certainly wasn't brought into the RV by
12   anybody but one of the members of the Texas Seven.
13         MS. BUSBEE:  I don't know how you can
14   even say that.
15         MR. SHOOK:  There's no evidence that
16   people were running around, you know, in and out of there.
17         MS. BUSBEE:  Or the other.  It's just
18   irrelevant.
19         THE COURT:  I understand the State's
20   theory.  You know, previous rule that these exhibits are not
21   admissible before the jury.  As far as 615, which is the
22   receipt for four bulletproof vests, that will go to the
23   weight that the jury may assign, if any, they wish to do so.
24         MS. BUSBEE:  May I see that, Your Honor?
25         THE COURT:  Yes.  That's why I was

1   asking.  The date on that receipt shows to be the 18th of

2   January, 2001, and those are certainly large enough that one

3   would be aware of the bulletproof vest and especially four

4   vests, if they were there.

5                   The question for the jury, that's why I'm

6   going to admit it, is the weight they wish to assign that,

7   if he was there and had purchased the vests.

8                   MS. BUSBEE:  On guilt or innocence?

9                   THE COURT:  Once again, it just goes to

10  weight.

11                  MS. BUSBEE:  So it's your ruling that

12  this is relevant on the issue of guilt or innocence?

13                  THE COURT:  I assume that's what the

14  State is offering it for.  I don't know what they are

15  offering it for.

16                  MS. BUSBEE:  But my objection is

17  relevance.  So if you are admitting it, you are saying it's

18  relevant?

19                  THE COURT:  I understand why they want to

20  offer the "Spec War" sheet.  What's the issue the State is

21  offering the receipt for?

22                  MS. SMITH:  It also goes to show the

23  mental state of the parties, their intent.  Why are they

24  buying ballistic vests?

25                  MS. BUSBEE:  A month before?

1          THE COURT:  A month after.

2          MS. BUSBEE:  That's what I'm saying,

3  their intent that weeks ago what they would do weeks ago is

4  reflected by something they did three or four weeks later,

5  three weeks later?

6          MR. SHOOK:  It all goes to entering into

7  a conspiracy with these individuals in anticipation of

8  violence.  You go in to commit robberies and continue to

9  associate with people that have guns and ballistic vests, it

10  all goes to the intent of the crime and what you anticipate.

11          MS. SMITH:  To do whatever they have to

12  do to stay free.

13          MS. BUSBEE:  Conspiracy has concluded.

14  We're in guilt or innocence.  It's my argument this is not

15  relevant.

16          MS. SMITH:  Conspiracy hasn't concluded.

17  They're in flight from the offense.

18          THE COURT:  Let me understand all the

19  evidence.  Agent, you never did find these four vests

20  anywhere in Colorado, did you?

21          THE WITNESS:  No.

22          MR. SHOOK:  Judge, I can tell you for the

23  record is they were not -- they got arrested before they

24  were picked up.

25          THE COURT:  Delivered.  That does change

1  it somewhat in that the defendant may not have had knowledge

2  that the order was placed, which goes to the relevancy at

3  this point.  Their argument, after understanding all the

4  evidence here, would be more on the issue of punishment than

5  it does on the issue of guilt.

6            I'll sustain the objection to 342-A and

7  344-A for all purposes at this time.  And 3 -- what's that

8  exhibit there?

9            MR. WIRSKYE:  No. 615, Your Honor.

10           THE COURT:  No. 615, I'll sustain it for

11 this phase of the trial.

12           MR. SHOOK:  While we're outside the

13 presence of the jury, may I put some other items in for

14 record purposes?

15           THE COURT:  You may.

16      Q.   (By Mr. Shook)  Special Agent Mahoney, let me

17 show you some other items that were taken from the RV and

18 see if you can identify them, 334, 336, 339, 338, 343-A,

19 344, 345, are all those items taken from the RV?

20      A.   Yes.

21           MR. SHOOK:  We would offer those for

22 record purposes.

23           THE COURT:  Any objection for record

24 only?

25           MS. BUSBEE:  No, Your Honor.

1            THE COURT:   Those items shall be admitted

2 for record purposes.

3        Q.     (By Mr. Shook)   State Exhibits 985 and 986,

4 were these wallets also recovered from the RV?

5        A.     They were.

6            MR. SHOOK:   We'll offer 985 and 986 for

7 record purposes, also.

8            MR. SANCHEZ:   No objection.

9            THE COURT:   Nos. 985 and 986 for record

10 only.

11                   [Jury in]

12            THE COURT:   Thank you.   You may be

13 seated.  Mr. Shook?

14            MR. SHOOK:   I believe we left off on

15 submitting evidence.

16            THE COURT:   Yes.   Any objection by the

17 defense to the box?

18            MS. BUSBEE:   No objection to those.

19            THE COURT:   State Exhibits 348 through

20 356, 358 and 483 shall be admitted.

21        Q.     (By Mr. Shook)   I'll show you State Exhibit

22 468.  Is that the identification that we saw on the front of

23 the Jeep in an earlier photograph?

24        A.     Yes, it is.

25            MR. SHOOK:   We'll offer 468, also.

1          MR. SANCHEZ:  No objection, Your Honor.

2          THE COURT:  No. 468 is admitted.

3          Q.     (By Mr. Shook)  No. 468, does that appear to

4    be some type of security badge, along with some ID, the name

5    on this Robert Swihart?

6          A.     Yes, it is.

7          Q.     The face there, do you recognize that from a

8    mug shot of a person involved in this case?

9          A.     There's a photograph of George Rivas.

10         Q.     I want to go over a couple of items that you

11   recovered in the Jeep.  Did you recover numerous items of

12   ammunition throughout the Jeep?

13         A.     Yes, we did.

14         Q.     Let me show you State Exhibit 354.  What is in

15   that particular bag?

16         A.     A two-way radio, batteries, purple duct tape,

17   rubber bands.

18         Q.     Was a scanner also found in the Jeep, if you

19   recall?

20         A.     I believe there was.

21         Q.     Okay.  Let me show you State Exhibit 483.

22   What is that?

23         A.     There's a Colorado Springs and Pueblo scanner

24   frequency list and then there's some earpieces for a

25   scanner.

1    Q.    Would this be the same type of information

2  that was contained in the frequency book that we saw

3  earlier?

4    A.    Yes.

5    Q.    But this is for the Colorado Springs area?

6    A.    Correct.

7    Q.    Lists the Colorado Springs Police Department,

8  as well as the El Paso County Sheriff's Office?

9    A.    Yes.

10    Q.    No. 356, is this an example of the type of

11  ammunition, different types of ammunition and boxes of

12  ammunition that you found throughout the Jeep?

13    A.    Yes, it is.

14    Q.    Let me show you what has been marked as State

15  Exhibit 359.   Inside that State Exhibit 359-A, is this an

16  item you recovered from the Jeep?

17    A.    It is.

18    Q.    What's that item?

19    A.    This is a nightvision scope.

20    Q.    Okay.

21         MR. SHOOK:   We'll offer State Exhibit 359

22  and 359-A.

23         MR. SANCHEZ:   No objection.

24         THE COURT:   Nos. 359 and 359-A will be

25  admitted.

1    Q.    (By Mr. Shook)   And what is a nightvision

2  scope used for?

3    A.    Basically, it's for seeing in the dark.   It

4  illuminates vision in your area.

5    Q.    And then State Exhibit 363, what is that?

6    A.    Another bandolier containing shotgun

7  ammunition.

8    Q.    Found in the Jeep?

9    A.    Yes.

10         MR. SHOOK:  We'll offer State Exhibit

11  363.

12         MR. SANCHEZ:  No objection.

13         THE COURT:  No. 363 shall be admitted.

14    Q.    (By Mr. Shook)   Let me show you State Exhibit

15  458.  Was there a search conducted of some of the bags there

16  in the back cargo compartment?

17    A.    Yes.

18    Q.    State Exhibit 459, do we see a shotgun that

19  was recovered?

20    A.    Yes, we do.

21    Q.    The bandolier there, is that the bandolier

22  that the jury has now and is passing around?

23    A.    Yes, it is.

24    Q.    Let me show you State Exhibits 460 and 461.

25  Does this show the -- 460 show the shotgun after it's been

1   unarmed?

2        A.    Yes.

3        Q.    How many shells were in that particular one?

4        A.    Okay.   There was a total of four, three in the

5   magazine and one in the chamber.

6        Q.    Okay.   Let me show you State Exhibit 320.   Was

7   this the shotgun that we see in the photograph that was

8   taken into custody?

9        A.    Yes, it is.

10            MR. SHOOK:   We'll offer State Exhibit

11   320.

12            MR. SANCHEZ:   No objection.

13            THE COURT:   No. 320 shall be admitted.

14       Q.    (By Mr. Shook)   What type of weapon is 320?

15       A.    A Remington shotgun.

16       Q.    Okay.   Is it -- has it been altered in any

17   way?

18       A.    Yes, in two ways.   This particular one, the

19   barrel has been sawed off, as well as the stock.

20       Q.    Okay.   And a strap was attached to it in this

21   manner?

22       A.    Yes.

23       Q.    Based on your experience in law enforcement,

24   what is the purpose for altering a shotgun in this manner?

25       A.    It makes it more easily to -- easy to conceal.

1    MR. SHOOK:  Your Honor, we will pass the

2  witness.

3    MR. SANCHEZ:  I have no questions of this

4  witness, Your Honor.

5    THE COURT:  Very well, thank you, Special

6  Agent Mahoney.  You may stand down.  May this witness be

7  excused?

8    MR. SHOOK:  No objection.

9    MR. SANCHEZ:  No objection.

10    MR. SHOOK:  We'll call Special Agent

11  Gooderham.

12    MILES GOODERHAM,

13  having been duly sworn, was examined and testified as

14  follows:

15    DIRECT EXAMINATION

16  BY MR. SHOOK:

17    Q.    Would you tell us your name, please.

18    A.    Miles Gooderham.

19    Q.    And how are you employed, sir?

20    A.    I'm a Special Agent with the FBI.

21    Q.    Special Agent Gooderham, where are you

22  assigned?

23    A.    I'm assigned to the Denver, Colorado, Field

24  Office.

25    Q.    What are your duties there?

1    A.    I'm presently assigned to a white-collar crime

2    squad.  I'm also assigned to the Division's Evidence

3    Response Team.

4    Q.    As part of -- and you have been trained in the

5    collection and processing of evidence for your duties with

6    the Evidence Response Team?

7    A.    That's correct.

8    Q.    Did you respond up to the Woodland Park area

9    on January 22nd of 2001?

10   A.    I did.

11   Q.    And did you participate in the search and

12   seizure of evidence from the RV located there?

13   A.    Yes, sir.

14   Q.    What was your assignment?  What area of the RV

15   did you search?

16   A.    I was responsible for the exterior of the

17   motor home, the area around the motor home, as well as any

18   storage compartments located on the outside of the motor

19   home.

20   Q.    Let me show you some photographs which have

21   been marked State Exhibits 469 through 478 and ask you if

22   you recognize those as photographs of items and areas that

23   were searched at the RV that evening and early morning

24   hours?

25   A.    Yes, sir, they are.

1          MR. SHOOK:  We'll offer State Exhibits

2     469 through 478.

3          MR. SANCHEZ:  No objection, Your Honor.

4          THE COURT:  Nos. 469 through 478 shall be

5     admitted.

6          Q.     (By Mr. Shook)  Let me show you 468 first.

7     What are we looking at there?

8          A.     This is a photograph of one exterior storage

9     compartments located on the driver's side of the motor home.

10          Q.     Okay.  And do we see after it's been opened,

11     are those some items that you searched after they were

12     photographed?

13          A.     That's correct.

14          Q.     Let me show you State Exhibit 470.  This

15     particular bag here, did that contain some other items that

16     were inside a garbage bag?

17          A.     Yes, it did.

18          Q.     Did that particular bag cause you some concern

19     once you started searching it or examining it?

20          A.     Yes, sir, it did.

21          Q.     Why is that?

22          A.     When I reached into the bag and pulled out the

23     garbage bag, it was a heavy item and I wasn't certain what

24     was causing it to be so heavy.

25          Q.     Okay.  Did you take some precautions there to

1  make sure you weren't dealing with anything lethal at that

2  time?

3        A.    Yes, sir, we did.

4        Q.    What do we see in the next photograph?

5        A.    In the photograph here it depicts the item

6  after it was removed from the garbage bag.  It was a bunch

7  of items wrapped in duct tape and then around the duct tape

8  was a white cloth or towel and that was placed inside the

9  trash bag.

10        Q.    And State Exhibit 472, does that show the

11  items after the bag has been opened?

12        A.    Yes, it does.

13        Q.    What types of things were located in there?

14        A.    Inside the bag were handgun frames, handgun

15  cylinders, handgun grips, and yokes.

16        Q.    And 473, is that another photograph of some of

17  the grips and cylinders that we can see?

18        A.    That's correct.

19        Q.    No. 474, what do we see there?

20        A.    These are -- this is a picture that depicts

21  the handgun frames laid out on a table once they were

22  removed from the bag.

23        Q.    Okay.  There are some items in front of you,

24  some handgun frames, which have been marked State Exhibits

25  324 through 333.  Are these the frames that we have seen in

1    the photographs and the items that you took into custody?

2         A.    Yes, they are.

3              MR. SHOOK:  We'll offer State Exhibits

4    324 through 333.

5              MR. SANCHEZ:  We have no objection, Your

6    Honor.

7              THE COURT:  Nos. 324 through 333 shall be

8    admitted.

9         Q.    (By Mr. Shook)  Let me show you some other

10   items which have been marked State Exhibits 479, 480, and

11   496.  Are these other parts of the weapons that were also

12   contained in the bags that you took into custody?

13        A.    Yes, they are.  They're the cylinders, yokes,

14   and grips from the handguns.

15             MR. SHOOK:  We'll offer 479 and 480, as

16   well as 496 at this time.

17             MR. SANCHEZ:  No objection.

18             THE COURT:  Nos. 479, 480, and 496 shall

19   be admitted.

20        Q.    (By Mr. Shook)  State Exhibit 475, is that

21   another bag that you found under the RV?

22        A.    That's correct.

23        Q.    And 476, does that show some items that were

24   contained in the bag?

25        A.    Yes, sir, it does.

1      Q.      What are we seeing there?

2      A.      Inside that bag were electronic communication

3  devices, radios, and scanner-type items.

4      Q.      And 477, does that show another different

5  black bag that had similar type of equipment in it?

6      A.      Yes, sir, it does.

7      Q.      Let me show you a green bag that has been

8  marked 481.  Is that the green bag that we see in the

9  photograph that you took into custody?

10      A.      Yes, it is with the scanners, radios, other

11  scanners, and other electronic communication devices inside.

12      Q.      And 846, is that the black bag we saw in the

13  photograph with the radio electronic equipment?

14      A.      It is.

15              MR. SHOOK:  Your Honor, at this time we

16  offer State Exhibits 846 and 481.

17              MR. SANCHEZ:  No objection.

18              THE COURT:  Nos. 481 and 846 shall be

19  admitted.

20              MR. SHOOK:  We'll pass the witness, Your

21  Honor.

22              MR. SANCHEZ:  No questions, Your Honor.

23              THE COURT:  Thank you, Special Agent, you

24  may stand down.

25              MR. SHOOK:  May this witness be excused?

194

1          MR. SANCHEZ:  That's fine with us, Your

2     Honor.

3          THE COURT:  He may.

4          MR. SHOOK:  We call Lannie Emanuel.

5                    LANNIE EMANUEL,

6     having been duly sworn, was examined and testified as

7     follows:

8                    DIRECT EXAMINATION

9     BY MR. SHOOK:

10         Q.     Would you tell us your name, please.

11         A.     My name is Lannie G. Emanuel.

12         Q.     How are you employed, sir?

13         A.     I'm employed with the Southwestern Institute

14    of Forensic Sciences.  That's sometimes referred to as the

15    Dallas County Crime Lab or SWIFS.

16         Q.     What are your duties there?

17         A.     Some of my duties include the examination of

18    firearms, examination of ammunition and ammunition

19    components, microscopic examination of questioned bullets,

20    cartridge cases, and toolmarks.  I'm also responsible for

21    serial number restorations of obliterated serial numbers,

22    distance determinations, fracture matches, and examination

23    of security devices.

24         Q.     Can you tell the jury the training that you

25    have had for the position that you hold?

1     A.    My formal training in firearm and toolmark

2   came when I was on active duty with the United States Army.

3   This was a two-year resident course of instruction that

4   began in 1979.  After successful completion of the course, I

5   was assigned to several laboratories within the U. S. Army

6   Crime Laboratory system, the first being in Fort Gordon,

7   Georgia.

8               I also had a tour of duty at the Fort

9   Gillum laboratory, which is located just outside of Atlanta,

10   Georgia.  I was then transferred to the European laboratory

11   located in Frankfort, germany, and I returned to the Fort

12   Gillum laboratory just prior to my decision to retire from

13   active duty and come to work for Dallas County in 1990.

14     Q.    Mr. Emanuel, you are the firearms examiner

15   that conducted several tests on bullet fragments, casings,

16   and handguns that were submitted to you during the

17   investigation of the capital murder of Aubrey Hawkins by the

18   Irving Police Department; is that correct?

19     A.    That's correct.

20     Q.    You do several tests out there.  Is one of

21   those comparing bullets, bullet fragments, from autopsies,

22   recovered from autopsies and crime scenes to each other and

23   also to handguns?

24     A.    Yes.

25     Q.    In that type of comparison are you sometimes

1  able to match a particular bullet or bullet fragment to a

2  particular weapon?

3       A.      Yes, provided there is sufficient marks on the

4  items involved.

5       Q.      Could you explain to the jury how that process

6  occurs?

7       A.      In the case of, for example, a bullet, when a

8  bullet is fired down a barrel, it picks up certain

9  characteristics.  The first would be class characteristics

10  and class characteristics would be imparted through the

11  rifling in the barrel.  And the rifling is placed in the

12  barrel during the manufacturing process.

13              As an example, it could be five lands and

14  grooves with right twist.  That's something that the

15  manufacturer designates and actually produces that way.

16              The other thing that we look for as it's

17  forced down the barrel, individual marks or individual

18  characteristics will also be placed on the bullet or the

19  projectile.  These marks or characteristics are individual

20  and they are to one gun and only one gun will produce that

21  type of mark or that particular mark.  And those are the

22  marks that we look for microscopically under the scope

23  during our comparison process.

24              Two basic examinations are available.  If

25  we have items of evidence from the scene that are submitted,

1   we can intercompare them without a weapon.  If a firearm is

2   later developed or a firearm is developed and submitted, we

3   would test fire the firearm, obtain known standards from

4   that, and then use that to compare to the unknown bullets or

5   cartridge casings.

6        Q.    The jury has heard some evidence of copper

7   jackets and lead bullets.  But if you could give them a

8   little more detail of what a copper jacket bullet is and how

9   that fits in with your comparison.

10       A.    A copper jacketed bullet designates a

11  particular type of projectile.  And it's actually made by

12  taking a copper jacket and semihard metal jacket and placing

13  a lead core in it.  And it's done in such a way that it's

14  sealed within the metal jacketing.  Of course, when it's

15  fired down the barrel, the part that comes in contact with

16  the barrel would be the metal jacket and that would pick up

17  the marks that I talked about earlier.  The lead core, of

18  course, is encased within that jacketing and it would not

19  pick up any of the marks that we use for comparison

20  purposes.

21       Q.    When a copper jacketed bullet is fired, does

22  the copper jacket come off the lead core at times?

23       A.    Not routinely.  However, if the bullet were to

24  strike something that could disrupt it, break it up,

25  fragment it, it could.  And there are bullets that are

1    submitted in the laboratory that have the -- the jackets

2    have pulled off of the lead core.

3            Q.    If a lead core, for instance, is recovered

4    from -- during an autopsy, would you be able to do any types

5    of comparisons or match that to any gun, if you just

6    recovered the lead core and not the copper jacket?

7            A.    I would say routinely no.  Again, the lead

8    core is contained within the jacketing and it doesn't come

9    into contact with the barrel; therefore, it does not pick up

10   any of the marks that we need to examine.

11           Q.    Now, the Irving Police Department submitted to

12   you a number of bullet fragments that they recovered from

13   their crime scenes from various cars involved and also the

14   pavement out there; is that correct?

15           A.    Yes.

16           Q.    And in addition to that, did the ME's Office,

17   Dr. Barnard, submit to you some projectiles that he

18   recovered from the autopsy of Officer Hawkins?

19           A.    Yes.

20           Q.    Was there one .357 revolver that was submitted

21   to you at the time that the crime occurred that was fully

22   intact?

23           A.    Yes.  In the initial evidence submission there

24   was one.

25           Q.    And I believe that would be what's been marked

1    as State Exhibits 178; is that correct?

2         A.    Yes, it is.

3         Q.    Okay.  And then at a later date were some

4    other bullet frames, along with cylinders, yokes, and grips,

5    gun frames, also submitted to you?

6         A.    Yes.

7         Q.    And before you is State Exhibits 324 through

8    333.  You have examined these outside the presence of the

9    jury?

10        A.    Yes.

11        Q.    Are these the gun frames that were submitted

12   to you?

13        A.    Yes, they are.

14        Q.    And then these packages that are before you,

15   State Exhibits 480, 479, and I believe that's 496, are those

16   the yokes, the cylinders, and the pistol grips that were

17   also submitted to you?

18        A.    Yes, they are.

19        Q.    And you conducted examinations on all of

20   these?

21        A.    Yes.

22        Q.    Now, as far as the fact that the guns were

23   disassembled, did that prevent you in any way from

24   conducting firearms tests on them?

25        A.    No, it didn't, not to obtain a test bullet

1    from each of the barrels.

2        Q.    Okay.  First of all, on State Exhibit 178, the

3    gun that was first submitted to you, what type of weapon is

4    that?

5        A.    This is a revolver.  It's .357 caliber Smith &

6    Wesson manufacturer.

7        Q.    And did you conduct a test to find out what

8    the trigger pull was on that particular weapon?

9        A.    Yes, I did.

10       Q.    What were the results of your tests?

11       A.    The single-action trigger pull was between

12   three and three-quarter pounds and four pounds.  The

13   double-action trigger pull was between ten and ten and

14   one-quarter pounds.

15       Q.    You conducted firearm tests from all those

16   weapons and compared them to the projectiles that were

17   submitted to you by the Irving Police Department; is that

18   right?

19       A.    That's correct.

20       Q.    Were you able to match some of those bullet

21   fragments to some of these weapons?

22       A.    Yes.

23       Q.    And to make your testimony more clear, I

24   believe you color coded the weapons with some of the

25   canisters that you matched comparisons to, correct?

1    A.    That's correct.

2    Q.    Let's go over some of those matches now.

3         MR. SHOOK:   Can I have the witness step

4    down, Your Honor?

5         THE COURT:   You may.

6    Q.    (By Mr. Shook)   Let me first show you what has

7    been marked as State Exhibit 324.   Were you able to match

8    that particular weapon to some of the bullet fragments

9    recovered from the autopsy, as well as the bullet fragments

10   from the crime scene?

11   A.    Yes.   This is my item 140 on my report.   And I

12   was able through microscopic examination of the items

13   submitted, it was determined that items 1, my item on my

14   report, items 1, 7, 11, and 42, bullet jackets as having

15   been fired through this barrel.

16   Q.    Let's start with some of the bullet fragments

17   that were recovered from the autopsy which are reflected

18   here on the mannequin.   Let me show you what has first been

19   marked as State Exhibit 213.   Does Dr. Barnard indicate on

20   the packaging where he recovered that particular bullet

21   fragment?

22   A.    Yes.   This is designated as removed from the

23   uniform shirt.

24   Q.    Okay.   And would that be the particular

25   exhibit marked here in purple corresponding with the

1    markings you placed on 213?

2         A.    Yes.

3         Q.    And that was matched to that particular

4    weapon, 324?

5         A.    Yes.

6         Q.    And State Exhibits 214 and 215, were they also

7    matched to that particular weapon?

8         A.    Yes, they were.

9         Q.    And where does Dr. Barnard indicate on those

10   exhibits where those bullets came from?

11        A.    No. 214 is designated as removed from left

12   cheek.

13        Q.    And that would be indicated here by the

14   marker?

15        A.    Yes.  And State Exhibit 215, my item No. 1,

16   removed from clothes.

17        Q.    And that would be --

18        A.    Down here.

19        Q.    -- down here.  Were there some other matches

20   made with that particular weapon to some items submitted to

21   you from the crime scene?

22        A.    Yes, I believe there were.

23        Q.    And is that reflected in State Exhibit 186-A?

24        A.    Yes, my item 42.

25        Q.    Here's a diagram that is already in evidence

1  marked State Exhibit 759.  And do we see State Exhibit 186-A

2  reflected in that particular diagram?

3       A.    Yes, it is.

4       Q.    Now, the next gun that you matched some

5  projectiles to, I believe, was State Exhibit 321.  You used

6  a color code green for that particular weapon; is that

7  right?

8       A.    That's correct.

9       Q.    And were some projectiles from the autopsy

10  matched to that particular weapon?

11       A.    Yes.

12       Q.    And are those reflected in State Exhibits 210,

13  211, and 212?

14       A.    Yes, they are.

15       Q.    And could you inform the jury as to where

16  those particular projectiles were recovered from?

17       A.    State Exhibit 210, my item No. 9, is

18  designated removed from the left forearm.

19       Q.    Which would be located here?

20       A.    That is correct.

21       Q.    All right.

22       A.    State Exhibit 211, my item No. 6, designated

23  as removed from left mastoid bone.  Here it is.

24       Q.    Indicated here?

25       A.    Right here.

1    Q.    All right.

2    A.    And State Exhibit 212, my item No. 3,

3  designated as removed from the pericardial sac, which would

4  be this rod.

5    Q.    This would be the wound going down indicated

6  in the neck area on the mannequin?

7    A.    Yes.

8    Q.    All right.  Now, there were some other

9  projectiles from the autopsy that were submitted to you,

10  State Exhibits 216 through 220, that you were unable to

11  match to any weapon; is that correct?

12    A.    That's correct.

13    Q.    And what would the explanation be for that?

14    A.    These items are either fragments or could be

15  bullet cores.

16    Q.    Again, I think we have gone over it, but if

17  there's a bullet core, you can't usually get enough

18  characteristics to match that?

19    A.    The bullet core, actually, does not pick up

20  the marks that are necessary for the comparison process.

21    Q.    The next weapon you made a match to would be

22  State Exhibit 323; is that correct?

23    A.    That is correct.

24    Q.    And you designated that, I believe, in brown?

25    A.    Yes.

1      Q.      Let me show you what has been marked as State

2   Exhibits 185-C and D.  Are those fragments that you were

3   able to match to those weapons?

4      A.      Yes, they are.

5      Q.      And do we see those there on that particular

6   exhibit?  At the top would be 185-D?

7      A.      Yes.

8      Q.      And designated No. 8 is --

9      A.      That's correct.

10     Q.      -- 185.  Is that all the matches that you made

11  with that particular weapon?

12     A.      Yes.

13     Q.      And the next weapon is State Exhibit 322?

14     A.      Yes.

15     Q.      State Exhibit 185-A and 185-B, are those

16  fragments that were found at the scene that were matched to

17  that particular weapon?

18     A.      Yes, they are.

19     Q.      And, again, are they reflected on the diagram?

20     A.      I see 185-A and 185-B, yes.

21     Q.      State Exhibit 184-A and 184-B and 488, are

22  these items that you were able to match to that particular

23  weapon?

24     A.      Yes, they are.

25     Q.      Okay.  What is 488?

1    A.    No. 488 is designated as my items 37 and 38 on

2  the report.  They are two PMC .357 Magnum cartridge cases.

3    Q.    And is that a different type of examination

4  that allowed you to match that particular weapon?

5    A.    It's -- the principle is the same.  We're

6  still looking for marks.  This is a different portion of the

7  firearm mark, the item, that I actually look at.

8    Q.    Okay.  And then 184-A and 184-B appear on the

9  diagram to be fragments found in the door of the Explorer?

10   A.    Yes.

11   Q.    Then State Exhibits 186-B and C, I'm not sure

12 if we have gone over those yet.  Those go back to the gun

13 that you have labeled green which is State Exhibit 321; is

14 that right?

15   A.    I would have to look at it.  It's my item 129,

16 which is State Exhibit 321, yes.

17   Q.    Those reflected on the diagram of bullets

18 recovered from the squad car?

19   A.    Yes, that's correct.

20   Q.    No. 486-A -- let me ask you this first.  Let

21 me show you what has been marked as State Exhibit 183.  Do

22 you recognize the ammunition in that particular exhibit?

23   A.    Yes, I do.

24   Q.    And was that ammunition that you examined from

25 the weapon that was fully intact that was submitted to you,

1    which is State Exhibit 178?

2         A.     Yes.  It was submitted with this particular

3    firearm.

4         Q.     When it was submitted to you, were there five

5    live rounds in the weapon?

6         A.     The weapon was actually unloaded, but they

7    were submitted with it.

8         Q.     And did you examine the actual live round?

9         A.     Yes.  I actually disassembled two of them.

10        Q.     Okay.  Did you notice anything unusual on the

11   particular rounds from that particular weapon?

12        A.     The thing that I noticed -- and these are

13   lead, round-nosed bullets.  They do not have jacketing.

14   It's a -- lead, of course, is a soft material.  And at one

15   time or another someone has put a cut across the nose of the

16   bullet.

17        Q.     If I could get you just to go kind of up to

18   the jury rail and go slowly down it to show the jurors the

19   types of cuts that were put in the bullets.

20        A.     [Witness complies.]

21        Q.     That would not have been put there by the

22   manufacturer; is that correct?

23        A.     No, this is not the manufacturer.

24        Q.     Based on your experience, Mr. Emanuel, what is

25   the purpose in marking the bullet in that manner?

1          A.     When a projectile is cut like that, the theory

2    behind it is when it is fired and strikes a target, it is,

3    an example, human tissue, it will actually cause it to break

4    up or deform more readily than if it was a complete whole

5    unit without the marks in it.  In other words, it's somewhat

6    prescored.  This was actually started long before items like

7    modern ammunition.  Today we have hollow-point bullets and

8    soft-nosed bullets that are actually designed to do that.

9    But before that was developed, that was actually done in an

10   effort to cause more damage or more wounding power to the

11   bullet.  Of course, it is dependent on velocity.  It has to

12   have sufficient velocity for it to actually break up or

13   mushroom out.

14         Q.     I'll show you what has been marked as State

15   Exhibit 182 and did you match this particular fragment to

16   178?

17         A.     Yes, I did.

18         Q.     And does that indicate on the diagram that 182

19   was recovered from the dashboard of the squad car?

20         A.     Yes, it does.

21         Q.     Now, as a result of your examinations, how

22   many different weapons were used during the incident that

23   occurred behind the Oshman's?

24         A.     Based on the microscopic examinations of the

25   items that were submitted to me, there are five firearms

1    that were identified as being used during the incident.

2         Q.    Could there have been more firearms used?

3         A.    Yes.  There's a possibility there could be.

4         Q.    And why is there a possibility that there

5    could be?

6         A.    Because some of the fragments that were

7    submitted, I was unable to identify to a particular weapon,

8    so it has a potential to, number one, be another weapon

9    involved or, number two, it could actually be one of the

10   five that I have identified, but I just couldn't say for

11   sure that that was the one.

12        Q.    Now, did you also examine the revolvers and

13   the revolver frames to try to find some serial numbers or

14   try to recover some serial numbers from it?

15        A.    Yes.

16        Q.    What process did you use for that?

17        A.    The process that we use or I used in this

18   particular case is called acid etching polishing technique.

19   When a serial number is obliterated, the majority of the

20   time the sandpaper or grinding or scraping is used and

21   whoever is doing it will usually stop when it's no longer

22   visible.

23              But when it's -- the weapon is made and

24   the serial number is imprinted on it, it's done with a lot

25   of pressure and it actually disturbs the metal where the

1    serial number is impressed into the metal itself.

2              What I do is I polish that out to take

3    off all of the marks that were used to obliterate it and I

4    place acid on it.  And the acid etches the disturbed metal

5    at a different rate than it does the normal metal that has

6    not been damaged during the serial number application.  And

7    it gives the appearance that the number comes back up.

8              Sometimes this works and sometimes it

9    doesn't.  If it's taken down too far and there's no damaged

10   metal for me to work with, of course, the number cannot be

11   raised.

12        Q.    Were you successful in your examinations to

13   recover serial numbers on all these weapons?

14        A.    Either serial numbers or, I believe, Texas

15   Department of Correction numbers.

16        Q.    Let me show you what has been marked as State

17   Exhibit 495.  Is this a diagram that you prepared to assist

18   you in your testimony?

19        A.    I didn't prepare the chart, but this is from

20   my report, yes.

21        Q.    And does this have the Texas Department of

22   Corrections number, as well as the serial numbers that you

23   were able to recover in your process?

24        A.    Yes.

25              MR. SHOOK:  Your Honor, at this time

1    we'll offer State Exhibit 495.

2                    MR. SANCHEZ:  We have no objection.

3                    THE COURT:  No. 495 shall be admitted.

4        Q.     (By Mr. Shook)  If you could, explain what we

5    see on the diagram.

6        A.     The first thing in the column to the far left

7    would be my exhibit number as it's listed in my report.  The

8    next column is a fitting number and that's the number of --

9    during the manufacture of a firearm like this, there are

10   pieces that need to be fit together in the early stages of

11   the manufacture.  Then it will go out for processing, either

12   bluing or nickeling process, perhaps, but they want to keep

13   those two pieces together.

14                   So after they go out to the different

15   manufacturing areas and come back, they can mate them back

16   up and that's what is designated as a fitting number.  The

17   third column is a model number.  All of these were model 65

18   revolvers.  There were two serial numbers on this particular

19   model of gun.  There's one on the butt of the weapon, which

20   would be this area right here.  And there's also a serial

21   number under the yoke, which would be this area right here.

22   They're so designated.

23                   I have listed the serial numbers, if they

24   were available on the frame.  If you see an OB, that stands

25   for obliteration.  And if, as an example, my item No. 130,

1   there's a CAA93440B, that serial number in that particular

2   location was when I received it obliterated and I was able

3   to restore it to read the numbers that I just read out.

4                    The same gun, the Department of

5   Corrections number was obliterated, but it has a straight

6   line and that indicates that I was unable to bring that

7   particular number up.  And it carries on down through the

8   chart.

9                    The next column would be the

10  single-action trigger pull of the different frames.  And

11  there were other numbers that were on the frames that I

12  designated and listed and some of them had been obliterated

13  and some of them hadn't.

14       Q.    So there are two types of numbers on the

15  weapons?

16       A.    Yes.

17       Q.    Let me show you a poster that has been marked

18  State Exhibit 260.  You have seen this poster before, I

19  believe; is that correct?

20       A.    Yes, I have.

21       Q.    It contains serial numbers, as well as TDCJ

22  numbers?

23       A.    Yes.

24       Q.    Were you able to match one or the other or

25  both to all the numbers that are reflected in State Exhibit

```
 1   495?

 2        A.      Yes.

 3             MR. SHOOK:   We'll pass the witness.

 4             CROSS-EXAMINATION

 5   BY MR. SANCHEZ:

 6        Q.      Mr. Emanuel, based on your analysis of the

 7   fragments that were given to you that came from an autopsy

 8   that came from the crime scene and also came from vehicles

 9   that were looked at in this case, you were able to determine

10   that those fragments came from five guns that you looked at,

11   correct?

12        A.      Yes, the ones that I was able to identify.

13        Q.      And that's all you were able to do, correct?

14        A.      Yes.

15             MR. SANCHEZ:   That's all we have, Your

16   Honor.

17             MR. SHOOK:   We have no further questions.

18   May this witness be excused?

19             MR. SANCHEZ:   No objection.

20             THE COURT:   Yes, he may.  Thank you, sir,

21   you are excused from this trial and free to go.

22             MR. SHOOK:   May we approach the bench,

23   Your Honor?

24             (Bench conference)

25             THE COURT:   Members of the jury, we've
```

1  reached a point this afternoon that I can't get the next

2  witness on and off before, you know, it gets too late.

3  Tomorrow morning I have other obligations.  I must attend a

4  meeting with the other 14 district judges.  I want you to

5  know what I'm doing and why I'm doing it.  It has nothing to

6  do with this trial.  I have a meeting and my obligation will

7  take me a while.

8              We're not going to be able to start until

9  10:00 tomorrow morning, 10:00.  So, as I said, I'm going to

10  be a broken record, but I'm going to say it one more time.

11  You know what I'm fixing to say.  No media, no news, no TV,

12  no newspaper, no Internet, no conversation with the spouses,

13  friends, or coworkers.  Everything that you need to learn

14  about this case comes from where?  Right there.  Very good.

15              So with that, it's a beautiful day this

16  afternoon.  You can enjoy the remainder of your afternoon.

17  Tomorrow morning be ready to go to work at 10:00.

18                      [Jury out]

19                      [End of Volume]

20

21

22

23

24

25

1   STATE OF TEXAS          *

2   COUNTY OF DALLAS        *

3       I, NANCY BREWER, Official Court Reporter for the 283rd

4   Judicial District Court, do hereby certify that the above

5   and foregoing constitutes a true and correct transcription

6   of all portions of evidence and other proceedings requested

7   in writing by counsel for the parties to be included in this

8   volume of the Reporter's Record, in the above-styled and

9   numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11      WITNESS MY OFFICIAL HAND on this the ___ day of

12  _____ March, 2004.

13

14

15                          _____
                            NANCY BREWER, CSR, NO. 5759
16                          Expiration Date:  12-31-04
                            Official Reporter, 283rd JDC
17                          Frank Crowley Crts. Bldg. LB33
                            133 No. Industrial Blvd.
18                          Dallas, TX 75207
                            (214)653-5863p
19

20

21

22

23

24

25

REPORTER'S RECORD

VOLUME 43 OF 61 VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| STATE OF TEXAS | * | IN THE DISTRICT COURT |
|---|---|---|
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JURY TRIAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 12th day of November, 2003, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Vickers L. Cunningham, Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

ORIGINAL

1                    A P P E A R A N C E S

2    APPEARING FOR THE STATE

3    Mr. Toby Shook
     SBOT NO. 18293250
4    And
     Mr. Bill Wirskye
5    SBOT NO. 00788696
     Assistant District Attorneys
6    133 No. Industrial Blvd.
     Dallas, Texas 75207
7    Phone:  214/653-3600

8

     APPEARING FOR THE DEFENDANT
9
     Ms. Brook Busbee
10   Attorney at Law
     SBOT:  03488000
11   703 McKinney Ave. Ste. 312
     Dallas, TX 75202
12   214/754-9090

13   Mr. Juan Sanchez
     Attorney at Law
14   SBOT:  00791599
     5630 Yale Blvd.
15   Dallas, TX 75206
     214/365-0700

16

17

18
19

20

21

22

23

24

25

| | WITNESS INDEX | | |
|---|---|---|---|
| **WITNESS** | **DIRECT** | **CROSS** | **VOL.** |
| Jim Stinson | 3,46 | 16,44 | 43 |
| Matt Harrell | 27,47 | 31,50 | 43 |
| John Ford | 52 | 66 | 43 |
| Stephen DiRito | 68 | 79 | 43 |
| Jeff Spivey | 81 | 87 | 43 |

## EXHIBIT INDEX

| EXHIBIT | IDENT. | OFFER | ADMIT | VOL. |
|---------|--------|-------|-------|------|
| ST.465 | POSTER | 75 | 75 | 43 |
| ST.466 | POSTER | 75 | 75 | 43 |
| ST.467 | POSTER | 75 | 75 | 43 |
| ST.489 | DIAGRAM | 87 | 87 | 43 |
| ST.781 | PHOTO, AERIAL | 7 | 7 | 43 |
| ST.782 | PHOTO, AERIAL | 7 | 7 | 43 |
| ST.783 | PHOTO, HOLIDAY INN | 7 | 7 | 43 |
| ST.784 | PHOTO, HOLIDAY INN ROOM | 7 | 7 | 43 |
| ST.785 | PHOTO, HOLIDAY INN ROOM | 7 | 7 | 43 |
| ST.786 | PHOTO, HOLIDAY INN ROOM | 7 | 7 | 43 |
| ST.787 | PHOTO, HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.788 | PHOTO, HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.789 | PHOTO, HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.790 | PHOTO, HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.791 | PHOTO, HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.792 | PHOTO, HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.793 | PHOTO, HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.794 | PHOTO, HOLIDAY INN ROOM | 69 | 69 | 43 |

| | | | | |
|---|---|---|---|---|
| ST.795 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.796 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.797 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.798 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.799 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.800 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.801 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.802 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.803 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.804 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.805 | PHOTO,HOLIDAY INN ROOM | 69 | 69 | 43 |
| ST.808 | HANDGUN | 69 | 69 | 43 |
| ST.810 | HANDGUNS | 69 | 79 | 43 |
| ST.811 | HANDGUNS | 69 | 69 | 43 |
| ST.812 | HANDGUNS | 69 | 69 | 43 |
| ST.813 | HANDGUNS | 69 | 69 | 43 |
| ST.814 | HANDGUNS | 69 | 69 | 43 |
| ST.815 | HANDGUNS | 69 | 69 | 43 |
| ST.817 | HANDGUNS | 69 | 69 | 43 |
| ST.818 | HANDGUNS | 69 | 69 | 43 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.819 | SHOTGUN | 76 | 76 | 43 |
| 2 | ST.820 | SHOTGUN | 76 | 76 | 43 |
| 3 | ST.822 | POSTER - GUN INFO | 75 | 75 | 43 |
| 4 | ST.987 | HAWKINS' GUN | 82 | 82 | 43 |
| 5 | ST.988 | HAWKINS' GUN CLIP | 82 | 82 | 43 |
| 6 | ST.989 | HAWKINS' HOLSTER | 82 | 82 | 43 |

```
1                    P R O C E E D I N G S

2                    [Jury in]

3                    THE COURT:  Good morning.  Please be

4    seated.  Mr. Shook?

5                    MR. SHOOK:  Your Honor, we'll call

6    Detective Stinson.

7                    JIM STINSON,

8    having been duly sworn, was examined and testified as

9    follows:

10                   DIRECT EXAMINATION

11   BY MR. SHOOK:

12        Q.    Would you tell us your name, please.

13        A.    It's James Stinson, S-T-I-N-S-O-N.

14        Q.    And how are you employed, sir?

15        A.    I'm a police officer with the Colorado Springs

16   Police Department in Colorado Springs, Colorado.

17        Q.    How long have you been with the Colorado

18   Springs Police Department?

19        A.    Almost 14 years now.

20        Q.    And what division are you assigned?

21        A.    Right now I'm in patrol.

22        Q.    Okay.  Let me talk -- bring your attention

23   back to January 23rd of 2001.  What division were you in at

24   that time?

25        A.    I was detective in the Homicide Unit.
```

1      Q.      On that particular date were you given an

2 assignment, along with other detectives, in relation to the

3 suspects that had become known to law enforcement as the

4 Texas Seven?

5      A.      Yes, sir.

6      Q.      What type of assignment were you given?

7      A.      Well, the day before five of the Texas Seven

8 had been located.  Four were arrested and one had committed

9 suicide and there were still two out on the streets.  We

10 were receiving lots of tips in the police department and so

11 we were just following up tips, trying to contact the

12 remaining two.

13     Q.      In fact, on that day, the 23rd ,had a van been

14 located in Colorado Springs?

15     A.      Yes, sir.

16     Q.      What part of the city was it?

17     A.      It was in the midwestern portion, closer to

18 the north.

19     Q.      Let me turn your attention to around 7:00 p.m.

20 that evening and ask if you went to a particular location

21 and followed up one of those leads?

22     A.      Yes, sir.  I was partnered up with Detective

23 Todd Drennan.  We received a tip from the Holiday Inn

24 located at 505 Pope's Bluff Trail.  And the receptionist had

25 checked in a gentleman the night before, using a drivers

1  license under the name of Andres Aguilar.  The back of this

2  drivers license had been peeled off, which she thought was

3  suspicious.  It looked like to her it had been tampered

4  with.

5              When he came in to -- when this gentleman

6  came into the Holiday Inn the night before, he was wearing a

7  blue hooded jacket with the hood over his head.  He didn't

8  come in from the front door, but he came in from a hallway.

9  That's when the receptionist first saw him.

10             When he came up to pay for a room, asked

11 for a room, he, like I said, he had this hood on, but he was

12 looking down at his feet.  He wouldn't have eye contact with

13 this receptionist.  He said he wanted a room for the night.

14 Said it didn't matter to him what it cost and he paid for

15 the room with a 100-dollar bill.

16      Q.      In fact, did he request another room later

17 that evening?

18      A.      Yes.  Later on he called back and stated that

19 he wanted another room.  He wanted a smoking room.  So he

20 moved -- he originally was given room 211 and they moved him

21 to room 426.

22      Q.      Did you, yourself, look at his identification

23 or a copy of the identification?

24      A.      A photocopy of it, yes, sir.

25      Q.      Did his photograph resemble any of the

1    suspects that you were looking for?

2         A.      Well, yes.  We were carrying photocopies of

3    the two gentlemen we were looking for, Patrick Murphy and

4    Donald Newbury.  And with the quality of the photocopies,

5    there's a resemblance between Mr. Aguilar and Mr. Newbury.

6         Q.      As a result of listening to what she had seen

7    and heard with this person, what did you decide to do then?

8         A.      Well, there were approximately 17 teams of

9    detectives out following tips.  We had a SWAT Team on

10   standby, meaning that they had all their gear on, they were

11   ready to answer anything that was suspicious.  Something

12   like this, this seemed to have a little more umph to it, so

13   we called our sergeant and advised him of what was going on.

14              And we had a SWAT Team respond to a

15   location where we briefed him on what was going on.  By this

16   time I had a map of the hotel, found out that there was a

17   vacant room immediately adjacent to the room that these

18   gentlemen or Mr. Aguilar had rented.  And other than that,

19   the whole wing was completely occupied.

20              We met with the SWAT Team about two miles

21   away, gave them the card keys, and planned the approach.

22   And then we came back to the hotel.

23        Q.      What was your purpose, then, to -- in meeting

24   the SWAT Team two miles away?

25        A.      Well, initially we were going to meet them

1    across the street, but across the street is where the van

2    was found and there was quite a bit of media attention

3    there.  So, I mean, there were probably 20, 30 satellite

4    trucks from different news stations around.  So we couldn't

5    do it anywhere close, because we didn't want to get the

6    media involved or in the way, so we just moved it farther

7    down the street.

8            Q.    Let me show you some photographs which have

9    been marked State Exhibit 781 through 786 and ask you if you

10   recognize those as being some aerial photos of the Holiday

11   Inn, as well as some photos of the Holiday Inn itself and

12   some interior shots?

13           A.    Yes, sir.

14                 MR. SHOOK:  Your Honor, at this time we

15   offer State Exhibits 781 through 786.

16                 MR. SANCHEZ:  No objection, Your Honor.

17                 THE COURT:  Nos. 781 through 786 shall be

18   admitted.

19           Q.    (By Mr. Shook)  Looking on the monitor, does

20   that show us an overview of where the Holiday Inn was

21   located?

22           A.    Yes, sir, it does.

23           Q.    Where do we see that on the monitor?

24           A.    Okay.  This is the front area where the

25   check-ins are made and back over here is where room 426 is

1    on the lower floor.

2         Q.    Okay.  Can we see where -- the area where the

3    van was located earlier that day in that photograph?

4         A.    To the top of the photograph you can almost.

5    It's just right above where the --

6         Q.    I think we may see that in the next photo.

7    Does that show the --

8         A.    Yes, sir.  It's right over here was where the

9    van was found.  This is the restaurant called the Hungry

10   Farmer Restaurant.  It's roughly three-quarters of a mile

11   from where the van was found to where the Holiday Inn is.

12        Q.    Let me show you State Exhibit 783.  Is this

13   the entrance to the Holiday Inn?

14        A.    Yes.

15        Q.    That's where you went to talk with the

16   receptionist?

17        A.    Yes.

18        Q.    And then the room you were concerned with was

19   426?

20        A.    Yes, sir.

21        Q.    Is that a photo of the door 426?

22        A.    Yes, sir.

23        Q.    And then 785, does this show the room along

24   with kind of -- with the hallway there?

25        A.    Yes.  This next room is 422.

1    Q.    And 786, what does that photo show us?

2    A.    This is 426, the sliding glass door to the

3    back of room 426.

4    Q.    After you had met with the Tact officers, did

5    you then proceed then to go back to the Holiday Inn?

6    A.    Yes.

7    Q.    Approximately what time did you arrive there?

8    A.    That was roughly 9:30 p.m.

9    Q.    As you got out of your vehicles, did you

10   approach the Holiday Inn yourself at that time?

11   A.    No.  As we were driving, mind you, I was a

12   detective, so I was wearing just clothes like this.  I did

13   not have a vest on, so I wasn't going to make the initial

14   contact.

15           So as we were pulling up, ironically

16   enough, a media helicopter flew right overhead and as the

17   SWAT guys were unloading from their van and setting up the

18   outer perimeter, then we just pulled past the room and they

19   had their approach team come in and they went in through the

20   locked doors, but I had the keys and they made their

21   approach and knocked on room 426.

22   Q.    Did you stay in communication with those

23   officers?

24   A.    Yes, I did, via telephone.

25   Q.    Did anyone answer the door at that time?

1    A.    No.

2    Q.    What was your next move?

3    A.    After they received no answer, the sergeant,

4  Sergeant Lofgren from the SWAT Team, called me and asked for

5  me to call the front desk and have a phone call in to 426 to

6  see if they would answer the telephone.

7    Q.    Did you do that at that time?

8    A.    Yes.

9    Q.    Were you able to make contact at that point in

10  time?

11    A.    No, sir.

12    Q.    What happened then?

13    A.    After that Detective Drennan and I then went

14  into the Holiday Inn and, like I said before, room 422 is

15  immediately adjacent.  We opened up that room and the SWAT

16  Team still had one of the their lookouts sitting at the door

17  of room 422, but the whole team and Detective Drennan and I

18  went into this room where we were going to make plans on

19  what we were going to do next.

20    Q.    So you are right next door to where the

21  suspects -- or where you thought they may be located?

22    A.    Exactly, yes.

23    Q.    Then what happened?

24    A.    After a couple of minutes, I guess roughly 30

25  minutes, of trying to come up with a plan, I was talking to

1   my sergeant on the telephone.  Sergeant Lofgren was talking

2   to his lieutenant.  We were trying to figure out what the

3   game plan was.  And we also had other detectives following

4   up on trying to identify Andres Aguilar to see if he could

5   be contacted and see what his story was.

6              During that time we had a lot of phone

7   calls on cell phones.  We had phone calls routed in through

8   the front desk and when the phone rang from the front desk

9   and I spoke with the receptionist and they said that one of

10  the occupants of room 426 had called and was asking if

11  somebody was looking for them.

12        Q.    Did you -- were you able to make contact with

13  the room?

14        A.    Yes.  After I received that phone call, I

15  advised Sergeant Lofgren, so he redeployed his men and then

16  I called up room 426.

17              MR. SHOOK:  Judge, could we approach the

18  bench for a moment?

19                   (Bench conference)

20              THE COURT:  Members of the jury, I need

21  to have a hearing.  Go with the Sheriff and I'll have you

22  back in just a minute.

23                   [Jury out]

24              THE COURT:  Let the record reflect the

25  jury has been retired pursuant to the pretrial motions filed

1  by the defense.  The Court needs to conduct a hearing on the

2  admissibility of certain evidence that the State tenders at

3  this time.  Mr. Shook?

4      Q.     (By Mr. Shook)  Detective Stinson, at that

5  point in time were you able to talk with an occupant in that

6  room?

7      A.     Yes, I was.

8      Q.     And what did he say to you?

9      A.     I advised -- when the gentleman answered the

10 phone, I was giving him the benefit of the doubt.  And I

11 said, "Andres"?  And the person on the phone said, "Yeah."

12 And I said, "This is Detective Stinson with the Colorado

13 Springs Police Department."  I told him that I was part of

14 this group of people looking for the remaining two Texas

15 fugitives.

16             And I asked him to step outside.  I told

17 him his room was surrounded and I asked him to step outside

18 with his hands up and after we identified him, we would let

19 him go on his way, unless he was one of the fugitives.

20     Q.     What did he say?

21     A.     He said, quote, "Well, Detective, you found

22 us," end quote.

23     Q.     Then what happened?

24     A.     I was trying to get Sergeant Lofgren's

25 attention to let him know that, you know, that this

1  gentleman had identified himself as one of the fugitives.   I

2  then began to try to stall for time.   The whole -- like I

3  said before, the whole wing was occupied with people.   And

4  if there was going to end up being a shootout, we wanted to

5  get as many people out as possible.

6          So I just began talking to him.   Asked

7  him who he was.   He said he was Patrick.   I knew that to be

8  Patrick Murphy.   I'm from Austin, so I know a little bit of

9  the area and I knew he was from Rockdale.   And we started

10  talking about Rockdale.

11      Q.      Did he ask you how you had found him?

12      A.      Yes, he did.

13      Q.      And after you spoke with him, at some point in

14  time did he want to hang up the phone?

15      A.      Yes, I spoke with him for a few moments.   He

16  wanted to speak to a supervisor and I let Sergeant Lofgren

17  talk to him for a few seconds and then he hands me back the

18  phone.   We talked a little bit more.   I asked him if he was

19  going to come out and he said he didn't know what he was

20  going to do at that time, but he did want to get his phone

21  on a speaker phone.   And I told him, you know, I made it

22  sound like I wasn't anywhere around him.   I said, I don't

23  know what kind of phone you have, even though I was probably

24  about two feet from him.   And I told him I didn't know how

25  to convert his phone to a speaker phone.   And I asked him

1   why he needed to have this done and he said he wanted to

2   keep his hands free.

3        Q.       Did he get agitated when you couldn't help

4   him?

5        A.       Yes.  He seemed agitated.  Then he told me he

6   just didn't want to talk to me anymore and he hung up the

7   phone.

8        Q.       Did you establish contact with him again a

9   short time later?

10        A.       Yes.  While I was doing that -- you know, that

11   conversation lasted maybe five minutes.  And while I was

12   doing that they were -- the SWAT guys and Detective Drennan

13   were able to get one person out catty-cornered to room 422.

14   So we transferred to her room, 416 I believe, and went over

15   there.

16                    And as they were still trying to get

17   people out, I recontacted 426.  They had called -- the

18   people in 426 had called the front desk.  The front desk

19   called me because I was letting them know we had changed

20   rooms.  They told me that 426 was wanting a phone call

21   again.  So then I called back and spoke to Mr. Murphy

22   briefly again.  The receptionist advised me that they had

23   called back, so I put in a phone call to room 426 again and

24   spoke with Mr. Murphy again and we talked for a brief moment

25   and then he put Mr. Newbury on the phone and I talked to him

1   for --

2        Q.    When you called Mr. Murphy back the second

3   time, did you ask him what he was doing?

4        A.    Yeah.  I said, "What's going on?"  And he

5   said, "Well, we're watching a porno movie," or watching

6   porn.

7        Q.    And then you talked with Mr. Newbury?

8        A.    Yeah.  I talked with him for about five or six

9   minutes after that.

10        Q.    Did Mr. Newbury -- did he want to know how his

11   friends were doing in Teller County?

12        A.    Yes, he asked that question.

13        Q.    And did he also want to know if you were

14   impressed that he had been out for forty days?

15        A.    Yes.  He was talking about how they were on

16   "America's Most Wanted" for four weeks in a row and that had

17   never been done before.

18        Q.    And did he make some comments about the host

19   of "America's Most Wanted"?

20        A.    Yes, he did.  He said he was a dick, John

21   Walsh.

22        Q.    And soon after that were negotiations turned

23   over to Matt Harrell?

24        A.    Yes.  Newbury and I talked for a little while

25   and he asked what my rank was and I told him I was a

1    homicide detective and he apologized and said, "I'm not

2    trying to disrespect you.  I'm sure that's impressive, but I

3    want to talk with somebody with more power, somebody from

4    the FBI or ATF."

5              And I told them, I said, you know,

6    listen, there's a whole lot of cops out here.  It's going to

7    take me a while to find somebody.  And I need him, I needed

8    about fifteen minutes, once again, stalling for more time.

9              MR. SHOOK:  That's all we have of this

10   witness, Judge.

11             THE COURT:  Ms. Busbee, do you have any

12   questions?

13             MS. BUSBEE:  Yes, Your Honor, I do.

14                        CROSS-EXAMINATION

15   BY MS. BUSBEE:

16        Q.    Detective Stinson, you said that when you got

17   him on the telephone you were stalling.  Could you tell us

18   what you did to stall?

19        A.    Just -- I spoke with Mr. Murphy about

20   Rockdale.  I spoke to Mr. Newbury about Brady, Texas.  I was

21   asking him about his family, just anything to keep him

22   talking and just so we could get more people into position

23   and get the people in the hotel room evacuated -- in the

24   hotel wing evacuated.

25        Q.    So your first conversation with him was about

```
 1   coming out of the room --
 2        A.     Yes, ma'am.
 3        Q.     -- is that right?
 4        A.     Yes.
 5        Q.     And then you decided to stall him?
 6        A.     Well, when he identified himself as being one
 7   of the two we were looking for, it became apparent to me
 8   that he wasn't just going to open the door automatically.
 9   So at that time, just kicked in to start stalling.
10        Q.     How did that become apparent to you?
11        A.     Because he didn't say he was going to do it.
12   He didn't say, okay, I'll do that.
13        Q.     Did you ask him?
14        A.     I asked him to come out and keep his hands up
15   and once he did that and we identified him, we would let him
16   go, if he wasn't one of the two.
17        Q.     And then he said he was one of the two or
18   words to that effect and then you decided to stall?
19        A.     He didn't make any comments about him coming
20   out.  The doors weren't opening so --
21        Q.     What was the next thing he said after he said,
22   "Well, Detective, you got me," what was the next thing that
23   was said?
24        A.     I was asking him who he was and that's when he
25   said he was Patrick.
```

1     Q.    Okay.  And then what was the next thing that

2  was said?

3     A.    I don't remember immediately.  Around that

4  time we started talking about being from Rockdale.

5     Q.    Okay.  And in order to buy some time, you

6  asked him questions about where he was from?

7     A.    Yes.

8     Q.    And do you remember what questions you asked

9  him?

10     A.    Just where he was from.  He said Rockdale.

11  I'm familiar with that area and we talked about -- when I

12  was out of high school I had a job as a produce deliverer.

13  I delivered to some stores in Rockdale.  We talked about

14  that and we talked about people who worked at the U-Tote-Ums

15  back there.

16     Q.    And about how long did you talk to him about

17  Rockdale?

18     A.    Oh, a couple of minutes.  The first

19  conversation with him was maybe five minutes.

20     Q.    Okay.  Now, I notice that you say that he

21  became frustrated or decided that he didn't want to talk to

22  you anymore.  At what point did he become frustrated?

23     A.    When I couldn't tell him how to change his

24  telephone to a speaker phone.

25     Q.    Okay.  Now, the next thing is that you get a

1    call from the front office; is that correct?

2          A.      No.  The next thing is he hung up on me.  And

3    then we transferred rooms from 422 to 416.

4          Q.      Okay.  I guess that's true.  The next contact

5    or concerning these conversations was you got a phone call

6    from someone who said they were at the front desk?

7          A.      Right.

8          Q.      And said that they had called, wanting to talk

9    to someone?

10         A.      Yes.

11         Q.      Okay.  And did you call the room again?

12         A.      Yes, I did.

13         Q.      And did you ask them if they wanted to

14   reinitiate the conversation?

15         A.      No.  I just spoke with Mr. Murphy who answered

16   the phone.

17         Q.      Okay.  Now, had you ever spoken with Mr.

18   Murphy before?

19         A.      No, I had not.

20         Q.      Did you talk with him after he was arrested?

21         A.      Yes, I did.

22         Q.      How long did you talk to him?

23         A.      Enough time to walk him from the Holiday Inn

24   to the police car.

25         Q.      And what did that conversation consist of?

1    A.    We talked about how cold it was, how he

2    enjoyed his stay in Colorado.  He didn't have a shirt on.

3    We were talking about the temperature and we were walking

4    through snow.

5         Q.    Did you ever talk to Mr. Newbury outside?

6         A.    No, I did not.

7         Q.    Now, I had an opportunity to look at your

8    report and read your prior testimony.  I don't see anywhere

9    in here where you Mirandized Mr. Murphy or anybody when you

10   were on the phone with him; is that correct?

11        A.    That's correct.

12        Q.    And did you make any recordings of these

13   conversations?

14        A.    With my conversations?  No, I did not.

15        Q.    Did you make any notes?

16        A.    No, I did not.

17        Q.    That's understandable.  I just wanted to know

18   if you had.  This is a silly question, I suppose, but was

19   Mr. Murphy free to leave that room?

20        A.    He was free to move about the room.

21        Q.    Was he free to walk out of that room and go

22   about his business?

23        A.    He was free to walk out of the room, yes.

24        Q.    That's not exactly an answer to my question.

25   Was he free to leave the room and go about his business?

1       A.      Once he left the room, he would not be going

2  about his business, no.

3       Q.      And, in fact, you told him that there was a

4  SWAT Team in place; is that correct?

5       A.      Yes, yes, I did.

6       Q.      Okay.  And do you remember exactly what you

7  told him?

8       A.      I just told him he was completely surrounded.

9       Q.      Okay.

10       A.      He indicated that he knew that, because he had

11  heard the helicopter.  He thought it was a police

12  helicopter.

13       Q.      Okay.

14                   MS. BUSBEE:  That's all the questions

15  that I have right now for this hearing outside the presence.

16                   THE COURT:  Do you reurge your motion?

17                   MS. BUSBEE:  Yes.

18                   MR. SHOOK:  Judge, we have one more

19  witness, if you want to hear.  It will be the following

20  witness.

21                   MS. BUSBEE:  Can we -- can we discuss

22  this testimony outside the presence of the witness and then

23  hear the second one?

24                   THE COURT:  Yes.

25                        (Witness out.)

1          MS. BUSBEE:  Your Honor, I'm going to

2    object to any conversations that -- any of these statements

3    that the defendant made, because it's our position that he

4    was in custody.  The State has given me some cases about

5    hostage situations where a person has taken control of a

6    situation by threatening other people.

7          In this situation it sounds to me from

8    the testimony and the Court has also heard the testimony in

9    the Newbury case, which tracks this officer's testimony

10   today, that at the time that they began discussing -- that

11   they cut them off from the discussion of leaving the room in

12   order, whether it was a legitimate law enforcement purpose

13   or not, they did not give them the opportunity -- they were

14   holding off the opportunity to have them come out and

15   engaging them in question and answer.

16         For whatever purpose they were not

17   Mirandized and I think that the case law is clear that they

18   were in custody.  I would like to draw the Court's attention

19   to some state cases and then some federal cases.  Our Court

20   of Criminal Appeals has held in Miestis (phonetic) versus

21   the State which is Texas Criminal Appeal case from 1999,

22   that there are four factors important to this analysis,

23   whether the suspect was informed of his right to remain

24   silent, whether he was informed to remain silent prior to

25   subsequent questioning, the length of time.

He wasn't warned at all, Your Honor.
And, moreover -- actually I misread that as far as that has
to go to a subsequent thing.

The question is whether there was a form
of restraint of freedom or movement and whether or not that
person, a reasonable person under the same circumstances,
would think that they were being restrained.  I don't think
that there is any doubt in this situation, that they knew
very well that they were not free to leave.  They were not
given an opportunity.

So this is like a situation set up by the
police to question them while they were waiting -- for
whatever reason, these people were not apprized of the fact
that they had the right not to discuss matters with the
police.

And secondary to that, he stopped talking
to the police officers.  They didn't want to talk to them
anymore.  When the police reinitiated this conversation with
him, it was based on something that an unknown third party
had told them.  They are required when a suspect has cut off
communication and said they do not want to talk to the
police anymore to question that person to establish beyond
any question that that person wishes to reinitiate a
conversation and that was not done in this case.

Thirdly, I would object to this as being

1    not relevant to the issue of guilt or innocence,

2    particularly the business about watching a porn movie.  And

3    if relevant, I would say that its prejudicial nature far

4    outweighs its probative value.

5                        And would also object to anything that

6    Mr. Newbury has said in this instance as being hearsay to

7    this defendant.  And would also point out to the Court that

8    this has not been identified satisfactorily as Mr.

9    Murphy's statements.  There's no voice analysis, nothing

10   other than this detective's opinion, who had never spoken to

11   him before, that this was Mr. Murphy making these

12   statements.

13                       So while that's a laundry list of things,

14   objections, I believe that that is -- makes the Court

15   apprized of why we would hold -- or would request the Court

16   hold that these statements should not be admitted into

17   evidence in this portion of the trial.

18                       THE COURT:  Mr. Wirskye, if you would

19   speak to the State's position on the relevance of the porn

20   issue.

21                       MR. WIRSKYE:  Goes to show a state of

22   mind, Your Honor.  It shows no remorse on the part of these

23   individuals, it shows their state of mind being surrounded

24   by a group of police officers, and just the complete lack of

25   worry on their part about a stand-off.  Completely relevant.

1  Goes exactly to their state of mind, remorse on the offense,

2  and their state of mind to the actual situation they were in

3  at the time.

4  THE COURT:  I'm trying to separate out

5  these issues.  The Court is very satisfied that the person

6  making the statements was, in fact, Patrick Murphy.  Not

7  only did he identify himself by name, but also by history.

8  For someone who has studied the file would be able to

9  distinguish between the two individuals as to who was making

10  the statement because of the detective's personal knowledge

11  of the history of the defendant and the conversation between

12  the two.  He also spoke to the other suspect, Newbury, and

13  was able to distinguish the declarants.  So the issue of

14  identification of the declarant is not a concern for the

15  Court.

16  As far as custodial interrogation,

17  certainly he was surrounded, certainly he was not free to

18  go, but he was at that point not restrained, but he was

19  certainly not free to go.

20  As far as custodial interrogation, the

21  issue then becomes to the Court in my opinion was the

22  communication initiated by the police officers designed to

23  elicit an incriminating response.  The bottom line was, they

24  were attempting to have the individuals in the room

25  surrender peaceably.  The detective, he certainly didn't

1  question him about anything that happened in Irving.  The

2  only response that I heard testified here was, well, you got

3  us, as far as an incriminating response.  Well, yeah, that's

4  a fairly true statement there.  They got them.

5                    What other incriminating response has

6  been proffered by the State that you object to?

7                    MS. BUSBEE:  Well, of course, part of

8  that is going to come in on the second part.  But if all

9  they have is -- what's the purpose of offering this, these

10  statements, if -- okay, you got us.  If you let that in, why

11  are we allowing them to say the business about the porn

12  movie?  How is that relevant to guilt or innocence?  A state

13  of mind a month later is not relevant to a culpable mental

14  state on Christmas Eve of 2000.

15                    THE COURT:  I tend to agree with you

16  there.  I don't see any relevance as far as a hostage or --

17  not hostage, but as far as a stand-off and/or surrender

18  negotiations.  What they were doing prior to when the police

19  officers announced their arrival is really not relevant to

20  this issue.

21                    MR. WIRSKYE:  Judge, I believe the

22  testimony was this was the second phone call and when they

23  initiated the second phone call to suspect Murphy, the

24  detective asked, what were you doing?  Oh, we're just

25  watching porn.  This was after they knew they were

27

```
1    surrounded, after they knew law enforcement was there.  And

2    that's why one of the reasons we think it's so relevant.

3                      THE COURT:  That point was not

4    sufficiently developed yet.  Do you have another witness

5    that you intend to call?

6                      MR. SHOOK:  Yes, sir.

7                      THE COURT:  Call your next witness.

8                      MATT HARRELL,

9    having been duly sworn, was examined and testified as

10   follows:

11                      DIRECT EXAMINATION

12   BY MR. SHOOK:

13        Q.    Would you tell us your name, please.

14        A.    Matt Harrell.

15        Q.    And how are you employed, sir?

16        A.    I'm a Sergeant with the Colorado Springs

17   Police Department.

18        Q.    And how long have you been with them?

19        A.    Approximately 15 years.

20        Q.    And what division are you assigned?

21        A.    Currently I'm assigned to the Falcon Patrol

22   Division.

23        Q.    Let me turn your attention back to January of

24   2001.  What division were you assigned at that time?

25        A.    I was assigned to the Colorado Springs
```

1  Fugitive Unit.

2      Q.     And were you summoned to the Holiday Inn Hotel

3  in Colorado Springs to assist in some negotiations?

4      A.     Yes.

5      Q.     Are you trained as a police negotiator?

6      A.     Yes, I am.

7      Q.     Approximately at what point in time did you

8  begin contact with the individuals in that room?

9      A.     It was approximately 10:20 p.m.

10     Q.     Okay.  And did you speak to them by phone?

11     A.     Yes, I did.

12     Q.     And did one of those individuals identify

13 themselves as Patrick Murphy?

14     A.     Yes, he did.

15     Q.     During your talks with him, did Mr. Murphy

16 bring up the Oshman's incident?

17     A.     Yes, he did.

18     Q.     And what did he tell you about the Oshman's

19 incident?

20     A.     He told me that he was in a truck with radio

21 contact and an AR-15 set up to do damage from behind in a

22 stand-off situation.

23     Q.     Did he also tell you something about some

24 people acting in a wrongful manner out there?

25     A.     Yes.

1    Q.    What did he say about that?

2    A.    He said some people acted in a wrongful manner
3    and a police officer lost his life.

4    Q.    When he brought up that -- was that something
5    you were interrogating him about or did he bring up the
6    subject of Oshman's himself?

7    A.    He brought it up.

8    Q.    In fact, was that a subject you were trying to
9    avoid?

10    A.    At that point, definitely.

11    Q.    And why was that?

12    A.    Early in a negotiation, we're just biding for
13    time.  We don't want to hit any hot button topics, anything
14    that might set them off or -- until we know what their
15    mindset is, we don't want to set them off.

16              MR. SHOOK:  That's all we have, Judge.

17                    CROSS-EXAMINATION

18    BY MS. BUSBEE:

19    Q.    Okay.  Detective Harrell, I just have a few
20    questions.  Do you know how long there had been phone
21    contact with room 426 at the time that you took over?

22    A.    At the time I took over, I didn't know exactly
23    how long.

24    Q.    And did you tape record the comments that you
25    are talking about now or was that prior to the time the

1   tape-recording was set up?

2         A.      That was prior to the tape-recording being set

3   up.

4         Q.      And those comments weren't made on the

5   tape-recording?

6         A.      No, they were not.

7         Q.      Did he ever ask you for an attorney?

8         A.      No, he did not.

9         Q.      Did you ever tell him that he could have an

10  attorney?

11        A.      No, I did not.

12        Q.      All right.  And had you ever spoken with Mr.

13  Murphy before?

14        A.      No, I had not.

15        Q.      Did you speak with him subsequent to that?

16        A.      Since the negotiations that night?

17        Q.      Yes.

18        A.      No.

19        Q.      Okay.  So you're basing your testimony that it

20  was his statement, basing that on the fact that the person

21  said he was Patrick?

22        A.      Correct.

23        Q.      Okay.  Tell me again how the business about

24  Oshman's came up?

25        A.      We were just talking.  I was stalling for

1   time.  He brought it up.

2        Q.     Well, okay, in what way?

3        A.     I can't remember the exact conversation that

4   led up to it or what we were talking about.

5        Q.     Were you taking notes?

6        A.     Yes, I did.

7        Q.     I don't believe I have ever seen those notes.

8   I have a report.  Did you --

9        A.     My notes were --

10       Q.     Reduced to a report?

11       A.     Were reduced to a report.

12       Q.     Okay.  Fair enough.

13            THE COURT:  When did you record your

14   recollection of the conversation?  That night?  The next

15   day?

16            THE WITNESS:  The next day.

17            THE COURT:  Did you get in on the first

18   phone call that Detective Stinson had or did you come in on

19   the second phone call Detective Stinson had?

20            THE WITNESS:  I came in after the second

21   phone call that Detective Stinson had.

22            THE COURT:  I'm trying to understand the

23   order of events.  There was one phone call, disconnect.  A

24   second phone call, disconnect.  And you were the third phone

25   call?

```
1                    THE WITNESS:  Yes.

2                    THE COURT:  And did you make the phone

3    call?

4                    THE WITNESS:  No, I did not.

5                    THE COURT:  Who placed the connection

6    between the two rooms?

7                    THE WITNESS:  Special Agent Dan Bradley

8    of the FBI.

9                    THE COURT:  So there was enough time to

10   get the FBI into the loop?

11                   THE WITNESS:  Yes, it was.  The FBI was

12   already there because of the van being found.

13                   THE COURT:  How long in the -- how long

14   after you realized who it was did your communication occur?

15                   THE WITNESS:  I believe Detective Stinson

16   found them like around 9:00 at night and I started talking

17   to them at approximately 10:20, so maybe an hour and 20

18   minutes or so.

19        Q.     (By Ms. Busbee)  Did you ever talk to

20   Mr. Newbury?

21        A.     Yes, I did.

22        Q.     Okay.  Are you sure that it was Patrick Murphy

23   who told you this stuff about -- or was it Donald Newbury?

24   This is before you were taping?

25        A.     It was the person that told me their name was
```

1  Patrick that told me the information about being in a truck.

2           THE COURT:  Did you ever have any

3  conversation with either of the two individuals as to what

4  they were doing after the police initiated contact with them

5  in the room?

6           THE WITNESS:  There was some talk about

7  that, yes.

8           THE COURT:  And their response?

9           THE WITNESS:  They were watching TV for

10  the most part.  Um, I can't really, really think of what

11  else in particular they said they were doing.  They kept

12  mentioning the weapons they had and later I got information

13  that they could hear what sounded like shotguns being racked

14  or something to that effect during the negotiations.

15           THE COURT:  That's because you were in

16  the adjacent room?

17           THE WITNESS:  I wasn't.  By the time I

18  got involved, I was in a conference room set up away from

19  the location at a safe distance.  But the SWAT Team was

20  probably still in the adjacent rooms or somewhere real

21  close.

22           MS. BUSBEE:  What are you offering, just

23  what he has said as to what Murphy said, not what he's been

24  asked about other things the Judge is asking for?

25           MR. SHOOK:  No.  Right now all the

1  comments that I elicited.

2          THE COURT:  I'm just trying to put it all

3  in context, so I can make the proper ruling.

4          MS. BUSBEE:  Right.  I just wanted to

5  know what I would be objecting to.  I'm ready to argue that

6  now.

7          THE COURT:  Detective, please wait for us

8  outside.

9          [Witness out.]

10          MS. BUSBEE:  Your Honor, if I may,

11  instead of going through that laundry list again, ask the

12  Court to remember the objection that I had on the previous

13  witness.

14          This witness has no independent knowledge

15  that who he was speaking to was Mr. Murphy.  And I would

16  renew, much more fervently, my objection to anything he has

17  to say as related to Mr. Murphy because he can't say for a

18  positive fact that what he is saying Patrick Murphy said was

19  said by the man who is sitting here on trial today.

20          But I believe, if anything, this

21  officer's testimony further strengthens my argument that

22  this was a questioning situation.  He says, I asked him

23  questions, I asked him questions, in order to stall.  It

24  seems fundamentally unfair to surround a man's room with a

25  SWAT Team, let them know that there's a SWAT Team there, and

35

1   continue to engage them in dialog until they are ready to

2   ask them to come out.

3                    And I think that that goes to the heart

4   of what the Supreme Court is concerned about in Miranda.

5   They were not warned that these statements could be used

6   against them and they were in, most definitely, a situation

7   where they knew they were not free to leave.

8                    And I would ask the Court to suppress any

9   statement that he made to Mr. Harrell and any statement that

10  he made to Detective Stinson.  I would urge that objection

11  based on the new testimony that the Court has heard from

12  this witness.

13                   THE COURT:  Previous issues that I have

14  already listed with the first detective still apply.  The

15  issue on whether or not they can testify they were watching

16  porn, you have got two conflicting statements here.  He told

17  one officer that they had been watching porn or were

18  watching porn and he tells this officer here that he's

19  watching TV.  I think that --

20                   MR. SHOOK:  Not conflicting, Judge.  This

21  is later on in the night.

22                   MS. BUSBEE:  I would acknowledge that,

23  that they told different things to different officers.

24                   THE COURT:  They told different things to

25  different people and I think it just all goes to the jury

1    has a right to weigh the evidence.   If it's before or during

2    and they can weigh the evidence, bottom line.

3                    I don't find this to be previously

4    custodial interrogation was not intended or calculated to

5    elicit an incriminating response.   Obviously, in a stand-off

6    situation, the police need time to -- if they want to stall

7    until they can get their people in place, which is logical

8    and ended in a safe resolution to this matter.

9                    Depending on how the State asks the

10   question with the first detective as to whether they were

11   watching porn, I may still sustain that objection, depending

12   on how it's set up.   Everything else is coming in.

13                   MS. BUSBEE:   Then just to get this on the

14   record as far as findings of fact.   Is the Court's ruling

15   that this is relevant and you are overruling my objection

16   it's unduly prejudicial?

17                   THE COURT:   Yes.   I have made a 403, 404

18   balancing test and found it's relevant.   It goes to the

19   state of mind of the defendants in this matter and the jury

20   may weigh the declarant's testimony.

21                   MS. BUSBEE:   Your Honor, secondarily,

22   these things that Mr. Newbury said as to comments about

23   America's Most Wanted host and some other derogatory

24   comments that he made, we're objecting to that as hearsay.

25   There's not any evidence that the defendant was present when

37

1    he made these statements.  They can't possibly be relevant

2    on the issue of guilt or innocence as far as the defendant

3    is concerned.

4                    THE COURT:  I agree.  There's enough in

5    here for the jury to worry about with just Mr. Murphy's

6    statements.  I understand the State's position

7    co-conspirator and everything else.  You have got enough.

8    That's all there is.  It's going to come in.  Sorry to cut

9    your arguments off, but stick with Mr. Murphy.  Bring in the

10   jury.

11                        [Jury in]

12                    THE COURT:  Thank you.  You may be

13   seated.  Mr. Shook?

14                    JIM STINSON,

15   having been duly sworn, was examined and testified as

16   follows:

17              DIRECT EXAMINATION CONTINUED

18   BY MR. SHOOK:

19        Q.    Detective Stinson, I believe we left off where

20   you were going to make contact with the person in that room;

21   is that correct?

22        A.    Yes, sir.

23        Q.    And, again, how did you make contact with

24   them?

25        A.    Through a telephone.

1    Q.    Okay.  Once you connected with that person,

2  did you identify yourself?

3    A.    Yes, I did.

4    Q.    And what did you tell him?

5    A.    I told him my name was Detective Jim Stinson

6  with the Colorado Springs Police Department and I advised

7  him that I was -- first of all, let me backtrack.

8         The gentleman -- when the phone rang, the

9  gentleman said hello.  And giving that person the benefit of

10  the doubt, I said, "Andres"?  And there was a slight pause

11  and he responded, "Um, yeah."  And I identified myself.  I

12  said I was Jim Stinson with the Colorado Springs Police

13  Department.  I advised him that I was with a part of

14  detectives that were out looking for the remaining two of

15  these Texas fugitives and that what we needed to do is --

16  that we had gathered information, thinking that they may be

17  in this room.  I said, the room is surrounded.  All we

18  needed him to do is come out with his hands up.  We would

19  identify him.  And once we found out he wasn't one of the

20  fugitives, we would let him go on his way.

21    Q.    What was his response to you?

22    A.    He said, quote, "Well, Detective, you found

23  us," end quote.

24    Q.    Then what was said?

25    A.    I was just, you know, right now I'm not a

1  trained negotiator, so I'm stalling for time.  Like I said

2  earlier, the wing was completely occupied with the exception

3  of the room that we were in, right next door to their room.

4  So I started stalling for time to try to give us the

5  opportunity to get the wing vacated.

6           So we just began talking.  I wanted to

7  find out who I was talking to.  I said, "Who is this"?  And

8  he said it was Patrick.  I knew that to be Patrick Murphy.

9  With the information that we had been given about these two

10 guys, I knew that he was from Texas.  I'm from Austin.  He's

11 from Rockdale.  And so I know a little bit about Rockdale,

12 so I got him to talking about that.

13      Q.      Okay.  Now, you are in, actually, the room

14 right next door; is that right?

15      A.      Yes, sir.

16      Q.      And did you know where his telephone would be

17 located?

18      A.      Yes.  These rooms are set up mirror opposites.

19 So the wall that separated our rooms, the telephones were

20 just on the other side of the wall.  So if he's standing

21 there at the telephone, we're about three feet from each

22 other with a wall separating us.

23      Q.      And did that make you a little nervous for

24 your own personal sake?

25      A.      Sure.

1      Q.    Those walls aren't that thick?

2      A.    That's correct.  They're just sheetrock.

3      Q.    What did you do?  Did you take any precautions

4 for your safety?

5      A.    Well, once he identified himself as being one

6 of the two we were looking for, I was sitting on the bed.

7 Then I got down and tried to made myself as small as

8 possible.  I'm, you know, crouched down on the floor.  And

9 at the same time I'm trying to contact through hand signals,

10 not giving away any sound, with the sergeant at the door,

11 because he doesn't know who I'm talking to and I'm trying to

12 let him know that I'm talking to the guys we're looking for.

13      Sometime during my conversation Sergeant

14 Lofgren took a ballistic shield and placed it between me and

15 the wall and I was too intent on what I was doing.  I don't

16 know at what time he did that.

17      Q.    Did Mr. Murphy ask you or did he inquire about

18 you on how you had been able to locate him?

19      A.    Yes.  He wanted to know how we had found them.

20      Q.    Okay.  And what did you tell him?

21      A.    I just told him we had received information

22 through police work.  I didn't want to give up, you know,

23 how we knew.

24      Q.    Did he make any other requests to you, of you,

25 concerning the telephone?

1    A.    Um, I had asked him -- or he had asked me if I

2  could turn his phone into a speakerphone.  And I played it

3  off that I didn't know what kind of phone he was on and I

4  didn't know anything about his phone, so I don't know how to

5  do that.  And so I told him, no, I couldn't do it.

6    Q.    Okay.  Then what happened?

7    A.    Well, he -- I tried to change the subject

8  again, but then he came back to make it -- he wanted it a

9  speaker phone.  He seemed to be a little agitated.  I asked

10  him, "Why do you need a speakerphone anyway?"  And he said

11  that he needed to keep his hands free.

12    Q.    Did that worry you some at that time?

13    A.    Sure.  When we're looking at a suspect, what

14  can hurt us are the hands.  They're the ones that can use a

15  gun or hit us.  So somebody needing their hands free makes

16  me think that something is going to happen to me.

17    Q.    Then what happened?

18    A.    After I told him I couldn't -- I didn't have

19  the technology to change his phone into a speaker phone, he

20  just told me he didn't want to talk to me anymore and he

21  hung up.

22    Q.    Were you able to establish contact again with

23  him?

24    A.    Yes.  While I was speaking with him on the

25  phone, Sergeant Lofgren and my partner, Detective Todd

1   Drennan, were starting to make arrangements to get the wing

2   evacuated.  Detective Drennan had gotten a lady in room, I

3   believe it was 416, which is cattycornered to the room I was

4   in, got her out through a sliding glass door, so we had

5   access to her room.

6              So after I got off the phone, I got all

7   my stuff and went over to that room.  So now I'm across the

8   hall a little bit down the hall.  I had called the front

9   desk to let them know that we had changed rooms in case

10  anybody from the police station was going to call in.  And

11  at that time they told me that the people in 426 had

12  contacted them and wanted to talk on the phone again.

13       Q.    How much time had passed to that point in

14  time?

15       A.    Maybe two minutes between leaving 422 and

16  getting over and starting the phone call again.  It was

17  about two minutes.

18       Q.    And were you able to establish contact again?

19       A.    Yes, I was.

20       Q.    And who were you talking with at that point?

21       A.    I rang the phone again and it was picked up

22  and it was Patrick Murphy again.

23       Q.    Okay.  And did you ask him a question at that

24  time?

25       A.    Yes.  I just said, "What are you doing?

1   What's going on?"

2        Q.     What are you doing?  What's going on?

3        A..    Words to that effect, yeah.

4        Q.     What was his response?

5               MR. SANCHEZ:  Your Honor, at this time we

6   would reurge our prior objections as stated to the Court.

7               THE COURT:  Overruled.

8        A.     At this time he said, "We're watching porn."

9        Q.     (By Mr. Shook)  "We're watching porn"?

10       A.     Yes, sir.

11       Q.     Then what did you talk to him about?

12       A.     I asked him, you know, what was his plan, you

13  know, what is going to happen?  Are they going to come out?

14  And at this time he told me, "Here, I'll let you talk to my

15  partner."

16       Q.     Now, you stated before, you are not a trained

17  negotiator; is that right?

18       A.     That's correct.

19       Q.     Did a negotiator with the Colorado Springs

20  Police Department eventually arrive there?

21       A.     Well, I spoke with Mr. Newbury for a short

22  time and as I was doing that, the evacuation process was

23  continuing.  But a command post was being set up in a

24  conference room on the other side of the hotel.  After I got

25  off the phone with Mr. Newbury, I went over to the command

1  post and that's where I met with Detective Matt Harrell who

2  eventually conducted the negotiations and he is a trained

3  negotiator.

4       Q.     You stayed there throughout the whole

5  stand-off process?

6       A.     For most of it.  At one point I left because

7  it was thought that I was going to have to do a search

8  warrant, so I went down to headquarters and that changed and

9  I came back.  So I was probably gone for maybe 30 minutes.

10      Q.     After Mr. Murphy and Mr. Newbury were taken

11 into custody, did you escort Mr. Murphy out to a police

12 vehicle?

13      A.     Yes, sir, I did.

14      Q.     And did you have an opportunity to speak to

15 him at that time?

16      A.     Yes.

17      Q.     And was it the same voice you had heard

18 talking earlier over the phone?

19      A.     Yes, sir.

20             MR. SHOOK:  We'll pass the witness.

21                   CROSS-EXAMINATION

22 BY MR. SANCHEZ:

23      Q.     Officer, did you -- were you able to establish

24 when Mr. Murphy and Mr. Newbury actually checked into that

25 room?

1    A.    It was -- I had spoke with a lady who checked

2  them in, Ms. Christianson, and she thought it was around

3  7:00 or 8:00 on the 22nd, Monday the 22nd of January.

4    Q.    So they had been there for about a day?

5    A.    Yes, sir, a little over a day.

6    Q.    And your job was to get there, secure the

7  place, and start negotiations with whoever was in that room?

8    A.    No.  My job was to answer the tip to see if

9  there was any validity to it.  And once Detective Drennan

10  and I had done that and felt there was some potential there,

11  for our safety we contacted the SWAT Team.

12    Q.    And you were the first law enforcement

13  official to actually have contact with Mr. Murphy --

14    A.    Yes, sir.

15    Q.    -- at that hotel that evening?

16    A.    Yes, sir.

17    Q.    And at some point you stopped doing that,

18  talking to Mr. Murphy, and handed over your duties to, I

19  guess, Detective Matt Harrell?

20    A.    Yes, sir.

21    Q.    And are you with the same law enforcement

22  agency as him?

23    A.    Yes.

24    Q.    And eventually Mr. Murphy gave himself up; is

25  that true?

1        A.      Yes, sir.

2        Q.      It was done peacefully?

3        A.      Yes.

4        Q.      As far as your understanding was, that was

5   what they wanted, correct, a peaceful --

6        A.      Um, you know, I don't know what they wanted.

7   I mean, it was -- they were arrested peacefully is about the

8   best I can say.

9        Q.      Were you present when Mr. Murphy actually came

10  out to the hall?

11       A.      No, I was not.

12                  MR. SANCHEZ:  I pass the witness.

13                  MR. SHOOK:  That's all we have, Judge.

14                  THE COURT:  Thank you, Detective.

15                  MR. SHOOK:  May this witness be excused?

16                  MR. SANCHEZ:  No objection, Your Honor.

17                  THE COURT:  He may.

18                  MR. SHOOK:  Call Sergeant Harrell.  May I

19  recall Detective Stinson?

20                  THE COURT:  Yes.

21                  REDIRECT EXAMINATION

22  BY MR. SHOOK:

23       Q.      Detective Stinson, when you were following up

24  leads that day, had you, in fact, confirmed or had officers

25  confirm that there were warrants out of the state of Texas

1    for Mr. Murphy?

2         A.    Yes, sir.

3         Q.    Warrants for escape, as well as capital murder

4    warrants?

5         A.    Yes, sir.

6         Q.    And federal warrants?

7         A.    Yes -- well, I'm not sure about the federal

8    warrants, but the capital murder of the police officer and

9    the escape, yes.

10        Q.    And you confirmed those?

11        A.    Yes.

12              MR. SHOOK:  That's all we have.

13              MR. SANCHEZ:  I have nothing further,

14   Your Honor.

15              MR. SHOOK:  We'll call Matt Harrell.

16              THE COURT:  Let the record reflect this

17   witness has been previously sworn.

18                    MATT HARRELL,

19   having been duly sworn, was examined and testified as

20   follows:

21                    DIRECT EXAMINATION

22   BY MR. SHOOK:

23        Q.    Would you tell us your name, please.

24        A.    Matt Harrell.

25        Q.    And could you spell your last name for the

1    Court Reporter?

2         A.    H-A-R-R-E-L-L.

3         Q.    How are you employed, sir?

4         A.    I'm a Sergeant with the Colorado Springs

5    Police Department.

6         Q.    And what division are you assigned?

7         A.    I'm assigned to a Falcon Division Patrol.

8         Q.    Let me turn your attention back to January of

9    2001 and ask what division you were assigned at that time?

10        A.    I was assigned to the Colorado Springs Police

11   Department Fugitive Unit.

12        Q.    Have you also been trained as a police

13   negotiator?

14        A.    Yes.

15        Q.    And how long have you served in that capacity?

16        A.    Approximately ten years.

17        Q.    Let me turn your attention to the 23rd of

18   January, 2001.  Were you asked or were you one of the group

19   of detectives that were following up leads about the

20   fugitives from Texas?

21        A.    Yes, I was.

22        Q.    The evening of the 23rd, were you asked to go

23   to a Holiday Inn there in Colorado Springs?

24        A.    Yes.

25        Q.    And what was the purpose of you going to that

1  location?

2      A.      I was to be the negotiator to negotiate with

3  the last two of the Texas Seven that were holed up in one of

4  the rooms at the hotel.

5      Q.      And what area of the hotel did you go to?

6      A.      I went to one of the conference room areas.

7  It was called the Regency Conference Room.

8      Q.      Were you able to establish phone contact with

9  the individuals in the room?

10     A.      Yes, I was.

11     Q.      Approximately what time did that take place?

12     A.      Approximately 10:20 p.m.

13     Q.      And did you speak to a man who identified

14  himself as Patrick?

15     A.      Yes, I did.

16     Q.      Did you understand him to be Patrick Murphy?

17     A.      Yes.

18     Q.      During the course of that conversation, did

19  Mr. Murphy bring up the Oshman's incident?

20     A.      Yes, he did.

21     Q.      Was that any information that you were trying

22  to elicit or something he was bringing up on his own?

23     A.      No.  He brought it up on his own.

24     Q.      What information did he give you regarding the

25  incident in Oshman's?

1      A.      He stated that he was in a truck with radio

2  contact, with an AR-15, and he was set up to do damage from

3  behind in a stand-off situation.

4      Q.      Did he also talk to you about whether some

5  people had acted in a wrongful manner?

6      A.      Yes, he did.

7      Q.      What did he say about that?

8      A.      He said that during the Oshman's some people

9  acted in a wrongful manner and a police officer lost his

10 life.

11     Q.      And I take it negotiations continued for some

12 time to the early morning hours?

13     A.      Yes.

14     Q.      You weren't one of the officers that actually

15 took Mr. Murphy or Mr. Newbury into custody, were you?

16     A.      No, I was not.

17             MR. SHOOK:   We'll pass the witness, Your

18 Honor.

19                    CROSS-EXAMINATION

20 BY MR. SANCHEZ:

21     Q.      Officer Harrell, before testifying today did

22 you have an opportunity to look at your report that you

23 wrote in this case?

24     A.      Yes, I did.

25     Q.      You had testified that Mr. Murphy told you

```
 1   that some people had acted in a wrongful manner and that an
 2   officer had lost his life.  Isn't it true that prior to him
 3   telling you that, he told you that he wouldn't have done the
 4   Oshman's; isn't that correct?
 5        A.   That's correct.
 6        Q.   So that prior to him giving you that statement
 7   about some people acting wrongfully, he had told you that he
 8   wouldn't have done the Oshman's.  And then he said some
 9   people acted in a wrongful manner and an officer lost his
10   life?
11        A.   That's correct.
12        Q.   Again, you weren't present when Mr. Murphy
13   surrendered to the law enforcement officials there at the
14   hotel, correct?
15        A.   I was at the hotel, but I wasn't in the area
16   where he surrendered.
17        Q.   You weren't in the hallway?
18        A.   No, I was not.
19             MR. SANCHEZ:  That's all I have for now,
20   Your Honor.
21             MR. SHOOK:  May the witness be excused?
22             THE COURT:  He may.
23             MS. BUSBEE:  Your Honor, we would like to
24   have him subject to recall.
25             THE COURT:  Yes.  Detective, you are
```

1    subject to recall.

2                    THE WITNESS:  Yes, Your Honor.

3                    MR. WIRSKYE:  State would call Officer

4    Ford.

5                    JOHN FORD,

6    having been duly sworn, was examined and testified as

7    follows:

8                    DIRECT EXAMINATION

9    BY MR. WIRSKYE:

10        Q.    Officer, can you tell us your full name.

11        A.    John Ford.

12        Q.    And how are you employed, sir?

13        A.    By the City of Colorado Springs as a police

14   officer.

15        Q.    How long have you been a police officer in

16   Colorado Springs?

17        A.    This is my 13th year.

18        Q.    Are you currently assigned to your SWAT Team

19   or Tactical Team?

20        A.    Yes, I am.

21        Q.    How long have you been on that team?

22        A.    I've been on the team approximately nine

23   years.

24        Q.    And kind of describe the team for us, how many

25   people are in it, what type of training y'all do, that sort

1    of thing.

2        A.    The team then had original team members of

3    ten, which included our supervisor, our sergeant, and we had

4    a supplemented team called our SRT team, which consists of

5    our canine intermixed with approximately another ten, so we

6    can beef up our tactical squad to about 20 or 21 people, if

7    necessary.

8        Q.    How often do, I guess, the original or the ten

9    that do it full time, how often do y'all train?

10       A.    We train once a week.

11       Q.    And do you have any particular

12   responsibilities on the team?

13       A.    I am considered the team leader and that

14   really mainly comprises of when my supervisor, my sergeant,

15   is out of town on vacation, I am in charge of any -- as

16   acting sergeant of any critical incident that would occur.

17       Q.    Directing your attention back to January of

18   2001, your tactical sergeant at that time was Sergeant

19   Lofgren; is that correct?

20       A.    Yes, sir.

21       Q.    Specifically going to that Tuesday, January

22   23rd of 2001, did y'all get called out to help assist in

23   maybe a possible apprehension of the Texas Seven suspects?

24       A.    Yes, we did.  We got paged out to come to what

25   would be the Hungry Farmer slash Quality Inn.  It was a

1    hotel and restaurant right there.  And right next to it was

2    a Quality Inn, a hotel, which the pager read, gave both

3    locations.  And it was stated that the van that was used by

4    the Texas Seven was located in that area.

5         Q.    So once you found out that the suspects' van

6    was located in your city, did y'all create a police command

7    center?

8         A.    Yes, we did.

9         Q.    And you had officers from different agencies,

10   state and federal, helping process tips; is that right?

11        A.    Yes, sir.

12        Q.    That day, that Tuesday, did your team get

13   called out on a number of other leads?

14        A.    Once we got done with the Quality Inn where

15   the van was, we basically as a team stayed at our police

16   operation center.  And they had different officers and

17   different detectives follow up various leads.  We were on

18   standby in case one of the leads that came in was a really

19   hot tip where we would deploy from the police operations

20   center.

21        Q.    And, I guess, about 8:00 that night, you got a

22   hot tip about the Holiday Inn; is that right?

23        A.    Yes, sir.

24        Q.    And your team went to that location?

25        A.    Yes, we did.

55

1       Q.     How does your team dress or how are y'all

2  outfitted?

3       A.     Our Tactical Team consists of black BDUs and

4  we also have a black TACT vest with a black helmet with

5  police markings on the helmet and the vest.

6       Q.     What type of arms do y'all carry?

7       A.     Anywhere between an MP-5 and an AR-15.

8       Q.     What is an MP-5?

9       A.     It's just a German made weapon.  It's a weapon

10  that shoots a 9 millimeter round, the same round that our

11  handgun uses, consisting of you have a single fire, I think,

12  to fully automatic.

13       Q.     What type of weapon did you have that evening?

14       A.     I had an MP-5.

15       Q.     Once you got to the Holiday Inn, what

16  happened?

17       A.     Once we got there, Sergeant Lofgren met with

18  Detective Stinson and Drennan to get further information on

19  the actual situation there.  There was a room there, I

20  believe is 426 that they thought a member of the Texas Seven

21  or suspicious parties had checked in and that was actually

22  the hot lead that came from that area.

23       Q.     And once you found out that information, did

24  your team come up with an initial plan to make a perimeter?

25       A.     Yes, sir.  Sergeant Lofgren, we had our team

1   divided into basically what we call a crisis entry team,

2   which is a team that is usually on the inside.  And then we

3   have a containment team.

4                       The plan was that we would actually take

5   one of our tactical vehicles and drive through the parking

6   lot and drop our containment team, outside containment team,

7   in the various positions.  And once that was done, the

8   crisis entry team would make entry into the hotel and find

9   the best stationing place there.

10       Q.       Why was it important that y'all set up that

11   perimeter?

12       A.       The perimeter needed to be set up quickly,

13   just because if it was a member of the Texas Seven that they

14   could not get back into the community, that we had it

15   basically locked down from the outside in.

16       Q.       And y'all were able to set up that perimeter?

17       A.       Yes, sir.

18       Q.       And you yourself were on the crisis entry

19   team; is that right?

20       A.       Yes, sir.

21       Q.       What did you do after the perimeter was

22   secured?

23       A.       Once we knew that the outside perimeter was

24   secured, we went in and got our best vantage point in the

25   hallway where the target location was.  At that point

1   Sergeant Lofgren directed the team to go up to 426,

2   protected by a shield, what we called a shield movement,

3   where we have a ballistic shield and tactical officers

4   approach whatever threat area there is.

5              We went up to 426 and Officer Stephens

6   was instructed by Sergeant Lofgren to put a piece of

7   electrical tape over the peephole.  Once that was done,

8   Officer Stephens knocked approximately three times on the

9   door to see if there was a response that would be given and

10  there was none.

11       Q.    Did y'all hear anything at that point coming

12  from inside the room?

13       A.    We could hear the TV.

14       Q.    How many people actually approached the door

15  initially?

16       A.    Five.

17       Q.    And was everybody protected behind that

18  ballistic shield?

19       A.    As best we could, yes.

20       Q.    How big are those shields?

21       A.    It's probably about 3 feet by 6 feet.

22       Q.    Once you found out that, I guess, no one was

23  going to answer the door, what did y'all do?

24       A.    We were instructed to back off.  Sergeant

25  Lofgren had a master key to the rooms in that area.  We

1    backed off to room 422 and basically took a foothold in room

2    422.

3         Q.    And that was the unoccupied room?

4         A.    Yes, sir.

5         Q.    What happened once y'all got into 422?

6         A.    Basically what happened once we were in 422,

7    is Sergeant Lofgren, along with Detective Stinson and

8    Detective Drennan were constantly getting fed information

9    from our command post from the front desk of the hotel.

10   Myself and the other tactical officers were taking various

11   positions -- were rotating --

12              THE COURT:  Sir, you are going to have to

13   slow down.  She's typing word for word.  I can't even keep

14   up with a summary.

15        A.    Myself and the other tactical officers, to not

16   include Sergeant Lofgren, rotated to the front door at

17   various times to keep an eye out to make sure no one came

18   out of that room or any other various rooms that we felt

19   were unsafe areas.

20        Q.    So once y'all initially tried to knock on the

21   door, somebody always had eyes on the door of 426?

22        A.    Yes.  It wasn't us.  We had another

23   containment team on the other end of the hall who could

24   actually see the door.  The way we were, we were set, but we

25   were able to communicate with the other containment team.

1    If that door did open, we were able to be there right away

2    for any necessary incident.

3          Q.     You were in 422, which is right next door to

4    426?

5          A.     Yes.

6          Q.     I guess Detective Stinson is on the phone and

7    at some point gives you guys the high sign that, hey, you

8    got your two guys, the two members of the Texas Seven; is

9    that correct?

10         A.     Yes.  As I recall, basically his statement

11   was, "It's them."

12         Q.     And once y'all find out that from your

13   tactical perspective, what happens?

14         A.     Once that we were informed of that, we

15   immediately felt that we were too close to the room.

16   Sergeant Lofgren instructed us to back off down to room, I

17   believe, it was 416 and 418.

18         Q.     Why were you concerned that you were too close

19   to the room?

20         A.     Because, basically, there was just a wall

21   between us of sheetrock.

22         Q.     The sheetrock wouldn't stop bullets?

23         A.     No, sir.

24         Q.     Once y'all backed off, did you call in more

25   resources?

1      A.      Yes, we did.

2      Q.      Who did you call in?

3      A.      Sergeant Lofgren asked for what we call the

4  SRT Team, Special Response Team, which is just supplemental

5  tactical officers who are trained in statistical situations,

6  not as extensively as we are, but they are there to

7  supplement us.  And he also called our canine team in.

8      Q.      At that point you had at least 20 tactically

9  trained officers surrounding that room?

10     A.      Yes.

11     Q.      Why did you call the canine team in?

12     A.      We called the canine team in for various

13 reasons, any tactical situation, in case for some reason

14 suspects -- or suspects would break the perimeter, it's

15 easier to track.  We also used that as a deterrent.  A lot

16 of suspects, when they hear the dog or see the dog, they'll

17 comply even faster.

18     Q.      Did you also call in a medical team?

19     A.      Yes, we did.

20     Q.      What medical team was called in?

21     A.      Our fire department has what we call tactical

22 medical team that deploys with us on any critical incident

23 or any warrant that we serve.  They have a team that deploys

24 that trains with us and we brought them in to bring them in

25 case someone were to be hurt.

1    Q.    And did y'all manage to evacuate that 400 wing

2  or block of rooms in the hotel?

3    A.    Yes, we did.

4    Q.    I guess you stayed in position or stayed there

5  as the negotiations went on; is that right?

6    A.    Yes, we did.

7    Q.    Where did you stay during the majority of the

8  negotiations?

9    A.    Basically, I was right with the other team

10  members, right between room 416 and 418.  We had a couple of

11  shields that were set up, basically offset, from the doorway

12  of 416, I believe, into the hallway.

13    Q.    During the time that you were set up out

14  there, did you hear any noises coming from the rooms?

15    A.    Yes, I did.

16    Q.    Could you describe what you heard coming from

17  the room for the members of the jury?

18    A.    At one point I heard what I thought was a

19  shotgun being racked at least twice.  And shortly after that

20  I heard what I thought was bullets hitting the ground.

21    Q.    When you say bullets hitting the ground, you

22  mean fired bullets or bullets that had been dropped?

23    A.    Bullets that had been dropped like knocked

24  over or something.

25    Q.    When you heard that shotgun racked, what went

1    through your mind?

2        A.    Basically, we were thinking -- once we heard

3    it, we got to the point where they were saying, okay, they

4    are not going to -- the individuals are not going to come

5    out peacefully.  That's what my initial thought was and the

6    other team members probably.

7        Q.    As the morning drug on and negotiations went

8    on, about 2:30 a.m. in the morning, was a plan made for the

9    two individuals to come out and give themselves up?

10       A.    Yes.  They had talked to Eric Singer from our

11   news channel and they would develop a plan where once they

12   had their interviews on TV, that they were to come out

13   peacefully.

14       Q.    After they gave their interviews, did they, in

15   fact, come out?

16       A.    Yes, they did.

17       Q.    Did y'all have a plan in place for them to get

18   out of that room?

19       A.    Yes, we did.

20       Q.    Tell us the plan.

21       A.    The initial plan was that they were to come

22   out one by one with their shirts off.  By having their

23   shirts off, we would be able to see if they had any weapons,

24   basically, in their waistbands or in their upper part of

25   their body.  They were to come out, again, one by one.  And

1   once they got into the hallway, then they were instructed to

2   take orders from -- which would be from Sergeant Lofgren who

3   would give the verbals, as far as backing them up to us for

4   us to take them into custody.

5        Q.    Did they, in fact, come out one by one?

6        A.    No, they did not.

7        Q.    Describe how it was that they came out of the

8   room.

9        A.    They both came out together and they were

10  holding hands, their inner hands were locked, hands were up,

11  and they did have no shirts on.

12       Q.    The fact that they came out together, holding

13  hands, was that something that y'all had commanded them to

14  do from a tactical sense or why did that come about?

15       A.    That was a plan they made up themselves.  As

16  from a tactical aspect of it, that was not information given

17  from us.

18       Q.    You would rather have them come out one by

19  one?

20       A.    Yes, we would.

21       Q.    But it was their demand to come out at the

22  same time, holding hands?

23       A.    Yes.

24       Q.    Were the hands up or down?

25       A.    They were up.

1      Q.    Once they came out of the room with their

2 hands up, what happened?

3      A.    Sergeant Lofgren instructed them to back

4 toward us, which they did, at one point I would say probably

5 approximately five feet.  They were instructed to kneel down

6 and let go of hands, which they did.  Sergeant Lofgren gave

7 one of the individuals -- to one of the individuals on the

8 left side, who I believe was Newbury, to back up, at which

9 time we had two officers as an arrest team and they were

10 strictly there to put hands on.  And once that order was

11 given, they took that individual into custody.  They secured

12 him in a room.  They took the other individual into custody

13 and secured him in the same room.

14      Q.    So the second individual was the person you

15 later came to know as Patrick Murphy, Jr.?

16      A.    Yes, sir.

17      Q.    When they came out of the room, approximately

18 how many weapons were trained or aimed at them?

19      A.    From our end there were at least five.  From

20 the other end when they initially came out of the room, I

21 believe there was three.

22      Q.    Something you describe as overwhelming fire

23 power?

24      A.    As best we could, yes.

25      Q.    If they hadn't complied with your commands,

1    what is your team prepared to do?

2         A.      We were prepared to take lethal action, if

3    necessary.

4         Q.      When you got a chance to see Mr. Murphy come

5    out of the room, could you describe just in general terms

6    for the members of the jury what he looked like?

7         A.      Basically, I just saw his back.  His hair was

8    dyed and we were informed of that kind of before they came

9    out.  But basically I just saw the back of them.

10        Q.      Never got a good look at his face?

11        A.      No, I did not.

12        Q.      After these two were taken into custody, what

13   did your team do next?

14        A.      At that point once we knew they were secure

15   with our officers, we approached the room 426 with our

16   canine officer, who cast a dog into the room.  Once the

17   canine did not hit on anything in the room, we actually made

18   entry into the room to clear it to make sure there were no

19   other individuals inside that room.

20        Q.      So you sent the dog in to see if there was

21   another person?

22        A.      Yes.

23        Q.      Once you determined no one else was in there,

24   y'all went in to secure it?

25        A.      Yes, we did.

66

1      Q.      Did you find any weapons?

2      A.      There were several weapons.

3      Q.      When you say several, about how many?  Not to

4  be exact.

5      A.      I would say 10 to 12 or so.

6      Q.      And at that point does that end your

7  responsibility and your Tactical Team?

8      A.      Actually, my responsibilities, I went in.  I

9  immediately went to the left, which was to the bathroom

10  area.  The other team flowed in through the main area of the

11  bedroom.  Once we found that there were no individuals, we

12  were instructed immediately to exit the room and turn it

13  over to the detectives.

14      Q.      Okay.  You didn't do -- you or your team

15  didn't do the thorough, complete search of everything in

16  that room?

17      A.      No, we did not.

18          MR. SHOOK:  I'll pass the witness, Your

19  Honor.

20                  CROSS-EXAMINATION

21  BY MR. SANCHEZ:

22      Q.      Officer, when they came out to the hallway,

23  they weren't armed, were they?

24      A.      No, they were not.

25      Q.      Did you approach them personally?

1    A.    No, I did not.

2    Q.    Can you see somebody approach them personally?

3    A.    Once they backed up to us, we did have two

4    officers who approached them personally.

5    Q.    And they patted them down?

6    A.    Yes.

7    Q.    And there were no weapons on them?

8    A.    No, there were not.

9    Q.    And other than coming out holding hands

10   together, they followed your directions, correct?

11   A.    Yes, they did.

12   Q.    And you said there were some weapons inside.

13   Did you see them yourself?

14   A.    Yes, I did.

15   Q.    You weren't the one who retrieved them or

16   anything like that?

17   A.    No, I was not.

18             MR. SANCHEZ:  I pass the witness.

19             MR. WIRSKYE:  I have nothing further,

20   Your Honor.

21             THE COURT:  Thank you, Officer.

22             MR. WIRSKYE:  May this witness be

23   excused?

24             MR. SANCHEZ:  No objection.

25             THE COURT:  He may.

1          MR. SHOOK:   We'll call Special Agent

2    DiRito.

3                    STEPHEN DIRITO,

4    having been duly sworn, was examined and testified as

5    follows:

6                  DIRECT EXAMINATION

7    BY MR. SHOOK:

8          Q.    Would you tell us your name, please.

9          A.    My name is Stephen W. DiRito.

10         Q.    And how are you employed, sir?

11         A.    I'm a Special Agent with the Federal Bureau of

12   Investigation, the FBI.

13         Q.    How long have you been with the FBI?

14         A.    I've been with the FBI for seven years.

15         Q.    Where are you assigned?

16         A.    I'm assigned in Denver, Colorado.

17         Q.    What are your duties there?

18         A.    I'm a Special Agent on the Terrors and Task

19   Force and I'm also a team leader on our Evidence Response

20   Team.

21         Q.    As part of the Evidence Response Team back in

22   January of 2001, were you called out, first of all, to

23   Woodland Park and participate in that search?

24         A.    Yes, sir.  On the 22nd of January I was called

25   to Woodland Park and took part in the RV search that we did

1    there.  Subsequently, then, I took part in a number of other

2    searches, one was, I believe, a Jeep, and then finally was

3    involved in the search of the hotel room.

4         Q.    Okay.  Specifically in the early morning hours

5    of January 24th, were you involved in the search of a hotel

6    room there in Colorado Springs at a Holiday Inn?

7         A.    Yes, sir.  I was the team leader in that

8    search.

9         Q.    As the team leader, were you in charge of

10   logging in all the property that was seized from that room?

11        A.    Yes, sir, I was.

12        Q.    Okay.  Let me show you what has been marked as

13   State Exhibit 787 through 805.  You have seen these

14   photographs outside the presence of the jury?

15        A.    Yes, sir, I have.

16        Q.    Are they all photographs of the inside of that

17   room and the evidence that was seized?

18        A.    Yes, sir, they are.

19             MR. SHOOK:  We'll offer State Exhibits

20   787 through 805.

21             MR. SANCHEZ:  We have no objection.

22             THE COURT:  State's 787 through 805 shall

23   be admitted.

24        Q.    (By Mr. Shook)  Special Agent DiRito, do you

25   see a laser pointer up there?

1          A.     Yes, sir.

2          Q.     Feel free to use that, if it would aid you in

3     going over these photos.

4          A.     Yes.

5          Q.     First of all, 787, does that show the room as

6     it was first entered?

7          A.     Yes, sir, it does.  The first thing I did when

8     we got to the room is because we had a large number of

9     agencies involved, I wanted to try to reduce the number of

10    people that were in there at one time.  So I took a

11    photographer in with me initially and we took some overall

12    shots of the scene.

13         Q.     And that's what we're seeing, I guess, from

14    the front door as you look into the room?

15         A.     Yes, sir.  That's looking in.  That's probably

16    one of the first shots that he took, coming in the front

17    door.

18         Q.     State Exhibit 788, is that a photograph after

19    you have gotten a little farther into the room?

20         A.     Yes, sir.  That's inside the room, showing the

21    right side opposite where two beds were located.

22         Q.     I see a mattress is up against the wall there?

23         A.     Yes, sir.

24         Q.     Did it appear that mattress came from, I

25    guess, the bed we see there in the foreground?

1    A.    Yes, sir.   That was the way the mattress was

2  located when we initially got in there.   My understanding is

3  that the SWAT team had to move that mattress aside once they

4  were coming into the room or they found the mattress was up

5  there, already placed that way.

6    Q.    Okay.   The next photograph, is this looking

7  back from the other end of the room?

8    A.    Yes, sir.   This is roughly where the mattress

9  was located, looking back towards the two beds and then the

10  bathroom is on the far side on the right.

11    Q.    The items there on the bed, what do those

12  consist of?

13    A.    Placed on the bed -- the negotiators had told

14  the people inside the room to place all the firearms on the

15  bed.   And I believe that's exactly as the -- that is exactly

16  as the room was laid out with firearms laid on the bed as we

17  got there.

18    Q.    Okay.   Showing you State's Exhibit 790.   Is

19  that a closer view of the firearms as they were laid out on

20  the bed?

21    A.    Yes, sir, it is.

22    Q.    We also see some -- two bandoliers there; is

23  that right?

24    A.    Yes, sir, two bandoliers had shotgun shells,

25  12-gauge shotgun shells, in them.

1    Q.    Again, State Exhibit 791 shows another angle

2  of all the weapons that are on the bed?

3    A.    Yes, sir.

4    Q.    Let me show you State Exhibit 794.  What do we

5  see there?

6    A.    After the initial photographs were taken, I

7  then pulled two individuals in the room with me to

8  essentially help me go through the room and look for

9  firearms and to make the firearms safe for handling and

10  collection.  So inside the room I had Detective Jim Rogers

11  from the Colorado Springs Police Department and Special

12  Agent Ken Whitley from the Bureau of Alcohol, Tobacco, &

13  Firearms.

14         So they came into the room and made the

15  firearms safe.  And then one at a time we placed each of the

16  firearms on the bed with any magazines and rounds that were

17  also in the firearms laid right there with them.

18    Q.    So we see the ammunition that was in the

19  firearms there laying with them outside the firearms?

20    A.    Yes.  For instance, on the firearm here, right

21  next to it is the magazine that was inserted inside the

22  weapon and then there's one round that was also inside the

23  barrel of the weapon.

24    Q.    State Exhibit 795, does that show the firearms

25  after they've been bagged?

1      A.      Yes, sir.  We actually bag the firearms and we

2   put the ammunition and clips separately in a separate bag.

3   So we kept ammunition and a round that was maybe inside of a

4   chamber all together just labeled and associated with the

5   firearm it came from.

6      Q.      State Exhibit 797, does it show another angle

7   of the room?

8      A.      Yes, sir.  There is looking away from the beds

9   towards the opposite wall and there was some personal

10  belongings on the floor there.

11     Q.      Various bags and things of that nature?

12     A.      Yes, sir.

13     Q.      And, now, looking at another photograph of the

14  room, the box there down on the carpet, what is that a box

15  of?

16     A.      I believe that was ammunition that was on the

17  floor in the room there.

18     Q.      Did you find various types of boxes of

19  ammunition throughout the room?

20     A.      Yes, sir, we did.  Primarily in the boxes

21  there was shotgun rounds, both pellet rounds and then slug

22  rounds, which are two different types of shotgun rounds.

23     Q.      What are slug rounds?

24     A.      We would use -- for instance, from the law

25  enforcement perspective, we would use slug rounds more as a

1    type of round we would use in a shotgun, if we were going to

2    aim the gun using the sights on the guns.   The pellet rounds

3    shotgun rounds that have small, basically BBs inside of it.

4    And you would use that more if you were trying to shoot at a

5    general broad area.

6          Q.     Were slug rounds found in those bandoliers?

7          A.     Yes, sir.

8          Q.     And then State Exhibit 799, does that show --

9          A.     That's more ammunition there.

10         Q.     And then --

11         A.     That's a fanny pack and it had shotgun rounds

12   that were inside of it.

13         Q.     State Exhibit 800, what is that we see right

14   below the bed?

15         A.     There were a number of different holsters that

16   were there.   There was some ammunition and I believe it was

17   fanny packs that were also on the ground.   Fanny packs would

18   be used to conceal a handgun.

19         Q.     And 801, is this some of the handgun

20   ammunition you previously testified about?

21         A.     Yes, sir, it is.

22         Q.     Let me show you some posters, three of which

23   have been marked State Exhibits 465, 466, and 467.   You took

24   part in the seizure of the evidence from the RV and the

25   Jeep; is that right?

1    A.    Yes, sir, I did.

2    Q.    You have seen these outside the presence of

3  the jury?

4    A.    Yes, I have.

5    Q.    Are these a list of the weapons along with the

6  model, type, and serial number of those seized from the RV,

7  as well as the Jeep?

8    A.    Yes, sir, they are.

9    Q.    And then State Exhibit 822, is that a poster

10  that reflects the weapons that you took custody of in the

11  hotel room?

12    A.    Yes, sir, it is.

13         MR. SHOOK:  Your Honor, at this time

14  we'll offer State Exhibit 822 with State Exhibits 465, 466,

15  and 467.

16         MR. SANCHEZ:  No objection, Your Honor.

17         THE COURT:  State 822, 465 through 467

18  shall be admitted.

19    Q.    (By Mr. Shook)  I'll show you these firearms,

20  which have been marked State Exhibit 808, as well as 810

21  through 818.  Are these the actual handguns that you took

22  into custody?

23    A.    Yes, sir, they are.

24    Q.    You have seen these outside the presence of

25  the jury?

1    A.    Yes, sir, I have.

2              MR. SHOOK:  Your Honor, at this time we

3    will offer State Exhibit 808 along with 810 through 818.

4              MR. SANCHEZ:  No objection.

5              THE COURT:  State Exhibits 808, 810

6    through 818 shall be admitted.

7    Q.    (By Mr. Shook)  Let me show you two shotguns

8    which have been marked 818 and 820.  Are these the two

9    shotguns you took into custody?

10   A.    Yes, sir, they are.

11             MR. SHOOK:  We'll offer State Exhibits

12   819 and 820.

13             MR. SANCHEZ:  No objection.

14             THE COURT:  Nos. 819 and 820 shall be

15   admitted.

16   Q.    (By Mr. Shook)  Special Agent DiRito, why

17   don't we just go through one at a time, just kind of

18   correlating with the poster we have.  The first one up

19   there, the Smith & Wesson, is that reflected there in the

20   gun there at the top?

21   A.    Yes, sir, it is.  It's a Smith & Wesson, model

22   SW-380.

23   Q.    What is the State exhibit marker on that

24   particular weapon?

25   A.    That's No. 808.

1       Q.    Did your notes indicate that every one of

2 those weapons were loaded at the time of their seizure?

3       A.    Yes, sir. This gun had a round in the chamber

4 and a magazine inserted into the firearm.

5       Q.    Okay. And then the second, the Smith &

6 Wesson .40 caliber that is listed as No. 37?

7       A.    That's State Exhibit 816. That's a Smith &

8 Wesson SW-40VE and this one is a .40 caliber. It also had a

9 fire -- a round inserted into the chamber and a magazine

10 inserted into it.

11       Q.    Okay. And then the next weapon there on the

12 rack.

13       A.    This is a Smith & Wesson 629-5. It's State

14 Exhibit 810 and it's a .44 Magnum. This is a revolver and

15 it had six rounds that were in the cylinder.

16       Q.    All right.

17       A.    The next one is a Smith & Wesson. It's State

18 Exhibit No. 811. It's also the same model as 629-5. It's a

19 .44 caliber handgun and it did have six rounds that were

20 inserted into the cylinder.

21       Q.    Okay. The next weapon.

22       A.    The next one is a Beretta. It's State Exhibit

23 No. 812. It's a model 96 and it's a .40 caliber handgun.

24 This one did have a round in the chamber and a magazine

25 inserted into it. The next firearm was a Heckler and Koch.

1   It's a .40 caliber handgun.  It's State Exhibit No. 813.

2   And it did have a round inserted into the chamber and a

3   magazine inside of it.

4            The next firearm was a Smith & Wesson.  This

5   is a .40 caliber handgun.  It's State Exhibit No. 814.  It

6   had a round inserted into the chamber and a magazine inside

7   of the handgun.

8            The next firearm is a Charles Dailey.

9   It's model 1911 A-1, State Exhibit No. 815.  This is a .45

10  caliber handgun and it did have a round inserted into the

11  chamber and a magazine inside of it, also.

12           The next one was a North American Arms.

13  It's a real small revolver, .22 caliber, and it had five

14  rounds in the cylinder.

15       Q.    Okay.

16       A.    And the last one here is a Smith & Wesson,

17  model 60-9.  It's a .357 revolver.  State Exhibit No. 818.

18  And this one had five rounds that were in the cylinder.

19       Q.    Then the two shotguns that were taken in, 819

20  and 820, are those reflected also on the poster?

21       A.    Yes, sir, they are.

22       Q.    And were they loaded or unloaded?

23       A.    The model -- the first one, the Remington

24  model 870, is a 12-gauge shotgun, that one had five rounds

25  that were inside the shotgun, but there was no round in the

1  chamber.  Essentially to get a round in the chamber, you

2  would have to pump the action on the shotgun once to get a

3  round in there.

4                    The last one was a Mossberg.  It's a

5  model five hundred 12-gauge shotgun.  That one had six

6  rounds that were inserted and one round was chambered inside

7  of it.

8           Q.    Let me show you State Exhibit 803.  Is this

9  some other clothing items that you photographed in the room?

10          A.    Yes, sir.  These were two ski masks that were

11 located inside there.  They had the holes cut out for the

12 mouth and the eyes.

13          Q.    Now, did you also recover some cash from the

14 room?

15          A.    Yes, sir, two separate locations inside the

16 room.  One contained $3,525 and the other one was $1,300.

17          Q.    State Exhibit 805 shows some of that money on

18 the bed?

19          A.    Yes, sir, it is.

20          Q.    And State Exhibit 804, after it's been bagged

21 up?

22          A.    Yes, sir.

23                    MR. SHOOK:  We'll pass the witness.

24                    CROSS-EXAMINATION

25 BY MR. SANCHEZ:

1          Q.     Agent, the weapons that were recovered that

2    you testified about today, were they all on the bed?

3          A.     Um, I know the handguns.  I would have to look

4    back at the actual notes from -- I actually placed each of

5    the items inside the room there.  Quite honestly, I don't

6    recall offhand.  The majority were on the bed, though.

7          Q.     And that's how they were directed to --

8          A.     Yes, sir.

9          Q.     -- put them on the bed; is that correct?

10         A.     They were told by the negotiators to place all

11   the firearms on the bed.

12         Q.     What you found throughout the room was

13   ammunition, but the weapons were on the bed; is that

14   correct?

15         A.     Yes, sir.

16         Q.     And the weather around that time was --

17         A.     It was very early in the morning, chilly.

18         Q.     Okay.  It had been snowing prior to that day?

19         A.     Yes, sir.

20                MR. SANCHEZ:  I pass the witness.

21                MR. SHOOK:  That's all we have.  May this

22   witness be excused, Your Honor?

23                MR. SANCHEZ:  No objection, Your Honor.

24                THE COURT:  He may.

25                MR. SHOOK:  Call Sergeant Spivey.

1          THE COURT:  We'll take our lunch break

2    now until 1:00 and we'll resume testimony at 1:00.

3                    (Recess)

4                    [Jury in]

5          THE COURT:  Please be seated.  Mr. Shook?

6          MR. SHOOK:  State calls Sergeant Spivey.

7                    JEFF SPIVEY,

8    having been duly sworn, was examined and testified as

9    follows:

10                DIRECT EXAMINATION

11   BY MR. SHOOK:

12        Q.    Tell us your name, please.

13        A.    It's Jeff Spivey.

14        Q.    And how are you employed, sir?

15        A.    I'm a Sergeant with the Irving Police

16   Department.

17        Q.    How long have you been with the Irving Police

18   Department?

19        A.    Seventeen years.

20        Q.    And what division are you assigned?

21        A.    Criminal Investigations Division.

22        Q.    Back on December 24th of 2000, were you

23   requested to go to the Oshman's store there off Highway 183?

24        A.    Yes, sir, I was.

25        Q.    And what was your assignment that evening?

1       A.      I was assigned the co-lead investigation of

2   the murder of Officer Hawkins.

3       Q.      And you shared those duties with Detective

4   Johnson?

5       A.      That's correct.

6       Q.      In the early morning hours of the 25th, did

7   you attend the autopsy of Aubrey Hawkins?

8       A.      Yes, I did.

9       Q.      And were his personal effects delivered to the

10  Medical Examiner's Office, along with his body?

11      A.      Yes, they were.

12      Q.      Did those include his second gun?

13      A.      Yes.

14      Q.      Let me show you what has been marked as State

15  Exhibits 987, 988, and 989.  Is 987 his weapon, 988 the

16  clip, and 989 the holster it was in?

17      A.      Yes, they are.

18              MR. SHOOK:  We'll offer State Exhibits

19  987 through 989.

20              MR. SANCHEZ:  No objection, Your Honor.

21              THE COURT:  Nos. 987 through 989 shall be

22  admitted.

23      Q.      (By Mr. Shook)  That evening and in the

24  morning hours, did you develop seven suspects that you

25  thought were involved in the murder of Officer Hawkins?

1          A.     Yes, we did.

2          Q.     And were those the seven individuals that had

3    escaped from the penitentiary on December 13th, 2000?

4          A.     Yes, they were.

5          Q.     Did those include Patrick Murphy?

6          A.     Yes.

7          Q.     Do you see Patrick Murphy here in the

8    courtroom today?

9          A.     Yes, I do.

10         Q.     And where is he seated?

11         A.     He's seated at the defense table, left, in a

12   black sportcoat.

13                MR. SHOOK:   Your Honor, if the record

14   could reflect that the witness has identified the defendant.

15         Q.     (By Mr. Shook)   At that point in time were

16   warrants, arrest warrants, issued for Mr. Murphy and his

17   accomplices?

18         A.     Yes, they were.

19         Q.     The information you had on hand, did that

20   include identification of all seven suspects there by the

21   employees at the Oshman's?

22         A.     Yes, it did.

23         Q.     And was there a piece of evidence left there

24   at the crime scene that was linked back to those suspects?

25         A.     Yes.  A revolver that had been stolen from the

1    Department of Corrections.

2           Q.     All right.  Now, there was another piece of

3    evidence, a smoke grenade that was left inside the Oshman's?

4           A.     Yes, there was.

5           Q.     Did you make some efforts to try to locate

6    where that was sold?

7           A.     Yes.  By tracking through the manufacturer

8    where the -- that lot number had been shipped, I was able to

9    determine where that particular smoke grenade had been

10   purchased.

11          Q.     And where had it been purchased?

12          A.     At a Spy Store in Arlington.

13          Q.     Did you go to that store itself?

14          A.     Yes, I did.

15          Q.     And did you -- were you able to determine how

16   many of these smoke grenades had been sold?

17          A.     Two.

18          Q.     Let me show you State Exhibit 341.  Is that

19   the same type of smoke grenade that was recovered at the

20   Oshman's?

21          A.     Yes, it is.

22          Q.     Did you also look at the Spy Store to

23   determine if they sold security caps and badges?

24          A.     Yes, they did.

25          Q.     And let me show you what has been marked as

1   State Exhibit 342, the security hat.  Did you see similar

2   hats on sale at that particular store?

3        A.    Yes, there were.

4        Q.    Let me show you State Exhibit 468, which is a

5   wallet that has a security police badge.  Did you see

6   similar badges on sale at that particular store?

7        A.    Yes, sir.

8        Q.    All the -- did you receive an inventory list

9   of all the guns that were taken from the Oshman's?

10        A.    Yes, I did.

11        Q.    Including their serial numbers?

12        A.    Yes.

13        Q.    And after the capture of Mr. Murphy and his

14   accomplices, did you check to see if all weapons had been

15   recovered in the search of the RV, the Jeep, the persons

16   that were arrested, as well as that hotel room?

17        A.    Yes.  We did recover all the weapons that were

18   stolen from the Oshman's.

19        Q.    And they were all accounted for?

20        A.    Yes, sir.

21        Q.    Now, there was a video camera and tape in

22   Officer Hawkins' squad car; is that correct?

23        A.    That's correct.

24        Q.    Was that tape turned over to you the night of

25   the incident?

1      A.      Yes, it was.

2      Q.      Did you review the tape?

3      A.      Yes, I did.

4      Q.      What was your purpose for doing that?

5      A.      To see if the offense had been captured on his

6   in-car video.

7      Q.      Had the offense been captured?

8      A.      No.

9      Q.      Had the camera recorded Officer Hawkins on

10   that day?

11      A.      Yes, it had.

12      Q.      And what incident had that occurred?

13      A.      A traffic stop that he had made at

14   approximately 5:00 that afternoon.

15      Q.      And does that tape show Officer Hawkins on

16   camera and show how he was dressed that day?

17      A.      Yes, it does.

18      Q.      Did it show the position of the medals on his

19   uniform, as well as how his belt was positioned?

20      A.      That's correct.

21      Q.      Let me show you State Exhibit 489.  Have you

22   reviewed this and is this the copy of the videotape that

23   shows that last stop by Officer Hawkins?

24      A.      Yes, it is.

25              MR. SHOOK:  Your Honor, at this time

1    we'll offer State Exhibit 489.

2                    MR. SANCHEZ:  No objection.

3                    THE COURT:  No. 489 shall be admitted,

4    subject to the ruling made by the Court.

5                    MR. SHOOK:  May I have permission to play

6    a portion of that tape at this time, Your Honor?

7                    THE COURT:  You may.

8         Q.    (By Mr. Shook)  Is this Officer Hawkins as

9    he's issuing a citation?

10        A.    Yes, it is.

11        Q.    That's how the belt was positioned along with

12   where he had his ammo clips on that particular day?

13        A.    That's correct.

14                   MR. SHOOK:  We'll pass the witness.

15                   CROSS-EXAMINATION

16   BY MR. SANCHEZ:

17        Q.    Sergeant, in your investigation were you able

18   to determine who actually purchased those items from the Spy

19   Store?

20        A.    Through other interviews with the other

21   defendants, yes.

22        Q.    And who was that?

23        A.    That was George Rivas, Donald Newbury, Randy

24   Halprin, and Randy (sic) Harper were in that store that day.

25                   MR. SANCHEZ:  I pass the witness.

1    MR. SHOOK:  That's all we have, Judge.

2    THE COURT:  Thank you, Sergeant.

3    MR. SHOOK:  Your Honor, members of the

4  jury, at this time the State will rest its case in chief.

5    THE COURT:  State rests.  Members of the

6  jury, I need to have a brief recess.  If you would, go with

7  the Sheriff.

8    [Jury out]

9    THE COURT:  Let the record reflect the

10  State has rested their case in chief at 1:12 p.m.  What says

11  the defense?

12    MS. BUSBEE:  At this time, Your Honor,

13  may it please the Court, we make a motion for an instructed

14  verdict.  The State has failed to make a prima facie case of

15  all the elements alleged in the indictment.

16    THE COURT:  Motion denied.

17    MS. BUSBEE:  At this point, Your Honor,

18  we do intend to rest.  In an abundance of caution, we have

19  discussed this with our client and he does not intend to

20  avail himself of his right to testify.  If the Court would

21  like to inquire, he's ready to answer your question on that

22  matter as well.

23    THE COURT:  Mr. Murphy, it's real simple.

24  You've been in court the whole time and you know the drill

25  and you know the program.  You have an absolute right to

1   testify, present evidence on your behalf, if you choose to

2   do so.  Obviously, if you elect not to do so, I'm going to

3   instruct this jury that they cannot consider that for any

4   fact or circumstance against you whatsoever, period, end of

5   story.

6                    It's your decision and your decision

7   alone on advice of counsel.

8                    THE DEFENDANT:  Yes, sir.  I've decided

9   not to testify, sir.

10                   THE COURT:  Very well, sir.  Do you have

11  any questions of me?

12                   THE DEFENDANT:  No, sir.

13                   THE COURT:  For the benefit of the

14  parties, given the hour of the day and the fact that we've

15  still got to work on a charge and then by the time we get

16  the charge worked up, it takes me 20 minutes to read it and

17  an hour per side to argue -- or how much time would you need

18  to argue?

19                   MS. BUSBEE:  Well, I don't think we need

20  an hour.

21                   THE COURT:  So I'm not going to limit

22  argument.

23                   MS. BUSBEE:  What do you think,

24  Mr. Shook?

25                   MR. SHOOK:  Can I think on it for a

```
 1    minute?

 2                    THE COURT:  Yes.

 3                    MR. SHOOK:  We don't have to decide this

 4    second, do we?

 5                    THE COURT:  The bottom line is we can't

 6    get through arguments and give the people any time at all to

 7    deliberate today.

 8                    MS. BUSBEE:  I appreciate that.  That

 9    would be unkind.  So maybe we should start in the morning.

10                    THE COURT:  Give people an opportunity to

11    collect their thoughts and present arguments first thing

12    tomorrow morning.  I think that I can be here at 8:30.

13    We'll look.  So with that, the defense intends to rest?

14                    MS. BUSBEE:  Yes, Your Honor.

15                    THE COURT:  State will close?

16                    MR. SHOOK:  Yes, sir.

17                    THE COURT:  Defendant will close?

18                    MS. BUSBEE:  Naturally.

19                    THE COURT:  Very well, Sheriff.  Bring

20    the jury back in.

21                         [Jury in]

22                    THE COURT:  Please be seated.

23    Mr. Sanchez, the State having rested, what says the defense?

24                    MR. SANCHEZ:  Ladies and gentlemen and

25    Your Honor, at this time we would rest.
```

```
 1                    THE COURT:  Defense rests.

 2                    MR. SHOOK:  State will close.

 3                    MR. SANCHEZ:  We will close.

 4                    THE COURT:  Members of the jury, that's

 5   all the evidence you are going to hear on the indictment

 6   presented to this jury.

 7                    Now, we would normally -- the next step

 8   is the Court will prepare a charge and I'm at 15 pages right

 9   now.  This is the law that I will present to you.  Then the

10   attorneys will follow with their summations.  I give each

11   side approximately an hour.  We still have to get together

12   on the charge.  So you look at the time.  By the time I get

13   the charge prepared and if we were to let the attorneys

14   argue this afternoon, you wouldn't retire to begin

15   deliberations until somewhere around 4:00.  And that's being

16   optimistic, okay?

17                    Any time you put six lawyers and a judge

18   together to try to agree on the charge, even at the very

19   best, it takes a long time.  So I'm not going to put you in

20   a situation to be here late.  I told you that when we seated

21   this jury.  I'm not going to do that.  I want you to

22   understand what I'm doing and why I'm doing it.

23                    So don't leave thinking we only worked

24   half a day.  That's because I can't predict exactly how long

25   the testimony will last.  So the trial in this phase has
```

1  been concluded and you have all the evidence that you are

2  going to hear in this matter.

3                    I'll have you back tomorrow morning at

4  8:30.  At that point we will have a charge ready.  I will

5  present the charge to you.  And then the attorneys will

6  present their final arguments.

7                    Same warnings, no media, no newspaper, no

8  TV news, no Internet, no friends, family, coworkers, radio.

9  Everything you need to learn about this case comes from

10  where?  The witness stand.  All right.  So you get an early

11  day off, go to work, go shopping, enjoy the weather while it

12  lasts, be ready to go to work.  Tomorrow will be a tough day

13  for y'all.

14                    So, if you would, we'll see you tomorrow

15  morning.  I hear 9:30 over here.  Let's make it 9:00.

16  That's usually when I like to start.  Straight up 9:00.  And

17  the Sheriff will have you here ready to go to work at 9:00

18  a.m. tomorrow morning.  See you at that time.

19                    [Jury out]

20                    [End of Volume]

21

22

23

24

25

1  STATE OF TEXAS          *

2  COUNTY OF DALLAS        *

3      I, NANCY BREWER, Official Court Reporter for the 283rd

4  Judicial District Court, do hereby certify that the above

5  and foregoing constitutes a true and correct transcription

6  of all portions of evidence and other proceedings requested

7  in writing by counsel for the parties to be included in this

8  volume of the Reporter's Record, in the above-styled and

9  numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11      WITNESS MY OFFICIAL HAND on this the 4 day of

12  _____March_____, 2004.

13

14

15  _____Nancy Brewer_____

16  NANCY BREWER, CSR, NO. 5759
    Expiration Date:  12-31-04

17  Official Reporter, 283rd JDC
    Frank Crowley Crts. Bldg. LB33

18  133 No. Industrial Blvd.
    Dallas, TX 75207

19  (214)653-5863

20

21

22

23

24

25

REPORTER'S RECORD

VOLUME 44 OF 61 VOLUMES

**74851**

TRIAL COURT CAUSE NO. F01-00328-T

| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JURY TRIAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS
MAR 9 - 2004
Troy C. Bennett, Jr., Clerk

On the 13th day of November, 2003, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Vickers L. Cunningham, Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

ORIGINAL

283RD JUDICIAL DISTRICT COURT 214/653-5863
NANCY BREWER, OFFICIAL COURT REPORTER

1                    A P P E A R A N C E S

2    APPEARING FOR THE STATE

3    Mr. Toby Shook
     SBOT NO. 18293250
4    And
     Mr. Bill Wirskye
5    SBOT NO. 00788696
     Assistant District Attorneys
6    133 No. Industrial Blvd.
     Dallas, Texas 75207
7    Phone:  214/653-3600

8

     APPEARING FOR THE DEFENDANT
9
     Ms. Brook Busbee
10   Attorney at Law
     SBOT:  03488000
11   703 McKinney Ave. Ste. 312
     Dallas, TX 75202
12   214/754-9090

13   Mr. Juan Sanchez
     Attorney at Law
14   SBOT:  00791599
     5630 Yale Blvd.
15   Dallas, TX 75206
     214/365-0700

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

[Jury out]

THE COURT:  We're on the record.  State ready to go over the charge?

MS. SMITH:  Yes, we are, Your Honor.

THE COURT:  Defense?

MR. TATUM:  Yes, Your Honor.

THE COURT:  State have any objections, suggestions for language to be included in this charge?

MS. SMITH:  No, Your Honor.

THE COURT:  Defense?

MR. TATUM:  Yes, Your Honor.  We certainly thank you for all the work you did before the trial and giving us the basis to work with, which saved a lot of time.  For the record I want to thank you for that.

Of course, we must maintain certain positions and we wanted to reiterate our constitutional objections that were raised pretrial through the prosecution of this case as a death penalty case and ask the Court to take judicial notice of those pretrial motions and rulings in regards as this case is submitted as a death penalty case.

THE COURT:  The Court will take judicial knowledge of all the previously filed motions.

MR. TATUM:  I assume --

```
 1            THE COURT:  My previous rulings will
 2   stand.
 3            MR. TATUM:  Thank you, Your Honor.  We
 4   would also ask the Court to enter an instructed verdict
 5   based on the Enmund versus Florida case 458 US782, that
 6   evidence fails to show that defendant killed or attempted to
 7   kill the deceased.  We submit that to the Court.
 8            THE COURT:  Overruled.
 9            MR. TATUM:  Thank you.  We would also ask
10   the Court to require the State to elect which of the two
11   means or methods in the indictment to prove capital murder,
12   since there's two separate allegations, one being killing a
13   police officer and one the murder during the commission of a
14   felony.
15            Being that if they are both submitted
16   under the Texas General Verdict Statute, the jury, we do not
17   have a requirement or instruction that all 12 must agree on
18   which theory.  In other words, we could have ten for one
19   theory and two for another or they could split and still
20   come to a unanimous verdict.
21            And we feel that this violates the
22   constitutional requirements for all 12 to agree beyond a
23   reasonable doubt as to the various elements of the offense.
24            THE COURT:  That issue has been up and
25   down many times and I will deny your request.
```

1   MR. TATUM:  Thank you.  We also request

2   an election between the two types of parties charge.

3   There's a 702(a) which we call basically assisting and a

4   702(b), which is basically -- defines it as joining a

5   conspiracy.

6   The same argument being that the jury may

7   split under the General Verdict Statute using Texas and not

8   be unanimous on either type of parties and/or as it applies

9   to the two types of ways to commit the offense.

10  THE COURT:  I understand your issue.

11  Motion denied.

12  MR. TATUM:  Thank you, Your Honor.  We

13  also raise those issues and argue that they violate the

14  United States Constitution's Amendment 6, 14, Texas

15  Constitution, Article 1, Section 19, Article 5, Section 13,

16  in raising that as a constitutional issue, too.  We do not

17  want to waive that provision.

18  THE COURT:  Yes, sir.

19  MR. TATUM:  Same rulings?

20  THE COURT:  Same rulings.

21  MR. TATUM:  Thank you.  We also from our

22  discussion yesterday had requested the submission of the

23  offense of murder as a lesser included offense to follow the

24  submission of the offense of capital murder and with the

25  appropriate language that if the jury were to have a

1   reasonable doubt of which one to do or convict of, that they

2   would convict of murder instead of capital murder.  We feel

3   that the evidence, when dissected enough, the jury could

4   believe there is a lack of specific intent to kill.

5               THE COURT:  And let the record reflect

6   that the Court very diligently reviewed that issue and asked

7   the parties to bring me any evidence that would allow me to

8   put that in the charge, any cases, and I have not seen any

9   evidence that would allow me to include that lesser

10  application in the charge.

11              MR. TATUM:  Thank you, Your Honor.

12  That's overruled, too?

13              THE COURT:  Yes, it is.

14              MR. TATUM:  We also request a defensive

15  charge on what is called independent impulse, which has been

16  defined basically as part of Mayfield versus State, and ask

17  that the Court include a defensive instruction in that

18  regard which arises out of the charge of Section 702(b) of

19  the conspiracy as part of the parties definition and that's

20  Mayfield versus State, 716 Southwestern 2nd 509, Texas Crim.

21  App. 1986.

22              THE COURT:  The Court has also reviewed

23  that language and overrules your request.

24              MR. TATUM:  We also object to the

25  submission of the case under the 702(b) theory of

1    co-conspirator liability as a parties charge because it

2    conflicts with the requirement of capital murder that there

3    be a specific intent to kill or the conscious objective of

4    the defendant to kill or to cause the loss of life.  And it

5    was -- or you cannot work it together.  They don't work

6    together.

7                   And we also feel that it violates the

8    various constitutional sections that were previously stated.

9                   THE COURT:  I understand your issue and

10   overrule your request.

11                  MR. TATUM:  I believe that concludes our

12   objections, Your Honor.

13                  THE COURT:  How much time does each side

14   wish to request argument?  Can you do it in an hour or less?

15                  MR. SANCHEZ:  I can do it in less than an

16   hour.

17                  THE COURT:  Mr. Shook, can you work with

18   an hour?

19                  MR. SHOOK:  Sure, Judge.

20                  THE COURT:  Ready for the jury.

21                  MR. SANCHEZ:  Your Honor, if I could just

22   be told when I've used half an hour.

23                  THE COURT:  I'll set the timer for half

24   an hour.  Who will open for the State?

25                  MR. WIRSKYE:  I will, Your Honor.

```
 1                    THE COURT:  How much time do you want?

 2                    MR. WIRSKYE:  When and if I've used 20.

 3                    THE COURT:  You will hear the beeper.

 4   We're ready for the jury.

 5                    [Jury in]

 6                    THE COURT:  Good morning.  Please have a

 7   seat.  Members of the jury, I'm glad we didn't try to push

 8   this yesterday.  As you can see, I didn't finish the charge

 9   until 3:51 yesterday afternoon.  So like I said, I'm not

10   going to waste your time, but when we're here, we're

11   working.

12                    As I said yesterday, what I'm going to do

13   at this time is I'm going to read to you the Court's charge.

14   That's the law you will follow in this case.  And then the

15   attorneys will have their final summations.  And you will

16   have this copy in writing.  So listen carefully at this

17   time.

18                         [At this time the jury charge was

19                          read to the jury by the Court.]

20                    THE COURT:  With that, we'll have final

21   summation.  Mr. Wirskye?

22                    MR. WIRSKYE:  May it please the Court.

23   Ladies and gentlemen, thank you for your patience and

24   attention as the trial goes into its fourth day.  You heard

25   about two and a half days, I guess, of evidence.  You saw
```

9

1    quite a bit of evidence.  It's overwhelming evidence.  It's

2    evidence that makes your decision very clear.  It's evidence

3    that shows that there is only one just verdict in this case

4    and that is finding Patrick Murphy guilty of capital murder.

5                         What I would like to do is briefly talk

6    to you a little bit about the law, some of the things in the

7    Court's charge, and then I would like to run through and

8    share some observations that I have on the facts of the

9    case, the evidence that you heard.

10                        You know, we talked to each and every one

11   of you in jury selection.  We told you up front we're trying

12   him as a nonshooter.  We are trying him as a nontriggerman.

13   We told you that up front.  And we explained the law to you

14   when it comes to a conspirator.

15                        If the conspirator should have

16   anticipated the murder, then he is guilty of capital murder.

17   Each and every one of you told us you understood the law,

18   you agreed with the law, and you could follow the law in the

19   appropriate case.  And this is the appropriate case.  The

20   evidence cannot be more clear.  The evidence cannot be more

21   damning for Patrick Murphy.

22                        In the Court's charge, I know the Judge

23   read it and you haven't seen a copy of it yet, there are

24   basically four different ways to find him guilty of capital

25   murder.  Let me try to run through it really quick and try

1    to simplify it for you.

2                    If you will recall, we have alleged

3    capital murder has been committed two different ways in this

4    case, one, the murder of a police officer on duty; secondly,

5    an intentional murder during the course of a robbery.  And

6    recall, also, there are two different ways to prove each of

7    those.  Okay?  That's why you have the four different ways

8    to find him guilty.

9                    You could find him guilty as a party if

10   you think he aided, assisted, or directed someone to commit

11   capital murder.  And, of course, you could find him guilty

12   as a conspirator, if you think that he should have

13   anticipated murder.  That's why you have the four different

14   ways.  If we prove one or if we prove all, he would be found

15   guilty of capital murder.

16                    There's things you may recall from jury

17   selection, these things called lesser included offenses.

18   There is one in the Court's charge, the lesser included

19   offense of aggravated robbery.  Simply, folks, I can tell

20   you up front, you will never even reach it during your

21   deliberations.

22                    And the reason is this.  Before you ever

23   even consider aggravated robbery, each and every one of you

24   have to agree that he's not guilty of capital murder.

25   That's simply not the case.  It flies in the face of reason.

1   It flies in the face of all the evidence that you have

2   heard.

3                And, I mean, really, it was overwhelming

4   evidence, a fraction of which we see in the courtroom today.

5   You know, this is not a whodunit.  It's not a TV mystery

6   that has all these fictional twists and turns and different

7   suspects.  This case is straightforward.  We don't need a

8   Sherlock Holmes to come in here and make a brilliant

9   deduction about who the real villains were.  We know exactly

10   who the villains are.

11                There's no drama in this case, really, in

12   the guilt phase, in this phase.  We know exactly who the

13   villains are, because they got caught redhanded with all the

14   Oshman guns, they got caught redhanded with all the Oshman's

15   goods.  Okay?

16                This is a simple case, really.  You know,

17   even excellent, fine lawyers have difficulty mounting a

18   defense in a case like this where the evidence is so

19   overwhelming.

20                And, very frankly, it boils down to one

21   thing.  The whole case boils down to one issue and that

22   issue is, do you think Patrick Murphy should have

23   anticipated the murder that Christmas Eve.  Okay?

24   Again, the evidence is clear.  Of course he should have.  In

25   fact, you can take that evidence to the next step.  He

1  actually anticipated that murder.

2              That's what I want to visit with you now.

3  At this stage of the trial your only relevant concern is

4  should he have anticipated.  But I'll submit to you the

5  evidence shows beyond any doubt that he went a step further,

6  that he actually anticipated the murder.

7              And, basically, it's such a common sense

8  proposition, folks, okay, when you are talking about a

9  person's intent, what they anticipated.  There was only one

10 reason to take a loaded weapon to a robbery.  That is

11 because you anticipate using it.  You anticipate violence.

12 You anticipate murder.  He not only took one loaded weapon

13 to a robbery, he took four loaded weapons to a robbery.

14 That shows you his intent.  That shows you his actual

15 anticipation.

16             I mean, look at what he took.  He had the

17 two .357s from the prison.  Of course, then they were

18 functional and fully loaded with what he calls the Magnum

19 rounds.  He also had this shotgun, a prison shotgun,

20 12-gauge shotgun, had ten rounds for that.

21             What else does he have?  What does he

22 tell us?  He's got a scanner.  He has got a two-way radio.

23 And, of course, he's got this book, the newest and most

24 updated edition, the 2001 edition of the police frequency

25 which we know he programed personally, each and every code

1   for the Irving Police Department.

2                    And, finally, he has his AR-15 assault

3   rifle, as he's sitting out there in the Suburban in the

4   Oshman's parking lot.  He has this as well.

5                    Imagine, if you will, that this witness

6   chair is the front seat of that Suburban and Patrick Murphy

7   is sitting right there.  Look at what he has around him.  I

8   mean, that pile of evidence, that pile of equipment, speaks

9   more loudly and more eloquently as to his intent and his

10  anticipation than I ever could.  Think about that, folks.

11  Why was he sitting there with all those things?  Why do you

12  need a scanner?  If you don't anticipate that the police are

13  coming, why do you need a police scanner?  It's just such a

14  common sense proposition and it makes your decision so very

15  clear.  Okay?

16                    But there's even further evidence.  Okay?

17  If you want to talk about his mindset, what is really going

18  on in his mind, you can look at three different things.  You

19  can look at the circumstances of his life.  Okay?  You can

20  look at his actions.  And, finally, third, you can look at

21  his words.

22                    Let's go through each of those and try to

23  determine what his mindset, what his intent was.  What was

24  his existence like back in December, 2000?  What was his

25  life like?  What was going on in Patrick Murphy's life?

14

1      He and the six others had escaped from

2   the Connally Unit in south Texas.  He was on the run.  They

3   knew law enforcement would be after them.  They knew modern

4   day posses of lawmen would do their sworn duty and try to

5   recapture them and send them back.

6      In December of 2000 he led a life of

7   desperation.  Okay?  And that desperation equals

8   anticipation, because don't be fooled, folks, he

9   consistently and constantly, every moment of his existence

10   back then, he was anticipating a police officer.  Behind

11   every door, around every corner, behind every bush, he was

12   constantly, consistently, anticipating that he may run into

13   law enforcement.  That was his existence back then.  It was

14   complete and totally consumed with anticipation.

15      And then take it another step further.

16   He decides with his friends to go do an aggravated robbery,

17   an armed robbery of that Oshman's, basically an armed

18   assault of that Oshman's.  Do you think that may have

19   heightened his sense of anticipation that there may be an

20   encounter with law enforcement and someone may be hurt,

21   someone may be killed, someone may be murdered?  Of course

22   it does.  He has to know that.

23      In a sense, that was his most desperate

24   hour in front of that Oshman's.  What do you think he

25   anticipated when he saw Officer Hawkins' cruiser come

1   around?   When he heard the radio call that Officer Hawkins

2   got?   Suspicious persons at Oshman's.   Do you think he was

3   shocked that Aubrey Hawkins actually answered that call?   Do

4   you think that he was shocked that Aubrey Hawkins showed up

5   to what turned out to be the last call he ever answered?   Of

6   course not.   It flies in the face of reason.   It flies in

7   the face of the evidence.

8                    To believe that he is not guilty of

9   capital murder, you would have to believe that he sat in

10  that Suburban, that chair right there, surrounded by that

11  equipment, in basically a state of suspended animation,

12  deaf, dumb, nothing going on upstairs, that he was some sort

13  of vegetable.   And, of course, he wasn't.

14                    How do we know he wasn't?   We can look at

15  his actions around the actual robbery.   Okay?   They did

16  quite a bit of planning.   I'm not going to tell you it was a

17  good plan, but it was at least a plan that they had thought

18  about.   They, in their own way, tried to analyze the

19  situation and planned for every contingency.   Don't you

20  think they planned for the contingency of the Irving police

21  officers?   Come on, he tells you in his own words, folks,

22  hey, I think it's high risk.   I wouldn't have done Oshman's.

23  And then he tells you why.   He wouldn't have done Oshman's,

24  because he's familiar with Irving Police Department's quick

25  response time.   Again, how much simpler does it get?

1    It shows exactly his actual anticipation

2    that Officer Hawkins or another Irving officer would show up

3    out there and there would be violence and there would be

4    murder.  He's concerned about the number of employees, too

5    many employees.  Why is he concerned about that?  Because

6    the greater number of employees, the greater chance that

7    something could go wrong and there may be violence out

8    there.  There may be murder out there.  He is anticipating

9    this all the way through.

10    Let's talk about his role in the offense,

11    this lookout, this backup, this sniper.  His role in the

12    offense tells you everything that you need to know about his

13    state of mind and his anticipation.

14    And the reason is this, okay?  Of all

15    those seven people involved in that robbery, it was his job

16    and his job alone to have that heightened sense of

17    anticipation.  That was his job.  He was the lookout.  He

18    was supposed to anticipate Officer Hawkins coming.  That was

19    his job.  He was the most trusted one.  The others are

20    inside.  They were relying on him to call in.  His role

21    tells you everything you need to know about his mindset,

22    folks.

23    And I guess it's unfortunate that he

24    performed his role so well and so ably that night.  We know

25    now that he radioed in, we've got company.  There's police.

They're going around to the back.  He gave out the precise information that basically sent a team of assassins back to the back that felled Officer Hawkins in a frenzy of gunfire. We know he was too good at his job.

You know, they may argue -- they may say, well, he said abort.  He said, leave, leave.  They may say, well, that's got to show you something about him.  That's got to show you something that he didn't anticipate or he shouldn't have anticipated or he didn't want anything bad to happen.  And, folks, nothing is further from the truth.

When he radioed that, assuming he did, assuming that was the truth, that he was really on the radio saying, abort, leave, leave, assuming that he said that, that wasn't a warning for them to run.  They could have run, if they wanted to.  Of course, they would have had to drop the money, the guns, the ammunition.  They weren't about to do that.  They weren't about to do that.

They didn't run.  It wasn't a signal to them to get the heck out of there.  No.  It was a signal to them, hey, we've got company.  It's going down.  You need to arm yourselves and prepare accordingly.  Because, you see, this whole thing was planned.  Okay?  They had planned for an Aubrey Hawkins.  They had armed themselves for an Aubrey Hawkins.  They had anticipated, actually anticipated, an Aubrey Hawkins.  That wasn't a warning for them to leave.

1    It was a heads up.  It was a heads up, folks, we got

2    company.

3                   What did he do after the robbery?  What

4    does he tell us?  He gets the AR-15, goes over to the

5    rendezvous point, gets out of the driver's seat, and gets in

6    the back seat with his AR-15.  Says he's prepared to

7    initiate a firefight with pursuing police.  Again, it

8    doesn't get any clearer.  That's his frame of mind.  That's

9    his mindset.  That's his intention.  That's his

10   anticipation.  That's what he told Detective Johnson.

11                  What does he tell Detective Herrill,

12   Colorado Springs?  I was set up to do damage from behind in

13   the event of a standoff.  That was his intent.  If he had

14   had his way, what he intended, what he anticipated, was to

15   leave more bullet riddled bodies of Irving police officers

16   out along 183.  And thank God that there was not another

17   police officer behind him on 183, because he would have

18   never known.  He would never have anticipated what was

19   waiting for him, Patrick Murphy and an AR-15.

20                  That was his bloody, bloody intention

21   that day.  Don't be fooled, don't be led astray, keep your

22   eyes on the evidence.

23                  Folks, I'm not going to take up much more

24   of your time.  The evidence is clear.  The evidence is

25   overwhelming.  I want to leave with you a couple of final

1   thoughts, though.

2              But for the actions and the abilities of

3   Patrick Murphy, Aubrey Hawkins may have had a fighting

4   chance.  We'll never know.  As outgunned and as outnumbered

5   as he was, he may have had a fighting chance.  But we'll

6   never know and we'll never know because of this man.  We'll

7   never know because this man anticipated an Aubrey Hawkins, a

8   police officer.  And he called in his team to dispatch that

9   threat and they did so in a very deadly, a very lethal way,

10  11 gunshot wounds to Officer Hawkins, three more stopped by

11  his ballistic vest.

12             But for Patrick Murphy, Aubrey Hawkins

13  would have had a fighting chance.  In a very real sense,

14  folks, you don't have to pull a trigger to kill someone.

15  Okay?  You don't have to.  You don't have to use your

16  trigger finger to get blood on your hands.  And just

17  assuredly as the other six of the Texas Seven have the blood

18  of Aubrey Hawkins on their hands, so does Patrick Murphy as

19  he sits in the courtroom today.  He has got Aubrey Hawkins'

20  blood on his hands.  And because he does and because he does

21  have that blood on his hands, he's guilty, guilty of capital

22  murder.  Thank you, folks.

23             THE COURT:  Mr. Sanchez?

24             MR. SANCHEZ:  May it please the Court.

25  Good morning.  I've got -- we have been given an hour to

1    give a summary of the evidence.  I'm not going to take up

2    this whole hour.  I'm going to address the evidence in this

3    case that pertains to Patrick Murphy, because that's the

4    person that's on trial here.  The State gets up here and

5    they are going to try to whip up your emotion and point at

6    the board.  But let's remember and get back to the issue

7    that Patrick Murphy is the only one that's on trial here

8    today.

9                     When we spoke to all of you in voir dire,

10   for some of you it was over a month ago, you all indicated

11   to me and we all were confident that you could look at this

12   case logically, without emotion, without sympathy, and

13   decide it based only on the evidence.  Every time you left

14   this courtroom, the Judge would ask you, you decide this

15   case from where?  From the evidence that comes from the

16   witness stand.  Emotion and sympathy are not to play a part

17   in that.

18                     And when we selected you to be jurors on

19   this case, we were confident that all of you could do that.

20   On voir dire we talked about the fact that when you look at

21   a case, as jurors, your only job is to judge the State's

22   evidence.  As Mr. Shook put it during voir dire, it's like

23   being an umpire.  You call balls or strikes.

24                     Either they prove the case or they don't

25   prove the case.  You don't convict somebody solely because

1   the State wants you to do it.  It's because they've

2   presented the evidence that convinces you beyond a

3   reasonable doubt.  You don't convict somebody solely because

4   a life was lost, only if they are guilty of what they allege

5   that he's guilty of.

6              And that's really the issue that you are

7   going to have to deal with when you are back there

8   deliberating on this case.  You are going to have to use

9   that mental discipline that Mr. Wirskye talked about when he

10  was speaking to some of you jurors, the mental discipline to

11  distinguish between the acts of people.

12             The way the law works is not that you

13  just throw out a net and whoever comes up is guilty.  The

14  saints and the sinners don't go all in the same net.  The

15  fact they put them all on the board next to each other

16  doesn't mean they are all guilty of the same thing.

17             So you are going to have to decide, what

18  is Patrick Murphy guilty of?  You are going to have to

19  decide, what was his intent in combination with his acts and

20  decide what is he really guilty of?

21             Mr. Wirskye just indicated that if it

22  wasn't for Patrick Murphy that Aubrey Hawkins would have a

23  fighting chance.  I would tell you that if they had listened

24  to Patrick Murphy, Aubrey Hawkins and these other six would

25  have never met.  He was trying to prevent exactly what

1   happened.

2                   Abort and leave, leave, is the exact

3   opposite of ambush.  It's the exact opposite of attack.

4   It's the exact opposite of get ready for him.  His job was

5   to warn them so they could leave.  That was the plan.  That

6   was his mindset.  That was his intent.

7                   So when you are looking at this case, you

8   know, the State, I'm sure, won't argue with this.  You know

9   Patrick Murphy never fired a weapon.  There's been no

10  evidence that he ever fired a weapon.  He never went back to

11  the loading dock.  He was never in that area.  He never went

12  inside the store.  And he never had the intent that Aubrey

13  Hawkins die that day.

14                  In order to find him guilty as a party,

15  you have to find he acted with the desire and intent that

16  Aubrey Hawkins die and that just wasn't the case.  You can't

17  convict somebody of something they did not want to happen.

18                  Under the rule of parties he would have

19  to have assisted with the intent that Aubrey Hawkins be

20  killed.  His only intent that day was that the Oshman's be

21  robbed and that they get out of there.  That's why they had

22  scanners, so they could have enough warning to leave.  And

23  the plan went wrong.  Some people got greedy, I'm sure,

24  inside that Oshman's and made them stay longer than they had

25  to.

1               Just to clear up something about that,

2    George Rivas was the one that said, we've got company.  I

3    think if you recall the testimony that those words didn't

4    come from Mr. Murphy.  He said, we've got company.  And what

5    did they do?  They were trying to get out of there.  As soon

6    as they heard that, they were trying to leave.  He was

7    urgently telling them abort, leave, leave.

8               Now, this comes from his statement.  This

9    is really the only piece of evidence that you have that can

10   show you Mr. Murphy's intent.  The only tangible piece of

11   evidence that shows you his intent that day.  The State

12   would have you speculate as to what his intent would be, but

13   we don't convict people on speculation.  The only evidence

14   that you have is the evidence that they brought to you,

15   which is the statement.

16               And they can't have it both ways.  They

17   can't use what's in the statement and say, believe this

18   part, believe how the guns were set up and what he was doing

19   in the car, but don't really believe about what he said

20   about what his intent was.

21               Look at the statement.  It makes sense.

22   It was forthcoming.  It was truthful.  Everything in that

23   statement is supported by the facts, even the fact that some

24   ammo was left out in the back that he found out later when

25   people were telling him after they got back together.  If

1    you read that statement, he didn't know that an officer was

2    shot until they got back together.

3                    Does that show that somebody had the

4    intent that someone die that day?  Does that show that he

5    anticipated that the plan would go awry like that?

6                    Usually I don't refer to notes, but this

7    is a very important case and I think it's important, again,

8    that you focus on two areas.  You have plenty of evidence in

9    front of you of what happened back in the loading dock

10   behind Oshman's.  You may have been wondering, you know, I

11   wonder why they didn't cross-examine more that witness that

12   testified about DNA or testified about gunshot residue,

13   trajectory of the bullets, diagrams of how the area looked

14   back there, what the officer found.  It's because that had

15   nothing to do with Mr. Murphy.  None of that evidence even

16   connected him to that scene that day.

17                    So don't think just because the questions

18   weren't asked that somehow that was a sign or message that

19   somehow we believe they have proven their case.  No.  We're

20   not going to waste your time asking questions that don't

21   mean anything, that are not relevant to Mr. Murphy.

22                    As a matter of fact, I think you only

23   heard from three witnesses that said anything about Mr.

24   Murphy.  So, again, how do we know that it wasn't

25   anticipated or the intent was not there that someone should

1   die in the course of this robbery?  Look at the State's own

2   witnesses.  Wes Ferris, the manager, he had the most direct

3   contact of any of these witnesses with Mr. Rivas, who we all

4   know was the one who was leading the operation.  And he even

5   told you, I got the feeling that he just wanted to get in,

6   get the stuff, and leave, that they didn't want to hurt

7   anybody.

8            I mean, he told you that himself.  And

9   this is the person who had the most direct contact with the

10  person who was running the operation.  And if the person who

11  is running the operation has that intent, then how can you

12  say it was planned that they were going to hurt somebody?

13  How can you say that anybody anticipated someone would get

14  hurt?  George Rivas gave the impression to everybody and

15  everybody got the feeling that they just wanted to leave.

16  Even Mr. Simpson told you that.

17            Again, I'm going to have to talk about

18  Mr. Murphy's statement.  That right there is the most

19  convincing evidence that Mr. Murphy had no intent while he

20  was sitting in that vehicle, ready to warn them to leave,

21  that Officer Hawkins was shot or hurt in any way.  Look at

22  the statement.  Read it.  You will get it back there.  It's

23  in evidence and you will be able to go over it as many times

24  as you like and discuss it.

25            In here he talks about the fact that he

1    signed up for a robbery and only a robbery.  He talks about

2    the fact that he was listening to scanners, but only to tell

3    them to get out.  And when he did see Officer Hawkins, he

4    said, leave, abort.

5              The State can try to characterize those

6    statements as something different, but they are plain.  You

7    don't have to look it up in a dictionary to find out what

8    that means.  That means get out.  Not only in here he shows

9    there was urgency in telling them leave, leave.  He said it

10   twice because he wanted them out of there.  And like I said

11   before, if they would have listened to him, that's what

12   would have happened.

13             Now, these cases are difficult because

14   you are saying to yourself, well, this person decided to

15   commit a robbery, so let's just find him guilty of capital

16   murder.  Well, that's not the way it works.  I mean, we've

17   all grown up, we've all grown up knowing that guilt by

18   association is not a good thing.  You can't just find

19   somebody guilty by association.  We've known that since we

20   were young.

21             And the law recognizes that.  The law

22   recognizes that there's dangers in people being convicted

23   for the acts of other people, if they didn't have the intent

24   that those acts occur.  So the law puts that protection in

25   there.

1       And they say to you, in order to find him

2  guilty for the acts of another person, they have to prove to

3  you that he had the intent and he aided in doing that, if he

4  had the intent at all.  Or they have to prove to you under

5  the conspiracy theory that he anticipated that a human life

6  would be taken or that a murder were to occur.  And when you

7  look at the statement, you know that's not the fact.

8       And the most telling, the most telling

9  part of this statement is not just the fact that he said,

10  leave, abort, abort, is that you look back at the last page.

11  At the last page at the very end he said, "Donald and I

12  almost left that day."  That right there should indicate to

13  you that something happened that he didn't want to, that he

14  didn't agree with, and that wasn't planned.  Why would you

15  want to leave the group if it happened just like you

16  anticipated or thought it would happen?

17       That's the most telling part of this

18  whole statement is that he wanted to leave the group that

19  day because he found out later that the officer was shot and

20  that's not what he had planned for.  That's not what he had

21  signed up for.  He had signed up only for a robbery.  And

22  that's what his whole intent was, a robbery.  And if he's

23  guilty of anything, that's what he's guilty of, a robbery.

24       Now, let's look at the rest of the case

25  that you saw.  There were some -- you have the trajectory of

1    the bullets that they put here in front of you.  You have

2    all these guns that they are laying in front of you.  And I

3    just want to remind you that all these guns were not brought

4    into the Oshman's.  Most of these guns were the ones that

5    were taken out of the Oshman's.  So when they lay these in

6    front of you remember that, remember that.

7                     They brought in DNA evidence that shows

8    it was Mr. Rivas and one of the other ones and Officer

9    Hawkins' DNA that was found back there and in the cars.

10   They brought you evidence -- I didn't hear any fingerprint

11   evidence, but I would suggest to you that if they had,

12   Mr. Murphy was never in the store, never fired a weapon,

13   never in the Explorer.

14                     They brought you evidence of how they

15   arrested the other six, but, again, it had nothing to do

16   with Mr. Murphy.  The only thing is that it was peaceful and

17   done without incident.  When Mr. Murphy was talked to there

18   at the Holiday Inn that day, they tried to make a big thing

19   out of the fact that they may have been watching porn.  I

20   know you are not going to convict somebody of capital murder

21   based on that.

22                     But what you did learn is that he told

23   Agent Harrell that he would have never done the Oshman's.

24   And that some people had acted in a wrongful manner.  And he

25   was talking about the other six.  Even then, he was still

1   showing you the disagreement and the lack of intent that he

2   had that that would have happened.  Even then he was saying.

3                    So when you go back there, you would have

4   to look at all the evidence.  I want you to read the charge.

5   I want you to read the charge and look at it logically,

6   without emotion, and decide has the State proven to me his

7   intent or his anticipation.  Because that's what it all

8   comes down to.  What happened behind the store and what was

9   happening in that car where Mr. Murphy was sitting and what

10  was going on in his mind, that's basically the whole issue.

11  That's basically all your deliberations should be about,

12  because that's the only way that the State can get you to

13  where they want to get you.  That's the only way

14                    But you can't get to it.  They have to

15  prove it to you beyond a reasonable doubt.  You know, we

16  talked about these concepts of beyond a reasonable doubt and

17  holding the State to their burden and that that's the law.

18  And you all took an oath to follow that law.  Well, that law

19  only means something and those concepts only mean something,

20  if you uphold them.  That's the only way they are going to

21  work.

22                    That's the only way the State will ever

23  have to prove their case beyond a reasonable doubt is when a

24  jury requires them to do so.  And we know that you are going

25  to do that.

1          So I want you to go back there and look

2     at all the evidence that pertains to Mr. Murphy.  You have

3     got a lot of evidence about other people here.  Evidence

4     that pertains to Mr. Murphy and his intent and his

5     anticipation that he had down there.  And, really, the only

6     evidence that you are going to have are the witnesses that

7     talked to him and his statement.

8          And I think once you look at that, once

9     you honestly look in your heart and look at the facts of

10    this case as it applies to Mr. Murphy, the most you can find

11    him guilty of is aggravated robbery, because he never wanted

12    it to happen that way.

13         Deliberations should be thorough.  You

14    should talk about things, read the charge more than once, if

15    you have to, so you understand how to apply the law.  It can

16    be a little confusing, even for us who are explaining it to

17    you.  Read the charge.

18         And your verdict must be unanimous.  All

19    twelve of you must reach an agreement as to a verdict.  But

20    it's also your verdict, a true verdict rendered.  It's a

21    verdict that you want to give.  You don't compromise on

22    verdicts.  You don't vote a certain way, just because

23    somebody else wants you to or because you want to go home at

24    5:00 or you want to leave at a certain time.  But it's a

25    true verdict.

1          I want you to go back there and look at

2    this evidence logically, look at the actual intent of Mr.

3    Murphy, and what he actually anticipated, and you will find

4    him not guilty of capital murder.

5                    THE COURT:  Mr. Shook?

6                    MR. SHOOK:  May it please the Court.

7    Members of the jury.  Back on Christmas Eve of 2000 dark

8    forces descended upon that Oshman's.  There were seven

9    outlaws that went out there.  And the defense may want you

10   to ignore those six other outlaws and their actions so you

11   can't associate them with Mr. Murphy, but you can't do that,

12   you see, because they were in this together.  They were a

13   gang, an outlaw gang.  They were a team and they chose to

14   commit a crime which required all seven of them acting

15   together as a team.

16                   And now you realize why we talked so long

17   on voir dire with each of you about the law of parties.

18   Naturally, when we first spoke to you about capital murder,

19   the first examples that you think of, as anyone would, is

20   someone who is an actual triggerman.

21                   But when we talk about it further,

22   sometimes crimes are committed with more than one

23   individual.  Sometimes you have to have groups of

24   individuals to commit crimes.  And that's why we have this

25   law of parties.  That's the logic behind it.  And you all

1    agreed with that.

2                         Now, we used some simple examples back at

3    that time and we asked you some openended questions and each

4    of you came up with some good examples.  We talked about how

5    a person's intent would be important, how actively involved

6    they were, that sort of thing.

7                         If we could have given you the details of

8    this crime, then I have no doubt at all that all of you

9    would have said, yes, obviously, that's the kind of case

10   someone should be prosecuted for capital murder as a party.

11                        This kind of case is a textbook example

12   as to why we have the law, because the law seeks to deter

13   gangs from committing these types of crimes.  The law

14   doesn't allow criminals to say king's X, you can't touch me.

15   I didn't pull the actual trigger.  I was just there helping

16   this thing.  You can't do that.  The law doesn't protect the

17   criminal that way.  You have to be held responsible, you

18   have to be held accountable, because we want to deter these

19   types of crimes.

20                        So Patrick Murphy can't hide from the

21   fact that he was out front, giving instructions, giving

22   warnings, with his AR-15.  He can't hide from that.  He

23   can't hide from the law.  There's only one just verdict in

24   this case.

25                        The instructions are quite clear in the

1    charge.  You have one lesser included offense, but you don't

2    get to that.  And Judge Cunningham is quite clear.  Only if

3    you have a reasonable doubt about capital murder, acquit the

4    defendant of capital murder, and proceed to consider whether

5    the defendant is guilty of a lesser included offense of

6    aggravated robbery.  And, as Mr. Wirskye said, you will

7    never get to that particular issue, because the evidence is

8    so overwhelming of his guilt.

9              Mr. Murphy's intent is clear in this

10   case.  At this stage of the crime -- of the case, we only

11   have to prove that he should have anticipated.  He doesn't

12   even have to have the intent of someone to die to be found

13   guilty of capital murder.  But, folks, I think it's clear

14   that he did have that anticipation, as Mr. Wirskye pointed

15   out, with the overwhelming evidence we have.

16             The planning that went into it, the fact

17   that they had these guns, the very fact that their goal was

18   to obtain guns, as Mr. Murphy says in his statement, we

19   wanted to increase our arsenal.  We wanted a wider range of

20   weaponry.  That's their goal.  They're anticipating violence

21   the whole time.  They wanted money and they wanted guns and

22   ammunition.

23             And not to sell these guns.  We know that

24   because they kept every one of them.  They, in fact, took

25   Officer Hawkins' gun.  That shows you their intent.  These

1   are the people he decides to associate with.  They murder

2   him, they are in a hurry, but they take the time to take

3   this gun out of his holster, as if they needed another

4   weapon.  Why?  It shows their intent.  Did they want a

5   trophy?  They want to brag about what they had done back

6   behind the Oshman's?

7                    But these are the people that Patrick

8   Murphy associates with.  See, he stays with them.  Defense

9   counsel says, well, he said in his statement, we almost left

10  that day.  Well, they didn't.  They didn't leave.  He

11  stayed.  He went to Colorado.  He partied at the campsite

12  with them.  He was all over the campgrounds with them.  He's

13  driving in and out with Donald Newbury.  And when he does

14  leave, he stays with Mr. Newbury and they have 12 loaded

15  weapons with extra ammunition in that hotel room.  That

16  tells you about his intent and what he anticipated.

17                    He wasn't so upset that he ran from this

18  gang, that he put down his weapons and couldn't believe what

19  they had done behind the Oshman's.  No, he's still with

20  them.  And it shows what his attitude is.  He knows he's

21  surrounded by the police when they contact him the second

22  time.  What are you doing?  Watching some porn.  That shows

23  that outlaw attitude.

24                    And, of course, when they can get the

25  drop on someone, when they have a lookout who can notify

them that the police have arrived, when they can get the
drop and outnumber Officer Hawkins seven to one, they are
real brave then.   They can surround him and they can kill
him.

            But when it's an even fight, when police
officers know they are there and they have weapons, also,
and they are ready, you don't see them come out of that
hotel room in a fight.   Eventually they just give up and
they hold hands and walk down the hall, because it's a fair
fight then.   They don't have the drop on those police
officers.   They are cowards, they are outlaws, and they are
cowards.

            The evidence shows that they put a lot of
thought.   They weren't just driving down the highway and
decided let's hit that Oshman's.   They cased it, they looked
at it, they weighed the pros and cons.   Patrick Murphy was
concerned.   I mean, legitimately so.   All these people, you
know, they put a lot of thought into it, but this plan was
destined to fail.   When you are going to rob a store that
large on Christmas Eve with that many employees, the chances
of something going wrong are astronomical.

            All those young kids in there, don't you
think one might panic when you have these guys running
around with guns?   You don't think the police might be
coming by?   You don't think people -- exactly what happened,

1   someone was going to pick them up and they notified the

2   police when they see something strange going on?  You don't

3   think the police are going to respond and try to stop

4   something?

5                    And that's why you have Patrick Murphy

6   out here.  He can't hide from the fact that he is not behind

7   the back of the store and avoid a conviction in this case,

8   because he served a very important role.  He was their

9   guardian angel.  Their guardian angel.

10                   And as Mr. Wirskye said, but for their

11  actions, Aubrey Hawkins may have been alive.  Perhaps he

12  could have surprised George Rivas back there.  Perhaps he

13  may have seen them loading that equipment up, knowing

14  something was wrong, been about to back off, summon help,

15  wait.

16                   But Patrick Murphy allowed them to know

17  that Aubrey Hawkins was coming and that allowed them to set

18  up an ambush.  And that's all that was.  The facts clearly

19  show that.  We know that from the physical evidence.  We

20  know that Officer Hawkins could only get his hand up in time

21  to defend himself before he was shot.

22                   We know from the testimony from the

23  people at the Oshman's and Mr. Washington, who was in those

24  apartments, that the gunfire when it began, began

25  immediately and it was rapid and it was continuous.

1          And you know from these trajectories that
2  it was all around that car, coming in from every angle.  And
3  you know it was close, very close.  This shot Mr. Spence
4  says was probably six inches, six inches.

5          He was surrounded and they ambushed him.
6  They lured him in.  And the only reason they were able to do
7  that is because of him.  You can call him all kinds of
8  things.  He was their lookout, he was their guardian angel.

9          I'm reminded, you know, this year we've
10  had troops over in Iraq fighting and we saw it on the news
11  all the time.  They talk about the guys that are on the
12  ground.

13          MR. SANCHEZ:  I'll have to object to
14  arguing outside the record.

15          THE COURT:  Overruled at this time.  Be
16  careful, Mr. Shook.

17          MR. SHOOK:  Air controller, the guys that
18  are out there and can target our bombs.  They put the laser
19  on the individual, the air, the building, whatever.  And
20  that allows airplanes to come in, the precision bombing.
21  That's what Mr. Murphy is.  He allows them, he lets them
22  know there's a police officer here.  He gives them details.
23  He's going out front.  He's coming around back.

24          And he can say all he wants about abort.
25  I know the defense counsel didn't address the other things

1    he says in the confession, about initiating a firefight.

2    And that tells you all you need to know.  He didn't shoot

3    back behind that Oshman's because he was never given the

4    chance.  He was never given that opportunity.  We know that

5    from what he said in his confession and what he told

6    Sergeant Matt Harrell.  I was set up to do damage from

7    behind with the AR-15.

8                      Had Aubrey Hawkins stopped up front and

9    some confrontation taken place at the front of that

10   Oshman's, does anyone doubt what Patrick Murphy would have

11   done then?  That was his role.  Set up to do damage from

12   behind in case of a standoff.  That's why he was out there.

13   One of the most trusted positions they had in this crime.

14   They had to depend on someone who could do that, who had the

15   will to do that, and that was Patrick Murphy.

16                      These seven acted as a team.  And they

17   were responsible.  They said, we cast a wide net.  We bring

18   up sinners and saints.  I don't think there's any saints in

19   that group, no saints at all.  They're outlaws.

20                      The evidence has been overwhelming.  We

21   appreciate your patience as we put it on painstakingly.

22   It's important that as a jury that you get the full picture

23   of what happened out there and that's why we put on all the

24   evidence.  Sometimes it takes time and we appreciate your

25   patience.

1        But once that picture is clear, it

2   clearly paints this man guilty.  We didn't need his

3   confession, necessarily, because you had Wes Ferris'

4   testimony, who told you that what George Rivas said was, if

5   we shoot one of you, we're going to kill all of you.  What

6   does that tell you about their planning and anticipation of

7   violence?  Obviously, that was talked among them all, the

8   threats of killing everyone in that store, if they had to.

9        You also know from his testimony that he

10  heard someone outside, Patrick Murphy, giving warnings.  The

11  police are tied up on Highway 183.  He knew there was

12  communication going on.  And then finally, yes, you have got

13  company.  And they hurried up and they went outside and the

14  shots took place.

15       From circumstantial evidence alone, you

16  can find Patrick Murphy guilty.  But his confession shows

17  his true intent, shows his true intent.

18       You know, this day back on Christmas Eve,

19  Aubrey Hawkins was on the job.  Most fathers of

20  nine-year-old boys were home on Christmas Eve having dinner

21  with their families, perhaps reading a story to their

22  children, putting together a bicycle, some other toys.

23       But Aubrey Hawkins chose to be a police

24  officer.  And on that day, that evening, he was out alone

25  and he was in the cold and he was in the wet and he was

1   outnumbered and he was ambushed.

2           But his killers were hunted down and they

3   were caught and captured and they are being brought back to

4   Texas for some justice.  You have been given the evidence,

5   the overwhelming evidence, to convict Patrick Murphy of the

6   only crime he's guilty of and that is capital murder.  And

7   we'll ask you to do that.  Thank you.

8           THE COURT:  Members of the jury, it's now

9   time for you to retire and consider your verdict.  Go with

10  the Sheriff.

11                  [Jury out]

12          THE COURT:  Let the record reflect the

13  jury has been retired to deliberate at 10:10 a.m.  Do I have

14  a motion for the parties to excuse Mr. Daigle as the

15  alternate in this matter?

16          MR. SHOOK:  Yes, Your Honor.

17          MS. BUSBEE:  Yes.

18          THE COURT:  Sheriff, put Mr. Daigle in my

19  office.  If he wishes to visit with you, he may, or he may

20  not.

21                  [Jury in]

22          THE COURT:  Please be seated.  Mr.

23  Murphy, if you will remain standing.  Let the record reflect

24  the jury has reached a verdict at approximately 11:20 a.m.

25  and that the foreman is Mr. Scott Albright; is that correct?

1           FOREMAN:  Yes, sir.

2           THE COURT:  Has your jury reached a

3  verdict?

4           FOREMAN:  Yes, we have.

5           THE COURT:  Would you please read your

6  verdict.

7           FOREMAN:  "We, the jury, find the

8  defendant guilty of capital murder as charged in the

9  indictment."

10           THE COURT:  Thank you, sir.  Is that each

11  and every one of your individual verdicts, if you would,

12  please signify by raising your right hand.  We have a

13  unanimous verdict.  Thank you, Mr. Albright.  You may be

14  seated.

15           Members of the jury, as you already know,

16  this is the first phase of this trial and then the

17  punishment phase will now begin.  We never know exactly how

18  long a jury might deliberate and it's for planning purposes

19  we try to accommodate a lot of people in this matter.

20           The punishment phase shall not begin in

21  this trial until Monday morning at 9:30.  So, but once

22  again, I have to allow, anticipate enough time for a jury to

23  have and don't know exactly how long the testimony will be

24  and we have a lot of people from out of town.  So it's one

25  of those things that I know you are disappointed not to go

1   straight into the punishment phase, but as far as

2   anticipation on the witnesses and when to be here, we've got

3   everybody scheduled for Monday morning.

4                      So we're going to be in recess on this

5   trial until Monday morning at 9:30.  All the previous

6   instructions still apply.  No media of any type, no

7   Internet, no newspaper, no radio, no friends, no spouses.

8   And you are halfway through this thing.  You will have to

9   make it another week.

10                      So you can do whatever you want to

11  tomorrow.  If you want to, you can go to work, if your

12  employer thinks that you are got going to be there, you can

13  do whatever you want to do.  But as far as this phase of the

14  trial, this is behind you.  And we'll start the second phase

15  of the trial Monday morning.

16                      So if you would, Sheriff, would you

17  please retrieve the verdict form from Mr. Albright and the

18  Court shall receive this verdict.

19                      Mr. Shook, anything else today in front

20  of this jury?

21                      MR. SHOOK:  No, sir.

22                      THE COURT:  Ms. Busbee?

23                      MS. BUSBEE:  No, Your Honor.

24                      THE COURT:  Members of the jury, we stand

25  in recess until Monday morning at 9:30.  The Sheriff will

1   give you whatever instructions to be here and ready to go to

2   work at 9:30.  Once again, everything you need to learn

3   about this case comes from where?  The witness stand.  I'm a

4   broken record, but that's how important it really is.  So

5   we'll let you retire and see you Monday morning at 9:30.

6                    [Jury out]

7                    [End of Volume]

1    STATE OF TEXAS            *

2    COUNTY OF DALLAS          *

3        I, NANCY BREWER, Official Court Reporter for the 283rd

4    Judicial District Court, do hereby certify that the above

5    and foregoing constitutes a true and correct transcription

6    of all portions of evidence and other proceedings requested

7    in writing by counsel for the parties to be included in this

8    volume of the Reporter's Record, in the above-styled and

9    numbered cause, all of which occurred in open court or in

10   chambers and were reported by me.

11       WITNESS MY OFFICIAL HAND on this the ___4___ day of

12   _____March_____, 2004.

13

14

15   _____
     NANCY BREWER, CSR, NO. 5759
16   Expiration Date:  12-31-04
     Official Reporter, 283rd JDC
17   Frank Crowley Crts. Bldg. LB33
     133 No. Industrial Blvd.
18   Dallas, TX 75207
     (214)653-5863
19

20

21

22

23

24

25

74851

REPORTER'S RECORD

VOLUME 45 OF 6 1 VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

STATE OF TEXAS               *        IN THE DISTRICT COURT

VS.                          *        DALLAS COUNTY, TEXAS

PATRICK HENRY MURPHY, JR.    *        283RD DISTRICT COURT

* * * * * * * * * * * * * * * * * * * * *

JURY TRIAL

* * * * * * * * * * * * * * * * * * * * *

FILED IN
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 17 day of November, 2003, part one, the

following proceedings came on to be heard in the

above-entitled and numbered cause before the Honorable

Vickers L. Cunningham, Sr., Judge Presiding, held in Dallas,

Dallas County, Texas.

Proceedings reported by machine shorthand.

ORIGINAL

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600


APPEARING FOR THE DEFENDANT

Ms. Brook Busbee
Attorney at Law
SBOT:  03488000
703 McKinney Ave. Ste. 312
Dallas, TX 75202
214/754-9090

Mr. Juan Sanchez
Attorney at Law
SBOT:  00791599
5630 Yale Blvd.
Dallas, TX 75206
214/365-0700

1                      WITNESS INDEX

2    WITNESS                DIRECT        CROSS     VOL.

3    Troy Graham            16            26        45

4    Holly Becka            28,32         29        45

5    Jeannie Grieser        35                      45

6    Donald Kearney         72                      45

7    Bill Brown             84            95        45

8    Timothy Sliter         94                      45

9    Patrick Moczygemba     102           151       45

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT INDEX

| EXHIBIT | IDENT. | OFFER | ADMIT | VOL. |
|---------|--------|-------|-------|------|
| ST.498 | RIVAS' PEN PACKET | 14 | 14 | 45 |
| ST.500 | PHOTO | 112 | 112 | 45 |
| ST.501 | PHOTO | 112 | 112 | 45 |
| ST.502 | PHOTO | 112 | 112 | 45 |
| ST.503 | PHOTO | 112 | 112 | 45 |
| ST.504 | PHOTO | 112 | 112 | 45 |
| ST.505 | PHOTO | 112 | 112 | 45 |
| ST.506 | PHOTO | 112 | 112 | 45 |
| ST.507 | PHOTO | 112 | 112 | 45 |
| ST.508 | PHOTO | 112 | 112 | 45 |
| ST.509 | PHOTO | 112 | 112 | 45 |
| ST.510 | PHOTO | 112 | 112 | 45 |
| ST.511 | PHOTO | 112 | 112 | 45 |
| ST.511-A | PHOTO | 112 | 112 | 45 |
| ST.512 | PHOTO | 112 | 112 | 45 |
| ST.512-A | PHOTO | 112 | 112 | 45 |
| ST.513 | PHOTO | 112 | 112 | 45 |
| ST.514 | PHOTO | 112 | 112 | 45 |
| ST.515 | PHOTO | 112 | 112 | 45 |
| ST.516 | PHOTO | 112 | 112 | 45 |
| ST.517 | PHOTO | 112 | 112 | 45 |
| ST.518 | PHOTO | 112 | 112 | 45 |
| ST.519 | PHOTO | 112 | 112 | 45 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.520 | PHOTO | 112 | 112 | 45 |
| 2 | ST.521 | PHOTO | 112 | 112 | 45 |
| 3 | ST.522 | PHOTO | 112 | 112 | 45 |
| 4 | ST.523 | PHOTO | 112 | 112 | 45 |
| 5 | ST.524 | PHOTO | 112 | 112 | 45 |
| 6 | ST.525 | PHOTO | 112 | 112 | 45 |
| 7 | ST.526 | PHOTO | 112 | 112 | 45 |
| 8 | ST.529 | PHOTO | 112 | 112 | 45 |
| 9 | ST.530 | PHOTO | 112 | 112 | 45 |
| 10 | ST.531 | PHOTO | 112 | 112 | 45 |
| 11 | ST.532 | PHOTO | 112 | 112 | 45 |
| 12 | ST.533 | PHOTO | 112 | 112 | 45 |
| 13 | ST.534 | PHOTO | 112 | 112 | 45 |
| 14 | ST.535 | PHOTO | 112 | 112 | 45 |
| 15 | ST.536 | PHOTO | 112 | 112 | 45 |
| 16 | ST.537 | PHOTO | 112 | 112 | 45 |
| 17 | ST.538 | PHOTO | 112 | 112 | 45 |
| 18 | ST.539 | PHOTO | 112 | 112 | 45 |
| 19 | ST.540 | PHOTO | 112 | 112 | 45 |
| 20 | ST.541 | PHOTO | 112 | 112 | 45 |
| 21 | ST.542 | PHOTO | 112 | 112 | 45 |
| 22 | ST.543 | DIAGRAM | 113 | 113 | 45 |
| 23 | ST.544 | DIAGRAM | 113 | 113 | 45 |
| 24 | ST.545 | PHOTO | 112 | 112 | 45 |
| 25 | ST.547 | PHOTO | 112 | 112 | 45 |
| 26 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.548 | PHOTO | 112 | 112 | 45 |
| 2 | ST.549 | PHOTO | 112 | 112 | 45 |
| 3 | ST.550 | PHOTO | 112 | 112 | 45 |
| 4 | ST.582 | POSTER | 113 | 113 | 45 |
| 5 | ST.824 | PEN PACKET,NEWBURY | 14 | 14 | 45 |
| 6 | ST.825 | PEN PACKET,NEWBURY | 14 | 14 | 45 |
| 7 | ST.826 | PEN PACKET,NEWBURY | 14 | 14 | 45 |
| 8 | ST.827 | PEN PACKET,HALPRIN | 14 | 14 | 45 |
| 9 / 10 | ST.828 | PEN PACKET, RODRIGUEZ | 14 | 14 | 45 |
| 11 | ST.829 | PEN PACKET,GARCIA | 14 | 14 | 45 |
| 12 | ST.830 | PEN PACKET,MURPHY | 14 | — 14 | 45 |
| 13 | ST.979 | MURPHY'S STMT. | 24 | 24 | 45 |
| 14 | ST.985 | WALLET | 151 | 151(ALL) | 45 |
| 15 | ST.990 | PHOTO OF DIAGRAM | 44 | 44 | 45 |
| 16 / 17 | ST.991 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| 18 | ST.992 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| 19 / 20 | ST.993 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| 21 | ST.994 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| 22 / 23 | ST.995 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| 24 | ST.996 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| 25 | ST.997 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |

| | | | | |
|---|---|---|---|---|
| ST.998 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.999 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1000 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1001 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1002 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1003 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1004 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1005 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1006 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1007 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1008 | PHOTO,GRIESER'S APARTMENT | 44 | 44 | 45 |
| ST.1009 | DIAGRAM,APARTMENT | 78 | 78 | 45 |
| ST.1013 | DNA REPORT | 101 | 101 | 45 |
| ST.1025 | LETTER TO BECKA | 30 | 30(REC) | 45 |
| ST.1026 | LETTER TO BECKA | 30 | 30(REC) | 45 |
| ST.1027 | AERIAL PHOTO | 46 | 46 | 45 |
| ST.1028 | AERIAL PHOTO | 46 | 46 | 45 |
| ST.1029 | AERIAL PHOTO | 46 | 46 | 45 |

1               P R O C E E D I N G S

2               THE COURT:  A Motion to Quash Subpoena

3    issued for Ms. Holly Becka has been issued or filed on the

4    subpoena that was issued by the State.  And Mr. Paul Watler,

5    who was here last week appearing on another subpoena that

6    the Court did quash for Mr. Thorpe, is here on behalf of

7    Ms. Becka.

8               Mr. Watler, would you like to state for

9    the record very briefly the nature of the issue and the

10   subpoena?

11              MR. WATLER:  Yes, Your Honor.  We're here

12   on the Motion to Quash the subpoena issued to Ms. Becka and

13   under the Coleman case we're relying on that case for the

14   proposition that the State has the burden to show that any

15   testimony that they would elicit from Ms. Becka would be

16   both favorable to the State and material to the presentation

17   of the State's case.

18              THE COURT:  Mr. Shook, how is it

19   favorable?

20              MR. SHOOK:  Judge, the -- I can get these

21   marked, if you want to review them.  Judge, I'll show you

22   what has been marked 1025 and 1026.  To summarize, I believe

23   the many parts of the letters more or less, is Mr. Murphy

24   reciting his personal history, which includes his criminal

25   history, including juvenile convictions, arrests, different

1    crimes such as that, and also his family background and

2    personal history which would be very relevant to the jury.

3                        THE COURT:  As statements admitted

4    against interest, obviously among other exceptions.  And are

5    you calling Ms. Becka for the purpose of --

6                        MR. SHOOK:  Identifying the letters that

7    they were sent to her.  And my plan at this time, Judge, is

8    simply have her identify them and enter them for record

9    purposes in front of the jury.  And then when it becomes

10   more relevant in the trial, publish them, perhaps, at that

11   time.

12                       THE COURT:  And you are not asking for

13   any communications from Ms. Becka, just simply the fact that

14   she can authenticate having received these letters?

15                       MR. SHOOK:  I think that the letters

16   speak for themselves.

17                       THE COURT:  And the Morning News'

18   position on a noncommunication issue?

19                       MR. WATLER:  I think that would be in the

20   Court's discretion whether the State has met its burden to

21   show up the elements under the Coleman case.

22                       THE COURT:  They certainly have.  I'll

23   deny your motion to quash the subpoena.  And Ms. Becka may

24   testify.

25                        [Jury in]

1            THE COURT:  Good morning.  Please be

2   seated.  Mr. Shook, is the State ready on punishment?

3            MR. SHOOK:  Yes, Your Honor.

4            THE COURT:  Defense?

5            MS. BUSBEE:  We're ready, Your Honor.

6            THE COURT:  Opening remarks?

7            MR. SHOOK:  Yes, Your Honor.  May it

8   please the Court.  Members of the jury, as you will recall

9   from our discussions with you during jury selection, there

10   are two parts to a capital murder trial.  The second part is

11   the punishment phase in which the jury is allowed to hear

12   evidence that was not admissible in the guilt/innocence

13   stage.

14            That evidence can consist of background

15   evidence, a person's criminal history, if they have been

16   convicted of crimes in the past, what types of crimes, the

17   sentence that was imposed, and if the witnesses are

18   available, the actual fact witnesses to those cases.

19            This will be the type of evidence that you

20   will be hearing in this particular portion of this trial.

21   The evidence will show, in fact, that all these men were

22   obviously convicted.  That's why they were in the Connally

23   Unit.  You will hear evidence that George Rivas was serving

24   18 life sentences for the crimes of burglary, aggravated

25   robbery, and kidnapping from a string of robberies out of

1   the El Paso area.  He had been sentenced in 1994 and 1995.

2           Michael Rodriguez was serving a capital

3   life sentence from San Antonio.  Donald Newbury had been to

4   the penitentiary three times, all for aggravated robbery and

5   most recently for serving a 99-year sentence conviction out

6   of Travis County.  Joseph Garcia was serving a 50-year

7   sentence out of San Antonio for murder.  Randy Halprin was

8   serving a 30-year sentence for child abuse out of Tarrant

9   County.  Larry Harper was serving three 50-year sentences

10  for sexual assault out of El Paso.

11          And the defendant, Patrick Murphy, was

12  serving a 50-year sentence for aggravated sexual assault out

13  of a conviction out of Dallas County that he received in

14  1984.  There's also evidence that shows that he was placed

15  on probation in 1984 for the offense of burglary of a

16  building and that probation was revoked and he was sentenced

17  to six years in prison.

18          The evidence will show that back in 1984,

19  February 23rd of 1984, Patrick Murphy committed the offense

20  of burglary of a building.  He was caught in a grocery store

21  in Balch Springs, Texas.  He was arrested at that time with

22  his stepbrother, his younger stepbrother.  He was arrested

23  and he confessed to that crime.  He was placed on probation

24  on March 19, 1984.

25          Three days later he committed rape.  The

1    evidence will show that he knew the victim.  You will hear

2    from that victim, Jeannie Kay.  She will tell you that she

3    first met the defendant as she was growing up in Irving and

4    attending Irving High School, that they were in an ROTC

5    class together, that they even had one date together, went

6    to a football game, that they had the same friends and

7    acquaintances and socialized together.  And she was very

8    familiar with him in her high school days.

9              Also after high school, she was invited

10   to his wedding and attended that.  Lost track of him.  And

11   then in early 1984 he called her, called on the phone, and

12   identified himself and began calling her once a week or so.

13   He wanted to know if she had a boyfriend.  She did.  And

14   they talked about just things in general.

15             On one occasion he came over to her

16   sister's house and met with her and talked with her.  Then

17   on March 20th, she was living in Irving with her mother in

18   an apartment with her three-year old son, single mother,

19   working two jobs.

20             Patrick Murphy showed up with her

21   brother-in-law and her sister.  The reason for coming over

22   to the apartment at that time was to borrow a book.  It was

23   this opportunity that he had to see her apartment and see

24   the layout.

25             In fact, he had been arrested and placed

1    on probation just on the 19th of March.  He had gone and

2    called two high school friends, Bill Brown and the victim's

3    brother-in-law, Donny Kearney, and asked them if he could

4    stay at their apartment for a few days.

5                    Their apartment was located just half a

6    mile from where the victim was staying.  He stayed there.

7    And the evidence will show that on the 21st of March in the

8    evening hours he spent time with Donald Kearney.  They went

9    to a 7-Eleven.  They played video games.

10                   When he got back to the apartment, he

11   began to drink beer.  At some point in time Mr. Kearney went

12   to bed, but the other roommate came home, Bill Brown.  He

13   continued to have a few beers with the defendant.  Both of

14   the gentlemen had buck knives and they laid them out on the

15   counter before they went to bed.

16                   They will be able to tell you that Mr.

17   Murphy that evening was dressed in a checkered shirt and

18   baggy pants.  And he talked about the victim and his desires

19   for her, nothing that alarmed them at that time.  Mr. Brown

20   went to bed.

21                   Both will tell you and can testify that

22   that apartment was small and at approximately 3:00 to 3:30

23   in the morning they heard the door open and close.  They

24   heard it again open and close, the front door, at

25   approximately 5:30 in the morning.  They saw Mr. Murphy.  He

1    was still dressed in the plaid shirt and he appeared to be

2    tired.  Said he had been up all night.

3                     You will hear from the victim who will

4    tell you that on the night of March 21st she got home around

5    9:00 p.m.  She was tired.  She gave her son a bath.  She put

6    him to bed.  Her mother was still at work.  She was out.

7    Her boyfriend came over at 10:00 p.m. and stayed for about

8    an hour and left.  She then went to bed.

9                     She slept on the couch.  She was in a

10   nightgown.  She had her alarm set for 5:00 in the morning so

11   she could go to her second job.  She did not awaken when her

12   mother came home that evening.

13                    At approximately 4:45 in the morning she

14   awakened, saw a man's silhouette by the front window inside

15   the apartment.  She was frightened.  She was frightened for

16   her life, her son's life, and her mother's.  He had a towel

17   wrapped around his face and he was wearing a checkered shirt

18   and baggy pants.

19                    She didn't say anything.  She wanted to

20   pretend she was asleep and she watched him move across the

21   room and unplug the alarm and the lamp and then come over to

22   her and stand over her.  He then bent down, covered her

23   eyes, and put a knife to her throat.  Told her to be quiet

24   and cooperate or something might happen.

25                    She recognized that voice immediately as

1  Patrick Murphy, the same person she had known in high

2  school, and had seen the previous day at her house.  He then

3  took a pillow from under her head, took the pillow case off,

4  and made her put the pillow case over her head, so she could

5  not see him.

6                    And he turned her over and used the towel

7  to bind her hands.  He then had her get off the couch.  She

8  could hear him then take off his clothes.  First he laid her

9  down, took the knife out, and stroked the knife down her

10  chin, her neck, her body.  He then took the knife and cut

11  the straps of her nightgown, took her nightgown off.  When

12  she was naked, he took the knife again and stroked it down

13  her chin, her throat, her chest, and under her breasts.

14                    At that point in time he forced her off

15  the couch.  She stumbled, touched him.  He told her not to

16  touch him anymore.  He told her, you can get to it better

17  here.  And with the pillow case on her head, forced her to

18  have oral sex with him, the entire time with the knife to

19  her back.

20                    He then placed her on the back of that

21  couch and raped her with a knife to her at all times.  After

22  the rape he gagged her.  He tied her hands more tightly.  He

23  told her that he would cover her with a blanket and when he

24  was gone, she could call out for help.  He even gave her a

25  glass and told her, if you can't wake your mom up, throw

1  this glass.

2              She knew the entire time it was Patrick

3  Murphy, recognizing his voice.  He left the front of the

4  apartment.  As soon as he was gone, she was able to get up,

5  go down the hallway, and awaken her mother and call the

6  police.

7              The police came immediately.  She was

8  taken down to the station.  She talked with Detective Dix

9  (phonetic) and told her, yes, I know who did this.  I

10 recognized the voice.  She then went to the hospital and was

11 given a rape exam.  Mr. Murphy was arrested and put in a

12 lineup, a voice identification lineup, at the Dallas County

13 Jail.  And when she had him repeat the threats he made, she

14 recognized his voice immediately.  A case was filed on him.

15             DNA evidence was not as advanced at that

16 point in time.  In fact, he was labeled what is a

17 nonsecretor that didn't show numbers, blood numbers, blood

18 types, that could link him to the crime.  However, since

19 that time DNA has advanced.  You will hear about that

20 evidence and it links him to one in 36 trillion,

21 astronomical numbers as a person that deposited sperm in the

22 victim that night, that morning.

23             He was tried and convicted.  He was

24 sentenced to 50 years.  You will hear evidence that he

25 eventually was transferred to the Connally Unit where he

1  worked in the maintenance department with these men.  All

2  these men worked in the maintenance department, except

3  Michael Rodriguez.

4                    Mr. Murphy's job was a carpenter.  You

5  will learn that the prison runs much like a city, that there

6  are craftsmen that are employed there.  There are lock

7  techs, electricians, carpenters, plumbers, and they run the

8  prison and they have inmates who run and perform these jobs

9  and occupations under them.

10                   You will learn that these are the more

11 desired occupations to have in a prison.  And Mr. Murphy did

12 well at his occupation and was considered a skilled

13 craftsman.

14                   You will also learn that he participated

15 in the largest breakout in prison history with these seven

16 men.  That on December 13th he got together and in an

17 organized fashion, much like the same organized fashion that

18 the Oshman's crime was carried out, they selectively took

19 down these craftsmen, these guards that worked there.

20                   They decided as their plan unfolded that

21 it would occur at lunchtime after the craftsmen had all gone

22 to lunch.  The seven stayed behind.  They were working to

23 seal the warehouse floor and there was one supervisor,

24 Patrick Moczygemba.  He was to take them to lunch later in

25 the day.

1        They lured him into the back of the

2   warehouse.  He was then hit over the head with a heavy

3   object, knocking him unconscious.  When he awoke, he was

4   wrestling and fighting with George Rivas and the others.

5   Shanks, homemade knives, were then placed to his throat and

6   his life was threatened.  He was then bound and gagged and

7   dragged to a utility room, an electrical room.  And he then

8   heard as the other craftsmen would come in, bound and

9   gagged.  All in all, 17 men would be placed in that room.

10  Death threats would be made to them.  They would be

11  threatened and knives placed in their ears.

12        Eventually George Rivas, along with Larry

13  Harper, were dressed as civilians.  They were called out to

14  a back gate, the back gate where trucks made deliveries in

15  and out, saying that they were coming out to install some

16  cameras.  They then proceeded to that back gate, along with

17  Patrick Murphy and Donald Newbury, who were posing as

18  inmates to help the craftsmen.

19        They made their way to the back gate.

20  Mr. Murphy, Mr. Newbury, and Mr. Harper overpowered the

21  guard at the building there.  Mr. Rivas went up into the

22  guard tower picket and was able to overpower that guard, and

23  then they made their escape.

24        You would learn that they go to Houston,

25  Texas, where they rob an Auto Zone.  Mr. Newbury, Mr. Rivas,

1   pose as customers, they wait until closing time, and then

2   pull guns on the three employees.  They were in radio

3   communication with persons outside.  The manager knows it's

4   no use trying to get away because there's men outside.

5   Several thousand dollars are taken from the Auto Zone.

6          The car is recovered by the employees

7   just down the street and there are earplugs found and

8   recovered from that car.  DNA tests are done.  And those DNA

9   tests will show and we'll link evidence back to Mr. Murphy,

10   again, in astronomical numbers, linking him to that

11   particular crime.

12          All this evidence is relevant and will

13   prove the Special Issues, the State's contention of yes,

14   yes, and no.

15          Your Honor, at this time we would offer

16   State Exhibits 498, 824, 825, 826, 827, 828, 829, and 830.

17          MS. BUSBEE:  Your Honor, I have had an

18   opportunity to examine these and we have no objection.

19          THE COURT:  Those State exhibits may be

20   admitted.

21          MR. SHOOK:  May I publish to the jury?

22          THE COURT:  You may.

23          MR. SHOOK:  Members of the jury, these

24   are penitentiary packets, certified criminal judgments of

25   these particular inmates.

1      State Exhibit 498 is the penitentiary

2  packet of George Rivas.  This is his photograph.  It has the

3  18 life sentences which include a burglary, which he was

4  placed on probation July 6, 1989.  There are also two

5  separate trials, one taking place in 1994, one in 1995,

6  involving aggravated robbery and kidnapping.  The sentences

7  were all life sentences.  Probation was revoked for the

8  burglary and he was sentenced to life in prison.  Those were

9  all out of El Paso, Texas.

10     State Exhibits 824, 825, and 826 are the

11  penitentiary packets and convictions of Donald Newbury.  He

12  received three separate trips to the penitentiary.  No. 824,

13  which is the penitentiary packet in which he was convicted

14  of aggravated robbery in 1981.  Sentenced to ten years in

15  the penitentiary.  State Exhibit 825 is the penitentiary

16  packet for a second trip to the penitentiary in April 1987,

17  which he was sentenced to 15 years in the penitentiary.

18  Both of those are out of Travis County for aggravated

19  robbery.

20     And State Exhibit 826 is the penitentiary

21  packet for a jury trial conviction that occurred April

22  1st, 1998, out of Travis County in which he was sentenced to

23  99 years for the crime of aggravated robbery.

24     No. 827 is the penitentiary packet for

25  Randy Halprin.  A conviction out of Tarrant County, May 7th,

1   1997.   He pled guilty and received 30 years in prison for

2   the felony offense of injury to a child.

3                     State Exhibit 828 is the penitentiary

4   packet of Michael Rodriguez.   It is out of San Antonio.

5   Shows he was convicted February 13, 1995, pled guilty, and

6   received a capital life sentence.   Shows that the actual

7   crime was committed July 14, 1992.

8                     Joseph Garcia, State Exhibit 829 is a

9   felony conviction for the crime of murder out of San

10  Antonio.   Conviction date is November 8, 1996.   It was a

11  jury trial.

12                    Finally, State Exhibit 830 is a

13  penitentiary packet for Patrick Murphy.   Shows that Mr.

14  Murphy was first placed on probation, six-years' probation,

15  for the felony offense of burglary of a building.   And then

16  he was convicted in a jury trial on November 2nd of 1984 and

17  sentenced to 50 years in prison for the crime of aggravated

18  sexual assault.   His probation was revoked and he also

19  served a sentence of six years for burglary of a building.

20                    MR. WIRSKYE:   State will call Deputy

21  Graham.

22                    TROY GRAHAM,

23  having been duly sworn, was examined and testified as

24  follows:

25                    DIRECT EXAMINATION

17

BY MR. WIRSKYE:

Q.   Sir, can you tell us your full name.

A.   Troy Gene Graham.

Q.   How are you currently employed?

A.   Kaufman County Deputy Sheriff.

Q.   How long have you been with Kaufman County?

A.   It was a year Saturday.

Q.   What do you do for Kaufman County?

A.   Right now assigned as a training coordinator, background investigator for applicants and a crime prevention officer.

Q.   Before you became a deputy in Kaufman County, were you in law enforcement?

A.   Yes, sir, I was.

Q.   Can you tell us about your prior law enforcement experience?

A.   I spent 14 years with the City of Lancaster and then approximately -- well, 11 years with the City of Balch Springs.  And at Lancaster I was patrol sergeant and Balch Springs I made patrol sergeant before I retired from the two.

Q.   In February of 1984 were you a patrol officer for the City of Balch Springs?

A.   Yes, sir, I was.

Q.   Back in February of '84 did you arrest Patrick

1    Murphy for the felony offense of burglary of a building?

2         A.       Yes, sir, I did.

3         Q.       How many arrests do you think that you have

4    made since that day in 1984?

5         A.       Hundreds.

6         Q.       When you make an arrest, do you do a report?

7         A.       Yes, sir.

8         Q.       And what is the purpose of doing a report?

9         A.       Basically is to be able to refresh your memory

10   for court purposes.

11        Q.       And you have looked at the report that was

12   generated in this case; is that right?

13        A.       I have.

14        Q.       To refresh your memory?

15        A.       Yes, sir.

16        Q.       Let me specifically turn your attention to

17   February 23rd of 1984 at about 1:20 a.m. in the morning, and

18   ask you if as a patrol officer for the City of Balch

19   Springs, did you respond to a silent alarm at a supermarket?

20        A.       Yes, sir, I did.

21        Q.       And that was a Jordan's Supermarket on Peach

22   Tree Road?

23        A.       I believe it was 1701, if I'm not mistaken.

24        Q.       Could you describe to the members of the jury

25   kind of generally what that location is and that store?

```
1          A.     Basically, it's a strip mall, at the time

2    maybe half a city block long and businesses on each side, as

3    I recall, of the supermarket.  And the only thing I can

4    compare it to with today's supermarket would be like a

5    Brookshires, not a normal mom-and-pop-type store, a little

6    bit larger.

7          Q.     So a fairly large store?

8          A.     Correct.

9          Q.     And the silent alarm call, was that something

10   that is common for patrol officers to answer those types of

11   things?

12         A.     Yes, sir, it is, for businesses.

13         Q.     And that was your assignment that night or the

14   call you answered that night?

15         A.     Yes, sir.

16         Q.     As you arrived at that scene, tell the members

17   of the jury what you observed.

18         A.     When I pulled up to the front of the store,

19   there was a broken -- and I cannot honestly remember if the

20   plate glass doors or the window, but as I pulled up, there

21   were two males trying to exit the business with the broken

22   glass.

23                And I immediately got out of my squad car

24   and got my duty shotgun.  And there was nowhere for them to

25   go, but back in the store.
```

1    Q.    And that's where they went?

2    A.    Yes, sir, it was.

3    Q.    What race were these two individuals?

4    A.    White males, white.

5    Q.    Once you saw this, what did you do next?

6    A.    I secured the front of the building and waited

7    on a backup, one of my backup officers.

8    Q.    Did you have a backup officer that night?

9    A.    Yes, sir.

10   Q.    Who assisted you that night?

11   A.    The one that -- there were more than one, but

12   the one that comes to mind is Officer J. R. Patterson, who

13   was a patrol officer with Balch Springs at the time.

14   Q.    Once you got help at that store, what did

15   y'all proceed to do?

16   A.    Once it was secured inside and out, then we

17   just started a little search inside the store, front to

18   back, aisle to aisle.

19   Q.    How long did this search last?

20   A.    Well over an hour.

21   Q.    At some point did you find something

22   suspicious?

23   A.    Yes, sir, we did.

24   Q.    What was that?

25   A.    The very back right-hand corner of the store,

1  I cannot recall if it was a bread rack or a potato chip

2  rack, but it was just about eye level that you could see

3  where the products had been pushed to one side.  Some of it

4  was stepped on and then a ceiling tile had like the dust had

5  fell on the top of this counter.

6         Q.    And I guess after an hour you had a pretty

7  good chance to search the store?

8         A.    Oh, exactly.

9         Q.    Did you think they were in there at that

10 point?

11        A.    I knew they were.  There was absolutely no

12 other way out.

13        Q.    Once you saw that ceiling tile ajar, what did

14 you do?

15        A.    Made verbal contact with the individuals in

16 the attic of the store.

17        Q.    Okay.  Did you or another officer actually go

18 up and get them or did they come down?

19        A.    No.  As I recall, they actually came down on

20 their own.

21        Q.    Two white males, one of which you later came

22 to know as Patrick Murphy?

23        A.    Yes, sir, that's correct.

24        Q.    And another younger male that you later came

25 to know was Patrick Murphy's half-brother, Allen Ray

1   Skinner; is that right?

2          A.      Yes, sir.

3          Q.      Once you had them in custody, did you take

4   them back to the police department?

5          A.      Yes, sir, we did.

6          Q.      Were you able to search the two defendants?

7          A.      I can't recall if I did specifically.  Of

8   course, they would have been searched at the store as well

9   as a thorough search at the book-in area.

10         Q.      Do you recall that Allen Ray Skinner was found

11  with $226 in his pocket?

12         A.      Having reviewed the report, yes, sir, I do.

13         Q.      Having reviewed the report, can you tell the

14  members of the jury how Patrick Murphy and his stepbrother

15  were dressed that morning?

16         A.      I specifically remember as a result of the

17  report they did have on camouflage clothing.

18         Q.      In addition to the money, were you able to

19  determine what, if anything, they were trying to get out of

20  there with?

21         A.      I think they had already made entry into the

22  store and brought cigarettes and some other items, maybe

23  razor blades or something to that effect, and stashed it

24  outside before they entered the store the second time, at

25  which time I had pulled up on the location, as I remember.

1      Q.     By the time you get them back to the station,

2  it's early in the morning; is that right?

3      A.     Yes, sir.

4      Q.     Were there any detectives on duty or anything

5  like that?

6      A.     No, they were not.

7      Q.     Was it your policy in Balch Springs at that

8  time that the arresting officers try to get a statement or

9  confession from the individuals?

10     A.     Absolutely, yes, sir.

11     Q.     Indeed, is that what you tried to do that

12  evening?

13     A.     I did, yes, sir.

14     Q.     You did get a written voluntary statement from

15  Patrick Murphy?

16     A.     Yes, sir, I did.

17            MR. WIRSKYE:   Your Honor, may I approach

18  the witness?

19            THE COURT:   You may.

20     Q.     (By Mr. Wirskye)  Deputy Graham, let me show

21  you one page there that's marked for identification as

22  State's No. 979.  Do you recognize that as the voluntary

23  statement that you took from Patrick Murphy that night?

24     A.     Yes, sir.

25     Q.     Are the Miranda warnings clear on the face of

1   the statement?

2       A.    Yes, sir, they are.

3       Q.    And you see his initials and his signature on

4   the statement; is that right?

5       A.    Yes, sir.

6       Q.    And did he, in fact, waive his Miranda

7   warnings and gave you a written statement of what happened

8   that night; is that correct?

9       A.    Exactly.

10             MR. WIRSKYE:  Your Honor, we offer

11   State's 979.

12             MS. BUSBEE:  We've had an opportunity to

13   take a look at that, Your Honor, and we have no objections.

14             THE COURT:  State's 979 shall be

15   admitted.

16             MR. WIRSKYE:  Permission to publish for

17   the members of the jury, Your Honor?

18             THE COURT:  You may.

19       Q.    (By Mr. Wirskye)  Ladies and gentlemen, this

20   is a one-page voluntary statement.  It starts, "Date,

21   2-23-84, place, Balch Springs Police Department, time

22   started, 3:42 a.m.

23             "I, the undersigned, Patrick H. Murphy,

24   Jr., am 22 years of age.  My date and place of birth being

25   the 3rd day of October, 1961, at Parkland Hospital, Dallas,

1  Texas.  I now live at 11031 Martin Street, Balch Springs,

2  Texas, 75180.

3  "Before answering any questions or making

4  any statements, T. G. Graham, a person who has identified

5  himself as a Balch Springs police officer, has duly warned

6  and advised me of my rights."  And we have the preprinted

7  Miranda rights there.

8  The handwritten part of the statement

9  reads as follows.  "I walked up to the front window of the

10  store with the piece of 600 MCM copper clad wire and struck

11  the window three times to break it out.  After breaking the

12  window I ran around the south corner of the store and

13  through the vacant field.  This was about 12:30 a.m.

14  where I met my brother Allen.

15  "We then walked around to Bruton and went

16  down to Peach Tree to see if the police had arrived.  They

17  had not, so we went into the store, sacked two sacks of

18  cigarettes and some lunchmeat.  We left the building and

19  came back in.  Then we saw the police officer with a shotgun

20  in his hand.

21  "We then went to the storeroom and

22  realized there was no way out.  We then climbed into the

23  ceiling and was there for almost two hours.  Then we were

24  found and arrested."

25  That's all of the handwritten part of the

1  statement.  And it's signed at 4:06 a.m., signature of

2  Patrick Murphy.

3                    Officer Graham, burglary of a building

4  was a felony offense back in 1984?

5       A.    Correct.

6       Q.    And still is for that matter?

7       A.    Yes, sir.

8       Q.    Back in '84 was it a second-degree felony?

9       A.    Yes, sir.

10      Q.    And Patrick Murphy at that time he told us in

11  his statement was 22 years of age?

12      A.    Correct.

13      Q.    And you came to find out that his stepbrother,

14  Allen Skinner, was 18 years of age; is that right?

15      A.    Yes, sir.

16                    MR. WIRSKYE:  I'll pass the witness, Your

17  Honor.

18                    CROSS-EXAMINATION

19  BY MS. BUSBEE:

20      Q.    Officer Graham, just a few questions.  When --

21  do you recall how you got those gentlemen out of the

22  ceiling?  Did you call to them?  How did that event occur,

23  if you remember?

24      A.    To the best of my knowledge it was just verbal

25  commands to come out of this roof.

1    Q.    Okay.  Now, this statement that has been

2  introduced into evidence, did the defendant write that or

3  did you write it out based on what he told you?

4    A.    No, ma'am, he wrote it out himself.

5    Q.    And was he cooperative with you after you

6  placed him under arrest?

7    A.    Yes, ma'am, to my memory he was.

8              MS. BUSBEE:  I'll pass the witness, Your

9  Honor.

10             MR. WIRSKYE:  I have nothing further of

11 this witness, Your Honor.

12             THE COURT:  Thank you, Sheriff.  You may

13 stand down.

14             MR. SHOOK:  May he be finally excused,

15 Your Honor?

16             MS. BUSBEE:  We have no objection.

17             THE COURT:  He may.

18             MR. SHOOK:  May we approach the bench?

19             THE COURT:  You may.

20                  (Bench conference)

21             THE COURT:  Members of the jury, I need

22 to have a brief hearing.  If you would, go with the Sheriff

23 and I'll have you back in a few minutes.

24                  [Jury out]

25             THE COURT:  Call your next witness.

1         MR. SHOOK:  We call Holly Becka.

2                HOLLY BECKA,

3 having been duly sworn, was examined and testified as

4 follows:

5              DIRECT EXAMINATION

6 BY MR. SHOOK:

7       Q.    Could you tell us your name, please.

8       A.    My name is Holly, last name Becka, B-E-C-K-A.

9       Q.    How are you employed?

10      A.    I'm employed with the Dallas Morning News.

11      Q.    And let me turn your attention back to March

12 of 2001 and April of 2001 and ask what your assignment was

13 back at that time?

14      A.    At that time I was covering Dallas County

15 criminal courts and the Texas Seven case.

16      Q.    Back in that time did you receive some

17 correspondence from Patrick Murphy?

18      A.    Yes, sir.

19      Q.    And let me show you State Exhibits 1025, 1026.

20 Do these appear to be copies of letters that Mr. Murphy sent

21 you?

22      A.    I believe so.

23      Q.    Had you written him a letter asking him

24 questions previous to that?

25      A.    Yes, sir.

1    Q.    And were these letters in response to your

2  letter, asking him basic questions about his background?

3    A.    Yes.

4           MR. SHOOK:  Pass the witness, Judge.

5                    CROSS-EXAMINATION

6  BY MS. BUSBEE:

7    Q.    Ms. Becka, where are the originals?

8    A.    They may be somewhere in my possession.  I was

9  unable to locate them.

10    Q.    You didn't turn these over to the State of

11  Texas?

12    A.    No.

13    Q.    Did you let them know that you had this

14  correspondence?

15    A.    No.

16    Q.    Ms. Becka, are these two exhibits, is this the

17  entire correspondence that you had with the defendant?

18    A.    I believe it is.  I remember two letters.

19    Q.    Are you -- had you -- are these the only

20  handwritten items that you received from the defendant?

21    A.    I believe so.

22    Q.    Were you familiar with his handwriting?

23    A.    No.

24    Q.    So do you know for a fact that this is his

25  handwriting?  Are you assuming that because you received the

1   originals of these letters?

2       A.    Yeah.  I was just assuming based on, you know,

3   his book-in number and his name and then his, you know, the

4   letter was responsive to questions that I had asked.

5       Q.    Do you know for a fact that those are exact

6   duplicates?

7       A.    No.

8           MS. BUSBEE:  Pass the witness, Your

9   Honor.

10          MR. SHOOK:  Nothing further, Judge.  And

11  we'll offer those for record purposes in front of the jury.

12          MS. BUSBEE:  Your Honor, I object to any

13  reference to this correspondence in front of the jury.  I

14  don't think a proper predicate has been laid and I would ask

15  the Court to comply with rule -- Texas rule of evidence

16  1002.

17          THE COURT:  At this time State's Exhibits

18  Nos. 1025, 1026 will be admitted for record purposes at this

19  time, but not in front of the jury until they have been

20  authenticated.

21          MS. BUSBEE:  So there's no reason to put

22  her on the witness stand in front of the jury.

23          MR. SHOOK:  The letters speak for

24  themselves, Judge, as far as authentication goes.  The very

25  text of the letters identifies them.  I don't think we have

1   to have the original.  They are exact copies.

2              MS. BUSBEE:  We don't know that, Your

3   Honor, because this witness has said that she does not know

4   if these are exact copies and she's not even sure where the

5   originals are.  Where there are originals, there's no --

6   there's no exception to admitting those that has been shown

7   to this Court.  Moreover, this witness is not acquainted

8   with his handwriting.  And it's our position that they

9   haven't been properly authenticated and no predicate has

10  been laid to authenticate them.

11             THE COURT:  Well, not that they cannot be

12  authenticated.  I don't know where the copy came from.  If

13  it came from the jail, you can put the jail people on that

14  we took it from Murphy before he came out, then it's coming

15  in.

16             MR. SHOOK:  If I could have Ms. Becka,

17  then, read the entire letters to see if they look like the

18  letters that she received.

19             MS. BUSBEE:  Well, she said she doesn't

20  know, Your Honor, whether or not those are exact duplicates,

21  but that she has the originals some place and may have them.

22  That would be the proper way to authenticate these, not to

23  have her read something that she received two years ago,

24  multiple pages of handwritten documents, asking her to say

25  that's the same one when she said already she can't say for

1    certain.

2                    THE COURT:  All she's testified to is she

3    received letters that looked like that.  That's halfway

4    there.

5                    THE WITNESS:  (Witness reads letters.)

6                    REDIRECT EXAMINATION

7    BY MR. SHOOK:

8         Q.    Do those appear to be the copies of the two

9    letters that you received from Mr. Murphy?

10        A.    I believe so.  I remember reading, you know,

11   parts of these.

12        Q.    Okay.  And you said you looked for the

13   original?

14        A.    Yes.

15        Q.    And you were unable to find it?

16        A.    Yes.

17        Q.    Do you know if it has been lost, destroyed, or

18   --

19        A.    Well, I believe that I had them at home and

20   then I packed up a bunch of stuff when we moved, so they may

21   be in my storage facility, but I don't have them right now

22   at my house or at work.

23        Q.    And you have looked and you have been unable

24   to find them?

25        A.    Yes, sir.

```
1          MR. SHOOK:  Judge, I feel that under 1004
2   they are admissible.  If the originals are lost or destroyed
3   or not obtainable, they come in.  I think the letters
4   themselves speak for themselves.  They were written in
5   response to Ms. Becka's letters and they contain his name,
6   along with his identification numbers.  And the text of the
7   letters themselves obviously identify it as Mr. Murphy.
8          So I think any other objections that the
9   defense would have would go not to admissibility, but to
10  weight.  I guess they could try to argue some mischievous
11  inmate somehow forged some letters about Mr. Murphy and sent
12  them to Ms. Becka, but it's obvious that those are from Mr.
13  Murphy and he identifies himself.  And Ms. Becka has
14  testified that those, indeed, appear to be copies of the
15  letters that were sent.
16         MS. BUSBEE:  Your Honor, our position is
17  we have these rules of evidence for a reason and the reason
18  is so that trustworthy evidence can be introduced into court
19  and it couldn't be more important than in a hearing where a
20  man faces a death sentence.
21         THE COURT:  I've already ruled as soon as
22  the State can prove where they got the copies from or how
23  they got them --
24         MS. BUSBEE:  May I be heard in response
25  of what he said about compliance with Rule 1004?  We have
```

34

1   not heard any testimony that indicates that they are lost or

2   not available, just that they weren't where she looked, but

3   there are other places where they may be.

4              And, secondarily, she has -- I renew my

5   objection under Texas Rule of Evidence No. 901, this witness

6   has no familiarity and cannot say that this is the

7   defendant's handwriting, and to make my objection crystal

8   clear on the record.

9              MR. SHOOK:  In response to that, Judge,

10  as far as the identification of handwriting, the jury has

11  samples of his handwriting and signature and they can make

12  that judgment.  That law is clear on that.

13             As far as having to put a witness on to

14  say where the copy comes from, that's not a requirement

15  under the law.  Once Ms. Becka has identified it, yeah,

16  that's copies of the letters I got, she's identified the

17  document.

18             THE COURT:  Anything more from this

19  witness?

20             MR. SHOOK:  No.

21             MS. BUSBEE:  No.

22             THE COURT:  Thank you, Ms. Becka.  I'll

23  take these issues under advisement and move on with the jury

24  and we'll come back to this later.

25             MR. SHOOK:  Can Ms. Becka be excused

```
 1    subject to recall?

 2                    THE COURT:  She is subject to recall.

 3                         [Jury in]

 4                    THE COURT:  Thank you.  You may be

 5    seated.  Call your next witness.

 6                    MR. SHOOK:  Call Jeannie Grieser.

 7                    JEANNIE GRIESER,

 8    having been duly sworn, was examined and testified as

 9    follows:


10                    DIRECT EXAMINATION

11    BY TOBY SHOOK:

12         Q.    Would you tell us your name, please.

13         A.    Jeannie Grieser.

14         Q.    Could you spell your last name for the Court

15    Reporter, please.

16         A.    G-R-I-E-S-E-R.

17         Q.    Are you married and have a family?

18         A.    Yes, I am.

19         Q.    How many children do you have?

20         A.    Two boys.

21         Q.    And are you employed?

22         A.    Yes, I am.

23         Q.    What type of job do you have?

24         A.    I'm an executive administrator.

25         Q.    Let me turn your attention back and ask you
```

1    where you were born and raised?

2          A.     In Irving, Texas.

3          Q.     Did you have brothers and sisters?

4          A.     I have one sister.

5          Q.     And what high school did you attend?

6          A.     Irving High.

7          Q.     What year did you graduate?

8          A.     1980.

9          Q.     Let me turn your attention back to your high

10   school years and ask if you met a person by the name of

11   Patrick Murphy?

12         A.     Yes, I did.

13         Q.     And how did you meet Mr. Murphy?

14         A.     Through ROTC.

15         Q.     Did you actually have a class together?

16         A.     I can't remember if we were in the same class

17   or not.  We were both on drill team.

18         Q.     Do you see Mr. Murphy here in the courtroom

19   today?

20         A.     Yes, I do.

21         Q.     Could you point him out, please?

22         A.     The last man at the desk there.

23         Q.     The man in the blue shirt with the coat on?

24         A.     Correct.

25                MR. SHOOK:  Your Honor, let the record

1    reflect the witness has identified the defendant.

2         Q.    (By Mr. Shook)  Approximately how old were you

3    when you first met Mr. Murphy?

4         A.    Fifteen.

5         Q.    Was he older than you?

6         A.    I believe so.

7         Q.    Okay.  Near the same age, though?

8         A.    Yes, sir.

9         Q.    And you were on the same drill team with him?

10        A.    I was on the girl's drill team.  We had

11   separate drill teams.

12        Q.    That's for ROTC?

13        A.    Yes, sir.

14        Q.    Did you ever go to any social activities with

15   him?

16        A.    I went to one homecoming dance which his

17   parents took us and dropped us off.  Other than that it was

18   just as ROTC went out as a group.

19        Q.    How did that particular date go with him to

20   the homecoming dance?

21        A.    It went very badly.  He insulted me several

22   times and I found a different way home.

23        Q.    Did you still see him at school and after

24   school after that?

25        A.    Through ROTC activities, yes.

1    Q.    Did you have the same friends or

2    acquaintances?

3         A.    Yes, sir.

4         Q.    So you were still around him after that

5    particular time?

6         A.    Yes, I was.

7         Q.    Let me turn your attention to after or near

8    the time you graduated.  Did you see Mr. Murphy again on one

9    occasion where he invited you to his wedding?

10        A.    Uh, yes.

11        Q.    Do you remember how old you were at that time?

12        A.    I don't recall.

13        Q.    Did you actually go to the wedding?

14        A.    Yes, with my sister and her husband at that

15   time.

16        Q.    Okay.  At that time did you lose track or did

17   you not talk to Mr. Murphy after that?

18        A.    No, I didn't.

19        Q.    Okay.  Let me turn your attention now to 1984,

20   early 1984.  Did you come into contact with him, with

21   Patrick Murphy again at that time?

22        A.    Yes.  He called me at work one day.

23        Q.    In early 1984, how old you were at that time?

24        A.    I was 22.

25        Q.    And were you working?

1      A.     Yes, I was, two jobs.

2      Q.     Two jobs?

3      A.     Two jobs.

4      Q.     And where were you working?

5      A.     I was working at Sleep Country and at a place

6  called Fast Tax.

7      Q.     What did you do at Sleep Country?

8      A.     Customer service.

9      Q.     Okay.  How about Fast Tax?

10     A.     The same thing, customer service.

11     Q.     All right.  So you were working two jobs at

12  that time?

13     A.     Correct.

14     Q.     And how did Patrick Murphy get a hold of you

15  at that point in time?

16     A.     Through mutual acquaintances.

17     Q.     Did he call you on the phone?

18     A.     Yes, he did.

19     Q.     When he called you on the phone the first

20  time, was that at work?

21     A.     Yes, it was.

22     Q.     Did you recognize his voice then?

23     A.     Not the first time.

24     Q.     Did he identify himself?

25     A.     Yeah.

```
1        Q.    Okay.  What types of things did he talk to you

2   about then?

3        A.    Basically just catching up, what I had been up

4   to.

5        Q.    Okay.  Did he inquire whether you had a

6   boyfriend?

7        A.    Yes.

8        Q.    And what did you tell him?

9        A.    Yes, I did.

10       Q.    Did he ask you out on a date at that time?

11       A.    Yes, he did.

12       Q.    And did you turn him down?

13       A.    Yes, I did.

14       Q.    The rest of the conversation, just casual

15  conversation about what you had been doing?

16       A.    Yes.

17       Q.    Okay.  Now, did he continue to call you after

18  that?

19       A.    Three or four times.

20       Q.    When he would call you on those other

21  occasions, did you recognize his voice right away?

22       A.    Yes, I did.

23       Q.    And what types of things did he talk to you

24  about on those other occasions?

25       A.    It was the same thing, what are you doing?
```

1    What's going on?

2          Q.     Okay.  Did you ever have a chance to see him

3    in person?

4          A.     Um, yes, I did.

5          Q.     And when did that happen?

6          A.     I had -- my boyfriend and I had a date.  I was

7    dropping my son off at my sister's house.  And she called

8    and asked if he would want to come say hello and he did.

9    And we talked five to ten minutes and I introduced him to my

10   boyfriend and then we left.

11         Q.     Your boyfriend at that time is now your

12   husband?

13         A.     Yes.

14         Q.     Okay.  So you had a chance not only to talk to

15   him in person, but also see him physically again?

16         A.     Yes.

17         Q.     And let me ask you back in March, 1984, where

18   were you living at that time?

19         A.     I was living with my mom in her apartment.

20         Q.     Okay.  Was that in Irving, Texas?

21         A.     Yes, it was.

22         Q.     And what were some of the major streets

23   located around there?

24         A.     Walnut Hill Lane and Beltline Road.

25         Q.     Who else was living with you and your mother

42

1   in that apartment?

2        A.   My son.

3        Q.   And where did your son stay in the apartment?

4        A.   He had a bed in an alcove off of the bedroom.

5   It was a one-bedroom apartment with an office alcove area.

6   And we put his bed there.  But most of the time, he was two

7   years old, he wanted to sleep with grandma.

8        Q.   And where did you stay at?  Where did you

9   sleep at night?

10        A.   Most of the time I slept on the couch.

11        Q.   And you were working two jobs at that point in

12   March?

13        A.   Yes.

14        Q.   Okay.  Let me turn your attention, then, to

15   March 20th of 1984 and ask if some people came over to visit

16   you at your apartment that evening?

17        A.   Yes, they did.  My sister, Donald Kearney,

18   Carla, who was Donny's girlfriend, and Mr. Murphy came over

19   to borrow a couple of books for Carla.

20        Q.   Were you expecting them to come over that

21   evening?

22        A.   No.

23        Q.   About what time did they arrive?

24        A.   About 8:00 at night.

25        Q.   How were you dressed?

```
 1         A.      I was dressed for bed in my nightgown and

 2   robe.

 3         Q.      Did they all four come into your apartment

 4   then?

 5         A.      Yes, they did.

 6         Q.      How long did they stay?

 7         A.      Ten, fifteen minutes.

 8         Q.      Did you talk to Mr. Murphy that evening?

 9         A.      No, I didn't.

10         Q.      Is that the first time that he had ever been

11   in your apartment?

12         A.      Yes.

13         Q.      After they picked the book up and you had some

14   conversations with your sister, did they leave at that point

15   in time?

16         A.      Yes, they did.

17         Q.      Were you surprised to see Mr. Murphy there

18   that night of the 20th?

19         A.      I was surprised to see all of them.  That he

20   was with them, no, because I knew he was staying with Donny.

21         Q.      Okay.  And how did you know Donny Kearney?

22         A.      I've known him through school.

23         Q.      Okay.  So you have known him for a number of

24   years?

25         A.      Yes.
```

1       Q.    And did he live in some apartments near yours?

2       A.    Yes, he did, right down the road.

3       Q.    Who was his roommate at the time?

4       A.    Billy Brown.

5       Q.    Is he another high school friend?

6       A.    Yes.

7       Q.    And it was your understanding that Mr. Murphy

8 was going to be staying with them?

9       A.    Yes.

10      Q.    Okay.  Let me show you some photographs which

11 have been marked State Exhibit 990 through 1008.  And I

12 believe you have seen these photographs outside the presence

13 of the jury.

14      A.    Yes.

15      Q.    Is 990, is that a photograph of the diagram of

16 the apartment you were staying in?

17      A.    Yes, it is.

18      Q.    And the rest of the photographs, 991 through

19 1008, are those photographs of the apartment, the exterior

20 as well as the interior?

21      A.    Yes.

22            MR. SHOOK:  Your Honor, at this time we

23 would offer State Exhibits 990 through 1008.

24            MS. BUSBEE:  We've seen those, Your

25 Honor, and we have no objection.

1    THE COURT:  Nos. 990 through 1008 shall

2  be admitted.

3    Q.    (By Mr. Shook)  What we're seeing in 990 is a

4  drawing of how your apartment was laid out at that time; is

5  that right?

6    A.    Correct.

7    Q.    And we see -- where would the front door be?

8    A.    It would be on the far right, right there by

9  that square box right where you are pointing.

10    Q.    Okay.  And that's, then, would open into the

11  living room area?

12    A.    Correct.

13    Q.    Now, we see some, I believe a table and some

14  couches there in the living room area?

15    A.    Yes.

16    Q.    Is that couch there against the wall the one

17  that you slept on at night?

18    A.    Yes, it is.

19    Q.    And is that the area that Patrick Murphy was

20  in the evening of the 20th when he came over with your

21  sister?

22    A.    Yes.  He was in the living room area.

23    Q.    All right.  Now, the bedroom area is, that

24  then back behind the living room area, just down the hall?

25    A.    Down the hall behind the living room, yes.

1    Q.    Is there a patio that's located there in the

2  apartment?

3    A.    Yes.

4    Q.    And we see that located right where we're

5  pointing now?

6    A.    Correct.

7    Q.    And how many sliding glass doors open onto

8  that patio?

9    A.    Two, one from the bedroom and one from the

10  living room.

11    Q.    So the way you were sleeping, there is

12  actually a sliding glass door very close to it?

13    A.    Correct.

14    Q.    Let me show you State Exhibit 991.  Does that

15  show the front door to the apartment?

16    A.    Yes, it does.

17    Q.    I want to show you some black and white photos

18  that are aerial views.  Do you recognize 1027 through 1029

19  as being aerial photographs showing where your apartment was

20  located, as well as the surrounding area?

21    A.    Yes, sir.

22         MR. SHOOK:  We'll offer State Exhibits

23  1027 through 1029.

24         MS. BUSBEE:  No objection, Your Honor.

25         THE COURT:  Nos. 1027 through 1029 shall

1    be admitted.

2            Q.      (By Mr. Shook)   On State Exhibit 1027 there

3    are two red dots, one that has the initials DK on it and

4    then one with JK; is that right?

5            A.      Correct.

6            Q.      Do those represent where Donny Kearney was

7    staying, as well as where your apartment was?

8            A.      Yes, it does.

9            Q.      Now, at that time you were Jeannie Kay; is

10   that right?

11           A.      Correct.

12           Q.      Looking on the monitor at 1027, this is the

13   photograph that actually shows where Donny Kay's apartment

14   was, which was in the lower part of the photograph where the

15   red dot is; is that right?

16           A.      Correct.

17           Q.      And then the red dot at the top of the

18   photograph, is that approximately where your apartment was

19   located?

20           A.      Yes, it is.

21           Q.      And the curvy road we see on the side, which

22   particular street was that?

23           A.      Walnut Hill Lane.

24           Q.      Now, let me show you State Exhibit 1028.   Does

25   this show a side view of -- along where the power lines were

```
 1   where your apartments were located?

 2         A.    Yes, it is.

 3         Q.    And the 7-Eleven was located near this area;

 4   is that right?

 5         A.    Correct.

 6         Q.    Was that near the corner of Beltline and

 7   Walnut Hill?

 8         A.    Yes, it was.

 9         Q.    Near your apartment?

10         A.    Yes.

11         Q.    How much of a walk would it have been from

12   your apartment down to Donny Kearney's apartment?

13         A.    Maybe ten, fifteen minutes.

14         Q.    Okay.  Let me turn your attention to the day

15   after Patrick Murphy had showed up at your apartment with

16   Donny Kearney, the 21st of March.  Do you recall the time

17   that you got home that evening?

18         A.    It was between 9:00 and 9:30 p.m.

19         Q.    Is that when you had gotten off work from your

20   job at Sleep Country?

21         A.    Yes, it is.

22         Q.    When you got home, what did you do once you

23   arrived?

24         A.    I gave my son a bath and put him to bed.  And

25   my boyfriend came over for about an hour.  He left at 11:00.
```

1    Q.    Okay.   About 11:00 p.m.?

2    A.    Yes.   And then I went to bed at 11:30.

3    Q.    Okay.   When you went to bed, how were you

4  dressed?

5    A.    In my nightgown.

6    Q.    Okay.   Is that a red nightgown that you were

7  wearing?

8    A.    Yes, it is.

9    Q.    Was your mother home at that time?

10    A.    No.   She didn't get home until about 12:15

11  a.m., between 12:15 and 12:30.   She worked nights.

12    Q.    What time were you going to wake up in the

13  morning?

14    A.    Um, by 5:00.

15    Q.    Okay.   Did you have an alarm set out there in

16  the living room area?

17    A.    Yes, I did.

18    Q.    Where did you have that set up?

19    A.    On an end table.

20    Q.    Now, when you went to bed, did you keep any

21  particular lights on?

22    A.    The laundry room light stayed on and porch

23  light, patio light.

24    Q.    So where the patio was in the diagram, there

25  was a light out there?

```
 1          A.     Correct.

 2          Q.     And that was on when you went to bed?

 3          A.     Yes.

 4          Q.     Now, did you awaken when your mother came home

 5   that evening?

 6          A.     No.

 7          Q.     Was that unusual for you not to wake up?

 8          A.     No.

 9          Q.     I want to turn your attention to around 4:40

10   in the morning then, be on the morning of March 22nd of

11   1984.  Did you awaken approximately at that time?

12          A.     Yes, I did.

13          Q.     Do you know what woke you up at that time?

14          A.     No, I don't.

15          Q.     When you woke up, what did you see?

16          A.     The silhouette of a man standing by the table

17   in front of the window.

18          Q.     Was that the table there in the living room

19   where you were laying?

20          A.     Yes.

21          Q.     Let me show you State Exhibit 992.  Does that

22   show the front door of your apartment?

23          A.     Yes, it does.

24          Q.     And then there's -- looks like -- is that a

25   collection of -- are those salt shakers?
```

1    A.      Salt and pepper shakers.

2    Q.      Was he standing near that area?

3    A.      Yes.  The table was right to the left of that,

4  along with the front window and that's where he was

5  standing.

6    Q.      Okay.  And that's what we see in 993.  He was

7  standing by that table.  Could you see his silhouette?

8    A.      Yes, I could.

9    Q.      And what could you tell about him at that

10 time?

11   A.      Um, he had dark hair, very full on top.  He

12 was wearing some type of checkered shirt.  I couldn't make

13 out the colors, but I could make out the light and dark

14 checks and baggy jeans.

15   Q.      Did he have anything over his face?

16   A.      Yeah.  He had a towel wrapped around his face

17 from the eyes down.

18   Q.      Okay.  Now, was he moving at all at that time?

19   A.      At that moment, no.

20   Q.      All right.  Did you cry out, make any noise at

21 all?

22   A.      No, I pretended to be asleep.

23   Q.      Why did you do that?

24   A.      Because officers had come to my high school

25 and said if you wake up with someone in your house, pretend

1    to be asleep and maybe they would take what they want and

2    leave.

3              Q.      Were you frightened for your life at that

4    time?

5              A.      Yes.

6              Q.      How about the life of your son?

7              A.      Absolutely.

8              Q.      And your mother?

9              A.      Absolutely.

10             Q.      After you saw him standing there, what did he

11   do next?

12             A.      He walked around the apartment towards the

13   salt and pepper shakers and in front of the television set

14   to where I had my alarm clock and a lamp plugged in and he

15   unplugged those.

16             Q.      Let me show you State Exhibit 994.  Is this

17   the couch you were laying on at that time?

18             A.      Yes, it is.

19             Q.      And was your head located near the corner

20   there?

21             A.      Yes, it was.

22             Q.      Let me show you State Exhibit 996.  Is this

23   the table that you kept your alarm clock on?

24             A.      Yes, it is.

25             Q.      And once you saw him walk across the room and

1    go towards that table, what did he do then?

2          A.     He unplugged the alarm clock and the lamp and

3    then came over to the couch and stood over me and stared at

4    me.

5          Q.     How long did he stand over and stare at you?

6          A.     Um, I'm not sure, maybe less than a minute.

7          Q.     Okay.  Were you remaining perfectly still at

8    that time?

9          A.     Yes.

10         Q.     What's the next thing you saw him do?

11         A.     He knelt down and I saw him reach out or felt

12   him reach out and I opened my eyes very quickly.

13         Q.     What did you see when you opened your eyes?

14         A.     A knife.

15         Q.     What type of knife was it?

16         A.     It looked to me like a paring knife, only

17   larger, maybe three inches.  And I just caught a glimpse of

18   that as he put his hand over my eyes.

19         Q.     What did he do with the knife after he put his

20   hand over your eyes?

21         A.     He put the knife against my throat.

22         Q.     Did you feel the knife against your throat?

23         A.     Yes, I did.

24         Q.     Once he put the knife against your throat,

25   what did he say to you?

54

```
 1        A.     He told me to keep my eyes shut and cooperate

 2   or something might happen.

 3        Q.     When you heard him say and make that threat,

 4   did you recognize the voice?

 5        A.     Yes.

 6        Q.     Whose voice was it?

 7        A.     It was Pat Murphy's.

 8        Q.     No doubt about that in your mind?

 9        A.     No.

10        Q.     After he made that threat to you, what's the

11   next thing that he did?

12        A.     He turned me over and tied my hands behind my

13   back.

14        Q.     Could you tell what he tied your hands with?

15        A.     A towel.

16        Q.     Is that the towel that he had over his face or

17   did you know at that time?

18        A.     Um, I didn't know at that time.

19        Q.     Okay.  So he turned you over and then tied

20   your hands behind your back?

21        A.     Yes.

22        Q.     What did he do next?

23        A.     Um, pulled the pillowcase out from under my

24   head, shook the case off because he still had the knife to

25   my throat, so I assume he shook the pillowcase off and put
```

1    that over my head.

2         Q.    So after he had taken the pillowcase off the

3    pillow, he then placed the pillowcase over your head?

4         A.    Yes, he did.

5         Q.    Let me show you State Exhibit 995.  Is this

6    the pillowcase we see laying on the couch?

7         A.    Yes, it is.

8         Q.    And this was the pillow that you had been

9    laying on?

10        A.    Yes.

11        Q.    After your hands were tied behind your back

12   and the pillowcase was placed over your head, what did he do

13   then?

14        A.    He sat on my stomach.

15        Q.    Okay.  Did he straddle your stomach?

16        A.    Yes, he did.

17        Q.    Once he straddled your stomach, what did he do

18   with the knife?

19        A.    He took the knife and ran it along my neck and

20   down my chest and stopped just below the breast.

21        Q.    Did he say anything while he was running this

22   knife down your body?

23        A.    He told me once again to be quiet and

24   cooperate and no one would be hurt.

25        Q.    Okay.  Then what's the next thing that he did?

1    A.    He cut the straps to my nightgown and pulled

2    it off.

3    Q.    After he pulled your nightgown off, what did

4    he do then?

5    A.    He did the same thing he did before with the

6    knife, ran it down my throat and chest.

7    Q.    He started at your throat?

8    A.    Uh-huh.

9    Q.    And went down your chest?

10   A.    Yes.

11   Q.    Stopped just below your breasts?

12   A.    Yes, he did.

13   Q.    After he did that, what did he do?

14   A.    Put his hands on me.

15   Q.    Okay.  Where did he put his hands?

16   A.    On my vagina.

17   Q.    Then what did he do?

18   A.    Then he rolled me onto the floor between the

19   couch and coffee table.

20   Q.    Were your hands tied behind your back at that

21   time?

22   A.    Yes, they were.

23   Q.    Pillowcase still over your head?

24   A.    Yes.

25   Q.    When he rolled you to the floor, what

1  happened?

2          A.      I kind of lost my balance and reached out kind

3  of like that (demonstrating) and touched his knee and he

4  told me not to touch him again.

5          Q.      Then what happened?

6          A.      He said I could stay down there where I could

7  get to it better and lifted the pillowcase up to the edge of

8  my nose and forced oral sex.

9          Q.      Okay.  As he was forcing you to have oral sex

10  with him, could you feel the knife near your body?

11         A.      Yes.  He was running it across my back.

12         Q.      The top part of your back?

13         A.      Yes.

14         Q.      Just running it back and forth?

15         A.      Uh-huh.

16         Q.      After -- after he had forced you to have oral

17  sex with him, what did he do with you then?

18         A.      He put me back up on the couch and proceeded

19  to have intercourse.

20         Q.      Did he lay you on your back?

21         A.      Yes.

22         Q.      Did you still have the pillowcase over your

23  face?

24         A.      Yes.

25         Q.      And by that time he sexually assaulted you?

1    A.    Yes, he did.

2    Q.    While he was sexually assaulting you, did he

3    have the knife still against your body?

4    A.    Yes.

5    Q.    Where did he have it?

6    A.    I believe it was somewhere up in here

7    (demonstrating).

8    Q.    Do you have any idea how long he assaulted

9    you?

10   A.    No, I don't.  Seemed like forever to me.

11   Q.    Did he say anything while this act was going

12   on?

13   A.    No, not that I recall.

14   Q.    At some point in time did he ejaculate?

15   A.    Yes.

16   Q.    After he had done that, what did he do then?

17   A.    He got up and told me -- rolled me over and

18   told me he was going to untie my hands and tie them tighter.

19   Q.    Okay.

20   A.    And at that point I heard him rip something.

21   I was assuming it was the towel and tied my hands tighter

22   and then gagged me with the other half.

23   Q.    And he put a gag in your mouth?

24   A.    Uh-huh.

25   Q.    Had he gagged you earlier when he first had

1    approached you?

2         A.      When he first approached me, yes.

3         Q.      During this whole assault were you concerned
4    about whether your son and mother would be harmed?

5         A.      Yes.

6         Q.      At some point in time did you hear your mother
7    make a noise?

8         A.      Yes, I did.  She coughed in her sleep, so I
9    knew at that point in time they were all right.

10        Q.      You just wanted to not resist and hope that
11   everyone would make it out alive?

12        A.      Correct.

13        Q.      After he tied your hands tighter and put a gag
14   in your mouth, what's the next thing that he did?

15        A.      He said he would cover me up with a blanket so
16   I wouldn't catch cold in case no one found me.

17        Q.      Then what did he do?

18        A.      He walked -- he told me that once he left, I
19   could scream and make as much noise as I wanted, that he
20   would leave the patio door open, so that if my mother didn't
21   wake up, someone else would hear.

22        Q.      So he said if your mother didn't wake up,
23   someone else would hear?

24        A.      Yes.

25        Q.      Now, had you mentioned your mother at all to

1   him during this assault?

2          A.       I didn't say a word.

3          Q.       He's the one that brought up the fact that he

4   knew your mother was there?

5          A.       Yes.

6          Q.       Did you hear him moving around the apartment

7   at that time?

8          A.       He walked all around the apartment.  I heard

9   him open the sliding glass door and walk out onto the patio.

10         Q.       Could you hear what he was doing out on the

11  patio?

12         A.       No, I couldn't tell.  I still had the

13  pillowcase over my head and he the entire time was saying,

14  "I'm still here.  I'm still here."

15         Q.       Then what happened?

16         A.       He came back and approached me and took the

17  pillow -- made me face my head to the corner of the couch,

18  took the pillowcase off and laid it across the back of my

19  head.  And I believe at that point in time he left out the

20  front door.

21         Q.       Okay.  After you heard him leave out the front

22  door, what did you do?

23         A.       I got up and went into my mother's room, woke

24  her up, and had her untie me and called the police.

25         Q.       Did the police come quickly after that?

1          A.      Absolutely.

2          Q.      The towel that was used to tie up your hands,

3  were you able to identify that towel?

4          A.      It was the towel I had dried my hair with that

5  night.

6          Q.      And where had you left it?

7          A.      In the bathroom.

8          Q.      After the police arrived, did you tell the

9  officers there what had happened to you?

10         A.      Yes, I did.

11         Q.      Where did they take you?

12         A.      They took me to the Irving Police Department.

13         Q.      Did you talk to a Detective Dix at that time?

14         A.      Yes, I did.

15         Q.      And did Detective Dix ask you if you

16  recognized this man's voice?

17         A.      Yes, he did.

18         Q.      And what did you tell him?

19         A.      I said that I did, that I was fairly certain

20  it was Patrick Murphy, that I would like to hear the voice

21  one more time.

22         Q.      After you spoke with Detective Dix, did --

23  were you then taken to Parkland Hospital?

24         A.      Yes, I was.

25         Q.      At that time did you undergo a rape exam?

1    A.    Yes, I did.

2    Q.    A couple of days later on March 26th, did the

3  police arrange for you to come down to the Sheriff's Office

4  for a voice identification lineup?

5    A.    Yes.

6    Q.    And what type instructions were given to you

7  before that lineup?

8    A.    They told me to sit and listen to all six

9  voices and not to say anything until I had heard all of

10  them.

11    Q.    Okay.  What -- did you actually see the person

12  that was making statements?

13    A.    No.  There was a wooden screen between us

14  where I couldn't see any of their faces.

15    Q.    What statement were they to make to you?

16    A.    Um, the first two that he had said to me that

17  night.  "Be quiet and cooperate or something might happen."

18  And "to cooperate and no one would get hurt."

19    Q.    And were you able to make an identification

20  from that voice lineup?

21    A.    Immediately.

22    Q.    And do you recall the number of the person

23  that you picked out that night?

24    A.    It was No. 4.

25    Q.    And any doubt in your mind once you heard the

1    voice that that was Patrick Murphy?

2         A.     No.

3         Q.     You had a chance to observe the height and

4    build of the person in your apartment that evening.  Was it

5    the same height and build of Patrick Murphy?

6         A.     Yes, it was.

7         Q.     You also had a chance to observe him walk

8    around your apartment, move around your apartment.  Did he

9    move and walk the same way Patrick Murphy did?

10        A.     Yes, he did.

11        Q.     Let me show you State Exhibit 998.  Is this

12   the hallway that leads from the living room down to where

13   your mother was at that evening?

14        A.     Yes, it is.

15        Q.     Is that your red robe that was draped on the

16   side of the couch?

17        A.     Yes.

18        Q.     State Exhibit 999, does that show the glass

19   that was given to you?

20        A.     Yes.  He had put a glass in my hands and told

21   me I could throw it to wake someone up.

22        Q.     State Exhibit 1000, does this kind of show a

23   view from the hallway into the living room area?

24        A.     Yes, it does.

25        Q.     In fact, is that your mother with your son who

1    was three at the time; is that right?

2          A.    He was two at the time.

3          Q.    Two at the time.  State Exhibit 1001, is this

4    your mother's bedroom?

5          A.    Yes, it is.

6          Q.    That's where your son stayed?

7          A.    Yes.

8          Q.    And 1002, does that show the patio door that

9    -- as it was located from her bedroom?

10         A.    Yes, it does.

11         Q.    No. 1003 shows the curtain after it's been

12   drawn back?

13         A.    Yes.

14         Q.    Now, let me show you State Exhibit 1004.  Is

15   this a photograph of the patio itself?

16         A.    Yes, it is.

17         Q.    We may be able to see it better here in

18   another photograph, 1005.  Does that show the light that was

19   on at the time you went to bed that night?

20         A.    Yes, it does.

21         Q.    Had that light been altered in any way?

22         A.    Yes, there was a globe on it.

23         Q.    And was that missing?

24         A.    Yes.

25         Q.    And was the light on or off when the police

```
 1   arrived?

 2        A.      Off.

 3        Q.      Okay.  So at the time during this attack the

 4   light was off?

 5        A.      Correct.

 6        Q.      How about the laundry room light inside the

 7   apartment, was that on or off?

 8        A.      I believe that was off at the time of the

 9   attack.  It was on when I went to bed.

10        Q.      Let me show you State Exhibit 1007.  Is that

11   the patio from the outside showing the fence and the air

12   conditioning units next to it?

13        A.      Yes, it is.

14        Q.      And do you know if this wooden post was --

15   that's leaned up against it, was there that night?

16        A.      I don't know.

17        Q.      It's not anything that you or your mother had

18   ever placed there?

19        A.      No.

20        Q.      And then 1008, does that show a knife that the

21   police photographed that evening?

22        A.      Yes.

23        Q.      Is that a knife that you showed them?

24        A.      Yes, it is.

25        Q.      And why did you show them that knife?
```

1    A.    Because it was similar to the knife I saw.

2    Q.    The type of blade and that sort of thing?

3    A.    Yes.

4    Q.    Okay.  Did you have some other items taken

5    from your apartment?

6    A.    My cigarettes and lighter were missing.

7    Q.    What types of cigarettes were those?

8    A.    Marlboro Light 100s.

9    Q.    You have testified to these events back in

10   1984, November of 1984, did you not?

11   A.    Yes, I did.

12   Q.    In front of a jury?

13   A.    Yes, I did.

14   Q.    Were you present when that jury convicted

15   Patrick Murphy?

16   A.    Yes.

17   Q.    Were you also present when Judge MacDowel

18   sentenced him to 50 years in the penitentiary?

19   A.    Yes, I was.

20   Q.    Since that time you have become married and

21   you have another child?

22   A.    Yes.

23   Q.    Would you just tell the jury how this crime

24   affected you?

25            MS. BUSBEE:  Your Honor, may we approach?

1          THE COURT:  You may.

2                    (Bench conference)

3          THE COURT:  Members of the jury, I need

4    to have a brief hearing.  If you will, go with the Sheriff.

5                    [Jury out]

6          THE COURT:  Please be seated.  Let the

7    record reflect the jury has been retired, pursuant to the

8    previously filed motion for a hearing outside the presence

9    of the jury before any victim impact statements being made

10   or tendered by the State.  Mr. Shook?

11         Q.    (By Mr. Shook)  Could you tell the Court how

12   the crime has affected you?

13         A.    I had to move.  I couldn't stay in the

14   apartment.  I moved within a week afterwards.  I was only

15   getting a half hour's sleep at night.  I ended up having to

16   quit my second job because I was just too tired to work two

17   jobs.  I've had nightmares almost every night for the first

18   five years, which also encompassed crying in my sleep,

19   waking up screaming.  Took about ten years for them to go

20   away completely.  And to this day I will not live in a house

21   without a dog because I didn't wake up that night.

22         Q.    Do you take other security measures in the

23   house that you live in?

24         A.    I take a lot of security measures.  When they

25   broke out we had flood lights put on every corner of the

1   house.  We have extra locks on all the windows.  We have

2   striker plates on our doors and we have the puzzle disk

3   locks also on the doors.

4        Q.    When Mr. Murphy and the others broke out, did

5   that affect you, also?

6        A.    Yes.

7        Q.    How did that affect you?

8        A.    I was scared to death the entire time they

9   were out.  I informed my workplace and they would not let me

10  come back to work for three weeks, afraid that they would

11  show up there.

12       Q.    You said that you had nightmares for some five

13  years and they finally dissipated after ten years.  What

14  types of nightmares were they?

15       A.    Nightmares that he would get out and come

16  after me or my kids.

17       Q.    Have you also -- are you taking medication for

18  panic attacks?

19       A.    Yes.

20       Q.    And when did those begin?

21       A.    Um, the day Mr. Bosillo told me that we had a

22  trial date set.

23            MR. SHOOK:  That's all the questions that

24  I have in regard to those areas, Judge.

25            MS. BUSBEE:  Your Honor, objecting to any

1  victim impact testimony as to a crime for which the

2  defendant is indicted for or tried, being tried for in this

3  case.  It's not relevant to any of the Special Issues and

4  it's highly prejudicial.

5                    MR. SHOOK:  Judge, I think this would be

6  relevant, since it's an emotional injury, as well as a

7  physical injury.  These are emotional injuries that she

8  received from this particular offense that are continuing,

9  injuries that were received because of the defendant's

10 actions.  And I believe those as far as the nightmares and

11 the emotional effect they had would be relevant in this

12 particular case, as well as when the defendant escaped

13 prison.  Obviously, the victim is a victim again and her

14 fears are real.  And it's another wrong that's been done to

15 her.  And I think that's relevant, also.  These are his

16 actions, too, breaking out and causing her fears, legitimate

17 fears at that time.

18                    MS. BUSBEE:  And that's precisely why,

19 although I don't at all conceive that this is relevant or

20 admissible, but that goes to how prejudicial it is, since

21 the defendant actually took no actions while he was escaped.

22                    THE COURT:  Give me a few minutes.

23                    MR. SHOOK:  Can I have the witness go

24 back to the witness room?

25                    THE COURT:  Yes.

```
 1                    [Off the record]
 2                    THE COURT:  The Court, after reviewing
 3   the proper testimony, will make the following rulings that
 4   the emotional distress that was caused to the victim
 5   immediately after the break occurred is admissible.  She can
 6   testify she's had nightmares, moved from her apartment, and
 7   took various security measures after the initial sexual
 8   assault occurred.
 9                    The issue with the subsequent escape and
10   what the employer did is not admissible.
11                    MS. BUSBEE:  So, Your Honor, just while
12   we're on the record here, it's your ruling that it's
13   relevant and you have done the 404 -- your balancing test,
14   and you found it is not unduly prejudicial?
15                    THE COURT:  That's correct.  I made the
16   same analysis as to what was going through her mind at the
17   time of the prison break, because it didn't happen, it's
18   speculative, and that's not admissible.
19                    MS. BUSBEE:  Your Honor, if I may also,
20   just in an abundance of caution, advise the Court that when
21   we said victim impact testimony, we meant any testimony so
22   we might have a hearing outside the presence of the jury if
23   that's raised again.  I don't know that it will be.
24                    MR. SHOOK:  Patrick Moczygemba, that you
25   heard from the prison, still suffers, I know, as well as
```

1    Mr. Burgess from injuries to this day.  I know Burgess has

2    had some operations and Moczygemba is under a doctor's care

3    because of the dizziness from the head injury.  So we plan

4    on eliciting that.

5                    THE COURT:  That's admissible.

6                    MS. BUSBEE:  Injuries, yes, but as to --

7    of course, we would have another objection to any kind of --

8    I don't think that's victim impact.  I think that's -- but

9    if there is any other that may be characterized as victim

10   impact, other than what he just stated.

11                   THE COURT:  Pull up, have a hearing and

12   make the Court aware and give me an opportunity to give a

13   ruling.  And please advise her as to what she can testify

14   to.

15                   MR. SHOOK:  We will advise her.

16                   THE COURT:  We need a jury.

17                        [Jury in]

18                   THE COURT:  Please be seated.  Mr. Shook?

19                   MR. SHOOK:  Judge, we will pass the

20   witness.

21                   MS. BUSBEE:  No questions, Your Honor.

22                   THE COURT:  Thank you, ma'am.  You may

23   stand down.

24                   MR. SHOOK:  May this witness be excused?

25                   MS. BUSBEE:  No objection, Your Honor.

1        THE COURT:  She may.

2        MR. SHOOK:  Call Donald Kearney.

3        DONALD KEARNEY,

4   having been duly sworn, was examined and testified as

5   follows:

6        DIRECT EXAMINATION

7   BY MR. SHOOK:

8        Q.    Could you tell us your name, please.

9        A.    Donny Kearney.

10       Q.    Could you spell your last name for the Court

11  Reporter?

12       A.    K-E-A-R-N-E-Y.

13       Q.    And how are you employed, sir?

14       A.    I'm employed with Simmons.

15       Q.    Do you have a family?

16       A.    Yes, I do.

17       Q.    What does your family consist of?

18       A.    I'm sorry?

19       Q.    What does your family consist of?

20       A.    Um, I have one son and two daughters.

21       Q.    Okay.  Let me ask you where you were born and

22  raised.

23       A.    I was born in Pennsylvania and I was raised

24  here in Texas.

25       Q.    And what high school did you go to?

1    A.    Irving High School.

2    Q.    What year did you graduate?

3    A.    '79.

4    Q.    Did you know in your high school days a man by

5    the name of Patrick Murphy?

6    A.    I did.

7    Q.    Do you see Mr. Murphy here in the courtroom

8    today?

9    A.    Yes, sir, right there (Witness pointing).

10    Q.    You are pointing to the man at the end of the

11    table with the glasses?

12    A.    Yes, sir.

13    Q.    And approximately when was it that you first

14    met Mr. Murphy in high school?

15    A.    I met him my freshman year.

16    Q.    Did you have any classes together with him?

17    A.    No, I didn't.

18    Q.    What was your relationship with him at that

19    time?

20    A.    Friend of a friend.

21    Q.    Okay.  Saw him at school?

22    A.    Yeah.

23    Q.    Talked to him, that sort of thing?

24    A.    Right.

25    Q.    Let me turn your attention to March of 1984

1    and ask if you came in contact with him at that time?

2          A.    Yes, I did.

3          Q.    And do you recall how you came into contact

4    with him?

5          A.    He wanted to know if he could stay a couple of

6    days with us.  He had -- I think if I remember right, he was

7    kicked out of his aunt's house and wanted a place to stay

8    for a couple of days, so we gave him a place to stay.

9          Q.    Where were you living at that time?

10         A.    I was living in Irving off of Walnut Hill.

11         Q.    Were you living in apartments there?

12         A.    Yes, sir.

13         Q.    Where were you working at that time?

14         A.    I was working at Tool Tronics.

15         Q.    Who -- did you have a roommate?

16         A.    Yes, I did.

17         Q.    And who was that?

18         A.    Bill Brown.

19         Q.    Was he another high school friend of yours?

20         A.    Yes, sir.

21         Q.    Did you and Mr. Brown agree that Patrick

22   Murphy could come stay with you for a couple of days?

23         A.    Yes.

24         Q.    Was Mr. Murphy working at that time?

25         A.    I don't know if he was or not.  I don't

1    recall.

2         Q.    Did he have a car?

3         A.    No, he did not.

4         Q.    Okay.  I want to turn your attention to March

5    20th and that evening and ask if you and Mr. Murphy and some

6    other people went over to Jeannie Kay's house?

7         A.    We did.

8         Q.    And who else did you go over there with?

9         A.    It was myself, Becky Savage, and Mr. Murphy

10   and I want to say Carla Jones -- I mean, Carla Kearney.

11        Q.    Let me show you State Exhibit 1027.  Does this

12   show an aerial view of where you lived and Jeannie Kay

13   lived?

14        A.    Yes, it does.

15        Q.    Down here in the lower part of the photograph,

16   is that where your apartment was located?

17        A.    Yes, sir.

18        Q.    And then up here where we see a red dot, is

19   that the approximate location of where Jeannie Kay lived

20   with her mother?

21        A.    Yes, sir.

22        Q.    About what's the distance between those two

23   points?

24        A.    Probably if you were to walk it, probably

25   about fifteen minutes.

1    Q.    Okay.  And then this area here to the side,

2  what -- describe that area.

3    A.    That area, it's a path.  It's probably a dirt

4  path.  That's grass on the side.  It looks like it was used

5  for like riding motorcycles or, you know, foot traffic or

6  something like that.

7    Q.    Okay.  Now, on March 20th when you went over

8  there with these folks, what was your purpose in going over

9  there?

10   A.    If I'm not mistaken, we went over there to

11  borrow some books that Carla needed for, I think for a

12  report that she was doing at school.

13   Q.    Okay.  And Patrick Murphy went along with you?

14   A.    Right.

15   Q.    How long did y'all stay in the apartment?

16   A.    I want to say it was about fifteen minutes.

17   Q.    Okay.  Did you see Mr. Murphy move around the

18  apartment while you were there?

19   A.    I think I remember that he was with Jeannie's

20  son, Stephen, and he was showing him around the apartment.

21   Q.    Do you remember Steven being a little over two

22  years old?

23   A.    Yes.

24   Q.    And he actually showed Mr. Murphy around the

25  apartment?

```
 1        A.     He did.

 2        Q.     Did he show him his room?

 3        A.     That I don't recall.  He may have.

 4        Q.     But you do remember him taking him around the

 5   apartment?

 6        A.     Yes, I do.

 7        Q.     After that you left.  Did you go back to your

 8   apartment?

 9        A.     Yes.

10        Q.     Where did Mr. Murphy stay?  Where did he

11   sleep?

12        A.     He slept on -- I think he slept on our couch,

13   if I'm not mistaken, because both bedrooms were occupied.

14        Q.     While -- let me turn your attention to the

15   next day and ask if you -- about what time you would have

16   gotten off work?

17        A.     I had gotten off work, I usually got off

18   around somewhere between 4:00 and 5:00, maybe 5:30 by the

19   time I got home.

20        Q.     When you got home, was Patrick Murphy there at

21   the apartment?

22        A.     Yes, he was.

23        Q.     Could you describe the apartment you lived in?

24        A.     It was a two-bedroom apartment.  Both the

25   bedrooms were on opposite ends.
```

1    Q.    Let me show you State Exhibit 1009. Is that a

2 diagram of the layout of the apartment?

3    A.    Yes, it is.

4         MR. SHOOK:  We'll offer State Exhibit

5 1009.

6         MS. BUSBEE:  No objection, Your Honor.

7         THE COURT:  State 1009 shall be admitted.

8    Q.    (By Mr. Shook)  Looking at the diagram, is

9 this the front door to the apartment?

10   A.    That's correct.

11   Q.    And what would this room be?

12   A.    That would be a living area.

13   Q.    Just to the left of the front door was this

14 the bedroom you stayed in?

15   A.    Yes.

16   Q.    And then this bedroom here?

17   A.    That would have been Bill's bedroom.

18   Q.    Talking about a pretty small apartment?

19   A.    Pretty small.

20   Q.    Okay.  So on the 21st you get home and Patrick

21 Murphy is there.  Did you go somewhere with him that

22 evening?

23   A.    I think we went and played video games down at

24 the store.

25   Q.    And what store would you have gone to?

1    A.    We went to 7-Eleven on Walnut Hill and

2  Beltline.

3    Q.    Is that the store located near the apartments

4  where Jeannie Kay was staying?

5    A.    Fairly close.

6    Q.    Do you recall about what time that you

7  returned home that night?

8    A.    I want to say it was probably between 10:00

9  and 11:00.

10   Q.    Now, do you remember how Mr. Murphy was

11 dressed that night?

12   A.    If I remember right, it was a plaid shirt and

13 jeans and a pair of sneakers.

14   Q.    And after you got back to the apartment, what

15 did y'all do then?

16   A.    I think we just sat around and drank some

17 beer, sat around and talked and watched TV.

18   Q.    Do you remember him while you were drinking

19 beer make a comment about Jeannie?

20   A.    I think a comment may have come up.

21   Q.    What type of comment was it?

22   A.    He wouldn't mind getting a hold of her.

23   Q.    He wouldn't mind getting a hold of her?

24   A.    Right.

25   Q.    Now, when he said it at that time, that didn't

1    alarm you then, did it?

2            A.    It didn't alarm me, no.

3            Q.    About what time would you have gone to bed

4    that evening?

5            A.    I want to say it was around 11:30.

6            Q.    What time did you have to get up and go to

7    work?

8            A.    I had to be at work by 7:00 in the morning.

9            Q.    Did you have a knife back -- did you carry a

10   knife as part of your routine?

11           A.    I did.

12           Q.    What type of knife was that?

13           A.    I want to say it was like a lock blade.

14           Q.    One of these fold out lock blade knives?

15           A.    Yes.

16           Q.    Where did you keep it that night?

17           A.    Both Bill and I kept them on the counter.

18           Q.    Bill Brown also had one?

19           A.    Right.

20           Q.    When you say the counter, you talking about

21   the counter that was here in the --

22           A.    Yeah, right around that area.  There would

23   have been like a bar type right there.

24           Q.    Okay.  So when you went to bed that evening,

25   that's where the knife was located?

1       A.      Right.

2       Q.      Was Mr. Murphy still awake when you went to

3   bed?

4       A.      Yes, he was.

5       Q.      Had your roommate, Mr. Brown, come home yet?

6       A.      I think he came home shortly after that.

7       Q.      And your bedroom is the one located here next

8   to the front door?

9       A.      Yes.

10      Q.      Let me ask you if anything caused you to

11  become awake in the early morning hours?

12      A.      What caused me to wake was that my door is --

13  my bedroom, there's a glass window right there in my

14  bedroom.  And with the door the way it was positioned, if

15  the door was opened or closed, you could feel it vibrate or

16  you could feel the wall vibrate.

17      Q.      Okay.  Did that front door, then, open at some

18  point in time in the morning and wake you up?

19      A.      It did.

20      Q.      Approximately what time was that?

21      A.      Around 3:00, 3:30, something like that.

22      Q.      Then again later on in the morning, were you

23  awakened again with the door opening and closing?

24      A.      Around 5:00.

25      Q.      Around 5:00 in the morning?

1      A.      Yeah.

2      Q.      Okay.  When you awakened in the morning, was

3  Mr. Murphy awake?

4      A.      He was.

5      Q.      And what was he doing?

6      A.      He was up, I think watching TV, if I'm not

7  mistaken.

8      Q.      Okay.  Was he still dressed in the plaid

9  shirt?

10      A.      Yes.

11      Q.      Did he indicate to you that he had been awake

12  all night?

13      A.      He looked awful tired, so I just assumed that

14  he was awake all night or might have been up the majority of

15  the night.

16      Q.      Did it appear -- in the refrigerator or on the

17  counter, was there a drink that caught your attention?

18      A.      There was a Dr. Pepper bottle.

19      Q.      Where was that located?

20      A.      It was located on the bar.

21      Q.      What type of Dr. Pepper bottle was that?

22      A.      It was a plastic nonreturnable.

23      Q.      Nonreturnable bottle?

24      A.      Right.

25      Q.      In your apartment complex at that time, did

1   they sell those types of bottles --

2        A.      No, they did not.

3        Q.      Did they sell those in the machines?

4        A.      No, they did not.

5        Q.      Where could you purchase those bottles in that

6   particular area?

7        A.      It would have to be one of the gas stations or

8   7-Eleven or Gulfs.

9        Q.      The 7-Eleven that was near Jeannie Kay's

10  house, did they sell those types of bottles?

11       A.      Yes, they did.

12       Q.      When he left the 7-Eleven with you, did he

13  have that Dr. Pepper with him?

14       A.      Not that I recall.

15       Q.      And the other stores that were located near

16  there, were they closed during the later evening hours?

17       A.      Yes.

18       Q.      What time did they close?

19       A.      Most of them closed before midnight.

20              MR. SHOOK:  That's all the questions we

21  have at this time, Judge.

22              MS. BUSBEE:  I have no questions, Your

23  Honor.

24              THE COURT:  Thank you, Mr. Kearney.  You

25  may stand down.

1            MR. SHOOK:  May this witness be excused?

2            MS. BUSBEE:  No objection, Your Honor.

3            THE COURT:  He may.

4            MR. SHOOK:  Call Bill Brown.

5                    BILL BROWN,

6   having been duly sworn, was examined and testified as

7   follows:

8                 DIRECT EXAMINATION

9   BY MR. SHOOK:

10          Q.    Would you tell us your name, please.

11          A.    My name is William Brown.

12          Q.    And how are you employed, sir?

13          A.    I am employed by the County.

14          Q.    What do you do with the County?

15          A.    I work for Facilities Management.  I'm an

16  electrician.

17          Q.    Okay.  And let me ask you where you went to

18  high school?

19          A.    I went to high school at Irving High.

20          Q.    Were you born and raised in Irving?

21          A.    Yes, sir.  I was born in Dallas and raised in

22  Irving.

23          Q.    And what year did you graduate from Irving

24  High?

25          A.    1979.

1      Q.     Did you know a man by the name of Patrick

2  Murphy in high school?

3      A.     Yes, sir, I did.

4      Q.     Do you see Mr. Murphy today?

5      A.     Yes, I do.  He's the first person right over

6  here.

7             MR. SHOOK:  Your Honor, if the record

8  could reflect the witness has identified the defendant.

9      Q.     (By Mr. Shook)  About how old were you when

10 you met Mr. Murphy?

11     A.     I was probably about 15, 16 years old.  I met

12 him in high school.

13     Q.     Did you have classes with him?

14     A.     We were in Jr. ROTC together at one time.

15     Q.     Were you friends with him?

16     A.     Yes, I was.

17     Q.     Did he actually graduate with you?

18     A.     No, sir, he did not.

19     Q.     What was Mr. Murphy's -- what was his

20 personality like when you knew him in high school?

21     A.     He had aggressive behavior.  He was easily

22 provoked.  Got in fights frequently.

23     Q.     Did he have a temper?

24     A.     Yes, he did.

25     Q.     Okay.  After you graduated -- let me turn your

1    attention to 1984.  Where were you working then?

2         A.     I was working for American Color.

3         Q.     What did you do with them?

4         A.     I was what was called a color proofer.

5         Q.     And where were you living in 1984?

6         A.     I was living in the Walnut Tree Apartments at

7    the time.

8         Q.     Was your roommate Donny Kearney?

9         A.     Yes, it was.

10        Q.     You know him from high school?

11        A.     Yes, I do.

12        Q.     In March of 1984, did you come into contact

13   again with Patrick Murphy?

14        A.     Yes, I did.

15        Q.     How did that occur?

16        A.     I believe it happened when I was working at

17   Sears and I came across his path.

18        Q.     Okay.  Did Mr. Murphy make a request of you at

19   that point in time?

20        A.     It was at a later time that he did that and,

21   yes, he did make a request.

22        Q.     Okay.  What was his request he made of you?

23        A.     He wanted -- he needed a place to stay.  What

24   had happened is he said that he had been in jail for ticket

25   violations and that he had gotten in an argument with his

1    aunt and he needed a place to stay.

2         Q.    Okay.  Did you and your roommate agree to

3    allow him to stay at your place for a few days?

4         A.    We did.

5         Q.    And do you remember him coming over there

6    approximately March 20th of 1984?

7         A.    Yes, I do.

8         Q.    Did he bring anything with him at that time?

9         A.    He had one luggage with him.

10        Q.    And where would he stay when he went to sleep?

11        A.    He would stay on the couch there.

12        Q.    I believe, if you will look at the monitor, we

13   have a diagram of the apartment that you were staying in at

14   that time.

15        A.    Okay.

16        Q.    Do you see the living room area that would be

17   when you first open the door, is that where the couch was

18   that he slept?

19        A.    I believe it was more towards the back wall

20   over towards where my bedroom was there.

21        Q.    This area here?

22        A.    Yeah, I believe so, yeah.

23        Q.    And this was your bedroom here?

24        A.    Yes, sir.

25        Q.    Okay.  Let me turn your attention to the

```
 1    evening of March 21st.  What time would you have come home

 2    from working that night?

 3         A.      Well, I had been working ten-hour shifts with

 4    American Color, so I worked from 4:30 to 12:30 that night.

 5    So I probably -- around a little after 12:00.

 6         Q.      So a little after midnight?

 7         A.      Excuse me, a little after 12:30.

 8         Q.      So you actually would have gotten there the

 9    early morning hours of the 22nd of March?

10         A.      Right.

11         Q.      When you got there, was Patrick Murphy awake

12    at that time?

13         A.      Yes, he was.

14         Q.      And what was he doing?

15         A.      He was watching TV.  He had been drinking a

16    little bit.  He had some, I believe, Southern Comfort and

17    had been drinking some beer.

18         Q.      And what did you do at that time?

19         A.      I sat down to unwind and we talked a little

20    bit.

21         Q.      Okay.  Did you have some beer, also?

22         A.      No, sir.

23         Q.      Okay.  How was he dressed?

24         A.      If I remember right, he had jeans and a plaid

25    shirt on, if I'm not mistaken.
```

```
1        Q.     So you had some conversation with him at that
2   time?
3        A.     Yes, sir.
4        Q.     What types of things did he talk about?
5        A.     He usually talked about sex with women.  How
6   he wanted to take women.  Work them up, like start at their
7   toes and probably eat their pussy and work their way up and
8   then he would actually go into how he would have intercourse
9   with them.
10        Q.     Did he get pretty graphic in his details?
11        A.     Yes, sir, he did.
12        Q.     The words you have just explained to the jury,
13   were those his words?
14        A.     Those were his words.
15        Q.     Okay.  Was he the one that brought this up?
16        A.     Yes, sir.
17        Q.     Did he talk to you about what you and he might
18   do that evening?
19        A.     Well, he talked about if I didn't have to work
20   the next day that we'd go out and get some pussy somewhere
21   like that.
22        Q.     Again, were those his exact words?
23        A.     Those were his exact words.
24        Q.     And what did you tell him?
25        A.     I told him, you know, well, I had to work, so
```

1    I said, well, that probably isn't a good idea right now.  So

2    I'll be passing on it.

3         Q.    Okay.  Had he brought up the issue of sex

4    before?

5         A.    Plenty of times.  He seemed to be a little

6    obsessed with it.

7         Q.    And did it make you a little bit uncomfortable

8    at times?

9         A.    Yes.

10        Q.    Now, after -- what time would you say you went

11   to bed that --

12        A.    I probably went to bed about 2:30.

13        Q.    At some point in time were you awakened by the

14   front door opening?

15        A.    Yes.  The door did open approximately from

16   3:00, maybe 3:30, around in there.

17        Q.    Okay.  Did you hear the door open and close

18   again later in the morning?

19        A.    Yes.  At approximately 5:00, 5:15, around that

20   area.

21        Q.    What time would you have woke up the next day?

22        A.    7:00.

23        Q.    When you got up, was Mr. Murphy still awake?

24        A.    Yes, he was.

25        Q.    What was he doing?

1     A.     He was watching TV.

2     Q.     Was he still dressed in the same clothes you

3  had seen him that previous evening?

4     A.     Yes, sir.

5     Q.     Did it look like he had been asleep at all?

6     A.     No.

7     Q.     Did you ask him if he had been asleep?

8     A.     I didn't ask him that.

9     Q.     Now, did you have a knife back then?

10    A.     Yes, I usually carried a knife.

11    Q.     What type of knife was it?

12    A.     It was a regular pocketknife.  I believe it

13  was a folding blade knife.

14    Q.     Where did you keep that when you went to bed?

15    A.     Well, I usually take things out of my pocket

16  and lay it on the counter there where the kitchen was and I

17  laid it right there on top of the counter.

18    Q.     That's what you had done when you had gone to

19  bed that --

20    A.     Yes, it was.

21    Q.     Okay.  Now, did Mr. Murphy you said brought a

22  suitcase with him; is that right?

23    A.     That's right.  He brought a suitcase with him.

24    Q.     Where did he keep that suitcase?

25    A.     That was kept in my room at that time.

1        Q.   All right.   Now, did you learn soon after the

2   date of the 22nd was Mr. Murphy arrested for sexual assault

3   of Jeannie Kay?

4        A.   Excuse me?   I didn't -- would you repeat the

5   question, please?

6        Q.   Did you learn soon after the 22nd, was Mr.

7   Murphy arrested for the sexual assault?

8        A.   Yes.

9        Q.   And after he was arrested, did he attempt to

10   contact you at all?

11        A.   He tried to contact me one time and I refused

12   to accept the charges.

13        Q.   Okay.   Now, what did you do with the suitcase

14   that had been left there at your apartment?

15        A.   Well, at first I went through the suitcase.

16   It was already halfway open and went through it and

17   discovered some hard-core pornography and condoms in his

18   suitcase.

19        Q.   When you say hard-core pornography, what type

20   of material was it?

21        A.   Sexual acts by men and women, stuff you would

22   buy at an adult bookstore.

23        Q.   Okay.

24        A.   Things of that nature.

25        Q.   Pretty graphic stuff?

1      A.      Very explicit.

2      Q.      Okay.  And then eventually what did you do

3  with the suitcase?

4      A.      I believe we returned it to his mother.

5      Q.      Okay.

6              MR. SHOOK:  We'll pass the witness.

7                      CROSS-EXAMINATION

8  BY MS. BUSBEE:

9      Q.      Just a couple of questions, Mr. Brown.  Is

10  this the only -- so you were, what, 20 years old?

11      A.      I was 24 at the time.

12      Q.      Twenty-four.  And was this the only friend

13  that you ever had conversations about having sex with girls?

14      A.      Well, no.

15      Q.      And didn't you at one time have a relationship

16  with his 15-year-old sister?

17      A.      No, ma'am.

18      Q.      You didn't have a sexual relationship with her

19  when she was 15?

20      A.      No, ma'am.

21              MS. BUSBEE:  I'll pass the witness.

22              MR. SHOOK:  That's all we have.

23              THE COURT:  Thank you, Mr. Brown.

24              MR. SHOOK:  May this witness be excused?

25              MS. BUSBEE:  No objection.

1          THE COURT:  He may.  You are already

2    sworn in.  Thank you, sir.  Let the record reflect this

3    witness has been previously sworn.

4                    TIMOTHY SLITER,

5    having been duly sworn, was examined and testified as

6    follows:

7                  DIRECT EXAMINATION

8    BY MR. WIRSKYE:

9          Q.    Sir, can you tell us your name, again?

10         A.    Timothy Sliter.

11         Q.    You are the same Dr. Sliter that testified

12   last week in this case; is that right?

13         A.    That's correct.

14         Q.    And tell the members of the jury what your job

15   is again and what you do on a day-in, day-out basis.

16         A.    I work at the Southwestern Institute of

17   Forensic Sciences, or SWIFS, here in Dallas as a supervisor

18   of the Forensic Biology Laboratory and I perform,

19   personally, DNA testing in criminal investigations.

20         Q.    And I think you told us last week that

21   sometimes your lab retains evidence from older cases; is

22   that right?

23         A.    Yes, usually we do.

24         Q.    And you recently did some additional DNA

25   testing involving this defendant Patrick Murphy; is that

1    right?

2           A.      That's correct.

3           Q.      At the request of the District Attorney's

4    Office, were you able to locate some evidence at your lab

5    involving a 1984 sexual assault with a complainant that was

6    named Jeannie Savage?

7           A.      Yes.  Our records, Jeannie Savage Kay.

8           Q.      And what type of evidence were you able to

9    locate?

10          A.      I was able to identify two items of evidence

11   that had been submitted in 1984, a vaginal swab and an oral

12   swab.

13          Q.      And how were those items stored?

14          A.      They were stored, packaged individually, in

15   small glass vials, which was the custom at that time and

16   initially they would have been stored in a frozen state and

17   then at a point in time probably 1988 or '89 they were

18   removed from frozen storage into an archived room

19   temperature storage.  And I located them in our room

20   temperature storage.

21          Q.      Would the room temperature storage versus the

22   frozen storage or the age of the particular piece of

23   evidence, would that inhibit your ability to obtain a DNA

24   profile off that evidence?

25          A.      No.  As long as items are stored dry, we would

1   expect to get DNA profiles from them for decades.  We

2   routinely do testing on evidence stored in this way from the

3   early 1980's and we are generally successful at it.  Of

4   course, if the evidence was in a compromised state at the

5   original time, it's not going to get any better having been

6   stored for 20 years.

7          Q.      The items of evidence that you have told us

8   about, do they contain the unique lab number that was

9   assigned this case back in 1984?

10         A.      Yes.  That was 84P0583.

11         Q.      And no signs of any irregularities with either

12  of those pieces of evidence?

13         A.      No.

14         Q.      Tell us again exactly what two pieces of

15  evidence did you find?

16         A.      The one item our number K-1, was a vaginal

17  swab.  That would be a swab which was collected by doctors

18  at Parkland Memorial Hospital in the OB/GYN Unit, the

19  emergency room.  And it was originally screened for the

20  presence of spermatozoa, or seminal fluid.  And it tested

21  positive for seminal fluid at that time in 1984.

22                 The second item was an oral swab which

23  was again collected by the doctors at Parkland.  It was our

24  item No. K-4.  It was originally screened for seminal fluid,

25  but it did not contain seminal fluid.  And so it was

1    processed in addition to the vaginal swab essentially as a

2    standard in the case.

3              Q.    Okay.  Back in 1984 was DNA testing available

4    to labs such as yours?

5              A.    No.

6              Q.    And you processed these items using the PCR

7    DNA technique that you told us about last week; is that

8    right?

9              A.    That's correct.

10             Q.    And the technique in this case was applied

11   properly?

12             A.    That's correct.

13             Q.    What were you able to get from those two

14   swabs?

15             A.    From the oral swab -- let me say in both cases

16   I processed them using a slightly different process than we

17   would use for a bloodstain, because in the case of seminal

18   fluid it generally comes as a mixture of cellular material

19   from the complaining witness and the smaller amount of

20   cellular material from the semen.

21                      We process it in a two-step process which

22   gives us what we refer to as fractions.  One fraction would

23   be enriched for the DNA from the complaining witness, which

24   comes in cells referred to as epithelial cells.  The other

25   fraction would be enriched from the DNA from spermatozoa.

```
 1              And this process is carried out -- the
 2   DNA in spermatozoa, the spermatozoa consists of very tightly
 3   packed DNA.  The spermatozoa doesn't release or don't
 4   release their DNA, except under fairly stringent chemical
 5   conditions, whereas the epithelial cells from the
 6   complaining witness would release the DNA under fairly mild
 7   chemical conditions, so that's how we do it.
 8         Q.    So when you look at a piece of evidence like
 9   that, you are kind of able to separate into the male
10   fraction and female fraction?
11         A.    Yes.  And often it's not a perfect separation.
12   We would normally expect or we wouldn't be surprised to see
13   some incomplete separation, so we call them enriched
14   fractions, not pure fractions.
15         Q.    What were you able to find from the oral swab
16   of Jeannie Savage Kay?
17         A.    From the male fraction I got no DNA and no DNA
18   profile.  From the epithelial cell fraction I got a female
19   DNA profile.
20         Q.    When you looked at the vaginal swab, what did
21   you find?
22         A.    When I processed the vaginal swab, when I did
23   the processing, I, in addition to carrying out this
24   chemical extraction process, I also prepared a microscope
25   slide from the male fraction in order to determine if there
```

1    were actually spermatozoa present in the sample and I did

2    detect spermatozoa.

3                        So the female fraction gave DNA which was

4    a mixture of DNA, mostly from a female which had the same

5    DNA profile as the oral swab.  And then there was a smaller

6    amount of DNA from a male.

7                        The male fraction gave a DNA profile that

8    corresponded to a single male.  I didn't detect any DNA from

9    the complaining witness and that DNA profile was the same

10   DNA profile as I had previously obtained from the buccal

11   swab of Patrick Murphy.

12        Q.    You already had his buccal swab or the profile

13   from the buccal swab on file; is that correct?

14        A.    Yes.  I compared it.  I didn't process that

15   buccal swab again.  I simply compared it to the results that

16   I had obtained in 2001.

17        Q.    And it was a match to the male fraction on the

18   vaginal swab?

19        A.    Yes.

20        Q.    You told us last week that numbers give

21   meaning to matches.

22        A.    Yes.

23        Q.    The higher the number, the more meaningful

24   they are.  What were the numbers associated with the match

25   involving Patrick Murphy?

1   A.      I used the Texas Department of Public Safety

2   data base and looked in -- compared that profile or

3   calculated the random match statistic for Texas Caucasians,

4   African-Americans, and Hispanics.   The conservative number

5   was seen in Texas Caucasians and that was one in 36

6   trillion.   And what that means is that if I had a population

7   of people equal to about six thousand times the population

8   of the Earth, I would expect one person in that population

9   to have this particular DNA profile.

10  Q.      The items of evidence that you told us about,

11  both, I guess, the buccal swab and the two swabs from the

12  rape exam, are those items still over at your lab for

13  retesting if anybody disagrees with your results?

14  A.      Yes.

15  Q.      Did you prepare a written report that reflects

16  the findings that you told us about just now?

17  A.      Yes, I did.

18          MR. WIRSKYE:  May I approach, Your Honor?

19          THE COURT:  You may.

20  Q.      (By Mr. Wirskye)  Doctor, let me show you a

21  copy of the report marked for identification as State 1013.

22  I'll have you look at that and just make sure that that is,

23  indeed, an exact duplicate of your report?

24  A.      Yes, it is.

25          MR. WIRSKYE:  Your Honor, at this time we

101

1    offer State 1013.

2                     MS. BUSBEE:  May I?  I believe that this

3    is the report that they previously tendered to me, Your

4    Honor.  No objection.

5                     THE COURT:  State 1013 shall be admitted.

6         Q.    (By Mr. Wirskye)  One last thing.  Do your

7    records in this case reflect that in July of 2001 that you

8    sent some items of evidence to the Department of Public

9    Safety Lab in Houston?

10        A.    Yes, they do.

11        Q.    The blood sample of Larry Harper and then the

12   buccal swabs of the other Texas Seven, including Patrick

13   Murphy?

14        A.    That's correct.

15        Q.    Did that by Federal Express?

16        A.    That's correct.

17        Q.    The Federal Express number would be

18   821431225205; is that correct?

19        A.    That's correct.

20                    MR. WIRSKYE:  I'll pass the witness.

21                    MS. BUSBEE:  No questions.

22                    THE COURT:  Thank you, Dr. Sliter.

23                    MR. SHOOK:  We'll call Patrick

24   Moczygemba.

25                    PATRICK MOCZYGEMBA,

1    having been duly sworn, was examined and testified as

2    follows:

3                        DIRECT EXAMINATION

4    BY MR. SHOOK:

5          Q.    Tell us your name, please.

6          A.    My name is Patrick Moczygemba.

7          Q.    How are you employed, sir?

8          A.    At the current time I'm unemployed.

9          Q.    Okay.   Let me turn your attention back to

10   December of 2000 and ask how you were employed at that time?

11         A.    I was the Assistant Maintenance Supervisor at

12   the Connally Unit.

13         Q.    Tell the jury what the Connally Unit is.

14         A.    The Connally Unit is the maximum facility

15   located in Karnes County.

16         Q.    And where is Karnes County located?

17         A.    Approximately halfway between San Antonio and

18   Corpus Christi.

19         Q.    About 60 miles or so southeast of San Antonio?

20         A.    Yes, sir, that's correct.

21         Q.    Were you born and raised in that area?

22         A.    Yes, sir, I was.

23         Q.    Prior to working there at the prison, what

24   line of work were you in?

25         A.    I was a heavy equipment operator for a local

1   uranium company.

2       Q.      Now, you said that you were the assistant

3   maintenance supervisor?

4       A.      Yes, sir, that's correct.

5       Q.      How long had you worked there at the Connally

6   Unit?

7       A.      At the time it was five years.

8       Q.      Okay.  You said that -- what type of unit was

9   that prison union?

10      A.      It was a maximum facility.

11      Q.      What types of inmates are housed there?

12      A.      We have anything from a line one all the way

13  up to ad seg units.

14      Q.      Okay.  And we're talking about people that

15  have been convicted of felonies?

16      A.      Yes, sir.

17      Q.      Serving long prison terms?

18      A.      That's correct.

19      Q.      Explain to the jury in a Texas prison such as

20  the Connally Unit, do the inmates have jobs?

21      A.      Yes, sir, that's correct.  Each inmate has a

22  certain type of job.  They either work in the kitchen where

23  they cook the food or maintenance or they do work in the

24  laundry.  They have a job somewhere in the unit.  They just

25  can't sit still.

1    Q.    Are the prison units, do they operate like a
2 city unto themselves?

3    A.    Yes, sir, that's correct.

4    Q.    Do you have area craftsmen, people in skilled
5 positions, that work there in the prison?

6    A.    Yes, sir.

7    Q.    And do they -- are they assigned there to the
8 maintenance department?

9    A.    Yes, sir, they are.

10   Q.    What types of craftsmen do you have working
11 there?

12   A.    We have heating ventilation, air conditioning,
13 plumbing.  We have carpenters, we have electricians,
14 basically everything you need to repair a city, that's what
15 we have right there.

16   Q.    And these are the people that work under your
17 supervision there in the prison?

18   A.    Yes, sir.

19   Q.    And are inmates employed that work under these
20 particular craftsmen's supervision?

21   A.    Yes, sir, they are.

22   Q.    How is it that an inmate will come to work in
23 that particular department under their supervision?

24   A.    What they basically do, they send like an
25 application or a letter of their qualifications and it goes

1    to the maintenance supervisor and we kind of pick through

2    them and try to pick out the best one suited for the job,

3    typical job, that we're going to assign them for.

4         Q.    And did you have some inmates that worked in

5    the maintenance department in the warehouse area, also?

6         A.    Yes, sir, we did.

7         Q.    As part of your training there at the prison,

8    are you trained to deal with hostage situations?

9         A.    Yes, sir, we are.

10        Q.    And what type of training did you receive?

11        A.    We received -- right at the very beginning, we

12   go through a six-week training course and they basically

13   teach us everything how to handle offenders, how to deal

14   with them in crisis intervention, basically hostage,

15   everything.

16        Q.    And one of the things you are trained to do is

17   look for weapons; is that right?

18        A.    Yes, sir, that's correct.

19        Q.    Are weapons found in virtually every place in

20   the penitentiary?

21        A.    Yes, sir, they are.

22        Q.    And these are weapons that the inmates make?

23        A.    Yes, sir.

24        Q.    What type of weapons have you found in your

25   experience?

1    A.    There's anything from weapons fashioned out of

2    plexiglass all the way to pieces of metal or wire.   Anything

3    that they can fashion a weapon out of, they will fashion it.

4    Q.    And what's the names for these weapons?

5    A.    They are called shanks.

6    Q.    Shanks?   Okay.   Now, are the inmates that work

7    there on any occupation in prison, are they actually paid

8    money?

9    A.    No, sir, they are not.

10   Q.    How is it -- how many inmates did you have

11   working for you under the maintenance department back in

12   December of 2000?

13   A.    I think it was around 60 or so.

14   Q.    Okay.   What would they do during the day?

15   A.    During the day we usually pull out -- each

16   craftsman would pull out two to three offenders and they

17   will assist the craftsmen in doing their workload.

18   Q.    Would the craftsmen go throughout the prison

19   and then take these inmates with them?

20   A.    Yes, sir, that's correct.

21   Q.    Now, looking at State Exhibit 44, which is the

22   board there behind you, did six of those inmates work in the

23   maintenance department?

24   A.    Yes, sir, that's correct.

25   Q.    Let's start with George Rivas there.   What was

1    his job in the maintenance department?

2         A.      He was like the purchaser.  He did the

3    paperwork in the office.

4         Q.      Was he more or less a clerk position?

5         A.      Yes, sir, he was a clerk.

6         Q.      And he worked in your offices there; is that

7    right?

8         A.      Yes, sir, that's correct.

9         Q.      As a clerk in your offices, would he be in the

10   room when the phone calls were made, that sort of thing?

11        A.      Yes, sir, that's correct.

12        Q.      Were part of his duties to keep an inventory

13   of the materials that you had?

14        A.      Yes, sir.

15        Q.      In your maintenance offices was there a

16   warehouse attached to it?

17        A.      Yes, sir, there was.

18        Q.      What types of things were kept in that

19   warehouse?

20        A.      Basically, everything just to repair any type

21   of piece of equipment that we have there.  It's nuts, bolts,

22   wire.  You name it, it was in there.

23        Q.      If you were running low on supplies, who would

24   notify you of that?

25        A.      George Rivas would.

```
1       Q.    Okay.  And how would you resupply the
2  maintenance department?
3       A.    We either placed an order or we used the State
4  truck to go to town to pick stuff up.
5       Q.    Just go to the Wal-Mart --
6       A.    Yes, sir.
7       Q.    -- or store like that?
8       A.    Yes, sir, that's correct.
9       Q.    Did that State truck stay inside the prison or
10 outside?
11      A.    It stayed outside most of the time.
12      Q.    And how was it brought in?
13      A.    It was brought in through the back gate.
14      Q.    Okay.  And it would only be brought in on
15 occasions when you needed to bring in supplies?
16      A.    Yes, sir, that's correct.
17      Q.    Would Mr. Rivas know or would he be able, if
18 he paid attention, have knowledge as to when you were going
19 to need supplies?
20      A.    Yes, sir, that's correct.
21      Q.    Now, did he have access to the warehouse
22 department, also?
23      A.    Yes, he did.
24      Q.    What other inmates on the board worked in the
25 warehouse?
```

1        A.      Joseph Garcia, Randy Halprin, and Larry

2    Harper, they all did.  They all worked in the warehouse

3    area.

4        Q.      What did they do in the warehouse area?

5        A.      Joseph Garcia and Larry Harper handed out

6    parts at the window and they charged them out to the job.

7        Q.      Okay.  When you say parts, you are talking

8    about tools and things like that?

9        A.      Well, the toolman was Halprin.  He handed out

10   tools.

11       Q.      Okay.  And just on a daily basis they would be

12   there working in the warehouse?

13       A.      Yes, sir.

14       Q       What about Donald Newbury, what did he do in

15   the maintenance department?

16       A.      He worked with the lock techs, fixing locks

17   and detention locks in the prison.

18       Q.      Okay.  And was he one of these inmates that

19   would go to different parts of the prison and work on --

20   under the supervision of a craftsman?

21       A.      Yes, sir, that's correct.

22       Q.      And Patrick Murphy, what did he do?

23       A.      He was a carpenter.

24       Q.      Do you see Mr. Murphy here in the courtroom?

25       A.      Yes, sir, I do.

```
1      Q.     Would you point him out, please?

2      A.     He's sitting at the end of the table right

3   there.

4      Q.     The man there with the blue coat, glasses,

5   long brown hair?

6      A.     That's correct.

7             MR. SHOOK:  Your Honor, if the record

8   could reflect the witness has identified the defendant.

9      Q.     (By Mr. Shook)  And he worked as a carpenter?

10     A.     Yes, sir, that's correct.

11     Q.     Was there a carpenter shop there located near

12  your offices?

13     A.     Yes, sir, there was.

14     Q.     What types of things would he build?

15     A.     He would basically repair things, build

16  picture frames for the plaques and everything that we needed

17  for the offices.

18     Q.     And was he skilled at his job?

19     A.     Yes, he was.

20     Q.     These -- of the -- one other inmate up there,

21  Michael Rodriguez, did he actually work in the maintenance

22  department?

23     A.     No, he didn't.

24     Q.     What did he do in the prison?

25     A.     He worked on the -- he worked on the inside
```

1    yard squad.

2            Q.      What does the inside yard squad do?

3            A.      They are the ones that mow the grass, take

4    care of the flowerbeds and stuff like that around the unit

5    inside the fence.

6            Q.      Would -- that would enable him to move around

7    inside the fence?

8            A.      Yes, sir.

9            Q.      To different areas in the prison?

10           A.      Yes, sir.

11           Q.      Okay.  Who had worked at the time of December

12   2000, who had worked in the maintenance department the

13   longest?

14           A.      Probably Murphy.

15           Q.      Okay.  And how long had George Rivas been

16   there?

17           A.      Probably about two years, I would say.

18           Q.      Okay.  Had the others come in after Mr. Rivas

19   had arrived?

20           A.      Yes, sir.

21           Q.      Had you had any problems, any large problems,

22   with Mr. Murphy back in December?

23           A.      I -- basically we had problems in the

24   carpenter shop.  There was always things being hidden in the

25   shop.  You had to shake down the shop pretty often just to

1    make sure -- to keep them honest.

2         Q.    Was Mr. Murphy the type of inmate that you

3    trusted?

4         A.    Not really.

5         Q.    Okay.  I want to show you some photographs.

6    You have seen these before outside the presence of the jury?

7         A.    Yes, sir.

8         Q.    They are marked State Exhibits 500 through 542

9    and State Exhibits 545 and 547 through 550.  Do you

10   recognize those as being photos of the prison unit, the

11   maintenance department, both interior and exterior?

12        A.    Yes, sir, that's correct.

13             MR. SHOOK:  Your Honor, we'll offer those

14   exhibits at this time.

15             MS. BUSBEE:  We've seen them, Your Honor,

16   no objection.

17             THE COURT:  State Exhibits 500 through

18   542, 545 and 547 through 550 shall be admitted.

19        Q.    (By Mr. Shook)  I want to show you what has

20   been marked as State Exhibit 544.  Is that a general drawing

21   overview of how the prison is laid out?

22        A.    Yes, sir, that's correct.

23        Q.    And then State Exhibit 543, is this a diagram

24   of the maintenance department and the warehouse area?

25        A.    Yes, sir, that's correct.

1        MR. SHOOK:  We'll offer 543 and 544 at

2    this time.

3        MS. BUSBEE:  No objection.

4        THE COURT:  Nos. 544 and 543 shall be

5    admitted.

6        Q.    (By Mr. Shook)  I'll show you a poster which

7    has been marked State Exhibit 582, do you recognize the

8    names on that poster?

9        A.    Yes, sir, I do.

10       Q.    Are these the names of the persons that worked

11   in the maintenance department, as well as the guards that

12   were taken as hostage on December 13, 2000?

13       A.    Yes, sir, that's correct.

14       MR. SHOOK:  We'll offer State Exhibit

15   582.

16       MS. BUSBEE:  No objection, Your Honor.

17       THE COURT:  No. 582 shall be admitted.

18       Q.    (By Mr. Shook)  Mr. Moczygemba, let me show

19   you State Exhibit 500.  Is this an aerial view of the prison

20   unit?

21       A.    Yes, sir, that's correct.

22       Q.    This -- is this the parking lot area?

23       A.    Yes, sir.

24       Q.    Okay.  And how many gates lead into the

25   prison?

1          A.      We have the main front entrance gate and then

2    the rear gate and that's the only two entrances to the unit.

3          Q.      The main entrance gate, is that here?

4          A.      Yes, sir.

5          Q.      And is that the way that you would come in

6    when you come to work?

7          A.      Yes, sir.

8          Q.      Now, the other gate in which deliveries were

9    made, where was that located?

10          A.      That's located to the back of the unit, right

11    in that area right there.

12          Q.      This area here?

13          A.      Yes, sir.

14          Q.      And the closest town to the prison unit, what

15    is that?

16          A.      It's a town called Kenedy.

17          Q.      How far from the prison unit is that?

18          A.      I believe about three miles or so.

19          Q.      Let me show you State Exhibit 501.  Does this

20    kind of show the area from behind the prison?

21          A.      Yes, sir.

22          Q.      Is that the back gate with the picket tower?

23          A.      Yes, it is.

24          Q.      Could you tell the jury what a picket tower

25    is?

1      A.      The picket is a tall structure there.  It's

2  made -- it's probably about 60 feet tall and it's got an

3  outlook up on top where the person inside can watch over the

4  whole unit.

5      Q.      Now, obviously, there are guards that work

6  there.  The ones that are inside the unit itself, do they

7  carry firearms?

8      A.      No, sir, they don't.

9      Q.      Where are the firearms kept in the prison?

10      A.      They are kept at that back gate right there

11  and the armory up at the entrance, main entrance of the

12  building, of the prison.

13      Q.      So they are actually kept outside the gated

14  area?

15      A.      Yes, sir.

16      Q.      And what type of weapons do the guards keep

17  out there?

18      A.      They keep handguns, shotguns, and AR-15s.

19      Q.      Okay.  Do inmates -- do some of the inmates'

20  jobs have to do with working in the fields outside the

21  prison?

22      A.      Yes, sir, that's correct.

23      Q.      When they are escorted outside the fields, do

24  the guards that are with them, do they retrieve weapons?

25      A.      Yes, sir, they do.

1    Q.    And how do they do that?

2    A.    There's a rope that's attached and they have a

3    basket and the rope is in the basket is lowered down with

4    weapons inside.

5    Q.    Okay.  So there's actually no firearms inside

6    the prison itself?

7    A.    That's correct.

8    Q.    Let me show you State Exhibit 502.  What do we

9    see in this photograph?

10   A.    You see one of the dorms and both dorms, the

11   maintenance shop, and I think that's 4 building right there.

12   Q.    These buildings that we see down in the

13   center, who is housed in there?

14   A.    Those are closed -- not closed custody, but

15   they are a little bit higher class inmates that are

16   considered a threat.  So they stay in those units.

17   Q.    All right.  These large buildings here, what

18   are those?

19   A.    Those are the dorms.  Those are the offenders

20   that have or are considered not a threat.  They stay in

21   those units right there.

22   Q.    Do they have more freedom of movement there?

23   A.    Yes, sir, they do.

24   Q.    Is that where Mr. Murphy stayed?

25   A.    Yes, sir, that's correct.

1    Q.    You said the maintenance department, is that

2  this building --

3    A.    Yes, sir.

4    Q.    -- right here?

5    A.    Yes, sir.

6    Q.    And that's where you were headquartered?

7    A.    Yes, sir.

8    Q.    When Mr. Murphy would be working during the

9  day, did he stay in this area?

10   A.    Yes, he did.

11   Q.    Okay.  Some of the inmates would actually go

12 to different parts of the prison?

13   A.    Yes, sir.

14   Q.    But his job required him to stay there?

15   A.    Yes, sir, that's correct.

16   Q.    State Exhibit 503.  Again, that's the back

17 gate where the deliveries would come in and out of?

18   A.    Yes, sir.

19   Q.    This road here, where does that lead around

20 to?

21   A.    That goes around to the maintenance shop right

22 there and the backside of the education building.

23   Q.    And State Exhibit 504, is that a closer view

24 of the maintenance department?

25   A.    Yes, sir, it is.

```
 1          Q.     If you are going to have a vehicle, did you
 2   use vehicles to get out to different parts of the prison,
 3   other than that truck?
 4          A.     No, sir.  That's the only vehicle that came in
 5   there.  At least our State vehicle, that's the only one, the
 6   only place it came in.
 7          Q.     Okay.  Let me show you State Exhibit 508.  Is
 8   this a view of your offices?
 9          A.     Yes, sir, it is.
10          Q.     How many people worked inside that office?
11          A.     The maintenance supervisor, the coordinator,
12   and we usually had two offenders that worked inside the
13   office.
14          Q.     Okay.  Was your supervisor there on December
15   13th?
16          A.     No, she wasn't.
17          Q.     So you were in charge at that time?
18          A.     Yes, I was.
19          Q.     Let me show you State Exhibit 543.  Is this
20   kind of a diagram of the maintenance area?
21          A.     Yes, it is.
22          Q.     Okay.
23                 MR. SHOOK:  Could the witness stand up to
24   point out some things on the diagram?
25                 THE COURT:  He may.
```

1      Q.      (By Mr. Shook)  If you would just kind of, so

2   all the jurors can see, point or where is the entrance to

3   the maintenance department?

4      A.      The entrance to the maintenance shop is right

5   here.  It's a door that goes in right here.

6      Q.      And what are these areas right here?

7      A.      This is where the coordinator, the two

8   offenders that work in this area right here.

9      Q.      Is that what we're seeing here in the

10  photograph?

11     A.      Yes, it is.

12     Q.      What about this area back here?

13     A.      This is the maintenance supervisor's office

14  right here.

15     Q.      And where did you office?

16     A.      I was in the same office as the maintenance

17  supervisor.

18     Q.      Okay.  Now, this area back in here, that's

19  titled warehouse; is that right?

20     A.      Yes, sir, that's correct.

21     Q.      And is that the warehouse area you described

22  earlier?

23     A.      Yes, I did.

24     Q.      And who was working back there?

25     A.      Halprin, Harper, and Garcia.

```
1          Q.     Okay.  And Mr. Rivas worked in this area?

2          A.     He worked in this area right here and in this

3    corner.

4          Q.     And he was -- also had access to the

5    warehouse?

6          A.     Yes, he did.

7          Q.     What is this area over here?

8          A.     This area right here looks into the shop.

9          Q.     Okay.  What type of shop is that?

10         A.     The middle part was a general area where we

11   did all our maintenance and then beyond it was a caged-in

12   area called -- it was where the carpenter shop was.

13         Q.     Is that where Mr. Murphy worked?

14         A.     Yes, that's correct.

15         Q.     State Exhibit 509, does that show another view

16   of the desk there in the maintenance department?

17         A.     Yes, it does.

18         Q.     State Exhibit 511, that would be where you

19   were officing; is that right?

20         A.     Yes, sir, that's correct.

21         Q.     Now, 513, does that show the door that

22   actually leads to the warehouse?

23         A.     Yes, it does.

24         Q.     That's this door here?

25         A.     Yes, sir.
```

1    Q.    The toolroom, what's in there?

2    A.    That's all types of tools that can be used to

3  cut wire or cut metal or cut any type of material at all

4  that could be used for an escape.

5    Q.    Let me show you State Exhibit 514.  What do we

6  see in that photograph?

7    A.    That is our toolroom.

8    Q.    And 515?

9    A.    Just a closer view of the toolroom.

10    Q.    Are these screwdrivers that are on the wall

11  here?

12    A.    Yes, sir.

13    Q.    They look to have yellow handles with some

14  type of red on them?

15    A.    Each one of the tools has got its own specific

16  number where it can be tracked.  And it's tracked from the

17  time it's bought and put on the wall to the time it's either

18  broken or destroyed.

19    Q.    Okay.  Now, let me turn your attention

20  specifically to December 13th of 2000.  What time would you

21  arrive there at work?

22    A.    I usually arrived at work about fifteen

23  minutes to 7:00.

24    Q.    Is that about the same time that the other

25  craftsmen would report in?

1      A.      Yes, sir, that's correct.

2      Q.      And what time would the inmates that are

3  assigned to the maintenance department arrive?

4      A.      They usually get to the shop about 7:00.

5      Q.      Okay.  What is the procedure from getting them

6  to their cells or the dorm they stay in to where you were in

7  the maintenance department?

8      A.      It was called a call-out.  We had an officer

9  that was assigned early, he would come in early, usually

10  about 6:30 in the morning.  And we have a list of offenders

11  that we needed to pull out that day.  And his job was to

12  pull them out early in the morning.

13      Q.      Okay.  Where would he, as you say, pull them

14  out from?

15      A.      They would -- he would go to the buildings and

16  pull them each one out from the buildings, you know, he'd

17  just escort them up to A-turnout.

18      Q.      And you used the term "A-turnout", what is

19  that?

20      A.      A-turnout is a determination point where it

21  changes from the inside of the compound to the outside to

22  where you basically go to maintenance.

23      Q.      Okay.  And how many guards would escort the

24  inmates, actually, to the maintenance department?

25      A.      One.

1    Q.    Just one?

2    A.    Yes, sir.

3    Q.    Okay.  And did Mr. Murphy, along with the
4 others we see, except for Mr. Rodriguez, arrive at their
5 regular time on December 13th?

6    A.    Yes, they did.

7    Q.    On that day was there anything unusual about
8 what happened in the morning?

9    A.    It was a very cold and icy day that day.  Some
10 of my craftsmen didn't show up that day because it was
11 really bad weather that morning.

12    Q.    Was there anything going on in the maintenance
13 department itself?  Anything coming up?

14    A.    We had an ACA.  We had to pass an ACA
15 accreditation and we were just basically getting prepared
16 for it and cleaning up after it.

17    Q.    What type of accreditation was that?

18    A.    It was American Correctional Association.  You
19 know, they just check out the unit and make sure we are
20 following all the rules and credentials and everything else
21 was up to par.

22    Q.    Did you have any special plans on preparing
23 for that inspection that day?

24    A.    Yes, we did.  We were preparing to seal the
25 floor in the shop to keep the dust down so our area would

1    look more presentable.

2         Q.    Okay.  And that's what you were working on

3    that day?

4         A.    Yes, sir.

5         Q.    About what time do you take a lunch break

6    every day?

7         A.    Usually we had about a quarter to 12:00 --

8    well, that day I think it was 11:30.  About 11:15 or so we

9    start getting the inmates out of the shop.  We shake them

10   down and strip search them and line them up outside the shop

11   and take them back to A-turnout.

12        Q.    So every day at lunch they go to another

13   location to eat; is that right?

14        A.    Yes, sir, that's correct.

15        Q.    And the procedure is to search them before

16   they leave?

17        A.    Yes, sir, that's correct.

18        Q.    And then they are taken back to A-turnout?

19        A.    Yes, sir.

20              THE COURT:  Mr. Shook, speaking of lunch,

21   now that you brought the subject up, it's time for us to

22   take our lunch break.  We stand in recess until 1:15.

23              (Recess)

24              [Jury in]

25              THE COURT:  Please be seated.  Mr. Shook?

1    Q.    (By Mr. Shook)  Again, what time is it that

2  the -- when is your lunch break?

3    A.    From 11:30 to 12:30.

4    Q.    And is that the same time every day?

5    A.    Yes, sir.

6    Q.    And that's the time the prisoners are normally

7  taken to lunch?

8    A.    Yes, sir.

9    Q.    Where do the craftsmen eat in the prison?

10    A.    They either eat in the officer's dining room

11  or they go to the town to eat or they eat in their vehicles.

12    Q.    Vehicles outside in the parking lot?

13    A.    Yes, sir.

14    Q.    When they come back, do they generally come

15  back somewhere between 12:00 and 12:30?

16    A.    Yes, sir, just depends.  If they have

17  paperwork to do, they sometimes come in early to do their

18  paperwork at lunchtime.

19    Q.    Will they oftentimes come back in one at a

20  time or two at a time?

21    A.    Yes, sir.  They usually come in one at a time,

22  sometimes two at a time.

23    Q.    On this particular date did all the craftsmen

24  leave to go eat at 11:30?

25    A.    Yes, sir, they did.

1    Q.    Did all the inmates go eat at that time?

2    A.    All the inmates went, except for the six that

3 I kept back.

4    Q.    Okay.  And those are George Rivas, Donald

5 Newbury, Patrick Murphy, Joseph Garcia, Randy Halprin, and

6 Larry Harper?

7    A.    That's correct.

8    Q.    And what was the reason you were keeping them

9 back that day?

10    A.    We had started sealing the floor and taking

11 stuff apart to seal the floor, so I kept them back a little

12 bit longer, just so we could finish the procedure.

13    Q.    And is this something that they had known

14 about prior to you making that decision?

15    A.    We had talked about it earlier in the day.

16    Q.    Okay.  Now, they were going to get to eat

17 lunch at some point in time; is that right?

18    A.    Yes, sir, that's correct.

19    Q.    So the craftsmen went to eat and the rest of

20 the inmates went to eat and it was just you and those six?

21    A.    Yes, sir, that's correct.

22    Q.    You didn't see Michael Rodriguez around the

23 area at that time, did you?

24    A.    No, sir, I didn't.

25    Q.    Okay.  Where were you located during the lunch

1  hour?

2          A.      I was sitting in my office, doing paperwork.

3          Q.      Did one of the inmates come and ask you to --

4  make a request of you?

5          A.      Yes, he did.

6          Q.      Which one was that?

7          A.      Rivas.

8          Q.      And what did he ask you to do?

9          A.      He asked me to come back in the warehouse and

10  identify a motor for me to look at and see if they were

11  supposed to move it or not.

12          Q.      Anything seem suspicious to you at that time?

13          A.      Not at that time.

14          Q.      Did you go with Mr. Rivas back to the

15  warehouse?

16          A.      Yes, I did.

17          Q.      When you went back to the warehouse, where is

18  it they had you go?

19          A.      Basically when I walked to the door I took a

20  little short right and there was a table and the motor was

21  under it and they asked me to look at that motor.

22          Q.      All right.  Let's look at the poster for a

23  minute.  I'll show you State Exhibit 543 again.  If you

24  could, just show the jury where you went through the door

25  and where you went to the motor?

1    A.    I was in my office right here and I went out

2  and through this door right here and the table was in this

3  area right here.

4    Q.    So you just had to go a short distance?

5    A.    Yes, sir.

6    Q.    Now, what inmates did you see near or around

7  the table at that time?

8    A.    Joseph Garcia, Randy Halprin, Larry Harper,

9  and Rivas were all standing in that particular area.

10   Q.    Okay.  Let me show you State Exhibit 516.  Is

11 this the area where that table was located?

12   A.    Yes, sir.

13   Q.    And the table is not there right now; is that

14 right?

15   A.    That's correct.

16   Q.    It would have been in this area?

17   A.    Yes, sir, that's correct.

18   Q.    The door you would have come out would be on

19 the other side of these file cabinets?

20   A.    Yes, sir.

21   Q.    What's around the corner there?

22   A.    As you go around that corner, you would be

23 going toward the electrical room.

24   Q.    Did you see Donald Newbury around?

25   A.    Yes.  He was laying -- taking apart a shelf up

1   to -- further towards to my left.

2          Q.   These shelves here --

3          A.   Yes, sir.

4          Q.   -- in the background?

5          A.   Yes, sir.

6          Q.   And then those other inmates were Garcia,

7   Rivas, Halprin, and who else?

8          A.   Harper.

9          Q.   Harper, were all in the immediate vicinity?

10         A.   Yes, sir.

11         Q.   Did you see the motor they were talking about?

12         A.   Yes, sir, I did.

13         Q.   What did you do at that time?

14         A.   At that time I bent over to get a closer look

15  at it and when I did, all of a sudden I just, you know,

16  lights went out.  I just found myself on the floor when I

17  regained consciousness.

18         Q.   So you were knocked out at that time?

19         A.   Yes, sir, I was.

20         Q.   Where were you hit?

21         A.   On the -- across the ear and the back of the

22  head.

23         Q.   You were hit hard enough to be knocked

24  unconscious?

25         A.   Yes, sir.

1    Q.     Could you feel what type of instrument you

2  were hit with?

3    A.     I could not tell.

4    Q.     Did it cause some damage to your head?

5    A.     Yes, it did.  It almost cut my ear in half.

6    Q.     Your ear was severed badly?

7    A.     Yes, sir, it was.

8    Q.     Did you later have to have stitches to sew it

9  back?

10    A.     Yes, sir, that's correct.

11    Q.     When you came to, what was going on?

12    A.     I was struggling with Rivas and I was trying

13  to get away from him.

14    Q.     And how did Rivas have a hold of you?

15    A.     I was basically laying on his stomach and he

16  had me in a bearhug.

17    Q.     Did you see any of the other inmates around?

18    A.     Yes.  They were all coming towards me, trying

19  to help Rivas.  And I was struggling, you know, with Rivas

20  and then Garcia put a knife to my throat.

21    Q.     Prior to having a knife put to your throat,

22  did you knock any of them off of you?

23    A.     I think -- if I remember correctly, I think I

24  kicked Harper in the face, I believe.  He was bending over,

25  trying to reach in to help Rivas.

1    Q.    And then Garcia put a knife to your throat?

2    A.    That's correct.

3    Q.    What type of knife was this?

4    A.    It was a shank made out of metal with a handle

5  wrapped around with like a cloth handle.

6    Q.    These are some of those homemade weapons that

7  you are always on the lookout for?

8    A.    That's correct.

9    Q.    Can these types of weapons be quite deadly?

10    A.    Excuse me?

11    Q.    Are these type of weapons, can they be quite

12  deadly?

13    A.    Yes, they are.  It was pinpoint razor sharp.

14    Q.    Once you felt that shank up next to your

15  throat, did Garcia say anything to you?

16    A.    Yes, he did.  He said, "We can end it right

17  now or if we end it right now for you, we're going to have

18  to do -- everybody else is going to get the same thing."

19    Q.    Did you take his threats seriously?

20    A.    Yes, I did.

21    Q.    When he said, "We can end it right now" --

22  what was the other part of his threat?

23    A.    He said, "If we finish you off, we will have

24  to do that to everybody else."

25    Q.    Okay.  And what did you take that to mean?

1    A.    I took that that if they kill me, they were

2  going to kill everybody else that walks in that door.

3    Q.    What's the next thing that happened to you?

4    A.    They started removing my clothes and took off

5  my boots, took off my clothes, and stuff, and they tied me

6  up.

7    Q.    Okay.  How did they tie you?

8    A.    They tied me up with my hands in front and

9  they put a gag in my mouth and a pillow case over my head.

10    Q.    What type of gag was this they put in your

11  mouth?

12    A.    It was part of a pillow case with duct tape

13  wrapped around it.

14    Q.    Did they shove it in your mouth pretty deeply?

15    A.    Yes.  They shoved it in pretty deep and they

16  tied it pretty tight, so I couldn't make any noise.

17    Q.    And then they put a pillow case over your

18  head?

19    A.    Yes, sir.

20    Q.    Were you bleeding a lot from your ear?

21    A.    Yes, I was.

22    Q.    After they had you tied and gagged and put the

23  pillow case over you, what did they do then?

24    A.    They carried me to the electric room.

25    Q.    Let me show you State Exhibit 517.  Does this

1    show -- you were just on the other side of this trash can

2    when this happened; is that right?

3          A.      Yes, sir, that's correct.

4          Q.      As you go down this pathway here, does that

5    lead to the electrical room?

6          A.      Yes, sir, it does.

7          Q.      Let me show you 518.  Is this a photograph how

8    -- looking back the opposite way?

9          A.      Yes, sir, it is.

10         Q.      Is the electrical room located right here?

11         A.      It's on the other side of that round thing

12   right there.

13         Q.      So they brought you down this pathway?

14         A.      Yes, sir, they did.

15         Q.      State Exhibit 531.  Is that the door to the

16   electrical room?

17         A.      Yes, sir, it is.

18         Q.      And then 525, is that the view of the

19   electrical room once the door is opened?

20         A.      Yes, sir, that's correct.

21         Q.      About how large is that room?

22         A.      It's probably about a ten by ten.

23         Q.      Okay.  And what type of equipment is in there?

24         A.      Electrical breakers, telephone wires,

25   telephone cables, just basically what, you know, you have

1    like in your house.

2         Q.   Could you just show the jury where the

3    electrical room is located?

4         A.   It's right here.

5         Q.   Where did they place you in the electrical

6    room?

7         A.   They kind of set me against one wall and put

8    me down right there.

9         Q.   Okay.  Now, were you able to see at all with

10   this pillow case over your head?

11        A.   Just a little bit, just barely.  When I looked

12   straight down, I could see just a little bit what was going

13   on.

14        Q.   Out from under the pillow case?

15        A.   Yes, sir.

16        Q.   After they laid you into the room, what did

17   you think was going to happen to you?

18        A.   I didn't know what was going to happen because

19   I had lost all control of everything.

20        Q.   You were completely helpless at that time?

21        A.   I was.

22        Q.   Did any of the inmates threaten you at that

23   point in time?

24        A.   Yes, they did.  Garcia was threatening me

25   really severely.  He was telling me to be quiet and not to

1    try to warn anybody.

2          Q.    After you were laying in there, could you hear

3    what was happening to other employees?

4          A.    Yes, I did.  I heard other employees coming in

5    and struggling with them.

6          Q.    Struggling in that warehouse area?

7          A.    Yes, sir.

8          Q.    After they struggled with them, would they

9    bring them into the electrical room?

10         A.    Yes, they did.

11         Q.    Once they -- could you tell who they were

12   bringing into the electrical room?

13         A.    I couldn't tell.  As far as I could tell, when

14   they came in, I thought they were dead.

15         Q.    Why did you think they were dead?

16         A.    They were not moving at all, just like I was.

17   I wasn't moving at all.  I was scared.

18         Q.    Were they laying these bodies up next to you?

19         A.    Yes.

20         Q.    Did you hear any threats being made to persons

21   in the room?

22         A.    Yes, I did.

23         Q.    What types of threats did you hear?

24         A.    The same basic threats, you know, if you move

25   or make noise, we'll kill you right here.

1   Q.    Did you take those threats seriously?

2   A.    Yes, we did.

3   Q.    How long were you back there in the room
4   hearing these employees being dragged in there?

5   A.    It was quite a while.  I really don't know.  I
6   lost track of time.

7   Q.    Okay.  Were these the craftsmen that were
8   being brought in or did you know who they were at that time?

9   A.    At that time I didn't know who it was.

10  Q.    Okay.  Now, as far as when you were being
11  bound and gagged and brought back, who looked like they were
12  in charge there?

13  A.    Rivas was the one basically barking orders.

14  Q.    Okay.  Did all of them seem to be working as a
15  team?

16  A.    Yes, sir, they did.

17  Q.    Did they all seem to have an -- assigned
18  specific roles?

19  A.    It appeared that each one of them had a
20  specific job and Rivas was the one coordinating everything.

21  Q.    What different things did you see them doing?

22  A.    They were -- they were -- basically looked
23  like they all had jobs to clean up and stuff like that is
24  all I could tell.  They were standing by buckets with mops
25  and stuff like that.

1       Q.      So after you got jumped and assaulted, some of

2  them were actually cleaning up after you were under control?

3       A.      Yeah, that's what I assumed.

4       Q.      Okay.  And you are not sure how long you were

5  back there as workmen were being brought in; is that right?

6       A.      I couldn't tell how long it was.

7       Q.      Could you tell if some actual inmates were

8  brought back there?

9       A.      Yes, we did.  I could tell because they were

10 actually threatening them worse.  You know, they were saying

11 -- they were calling them heros and stuff like that.

12      Q.      Okay.  These were some of the inmates that

13 actually worked in the maintenance department?

14      A.      Yes, that's correct.

15      Q.      Did it sound like some of them were being hit

16 or beat?

17      A.      Yes, they were.

18      Q.      At one point in time were the lights turned

19 out in there?

20      A.      Yes, they were.

21      Q.      And was this towards the end after the last

22 employee was placed in the electrical room?

23      A.      Yes, it was.

24      Q.      After that light was turned out, what happened

25 then?

138

1    A.    One of the craftsmen slid his hands out from

2  the ties that he was tied up with and he started to untie

3  himself.

4    Q.    Who was that?

5    A.    That was Terry Schmidt.

6    Q.    Mr. Schmidt?  And what was his job there?

7    A.    He was a lock tech.

8    Q.    Okay.  One of these persons that works on the

9  locks throughout the prison?

10    A.    That's correct.

11    Q.    Once he got his hands free, what did he do?

12    A.    Well, we all started talking a little bit and

13  we were trying to figure out if somebody had a knife in

14  their hands where we could start cutting people loose.  And

15  one guy that was laying next to me said he thought he had a

16  knife in his pocket.  So I continued to proceed to search

17  for it in his pocket because we were tied up.

18    Q.    Now, were the lights back on at that point in

19  time?

20    A.    Not yet.

21    Q.    Okay.  But there were -- none of these seven

22  inmates were back there then?

23    A.    No, sir, they weren't.

24    Q.    The door was closed?

25    A.    The door was closed.

1    Q.    What's the next thing that happened?

2    A.    At some point in time they -- we started

3  making a little bit too much noise, I guess, and they

4  realized that we were trying to get loose.  And Newbury

5  tried to force himself inside the door.

6    Q.    Prior to Newbury forcing himself in there,

7  were some of you able to get loose?

8    A.    Yes, we did.

9    Q.    Did you have the pillow case taken off your

10  head?

11    A.    Yes, I did.

12    Q.    So now you were free and could see everything?

13    A.    Yes, sir.

14    Q.    How about your hands, were they --

15    A.    My hands were untied already at the time.  My

16  feet were still tied, but my hands were untied.

17    Q.    So y'all were really in the process of getting

18  undone and untied; is that right?

19    A.    Yes, sir, that's correct.

20    Q.    Was the light on at that point in time?

21    A.    Yes, it was.  I think we flipped it on at that

22  time, at that point.

23    Q.    How many people were back there in that room?

24    A.    I think there were about 14 of us in there, I

25  believe.

1    Q.    Okay.  Was it pretty crowded?

2    A.    They were -- basically what they were doing,

3    they were throwing people -- they had some people laying

4    right across my legs like they were stacking like cord wood.

5    Q.    So by the time y'all started getting free --

6    well, was there everyone, except Vernon Janssen and Lou

7    Gips?

8    A.    That's correct.

9    Q.    Those 14 people, then, were back there in the

10    --

11    A.    That's correct.

12    Q.    And their particular assignment is there on

13    the right side; is that right?

14    A.    That's correct.

15    Q.    So you had a couple of officers and craftsmen

16    and a couple of inmates?

17    A.    That's correct.

18    Q.    Let me show you State Exhibit 532.  Does that

19    show the flooring of the electrical room after you were able

20    to get free?

21    A.    Yes, sir, that's correct.

22    Q.    We see various -- looks like tape and ties.

23    Were these the types of ties that you were bound with?

24    A.    Yes, sir.

25    Q.    State Exhibit 535, that's the general middle

1    area of the electrical room?

2        A.    Yes, sir.

3        Q.    Are these large objects here, are these the

4    gags that were put in your mouths?

5        A.    Yes, sir, that's correct.

6        Q.    We also see pillow cases, things like that?

7        A.    Yes, sir.

8        Q.    This yellow object, what is that?

9        A.    There's probably some wire there that we were

10   trying to tie the door up with that we tore from the conduit

11   after we shut some breakers off and the ties, they were

12   using those tie straps to bind some of our hands.

13       Q.    Okay.  Again, in the corner here, is this some

14   blood, bloody cloth, as well as one of the gags?

15       A.    Yes, sir.

16       Q.    Let me show you 537.  Is that -- does that

17   show a water cooler that was back there?

18       A.    Yes, sir.

19       Q.    Had y'all placed that back there?

20       A.    I don't know how that got there, but it was

21   there whenever we were put in there.

22       Q.    And this is some blood on a -- some type of

23   pillow case?

24       A.    Yes, sir.

25       Q.    And then here's another one of the gags?

1    A.    Yes, sir.

2    Q.    Now that Mr. Schmidt had gotten free, your

3  hands were undone at this point in time.  Some of the other

4  hostages, did they have their hands free?

5    A.    Yes, they did.

6    Q.    Was Mr. Schmidt located near that door?

7    A.    Yes, he was.

8    Q.    You said you must have made some noise because

9  that's when Mr. Newbury tried to get in?

10    A.    Yes, he did.

11    Q.    From your vantage point, could you see who was

12  on the other side of the door when it was forced open?

13    A.    I saw Rodriguez and Rivas and Newbury.

14  Newbury was trying to force his arm inside the door.

15    Q.    Did he get inside the door?

16    A.    He shoved up to his shoulder and he was waving

17  a shank.  He was trying to stab anybody by the door so they

18  could turn the door loose.

19    Q.    So he got his arm inside there?

20    A.    Yes, sir, he did.

21    Q.    What prevented him from getting any further?

22    A.    Two offenders and Terry Schmidt were pushing

23  against the door to hold it closed.

24    Q.    So when you say the two offenders, is that the

25  two hostage inmates?

143

1    A.    Yes, sir, that's correct.

2    Q.    They pushed the door closed?

3    A.    Yes, sir, they did.

4    Q.    Along with Mr. Schmidt?

5    A.    Along with Mr. Schmidt.  They were all three

6  pushing on that door.

7    Q.    Did Mr. Newbury get caught inside that door?

8    A.    Yes, he did.  His shoulder was wedged in there

9  and they were holding his shoulder in there.

10    Q.    But his arm was inside and he had a shank?

11    A.    Yes, sir.

12    Q.    What did the shank look like?

13    A.    It was a long metal object and he was just

14  waving it, you know, at anybody by the door, trying to see

15  if he could stab somebody by the door.

16    Q.    Was he able to stab anyone at that time?

17    A.    No, he didn't.

18    Q.    That was Mr. Newbury?

19    A.    Yes, sir.

20    Q.    You also saw Rodriguez and Rivas?

21    A.    Standing by the door.

22    Q.    Was that the first time that you had seen

23  Rodriguez?

24    A.    That's the first time.

25    Q.    Okay.  How was Mr. Newbury -- how did he get

1    himself out from that wedged-in spot?

2         A.     They went and got some pry bars and pried the

3    door open where he could get his shoulder out.

4         Q.     Rivas and Rodriguez and the others?

5         A.     I think it was Halprin and Harper, I believe.

6         Q.     Okay.  So they pried the door open and got him

7    out?

8         A.     Right.

9         Q.     After he got out from the door, was the door

10   shut again?

11        A.     The door was shut again and they tried to weld

12   it shut, I think.

13        Q.     Were y'all pressing up against the door to

14   prevent them from coming in?

15        A.     Yes, we did.  And we also tried to tie it shut

16   with some of the material we had inside the room.

17        Q.     What did you think was going to happen if they

18   made it in that room?

19        A.     We thought they were going to kill us all.

20        Q.     Did you try to fashion some weapons in the

21   room?

22        A.     Yes, we did.  We tore some conduit off the

23   wall and there was some nails there on the floor and we put

24   it in some pillow cases for something that we could hit

25   with.

1      Q.    Okay.  You said that you heard some other

2 activity going on outside the door?

3      A.    Yes, we did.  It sounded like they were

4 welding on the door or trying to cut the door open or cut

5 the doorknob off or whatever it was.

6      Q.    Everyone was in a pretty excited --

7      A.    Yes.

8      Q.    -- condition at that point?

9      A.    Yes, sir, they were.  Everybody was pretty

10 well agitated.

11      Q.    State Exhibit 534, does that show the inside

12 of the door?

13      A.    Yes, sir, it is.

14      Q.    Were you trying to tie the door shut?

15      A.    Yes, sir, we were.

16      Q.    Let me show you State Exhibit 533.  What do we

17 see there?

18      A.    That's the fire alarm panel.  We tried to set

19 it off to bring attention to us where somebody would come

20 and get us out of there.

21      Q.    Okay.  After a while could you hear any more

22 activity outside the door?

23      A.    No.  It just quieted down like it all went

24 away.

25      Q.    How long were you in there before some other

1    prison officials arrived?

2    A.    I estimate probably about 15, 20 minutes.

3    Q.    Okay.  Was one of the guards back there, was

4    he suffering from some injuries?

5    A.    Yes, he was.  They handcuffed him with his own

6    handcuffs and they didn't use a lock and they forced the

7    handcuffs down where they were real tight on his hands.

8    Q.    Was that Randy Albert?

9    A.    Randy Albert, yes, that's correct.

10    Q.    You didn't have a key to undo those cuffs?

11    A.    No, we didn't.

12    Q.    But the cuffs locked that hard on his hands.

13    What did that do to his hands?

14    A.    His hands were swelling and turning blue.

15    Q.    Was anything being done to relieve them?

16    A.    They were trying to put some cold water from

17    that water can on his hands, trying to get the swelling to

18    slow down a little bit.

19    Q.    Was he in a lot of pain at that time?

20    A.    He was in a lot of pain, yes, he was.

21    Q.    How about your injuries, the ear and the blow

22    to your head?  How were you feeling?

23    A.    I was real dizzy and somewhat confused and

24    really upset, you know, that that happened.

25    Q.    Did you see any other physical injuries on the

1    other hostages?

2         A.      Everybody had, basically had cuts and bruises

3    and different things, you know.

4         Q.      How were you finally removed from that room?

5         A.      The -- a team came in and they basically

6    unlocked the door and escorted us out one by one and until

7    we were identified.   And then we were taken to a different

8    area.

9         Q.      Okay.   Were your wounds treated then?

10        A.      Yes, we were.

11        Q.      What type of treatment did you have for your

12   wounds?

13        A.      They did some triage at the hospital there at

14   the prison and they shipped us to Otto Kaiser.

15        Q.      Now, you said your ear was cut pretty badly?

16        A.      Yes, sir.   It was basically severed in half.

17   It was just hanging there.

18        Q.      Did they sew it back on?

19        A.      Yes, sir, they did.

20        Q.      All right.   Have you suffered some damage or

21   some illness from these injuries?

22        A.      Yes, I have.

23        Q.      What type of injuries are those?

24        A.      Basically postconcussion syndrome and some

25   numbness in my hands and legs after a while and dizziness,

1    constant dizziness and headaches.

2         Q.    Okay.  Is that from the blow you received on

3    your head?

4         A.    Yes, sir.

5         Q.    Have you been under a doctor's care?

6         A.    Yes, I am.

7         Q.    Now, since that time you've quit your work at

8    the prison; is that right?

9         A.    That's correct.

10        Q.    When did you do that?

11        A.    I think it was a couple of months afterwards,

12   I believe.

13        Q.    Did you try to work in the private sector

14   after that?

15        A.    Yes, I did.  I went to work as a tractor

16   salesman.  And I worked for a while and after a while my

17   driving got to be really bad and erratic and I was getting

18   dizzy all the time, so I had to quit.

19        Q.    Would you actually have to pull off the side

20   of the road?

21        A.    Yes, I did.

22        Q.    And this, again, is the dizziness problems?

23        A.    Yes, sir.

24        Q.    You still undergoing those problems?

25        A.    Yes, sir, I am.

1    Q.    Okay.  Let me show you State Exhibit 545.  Is

2  that a photograph of your ear, the left ear, where it was

3  damaged?

4    A.    Yes, sir, it is.

5    Q.    You said you saw some shanks that day.  Let me

6  show you a couple of photographs.  No. 547, does that look

7  to be one of the types of shanks that was used?

8    A.    Yes, sir, that looks something like them.

9    Q.    No. 548, what are those objects?

10    A.    That looks just like some tire straps that we

11  had.  Metal banding, I think, is what it's called.

12    Q.    No. 549.

13    A.    That looks like a piece of rebar or some more

14  of that tie stuff.

15    Q.    And then 550?

16    A.    It's a piece of wire sharpened to a point with

17  like a rubber handle, electrical tape handle.

18    Q.    Now, State Exhibit 523, what area of the

19  maintenance department is that?

20    A.    That's the -- that's looking -- the

21  maintenance officer's window, supervisor's window, is to

22  your left and that's looking basically out our window, my

23  office window, out to the shop.

24    Q.    And 524, is that the truck that is used for

25  deliveries?

150

```
 1          A.     Yes, sir, that's correct.

 2          Q.     When had that been brought in?

 3          A.     That was brought in right before lunch.  I was

 4   supposed to go to town and pick up some materials.

 5          Q.     Okay.  And was that truck taken during the

 6   escape?

 7          A.     Yes, it was.

 8          Q.     Let me show you State Exhibit 529.  Is that

 9   the entrance to the maintenance department?

10          A.     Yes, sir, it is.

11          Q.     That green vehicle there, what is that?

12          A.     We call it a Gator.  It's what we travel on

13   inside the unit.

14          Q.     Okay.  If you were going to go make some

15   repairs and need to drive a vehicle, that's what you would

16   drive in?

17          A.     Yes, sir, that's correct.

18          Q.     Up until the 13th of December, had you had any

19   major problems of violence with any of these inmates?

20          A.     No, I hadn't.

21          Q.     Were any of your personal items taken?

22          A.     Yes.  They took basically everything, all my

23   keys, my wallet, all my credit cards that were in there, and

24   all that stuff was taken from me.

25          Q.     Let me show you State Exhibit 985.  Do you
```

151

1  recognize this wallet?

2      A.    Yes, I do.

3      Q.    Is that your wallet?

4      A.    Yes, it is.

5      Q.    Is this your drivers license inside?

6      A.    Yes, sir, it is.

7      Q.    Along with credit cards?

8      A.    Yes, that's correct.

9          MR. SHOOK:  Your Honor, at this time we

10  offer State Exhibit 985.

11          MS. BUSBEE:  No objection, Your Honor.

12          THE COURT:  No. 985 shall be admitted.

13          MR. SHOOK:  I believe it was previously

14  admitted for record purposes from the objects found at the

15  RV.  Your Honor, we'll pass the witness.

16              CROSS-EXAMINATION

17  BY MS. BUSBEE:

18      Q.    I have just a few questions.  Tell me if I'm

19  pronouncing your name wrong, because I've read it, but this

20  is the first time I've heard it.  Is it Moczygemba?

21      A.    Moczygemba.

22      Q.    I just have a few questions.  It sounds to me

23  like you saw everybody except Mr. Murphy when this escape

24  occurred?

25      A.    That's correct.

1     Q.    Okay.  Now, they have filed some felony

2  charges in Karnes County alleging that you were kidnapped

3  and Mr. Murphy is indicted for that offense as well, isn't

4  he?  Did you testify in front of the Grand Jury?

5     A.    I didn't.

6     Q.    Now, just to clear up a couple of things.

7  Inmates are required to have jobs, unless they are in this

8  unit that's called ad seg; isn't that correct?

9     A.    That's correct.

10     Q.    Could you explain that to the jury, what that

11  is?

12     A.    Ad seg is called administrative segregation.

13  When you break a certain amount of rules and regulations in

14  the prison, if you can't follow the rules, you end up there.

15  And there is certain line classes.  As you go in from A pod,

16  to B pod, to C pod, as you progress your way up to F pod,

17  which are the worst of the worst.

18     Q.    Okay.  So except for those people in ad seg,

19  everyone else is required to work?

20     A.    That's correct.

21     Q.    All right.  Now, I don't remember you saying

22  this to the jury, but didn't Rivas put on your clothes?

23     A.    Yes, he did.

24     Q.    And he walked off with your clothes and your

25  billfold and everything else?

1         A.      I think so.

2                   MS. BUSBEE:  That's all I have, Your

3    Honor.

4                   MR. SHOOK:  We have no further questions.

5    May this witness be excused?

6                   MS. BUSBEE:  I have no objection.

7                   THE COURT:  He may.

8                        [End of Volume]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF TEXAS          *

2  COUNTY OF DALLAS      *

3     I, NANCY BREWER, Official Court Reporter for the 283rd

4  Judicial District Court, do hereby certify that the above

5  and foregoing constitutes a true and correct transcription

6  of all portions of evidence and other proceedings requested

7  in writing by counsel for the parties to be included in this

8  volume of the Reporter's Record, in the above-styled and

9  numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11     WITNESS MY OFFICIAL HAND on this the ____ day of

12  _____ March , 2005.

13

14

15         _____

16         NANCY BREWER, CSR, NO. 5759
           Expiration Date:  12-31-04

17         Official Reporter, 283rd JDC
           Frank Crowley Crts. Bldg. LB33

18         133 No. Industrial Blvd.
           Dallas, TX 75207

19         (214)653-5863

20

21

22

23

24

25

REPORTER'S RECORD

74851

VOLUME 46 OF ___6___ VOLUMES

TRIAL COURT CAUSE NO. F01-00328-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| PATRICK HENRY MURPHY, JR. | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JURY TRIAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

MAR 9 - 2004

Troy C. Bennett, Jr., Clerk

On the 17th day of November, 2003, part two, the
following proceedings came on to be heard in the
above-entitled and numbered cause before the Honorable
Vickers L. Cunningham, Sr., Judge Presiding, held in Dallas,
Dallas County, Texas.

Proceedings reported by machine shorthand.

ORIGINAL

1                          A P P E A R A N C E S

2      APPEARING FOR THE STATE

3      Mr. Toby Shook
       SBOT NO. 18293250
4      And
       Mr. Bill Wirskye
5      SBOT NO. 00788696
       Assistant District Attorneys
6      133 No. Industrial Blvd.
       Dallas, Texas 75207
7      Phone:  214/653-3600

8

       APPEARING FOR THE DEFENDANT
9

       Ms. Brook Busbee
10     Attorney at Law
       SBOT:  03488000
11     703 McKinney Ave. Ste. 312
       Dallas, TX 75202
12     214/754-9090

13     Mr. Juan Sanchez
       Attorney at Law
14     SBOT:  00791599
       5630 Yale Blvd.
15     Dallas, TX 75206
       214/365-0700

16

17

18
19

20

21

22

23

24

25

<u>WITNESS INDEX</u>

| WITNESS | DIRECT | VD | CROSS | VOL. |
|---------|--------|-----|-------|------|
| Mark Burgess | 5 | | 20 | 46 |
| Martin Gilley | 22 | | | 46 |
| Vernon Janssen | 32 | | | 46 |
| Rita Samaniego | 45,51,60 | 48 | 57 | 46 |
| John Kemp | 61,82 | | 81,83 | 46 |
| Larry Jaramillo | 85 | | | 46 |
| Kurt Bonsal | 94,99 | | 98 | 46 |

EXHIBIT INDEX

| EXHIBIT | IDENT. | OFFER | ADMIT | VOL. |
|---------|--------|-------|-------|------|
| ST.343-A | PURSE | 80 | 81 | 46 |
| ST.344 | CONTENTS, TORN PICTURES | 79 | 79 | 46 |
| ST.345 | PKG. INSURANCE PAPERS | 80 | 80 | 46 |
| ST.551 | PHOTO, PRISON | 33 | 33 | 46 |
| ST.552 | PHOTO, PRISON | 33 | 33 | 46 |
| ST.553 | PHOTO, PRISON | 33 | 33 | 46 |
| ST.554 | PHOTO, PRISON | 33 | 33 | 46 |
| ST.555 | PHOTO, PRISON | 33 | 33 | 46 |
| ST.556 | PHOTO, PRISON | 33 | 33 | 46 |
| ST.557 | PHOTO, PRISON | 33 | 33 | 46 |
| ST.558 | PHOTO, PRISON | 33 | 33 | 46 |
| ST.559 | PHOTO, PRISON | 33 | 33 | 46 |
| ST.560 | PHOTO, PRISON | 33 | 33 | 46 |
| ST.561 | PHOTO, PRISON | 33 | 33 | 46 |
| ST.562 | PHOTO, PRISON | 33 | 33 | 46 |
| ST.563 | PHOTO, PRISON | 33 | 33 | 46 |
| ST.564 | PHOTO, PRISON | 33 | 33 | 46 |
| ST.565 | PHOTO, PRISON | 33 | 33 | 46 |
| ST.566 | PHOTO, PRISON | 33 | 33 | 46 |
| ST.567 | PHOTO, PRISON | 33 | 33 | 46 |
| ST.607 | PHOTO, AUTO ZONE | 63 | 63 | 46 |
| ST.608 | PHOTO, AUTO ZONE | 63 | 63 | 46 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.609 | PHOTO,AUTO ZONE | 63 | 63 | 46 |
| 2 | ST.610 | PHOTO,AUTO ZONE | 63 | 63 | 46 |
| 3 | ST.611 | PHOTO,AUTO ZONE | 63 | 63 | 46 |
| 4 | ST.612 | PHOTO | 83 | 83 | 46 |
| 5 | ST.986 | WALLET | 80 | 80(ALL) | 46 |
| 6 | ST.1010 | MURPHY'S LETTER | 47 | 51 | 46 |
| 7 | ST.1014 | PHOTO | 55 | 55 | 46 |
| 8 | ST.1015 | PHOTO | 87 | 87 | 46 |
| 9 | ST.1016 | PHOTO | 87 | 87 | 46 |
| 10 | ST.1017 | PHOTO | 87 | 87 | 46 |
| 11 | ST.1018 | PHOTO | 87 | 87 | 46 |
| 12 | ST.1019 | PHOTO | 87 | 87 | 46 |
| 13 | ST.1020 | PHOTO | 87 | 87 | 46 |
| 14 | ST.1021 | PHOTO | 87 | 87 | 46 |
| 15 | ST.1022 | PHOTO | 87 | 87 | 46 |
| 16 | ST.1023 | PHOTO | 87 | 87 | 46 |
| 17 | ST.1030 | EARPIECE | 92 | 92 | 46 |
| 18 | ST.1031 | EARPIECE | 92 | 92 | 46 |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

1           P R O C E E D I N G S

2           MR. WIRSKYE:  State will call Mark

3    Burgess.

4                    MARK BURGESS,

5    having been duly sworn, was examined and testified as

6    follows:

7                 DIRECT EXAMINATION

8    BY MR. WIRSKYE:

9           Q.    Sir, can you tell us your full name?

10          A.    Mark Burgess.

11          Q.    And how old a man are you?

12          A.    Forty-five.

13          Q.    And where do you currently live?

14          A.    I live in Karnes County, Texas.

15          Q.    You currently employed?

16          A.    No, sir, I'm not.

17          Q.    Back in December of 2000, were you employed?

18          A.    Yes, sir, I was.

19          Q.    And where were you employed then?

20          A.    At the John B. Connally Unit, Texas Department

21   of Corrections.

22          Q.    What was your job at the Connally Unit?

23          A.    I was maintenance supervisor, carpenter,

24   painter, lock tech.

25          Q.    As a part of your job, did you supervise

1     inmates?

2          A.     Yes, sir.

3          Q.     Looking at the exhibit behind you with the

4     seven photographs, did you have contact with each of those

5     seven individuals?

6          A.     Yes, sir, I did.

7          Q.     Were you directly responsible for supervising

8     any of those individuals?

9          A.     Yes, sir, I was directly responsible for

10    Patrick Murphy.

11         Q.     Looking around the courtroom, do you see

12    Mr. Murphy in the court today?

13         A.     Yes.  Offender Murphy is at the end of the

14    table right there.

15         Q.     Can you tell us what he's wearing?

16         A.     Blue shirt, gold tie, yellow gold tie.

17              MR. WIRSKYE:  Let the record reflect this

18    witness has identified the defendant.

19         Q.     (By Mr. Wirskye)  Prior to December of 2000,

20    how long had you worked in the Connally Unit?

21         A.     A couple of years, approximately.

22         Q.     Just to give the jury an idea, what was kind

23    of a normal day like for you?

24         A.     I had various jobs from shopwork, repairing

25    furniture, building boxes, you know, storage boxes, things

1  like that, to building maintenance, repairing broken

2  windows, walls, cracks in walls, concrete, just anything

3  with carpentry work and then painting sheetrock, fixing

4  doors, general repair in the carpentry.

5          Q.     During the time you worked at the Connally

6  Unit, did Patrick Murphy work for you?

7          A.     Yes, sir, he did.

8          Q.     And he would do the same types of things at

9  your direction?

10         A.     Yes, sir.

11         Q.     How did y'all get along?

12         A.     Fair.

13         Q.     Did you ever have any major problems or

14  anything like that?

15         A.     No, sir, not -- not anything to speak of with

16  Murphy, no, sir.

17         Q.     Did you trust Mr. Murphy?

18         A.     No, sir, I didn't.

19         Q.     Why not?

20         A.     He was -- when I first got there, it was told

21  to me to watch Murphy in case he --

22                MS. BUSBEE:  I'm going to object to

23  hearsay.

24                THE COURT:  Sustained.

25         Q.     (By Mr. Wirskye)  Mr. Burgess, we can't go

1   into what other people told you.

2       A.    Yes, sir.  I knew that a lot of contraband

3   flowed through my shop and it was always that Mr. Murphy

4   knew what was going on or had something to do with it

5   directly.

6       Q.    By contraband, would you include shanks or

7   homemade knives?

8       A.    Various things from radio boxes to -- that

9   could have been knives or food, a lot of different things.

10      Q.    Nevertheless, you never personally caught him

11  with any of these items?

12      A.    No, sir.

13      Q.    Directing your attention to December 13th of

14  2000, do you remember that day?

15      A.    Sir?

16      Q.    December 13 of 2000, do you remember that day?

17      A.    Yes, sir, I do.

18      Q.    What time did you get to work that day?

19      A.    Regular time, 7:30 or 7:00.

20      Q.    What did you do when you got to work?

21      A.    It was a cold day that day.  I wasn't going to

22  bring any inmates out to work, just offender Murphy because

23  he had some shop items to get done and I was going to catch

24  up on paperwork.

25      Q.    And how long did that take you?

A.      It was going to take me most of the day to get everything in order.

Q.      At some point did you go to lunch that day?

A.      Sir?

Q.      At some point did you go to lunch that day?

A.      Yes, sir.

Q.      Up until that time until you went to lunch, what had you and Mr. Murphy been doing?

A.      Mr. Murphy was working on a -- offender Murphy was working on a desk, I believe it was, and a couple of other little small jobs like that.  And I had been doing paperwork.  I escorted some free world contractors onto the unit.  Just various things, things I had to do and then projects that Mr. Moczygemba had asked me to get done for him, you know, help him out.

Q.      When you went to lunch, what happened to Mr. Murphy?

A.      He stayed with the work crew that was going to work on the floor.  Usually he was turned in for lunch, but that day he stayed back to help disassemble shelves because they were going to seal the floor in the warehouse.

Q.      And that was something that inmates knew about beforehand?

A.      Yes, sir.

Q.      How long did you stay at lunch?

1   A.   One hour -- well, we have a one-hour

2   lunchtime, I stayed gone about 30 minutes.

3        Q.   What happened when you got back from lunch?

4        A.   I walked in the door and I was -- I noticed

5   some inmates there.  There was offender Halprin, offender

6   Rivas, and offender Murphy walked in through the shop door.

7        Q.   Okay.  And what happened when you saw them?

8        A.   Well, Halprin and Rivas, nothing.  I had

9   forgotten Murphy was going to stay back.  And I said, "What

10  are you doing?"  And he said, "I stayed back to help."  And

11  I was okay.  And that's when offender Rivas told me that

12  Moczygemba was in the back.  Mr. Moczygemba was in the back

13  and wanted to see me.

14       Q.   Did that arouse your suspicion in any way?

15       A.   No, sir, not really.

16       Q.   Once Rivas told you that, what happened next?

17       A.   I walked into the shop area or into the

18  warehouse area.  And that's when I was struck in the back of

19  the head -- well, then offender Halprin tried to get my

20  attention to something on the floor, a box that had an

21  electric motor in it.  And he said, "Here, check this motor

22  out."  I'm a carpenter and I don't have anything to do with

23  motors and I kind of blew it off.  And I looked around and

24  noticed the lights were out and that's when I realized

25  something was wrong and that's when I was struck in the back

1  of the head.

2       Q.     What happened once you were struck?

3       A.     I was unconscious and I woke up and I was on

4  top of offender Rivas.

5       Q.     Did you have any idea who had struck you?

6       A.     No, sir.

7       Q.     Which inmates were around when you were

8  struck?

9       A.     For sure that I know, it was offender Rivas,

10  offender Newbury, and offender Halprin.

11       Q.     Where had Newbury come from?

12       A.     He was in the shop -- I mean, in the warehouse

13  already.  He was not in the office area when I walked in, so

14  he must have been in hiding, waiting.

15       Q.     Do you know what you were struck with?

16       A.     No, sir.

17       Q.     Did you lose consciousness?

18       A.     Yes, sir.

19       Q.     How long were you out?

20       A.     I have no idea.

21       Q.     What happened when you came to?

22       A.     I was -- I believe I was struggling with Rivas

23  and I was thinking, you know, this isn't normal.  I usually

24  don't -- you know, why am I on top of Rivas like this?  And

25  that's when I felt points in my back and Rivas, you know,

1   told me to stop.  He said, "Do you know what that is?"  And

2   immediately I realized that those were knives, shanks.  And

3   he goes, "Do you know what that is?"  And I said, "Yes, I

4   do."  And he goes, "Okay.  We got you."  And I said, "Yes,

5   you do."

6          Q.    And at that point did you stop resisting?

7          A.    Yes, sir.

8          Q.    What happened next?

9          A.    That's when Rivas told me, he says, "We're

10   going home and you can go home, too, or not.  It's up to

11   you."  And I said, "Okay."

12          Q.    Did you think they were serious at this time?

13          A.    Yes, yes, definitely serious.  And that's when

14   Rivas gave the order -- they turned me over.  Offender

15   Newbury stuck a knife right here (witness pointing) and had

16   a knee over the top of me like this and that's when Halprin

17   says, "Okay, take his clothes."  And they started striping

18   me.  They took me down to my underwear.

19          Q.    And once they got your clothes off, what

20   happened?

21          A.    That's when they started binding me.  They set

22   me up, jerked my arms behind my back forcibly.  They duct

23   taped from right below my shoulders to my elbows and on my

24   wrists they put these zipties that we used in electrical

25   work.

1    Q.    Did you get injured during this?

2    A.    Yes, sir, I did.  It caused nerve -- pinching

3 of the nerve in the joints in both arms.  It caused carpal

4 tunnel syndrome in my wrist.  I've had three surgeries.  And

5 being struck on the back of the head has given me vertigo,

6 fluid on my inner ear.

7    Q.    When all this is going on, you are out in the

8 warehouse; is that right?

9    A.    Yes, sir.

10   Q.    What inmates are around?

11   A.    The ones -- those that I saw, Rivas, Newbury,

12 and Halprin.

13   Q.    Was Patrick Murphy anywhere there?

14   A.    There was movement going around, but I never

15 saw any other faces at that time.

16   Q.    Once they got your hands tied behind your

17 back, what happened?

18   A.    They had me blindfolded with duct tape around

19 my head.  They put a gag in my mouth.  And then Halprin made

20 a statement that, he says, "You always thought I liked you,

21 but I hate your fucking ass.  I would just as soon kill you

22 right now."  And they said, okay, get him back to the

23 warehouse -- or get him back to the room.

24   Q.    Did you believe Halprin when he told you that?

25   A.    Yes, sir.

```
1      Q.      Thought he was serious?

2      A.      Most definitely, yes.

3      Q.      What happened next?

4      A.      They picked me up and they carried me back to

5  the electrical room and they threw me in and --

6      Q.      Could you see at this point?

7      A.      Not at this point -- well, I didn't want to

8  see.  I followed my training.  When you are -- hostage

9  training tells you to don't look directly at anybody, keep

10 your head down, don't talk, follow orders, you know, don't

11 cause any agitation amongst the captors.

12     Q.      So once you get back to the electrical room,

13 what happens?

14     A.      Then I could start to see.  I could see out of

15 one eye, right here.  And that's when offender Garcia, he

16 was watching the inmates or the captives in the electrical

17 room.  And I'm bound, my legs are bound.  Just like a

18 newborn baby, I can't move.

19              There are four other bodies in the room.

20 They were all laying down and I thought they were dead.

21 There was blood on the floor, no movement.  And I thought,

22 well, this is where I die.  And when they threw me down,

23 Garcia puts a knife in my ear, real pointed shank.  I could

24 feel it biting in right here.  And he tells me that, "That's

25 one pound of pressure."  And he said, "That's one pound of
```

1   pressure.  Two more pounds and it's in your brain and you

2   are dead."  He says, "If anything goes wrong, we'll both get

3   the needle."  He says, "You'll get yours right now and I'll

4   get mine in five years."  And he said, "The year 2050

5   doesn't come soon enough."  And I took that to mean that was

6   his parole date or release date.

7        Q.     Did you believe him?

8        A.     Yes, sir, I did.

9        Q.     Were you scared?

10       A.     Yes, sir, I was.

11       Q.     Did you resist in any way?

12       A.     No, sir, I did not.

13       Q.     Once Garcia told you that, what happened next?

14       A.     They laid me up against the wall.  And I was

15   on the floor, kind of in a fetal position.  And then they --

16   everybody else went forward back to the spot to where they

17   took me down and Garcia stayed with us as a watchout for the

18   captives.

19       Q.     Were other hostages brought back to the

20   electrical room?

21       A.     Yes, sir.  One by one they would bring by ones

22   or twos they would bring people in and throw them on the

23   floor and Garcia would go through the same, one pound of

24   pressure, two more pounds and it's in your brain and you're

25   dead.

1    And he did that over and over.  And

2    finally the room was full and Garcia made the statement, "We

3    don't have any more room."  It was people just stacked up

4    like cord wood.  So they had to reposition us and so we

5    could all fit.

6         Q.    Once they repositioned you, what happened?

7         A.    I was sitting with my back against Officer

8    Marroquin.  And I could see then.  I could see the door.

9    The door was about right here, you know, this angle.  And I

10   could see people through this eye.  And then they finally

11   got everyone and they made the statement, "Okay, that's it."

12                 And then Halprin -- and Marroquin

13   complaining about his hands, you know, and, "I can't feel my

14   hands," he says.  I mean, all of us our hands were swollen

15   and numb and --

16        Q.    Once he makes that comment, what happened?

17        A.    Sir?

18        Q.    Once he makes that comment, Officer Marroquin

19   --

20        A.    Halprin said something to the effect, "You

21   know, when I was on the chain bus coming here, they kept me

22   in handcuffs the whole time and my hands hurt, too, so fuck

23   you."  And walked out and just, you know, had no compassion

24   whatsoever.

25        Q.    At some point did that electrical room become

1    full of hostages?

2         A.    Yes, sir.  It was 13 of us in a small room.

3         Q.    At some point did the escapees quit coming to

4    the door and things go quiet?

5         A.    Yes, sir.  In fact, that's when Garcia left

6    and they all went out and they turned out the light and shut

7    the door.

8         Q.    Then what happened?

9         A.    As soon as the door was shut and we knew that

10   we were alone, somebody said, "I've got a pocketknife,"

11   because a couple of people still had their pants on.  They

12   didn't need 13 pairs of pants.  They just took what they

13   needed.  And so I remember Patrick Moczygemba sat up.  His

14   hands were tied in front of him and he got to the

15   pocketknife and he cut -- was cutting a couple of people

16   loose.  And he got to me and cut me loose.

17                   And people were really, you know, frantic

18   at this time.  And they were telling him, cut me loose, get

19   me out of this, and the inmates heard us.  I know it was

20   Newbury kind of pushed the door open just a crack and he saw

21   that people were up, you know, I was -- by then I wasn't cut

22   loose completely then.  In fact, they were working on me.

23        Q.    At that point how many people were cut loose?

24        A.    Just one, one or two were.  I know Terry

25   Schmidt, the lock tech, was cut loose completely.  And he

1   was closest to the door.  And when Newbury stuck his head in

2   and says, "They're getting loose," well, Schmidt stood up

3   and his legs were still tied, but his hands were free and he

4   closed the door, pushed the door closed and that's when the

5   inmates tried to get back in.

6          Q.     And how did they try to get back in?

7          A.     They had pry bars, crow bars, hammers, they

8   were trying to beat the door down.  Finally, Newbury got

9   himself halfway in the door and there were two inmates that

10  were captives with us that had their backs against the

11  electrical box, the transformer box.  And it was enough

12  space for them to just straighten out their legs and they

13  wedged the door closed with their legs.

14          And so Newbury was caught.  And he had a

15  large shank in his hand and he's (demonstrating) slashing,

16  he's trying to cut anything that he can get a hold of.  And

17  he's cutting.  And finally he goes, "I'm stuck."  And they

18  had him pinned in pretty good.  But he's still trying to

19  cut.  He's trying to cut Terry Schmidt.  He's trying to stab

20  these inmates in the legs.

21         Q.     Was he ever able to --

22         A.     No.

23         Q.     -- stab anyone?

24         A.     And I saw Halprin.  He was outside with the

25  long pry bar and he's trying to pry the top of the door

```
 1    open.  And then I could hear somebody hitting it with a
 2    hammer.  And I saw the hammer swing.  And that's when all of
 3    a sudden Halprin just finally forced himself out and the
 4    door closed again.  And Schmidt told them, he says, "Just
 5    get out of here."  He said, "We can't leave and you can't
 6    get in."  You know, "So do what you are going to do and just
 7    go."
 8             Q.    Was there any response when Schmidt told them
 9    that?
10             A.    No.
11             Q.    Had they gotten back in the room, what would
12    have happened?
13             A.    People would have died.
14             Q.    Why do you say that?
15             A.    They were -- they were coming in ready to
16    kill.
17             Q.    At some point did you and the other hostages
18    make an attempt to arm yourselves?
19             A.    Yes, sir.  As soon as the door closed and we
20    all started to get loose, people started tearing down the
21    electrical conduit.  I found a bag of nails behind the
22    transformer and they had put pillow cases over our head
23    before they left.  And we had all taken the pillow cases off
24    and they took the nails and put a handful of nails and made
25    a knot and so that was a weapon.  And people had pieces of
```

1    tubing wire, I mean, metal tubing for a weapon.  And then

2    Allen Camber started trying to make the fire alarm go off.

3          Q.    While this is going on, do you hear anything

4    outside the door?

5          A.    In the carpentry -- well, outside the door it

6    was just -- you could hear those guys and I could hear the

7    saws in the carpentry shop, the table saws, and things like

8    that.

9          Q.    When you heard the saw in the carpentry shop,

10   what did that tell you?

11         A.    I was wondering what the heck was Murphy

12   doing, because he was the carpenter and he's got to be

13   building something.  They were cutting a lot of wood.

14         Q.    So you assumed it was Murphy that was using

15   the saw?

16         A.    I assumed that, yes.

17         Q.    And that was the part of the shop where he

18   worked with you?

19         A.    Right.

20         Q.    How long were y'all in there total before you

21   were rescued?

22         A.    Approximately three hours.

23         Q.    And how did it come about that they were able

24   to rescue you?

25         A.    After the inmates left and the -- Mr. Gips, I

1  think, got loose from the tower and he called the Warden's

2  Office and then they sent somebody, a lieutenant back to the

3  maintenance shop.  And he was outside the door and we were

4  locked -- we were locked inside.  They had dismantled the

5  lock on the door and disabled it.  We couldn't open it at

6  that time.

7        Q.     Once you got out, did they give you any

8  medical treatment?

9        A.     Yes.  They sent us to the unit infirmary, sort

10 of a triage, to find out the worse cases, you know, people

11 with lacerations and cuts, everything, and they sent those

12 on to the hospital in an ambulance.  And then they would

13 ship us out as needed and in worse case scenario, I was

14 about the middle, because I had no visible signs of injury.

15       Q.     Describe your injuries for us.

16       A.     When they hit me in the back of the head, it

17 caused fluid in the ear.  I lose my balance.  I can't work.

18 I get nausea.  I have to take medication every day for the

19 rest of my life now.  Then the -- when they jacked my -- or

20 when they pulled my arms behind my back, it forced the

21 nerves in my elbow and pinched them, caused nerve damage.

22 And they had to surgically take the nerve out and set it to

23 the side.

24             My carpal tunnel, my hands go numb now.

25 If I lay my hands down like this for any length of time, my

1   arms and hands go numb.  Like I said, it's just -- I

2   received a permanent disability out of this.

3        Q.    Before this happened, you were, I guess, by

4   profession a carpenter?

5        A.    Yes, sir.

6        Q.    Have you ever worked as a carpenter since that

7   day?

8        A.    No, sir.

9        Q.    Will you ever be able to work as a carpenter?

10       A.    No, sir.

11       Q.    Did you lose property as well?

12       A.    I lost all my clothes, my jacket, my wallet,

13   my keys, they had the keys to my house, they had my address,

14   everything.  The only thing I had after it was over was a

15   pair of underwear and a pair of socks.

16             MR. WIRSKYE:  Thank you, sir.  I'll pass

17   the witness, Judge.

18                      CROSS-EXAMINATION

19   BY MS. BUSBEE:

20       Q.    Mr. Burgess, when was the last time you saw

21   Mr. Murphy before you were conked in the head?

22       A.    When he walked into the maintenance shop or

23   maintenance office from the shop area and which was about

24   three or four minutes before I was hit.

25       Q.    Was that the conversation about, what are you

1    doing here, and I'm helping to clean up?

2         A.     Yes.

3         Q.     And he had a broom?

4         A.     Well, he had a small whisk broom, long

5    handled, what we use for a whisk broom.

6         Q.     Now, Mr. Rivas, did you get the impression

7    that he was directing this escape?

8         A.     By all means, yes.

9         Q.     Okay.  What things did he do that gave you

10   that impression?

11        A.     He gave the orders.

12        Q.     Okay.  Mr. Halprin and Mr. Newbury and Mr. --

13   sounds like Mr. Garcia, also took a real active part in

14   manhandling people and threatening then?

15        A.     Yes, ma'am.

16        Q.     Did I skip somebody?  Because I remember you

17   talking about some of the others, but perhaps these were the

18   ones that were the most brutal that you observed?

19        A.     Yes, ma'am, well, as I said, those are the

20   ones that I saw.  There were other people I could hear

21   walking, movement, but I couldn't see them and I couldn't

22   tell you who they were.

23        Q.     Okay.  Had you trusted Rivas prior to this

24   time?

25        A.     I trusted him as much as I did any inmate.

1    You don't trust an inmate completely.

2         Q.    That turned out to be wise.

3         A.    Pardon?

4         Q.    That turned out to be a wise policy.

5         A.    Yes.  But maybe a little more than I should

6    have.

7         Q.    Okay.

8              MS. BUSBEE:  I'll pass the witness.

9    Thank you.

10             MR. WIRSKYE:  Nothing further, Your

11   Honor.

12             THE COURT:  Thank you, Mr. Burgess.

13             MR. WIRSKYE:  May this witness be finally

14   excused, Your Honor?

15             MS. BUSBEE:  No objection.

16             THE COURT:  He may.

17             MR. SHOOK:  Call Martin Gilley.

18                  MARTIN GILLEY,

19   having been duly sworn, was examined and testified as

20   follows:

21                  DIRECT EXAMINATION

22   BY MR. SHOOK:

23        Q.    Would you tell us your name, please.

24        A.    Martin Gilley.

25        Q.    And how are you employed, sir?  How are you

1  employed?

2      A.      I work for Texas State University in San

3  Marcos.

4      Q.      Let me turn your attention back to December

5  2000 and where were you employed at that time?

6      A.      Texas Department of Criminal Justice, Connally

7  Unit.

8      Q.      How long had you worked with them?

9      A.      Since 1994.

10      Q.      And what were your duties with them?

11      A.      I was a plumbing supervisor in the maintenance

12  department.

13      Q.      And you worked there in the maintenance

14  department in the Connally Unit?

15      A.      That's correct.

16      Q.      On a day-to-day basis, what were your duties?

17      A.      Take -- I had a crew, usually two, maybe three

18  guys, that go over the unit and take care of plumbing

19  problems, you know, just repairs.

20      Q.      Okay.  Did you know an inmate by the name of

21  Patrick Murphy?

22      A.      I did.

23      Q.      Do you see Mr. Murphy in the courtroom today?

24      A.      I do.

25      Q.      Is he the man seated here at the end of the

1  table with the brown hair and glasses?

2       A.    That's correct.

3                 MR. SHOOK:  Your Honor, if the record

4  could reflect that the witness has identified the defendant.

5       Q.    (By Mr. Shook)  And where did Mr. Murphy work?

6       A.    He worked in the carpenter shop.

7       Q.    Did you see him on a daily basis?

8       A.    I did.

9       Q.    All right.  I want to turn your attention back

10  to December 13 of 2000 and ask if you had come to work on

11  that day?

12       A.    Yes.

13       Q.    What -- about what time did you break for

14  lunch?

15       A.    I don't remember if it was 11:30 or -- I think

16  we broke for lunch at 11:30 at that time.

17       Q.    Was that the regular time?

18       A.    Yes, sir.

19       Q.    And do you recall where you ate lunch that

20  day?

21       A.    I ate in the ODR and went to the parking lot.

22       Q.    Let me turn your attention back to around

23  12:35.  Would that be about the time that you arrived back

24  at the maintenance department?

25       A.    Yes, sir.

1    Q.    Where did you go when you arrived back at the

2  maintenance department?

3    A.    I went into the shop area.

4    Q.    Was anyone in the shop with you?

5    A.    There was a couple of inmates in the shop,

6  yes.

7    Q.    Had you come back from lunch with any of the

8  other supervisors?

9    A.    I came back with Mark Garza and Ronny Hahn.

10   Q.    Okay.  And what did Mr. Hahn do there at the

11 maintenance department?

12   A.    He was a lock tech.

13   Q.    Okay.  What about Mr. Garza?

14   A.    He was -- he was the welding supervisor.

15   Q.    Once y'all walked in together, did you

16 separate at that time?

17   A.    We did.

18   Q.    Where did they go?

19   A.    They went toward the warehouse area and I went

20 into the shop area.

21   Q.    Okay.  The shop area, what types of things go

22 on in there?

23   A.    It's where all our carts were sitting out

24 there and we had a few tables, the work benches, and stuff

25 in there.  The carpentry shop was in that area.

1   Q.      Were you the only supervisor out there at that

2   time?

3   A.      Yes.

4   Q.      And what were you doing there in the shop

5   area?

6   A.      I was just sitting at one of the tables, doing

7   some paperwork, getting ready for the afternoon.

8   Q.      Did inmate Garcia come and speak to you at

9   that time?

10   A.      Yes, he did.

11   Q.      What did he want from you?

12   A.      He asked me if I wanted something to eat.

13   They were having a spread or something back in the office.

14   Q.      What did you tell him?

15   A.      I told him ,said, no, I had paperwork to do

16   and I didn't need anything.

17   Q.      After that, did another inmate come and say

18   anything to you?

19   A.      Yes.

20   Q.      Who was that?

21   A.      That was Patrick Murphy.

22   Q.      What did he say to you?

23   A.      He told me that Pat Moczygemba wanted to see

24   me in the warehouse.

25   Q.      Had he come in from the maintenance office

1    area --

2         A.     He was the one that came out of the office

3    area.

4         Q.     Okay.  And then he came into the shop area?

5         A.     That's correct.

6         Q.     And that's when he told you Pat Moczygemba

7    wanted to see you?

8         A.     Right.

9         Q.     After he told you that, what did you do?

10        A.     I was frustrated with the paperwork I was

11   doing and I just threw it on the table and got up and walked

12   into the area and that's when I was jumped from behind.

13        Q.     When you went to the warehouse itself -- after

14   you went in the warehouse itself, who did you see jump you

15   from behind?

16        A.     It was Garcia, Newbury, Halprin, and one other

17   -- Rodriguez, I believe.

18        Q.     Did they knock you to the ground?

19        A.     They drug me around the corner and into the

20   ground, yes.

21        Q.     And as you struggled with them, did any of

22   them produce some weapons?

23        A.     Yes.

24        Q.     What type of weapons were those?

25        A.     Homemade knives, the regular, what we call a

1   Connally shank.  It was just a round piece of steel,

2   sharpened off to a sharp point.

3        Q.        What did they do with those shanks?

4        A.        I had some lacerations to both sides of the

5   head.

6        Q.        Put them up to each side of your head?

7        A.        Right.

8        Q.        Were threats made to you at that time?

9        A.        Yes.

10       Q.        What type of threats were made?

11       A.        I was told, if I cooperated, I could go home

12  or I could die right there.  It didn't matter to them.  But

13  they were going home and I could go home, too, if I wanted

14  to.

15       Q.        Did you take their threats seriously?

16       A.        Absolutely.

17       Q.        At that point in time did you quit resisting?

18       A.        Yes.

19       Q.        Then what happened?

20       A.        I was bound and gagged and drug into the

21  electrical room where I saw the rest of the supervisors that

22  had come in with me and before me were in the same shape I

23  was in.

24       Q.        Mr. Garza already in there?

25       A.        Yes.

```
1        Q.    Along with Mr. Hahn?

2        A.    Yes.

3        Q.    Mr. Moczygemba back there?

4        A.    Yes, sir.

5        Q.    Mr. Burgess?

6        A.    Yes.

7        Q.    Could you tell if they were hurt in any way?

8        A.    I could tell they were hurt some.  I didn't
```
know if anybody was still alive until I felt one of the
other guys breathing and then, you know, then I knew they
weren't dead yet.
```
         Q.    After you were placed down in that room, did
```
you hear other employees being drug back there?
```
         A.    Yes, sir.

         Q.    Could you hear them being taken down as you
```
were?
```
         A.    Yes, sir.

         Q.    Once they were in the room, were more threats
```
made to you?
```
         A.    Yes, sir.

         Q.    What types of threats were made?

         A.    I had a blindfold over my head, but I could
```
see out of my right eye.  One of the inmates had one of the
shanks and he would stick it in the ear of one of the
hostages and made the statement two or three -- I heard it

```
1   two or three times, they did it two or three times, "That's
2   just one pound of pressure.  Two or three more pounds of
3   pressure and I can ram this thing through your brain."
4          Q.     Okay.  At some point in time after the room
5   was filled up, did the inmates leave?
6          A.     Yes.
7          Q.     After that did Mr. Schmidt, was he able to get
8   free?
9          A.     Yes, sir.
10         Q.     Were you untied at that point in time?
11         A.     Yes, sir.
12         Q.     Okay.
13         A.     Right after that.
14         Q.     At some point in time did the inmates then try
15   to get back into the electrical room?
16         A.     When we were in the process of freeing each
17   other, well, that's when they were trying to get back in,
18   yeah.
19         Q.     Who did you see trying to come back in there?
20         A.     Um, Newbury.
21         Q.     Okay.  Did he get wedged in the door at some
22   point?
23         A.     He had his arm caught in the door at one
24   point, yes, sir.
25         Q.     And what was everyone inside of the electrical
```

1    room doing?

2         A.    We were just trying to bar the door and keep

3    him out, you know, trying to get his arm back out of the

4    door, get him pushed out and bar the door where they

5    couldn't get back in.

6         Q.    What were you afraid was going to happen, if

7    they got back in?

8         A.    We knew if they got back in, it was going to

9    be them or us.

10         Q.    What types of injuries did you receive from

11   this?

12         A.    I was one of the lucky ones.  I just had

13   superficial lacerations on one side of my head and I had a

14   couple of stitches behind my ear on the left side.

15         Q.    Did it appear some of the others had received

16   more serious injuries?

17         A.    Yes.

18                   MR. SHOOK:  We'll pass the witness.

19                   MS. BUSBEE:  No questions, Your Honor.

20                   MR. SHOOK:  May this witness be excused?

21              THE COURT:  He may.

22                   MR. SHOOK:  Call Vernon Janssen.

23                   VERNON JANSSEN,

24   having been duly sworn, was examined and testified as

25   follows:

DIRECT EXAMINATION

BY MR. SHOOK:

Q.    Would you tell us your name, please.

A.    Vernon Janssen.

Q.    And how are you employed, sir?

A.    I was employed by the State of Texas.

Q.    Okay.  Back in December of 2000?

A.    Yes.

Q.    Did you work at the Connally Unit?

A.    Yes.

Q.    And what were your duties there?

A.    I was an officer.

Q.    And in what particular area did you work?

A.    All over.

Q.    Okay.  Did you work at all parts of the prison, just depending on what was going on that day?

A.    Yes, sir.

Q.    Let me turn your attention back to December 13th, 2000, and where were you assigned that morning?

A.    Feeding chow.

Q.    Okay.  After the lunchtime, were you given another assignment?

A.    Yes, sir.

Q.    And what was that assignment?

A.    Back gate officer.

1     Q.     And when you say the back gate, is that the

2     gate where the deliveries are brought into the prison?

3     A.     Yes.

4     Q.     And they have an officer that works down at

5     the gate itself?

6     A.     Yes.

7     Q.     Let me show you some photographs that have

8     been marked as State Exhibits 551 through 567.  You have

9     seen these photographs outside the presence of the jury on a

10    previous occasion; is that right?

11    A.     Yes, sir.

12    Q.     Are these photographs of the back gate area

13    and some interior shots of the building that you were in on

14    that day?

15    A.     Yes.

16              MR. SHOOK:  Your Honor, at this time we

17    offer State Exhibits 551 through 567.

18              MS. BUSBEE:  We've seen them, Your Honor,

19    and we have no objection.

20              THE COURT:  Nos. 551 through 567 shall be

21    admitted.

22    Q.     (By Mr. Shook)  First, let me show you State

23    Exhibit 551.  Is that a photograph of the back gate itself?

24    A.     Yes.

25    Q.     And that tower there, what is that called?

1      A.      The picket.

2      Q.      Okay.   Is there a guard on duty up there at

3  all times?

4      A.      Yes.

5      Q.      And the weapons that the guards have at the

6  prison, is that where they are kept?

7      A.      They are stored up there, yes.

8      Q.      Where are they stored in the picket?

9      A.      In the very top at the -- where the officer

10 stays.

11     Q.      Okay.   What types of weapons are kept up

12 there?

13     A.      Handguns, .357 handguns, AR-15 rifles, and

14 shotguns.

15     Q.      Okay, 12-gauge shotguns?

16     A.      Twelve gauge.

17     Q.      And ammunition for those guns also kept up

18 there?

19     A.      Yes.

20     Q.      There seems to be, is this a rope or a pulley

21 that's on the outside of the picket?

22     A.      Yes.

23     Q.      And what's that used for?

24     A.      To lower weapons down to officers that take

25 inmates out of the prison.

1    Q.    Okay.  So if inmates are working outside the

2    fence, the officers then receive their weapons?

3    A.    They receive them there, too, yes.

4    Q.    Do guards actually have guns inside the

5    prison?

6    A.    No guns are allowed in.

7    Q.    Let me show you State Exhibit 552 -- let me

8    first show you, that building there, is that the building

9    you were assigned to?

10    A.    Yes, sir.

11    Q.    And the back gate, are there two actually

12    different gates?

13    A.    Yes.  There's a walkway gate and a

14    drive-through gate.

15    Q.    The drive-through gate is right here?

16    A.    Yes.

17    Q.    And the walk-through gate is over here?

18    A.    Right, yes, sir.

19    Q.    What's the process for getting in and out of

20    the prison?  Who operates those gates?

21    A.    The officer in the tower.

22    Q.    Okay.  And on that particular day was a man by

23    the name of Lou Gips operating that particular gate from the

24    tower?

25    A.    Yes.

36

1    Q.    And then your assignment was for this area

2  down here?

3    A.    Yes.

4    Q.    Let me show you the next photo.  Does this

5  kind of show your viewpoint from the tower down to the

6  prison?

7    A.    Yes.

8    Q.    This building here, is that the maintenance

9  department?

10   A.    Yes.

11   Q.    Okay.  If you were going to drive to the

12 maintenance department, you would go this way and towards

13 this gate?

14   A.    Yes.

15   Q.    And 553, is that the gate you would have to

16 come through to get to the building that you were located

17 in?

18   A.    Yes.

19   Q.    No. 554, is that the outside of the building?

20   A.    That's the -- where the vehicle sallyport is

21 to the building that I was in.

22   Q.    What are these instruments here?

23   A.    Mirrors to look under vehicles.

24   Q.    State Exhibit 555, is this a side view of the

25 building?

1    A.    Yes.

2    Q.    State Exhibit 557, does this show the building

3    that you were in on that day?

4    A.    Yes.

5    Q.    And were you seated at that desk?

6    A.    Yes.

7    Q.    Let me turn your attention to about 1:20 that

8    day.  Did you receive a phone call while you were down in

9    that office?

10    A.    Yes, I did.

11    Q.    And how did they identify themselves?

12    A.    Said they were Moczygemba.

13    Q.    Okay.  And is that one of the supervisors at

14    the maintenance department?

15    A.    The head supervisor of the maintenance

16    department.

17    Q.    Do you remember the name of the guard that you

18    relieved that usually worked the back gate?

19    A.    Officer Puentes.

20    Q.    Did they ask for Officer Puentes then?

21    A.    Yes.

22    Q.    Okay.  Did you tell them he had gone home?

23    A.    I said he was off.

24    Q.    All right.  What information did they give you

25    at that time?

1    A.   They said they were going to come to the back

2  gate and install cameras and monitors.

3    Q.   Did that arouse your suspicion at all at that

4  time?

5    A.   No.

6    Q.   Why was that?

7    A.   Because a month earlier they installed some in

8  another picket, another tower.

9    Q.   All right.  About 1:40 or so after that call,

10  did, in fact, some inmates and what you believed at the time

11  a maintenance boss come to that back gate?

12    A.   Yes.

13    Q.   And how did they come to the back gate?

14    A.   Two inmates came through the walkway into the

15  office and one civilian came in the other -- the

16  drive-through door.

17    Q.   Okay.  At that time did you believe that

18  civilian was one of the maintenance supervisors?

19    A.   Yes.

20    Q.   Was there another person you believed to be a

21  maintenance supervisor also there?

22    A.   Standing outside.

23    Q.   Okay.  Which direction did he go?

24    A.   He was standing at the door, just outside.

25    Q.   All right.  So three came inside the building

1    you were in; is that right?

2          A.    Yes.

3          Q.    Two inmates and what you believed to be a

4    supervisor?

5          A.    Yes.

6          Q.    And do you see one of those two inmates or

7    persons dressed as an inmate here in the courtroom today?

8          A.    Yes.

9          Q.    And was his name Patrick Murphy?

10         A.    Yes, sir.

11         Q.    Where is Mr. Murphy seated?

12         A.    Seated right there.

13         Q.    Seated there with the coat and tie on and

14   glasses?

15         A.    Yes.

16               MR. SHOOK:   Your Honor, if the record

17   could reflect the witness has identified the defendant.

18         Q.    (By Mr. Shook)   Mr. Murphy was dressed as he

19   always had been at that time as an inmate; is that right?

20         A.    Right.

21         Q.    Who was the other inmate with him?

22         A.    Newbury.

23         Q.    So Murphy and Newbury were dressed as inmates?

24         A.    Yes.

25         Q.    Was that unusual to have two inmates with a

1    maintenance supervisor?

2        A.    No, they all -- all the maintenance

3    supervisors usually carried two inmates.

4        Q.    And they work with them on a daily basis?

5        A.    Yes.

6        Q.    The maintenance supervisor, did he look at you

7    directly at that time?

8        A.    No, he never looked at me directly.

9        Q.    What did he do once he got in the building?

10       A.    He sat a box down on the desk and turned

11   around and started looking at the wall and said, "We need to

12   put this conduit here."  And his back was away from me.

13       Q.    Okay.  And once he started saying that, did

14   the phone ring?

15       A.    The phone rang, yes.

16       Q.    Did he answer the phone?

17       A.    Yes.

18       Q.    And who was it at that time?

19       A.    They asked for the area, is there a supervisor

20   there, maintenance supervisor there, and I said yes and they

21   wanted to talk to him.

22       Q.    Did you believe it was someone from the

23   maintenance department calling?

24       A.    Yes.

25       Q.    And did you hand the phone over to him at that

1    time?

2         A.    Yes.

3         Q.    What did he do then?

4         A.    He said, I thought I gave you those numbers

5    before and then he reached and got a box that was on the

6    table and he read off some kind of serial numbers.

7         Q.    And then what did he do?

8         A.    He said, "They want to talk to you."

9         Q.    Did he hand the phone back to you at that

10   time?

11        A.    Yes.

12        Q.    And then what happened?

13        A.    I said, hello, and that's when he pulled me

14   over the chair.

15        Q.    Okay.  So he had gotten behind you at that

16   point in time?

17        A.    Yeah.  When I answered the phone, he walked

18   behind me.

19        Q.    And did he put his arm, kind of get you in a

20   headlock?

21        A.    Yeah.

22        Q.    And flipped you over the chair?

23        A.    Yes.

24        Q.    When he flipped you to the ground, what did

25   Mr. Murphy and Mr. Newbury do?

1   A.   They also assisted him in holding me down.

2   Q.   They all three grabbed a hold of you?

3   A.   Yes.

4   Q.   And what did they do to you then?

5   A.   They grabbed my handcuffs and handcuffed me.

6   Q.   So you got handcuffed in front or behind?

7   A.   Behind.

8   Q.   And what did they do with your legs?

9   A.   They taped my ankles.

10  Q.   Was this all three of them doing this?

11  A.   Yes.

12  Q.   Did you recognize now who the person was

13  disguised as a maintenance supervisor?

14  A.   Yeah, I believe it was Harper.

15  Q.   Larry Harper?

16  A.   (Witness nods head.)

17  Q.   So Harper and Mr. Newbury and Mr. Murphy

18  subdued you and then they bound you?

19  A.   Yes.

20  Q.   After you were bound, what did they do with

21  you?

22  A.   Slid me into the restroom.

23  Q.   Okay.  Let me show you State Exhibit 558.  Is

24  this the desk you were sitting at?

25  A.   Yes.

1    Q.    Those some of the boxes there that they

2  brought in?

3    A.    Yes.

4    Q.    And the tape there, is that some of the tape

5  they used to tie you up with?

6    A.    Yes.

7    Q.    State Exhibit 559, are these some of the tools

8  Mr. Murphy and Mr. Newbury brought in with them?

9    A.    Yes.

10    Q.    State Exhibit 561, does that show the restroom

11  where you were taken to?

12    A.    No.  It's a restroom in the very corner back

13  there.

14    Q.    Let me show you, then, 562.  Is that the

15  restroom?

16    A.    Yes.

17    Q.    And that tape, is that the type of tape that

18  your legs were bound with?

19    A.    Yes.

20    Q.    After you were placed in the bathroom, what

21  happened then?

22    A.    I kicked the door open.

23    Q.    Okay.

24    A.    They didn't shut it all the way.

25    Q.    After you kicked the door open, what happened?

1    A.    Newbury came back and pushed my feet in and

2  slammed the door.

3    Q.    Did he say anything to you at that time?

4    A.    He said, "Don't worry about it, Janssen."

5    Q.    How long did you stay back there in that room?

6    A.    Probably five to ten minutes.

7    Q.    Okay.  And how were you freed?

8    A.    Officers came running back there.

9    Q.    Other guards?

10   A.    Yes.

11   Q.    Before you were freed and after they left, did

12  you hear any vehicles come to the gate?

13   A.    I heard a vehicle horn honking.

14   Q.    And once you heard it honking, did you hear

15  the gates open up?

16   A.    I heard a gate, yes.

17   Q.    Did you hear anything else after that?

18   A.    Just doors slamming.  That's about it.

19   Q.    And then after that --

20   A.    Pickup door slamming.

21   Q.    Pickup door slamming?  And after that you were

22  freed several minutes later?

23   A.    Yeah.

24        MR. SHOOK:  That's all the questions we

25  have.

1          MS. BUSBEE:  No questions, Your Honor.

2          THE COURT:  Thank you, Mr. Janssen.

3          MR. SHOOK:  May this witness be excused?

4          MS. BUSBEE:  No objection.

5          THE COURT:  He may.

6          MR. WIRSKYE:  May we approach, Your

7    Honor?

8          THE COURT:  You may.

9               (Bench conference)

10         THE COURT:  We'll take our afternoon

11   break at this time and stand in recess until -- take 20

12   minutes and push almost to 3:00.

13              [Jury out]

14         THE COURT:  Let the record reflect the

15   jury has been retired and we'll have a hearing outside the

16   presence of the jury.  Mr. Wirskye, call your next witness.

17              <u>RITA SAMANIEGO</u>

18   having been duly sworn, was examined and testified as

19   follows:

20              <u>DIRECT EXAMINATION</u>

21   <u>BY MR. WIRSKYE</u>:

22         Q.    Can you tell us your full name and spell your

23   last name for the Court Reporter.

24         A.    Rita Samaniego, S-A-M-A-N-I-E-G-O.

25         Q.    Directing your attention back to December 13th

1    of 2000, were you employed at the Connally Unit?

2          A.     Yes, sir.

3          Q.     What did you do at the Connally Unit?

4          A.     I worked with the gang office in the Connally

5    Unit, gang officer.

6          Q.     And you were there the day of the escape?

7          A.     Yes, sir.

8          Q.     Once you became aware of the escape, did you

9    receive an assignment to go search some dormitory rooms?

10         A.     Yes, sir.

11         Q.     Whose rooms did you search?

12         A.     I searched Murphy, Newbury, a couple of the

13   other guys that -- Halprin, Harper.

14         Q.     How long from the time you became aware of the

15   escape until you searched the dormitory rooms was it?

16         A.     I would say 20 to 30 minutes.

17         Q.     So fairly quickly?

18         A.     Uh-huh, yes, sir.

19         Q.     Did you find anything in Mr. Murphy's room?

20         A.     Yes, sir.

21         Q.     Tell the Court what you found.

22         A.     A letter was recovered from his cubicle, a

23   handwritten letter.

24                     MR. WIRSKYE:  May I approach, Your Honor?

25                     THE COURT:  You may.

1    Q.    (By Mr. Wirskye)  Let me show you a
2  handwritten letter marked for identification as State 1010.
3  Do you recognize that?
4    A.    Yes, sir.
5    Q.    What is that?
6    A.    It's a letter that was found in his cubicle at
7  the dormitory.
8    Q.    How do you know that's the letter that you
9  found?
10   A.    When I found the letter, I wrote the housing
11 area on the top and I wrote the name of the offender that
12 lived in that housing cubicle.
13   Q.    At the top of this letter we see Murphy?
14   A.    Right.
15   Q.    Is that your handwriting?
16   A.    Yes, it is.
17   Q.    And we also see No. 43?
18   A.    Yes, sir.
19   Q.    Is that your handwriting?
20   A.    Yes, sir.
21   Q.    What does the 43 signify?
22   A.    Forty-three is the bunk, the cubicle, that he
23 was living in.
24          MR. WIRSKYE:  Your Honor, at this time we
25 offer the letter, State's 1010 and for record purposes,

1    State 1011, the packaging of the letter.

2                    MS. BUSBEE:  May I take this witness on

3    voir dire, Your Honor?

4                    THE COURT:  You may.

5                    VOIR DIRE EXAMINATION

6    BY MR. BUSBEE:

7         Q.    I was talking when you said your name.  Would

8    you mind telling me again, I'm sorry.

9         A.    Rita.

10        Q.    I can't call you Rita.

11        A.    Samaniego is the last name.

12        Q.    Samaniego?

13        A.    Yes, ma'am.

14        Q.    Okay.  Did you know Mr. Murphy prior to

15   searching his cubicle?

16        A.    I have seen him before.  I knew of him.

17        Q.    And these cubicles, are they as depicted in

18   State's Exhibit No. 1014 to look like little half-walls?

19        A.    Yes, ma'am.

20        Q.    And there's a bunk and a table in that area?

21        A.    Right.

22        Q.    How many people live in that dormitory?

23        A.    There are approximately 105.

24        Q.    All right.  And during the day, more

25   specifically during this day, were some of them in the dorm?

1    A.    Yes, ma'am.

2    Q.    About how many?

3    A.    Oh, an estimated maybe 60 to 70.

4    Q.    Okay.  And did you recover anything else from

5  his cubicle?

6    A.    Not that I recall.

7    Q.    Okay.  Now, this State Exhibit No. 1010, that

8  appears to have some red stain on it.  Do you know what that

9  is?

10    A.    I was told they were the handwriting, the

11  sampling, when they did the fingerprinting.

12    Q.    Okay.

13    A.    It wasn't like that.

14        MS. BUSBEE:  May I approach the witness,

15  Your Honor?

16        THE COURT:  You may.

17    Q.    (By Ms. Busbee)  Ma'am, I'm going to show you

18  State Exhibit 1010 again and ask you, I know that you wrote

19  43 up here.  Did you also write Murphy?

20    A.    Yes, ma'am, that's the cell.

21    Q.    And so this number that's written in blue ink

22  --

23    A.    No.

24    Q.    -- do you know where that came from?

25    A.    No, ma'am.

1    Q.    So would it be fair to say that No. 43,

2  Murphy, this L number written in blue with some initials,

3  and the State exhibit number were not on this piece of paper

4  when you recovered it?

5    A.    Right.

6    Q.    Okay.  Were you acquainted with Mr. Murphy's

7  handwriting?

8    A.    No, ma'am.

9    Q.    Is there any one -- was there any way that his

10  cubicle was secured during the day that day?  It looks to me

11  from State Exhibit 1014 that probably by design you have

12  very little privacy and this is open to the rest of the

13  dormitory; is that correct?

14    A.    Yes, ma'am.

15    Q.    Do you know whether or not any fingerprints

16  were recovered from this document?

17    A.    I'm not sure.

18        MS. BUSBEE:  That concludes my

19  questioning.  I'm going to object to inclusion or admitting

20  this into evidence as this witness cannot authenticate it as

21  being written by the defendant and it was in an area where

22  anyone could have put it at any time.  And since it's not

23  linked to the defendant, I'm objecting to it under 901.

24        THE COURT:  It goes to weight.  You can

25  argue that to the jury all day long.  Overruled.  No. 1010

1    shall be admitted.

2                        (Recess)

3                        [Jury in]

4                   THE COURT:  Please be seated.  Call your

5    next witness.  Let the record reflect this witness has been

6    previously sworn.

7                        RITA SAMANIEGO,

8    having been duly sworn, was examined and testified as

9    follows:

10                       DIRECT EXAMINATION

11   BY MR. WIRSKYE:

12        Q.     Ma'am, can you tell us your full name.

13        A.     Rita Samaniego.

14        Q.     Where do you live?

15        A.     I live in Beeville, Texas.

16        Q.     Where are you employed?

17        A.     At the Connally Unit in Kenedy, Texas.

18        Q.     And how long have you worked in the Connally

19   Unit?

20        A.     Eight years.

21        Q.     Where are you currently assigned?

22        A.     I'm currently assigned with the Gang Office,

23   Security Threat Office.

24        Q.     What do you do for the Gang Office?

25        A.     Monitor gang offenders and their activities.

1    Q.    And how long have you done that?

2    A.    Approximately three, three and a half years.

3    Q.    Was that your assignment back on the day of

4 this escape, December 13th, 2000?

5    A.    Yes, sir.

6    Q.    As a part of just working in the Connally

7 Unit, were you familiar with the inmates behind you, those

8 seven individuals?

9    A.    Yes, sir.

10    Q.    Does that include Patrick Murphy?

11    A.    Yes, sir.

12    Q.    Do you see Patrick Murphy in the courtroom

13 today?

14    A.    Yes, sir.

15    Q.    Could you point him out and tell us what he's

16 wearing?

17    A.    The blue shirt, black coat, and yellow tie.

18         MR. WIRSKYE:   Your Honor, let the record

19 reflect the witness has identified the defendant.

20    Q.    (By Mr. Shook)   Now, to your knowledge, at

21 least, the Connally Unit, Mr. Murphy was not in any sort of

22 gang or anything like that; is that correct?

23    A.    That's correct.

24    Q.    If he was, he wouldn't have had the job that

25 he held at the prison unit; is that correct?

```
1       A.      Correct.

2       Q.      Taking you back to the day of the escape, you

3    were working that day?

4       A.      Yes, sir.

5       Q.      How did you first become aware there was an

6    escape?

7       A.      We heard a call over the radio to respond to

8    the back gate.

9       Q.      And did you do that?

10      A.      Yes, sir.

11      Q.      What happened when you got to the back gate?

12      A.      We realized that several offenders had escaped

13   in one of the State vehicles through the back gate.

14      Q.      Pretty quickly, were the names of these

15   offenders, were y'all able to get the names?

16      A.      Fairly quickly, yes, sir.

17      Q.      Once you had the names, did you receive an

18   assignment?

19      A.      Yes.

20      Q.      What was that?

21      A.      To shake down their houses.

22      Q.      When you say shake down their houses --

23      A.      Means to go through their houses, look for any

24   items they may have left behind.

25      Q.      And their house would be their dormitory room
```

1   or their cell?

2       A.      Their cubicle, yes.  He was living in a

3   dormitory setting, so that would be his cubicle.

4               MR. WIRSKYE:  May I approach, Your Honor?

5               THE COURT:  You may.

6       Q.      (By Mr. Shook)  Officer, let me show you a

7   photograph that's been marked for identification as State

8   Exhibit 1014.  You and I have looked at this photo outside

9   the presence of the jury?

10      A.      Yes, sir.

11      Q.      And what does the photograph show?

12      A.      It's the cubicle in the dormitories.

13      Q.      And what number is it?

14      A.      43.

15      Q.      And the day of the escape, what number

16  dormitory cell did Mr. Murphy reside in?

17      A.      43 cell.

18      Q.      And, again, this photograph was not taken the

19  day of the escape; is that right?

20      A.      Right.

21      Q.      But at some point afterwards?

22      A.      Right.

23              MR. WIRSKYE:  Your Honor, at this point

24  we offer State 1014.

25              MS. BUSBEE:  No objection.

55

1          THE COURT:   State 1014 shall be admitted.

2          Q.     (By Mr. Wirskye)   If you could look up on the

3     big screen, Officer, and just kind of show the members of

4     the jury or tell them what they are looking at.

5          A.     They are looking at a cubicle, standard

6     cubicle, for a dormitory housing area.   Consists of a bunk,

7     which is the bed, a table, and a locker box.

8          Q.     Where is the locker box?

9          A.     It's underneath the bunk all the way to the

10    back of the wall.

11         Q.     Is it right there?

12         A.     Yes.

13         Q.     Are those boxes locked?

14         A.     They can be, if they have a lock to put on it.

15         Q.     And it's up to the inmate, right?

16         A.     To purchase one, yes.

17         Q.     So this is where you went to search right

18    after the escape; is that right?

19         A.     Correct.

20         Q.     When you searched 43 where Mr. Murphy was, did

21    you find anything?

22         A.     I recovered a letter out of his cubicle, a

23    handwritten.

24         Q.     Officer, let me show you what has been marked

25    for identification as State Exhibit 1010 and ask you if

1  that's the letter you recovered from Mr. Murphy's dormitory

2  room?

3      A.      Yes, sir.

4      Q.      How are you able to tell that that is the

5  letter?

6      A.      When I searched their houses, I label what I

7  recovered from that house and I marked this particular

8  letter with his name and the cubicle that he was assigned

9  to.

10     Q.      And there's a No. 43 in your handwriting in

11 the upper left?

12     A.      Correct.

13     Q.      And Murphy in your handwriting in the upper

14 right?

15     A.      Correct.

16     Q.      There's also some writing with a blue pen and

17 looks like some red stains?  Is it your understanding that's

18 from the crime lab?

19     A.      Right.

20     Q.      How soon would you say you recovered this

21 letter after the escape?

22     A.      Maybe 30 minutes or so, give or take.

23             MR. WIRSKYE:  Your Honor, at this time we

24 offer State Exhibit 1010.

25             MS. BUSBEE:  The Court made a ruling on

1    this already, did you not?

2                     THE COURT:  I did.  No. 1010 shall be

3    admitted.

4                     MR. WIRSKYE:  Permission to publish to

5    the members of the jury?

6                     THE COURT:  You may.

7         Q.    (By Mr. Wirskye)  Ladies and gentlemen, this

8    is the letter projected up on the big screen.  It reads as

9    follows.  "I refuse to abide by the dictations of a police

10   state, which Texas has surely become.  Today I fired the

11   first shot of the new revolution" -- misspelled -- "long

12   live freedom.  Death to tyranny."

13                    After you found the letter, you turned

14   it over to internal affairs there at the prison system; is

15   that right?

16        A.    Yes, sir.

17                    MR. WIRSKYE:  I'll pass the witness, Your

18   Honor.

19                    CROSS-EXAMINATION

20   BY MS. BUSBEE:

21        Q.    Ma'am, did you generate a report in connection

22   with this incident?

23        A.    I can't say I did right at the time, because

24   of all the stuff that was going on.  But I did at a later

25   date.

1    Q.    And you wrote this out at the request of the

2    District Attorney's Office?

3    A.    Yes, ma'am.

4    Q.    And you wrote that this year; is that right?

5    A.    Correct, uh-huh.

6    Q.    In March of this year?

7    A.    Yes, ma'am.

8    Q.    Do you remember whose cubicle you searched

9    first?

10   A.    I don't recall.  I just know that I shook down

11   the ones that I was told to shake down that they had

12   identified as the escapees.

13   Q     And were they all in the same dormitory?

14   A.    No, ma'am.

15   Q.    But you at this late date don't remember how

16   much time passed from the time of the escape and the time

17   that you searched offender Murphy's cubicle?

18   A.    No, I can't say exactly the time.

19   Q.    Now, had you ever seen Mr. Murphy's

20   handwriting?

21   A.    No, ma'am, I don't believe.

22   Q.    And in this dormitory, how many other inmates

23   were in that dormitory that day, if you can give us an

24   estimate?

25   A.    An estimate between 60 and 70.

```
1         Q.      And not very many of them were working or --

2         A.      The remainder of the ones that weren't there

3   were either at work or at school or vocation or something.

4         Q.      So 60 or 70 there that day to the best of your

5   recollection?

6         A.      Yes, ma'am.

7         Q.      And as it's shown in State Exhibit 1014, these

8   are just kind of half-walls that form almost a box?

9         A.      Yes, ma'am.

10        Q.      And there's not much privacy?

11        A.      No, ma'am.

12        Q.      And I take it that during the day these people

13  can mill around and go in each other's cubicles?

14        A.      They can.  They're not supposed to, but they

15  can.

16        Q.      You call that a lock box underneath the cot.

17  Is it locked?

18        A.      If they have funds to purchase a lock, they

19  can purchase a lock and lock it.

20        Q.      Was that locked that day or do you recall?

21        A.      No, ma'am.

22        Q.      Where did you say that you found State Exhibit

23  1010?

24        A.      In his cell in the box.

25        Q.      In the box?
```

1    A.    Yes, ma'am.

2    Q.    What else did you find in there?

3    A.    I don't recall finding anything else.

4    Q.    Was it just this?

5    A.    I believe so.

6    Q.    Now, do you know whether or not any

7  fingerprints were recovered?

8    A.    I'm not sure.

9    Q.    Do you know if any other evidence was

10 recovered that would link Mr. Murphy to this letter?

11   A.    I'm not sure.

12          MS. BUSBEE:  I'll pass the witness.

13              REDIRECT EXAMINATION

14 BY MR. WIRSKYE:

15   Q.    When you handled the letter, were you wearing

16 gloves?

17   A.    No, sir.

18   Q.    When you turned it over to the people in

19 internal affairs, were they wearing gloves?

20   A.    No, sir.

21   Q.    Everybody connected with it touched it with

22 bare hands?

23   A.    Right.

24   Q.    And, again, you get there probably under an

25 hour of the escape?

1    A.    Probably under an hour.

2              MR. WIRSKYE:  That's all I have, Judge.

3              MS. BUSBEE:  I have no further questions.

4              THE COURT:  Thank you, ma'am.  You may

5    stand down.

6              MR. WIRSKYE:  May she be finally excused,

7    Your Honor?

8              MS. BUSBEE:  No objection.

9              THE COURT:  She may.

10             MR. SHOOK:  Call John Kemp.

11                  JOHN KEMP,

12   having been duly sworn, was examined and testified as

13   follows:

14                  DIRECT EXAMINATION

15   BY MR. SHOOK:

16        Q.    Would you tell us your name, please.

17        A.    My name is John Kemp.

18        Q.    And where do you live, sir?

19        A.    La Porte, Texas.

20        Q.    And where is La Porte, Texas?

21        A.    Just south of Houston.

22        Q.    Okay.  Do you have a family?

23        A.    Yes, sir, I do.

24        Q.    What does your family consist of?

25        A.    Wife and three children, oldest a daughter, a

1    boy in the middle and my wife just had a baby girl before

2    all this started.

3        Q.    All right.  And how are you employed?

4        A.    I'm a manager for an automotive retail

5    company, Auto Zone.

6        Q.    How long have you worked for Auto Zone?

7        A.    A total of about ten years now.

8        Q.    Let me turn your attention back to December

9    18th of 2000 and ask if you were working at an Auto Zone at

10   that time?

11       A.    Yes, sir, I was.

12       Q.    Which store were you assigned to?

13       A.    Store number is 1455.  It's near the corner of

14   Spencer Highway and Center Street in Pasadena, Texas.

15       Q.    Pasadena, Texas, is a suburb of Houston?

16       A.    Correct.

17       Q.    What time did you come to work that day?

18       A.    About 11:00 in the morning.  I had a late

19   shift that night.  I was closing the store.

20       Q.    Were you the manager of that particular store?

21       A.    Yes, sir.

22       Q.    What time were y'all closing?

23       A.    I believe we closed at 11:00 that evening.

24       Q.    Okay.  Let me show you some exhibits which

25   have been marked State Exhibits 607 through 611.  Are these

1  photographs of that particular Auto Zone, both the outside

2  and inside of the store?

3        A.  Yes, sir, they were.

4            MR. SHOOK:  We offer State Exhibits 607

5  through 611.

6            MS. BUSBEE:  I have no objection, Your

7  Honor.

8            THE COURT:  Nos. 607 through 611 shall be

9  admitted.

10        Q.  (By Mr. Shook)  Is this the Auto Zone as it

11  appeared from the outside?

12        A.  Yes, sir.

13        Q.  How many people did you have working with you

14  that evening?

15        A.  There was two other people, Robert and Jenny.

16        Q.  Okay.  And what were they doing there?

17        A.  Um, we were all helping customers, me and

18  Robert mainly.  Jenny was the cashier.

19        Q.  Okay.  Anything unusual happen that night

20  during your regular shift?

21        A.  Not during the regular shift, no.

22        Q.  Up near closing time, right at closing time,

23  did you have about three or four customers in there?

24        A.  Yeah, we were getting ready to close.  It was

25  late.  I had already shut the lights out for the evening.  I

1    was hoping -- there was a few customers I had checked to

2    make sure there was just a limited number of customers in

3    the store.   I had Jenny lock the front door.   And a customer

4    had come up to the counter and we were discussing an

5    overheating problem that he was having with his car.

6              One of my regulars had come in, too, and

7    he had gotten involved in this conversation we had had about

8    this overheating problem and he had offered his assistance

9    and then he was on his way out.   And Jenny let him out and

10   then locked the door behind her.

11        Q.    You had a few regular customers that come in

12   on a weekly basis?

13        A.    Right.   This was one of the guys that he had

14   heard us talking about the overheating problem and he

15   offered his assistance.

16        Q.    Okay.   So you were already talking with this

17   other customer when this regular guy, regular customer,

18   entered into the conversation?

19        A.    Correct, that's correct.

20        Q.    And what did this customer that was asking you

21   for assistance, what did he look like?

22        A.    Short brown hair, just an everyday guy.

23        Q.    Okay.   You testified in the trial of George

24   Rivas; is that correct?

25        A.    Yes, sir, that's correct.

1    Q.    When you came to testify at the trial of

2  George Rivas, did you once again see the man that talked to

3  you about his overheating problem?

4    A.    Oh, yeah, yeah, there was just no doubt.

5    Q.    And once you saw him in person, did you

6  recognize him to be George Rivas?

7    A.    Yes, sir, I did.

8    Q.    How long did Mr. Rivas talk to you that day?

9    A.    Oh, we were probably in a conversation for

10  about ten minutes, just across the counter.  We were

11  discussing several different things that it could have been,

12  what would cause the overheating problems.  And he was

13  giving me all different kinds of things that he had done, so

14  it was like he knew automotive.  I couldn't come up with

15  anything and that's when this regular customer, he's a

16  mechanic, he does work on the side in his garage.  And he

17  got involved.  And he said, it could be this and it could be

18  that.  We were just throwing a bunch of stuff around.

19    Q.    So the three of y'all were talking about

20  trying to solve what you thought was Mr. Rivas' problem?

21    A.    Right, right.

22    Q.    Anything about that ten-minute conversation at

23  the time arouse your suspicions about Mr. Rivas?

24    A.    No.

25    Q.    Anything about what he said or his demeanor

1    arouse you whether he was lying to you or planning to rob

2    you within a few minutes?

3           A.      No, I had no idea.

4           Q.      Did he seem like a perfectly --

5           A.      Just a regular guy.

6           Q.      Okay.  You said that your employee that worked

7    under you locked the door; is that right?

8           A.      Yeah, after -- after my regular customer had

9    -- he just come in for some technical information.  He had a

10   book out and he was looking through it trying to get some

11   specifications on something.  And once he got the

12   information and offered the assistance to, you know, help

13   this guy out, he was like, look, I have got a shop.  If you

14   need anything, here's my card.  He just went on his way and

15   Jenny led him to the door and locked the door after he was

16   out.

17                  Basically, what we were trying to do is

18   control the inflow of customers.  I didn't want any more

19   people coming into the store.

20          Q.      So now after the door was locked, you had what

21   you later found out to be Mr. Rivas still in there and a

22   couple of other people?

23          A.      Right.  Once Jenny had locked the door and was

24   walking back towards the counter, that's when Rivas informed

25   me.  He said, "Well, if you haven't figured it out yet, I'm

1   here to rob you," and he picked his shirt up and showed me a

2   gun.

3          Q.      Where was the gun located?

4          A.      It was stuffed right in the front of his

5   pants.

6          Q.      When you saw that gun, what went through your

7   mind?

8          A.      I just -- it wasn't going to be good.

9          Q.      Okay.  You take his threats seriously?

10          A.      Oh, yeah, oh, yeah.

11          Q.      Once he showed you that gun, could you tell

12   what type of gun it was?

13          A.      It was just a dark -- I'm going to assume it

14   was a revolver -- I think it was a revolver.  I don't know.

15   It was a gun.  I could make out that it was a gun, so --

16          Q.      Were you pretty scared at that point in time?

17          A.      Pretty much, yeah.

18          Q.      What did he do then?

19          A.      Jenny had walked up to us and she said,

20   "What's going on?"  And I told her, I said, "Look, just

21   listen to what he's got to say.  Just do what he says and

22   we'll be all right."

23                  And I turned to look down towards the end

24   of the counter and a guy had come out from the end and he

25   was already holding a gun out on Robert.  Robert had gone in

1   the back and had gotten a dust mop thing we use to clean the

2   floor and he was already, you know, starting to prepare to

3   get everything ready so we could get out of there.  And he

4   pulled a gun out on Robert.

5                    And Robert's a pretty big guy and he's

6   had some experience in security, so he was trying to make

7   some moves, I guess to either get the gun or get a position

8   on him.  And I was just thinking, you know, Robert, you need

9   to just settle down and relax.  And finally he did.  Finally

10  he just settled down and listened to what the guy had to

11  say.

12         Q.    Okay.  So there was another man with a gun at

13  that point?

14         A.    Right.

15         Q.    What did that man look like?

16         A.    He was taller than I was, blondish hair,

17  skinny.

18         Q.    Okay.  So Mr. Rivas, was he still standing

19  near you?

20         A.    Yeah.  He was standing directly across the

21  counter from me.  I let Jenny walk by me and he asked, he

22  said, "You need to go to the back of the store."  And so we

23  started to move towards the back of the store.  And Robert

24  was in this confrontation with this other guy, well, they

25  had already started to move back towards the back of the

1   store.  And Rivas told me, he said, "Put your hands up."

2   And I was just panicked.  And so I did.  I just threw my

3   hands way up in the air and he told me to put them back down

4   again.

5          Q.    So you stuck your hands straight up?

6          A.    Right.  I was putting them way up in the air.

7   And he said, "No, put them back down."  And so I put them

8   back down.  And he said, "Put them where I can see them."

9   So I did that.

10          And then I looked out and I saw him

11   putting something in his ear.  And the whole time he was

12   waving this gun and saying, "Move towards the end of the

13   counter."  And so we were doing that.  And we walked down to

14   the end of the counter and then came out into this open area

15   and walked down this aisle.

16          Q.    Let me stop you there.  He had his gun out

17   from his belt at that point in time?

18          A.    Right.

19          Q.    Did he have the gun pointed at you?

20          A.    Well, it was in the general direction.

21          Q.    Then he put something in his ear?

22          A.    Right.  He put something in his ear.  And I

23   heard him say something to somebody.  The key word was

24   "maximizing".  He said, "We're maximizing."  And he said it

25   twice.

1      Q.    Okay.  When you saw him talk, did it appear he

2  was talking on a radio or something?

3      A.    Right.

4      Q.    And he said, "We're maximizing"?

5      A.    He said, "We're maximizing.  We're

6  maximizing."  And I distinctly remember that one word.

7      Q.    And what went through your mind when you heard

8  him saying that and saw that he was on the radio?

9      A.    Yeah.  That's when I knew that there was

10 somebody outside.

11     Q.    Okay.

12     A.    Because we have a door in the back of the

13 store and for a second I'm thinking, if I can get to that

14 door, I can get outside.  And then he's talking on a radio

15 and I realize he's talking to somebody outside, so there's

16 no sense in me going there, because I'm just going to be in

17 the same situation I am in here.

18     Q.    Okay.  So then what happened?

19     A.    So then he takes us -- we're walking down this

20 aisle and this customer comes walking out of nowhere down

21 the back by this oil rack.  And he's walking up and he says,

22 "What's going on?"  And I looked at him and I said, "Just do

23 what they say.  Just listen to what they say and everybody

24 will be all right."

25     Q.    What did this customer look like?

1      A.      He was -- I don't know, a little heavy set

2   Hispanic guy with chrome or gold frame glasses and he fell

3   in and we all went behind the counter -- went behind the oil

4   rack.   And we came around the oil rack and Robert was

5   already down on his knees and they were pulling his shirt

6   off of him.   And then Jenny went around him and the guy

7   stayed behind Robert and I went around Jenny, the farthest

8   away from where we had went through the oil rack at.

9      Q.      Then what happened?

10      A.      They had us lay down.   They told us to empty

11   out our pockets.   They asked who was in charge and so I

12   lifted my hand up.   I was face down and I lifted my hand up

13   and said, "I am."

14              And so they had me get up and I turned

15   around and they patted me down.   And all my stuff was

16   already out on the floor.   And then who I found out was

17   eventually Rivas, had put on Robert's shirt and a ballcap

18   and he took me back up towards the front of the store.

19      Q.      Okay.   Let me show you State Exhibit 609.

20   Does this show the dust mop that the employee, Robert, was

21   using?

22      A.      Right.   That's at the end of the counter

23   there.   That's where -- because the guy had came out -- if

24   you are looking at this picture, he had came out from the

25   left, because Robert was on the aisle and he had pointed the

1   gun at Robert.  And both of them went straight back down

2   that aisle.  You can go back there straight through to the

3   oil rack.

4        Q.    State Exhibit 611, is this the area in the

5   back where they originally had taken you?

6        A.    Yes.  Robert would have been right here close

7   and Jenny and me out towards the top of the screen there.

8        Q.    After they identified you as the person in

9   charge, did Mr. Rivas take you back to the front?

10       A.    Right.  We went back up to the front.  He

11  walked behind me and the whole time he was trying to, I

12  guess, reassure me that everything would be all right.  He

13  said, "Look, this is my first time doing this.  I know you

14  are scared.  I know you are nervous.  Just relax and do what

15  I say and everything will be all right."  He said, "I'm

16  scared, too."  And I'm thinking, man, you have got a gun in

17  your hand.  What are you talking about?

18       Q.    Did he have that gun out still?

19       A.    Oh, yeah, it was out.

20       Q.    Did he have it pointed at you?

21       A.    Oh, yeah.  Well, I mean, I didn't have eyes in

22  the back of my head, but I could just imagine there was a

23  gun pointed in my back.  Anyway, we make this turn to go

24  into the office and he asked me, do I have a bag and I said,

25  no.  And he said, "Where is it at?"  And I said, "There's

one in front."

So he made me come out.  And when I did,
a car had pulled up.  So he told me, he said, "Get back
here."  And he put me in the back.  There's a little opening
before you get to the office and he made me lay face down on
the floor and he walked up to the door and waved these
people off.  And he came back and he made me get a bag,
stood me up, and made me get a bag.  And we went into the
office and he knelt me down in front of the safe and he
said, "Open it up and get the money out."  And so that's
what I did.

Q.     Did you comply with that?

A.     Oh, yes.

Q.     Let me show you State's Exhibit 610, is that
the photograph of the safe after it's been opened and
emptied out?

A.     Yes, sir.  That is.  Those drawers right there
were stacked in the bottom.  There's a computer just to the
right of it.  And I just went in and opened it up and
started emptying the stuff out in the bag.  And when I was
done -- I was knelt down just -- this would be to the right
of where those drawers were.  They were sitting in between
my legs.  And I turned around to look up at him to show him
that I was done emptying out the cash registers and there
was a gun pointed at my head.

1   Q.    How close was it to you?

2   A.    It was very far.  I was focused on the gun

3   very easily.

4   Q.    And it was pointed directly at you?

5   A.    Directly at me.

6   Q.    Okay.  Then what happened?

7   A.    I told him, "That's it."  And he said, "Do you

8   have any quarters?"  And I said, "Yeah.  There's a bunch of

9   rolls here."  And he said, "Put some of those in, too."  And

10  so I threw a couple of rolls of quarters in.  And I looked

11  up and I said, "That's it."  And he said, "All right.  Get

12  up."

13          And so he stood me up and we walked out

14  of the office back out towards the front.  And there's three

15  cash registers.  Where that safe is right there, there's a

16  wall and then directly in front of that wall is where the

17  check-out counter is.

18          And so we went out there and we stopped

19  at the first one and he had me open it up and empty out the

20  cash into it.  And then we went to the second one and that

21  time when we removed the second one, he moved behind me

22  towards the window.  And he had me open it up and empty it

23  out.

24          When I got to the third one, it was windy

25  outside and there's a garbage can out there.  And we had

1   just emptied them out.  I had Robert go empty out the
2   garbage can, so there wasn't anything in it but an empty
3   bag.  The wind had sucked the bag up out of the garbage can
4   and it was floating in the air and he had seen it.  And with
5   his back to the window and the gun pointed at me, he asked
6   me if there was somebody behind him and I looked out the
7   window and there wasn't anyone there, so I told him no.

8                    And I know that -- I mean, whoever was on
9   the other end of that microphone could hear that same thing,
10  too.  I emptied outside the third one and we went back, took
11  me back behind the oil rack.

12           Q.     So he took all the cash from the safe and the
13  three registers?

14           A.     And the three registers.

15           Q.     Once you got to the back, what was going on
16  back there?

17           A.     By the time I got to the back, Robert and
18  Jenny were tied up face down with their hands behind their
19  backs.  They had been taped up.  They laid me down.  They
20  asked us if any of us had driven a vehicle there and if we
21  had it there.  Jenny told them that she had and where her
22  keys were at.

23           Q.     The other man that you encountered, not the
24  other man with the gun, but the one that was identifying
25  himself as a customer, what was he doing?

1    A.    He was actually sitting by where Robert was.

2    They were -- once I got to the back, they laid me face down

3    and the guy that had had the confrontation with Robert, he's

4    the one -- he came back and he pulled my hands behind my

5    back and tied me up.  And they were getting ready to leave.

6    And he was just kind of crying and whining.

7    Q.    You talking about the man?

8    A.    The guy, the customer.

9    Q.    The Hispanic man that said he was a customer?

10   A.    Right.  They were telling us that they were

11   going to take him as hostage.  They wanted us to be still

12   and be quiet for ten minutes after they had left or they

13   would kill this guy.  And he started crying.  He was like,

14   look, you can take my watch, you can take whatever, do

15   whatever, but just don't take me hostage.  And I was just

16   glad they weren't taking Jenny, but I felt bad for the guy,

17   too.

18   Q.    After awhile after you reflected upon it and

19   this incident was over, did you change your mind about that

20   customer?

21   A.    Oh, yeah.  We figured out later that he was in

22   on it.  He was one of them and it was just all a ploy.

23   Q.    Okay.  So after he said that and you were tied

24   up, what did they do then?

25   A.    They had gathered up everything and I

1    remembered the customer had a basket full of merchandise and

2    so did this guy that had gotten in the confrontation with

3    Robert.  So they laid us down and told us, look, it was ten

4    minutes, you know, if we hear anything within ten minutes,

5    we're going to kill this guy.

6                    And they went walking out.  And they

7    walked right out -- they unlocked and walked right out the

8    front door.  And when they did that, whatever the

9    merchandise they had had, we have these tags that make an

10   alarm go off and it's just an internal-type of thing.  And

11   when they walked through, it did, and it went off.

12                   And we waited and it wasn't long Jenny's

13   car -- or Jenny's truck fired up.  I heard it and they

14   pulled back up to the front door and one of them came back

15   inside and we're still laying face down.  And he came back

16   to the back and he said, "All right," he said, "We're giving

17   you guys ten minutes.  You know, we don't want to hear

18   nothing."

19                   And this guy went walking back out and I

20   heard him drop something.  And I heard him drop something.

21   And I had a feeling it was that radio.  I heard it hit the

22   ground and I heard something break apart and he said

23   something and then he picked it up and walked out.  And it

24   was quiet.  And we just laid there for a minute or so.

25        Q.     How did you get free?

1    A.    Robert, Robert got out.  He was a pretty

2  good-sized guy and there was no way duct tape was keeping

3  him tied up.

4    Q.    After he got free, did he help free you?

5    A.    Yeah.  He got Jenny and then got me and we got

6  up and called the police.

7    Q.    Had they taken Jenny's car?

8    A.    Oh, yeah.  They found it.  It was about a

9  block away in a Kroger's parking lot.

10   Q.    Did you determine how much cash,

11 approximately, was taken from the safe and registers?

12   A.    I never asked or found out exactly how much,

13 but it was well over $6,000.

14   Q.    Over $6,000?

15   A.    Probably, somewhere in that range, I'm sure.

16   Q.    Okay.  Did they take some of your personal

17 property with them?

18   A.    Yeah, when we emptied out our wallets, they

19 took everything that we had emptied out.  I emptied out my

20 wallet and my keys onto the ground and they took all of it.

21   Q.    Okay.  Let me show you some objects that have

22 been entered for record purposes.  Do you recognize these

23 torn-up photographs?

24   A.    Yes.  These are pictures of my wife and my

25 daughter.

1          MR. SHOOK:  Your Honor, at this time

2    we'll offer 344 for all purposes.

3          MS. BUSBEE:  No objection.

4          THE COURT:  No. 344 shall be admitted.

5          Q.    (By Mr. Wirskye)  No. 344 found in the trash

6    outside an RV.  The torn photographs we see here is your

7    wife and oldest daughter?

8          A.    Correct.

9          Q.    Had those photographs been in your wallet?

10         A.    Yes, sir, they had.

11         Q.    Let me show you what has been marked and

12   entered for record purposes as 986, the ID there for Texas

13   Board of Private Investigators.  Do you recognize that name?

14         A.    Robert Swihart.  This was the employee that I

15   had working for me.

16         Q.    Okay.  His name was Robert Swihart?

17         A.    Correct.

18         Q.    And let me show you some other identification

19   in there, a driver's license and a concealed handgun

20   license.

21         A.    This is Robert.

22         Q.    That's Robert Swihart's photo?

23         A.    This is his photograph and these are his

24   licenses, that's correct.

25         Q.    This particular photograph that we see in the

1   private investigator is not --

2        A.    That's not Robert.

3        Q.    Okay.

4             MR. SHOOK:  Your Honor, at this time we

5   offer State Exhibit 986.  I may have misidentified it as

6   486.

7             MS. BUSBEE:  No objection.

8             THE COURT:  No. 986 shall be admitted.

9        Q.    (By Mr. Shook)  Let me show you what has been

10  entered for record purposes as 345, a package recovered from

11  the bedroom of the RV.  Do you recognize this document?

12       A.    That's my insurance card.

13       Q.    That's your -- John and Elizabeth Kemp?

14       A.    Correct.

15             MR. SHOOK:  We'll offer State Exhibit

16  345.

17             MS. BUSBEE:  No objection.

18             THE COURT:  No. 345 shall be admitted.

19       Q.    (By Mr. Shook)  And you said the employee that

20  worked for you, let me show you State Exhibit 343-A,

21  contents of that, and this purse.  Is this Jeanne

22  Hawkinson's driver's license, as well as credit cards?

23       A.    Yes, sir.  Employment discount card there,

24  also, for Auto Zone.

25             MR. SHOOK:  We'll offer the contents of

1    State Exhibit 343-A.

2                    MS. BUSBEE:  No objection.

3                    THE COURT:  No. 343-A shall be admitted.

4         Q.    (By Mr. Shook)  Was her vehicle taken from the

5    location?

6         A.    Yes, sir, it was.  They found it about a block

7    away.  Put it in the parking lot.

8                    MR. SHOOK:  We'll pass the witness, Your

9    Honor.

10                        CROSS-EXAMINATION

11   BY MS. BUSBEE:

12        Q.    I have some questions.  Who were the other two

13   people?  Did you ever identify them?

14        A.    The other two people?

15        Q.    The other two people that were in your store

16   that weren't employees like the man that had the gun that

17   threatened Robert?  Did you identify him?

18        A.    Um, did I identify him?

19        Q.    Uh-huh.

20        A.    I believe it was Newbury.

21        Q.    Okay.  What about the pretend customer, was

22   that Joseph Garcia?

23        A.    I believe so.

24                    MS. BUSBEE:  I'll pass the witness, Your

25   Honor.

1               MR. SHOOK:  Just one more question,

2    Judge.

3               REDIRECT EXAMINATION

4    BY MR. SHOOK:

5         Q.     The type of radio, did you see the type of

6    radio Mr. Rivas was using?

7         A.     Yeah.  It was a little two-way radio like

8    this.

9         Q.     Let me show you State Exhibit 612.  Is that

10   the two-way radio?

11        A.     It was similar to that.  And the only reason

12   that I recognized it, during Thanksgiving we had gone on a

13   vacation.  We had gone up to a campsite and this was like

14   the latest new toy gadget device.  They were these little

15   miniature type of two-way walkie-talkies.  And an aunt and

16   uncle had brought a set, actually two different sets of

17   aunts and uncles had brought them up there and my daughter

18   was just totally fascinated with this little thing.

19             So when I saw it, I remembered thinking

20   that, oh, he's got one of those little -- that's how I knew

21   it was a two-way radio.

22        Q.     And that's the one he was saying "maximizing"?

23        A.     Right.  When he put the earpiece on and he

24   made it click, I heard it.

25              MR. SHOOK:  We'll offer State Exhibit

1  612.

2               MS. BUSBEE:  I have no objection.

3               THE COURT:  No. 612 shall be admitted.

4       Q.    (By Mr. Shook)  That's a photograph that you

5  have just identified; is that correct?

6       A.    Correct.

7               MR. SHOOK:  We'll pass the witness.

8                    RECROSS EXAMINATION

9  BY MS. BUSBEE:

10      Q.    You said that it was dropped on the floor.

11 Was it broken?

12      A.    Oh, yeah, there was pieces of it.

13      Q.    Was that the one that was dropped on the

14 floor?

15      A.    No.

16      Q.    Do you know where that one came from?

17      A.    Where what one came from?

18      Q.    Is that --

19      A.    I have no idea where that radio -- I'm going

20 to assume Radio Shack is what it says on it.

21      Q.    But that's not the one that was dropped on the

22 floor?

23      A.    No, it's not.  It has a similarity.  The one

24 that was dropped in the store was transparent blue hard

25 plastic, just like -- well, just that.

1   Q.   Okay.  But just transparent.  Was it broken?

2   A.   Oh, yeah, there was pieces of it.  I had heard

3   it and everything that was happening.  It wasn't until after

4   the police were in the store that I remembered I heard

5   something hit the ground.  He dropped something.  And so I

6   just got down on all hands, on my hands and knees.  I mean,

7   the cops are in the store, I've got district managers,

8   managers from other stores in the store and I'm on my hands

9   and knees looking around.  And they're like, what are you

10  doing?  And I said, he dropped something.  I heard something

11  hit the ground.  And I found pieces of it.  There were

12  pieces of it laying on the floor.  I found the batteries.

13  Q.   I'm guessing the police took that with them?

14  A.   I'm sure they did.  I don't know.

15      MS. BUSBEE:  Thank you, sir.  I have no

16  more questions, Your Honor.

17      MR. SHOOK:  That's all we have, Judge.

18      THE COURT:  Thank you, Mr. Kemp.

19      MR. SHOOK:  May this witness be excused?

20      MS. BUSBEE:  No objection, Your Honor.

21      THE COURT:  He may.

22      MR. WIRSKYE:  Call Detective Jaramillo.

23      LARRY JARAMILLO,

24  having been duly sworn, was examined and testified as

25  follows:

1                    DIRECT EXAMINATION

2    BY MR. WIRSKYE:

3         Q.    Sir, can you tell us your full name and please

4    spell your last name for the Court Reporter.

5         A.    Yes, sir.  My name is Larry M. Jaramillo.  the

6    spelling is J-A-R-A-M-I-L-L-O.

7         Q.    How are you employed?

8         A.    I'm employed with the City of Pasadena.

9         Q.    As a police officer, obviously?

10        A.    Yes.

11        Q.    What is your specific assignment or duty for

12   the City of Pasadena?

13        A.    I'm a Crime Scene Investigator assigned to the

14   Identification and Crime Scene Unit.

15        Q.    What type of training or experience do you

16   have that allows you to be a crime scene investigator?

17        A.    I have several hundred hours of crime scene

18   investigation that I have taken through various different

19   agencies, DPS, Department of Public Safety, Houston, and

20   also at the Pasadena Police Department.

21        Q.    Let me direct your attention back to Tuesday,

22   December 19 of 2000.  Did you get a call to go out and

23   process a gray pickup truck?

24        A.    Yes, I did.

25        Q.    Was it your understanding that that truck was

1   related to a robbery that had happened at an Auto Zone?

2       A.      Yes, sir.

3       Q.      Were you the crime scene officer that went to

4   the Auto Zone?

5       A.      No, sir.

6       Q.      There was another detective that went there to

7   process that scene?

8       A.      Yes, sir.

9       Q.      Where did you get called out to to process

10  that truck?

11      A.      I got called out to the 7300 block of Spencer,

12  located in Pasadena.

13      Q.      And what is at that location?

14      A.      There's a grocery store, an Albertson's, and a

15  little strip center in that hundred block.

16      Q.      And who was there when you got there to the

17  scene?

18      A.      Officer Gunther.

19      Q.      Were there any civilians around?

20      A.      No, sir.

21      Q.      Did you later come to know that that truck

22  belonged to an Auto Zone employee named Jeanne Hawkinson?

23      A.      Yes, sir, I did.

24      Q.      While you were out there, did you take

25  photographs of that car while you were out there?

```
1        A.      Yes, sir, I did.

2                        MR. WIRSKYE:  May I approach, Your Honor?

3                        THE COURT:  You may.

4        Q.      (By Mr. Wirskye)  Detective, let me show you a

5   series of photographs marked for identification as State's

6   1015 through 1023.  Are these the photographs of the car and

7   the scene that you processed that night?

8        A.      Yes, sir, they are.

9                        MR. WIRSKYE:  Judge, we offer 1015

10  through 1023.

11                       MS. BUSBEE:  No objection, Your Honor.

12                       THE COURT:  States 1015 through 1023

13  shall be admitted.

14       Q.      (By Mr. Wirskye)  What type of stores are in

15  this strip center?

16       A.      In the strip center you have a Marble Slab, a

17  nail polish or a nail place, and CiCi's Pizza.

18       Q.      Where was the truck located?

19       A.      It was located on the -- it was actually

20  located between the Albertson's and the strip center, east

21  of the Albertson's and west of the strip center.

22       Q.      Let me show you State's 1015 and see if you

23  recognize that.

24       A.      Yes, sir.

25       Q.      Okay.  This is the truck, Ms. Hawkinson's
```

1  truck?

2         A.    Yes, sir.

3         Q.    What is this building?

4         A.    That is the building where the Marble Slab,

5  the strip center.

6         Q.    What side is the Albertson's on?

7         A.    It's to the left.

8         Q.    This vehicle right here, what is that?

9         A.    That's our Crime Scene Unit, our crime scene

10  van.

11         Q.    And State's 1016, what does that show?

12         A.    That's the same truck with the strip center.

13  It's just a different angle, showing southbound.

14         Q.    And when you rolled up to process that scene

15  and talk with the officer who was there, walk us through

16  exactly what you did to process that truck.

17         A.    Um, upon arrival I contacted Officer Gunther

18  who is parked actually to the right of my truck.  He told me

19  that he would fill me in with the details, that the vehicle

20  had been taken during a robbery and there was two pieces of

21  items that he wanted me to pay close attention to because

22  the owner of the vehicle who had found the truck had told

23  them that those weren't hers.

24         Q.    And what were those two items?

25         A.    In particular, it was two earpieces that go to

1   a little radio, handheld radios.

2          Q.      Did you see those when you examined the truck?

3          A.      Yes, I did.

4          Q.      Where were they located?

5          A.      The first one was located hanging out of the

6   driver's side door.

7          Q.      Let me show you State's 1017.  Is that it?

8          A.      Yes, sir.  And the second one was in the bed

9   of the truck.

10          Q.      I'll show you State's 1021.  What do we see in

11   State's 1021?

12          A.      That's that earpiece that goes to the radio.

13          Q.      Okay.  And State's 1023, is that just a closer

14   shot of the --

15          A.      Yes.  It's just a different angle.

16          Q.      So you had two earpieces, one in the driver's

17   door and one in the bed; is that right?

18          A.      Yes, sir.

19          Q.      What did you do when you saw those two pieces

20   of evidence?

21          A.      I photographed them and then after I had

22   completed taking all my photographs, I collected them.  The

23   first one was -- I took a bag with me and collected it and

24   labeled the bag as ID-1 and where I recovered the piece

25   from.

1    Q.    What is the significance of ID-1?

2    A.    It shows each particular piece of evidence, so

3 that way you don't get them confused as mistakenly saying

4 this one was actually in the bed of the truck when it was

5 actually hanging out the door.

6    Q.    So the one hanging out the driver's door was

7 labeled ID-1?

8    A.    Yes.

9    Q.    And what we see up on the screen --

10    A.    Is ID-2.

11    Q.    -- ID-2 from the truck bed?

12    A.    Yes, sir.

13    Q.    Did you do anything else with that evidence

14 after you collected it?

15    A.    Um, I sealed it up and submitted it or placed

16 it into the property room, so it could be secured.

17    Q.    And you brought some evidence with you when

18 you came up from Pasadena; is that correct?

19    A.    Yes, sir.

20    Q.    Let me show you two pieces of evidence.  The

21 first has been marked State's 1030, and ask you to look at

22 that and see if you can identify it.

23    A.    Yes.

24    Q.    And that's the earpiece from the driver's side

25 door?

1      A.      Yes, sir.

2      Q.      And also 1031 and ask you to look at that and

3  I kind of want to focus on that piece of evidence.  Would

4  you pull it out and show it to the members of the jury?

5      A.      [Witness complies.]

6      Q.      And that's ID-2 from the bed of the truck?

7      A.      Yes, sir.  I labeled the bag accordingly.

8      Q.      And these bags have your markings that show

9  exactly where you found them?

10     A.      Yes, sir.

11     Q.      What do you do with evidence once you pick it

12  up at the crime scene like that?  Where do you keep it in

13  the police station?

14     A.      We have got a property room where all the

15  evidence is secured.  There's only three people that have

16  access to that property room, which are the property room

17  officers and our supervisor.

18     Q.      And that's what you did with this property

19  that evening?

20     A.      Yes, sir.

21     Q.      Did that end your involvement in investigating

22  that Auto Zone robbery?

23     A.      Yes, sir.

24     Q.      Who was the lead detective that was assigned

25  to that case?

1      A.      That would be Detective Sergeant Bonsal.

2      Q.      And he's out in the hall ready to testify

3  next; is that right?

4      A.      Yes, sir.

5              MR. WIRSKYE:  Judge, I offer 1030 and

6  1031.

7              MS. BUSBEE:  No objection, Your Honor.

8              THE COURT:  Nos. 1030 and 1031 shall be

9  admitted.

10             MR. WIRSKYE:  I'll pass the witness.

11             MS. BUSBEE:  No questions, Your Honor.

12             THE COURT:  Thank you, Officer.  You may

13 stand down.

14                    KURT BONSAL,

15 having been duly sworn, was examined and testified as

16 follows:

17                 DIRECT EXAMINATION

18 BY MR. WIRSKYE:

19     Q.      Detective, could you tell us your full name

20 and spell your last name, please.

21     A.      My name is Kurt W. Bonsal.  It's B-O-N-S-A-L.

22     Q.      And you are a police officer with the City of

23 Pasadena, Texas?

24     A.      Yes, sir, I am.

25     Q.      How big is Pasadena?

1        A.      Population is about 150,000, roughly.

2        Q.      And where is it located?

3        A.      Southeast of Harris County, next to the city

4   limits of Houston.

5        Q.      You were within Harris County?

6        A.      Yes, sir.

7        Q.      How long have you been a police officer there?

8        A.      A little over 16 years.

9        Q.      Where are you currently assigned?

10       A.      I'm a Supervisor in the Detective Division.

11       Q.      And how long have you had that assignment?

12       A.      About five years.

13       Q.      Let me direct your attention back to December

14   of 2000.  Were you the lead detective on an Auto Zone

15   robbery that happened in your city?

16       A.      Yes, sir, I was.

17       Q.      Did you actually make it out to the scene that

18   night?

19       A.      No, I did not.

20       Q.      When was your first involvement in the case?

21       A.      The day after.

22       Q.      And what did that consist of?

23       A.      The case was assigned to me to conduct the

24   follow-up investigation.  I reviewed the police reports that

25   were submitted.

1    Q.    Once you reviewed the reports from that

2  evening, did anything strike you or stand out in your mind

3  with respect to the way the robbery was committed?

4    A.    Yes.

5    Q.    And what were those things?

6    A.    The revolvers were used, multiple suspects,

7  and the take-over-type robbery, along with one of the

8  complainant's vehicles being taken.

9    Q.    In your mind why was it unusual that these

10  people used revolvers?

11    A.    I'm the robbery squad supervisor and have been

12  for some time and we don't have a lot of robberies where

13  revolvers are used.  It's an old weapon for a lot of people

14  now.  And I've been aware of a newspaper report of revolvers

15  being stolen from TDC.

16    Q.    So in your mind you instantly thought this may

17  be connected to the Connally Unit prison break?

18    A.    Yes, sir.

19    Q.    At this point how many people did you think

20  were involved in the robbery?  How many individuals?

21    A.    At that point I knew of three that had been

22  inside the business, yeah, three.

23    Q.    Did you think the participants were just

24  limited to those three?

25    A.    No, sir.

1    Q.    Why not?

2    A.    There was radios used and communication was

3    being conducted over small, handheld radios.

4    Q.    What physical evidence was collected from that

5    Auto Zone, the actual store?

6    A.    From the actual store there was some duct tape

7    that was recovered, along with an earpiece from a radio and

8    a battery holder out of a radio.

9    Q.    And from the truck that was recovered, what

10   did you have?

11   A.    Out of the truck it was two earpieces.  One

12   was recovered from the bed of the truck and one from the

13   door, hanging out of the door, and I believe a piece of

14   tissue.

15   Q.    With respect to your follow-up investigation

16   from that point, did you contact the prison system?

17   A.    Yes, sir, I did.

18   Q.    And you made them aware of your robbery?

19   A.    Yes, sir.

20   Q.    Did you receive photographs of the individuals

21   involved in the robbery?

22   A.    Yes, sir, I did.

23   Q.    Did you show lineups to your witnesses?

24   A.    Yes, I did.

25   Q.    Did you ever have any positive identifications

1   in your lineups?

2         A.      No positive identifications.

3         Q.      To what do you attribute that?

4         A.      I believe the photographs were old.

5         Q.      At some point as your investigation went on,

6   were you made aware of a robbery up here in Irving, Texas,

7   of an Oshman's?

8         A.      Yes, sir.

9         Q.      Did you see any similarities between that

10  robbery and the robbery that you were working at Auto Zone?

11        A.      Yes.

12        Q.      And what was that?

13        A.      The number of people, the radios, the

14  take-over, and also I believe the vehicle taken from one of

15  the complainants.

16        Q.      And that is exactly what you had at Auto Zone?

17        A.      Yes, sir.

18        Q.      Once you heard about the Oshman's robberies,

19  what did you do?

20        A.      I contacted the Fugitive Unit at the

21  Department of Public Safety.

22        Q.      Why did you contact them?

23        A.      The -- my understanding, they were involved in

24  the -- part of the investigation.

25        Q.      Did you ever turn any evidence over to the

1    Department of Public Safety?

2          A.     Yes, I did.

3          Q.     And what -- specifically, what items of

4    evidence did you turn over to the DPS?

5          A.     The earpieces that were recovered from the

6    vehicle that had belonged to the complainant.

7          Q.     Okay.

8                 MR. WIRSKYE:  Your Honor, may I approach?

9                 THE COURT:  You may.

10         Q.     (By Mr. Wirskye)  Detective Bonsal, let me

11   show you two pieces of evidence, first State's 1030.  See if

12   you can tell if that's the evidence that you turned over to

13   DPS?

14         A.     Yes, it is.

15         Q.     And that's ID-1 from the driver's side door?

16         A.     Yes.

17         Q.     And more importantly I'll have you look at

18   State's 1031, ID-2, is that the earpiece from the bed of the

19   pickup truck?

20         A.     Yes.

21         Q.     And that was also turned over to DPS?

22         A.     Yes, sir, it was.

23         Q.     Was that for the purpose of any DNA testing on

24   those earpieces?

25         A.     Yes, sir.

1    Q.    Did you come to know that the Department of

2  Public Safety Lab was able to get a DNA profile off those

3  earpieces?

4    A.    Yes, sir.

5    Q.    And they subsequently returned those pieces of

6  evidence to your office and you brought them with you to

7  court today; is that right?

8    A.    Yes, sir, that's correct.

9    Q.    Based on your investigation, you believe that

10  the inmates involved in the prison breakout were responsible

11  for your Auto Zone robbery?

12    A.    Yes, sir, that's correct.

13          MR. WIRSKYE:   I'll pass the witness.

14               CROSS-EXAMINATION

15  BY MS. BUSBEE:

16    Q.    Just one question.   How many earpieces did you

17  recover?

18    A.    Um, I believe there were two recovered from

19  the vehicle and a piece of an earpiece was recovered inside

20  the store.

21    Q.    Did you turn that over for DNA testing?

22    A.    I don't know if that one was or not.

23    Q.    Did you find pieces of a radio in the store?

24    A.    Yes.

25    Q.    What do you did with that?

1      A.    The radio was still -- the pieces of the radio

2  is still in evidence.

3      Q.    Okay.  And do you know if any testing was done

4  on that?

5      A.    No.

6      Q.    Were any fingerprints taken?

7      A.    They were processed for fingerprints, yes,

8  ma'am.

9      Q.    Do you know the results of those fingerprint

10  examinations?

11      A.    No matches.

12      Q.    Okay.

13          MS. BUSBEE:  I have no more questions,

14  Your Honor.

15               REDIRECT EXAMINATION

16  BY MR. WIRSKYE:

17      Q.    One question, Detective.  Let me show you this

18  photograph.  I believe you took State's 612; is that

19  correct?

20      A.    Yes, I took this photograph.

21      Q.    I guess we see some battery cartridges in that

22  photograph?

23      A.    Yes, sir.

24      Q.    I'll take it back and put it up on the screen.

25  One of the battery cartridges was actually recovered from

1    the Auto Zone; is that correct?

2          A.    Yes, sir, that's correct.

3          Q.    We see that on the screen?

4          A.    Yes, sir.

5          Q.    And you were able to actually match it back to

6    a Radio Shack radio; is that correct?

7          A.    Yes, sir, that's correct.

8          Q.    Because of the cartridge battery cases are

9    similar or the same?

10          A.    Yes, sir.

11               MR. WIRSKYE:  I'll pass the witness.

12               MS. BUSBEE:  I have no more questions,

13    Your Honor.

14               THE COURT:  Thank you, Detective.

15               MR. WIRSKYE:  May we approach, Your

16    Honor?

17               THE COURT:  You may.

18                   (Bench conference)

19               THE COURT:  Members of the jury, it's now

20    4:00 and we can't get all the -- I'm not going to go to the

21    next witness today.  That's what we're having a conference

22    about.  Unlike what you see on TV, you don't have the two or

23    three commercial breaks between witnesses.  There's a lot

24    that goes into scheduling.

25               As I said, I'm not going to waste your

191

1   time.  We don't need you back until 10:30 tomorrow morning,

2   10:30.  That way we won't have you back here waiting.  We'll

3   have you back tomorrow morning at 10:30 a.m. ready for

4   trial.

5                All the previous instructions that I have

6   given you still apply.  I'm going to go through them again.

7   I know you get tired of it.  No media from any source,

8   radio, Internet, TV, newspaper, friends, you know, anything.

9   Don't discuss it.  Avoid it like the plague.  Everything you

10  need to learn about this case comes from where?  The witness

11  stand.  A few more days to go.

12               So, if you would, please recess with the

13  Sheriff and be back here tomorrow morning ready to go to

14  work at 10:30.

15                        [Jury out]

16                        [End of Volume]

17

18

19

20

21

22

23

24

25

1   STATE OF TEXAS            *

2   COUNTY OF DALLAS          *

3       I, NANCY BREWER, Official Court Reporter for the 283rd

4   Judicial District Court, do hereby certify that the above

5   and foregoing constitutes a true and correct transcription

6   of all portions of evidence and other proceedings requested

7   in writing by counsel for the parties to be included in this

8   volume of the Reporter's Record, in the above-styled and

9   numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11      WITNESS MY OFFICIAL HAND on this the 4 day of

12  _____March_____, 2004.

13

14

15          NANCY BREWER, CSR, NO. 5759

16          Expiration Date:  12-31-04
            Official Reporter, 283rd JDC

17          Frank Crowley Crts. Bldg. LB33
            133 No. Industrial Blvd.

18          Dallas, TX 75207
            (214)653-5863

19

20

21

22

23

24

25