# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————

No. 17-70030

———————

PATRICK HENRY MURPHY,

        Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

        Respondent - Appellee

United States Court of Appeals
Fifth Circuit

**FILED**

June 11, 2018

Lyle W. Cayce
Clerk

———————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:09-CV-1368

———————

Before KING, ELROD, and HIGGINSON, Circuit Judges.

PER CURIAM:*

Patrick Henry Murphy and six other Texas inmates escaped from prison and then pulled off a string of armed robberies, culminating in the fatal shooting of a police officer. Murphy was caught, convicted, and sentenced to death. Murphy's direct appeal and state habeas application failed, and the district court denied his federal habeas petition.

———————

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-70030

Murphy now asks this court for a certificate of appealability under 28 U.S.C. § 2253(c)(2) to appeal the denial of his petition for writ of habeas corpus. He presents three claims that he believes warrant further development: (1) an Eighth Amendment claim that his criminal culpability does not permit a death sentence under *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987); (2) an ineffective-assistance-of-appellate-counsel claim based on appellate counsel's failure to raise the just-referenced *Enmund/Tison* claim on direct appeal; and (3) an ineffective-assistance-of-trial-counsel claim based on trial counsel's performance at the penalty phase of trial. We DENY Murphy's request on all claims.

## I.

## A.

On December 13, 2000, seven inmates escaped from a Texas state prison located in Kenedy, Texas. The seven inmates—George Rivas, Larry Harper, Donald Newbury, Randy Halprin, Joseph Garcia, Michael Rodriguez, and Patrick Henry Murphy—all were serving long sentences for violent crimes. The newspapers would call this group the "Texas Seven."

The breakout happened during lunch. Six of the seven, including Murphy, had work assignments in the prison's maintenance department. The day of the breakout, those six stayed behind during their lunch break to work in the warehouse. Once most of the people had cleared out for lunch, George Rivas asked Patrick Moczygemba, a civilian supervisor overseeing their work, to check some equipment under a table. As Moczygemba bent down, he was struck on the back of the head and knocked unconscious.

When he came to, Moczygemba struggled but was quickly subdued when Joseph Garcia put a shank to his throat. Moczygemba's clothes were stripped and he was tied, gagged, blindfolded, and carried to an electrical room. As other employees and inmates trickled back from lunch, they received similar

2

Case: 17-70030    Document: 00514538736    Page: 3    Date Filed: 07/03/2018
Case 3:09-cv-01368-L-BN   Document 129   Filed 07/03/18   Page 3 of 26   PageID 10467

No. 17-70030

treatment. In total, about 14 people were caught and stuffed in the electrical room.

Sometime shortly after, the back-gate guard got a phone call from a person identifying himself as Patrick Moczygemba. The man said maintenance was en route to install surveillance equipment. Soon after, two inmates—one of whom was Murphy—and a man dressed as a civilian supervisor (who turned out to be Larry Harper) showed up at the back gate. Using a telephone call as a distraction, the inmates overpowered the guard, taped his ankles, handcuffed him to a chair, and shut him in a restroom. From there, the seven stole a variety of firearms and ammunition, and fled the prison in a stolen vehicle.

The group then headed to Irving, Texas, where they hatched a plan to rob Oshman's Supersports on December 24. It was during the Oshman's robbery that Officer Aubrey Hawkins was shot and killed.

Fifteen minutes before Oshman's closed, George Rivas and Larry Harper entered the store disguised as security guards. The other escapees—besides Murphy—were already inside, spread around the store, and pretending to be customers. Murphy was parked in Oshman's lot in a Chevrolet Suburban. He was, in his words, the "backup and lookout."

Back in the store, Rivas and Harper approached a store manager and told him they were investigating a local shoplifting ring. Rivas convinced the manager to let him check the store's security tapes. After viewing the tapes, Rivas said they did not help his investigation, and they returned to the store floor. By then, most of the store employees were gathered at the front, talking with Harper. With them gathered, Rivas announced that they were robbing the store.

The escapees surrounded the employees, guns drawn. The employees surrendered, got patted down, and were walked to a breakroom in the back. Rivas took the store manager back through the store, grabbing cash from the

registers and guns from the gun department. The manager was then returned to the back, where he and the other employees were tied up. Rivas took the keys to the manager's Ford Explorer and told the other escapees to meet him behind the store. Rivas left Oshman's, retrieved the manager's Explorer, and drove it around to the back of the store. While Rivas was retrieving the car, a witness who spotted some of the events inside Oshman's called the police.

Back inside the store, the manager heard someone on the radio tell the escapees to hurry up and get out because they "had company." Another employee said he heard, "Come on, we got to go. We got to go. We got company."

Officer Aubrey Hawkins was the company. He was the responding officer, sent to Oshman's on a suspicious persons call. When he drove around the store to the back, a firefight ensued. Hawkins was shot multiple times (Rivas and Halprin were as well). Hawkins was then pulled out of his car, run over, and dragged several feet by the escapees fleeing the scene in the Explorer. At the scene, Hawkins was found lying face down on the ground without a pulse.

The six in the Explorer met up with Murphy at a nearby apartment complex. From there, they headed to Colorado. A little less than a month after the shooting, Murphy and five of the other escapees were captured (Larry Harper committed suicide before being taken). Murphy and the surviving escapees were brought back to Texas, charged with capital murder, and informed that Texas would seek the death penalty in all their cases.[1]

## B.

Pursuant to Texas's death-penalty scheme, Murphy's trial was split into guilt and penalty phases. Central to the State's case for Murphy's guilt was a

---

[1] All the surviving escapees were sentenced to death. George Rivas, Donald Newbury, and Michael Rodriguez have been executed. Joseph Garcia and Randy Halprin currently sit on death row.

statement Murphy wrote for police after he was captured. In this statement, Murphy explained the rationale for the robbery, his role in the heist, and what occurred.

Murphy wrote that the group picked Oshman's because it had a wide range of weaponry and clothing. Their goal was to increase their "arsenal" and ditch the guns taken from prison. Murphy explained that members of the group "were pretty much equal," and they "weighed the pro's and con's" of robbing Oshman's. Murphy added that he was against the plan because Oshman's had a lot of employees and he was afraid of being recognized. Nevertheless, he went along as the "backup and lookout."

To play his part, Murphy had a two-way radio and a radio scanner he programmed to police frequencies. He also had several loaded guns in the Suburban—two .357 revolvers, an AR-15, and a .12-gauge pump shotgun. Murphy knew that the escapees inside the store were similarly armed. Murphy added that if he were pursued by police, his purpose "was to initiate a firefight with the AR-15."

Murphy also described the events that precipitated Hawkins's death. While the robbery was in progress, Murphy spotted a police car and heard over the scanner a report of suspicious activity at Oshman's. Murphy radioed the group "to abort" because the police were there. He told them the patrol car's location and the direction it was headed. When he saw the car pass Oshman's and pull around to the back, Murphy radioed, "He's coming around the corner. Leave. Leave." Shortly after, one of the other escapees radioed Murphy and told him to meet them at the pickup point. Murphy secured his guns and rendezvoused with the group. When they met up, the other escapees told Murphy they had shot a police officer.

Murphy's counsel gave no opening statement, called no witnesses, and put on no evidence. The jury convicted Murphy of capital murder.

No. 17-70030

**C.**

At the penalty phase, the State introduced Murphy's prior convictions for burglary and aggravated sexual assault, called Murphy's sexual-assault victim to describe the facts of the at-knifepoint rape, corroborated her story with several witnesses and DNA evidence, called witnesses to the prison break, and put on a handwritten note found in Murphy's prison dormitory. The note read: "I refuse to abide by the dictations of a police state, which Texas has surely become. Today I fire the first shot of THE NEW REV[O]LUTION. Long live freedom. Death to tyranny."

To avoid the death penalty, Murphy called several witnesses to testify about his terrible childhood. Murphy's aunt testified that after Murphy was born, his mother would frequently leave him with relatives for long periods without explanation. When his mother would pick him up, she would be under the influence of drugs and alcohol. When Murphy was just a few months old, his mother became pregnant. Murphy's biological father, according to the aunt, physically abused his mother such that she miscarried. The two soon divorced. When Murphy was one and a half, his father lost custody rights over Murphy by failing to return him one weekend. Murphy's aunt added that when Murphy's father brought him to court for a custody hearing, Murphy was in bad shape. He, his clothes, and his diaper were dirty, he was covered with cigarette burns, and his diaper pin went through his skin.

When Murphy was four, his mother had another child. Soon after the child was brought home from the hospital, the man Murphy's mother was dating raped her, resulting in a two-week hospitalization. After this, Murphy's mother became physically abusive towards Murphy, hitting and slapping him. Murphy's mother also dated—on-again, off-again—a convicted child molester who served jail time on weekends. Murphy's mother continued to drink and use drugs regularly, and she gave birth to a child that had severe birth defects.

6

Case: 17-70030    Document: 00514538736    Page: 7    Date Filed: 07/03/2018
Case 3:09-cv-01368-L-BN    Document 129    Filed 07/03/18    Page 7 of 26    PageID 10471

No. 17-70030

By nine or ten, Murphy became uncontrollable. Around that time, he began living with his biological father.

Murphy's biological father picked up where the aunt left off. He said that when he regained custody over Murphy, Murphy was dirty and covered in infected mosquito bites and ringworms. Murphy's father had to teach him basic hygiene, like how to bathe and brush his teeth. Murphy's father admitted he was frequently away from the house, due to his trucking job. Murphy would often run away from home.

On top of evidence of his rough upbringing, Murphy presented evidence that he would not be a future threat to society. One key witness for this was S. O. Woods, a former assistant director for the Texas Department of Criminal Justice institutional division. Before the breakout, Murphy had been incarcerated for 16 years. During that time, he incurred just three major disciplinary offenses. Murphy also was not in a prison gang, and, at one time, he had a projected release date of 2001. Woods said that if Murphy returned to prison, he would be put in administrative segregation, and would be given just one hour a day outside of his cell. By contrast, during Murphy's previous prison stint, he was housed in a low-security dormitory and had a low-security job.

Wood's cross-examination did not go well. The prosecutor asked Woods about Murphy's past crimes and the prison break. Eventually, the prosecutor pressed Woods into admitting that he thought Murphy would be "a very dangerous inmate."

Murphy's last witness was Doctor Mark Vigen. Vigen—who is a licensed forensic psychologist with over twenty years of experience at the time of trial— testified on Murphy's mental state and future dangerousness. To form the basis for his opinion, Vigen interviewed Murphy, his family members (Murphy's father, aunt, half-brother, two half-sisters, and two cousins), and two doctors—one psychiatrist and one psychologist—who had previously

### No. 17-70030

evaluated Murphy. Vigen also reviewed Murphy's pre-prison records (juvenile records, army records, and arrest records) and his prison records, including Murphy's mental-health records, social-services records, and clinical records.

From this investigation, Vigen reached five conclusions. First, Murphy has a sexual disorder, not otherwise specified, and narcissistic, borderline, and antisocial personality traits.[2] Second, the disorder and traits were a result of a long and severe developmental history of family dysfunction. Specifically, Vigen isolated Murphy's experience of childhood neglect, abandonment, upheaval, physical abuse, and sexual abuse. Third, Murphy was more a follower than a leader in the escape, robbery, and murder. Fourth, Murphy presented a very low risk of future violence in prison because Texas would likely put him in administrative segregation. Fifth and finally, Murphy had potential for rehabilitation and "personal spiritual conversion" as he aged and received therapy in prison.

Both sides rested. After the jury was instructed on Texas's standard for a death sentence, it returned answers authorizing imposition of the death penalty. Murphy was then sentenced to death.

### D.

After Murphy's direct appeal and state habeas application failed, he filed a federal habeas petition, which was referred to a magistrate judge. In it, Murphy attacked the constitutionality of his death sentence. Specifically, Murphy argued that the test for imposing the death penalty on a non-triggerman under *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987), was not satisfied. Murphy argued that under

---

[2] Vigen explained the difference between disorders and traits. A disorder is a group of symptoms that causes personal distress, dysfunction, loss of freedom, or the threat of death. By contrast, a trait is less severe. It meets some criteria of the associated disorder but not a sufficient number to cause distress or dysfunction.

No. 17-70030

*Enmund/Tison*, the death penalty may only be imposed on a non-triggerman that at least: (1) "played a major role in the criminal activities leading to [the] death," and (2) "displayed reckless indifference to human life." *See Foster v. Quarterman*, 466 F.3d 359, 370 (5th Cir. 2006). According to Murphy, the jury instructions across both stages of his trial were worded in such a way that the jury could have sentenced him to death without making either finding.

Murphy also brought two relevant claims not raised before any state court. He raised an ineffective-assistance-of-appellate-counsel (IAAC) claim, attacking state appellate counsel's failure to raise his *Enmund/Tison* claim. He also brought an ineffective-assistance-of-trial-counsel (IATC) claim, attacking trial counsel's performance at the penalty phase.

The magistrate judge held an evidentiary hearing to determine whether Murphy could excuse his procedural default of these ineffectiveness claims via *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013). Ultimately, the magistrate judge recommended denial of all Murphy's claims as procedurally barred and meritless. The district court adopted this recommendation, and also declined to issue a certificate of appealability (COA) on any of Murphy's claims. Murphy now seeks a COA from this court.

## II.

We may issue a COA only when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further'"—that is, whether the applicant's claims are "debatable." *Buck v. Davis*, 137 S. Ct. 759, 773-74 (2017) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327, 348 (2003)).

9

### No. 17-70030

Despite this lenient standard, issuance of a COA is not automatic. *See Miller-El*, 537 U.S. at 337. "A prisoner seeking a COA must prove 'something more than the absence of frivolity' or the existence of mere 'good faith' on his or her part." *Id.* at 338 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)). If a district court dismisses a claim on procedural grounds (as was the case here), a COA should issue only if (1) "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," and (2) "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

In this case, Murphy seeks a COA on three constitutional claims:

(1) Murphy claims he was sentenced to death without either necessary finding under *Enmund/Tison* for imposition of the death penalty on a non-triggerman.
(2) Murphy next claims that if his state appellate counsel failed to raise his *Enmund/Tison* claim on direct appeal, then appellate counsel rendered constitutionally deficient assistance.
(3) Murphy finally claims he was deprived of effective assistance of counsel in the penalty phase of his trial.

We consider each claim in turn. We ultimately conclude that all three are undebatably procedurally barred. Thus, we deny a COA on all three claims.

### III.

Murphy's *Enmund/Tison* claim is clearly procedurally barred. But an extended digression into the path Murphy's *Enmund/Tison* claim took to get to us is necessary to understand why.

At the guilt phase of Murphy's trial, the jury was instructed on a total of four theories of capital murder. The jury was presented with two potential theories on the means or method of capital murder—murder of a peace officer and murder in the course of a robbery. *See* Tex. Penal Code Ann. § 19.03(a)(1),

## No. 17-70030

(2). The jury was also given two so-called "law of parties" instructions—aider and abettor liability and conspiracy liability. *See id.* § 7.02(a), (b). This created a total of four potential theories of guilt (two means or methods times two criminal liability theories).

Before the jury was instructed, Murphy raised a variety of objections. Three of those objections are relevant here. First, he asked "the Court to enter an instructed verdict based on" *Enmund*, as the evidence failed to show that Murphy killed or attempted to kill Officer Hawkins. Next, Murphy asked the court to force the state to elect one of the two means or methods of capital murder—killing a police officer or murder during a robbery. Murphy argued that if both theories were given to the jury, the jury could split on the theories and still return a unanimous verdict. This, according to Murphy, would violate a constitutional requirement of jury unanimity. Finally, Murphy asked for an election between the two law of parties instructions—aider and abettor or conspiracy liability—again, based on jury unanimity concerns. All three objections were overruled.

At the penalty phase, the jury was instructed on Texas's standard for imposing the death penalty. *See* Tex. Code Crim. Proc. Ann. art. 37.071 § 2. The jury received the traditional future-dangerousness and mitigating-circumstances special issues. *See id.* § 2(b)(1), (d)(1). But in addition, because the guilt-phase charge allowed the jury to find Murphy guilty as a party, the jury was given a modified version of the so-called "anti-parties" special issue meant to render a death sentence *Enmund/Tison* compliant. *See id.* § 2(b)(2). The jury was asked, "do you find from the evidence beyond a reasonable doubt that the defendant . . . intended to kill the deceased or another or anticipated that a human life would be taken." Murphy objected to this wording, claiming that it was not enough to render a potential death sentence *Enmund/Tison*

11

No. 17-70030

compliant. The court overruled this objection, and the jury received the anti-parties special issue described above.

After being convicted and sentenced, Murphy filed a direct appeal to the Texas Court of Criminal Appeals (TCCA), where he raised 42 points of error. He broke his claims into four categories: "Issues on Voir Dire," "Issues on Trial," "Issues on Punishment," and "Constitutional Issues." Murphy's eighteenth point—which fell in the "Issues on Trial" section—addressed *Enmund*. We reproduce it in full below:

### Issue No. 18

**The trial court erred in overruling appellant's objection to the jury charge concerning the applicability of sec. 7.02(b) (conspirator liability) of the law of parties as being contrary to the constitutional requirements of Enmund v. Florida, supra; which requires that there be specific intent of the accused to kill or to cause the loss of life**

### Arguments and Authorities

Appellant directs this Honorable Court's attention to Rep. R. Vol. 44 pp. 4-5 at which Appellant objected to the jury submission dealing with the law of parties as applied by the trial court in this case as it violated the holding of the United States Supreme Court in Enmund v. Florida, supra; which has specific requirements not found in the Texas Death Penalty Statute before death can be imposed as a possible punishment. The trial court erred in using language on issues not sanctioned by the Enmund case; which calls for reversal and new punishment hearing or rendering of a life sentence.

The TCCA overruled this point of error. *Murphy v. State*, No. AP–74,851, 2006 WL 1096924, at *21 (Tex. Crim. App. Apr. 26, 2006) (not designated for publication). Per the TCCA, Murphy only raised a challenge to the constitutionality of his conviction under *Enmund*. *Id.* This reliance on *Enmund* was misplaced according to the TCCA: "*Enmund* prevents imposition of the death penalty under certain circumstances; it does not prohibit a capital

12

Case: 17-70030    Document: 00514538736    Page: 13    Date Filed: 07/03/2018
Case 3:09-cv-01368-L-BN   Document 129   Filed 07/03/18   Page 13 of 26   PageID 10477

No. 17-70030

murder conviction for a non-triggerman under the law of parties." *Id.* (citing *Johnson v. State*, 853 S.W.2d 527, 535 (Tex. Crim. App. 1992)). The TCCA recognized that Murphy "made an *Enmund* objection at the punishment phase of the trial, but in his brief he cites and refers only to his objection at the guilt or innocence phase." *Id.* at \*21 n.58.

Following the failure of his direct appeal, Murphy once again raised an *Enmund/Tison* claim in his state habeas application. This time, he broke the claim into two parts and made clear he was attacking his conviction *and* death sentence. The state habeas court found both claims procedurally barred and alternatively meritless. Murphy's attack on his sentence was procedurally defaulted based on *Ex parte Ramos*, 977 S.W.2d 616, 617 (Tex. Crim. App. 1998), per the state court because Murphy did not avail himself of the opportunity to raise it on direct appeal. The TCCA adopted the state habeas court's findings and denied Murphy's application. *Ex parte Murphy*, No. WR–63,549–01, 2009 WL 1900369, at \*1 (Tex. Crim. App. July 1, 2009) (per curiam) (not designated for publication).

Based on this procedural history, it is undebatable that Murphy's *Enmund/Tison* claim is procedurally barred. Under the doctrine of procedural default, we are precluded from reviewing "claims that the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017). The state habeas court's finding of procedural default constitutes such a denial. The state court held Murphy's *Enmund/Tison* attack on his sentence procedurally defaulted under *Ramos*, 977 S.W.2d at 617, a case which in turn relies on *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996), *clarified on reh'g* (Feb. 4, 1998). This rule from *Gardner*—which bars consideration of claims that could have been but were not raised on direct appeal—is "an adequate state ground capable of barring

No. 17-70030

federal habeas review." *Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005) (quoting *Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir. 2004)).

Murphy makes neither of the traditional arguments to excuse his default: that (1) cause for the default and actual prejudice exist, or (2) failure to consider his claim will result in a miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Instead, Murphy's only retort is that the TCCA and state habeas court misapplied their own rules. But we cannot review the correctness of the state court's application of its own rule: "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Nobles v. Johnson*, 127 F.3d 409, 419 n.21 (5th Cir. 1997) ("[I]nsofar as [the petitioner] asks us to review the state court's application of state law, his claims are outside the scope of federal habeas review.").

Thus, as Murphy's *Enmund/Tison* claim is undebatably procedurally barred, we deny a COA on it.

## IV.

Murphy next contends that if his appellate counsel failed to raise his *Enmund/Tison* claim on direct appeal, then appellate counsel rendered constitutionally deficient assistance. We will not linger on this claim as it is undebatably procedurally barred.

Murphy did not raise this IAAC claim in his original state habeas application. This failure renders it unexhausted. *See Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001). His unexhausted claim is procedurally barred if Texas courts would treat the claim as procedurally defaulted if presently raised. *See Bagwell v. Dretke*, 372 F.3d 748, 755 (5th Cir. 2004). Texas courts would do so under the abuse-of-the-writ doctrine, a doctrine we recognize as an adequate and independent procedural rule in this context. *See Rocha v. Thaler*, 626 F.3d 815, 832 (5th Cir. 2010); *Beazley v. Johnson*, 242

No. 17-70030

F.3d 248, 264 (5th Cir. 2001). Murphy does not argue that an exception to this procedural bar is available. And none would be. The Supreme Court has recently held that default of an IAAC claim cannot be excused by ineffectiveness of habeas counsel via *Martinez* and *Trevino*. *See Davila*, 137 S. Ct. at 2063-64. Thus, as Murphy's IAAC claim is procedurally defaulted with no debatable case for excuse, we deny a COA on it.

## V.

Murphy's final claim is that trial counsel rendered constitutionally deficient assistance at the penalty phase. As this IATC claim was not raised in Murphy's state habeas application, Murphy normally would be barred from raising it. *See Bagwell*, 372 F.3d at 755; *Beazley*, 242 F.3d at 264. But as this claim asserts ineffectiveness of *trial* not *appellate* counsel, Murphy may overcome this bar via the exception to procedural default set forth in *Martinez* and *Trevino*. *See Davila*, 137 S. Ct. at 2062-64.

Under *Martinez* and *Trevino*, Murphy may show cause and prejudice to excuse his default. To show cause, Murphy must demonstrate: "(1) that his claim of ineffective assistance of counsel at trial is substantial—i.e., has some merit—and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013). Conveniently, the test for whether Murphy's underlying claim is "substantial" is the same as the one for granting a COA—that is, the test is whether the claim is debatable by reasonable jurists. *Trevino v. Davis*, 861 F.3d 545, 548-49 (5th Cir. 2017).

Most of the action on this claim pertains to prong one of *Martinez* and *Trevino*—whether Murphy's underlying IATC claim is "substantial." This underlying IATC claim is governed by the well-known *Strickland* standard. Murphy must show: (1) that his trial counsel rendered deficient performance,

Case: 17-70030    Document: 00514538736    Page: 16    Date Filed: 07/03/2018
Case 3:09-cv-01368-L-BN  Document 129  Filed 07/03/18  Page 16 of 26  PageID 10480

No. 17-70030

and (2) that this deficient performance resulted in actual prejudice. *See Rhoades v. Davis*, 852 F.3d 422, 431 (5th Cir. 2017).

The first prong of *Strickland* "sets a high bar." *Buck*, 137 S. Ct. at 775. "To demonstrate deficient performance, the defendant must show that, in light of the circumstances as they appeared at the time of the conduct, 'counsel's representation fell below an objective standard of reasonableness' as measured by 'prevailing professional norms.'" *Rhoades*, 852 F.3d at 431-32 (quoting *Strickland*, 466 U.S. at 687-88). "Restatements of professional standards," like the American Bar Association's (ABA) Guidelines for defense attorneys, "can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." *See Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 689).

To meet the second prong of *Strickland*, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

We review the district court's conclusions of law de novo and factual findings for clear error. *See Woodfox v. Cain*, 609 F.3d 774, 788-89 (5th Cir. 2010). "A claim of ineffective assistance of counsel presents a mixed question of law and fact." *Id.* at 789. When confronting a mixed question of law and fact, we use "a de novo standard by independently applying the law to the facts found by the district court, as long as the district court's factual determinations are not clearly erroneous." *See Richards v. Quarterman*, 566 F.3d 553, 561

No. 17-70030

(5th Cir. 2009) (quoting *Ramirez v. Dretke*, 396 F.3d 646, 649 (5th Cir. 2005)). A district court's finding of fact is "'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).[3]

For his part, Murphy argues that his procedural default is excused by *Martinez* and *Trevino* and that his underlying IATC claim has at least debatable merit. He focuses on his underlying IATC claim, arguing that trial counsel made errors that prejudiced him on both of Texas's special issues at the penalty phase—future dangerousness and mitigating circumstances.

On future dangerousness, Murphy claims that counsel elicited highly damaging testimony from her own expert—S. O. Woods—on the threat Murphy would pose if left alive in prison. In the same vein, he claims that a reasonable investigation would have revealed that Woods would give harmful testimony when cross-examined and therefore Woods should never have been called.

On mitigating circumstances, Murphy claims that counsel failed to conduct a reasonable mitigation investigation. This meant she never discovered or developed evidence that Murphy suffers from post-traumatic stress disorder (PTSD). If the jury knew of this PTSD diagnosis, according to Murphy, it may have found mitigating circumstances warranted a life-in-prison sentence rather than death sentence.

We consider both arguments in turn. For both, we conclude that Murphy cannot satisfy the first prong of *Martinez* and *Trevino*—that his underlying IATC claim is substantial or debatable.

---

[3] The strictures of § 2254(d) do not apply as this claim was not presented to the state courts. *See* 28 U.S.C. § 2254(d) (governing only claims "adjudicated on the merits" by the state courts).

Case: 17-70030    Document: 00514538736    Page: 18    Date Filed: 07/03/2018
Case 3:09-cv-01368-L-BN   Document 129   Filed 07/03/18   Page 18 of 26   PageID 10482

No. 17-70030

### A.

Murphy's first alleged error is easily dispensed with. We have previously held that "[t]he decision whether to present a witness is considered to be essentially strategic." *See Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010). A "strategic choice[]" made after "thorough investigation of law and facts relevant to plausible options [is] virtually unchallengeable." *Strickland*, 466 U.S. at 690. "[A]nd [a] strategic choice[] made after less than complete investigation [is] reasonable precisely to the extent that reasonable professional judgment[] support[s] the limitation[] on investigation." *Id.* at 690-91.

Here, counsel's decision to call Woods was an informed, strategic choice that simply backfired. At the evidentiary hearing, Murphy's lead trial counsel explained Woods's perks: he was a former warden, "a nationally respected expert" on prison safety, and he told trial counsel that he did not think Murphy would be a danger when placed in administrative segregation. In fact, trial counsel had spoken with Woods several times before trial and thought he would say that Murphy would not be a future threat in prison. Woods's damaging concession surprised trial counsel because it contradicted what he had told her in private. Based on this investigation, the fact that Woods buckled under cross-examination does not show that calling him was strategically unreasonable. *See id.*

And either way, the impact of Woods's admission is not measurably more damaging than the facts already before the jury. The evidence of Murphy's future dangerousness was already overwhelming. Murphy had been convicted of aggravated sexual assault and burglary. He had coordinated with others to break out of prison, during which his group violently incapacitated numerous people. He and the group were able to pull off an armed robbery during which a police officer was killed. Woods's opinion—that Murphy was a "very

18

### No. 17-70030

dangerous inmate"—had no reasonable probability of changing the jury's mind on the future-dangerousness issue given all this other evidence. *See id.* at 694.

### B.

Murphy's second alleged error—which relates to trial counsel's mitigation investigation—is also undebatably meritless. Viewed in its totality, without nitpicking or allowing hindsight bias to creep in, trial counsel's mitigation investigation was reasonable. A review of the evidence elicited at the evidentiary hearing amply demonstrates this.

At the evidentiary hearing, Murphy's lead trial counsel testified at length about her mitigation investigation. She explained that her main goal at trial was to save Murphy's life. Accordingly, she started looking for mitigation evidence soon after she was appointed to Murphy's case in 2001. She quickly hired a fact investigator. She and the investigator tracked down and interviewed Murphy's family, ex-girlfriends, and his ex-wife. They also gathered and reviewed Murphy's relevant records from schools, doctors, and prison.

In late June 2003, the Supreme Court decided *Wiggins v. Smith*, 539 U.S. 510 (2003). In *Wiggins*, the Supreme Court granted an ineffective-assistance-of-trial-counsel claim based on trial counsel's failure to conduct an adequate mitigation investigation. *See id.* at 514, 519. Specifically, the Court held that counsel's failure in that case to retain a forensic social worker to prepare a social-history report on their client when funding was available rendered counsel's assistance constitutionally ineffective. *Id.* at 524.

According to counsel, *Wiggins* changed the prevailing norms on defense counsel's responsibilities with respect to mitigation investigations. Before *Wiggins*, counsel said lawyers still had to conduct a mitigation investigation, but it was not incumbent upon lawyers to retain a mitigation expert. Accordingly, before *Wiggins*, Dallas County judges were hesitant to pay for a

## No. 17-70030

separate mitigation expert. But after *Wiggins*, Murphy's trial judge expressed willingness to pay for one. After getting the green light, trial counsel began looking for a mitigation expert.

Counsel got solicitations from a slew of "mitigation experts," but they all seemed suspect to her. Counsel, who was following the trials of the other members of the Texas Seven, thought that the mitigation experts in those cases were subpar. Instead of relying on solicitations, trial counsel made her own calls, and eventually got in touch with a psychologist she had worked with before. That psychologist recommended Doctor Mark Vigen. Lead counsel met Vigen, liked him, liked his curriculum vitae, and figured he would look good in front of a jury. She formally hired Vigen in September 2003.

When hired, Vigen had no specialized training or education as a mitigation investigator. Rather, he was an experienced forensic psychologist. Trial counsel knew this, but thought that few people had adequate training as mitigation investigators at the time.[4] She also lacked any confidence in the people who reached out to her.

Vigen was hired over two months before the guilt phase of Murphy's trial. Between when he was hired and trial, Vigen reviewed Murphy's records, spoke with other doctors, evaluated Murphy, and interviewed Murphy's family. Vigen reviewed Murphy's brain scans and neurological tests administered by other doctors. Before trial, Vigen relayed to counsel what he testified to at

---

[4] After the hearing, Murphy tried to submit affidavits impeaching trial counsel's testimony on this point. He submitted affidavits from mitigation experts who claimed to have been practicing in Dallas before 2003. The magistrate judge held that Murphy waived the opportunity to impeach trial counsel with these documents because they were not presented at the hearing. While Murphy argues that this ruling was erroneous, he cites no authority for his argument. Accordingly, his argument is forfeited. *See United States v. Scroggins*, 599 F.3d 433, 447 (5th Cir. 2010); *see also* Fed. R. App. P. 28(a)(8)(A) (stating that briefs "must contain" the "appellant's contentions and the reasons for them, with citations to the authorities . . . on which the appellant relies").

## No. 17-70030

trial—namely, that Murphy had a sexual disorder as well as narcissistic, borderline, and antisocial traits; the disorder and traits were caused by childhood neglect and abuse; Murphy was more of a follower than a leader; Murphy had a low risk of future violence; and Murphy could be rehabilitated. Based on all of this, trial counsel's strategy was to show Murphy was a follower, an ineffective criminal, and had a terrible childhood that led to bad decisions. Her plan was to distance Murphy from "the really bad criminals he escaped with."

To support his case that trial counsel's mitigation investigation was lacking, Murphy submitted an affidavit of a psychologist, Doctor Behk Bradley-Davino, who reviewed Vigen's notes and the trial testimony of Murphy's father and aunt. Based on this review, Bradley-Davino determined that Murphy displayed behaviors and problems associated with PTSD. According to the Bradley-Davino, an in-person comprehensive psychological assessment taking into account PTSD was warranted. While Murphy's petition was pending, he was given another round of psychological tests by Doctor John Fabian. This evaluation revealed that he suffers from PTSD.[5]

At the evidentiary hearing, trial counsel was shown Fabian's report. Trial counsel swore that she was aware from her investigation of all the sources of trauma Fabian's report identified. But she did not pursue PTSD as a mitigation theory because neither Vigen nor three other mental health experts who evaluated Murphy suggested to trial counsel that Murphy might have PTSD. Counsel added that if Murphy had been diagnosed with PTSD or someone had raised the suggestion, she would have used it at trial because "it

---

[5] The State submitted its own expert reports claiming that Murphy did not suffer from PTSD. As reasonable jurists could debate whether Murphy suffers from PTSD, we will assume without deciding for the sake of the COA analysis that Murphy did in fact have PTSD at the time of trial. *See Buck*, 137 S. Ct. at 773-74.

### No. 17-70030

would have dovetailed perfectly" with the defense case that Murphy "was a
product of a terrible upbringing."

Before this court, to show trial counsel's ineffectiveness, Murphy argues
that Vigen's hiring occurred later than it should have. Counsel only started
looking for a mitigation expert after *Wiggins* was decided. But according to
Murphy, even before *Wiggins* was decided, it was a prevailing professional
norm for a defense lawyer to hire a mitigation expert as soon as she was
appointed to a death-penalty case. Murphy also argues that Vigen was not
qualified as a mitigation expert. He had no training, education, or experience
in the field, and thus could not perform key tasks like compiling a life and
social history.[6]

We are unpersuaded. On the timeliness argument, Murphy cites no
evidence that pre-*Wiggins* there was a prevailing norm that lawyers
representing death-penalty defendants had to hire a separate mitigation
expert to compile a life and social history instead of relying on a fact
investigator to track down and interview friends and family.[7] And even if the

---

[6] *See* Guidelines for the Appointment and Performance of Def. Counsel in Death
Penalty Cases Guideline 4.1 cmt. B (Am. Bar Ass'n, rev. ed. 2003), *reprinted in* 31 Hofstra
L. Rev. 913, 959 (2003) [hereinafter 2003 ABA Guidelines] (explaining that mitigation
specialists possess "clinical and information-gathering skills and training," including the
ability to elicit sensitive information and compile life and social histories).

[7] We note that Murphy's references to the ABA's guidelines for defense lawyers are
unavailing. The ABA's guidelines for defense lawyers on death-penalty cases underwent a
revision in October 2003, over a month after Vigen was hired and months after *Wiggins* was
decided. The revised guidelines place a duty on trial counsel promptly to retain a mitigation
specialist. *See* 2003 ABA Guidelines, *supra*, Guideline 4.1(A)(1), at 952 ("The defense team
should consist of no fewer than two attorneys . . . , an investigator, and a mitigation
specialist.").

But the ABA's prior guidelines, effective at the time *Wiggins* was decided and when
Vigen was hired, did not provide such a specific command. Instead, defense counsel is
directed to obtain "all reasonably available mitigating evidence." *See* Guidelines for
Appointment and Performance of Counsel in Death Penalty Cases Guideline 11.4.1(C)
(Am. Bar Ass'n 1989). To do so, counsel must begin a mitigation investigation immediately
upon appointment, hiring needed investigators. *See id.* Guideline 8.1 cmt. ("Since pretrial
investigation and preparation are fundamental to attorney competence at trial . . . assigned

No. 17-70030

delay in hiring Vigen was unreasonable, Murphy presents no link between this delay and prejudice to his case. Murphy can only speculate that the two-month window between Vigen's hiring and trial caused Vigen to overlook PTSD. This speculation is unevidenced and unwarranted. In addition to citing no evidence on how much time a psychologist needs to spot PTSD, Murphy has no explanation for why his other evaluators, who had more than two months, also failed to spot PTSD.

Moving on, Murphy's argument that Vigen was not properly qualified to be a mitigation expert also falls flat. Again, he fails to cite anything to establish that at the time Vigen was hired, there were prevailing professional norms related to mitigation experts' precise qualifications, training, and role.[8] And even if there were such norms, counsel's selection of Vigen was a sound strategic judgment. Vigen was recommended to her by a psychologist she knew and trusted. Counsel thought Vigen had a strong curriculum vitae and would perform well in front of a jury. And counsel concluded that using a psychologist to organize and present Murphy's mitigation case would suffice, as other

_____

counsel requires the services of trial assistants such as investigators to gather evidence and witnesses favorable to the client and to enable counsel to intelligently assess conflicting options. . . . [C]ounsel in a capital case is obligated to conduct a thorough investigation of the defendant's life history and background . . . . Counsel . . . cannot adequately perform these and other crucial penalty phase tasks without the assistance of investigators and other assistants."). While the prior guidelines recommend the use of experts, it does not state that their use is mandatory to compile and present a social or life history. *See id.* Guideline 1.1 cmt. ("Utilization of experts has become the rule, rather than the exception, in proper preparation of capital cases."); *id.* Guideline 11.4.1(D)(7)(D) ("Counsel should secure the assistance of experts where it is necessary or appropriate for: . . . presentation of mitigation."); *id.* Guideline 11.8.3(F) ("In deciding which witnesses and evidence to prepare for presentation at the sentencing phase, counsel should consider the following: . . . (2) Expert witnesses to provide medical, psychological, sociological or other explanations for the offense(s) for which the client is being sentenced, to give a favorable opinion as to the client's capacity for rehabilitation, etc. and/or to rebut expert testimony presented by the prosecutor; . . . ."). We cannot say that it was unreasonable for trial counsel to decide, at least initially, to rely upon an investigator to compile the factual materials needed for a mitigation case.

    [8] The ABA's guidelines effective at the time Vigen was hired do not mention mitigation experts, their role, or their requisite qualifications.

Case: 17-70030    Document: 00514538736    Page: 24    Date Filed: 07/03/2018
Case 3:09-cv-01368-L-BN   Document 129   Filed 07/03/18   Page 24 of 26   PageID 10488

No. 17-70030

lawyers she respected had done. She testified that she thought a psychologist would be capable of doing the job of a mitigation expert—interviewing people, conducting and interpreting tests, and guiding counsel on putting together a mitigation case. Finally, trial counsel did not think she had better alternatives—she had no confidence in the mitigation experts who reached out to her. From counsel's perspective, "there were any number of hypothetical experts—specialists in psychiatry, psychology, . . . or numerous other disciplines and subdisciplines—whose insight might possibly have been useful." *See Richter*, 562 U.S. at 107. Given this array of options, we cannot say that counsel's reasoned selection of Vigen was even debatably outside "the range of professionally reasonable judgments." *See Strickland*, 466 U.S. at 699.

In any event, even if Vigen was unqualified to perform the tasks unique to mitigation experts, Murphy does not explain how that deficit made a difference. Murphy's current experts are also psychologists with no documented training (at least according to their CVs) in mitigation investigation. Trial counsel and Vigen were aware of the same traumatic childhood events that Murphy's current experts used to render a PTSD diagnosis. Indeed, that trial counsel collected the building blocks for a PTSD diagnosis and handed them over to her psychologist reflects the reasonableness of her investigation. In light of this, counsel cannot be faulted for Vigen's failure to spot PTSD. This failure was, at worst, attributable to Vigen's mistake as psychologist, not counsel's decision to hire a psychologist without training as a mitigation expert.[9] Without a red flag that Vigen's evaluation was

---

[9] *See Turner v. Epps*, 412 F. App'x 696, 702 (5th Cir. 2011) ("[C]ounsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses without worrying that a reviewing court will substitute its own judgment . . . and rule that his performance was substandard for doing so." (second alteration in original) (quoting *Smith v. Cockrell*, 311 F.3d 661, 676-77 (5th Cir. 2002), *overruled in part on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004))); *Earp v. Cullen*, 623 F.3d 1065, 1077

No. 17-70030

defective or an indication from Vigen that he needed more information to properly evaluate Murphy, it is too much to insist that counsel second-guess her experts' conclusions.[10]

In sum, Murphy cannot show he has a substantial underlying IATC claim, and therefore he cannot debatably excuse his procedural default under *Martinez* and *Trevino*.

\*     \*     \*

For the foregoing reasons, we DENY Murphy's request for a COA.

---

(9th Cir. 2010) (holding that even if the mental-health professionals who evaluated the petitioner at the time of trial failed to diagnose the petitioner properly, their failure "does not constitute ineffective assistance of *counsel*"); *Wilson v. Sirmons*, 536 F.3d 1064, 1089 (10th Cir. 2008) (noting that, to a degree, counsel should be able to rely on an expert to determine what evidence is necessary to an effective evaluation and what additional evidence the expert needs to complete testing); *cf. Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) ("In general, an attorney is entitled to rely on the opinions of mental health experts in deciding whether to pursue an insanity or diminished capacity defense.").

[10] Because we conclude that Murphy's case for deficient performance is undebatably meritless, we need not consider whether the failure to obtain a PTSD diagnosis was prejudicial.

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

July 03, 2018

Ms. Karen S. Mitchell
Northern District of Texas, Dallas
United States District Court
1100 Commerce Street
Earle Cabell Federal Building
Room 1452
Dallas, TX 75242

     No. 17-70030   Patrick Murphy v. Lorie Davis, Director
                USDC No. 3:09-CV-1368

Dear Ms. Mitchell,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                   Sincerely,

                   LYLE W. CAYCE, Clerk

                   By: _____
                   Monica R. Washington, Deputy Clerk
                   504-310-7705

cc:  Mr. David R. Dow
     Ms. Gwendolyn Suzanne Vindell